# UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, <u>EX REL.</u> [UNDER SEAL]<br><br>Plaintiff,<br><br>v.<br><br>[UNDER SEAL]<br><br>Defendants. | Civil Action No:<br><br>**COMPLAINT** |

## FILED IN CAMERA AND UNDER SEAL

## DO NOT ENTER IN PACER

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, <u>EX REL.</u> BENJAMIN POEHLING,<br><br>                             Plaintiff,<br><br>        v.<br><br>UNITEDHEALTH GROUP, INC., WELLMED MEDICAL MANAGEMENT, INC., HEALTH NET, INC., ARCADIAN MANAGEMENT SERVICES, INC., AND TUFTS ASSOCIATED HEALTH PLANS, INC.,<br><br>                         Defendants. | Civil Action No:<br><br>**COMPLAINT FOR VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729 <u>ET SEQ.</u>**<br><br>**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>**DO NOT ENTER IN PACER** |

For its complaint, the United States of America *ex rel.* Benjamin Poehling ("United States") alleges as follows:

## I.    INTRODUCTION

1.    This is an action to recover damages and civil penalties on behalf of the United States under the Federal False Claims Act, 31 U.S.C. §§ 3729–33 (the "FCA"), against UnitedHealth Group, Inc., WellMed Medical Management, Inc., Health Net, Inc., Arcadian Management Services, Inc., and Tufts Associated Health Plans, Inc. (hereafter collectively "Defendants").

2.    Defendants are managed care companies that cover benefits for Medicare beneficiaries under the Medicare Advantage ("MA") program.  Since at least 2006, some or all of the defendants have knowingly submitted, or caused to be submitted, false claims for payment to the United States by submitting false risk adjustment information

to the Centers for Medicare & Medicaid Services ("CMS") in order to improperly increase the amounts CMS pays them.  Likewise, since at least 2006, defendants have knowingly retained overpayments received from CMS as a result of their false risk adjustment submissions.

3.      The MA program, in which the defendant health insurers participate, is designed to apply to Medicare a form of the "managed care" model commonly used by private health insurance companies.  Under the managed care model, an employer or other organization seeking health care for its members—here the United States through the Medicare Program—pays a managed care organization a fixed fee to provide health services to its members.  The payment is typically a per-member-per-month ("PMPM") rate, also known as a capitation rate.  The managed care organization receiving capitation payments (often a hospital, physician group, or other health insurance company) is responsible for paying hospitals, physicians and all other medical providers for health care services provided to a member of the plan.  This differs from traditional fee-for-service ("FFS") models, where the organization pays individual physicians, hospitals and other providers for each service they provide to the organization's members.

4.      Through the MA program, Medicare allows private health insurers to set up managed care plans to cover Medicare beneficiaries.  Medicare pays a monthly capitation rate for each beneficiary enrolled as a member of a MA plan.  MA plans must then use that money to pay hospitals, physicians and other health care providers for the services the plan members receive and cover MA plans' administrative expenses.  CMS adjusts the capitation rate for each beneficiary to reflect that beneficiary's individual demographics (*e.g.*, age and gender), geographic location, and health status.

3

5.      The adjustment for each member's health status is one of the most significant components of the capitation rate.  Individuals with multiple and/or serious health conditions account for more healthcare costs than healthy members.  Accordingly, CMS pays a substantially higher capitation rate for members who have been recently treated for one or more serious, expensive diseases or conditions.  These increased payments are known as "risk adjustment" payments.  On average, CMS pays a MA plan close to $3,000 per year for each condition that a member has that requires a risk adjustment payment.

6.      To receive these risk adjustment payments, MA plans submit claims to CMS each year for each member for each qualifying disease or condition.  When the plan submits these claims, it must claim the member received treatment in the twelve-month period before the payment year for the diagnosed condition from a qualified healthcare provider.  MA organizations may only submit a diagnosis for risk adjustment that: (1) stems from a face-to-face visit; (2) with a qualified healthcare provider; (3) during the appropriate service period; and (4) is documented in a medical record.

7.      Defendants are engaged in systematic fraud in which they routinely:

(a)      submit risk adjustment claims for diagnoses that the member either does not have or for which the member was not treated in the relevant year;
(b)      upcode diagnosis codes, claiming that a member was treated for a more serious condition than the member actually has; and
(c)      refuse to correct previously submitted risk adjustment claims when defendants discover, or in the exercise of reasonable care should discover, that those previously submitted claims were false.

4

8.      Among the fraudulent acts described herein, defendant UnitedHealth Group, Inc. submits diagnosis claims to CMS using a data system (IRADS) that it knows (within the meaning of the FCA) cannot properly screen for ineligible diagnoses and allows the submission of tens or hundreds of thousands of false diagnosis codes. Defendants similarly undertake "chart reviews" where they selectively review hundreds of thousands of medical charts annually for additional diagnosis codes (*i.e.*, codes not submitted in the ordinary course of business) that increase their risk scores.  These "chart reviews" are rigged to only look for incremental (new) diagnosis codes to submit to CMS and thus to *only* increase risk scores.  Although the chart reviewers routinely provide defendants with information indicating that diagnoses defendants sent to CMS previously were false or unsubstantiated, defendants intentionally do not match the reviewers' information against their previous submissions to CMS or otherwise use this information to correct the risk adjustment claims previously submitted to CMS.

9.      Through this fraudulent scheme, defendants have defrauded the United States of hundreds of millions—and likely billions—of dollars.

10.      Defendant's conduct alleged herein violates the federal False Claims Act. The federal False Claims Act (the "FCA") was originally enacted during the Civil War. Congress substantially amended the Act in 1986—and, again, in 2009 and 2010—to enhance the ability of the United States Government to recover losses sustained as a result of fraud against it.  The Act was amended after Congress found that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating government fraud, was in need of modernization.  Congress intended that the amendments would create incentives for individuals with knowledge of

fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

11.     The FCA prohibits, *inter alia*: (a) knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment or approval; (b) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim; (c) knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government; and (d) conspiring to violate any of these three sections of the FCA.  31 U.S.C. §§3729(a)(1)(A)-(C), and (G).  Any person who violates the FCA is liable for a civil penalty of up to $11,000 for each violation, plus three times the amount of the damages sustained by the United States.  31 U.S.C. §3729(a)(1).

12.     For purposes of the FCA, a person "knows" a claim is false if that person: "(i) has actual knowledge of [the falsity of] the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. §3729(b)(1).  The FCA does not require proof that the defendants specifically intended to commit fraud.  *Id.*  Unless otherwise indicated, whenever the words "know," "learn," discover" or similar words indicating knowledge are used in this Complaint, they mean knowledge as defined in the FCA.

13.     Each claim for risk adjustment payments that defendants have submitted to CMS, where the patient was not treated, by a qualified provider, for that condition in

the year in question is a false and/or fraudulent claim within the meaning of the FCA, so long as defendant knew that the claim was false when it was submitted, or the defendant later discovered its falsity and refused to correct the claim.

14.     The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery.  The FCA requires that the Complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

15.     Based on the foregoing laws, *qui tam* plaintiff Benjamin Poehling seeks, through this action, to recover damages and civil penalties arising from the false or fraudulent records, statements and/or claims that the Defendants made or caused to be made in connection with false and/or fraudulent claims for Medicare Advantage risk adjustment payments.

## II.     PARTIES

16.     Relator Benjamin Poehling is Director of Finance for UnitedHealthcare Medicare & Retirement ("UHMR"), a subsidiary of UnitedHealth Group ("UHG").  (This Complaint refers to UHG and its subsidiaries and affiliates collectively as "UHG" or "United.")   Prior to the fall of 2010, UHMR was known as Ovations, Inc. (unless otherwise specified, this Complaint refers to Ovations, Inc. as UHMR when it is discussed as distinct from United).

17.     Relator joined United in 2002 from Arthur Anderson, where he had participated in consulting engagements for UHG.  In mid-2002, Relator joined United subsidiary Ingenix, Inc. ("Ingenix") in New Jersey.  Relator transferred to UHMR in 2004, relocating to Minnesota.  At UHMR, Relator has held a variety of positions within

the Finance Department.  When United's risk adjustment services were moved to Ingenix in mid-2007, Relator was assigned to be UHMR's day-to-day liaison with the risk adjustment segment at Ingenix.   In this new position, Relator is responsible for coordinating with Ingenix to provide UHMR with risk adjustment services, described in depth below.   The scope and workload of the assignment grew from a part-time responsibility (shared with his other duties) until Relator was working full-time with Ingenix on risk adjustment.   During this period, risk adjustment was becoming increasingly more important to UHG's revenue, and attracted increasing attention from UHG's and UHMR's senior management.

18.   The United States, on whose behalf Relator brings this suit, is the real party in interest.  The United States has ongoing contracts with defendants through the Centers for Medicare & Medicaid Services ("CMS") of the United States Department of Health and Human Services, in accordance with defendants' participation in the Medicare and Medicaid programs.

19.   Defendant UnitedHealth Group Inc. ("UHG") is a Minnesota corporation headquartered in Minnetonka, Minnesota.  For purposes of this Complaint, defendant UHG includes all subsidiaries and affiliates that do business with the United States, including without limitation UHMR (formerly Ovations), UnitedHealthcare Community & State ("UHCS" and formerly AmeriChoice), Ingenix, and all UHG entities holding Medicare Advantage contracts with CMS during the period discussed *infra*, a partial list of which is incorporated herein as Exhibit 1.

20.   UHG is the parent corporation for a large number of businesses within two basic market areas—health benefits and health services.   United's health benefits

business covers health insurance benefits in both public and private markets. United's managed care company for the private sector is UnitedHealthcare Employer & Individual ("UHEI"). United's managed care companies for the public sector—Medicare and Medicaid—are UHMR and UHCS. Together, UHMR and UHCS form United's Public & Senior Markets Group ("PSMG"). The health services business, meanwhile, offers various services to consumers and the health care industry, including United's health benefits companies. The principal companies within health services are Ingenix (discussed below), which provides data services and consulting, OptumHealth, which provides a variety of specialty and ancillary services (such as dental and chiropractic benefits), and Prescription Solutions, a pharmacy benefits manager. UHG reports revenue in four segments: (a) Health Benefits (UHEI, UHMR, and UHCS); (b) OptumHealth; (c) Ingenix; and (d) Prescription Solutions.

21.   United—through its UHMR and UHCS subsidiaries—is the largest provider of health insurance coverage for Medicare beneficiaries pursuant to MA contracts with CMS. United operates MA plans in all fifty states and the District of Columbia. These MA plans covered approximately 2.1 million enrolled Medicare beneficiaries as of December 31, 2010. United is also the largest provider of Medicare Part D plans. It additionally offers Medicare supplemental and hospital indemnity insurance plans, as well as various care services. United's revenue from UHMR (including the bulk of its Medicare Advantage business) was $32.1 billion in 2009 and $35.9 billion in 2010. This business segment accounted for 37% of UHG's total revenue in 2009 and 2010.

22.     United's Ingenix subsidiary offers data and consulting services to United companies as well as other insurance companies, hospitals, physicians, and others. Ingenix's revenues were $1.8 billion in 2009 and $2.3 billion in 2010.  Historically, risk adjustment services were provided to UHMR through a team located within the UHMR business unit.  In 2007, United moved its risk adjustment services group, or Clinical Assessment Solutions ("CAS"), to Ingenix.  (CAS has changed titles several times.  It has also operated as Advanced Clinical Solutions ("ACS"), Clinical Performance Solutions ("CPS"), and, currently, Clinical Performance & Compliance ("CPC").)

23.     Defendant WellMed Medical Management, Inc. ("WellMed") is a Texas corporation headquartered in San Antonio, Texas.  WellMed provides healthcare benefits for United's Medicare members in certain regions pursuant to a capitation agreement with UHMR.  Recently, United acquired several components of WellMed.

24.     Defendant Health Net, Inc. ("Health Net") is a Delaware corporation headquartered in Woodland Hills, California.  Health Net operates MA plans pursuant to contracts with CMS.  United holds a contract with Health Net whereby United submits Health Net's risk adjustment data to CMS and performs additional risk adjustment services, including chart reviews, as described below.

25.     Defendant Arcadian Management Services, Inc. ("Arcadian") is a Delaware corporation headquartered in Oakland, California. Arcadian operates MA plans pursuant to contracts with CMS.  United holds a contract with Arcadian whereby United submits Arcadian's risk adjustment data to CMS and performs additional risk adjustment services, including chart reviews, as described below.

26.     Defendant Tufts Associated Health Plans, Inc. ("Tufts") is a Delaware corporation headquartered in Waltham, Massachusetts. Tufts operates MA plans pursuant to contracts with CMS.  United holds a contract with Tufts whereby United submits Tufts' risk adjustment data to CMS and performs additional risk adjustment services, including chart reviews, as described below.

## III.    JURISDICTION & VENUE

27.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. § 3730.

28.     This Court has personal jurisdiction over the Defendants, pursuant to 31 U.S.C. § 3732(a), as one or more Defendants can be found in, reside in, transact business in, and have committed acts related to the allegations in this Complaint in the Western District of New York.  For example, United's SecureHorizons Medicare Advantage plan operates in the Western District of New York.

29.     Venue is proper, pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b)–(c), as the Defendants can be found in, reside in, and/or transact business in the Western District of New York, and because many of the violations of 31 U.S.C. § 3729 discussed herein occurred within this judicial district.

## IV.    LEGAL BACKGROUND

30.     Medicare is a federally-funded health care program primarily serving people age 65 or older.  Initially created in Title XVIII of the Social Security Act of 1965, Medicare now has four Parts, A through D.  The two original components of Medicare are Part A, which covers inpatient hospital costs and related services, and Part B, which covers outpatient health care costs, such as physicians' fees.  Medicare Part D

was created by the Medicare Prescription Drug, Improvement, and Modernization Act established in 2003 ("MMA"), and covers prescription drugs.

31.     Traditionally, Medicare operates on a fee-for-service basis, meaning that Medicare directly pays hospitals, physicians and other health care providers for each service they provide to a Medicare beneficiary.  Medicare beneficiaries are generally required to pay some portion of many of these services in the form of copayments, deductibles, coinsurance, or other set fees (collectively known as the members' "out of pocket" expenses).

32.     In 1997, Congress created Medicare Part C, which provides similar benefits to Medicare members, but does so based on a managed care model, rather than the traditional fee-for-service model.  Under Part C, rather than pay providers directly, Medicare pays private managed care plans (later named "Medicare Advantage" or "MA" plans) a capitation rate (per member per month) and those plans are responsible for paying providers for the services they provide to members of that specific MA plan.

33.     MA plans must provide Medicare beneficiaries benefits at least equivalent to those they would have received under the traditional Medicare Parts A and B. Depending on the structure of the plan, MA plans may also provide additional benefits beyond what traditional Medicare would have covered, such as dental care, or cover some or all of their members' out of pocket expenses associated with basic Medicare Parts A and B services or Part D prescription drugs.

**A.     Calculation of MA Plan Capitation Rates**

34.     The capitation rates Medicare pays to MA plans are determined based on a process involving consideration of past and expected future medical expenses, the location of the plan's actual and expected members, the health status and demographics

of those members and whether the plan will include any additional benefits. That process is summarized in Medicare regulations as follows:

> In short, under the bidding methodology each plan's bid for coverage of Part A and Part B benefits (*i.e.*, its revenue requirements for offering original Medicare benefits) is compared to the plan benchmark (*i.e.*, the upper limit of CMS' payment, developed from the county capitation rates in the local plan's service area or from the MA regional benchmarks for regional plans). The purpose of the bid-benchmark comparison is to determine whether the plan must offer supplemental benefits or must charge a basic beneficiary premium for A/B benefits.

Medicare Managed Care Manual ("MMCM"), ch. 8, § 60.

35.     In other words, it is a three-step process involving: (a) development of the MA plan's bid rate; (b) review of the CMS benchmark rate; and (c) comparison of those two rates to develop the base capitation rate and determine whether any adjustments in the plan benefits or member premiums are required.

36.     First, the MA plan develops a bid rate. This rate is the amount that the MA plan expects it will be required to pay to provide Medicare Parts A and B benefits to a hypothetical average member of the plan. This estimate must be based on either the MA plan's prior experience covering Medicare members, or an actuarially validated data analysis of expected costs. To represent an "average" plan member, the bid rate must make adjustments to standardize the effect of expected geographic diversity (because some areas are more expensive than others) and the relative health status (*i.e.*, the number and nature of chronic conditions) of the members whose claims experience provided the basis for the bid. The bid rate also includes an amount that the MA plan expects to spend on administrative costs, and a profit margin.

37.     The mechanism for standardizing the bid for individuals' demographic factors and health status is known as the "risk score."  It is an artificial score that CMS assigns to every beneficiary.  CMS starts with a score of zero, and then adds points for the beneficiary's demographic condition (such as age and gender) and individual disease states (such as diabetes or congestive heart failure).  The average risk score is one, with most Medicare beneficiaries having scores under three.  The risk score model is designed so that a population with an average risk score of two would be expected to use twice as much health care (in dollars) as a population with a score of one.  The bid rate the MA plans develop must reflect the amount they will require to provide services to a hypothetical population with a risk score of one.

38.     Second, the MA plan must review the Medicare benchmark rate provided by CMS.  This rate is provided by CMS and is the amount that the Medicare program would spend to provide Parts A and B benefits to an average member in the geographic area covered by the MA plan's bid.  The benchmark rate also includes several other adjustments, including until recently a bonus payment to incentivize health insurance companies to enter the MA market.

39.     Third, the bid rate and the benchmark rate are compared to determine whether the MA plan must charge its members a premium, or, instead, if it must offer them enhanced benefits.  If the bid rate is greater than the benchmark rate, Medicare will only pay the MA plan the benchmark rate per member per month.  That benchmark rate becomes the base capitation rate that CMS pays the MA plan for a member with a 1.0 risk score (described below).  The MA plan must then charge the beneficiaries who join

its plan a monthly premium in order to make up the shortfall between the bid rate and the base capitation rate.  *See* MMCM, ch. 8, § 60.1.

40.     If, on the other hand, the bid rate is less than the benchmark rate, then the bid rate becomes the base capitation rate.  The difference between the benchmark rate and the bid rate is then split between the MA plan and the Medicare program.  The first 25% of the difference is retained by the Medicare program as plan savings.  The remaining 75% is returned to the MA plan, which must use the rebate to either provide enhanced benefits to its plan members or to cover the members' out of pocket expenses. In the end, then, in such situations, the base capitation rate equals the bid rate, plus the MA plan receives 75% of the difference between the bid rate and the benchmark rate.

41.     Medicare does not, however, pay the plans the base capitation rate. Instead, when payments are actually made, the base capitation rate is adjusted, for each member, to reflect his or her actual age, gender, location, and, most important, health status.

42.     MA plans must rebid their rates every year.

**B.     Risk Adjustment Depends on Accurate, Substantiated Health Condition Codes**

43.     As described above, CMS pays MA plans at a capitation rate that reflects, among other things, each member's health status.  The process of adjusting the capitation rate to reflect a member's disease states is known as risk adjustment.  Risk adjustment is intended to improve the accuracy of the payments CMS makes to MA plans.  To this end, CMS pays a higher future premium for enrollees whom the MA plan represents have been treated for certain diseases and conditions in the current year, based on the expectation that those enrollees will require treatment and/or management for the

conditions in the following year.  *See 2008 Risk Adjustment Training for Medicare Advantage Organizations Participant Guide* ("*Participant Guide*"), at 6.4.1 (for purposes of this Complaint, "treatment" is defined as treatment and management within the meaning of the *Participant Guide*).

44.    Conversely, CMS pays a lower premium for enrollees who, although they may have certain typically expensive conditions, did not require care, treatment or management for those conditions in the current year.  For these patients, the risk adjustment methodology assumes that because their condition did not require treatment in the current year, it has improved or otherwise changed so that it is not expected to require treatment in the following year.

45.    As a practical matter, the CMS risk adjustment model evaluates enrollee health (and establishes risk adjustment payment rates) using diagnosis classifications set forth in the International Classification of Diseases, 9th Edition, Clinical Modification ("ICD-9-CM") system.  The ICD-9 system assigns each diagnosis a specific code.  These individual diagnosis codes are then organized into groups, called Hierarchical Condition Categories ("HCCs").  MMCM, ch. 8, § 50.  Every HCC consists of several ICD-9-CM diagnosis codes that are clinically related and are expected to require a similar level of resources to treat.  *Id.*  For example, there are five HCCs for patients with diabetes: HCC 15 (diabetes with renal or vascular manifestation); HCC 16 (Diabetes with Neurologic or Other Specified Manifestation); HCC 17 (Diabetes with Acute Complications); HCC 18 (Diabetes with Ophthalmologic or Unspecified Manifestation); and HCC 19 (Diabetes without Complication).  Generally speaking, patients grouped in HCC 15 have the most serious type of diabetes, and are expected to cost the most to treat.  Patients in HCC 19

have the least cost-intensive type of diabetes, and therefore the CMS risk adjustment system provides a smaller enhanced payment for these patients.

46.     An individual ICD-9-CM code included in the HCC system for a particular member corresponds on average to nearly $3,000 in extra revenue for the plan over the course of the following year for that member.  So, for example, if a MA plan like United with 2.1 million members submitted just one incremental HCC-based diagnosis code per member to CMS, it would result in approximately $6.3 billion in additional capitation payments from CMS.

47.     Because submitting incorrect diagnosis codes increases risk adjustment payments, CMS requires MA plans to follow strict guidelines when submitting codes. *See, e.g.*, *2008 Risk Adjustment Training for Medicare Advantage Organizations Participant Guide*.

48.     CMS requires that the patient must have been treated for the relevant diagnoses during a face-to-face encounter with an eligible provider, such as a physician, physician extender, or hospital, during the year in question.

49.     Only services provided by an eligible provider type may be included. CMS expressly prohibits MA plans from submitting "risk adjustment diagnoses based on any diagnostic radiology services" or laboratory services.  *Participant Guide*, at 3.2.2, 4-3.  The reason CMS prohibits MA plans from submitting codes based on radiology charts, for example, is that "[d]iagnostic radiologists typically *do not document confirmed diagnoses*.  Confirmed diagnoses come from referring physician or physician extenders." *Id.*, at 4-3 (emphasis added).  Because radiologists generally list on their charts the diagnoses a doctor wants them to look for, not which diagnoses the patient actually has,

CMS excludes radiology services as a valid provider type (*i.e.*, source of risk adjustment data).

50.    The treating provider must document the facts supporting the coded diagnosis in the patient's medical record and sign and date the record.  At a minimum, the plan must record five elements for submission to CMS:

> (a) the member's Health Insurance Claim ("HIC") number;
> (b) the ICD-9-CM diagnosis code;
> (c) the "service from" date;
> (d) the "service through" date; and
> (e) the provider type.

51.    MA plans are responsible for the content of risk adjustment data submissions to CMS, regardless of whether they submit the data themselves or through an intermediary.  *Participant Guide*, at 3-13.    Before submitting data to CMS, MA plans are required to filter the data "to ensure that they submit data from only appropriate data sources."  *Participant Guide*, at 4-11.  For example, filters should include checking that physician data comes from face-to-face encounters with patients and ensuring that data does not come from non-covered providers, such as diagnostic radiology services.

52.    MA plans must also filter the data to ensure that only diagnoses treated through approved procedure types are included.  *Id.* at 4-11.  MA organizations typically classify professional (*e.g.*, physician) procedures using Current Procedural Terminology ("CPT") codes and institutional procedures using revenue codes.  These codes show whether the type of service in question was a face-to-face procedure such as a physical examination, or a non-qualifying remote procedure, such as a laboratory test or radiology exam.

53.    MA plans are required to correct the risk adjustment data they submit to CMS.  When the MA plan learns that information in a risk adjustment claim (*i.e.*, HIC

number, diagnosis code, service dates, and provider type) contains an error, it must submit a "delete record" to CMS for that claim.

54.     CMS also requires that diagnosis codes used as the basis for a risk adjustment claim be substantiated through documentation in a medical record.  Upon request by CMS, MA plans must provide documentation to support each diagnosis and substantiate that the provider followed proper coding guidelines.  *Id.* at 6-5; 5-52.

55.     In general, CMS sets risk scores based on risk adjustment data submitted for services provided during the year preceding the payment year.   42 C.F.R. § 422.310(g).  The annual deadline for submitting risk adjustment data to CMS is in early September.  *Id.*  The data submitted by the September deadline determines members' preliminary risk scores for the following year.

56.     Despite the September deadline, CMS accepts submissions of risk adjustment data for a period after the end of service year and, through a reconciliation process, adjusts its payments to the MA plan retroactively to account for codes submitted after the September deadline.  MA plans are allowed to submit risk adjustment data until after the end of the payment year.  After the payment year ends, CMS recalculates the risk score for any members for whom the MA plan made a retroactive submission.

57.     Thus, for example, the capitation rates for 2010 are based on the MA plans' members' health status (diagnosis codes) from 2009.  The initial submission deadline for the 2009 diagnosis codes was September 4, 2009 and the final submission deadline was January 31, 2011.  Thus, CMS calculated members' initial risk factors for 2010 based on the September 4, 2009 data, but MA plans have been allowed to continue to submit 2009 diagnoses until January 31, 2011.  After that date, for every member with

a newly-submitted diagnosis, CMS recalculated the risk score and reconciled the member's payments in 2010 with the amount it would have paid at the new score.

58.    To test the validity of MA plan risk adjustment data, CMS conducts Risk Adjustment Data Validation ("RADV") audits after the MA plan's final deadline for submitting risk adjustment data for the payment year.  During such audits, CMS "validates" some of the MA plan's CMS—HCC scores by reviewing the medical records that the plan contends support the claimed diagnosis codes.  *Id.* at 7-1.  To facilitate the RADV audits, MA plans are required to submit to CMS medical records and coversheets for each sampled enrollee, including the "one best medical record" supporting each HCC. *Id.* at 7-9.

59.    Historically, CMS has not extrapolated RADV audit results to the MA plan as a whole.  (CMS has recently proposed moving toward extrapolation of RADV results.)  Instead, CMS has merely sought repayment for those risk adjustment claims found to be false during the RADV audit.  Because RADV audits generally used relatively small samples—a few hundred risk adjustment claims—the potential risk to MA plans, should they be found to have submitted false risk adjustment claims, was relatively small.  Without meaningful financial penalties, MA organizations have generally seen little incentive to conform to CMS's risk adjustment rules.  The fraudulent practices described in this Complaint are a product of the belief, common among MA organizations, that the law could be violated without meaningful consequence.

**C.    CMS Requires MA Plans To Certify the Validity of Their Bid Rates and Risk Adjustment Data To Prevent Fraud**

60.    In recognition of the fact that the integrity of the capitation rates depends on the integrity of the actuarial information used by the MA plans in developing their bid

rates, and to otherwise guard against fraud, CMS requires MA organizations to submit three separate attestations, each signed by the CEO or CFO (or their authorized, direct subordinate).  These attestations are a condition that the MA plans must meet to be eligible to receive any capitation payments from CMS.

61.     The first attestation, which the MA organization submits on a monthly basis, requires the MA organization to "attest based on best knowledge, information, and belief that each enrollee for whom the MA Organization is requesting payment is validly enrolled, or was validly enrolled during the period for which payment is requested, in an MA plan offered by the MA Organization."

62.     The second attestation, which is submitted annually, requires the MA organization to attest that the risk adjustment data it submits annually to CMS is "accurate, complete, and truthful."  The attestation acknowledges that risk adjustment information "directly affects the calculation of CMS payments . . . and that misrepresentations to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution."

63.     The third attestation is the MA organization's certification "that the information and documentation comprising the bid submission proposal is accurate, complete, and truthful and fully conforms to the Bid Form and Plan Benefit Package requirements; and that the benefits described in the CMS-approved proposal bid submission agree with the benefit package the MA Organization will offer during the period covered by the proposal bid submission."

**D.     The False Claims Act Contains a Duty to Correct Known Errors**

64.     The False Claims Act contains an independent requirement to correct errors that will cause, or have caused, a government overpayment.  The Act attaches

liability to anyone who knowingly makes, uses, or causes to be made or used, a false statement or record material to an obligation to pay or transmit money to the government, or who knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money to the government.  31 U.S.C. § 3729(a)(1)(G).

65.     Accordingly, MA plans not only have a duty not to submit incorrect data to CMS, but also, for data they have already submitted, must delete the records from CMS's database using a "delete code."

## V.     BACKGROUND

66.     United is the largest provider of MA plans nationwide, covering benefits under Medicare Part C in all fifty states and in most U.S. territories.  United had 2.1 million individuals enrolled in its MA plans at the end of 2010.  The MA plans are operated by UHMR and UHCS and offered to Medicare beneficiaries under such brand names as SecureHorizons, AmeriChoice, and Evercare.

67.     United has expanded rapidly since its founding in 1977.  The company's growth in recent years has been driven by acquisitions, nowhere more so than in its Medicare business.  These acquisitions included the 2004 purchase of Oxford Health Plans, the 2005 acquisition of PacifiCare Health Systems, and the 2007 acquisition of Sierra Health Services, Inc.

68.     Recently, United has also been expanding vertically by acquiring provider groups who care for many of the patients in United's MA plans.  Foremost among these purchases was the 2011 purchase of WellMed, a large physician-owned practice management company located primarily in Texas.

69.     United has organized its businesses into two primary segments: health plans and health services, as described above.  *See* ¶¶20–22.  Within the health services

segment, Ingenix provides risk adjustment services (and other services) to United's MA plans and also sells those same services commercially to other MA plans.

70.     Ingenix submits diagnosis codes for risk adjustment to CMS on behalf of UHMR and UHCS as well as on behalf of commercial clients including Health Net, Arcadian, and Tufts.  United relocated its risk adjustment team from UHMR to Ingenix to enable these commercial deals, as well as to allow UHMR and UHCS to charge their risk adjustment costs with markups to CMS on their annual bids.

71.     At every level, United is driven by a corporate culture that demands and rewards financial success from its employees.  The risk adjustment practices described in this Complaint are attributable in large part to these demands and rewards.  As to demands, United evaluated many of its employees, including Relator, until recently on their success at "maximizing revenue" by increasing risk scores.  United gave Relator as well as clinical staff specific goals for increasing risk scores.  Relator's March 30, 2008 review, for example, evaluated him against United's "business goal" of increasing risk scores by 3%.  There were no similar performance goals for the overall accuracy of risk adjustment submissions.  Nor was there any accountability assigned for reducing the number of false claims submitted to CMS.

72.     For rewards, United tied its performance incentives directly to risk score increases.  These incentives have been at the center of United's risk adjustment practices. Relator, for example, received a $15,000 bonus in 2010 for his work to meet UHMR's target of $100 million in additional internal operating income ("IOI") from risk adjustment payments.  His bonus, however, paled in comparison to the incentives offered to those higher up in the company.  UHG Executive Vice President (and former CEO of

UHMR) Larry Renfro received a compensation package in 2010 that included a potential bonus, called a "cash incentive award," which tied his earnings to revenue, IOI, and provider satisfaction.  Increasing risk scores met all three objectives.  Mr. Renfro's 2010 cash incentive award was $900,000—150% of his bonus target.

73.     During Mr. Renfro's term as UHMR's CEO, UHMR set revenue and IOI targets based on risk adjustment and entered into agreements with providers that offered financial rewards for increasing risk scores.  As discussed below, many of the policies and practices United used to achieve these goals were fraudulent.  Despite misgivings expressed by various United personnel, however, United took no action to stop its misconduct.  Lack of independence contributed to the problem.  For example, PSMG's Chief Compliance Officer, David Orbuch, reported not to the Board of Directors, but to Mr. Renfro.

74.     United aligned the incentives of its entities, staff, and vendors to increase risk scores.  Ingenix had an incentive to increase the number of risk adjustment claims (based on incremental/newly-found diagnosis codes) it submitted to CMS for payment under the terms of its Service Level Agreement with UHMR.  The Agreement provided for base payments plus a significant "incentive fee" tied to risk score increases.  Exhibit 2, incorporated herein.

75.     In 2009, United changed to a more fixed-fee arrangement with Ingenix. Ingenix, however, continues to receive incentive fees based on risk score increases from its commercial clients, specifically Health Net.

76.     In addition, the managers responsible for Ingenix's risk adjustment program (now called CPC), including Jeff Dumcum, Paul Bihm, and Stephanie Will, had

employment agreements with United that included financial incentives based on increased risk scores. Furthermore, United gave incentives to its healthcare providers and vendors. As described below, for example, United (PacifiCare at the time) entered into an agreement with WellMed, such that WellMed's data subsidiary, DataRap, would provide risk adjustment services for a subset of United's MA plan in Dallas, Texas. The agreement paid WellMed a fee based almost entirely on the increase in United's risk score year over year.

77. United's senior management push relentlessly to increase United's revenue from risk adjustment. Tellingly, UHMR has assigned risk adjustment to its Finance Department, not one of its clinical departments. (Relator was assigned to his job despite having no clinical background.) In 2010 and 2011, UHMR has implemented projects referred to as "remediation plans", "focus area projects," or "affordability agendas" to increase internal operating income ("IOI").

78. The remediation plan for 2010 called for $800 million in additional IOI, $100 million of which was to come from increased risk adjustment revenue. In 2011, the additional IOI target from risk adjustment rose to approximately $125 million.

79. While speaking at the Citi 2011 Global Healthcare Investor conference on March 2, 2011, UHMR's CEO, Tom Paul, commented that United's 2010 affordability agenda allowed United to not raise premiums or cut benefits, while still achieving business objectives. He went on to say the affordability agenda will continue in 2011 and beyond. These remediation plans are merely United's latest effort to exploit risk adjustment's large revenue potential. As described below, United has engaged in a course of conduct since at least 2006 to maximize its risk adjustment payments from

CMS.  For much of the past decade, United's attitude may be summarized by an email from former UHMR CFO Jerry Knutson to Ingenix's Jeff Dumcum:

> Wanted to get together with you and discuss what we can do in the short term and long term to really go after the potential risk scoring you have consistently indicated is out there. . . . You mentioned vasculatory disease opportunities, screening opportunities, etc with huge $ opportunities.  Lets turn on the gas!

Exhibit 3, incorporated herein.

## VI.    UNITED'S FRAUD AGAINST THE UNITED STATES

80.    As outlined below, since at least 2005, United and the other defendants have engaged in a deliberate scheme to defraud the United States by submitting tens or hundreds of thousands of false claims for risk adjustment payments.  Defendants submitted these false claims even though they knew that the patients upon whom the claims were based did not have the claimed diagnoses, had not been treated for those diagnoses in that year, or were otherwise ineligible for risk adjustment payments under CMS rules.

81.    Defendants' knowledge of the falsity of these claims runs the full gamut of culpable *mens rea* covered by the False Claims Act.

82.    In some cases, United had actual knowledge that the members in question had not been treated for a given diagnosis—yet defendants nonetheless submitted a risk adjustment claim to CMS based on that diagnosis.  For example, United's Fraud and Abuse department identifies fraudulent claims for services that had not actually been provided (*e.g.*, claims that a patient had been treated with an expensive therapy for cancer when the patient did not have cancer), and recovered the payments in question from the

providers.  However, United deliberately refused to use this information to delete any risk adjustment claims that had been submitted based on that fraudulent claims data.

83.    In other cases, although United takes aggressive steps to try to find any "incremental" diagnosis codes—situations where a member was treated for a diagnosis that could have been the basis for a risk adjustment claim, but was not coded properly by the physician—it largely pursues a strategy of deliberate ignorance with regard to finding potential "delete" codes—situations where a claim was submitted based on provider claims data that incorrectly stated a patient was treated for a given diagnosis.

84.    Additionally, defendants were on notice that certain individual risk adjustment claims or certain classes of claims were potentially or likely false.  Acting in reckless disregard of the potential falsity of those claims, defendants submitted them without attempting to ensure their accuracy.  For example, United knows that the system it uses to submit risk adjustment claims to CMS is fundamentally flawed in ways that cause it to submit false claims to CMS.  These flaws in the system produce fraudulently upcoded claims.  Yet, defendants have continued to use this flawed system to submit their risk adjustment claims.

85.    Defendants have also paid kickbacks to physicians and other providers to get those providers to upcode the diagnosis codes on their claims, and thus increase defendants' risk adjustment claims.

86.    Moreover, in many cases, United knows that certain provider groups are submitting false and invalid data concerning the diagnoses for which patients were treated, yet Defendants submit and/or accept payment for risk adjustment claims based on that false data.

87.     Finally, United's Ingenix subsidiary submits, conspires to submit, and/or causes the submission of false and fraudulent risk adjustment claims for other MA plans who contract with Ingenix for risk adjustment analysis and other services.

88.     In this manner, defendants have fraudulently caused CMS to pay tens or hundreds of thousands of false claims for risk adjustment payments worth hundreds of millions of dollars.

### A.      United Submits Claims to CMS for Diagnoses Taken From Claims That It Itself Refuses to Pay as Being Fraudulent and/or Abusive

89.     Through its fraud and abuse department, regular claims processing efforts, and some of the other initiatives discussed in greater detail below, United routinely learns that the claims data that was used as the basis for certain risk adjustment claims is erroneous.  Nonetheless, defendants routinely submit risk adjustment claims—or fail to correct previously submitted claims—in purported reliance on that false data.

90.     Like most insurance companies, United contains a Fraud and Abuse Prevention Unit ("F&A") in Ingenix that is responsible for identifying and resolving fraudulent claims.  F&A mines claims data for anomalies that suggest a fraudulent claim. For example, if F&A looks for claims for drugs that were not truly administered to patients, such as patients who supposedly received cancer drugs despite not having a cancer diagnosis.  If and when F&A identifies a claim that it considers sufficiently false to be fraudulent, it takes action against the provider who submitted the claim, either by denying the claim or demanding reimbursement.

91.     Ingenix, however, refuses to use this information to correct its risk adjustment database or claims submissions.  Ingenix's F&A unit does not report the fraudulent claim to Ingenix's Clinical Assessment Solutions ("CAS") group; thus the

CAS group cannot block submission of the claim's diagnosis codes to CMS or delete HCCs it already submitted due to the claim.

92.     Ingenix knows that CAS is submitting fraudulent codes to CMS because it cannot interact with F&A, but has chosen not to fix the problem.  Beginning as late as 2009, Ingenix explored improving the coordination between CAS and F&A as a way to increase coding accuracy.  Dr. Maninder Khalsa of CAS stated in May 2009 that "[w]e have reached out to the INGENIX Fraud and Abuse Prevention Unit in an effort to coordinate our areas of expertise and collaborate where possible."  During that time and subsequently, Relator recommended to Ingenix that it must coordinate CAS and F&A to prevent the submission of fraudulent codes.  He voiced these same concerns to his superior at UHMR, Scott Theisen.  Ingenix, however, has refused to fix the problem.

93.     United's submission of fraudulent codes reflects its broader failure to coordinate its claims processing system with IRADS (the system it uses to process and submit risk adjustment claims), as discussed below.  Specifically, when a claim is denied, United deliberately refuses to check whether the denial affects the validity of risk adjustment claims, *i.e.*, whether it compels United to delete any diagnosis codes.

94.     There are similar problems with other programs and initiatives at United.  As described below, in other situations, United learns through chart review initiatives or other programs that certain claims data or other sources of diagnosis codes used in risk adjustment claims are false.  United deliberately refuses to delete those false diagnosis codes from its risk adjustment claims systems, and refuses to correct previously submitted risk adjustment claims that were based on those false diagnosis codes.

**B.     United Aggressively Seeks To Correct Claims Errors That Reduce Its Risk Adjustment Payments—While Aggressively Attempting to**

**Remain Ignorant of Errors That Improperly Inflate Its Risk Adjustment Payments**

95.     United knows that much of the claims data and other information that it receives from physicians and other providers is unreliable.  For this reason, United engages in extensive and expensive initiatives to review and correct that claims data. Unfortunately—for the United States—United deliberately chooses to look only one way in its remedial efforts.

96.     United designs its chart review and other corrective initiatives to seek out only errors that, if corrected, will lead to increased risk adjustment payments.  With the exception of certain small programs—designed to provide the appearance of fairness— United deliberately designs these programs to avoid discovering that United's previously submitted risk adjustment claims are false (and thus that United should submit a "delete" code).

97.     Although many of these programs could easily be used to look for both incremental and delete codes, United has deliberately structured them to look only for incremental codes.  To provide cover for its scheme, United has a few limited initiatives designed to look for delete codes.  However, these initiatives designed to find false claims are far smaller than their counterparts, and are subject to far stricter data validation rules.

98.     Perhaps the best evidence of both United's knowledge that the underlying claims data requires verification, and United's fraudulent refusal to correct false claims is the disparity between its efforts to find "incremental" (new) codes and "delete" (previously submitted, but false) codes.  United attempts to review the medical record for every member once every two years to try to find incremental codes, but only has a

nascent, limited project to identify delete codes. For 2009 dates of service, United reviewed approximately 1.4 million charts to try to find incremental codes, but only reviewed approximately 2,000 charts to try to find delete codes (and even then, only a limited portion of each chart was reviewed).

99. United runs multiple programs designed to identify additional HCCs for submission to CMS to increase its risk scores, including: (a) reviewing medical charts, (b) paying physicians bonuses for submitting paperwork to support claims for additional diagnosis codes, (c) sending physicians forms identifying conditions that United suspects the patient has, and (d) initiatives designed to get patients to visit their doctors each year for the purpose of being "treated" for high value diagnoses.

100. United pursues new codes through these initiatives with single-minded focus. As noted above, in the course of pursuing these initiatives, United often generates information that gives it reason to question the accuracy of diagnosis codes it has already submitted to CMS. United, however, intentionally (and myopically) does not compare the information to the diagnoses it has already submitted to CMS. Instead, United simply submits the incremental diagnoses it finds to CMS, purposely ignoring all evidence or suggestions of invalid diagnoses that it submitted improperly in the past.

### 1.    Chart Review

101. As described above, the vast majority of the information United uses as the basis for its risk adjustment claims comes initially from physicians, hospital or other providers in the form of claims data or other submissions. These sources are secondary to the primary records those providers hold—namely the patients' medical records, also known as charts.

102.    As is common with secondary sources, the claims data and other information United receives from providers is known to have some (and at times many) errors—even when providers make good faith efforts to submit only accurate information.  (As discussed in greater detail below, some providers deliberately upcode their claims information to manipulate the risk adjustment system; often because United pays them kickbacks to do so.)

103.    For example, in some cases, the claims data does not include all of the diagnoses codes that it should.  Providers often fail to document all diagnoses that were treated, because, historically, complete reporting of all treated diagnosis codes was generally not essential for reimbursement.

104.    In other cases, the claims data erroneously indicates a patient was treated for a certain diagnoses.  Sometimes this happens because of mere clerical error, but often it is the result of limitations in claims processing computer systems or a misunderstanding by coding personnel of the proper coding rules.  For example, coders sometimes indicate that a patient was treated for a certain diagnosis, where, in fact, the patient only had a history of past treatment for the diagnosis, or the patient was tested to see if they had that diagnosis.

105.    Moreover, there are routinely situations where the coding personnel correctly identify the patient as having been treated for a certain diagnosis, but make a mistake as to how severe the patient's illness is.  Thus, the coders may either overstate or understate the severity of the diagnosis.

106.    United's chart review program is designed to directly review the original documents—the patient medical records held by the providers—to correct these known problems.

107.    Because United has a duty to submit accurate data, and it knows that the claims data contains substantial errors, it has a dual responsibility when conducting these reviews: it should verify that already-submitted codes are accurate and documented while it looks for codes that should have been, but were not, submitted to CMS.

108.    Ingenix conducts chart reviews on behalf of UHMR, UHCS, and commercial clients.  In the retrospective chart review process, Ingenix identifies provider charts to review and arranges for the charts to be collected.  It uses both internal coders and also contracts with external vendors to review and code the charts.

109.    These vendors review charts using a blind review.  In a blind review, the reviewer codes every condition he or she identifies from the chart without knowing what codes the provider identified from the chart previously.  Thus, the reviewer works from the raw chart material and reaches independent conclusions.

110.    Ingenix conducts chart reviews provider-by-provider.  For each provider, the chart review vendor selects the United members who have not been reviewed in the past year.  Following every provider review, the reviewer submits the diagnosis codes it found to Ingenix.

111.    Ingenix defrauds CMS by acting on chart review data in two very different ways: it acts on the missed codes by submitting risk adjustment claims to CMS, but takes no action on the incorrect codes.

112.    When it receives the data from the reviewer, listing the diagnosis codes found during the review, Ingenix inputs the list into IRADS, its risk adjustment database (discussed in greater detail below).  IRADS' design adds the reviewer's codes to the codes already in the system (*i.e.*, the provider's codes) like pouring additional water into a bucket.

113.    For codes the reviewer coded but the provider did not code, IRADS will add a new entry.  If this is a newly discovered diagnosis code for that patient—meaning no other provider had also reported treating the patient for that diagnosis during that time period—Ingenix will then submit a new risk adjustment claim to CMS.

114.    Ingenix could easily perform a comparable comparison to look for over-coded diagnosis codes.  Using either the data available from the chart reviewers or readily available additional information, Ingenix could determine whether a diagnosis code contained in IRADS was absent from the patient's medical record for that given provider.  Ingenix, however, refuses to take any steps to determine whether the chart review data has identified over-coded claims.

115.    For situations where an existing code (*e.g.*, one a provider had submitted with its claims data) was not validated by the reviewed provider's medical records by the reviewers, IRADS does nothing.  No effort is made to find other support for the diagnosis code or to delete from the IRADS system any claims that suggested the reviewed provider had treated the patient for the non-validated diagnosis.

116.    Chart reviews have been lucrative for United.  For 2006 dates of service, the first year of fully-phased in risk adjustment, United's return on investment ("ROI") from chart reviews was 15 to 1.  Exhibit 4, incorporated herein.  United spends

approximately $30 for each chart it reviews but receives an average of $450 per chart in additional CMS payments for the new codes it submitted. *Id.*

117.    Relator believes that even if United properly conducted chart review— "looking both ways" for both helpful and harmful errors—United would still earn substantially more in newly found codes than it lost by correcting erroneous codes. However, United has steadfastly refused to take anything more than token steps to "look both ways."

118.    Unsurprisingly, UHMR and Ingenix have emphasized performing as many chart reviews as possible.  UHMR reviewed approximately 600,000 charts in 2006 and approximately 600,000 in 2007.  *See* Exhibit 4.  On information and belief, Ingenix reviewed between 600,000 and 800,000 charts in 2008.  In 2009, Ingenix reviewed approximately 800,000 charts.  Exhibit 5, incorporated herein.  United's only limitation in the number of charts it can review is its providers' dislike of the disruptions the reviews cause to their practices.

119.    In 2010, United's senior executives set a target for United's risk adjustment programs to generate an additional $100 million in internal operating income ("IOI") above and beyond what was originally targeted.  For 2011, United's incremental IOI target for risk adjustment is $125 million.  Chart reviews are an important part of United's strategy for realizing this additional IOI.

### 2.    Patient Assessment Forms

120.    In addition to the chart review program, which involves broad review of the provider medical records, United has several initiatives which are targeted to a specific subset of patients or providers.  As with the chart review program, these other

initiatives are designed to "look" just one way—seeking only to add incremental codes and ignoring evidence that previously submitted risk adjustment claims may be false.

121.    United's Patient Assessment Forms ("PAF") program targets suspected undercoded conditions, such as certain chronic conditions that a provider or group has coded less frequently than their prevalence rates would indicate.  For these conditions, such as diabetes and chronic kidney disease ("CKD"), Ingenix mines patient data for episodes in which a patient with a chronic condition has not been treated for a diagnosis during the payment year.

122.    The PAF program also identifies target patients by looking for situations where a patient filled a prescription for a drug that suggests the patient has a given diagnosis, or engages in a behavior (*e.g.*, smoking) that suggests a risk adjustment eligible diagnosis may be present.

123.    Ingenix prepares a form for these target patients and sends the form to their doctor, so he or she can "treat" the patient for that condition.  For example, if a provider diagnosed a member with diabetes in 2008 and 2009 but not 2010, Ingenix would send the provider a PAF and ask the provider to check the member for diabetes.

124.    Ingenix pays providers a fee to encourage them to consult PAFs when treating their patients.

125.    The program may have certain clinical benefit if and to the extent it helps ensure that members with chronic diseases receive treatment for their conditions.  However, that clinical concerns are not driving this program is demonstrated by which patients are targeted.  As with the chart review program, the PAF program focuses solely on disease and conditions that tend to be under-coded—and thus for which improved

coding accuracy stands to increase its revenue.  Ingenix chooses the conditions it targets through PAFs based on revenue impact, not clinical impact, and ignores conditions that are frequently overcoded.

126.    For example, United knows that cancer and stroke are often improperly coded years after the patient stopped receiving treatment.  United could use the PAF program to highlight these potentially overcoded conditions to providers.  For example, if a member has been coded with an acute episodic stroke for three continuous years, United can easily notify the provider that two of the three codes are probably incorrect. The member most likely had a stroke in the first year (*i.e.*, not each year) and the condition should now be coded as "history of stroke."  United could alert the provider as to its suspicion, ask the provider to assess their coding and documentation for accuracy, and submit a medical chart supporting the diagnosis.  United does not include this information in its PAF reviews, however, because the provider's poor coding habits actually increase United's reimbursement from CMS.  Therefore, though patients and providers might benefit from knowing this information, United chooses not to use it because it would decrease United's revenue from CMS.

127.    Initially, Ingenix received completed PAFs from providers and submitted the diagnoses listed on the PAF without reviewing the medical record.  More recently, Ingenix has required that the medical record accompany the completed PAF— purportedly so that diagnoses claimed on the PAF could be "validated."  Instead, United actually reviews these medical records for incremental diagnoses that the provider may have missed.  In this way, the PAF program has become a one-way chart review designed to only find incremental codes to submit to CMS for reimbursement.

128.    United not only skews the PAF program to focus solely on undercoded diagnoses, it prevents providers from taking the initiative on their own to focus on overcoded conditions.   Ingenix maintains an online provider portal, called Insite, that "percent of premium" capitated providers (*see* ¶¶210–211) use to manage risk adjustment activities for their members.

129.    Insite contains numerous reports geared towards helping providers assess, diagnose and code incremental conditions.   One such report, for example, is the Central Suspect Report ("CSI").   Similar to PAFs, this report lists conditions that United suspects the member may have, but are not coded currently.   Another report is the Declining RAF report.   This report ranks members with risk scores that have declined period over period, a fact that highlights to providers that they may have missed one or more conditions in their coding.   Some Insite reports go so far as to calculate the estimated financial impact for coding a particular condition.   This allows the provider to estimate the incremental reimbursement the provider would receive from United by coding the specific condition. Similar to United's other risk adjustment programs, Insite is designed to identify incremental diagnosis codes that United may submit to CMS for payment.

130.    To Relator's knowledge, however, Insite contains no function for providers to notify United of overcoded conditions.

131.    Relator brought the discrepancy between overcoded and undercoded conditions to the attention of senior UHMR and Ingenix management.   Management dismissed his concerns, however, with Ingenix arguing there were "better ways" to address overcoded conditions, such as chart validation, discussed below.   Both UHMR and Ingenix knew, however, the chart validation program was incredibly limited, and that

the company had no plans to provide resources to address the problem of overcoded conditions through that program.

132.    Instead, the PAF program is deliberately limited to seeking under-coded diagnosis codes so that United can avoid discovering over-coded diagnoses that it knows exist.

### 3.    Clinical Operations Initiatives

133.    Clinical Operations Initiatives ("COI") is a program designed in part to "improve" the coding of conditions that United believes are frequently "undercoded." One such COI focuses on diabetes coding.  As described above, the HCC model assigns multiple HCCs to conditions, such as diabetes, that have variations in severity and cost. For instance, a patient with well-controlled diabetes is likely to incur lower medical expenses than a patient with uncontrolled diabetes and complications.  CMS therefore assigns a lower-paying HCC to well-controlled diabetes and a higher-paying HCC to uncontrolled diabetes.  The goal of the COI program is to increase the severity of the diagnosis codes assigned to patients with one of these target HCCs.

134.    Originally, the COI program sought to improve diabetes coding by monitoring providers with high percentages of HCC 19 codes.  HCC 19 is a code for diabetes without complications.  The risk score associated with HCC 19 is much lower than the risk score for HCC 15, which is the code for diabetes with renal complications. United suspected that some providers were  coding HCC 19 when one of the more severe diabetes codes (HCC 15–18) would be more appropriate.

135.    Under the COI program, United pays providers approximately $100 for each diabetes patient they assess for diabetes complications, submit a supporting diagnosis via a claim, and submit a medical record with matching documentation.  In

addition, it pays $200 for each doctor that receives training on the COI program and diagnosis coding.  Recently, the COI program has expanded to other conditions that United suspects are frequently undercoded, such as chronic kidney disease ("CKD"), and chronic pulmonary disease ("COPD").

136.    Like the PAF program, however, United does not pay doctors to improve coding for conditions that are frequently overcoded.  Again, United knows that cancer and stroke are generally overcoded.  But because improving their accuracy would decrease revenue, United does not include these conditions in COI.  Instead, COI is limited to conditions United believes are the most frequently undercoded, such as diabetes, CKD, and COPD, and represent large opportunities for increased reimbursement from CMS.

137.    In addition, United looks one way with the medical records it receives from doctors under the COI program.  Thus, when United receives a chart, it does not check whether the other diagnoses listed in the chart (such as those submitted through claims) are correct.

138.    Even worse, Relator has information and believes that United does not delete its previous diagnosis when the provider submits a medical record that diagnoses the member with a *less* severe condition (such as diabetes) than before.  For example, United may send the doctor a list of diabetic members to assess.  One or more members may be coded with HCC 15 (diabetes with complications).  If the doctor submits a claim and medical records for that member diagnosing the member with HCC 19 (diabetes without complications), United does not submit a delete code to CMS for HCC 15. United simply assumes, without justification, that another doctor was responsible for the

HCC 15 code.  Similar to its chart reviews, therefore, United affirmatively solicits diagnoses from its providers but ignores them when they cast doubt on the validity of a higher-paying diagnosis.

### 4.    Other Initiatives to Increase Risk Adjustment Payments

139.    Ingenix runs several additional programs to increase risk adjustment payments, including:

140.    ***Provider Attestations***: Medical charts must be signed, credentialed and dated to be used to validate a diagnosis.  When Ingenix performs chart reviews, it identifies charts that are missing one of these elements, preventing United from submitting the incremental diagnoses found in those charts to CMS for payment.  To get around this obstacle, when Ingenix identifies a chart that is (1) missing an administrative element and (2) contains an incremental diagnosis that would increase United's reimbursement from CMS, Ingenix sends an attestation form to the provider to confirm the administrative elements.  If it receives the attestation from the provider, Ingenix submits the incremental codes in the charts to CMS for risk adjustment payment.  If it does not receive the attestation, however, Ingenix does not delete any codes that the provider previously submitted for that member, even though Ingenix knows the member's chart is invalid.

141.    ***Members without Visits***: To encourage members to visit their doctors at least once each year, Ingenix works with providers to schedule annual checkups.  In some cases, this program can have clinical benefits, if the physician actually treats the patient, substantively, for the condition in question.  However, in other situations, the visit is medically unnecessary if the patient is merely brought in so that the physician can "code the diagnosis" United has flagged for risk adjustment purposes.

142.    *Hospital Data Capture*: Under this program, Ingenix elicits "data dumps" from hospitals to ensure it has received all of their diagnosis codes.  Hospitals often enter more diagnoses for a patient than are transmitted to United.  The Hospital Data Capture program is designed to retrieve the incremental codes that United did not receive so that United can submit those codes to CMS for payment.

143.    *Provider Coding Training*: United trains providers on how to code "properly."   United often directs training to providers with low risk scores or with a financial incentive to increase risk scores, such as percent of premium capitated providers.  Historically, however, it does not proactively offer training to providers who have performed poorly in validation audits, because they routinely over-coded diagnoses. The reason, again, is that United's priority is increasing code submissions.

144.    United employs each of the above programs to increase its risk adjustment payments from CMS.  In 2010 and 2011, United's management directed UHMR to increase its internal operating income from risk adjustment by $100 million and $125 million, respectively, above and beyond what was already planned.  UHMR worked to achieve the targets by increasing its risk adjustment scores by capturing past conditions (PAF), decreasing the percentage of members without visits, increasing the number of providers that use Insite, and performing more chart reviews.

145.    The company monitored the progress of each program closely.   The pressure to earn $100 million in additional risk adjustment income, however, gave UHMR no incentive to identify, block, and delete incorrect codes.  In fact, the company viewed the possibility that it would have to start reviewing charts for incorrect codes as a negative.   In a January 2010 "Coding Accuracy Progress Report," UHMR warned,

"Potential changes to general coding accuracy strategy, including chart audits, could impact 2010 results."  Exhibit 6, incorporated herein.  In other words, looking both ways in chart reviews to identify both incremental and incorrect codes would jeopardize its ability to achieve the $100 million target.

> **5.     United Has Implemented Several Extremely Limited Programs to Look for Unsupported HCCs**

146.    United knows that the claims and other data that provide the basis for its risk adjustment claims include errors in both directions—upcoding and downcoding.  As such, United is well aware that it should be "looking both ways" during chart reviews, *i.e.*, looking for both incremental and unsubstantiated codes.   However, rather than structure its chart reviews or its various related programs described above to "look both ways," United has half-heartedly created a small chart validation program that is little more than a fig leaf designed to obscure its misconduct, and has been dragging its feet for years in completing a very limited pilot program designed to develop a system to look both ways.

147.    Under the chart validation program, Ingenix selects providers who have coded certain HCCs at levels above the condition's national prevalence rate.  Ingenix audits the providers' charts for those codes to determine if the codes were properly documented and substantiated.

148.    United, however, imposes four restrictions to limit the number of validation audits it performs.  First, the provider who submitted the code must be a Level I provider, defined as a provider with a financial incentive contract with United, such as a capitation or gainshare agreement.  This limitation excludes both large provider groups without coding incentives (Level II) and small provider groups (Level III).  Second, the

provider must have at least 500 United Medicare members.  Third, for an HCC to qualify as "suspect," the provider must have coded it at over 300% of Ingenix's national prevalence rate.  Fourth, United reviews a maximum of 30 members per provider and HCC, often a tiny sample size relative to the number of codes the provider submitted.

149.    Ingenix's approach to chart validation is therefore highly focused and excludes a vast majority of United's providers and risk adjustment data.  None of the limits on chart validation exist for chart reviews.  For example, whereas chart validation contains safeguards to ensure diagnoses are not improperly deleted, United submits diagnoses from outside vendors' chart reviews without validating them in any way.  The reason for the limits on chart validation is that chart validation is an expense that has no revenue potential.

150.    Ingenix's chart validation program reviewed 4,000 charts in 2010 for the 2008 and 2009 service years.  By comparison, Ingenix's chart review program reviewed approximately 1.4 million charts for the 2008 and 2009 service years.  *See* Exhibit 5 (2009 chart reviews).

151.    Despite their limited scope, Ingenix monitors the results of its validation audits closely.  It compiles data on the validation percentages of each HCC, as well as the validation percentages for each provider group.  Often, Ingenix identifies specific HCCs and specific provider groups with low validation percentages.  In May 2009, for instance, Ingenix's Dr. Maninder Khalsa identified five problem HCCs (15 to 30% rejected codes): HCC 10 (breast, prostate, colorectal cancers); HCC 96 (stroke); HCC 15 (diabetes with renal/circulatory complications); HCC 105 (vascular disease); and HCC 92 (arrhythmias).

152.    Similarly, an Ingenix validation audit of 2008 codes from Hemet Community Medical Group reviewed 30 HCC 67 (quadriplegia) codes and validated two. Though this was an extreme result, Ingenix identified dozens of other provider groups with low validation totals in specific HCCs.

153.    United, however, does little to nothing with the data it finds during chart validation.  Though it submits delete codes for diagnoses that it cannot substantiate, Ingenix does not expand its search when it identifies a problem area.

154.    For example, despite validating only 2 of 30 (less than 7 percent) quadriplegia HCCs from Hemet Community Medical Group, on information and belief Ingenix did not review any quadriplegia codes beyond the audit sample.

155.    Nor has Ingenix targeted known over-coded conditions, such as cancer or strokes, for additional scrutiny.  (By contrast, in 2009 Ingenix planned a "High Value Suspects" initiative to target potentially under-coded, high-revenue members and providers.)

156.    In 2010, United developed a pilot program that would look for both incremental and unsupported diagnoses during chart reviews.  Though the pilot program would look both ways if adopted, United continues to stack the deck in favor of submitting incremental codes.  The pilot contains several limitations that do not exist in ordinary chart reviews.

157.    First, the pilot is limited to members with only one provider so that United does not delete a diagnosis that some other provider's chart might validate.  This restriction does not apply to chart reviews—during chart reviews, whenever United identifies a chart that calls another provider's diagnosis into question, it ignores the chart.

158.    Second, United limited the number of charts the pilot program reviewed so that it had time to validate all of them before CMS's January 31, 2011 deadline for submitting diagnoses from 2009 dates of service.  In contrast, United does not limit its efforts to find *incremental* codes before the January 31 deadline to build in time to ensure the codes are valid.  On the contrary—United runs special programs up to the deadline to find as many incremental diagnoses as possible.  United does not pause to check whether it will have enough time to validate these incremental diagnoses, because it simply does not validate the diagnoses it submits.

### 6.    United Continues To Develop New Programs To Seek Incremental Codes, While Slow-Walking Its Limited Efforts to Correct Overcoded Claims

159.    Relator has spoken with senior United executives about, and has other personal knowledge that those executives are aware of, the fraudulent risk adjustment practices discussed in this Complaint, including United's chart review practices and other risk adjustment initiatives.  On this basis, Relator knows that at least the following United executives know about some or all of the problems discussed herein, and have participated in the scheme to continue submitting fraudulent claims and to refuse to correct previously submitted false claims: Larry Renfro, UHG Executive Vice President; Tom Paul, UHMR Chief Executive Officer; Cindy Polich, UHMR President; Lee Valenta, Ingenix's former Chief Operating Officer (and current President of Ingenix's Life Sciences Division); Jack Larsen, former CFO of PSMG (and current CEO of UHCS); Scott Theisen, UHMR Senior Vice President of Finance; Jeff Dumcum, Senior Vice President of Ingenix; and David Orbuch, PSMG Chief Compliance Officer.

160.    Although numerous United officials have acknowledged to Relator that the company should be "looking both ways" when it tests the validity of its risk

adjustment data sources, United continues to focus almost exclusively on adding incremental codes. Although United has created a very limited "pilot project" to test the possibility of "looking both ways" during chart reviews, that program gets limited resources and serves primarily as a fig leaf to mask the one-sided nature of United's efforts.

161.     Though the pilot is only experimental, United invokes it as justification for continuing its fraudulent chart reviews.  In an email on September 9, 2010, UHMR President Cindy Polich emailed Relator that she and UHMR Chief Executive Officer Tom Paul had discussed whether to increase chart reviews despite knowing the reviews disregarded incorrect codes, and "had resolved the issue of concern by agreeing to develop and implement a pilot." Exhibit 7, incorporated herein.  Polich told Relator that she and Paul "both agreed that this issue should not stand in the way of moving forward with additional chart audits." *Id.*

162.     Moreover, United continues to invest significant resources toward finding incremental diagnoses at the same time it is not devoting resources to the pilot or to fixing IRADS.  For example, United is developing "playbooks" containing ideas for increasing its risk scores.  These playbooks are garnering top-level attention at the company while the myriad problems with United's risk adjustment programs and processes go unresolved.

163.     United conceals the one-way nature of its risk adjustment programs from CMS and even its investors.  For example, United's remediation plan for 2010 that sought to increase IOI by $800 million allocated $100 million to "Project 7." Project 7 was United's codeword for initiatives to increase risk adjustment payments.  The

company used a codeword (as opposed to "growth," "enrollment," or "claims") because it did not want CMS or other investigatory government agencies to know it had a campaign to claim an additional $100 million through risk score increases.

164.    Similarly, during its fourth-quarter earnings call on January 21, 2011, Tom Paul, CEO of UHMR, told investors that UHMR "on a year-over-year basis" was seeing "improvements" in its risk adjustment "accuracy rates."  This statement was misleading, for while UHMR had found and submitted a substantial number of incremental codes, it has no evidence that its submissions were more accurate (*i.e.*, the error rate of the data it submits has decreased).  This fact is well known at United.

165.    At Relator's urging, United has changed the text of the letters it sends to providers about chart reviews to remove the word "accuracy."  The letters now say that United reviews charts to ensure it submits "complete diagnosis information" to CMS, not complete and accurate information.

### C.    United Knows that its Risk Adjustment Claims Submission System Is Flawed, and Routinely Submits False Claims, But Has Failed to Fix that System or To Find and Fix Past False Claims

166.    United knows of several significant problems with the way that its Ingenix Risk Adjustment Data System ("IRADS") processes claims data and submits risk adjustment claims to CMS.  These errors always, or almost always, cause the submission of false and/or upcoded claims.  Almost never do these errors cause United to fail to submit a valid claim.

167.    Notwithstanding this knowledge, United has failed to fix the IRADS system, or to fix the previously submitted false claims caused by these flaws in the programming and logic of the IRADS system.

### 1.     Background

168.     The risk adjustment information United submits to CMS originates primarily from provider encounter and claims data.   Providers submit encounters and claims information to United through one of several automated systems, such as the Professional Encounter System ("PES"), COSMOS, NICE, Pulse, Facets, and others.

169.     United collects data from these systems and sends the data to Ingenix for incorporation into IRADS.   IRADS applies multiple logic filters to the data to identify which diagnosis codes are eligible for submission to CMS, and which are not.

170.     For example, when UHMR receives a claim from a provider containing an ICD-9-CM diagnosis code for diabetes, IRADS should screen that claim to ensure that all the required data elements are present, pursuant to CMS rules. If IRADS finds the Provider ID on the claim corresponds to a primary care physician, and a CPT code for a physical examination, it should then submit the code for risk adjustment.   This is because the information on the claim corresponds to a face-to-face encounter between a physician and the patient.   However, if the claim's Provider ID corresponds to a laboratory technician and the CPT code is for blood work, IRADS should filter out that claim because it is clear the diagnosis code is based on a lab test, not a face-to-face encounter with an appropriate provider type.

171.     From these eligible codes, IRADS creates the data file that Ingenix submits to CMS's risk adjustment processing system ("RAPS").   Claims and encounter data processed through IRADS account for approximately 95% of the diagnoses United submits to CMS.

### 2. United Knows that the Filtering Logic Built Into IRADS is Deeply Flawed and Consistently Errs in Favor of Overcoding Risk Adjustment Claims

172. The serious problems that United has identified with IRADs include, but are not limited to:

(a) use of "exclusion logic" to bias IRADS filters so that when in doubt they err on the side of including a diagnosis code and submitting a claim;

(b) use of flawed logic concerning identification of provider specialties, leading to the inclusion of services provided by ineligible provider types;

(c) failing to correct the IRADS data, and failing to correct previously submitted claims, when a provider informs United that a previously submitted claim was invalid or incorrect;

(d) failing to properly separate information on individual service lines where one claim includes more than one separate procedure;

(e) consolidating provider information in a way that causes certain eligible and ineligible providers to share the same identifier;

(f) resubmitting previously deleted diagnoses to CMS;

(g) submitting diagnoses from an institutional claim where the patient did not receive a face-to-face service; and

(h) failing to update IRADS' filtering logic to include the most current CPT codes.

173. These problems are interrelated and often work in conjunction to cause erroneous submissions.

174. Relator has discussed the problems with IRADS with many of United's senior executives. In this way, Relator knows the company is aware of the problems.

Although United knows about the issues with IRADS, it has allowed Ingenix to continue submitting risk adjustment data to CMS, and has not disclosed the problems to CMS. United continues to submit diagnosis codes it knows are ineligible for risk adjustment. Likewise, United has not deleted codes that IRADS improperly submitted or even investigated the extent of the errors.

175.    Relator has information to believe that the problems with IRADs may also be found in its legacy risk adjustment processing systems, and thus date from the very beginning of the risk adjustment system in 2004. United has intentionally not reviewed whether its legacy systems contained an error it has identified in IRADS ("Issue 1," discussed *infra*) and thus whether it needs to delete any improperly-submitted codes, for example. United also has not reviewed whether its legacy systems contained any of the other errors it has identified in IRADS.

### a)      Improper Use of Exclusion Logic

176.    The most pervasive problem with IRADS is that it was built to use "exclusion logic" to filter diagnosis codes. As a result, the system essentially takes the position of "when in doubt, submit a claim."

177.    Generally speaking, exclusion logic compares objects in a database against a defined "exclusion list" and marks the matches (if any) for exclusion. For example, exclusion logic in an airport security system might compare travelers' names against a list of the FBI's Ten Most Wanted and flag any matches for security officials.

178.    In IRADS, the exclusion logic filters out claims data if one or more of the data elements exactly matches a list of codes to exclude. For physician claims, the exclusion lists include, without limitation: (a) CPT codes; and (b) the provider's specialty

type.  For institutional claims, the lists include, without limitation: (a) the bill type; (b) the revenue code; and (c) discharge status.

179.    Thus, for example, IRADS' exclusion list for CPT codes includes the codes for ineligible procedures such as laboratory work and diagnostic radiology.  If a CPT code for the diagnosis matches a CPT code on the exclusion list, IRADS excludes the diagnosis from the data United submits to CMS for risk adjustment.

180.    IRADS' exclusion logic, however, contains a basic and devastating error—it only catches information that *matches* information on its exclusion lists *exactly*. Information that is invalid but not on the exclusion list passes through the filter.

181.    Incredibly, this means that even if a key data element is left blank, or filled with a completely erroneous value, IRADS assumes that is a valid value because the blank or erroneous value does not appear on the list of codes to exclude.  Thus IRADS will use that claim data when submitting risk adjustment claims.

182.    This error causes Ingenix to claim payment for HCCs taken from claims data that are obviously ineligible for risk adjustment.  For example, IRADS may catch and filter a diagnosis with CPT code 74150 (a radiology code).  However, it will not catch a diagnosis with a CPT code field that is blank, erroneous (*e.g.*, 74x50), or even reads "this diagnosis is not eligible for risk adjustment."  So long as the field does not match the CPT codes on the exclusion list, the IRADS filter will not catch the bogus entry and the invalid diagnosis code will pass through to CMS.

183.    The exclusion logic error is emblematic of United's design for IRADS and its approach to risk adjustment in general—if United has any doubt about whether a diagnosis is eligible for risk adjustment, it submits it for payment.

**b)**      **Flawed Provider Specialty Logic**

184.    Because of an error in the way IRADS processes provider billing identification numbers ("billing IDs"), IRADS fails to screen many diagnoses by provider type. As described above, CMS forbids MA plans from submitting diagnoses based on documents from ineligible providers such as registered nurses ("RN") or radiologists. Thus, CMS requires MA plans to screen the diagnosis codes they submit by provider type.

185.    The claims and encounter forms that United enters into IRADS each contain a billing provider identification number ("billing ID"). UHMR typically assigns billing IDs on a billing/contract basis, such that large, multi-specialty provider groups contracted with UHMR often have a single billing ID.

186.    IRADS takes a shortcut in how it screens for provider types—it assumes that if a billing ID ever submits a claim or encounter with an eligible provider type, then the billing ID's future claims and encounter forms will also have eligible provider types. When IRADS receives a claim with an eligible provider type, it adds the billing ID from that claim to its list of billing IDs associated with eligible provider types. Once the billing ID has been added to that list, IRADS treats all claims submitted by that billing ID as valid, regardless of the actual provider specialty of the provider who provided the service in question.

187.    For example, if a newly-credentialed medical center submits five claims to United for a radiologist, IRADS will identify the provider specialty as "radiologist," an ineligible provider type, and block the diagnoses from going to CMS.

188.    However, the first time the medical center submits a code from an *eligible* provider (*e.g.*, internist), IRADS treats the billing ID as conclusive evidence that the

medical center's future diagnoses will likewise be made by eligible providers.  From that point forward, IRADS stops filtering the medical center's claims by provider type altogether, allowing all subsequent diagnoses from the medical center's radiologists to be submitted to CMS for risk adjustment (assuming they pass the other filters).

c)      <strong>Failure to Remove Diagnosis Codes Associated With Claims "Voided" by the Provider</strong>

189.    When one of United's institutional providers voids a claim that was the source of a risk adjustment claim submitted to CMS, United processes the void instruction (*i.e.*, reverses the claim and recoups any claim payment) but does not delete the diagnosis code from its IRADS database or submit a delete code to CMS to reverse the risk adjustment claim.   CMS therefore pays United an additional amount for diagnoses taken from cancelled claims.

190.    United's general process for submitting diagnoses for risk adjustment starts with the claims and encounter data it receives from providers.  Providers submit these claims and encounter data to United, which extracts data from them and enters the data into IRADS.

191.    The "void and replace" occurs because IRADS only collects a limited portion of the data in the claims system.  For example, United receives most claims from hospitals and other institutional providers on Form UB-04.  Exhibit 8, incorporated herein.  Form UB-04 includes a field for the type of bill the claim represents (Item 4). The bill type is a three-digit code.  The last digit of the code indicates whether the institution submitted the bill to void or replace a prior Form UB-04.

192.    IRADS, however, is unable to process the bill type's void/replace instruction.  Thus when United receives instructions from a provider to void out a prior

54

claim, and then replace it with a new claim, IRADS essentially treats this as three valid claims: (a) the original claim; (b) the "void" instruction, which looks like the original claim but for the data element that identifies it as a voiding claim; and (c) the new claim. Thus, if no filter applies, IRADS submits to CMS *both* the diagnosis from the original claim *and* the diagnosis from the replacement claim.

193.    IRADS submits false data because of this error.  For example, a fee-for-service provider who submits a claim ("claim #2") on Form UB-04 (diagnosis: vascular disease) to replace a claim ("claim #1") on Form UB-04 (diagnosis: congestive heart failure ("CHF")) will receive payment from United based on claim #2 only.  United, however, submits both the vascular disease diagnosis (HCC 105) and the CHF diagnosis (HCC 80) to CMS for risk adjustment.  By doing so, United represents that its member was treated for both conditions in the present year, when in fact the member was only treated for one.  United claims payment from CMS for both conditions.

> **d)    Failure to Separately Filter Procedure Codes When Multiple Services Are Included on a Single Claim**

194.    IRADS also fails to distinguish which diagnosis codes are associated with which procedures in situations where one claim form contains separate line items for two or more different procedures.  Instead, IRADS assumes that all diagnosis codes on a claim are associated with each of the procedure codes.  Thus, if either of the procedure codes is valid for risk adjustment purposes, IRADS uses all of the diagnosis codes for risk adjustment.

195.    Both professional (*i.e.*, physician) and institutional (*i.e.*, hospital) claims forms have multiple lines in which the provider can list the multiple procedures that may have been performed for a member.  At least some of United's claims systems, such as

NICE (legacy PacifiCare) are capable of processing individual service lines. IRADS, however, is not programmed to treat each line separately.

196.    For example, a claim may contain two service lines: (1) an office visit with a doctor who diagnosed cancer; and (2) a laboratory procedure performed by a technician to determine if the member has diabetes. The claim contains two diagnoses (cancer and diabetes) drawn separately from the two service lines. IRADS, however, *conflates* the service lines into a single data point. When checking for CPT codes, therefore, IRADS identifies the eligible CPT code (the office visit) and attributes it to both the cancer and diabetes diagnoses, even though the doctor had only diagnosed cancer. The CPT code for the laboratory procedure is effectively ignored. Consequently, IRADS submits both diagnoses to CMS, falsely representing that the doctor had diagnosed and treated the patient for two conditions, when it fact the doctor had only diagnosed one.

197.    The service lines that IRADS is incapable of processing appear in United's claims forms. For example, Health Insurance Claims Form 1500 ("Form 1500"), the industry's standard claims form for professional health services, contains a field (Item 33) for the provider ID as well as a field (Item 21) for diagnosis codes. Exhibit 9, incorporated herein. Form 1500 also includes six "service lines" (each line consists of Items 24A–J) indicating, *inter alia*, the dates of service, the procedures performed (*i.e.*, CPT codes), the "diagnosis pointer," and the rendering provider identification number. The diagnosis pointer (Item 24E) relates one of the diagnoses in Item 21 to each of the service lines in Item 24 in order to document which health condition each service treated.

198.    IRADS is unable to process critical information in Form 1500's service lines (Item 24) that determines the claim's risk adjustment eligibility.  In addition to its inability to process CPT codes correctly, IRADS uses the field for *billing* provider number (Item 33) to determine whether an eligible provider type submitted the claim.  In doing so, IRADS ignores Item 24J, which lists the *rendering* provider identification number for each service line.  (The provider accumulator error is associated with this false correlation. *See* ¶¶184–188.)  For example, in the prior example of a claim with two diagnoses (cancer and diabetes) from two service lines, Form 1500 lists the cancer and diabetes diagnoses in Item 21 and the doctor and the laboratory technician as rendering providers in Item 24J(1)–(2).  Because IRADS relies on the billing provider (Item 33) and ignores the rendering provider (Item 24J), it does not filter the diabetes diagnosis, even though it is supported only by a lab request.

### e)        Inappropriate Consolidation of Provider ID Numbers

199.    IRADS misidentifies which providers are responsible for the diagnoses it submits to CMS.  Due to its poor compatibility with United's legacy claims systems, IRADS omits important information when consolidating the coding data it submits to CMS.

200.    For example, COSMOS, one of United's many claims adjudication systems, identifies providers with a code that is both alphabetic and numeric.  The alphabetic code corresponds to the provider's location.  The provider ID for a primary care doctor in Birmingham, Alabama, for example, might resemble the following: BHM-012345.  COSMOS either does not transmit the alphabetic portion of the code to IRADS, or it transmits the portion and IRADS does not process it.  Either way, during consolidation IRADS fails to process the BHM prefix and identifies the doctor simply as

012345.  The truncation results in providers sharing the same identifier.  IRADS cannot differentiate, for example, between the Birmingham primary care doctor and a radiologist in Cleveland, Ohio, whose provider ID was formerly OHC-012345.  In IRADS, both providers share the same 012345 provider ID.

201.   Due to the provider accumulator error, discussed in ¶¶184–188, once IRADS identifies a provider ID as valid, it does not filter claims from that provider ID even if the claims list an ineligible provider type.  Thus, continuing the prior example, if the claim passes IRADS other filters, IRADS will submit diagnoses from both the Birmingham doctor and the Cleveland radiologist, even though the radiologist's claims identify the radiologist as an ineligible provider type.

### f)      Resubmission of Previously Deleted Diagnoses

202.   IRADS submits improper diagnoses to CMS because it is unable to associate a diagnosis Ingenix has deleted with a duplicate diagnosis in a resubmitted claim.  When Ingenix decides to delete a diagnosis code listed in a claim, and the claim is later resubmitted by the provider, IRADS does not associate the newly-resubmitted claim with the deleted diagnosis.  Therefore, Ingenix may determine that a diagnosis was improperly submitted to CMS, and yet resubmit the same code (if no filter applies) because IRADS is unable to associate the resubmitted claim with the deleted diagnosis.

### g)      Submitting Institutional Claims for Non-Face-To-Face Services

203.   Perhaps most egregiously, United identified and disclosed to CMS a problem in IRADS that was causing it to submit false diagnoses, but has knowingly fixed the problem in only one out of two contexts.

58

204. The problem, which United refers to as "Issue 1," affects diagnosis codes that corresponded to multiple procedure codes. As discussed above, MA plans must use procedure codes to filter diagnoses codes to ensure the diagnoses were made during a face-to-face encounter with an eligible provider. The procedure codes used in professional (*e.g.*, physician) claims are known as CPT codes; the procedure codes used in institutional (*e.g.*, hospital) claims are called revenue codes.

205. For Issue 1, IRADS was inexplicably programmed to skip CPT code filtering—and essentially assume that a diagnosis was made during a face-to-face encounter with an eligible provider—as long as the diagnosis code was associated with two or more CPT codes. IRADS made this assumption regardless of what the CPT code values were. Thus, even when the diagnosis code was submitted with two invalid CPT codes, IRADS would assume one of those codes was valid and submit a risk adjustment claim based on that diagnosis code.

206. In 2008 and 2009, United investigated Issue 1 and confirmed it had caused United to submit invalid diagnoses to CMS. United notified CMS, fixed the CPT code filter, and submitted delete codes for the false diagnoses.

207. United, however, knowingly did not fix Issue 1 as it pertains to *institutional* claims. For institutional claims, IRADS continues to use the same erroneous logic such that an institutional claim with multiple non face-to-face revenue codes (the institutional equivalent to CPT codes) will pass IRADS' revenue code filter automatically. The result is that two wrongs often equal a right. A diagnosis with one bad revenue code is filtered out; a diagnosis with two bad revenue codes is submitted to CMS for payment.

**h)    United Knowingly Fails to Filter Diagnoses With Current Procedure Codes**

208.    To ensure that it screens diagnoses based on their procedure codes properly, United is required to review the procedure codes on its exclusion list annually. Procedure codes—CPT codes and revenue codes—are regularly modified or changed year-over-year, and MA plans often determine that they need to update their risk adjustment filters to reflect the changes.   United, however, fails to perform annual procedure code reviews.   The exclusion logic in IRADS is therefore out of date and results in United improperly submitting to CMS diagnoses with procedure codes that are no longer associated with a face-to-face encounter with an eligible provider.

**D.    United Pays Kickbacks to Providers to Increase their Risk Scores**

209.    UHMR pays kickbacks to many of its provider groups to encourage them to increase the number and severity of diagnoses they submit to United.   Since at least 2005, UHMR has offered providers additional payments if and when the providers' patients' risk scores increased.

210.    United customizes its kickbacks depending on the nature of its overall reimbursement arrangement with the provider group.   The providers United chooses to pay additional amounts for increased risk scores are those that do not already have an incentive to upcode diagnoses.   United uses three basic payment structures for its providers: (1) percent of premium capitated providers, which receive a percent of United's CMS premiums for its patients; (2) "fixed" capitated providers, which receive PMPM payments from United that are not tied to United's CMS premiums; and (3) fee-for-service providers, which are paid based on the claims they submit to United.

211.    "Percent of premium" capitated providers already share an incentive with United to upcode diagnosis codes, because they stand to earn a percentage of the additional revenue from CMS.  Accordingly, United gives them no additional payment to reward increased risk scores.

212.    Flat capitated providers and FFS providers, however, have no financial incentive to upcode diagnoses.  United makes up for this by paying a "bonus" (kickback) if and when such providers increase their risk scores.

213.    Generally speaking, United pays fixed capitated providers a PMPM amount for its members, with the provider carrying the risk of covering the members' healthcare costs.  To encourage fixed capitated providers to maximize risk adjustment submissions, however, UHMR pays them an extra percentage of the capitation rate (or other bonus) when their patients' risk scores increase.

214.    For example, a January 1, 2009 Health Services Agreement between PacifiCare and Banner Physicians Hospital ("Banner") promised to pay the hospital "an additional increase in Capitation Payment PMPM retroactive to January 1, 2009 if the increase in RAF [risk adjustment] score between July 2008 and July 2009 is in excess of 3%."  Exhibit 10, incorporated herein.  The amount of the increase equaled the amount of the percentage increase over 3%, such that a 4% increase in risk score would increase Banner's capitation payments by 1%.  *Id.*

215.    UHMR's contract with Banner reflects its policy and practice of offering providers (both capitated and fee-for-service) financial incentives to increase their risk adjustment submissions.   These agreements exist across UHMR's plans, and were entered into between 2005 (or earlier) and 2010.  The agreements are kickbacks that give

United's providers a financial incentive to upcode the diagnoses codes they submit on their claims.

216.   United also enters into contracts known as gainshare agreements with certain FFS provider groups.   Under these agreements, United and the provider group agree on a target benefit-cost ratio ("BCR").   If the provider group achieves a BCR lower than the target, United and the provider share the savings.

217.   United provides kickbacks to provider groups, however, by renegotiating the terms of gainshare agreements to ensure the groups realize savings.   For example, on January 24, 2011, UHMR Vice President of Finance Tim Noel told Relator that United and MedicalEdge, a provider group in Texas, entered into a gainshare agreement for a particular year in which the target BCR was 79% and any savings would be split 60/40 between MedicalEdge and United.   In May of that year, United renegotiated the agreement.   The new agreement raised the BCR from 79% to 82%, making it easier to attain, but changed the split from 60/40 to 50/50.   Though MedicalEdge took a lower percentage, the renegotiation more or less guaranteed that it would receive a savings payment.   Furthermore, the renegotiated target was applied retroactively back to January of the contract year.   Because of the mid-year contract renegotiation, MedicalEdge received millions of dollars more than it otherwise would have under the terms of the original gainshare agreement.

218.   UHMR enters into gainshare agreements with provider groups across its various plans and networks.   On information and belief, UHMR's gainshare practices began at least as far back as 2007 (and most likely earlier) and continue to the present.

E.   **UHMR's Percent of Premium Capitated Provider Groups Submit False Risk Adjustment Data with United's Knowledge and Approval**

219.   UHMR contracts with many capitated provider groups nationwide.   As described above, percent of premium capitated providers are paid a portion of whatever premiums United receives from CMS.   Consequently, such capitated providers share UHMR's incentive to submit as many diagnosis codes as possible to CMS.

220.   From the inception of CMS's risk adjustment system, UHMR and Ingenix have known that many of their capitated providers are fraudulently submitting false and incorrect risk adjustment diagnoses.   United's policy and practice, however, has been to continue accepting diagnoses from its capitated providers even when it knows the data from those providers is unreliable.   Only in rare instances does United audit its providers, and in those instances it merely deletes whatever bad diagnoses it finds without conducting a top-to-bottom review, correcting the capitated provider's methods or terminating its relationship with the provider.   Thus, UHMR and Ingenix knowingly submit, or cause the submission of, false risk adjustment claims to CMS.

221.   On information and belief, UHMR's capitated providers are knowingly submitting incorrect and/or unsubstantiated codes to Ingenix, for transmission to CMS. For example, Princeton IPA of San Antonio, a capitated provider within defendant WellMed, had a risk score of 1.383 in January 2010 among its 34,163 members (by January 2011, Princeton's risk score was 1.504 among 34,902 members).   Exhibit 11, incorporated herein.   Such a risk score suggested that WellMed's members were substantially sicker than average (CMS sets the risk score for an average Medicare beneficiary at 1).   UHMR knows that WellMed's unusually high risk score is in large part attributable to fraud.   For example, Relator learned in the fall of 2010, following an audit

conducted by Ingenix, that WellMed (Princeton IPA of San Antonio) routinely submits improper diagnoses.

222.    Relator has information and believes that WellMed maintains policies and practices designed to maximize its risk adjustment submissions without regard to their accuracy or eligibility.  WellMed allocates significant resources to increasing its risk adjustment payments, submitting data to IRADS through its own processing system, DataRap, which is designed to identify HCCs (and which UHMR previously used directly for a portion of its Texas membership).  In addition, WellMed previously conducted chart reviews on behalf of UHMR to identify codes for retroactive submission to CMS.

223.    As a further incentive to find and submit diagnoses, WellMed received kickbacks from United for submitting risk adjustment codes.  For example, WellMed's 2005 contract with PacifiCare (later United) included annual payments according to a payment schedule tied to increased risk scores.  Exhibit 12, incorporated herein.  (If WellMed's risk scores fell below a 2005 benchmark, no payment was due.)

224.    Moreover, PacifiCare agreed "to pay a[n additional] contingency for *maintaining* an increased HCCRAF [*i.e.*, risk] score." *Id.* at 12 (Emphasis added.)  Thus, if WellMed maintained United's high risk scores year over year, PacifiCare would pay WellMed an *extra* amount annually on top of the payment schedule.  These fees totaled $450,000 in 2006, between $3.1 and $3.5 million in 2007, $5.2 million in 2008, and $6.4 million in 2009.  As described *supra* ¶¶209–218, WellMed's contract contains an illegal kickback and motivated WellMed to report inflated risk scores.

225.    WellMed's risk adjustment practices gave it the highest projected risk score among UHMR's capitated providers with over 2,000 members in January 2010. On information and belief, WellMed knows, and has ample reason to know, that the risk adjustment information it submits to Ingenix is ineligible for transmission to CMS.

226.    Instead of imposing a corrective action plan on WellMed or terminating its contract, UHMR bought most of WellMed's business in 2011.  Thus, UHMR continues to submit—and has refused to correct previously submitted—diagnoses to CMS from WellMed, even though it knows many of those diagnoses are false, and has increased its revenue from WellMed's fraudulent coding by buying a stake in it.

227.    On information and belief, UHMR and Ingenix are aware that other capitated providers are submitting false risk adjustment data, based in part on UHMR's and Ingenix's policy and practice of conducting risk score studies and prevalence rate analyses.  UHMR's and Ingenix's course of conduct, however, has been to continue submitting—and to refuse to correct previously submitted—risk adjustment data to CMS for these capitated providers, even when they have identified the providers' information as suspect.

**F.      Ingenix and Its Commercial Customers Also Submit False Risk Adjustment Claims**

228.    Ingenix performs risk adjustment services for health plans other than United's.  The health plans include, without limitation, defendants Health Net, Arcadian, and Tufts.  The services Ingenix provides these plans include both processing and submitting risk adjustment claims to CMS using the flawed IRADS system and performing chart reviews for incremental codes.  Ingenix performs these services in the

same manner as it does for United, as discussed *infra*. As such, Ingenix knowingly submits, and causes to be submitted, false claims on behalf of its commercial clients.

229. Ingenix's commercial clients named as defendants in this Complaint know or have reason to believe that Ingenix's chart review practices are fraudulent. Their knowledge is in some instances direct.

230. For example, Ingenix told at least some clients that it was developing a system to start "looking both ways"—*e.g.*, to look for both incremental and inaccurate diagnoses during chart reviews (this system has not been adopted). Relator has information and believes that some of Ingenix's commercial clients, having opt-out clauses in their contracts, have told Ingenix that they will cease using Ingenix to submit their risk adjustment data if Ingenix decides to start "looking both ways."

231. Health Net, meanwhile, has told Ingenix that it would simply follow United's lead, agreeing to having Ingenix review its charts for incremental and incorrect codes only if and when United implemented such reviews.

232. In addition, defendants have reason to know that Ingenix ignores incorrect diagnoses when it performs chart reviews: when Ingenix reports chart review results to its clients, it reports thousands of additional diagnoses, but no delete codes. The defendants know the risk adjustment data they submitted to CMS was not 100% accurate and substantiated. By not identifying a single diagnosis to delete or replace, Ingenix clearly demonstrates to its clients that it disregards inaccurate and/or ineligible diagnoses.

## COUNT

### Substantive Violations of the Federal False Claims Act
### 31 U.S.C. §§ 3729(a)(1)(A)–(C), (a)(1)(G)

233.    Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 232 of this Complaint.

234.    This is a claim for treble damages and forfeitures under the Federal False Claims Act, 31 U.S.C. §§ 3279–33, as amended.

235.    Through the acts described above, Defendants their agents, employees, and co-conspirators, knowingly presented, or caused to be presented, to the United States false and fraudulent claims, and knowingly failed to disclose material facts, in order to obtain payment or approval from the United States and its contractors, grantees, and other recipients of its funds.

236.    Through the acts described above, Defendants, their agents, employees, and co-conspirators, knowingly made, used, and caused to be made and used false records and statements, which also omitted material facts, in order to induce the United States to approve and pay false and fraudulent claims.

237.    Through the acts described above, Defendants, their agents, employees, and co-conspirators, knowingly made, used, and caused to be made and used false records and statements material to an obligation to pay and transmit money to the United States, and knowingly concealed and improperly avoided and decreased an obligation to pay and transmit money to the United States.

238.    Through the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the United States and to deceive the United States for the purpose of getting the United States to pay or allow false or fraudulent claims.

239. The United States, unaware of the falsity of the records, statements, and claims made and submitted by Defendants, its agents, employees, and co-conspirators, and as a result thereof, paid money that it otherwise would not have paid.

240. By reason of the payment made by the United States, as a result of Defendants' fraud, the United States has suffered millions of dollars in damages and continues to be damaged.

## PRAYER

WHEREFORE, *qui tam* plaintiff Benjamin Poehling prays for judgment against defendants as follows:

1. That Defendants cease and desist from violating 31 U.S.C. §§ 3279–33;

2. That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' actions in violation of the Federal False Claims Act, as well as a civil penalty of $11,000 for each violation of 31 U.S.C. § 3729;

3. That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the Federal False Claims Act;

4. That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

5. That the United States and Relator receive all such other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands trial by jury.

DATED: March 24, 2011                    Respectfully submitted,


By:  /s/ Brian M. Melber
     Rodney O. Personius
     Brian M. Melber
     Personius Melber LLP
     2100 Main Place Tower
     Buffalo, NY 14202
     Tel: (716) 855-1050
     Fax: (716) 855-1052
     rop@personiusmelber.com
     bmm@personiusmelber.com

     Mary A. Inman
     Timothy P. McCormack
     Edward H. Arens
     Phillips & Cohen LLP
     131 Steuart Street, Suite 501
     San Francisco, California  94105
     Tel:  (415) 836-9000
     Fax: (415) 836-9001
     mai@pcsf.com
     tmccormack@phillipsandcohen.com
     eha@pcsf.com