# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, <u>EX REL.</u> [UNDER SEAL] | Civil Action No: 11-cv-0258-A |
| Plaintiff, | **FIRST AMENDED COMPLAINT** |
| v. | |
| [UNDER SEAL] | |
| Defendants. | |

## FILED IN CAMERA AND UNDER SEAL

## DO NOT ENTER IN PACER

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, <u>EX REL.</u> BENJAMIN POEHLING,<br><br>    Plaintiff,<br><br>v.<br><br>UNITEDHEALTH GROUP, INC., WELLMED MEDICAL MANAGEMENT, INC., HEALTH NET, INC., ARCADIAN MANAGEMENT SERVICES, INC., TUFTS ASSOCIATED HEALTH PLANS, INC., AETNA INC., BLUE CROSS AND BLUE SHIELD OF FLORIDA, INC., BLUE CROSS BLUE SHIELD OF MICHIGAN, BRAVO HEALTH, INC., EMBLEMHEALTH, INC., MANAGED HEALTH, INC., d/b/a HEALTHFIRST NEW YORK, HUMANA, INC., MEDICA HOLDING COMPANY, WELLCARE HEALTH PLANS, INC., and MEDASSURANT, INC.,<br><br>    Defendants. | Civil Action No: 11-cv-0258-A<br><br>**FIRST AMENDED COMPLAINT FOR VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729 <u>ET SEQ.</u>**<br><br>**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>**DO NOT ENTER IN PACER** |

For its complaint, the United States of America *ex rel.* Benjamin Poehling ("United States") alleges as follows:

## I.    INTRODUCTION

1.    This is an action to recover damages and civil penalties on behalf of the United States under the Federal False Claims Act, 31 U.S.C. §§ 3729–33 (the "FCA"), against UnitedHealth Group, Inc., WellMed Medical Management, Inc., Health Net, Inc., Arcadian Management Services, Inc., Tufts Associated Health Plans, Inc., Aetna Inc., Blue Cross and Blue Shield of Florida, Inc., Blue Cross Blue Shield of Michigan, Bravo

Health, Inc., EmblemHealth, Inc., Managed Health, Inc., d/b/a Healthfirst New York, Humana, Inc., Medica Holding Company, WellCare Health Plans, Inc. (collectively the "Health Plan Defendants") and MedAssurant, Inc. ("MedAssurant") (collectively hereafter collectively "Defendants").

2.      Defendants are now and have been, in some cases since at least 2006, engaged in a widespread scheme to knowingly submit, or cause to be submitted, false claims for payment to the United States by submitting false "risk adjustment" information to the Centers for Medicare & Medicaid Services ("CMS") in order to improperly increase the amounts CMS pays them or their clients. Likewise, Defendants have knowingly retained overpayments received from CMS as a result of their false risk adjustment submissions.

3.      The Medicare Advantage ("MA") program is designed to apply to Medicare a form of the "managed care" model commonly used by private health insurance companies. Under the managed care model, an employer or other organization seeking health care for its members—here the United States through the Medicare Program—pays a managed care organization a fixed fee to provide health services to its members. The payment is typically a per-member-per-month ("PMPM") rate, also known as a capitation rate. The managed care organization receiving capitation payments (often a hospital, physician group, or other health insurance company) is responsible for paying hospitals, physicians and all other medical providers for health care services provided to the members of the plan. This differs from traditional fee-for-service ("FFS") models, where the organization pays individual physicians, hospitals and other providers for each service they provide to the organization's members.

4.       Through the MA program, Medicare allows private health insurers to set up managed care plans to cover Medicare beneficiaries.  Medicare pays a monthly capitation rate for each beneficiary enrolled as a member of a MA plan.  MA plans must then use that money to pay hospitals, physicians and other health care providers for the services the plan members receive and cover the plans' administrative expenses.  Certain MA plans are also given money to pay for the plan members' prescription drugs.  Under both types of plans, CMS adjusts the capitation rate for each beneficiary to reflect that beneficiary's individual demographics (*e.g.*, age and gender), geographic location, and health status.

5.       The adjustment for each member's health status is one of the most significant components of the capitation rate.  Individuals with multiple and/or serious health conditions account for more healthcare costs than healthy members.  Accordingly, CMS pays a substantially higher capitation rate for members who have been recently treated for one or more serious, expensive diseases or conditions.  These increased payments are known as "risk adjustment" payments.  On average, CMS pays a MA plan close to $3,000 per year for each condition that a member has that requires a risk adjustment payment.

6.       To receive these risk adjustment payments, MA plans submit claims to CMS each year for each member for each qualifying disease or condition.  When the plan submits these claims, it must assert that the member received treatment in the twelve-month period before the payment year for the diagnosed condition from a qualified healthcare provider.  MA organizations may only submit a diagnosis for risk adjustment

253

that: (1) stems from a face-to-face visit; (2) with a qualified healthcare provider; (3) during the appropriate service period; and (4) is documented in a medical record.

7.      The Health Plan Defendants are engaged in systematic fraud in which they routinely:

(a)      "Upcode" risk adjustment claims by submitting claims for diagnoses that the member does not have or for which the member was not treated in the relevant year, or by claiming that a member was treated for a more serious condition than the member actually has; and

(b)      refuse to correct (and refuse to reimburse Medicare for) previously submitted risk adjustment claims when defendants discover, or in the exercise of reasonable care should discover, that those previously submitted claims were false.

8.      MedAssurant and United (through its subsidiary Ingenix) are engaged in systematic fraud by assisting and causing MA organizations, including many of the Health Plan Defendants, to submit fraudulent risk adjustment claims, and failing to correct (and reimburse Medicare) for previously submitted false claims.

9.      Through this fraudulent scheme, defendants have defrauded the United States of hundreds of millions—and likely billions—of dollars.

10.      Defendants' conduct alleged herein violates the federal False Claims Act. The federal False Claims Act (the "FCA") was originally enacted during the Civil War. Congress substantially amended the Act in 1986—and, again, in 2009 and 2010—to enhance the ability of the United States Government to recover losses sustained as a result of fraud against it.  The Act was amended after Congress found that fraud in

federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating government fraud, was in need of modernization. Congress intended that the amendments would create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

11.     The FCA prohibits, *inter alia*: (a) knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment or approval; (b) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim; (c) knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government; and (d) conspiring to violate any of these three sections of the FCA. 31 U.S.C. §§3729(a)(1)(A)-(C), and (G). Any person who violates the FCA is liable for a civil penalty of up to $11,000 for each violation, plus three times the amount of the damages sustained by the United States. 31 U.S.C. §3729(a)(1).

12.     For purposes of the FCA, a person "knows" a claim is false if that person: "(i) has actual knowledge of [the falsity of] the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. §3729(b)(1). The FCA does not require proof that the defendants specifically intended to commit fraud. *Id.* Unless otherwise

indicated, whenever the words "know," "learn," discover" or similar words indicating knowledge are used in this Complaint, they mean knowledge as defined in the FCA.

13.     Each claim for risk adjustment payments that defendants have submitted or caused to be submitted to CMS, where the patient was not treated, by a qualified provider, for that condition in the year in question, and/or the treatment and condition are not properly documented in the medical record is a false and/or fraudulent claim within the meaning of the FCA, so long as defendant knew that the claim was false when it was submitted, or the defendant later discovered its falsity and refused to correct the claim.

14.     The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery.  The FCA requires that the Complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

15.     Based on the foregoing laws, *qui tam* plaintiff Benjamin Poehling seeks, through this action, to recover damages and civil penalties arising from the false or fraudulent records, statements and/or claims that the Defendants made or caused to be made in connection with false and/or fraudulent claims for Medicare Advantage and Medicare Part D risk adjustment payments.

## II.     PARTIES

### A.     Plaintiffs

16.     Relator Benjamin Poehling is Director of Finance for UnitedHealthcare Medicare & Retirement ("UHMR"), a subsidiary of UnitedHealth Group ("UHG").  (This Complaint refers to UHG and its subsidiaries and affiliates collectively as "UHG" or "United.")  Prior to the fall of 2010, UHMR was known as Ovations, Inc. (unless

otherwise specified, this Complaint refers to Ovations, Inc. as UHMR when it is discussed as distinct from United).

17. Relator joined United in 2002 from Arthur Andersen, where he had participated in consulting engagements for UHG. In mid-2002, Relator joined United subsidiary Ingenix, Inc. ("Ingenix") in New Jersey. Relator transferred to UHMR in 2004, relocating to Minnesota. At UHMR, Relator has held a variety of positions within the Finance Department. When United's risk adjustment services were moved to Ingenix in mid-2007, Relator was assigned to be UHMR's day-to-day liaison with the risk adjustment segment at Ingenix. In this new position, Relator is responsible for coordinating with Ingenix to provide UHMR with risk adjustment services, described in depth below. The scope and workload of the assignment grew from a part-time responsibility (shared with his other duties) until Relator was working full-time with Ingenix on risk adjustment. During this period, risk adjustment was becoming increasingly important to UHG's revenue, and attracted increasing attention from UHG's and UHMR's senior management.

18. The United States, on whose behalf Relator brings this suit, is the real party in interest. The United States has ongoing contracts with defendants through CMS, in accordance with defendants' participation in the Medicare and Medicaid programs.

**B.     Defendants**

19. Defendant UnitedHealth Group Inc. ("UHG") is a Minnesota corporation headquartered in Minnetonka, Minnesota. For purposes of this Complaint, defendant UHG includes all subsidiaries and affiliates that do business with the United States, including without limitation UHMR (formerly Ovations), UnitedHealthcare Community & State ("UHCS" and formerly AmeriChoice), Ingenix (rebranded as OptimumInsight in

8

20.     UHG is the parent corporation for a large number of businesses within two basic market areas—health benefits and health services.   United's health benefits business, UnitedHealthcare, covers health insurance benefits in both public and private markets.   United's managed care company for the private sector is UnitedHealthcare Employer & Individual ("UHEI").   United's managed care companies for the public sector—Medicare and Medicaid—are UHMR and UHCS.   Together, UHMR and UHCS form United's Public & Senior Markets Group ("PSMG").   The health services business, meanwhile, offers various services to consumers and the health care industry, including United's health benefits companies.   The principal companies within health services, now known as Optum, are Ingenix, recently renamed OptumInsight (discussed below), which provides data services and consulting, OptumHealth, which provides a variety of specialty and ancillary services (such as dental and chiropractic benefits as well as acquiring provider groups), and Prescription Solutions, now named OptumRx, a pharmacy benefits manager.   UHG reports revenue in four segments: (a) UnitedHealthcare (UHEI, UHMR, and UHCS); (b) OptumHealth; (c) OptumInsight (formerly Ingenix); and (d) OptumRx (formerly Prescription Solutions).

21.     United—through its UHMR and UHCS subsidiaries—is the largest provider of health insurance coverage for Medicare beneficiaries pursuant to MA contracts with CMS.   United operates MA plans in all fifty states and the District of Columbia.    These MA plans covered approximately 2.2 million enrolled MA

9

beneficiaries. United is also the largest provider of Medicare Part D plans with an enrollment of over 4.7 million Medicare beneficiaries as of June 30, 2011. United additionally offers Medicare supplemental and hospital indemnity insurance plans, as well as various care services. United's revenue from UHMR (including the bulk of its Medicare Advantage business) was $32.1 billion in 2009 and $35.9 billion in 2010. This business segment accounted for 37% of UHG's total revenue in 2009 and 2010.

22.     United's Ingenix subsidiary offers data and consulting services to United companies as well as other insurance companies, hospitals, physicians, and others. Ingenix's revenues were $1.8 billion in 2009 and $2.3 billion in 2010. (Ingenix was renamed as OptumInsight in 2011, but is referred to herein as Ingenix unless otherwise noted.) Historically, risk adjustment services were provided to UHMR through a team located within the UHMR business unit. In 2007, United moved its risk adjustment services group, or Clinical Assessment Solutions ("CAS"), to Ingenix. (CAS has changed titles several times. It has also operated as Advanced Clinical Solutions ("ACS"), Clinical Performance Solutions ("CPS"), and, currently, Clinical Performance & Compliance ("CPC").)

23.     Between August 2006 and June 2011, Medicare Part C beneficiaries enrolled in UHG plans resided in the Western District of New York for approximately 308,078 "person-months." Each person-month equates to one month of a Part C beneficiary's enrollment in a United health plan.

24.     Defendant WellMed Medical Management, Inc. ("WellMed") is a Texas corporation headquartered in San Antonio, Texas. WellMed provides healthcare benefits for United's Medicare members in certain regions pursuant to a capitation agreement

25.     Defendant Health Net, Inc. ("Health Net") is a Delaware corporation headquartered in Woodland Hills, California.  Health Net operates MA plans pursuant to contracts with CMS.  Currently, Health Net has approximately 203,000 members enrolled in its MA plans.  United holds a contract with Health Net whereby United submits Health Net's risk adjustment data to CMS and performs additional risk adjustment services, including chart reviews, as described below.  Between August 2006 and June 2011, Health Net plan members resided in the Western District of New York for approximately 24,960 Part C "person-months." For purposes of this Complaint, defendant Health Net includes all subsidiaries and affiliates that do business with the United States.

26.     Defendant Arcadian Management Services, Inc. ("Arcadian") is a Delaware corporation headquartered in Oakland, California.  Arcadian operates MA plans pursuant to contracts with CMS, covering approximately 64,000 MA beneficiaries. Until approximately August 2011, United held a contract with Arcadian whereby United submitted Arcadian's risk adjustment data to CMS and performed additional risk adjustment services, including chart reviews, as described below.  In August 2011, Arcadian was acquired by defendant Humana, Inc., and terminated its contract with United for risk adjustment services around that time.  Between August 2006 and June 2011, Arcadian plan members resided in the Western District of New York for

approximately 3,690 Part C "person-months." For purposes of this Complaint, defendant Arcadian includes all subsidiaries and affiliates that do business with the United States.

27. Defendant Tufts Associated Health Plans, Inc. ("Tufts") is a Delaware corporation headquartered in Waltham, Massachusetts. Tufts operates MA plans pursuant to contracts with CMS, covering approximately 88,000 MA beneficiaries. United holds a contract with Tufts whereby United submits Tufts' risk adjustment data to CMS and performs additional risk adjustment services, including chart reviews, as described below. Between August 2006 and June 2011, Tufts plan members resided in the Western District of New York for approximately 423 Part C "person-months." For purposes of this Complaint, defendant Tufts includes all subsidiaries and affiliates that do business with the United States.

28. Defendant Aetna Inc. ("Aetna") is a Pennsylvania corporation headquartered in Hartford, Connecticut. Aetna offers a broad range of health insurance products including MA and Medicaid managed care plans. Aetna's MA plans cover over 400,000 individuals. Between August 2006 and June 2011, Medicare Part C beneficiaries enrolled in Aetna plans resided in the Western District of New York for approximately 28,380 "person-months." For purposes of this Complaint, defendant Aetna includes all subsidiaries and affiliates that do business with the United States.

29. Defendant Blue Cross and Blue Shield of Florida, Inc. ("BCBS Florida") is a health insurance provider headquartered in Jacksonville, Florida. BCBS Florida's plans have a total enrollment of over 3 million members, including over 55,000 members enrolled in MA plans. Between August 2006 and June 2011, BCBS Florida plan members resided in the Western District of New York for approximately 1,229 Part C

"person-months." For purposes of this Complaint, defendant BCBS Florida includes all subsidiaries and affiliates that do business with the United States.

30.     Defendant Blue Cross Blue Shield of Michigan ("BCBS Michigan") is a Michigan non-profit health care corporation headquartered in Detroit, Michigan. BCBS Michigan's plans cover approximately 4.3 million members, including over 260,000 MA beneficiaries. Between August 2006 and June 2011, BCBS Michigan's MA plan beneficiaries resided in the Western District of New York for approximately 1,448 Part C "person-months." For purposes of this Complaint, defendant BCBS Michigan includes all subsidiaries and affiliates that do business with the United States.

31.     Defendant Bravo Health, Inc. ("Bravo"), headquartered in Baltimore, Maryland, is an organization offering MA plans. Bravo's MA plans cover approximately 100,000 Part C members. Between August 2006 and June 2011 Bravo health plans' beneficiaries resided in the Western District of New York for approximately 312 Part C "person-months." On November 30, 2010, Bravo was acquired by HealthSpring, Inc., a Delaware corporation headquartered in Franklin, Tennessee. HealthSpring, Inc., like Bravo, operates managed care plans with a focus on Medicare. For purposes of this Complaint, defendant Bravo includes all subsidiaries and affiliates that do business with the United States.

32.     Defendant EmblemHealth, Inc. ("Emblem") is a health maintenance organization and health insurance company headquartered in New York, New York. It was formed in 2006 by the merger of Group Health Incorporated and HIP Health Plan of New York, at which time it became a for-profit company. As of 2011, EmblemHealth and its subsidiaries (including HIP Health Plan of New York and ConnectiCare) served

more than 3.7 million members, including over 170,000 MA beneficiaries. Between August 2006 and June 2011, members covered by Emblem's Medicare Advantage plans resided in the Western District of New York for approximately 3,594 "person-months." For purposes of this Complaint, defendant Emblem includes all subsidiaries and affiliates that do business with the United States.

33.     Defendant Managed Health, Inc., d/b/a Healthfirst New York ("Healthfirst"), is a New York non-profit corporation headquartered in New York, New York. Healthfirst operates a variety of health plans including plans that cover nearly 95,000 MA beneficiaries. Between August 2006 and June 2011 Healthfirst's Part C beneficiaries resided in the Western District of New York for approximately 589 "person-months." For purposes of this Complaint, defendant Healthfirst includes all subsidiaries and affiliates that do business with the United States.

34.     Defendant Humana Inc. ("Humana") is a Delaware corporation headquartered in Louisville, Kentucky. Humana offers a wide range of health insurance products, including MA and Medicaid managed care plans. Humana's total enrollment in its medical insurance plans totals over 10.2 million members with over 1.6 million enrolled in MA plans. Between August 2006 and June 2011, Humana's Part C covered beneficiaries resided in the Western District of New York for approximately 71,549 "person-months." For purposes of this Complaint, defendant Humana includes all subsidiaries and affiliates that do business with the United States.

35.     Defendant Medica Holding Company ("Medica") is a Minnesota non-profit holding company headquartered in Minnetonka, Minnesota. Its family of businesses include Medica Health Plans, Medica Health Plans of Wisconsin, Medica

14

Insurance Company, Medica Self-Insured, and Medica Health Management, LLC. Through its companies, Medica provides coverage to 1.6 million members, including over 126,000 members enrolled in MA plans. Between August 2006 and June 2011, Medica's Part C plan beneficiaries resided in the Western District of New York for approximately 1,813 "person-months." For purposes of this Complaint, defendant Medica includes all subsidiaries and affiliates that do business with the United States.

36. Defendant WellCare Health Plans, Inc. ("WellCare") is a Delaware corporation headquartered in Tampa, Florida. WellCare provides managed care health plans targeted to government-sponsored health care programs, including MA and Medicaid plans. As of June 30, 2011, the company served approximately 2.4 million members nationwide, including approximately 130,000 MA members. WellCare has regional offices in seven states, including New York. Between August 2006 and June 2011, WellCare represented members in the Western District of New York for approximately 171,040 Part C "person-months." For purposes of this Complaint, defendant WellCare includes all subsidiaries and affiliates that do business with the United States.

37. Defendant MedAssurant, Inc. ("MedAssurant") is a privately held company headquartered in Bowie, Maryland. MedAssurant provides risk adjustment services, including chart review and data submission, to numerous health plans that offer MA coverage. MedAssurant has numerous clients in, and routinely does business, including business involving Medicare risk adjustment, in the Western District of New York. For purposes of this Complaint, defendant MedAssurant includes all subsidiaries and affiliates that do business with the United States.

15

## III. JURISDICTION & VENUE

38.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. § 3730.

39.     This Court has personal jurisdiction over the Defendants, pursuant to 31 U.S.C. § 3732(a), as one or more Defendants can be found in, reside in, transact business in, and have committed acts related to the allegations in this Complaint in the Western District of New York.  For example, United's SecureHorizons Medicare Advantage plan operates in the Western District of New York.  Additionally, each of the Defendant health plan issuers knowingly represented beneficiaries located in the Western District of New York.

40.     Venue is proper, pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b)–(c), as the Defendants can be found in, reside in, and/or transact business in the Western District of New York, and because many of the violations of 31 U.S.C. § 3729 discussed herein occurred within this judicial district.

## IV. LEGAL BACKGROUND

41.     Medicare is a federally-funded health care program primarily serving people age 65 or older.  Initially created in Title XVIII of the Social Security Act of 1965, Medicare now has four Parts, A through D.  The two original components of Medicare are Part A, which covers inpatient hospital costs and related services, and Part B, which covers outpatient health care costs, such as physicians' fees.

42.     Traditionally, Medicare operates on a fee-for-service basis, meaning that Medicare directly pays hospitals, physicians and other health care providers for each service they provide to a Medicare beneficiary.  Medicare beneficiaries are generally

16

required to pay some portion of many of these services in the form of copayments, deductibles, coinsurance, or other set fees (collectively known as the members' "out of pocket" expenses).

43. In 1997, Congress created Medicare Part C, which provides similar benefits to Medicare members, but does so based on a managed care model, rather than the traditional fee-for-service model. Under Part C, rather than pay providers directly, Medicare pays private managed care plans (later named "Medicare Advantage" or "MA" plans) a capitation rate (per member per month) and those plans are responsible for paying providers for the services they provide to members of that specific MA plan.

44. MA plans must provide Medicare beneficiaries benefits at least equivalent to those they would have received under the traditional Medicare Parts A and B. Depending on the structure of the plan, MA plans may also provide additional benefits beyond what traditional Medicare would have covered, such as dental care, or cover some or all of their members' out of pocket expenses associated with basic Medicare Parts A and B services.

45. In 2003, Congress passed the Medicare Prescription Drug, Improvement, and Modernization Act, creating Medicare Part D which provides prescription drug coverage. Although a limited number of Medicare Part D plans are operated under a cost-reimbursement contract, the plans are generally financed under a managed care model. These managed care model plans are provided under both Part D prescription drug plans, which offer only prescription drug coverage, and Part C plans, which integrate the prescription drug coverage with the traditional Part C health care coverage.

46. This Complaint refers, collectively, to Medicare Advantage plans with and without Part D coverage, and stand-alone managed care Medicare Part D Plans as "Medicare Advantage Plans" or "MA Plans."

**A.    Calculation of MA Plan Capitation Rates**

47. The capitation rates Medicare pays to MA plans are determined based on a process involving consideration of past and expected future medical expenses, the location of the plan's actual and expected members, the health status and demographics of those members and whether the plan will include any additional benefits.  That process is summarized in Medicare regulations as follows:

> In short, under the bidding methodology each plan's bid for coverage of Part A and Part B benefits (*i.e.*, its revenue requirements for offering original Medicare benefits) is compared to the plan benchmark (*i.e.*, the upper limit of CMS' payment, developed from the county capitation rates in the local plan's service area or from the MA regional benchmarks for regional plans). The purpose of the bid-benchmark comparison is to determine whether the plan must offer supplemental benefits or must charge a basic beneficiary premium for A/B benefits.

Medicare Managed Care Manual ("MMCM"), ch. 8, § 60.

48. In other words, it is a three-step process involving: (a) development of the MA plan's bid rate; (b) review of the CMS benchmark rate; and (c) comparison of those two rates to develop the base capitation rate and determine whether any adjustments in the plan benefits or member premiums are required.

49. First, the MA plan develops a bid rate.  This rate is the amount that the MA plan expects it will be required to pay to provide Medicare Parts A and B benefits to

18

a hypothetical average member of the plan. This estimate must be based on either the MA plan's prior experience covering Medicare members, or an actuarially validated data analysis of expected costs. To represent an "average" plan member, the bid rate must make adjustments to standardize the effect of expected geographic diversity (because some areas are more expensive than others) and the relative health status (*i.e.*, the number and nature of chronic conditions) of the members whose claims experience provided the basis for the bid. The bid rate also includes an amount that the MA plan expects to spend on administrative costs, and a profit margin.

50. The mechanism for standardizing the bid for individuals' demographic factors and health status is known as the "risk score." It is an artificial score that CMS assigns to every beneficiary. CMS starts with a score of zero, and then adds points for the beneficiary's demographic condition (such as age and gender) and individual disease states (such as diabetes or congestive heart failure). The average risk score is one, with most Medicare beneficiaries having scores under three. The risk score model is designed so that a population with an average risk score of two would be expected to use twice as much health care (in dollars) as a population with a score of one. The bid rate the MA plans develop must reflect the amount they will require to provide services to a hypothetical population with a risk score of one.

51. Second, the MA plan must review the Medicare benchmark rate provided by CMS. This rate is the amount that the Medicare program would spend to provide Parts A and B benefits to an average member in the geographic area covered by the MA plan's bid. The benchmark rate also includes several other adjustments, including until

19

268

recently a bonus payment to incentivize health insurance companies to enter the MA market.

52.     Third, the bid rate and the benchmark rate are compared to determine whether the MA plan must charge its members a premium, or, instead, if it must offer them enhanced benefits.  If the bid rate is greater than the benchmark rate, Medicare will only pay the MA plan the benchmark rate per member per month.  That benchmark rate becomes the base capitation rate that CMS pays the MA plan for a member with a 1.0 risk score (described below).  The MA plan must then charge the beneficiaries who join its plan a monthly premium in order to make up the shortfall between the bid rate and the base capitation rate.  *See* MMCM, ch. 8, § 60.1.

53.     If, on the other hand, the bid rate is less than the benchmark rate, then the bid rate becomes the base capitation rate.  The difference between the benchmark rate and the bid rate is then split between the MA plan and the Medicare program.  The first 25% of the difference is retained by the Medicare program as plan savings.  The remaining 75% is returned to the MA plan, which must use the rebate to either provide enhanced benefits to its plan members or to cover the members' out of pocket expenses.  In the end, then, in such situations, the base capitation rate equals the bid rate, plus the MA plan receives 75% of the difference between the bid rate and the benchmark rate.

54.     Medicare does not, however, pay the plans the base capitation rate.  Instead, when payments are actually made, the base capitation rate is adjusted, for each member, to reflect his or her actual age, gender, location, and, most important, health status.

55.     MA plans must rebid their rates every year.

### B.  Calculation of Part D Plan Capitation Rates

56.  The process of calculating the capitation rates for the Part D portion of MA plans is very similar to the process used for the base portion of the MA rate. Annually, the plan develops and submits a bid rate based on the plan's estimate of the monthly revenue requirements it will require to provide qualified prescription drug coverage for an average, eligible individual.  42 C.F.R. § 423.265(c).  As for the base MA rate, a Medicare prescription drug coverage plan's average monthly bid rate is adjusted to take into account the geographic differences in pricing and the relative health status of the members on whom the bid calculation was based.

57.  The risk score calculations for the Medicare Part D portion of the plans mirror the calculation for the basic MA rate, determined by each beneficiary's demographic information and health status.  Each plan's bid must reflect the revenue the plan will require to provide services to a population of "average" members, *i.e.*, those with a risk score equal to one.

### C.  Risk Adjustment Depends on Accurate, Substantiated Health Condition Codes

58.  As described above, CMS pays MA plans at a capitation rate that reflects, among other things, each member's health status.  The process of adjusting the capitation rate to reflect a member's disease states is known as risk adjustment.  Risk adjustment is intended to improve the accuracy of the payments CMS makes to these plans.  To this end, CMS pays a higher future premium for enrollees whom the MA plan represents have been treated for certain diseases and conditions in the current year, based on the expectation that those enrollees will require treatment and/or management for the conditions in the following year.  *See 2008 Risk Adjustment Training for Medicare*

*Advantage Organizations Participant Guide* ("*Participant Guide*"), at 6.4.1 (for purposes of this Complaint, "treatment" is defined as treatment and management within the meaning of the *Participant Guide*).

59.     Conversely, CMS pays a lower premium for enrollees who, although they may have certain typically expensive conditions, did not require care, treatment or management for those conditions in the current year.  For these patients, the risk adjustment methodology assumes that because their condition did not require treatment in the current year, it has improved or otherwise changed so that it is not expected to require treatment in the following year.

60.     As a practical matter, the CMS risk adjustment model evaluates enrollee health (and establishes risk adjustment payment rates) using diagnosis classifications set forth in the International Classification of Diseases, 9th Edition, Clinical Modification ("ICD-9-CM") system.  The ICD-9 system assigns each diagnosis a specific code.  Under the MA model, these individual diagnosis codes are then organized into groups, called Hierarchical Condition Categories ("HCCs").  MMCM, ch. 8, § 50.  Every HCC consists of several ICD-9-CM diagnosis codes that are clinically related and are expected to require a similar level of resources to treat.  *Id.*  For example, there are five HCCs for patients with diabetes: HCC 15 (diabetes with renal or vascular manifestation); HCC 16 (Diabetes with Neurologic or Other Specified Manifestation); HCC 17 (Diabetes with Acute Complications); HCC 18 (Diabetes with Ophthalmologic or Unspecified Manifestation); and HCC 19 (Diabetes without Complication).  Generally speaking, patients grouped in HCC 15 have the most serious manifestations associated to their diabetes, and are expected to cost the most to treat.  Patients in HCC 19 have the least

271

cost-intensive type of diabetes, and therefore the CMS risk adjustment system provides a smaller enhanced payment for these patients.

61.    CMS has used the same model for the Part D portion of risk adjustment. However, because certain diagnoses will be expected to increase liability for prescription drugs covered under Part D, but not hospital costs and physician fees covered under Part C, and vice versa, a distinct list of Hierarchical Condition Categories ("RxHCCs") with corresponding diagnosis codes was created for Medicare's Part D risk adjustment. *See* Participant Guide at 8.2.5.2. For example, RxHCC 75 represents Attention Deficit Disorder, a condition predicted to increase drug spending. However, because Attention Deficit Disorder is unlikely to result in hospitalization, RxHCC 75 has no corresponding HCC. On the other hand, HCC 77, Respirator Dependence/ Trachostomy Status, a condition category predictive of Medicare Part C medical costs, but not necessarily predictive of Part D drug expenses, has no RxHCC equivalent.

62.    Although the HCC and RxHCC systems are not identical, they do have significant overlap. Certain HCCs have equivalent RxHCCs, meaning that the condition categories consist of identical ICD-9-CM diagnosis codes. For example, HCC 5 (Opportunistic Infections) is equivalent to RxHCC 2 (Opportunistic Infections), and HCC 37 (Bone/Joint/Muscle Infections/Necrosis) is the equivalent of RxHCC 39 (Bone/Joint/Muscle Infections/Necrosis). Even where they are not identical, most HCCs overlap with one or more RxHCCs. For example, of the thirty-seven diagnosis codes that fall within HCC 45 (Disorders of Immunity), twenty-seven fall within RxHCC 52 (Disorders of Immunity), seven fall within RxHCC 51 (Severe Hematological Disorders),

and three do not fall within any RxHCCs. Thus, the majority of ICD-9-CM diagnosis codes that capture an HCC will also capture an RxHCC.

63. An individual ICD-9-CM code included in the HCC system for a particular member corresponds on average to nearly $3,000 in extra revenue for the plan over the course of the following year for that member. So, for example, if a MA plan like United with 2.1 million members submitted just one incremental HCC-based diagnosis code per member to CMS, it would result in approximately $6.3 billion in additional capitation payments from CMS.

64. Because submitting incorrect diagnosis codes increases risk adjustment payments, CMS requires MA plans to follow strict guidelines when submitting codes. *See, e.g.*, *2008 Risk Adjustment Training for Medicare Advantage Organizations Participant Guide*.

65. CMS requires that the patient must have been treated for the relevant diagnoses during a face-to-face encounter with an eligible provider, such as a physician, physician extender, or hospital, during the year in question.

66. Only services provided by an eligible provider type may be included. CMS expressly prohibits MA plans from submitting "risk adjustment diagnoses based on any diagnostic radiology services" or laboratory services. *Participant Guide*, at 3.2.2, 4-3. The reason CMS prohibits MA plans from submitting codes based on radiology charts, for example, is that "[d]iagnostic radiologists typically *do not document confirmed diagnoses*. Confirmed diagnoses come from referring physician or physician extenders." *Id.*, at 4-3 (emphasis added). Because radiologists generally list on their charts the diagnoses a doctor wants them to look for, not which diagnoses the patient actually has,

CMS excludes radiology services as a valid provider type (*i.e.*, source of risk adjustment data).

67.     The treating provider must document the facts supporting the coded diagnosis in the patient's medical record and sign and date the record.  At a minimum, the plan must record five elements for submission to CMS:

(a) the member's Health Insurance Claim ("HIC") number; (b) the ICD-9-CM diagnosis code;

(c) the "service from" date;

(d) the "service through" date; and

(e) the provider type.

68.     MA plans are responsible for the content of risk adjustment data submissions to CMS, regardless of whether they submit the data themselves or through an intermediary.  *Participant Guide*, at 3-13.  Before submitting data to CMS, MA plans are required to filter the data "to ensure that they submit data from only appropriate data sources."  *Participant Guide*, at 4-11.  For example, filters should include checking that physician data comes from face-to-face encounters with patients and ensuring that data does not come from non-covered providers, such as diagnostic radiology services.

69.     MA plans that filter risk adjustment claims by CPT codes must also filter the data to ensure that only diagnoses treated through approved procedure types are included.  *Id.* at 4-11.  MA organizations typically classify professional (*e.g.*, physician) procedures using Current Procedural Terminology ("CPT") codes and institutional procedures using revenue codes.  These codes show whether the type of service in

question was a face-to-face procedure such as a physical examination, or a non-qualifying remote procedure, such as a laboratory test or radiology exam.

70.     MA plans are required to correct the risk adjustment data they submit to CMS.  When the MA plan learns that information in a risk adjustment claim (*i.e.*, HIC number, diagnosis code, service dates, and provider type) contains an error, it must submit a "delete record" to CMS for that claim.

71.     CMS also requires that diagnosis codes used as the basis for a risk adjustment claim be substantiated through documentation in a medical record.  Upon request by CMS, MA plans must provide documentation to support each diagnosis and substantiate that the provider followed proper coding guidelines.  *Id.* at 6-5; 5-52.

72.     In general, CMS sets risk scores based on risk adjustment data submitted for services provided during the year preceding the payment year.  42 C.F.R. §§ 422.310(g), 423.329(b)(3).  The annual deadline for submitting risk adjustment data to CMS is in early September.  *Id.*  The data submitted by the September deadline determines members' preliminary risk scores for the following year.

73.     Despite the September deadline, CMS accepts submissions of risk adjustment data for a period after the end of service year and, through a reconciliation process, adjusts its payments to the MA plan retroactively to account for codes submitted after the September deadline.  MA plans are allowed to submit risk adjustment data until after the end of the payment year.  After the payment year ends, CMS recalculates the risk score for any members for whom the MA plan made a retroactive submission.

74.     Thus, for example, the capitation rates for 2010 are based on the MA plans' members' health status (diagnosis codes) from 2009.  The initial submission

26

deadline for the 2009 diagnosis codes was September 4, 2009 and the final submission deadline was January 31, 2011. Thus, CMS calculated members' initial risk factors for 2010 based on the September 4, 2009 data, but MA plans were allowed to continue to submit 2009 diagnoses until January 31, 2011. After that date, for every member with a newly-submitted diagnosis, CMS recalculated the risk score and reconciled the member's payments in 2010 with the amount it would have paid at the new score.

75. To test the validity of MA plan risk adjustment data, CMS conducts Risk Adjustment Data Validation ("RADV") audits after the MA plan's final deadline for submitting risk adjustment data for the payment year. During such audits, CMS "validates" some of the MA plan's HCC scores by reviewing the medical records that the plan contends support the claimed diagnosis codes. *Id.* at 7-1. To facilitate the RADV audits, MA plans are required to submit to CMS medical records and coversheets for each sampled enrollee, including the "one best medical record" supporting each HCC. *Id.* at 7-9.

76. Historically, CMS has not extrapolated RADV audit results to the plan as a whole. (CMS has recently proposed moving toward extrapolation of RADV results.) Instead, CMS has merely sought repayment for those risk adjustment claims found to be false during the RADV audit. Because RADV audits generally used relatively small samples—a few hundred risk adjustment claims—the potential risk to MA plans, should they be found to have submitted false risk adjustment claims, has been relatively small. Without meaningful financial penalties, MA organizations have generally seen little incentive to conform to CMS's risk adjustment rules. The fraudulent practices described

27

in this Complaint are a product of the belief, common among MA organizations, that the law could be violated without meaningful consequence.

### D. CMS Requires MA Plans To Certify the Validity of Their Bid Rates and Risk Adjustment Data To Prevent Fraud

77.     In recognition of the fact that the integrity of the capitation rates depends on the integrity of the actuarial information used by the MA plans in developing their bid rates, and to otherwise guard against fraud, CMS requires MA organizations to submit three separate attestations, each signed by the CEO or CFO (or their authorized, direct subordinate).  These attestations are a condition that the MA plans must meet to be eligible to receive any capitation payments from CMS.

78.     The first attestation, which the MA organization submits on a monthly basis, requires the MA organization to "attest based on best knowledge, information, and belief that each enrollee for whom the MA Organization is requesting payment is validly enrolled, or was validly enrolled during the period for which payment is requested, in an MA plan offered by the MA Organization."

79.     The second attestation, which is submitted annually, requires the MA organization to attest that the risk adjustment data it submits annually to CMS is "accurate, complete, and truthful."  The attestation acknowledges that risk adjustment information "directly affects the calculation of CMS payments . . . and that misrepresentations to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution."  The regulations also provide that if the claims data are generated by a "related entity, contractor, or subcontractor of an MA organization," that entity must similarly certify the "accuracy, completeness, and truthfulness of the data."  42 C.F.R. §422.504(l)(2).

80. The third attestation is the MA organization's certification "that the information and documentation comprising the bid submission proposal is accurate, complete, and truthful and fully conforms to the Bid Form and Plan Benefit Package requirements; and that the benefits described in the CMS-approved proposal bid submission agree with the benefit package the MA Organization will offer during the period covered by the proposal bid submission."

81. MA organizations must also submit bid submission attestations, certifying "that the information in its bid submission and assumptions related to projected reinsurance and low income cost sharing subsidies is accurate, complete, and truthful and fully conforms to the [bid submission regulations]."

### E. The False Claims Act Contains a Duty to Correct Known Errors

82. The False Claims Act contains an independent requirement to correct errors that will cause, or have caused, a government overpayment. The Act attaches liability to anyone who knowingly makes, uses, or causes to be made or used, a false statement or record material to an obligation to pay or transmit money to the government, or who knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money to the government. 31 U.S.C. § 3729(a)(1)(G).

83. Accordingly, MA plans not only have a duty not to submit incorrect data to CMS, but also, for data they have already submitted, must delete the records from CMS's database using a "delete code."

## V. BACKGROUND

### A. UnitedHealth Group

84. United is the largest provider of MA plans nationwide, covering benefits under Medicare Parts C and D in all fifty states and in most U.S. territories. United had

6.8 million individuals enrolled in its MA plans (Part C and Part D) at the end of 2010. The MA plans are operated by UHMR and UHCS and offered to Medicare beneficiaries under such brand names as, for example, SecureHorizons, AmeriChoice, Evercare, AARP MedicareRx and UnitedHealth Rx.

85.     United has expanded rapidly since its founding in 1977.  The company's growth in recent years has been driven by acquisitions, nowhere more so than in its Medicare business.  These acquisitions included the 2004 purchase of Oxford Health Plans, the 2005 acquisition of PacifiCare Health Systems, and the 2007 acquisition of Sierra Health Services, Inc.

86.     Recently, United has also been expanding vertically by acquiring provider groups who care for many of the patients in United's MA plans.  Foremost among these purchases was the 2011 purchase of WellMed, a large physician-owned practice management company located primarily in Texas.

87.     United has organized its businesses into two primary segments: health plans and health services, as described above.  *See* ¶¶20–22.  Within the health services segment, Ingenix provides risk adjustment services (and other services) to United's MA plans and also sells those same services commercially to other MA plans.

88.     Ingenix submits or previously submitted diagnosis codes for risk adjustment to CMS on behalf of UHMR and UHCS as well as on behalf of commercial clients including, for example, Health Net, Arcadian, Tufts, and Medica.  United relocated its risk adjustment team from UHMR to Ingenix to enable these commercial deals, as well as to allow UHMR and UHCS to charge their risk adjustment costs with markups to CMS on their annual bids.

89.     At every level, United is driven by a corporate culture that demands and rewards financial success from its employees.  The risk adjustment practices described in this Complaint are attributable in large part to these demands and rewards.  As to demands, United evaluated many of its employees, including Relator, until recently on their success at "maximizing revenue" by increasing risk scores.  United gave Relator as well as clinical staff specific goals for increasing risk scores.  Relator's March 30, 2008 review, for example, evaluated him against United's "business goal" of increasing risk scores by 3%.  There were no similar performance goals for the overall accuracy of risk adjustment submissions.  Nor was there any accountability assigned for reducing the number of false claims submitted to CMS.

90.     For rewards, United tied its performance incentives directly to risk score increases.  These incentives have been at the center of United's risk adjustment practices.  Relator, for example, received a $15,000 bonus in 2010 for his work to meet UHMR's target of $100 million in additional internal operating income ("IOI") from risk adjustment payments.  His bonus, however, paled in comparison to the incentives offered to those higher up in the company.  Optum CEO (and former CEO of UHMR) Larry Renfro received a compensation package in 2010 that included a potential bonus, called a "cash incentive award," which tied his earnings to revenue, IOI, and provider satisfaction.  Increasing risk scores met all three objectives.  Mr. Renfro's 2010 cash incentive award was $900,000—150% of his bonus target.  In 2011, Mr. Renfro received a $1.4 million cash incentive award, which was made in consideration of his "successful execution of a major multi-track Medicare remediation initiative," of which increasing United's risk score was a substantial component.

91.     During Mr. Renfro's term as UHMR's CEO, UHMR set revenue and IOI targets based on risk adjustment and entered into agreements with providers that offered financial rewards for increasing risk scores.  As discussed below, many of the policies and practices United used to achieve these goals were fraudulent.  Despite misgivings expressed by various United personnel, however, United took no action to stop its misconduct.  Lack of independence contributed to the problem.  For example, PSMG's Chief Compliance Officer, David Orbuch, reported not to the Board of Directors, but to Mr. Renfro.

92.     United aligned the incentives of its entities, staff, and vendors to increase risk scores.  Ingenix had an incentive to increase the number of risk adjustment claims (based on incremental/newly-found diagnosis codes) it submitted to CMS for payment under the terms of its Service Level Agreement with UHMR.  The Agreement provided for base payments plus a significant "incentive fee" tied to risk score increases.  Exhibit 2, incorporated herein.

93.     In 2009, United changed to a more fixed-fee arrangement with Ingenix.  Ingenix, however, continues to receive incentive fees based on risk score increases from at least one of its commercial clients, Health Net.

94.     In addition, the managers responsible for Ingenix's risk adjustment program (now called CPC), including Jeff Dumcum, Paul Bihm, and Stephanie Will, had employment agreements with United that included financial incentives based on increased risk scores.  Furthermore, United gave incentives to its healthcare providers and vendors.  As described below, for example, United (PacifiCare at the time) entered into an agreement with WellMed, such that WellMed's data subsidiary, DataRap, would

281

95.     United's senior management push relentlessly to increase United's revenue from risk adjustment. Tellingly, UHMR has assigned risk adjustment to its Finance Department, not one of its clinical departments. (Relator was assigned to his job despite having no clinical background.) In 2010 and 2011, UHMR has implemented projects referred to as "remediation plans", "focus area projects," or "affordability agendas" to increase IOI.

96.     The remediation plan for 2010 called for $800 million in additional IOI, $100 million of which was to come from increased risk adjustment revenue. In 2011, the additional IOI target from risk adjustment rose to approximately $125 million.

97.     While speaking at the Citi 2011 Global Healthcare Investor conference on March 2, 2011, UHMR's CEO, Tom Paul, commented that United's 2010 affordability agenda allowed United to not raise premiums or cut benefits, while still achieving business objectives. He went on to say the affordability agenda will continue in 2011 and beyond. These remediation plans are merely United's latest effort to exploit risk adjustment's large revenue potential. As described below, United has engaged in a course of conduct since at least 2006 to maximize its risk adjustment payments from CMS. For much of the past decade, United's attitude may be summarized by an email from former UHMR CFO Jerry Knutson to Ingenix's Jeff Dumcum:

> Wanted to get together with you and discuss what we can do in the short term and long term to really go after the potential risk scoring you have consistently

33

indicated is out there. . . . You mentioned vasculatory disease opportunities, screening opportunities, etc with huge $ opportunities. Lets turn on the gas!

Exhibit 3, incorporated herein.

### B.  MedAssurant, Inc.

98.  MedAssurant is a large data analytics company that offers a variety of product solutions to clients in the health care industry, including local and national health plans, care delivery networks, employers, pharmaceutical companies and government organizations. MedAssurant's earliest component was formed in Michigan in 1998, but its significant growth and expansion began in 2005 after the company launched its portfolio of data aggregation, abstraction, validation, and analysis toolsets in response to demand from the changing market. Today, MedAssurant operates in all 50 states, Puerto Rico, and the District of Columbia, in over 99.5% of counties across the U.S., and partners with nearly 200 managed care organizations touching millions of members.

99.  At the heart of many of MedAssurant's solutions is the company's healthcare data warehouse which stores client data dating back to at least January 2006. As of 2008, the database held data pertaining to more than 450 million member-months of member clinical, laboratory, pharmacy, medical product utilization, and encounter data.

100.  MedAssurant organizes its product solutions into four categories: (1) Clinical and Quality Outcomes; (2) Claims & Payment Integrity; (3) Care Coordination & Enhancement; and (4) Healthcare Data Insights. This Complaint addresses fraudulent practices within MedAssurant's risk adjustment and claims submission services, which fall under the "Claims & Payment Integrity" category (formerly known as "Claims Analytics and Risk Adjustment").

34

283

101.    Although MedAssurant promises MA risk score improvement through a variety of its products, only its Capitation Risk Adjustment ("CARA") solutions are marketed as complete "end-to-end" risk adjustment solutions.  MedAssurant provides its CARA solution clients services that are designed to "identify, analyze, pursue, and document valid diagnoses not otherwise properly or fully captured by a plan's primary claims systems."

102.    Broadly speaking, the CARA solution utilizes proprietary algorithms to analyze the member data and identify patients who might be ripe for the submission of additional or more intense risk adjustment claims.  Among the data MedAssurant uses to identify these HCC coding "opportunities" are data for services such as radiology and laboratory services and prescription drug use that are prohibited as evidence to support HCC claims.  MedAssurant calls these "opportunities" to increase the Plan's HCC-driven reimbursement Clinical Encounter Data Incongruences ("CEDIs").

103.    MedAssurant has a nationwide employee network of chart reviewers who perform chart reviews on-location in providers' offices and, where the on-location reviews are not feasible, in other centralized locations.  MedAssurant coordinates the chart reviews with its proprietary ChartWise solution, a logic system designed to select and prioritize the medical facilities and providers holding medical records in need of review.

104.    After identification of the target CEDIs, MedAssurant conducts reviews of members' medical records to find a basis to submit a claim for each target diagnosis.

105.    During these chart reviews, MedAssurant's employees are instructed to look only for diagnosis codes that would support new HCCs.  They are not instructed to

assess the accuracy of any diagnosis codes that have already been submitted for risk adjustment reimbursement. Nor are they provided a way, if they find that a previously submitted diagnosis was incorrect, to report that information to Medicare.

106. When, after a medical record review, MedAssurant decides to submit an HCC claim, it converts the necessary data about the new diagnosis into the CMS-required file format and either provides the files to the CARA client or submits the files directly to CMS.

107. MedAssurant promises significant return-on-investment ("ROI") from its CARA solution. The company claims in its promotional material that many plans achieve reimbursement gains in excess of $3,200 per confirmed CEDI. MedAssurant is so confident in the profitability of its services that it allows client health plans to set "ROI thresholds" requiring the achievement of specified financial gains. Overall, MedAssurant reports that ROI typically ranges from 7:1 to 12:1, but can be in excess of 27:1.

108. MedAssurant also offers a Claims Aggregation, Analysis and Submission ("CAAS") solution, which it calls a "staple to CARA clients." For CARA clients, the addition of the CAAS solution provides that MedAssurant will convert not only the new diagnoses, but all of the health plan's raw data into the required format for submission to CMS.

## VI. DEFENDANTS' FRAUD AGAINST THE UNITED STATES

109. As outlined below, since at least 2006, Defendants have engaged in a deliberate scheme to defraud the United States by submitting tens or hundreds of thousands of false claims for risk adjustment payments. Defendants submitted these false claims even though they knew that the patients upon whom the claims were based did not

have the claimed diagnoses, had not been treated for those diagnoses in that year, or were otherwise ineligible for risk adjustment payments under CMS rules.

110.    Defendants routinely "upcoded" the risk adjustment claims they submitted to Medicare, claiming that a patient had been treated, in the relevant time period for: (a) a diagnosis that the patient did not have; (b) a more severe diagnosis than the one the patient had; and/or (c) a diagnosis that the patient may have previously been treated for, but which was not treated in the relevant year.

111.    Defendants engaged in the upcoding both directly, by creating documents to use to submit the risk adjustment claims themselves, or indirectly by paying, encouraging or otherwise convincing physicians, hospitals or others to submit upcoded data to Defendants, which upcoded data Defendants then used to submit risk adjustment claims.

112.    Defendants also refused to correct previously submitted risk adjustment claims even thought the Defendants knew, or should have known, that those claims were false.  Defendants were on notice that certain individual risk adjustment claims or certain classes of claims were potentially or likely false, but nonetheless submitted them without attempting to ensure their accuracy.

113.    In this manner, Defendants have fraudulently caused CMS to pay tens or hundreds of thousands of false claims for risk adjustment payments worth at least hundreds of millions of dollars.

A. **United Knowingly Submits, and Causes To Be Submitted, False Risk Adjustment Claims and Fails to Correct Previously-Submitted False Risk Adjustment Claims**

1. **United Upcodes Risk Adjustment Claims**

114. UHG engages in an aggressive and extensive effort to find a justification or pretext to submit risk adjustment claims for additional diagnoses—regardless of whether the patient had or was actually treated for the diagnosis in the relevant period by a qualifying provider. United's program has some components that are broad-based, and others that target specific high value HCCs. As an overall goal, UHG attempts to reach each of its members at least once every two years through one of its programs designed to find additional risk adjustment claims.

115. United runs multiple programs designed to identify additional HCCs for submission to CMS to increase its risk scores, including: (a) reviewing medical charts, (b) paying physicians bonuses for submitting paperwork to support claims for additional diagnosis codes, (c) sending physicians forms identifying conditions that United suspects the patient has, and (d) initiatives designed to get patients to visit their doctors each year for the purpose of being "treated" for high value diagnoses.

116. These programs are designed with one primary goal – to increase UHG's Medicare risk adjustment reimbursement. Accuracy of the claims is, at best, a secondary concern.

117. United has used its programs to promote increased coding of numerous HCCs that United knows are regularly submitted by providers when those providers should have submitted a less severe HCC code or no code at all. Notwithstanding this knowledge, United not only refuses, beyond a limited audit sample, to confirm the accuracy of these codes when submitted, but actually pushes chart reviewers, physicians,

and others to code for these problematic HCCs more often. United calls them "undercoded" HCCs.

118. Some examples of such HCCs that United knows are over-coded, but still encourages reviewers and providers to increase coding for include, but are not limited to, HCC 7 (Metastatic Cancer and Acute Leukemia), HCC 8 (Lung, Upper Digestive Tract, and Other Severe Cancers), HCC 9 (Lymphatic, Head and Neck, Brain, and Other Major Cancers), HCC 10 (Breast, Prostate, Colorectal and Other Cancers and Tumors), HCC 15 (Diabetes with Renal or Peripheral Circulatory Manifestation), HCC 16 (Diabetes with Neurological or Other Specified Manifestation), HCC 18 (Diabetes with Ophthalmologic or Unspecified Manifestation), HCC 19 (Diabetes without Complication), HCC 21 (Protein-Calorie Malnutrition), HCC 51 (Drug/Alcohol Psychosis), HCC 52 (Drug/Alcohol Dependence), HCC 55 (Major Depressive, Bipolar, and Paranoid Disorders), HCC 69 (Spinal Cord Disorders/Injuries), HCC 71 (Polyneuropathy), HCC 80 (Congestive Heart Failure), HCC 82 (Unstable Angina and Other Acute Ischemic Heart Disease), HCC 92 (Specified Heart Arrhythmias), HCC 96 (Ischemic or Unspecified Stroke), HCC 105 (Vascular Disease), HCC 108 (Chronic Obstructive Pulmonary Disease), HCC 108 (Chronic Obstructive Pulmonary Disease), HCC 112 (Pneumococcal Pneumonia, Empyema, Lung Abcess), HCC 131 (Renal Failure), HCC 132 (Nephritis), and HCC 155 (Vertebral Fractures w/o Spinal Cord Injury).

119. United trains and otherwise encourages its chart reviewers to identify diagnoses that do not qualify for risk adjustment claims. Chart reviewers are encouraged to look beyond members' provider-reported diagnoses and identify diagnoses from

supplementary data in the medical records. United submits these additional diagnoses without seeking any confirmation from the appropriate providers.

120. For example, in January 2009, a representative of the University Physician's Network ("UPN") emailed United's executives to inform them that, because of Ingenix's illegal practices, UPN was terminating its plan to assist United with the collection of diagnosis information. The email explained that Ingenix's chart review methods result in the submission of diagnoses that were not certified by, and may not be supported by the treating physician. The UPN representative reported that Ingenix's staff attempted to assure him that the practice was legal, but that research and consultation with others confirmed that Medicare regulations do not permit a "non-treating [provider]…submitting data for the purpose of increasing the compensation to United from Medicare."

### a) Chart Review

121. As described above, the vast majority of the information United uses as the basis for its risk adjustment claims comes initially from physicians, hospital or other providers in the form of claims data or other submissions. These sources are secondary to the primary records those providers hold—namely the patients' medical records, also known as charts.

122. As is common with secondary sources, the claims data and other information United receives from providers is known to have some (and at times many) errors—even when providers make good faith efforts to submit only accurate information. (As discussed in greater detail below, some providers deliberately upcode their claims information to manipulate the risk adjustment system; often because United pays them kickbacks to do so.)

123.    For example, in some cases, the claims data does not include all of the diagnosis codes that it should.  Providers often fail to document all diagnoses that were treated, because, historically, complete reporting of all treated diagnosis codes was generally not essential for reimbursement.

124.    In other cases, the claims data erroneously indicates a patient was treated for a certain diagnosis.  Sometimes this happens because of mere clerical error, but often it is the result of limitations in claims processing computer systems or a misunderstanding by coding personnel of the proper coding rules.  For example, coders sometimes indicate that a patient was treated for a certain diagnosis, where, in fact, the patient only had a history of past treatment for the diagnosis, or the patient was tested to see if they had that diagnosis.

125.    Moreover, there are routinely situations where the coding personnel correctly identify the patient as having been treated for a certain diagnosis, but make a mistake as to how severe the patient's illness is.  Thus, the coders may either overstate or understate the severity of the diagnosis.

126.    United's chart review program is designed to directly review the original documents—the patient medical records held by the providers—to correct these known problems.

127.    Because United has a duty to submit accurate data, and it knows that the claims data contains substantial errors, it has a dual responsibility when conducting these reviews: it should verify that already-submitted codes are accurate and documented while it looks for codes that should have been, but were not, submitted to CMS.  However, as

290

detailed below, United fails to meet his obligation to identify and correct previously submitted, but erroneous risk adjustment claims.

128. Ingenix conducts chart reviews on behalf of UHMR, UHCS, and commercial clients. In the retrospective chart review process, Ingenix identifies provider charts to review and arranges for the charts to be collected. It uses both internal coders and also contracts with external vendors to review and code the charts.

129. These vendors review charts using a blind review. In a blind review, the reviewer codes every condition he or she identifies from the chart without knowing what codes the provider identified from the chart previously. Thus, the reviewer works from the raw chart material and reaches independent conclusions.

130. Ingenix conducts chart reviews provider-by-provider. For each provider, members are selected for review, with a priority placed on members who have not been reviewed in the past year and members whom United believes may have a risk adjusting condition that has not been reported to CMS. Following every provider review, the reviewer submits the diagnosis codes it found to Ingenix.

131. Ingenix defrauds CMS by acting on chart review data in two very different ways: it acts on the missed codes by submitting risk adjustment claims to CMS, but takes no action on the incorrect codes.

132. When it receives the data from the reviewer, listing the diagnosis codes found during the review, Ingenix inputs the list into IRADS, its risk adjustment database (discussed in greater detail below). IRADS' design adds the reviewer's codes to the codes already in the system (*i.e.*, the provider's codes) like pouring additional water into a bucket.

133. For codes the reviewer coded but the provider did not code, IRADS will add a new entry. If this is a newly discovered diagnosis code for that patient—meaning no other provider had also reported treating the patient for that diagnosis during that time period—Ingenix will then submit a new risk adjustment claim to CMS.

134. Ingenix could easily perform a comparable comparison to look for over-coded diagnosis codes. Using either the data available from the chart reviewers or readily available additional information, Ingenix could determine whether a diagnosis code contained in IRADS was absent from the patient's medical record for that given provider. Ingenix, however, refuses to take any steps (other than an extremely limited program described below) to determine whether the chart review data has identified over-coded claims.

135. For situations where an existing code (*e.g.*, one a provider had submitted with its claims data) was not validated by the reviewed provider's medical records by the reviewers, IRADS does nothing. No effort is made to find other support for the diagnosis code or to delete from the IRADS system any claims that suggested the reviewed provider had treated the patient for the non-validated diagnosis.

136. United has also found high error rates in diagnoses identified by a former external chart review vendor, Outcomes, Inc., but, beyond a limited audit sample, United has not reviewed the vendor's work in order to determine the extent of CMS's overpayment for the vendor's erroneous diagnoses.

137. Chart reviews have been lucrative for United. For 2006 dates of service, the first year of fully phased-in risk adjustment, United's return on investment ("ROI") from chart reviews was 15 to 1. Exhibit 4, incorporated herein. United spends

43

approximately $30 for each chart it reviews but receives an average of $450 per chart in additional CMS payments for the new codes it submitted. *Id.*

138. Relator believes that even if United properly conducted chart review—"looking both ways" for both helpful and harmful errors—United would still earn substantially more in newly found codes than it lost by correcting erroneous codes. However, United has steadfastly refused to take anything more than token steps to "look both ways."

139. Unsurprisingly, UHMR and Ingenix have emphasized performing as many chart reviews as possible. UHMR reviewed approximately 600,000 charts in 2006 and approximately 600,000 in 2007. *See* Exhibit 4. On information and belief, Ingenix reviewed between 600,000 and 800,000 charts in 2008. In 2009, Ingenix reviewed approximately 800,000 charts. Exhibit 5, incorporated herein. United's only limitation in the number of charts it can review is its providers' dislike of the disruptions the reviews cause to their practices.

140. In 2010, United's senior executives set a target for United's risk adjustment programs to generate an additional $100 million in internal operating income ("IOI") above and beyond what was originally targeted. For 2011, United's incremental IOI target for risk adjustment is $125 million. Chart reviews are an important part of United's strategy for realizing this additional IOI. United's senior executives are fully aware that the company "looks one way" during chart reviews. *See* ¶¶191–197.

### b) Patient Assessment Forms

141. In addition to the chart review program, which involves broad review of the provider medical records, United has several initiatives which are targeted to a specific subset of patients or providers. As with the chart review program, these other

44

initiatives are designed to "look" just one way—seeking only to add incremental codes and ignoring evidence that previously submitted risk adjustment claims may be false.

142.    United's Patient Assessment Forms ("PAF") program targets suspected undercoded conditions, such as certain chronic conditions that a provider or group has coded less frequently than their prevalence rates would indicate.  For these conditions, such as diabetes and chronic kidney disease ("CKD"), Ingenix mines patient data for episodes in which a patient with a chronic condition has not been treated for a diagnosis during the payment year.

143.    The PAF program also identifies target patients by looking for situations where a patient filled a prescription for a drug that suggests the patient has a given diagnosis, or engages in a behavior (*e.g.*, smoking) that suggests a risk adjustment eligible diagnosis may be present.

144.    Ingenix prepares a form for these target patients and sends the form to their doctor, so he or she can "treat" the patient for that condition.  For example, if a provider diagnosed a member with diabetes in 2008 and 2009 but not 2010, Ingenix would send the provider a PAF and ask the provider to check the member for diabetes.

145.    Ingenix pays providers a fee to encourage them to consult PAFs when treating their patients.

146.    The program may have certain clinical benefit if and to the extent it helps ensure that members with chronic diseases receive treatment for their conditions.  However, that clinical concerns are not driving this program is demonstrated by which patients are targeted.  For example, PAFs are only distributed to providers for members for whom United, or one of its risk adjustment clients such as Health Net, receives risk

adjustment payments from CMS.  If United were using the PAFs to improve clinical outcomes, they would include all their members, including their non-Medicare members, in the PAF program.  Furthermore, as with the chart review program, the PAF program focuses solely on conditions that tend to be under-coded—and thus for which improved coding accuracy stands to increase revenue.  Ingenix chooses the conditions it targets through PAFs based on revenue impact, not clinical impact, and ignores conditions that are frequently overcoded.

147.    For example, United knows that cancer and stroke are often improperly coded years after the patient stopped receiving treatment.  United could use the PAF program to highlight these potentially overcoded conditions to providers.  For example, if a member has been coded with an acute episodic stroke for three continuous years, United can easily notify the provider that two of the three codes are probably incorrect.  The member most likely had a stroke in the first year (*i.e.*, not each year) and the condition should now be coded as "history of stroke."  United could alert the provider as to its suspicion, ask the provider to assess their coding and documentation for accuracy, and submit a medical chart supporting the diagnosis.  United does not include this information in its PAF reviews, however, because the provider's poor coding habits actually increase United's reimbursement from CMS.  Therefore, though patients and providers might benefit from knowing this information, United chooses not to use it because it would decrease United's revenue from CMS.

148.    Initially, Ingenix received completed PAFs from providers and submitted the diagnoses listed on the PAF without reviewing the medical record.  More recently, Ingenix has required that the medical record accompany the completed PAF—

purportedly so that diagnoses claimed on the PAF could be "validated." Instead, United actually reviews these medical records for incremental diagnoses that the provider may have missed. In this way, the PAF program has become a one-way chart review designed to only find incremental codes to submit to CMS for reimbursement.

149.    United not only skews the PAF program to focus solely on undercoded diagnoses, it prevents providers from taking the initiative on their own to focus on overcoded conditions. Ingenix maintains an online provider portal, called Insite, that "percent of premium" capitated providers (*see* ¶¶201–202) use to manage risk adjustment activities for their members.

150.    Insite contains numerous reports geared towards helping providers assess, diagnose and code incremental conditions. One such report, for example, is the Central Suspect Report ("CSI"). Similar to PAFs, this report lists conditions that United suspects the member may have, but are not coded currently. Another report is the Declining RAF report. This report ranks members with risk scores that have declined period over period, a fact that highlights to providers that they may have missed one or more conditions in their coding. Some Insite reports go so far as to calculate the estimated financial impact of coding a particular condition. This allows the provider to estimate the incremental reimbursement the provider would receive from United by coding the specific condition. Similar to United's other risk adjustment programs, Insite is designed to identify incremental diagnosis codes that United may submit to CMS for payment.

151.    To Relator's knowledge, however, Insite contains no function for providers to notify United of overcoded conditions.

152.    Relator brought the discrepancy between overcoded and undercoded conditions to the attention of senior UHMR and Ingenix management. Management dismissed his concerns, however, arguing there were "better ways" to address overcoded conditions, such as chart validation, discussed below. Both UHMR and Ingenix knew, however, that the chart validation program was incredibly limited, and that the company had no plans to provide resources to address the problem of overcoded conditions through that program.

153.    Instead, the PAF program is deliberately limited to seeking under-coded diagnosis codes so that United can avoid discovering over-coded diagnoses that it knows exist.

### c)    Clinical Operations Initiatives

154.    Clinical Operations Initiatives ("COI") is a program designed in part to "improve" the coding of conditions that United believes are frequently "undercoded." One such COI focuses on diabetes coding. As described above, the HCC model assigns multiple HCCs to conditions, such as diabetes, that have variations in severity and cost. For instance, a patient with well-controlled diabetes is likely to incur lower medical expenses than a patient with uncontrolled diabetes and complications. CMS therefore assigns a lower-paying HCC to well-controlled diabetes and a higher-paying HCC to uncontrolled diabetes. The goal of the COI program is to increase the severity of the diagnosis codes assigned to patients with one of these target HCCs.

155.    Originally, the COI program sought to improve diabetes coding by monitoring providers with high percentages of HCC 19 codes. HCC 19 is a code for diabetes without complications. The risk score associated with HCC 19 is much lower than the risk score for HCC 15, which is the code for diabetes with renal complications.

United suspected that some providers were coding HCC 19 when one of the more severe diabetes codes (HCC 15–18) would be more appropriate.

156.    Under the COI program, United pays providers approximately $100 for each diabetes patient they assess for diabetes complications, submit a supporting diagnosis via a claim, and submit a medical record with matching documentation.  In addition, it pays $200 for each doctor that receives training on the COI program and diagnosis coding.  Recently, the COI program has expanded to other conditions that United suspects are frequently undercoded, such as chronic kidney disease ("CKD"), and chronic pulmonary disease ("COPD").

157.    Like the PAF program, however, United does not pay doctors to improve coding for conditions that are frequently overcoded.  Again, United knows that cancer and stroke are generally overcoded.  But because improving their accuracy would decrease revenue, United does not include these conditions in COI.  Instead, COI is limited to conditions United believes are the most frequently undercoded, such as diabetes, CKD, and COPD, and represent large opportunities for increased reimbursement from CMS.

158.    In addition, United looks one way with the medical records it receives from doctors under the COI program.  Thus, when United receives a chart, it does not check whether the other diagnoses listed in the chart (such as those submitted through claims) are correct.

159.    Even worse, Relator has information and believes that United does not delete its previous diagnosis when the provider submits a medical record that diagnoses the member with a *less* severe condition (such as diabetes) than before.  For example,

United may send the doctor a list of diabetic members to assess. One or more members may be coded with HCC 15 (diabetes with complications). If the doctor submits a claim and medical records for that member diagnosing the member with HCC 19 (diabetes without complications), United does not submit a delete code to CMS for HCC 15. United simply assumes, without justification, that another doctor was responsible for the HCC 15 code. Similar to its chart reviews, therefore, United affirmatively solicits diagnoses from its providers but ignores them when they cast doubt on the validity of a higher-paying diagnosis.

### d) Other Initiatives to Increase Risk Adjustment Payments

160. Ingenix runs several additional programs to increase risk adjustment payments, including:

161. ***Provider Attestations***: Medical charts must be signed, credentialed and dated to be used to validate a diagnosis. When Ingenix performs chart reviews, it identifies charts that are missing one of these elements, preventing United from submitting the incremental diagnoses found in those charts to CMS for payment. To get around this obstacle, when Ingenix identifies a chart that is (1) missing an administrative element and (2) contains an incremental diagnosis that would increase United's reimbursement from CMS, Ingenix sends an attestation form to the provider to confirm the administrative elements. If it receives the attestation from the provider, Ingenix submits the incremental codes in the charts to CMS for risk adjustment payment. If it does not receive the attestation, however, Ingenix does not delete any codes that the provider previously submitted for that member, even though Ingenix knows the member's chart is invalid. Moreover, when Ingenix identifies a chart that is missing an administrative element but does *not* contain an incremental diagnosis, Ingenix does not

send an attestation form to the provider, though it knows United may have submitted diagnoses to CMS based on the invalid chart.

162. **Members without Visits**: To encourage members to visit their doctors at least once each year, Ingenix works with providers to schedule annual checkups. In some cases, this program can have clinical benefits, if the physician actually treats the patient, substantively, for the condition in question. However, in other situations, the visit is medically unnecessary if the patient is merely brought in so that the physician can "code the diagnosis" United has flagged for risk adjustment purposes.

163. **Hospital Data Capture**: Under this program, Ingenix elicits "data dumps" from hospitals to ensure it has received all of their diagnosis codes. Hospitals often enter more diagnoses for a patient than are transmitted to United. The Hospital Data Capture program is designed to retrieve the incremental codes that United did not receive so that United can submit those codes to CMS for payment.

164. **Provider Coding Training**: United trains providers on how to code "properly." United often directs training to providers with low risk scores or with a financial incentive to increase risk scores, such as percent of premium capitated providers. Historically, however, it did not proactively offer training to providers who performed poorly in validation audits, because they routinely over-coded diagnoses. Only recently has United begun offering any such training. The reason, again, is that United's priority is increasing code submissions.

165. United employs each of the above programs to increase its risk adjustment payments from CMS. In 2010 and 2011, United's management directed UHMR to increase its internal operating income from risk adjustment by $100 million and $125

million, respectively, above and beyond what was already planned. UHMR worked to achieve the targets by increasing its risk adjustment scores by capturing past conditions (PAF), decreasing the percentage of members without visits, increasing the number of providers that use Insite, and performing more chart reviews.

166. The company monitored the progress of each program closely. The pressure to earn $100 million in additional risk adjustment income, however, gave UHMR no incentive to identify, block, and delete incorrect codes. In fact, the company viewed the possibility that it would have to start reviewing charts for incorrect codes as a negative. In a January 2010 "Coding Accuracy Progress Report," UHMR warned, "Potential changes to general coding accuracy strategy, including chart audits, could impact 2010 results." Exhibit 6, incorporated herein. In other words, looking both ways in chart reviews to identify both incremental and incorrect codes would jeopardize its ability to achieve the $100 million target.

### 2. United Fails To Correct (and Reimburse Medicare for) False Risk Adjustment Claims

167. United knows that much of the claims data and other information that it receives from physicians and other providers is unreliable. For this reason, United engages in extensive and expensive initiatives to review and correct that claims data, outlined in the prior section. Unfortunately—for the United States—United deliberately chooses to look only one way in its remedial efforts.

168. United designs its chart review and other corrective initiatives to seek out only errors that, if corrected, will lead to increased risk adjustment payments. With the exception of certain small programs—designed to provide the appearance of fairness— United deliberately designs these programs to avoid discovering that United's previously

submitted risk adjustment claims are false (and thus that United should submit a "delete" code).

169.    Although many of these programs could easily be used to look for both incremental and delete codes, United has deliberately structured them to look only for incremental codes.  To provide cover for its scheme, United has a few limited initiatives designed to look for delete codes.  However, these initiatives designed to find false claims are far smaller than their counterparts, and are subject to far stricter data validation rules.

170.    Notwithstanding its efforts to avoid learning that previously-submitted claims are false, United nonetheless often generates information that gives it reason to question the accuracy of diagnosis codes it has already submitted to CMS.  United, however, intentionally (and myopically) does not compare the information to the diagnoses it has already submitted to CMS.  Instead, United simply submits the incremental diagnoses it finds to CMS, purposely ignoring all evidence or suggestions of invalid diagnoses that it submitted improperly in the past.

171.    Perhaps the best evidence of both United's knowledge that the underlying claims data requires verification, and United's fraudulent refusal to correct false claims, is the disparity between its efforts to find "incremental" (new) codes and "delete" (previously-submitted, but false) codes.  United attempts to review a medical record for every member once every two years to try to find incremental codes, but only has a nascent, limited project to identify delete codes.  For 2009 dates of service, United reviewed approximately 1.4 million charts to try to find incremental codes, but only

reviewed approximately 3,000 to 5,000 charts to try to find delete codes (and even then, only a limited portion of each chart was reviewed).

172.     United has half-heartedly created a small chart validation program that is little more than a fig leaf designed to obscure its misconduct, and has been dragging its feet for years in completing a very limited pilot program designed to develop a system to look both ways.

173.     Under the chart validation program, Ingenix selects providers who have coded certain HCCs at levels significantly above the condition's national prevalence rate. Ingenix audits the providers' charts for those codes to determine if the codes were properly documented and substantiated.

174.     United, however, imposes four restrictions to limit the number of validation audits it performs.  First, the provider who submitted the code must be a Level I provider, defined as a provider with a financial incentive contract with United, such as a capitation or gainshare agreement.  This limitation excludes both large provider groups without coding incentives (Level II) and small provider groups (Level III).  Second, the provider must have at least 500 United Medicare members.  Third, for an HCC to qualify as "suspect," the provider must have coded it at over 300% of Ingenix's national prevalence rate.  Fourth, United reviews a small number of members (initially only 30) per provider and HCC, often a tiny sample size relative to the number of codes the provider submitted.

175.     Ingenix's approach to chart validation is therefore highly focused and excludes a vast majority of United's providers and risk adjustment data.  None of the limits on chart validation exist for chart reviews.  For example, whereas chart validation

54

contains safeguards to ensure diagnoses are not improperly deleted, United submits diagnoses from outside vendors' chart reviews without validating them in any way. The reason for the limits on chart validation is that chart validation is an expense that has no revenue potential.

176.    Ingenix's chart validation program reviewed 4,000 charts in 2010 for the 2008 and 2009 service years. By comparison, Ingenix's chart review program reviewed approximately 1.4 million charts for the 2008 and 2009 service years. *See* Exhibit 5 (2009 chart reviews).

177.    Despite their limited scope, Ingenix monitors the results of its validation audits closely. It compiles data on the validation percentages of each HCC, as well as the validation percentages for each provider group. Often, Ingenix identifies specific HCCs and specific provider groups with low validation (*i.e.*, high error) percentages. In May 2009, for instance, Ingenix's Dr. Maninder Khalsa identified five problem HCCs (with 15 to 30% error rates): HCC 10 (breast, prostate, colorectal cancers); HCC 96 (stroke); HCC 15 (diabetes with renal/circulatory complications); HCC 105 (vascular disease); and HCC 92 (arrhythmias).

178.    Similarly, an Ingenix validation audit of 2008 codes from Hemet Community Medical Group reviewed 30 HCC 67 (quadriplegia) codes and validated only two. Though this was an extreme result, Ingenix identified dozens of other provider groups with low validation totals in specific HCCs.

179.    Previously, United did little to nothing with the data it found during chart validation. Though it submitted delete codes for diagnoses that it could not substantiate, until recently Ingenix did not expand its search when it identified a problem area.

55

Recently it has enacted a policy calling for an expanded review of any HCC that validates 80% or less of the time.

180.    Nor has Ingenix targeted known over-coded conditions, such as cancer or strokes, for additional scrutiny.  (By contrast, in 2009 Ingenix planned a "High Value Suspects" initiative to target potentially under-coded, high-revenue members and providers.)

181.    In 2010, United developed a pilot program that would look for both incremental and unsupported diagnoses during chart reviews.  Though aspects of the pilot program have recently been adopted, United continues to stack the deck in favor of submitting incremental codes.  The pilot, as well as United's subsequent program, contain several limitations that do not exist in ordinary chart reviews.

182.    First, the pilot was limited to members with only one provider so that United does not delete a diagnosis that some other provider's chart might validate.  This restriction does not apply to chart reviews—during chart reviews, whenever United identifies a chart that calls another provider's diagnosis into question, it ignores the chart.  United's limited program to look both ways subsequent to the pilot continues to only review charts from members with just one provider.

183.    Second, United limited the number of charts the pilot program reviewed so that it had time to validate all of them before CMS's January 31, 2011 deadline for submitting diagnoses from 2009 dates of service.  In contrast, United does not limit its efforts to find *incremental* codes before the January 31 deadline to build in time to ensure the codes are valid.  On the contrary—United runs special programs up to the deadline to find as many incremental diagnoses as possible.  United does not pause to check whether

56

it will have enough time to validate these incremental diagnoses, because it simply does not validate the diagnoses it submits.

184.     United's refusal to correct errors in its risk adjustment claims is so extreme that it submits risk adjustment claims to CMS for diagnoses taken from claims that it itself refuses to pay as being fraudulent and/or abusive.

185.     Through its fraud and abuse department, regular claims processing efforts, and some of the other initiatives discussed in greater detail above, United routinely learns that the claims data that was used as the basis for certain risk adjustment claims is erroneous.   Nonetheless, United routinely submits risk adjustment claims—or fails to correct previously submitted claims—in purported reliance on that false data.

186.     Like most insurance companies, United contains a Fraud and Abuse Prevention Unit ("F&A") in Ingenix that is responsible for identifying and resolving fraudulent claims.  F&A mines claims data for anomalies that suggest a fraudulent claim. For example, F&A looks for claims for drugs that were not truly administered to patients, such as patients who supposedly received cancer drugs despite not having a cancer diagnosis.  If and when F&A identifies a claim that it considers sufficiently false to be fraudulent, it takes action against the provider who submitted the claim, either by denying the claim or demanding reimbursement.

187.     Ingenix, however, refuses to use this information to correct its risk adjustment database or claims submissions.  Ingenix's F&A unit does not report the fraudulent claim to Ingenix's Clinical Assessment Solutions ("CAS") group; thus the CAS group cannot block submission of the claim's diagnosis codes to CMS or delete HCCs it already submitted due to the claim.

188.     Ingenix knows that CAS is submitting fraudulent codes to CMS because it cannot interact with F&A, but has chosen not to fix the problem.  Beginning as late as 2009, Ingenix explored improving the coordination between CAS and F&A as a way to increase coding accuracy.  Dr. Maninder Khalsa of CAS stated in May 2009 that "[w]e have reached out to the INGENIX Fraud and Abuse Prevention Unit in an effort to coordinate our areas of expertise and collaborate where possible."  During that time and subsequently, Relator recommended to Ingenix that it must coordinate CAS and F&A to prevent the submission of fraudulent codes.  He voiced these same concerns to his superior at UHMR, Scott Theisen.  Ingenix, however, has refused to fix the problem.

189.     United's submission of fraudulent codes reflects its broader failure to coordinate its claims processing system with IRADS (the system it uses to process and submit risk adjustment claims), as discussed below.  Specifically, when a claim is denied, United deliberately refuses to check whether the denial affects the validity of risk adjustment claims, *i.e.*, whether it compels United to delete any diagnosis codes.

190.     There are similar problems with other programs and initiatives at United.  As described above, in other situations, United learns through chart review initiatives or other programs that certain claims data or other sources of diagnosis codes used in risk adjustment claims are false.  United deliberately refuses to delete those false diagnosis codes from its risk adjustment claims systems, and refuses to correct previously submitted risk adjustment claims that were based on those false diagnosis codes.

### 3.     United Continues To Develop New Programs To Seek New Claims To Submit, While Slow-Walking Its Limited Efforts to Correct Overcoded Claims

191.     Relator has spoken with senior United executives about, and has other personal knowledge that those executives are aware of, the fraudulent risk adjustment

practices discussed in this Complaint, including United's chart review practices and other risk adjustment initiatives. On this basis, Relator knows that at least the following United executives know about some or all of the problems discussed herein, and have participated in the scheme to continue submitting fraudulent claims and to refuse to correct previously submitted false claims: Stephen Hemsley, UHG Chief Executive Officer; Gail Boudreaux, UHG Executive Vice President and CEO of United Healthcare; Larry Renfro, Optum CEO; Tom Paul, UHMR Chief Executive Officer; Cindy Polich, UHMR President; Lee Valenta, Ingenix's former Chief Operating Officer (and current President of Ingenix's Life Sciences Division); Jack Larsen, former CFO of PSMG (and current CEO of UHCS); Scott Theisen, UHMR Senior Vice President of Finance; Jeff Dumcum, Senior Vice President of Ingenix; and David Orbuch, PSMG Chief Compliance Officer.

192.    Although numerous United officials have acknowledged to Relator that the company should be "looking both ways" when it tests the validity of its risk adjustment data sources, United continues to focus almost exclusively on adding incremental codes. Although United has created a very limited "pilot project" to test the possibility of "looking both ways" during chart reviews, that program gets limited resources and serves primarily as a fig leaf to mask the one-sided nature of United's efforts.

193.    Though the pilot is only experimental, United invokes it as justification for continuing its fraudulent chart reviews. In an email on September 9, 2010, UHMR President Cindy Polich emailed Relator that she and UHMR Chief Executive Officer Tom Paul had discussed whether to increase chart reviews despite knowing the reviews

disregarded incorrect codes, and "had resolved the issue of concern by agreeing to develop and implement a pilot." Exhibit 7, incorporated herein. Polich told Relator that she and Paul "both agreed that this issue should not stand in the way of moving forward with additional chart audits." *Id.* In May 2011, UHMR CFO Scott Theisen decided that UHMR should limit the number of chart reviews and PAFs it performed in 2012 to the number it performed in 2011, due to his "compliance concerns." At or around the same time, Theisen told Relator and senior executives at Ingenix that he had discussed the chart review problem, as well as the IRADS problems discussed below, with UHG CEO Stephen Hemsley and UHG Executive Vice President Gail Boudreaux.

194. Moreover, United continues to invest significant resources toward finding incremental diagnoses while at the same time devoting significantly fewer resources to the pilot or to fixing IRADS. For example, United developed "playbooks" containing ideas for increasing its risk scores. These playbooks are garnering top-level attention at the company while the myriad problems with United's risk adjustment programs and processes go unresolved.

195. United conceals the one-way nature of its risk adjustment programs from CMS and even its investors. For example, United's remediation plan for 2010 that sought to increase IOI by $800 million allocated $100 million to "Project 7." Project 7 was United's codeword for initiatives to increase risk adjustment payments. The company used a codeword (as opposed to "growth," "enrollment," or "claims") because it did not want CMS or other investigatory government agencies to know it had a campaign to claim an additional $100 million through risk score increases.

196.    Similarly, during its fourth-quarter earnings call on January 21, 2011, Tom Paul, CEO of UHMR, told investors that UHMR "on a year-over-year basis" was seeing "improvements" in its risk adjustment "accuracy rates."  This statement was misleading, for while UHMR had found and submitted a substantial number of incremental codes, it has no evidence that its submissions were more accurate (*i.e.*, the error rate of the data it submits has decreased).  This fact is well known at United.

197.    At Relator's urging, United has changed the text of the letters it sends to providers about chart reviews to remove the word "accuracy."  The letters now say that United reviews charts to ensure it submits "complete diagnosis information" to CMS, not complete and accurate information.

### 4.    United Encourages Providers To Upcode, and Submits False Risk Adjustment Claims Based on That Upcoding

198.    United encourages and provides incentives to its provider groups and risk adjustment vendors to upcode their claims data, and then uses that upcoded data to submit false and/or fraudulent risk adjustment claims to Medicare.  Moreover, even when it is faced with evidence that a provider or provider group is routinely upcoding its diagnosis information, United does little or nothing to either correct the provider's coding practices, or give that provider's claims information special scrutiny before using it as the basis for the submission of a risk adjustment claim to Medicare.

199.    United routinely provides physicians, hospitals and other providers information on diagnoses that United wants them to code more frequently.  Often this information is presented as educational material designed to increase coding accuracy.  Significantly, though, this information routinely focuses only on diagnoses that, if coded, would lead to increased reimbursement for United.  In fact, United often pairs this coding

"advice" with information on how much money United (and, often, the providers themselves) stands to make if the diagnoses is coded more often.

200.    United routinely couples such promotion of the coding of lucrative diagnosis codes with direct financial benefits (hereafter "kickbacks") to providers to encourage them to increase the number and severity of diagnoses they submit to United. Since at least 2005, UHMR has offered providers additional payments if and when the providers' patients' risk scores increased.

201.    United customizes its kickbacks depending on the nature of its overall reimbursement arrangement with the provider group.  The providers United chooses to pay additional amounts for increased risk scores are those that do not already have an incentive to upcode diagnoses.  United uses three basic payment structures for its providers: (1) percent of premium capitated providers, which receive a percent of United's CMS premiums for its patients; (2) "fixed" capitated providers, which receive PMPM payments from United that are not tied to United's CMS premiums; and (3) fee-for-service providers, which are paid based on the claims they submit to United.

202.    "Percent of premium" capitated providers already share an incentive with United to upcode diagnosis codes, because they stand to earn a percentage of the additional revenue from CMS.

203.    Flat capitated providers and FFS providers, however, have no financial incentive to upcode diagnoses.  United makes up for this by paying a "bonus" (kickback) if and when such providers increase their risk scores.

204.    Generally speaking, United pays fixed capitated providers a PMPM amount for its members, with the provider carrying the risk of covering the members'

healthcare costs. To encourage fixed capitated providers to maximize risk adjustment submissions, however, UHMR pays them an extra percentage of the capitation rate (or other bonus) when their patients' risk scores increase.

205. For example, a January 1, 2009 Health Services Agreement between PacifiCare and Banner Physicians Hospital ("Banner") promised to pay the hospital "an additional increase in Capitation Payment PMPM retroactive to January 1, 2009 if the increase in RAF [risk adjustment] score between July 2008 and July 2009 is in excess of 3%." Exhibit 10, incorporated herein. The amount of the increase equaled the amount of the percentage increase over 3%, such that a 4% increase in risk score would increase Banner's capitation payments by 1%. *Id.*

206. UHMR's contract with Banner reflects its policy and practice of offering providers (both capitated and fee-for-service) financial incentives to increase their risk adjustment submissions. These agreements exist across UHMR's plans, and were entered into between 2005 (or earlier) and 2010. The agreements are kickbacks that give United's providers a financial incentive to upcode the diagnoses codes they submit on their claims.

207. Similarly, WellMed's 2005 contract with PacifiCare (later United) for DataRap services included annual payments according to a payment schedule tied to increased risk scores. Exhibit 12, incorporated herein. (If risk scores fell below a 2005 benchmark, no payment was due to WellMed.)

208. Moreover, PacifiCare agreed "to pay a[n additional] contingency for *maintaining* an increased HCCRAF [*i.e.*, risk] score." *Id.* at 12 (Emphasis added.) Thus, if WellMed maintained United's high risk scores year over year, PacifiCare would pay

WellMed an *extra* amount annually on top of the payment schedule. These fees totaled $450,000 in 2006, between $3.1 and $3.5 million in 2007, $5.2 million in 2008, and $6.4 million in 2009. For the reasons described above, WellMed's contract contains a kickback and motivated WellMed to report inflated risk scores.

209. United also enters into contracts known as gainshare agreements with certain FFS provider groups. Under these agreements, United and the provider group agree on a target benefit-cost ratio ("BCR"). If the provider group achieves a BCR lower than the target, United and the provider share the savings.

210. United also provides kickbacks to provider groups by renegotiating the terms of gainshare agreements to ensure the groups realize savings. For example, on January 24, 2011, UHMR Vice President of Finance Tim Noel told Relator that United and MedicalEdge, a provider group in Texas, entered into a gainshare agreement for a particular year in which the target BCR was 79% and any savings would be split 60/40 between MedicalEdge and United. In May of that year, United renegotiated the agreement. The new agreement raised the BCR from 79% to 82%, making it easier to attain, but changed the split from 60/40 to 50/50. Though MedicalEdge took a lower percentage, the renegotiation more or less guaranteed that it would receive a savings payment. Furthermore, the renegotiated target was applied retroactively back to January of the contract year. Because of the mid-year contract renegotiation, MedicalEdge received millions of dollars more than it otherwise would have under the terms of the original gainshare agreement.

64

211.     UHMR enters into gainshare agreements with provider groups across its various plans and networks.  On information and belief, UHMR's gainshare practices began at least as far back as 2007 (and most likely earlier) and continue to the present.

212.     UHMR contracts with many capitated provider groups nationwide.  As described above, percent of premium capitated providers are paid a portion of whatever premiums United receives from CMS.  Consequently, such capitated providers share UHMR's incentive to submit as many diagnosis codes as possible to CMS.

213.     From the inception of CMS's risk adjustment system, UHMR and Ingenix have known that many of their capitated providers are fraudulently submitting false and incorrect risk adjustment diagnoses.  United's policy and practice, however, has been to continue accepting diagnoses from its capitated providers even when it knows the data from those providers is unreliable.  Only in rare instances does United audit its providers, and in those instances it merely deletes whatever bad diagnoses it finds without conducting a top-to-bottom review, correcting the capitated provider's methods or terminating its relationship with the provider.  Thus, UHMR and Ingenix knowingly submit, or cause the submission of, false risk adjustment claims to CMS.

214.     On information and belief, UHMR's capitated providers are knowingly submitting incorrect and/or unsubstantiated codes to Ingenix, for transmission to CMS. For example, Princeton IPA of San Antonio, a capitated provider within defendant WellMed, had a risk score of 1.383 in January 2010 among its 34,163 members (by January 2011, Princeton's risk score was 1.504 among 34,902 members).  Exhibit 11, incorporated herein.  Such a risk score suggested that WellMed's members were substantially sicker than average (CMS sets the risk score for an average Medicare

beneficiary at 1). UHMR knows that WellMed's unusually high risk score is in large part attributable to fraud. For example, Relator learned in the fall of 2010, following an audit conducted by Ingenix, that WellMed (Princeton IPA of San Antonio) routinely submits improper diagnoses.

> ### 5. United Knows that its Risk Adjustment Claims Submission System Is Flawed, and Routinely Submits False Claims, But Has Failed to Fix that System or To Find and Fix Past False Claims

215. United knows of several significant problems with the way that its Ingenix Risk Adjustment Data System ("IRADS") processes claims data and submits risk adjustment claims to CMS. These errors always, or almost always, cause the submission of false and/or upcoded claims. Almost never do these errors cause United to fail to submit a valid claim.

216. Notwithstanding this knowledge, United has failed to fix the IRADS system, or to fix the previously submitted false claims caused by these flaws in the programming and logic of the IRADS system.

### a) Background

217. The risk adjustment information United submits to CMS originates primarily from provider encounter and claims data. Providers submit encounters and claims information to United through one of several automated systems, such as the Professional Encounter System ("PES"), COSMOS, NICE, Pulse, Facets, and others.

218. United collects data from these systems and sends the data to Ingenix for incorporation into IRADS. IRADS applies multiple logic filters to the data to identify which diagnosis codes are eligible for submission to CMS, and which are not.

219. For example, when UHMR receives a claim from a provider containing an ICD-9-CM diagnosis code for diabetes, IRADS should screen that claim to ensure that all the required data elements are present, pursuant to CMS rules. If IRADS finds the Provider ID on the claim corresponds to a primary care physician, and a CPT code for a physical examination, it should then submit the code for risk adjustment. This is because the information on the claim corresponds to a face-to-face encounter between a physician and the patient. However, if the claim's Provider ID corresponds to a laboratory technician and the CPT code is for blood work, IRADS should filter out that claim because it is clear the diagnosis code is based on a lab test, not a face-to-face encounter with an appropriate provider type.

220. From these eligible codes, IRADS creates the data file that Ingenix submits to CMS's risk adjustment processing system ("RAPS"). Claims and encounter data processed through IRADS account for approximately 95% of the diagnoses United submits to CMS.

**b)** **United Knows that the Filtering Logic Built Into IRADS is Deeply Flawed and Consistently Errs in Favor of Overcoding Risk Adjustment Claims**

221. The serious problems that United has identified with IRADs include, but are not limited to:

(1) use of "exclusion logic" to bias IRADS filters so that when in doubt they err on the side of including a diagnosis code and submitting a claim;

(2) use of flawed logic concerning identification of provider specialties, leading to the inclusion of services provided by ineligible provider types;

(3)     failing to correct the IRADS data, and failing to correct previously submitted claims, when a provider informs United that a previously submitted claim was invalid or incorrect;

(4)     failing to properly separate information on individual service lines where one claim includes more than one separate procedure;

(5)     resubmitting previously deleted diagnoses to CMS;

(6)     submitting diagnoses from an institutional claim where the patient did not receive a face-to-face service; and

(7)     failing to update IRADS' filtering logic to include the most current CPT codes.

222.    These problems are interrelated and often work in conjunction to cause erroneous submissions.

223.    Relator has discussed the problems with IRADS with many of United's senior executives.  In this way, Relator knows the company is aware of the problems. Although United knows about the issues with IRADS, it has allowed Ingenix to continue submitting risk adjustment data to CMS, and has not disclosed the problems to CMS. United continues to submit diagnosis codes it knows are ineligible for risk adjustment. Likewise, United has not deleted codes that IRADS improperly submitted and has limited its investigation into the extent of the errors.

224.    Relator has information to believe that the problems with IRADS may also be found in its legacy risk adjustment processing systems, and thus date from the very beginning of the risk adjustment system in 2004.  United has intentionally not reviewed whether its legacy systems contained an error it has identified in IRADS ("Issue 1,"

317

discussed *infra*) and thus whether it needs to delete any improperly-submitted codes, for example. United also has not reviewed whether its legacy systems contained any of the other errors it has identified in IRADS.

### (1) Improper Use of Exclusion Logic

225. The most pervasive problem with IRADS is that it was built to use "exclusion logic" to filter diagnosis codes. As a result, the system essentially takes the position of "when in doubt, submit a claim."

226. Generally speaking, exclusion logic compares objects in a database against a defined "exclusion list" and marks the matches (if any) for exclusion. For example, exclusion logic in an airport security system might compare travelers' names against a list of the FBI's Ten Most Wanted and flag any matches for security officials.

227. In IRADS, the exclusion logic filters out claims data if one or more of the data elements exactly matches a list of codes to exclude. For physician claims, the exclusion lists include, without limitation: (a) CPT codes; and (b) the provider's specialty type. For institutional claims, the lists include, without limitation: (a) the bill type; (b) the revenue code; and (c) discharge status.

228. Thus, for example, IRADS' exclusion list for CPT codes includes the codes for ineligible procedures such as laboratory work and diagnostic radiology. If a CPT code for the diagnosis matches a CPT code on the exclusion list, IRADS excludes the diagnosis from the data United submits to CMS for risk adjustment.

229. IRADS' exclusion logic, however, contains a basic and devastating error—it only catches information that *matches* information on its exclusion lists *exactly*. Information that is invalid but not on the exclusion list passes through the filter.

230.    Incredibly, this means that even if a key data element is left blank, or filled with a completely erroneous value, IRADS assumes that is a valid value because the blank or erroneous value does not appear on the list of codes to exclude.  Thus IRADS will use that claim data when submitting risk adjustment claims.

231.    This error causes Ingenix to claim payment for HCCs taken from claims data that are obviously ineligible for risk adjustment.  For example, IRADS may catch and filter a diagnosis with CPT code 74150 (a radiology code).  However, it will not catch a diagnosis with a CPT code field that is blank, erroneous (*e.g.*, 74x50), or even reads "this diagnosis is not eligible for risk adjustment."  So long as the field does not match the CPT codes on the exclusion list, the IRADS filter will not catch the bogus entry and the invalid diagnosis code will pass through to CMS.

232.    The exclusion logic error is emblematic of United's design for IRADS and its approach to risk adjustment in general—if United has any doubt about whether a diagnosis is eligible for risk adjustment, it submits it for payment.

### (2)    Flawed Provider Specialty Logic

233.    United designed its claims systems and IRADS in such a way that it improperly submits claims to CMS for diagnoses made by ineligible provider types.

234.    First, because of an error in the way IRADS processes provider billing identification numbers ("billing IDs"), IRADS fails to screen many diagnoses by provider type.  As described above, CMS forbids MA plans from submitting diagnoses based on documents from ineligible providers such as registered nurses ("RN") or radiologists.  Thus, CMS requires MA plans to screen the diagnosis codes they submit by provider type.

319

235. The claims and encounter forms that United enters into IRADS each contain a billing provider identification number ("billing ID"). UHMR typically assigns billing IDs on a billing/contract basis, such that large, multi-specialty provider groups contracted with UHMR often have a single billing ID.

236. IRADS takes a shortcut in how it screens for provider types—it assumes that if a billing ID ever submits a claim or encounter with an eligible provider type, then the billing ID's future claims and encounter forms will also have eligible provider types. When IRADS receives a claim with an eligible provider type, it adds the billing ID from that claim to its list of billing IDs associated with eligible provider types. Once the billing ID has been added to that list, IRADS treats all claims submitted by that billing ID as valid, regardless of the actual provider specialty of the provider who provided the service in question.

237. For example, if a newly-credentialed medical center submits five claims to United for a radiologist, IRADS will identify the provider specialty as "radiologist," an ineligible provider type, and block the diagnoses from going to CMS.

238. However, the first time the medical center submits a code from an *eligible* provider (*e.g.*, internist), IRADS treats the billing ID as conclusive evidence that the medical center's future diagnoses will likewise be made by eligible providers. From that point forward, IRADS stops filtering the medical center's claims by provider type altogether, allowing all subsequent diagnoses from the medical center's radiologists to be submitted to CMS for risk adjustment (assuming they pass the other filters).

239. Second, United designed its claims systems to default all unknown provider types to CMS physician specialty code 99, "unknown physician specialty."

71

320

Generally speaking, health care providers use a different taxonomy for provider specialties than CMS. CMS requires providers to submit a valid provider type with each claim, so providers must map their taxonomy to CMS's. CMS recognizes approximately 66 physician specialty codes. Thus, a provider submitting a claim for a diagnosis made by an acute care nurse practitioner must map its code for the nurse practitioner, code 363LA2100X, to the appropriate CMS physician specialty code, code 50. United's claims systems are designed so that many provider specialty codes default to physician code 99. For some of United's claims systems, codes default when they fail to map to an eligible CMS physician specialty type. In another system, the Provider Encounter System, *all* provider specialties map to code 99. Thus, IRADS cannot filter many claims for ineligible provider specialties. United's use of code 99 as a default is improper, because to use it United has to know the provider is a *physician*. It cannot use the code whenever it knows nothing about the provider who submitted the claim.

### (3) Failure to Remove Diagnosis Codes Associated With Claims "Voided" by the Provider

240. When one of United's institutional providers voids a claim that was the source of a risk adjustment claim submitted to CMS, United processes the void instruction (*i.e.*, reverses the claim and recoups any claim payment) but does not delete the diagnosis code from its IRADS database or submit a delete code to CMS to reverse the risk adjustment claim. CMS therefore pays United an additional amount for diagnoses taken from cancelled claims.

241. United's general process for submitting diagnoses for risk adjustment starts with the claims and encounter data it receives from providers. Providers submit

242. The "void and replace" occurs because IRADS only collects a limited portion of the data in the claims system. For example, United receives most claims from hospitals and other institutional providers on Form UB-04. Exhibit 8, incorporated herein. Form UB-04 includes a field for the type of bill the claim represents (Item 4). The bill type is a three-digit code. The last digit of the code indicates whether the institution submitted the bill to void or replace a prior Form UB-04.

243. IRADS, however, is unable to process the bill type's void/replace instruction. Thus when United receives instructions from a provider to void out a prior claim, and then replace it with a new claim, IRADS essentially treats this as three valid claims: (a) the original claim; (b) the "void" instruction, which looks like the original claim but for the data element that identifies it as a voiding claim; and (c) the new claim. Thus, if no filter applies, IRADS submits to CMS *both* the diagnosis from the original claim *and* the diagnosis from the replacement claim.

244. IRADS submits false data because of this error. For example, a fee-for-service provider who submits a claim ("claim #2") on Form UB-04 (diagnosis: vascular disease) to replace a claim ("claim #1") on Form UB-04 (diagnosis: congestive heart failure ("CHF")) will receive payment from United based on claim #2 only. United, however, submits both the vascular disease diagnosis (HCC 105) and the CHF diagnosis (HCC 80) to CMS for risk adjustment. By doing so, United represents that its member was treated for both conditions in the present year, when in fact the member was only treated for one. United claims payment from CMS for both conditions.

322

### (4) Failure to Separately Filter Procedure Codes When Multiple Services Are Included on a Single Claim

245.    IRADS also fails to distinguish which diagnosis codes are associated with which procedures in situations where one claim form contains separate line items for two or more different procedures.  Instead, IRADS assumes that all diagnosis codes on a claim are associated with each of the procedure codes.  Thus, if either of the procedure codes is valid for risk adjustment purposes, IRADS uses all of the diagnosis codes for risk adjustment.

246.    Both professional (*i.e.*, physician) and institutional (*i.e.*, hospital) claims forms have multiple lines in which the provider can list the multiple procedures that may have been performed for a member.  At least some of United's claims systems, such as NICE (legacy PacifiCare) are capable of processing individual service lines.  IRADS, however, is not programmed to treat each line separately.

247.    For example, a claim may contain two service lines: (1) an office visit with a doctor who diagnosed cancer; and (2) a laboratory procedure performed by a technician to determine if the member has diabetes.  The claim contains two diagnoses (cancer and diabetes) drawn separately from the two service lines.  IRADS, however, *conflates* the service lines into a single data point.  When checking for CPT codes, therefore, IRADS identifies the eligible CPT code (the office visit) and attributes it to both the cancer and diabetes diagnoses, even though the doctor had only diagnosed cancer.  The CPT code for the laboratory procedure is effectively ignored.  Consequently, IRADS submits both diagnoses to CMS, falsely representing that the doctor had diagnosed and treated the patient for two conditions, when it fact the doctor had only diagnosed one.

248.    The service lines that IRADS is incapable of processing appear in United's claims forms.  For example, Health Insurance Claims Form 1500 ("Form 1500"), the industry's standard claims form for professional health services, contains a field (Item 33) for the provider ID as well as a field (Item 21) for diagnosis codes.  Exhibit 9, incorporated herein.  Form 1500 also includes six "service lines" (each line consists of Items 24A–J) indicating, *inter alia*, the dates of service, the procedures performed (*i.e.*, CPT codes), the "diagnosis pointer," and the rendering provider identification number.  The diagnosis pointer (Item 24E) relates one of the diagnoses in Item 21 to each of the service lines in Item 24 in order to document which health condition each service treated.

249.    IRADS is unable to process critical information in Form 1500's service lines (Item 24) that determines the claim's risk adjustment eligibility.  In addition to its inability to process CPT codes correctly, IRADS uses the field for *billing* provider number (Item 33) to determine whether an eligible provider type submitted the claim.  In doing so, IRADS ignores Item 24J, which lists the *rendering* provider identification number for each service line.  (The provider accumulator error is associated with this false correlation.  *See* ¶¶233–239.)  For example, in the prior example of a claim with two diagnoses (cancer and diabetes) from two service lines, Form 1500 lists the cancer and diabetes diagnoses in Item 21 and the doctor and the laboratory technician as rendering providers in Item 24J(1)–(2).  Because IRADS relies on the billing provider (Item 33) and ignores the rendering provider (Item 24J), it does not filter the diabetes diagnosis, even though it is supported only by a lab request.

250.     When United stands to have to *delete* HCCs because of an invalid CPT code, however, it finds itself quite capable of processing service lines individually.  For example, in August 2009 Ingenix learned that it had submitted 257,515 diagnoses to CMS that were associated with a CPT code that was inconsistent with a face-to-face encounter with a qualifying provider.  Because the CPT code was invalid, United knew it likely had to delete the diagnosis codes.  In discussing the potential loss of 257,515 diagnoses, however, Ingenix's Angelo Fiorucci wrote Ingenix's Paul Bihm and Randall Myers that "I believe that we will be able to reduce the 257,515 because we have to validate that every claim line was coded as an 'Invalid CPT Code.'"  Two things are clear from this response.  First, United knows that just because IRADS submitted a diagnosis code to CMS does not mean that the diagnosis code is linked to a valid CPT code on the claims form.  Thus, United has reason to know that IRADS submits false claims to CMS.  Second, United is willing and able to process claims forms by individual service lines— in other words, to correct the mistake caused by the logic error in IRADS—only when it would otherwise have to delete a diagnosis.

251.     In April 2011, Ingenix Director of Encounter Operations, Rebecca Martin, confirmed to Relator that Ingenix had in fact reviewed individual service lines when it deleted diagnoses in 2009.  Martin said she suspected Ingenix had done the same when it had deleted diagnoses in 2006 as well.  Relator gave Martin the hypothetical of a claim containing diagnoses of diabetes from a laboratory CPT (ineligible), cancer from a radiology CPT (ineligible), and CHF from an office visit CPT (eligible).  As discussed previously, IRADS improperly submits all three diagnoses to CMS.  In acknowledging

76

that Ingenix acts differently when it has to delete diagnoses, Martin told Relator: "In your example, we would have put diabetes and cancer on the delete list and saved CHF."

### (5) Resubmission of Previously Deleted Diagnoses

252. IRADS submits improper diagnoses to CMS because it is unable to associate a diagnosis Ingenix has deleted with a duplicate diagnosis in a resubmitted claim. When Ingenix decides to delete a diagnosis code listed in a claim, and the claim is later resubmitted by the provider, IRADS does not associate the newly-resubmitted claim with the deleted diagnosis. Therefore, Ingenix may determine that a diagnosis was improperly submitted to CMS, and yet resubmit the same code (if no filter applies) because IRADS is unable to associate the resubmitted claim with the deleted diagnosis.

### (6) Submitting Institutional Claims for Non-Face-To-Face Services

253. Perhaps most egregiously, United identified and disclosed to CMS a problem in IRADS that was causing it to submit false diagnoses, but has knowingly fixed the problem in only one out of two contexts.

254. The problem, which United refers to as "Issue 1," affects diagnosis codes that corresponded to multiple procedure codes. As discussed above, MA plans must use procedure codes to filter diagnoses codes to ensure the diagnoses were made during a face-to-face encounter with an eligible provider. The procedure codes used in professional (*e.g.*, physician) claims are known as CPT codes; the procedure codes used in institutional (*e.g.*, hospital) claims are called revenue codes.

255. For Issue 1, IRADS was inexplicably programmed to skip CPT code filtering—and essentially assume that a diagnosis was made during a face-to-face encounter with an eligible provider—as long as the diagnosis code was associated with

256. In 2008 and 2009, United investigated Issue 1 and confirmed it had caused United to submit invalid diagnoses to CMS. United notified CMS, fixed the CPT code filter, and submitted delete codes for the false diagnoses.

257. United, however, knowingly did not fix Issue 1 as it pertains to *institutional* claims. For institutional claims, IRADS continues to use the same erroneous logic such that an institutional claim with multiple non face-to-face revenue codes (the institutional equivalent to CPT codes) will pass IRADS' revenue code filter automatically. The result is that two wrongs often equal a right. A diagnosis with one bad revenue code is filtered out; a diagnosis with two bad revenue codes is submitted to CMS for payment.

### (7) United Knowingly Fails to Filter Diagnoses With Current Procedure Codes

258. To ensure that it screens diagnoses based on their procedure codes properly, United is required to review the procedure codes on its exclusion list annually. Procedure codes—CPT codes and revenue codes—are regularly modified or changed year-over-year, and MA plans often determine that they need to update their risk adjustment filters to reflect the changes. United, however, fails to perform annual procedure code reviews. The exclusion logic in IRADS is therefore out of date and results in United improperly submitting to CMS diagnoses with procedure codes that are no longer associated with a face-to-face encounter with an eligible provider.

**B.** **Ingenix and Its Commercial Customers Knowingly Submit, and Cause To Be Submitted, False Risk Adjustment Claims and Fail to Correct Previously-Submitted False Risk Adjustment Claims**

259. UHG's Ingenix subsidiary performs risk adjustment services for health plans other than United's. The health plans include, without limitation, defendants Health Net, Arcadian, and Tufts. The services Ingenix provides these plans include both processing and submitting risk adjustment claims to CMS using the flawed IRADS system and performing chart reviews for incremental codes. Ingenix performs these services in the same manner as it does for United, as discussed *infra*. As such, Ingenix knowingly submits, causes to be submitted, and conspires with its commercial clients to submit false claims on behalf of its commercial clients. So too, those commercial clients submit, cause to be submitted, and conspire with Ingenix to submit false claims. Ingenix and its commercial clients also fail to correct (and reimburse Medicare for) previously submitted claims that they later learn, or should learn, are false.

260. Ingenix's commercial clients named as defendants in this Complaint know or have reason to believe that Ingenix's chart review practices are fraudulent. Their knowledge is in some instances direct.

261. For example, Ingenix told at least some clients that it was developing a system to start "looking both ways"—*e.g.*, to look for both incremental and inaccurate diagnoses during chart reviews (a limited system was adopted in July 2011). Relator has information and believes that some of Ingenix's commercial clients, having opt-out clauses in their contracts, have told Ingenix that they will cease using Ingenix to submit their risk adjustment data if Ingenix decides to start "looking both ways."

262.    Health Net, meanwhile, has told Ingenix that it would simply follow United's lead, agreeing to having Ingenix review its charts for incremental and incorrect codes only if and when United implemented such reviews.

263.    In a June 2011 meeting with senior UHMR executives, Jeff Dumcum said that Ingenix's commercial clients had not asked it to look both ways during chart reviews, but that they "may change their opinion when CMS releases their RADV extrapolation methodology."  He noted that Health Net was the only commercial client currently willing to purchase "two way" chart reviews when United eventually implemented it.  In March 2011, meanwhile, Dumcum told senior UHMR managers that he was unaware of any other large plan that looked both ways in its chart reviews. Ingenix understands from its interaction with smaller MA plans, meanwhile, that they have overwhelmingly chosen not to look both ways because, as self-perceived "small fish," they believe they stand a lesser chance of CMS singling them out for defrauding the government.

264.    In addition, Ingenix's commercial risk adjustment clients have independent reason to know that Ingenix ignores incorrect diagnoses when it performs chart reviews: when Ingenix reports chart review results to its clients, it reports thousands of additional diagnoses, but no delete codes.  The Defendants know the risk adjustment data they submitted to CMS was not 100% accurate and substantiated.  By not identifying a single diagnosis to delete or replace, Ingenix clearly demonstrates to its clients that it disregards inaccurate and/or ineligible diagnoses.

**C.** **WellMed Knowingly Submits, and Causes To Be Submitted, False Risk Adjustment Claims and Fails to Correct Previously-Submitted False Risk Adjustment Claims**

265.    WellMed, through its various affiliates and subsidiaries, is both a provider group and a managed care plan.  In those joint roles, WellMed has both caused MA plans to submit false risk adjustment claims by providing those plans with false and fraudulent diagnosis information in connection with claims for physician services, and submitted false risk adjustment claims on its own in its capacity as a MA health plan.  WellMed also fails to correct (and reimburse Medicare for) previously submitted claims that it later learns, or should learn, are false

266.    Relator has information and believes that WellMed maintains policies and practices designed to maximize its risk adjustment submissions without regard to their accuracy or eligibility.  WellMed allocates significant resources to increasing its risk adjustment payments, submitting data to IRADS through its own processing system, DataRap, which is designed to identify HCCs (and which UHMR previously used directly for a portion of its Texas membership).

267.    DataRap is WellMed's system for identifying, processing, and submitting diagnosis codes to CMS for payment.  WellMed developed the system now called DataRap around 2005 to allow its nurse practitioners to perform chart reviews.  In 2008, WellMed expanded the system to include filtering and submitting diagnoses to CMS.  Like IRADS, however, DataRap contains serious flaws that have caused WellMed and United to submit false claims to CMS.  WellMed built DataRap using exclusionary logic that fails to filter diagnoses that are missing necessary information, such as CPT codes or provider specialty information.  DataRap's list of CPT codes is sparse and has not been updated since the system's development in 2008, which causes it to submit diagnoses

81

330

associated with CPT codes that are no longer eligible for risk adjustment. It also cannot accommodate service line item processing and only filters for laboratory and radiology CPT codes—not other CPT codes that indicate the absence of a face-to-face encounter. Therefore, like IRADS, WellMed designed DataRap to maximize the number of claims it could submit with disregard for whether those claims were false.

268. In addition, WellMed previously conducted chart reviews on behalf of UHMR to identify codes for submission to CMS. Unlike United, WellMed's chart audits are prospective. The reviewer looks at present-year charts to check if the doctor had failed to code a diagnosis made in the prior year. The reviewer does not, however, look for invalid diagnoses in the chart. Furthermore, in July 2011, WellMed IT employee Bryan Bain told Relator that WellMed's practice is not to delete incorrect diagnoses from prior years. Thus, if a chart reviewer in 2011 found an invalid diagnosis code in a 2010 chart, he or she could not delete that diagnosis because the "delete file" that WellMed prepares for submission to CMS is designed to include only present-year diagnoses.

269. When WellMed denies a claim on grounds of fraud, waste, and abuse, it does not check whether it submitted diagnoses to CMS based on the denied claim. It thus claims payment from CMS for diagnoses taken from claims it identified as fraudulent.

270. The serious problems with DataRap, chart review, and fraud, waste, and abuse have contributed to WellMed's artificially inflated risk scores.

271. WellMed's risk adjustment practices gave it the highest projected risk score among UHMR's capitated providers with over 2,000 members in January 2010.

272. Instead of imposing a corrective action plan on WellMed or terminating its contract, UHMR bought most of WellMed's business in 2011. Thus, UHMR continues

331

273.    Prior to its purchase by United, defendant WellMed owned two health plans, Physicians Health Choice ("PHC") and Citrus Health Care, Inc. ("Citrus").  PHC insures or insured approximately 40,000 Part C beneficiaries in Texas, Florida, Arkansas, and New Mexico.  Citrus insures or insured approximately 10,000 Part C beneficiaries and 44,000 Medicaid beneficiaries in Florida.  United acquired both PHC and Citrus when it bought WellMed.

274.    WellMed, through its health plans PHC and Citrus, defrauded CMS through the plans' risk adjustment practices.

275.    Both PHC and Citrus use WellMed's DataRap system to filter and submit diagnoses to CMS.  As described above, DataRap was designed to submit diagnoses so long as WellMed lacked tangible evidence the diagnosis was false, *i.e.*, it submits diagnoses that it failed to confirm, but also could not disprove, to have come from a qualifying face-to-face encounter.  WellMed's CFO, Joe Zimmerman, told Relator in April 2011 that any problems found in WellMed's charts would logically exist in PHC's and Citrus's charts as well.  He said "we use the same training, tools and process with our own health plans as we do in San Antonio," *i.e.*, at Princeton IPA, which submits WellMed's risk adjustment data to CMS through DataRap.  Therefore, in addition to DataRap, PHC and Citrus share WellMed's fraudulent chart review and fraud, waste, and abuse processes.

276.    In May 2011, Relator was assigned to review PHC's and Citrus's submission systems as part of United's ongoing efforts to absorb WellMed. UHMR CFO Scott Theisen warned Relator to be careful because employees at WellMed would be paranoid on account of the many compliance issues United was finding at its new company.

**D.    MedAssurant Knowingly Submits, and Causes To Be Submitted, False Risk Adjustment Claims and Fails to Correct Previously-Submitted False Risk Adjustment Claims**

277.    Through its CARA and CAAS solutions, MedAssurant both submits risk adjustment data directly to CMS and provides data to client health care plans in the submission-ready CMS-required RAPS format. For CARA solution clients, MedAssurant submits to CMS or provides to the plan RAPS files containing the incremental codes identified through CARA's one-sided data analysis and chart reviews. For CAAS clients, MedAssurant submits to CMS or provides to the plan RAPS files for all of the diagnosis codes contained in the client's data.

278.    Whether MedAssurant submits data directly to CMS or provides data to its clients with the representation that it is ready for submission to CMS, MedAssurant has a duty to provide only data that it reasonably believes to be accurate. Nevertheless, MedAssurant regularly submits data that it knows to be unreliable. The unreliability of physician submitted data is the very premise of MedAssurant's CARA solution, and yet MedAssurant looks only for incremental diagnosis codes and makes no effort to correct the over-coded and mis-coded diagnoses that it knows to be present. Thus, MedAssurant knowingly submits, and causes the submission of, false risk adjustment claims to CMS.

279. MedAssurant submits or causes the submission of false claims for many MA plans, including, but not limited to Defendants Aetna, BCBS Florida, BCBS Michigan, Bravo, Emblem, Healthfirst, Humana, Medica, and WellCare.

### 1.  MedAssurant Upcodes Risk Adjustment Claims

280. MedAssurant's elaborate system for increasing patient risk scores includes submission of risk adjustment claims for diagnoses that it knows to be unsupported by patient's records.   As explained above, ¶¶65–67, CMS guidelines dictate that ICD-9 codes may only be submitted for diagnoses that were treated in the applicable year during a face-to-face visit with an eligible provider, and recorded in the member's medical record.   However, MedAssurant ignores these requirements and instructs its chart reviewers to seek out and code for conditions that were not treated in the applicable  year and were otherwise undocumented and unsubstantiated.

281. MedAssurant's chart reviewers are trained to submit the codes that will result in the highest risk adjustment payments.  Former reviewers reported to Relator that "MedAssurant told us which codes paid the most," and reviewers were expected to keep the reimbursement rates of the different diagnosis codes in mind during the chart reviews. As one reviewer explained, "you code for the highest that you can because that's what gets reimbursed.  That's the system."

282. MedAssurant's reviewers are expected to do more than "code" the patient's medical records, they are supposed to interpret them, which means using the data to develop diagnoses that were not identified by the treating provider.  MA plans are only permitted to submit codes for diagnoses that are explicitly stated in a member's medical records.  However, MedAssurant trains its reviewers to go beyond reading charts for the explicitly stated diagnoses, and actually *interpret* patient's charts.  Reviewers are

trained to look beyond the documented diagnoses and into the other information, including prescription drugs and diagnostic tests, and directed to form their own conclusions regarding the applicable diagnoses. Thus, for example, if a diagnostic test showed that a patient had 80% blockage of a carotid artery, the reviewer would be expected to interpret the results of the test and submit a diagnosis code for restriction of the artery. Some MedAssurant reviewers were even trained to submit diagnoses based on members' medications. For example, if a patient were taking drugs typically associated with kidney disease, a reviewer would code for it, even though the chart did not contain any such diagnosis.

283.    MedAssurant has certain, specific rules regarding the appropriate way to interpret a chart in order to maximize members' risk scores. For example, if a member's medical record shows renal insufficiency for three months, MedAssurant directs its reviewers to code for chronic kidney disease, even where that diagnosis has not been documented by the treating physician. Although the prolonged renal insufficiency may provide sufficient diagnostic criteria from which a physician could determine that a patient had chronic kidney disease, it is a determination that must be made by the clinician, not a chart reviewer. CMS is very clear that only diagnoses recorded by an appropriate provider may constitute the basis for a risk score adjustment; other submissions are false.

284.    MedAssurant also fraudulently upcodes depression to major depression. When a chart reflects that a patient has had depression for six or more months, MedAssurant's chart reviewers are trained to automatically submit a code for a major depressive disorder. Major depression is characterized by certain traits, which may not

be present in unspecified depression. The Fourth Edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), which corresponds with the ICD-9 codes, lists several symptoms of depression (*e.g.*, significant weight loss when not dieting or weight gain, insomnia or hypersomnia nearly every day, fatigue or loss of energy nearly every day) and, for diagnostic purposes, defines major depressive disorder as the presence of the majority of the designated symptoms. Thus, in directing its reviewers to code major depression for members with no additional clinical symptoms, MedAssurant causes the submission of fraudulent codes for conditions that were never documented by an appropriate provider, and that the members likely did not have.

285. A further tactic used by MedAssurant is the "linking" of two separate coexisting conditions, by coding one condition as a complication of the other. MedAssurant trains reviewers to watch for instances of multiple coexisting conditions that are distinct diagnoses, but, if coded as one condition having caused or led to another, would increase a member's risk score. MedAssurant instructs reviewers to code such conditions as linked, even where the member's medical records do not support a causal relationship between them.

286. These fraudulent representations of causality are most often seen in the context of diabetes. For example, diagnoses of diabetes and chronic kidney disease should be represented with ICD-9-CM codes 2500.00-.03 (general diabetes) and 585.10-.90 (chronic kidney disease). These codes capture HCCs 19 and 131. HCC 19 adds .162 to the patient's risk score and HCC 131 adds .368. MedAssurant coders however, upon finding these two distinct diagnoses in a patient's chart, are directed to code the chronic kidney disease as a *complication* of diabetes, using ICD-9-CM code 250.40-.43 (diabetes

336

with renal manifestations), even where the medical record shows no evidence that the diabetes contributed to the member's chronic kidney disease. By coding chronic kidney disease as a complication, MedAssurant replaces HCC 19 (.162) with HCC 15 (.508), thus increasing the member's risk score by .346, which corresponds to approximately $3,000 or more in extra annual revenue for a single member. Former MedAssurant employees report that the company instructs reviewers to code for HCC 15 any time a patient's medical record contains both diabetes and chronic kidney disease.

287. MedAssurant also trains its reviewers to submit codes for every chronic condition that a member patient has been diagnosed with throughout his or her medical history, including conditions that the member has neither needed nor received treatment for in the relevant, preceding year. This practice violates CMS guidelines, which dictate that even when a member has been diagnosed with a chronic condition, the condition cannot be submitted to CMS or impact a patient's risk score unless the patient was treated for it in the relevant time period. CMS reasons that even though a condition may never go away, it will only increase the insurer's costs to the extent that it requires treatment. Had CMS intended to establish permanent HCCs for "chronic" conditions, it would have done so. Instead, it deliberately created a system by which a patient must be treated for a condition within the given year to justify the higher risk score. Nevertheless, MedAssurant trains coders that once a patient has been diagnosed with a chronic disease, it should always be captured as a current condition. MedAssurant fraudulently submits these unsupported diagnoses directly to CMS and to its client health plans for submission to CMS.

### 2. MedAssurant Fails To Correct (and Reimburse Medicare for) False Risk Adjustment Claims

288. MedAssurant, like United, knows that the claims data it receives from providers is often unreliable. MedAssurant capitalizes on this unreliability by offering product solutions to health plans through which MedAssurant conducts extensive data analysis and chart reviews to "correct" these errors. However, MedAssurant's CARA solution only seeks and implements the corrections that increase members' risk scores and payments, deliberately ignoring any mistakes that were financially beneficial to a client health plan.

289. MedAssurant's CARA solution is offered to clients as a way to "leverage a patient's healthcare data" to "identify pertinent 'gaps' of applicable ROI potential." As with United's programs, MedAssurant's CARA services could easily be used to look for both incremental and delete codes, however MedAssurant has deliberately designed the processes to look for incremental codes only.

290. MedAssurant's deliberate choice to seek out and correct physician errors only where the correction will increase a client plan's risk adjustment payments is particularly evident in two of the key CARA processes. First, the algorithms MedAssurant designed to identify CEDI gaps in member patients' data are structured to identify suspected un-coded and under-coded diagnoses, and ignore indications that a diagnosis was improperly submitted. Second, in its chart reviews, MedAssurant looks specifically for documentation to support incremental diagnoses and makes no effort to validate the codes that have been previously submitted. Through its CARA and CAAS solutions, MedAssurant submits health plan data directly to CMS and, thus, has a duty to submit accurate data.

89

291. Upon information and belief, MedAssurant designed the CARA solution's proprietary algorithms to ignore any signals that a diagnosis code was incorrectly documented, if the correction of that code would decrease the client plan's risk adjustment payments. As such, MedAssurant refers to CEDIs as "reimbursement improvement opportunities" and repeatedly describes them as data suggesting the existence of "chronic, additional, worsening, or more optimally classified disease processes," all terms highlighting CEDIs use to increase members' risk scores. Additionally, in its explanations of the CARA CEDI identifications, MedAssurant provides examples of "Under-Coded," "Worsening," and "Non-Coded" conditions, but no examples of, or even suggestions that CARA identifies, over-coded or mis-coded conditions.

292. Furthermore, even if the CARA CEDI identifications included a suspected mis-coded or over-coded condition, MedAssurant's CARA solution processes would dictate that the signal be ignored, rather than confirmed through review of the patient's chart. MedAssurant evaluates each CEDI based on the financial impact to the plan if the suspected diagnosis (or mis-diagnosis) were confirmed, as well as the probability that the patient's chart will contain sufficient documentation of the suspected diagnosis. MedAssurant uses these two factors to predict each CEDI's return-on-investment, and pursues only those CEDIs that are in line with the plan's ROI goals. Thus, under the CARA solution, MedAssurant would never investigate or further pursue a CEDI with a negative financial impact to a client health plan.

293. That the program could also easily help identify false claims previously submitted is demonstrated, if nothing else, by the fact that Relator believes, and on that

339

basis alleges, that MedAssurant has already created algorithms that identify data incongruences signaling mis-coded or over-coded conditions, which it uses in some of its other "solutions" and it would take little to no work to include these accuracy-based algorithms in its CARA solution as well.

294. Notwithstanding the design of its databases and algorithms, MedAssurant has ample opportunity during its chart review process to identify incorrect diagnoses that were the basis for previously submitted risk adjustment claims. Yet MedAssurant fastidiously refuses to take any steps to correct such erroneous prior claims.

295. That MedAssurant's reviews look only for new HCCs to submit, and ignore any previously submitted false claims, is well understood within the industry. For example, a newsletter sent out by a medical society addressed physician concerns about impending audits, writing:

> The audit that you don't have to worry about is the one where MedAssurant is auditing on behalf of an insurer which is a Medicare Advantage program. In this audit, MedAssurant is only trying to get more money from Medicare, which it can do if it can 'jack up' the intensity of the diagnosis code it finds in your charts. So, in this type of audit, MedAssurant is not looking for money from you.

*See* "UHC and MedAssurant Audits." FSIPP Newsletter, Vol. IV, Issue 2 (December 2010).

296. For CARA solution clients, MedAssurant conducts chart reviews in one of two ways: Certain reviewers are given a targeted list of diagnoses for each patient, the documentation of which they are directed to seek in patients' charts, while other, higher-level reviewers are not given a targeted list, but instead given a list of the HCC codes that

340

have already been assigned to each patient and trained to identify each and every opportunity to upcode, increasing patients' risk scores. For the purposes of this complaint, we will call the former method a targeted review, and the latter a comparative review.

297. A reviewer conducting a targeted review is given patient-specific sets of diagnoses that MedAssurant, through CEDI identification and ROI analysis, has determined are likely supported by documentation in the patient's chart and could substantially increase risk adjustment payments. Each diagnosis on a patient's list captures an additional or incremental HCC and the accordant increase in risk adjustment payments. These reviewers are trained to look only for the selected diagnoses, while ignoring any additional information in the chart, including evidence that diagnoses had been submitted in error. Thus, for example, if MedAssurant's CEDI analysis of a member has identified three suspected diagnoses that meet the ROI threshold, the chart reviewer will be directed to look for documentation supporting those three diagnoses only.

298. To facilitate coding of the new and incremental diagnoses in targeted chart reviews and to ensure that reviewers focus exclusively on the selected diagnoses, MedAssurant provides diagnosis-specific medical chart data templates designed to locate and fill in the information necessary to abstract the designated diagnoses. Thus, the only information that the reviewer seeks from the chart is that which will substantiate a suspected diagnosis. The reviewer is provided no templates to confirm that previously submitted diagnoses are accurate.

299.    The comparative record review method utilized by MedAssurant is even more insidious.  MedAssurant provides reviewers using the comparative method with lists of the HCC codes that have already been assigned to each of the members for use in their chart reviews.  However, MedAssurant instructs the comparative reviewers that their reviews should be used only to look for ways to code new and incremental conditions, not to verify the legitimacy of existing HCCs.

300.    A comparative review entails, by necessity, examination of the entirety of a member patient's medical record and comparison of the record with a list of HCC codes previously assigned to that member.  As such, reviewers inevitably identify assigned HCC codes that are not supported by the patient's record, and are thus false.  However, MedAssurant directs reviewers to ignore, rather than report, any such findings.  As one former chart reviewer explained, the purpose of the reviews is "to get the insurance company more money—they look for opportunities to receive more reimbursement."

301.    MedAssurant's executives and employees confirm that the company does not act on mis-coded or over-coded diagnoses in chart reviews.  In a phone call with a MedAssurant representative, Relator asked whether MedAssurant's chart reviewers ever look for incorrectly-coded diagnoses, the correction of which would reduce a plans' risk adjustment payments, and the MedAssurant representative responded with silence.  Likewise one of Relator's colleagues has spoken with MedAssurant regarding its chart review processes and MedAssurant conceded that the reviews are structured to look only for information to substantiate incremental diagnosis codes.

302.    MedAssurant could easily use their existing reviews to confirm whether physician-submitted diagnosis are substantiated by the medical record.  However, the

93

company is focused entirely on obtaining a maximized return-on-investment, and refuses to consider any actions that could jeopardize that goal.

### E. MedAssurant's Clients Knowingly Submit False Risk Adjustment Claims and Fail to Correct Previously-Submitted False Risk Adjustment Claims

303.    Defendants Aetna, BCBS Florida, BCBS Michigan, Bravo, Emblem, Healthfirst, Humana, Medica, and WellCare all have hired, used and otherwise conspired with MedAssurant, through its CARA and CAAS programs, to submit false and fraudulent risk adjustment claims.

304.    Evidence of each of these Defendants' work with MedAssurant, and other efforts to submit fraudulent risk adjustment claims include, but are not limited to, the following:

305.    A former MedAssurant coder reported to Relator that they reviewed charts for Aetna as part of the CARA program. Additionally, in approximately September 2008, the Michigan State Medical Society issued an alert advising providers that MedAssurant would be conducting medical chart reviews for risk adjustment purposes on behalf of several insurers, including Aetna.

306.    In November of 2010, MedAssurant issued a press release announcing an expansion of the company's relationship with BCBS Florida. The release described the services that MedAssurant had provided BCBS Florida, including "risk adjustment, medical record review and claims analytics." Upon information and belief, this is a description of BCBS Florida's use of MedAssurant's CARA and CAAS solutions, through which false risk adjustment data was knowingly submitted to CMS.

307.    BCBS Michigan has utilized the CARA and CAAS programs to increase the company's risk adjustment payments since at least 2008. When MedAssurant tried to

343

sell UHG the CARA and CAAS solutions, MedAssurant offered BCBS Michigan as a reference for the efficacy of their risk adjustment programs. BCBS Michigan gave MedAssurant a strong recommendation, citing the huge amount of money MedAssurant's programs brought the organization. In addition, in approximately September 2008, the Michigan State Medical Society issued an alert advising providers that MedAssurant would be conducting medical chart reviews for risk adjustment purposes on behalf of several insurers, including BCBS Michigan.

308.    In the Fall of 2008, Bravo sent a newsletter to participating physicians, notifying them that MedAssurant would be conducting chart reviews of Medicare Advantage beneficiaries "for risk adjustment purposes."

309.    Emblem has utilized the CARA and CAAS programs to increase the company's risk adjustment payments since at least 2008. When MedAssurant tried to sell UHG the CARA and CAAS solutions, MedAssurant offered Emblem as a reference for the efficacy of their risk adjustment programs. UHG contacted the company, and Emblem reported huge revenues from the programs in the form of large increases in the risk adjustment payments from CMS.

310.    In addition, Emblem's subsidiaries, ConnectiCare and HIP, also use MedAssurant's CARA and CAAS solutions. On or about May of 2009, ConnectiCare sent a newsletter reminding providers that MedAssurant would be conducting medical record reviews on behalf of the company "to ensure that all applicable diagnosis codes indicated in the patient charts are reflected on claims that are submitted to ConnectiCare for payment." Similarly, in Spring 2008, HIP issued a clinician newsletter explaining the year-round "risk adjustment reviews" of HIP Medicare Advantage patients' medical

records. The newsletter explained that MedAssurant conducts these reviews, during which they are "looking back at varying dates of service periods as well as looking for different documentation to support coding standards."

311. In the Spring of 2009, Healthfirst issued a newsletter to providers announcing an "exciting new partnership with MedAssurant." Healthfirst explained that MedAssurant would be performing ongoing chart reviews in response to CMS requirements that MA plans "document diagnoses in order to clarify specific medical conditions and identify chronically ill members"—phrasing that is consistent with MedAssurant's promotional material for the CARA program. Healthfirst also assured the providers that these reviews would not function as an audit of any provider's practice.

312. In approximately September 2008, the Michigan State Medical Society issued an alert advising providers that MedAssurant would be conducting medical chart reviews for risk adjustment purposes on behalf of several insurers, including Humana. According to the alert, any providers contacted by MedAssurant were required to participate in risk adjustment audits.

313. Relator also learned from a former Humana chart reviewer that Humana conducts chart reviews using internally-trained coders. Like MedAssurant, Humana's reviews are designed with the goal of increasing members' risk adjustment payments, and are aggressively one-sided.

314. The former Humana reviewer reported that Humana provides its chart reviewers with a list of chronic conditions and instructs reviewers where to seek documentation for those conditions in each patient chart. Some of the conditions the

chart reviewers were instructed to seek out include history of heart attack, hypertension, and peripheral vascular disease.

315. The Humana reviewers were instructed to look at materials beyond the physician's notes, including test results and prescription drug information, when looking for additional HCCs.

316. Even more, two former Humana chart reviewers (one of whom was also a trainer for the company) reported that Humana looks only for incremental diagnoses; they do not correct any diagnoses that were incorrectly submitted.

317. In September 2009, Medica issued a "diagnosis-verification update" in which it explained that it would continue using MedAssurant to conduct chart reviews for risk adjustment purposes (*i.e.*, to "validate the diagnos[e]s submitted to CMS as well as assist providers with comprehensive diagnosis-coding practices"). The update also provided a chart-review timeline dating back to March 2008 and going forward to January 2010, and suggesting that the project may have extended back to 2007.

318. WellCare has publicly announced that it has used MedAssurant's CARA services since at least October 2010.

319. Additionally, based on Relator's experience in the industry and knowledge of the business practices of various other health plans, he believes, and on that basis alleges, that these companies are also performing one-sided chart reviews and upcoding risk adjustment claims through vendors other than MedAssurant and using internal personnel.

320. Among the experience and knowledge Relator relies upon is his belief that no health plan would hire MedAssurant to perform risk adjustment-related services

unless that plan intended to, and as a general practice did, fraudulently increase its risk adjustment claims. After reviewing MedAssurant's data analysis algorithms and chart review practice, Relator believes that MedAssurant's processes are so obviously designed to fraudulently inflate risk scores (and offer no mechanism to correct errors found) that a health plan would not hire MedAssurant unless the plan itself was already applying or planning to apply that approach to all of its MA business.

321.    On this basis, Relator alleges that the named health plans have engaged in a widespread pattern of fraudulently upcoding the HCCs they have submitted, submitting HCCs that they otherwise know to be false, failing to correct previously submitted false claims, and conspiring with MedAssurant and others to do all of the same.

## COUNT

### Substantive Violations of the Federal False Claims Act
### 31 U.S.C. §§ 3729(a)(1)(A)–(C), (a)(1)(G)

322.    Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 321 of this Complaint.

323.    This is a claim for treble damages and forfeitures under the Federal False Claims Act, 31 U.S.C. §§ 3279–33, as amended.

324.    Through the acts described above, Defendants, their agents, employees, and co-conspirators, knowingly presented, or caused to be presented, to the United States false and fraudulent claims, and knowingly failed to disclose material facts, in order to obtain payment or approval from the United States and its contractors, grantees, and other recipients of its funds.

325.    Through the acts described above, Defendants, their agents, employees, and co-conspirators, knowingly made, used, and caused to be made and used false

records and statements, which also omitted material facts, in order to induce the United States to approve and pay false and fraudulent claims.

326.    Through the acts described above, Defendants, their agents, employees, and co-conspirators, knowingly made, used, and caused to be made and used false records and statements material to an obligation to pay and transmit money to the United States, and knowingly concealed and improperly avoided and decreased an obligation to pay and transmit money to the United States.

327.    Through the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the United States and to deceive the United States for the purpose of getting the United States to pay or allow false or fraudulent claims.

328.    The United States, unaware of the falsity of the records, statements, and claims made and submitted by Defendants, its agents, employees, and co-conspirators, and as a result thereof, paid money that it otherwise would not have paid.

329.    By reason of the payment made by the United States, as a result of Defendants' fraud, the United States has suffered hundreds of millions of dollars in damages and continues to be damaged.

## PRAYER

WHEREFORE, *qui tam* plaintiff Benjamin Poehling prays for judgment against Defendants as follows:

1.    That Defendants cease and desist from violating 31 U.S.C. §§ 3279–33;

2.    That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of

Defendants' actions in violation of the Federal False Claims Act, as well as a civil

penalty of $11,000 for each violation of 31 U.S.C. § 3729;

3.      That Relator be awarded the maximum amount allowed pursuant to 31

U.S.C. § 3730(d) of the Federal False Claims Act;

4.      That Relator be awarded all costs of this action, including attorneys' fees

and expenses; and

5.      That the United States and Relator receive all such other relief as the

Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby

demands trial by jury.

DATED: October 27, 2011                     Respectfully submitted,


By:  /s/ Brian M. Melber, Esq.
     Rodney O. Personius
     rop@personiusmelber.com
     Brian M. Melber
     bmm@personiusmelber.com
     Personius Melber LLP
     2100 Main Place Tower
     Buffalo, NY 14202
     Tel: (716) 855-1050
     Fax: (716) 855-1052

Mary A. Inman, *pro hac vice*
mai@pcsf.com
Timothy P. McCormack
tmccormack@phillipsandcohen.com
Edward H. Arens, *pro hac vice*
eha@pcsf.com
Phillips & Cohen LLP
131 Steuart Street, Suite 501
San Francisco, California  94105
Tel:  (415) 836-9000
Fax: (415) 836-9001
mai@pcsf.com

350

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of October, 2011, I forwarded the foregoing

document via first-class mail, postage prepaid to the following:

Robert Trusiak
Assistant United States Attorney
United States Attorney's Office for the
Western District of New York
138 Delaware Avenue
Buffalo, NY 14202

Richard S. Nicholson
Trial Attorney
U.S. Department of Justice
Civil Division, Civil Fraud Section
601 D. St., NW, Room 1209
Washington, D.C. 20004

/s/ Brian M. Melber, Esq.
Rodney O. Personius
rop@personiusmelber.com
Brian M. Melber
bmm@personiusmelber.com
Personius Melber LLP
2100 Main Place Tower
Buffalo, NY 14202
Tel: (716) 855-1050
Fax: (716) 855-1052

# EXHIBIT 1



March 26, 2010


Ms. Marilyn Hunter
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Mail Stop C4-21-26
Baltimore, MD 21244


Reference: 2009 Risk Adjustment Attestation


Dear Ms. Hunter:

Please find attached the signed 2009 Risk Adjustment Attestation for UnitedHealth Group
Medicare business.

If you have any questions, I may be reached via email at emily_e_vue@uhc.com or by telephone
at 952-931-4677.

Sincerely,

Emily Vue
Senior Regulatory Affairs Analyst
PSMG Regulatory Affairs

## ATTESTATION OF RISK ADJUSTMENT DATA INFORMATION RELATING TO CMS PAYMENT TO A MEDICARE ADVANTAGE ORGANIZATION

Pursuant to the contracts between the Centers for Medicare & Medicaid Services (CMS) and the UnitedHealth Group affiliate listed in Attachment 1, hereafter referred to as the MA Organization, governing the operation of the Medicare Advantage and Medicare Advantage-Prescription Drug plans listed in Attachment 1, the MA Organization hereby requests payment under the contract and, in doing so, makes the following attestation concerning CMS payments to the MA Organization.\*  The MA Organization acknowledges that the information described below directly affects the calculation of CMS payments to the MA Organization or additional benefit obligations of the MA Organization and that misrepresentations to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution.

The MA Organization has reported to CMS for the period of January 1, 2009 to December 31, 2009 all risk adjustment data for 2009 dates of service available to the MA Organization as of December 31, 2009, with respect to the MA and MA-PD plans listed in Attachment 1.  Based on best knowledge, information, and belief as of the date indicated below, all information submitted to CMS in such report and not subsequently deleted prior to the date hereof is accurate, complete, and truthful.

NAME: John Larsen
TITLE: Chief Financial Officer,
 Public & Senior Markets Group
On behalf of the UnitedHealth Group
entities listed in Attachment 1

3/26/10

DATE

\* This Certification is based on facts reasonably available or made available to the MA Organization as of the date of this Certification and is not to be construed as a representation by the entities listed in Attachment 1, their affiliates, officers, representatives, or agents that the data to which the Certification relate may not require subsequent modification should additional information become available. Best knowledge, information, and belief means based on normal business practices.  In addition, the scope of this Certification does not include risk adjustment data related to "long-term institutionalized" or "community," which the MA Organization is not required to report to or otherwise verify for CMS.  Such designations are made by CMS based on a CMS data source and are subject to reconciliation by CMS in accordance with Section 91.4.2 of Chapter 7 of the Medicare Managed Care Manual.  As previously communicated to CMS, we believe these designations are materially inaccurate.  However, we acknowledge CMS' position that such designations are generally accurate.

Annual Risk Adjustment Attestation/United Medicare

| Contract | Contracting Party |
|----------|-------------------|
| H0151 | United HealthCare of Alabama, Inc. |
| H0251 | United HealthCare Plan of the River Valley, Inc. |
| H0303 | PacifiCare of Arizona, Inc |
| H0316 | United HealthCare of Arizona Inc |
| H0321 | Arizona Physicians IPA, Inc. |
| H0401 | United HealthCare of Arkansas, Inc. |
| H0408 | United HealthCare Insurance Company |
| H0410 | United HealthCare Insurance Company |
| H0543 | PacifiCare of California |
| H0609 | PacifiCare of Colorado, Inc. |
| H0620 | United HealthCare Insurance Company |
| H0624 | United HealthCare Insurance Company |
| H0710 | United HealthCare Insurance Company |
| H0752 | Oxford Health Plans (CT), Inc. |
| H1080 | United HealthCare of Florida, Inc. |
| H1108 | United HealthCare Insurance Company |
| H1111 | United Healthcare of Georgia, Inc. |
| H1286 | United HealthCare Insurance Company |
| H1303 | United HealthCare Insurance Company |
| H1509 | United HealthCare Insurance Company |
| H1717 | United HealthCare Insurance Company |
| H1944 | United HealthCare Insurance Company |
| H2001 | United HealthCare Insurance Company |
| H2003 | United HealthCare Insurance Company |
| H2011 | United HealthCare Insurance Company |
| H2182 | United HealthCare Insurance Company |
| H2226 | United HealthCare Insurance Company |
| H2228 | United HealthCare Insurance Company |
| H2406 | United HealthCare Insurance Company |
| H2654 | United HealthCare of the Midwest, Inc. |
| H2802 | United HealthCare of the Midlands, Inc. |
| H2803 | United HealthCare Insurance Company |
| H2905 | Sierra Health and Life Insurance Company, Inc. |
| H2931 | Health Plan Of Nevada, Inc |
| H2961 | Health Plan of Nevada, Inc. |
| H3107 | Oxford Health Plans (NJ), Inc. |
| H3113 | Oxford Health Plans (NJ), Inc. |
| H3164 | AmeriChoice Of New Jersey, Inc. |
| H3209 | United HealthCare Insurance Company |
| H3307 | Oxford Health Plans (NY) Inc. |
| H3379 | United HealthCare of New York, Inc. |
| H3387 | United HealthCare of New York, Inc. |
| H3456 | United HealthCare of North Carolina, Inc. |

Annual Risk Adjustment Attestation/United Medicare

| Contract | Contracting Party |
|---|---|
| H3659 | United HealthCare of Ohio, Inc. |
| H3749 | PacifiCare of Oklahoma, Inc. |
| H3805 | PacifiCare of Oregon, Inc. |
| H3812 | United HealthCare Insurance Company |
| H3887 | United HealthCare Insurance Company |
| H3912 | United HealthCare Insurance Company |
| H3921 | United HealthCare Insurance Company |
| H4102 | United HealthCare of New England, Inc. |
| H4106 | United HealthCare Insurance Company |
| H4406 | United HealthCare of Tennessee, Inc. |
| H4449 | Sierra Health and Life Insurance Company, Inc. |
| H4514 | Evercare of Texas, LLC |
| H4456 | United HealthCare Plan of the River Valley, Inc. |
| H4522 | United HealthCare Insurance Company |
| H4590 | PacifiCare of Texas, Inc. |
| H4604 | United HealthCare of Utah |
| H4720 | United HealthCare Insurance Company of New York |
| H4837 | United HealthCare of Wisconsin |
| H4971 | United HealthCare Insurance Company |
| H5005 | PacifiCare of Washington, Inc. |
| H5008 | United HealthCare Insurance Company |
| H5253 | United HealthCare of Wisconsin, Inc |
| H5417 | United HealthCare Insurance Company |
| H5424 | United HealthCare Insurance Company |
| H5435 | PacifiCare Life & Health Insurance Company |
| H5440 | United HealthCare Insurance Company |
| H5507 | United HealthCare Insurance Company |
| H5516 | United HealthCare Insurance Company |
| H5532 | United HealthCare Insurance Company |
| H5678 | United HealthCare Insurance Company |
| H5697 | United HealthCare Insurance Company |
| H5749 | United HealthCare Insurance Company |
| H5754 | United HealthCare Insurance Company |
| H5918 | United HealthCare Insurance Company |
| H6228 | United HealthCare Insurance Company |
| H6793 | United HealthCare Insurance Company |
| H6952 | Great Lakes Health Plan, Inc. |
| H7187 | United HealthCare Insurance Company |
| H7949 | PacifiCare Of Nevada, Inc. |
| H8748 | United HealthCare Insurance Company |
| H9011 | United HealthCare of Florida Inc. |
| H9149 | United HealthCare Insurance Company |
| R3175 | United HealthCare Insurance Company |

| Contract | Contracting Party |
|----------|-------------------|
| R5287 | United HealthCare Insurance Company |
| R5342 | United HealthCare Insurance Company of New York |
| R5674 | Sierra Health and Life Insurance Company, Inc. |
| R7444 | United HealthCare Insurance Company |

# EXHIBIT 2

Advanced Clinical Solutions Group
Service Level Agreement
Clinical Quality & Risk Scoring Analytic Services

1. Services:
   a. Ingenix, through its Advanced Clinical Solutions Group ("ACS"), will provide Clinical Quality and Risk Scoring Analytic Services (the "Clinical Quality & Analytic Services", or "Services") to Ovations for Medicare Advantage members belonging to SecureHorizons and Evercare (including Medicaid) as follows:
      i. Data mining and tool development
      ii. Provider Engagement and education around diagnostic coding.
      iii. Oversight of encounter collection, submission and reconciliation pursuant to CMS risk adjustment rules and requirements.
      iv. Optimize the level of accuracy and completeness of diagnostic coding for a respective population by identifying opportunities to improve documentation and coding accuracy, facilitating improvement in accuracy by working directly with providers, Nurse Practioners and Care Managers to improve documentation and coding practices, and finally executing the timely and accurate submission of claim coding information to CMS, thereby ensuring appropriate revenues are being paid by CMS for the underlying risk inherent within the member population
      v. Provide clinical support programs to encourage early assessment and on-going treatment of chronic disease.
      vi. Conduct internal validation testing of outlier providers and fully support the CMS validation requirements.
      vii. Provide analysis on payments received from CMS
      viii. Perform reasonable ad hoc reporting and analysis relating to Medicare Advantage revenue as required to support Ovations
   b. ACS must comply with all HIPAA requirements and CMS requirements on patient confidentiality
   c. ACS to be subject to Ovations compliance and delegated provider oversight programs
   d. Ingenix must comply with all applicable Fraud and Abuse regulations including the False Claims Act

2. Technology
   a. To the extent allowed by existing licensing arrangements, contracts and legal restrictions, Ovations will grant licensing rights allowing Ingenix to make the following systems commercially available:
      i. iRADS – encounter submission system
      ii. CERTS – Membership & Revenue Reconciliation system
   b. Ingenix to make systems commercially available to plans external to UHG with prior consent of Ovations, whose consent will not be unreasonably withheld.
   c. Ovations will transfer necessary technology and intellectual property to enable performance of the Services, commercialization of the Services, as

Advanced Clinical Solutions Group
Service Level Agreement
Clinical Quality & Risk Scoring Analytic Services

well as to enable Ingenix to make future enhancements to the ACS technology.

   d. Disputes related to above consent will be decided by the UHG CEO and CFO or their designee

   e. Ingenix to make systems commercially available to Providers at their own discretion as allowed by existing licensing arrangements.

3. Steering Committee
   a. Ingenix will form a "steering committee" to meet at least quarterly and discuss progress and issues
   b. Steering Committee to be comprised of:
      i. Secure Horizons President (Sheila McMillan),
      ii. Secure Horizons CFO (Joe Hafermann),
      iii. Secure Horizons or Ovations Chief Medical Officer,
      iv. Evercare President, CFO, or other executive (Jeff Maloney),
      v. Head of Ingenix Clinical Analytics unit (Jeff Dumcum),
      vi. Ingenix Business Solutions representative ( Dave Ostler), and
      vii. Ingenix Chief Operating Officer ( Lee Valenta ),and
      viii. CSG President (Richard Anderson)
   c. Agenda at quarterly steering committee meeting to include:
      i. Strategic direction
      ii. Resourcing Issues
      iii. Compliance with Service Level Agreement provisions
      iv. Clinical Integration
      v. Network development integration
      vi. Preliminary upcoming year financial targets

4. Reporting
   a. Head of Ingenix Clinical Quality Unit and Secure Horizons CFO/Evercare CFO to meet monthly and discuss financial forecasts.
   b. Ingenix Clinical Quality Unit to provide monthly report specifying:
      i. Summary of any compliance issues
      ii. Current and Forecasted FTE's dedicated to the Clinical Quality Unit,
      iii. Projected results to Ovations including:
         1. Estimation of Elimination of current year Lag payment
         2. Estimation of current year Final Settlement payment
         3. Estimation of prior year Final Settlement
      iv. Other Financial and Operational Reports as reasonably requested.
   c. Ingenix will work jointly with Ovations in the period leading up to the annual bid process (early June) in developing forecasted revenue assumptions for the subsequent year to support Ovations bid planning process. Prior to April 15 of each year, Ingenix will provide to Ovations

Advanced Clinical Solutions Group
Service Level Agreement
Clinical Quality & Risk Scoring Analytic Services

its best estimates for revenue rate impacts from risk scoring, in a format
acceptable to the Secure Horizons and Evercare CFOs.

    d. Ingenix will provide Ovations with prior notification ( as soon as practical,
but in no case less than 45 days), with its intent to take any of the
following actions:

        i. A reduction of force that is greater than 10% of the then current
Clinical Quality Unit workforce. In such case, the parties will
meet and agree to any necessary amendments to the Monthly Base
Fee described in Section 5(a)i below.

        ii. Termination of any of the top 5 most highly compensated
employees of the Clinical Quality Unit.

5. Exclusivity

    a. For 2007, Ingenix will perform the Clinical Quality & Analytic Services
exclusively for Ovations with the following exceptions:

        i. Member and Revenue Reconciliation and Encounter submission
software

        ii. State Medicaid Programs with prior consent of Ovations, whose
consent will not be unreasonably withheld, and

        iii. UHG Affiliated entities.

    b. For 2008, Ingenix will perform the Clinical Quality & Analytic Services
exclusively for Ovations with the following exceptions:

        i. Member and Revenue Reconciliation and Encounter submission
software

        ii. State Medicaid Programs with prior consent of Evercare, whose
consent will not be unreasonably withheld,

        iii. UHG Affiliated entities

        iv. Regional Payers with prior consent of Ovations, whose consent
will not be unreasonably withheld, and

        v. Ingenix may sell Clinical Quality & Analytic Services to
Providers at its own discretion.

    c. For 2009 and beyond , Ingenix will perform the Clinical Quality &
Analytic Services exclusively for Ovations with the following exceptions:

        i. Member and Revenue Reconciliation and Encounter submission
software

        ii. State Medicaid Programs with prior consent of Evercare, whose
consent will not be unreasonably withheld,

        iii. UHG Affiliated entities

        iv. Regional Payers with prior consent of Ovations, whose consent
will not be unreasonably withheld,

        v. National Payers with the prior consent of Ovations, whose consent
will not be unreasonably withheld.

        vi. Ingenix may sell Clinical Quality & Analytic Services to
Providers at its own discretion.

    d. Disputes related to the above Exclusivity Consent Waivers will be decided
by the UHG CEO and CFO or their designee.

Advanced Clinical Solutions Group
Service Level Agreement
Clinical Quality & Risk Scoring Analytic Services

6. Financial Relationship

    a. Ingenix will be paid a Monthly Base Fee and an Incentive Fee as described below:

        i. The Base Fee will be $3.00 PMPM beginning June 1, 2007 and ending December 31, 2007. The Base Fee will be $2.25 PMPM beginning January 1, 2008 and ending December 31, 2008. PMPM is defined as the monthly average of Secure Horizons and Evercare Medicare Advantage members, excluding Evercare Institutional members, that are Continuously Enrolled for the rolling three prior months. Evercare Institutional Members Monthly Base Fee will be $.25 PMPM.

            1. Fees for years subsequent to 2008 will be negotiated in the normal course (prior to June 1, 2008 for 2009) and will take into consideration historical results of the Clinical Quality and analytical Services, Ingenix cost forecasts, and federal funding levels and medical trend for Medicare Advantage products.

        ii. The Incentive Fee will be calculated as follows:

| HCC Change | 2.5% to 3.0% | 3.0% to 3.5% | 3.5% to 4.0% | 4.0 to 4.5% | > 4.5% |
|---|---|---|---|---|---|
| Reimbursement Percentage | 5.0% | 5.5% | 6.0% | 6.5% | 7.0% |

Incentive Fees - 2008 and beyond

| HCC Change | 2.5% to 3.0% | 3.0% to 3.5% | 3.5% to 4.0% | 4.0 to 4.5% | > 4.5% |
|---|---|---|---|---|---|
| Reimbursement Percentage | 8.0% | 10.0% | 10.5% | 11.0% | 11.5% |

    b. For purposes of calculating the 2007 Incentive Payment, Incremental Plan Revenues will represent the combined total of the Current Year (CY) Lag Elimination Payment to be paid by CMS during calendar 2007, the Current Year (CY) Estimate of the 2007 Final Settlement (as determined and reported by Ovations accounting, and reviewed by Ingenix), and the Prior Year (PY) Final Settlement (for 2006) to be paid by CMS during calendar 2007.

362

Advanced Clinical Solutions Group
Service Level Agreement
Clinical Quality & Risk Scoring Analytic Services

c. For purposes of calculating the 2008 (and beyond) Incentive Payments, Incremental Plan Revenues will be calculated in accordance with Exhibit A attached hereto.

d. During the November submission of the Annual Budget cycle, the Parties will agree on an estimated calendar year "Contingent Fee" to use in each UHG forecasting cycle. Monthly "accruals" will be recorded based on one-twelfth of this agreed estimate. The Parties will adjust the calendar year Contingent Fee estimates at each UHG forecasting cycle date. (presumably April 30, June 30, August 31, October 31) and adjust the Monthly accrual to obtain the goal of not having an over accrual or under accrual at December 31st of such calendar year.

e. Calculation of the Incentive Fee will be trued up by April 15 of the succeeding year. The Secure Horizons CFO will verify results and payment calculation prior to payment.

f. 2007 arrangements:

i. The Base Fee of $3.00 PMPM will begin effective June 1st An estimate of the Monthly Incentive Fee will be agreed between the two parties by June 8th and recorded for the remaining 7 months of 2007. Such estimate will be reviewed on August 31st and October 31st to determine if a change in the monthly accrual is necessary.

g. Notwithstanding the preceding paragraphs, in the event that Ingenix proposes to offer Clinical Quality Services to an Ovations National Competitor and Ingenix has offered more favorable pricing terms to such National Competitor for the same type, scope and level of effort of Services, then Ingenix shall make such more favorable pricing terms available to Ovations on a go-forward basis for such services in the affected geographic market.

Agreed & Acknowledged:

Ovations, Inc

Jerry Knutson

Ingenix, Inc

Lee D. Valenta

# Ingenix/Ovations Service Level Agreement
## Exhibit A:  Incentive Fee HCC RAF Change

| | | Assumptions | Base Yr 2007 | Year 1 2008 | Year 2 2009 | Year 3 2010 |
|---|---|---|---|---|---|---|
| **Summary Information** | | | | | | |
| **Total Members** | a | +50k/Yr | 1,300,000 | 1,350,000 | 1,400,000 | 1,450,000 |
| Continuously Enrolled | b | 82% | n/a | 1,066,000 | 1,107,000 | 1,148,000 |
| New Members | c = a-b | | n/a | 284,000 | 293,000 | 302,000 |
| **RAF** | | | | | | |
| Age/Sex | d | 0.005 | 0.470 | 0.475 | 0.480 | 0.485 |
| Medicaid/Previously Disabled | e | | 0.020 | 0.020 | 0.020 | 0.020 |
| HCC - Chronic Conditions | f | 0.025 | 0.490 | 0.515 | 0.540 | 0.565 |
| Total | g = sum(d:f) | | 0.980 | 1.010 | 1.040 | 1.070 |

*For Illustration Benchmark and Measurement period RAF scores are shown to be the same; however, they will be different values based on the defined populations.

| | | | | | | |
|---|---|---|---|---|---|---|
| **Avg Rate (Avg PMPM/Total RAF)** | h | | $ 800 | $ 832 | $ 865 | $ 900 |
| | | | | | | |
| **HCC RAF Change Only** | | | | | | |
| **Prospective RAF Change** | i | | | 0.025 | 0.025 | 0.025 |
| Incremental Revenue | j = b*h*i*12 | | | $ 266,073,600 | $ 287,359,488 | $ 309,922,529 |
| Percent Change | k= i/g | | | 2.5% | 2.4% | 2.3% |
| | | | | | | |
| **Retrospective RAF Change** | | | | | | |
| PY Final Payment | l | | | $ 87,000,000 | $ 100,065,546 | $ 113,131,093 |
| PY Total Revenue | m | | | $13,151,000,000 | $15,126,000,000 | $17,101,000,000 |
| % Change | n = l/m | | | 0.7% | 0.7% | 0.7% |
| | | | | | | |
| **NewCo Incentive Calc** | | | | | | |
| Total Change % for incentive schedule | o = k+n | | | 3.1% | 3.1% | 3.0% |
| Total Incremental Revenue | p = j+l | | | $ 353,073,600 | $ 387,425,034 | $ 423,053,622 |
| Incentive % | q | | | 10.000% | | |
| Incentive | r = q*p | | | $ 35,307,360 | | |

**Incentive Schedule - Continuously Enrolled Intersegment MA Members**

| Range | Incentive % of Incremental Revenue |
|---|---|
| <2.5% | 0.0% |
| 2.5% - 3.0% | 8.0% |
| 3.0% - 3.5% | 10.0% |
| 3.5% - 4.0% | 10.5% |
| 4.0% - 4.5% | 11.0% |
| >4.5% | 11.5% |

# Jeff Dumcum
# Exhibit A Definitions

a.      Total MA Members = Total Members enrolled on July 1st of each year (include retro-active enrollment/disenrollment)
b.      Continuously Enrolled MA Members = Members enrolled 7/1 of the baseline year still enrolled 7/1 of the following year.
c.      New MA Members = Members enrolled post 7/1 of the baseline year
         *Membership numbers include all contracted MA Plans.
                 Ovations
                 Includes:  All Secure Horizons and Evercare Community MA Plans
                 Excludes:  Evercare Institutional Plans, Medicaid Only Plans and Prescription Drug Plans (PDP).
                 Members switching Ovations MA plans will be counted in the plan of record as of 7/1 of measurement year.
d.      Average Age/Sex RAF = Average of member level RAF scores calculated from CMS Age/Sex Tables
e.      Average Medicaid/Previously Disabled = Average of member level RAF scores calculated for Medicaid Add-on and Previously Disabled
f.      Average HCC RAF = Average of member level RAF scores calculated for reported HCC conditions
g.      Average Total RAF = d + e + f
h.      Average Rate = Average Total CMS Payment PMPM divided by Average Total RAF
i.      Prospective HCC RAF Change = Measurement Year HCC RAF minus Benchmark Year HCC RAF (2) - (1)
         (1) Benchmark Year HCC RAF - Average RAF from HCC factors for Continuously Enrolled MA Members (b.)
                 Use the conditions reported for benchmark year at payment year factors (Remove impact CMS model adjustments to HCC scores)
                 Assume all members in Community plans at Community risk scores and all Institutional Plans at Institutional Risk scores (Remove C to I impact)
         (2) Measurement Year HCC RAF - Average RAF from HCC factors for Continuously Enrolled MA Members (b.)
                 Use the conditions reported for measurement year at payment year factors (Remove impact CMS model adjustments to HCC scores)
                 Assume all members in Community plans at Community risk scores and all Institutional Plans at Institutional Risk scores (Remove C to I impact)
j.      Incremental Revenue = b * h * i *12
k.      Prospective Percent Change = i / g
l.      Prior Year Final Payment = HCC Portion of Final Payment for Benchmark year received in the Payment Year for all community plans
                 Excludes:  Final payment impact from changes of status for enrollment, special status and demographic factors (ie C to I)
m.      Prior Year Total Revenue = Total revenue received from CMS (MMR files) for members effective the prior year.
n.      Retrospective Percent Change = l / m
o.      Total Change Percent for Incentive Schedule = k + n
p.      Total Incremental Revenue = j + l
q.      Reimbursement Percent = Applicable percent of incremental revenue per the Incentive Schedule.
r.      Incentive Payment = q * p

Benchmark/Baseline Year = Year prior to Incentive plan (For 2008 Incentive Plan the Benchmark/Baseline year is 2007)
Measurement/Payment Year = Year of the Incentive Plan and the expected year of CMS payment receipt.

**Estimate of Intersegment ACS Revenue**
**2008 Payment Year**
**Per Provisions of Exhibit A**
**Values Based on Estimated Change From 2006 to 2007**

| | | Base Yr 2007 | Year 1 2008 |
|---|---|---|---|
| **Summary Information** | | | |
| **Total Members** | a | | 1,349,344 |
| Continously Enrolled | b | | 1,122,576 |
| New Members | c = a-b | | 226,768 |
| **RAF** | | | |
| Age/Sex | d | 0.493 | 0.460 |
| Medicaid/Previously Disabled | e | 0.020 | 0.020 |
| HCC - Chronic Conditions | f | 0.430 | 0.458 |
| Total | g = sum(d:f) | 0.943 | 0.939 |
| | | | |
| **Avg Rate (Avg PMPM/Total RAF)** | h | | $ 832 |
| | | | |
| **HCC RAF Change Only** | | | |
| **Prospective RAF Change** | i | | 0.034 |
| Incremental Revenue | j = b*h*i*12 | | $ 376,043,790 |
| Percent Change | k= i/g | | 3.57% |
| | | | |
| **Retrospective RAF Change** | | | |
| PY Final Payment | l | | $ 165,000,000 |
| PY Total Revenue | m | | $ 13,100,000,000 |
| % Change | n = l/m | | 1.26% |
| | | | |
| **NewCo Incentive Calc** | | | |
| Total Change % for incentive | o = k+n | | 4.83% |
| Total Incremental Revenue | p = j+l | | $ 541,043,790 |
| Incentive % | q | | 11.500% |
| Incentive | r = q*p | | $ 62,220,036 |

C:\Documents and Settings\bpoehli\Local Settings\Temporary Internet Files\OLK15F\2008 Ovations Exhibit A Estimated Revenue      1/20/2011 3:03 PM

366

# EXHIBIT 3

| From: | Knutson, Jerry J |
|---|---|
| Sent: | Wednesday, November 07, 2007 11:52 AM |
| To: | Dumcum, Jeff S |
| Cc: | Valenta, Lee D; Hafermann, Joseph A; Poehling, Benjamin |
| Subject: | Step on the Gas |

Jeff:

Wanted to get together with you and discuss what we can do in the short term and long-term to really go after the potential risk scoring you have consistently indicated is out there. As we have discussed, I'd like to see an action plan as to what is achievable for 2008 reimbursements and long-term.

You mentioned vasculatory disease opportunities, screening opportunities, etc with huge $ opportunities. Lets turn on the gas! What can we do to make sure we are being reimbursed fairly for the members and risk we take on more than what we are currently doing.

When we meet next on our steering committee, I'd like to see what it would take to add another $100M to our 2008 revenue from where we are. What would be doable? What resources would you need? What technology would you need?

Also, I'd like to explore the question of: With us paying Optum something like $125M this year, including newly delivered disease management and clinical programs, I'd like to understand how you can leverage off of that investment. As our members are being engaged clinically, what can you leverage? Add questions to the HRA? Get you "suspect lists" from the Optum clinical engagement, etc?

I believe Ben is supporting you from ourside, so use him to help navigate Ovatinos - but lets go after it.

jk

# EXHIBIT 4



# INGENIX®

## Ovations
## Risk Adjustment Programs

September 21, 2007

Ingenix | Intelligence for Health Care | ingenix.com

# Agenda

I. **Risk Score Trends**
    A. Trends/Budgets
    B. September Submission
    C. Disease Prevalence

II. **Chart Validation**

III. **Staffing Plan**

IV. **Key Initiatives**

V. **IT**

VI. **Commercialization**

# Risk Adjustment – Lump Sum Payments

**Elimination of Lag**

| | Part A/B | | | | Part D | | | | Total | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2005 | 2006 | 2007 | 2008 | 2005 | 2006 | 2007 | 2008 | 2005 | 2006 | 2007 | 2008 |
| **SH** | | | | | | | | | | | | |
| *West* | $ 140.7 | $ 139.2 | $ 146.9 | $ 142.0 | | $ 9.9 | $ 3.2 | $ 2.9 | $ 140.7 | $ 149.1 | $ 150.1 | $ 144.9 |
| *East* | $ 26.8 | $ 10.3 | $ 102.8 | $ 79.0 | | $ (1.3) | $ 5.0 | $ 4.4 | $ 26.8 | $ 9.0 | $ 107.8 | $ 83.4 |
| SH Total | $ 167.5 | $ 149.5 | $ 249.7 | $ 221.0 | $ - | $ 8.6 | $ 8.2 | $ 7.3 | $ 167.5 | $ 158.1 | $ 257.9 | $ 228.3 |
| **EVC** | | | | | | | | | | | | |
| *Community* | $ 1.4 | $ 6.0 | $ 17.1 | $ 16.8 | | $ 0.5 | $ 1.1 | $ 1.0 | $ 1.4 | $ 6.5 | $ 18.2 | $ 17.8 |
| *Institutional* | $ 4.6 | $ (5.4) | $ 15.8 | $ 5.5 | | $ 0.4 | $ 1.3 | $ 0.4 | $ 4.6 | $ (5.0) | $ 17.1 | $ 5.9 |
| EVC Total | $ 6.0 | $ 0.6 | $ 32.9 | $ 22.3 | $ - | $ 0.9 | $ 2.4 | $ 1.4 | $ 6.0 | $ 1.5 | $ 35.3 | $ 23.7 |
| **Ovations Total** | $ 173.5 | $ 150.2 | $ 282.6 | $ 243.3 | $ - | $ 9.5 | $ 10.6 | $ 8.7 | $ 173.5 | $ 159.7 | $ 293.2 | $ 252.0 |

**Final**

| | Part A/B | | | | Part D | | | | Total | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2005 | 2006 | 2007 | 2008 | 2005 | 2006 | 2007 | 2008 | 2005 | 2006 | 2007 | 2008 |
| **SH** | | | | | | | | | | | | |
| *West* | $ 106.4 | $ 136.5 | | | | $ 12.2 | | | $ 106.4 | $ 148.7 | $ - | $ - |
| *East* | $ 14.0 | $ 139.8 | | | | $ 17.5 | | | $ 14.0 | $ 157.3 | $ - | $ - |
| SH Total | $ 120.5 | $ 276.3 | $ 150.0 | $ 126.0 | $ - | $ 29.7 | $ 15.0 | $ 12.6 | $ 120.5 | $ 306.0 | $ 165.0 | $ 138.6 |
| **EVC** | | | | | | | | | | | | |
| *Community* | $ 1.8 | $ 10.2 | | | | $ 1.4 | | | $ 1.8 | $ 11.6 | $ - | $ - |
| *Institutional* | $ (11.9) | $ 11.6 | | | | $ 3.0 | | | $ (11.9) | $ 14.6 | $ - | $ - |
| EVC Total | $ (10.0) | $ 21.8 | $ 12.0 | $ 10.0 | $ - | $ 4.4 | $ 2.0 | $ 1.5 | $ (10.0) | $ 26.2 | $ 14.0 | $ 11.5 |
| **Ovations Total** | $ 110.4 | $ 298.1 | $ 162.0 | $ 136.0 | $ - | $ 34.1 | $ 17.0 | $ 14.1 | $ 110.4 | $ 332.2 | $ 179.0 | $ 150.1 |

*2007 Final Range of $142 to $162

Ingenix | Intelligence for Health Care | ingenix.com

© Ingenix, Inc.  3

# Risk Adjustment HCAI Measurement

| | 2007 HCAI | | 2008 HCAI |
|---|---|---|---|
| Jul 06 RAF | 0.941 | Jul 07 RAF | 0.998 |
| Jul 07 RAF | 0.998 | Jul 08 RAF | 1.029 |
| **Change** | **0.057** | **Change** | **0.031** |
| PMPM Rate | $ 800.00 | PMPM Rate | $ 800.00 |
| MMs | 16,150,000 | MMs | 17,000,000 |
| **HCAI Total** | **$ 734,000,000** | **HCAI Total** | **$ 420,000,000** |
| 2006 Final | $ 298,000,000 | 2007 Final | $ 18,000,000 |
| 2007 Final | $ 144,000,000 | 2008 Final | $ 135,000,000 |
| **Total** | **$ 1,176,000,000** | **Total** | **$ 573,000,000** |

# Submission and Payment Dates

**Jan 08** -------------- **Jun 08**   **Jul 08** ------------- **Dec 08**

### Preliminary Risk Payment

Data Collection Period:  Jul 06 – Jun 07

Data Submitted:          Sep 07

Cash Received:           Jan 08 – Jun 08

### Adjusted Risk Payment

Data Collection Period:  Jan 07 – Dec 07

Data Submitted:          Mar 08

Cash Received:           Jul 08 – Dec 08

### Retroactive Risk Payment

Data Collection Period:  Jan 07 – Dec 07

Data Submitted:          Mar 08

Cash Received:           Q3 08

### Final Risk Payment

Data Collection Period:  Jan 07 – Dec 07

Data Submitted:          Jan 09

Cash Received:           TBD 09

# Ovations Risk Score Trend



# Ovations Disease Prevalence - Summary

| HCC | Description | 2006 Prevalence | 2007 Prevalence | 2008 Target | Change | Avg RAF | Impact | Target |
|-----|-------------|-----------------|-----------------|-------------|--------|---------|--------|--------|
| **Vascular Disease** | | | | | | | | |
| 104 | Vascular Disease w/complications | 1.46% | 1.64% | | | | | |
| 105 | Vascular Disease w/o complications | 8.36% | 9.71% | | | | | |
| | Subtotal Vascular Disease | 9.82% | 11.35% | 13.00% | 1.65% | 0.315 | 0.0052 | 35% |
| **Pulmonary Disease** | | | | | | | | |
| 107 | Cystic Fibrosis | 0.02% | 0.20% | | | | | |
| 108 | COPD | 11.49% | 12.24% | | | | | |
| | Subtotal Pulmonary Disease | 11.50% | 12.44% | 13.44% | 1.00% | 0.387 | 0.0039 | 18% |
| **Diabetes** | | | | | | | | |
| 015 | Diabetes w/Renal/Peripheral Circ Manifestations | 2.90% | 4.04% | | | | | |
| 016 | Diabetes w/Neurologic Manifestations | 3.15% | 3.18% | | | | | |
| 017 | Diabetes w/ Acute Complications | 0.24% | 0.13% | | | | | |
| 018 | Diabetets w/ Ophthalmic Complications | 2.14% | 2.38% | | | | | |
| | Subtotal Diabetic Complications | 8.44% | 9.73% | 11.23% | 1.50% | 0.267 | 0.0040 | 15% |
| 019 | Diabetes w/o complication | 15.32% | 15.68% | 15.68% | | | | |
| | Subtotal Diabetes | 23.75% | 25.41% | 26.91% | 1.50% | | | 35% |
| **Renal Conditions** | | | | | | | | |
| 130 | Dialysis Status | 0.09% | 0.29% | 0.29% | | | | |
| 131 | Renal Failure | 3.56% | 6.30% | 7.80% | 1.50% | 0.378 | 0.0057 | 20% |
| 132 | Nephritis | 0.56% | 0.62% | 0.62% | | | | |
| | Subtotal Renal Conditions | 4.21% | 7.21% | 8.71% | 1.50% | | | |
| **Mental Health** | | | | | | | | |
| 055 | Major Depressive Disorder/Bipolar | 2.45% | 3.12% | | | | | |
| 054 | Schizophrenia | 0.35% | 0.39% | | | | | |
| 052 | Drug/Alcohol Dependence | 0.50% | 0.59% | | | | | |
| 051 | Drug/Alcohol Psychosis | 0.28% | 0.33% | | | | | |
| | Subtotal Mental Health Disorders | 3.58% | 4.43% | 5.43% | 1.00% | 0.360 | 0.0036 | 7% |

**Ingenix** | Intelligence for Health Care | ingenix.com

© Ingenix, Inc.   7

# Ovations Disease Prevalence - Summary

| HCC | Description | 2006 Prevalence | 2007 Prevalence | 2008 Target | Change | Avg RAF | Impact | Target |
|---|---|---|---|---|---|---|---|---|
| *Cardiac Conditions* | | | | | | | | |
| 080 | CHF | 9.18% | 10.10% | | | | | |
| 081 | Acute MI | 0.88% | 0.95% | | | | | |
| 082 | Unstable Angina, Acute Ischemic Heart Disease | 2.33% | 2.05% | | | | | |
| 083 | Angina/Old MI | 4.88% | 4.74% | | | | | |
| 092 | Specified Heart Arrhythmias | 9.21% | 10.15% | | | | | |
| | Subtotal Cardiac Conditions | 26.48% | 27.99% | 29.00% | 1.01% | 0.340 | 0.0034 | 32% |
| *Cancers* | | | | | | | | |
| 007 | Metastatic Cancer | 0.78% | 0.82% | | | | | |
| 008 | Lung/Other Severe Cancers | 0.85% | 0.73% | | | | | |
| 009 | Lymphatic/Other Major Cancers | 1.35% | 1.24% | | | | | |
| 010 | Breast/Prostate/Colorectal Cancer | 7.26% | 7.06% | | | | | |
| | Subtotal Cancers | 10.24% | 9.85% | 9.85% | 0.00% | 0.400 | 0.0000 | 10% |
| *Other* | | | | | | | | |
| 071 | Polyneuropathy | 3.47% | 4.65% | 5.40% | 0.75% | 0.315 | 0.0024 | 6% |
| *Institutional Items - Much higher prevalence in Institutional Population* | | | | | | | | |
| 031 | Intestinal Obstruction | 1.21% | 1.31% | | | | | |
| 148 | Decubitus Ulcer | 0.30% | 0.65% | | | | | |
| 021 | Protein Calorie Malnutrition | 0.52% | 0.70% | | | | | |
| | Subtotal - Key Institutional Items | 2.03% | 2.66% | 2.66% | 0.00% | | | |
| **All Other Conditions (42 HCCs)** | | **26.87%** | **29.14%** | 30.14% | 1.00% | 0.300 | 0.0030 | 33% |
| **Total** | | **121.97%** | **135.13%** | 144.54% | **9.41%** | | **0.0311** | |

© Ingenix, Inc.   8

# Evercare Institutional – Draft – Very Preliminary

| HCC | Description | Relative Risk Factor | 07 Prev Rate% | 08 Prev Rate % |
|---|---|---|---|---|
| 105 | Vascular Disease | 0.158 | 39.26% | 46.96% |
| 131 | Renal Failure | 0.395 | 18.66% | 41.77% |
| 080 | Congestive Heart Failure | 0.222 | 25.97% | 34.53% |
| 108 | COPD | 0.314 | 17.45% | 22.65% |
| 055 | Major Depression | 0.296 | 13.97% | 21.96% |
| 015 | Diabetes with Renal CC | 0.448 | 11.11% | 18.16% |
| 021 | Protein-Calorie Malnutrition | 0.380 | 6.09% | 11.51% |

*Increase appears overstated as by the time we reach the end of 2008 some of these members will leave due to death.

| HCC | Description | EVCI_INST_AZ_H0319 | EVCI_INST_TN_H0408 | EVCI_INST_CO_H0820 | EVCI_INST_CT_H0710 | EVCI_INST_GA_H1108 | EVCI_INST_MN_TI_H2111 | EVCI_INST_MA-RI_H2228 | EVCI_INST_OH_H2408 | EVCI_INST_IA-NE_H2802 | EVCI_INST_NJ_H3113 | EVCI_INST_MI_H3209 | EVCI_INST_NY_H3379_002 | EVCI_INST_NY_H3379_022 | EVCI_INST_NC_H3456 | EVCI_INST_OR_H3912 | EVCI_INST_PA_H3912 | EVCI_INST_H3908 | EVCI_INST_WI_H6263 | EVCI_INST_FL_H6417 | EVCI_INST_GA_H7284 | EVCI_INST_CT_* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Plan Prevalence Rate (%) | Plan Prevalence Rate (%) | Plan Prevalence Rate (%) | Plan Prevalence Rate (%) | Plan Prevalence Rate (%) | Plan Prevalence Rate (%) | Plan Prevalence Rate (%) | Plan Prevalence Rate (%) | Plan Prevalence Rate (%) | Plan Prevalence Rate (%) | Plan Prevalence Rate (%) | Plan Prevalence Rate (%) | Plan Prevalence Rate (%) | Plan Prevalence Rate (%) | Plan Prevalence Rate (%) | Plan Prevalence Rate (%) | Plan Prevalence Rate (%) | Plan Prevalence Rate (%) | Plan Prevalence Rate (%) | Plan Prevalence Rate (%) | Plan Prevalence Rate (%) |
| 105 | Vascular Disease | 33.24% | 14.50% | 38.44% | 43.58% | 39.92% | 48.54% | 57.82% | 36.04% | 28.79% | 59.05% | 24.30% | 59.83% | 43.58% | 24.98% | 20.39% | 60.00% | 31.94% | 47.89% | 40.28% | 44.40% | 51.85% |
| 131 | Renal Failure | 13.26% | 22.90% | 62.04% | 23.92% | 56.69% | 26.78% | 49.34% | 20.75% | 49.24% | 61.59% | 16.82% | 29.20% | 50.42% | 54.88% | 48.03% | 59.78% | 47.16% | 59.62% | 47.72% | 45.52% | 23.70% |
| 080 | Congestive Heart Failure | 26.07% | 27.48% | 31.15% | 26.03% | 44.11% | 28.08% | 33.72% | 33.88% | 33.33% | 51.75% | 34.58% | 38.62% | 31.49% | 32.79% | 34.67% | 40.77% | 32.24% | 34.11% | 39.02% | 33.96% | 28.15% |
| 108 | COPD | 18.89% | 26.72% | 26.92% | 19.50% | 21.76% | 20.21% | 21.08% | 24.31% | 37.12% | 16.51% | 21.50% | 24.44% | 19.03% | 21.62% | 21.71% | 23.61% | 20.00% | 20.60% | 28.81% | 17.54% | 28.15% |
| 055 | Major Depression | 6.99% | 29.77% | 9.45% | 20.36% | 57.82% | 20.91% | 19.71% | 24.40% | 31.82% | 14.60% | 13.08% | 14.54% | 12.65% | 9.91% | 29.61% | 22.19% | 14.63% | 9.82% | 39.12% | 54.48% | 6.67% |
| 015 | Diabetes with Renal CCC | 19.35% | 12.98% | 16.44% | 14.78% | 20.63% | 18.35% | 20.68% | 14.36% | 12.88% | 12.38% | 7.48% | 16.22% | 18.46% | 20.61% | 17.76% | 19.67% | 17.61% | 21.69% | 18.03% | 18.28% | 15.56% |
| 021 | Protein-Calorie Malnutrition | 4.09% | 0.76% | 31.28% | 12.15% | 32.91% | 4.92% | 3.36% | 7.75% | 0.76% | 4.76% | 3.74% | 5.89% | 1.31% | 13.82% | 3.95% | 13.11% | 13.43% | 3.41% | 27.41% | 14.55% | 5.93% |

**Ingenix** | Intelligence for Health Care | ingenix.com

© Ingenix, Inc.  9

# September Submission Update

| | Jul-07 | Jan-08 | Change | % Change | Budget | Variance |
|---|---|---|---|---|---|---|
| Legacy SRS | 0.959 | 0.961 | 0.003 | 0.3% | 2.0% | -1.7% |
| JDR | 0.905 | 0.905 | 0.000 | 0.0% | 2.0% | -2.0% |
| OXF | 0.927 | 0.947 | 0.020 | 2.1% | 2.0% | 0.1% |
| PFFS | 0.913 | 0.911 | (0.002) | -0.2% | 0.0% | -0.2% |
| West | 0.956 | 0.988 | 0.032 | 3.3% | 2.0% | 1.3% |
| Secure Total | 0.951 | 0.971 | 0.020 | 2.1% | 1.9% | 0.2% |

- EVCC estimated flat – requires more analysis as most of the members were not enrolled for 12 months in the data collection period.

- EVCI – Seeing a marked increase needs additional analysis for member not enrolled for 12 months in the data collection period.

- Key risk to PMPM revenue projection is member growth/mix.  Important to break out existing and new members and track their impact on overall risk score.

ingenix | Intelligence for Health Care | ingenix.com

© Ingenix, Inc.   10

# Risk Adjustment Data Validation

| Status of Reviewed Records to date: | | | | |
|---|---|---|---|---|
| Total HCCs to Validate | Total HCCs Confirmed | HCCs NOT supported & Sent to CMS | "Maybe" - most likely "No" but depends on reviewer | Received No Records for This Patient |
| 1160 | 836 | 208 | 98 | 18 |
| | **72%** | 18% | 8% | 2% |

*2005 Dates of Service

### 2006 CMS Chart Validation Summary

| | Totals | Percent |
|---|---|---|
| HCC Found | 731 | **59%** |
| HCC Not Found | 399 | 32% |
| Questionable HCC Submitted | 63 | 5% |
| Higher HCC Found w/in Hierarchy | 11 | 1% |
| Lower HCC Found w/in Hierarchy | 27 | 2% |
| Total | **1,231** | |

**DATES OF SERVICE 2004 (PY 2005)

© Ingenix, Inc.   11

# Key Initiatives

- **Chart Audit**
    - 2006 (600k Audits)
        - ROI 15 to 1 = Recovery $450/Cost $30 per chart
        - All EVC Inst.
        - All East (Except OXF & Partial NC)
        - PFFS
    - 2007 (400k Audits Complete)
        - NY, NC, CA, CO, TX, NV, OK
    - 2007 Q4 – (200k Audits to Complete)
        - AZ, NY/NJ/CT, NW
- **Facilitated Visits (20k members in non groups)**
- **Patient Assessment Forms**

# ACS Staffing Update

| | FTEs |
|---|---|
| Transferred FTEs | 81 |
| Terms | -5 |
| Adds | 12 |
| Current | 88 |
| Posted | 63 |
| To be Posted 10/1/07 | 38 |
| **Year End FTEs** | **189** |

**Key Position Status**

| | |
|---|---|
| National Field Lead | Candidate Identified |
| Product Lead | Candidate Identified |
| Medical Director | Candidate Identified |
| **Field Leads** | |
| East Field Lead | Candidate Identified |
| FL | Hired |
| NY | Start Date 10/1 |
| AL | Offer Outstanding |
| TX | Offer Outstanding |
| MO | Candidate Identified |
| AZ | Director Open |
| AZ Mgr | Start Date 10/8 |
| CO Mgr | Candidate Identified |
| **Finance/Ops/Analytics** | |
| Director Analytics | Final Round of Interviews |
| EIQ Lead | Hired |
| Director of Rev Projections | Open |
| Director of Medicare Ops | Open |
| Manager of Revenue Recon | Hired |
| Director of Encounter Ops | Replaced - Internal Promotion |

# IT

- IRADs
- CERTs
- CMS Repository
- Reporting Portal
- IT Road Map
  - Problem List tied to eligibility checks
  - Scanned Chart Review (Storage and Management)

# Commercialization

- Sierra

- Americhoice

- HealthNet (April 2008)
  - Currently Contract with
    - Leprechaun
    - MMC 20/20
    - Clear Vision
    - Outcomes Inc
    - The Coding Source
    - Social Service Coordinators
  - Key Markets CA, AZ and CT

# EXHIBIT 5

# Ovations & CAS Executive Steering Committee

July 1, 2009

# INGENIX®

Information is the lifeblood of health care.

# Agenda

- 2008 and 2009 Payment Projections

- Risk Adjustment Programs Activity

- Validation, Compliance and Control Initiatives

- Future Direction

Information is the lifeblood of health care.  **INGENIX**

# MA Payment Trends

**Elimination of Lag**

|  | | Part A/B | | | | |
|---|---|---|---|---|---|
|  | 2005 | 2006 | 2007 | 2008 | 2009 |
| **SH** | | | | | |
| *West* | $ 140.7 | $ 139.2 | $ 146.9 | $ 180.0 | $ 116.9 |
| *East* | $ 26.8 | $ 10.3 | $ 102.8 | $ 81.3 | $ 106.6 |
| SH Total | $ 167.5 | $ 149.5 | $ 249.7 | $ 261.3 | $ 223.6 |
| **EVC** | | | | | |
| *Community* | $ 1.4 | $ 6.0 | $ 17.1 | $ 40.7 | $ 45.2 |
| *Institutional* | $ 4.6 | $ (5.4) | $ 15.8 | $ 21.1 | $ 11.7 |
| EVC Total | $ 6.0 | $ 0.6 | $ 32.9 | $ 61.8 | $ 56.9 |
| **Ovations Total** | **$ 173.5** | **$ 150.2** | **$ 282.6** | **$ 323.1** | **$ 280.5** |

**Final**

|  | | Part A/B | | | | |
|---|---|---|---|---|---|
|  | 2005 | 2006 | 2007 | 2008 | 2009 |
| **SH** | | | | | |
| *West* | $ 106.4 | $ 136.5 | $ 165.7 | $ 224.8 | |
| *East* | $ 14.0 | $ 139.8 | $ 64.4 | $ 75.1 | |
| SH Total | $ 120.5 | $ 276.3 | $ 230.1 | $ 299.9 | |
| **EVC** | | | | | |
| *Community* | $ 1.8 | $ 10.2 | $ 13.7 | $ 41.4 | |
| *Institutional* | $ (11.9) | $ 11.6 | $ 4.3 | $ 5.1 | |
| EVC Total | $ (10.0) | $ 21.8 | $ 18.0 | $ 46.5 | |
| **Ovations Total** | **$ 110.4** | **$ 298.1** | **$ 248.1** | **$ 346.4** | |

© Ingenix, Inc.   3

Information is the lifeblood of health care.   **INGENIX**

# Forecast Variance Summary

**EOL Forecast Variance Summary**

Under-Value of West Market Deletes (Best/Legacy PHS Systems)      ($42.0)
Incomplete Data Assumptions (members with < 12 months in DCP)      ($3.4)
Total Variance                                                                          ($45.4)

**Under-Value of West Market Deletes (Best/Legacy PHS Systems)**

WellMed / DataRaps (Texas)          ($31.7)  Provider Group defaulting all submissions to 99090
California                                        ($3.9)
AZ/WA/CO/OR/OK/NV/Other TX      ($6.4)
Total Under-Value of West Deletes    ($42.0)

▪ **7/1 Meeting w/ WellMed (Dr. Rapier)**

© Ingenix, Inc.  5                                          Information is the lifeblood of health care.  INGENIX

389

# Operational Issues

- **Audit of Core Transaction Systems**
  - PacifiCare Professional Encounter System (PES)
    - Final System Audit in December 2008
    - Key Findings of Encounters without a From DOS
  - All systems have now been through audit reconciliation process
- **Filter Logic Review**
  - Non-Face to Face Procedure Code Deletes
    - Valid providers but with CPT codes that do not indicate face to face visit
  - Future logic changes run in test environment to fully understand impacts
- **Revenue Projections**
  - Pulling from multiple systems to capture all RAPs file
  - Underestimated value of deletes (Overestimate of EOL)
  - Issue Corrected – Single source of truth
- **WellMed/Data Raps**
  - Use of default code 99090

© Ingenix, Inc.   6

Information is the lifeblood of health care.   **INGENIX**

# 2009 Activities for 2008 DOS

## 2008 DOS drive 2009 Revenue

— Chart Review (08 DOS) through Jan sweep

— Hospital Data Capture

— ASM/encounter data processing

© Ingenix, Inc.   7

Information is the lifeblood of health care.   **INGENIX**

# 2009 Activities – 2009 DOS

■ **Focus on High Risk Suspects**
  – **220K members**
  – **Increase # of suspects with enhanced clinical logic**
    • **Lab data (CKD, neuropathy) started 5/09**

  – **Identify whether members had visit or not to date in 09**
    • **Members with visit**
      – Member focused chart review/multiple providers

    • **Members w/out visit**
      – Clinical calls (starting 7/09)
      – PAFs faxed to physician

© Ingenix, Inc.   **8**

Information is the lifeblood of health care.   INGENIX.

# 2009 Activities – 2009 DOS

- ## Provider focused/broad based chart review
  - ~770K CAS led

- ## MWOV call campaign
  - Targeting 120K members
  - Currently 12% able to impact with PAFs

- ## Insite deployment
  - CA – Nearly all groups deployed
  - PHP/Integris deployed
  - CO/WA Q409
  - National 2010

- ## Embedded Coding Pilot (CA/TX)

© Ingenix, Inc.  9

Information is the lifeblood of health care.  **INGENIX.**

# Validation Audits

⬚ **RAF outlier audits**

Identified capitated/gain share providers that are outside of the mean range of prevalence rates at HCC level DOS: CY 2008

–California

  – 20 groups / 45 locations

–TX

  • Wellmed – 14 locations

  • Estimated Audit Start Date: July 2009

  • Estimated Audit Completion Date: October 2009

  • Audit results with HCC error for CMS correction & reporting before 01/01/2010

# Validation Audits

**OIG Audits**

— TX (H4590) – audit sample size: 100 members/247 HCCs

- Audit deadline/completed: 01/15/2009
- Received OIG's partial preliminary review results and responded with comments
- <u>Final</u> Review Results from OIG not yet received

— CA (H0543)– audit sample size: 100 members/ 302 HCCs

- Audit deadline/completed: 03/20/2009
- <u>Initial</u> Review Results from OIG, not yet received
- In preparation, Market Consult outreached to MG's for addt'l record chase on HCCs assessed as non-validating

© Ingenix, Inc. **11**                    Information is the lifeblood of health care. **INGENIX**

# Validation Audits

■ **CMS Audits**

— WA (H5005)– audit sample size: 200 members/ 744 HCCs

- Audit deadline/completed: 09/15/2008

- Initial Review Results from CMS, not yet received.

— National Sample Audit (26 HP's for Ovations & 2 HP's for AmeriChoice)

- Review Results from CMS not yet received

— Pending RADV Audits:

- AL (H0151)

- CO (H0609)

- Notification Date 11/10/2008. Estimated audit sample size: 200 members per H contract

- No known start date; on indefinite hold

© Ingenix, Inc.   **12**

Information is the lifeblood of health care.   INGENIX.

# Compliance & Controls

- Compliance
  - PHI protection
    - Instituted significant CAS PHI training activity
    - All CAS personnel underwent re-training on HIPAA
    - Issued new data distribution guidelines w/ QA & controls on validating content appropriate to recipient

  - Program Controls
    - Coding accuracy oversight
      - Vendor auditing
      - Insourcing of chart review/internal controls

© Ingenix, Inc.   13

Information is the lifeblood of health care.   INGENIX.

397

# Operational Controls

## Ensure controls and accuracy of CAS end to end process of encounter submissions and revenue projections

- On-going E & Y testing of forecasting model

- Ingenix Consulting engagement on deep dive of controls and processes of CAS encounter processing and forecasting

  - Commenced Q1 2009

  - Focus on 6 key areas: ASM Data Exchange Management, Data Quality Controls, (Primary Channel), IRADS Project Controls, Policies and Procedures, Core Client System Extract Logic and Revenue Projection

- External audit engagement to test deployment of IC engagement

© Ingenix, Inc.   **14**

Information is the lifeblood of health care.   **INGENIX.**

# Sierra Integration

- CAS is actively managing:
  - Chart audit/embedded coder
  - Provider engagement
  - Provider and member analysis

- Staff fully transitioned to CAS

- On Track for IRADS targeted go live date of late July / early August for September sweep
  - Initial test run of member and provider files have uncovered no issues

- Evaluating remaining PDM transition (suspect tracking and chart review results)
  - PDM has agreed to month-to-month if necessary

© Ingenix, Inc.  **15**

Information is the lifeblood of health care.  **INGENIX**

# 2010 Initiatives (PY 2011)

⊠ **Finish National InSite Rollout**

⊠ **EMR Integration**
   – **To enable physician/user prompting related to HCC related chronic diseases and accurate coding**

⊠ **RAVAS**
   – **Risk Adjustment Validation / Audit Services (RAVAS) will support internal validation audits as well as:**
      • Chart review services
      • Chart validation capabilities
      • Chart Scan with chart note mapping to member HCCs

⊠ **Improved Suspect Identification and Close Rate**
   – **Alternative sources (lab, HRA, etc)**
   – **Algorithms**

© Ingenix, Inc.   **16**                    Information is the lifeblood of health care.   **INGENIX**

# Next Steps

- WellMed and other EOL action items

- Regional deep dives July through September

- 2010 financial projections

Information is the lifeblood of health care.   **INGENIX**

INGENIX

Information is the lifeblood of health care.

Appendix

© Ingenix, Inc.   **18**

# Risk Adjustment Programs

**Additional Compensation Program (ACP)/COI**

▢ Status

— 33 Groups with a PCP count of 2,114 and membership of 42K

— '08 Final Measurement Reports Completed & Distributed

— '09 Initial Diabetes Reports

  • Reviewed w/PIP team and reports are being delivered by Market Consultation to groups

  • 5 groups have data issues (network #'s); CAS working with PIP team to resolve

— '09 Chronic Conditions Reports

  • Reviewed w/PIP team and reports are being delivered to groups

▢ Milestones

— Collaboration with PIP team to clearly define COI processes, reporting, and guidelines

— Incorporate CAS activities into ACP group business plans by 8/1/09

© Ingenix, Inc.   **19**

Information is the lifeblood of health care.   **INGENIX**

# Risk Adjustment Programs

**Stand Alone (SA) COI**

- ## Status
  - 7 current SA COI agreements (4 existing from prior year; 3 new in '09)
  - 22 groups included on target list (for '09 effective dates)
    - 7 active negotiations (FL, MA, AZ markets)
- ## Milestones
  - SA Alone Criteria and Targeting process completed and implemented
  - Diabetic COI has been clearly defined and is currently being rolled out to targeted groups for '09
  - Chronic Conditions reporting is being revised and SA program will be available for 2010
- ## SA Dependencies and Challenges
  - Provider setup (TIN, Network ID)

© Ingenix, Inc.   **20**

Information is the lifeblood of health care.   **INGENIX**

# Risk Adjustment Programs

**Member Outreach**

⊠ **MWOV**

   – Initiated in May; runs through November

   – Approximately 120K members to be contacted

   – Completed ~ 15K calls to date

   – 12% with appointments/PAFs to send

      • ~ 800 via 3 way appts

      • ~ 1,000 mbrs scheduled

⊠ **Clinical calls**

   – Target high value suspects w/o claim

   – Expected start date July '09

⊠ **WI PFFS**

   – 11K PFFS & 1.2K PFFS members to be contacted

   – Expected start date July '09

© Ingenix, Inc.   **21**

Information is the lifeblood of health care.   **INGENIX**

# Risk Adjustment Programs

## Hospital Outreach

■ Status

March 2009 Sweep
(2008 DOS captured through the March Sweep)

| Admits/DOS | #Dx | New HCC's |
|---|---|---|
| 93,223 | 431,291 | 14,679 |

■ Milestones

– September Sweeps currently underway

– Targeting 80% of admits

© Ingenix, Inc.   22

Information is the lifeblood of health care.   INGENIX.

# Risk Adjustment Programs

## Chart Review Activity

- 796K Chart Reviews Planned in 2009
  - Targeted by market/provider

- 375K charts are currently in the review process thru June 29th
  - Planned to complete by Sept sweep

- 416K charts will be sent to vendor prior to Sept 1st
  - Planned to complete by Jan sweep (08 DOS)/Mar sweep (09 DOS)

- Additional activity planned in 09 through High Value Suspects initiative
  - Targeted by member/multiple provider

© Ingenix, Inc.   23

Information is the lifeblood of health care.   INGENIX

# Clinical Laboratory Data

- **Diabetic Nephropathy (0.508)**

    - 5K High Likely Suspects Identified
    - $19 Million of Opportunity
    - $ 3.8 Million for 2010

- **Chronic Kidney Disease (0.368)**

    - 120K High Likely Suspects Identified
    - $ 334 Million of Opportunity
    - $ 67 Million for 2010

- **Additional Key Lab Suspects Currently in Process**

    - Diabetes Mellitus (0.157)
    - Metastatic Cancer (2.210)
    - Chronic Hepatitis B & C (0.394)
    - End Stage Liver Disease (0.950)
    - HIV Infection, as allowed by law (0.917)
    - Heart Failure (0.398)



© Ingenix, Inc.   24

Information is the lifeblood of health care.  

# EXHIBIT 6



# Coding Accuracy Progress Report

1/04/2010

**Confidential**





# Coding Accuracy Update

| | |
|---|---|
| Last updated | 1/4/10 |
| Initiative Status | Green |
| IOI Target | $100M |
| IOI Achieved | $M |

## The 5 ONs:  Summary by Initiative

### Comments

| Program Initiatives | Overall | Time | Scope | Net IOI | Benefit | Quality | |
|---|---|---|---|---|---|---|---|
| Complete 750,000 Chart Audits in 2009 | ● | ON | ON | ON | ON | ON | |
| Receive 75,000 PAFs in 2009 | ● | OFF | OFF | OFF | ON | ON | - PAFs are currently tracking behind plan – 29K received |
| Utilize lab data to close 15,000 suspects | ● | OFF | OFF | OFF | ON | ON | - Opportunity was too optimistic – tracking to 9K |
| Recapture 81% of past conditions of existing members | ● | ON | ON | ON | ON | ON | - On target – at 78% |
| Drive Members without visits below 10% | ● | ON | ON | ON | ON | ON | - On target to exceed performance – at 9% |
| Deploy Insight to providers representing 300K members | ● | ON | ON | ON | ON | ON | - On track for 384K members |

## Risk Mitigations for the "Missed-ONs"

- Ingenix suspended distribution of PAFs for 4 weeks pending compliance review.
- The distribution of PAFs has been activated again, but we will not make up the difference
- We are pursuing additional chart audits to make up the difference.  The costs associated with doing incremental audits would be almost entirely offset by a reduction in PAF costs.
- Results from September sweep were favorable, providing an indication that we are on track from an overall perspective
- Preliminary views of 2010 revenue per member also appear to be on track, providing an additional positive indication
- Potential changes to general coding accuracy strategy, including chart audits, could significantly impact 2010 results
- Current discussions being held around Coding Accuracy infrastructure and process would increase operating cost structure.  Costs are not included in the 2010 budget.

## Key Upcoming Milestones

| Action Item | Date |
|---|---|
| January MMR with initial data on RAF scores for members | 1/25/10 |
| February MMR with initial data on RAF scores for members | 2/22/10 |
| Results from January sweep – data submitted for 2009 Final Payment | End of February |
| March sweep – data submitted for 2010 EOL | 4/1/10 |



A UnitedHealth Group Company

UnitedHealth Group Proprietary and Confidential


United for Medicare
·Focus on the Core·

2

# EXHIBIT 7

**From:** Polich, Cynthia L
**Sent:** Thursday, September 09, 2010 8:45 AM
**To:** Poehling, Benjamin
**Subject:** RAF Chart Audits

Ben -
Wanted to check back with you on status of the discussions with Ingenix re: increasing the number of chart audits.  I did followup with Tom after our brief conversation on this and he felt that we had resolved the issue of concern by agreeing to develop and implement a pilot.  We both agreed that this issue should not stand in the way of moving forward with additional chart audits.  Let me know if there is more we need to do on this.
Thanks
Cindy

**Cindy Polich**
*President*, Ovations
520-615-5204 - AZ office
714-825-5308 - CA office
714-342-0539 - mobile

# EXHIBIT 8

| 1 | | | 2 | | 3a PAT. CNTL # | | 4 TYPE OF BILL |
| | | | | | b. MED. REC. # | | |
| | | | | 5 FED. TAX NO. | 6 STATEMENT COVERS PERIOD FROM THROUGH | 7 | |

| 8 PATIENT NAME | a | | 9 PATIENT ADDRESS | a | | | c | d | | e |
| | b | | | b | | | | | | |

| 10 BIRTHDATE | 11 SEX | 12 DATE | ADMISSION 13 HR 14 TYPE 15 SRC | 16 DHR | 17 STAT | 18 | 19 | 20 | 21 | CONDITION CODES 22 23 24 25 26 27 28 | 29 ACDT STATE | 30 |

| 31 OCCURRENCE CODE DATE | 32 OCCURRENCE CODE DATE | 33 OCCURRENCE CODE DATE | 34 OCCURRENCE CODE DATE | 35 OCCURRENCE SPAN CODE FROM THROUGH | 36 OCCURRENCE SPAN CODE FROM THROUGH | 37 |
| a | | | | | | a |
| b | | | | | | b |

| 38 | | 39 VALUE CODES CODE AMOUNT | 40 VALUE CODES CODE AMOUNT | 41 VALUE CODES CODE AMOUNT |
| | a | | | |
| | b | | | |
| | c | | | |
| | d | | | |

| 42 REV. CD. | 43 DESCRIPTION | 44 HCPCS / RATE / HIPPS CODE | 45 SERV. DATE | 46 SERV. UNITS | 47 TOTAL CHARGES | 48 NON-COVERED CHARGES | 49 |
| 1 | | | | | | | 1 |
| 2 | | | | | | | 2 |
| 3 | | | | | | | 3 |
| 4 | | | | | | | 4 |
| 5 | | | | | | | 5 |
| 6 | | | | | | | 6 |
| 7 | | | | | | | 7 |
| 8 | | | | | | | 8 |
| 9 | | | | | | | 9 |
| 10 | | | | | | | 10 |
| 11 | | | | | | | 11 |
| 12 | | | | | | | 12 |
| 13 | | | | | | | 13 |
| 14 | | | | | | | 14 |
| 15 | | | | | | | 15 |
| 16 | | | | | | | 16 |
| 17 | | | | | | | 17 |
| 18 | | | | | | | 18 |
| 19 | | | | | | | 19 |
| 20 | | | | | | | 20 |
| 21 | | | | | | | 21 |
| 22 | | | | | | | 22 |
| 23 | PAGE ___ OF ___ | CREATION DATE | | TOTALS ▶ | | | 23 |

| 50 PAYER NAME | 51 HEALTH PLAN ID | 52 REL INFO | 53 ASG. BEN. | 54 PRIOR PAYMENTS | 55 EST. AMOUNT DUE | 56 NPI | | |
| A | | | | | | | 57 OTHER PRV ID | A |
| B | | | | | | | | B |
| C | | | | | | | | C |

| 58 INSURED'S NAME | 59 P.REL | 60 INSURED'S UNIQUE ID | 61 GROUP NAME | 62 INSURANCE GROUP NO. |
| A | | | | |
| B | | | | |
| C | | | | |

| 63 TREATMENT AUTHORIZATION CODES | 64 DOCUMENT CONTROL NUMBER | 65 EMPLOYER NAME |
| A | | |
| B | | |
| C | | |

| 66 DX | 67 | A B C D E F G H | 68 |
| | | I J K L M N O P Q | |

| 69 ADMIT DX | 70 PATIENT REASON DX a b c | 71 PPS CODE | 72 ECI a b c | 73 |

| 74 PRINCIPAL PROCEDURE CODE DATE | a. OTHER PROCEDURE CODE DATE | b. OTHER PROCEDURE CODE DATE | 75 | 76 ATTENDING NPI QUAL |
| | | | | LAST FIRST |
| c. OTHER PROCEDURE CODE DATE | d. OTHER PROCEDURE CODE DATE | e. OTHER PROCEDURE CODE DATE | | 77 OPERATING NPI QUAL |
| | | | | LAST FIRST |

| 80 REMARKS | 81CC a | | 78 OTHER NPI QUAL |
| | b | | LAST FIRST |
| | c | | 79 OTHER NPI QUAL |
| | d | | LAST FIRST |

UB-04 CMS-1450    APPROVED OMB NO. 0938-0997    **NUBC** National Uniform Billing Committee    THE CERTIFICATIONS ON THE REVERSE APPLY TO THIS BILL AND ARE MADE A PART HEREOF.

415

**UB-04 NOTICE:** **THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARTY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S).**

Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts. The following certifications or verifications apply where pertinent to this Bill:

1. If third party benefits are indicated, the appropriate assignments by the insured /beneficiary and signature of the patient or parent or a legal guardian covering authorization to release information are on file. Determinations as to the release of medical and financial information should be guided by the patient or the patient's legal representative.

2. If patient occupied a private room or required private nursing for medical necessity, any required certifications are on file.

3. Physician's certifications and re-certifications, if required by contract or Federal regulations, are on file.

4. For Religious Non-Medical facilities, verifications and if necessary re-certifications of the patient's need for services are on file.

5. Signature of patient or his representative on certifications, authorization to release information, and payment request, as required by Federal Law and Regulations (42 USC 1935f, 42 CFR 424.36, 10 USC 1071 through 1086, 32 CFR 199) and any other applicable contract regulations, is on file.

6. The provider of care submitter acknowledges that the bill is in conformance with the Civil Rights Act of 1964 as amended. Records adequately describing services will be maintained and necessary information will be furnished to such governmental agencies as required by applicable law.

7. For Medicare Purposes: If the patient has indicated that other health insurance or a state medical assistance agency will pay part of his/her medical expenses and he/she wants information about his/her claim released to them upon request, necessary authorization is on file. The patient's signature on the provider's request to bill Medicare medical and non-medical information, including employment status, and whether the person has employer group health insurance which is responsible to pay for the services for which this Medicare claim is made.

8. For Medicaid purposes: The submitter understands that because payment and satisfaction of this claim will be from Federal and State funds, any false statements, documents, or concealment of a material fact are subject to prosecution under applicable Federal or State Laws.

9. For TRICARE Purposes:

   (a) The information on the face of this claim is true, accurate and complete to the best of the submitter's knowledge and belief, and services were medically necessary and appropriate for the health of the patient;

(b) The patient has represented that by a reported residential address outside a military medical treatment facility catchment area he or she does not live within the catchment area of a U.S. military medical treatment facility, or if the patient resides within a catchment area of such a facility, a copy of Non-Availability Statement (DD Form 1251) is on file, or the physician has certified to a medical emergency in any instance where a copy of a Non-Availability Statement is not on file;

(c) The patient or the patient's parent or guardian has responded directly to the provider's request to identify all health insurance coverage, and that all such coverage is identified on the face of the claim except that coverage which is exclusively supplemental payments to TRICARE-determined benefits;

(d) The amount billed to TRICARE has been billed after all such coverage have been billed and paid excluding Medicaid, and the amount billed to TRICARE is that remaining claimed against TRICARE benefits;

(e) The beneficiary's cost share has not been waived by consent or failure to exercise generally accepted billing and collection efforts; and,

(f) Any hospital-based physician under contract, the cost of whose services are allocated in the charges included in this bill, is not an employee or member of the Uniformed Services. For purposes of this certification, an employee of the Uniformed Services is an employee, appointed in civil service (refer to 5 USC 2105), including part-time or intermittent employees, but excluding contract surgeons or other personal service contracts. Similarly, member of the Uniformed Services does not apply to reserve members of the Uniformed Services not on active duty.

(g) Based on 42 United States Code 1395cc(a)(1)(j) all providers participating in Medicare must also participate in TRICARE for inpatient hospital services provided pursuant to admissions to hospitals occurring on or after January 1, 1987; and

(h) If TRICARE benefits are to be paid in a participating status, the submitter of this claim agrees to submit this claim to the appropriate TRICARE claims processor. The provider of care submitter also agrees to accept the TRICARE determined reasonable charge as the total charge for the medical services or supplies listed on the claim form. The provider of care will accept the TRICARE-determined reasonable charge even if it is less than the billed amount, and also agrees to accept the amount paid by TRICARE combined with the cost-share amount and deductible amount, if any, paid by or on behalf of the patient as full payment for the listed medical services or supplies. The provider of care submitter will not attempt to collect from the patient (or his or her parent or guardian) amounts over the TRICARE determined reasonable charge. TRICARE will make any benefits payable directly to the provider of care, if the provider of care is a participating provider.

---

SEE  http://www.nubc.org/  FOR MORE INFORMATION ON UB-04 DATA ELEMENT AND PRINTING SPECIFICATIONS

# EXHIBIT 9

| 1500 |

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE 08/05

☐☐ PICA            PICA ☐☐

**1.** MEDICARE ☐ *(Medicare #)*   MEDICAID ☐ *(Medicaid #)*   TRICARE CHAMPUS ☐ *(Sponsor's SSN)*   CHAMPVA ☐ *(Member ID#)*   GROUP HEALTH PLAN ☐ *(SSN or ID)*   FECA BLK LUNG ☐ *(SSN)*   OTHER ☐ *(ID)*    **1a. INSURED'S I.D. NUMBER** (For Program in Item 1)

**2. PATIENT'S NAME** (Last Name, First Name, Middle Initial)

**3. PATIENT'S BIRTH DATE** MM | DD | YY    SEX M ☐ F ☐

**4. INSURED'S NAME** (Last Name, First Name, Middle Initial)

**5. PATIENT'S ADDRESS** (No., Street)

**6. PATIENT RELATIONSHIP TO INSURED**   Self ☐ Spouse ☐ Child ☐ Other ☐

**7. INSURED'S ADDRESS** (No., Street)

CITY    STATE

**8. PATIENT STATUS**   Single ☐ Married ☐ Other ☐

Employed ☐ Full-Time Student ☐ Part-Time Student ☐

CITY    STATE

ZIP CODE   TELEPHONE (Include Area Code) ( )

ZIP CODE   TELEPHONE (Include Area Code) ( )

**9. OTHER INSURED'S NAME** (Last Name, First Name, Middle Initial)

**10. IS PATIENT'S CONDITION RELATED TO:**

**11. INSURED'S POLICY GROUP OR FECA NUMBER**

**a. OTHER INSURED'S POLICY OR GROUP NUMBER**

**a. EMPLOYMENT?** (Current or Previous)   YES ☐ NO ☐

**a. INSURED'S DATE OF BIRTH** MM | DD | YY   SEX M ☐ F ☐

**b. OTHER INSURED'S DATE OF BIRTH** MM | DD | YY   SEX M ☐ F ☐

**b. AUTO ACCIDENT?**   PLACE (State)   YES ☐ NO ☐

**b. EMPLOYER'S NAME OR SCHOOL NAME**

**c. EMPLOYER'S NAME OR SCHOOL NAME**

**c. OTHER ACCIDENT?**   YES ☐ NO ☐

**c. INSURANCE PLAN NAME OR PROGRAM NAME**

**d. INSURANCE PLAN NAME OR PROGRAM NAME**

**10d. RESERVED FOR LOCAL USE**

**d. IS THERE ANOTHER HEALTH BENEFIT PLAN?**   YES ☐ NO ☐ *If yes*, return to and complete item 9 a-d.

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**
**12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE** I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED _____ DATE _____

**13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE** I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED _____

**14. DATE OF CURRENT:** MM | DD | YY   ILLNESS (First symptom) OR INJURY (Accident) OR PREGNANCY(LMP)

**15. IF PATIENT HAS HAD SAME OR SIMILAR ILLNESS.** GIVE FIRST DATE MM | DD | YY

**16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION** FROM MM | DD | YY   TO MM | DD | YY

**17. NAME OF REFERRING PROVIDER OR OTHER SOURCE**   17a.   17b. NPI

**18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES** FROM MM | DD | YY   TO MM | DD | YY

**19. RESERVED FOR LOCAL USE**

**20. OUTSIDE LAB?** YES ☐ NO ☐   $ CHARGES

**21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY** (Relate Items 1, 2, 3 or 4 to Item 24E by Line)

1. |___ . ___|    3. |___ . ___|
2. |___ . ___|    4. |___ . ___|

**22. MEDICAID RESUBMISSION** CODE   ORIGINAL REF. NO.

**23. PRIOR AUTHORIZATION NUMBER**

| 24. A. DATE(S) OF SERVICE | | | | | | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS / MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID. QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| From MM | DD | YY | To MM | DD | YY | | | | | | | | | |
| 1 | | | | | | | | | | | | | NPI | |
| 2 | | | | | | | | | | | | | NPI | |
| 3 | | | | | | | | | | | | | NPI | |
| 4 | | | | | | | | | | | | | NPI | |
| 5 | | | | | | | | | | | | | NPI | |
| 6 | | | | | | | | | | | | | NPI | |

**25. FEDERAL TAX I.D. NUMBER**   SSN ☐ EIN ☐

**26. PATIENT'S ACCOUNT NO.**

**27. ACCEPT ASSIGNMENT?** (For govt. claims, see back) YES ☐ NO ☐

**28. TOTAL CHARGE** $

**29. AMOUNT PAID** $

**30. BALANCE DUE** $

**31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS** (I certify that the statements on the reverse apply to this bill and are made a part thereof.)

SIGNED _____ DATE _____

**32. SERVICE FACILITY LOCATION INFORMATION**

a. NPI   b.

**33. BILLING PROVIDER INFO & PH #** ( )

a. NPI   b.

NUCC Instruction Manual available at: www.nucc.org    APPROVED OMB-0938-0999 FORM CMS-1500 (08-05)

**BECAUSE THIS FORM IS USED BY VARIOUS GOVERNMENT AND PRIVATE HEALTH PROGRAMS, SEE SEPARATE INSTRUCTIONS ISSUED BY APPLICABLE PROGRAMS.**

**NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.**

### REFERS TO GOVERNMENT PROGRAMS ONLY

MEDICARE AND CHAMPUS PAYMENTS: A patient's signature requests that payment be made and authorizes release of any information necessary to process the claim and certifies that the information provided in Blocks 1 through 12 is true, accurate and complete. In the case of a Medicare claim, the patient's signature authorizes any entity to release to Medicare medical and nonmedical information, including employment status, and whether the person has employer group health insurance, liability, no-fault, worker's compensation or other insurance which is responsible to pay for the services for which the Medicare claim is made. See 42 CFR 411.24(a). If item 9 is completed, the patient's signature authorizes release of the information to the health plan or agency shown. In Medicare assigned or CHAMPUS participation cases, the physician agrees to accept the charge determination of the Medicare carrier or CHAMPUS fiscal intermediary as the full charge, and the patient is responsible only for the deductible, coinsurance and noncovered services. Coinsurance and the deductible are based upon the charge determination of the Medicare carrier or CHAMPUS fiscal intermediary if this is less than the charge submitted. CHAMPUS is not a health insurance program but makes payment for health benefits provided through certain affiliations with the Uniformed Services. Information on the patient's sponsor should be provided in those items captioned in "Insured"; i.e., items 1a, 4, 6, 7, 9, and 11.

### BLACK LUNG AND FECA CLAIMS

The provider agrees to accept the amount paid by the Government as payment in full. See Black Lung and FECA instructions regarding required procedure and diagnosis coding systems.

### SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, CHAMPUS, FECA AND BLACK LUNG)

I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

For services to be considered as "incident" to a physician's professional service, 1) they must be rendered under the physician's immediate personal supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician's service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of nonphysicians must be included on the physician's bills.

For CHAMPUS claims, I further certify that I (or any employee) who rendered services am not an active duty member of the Uniformed Services or a civilian employee of the United States Government or a contract employee of the United States Government, either civilian or military (refer to 5 USC 5536). For Black-Lung claims, I further certify that the services performed were for a Black Lung-related disorder.

No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32).

NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

### NOTICE TO PATIENT ABOUT THE COLLECTION AND USE OF MEDICARE, CHAMPUS, FECA, AND BLACK LUNG INFORMATION
(PRIVACY ACT STATEMENT)

We are authorized by CMS, CHAMPUS and OWCP to ask you for information needed in the administration of the Medicare, CHAMPUS, FECA, and Black Lung programs. Authority to collect information is in section 205(a), 1862, 1872 and 1874 of the Social Security Act as amended, 42 CFR 411.24(a) and 424.5(a) (6), and 44 USC 3101;41 CFR 101 et seq and 10 USC 1079 and 1086; 5 USC 8101 et seq; and 30 USC 901 et seq; 38 USC 613; E.O. 9397.

The information we obtain to complete claims under these programs is used to identify you and to determine your eligibility. It is also used to decide if the services and supplies you received are covered by these programs and to insure that proper payment is made.

The information may also be given to other providers of services, carriers, intermediaries, medical review boards, health plans, and other organizations or Federal agencies, for the effective administration of Federal provisions that require other third parties payers to pay primary to Federal program, and as otherwise necessary to administer these programs. For example, it may be necessary to disclose information about the benefits you have used to a hospital or doctor. Additional disclosures are made through routine uses for information contained in systems of records.

**FOR MEDICARE CLAIMS:** See the notice modifying system No. 09-70-0501, titled, 'Carrier Medicare Claims Record,' published in the <u>Federal Register</u>, Vol. 55 No. 177, page 37549, Wed. Sept. 12, 1990, or as updated and republished.

**FOR OWCP CLAIMS:** Department of Labor, Privacy Act of 1974, "Republication of Notice of Systems of Records," <u>Federal Register</u> Vol. 55 No. 40, Wed Feb. 28, 1990, See ESA-5, ESA-6, ESA-12, ESA-13, ESA-30, or as updated and republished.

**FOR CHAMPUS CLAIMS:** <u>PRINCIPLE PURPOSE(S):</u> To evaluate eligibility for medical care provided by civilian sources and to issue payment upon establishment of eligibility and determination that the services/supplies received are authorized by law.

<u>ROUTINE USE(S):</u> Information from claims and related documents may be given to the Dept. of Veterans Affairs, the Dept. of Health and Human Services and/or the Dept. of Transportation consistent with their statutory administrative responsibilities under CHAMPUS/CHAMPVA; to the Dept. of Justice for representation of the Secretary of Defense in civil actions; to the Internal Revenue Service, private collection agencies, and consumer reporting agencies in connection with recoupment claims; and to Congressional Offices in response to inquiries made at the request of the person to whom a record pertains. Appropriate disclosures may be made to other federal, state, local, foreign government agencies, private business entities, and individual providers of care, on matters relating to entitlement, claims adjudication, fraud, program abuse, utilization review, quality assurance, peer review, program integrity, third-party liability, coordination of benefits, and civil and criminal litigation related to the operation of CHAMPUS.

<u>DISCLOSURES:</u> Voluntary; however, failure to provide information will result in delay in payment or may result in denial of claim. With the one exception discussed below, there are no penalties under these programs for refusing to supply information. However, failure to furnish information regarding the medical services rendered or the amount charged would prevent payment of claims under these programs. Failure to furnish any other information, such as name or claim number, would delay payment of the claim. Failure to provide medical information under FECA could be deemed an obstruction.

It is mandatory that you tell us if you know that another party is responsible for paying for your treatment. Section 1128B of the Social Security Act and 31 USC 3801-3812 provide penalties for withholding this information.

You should be aware that P.L. 100-503, the "Computer Matching and Privacy Protection Act of 1988", permits the government to verify information by way of computer matches.

### MEDICAID PAYMENTS (PROVIDER CERTIFICATION)

I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency or Dept. of Health and Human Services may request.

I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program, with the exception of authorized deductible, coinsurance, co-payment or similar cost-sharing charge.

**SIGNATURE OF PHYSICIAN (OR SUPPLIER):** I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0999. The time required to complete this information collection is estimated to average 10 minutes per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, Attn: PRA Reports Clearance Officer, 7500 Security Boulevard, Baltimore, Maryland 21244-1850.   This address is for comments and/or suggestions only.   DO NOT MAIL COMPLETED CLAIM FORMS TO THIS ADDRESS.

# EXHIBIT 10

**AMENDMENT NO. 1
TO THE HEALTH SERVICES AGREEMENT BETWEEN
PACIFICARE OF ARIZONA, INC.
AND
BANNER PHYSICIANS HOSPITAL ORGANIZATION**

This Amendment modifies that certain Health Services Agreement dated January 1, 2009 (hereinafter "Agreement") by and between:

**PACIFICARE OF ARIZONA, INC.**, an Arizona corporation and its Affiliates (hereinafter "PacifiCare"), and **BANNER PHYSICIANS HOSPITAL ORGANIZATION** an Arizona Professional Corporation ("Provider Group")

**WHEREAS**, PacifiCare and Provider Group desire to amend the Agreement to:

1. Delete and replace Article 1.18 entitled **"Members"**

2. Add Product Attachment A, Section 3.1.1 entitled **"2009 Payments"**

3. Rename Product Attachment A, Section 3.1.2 entitled **"Adjustment for Benefit Plans"**

4. Add Product Attachment A, Section 3.2.1 entitled **"2010 Payments"**

5. Add Product Attachment A, Section 3.2.2 entitled **"Adjustment for Benefit Plans - 2010"**

**NOW THEREFORE**, in consideration of the mutual covenant and agreements contained herein, PacifiCare and Provider Group agree to amend the Agreement as follows:

1. Article 1.18 **"Members"** is hereby deleted and replaced with the following:

    1.18    **Members** are eligible provider group Members enrolled in a Secure Horizons Healthplan assigned to Banner Baywood/Banner Heart/Banner Gateway/Banner Desert network. From January 1, 2009 through May 31, 2009 members will continue to be in Banner Baywood Gateway network and East Valley Network. Effective June 1, 2009, members from East Valley network will be rolled into the Banner Baywood Gateway network under the new network name of Banner East Valley Network.

2. Product Attachment A, Section 3.1.1 entitled **"2009 Payments"** is hereby added:

    3.1.1    **2009 Payments.** Provider Group will be entitled to an additional increase in Capitation Payment PMPM retroactive to January 1, 2009 if the increase in RAF score between July 2008 and July 2009 is in excess of 3% (three percent). The amount of the additional increase will be equal to the amount of the actual percentage increase in RAF that is in excess of 3% (three percent). For example, if the percentage increase in RAF score between July 2008 and July 2009 is 4% (four percent), then Provider Group would be entitled to an additional 1% (one percent) increase in cap retroactive to January 1, 2009. The cap rate will be changed prospectively once the calculation has been completed and a lump sum payment will be made for the retro portion of the additional increase.

421

3. Product Attachment A, Section 3.1.2 entitled **"Adjustment for Benefit Plans"** is hereby delete, renamed and replaced with the following:

   **3.1.2** <u>Adjustments for Benefit Plans - 2009.</u> PacifiCare may elect to make ("SH Benefit Changes") which are defined as improvements or reductions in Secure Horizons benefits and/or increases or decreases in the cost sharing for Secure Horizons Members, from current coverage year to the subsequent coverage year. Should PacifiCare make SH Benefit Changes in a coverage year that are the financial responsibility of Provider Group as defined by the Division of Financial Responsibility (DOFR), then PacifiCare may request modification to this Section, <u>Capitation Payments for Secure Horizons Members</u> to cover the change in risk assumed by Provider Group or PacifiCare. Such request shall be made in writing in accordance with the <u>Notices</u> Section of the Agreement. PacifiCare shall provide to Provider Group an actuarial assessment of the value of the SH Benefit Changes applicable to the risk assumed by Provider Group or PacifiCare within ten (10) business days of the previous request. Provider Group shall have thirty (30) calendar days to review the actuarial assessment provided by PacifiCare. The payment modification aspect of this Section shall not apply to benefits which are changed as a result of benefit addition or reduction required by CMS regardless of whether or not those benefit changes are the financial responsibility of Provider Group as defined by the DOFR.

4. Product Attachment A, Section 3.2.1 entitled **"2010 Payments"** is hereby added:

   **3.2.1** <u>2010 Payments.</u> Provider Group will be entitled to an additional increase in Capitation Payment PMPM retroactive to January 1, 2010 if the increase in RAF score between July 2009 and July 2010 is in excess of 3% (three percent). The amount of the additional increase will be equal to the amount of the actual percentage increase in RAF that is in excess of 3% (three percent). For example, if the percentage increase in RAF score between July 2009 and July 2010 is 4% (four percent), then Provider Group would be entitled to an additional **1%** (one percent) increase in cap retroactive to January 1, 2010. The cap rate will be changed prospectively once the calculation has been completed and a lump sum payment will be made for the retro portion of the additional increase.

5. Product Attachment A, Section 3.2.2 entitled **"Adjustment for Benefit Plans - 2010"** is hereby added:

   **3.2.2** <u>Adjustments for Benefit Plans – 2010.</u> PacifiCare may elect to make ("SH Benefit Changes") which are defined as improvements or reductions in Secure Horizons benefits and/or increases or decreases in the cost sharing for Secure Horizons Members, from current coverage year to the subsequent coverage year. Should PacifiCare make SH Benefit Changes in a coverage year that are the financial responsibility of Provider Group as defined by the Division of Financial Responsibility (DOFR), then PacifiCare may request modification to this Section, <u>Capitation Payments for Secure Horizons Members</u> to cover the change in risk assumed by Provider Group or PacifiCare. Such request shall be made in writing in accordance with the <u>Notices</u> Section of the Agreement. PacifiCare shall provide to Provider Group an actuarial assessment of the value of the SH Benefit Changes applicable to the risk assumed by Provider Group or PacifiCare within ten (10) business days of the previous request. Provider Group shall have thirty (30) calendar days to review the actuarial assessment provided by PacifiCare. The payment modification aspect of this Section shall not apply to benefits which are changed as a result of benefit addition or reduction required by CMS regardless of whether or not those benefit changes are the financial responsibility of Provider Group as defined by the DOFR.

This Amendment shall be deemed to be part of the Agreement and, as modified in accordance herewith, the Agreement is hereby affirmed and declared in full force and effect. This Amendment fully supersedes and replaces any conflicting provisions contained in the Agreement, leaving all other provisions of the Agreement unaffected.

IN WITNESS WHEREOF, the parties have the authority necessary to bind the entities identified herein and have executed this Amendment to be effective January 1, 2009.

| PACIFICARE OF ARIZONA, INC. | | PACIFICARE OF ARIZONA, INC |  |
|---|---|---|---|
| _Camille Kendrick 6-5-09_ | | _AHSL_ | _6/12/2009_ |
| (Signature) | Date | (Signature) | Date |
| _Camille Kendrick_ | | _Anthony Solem_ | |
| Name | | Name | |
| _Vice President_ | | _President / CEO_ | |
| Title | | Title | |

**BANNER PHYSICIANS HOSPITAL ORGANIZATION**

_Rod Shotton_

(Signature)          Date

Rodney Shotton, MD
Name

President
Title

C:\PacAcare\FINAL '09\Banner PHO Amendment 1.docx          Page 3 of 3

# EXHIBIT 11


(2) - 2010 EOL Projection as of 3/31/10

(3) - RAF Degradation: March less January MOR RAF plus a degradation factor of 0.4% per month from March to July

(4) - Projected July 2010 RAF based on Jan 2010 actuals plus EOL plus RAF Degradation

| DEC State | Provider Group Name | Jan 2010 Members (1) | Jan 2010 Actual RAF (1) | EOL RAF (2) | RAF Degradation (Jan-Jul) (3) | July 2010 Proj. RAF (4) | Jan 2010 PMPM (1) | EOL PMPM (2) | PMPM Degradation (Jan-Jul) (3) | July 2010 Proj. PMPM (4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | RAF Drivers | | | | PMPM Drivers | | |
| CALIFORNIA | Petaluma Health Center | 1 | 3.973 | 0.127 | (0.065) | 4.035 | $3,154.09 | $100.01 | ($51.42) | $3,202.68 |
| CALIFORNIA | UNK | 7 | 2.362 | 0.150 | (0.040) | 2.472 | $1,868.50 | $115.93 | ($30.86) | $1,953.57 |
| CALIFORNIA | FAMILY PRACTICE MEDICAL GROUP | 652 | 2.461 | 0.060 | (0.055) | 2.466 | $1,999.58 | $47.14 | ($43.28) | $2,003.43 |
| CALIFORNIA | SAN DIEGO PHYS MG/CHULA VISTA | 3 | 1.897 | 0.135 | (0.032) | 1.999 | $1,513.10 | $103.66 | ($24.66) | $1,591.89 |
| ARIZONA | PLUS NETWORK | 261 | 1.851 | 0.052 | (0.044) | 1.859 | $1,476.38 | $40.49 | ($34.31) | $1,482.56 |
| OREGON | GREEN MOUNTAIN | 8 | 1.008 | 0.520 | (0.024) | 1.503 | $840.36 | $418.11 | ($19.55) | $1,238.92 |
| CALIFORNIA | ACCESS MEDICAL GROUP INC | 1,016 | 1.167 | 0.343 | (0.019) | 1.491 | $1,060.89 | $285.15 | ($15.97) | $1,330.08 |
| TEXAS | PRINCETON IPA OF SAN ANTONIO | 34,163 | 1.383 | 0.128 | (0.038) | 1.473 | $1,265.16 | $102.50 | ($30.48) | $1,337.18 |
| CALIFORNIA | HEALTHCARE PARTNERS MED GRP | 29,695 | 1.226 | 0.154 | (0.027) | 1.354 | $1,156.18 | $131.81 | ($22.85) | $1,265.15 |
| COLORADO | NEW WEST PHYSICIANS/HEALTH ONE | 640 | 1.339 | 0.029 | (0.037) | 1.332 | $1,092.93 | $22.90 | ($28.83) | $1,087.00 |
| TEXAS | UNK | 1,281 | 1.198 | 0.161 | (0.032) | 1.327 | $1,093.07 | $129.50 | ($25.50) | $1,197.07 |
| CALIFORNIA | VALLEY CARE IPA | 750 | 1.259 | 0.098 | (0.030) | 1.326 | $1,121.90 | $86.15 | ($26.48) | $1,181.57 |
| CALIFORNIA | PHYSICIANS ASSOCIATES | 4,701 | 1.228 | 0.095 | (0.029) | 1.295 | $1,149.15 | $81.96 | ($24.58) | $1,206.54 |
| COLORADO | SENIOR CARE COLORADO | 1,318 | 1.222 | 0.107 | (0.036) | 1.293 | $987.13 | $83.42 | ($28.35) | $1,042.19 |
| OKLAHOMA | STEVEN KING | 20 | 1.428 | (0.116) | (0.021) | 1.291 | $1,163.31 | ($90.93) | ($16.33) | $1,056.05 |
| CALIFORNIA | GOLDEN CARE | 3 | 0.933 | 0.248 | 0.106 | 1.287 | $864.18 | $201.28 | $86.38 | $1,151.84 |
| NEVADA | LAS VEGAS NETWORK | 1,110 | 1.184 | 0.138 | (0.037) | 1.286 | $1,042.78 | $123.92 | ($33.37) | $1,133.33 |
| ARIZONA | JOHN C LINCOLN NETWORK | 1 | 0.982 | 0.324 | (0.021) | 1.285 | $771.92 | $239.74 | ($15.39) | $996.28 |
| TEXAS | HOUSTON DCN | 19 | 1.167 | 0.048 | 0.039 | 1.254 | $1,099.34 | $42.47 | $34.39 | $1,176.20 |
| OREGON | THE PORTLAND CLINIC (CMG) | 1,449 | 1.219 | 0.051 | (0.027) | 1.242 | $1,005.74 | $41.05 | ($22.12) | $1,024.67 |
| OREGON | West Linn Pediatric And Women | 1 | 1.420 | 0.158 | (0.020) | 1.242 | $1,141.25 | ($125.02) | ($16.84) | $1,000.39 |
| CALIFORNIA | MERCY PHYSICIANS MEDICAL GROUP | 2,964 | 1.203 | 0.072 | (0.038) | 1.236 | $992.52 | $55.86 | ($29.58) | $1,018.80 |
| OREGON | UNK | 46 | 1.129 | 0.125 | (0.020) | 1.234 | $1,005.87 | $112.28 | ($17.90) | $1,100.24 |
| OREGON | PRIME MED | 49 | 1.227 | 0.023 | (0.038) | 1.212 | $1,098.10 | $20.55 | ($34.19) | $1,084.48 |
| CALIFORNIA | TALBERT MEDICAL GROUP | 5,709 | 1.160 | 0.049 | (0.019) | 1.189 | $1,031.76 | $39.63 | ($15.74) | $1,055.65 |
| OREGON | NORTHWEST PRIMARY CARE (CMG) | 1,201 | 1.104 | 0.109 | (0.026) | 1.187 | $904.54 | $87.97 | ($21.02) | $971.49 |
| CALIFORNIA | OMNI IPA UHC-STOCKTON | 1 | 0.875 | 0.329 | (0.019) | 1.185 | $772.80 | $275.10 | ($16.01) | $1,031.89 |
| COLORADO | NEW WEST PHYSICIANS/LUTHERAN | 4,135 | 1.137 | 0.065 | (0.019) | 1.183 | $918.29 | $58.79 | ($23.42) | $953.66 |
| OREGON | Q STREET INTERNISTS | 22 | 1.191 | 0.071 | (0.080) | 1.182 | $969.62 | $56.10 | ($63.21) | $962.51 |
| CALIFORNIA | GREATER NEWPORT PHYS@HOAG HOSP | 8,896 | 1.118 | 0.085 | (0.025) | 1.178 | $976.48 | $66.96 | ($19.88) | $1,023.56 |
| TEXAS | PHYSICIAN PRIMECARE | 7,257 | 1.073 | 0.130 | (0.027) | 1.176 | $1,050.59 | $106.69 | ($21.93) | $1,135.35 |
| CALIFORNIA | AFFINITY WEST COUNTY REGION | 1,898 | 1.142 | 0.067 | (0.036) | 1.174 | $1,106.26 | $63.21 | ($33.59) | $1,135.88 |
| CALIFORNIA | AXMINSTER MEDICAL GROUP INC | 986 | 1.139 | 0.058 | (0.025) | 1.172 | $1,086.81 | $50.77 | ($21.96) | $1,115.61 |
| CALIFORNIA | ALTA BATES MEDICAL GROUP | 1,334 | 1.161 | 0.055 | (0.045) | 1.171 | $1,108.31 | $51.34 | ($41.98) | $1,117.67 |
| OREGON | FIVE RIVERS | 10 | 0.866 | 0.233 | 0.066 | 1.165 | $706.94 | $187.26 | $52.86 | $947.06 |
| CALIFORNIA | SAN JOSE MEDICAL GROUP | 2,329 | 1.152 | 0.033 | (0.027) | 1.158 | $1,024.59 | $29.56 | ($23.99) | $1,030.16 |
| OREGON | HEALTH CARE RESOURCES NW | 1,245 | 1.051 | 0.120 | (0.018) | 1.153 | $880.22 | $98.77 | ($14.53) | $964.46 |
| CALIFORNIA | HEMET COMMUNITY MEDICAL GROUP | 6,912 | 1.058 | 0.132 | (0.025) | 1.143 | $902.90 | $103.51 | ($19.36) | $987.05 |
| CALIFORNIA | EPIC | 9,313 | 1.089 | 0.074 | (0.020) | 1.142 | $942.72 | $58.08 | ($15.96) | $984.83 |
| COLORADO | NEW WEST PHYSICIANS/CENTURA | 2,843 | 1.086 | 0.082 | (0.029) | 1.139 | $872.65 | $63.10 | ($22.21) | $913.54 |
| CALIFORNIA | ENCOMPASS MEDICAL GROUP INC | 1,043 | 1.112 | 0.046 | (0.026) | 1.133 | $910.74 | $33.66 | ($19.98) | $926.41 |
| CALIFORNIA | MONARCH HEALTHCARE | 9,468 | 1.122 | 0.035 | (0.033) | 1.123 | $981.05 | $27.21 | ($26.21) | $982.06 |
| CALIFORNIA | CENTRAL VALLEY MEDICAL GROUP | 3,782 | 1.102 | 0.046 | (0.028) | 1.120 | $1,003.07 | $39.96 | ($24.75) | $1,018.28 |
| TEXAS | CORPUS CHRISTI DIRECT | 1,803 | 1.105 | 0.041 | (0.033) | 1.113 | $1,071.86 | $36.71 | ($29.43) | $1,079.14 |
| CALIFORNIA | APPLECARE | 1,974 | 1.029 | 0.097 | (0.014) | 1.112 | $1,005.68 | $85.05 | ($12.23) | $1,078.50 |
| CALIFORNIA | INLAND HEALTH CARE GROUP | 295 | 1.165 | (0.008) | (0.047) | 1.111 | $1,040.76 | ($6.54) | ($38.50) | $995.72 |
| CALIFORNIA | PRIMARY CARE ASSOCIATED MG | 3,905 | 1.032 | 0.092 | (0.019) | 1.104 | $865.84 | $72.37 | ($15.29) | $922.92 |
| CALIFORNIA | SANTA CLARA COUNTY IPA | 3,140 | 1.052 | 0.080 | (0.029) | 1.104 | $928.09 | $70.60 | ($25.56) | $973.13 |
| CALIFORNIA | MIDCOAST IPA | 1,459 | 1.047 | 0.076 | (0.020) | 1.100 | $884.13 | $60.50 | ($18.09) | $896.34 |
| CALIFORNIA | PIONEER PROVIDER NETWORK A MED | 1,126 | 1.149 | (0.023) | (0.031) | 1.094 | $1,075.22 | ($20.12) | ($26.72) | $1,028.37 |
| CALIFORNIA | SUTTER EAST BAY MEDICAL FOUNDATION | 762 | 1.057 | 0.066 | (0.030) | 1.093 | $1,042.11 | $63.76 | ($28.98) | $1,076.88 |
| CALIFORNIA | RIVERSIDE MEDICAL CLINIC INC | 1,405 | 1.090 | 0.032 | (0.030) | 1.092 | $954.12 | $25.88 | ($23.95) | $956.05 |
| OREGON | CASTILLO | 18 | 0.948 | 0.184 | (0.041) | 1.091 | $691.87 | $129.12 | ($28.57) | $792.42 |
| CALIFORNIA | CHOICE MEDICAL GROUP | 427 | 1.037 | 0.075 | (0.040) | 1.072 | $877.43 | $57.14 | ($30.45) | $904.12 |
| CALIFORNIA | SAN BERNARDINO MEDICAL GROUP | 1,481 | 0.896 | 0.190 | (0.014) | 1.066 | $804.38 | $152.17 | ($16.68) | $939.87 |
| CALIFORNIA | HEALTHCARE PARTNERS | 1,431 | 1.032 | 0.047 | (0.015) | 1.064 | $988.90 | $40.49 | ($12.71) | $1,016.68 |
| CALIFORNIA | SCRIPPS CLINIC | 14,133 | 0.974 | 0.110 | (0.022) | 1.062 | $814.44 | $87.08 | ($17.40) | $884.12 |
| OREGON | PACIFIC MEDICAL | 1,794 | 1.058 | 0.019 | (0.017) | 1.060 | $866.44 | $16.55 | ($13.54) | $868.45 |
| CALIFORNIA | SEAVIEW IPA | 3,822 | 1.025 | 0.056 | (0.023) | 1.058 | $933.57 | $49.89 | ($20.45) | $963.01 |
| OREGON | PROVIDENCE MED GRP | 2,684 | 1.017 | 0.060 | (0.020) | 1.057 | $835.90 | $48.22 | ($15.72) | $868.40 |
| CALIFORNIA | BRISTOL PARK MEDICAL GROUP | 1,724 | 1.017 | 0.066 | (0.026) | 1.057 | $905.41 | $52.28 | ($20.63) | $937.06 |

INGENIX.

(2) - 2010 EOL Projection as of 3/31/10
(3) - RAF Degradation: March less January MOR RAF plus a degradation factor of 0.4% per month from March to July
(4) - Projected July 2010 RAF based on Jan 2010 actuals plus EOL plus RAF Degradation

| DEC State | Provider Group Name | Jan 2010 Members (1) | Jan 2010 Actual RAF (1) | EOL RAF (2) | RAF Degradation (Jan-Jul) (3) | July 2010 Proj. RAF (4) | Jan 2010 PMPM (1) | EOL PMPM (2) | PMPM Degradation (Jan-Jul) (3) | July 2010 Proj. PMPM (4) |
|---|---|---|---|---|---|---|---|---|---|---|
| CALIFORNIA | MEMORIAL HEALTHCARE IPA/LB | 2,100 | 0.980 | 0.103 | (0.027) | 1.056 | $904.85 | $86.62 | ($22.66) | $968.82 |
| CALIFORNIA | COAST HEALTHCARE | 2,144 | 1.002 | 0.071 | (0.019) | 1.054 | $957.16 | $61.04 | ($16.71) | $1,001.48 |
| CALIFORNIA | SHARP REES-STEALY MEDICAL GRP | 12,856 | 0.936 | 0.138 | (0.024) | 1.050 | $795.08 | $110.34 | ($18.83) | $886.60 |
| TEXAS | DALLAS COUNTY HOSPITAL DISTRIC | 228 | 0.981 | 0.101 | (0.034) | 1.048 | $979.86 | $91.22 | ($30.51) | $1,040.57 |
| CALIFORNIA | SUTTER INDEPENDENT PHYSICIANS | 1,992 | 1.040 | 0.025 | (0.028) | 1.038 | $864.87 | $20.12 | ($20.97) | $864.03 |
| TEXAS | DALLAS DCN | 47,803 | 1.008 | 0.060 | (0.030) | 1.038 | $981.55 | $53.25 | ($26.58) | $1,008.23 |
| COLORADO | UNK | 5,726 | 0.973 | 0.090 | (0.027) | 1.037 | $782.94 | $70.03 | ($20.68) | $832.29 |
| CALIFORNIA | PHYS MED GRP OF SANTA CRUZ COU | 2,084 | 0.972 | 0.091 | (0.027) | 1.036 | $793.89 | $74.54 | ($22.09) | $846.44 |
| CALIFORNIA | CENTRE FOR HEALTH CARE | 2,296 | 0.994 | 0.052 | (0.012) | 1.035 | $828.03 | $40.43 | ($9.37) | $859.08 |
| CALIFORNIA | UNITED FAMILY CARE OF RIALTO | 645 | 0.992 | 0.058 | (0.015) | 1.034 | $871.13 | $45.69 | ($12.18) | $904.64 |
| OREGON | PORTLAND DIRECT | 1,060 | 1.024 | 0.030 | (0.022) | 1.032 | $860.09 | $25.28 | ($18.32) | $867.05 |
| COLORADO | PRIMARY PHYSICIAN PARTNERS | 15,265 | 0.967 | 0.088 | (0.024) | 1.031 | $788.95 | $67.95 | ($18.30) | $838.60 |
| NEVADA | UNK | 3 | 0.889 | 0.153 | (0.017) | 1.026 | $765.38 | $134.86 | ($14.58) | $885.66 |
| TEXAS | NORTH TX SPEC PHYSICIANS (PCP) | 23,466 | 0.979 | 0.073 | (0.027) | 1.026 | $907.05 | $61.81 | ($22.56) | $946.30 |
| OREGON | SALEM CLINIC PC (CMG) | 1,649 | 0.935 | 0.104 | (0.017) | 1.022 | $778.92 | $84.13 | ($13.88) | $849.17 |
| CALIFORNIA | HIGH DESERT PRIMARY CARE MG | 1,541 | 0.956 | 0.081 | (0.017) | 1.021 | $843.86 | $64.14 | ($12.71) | $895.29 |
| CALIFORNIA | MILLS PENINSULA | 4,459 | 1.039 | 0.009 | (0.029) | 1.019 | $857.42 | $7.13 | ($22.71) | $841.84 |
| OREGON | SOUTH TABOR FAMILY PHYS (CMG) | 480 | 0.975 | 0.059 | (0.016) | 1.018 | $811.39 | $48.25 | ($13.29) | $846.36 |
| CALIFORNIA | ALLCARE IPA | 2,110 | 1.021 | 0.029 | (0.033) | 1.017 | $908.76 | $24.65 | ($27.91) | $905.50 |
| CALIFORNIA | UCLA MEDICAL GROUP/IPA | 3,525 | 0.996 | 0.037 | (0.019) | 1.014 | $957.68 | $31.56 | ($16.09) | $973.16 |
| TEXAS | TARRANT DCN | 14,574 | 0.986 | 0.053 | (0.029) | 1.011 | $920.58 | $45.12 | ($24.27) | $941.44 |
| CALIFORNIA | PRIMECARE OF REDLANDS | 11,972 | 0.983 | 0.050 | (0.022) | 1.011 | $871.04 | $39.36 | ($17.58) | $892.82 |
| OREGON | OREGON CITY INTERNAL MEDICINE | 138 | 1.047 | (0.011) | (0.025) | 1.010 | $874.84 | ($9.27) | ($20.95) | $844.62 |
| OKLAHOMA | BROKEN ARROW | 24 | 0.905 | 0.138 | (0.037) | 1.006 | $720.86 | $105.38 | ($28.29) | $797.95 |
| CALIFORNIA | MERCY MEDICAL GROUP | 2,390 | 1.028 | 0.002 | (0.024) | 1.006 | $844.41 | $1.33 | ($18.79) | $826.96 |
| CALIFORNIA | BRIGHT HEALTH PHYSICIANS | 4,815 | 0.969 | 0.065 | (0.028) | 1.006 | $939.10 | $55.91 | ($24.56) | $970.44 |
| OREGON | PROVIDENCE MEDICAL GROUP | 19 | 1.148 | (0.091) | (0.052) | 1.004 | $939.90 | ($74.47) | ($42.72) | $822.71 |
| CALIFORNIA | PROSPECT MEDICAL GROUP/NORTH | 4,527 | 0.934 | 0.088 | (0.019) | 1.003 | $854.08 | $72.63 | ($15.61) | $911.09 |
| CALIFORNIA | SANTA BARBARA SELECT IPA | 1,730 | 0.909 | 0.116 | (0.023) | 1.003 | $765.18 | $95.15 | ($18.65) | $841.68 |
| OKLAHOMA | Jenks Family Physicians | 30 | 1.094 | (0.001) | (0.091) | 1.002 | $1,186.92 | ($0.61) | ($82.68) | $1,103.63 |
| CALIFORNIA | SUTTER GOULD MEDICAL FOUNDATIO | 8,532 | 0.984 | 0.039 | (0.022) | 1.001 | $892.88 | $33.58 | ($18.78) | $907.67 |
| CALIFORNIA | HILL PHYSICIANS SAN FRANCISCO | 6,474 | 0.989 | 0.040 | (0.028) | 1.001 | $879.99 | $34.44 | ($24.02) | $890.41 |
| CALIFORNIA | FACEY MEDICAL FOUNDATION | 5,101 | 0.959 | 0.059 | (0.019) | 1.000 | $925.08 | $51.05 | ($16.41) | $959.72 |
| OREGON | OAK STREET MEDICAL PC | 35 | 0.984 | 0.021 | (0.012) | 0.993 | $804.71 | $16.41 | ($9.31) | $811.81 |
| ARIZONA | SUN HEALTH NETWORK | 4,787 | 0.984 | 0.033 | (0.025) | 0.992 | $803.87 | $26.10 | ($19.44) | $810.53 |
| CALIFORNIA | SLO SELECT IPA SO CNTY | 1,494 | 0.967 | 0.043 | (0.020) | 0.990 | $736.59 | $31.64 | ($14.46) | $753.78 |
| CALIFORNIA | SANSUM CLINIC | 1,969 | 0.953 | 0.068 | (0.032) | 0.989 | $782.28 | $54.65 | ($25.61) | $811.32 |
| CALIFORNIA | SUTTER MEDICAL GROUP | 5,065 | 0.982 | 0.034 | (0.029) | 0.987 | $808.60 | $26.81 | ($22.73) | $812.67 |
| CALIFORNIA | ST JOSEPH HERITAGE MEDICAL GRO | 1,209 | 0.969 | 0.036 | (0.022) | 0.984 | $869.04 | $28.91 | ($17.20) | $880.75 |
| CALIFORNIA | ST VINCENT MEDICAL GROUP IPA | 898 | 0.901 | 0.098 | (0.016) | 0.983 | $862.74 | $83.07 | ($13.19) | $932.62 |
| OKLAHOMA | Dubois Medical Clinic | 94 | 0.962 | 0.054 | (0.033) | 0.982 | $805.64 | $42.13 | ($25.84) | $821.92 |
| CALIFORNIA | GREATER TRI-CITIES IPA MEDICAL | 2,492 | 0.928 | 0.067 | (0.014) | 0.980 | $799.82 | $53.48 | ($11.19) | $842.11 |
| OREGON | TUALITY HEALTH ALLIANCE | 122 | 0.898 | 0.091 | (0.009) | 0.979 | $834.35 | $79.53 | ($8.02) | $905.86 |
| COLORADO | AVISTA | 554 | 0.960 | 0.042 | (0.024) | 0.978 | $783.35 | $32.72 | ($18.48) | $797.59 |
| ARIZONA | THUNDERBIRD NETWORK | 3,960 | 0.956 | 0.042 | (0.022) | 0.977 | $796.84 | $34.01 | ($17.58) | $813.17 |
| CALIFORNIA | ST JOSEPH HOSPITAL AFFILIATED | 3,257 | 0.963 | 0.029 | (0.024) | 0.973 | $868.68 | $23.32 | ($19.07) | $872.93 |
| ARIZONA | PHX SECURE HOSPITAL NETWORK | 33,606 | 0.955 | 0.038 | (0.024) | 0.969 | $777.33 | $30.09 | ($19.00) | $788.42 |
| CALIFORNIA | PALO ALTO MEDICAL FOUNDATION | 3,872 | 0.987 | 0.008 | (0.027) | 0.968 | $846.26 | $6.48 | ($22.96) | $829.78 |
| WASHINGTON | PHYSICIANS CARE NETWORK (CMG) | 2,173 | 0.966 | 0.023 | (0.022) | 0.967 | $793.76 | $18.39 | ($17.64) | $794.52 |
| WASHINGTON | PACMED | 1,649 | 0.922 | 0.074 | (0.033) | 0.963 | $761.80 | $60.23 | ($26.56) | $795.47 |
| OREGON | MARTIN L JONES | 35 | 0.943 | 0.034 | (0.016) | 0.961 | $774.24 | $26.93 | ($12.29) | $788.89 |
| WASHINGTON | CLARK COUNTY DIRECT | 4,345 | 0.930 | 0.055 | (0.025) | 0.960 | $758.72 | $43.73 | ($19.86) | $782.60 |
| COLORADO | EXEMPLA MEDICAL SECURE | 92 | 0.884 | 0.111 | (0.037) | 0.958 | $693.45 | $92.38 | ($27.69) | $748.14 |
| CALIFORNIA | SHARP COMMUNITY MEDICAL GROUP | 23,987 | 0.942 | 0.035 | (0.021) | 0.956 | $799.16 | $28.30 | ($16.75) | $810.71 |
| CALIFORNIA | ST JUDE HERITAGE MEDICAL GROUP | 3,442 | 0.939 | 0.036 | (0.019) | 0.955 | $839.40 | $28.21 | ($15.46) | $852.16 |
| (blank) | UNK | 1,200,086 | 0.955 | 0.036 | (0.038) | 0.953 | $791.78 | $27.63 | ($29.28) | $790.12 |
| ARIZONA | BANNER MESA/BAYWOOD NETWORK | 13,793 | 0.935 | 0.037 | (0.021) | 0.950 | $763.94 | $28.87 | ($16.87) | $775.94 |
| CALIFORNIA | CEDARS SINAI MEDICAL GROUP | 1,659 | 0.903 | 0.068 | (0.022) | 0.950 | $847.18 | $56.72 | ($18.01) | $885.89 |
| WASHINGTON | CASTLE ROCK | 11 | 0.788 | 0.113 | 0.048 | 0.949 | $563.63 | $73.25 | $31.29 | $668.17 |
| CALIFORNIA | HERITAGE PROVIDER NETWORK | 23,374 | 0.924 | 0.042 | (0.018) | 0.949 | $835.21 | $34.21 | ($14.34) | $855.08 |
| OREGON | LAKESIDE CLINIC | 10 | 0.852 | 0.112 | (0.015) | 0.949 | $703.06 | $88.64 | ($12.08) | $779.61 |



RAF and PMPM Build-Up Report
(2) 2010 EOL Projection as of 3/31/10
(3) RAF Degradation: March less January MOR RAF plus a degradation factor of 0.4% per month from March to July
(4) Projected July 2010 RAF based on Jan 2010 actuals plus EOL plus RAF Degradation

| | | | RAF Drivers | | | | PMPM Drivers | | |
|---|---|---|---|---|---|---|---|---|---|
| DEC State | Provider Group Name | Jan 2010 Members (1) | Jan 2010 Actual RAF (1) | EOL RAF (2) | RAF Degradation (Jan-Jul) (3) | July 2010 Proj. RAF (4) | Jan 2010 PMPM (1) | EOL PMPM (2) | PMPM Degradation (Jan-Jul) (3) | July 2010 Proj. PMPM (4) |
| OREGON | FAMILY HEALTHPARTNERS | 8 | 1.428 | (0.469) | (0.015) | 0.943 | $1,146.89 | ($370.09) | ($12.00) | $764.77 |
| CALIFORNIA | SUTTER WEST MEDICAL GROUP | 135 | 0.910 | 0.057 | (0.023) | 0.943 | $831.30 | $48.61 | ($19.60) | $860.32 |
| OKLAHOMA | OKC DCN | 14,452 | 0.938 | 0.028 | (0.023) | 0.943 | $790.28 | $22.34 | ($18.05) | $794.57 |
| WASHINGTON | PROVIDENCE HEALTH SYSTEMS | 86 | 0.979 | 0.032 | (0.069) | 0.942 | $714.82 | $22.38 | ($47.79) | $689.41 |
| OKLAHOMA | UNK | 1,708 | 0.945 | 0.030 | (0.033) | 0.942 | $797.40 | $24.19 | ($26.71) | $794.89 |
| WASHINGTON | THURSTON DIRECT | 911 | 0.889 | 0.073 | (0.021) | 0.940 | $717.19 | $59.17 | ($17.28) | $759.07 |
| COLORADO | COLO SPGS HEALTH PARTNERS | 3,836 | 0.955 | 0.010 | (0.025) | 0.939 | $770.39 | $7.33 | ($19.33) | $758.38 |
| WASHINGTON | LEWIS DIRECT | 522 | 0.907 | 0.064 | (0.032) | 0.939 | $677.11 | $46.27 | ($22.95) | $700.43 |
| OREGON | CORVALLIS | 135 | 0.942 | 0.032 | (0.037) | 0.937 | $689.97 | $22.39 | ($26.15) | $686.22 |
| ARIZONA | METRO TUCSON NETWORK | 24,800 | 0.910 | 0.041 | (0.017) | 0.935 | $748.09 | $33.84 | ($14.01) | $767.92 |
| OKLAHOMA | TULSA DCN | 2,905 | 0.937 | 0.026 | (0.030) | 0.933 | $774.65 | $21.00 | ($24.17) | $771.48 |
| WASHINGTON | HEALTH CARE RESOURCES NW | 117 | 0.782 | 0.142 | 0.007 | 0.931 | $625.11 | $110.08 | $5.34 | $740.53 |
| WASHINGTON | PRIMARY CARE OF PUYALLUP | 164 | 0.933 | 0.013 | (0.016) | 0.929 | $769.95 | $10.76 | ($13.53) | $767.18 |
| CALIFORNIA | WOODLAND CLINIC MED GROUP | 140 | 0.952 | 0.008 | (0.032) | 0.928 | $825.04 | $6.77 | ($26.03) | $805.78 |
| OKLAHOMA | Putnam North Family Medical | 43 | 0.933 | 0.036 | (0.043) | 0.927 | $779.26 | $28.19 | ($33.21) | $774.24 |
| OREGON | THE CORVALLIS CLINIC (CMG) | 1,657 | 0.925 | 0.027 | (0.026) | 0.926 | $700.82 | $19.40 | ($19.27) | $700.94 |
| CALIFORNIA | Sonoma DCN PCPs | 185 | 0.924 | 0.035 | (0.040) | 0.919 | $774.41 | $28.16 | ($32.44) | $770.13 |
| WASHINGTON | SEATTLE DIRECT | 1,858 | 0.896 | 0.055 | (0.033) | 0.919 | $736.27 | $44.62 | ($26.29) | $754.61 |
| WASHINGTON | SWEDISH | 2,064 | 0.887 | 0.061 | (0.030) | 0.918 | $735.38 | $49.60 | ($24.43) | $760.55 |
| WASHINGTON | PIERCE COUNTY DIRECT | 4,366 | 0.882 | 0.057 | (0.026) | 0.914 | $719.57 | $45.63 | ($20.55) | $744.65 |
| WASHINGTON | KIRKPATRICK FAMILY CARE PS | 186 | 0.881 | 0.058 | (0.025) | 0.914 | $623.53 | $37.61 | ($16.38) | $644.76 |
| CALIFORNIA | CHINO MEDICAL GROUP INC | 423 | 0.901 | 0.026 | (0.014) | 0.913 | $780.42 | $19.75 | ($10.56) | $789.61 |
| CALIFORNIA | WHITEHORSE FAMILY MEDICINE | 142 | 0.932 | 0.040 | (0.060) | 0.911 | $747.01 | $30.15 | ($45.75) | $731.41 |
| WASHINGTON | PORTLAND DIRECT | 264 | 0.934 | 0.018 | (0.041) | 0.911 | $739.33 | $13.60 | ($30.70) | $722.23 |
| CALIFORNIA | PREMIER PHYSICIANS NETWORK | 704 | 0.897 | 0.031 | (0.022) | 0.906 | $906.34 | $27.74 | ($19.62) | $914.47 |
| CALIFORNIA | GOOD SAM MED PRAC ASSOC | 647 | 0.882 | 0.046 | (0.022) | 0.905 | $855.70 | $38.94 | ($19.06) | $875.57 |
| OREGON | SAMARITAN HEALTH SERVICES -PCP | 877 | 0.872 | 0.050 | (0.018) | 0.904 | $663.31 | $36.14 | ($12.91) | $686.53 |
| OREGON | MONTEREY HEALTH | 4 | 1.025 | (0.107) | (0.015) | 0.903 | $828.80 | ($84.19) | ($11.52) | $733.09 |
| CALIFORNIA | OMNICARE MEDICAL GROUP | 149 | 0.938 | (0.017) | (0.021) | 0.900 | $873.60 | ($14.01) | ($17.45) | $842.14 |
| CALIFORNIA | BAY AREA COM MED GRP | 450 | 0.854 | 0.072 | (0.033) | 0.893 | $792.35 | $58.06 | ($26.61) | $823.81 |
| CALIFORNIA | SANTE COMMUNITY PHYS-FRESNO | 3,750 | 0.910 | 0.012 | (0.029) | 0.892 | $756.35 | $9.14 | ($23.00) | $742.49 |
| CALIFORNIA | EMPIRE PHYS MG | 2,199 | 0.880 | 0.036 | (0.024) | 0.892 | $774.88 | $28.06 | ($18.77) | $784.17 |
| CALIFORNIA | MARIN IPA SONOMA | 215 | 0.861 | 0.068 | (0.038) | 0.891 | $727.75 | $55.06 | ($31.22) | $751.59 |
| OREGON | LANE DIRECT | 2,824 | 0.866 | 0.039 | (0.016) | 0.889 | $717.36 | $31.54 | ($12.82) | $736.08 |
| ARIZONA | ABRAZO NETWORK | 2 | 1.403 | 0.000 | (0.514) | 0.889 | $1,107.97 | $0.00 | ($446.39) | $661.58 |
| CALIFORNIA | CENTINELA VALLEY IPA MG INC | 343 | 0.816 | 0.079 | (0.011) | 0.886 | $827.15 | $69.34 | ($9.47) | $887.03 |
| CALIFORNIA | JOHN MUIR HEALTH NETWORK | 724 | 0.851 | 0.041 | (0.008) | 0.884 | $842.11 | $39.17 | ($7.39) | $873.89 |
| WASHINGTON | SNOHOMISH DIRECT | 5,231 | 0.863 | 0.049 | (0.030) | 0.882 | $704.51 | $38.00 | ($23.05) | $719.45 |
| OREGON | VENETA MEDICAL CLINIC | 5 | 1.142 | (0.221) | (0.040) | 0.882 | $930.61 | ($174.64) | ($31.60) | $724.37 |
| TEXAS | Deuteronomy-2 | 987 | 0.870 | 0.035 | (0.024) | 0.880 | $819.01 | $29.54 | ($20.62) | $827.93 |
| CALIFORNIA | ST JUDE AFFILIATED PHYSICIANS | 685 | 0.840 | 0.047 | (0.009) | 0.878 | $815.00 | $39.18 | ($7.58) | $846.60 |
| WASHINGTON | UNK | 2,162 | 0.888 | 0.024 | (0.037) | 0.875 | $730.86 | $19.19 | ($29.46) | $720.59 |
| COLORADO | DENVER PROPRIETARY SECURE | 12,866 | 0.860 | 0.033 | (0.020) | 0.874 | $701.30 | $25.50 | ($15.19) | $711.61 |
| CALIFORNIA | TORRANCE HOSPITAL IPA | 875 | 0.870 | 0.026 | (0.024) | 0.873 | $818.47 | $21.70 | ($19.44) | $820.73 |
| WASHINGTON | MULTICARE | 2,765 | 0.867 | 0.030 | (0.027) | 0.871 | $696.96 | $23.52 | ($20.71) | $699.78 |
| CALIFORNIA | Independence IPA | 321 | 0.870 | 0.040 | (0.040) | 0.871 | $738.11 | $30.23 | ($30.05) | $738.29 |
| ARIZONA | PINAL HEALTH CARE NETWORK | 2,196 | 0.869 | 0.021 | (0.021) | 0.869 | $712.98 | $16.23 | ($16.34) | $712.88 |
| CALIFORNIA | OJAI VALLEY MEDICAL GROUP | 515 | 0.857 | 0.029 | (0.017) | 0.869 | $765.13 | $24.88 | ($15.03) | $774.98 |
| COLORADO | LOVELAND PROPRIETARY | 2,071 | 0.874 | 0.016 | (0.026) | 0.863 | $710.79 | $12.32 | ($20.19) | $702.93 |
| TEXAS | Jefferson Phys Grd | 1,928 | 0.872 | 0.022 | (0.033) | 0.861 | $852.71 | $19.48 | ($28.99) | $843.20 |
| CALIFORNIA | Brookwood Internal Medical | 46 | 0.951 | (0.058) | (0.034) | 0.859 | $770.19 | ($45.50) | ($27.11) | $697.58 |
| CALIFORNIA | SONOMA COUNTY PRIMARY CARE IPA | 75 | 0.757 | 0.126 | (0.025) | 0.857 | $615.35 | $98.72 | ($19.78) | $694.29 |
| CALIFORNIA | ADOC-FOUNTAIN VALLEY DIVISION | 748 | 0.839 | 0.040 | (0.023) | 0.856 | $801.43 | $33.48 | ($19.50) | $815.40 |
| COLORADO | COLORADO SPRINGS DIRECT | 6,039 | 0.849 | 0.031 | (0.025) | 0.855 | $682.98 | $23.00 | ($18.43) | $687.55 |
| COLORADO | FREMONT COUNTY SECURE | 308 | 0.764 | 0.114 | (0.025) | 0.853 | $569.16 | $77.34 | ($17.15) | $629.35 |
| WASHINGTON | EASTSIDE DIRECT | 1,870 | 0.850 | 0.031 | (0.030) | 0.851 | $692.19 | $24.51 | ($23.92) | $692.79 |
| CALIFORNIA | COMPLETE ACCESS NETWORK | 5,258 | 0.823 | 0.045 | (0.021) | 0.847 | $673.32 | $35.93 | ($16.83) | $692.42 |
| COLORADO | PUEBLO PROPRIETARY CENTURA | 1,889 | 0.848 | 0.018 | (0.025) | 0.841 | $616.08 | $11.86 | ($16.61) | $611.33 |
| OKLAHOMA | NORMAN PHO PCPS | 346 | 0.802 | 0.040 | (0.005) | 0.838 | $649.95 | $29.74 | ($3.32) | $676.37 |
| WASHINGTON | PEACEHEALTH MEDICAL GROUP | 703 | 0.798 | 0.053 | (0.027) | 0.823 | $577.66 | $34.82 | ($18.15) | $594.33 |
| CALIFORNIA | LA VIDA MULTISPECIALTY | 576 | 0.828 | 0.000 | (0.013) | 0.816 | $839.53 | $0.40 | ($12.02) | $827.91 |

427



RAF and PMPM Build-Up Report
Case 2:36-cv-03987-WRSS Document 8 Filed 11/22/15 Page 179 of 218 Page ID: 984

(2) - 2010 EOL Projection as of 3/31/10
(3) - RAF Degradation: March less January MOR RAF plus a degradation factor of 0.4% per month from March to July
(4) - Projected July 2010 RAF based on Jan 2010 actuals plus EOL plus RAF Degradation

| | | | | RAF Drivers | | | PMPM Drivers | | |
|---|---|---|---|---|---|---|---|---|---|
| DEC State | Provider Group Name | Jan 2010 Members (1) | Jan 2010 Actual RAF (1) | EOL RAF (2) | RAF Degradation (Jan-Jul) (3) | July 2010 Proj. RAF (4) | Jan 2010 PMPM (1) | EOL PMPM (2) | PMPM Degradation (Jan-Jul) (3) | July 2010 Proj. PMPM (4) |
| CALIFORNIA | RIVERSIDE PHYS NTWK RSDE COMM | 1,348 | 0.797 | 0.036 | (0.018) | 0.815 | $737.29 | $29.07 | ($14.69) | $751.67 |
| WASHINGTON | VALLEY DIRECT | 817 | 0.779 | 0.043 | (0.008) | 0.815 | $642.14 | $33.53 | ($6.04) | $669.63 |
| WASHINGTON | HIGHLINE MSO (CMG) | 551 | 0.775 | 0.037 | 0.001 | 0.813 | $644.02 | $28.59 | $0.81 | $673.43 |
| OKLAHOMA | CANADIAN VALLEY | 631 | 0.791 | 0.033 | (0.013) | 0.811 | $707.10 | $26.73 | ($10.34) | $723.49 |
| CALIFORNIA | PACIFIC INDEPENDENT PHY ASSOC | 1,054 | 0.814 | 0.018 | (0.030) | 0.802 | $822.81 | $15.78 | ($26.22) | $812.37 |
| CALIFORNIA | SIERRA NEVADA MEDICAL ASSOC | 1,019 | 0.791 | 0.018 | (0.021) | 0.788 | $632.11 | $14.17 | ($16.29) | $629.99 |
| CALIFORNIA | MARIN IPA - SONOMA | 39 | 0.712 | 0.093 | (0.020) | 0.785 | $581.67 | $73.45 | ($15.45) | $639.67 |
| TEXAS | SAN ANTONIO DCN | 16 | 0.647 | 0.078 | 0.060 | 0.785 | $636.29 | $56.55 | $43.18 | $736.02 |
| OKLAHOMA | THE PHYSICIANS GROUP | 1,107 | 0.775 | 0.028 | (0.018) | 0.784 | $656.42 | $21.43 | ($14.25) | $663.60 |
| CALIFORNIA | PORTERVILLE | 81 | 0.797 | 0.015 | (0.029) | 0.783 | $645.08 | $11.30 | ($21.49) | $634.88 |
| ARIZONA | RURAL AREA NETWORK | 1,025 | 0.753 | 0.041 | (0.011) | 0.783 | $549.77 | $32.23 | ($8.40) | $573.59 |
| CALIFORNIA | SIERRA MEDICAL CLINIC, INC | 8 | 0.678 | 0.155 | (0.054) | 0.779 | $654.75 | $126.70 | ($44.17) | $737.27 |
| CALIFORNIA | ALLIED PHYSICIANS OF CALIF | 765 | 0.794 | (0.003) | (0.012) | 0.779 | $814.24 | ($2.28) | ($10.85) | $801.11 |
| WASHINGTON | Meadowbrook Urgent Care | 17 | 0.650 | 0.137 | (0.028) | 0.759 | $530.33 | $103.52 | ($20.90) | $612.96 |
| COLORADO | BOULDER COUNTY SECURE | 1,632 | 0.755 | 0.010 | (0.016) | 0.750 | $611.75 | $7.60 | ($11.76) | $607.59 |
| CALIFORNIA | EL ROSE MG | 22 | 0.619 | 0.107 | 0.012 | 0.737 | $511.38 | $83.60 | $9.34 | $604.31 |
| CALIFORNIA | BROWN & TOLAND MED GRP | 1,245 | 0.698 | 0.054 | (0.019) | 0.734 | $599.99 | $41.70 | ($14.30) | $627.39 |
| CALIFORNIA | IMPERIAL CNTY PHYS MEDICAL GRP | 115 | 0.668 | 0.062 | (0.012) | 0.718 | $500.34 | $42.69 | ($8.51) | $534.52 |
| COLORADO | SECURE ADVANTAGE CO | 417 | 0.726 | 0.035 | (0.045) | 0.716 | $580.33 | $25.89 | ($33.13) | $573.09 |
| CALIFORNIA | Visalia Medical Clinic | 97 | 0.767 | 0.009 | (0.079) | 0.697 | $621.20 | $6.41 | ($59.19) | $568.43 |
| OREGON | FANNO CREEK | 36 | 0.736 | (0.035) | (0.008) | 0.693 | $599.86 | ($28.07) | ($6.72) | $565.07 |
| CALIFORNIA | PRUDENT MEDICAL GROUP | 17 | 0.657 | 0.077 | (0.042) | 0.692 | $634.69 | $63.44 | ($34.82) | $663.31 |
| OKLAHOMA | FAMILY MEDICINE SPECIALISTS | 33 | 0.714 | (0.020) | (0.014) | 0.679 | $576.67 | ($14.75) | ($10.51) | $551.42 |
| CALIFORNIA | UNIVERSAL CARE MEDICAL GROUP | 4 | 0.553 | 0.076 | 0.048 | 0.676 | $539.53 | $59.37 | $37.99 | $636.89 |
| CALIFORNIA | PREMIER CARE IPA | 10 | 0.704 | 0.021 | (0.053) | 0.672 | $603.50 | $18.34 | ($45.25) | $576.59 |
| CALIFORNIA | AMVI | 12 | 0.571 | 0.028 | 0.010 | 0.608 | $536.37 | $22.00 | $7.73 | $566.09 |
| WASHINGTON | PROVIDENCE MED GRP | 9 | 0.585 | 0.045 | (0.032) | 0.598 | $468.33 | $33.61 | ($23.74) | $478.20 |
| CALIFORNIA | KOREAN AMERICAN MEDICAL GROUP | 91 | 0.535 | 0.057 | (0.014) | 0.578 | $534.99 | $45.03 | ($11.18) | $568.84 |
| OREGON | HEALTHMAX | 4 | 0.371 | 0.195 | (0.009) | 0.557 | $299.42 | $158.17 | ($7.30) | $450.29 |
| WASHINGTON | PACIFIC MEDICAL | 1 | 2.416 | (0.985) | (0.879) | 0.552 | $1,784.97 | ($707.88) | ($631.85) | $445.24 |
| NEVADA | SECURE ADVANTAGE NV | 0 | 0.000 | 0.000 | 0.526 | 0.526 | $0.00 | $0.00 | $459.61 | $459.61 |
| ARIZONA | KINO NETWORK | 1 | 0.461 | 0.006 | 0.011 | 0.478 | $378.27 | $4.31 | $8.67 | $391.25 |
| WASHINGTON | TUALITY HEALTH ALLIANCE | 1 | 0.461 | 0.006 | (0.007) | 0.459 | $379.54 | $4.22 | ($5.34) | $378.42 |
| OKLAHOMA | Jerry A Helms Do Inc | 10 | 0.395 | 0.009 | (0.006) | 0.397 | $332.10 | $6.88 | ($5.05) | $333.93 |
| WASHINGTON | PORTLAND AVENUE FAMILY CLINIC | 4 | 0.398 | 0.000 | (0.008) | 0.391 | $317.83 | $0.00 | ($5.13) | $312.70 |

(2) and EOL Projection as of 3/31/10
(3) - RAF Degradation: March less January MOR RAF plus a degradation factor of 0.4% per month from March to July
(4) - Projected July 2010 RAF based on Jan 2010 actuals plus EOL plus RAF Degradation

| DEC State | Provider Group Name | January 2010 RAF Components | | | | July 2010 RAF Components | | | | Avg RAF Improvement (Jan to Jul) | | | | Avg % RAF Improvement (Jan to Jul) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Jan Total RAF (1) | HCC (1) | Age/Sex (1) | Special Status (1) | July Total RAF (4) | HCC (4) | Age/Sex (4) | Special Status (4) | RAF | HCC | Age/Sex | Special Status | RAF | HCC | Age/Sex | Special Status |
| CALIFORNIA | Petaluma Health Center | 3.973 | 3.669 | 0.304 | - | 4.035 | 3.735 | 0.299 | - | 0.062 | 0.066 | (0.005) | 0.000 | 1.6% | 1.8% | -1.6% | 0.0% |
| CALIFORNIA | UNK | 2.362 | 1.555 | 0.732 | 0.075 | 2.472 | 1.678 | 0.720 | 0.074 | 0.110 | 0.123 | (0.012) | (0.001) | 4.7% | 7.9% | -1.6% | -1.6% |
| CALIFORNIA | FAMILY PRACTICE MEDICAL GROUP | 2.461 | 1.997 | 0.438 | 0.026 | 2.466 | 2.009 | 0.431 | 0.025 | 0.005 | 0.013 | (0.007) | (0.001) | 0.2% | 0.6% | -1.5% | -3.4% |
| CALIFORNIA | SAN DIEGO PHYS MG/CHULA VISTA | 1.897 | 1.155 | 0.559 | 0.183 | 1.999 | 1.269 | 0.551 | 0.180 | 0.102 | 0.114 | (0.009) | (0.003) | 5.4% | 9.9% | -1.6% | -1.6% |
| ARIZONA | CARE PLUS NETWORK | 1.851 | 1.058 | 0.720 | 0.073 | 1.859 | 1.067 | 0.720 | 0.071 | 0.008 | 0.009 | 0.000 | (0.002) | 0.4% | 0.9% | 0.0% | -2.3% |
| OREGON | GREEN MOUNTAIN | 1.008 | 0.501 | 0.463 | 0.044 | 1.503 | 1.005 | 0.455 | 0.044 | 0.495 | 0.503 | (0.007) | 0.000 | 49.1% | 100.4% | -1.6% | -1.6% |
| CALIFORNIA | ACCESS MEDICAL GROUP INC | 1.167 | 0.666 | 0.479 | 0.021 | 1.491 | 0.995 | 0.475 | 0.021 | 0.324 | 0.329 | (0.003) | 0.000 | 27.7% | 49.3% | -0.6% | -0.5% |
| TEXAS | PRINCETON IPA OF SAN ANTONIO | 1.383 | 0.906 | 0.429 | 0.049 | 1.473 | 1.002 | 0.424 | 0.047 | 0.090 | 0.096 | (0.005) | (0.001) | 6.5% | 10.6% | -1.2% | -2.2% |
| CALIFORNIA | HEALTHCARE PARTNERS MED GRP | 1.226 | 0.734 | 0.467 | 0.026 | 1.354 | 0.868 | 0.461 | 0.025 | 0.127 | 0.134 | (0.006) | (0.000) | 10.4% | 18.3% | -1.4% | -1.9% |
| COLORADO | NEW WEST PHYSICIANS/HEALTH ONE | 1.339 | 0.869 | 0.456 | 0.014 | 1.332 | 0.868 | 0.451 | 0.013 | (0.008) | (0.002) | (0.005) | (0.001) | -0.6% | -0.2% | -1.1% | -6.2% |
| TEXAS | UNK | 1.198 | 0.729 | 0.420 | 0.048 | 1.327 | 0.863 | 0.418 | 0.046 | 0.129 | 0.134 | (0.003) | (0.002) | 10.8% | 18.3% | -0.7% | -3.9% |
| CALIFORNIA | VALLEY CARE IPA | 1.259 | 0.747 | 0.484 | 0.028 | 1.326 | 0.825 | 0.474 | 0.027 | 0.068 | 0.078 | (0.010) | (0.001) | 5.4% | 10.5% | -2.0% | -1.9% |
| CALIFORNIA | PHYSICIANS ASSOCIATES | 1.228 | 0.757 | 0.448 | 0.022 | 1.295 | 0.830 | 0.442 | 0.022 | 0.067 | 0.073 | (0.006) | (0.000) | 5.4% | 9.6% | -1.3% | -0.9% |
| COLORADO | SENIOR CARE COLORADO | 1.222 | 0.704 | 0.501 | 0.017 | 1.293 | 0.784 | 0.491 | 0.017 | 0.071 | 0.080 | (0.010) | 0.000 | 5.8% | 11.4% | -1.9% | 0.1% |
| OKLAHOMA | STEVEN KING | 1.428 | 0.916 | 0.487 | 0.025 | 1.291 | 0.787 | 0.479 | 0.025 | (0.137) | (0.129) | (0.008) | 0.000 | -9.6% | -14.1% | -1.6% | -1.6% |
| CALIFORNIA | GOLDEN CARE | 0.933 | 0.212 | 0.666 | 0.055 | 1.287 | 0.533 | 0.718 | 0.037 | 0.354 | 0.322 | 0.051 | (0.018) | 38.0% | 152.0% | 7.7% | -33.4% |
| NEVADA | LAS VEGAS NETWORK | 1.184 | 0.760 | 0.415 | 0.010 | 1.286 | 0.865 | 0.411 | 0.009 | 0.101 | 0.105 | (0.004) | (0.000) | 8.5% | 13.8% | -0.9% | -1.1% |
| ARIZONA | JOHN C LINCOLN NETWORK | 0.982 | 0.272 | 0.554 | 0.156 | 1.285 | 0.586 | 0.545 | 0.153 | 0.303 | 0.314 | (0.009) | (0.003) | 30.8% | 115.5% | -1.6% | -1.6% |
| TEXAS | HOUSTON DCN | 1.167 | 0.739 | 0.372 | 0.057 | 1.254 | 0.829 | 0.369 | 0.056 | 0.087 | 0.090 | (0.003) | (0.001) | 7.5% | 12.2% | -0.7% | -0.9% |
| OREGON | THE PORTLAND CLINIC (CMG) | 1.219 | 0.687 | 0.514 | 0.018 | 1.242 | 0.718 | 0.507 | 0.018 | 0.023 | 0.031 | (0.007) | 0.000 | 1.9% | 4.4% | -1.4% | 0.3% |
| CALIFORNIA | West Linn Pediatric And Women | 1.420 | 0.877 | 0.502 | 0.042 | 1.242 | 0.707 | 0.494 | 0.041 | (0.178) | (0.170) | (0.008) | (0.001) | -12.6% | -19.4% | -1.6% | -1.6% |
| CALIFORNIA | MERCY PHYSICIANS MEDICAL GROUP | 1.203 | 0.710 | 0.467 | 0.026 | 1.236 | 0.753 | 0.459 | 0.025 | 0.034 | 0.043 | (0.008) | (0.000) | 2.8% | 6.1% | -1.8% | -3.4% |
| OREGON | UNK | 1.129 | 0.585 | 0.524 | 0.020 | 1.234 | 0.698 | 0.516 | 0.020 | 0.105 | 0.114 | (0.008) | (0.000) | 9.3% | 19.5% | -1.6% | -1.6% |
| OREGON | PRIME MED | 1.227 | 0.746 | 0.439 | 0.042 | 1.212 | 0.742 | 0.429 | 0.041 | (0.015) | (0.004) | (0.010) | (0.002) | -1.2% | -0.5% | -2.2% | -3.6% |
| CALIFORNIA | TALBERT MEDICAL GROUP | 1.160 | 0.647 | 0.484 | 0.029 | 1.189 | 0.683 | 0.478 | 0.028 | 0.030 | 0.036 | (0.006) | (0.000) | 2.6% | 5.6% | -1.3% | -1.8% |
| OREGON | NORTHWEST PRIMARY CARE (CMG) | 1.104 | 0.576 | 0.507 | 0.021 | 1.187 | 0.666 | 0.500 | 0.021 | 0.083 | 0.090 | (0.007) | 0.000 | 7.5% | 15.6% | -1.4% | 0.8% |
| CALIFORNIA | OMNI IPA INC-STOCKTON | 0.875 | 0.492 | 0.383 | - | 1.185 | 0.802 | 0.383 | - | 0.310 | 0.316 | (0.006) | 0.000 | 35.4% | 64.2% | -1.6% | 0.0% |
| COLORADO | NEW WEST PHYSICIANS/LUTHERAN | 1.137 | 0.689 | 0.436 | 0.012 | 1.183 | 0.741 | 0.431 | 0.011 | 0.046 | 0.052 | (0.006) | (0.000) | 4.0% | 7.5% | -1.3% | -2.7% |
| OREGON | Q STREET INTERNISTS | 1.191 | 0.714 | 0.432 | 0.046 | 1.182 | 0.728 | 0.413 | 0.041 | (0.009) | 0.014 | (0.018) | (0.005) | -0.8% | 2.0% | -4.3% | -9.8% |
| CALIFORNIA | GREATER NEWPORT PHYS@HOAG HOSP | 1.118 | 0.656 | 0.448 | 0.014 | 1.178 | 0.722 | 0.441 | 0.014 | 0.060 | 0.066 | (0.007) | (0.000) | 5.3% | 10.1% | -1.5% | -1.9% |
| TEXAS | PHYSICIAN PRIMECARE | 1.073 | 0.591 | 0.423 | 0.059 | 1.176 | 0.701 | 0.417 | 0.057 | 0.103 | 0.110 | (0.006) | (0.002) | 9.6% | 18.6% | -1.4% | -2.6% |
| CALIFORNIA | AFFINITY WEST COUNTY REGION | 1.142 | 0.628 | 0.489 | 0.025 | 1.174 | 0.670 | 0.479 | 0.025 | 0.031 | 0.042 | (0.010) | (0.001) | 2.8% | 6.7% | -2.1% | -1.0% |
| CALIFORNIA | AXMINSTER MEDICAL GROUP INC | 1.139 | 0.618 | 0.477 | 0.044 | 1.172 | 0.657 | 0.472 | 0.043 | 0.033 | 0.039 | (0.005) | (0.001) | 2.9% | 6.3% | -1.0% | -2.5% |
| CALIFORNIA | ALTA BATES MEDICAL GROUP | 1.161 | 0.655 | 0.478 | 0.028 | 1.171 | 0.676 | 0.469 | 0.026 | 0.010 | 0.021 | (0.009) | (0.001) | 0.9% | 3.1% | -1.8% | -5.2% |
| OREGON | FIVE RIVERS | 0.866 | 0.413 | 0.406 | 0.047 | 1.165 | 0.702 | 0.406 | 0.056 | 0.299 | 0.290 | 0.000 | 0.009 | 34.5% | 70.2% | 0.0% | 18.9% |
| CALIFORNIA | SAN JOSE MEDICAL GROUP | 1.152 | 0.615 | 0.514 | 0.022 | 1.158 | 0.631 | 0.505 | 0.021 | 0.006 | 0.016 | (0.009) | (0.001) | 0.5% | 2.6% | -1.7% | -4.4% |
| OREGON | HEALTH CARE RESOURCES NW | 1.051 | 0.556 | 0.470 | 0.025 | 1.153 | 0.665 | 0.464 | 0.025 | 0.102 | 0.109 | (0.007) | (0.000) | 9.7% | 19.6% | -1.4% | -0.6% |
| CALIFORNIA | HEMET COMMUNITY MEDICAL GROUP | 1.036 | 0.560 | 0.449 | 0.027 | 1.143 | 0.675 | 0.441 | 0.027 | 0.107 | 0.116 | (0.008) | (0.000) | 10.3% | 20.7% | -1.9% | -1.6% |
| CALIFORNIA | EPIC | 1.089 | 0.603 | 0.461 | 0.025 | 1.142 | 0.663 | 0.455 | 0.025 | 0.054 | 0.060 | (0.006) | (0.000) | 4.9% | 10.0% | -1.4% | -1.6% |
| COLORADO | NEW WEST PHYSICIANS/CENTURA | 1.086 | 0.633 | 0.436 | 0.017 | 1.139 | 0.692 | 0.430 | 0.017 | 0.053 | 0.059 | (0.006) | (0.000) | 4.9% | 9.3% | -1.3% | -2.0% |
| CALIFORNIA | ENCOMPASS MEDICAL GROUP INC | 1.112 | 0.640 | 0.451 | 0.021 | 1.133 | 0.670 | 0.443 | 0.020 | 0.020 | 0.028 | (0.008) | (0.000) | 1.8% | 4.6% | -1.8% | -4.7% |
| CALIFORNIA | MONARCH HEALTHCARE | 1.122 | 0.629 | 0.477 | 0.016 | 1.123 | 0.639 | 0.468 | 0.016 | 0.001 | 0.010 | (0.008) | (0.000) | 0.1% | 1.6% | -1.8% | -2.0% |
| CALIFORNIA | CENTRAL VALLEY MEDICAL GROUP | 1.102 | 0.630 | 0.444 | 0.028 | 1.120 | 0.654 | 0.438 | 0.027 | 0.018 | 0.025 | (0.007) | (0.000) | 1.6% | 4.0% | -1.5% | -2.2% |
| TEXAS | CORPUS CHRISTI DIRECT | 1.105 | 0.615 | 0.401 | 0.088 | 1.113 | 0.632 | 0.396 | 0.085 | 0.008 | 0.017 | (0.006) | (0.003) | 0.7% | 2.8% | -1.4% | -4.1% |
| CALIFORNIA | APPLECARE | 1.029 | 0.533 | 0.451 | 0.045 | 1.112 | 0.623 | 0.445 | 0.044 | 0.083 | 0.090 | (0.006) | (0.001) | 8.1% | 16.9% | -1.3% | -1.4% |
| CALIFORNIA | INLAND HEALTH CARE GROUP | 1.165 | 0.679 | 0.438 | 0.048 | 1.111 | 0.631 | 0.432 | 0.048 | (0.055) | (0.048) | (0.006) | (0.000) | -4.7% | -7.1% | -1.3% | -1.2% |
| CALIFORNIA | PRIMARY CARE ASSOCIATED MG | 1.032 | 0.535 | 0.483 | 0.014 | 1.104 | 0.614 | 0.477 | 0.013 | 0.073 | 0.079 | (0.006) | (0.000) | 7.0% | 14.7% | -1.2% | -2.1% |
| CALIFORNIA | SANTA CLARA COUNTY IPA | 1.052 | 0.535 | 0.498 | 0.019 | 1.104 | 0.595 | 0.489 | 0.019 | 0.051 | 0.060 | (0.008) | (0.000) | 4.9% | 11.2% | -1.7% | -2.3% |
| CALIFORNIA | MIDCOAST IPA | 1.047 | 0.547 | 0.476 | 0.024 | 1.100 | 0.611 | 0.468 | 0.023 | 0.053 | 0.064 | (0.010) | (0.001) | 5.1% | 11.7% | -2.0% | -4.7% |
| CALIFORNIA | PIONEER PROVIDER NETWORK A MED | 1.149 | 0.658 | 0.466 | 0.027 | 1.094 | 0.611 | 0.459 | 0.026 | (0.054) | (0.046) | (0.008) | (0.000) | -4.7% | -7.1% | -1.6% | -1.4% |
| CALIFORNIA | SUTTER EAST BAY MEDICAL FOUNDATION | 1.057 | 0.548 | 0.485 | 0.024 | 1.093 | 0.594 | 0.475 | 0.024 | 0.036 | 0.046 | (0.009) | (0.000) | 3.4% | 8.3% | -1.9% | 0.3% |
| CALIFORNIA | RIVERSIDE MEDICAL CLINIC INC | 1.090 | 0.651 | 0.412 | 0.026 | 1.092 | 0.657 | 0.409 | 0.026 | 0.002 | 0.006 | (0.003) | (0.000) | 0.2% | 1.0% | -0.8% | -2.1% |
| OREGON | CASTILLO | 0.948 | 0.513 | 0.417 | 0.018 | 1.091 | 0.660 | 0.415 | 0.017 | 0.143 | 0.146 | (0.002) | (0.001) | 15.1% | 28.5% | -0.4% | -6.8% |
| CALIFORNIA | CHOICE MEDICAL GROUP | 1.037 | 0.587 | 0.420 | 0.030 | 1.072 | 0.630 | 0.413 | 0.028 | 0.035 | 0.043 | (0.006) | (0.001) | 3.4% | 7.2% | -1.5% | -4.7% |
| CALIFORNIA | SAN BERNARDINO MEDICAL GROUP | 0.896 | 0.416 | 0.448 | 0.033 | 1.064 | 0.592 | 0.442 | 0.032 | 0.169 | 0.176 | (0.006) | (0.000) | 18.9% | 42.2% | -1.3% | -1.7% |
| CALIFORNIA | HEALTHCARE PARTNERS | 1.032 | 0.529 | 0.429 | 0.025 | 1.064 | 0.567 | 0.422 | 0.023 | 0.032 | 0.038 | (0.005) | (0.000) | 3.1% | 7.2% | -1.1% | -1.6% |
| CALIFORNIA | SCRIPPS CLINIC | 0.974 | 0.486 | 0.472 | 0.015 | 1.062 | 0.582 | 0.465 | 0.015 | 0.088 | 0.096 | (0.007) | (0.000) | 9.0% | 19.7% | -1.6% | -2.4% |
| OREGON | PACIFIC MEDICAL | 1.058 | 0.518 | 0.518 | 0.022 | 1.060 | 0.528 | 0.510 | 0.022 | 0.002 | 0.011 | (0.008) | (0.000) | 0.2% | 2.1% | -1.5% | -2.4% |
| CALIFORNIA | SEAVIEW IPA | 1.025 | 0.515 | 0.484 | 0.027 | 1.058 | 0.556 | 0.476 | 0.026 | 0.033 | 0.041 | (0.007) | (0.001) | 3.2% | 7.9% | -1.5% | -3.0% |
| CALIFORNIA | PROVIDENCE MED GRP | 1.017 | 0.489 | 0.504 | 0.025 | 1.057 | 0.538 | 0.495 | 0.024 | 0.040 | 0.049 | (0.009) | (0.001) | 4.0% | 10.2% | -1.8% | -1.6% |
| CALIFORNIA | BRISTOL PARK MEDICAL GROUP | 1.017 | 0.562 | 0.438 | 0.017 | 1.057 | 0.609 | 0.431 | 0.016 | 0.040 | 0.048 | (0.007) | (0.000) | 3.9% | 8.5% | -1.7% | -2.6% |



(2) Jan EOL Projection as of 3/31/10
(3) - RAF Degradation: March less January MOR RAF plus a degradation factor of 0.4% per month from March to July
(4) - Projected July 2010 RAF based on Jan 2010 actuals plus EOL plus RAF Degradation

| DEC State | Provider Group Name | January 2010 RAF Components | | | | July 2010 RAF Components | | | | Avg RAF Improvement (Jan to Jul) | | | | Avg % RAF Improvement (Jan to Jul) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Jan Total RAF (1) | HCC (1) | Age/Sex (1) | Special Status (1) | July Total RAF (4) | HCC (4) | Age/Sex (4) | Special Status (4) | RAF | HCC | Age/Sex | Special Status | RAF | HCC | Age/Sex | Special Status |
| CALIFORNIA | MEMORIAL HEALTHCARE IPA/LB | 0.980 | 0.518 | 0.440 | 0.022 | 1.056 | 0.602 | 0.432 | 0.022 | 0.076 | 0.084 | (0.008) | (0.001) | 7.8% | 16.3% | -1.7% | -3.2% |
| CALIFORNIA | COAST HEALTHCARE | 1.002 | 0.528 | 0.446 | 0.028 | 1.054 | 0.587 | 0.439 | 0.028 | 0.052 | 0.059 | (0.007) | (0.000) | 5.1% | 11.2% | -1.6% | -1.6% |
| CALIFORNIA | SHARP REES-STEALY MEDICAL GRP | 0.936 | 0.438 | 0.478 | 0.020 | 1.050 | 0.561 | 0.470 | 0.020 | 0.115 | 0.123 | (0.008) | (0.000) | 12.2% | 28.0% | -1.6% | -2.3% |
| TEXAS | DALLAS COUNTY HOSPITAL DISTRIC | 0.981 | 0.483 | 0.404 | 0.093 | 1.048 | 0.554 | 0.409 | 0.085 | 0.067 | 0.071 | 0.005 | (0.009) | 6.8% | 14.6% | 1.3% | -9.4% |
| TEXAS | SUTTER INDEPENDENT PHYSICIANS | 1.040 | 0.544 | 0.467 | 0.029 | 1.039 | 0.552 | 0.459 | 0.028 | (0.001) | 0.008 | (0.008) | (0.001) | -0.1% | 1.4% | -1.7% | -1.6% |
| TEXAS | DALLAS DCN | 1.008 | 0.553 | 0.420 | 0.034 | 1.038 | 0.591 | 0.414 | 0.033 | 0.030 | 0.037 | (0.006) | (0.001) | 3.0% | 6.7% | -1.4% | -3.4% |
| COLORADO | UNK | 0.973 | 0.504 | 0.457 | 0.012 | 1.037 | 0.576 | 0.449 | 0.012 | 0.064 | 0.072 | (0.008) | (0.001) | 6.5% | 14.3% | -1.7% | -4.5% |
| CALIFORNIA | PHYS MED GRP OF SANTA CRUZ COU | 0.972 | 0.462 | 0.491 | 0.018 | 1.036 | 0.537 | 0.481 | 0.018 | 0.064 | 0.075 | (0.010) | (0.000) | 6.6% | 16.2% | -2.1% | -1.6% |
| CALIFORNIA | CENTRE FOR HEALTH CARE | 0.994 | 0.514 | 0.469 | 0.012 | 1.035 | 0.560 | 0.463 | 0.012 | 0.040 | 0.045 | (0.005) | (0.000) | 4.0% | 8.8% | -1.1% | -0.8% |
| CALIFORNIA | UNITED FAMILY CARE OF RIALTO | 0.992 | 0.502 | 0.443 | 0.047 | 1.034 | 0.551 | 0.437 | 0.046 | 0.042 | 0.049 | (0.006) | (0.001) | 4.3% | 9.7% | -1.3% | -1.5% |
| OREGON | PORTLAND DIRECT | 1.024 | 0.528 | 0.472 | 0.023 | 1.032 | 0.548 | 0.464 | 0.023 | 0.008 | 0.018 | (0.009) | (0.000) | 0.8% | 3.3% | -1.8% | -2.1% |
| COLORADO | PRIMARY PHYSICIAN PARTNERS | 0.967 | 0.503 | 0.442 | 0.022 | 1.031 | 0.574 | 0.436 | 0.021 | 0.064 | 0.071 | (0.006) | (0.001) | 6.6% | 14.1% | -1.4% | -3.0% |
| NEVADA | UNK | 0.889 | 0.306 | 0.504 | 0.080 | 1.026 | 0.452 | 0.496 | 0.079 | 0.137 | 0.146 | (0.008) | (0.001) | 15.4% | 47.8% | -1.6% | -1.6% |
| TEXAS | NORTH TX SPEC PHYSICIANS (PCP) | 0.979 | 0.522 | 0.431 | 0.027 | 1.026 | 0.575 | 0.424 | 0.026 | 0.047 | 0.054 | (0.006) | (0.001) | 4.8% | 10.3% | -1.4% | -3.1% |
| OREGON | SALEM CLINIC PC (CMG) | 0.935 | 0.434 | 0.471 | 0.030 | 1.022 | 0.529 | 0.464 | 0.029 | 0.087 | 0.095 | (0.008) | (0.000) | 9.3% | 21.9% | -1.6% | -2.0% |
| CALIFORNIA | HIGH DESERT PRIMARY CARE MG | 0.956 | 0.505 | 0.418 | 0.033 | 1.021 | 0.577 | 0.412 | 0.032 | 0.065 | 0.071 | (0.005) | (0.001) | 6.8% | 14.1% | -1.3% | -2.6% |
| CALIFORNIA | MILLS PENINSULA | 1.039 | 0.522 | 0.504 | 0.013 | 1.019 | 0.512 | 0.494 | 0.013 | (0.020) | (0.009) | (0.010) | (0.000) | -1.9% | -1.8% | -2.0% | -2.0% |
| OREGON | SOUTH TABOR FAMILY PHYS (CMG) | 0.975 | 0.476 | 0.481 | 0.018 | 1.018 | 0.525 | 0.475 | 0.017 | 0.043 | 0.049 | (0.006) | (0.000) | 4.4% | 10.3% | -1.2% | -2.2% |
| CALIFORNIA | ALLCARE IPA | 1.021 | 0.565 | 0.429 | 0.027 | 1.017 | 0.568 | 0.423 | 0.026 | (0.004) | 0.003 | (0.006) | (0.001) | -0.4% | 0.5% | -1.4% | -3.1% |
| CALIFORNIA | UCLA MEDICAL GROUP/IPA | 0.996 | 0.487 | 0.487 | 0.022 | 1.014 | 0.512 | 0.480 | 0.021 | 0.018 | 0.026 | (0.007) | (0.001) | 1.8% | 5.3% | -1.4% | -2.6% |
| TEXAS | TARRANT DCN | 0.986 | 0.533 | 0.421 | 0.033 | 1.011 | 0.564 | 0.415 | 0.032 | 0.025 | 0.031 | (0.006) | (0.001) | 2.5% | 5.8% | -1.3% | -2.6% |
| CALIFORNIA | PRIMECARE OF REDLANDS | 0.983 | 0.510 | 0.445 | 0.028 | 1.011 | 0.544 | 0.439 | 0.028 | 0.027 | 0.034 | (0.006) | (0.000) | 2.8% | 6.7% | -1.4% | -1.5% |
| OREGON | OREGON CITY INTERNAL MEDICINE | 1.047 | 0.491 | 0.536 | 0.020 | 1.010 | 0.469 | 0.522 | 0.019 | (0.037) | (0.022) | (0.014) | (0.000) | -3.5% | -4.4% | -2.7% | -2.3% |
| OKLAHOMA | BROKEN ARROW | 0.905 | 0.386 | 0.477 | 0.043 | 1.006 | 0.517 | 0.451 | 0.039 | 0.101 | 0.131 | (0.026) | (0.004) | 11.1% | 34.1% | -5.6% | -9.3% |
| CALIFORNIA | MERCY MEDICAL GROUP | 1.028 | 0.521 | 0.481 | 0.027 | 1.006 | 0.508 | 0.472 | 0.026 | (0.022) | (0.013) | (0.008) | (0.001) | -2.1% | -2.5% | -1.8% | -3.0% |
| CALIFORNIA | BRIGHT HEALTH PHYSICIANS | 0.969 | 0.484 | 0.467 | 0.019 | 1.006 | 0.529 | 0.459 | 0.018 | 0.036 | 0.044 | (0.008) | (0.000) | 3.7% | 9.2% | -1.7% | -1.7% |
| CALIFORNIA | PROVIDENCE MEDICAL GROUP | 1.148 | 0.613 | 0.526 | 0.008 | 1.004 | 0.484 | 0.513 | 0.008 | (0.144) | (0.130) | (0.013) | (0.000) | -12.5% | -21.2% | -2.6% | -0.6% |
| CALIFORNIA | PROSPECT MEDICAL GROUP/NORTH | 0.934 | 0.455 | 0.454 | 0.025 | 1.003 | 0.531 | 0.448 | 0.024 | 0.069 | 0.076 | (0.006) | (0.001) | 7.4% | 16.7% | -1.3% | -2.3% |
| CALIFORNIA | SANTA BARBARA SELECT IPA | 0.909 | 0.377 | 0.514 | 0.018 | 1.003 | 0.479 | 0.505 | 0.018 | 0.093 | 0.103 | (0.009) | (0.000) | 10.3% | 27.3% | -1.7% | -2.8% |
| OKLAHOMA | Jenks Family Physicians | 1.094 | 0.646 | 0.424 | 0.024 | 1.002 | 0.558 | 0.421 | 0.024 | (0.091) | (0.088) | (0.003) | (0.000) | -8.4% | -13.7% | -0.7% | -0.1% |
| CALIFORNIA | SUTTER GOULD MEDICAL FOUNDATIO | 0.984 | 0.494 | 0.460 | 0.030 | 1.001 | 0.519 | 0.452 | 0.030 | 0.017 | 0.026 | (0.008) | (0.000) | 1.8% | 5.2% | -1.7% | -1.9% |
| CALIFORNIA | HILL PHYSICIANS SAN FRANCISCO | 0.989 | 0.498 | 0.468 | 0.024 | 1.001 | 0.518 | 0.460 | 0.024 | 0.012 | 0.020 | (0.008) | (0.001) | 1.2% | 4.1% | -1.7% | -2.6% |
| CALIFORNIA | FACEY MEDICAL FOUNDATION | 0.959 | 0.466 | 0.470 | 0.023 | 1.000 | 0.514 | 0.463 | 0.023 | 0.040 | 0.048 | (0.008) | (0.000) | 4.2% | 10.3% | -1.6% | -1.2% |
| OREGON | OAK STREET MEDICAL PC | 0.984 | 0.524 | 0.397 | 0.063 | 0.993 | 0.542 | 0.390 | 0.061 | 0.009 | 0.018 | (0.007) | (0.003) | 0.9% | 3.5% | -1.7% | -4.3% |
| ARIZONA | SUN HEALTH NETWORK | 0.984 | 0.519 | 0.440 | 0.025 | 0.992 | 0.535 | 0.433 | 0.024 | 0.008 | 0.016 | (0.007) | (0.001) | 0.8% | 3.0% | -1.5% | -3.4% |
| CALIFORNIA | SLO SELECT IPA SO CNTY | 0.967 | 0.443 | 0.506 | 0.018 | 0.990 | 0.477 | 0.496 | 0.017 | 0.023 | 0.033 | (0.009) | (0.000) | 2.4% | 7.5% | -1.9% | -2.3% |
| CALIFORNIA | SANSUM CLINIC | 0.953 | 0.457 | 0.482 | 0.014 | 0.989 | 0.504 | 0.472 | 0.013 | 0.036 | 0.047 | (0.010) | (0.000) | 3.8% | 10.3% | -2.1% | -3.4% |
| CALIFORNIA | SUTTER MEDICAL GROUP | 0.982 | 0.487 | 0.473 | 0.022 | 0.987 | 0.501 | 0.465 | 0.021 | 0.005 | 0.015 | (0.008) | (0.000) | 0.5% | 2.7% | -1.6% | -1.6% |
| CALIFORNIA | ST JOSEPH HERITAGE MEDICAL GRO | 0.969 | 0.500 | 0.450 | 0.019 | 0.984 | 0.522 | 0.442 | 0.019 | 0.015 | 0.022 | (0.007) | (0.000) | 1.5% | 4.4% | -1.6% | -1.0% |
| CALIFORNIA | ST VINCENT MEDICAL GROUP IPA | 0.901 | 0.395 | 0.476 | 0.029 | 0.983 | 0.484 | 0.471 | 0.028 | 0.082 | 0.090 | (0.005) | (0.001) | 9.2% | 22.8% | -1.0% | -1.9% |
| OKLAHOMA | Dubois Medical Clinic | 0.962 | 0.485 | 0.423 | 0.054 | 0.982 | 0.516 | 0.415 | 0.052 | 0.021 | 0.030 | (0.008) | (0.002) | 2.2% | 6.3% | -1.8% | -3.3% |
| CALIFORNIA | GREATER TRI-CITIES IPA MEDICAL | 0.928 | 0.421 | 0.486 | 0.021 | 0.980 | 0.480 | 0.480 | 0.021 | 0.053 | 0.058 | (0.005) | (0.000) | 5.7% | 13.8% | -1.0% | -2.0% |
| OREGON | TUALITY HEALTH ALLIANCE | 0.898 | 0.397 | 0.468 | 0.033 | 0.979 | 0.489 | 0.460 | 0.032 | 0.081 | 0.090 | (0.008) | (0.001) | 9.1% | 22.6% | -1.7% | -3.8% |
| COLORADO | AVISTA | 0.960 | 0.508 | 0.429 | 0.023 | 0.978 | 0.535 | 0.421 | 0.022 | 0.018 | 0.027 | (0.007) | (0.001) | 1.9% | 5.2% | -1.7% | -3.8% |
| ARIZONA | THUNDERBIRD NETWORK | 0.956 | 0.507 | 0.421 | 0.029 | 0.977 | 0.534 | 0.415 | 0.028 | 0.020 | 0.027 | (0.006) | (0.001) | 2.1% | 5.4% | -1.3% | -5.1% |
| CALIFORNIA | ST JOSEPH HOSPITAL AFFILIATED | 0.968 | 0.492 | 0.456 | 0.021 | 0.973 | 0.505 | 0.448 | 0.020 | 0.005 | 0.013 | (0.008) | (0.000) | 0.6% | 2.7% | -1.7% | -1.8% |
| ARIZONA | PHX SECURE HOSPITAL NETWORK | 0.955 | 0.491 | 0.434 | 0.031 | 0.969 | 0.512 | 0.427 | 0.030 | 0.014 | 0.022 | (0.007) | (0.001) | 1.5% | 4.4% | -1.6% | -2.9% |
| CALIFORNIA | PALO ALTO MEDICAL FOUNDATION | 0.987 | 0.485 | 0.487 | 0.014 | 0.968 | 0.476 | 0.479 | 0.013 | (0.019) | (0.010) | (0.009) | (0.001) | -2.0% | -2.0% | -1.8% | -3.0% |
| WASHINGTON | PHYSICIANS CARE NETWORK (CMG) | 0.966 | 0.477 | 0.473 | 0.016 | 0.967 | 0.487 | 0.465 | 0.016 | 0.001 | 0.010 | (0.008) | (0.000) | 0.1% | 2.0% | -1.8% | -1.9% |
| WASHINGTON | PACMED | 0.922 | 0.423 | 0.473 | 0.026 | 0.963 | 0.474 | 0.464 | 0.026 | 0.041 | 0.051 | (0.009) | (0.000) | 4.5% | 12.0% | -1.9% | -1.9% |
| OREGON | MARTIN J JONES | 0.943 | 0.476 | 0.462 | 0.004 | 0.961 | 0.502 | 0.455 | 0.004 | 0.019 | 0.026 | (0.007) | (0.000) | 2.0% | 5.4% | -1.6% | -1.6% |
| WASHINGTON | CLARK COUNTY DIRECT | 0.930 | 0.448 | 0.458 | 0.025 | 0.960 | 0.487 | 0.449 | 0.025 | 0.030 | 0.039 | (0.009) | (0.000) | 3.2% | 8.8% | -1.9% | -2.6% |
| COLORADO | EXEMPLA MEDICAL SECURE | 0.884 | 0.419 | 0.426 | 0.039 | 0.958 | 0.495 | 0.419 | 0.044 | 0.074 | 0.076 | (0.007) | 0.005 | 8.4% | 18.1% | -1.6% | 12.1% |
| CALIFORNIA | SHARP COMMUNITY MEDICAL GROUP | 0.942 | 0.457 | 0.463 | 0.022 | 0.956 | 0.479 | 0.456 | 0.021 | 0.014 | 0.022 | (0.007) | (0.000) | 1.5% | 4.9% | -1.6% | -2.5% |
| CALIFORNIA | ST JUDE HERITAGE MEDICAL GROUP | 0.939 | 0.477 | 0.449 | 0.014 | 0.955 | 0.500 | 0.441 | 0.014 | 0.016 | 0.024 | (0.008) | (0.000) | 1.7% | 4.9% | -1.7% | -2.0% |
| (blank) | UNK | 0.955 | 0.483 | 0.432 | 0.040 | 0.952 | 0.490 | 0.425 | 0.037 | (0.002) | 0.006 | (0.007) | (0.003) | -0.2% | 1.2% | -1.7% | -3.5% |
| ARIZONA | BANNER MESA/BAYWOOD NETWORK | 0.935 | 0.465 | 0.440 | 0.030 | 0.950 | 0.488 | 0.432 | 0.029 | 0.015 | 0.024 | (0.007) | (0.001) | 1.6% | 5.1% | -1.7% | -3.3% |
| CALIFORNIA | CEDARS SINAI MEDICAL GROUP | 0.903 | 0.376 | 0.491 | 0.036 | 0.950 | 0.431 | 0.485 | 0.035 | 0.047 | 0.055 | (0.006) | (0.001) | 5.2% | 14.5% | -1.3% | -4.1% |
| WASHINGTON | CASTLE ROCK | 0.788 | 0.402 | 0.386 | - | 0.949 | 0.580 | 0.370 | - | 0.161 | 0.177 | (0.016) | 0.000 | 20.4% | 44.0% | -4.2% | 0.0% |
| CALIFORNIA | HERITAGE PROVIDER NETWORK | 0.924 | 0.447 | 0.449 | 0.028 | 0.949 | 0.478 | 0.443 | 0.028 | 0.025 | 0.031 | (0.006) | (0.000) | 2.7% | 6.9% | -1.3% | -2.0% |
| OREGON | LAKESIDE CLINIC | 0.852 | 0.400 | 0.405 | 0.047 | 0.949 | 0.505 | 0.398 | 0.046 | 0.097 | 0.104 | (0.006) | (0.001) | 11.4% | 26.1% | -1.6% | -1.6% |



(2) and EOL Projection as of 3/31/10
(3) - RAF Degradation: March less January MOR RAF plus a degradation factor of 0.4% per month from March to July
(4) - Projected July 2010 RAF based on Jan 2010 actuals plus EOL plus RAF Degradation

| DEC State | Provider Group Name | January 2010 RAF Components | | | | July 2010 RAF Components | | | | Avg RAF Improvement (Jan to Jul) | | | | Avg % RAF Improvement (Jan to Jul) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Jan Total RAF (1) | HCC (1) | Age/Sex (1) | Special Status (1) | July Total RAF (4) | HCC (4) | Age/Sex (4) | Special Status (4) | RAF | HCC | Age/Sex | Special Status | RAF | HCC | Age/Sex | Special Status |
| OREGON | FAMILY HEALTHPARTNERS | 1.428 | 0.936 | 0.444 | 0.047 | 0.943 | 0.459 | 0.437 | 0.046 | (0.484) | (0.476) | (0.007) | (0.001) | -33.9% | -50.9% | -1.6% | -1.6% |
| CALIFORNIA | SUTTER WEST MEDICAL GROUP | 0.910 | 0.439 | 0.444 | 0.027 | 0.943 | 0.485 | 0.432 | 0.026 | 0.034 | 0.046 | (0.011) | (0.001) | 3.7% | 10.5% | -2.5% | -4.4% |
| OKLAHOMA | OKC DCN | 0.938 | 0.484 | 0.420 | 0.034 | 0.943 | 0.497 | 0.414 | 0.033 | 0.005 | 0.013 | (0.006) | (0.001) | 0.6% | 2.6% | -1.5% | -2.7% |
| WASHINGTON | PROVIDENCE HEALTH SYSTEMS | 0.979 | 0.528 | 0.418 | 0.032 | 0.942 | 0.504 | 0.403 | 0.035 | (0.037) | (0.025) | (0.015) | 0.003 | -3.7% | -4.7% | -3.6% | 9.1% |
| OKLAHOMA | UNK | 0.945 | 0.490 | 0.417 | 0.038 | 0.942 | 0.490 | 0.413 | 0.036 | (0.003) | 0.004 | (0.004) | (0.003) | -0.3% | 0.7% | -1.0% | -6.6% |
| WASHINGTON | THURSTON DIRECT | 0.889 | 0.432 | 0.438 | 0.020 | 0.940 | 0.490 | 0.431 | 0.019 | 0.052 | 0.059 | (0.007) | (0.000) | 5.8% | 13.6% | -1.6% | -2.1% |
| COLORADO | COLO SPGS HEALTH PARTNERS | 0.955 | 0.486 | 0.450 | 0.019 | 0.939 | 0.479 | 0.442 | 0.019 | (0.016) | (0.007) | (0.009) | (0.000) | -1.7% | -1.5% | -1.9% | -0.6% |
| WASHINGTON | LEWIS DIRECT | 0.907 | 0.412 | 0.457 | 0.038 | 0.939 | 0.457 | 0.447 | 0.035 | 0.032 | 0.045 | (0.010) | (0.002) | 3.5% | 10.8% | -2.2% | -6.4% |
| OREGON | CORVALLIS | 0.942 | 0.467 | 0.449 | 0.027 | 0.937 | 0.472 | 0.440 | 0.025 | (0.005) | 0.005 | (0.009) | (0.002) | -0.6% | 1.1% | -2.0% | -6.4% |
| CALIFORNIA | METRO TUCSON NETWORK | 0.910 | 0.438 | 0.442 | 0.030 | 0.935 | 0.469 | 0.436 | 0.030 | 0.024 | 0.032 | (0.007) | (0.001) | 2.7% | 7.2% | -1.5% | -2.6% |
| OKLAHOMA | TULSA DCN | 0.937 | 0.472 | 0.436 | 0.030 | 0.933 | 0.476 | 0.429 | 0.028 | (0.004) | 0.004 | (0.007) | (0.001) | -0.4% | 0.8% | -1.6% | -2.2% |
| WASHINGTON | HEALTH CARE RESOURCES NW | 0.782 | 0.327 | 0.427 | 0.028 | 0.931 | 0.488 | 0.418 | 0.025 | 0.149 | 0.161 | (0.009) | (0.002) | 19.1% | 49.1% | -2.2% | -7.3% |
| WASHINGTON | PRIMARY CARE OF PUYALLUP | 0.933 | 0.453 | 0.450 | 0.029 | 0.929 | 0.459 | 0.441 | 0.029 | (0.003) | 0.006 | (0.009) | (0.000) | -0.4% | 1.3% | -2.0% | -0.8% |
| CALIFORNIA | WOODLAND CLINIC MED GROUP | 0.952 | 0.481 | 0.455 | 0.015 | 0.928 | 0.463 | 0.448 | 0.017 | (0.024) | (0.018) | (0.007) | 0.001 | -2.5% | -3.8% | -1.5% | 7.9% |
| OKLAHOMA | Putnam North Family Medical | 0.933 | 0.510 | 0.406 | 0.017 | 0.927 | 0.522 | 0.389 | 0.015 | (0.006) | 0.012 | (0.017) | (0.002) | -0.7% | 2.4% | -4.2% | -10.0% |
| OREGON | THE CORVALLIS CLINIC (CMG) | 0.925 | 0.421 | 0.483 | 0.022 | 0.926 | 0.431 | 0.474 | 0.021 | 0.000 | 0.010 | (0.009) | (0.001) | 0.0% | 2.4% | -1.8% | -4.1% |
| CALIFORNIA | Sonoma DCN PCPs | 0.924 | 0.457 | 0.455 | 0.012 | 0.919 | 0.461 | 0.446 | 0.012 | (0.005) | 0.003 | (0.009) | 0.000 | -0.6% | 0.7% | -1.9% | 0.1% |
| WASHINGTON | SEATTLE DIRECT | 0.896 | 0.402 | 0.474 | 0.020 | 0.919 | 0.436 | 0.464 | 0.019 | 0.023 | 0.034 | (0.011) | (0.001) | 2.5% | 8.6% | -2.3% | -4.9% |
| WASHINGTON | SWEDISH | 0.887 | 0.383 | 0.486 | 0.018 | 0.918 | 0.426 | 0.474 | 0.018 | 0.031 | 0.044 | (0.012) | (0.001) | 3.5% | 11.4% | -2.5% | -3.7% |
| WASHINGTON | PIERCE COUNTY DIRECT | 0.882 | 0.407 | 0.450 | 0.025 | 0.914 | 0.450 | 0.439 | 0.024 | 0.032 | 0.043 | (0.011) | (0.001) | 3.6% | 10.5% | -2.3% | -2.8% |
| CALIFORNIA | KIRKPATRICK FAMILY CARE PS | 0.881 | 0.426 | 0.412 | 0.043 | 0.914 | 0.463 | 0.412 | 0.039 | 0.033 | 0.037 | (0.000) | (0.005) | 3.7% | 8.8% | 0.0% | -10.9% |
| CALIFORNIA | CHINO MEDICAL GROUP INC | 0.901 | 0.405 | 0.465 | 0.031 | 0.913 | 0.410 | 0.460 | 0.029 | 0.012 | 0.019 | (0.005) | (0.002) | 1.3% | 4.7% | -1.2% | -5.4% |
| WASHINGTON | WHITEHORSE FAMILY MEDICINE | 0.932 | 0.452 | 0.456 | 0.030 | 0.911 | 0.440 | 0.443 | 0.028 | (0.020) | (0.012) | (0.007) | (0.002) | -2.2% | -2.6% | -1.5% | -7.6% |
| WASHINGTON | PORTLAND DIRECT | 0.934 | 0.447 | 0.458 | 0.028 | 0.911 | 0.438 | 0.446 | 0.027 | (0.023) | (0.009) | (0.012) | (0.001) | -2.4% | -2.1% | -2.6% | -5.2% |
| CALIFORNIA | PREMIER PHYSICIANS NETWORK | 0.897 | 0.419 | 0.439 | 0.040 | 0.906 | 0.436 | 0.431 | 0.039 | 0.009 | 0.017 | (0.008) | (0.001) | 1.0% | 4.0% | -1.6% | -1.6% |
| CALIFORNIA | GOOD SAM MED PRAC ASSOC | 0.882 | 0.397 | 0.466 | 0.019 | 0.905 | 0.428 | 0.459 | 0.018 | 0.023 | 0.032 | (0.007) | (0.001) | 2.6% | 8.0% | -1.6% | -4.0% |
| OREGON | SAMARITAN HEALTH SERVICES -PCP | 0.872 | 0.422 | 0.421 | 0.029 | 0.904 | 0.460 | 0.418 | 0.027 | 0.032 | 0.038 | (0.004) | (0.002) | 3.7% | 9.0% | -0.9% | -7.3% |
| OREGON | MONTEREY HEALTH | 1.025 | 0.493 | 0.484 | 0.047 | 0.903 | 0.381 | 0.476 | 0.047 | (0.121) | (0.113) | (0.008) | (0.001) | -11.8% | -22.9% | -1.6% | -1.6% |
| CALIFORNIA | OMNICARE MEDICAL GROUP | 0.938 | 0.449 | 0.419 | 0.070 | 0.900 | 0.415 | 0.417 | 0.069 | (0.038) | (0.034) | (0.003) | (0.001) | -4.1% | -7.6% | -0.7% | -1.8% |
| CALIFORNIA | BAY AREA COM MED GRP | 0.854 | 0.393 | 0.441 | 0.021 | 0.893 | 0.438 | 0.435 | 0.020 | 0.039 | 0.045 | (0.006) | (0.001) | 4.5% | 11.6% | -1.3% | -4.2% |
| CALIFORNIA | SANTE COMMUNITY PHYS-FRESNO | 0.910 | 0.417 | 0.468 | 0.025 | 0.892 | 0.409 | 0.458 | 0.024 | (0.018) | (0.007) | (0.010) | (0.000) | -1.9% | -1.7% | -2.2% | -1.6% |
| CALIFORNIA | EMPIRE PHYS MG | 0.880 | 0.398 | 0.462 | 0.020 | 0.892 | 0.419 | 0.454 | 0.019 | 0.012 | 0.021 | (0.008) | (0.001) | 1.4% | 5.2% | -1.7% | -1.9% |
| CALIFORNIA | MARIN IPA SONOMA | 0.861 | 0.385 | 0.462 | 0.014 | 0.891 | 0.422 | 0.454 | 0.014 | 0.029 | 0.037 | (0.008) | 0.000 | 3.4% | 9.6% | -1.7% | 1.9% |
| OREGON | LANE DIRECT | 0.866 | 0.393 | 0.447 | 0.027 | 0.889 | 0.424 | 0.439 | 0.026 | 0.023 | 0.031 | (0.007) | (0.001) | 2.7% | 8.0% | -1.6% | -2.4% |
| ARIZONA | ABRAZO NETWORK | 1.403 | 1.020 | 0.382 | - | 0.889 | 0.511 | 0.377 | - | (0.514) | (0.509) | (0.005) | 0.000 | -36.6% | -49.9% | -1.4% | 0.0% |
| CALIFORNIA | CENTINELA VALLEY IPA MG INC | 0.818 | 0.339 | 0.436 | 0.043 | 0.886 | 0.413 | 0.433 | 0.040 | 0.068 | 0.074 | (0.003) | (0.003) | 8.3% | 21.8% | -0.7% | -6.2% |
| CALIFORNIA | JOHN MUIR HEALTH NETWORK | 0.851 | 0.388 | 0.447 | 0.016 | 0.884 | 0.426 | 0.442 | 0.016 | 0.033 | 0.038 | (0.005) | (0.000) | 3.9% | 9.9% | -1.2% | 0.7% |
| WASHINGTON | SNOHOMISH DIRECT | 0.863 | 0.401 | 0.441 | 0.021 | 0.882 | 0.420 | 0.433 | 0.020 | 0.019 | 0.028 | (0.008) | (0.001) | 2.2% | 7.0% | -1.9% | -2.7% |
| OREGON | VENETA MEDICAL CLINIC | 1.142 | 0.682 | 0.460 | - | 0.882 | 0.441 | 0.440 | - | (0.260) | (0.240) | (0.020) | 0.000 | -22.8% | -35.3% | -4.3% | 0.0% |
| TEXAS | Deuteronomy-2 | 0.870 | 0.434 | 0.412 | 0.023 | 0.880 | 0.452 | 0.406 | 0.023 | 0.011 | 0.017 | (0.006) | (0.001) | 1.2% | 4.0% | -1.5% | -2.2% |
| CALIFORNIA | ST JUDE AFFILIATED PHYSICANS | 0.840 | 0.380 | 0.445 | 0.014 | 0.878 | 0.425 | 0.439 | 0.014 | 0.038 | 0.044 | (0.006) | (0.001) | 4.5% | 11.6% | -1.4% | -2.1% |
| WASHINGTON | UNK | 0.888 | 0.394 | 0.472 | 0.023 | 0.875 | 0.396 | 0.458 | 0.022 | (0.013) | 0.002 | (0.014) | (0.001) | -1.5% | 0.5% | -2.9% | -4.4% |
| COLORADO | DENVER PROPRIETARY SECURE | 0.860 | 0.411 | 0.432 | 0.018 | 0.874 | 0.430 | 0.426 | 0.017 | 0.013 | 0.019 | (0.005) | (0.001) | 1.6% | 4.6% | -1.2% | -2.6% |
| CALIFORNIA | TORRANCE HOSPITAL IPA | 0.870 | 0.432 | 0.420 | 0.018 | 0.871 | 0.436 | 0.416 | 0.017 | 0.003 | 0.008 | (0.004) | (0.000) | 0.3% | 1.7% | -1.0% | -3.6% |
| WASHINGTON | MULTICARE | 0.867 | 0.405 | 0.442 | 0.021 | 0.871 | 0.418 | 0.433 | 0.021 | 0.004 | 0.013 | (0.009) | (0.000) | 0.4% | 3.2% | -2.0% | -1.4% |
| CALIFORNIA | Independence IPA | 0.870 | 0.402 | 0.430 | 0.038 | 0.871 | 0.410 | 0.423 | 0.038 | 0.000 | 0.007 | (0.007) | (0.001) | 0.0% | 1.8% | -1.6% | -0.9% |
| ARIZONA | PINAL HEALTH CARE NETWORK | 0.869 | 0.419 | 0.414 | 0.035 | 0.869 | 0.427 | 0.408 | 0.033 | (0.000) | 0.008 | (0.006) | (0.002) | 0.0% | 2.1% | -1.6% | -5.4% |
| CALIFORNIA | OJAI VALLEY MEDICAL GROUP | 0.857 | 0.351 | 0.485 | 0.022 | 0.869 | 0.371 | 0.476 | 0.022 | 0.011 | 0.020 | (0.008) | (0.000) | 1.3% | 5.7% | -1.7% | -1.5% |
| COLORADO | LOVELAND PROPRIETARY | 0.874 | 0.411 | 0.443 | 0.020 | 0.863 | 0.411 | 0.433 | 0.019 | (0.010) | (0.000) | (0.009) | (0.001) | -1.2% | -0.1% | -1.9% | -3.8% |
| TEXAS | Jefferson Phys Grp | 0.872 | 0.434 | 0.410 | 0.029 | 0.861 | 0.428 | 0.406 | 0.027 | (0.011) | (0.005) | (0.004) | (0.002) | -1.2% | -1.2% | -0.9% | -6.1% |
| CALIFORNIA | Brookwood Internal Medicine | 0.951 | 0.464 | 0.487 | - | 0.859 | 0.383 | 0.475 | - | (0.092) | (0.081) | (0.012) | 0.000 | -9.7% | -17.4% | -2.4% | 0.0% |
| CALIFORNIA | SONOMA COUNTY PRIMARY CARE IPA | 0.757 | 0.296 | 0.451 | 0.010 | 0.857 | 0.399 | 0.448 | 0.011 | 0.101 | 0.103 | (0.003) | 0.001 | 13.3% | 34.8% | -0.7% | 5.4% |
| CALIFORNIA | ADOC-FOUNTAIN VALLEY DIVISION | 0.839 | 0.384 | 0.427 | 0.029 | 0.856 | 0.405 | 0.422 | 0.029 | 0.017 | 0.021 | (0.004) | (0.000) | 2.0% | 5.5% | -1.0% | -0.4% |
| COLORADO | COLORADO SPRINGS DIRECT | 0.849 | 0.401 | 0.428 | 0.020 | 0.855 | 0.413 | 0.422 | 0.019 | 0.006 | 0.012 | (0.005) | (0.001) | 0.7% | 3.0% | -1.3% | -3.5% |
| CALIFORNIA | FREMONT COUNTY SECURE | 0.764 | 0.330 | 0.412 | 0.022 | 0.853 | 0.422 | 0.410 | 0.020 | 0.089 | 0.092 | (0.002) | (0.001) | 11.6% | 28.0% | -0.5% | -6.8% |
| COLORADO | EASTSIDE DIRECT | 0.850 | 0.371 | 0.466 | 0.013 | 0.851 | 0.383 | 0.455 | 0.012 | 0.001 | 0.013 | (0.011) | (0.001) | 0.1% | 3.4% | -2.3% | -8.1% |
| ARIZONA | COMPLETE ACCESS NETWORK | 0.823 | 0.376 | 0.428 | 0.018 | 0.847 | 0.408 | 0.421 | 0.017 | 0.024 | 0.032 | (0.006) | (0.001) | 2.9% | 8.5% | -1.5% | -5.9% |
| COLORADO | PUEBLO PROPRIETARY CENTURA | 0.848 | 0.381 | 0.435 | 0.032 | 0.841 | 0.380 | 0.429 | 0.031 | (0.007) | (0.001) | (0.006) | (0.000) | -0.8% | -0.2% | -1.3% | -2.1% |
| OKLAHOMA | NORMAN PHO PCPS | 0.802 | 0.341 | 0.437 | 0.024 | 0.838 | 0.379 | 0.436 | 0.022 | 0.036 | 0.038 | (0.000) | (0.002) | 4.5% | 11.3% | -0.1% | -9.2% |
| WASHINGTON | PEACEHEALTH MEDICAL GROUP | 0.798 | 0.354 | 0.413 | 0.032 | 0.823 | 0.386 | 0.408 | 0.030 | 0.025 | 0.032 | (0.005) | (0.002) | 3.2% | 9.1% | -1.3% | -5.7% |
| CALIFORNIA | LA VIDA MULTISPECIALTY | 0.828 | 0.349 | 0.453 | 0.026 | 0.816 | 0.345 | 0.446 | 0.025 | (0.013) | (0.005) | (0.008) | (0.001) | -1.5% | -1.3% | -1.7% | -2.6% |

RAF by Component Report
Case 2:16-cv-08697-FMO-SS Document 8 Filed 11/22/16 Page 183 of 218 Page ID #:988

(2) - 2010 EOL Projection as of 3/31/10
(3) - RAF Degradation: March less January MOR RAF plus a degradation factor of 0.4% per month from March to July
(4) - Projected July 2010 RAF based on Jan 2010 actuals plus EOL plus RAF Degradation



| DEC State | Provider Group Name | January 2010 RAF Components | | | | July 2010 RAF Components | | | | Avg RAF Improvement (Jan to Jul) | | | | Avg % RAF Improvement (Jan to Jul) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Jan Total RAF (1) | HCC (1) | Age/Sex (1) | Special Status (1) | July Total RAF (4) | HCC (4) | Age/Sex (4) | Special Status (4) | RAF | HCC | Age/Sex | Special Status | RAF | HCC | Age/Sex | Special Status |
| CALIFORNIA | RIVERSIDE PHYS NTWK RSDE COMM | 0.797 | 0.350 | 0.415 | 0.032 | 0.815 | 0.375 | 0.409 | 0.031 | 0.018 | 0.025 | (0.006) | (0.001) | 2.2% | 7.2% | -1.5% | -3.2% |
| WASHINGTON | VALLEY DIRECT | 0.779 | 0.325 | 0.437 | 0.018 | 0.815 | 0.365 | 0.432 | 0.018 | 0.035 | 0.040 | (0.005) | (0.000) | 4.5% | 12.3% | -1.1% | -0.2% |
| WASHINGTON | HIGHLINE MSO (CMG) | 0.775 | 0.298 | 0.460 | 0.017 | 0.813 | 0.344 | 0.454 | 0.015 | 0.038 | 0.046 | (0.006) | (0.002) | 4.9% | 15.3% | -1.3% | -9.0% |
| OKLAHOMA | CANADIAN VALLEY | 0.791 | 0.346 | 0.419 | 0.026 | 0.811 | 0.375 | 0.411 | 0.024 | 0.020 | 0.029 | (0.007) | (0.002) | 2.5% | 8.3% | -1.7% | -5.9% |
| CALIFORNIA | PACIFIC INDEPENDENT PHY ASSOC | 0.814 | 0.345 | 0.440 | 0.029 | 0.802 | 0.340 | 0.434 | 0.028 | (0.012) | (0.005) | (0.006) | (0.001) | -1.5% | -1.4% | -1.5% | -2.8% |
| CALIFORNIA | SIERRA NEVADA MEDICAL ASSOC | 0.791 | 0.346 | 0.431 | 0.014 | 0.788 | 0.349 | 0.426 | 0.013 | (0.003) | 0.003 | (0.005) | (0.001) | -0.3% | 0.7% | -1.1% | -4.3% |
| CALIFORNIA | MARIN IPA - SONOMA | 0.712 | 0.267 | 0.436 | 0.009 | 0.785 | 0.327 | 0.448 | 0.011 | 0.074 | 0.060 | 0.012 | 0.002 | 10.3% | 22.3% | 2.7% | 23.8% |
| TEXAS | SAN ANTONIO DCN | 0.647 | 0.189 | 0.416 | 0.042 | 0.785 | 0.357 | 0.385 | 0.043 | 0.138 | 0.168 | (0.031) | 0.001 | 21.4% | 89.2% | -7.4% | 1.2% |
| OKLAHOMA | THE PHYSICIANS GROUP | 0.775 | 0.345 | 0.402 | 0.027 | 0.784 | 0.360 | 0.399 | 0.026 | 0.009 | 0.014 | (0.004) | (0.002) | 1.2% | 4.1% | -0.9% | -5.5% |
| CALIFORNIA | PORTERVILLE | 0.797 | 0.331 | 0.415 | 0.051 | 0.783 | 0.334 | 0.406 | 0.043 | (0.014) | 0.003 | (0.009) | (0.008) | -1.7% | 0.9% | -2.2% | -15.0% |
| ARIZONA | RURAL AREA NETWORK | 0.753 | 0.335 | 0.403 | 0.014 | 0.783 | 0.368 | 0.401 | 0.014 | 0.030 | 0.032 | (0.002) | (0.000) | 4.0% | 9.7% | -0.5% | -1.4% |
| CALIFORNIA | SIERRA MEDICAL CLINIC, INC | 0.678 | 0.119 | 0.515 | 0.044 | 0.779 | 0.257 | 0.484 | 0.039 | 0.101 | 0.138 | (0.031) | (0.006) | 14.9% | 116.0% | -6.1% | -12.5% |
| CALIFORNIA | ALLIED PHYSICIANS OF CALIF | 0.794 | 0.308 | 0.459 | 0.027 | 0.779 | 0.299 | 0.453 | 0.028 | (0.015) | (0.009) | (0.006) | 0.000 | -1.9% | -2.9% | -1.4% | 1.6% |
| WASHINGTON | Meadowbrook Urgent Care | 0.650 | 0.156 | 0.456 | 0.038 | 0.759 | 0.270 | 0.457 | 0.033 | 0.109 | 0.114 | 0.001 | (0.006) | 16.8% | 73.2% | 0.3% | -15.1% |
| COLORADO | BOULDER COUNTY SECURE | 0.755 | 0.325 | 0.416 | 0.014 | 0.750 | 0.326 | 0.410 | 0.014 | (0.006) | 0.000 | (0.006) | (0.000) | -0.7% | 0.1% | -1.4% | -0.5% |
| CALIFORNIA | EL ROSE MG | 0.619 | 0.221 | 0.398 | - | 0.737 | 0.338 | 0.399 | - | 0.119 | 0.118 | 0.001 | 0.000 | 19.2% | 53.5% | 0.2% | 0.0% |
| CALIFORNIA | BROWN & TOLAND MED GRP | 0.698 | 0.251 | 0.430 | 0.017 | 0.734 | 0.292 | 0.423 | 0.018 | 0.036 | 0.041 | (0.006) | 0.001 | 5.1% | 16.3% | -1.5% | 5.8% |
| CALIFORNIA | IMPERIAL CNTY PHYS MEDICAL GRP | 0.668 | 0.232 | 0.411 | 0.025 | 0.718 | 0.286 | 0.409 | 0.023 | 0.050 | 0.054 | (0.002) | (0.002) | 7.5% | 23.5% | -0.5% | -9.1% |
| COLORADO | SECURE ADVANTAGE CO | 0.726 | 0.290 | 0.414 | 0.022 | 0.716 | 0.289 | 0.409 | 0.018 | (0.010) | (0.001) | (0.005) | (0.004) | -1.4% | -0.4% | -1.2% | -17.5% |
| CALIFORNIA | Visalia Medical Clinic | 0.767 | 0.298 | 0.450 | 0.019 | 0.697 | 0.252 | 0.429 | 0.016 | (0.071) | (0.046) | (0.021) | (0.003) | -9.2% | -15.5% | -4.7% | -17.2% |
| OREGON | FANNO CREEK | 0.736 | 0.258 | 0.466 | 0.012 | 0.693 | 0.225 | 0.457 | 0.011 | (0.044) | (0.033) | (0.009) | (0.001) | -5.9% | -13.0% | -2.0% | -9.2% |
| CALIFORNIA | PRUDENT MEDICAL GROUP | 0.657 | 0.206 | 0.440 | 0.011 | 0.692 | 0.257 | 0.426 | 0.009 | 0.035 | 0.051 | (0.014) | (0.002) | 5.3% | 24.8% | -3.2% | -20.3% |
| OKLAHOMA | FAMILY MEDICINE SPECIALISTS | 0.714 | 0.264 | 0.402 | 0.058 | 0.679 | 0.236 | 0.389 | 0.054 | (0.035) | (0.018) | (0.012) | (0.005) | -4.9% | -7.1% | -3.0% | -7.9% |
| CALIFORNIA | UNIVERSAL CARE MEDICAL GROUP | 0.553 | - | 0.511 | 0.042 | 0.676 | 0.142 | 0.469 | 0.065 | 0.124 | 0.142 | (0.041) | 0.024 | 22.4% | 0.0% | -8.1% | 57.5% |
| CALIFORNIA | PREMIER CARE IPA | 0.704 | 0.285 | 0.402 | 0.017 | 0.672 | 0.259 | 0.401 | 0.013 | (0.032) | (0.026) | (0.002) | (0.004) | -4.5% | -9.1% | -0.4% | -24.3% |
| CALIFORNIA | AMVI | 0.571 | 0.049 | 0.480 | 0.042 | 0.608 | 0.076 | 0.492 | 0.041 | 0.038 | 0.027 | 0.012 | (0.001) | 6.6% | 54.8% | 2.5% | -1.6% |
| WASHINGTON | PROVIDENCE MED GRP | 0.585 | 0.172 | 0.395 | 0.018 | 0.598 | 0.184 | 0.389 | 0.025 | 0.013 | 0.012 | (0.006) | 0.007 | 2.3% | 7.2% | -1.5% | 36.3% |
| CALIFORNIA | KOREAN AMERICAN MEDICAL GROUP | 0.535 | 0.104 | 0.426 | 0.006 | 0.578 | 0.152 | 0.418 | 0.008 | 0.043 | 0.048 | (0.008) | 0.002 | 8.0% | 46.7% | -1.9% | 40.3% |
| OREGON | HEALTHMAX | 0.371 | 0.080 | 0.291 | - | 0.557 | 0.271 | 0.286 | - | 0.186 | 0.191 | (0.005) | 0.000 | 50.2% | 237.7% | -1.6% | 0.0% |
| WASHINGTON | PACIFIC MEDICAL | 2.416 | 2.112 | 0.304 | - | 0.552 | 0.070 | 0.483 | - | (1.864) | (2.042) | 0.178 | 0.000 | -77.1% | -96.7% | 58.6% | 0.0% |
| NEVADA | SECURE ADVANTAGE NV | 0.000 | - | - | - | 0.526 | 0.148 | 0.377 | - | 0.526 | 0.148 | 0.377 | 0.000 | 0.0% | 0.0% | 0.0% | 0.0% |
| ARIZONA | KINO NETWORK | 0.461 | - | 0.461 | - | 0.478 | 0.006 | 0.473 | - | 0.017 | 0.006 | 0.011 | 0.000 | 3.7% | 0.0% | 2.5% | 0.0% |
| WASHINGTON | TUALITY HEALTH ALLIANCE | 0.461 | - | 0.461 | - | 0.459 | 0.006 | 0.454 | - | (0.002) | 0.006 | (0.007) | 0.000 | -0.3% | 0.0% | -1.6% | 0.0% |
| OKLAHOMA | Jerry A Nelms Do Inc | 0.395 | 0.019 | 0.357 | 0.019 | 0.397 | 0.028 | 0.351 | 0.019 | 0.002 | 0.008 | (0.006) | (0.000) | 0.6% | 43.0% | -1.6% | -1.6% |
| WASHINGTON | PORTLAND AVENUE FAMILY CLINIC | 0.398 | - | 0.398 | - | 0.391 | - | 0.392 | - | (0.006) | 0.000 | (0.006) | 0.000 | -1.6% | 0.0% | -1.6% | 0.0% |

# EXHIBIT 12

# PacifiCare®

GENERAL SERVICES AGREEMENT

Agreement No.:

Effective Date:     October 26, 2005

Expiration Date:    July 31, 2010

Name:               WellMed Medical Management, Inc.

Address:            8637 Fredericksburg Road., Suite 360; San Antonio, TX 78240

Telephone:          210.617.4016

This General Services Agreement ("**Agreement**") is entered into as of the Effective Date by and between PacifiCare Health Systems, Inc. on behalf of itself and its Associated Companies ("**PacifiCare**"), and the above-named WellMed Medical Management, Inc. ("**WMMI**"), a Texas corporation, and consists of this signature page and the following documents, which are attached hereto and made a part hereof by this reference:

    Schedule A, Special Conditions
    Schedule B, General Terms & Conditions
    Schedule C, Price, Payment & Delivery Terms
    Schedule D, Service Specifications
    Schedule E, Business Associate Addendum

The rights of PacifiCare set forth in this Agreement shall inure to all its Associated Companies.  The parties have caused this Agreement to be executed and warrant that their respective signatories are authorized to execute this Agreement as of the effective date.

WellMed Medical Management, Inc.            PacifiCare Health Systems, Inc.
("**WMMI**")                                ("**PacifiCare**")
By:                                         By:
Name:                                       Name:  Austin Pittman
Title:                                      Title: President

Address for Notices:                        Address for Notices:
WellMed Medical Management, Inc.            PacifiCare Health Systems
8637 Fredericksburg Road, Suite 360         Network Management
San Antonio, TX 78240                       Attn: Vice President
Attn:  President                            5001 LBJ Freeway #600
                                            Dallas, TX 75244

                                            CC:
                                            PacifiCare Health Systems
                                            Attn: Network Management
                                            6200 Northwest Freeway
                                            San Antonio, TX 78249

SANANTONIO 439038v7 51445-00007          1

SCHEDULE C
PRICE, PAYMENT & DELIVERY TERMS

C-1   PRICING and DELIVERABLES:

A.    Both parties agree to the following pricing for the Services to be rendered by WMMI.  PacifiCare is paid for its Medicare Membership by the Centers for Medicare and Medicaid Services ("**CMS**") based on reported diagnoses as submitted in the encounter data by Practitioners. PacifiCare may increase its Medicare revenue by (i) reviewing targeted member diagnosis charts that it suspects have miscoded or unreported diagnosis information; and (ii) reporting the missing or updated information to CMS.  To this end, WMMI will evaluate the accuracy of Practitioner diagnostic coding for PacifiCare's Medicare Membership, to ensure maximization of risk adjusted payments by CMS.

| Description | Fees | | |
|---|---|---|---|
| Chart volume | All Medical Records made available to WMMI  in accordance with this Agreement | | |
| Markets | Dallas Direct Network | | |
| | | | |
| Calculation of Fees For Services: | Included in Section SC3 | | |
| | | | |
| File copy charges | Pass-through to PacifiCare if levied by Practitioner | | |
| Standard Project Reports | Included in  Fees | | |

| Payment Schedule | PacifiCare agrees to reimburse WMMI for Practitioner compensation within thirty (30) days of receiving a monthly invoice with attached copies of signed DataRap Certification Forms. WMMI agrees to use PacifiCare's name on the explanation of payment or on an enclosed letter sent with the check . WMMI will compensate Practitioners in the amount of $20.00 for each returned signed HCCRAF form. PacifiCare will reimburse WMMI for such expense by monthly invoice.<br><br>PacifiCare agrees to reimburse WMMI for the increased HCCRAF on or before July 30 or the month the payment and calculation are received from CMS.<br><br>Beginning with the July 2008 Payment:<br>The intent is to pay a contingency for maintaining an increased HCCRAF score.<br>If the Year 2 July Direct HCC RAF is better than the original September Benchmark and the score is either maintained or increased in Year 3 an additional payment of 50% of the Year 2 fee schedule payment will be made to WMMI. This payment will be in addition to the Year 3 payment on the reset schedule. If that score is maintained or increased again in Year 4 an additional payment of 25% of the Year 2 fee schedule payment will be made to WMMI. This payment will be in addition to any payment owed for maintaining the Year 3 HCCRAF score or any monies due for Year 4 reset schedule.<br><br>100% beginning Year Two, 50% Year Three, 25% Year Four (Based on Year Two payment)<br><br>Future Years:<br>If the Year 3 July Direct HCC RAF is better than the original September benchmark and the Year 3 score is either maintained or increased in Year 4 an additional payment of 50% of the Year 3 fee schedule payment will be made to WMMI and an additional payment of 25% of the year two fee schedule will be made to WMMI. This payment will be in addition to the Year 4 payment on the reset schedule.<br><br>Each year beginning contract Year 3 the HCC RAF score and benchmark reset. An additional payment is made for any increased HCC RAF scores. |

B.    WMMI warrants and represents that the prices set forth herein for Services are available to other purchasers in the geographic area occupied by PacifiCare and its Associated Companies, reflect the economies of doing business with PacifiCare at the volumes projected, or are necessary to meet the pricing levels of WMMI's competitors who may wish to sell to PacifiCare. WMMI shall defend, indemnify and hold PacifiCare harmless from all losses, costs or damages arising from any claim that WMMI's prices are discriminatory. The rates stated above shall include the following:

1.    Recruiting, training, and supervising reviewers and other personnel
2.    Scheduling all Practitioners
3.    Technological requirements including software and hardware
4.    Practitioner copying charges (To be reimbursed by PacifiCare)
5.    Travel Expenses including mileage
6.    Meetings as reasonably requested by PacifiCare
7.    Reasonable reporting as mutually agreed upon by the Parties in writing

SANANTONIO 439038v7 51445-00007                   12

436

8.    Any other DataRap™ Services mutually agreed upon by the Parties in writing

C-2    INVOICES:

A.    Invoices submitted by WMMI shall be sent to the following address:

PacifiCare Health Systems
Nick Chiechi    Mail Stop LC03-366
3100 Lake Center Drive
Santa Ana, CA 92704

Copy to:
PacifiCare Health Systems
Jeannine Ruffner
6200 Northwest Parkway
San Antonio, TX 78249

B.    Unless otherwise stated, all charges shall be invoiced as follows within 30 days after Services are rendered.

C.    All invoices must contain the following data elements, to the extent applicable:
- WMMI Name and Address
- Agreement number
- PacifiCare's accounting charge number by product and state
- Price per line item and extended totals
- Attached copies of signed DataRap™ Certification Forms.
- Anything else the Parties mutually agree to include

C-3    PAYMENT TERMS:

A.    All payments to WMMI will be made by PacifiCare on the due date. Notwithstanding the above, both parties recognize that CMS may from time to time extend its reporting deadlines. The deadlines in this agreement may be moved to coincide to pay by the 30th of the month from which the payment is received. In the event any payment is not made as and when due, Payment terms are Net 30 following receipt by PacifiCare of a correct invoice. Past due amounts, amounts outstanding for more than sixty days, shall be subject to an interest charge from the date the initial installment was due and the interest rate shall be the I lesser of one percent (1%) per month or the highest rate permitted by law. WMMI may suspend performance hereunder or terminate this Agreement in the event PacifiCare fails to make payment within 90 days of invoice but the obligation of PacifiCare to continue to pay WMMI under this Section C-3 shall continue nevertheless. Incorrect or incomplete invoices shall be returned to supplier for correction or completion. Payment shall be withheld on all incorrect or incomplete invoices until corrected.

B.    For a period of one (1) year after the termination of this Agreement, PacifiCare will continue to reimburse WMMI the $20.00 fee that WMMI paid the Practitioner for returning DataRap™ Certification forms. In addition, PacifiCare will also pay WMMI an additional $20.00 for each returned confirmed DataRap™ Certification form.

**Schedule SC-3A**

On or before July 31, 2006 PacifiCare will make a payment to WMMI in accordance to the following schedule for 2006 July Direct HCCRAF:    This fee schedule is based on the 2005 September Benchmark being .49.  If that benchmark is finalized to be a different number in January of 2006, then this fee schedule will be adjusted in accordance to the same methodology used to calculate this schedule.  No Payment will be made if the 2006 July Direct HCCRAF score drops below the 2005 September Benchmark.

| 2006 July Direct HCCRAF | | WMMI Data Rap Fee |
|---|---|---|
| 0.5 | 0.5099 | 154,887 |
| 0.51 | 0.5199 | 309,774 |
| 0.52 | 0.5299 | 464,661 |
| 0.53 | 0.5399 | 929,322 |
| 0.54 | 0.5499 | 1,161,652 |
| 0.55 | 0.5599 | 1,393,983 |
| 0.56 | 0.5699 | 1,626,313 |
| 0.57 | 0.5799 | 1,858,644 |
| 0.58 | 0.5899 | 2,090,974 |
| 0.59 | 0.5999 | 2,323,305 |
| 0.6 | 0.6099 | 2,555,635 |
| 0.61 | 0.6199 | 2,787,966 |
| 0.62 | 0.6299 | 3,020,296 |
| 0.63 | 0.6399 | 3,252,627 |
| 0.64 | 0.6499 | 3,484,957 |
| 0.65 | 0.6599 | 4,956,384 |
| 0.66 | 0.6699 | 5,266,158 |
| 0.67 | 0.6799 | 5,575,932 |
| 0.68 | 0.6899 | 5,885,706 |
| 0.69 | 0.6999 | 6,195,480 |
| 0.7 | 0.7099 | 6,505,253 |
| 0.71 | 0.7199 | 6,815,027 |
| 0.72 | 0.7299 | 7,124,801 |
| 0.73 | 0.7399 | 7,434,575 |
| 0.74 | 0.7499 | 7,744,349 |
| 0.75 | 0.7599 | 8,054,123 |
| 0.76 | 0.7699 | 8,363,897 |
| 0.77 | 0.7799 | 10,408,406 |
| 0.78 | 0.7899 | 10,780,134 |
| 0.79 | 0.7999 | 11,151,863 |
| 0.8 | 0.8099 | 11,523,592 |
| 0.81 | 0.8199 | 11,895,321 |
| 0.82 | 0.8299 | 12,267,049 |
| 0.83 | 0.8399 | 12,638,778 |
| 0.84 | 0.8499 | 13,010,507 |
| 0.85 | 0.8599 | 13,382,236 |
| 0.86 | 0.8699 | 13,753,965 |
| 0.87 | 0.8799 | 14,125,693 |
| 0.88 | 0.8899 | 14,497,422 |
| 0.89 | 0.8999 | 14,869,151 |
| 0.9 | 0.9099 | 15,240,880 |
| 0.91 | 0.9199 | 17,564,184 |
| 0.92 | 0.9299 | 17,982,379 |
| 0.93 | 0.9399 | 18,400,574 |
| 0.94 | 0.9499 | 18,818,769 |
| 0.95 | 0.9599 | 19,236,964 |
| 0.96 | 0.9699 | 19,655,159 |
| 0.97 | 0.9799 | 20,073,354 |

On or before July 31, 2007, PacifiCare will make a payment to WMMI in accordance to the following schedule for 2007 July Direct HCCRAF: This fee schedule is based on the 2005 September Benchmark being .49. If the 2005 September Benchmark is determined to be a different number in January of 2006, then this fee schedule will be adjusted in accordance to the same methodology used to calculate this schedule. No adjustment will be made to adjust the 2005 Benchmark on the payment fee schedule. No Payment will be made if the 2007 July Direct HCCRAF score drops below the 2005 September Benchmark. PacifiCare has the right to terminate this contract if the 2007 July Direct HCCRAF does not increase by at least .05 as compared to the 2005 September Benchmark. If the 2007 July Direct HCCRAF is not at a score of .54; then PacifiCare has the right to immediately terminate this contract.

| 2007 July Direct HCCRAF | | WMMI DataRap fee |
|---|---|---|
| 0.5 | 0.5099 | 206,516 |
| 0.51 | 0.5199 | 413,032 |
| 0.52 | 0.5299 | 619,548 |
| 0.53 | 0.5399 | 1,239,096 |
| 0.54 | 0.5499 | 1,548,870 |
| 0.55 | 0.5599 | 1,858,644 |
| 0.56 | 0.5699 | 2,168,418 |
| 0.57 | 0.5799 | 2,478,192 |
| 0.58 | 0.5899 | 2,787,966 |
| 0.59 | 0.5999 | 3,097,740 |
| 0.6 | 0.6099 | 3,407,514 |
| 0.61 | 0.6199 | 3,717,288 |
| 0.62 | 0.6299 | 4,027,062 |
| 0.63 | 0.6399 | 4,336,836 |
| 0.64 | 0.6499 | 4,646,610 |
| 0.65 | 0.6599 | 6,608,511 |
| 0.66 | 0.6699 | 7,021,543 |
| 0.67 | 0.6799 | 7,434,575 |
| 0.68 | 0.6899 | 7,847,607 |
| 0.69 | 0.6999 | 8,260,639 |
| 0.7 | 0.7099 | 8,673,671 |
| 0.71 | 0.7199 | 9,086,703 |
| 0.72 | 0.7299 | 9,499,735 |
| 0.73 | 0.7399 | 9,912,767 |

439

| | | |
|------|--------|------------|
| 0.74 | 0.7499 | 10,325,799 |
| 0.75 | 0.7599 | 10,738,831 |
| 0.76 | 0.7699 | 11,151,863 |
| 0.77 | 0.7799 | 13,877,874 |
| 0.78 | 0.7899 | 14,373,512 |
| 0.79 | 0.7999 | 14,869,151 |
| 0.8 | 0.8099 | 15,364,789 |
| 0.81 | 0.8199 | 15,860,428 |
| 0.82 | 0.8299 | 16,356,066 |
| 0.83 | 0.8399 | 16,851,704 |
| 0.84 | 0.8499 | 17,347,343 |
| 0.85 | 0.8599 | 17,842,981 |
| 0.86 | 0.8699 | 18,338,619 |
| 0.87 | 0.8799 | 18,834,258 |
| 0.88 | 0.8899 | 19,329,896 |
| 0.89 | 0.8999 | 19,825,534 |
| 0.9 | 0.9099 | 20,321,173 |
| 0.91 | 0.9199 | 23,418,913 |
| 0.92 | 0.9299 | 23,976,506 |
| 0.93 | 0.9399 | 24,534,099 |
| 0.94 | 0.9499 | 25,091,692 |
| 0.95 | 0.9599 | 25,649,285 |
| 0.96 | 0.9699 | 26,206,878 |
| 0.97 | 0.9799 | 26,764,472 |

On or before July 31, 2008, PacifiCare will make a payment to WMMI in accordance to the following schedule for 2008 July Direct HCCRAF. This fee schedule is reset to conform to a new calculation based on the 2007 April Benchmark. If the 2007 April Benchmark is determined to be a different number in July of 2007, then this fee schedule will be adjusted in accordance to the same methodology used to calculate this schedule. No Payment will be made if the 2008 July Direct HCCRAF is below the September benchmark. PacifiCare has the right to terminate this contract if the 2008 July Direct HCCRAF does not increase by at least .10 as compared the original 2005 September Benchmark. If the 2008 July Direct HCCRAF is not at a score of .59 (assuming the 2005 September Benchmark is .49); then PacifiCare has the right to immediately terminate this contract. The payment will be made in accordance with the first column below.

440

| DataRaps Proposal Analysis - Annuity Payment | | | | |
|---|---|---|---|---|
| Assumptions | | | | |
| Revised Membership Assumptions | 43,204 | * In 2008 the fee schedule resets to the new April benchmark number. The new number may not be less than the September benchmark. | | |
| Demo 2005 Projected PMPM | 708.690 | | | |
| Demo 2006 Projected PMPM | 709.170 | | | |
| Risk 2005 Projected PMPM | 749.750 | | | |
| Risk 2006 Projected PMPM | 828.537 | | | |
| Total 2005 Projected PMPM | | 729.22 | | |
| Total 2006 Projected PMPM | | 798.695 | | |
| Current HCC RAF | | .58* | | |
| Demo Component 2006 Projected Revenue | | | | |
| Risk Component 2006 Projected Revenue | | | | |
| | | Payable July 2008 | Payable July 2009 | Payable July 2010 |
| | | WMMI DataRap fee | WMMI DataRap Fee ( If Threshold is met) | WMMI DataRap Fee ( If Threshold is met) |
| 0.59 | 0.5999 | 429,553 | 214,777 | 107,388 |
| 0.6 | 0.6099 | 859,106 | 429,553 | 214,777 |
| 0.61 | 0.6199 | 1,288,660 | 644,330 | 322,165 |
| 0.62 | 0.6299 | 1,718,213 | 859,106 | 429,553 |
| 0.63 | 0.6399 | 2,147,766 | 1,073,883 | 536,942 |
| 0.64 | 0.6499 | 2,577,319 | 1,288,660 | 644,330 |
| 0.65 | 0.6599 | 3,006,873 | 1,503,436 | 751,718 |
| 0.66 | 0.6699 | 3,436,426 | 1,718,213 | 859,106 |
| 0.67 | 0.6799 | 3,865,979 | 1,932,990 | 966,495 |
| 0.68 | 0.6899 | 4,295,532 | 2,147,766 | 1,073,883 |
| 0.69 | 0.6999 | 4,725,086 | 2,362,543 | 1,181,271 |
| 0.7 | 0.7099 | 5,154,639 | 2,577,319 | 1,288,660 |
| 0.71 | 0.7199 | 6,701,031 | 3,350,515 | 1,675,258 |
| 0.72 | 0.7299 | 7,216,495 | 3,608,247 | 1,804,124 |
| 0.73 | 0.7399 | 7,731,958 | 3,865,979 | 1,932,990 |
| 0.74 | 0.7499 | 8,247,422 | 4,123,711 | 2,061,856 |

441

| | | | | | |
|---|---|---|---|---|---|
| 0.75 | 0.7599 | 8,762,886 | | | |
| | | | 4,381,443 | | 2,190,722 |
| 0.76 | 0.7699 | 9,278,350 | | | |
| | | | 4,639,175 | | 2,319,588 |
| 0.77 | 0.7799 | 9,793,814 | | | |
| | | | 4,896,907 | | 2,448,454 |
| 0.78 | 0.7899 | 10,309,278 | | | |
| | | | 5,154,639 | | 2,577,319 |
| 0.79 | 0.7999 | 10,824,742 | | | |
| | | | 5,412,371 | | 2,706,185 |
| 0.8 | 0.8099 | 11,340,206 | | | |
| | | | 5,670,103 | | 2,835,051 |
| 0.81 | 0.8199 | 11,855,670 | | | |
| | | | 5,927,835 | | 2,963,917 |
| 0.82 | 0.8299 | 12,371,134 | | | |
| | | | 6,185,567 | | 3,092,783 |
| 0.83 | 0.8399 | 12,886,597 | | | |
| | | | 6,443,299 | | 3,221,649 |
| 0.84 | 0.8499 | 13,402,061 | | | |
| | | | 6,701,031 | | 3,350,515 |
| 0.85 | 0.8599 | 15,657,216 | | | |
| | | | 7,828,608 | | 3,914,304 |
| 0.86 | 0.8699 | 16,237,113 | | | |
| | | | 8,118,556 | | 4,059,278 |
| 0.87 | 0.8799 | 16,817,010 | | | |
| | | | 8,408,505 | | 4,204,252 |
| 0.88 | 0.8899 | 17,396,906 | | | |
| | | | 8,698,453 | | 4,349,227 |
| 0.89 | 0.8999 | 17,976,803 | | | |
| | | | 8,988,402 | | 4,494,201 |
| 0.9 | 0.9099 | 18,556,700 | | | |
| | | | 9,278,350 | | 4,639,175 |
| 0.91 | 0.9199 | 19,136,597 | | | |
| | | | 9,568,299 | | 4,784,149 |
| 0.92 | 0.9299 | 19,716,494 | | | |
| | | | 9,858,247 | | 4,929,124 |
| 0.93 | 0.9399 | 20,296,391 | | | |
| | | | 10,148,195 | | 5,074,098 |
| 0.94 | 0.9499 | 20,876,288 | | | |
| | | | 10,438,144 | | 5,219,072 |
| 0.95 | 0.9599 | 21,456,185 | | | |
| | | | 10,728,092 | | 5,364,046 |
| 0.96 | 0.9699 | 22,036,082 | | | |
| | | | 11,018,041 | | 5,509,020 |
| 0.97 | 0.9799 | 22,615,978 | | | |
| | | | 11,307,989 | | 5,653,995 |

The intent of this payment fee schedule is to compensate for maintained and increased HCCRAF scores on a year over year basis. If the 2007 July Direct HCCRAF for the April Member list was increased over the 2007 September benchmark and the 2008 July Direct HCCRAF score in this year is greater than or equal to the April 2007 benchmark, than an additional payment of 50% of the prior years payment will be paid in addition to a new payment for the reset fee schedule. For Example: If the HCCRAF achieved in July 07 is .54 and that score is maintained in July 08 and additional payment of 50% of the 2007 Payment will be made to the provider. The Payment would be made in accordance to the second column in the schedule file below. For this example an additional payment of $774,435 would be paid in July 2008. If that HCCRAF score is maintained or increased for the April Member list in July 2009 and additional payment of $387,217 in July of 2008. These payments will be made in addition to the payments made by PacifiCare to WMMI for Increases in the July HCCRAF score.

| July Direct HCCRAF | | Payable July 2007 WMMI DataRap fee | Payable July 2008 WMMI DataRap fee | Payable July 2009 WMMI DataRap Fee |
|---|---|---|---|---|
| 0.5 | 0.5099 | 206,516 | 103,258 | 51,629 |
| 0.51 | 0.5199 | 413,032 | 206,516 | 103,258 |
| 0.52 | 0.5299 | 619,548 | 309,774 | 154,887 |
| 0.53 | 0.5399 | 1,239,096 | 619,548 | 309,774 |
| 0.54 | 0.5499 | 1,548,870 | 774,435 | 387,217 |
| 0.55 | 0.5599 | 1,858,644 | 929,322 | 464,661 |
| 0.56 | 0.5699 | 2,168,418 | 1,084,209 | 542,104 |
| 0.57 | 0.5799 | 2,478,192 | 1,239,096 | 619,548 |
| 0.58 | 0.5899 | 2,787,966 | 1,393,983 | 696,991 |
| 0.59 | 0.5999 | 3,097,740 | 1,548,870 | 774,435 |
| 0.6 | 0.6099 | 3,407,514 | 1,703,757 | 851,878 |
| 0.61 | 0.6199 | 3,717,288 | 1,858,644 | 929,322 |
| 0.62 | 0.6299 | 4,027,062 | 2,013,531 | 1,006,765 |
| 0.63 | 0.6399 | 4,336,836 | 2,168,418 | 1,084,209 |
| 0.64 | 0.6499 | 4,646,610 | 2,323,305 | 1,161,652 |
| 0.65 | 0.6599 | 6,608,511 | 3,304,256 | 1,652,128 |
| 0.66 | 0.6699 | 7,021,543 | 3,510,772 | 1,755,386 |
| 0.67 | 0.6799 | 7,434,575 | 3,717,288 | 1,858,644 |
| 0.68 | 0.6899 | 7,847,607 | 3,923,804 | 1,961,902 |
| 0.69 | 0.6999 | 8,260,639 | 4,130,320 | 2,065,160 |
| 0.7 | 0.7099 | 8,673,671 | 4,336,836 | 2,168,418 |
| 0.71 | 0.7199 | 9,086,703 | 4,543,352 | 2,271,676 |
| 0.72 | 0.7299 | 9,499,735 | 4,749,868 | 2,374,934 |
| 0.73 | 0.7399 | 9,912,767 | 4,956,384 | 2,478,192 |
| 0.74 | 0.7499 | 10,325,799 | 5,162,900 | 2,581,450 |
| 0.75 | 0.7599 | 10,738,831 | 5,369,416 | 2,684,708 |
| 0.76 | 0.7699 | 11,151,863 | 5,575,932 | 2,787,966 |
| 0.77 | 0.7799 | 13,877,874 | 6,938,937 | 3,469,469 |

SANANTONIO 439038v7 51445-00007

| | | | | |
|------|--------|------------|------------|-----------|
| 0.78 | 0.7899 | | | |
| | | 14,373,512 | 7,186,756 | 3,593,378 |
| 0.79 | 0.7999 | | | |
| | | 14,869,151 | 7,434,575 | 3,717,288 |
| 0.8 | 0.8099 | | | |
| | | 15,364,789 | 7,682,395 | 3,841,197 |
| 0.81 | 0.8199 | | | |
| | | 15,860,428 | 7,930,214 | 3,965,107 |
| 0.82 | 0.8299 | | | |
| | | 16,356,066 | 8,178,033 | 4,089,016 |
| 0.83 | 0.8399 | | | |
| | | 16,851,704 | 8,425,852 | 4,212,926 |
| 0.84 | 0.8499 | | | |
| | | 17,347,343 | 8,673,671 | 4,336,836 |
| 0.85 | 0.8599 | | | |
| | | 17,842,981 | 8,921,491 | 4,460,745 |
| 0.86 | 0.8699 | | | |
| | | 18,338,619 | 9,169,310 | 4,584,655 |
| 0.87 | 0.8799 | | | |
| | | 18,834,258 | 9,417,129 | 4,708,564 |
| 0.88 | 0.8899 | | | |
| | | 19,329,896 | 9,664,948 | 4,832,474 |
| 0.89 | 0.8999 | | | |
| | | 19,825,534 | 9,912,767 | 4,956,384 |
| 0.9 | 0.9099 | | | |
| | | 20,321,173 | 10,160,586 | 5,080,293 |
| 0.91 | 0.9199 | | | |
| | | 23,418,913 | 11,709,456 | 5,854,728 |
| 0.92 | 0.9299 | | | |
| | | 23,976,506 | 11,988,253 | 5,994,126 |
| 0.93 | 0.9399 | | | |
| | | 24,534,099 | 12,267,049 | 6,133,525 |
| 0.94 | 0.9499 | | | |
| | | 25,091,692 | 12,545,846 | 6,272,923 |
| 0.95 | 0.9599 | | | |
| | | 25,649,285 | 12,824,643 | 6,412,321 |
| 0.96 | 0.9699 | | | |
| | | 26,206,878 | 13,103,439 | 6,551,720 |
| 0.97 | 0.9799 | | | |
| | | 26,764,472 | 13,382,236 | 6,691,118 |

The formulas for the above calculations are listed below:

July 2006 Payment Fee Schedule:

| Row | Column A | Column B | Column C | Column E | Column F |
|---|---|---|---|---|---|
| 1 | DataRaps Proposal Analysis – Annuity Payment | | | | |
| 2 | | | | | |
| 3 | Assumptions | | | | |
| 4 | Revised Membership Assumptions | | 43204 | | |
| 5 | Demo 2005 Projected PMPM | | 708.69 | | |
| 6 | Demo 2006 Projected PMPM | | 709.17 | | |
| 7 | Risk 2005 Projected PMPM | | 749.75 | | |
| 8 | Risk 2006 Projected PMPM | | 796.67 | | |
| 9 | Total 2005 Projected PMPM | | =(C5+C7)/2 | | |
| 10 | Total 2006 Projected PMPM | | =(C8*0.75)+(C6*0.25) | | |
| 11 | Current HCC RAF | | 0.49 | | |
| 12 | Demo Component 2006 Projected Revenue | | =C6*C4*12*0.25 | | |
| 13 | Risk Component 2006 Projected Revenue | | =C8*C4*12*0.75 | | |
| 15 | Total 2006 Projected Revenue | | =C10*C4*12 | | |
| 16 | | | Incremental | Payable July 2006 | |
| 17 | | | | WMMI DataRap | WMMI DataRap |
| 18 | July Direct HCCRAF | | | fee | % |
| 19 | | | | | |
| 20 | 0.5 | =A20+0.0099 | =(((A20)-C$11)*C$8*0.75)*C$4*12 | =C20*F20 | 0.05 |
| 21 | =+A20+0.01 | =A21+0.0099 | =(((A21)-C$11)*C$8*0.75)*C$4*12 | =C21*F21 | 0.05 |
| 22 | =+A21+0.01 | =A22+0.0099 | =(((A22)-C$11)*C$8*0.75)*C$4*12 | =C22*F22 | 0.05 |
| 23 | =+A22+0.01 | =A23+0.0099 | =(((A23)-C$11)*C$8*0.75)*C$4*12 | =C23*F23 | 0.075 |

| 24 | =+A23+0.01 | =A24+0.0099 | =(((A24)-C$11)*C$8*0.75)*C$4*12 | =C24*F24 | 0.075 |
| 25 | =+A24+0.01 | =A25+0.0099 | =(((A25)-C$11)*C$8*0.75)*C$4*12 | =C25*F25 | 0.075 |
| 26 | =+A25+0.01 | =A26+0.0099 | =(((A26)-C$11)*C$8*0.75)*C$4*12 | =C26*F26 | 0.075 |
| 27 | =+A26+0.01 | =A27+0.0099 | =(((A27)-C$11)*C$8*0.75)*C$4*12 | =C27*F27 | 0.075 |
| 28 | =+A27+0.01 | =A28+0.0099 | =(((A28)-C$11)*C$8*0.75)*C$4*12 | =C28*F28 | 0.075 |
| 29 | =+A28+0.01 | =A29+0.0099 | =(((A29)-C$11)*C$8*0.75)*C$4*12 | =C29*F29 | 0.075 |
| 30 | =+A29+0.01 | =A30+0.0099 | =(((A30)-C$11)*C$8*0.75)*C$4*12 | =C30*F30 | 0.075 |
| 31 | =+A30+0.01 | =A31+0.0099 | =(((A31)-C$11)*C$8*0.75)*C$4*12 | =C31*F31 | 0.075 |
| 32 | =+A31+0.01 | =A32+0.0099 | =(((A32)-C$11)*C$8*0.75)*C$4*12 | =C32*F32 | 0.075 |
| 33 | =+A32+0.01 | =A33+0.0099 | =(((A33)-C$11)*C$8*0.75)*C$4*12 | =C33*F33 | 0.075 |
| 34 | =+A33+0.01 | =A34+0.0099 | =(((A34)-C$11)*C$8*0.75)*C$4*12 | =C34*F34 | 0.075 |
| 35 | =+A34+0.01 | =A35+0.0099 | =(((A35)-C$11)*C$8*0.75)*C$4*12 | =C35*F35 | 0.1 |
| 36 | =+A35+0.01 | =A36+0.0099 | =(((A36)-C$11)*C$8*0.75)*C$4*12 | =C36*F36 | 0.1 |
| 37 | =+A36+0.01 | =A37+0.0099 | =(((A37)-C$11)*C$8*0.75)*C$4*12 | =C37*F37 | 0.1 |
| 38 | =+A37+0.01 | =A38+0.0099 | =(((A38)-C$11)*C$8*0.75)*C$4*12 | =C38*F38 | 0.1 |
| 39 | =+A38+0.01 | =A39+0.0099 | =(((A39)-C$11)*C$8*0.75)*C$4*12 | =C39*F39 | 0.1 |
| 40 | =+A39+0.01 | =A40+0.0099 | =(((A40)-C$11)*C$8*0.75)*C$4*12 | =C40*F40 | 0.1 |
| 41 | =+A40+0.01 | =A41+0.0099 | =(((A41)-C$11)*C$8*0.75)*C$4*12 | =C41*F41 | 0.1 |
| 42 | =+A41+0.01 | =A42+0.0099 | =(((A42)-C$11)*C$8*0.75)*C$4*12 | =C42*F42 | 0.1 |
| 43 | =+A42+0.01 | =A43+0.0099 | =(((A43)-C$11)*C$8*0.75)*C$4*12 | =C43*F43 | 0.1 |
| 44 | =+A43+0.01 | =A44+0.0099 | =(((A44)-C$11)*C$8*0.75)*C$4*12 | =C44*F44 | 0.1 |

| 45 | =+A44+0.01 | =A45+0.0099 | =(((A45)-C$11)*C$8*0.75)*C$4*12 | =C45*F45 | 0.1 |
| 46 | =+A45+0.01 | =A46+0.0099 | =(((A46)-C$11)*C$8*0.75)*C$4*12 | =C46*F46 | 0.1 |
| 47 | =+A46+0.01 | =A47+0.0099 | =(((A47)-C$11)*C$8*0.75)*C$4*12 | =C47*F47 | 0.12 |
| 48 | =+A47+0.01 | =A48+0.0099 | =(((A48)-C$11)*C$8*0.75)*C$4*12 | =C48*F48 | 0.12 |
| 49 | =+A48+0.01 | =A49+0.0099 | =(((A49)-C$11)*C$8*0.75)*C$4*12 | =C49*F49 | 0.12 |
| 50 | =+A49+0.01 | =A50+0.0099 | =(((A50)-C$11)*C$8*0.75)*C$4*12 | =C50*F50 | 0.12 |
| 51 | =+A50+0.01 | =A51+0.0099 | =(((A51)-C$11)*C$8*0.75)*C$4*12 | =C51*F51 | 0.12 |
| 52 | =+A51+0.01 | =A52+0.0099 | =(((A52)-C$11)*C$8*0.75)*C$4*12 | =C52*F52 | 0.12 |
| 53 | =+A52+0.01 | =A53+0.0099 | =(((A53)-C$11)*C$8*0.75)*C$4*12 | =C53*F53 | 0.12 |
| 54 | =+A53+0.01 | =A54+0.0099 | =(((A54)-C$11)*C$8*0.75)*C$4*12 | =C54*F54 | 0.12 |
| 55 | =+A54+0.01 | =A55+0.0099 | =(((A55)-C$11)*C$8*0.75)*C$4*12 | =C55*F55 | 0.12 |
| 56 | =+A55+0.01 | =A56+0.0099 | =(((A56)-C$11)*C$8*0.75)*C$4*12 | =C56*F56 | 0.12 |
| 57 | =+A56+0.01 | =A57+0.0099 | =(((A57)-C$11)*C$8*0.75)*C$4*12 | =C57*F57 | 0.12 |
| 58 | =+A57+0.01 | =A58+0.0099 | =(((A58)-C$11)*C$8*0.75)*C$4*12 | =C58*F58 | 0.12 |
| 59 | =+A58+0.01 | =A59+0.0099 | =(((A59)-C$11)*C$8*0.75)*C$4*12 | =C59*F59 | 0.12 |
| 60 | =+A59+0.01 | =A60+0.0099 | =(((A60)-C$11)*C$8*0.75)*C$4*12 | =C60*F60 | 0.12 |
| 61 | =+A60+0.01 | =A61+0.0099 | =(((A61)-C$11)*C$8*0.75)*C$4*12 | =C61*F61 | 0.135 |
| 62 | =+A61+0.01 | =A62+0.0099 | =(((A62)-C$11)*C$8*0.75)*C$4*12 | =C62*F62 | 0.135 |
| 63 | =+A62+0.01 | =A63+0.0099 | =(((A63)-C$11)*C$8*0.75)*C$4*12 | =C63*F63 | 0.135 |
| 64 | =+A63+0.01 | =A64+0.0099 | =(((A64)-C$11)*C$8*0.75)*C$4*12 | =C64*F64 | 0.135 |
| 65 | =+A64+0.01 | =A65+0.0099 | =(((A65)-C$11)*C$8*0.75)*C$4*12 | =C65*F65 | 0.135 |

447

| 66 | =+A65+0.01 | =A66+0.0099 | =(((A66)-C$11)*C$8*0.75)*C4*12 | =C66*F66 | 0.135 |
| 67 | =+A66+0.01 | =A67+0.0099 | =(((A67)-C$11)*C$8*0.75)*C4*12 | =C67*F67 | 0.135 |

For the July 2007 Payment Fee Schedule:

| Row | Column A | Column B | Column C | Column E | Column F | Column H | Column J |
|---|---|---|---|---|---|---|---|
| 1 | DataRaps Proposal Analysis – Annuity Payment | | | | | | |
| 2 | Assumptions | | | | | | |
| 3 | Revised Mem Assumpt | | 43204 | | | | |
| 4 | Demo 2005 Projected PMPM | | 708.69 | | | | |
| 5 | Demo 2006 Projected PMPM | | 709.17 | | | | |
| 6 | Risk 2005 Projected PMPM | | 749.75 | | Same schedule as Year one | | |
| 7 | Risk 2006 Projected PMPM | | 796.67 | | | | |
| 8 | Total 2005 Projected PMPM | | =(C5+C7)/2 | | | | |
| 9 | Total 2006 Projected PMPM | | =(C8*0.75)+(C6*0.25) | | | | |
| 10 | Current HCC RAF | | 0.49 | | | | |
| 11 | Demo Comp06 Projected Rev | | =C6*C4*12*0.25 | | | | |
| 12 | Risk Comp 06 Projected Rev | | =C8*C4*12*0.75 | | | | |
| 13 | Total 2006 Projected Revenue | | =C10*C4*12 | | | If threshold is maintained | If threshold is maintained |
| 14 | | | | | Payable July 2007 | | Payable July 2009 |
| 15 | | | | WMMI DataRap | WMMI DataRap | WMMI DataRap | WMMI DataRap |
| 16 | July Direct HCCRAF | | | % | fee | fee | fee |
| 19 | 0.5 | =A19+0.0099 | =((($A19-$C$11)*$C$8)*$C$4*12) | 0.05 | =+E19*C19 | =+F19*0.5 | =+F19*0.25 |
| 20 | =+A19+0.01 | =A20+0.0099 | =((($A20-$C$11)*$C$8)*$C$4*12) | 0.05 | =+E20*C20 | =+F20*0.5 | =+F20*0.25 |
| 21 | =+A20+0.01 | =A21+0.0099 | =((($A21-$C$11)*$C$8)*$C$4*12) | 0.05 | =+E21*C21 | =+F21*0.5 | =+F21*0.25 |
| 22 | =+A21+0.01 | =A22+0.0099 | =((($A22-$C$11)*$C$8)*$C$4*12) | 0.075 | =+E22*C22 | =+F22*0.5 | =+F22*0.25 |
| 23 | =+A22+0.01 | =A23+0.0099 | =((($A23-$C$11)*$C$8)*$C$4*12) | 0.075 | =+E23*C23 | =+F23*0.5 | =+F23*0.25 |
| 24 | =+A23+0.01 | =A24+0.0099 | =((($A24-$C$11)*$C$8)*$C$4*12) | 0.075 | =+E24*C24 | =+F24*0.5 | =+F24*0.25 |

| 25 | =+A24+0.01 | =A25+0.0099 | =((($A25-$C$11)*$C$8)*$C$4*12) | 0.075 | =+E25*C25 | =+F25*0.5 | =+F25*0.25 |
|----|-----------|-------------|--------------------------------|-------|-----------|-----------|------------|
| 26 | =+A25+0.01 | =A26+0.0099 | =((($A26-$C$11)*$C$8)*$C$4*12) | 0.075 | =+E26*C26 | =+F26*0.5 | =+F26*0.25 |
| 27 | =+A26+0.01 | =A27+0.0099 | =((($A27-$C$11)*$C$8)*$C$4*12) | 0.075 | =+E27*C27 | =+F27*0.5 | =+F27*0.25 |
| 28 | =+A27+0.01 | =A28+0.0099 | =((($A28-$C$11)*$C$8)*$C$4*12) | 0.075 | =+E28*C28 | =+F28*0.5 | =+F28*0.25 |
| 29 | =+A28+0.01 | =A29+0.0099 | =((($A29-$C$11)*$C$8)*$C$4*12) | 0.075 | =+E29*C29 | =+F29*0.5 | =+F29*0.25 |
| 30 | =+A29+0.01 | =A30+0.0099 | =((($A30-$C$11)*$C$8)*$C$4*12) | 0.075 | =+E30*C30 | =+F30*0.5 | =+F30*0.25 |
| 31 | =+A30+0.01 | =A31+0.0099 | =((($A31-$C$11)*$C$8)*$C$4*12) | 0.075 | =+E31*C31 | =+F31*0.5 | =+F31*0.25 |
| 32 | =+A31+0.01 | =A32+0.0099 | =((($A32-$C$11)*$C$8)*$C$4*12) | 0.075 | =+E32*C32 | =+F32*0.5 | =+F32*0.25 |
| 33 | =+A32+0.01 | =A33+0.0099 | =((($A33-$C$11)*$C$8)*$C$4*12) | 0.075 | =+E33*C33 | =+F33*0.5 | =+F33*0.25 |
| 34 | =+A33+0.01 | =A34+0.0099 | =((($A34-$C$11)*$C$8)*$C$4*12) | 0.1 | =+E34*C34 | =+F34*0.5 | =+F34*0.25 |
| 35 | =+A34+0.01 | =A35+0.0099 | =((($A35-$C$11)*$C$8)*$C$4*12) | 0.1 | =+E35*C35 | =+F35*0.5 | =+F35*0.25 |
| 36 | =+A35+0.01 | =A36+0.0099 | =((($A36-$C$11)*$C$8)*$C$4*12) | 0.1 | =+E36*C36 | =+F36*0.5 | =+F36*0.25 |
| 37 | =+A36+0.01 | =A37+0.0099 | =((($A37-$C$11)*$C$8)*$C$4*12) | 0.1 | =+E37*C37 | =+F37*0.5 | =+F37*0.25 |
| 38 | =+A37+0.01 | =A38+0.0099 | =((($A38-$C$11)*$C$8)*$C$4*12) | 0.1 | =+E38*C38 | =+F38*0.5 | =+F38*0.25 |
| 39 | =+A38+0.01 | =A39+0.0099 | =((($A39-$C$11)*$C$8)*$C$4*12) | 0.1 | =+E39*C39 | =+F39*0.5 | =+F39*0.25 |
| 40 | =+A39+0.01 | =A40+0.0099 | =((($A40-$C$11)*$C$8)*$C$4*12) | 0.1 | =+E40*C40 | =+F40*0.5 | =+F40*0.25 |
| 41 | =+A40+0.01 | =A41+0.0099 | =((($A41-$C$11)*$C$8)*$C$4*12) | 0.1 | =+E41*C41 | =+F41*0.5 | =+F41*0.25 |
| 42 | =+A41+0.01 | =A42+0.0099 | =((($A42-$C$11)*$C$8)*$C$4*12) | 0.1 | =+E42*C42 | =+F42*0.5 | =+F42*0.25 |
| 43 | =+A42+0.01 | =A43+0.0099 | =((($A43-$C$11)*$C$8)*$C$4*12) | 0.1 | =+E43*C43 | =+F43*0.5 | =+F43*0.25 |
| 44 | =+A43+0.01 | =A44+0.0099 | =((($A44-$C$11)*$C$8)*$C$4*12) | 0.1 | =+E44*C44 | =+F44*0.5 | =+F44*0.25 |
| 45 | =+A44+0.01 | =A45+0.0099 | =((($A45-$C$11)*$C$8)*$C$4*12) | 0.1 | =+E45*C45 | =+F45*0.5 | =+F45*0.25 |

| 46 | =+A45+0.01 | =A46+0.0099 | =(((\$A46-\$C\$11)*\$C\$8)*\$C\$4*12) | 0.12 | =+E46*C46 | =+F46*0.5 | =+F46*0.25 |
|----|-----------|-------------|----------------------------------|------|-----------|-----------|------------|
| 47 | =+A46+0.01 | =A47+0.0099 | =(((\$A47-\$C\$11)*\$C\$8)*\$C\$4*12) | 0.12 | =+E47*C47 | =+F47*0.5 | =+F47*0.25 |
| 48 | =+A47+0.01 | =A48+0.0099 | =(((\$A48-\$C\$11)*\$C\$8)*\$C\$4*12) | 0.12 | =+E48*C48 | =+F48*0.5 | =+F48*0.25 |
| 49 | =+A48+0.01 | =A49+0.0099 | =(((\$A49-\$C\$11)*\$C\$8)*\$C\$4*12) | 0.12 | =+E49*C49 | =+F49*0.5 | =+F49*0.25 |
| 50 | =+A49+0.01 | =A50+0.0099 | =(((\$A50-\$C\$11)*\$C\$8)*\$C\$4*12) | 0.12 | =+E50*C50 | =+F50*0.5 | =+F50*0.25 |
| 51 | =+A50+0.01 | =A51+0.0099 | =(((\$A51-\$C\$11)*\$C\$8)*\$C\$4*12) | 0.12 | =E51*C51 | =+F51*0.5 | =+F51*0.25 |
| 52 | =+A51+0.01 | =A52+0.0099 | =(((\$A52-\$C\$11)*\$C\$8)*\$C\$4*12) | 0.12 | =E52*C52 | =+F52*0.5 | =+F52*0.25 |
| 53 | =+A52+0.01 | =A53+0.0099 | =(((\$A53-\$C\$11)*\$C\$8)*\$C\$4*12) | 0.12 | =E53*C53 | =+F53*0.5 | =+F53*0.25 |
| 54 | =+A53+0.01 | =A54+0.0099 | =(((\$A54-\$C\$11)*\$C\$8)*\$C\$4*12) | 0.12 | =E54*C54 | =+F54*0.5 | =+F54*0.25 |
| 55 | =+A54+0.01 | =A55+0.0099 | =(((\$A55-\$C\$11)*\$C\$8)*\$C\$4*12) | 0.12 | =+E55*C55 | =+F55*0.5 | =+F55*0.25 |
| 56 | =+A55+0.01 | =A56+0.0099 | =(((\$A56-\$C\$11)*\$C\$8)*\$C\$4*12) | 0.12 | =+E56*C56 | =+F56*0.5 | =+F56*0.25 |
| 57 | =+A56+0.01 | =A57+0.0099 | =(((\$A57-\$C\$11)*\$C\$8)*\$C\$4*12) | 0.12 | =+E57*C57 | =+F57*0.5 | =+F57*0.25 |
| 58 | =+A57+0.01 | =A58+0.0099 | =(((\$A58-\$C\$11)*\$C\$8)*\$C\$4*12) | 0.12 | =+E58*C58 | =+F58*0.5 | =+F58*0.25 |
| 59 | =+A58+0.01 | =A59+0.0099 | =(((\$A59-\$C\$11)*\$C\$8)*\$C\$4*12) | 0.12 | =+E59*C59 | =+F59*0.5 | =+F59*0.25 |
| 60 | =+A59+0.01 | =A60+0.0099 | =(((\$A60-\$C\$11)*\$C\$8)*\$C\$4*12) | 0.135 | =+E60*C60 | =+F60*0.5 | =+F60*0.25 |
| 61 | =+A60+0.01 | =A61+0.0099 | =(((\$A61-\$C\$11)*\$C\$8)*\$C\$4*12) | 0.135 | =+E61*C61 | =+F61*0.5 | =+F61*0.25 |
| 62 | =+A61+0.01 | =A62+0.0099 | =(((\$A62-\$C\$11)*\$C\$8)*\$C\$4*12) | 0.135 | =+E62*C62 | =+F62*0.5 | =+F62*0.25 |
| 63 | =+A62+0.01 | =A63+0.0099 | =(((\$A63-\$C\$11)*\$C\$8)*\$C\$4*12) | 0.135 | =+E63*C63 | =+F63*0.5 | =+F63*0.25 |
| 64 | =+A63+0.01 | =A64+0.0099 | =(((\$A64-\$C\$11)*\$C\$8)*\$C\$4*12) | 0.135 | =+E64*C64 | =+F64*0.5 | =+F64*0.25 |
| 65 | =+A64+0.01 | =A65+0.0099 | =(((\$A65-\$C\$11)*\$C\$8)*\$C\$4*12) | 0.135 | =+E65*C65 | =+F65*0.5 | =+F65*0.25 |
| 66 | =+A65+0.01 | =A66+0.0099 | =(((\$A66-\$C\$11)*\$C\$8)*\$C\$4*12) | 0.135 | =+E66*C66 | =+F66*0.5 | =+F66*0.25 |

For the July 2008 and Future Years Payment Fee Schedule:

| Row | Column A | Column B | Column C | Column E | Column F | Column G | Column I |
|---|---|---|---|---|---|---|---|
| | DataRaps Proposal Analysis - Annuity Payment | | | | | | |
| 1 | Assumptions | | | | | | |
| 4 | Revised Membership Assumptions | | =' 2006 Payment Fee Schedule'!C4 | * In 2008 the fee schedule resets to the new April benchmark number. The new number may not be less than the September benchmark. | | | |
| 5 | Demo 2005 Projected PMPM | | 708.69 | | | | |
| 6 | Demo 2006 Projected PMPM | | 709.17 | | | | |
| 7 | Risk 2005 Projected PMPM | | 749.75 | | | | |
| 8 | Risk 2006 Projected PMPM | | =796.67*1.04 | | | | |
| 9 | Total 2005 Projected PMPM | | =(C5+C7)/2 | | | | |
| 10 | Total 2006 Projected PMPM | | =(C8*0.75)+(C6*0.25) | | | | |
| 11 | Current HCC RAF | | 0.58 | * | | | |
| 12 | Demo Component 2006 Projected Revenue | | =C6*C4*12*0.25 | | | | |
| 13 | Risk Component 2006 Projected Revenue | | =C8*C4*12*0.75 | | | If threshold is maintained | If threshold is maintained |
| 14 | Total 2006 Projected Revenue | | =C10*C4*12 | | | | |
| 15 | | | | | | | |
| 16 | | | | Payable July 2008 | | Payable July 2009 | Payable July 2010 |
| 17 | | | PCTX Incremental | WMMI DataRap | | WMMI DataRap | WMMI DataRap |
| 18 | | | Revenue 2007 and 08 @ 100% | fee | | fee | fee |
| 19 | | | | | | | |
| 20 | 0.59 | =A20+0.0099 | =(($A20-$C$11)*$C$8)*$C$4*12) | =+D20*C20 | | =+E20*0.5 | =+E20*0.25 |
| 21 | =+A20+0.01 | =A21+0.0099 | =(($A21-$C$11)*$C$8)*$C$4*12) | =+D21*C21 | | =+E21*0.5 | =+E21*0.25 |
| 22 | =+A21+0.01 | =A22+0.0099 | =(($A22-$C$11)*$C$8)*$C$4*12) | =+D22*C22 | | =+E22*0.5 | =+E22*0.25 |
| 23 | =+A22+0.01 | =A23+0.0099 | =(($A23-$C$11)*$C$8)*$C$4*12) | =+D23*C23 | | =+E23*0.5 | =+E23*0.25 |
| 24 | =+A23+0.01 | =A24+0.0099 | =(($A24-$C$11)*$C$8)*$C$4*12) | =+D24*C24 | | =+E24*0.5 | =+E24*0.25 |
| 25 | =+A24+0.01 | =A25+0.0099 | =(($A25-$C$11)*$C$8)*$C$4*12) | =+D25*C25 | | =+E25*0.5 | =+E25*0.25 |
| 26 | =+A25+0.01 | =A26+0.0099 | =(($A26-$C$11)*$C$8)*$C$4*12) | =+D26*C26 | | =+E26*0.5 | =+E26*0.25 |
| 27 | =+A26+0.01 | =A27+0.0099 | =(($A27-$C$11)*$C$8)*$C$4*12) | =+D27*C27 | | =+E27*0.5 | =+E27*0.25 |
| 28 | =+A27+0.01 | =A28+0.0099 | =(($A28-$C$11)*$C$8)*$C$4*12) | =+D28*C28 | | =+E28*0.5 | =+E28*0.25 |
| 29 | =+A28+0.01 | =A29+0.0099 | =(($A29-$C$11)*$C$8)*$C$4*12) | =+D29*C29 | | =+E29*0.5 | =+E29*0.25 |

| 30 | =+A29+0.01 | =A30+0.0099 | =(((A30-$C$11)*$C$8)*$C$4*12) | =+D30*C30 | =+E30*0.5 | =+E30*0.25 |
|----|-----------|-------------|------------------------------|-----------|-----------|-----------|
| 31 | =+A30+0.01 | =A31+0.0099 | =(((($A31-$C$11)*$C$8)*$C$4*12) | =+D31*C31 | =+E31*0.5 | =+E31*0.25 |
| 32 | =+A31+0.01 | =A32+0.0099 | =(((($A32-$C$11)*$C$8)*$C$4*12) | =+D32*C32 | =+E32*0.5 | =+E32*0.25 |
| 33 | =+A32+0.01 | =A33+0.0099 | =(((($A33-$C$11)*$C$8)*$C$4*12) | =+D33*C33 | =+E33*0.5 | =+E33*0.25 |
| 34 | =+A33+0.01 | =A34+0.0099 | =(((($A34-$C$11)*$C$8)*$C$4*12) | =+D34*C34 | =+E34*0.5 | =+E34*0.25 |
| 35 | =+A34+0.01 | =A35+0.0099 | =(((($A35-$C$11)*$C$8)*$C$4*12) | =+D35*C35 | =+E35*0.5 | =+E35*0.25 |
| 36 | =+A35+0.01 | =A36+0.0099 | =(((($A36-$C$11)*$C$8)*$C$4*12) | =+D36*C36 | =+E36*0.5 | =+E36*0.25 |
| 37 | =+A36+0.01 | =A37+0.0099 | =(((($A37-$C$11)*$C$8)*$C$4*12) | =+D37*C37 | =+E37*0.5 | =+E37*0.25 |
| 38 | =+A37+0.01 | =A38+0.0099 | =(((($A38-$C$11)*$C$8)*$C$4*12) | =+D38*C38 | =+E38*0.5 | =+E38*0.25 |
| 39 | =+A38+0.01 | =A39+0.0099 | =(((($A39-$C$11)*$C$8)*$C$4*12) | =+D39*C39 | =+E39*0.5 | =+E39*0.25 |
| 40 | =+A39+0.01 | =A40+0.0099 | =(((($A40-$C$11)*$C$8)*$C$4*12) | =+D40*C40 | =+E40*0.5 | =+E40*0.25 |
| 41 | =+A40+0.01 | =A41+0.0099 | =(((($A41-$C$11)*$C$8)*$C$4*12) | =+D41*C41 | =+E41*0.5 | =+E41*0.25 |
| 42 | =+A41+0.01 | =A42+0.0099 | =(((($A42-$C$11)*$C$8)*$C$4*12) | =+D42*C42 | =+E42*0.5 | =+E42*0.25 |
| 43 | =+A42+0.01 | =A43+0.0099 | =(((($A43-$C$11)*$C$8)*$C$4*12) | =+D43*C43 | =+E43*0.5 | =+E43*0.25 |
| 44 | =+A43+0.01 | =A44+0.0099 | =(((($A44-$C$11)*$C$8)*$C$4*12) | =+D44*C44 | =+E44*0.5 | =+E44*0.25 |
| 45 | =+A44+0.01 | =A45+0.0099 | =(((($A45-$C$11)*$C$8)*$C$4*12) | =+D45*C45 | =+E45*0.5 | =+E45*0.25 |
| 46 | =+A45+0.01 | =A46+0.0099 | =(((($A46-$C$11)*$C$8)*$C$4*12) | =+D46*C46 | =+E46*0.5 | =+E46*0.25 |
| 47 | =+A46+0.01 | =A47+0.0099 | =(((($A47-$C$11)*$C$8)*$C$4*12) | =+D47*C47 | =+E47*0.5 | =+E47*0.25 |
| 48 | =+A47+0.01 | =A48+0.0099 | =(((($A48-$C$11)*$C$8)*$C$4*12) | =+D48*C48 | =+E48*0.5 | =+E48*0.25 |
| 49 | =+A48+0.01 | =A49+0.0099 | =(((($A49-$C$11)*$C$8)*$C$4*12) | =+D49*C49 | =+E49*0.5 | =+E49*0.25 |
| 50 | =+A49+0.01 | =A50+0.0099 | =(((($A50-$C$11)*$C$8)*$C$4*12) | =+D50*C50 | =+E50*0.5 | =+E50*0.25 |
| 51 | =+A50+0.01 | =A51+0.0099 | =(((($A51-$C$11)*$C$8)*$C$4*12) | =+D51*C51 | =+E51*0.5 | =+E51*0.25 |
| 52 | =+A51+0.01 | =A52+0.0099 | =(((($A52-$C$11)*$C$8)*$C$4*12) | =+D52*C52 | =+E52*0.5 | =+E52*0.25 |
| 53 | =+A52+0.01 | =A53+0.0099 | =(((($A53-$C$11)*$C$8)*$C$4*12) | =+D53*C53 | =+E53*0.5 | =+E53*0.25 |
| 54 | =+A53+0.01 | =A54+0.0099 | =(((($A54-$C$11)*$C$8)*$C$4*12) | =+D54*C54 | =+E54*0.5 | =+E54*0.25 |
| 55 | =+A54+0.01 | =A55+0.0099 | =(((($A55-$C$11)*$C$8)*$C$4*12) | =+D55*C55 | =+E55*0.5 | =+E55*0.25 |
| 56 | =+A55+0.01 | =A56+0.0099 | =(((($A56-$C$11)*$C$8)*$C$4*12) | =+D56*C56 | =+E56*0.5 | =+E56*0.25 |
| 57 | =+A56+0.01 | =A57+0.0099 | =(((($A57-$C$11)*$C$8)*$C$4*12) | =+D57*C57 | =+E57*0.5 | =+E57*0.25 |
| 58 | =+A57+0.01 | =A58+0.0099 | =(((($A58-$C$11)*$C$8)*$C$4*12) | =+D58*C58 | =+E58*0.5 | =+E58*0.25 |

Some Examples of payment Calculations are as follows:

| Example 1 | | July 2006 Payment | July 2007 Payment | July 2008 Payment | July 2009 Payment |
|---|---|---|---|---|---|
| September Benchmark: | .49 | | | | |
| 2007 July HCCRAF Minimum: .54 | | | | | |
| 2008 July HCCRAF Minimum: . 59 | | | | | |
| July HCCRAF 2006 Score for September Member List: | .52 | $464,661 | | | |
| July HCCRAF 2007 Score for April Member List: | .52 | | $619,548 PacifiCare has right to term contract | $309,774 PacifiCare has right to term contract | $154,887 |
| July HCCRAF 2008 Score for April Member List: | .52 | | | | |

The July 2009 Payment is considered the payment tail for purposes of this example. If this contract were to term before the WMMI has the opportunity to maintain or increase the HCCRAF for that period, then PacifiCare will make a payment of twenty-five (25%) of any outstanding tail within thirty (30) days of the termination.("Payment Tail")  In this example the Payment Tail would be 25% of the $154, 877.  The amount would be reimbursed within forty-five (45) days of the termination would be $38,722.

| Example 2 September Benchmark: .49 2007 July HCCRAF Minimum: .54 2008 July HCCRAF Minimum: . 59 | | | | | | |
|---|---|---|---|---|---|---|
| | | July 2006 | July 2007 | July 2008 | July 2009 | July 2010 |
| | | Payment | Payment | Payment | Payment | Payment |
| July HCCRAF 2006 Score for September Member List: | .56 | $1,626,313 | | | | |
| July HCCRAF 2007 Score for April Member List: | .58 | | $2,787,966 Right to term Contract | $1,393,983 | $696,991 | |
| July HCCRAF 2008 Score for April Member List: | .6 | | | $859,106 | $429,553 | $214,777 |
| Total | | $l,626,313 | $2,787,966 | $2,253,089 | Tail | Tail |

The July 2009 and July 2010 Payment is considered the payment tail for purposes of this example. If this contract were to term before the WMMI has the opportunity to maintain or increase the HCCRAF for that period, then PacifiCare will make a payment of twenty-five (25%) of any outstanding tail within thirty (30) days of the termination.("Payment Tail")  In this example the Payment Tail would be 25% of the $ 1,341,321. The amount would be reimbursed within forty-five (45) days of the termination would be $335,330.

| Example 3 September Benchmark: .49 2007 July HCCRAF Minimum: .54 2008 July HCCRAF Minimum: . 59 | | | | | | |
|---|---|---|---|---|---|---|
| | | July 2006 | July 2007 | July 2008 | July 2009 | July 2010 |
| | | Payment | Payment | Payment | Payment | Payment |
| July HCCRAF 2006 Score for September Member List: | .60 | $2,555,635 | | | | |
| July HCCRAF 2007 Score for April Member List: | .59 | | $3,097,740 | $1,548,870 | $774,435 | |

| | | July 2006 | July 2007 | July 2008 | July 2009 | July 2010 |
|---|---|---|---|---|---|---|
| July HCCRAF 2008 Score for April Member List: | .62 | | | $1,288,660 | $644,330 | $322,165 |
| Total | | $2,555,635 | $3,097,740 | $2,837,530 | Tail | Tail |

The July 2009 and July 2010 Payment is considered the payment tail for purposes of this example. If this contract were to term before the WMMI has the opportunity to maintain or increase the HCCRAF for that period, then PacifiCare will make a payment of twenty-five (25%) of any outstanding tail within thirty (30) days of the termination.("Payment Tail") In this example the Payment Tail would be 25% of the $ 1,740,930. The amount would be reimbursed within forty-five (45) days of the termination would be $435,332.

| Example 4 | | July 2006 | July 2007 | July 2008 | July 2009 | July 2010 |
|---|---|---|---|---|---|---|
| September Benchmark: .49 2007 July HCCRAF Minimum: .54 2008 July HCCRAF Minimum: .59 | | | | | | |
| | | Payment | Payment | Payment | Payment | Payment |
| July HCCRAF 2006 Score for September Member List: | .55 | $1,393,983 | | | | |
| July HCCRAF 2007 Score for April Member List: | .52 | | $619,584 | $309,774 Right to term Contract | $154,887 | |
| July HCCRAF 2008 Score for April Member List: | .57 | | | $1,610,825 | $805,412 | $402,706 |
| Total | | $1,393,983 | $619,584 | $1,920,599 | Tail | Tail |

The July 2009 and July 2010 Payment is considered the payment tail for purposes of this example. If this contract were to term before the WMMI has the opportunity to maintain or increase the HCCRAF for that period, then PacifiCare will make a payment of twenty-five (25%) of any outstanding tail within thirty (30) days of the termination.("Payment Tail") In this example the Payment Tail would be 25% of the $ 1,363,005. The amount would be reimbursed within forty-five (45) days of the termination would be $340,751.

| Example 5 | | July 2006 | July 2007 | July 2008 | July 2009 | July 2010 |
|---|---|---|---|---|---|---|
| September Benchmark: .49 2007 July HCCRAF Minimum: .54 2008 July HCCRAF Minimum: .59 | | | | | | |
| | | Payment | Payment | Payment | Payment | Payment |
| July HCCRAF 2006 Score for September Member List: | .45 | No Payment | | | | |
| July HCCRAF 2007 Score for April Member List: | .52 | | $619,584 | $309,774 Right to term Contract | $154,887 | |
| July HCCRAF 2008 Score for April Member List: | .59 | | | $3,006,873 | $1,503,436 | $751,718 |
| Total | | $1,393,983 | $619,584 | $1,920,599 | Tail | Tail |

The July 2009 and July 2010 Payment is considered the payment tail for purposes of this example. If this contract were to term before the WMMI has the opportunity to maintain or increase the HCCRAF for that period, then PacifiCare will make a payment of twenty-five (25%) of any outstanding tail within thirty (30) days of the termination.("Payment Tail") In this example the Payment Tail would be 25% of the $ 2,410,042. The amount would be reimbursed within forty-five (45) days of the termination would be $602,510.

| Example 6 | |
|---|---|
| September Benchmark: | .49 |

SANANTONIO 439038v7 51445-00007                    41

| | | | | |
|---|---|---|---|---|
| 2007 July HCCRAF Minimum: .54 | | | | |
| 2008 July HCCRAF Minimum: .59 | | | | |

| | | July 2006 Payment | July 2007 Payment | July 2008 Payment | July 2009 Payment | July 2010 Payment |
|---|---|---|---|---|---|---|
| July HCCRAF 2006 Score for September Member List: | .38 | No Payment | | | | |
| July HCCRAF 2007 Score for April Member List: | .62 | | $4,027,062 | | | |
| July HCCRAF 2008 Score for April Member List: | .58 | | | Right to term Contract | | |

The Payment Fee Schedules for these examples are below:
2006 Payment Fee Schedule:

| DataRaps Proposal Analysis - Annuity Payment | | | | |
|---|---|---|---|---|
| Assumptions | | | | |
| Revised Membership Assumptions | | 43,204 | | |
| Demo 2005 Projected PMPM | | 708.690 | | |
| Demo 2006 Projected PMPM | | 709.170 | | |
| Risk 2005 Projected PMPM | | 749.750 | | |
| Risk 2006 Projected PMPM | | 796.670 | | |
| Total 2005 Projected PMPM | | 729.220 | | |
| Total 2006 Projected PMPM | | 774.795 | | |
| Current HCC RAF | | 0.490 | | |
| Demo Component 2006 Projected Revenue | | 91,916,942 | | |
| Risk Component 2006 Projected Revenue | | 309,773,976 | | |
| | | | | |
| | | Incremental | Payable July 2006 | |
| | | | WMMI DataRap fee | WMMI DataRap % |
| July Direct HCCRAF | | | | |
| 0.5 | 0.5099 | 3,097,740 | 154,887 | 5.00% |
| 0.51 | 0.5199 | 6,195,480 | 309,774 | 5.00% |
| 0.52 | 0.5299 | 9,293,219 | 464,661 | 5.00% |
| 0.53 | 0.5399 | 12,390,959 | 929,322 | 7.50% |
| 0.54 | 0.5499 | 15,488,699 | 1,161,652 | 7.50% |
| 0.55 | 0.5599 | 18,586,439 | 1,393,983 | 7.50% |
| 0.56 | 0.5699 | 21,684,178 | 1,626,313 | 7.50% |

| | | | |
|---|---|---|---|
| 0.57 | 0.5799 | | 7.50% |
| | | 24,781,918 | 1,858,644 | |
| 0.58 | 0.5899 | | 7.50% |
| | | 27,879,658 | 2,090,974 | |
| 0.59 | 0.5999 | | 7.50% |
| | | 30,977,398 | 2,323,305 | |
| 0.6 | 0.6099 | | 7.50% |
| | | 34,075,137 | 2,555,635 | |
| 0.61 | 0.6199 | | 7.50% |
| | | 37,172,877 | 2,787,966 | |
| 0.62 | 0.6299 | | 7.50% |
| | | 40,270,617 | 3,020,296 | |
| 0.63 | 0.6399 | | 7.50% |
| | | 43,368,357 | 3,252,627 | |
| 0.64 | 0.6499 | | 7.50% |
| | | 46,466,096 | 3,484,957 | |
| 0.65 | 0.6599 | | 10.00% |
| | | 49,563,836 | 4,956,384 | |
| 0.66 | 0.6699 | | 10.00% |
| | | 52,661,576 | 5,266,158 | |
| 0.67 | 0.6799 | | 10.00% |
| | | 55,759,316 | 5,575,932 | |
| 0.68 | 0.6899 | | 10.00% |
| | | 58,857,055 | 5,885,706 | |
| 0.69 | 0.6999 | | 10.00% |
| | | 61,954,795 | 6,195,480 | |
| 0.7 | 0.7099 | | 10.00% |
| | | 65,052,535 | 6,505,253 | |
| 0.71 | 0.7199 | | 10.00% |
| | | 68,150,275 | 6,815,027 | |
| 0.72 | 0.7299 | | 10.00% |
| | | 71,248,015 | 7,124,801 | |
| 0.73 | 0.7399 | | 10.00% |
| | | 74,345,754 | 7,434,575 | |
| 0.74 | 0.7499 | | 10.00% |
| | | 77,443,494 | 7,744,349 | |
| 0.75 | 0.7599 | | 10.00% |
| | | 80,541,234 | 8,054,123 | |
| 0.76 | 0.7699 | | 10.00% |
| | | 83,638,974 | 8,363,897 | |
| 0.77 | 0.7799 | | 12.00% |
| | | 86,736,713 | 10,408,406 | |
| 0.78 | 0.7899 | | 12.00% |
| | | 89,834,453 | 10,780,134 | |
| 0.79 | 0.7999 | | 12.00% |
| | | 92,932,193 | 11,151,863 | |
| 0.8 | 0.8099 | | 12.00% |
| | | 96,029,933 | 11,523,592 | |
| 0.81 | 0.8199 | | 12.00% |
| | | 99,127,672 | 11,895,321 | |
| 0.82 | 0.8299 | | 12.00% |
| | | 102,225,412 | 12,267,049 | |
| 0.83 | 0.8399 | | 12.00% |
| | | 105,323,152 | 12,638,778 | |
| 0.84 | 0.8499 | | 12.00% |
| | | 108,420,892 | 13,010,507 | |
| 0.85 | 0.8599 | | 12.00% |
| | | 111,518,631 | 13,382,236 | |
| 0.86 | 0.8699 | | 12.00% |
| | | 114,616,371 | 13,753,965 | |
| 0.87 | 0.8799 | | 12.00% |
| | | 117,714,111 | 14,125,693 | |

| 0.88 | 0.8899 | 120,811,851 | 14,497,422 | 12.00% |
|------|--------|-------------|------------|--------|
| 0.89 | 0.8999 | 123,909,590 | 14,869,151 | 12.00% |
| 0.9 | 0.9099 | 127,007,330 | 15,240,880 | 12.00% |
| 0.91 | 0.9199 | 130,105,070 | 17,564,184 | 13.50% |
| 0.92 | 0.9299 | 133,202,810 | 17,982,379 | 13.50% |
| 0.93 | 0.9399 | 136,300,549 | 18,400,574 | 13.50% |
| 0.94 | 0.9499 | 139,398,289 | 18,818,769 | 13.50% |
| 0.95 | 0.9599 | 142,496,029 | 19,236,964 | 13.50% |
| 0.96 | 0.9699 | 145,593,769 | 19,655,159 | 13.50% |
| 0.97 | 0.9799 | 148,691,509 | 20,073,354 | 13.50% |

The 2007 Fee Schedule

| DataRaps Proposal Analysis - Annuity Payment | | | | |
|---|---|---|---|---|
| Assumptions | | | | |
| Revised Mem Assumpt | 43,204 | | | |
| Demo 2005 Projected PMPM | 708.690 | | | |
| Demo 2006 Projected PMPM | 709.170 | | | |
| Risk 2005 Projected PMPM | 749.750 | Same schedule as Year one | | |
| Risk 2006 Projected PMPM | 796.670 | | | |
| Total 2005 Projected PMPM | 729.220 | | | |
| Total 2006 Projected PMPM | 774.795 | | | |
| Current HCC RAF | 0.490 | | | |
| Demo Comp06 Projected Rev | 91,916,942 | | | |
| Risk Comp 06 Projected Rev | 309,773,976 | | | |
| | | | If threshold is maintained | If threshold is maintained |
| | | | Payable July 2007 | Payable July 2009 |
| | | WMMI DataRap % | WMMI DataRap fee | WMMI DataRap fee | WMMI DataRap fee |
| July Direct HCCRAF | | | | |
| 0.5 | 0.5099 | 5.00% | 206,516 | 103,258 | 51,629 |
| 0.51 | 0.5199 | 5.00% | 413,032 | 206,516 | 103,258 |

| | | | | | |
|---|---|---|---|---|---|
| 0.52 | 0.5299 | 5.00% | | | |
| | | | 619,548 | 309,774 | 154,887 |
| 0.53 | 0.5399 | 7.50% | | | |
| | | | 1,239,096 | 619,548 | 309,774 |
| 0.54 | 0.5499 | 7.50% | | | |
| | | | 1,548,870 | 774,435 | 387,217 |
| 0.55 | 0.5599 | 7.50% | | | |
| | | | 1,858,644 | 929,322 | 464,661 |
| 0.56 | 0.5699 | 7.50% | | | |
| | | | 2,168,418 | 1,084,209 | 542,104 |
| 0.57 | 0.5799 | 7.50% | | | |
| | | | 2,478,192 | 1,239,096 | 619,548 |
| 0.58 | 0.5899 | 7.50% | | | |
| | | | 2,787,966 | 1,393,983 | 696,991 |
| 0.59 | 0.5999 | 7.50% | | | |
| | | | 3,097,740 | 1,548,870 | 774,435 |
| 0.6 | 0.6099 | 7.50% | | | |
| | | | 3,407,514 | 1,703,757 | 851,878 |
| 0.61 | 0.6199 | 7.50% | | | |
| | | | 3,717,288 | 1,858,644 | 929,322 |
| 0.62 | 0.6299 | 7.50% | | | |
| | | | 4,027,062 | 2,013,531 | 1,006,765 |
| 0.63 | 0.6399 | 7.50% | | | |
| | | | 4,336,836 | 2,168,418 | 1,084,209 |
| 0.64 | 0.6499 | 7.50% | | | |
| | | | 4,646,610 | 2,323,305 | 1,161,652 |
| 0.65 | 0.6599 | 10.00% | | | |
| | | | 6,608,511 | 3,304,256 | 1,652,128 |
| 0.66 | 0.6699 | 10.00% | | | |
| | | | 7,021,543 | 3,510,772 | 1,755,386 |
| 0.67 | 0.6799 | 10.00% | | | |
| | | | 7,434,575 | 3,717,288 | 1,858,644 |
| 0.68 | 0.6899 | 10.00% | | | |
| | | | 7,847,607 | 3,923,804 | 1,961,902 |
| 0.69 | 0.6999 | 10.00% | | | |
| | | | 8,260,639 | 4,130,320 | 2,065,160 |
| 0.7 | 0.7099 | 10.00% | | | |
| | | | 8,673,671 | 4,336,836 | 2,168,418 |
| 0.71 | 0.7199 | 10.00% | | | |
| | | | 9,086,703 | 4,543,352 | 2,271,676 |
| 0.72 | 0.7299 | 10.00% | | | |
| | | | 9,499,735 | 4,749,868 | 2,374,934 |
| 0.73 | 0.7399 | 10.00% | | | |
| | | | 9,912,767 | 4,956,384 | 2,478,192 |
| 0.74 | 0.7499 | 10.00% | | | |
| | | | 10,325,799 | 5,162,900 | 2,581,450 |
| 0.75 | 0.7599 | 10.00% | | | |
| | | | 10,738,831 | 5,369,416 | 2,684,708 |
| 0.76 | 0.7699 | 10.00% | | | |
| | | | 11,151,863 | 5,575,932 | 2,787,966 |
| 0.77 | 0.7799 | 12.00% | | | |
| | | | 13,877,874 | 6,938,937 | 3,469,469 |
| 0.78 | 0.7899 | 12.00% | | | |
| | | | 14,373,512 | 7,186,756 | 3,593,378 |
| 0.79 | 0.7999 | 12.00% | | | |
| | | | 14,869,151 | 7,434,575 | 3,717,288 |
| 0.8 | 0.8099 | 12.00% | | | |
| | | | 15,364,789 | 7,682,395 | 3,841,197 |
| 0.81 | 0.8199 | 12.00% | | | |
| | | | 15,860,428 | 7,930,214 | 3,965,107 |
| 0.82 | 0.8299 | 12.00% | | | |
| | | | 16,356,066 | 8,178,033 | 4,089,016 |

SANANTONIO 439038v7 51445-00007

45

| 0.83 | 0.8399 | 12.00% | | | |
|---|---|---|---|---|---|
| | | | 16,851,704 | 8,425,852 | 4,212,926 |
| 0.84 | 0.8499 | 12.00% | | | |
| | | | 17,347,343 | 8,673,671 | 4,336,836 |
| 0.85 | 0.8599 | 12.00% | | | |
| | | | 17,842,981 | 8,921,491 | 4,460,745 |
| 0.86 | 0.8699 | 12.00% | | | |
| | | | 18,338,619 | 9,169,310 | 4,584,655 |
| 0.87 | 0.8799 | 12.00% | | | |
| | | | 18,834,258 | 9,417,129 | 4,708,564 |
| 0.88 | 0.8899 | 12.00% | | | |
| | | | 19,329,896 | 9,664,948 | 4,832,474 |
| 0.89 | 0.8999 | 12.00% | | | |
| | | | 19,825,534 | 9,912,767 | 4,956,384 |
| 0.9 | 0.9099 | 12.00% | | | |
| | | | 20,321,173 | 10,160,586 | 5,080,293 |
| 0.91 | 0.9199 | 13.50% | | | |
| | | | 23,418,913 | 11,709,456 | 5,854,728 |
| 0.92 | 0.9299 | 13.50% | | | |
| | | | 23,976,506 | 11,988,253 | 5,994,126 |
| 0.93 | 0.9399 | 13.50% | | | |
| | | | 24,534,099 | 12,267,049 | 6,133,525 |
| 0.94 | 0.9499 | 13.50% | | | |
| | | | 25,091,692 | 12,545,846 | 6,272,923 |
| 0.95 | 0.9599 | 13.50% | | | |
| | | | 25,649,285 | 12,824,643 | 6,412,321 |
| 0.96 | 0.9699 | 13.50% | | | |
| | | | 26,206,878 | 13,103,439 | 6,551,720 |
| 0.97 | 0.9799 | 13.50% | | | |
| | | | 26,764,472 | 13,382,236 | 6,691,118 |

2008 Fee Schedule Example 2

| DataRaps Proposal Analysis - Annuity Payment | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| Assumptions | | | | | |
| Revised Membership Assumptions | 43,204 | * In 2008 the fee schedule resets to the new April benchmark number. The new number may not be less than the September benchmark. | | | |
| Demo 2005 Projected PMPM | 708.690 | | | | |
| Demo 2006 Projected PMPM | 709.170 | | | | |
| Risk 2005 Projected PMPM | 749.750 | | | | |
| Risk 2006 Projected PMPM | 828.537 | | | | |
| Total 2005 Projected PMPM | 729.220 | | | | |

| | | | Total 2006 Projected PMPM | 798.695 | | | |

| Total 2006 Projected PMPM | 798.695 | | | |
|---|---|---|---|---|
| Current HCC RAF | 0.580 | * | | |
| Demo Component 2006 Projected Revenue | 91,916,942 | | | |
| Risk Component 2006 Projected Revenue | 322,164,935 | | If threshold is maintained | If threshold is maintained |
| Total 2006 Projected Revenue | 414,081,877 | | | |

| | | | Payable July 2008 | Payable July 2009 | Payable July 2010 |
|---|---|---|---|---|---|
| | | PCTX Incremental | WMMI DataRap | WMMI DataRap | WMMI DataRap |
| | | Revenue 2007 and 08 @ 100% | fee | fee | fee |
| 0.59 | 0.6 | 4,295,532 | 429,553 | 214,777 | 107,388 |
| 0.6 | 0.61 | 8,591,065 | 859,106 | 429,553 | 214,777 |
| 0.61 | 0.62 | 12,886,597 | 1,288,660 | 644,330 | 322,165 |
| 0.62 | 0.63 | 17,182,130 | 1,718,213 | 859,106 | 429,553 |
| 0.63 | 0.64 | 21,477,662 | 2,147,766 | 1,073,883 | 536,942 |
| 0.64 | 0.65 | 25,773,195 | 2,577,319 | 1,288,660 | 644,330 |
| 0.65 | 0.66 | 30,068,727 | 3,006,873 | 1,503,436 | 751,718 |
| 0.66 | 0.67 | 34,364,260 | 3,436,426 | 1,718,213 | 859,106 |
| 0.67 | 0.68 | 38,659,792 | 3,865,979 | 1,932,990 | 966,495 |
| 0.68 | 0.69 | 42,955,325 | 4,295,532 | 2,147,766 | 1,073,883 |
| 0.69 | 0.7 | 47,250,857 | 4,725,086 | 2,362,543 | 1,181,271 |
| 0.7 | 0.71 | 51,546,390 | 5,154,639 | 2,577,319 | 1,288,660 |
| 0.71 | 0.72 | 55,841,922 | 6,701,031 | 3,350,515 | 1,675,258 |
| 0.72 | 0.73 | 60,137,455 | 7,216,495 | 3,608,247 | 1,804,124 |
| 0.73 | 0.74 | 64,432,987 | 7,731,958 | 3,865,979 | 1,932,990 |
| 0.74 | 0.75 | 68,728,520 | 8,247,422 | 4,123,711 | 2,061,856 |
| 0.75 | 0.76 | 73,024,052 | 8,762,886 | 4,381,443 | 2,190,722 |

460

| | | | | | |
|---|---|---|---|---|---|
| 0.76 | 0.77 | 77,319,584 | 9,278,350 | 4,639,175 | 2,319,588 |
| 0.77 | 0.78 | 81,615,117 | 9,793,814 | 4,896,907 | 2,448,454 |
| 0.78 | 0.79 | 85,910,649 | 10,309,278 | 5,154,639 | 2,577,319 |
| 0.79 | 0.8 | 90,206,182 | 10,824,742 | 5,412,371 | 2,706,185 |
| 0.8 | 0.81 | 94,501,714 | 11,340,206 | 5,670,103 | 2,835,051 |
| 0.81 | 0.82 | 98,797,247 | 11,855,670 | 5,927,835 | 2,963,917 |
| 0.82 | 0.83 | 103,092,779 | 12,371,134 | 6,185,567 | 3,092,783 |
| 0.83 | 0.84 | 107,388,312 | 12,886,597 | 6,443,299 | 3,221,649 |
| 0.84 | 0.85 | 111,683,844 | 13,402,061 | 6,701,031 | 3,350,515 |
| 0.85 | 0.86 | 115,979,377 | 15,657,216 | 7,828,608 | 3,914,304 |
| 0.86 | 0.87 | 120,274,909 | 16,237,113 | 8,118,556 | 4,059,278 |
| 0.87 | 0.88 | 124,570,442 | 16,817,010 | 8,408,505 | 4,204,252 |
| 0.88 | 0.89 | 128,865,974 | 17,396,906 | 8,698,453 | 4,349,227 |
| 0.89 | 0.9 | 133,161,507 | 17,976,803 | 8,988,402 | 4,494,201 |
| 0.9 | 0.91 | 137,457,039 | 18,556,700 | 9,278,350 | 4,639,175 |
| 0.91 | 0.92 | 141,752,571 | 19,136,597 | 9,568,299 | 4,784,149 |
| 0.92 | 0.93 | 146,048,104 | 19,716,494 | 9,858,247 | 4,929,124 |
| 0.93 | 0.94 | 150,343,636 | 20,296,391 | 10,148,195 | 5,074,098 |
| 0.94 | 0.95 | 154,639,169 | 20,876,288 | 10,438,144 | 5,219,072 |
| 0.95 | 0.96 | 158,934,701 | 21,456,185 | 10,728,092 | 5,364,046 |
| 0.96 | 0.97 | 163,230,234 | 22,036,082 | 11,018,041 | 5,509,020 |
| 0.97 | 0.98 | 167,525,766 | 22,615,978 | 11,307,989 | 5,653,995 |

2008 Fee Schedule Example 3

| DataRaps Proposal Analysis - Annuity Payment | | | | |
|---|---|---|---|---|
| | | | | |
| Assumptions | | | | |
| Initial Membership Assumptions | 10,000 | | | |
| Revised Membership Assumptions | | | | |
| Demo 2005 Projected PMPM | 708.690 | | | |
| Demo 2006 Projected PMPM | 709.170 | | | |
| Risk 2005 Projected PMPM | 749.750 | | | |
| Risk 2006 Projected PMPM | 828.537 | | | |
| Total 2005 Projected PMPM | 729.220 | | | |

| | | | | |
|---|---|---|---|---|
| 0.67 | 0.6799 | | | |
| | | 3,436,426 | 1,718,213 | 859,106 |
| 0.68 | 0.6899 | | | |
| | | 3,865,979 | 1,932,990 | 966,495 |
| 0.69 | 0.6999 | | | |
| | | 4,295,532 | 2,147,766 | 1,073,883 |
| 0.7 | 0.7099 | | | |
| | | 4,725,086 | 2,362,543 | 1,181,271 |
| 0.71 | 0.7199 | | | |
| | | 6,185,567 | 3,092,783 | 1,546,392 |
| 0.72 | 0.7299 | | | |
| | | 6,701,031 | 3,350,515 | 1,675,258 |
| 0.73 | 0.7399 | | | |
| | | 7,216,495 | 3,608,247 | 1,804,124 |
| 0.74 | 0.7499 | | | |
| | | 7,731,958 | 3,865,979 | 1,932,990 |
| 0.75 | 0.7599 | | | |
| | | 8,247,422 | 4,123,711 | 2,061,856 |
| 0.76 | 0.7699 | | | |
| | | 8,762,886 | 4,381,443 | 2,190,722 |
| 0.77 | 0.7799 | | | |
| | | 9,278,350 | 4,639,175 | 2,319,588 |
| 0.78 | 0.7899 | | | |
| | | 9,793,814 | 4,896,907 | 2,448,454 |
| 0.79 | 0.7999 | | | |
| | | 10,309,278 | 5,154,639 | 2,577,319 |
| 0.8 | 0.8099 | | | |
| | | 10,824,742 | 5,412,371 | 2,706,185 |
| 0.81 | 0.8199 | | | |
| | | 11,340,206 | 5,670,103 | 2,835,051 |
| 0.82 | 0.8299 | | | |
| | | 11,855,670 | 5,927,835 | 2,963,917 |
| 0.83 | 0.8399 | | | |
| | | 12,371,134 | 6,185,567 | 3,092,783 |
| 0.84 | 0.8499 | | | |
| | | 12,886,597 | 6,443,299 | 3,221,649 |
| 0.85 | 0.8599 | | | |
| | | 15,077,319 | 7,538,659 | 3,769,330 |
| 0.86 | 0.8699 | | | |
| | | 15,657,216 | 7,828,608 | 3,914,304 |
| 0.87 | 0.8799 | | | |
| | | 16,237,113 | 8,118,556 | 4,059,278 |
| 0.88 | 0.8899 | | | |
| | | 16,817,010 | 8,408,505 | 4,204,252 |
| 0.89 | 0.8999 | | | |
| | | 17,396,906 | 8,698,453 | 4,349,227 |
| 0.9 | 0.9099 | | | |
| | | 17,976,803 | 8,988,402 | 4,494,201 |
| 0.91 | 0.9199 | | | |
| | | 18,556,700 | 9,278,350 | 4,639,175 |
| 0.92 | 0.9299 | | | |
| | | 19,136,597 | 9,568,299 | 4,784,149 |
| 0.93 | 0.9399 | | | |
| | | 19,716,494 | 9,858,247 | 4,929,124 |
| 0.94 | 0.9499 | | | |
| | | 20,296,391 | 10,148,195 | 5,074,098 |
| 0.95 | 0.9599 | | | |
| | | 20,876,288 | 10,438,144 | 5,219,072 |
| 0.96 | 0.9699 | | | |
| | | 21,456,185 | 10,728,092 | 5,364,046 |
| 0.97 | 0.9799 | | | |
| | | 22,036,082 | 11,018,041 | 5,509,020 |

2008 Fee Schedule Example 4

| DataRaps Proposal Analysis - Annuity Payment | | | | |
|---|---|---|---|---|
| Assumptions | | | | |
| Initial Membership Assumptions | 10,000 | | | |
| Revised Membership Assumptions | 43,204 | * In 2008 the fee schedule resets to the new April benchmark number. The new number may not be less than the September benchmark. | | |
| Demo 2005 Projected PMPM | 708.690 | | | |
| Demo 2006 Projected PMPM | 709.170 | | | |
| Risk 2005 Projected PMPM | 749.750 | | | |
| Risk 2006 Projected PMPM | 828.537 | | | |
| Total 2005 Projected PMPM | 729.220 | | | |
| Total 2006 Projected PMPM | 798.695 | | | |
| Current HCC RAF | 0.520 | * | | |
| Demo Component 2006 Projected Revenue | | | | |
| Risk Component 2006 Projected Revenue | | | | |
| Total 2006 Projected Revenue | 414,081,877 | | | |

| | | WMMI DataRap | Payable July 2008 WMMI DataRap fee | Payable July 2008 WMMI DataRap fee | Payable July 2009 WMMI DataRap fee |
|---|---|---|---|---|---|
| | | % | | | |
| 0.44 | 0.4499 | 5.00% | (1,718,213) | (859,106) | (429,553) |
| 0.45 | 0.4599 | 5.00% | (1,503,436) | (751,718) | (375,859) |
| 0.46 | 0.4699 | 5.00% | (1,288,660) | (644,330) | (322,165) |
| 0.47 | 0.4799 | 7.50% | (1,610,825) | (805,412) | (402,706) |
| 0.48 | 0.4899 | 7.50% | (1,288,660) | (644,330) | (322,165) |
| 0.49 | 0.4999 | 7.50% | (966,495) | (483,247) | (241,624) |
| 0.5 | 0.5099 | 7.50% | (644,330) | (322,165) | (161,082) |
| 0.51 | 0.5199 | 7.50% | (322,165) | (161,082) | (80,541) |
| 0.52 | 0.5299 | 7.50% | - | - | - |
| 0.53 | 0.5399 | 7.50% | 322,165 | 161,082 | 80,541 |
| 0.54 | 0.5499 | 7.50% | 644,330 | 322,165 | 161,082 |
| 0.55 | 0.5599 | 7.50% | 966,495 | 483,247 | 241,624 |

| | | | | | |
|---|---|---|---|---|---|
| 0.56 | 0.5699 | 7.50% | | | |
| | | | 1,288,660 | 644,330 | 322,165 |
| 0.57 | 0.5799 | 7.50% | | | |
| | | | 1,610,825 | 805,412 | 402,706 |
| 0.58 | 0.5899 | 7.50% | | | |
| | | | 1,932,990 | 966,495 | 483,247 |
| 0.59 | 0.5999 | 10.00% | | | |
| | | | 3,006,873 | 1,503,436 | 751,718 |
| 0.6 | 0.6099 | 10.00% | | | |
| | | | 3,436,426 | 1,718,213 | 859,106 |
| 0.61 | 0.6199 | 10.00% | | | |
| | | | 3,865,979 | 1,932,990 | 966,495 |
| 0.62 | 0.6299 | 10.00% | | | |
| | | | 4,295,532 | 2,147,766 | 1,073,883 |
| 0.63 | 0.6399 | 10.00% | | | |
| | | | 4,725,086 | 2,362,543 | 1,181,271 |
| 0.64 | 0.6499 | 10.00% | | | |
| | | | 5,154,639 | 2,577,319 | 1,288,660 |
| 0.65 | 0.6599 | 10.00% | | | |
| | | | 5,584,192 | 2,792,096 | 1,396,048 |
| 0.66 | 0.6699 | 10.00% | | | |
| | | | 6,013,745 | 3,006,873 | 1,503,436 |
| 0.67 | 0.6799 | 10.00% | | | |
| | | | 6,443,299 | 3,221,649 | 1,610,825 |
| 0.68 | 0.6899 | 10.00% | | | |
| | | | 6,872,852 | 3,436,426 | 1,718,213 |
| 0.69 | 0.6999 | 10.00% | | | |
| | | | 7,302,405 | 3,651,203 | 1,825,601 |
| 0.7 | 0.7099 | 10.00% | | | |
| | | | 7,731,958 | 3,865,979 | 1,932,990 |
| 0.71 | 0.7199 | 12.00% | | | |
| | | | 9,793,814 | 4,896,907 | 2,448,454 |
| 0.72 | 0.7299 | 12.00% | | | |
| | | | 10,309,278 | 5,154,639 | 2,577,319 |
| 0.73 | 0.7399 | 12.00% | | | |
| | | | 10,824,742 | 5,412,371 | 2,706,185 |
| 0.74 | 0.7499 | 12.00% | | | |
| | | | 11,340,206 | 5,670,103 | 2,835,051 |
| 0.75 | 0.7599 | 12.00% | | | |
| | | | 11,855,670 | 5,927,835 | 2,963,917 |
| 0.76 | 0.7699 | 12.00% | | | |
| | | | 12,371,134 | 6,185,567 | 3,092,783 |
| 0.77 | 0.7799 | 12.00% | | | |
| | | | 12,886,597 | 6,443,299 | 3,221,649 |
| 0.78 | 0.7899 | 12.00% | | | |
| | | | 13,402,061 | 6,701,031 | 3,350,515 |
| 0.79 | 0.7999 | 12.00% | | | |
| | | | 13,917,525 | 6,958,763 | 3,479,381 |
| 0.8 | 0.8099 | 12.00% | | | |
| | | | 14,432,989 | 7,216,495 | 3,608,247 |
| 0.81 | 0.8199 | 12.00% | | | |
| | | | 14,948,453 | 7,474,226 | 3,737,113 |
| 0.82 | 0.8299 | 12.00% | | | |
| | | | 15,463,917 | 7,731,958 | 3,865,979 |
| 0.83 | 0.8399 | 12.00% | | | |
| | | | 15,979,381 | 7,989,690 | 3,994,845 |
| 0.84 | 0.8499 | 12.00% | | | |
| | | | 16,494,845 | 8,247,422 | 4,123,711 |
| 0.85 | 0.8599 | 13.50% | | | |
| | | | 19,136,597 | 9,568,299 | 4,784,149 |
| 0.86 | 0.8699 | 13.50% | | | |
| | | | 19,716,494 | 9,858,247 | 4,929,124 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 0.87 | 0.8799 | 13.50% | | | | |
| | | | 20,296,391 | 10,148,195 | | 5,074,098 |
| 0.88 | 0.8899 | 13.50% | | | | |
| | | | 20,876,288 | 10,438,144 | | 5,219,072 |
| 0.89 | 0.8999 | 13.50% | | | | |
| | | | 21,456,185 | 10,728,092 | | 5,364,046 |
| 0.9 | 0.9099 | 13.50% | | | | |
| | | | 22,036,082 | 11,018,041 | | 5,509,020 |
| 0.91 | 0.9199 | 13.50% | | | | |
| | | | 22,615,978 | 11,307,989 | | 5,653,995 |
| 0.92 | 0.9299 | 13.50% | | | | |
| | | | 23,195,875 | 11,597,938 | | 5,798,969 |
| 0.93 | 0.9399 | 13.50% | | | | |
| | | | 23,775,772 | 11,887,886 | | 5,943,943 |
| 0.94 | 0.9499 | 13.50% | | | | |
| | | | 24,355,669 | 12,177,835 | | 6,088,917 |
| 0.95 | 0.9599 | 13.50% | | | | |
| | | | 24,935,566 | 12,467,783 | | 6,233,891 |
| 0.96 | 0.9699 | 13.50% | | | | |
| | | | 25,515,463 | 12,757,731 | | 6,378,866 |
| 0.97 | 0.9799 | 13.50% | | | | |
| | | | 26,095,360 | 13,047,680 | | 6,523,840 |

**2008 Example 5**

| DataRaps Proposal Analysis - Annuity Payment | | | | | |
|---|---|---|---|---|---|
| Assumptions | | | | | |
| Initial Membership Assumptions | | | | | |
| Revised Membership Assumptions | | | | | |
| Demo 2005 Projected PMPM | | | | | |
| Demo 2006 Projected PMPM | | | | | |
| Risk 2005 Projected PMPM | | | | | |
| Risk 2006 Projected PMPM | | | | | |
| Total 2005 Projected PMPM | | | | | |
| Total 2006 Projected PMPM | | | | | |
| Current HCC RAF | | 0.520 | * In 2008 the fee schedule resets to the new April benchmark number. The new number may not be less than the September benchmark. | | |
| Demo Component 2006 Projected Revenue | | | | | |
| Risk Component 2006 Projected Revenue | | | | | |
| Total 2006 Projected Revenue | | | | | |
| | | | Payable July 2008 | | Payable July 2009 |
| | | WMMI DataRap | WMMI DataRap | WMMI DataRap | WMMI DataRap |
| | | % | fee | fee | fee |
| 0.44 | 0.4499 | 5.00% | | | |
| | | | (1,718,213) | (859,106) | (429,553) |
| 0.45 | 0.4599 | 5.00% | | | |
| | | | (1,503,436) | (751,718) | (375,859) |
| 0.46 | 0.4699 | 5.00% | | | |
| | | | (1,288,660) | (644,330) | (322,165) |
| 0.47 | 0.4799 | 7.50% | | | |
| | | | (1,610,825) | (805,412) | (402,706) |
| 0.48 | 0.4899 | 7.50% | | | |
| | | | (1,288,660) | (644,330) | (322,165) |
| 0.49 | 0.4999 | 7.50% | | | |
| | | | (966,495) | (483,247) | (241,624) |

465

| | | | | | |
|---|---|---|---|---|---|
| 0.5 | 0.5099 | 7.50% | | | (161,082) |
| | | | (644,330) | (322,165) | |
| 0.51 | 0.5199 | 7.50% | | | (80,541) |
| | | | (322,165) | (161,082) | |
| 0.52 | 0.5299 | 7.50% | | | - |
| | | | - | - | |
| 0.53 | 0.5399 | 7.50% | | | 80,541 |
| | | | 322,165 | 161,082 | |
| 0.54 | 0.5499 | 7.50% | | | 161,082 |
| | | | 644,330 | 322,165 | |
| 0.55 | 0.5599 | 7.50% | | | 241,624 |
| | | | 966,495 | 483,247 | |
| 0.56 | 0.5699 | 7.50% | | | 322,165 |
| | | | 1,288,660 | 644,330 | |
| 0.57 | 0.5799 | 7.50% | | | 402,706 |
| | | | 1,610,825 | 805,412 | |
| 0.58 | 0.5899 | 7.50% | | | 483,247 |
| | | | 1,932,990 | 966,495 | |
| 0.59 | 0.5999 | 10.00% | | | 751,718 |
| | | | 3,006,873 | 1,503,436 | |
| 0.6 | 0.6099 | 10.00% | | | 859,106 |
| | | | 3,436,426 | 1,718,213 | |
| 0.61 | 0.6199 | 10.00% | | | 966,495 |
| | | | 3,865,979 | 1,932,990 | |
| 0.62 | 0.6299 | 10.00% | | | 1,073,883 |
| | | | 4,295,532 | 2,147,766 | |
| 0.63 | 0.6399 | 10.00% | | | 1,181,271 |
| | | | 4,725,086 | 2,362,543 | |
| 0.64 | 0.6499 | 10.00% | | | 1,288,660 |
| | | | 5,154,639 | 2,577,319 | |
| 0.65 | 0.6599 | 10.00% | | | 1,396,048 |
| | | | 5,584,192 | 2,792,096 | |
| 0.66 | 0.6699 | 10.00% | | | 1,503,436 |
| | | | 6,013,745 | 3,006,873 | |
| 0.67 | 0.6799 | 10.00% | | | 1,610,825 |
| | | | 6,443,299 | 3,221,649 | |
| 0.68 | 0.6899 | 10.00% | | | 1,718,213 |
| | | | 6,872,852 | 3,436,426 | |
| 0.69 | 0.6999 | 10.00% | | | 1,825,601 |
| | | | 7,302,405 | 3,651,203 | |
| 0.7 | 0.7099 | 10.00% | | | 1,932,990 |
| | | | 7,731,958 | 3,865,979 | |
| 0.71 | 0.7199 | 12.00% | | | 2,448,454 |
| | | | 9,793,814 | 4,896,907 | |
| 0.72 | 0.7299 | 12.00% | | | 2,577,319 |
| | | | 10,309,278 | 5,154,639 | |
| 0.73 | 0.7399 | 12.00% | | | 2,706,185 |
| | | | 10,824,742 | 5,412,371 | |
| 0.74 | 0.7499 | 12.00% | | | 2,835,051 |
| | | | 11,340,206 | 5,670,103 | |
| 0.75 | 0.7599 | 12.00% | | | 2,963,917 |
| | | | 11,855,670 | 5,927,835 | |
| 0.76 | 0.7699 | 12.00% | | | 3,092,783 |
| | | | 12,371,134 | 6,185,567 | |
| 0.77 | 0.7799 | 12.00% | | | 3,221,649 |
| | | | 12,886,597 | 6,443,299 | |
| 0.78 | 0.7899 | 12.00% | | | 3,350,515 |
| | | | 13,402,061 | 6,701,031 | |
| 0.79 | 0.7999 | 12.00% | | | 3,479,381 |
| | | | 13,917,525 | 6,958,763 | |
| 0.8 | 0.8099 | 12.00% | | | 3,608,247 |
| | | | 14,432,989 | 7,216,495 | |

| 0.81 | 0.8199 | 12.00% | | | | 3,737,113 |
| | | | 14,948,453 | 7,474,226 | | |
| 0.82 | 0.8299 | 12.00% | | | | 3,865,979 |
| | | | 15,463,917 | 7,731,958 | | |
| 0.83 | 0.8399 | 12.00% | | | | 3,994,845 |
| | | | 15,979,381 | 7,989,690 | | |
| 0.84 | 0.8499 | 12.00% | | | | 4,123,711 |
| | | | 16,494,845 | 8,247,422 | | |
| 0.85 | 0.8599 | 13.50% | | | | 4,784,149 |
| | | | 19,136,597 | 9,568,299 | | |
| 0.86 | 0.8699 | 13.50% | | | | 4,929,124 |
| | | | 19,716,494 | 9,858,247 | | |
| 0.87 | 0.8799 | 13.50% | | | | 5,074,098 |
| | | | 20,296,391 | 10,148,195 | | |
| 0.88 | 0.8899 | 13.50% | | | | 5,219,072 |
| | | | 20,876,288 | 10,438,144 | | |
| 0.89 | 0.8999 | 13.50% | | | | 5,364,046 |
| | | | 21,456,185 | 10,728,092 | | |
| 0.9 | 0.9099 | 13.50% | | | | 5,509,020 |
| | | | 22,036,082 | 11,018,041 | | |
| 0.91 | 0.9199 | 13.50% | | | | 5,653,995 |
| | | | 22,615,978 | 11,307,989 | | |
| 0.92 | 0.9299 | 13.50% | | | | 5,798,969 |
| | | | 23,195,875 | 11,597,938 | | |
| 0.93 | 0.9399 | 13.50% | | | | 5,943,943 |
| | | | 23,775,772 | 11,887,886 | | |
| 0.94 | 0.9499 | 13.50% | | | | 6,088,917 |
| | | | 24,355,669 | 12,177,835 | | |
| 0.95 | 0.9599 | 13.50% | | | | 6,233,891 |
| | | | 24,935,566 | 12,467,783 | | |
| 0.96 | 0.9699 | 13.50% | | | | 6,378,866 |
| | | | 25,515,463 | 12,757,731 | | |
| 0.97 | 0.9799 | 13.50% | | | | 6,523,840 |
| | | | 26,095,360 | 13,047,680 | | |