1  CHAD A. READLER
   Acting Assistant Attorney General, Civil Division
2  SANDRA R. BROWN
   Acting United States Attorney
3  DOROTHY A. SCHOUTEN
   DAVID K. BARRETT
4  LINDA A. KONTOS
   JOHN E. LEE (CBN 128696)
5  Assistant United States Attorneys
        300 N. Los Angeles Street, Room 7516
6       Los Angeles, California 90012
        Tel: (213) 894-3995; Fax: (213) 894-7819
7       Email: john.lee2@usdoj.gov
   MICHAEL D. GRANSTON
8  DANIEL R. ANDERSON
   CAROL L. WALLACK
9  JESSICA KRIEG
   JUSTIN DRAYCOTT
10 PAUL PERKINS
   Attorneys, Civil Division
11 United States Department of Justice
        P.O. Box 261, Ben Franklin Station
12      Washington, D.C. 20044
        Tel: (202) 307-0486; Fax: (202) 307-3852
13      E-mail:  carol.wallack@usdoj.gov
   JAMES P. KENNEDY, JR.
14 Acting United States Attorney
   KATHLEEN ANN LYNCH
15 Assistant United States Attorney (Admitted PHV)
        138 Delaware Avenue
16      Buffalo, New York 14201
        Tel: (716) 843-5830; Fax: (716) 551-3052
17      E-mail:  kathleen.lynch@usdoj.gov
   Attorneys for the United States of America

18                UNITED STATES DISTRICT COURT

19          FOR THE CENTRAL DISTRICT OF CALIFORNIA

20                     WESTERN DIVISION

21

22 | | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING, | No. CV 16-08697 WMF (SSx) |
| Plaintiffs, | UNITED STATES' COMPLAINT-IN-PARTIAL-INTERVENTION AND DEMAND FOR JURY TRIAL |
| v. | |
| UNITEDHEALTH GROUP, INC., a Delaware corporation; UNITED HEALTHCARE SERVICES, INC., a Minnesota corporation; UNITED HEALTHCARE, INC., a Delaware corporation; UNITEDHEALTHCARE INSURANCE COMPANY, a | |

1   Connecticut corporation; UHIC
    HOLDINGS, INC., a Delaware
2   corporation; OVATIONS, INC., a
    Delaware corporation; OPTUM, INC. &
3   OPTUMINSIGHT, INC., Delaware
    corporations; and Defendants listed on
4   Exhibit 1,

5          Defendants.

6

7

8          This is a civil fraud action brought by the United States of America ("United

9   States" or "Government") to recover treble damages and civil penalties under the False

10  Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, as well as for restitution and common

11  law damages, for monies unlawfully obtained and/or retained from the federal Medicare

12  Program by Defendant UnitedHealth Group Inc. and various of its direct and indirect

13  subsidiaries involved in the Medicare Advantage Program ("United" or the "United

14  Defendants"). Having filed a notice of intervention pursuant to 31 U.S.C. § 3730(b)(4),

15  the United States alleges for its complaint-in-partial-intervention (the "Government's

16  Complaint" or "Complaint") as follows:

17                              **INTRODUCTION**

18  1.     Millions of elderly and disabled individuals throughout the United States receive

19  their Medicare benefits through the Medicare Advantage Program. A central,

20  distinguishing feature of the Medicare Advantage Program is the provision of Medicare

21  benefits by private healthcare insurance organizations. Medicare beneficiaries enroll in

22  managed healthcare insurance plans called Medicare Advantage Plans ("MA Plans") that

23  are owned and operated by these private organizations, called Medicare Advantage

24  Organizations ("MA Organizations"). This case involves conduct by United – the

25  nation's largest owner of MA Organizations – to improperly obtain or avoid returning

26  payments under the Medicare Advantage Program that it was not entitled to receive.

27  2.     The Government pays each MA Organization a fixed monthly payment for each

28  Medicare beneficiary enrolled in its plans. The Government adjusts these payments for

                                      2

various risk factors that affect expected healthcare expenditures, including the health status of each enrollee.  The adjustments are intended to ensure that MA Organizations are paid more for those enrollees expected to incur higher healthcare costs and less for healthier enrollees expected to incur lower costs.

3.    To obtain payments based on adjustments for health status, MA Organizations submit diagnosis codes to the Government for the beneficiaries in their MA Plans.  These diagnosis codes are from the beneficiaries' medical encounters (*e.g.*, office visits and hospital stays).  Using these diagnosis codes, the Government calculates a risk score for each beneficiary.  The beneficiary's risk score is then used to calculate monthly payments to the MA Organization for that beneficiary for the following year.  In general, the more numerous the conditions, and the more severe the conditions, the higher the risk score for a beneficiary and, thus, the greater the risk-adjusted payments made to the MA Organization for that beneficiary.

4.    This payment model creates powerful incentives for MA Organizations to over-report diagnosis codes in order to exaggerate the expected healthcare costs for their enrollees.  In order to combat these incentives and protect the Government from making erroneous payments to MA Organizations, the Government requires that submitted diagnoses be supported and validated by the beneficiaries' medical records.  It is a well-established requirement that all diagnosis codes submitted to the Medicare Program for risk adjustment payments must be unambiguously supported by information included in the beneficiaries' medical records.  United knew that these medical records are the "source of truth" for the purpose of receiving and retaining risk adjustment payments.

5.    In addition, each MA Organization must expressly certify that the diagnosis codes it has provided are accurate and truthful.  42 C.F.R. § 422.504(l)(2).  Each MA Organization must also "[a]dopt and implement an effective compliance program, which must include measures that prevent, detect, and correct non-compliance with [the Government's] program requirements as well as measures that prevent, detect, and correct fraud, waste, and abuse."  42 C.F.R. § 422.503(b)(4)(vi).

3

6.      Millions of elderly and disabled Medicare beneficiaries are enrolled in MA Plans that are owned and operated by United throughout the United States.  United is the nation's largest owner and operator of MA Plans.  Furthermore, in March 2017, approximately 229,000 Medicare beneficiaries in the Central District of California were enrolled in United's MA Plans, including those of Defendants UHC of California (previously known as PacifiCare of California) and Sierra Health and Life Insurance Company.

7.      The Government pays billions of taxpayer dollars each year to United for the Medicare beneficiaries enrolled in its MA Plans.  Risk adjustment payments account for a substantial amount of these dollars.  The diagnoses submitted by United drive a large percentage of the payments it receives from the Medicare Program.  It is not surprising then that United is not a passive conduit of diagnoses from healthcare providers to the Medicare Program.  Rather, for many years, United has conducted programs and engaged in other activities to increase the amount of risk adjustment payments from Medicare.  This includes programs and other efforts to directly influence both the number of diagnoses and the severity of the medical conditions reported by providers.  This also includes programs and efforts which do not involve the providers.

8.      In particular, for many years, United has conducted a very large national Chart Review Program to increase the risk adjustment payments it receives from Medicare.  For many years, this was United's biggest effort aimed at increasing risk adjustment payments.  During the last ten years, United increased the amount of risk adjustment payments that it received from the Medicare Program by collecting millions of medical records (also known as "charts") from providers and then employing diagnosis coders (also known as "chart reviewers") to review the medical records in order to mine for diagnoses that the providers themselves did not report to United for their patients in United's MA Plans.  United then submitted these additional diagnosis codes ("ADDS") to the Medicare Program for billions of dollars of additional risk adjustment payments.

4

9.      United's national Chart Review Program was strictly a one-sided revenue-generating program.  United did not review the beneficiaries' medical records in good faith in order to obtain a true and accurate picture of the health status of the beneficiaries in its MA Plans or to submit truthful and accurate risk adjustment data to the Government.  United used the results of the chart reviews to only increase government payments (*i.e.*, submit additional codes not reported by the providers) while in bad faith systemically ignoring other information from the chart reviews which would have led to decreased payments (*i.e.*, information about diagnoses reported by providers to United and then submitted by United to Medicare which were not supported and validated by the medical records).

10.     Yet, since at least 2005, United has known that a significant percentage of diagnoses reported by providers to it (hereinafter "provider-reported diagnoses") are invalid because the beneficiaries' medical records do not substantiate that the beneficiaries had the medical conditions identified by the diagnosis codes reported by the providers.  It knew this very early on from audits conducted by the Government and its own internal medical record reviews.  Despite this knowledge, United knowingly avoided "looking both ways" as part of its national Chart Review Program, except for a very limited time period when it "looked both ways" at some of its chart review results as part of its Claims Verification Program.  That is, United knowingly and improperly avoided comparing the diagnoses reported by the providers and submitted by it to the Government with the results of its coders' chart reviews to identify those provider-reported codes that were not supported by the beneficiaries' medical records.  United could and should have done this comparison and deleted its prior submission of these unsupported diagnoses, that is, made "DELETES."  If United had done so, the Medicare Program would not have made risk adjustment payments based on these unsupported diagnoses or, if it had already made the payments, it would have recovered them from United.

11.     By failing to "look both ways," United improperly generated and reported skewed data artificially inflating beneficiaries' risk scores, avoided negative payment adjustments, and retained payments to which it was not entitled.  The Government has conservatively estimated that, if United had "looked both ways," it would not have submitted or, if submitted, it would have deleted hundreds of thousands of invalid diagnoses and the Medicare Program would not have erroneously paid or would have recovered at least over a billion dollars in risk adjustment payments to which United was not entitled.

12.     By failing to "look both ways," United violated the FCA.  United knowingly presented or caused to be presented false or fraudulent claims to the Medicare Program; knowingly made or used or caused to be made or used false records or statements material to these false or fraudulent claims and to obligations to pay (*i.e.*, return) monies to the Medicare Program; knowingly concealed obligations to pay (*i.e.*, return) monies owed to the Medicare Program; and knowingly and improperly avoided or decreased obligations to pay (*i.e.*, return) monies owed to the Medicare Program.

13.     In addition, United violated the FCA by deliberately ignoring or recklessly disregarding information from its Risk Adjustment Coding Compliance Review (RACCR) Program about invalid diagnoses reported to it by certain of its "incentivized" providers, including certain capitated and gainsharing providers.

14.     United paid its providers through a variety of arrangements.  United paid many large provider groups on a "capitated" basis.  It paid these capitated providers a "fixed" fee per beneficiary cared for by these providers; these fees generally were not dependent on the amount of services rendered by these providers.  Often the "fixed" fees were based on a percentage share of the payments that United received from the Medicare Program for the beneficiaries cared for by the "capitated" providers.  United's other providers were paid on a fee-for-service basis for each service (*e.g.*, office visit) they provided.  United, however, also entered into "gainsharing" agreements whereby it made incentive payments to some of its fee-for-serve providers.  These incentive payments

1  were based in whole or part on total revenues that United received from the Medicare

2  Program for the beneficiaries cared for by these gainsharing providers.

3  15.     United's agreements with gainsharing and with capitated providers incentivized

4  these providers to increase the number of diagnoses that they reported to United and to

5  report diagnoses for more severe medical conditions.  The more risk adjustment

6  payments obtained by United for the beneficiaries cared for by these providers, the more

7  money United paid to these providers pursuant to the gainsharing and capitation

8  agreements.

9  16.     United knew that these gainsharing and capitated providers had a financial

10  incentive increasing the risk of their reporting invalid diagnoses in order to increase their

11  own revenues.  In fact, based on the results of its own data analyses and medical record

12  reviews as part of its RACCR Program, United knew which incentivized providers were

13  actually or likely engaged in over-reporting diagnoses, including some providers located

14  in this District.  But it knowingly continued to submit diagnoses from these incentivized

15  providers to Medicare and knowingly and improperly avoided repaying Medicare for

16  risk adjustment payments based on invalid diagnoses from these providers, all in

17  violation of the FCA.

18  **JURISDICTION AND VENUE**

19  17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

20  § 1345 because the United States is the Plaintiff.  In addition, the Court has subject

21  matter jurisdiction over the FCA claims for relief under 28 U.S.C. §§ 1331 and 1345 and

22  31 U.S.C. § 3732(a)-(b) and supplement jurisdiction to entertain the common law and

23  equitable claims for relief under 28 U.S.C. § 1367(a).

24  18.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C.

25  § 3732(a) because at least one of the Defendants can be found in, resides in, transacts

26  business in, or has committed the alleged acts in the Central District of California.

27  19.     Venue also lies in this District pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C.

28  § 3732(a) because at least one of the Defendants can be found in, resides in, and

transacts business in this District, a substantial part of the events or omissions giving rise to the claims occurred in this District, and/or all of the Defendants are subject to the Court's personal jurisdiction under the FCA.

## PARTIES

### I.    Plaintiffs

20.    Plaintiff is the United States of America, suing on behalf of the United States Department of Health and Human Services ("HHS"), which includes its operating division, the Centers for Medicare and Medicaid Services ("CMS").  At all times relevant to this Complaint, CMS administered and supervised the Medicare Program and made risk adjustment payments to MA Organizations, including United and its affiliates, under Parts C and D of the Program.  The United States filed its notice of partial intervention in this action on February 14, 2017.

21.    The *qui tam* plaintiff ("Relator") is Benjamin Poehling, the former Director of Finance for UnitedHealthcare Medicare & Retirement (and its predecessor Ovations), which was the group at United that managed its MA Plans and its Medicare Part D Prescription Drug Programs.  From mid-2007 until he left United at the end of 2012, Poehling ran the risk adjustment team at UnitedHealthcare Medicare & Retirement.  He was one of United's management employees responsible for United's submission of claims to the Medicare Program for risk adjustment payments.  He was also one of United's management employees responsible for United's risk adjustment revenue-generating activities, including, but not limited to, United's national Chart Review Program.  Poehling expressed concerns to United's executives about United's failure to "look both ways" as a part of its Chart Review Program.  In March 2011, Poehling initiated this action by filing a complaint against United pursuant to the *qui tam* provisions of the FCA.  31 U.S.C. § 3730(b)(1).

### II.    Defendants

22.    Defendant UnitedHealth Group Inc. ("UHG") is a publicly traded Delaware corporation.  It is the parent company for all other United Defendants in this action.

8

1    UHG, the other United Defendants, and their affiliates have offices in various locations

2    throughout the United States, including in the Central District of California.  UHG's

3    healthcare insurance products, including those under Parts C and D of the Medicare

4    Program, are offered by, and UHG's MA Plans are managed by, various entities that are

5    UHG's direct or indirect subsidiaries, including, but not limited to, the other United

6    Defendants identified below.  UHG controls all of these entities.

7    23.    UHG and its direct and indirect subsidiaries and affiliates operate MA Plans in all

8    fifty states and the District of Columbia.  As of December 31, 2008, United had

9    approximately 1.5 million Medicare beneficiaries enrolled in its plans under Part C of

10   the Medicare Program and millions of additional beneficiaries enrolled in its prescription

11   drug benefit plans under Part D of the Medicare Program.  As of December 31, 2009,

12   United had approximately 1.8 million Medicare beneficiaries enrolled in its plans under

13   Part C of the Medicare Program and millions of additional beneficiaries enrolled in its

14   prescription drug benefit plans under Part D of the Medicare Program.  As of December

15   31, 2010, United had approximately 2.1 million beneficiaries in its plans under Part C of

16   the Medicare Program and millions of additional beneficiaries in its drug benefit plans

17   under Part D.  As of December 31, 2011, United had 2.2 million beneficiaries in its plans

18   under Part C and millions of additional beneficiaries in its plans under Part D.  As of

19   December 31, 2012, United had approximately 2.6 million beneficiaries in its Part C

20   plans and millions of additional beneficiaries in its Part D plans.  In 2013, 2014, and

21   2015 United had approximately 3 million beneficiaries in its Part C plans and

22   approximately 8 million in its Part D plans.  In 2013, United's revenues from Part C and

23   D of the Medicare Program were approximately $44 billion.  In 2014, United's revenues

24   from Parts C and D of the Medicare Program were approximately $46 billion.  In 2015,

25   United's revenues from Parts C and D of the Medicare Program were approximately $50

26   billion.  In 2016, United had approximately 3.6 million beneficiaries in its Part C plans,

27   and approximately 8.6 million beneficiaries in its Part D plans.  For 2016, United's

28   revenues from Parts C and D of the Medicare Program were approximately $56 billion.

24.     United's Medicare Part C and D managed healthcare insurance products are offered by it through various entities that are direct and indirect subsidiaries of UHG, including, but not limited to, Defendants UnitedHealthcare Insurance Company, Defendant UnitedHealthcare, Inc., Defendant United HealthCare Services, Inc., Defendant UHIC Holdings, Inc., and the Defendant MA Plans.

25.     Defendant UnitedHealthcare Insurance Company is a Connecticut corporation, a direct subsidiary of Defendant UHIC Holdings, Inc., and an indirect subsidiary of Defendant UHG.

26.     Defendant UHIC Holdings, Inc. is a Delaware corporation, a direct subsidiary of Defendant United HealthCare Services, Inc., and an indirect subsidiary of Defendant UHG.

27.     Defendant UnitedHealthcare, Inc. is a Delaware corporation, a direct subsidiary of Defendant United HealthCare Services, Inc., and an indirect subsidiary of Defendant UHG.

28.     Defendant United HealthCare Services, Inc. is a Minnesota corporation and a direct or indirect subsidiary of Defendant UHG.  Defendant United HealthCare Services, Inc. is also the successor to PacifiCare Health Systems, LLC and PacifiCare Health Plan Administrators, Inc., which were the direct or indirect parents of PacifiCare of California and the other PacifiCare MA Plans acquired by United in 2005.

29.     Defendant Ovations, Inc. is a Delaware corporation.  It is a direct subsidiary of Defendant United HealthCare Services, Inc. and an indirect subsidiary of Defendant UHG.  Ovations, including its subgroups such as Secure Horizons & Evercare, provided managed healthcare insurance coverage under Part C of the Medicare Advantage Program.  Another Ovations subgroup called Ovations Part D provided the prescription drug benefits under Part D of the Medicare Program.

30.     United had one or more groups which had some management or oversight over its MA Organizations and MA Plans.  These groups were located within Defendant UnitedHealthcare, Inc.  They included, depending on the time period, Secure Horizons,

Evercare, the Public and Senior Market Group (which included two subgroups: Ovations and AmeriChoice and which was also referred to as the Public Sector Market Group), and, more recently, UnitedHealthcare Medicare & Retirement and UnitedHealthcare Community & State.  Among other things, these groups oversaw United's risk adjustment activities such as the submission of risk adjustment data and claims to the Medicare Program and the Chart Review, Claims Verification (CV), and RACCR Programs.  However, the actual data and claim submission and program work was conducted by Defendants Optum, Inc. and OptumInsight, Inc. and their predecessors, including Ingenix, from offices in this District and elsewhere.

31.     Defendants Optum, Inc. and OptumInsight, Inc. (collectively "Optum") are Delaware corporations.  Optum is a direct or indirect subsidiary of Defendant UHG. Optum and its predecessor, Ingenix, Inc., were the entities that were responsible for the submission of risk adjustment data and claims to the Medicare Program, the deletion of invalid diagnoses and claims, and the management and operation of the Chart Review, Claims Verification, RACCR and other risk adjustment programs for United.  Optum (and formerly Ingenix) also performed this risk adjustment work for third-parties which owned and operated MA Organizations and MA Plans.  It referred to these third-parties as commercial clients.  Optum (and formerly Ingenix) performed a significant amount of its risk adjustment work for United and its commercial clients from its offices in the Central District of California.

32.     United became the largest owner of MA Organizations and MA Plans in large part by acquiring them.  In 2004, United acquired Oxford Health Plans LLC (doing business as Oxford Health Plans, Inc.) and Oxford's plans.  Also, in 2004, United acquired Mid-Atlantic Medical Services, Inc. and its plans.

33.     In 2005, United acquired PacifiCare Health Systems ("PacifiCare") and PacifiCare's and its affiliates' MA Plans, including Defendants PacifiCare of Arizona, Inc., incorporated in Arizona; PacifiCare of California, incorporated in California; PacifiCare of Colorado, Inc., incorporated in Colorado; PacifiCare of Nevada, Inc.,

incorporated in Nevada; PacifiCare of Oklahoma, Inc., incorporated in Oklahoma; PacifiCare of Oregon, Inc., incorporated in Oregon; PacifiCare of Texas, Inc. incorporated in Texas; and PacifiCare of Washington, incorporated in Washington.  Both before and after the acquisition, PacifiCare of California and possibly other PacifiCare plans referred to themselves or to their brand of MA Plans as Secure Horizons.  Since 2005, these PacifiCare plans have been indirect subsidiaries of and controlled by UHG. Several years after the acquisition, these PacifiCare plans were re-named or re-branded as United plans or merged into other United plans.  For instance, in 2011, PacifiCare of California became Defendant UHC of California.  After the acquisition, Pacificare Health Systems and one or more entities affiliated with it were merged with and into Defendant United Healthcare Services, Inc.  All PacifiCare entities and their successors were direct or indirect subsidiaries of Defendant UGH.

34.     Before United's acquisition of PacifiCare, the PacifiCare employees with responsibilities relating to the submission of risk adjustment data and claims to Medicare and to other risk adjustment-related activities worked at a PacifiCare office in Cypress, California, within this District.  Sometime after the acquisition, United moved this office to Santa Ana, California, within this District.  A substantial part of the events or omissions relevant to this litigation occurred at these and other locations within this District.

35.     In 2008, United acquired Unison Health and its MA Plans.  Also, in 2008, United acquired Sierra Health Services, Inc. and its MA Plans, including Defendants Health Plan of Nevada, Inc. and Sierra Health and Life Insurance, Inc.  Sierra Health Services Inc. is or was a Nevada corporation located in and around Las Vegas.

36.     In January 2011, United acquired WellMed Medical Management, Inc. ("WMMI").  United's acquisition of WMMI included its subsidiaries and affiliates, including, but not limited to, WMMI's MA Plans, Physician's Health Choice of Texas, LLC and Citrus Health Care, Inc., which operated in Texas, Florida, New Mexico and Arkansas.  Citrus Health Care, Inc. was a Florida corporation and a subsidiary of PHC

Holdings of Florida, Inc.  Sometime after the acquisition, United re-named or re-branded these plans as United plans or merged them with or into United's other MA Organizations or plans in these states.

37.    In 2012, United acquired XLHealth Corporation and its MA Plans, including Community Improvement Plus.  XL Health (formerly known as Diabetex Corporation) is a Maryland corporation with its principal place of business in Elkridge, Maryland.  XLHealth is now part of UnitedHealthCare Medicare Solutions.

38.    All MA Organizations and MA Plans acquired, owned, and controlled by United after 2005 are Defendants in this action.  These entities are listed in Exhibit 1 to this Complaint, in the Risk Adjustment Attestations submitted by United to Medicare for 2005 and subsequent payment years, and/or in the "Subsidiaries of the Company" exhibit to United's Annual Reports (Forms 10-K) for 2005 and subsequent years.  All of these Defendants are directly or indirectly owned and controlled by UHG.

39.    Over the last decade, United has also sought to vertically integrate in the health care market by acquiring and/or operating large groups or networks of direct providers of healthcare services and other entities that manage the provision of such services to beneficiaries enrolled in United's MA Plans.  For instance, as part of its acquisition of Sierra Health Services in 2008, United acquired Southwest Medical Associates, Inc. (SMA), which was owned by Sierra.  At the time, SMA was the largest physician group in Las Vegas, Nevada.  Currently, Defendant Optum, through its groups called OptumHealth and OptumCare, owns and/or operates large physician groups and large integrated healthcare delivery systems in Arizona, California, Connecticut, Florida, Nevada, New York, Texas, and Utah.  This includes SMA in Nevada.

40.    Vertical integration was also one of the primary reasons, if not the primary reason, that United acquired WMMI in 2011.  For many years, WMMI had subsidiaries and other affiliates that directly managed the provision of or directly provided healthcare services.  These affiliates included WellMed Networks, Inc., WellMed Networks Inc. of Florida, WellMed Medical Management of Florida Inc., and WellMed Medical Group,

PA.  After the acquisition, WellMed became part of the United group called OptumCare.

After the acquisition, WellMed also significantly expanded by acquiring more than 50

medical practices in Texas and Florida.  WellMed included more than 10,000 physicians

that provided healthcare to hundreds of thousands of Medicare beneficiaries in Texas

and Florida, including beneficiaries enrolled in United's MA Plans.

41.    All references to "United" and the "United Defendants" in this Complaint include

all of the Defendants identified above and in Exhibit 1 to this Complaint.

## THE LAW

### I.    The False Claims Act

42.    The FCA reflects Congress's objective to "enhance the Government's ability to

recover losses as a result of fraud against the Government."  S. Rep. No. 99-345, at 1

(1986), available at 1986 U.S.C.C.A.N. 5266.  First, a defendant violates the FCA when

it "knowingly presents, or causes to be presented, a false or fraudulent claim for payment

or approval."  31 U.S.C. § 3729(a)(1)(A).  Under the FCA, a claim includes a request for

money.  *Id*., § 3729(b)(2).  Further, a claim is "false or fraudulent" under the FCA if the

entity or person submitting the claim was not entitled to payment.

43.    Second, after the 2009 amendments to the FCA by the Fraud Enforcement

and Recovery Act of 2009 ("FERA"), Pub.L. 111-21 (May 20, 2009), a defendant

violates the FCA when it "knowingly makes, uses, or causes to be made or used, a

false record or statement material to a false or fraudulent claim."  31 U.S.C.

§ 3729(a)(1)(B).  Prior to FERA, a defendant violated this provision of the FCA

when it "knowingly [made], use[d], or cause[d] to be made or used, a false record

or statement to get a false or fraudulent claim paid or approved by the

Government."

44.    Third, after FERA's enactment in May 2009, a defendant violates the FCA when

it "knowingly makes, uses, or causes to be made or used, a false record or statement

material to an obligation to pay or transmit money or property to the Government, or

knowingly conceals or knowingly and improperly avoids or decreases an obligation to

pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). Prior to FERA, this provision of the FCA, commonly referred to as the "reverse false claims act" provision of the statute, provided that a defendant violates the FCA when it "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government."

45.     Under the FCA, the terms "knowing" and "knowingly" mean that the defendant had actual knowledge of or acted in deliberate ignorance or reckless disregard of information relating to the truth or falsity of its claims for payment or its false records or statements. *Id*. § 3729(b)(1)(A).  Proof that the defendant had specific intent to defraud the Government is not required.  *Id*. § 3729(b)(1)(B).  Congress included "deliberate ignorance" in its definition of the terms "knowing" and "knowingly" to hold a defendant accountable for failing to make the inquiry that a reasonable and prudent person or entity would have made under the circumstances to be reasonably certain that he, she, or it was entitled to the money that he, she, or it sought from the Government.  S. Rep. No. 99-345, at 21 (1986), as reprinted in 1986 U.S.C.A.N. 5266, 5286.  The terms "knowing" and "knowingly" used in this Complaint have the meaning ascribed to them by the FCA. Similarly, the terms "knowledge," "knows" and "knew" are used in this Complaint to have the same meaning.

46.     In 2009, Congress also amended the FCA to provide a definition of the term "obligation."  *See* FERA, Pub. L. 111-21, 123 Stat. 1617, 1621-25 (2009).  It defined the term to mean "an established duty, whether or not fixed, arising from an express or implied contractual … relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."  31 U.S.C. § 3729(b)(3). Congress promulgated this definition to reflect its long-held view that an "obligation" under the FCA's reverse FCA provision, 31 U.S.C. § 3729(a)(1)(G), encompasses non-fixed and contingent duties to pay or repay monies to the Government.  S. Rep. 111-10, 14, 2009 U.S.C.C.A.N. 430, 441.

47.     Under the FCA, "material" means "having a natural tendency to influence, or capable of influencing, the payment or receipt of money or property." *Id*. § 3729(b)(4).

48.     Under the FCA, the Government is entitled to recover three times the amount of damages which it sustained because of a defendant's violation of the statute and, for each act by the defendant violating the statute, a civil penalty.  For violations that occurred before November 2, 2015, the FCA imposes a penalty for each violation of not less than $5,500 and not more than $11,000.  For violations occurring after November 2, 2015, all civil statutory penalties, including the FCA, are subject to an annual adjustment for inflation pursuant to Section 701 of the Bipartisan Budget Act of 2015, Public Law 114-74 (No. 2, 2015) ("BBA").  At this time, by operation of the BBA, for all FCA penalties assessed after February 3, 2017, whose associated violations occurred after November 2, 2015, the penalty for each violation is not less than $10,957 and not more than $21,916.

## II.     The Medicare Statute

49.     Medicare is a federally-operated health insurance program administered by CMS. Medicare benefits individuals age 65 and older and the disabled.  42 U.S.C. § 1395c *et seq.*  Parts A and B of the Medicare Program are known as "traditional" Medicare. Medicare Part A covers inpatient and institutional care.  Medicare Part B covers physician, hospital outpatient, and ancillary services and durable medical equipment.

50.     Under Medicare Parts A and B, CMS reimburses healthcare providers (*e.g.,* hospitals and physicians) using what is known as a "fee-for-service" ("FFS") payment system.  Under a FFS payment system, healthcare providers submit claims to CMS for reimbursement for each service, such as a physician office visit or a hospital stay.  CMS then pays the providers directly for each service.

51.     Under Medicare Part C (the "Medicare Advantage Program"), Medicare beneficiaries can opt out of the traditional Medicare Program (Parts A and B) and instead enroll in and receive managed health care services from MA Plans.  MA Plans must provide Medicare beneficiaries all the services that they are entitled to receive from the traditional Medicare Program.

52.     Under Medicare Part D, Medicare beneficiaries can elect to enroll in either a Prescription Drug plan (known as a PD Plan) or an MA Plan that provides prescription drug coverage in addition to the physician office visit and hospital outpatient and inpatient coverage provided under Part C (known as an MAPD Plan).  For simplicity, in this Complaint, the Government refers to all MA and MAPD Plans as Medicare Advantage Plans or MA Plans.

53.     Medicare beneficiaries who enroll in an MA Plan are considered a member of and enrollee in that plan.  In this Complaint, the terms beneficiaries, members, enrollees, and patients are used interchangeably, but mean the same thing, that is, individuals enrolled in MA plans.

54.     MA Organizations' obligations to the Medicare Program and the requirements for them to participate in the Program are set forth in CMS regulations and, each year, the MA Organizations agree in writing to comply with those regulations.  42 C.F.R. §§ 422.504 & 422.505 (Part C); 42 C.F.R. §§ 423.504 & 423.505 (Part D).  In addition, MA Organizations must comply with requirements set forth in statutes, such as the FCA, and guidance documents, such as the Medicare Managed Care Manual, the Medicare Prescription Drug Benefit Manual, and Medicare Advantage operating instructions.

### III.     Medicare Parts C and D Risk Adjustment Payments

55.     Under Part C, the Medicare Program pays each MA Organization a predetermined monthly amount for each Medicare beneficiary in the plan.  This monthly payment is known as a "per-member, per-month" payment.  This capitated payment for each plan varies depending on various factors, including amounts set forth in the plan's bid submitted to CMS.  Since 2000, Congress has also required that the payments be risk adjusted for each beneficiary based on demographic factors (*e.g.*, gender, age) and health status.  By risk adjusting for health status, Congress required that more be paid for beneficiaries with higher risk scores than be paid for beneficiaries with lower risk scores.  CMS currently employs a health-based risk adjustment model – known as the

1  Hierarchical Conditions Category ("HCC") model – that takes into account diagnoses

2  from inpatient hospital stays, outpatient encounters, and physician office visits.

3  56.      The HCC model is prospective, meaning that it relies on diagnoses for certain

4  medical conditions assigned to beneficiaries by their physicians in one year (referred to

5  by CMS as the "data collection" year but also generally known as the "date of service"

6  or "DOS" year) to set the payment for each beneficiary for the following year (often

7  referred to as the "payment year" or "PY").  The medical conditions included in the

8  model are grouped into HCCs, which are categories of clinically-related medical

9  diagnoses.  *See* 42 C.F.R. § 422.2.  The diagnoses grouped into HCCs include major,

10  severe, and/or chronic illnesses.  Related groups of diagnoses are ranked on the basis of

11  disease severity and the cost associated with their treatment.  Between 2004 and 2013,

12  the CMS-HCC model included 70 HCCs.  Starting in 2014, the CMS-HCC model

13  included 79 HCCs.

14  57.      Under Medicare Part D, payments to MAPD Plans are also risk adjusted based on

15  health status.  As with Part C, Part D employs a health-based risk adjustment model –

16  known as the Rx Hierarchical Condition Categories ("RxHCC") model.  Like HCCs,

17  RxHCCs are also groups of clinically-related medical diagnoses that are ranked by

18  disease severity and the cost associated with pharmaceutical drugs used to treat them.

19  58.      The Government assigns a relative numerical value to each HCC and RxHCC

20  group that correlates to the predicted incremental costs of care associated with treating

21  the medical conditions in each category.  It determines the relative values based on the

22  amounts that it paid to fee-for-service providers to treat these major, severe, and chronic

23  medical conditions under Parts A and B of the Medicare Program.  Higher relative

24  values are assigned to HCCs and RxHCCs that include diagnoses with greater disease

25  severity and greater costs associated with their treatment.

26  59.      As previously stated, the HCC and RxHCC risk adjustment models are

27  prospective and a beneficiary's risk score for a particular payment year is determined by

28  his or her medical conditions during the previous year (*i.e.*, the date of service year).

18

1    These medical conditions must be documented by a qualified healthcare provider (*e.g*., a

2    doctor) in the beneficiary's medical record during the previous year.

3    60.    Each beneficiary's risk score is calculated anew for each payment year.  For

4    example, a beneficiary's risk score for payment year 2012 is determined by the

5    diagnoses that his or her qualified healthcare providers documented in his or her medical

6    records during face-to-face medical encounters during date of service year 2011.

7    61.    MA Organizations obtain diagnosis data from the healthcare providers that treat

8    the beneficiaries in their plans.  Healthcare providers can transmit diagnosis codes to

9    MA Organizations with claims for payment for services rendered, in encounter records

10   reporting the services rendered, or by alternative means.  In this Complaint, the United

11   States refers to diagnosis codes reported by providers through any means as "provider-

12   reported diagnoses."

13   62.    MA Organizations submit risk adjustment data, including diagnoses, to CMS

14   using CMS' Risk Adjustment Processing System ("RAPS").  Each RAPS submission

15   must include the following information:  the Medicare beneficiary's identification

16   number (called a "HIC number" or "HICN"); the date(s) of the medical encounter; the

17   type of provider (physician or hospital); and the diagnosis code(s) reported by the

18   provider for the encounter.  Medical encounters include physician office visits, hospital

19   outpatient visits, and hospital inpatient stays.

20        **IV.    Legal Obligation to Submit Valid Risk Adjustment Data**

21   63.    MA Organizations are entitled to risk adjustment payments based on the diagnosis

22   codes that they submit to CMS *only* if the codes are from face-to-face medical

23   encounters between the Medicare beneficiary and provider, the encounter occurred

24   during the relevant date of service year, the provider was of a type and specialty

25   acceptable for risk adjustment purposes, and at the time of the encounter, the provider

26   documented the medical conditions identified by the diagnosis codes in the medical

27   record based on acceptable documentation.  In addition, codes should be based on

28   documented conditions that require or affect patient care treatment or management.  *See*

19

2008 Risk Adjustment Data Technical Assistance for Medicare Advantage Organizations Participant Guide ("2008 RA Participation Guide") at § 6.4.1.

64.     Risk adjustment claims are true and the resulting risk adjustment payments are valid only to the extent that the diagnosis codes submitted by the MA Organizations are valid.  The diagnoses must be coded according to the *International Classification of Diseases (ICD) Clinical Modification Guidelines for Coding and Reporting* ("ICD-9-CM" & "ICD-10-CM") and documented with sufficient clinical specificity.  All diagnosis codes submitted by MA Organizations must be supported by medical record documentation.  If the medical record is ambiguous, it cannot be relied on for diagnosis information for risk adjustment payments.  *See* 2008 RA Participation Guide at § 7.2.4.1 (stating that risk adjustment claims and payments cannot be based on questionable diagnoses).

65.     CMS recognizes that risk adjusting based on health status creates a strong incentive for MA Organizations to report diagnoses that are not validated by the beneficiary's medical records or to not delete previously-submitted invalid diagnoses so that they can increase their payments.  Thus, CMS engages in a variety of program integrity activities, including audits of diagnoses submitted by MA Organizations, known as Risk Adjustment Data Validation ("RADV") audits.  To support these audits, MA Organizations and their providers are required, when requested, to provide medical records to validate the diagnoses that they submitted for risk adjustment payments.  *See* 42 C.F.R. § 422.310(e).

66.     In addition, MA Organizations must (i) establish and implement effective compliance programs to ensure the integrity of their payment data, 42 CFR § 422.503(b)(4)(vi) (Part C compliance program regulation); 42 C.F.R. § 423.504(b)(4)(vi) (Part D compliance program regulation); (ii) annually attest to the accuracy and truthfulness of the diagnosis data that they submit for risk adjustment payments, 42 C.F.R. § 422.504(*l*) (Part C regulation); 42 C.F.R. § 423.505(k) (Part D regulation); and (iii) "comply with . . . Federal laws and regulations designed to prevent

or ameliorate fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law [and] the False Claims Act (31 USC §§ 3729 et seq.)."  42 C.F.R. § 422 (Part C regulation); 42 C.F.R. § 423 (Part D regulation).

### A.  MA Organizations Must Have Effective Compliance Programs

67.  The implementation of an effective compliance program is a prerequisite to an MA Organization's obtaining and retaining payments under both Parts C and D of the Medicare Program.  *Id.* §§ 422.503(a) (Part C) & 423.504(b)(4)(vi) (Part D).  One purpose of requiring a compliance program is to ensure that MA Organizations submit accurate and truthful information to CMS.  65 FR 40170-01 at 40264 (June 29, 2000).

68.  Specifically, each MA Organization must "[a]dopt and implement an effective compliance program, which must include measures that prevent, detect, and correct non-compliance with CMS' program requirements as well as measures that prevent, detect, and correct fraud, waste, and abuse."  42 C.F.R. § 422.503(b)(4)(vi) (Part C); 42 C.F.R. § 423.504(b)(4)(vi) (Part D).  The compliance program "must, at a minimum, include [certain] core requirements," including (but not limited to):

(F)  Establishment and implementation of an effective system for routine monitoring and identification of compliance risks.  The system should include internal monitoring and audits and, as appropriate, external audits, to evaluate the MA organization['s], including first tier entities', compliance with CMS requirements and the overall effectiveness of the compliance program.

(G)  Establishment and implementation of procedures and a system for promptly responding to compliance issues as they are raised, investigating potential compliance problems as identified in the course of self-evaluations and audits, correcting such problems promptly and thoroughly to reduce the potential for recurrence, and ensuring ongoing compliance with CMS requirements.

1           (1) If the MA organization discovers evidence of misconduct

2           related to payment or delivery of items or services under the

3           contract, it must conduct a timely, reasonable inquiry into that

4           conduct.

5           (2) The MA organization must conduct appropriate corrective

6           actions (for example, repayment of overpayments, disciplinary

7           actions against responsible employees) in response to the potential

8           violation referenced in paragraph (b)(4)(G)(1) of this section.

9           (3) The MA organization should have procedures to voluntarily

10          self-report potential fraud or misconduct related to the MA

11          program to CMS or its designee.

12 69.    A compliance program is not effective unless the MA Organization devotes

13 adequate resources to the program.

14 70.    MA Organizations must ensure the validity of the diagnoses they submit.  Among

15 other things, MA Organizations are responsible for deleting RAPS data submissions if

16 the diagnoses that they submitted are invalid.  Deletion of invalid diagnoses allows CMS

17 to recalculate the beneficiaries' risk scores and ensure that the Medicare Program does

18 not make improper risk adjustment payments to MA Organizations or that the Program

19 recovers improper payments that were already made.

20 71.    An MA Organization "maintains ultimate responsibility for adhering to and

21 otherwise fully complying with all terms and conditions of its contract with CMS,"

22 regardless of any relationship it may have with a downstream or related entity.  42

23 C.F.R. § 422.504.  Thus, an MA Organization cannot delegate away its ultimate

24 responsibility for its obligations to the Medicare Program.

25 72.    The final deadline for RAPS data submissions is generally four to six weeks after

26 the end of the payment year at issue.  For example, for the 2012 payment year, MA

27 Organizations could submit diagnosis codes relating to 2011 date of service medical

28 encounters until February 15, 2013.

73.     The final deadline is only a submission deadline; it does not pertain to deleting invalid diagnoses in order to withdraw them.  *See* 42 C.F.R. § 422.310(g)(2)(ii) (codifying pre-existing process permitting, after the final deadline, only corrections to delete diagnoses from previously-submitted risk adjustment data).  Accordingly, MA Organizations can delete invalid diagnoses both before the deadline for RAPS data submissions for a payment year (known as "open-period deletes") and after the deadline for RAPS data submissions for a payment year (known as "closed-period deletes").

74.     Because the final submission deadline is after the completion of the payment year, monthly payments made during the payment year are interim payments.  After the final submission deadline (February 15, 2013 in the example given above), CMS determines if any adjustments to these interim monthly payments are necessary based on all diagnoses submitted for each beneficiary up until the final submission deadline (excluding those diagnoses that were deleted prior to the deadline) and re-calculates each beneficiary's risk score for the payment year to determine if it has changed and whether a plus or minus adjustment to the payment for the beneficiary is necessary.  If the beneficiary's risk score is higher because of the submission of additional diagnoses for that beneficiary, CMS makes a final reconciliation payment of any additional payment owed to the plan for that beneficiary for that payment year.  Conversely, if the beneficiary's risk score is lower because of the deletion of diagnoses for that beneficiary prior to the final submission deadline, CMS recovers the funds associated with the deleted diagnoses as part of this final reconciliation payment process.

**B.     MA Organizations Must Attest to the Validity of Their Data**

75.     After the final submission deadline but before their receipt of the final reconciliation payments, MA Organizations must attest to the validity of their risk adjustment data, including diagnoses, in a Risk Adjustment Attestation submitted to CMS.  Specifically, the chief executive officer, chief financial officer, or an individual delegated with authority to sign on behalf of one of these officers, and who reports

directly to such officer, must certify that the risk adjustment data that the MA Organization submitted to CMS was accurate, complete, and truthful.

76.    An MA Organization must request payment on a document that contains this Attestation and the submission of this Attestation to CMS is a condition of receiving Risk Adjustment payments.

77.    The Part D regulations include a similar attestation for risk adjustment data, including diagnoses, submitted for risk adjustment payments under the prescription drug program.  Under the applicable Part D regulation, these attestations are referred to as certifications.  42 C.F.R. § 423.505(k).

78.    Every year, each MA Organization agrees in writing that:

> [a]s a condition for receiving a monthly payment under paragraph B of this article, and 42 CFR Part 422 Subpart G, the MA Organization agrees that its chief executive officer (CEO), chief financial officer (CFO), or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to such officer, must request payment under the contract on the form[] attached hereto as . . . Attachment B (risk adjustment data) which attest to (based on best knowledge, information and belief, as of the date specified on the attestation form) the accuracy, completeness and truthfulness of the data identified on these attachments. . . .
>
> 2.  Attachment B requires the CEO, CFO, or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to such officer, must attest to (based on best knowledge, information and belief, as of the date specified on the attestation form) that the risk adjustment data it submits to CMS under 42 CFR § 422.310 are accurate, complete, and truthful.  The MA Organization shall make annual attestations to this effect for risk adjustment data on Attachment B and according to a schedule to be published by CMS. If such risk adjustment

data are generated by a related entity, contractor, or subcontractor must also attest to (based on best knowledge, information, and belief, as of the date specified on the attestation form) the accuracy, completeness, and truthfulness of the data. [422.504(l).]

79.     MA Organizations have an obligation to acquire knowledge, information, and belief about their risk adjustment data, including diagnoses, in order to both submit such data and attest to the accuracy and truthfulness of the data.  Nearly 17 years ago, CMS put MA Organizations on notice that they were "responsible for making *good faith efforts* to certify the accuracy, completeness, and truthfulness of the encounter [*i.e.,* risk adjustment] data submitted" for payments from the Medicare Program.  65 Fed. Reg. 40,170, 40,268 (June 29, 2000) (emphasis added); *see also* Medicare Managed Care Manual, Chapter 7, at § 111.7 (February 2004).  When MA Organizations fail to act in good faith and turn a blind eye to their submission of inaccurate or untruthful data, their Risk Adjustment Attestations are false.

## THE FACTS

80.     Since at least 2005, United knew that diagnoses submitted to Medicare for risk adjustment payments had to satisfy various criteria and be supported and validated by the medical records of the beneficiaries its MA Plans.  United also knew that many provider-reported diagnoses were not supported and validated by the beneficiaries' medical records and that it was obliged to undertake good faith efforts to identify and delete those unsupported and invalid diagnoses.  Moreover, United knew that it was obligated to "look both ways" at the results of its chart reviews and delete unsupported provider-reported diagnoses.  Nonetheless, United conducted millions of medical record reviews as part of its revenue-generating national Chart Review Program, turned a blind eye to the negative results of those reviews showing hundreds of thousands of unsupported diagnoses that it had previously submitted to Medicare, and knowingly and improperly avoided repaying Medicare for at least over a billion dollars in risk adjustment payments to which it was not entitled.  Similarly, United disregarded information from its RACCR

25

Program about invalid coding practices by its incentivized capitated and gain-sharing providers and failed to repay Medicare for additional erroneous payments based on their invalid diagnoses.

**I.     United Knew That Many Provider-Reported Diagnoses Were Invalid And That It Was Obligated To Undertake Good Faith Efforts To Identify And Delete Them**

81.     In 2005, as part of its acquisition of PacifiCare, United retained PacifiCare employees who knew the requirements for the submission of valid diagnoses, the obligation to identify and delete invalid codes, and the various problems relating to the invalidity of provider-reported diagnoses.

82.     For example, Jeffrey Dumcum, Stephanie Will, Pam Holt, and Pam Leal were all former PacifiCare employees knowledgeable about risk adjustment.  Dumcum had been PacifiCare's Chief Financial Officer and became United's Vice President of Finance. Will had been a Principal Analyst at PacifiCare who designed risk adjustment programs and joined United as the Program Manager for United's national Chart Review Program. Holt had been a Project Manager for Network Management Operations at PacifiCare and became the Manager of United's Provider Outreach for its Risk Adjustment Program. Leal had been an Executive Director of Provider Training and Development for PacifiCare and became United's Regional Vice President for Market Consultation.

83.     From 2005 to 2007, Dumcum, Will, Holt, and Leal worked for United at the PacifiCare office in the Central District of California.  Thereafter, Holt and Leal worked at the Ingenix office in the Central District of California.

84.     The PacifiCare employees obtained their knowledge about risk adjustment from various sources, including CMS.  PacifiCare also had conducted various risk adjustment programs, including a chart review program, and had provided training to healthcare professionals concerning medical record documentation and diagnosis coding.

85.     In addition, PacifiCare had been a member of an industry association called the Industry Collaboration Effort ("ICE") and ICE's Risk Adjustment Data Acquisition &

1    Reporting ("RADAR") team.  ICE was an association of MA Organizations and their

2    MA Plans as well as provider groups in California that served beneficiaries in MA Plans.

3    ICE focused on risk adjustment issues and other matters of particular importance to the

4    managed care industry.  After the PacifiCare employees were retained by United, they

5    continued to participate in ICE and its RADAR team.  In the mid-2000s, Leal was the

6    President and a member of the Board of Directors of ICE.

7    86.     The former PacifiCare employees knew that a beneficiary's medical record was

8    the "source of truth" for purposes of providing valid diagnosis data for risk adjustment

9    payments.  For example, in a March 2006 email, Will acknowledged that diagnosis data

10   had to be "fully supported by medical record documentation."  Others at United also

11   understood this, including Patty Brennan who, when she was Director of Retrospective

12   Services (including chart review services) at Ingenix, acknowledged that CMS' Risk

13   Adjustment Participant Guide established that the medical record was the "one source of

14   truth" for MA Organizations to ensure that they were submitting accurate data to CMS

15   for risk adjustment payments.  In fact, United sent notices to physician groups

16   instructing them that they should only report to United "diagnosis codes that can be

17   supported by the documentation in the medical record."

18   87.     In addition, United also knew from its involvement in ICE that enrollees' medical

19   records are the "source of truth."  In 2010, ICE's RADAR team issued a guidance

20   document highlighting that CMS requires complete and accurate documentation of

21   medical conditions for the submission of diagnoses, that only diagnoses depicting

22   documented medical conditions which required care or affected patient care are valid,

23   and that diagnosis codes cannot be submitted "until [the provider] is sure the patient has

24   the condition."  The ICE RADAR Physician Education Work Group also issued a similar

25   document called "Best Practices for Risk Adjustment," which advised that "ICD-9-CM

26   coding requires documentation of the diagnosis in the medical record as well as

27   evaluation and management.  Documentation should indicate how this diagnosis

28   impacted this episode of care."  In 2012, ICE also issued a Medical Record

Documentation Tips sheet, which once again warned MA Organizations and providers not to code diagnoses that are probable, suspected, questionable, or "working diagnoses" and also not to code diagnoses when medical records use "other similar terms indicating uncertainty." More recently, in 2013, ICE issued a "Documentation Newsletter" that repeated earlier advice and also cautioned that "[c]oding guidelines prohibit coders from making assumptions" regarding whether a diagnosis is or is not substantiated by a patient's medical record. (Emphasis in the original.) That is, the medical record must "clearly reflect" the medical condition.

88.    However, the former PacifiCare employees were aware that provider-reported diagnoses often did not comply with CMS requirements and were often inconsistent with the information in their patients' medical records. According to Dumcum, when he was the Chief Financial Officer of PacifiCare, he and others there knew "in Medicare Advantage that the claims did not always match the medical record documentation. So … we were concerned that it should be a place that we try to improve, that we try to educate and try to identify things to make that better." In addition, Will, Holt and other former PacifiCare employees were aware of common diagnosis coding errors made by providers. They learned of these problems from PacifiCare employees working in the field with physicians, reports of physician-coding trends, and reports from PacifiCare-employed certified coders. For example, a June 2003 PacifiCare PowerPoint Presentation by Will, Holt, and other PacifiCare employees identified diabetes as a medical condition that was often miscoded.

89.    In 2005, the PacifiCare employees, including Will and Holt, were also aware of a data validation review conducted by the Government of diagnosis codes previously submitted for medical encounters that occurred in 2003 (*i.e.*, encounters with 2003 dates of service). The PacifiCare employees were aware that the results of CMS' medical record reviews showed that approximately 30 percent of the provider-reported diagnoses were invalid. The results from this review also put them on notice that providers were reporting codes that were just plain wrong, were coded from laboratory reports, and did

not reflect current medical conditions – all of which was in breach of the fundamental rules that the diagnosis codes submitted to Medicare must be accurate and truthful, based on face-to-face visits (*e.g*., not lab reports), reflect current conditions, and otherwise be valid.

90.    Moreover, the former PacifiCare employees were aware that MA Organizations are not entitled to risk adjustment payments based on diagnoses that are unsupported by the beneficiaries' medical records, and that CMS expected health plans to delete incorrect diagnosis codes submitted for risk adjustment payments.  They also knew, based on their experiences at PacifiCare, that CMS could audit the diagnoses MA Organizations submitted for risk adjustment payments.

91.    In April 2005, Holt participated in a "CMS data validation call" in which CMS explained that it expected MA Organizations to correct invalid diagnoses submitted to Medicare for risk adjustment payments.  Holt reported this to Will and suggested creating a spreadsheet to give to providers for them to use to inform PacifiCare of invalid diagnoses and allow PacifiCare to delete them.  As part of this discussion, Leal explained to Will that, if provider groups "during their chart audits find that physicians have documented rule-out or history-of but coded as if the member had [the medical condition,] they want to be able to fix it so when we get audited again by CMS it is fixed."  Leal further stated that "[o]bviously, as issues are identified there will need to be education to physician[s] on changing their practice of coding incorrectly (as you remember Dr. Norman mentioned habits doctors have, that we will need to break)."  Holt agreed that provider groups

> need something 'standardized and formalized' so they know what fields to
> report if and when they find any obvious discrepancies.  They are the type of
> thing that Pam [Leal] stated in her email below, the code of the actual disease
> when the documentation clearly only supports 'history of' or 'suspected' (and
> then it was not confirmed), or an obvious miscode; the things that Melissa

29

[Ferron] is finding in the data validation. Provider groups will find this during their own chart audits.

Holt then reiterated that CMS "was very firm that we need to be doing this, so I would expect [CMS] will look for our process when they get around to more formally auditing our oversight of this process."

92.   In addition, in August 2006, a year after the April 2005 CMS validation call, Will and Holt knew that CMS had confirmed, in responses to questions about its RADV audits, that it would invalidate diagnosis codes submitted to Medicare that were not supported by the beneficiaries' medical records.

93.   After United's acquisition of PacifiCare, the former PacifiCare employees began educating others at United about risk adjustment. In particular, Dumcum made formal presentations to various United employees, including senior executives. Dumcum gave a series of presentations where he explained to other United employees that "[p]rovider coding is highly inaccurate and incomplete" and that "more than 30% of coded conditions are not supported by CMS validation findings." United senior management such as Jerry Knutson, the Chief Financial Officer of the group that managed United's MA Plans from 2003 to 2009, participated in meetings in which Dumcum made these presentations.

94.   Furthermore, United's own data revealed and confirmed problems with provider-reported diagnoses. United tracked the risk scores for Medicare beneficiaries cared for by its providers and, for various providers, saw increases in risk scores that were significantly above the norm. United also generated reports that identified the providers with abnormally high average risk scores. Prevalence reports also identified specific medical conditions that were reported by various providers at rates significantly above average. In September 2006, Will, Holt, Leal, and others generated a list of providers that were outliers, which, at that time, they defined as providers with significant increases in their patients' risk scores. This information made them "question the validity" of these providers' codes.

30

95.     In 2007, United assigned to Dumcum and the other former PacifiCare employees the responsibility for creating and then managing a risk adjustment service group within Ingenix (later known as Optum).  This enabled United to move the risk adjustment operations from Ovations (the predecessor of UnitedHealth Medicare & Retirement) to Ingenix.  Ovations (then UnitedHealth Medicare & Retirement) became Ingenix's internal "client."  This move also enabled Ingenix to offer its risk adjustment services to other MA Organizations which it referred to as its "commercial clients."  Dumcum became Senior Vice President and Will became Vice President of Risk Adjustment Programs for this new risk adjustment service group.  After 2007, Ingenix hired additional employees and increased the size of the Ingenix risk adjustment group, including the size of the group in this District.  The Ingenix risk adjustment group in this District was responsible for, among other things, risk adjustment data/diagnosis codes submissions, risk adjustment data remediation and the deletion of invalid diagnoses, risk adjustment data analytics and finance (*e.g.*, tracking the results and financial impact of the Chart Review and Claims Verification Programs), provider outreach and programs relating to risk adjustment, and the Chart Review Program operations.

96.     In January 2007, Dumcum told United that it had to improve the validation of provider-reported diagnosis codes.  Dumcum knew that United had providers who were paid on either a fee-for-service or capitated basis and who were reporting unsupported diagnoses and that both needed to improve their validation rates.

97.     Prior to this, in 2006, Dumcum, Will, Holt and others had already participated in discussions about conducting an Internal Data Validation ("IDV") Program focused on the validity of provider-reported diagnoses.  The purpose of the IDV Program was to determine if the physicians' medical records supported the diagnoses that they reported to United and United submitted to Medicare for risk adjustment payments.

98.     In February 2007, Will, Holt, and Patricia Rasmussen, Manager of Encounter Submissions at Ingenix, were informed of specific provider-reported codes that were reported based on "faulty coding."  For example, Sharp Community Medical Group in

California submitted a diagnosis tracking to HCC 155 (Major Head Injury) but there was "no documentation to support intracranial injury."  Likewise, Monarch/South Coast, located in this District, submitted a diagnosis tracking to HCC 17 but there was "[n]o documentation of diabetes or diabetic complication[.]"  Will, Holt, and Rasmussen were requested to remove, or delete, these codes before the final submission deadline but Rasmussen replied that they did not have resources and could not do this.

99.     In addition, United knew that a significant percentage of provider-reported diagnoses were invalid based on audits performed by CMS and similar internal audits or reviews that United performed.  For example, one such audit was performed on diagnoses submitted for 2004 date of service medical encounters (*e.g.* physician office visits) that mapped to 1,231 HCCs.  The results were reported in a September 2007 Risk Adjustment Programs presentation made by Dumcum to others at United.  The presentation showed that no support was found in the beneficiaries' medical records for 32 percent of the HCCs at issue.  That is, the records did not confirm the diagnoses mapping to 32 percent of the HCCs under review.  The same presentation showed the results of another audit of diagnoses submitted for 2005 date of service medical encounters that mapped to 1,160 HCCs.  It showed that, as of the date of the presentation, 18 percent of the HCCs were "NOT supported" and another 8 percent were most likely not supported.

100.    In October 2007, Ingenix also emphasized the fact that more than 30 percent of provider-reported diagnoses were unsupported by the beneficiaries' medical records as a selling point for the risk adjustment services, including data validation services, that it marketed to another MA Organization.

101.    During the 2007 and 2008 time period, United implemented the IDV Program. The program focused on physicians in California, Missouri, Texas, and Washington who reported more than three times the number of diagnoses than the average.  The program was very small in scope, but the results confirmed that providers reported many invalid diagnoses.  In January 2008, the results for medical encounters in 2006 showed a 30

percent invalidation rate.  That is, approximately 30 percent of provider-reported diagnoses were invalid, which was consistent with what the PacifiCare employees had known since at least 2005.  Accordingly, by at least 2007, the former PacifiCare employees imparted their knowledge to others at United that approximately 30 percent of provider reported conditions were not supported by medical records and, by at least 2008, United's own medical record reviews had confirmed that fact.

102.   Additional evidence demonstrates that, by at least the 2007 and 2008 time period, the invalidity of provider-reported diagnoses was an on-going concern.  For example, in September 2008, one of United's own actuarial consulting subsidiaries, Reden & Anders, identified unsupported diagnosis codes as a "Potential Compliance Risk Area" and warned that "[t]here is no such thing as minimally compliant."

103.   In addition, by at least 2008, the former PacifiCare employees had also imparted their knowledge that United was obligated to identify and delete invalid provider-reported diagnoses.  For example, a January 2008 United training guide entitled "CMS-HCC Risk Adjustment Training Module," which was created for provider outreach, recognized that it is the accuracy of medical record documentation and coding that supports entitlement to risk adjusted payments from the Medicare Program.  The presentation recognized that accurate medical record documentation is key to accurate risk adjustment payments and necessary to validate payments.  In addition, in June 2008 emails, Patty Brennan, the Compliance Manager for Ingenix, and Karen Wagor, a Senior Coder and National Trainer for Ingenix, both of whom worked at Ingenix's Santa Ana office, recognized that United was not entitled to payment based on diagnoses that were not validated by beneficiaries' medical records and that United risked having to return money to the Medicare Program for risk adjustment payments based on invalid diagnoses:  "We could be at risk of losing $$ if there isn't another piece in the documentation before or after this date of service for the HCC if it can't be verified with the most accurate validation.  **The medical record must support all diagnoses coded**

**for the date of service and must be able to** <u>stand alone</u> **for an audit on those reported diagnosis codes.**"  (Emphasis in the original.)

104.   Moreover, United knew it was required to effectively address compliance issues. A United presentation from November 2009 entitled "Audit Management Overview" reflects United's knowledge that it was legally required to implement an effective compliance program and that "[i]n order to have an effective Compliance Program, an organization must have a robust internal monitoring and auditing process in place."  In addition, in approximately May 2010, Larry Renfro, who was then the Chief Executive Officer of both the Public and Senior Market Group (PSMG) and Ovations, and David Orbuch, who was then the Executive Vice President and Chief Compliance Officer of PSMG, met with CMS regarding United's Medicare compliance program and represented to CMS that United would "meet and exceed" CMS' expectations.

105.   Kimberly Halva, UnitedHealth Medicare & Retirement's Finance Compliance Officer from 2010 to 2013, also was keenly aware that one of the issues that United had to effectively address was the validity of provider-reported diagnosis.  Halva understood that United had an obligation to identify and delete diagnoses that were not supported by its beneficiaries' medical records.  In November 2010, she sent a memorandum to Relator Poehling with recommendations for compliance problems focused on identifying and deleting invalid provider-reported diagnoses.  In January 2011, she sent Relator Poehling "a few suggestions for risk mitigation type programs UnitedHealthcare Medicare and Retirement could take to more equally distribute resources between programs dedicated to improper coding or billing and those focused on identifying additional reimbursement opportunities through improved coding/documentation."  One of Halva's suggestions was for United to perform "General Coding Accuracy Audits," which were essentially "look both ways" medical record reviews that would identify both incomplete coding (which she referred to as "under-coding") and inaccurate coding (which she referred to as "over-coding").  Another of her suggestions was for United to "Specifically Identify Traditionally Over-Coded or Incorrectly Coded Conditions," "such

as stroke or COPD," and conduct medical record reviews to determine if those traditionally over-coded or incorrectly coded conditions could be validated.

106.   United was also aware from audits performed for it by its public accounting firm that chart reviews that "looked both ways" was the only way to achieve a full and complete picture of a beneficiary's health status and that United was obligated to delete invalid provider-reported diagnoses.

107.   In addition, as part of its compliance efforts, United had, since at least 2008, required financially-incentivized capitated provider groups to submit attestations to it that certified that the diagnoses that they reported to United were valid and met CMS's requirements.  United sent notices to these providers describing these "**CMS DATA ACCEPTANCE GUIDELINES**."  (Emphasis in the original.)  These notices stated that **"[a]ll diagnoses must be documented at the time of the patient encounter or after receipt and confirmation of the diagnosis (i.e. Lab or Radiology report) and must be documented in the medical record**," and **"[o]nly report diagnosis codes that can be supported by the documentation in the medical record**," and **"[a]ll diagnosis codes should be valid** . . . ."  (Emphasis in the original.)

108.   In 2010, Holt and Leal were a part of an email chain discussing California provider groups and risk adjustment data validation.  Based on Holt's involvement with ICE's RADAR team (and possibly other sources), Holt noted that California provider groups are "acutely aware of the importance of data validation" and that risk adjustment data validation was "a subject discussed frequently at the ICE meetings."  In the same email chain, Holt also assured Relator Poehling that provider groups in California would understand the importance of CMS's RADV audits.

109.   In November 2009, the results of the IDV audit for one of Ingenix's commercial clients, another company that owned and operated MA Plans, further confirmed what United already knew, that is, that providers were reporting invalid diagnoses at an alarming rate.  The results of the audit showed a 45 percent invalidation rate.  Providers in the commercial client's plans were also in United's plans.

35

110.    In June 2010, the results of United's IDV reviews of its California providers once again confirmed an on-going problem with the validity of provider-reported diagnoses. The results showed a 40 percent invalidation rate.  Higher than the 30 percent invalidation rate reported in 2005, these results confirmed that a significant percentage of provider-reported diagnoses were invalid.

111.    Also, in June 2010, an Ingenix Health Reform Implementation (HRI) Report prepared for UHG's Chief Executive Officer, Steve Hemsley, and other members of the UHG executive team identified compliance as an important issue of immediate concern to United, particularly compliance with the FCA.  The Report also shows that United was aware of a new statute making MA Organizations liable under the FCA for reporting and refunding overpayments in an untimely manner.

112.    Furthermore, in mid-2010, additional Government audits confirmed the problem with invalid provider-reported diagnoses.  At that time, the HHS Office of Inspector General ("OIG") sent United executives draft reports of audits of the risk adjustment data that two of United's MA Plans (then called PacifiCare of California and PacifiCare of Texas) submitted for payment year 2007.  In the draft reports, the OIG concluded that the diagnoses for half the beneficiaries in the California audit and 44 percent of the beneficiaries in the Texas audit were invalid, and that both plans' practices were not effective for ensuring that the diagnoses they submitted to CMS complied with CMS requirements.  After consideration of United's responses to the draft audit reports, the OIG issued final reports concluding that the health risk scores for 45 percent of the beneficiaries in the California audit and 43 percent of the beneficiaries in the Texas audit were invalid because the diagnoses were not supported by the beneficiaries' medical records or were uncertain or unconfirmed diagnoses.  In both the draft and final reports, the OIG provided examples of unsupported diagnoses.

113.    The results of prior RADV audits were also of concern to United.  When CMS announced in February 2011 that it planned to extrapolate the sample audit results, Charles Hansen, the Vice President of Finance and Underwriting at UnitedHealth

1   Medicare & Retirement, left a voicemail message for Relator Poehling stating: "I

2   haven't been close to this for . . . three or four years now probably, but back that far I

3   know the results of our RADV audits were concerning, to say the least.  That we had

4   significant . . . errors or undocumented RAFs [*i.e.*, undocumented diagnoses] in our

5   claim submissions."  He asked Poehling: "I'm sure we're careful about how we

6   communicate these findings, but can you give me a sense of kind of more recent RADV

7   audits, what impact could this have?  So just generally, are we still sort of, I'll say as bad

8   as we were a few years ago? . . . So, what's the potential impact on revenue of

9   extrapolating these RADV audit findings . . . ?"

10   114.   Because of the problem with provider-reported diagnoses, in 2010, United started

11   its RACCR Program, described more fully at Section VI below of the Government's

12   Complaint, and its CV Program, described more fully at Section IV below.  Mary

13   Hammond, one of the UnitedHealthcare Medicare & Retirement employees that oversaw

14   the RACCR Program, described it as "an important part of Medicare & Retirement's

15   efforts to meet CMS requirements to submit accurate risk adjustment data."  The CV

16   Program was also supposed to satisfy this basic payment rule.

17   115.   However, the major effect of the CV and RACCR Programs was that they

18   highlighted that United was not entitled to a significant amount of the risk adjustment

19   payments that it had received from Medicare because significant percentages of the

20   diagnoses it had submitted were unsupported and invalidated by its beneficiaries'

21   medical records.  For instance, as explained in more detail in paragraph 162 below, in

22   December 2010, the results of the first pilot phase (Phase I) of the CV Program showed

23   that provider-reported diagnoses were unsupported for over 50 percent of the medical

24   records reviewed.  Over a year later, as explained in more detail in paragraph 164 below,

25   United completed the second pilot phase (Phase II) of the CV Program on 17,398 charts

26   and the results were even more striking.  United identified 4,786 invalid diagnoses to be

27   deleted, which was greater than the number of additional diagnoses (ADDS) identified

28   by United's coders based on their review of the same medical records.  In February

37

2012, Dumcum, who was responsible for the CV Program, met with Relator Poehling and Theisen, who was the Chief Financial Officer of UnitedHealth Medicare & Retirement at that time, and reported: "I'm deleting as much as I'm adding at the end of the day. And I don't know if—you know, what I want to do." He also stated: "we're getting more and more red here," and that CV "eats in very substantially" to the revenue from ADDS from chart reviews.

116. In addition, by February 2012, United had "identified and deleted 5,519 bad codes" as the result of its RACCR reviews of the medical records for only 13,451 beneficiaries. On a beneficiary basis, the results showed more than a 40 percent invalidation rate.

117. Over time, United also obtained more information about incorrect diagnosis coding by providers, some of which information confirmed what United already knew years before about this problem. By at least 2013, Tracey Bradberry, a United employee who was a certified coder, was aware of various reasons for invalid provider-reported diagnoses, including, for example, the "[c]linical findings and/or treatment does not support the diagnosis" and "[n]ot a current condition." In addition, in March of 2014, Melissa Ferron, a coding consultant, sent United a list identifying various HCC codes and diagnosis codes that were unlikely to validate based on medical record reviews because providers frequently used the codes incorrectly. These included HCCs 17 (diabetes with acute complications), 96 (specified heart arrhythmias), 104 (monoplegia, other paralytic syndromes), and 111 (chronic obstructive pulmonary disease).

118. More recently, other United employees have also recognized United's obligation to ensure that diagnoses United submits for risk adjustment payments are supported and validated by its beneficiaries' medical records. They also understood that United was obligated to correct invalid data provided by it to Medicare for risk adjustment payments. For example, in an April 2013 email, Marybeth Meyer, the new Director of Finance for UnitedHealthcare Medicare & Retirement who succeeded Relator Poehling, stated that "as a Medicare Advantage Plan, if we become aware of a coding issue that

impacted the revenue received from CMS for risk adjustment, we are obligated to investigate and correct the submissions to CMS." In response to Meyer's email, Halva, the Compliance Officer, agreed. She also stated that United had "an obligation to go back to CMS and correct submissions that impact the revenue received for risk adjustment purposes." Halva did not think that anything was wrong with the requirement that United delete unsupported diagnoses. Moreover, she believed that "arguably" this obligation existed for ten years because of the ten-year statute of limitation for the Government to pursue FCA claims against United for its failure to delete unsupported diagnoses.

119.    As another example, in February 2014, Melissa Sedor, a Director at UnitedHealthcare Medicare & Retirement, told Marybeth Meyer that United had ultimate responsibility to ensure that the diagnoses that it submitted to Medicare for payment were valid. She stated that it was United's "responsibility to submit accurate records to CMS. Even if the provider submits bad data to us, the responsibility is on us to be submitting the correct data." Sedor further explained that this was the reason United implemented compliance programs like RACCR and CV.

120.    Finally, other United employees in addition to Halva were aware of United's potential FCA liability for submitting invalid diagnoses to CMS for risk adjustment payments or for failing to delete them.   For example, in 2010, Carol Thompson, the National Manager for Ingenix's Risk Adjustment Programs who worked at the Ingenix office in this District, provided the following reason as justification for funding for a coding vendor who was assisting United with a CMS RADV audit:  "Politics and Congressional scrutiny put an exclamation point on our need to demonstrate that the data submitted to CMS for risk adjustment payment is valid.  Data that drives payment from the government can be reviewed to determine if the claims are 'valid.'  Improper claims submission can fall under the False Claims Act." Also, as alleged more fully below, Dumcum informed Relator Poehling that the FCA was a consideration in deciding

whether United should implement the CV Program and "look both ways" at the results of its Chart Review Program.

## II.     United's "Look One Way" Chart Review Program

121.   Over the last decade, United has obtained billions of dollars of risk adjustment payments from Medicare from its national Chart Review Program because it only looked one way at the results of its coders' chart reviews.  As part of this program, United's coders performed "blind" reviews of the beneficiaries' medical records.  That is, the coders did not know which, if any, diagnoses had been reported by the providers who treated the beneficiaries and created the medical records.  Thus, rather than confirming diagnoses already reported by the providers or identifying only additional diagnoses supported by the records, the coders were instructed to look for all medical conditions purportedly documented in the records, record all diagnosis codes identifying those conditions, and give all of those codes to United.  But, United utilized results of these chart reviews – that is, the coders' list of diagnosis codes – for the sole purpose of identifying diagnosis codes that the providers had not reported and submitting ADDS for additional risk adjustment payments.  United did not utilize the coders' lists of diagnosis codes to determine if the providers had reported codes that were not supported by their own medical records.  If United had looked both ways and deleted these unsupported and, thus, invalid provider-reported codes, United's national Chart Review Program would have been far less lucrative.

122.   United's national Chart Review Program was its largest risk adjustment revenue-generating program.  United started this program in 2006.  During the first few years of the program, United reviewed hundreds of thousands of charts each year in order to mine them for additional diagnosis codes.

123.   Dumcum, Will, and other former PacifiCare employees became key participants in designing, implementing, and managing United's revenue-generating national Chart Review Program.  Will was the Program Manager for the program.

124.   In 2009, United's senior management significantly expanded the size of United's national Chart Review Program by providing Ingenix with the funds to acquire a coding vendor called AIM Healthcare Services, Inc. and integrating Ingenix's operations in Santa Ana, California, and the AIM coding operations in Tennessee, and by providing Ingenix with the funds to develop an in-house chart review computer database system called ChartSync so that Ingenix's in-house coders and third-party coding vendors could electronically review medical records and electronically record the coding results of their reviews.  At or about the same time, United also expanded the size of its Chart Review Program by providing Ingenix with the funds to open offices in foreign countries (the Philippines and India) where it could hire foreign workers to review beneficiaries' medical records in order to try to find additional diagnosis codes.

125.   Due to the increased resources devoted to United's Chart Review Program, the number of medical records reviewed in the hunt for additional codes significantly increased over time.  For the first few years of its Chart Review Program, United reviewed between 500,000 and 600,000 charts each year.  According to a presentation by Dumcum, United reviewed 600,000 charts in 2006 and, as of September 21, 2007, had completed 400,000 chart reviews so far that year with 200,000 charts remaining for review during the fourth quarter of 2007.

126.   By 2010, the number of chart reviews had increased substantially to approximately 850,000 charts for that year.  For 2011 to 2014, United reviewed approximately 1.5 million charts a year.  The Government believes that, after 2014, United's national Chart Review Program was most likely similar in size.

127.   As part of this national Chart Review Program, United focused primarily on its providers paid on a fee-for-service basis.  United or its vendors obtained medical records from thousands of these providers throughout the United States.  United sent these medical records to coders that it employed in Tennessee, India, and the Philippines.  It also hired coding vendors to review these medical records.  Those vendors were located in various locations within and outside of the United States.

128.   United's own physician groups also had chart review programs.  WellMed had a group called DataRaps that conducted reviews of its physicians' medical records for patients in United's MA Plans.  Southwest Medical Associates conducted some of its own reviews though it also relied on United's coding operations in Tennessee and coding vendors for its chart reviews.

129.   In 2006, United obtained approximately $270 million in additional risk adjustment payments from the ADDS that it submitted based on its national Chart Review Program.  The return on investment was substantial (approximately $250 million) as it cost United only approximately $18 million to review the charts in 2006.

130.   Not unexpectedly, as the number of medical records reviewed significantly increased over the years so did United's earnings from its Chart Review Program.  United received approximately $426 million in additional risk adjustment payments from ADDs that it submitted to Medicare based on the medical record reviews conducted as part of its Chart Review Program for the 2011 payment year, approximately $455 million for the 2012 payment year, approximately $758 million for the 2013 payment year, and approximately $882 million for the 2014 payment year.

131.   For payment years 2010 to 2015 combined, United obtained over $3 billion in additional risk adjustment payments from Medicare due to the ADDs which it submitted based on medical record reviews conducted as part of its national Chart Review Program.

132.   United's Chart Review Program was conducted according to an annual cycle.  For example, in the spring of 2012, United started its collection and review of medical records relating to medical encounters in 2011 (*i.e.*, with 2011 dates of service).  These efforts then intensified through the remainder of the year until the final deadline for submitting diagnosis codes to Medicare for payment year 2012, which was February 15, 2013.

133.   Prior to the start of each annual cycle, United's senior executives set a revenue target for the program.  After chart reviews started, United's senior executives then

42

closely monitored the progress of the program and, if the forecast did not look like the program would achieve the revenue target, United made changes to the diagnostic coding being performed by the coders.  For instance, when United was not achieving the return on investment it expected from chart reviews for the 2012 payment year, it "liberalized" its coding policies and engaged in a "Recode Project" consisting of re-reviewing 900,000 charts that had already been mined once for additional diagnoses. United liberalized its coding policies to enable the coders to identify more diagnosis codes purportedly supported by the beneficiaries' medical records.  In this second-round review, the coders did identify more codes purportedly supported by the records based on the liberalized coding policies and United submitted those to Medicare for additional risk adjustment payments.

134.   Despite its aggressive coding to submit as many ADDS as possible to meet its annual revenue targets for its Chart Review Program, United attested to the validity of *all* of these ADDS in its annual Risk Adjustment Attestations submitted to Medicare.  If the results of United's chart reviews were so reliable that United could attest to the validity of all of the ADDS, then the results were of equal reliability for United to have deleted all previously-submitted diagnoses invalidated by the reviews.  To the extent that United calls into question the results of its own chart reviews in *not* finding support for and *not* validating hundreds of thousands of diagnoses, it also calls into question the overall reliability of its chart reviews and validity of the ADDS.  Under those circumstances, United acted with reckless disregard for the truth by submitting the ADDS and attesting to their validity, knowing it was not entitled to payments by Medicare based on such unreliable data and the United States is entitled to recover those payments in this action.

### III.    United Knew It Was Obligated To Look Both Ways At The Results Of Its Chart Reviews And Make DELETES As Well As ADDS

135.   By 2008, Relator Poehling and others began to question United's practice of ignoring the negative results of its blind chart reviews invalidating many provider-

43

reported diagnoses.  In May 2008, Relator Poehling participated in a meeting in which he discussed this issue with Will.  She explained to Relator Poehling that, as part of its Chart Review Program, United did not look at whether provider-reported diagnoses were not substantiated by the results of the coders' blind chart reviews.  Poehling and Will discussed the idea of United changing this process to compare the results of the blind chart reviews to the provider-reported diagnoses that United submitted to CMS and deleting the unsupported diagnoses.

136.   United's need to address problems with the diagnoses reported by providers paid on a fee-for-service basis continued to be an issue.  In March 2009, this question arose during a discussion among Ingenix employees about United's IDV Program.  During that discussion, Ronnie Grower, Vice President of Market Consultation for Ingenix, noted that United's IDV program excluded fee-for-service providers and questioned whether United would have another program to address diagnoses reported by fee-for-service providers given that "there are common coding errors that get reported across all providers."  In fact, other than its short-lived CV Program, United never had a medical record review program like the IDV or RACCR Programs to address the validity (or lack thereof) of diagnoses reported to it by its fee-for-service providers.

137.   In 2009, these internal discussions continued.  In early April 2009, Relator Poehling, Dumcum, Will, Halva, Janice Redmond (the Senior Vice President of Market Outreach for Ingenix's risk adjustment group, who worked in Santa Ana, California) and others participated in a discussion about compliance risks, including provider over-coding (*i.e.*, invalid coding).  One of the items on the agenda that they discussed included "[a]uditing under & over coded conditions" as part of the chart review process, that is, "looking both ways."  A few weeks later, Relator Poehling again met with Will and others to discuss what United should do when provider-reported diagnosis codes were inconsistent with the results of the coders' blind chart reviews of the providers' medical records.  At this second meeting in April 2009, the participants began to design a methodology for "looking both ways."  This led to subsequent discussions about

44

1    creating a CV Program in order to look both ways at the coders' blind chart review

2    results and make DELETES as well as ADDS.

3    138.   A few months later, in August 2009, in an internal presentation, Redmond noted

4    that chart reviews only looked for additional revenue and suggested that the process

5    should also include a certain amount of charts that are reviewed to determine the validity

6    of providers' codes.  Redmond was concerned that providers paid by United on a fee-for-

7    service basis were not being audited to validate their diagnoses.  Her presentation states:

8    "Known problematic codes are not audited across plans/providers raising the risk of

9    error."

10   139.   In early 2010, Will sent Dumcum a presentation proposing the CV Program.  The

11   stated goal of the program was to improve the accuracy of the diagnosis data that United

12   submitted to CMS.  Will believed that CV would achieve this goal.

13   140.   In May 2010, Relator Poehling discussed the potential creation of the CV Program

14   with Dumcum.  Dumcum referenced the Department of Justice's enforcement of the

15   FCA as a consideration.

16   141.   According to Halva, while she was the UnitedHealthcare Medicare & Retirement

17   Compliance Officer from 2010 to 2013, the "general consensus from the

18   [UnitedHealthcare Medicare & Retirement] point of view was . . . that any time we

19   opened a chart we should be looking both ways."

20   142.   In the fall of 2010, after two years of discussions, United senior executives

21   acknowledged that United should "look both ways" at the results of its blind chart

22   reviews.  By at least that time, however, United should and could have compared the

23   results of *all* chart reviews to the provider-reported diagnoses and deleted all of the

24   invalid provider-reported diagnoses that it previously had submitted to the Medicare

25   Program.  United also should and could have done this contemporaneously with

26   submitting ADDS based on the same chart reviews.  Instead, United embarked on a very

27   slow, phased development of its CV Program.  The senior executives authorized only a

28   pilot test program to look at the negative results (*i.e.*, the results showing that provider-

reported diagnoses were invalid) from only a very small sample of United's chart reviews.  Moreover, the CV process was designed to "save," – that is, avoid reporting – the provider-reported diagnoses invalidated by the blind chart reviews conducted as a part of the Chart Review Program.  United attempted and sometimes did save some of these invalid codes by re-reviewing the beneficiaries' medical records, sometimes multiple times, to try to glean any support, even doubtful or ambiguous support, for the provider-reported diagnoses at issue.

143.   In August 2011, Relator Poehling made clear to Scott Theisen, the Chief Financial Officer of UnitedHealthcare Medicare & Retirement, that Poehling did not believe it was appropriate to conduct chart reviews unless and until CV was fully implemented and United "looked both ways."  Theisen was one of the United senior managers charged with making decisions regarding the implementation and design of the CV Program.  At that time, in an email to another United employee, Poehling wrote:  "You (and Scott [Theisen]) know where I stand on chart reviews without full CV in place … I wouldn't do them.  Scott, though, is the decision maker . . . ."

144.   In September 2011, Mary Hammond, Associate Director of Strategy and Support for UnitedHealthcare Medicare & Retirement's risk adjustment team, attended an industry conference in Washington, D.C. on risk adjustment.  She reported that it was "great to get a perspective on what the activity in DC may mean for risk adjustment.  More audit protection (*looking both ways compliance programs*), . . . and less reliance on chart review are the recommendations."  (Emphasis added.)

145.   In approximately November 2011, a "factual and unbiased" presentation was created for UHG's Chief Executive Officer Steve Hemsley, to provide him information about Optum's and its competitors' risk adjustment programs and other risk adjustment services.  The presentation described "Compliance" as "the True Value of Claims Verification."  The presentation further noted that the medical record is the "source of truth" and that looking at this "source of truth" had a negative revenue impact because

comparing provider-reported diagnoses with the information in the providers' medical records resulted in having to delete some of their diagnoses.

146.   In December 2012, Mike Jacobson, Program Business Analyst/Project Management at Optum, sent Patty Brennan an updated version of Optum's Business Vision Document (BVD) for the marketing of the CV Program to commercial clients (*i.e.*, third-party MA Organizations).  Under the section titled "Business Segment Strategies and Tactics," the document stated that "Optum has an industry compliance duty and responsibility to ensure that each HCC code is accurate and can be substantiated within the medical charts."  Under the section titled "Competitive Analysis – Market Research," the document stated:  "The marketplace will soon recognize the need and importance of performing due diligence on HCCs added during the chart review process but also verifying HCCs submitted to CMS can be substantiated within the medical chart according to CMS guidelines.  For HCCs that cannot be substantiated within the medical chart, clients will need to perform the appropriate deletes in order to remain compliant with CMS guidelines."  At this time, Optum had already begun marketing CV or "looking both ways" chart reviews to commercial clients.

147.   In September 2012, the Chief Executive Officer of OptumInsight, Bill Miller, informed the Government that United was developing a CV Program to ensure the accuracy of the diagnosis data it submitted to CMS.  He explained that the purpose of the program was to determine if United could find support for provider-reported diagnoses that were not identified as a result of the blind chart reviews during the Chart Review Program.  Miller further stated that unsupported diagnoses would be deleted.  United knew that this information was important to the Government.  United led the Government to believe that it was not deliberately ignoring or recklessly disregarding the negative results of its Chart Review Program showing that numerous provider-reported diagnoses that it had submitted for payment were invalid.

148.   Until 2012, United allowed coders to review medical records at providers' offices if the providers did not want United to copy the records.  However, in 2012, in

47

accordance with its acknowledgement of its obligation to "look both ways," United changed its policy and restricted on-site reviews because it needed copies of the charts in order to conduct CV.  Hammond, in an April 2012 email, explained this decision: "M&R has made a decision on the chart reviews where providers are requiring onsite coding.  We will ask the [United] Provider Advocates to talk to the groups to try to talk them out of it.  If they won't budge, then we will allow onsite coding if OptumInsight has a solution for doing claims verification on those charts."

149.   Similarly, at around the same time, United also decided that Optum's commercial clients were required to retain Optum to perform CV (*i.e.*, to "look both ways") if Optum performed chart reviews for them and submitted risk adjustment data, including diagnoses, to CMS on their behalf.  According to Dumcum, United decided "that if we did chart review and submissions, that we then must do the two-way look.  It became our policy of how we executed business at the time.  So if they bought both, then we required that piece [*i.e.*, CV] be implemented."

150.   United has also consistently demanded that CMS and HHS OIG, when performing their audits, credit United for any additional medical conditions that United believed were supported by the medical records but that had not been reported by the providers.  United took the firm position with the Government that, in order to accurately reflect a patients' true health status, it was necessary to review patients' medical records for both the under-reporting (not reporting diagnoses supported by the beneficiaries' medical records) and over-reporting (the reporting of codes unsubstantiated by the beneficiaries' medical records) of medical conditions by providers.  In fact, CMS RADV audits have historically credited MA Organizations, including United, for additional diagnoses found during such audits.

151.   For example, in a February 2011 letter from Thomas Paul, the Chief Executive Officer of UnitedHealth Medicare & Retirement, to CMS concerning the parties' dispute about the preliminary results of CMS' pilot RADV audit of one of United's MA Plans, United argued that the dispute process "incorrectly exclude[d] consideration of

48

additional CMS-HCCs" supported by the beneficiaries' medical records. United stated that it identified additional HCCs (*i.e.*, additional diagnoses mapping to additional HCCs) in the medical records and, if CMS refused to give it credit for them, it would challenge CMS legally. In September 2012, in a letter from Theisen, the Chief Financial Officer of UnitedHealthcare Medicare & Retirement, to CMS about the same pilot RADV audit, United continued to complain that the audit incorrectly excluded consideration of additional HCCs and argued that United should receive credit for the additional HCCs. United stated: "If [the MA Plan] is not credited for these incremental HCCs, then any adjustments made by CMS do not accurately reflect an enrollee's comprehensive medical conditions. The goal of RADV audits should be to determine the full extent of enrollees' medical conditions, and **make overpayment and underpayment adjustments so that [MA Plans] are paid commensurate with enrollees' health status**." (Emphasis added.) Similarly, in a September 2012 letter from Thomas Paul to HHS OIG, United stated that "the OIG should correct the invalid HCCs and credit [the MA Plan] with the incidental HCCs documented in the submitted medical records."

152.   ICE, the industry group to which United belonged and which it financially supported, also opined that "looking both ways" was a "Best Practice." It issued a Best Practices document encouraging the industry to conduct chart reviews that "looked both ways." It described the advantages of such chart reviews as "[p]romoting validation functions for diagnostic codes previously submitted by providers" and "[p]roviding the ability to submit code corrections forward (additions and deletions) to health plans upon the completion of review."

## IV.   United's Short-lived "Look Both Ways" Claims Verification Program

153.   In September 2010, Lee Valenta, Ingenix's Chief Operating Officer, sent Thomas Paul, the Chief Executive Officer of UnitedHealthcare Medicare & Retirement, a memorandum "summariz[ing] Ingenix's plans for implementing a claims verification program for charts reviewed by Ingenix on behalf of Ovations [*i.e.*, United's] Medicare

49

Advantage Plans."  Valenta explained that the "overarching aim" of the CV Program was "improving the quality of member-level diagnosis information submitted to CMS." He also explained that the purpose of the program was to identify the provider-reported diagnoses that were not validated by the blind medical record reviews conducted as part of the Chart Review Program and for another coder to conduct a second non-blind review to determine if the provider-reported diagnoses were missed by the first blind coder.

154.   Valenta's memorandum also set forth a three-phased approach for the development of the CV Program.  The first phase, Phase I, was supposed to focus on a random sample of 850 beneficiaries in United's MA Plans whose medical records for encounters (*i.e*., provider office visits) in 2009 were included in the Chart Review Program in 2010 and had already been subject to a blind review as part of that Program. Phase I was supposed to start in October 2010 and be completed by January 31, 2011. The second phase, Phase II, was supposed to focus on a larger sample of beneficiaries and, thus, a larger number of medical records for encounters in 2010.  This group was supposed to include all beneficiaries who had medical encounters with only one provider during 2010.  Phase II was supposed to start by May 2011.  The final phase, Phase III, was supposed to focus on all beneficiaries in United's MA Plans whose medical records for medical encounters in 2011 were included in United' national Chart Review Program in 2012 and had already been subject to a blind review as part of that Program.  Phase III was supposed to be implemented in 2012.

155.   In October 2010, Cindy Polich, the President of the group that managed United's MA Plans at the time (and who worked at United's Santa Ana office), responded to Valenta's memorandum.  Polich agreed to his proposal.  Polich also acknowledged that United needed to improve its risk adjustment programs, including its chart review strategy.  She stated that "[w]hile Ingenix is implementing Phase II [of CV], PSMG will conduct a comprehensive review of its current risk adjustment strategies, including our

1   chart review strategy.  The purpose of this review is to determine the future programs

2   and approaches to be used to improve the accuracy of our risk scores."

3   156.   In a CV project management document, United also described CV as "[a] risk

4   adjustment chart audit service designed to ensure that qualified patient diagnoses and

5   conditions are identified and supported in the physician medical record documentation.

6   This audit service identifies any discrepant coding patterns contained within the medical

7   record documentation and the associated claims and encounters.  This service includes

8   the submission and delete process to CMS, financial reporting, and training/education for

9   providers.  Claims Verification will further supplement our efforts to assess coding

10  accuracy and our ability to drive prospective improvements by engaging and educating

11  providers."

12  157.   According to Theisen, United decided to "look both ways" and implement CV in

13  order to defend its Chart Review Program in light of increased scrutiny on risk

14  adjustment.

15  158.   United, however, took over three years to develop its CV Program.  Furthermore,

16  the manner in which United developed and then implemented its CV Program shows that

17  United was never committed to honoring its obligation to undertake good faith efforts to

18  ensure the validity of the risk adjustment data that it submitted to the Medicare

19  Advantage Program.  United did not automatically delete the provider-reported

20  diagnoses that were not supported by its medical record reviews conducted as part of its

21  Chart Review Program.  Rather, United considered these invalid diagnoses as mere

22  "potential deletes" and instructed its coders to re-review the medical records to try to

23  avoid deleting them.  United trained the CV coders that the goal of CV, above all else,

24  was to "validate" or "save" the potential deletes through finding any support for the

25  diagnosis anywhere in the beneficiary's chart.  Additionally, United instructed its coders

26  to save these invalid diagnoses even if the information in the medical records was

27  ambiguous.

28

51

159.   When performing CV, United also did not consult providers even when medical records were ambiguous concerning whether the beneficiaries actually had the medical conditions depicted by the diagnosis codes.

160.   United also saved "potential deletes" by simply just accepting the diagnoses reported by providers even when the medical conditions were not unambiguously documented in the beneficiaries' medical records.  United characterized this as deferring to the judgment of the provider or the provider's administrative staff who assigned the diagnosis codes.  For example if a chart was unclear, illegible, or missing, and even though United could not identify any medical records documenting the medical conditions identified by the provider-reported codes, it just accepted the codes and did not delete them.  United did this with either deliberate ignorance or reckless disregard for the truth in light of the mountain of knowledge it possessed about the significant percentage of invalid provider-reported diagnoses.

161.   However, despite all its flaws, the CV Program confirmed what United already knew about the significant error rate associated with provider-reported diagnoses that it submitted to Medicare for risk adjustment payments.

162.   At the end of 2010, United conducted the first pilot phase, Phase I, of its development of the CV Program.  As specified in Valenta's memorandum, Phase I included a very small sample of medical records that United had reviewed as part of its Chart Review Program for encounters (*e.g*., office visits) that beneficiaries had with providers in 2009.  A "CV Dashboard" summary from December 2010 shows that out of the many hundreds of thousands of medical records included in its Chart Review Program for 2009 encounters, only 843 records were included in Phase I of the CV Program.  By December 2010, the review for 728 of those medical records had been completed.  The results showed that 224 of the 728 medical records re-reviewed as part of CV (*i.e*., reviewed once as part of the Chart Review Program and then again as part of Phase I of the CV Program) had both at least one ADD (a diagnosis code that the provider had not reported) and at least one DELETE (a diagnosis code that was reported

by the provider but not validated by the medical record) and 167 of the 728 medical records re-reviewed as part of CV had at least one DELETE but no ADDS. Furthermore, of the HCCs and the RxHCCs for which United looked for validation in these 728 records that it had re-reviewed, 19 percent of the HCCs and 15 percent of the RxHCCs did not validate.  At the time that the summary was prepared, United was conducting "follow-up" on 39 medical records.  Of the HCCs and the RxHCCs for which United looked for validation in these 39 medical records that it had re-reviewed, 47 percent of the HCCs and approximately 45 percent of the RxHCCs did not validate.

163.    As part of Phase I, but only as part of Phase I, United sometimes contacted the providers who gave it the medical records.  It did this when the second non-blind review of the records in CV failed to validate the diagnoses that the first blinded review failed to validate as part of the Chart Review Program.  For some beneficiaries, the providers responded that they should not have submitted their claims (*i.e.*, the claims which included the diagnoses) to United.  Consequently, the diagnoses should not have been submitted by United to CMS.  For some other beneficiaries, the providers did not have additional records or their additional records did not support the diagnoses in question.

164.    In mid-2011, United began conducting the second pilot phase, Phase II, of its CV Program.  Phase II began in the summer of 2011 and was completed in early 2012.  Out of the many hundreds of thousands of medical records included in the Chart Review Program for 2010 medical encounters, United included only approximately 17,000 charts in Phase II.  United's coders tried to save as many "potential deletes" as possible when reviewing these medical records as part of Phase II.  Nonetheless, the results of their CV reviews confirmed more invalid diagnoses (DELETES) than the number of additional codes (ADDS) gleaned from the same records.

165.    In mid-2012, United began conducting a preliminary test or pilot for Phase III of the CV Program.  This pilot included approximately 5,000 medical records relating to encounters (*e.g.* office visits) that beneficiaries had with providers during calendar year 2011.  In September 2012, Theisen explained to others at United, including Relator

53

Poehling, that UnitedHealthcare Medicare & Retirement, relying on the results of this sample review, had increased its estimate of the financial impact of CV deletes.  In October 2012, Theisen sent Daniel Schumacher, the CFO of Defendant UnitedHealthcare, Inc., and others a "CV III analysis – based on 2011-2012 Chart review activity for 2011 DOS."  The document showed validation rates based on the review of HCCs because the coders were instructed to find support for any diagnosis that mapped to the HCC under review even if it was not the same diagnosis reported by the provider that originally mapped to that HCC.  The document showed that the validation rate "[b]ased on results of CV3 pilot (5,000 chart sample)" was 66.4 percent.  In other words, only 66.4 percent of the HCCs reviewed were supported by the beneficiaries' medical records.  That meant that 33.6 percent of the HCCs were unsupported by the beneficiaries' medical records even after United reviewed them twice, once as part of the Chart Review Program and again as part of the pilot CV Phase III process.  Based on these results, United estimated that the negative financial impact of CV in 2012 would be $226 million based on the number of estimated "potential deletes" that it could not save and would have to be made.  United estimated that diagnoses mapping to 120,147 HHCs would have to be deleted and that, on average, <u>each</u> delete would result in a $1,924 negative financial impact.

166.   In or about October 2012, United recorded in its financial records a $208 million accrual for potential revenue reductions due to deletes that would need to be made as part of the CV Program (hereinafter referred to as a "CV liability accrual").

167.   Until late 2012, United did not complete its pilot tests and start to implement its CV Program for charts relating to 2011 medical encounters (*i.e*., with 2011 dates of service).  Even after that, it never fully implemented the program.  It also continually changed the program in order to limit its scope and created arbitrary rules to avoid looking at the negative results of many of the blind chart reviews conducted as part of the Chart Review Program.  In addition, when United learned that its second review of the medical records in CV was not saving a significant number of diagnoses from

1  deletion, it created another level of review.  That is, it created a re-re-review or third

2  review of the beneficiaries' medical records in order to keep trying to save the diagnoses

3  from deletion.  United also limited the scope of CV by excluding certain providers,

4  including providers that it owned and operated.  In 2014, United then terminated CV

5  without completing the program for charts relating to 2012 medical encounters (with

6  2012 dates of service).

7  168.   United imposed several arbitrary exclusionary rules to improperly disqualify many

8  medical records reviewed as part of its Chart Review Program from its CV Program.

9  For medical records for encounters in 2011 and 2012, United arbitrarily and improperly

10  excluded numerous medical records from CV.  By arbitrarily and improperly excluding

11  all these medical records from CV, United deliberately ignored or recklessly disregarded

12  a lot of the negative results from its Chart Review Program and knowingly failed to

13  delete all invalid provider-reported diagnoses.  For example, United excluded numerous

14  charts from CV because the image of the chart was purportedly "unavailable."  Yet,

15  when making ADDS in the Chart Review Program, the image of the chart or chart itself

16  must have been available.  But, instead of locating the images or obtaining the charts for

17  CV, United decided not to re-review the charts to save those diagnoses invalided by the

18  results of its Chart Review Program.  It also did not delete those invalid diagnoses.

19  169.   The re-reviews conducted as part of United's CV Program did not save as many

20  deletes as United would have liked and, in 2013, Theisen and others at United became

21  increasingly concerned about the financial impact of the deletes.  United decided that its

22  coders were not saving enough "potential deletes."  Accordingly, sometime in 2013,

23  United decided that a third review or a re-re-review of the medical records had to be

24  conducted to try to save more deletes.

25  170.   Thus, if United's internal coders were unable, despite their best efforts, to "save" a

26  diagnosis code, United sent that code to a coding consultant for re-re-review.  United

27  knew, however, that the consultant engaged in a pattern of "saving" diagnoses without

28  supporting medical records in several circumstances, including when the chart was

scanned illegibly, when pages were missing from a chart and the diagnosis could not be validated, and when the reported date of service did not appear in the chart.  By accepting validation of these diagnoses without supporting medical records, United knowingly and improperly avoided its obligation to return monies to the Medicare Program to which it was not entitled.

171.   In November 2013, Donald James, the Director of Program Strategy for Optum in Santa Ana, California, reported to senior management that the CV Program had not yet started for charts reviewed as part of the 2013 Chart Review Program.  In December 2013, Patty Brennan, also in the Optum Santa Ana office, reported to Dumcum that "[h]alf of the CV volume for 2012 DOS has been completed but deletes are on hold."  She also informed him that UnitedHealthcare Medicare & Retirement "[r]equested all CV deletes be held until further noticed so Ops is not going to complete the second half of the volume at this time."

172.   When Steve Nelson became the Chief Executive Officer of UnitedHealthcare Medicare & Retirement in early 2014, he spoke with Steve Hemsley, the Chief Executive Officer of UHG, about whether United should continue the CV Program. Hemsley encouraged Nelson to look into whether or not United should do so, formulate an opinion, and report back to him.

173.   In February 2014, Marc Beckmann, in the Finance – Risk Adjustment Analysis Group at UnitedHealthcare Medicare & Retirement, sent information about CV liability accruals to Daniel Schumacher, the Chief Financial Officer of Defendant UnitedHealthcare, Inc., and Brian Thompson, the new Chief Financial Officer for UnitedHealthcare Medicare & Retirement.  He estimated that the effect of CV on United's revenue would be $208 million for payment year 2012, $125 million for payment year 2013, and either $125 million or $175 million (depending on the number of charts reviewed) for payment year 2014.

174.   On March 3, 2014, Jon Bird, the Senior Vice President of Risk and Quality Analytics who worked at Optum in Santa Ana, California, participated in a meeting with

Thompson about the CV liability accrual for 2013.  Thompson wanted to "move toward the more conservative range of the confidence interval (from 50% to 80%) resulting in [a] $29M higher CV estimate" for the liability accrual.  By March 3, 2014, United's estimate of its CV liability accrual for 2013 already had been increased by over $50 million dollars from $125 million to $180 million.

175.   Also, in February or March 2014, the financial managers at UnitedHealthcare Medicare & Retirement, including Brian Thompson, performed a comparison of their then-expected revenues for 2014 with the revenue estimated in UnitedHealthcare Medicare & Retirement's annual budget for 2014.  They determined that there was going to be a shortfall in their financial performance relative to that budget and they started to think about ways to eliminate the shortfall.

176.   In March 2014, Thompson sent Nelson "a current brain dump of 'shut off/stop doing' that is not yet valued/included in the road back to plan."  Part of the "brain dump" was to "shut off" or reduce compliance efforts.  Thompson asked others at UnitedHealthcare Medicare & Retirement for other "shut offs."

177.   Subsequently in March 2014, Marybeth Meyer, the United employee who ran the risk adjustment team at UnitedHealthcare Medicare & Retirement after Relator Poehling left United, reported to Thompson that the "CV estimate of $125M may be light (estimate for 2012 DOS/2013 payment year of $167M)."

178.   In late March or early April, Nelson met with other Chief Executive Officers at Defendant UnitedHealthcare, Inc. to discuss UnitedHealthcare Medicare & Retirement's financial performance.  A very detailed slide deck was created for that meeting.  After the meeting, the slide deck was sent by Schumacher to senior executives at United, including executives who reported to Hemsley.  The slide deck highlighted that UnitedHealthcare Medicare & Retirement was projecting that its actual revenues for 2014 were going to miss the target set forth in the annual budget by half of a billion dollars.  It stated:  "Best estimate of $500 million budget miss."  It also stated that, because of that projected miss, UnitedHealthcare Medicare & Retirement's management

57

was making a commitment to the senior executives to "find $250 million to cut miss in half."  UnitedHealthcare Medicare & Retirement referred to this "Management Commitment" as a $250M "good guy."

179.   Nelson and others at United, including Hemsley, knew that, if United terminated the CV Program, it could cut the $500 million miss by $250 million by reversing the CV liability accruals and not deleting the provider-reported diagnoses invalidated by its chart reviews.  This was their "good guy."  But, United was concerned about the consequences of terminating the program and reverting to ignoring the negative results of its chart reviews.  It decided to ask CMS about the retroactivity of a proposed regulation requiring MA Organizations to design all medical record reviews to validate diagnoses submitted to CMS.

180.   Under Hemsley's direction, Larry Renfro, the Chief Executive Officer of Optum, contacted senior government employees at CMS, including the Administrator of CMS, to ask whether United had a legal obligation to perform CV before the effective date of the proposed rule.  These employees were not government attorneys and could not render the requested legal advice.  Renfro, moreover, knew nothing about United's Chart Review or CV Programs and could not impart any meaningful information about these programs to the government employees.  Accordingly, Renfro could not and did not provide the senior government employees with any description of United's CV Program or its purpose.  Hemsley and his attorneys, however, continued to push Renfro to make further contacts with these employees when United did not initially obtain from them the legal opinion it wanted.

181.   On or before April 8, 2014, Renfro asked Karen Erickson, an Optum employee who worked directly for him, for speaking points for a call with the Administrator of CMS.  On April 8, 2014, Erickson sent Renfro's assistant, Juliet Domb, "aspirational" talking points, that is, things that they wanted Renfro to get the CMS employees to say, including "CV is not currently required" and that United was "allowed to stop any CV activities (including delete submission) currently underway." (Emphasis in the original.)

58

In her email, Erickson told Domb: "I sent this to Marianne [Short] and Matt Shors for editing – they will send final directly, and they know it has to be today." The same day, Renfro spoke to Hemsley and Short to obtain direction about what he should say to the Administrator of CMS on the call that he had scheduled with the Administrator. Renfro then purportedly spoke with the CMS Administrator and purportedly dictated notes of the call to Domb who wrote the notes by hand on Renfro's notepad and sent them to Short. According to Renfro, he dictated these notes from memory and he does not usually take notes, but was asked to do so by Short.

182.   On April 26, 2014, Short asked Renfro to again contact the Administrator of CMS. According to Thompson (the Chief Financial Officer of UnitedHealthcare Medicare & Retirement in 2014), Renfro had not obtained the "clarity" United wanted from the Administrator about whether it was obligated to perform CV. Accordingly, on April 27, 2014, Renfro sent an email to the Administrator asking the same questions he had purportedly asked her on April 8 and to which she purportedly had responded on April 8. He also asked for a meeting with other employees at CMS who were responsible for operating the Medicare Advantage Program. On April 27, 2017, Renfro reported to Hemsley and Short that CMS was arranging for United to meet with these employees.

183.   On April 29, 2014, Hemsley sent United's attorney, Thad Johnson, to Washington, D.C. to speak with those CMS employees responsible for the Medicare Advantage Program, including Cheri Rice, the Director of the Medicare Plan Payment Group at CMS. Nelson, Schumacher, and an Optum employee, Karen Erickson, also attended the meeting. Long before this meeting, United knew that the Department of Justice was conducting a FCA investigation relating to United's Chart Review and CV Programs. Yet, United did not notify the Department of Justice that it was sending an attorney and others to speak with government employees about matters under investigation. Accordingly, the government employees at the meeting were unrepresented by government counsel and were not authorized to provide legal advice about United's obligations under the FCA or any other laws.

59

184.   At the meeting on April 29, 2014, when United informed CMS about the possibility of terminating its CV Program, CMS told United that it had a statutory obligation to report and repay Medicare for erroneous risk adjustment payments and that there were FCA implications if it failed to do so.

185.   CMS also told United that it could not ignore information in its possession showing that diagnoses may be invalid and that United was obligated to delete invalid diagnoses.  According to Erickson, CMS told United that "if there was reason to have knowledge that something had been begun and we were [*i.e.*, United was] far enough along that there was knowledge that something might not be supported that we needed to continue the investigation into those numbers, or those codes."  Erickson further recalled CMS stating that, if United had "knowledge of things that might not be supported we [*i.e.*, United] needed to continue the investigation."  According to Schumacher, CMS also told United that it did not have sufficient information about United's CV Program to provide further guidance.

186.   On April 30, 2014, Nelson sent an email to Cheri Rice at CMS about the meeting between United and CMS on April 29, 2014.  He stated:  "[A]s we discussed yesterday, CMS recently issued a proposed rule that would, if finalized, require MA plans to design any medical record reviews to determine the accuracy of risk adjustment diagnoses associated with those records.  During our conversation yesterday and other recent conversations, CMS confirmed to us that these requirements do not apply until the effective date of the rule, and that MA plans are thus not currently required to design their medical record reviews to determine the accuracy of risk adjustment diagnoses. We currently have a process through which we review certain medical records to determine the accuracy of risk adjustment diagnoses and submit appropriate deletes. This process already has resulted in the identification of and, in some instances, the submission of deletes for 2012 dates of service.  But based on the proposed rule, including the preamble, and recent conversations with CMS, we suspended that process for 2012 dates of service while we consider whether to make changes.  Pursuant to our

discussion, however, we will soon submit for deletion those diagnosis codes that have undergone a complete review and that we have therefore identified as appropriate deletes.  In the near future, we will determine whether to continue our review process for the diagnosis codes which were still under review at the time we suspended our process. In the meantime we will not delete these codes."

187.   On May 2, 2014, Cheri Rice replied to Nelson's email:  "[R]egardless of the effective date of the proposed requirement related to medical record reviews, there are other laws that do impose standards, requirements and responsibilities on MA plans in connection with the federal payments they receive from CMS.  We cannot provide advice to United about the scope of those other laws.  Nor can we provide advice on whether United's plan[ned] course of action and/or purported limits on the scope of its [Risk Adjustment Attestation, submitted April 30, 2014] are compliant with such other laws.  Your statement concerning the data submissions that have already been made and United's plans for future action will be included in our records and we will proceed with our evaluation and use of the risk adjustment data consistent with 42 CFR § 422.308, § 422.310, and other applicable law."

188.   According to Schumacher and Nelson, Rice's May 2, 2014 email did not say anything that was inconsistent with what CMS said in the meeting on April 29, 2014. And, as CMS mentioned during the April 29 meeting, the FCA is one of the "other laws" that imposes standards, requirements, and responsibilities on MA Organizations and their MA Plans in connection with the federal payments they receive from CMS.  After Rice sent her May 2 email, the Department of Justice sent a letter to United's counsel emphasizing that point.

189.   On May 5, 2014, UnitedHealthcare Medicare & Retirement informed Jeffrey Putman, UHG's Controller who reported to Hemsley, that "M&R CV delete, good guy, is ~$250M for the year (note this is just the M&R piece and there is an incremental component at C&S)."  According to Schumacher, the $250 million was the estimated amount of the deletes from CV for 2014 and prior years and, thus, the CV liability

accruals that United had recorded for 2014 and prior years.  The "good guy" was the hoped-for release or reversal of those accruals.  United knew the accruals were likely underestimated and the financial impact likely greater if it continued CV.

190.    Despite CMS' warnings in the April 29 meeting and Cheri Rice's May 2 email, Nelson, Schumacher, and Thompson decided to terminate the CV Program.  This decision was reported to Hemsley and, according to Nelson, Hemsley could have reversed this decision but instead he supported it.

191.    United also decided not to delete or otherwise report to CMS at least 100,000 invalid diagnoses about which it had *actual* knowledge based on more than one review of the patients' medical records for encounters in 2011 and 2012 (*i.e.*, encounters with 2011 and 2012 dates of service).  The single damages to the Medicare Program arising from United's submission and failure to delete just these invalid diagnoses is approximately $190 million under Part C alone.

192.    After it terminated CV, United reverted to "looking one way" at the results of its chart reviews, making only ADDS, and knowingly and improperly failing to delete invalid provider-reported diagnoses and repay the Medicare Program for them.

193.    At the time they decided to terminate CV, Steve Nelson, Dan Schumacher, and Brian Thompson knew that their decision would enable United to reverse its CV liability accruals by more than $250 million dollars.  Hemsley also was aware that terminating CV would enable United to achieve this financial benefit.  This was important to all of them because they wanted to represent to investors that UnitedHealthcare Medicare & Retirement's actual revenues were on target.  An internal document relating to United's second quarter 2014 "earnings release" issued in July 2014 states:  "Q2 was on track and we are building momentum that will take us through the year and into 2015. *Internal: Important to note that 2014 benefits from the one-time claims verification policy change which investors are unaware of*."  (Emphasis in the original.)

62

1

## V. United Failed to Delete At Least Over A Billion Dollars of Diagnoses Invalidated By Its Own Chart Review Program

2

3    194.    The results of United's chart reviews provided it with information about a

4    significant number of invalid provider-reported diagnoses that should not have been, but

5    were, submitted by United to the Medicare Program for risk adjustment payments.  For

6    example, for the 2011 payment year (involving payments based on diagnoses with 2010

7    dates of service), United submitted at least 197,000 diagnoses that were invalidated by

8    its medical record reviews conducted as part of its Chart Review Program.  But, for that

9    year, United deleted only a very few (approximately 1,800) of these invalid diagnoses

10   based on the results of Phase II of its CV Program.  For the 2012 payment year

11   (involving payments based on diagnoses with 2011 dates of service), United submitted at

12   least 222,329 diagnoses that were invalidated by its medical record reviews conducted as

13   part of its Chart Review Program.  Based on the results of its CV Program for charts

14   with 2011 dates of service, United deleted approximately 120,000 of these invalid

15   diagnoses despite its arbitrary exclusionary rules and attempts to save these deletes.  For

16   the 2013 payment year (involving payments based on diagnoses with 2012 dates of

17   service), United submitted at least 285,122 diagnoses that were invalidated by its

18   medical record reviews conducted as part of its Chart Review Program.  Based on the

19   results of its CV Program for charts with 2012 dates of service, United deleted

20   approximately 27,000 of these invalid diagnoses despite its arbitrary exclusionary rules,

21   its multiple attempts to save these deletes, and its failure to complete the program.  For

22   the 2014 payment year (involving payments based on diagnoses with 2013 dates of

23   service), United submitted at least 199,039 diagnoses that were invalidated by its

24   medical record reviews conducted as part of its Chart Review Program.  Because United

25   terminated the CV Program, it did not delete any of these invalid diagnoses.  These

26   numbers apply to invalid diagnoses relating to risk adjustment payments under Part C

27   only and not also Part D.

28

195.    Accordingly, United knowingly and improperly failed to delete or otherwise repay Medicare for most of the diagnoses invalidated by its Chart Review Program over the last decade.  For example:  for the 2011 payment year, United damaged the Medicare Program by at least $377,734,792 by failing to look both ways and delete diagnoses invalidated by its Chart Review Program; for the 2012 payment year, United damaged the Medicare Program by at least $213,978,134 by failing to look both ways and delete diagnoses invalidated by it Chart Review Program; for the 2012 payment year, United damaged the Medicare Program by at least $317,329,602 by failing to look both ways and delete diagnoses invalidated by its Chart Review Program; and for the 2014 payment year, United damaged the Medicare Program by at least $234,159,775 by failing to look both ways and delete diagnoses invalidated by its Chart Review Program.  These numbers apply to damages relating to risk adjustment payments under Part C only and not also Part D.

196.    Examples of beneficiaries with invalid diagnoses about which United knew but failed to delete based on its Chart Review Programs for payment years 2011 through 2014 are set forth in Exhibit 2 to this Complaint.

197.    Under the FCA, the United States is entitled to treble damages and penalties for the invalid diagnoses that United failed to delete for payment years 2011 through 2014 plus treble damages and penalties for the additional diagnoses invalidated by United's Chart Review Programs for the years before 2011 and after 2014.

**VI.    United Knowingly and Improperly Avoided Repaying Medicare For Invalid Diagnoses Reported By Its Financially-Incentivized Providers**

198.    As alleged below, the financial arrangements that United entered into with capitated and gainsharing providers were tied to the risk adjustment payments that United received from the Medicare Program.  These providers benefitted financially from any increase in risk adjustment payments resulting from the diagnoses they reported to United for beneficiaries enrolled in United's MA Plans.  United knew that these compensation arrangements created a strong financial incentive for the provider

1  groups to increase the number of diagnoses reported to United for each beneficiary, and
2  in some cases to report invalid diagnosis codes.
3  199.   Furthermore, United recognized that it had an obligation to review diagnoses
4  reported by these incentivized providers to determine their validity.  Thus, early on, it
5  performed the Internal Data Validation ("IDV") reviews discussed earlier in this
6  Complaint.  Then, in 2010, United implemented its Risk Adjustment Coding and
7  Compliance Reviews ("RACCR") Program with the stated goal of safeguarding against
8  improper diagnosis coding by these incentivized providers.
9  200.   Although the IDV and RACCR Programs were extremely limited in scope and
10  utility, they confirmed what United already knew:  that there were serious problems with
11  the diagnoses being reported by a number of its financially-incentivized providers,
12  including WellMed.  The programs also show how United knowingly avoided
13  identifying and deleting invalid diagnoses reported by these providers and repaying
14  Medicare for risk adjustment payments to which United and these providers were not
15  entitled.  They also provide additional facts showing the scope of the false claims
16  submitted by United to Medicare for risk adjustment payments and the falsity of
17  United's Risk Adjustment Attestations.
18  201.   United scoured millions of medical records through its Chart Review Program in
19  an effort to identify additional diagnoses and increase revenue, but it only reviewed
20  thousands of charts to identify invalid coding as part of the RACCR Program.  Like with
21  CV, United implemented RACCR in such a way as to drastically limit the program's
22  scope and utility and to avoid deleting invalid diagnoses.
23  202.   First, United excluded from its RACCR Program any incentivized providers with
24  fewer than 500 beneficiaries in United's MA Plans.  This resulted in the exclusion of
25  approximately 40 percent of the financially-incentivized providers from the RACCR
26  Program for medical encounters in 2008, 2009, and 2010 (*i.e.*, with dates of service in
27  those years).
28

203.   Second, for the incentivized provider groups with 500 beneficiaries or more, United did not review the medical documentation for any diagnoses unless the provider group was an extreme outlier in reporting diagnoses that mapped to one or more HCCs. Combined with the exclusion of providers with less than 500 beneficiaries, this resulted in a total exclusion of over 80 percent of the financially-incentivized providers for medical encounters in 2008, 2009, and 2010.

204.   For medical encounters in 2008, 2009 and 2010 (*i.e.*, with dates of service in those years), United defined an outlier as a provider that reported diagnoses mapping to a particular HCC more than three times as often as the average national prevalence rate for that HCC for all beneficiaries in United's MA Plans.  For example, if 15 percent of the beneficiaries in United's MA Plans nationwide were reported by providers to have a diagnosis that mapped to HCC 52 (Drug/Alcohol Dependence), United did not consider the incentivized provider an outlier unless it reported diagnoses mapping to HCC 52 for more than 45 percent of  its patients enrolled in United's MA Plans.

205.   For medical encounters in 2011 and 2012, United further limited which providers would qualify as an outlier in order to reduce the number of providers and HCCs subject to review.  Instead of using a national average prevalence rate for each HCC based on diagnoses reported by *all* of its providers, United used the average rate at which its financially-incentivized providers reported diagnoses mapping to each HCC.  Thus, an incentivized provider was considered an outlier only if it reported diagnoses mapping to an HCC more than three times as often as other incentivized providers, that is, providers who *also* had a financial incentive to invalidly code.

206.   A large percentage of the outliers were located in the Central District of California.  They are listed in Exhibit 3 to this Complaint.

207.   Third, after limiting the program to only extreme outliers, United conducted an initial review of just a small sample of beneficiaries for whom the provider had reported diagnoses mapping to the problematic HCC or HCCs (*i.e.*, a problematic HCC being one over 300 percent of the average prevalence rate).  For medical encounters in 2008, 2009,

and 2010, the initial sample size for even the largest provider groups was never more than 30 beneficiaries per problematic HCC, and was often as few as 10 beneficiaries per problematic HCC.  United purposefully kept the sample size small to ensure the samples were not statistically significant, enabling it to later argue that it was unable to extrapolate the results of its sample reviews to all of the diagnoses reported by the provider that mapped to the problematic HCC.  For 2011 and 2012 medical encounters, United increased the initial sample size to 50 beneficiaries per provider for each problematic HCC, which still ensured the results were not statistically significant for many providers.

208.   Fourth, after reviewing the medical records for the beneficiaries in the sample to determine if the diagnoses were valid, United gave a provider a "passing" grade if anything less than 20 percent of the diagnoses were determined to be invalid.  Accordingly, if 19 percent of the diagnoses were invalid, the provider passed this extraordinary lenient test and no further review was conducted.

209.   Fifth, if a provider failed the initial review for a particular problematic HCC, United often added only a few additional beneficiaries to the sample (*i.e*., additional beneficiaries for whom the provider had reported diagnoses mapping to the problematic HCC).  United called this an "incremental sample."  If United was successful in decreasing the invalidation rate to below 20 percent based on increasing the sample size, United considered the provider group to have a passing grade for that HCC.  Accordingly, if 19 percent of the diagnoses in the "incremental sample" were invalid, the provider passed and no further review was conducted.

210.   Sixth, if United determined that diagnoses in a sample review were not supported by the medical records, United did not always delete them.  For example:

- For 2008 medical encounters, United conducted a sample review for Edinger Medical Group of diagnoses mapping to Drug/Alcohol Dependence (HCC 52) and Major Complications of Medical Care & Trauma (HCC 164).  United's coders determined that "[t]here was no clinical documentation to support the diagnoses"

67

mapping to HCC 52 for six beneficiaries and that the diagnosis mapping to HCC 164 was the "wrong code" for one beneficiary.  (For all examples, further information to identify or aid in identifying the beneficiaries will be separately provided to the Defendants.)

- For 2008 medical encounters, United conducted a sample review for Family Practice Medical Group's diagnoses mapping to Drug/Alcohol Dependence (HCC 52).  For two beneficiaries, United's coder concluded there was "no clinical documentation to support the diagnoses."

- In a sample review for Sharp-Rees Sealy for Vascular Disease (HCC 105) for 2011, United failed to delete a diagnosis for Beneficiary AA even though its own coder determined it was the "wrong code."

- In a sample review for HealthCarePartners for Protein-Calorie Malnutrition (HCC 21) for 2011, United failed to delete a diagnosis for Beneficiary BB even though its own coder determined it was the "wrong code."

- In a sample review for Mercy Physicians Medical Group for Protein-Calorie Malnutrition (HCC 21) for 2011, United failed to delete a diagnoses for Beneficiary CC even though its own coder determined that it was the "wrong code."

- In a sample review for WellMed for Major Complications of Medical Care and Trauma (HCC 164) for 2011, United did not delete a diagnoses for Beneficiary DD even though its coder noted the "dx [was] not documented" in the record.

- In a sample review for HealthCarePartners for Pneumococcal Pneumonia, Emphysema, Lung Abscess (HCC 112) for 2012, United did not delete a diagnosis code for Beneficiary EE even though its coder determined the "dx [was] not documented."

- In a sample review for WellMed for Disorders of Immunity (HCC 45) for 2011, United did not delete a diagnosis code for Beneficiary FF even though its coder determined the diagnosis in the record was "not a current condition."

68

211.   Seventh, when United determined that an outlier provider failed the incremental sample review, United's RACCR policy specified that, with limited exceptions, *all* diagnoses reported by that provider mapping to the problematic HCC should be reviewed.  In other words, once it was established that a provider reported diagnoses mapping to a particular HCC three times or more than the average *and* that 20 percent or more of those diagnoses were not supported by the beneficiaries' medical records in the sample review, even United recognized that, with limited exceptions, a complete review of the medical records for all beneficiaries for whom the provider had reported diagnoses mapping to the problematic HCC was essential.  But, generally, United did not conduct these 100 percent reviews.  Instead, as part of the RACCR Program, United purported to require its providers – the very outliers who had reported the diagnoses at issue – to conduct these 100 percent reviews.  Not surprisingly, the providers were very resistant to performing these 100 percent reviews.  Sometimes, the providers reviewed the records for only some, but not all, additional beneficiaries for whom they had reported diagnoses mapping to the problematic HCC.  Sometimes, they did nothing.

212.   With respect to WellMed, United also knew that it could not rely on it to review its own diagnoses.  For example, in a "WellMed RACCR Audit Status Summary as of 2-9-12," it was reported that WellMed did a self-audit for 8 HCCs, but United determined that "70% of the codes [WellMed] indicated were properly documented actually were not supported in the medical record."  The same summary stated that, based on the sample reviews for 2008, 2009, and 2010, "WellMed failed to achieve an acceptable validation rate for multiple HCCs …, as defined by the RACCR audit program policy and procedure."

213.   For medical encounters in 2008 to 2010, at least 58 provider groups should have performed 100 percent reviews because they failed United's sample validation test for at least one HCC.  Combined, these providers should have conducted 100 percent reviews relating to 192 problematic HCCs.  However, the providers only conducted reviews of 143 of the 192 HCCs.  Thus, a quarter of all HCCs that failed United's validation test

69

1    were not further reviewed by either the provider groups or United.  Similarly, for 2011

2    encounters, 100 percent reviews were conducted for only 69 of 82 HCCs that failed

3    United's sample validation test.

4    214.   For example, for 2010 encounters, Edinger Medical Group coded Drug/Alcohol

5    Dependence (HCC 52) at a rate greater than three times the national rate.  United

6    determined that only 70 percent of the diagnoses in its sample were supported by

7    medical record documentation.  Because 30 percent of the sampled diagnoses were

8    invalid, a review should have been conducted for the additional 66 Edinger beneficiaries

9    with a diagnosis mapping to HCC 52 that were not included in the sample.  Nonetheless,

10   United did not require Edinger to do this review and United did nothing further to

11   examine Edinger's additional diagnoses mapping to HCC 52 that were not included in

12   the sample.

13   215.   Additional examples of provider groups that failed to conduct 100 percent reviews

14   for particular HCCs are shown in the chart attached as Exhibit 4 to this Complaint.

15   United also did not conduct the 100 percent reviews of these problematic HCCs.

16   216.   United knew that it was problematic that neither it nor the outlier providers

17   reviewed 100 percent of the diagnoses mapping to the problematic HCCs when the

18   providers failed the sample validation test.  It knew this because, in those cases where

19   100 percent reviews were conducted for problematic HCCs, more than seventy percent

20   of the HCCs had validation rates below 80 percent.

21   217.   Indeed, despite the many flaws of the RACCR Program, United knew from the

22   results of its small sample reviews and the 100 percent reviews that were actually

23   conducted that significant problems existed with diagnoses reported by its financially-

24   incentivized providers.  For example, for the sample reviews for 2008, 2009, and 2010

25   encounters, nearly half (49.61 percent) of the HCCs reviewed failed the 80% validation

26   test.  Over a third (37.01 percent) of all sampled diagnoses were not supported by the

27   beneficiaries' medical records.  Similarly, for the sample reviews for 2011 encounters,

28   more than half (57.34 percent) of the HCCs reviewed failed the 80 percent validation

70

1    test, and over 30 percent of all sampled diagnoses that United reviewed for that year

2    were not supported by the beneficiaries' medical records.

3    218.    Moreover, the problems with incentivized providers' invalid diagnoses were not

4    isolated incidents, but in many circumstances reflected a clear pattern of miscoding by

5    provider groups.  Although United purposefully reviewed only a small sample of

6    medical records each year, it knew that certain provider groups were consistently

7    identified as extreme outliers on certain HCCs and failed the 80 percent sample

8    validation test year after year.

9    219.    For example, every year from 2008 through 2011, Edinger Medical Group was an

10   extreme outlier for Spinal Cord Disorders/Injuries (HCC 69).  Over those four years,

11   United reviewed medical records for a total of 126 beneficiaries that Edinger diagnosed

12   with Spinal Cord Disorders/Injuries and determined that the medical records of only *two*

13   of those beneficiaries actually supported those diagnoses.  Nevertheless, United never

14   required Edinger to conduct a 100 percent review of its diagnoses that mapped to this

15   HCC and United itself never performed this 100 percent review.

16   220.    Similarly, every year from 2008 through 2012, HealthCarePartners was an

17   extreme outlier for Drug/Alcohol Psychosis (HCC 51).  During those five years,

18   HealthCarePartners's highest sample validation rate for this HCC was 57.14 percent.

19   HealthCarePartners conducted 100 percent reviews for 2008, 2009, and 2011, and each

20   time found that less than a third of the diagnoses were supported by its medical records.

21   HealthCarePartners or United should have conducted 100 percent reviews for 2010 and

22   2012 and for subsequent years until it was determined that HealthCarePartners was no

23   longer reporting invalid diagnoses mapping to this HCC, but they did not do so.

24   221.    Every year from 2008 through 2012, a provider named CAIPA was an extreme

25   outlier for Chronic Hepatitis (HCC 27).  During those five years, CAIPA's highest

26   sample validation rate for this HCC was 76.92 percent.  CAIPA conducted 100 percent

27   reviews for 2008 and 2009 encounters, and it was never able to validate more than 56.73

28   percent of the HCCs that it reviewed.  A 100 percent review should have been performed

71

1    for 2010 through 2012 encounters and subsequent years until it was determined that

2    CAIPA was no longer reporting invalid diagnoses mapping to this HCC, but neither

3    United nor CAIPA did so.

4    222.   Every year from 2008 through 2012, Hemet Community Medical Group was an

5    extreme outlier for Spinal Cord Disorders/Injuries (HCC 69).  During those five years,

6    Hemet's highest sample validation rate for this HCC was 50 percent.  Hemet conducted

7    100 percent reviews for 2008 through 2011, and its highest self-audit validation rate also

8    was 50 percent.  Hemet or United should have conducted a 100 percent review for 2012

9    and subsequent years until it was determined that Hemet was no longer reporting invalid

10   diagnoses mapping to this HCC, but neither did so.

11   223.   Every year from 2008 through 2012, WellMed was an extreme outlier for

12   Disorders of Immunity (HCC 45).  During those five years, WellMed's highest sample

13   validation rate for this HCC was 56.00 percent and its highest 100 percent review

14   validation rate was 63.64 percent.  A 100 percent review should have been performed for

15   2010 and 2012 encounters and for subsequent years until it was determined that

16   WellMed was no longer reporting invalid diagnoses mapping to this HCC, but neither

17   United nor WellMed did so.

18   224.   Although the sample reviews were limited and the 100 percent reviews were not

19   always performed, United knew that the invalid diagnoses identified through the

20   RACCR Program were significant in value.  In late 2012, United estimated that the

21   overpayment based on the RACCR 100 percent reviews for medical encounters in 2008,

22   2009, and 2010 (*i.e.*, with dates of service in those years) was $79 million and,

23   accordingly, took a liability accrual in that amount.  By early 2014, United also knew,

24   based on its observation of the results of the RACCR Program, that many of its large

25   incentivized providers had reported unacceptably high rates of invalid diagnoses for

26   numerous conditions.  However, rather than redoubling its efforts to address invalid

27   coding by incentivized providers, United restructured RACCR into but another chart

28   review program focused on making ADDS.  During the first half of 2014, United made

72

1    changes to its RACCR Program that effectively terminated the program as a tool for

2    identifying invalid coding by incentivized providers and refunding Medicare for risk

3    adjustment payments based on those providers' invalid diagnoses.

4    225.   First, United stopped requiring any 100 percent reviews when the sample reviews

5    failed the 80 percent validation test.  At the time United made this decision, it was

6    conducting RACCR sample reviews for 2012 medical encounters.  Accordingly, no 100

7    percent reviews were conducted for problematic HCCs associated with 2012 medical

8    encounters.

9    226.   For 2012, there were 21 outlier provider groups that had failed United's 80 percent

10   sample validation test.  United had determined that the average invalidation rate was

11   34.73 percent for these 21 providers based on the sample reviews of their problematic

12   HCCs.  United knew from prior years that 100 percent reviews would result in the

13   identification of more deletes.  Nonetheless, United failed to require 100 percent reviews

14   of the problematic HCCs or perform them itself.

15   227.   Second, for dates of service years after 2012, United stopped selecting sample

16   beneficiaries for reviews based on whether the providers had submitted diagnoses for

17   them mapping to problematic HCCs.  Instead, United began selecting beneficiaries and

18   medical records based on what it believed would yield additional codes and result in

19   increased risk adjustment payments.

20   228.   Third, starting with 2013, United reviewed even fewer medical records than in

21   previous years (less than 100 total) for each incentivized provider group.  Thus, United

22   reviewed only several thousand medical records as part of its new program.

23   229.   By making these changes, United effectively terminated the RACCR Program and

24   deliberately avoided identifying and, thus, deleting invalid diagnoses reported by its

25   financially-incentivized providers and repaying Medicare for risk adjustment payments

26   based on them.  The FCA was enacted to prevent and sanction defendants like United for

27   this type of deliberate ignorance, reckless disregard, and, in some cases, actual

28

73

knowledge of the invalidity of the data they submit to the Government for payments made with taxpayer dollars.

## VII.   United's False Risk Adjustment Attestations

230.   United submitted a Risk Adjustment Attestation each year after the final risk adjustment submission deadline.  United knew that it was required to submit a truthful Risk Adjustment Attestation to the Medicare Program.  United also knew that, if it deleted invalid diagnoses from RAPS prior to the submission of the Attestation, Medicare would not pay for them or would recover any erroneous payments associated with them.  However, United failed to do this and knowingly submitted false Attestations.  United had actual knowledge that the Attestations were false or acted in deliberate ignorance or reckless disregard of the falsity of the Attestations.

231.   Starting with the Attestation for payment year 2008 (if not earlier) and continuing forward, United added to its Attestations a footnote which stated that the Attestations were "based on facts reasonably available or made available to" it as of the date of the Attestation.  Facts reasonably available or made available to United included the negative results of its medical record reviews as part of its Chart Review, CV, and RACCR Programs.

232.   For example, on March 9, 2012, United submitted to CMS a Risk Adjustment Attestation attesting to the validity of diagnoses submitted for payment year 2011.  The Attestation was signed by UnitedHealth Medicare & Retirement's Chief Financial Officer Scott Theisen.  United added a footnote to his Attestation stating that it was "based on facts reasonably available or made available to [United] as of the date of" the Attestation.  In March 2012, facts reasonably available to United included, for instance, the negative results of the blind medical record reviews conducted as part of it Chart Review Program for payment year 2011.  In addition, in March 2012, facts reasonably available to United included the negative results of its CV Phase II pilot program showing that there were more DELETES than ADDS.  *See* paragraph 164 above.

233.   As another example, on April 30, 2014, UnitedHealthcare Medicare & Retirement's Chief Executive Officer, Steve Nelson, also sent an email to CMS about the Risk Adjustment Attestation that United had just submitted for payment year 2013. The email included that the Attestation was based on facts reasonably available or made available to United as of the date of its submission.  Those facts included, for instance, millions of dollars of invalid diagnoses about which United had *actual* knowledge but never deleted.  *See* paragraph 186 above.

## FIRST CLAIM FOR RELIEF

### False Claims Act:  Presentation of False or Fraudulent Claims
### 31 U.S.C. § 3729(a)(1)(A) (formerly 31 U.S.C. § 3729(a)(1))

234.   The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 233 above as though they are fully set forth herein.

235.   Defendants violated 31 U.S.C. § 3729(a)(1)(A) as follows:  Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) presented or caused to be presented a false or fraudulent claim for payment or approval.  Specifically, Defendants knowingly presented or caused to be presented a false or fraudulent Risk Adjustment Attestation to the Government in order to receive and retain risk adjustment payments from the Medicare Program.

236.   Defendants violated former 31 U.S.C. § 3729(a)(1) as follows:  Defendants knowingly presented, or caused to be presented, to the Government a false or fraudulent claim for payment or approval.  Specifically, Defendants knowingly presented or caused to be presented a false or fraudulent Risk Adjustment Attestation to the Government in order to receive and retain risk adjustment payments from the Medicare Program.

237.   By virtue of the said false or fraudulent claim, the United States incurred damages and therefore is entitled to multiple damages under the False Claims Act, plus a civil penalty for each violation of the Act.

### SECOND CLAIM FOR RELIEF

**False Claims Act: Making or Using False Records or Statements**

**31 U.S.C. § 3729(a)(1)(B) (formerly 31 U.S.C. § 3729(a)(2))**

238.   The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 233 above as though they are fully set forth herein.

239.   Defendants violated 31 U.S.C. § 3729(a)(1)(B) as follows:  Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim.  Specifically, Defendants knowingly made, used, or caused to be made or used a false Risk Adjustment Attestation material to a false or fraudulent claim for risk adjustment payments from the Medicare Program.

240.   Defendants violated former 31 U.S.C. § 3729(a)(2) as follows:  Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.  Specifically, Defendants knowingly made, used, or caused to be made or used a false Risk Adjustment Attestation to get a false or fraudulent claim for risk adjustment payments paid or approved by the Medicare Program.

241.   By virtue of the said false record or statement, the United States incurred damages and therefore is entitled to multiple damages under the False Claims Act, plus a civil penalty for each violation of the Act.

### THIRD CLAIM FOR RELIEF

**False Claims Act:  Reverse False Claims**

**31 U.S.C. § 3729(a)(1)(G) (formerly 31 U.S.C. § 3729(a)(7))**

242.   The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 233 above as though they are fully set forth herein.

243.   Defendants violated 31 U.S.C. § 3729(a)(1)(G) as follows:  Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or

property to the Government.  Specifically, Defendants knowingly made, used, or caused to be made or used a false Risk Adjustment Attestation material to an obligation to repay risk adjustment payments to which they were not entitled from the Medicare Program.

244.   Defendants also violated 31 U.S.C. § 3729(a)(1)(G) as follows:  Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.  Specifically, Defendants knowingly concealed or knowingly and improperly avoided or decreased an obligation to repay risk adjustment payments to which they were not entitled from the Medicare Program.

245.   Defendants violated former 31 U.S.C. § 3729(a)(7) as follows:  Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the Government.  Specifically, Defendants knowingly made, used, or caused to be made or used, a false Risk Adjustment Attestation to conceal, avoid or decrease an obligation to repay risk adjustment payments to which they were not entitled from the Medicare Program.

246.   By virtue of the said false record, statement, and other acts of concealment and improper avoidance, the United States incurred damages and therefore is entitled to multiple damages under the False Claims Act, plus a civil penalty for each violation of the Act.

## FOURTH CLAIM FOR RELIEF
### Restitution (Unjust Enrichment)

247.   The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 233 above as though they are fully set forth herein.

248.   Defendants have received money from the United States to which Defendants were not entitled, which unjustly enriched Defendants, and for which Defendants must make restitution.  Defendants received such money by claiming and retaining Medicare

risk adjustment payments based on invalid risk adjustment data.  In equity and good conscience, such money belongs to the United States and to the Medicare Program.

249.   The United States is entitled to recover such money from Defendants in an amount to be determined at trial.

### FIFTH CLAIM FOR RELIEF

### Payment by Mistake

250.   The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 233 above as though they are fully set forth herein.

251.   The United States paid money to Defendants as a result of a mistaken understanding.  Specifically, the United States paid Defendants claims for risk adjustment payments under the mistaken understanding that such claims were based on valid risk adjustment data.  Had the United States known the truth, it would not have paid such claims.  Payment was therefore by mistake.

252.   As a result of such mistaken payments, the United States has sustained damages for which Defendants are liable in the amount to be determined at trial.

### PRAYER

**WHEREFORE**, the United States requests that judgment be entered in its favor and against Defendants as follows:

253.   On Claims I, II,  and III (False Claims Act), against all Defendants jointly and severally, for the amount of the United States' damages, trebled as required by law, together with the maximum civil penalties allowed by law, costs, post-judgment interest, and such other and further relief as the Court may deem appropriate;

254.   On Claim IV (Restitution), against all Defendants jointly and severally, for an amount equal to the monies that Defendants obtained from the United States without right and by which Defendants have been unjustly enriched, plus costs, pre- and post-judgment interest, and such other and further relief as the Court may deem appropriate; and

255.   On Claim V (Payment By Mistake), against Defendants for an amount equal to the United States' damages, plus costs, pre- and post-judgment interest, and such other and further relief as the Court may deem appropriate.

## **DEMAND FOR JURY TRIAL**

The United States of America hereby demands a trial by jury.

Dated:  May 16, 2017                    Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General, Civil Division
SANDRA R. BROWN
Acting United States Attorney
DOROTHY A. SCHOUTEN
Chief, Civil Division
DAVID K. BARRETT
Chief, Civil Fraud Section
LINDA A. KONTOS
Deputy Chief, Civil Fraud Section
Assistant United States Attorneys

MICHAEL D. GRANSTON
DANIEL R. ANDERSON
CAROL L. WALLACK
JESSICA KRIEG
JUSTIN DRAYCOTT
PAUL PERKINS
Attorneys, Civil Division
United States Department of Justice

JAMES P. KENNEDY, JR.
Acting United States Attorney
KATHLEEN ANN LYNCH
Assistant United States Attorney

  /S/ John E. Lee
_____
JOHN E. LEE
Assistant United States Attorney

Attorneys for the
United States of America