CHAD A. READLER
Principal Deputy Assistant Attorney General, Civil Division
SANDRA R. BROWN
Acting United States Attorney
DOROTHY A. SCHOUTEN
DAVID K. BARRETT
JOHN E. LEE (CBN 128696)
Assistant United States Attorneys
    300 N. Los Angeles Street, Room 7516
    Los Angeles, California 90012
    Tel: (213) 894-3995; Fax: (213) 894-7819
    Email: john.lee2@usdoj.gov
MICHAEL D. GRANSTON
DANIEL R. ANDERSON
CAROL L. WALLACK
JESSICA KRIEG
JUSTIN DRAYCOTT
PAUL PERKINS
Attorneys, Civil Division
United States Department of Justice
    P.O. Box 261, Ben Franklin Station
    Washington, D.C. 20044
    Tel: (202) 307-0486; Fax: (202) 307-3852
    E-mail:  carol.wallack@usdoj.gov
JAMES P. KENNEDY, JR.
Acting United States Attorney
KATHLEEN ANN LYNCH
Assistant United States Attorney (Admitted PHV)
    138 Delaware Avenue
    Buffalo, New York 14201
    Tel: (716) 843-5830; Fax: (716) 551-3052
    E-mail:  kathleen.lynch@usdoj.gov
Attorneys for the United States of America

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING,<br><br>        Plaintiffs,<br><br>        v.<br><br>UNITEDHEALTH GROUP, INC., a Delaware corporation; UNITED HEALTHCARE SERVICES, INC., a Minnesota corporation; UNITED HEALTHCARE, INC., a Delaware corporation; OVATIONS, INC., a Delaware corporation; OPTUM, INC., a Delaware corporation; OPTUMINSIGHT, INC., a Delaware corporation; AMERICHOICE OF NEW | No. CV 16-08697 MWF (SSx)<br><br>UNITED STATES' AMENDED COMPLAINT-IN-PARTIAL-INTERVENTION AND DEMAND FOR JURY TRIAL |

JERSEY, INC., a New Jersey corporation; ARIZONA PHYSICIANS IPA, INC., an Arizona corporation; CARE IMPROVEMENT PLUS OF MARYLAND, INC., a Maryland corporation; CARE IMPROVEMENT PLUS OF TEXAS INSURANCE COMPANY, a Texas insurance company; CARE IMPROVEMENT PLUS SOUTH CENTRAL INSURANCE CO., an Arkansas insurance company; CARE IMPROVEMENT PLUS WISCONSIN INSURANCE COMPANY, a Wisconsin insurance company; OPTUM INSURANCE CO., an Ohio corporation; CITRUS HEALTH CARE, INC., a Florida corporation; HEALTH PLAN OF NEVADA, INC., a Nevada corporation; MEDICA HEALTHCARE PLANS, INC., a Florida corporation; OXFORD HEALTH PLANS (CT), INC., a Connecticut corporation; OXFORD HEALTH PLANS (NJ), INC., a New Jersey corporation also known as Oxford Health Plans of New Jersey, Inc.; OXFORD HEALTH PLANS (NY), INC., a New York corporation; PACIFICARE LIFE AND HEALTH INSURANCE COMPANY, an Indiana insurance company; PACIFICARE OF ARIZONA, INC., an Arizona corporation; PACIFICARE OF COLORADO, INC., a Colorado corporation; PACIFICARE OF NEVADA, INC., a Nevada corporation also known as PacifiCare/UHC of Nevada; PHYSICIANS HEALTH CHOICE OF TEXAS, LLC, a Texas limited liability company; PREFERRED CARE PARTNERS, INC., a Florida corporation; ROCKY MOUNTAIN HEALTH MAINTENANCE ORGANIZATION, INC., a Colorado company; SIERRA HEALTH AND LIFE INSURANCE COMPANY, INC., a Nevada corporation; SYMPHONIX HEALTH INSURANCE, INC., an Illinois insurance company; UNITEDHEALTHCARE OF CALIFORNIA, INC., a California corporation also known as UHC of California, Inc. and formerly known as PacifiCare of California, Inc. and PacifiCare of California/Secure Horizons; UNISON HEALTH PLAN OF

2

TENNESSEE, INC., a Tennessee corporation; UNITED HEALTH CARE INS. CO. AND UNITED NEW YORK, a New York insurance company; UNITEDHEALTHCARE BENEFITS OF TEXAS, INC., a Texas corporation formerly known as PacifiCare of Texas, Inc.; UNITEDHEALTHCARE COMMUNITY PLAN OF OHIO, INC., an Ohio corporation formerly known as Unison Health Plan of Ohio, Inc.; UNITEDHEALTHCARE COMMUNITY PLAN OF TEXAS, L.L.C., a Texas limited liability company formerly known as Evercare of Texas, LLC; UNITEDHEALTHCARE COMMUNITY PLAN, INC., a Michigan corporation also known as Great Lakes Health Plan, Inc. and UnitedHealthcare of the Great Lakes Health Plan, Inc.; UNITEDHEALTHCARE INSURANCE COMPANY, a Connecticut insurance company also known as United Healthcare Insurance Company; UNITEDHEALTHCARE INSURANCE COMPANY OF NEW YORK, a New York insurance company also known as United Healthcare Insurance Company of New York; UNITEDHEALTHCARE OF ALABAMA, INC., an Alabama corporation also known as United HealthCare of Alabama, Inc.; UNITEDHEALTHCARE OF ARIZONA, INC., an Arizona corporation also known as United HealthCare of Arizona, Inc.; UNITEDHEALTHCARE OF ARKANSAS, INC., an Arkansas corporation also known as United Healthcare of Arkansas, Inc.; UNITEDHEALTHCARE OF FLORIDA, INC., a Florida corporation also known as United Healthcare of Florida, Inc.; UNITEDHEALTHCARE OF GEORGIA, INC., a Georgia corporation also known as United Healthcare of Georgia, Inc.; UNITEDHEALTHCARE OF NEW ENGLAND, INC., a Rhode Island corporation also known as United HealthCare of New England, Inc. and United Health Plans of New England, Inc.; UNITEDHEALTHCARE OF NEW YORK, INC., a New York corporation also known as AmeriChoice of New York, Inc. and United Healthcare of New

3

York, Inc.; UNITEDHEALTHCARE OF NORTH CAROLINA, INC., a North Carolina corporation also known as United Healthcare of North Carolina, Inc.; UNITEDHEALTHCARE OF OHIO, INC., an Ohio corporation also known as United Healthcare of Ohio, Inc.; UNITEDHEALTHCARE OF OKLAHOMA, INC., an Oklahoma corporation formerly known as PacifiCare of Oklahoma, Inc.; UNITEDHEALTHCARE OF OREGON, INC., an Oregon corporation formerly known as PacifiCare of Oregon, Inc.; UNITEDHEALTHCARE OF PENNSYLVANIA, INC., a Pennsylvania corporation formerly known as Unison Health Plan of Pennsylvania, Inc.; UNITEDHEALTHCARE OF TENNESSEE, INC., a Tennessee corporation also known as United Healthcare of Tennessee, Inc.; UNITEDHEALTHCARE OF THE MIDLANDS, INC., a Nebraska corporation also known as United Healthcare of the Midlands, Inc.; UNITEDHEALTHCARE OF THE MIDWEST, INC., a Missouri corporation also known as United Healthcare of the Midwest, Inc.; UNITEDHEALTHCARE OF UTAH, INC., a Utah corporation also known as United Healthcare of Utah, Inc.; UNITEDHEALTHCARE OF WASHINGTON, INC., a Washington corporation formerly known as PacifiCare of Washington, Inc.; UNITEDHEALTHCARE OF WISCONSIN, INC., a Wisconsin corporation also known as United Healthcare of Wisconsin, Inc.; UNITEDHEALTHCARE PLAN OF THE RIVER VALLEY, INC., an Illinois corporation also known as United Healthcare Plan of the River Valley, Inc., UnitedHealth Care Plan of the River Valley, Inc., and United HealthCare of the River Valley, Inc.,

                    Defendants.

4

This is a civil fraud action brought by the United States of America ("United States" or "Government") to recover treble damages and civil penalties under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, as well as for restitution and common law damages, for monies unlawfully obtained and retained by Defendant UnitedHealth Group Inc. and various of its direct and indirect subsidiaries ("Defendants") involved in Parts C and D of the Medicare Program.  Defendants knowingly submitted false claims and made false statements to the Medicare Program.  Moreover, Defendants have knowingly and improperly avoided their obligations to repay significant sums of money to the Medicare Program.

Having filed a notice of intervention pursuant to 31 U.S.C. § 3730(b)(4), the United States alleges for its amended complaint-in-partial-intervention (the "Amended Complaint") as follows:

## **INTRODUCTION**

1.     Millions of elderly and disabled individuals throughout the United States receive their Medicare benefits through Parts C and D of the Medicare Program, hereinafter referred to as the Medicare Advantage (MA) Program, which is administered by the Government agency called the Centers for Medicare and Medicaid Services ("CMS").  A central, distinguishing feature of the MA Program is the provision of Medicare benefits by private healthcare insurance organizations, which are called Medicare Advantage Organizations ("MA Organizations").  Medicare beneficiaries enroll in managed healthcare insurance plans called Medicare Advantage Plans ("MA Plans") and prescription drug plans ("PD Plans") that are offered by these MA Organizations.  The MA Plans are packages of healthcare insurance benefits and the PD Plans are packages of prescription drug benefits.  Hereinafter MA Plans and PD Plans are collectively referred to as "Plans."

2.     The Government pays each MA Organization a fixed monthly payment for each Medicare beneficiary enrolled in its Plans.  The Government adjusts these payments for various risk factors that affect expected healthcare expenditures, including the age,

gender, and health status of each beneficiary.  The adjustments are intended to ensure that MA Organizations are paid more for beneficiaries whose healthcare expenses are *expected* to be more and less for beneficiaries whose health care expenses are *expected* to be less.  However, these adjustments to the fixed monthly payments are made regardless of the actual services provided to the beneficiaries and, thus, regardless of whether those beneficiaries expected to need more or more costly services actually obtain more or more costly services, and whether those beneficiaries expected to need less or less costly services actually obtain less or less costly services.

3.     To obtain payments based on adjustments for health status, MA Organizations submit diagnosis codes to the Government for the beneficiaries in their Plans.  These diagnosis codes are from the beneficiaries' medical encounters with healthcare providers (*e.g.*, physician office visits and hospital stays) during the year prior to the actual payment year (often referred to as the "data collection" year or the "date of service" year).  Payments are based on diagnoses from the prior year because they are used to predict the *expected* needs of a beneficiary for more or less costly healthcare services during the payment year.  Using these diagnosis codes submitted by or on behalf of MA Organizations, the Government calculates a risk score for each beneficiary.  The beneficiary's risk score is then used to calculate monthly payments to the MA Organization for that beneficiary for the payment year.  In general, the more numerous and severe the conditions identified by the diagnosis codes, the higher the risk score for a beneficiary and, thus, the greater the risk adjustment payments made to the MA Organization for that beneficiary for the payment year.

4.     This payment model creates powerful incentives for MA Organizations and their owners and operators to exaggerate the expected healthcare costs for the beneficiaries in their Plans by submitting invalid diagnosis codes and failing to comply with their obligation to retract invalid diagnoses.  In order to combat these incentives and protect the Government from overpaying MA Organizations, the Government requires that submitted diagnoses be unambiguously supported and, thus, validated by the

beneficiaries' medical records for medical encounters during the data collection year. Medical records are the "source of truth" for the purpose of receiving and retaining risk adjustment payments.

5.      The medical records that must support the diagnosis codes are not provided to the Government as part of the payment process.  Instead, the Government requires that each MA Organization expressly certify that the diagnosis codes it has submitted for risk adjustment payments are accurate and truthful based on best knowledge, information, and belief.  42 C.F.R. § 422.504(*l*)(2).  Each MA Organization must exercise due diligence in order to make this express certification.  Each MA Organization must also "[a]dopt and implement an effective compliance program, which must include measures that prevent, detect, and correct non-compliance with [the Government's] program requirements as well as measures that prevent, detect, and correct fraud, waste, and abuse."  42 C.F.R. § 422.503(b)(4)(vi).

6.      As explained by the United States Court of Appeals for the Ninth Circuit, CMS, in 2000, made clear that

> Medicare Advantage organizations have always had "an obligation to take steps to ensure the accuracy, completeness, and truthfulness of the [medical] encounter data" [*i.e.*, diagnoses] and "an obligation to undertake 'due diligence' to ensure the accuracy, completeness, and truthfulness of encounter data submitted to [CMS]."  . . .  CMS made perfectly clear that Medicare Advantage organizations would be "held responsible for making good faith efforts to certify the accuracy, completeness, and truthfulness of encounter data submitted."

*United States ex rel. Swoben v. UnitedHealthcare Ins. Co.*, 848 F.3d 1161, 1174 (9th Cir. 2016) (quoting 65 Fed. Reg. 40,170, 40,268 (June 29, 2000)).  The Ninth Circuit further explained that the requirement that MA Organizations take affirmative steps to address errors in their data is further demonstrated by "§ 422.503, which since 2005 has required Medicare Advantage organizations to have effective compliance programs in place,

including '[p]rocedures for internal monitoring and auditing' and 'for ensuring prompt response to detected offenses'." *Id.* (quoting 42 C.F.R. § 422.503(b)(4)(vi), (vi)(F), (vi)(G) (2005)).

7.      For many years, Defendant UnitedHealth Group Inc. ("UHG") has been the nation's largest owner of MA Organizations.  These organizations offer MA and PD Plans throughout the country.  Millions of elderly and disabled Medicare beneficiaries throughout the United States are enrolled in MA and PD Plans that are offered by UHG and the MA Organizations owned by it.  In March 2017, approximately 229,000 Medicare beneficiaries in the Central District of California were enrolled in MA Plans offered by Defendants UnitedHealthcare of California, Inc. (previously known as PacifiCare of California, Inc.) and Sierra Health and Life Insurance Company, Inc.

8.      UHG manages and operates the Defendant MA Organizations itself and through its business divisions which, depending on the time period, were or are part of Defendants UnitedHealthcare, Inc.; United HealthCare Services, Inc.; Ovations, Inc.; Optum, Inc.; and OptumInsight, Inc.  Hereinafter, UHG, UnitedHealthcare, Inc.; United HealthCare Services, Inc.; Ovations, Inc.; Optum, Inc.; and OptumInsight, Inc. are sometimes collectively referred to as the "UHG Managing Defendants," based on their roles in managing and operating the Defendant MA Organizations, as described more fully herein.  When the term "UHG Managing Defendants" is used in this Amended Complaint in reference to specific facts (*e.g.*, meetings and communications), it refers to those Defendants that managed and operated the Defendant MA Organizations at the time relating to the facts alleged.

9.      The Government pays billions of taxpayer dollars each year to the Defendant MA Organizations for the Medicare beneficiaries enrolled in the Defendant MA Organizations' Plans.  Risk adjustment payments account for a substantial percentage of these dollars.  The diagnoses submitted to the Government by the UHG Managing Defendants on behalf of the Defendant MA Organizations drive a large percentage of the payments that the Defendant MA Organizations receive from the Government.

Accordingly, it is not surprising that the UHG Managing Defendants and the Defendant MA Organizations are not passive conduits of diagnoses from healthcare providers to the Government.  Rather, for many years, the UHG Managing Defendants have conducted programs and engaged in other activities to increase the amount of risk adjustment payments from the Government to the Defendant MA Organizations.  This includes programs and other efforts to directly influence both the number of diagnoses and the severity of the medical conditions reported by providers (such as educating physicians about diagnoses associated with greater risk adjustment payments).  This also includes programs and efforts that do not involve providers but nonetheless materially increase the number of diagnoses submitted to the Government and, thus, the amount of risk adjustment payments to the Defendant MA Organizations.  Since 2005, the UHG Managing Defendants and/or their predecessors have worked jointly to conduct these programs and perform these activities.

10.     In particular, since 2005, the UHG Managing Defendants have conducted a very large national Chart Review Program to significantly increase the risk adjustment payments that the Defendant MA Organizations receive from the Government.  For many years, this was their biggest effort aimed at increasing risk adjustment payments. During the last ten years, they significantly increased the amount of risk adjustment payments that the Defendant MA Organizations received from the Government by collecting millions of medical records (also known as "charts") from providers and then employing diagnosis coders (also known as "chart reviewers") to review the medical records in order to mine them for diagnoses that the providers themselves did not report to the Defendant MA Organizations for the beneficiaries in their Plans.  The UHG Managing Defendants then submitted these additional diagnosis codes ("ADDS") to the Government for billions of dollars of additional risk adjustment payments.

11.     The UHG Managing Defendants' national Chart Review Program was strictly a one-sided revenue-generating program.  The UHG Managing Defendants did not review the beneficiaries' medical records in good faith in order to obtain a true and accurate

9

picture of the health status of the beneficiaries in the Defendant MA Organizations' Plans or to submit truthful and accurate risk adjustment data to the Government.  They used the results of the chart reviews to only increase payments, *i.e.*, to submit additional diagnoses not reported by the providers.  At the same time, they systematically ignored the results of chart reviews that would have led to decreased payments, *i.e.*, results showing that diagnoses reported by providers to them and then submitted by them to the Government were not supported by the beneficiaries' medical records.

12.     Moreover, since at least 2005, the UHG Managing Defendants and/or their predecessors have known that a significant percentage of diagnoses reported by providers to them (hereinafter "provider-reported diagnoses") are invalid because the beneficiaries' medical records do not substantiate that the beneficiaries had the medical conditions identified by the diagnosis codes reported by the providers.  They knew this from audits conducted by the Government and from their own internal medical record reviews.  Despite this knowledge, they knowingly avoided "looking both ways" as part of their national Chart Review Program, except for a very limited time period when they "looked both ways" at some of the chart review results as part of their Claims Verification ("CV") Program.  That is, they knowingly and improperly avoided comparing the diagnoses reported by the providers and submitted by them to the Government with the results of the coders' chart reviews to identify those provider-reported diagnoses that were not supported by the beneficiaries' medical records.  They could and should have done this comparison and withdrawn their prior submission of these unsupported diagnoses, that is, made "DELETES."  If they had done so, the Government would not have made risk adjustment payments based on these unsupported diagnoses or, if it had already made the payments, it would have recovered them from the Defendant MA Organizations or the other Defendants.

13.     By failing to "look both ways," the UHG Managing Defendants generated and reported skewed data artificially inflating beneficiaries' risk scores, avoided negative payment adjustments, and caused the Defendant MA Organizations to retain payments to

10

which they were not entitled.  They did this "knowingly," as that term is defined in the FCA.  The Government has conservatively estimated that, if the UHG Managing Defendants had "looked both ways," they would not have submitted on behalf of the Defendant MA Organizations or, if submitted, they would have withdrawn hundreds of thousands of invalid diagnoses on behalf of the Defendant MA Organizations, and the Government would not have erroneously paid or would have recovered substantial sums of money (*e.g.*, potentially over a billion dollars in risk adjustment payments for four payment years) to which the Defendant MA Organizations were not entitled.

14.     By failing to "look both ways," the UHG Managing Defendants and the Defendant MA Organizations knowingly submitted false certifications about the accuracy and truthfulness of their data and knowingly and improperly avoided or decreased obligations to repay (*i.e.*, return) monies owed to the Government in violation of the FCA.

15.     In addition, Defendants engaged in other conduct (unrelated to their Chart Review Program) that violated the FCA.  Defendants deliberately ignored or recklessly disregarded information from their Risk Adjustment Coding Compliance Review ("RACCR") Program about invalid diagnoses.  This information showed that significant percentages of the diagnoses reported to the UHG Managing Defendants and the Defendant MA Organizations by certain "financially incentivized" providers, including certain capitated and gainsharing providers, were unsubstantiated by their patients' medical records.

16.     The UHG Managing Defendants and the Defendant MA Organizations paid providers who cared for the beneficiaries in the Defendant MA Organizations' MA Plans through a variety of arrangements.  They paid some healthcare providers on a fee-for-service basis for each service (*e.g.*, office visit) they provided to a beneficiary.  However, they negotiated payment arrangements with large provider groups that were intended to more closely align their financial interests.  For example, the UHG Managing Defendants and the Defendant MA Organizations paid many large provider groups a

11

"fixed" fee for each beneficiary cared for by these providers. These "capitated" fees generally were not dependent on the amount of services rendered by these providers. Instead, the "capitated" fees were often based on a percentage share of the payments that the Defendant MA Organizations received from the Government for the beneficiaries cared for by the providers.  The UHG Managing Defendants and the Defendant MA Organizations also entered into "gainsharing" agreements whereby they made incentive payments to some of their fee-for-service providers.  These incentive payments were based in whole or part on total revenues that the Defendant MA Organizations received from the Government for the beneficiaries cared for by these gainsharing providers.

17.     The UHG Managing Defendants' and the Defendant MA Organizations' agreements with capitated and gainsharing providers incentivized these providers to increase the number of diagnoses that they reported to the UHG Managing Defendants and the Defendant MA Organizations and to report diagnoses for more severe medical conditions.  The more risk adjustment payments obtained by the Defendant MA Organizations for the beneficiaries cared for by these providers, the more money the UHG Managing Defendants and the Defendant MA Organizations paid to these providers pursuant to the capitation and gainsharing agreements.

18.     The UHG Managing Defendants knew that these capitated and gainsharing providers had a financial incentive to report invalid diagnoses in order to increase their own revenues.  In fact, based on the results of their own data analyses and medical record reviews conducted as part of their RACCR Program, they knew which incentivized providers were actually or likely engaged in over-reporting diagnoses, including a significant number of providers located in this District.  But the UHG Managing Defendants knowingly continued to submit diagnoses from these incentivized providers to the Government and knowingly and improperly avoided repaying the Government for risk adjustment payments based on invalid diagnoses from these providers, all in violation of the FCA.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1345 because the United States is the Plaintiff.  In addition, the Court has subject matter jurisdiction over the FCA claims for relief under 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. § 3732(a)-(b) and supplemental jurisdiction to entertain the common law and equitable claims for relief under 28 U.S.C. § 1367(a).

20.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because at least one of the Defendants can be found in, resides in, transacts business in, or has committed the alleged acts in the Central District of California.

21.     Venue also lies in this District pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because at least one of the Defendants can be found in, resides in, and transacts business in this District, a substantial part of the events or omissions giving rise to the claims occurred in this District, and/or all of the Defendants are subject to the Court's personal jurisdiction under the FCA.

## PARTIES

### I.     Plaintiffs

22.     Plaintiff is the United States of America, suing on behalf of the United States Department of Health and Human Services ("HHS"), which includes its operating division, the Centers for Medicare and Medicaid Services ("CMS").  At all times relevant to this Complaint, CMS administered and supervised the MA Program and made risk adjustment payments to MA Organizations, including the Defendant MA Organizations in this action, under Parts C and D of the Program.  The United States filed its notice of partial intervention in this action on February 14, 2017.

23.     The *qui tam* plaintiff ("Relator") is Benjamin Poehling, a former employee of United HealthCare Services, Inc. who was the Director of Finance for Ovations, the group that managed the Defendant MA Organizations until approximately 2010 and, after that, the Director of Finance for UnitedHealthcare Medicare & Retirement, which was the group at UnitedHealthcare, Inc. that succeeded Ovations in managing the

13

Defendant MA Organizations.  From mid-2007 until he left at the end of 2012, Poehling ran the risk adjustment team at Ovations and then at UnitedHealthcare Medicare & Retirement, where he was one of the management employees responsible for the submission of claims (*i.e.*, diagnoses) by the UHG Managing Defendants to the Government for risk adjustment payments to the Defendant MA Organizations.  He was also one of the management employees responsible for risk adjustment revenue-generating activities, including, but not limited to, the UHG Managing Defendants' national Chart Review Program.  Poehling expressed concerns to fellow executives about the failure of the UHG Managing Defendants' Chart Review Program to "look both ways."  In March 2011, Poehling initiated this action by filing a complaint pursuant to the *qui tam* provisions of the FCA.  31 U.S.C. § 3730(b)(1).

## II.   Defendants

24.   Defendant UnitedHealth Group, Inc. ("UHG") is a publicly traded Delaware corporation.  It is the parent company for all other Defendants in this action.  UHG, the other Defendants, and their affiliates have offices in various locations throughout the United States, including in the Central District of California.  UHG offers a broad spectrum of products and services through two distinct primary direct corporate subsidiaries (each of which has numerous direct and indirect subsidiaries of its own): (1) UnitedHealthcare, Inc., a health benefits (i.e., insurance) company, and (2) Optum, Inc., a health services company.  Accordingly, UHG's healthcare insurance products, including those under Parts C and D of the Medicare Program, are offered by, and UHG's MA and PD Plans are managed by, various entities that are UHG's direct or indirect subsidiaries, including, but not limited to, the other Defendants identified below.  UHG controls all of these entities.

25.   UHG and its direct and indirect subsidiaries and affiliates operate MA Organizations in all fifty states and the District of Columbia.  Each of these MA Organizations offers one or more MA Plans, that is, one or more packages of healthcare insurance benefits under Part C of the Medicare Program.  Many, if not all, of these MA

Organizations also offer PD Plans, that is, drug benefit packages under Part D of the Medicare Program.  As of December 31, 2008, UHG had approximately 1.5 million Medicare beneficiaries enrolled in its MA Plans under Part C of the Medicare Program and millions of additional beneficiaries enrolled in its PD Plans.  As of December 31, 2009, UHG had approximately 1.8 million Medicare beneficiaries enrolled in its MA and millions of additional beneficiaries enrolled in its PD Plans.  As of December 31, 2010, UHG had approximately 2.1 million beneficiaries in its MA Plans and millions of additional beneficiaries in its PD Plans.  As of December 31, 2011, UHG had 2.2 million beneficiaries in its MA Plans and millions of additional beneficiaries in its PD Plans.  As of December 31, 2012, UHG had approximately 2.6 million beneficiaries in its MA Plans and millions of additional beneficiaries in its PD Plans.  In 2013, 2014, and 2015 United had approximately 3 million beneficiaries in its MA Plans and approximately 8 million in its PD Plans.  In 2016, UHG had approximately 3.6 million beneficiaries in its MA Plans, and approximately 8.6 million beneficiaries in its PD Plans.  Annually, UHG's revenues from the MA Program have been in the tens of billions of dollars.

26.     All Defendant MA Organizations entered into one or more agreements with the Government during the relevant time period to offer MA Plans and/or PD Plans to Medicare beneficiaries under Parts C and D of the Medicare Program, presented or had the UHG Managing Defendants present on their behalf claims to the Government for risk adjustment payments under Parts C and D of the Medicare Program, submitted or had the UHG Managing Defendants submit on their behalf one or more Risk Adjustment Attestations to the Government for risk adjustment payments from the Medicare Program, and received risk adjustment payments from the Government.  These Defendant MA Organizations include all MA Organizations acquired, owned, and controlled directly or indirectly by UHG after 2005, including:

       a.     AmeriChoice of New Jersey, Inc., a New Jersey corporation, doing business as AmeriChoice Personal Care Plus and UnitedHealthcare Community Plan.

b.      Arizona Physicians IPA, Inc., an Arizona corporation, doing business as APIPA Personal Care Plus and UnitedHealthcare Community Plan.

c.      Care Improvement Plus of Maryland, Inc., which is or was a Maryland corporation, doing business as Care Improvement Plus.

d.      Care Improvement Plus of Texas Insurance Company, which is a Texas insurance company, doing business as Care Improvement Plus.

e.      Care Improvement Plus South Central Insurance Co., which is an Arkansas insurance company, doing business as Care Improvement Plus and UnitedHealthcare.

f.      Care Improvement Plus Wisconsin Insurance Company, which is a Wisconsin insurance company, doing business as Care Improvement Plus and UnitedHealthcare.

g.      Optum Insurance Co., which is an Ohio corporation.

h.      Citrus Health Care, Inc., which is or was a Florida corporation.

i.      Health Plan of Nevada, Inc., which is a Nevada corporation.

j.      Medica HealthCare Plans, Inc., which is a Florida corporation.

k.      Oxford Health Plans (CT), Inc., which is a Connecticut corporation, doing business as AARP MedicareComplete from SecureHorizons; Oxford Medicare Advantage; SecureHorizons; SecureHorizons by UnitedHealthCare; and UnitedHealthcare.

l.      Oxford Health Plans (NJ), Inc., which is a New Jersey corporation, also known as Oxford Health Plans of New Jersey, Inc., doing business as AARP MedicareComplete from SecureHorizons; AARP MedicareComplete provided by SecureHorizons; Evercare; Evercare by UnitedHealthcare; Evercare Health Plans; Evercare Plan H; SecureHorizons; SecureHorizons by UnitedHealthCare; and UnitedHealthcare.

m.      Oxford Health Plans (NY), Inc. which is a New York corporation, doing business as Oxford Medicare Advantage; SecureHorizons; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

n.      PacifiCare Life and Health Insurance Company, which is an Indiana insurance company, doing business as SecureHorizons Direct and SecureHorizons MedicareDirect.

o.      PacifiCare of Arizona, Inc., which is an Arizona corporation doing business as SecureHorizons Medicare Advantage Plan; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

p.      PacifiCare of Colorado, Inc., which is a Colorado corporation doing business as AARP MedicareComplete from Secure Horizons; AARP MedicareComplete provided by SecureHorizons; Secure Horizons Medicare Advantage Plan; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

q.      PacifiCare of Nevada, Inc., which is a Nevada corporation, also known as PacifiCare/UHC of Nevada, doing business as AARP MedicareComplete provided by SecureHorizons; PacifiCare/UHC of Nevada; Secure Horizons Medicare Advantage Plan; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

r.      Physicians Health Choice of Texas, LLC, which is a Texas limited liability company doing business as Physicians Health Choice.

s.      Preferred Care Partners, Inc., which is a Florida corporation doing business as UnitedHealthcare.

t.      Rocky Mountain Health Maintenance Organization, Inc., which is a Colorado company.

u.      Sierra Health and Life Insurance Company, Inc., which is a Nevada corporation doing business as Erickson Advantage and UnitedHealthcare.

v.      Symphonix Health Insurance, Inc., which is an Illinois insurance company doing business as Symphonix Health.

w.     UnitedHealthcare of California, Inc., which is a California corporation, also known as UHC of California, Inc. and formerly known as PacifiCare of California, Inc. and PacifiCare of California/Secure Horizons, doing business as SecureHorizons by UnitedHealthcare, Secure Horizons Medicare Advantage Plan, and UnitedHealthcare.

x.     Unison Health Plan of Tennessee, Inc., which is a Tennessee corporation doing business as Unison Advantage and UnitedHealthcare Community Plan.

y.     United Health Care Ins. Co. and United New York, which is a New York insurance company doing business as UnitedHealthcare.

z.     UnitedHealthcare Benefits of Texas, Inc., which is a Texas corporation, formerly known as PacifiCare of Texas, Inc., doing business as SecureHorizons Medicare Advantage Plan; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

aa.     UnitedHealthcare Community Plan of Ohio, Inc., which is an Ohio corporation, formerly known as Unison Health Plan of Ohio, Inc., doing business as Unison Advantage and UnitedHealthcare Community Plan.

bb.     UnitedHealthcare Community Plan of Texas, L.L.C., which is a Texas limited liability company, formerly known as Evercare of Texas, LLC, doing business as Evercare by UnitedHealthcare and Evercare Health Plans; and UnitedHealthcare.

cc.     UnitedHealthcare Community Plan, Inc., which is a Michigan corporation, also known as Great Lakes Health Plan, Inc. and UnitedHealthcare of the Great Lakes Health Plan, Inc., doing business as Great Lakes Personal Care Plus and UnitedHealthcare Community Plan.

dd.     UnitedHealthcare Insurance Company, which is a Connecticut insurance company, also known as United Healthcare Insurance Company, doing business as AARP MedicareComplete from SecureHorizons; Erickson Advantage;

18

Evercare by UnitedHealthcare; Evercare Health Plans; Evercare Senior Care Options; SecureHorizons; SecureHorizons by UnitedHealthcare; SecureHorizons MedicareDirect; United Health Group; UnitedHealthcare; and UnitedHealthcare Community Plan.

ee. UnitedHealthcare Insurance Company of New York, which is a New York insurance company, also known as United Healthcare Insurance Company of New York, doing business as SecureHorizons; SecureHorizons MedicareDirect; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

ff. UnitedHealthcare of Alabama, Inc., which is an Alabama corporation, also known as United HealthCare of Alabama, Inc., doing business as SecureHorizons; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

gg. UnitedHealthcare of Arizona, Inc., which is an Arizona corporation, also known as United HealthCare of Arizona, Inc., doing business as SecureHorizons; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

hh. UnitedHealthcare of Arkansas, Inc., which is an Arkansas corporation, also known as United Healthcare of Arkansas, Inc., doing business as SecureHorizons; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

ii. UnitedHealthcare of Florida, Inc., which is a Florida corporation, also known as United Healthcare of Florida, Inc. doing business as AmeriChoice; Evercare at Home; SecureHorizons; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

jj. UnitedHealthcare of Georgia, Inc., which is a Georgia corporation, also known as United Healthcare of Georgia, Inc., doing business as SecureHorizons; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

kk. UnitedHealthcare of New England, Inc., which is a Rhode Island corporation, also known as United HealthCare of New England, Inc. and United Health Plans of New England, Inc., doing business as AARP MedicareComplete

provided by SecureHorizons; AARP MedicareComplete from SecureHorizons; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

ll.     UnitedHealthcare of New York, Inc., which is a New York corporation, also known as AmeriChoice of New York, Inc. and United Healthcare of New York, Inc. doing business as AmeriChoice Personal Care Plus; SecureHorizons; SecureHorizons by UnitedHealthcare; UnitedHealthcare; and UnitedHealthcare Community Plan.

mm.   UnitedHealthcare of North Carolina, Inc., which is a North Carolina corporation, also known as United Healthcare of North Carolina, Inc., doing business as SecureHorizons; SecureHorizons by UnitedHealthcare, and UnitedHealthcare.

nn.     UnitedHealthcare of Ohio, Inc., which is an Ohio corporation, also known as United Healthcare of Ohio, Inc., doing business as SecureHorizons, SecureHorizons by UnitedHealthcare, and UnitedHealthcare.

oo.     UnitedHealthcare of Oklahoma, Inc., which is an Oklahoma corporation, formerly known as PacifiCare of Oklahoma, Inc., doing business as Secure Horizons Medicare Advantage Plan; SecureHorizons by UnitedHealthcare, and UnitedHealthcare.

pp.     UnitedHealthcare of Oregon, Inc., which is an Oregon corporation, formerly known as PacifiCare of Oregon, Inc., doing business as AARP MedicareComplete from SecureHorizons; AARP MedicareComplete provided by SecureHorizons; SecureHorizons Medicare Advantage Plan; SecureHorizons by UnitedHealthCare; and UnitedHealthcare.

qq.     UnitedHealthcare of Pennsylvania, Inc., which is a Pennsylvania corporation, formerly known as Unison Health Plan of Pennsylvania, Inc., doing business as Unison Advantage; UnitedHealthcare Community Plan; and UnitedHealthcare.

rr.     UnitedHealthcare of Tennessee, Inc., which is a Tennessee corporation, also known as United Healthcare of Tennessee, Inc., doing business as AARP MedicareComplete from SecureHorizons; AARP MedicareComplete provided by SecureHorizons; SecureHorizons; and SecureHorizons by UnitedHealthcare.

ss.     UnitedHealthcare of the Midlands, Inc., which is a Nebraska corporation, also known as United Healthcare of the Midlands, Inc., doing business as SecureHorizons by UnitedHealthcare and UnitedHealthcare.

tt.     UnitedHealthcare of the Midwest, Inc., which is a Missouri corporation, also known as United Healthcare of the Midwest, Inc., doing business as SecureHorizons; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

uu.     UnitedHealthcare of Utah, Inc., which is a Utah corporation, also known as United Healthcare of Utah, Inc., doing business as SecureHorizons; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

vv.     UnitedHealthcare of Washington, Inc., which is a Washington corporation, formerly known as PacifiCare of Washington, Inc., doing business as AARP MedicareComplete from SecureHorizons; Secure Horizons Medicare Advantage Plan; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

ww.    UnitedHealthcare of Wisconsin, Inc., which is a Wisconsin corporation, also known as United Healthcare of Wisconsin, Inc. doing business as SecureHorizons; SecureHorizons by UnitedHealthcare; UnitedHealthcare Community Plan; UnitedHealthcare Personal Care Plus; and UnitedHealthcare.

xx.     UnitedHealthcare Plan of the River Valley, Inc., which is an Illinois corporation, also known as United Healthcare Plan of the River Valley, Inc., UnitedHealth Care Plan of the River Valley, Inc., and United HealthCare of the River Valley, Inc., doing business as AmeriChoice Secure Plus Complete; SecureHorizons by UnitedHealthcare; UnitedHealthcare; and UnitedHealthcare Community Plan.

21

yy.   Any other MA Organizations acquired, owned, or controlled by UHG since 2005.

27.   Defendant United HealthCare Services, Inc. ("United HealthCare Services") is a Minnesota corporation.  It is a direct subsidiary of Defendant UHG.  United HealthCare Services is the successor to PacifiCare Health Systems and PacifiCare Health Plan Administrators, Inc., which managed some of the Defendant MA Organizations.  *See infra* paragraph 37.  As previously stated, United HealthCare Services also employed Relator Poehling and, on information and belief, employed other individuals who held titles and positions within the other UHG Managing Defendants and who performed work on behalf of the Defendant MA Organizations.

28.   Defendant Ovations, Inc. ("Ovations") is a Delaware corporation.  It is a direct subsidiary of Defendant United HealthCare Services and an indirect subsidiary of Defendant UHG.  Until approximately 2010, one or more of the groups that managed some of the Defendant MA Organizations were located within Defendant Ovations.

29.   Defendant UnitedHealthcare, Inc. ("UnitedHealthcare") is a Delaware corporation, and a direct subsidiary of Defendant UHG.  UnitedHealthcare is the UHG business entity which owns, operates, and offers health insurance plans to governmental customers.  Various UnitedHealthcare subsidiaries operate health benefit plans and provide healthcare benefits to millions of Medicare beneficiaries under the MA Program.  UnitedHealthcare also is the UHG subsidiary which contracts (through its subsidiaries) with the Government to provide insurance benefits to MA beneficiaries, submits the annual Risk Adjustment Attestations to the Government, submits claims for payment to the Government, and receives payment from the Government.

30.   Defendants Optum, Inc. and OptumInsight, Inc. are health services companies.  They are Delaware corporations.  They are direct or indirect subsidiaries of Defendant UHG.  In 2011, OptumInsight became the successor to Ingenix, Inc. ("Ingenix").  Thereafter, OptumInsight operated as part of Optum.  For the purposes of this Amended Complaint, Optum, Inc. and OptumInsight, Inc. will be referred to as "Optum."

Furthermore, to the extent that the United States is uncertain whether an act or statement is attributable to Ingenix or its successor, Optum, the United States will refer to the entity as "Ingenix/Optum." Since 2007, the group within Ingenix and then Optum that performed risk adjustment-related work had various names. For purposes of this Amended Complaint, it is referred to as the "Risk Adjustment Group."

31.     Defendants United HealthCare Services, Ovations, UnitedHealthcare, and Optum (and Optum's predecessor, Ingenix) are or were "Related Entities" under the federal regulations that govern the MA Program. As explained more fully below, each of them has or had its own legal obligations to the MA Program relating to, among other things, the submission of valid risk adjustment data and the deletion or withdrawal of invalid data.

32.     The Defendant MA Organizations were not autonomous and do not appear to have had any management or any other employees who ran them or had any decision-making authority (if they had any of their own management or employees at all). Instead, UHG had various groups that managed and had oversight responsibilities and decision-making authority for the Defendant MA Organizations. At various times relevant to this Amended Complaint, these groups were located within Defendants United HealthCare Services (and/or its predecessors), Ovations, and UnitedHealthcare. Depending on the time period, the groups were known by the names Secure Horizons, Evercare, the Public & Senior Markets Group ("PSMG"), the Public Sector Market Group (also "PSMG"), Ovations, Ovations Part D, and AmeriChoice. Prior to approximately 2010, these groups were located in Defendants United HealthCare Services (and/or its predecessors) and Ovations. Since approximately 2010, these groups have been located within Defendant UnitedHealthcare and are referred to as UnitedHealthcare Medicare & Retirement and UnitedHealthcare Community & State. Among other things, these groups oversaw risk adjustment-related activities such as the submission of risk adjustment data (including diagnoses) to the Government on behalf of the Defendant MA Organizations, the retraction of invalid data that they had submitted to the Government on behalf of the

Defendant MA Organizations, and the Chart Review, Claims Verification, and RACCR Programs that they had conducted on behalf of the Defendant MA Organizations.  As explained more fully below, Defendants United HealthCare Services (and/or its predecessors), Ovations, UnitedHealthcare, and any other UHG entities in which these groups may have been located are "Related Entities" with their own legal obligations relating to, among other things, the submission of valid risk adjustment data to the Government and the deletion or withdrawal of invalid data.

33.    Starting in 2007, the actual risk adjustment data submission work was performed by the Risk Adjustment Group within Ingenix and then within Ingenix's successor, Optum.  First Ingenix and then Optum operated a computer system called the Internal Risk Adjustment Data System ("IRADS") that electronically submitted risk adjustment data (that is, diagnoses) to CMS' Risk Adjustment Processing System ("RAPS") in order for the Defendant MA Organizations to claim and receive risk adjustment payments.  In addition, Ingenix and then Optum helped to manage the Chart Review, Claims Verification, and RACCR Programs and performed the day-to-day activities necessary to conduct these programs.  Ingenix and then Optum performed activities relating to the submission of risk adjustment data and operated the various risk adjustment-related programs from offices in this District and elsewhere.

34.    Similar to the other UHG Managing Defendants, Ingenix was and Optum is a "Related Entity" because Ingenix was and Optum is related to the Defendant MA Organizations by common ownership or control through Defendant UHG and performed some or all of the management functions for the Defendant MA Organizations.  As previously explained, Optum is one of the "UHG Managing Defendants" because of the role that it (and its predecessor, Ingenix) played in managing the Defendant MA Organizations during the relevant time period.  Any reference in this Amended Complaint to the predecessors of the UHG Managing Defendants includes Ingenix.

35.    Ingenix and then Optum also performed risk adjustment-related services for third-parties which owned and operated their own MA Organizations and offered their own

Plans.  The UHG Managing Defendants referred to these third-parties as Ingenix's and then Optum's commercial clients.  Ingenix and then Optum submitted risk adjustment data to the Government on behalf of these commercial clients and conducted Chart Review and other programs for them.  Ingenix and then Optum performed this risk adjustment-related work for commercial clients from offices in this District and elsewhere.

36.    UHG became the largest owner of MA Organizations in large part by acquiring them.  For example, in 2005, UHG (directly or through a subsidiary) acquired PacifiCare Health Systems ("PacifiCare") and PacifiCare's and its affiliates' MA Organizations and MA Plans, including the following MA Organization Defendants:  PacifiCare of Arizona, Inc., incorporated in Arizona; PacifiCare of California, incorporated in California; PacifiCare of Colorado, Inc., incorporated in Colorado; PacifiCare of Nevada, Inc., incorporated in Nevada; PacifiCare of Oklahoma, Inc., incorporated in Oklahoma; PacifiCare of Oregon, Inc., incorporated in Oregon; PacifiCare of Texas, Inc. incorporated in Texas; and PacifiCare of Washington, incorporated in Washington.  Both before and after the acquisition, PacifiCare of California and possibly other PacifiCare MA Organizations and MA Plans referred to themselves or to their brand of MA Plans as Secure Horizons.  Since 2005, these PacifiCare MA Organizations have been indirect subsidiaries of and controlled by UHG.  Several years after the acquisition, these PacifiCare plans were renamed or rebranded as UnitedHealthcare MA Organizations or merged into other UHG MA Organizations.  For instance, in 2011, PacifiCare of California became Defendant UnitedHealthcare of California.

37.    Defendant United HealthCare Services is the successor of PacifiCare Health Systems and PacifiCare Health Plan Administrators, Inc., which were the direct or indirect parents of the PacifiCare MA Organizations acquired by UHG in 2005.  United HealthCare Services became their successor sometime after the acquisition.  For a short period of time after the acquisition, PacifiCare Health Systems (and possibly also PacifiCare Health Plan Administrators) was involved in the management of the

PacifiCare MA Organizations and perhaps other Defendant MA Organizations, including the management of risk adjustment-related activities.  All PacifiCare MA Organizations and other entities and their successors were direct or indirect subsidiaries of Defendant UHG.  Any reference in this Amended Complaint to United HealthCare Services or the UHG Managing Defendants includes PacifiCare Health Systems and PacifiCare Health Plan Administrators.

38.     Before UHG's acquisition of PacifiCare, the PacifiCare employees with responsibilities relating to the submission of risk adjustment data to the Government and responsibilities relating to other risk adjustment-related activities worked at a PacifiCare office in Cypress, California, within this District.  Sometime after the acquisition, this office moved to Santa Ana, California, within this District, and continued to submit claims and perform other risk adjustment-related activities.  In 2007, the employees in this Risk Adjustment Group in this District became employees of Ingenix and then they became employees of Optum in 2011.  A substantial part of the events or omissions relevant to this litigation occurred at these and other locations within this District.

39.     As an example of UHG's other acquisitions, UHG (directly or through a subsidiary) acquired WellMed Medical Management, Inc. ("WMMI") in 2011.  UHG's acquisition of WMMI included its subsidiaries and affiliates, including, but not limited to, WMMI's MA Organizations and MA Plans, Physician's Health Choice of Texas, LLC and Citrus Health Care, Inc., which operated in Texas, Florida, New Mexico and Arkansas.  Citrus Health Care, Inc. was a Florida corporation and a subsidiary of PHC Holdings of Florida, Inc.  Sometime after the acquisition, UHG renamed or rebranded these MA Organizations and MA Plans as UHG MA Organizations or MA Plans or merged them with or into UHG's other MA Organizations or MA Plans in these states.

40.     Over the last decade, UHG and its subsidiaries have also sought to vertically integrate in the health care market by acquiring and/or operating large groups or networks of direct providers of healthcare services and other entities that manage the provision of such services to beneficiaries enrolled in the Defendant MA Organizations'

MA Plans.  For example, UHG vertically integrated in several States when it acquired WMMI in 2011.  For many years, WMMI had subsidiaries and other affiliates that directly managed the provision of or directly provided healthcare services.  These affiliates included WellMed Networks, Inc., WellMed Networks Inc. of Florida, WellMed Medical Management of Florida Inc., and WellMed Medical Group, PA.  After the acquisition, WellMed became part of the group called OptumCare.  After the acquisition, WellMed also significantly expanded by acquiring more than 50 medical practices in Texas and Florida.  WellMed included more than 10,000 physicians that provided healthcare to hundreds of thousands of Medicare beneficiaries in Texas and Florida, including beneficiaries enrolled in Plans owned or operated by one or more Defendant MA Organizations.

41.    All references to "Defendants" in this Complaint include all of the Defendants identified above.

## DEFENDANTS' EXECUTIVES AND OTHER EMPLOYEES

42.    When the job titles of Defendants' executives and other employees are provided in this Amended Complaint, the United States, based on its best knowledge and belief, has provided their titles at the time relating to the facts alleged.  As a reference, the United States also provides, based on its best knowledge and belief, the following list of the job titles of Defendants' executives and other employees who are referenced in this Amended Complaint and the names of the specific business divisions or entities for which they worked during the time period that they were involved in matters relevant to this action (in alphabetical order by last name):

- Kyle Anderson – From 2009 to 2015, Anderson was the Director of Financial Planning and Analysis at UnitedHealthcare.

- Jason Bainbridge – Bainbridge worked for UnitedHealthcare Community & State in 2012.

- Paul Balthazor – From 2011 through 2015, Balthazor was the Chief Financial Officer of UnitedHealthcare Community & State.

- Marc Beckmann – Beckmann worked for UnitedHealthcare Medicare & Retirement in the Finance-Risk Adjustment Analysis Section.

- Paul Bihm – At PacifiCare, Bihm was a Vice President and Chief of Staff. After the acquisition, he worked for Ingenix as Chief Financial Officer and Chief Operating Officer from 2007 to 2010 and then for Optum's Risk Adjustment Group as a Senior Vice President of Client Management.

- Jon Bird – In 2008, Bird was hired to work for Ingenix's Risk Adjustment Group. In 2010, he became the Director of Revenue Projections for this group. In or about 2011, when the Risk Adjustment Group was moved to Optum, Bird became an employee of Optum. In or about 2013, Bird assumed significant responsibility for the Chart Review and Claims Verification Programs. He was also a "decision maker" for the Claims Verification and RACCR Programs and a member of United's Risk Adjustment Advisory Board/Council, which was chaired by Defendant UHG's Chief Executive Officer Steve Hemsley. By at least March 2014, Bird was the Senior Vice President of Risk and Quality Analytics at Optum.

- Gail Boudreaux – In 2008, Boudreaux became the Executive Vice President of UnitedHealthcare. From 2011 to 2014, she was the Chief Executive Officer of UnitedHealthcare. During Boudreaux's time as Chief Executive Officer of UnitedHealthcare, Steve Nelson, John Larsen, and Daniel Schumacher reported to her. She reported to Steve Hemsley. According to a 2011 document, Boudreaux was "significantly involved in the oversight and management of" UnitedHealthcare's "Medicare business."

- Tracey Bradberry – From 2008 through 2012, Bradberry was an Operations Manager at Ingenix. Since 2012, she has been an Associate Director of Operations at Optum. In that role, she leads diagnosis coding teams for the Chart Review Program.

- Patty Brennan – In 2008, Brennan was hired to work for Ingenix's Risk Adjustment Group. She was hired as Ingenix's Compliance Manager for Risk

28

Adjustment Programs.  In 2009, Brennan became the Ingenix Director of Retrospective Services relating to risk adjustment.  In or about 2011, when the Risk Adjustment Group was moved to Optum, Brennan became an employee of Optum.  From 2009 to 2013, Brennan oversaw the Chart Review Program.  In 2013, she became the Vice President of Retrospective Services.  Brennan, along with other individuals, was responsible for the development and execution of the Internal Data Validation Program, the RACCR Program, and the Claims Verification Program.  She was also the Program Manager for the Claims Verification Program for several years and had strategic oversight over the RACCR Program from 2009 to 2013.

- Jonathon Bunker – In 2009, Bunker was the President of Sierra Health and Life Insurance Company, Inc. and the President of Health Plan of Nevada, Inc.  Upon the close of the merger between UHG and Sierra Health Services, Bunker was the Chief Executive Officer of the southwest region of UnitedHealthcare.

- Barbara Carlson – In 2011, Carlson was a Senior Regulatory Affairs Analyst at the Regulatory Affairs Department at UnitedHealthcare Medicare & Retirement.

- Shelly Cranley – Cranley served as the Director of Regulatory Affairs for UnitedHealthcare.

- Keith Dobbins – Since 2006, Dobbins has been UnitedHealthcare's Deputy General Counsel.

- Juliet Domb – From 2012 to 2015, Domb was a Strategic Relationship Analyst at Optum.  She has also served as an administrative assistant to Larry Renfro.

- Jeffrey Dumcum – At PacifiCare, Dumcum was the Chief Financial Officer.  After the acquisition, he became a Vice President of Finance for Ovations.  In 2007, Dumcum became a Senior Vice President at Ingenix and oversaw the Risk Adjustment Group at Ingenix and then Optum until approximately 2014.

- Karen Erickson – Since 2011, Erickson has been an Executive Vice President and the Chief Quality Officer at Optum.  In this role, Erickson has reported to the

Chief Executive Officer of Optum, Larry Renfro.  Also in 2011, Erickson was the Chief Administrative Officer of Optum, and prior to that she worked for Optum for 12 years in various financial and administrative roles.

- Ronnie Grower – From 2008 to 2010 Grower was a Vice President of Market Consultation and a Vice President of Account Management at Ingenix.

- Joseph Haferman – Haferman was the Chief Financial Officer of Ovations in 2005 and the Chief Financial Officer of Secure Horizons in 2007 and possibly for some time thereafter.  Relator Poehling reported to Haferman from early 2007 to late 2008.

- Kimberly Halva – In 2009, Halva was an attorney for UnitedHealthcare Medicare & Retirement.  From 2010 to 2013, Halva was the UnitedHealthcare Medicare & Retirement's Finance Compliance Officer.  She also had the title Director of Compliance.  From 2010 to 2103, she reported to Jennifer O'Brien.

- Mary Hammond – From 2010 to 2013, Hammond was an Associate Director of Strategy and Support who worked for the risk adjustment team at UnitedHealthcare Medicare & Retirement.  She reported to Relator Poehling until he left at the end of 2012.

- Charles Hanson – From 2008 to 2013, Hanson was a Vice President of Underwriting and Finance at UnitedHealthcare Medicare & Retirement.

- Steve Hemsley – Hemsley is currently the Executive Chairman of UHG's Board of Directors.  He was the Chief Executive Officer of UHG from 2006 to 2017.  According to a 2011 document, Hemsley was "significantly involved in the oversight and management of" UHG's "Medicare business."

- James Higgins – Higgins was the Finance Director at PacifiCare.  After the acquisition, Higgins became a Director for Revenue Analytics.

- William Hnath – Hnath was the financial controller for UnitedHealthcare Medicare & Retirement.

- Pam Holt – Holt was a Project Manager for Network Management Operations at PacifiCare.  After the acquisition, she became a Manager of Provider Outreach for the Risk Adjustment Program.

- Scott Hughes – Starting in mid-2012, Hughes was a Senior Project Manager at Optum.

- Michael Jacobson – Jacobson was a Program Business Analyst/Project Manager at Optum.

- Donald James – James was a Director of Program Strategy at Optum from 2012 to 2015.

- Thad Johnson – Johnson is an attorney for UnitedHealthcare and is the current Chief Legal Officer for the company.

- Joseph Keen – Keen was a Vice President and Chief Compliance Audit Officer for UnitedHealthcare Medicare & Retirement in 2011.

- Gerald (Jerry) Knutson – Knutson was the Chief Financial Officer of Ovations from 2003 to 2009 and the Chief Financial Officer of OptumInsight from 2009 to 2012.

- John Larsen – Larsen was the Chief Financial Officer of UnitedHealthcare Medicare & Retirement (previously called Ovations-PSMG) until 2010, when Scott Theisen succeeded him in that position.  Larsen reported to Larry Renfro when Renfro was the Chief Executive Officer of Ovations-PSMG.  Relator Poehling reported to Larsen in 2010.  In August 2012, Larsen became the Chief Executive Officer of UnitedHealthcare Medicare & Retirement.  In early 2014, Steve Nelson took over that position.

- Pam Leal – Leal was the Executive Director of Provider Training and Development at PacifiCare.  After the acquisition, she became a Regional Vice President for Market Consultation at Ingenix.

- Rebecca Martin – In 2010, Martin became the Director of Encounter Operations at Ingenix.  From 2011 to 2015, Martin was the Director of Data Remediation at

Optum. In 2015, she became the Director of Data Management Strategies at Optum.

- Jay Matushak – From 2013 to 2015, Matushak was a Vice President of Financial Planning and Analysis for UnitedHealthcare Medicare & Retirement. He reported to Brian Thompson.

- Michael McCarthy – Starting in November 2011, McCarthy was the Executive Director of UnitedHealthcare Medicare & Retirement. In 2013, he also served as a Regional Vice President for Southern California for UnitedHealthcare Medicare Solutions.

- Marybeth Meyer – Since 2013, Meyer has been a Vice President of Operations at UnitedHealthcare Medicare & Retirement where she oversees risk adjustment programs and activities. Meyer reported to Theisen and then to Brian Thompson.

- Bill Miller – Miller was the Chief Executive Officer of OptumInsight from 2012 to 2017.

- Eric Murphy – Murphy was the President of Payer Solutions at Optum.

- Randall Myers – Myers worked for PacifiCare and, after the acquisition, for Ingenix and then Optum as a Director of Encounter Operations.

- Timothy Noel – Noel was the Vice President of Finance for Ovations and then UnitedHealthcare Medicare & Retirement from 2007 to 2013 and reported to the Chief Financial Officers of those groups. Poehling reported to Noel from the fall of 2010 until his departure in December 2012.

- Steve Nelson – Since 2017, Nelson has been the Chief Executive Officer of UnitedHealthcare. From 2014 to 2017, he was the Chief Executive Officer of UnitedHealthcare Medicare & Retirement.

- Jennifer O'Brien – O'Brien was the Chief Medicare Compliance Officer of Ovations and then UnitedHealthcare Medicare & Retirement. She reported to David Orbuch. She was part of the UnitedHealthcare Medicare & Retirement "Executive Leadership Team."

- Karin O'Hara – O'Hara worked at UnitedHealthcare Community & State.
- David Orbuch – Orbuch was the Chief Compliance Office for PSMG and UnitedHealthcare Medicare & Retirement.
- Thomas Paul – In the 2009 to mid-2010 time period, Paul was the Chief Executive Officer and Chief Operating Office of Ovations and, in the mid-2010 to August 2012 time period, Paul was the Chief Executive Officer of UnitedHealthcare Medicare & Retirement.  He reported to Renfro and then to Gail Boudreaux.  He was part of the UnitedHealthcare Medicare & Retirement "Executive Leadership Team."
- Karen Petroff – Petroff was the Senior Vice President of Business Development at Optum.
- Cindy Polich – Polich was the President of Ovations and then UnitedHealthcare Medicare & Retirement.  She reported to Larry Renfro and Thomas Paul.  She was part of the UnitedHealthcare Medicare & Retirement "Executive Leadership Team."
- Patricia Rasmussen – Rasmussen was Manager of Encounter Submissions at Ingenix.
- Janice Redmond – Prior to 2012, Redmond was Senior Vice President of Provider Outreach at Optum.  Since 2012, Redmond has been a Vice President of Market Consultation for Optum's Western Region.
- Anne Reis – In 2013, Reis was an Associate Director of Revenue for UnitedHealthcare Medicare & Retirement.
- Larry Renfro – During the 2009 to 2011 time period, Renfro served in various roles, including the Executive Vice President of Defendant UHG, the Chief Executive Officer of Defendant Ovations, and the Chief Executive Officer of the Public & Senior Markets Group.  Since July 2011, Renfro has been the current Chief Executive Officer of Defendant Optum.  Since November 2014, he has also been Vice Chairman of Defendant UHG.

33

- Sandy Rick – Rick was a Senior Regulatory Affairs Analyst at UnitedHealthcare Medicare & Retirement.

- Kara Rios – Rios was the Chief Financial Officer of AmeriChoice, one of the groups that managed some of the Defendant MA Organizations.

- Justin Roth – Roth was the Chief Financial Officer of Evercare, one of the groups that managed some of the Defendant MA Organizations.

- Daniel Schumacher – Since 2017, Schumacher has been the President and Chief Operating Officer of UnitedHealthcare.  Prior to that, he was the Chief Financial Officer of UnitedHealthcare.

- Melissa Sedor – Sedor worked in UnitedHealthcare's controller's office, in the area of revenue accounting.  Sedor was an accounting manager and reported to Bill Hnath, the controller for UnitedHealthcare Medicare & Retirement.

- Matt Shors – Shors is UHG's Senior Deputy General Counsel.

- Marianne Short – Short is UHG's Executive Vice President and Chief Legal Officer.

- Andy Slavitt – Slavitt was the Chief Executive Officer for OptumInsight and an Executive Vice President for Optum.

- Scott Theisen – From 2010 to 2013, Theisen was the Chief Financial Officer of UnitedHealthcare Medicare & Retirement.  In 2011, he was part of the UnitedHealthcare Medicare & Retirement "Executive Leadership Team" reporting to Tom Paul.  In 2014, Theisen moved to Optum, but, during that year, his responsibilities continued to include the risk adjustment-related work that Optum performed for UnitedHealthcare Medicare & Retirement.

- Brian Thompson – Since 2017, Brian Thompson has been the Chief Executive Officer of UnitedHealthcare Medicare & Retirement.  From 2013 to 2017, he was the Chief Financial Officer of UnitedHealthcare Medicare & Retirement.  He was also previously the Chief Financial Officer of UnitedHealthcare Community & State.

- Carol Thompson – Until 2009, Carol Thompson was a National Manager for Risk Adjustment Programs at Ingenix.  From 2009 to 2011, she was a Manager of the ChartSync operations (part of the Chart Review Program) at Ingenix.  From 2011 to 2014, she was a Manager and Analyst of Encounter Operations at Optum.
- Pam Thomsen – Thomsen worked for Optum in Data Validation Operations and Clinical Performance & Compliance.
- Lee Valenta – At various times, Valenta was the Chief Financial Officer, the Chief Operating Officer, the President of Life Sciences, and an Executive Vice President at Ingenix and then OptumInsight.
- Emily Vue – From 2009 to 2014, Vue was a Senior Regulatory Analyst and later a Manager of Regulatory Affairs at Ovations-PSMG and then UnitedHealthcare.
- Karen Wagor – Wagor was the Manager of the National Medical Coder Team and the National Coding Trainer at Ingenix and then Optum.  She previously worked at PacifiCare.
- David Walsh – In 2011, Walsh was the Director for Regulatory Affairs for and, in 2012, became the Senior Director of Regulatory Affairs for UnitedHealthcare Medicare & Retirement.
- John Way – Way was Chief Financial Officer of Secure Horizons.  Relator Poehling reported to Way from late 2008 to early 2010.
- Christopher Webb – Webb worked with Payer Operations at Optum in 2014.
- Timothy Wicks – Wicks served in a senior management position at Optum.
- Stephanie Will – Will had been a Principal Analyst at PacifiCare.  After the acquisition, she joined Ovations as the Program Manager for the national Chart Review Program.  In 2007, she became the Vice President of Risk Adjustment Programs at Ingenix.

# THE MEDICARE PROGRAM

## I.    The Medicare Statute

43.    Medicare is a federally-operated health insurance program administered by CMS. Medicare benefits individuals age 65 and older and the disabled.  42 U.S.C. § 1395c *et seq.*  Parts A and B of the Medicare Program are known as "traditional" Medicare. Medicare Part A covers inpatient and institutional care.  Medicare Part B covers physician, hospital outpatient, and ancillary services and durable medical equipment.

44.    Under Medicare Parts A and B, CMS reimburses healthcare providers (*e.g.,* hospitals and physicians) using what is known as a "fee-for-service" ("FFS") payment system.  Under an FFS payment system, healthcare providers submit claims to CMS for reimbursement for each service actually rendered, such as a physician office visit or a hospital stay.  CMS then pays the providers directly for each service based on payment rates pre-determined by the Government.

45.    Under Medicare Part C, Medicare beneficiaries can opt out of the traditional Medicare Program (Parts A and B) and instead enroll in MA Plans and receive health care services managed by those MA Plans.  MA Plans must provide Medicare beneficiaries all the services that they are entitled to receive from the traditional Medicare Program.

46.    Under Medicare Part D, Medicare beneficiaries can elect to enroll in either a Prescription Drug plan (known as a PD Plan) or an MA Plan that provides prescription drug coverage in addition to the physician office visit and hospital outpatient and inpatient coverage provided under Part C (known as an MAPD Plan).  For simplicity, in this Amended Complaint, the Government refers to Parts C and D collectively as the MA Program and refers collectively to MA, PD, and MAPD Plans as Plans.

47.    MA Organizations are "risk-bearing" entities that must be licensed by the State in which they are located.  42 C.F.R. §§ 422.2 & 422.503(b)(2).  Each MA Organization agrees to bear the risk that the amount that it pays providers for the health services for a

particular beneficiary in one of its Plans may exceed the amount that it was paid to insure the beneficiary.

48.     Medicare beneficiaries who enroll in an MA, PD or MAPD Plan are considered members of and enrollees in that Plan.  In this Amended Complaint, the terms beneficiaries, members, enrollees, and patients are used interchangeably, but mean the same thing, that is, individuals enrolled in Plans.

49.     MA Organizations' obligations to the MA Program and the requirements for them to participate in the Program are set forth in federal regulations and, each year, the MA Organizations must agree in writing to comply with those regulations and to other terms and conditions in order to participate in the MA Program.  42 C.F.R. §§ 422.504 & 422.505 (Part C); 42 C.F.R. §§ 423.504 & 423.505 (Part D).  In addition, MA Organizations must comply with requirements set forth in statutes, such as the FCA, and guidance documents, such as the Medicare Managed Care Manual, the Medicare Prescription Drug Benefit Manual, the Risk Adjustment Participant Guides, and Medicare Advantage operating instructions.

50.     Related Entities include those entities that are related to an MA Organization by common ownership or control and perform at least some of the MA Organization's management functions.  42 C.F.R. §§ 422.2 & 422.500.  As previously explained, the UHG Managing Defendants are or were Related Entities.

51.     First Tier Entities include those providers or provider groups that enter into a written arrangement with an MA Organization to provide healthcare services to the beneficiaries in the organization's Plan(s).  42 C.F.R. §§ 422.2 & 422.500.  The capitated providers in the RACCR Program were First Tier Entities.

52.     The obligations of Related Entities and First Tier Entities to the MA Program are also set forth in the MA Program regulations.  Related Entities and First Tier Entities must, among other things, (i) perform their services in a manner that complies with the MA Organization's contractual obligations to the Government, *id*. at 422.504(*i*)(3)(iii); agree to "comply with all applicable Medicare laws, regulations, and CMS instructions,"

*id*. at 422.504(*i*)(4)(v); and receive effective compliance training and education relating to preventing fraud, waste, and abuse. *Id*. at § 422.503(b)(4)(vi)(C)(1). Furthermore, if a Related Entity or First Tier Entity generates data relating to an MA Organization's claims for payments from the MA Program, it (as well as the MA Organization) must certify the accuracy and truthfulness of the data. *Id*. at § 422.504(l)(3).

53.    An MA Organization, however, cannot evade its legal and contractual obligations to the Government by using Related Entities to manage it or by contracting with First Tier Entities to provide services to its beneficiaries. An MA Organization "maintains ultimate responsibility for adhering to and otherwise fully complying with all terms and conditions of its contract with CMS." 42 C.F.R. § 422.504(*i*)(1). Thus, an MA Organization cannot delegate away its ultimate responsibility for its obligations to the Government.

## II.    Medicare Parts C and D Risk Adjustment Payments

54.    Under Part C, the Government pays each MA Organization a predetermined base monthly amount for each Medicare beneficiary in its MA Plans. This monthly payment is known as a "per-member, per-month" payment. This predetermined base payment varies for each MA Plan depending on various factors, including amounts set forth in the MA Plan's bid submitted to the Government, the scope of medical services covered by the Plan's benefit package (all packages must cover at least those services offered by Parts A and B of the Medicare Program), and the amount of premiums, deductibles, and co-pays for which an enrollee in the Plan is responsible (Plans have different premiums, deductibles and co-pays such that Plans with higher deductibles and co-pays may have lower premiums).

55.    Since 2000, Congress has also required that the payments be risk adjusted for each beneficiary based on "such risk factors as age, disability status, gender, institutional status, and *such other factors as [the Secretary of the United States Department of Health and Human Services] determines to be appropriate, including adjustment for health status* . . . to ensure actuarial equivalence." 42 U.S.C. § 1395w-23(a)(1)(C)

(emphasis added).  By risk adjusting for health status, the Government pays MA Organizations more for beneficiaries with certain serious chronic medical conditions and, thus, higher risk scores than for beneficiaries who do not have those conditions and, thus, have lower risk scores.

56.     Pursuant to 42 U.S.C. § 1395w-23(a)(1)(C), the Secretary has the authority to determine how to adjust for health status.  For example, the Secretary has the authority to decide to risk adjust only for serious chronic medical conditions and to risk adjust by requiring the submission of diagnoses from medical encounters that occurred the year preceding each payment year and projecting the possibility of additional costs for each payment year.  The Secretary also has authority to decide what historical cost and/or utilization data it should consider in projecting how much more it may cost an MA Organization to provide services to a beneficiary who has been assigned a diagnosis relating to a serious chronic medical condition.

57.     From 2000 to 2004, the Secretary employed a Principal Inpatient Diagnostic Cost Group ("PIP-DCG") model that took into account diagnoses from inpatient hospital stays to determine the risk scores of beneficiaries in MA Plans.  The PIP-DCG model was prospective.  Diagnoses for one year were used to determine each beneficiary's risk score for the following payment year.  During the 2000 to 2004 time period, MA Organizations (which were then called Medicare + Choice Organizations) had many of the same obligations that they have had since 2004.  For instance, they had the obligation to design and implement effective systems to monitor and review the accuracy and truthfulness of the diagnoses they submitted for risk adjustment payments in order to certify the accuracy and truthfulness of that data.  *See* Medicare Managed Care Manual, Chapter 7, Section 110.2 (entitled "Certification of Data Accuracy, Completeness, and Truthfulness") (Rev. 2, 10-01-01).

58.     Since 2004, the Secretary has employed the Hierarchical Conditions Category ("HCC") model, which takes into account both demographic factors (such as age and gender) and health status to determine the risk scores for beneficiaries in MA Plans.

With respect to health status, the model takes into account diagnoses from physician office visits and hospital outpatient encounters as well as hospital inpatient stays. Like the PIP-DCG model, the HCC model is prospective, meaning that it relies on diagnoses assigned to a beneficiary in one year (referred to by CMS as the "data collection" year but also generally known as the "date of service" or "DOS" year) to determine the risk score for the beneficiary for the following year (often referred to as the "payment year" or "PY"). The medical conditions included in the model are grouped into HCCs, which are categories of clinically-related medical diagnoses. *See* 42 C.F.R. § 422.2. The diagnoses grouped into HCCs include major, severe, and/or chronic illnesses. Related groups of diagnoses are ranked on the basis of disease severity and the cost associated with their treatment. Between 2004 and 2013, the CMS-HCC model included 70 HCCs. Starting in 2014, the CMS-HCC model included 79 HCCs.

59.     Under Medicare Part D, payments to PD or MAPD Plans for prescription drug benefits are also risk-adjusted based on health status. As with Part C, Part D employs a health-based risk adjustment model known as the Rx Hierarchical Condition Categories ("RxHCC") model. Like HCCs, RxHCCs are also groups of clinically-related medical diagnoses that are ranked by disease severity and the cost associated with the pharmaceutical drugs used to treat them.

60.     The Government assigns a relative numerical value (also known as a relative factor, multiplier, or coefficient) to each HCC and RxHCC group that correlates to the predicted incremental costs of care associated with treating the medical conditions in each category. It currently determines the relative values based on an analysis of the additional amounts that it paid on average for the treatment of these major, severe, and chronic medical conditions under Parts A and B of the Medicare Program. Higher relative values are assigned to HCCs and RxHCCs that include diagnoses with greater disease severity and greater costs associated with their treatment.

61.     As previously stated, the HCC and RxHCC risk adjustment models are prospective and a beneficiary's risk score for a particular payment year is determined by

his or her medical conditions during the previous year (*i.e.*, the date of service year).  For risk adjustment payment purposes, these medical conditions must be documented by a qualified healthcare provider (*e.g.*, a doctor) in the beneficiary's medical record during the previous year.  Accordingly, for risk adjustment payment purposes, the diagnosis codes that the healthcare provider, his or her administrative or billing support staff, or anyone else (such as the MA Organization or a Related Entity) assigns to a beneficiary must be supported by the beneficiary's medical record.

62.    Each beneficiary's risk score is calculated anew for each payment year.  For example, a beneficiary's risk score for payment year 2012 is determined by the diagnoses that his or her qualified healthcare providers documented in his or her medical records during medical encounters during date of service year 2011.

63.    MA Organizations obtain diagnosis data from the healthcare providers that treat the beneficiaries in their plans (as well as through other means and sources such as the MA Organizations' own medical record reviews).  Healthcare providers can transmit diagnosis codes to MA Organizations with claims for payment for services rendered, in encounter records reporting the services rendered, or by alternative means.  In this Amended Complaint, the United States refers to diagnosis codes reported by providers through any means as "provider-reported diagnoses."

64.    MA Organizations submit risk adjustment data, including diagnoses, to CMS using CMS' Risk Adjustment Processing System ("RAPS").  Each RAPS submission must include the following information:  the Medicare beneficiary's identification number (called a "HIC number" or "HICN"); the date(s) of the medical encounter (the physician office visit, hospital outpatient visit, or hospital inpatient stay); the type of provider (physician or hospital); and the diagnosis code(s) reported by the provider for the encounter.  Each RAPS submission is a claim for payment.  If the data submitted is invalid, the claim is false.

65.    RAPS also has a field that is called a "Delete Indicator" and allows MA Organizations and Related Entities to comply with their obligation to delete invalid

diagnoses that they previously submitted in order to withdraw or retract the invalid diagnoses.  That is, the RAPS system enables MA Organizations and Related Entities to withdraw or retract their false claims for risk adjustment payments.

## DEFENDANTS' AGREEMENTS

### I.       The Annual Parts C and D Agreements

66.      As previously explained, in order to participate in the MA Program, the Defendant MA Organizations were required to agree in writing to comply with the Part C and D regulations and any other terms and conditions CMS deemed appropriate.  42 C.F.R. §§ 422.504 & 422.505 (Part C); 42 C.F.R. §§ 423.504 & 423.505 (Part D).  Each year during the relevant time period, one or more executives of one or more of the UHG Managing Defendants or their predecessors executed these written agreements or renewals of these written agreements between the Defendant MA Organizations and CMS.

67.      The regulations specifying the terms and conditions of the contractual relationship between MA Organizations and CMS have remained the same for many years.  Accordingly, from year to year, the terms and conditions of these written agreements between the Defendant MA Organizations and CMS remained very similar, if not identical.

68.      The terms and conditions of the Part C agreements are exemplified by the attached contract that Defendant UnitedHealthcare Plan of River Valley, Inc. entered into with CMS relating to its participation in Medicare Part C in 2010.  *See* Exhibit 1, attached hereto.  The terms and conditions of these Part C contracts include, among many other things, that each of the MA Organizations agrees to (i) operate its Plans "in compliance with the requirements of [the] contract and applicable Federal statutes, regulations, and policies (e.g., policies as described in the Call Letter, Medicare Managed Care Manual, etc.)" (Article II, Section A); (ii) "implement a compliance plan in accordance with the requirements of § 422.503(b)(4)(vi)" (Article III, Section F); (iii) "[a]s a condition of receiving a monthly payment under" the contract, "request payment under the contract

on the forms attached" to the contract, including "Attachment B (risk adjustment data) which attest[s] to *(based on best knowledge, information and belief, as of the date specified on the attestation form)* the accuracy, completeness, and truthfulness of the data identified on" Attachment B (Article IV, Section C) (emphasis in the original); (iv) ensure that related entities, contractors, and subcontractors that generated risk adjustment data also attest to the accuracy and truthfulness of the data (Article IV, Section C.2); (v) ensure that all agreements with related entities, contractors, and subcontractors specify that the related entities, contractors, and subcontractors "must comply with all applicable Medicare laws, regulations, and CMS instructions" (Article V, Section D(5)); and (vi) comply with "Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to, applicable provisions of the Federal criminal law [and] the False Claims Act (31 USC 3729 et seq.)" (Article IX, Section A.1).  In accordance with 42 C.F.R. § 422.510, the agreements also provided that CMS may terminate the MA Organization's participation in the MA Program if it determines that the organization has submitted false data to it or "fail[ed] to provide CMS with valid risk adjustment data."  Article VIII, Section B.1(a)(iv) & (vii).

69.     The agreements for other years were very similar, if not identical.  For example, in September 2010, Tom Paul, the Chief Executive Office of UnitedHealthcare Medicare & Retirement, executed a new agreement between Defendant UnitedHealthcare of California (the successor to PacifiCare of California) and CMS relating to this MA Organization's participation in Medicare Part C in 2011.  *See* Exhibit 2, attached hereto. By executing this contract, UnitedHealthcare of California agreed to, among many other things, (i) operate its Plans "in compliance with the requirements of [the] contract and applicable Federal statutes, regulations, and policies (e.g., policies as described in the Call Letter, Medicare Managed Care Manual, etc.)" (Article II, Section A); (ii) "implement a compliance plan in accordance with the requirements of § 422.503(b)(4)(vi)" (Article III, Section F); (iii) "[a]s a condition of receiving a monthly payment under" the contract, "request payment under the contract on the forms attached"

to the contract, including "Attachment B (risk adjustment data) which attest[s] to *(based on best knowledge, information and belief, as of the date specified on the attestation form)* the accuracy, completeness, and truthfulness of the data identified on" Attachment B (Article IV, Section D); (iv) ensure that related entities, contractors, and subcontractors that generated risk adjustment data also attest to the accuracy and truthfulness of the data (Article IV, Section D.2); (v) ensure that all agreements with related entities, contractors, and subcontractors specify that the related entities, contractors, and subcontractors "must comply with all applicable Medicare laws, regulations, and CMS instructions" (Article V, Section D.5); and (vi) comply with "Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to, applicable provisions of the Federal criminal law [and] the False Claims Act (31 USC 3729 et seq.)" (Article IX, Section A.1). The agreement also provided that CMS had the right to terminate the agreement with the MA Organization if it determined that the organization had submitted false data to it or "fail[ed] to provide CMS with valid risk adjustment data." Article VIII, Section B.1(a)(iv) & (vii). In September 2010, Paul also executed an agreement with CMS relating to UnitedHealthcare of California's offering of prescription drug benefits under Medicare Part D. This Part D agreement was, in all respects relevant to this Amended Complaint, very similar to the one described above for the offering of healthcare insurance benefit packages under Part C. Furthermore, in September 2010, Tom Paul executed the same Part C and D agreements on behalf of other of the Defendant MA Organizations. All these agreements were very similar, if not identical, to the ones he executed for UnitedHealthcare of California.

70.     In September 2011, August 2012, and August 2013, Scott Theisen, the Chief Financial Officer of UnitedHealthcare Medicare & Retirement, executed agreements for many of the Defendant MA Organizations relating to their participation in Medicare Parts C and D for 2012, 2013, and 2014, respectively. *See, e.g.*, Exhibits 3, 4, & 5, attached hereto (Defendant UnitedHealthcare of California's Parts C agreements for

these years).  In August 2014 and 2015, Brian Thompson, the Chief Financial Officer of UnitedHealthcare Medicare & Retirement, executed agreements for many of the Defendant MA Organizations relating to their participation in Medicare Parts C and D for 2015 and 2016.  See, e.g., Exhibits 6 & 7, attached hereto (Defendant UnitedHealthcare of California's Part C agreements for these years).  These agreements were, in all respects relevant to this Amended Complaint, very similar, if not identical, to the agreements described in the preceding paragraphs relating to the agreements for 2010 and 2011 and imposed the same contractual obligations on the Defendant MA Organizations as the earlier agreements.

71.     The annual Attestations executed in order to renew existing contracts were also very similar as shown by the following:  In the fall of 2006, Jerry Knutson, the Chief Financial Officer of Ovations and Jeff Putnam, the Chief Financial Officer of Secure Horizons, executed Attestations renewing (for calendar year 2007) the existing contract between PacifiCare of California (the predecessor of Defendant UnitedHealthcare of California) and CMS.  Knutson and Putnam attested that PacifiCare of California would "comply with all applicable program guidance that CMS has issued to date and will issue during the remainder of 2006 and 2007 pursuant to Medicare program authorizing statutes and regulations, including but not limited to, . . . the CMS memoranda issued through the Health Plan Management System (HPMS)."  (HPMS is one of the web-based systems used by CMS to provide program information to MA Organizations and is used to communicate program requirements.)  In September 2007, Joseph Haferman, the Chief Financial Officer of Secure Horizons, executed another Attestation renewing the existing contract for PacifiCare of California (this time for calendar year 2008).  Haferman thereby attested that PacifiCare of California would comply "with all applicable program authorizing statutes and regulations and program guidance that CMS has issued to date and will issue during the remainder of 2007 and 2008, including but not limited to,  . . . the Medicare Managed Care Manual, and CMS memoranda issued through the Health Plan Management System (HPMS)."  In September 2008, Kenneth

1   Burdick, the Chief Executive Officer of Secure Horizons at the time, executed another

2   Attestation renewing the existing contract for PacifiCare of California (this time for

3   calendar year 2009).  Burdick thereby attested that PacifiCare of California would

4   comply "with all applicable Medicare program authorizing statutes and regulations and

5   program guidance that CMS has issued to date and will issue during the remainder of

6   2008 and 2009, including but not limited to, . . . the Medicare Managed Care Manual,

7   and the CMS memoranda issued through the Health Plan Management System

8   (HPMS)."  In September 2009, both Tom Paul, the Chief Executive Officer of Ovations,

9   and John Way, the Chief Financial Officer of Secure Horizons, executed an Attestation

10  renewing the existing contract for PacifiCare of California (this time for calendar year

11  2010).  They thereby attested that PacifiCare of California would comply "with all

12  applicable Medicare program authorizing statutes and regulations and program guidance

13  that CMS has issued to date or will issue during the remainder of 2009 and 2010,

14  including but not limited to, . . . the Medicare Managed Care Manual, and the CMS

15  memoranda issued through the Health Plan Management System (HPMS)."

16  72.    The United States hereby incorporates by reference as if they were recited herein

17  and attached hereto all of the agreements that all of the Defendant MA Organizations

18  entered into with CMS relating to their participation in Medicare Parts C and D for 2007

19  to present date.  All of these agreements were, in all respects relevant to this Amended

20  Complaint, very similar, if not identical, to the agreements described in the preceding

21  paragraphs.

22          **II.    The Electronic Data Interchange Agreements**

23  73.    In addition, since at least 2003, MA Organizations and entities that submit risk

24  adjustment data on their behalf have been required to execute Electronic Data

25  Interchange ("EDI") agreements prior to submitting risk adjustment data.  These EDI

26  agreements are considered contracts by which the MA Organizations attest to the

27  accuracy of the data submitted.  Even if another entity submits the data, the MA

28  Organizations are still responsible for the content of the submissions.  *See* 2003 Regional

Risk Adjustment Training for Medicare+Choice Organizations Participant Guide, § 6.1; 2004 Regional Risk Adjustment Training for Medicare+Choice Organizations Participant Guide, § 4.1; 2005 Risk Adjustment Data Basic Training for Medicare Advantage Organizations Participant Guide § 4.1; 2006 Risk Adjustment Data Basic Training for Medicare Advantage Organizations Participant Guide § 4.1; 2007 Risk Adjustment Data Training for Medicare Advantage Organizations Participant Guide § 4.1; 2008 Risk Adjustment Technical Assistance for Medicare Advantage Organizations Participant Guide § 4.1; Risk Adjustment 101 Participant Guide § 2.1 (2013). *See* also Medicare Managed Care Manual, Chapter 7, § 111.6.1 (Rev. 57, 08-13-04); *id.* § 120.2.1 (Rev. 114, 06-07-13).  By executing these EDI forms, the MA Organizations agree that (i) they will be responsible for all risk adjustment data submitted to CMS by themselves, their employees, and their agents; (ii) they will submit risk adjustment data that is accurate, complete, and truthful based on best knowledge, information, and belief; (iii) *they will research and correct risk adjustment data discrepancies*; and (iv) CMS has the right to audit and confirm the risk adjustment data, including diagnoses, submitted by the MA Organization and the right of access to the beneficiaries' medical records to conduct such audits.

74.     Each of the Defendant MA Organizations and Defendants Optum (and its predecessor, Ingenix) and Ovations executed these EDI agreements and submitted them to the MA Program in order to submit risk adjustment data to and receive risk adjustment payments from the MA Program.  Pursuant to the express terms of these EDI agreements, these Defendants promised to submit valid risk adjustment data to the MA Program and *to research and correct any data discrepancies*.

75.     For instance, in 2005, Joseph Haferman, the Chief Financial Officer of Defendant Ovations, executed and submitted to CMS an EDI agreement in order to obtain a "submitter ID" permitting Ovations to submit risk adjustment data on behalf of various of the Defendant MA Organizations.  *See* Exhibit 8, attached hereto.  By executing this agreement and submitting it to CMS on behalf of the "eligible organization," which was

1   identified as "United Health Group – Ovations" on the form, Defendants UHG and

2   Ovations and the Defendant MA Organizations each agreed that they would (i) be

3   responsible for all risk adjustment data submitted to CMS by themselves, their

4   employees, or their agents; (ii) submit accurate and truthful risk adjustment data; and

5   (iii) *research and correct discrepancies with its risk adjustment data*.  In addition, each

6   of them agreed that CMS could audit the data and have access to medical records to

7   conduct such audits.

8   76.    Additional examples include the EDI agreements that James Higgins, the Finance

9   Director of PacifiCare Health Systems, executed on behalf of the following Defendant

10  MA Organizations or their predecessors:  On September 14, 2006, Higgins signed EDI

11  agreements for UnitedHealthcare Insurance Company of New York (contract numbers

12  H5515 and R5342); UnitedHealthcare Insurance Company (the name for a number of

13  different MA Organizations with contract numbers R3175, R5287, H1717, H2803,

14  H2001, H2003, H2111, H2408, H0624, H0620, H1303, H1509, H3921, H0319, H5500,

15  H2406, H4106, H3812, H3209, H5918, H5697, H5754, H0315, H2228, H1108, H4522,

16  H5532, H5516, H5507, H5440, H5417, H5424, H5008, H5527, H2226 and H5518);

17  PacifiCare of Nevada, Inc. (contract number H2949); PacifiCare of Arizona, Inc.

18  (contract number H0303); UnitedHealthcare of Alabama, Inc. (contract number H0151);

19  UnitedHealthcare of the Midwest, Inc. (contract number H2654); Oxford Health Plans

20  (CT), Inc. (contract number H0752); Oxford Health Plans (NJ), Inc. (contract numbers

21  H3113 and H3107); UnitedHealthcare of Ohio, Inc. (contract numbers H3659 and

22  H5678); UHC of California, then known as PacifiCare of California (contract number

23  H0543); UnitedHealthcare of Florida, Inc. (contract number H1080 and H9011);

24  UnitedHealthcare Benefits of Texas, Inc. (contract number H4590); UnitedHealthcare of

25  Utah, Inc. (contract number H4604); UnitedHealthcare of Arizona, Inc. (contract number

26  H0316); UnitedHealthcare of Arkansas, Inc. (contract number H0401); UnitedHealthcare

27  of Georgia, Inc. (contract number H1111); UnitedHealthcare of Tennessee, Inc. (contract

28  number H4406); UnitedHealthcare of New England, Inc. (contract number H4102);

UnitedHealthcare of Oregon, Inc. (contract number H3805); UnitedHealthcare of Oklahoma, Inc. (contract number H3749); UnitedHealthcare of New York, Inc. (contract number H3379); Oxford Health Plans (NY), Inc. (contract number H3307); UnitedHealthcare of the Midlands, Inc. (contract number H2802); UnitedHealthcare of North Carolina, Inc. (contract number H3456); PacifiCare of Colorado, Inc. (contract number H0609); Sierra Health and Life Insurance Company, Inc. (contract number H5652); UnitedHealthcare of Washington, Inc. (contract number H5005); UnitedHealthcare of Wisconsin, Inc. (contract number H5253); and UnitedHealthcare Community Plan of Texas, L.L.C. (contract number H4514).  On November 2, 2006, Higgins signed EDI agreements for UnitedHealthcare of the Midwest, Inc. (contract number H3887), UnitedHealthcare Insurance Company of New York (contract number H4720), and UnitedHealthcare Insurance Company (contract numbers H9418, H8000, and H4779).  On December 13, 2006, Higgins signed EDI agreements for UnitedHealthcare Insurance Company (the name for a number of MA Organizations with contract numbers H0408, H1286, H3435, H7274, H7254, H0410, and H6717) and UnitedHealthcare of Wisconsin, Inc. (contract number H7187).  On January 1, 2007, Higgins signed an EDI agreement for UnitedHealthcare Insurance Company (contract number H5435).  On January 14, 2008, Higgins signed an EDI agreement for UnitedHealthcare Insurance Company (contract numbers H3912 and H0710).  *See, e.g.,* Exhibit 9, attached hereto (September 14, 2006 EDI for PacifiCare of California).  Pursuant to these EDI agreements, each of these MA Organizations agreed that it would (i) be responsible for all risk adjustment data submitted to CMS by itself, its employees, or its agents; (ii) submit accurate and truthful risk adjustment data; and (iii) *research and correct discrepancies with its risk adjustment data*.  In addition, each of them agreed that CMS could audit the data and have access to medical records to conduct such audits.

77.    In addition, on January 14, 2008, Patricia Rasmussen, who worked as a manager for Ingenix, signed EDI agreements for UnitedHealthcare Insurance Company (contract numbers H4971, H0710, H3912, H7698, H4971, H0710, H6793, H5749, and H6228),

UnitedHealthcare of New England, Inc. (contract number H1944), and UnitedHealthcare Insurance Company of New York (contract number H4720).  On June 18, 2008, Rasmussen signed an EDI agreement for PacifiCare of Nevada, Inc. (contract number H7949).  In January 2009, Rasmussen signed additional EDI agreements for UnitedHealthcare Insurance Company (contract numbers H7444, H8748, H2182, and H1949).  Pursuant to these EDI agreements, each of these MA Organizations agreed that it would (i) be responsible for all risk adjustment data submitted to CMS by itself, its employees, or its agents; (ii) submit accurate and truthful risk adjustment data; and (iii) *research and correct discrepancies with its risk adjustment data*.  In addition, each of them agreed that CMS could audit the data and have access to medical records to conduct such audits.

78.     On December 15, 2010, Timothy Noel, who was Vice President of Finance for UnitedHealthcare Medicare & Retirement, signed an EDI agreement for Oxford Health Plans (CT), Inc. (contract number H0755).  On September 22, 2011, Noel signed an EDI agreement for UnitedHealthcare Insurance Company of New York (contract number H1537).  Pursuant to these EDI agreements, each of these MA Organizations agreed that it would (i) be responsible for all risk adjustment data submitted to CMS by itself, its employees, or its agents; (ii) submit accurate and truthful risk adjustment data; and (iii) *research and correct discrepancies with its risk adjustment data*.  In addition, each of them agreed that CMS could audit the data and have access to medical records to conduct such audits.

79.     On April 27, 2011, Scott Theisen, the Chief Financial Officer of UnitedHealthcare Medicare & Retirement, submitted an EDI agreement for PacifiCare of California, which included all the same promises.  On October 21, 2013, Theisen also signed EDI agreements for Care Improvement Plus Wisconsin Insurance Company (contract number H3794) and Care Improvement Plus South Central Insurance Co. (contract number H5322).  Accordingly, each of these Defendant MA Organizations also agreed that it would (i) be responsible for all risk adjustment data (which includes encounter data)

submitted to CMS by itself, its employees, or its agents; (ii) submit accurate and truthful risk adjustment data; and (iii) *research and correct discrepancies with its risk adjustment data*.  In addition, each of them agreed that CMS could audit the data and have access to medical records to conduct such audits.

80.     Patricia Rasmussen also executed and submitted an EDI agreement so that Ingenix could submit risk adjustment data on behalf of the Defendant MA Organizations.  *See* Exhibit 10, attached hereto.  By doing this, Ingenix also agreed that it would (i) be responsible for all risk adjustment data submitted to CMS by itself, its employees, or its agents; (ii) submit accurate and truthful risk adjustment data; and (iii) *research and correct discrepancies with its risk adjustment data*.  In addition, it agreed that CMS could audit the data and have access to medical records to conduct such audits.  When Ingenix became OptumInsight, Rasmussen also notified CMS (that is, CMS' contractor Palmetto, which helped operate RAPS) that its records should be updated to reflect that OptumInsight was making the risk adjustment submissions for the Defendant MA Organizations.  Rasmussen identified OptumInsight as "part of Optum."  See Exhibit 11, attached hereto.

81.     Jeffrey Dumcum, a Senior Vice President at Optum, also executed an EDI agreement in May 2011 in order to submit risk adjustment data (also known as encounter data) to the MA Program on behalf of many of the Defendant MA Organizations, including those MA Organizations listed in a letter sent by Theisen to CMS' contractor in April 2011.  By doing this, Dumcum agreed that Optum would be responsible for the data it submitted, submit valid data, and *research and correct data discrepancies*.  *See* Exhibit 12, attached hereto.

82.     All EDI agreements executed by the UHG Managing Defendants on their own behalf and on behalf of the Defendant MA Organizations are incorporated by reference in this Amended Complaint as if they were recited in full and attached hereto.

### III.   The Ingenix/Optum Service Agreements

83.   Depending on the time period, Ingenix or Optum entered into internal agreements with Ovations or UnitedHealthcare regarding the risk adjustment-related services that Ingenix or Optum would provide to the Defendant MA Organizations.  These services included, among other things, the submission of risk adjustment data to CMS and the management of the Chart Review, Claims Verification, and RACCR Programs.  These internal agreements further confirm the parties' joint and several obligations to the MA Program to submit accurate and truthful risk adjustment data and to investigate and correct any data discrepancies.  These agreements also exemplify the UHG Managing Defendants' understanding of their joint and several obligations to the MA Program.  All of these agreements are incorporated herein by reference.

84.   By way of example, the Memorandum of Understanding ("MOU") entered into between Optum and UnitedHealthcare for risk adjustment-related services rendered by Optum in 2011 exemplifies the obligations undertaken by Optum not only to UnitedHealthcare but to the MA Program.  That MOU was executed by Jerry Knutson, Chief Financial Officer of Optum, and Scott Theisen, Chief Financial Officer of UnitedHealthcare Medicare & Retirement.  Paul Bihm at Optum, Relator Poehling at UnitedHealthcare Medicare & Retirement, and Jason Bainbridge at UnitedHealthcare Community & State were copied on the MOU.  (The MOU referred to UnitedHealthcare Medicare & Retirement and UnitedHealthcare Community & State collectively as "UnitedHealth Group's Public and Senior Markets Group ("PSMG")."  This is but one of many examples of the confusion that Defendants have created by the way they used names of groups and entities interchangeably.)  Pursuant to the MOU, Optum was compensated for its services through an "intercompany allocation of fees paid pursuant to [a separate] Management Agreement."

85.   Pursuant to this 2011 MOU, Optum provided many risk adjustment-related services to the Defendant MA Organizations, including, but not limited to the submission of risk adjustment data to CMS "pursuant to CMS risk adjustment rules and

1   requirements" and conducting the Chart Review, Claims Verification, and RACCR

2   Programs.  Importantly, Optum also agreed to (i) conduct "[p]rovider engagement and

3   education regarding accurate and complete diagnostic coding and documentation"; (ii)

4   "[c]ontribute (along with PSMG) to the level of accuracy and completeness of diagnostic

5   coding for a respective population by identifying opportunities to improve

6   documentation and coding for accuracy, facilitating improvement in accuracy by

7   working directly with providers to improve documentation and coding practices, and

8   executing the timely and accurate submission of claim coding information to CMS,

9   thereby ensuring appropriate revenues are being paid by CMS for the underlying risk

10  inherent within the member population;" (iii) "[m]onitor[] the appropriateness and

11  accuracy of provider coding;" and (iv) conduct "[i]nternal validation testing of outlier

12  providers, internal validation testing of other sample populations and support CMS

13  validation requirements."

14  86.    The 2011 MOU also included a "Medicare Advantage Regulatory Requirements

15  Appendix." This Appendix included Optum's agreement to (i) "comply with all

16  applicable federal and Medicare laws, regulations, and CMS instructions, including but

17  not limited to . . . federal laws and regulations designed to prevent or ameliorate fraud,

18  waste, and abuse, including but not limited to, applicable provisions of federal criminal

19  law [and] the False Claims Act (31 U.S.C. § 3729 et seq.);" (ii) "perform services and

20  provide the products set forth in the MOU in a manner consistent with and in compliance

21  with [the Defendant MA Organizations'] obligations under the CMS Contact[s]; " and

22  (iii) certify in writing that the risk adjustment data it submitted to CMS was "accurate,

23  complete, and truthful, based on [its] best knowledge, information and belief."  The

24  Appendix further specified that UnitedHealthcare and the Defendant MA Organizations

25  were accountable to CMS for fulfilling their regulatory and contractual obligations under

26  the MA Program, including those that they had delegated to Optum under the MOU and,

27  thus, that they were responsible for overseeing and monitoring Optum's performance

28  under the MOU.

## DEFENDANTS' DATA INTEGRITY OBLIGATIONS

### I.   Obligation to Submit Valid Diagnoses

87.   MA Organizations are entitled to risk adjustment payments based on the diagnosis codes that they submit to CMS *only* if the codes are from face-to-face medical encounters between the Medicare beneficiary and provider, the encounter occurred during the relevant date of service year, the provider was of a type and specialty acceptable for risk adjustment purposes, and at the time of the encounter, the provider documented the medical conditions identified by the diagnosis codes in the medical record based on acceptable documentation.  In addition, codes should be based on documented conditions that require or affect patient care treatment or management.  *See* Medicare Managed Care Manual, Chapter 7, Exhibit 30 (August 13, 2004) (stating that diagnosis codes submitted for risk adjustment payments should be for documented conditions that "require or affect patient care treatment or management").  *See also* 2008 Risk Adjustment Data Technical Assistance for Medicare Advantage Organizations Participant Guide ("2008 RA Participation Guide") at § 6.4.1.

88.   Risk adjustment claims are valid, and the resulting risk adjustment payments are therefore proper and justified, only to the extent that the diagnosis codes submitted by the MA Organizations are valid.  The diagnoses must be coded according to the *International Classification of Diseases (ICD) Clinical Modification Guidelines for Coding and Reporting* ("ICD-9-CM" & "ICD-10-CM") and documented with sufficient clinical specificity.  *See* Medicare Managed Care Manual, Chapter 7, Exhibit 30 (August 13, 2004).  In addition, codes cannot be submitted for diagnoses that are only probable or suspected, for diagnoses that are questionable, or for a condition that the provider is trying to rule out.  *Id.*

89.   Moreover, all diagnosis codes submitted by MA Organizations must be supported by medical record documentation.  The 2004 Medicare Managed Care Manual stated that "M+C organizations [now known as MA Organizations] must submit risk adjustment data that are substantiated by the physician or provider's full medical record."  Medicare

Managed Care Manual, Chapter 7, § 111.8 (August 13, 2004).  A later version of the Manual similarly states that MA Organizations "must . . . [e]nsure the accuracy and integrity of risk adjustment data to CMS.  All diagnosis codes submitted must be documented in the medical record . . . ." Medicare Managed Care Manual, Chapter 7, § 40 (June 2013).  Also similarly, the 2003 Participant Guide stated that MA Organizations "must submit risk adjustment data that are substantiated by the patient's medical record."  2003 Regional Risk Adjustment Training for Medicare+Choice Organizations Participant Guide, § 4.1.  This requirement was reiterated in the following CMS training guides and materials since 2003:  2003 Regional Risk Adjustment Training for Medicare+Choice Organizations Participant Guide, §§ 12.3, 12.6; 2004 Regional Risk Adjustment Training for Medicare+Choice Organizations Participant Guide, §§ 5.1, 5.5, 6.1.3; 2005 Risk Adjustment Data Basic Training for Medicare Advantage Organizations Participant Guide §§ 4.1, 5, 5.1, 5.5, 8.7.3, 9.1, 9.2; 2006 Risk Adjustment Data Basic Training for Medicare Advantage Organizations Participant Guide §§ 5.1, 5.4, 5.5, 7.7.3, 8.1, 8.2; 2007 Risk Adjustment Data Training for Medicare Advantage Organizations Participant Guide §§ 6.1, 6.4, 7.1, 7.2, 8.7.3; 2008 Risk Adjustment Technical Assistance for Medicare Advantage Organizations Participant Guide §§ 5.6, 6, 6.1, 6.4, 6.5, 7.1, 7.2; 2012 Regional Technical Assistance Participant Guide § 2.2; Risk Adjustment 101 Participant Guide §§ 3.2.4; 4.3 (2013); Risk Adjustment Webinar at p. 48 (July 1, 2014).  Furthermore, in a 2003 Regional Risk Adjustment Training for Medicare+Choice Organizations presentation, organizations were advised to "[t]ake steps to ensure that medical documentation supports submitted diagnoses."  *Id.* at §8-19.

90.     In connection with the requirement that the patient's medical record support the diagnosis(es) reported for him or her, the 2004 Medicare Managed Care Manual also provided that "M+C organizations must maintain sufficient information to trace the submitted diagnosis back to the hospital or physician that originally reported the diagnosis.  Since M+C organizations may submit summary level transactions without a

link to a specific encounter or claim, establishing an appropriate audit trail to the original source of the data requires diligent information management on the part of the M+C." Medicare Managed Care Manual, Chapter 7, § 111.8 (August 13, 2004).  Again, in the 2005 Risk Adjustment Data Basic Training for Medicare Advantage Organizations Participant Guide § 8.7.3, CMS advised that "MA organizations should take steps to ensure that they have, or have access to, the proper medical documentation to support diagnoses being submitted for risk adjustment.  MA organizations are responsible for the accuracy of the data they submit to CMS.  Where necessary, they should obtain the proper documentation to support diagnoses and maintain an efficient system for tracking diagnoses back to medical records."  This requirement was also reiterated in the following CMS training guides:  2003 Regional Risk Adjustment Training for Medicare+Choice Organizations Participant Guide, § 12.2; 2004 Regional Risk Adjustment Training for Medicare+Choice Organizations Participant Guide, § 6.1.3; 2004 Regional Risk Adjustment Training for Medicare+Choice Organizations Resource Guide at p. 20; 2005 Risk Adjustment Data Basic Training for Medicare Advantage Organizations Participant Guide §§ 5.1, 9.1.3; 2006 Risk Adjustment Data Basic Training for Medicare Advantage Organizations Participant Guide §§ 5.1, 7.7.3, 8.7.3; 2007 Risk Adjustment Data Training for Medicare Advantage Organizations Participant Guide §§ 6.1, 7.1.4, 8.7.3; 2008 Risk Adjustment Technical Assistance for Medicare Advantage Organizations Participant Guide §§ 5.6.3, 6.1; 2012 Regional Technical Assistance Participant Guide § 2.2.

91.    Furthermore, the medical record relied on by an MA Organization to support payment cannot be ambiguous.  *See* 2008 RA Participation Guide at § 7.2.4.1 (stating that risk adjustment claims and payments cannot be based on questionable diagnoses).

92.    CMS recognizes that risk adjusting based on health status creates a strong incentive for MA Organizations to report invalid diagnoses.  Thus, CMS engages in a variety of program integrity activities, including training MA Organizations about their obligations to submit valid data and withdraw invalid data.  For example, in a 2003

Regional Risk Adjustment Training for Medicare+Choice Organization Questions & Answers document, CMS stated all information that is submitted must be correct.  "If a plan identifies incorrect or invalid information that has been submitted, it must delete that information."  Likewise, in an August 9, 2005 Regional Training presentation made jointly by CMS and its contractor, Aspen Systems Corporation, called "Risk Adjustment Data Basic Training," MA Organizations were told that they "must . . . Delete a diagnosis cluster [that is, a RAPS submission] when any data in that cluster are in error."

93.     In addition, for many years, CMS has conducted audits of diagnoses submitted by MA Organizations, known as Risk Adjustment Data Validation ("RADV") audits.  In 2001, when the old PIP-DCG model was in place, CMS alerted M+C organizations that they were "required to submit medical records for validating encounter data" and that "[m]edical record reviews of a sample of hospital encounters may be audited to ensure the accuracy of diagnostic information."  Medicare Managed Care Manual, Chapter 7, § 110.3 (October 2001).  In 2004, CMS revised the Manual to provide that "[a] sample of risk adjustment data used for making payments may be validated against hospital inpatient, hospital outpatient, and physician medical records to ensure the accuracy of medical information.  Risk adjustment data will be validated to the extent that the diagnostic information justifies appropriate payment under the risk adjustment model."  Medicare Managed Care Manual, Chapter 7, § 111.8 (August 13, 2004).  The Manual further explained that the MA Organizations must be prepared to locate and produce the medical records to support the diagnoses codes that they submitted.  *Id*.  Federal regulations also require MA Organizations and their providers to provide medical records to CMS to validate the diagnoses they submitted for risk adjustment payments.  *See* 42 C.F.R. § 422.310(e).

94.     When making risk adjustment payments, CMS relies on MA Organizations to exercise due diligence to ensure that provider-reported diagnoses are supported by beneficiaries' medical records and are otherwise accurate and truthful.  This is why insurance companies that want to participate in the MA Program must agree, through

their Part C and D agreements and their EDI agreements, to provide valid diagnostic data and investigate and delete invalid data.  Moreover, this is why insurance companies that want to participate in the MA Program must (i) establish and implement effective compliance programs to ensure the integrity of their payment data, 42 CFR § 422.503(b)(4)(vi) (Part C compliance program regulation); 42 C.F.R. § 423.504(b)(4)(vi) (Part D compliance program regulation); (ii) annually attest to the accuracy and truthfulness of the diagnosis data that they submit for risk adjustment payments, 42 C.F.R. § 422.504(*l*) (Part C regulation); 42 C.F.R. § 423.505(k) (Part D regulation); and (iii) "comply with . . . Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law [and] the False Claims Act (31 USC §§ 3729 et seq.)."  42 C.F.R. § 422 (Part C regulation); 42 C.F.R. § 423 (Part D regulation).

## II.  Obligation to Implement an Effective Compliance Program

95.  The implementation of an effective compliance program is a prerequisite to an MA Organization's obtaining and retaining payments under both Parts C and D of the Medicare Program.  *Id*. §§ 422.503(a) (Part C) & 423.504(b)(4)(vi) (Part D).  One purpose of requiring a compliance program is to ensure that MA Organizations submit accurate and truthful information to CMS.  65 Fed. Reg. 40170-01 at 40264 (June 29, 2000).

96.  Specifically, each MA Organization must "[a]dopt and implement an effective compliance program, which must include measures that prevent, detect, and correct non-compliance with CMS' program requirements as well as measures that prevent, detect, and correct fraud, waste, and abuse."  42 C.F.R. § 422.503(b)(4)(vi) (Part C); 42 C.F.R. § 423.504(b)(4)(vi) (Part D).  The compliance program "must, at a minimum, include [certain] core requirements," including (but not limited to):

> (F)  Establishment and implementation of an effective system for routine monitoring and identification of compliance risks.  The system should include internal monitoring and audits and, as appropriate,

external audits, to evaluate the MA organization['s], including first tier entities', compliance with CMS requirements and the overall effectiveness of the compliance program.

(G)   Establishment and implementation of procedures and a system for promptly responding to compliance issues as they are raised, investigating potential compliance problems as identified in the course of self-evaluations and audits, correcting such problems promptly and thoroughly to reduce the potential for recurrence, and ensuring ongoing compliance with CMS requirements.

   (1)   If the MA organization discovers evidence of misconduct related to payment or delivery of items or services under the contract, it must conduct a timely, reasonable inquiry into that conduct.

   (2) The MA organization must conduct appropriate corrective actions (for example, repayment of overpayments, disciplinary actions against responsible employees) in response to the potential violation referenced in paragraph (b)(4)(G)(1) of this section.

   (3) The MA organization should have procedures to voluntarily self-report potential fraud or misconduct related to the MA program to CMS or its designee.

97.   A compliance program is not effective unless the MA Organization devotes adequate resources to the program.

**III.   Obligation to Attest to Validity of Risk Adjustment Data**

98.   After the final deadline for their submission of risk adjustment data but before their receipt of their final reconciliation payments for a given payment year, MA Organizations must attest to the validity of their risk adjustment data, including diagnoses, in a Risk Adjustment Attestation submitted to CMS.  Specifically, the chief

executive officer, chief financial officer, or another individual with delegated authority to sign on behalf of one of these officers, and who reports directly to such an officer, must certify that the risk adjustment data that the MA Organization submitted to CMS was accurate, complete, and truthful.

99.     An MA Organization must request payment on a document that contains this Attestation and the submission of this Attestation to CMS is a condition of receiving Risk Adjustment payments.

100.   The Part D regulations include a similar attestation for risk adjustment data, including diagnoses, submitted for risk adjustment payments under the prescription drug program.  Under the applicable Part D regulation, these attestations are referred to as certifications.  42 C.F.R. § 423.505(k).

101.   Every year, each MA Organization agrees in writing that:

> [a]s a condition for receiving a monthly payment under paragraph B of this article, and 42 CFR Part 422 Subpart G, the MA Organization agrees that its chief executive officer (CEO), chief financial officer (CFO), or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to such officer, must request payment under the contract on the form[] attached hereto as . . . Attachment B (risk adjustment data) which attest to (based on best knowledge, information and belief, as of the date specified on the attestation form) the accuracy, completeness and truthfulness of the data identified on these attachments.
>
> . . .
>
> 2.  Attachment B requires the CEO, CFO, or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to such officer, must attest to (based on best knowledge, information and belief, as of the date specified on the attestation form) that the risk adjustment data it submits to CMS under 42 CFR § 422.310 are accurate, complete, and truthful.  The MA Organization shall make annual

attestations to this effect for risk adjustment data on Attachment B and according to a schedule to be published by CMS.  If such risk adjustment data are generated by a related entity, contractor, or subcontractor, then such related entity, contractor, or subcontractor must also attest to (based on best knowledge, information, and belief, as of the date specified on the attestation form) the accuracy, completeness, and truthfulness of the data. [422.504(*l*).]

102.   MA Organizations have an obligation to acquire knowledge, information, and belief about their risk adjustment data, including diagnoses, in order to both submit such data and attest to the accuracy and truthfulness of the data.  Nearly 17 years ago, CMS put MA Organizations on notice that they were "responsible for making *good faith efforts* to certify the accuracy, completeness, and truthfulness of the encounter [*i.e.,* risk adjustment] data submitted" for payments from the Medicare Program.  65 Fed. Reg. 40,170, 40,268 (June 29, 2000) (emphasis added); *see also* Medicare Managed Care Manual, Chapter 7, § 110.2 (October 2001) (stating, under section titled "Certification of Data Accuracy, Completeness, and Truthfulness," that "CMS expects M+C organizations [now known as MA Organizations] to design and implement effective systems to monitor the accuracy, completeness, and truthfulness of encounter data [that is, diagnoses from hospital inpatient stays under the old PIP-DCG risk adjustment model] and to exercise due diligence in reviewing the information provided to CMS"); Medicare Managed Care Manual, Chapter 7, § 111.7 (August 2004) (stating, under section titled "Certification of Data Accuracy, Completeness, and Truthfulness," that "CMS expects M+C organizations [now known as MA Organizations] to design and implement effective systems to monitor the accuracy, completeness, and truthfulness of risk adjustment data and to exercise due diligence in reviewing the information provided to CMS").  When MA Organizations fail to act in good faith and deliberately ignore or recklessly disregard information about their submission of inaccurate or untruthful data, their Risk Adjustment Attestations are false.

## IV.   Obligation to Delete Invalid Diagnoses

103.   MA Organizations are obligated to delete invalid diagnoses previously submitted by them to RAPS or to use other available means to return risk adjustment payments based on invalid diagnoses.  Their deletion of invalid diagnoses is the principal mechanism by which CMS is able to recalculate beneficiaries' risk scores and ensure that the Government does not make improper risk adjustment payments to MA Organizations or that it recovers improper payments that were already made.  In particular, the submission of diagnoses that are not supported by the beneficiaries' medical records and, thus, are invalid directly and necessarily causes CMS to make risk-adjustment payments that it would not have made but for the submission of that false data.  Conversely, the "deletion" of previously-submitted diagnoses that are invalid because they are not supported by the beneficiaries' medical records directly and necessarily causes CMS either to avoid paying for previously-submitted false diagnoses or to recover payments it made for those false diagnoses.  As a result, an MA Organization's failure to "DELETE" invalid diagnoses results in that MA Organization's retention of payments to which it was not entitled.  Thus, both the submission of false diagnostic data and the failure to correct false diagnosis data influence CMS' payment, including the amount of the risk-adjustment payment, if any, that it makes for any given beneficiary based on his or her health status.

104.   The obligation to delete invalid diagnoses previously submitted to RAPS or to otherwise return risk adjustment payments based on invalid diagnoses arises from the contractual relationship between MA Organizations and the Government, from regulation, and from the retention of an overpayment and, thus, constitutes an "obligation to pay . . . the Government" under the reverse false claims act provision of the FCA.  31 U.S.C. §§ 3729(a)(1)(G) & (b)(3).  The obligation is imposed on MA Organizations by the following, among other things:

- The MA Organizations' execution of EDI agreements pursuant to which they agree to "research and correct risk adjustment data discrepancies."  *See supra*

paragraphs 73-82 (describing these agreements).  *See also* Exhibits 8-11, attached hereto (examples of EDI agreements that the Defendant MA Organizations executed).

- Regulations requiring MA Organizations to implement effective compliance programs and to "detect and correct non-compliance with CMS' program requirements as well as . . . [to] prevent, detect, and correct fraud, waste, and abuse."  *See supra* paragraphs 95-97 (describing these regulations).  Plus, the MA Organizations' execution of agreements with CMS under Parts C and D pursuant to which they agree to implement effective compliance programs.  *See* 42 C.F.R. § 422.504(a) (stating that the agreement between an MA Organization and CMS must include a provision by which the MA Organizations agree to comply with the Part C regulatory requirements and general instructions issued by CMS).  *See also supra* paragraphs 66-72 (describing the Part C and D agreements); Exhibits 1-7, attached hereto (examples of Part C agreements between the Defendant MA Organizations and CMS by which the Defendant MA Organizations agreed to implement effective compliance programs).

- The regulations requiring the submission of the Risk Adjustment Attestations.  *See supra* paragraphs 98-102 (describing those regulations).  Plus, the requirements set forth in the Medicare Managed Care Manual and elsewhere that MA Organizations exercise both good faith and due diligence in order to submit truthful Risk Adjustment Attestations to the Government certifying that their risk adjustment data is accurate and truthful.  *See supra* paragraph 102.  In addition, the separate contractual requirement to submit Risk Adjustment Attestations and to comply with the Medicare Managed Care Manual.  *See, e.g*., Exhibits 1-7, attached hereto (examples of the Defendant MA Organizations' Parts C agreements with CMS by which they agree to submit such Attestations and to comply with the Medicare Managed Care Manual).

- The requirement in the CMS' Participant Guides that MA Organizations delete erroneous diagnosis data submitted to CMS. *See* 2003 Regional Risk Adjustment Training for Medicare+Choice Organizations Participant Guide, § 6.1; 2004 Regional Risk Adjustment Training for Medicare+Choice Organizations Participant Guide, §§ 4.12 to 4.16; 2005 Risk Adjustment Data Basic Training for Medicare Advantage Organizations Participant Guide §§ 4.12 to 4.16; 2006 Risk Adjustment Data Basic Training for Medicare Advantage Organizations Participant Guide §§ 4.12 to 4.16; 2007 Risk Adjustment Data Training for Medicare Advantage Organizations Participant Guide §§ 4.12 to 4.16; 2008 Risk Adjustment Technical Assistance for Medicare Advantage Organizations Participant Guide §§ 4.12 to 4.16. This requirement is also included in 2014 and 2016 CMS training presentations. *See infra* paragraph 108. Plus, the regulatory and contractual requirement that MA Organizations' comply with CMS' instructions and policies. *See* 42 C.F.R. § 422.504(a) (stating that the agreement between an MA Organization and CMS must include a provision by which the MA Organizations agree to comply with the Part C regulatory requirements and general instructions issued by CMS) (emphasis added). *See also, e.g.*, Exhibits 1-7 hereto (examples of the Defendant MA Organization's agreements to comply with the CMS instructions and policies).

- The requirement in the Medicare Managed Care Manual that "[i]f upon conducting an internal review of submitted diagnosis codes, the [MA Organization] determines that any ICD-9-CM diagnosis codes that have been submitted do not meet risk adjustment submission requirements [which includes medical record support for all diagnoses], the [MA Organization] is responsible for deleting the submitted ICD-9-CM diagnosis codes as soon as possible." Medicare Managed Care Manual, Chapter 7, § 40 (June 2013). Plus, the regulatory requirement that MA Organizations' comply with the Manual and MA Organizations' contractual agreements to comply with the Manual. *See* 42 C.F.R.

§ 422.504(a) (stating that the agreement between an MA Organization and CMS must include a provision by which the MA Organizations agree to comply with the Part C regulatory requirements and general instructions issued by CMS). *See also, e.g.*, Exhibits 1-7 hereto (examples of the Defendant MA Organization's agreements to comply with the Medicare Managed Care Manual).

105.   Related Entities are also obligated to delete invalid diagnoses previously submitted by them to RAPS or to use other available means to return risk adjustment payments based on invalid diagnoses.  Like the MA Organizations to which they are related, they are required to comply with the Part C and D regulations, the Medicare Managed Care Manual, the Participant Guides, and the other general instructions issued by CMS.  In addition, when they submit risk adjustment data to the MA Program on behalf of their related MA Organizations, they are obligated to execute separate EDI agreements and Risk Adjustment Attestations, both of which impose an obligation to delete invalid diagnoses.

106.   As previously explained, RAPS provides a means for MA Organizations and others submitting data on their behalf (such as Ingenix and then Optum) to withdraw or retract invalid diagnoses that they previously submitted to RAPS for risk adjustment payments.  The process of withdrawing or retracting invalid diagnosis codes is often referred to as making "DELETES" because the field in RAPS that enables this to be accomplished is called a "Delete Indicator."  The withdrawal or retraction of a diagnosis codes is also often referred to as a "DELETE."

107.   CMS began instructing MA Organizations on the use of RAPS in the early 2000s in order to facilitate the phase in, during the 2004 to 2007 time period, of the use of diagnoses from physician office visits and hospital outpatient encounters to risk adjust for health status using the HCC model.  It issued Risk Adjustment Training Participant Guides in order to provide instructions relating to, among other things, the use of RAPS to submit and delete data.  The 2003 Risk Adjustment Training Participant Guide stated: "Now that the RAPS system is operational, effective October 1, 2002, the new system

65

allows for correction of risk adjustment data via the deletion process." 2003 Regional Risk Adjustment Training for Medicare+Choice Organizations Participant Guide, § 6.11 (titled "Modifying Risk Adjustment Data"). The 2003 Guide listed various reasons why risk adjustment data may need to be deleted, including in order to withdraw an erroneous diagnoses code. *Id*. at § 6.12.1. Finally, it stated that M+C organizations "must submit delete records" to correct erroneous diagnosis data. *Id*. at § 6.12.3. The Guide made very clear that deleting erroneous diagnoses was mandatory. Subsequent versions of the Guide have included the same mandatory deletion requirement and instructions. *See* 2004 Regional Risk Adjustment Training for Medicare+Choice Organizations Participant Guide, §§ 4.12 to 4.16; 2005 Risk Adjustment Data Basic Training for Medicare Advantage Organizations Participant Guide §§ 4.12 to 4.16; 2006 Risk Adjustment Data Basic Training for Medicare Advantage Organizations Participant Guide §§ 4.12 to 4.16; 2007 Risk Adjustment Data Training for Medicare Advantage Organizations Participant Guide §§ 4.12 to 4.16; 2008 Risk Adjustment Technical Assistance for Medicare Advantage Organizations Participant Guide §§ 4.12 to 4.16.

108. The same mandatory requirement and instructions about deletions of invalid diagnoses were also set forth in other CMS instructional materials used to train MA Organizations. For instance, a 2003 presentation titled "Regional Risk Adjustment Training for Medicare+Choice Organization Questions & Answers" instructed that "all information that is submitted must be correct. If a plan identifies incorrect or invalid information that has been submitted, it must delete that information." These instructions were also provided in CMS' presentation slides for a July 1, 2014 Risk Adjustment Webinar used to provide training to MA Organizations and others about how risk adjustment operates. A training presentation that CMS made to MA Organizations and others on June 23, 2016, also stated that it was the responsibility of each MA Organization to "delete each instance of unsupported diagnoses from" RAPS. All of the above-mentioned Participant Guides and other instructional materials also describe an alternative method for deleting erroneous data using a Direct Data Entry system.

109.   All of the above-mentioned Participant Guides and other instructional materials have been and continue to be available to all MA Organizations and others on a website hosted by a CMS contractor.  *See* www.csscoperations.com.  The 2003 to 2011 material is in the Training subsection under Risk Adjustment Processing System in the Archives and the 2012 to 2016 material is in the Training subsection under Risk Adjustment Processing System on the Home page.

110.   MA Organizations can delete invalid diagnoses both before and after the final deadline for RAPS data submissions, which is sometime during the year following the payment year at issue.  The final deadline is only a submission deadline; it does not pertain to deleting invalid diagnoses in order to withdraw them.  *See* 42 C.F.R. § 422.310(g)(2)(ii) (codifying pre-existing process permitting, after the final deadline, only corrections to delete diagnoses from previously-submitted risk adjustment data).  Diagnoses deleted before the deadline for RAPS data submissions for a payment year are known as "open-period deletes" and diagnoses deleted after the deadline for RAPS data submissions for a payment year are known as "closed-period deletes."

111.   Because the final submission deadline is after the completion of the payment year, monthly payments made during the payment year are interim payments.  After the final submission deadline, CMS determines if any adjustments to these interim monthly payments are necessary based on all diagnoses submitted (and not deleted) for each beneficiary up until the final submission deadline and re-calculates each beneficiary's risk score for the payment year to determine if it has changed and whether a plus or minus adjustment to the payment for the beneficiary is necessary.  If the beneficiary's risk score is higher because of the submission of additional diagnoses for that beneficiary, CMS makes a final reconciliation payment of any additional payment owed to the Plan for that beneficiary for that payment year.  Conversely, if the beneficiary's risk score is lower because of the deletion of diagnoses for that beneficiary prior to the final submission deadline, CMS recovers the payments associated with the deleted diagnoses as part of this final reconciliation payment process.

112. Accordingly, if, prior to the final submission deadline, an MA Organization is in possession of or has access to information about invalid diagnoses, it should delete invalid diagnoses prior to that deadline to ensure that the final reconciliation payment that it is claiming is correct.  If, however, an MA Organization comes into possession or otherwise gains access to information about invalid diagnoses after the final submission deadline, it must still delete the invalid diagnoses, and CMS will still recover the risk adjustment payments associated with the deleted diagnoses as part of additional risk score rerun and reconciliation processes it has in place to recover overpayments.

113. The UHG Managing Defendants knew how to make deletes in RAPS.  They also knew the difference in making "open-period" and "closed-period" deletes.  The individuals who knew about the delete process and the difference between "open-period" and "closed-period" deletes included, but were not limited to:  Rebecca Martin, the Director of Encounter Operations for Ingenix and then the Director of Data Remediation for Optum; Jon Bird at Optum; and Scott Theisen and Brian Thompson at UnitedHealthcare Medicare & Retirement.

114. However, Defendants violated the FCA by knowingly and improperly failing to delete many invalid diagnoses and, thus, failing to repay risk adjustment payments to which they were not entitled.

## THE FALSE CLAIMS ACT

115. The FCA reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government."  S. Rep. No. 99-345, at 1 (1986), available at 1986 U.S.C.C.A.N. 5266.  First, a defendant violates the FCA when it "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1)(A).  Under the FCA, a claim includes a request for money.  *Id*., § 3729(b)(2).  Further, a claim is "false or fraudulent" under the FCA if the entity or person submitting the claim was not entitled to payment.

116. Second, after the 2009 amendments to the FCA by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub.L. 111-21 (May 20, 2009), a defendant violates

the FCA when it "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(B).  Prior to FERA, a defendant violated this provision of the FCA when it "knowingly [made], use[d], or cause[d] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."

117.   Third, in May 2009, Congress amended the "reverse false claims act" provision of the FCA to provide that a defendant violates the FCA when it "knowingly conceals *or* knowingly and improperly avoids *or* decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G) (emphasis added).  Prior to FERA, this provision of the FCA provided that a defendant violates the FCA when it "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government."  After FERA, a defendant violates this provision of the FCA when it "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, *or* knowingly conceals *or* knowingly and improperly avoids *or* decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G) (emphasis added).

118.   Under the FCA, the terms "knowing" and "knowingly" mean that the defendant had actual knowledge of or acted in deliberate ignorance or reckless disregard of information relating to the truth or falsity of its claims for payment or its false records or statements.  *Id*. § 3729(b)(1)(A).  Proof that the defendant had specific intent to defraud the Government is not required.  *Id*. § 3729(b)(1)(B).  Congress included "deliberate ignorance" in its definition of the terms "knowing" and "knowingly" to hold a defendant accountable for failing to make the inquiry that a reasonable and prudent person or entity would have made under the circumstances to be reasonably certain that he, she, or it was entitled to the money that he, she, or it sought from the Government.  S. Rep. No. 99-345, at 21 (1986), as reprinted in 1986 U.S.C.A.N. 5266, 5286.  The terms "knowing"

and "knowingly" used in this Amended Complaint have the meaning ascribed to them by the FCA.  Similarly, the terms "knowledge," "knows" and "knew" are used in this Amended Complaint to have the same meaning.

119.   In 2009, Congress also amended the FCA to provide a definition of the term "obligation" for the purpose of the new "reverse false claims act" provision of the statute, section 3729(a)(1)(G).  *See* FERA, Pub. L. 111-21, 123 Stat. 1617, 1621-25 (2009).  It defined the term to mean "an established duty, *whether or not fixed*, arising from an express or implied contractual … relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."  31 U.S.C. § 3729(b)(3) (emphasis added).  Congress promulgated this definition to reflect its long-held view that an "obligation" under the FCA's reverse FCA provision, 31 U.S.C. § 3729(a)(1)(G), encompasses non-fixed and contingent duties to pay or repay monies to the Government.  S. Rep. 111-10, 14, 2009 U.S.C.C.A.N. 430, 441.

120.   Under the FCA, "material" means "having a natural tendency to influence, or capable of influencing, the payment or receipt of money or property."  *Id*. § 3729(b)(4).

121.   Under the FCA, the Government is entitled to recover three times the amount of damages which it sustained because of a defendant's violation of the statute and, for each act by the defendant violating the statute, a civil penalty.  For violations that occurred before November 2, 2015, the FCA imposes a penalty for each violation of not less than $5,500 and not more than $11,000.  For violations occurring after November 2, 2015, all civil statutory penalties, including the FCA, are subject to an annual adjustment for inflation pursuant to Section 701 of the Bipartisan Budget Act of 2015, Public Law 114-74 (No. 2, 2015) ("BBA").  At this time, by operation of the BBA, for violations that occurred after November 2, 2015, the FCA imposes a penalty of not less than $10,957 and not more than $21,916 per violation, and these amounts are subject to annual adjustment for inflation in future years.  *See* 28 C.R.F. § 85.5 (identifying applicable inflation adjustments on an annual basis).

## THE FACTS

122.   Since at least 2005, Defendants knew that diagnoses submitted to Medicare for risk adjustment payments had to satisfy various criteria and be supported and validated by the medical records of the beneficiaries in their MA Plans.  Defendants also knew that many provider-reported diagnoses were not supported and validated by the beneficiaries' medical records and that they were obliged to undertake good faith efforts to identify and delete those unsupported and invalid diagnoses.  Moreover, Defendants knew that they were obligated to "look both ways" at the results of their chart reviews and delete unsupported provider-reported diagnoses.  Nonetheless, Defendants conducted millions of medical record reviews as part of their revenue-generating national Chart Review Program, turned a blind eye to the negative results of those reviews showing hundreds of thousands of unsupported diagnoses that the UHG Managing Defendants had previously submitted to Medicare on behalf of the Defendant MA Organizations, and knowingly and improperly avoided repaying Medicare for at least over a billion dollars in risk adjustment payments to which they were not entitled.  Similarly, Defendants disregarded information from their RACCR Program about invalid coding practices by their incentivized capitated and gain-sharing providers and failed to repay Medicare for additional erroneous payments based on their invalid diagnoses.

### I.   Defendants Knew That Many Provider-Reported Diagnoses Were Invalid And That They Were Obligated To Undertake Good Faith Efforts To Identify And Delete Them

123.   As part of its 2005 acquisition of PacifiCare, UHG retained the PacifiCare employees with knowledge about the requirements for the submission of valid diagnoses, the obligation to delete invalid diagnoses, and the various problems relating to the invalidity of provider-reported diagnoses.  UHG retained these PacifiCare employees to continue performing work relating to risk adjustment.

124.   For example, Jeffrey Dumcum, Stephanie Will, Pam Holt, and Pam Leal were all former PacifiCare employees knowledgeable about risk adjustment and were retained by

71

UHG to run its risk adjustment programs.  Dumcum had been PacifiCare's Chief Financial Officer and, after the acquisition, became Vice President of Finance for Ovations.  Will had been a Principal Analyst at PacifiCare who designed risk adjustment programs and, after the acquisition, joined Ovations as the Program Manager for the national Chart Review Program.  Holt had been a Project Manager for Network Management Operations at PacifiCare and, after the acquisition, became the Manager of Provider Outreach for the Risk Adjustment Program.  Leal had been an Executive Director of Provider Training and Development for PacifiCare and, after the acquisition, became a Regional Vice President for Market Consultation.

125.   From 2005 to 2007, Dumcum, Will, Holt, and Leal worked at the PacifiCare office in the Central District of California.  Thereafter, Holt and Leal continued to work for Ingenix at its office in the Central District of California.

126.   The PacifiCare employees obtained their knowledge about risk adjustment from various sources, including CMS.  Will attended CMS training programs focused on the Risk Adjustment Participant Guide and was also familiar with the content of this document based on her reading of it.  Prior to the acquisition, PacifiCare also conducted various risk adjustment programs, including a chart review program, and provided training to healthcare professionals concerning medical record documentation and diagnosis coding.

127.   In addition, PacifiCare had been a member of an industry association called the Industry Collaboration Effort ("ICE") and ICE's Risk Adjustment Data Acquisition & Reporting ("RADAR") team.  ICE was an association of MA Organizations and provider groups in California that served beneficiaries in MA Plans.  ICE focused on risk adjustment issues and other matters of particular importance to the managed care industry.  After PacifiCare became part of UHG, the PacifiCare employees continued to participate in ICE and its RADAR team.  During the 2006 and 2007 time period (perhaps longer), Leal was the President and a member of the Board of Directors of ICE.  Leal continued in a leadership role at ICE until 2013.  During that time period, she worked for

Ingenix and then Optum.  At the ICE Annual Conferences in 2006 and 2007, Leal made presentations about "[p]rovider coding [being] highly inaccurate and incomplete," CMS reviews showing that 30 percent of the provider-reported diagnoses were not supported by medical records, and the use of chart reviews to generate larger risk adjustment payments.  Furthermore, throughout the time period relevant to this Amended Complaint, one or more of the Defendants were members of ICE and, at various times, employees of Ingenix, Optum, UnitedHealthcare of California, and UnitedHealthcare participated in the activities of the RADAR team.  As reflected in the meeting minutes of the RADAR team, these Defendants included Ingenix (*e.g.,* August 2011), UnitedHealthcare of California (*e.g.,* March 2014), Optum (*e.g.,* November 2014, June 2015, and March 2016), and UnitedHealthcare (*e.g.,* June 2015 and March 2016).

128.   The former PacifiCare employees knew that a beneficiary's medical record was the "source of truth" for purposes of submitting valid diagnostic data to the MA Program for risk adjustment payments.  For example, in a March 2006 email, Will acknowledged that diagnosis data had to be "fully supported by medical record documentation."  As another example, in 2008, Ingenix sent notices to capitated provider groups in California instructing them that they should only report to Ingenix "diagnosis codes that can be supported by the documentation in the medical record."  Furthermore, according to Randall Myers at Ingenix, these providers, when they submitted diagnoses through a web portal referred to as the Alternate Submission Method, were required to attest that their diagnostic data complied with CMS requirements for the submission of valid data.  Other employees of the UHG Managing Defendants also understood these requirements, including Patty Brennan who, when she was Director of Retrospective Services (including chart review services) at Ingenix and then Optum, acknowledged that CMS' Risk Adjustment Participant Guide established that the medical record was the "one source of truth" for MA Organizations to ensure that they were submitting accurate data to CMS for risk adjustment payments.  In addition, Kimberly Halva, the Compliance

1   Officer for UnitedHealthcare Medicare & Retirement from 2010 to 2013, was aware that
2   "[a] medical record must substantiate all diagnostic information provided to CMS."
3   129.   In addition, those Defendants and their employees involved in ICE and its
4   RADAR team knew or should have known that enrollees' medical records are the
5   "source of truth" based on guidance documents issued by the RADAR team about this
6   fundamental payment requirement.  In 2010, ICE's RADAR team issued a guidance
7   document highlighting that CMS requires complete and accurate documentation of
8   medical conditions for the submission of diagnoses, that only diagnoses depicting
9   documented medical conditions which required or affected patient care are valid, and
10  that diagnosis codes cannot be submitted "until [the provider] is sure the patient has the
11  condition."  The ICE RADAR Physician Education Work Group also issued a similar
12  document called "Best Practices for Risk Adjustment," which advised that "ICD-9-CM
13  coding requires documentation of the diagnosis in the medical record as well as
14  evaluation and management.  Documentation should indicate how this diagnosis
15  impacted this episode of care."  In 2012, ICE also issued a Medical Record
16  Documentation Tips sheet, which once again warned MA Organizations and providers
17  not to code diagnoses that are probable, suspected, questionable, or "working
18  diagnoses," and also not to code diagnoses when medical records use "other similar
19  terms indicating uncertainty."  More recently, in 2013, ICE issued a "Documentation
20  Newsletter" that repeated earlier advice and also cautioned that "[**c]oding guidelines
21  prohibit coders from making assumptions**" regarding whether a diagnosis is or is not
22  substantiated by a patient's medical record.  (Emphasis in the original.)  That is, the
23  medical record must "clearly reflect" the medical condition.
24  130.   The former PacifiCare employees also were aware that provider-reported
25  diagnoses often did not comply with CMS requirements and were often inconsistent with
26  the information in their patients' medical records.  According to Dumcum, when he was
27  the Chief Financial Officer of PacifiCare, he and others there knew "in Medicare
28  Advantage that the claims did not always match the medical record documentation.  So

… we were concerned that it should be a place that we try to improve, that we try to educate and try to identify things to make that better."  In addition, Will, Holt and other former PacifiCare employees were aware of common diagnosis coding errors made by providers.  They learned of these problems from PacifiCare employees working in the field with physicians, reports of physician-coding trends, and reports from PacifiCare-employed certified coders.  For example, a June 2003 PacifiCare PowerPoint Presentation by Will, Holt, and other PacifiCare employees identified diabetes as a medical condition that was often miscoded.

131.   In 2005, the PacifiCare employees, including Dumcum, Will, Leal, and Holt, were also aware of a data validation review conducted by the Government of diagnosis codes previously submitted for medical encounters that occurred in 2003 (*i.e.*, encounters with 2003 dates of service).  The PacifiCare employees were aware that the results of CMS' medical record reviews showed that approximately 30 percent of the provider-reported diagnoses were invalid and, after UHG acquired PacifiCare, Dumcum, Will, and Leal shared this information with other individuals who worked for various UHG Managing Defendants such as Jerry Knutson, Lee Valenta, Cynthia Polich, Relator Poehling, Paul Bihm, Janice Redmond, and Carol Thompson.  Furthermore, the results from this CMS review also put the former PacifiCare employees on notice that providers were reporting codes that were just plain wrong, were coded from laboratory reports, and did not reflect current medical conditions – all of which was in breach of the fundamental rules that the diagnosis codes submitted to Medicare must be accurate and truthful, based on face-to-face visits (*e.g.*, not lab reports), reflect current conditions, and otherwise be valid.

132.   Moreover, the former PacifiCare employees were aware that MA Organizations are not entitled to risk adjustment payments based on diagnoses that are unsupported by the beneficiaries' medical records, and that CMS expected health plans to delete incorrect diagnoses submitted for risk adjustment payments.  They also knew, based on their experiences at PacifiCare, that CMS could audit the diagnoses MA Organizations submitted for risk adjustment payments.

133.   In fact, in April 2005, Holt participated in a "CMS data validation call" in which CMS explained that it expected MA Organizations to correct invalid diagnoses submitted to Medicare for risk adjustment payments.  Holt reported this to Will and suggested creating a spreadsheet to give to providers for providers to use to inform PacifiCare of invalid diagnoses and allow PacifiCare to delete them.  As part of this discussion, Leal explained to Will that, if provider groups "during their chart audits find that physicians have documented rule-out or history-of but coded as if the member had [the medical condition,] they want to be able to fix it so when we get audited again by CMS it is fixed."  Leal further stated that "[o]bviously, as issues are identified there will need to be education to physician[s] on changing their practice of coding incorrectly (as you remember Dr. Norman mentioned habits doctors have, that we will need to break)."  Holt agreed that provider groups

- need something 'standardized and formalized' so they know what fields to report if and when they find any obvious discrepancies.  They are the type of thing that Pam [Leal] stated in her email below, the code of the actual disease when the documentation clearly only supports 'history of' or 'suspected' (and then it was not confirmed), or an obvious miscode; the things that Melissa [Ferron] is finding in the data validation.  Provider groups will find this during their own chart audits.

- and CMS "was very firm that we need to be doing this, so I would expect [CMS] will look for our process when they get around to more formally auditing our oversight of this process."

134.   In addition, in August 2006, a year after the April 2005 CMS validation call, Will and Holt knew that CMS had confirmed, in responses to questions about its RADV audits, that it would invalidate diagnoses submitted to Medicare that were not supported by the beneficiaries' medical records.

135.   After PacifiCare became part of UHG, the former PacifiCare employees began educating others at the UHG Managing Defendants about risk adjustment.  In particular, Dumcum made a series of presentations to various employees, including senior

management employees of the UHG Managing Defendants such as Ovations' Jerry Knutson, where he explained that "[p]rovider coding is highly inaccurate and incomplete" and that "more than 30% of coded conditions are not supported by CMS validation findings."  Other senior executives or managers of the UHG Managing Defendants that were recipients of the slide presentation with this information included Cynthia Polich at Ovations (who was emailed a copy of the presentation in March 2007), Lee Valenta at Ingenix (to whom Knutson emailed a copy of the presentation in May 2007), and Relator Poehling.

136.   Furthermore, Defendants' own data revealed and confirmed problems with provider-reported diagnoses.  In September 2006, Will, Holt, Leal, and others generated a list of providers that were outliers, which, at that time, they defined as providers with significantly above average patient risk scores.  This information made them "question the validity" of these providers' codes.  These provider groups included Healthcare Partners Medical Group, Edinger Medical Group, WellMed, and other incentivized provider groups which, based on subsequent reviews conducted as part of the RACCR Program, submitted significant numbers of invalid diagnoses.  After 2006, Ingenix and then Optum continued to track risk scores of beneficiaries cared for by various provider groups and saw risk scores they considered to be outliers.  They also generated prevalence reports that identified the provider groups with abnormally high average risk scores.  These prevalence reports also identified specific medical conditions (or categories of medical conditions, that is, HCCs) that were reported by various provider groups at rates significantly above average.

137.   In 2007, Dumcum and other former PacifiCare employees were given the responsibility for creating and then managing a risk adjustment service group within Ingenix, the predecessor to Optum.  This enabled UHG to move the risk adjustment operations to Ingenix.  Ovations and later UnitedHealthcare became Ingenix's internal "client."  This move also enabled Ingenix to offer its risk adjustment services to other MA Organizations which it referred to as its "commercial clients."  Dumcum became

Senior Vice President and Will became Vice President of Risk Adjustment Programs for this new risk adjustment service group within Ingenix.  After 2007, Ingenix hired additional employees and increased the size of the Ingenix risk adjustment group, including the size of the group in this District.  The Ingenix risk adjustment group in this District was responsible for, among other things, risk adjustment data/diagnosis codes submissions, risk adjustment data remediation and the deletion of invalid diagnoses, risk adjustment data analytics and finance (*e.g.*, tracking the results and financial impact of the Chart Review and Claims Verification Programs), provider outreach and programs relating to risk adjustment, and the Chart Review Program operations.

138.   In January 2007, Dumcum made a presentation in which he stated that the validation of provider-reported diagnosis codes had to improve.  Dumcum knew that providers were reporting unsupported diagnoses and that both fee-for-service and capitated providers needed to improve their validation rates.

139.   Prior to this, in 2006, Dumcum, Will, Holt and others had already participated in discussions about conducting an Internal Data Validation ("IDV") Program focused on the validity of provider-reported diagnoses.  The purpose of the IDV Program was to determine whether the physicians' medical records supported the diagnoses they reported to the UHG Managing Defendants, who in turn submitted the diagnoses to Medicare for risk adjustment payments.

140.   In February 2007, Will, Holt, and Patricia Rasmussen, Manager of Encounter Submissions at Ingenix, were informed of specific provider-reported codes that were reported based on "faulty coding."  For example, Sharp Community Medical Group in California submitted a diagnosis tracking to HCC 155 (Major Head Injury) but there was "no documentation to support intracranial injury."  Likewise, Monarch/South Coast, located in this District, submitted a diagnosis tracking to HCC 17 but there was "[n]o documentation of diabetes or diabetic complication[.]"  Will, Holt, and Rasmussen were requested to remove, or delete, these codes before the final submission deadline but Rasmussen replied that they did not have resources and could not do this.

141.   In addition, UHG Managing Defendants knew that a significant percentage of provider-reported diagnoses were invalid based on audits performed by CMS and similar internal audits or reviews that they performed.  For example, one such audit was performed on diagnoses submitted for 2004 date of service medical encounters (*e.g.* physician office visits) that mapped to 1,231 HCCs.  The results were reported in a September 2007 Risk Adjustment Programs presentation sent by Dumcum to Relator Poehling.  The presentation showed that no support was found in the beneficiaries' medical records for 32 percent of the HCCs at issue.  That is, the records did not confirm the diagnoses mapping to 32 percent of the HCCs under review.  The same presentation showed the results of another audit of diagnoses submitted for 2005 date of service medical encounters that mapped to 1,160 HCCs.  It showed that, as of the date of the presentation, 18 percent of the HCCs were "NOT supported" and another 8 percent were most likely not supported.

142.   In October 2007, Ingenix also emphasized the fact that more than 30 percent of provider-reported diagnoses were unsupported by the beneficiaries' medical records as a selling point for the risk adjustment services, including data validation services, that it marketed to another MA Organization.

143.   During the 2007 and 2008 time period, Ingenix implemented the IDV Program. The program focused on physicians in California, Missouri, Texas, and Washington who reported more than three times the number of diagnoses than the average.  The program was very small in scope, but the results confirmed that providers reported many invalid diagnoses.  In January 2008, the results for medical encounters in 2006 showed a 30 percent invalidation rate.  That is, approximately 30 percent of provider-reported diagnoses were invalid, which was consistent with what the PacifiCare employees had known since at least 2005.  In January 2008, these results were sent to Will, Holt, and Rasmussen.

144.   Accordingly, by at least 2005, the former PacifiCare employees Dumcum, Will, Holt, and Leal knew that at least 30 percent of provider-reported diagnoses were not

supported by the beneficiaries' medical records; by at least 2007, Dumcum had imparted this knowledge to others at the UHG Managing Defendants; and, by at least 2008, the UHG Managing Defendants' own medical record reviews had confirmed that fact.

145.   Additional evidence demonstrates that, by at least the 2007 and 2008 time period, the invalidity of provider-reported diagnoses was an ongoing concern.  For example, in September 2008, one of United's own actuarial consulting subsidiaries, Reden & Anders, made a presentation that identified unsupported diagnosis codes as a "Potential Compliance Risk Area" and warned that "[t]here is no such thing as minimally compliant."  Ovations' President Cynthia Polich possessed a copy of this presentation.

146.   In addition, by at least 2008, the former PacifiCare employees, then at Ingenix, had also imparted their knowledge that the UHG Managing Defendants were obligated to identify and delete invalid provider-reported diagnoses.  For example, a January 2008 training guide entitled "CMS-HCC Risk Adjustment Training Module," created by Ingenix personnel for provider outreach, recognized that it is the accuracy of medical record documentation and coding that supports entitlement to risk adjusted payments from the Medicare Program.  The presentation recognized that accurate medical record documentation is key to accurate risk adjustment payments and necessary to validate payments.  In addition, in June 2008 emails, Patty Brennan, the Compliance Manager for Ingenix, and Karen Wagor, a Senior Coder and National Trainer for Ingenix, both of whom worked at Ingenix's Santa Ana office, recognized that Defendant MA Organizations were not entitled to payment based on diagnoses that were not validated by beneficiaries' medical records and that those entities risked losing revenue based on invalid diagnoses:  "We could be at risk of losing $$ if there isn't another piece in the documentation before or after this date of service for the HCC if it can't be verified with the most accurate validation.  **The medical record must support all diagnoses coded for the date of service and must be able to** <u>stand alone</u> **for an audit on those reported diagnosis codes.**"  (Emphasis in the original.)

147.   Moreover, the UHG Managing Defendants knew they were required to effectively address compliance issues.  For example, a presentation from November 2009 entitled "UnitedHealth Group – Audit Management Overview," made at a Medicare Compliance Oversight Committee meeting, expressly acknowledged the legal obligation to implement an effective compliance program and stated that "[i]n order to have an effective Compliance Program, an organization must have a robust internal monitoring and auditing process in place."  In 2009, Jenny O'Brien, the Chief Medicare Compliance Officer, was a Co-Chair of the Medicare Compliance Oversight Committee, a position she held until approximately 2015.  During this time period, O'Brien worked for Ovations and then UnitedHealthcare Medicare & Retirement.  Her Co-Chair was the Chief Executive Officer or another officer of Ovations and then UnitedHealthcare Medicare & Retirement.  In the 2010-2011 time frame, the Co-Chair was Tom Paul.  And, as another example, in approximately May 2010, Larry Renfro, who was then the Chief Executive Officer of both the Public & Senior Market Group (PSMG) and Defendant Ovations, and David Orbuch, who was then the Executive Vice President and Chief Compliance Officer of PSMG, met with CMS regarding their Medicare compliance program and represented to CMS that they would "meet and exceed" CMS' expectations.

148.   Kimberly Halva, UnitedHealth Medicare & Retirement's Finance Compliance Officer from 2010 to 2013, also was keenly aware that the validity of provider-reported diagnoses needed to be addressed.  Halva understood that MA Organizations had an obligation to identify and delete diagnoses that were not supported by its beneficiaries' medical records.  (Halva was also familiar with the Risk Adjustment Participants Guide.)  In November 2010, she sent a memorandum to Relator Poehling with recommendations for compliance problems focused on identifying and deleting invalid provider-reported diagnoses.  In January 2011, she sent Relator Poehling "a few suggestions for risk mitigation type programs UnitedHealthcare Medicare and Retirement could take to more equally distribute resources between programs dedicated to improper coding or billing

1    and those focused on identifying additional reimbursement opportunities through

2    improved coding/documentation."  One of Halva's suggestions was for

3    UnitedHealthcare to perform "General Coding Accuracy Audits," which were essentially

4    "look both ways" medical record reviews that would identify both incomplete coding

5    (which she referred to as "under-coding") and inaccurate coding (which she referred to

6    as "over-coding").  Another of her suggestions was for UnitedHealthcare Medicare &

7    Retirement to "Specifically Identify Traditionally Over-Coded or Incorrectly Coded

8    Conditions," "such as stroke or COPD," and conduct medical record reviews to

9    determine if those traditionally over-coded or incorrectly coded conditions could be

10   validated.  Halva and Scott Theisen, the Chief Financial Officer for UnitedHealthcare

11   Medicare & Retirement from 2010 to 2013, were Co-Chairs of the UnitedHealthcare

12   Medicare & Retirement Finance Compliance Oversight Committee, which was

13   responsible for risk adjustment compliance issues.  Halva also reported to Theisen as

14   well as Jennifer O'Brien.

15   149.   In or around early 2009, Deloitte & Touche, which served as the public

16   accounting firm for UHG (which filed a consolidated financial statement for all of its

17   businesses), sent a memo to Ovations regarding an audit it performed to investigate the

18   appropriateness of an accounting treatment used by Ovations.  In the audit, Deloitte &

19   Touche "looked both ways" when reviewing MA Program beneficiaries' medical records

20   because, according to Auditor Bill Nepple, that was the only way to achieve a full and

21   complete picture of a beneficiary's health status.  The results of this "look both ways"

22   audit were communicated to Relator Poehling in February 2009 and he was aware that

23   both ADDS and DELETES resulted from the audit.

24   150.   In addition, as part of their compliance efforts, the UHG Managing Defendants

25   had, since at least 2008, required financially-incentivized capitated provider groups to

26   submit attestations to them that certified that the diagnoses that they reported to the UHG

27   Managing Defendants were valid and met CMS's requirements.  For example, in or

28   around 2008, Ingenix sent notices to these providers describing these "**CMS DATA**

**ACCEPTANCE GUIDELINES**," and stating that **"[a]ll diagnoses must be documented at the time of the patient encounter or after receipt and confirmation of the diagnosis (i.e. Lab or Radiology report) and must be documented in the medical record**," and **"[o]nly report diagnosis codes that can be supported by the documentation in the medical record**," and **"[a]ll diagnosis codes should be valid** . . . ." (Emphasis in the original.)

151.   In 2010, Holt and Leal were a part of an email chain discussing California provider groups and risk adjustment data validation. Based on Holt's involvement with ICE's RADAR team (and possibly other sources), Holt noted that California provider groups are "acutely aware of the importance of data validation" and that risk adjustment data validation was "a subject discussed frequently at the ICE meetings." In the same email chain, Holt also assured Relator Poehling that provider groups in California would understand the importance of CMS's RADV audits.

152.   In November 2009, the results of an IDV audit for one of Ingenix's commercial clients, another company that owned and operated MA Plans, further confirmed what the UHG Managing Defendants already knew, that is, that providers were reporting invalid diagnoses at an alarming rate. The results of the audit showed a 45 percent invalidation rate. Providers in that commercial client's plans were providers for beneficiaries in one or more of the Defendant MA Organizations' Plans.

153.   In mid-2010, the results of IDV reviews once again confirmed an ongoing problem with the validity of provider-reported diagnoses. The results showed an invalidation rate of approximately 40 percent for California provider groups which cared for beneficiaries enrolled in one of more UHG MA Plans. Higher than the 30 percent invalidation rate reported in 2005, these results confirmed that a significant percentage of provider-reported diagnoses were invalid. In mid-2010, these results were shared with Relator Poehling, Keith Dobbins (an attorney for one of the UHG Managing Defendants), Stephanie Will, Patty Brennan, Ronnie Grower, among other individuals working for the UHG Managing Defendants.

154.   Also, in June 2010, an Ingenix Health Reform Implementation (HRI) Report prepared for UHG's then Chief Executive Officer, Steve Hemsley, and other members of the "UHG executive team" identified compliance as an important issue of immediate concern to UHG, particularly compliance with the FCA.  This report was sent to Dumcum, Knutson, Valenta, Andy Slavitt, Timothy Wicks, and other individuals working for the UHG Managing Defendants at the time.

155.   Furthermore, in 2010, additional Government audits confirmed the problem with invalid provider-reported diagnoses.  In March 2010, the HHS Office of Inspector General ("OIG") sent Jack Larsen, the Chief Financial Officer of Ovations, a draft report of an audit of the risk adjustment data that one of UHG's Texas MA Organizations, then called PacifiCare of Texas, submitted for payment year 2007.  In July 2010, OIG sent Thomas Paul, the Chief Executive Officer of Ovations, a draft report of an audit of the risk adjustment data that UHG's California MA Organization, then called PacifiCare of California, submitted for payment year 2007.  In the draft reports, the OIG concluded that the diagnoses for half the beneficiaries in the California audit and 44 percent of the beneficiaries in the Texas audit were invalid, and that both plans' practices were not effective for ensuring that the diagnoses they submitted to CMS complied with CMS requirements.  These draft OIG reports were described as a "top issue" in the third quarter 2010 Public & Senior Markets Group Medicare Compliance Program Overview for which Jennifer O'Brien was the Compliance Program Lead and Tom Paul was the Business Lead.  In May 2010, Paul sent OIG a response about its draft report relating to PacifiCare of Texas and, in October 2010, Paul (whose job title had then been changed to Chief Executive Officer of UnitedHealthcare Medicare & Retirement) sent OIG a response about its draft report relating to PacifiCare of California. After consideration of Paul's responses to the draft audit reports, the OIG issued final reports concluding that the health risk scores for 45 percent of the beneficiaries in the California audit and 43 percent of the beneficiaries in the Texas audit were invalid because the diagnoses were not supported by the beneficiaries' medical records or were uncertain or unconfirmed

diagnoses. In both the draft and final reports, the OIG provided examples of unsupported diagnoses. The OIG also concluded that the MA Organizations should refund the overpayments due to these invalid diagnoses. In addition to Larsen and Paul, other individuals who were aware of the OIG audit reports during the 2010 and 2011 time period included Scott Theisen, Jenny O'Brien, Kimberly Halva, Joseph Keen, and Jeffrey Dumcum.

156.   The results of RADV audits were also of concern to UnitedHealthcare. The third quarter 2010 Public & Senior Markets Group Medicare Compliance Program Overview (for which Jennifer O'Brien was the Compliance Program Lead and Tom Paul was the Business Lead) also stated that CMS was conducting RADV audits of three of the Defendant MA Organizations. Then, when CMS announced in February 2011 that it planned to extrapolate the sample audit results, Charles Hanson, the then Vice President of Finance and Underwriting at UnitedHealthcare Medicare & Retirement, left a voicemail message for Relator Poehling stating: "I haven't been close to this for . . . three or four years now probably, but back that far I know the results of our RADV audits were concerning, to say the least. That we had significant . . . errors or undocumented RAFs [*i.e.*, undocumented diagnoses] in our claim submissions." He asked Poehling: "I'm sure we're careful about how we communicate these findings, but can you give me a sense of kind of more recent RADV audits, what impact could this have? So just generally, are we still sort of, I'll say as bad as we were a few years ago? . . . So, what's the potential impact on revenue of extrapolating these RADV audit findings . . . ?"

157.   Because of the problem with provider-reported diagnoses, in 2010, the UHG Managing Defendants started the RACCR Program, as described more fully at paragraphs 239-292 below, and Claims Verification Program, as described more fully at paragraphs 196-234 below. Mary Hammond, one of the UnitedHealthcare Medicare & Retirement employees who oversaw the RACCR Program, described it as "an important part of Medicare & Retirement's efforts to meet CMS requirements to submit accurate

risk adjustment data."  The Claims Verification Program was also supposed to satisfy this basic payment rule.

158.   However, the major effect of the Claims Verification and RACCR Programs was that they highlighted that a significant amount of the risk adjustment payments claimed by the UHG Managing Defendants on behalf of the Defendant MA Organizations and paid to the Defendant MA Organizations by the Medicare Program were unsupported and invalidated by beneficiaries' medical records.  For instance, as explained in more detail in paragraph 206 below, in December 2010, the results of the first pilot phase (Phase I) of the CV Program showed that provider-reported diagnoses were unsupported for over 50 percent of the medical records reviewed.  Over a year later, as explained in more detail in paragraph 208 below, Optum had completed the second pilot phase (Phase II) of the CV Program on 17,398 charts and the results were even more striking.  Phase II identified 4,786 invalid diagnoses to be deleted, which was greater than the number of additional diagnoses (ADDS) identified based reviews of the same medical records.  In February 2012, Dumcum, who was responsible for the Claims Verification Program, met with Relator Poehling and Theisen, who was the Chief Financial Officer of UnitedHealthcare Medicare & Retirement at that time, and reported:  "I'm deleting as much as I'm adding at the end of the day.  And I don't know if—you know, what I want to do."  He also stated:  "we're getting more and more red here," and that Claims Verification "eats in very substantially" to the revenue from ADDS from chart reviews.

159.   In addition, as explained in more detail below, by February 2012, there were "5,519 bad codes" that were "identified and deleted" as the result of RACCR reviews of the medical records for only 13,451 beneficiaries.  On a beneficiary basis, the results showed more than a 40 percent invalidation rate.

160.   Over time, the UHG Managing Defendants also obtained more information about incorrect diagnosis coding by providers, some of which information confirmed what had been known for years.  For example, by at least 2013, Tracey Bradberry, an Ingenix and then Optum employee who was a certified coder, was aware of various reasons for

invalid provider-reported diagnoses, including, for example, the "[c]linical findings
and/or treatment does not support the diagnosis" and "[n]ot a current condition."  In
addition, in March of 2014, Melissa Ferron, a coding consultant, sent Optum employee
Christopher Webb a list identifying various HCC codes and diagnosis codes that were
unlikely to validate based on medical record reviews because providers frequently used
the codes incorrectly.  These included HCCs 17 (diabetes with acute complications), 96
(specified heart arrhythmias), 104 (monoplegia, other paralytic syndromes), and 111
(chronic obstructive pulmonary disease).

161.   More recently, other employees of the UHG Managing Defendants also have
recognized the obligation to ensure the validity of diagnoses submitted for risk
adjustment payments.  They also understood that the obligation to correct invalid data
provided to Medicare for risk adjustment payments.  For example, in an April 2013
email, Marybeth Meyer, the Vice President of Operations for UnitedHealthcare
Medicare & Retirement who succeeded Relator Poehling in managing the risk
adjustment team for that group, stated that "as a Medicare Advantage Plan, if we become
aware of a coding issue that impacted the revenue received from CMS for risk
adjustment, we are obligated to investigate and correct the submissions to CMS."  In
response to Meyer's email, Halva, then Compliance Officer for UnitedHealthcare
Medicare & Retirement, agreed.  She also stated that "[w]e have an obligation to go back
to CMS and correct submissions that impact the revenue received for risk adjustment
purposes."  Halva did not think that anything was wrong with the requirement that
UnitedHealthcare Medicare & Retirement delete unsupported diagnoses.  Moreover, she
believed that "arguably" this obligation existed for ten years because of the ten-year
statute of limitation for the Government to pursue FCA claims against entities that
knowingly fail to delete unsupported diagnoses.

162.   As another example, in February 2014, Melissa Sedor who worked in
UnitedHealthcare Medicare & Retirement's controller's office, sent an email stating that
"it is our responsibility to submit accurate records to CMS.  Even if the provider submits

1  bad data to us, the responsibility is on us to be submitting the correct data." Sedor

2  further explained that this was the reason United implemented compliance programs like

3  RACCR and Claims Verification. Sedor's email was sent to others at UnitedHealthcare,

4  including Marybeth Meyer and William Hnath.

5  163. Finally, other employees in addition to Halva were aware of the potential FCA

6  liability for submitting invalid diagnoses to CMS for risk adjustment payments or for

7  failing to delete them. For example, in 2010, Carol Thompson, then National Manager

8  for Ingenix's Risk Adjustment Programs who worked at the Ingenix office in this

9  District, provided the following reason as justification for funding for a coding vendor

10 who was assisting the UHG Managing Defendants with a CMS RADV audit: "Politics

11 and Congressional scrutiny put an exclamation point on our need to demonstrate that the

12 data submitted to CMS for risk adjustment payment is valid. Data that drives payment

13 from the government can be reviewed to determine if the claims are 'valid.' Improper

14 claims submission can fall under the False Claims Act." Also, as alleged more fully

15 below, Dumcum informed Relator Poehling that the FCA was a consideration in

16 deciding whether the UHG Managing Defendants should implement the Claims

17 Verification Program and "look both ways" at the results of their Chart Review Program.

18     **II.**    **Chart Reviews and Claims Verification**

19        **A.**    **United's "Look One Way" Chart Review Program**

20 164. Over the last decade, Defendants have obtained billions of dollars of risk

21 adjustment payments from Medicare from its national Chart Review Program because

22 they only looked one way at the results of their coders' chart reviews. As part of this

23 program, the coders were instructed to perform "blind" reviews of the beneficiaries'

24 medical records. That is, the coders did not know which, if any, diagnoses had been

25 reported by the providers who treated the beneficiaries and created the medical records.

26 Thus, rather than confirming diagnoses already reported by the providers or identifying

27 only additional diagnoses supported by the records, the coders were instructed to look

28 for all medical conditions purportedly documented in the records, record all diagnosis

1    codes identifying those conditions, and give all of those codes to the UHG Managing

2    Defendants.  But, the UHG Managing Defendants selectively utilized results of these

3    chart reviews – that is, the coders' list of diagnosis codes – for the sole purpose of

4    identifying diagnosis codes that the providers had not reported and submitting ADDS for

5    additional risk adjustment payments.  They did not utilize the coders' lists of diagnosis

6    codes to determine if the providers had reported codes that were not supported by their

7    own medical records.  If the UHG Managing Defendants had looked both ways and

8    deleted these unsupported and, thus, invalid provider-reported codes, their national Chart

9    Review Program would have been far less lucrative.

10    165.   The UHG Managing Defendants' national Chart Review Program was their largest

11    risk adjustment revenue-generating program.  This program was started in 2005 as an

12    outgrowth of the chart review program that PacifiCare was already conducting.

13    Dumcum, Will, and other former PacifiCare employees became key participants in

14    designing, implementing, and managing the United Managing Defendants' revenue-

15    generating national Chart Review Program.  Will was the Program Manager for the

16    program.

17    166.   During the first few years of the program, hundreds of thousands of charts were

18    reviewed each year in order to mine them for additional diagnosis codes.  In 2008, The

19    Coding Source ("TCS"), a chart review/diagnosis coding vendor retained by Ingenix,

20    reported to Carol Thompson at Ingenix that "[s]ince 2005, TCS has partnered with

21    PacifiCare-United and Ingenix to support your HHC initiatives.  TCS has successfully

22    completed 460,000 chart reviews for multiple United regions."

23    167.   In 2009, the UHG Managing Defendants significantly expanded the size of the

24    national Chart Review Program by providing Ingenix with the funds to acquire a coding

25    vendor called AIM Healthcare Services, Inc. and integrating Ingenix's operations in

26    Santa Ana, California, and the AIM coding operations in Tennessee, and by providing

27    Ingenix with the funds to develop an in-house chart review computer database system

28    called ChartSync so that Ingenix's in-house coders and third-party coding vendors could

electronically review medical records and electronically record the coding results of their reviews.  At or about the same time, the UHG Managing Defendants also expanded the size of the Chart Review Program by providing Ingenix with the funds to open offices in foreign countries (the Philippines and India) where it could hire foreign workers to review beneficiaries' medical records in order to try to find additional diagnosis codes.

168.   Due to the increased resources devoted to the Chart Review Program, the number of medical records reviewed in the hunt for additional codes significantly increased over time.  For the first few years of the Chart Review Program, between 500,000 and 600,000 charts were reviewed each year.  According to a presentation by Dumcum, 600,000 charts were reviewed in 2006 and, as of September 21, 2007, 400,000 charts had been reviewed so far that year with 200,000 charts remaining for review during the fourth quarter of 2007.

169.   By 2010, the number of chart reviews had increased substantially to approximately 850,000 charts for that year.  For 2011 to 2014, approximately 1.5 million charts were reviewed each year.  The Government believes that, after 2014, the national Chart Review Program was most likely similar in size.

170.   As part of this national Chart Review Program, the UHG Managing Defendants focused primarily on the review of charts from providers paid on a fee-for-service basis. Ingenix and then Optum or their vendors obtained medical records from thousands of these providers throughout the United States.  They or their vendors sent these medical records to coders that they employed in Tennessee, India, and the Philippines.  They also hired coding vendors to review these medical records.  Those vendors were located in various locations within and outside of the United States.

171.   Physician groups owned by one or more of the UHG Managing Defendants also had chart review programs.  WellMed had a group called DataRaps that conducted reviews of its physicians' medical records for patients in one or more Defendant MA Organizations' MA plans.  Southwest Medical Associates conducted some of its own

reviews though it also relied on Ingenix's/Optum's coding operations in Tennessee and coding vendors for its chart reviews.

172.    In 2006, the Defendant MA Organizations obtained approximately $270 million in additional risk adjustment payments from the ADDS that were submitted on their behalf by the UHG Managing Defendants based on the national Chart Review Program.  The return on investment was substantial (approximately $250 million) as it cost only approximately $18 million to review the charts in 2006.

173.    Not unexpectedly, as the number of medical records reviewed significantly increased over the years, so did risk adjustment payments from ADDS based on the national Chart Review Program.  Defendant MA Organizations received approximately $426 million in additional risk adjustment payments from ADDs the UHG Managing Defendants submitted to Medicare based on the medical record reviews conducted as part of the Chart Review Program for the 2011 payment year, approximately $455 million for the 2012 payment year, approximately $758 million for the 2013 payment year, and approximately $882 million for the 2014 payment year.

174.    For payment years 2010 to 2015 combined, Defendant MA Organizations obtained over $3 billion in additional risk adjustment payments from Medicare due to the ADDs the UHG Managing Defendants submitted on their behalf based on medical record reviews conducted as part of the national Chart Review Program.

175.    United's Chart Review Program was conducted according to an annual cycle.  For example, in the spring of 2012, Optum started its collection and review of medical records relating to medical encounters in 2011 (*i.e.*, with 2011 dates of service).  These efforts then intensified through the remainder of the year until the final deadline for submitting diagnosis codes to Medicare for payment year 2012, which was February 15, 2013.

176.    Prior to the start of each annual cycle, the UHG Managing Defendants' senior executives set a revenue target for the program.  After chart reviews started, these senior executives then closely monitored the progress of the program and, if the forecast did not

1  look like the program would achieve the revenue target, they made changes to the

2  diagnostic coding being performed by the coders.  For instance, when UnitedHealthcare

3  Medicare & Retirement and Optum were not achieving the return on investment

4  expected from chart reviews for the 2012 payment year, they "liberalized" coding

5  policies and engaged in a "Recode Project" consisting of re-reviewing 900,000 charts

6  that had already been mined once for additional diagnoses.  They liberalized the coding

7  policies to enable the coders to identify more diagnosis codes purportedly supported by

8  the beneficiaries' medical records.  In this second-round review, the coders did identify

9  more codes purportedly supported by the records based on the liberalized coding

10  policies, and UnitedHealthcare Medicare & Retirement and Optum submitted those

11  codes to Medicare for additional risk adjustment payments.  Scott Theisen at

12  UnitedHealthcare Medicare & Retirement and Karen Erickson and Jon Bird at Optum

13  were involved in this "Recode Project."

14  177.   Despite their aggressive coding to submit as many ADDS as possible to meet their

15  annual revenue targets for their Chart Review Program, officers of UnitedHealthcare

16  Medicare & Retirement attested to the validity of *all* of these ADDS in the annual Risk

17  Adjustment Attestations submitted to Medicare and various senior management

18  employees of both UnitedHealthcare Medicare & Retirement and Optum attested to the

19  validity of *all* of these ADDS in approving the annual Risk Adjustment Attestations

20  submitted to Medicare.  *See infra* at paragraphs 296-308 (describing this internal

21  approval process).  If the results of these chart reviews were so reliable that they could

22  attest to the validity of all of the ADDS, then the results were of equal reliability for

23  them to have deleted all previously-submitted diagnoses invalidated by the reviews.  To

24  the extent that Defendants call into question the results of their own chart reviews in *not*

25  finding support for and *not* validating hundreds of thousands of diagnoses, they also call

26  into question the overall reliability of the chart reviews and validity of the ADDS.

27  Under those circumstances, Defendants acted with reckless disregard for the truth by

28  submitting the ADDS and attesting to their validity, knowing they were not entitled to

payments by Medicare based on such unreliable data and the United States is entitled to recover those payments in this action.

### B.   United Knew It Was Obligated To Look Both Ways At The Results Of Its Chart Reviews And Make DELETES As Well As ADDS

178.   By 2008, Relator Poehling and others began to question the practice of ignoring the negative results of blind chart reviews invalidating many provider-reported diagnoses.  In May 2008, Relator Poehling participated in a meeting in which he discussed this issue with Will.  She explained to Relator Poehling that, as part of the Chart Review Program, Ovations and Ingenix did not look at whether provider-reported diagnoses were not substantiated by the results of the coders' blind chart reviews. Poehling and Will discussed the idea of changing this process, comparing the results of the blind chart reviews to the provider-reported diagnoses that Ovations and Ingenix had submitted to CMS, and deleting the unsupported diagnoses.

179.   Thereafter, the need to address problems with the diagnoses reported by providers continued to be an issue.  In March 2009, the question of how to address problems with diagnoses reported by fee-for-service providers arose during a discussion among Ingenix employees about the Internal Data Validation Program that Ingenix conducted for Ovations and the Defendant MA Organizations.  During that discussion, Ronnie Grower, Vice President of Market Consultation for Ingenix, noted that the Internal Data Validation Program excluded fee-for-service providers and questioned whether the UHG Managing Defendants would have another program to address diagnoses reported by fee-for-service providers given that "there are common coding errors that get reported across all providers."  In fact, other than its short-lived Claims Verification Program, the UHG Managing Defendants never had a medical record review program like the IDV or RACCR Programs to address the validity (or lack thereof) of diagnoses reported to it by its fee-for-service providers.

180.   In 2009, these internal discussions continued.  In early April 2009, Relator Poehling, Dumcum, Will, Kimberly Halva, Janice Redmond (the Senior Vice President of Market Outreach for Ingenix's Risk Adjustment Group, who worked in Santa Ana, California) and others participated in a discussion about compliance risks, including provider over-coding (*i.e.*, invalid coding).  One of the items on the agenda that they discussed included "[a]uditing under & over coded conditions" as part of the chart review process, that is, "looking both ways."  A few weeks later, Relator Poehling again met with Will and others to discuss what to do when provider-reported diagnosis codes were inconsistent with the results of the coders' blind chart reviews of the providers' medical records.  At this second meeting in April 2009, the participants began to design a methodology for "looking both ways."  This led to subsequent discussions about creating a Claims Verification Program in order to look both ways at the coders' blind chart review results and make DELETES as well as ADDS.

181.   A few months later, in August 2009, in an internal presentation, Redmond noted that chart reviews only looked for additional revenue and suggested that the process should also include a certain amount of charts that are reviewed to determine the validity of providers' codes.  Redmond was concerned that providers paid on a fee-for-service basis were not being audited to validate their diagnoses.  Her presentation stated: "Known problematic codes are not audited across plans/providers raising the risk of error."

182.   In early 2010, Will sent Dumcum a presentation proposing the Claims Verification Program.  The stated goal of the program was to improve the accuracy of the diagnosis data that the UHG Managing Defendants submitted to CMS.  Will believed that Claims Verification would achieve this goal.

183.   In May 2010, Relator Poehling discussed the potential creation of the Claims Verification Program with Dumcum.  Dumcum referenced the Department of Justice's enforcement of the FCA as a consideration.

184.   According to Halva, while she was the UnitedHealthcare Medicare & Retirement Compliance Officer from 2010 to 2013, the "general consensus from the [UnitedHealthcare Medicare & Retirement] point of view was . . . that any time we opened a chart we should be looking both ways."

185.    In the fall of 2010, after two years of discussions, senior executives such as Thomas Paul, Cynthia Polich, and Lee Valenta acknowledged that the UHG Managing Defendants should "look both ways" at the results of their blind chart reviews.  By at least that time, however, these Defendants should and could have compared the results of *all* chart reviews to the provider-reported diagnoses and deleted all of the invalid provider-reported diagnoses that they previously had submitted to the Medicare Program.  They also should and could have done this contemporaneously with submitting ADDS based on the same chart reviews.  Instead, they embarked on a very slow, phased development of their Claims Verification Program.  The senior executives authorized only a pilot test program to look at the negative results (*i.e.*, the results showing that provider-reported diagnoses were invalid) from only a very small sample of chart reviews.  Moreover, the Claims Verification process was designed to "save" – that is, avoid deleting – the provider-reported diagnoses invalidated by the blind chart reviews conducted as a part of the Chart Review Program.  The UHG Managing Defendants attempted to and sometimes did save some of these invalid codes by re-reviewing the beneficiaries' medical records, sometimes multiple times, to try to glean any support, even doubtful or ambiguous support, for the provider-reported diagnoses at issue.

186.   In August 2011, Relator Poehling made clear to Scott Theisen, then Chief Financial Officer of UnitedHealthcare Medicare & Retirement, that Poehling did not believe it was appropriate to conduct chart reviews unless and until Claims Verification was fully implemented and they were "looking both ways."  Theisen was one of the senior managers charged with making decisions regarding the implementation and design of the Claims Verification Program.  At that time, in an email to Paul Bihm at

95

Optum, Poehling wrote:  "You (and Scott [Theisen]) know where I stand on chart reviews without full CV in place … I wouldn't do them.  Scott, though, is the decision maker . . . ."  At that time, Bihm was an Optum Senior Vice President of Client Management and had responsibilities relating to the Chart Review Program.

187.   In September 2011, Mary Hammond, Associate Director of Strategy and Support for UnitedHealthcare Medicare & Retirement's risk adjustment team, attended an industry conference in Washington, D.C. on risk adjustment.  She reported that it was "great to get a perspective on what the activity in DC may mean for risk adjustment.  More audit protection (*looking both ways compliance programs*), . . . and less reliance on chart review are the recommendations."  (Emphasis added.)

188.   In approximately November 2011, a "factual and unbiased" presentation was created for UHG's Chief Executive Officer Steve Hemsley, to provide him information about Optum's and its competitors' risk adjustment programs and other risk adjustment services.  The presentation described "Compliance" as "the True Value of Claims Verification."  The presentation further noted that the medical record is the "source of truth" and that looking at this "source of truth" had a negative revenue impact because comparing provider-reported diagnoses with the information in the providers' medical records resulted in having to delete some of their diagnoses.  In December 2011, a copy of this presentation was sent by Karen Petroff, the Senior Vice President of Business Development at Optum, to Dumcum and Eric Murphy at Optum.  Murphy was the President of Payer Solutions at Optum at the time.

189.   In December 2012, Mike Jacobson, Program Business Analyst/Project Management at Optum, sent Patty Brennan an updated version of Optum's Business Vision Document for the marketing of the Claims Verification Program to commercial clients (*i.e.*, third-party MA Organizations).  Under the section titled "Business Segment Strategies and Tactics," the document stated that "Optum has an industry compliance duty and responsibility to ensure that each HCC code is accurate and can be substantiated within the medical charts."  Under the section titled "Competitive Analysis

– Market Research," the document stated:  "The marketplace will soon recognize the need and importance of performing due diligence on HCCs added during the chart review process but also verifying HCCs submitted to CMS can be substantiated within the medical chart according to CMS guidelines.  For HCCs that cannot be substantiated within the medical chart, clients will need to perform the appropriate deletes in order to remain compliant with CMS guidelines."  At this time, Optum had already begun marketing Claims Verification or "looking both ways" chart reviews to commercial clients.

190.   In September 2012, the Chief Executive Officer of OptumInsight, William Miller, informed the Government that the UHG Managing Defendants were developing a Claims Verification Program to ensure the accuracy of the diagnosis data they submitted to CMS and look both ways at the results of the chart reviews conducted as part of the Chart Review Program.  Miller further stated that unsupported diagnoses would be deleted.  The UHG Managing Defendants knew that this information was important to the Government.  They led the Government to believe that they were not deliberately ignoring or recklessly disregarding the negative results of their Chart Review Program showing that numerous provider-reported diagnoses that they had submitted for payment were invalid.

191.   Until 2012, UnitedHealthcare Medicare and Retirement and Optum allowed coders to review medical records at providers' offices if the providers did not want to provide copies of their records.  However, in 2012, in accordance with their acknowledgement of their obligation to "look both ways," these Defendants changed this policy and restricted on-site reviews because they needed copies of the charts in order to conduct Claims Verification.  Mary Hammond, in an April 2012 email, explained this decision:  "M&R has made a decision on the chart reviews where providers are requiring onsite coding.  We will ask the [United] Provider Advocates to talk to the groups to try to talk them out of it.  If they won't budge, then we will allow onsite coding if OptumInsight has a solution for doing claims verification on those charts."

192.    Similarly, at around the same time, a decision was also made that Optum's commercial clients were required to retain Optum to perform Claims Verification (*i.e.*, to "look both ways") if Optum performed chart reviews for them and submitted risk adjustment data, including diagnoses, to CMS on their behalf.  According to Dumcum, Optum decided "that if we did chart review and submissions, that we then must do the two-way look.  It became our policy of how we executed business at the time.  So if they bought both, then we required that piece [*i.e.*, Claims Verification] be implemented."

193.    UnitedHealthcare has also consistently demanded that CMS and HHS OIG, when performing their audits, credit the Defendant MA Organizations for any additional medical conditions that UnitedHealthcare believed were supported by the medical records but that had not been reported by the providers.  UnitedHealthcare took the firm position with the Government that, in order to accurately reflect a patients' true health status, it was necessary to review patients' medical records for both the under-reporting (not reporting diagnoses supported by the beneficiaries' medical records) and over-reporting (the reporting of codes unsubstantiated by the beneficiaries' medical records) of medical conditions by providers.  In fact, CMS RADV audits have historically credited MA Organizations, including UnitedHealthcare, for additional diagnoses found during such audits.

194.    For example, in a February 2011 letter from Thomas Paul, the then Chief Executive Officer of UnitedHealthcare Medicare & Retirement, to CMS concerning the parties' dispute about the preliminary results of CMS' pilot RADV audit of one of the Defendant MA Organizations, UnitedHealthcare argued that the dispute process "incorrectly exclude[d] consideration of additional CMS-HCCs" supported by the beneficiaries' medical records.  The letter stated that UnitedHealthcare identified additional HCCs (*i.e.*, additional diagnoses mapping to additional HCCs) in the medical records and, if CMS refused to give it credit for them, it would challenge CMS legally.  In September 2012, in a letter from Theisen, the then Chief Financial Officer of UnitedHealthcare Medicare & Retirement, to CMS about the same RADV audit,

UnitedHealthcare continued to complain that the audit incorrectly excluded consideration of additional HCCs and argued that the Defendant MA Organization should receive credit for the additional HCCs.  The letter stated:  "If [the MA Organization] is not credited for these incremental HCCs, then any adjustments made by CMS do not accurately reflect an enrollee's comprehensive medical conditions.  The goal of RADV audits should be to determine the full extent of enrollees' medical conditions, and **make overpayment and underpayment adjustments so that [MA Organizations] are paid commensurate with enrollees' health status**."  (Emphasis added.)  Similarly, in a September 2012 letter from Thomas Paul to HHS OIG, UnitedHealthcare stated that "the OIG should correct the invalid HCCs and credit [the MA Organization] with the incidental HCCs documented in the submitted medical records."

195.   ICE, the industry group to which several of the Defendants belonged and which they financially supported, also opined that "looking both ways" was a "Best Practice." It issued a Best Practices document encouraging the industry to conduct chart reviews that "looked both ways."  It described the advantages of such chart reviews as "[p]romoting validation functions for diagnostic codes previously submitted by providers" and "[p]roviding the ability to submit code corrections forward (additions and deletions) to health plans upon the completion of review."

## C.   United's Short-lived "Look Both Ways" Claims Verification Program

196.   In September 2010, Lee Valenta, then Ingenix's Chief Operating Officer, sent Thomas Paul, then Chief Executive Officer of Ovations, a memorandum "summariz[ing] Ingenix's plans for implementing a claims verification program for charts reviewed by Ingenix on behalf of Ovations Medicare Advantage Plans."  Valenta explained that the "overarching aim" of the Claims Verification Program was "improving the quality of member-level diagnosis information submitted to CMS."  He also explained that the program's purpose was to identify the provider-reported diagnoses that were not

validated by the blind medical record reviews conducted as part of the Chart Review Program and for another coder to conduct a second non-blind review to determine if the provider-reported diagnoses had been missed by the first blind coder.

197.   Valenta's memorandum also set forth a three-phased approach for the development of the Claims Verification Program.  The first phase, Phase I, was supposed to focus on a random sample of 850 beneficiaries in Ovations MA Plans whose medical records for encounters (*i.e.*, provider office visits) in 2009 were included in the Chart Review Program in 2010 and had already been subject to a blind review as part of that Program.  Phase I was supposed to start in October 2010 and be completed by January 31, 2011.  The second phase, Phase II, was supposed to focus on a larger sample of beneficiaries and, thus, a larger number of medical records for encounters in 2010.  This group was supposed to include all beneficiaries who had medical encounters with only one provider during 2010.  Phase II was supposed to start by May 2011.  The final phase, Phase III, was supposed to focus on all beneficiaries in Ovations' MA Plans whose medical records for medical encounters in 2011 were included in the national Chart Review Program in 2012 and had already been subject to a blind review as part of that Program.  Phase III was supposed to be implemented in 2012.

198.   In October 2010, Cindy Polich, then President of Ovations, which was in the Public and Senior Markets Group ("PSMG") that managed the Defendant MA Organizations at the time, responded to Valenta's memorandum.  Polich agreed to his proposal.  Polich also acknowledged the need to improve PSMG's risk adjustment programs.  She stated that "[w]hile Ingenix is implementing Phase II [of Claims Verification], PSMG will conduct a comprehensive review of its current risk adjustment strategies, including our chart review strategy.  The purpose of this review is to determine the future programs and approaches to be used to improve the accuracy of our risk scores."

199.   A Claims Verification project management document, prepared by Optum, Ingenix's successor, described Claims Verification as "[a] risk adjustment chart audit

service designed to ensure that qualified patient diagnoses and conditions are identified and supported in the physician medical record documentation. This audit service identifies any discrepant coding patterns contained within the medical record documentation and the associated claims and encounters. This service includes the submission and delete process to CMS, financial reporting, and training/education for providers. Claims Verification will further supplement our efforts to assess coding accuracy and our ability to drive prospective improvements by engaging and educating providers."

200.    At a meeting in September 2012, Theisen explained to Jason Bainbridge and Karin O'Hara, both of whom worked for UnitedHealthcare Community & State, that UHG decided to "look both ways" and implement Claims Verification in order to defend the Chart Review Program in light of increased scrutiny on risk adjustment. According to Relator Poehling's notes, the meeting focused on the financial impact of Claims Verification, and Theisen "said historically when we audited we only added codes. UHG has decided from a defensibility standpt, & the increased scrutiny on risk adjustment, that we would begin deleting unsupported codes as well. Scott [Theisen] explained that [Optum] did a CV pilot on ~ 5k charts. Scott said we anticipated ~ $100M in give backs related to CV, but the pilot is showing ~ $225M/yr (extrapolating results)." Other attendees at this meeting included, but were not limited to, Relator Poehling, Jon Bird, William Hnath, and Melissa Sedor.

201.    At some point in 2012, UnitedHealthcare Medicare & Retirement also started to impose a "look both ways" requirement on providers with which it was sharing the cost of chart reviews. Many, if not all, of these providers were incentivized capitated providers. UnitedHealthcare Medicare & Retirement sent letters to these providers about this requirement. Some of the letters expressly stated that UnitedHealthcare Medicare & Retirement was agreeing to share in the cost of the chart reviews based on its understanding that the provider would use the information gathered from the chart reviews to verify the diagnosis data that it previously reported to UnitedHealthcare

Medicare & Retirement.  In other of the letters, UnitedHealthcare Medicare & Retirement requested that the provider ensure that it uses the information gathered during the chart reviews to verify the diagnoses that it previously reported to UnitedHealthcare Medicare & Retirement.  All of the letters further instructed the providers on how to submit to UnitedHealthcare Medicare & Retirement (via Optum) a data file of diagnosis codes that should be deleted (as well as those that should be added) as a result of the chart reviews.  In addition, UnitedHealthcare Medicare & Retirement required all of the providers to complete and return a certification.  Pursuant to the certification, the provider had to attest that it had compared diagnoses previously reported to UnitedHealthcare Medicare & Retirement with the charts that it reviewed, and that it had submitted to UnitedHealthcare Medicare & Retirement and Optum a data file of diagnoses that it had determined should be added or deleted.  Pursuant to the certification, the provider also had to certify that the information in the data file was accurate and truthful.  There was an attachment to the letters that specified the fields for the data file that the providers were required to use.  One of the fields was for the providers to identify diagnoses that needed to be deleted because they were not validated by the chart reviews.

202.   UnitedHealthcare Medicare & Retirement and Optum, however, took over three years to develop the Claims Verification Program.  Furthermore, the manner in which they developed and then implemented the Program shows that they were never committed to honoring their obligation to undertake good faith efforts to ensure the validity of the risk adjustment data that they submitted to the Medicare Program.  They did not automatically delete the provider-reported diagnoses that were not supported by the medical record reviews conducted as part of the Chart Review Program.  Rather, they considered these invalid diagnoses as mere "potential deletes" and instructed the coders to re-review the medical records to try to avoid deleting them.  Optum also trained the Claims Verification coders that the goal of Claims Verification, above all else, was to "validate" or "save" the potential deletes through finding any support for the diagnosis in

the beneficiary's chart.  Additionally, Optum instructed its coders to "save" these invalid diagnoses even if the information in the medical records was ambiguous.

203.   When performing Claims Verification, Optum also did not consult providers even when medical records were ambiguous concerning whether the beneficiaries actually had the medical conditions corresponding to the diagnosis codes.

204.   Optum also saved "potential deletes" by simply accepting the diagnoses reported by providers even when the medical conditions were not unambiguously documented in the beneficiaries' medical records.  Optum characterized this practice as deferring to the judgment of the provider or the provider's administrative staff who assigned the diagnosis codes.  For example, if a chart was unclear, illegible, or missing, and even though Optum could not identify any medical records documenting the medical conditions identified by the provider-reported codes, it just accepted the codes and did not delete them.  Optum did this with either deliberate ignorance or reckless disregard for the truth in light of the mountain of knowledge it possessed about the significant percentage of invalid provider-reported diagnoses.

205.   However, despite all its flaws, the Claims Verification Program confirmed what UnitedHealthcare Medicare & Retirement and Optum already knew about the significant error rate associated with provider-reported diagnoses that they submitted to the Medicare Program for risk adjustment payments.

206.   At the end of 2010, Ingenix, Optum's predecessor, had conducted the first pilot phase, Phase I, of its development of the Claims Verification Program.  As specified in Valenta's memorandum, Phase I included a very small sample of medical records that Ingenix had reviewed as part of the Chart Review Program for encounters (*e.g.*, office visits) that beneficiaries had with providers in 2009.  A "CV Dashboard" summary from December 2010 shows that out of the many hundreds of thousands of medical records included in the Chart Review Program for 2009 encounters, only 843 records were included in Phase I of the Claims Verification Program.  By December 2010, the review for 728 of those medical records had been completed.  The results showed that 224 of the

728 medical records re-reviewed as part of Claims Verification (*i.e.*, reviewed once as part of the Chart Review Program and then again as part of Phase I of the Claims Verification Program) had both at least one ADD (a diagnosis code that the provider had not reported) and at least one DELETE (a diagnosis code that was reported by the provider but not validated by the medical record) and 167 of the 728 medical records re-reviewed as part of Claims Verification had at least one DELETE but no ADDS. Furthermore, of the HCCs and the RxHCCs for which Ingenix looked for validation in these 728 records that it had re-reviewed, 19 percent of the HCCs and 15 percent of the RxHCCs did not validate.  At the time that the summary was prepared, Ingenix was conducting "follow-up" on 39 medical records.  Of the HCCs and the RxHCCs for which Ingenix looked for validation in these 39 medical records that it had re-reviewed, 47 percent of the HCCs and approximately 45 percent of the RxHCCs did not validate.

207.   As part of Phase I, but only as part of Phase I, Ingenix sometimes contacted the providers who gave it the medical records.  It did this when the second non-blind review of the records in Claims Verification failed to validate the diagnoses that the first blinded review had failed to validate as part of the Chart Review Program.  For some beneficiaries, the providers responded that they should not have submitted their claims (*i.e.*, the claims which included the diagnoses).  Consequently, the diagnoses should not have been submitted to CMS.  For some other beneficiaries, the providers did not have additional records or their additional records did not support the diagnoses in question.

208.   In mid-2011, Ingenix/Optum began conducting the second pilot phase, Phase II, of the Claims Verification Program.  Phase II began in the summer of 2011 and was completed in early 2012.  Out of the many hundreds of thousands of medical records included in the Chart Review Program for 2010 medical encounters, only approximately 17,000 charts were included in Phase II.  Coders tried to save as many "potential deletes" as possible when reviewing these medical records as part of Phase II.  Nonetheless, the results of their Claims Verification reviews confirmed more invalid diagnoses

1   (DELETES) than the number of additional codes (ADDS) gleaned from the same

2   records.

3   209.   In mid-2012, Optum began conducting a preliminary test or pilot for Phase III of

4   the Claims Verification Program.  This pilot included approximately 5,000 medical

5   records relating to encounters (*e.g.*, office visits) that beneficiaries had with providers

6   during calendar year 2011.  In September 2012, Theisen explained to others including

7   Relator Poehling, that UnitedHealthcare Medicare & Retirement, relying on the results

8   of this sample review, had increased its estimate of the financial impact of Claims

9   Verification deletes.  In October 2012, Theisen sent Daniel Schumacher, the then Chief

10   Financial Officer of Defendant UnitedHealthcare, and others a "CV III analysis – based

11   on 2011-2012 Chart review activity for 2011 DOS."  The document showed validation

12   rates based on the review of HCCs because the coders were instructed to find support for

13   any diagnosis that mapped to the HCC under review even if it was not the same

14   diagnosis reported by the provider that originally mapped to that HCC.  The document

15   showed that the validation rate "[b]ased on results of CV3 pilot (5,000 chart sample)"

16   was 66.4 percent.  In other words, only 66.4 percent of the HCCs reviewed were

17   supported by the beneficiaries' medical records.  That meant that 33.6 percent of the

18   HCCs were unsupported by the beneficiaries' medical records even after

19   UnitedHealthcare Medicare & Retirement and Optum had them reviewed twice, once as

20   part of the Chart Review Program and again as part of the pilot Claims Verification

21   Phase III process.  Based on these results, UnitedHealthcare Medicare & Retirement

22   estimated that the negative financial impact of Claims Verification in 2012 would be

23   $231 million based on the number of estimated "potential deletes" that it could not save

24   and would have to be made.  It estimated that diagnoses mapping to 120,147 HCCs

25   would have to be deleted and that, on average, each delete would result in a $1,924

26   negative financial impact.

27   210.   In or about October 2012, UnitedHealthcare Medicare & Retirement recorded in

28   its financial records a $208 million accrual for potential revenue reductions due to

deletes that would need to be made as part of the Claims Verification Program (hereinafter referred to as a "CV liability accrual") for payment year 2012.  Relator Poehling and Kyle Anderson were aware of this CV liability accrual.  In late 2012, other individuals at UnitedHealthcare Medicare & Retirement and Optum, including Timothy Noel, Scott Theisen, and Jon Bird, were also aware of the CV liability accrual and/or the estimated negative financial impact of the Claims Verification Program.

211.    UnitedHealthcare Medicare & Retirement and Optum did not complete their pilot tests and start to implement their Claims Verification Program for charts relating to 2011 medical encounters (*i.e.*, with 2011 dates of service) until late 2012.  Even after that, they never fully implemented the program.  They also continually changed the program in order to limit its scope and created arbitrary rules to avoid looking at the negative results of many of the blind chart reviews conducted as part of the Chart Review Program.  In addition, when they learned that their second review of the medical records in Claims Verification was not saving a significant number of diagnoses from deletion, they created another level of review.  That is, it created a re-re-review or third review of the beneficiaries' medical records in order to keep trying to save the diagnoses from deletion.  They also limited the scope of Claims Verification by excluding certain providers, including providers that they or their affiliates owned and operated.  In 2014, Defendants UHG and UnitedHealthcare then terminated CV without completing the program for charts relating to 2012 medical encounters (with 2012 dates of service).

212.    UnitedHealthcare Medicare & Retirement and Optum imposed several arbitrary exclusionary rules to improperly disqualify many medical records reviewed as part of their Chart Review Program from their Claims Verification Program.  For medical records for encounters in 2011 and 2012, they arbitrarily and improperly excluded numerous medical records from Claims Verification.  For example, they excluded numerous charts from Claims Verification because the image of the chart was purportedly "unavailable."  Yet, when making ADDS in the Chart Review Program, the image of the chart or chart itself must have been available.  But, instead of locating the

images or obtaining the charts for Claims Verification, they decided not to re-review the
charts to save those diagnoses invalided by the results of their Chart Review Program.
They also did not delete those invalid diagnoses.

213.   The re-reviews conducted as part of the Claims Verification Program did not save
as many deletes as UnitedHealthcare Medicare & Retirement would have liked and, in
2013, Theisen and others at UnitedHealthcare Medicare & Retirement became
increasingly concerned about the financial impact of the deletes.  UnitedHealthcare
Medicare & Retirement decided that its coders were not saving enough "potential
deletes."  Accordingly, sometime in 2013, UnitedHealthcare Medicare & Retirement
decided that a third review or a re-re-review of the medical records had to be conducted
to try to save more deletes.

214.   Thus, if Optum's internal coders were unable, despite their best efforts, to "save" a
diagnosis code, Optum sent that code to a coding consultant for re-re-review.  Optum
knew, however, that the consultant engaged in a pattern of "saving" diagnoses without
supporting medical records in several circumstances, including when the chart was
scanned illegibly, when pages were missing from a chart and the diagnosis could not be
validated, and when the reported date of service did not appear in the chart.  By
accepting validation of these diagnoses without supporting medical records, Optum
knowingly and improperly avoided its and UnitedHealthcare Medicare and Retirement's
obligation to return monies wrongfully obtained from the Medicare Program.

215.   In November 2013, Donald James, then Director of Program Strategy for Optum
in Santa Ana, California, reported to senior management that the Claims Verification
Program had not yet started for charts reviewed as part of the 2013 Chart Review
Program.  In December 2013, Patty Brennan, then also in the Optum Santa Ana office,
reported to Dumcum that "[h]alf of the CV volume for 2012 DOS has been completed
but deletes are on hold."  She also informed him that UnitedHealthcare Medicare &
Retirement "[r]equested all CV deletes be held until further noticed so Ops is not going
to complete the second half of the volume at this time."

216.    When Steve Nelson became the Chief Executive Officer of UnitedHealthcare Medicare & Retirement in early 2014, he spoke with Steve Hemsley, then Chief Executive Officer of UHG, about whether UnitedHealthcare Medicare & Retirement should continue the Claims Verification Program.  Hemsley encouraged Nelson to look into whether or not it should do so, formulate an opinion, and report back to him.

217.    In February 2014, Marc Beckmann, then in the Finance – Risk Adjustment Analysis Group at UnitedHealthcare Medicare & Retirement, sent information about CV liability accruals to Daniel Schumacher, the Chief Financial Officer of Defendant UnitedHealthcare, and Brian Thompson, the Chief Financial Officer for UnitedHealthcare Medicare & Retirement.  He estimated that the effect of Claims Verification on UnitedHealthcare Medicare & Retirement's revenue would be $208 million for payment year 2012, $125 million for payment year 2013, and either $125 million or $175 million (depending on the number of charts reviewed) for payment year 2014.  This information was also provided to other individuals at UnitedHealthcare Medicare & Retirement including, but not limited to, Jay Matushak, Marybeth Meyer, and Kyle Anderson.

218.    On March 3, 2014, Jon Bird, the Optum Senior Vice President of Risk and Quality Analytics, participated in a meeting with Brian Thompson about the CV liability accrual for 2013.  Thompson wanted to "move toward the more conservative range of the confidence interval (from 50% to 80%) resulting in [a] $29M higher CV estimate" for the liability accrual.  By March 3, 2014, UnitedHealthcare Medicare & Retirement's estimate of its CV liability accrual for 2013 already had been increased by over $50 million dollars from $125 million to $180 million.

219.    Also, in February or March 2014, the financial managers at UnitedHealthcare Medicare & Retirement, including Brian Thompson, performed a comparison of their then-expected revenues for 2014 with the revenue estimated in UnitedHealthcare Medicare & Retirement's annual budget for 2014.  They determined that there was going

to be a shortfall in their financial performance relative to that budget and they started to think about ways to eliminate the shortfall.

220.   In March 2014, Thompson sent Nelson "a current brain dump of 'shut off/stop doing' that is not yet valued/included in the road back to plan."  Part of the "brain dump" was to "shut off" or reduce compliance efforts.  Thompson asked others at UnitedHealthcare Medicare & Retirement for other "shut offs."

221.   Subsequently in March 2014, Marybeth Meyer, who ran the risk adjustment team at UnitedHealthcare Medicare & Retirement, reported to Thompson that the "CV estimate of $125M may be light (estimate for 2012 DOS/2013 payment year of $167M)."

222.   In late March or early April 2014, Nelson met with other Chief Executive Officers at Defendant UnitedHealthcare to discuss UnitedHealthcare Medicare & Retirement's financial performance.  A very detailed slide deck was created for that meeting.  The slide deck was sent by Schumacher to senior executives at UnitedHealthcare, including Gail Boudreaux (who reported to Hemsley), Nelson, Brian Thompson, and Paul Balthazor.  The slide deck highlighted that UnitedHealthcare Medicare & Retirement was projecting that its actual revenues for 2014 were going to miss the target set forth in the annual budget by half of a billion dollars.  It stated:  "Best estimate of $500 million budget miss."  It also stated that, because of that projected miss, UnitedHealthcare Medicare & Retirement's management was making a commitment to the senior executives to "find $250 million to cut miss in half."  UnitedHealthcare Medicare & Retirement referred to this "Management Commitment" as a $250M "good guy."

223.   Nelson and others, including Boudreaux (who reported to Hemsley), knew that, if UnitedHealthcare Medicare & Retirement terminated the Claims Verification Program, it could reduce the $500 million budget miss by not deleting the provider-reported diagnoses invalidated by its chart reviews and reversing the CV liability accruals.  This was their "good guy."  But, it appears that UHG, UnitedHealthcare, and Optum were concerned about the consequences of terminating the program and reverting to ignoring

the negative results of their chart reviews.  They decided to ask CMS about the retroactivity of a proposed regulation requiring MA Organizations to design all medical record reviews to validate diagnoses submitted to CMS.

224.   Under Hemsley's direction, Larry Renfro, the Chief Executive Officer of Optum, contacted senior government employees at CMS, including the Administrator of CMS, to ask whether the Defendants had a legal obligation to perform Claims Verification before the effective date of the proposed rule.  These employees were not government attorneys and could not render the requested legal advice.  Renfro, moreover, knew nothing about the UHG Managing Defendants' Chart Review and Claims Verification Programs and could not impart any meaningful information about these programs to the government employees.  Accordingly, Renfro could not and did not provide the senior government employees with any description of the Claims Verification Program or its purpose.  Hemsley and his attorneys, however, continued to push Renfro to make further contacts with these government employees when UHG, UnitedHealthcare, and Optum did not obtain from these government employees the legal opinion they wanted.

225.   On or before April 8, 2014, Renfro asked Karen Erickson, an Optum executive who worked directly for him, for speaking points for a call with the Administrator of CMS.  On April 8, 2014, Erickson sent Renfro's assistant, Juliet Domb, "aspirational" talking points, that is, things that they wanted Renfro to get the CMS employees to say, including "CV is not currently required" and that Defendants were "allowed to stop any CV activities (including delete submission) currently underway." (Emphasis in the original.)  In her email, Erickson told Domb:  "I sent this to Marianne [Short] and Matt Shors for editing – they will send final directly, and they know it has to be today."  The same day, Renfro spoke to Hemsley and Short to obtain direction about what he should say to the Administrator of CMS on the call that he had scheduled with the Administrator.  Renfro then purportedly spoke with the CMS Administrator and purportedly dictated notes of the call to Domb, who wrote the notes by hand on Renfro's

notepad and sent them to Short.  According to Renfro, he dictated these notes from memory and he does not usually take notes, but was asked to do so by Short.

226.   On April 26, 2014, Short asked Renfro to again contact the Administrator of CMS. According to Brian Thompson (the Chief Financial Officer of UnitedHealthcare Medicare & Retirement in 2014), Renfro had not obtained the "clarity" they wanted from the Administrator about whether they were obligated to perform Claims Verification.  Accordingly, on April 27, 2014, Renfro sent an email to the Administrator asking the same questions he had purportedly asked her on April 8 and to which she purportedly had responded on April 8.  He also asked for a meeting with other employees at CMS who were responsible for operating the MA Program.  On April 27, 2017, Renfro reported to Hemsley and Short that CMS was arranging for the UHG Managing Defendants to meet with these employees.  On April 29, 2014, Hemsley sent UnitedHealthcare's attorney, Thad Johnson, to Washington, D.C. to speak with those CMS employees responsible for the MA Program, including Cheri Rice, the Director of the Medicare Plan Payment Group at CMS.  Nelson, Schumacher, and an Optum executive, Karen Erickson, also attended the meeting.  At the meeting, when the UHG Managing Defendants informed CMS about the possibility of terminating their Claims Verification Program, CMS told them that they had a statutory obligation to report and repay the Medicare Program for erroneous risk adjustment payments and that there were FCA implications if they failed to do so.  CMS also told the UHG Managing Defendants that they could not ignore information in their possession showing that diagnoses may be invalid and that they were obligated to delete invalid diagnoses.  According to Erickson, CMS told the UHG Managing Defendants that "if there was reason to have knowledge that something had been begun and we were [*i.e.*, Defendants were] far enough along that there was knowledge that something might not be supported that we needed to continue the investigation into those numbers, or those codes."  Erickson further recalled CMS stating that, if they had "knowledge of things that might not be supported we [*i.e.*, the Defendants] needed to continue the investigation."  According to Schumacher, CMS

111

1   also told them that CMS did not have sufficient information about the Claims

2   Verification Program to provide further guidance.

3   227.   On April 30, 2014, Nelson sent an email to Cheri Rice at CMS about the meeting

4   between the UHG Managing Defendants and CMS on April 29, 2014.  He stated: "[A]s

5   we discussed yesterday, CMS recently issued a proposed rule that would, if finalized,

6   require MA plans to design any medical record reviews to determine the accuracy of risk

7   adjustment diagnoses associated with those records.  During our conversation yesterday

8   and other recent conversations, CMS confirmed to us that these requirements do not

9   apply until the effective date of the rule, and that MA plans are thus not currently

10  required to design their medical record reviews to determine the accuracy of risk

11  adjustment diagnoses.  We currently have a process through which we review certain

12  medical records to determine the accuracy of risk adjustment diagnoses and submit

13  appropriate deletes.  This process already has resulted in the identification of and, in

14  some instances, the submission of deletes for 2012 dates of service.  But based on the

15  proposed rule, including the preamble, and recent conversations with CMS, we

16  suspended that process for 2012 dates of service while we consider whether to make

17  changes.  Pursuant to our discussion, however, we will soon submit for deletion those

18  diagnosis codes that have undergone a complete review and that we have therefore

19  identified as appropriate deletes.  In the near future, we will determine whether to

20  continue our review process for the diagnosis codes which were still under review at the

21  time we suspended our process.  In the meantime we will not delete these codes."

22  228.   On May 2, 2014, Cheri Rice replied to Nelson's email:  "[R]egardless of the

23  effective date of the proposed requirement related to medical record reviews, there are

24  other laws that do impose standards, requirements and responsibilities on MA plans in

25  connection with the federal payments they receive from CMS.  We cannot provide

26  advice to United about the scope of those other laws.  Nor can we provide advice on

27  whether United's plan[ned] course of action and/or purported limits on the scope of its

28  [Risk Adjustment Attestation, submitted April 30, 2014] are compliant with such other

112

laws.  Your statement concerning the data submissions that have already been made and United's plans for future action will be included in our records and we will proceed with our evaluation and use of the risk adjustment data consistent with 42 CFR § 422.308, § 422.310, and other applicable law."

229.   According to Schumacher and Nelson, Rice's May 2, 2014 email did not say anything that was inconsistent with what CMS said in the meeting on April 29, 2014. After Rice sent her May 2 email, the Department of Justice sent a letter to Defendants' counsel emphasizing that the FCA is one of the "other laws" that imposes standards, requirements, and responsibilities on MA Organizations and Related Entities in connection with the federal payments received from the Medicare Program.

230.   On May 5, 2014, Jay Matushak informed Jeffrey Putman, UHG's Controller who reported to Hemsley, and others (including Schumacher and Brian Thompson) that "M&R CV delete, good guy, is ~$250M for the year (note this is just the M&R piece and there is an incremental component at C&S)."  On the same date, Brian Thompson also informed Putnam and others (including Matushak and Schumacher) that UnitedHealthcare Medicare & Retirement had "not made a final determination to our CV policy," "[o]ur RAF counsel will make that determination," and that "determination will not occur until later in May most likely."  According to Schumacher, the $250 million was the estimated amount of the deletes from Claims Verification for 2014 and prior years and, thus, the CV liability accruals that had been recorded for 2014 and prior years. The "good guy" was the hoped-for release or reversal of those accruals. UnitedHealthcare Medicare & Retirement knew the accruals were likely underestimated and the financial impact likely greater if it did not terminate the Claims Verification Program.

231.   Despite CMS' warnings in the April 29 meeting and Cheri Rice's May 2 email, Nelson, Schumacher, and Brian Thompson decided to go forward with the idea of terminating the Claims Verification Program.  This decision was reported to Hemsley

1  and, according to Nelson, Hemsley could have reversed this decision but instead he
2  supported it.

3  232.   Despite the warnings, UnitedHealthcare Medicare & Retirement also decided not
4  to delete or otherwise report to CMS at least 100,000 invalid diagnoses about which it
5  had *actual* knowledge based on more than one review of the patients' medical records
6  for encounters in 2011 and 2012 (*i.e.*, encounters with 2011 and 2012 dates of service).
7  The single damages to the Medicare Program arising from its submission of and failure
8  to delete just these invalid diagnoses is approximately $190 million under Part C alone.

9  233.   After they terminated the Claims Verification Program, UnitedHealthcare
10  (including UnitedHealthcare Medicare & Retirement and UnitedHealthcare Community
11  & State) and Optum reverted to "looking one way" at the results of their chart reviews,
12  making only ADDS, and knowingly and improperly failing to delete invalid provider-
13  reported diagnoses and repay the Medicare Program for them.

14  234.   At the time they decided to terminate the Claims Verification Program, Steve
15  Nelson, Dan Schumacher, and Brian Thompson knew that their decision would enable
16  UnitedHealthcare Medicare & Retirement to reverse its CV liability accruals by more
17  than $250 million dollars.  Hemsley also was aware that terminating Claims Verification
18  would enable UnitedHealthcare Medicare & Retirement to achieve this financial benefit.
19  This was important to all of them because they wanted to represent to investors that
20  UnitedHealthcare Medicare & Retirement's actual revenues were on target.  An internal
21  document relating to their second quarter 2014 "earnings release" issued in July 2014
22  states:  "Q2 was on track and we are building momentum that will take us through the
23  year and into 2015. *Internal:  Important to note that 2014 benefits from the one-time*
24  *claims verification policy change which investors are unaware of*."  (Emphasis in the
25  original.)  On July 11, 2014, this internal document was sent to Nelson and Thompson,
26  among others.

27

28

**D.    United Failed to Delete Diagnoses Invalidated By Its Own Chart Review Program**

235.   The results of the UHG Managing Defendants' national Chart Review Program provided them information about a significant number of invalid provider-reported diagnoses that should not have been, but were, submitted by them on behalf of the Defendant MA Organizations to the Medicare Program for risk adjustment payments. For example, for the 2011 payment year (involving payments based on diagnoses with 2010 dates of service), UnitedHealthcare Medicare & Retirement and Optum submitted at least 197,000 diagnoses that were invalidated by the medical record reviews conducted as part of their Chart Review Program.  But, for that year, they deleted only a very few (only about 1,800) of these invalid diagnoses based on the results of Phase II of the Claims Verification Program.  For the 2012 payment year (involving payments based on diagnoses with 2011 dates of service), UnitedHealthcare Medicare & Retirement and Optum submitted at least 222,329 diagnoses that were invalidated by the medical record reviews conducted as part of their national Chart Review Program.  Based on the results of the Claims Verification Program for charts with 2011 dates of service, they deleted approximately 120,000 of these invalid diagnoses despite their arbitrary exclusionary rules and attempts to save these deletes.  For the 2013 payment year (involving payments based on diagnoses with 2012 dates of service), UnitedHealthcare Medicare & Retirement and Optum submitted at least 285,122 diagnoses that were invalidated by the medical record reviews conducted as part of their national Chart Review Program. Based on the results of the Claims Verification Program for charts with 2012 dates of service, they deleted approximately 27,000 of these invalid diagnoses despite their arbitrary exclusionary rules, multiple attempts to save these deletes, and failure to complete the program.  For the 2014 payment year (involving payments based on diagnoses with 2013 dates of service), UnitedHealthcare Medicare & Retirement and Optum submitted at least 199,039 diagnoses that were invalidated by the medical record reviews conducted as part of their Chart Review Program.  Because UHG,

UnitedHealthcare, and Optum terminated the Claims Verification Program, they did not delete any of these invalid diagnoses.  These numbers apply to invalid diagnoses relating to risk adjustment payments under Part C only and not also Part D.

236.   Accordingly, the UHG Managing Defendants knowingly and improperly failed to delete or otherwise repay Medicare for most of the diagnoses invalidated by their national Chart Review Program over the last decade.

237.   For example:  for the 2011 payment year, they failed to repay the Medicare Program at least $377,734,792 by failing to look both ways and delete diagnoses invalidated by the Chart Review Program; for the 2012 payment year, they failed to repay the Medicare Program at least $213,978,134 by failing to look both ways and delete diagnoses invalidated by the Chart Review Program; for the 2013 payment year, they failed to repay the Medicare Program at least $317,329,602 by failing to look both ways and delete diagnoses invalidated by the Chart Review Program; and for the 2014 payment year, they failed to repay the Medicare Program at least $234,159,775 by failing to look both ways and delete diagnoses invalidated by the Chart Review Program. These numbers apply to the failure to make repayments relating to risk adjustment payments under Part C only and not also Part D.

238.   Examples of beneficiaries with invalid diagnoses about which Defendants knew but failed to delete based on its Chart Review Programs for payment years 2011 through 2014 are set forth in Exhibit 13 to this Complaint.

### III.    The RACCR Program

239.   The UHG Managing Defendants (which, in this section, refers to Ingenix or Optum, depending on the time period, and Ovations or UnitedHealthcare Medicare & Retirement, depending on the time period) negotiated agreements with some of the largest healthcare provider groups that tied the provider groups' compensation to their beneficiaries' risk scores.  The UHG Managing Defendants knew that this compensation structure created a financial incentive for the provider groups to increase the number and severity of diagnoses they reported and to report invalid diagnoses.  Nonetheless, while

1   the UHG Managing Defendants were scouring millions of medical records through the
2   Chart Review Program to identify additional diagnoses and increase their revenue, their
3   effort to identify the invalid codes submitted by these incentivized providers was limited
4   to the RACCR Program.  Moreover, the UHG Managing Defendants designed and
5   implemented the RACCR Program to limit its scope and to minimize the number of
6   invalid diagnoses for which the UHG Managing Defendants would have to return
7   overpayments to CMS.  They failed to delete invalid diagnosis codes identified through
8   the RACCR Program, and eventually restructured the RACCR program to become just
9   another program to identify additional diagnoses and to increase revenue, rather than a
10  program to remedy the known problem of invalid coding by incentivized providers.

A.   **Defendants Knew That Their Financially-Incentivized**
**Providers Were Reporting Invalid Codes**

13  240.   As discussed above, the UHG Managing Defendants entered into financial
14  arrangements with capitated and gainsharing providers that were tied to the risk
15  adjustment payments that the Defendant MA Organizations received from the Medicare
16  Program.  As a result, these providers benefited financially from any increase in risk
17  adjustment payments resulting from the diagnoses they reported to the UHG Managing
18  Defendants for beneficiaries enrolled in the Defendant MA Organizations' Plans.
19  241.   The UHG Managing Defendants knew that these compensation arrangements
20  created a strong financial incentive for these providers to increase the number and
21  severity of diagnoses they reported for each beneficiary, and in some cases to report
22  invalid diagnosis codes.
23  242.   Early on, Ingenix implemented the Internal Data Validation ("IDV") reviews
24  discussed earlier in this Amended Complaint.  In or about 2010, Ovations (or its
25  successor, UnitedHealthcare Medicare & Retirement) and Ingenix expanded and
26  changed the name of that program to RACCR.  Ingenix was responsible for conducting
27  the RACCR Program until Optum succeeded it in 2011, after which Optum was
28  responsible for conducting the program.  Likewise, Ovations was responsible for

117

1   managing the RACCR Program until UnitedHealthcare Medicare & Retirement
2   succeeded it and assumed responsibility for the program in 2010.

3   243.   Although the IDV and RACCR Programs were extremely limited in scope and
4   utility, they confirmed what the UHG Managing Defendants already knew:  that there
5   were serious problems with the diagnoses being reported by a number of the financially-
6   incentivized providers, including WellMed (which UHG acquired in 2011).

7                   **B.     UnitedHealthcare Structured The RACCR Program To**
8                           **Limit The Number Of Invalid Diagnosis Codes It Identified**

9   244.   The UHG Managing Defendants knew they had an obligation to review diagnoses
10  reported by incentivized providers to determine their validity.  In an April 23, 2012
11  email to many United Healthcare executives and managers (including Scott Theisen,
12  Keith Dobbins, Michael McCarthy, and Kimberly Halva), Mary Hammond, one of the
13  UnitedHealthcare employees who oversaw the RACCR program, described RACCR as
14  "an important part of Medicare & Retirement's efforts to meet CMS requirements to
15  submit accurate risk adjustment data."  Later, in a June 22, 2012 agenda for a meeting
16  attended by Keith Dobbins, Kim Halva, Benjamin Poehling, and others, Mary Hammond
17  stated that the answer to "Why RACCRs?" was that "We have an obligation to submit
18  accurate Dx data to CMS."

19  245.   Despite the UHG Managing Defendants' understanding that the RACCR Program
20  was part of UHG's effort to comply with CMS's accuracy requirements, they structured
21  the RACCR Program to limit its utility in identifying invalid diagnosis codes.  There
22  were various fundamental limitations on the RACCR Program.

23  246.   First, the UHG Managing Defendants excluded from their RACCR Program any
24  incentivized providers who cared for fewer than 500 beneficiaries in a Plan.  This
25  resulted in the exclusion of approximately 40 percent of the financially-incentivized
26  providers from the RACCR Program for medical encounters in 2008, 2009, and 2010
27  (*i.e.*, with dates of service in those years).

28

247.    Second, for the incentivized provider groups with 500 beneficiaries or more, the UHG Managing Defendants did not review the medical documentation for any diagnoses unless the provider group was an extreme outlier in reporting diagnoses that mapped to one or more HCCs.  For medical encounters in 2008, 2009, and 2010 (*i.e.*, with dates of service in those years), the UHG Managing Defendants defined an outlier as a provider that reported diagnoses mapping to a particular HCC more than three times as often as the average national prevalence rate for that HCC for all beneficiaries in the Defendant MA Organizations' MA Plans.  For example, if 15 percent of the beneficiaries in these MA Plans nationwide were reported by providers to have a diagnosis that mapped to HCC 52 (Drug/Alcohol Dependence), the UHG Managing Defendants did not consider the incentivized provider an outlier unless it reported diagnoses mapping to HCC 52 for more than 45 percent of its patients enrolled in a Defendant MA Organization's Plan.  Combined with the exclusion of providers with less than 500 beneficiaries, this resulted in a total exclusion of over 80 percent of the financially-incentivized providers for medical encounters in 2008, 2009, and 2010.

248.    For medical encounters in 2011 and 2012, the UHG Managing Defendants further limited which providers would qualify as outliers in order to reduce the number of providers and HCCs subject to review.  Instead of using a national average prevalence rate for each HCC based on diagnoses reported by *all* of the providers in the Defendant MA Organizations' MA Plans, the UHG Managing Defendants used the average rate at which only financially-incentivized providers reported diagnoses mapping to each HCC.  Thus, an incentivized provider was considered an outlier only if it reported diagnoses mapping to an HCC greater than two standard deviations above the rate that the HCC was coded by other incentivized providers, that is, providers who *also* had a financial incentive to invalidly code.

249.    A large percentage of the outliers were located in the Central District of California.  They are listed in Exhibit 14 to this Complaint.

250.   Third, after limiting the program to only extreme outliers, the UHG Managing Defendants conducted an initial review of just a small sample of beneficiaries for whom the provider had reported diagnoses mapping to the outlier HCC or HCCs (as used herein, an "outlier HCC" is one that meets the criteria identified in Paragraphs 246 and 247 above for a particular provider and a particular encounter year).  For medical encounters in 2008, 2009, and 2010, the initial sample size for even the largest provider groups was never more than 30 beneficiaries per outlier HCC, and was often as few as 10 beneficiaries per outlier HCC.  The UHG Managing Defendants purposefully kept the sample size small to ensure the samples were not statistically significant, in the hope of preserving the ability to argue later that they were unable to extrapolate the results of their sample reviews to all of the diagnoses reported by the provider that mapped to the outlier HCC.  For 2011 and 2012 medical encounters, the UHG Managing Defendants increased the initial sample size to 50 beneficiaries per provider for each outlier HCC.

251.   Fourth, after reviewing the medical records for the beneficiaries in the sample to determine if the diagnoses were valid, the UHG Managing Defendants gave a provider a "passing" grade if anything less than 20 percent of the diagnoses were determined to be invalid.  Accordingly, even if 19 percent of the diagnoses in the sample were invalid, the provider passed and no further review was conducted.

252.   Fifth, if a provider failed the initial review for a particular outlier HCC, the UHG Managing Defendants often added only a few additional beneficiaries to the sample (*i.e.*, additional beneficiaries for whom the provider had reported diagnoses mapping to the outlier HCC).  The UHG Managing Defendants called this slightly larger sample an "incremental sample."  If they were successful in decreasing the invalidation rate to below 20 percent based on increasing the sample size, the UHG Managing Defendants considered the provider group to have a passing grade for that HCC.  Accordingly, if 19 percent of the diagnoses in the "incremental sample" were invalid, the provider passed and no further review was conducted.

253.   Sixth, when the UHG Managing Defendants determined that a provider failed the incremental sample review for an outlier HCC, their RACCR policy specified that, with limited exceptions, *all* diagnoses reported by that provider mapping to the outlier HCC should be reviewed.  In other words, once it was established that a provider reported diagnoses mapping to a particular HCC three times or more than the national average *and* that 20 percent or more of the diagnoses in a sample review were not supported by the beneficiaries' medical records *and* that increasing the sample size did not reduce the percentage of unsupported codes, even the UHG Managing Defendants recognized that, with limited exceptions, a complete review of the medical records for all beneficiaries for whom the provider had reported diagnoses mapping to the outlier HCC was essential. But in most cases, the UHG Managing Defendants did not conduct these 100 percent reviews themselves.  Instead, as part of the RACCR Program, the UHG Managing Defendants purported to require the financially incentivized providers – the very providers who had over-reported the diagnoses at issue – to conduct these 100 percent reviews.

### C.   Despite Its Limited Scope, The RACCR Program Confirmed That Financially Incentivized Providers Were Submitting Invalid Diagnosis Codes

254.   Despite the many flaws of the RACCR Program, the UHG Managing Defendants knew from the results of their small sample reviews and the 100 percent reviews that were actually conducted that significant problems existed with diagnoses reported by financially-incentivized providers.

255.   By the end of March 2011, the UHG Managing Defendants were analyzing final results of RACCR sample analyses for encounters in 2008 and 2009, and had determined that a majority of the outlier HCCs analyzed in those years had validation rates below 80 percent, according to a March 29, 2011 email and spreadsheet that Benjamin Poehling sent to Paul Bihm.

256.   By mid-February 2012, the UHG Managing Defendants reviewed samples for encounters in 2010 and, again, found a substantial number of outlier HCCs that had validation rates below 80 percent, according to a February 13, 2012 email and supporting materials that Mary Hammond sent to Benjamin Poehling.

257.   Overall, for the sample reviews for 2008, 2009, and 2010 encounters, nearly half (49.61 percent) of the outlier HCCs reviewed failed the 80 percent validation test.  Over a third (37.01 percent) of all sampled diagnoses were not supported by the beneficiaries' medical records.  On April 23, 2012, Mary Hammond reported to numerous of the employees of the UHG Managing Defendants (including Scott Theisen, Michael McCarthy, Kimberly Halva, Keith Dobbins, and others) that Optum had calculated the final results for samples from encounters in 2008, 2009, and 2010, and had identified the providers who had failed the 80% validation test.

258.   For the sample reviews for 2011 encounters, more than half (57.34 percent) of the outlier HCCs reviewed failed the 80 percent validation test, and over 30 percent of all sampled diagnoses reviewed for that year were not supported by the beneficiaries' medical records, according to an August 8, 2013 email and supporting documentation from Optum's Tracey Bradberry to Scott Hughes at Optum and Melissa Ferron, the President of iCodify, a diagnosis coding consultant.

259.   For the sample reviews for 2012 encounters, more than half of the outlier HCCs failed the 80 percent validation test, and more than a third (38 percent) of all sampled diagnoses were invalid, according to a July 2, 2014 presentation by Marybeth Meyer.

260.   The problems with incentivized providers' invalid diagnoses were not isolated incidents, but in many circumstances reflected a clear pattern of miscoding by provider groups.  Although the UHG Managing Defendants purposefully reviewed only a small sample of medical records each year, they knew that certain provider groups were consistently identified as extreme outliers on certain HCCs and failed the 80 percent sample validation test year after year.  For example:

1  •  Every year from 2008 through 2011, Edinger Medical Group was an

2 extreme outlier for Spinal Cord Disorders/Injuries (HCC 69).  Over those four years,

3 Optum (or its predecessor, Ingenix) reviewed medical records for a total of 126

4 beneficiaries that Edinger diagnosed with Spinal Cord Disorders/Injuries and determined

5 that the medical records of only *two* of those beneficiaries actually supported those

6 diagnoses.  (Under the RACCR Program, Edinger or the UHG Managing Defendants

7 should have conducted 100 percent reviews of its diagnoses that mapped to this HCC for

8 the years 2008 through 2011, but they did not do so.)

9  •  Every year from 2008 through 2012, HealthCarePartners was an extreme

10 outlier for Drug/Alcohol Psychosis (HCC 51).  During those five years,

11 HealthCarePartners's highest sample validation rate for this HCC was 57.14 percent.

12 HealthCarePartners conducted 100 percent reviews for 2008, 2009, and 2011, and even

13 HealthCarePartners recognized that over a third of the diagnoses it reported were not

14 supported by its medical records.  (Under the RACCR Program, HealthCarePartners or

15 the UHG Managing Defendants should have conducted 100 percent reviews for 2010

16 and 2012, but they did not do so.)

17  •  Every year from 2008 through 2012, a provider named CAIPA was an

18 extreme outlier for Chronic Hepatitis (HCC 27).  During those five years, CAIPA's

19 highest sample validation rate for this HCC was 76.92 percent.  CAIPA conducted 100

20 percent reviews for 2008 and 2009 encounters, and its highest self-audit validation rate

21 was 56.73 percent.  (Under the RACCR Program, CAIPA or the UHG Managing

22 Defendants should have conducted a 100 percent reviews for 2010 through 2012, but

23 they did not do so.)

24  •  Every year from 2008 through 2012, Hemet Community Medical Group

25 was an extreme outlier for Spinal Cord Disorders/Injuries (HCC 69).  During those five

26 years, Hemet's highest sample validation rate for this HCC was 50 percent.  Hemet

27 conducted 100 percent reviews for 2008 through 2011, and its highest self-audit

28 validation rate also was 50 percent.  (Under the RACCR Program, Hemet or the UHG

Managing Defendants should have conducted a 100 percent review for 2012, but they did not do so.)

•       Every year from 2008 through 2012, WellMed was an extreme outlier for Disorders of Immunity (HCC 45).  During those five years, WellMed's highest sample validation rate for this HCC was 56.00 percent.  WellMed conducted 100 percent reviews for 2008, 2009 and 2011, and its highest self-audit validation rate was 63.64 percent.  (Under the RACCR Program, WellMed or the UHG Managing Defendants should have conducted a 100 percent review for 2010 and 2012 encounters, but they did not do so.)

261.   In those cases in which providers performed 100 percent reviews, the results confirmed that the providers had initially submitted numerous invalid codes.  Marybeth Meyer and Scott Hughes's RACCR tracking spreadsheet indicated that more than 65 percent of the HCCs that providers reviewed in conducting 100 percent reviews had validation rates below 80 percent.  The RACCR "master tracking" documents that Hughes updated regularly for Marybeth Meyer from 2013 through 2015 showed that validation rates for problematic HCCs did not improve over time.

262.   The UHG Managing Defendants' executives were routinely informed of RACCR results.  Beginning in 2011 and until at least 2014, the UHG Managing Defendants held frequent meetings – usually weekly – concerning the status of the RACCR Program and its results, with regular attendance by those responsible for the RACCR Program (including, at various times, Kim Halva, Keith Dobbins, Marybeth Meyer, Benjamin Poehling, Patty Brennan, Mary Hammond, Scott Hughes, and Pam Thomsen).  During these meetings, participants discussed the status and results of RACCR reviews, coding results for individual practice groups, provider meetings to discuss results and 100 percent reviews, how 100 percent reviews would be handled in cases of provider resistance, the financial impact of RACCR reviews, and changes to the RACCR Program.

263.   At least as early as February 14, 2012, Scott Theisen, Mary Hammond, and Benjamin Poehling met to discuss the deletion of codes resulting from the IDV and RACCR Programs for encounters in 2008, 2009, and 2010, and whether those deletions had been submitted.  In March 2012, Theisen asked Hammond, Dumcum, Poehling, and Paul Bihm to pull together summary data concerning RACCR sample results for discussions with the incentivized providers.  Theisen continued to be actively involved with some of the large incentivized providers that month, reviewing HealthCarePartners' results with Hammond and asking Hammond to identify the volume of codes that might be reviewed if WellMed were asked to do a 100 percent review so that he could provide a "worst case" scenario to John Way.  In April 2012, Poehling updated Way regarding the status of WellMed's RACCR review, and Kimberly Fadden wrote to a number of employees of the UHG Managing Defendants, including Jeff Dumcum, Stephanie Will, and Jon Bird, noting that, among other things, there were then 40 to 42 provider groups in the 100 percent review process.  The UHG Managing Defendants continued to provide periodic overviews or status updates concerning the RACCR Program to their executives and responsible employees.  For example, in October 2013, Hammond sent Karen Erickson, Jon Bird, Scott Theisen, Jeff Dumcum, Patty Brennan, Marybeth Meyer, and others a "two-page detailed document that outlines the status, by provider group and year, of the 2008-2012 RACCR program."

264.   The UHG Managing Defendants also kept their financial teams apprised of the status of the RACCR Program so that they could monitor, report, and account for its financial impact.  For example, at some time before April 4, 2012, Jon Bird and Scott Theisen began discussing a rough estimate of the financial impact of the deletion of diagnosis codes as a result of RACCR.  Theisen, Jon Bird, Bill Hnath, Melissa Sedor, and others also attended a December 3, 2012 meeting discussing, among other things, the financial effect of the IDV (*i.e.*, RACCR) Program, including the deletion of thousands of diagnosis codes as a result of that program.  As set forth in more detail below, the UHG Managing Defendants' financial teams, including, at various times,

1   Theisen, Brian Thompson, Sedor and Hnath, also calculated liability accruals that

2   UnitedHealthcare Medicare & Retirement  took in 2012 and 2013 to account for the

3   financial effect of the diagnosis codes that would have to be deleted as a result of the

4   RACCR Program.

### D.   UnitedHealthcare Knew It Was Obligated To Delete Invalid Diagnosis Codes Identified Through The RACCR Reviews

265.   The Managing Defendants knew that they were required to submit accurate diagnosis data to the Medicare Program.  First, as described above, many of those executives understood that RACCR was an important part of UnitedHealthcare Medicare & Retirement's efforts to meet CMS's requirements regarding the submission of accurate risk adjustment data, which necessarily implied the correction of inaccurate data identified through the program.

266.   Second, the UHG Managing Defendants' conduct demonstrated their knowledge that they were required to delete invalid diagnosis codes identified through the RACCR Program.  From 2012 through 2015, the Managing Defendants deleted – albeit belatedly – many invalid diagnosis codes submitted to CMS for encounters from 2008 through 2013, after determining, through the RACCR Program, that those codes were invalid.

267.   Third, UnitedHealthcare Medicare & Retirement's practice of booking contra-revenue accruals for the value of the deletions it had to submit as a result of the RACCR Program demonstrated that the UHG Managing Defendants knew of their obligation to return overpayments discovered through that program to the Government.  Pursuant to Statement of Financial Accounting Standards No. 5, *Accounting for Contingencies*, an estimated loss from a loss contingency shall be accrued by a charge to income if both: (a) a liability or impairment of an asset is "probable"; and (b) the amount of the loss can be reasonably estimated. Thus, the accrual of loss contingencies relating to RACCR reflected an acknowledgement that the return of an overpayment to the Government was

"probable," and that UnitedHealthcare could reasonably estimate the amount of the overpayment to be returned.

268.   Beginning in 2012, UnitedHealthcare began taking liability accruals to account for changes in its revenue that it expected to incur as a result of deletion of invalid codes identified through the RACCR Program.  By end of year 2012, it calculated that it would have to reduce its revenue by $79 million to account for its deletion of invalid codes resulting from RACCR reviews (including expected 100 percent reviews) of medical encounters in 2008, 2009, and 2010.  That $79 million was less than the total amount of overpayment that it estimated it owed the United States, since it included both a reduction in revenue resulting from the expected return of the overpayment and an offset for the amount of money that it expected to recover from the incentivized providers, which would have to share a portion of the burden of overpayment.

269.   Accordingly, UnitedHealthcare took a liability accrual of $79 million.  It shared this calculation with Deloitte and Touche in connection with that firm's audit of UHG's financial statements, as part of UnitedHealthcare's quarterly RAF Accounting Treatment for Q4 2012 and Risk Adjustment Factor Revenue and Receivable Accounting for 2012. Bill Hnath and Melissa Sedor told UHG's Deloitte auditors that the $79 million liability accrual was "related to overpayments by CMS" that were identified through the RACCR Program.

270.   Scott Theisen was aware of the existence of a RACCR liability, and the expectation that UnitedHealthcare would take an accrual for it, at least as early as October 9, 2012, when Melissa Sedor sent him and Bill Hnath an August 2012 RAF Financial Summary showing a $97.5 million exposure (*i.e.*, amount of overpayment to be returned) relating to the RACCR Program for encounters in 2008, 2009, and 2010.

271.   In December 2013, Anne Reis, UnitedHealthcare Medicare & Retirement's Associate Director of Revenue, shared risk adjustment accruals with UnitedHealthcare executives, including Scott Theisen, Brian Thompson, Bill Hnath, and Marybeth Meyer. Those accruals included an additional liability accrual of $34.5 million for RACCR

overpayments for the 2012 date of service year (2013 payment year), increasing the total liability accrual for the RACCR Program to $90.7 million for the 2008-2012 date of service years (2009-2013 payment years). In taking a liability accrual for the 2012 date of service year, UnitedHealthcare determined that it was probable that RACCR reviews for the 2012 date of service year would result in the identification of deletes of diagnoses reported by incentivized providers for medical encounters in 2012, as these reviews had done in previous years.

272. The accuracy of the risk adjustment data that UnitedHealthcare and others submitted to CMS on behalf of the Defendant MA Organizations was material to the government's decision to pay and to the amount of risk adjustment payments. The submission of inaccurate diagnosis data from incentivized providers directly resulted in increases in risk adjustment payments that the Government made to the Defendant MA Organizations.

273. Similarly, when the UHG Management Defendants deleted inaccurate diagnoses – as they did when inaccurate diagnoses were identified in sample RACCR reviews or 100 percent reviews under the RACCR Program – the Government was able to offset its subsequent payments to the Defendant MA Organizations by the value of those deletions. UnitedHealthcare Medicare & Retirement's and Optum's failure to delete unsupported codes because of their failure to conduct or complete 100 percent reviews when their sample reviews identified Provider/HCC combinations with unacceptably high error rates was material because if they had conducted the 100 percent reviews and submitted deletes for the inaccurate diagnosis codes found in those reviews, those deletions would have resulted in further offsets and, thus, reductions of payments to the Defendant MA Organizations.

### E. Defendants Failed To Follow Their Own RACCR Protocol Requiring 100 Percent Reviews

274. As set forth above, the RACCR Program provided that if the sample review of an outlier HCC showed that less than 80 percent of the diagnoses were supported by the

128

medical record, the provider would be required to perform a 100 percent review of all instances of that outlier HCC coded by that provider for the date-of-service year at issue. This requirement reflects a recognition by the UHG Managing Defendants that if a provider codes a diagnosis three times as often as the national average rate *and* a sample review shows that more than 1 in 5 diagnoses are not supported by the medical record, then the provider's other uses of the same diagnosis code are highly likely to include invalid diagnoses and must be reviewed for accuracy.  Nonetheless, despite this requirement of the RACCR Program, the UHG Managing Defendants frequently did not require providers to perform 100 percent reviews of problematic HCCs for which sample results showed unacceptably high error rates.

275.   Not surprisingly, many providers were very resistant to performing 100 percent reviews.  Sometimes, the providers reviewed the records for only some, but not all, additional beneficiaries for whom they had reported diagnoses mapping to the outlier HCC.  Sometimes, they did nothing.

276.   For medical encounters in 2008 to 2010, at least 58 provider groups should have performed 100 percent reviews because they failed the sample validation test for at least one outlier HCC.  Combined, these providers should have conducted 100 percent reviews relating to 192 problematic HCCs.  However, the providers only conducted reviews of 143 of the 192 HCCs.  Thus, a quarter of all outlier HCCs that failed the sample validation test were not further reviewed by either the provider groups or UnitedHealthcare.  Similarly, for 2011 encounters, 100 percent reviews were conducted for only 69 of 82 HCCs that failed Optum's sample validation test.  Because the UHG Managing Defendants did not require provider to perform 100 percent reviews of these high-frequency but low-validating codes, they were able to avoid deleting the invalid codes among them.

277.   For example, for 2010 encounters, Edinger Medical Group coded Drug/Alcohol Dependence (HCC 52) at a rate greater than three times the national rate.  Optum (or its predecessor, Ingenix) determined that only 70 percent of the diagnoses in its sample

were supported by medical record documentation.  Because 30 percent of the sampled diagnoses were invalid, the UHG Managing Defendants should have required Edinger to review the additional 66 Edinger beneficiaries with a diagnosis mapping to HCC 52 that were not included in the sample (or the UHG Managing Defendants should have performed that review themselves).  Nonetheless, the UHG Managing Defendants did not require Edinger to do this review and they did nothing further to examine Edinger's additional diagnoses mapping to HCC 52 that were not included in the sample.

278.   Additional examples of provider groups that failed to conduct 100 percent reviews for particular HCCs are shown in the chart attached as Exhibit 15 to this Complaint.  The UHG Managing Defendants also did not conduct the 100 percent reviews of these problematic HCCs.

279.   Moreover, even when a financially incentivized provider group conducted a 100 percent review, the UHG Managing Defendants knew they could not rely on the accuracy of that review.  For example, in a draft "WellMed RACCR Audit Status Summary as of 2-9-12" that Mary Hammond circulated to Benjamin Poehling for discussion with John Way in February 2012, Hammond reported that WellMed did a self-audit for eight HCCs, but that the UHG Managing Defendants determined that "70% of the codes [WellMed] indicated were properly documented actually were not supported in the medical record."  Hammond's summary also stated that, based on sample reviews for medical encounters in 2008, 2009, and 2010, "WellMed failed to achieve an acceptable validation rate for multiple HCCs …, as defined by the RACCR audit program policy and procedure."

### F.   Even After Identifying Miscoding By Providers, Defendants Failed To Delete Invalid Codes

280.   Even when the UHG Managing Defendants determined that diagnoses in a sample review or 100 percent review were not supported by the medical records, UnitedHealthcare Medicare & Retirement did not always delete them.  For example:

- For 2008 medical encounters, the UHG Managing Defendants conducted a sample review for Edinger Medical Group of diagnoses mapping to Drug/Alcohol Dependence (HCC 52) and Major Complications of Medical Care & Trauma (HCC 164). Optum's (or Ingenix's) coders determined that "[t]here was no clinical documentation to support the diagnoses" mapping to HCC 52 for six beneficiaries and that the diagnosis mapping to HCC 164 was the "wrong code" for one beneficiary. (For all examples, further information to identify or aid in identifying the beneficiaries will be separately provided to the Defendants.) On January 23, 2013, Mary Hammond recommended to Keith Dobbins and Marybeth Meyer that these results be put "on hold." The UHG Managing Defendants never deleted these codes.

- For 2008 medical encounters, Optum (or its predecessor, Ingenix) conducted a sample review for Family Practice Medical Group's diagnoses mapping to Drug/Alcohol Dependence (HCC 52). For two beneficiaries, Optum's (or Ingenix's) coder concluded there was "no clinical documentation to support the diagnoses." In the Corrective Action Plan for the sample review, the reviewer gave the provider "the benefit of the doubt" for the two diagnoses, despite noting that "if these were submitted for a CMS or OIG audit, they may have been rejected."

- In a sample review for Sharp-Rees Sealy for Vascular Disease (HCC 105) for 2011, the UHG Managing Defendants failed to delete a diagnosis for Beneficiary AA even though Optum's (or Ingenix's) coder, iCodify, determined it was the "wrong code."

- In a sample review for HealthCarePartners for Protein-Calorie Malnutrition (HCC 21) for 2011, the UHG Managing Defendants failed to delete a diagnosis for Beneficiary BB even though Optum's (or Ingenix's) coder, iCodify, determined it was the "wrong code."

- In a sample review for Mercy Physicians Medical Group for Protein-Calorie Malnutrition (HCC 21) for 2011, the UHG Managing Defendants failed to delete a diagnosis for Beneficiary CC even though Optum's (or Ingenix's) coders, under the supervision of Tracey Bradberry, an Optum Operations Manager, determined that it was the "wrong code."

- In a sample review for WellMed for Major Complications of Medical Care and Trauma (HCC 164) for 2011, the UHG Managing Defendants did not delete a diagnosis for Beneficiary DD even though Optum's (or Ingenix's) coder noted the "dx [was] not documented" in the record.

- In a sample review for HealthCarePartners for Pneumococcal Pneumonia, Emphysema, Lung Abscess (HCC 112) for 2012, the UHG Managing Defendants did not delete a diagnosis code for Beneficiary EE even though Optum's (or Ingenix's) coder determined the "dx [was] not documented."

- In a sample review for WellMed for Disorders of Immunity (HCC 45) for 2011, the UHG Managing Defendants did not delete a diagnosis code for Beneficiary FF even though Optum's (or Ingenix's) coder determined the diagnosis in the record was "not a current condition."

281. For some providers, the UHG Managing Defendants simply agreed not to delete invalid codes. In January 2013, Keith Dobbins was informed that the UHG Managing Defendants had not yet submitted deletes reflecting invalid codes found in RACCR sample reviews of Edinger and WellMed diagnoses for encounters in 2008, 2009, and 2010. Optum kept those deletes "on hold," meaning that the UHG Managing Defendants did not submit them, despite knowledge that the underlying codes had led to improper payments from CMS.

**G.     UnitedHealthcare Medicare & Retirement Discontinued 100 Percent Reviews And Converted The RACCR Program Into A Revenue Generating Program**

282.   By early 2014, UnitedHealthcare Medicare & Retirement knew, based on its observation of the results of the RACCR Program (as set forth above), that many of its large incentivized providers had reported unacceptably high rates of invalid diagnoses for numerous conditions.  However, rather than redoubling its efforts to address invalid coding by incentivized providers, UnitedHealthcare Medicare & Retirement had Optum restructure the RACCR Program to turn it into just another chart review program focused on making ADDS.  By July 2014, Optum made changes to the RACCR Program that effectively terminated the program as a tool for remedying the known problem of invalid coding by incentivized providers and refunding Medicare for risk adjustment payments based on those providers' invalid diagnoses.

283.   First, UnitedHealthcare Medicare & Retirement stopped requiring any 100 percent reviews when the sample reviews failed the 80 percent sample validation test.  At the time it made this decision, it was conducting RACCR sample reviews for 2012 DOS medical encounters.  Accordingly, no 100 percent reviews were conducted for any outlier HCCs associated with 2012 medical encounters.

284.   For 2012 DOS, there were 21 provider groups that had failed the 80 percent sample validation test for at least one outlier HCC.  Optum had determined that the average invalidation rate was 34.73 percent for these 21 providers based on the sample reviews of their outlier HCCs.  The UHG Managing Defendants knew from prior years that 100 percent reviews would result in the identification of more deletes.  Nonetheless, they failed to require 100 percent reviews of the outlier HCCs or perform reviews themselves.

285.   Second, for dates of service years after 2012, the UHG Managing Defendants stopped selecting sample beneficiaries for reviews based on whether the providers had submitted diagnoses for them mapping to outlier HCCs.  Instead, they began selecting

1    beneficiaries and medical records based on what they believed would yield additional

2    codes and result in increased risk adjustment payments.

3    286.   Third, starting with 2013 DOS medical encounters, UnitedHealthcare Medicare &

4    Retirement and Optum reviewed even fewer medical records than in previous years (less

5    than 100 total) for each incentivized provider group.  Thus, they reviewed only several

6    thousand medical records as part of this new program.

7    287.   By making these changes, the UHG Managing Defendants and Optum effectively

8    terminated the RACCR Program as an effort to correct the submission of invalid

9    diagnosis codes.  Instead, they deliberately avoided identifying (and, thus, deleting)

10   invalid diagnoses reported by their financially-incentivized providers and repaying

11   Medicare for risk adjustment payments based on them.

12   288.   Executives at Optum and UnitedHealthcare, including Scott Theisen, Jeff

13   Dumcum, Karen Erickson, Brian Thompson, and Keith Dobbins, were aware that the

14   changes to the RACCR Program for 2013 DOS and future years created a program that

15   no longer targeted outlier HCCs by provider, but instead selected beneficiaries and

16   medical records based on methods that Optum believed would yield additional codes and

17   result in increased risk adjustment payments.  They knew that there was no replacement

18   program put into place to target the outlier HCCs and providers that had previously been

19   identified by the RACCR program. They knew that by stopping its program to look for

20   inaccurate codes, outlier providers who had failed the 80 percent validation tests would

21   continue to submit inaccurate codes to UnitedHealthcare, causing the submission of

22   inaccurate codes to CMS.

23            **H.   RACCR-Related Falsehoods In UnitedHealthcare's And**

24                 **Optum's Attestations**

25   289.   As discussed in more detail below, Defendant UnitedHealthcare, on behalf of the

26   Defendant MA Organizations, submitted a Risk Adjustment Attestation to the Medicare

27   Program each year after the final risk adjustment submission deadline.  *See infra*

28

1   paragraphs 309 to 327.  Defendant Optum approved these Attestations in order for

2   UnitedHealthcare to submit them.  *Id*.

3   290.   In March 2012, Scott Theisen signed an Attestation on behalf of United's

4   Medicare & Retirement health plans certifying to the accuracy of UnitedHealthcare's

5   data for the 2010 date of service year (2011 payment year).  By that date, the members of

6   UHG Management Defendants' RACCR team (including Michael McCarthy, Keith

7   Dobbins, Kim Halva, Benjamin Poehling, and Mary Hammond) knew that the RACCR

8   Program had identified thousands of invalid codes mapping to outlier HCCs from

9   encounters in 2010, that those codes had not yet been deleted, and that efforts were

10  underway to identify the providers that would be required to conduct 100 percent

11  reviews for encounters in 2010 because some of their diagnosis codes did not pass the 80

12  percent sample validation test.

13  291.   In April 2013, Scott Theisen signed an Attestation on behalf of

14  UnitedHealthcare's Medicare & Retirement health plans certifying to the accuracy of

15  UnitedHealthcare's data for the 2011 date of service year (2012 payment year).  By that

16  date, Theisen, along with the members of UHG Management Defendants' RACCR team

17  (including Marybeth Meyer, Keith Dobbins, Kim Halva, Patty Brennan, Benjamin

18  Poehling, and Scott Hughes) knew that the RACCR Program had identified thousands of

19  invalid codes mapping to HCCs from encounters in 2011, that those codes had not yet

20  been deleted, and that efforts were underway to identify the providers that would be

21  required to conduct 100 percent reviews for encounters in 2011 because some of their

22  diagnosis codes did not pass the 80 percent sample validation test.

23  292.   In April 2014, Brian Thompson signed an Attestation on behalf of

24  UnitedHealthcare's Medicare & Retirement health plans certifying to the accuracy of

25  UnitedHealthcare's data for the 2012 date of service year (2013 payment year).  By that

26  date, the members of UHG Management Defendants' RACCR team (including Marybeth

27  Meyer, Keith Dobbins, Kim Halva, Scott Theisen, Scott Hughes, and Tracey Bradberry)

28  knew that the RACCR Program had identified thousands of invalid codes mapping to

1    HCCs from encounters in 2012 through sample reviews, and that those codes had not yet

2    been deleted.  Additionally, Thompson was aware that there was a contra-revenue

3    accrual in the amount of $34.5 million for anticipated RACCR deletes for the 2012 date

4    of service year alone.

### IV.    Defendants' False Risk Adjustment Attestations

5

6    293.    The UHG Managing Defendants submitted or caused the submission, on behalf of

7    the Defendant MA Organizations, of the annual Risk Adjustment Attestations to the

8    Medicare Program after the final submission deadline but before the final reconciliation

9    payment each year.  Officers of Defendants Ovations and UnitedHealthcare reviewed

10   and signed these Attestations.  Defendant Optum and its predecessor Ingenix reviewed

11   and approved these Attestations.  These Defendants knew that the Defendant MA

12   Organizations were required to submit truthful Risk Adjustment Attestations to the

13   Medicare Program.  Their officers and employees (*e.g.*, Jeffrey Dumcum, Stephanie

14   Will, Jon Bird, Patty Brennan, Rebecca Martin, Scott Theisen, Relator Poehling, Mary

15   Hammond) were aware of the obligations for deleting invalid diagnoses from RAPs or

16   otherwise reporting and repaying risk adjustment overpayments by other means.  Their

17   officers and employees (*e.g.*, Jeffrey Dumcum, Stephanie Will, Jon Bird, Patty Brennan,

18   Rebecca Martin, Scott Theisen, Relator Poehling, Mary Hammond) also knew that, if

19   they deleted or withdrew invalid diagnoses from RAPS prior to the submission of an

20   Attestation, Medicare would not pay for them or would recover any erroneous payments

21   associated with them.  However, Defendants failed to do this and knowingly submitted

22   or caused the submission of false Attestations.  They did this with actual knowledge that

23   the Attestations were false or acted in deliberate ignorance or reckless disregard of the

24   falsity of the Attestations.

25   294.    Starting with the Attestation for payment year 2008 (if not for earlier Attestations)

26   and continuing forward, attorneys for one or more of the UHG Managing Defendants

27   added a footnote to the Attestations which stated that the Attestations were "based on

28   facts reasonably available or made available to" the Defendant MA Organizations as of

the date of the Attestations.  Optum and its predecessor Ingenix knew about this footnote because its senior management, including Karen Erickson, Jeff Dumcum and Scott Theisen, reviewed the Attestations and approved them prior to their submission to the Medicare Program.  The officers of Ovations and UnitedHealthcare who signed the Attestations also knew about this footnote.  Even without this footnote, the Attestations themselves state that they must be made based on information available to the MA Organizations:  "Based on best knowledge, *information*, and belief as of the date indicated below, all information submitted to CMS in such report [*i.e.*, the risk adjustment data reported for the payment year at issue] and not subsequently deleted prior to the date hereof is accurate, complete, and truthful."  (Emphasis added).

295.   Information and facts reasonably available or made available to the Defendant MA Organizations and the groups and entities that managed them at the time the Attestations were submitted included the results of the medical record reviews conducted as part of the Chart Review, Claims Verification, and RACCR Programs.  In particular, the results of the Chart Review Program were available before the final submission deadline each year as the Chart Review Program ended when additional diagnoses could no longer be submitted.  Thus, the results of the Chart Review Program were "information" and "facts reasonably available" before Ingenix and Optum approved the Attestations and before Ovations and UnitedHealthcare executed and submitted the Attestations to CMS on behalf of the Defendant MA Organizations.  However, these Defendants knowingly failed to delete numerous diagnoses that they had previously-submitted that were unsupported and invalidated by their own chart reviews.

### A.   Defendants' Internal Attestation Approval Process

296.   Generally, the Chief Financial Officers of the groups with responsibility for managing the Defendant MA Organizations owned by UHG were the officers designated to sign and execute the annual Risk Adjustment Attestations on behalf of the Defendant MA Organizations.  Over the relevant time period, these groups included, but were not limited to, Secure Horizons, the Public & Seniors Markets Group, Ovations,

1   UnitedHealthcare Medicare & Retirement, and UnitedHealthcare Community & States.
2   They were "responsible for establishing and maintaining adequate internal controls over
3   completion of attestations" submitted to the Medicare Program.  They used a form to
4   "confirm that the appropriate legal, regulatory, and business owners" reviewed and
5   approved the attestations.  *Id.*  These legal, regulatory, and business owners were
6   required to sign Internal Approval Forms in order for the designated officials to sign the
7   Risk Adjustment Attestations.
8   297.   Part C regulation, 42 C.F.R. § 422.504(1), and the agreements between the MA
9   Organizations and CMS required that this internal approval process include any related
10  entity, contractor or subcontractor of the Defendant MA Organizations that generated or
11  submitted risk adjustment data on their behalf.  Furthermore, if a related entity generated
12  data relating to an MA Organization's claims for payments from the Medicare Program,
13  the related entity (as well as the MA Organization) must certify the accuracy and
14  truthfulness of the data.  *Id.* at § 422.504(l)(3).  The contracts stated:  "If such risk
15  adjustment data are generated by a related entity, contractor, or subcontractor of an MA
16  Organization, such entity, contractor, or subcontractor must also attest to (*based on best
17  knowledge, information, and belief, as of the date specified on the attestation form*) the
18  accuracy, completeness, and truthfulness of the data."  *See* Exhibits 1-7, attached hereto
19  (Article IV, Section D.2).  Optum (and its predecessor, Ingenix), Ovations, and
20  UnitedHealthcare Medicare &Retirement understood this requirement as shown by the
21  previously-described MOU that obligated Optum to attest to the validity of the risk
22  adjustment data that it submitted to the Medicare Program on behalf of the Defendant
23  MA Organizations.  *See supra* paragraphs 83-86.
24  298.   During the time period relevant to this Complaint, the "business owners" that
25  signed off on the Internal Approval Forms were executives of Optum and Ingenix.  One
26  of these business owners was Jeffrey Dumcum, who ran the Risk Adjustment Group at
27  Ingenix and then Optum.  Dumcum's internal attestations stated that he had reviewed the
28  content of the Risk Adjustment Attestations to be submitted by the managing entity (e.g.,

Ovations or UnitedHealthcare) to the Medicare Program and confirmed that the Attestations were factually accurate.  For example, on March 26, 2010,  Dumcum sent an email to Emily Vue, a Senior Regulatory Affairs Analyst for "Ovations – PSMG, UnitedHealth Group, Inc.," stating that he approved the Risk Adjustment Attestation for John Larsen, the Chief Financial Officer of the Ovation Public & Senior Markets Group, to submit to Medicare for payment year 2009.  On March 24, 2011, Dumcum sent an email to Barbara Carlson, a Senior Regulatory Affairs Analyst for UnitedHealthcare Medicare & Retirement, stating that he approved the Risk Adjustment Attestation for Scott Theisen, the Chief Financial Officer of UnitedHealthcare Medicare & Retirement, to submit to Medicare for payment year 2010.  On March 8, 2012, Dumcum sent an email to Sandy Rick, a Senior Regulatory Affairs Analyst for UnitedHealthcare Medicare & Retirement, stating that he approved the Risk Adjustment Attestation for Mr. Theisen to submit to Medicare for payment year 2011.

299.   Mr. Dumcum approved the Larsen and Theisen Risk Adjustment Attestations after reviewing them and the footnotes added by the attorneys to them, including the footnote stating that the Attestations were based on information available to the Defendant MA Organizations about the accuracy and truthfulness of the diagnosis data that was submitted on their behalf to the Medicare Program for risk adjustment payments. However, Dumcum deliberately ignored or recklessly disregarded information available to the Defendant MA Organizations and the entities that managed them (including Ovations, UnitedHealthcare, Ingenix, and Optum, depending on the time period) about invalid diagnoses, that is, he deliberately ignored and recklessly disregarded the negative results of the medical record reviews conducted as part of the Chart Review, Claims Verification, and RACCR Programs.  Accordingly, Dumcum, as a senior executive of Defendant Optum (and its predecessor, Ingenix), caused false Risk Adjustment Attestations to be submitted to the Medicare Program.

300.   For example, in March 2010, when Dumcum approved the Larsen Attestation for payment year 2009, his Risk Adjustment Group at Ingenix possessed information about

the negative results of the Chart Review Program focused on the review of medical records for medical encounters in date of service year 2008.  Also, in March 2010, Dumcum knew (or deliberately ignored or recklessly disregarded) that the managing entities were not deleting or withdrawing the diagnoses unsubstantiated and invalidated by those chart reviews.  At that time, Dumcum also knew (or deliberately ignored or recklessly disregarded) that these managing entities and the MA Organizations had an obligation to delete or withdraw those invalid diagnoses.  In fact, in 2009 prior to Dumcum's approval of the Larsen Attestation, Dumcum knew that his Risk Adjustment Group had already started discussing "looking both ways" at the results of chart reviews and the methodology to do so in order to make DELETES as well as ADDS.  *See supra* paragraphs 180-182.  Nonetheless, Dumcum signed the Internal Approval Form and caused Larsen to submit a false Attestation to the Medicare Program.

301.   As another example, in March 2011, when Dumcum approved the Theisen Attestation for payment year 2010, his Risk Adjustment Group at Optum possessed information about the negative results of the Chart Review Program focused on the review of medical records for medical encounters in date of service year 2009.  Also, in March 2011, Dumcum knew (or deliberately ignored or recklessly disregarded) that neither Optum nor UnitedHealthcare were deleting or withdrawing the diagnoses invalidated by those chart reviews because they were not supported by the beneficiaries' medical records.  At that time, Dumcum also knew (or deliberately ignored or recklessly disregarded) that both UnitedHealthcare and Optum had an obligation to delete or withdraw those invalid diagnoses.  In fact, in the fall of 2010 prior to Dumcum's approval of the Theisen Attestation, Dumcum knew that senior executives of Ingenix and Ovations had already acknowledged that they should be "looking both ways" at the results of the chart reviews to make DELETES as well as ADDS.  *See supra* paragraphs 185 and 196-198.  In December 2010, the results of the first pilot phase (Phase I) of the Claims Verification Program, which showed that provider-reported diagnoses were unsupported for over 50 percent of the medical records reviewed, were also known by or

available to Dumcum.  *See supra* paragraph 206.  Nonetheless, Dumcum signed the Internal Approval Form and caused Theisen to submit a false Attestation to the Medicare Program.

302.   In addition, in March 2012, when Dumcum approved the Theisen Attestation for payment year 2011, his risk adjustment group at Optum possessed information about the negative results of the Chart Review Program focused on the review of medical records for medical encounters in date of service year 2010.  Also, in March 2012, Dumcum knew (or deliberately ignored or recklessly disregarded) that neither Optum nor UnitedHealthcare were deleting or withdrawing the diagnoses invalidated by those chart reviews, *i.e.*, those diagnoses not supported by the beneficiaries' medical records.  At that time, Dumcum also knew (or deliberately ignored or recklessly disregarded) that both UnitedHealthcare and Optum had an obligation to delete or withdraw those invalid diagnoses but were not doing so.  In fact, by the time that Dumcum approved Theisen's Attestation in March 2012, Optum had completed the second pilot phase (Phase II) of the Claims Verification Program on 17,398 charts and the results were striking.  Optum identified 4,786 invalid diagnoses to be deleted, which was greater than the number of additional diagnoses (ADDS) identified by the coders based on their review of the same medical records.  And, as previously stated, in February 2012, Dumcum, who was responsible for the Claims Verification Program, met with Relator Poehling and Theisen and reported:  "I'm deleting as much as I'm adding at the end of the day.  And I don't know if—you know, what I want to do."  He also stated:  "we're getting more and more red here," and that Claims Verification "eats in very substantially" to the revenue from ADDS from chart reviews.  Nonetheless, Dumcum signed the Internal Approval Form and caused Theisen to submit a false Attestation.

303.   Another "business owner" who executed the Internal Approval Form was Karen Erickson, an Executive Vice President of Optum.  On April 3, 2013, Erickson approved Risk Adjustment Attestations for Scott Theisen, the Chief Financial Officer of UnitedHealthcare Medicare & Retirement, and Paul Balthazor, the Chief Financial

Officer of UnitedHealthcare Community & State, to submit to Medicare for payment year 2012.  Erickson's internal attestation stated that she had reviewed the content of the Theisen and Balthazor Risk Adjustment Attestations and confirmed that the Attestations were factually accurate.  Because she reviewed these Risk Adjustment Attestations she knew about the footnotes that UnitedHealthcare included in the Attestations, stating that the Attestations were based on information available to the Defendant MA Organizations.  In April 2013, Erickson knew (or deliberately ignored or recklessly disregarded) that this information included the negative results of the Chart Reviews focused on the review of medical records for medical encounters in date of service year 2011.  Also, in April 2013, Erickson knew (or deliberately ignored or recklessly disregarded) that neither Optum nor UnitedHealthcare were deleting or withdrawing all of the diagnoses invalidated by those chart reviews because they were not supported by the beneficiaries' medical records.  At that time, Erickson also knew (or deliberately ignored or recklessly disregarded) that both UnitedHealthcare and Optum had an obligation to delete or withdraw all invalid diagnoses.  In addition, prior to approving the Attestations in 2013, Erickson, who was part of the team that developed the operational plan for Claims Verification, knew and was concerned about the error rates based on chart reviews conducted as part of the Claims Verification Program.  Nonetheless, Erickson signed the Internal Approval Forms and caused Theisen and Balthazor to submit false Attestations.

304.   In addition, on April 17 and 21, 2014, Erickson approved Risk Adjustment Attestations for Brian Thompson, the Chief Financial Officer of UnitedHealthcare Medicare & Retirement, and for Paul Balthazor, the Chief Financial Officer of UnitedHealthcare Community & State, to submit to Medicare for payment year 2013. Erickson's internal attestation stated that she reviewed the content of the Thompson and Balthazor Risk Adjustment Attestations and confirmed that the Attestations were factually accurate.  Because she reviewed these Risk Adjustment Attestations she knew about the footnotes that UnitedHealthcare included in the Attestations, stating that the

Attestations were based on information available to the Defendant MA Organizations. In April 2014, Erickson knew (or deliberately ignored or recklessly disregarded) that this information included the negative results of the Chart Reviews focused on the review of medical records for medical encounters in date of service year 2012. Also, in April 2014, Erickson knew (or deliberately ignored or recklessly disregarded) that neither Optum nor UnitedHealthcare were deleting or withdrawing all of the diagnoses invalidated by those chart reviews because they were not supported by the beneficiaries' medical records. At that time, Erickson also knew (or deliberately ignored or recklessly disregarded) that both UnitedHealthcare and Optum had an obligation to delete or withdraw all invalid diagnoses. Nonetheless, Erickson signed the Internal Approval Forms and caused Thompson and Balthazor to submit false Attestations.

305. During the time period relevant to this Complaint, one of the "regulatory owners" that executed the Internal Approval Form was David Walsh, the Senior Director of Regulatory Affairs for UnitedHealthcare. He attested that he had reviewed the content of the Risk Adjustment Attestation "to confirm that it complies with applicable *regulatory* requirements and determined that it is appropriate for the designated executive to proceed with signature." However, Walsh deliberately ignored or recklessly disregarded the negative results of the Chart Review Program. He also ignored and disregarded that Defendants had failed to comply with the requirements that diagnoses must be supported by patients' medical records and those diagnoses that are not supported by the patients' medical records must be deleted from RAPS or otherwise reported to CMS and corrected to repay or avoid any overpayment.

306. During the time period relevant to this Complaint, one of the "legal owners" that executed the Internal Approval Form was UnitedHealthcare's Senior General Counsel Keith Dobbins. For example, on March 26, 2010, Dobbins approved the Risk Adjustment Attestation for John Larsen to submit to the Medicare Program for payment year 2009. Dobbins attested that he had reviewed the content of the Risk Adjustment Attestation to confirm that it complied with "applicable *legal* requirements" and was

1  "appropriate" for Larsen to sign.  (emphasis in the original).  As another example, on

2  March 25, 2011, Dobbins approved the Risk Adjustment Attestation for Scott Theisen,

3  the Chief Financial Officer of UnitedHealthcare Medicare & Retirement, to submit to the

4  Medicare Program for payment year 2010.  Again, Dobbins attested that he reviewed the

5  content of the Attestation to confirm that it complied with "applicable legal

6  requirements" and was "appropriate" for Theisen to submit to the Medicare Program for

7  payment year 2011.  In addition, on March 9, 2012, Dobbins approved the Risk

8  Adjustment Attestation for Scott Theisen, the Chief Financial Officer of

9  UnitedHealthcare Medicare & Retirement, to submit to the Medicare Program for

10  payment year 2011.  Again, Dobbins attested that he reviewed the content of the

11  Attestation to confirm that it complied with "applicable legal requirements" and was

12  "appropriate" for Theisen to submit to the Medicare Program for payment year 2011.

13  On April 30, 2014, Dobbins also approved the Risk Adjustment Attestation for Brian

14  Thompson, the Chief Financial Officer of UnitedHealthcare Medicare & Retirement, to

15  submit to Medicare for payment year 2013.  Again, Dobbins attested that he reviewed

16  the content of the Attestation to confirm that it complied with "applicable legal

17  requirements" and was "appropriate" for Theisen to submit to the Medicare Program for

18  payment year 2011.  On information and belief, Dobbins approved other Risk

19  Adjustment Attestations for other payment years and attested to their accuracy.

20  307.   Each time Dobbins approved the Attestations, he knew (or deliberately ignored or

21  recklessly disregarded) that information available to the Defendant MA Organizations

22  included the negative results of the chart reviews for the date of service years at issue.

23  Also, he knew (or deliberately ignored or recklessly disregarded) that neither

24  Ingenix/Optum nor Ovations/UnitedHealthcare (depending on the time period) were

25  deleting or withdrawing all of the diagnoses invalidated by those chart reviews because

26  they were not supported by the beneficiaries' medical records.  At that time, he also

27  knew (or deliberately ignored or recklessly disregarded) that both Ingenix/Optum and

28  Ovations/UnitedHealthcare had an obligation to delete or withdraw all invalid diagnoses.

144

308.   During the years relevant to his approvals, Dobbins was a member of UnitedHealthcare's Risk Adjustment Compliance Oversight Committee and Optum's Clinical Programs and Compliance Oversight Committee.  During those years, Dobbins also attended various meetings involving the work that Ingenix and then Optum performed for Ovations and then UnitedHealthcare.  As a member of these committees and a participant in these meetings, Dobbins was included in numerous discussions about the validity of the risk adjustment data submitted to the Medicare Program, the Chart Review Program, the development and results of the Claims Verification Program, and the RACCR Program.  Dobbins was also one of the individuals who was responsible for reviewing quarterly compliance scorecards that included detailed information about the Chart Review, Claims Verification, and RACCR Programs.  Despite these compliance responsibilities and this knowledge, Dobbins ignored and disregarded that Ovations, UnitedHealthcare, Optum, and Ingenix had failed to comply with the requirements that diagnoses must be supported by patients' medical records and that diagnoses unsupported by patients' medical records must be deleted from RAPS or otherwise reported to CMS and corrected to repay or avoid any overpayments.

## B.   The False Attestations Submitted To The Government

309.   On March 19, 2009, John Way executed and submitted or caused to be submitted to the Medicare Program an "Attestation of Risk Adjustment Data Information Relating to CMS Payment to a Medicare Advantage Organization."  He submitted this Attestation "[o]n behalf of the UnitedHealth Group entities listed in Attachment 1."  This Attestation related to risk adjustment data, that is, diagnoses, which Ovations and/or UnitedHealthcare and Ingenix submitted on behalf of many of the Defendant MA Organizations for risk adjustment payments for payment year 2008.  *See* Exhibit 16, attached hereto.  The Risk Adjustment data, that is, the diagnoses, were related to medical encounters that occurred in date of service year 2007.  Way signed the Attestation as "Chief Financial Officer, SecureHorizons."  At this time, March 2009, SecureHorizons was an internal group within Ovations or UnitedHealthcare.  Way added

a footnote to the Attestation which stated that the Attestation was "based on facts
reasonably available or made available to the MA Organization as of the date of" the
Attestation.  The Attestation itself said it was made based on information available to the
MA Organizations.  In March 2009, information and facts reasonably available to the
Defendant MA Organizations, Ovations and/or UnitedHealthcare, and Ingenix included
the negative results of the Chart Review Program for 2007 date of service medical
encounters.

310.   In March 2009, when Way signed the Attestation, he deliberately ignored or
recklessly disregarded the negative results of the Chart Review Program relating to
medical encounters with 2007 dates of service.  Way also ignored and disregarded that
Defendants had failed to comply with the requirements that diagnoses must be supported
by patients' medical records and those diagnoses that are not supported by patients'
medical records are invalid and must be deleted from RAPS or otherwise reported to
CMS and corrected to repay or avoid any overpayment.  In addition, at this time, Relator
Poehling was a direct report to Way, Relator Poehling and Way had numerous
conversations about risk adjustment programs, and Relator Poehling voiced his concerns
to Way about Ovations failure to "look both ways" at the results of medical record
reviews conducted as part of the Chart Review Program.

311.   On March 18, 2009, Kara Rios executed and submitted or caused to be submitted
to the Medicare Program an "Attestation of Risk Adjustment Data Information Relating
to CMS Payment to a Medicare Advantage Organization."  She submitted this
Attestation "[o]n behalf of the UnitedHealth Group entities listed in Attachment 1."  This
Attestation related to Risk Adjustment data, that is, diagnoses, that Ovations (or the
group known as AmeriChoice, which, on information and belief, was located within
Ovations at this time) and Ingenix submitted on behalf of certain Defendant MA
Organizations for Risk Adjustment payments for payment year 2008.  The Risk
Adjustment data, that is, the diagnoses, were related to medical encounters that occurred
in date of service year 2007.  Rios signed the Attestation as "Chief Financial Officer,

AmeriChoice."  Rios added a footnote to the Attestation which stated that the Attestation was "based on facts reasonably available or made available to the MA Organization as of the date of" the Attestation.  The Attestation itself said it was made based on information available to the MA Organizations.  In March 2009, information and facts reasonably available to all Defendants included the negative results of the Chart Review Program.

312.   On March 2, 2009, Jonathan Bunker executed and submitted or caused to be submitted to the Medicare Program an "Attestation of Risk Adjustment Data Information Relating to CMS Payment to a Medicare Advantage Organization."  He submitted this Attestation "[o]n behalf of Sierra Health and Life Insurance Company, Inc.," a Defendant MA Organization.  This Attestation was for payment year 2008.  The Risk Adjustment data, that is, the diagnoses, were related to medical encounters that occurred in date of service year 2007.  Bunker signed the Attestation as President of Sierra Health and Life Insurance Company, Inc.  At this time, March 2009, Sierra Health and Life Insurance Company, Inc. was an MA Organization owned by UHG and managed by UnitedHealthcare.  The Attestation was submitted to the Medicare Program by Shelly Cranley, the Director of Regulatory Affairs for UnitedHealthcare.

313.   On March 2, 2009, Jonathan Bunker executed and submitted or caused to be submitted to the Medicare Program another "Attestation of Risk Adjustment Data Information Relating to CMS Payment to a Medicare Advantage Organization."  He submitted this Attestation "[o]n behalf of Health Plan of Nevada, Inc.," a Defendant MA Organization, and its MA Plans.  This Attestation was for payment year 2008.  The Risk Adjustment data, that is, the diagnoses, were related to medical encounters that occurred in date of service year 2007.  Bunker signed the Attestation as President of Health Plan of Nevada, Inc.  At this time, March 2009, Health Plan of Nevada, Inc. was an MA Organization owned by UHG and managed by UnitedHealthcare.  The Attestation was submitted to the Medicare Program by Shelly Cranley, the Director of Regulatory Affairs for UnitedHealthcare.

314.    On March 19, 2009, Justin Roth executed and submitted or caused to be submitted to the Medicare Program another "Attestation of Risk Adjustment Data Information Relating to CMS Payment to a Medicare Advantage Organization." This Attestation was for payment year 2008. The Risk Adjustment data, that is, the diagnoses, were related to medical encounters that occurred in date of service year 2007. Roth signed the Attestation as "Chief Financial Officer of Evercare" and stated that the Attestation was signed "[o]n behalf of the UnitedHealth Group entities listed in Attachment 1," which included various Defendant MA Organizations, including many United Healthcare Insurance Company MA Organizations, Oxford Health Plans of New Jersey, Inc., and Evercare of Texas. At this time, March 2009, these MA Organizations were owned by UHG and managed by UnitedHealthcare. The Attestation stated that it was based on information and facts reasonably available or made available to the MA Organizations listed in Attachment 1 at the time the Attestation was submitted.

315.    On March 26, 2010, John Larsen executed and submitted or caused to be submitted to CMS an "Attestation of Risk Adjustment Data Information Relating to CMS Payment to a Medicare Advantage Organization." He submitted this Attestation "[o]n behalf of the UnitedHealth Group entities listed in Attachment 1." These entities included numerous Defendant MA Organizations. This Attestation related to Risk Adjustment data, that is, diagnoses, that Optum (or its predecessors Ingenix) and Ovations and/or UnitedHealthcare submitted on behalf of these MA Organizations to Medicare for Risk Adjustment payments for payment year 2009. *See* Exhibit 17, attached hereto. The Risk Adjustment data, that is, the diagnoses, were related to medical encounters that occurred in date of service year 2008. Larsen signed the Attestation as "Chief Financial Officer, Public & Senior Markets Group." At this time, the Public & Senior Markets Group included Ovations. Larsen added a footnote to his Risk Adjustment Attestation which stated that the Attestation was "based on facts reasonably available or made available to the MA Organization as of the date of" the Attestation. The Attestation itself stated that it was based on information available to the

MA Organizations.  In March 2010, information and facts reasonably available to the Defendant MA Organizations included the negative results of the Chart Review Program relating to medical encounters that occurred in 2008.

316.   When Larsen signed the Attestation, he deliberately ignored or recklessly disregarded the negative results of the Chart Review Program.  Larsen also ignored or disregarded that Defendants had failed to comply with the requirements that diagnoses must be supported by patients' medical records and that diagnoses that are not supported by patients' medical records are invalid and must be deleted from RAPS or otherwise reported to CMS and corrected to repay or avoid any overpayment.  During the relevant time period, Larsen was involved in meetings concerning the Chart Review Program and knew that the Public & Senior Markets Group could have "looked both ways" at the results of the chart reviews but was not doing so and, thus, that the Public & Senior Markets Group was not reporting to CMS those provider-reported codes that were not supported by the beneficiaries' medical records.

317.   On March 25, 2011, Scott Theisen executed and submitted or caused to be submitted to CMS an "Attestation of Risk Adjustment Data Information Relating to CMS Payment to a Medicare Advantage Organization."  He submitted this Attestation "[o]n behalf of the UnitedHealth Group entities listed in Attachment 1."  This Attestation related to Risk Adjustment data, that is, diagnoses, that UnitedHealthcare and Optum (or its predecessor Ingenix) submitted on behalf of numerous Defendant MA Organizations to Medicare for risk adjustment payments for payment year 2010.  *See* Exhibit 18, attached hereto.  The risk adjustment data, that is, the diagnoses, were related to medical encounters that occurred in date of service year 2009.  Theisen signed the Attestation as "Chief Financial Officer, UnitedHealthcare Medicare & Retirement."  Theisen added a footnote to his Risk Adjustment Attestation which stated that the Attestation was "based on facts reasonably available or made available to the MA Organization as of the date of" the Attestation.  The Attestation itself stated that it was made based on information available to the Defendant MA Organizations.  In March 2011, information and facts

reasonably available to the Defendant MA Organizations, UnitedHealthcare, and Optum (or its predecessor, Ingenix) included the negative results of the Chart Review Program relating to medical encounters in 2009.

318.   On March 9, 2012, Scott Theisen executed and submitted or caused to be submitted to CMS an "Attestation of Risk Adjustment Data Information Relating to CMS Payment to a Medicare Advantage Organization."  He submitted this Attestation "[o]n behalf of the UnitedHealth Group entities listed in Attachment 1."  This Attestation related to Risk Adjustment data, that is, diagnoses, that UnitedHealth and Optum submitted to on behalf of numerous MA Organizations to Medicare for risk adjustment payments for payment year 2011.  *See* Exhibit 19, attached hereto.  The risk adjustment data, that is, the diagnoses, were related to medical encounters that occurred in date of service year 2010.  Theisen signed the Attestation as "Chief Financial Officer, UnitedHealthcare Medicare & Retirement.  The Attestation stated that it was based on information available to the MA Organizations.  It also included a footnote that stated the Attestation was "based on facts reasonably available or made available to the MA Organization as of the date" of the Attestation.  In March 2012, information and facts reasonably available to all Defendants included the negative results of the medical record reviews conducted as part of the Chart Review Program for payment year 2011 (date of service year 2010).

319.   On April 9, 2013, Scott Theisen executed and submitted or caused to be submitted to CMS an "Attestation of Risk Adjustment Data Information Relating to CMS Payment to a Medicare Advantage Organization."  He submitted this Attestation "[o]n behalf of the UnitedHealth Group entities listed in Attachment A."  This Attestation related to Risk Adjustment data, that is, diagnoses, that UnitedHealthcare and Optum submitted on behalf of numerous MA Organizations to Medicare for risk adjustment payments for payment year 2012.  *See* Exhibit 20, attached hereto.  The risk adjustment data, that is, the diagnoses, were related to medical encounters that occurred in date of service year 2011.  Theisen signed the Attestation as "Chief Financial Officer, UnitedHealthcare

Medicare & Retirement."  The Attestation stated that it was based on information available to the MA Organizations and also included a footnote stating that the Attestation was "based on facts reasonably available or made available to the MA Organization as of the date of" the Attestation.  In March 2013, information and facts reasonably available to the MA Organizations, UnitedHealthcare, and Optum included the negative results of the medical record reviews conducted as part of the Chart Review Program for payment year 2012 (date of service year 2011).

320.   Each time Theisen signed the Attestations, he deliberately ignored or recklessly disregarded the negative results of the Chart Review Program for the 2010, 2011, and 2012 payment years and 2009, 2010, and 2011 date of service years at issue.  Theisen also ignored or disregarded that the Defendant MA Organizations, UnitedHealthcare, and Optum (or its predecessor, Ingenix) had failed to comply with the requirements that diagnoses must be supported by patients' medical records and that those diagnoses that are not supported by patients' medical records are invalid and must be deleted from RAPS or otherwise reported to CMS and corrected to repay or avoid any overpayments.

321.   During the years in which he was Chief Financial Officer of UnitedHealthcare Medicare & Retirement and approved the Attestations, Theisen was co-chair and business lead of UnitedHealthcare Medicare & Retirement's Financial Compliance Oversight Committee.  He also attended quarterly meetings with UnitedHealthcare Medicare & Retirement's Compliance Committee, comprised of UnitedHealthcare Medicare & Retirement's executive leadership team; Executive Steering Committee meetings; and meetings to identify and evaluate corporate risks.  As a member of these committees, a participant in these meetings, and in fulfilling his duties as UnitedHealthcare Medicare & Retirement's Chief Financial Officer, Theisen was involved in discussions about the Chart Review Program, the implementation and results of the Claims Verification Program, and the RACCR Program.  During this time period, Theisen had authority to make decisions on behalf of UnitedHealthcare, including how much to spend on the Chart Review Program, how many charts to include in the Chart

Review Program, and whether to submit DELETES based on information available to UnitedHealthcare.  He also had authority to make similar decisions about the RACCR Program.

322.   In addition, Theisen was aware of the significant number of invalid provider-reported diagnoses based on the results of the Chart Review and Claims Verification Programs.  For example, when Theisen executed the Risk Adjustment Attestation in March 2011, the results of the first pilot phase (Phase I) of the Claims Verification Program were available.  As previously explained, those results showed that provider-reported diagnoses were unsupported for over 50 percent of the medical records reviewed.  *See supra* paragraph 206.  As another example, in February 2012 prior to his signing the March 2012 Attestation, Theisen (as well as Dumcum and Relator Poehling) had actual knowledge of the strikingly negative results of the Claims Verification Phase II pilot program showing that there were more DELETES than ADDS.  *See supra* paragraph 158.  In addition, on April 3, 2013, when Theisen executed and submitted the Risk Adjustment Attestations for payment year 2012, the information available to the Defendants MA Organizations, UnitedHealthcare Medicare & Retirement (including Theisen), and Optum included the results of the chart reviews for 2011 dates of service, which showed that they had submitted at least 100,000 diagnoses that were invalid, but had not been deleted (and never were deleted).  *See supra* paragraph 235.  Yet, Theisen attested that these invalid diagnoses were accurate and truthful.

323.   On March 25, 2011, Brian Thompson, the Chief Financial Officer of UnitedHealthcare Community & State, executed and submitted or caused to be submitted an "Attestation of Risk Adjustment Data Information Relating to CMS Payment to a Medicare Advantage Organization."  He submitted this Attestation on behalf of "the UnitedHealth Group entities listed in Attachment 1."  This Attestation related to risk adjustment data, that is, diagnoses, that UnitedHealthcare and Optum (or its predecessor, Ingenix) submitted on behalf of certain of the Defendant MA Organizations to Medicare for payment year 2010.  The data related to the 2009 date of

service year.  The Attestation as based on information and facts reasonably available to
the MA Organizations, including the negative results of the Chart Review Program based
on medical record reviews for date of service year 2009.  Information and facts available
to the MA Organizations, UnitedHealthcare, and Optum (or its predecessor, Ingenix)
included the results of the medical record reviews conducted as part of the Chart Review
Program for medical encounters during the 2009 date of service year.  However,
Thompson and these Defendants deliberately ignored or recklessly disregarded the
negative results of these chart reviews.  They also ignored or disregarded that the
Defendant MA Organizations, UnitedHealthcare, and Optum (or its predecessor,
Ingenix) had failed to comply with the requirements that diagnoses must be supported by
patients' medical records and that those diagnoses that are not supported by patients'
medical records are invalid and must be deleted from RAPS or otherwise reported to
CMS and corrected to repay or avoid any overpayments.

324.   On March 29, 2012, Paul Balthazor, the Chief Financial Officer of
UnitedHealthcare Community & State, executed and submitted or caused to be
submitted an "Attestation of Risk Adjustment Data Information Relating to CMS
Payment to a Medicare Advantage Organization."  He submitted this Attestation on
behalf of "the UnitedHealth Group entities listed in Attachment 1."  This Attestation
related to risk adjustment data, that is, diagnoses, that UnitedHealthcare and Optum (or
its predecessor, Ingenix) submitted on behalf of certain of the Defendant MA
Organizations to Medicare for payment year 2011.  The data related to 2010 date of
service year.  The Attestation was based on information and facts reasonably available to
the MA Organizations, UnitedHealthcare, and Optum including the negative results of
the medical record reviews conducted as part of the Chart Review Program for the 2010
date of service year.  However, Balthazor and these Defendants deliberately ignored or
recklessly disregarded the negative results of these chart reviews.  They also ignored or
disregarded that the Defendant MA Organizations, UnitedHealthcare, and Optum had
failed to comply with the requirements that diagnoses must be supported by patients'

medical records and that those diagnoses that are not supported by patients' medical records are invalid and must be deleted from RAPS or otherwise reported to CMS and corrected to repay or avoid any overpayments.  In April 2013, Balthazor also executed the Risk Adjustment Attestation for the MA Organizations managed by UnitedHealthcare Community & State for payment year 2012 (date of service year 2011).  For this year too, Balthazor and the Defendant MA Organizations, UnitedHealthcare, and Optum ignored the results of the chart reviews and their obligations to delete invalid diagnoses.

325.   On April 30, 2014, Brian Thompson executed and submitted or caused to be submitted Risk Adjustment Attestations on behalf of all of the Defendant MA Organizations managed by UnitedHealthcare Medicare & Retirement at that time.  (On the same date, Paul Balthazor executed and submitted or caused to be submitted Risk Adjustment Attestations on behalf of all Defendant MA Organizations managed by UnitedHealthcare Community & State at the time.)  An example of one of Thompson's Attestations includes the Attestation he submitted "[o]n behalf of the UnitedHealth of California."  *See* Exhibit 21, attached hereto.  This Attestation related to risk adjustment data, that is, diagnoses, which UnitedHealthcare and Optum submitted on behalf of UnitedHealthcare of California to the Government for risk adjustment payments for payment year 2013.  The risk adjustment data, that is, the diagnoses, were related to medical encounters that occurred in date of service year 2012.  At the time Thompson signed this Attestation he was the Chief Financial Officer of UnitedHealthcare Medicare & Retirement.  The Attestation was based on information available to the MA Organizations.  UnitedHealthcare could not add a footnote to the Attestation because it was submitted electronically.  However, Steve Nelson, the Chief Executive Officer of UnitedHealthcare Medicare & Retirement, sent CMS an email on April 30, 2014, stating that the Attestation was "based on facts reasonably available or made available to *us* as of the date of" the Attestation.  (Emphasis added).  In April 2014, facts reasonably available to all the Defendant MA Organizations, UnitedHealthcare, and Optum included

the negative results of the Chart Review and Claims Verification Programs relating to medical encounters in 2012.  Other information and facts that were available included, for instance, millions of dollars of invalid diagnoses about which United had *actual* knowledge but never deleted.  *See supra* paragraph 232.

326.   In April 2014, when Thompson signed the Attestation, he deliberately ignored or recklessly disregarded the negative results of the Chart Review Program.  Thompson also ignored that Defendants had failed to comply with the requirements that diagnoses must be supported by patients' medical records and that those diagnoses that are not supported by patients' medical records must be deleted from RAPS or otherwise reported to CMS and corrected to repay or avoid any overpayment.  At the time that Thompson submitted the Attestation on April 30, 2014, he knew about the actual or estimated adverse financial impact of DELTES from the Chart Review and Claims Verification Programs for payment year 2013 (date of service year 2012) and he knew about CV liability accruals.  *See supra* paragraphs 217-221.  Furthermore, on April 30, 2014, the date the Attestations were submitted for the 2013 payment year, the information available to the Defendant MA Organizations, UnitedHealthcare Medicare & Retirement (including Thompson), and Optum included  the results of the chart reviews for the date of service year 2012, which showed that at least 250,000 diagnoses were invalid.  *See supra* paragraph 235.  Yet, Thompson certified that this invalid data was accurate and truthful even though the invalid diagnoses had not been deleted (and never have been).

327.   On June 26, 2015 and June 7, 2016, Thompson executed and submitted or caused to be submitted Risk Adjustment Attestations on behalf of all of the Defendant MA Organizations managed by UnitedHealthcare Medicare & Retirement on those dates. (On the same dates, UnitedHealthcare Community & State also submitted Risk Adjustment Attestations for the Defendant MA Organizations that it managed.)  These Attestations related to risk adjustment data, that is, diagnoses, which UnitedHealthcare and Optum submitted on behalf of these MA Organizations to the Government for risk

adjustment payments for payment years 2014 and 2015.  The risk adjustment data, that is, the diagnoses, were related to medical encounters that occurred in date of service years 2013 and 2014.  At the time Thompson signed these Attestations he was the Chief Financial Officer of UnitedHealthcare Medicare & Retirement.  The Attestations were the same as those for prior years (except that they did not have footnotes.)  The Attestations were based on information available to the MA Organizations, including information about diagnoses unsupported and, thus, invalidated by the chart reviews for the dates of service years at issue.  On June 26, 2015, the date the Attestations were submitted for the 2014 payment year, the information available to the Defendant MA Organizations, UnitedHealthcare Medicare & Retirement (including Thompson), and Optum were the results of the chart reviews for date of service year 2013, which showed that at least 199, 039 diagnoses were invalid.  *See supra* paragraph 235.  Yet, Thompson certified that this invalid data was accurate and truthful even though the invalid codes had not been deleted (and never have been).

## V.   Diagnoses Solely Determine Risk Adjustment Payments Based On Health Status

328.   The diagnostic data submitted by an MA Organizations are not merely ancillary to its claims for risk adjustment payments.  Rather, the diagnoses are the sole determinant in the calculation of any risk adjustment payment based on a beneficiary's health status.  The submissions of diagnoses are themselves claims for risk adjustment payments and are inexorably material to any payment based on the beneficiary's health status.  The diagnoses are the *raison d'etre* of RAPS submissions, *i.e*., risk adjustment claims.

329.   As emphasized throughout this Amended Complaint, the Government has never agreed to make risk adjustment payments based on invalid diagnoses, and MA Organizations are required by their contracts with CMS, federal regulations, and CMS instructions (*e.g*., the Managed Care Manual and Participant Guide) to delete invalid diagnoses.  Moreover, no statute or regulation entitles an MA Organization to risk adjustment payments based on invalid diagnoses, including payments based on

diagnoses that are unsubstantiated by the beneficiaries' medical records.  *See Swoben*, 848 F.3d at 1179 (rejecting arguments that MA Organizations are allowed to ignore information about invalid diagnoses based on their own chart reviews and that they are not obligated to delete such invalid diagnoses submitted by them for risk adjustment payments).

330.   When MA Organizations provide CMS with information identifying specific invalid diagnoses that were submitted for payment (such as by deleting the invalid diagnoses in the RAPS system) and, thus, CMS has *actual knowledge* about the specific invalid diagnoses that were submitted for payment (such as because they were deleted in the RAPS system), Medicare recovers the associated overpayments.  *See United States ex rel. Campie v. Gilead Sciences, Inc*., 862 F.3d 890, 906 (9th Cir. 2017) (holding that, in assessing materiality, the court must examine what the agency does when it has *actual knowledge* of the regulatory violation).  There is no way that CMS can obtain this actual knowledge about invalid diagnoses by looking at an Attestation.  The falsity of the Attestation is not apparent on the face of the document.  Someone must inform CMS that the MA Organization has information showing that its diagnoses are invalid and that it failed to delete those invalid diagnoses.

331.   The UHG Managing Defendants and the Defendant MA Organizations knew that they were required to delete invalid diagnoses that they had submitted for payment and, in fact, they did this by making deletes in the RAPS system.  For example, as previously explained, based on their short-lived Claims Verification Program, UnitedHealthcare Medicare & Retirement and Optum deleted diagnoses from the RAPS system.  They also deleted some invalid diagnoses from the RAPS system based on their RACCR reviews.

332.   In addition, in the past, when UnitedHealthcare has informed CMS that it is in possession of information about invalid diagnoses that it had submitted and requested some direction with respect to deleting the invalid diagnoses, CMS has worked with it to recover the overpayments.  In 2010 and 2011, CMS did this when Joseph Keen, the Chief Compliance Audit Officer at UnitedHealthcare, informed it about risk adjustment

data that UnitedHealthcare had submitted that included invalid diagnoses. Importantly, CMS also asked Keen a series of questions to obtain information about the invalid diagnoses, an explanation why the deletes were being made after the final submission deadline for the payment year (because, if made prior to the deadline, CMS would have been able to offset the overpayment as a part of the final reconciliation payment process), and for an explanation of the steps that UnitedHealthcare was taking to ensure that deletes were made in a timely manner. Keen responded that UnitedHealthcare was "continuing to conduct targeted chart validation reviews to determine if the member-diagnoses reviewed are supported by a medical record. These reviews continue and we may need to delete certain risk adjustment data in the future. We will promptly notify CMS of any risk adjustment data determined through these reviews to have been incorrectly submitted."

333. If Defendants had complied with their obligation to delete invalid diagnoses from RAPS, Medicare's Risk Adjustment System ("RAS") would have processed the corrected data and recalculated the risk score for the beneficiaries for whom an invalid diagnosis had been deleted. The degree of the change in the payment amount for that beneficiary would have depended on the HCC to which the invalid diagnosis was grouped. The risk adjustment reconciliation payment system would have made these adjustments automatically if the DELETES were made in RAPS. The system would have done this as part of the final reconciliation payment process or future reconciliations conducted by CMS for the payment year at issue.

334. If an MA Organization does not comply with its express obligation to delete the invalid diagnoses from RAPS prior to the final submission deadline, Medicare pays for the invalid diagnoses as part of its final reconciliation payment to the MA Organization or, if it already paid for the invalid diagnosis, does not recover the overpayment as part of the final reconciliation payment process. If the MA Organization never deletes the invalid diagnoses from RAPS, Medicare does not recover the overpayment when future payment reconciliations are done for the payment year at issue. Accordingly, the

diagnostic information submitted by an MA Organization is not merely ancillary to its claim for risk adjustment payments, it is the sole determinant in the calculation of the amount (if any) of the risk adjustment payments made by Medicare based on the health status of a beneficiary and, therefore, inexorably material to the amount (if any) paid.

335.   A false Risk Adjustment Attestation, by its very nature, is also material as it relates directly to the data element – diagnoses – that is the sole determinant of risk adjustment payments based on health status.  Submission of invalid diagnoses and failing to delete them are not minor or insubstantial infractions of the MA Organization's obligations to Medicare with which they pledge to comply.  Keen, the UnitedHealthcare Chief Compliance Audit Officer, and others at UnitedHealthcare and Optum were aware of these obligations.

336.   The purpose of the Risk Adjustment Attestation is, first, to remind MA Organizations that they may not ignore or disregard information about invalid diagnoses, such as (but not limited to) the negative results of chart reviews showing that diagnoses previously submitted for payment are unsupported by the charts; and, second, to enforce the fundamental program requirement that MA Organizations delete invalid diagnoses.  *See* 65 Fed. Reg. 40,170, 40,268 (June 29, 2000) (noting that "certifications would help ensure accurate data submissions").  When MA Organizations do not comply with these payment data integrity requirements of the MA Program (which are reiterated and enforced by the Attestations), the result is the submission of and/or failure to delete false diagnostic data and, thus, the submission of false Attestations that the data is accurate and truthful.  When MA Organizations do this by deliberately ignoring or recklessly disregarding information about invalid diagnoses and, thus fail to delete invalid diagnoses, as Defendants here have done, they are unable to represent that their data is accurate, complete, and truthful, as the Attestations require.  Moreover, in that situation, their Attestations are "knowingly" false, as the term knowingly is defined in the FCA.

337.   The Risk Adjustment Attestation itself includes language warning about the serious legal implications of making false representations about diagnoses.  It states that

"[t]he MA Organization acknowledges . . . that misrepresentations to CMS about the accuracy of such [risk adjustment] information may result in Federal civil action and/or criminal prosecution." *See* Exhibits 15-21.  Risk adjustment Attestations thus are intended to serve as a powerful deterrent against an MA Organization's "knowingly" submitting false claims for payment.  *United States ex rel. Swoben v. UnitedHealthcare Insurance Co. et al*., 848 F.3d 1161, 1168 (9th Cir. 2016) (characterizing certifications "[a]s a further bulwark against fraud").

338.   Defendants' knowledge of the importance of the Attestations is demonstrated by the footnotes that UnitedHealthcare and other UHG Managing Defendants added to the Attestations they submitted on behalf of the Defendant MA Organizations, such as the footnotes that stated the Attestations should not be construed as representations that the data may not require subsequent modification should additional information become available.  *See* Exhibits 15-20.  According to Dumcum, UnitedHealthcare's counsel added these footnotes.

339.   Defendants' knowledge of the importance of the Attestations is also demonstrated by the meeting they requested with CMS in April 2014.  As previously explained, on April 29, 2014, Steve Hemsley, Defendant UHG's Chief Executive Officer, sent UnitedHealthcare's attorney Thad Johnson, UnitedHealthcare Medicare & Retirement's Chief Executive Officer Steve Nelson, UnitedHealthcare's Chief Financial Officer Daniel Schumacher, and Optum executive Karen Erickson, to meet with CMS employees responsible for the MA Program, including Cheri Rice, the Director of the Medicare Plan Payment Group at CMS.  Defendant UHG and its subsidiaries, UnitedHealthcare and Optum, asked for this meeting on very short (just a few days) notice because the Chief Financial Officer of UnitedHealthcare Medicare & Retirement, Brian Thompson, had to execute and submit the Risk Adjustment Attestations for the Defendant MA Organizations on April 30, 2014.  Defendants UHG, UnitedHealthcare and Optum wanted to disclose to CMS, before the Attestations were submitted, that they were in possession of information ***from chart reviews*** (the nature and mechanics of

1    which they did not describe in any detail) about invalid diagnoses (which were not

2    specifically identified to CMS) that they had submitted to the Government but had not

3    deleted.  They apparently believed that this sort of very vague disclosure would

4    somehow render the Attestations truthful even if they did not delete the invalid diagnoses

5    from RAPS.

6    340.   In addition, for many years, Jeffrey Dumcum, the senior executive overseeing all

7    risk adjustment programs and activities at Ingenix and then Optum, was also aware of

8    the FCA implications of ignoring information about invalid diagnoses.  He told Poehling

9    that the Department of Justice's enforcement of the FCA was a consideration in deciding

10   to delete diagnoses when the results of blind chart reviews showed that they were

11   unsupported by the patients' medical records.  In fact, Optum even decided that all of its

12   clients (its commercial clients as well as its internal client, UnitedHealthcare) had to look

13   both ways at the results of blind chart reviews and delete diagnosis codes invalidated by

14   the chart reviews if Optum was responsible for submitting risk adjustment data to CMS

15   on their behalf.  This requirement was most likely imposed by Optum (at least for some

16   period of time) because Optum had to execute the internal attestations certifying the

17   accuracy and truthfulness of the diagnoses it submitted to Medicare on behalf of its

18   clients and, perhaps, it was also concerned about violating the FCA by causing its MA

19   Organization clients to submit false Attestations.  Accordingly, like UHG and

20   UnitedHealthcare, Optum was aware that the Attestations required it to make deletes

21   based on information available to it about the negative results of chart reviews.

## FIRST CLAIM FOR RELIEF

### False Claims Act:  Reverse False Claims

### 31 U.S.C. § 3729(a)(1)(G) (formerly 31 U.S.C. § 3729(a)(7))

25   341.   The United States repeats and re-alleges the allegations contained in Paragraphs 1

26   to 340 above as though they are fully set forth herein.

27   342.   Defendants violated the second part of 31 U.S.C. § 3729(a)(1)(G) as follows:

28   Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) concealed

or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government. Specifically, Defendants knowingly concealed or knowingly and improperly avoided or decreased an obligation to repay risk adjustment payments to which they were not entitled from the Medicare Program. In particular, Defendants knowingly and improperly failed to delete in the RAPS system the invalid diagnoses that had been submitted to the Medicare Program for risk adjustment payments which were made by the Medicare Program to them or knowingly and improperly failed to otherwise return to the Medicare Program the overpayments based on the invalid diagnoses.

343.   By virtue of the said acts of concealment and/or improper avoidance, the United States incurred damages and therefore is entitled to multiple damages under the False Claims Act, plus a civil penalty for each violation of the Act.

## SECOND CLAIM FOR RELIEF

**False Claims Act:  Presentation of False or Fraudulent Claims**

**31 U.S.C. § 3729(a)(1)(A) (formerly 31 U.S.C. § 3729(a)(1))**

344.   The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 340 above as though they are fully set forth herein.

345.   Defendants violated 31 U.S.C. § 3729(a)(1)(A) as follows:  Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) presented or caused to be presented a false or fraudulent claim for payment or approval.  Specifically, Defendants knowingly presented or caused to be presented to the Medicare Program a false or fraudulent Risk Adjustment Attestation claiming risk adjustment payments from the Medicare Program.

346.   Defendants violated former 31 U.S.C. § 3729(a)(1) as follows:  Defendants knowingly presented, or caused to be presented, to the Government a false or fraudulent claim for payment or approval.  Specifically, Defendants knowingly presented or caused to be presented to the Medicare Program a false or fraudulent Risk Adjustment Attestation claiming risk adjustment payments from the Medicare Program.

162

347.   By virtue of the said false or fraudulent claim, the United States incurred damages and therefore is entitled to multiple damages under the False Claims Act, plus a civil penalty for each violation of the Act.

### THIRD CLAIM FOR RELIEF

**False Claims Act: Making or Using False Records or Statements**

**31 U.S.C. § 3729(a)(1)(B) (formerly 31 U.S.C. § 3729(a)(2))**

348.   The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 340 above as though they are fully set forth herein.

349.   Defendants violated 31 U.S.C. § 3729(a)(1)(B) as follows:  Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim.  Specifically, Defendants knowingly made, used, or caused to be made or used a false Risk Adjustment Attestation material to a false or fraudulent claim for risk adjustment payments from the Medicare Program.

350.   Defendants violated former 31 U.S.C. § 3729(a)(2) as follows:  Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.  Specifically, Defendants knowingly made, used, or caused to be made or used a false Risk Adjustment Attestation to get a false or fraudulent claim for risk adjustment payments paid or approved by the Medicare Program.

351.   By virtue of the said false record or statement, the United States incurred damages and therefore is entitled to multiple damages under the False Claims Act, plus a civil penalty for each violation of the Act.

### FOURTH CLAIM FOR RELIEF

**False Claims Act:  Reverse False Claims**

**31 U.S.C. § 3729(a)(1)(G) (formerly 31 U.S.C. § 3729(a)(7))**

352.   The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 340 above as though they are fully set forth herein.

163

353.   Defendants violated the first part of 31 U.S.C. § 3729(a)(1)(G) as follows: Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government.  Specifically, Defendants knowingly made, used, or caused to be made or used a false Risk Adjustment Attestation material to an obligation to repay risk adjustment payments to which they were not entitled from the Medicare Program.

354.   Defendants also violated former 31 U.S.C. § 3729(a)(7) as follows:  Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the Government.  Specifically, Defendants knowingly made, used, or caused to be made or used, a false Risk Adjustment Attestation to conceal, avoid or decrease an obligation to repay risk adjustment payments to which they were not entitled from the Medicare Program.

355.   By virtue of the said false record, statement, and other acts of concealment and improper avoidance, the United States incurred damages and therefore is entitled to multiple damages under the False Claims Act, plus a civil penalty for each violation of the Act.

## FIFTH CLAIM FOR RELIEF

### Unjust Enrichment

356.   The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 340 above as though they are fully set forth herein.

357.   Defendants have received money from the United States to which Defendants were not entitled, which unjustly enriched Defendants, and for which Defendants must make restitution.  Defendants received such money by claiming and retaining Medicare risk adjustment payments based on invalid risk adjustment data.  In equity and good conscience, such money belongs to the United States and to the Medicare Program.

358.   The United States is entitled to recover such money from Defendants in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF

### Payment by Mistake

359.   The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 340 above as though they are fully set forth herein.

360.   The United States paid money to Defendants as a result of a mistaken understanding.  Specifically, the United States paid Defendants claims for risk adjustment payments under the mistaken understanding that such claims were based on valid risk adjustment data.  Had the United States known the truth, it would not have paid such claims.  Payment was therefore by mistake.

361.   As a result of such mistaken payments, the United States has sustained damages for which Defendants are liable in the amount to be determined at trial.

## PRAYER

**WHEREFORE**, the United States requests that judgment be entered in its favor and against Defendants as follows:

362.   On Claims I, II,  III, and IV (False Claims Act), against all Defendants jointly and severally, for the amount of the United States' damages, trebled as required by law, together with the maximum civil penalties allowed by law, costs, post-judgment interest, and such other and further relief as the Court may deem appropriate;

363.   On Claim V (Unjust Enrichment), against all Defendants jointly and severally, for an amount equal to the monies that Defendants obtained from the United States without right and by which Defendants have been unjustly enriched, plus costs, pre- and post-judgment interest, and such other and further relief as the Court may deem appropriate; and

364.   On Claim VI (Payment By Mistake), against Defendants for an amount equal to the United States' damages, plus costs, pre- and post-judgment interest, and such other and further relief as the Court may deem appropriate.

1

## **DEMAND FOR JURY TRIAL**

2

The United States of America hereby demands a trial by jury.

3

Dated: November 17, 2017

4

Respectfully submitted,

5

CHAD A. READLER
Principal Deputy Assistant Attorney General,
Civil Division

6

SANDRA R. BROWN
Acting United States Attorney

7

DOROTHY A. SCHOUTEN
Chief, Civil Division

8

DAVID K. BARRETT
Chief, Civil Fraud Section

9

Assistant United States Attorneys

10

MICHAEL D. GRANSTON

11

DANIEL R. ANDERSON
CAROL L. WALLACK

12

JESSICA KRIEG
JUSTIN DRAYCOTT

13

PAUL PERKINS
Attorneys, Civil Division

14

United States Department of Justice

15

JAMES P. KENNEDY, JR.
Acting United States Attorney

16

KATHLEEN ANN LYNCH
Assistant United States Attorney

17

18

/S/ John E. Lee

19

JOHN E. LEE
Assistant United States Attorney

20

21

Attorneys for the
United States of America

22

23

24

25

26

27

28

166