1  LATHAM & WATKINS LLP
       David J. Schindler (Bar No. 130490)
2        *david.schindler@lw.com*
   355 South Grand Avenue, Suite 100
3  Los Angeles, California 90071-1560
   Telephone: +1.213.485.1234
4  Facsimile: +1.213.891.8763

5  LATHAM & WATKINS LLP
       Daniel Meron (appearing *pro hac vice*)
6        *daniel.meron@lw.com*
       Abid R. Qureshi (appearing *pro hac vice*)
7        *abid.qureshi@lw.com*
   555 Eleventh Street, NW, Suite 1000
8  Washington, DC 20004-1304
   Telephone: +1.202.637.2200
9  Facsimile: +1.202.637.2201

10  Attorneys for United Defendants

11              **UNITED STATES DISTRICT COURT**

12              **CENTRAL DISTRICT OF CALIFORNIA**

13

14  UNITED STATES OF AMERICA *ex rel.*       CASE NO. 2:16-cv-08697-
15  BENJAMIN POEHLING,                       MWF(SSx)

16                                           Assigned to Hon. Michael W.
                Plaintiff,                   Fitzgerald
17
        v.                                   **UNITED'S NOTICE OF**
18                                           **MOTION AND MOTION TO**
    UNITEDHEALTH GROUP, INC. *et al.*,       **DISMISS UNITED STATES'**
19                                           **FIRST AMENDED**
                                             **COMPLAINT-IN-PARTIAL-**
20              Defendants.                  **INTERVENTION;**
                                             **MEMORANDUM OF POINTS**
21                                           **AND AUTHORITIES IN**
                                             **SUPPORT THEREOF**
22
                                             [*Declaration of David J. Schindler*
23                                           *and [Proposed] Order filed*
                                             *concurrently herewith*]
24
                                             Date:   January 29, 2018
25                                           Time:   10:00 a.m.
                                             Ctrm:   5A
26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

UNITED'S NOTICE OF MOTION AND MOTION TO
DISMISS UNITED STATES' COMPLAINT
2:16-cv-08697-MWF (SSx)

1       TO THE COURT, ALL PARTIES AND THEIR COUNSEL OF RECORD:

2       PLEASE TAKE NOTICE that, on January 29, 2018, at 10:00 a.m., or as

3   soon thereafter as the parties may be heard, in Courtroom 5A of the United States

4   District Court, Central District of California, located at 350 W. 1st Street, Los

5   Angeles, California 90012, Honorable Michael W. Fitzgerald presiding,

6   Defendants UnitedHealth Group Incorporated, United HealthCare Services, Inc.,

7   UnitedHealthcare, Inc., UnitedHealthcare Insurance Company, Ovations, Inc.,

8   Optum, Inc., OptumInsight, Inc., AmeriChoice of New Jersey, Inc., AmeriChoice

9   of New York, Inc., Arizona Physicians IPA, Inc., Care Improvement Plus of

10  Maryland, Inc., Care Improvement Plus of Texas Insurance Company, Care

11  Improvement Plus South Central Insurance Company, Care Improvement Plus

12  Wisconsin Insurance Company, Optum Insurance Co., Citrus Health Care, Inc.,

13  Health Plan of Nevada, Inc., Medica HealthCare Plans, Inc., Oxford Health Plans

14  (CT), Inc., Oxford Health Plans (NJ), Inc., Oxford Health Plans (NY), Inc.,

15  PacifiCare Life and Health Insurance Company, PacifiCare of Arizona, Inc.,

16  PacifiCare of Colorado, Inc., PacifiCare of Nevada, Inc., Physicians Health Choice

17  of Texas, LLC, Preferred Care Partners, Inc., Rocky Mountain Health Maintenance

18  Organization, Incorporated, Sierra Health and Life Insurance Company, Inc.,

19  Symphonix Health Insurance, Inc., UHC of California (f.k.a. PacifiCare of

20  California), United Health Care Ins. Co. and United New York, Unison Health

21  Plan of Tennessee, Inc., UnitedHealthcare Benefits of Texas, Inc. (f.k.a. PacifiCare

22  of Texas, Inc.), UnitedHealthcare Community Plan of Ohio, Inc. (f.k.a. Unison

23  Health Plan of Ohio, Inc.), UnitedHealthcare Community Plan of Texas, L.L.C.

24  (f.k.a. Evercare of Texas, L.L.C.), UnitedHealthcare Community Plan, Inc. (f.k.a.

25  UnitedHealthcare of the Great Lakes Health Plan, Inc.), UnitedHealthcare

26  Insurance Company of New York, UnitedHealthcare of Alabama, Inc.,

27  UnitedHealthcare of Arizona, Inc., UnitedHealthcare of Arkansas, Inc.,

28  UnitedHealthcare of Florida, Inc., UnitedHealthcare of Georgia, Inc.,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

2

UNITED'S NOTICE OF MOTION AND MOTION TO
DISMISS UNITED STATES' COMPLAINT
2:16-cv-08697-MWF (SSx)

1  UnitedHealthcare of New England, Inc., UnitedHealthcare of New York, Inc.,

2  UnitedHealthcare of North Carolina, Inc., UnitedHealthcare of Ohio, Inc.,

3  UnitedHealthcare of Oklahoma, Inc. (f.k.a. PacifiCare of Oklahoma, Inc.),

4  UnitedHealthcare of Oregon, Inc. (f.k.a. PacifiCare of Oregon, Inc.),

5  UnitedHealthcare of Pennsylvania, Inc. (f.k.a. Unison Health Plan of Pennsylvania,

6  Inc.), UnitedHealthcare of Tennessee, Inc., UnitedHealthcare of the Midlands, Inc.,

7  UnitedHealthcare of the Midwest, Inc., UnitedHealthcare of Utah, Inc.,

8  UnitedHealthcare of Washington, Inc. (f.k.a. PacifiCare of Washington, Inc.),

9  UnitedHealthcare of Wisconsin, Inc., and UnitedHealthcare Plan of the River

10  Valley, Inc. (collectively, "United") will, and hereby do, move the Court for

11  dismissal of this action (the "Motion").

12     This Motion is and will be made on the grounds that (1) the Government

13  fails adequately to plead that United's supposed regulatory violations were

14  material to the Centers for Medicare and Medicaid Services' decision to pay

15  United; and (2) the Government's First Cause of Action does not apply to alleged

16  overpayments that were identified prior to the 2009 Amendment to the False

17  Claims Act.

18     This Motion is based upon the accompanying Memorandum of Points and

19  Authorities, the Declaration of David J. Schindler filed concurrently herewith, the

20  pleadings and other papers on file herein, and such argument and evidence as may

21  be presented in connection with the hearing of this Motion.

22     This Motion is made following the conference of counsel pursuant to L.R. 7-

23  3, which took place on November 21, 2017.

24

25

26

27

28

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

3

UNITED'S NOTICE OF MOTION AND MOTION TO
DISMISS UNITED STATES' COMPLAINT
2:16-cv-08697-MWF (SSx)

1   Dated:  December 8, 2017          LATHAM & WATKINS LLP

2                                      DAVID J. SCHINDLER
                                       DANIEL MERON
3                                      ABID R. QURESHI

4

5                                      By /s/ David J. Schindler
                                          David J. Schindler
6                                         Attorneys for United Defendants

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................... 1

BACKGROUND .................................................................................................. 3

    A.    Medicare Advantage And Risk Adjustment ..................................... 3

    B.    The Government's Initial Complaint ................................................ 9

    C.    Judge Walter's Dismissal Of The Swoben Complaint And DOJ's Resulting Amendment In This Case ............................... 10

ARGUMENT ...................................................................................................... 11

I.    DOJ Still Fails Adequately To Allege That The Challenged Conduct Was Material To The Government's Decision To Pay United ............................................................................................... 11

    A.    DOJ Was Required To Plead That But For The Supposed Violations, CMS Would Not Have Paid The Relevant Claims ............................................................................................. 12

    B.    DOJ's Complaint Conspicuously Fails To Allege That CMS Would Not Have Paid Had It Known About The Supposed "Falsity" Of United's Attestations ................................. 13

    C.    DOJ's Allegation That CMS Would Have Accepted Repayments If United Had Deleted Unsupported Codes Cannot Establish The Materiality Of Its Reverse False Claims Allegations ........................................................................ 16

II.    DOJ's First Claim For Relief Does Not Apply To Alleged Overpayments Identified Before The 2009 Amendment To the False Claims Act ................................................................................. 18

Conclusion ........................................................................................................ 21

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*City of Chicago v. Purdue Pharma L.P.*,
211 F. Supp. 3d 1058 (N.D. Ill. 2016)..................................................14

*Household Credit Services, Inc. v. Pfenning*,
541 U.S. 232 (2004) ............................................................................21

*Jones v. United States*,
526 U.S. 227 (1999) ............................................................................21

*Knudsen v. Sprint Communications Co.*,
Nos. C13-04476 CRB et al., 2016 WL 4548924 (N.D. Cal. Sept. 1,
2016)......................................................................................................18

*United States v. BAE Systems Tactical Vehicle Systems, LP*,
No. 15-12225, 2017 WL 1457493 (E.D. Mich. Apr. 25, 2017).......................15

*United States v. Mead*,
426 F.2d 118 (9th Cir. 1970) ..............................................................12

*United States ex rel. Ahumada v. NISH*,
756 F.3d 268 (4th Cir. 2014) ..............................................................19

*United States ex rel. Dresser v. Qualium Corp.*,
No. 5:12-cv-0745-BLF, 2016 WL 3880763 (N.D. Cal. July 18,
2016)......................................................................................................13

*United States ex rel. Mateski v. Raytheon Corp.*,
No. 2:06-cv-03614-ODW(KSx), 2017 WL 3326452 (C.D. Cal.
Aug. 3, 2017) .......................................................................................13

*United States ex rel. Stone v. OmniCare, Inc.*,
No. 09 C 4319, 2011 WL 2669659 (N.D. Ill. July 7, 2011) ..............................20

*United States ex rel. Swoben v. Scan Health Plan*,
CV 09-5013-JFW, 2017 WL 4564722
(C.D. Cal. Oct. 5, 2017)...........................................................1, 10, 11, 14, 16

*United States ex rel. Swoben v. United Healthcare Insurance Co.*,
832 F.3d 1084 (9th Cir.), *amended on reh'g*, 848 F.3d 1161 (9th
Cir. 2016) .............................................................................................9, 16

**Page(s)**

*United States ex rel. Yannacopoulos v. General Dynamics*,
  636 F. Supp. 2d 739 (N.D. Ill. 2009), *aff'd*, 652 F.3d 818 (7th Cir.
  2011) ................................................................................................................ 19

*Universal Health Services, Inc. v. United States ex rel. Escobar*,
  136 S. Ct. 1989 (2016) ................................................................................ *passim*

## STATUTES AND REGULATIONS

31 U.S.C. § 3729(a)(1)(G) ................................................................................ 2, 11

31 U.S.C. § 3731(b) ............................................................................................. 20

42 U.S.C. § 1395c *et seq.* ..................................................................................... 3

42 U.S.C. § 1395j *et seq.* ...................................................................................... 3

42 U.S.C. § 1395w-21 *et seq.* ............................................................................... 4

42 U.S.C. § 1395w-23 ........................................................................................... 4

42 U.S.C. § 1395w-23(a)(1)(B) ............................................................................ 4

42 U.S.C. § 1395w-24(a)(6)(A) ............................................................................ 4

Pub. L. No. 111-21, 123 Stat. 1617 (2009) .................................................... 19, 20

42 C.F.R. § 422.254(b)(1) ..................................................................................... 4

74 Fed. Reg. 54,634 (Oct. 22, 2009) ..................................................................... 7

## OTHER AUTHORITIES

CMS, Notice of Final Payment Error Calculation Methodology (Feb.
  24, 2012), https://www.cms.gov/Research-Statistics-Data-and-
  Systems/Monitoring-Programs/recovery-audit-program-parts-c-
  and-d/Other-Content-Types/RADV-Docs/RADV-
  Methodology.pdf .............................................................................................. 8

John T. Boese, *Civil False Claims and* Qui Tam *Actions* (online 2017,
  4th ed.) ............................................................................................................ 20

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

iii

MEM. IN SUPPORT OF MOTION TO DISMISS
CASE NO. CV 16-08697-MWF

# INTRODUCTION

On October 5, 2017, Judge Walter dismissed a separate False Claims Act case against UnitedHealth Group, Inc. and certain of its subsidiaries ("United") on the ground that the Department of Justice ("DOJ") failed "to allege that CMS"—the Centers for Medicare and Medicaid Services—"would have refused to make risk adjustment payments to the United Defendants if it had known the facts." *United States ex rel. Swoben v. Scan Health Plan*, CV 09-5013-JFW (JEMx), 2017 WL 4564722, at *6 (C.D. Cal. Oct. 5, 2017).  Several days later, United notified DOJ that it intended to move for dismissal on that same ground in this case, which likewise presents questions about CMS risk adjustment payments.

DOJ responded by requesting an extra month to file an amended complaint first, before United filed that motion.  Yet, while the Amended Complaint-in-Intervention ("Amended Complaint" or "Compl."), ECF No. 171, includes more than a hundred new paragraphs of allegations, it still suffers from the same fundamental defect:  It fails to contain *any* allegation—even a cursory one—"that CMS would have refused to make risk adjustment payments to the United Defendants if it had known the facts."   *Swoben*, 2017 WL 4564722, at *6.  That omission infects all of DOJ's claims and warrants dismissal.

The omission is no mere oversight, either.  DOJ has not made that allegation because it *cannot* do so.  DOJ's claims rest on the premise that MA plans are entitled to risk adjustment payments only for medical conditions that are adequately documented in a patient's *medical charts* (as opposed to those conditions that are separately and sometimes incorrectly identified in provider-based coding included in *claims submissions*), notwithstanding the presence of similar discrepancies in CMS's own data.  That premise implicates an industry-wide regulatory discussion that has lasted the better part of a decade.  During that time, senior officials at CMS have acknowledged that the theory DOJ is pressing here would, if correct, result in Medicare Advantage plans being *under*paid for the

insurance risk they assume from CMS.  This motion does not present the merits of that issue, which are pending in an Administrative Procedure Act case United filed in the U.S. District Court for the District of Columbia.  But the issue nevertheless is highly relevant, because it explains why DOJ has been unable to make essential *factual* allegations here.

Put simply, the Amended Complaint lacks the essential allegations because DOJ knows the true facts: namely, that CMS has been aware of errors in coding data submitted by United (and every MA insurer) and has never once sought to withhold payment.  And while at times in this litigation DOJ has asserted that it should have the final say about how the Medicare Advantage program operates, it is CMS that has the statutory authority to run that program and decide what kinds of alleged violations warrant withholding payment.  DOJ cannot override that authority by converting an alleged regulatory violation the client agency *itself* has deemed immaterial into a vehicle for imposing draconian penalties and fines under the False Claims Act.  Because DOJ does not and cannot allege that CMS would have withheld payment if it had known the facts, the Amended Complaint should be dismissed in its entirety.

Seeking to avoid that outcome, DOJ asserts a *new* "First Claim for Relief" in the Amended Complaint under 31 U.S.C. § 3729(a)(1)(G), the so-called "reverse false claims" provision of the False Claims Act.  DOJ alleges there that even if CMS would not have denied payment if it had known the facts, CMS's computer system would have automatically accepted repayment if *United* had voluntarily cancelled its claims.  As a result, DOJ asserts, United's failure to rescind its claims was "inexorably material."  That novel and unsupported theory ignores that materiality is determined by how the *government* would have responded if it knew the facts, not by what would have happened if the defendant in a False Claims Act case had voluntarily repaid claims.  Otherwise, DOJ could convert literally any alleged regulatory violation, however immaterial, into a reverse false claim case

simply by alleging that if the defendant had mailed the government a check for repayment, the government would have cashed it.  To borrow the Supreme Court's recent language, "[t]he False Claims Act does not adopt such an extraordinarily expansive view of liability."  *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2004 (2016).  This portion of Section 3729(a)(1)(G) does not, in any event, even apply to overpayments DOJ alleges United received and had knowledge of before May 2009, when the language was added to the False Claims Act and made expressly prospective.

For these reasons, the Court should dismiss the Amended Complaint.[1]  And given that DOJ was aware of the importance of pleading "that CMS would have refused to make risk adjustment payments to the United Defendants if it had known the facts" yet was unable after a month-long amendment process to make that indispensable allegation in good faith, the dismissal should be with prejudice.

## BACKGROUND

### A.    *Medicare Advantage And Risk Adjustment*

The Medicare Act establishes a federal health insurance program for disabled and elderly individuals.  Parts A and B of the Act create the traditional Medicare program.  *See* 42 U.S.C. § 1395c *et seq.*; *id.* § 1395j *et seq.*  Beneficiaries enrolled in traditional Medicare receive healthcare from a network of healthcare providers, including doctors, hospitals, and other medical professionals, whom CMS reimburses based on the claims those professionals submit for the services

---

[1]    The United States has intervened in this case as to all of the claims brought against United, and its Amended Complaint is therefore the operative complaint. Relator Benjamin Poehling has indicated that he does not intend to pursue any claims beyond those asserted by the United States, *see* ECF No. 117 at 2, and has agreed that there is no need for United to respond to his Second Amended Complaint.

1    they render.  For this reason, traditional Medicare beneficiaries are often referred
2    to as fee-for-service ("FFS") beneficiaries.

3         This case concerns the Medicare Advantage program created under Part C of
4    the Medicare Act.  *See id.* § 1395w-21 *et seq*.  Medicare Advantage (sometimes
5    referred to here as "MA") allows individuals eligible for traditional Medicare to
6    receive healthcare benefits through private insurance plans instead.  Under the MA
7    program, private insurers like United are responsible for covering at least the same
8    level of benefits as traditional Medicare, and for ensuring that providers are paid
9    for their services.  In return, CMS makes fixed (or "capitated") per-member-per-
10   month payments to the MA plans—effectively insurance premiums.  *See generally*
11   *id*. § 1395w-23.

12        As with other types of insurance, it costs more to insure sicker beneficiaries
13   or beneficiaries who are projected to be sicker in the near future than healthier
14   beneficiaries.  The Medicare Advantage program addresses that fact through an
15   annual risk adjustment process.  Each year, an MA plan signs a contract with CMS
16   in which it agrees on the payment it will require from CMS to provide the benefits
17   covered by Medicare Parts A and B to a Medicare "enrollee with a national
18   average risk profile."   *Id.*  § 1395w-24(a)(6)(A);  *see also*  42  C.F.R.
19   § 422.254(b)(1).  That payment amount generally must be less than or equal to
20   CMS's actual costs for providing healthcare to an average FFS beneficiary in the
21   same area.  42 U.S.C. § 1395w-23(a)(1)(B).  CMS then adjusts that payment
22   amount to reflect the level of risk posed by the MA plan's actual beneficiaries.  If
23   the MA plan's beneficiaries are more risky than average, the plan's payment
24   amount will go up; if they are less risky, it will go down.

25        CMS designed, and implemented, a model to determine how much to pay an
26   MA plan in each year.  It was, and is, predicated on an analysis of medical
27   diagnosis codes, which are numerical codes used by doctors and other medical
28   professionals on claims and other forms to designate a particular medical

diagnosis.  *See* Compl. ¶ 63.  Using the diagnosis codes and cost data for its own FFS beneficiaries, CMS predicts how much it will cost an MA plan to care for a beneficiary who has a given diagnosis code.[2]  The model might indicate, for example, that Medicare beneficiaries who have a diagnosis code for diabetes cost 30 percent more to care for in the FFS program (on average) than they would if they did not have that code.  CMS assumes that MA plans will see a similar relationship between diagnosis codes and medical costs, and so it uses the analysis of its own FFS program codes and costs to adjust MA plans' payment amounts as well.  Thus, roughly speaking, an MA plan would receive an incremental payment of 30 percent of its agreed-upon payment amount for each of its patients with the diabetes code, in order to account for the increased risk associated with that code. CMS's model relies entirely on the codes it receives from third-party providers and, more importantly, CMS knows that a substantial number of those codes are not supported in the underlying medical charts.  Indeed, the projected payments assume that some of the codes reflect conditions that the patient does not actually have.

DOJ's allegations here concern United's submission of risk adjustment data generated by the medical professionals who treat United's MA plan members. Although the Complaint is exceedingly detailed in some respects, it boils down to the theory that United submitted risk adjustment codes that did not accurately measure the risk of its patient population because the codes lacked adequate support in the associated *medical charts* of its members.  *See, e.g.*, Compl. ¶¶ 11-12.  In simplest terms, DOJ claims that United knew, or should have known, that the third party coding it passed along to CMS contained errors.  DOJ notes that

---

[2]   United's motion for summary judgment in its APA case explains CMS's risk-adjustment model in greater detail.  *See* United's Mem. in Supp. of Mot. for Summ. J. 9-12, *UnitedHealthcare Insurance Co. v. Price*, No. 1:16-cv-00157 (D.D.C. Oct. 17, 2017), ECF No. 47-1.

United reviewed the medical charts of some of its plan members to find additional codes that *should* have been submitted (but were not), and claims that this review process put United on notice of the codes that should *not* have been submitted (but were). *See, e.g.*, *id.* ¶¶ 12-13.[3]  DOJ further alleges that United violated the False Claims Act when it submitted Attestations certifying that the codes it had submitted were accurate to the best of its knowledge, information, and belief.  *See, e.g.*, *id.* ¶¶ 98-102 (allegations about Attestations); *id.* ¶¶ 345-46 (identifying Attestations as basis for Second Claim for Relief); *id.* ¶¶ 349-50 (identifying Attestations as basis for Third Claim for Relief); *id.* ¶¶ 353-54 (identifying Attestations as basis for Fourth Claim for Relief).

Long before this False Claims Act suit was filed, CMS and the health insurance industry began a discussion of their own over the existence and implications of unsupported diagnosis codes in their respective sets of data. Insurance providers have argued that unsupported codes submitted by MA plans simply offset the unsupported codes similarly submitted by providers in the FFS program, such that MA plans would actually be *under*paid if they were required to delete codes that lacked support in their members' charts.  DOJ has repeatedly framed its allegations as showing that United has been paid for conditions that its plan members do not have (and will no doubt offer that framing again here).  But the reality is that CMS knew full well that some diagnosis codes reflect conditions

---

[3]   While United is required to accept DOJ's factual allegations for purposes of this motion, it vigorously disputes the suggestion that merely because a retrospective chart reviewer doing a "blind" chart review did not identify every diagnosis code that the provider's own coder had found, the provider's own codes were necessarily wrong or suspect.  There are many reasons that the billing staff in a doctor's office might capture a code that a later reviewer would not, such as greater familiarity with the doctor's handwriting or recordkeeping practices.  And given that medical charts of Medicare-eligible patients often span dozens, and sometimes even *hundreds*, of pages, it would be remarkable if either the first *or* second coder consistently captured every code that was supported in a given patient's charts.

1   that patients do not have, and it built the presence of those codes into its payment
2   system.

3        The payments that CMS makes to MA plans are lower than they otherwise
4   would be because they already take into account the existence of unsupported
5   diagnosis codes throughout the health system.  When CMS calculates the average
6   incremental cost associated with a given code in the FFS program, it does not
7   confirm that its FFS diagnosis codes seen in claims are supported by associated
8   medical charts.  Some of the patients CMS uses to calculate the average cost
9   associated with a diagnosis code thus do not actually have the condition with
10  which the code is associated.  This reduces the cost associated with the code
11  compared to a hypothetical model in which only patients with *verified* codes were
12  included.  MA plans have argued that it would violate basic principles of actuarial
13  science—and the Medicare Act itself—to use the risk associated with *unverified*
14  codes in the FFS population to determine payment amounts for *verified* codes in
15  the MA population.  More concretely, doing so would result in a windfall to CMS,
16  which reduces its per-code payments in the first place because of the presence of
17  unsupported codes, and would then recover essentially that same money a second
18  time by requiring plans to delete any codes that are not supported.

19       At times, CMS has acknowledged the merit of that position, which is
20  directly contrary to DOJ's theory in this case.  The most notable instance came in
21  connection with CMS's Risk Adjustment Data Validation ("RADV") audits,
22  through which CMS identifies and recovers overpayments it has made to MA
23  plans.  In 2008, CMS announced its intent to use RADV audits on samples of MA
24  plans' diagnosis codes to estimate the plans' overall rates of unsupported codes,
25  and to then reduce the plans' overall payment amounts in a way that would
26  effectively deny them payment for unsupported codes.  *See* 2009 Proposed RADV
27  Rule, 74 Fed. Reg. 54,634, 54,674 (Oct. 22, 2009).  The plans responded that doing
28  so would leave the plans underpaid, for the reasons explained above.  *See, e.g.,*

Aetna Inc. Comments on Proposed Payment Error Calculation Methodology for Part C Organizations Selected for Contract-Level RADV Audits at Exhibit 1, p. 21-25; Humana Comment on RADV Sampling and Error Calculation Methodology at Exhibit 2, p. 42-45.[4]  And CMS eventually agreed.  Internally, its Division of Payment Validation determined that MA plans would be undercompensated unless CMS accounted for its own use of diagnosis codes from FFS "beneficiaries who don't actually have the disease," which "tends to reduce the estimated average cost of various conditions" that CMS uses to calculate risk adjustment payments. United's Motion to Supplement the Administrative Record 13, *UnitedHealthcare Insurance Co. v. Price* ("*UnitedHealthcare v. Price*"), No. 1:16-cv-00157-RMC (D.D.C. Oct. 2, 2017), ECF No. 44 (quoting agency briefing materials released under FOIA attached as Exhibit C thereto, ECF No. 44-4).   Following that determination, CMS announced that it would develop a "FFS adjuster" for use in its RADV audits that would "account[] for the fact that the documentation standard used in RADV audits to determine [an MA] contract's payment error (medical records) is different from the documentation standard used to develop the Part C risk-adjustment model (FFS claims)."   CMS, Notice of Final Payment Error Calculation Methodology (Feb. 24, 2012), https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/recovery-audit-program-parts-c-and-d/Other-Content-Types/RADV-Docs/RADV-Methodology.pdf.

To be sure, CMS has not *always* agreed entirely with the MA plans' approach.  As this Court knows, United brought an administrative lawsuit in the

---

[4]   The regulatory comments cited in this brief, which are attached as Exhibits to the accompanying Declaration of David J. Schindler for ease of reference, have all been designated by CMS as part of the administrative record in the pending Administrative Procedure Act suit that raises these issues, *UnitedHealthcare Insurance Co. v. Price* ("*UnitedHealthcare v. Price*"), No. 1:16-cv-00157-RMC (D.D.C.).

U.S. District Court for the District of Columbia challenging a 2014 CMS rule that relies on the same theory that DOJ is pursuing here, and wholly fails to account for errors in FFS data when assessing overpayment amounts.  *See UnitedHealthcare v. Price*, Order Denying Motion to Transfer 3-4, ECF No. 154 (discussing APA suit).  Again, the merits of that dispute are not presently before this Court.[5]  For present purposes, the important point is that CMS has been aware of and engaged in this ongoing debate for a long time—and that its views have, at times, departed sharply from the understanding on which DOJ's theory here rests.  That reality helps to explain why DOJ has been unable to allege that if CMS had known the "truth" about United's risk adjustment data Attestations and the alleged absence of chart support for United's diagnosis codes, it would have refused to pay United's claims.

## B.   The Government's Initial Complaint

*Qui tam* relator Benjamin Poehling filed this False Claims Act case in the Western District of New York in 2011.  *See* First Am. Compl., ECF No. 8.  DOJ then spent more than five years deciding whether to pursue the case, ultimately opting to intervene in late 2016 after the Ninth Circuit reversed the dismissal of a different False Claims Act case against United involving risk adjustment.  *See United States ex rel. Swoben v. United Healthcare Ins. Co.*, 832 F.3d 1084 (9th Cir.), *amended on reh'g*, 848 F.3d 1161 (9th Cir. 2016).  Expressly declaring its desire to avoid "inconsistent judicial decisions," DOJ asked the Western District of New York on November 7, 2016 to transfer Poehling's suit to this District.

---

[5]   United and the Secretary of Health and Human Services have already filed lengthy cross-motions for summary judgment in that case, where the District Court has before it a 12,000-page Administrative Record that covers the past instances in which CMS has taken differing approaches on the question.  *See UnitedHealthcare v. Price*, United's Mem. in Supp. of Mot. for Summ. J., ECF No. 47-1; *UnitedHealthcare v. Price*, Defs.' Mem. in Supp. of Cross-Mot. for Summ. J., ECF No. 57-1.  America's Health Insurance Plans is also supporting United in that case as an amicus, presenting the views of the insurance industry more widely.

Memorandum of Law In Support of Unopposed Motion of the United States to Transfer Venue 6, ECF No. 49.  The Western District of New York agreed, *see* ECF No. 50, and DOJ thereafter formally intervened in the case and filed a Complaint-In-Intervention on May 16, 2017.  *See* ECF No. 114.  The complaint contained five counts—three counts asserting claims under the False Claims Act, and two asserting tag-along common law claims for Unjust Enrichment and Payment By Mistake.  *Id.* ¶¶ 234-52.

In July 2017, United moved to transfer this case to the District of Columbia, where it could be coordinated with United's pending APA action.  *See* ECF No. 134.  This Court denied that motion on September 28, 2017, and ordered United to respond to DOJ's Complaint within 20 days.  *See* ECF No. 154 at 12; *see also* ECF No. 133.

## C.    *Judge Walter's Dismissal Of The* Swoben *Complaint And DOJ's Resulting Amendment In This Case*

An intervening event interrupted that schedule.  On October 5, 2017, Judge Walter issued a decision dismissing DOJ's claims against United in *Swoben*—the case that led DOJ to seek a transfer to this District in the first place in order to avoid inconsistent judicial decisions.  *See Swoben*, 2017 WL 4564722, at *1-9. Judge Walter held (among other things) that DOJ's *Swoben* complaint "fail[ed] to allege that CMS would have refused to make risk adjustment payments to the United Defendants if it had known the facts about the United Defendants' alleged involvement with the . . . chart review process" at issue there.  *Id.* at *6.  Under the Supreme Court's decision in *Escobar*, Judge Walter held, that was fatal:  In order to survive a motion to dismiss, DOJ was required to plead "that [CMS] would not have paid these claims had it known of these violations."  *Id.* (quoting *Escobar*, 136 S. Ct. at 2004).

Judge Walter granted DOJ leave to amend its complaint in order to attempt to plead adequately that CMS would not have paid the claims in question.  *Id.*

DOJ instead elected to dismiss its claims against United in the *Swoben* suit in their entirety. Notice of Dismissal Without Prejudice Pursuant to Federal Rules of Civil Procedure 41(a) or (c), *Swoben* (C.D. Cal. Oct. 12, 2017), ECF No. 341.

Following the *Swoben* dismissal, United and DOJ conferred about United's upcoming motion to dismiss in this case. United expressed its intent to make a nearly identical materiality argument regarding the deficiencies in DOJ's complaint here. DOJ responded that it planned to file an amended Complaint-in-Intervention. *See* ECF No. 165 at 1. The parties thereafter agreed to, and this Court approved, a month-long extension that would allow DOJ adequate time to file an amended complaint. *See* ECF No. 166.

On November 17, 2017, DOJ filed the Amended Complaint, which added a new lead count. *See* ECF No. 171. The "First Claim for Relief" in the Amended Complaint now asserts violations of the "second part" of the so-called "Reverse False Claims" provision of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G). *Id.* ¶¶ 341-42. DOJ appears to have made that provision the basis for its new first count because it was not directly at issue in Judge Walter's recent *Swoben* dismissal (having been waived before the Ninth Circuit) and does not depend—at least according to DOJ—on the materiality of United's Attestations. *See Swoben,* 2017 WL 4564722, at *7-8; Compl. ¶ 342 (making no mention of United's Attestations, unlike the other three False Claims Act counts).

## ARGUMENT

## I. DOJ Still Fails Adequately To Allege That The Challenged Conduct Was Material To The Government's Decision To Pay United

The Amended Complaint fails adequately to allege that United's supposed regulatory violations were material to CMS's decision to pay United. As with its complaint in *Swoben*, the Amended Complaint here repeatedly affixes the "material" *label* to those alleged violations, *see, e.g.*, Compl. ¶¶ 334-35, but fails ever to allege that CMS would not have paid United's claims if it had known the

"truth" (as DOJ alleges it) about the accuracy of United's Risk Adjustment Attestations. As with its complaint in *Swoben*, therefore, the Amended Complaint here should be dismissed in its entirety for that basic pleading deficiency. Moreover, because DOJ was plainly on notice of the need to include such allegations, and took a month to do all it could to shore up its allegations following the *Swoben* dismissal (after a years-long investigation to ascertain the facts), the dismissal should be with prejudice.

### A. DOJ Was Required To Plead That But For The Supposed Violations, CMS Would Not Have Paid The Relevant Claims

The Supreme Court held in *Escobar* that, in order to be actionable under the False Claims Act, a "misrepresentation must be material to the other party's course of action," which generally means "the Government's payment decision." 136 S. Ct. at 2001, 2002.[6] This "materiality standard is demanding." *Id.* at 2003. The fact that the government "would have the option to decline to pay if it knew of the defendant's noncompliance," the Court held, is not "sufficient for a finding of materiality." *Id.* Even where the government has "designate[d] compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment," that is insufficient. *Id.* A complaint must instead allege factually, as a matter of "'likely or actual behavior'" rather than mere legal entitlement, "that the [government] would not have paid these claims had it known of these violations." *Id.* at 2002, 2004 (citation omitted); *see also id.* at 2003 n.5 (recognizing that plaintiff must allege that if the false statement "had . . . not been made, the party complaining of the fraud *would not have taken* the action alleged to have been induced by the misrepresentation" (emphasis added)).

---

[6]  The same materiality requirement also applies to DOJ's common law claims for unjust enrichment and payment by mistake. *See, e.g.*, *United States v. Mead*, 426 F.2d 118, 124 (9th Cir. 1970).

1    The Supreme Court also made clear that this "rigorous materiality
2    requirement" should be enforced vigilantly at the motion-to-dismiss stage,
3    specifically directing that "False Claims Act plaintiffs must . . . plead their claims
4    with plausibility and particularity under Federal Rules of Civil Procedure 8 and
5    9(b) by, for instance, pleading facts to support allegations of materiality." *Id.* at
6    1996, 2004 n.6.  In the year-and-a-half since *Escobar*, courts have done just that.
7    *Swoben* is one obvious (and directly applicable) example, *see* 2017 WL 4564722,
8    at *6, but there are many others.  In *United States ex rel. Dresser v. Qualium
9    Corp.*, for example, the Northern District of California dismissed a DOJ complaint
10   that "allege[d] in several places that the government would not have paid
11   Defendants' claims had they known of fraudulent conduct" because the complaint
12   "d[id] not explain why."  No. 5:12-cv-0745-BLF, 2016 WL 3880763, at *6 (N.D.
13   Cal. July 18, 2016).  And in *United States ex rel. Mateski v. Raytheon Corp.*, Judge
14   Wright held that an allegation that "'[t]he United States would not have paid
15   Raytheon's Requests for Payment if the United States Government knew . . . that
16   Raytheon had not performed . . . in conformity with the requirements and
17   specifications of the . . . Contract'" was "'insufficient'" because "it does not show
18   *how* Raytheon's misrepresentations were material."     No. 2:06-cv-03614-
19   ODW(KSx), 2017 WL 3326452, at *7 (C.D. Cal. Aug. 3, 2017) (citations omitted).
20   If generic allegations that the government would not have paid are insufficient
21   under *Escobar*, it necessarily follows that the wholesale failure even to make that
22   boilerplate allegation is insufficient as well.

23       **B.    DOJ's Complaint Conspicuously Fails To Allege That CMS Would
24           Not Have Paid Had It Known About The Supposed "Falsity" Of
               United's Attestations**

25       The Amended Complaint falls well short of *Escobar*'s "demanding" and
26   "rigorous" standard.  While it includes bare-bones assertions that United's Risk
27   Adjustment Attestations were "material," *see, e.g.*, Compl. ¶ 349 ("Defendants
28

knowingly made, used, or caused to be made or used a false Risk Adjustment Attestation material to a false or fraudulent claim . . . ."), it fails to allege (let alone plausibly or with particularity) that CMS would have refused to make risk adjustment payments to United if it had known the "facts" behind those Attestations.

This deficiency is especially conspicuous because DOJ took a month to attempt to bolster its allegations on precisely this point following Judge Walter's decision in *Swoben*.  DOJ *knew* that if it hoped to preserve its claims based on the materiality of the Attestations, it needed to allege that CMS would not have paid had it known that the Attestations were false.  *Swoben*, 2017 WL 4564722, at *6. The only explanation for its failure to make that allegation is that it *cannot* make it without running afoul of the good faith pleading requirements of Rule 11.

The government has known of Poehling's claims for six years, and has investigated those allegations exhaustively.  Indeed, some of the sources DOJ cites to show that United was on notice of the supposed falsity of its claims were CMS audits.  *See, e.g.*, Compl. ¶ 155.  If those audits were sufficient to put United on notice of the supposed falsity, then they were sufficient to put CMS on notice as well.  And at the very least, it is "difficult[ to] understand[] how the [government] remained unaware that the claims were false after the lawsuit was filed."  *City of Chicago v. Purdue Pharma L.P.*, 211 F. Supp. 3d 1058, 1079 (N.D. Ill. 2016).  Yet CMS has continued to make risk adjustment payments to United, without ever once holding back a payment because of doubts about whether United's Attestations are accurate.  DOJ cannot plausibly allege that CMS would not pay United on these claims because it knows full well that CMS *is* paying them.

Instead, this case is a clear example of DOJ pressing a theory that is at odds with—or at the very least unsupported by—the government agency that is actually charged with responsibility for deciding whether to pay the claims in question.  *Cf. United States v. BAE Sys. Tactical Vehicle Sys., LP*, No. 15-12225, 2017 WL

1457493, at *2 (E.D. Mich. Apr. 25, 2017) (describing DOJ's decision to pursue False Claims Act suit even after Army withdrew underlying contract claim on which False Claims Act allegations were based).  As discussed above, at least some senior CMS officials have long agreed with United's position that MA plans would be underpaid if—as DOJ's theory here would effectively require—they were paid only for *verified* diagnosis codes, but using payment amounts calculated with *unverified* FFS data.  *See supra* at 6-8.  United and CMS are currently litigating that issue in an important APA challenge, and the dispute stretches back to well before Poehling's *qui tam* complaint was first filed in 2011.  *See, e.g.*, American Academy of Actuaries Comment on RADV Sampling and Error Calculation Methodology at Exhibit 3, p. 69-70; Aetna Inc. Comments on Proposed Rule Regarding Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs, at Exhibit 4, p. 89; America's Health Insurance Plans Comment on Proposed Rulemaking Regarding Medicare Program; Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs, at Exhibit 5, p. 141-42.  And United employees have repeatedly discussed these issues with senior leadership at CMS, as the Complaint itself painstakingly acknowledges.  *See* Compl. ¶¶ 224-29.

DOJ has sought to insert itself as the relevant decision-maker in this process.  In its initial complaint, it went so far as to assert that because DOJ was not present at United's meetings with CMS, the senior CMS officials who participated "were not authorized to provide legal advice about United's obligations under the FCA *or any other laws*," including the Medicare Act.  First Complaint-in-Intervention ¶ 183, ECF No. 114 (emphasis added).  But arguments like that one cannot change the fact that it is CMS, not DOJ, that administers the Medicare Advantage program, and thus CMS, not DOJ, that decides whether an asserted regulatory violation is one over which the government will withhold payment.  That is

likewise why DOJ cannot allege consistent with Rule 11 that the government would not have paid United's claims if it had known the facts about United's Attestations that DOJ now asserts.

Without that allegation, *Escobar* requires dismissal of DOJ's claims based on the Attestations. *See* 136 S. Ct. at 2004. As in *Swoben*, DOJ's failure to allege adequately that the supposed falsity of United's Attestations was material to CMS's decision to pay dooms each of those Counts. *See* Compl. ¶ 345 (Second Claim for Relief, asserting liability under 31 U.S.C. § 3729(a)(1)(A) and its predecessor provision based on "a false or fraudulent Risk Adjustment Attestation"); *id.* ¶ 349 (Third Claim for Relief, asserting liability under 31 U.S.C. § 3729(a)(1)(B) and its predecessor provision based on "a false Risk Adjustment Attestation"); *id.* ¶ 353 (Fourth Claim for Relief, asserting liability under 31 U.S.C. § 3729(a)(1)(G) and its predecessor provision based on "a false Risk Adjustment Attestation").

### C. DOJ's Allegation That CMS Would Have Accepted Repayments If United Had Deleted Unsupported Codes Cannot Establish The Materiality Of Its Reverse False Claims Allegations

Unable to establish that the Attestations' supposed falsity was material, DOJ has tried to reshape its case around a new "reverse false claims" count that was not considered in *Swoben*, by either the Ninth Circuit or in the materiality decision on remand. *See* 848 F.3d at 1172 n.6 (noting that reverse false claims theory had been waived); 2017 WL 4564722, at *7-8 (refusing to consider waived reverse false claims theory on remand). As noted above, the First Claim for Relief of DOJ's Amended Complaint is now a claim under "the second part of 31 U.S.C. § 3729(a)(1)(G)," which DOJ has attempted to plead without reference to the materiality of the Attestations. Compl. ¶ 342. Instead, DOJ focuses that first count on the alleged falsity of *specific* diagnosis codes rather than (as in the other counts) the Attestations. *Id.* And it pleads that the codes are "inexorably material to the

amount (if any) paid" because "[i]f Defendants had complied with their obligation to delete invalid diagnoses . . ., Medicare's Risk Adjustment System . . . would have processed the corrected data and recalculated the risk score . . . automatically." *Id.* ¶¶ 333-34.

That novel and unsupported theory, if correct, would eviscerate the False Claims Act's materiality requirement in every case.   As the Supreme Court explained in *Escobar*, a proper materiality analysis focuses on the hypothetical response of "the party complaining of the fraud"—*i.e.*, the government—if it had known of the violations.   136 S. Ct. at 2003 n.5.   DOJ's Complaint, however, focuses instead on hypothetical different actions that the *defendant*, United, allegedly should have taken, and pleads that if United had attempted to return the payments, then of course CMS "automatically" would have accepted them. Compl. ¶¶ 333-34.  But that will always be true, regardless of the agency's view of how important the underlying violation is.

*Escobar* itself illustrates the problem with DOJ's approach.   There, the government conceded at oral argument that under its view of materiality, "[i]f the Government contracts for health services and adds a requirement that contractors buy American-made staplers, anyone who submits a claim for those services but fails to disclose its use of foreign staplers violates the False Claims Act" because "the defendant's use of foreign staplers would entitle the Government not to pay the claim in whole or in part."  136 S. Ct. at 2004.  "The False Claims Act," the Court responded, "does not adopt such an extraordinarily expansive view of liability."  *Id.*  It simply cannot be that the exact same use of foreign staplers would result in a violation of the *reverse* false claims provision merely because the government pleads that it would accept repayment if a contractor, having realized that it had violated that contractual provision, mailed back a check or rescinded previously submitted claims for payment.

DOJ has tried similar arguments before, without success.  In *Knudsen v. Sprint Communications Co.*, Judge Breyer considered a relator's allegations that a telephone company had failed to provide discounts to the government required under a "price reduction clause" of the government's contract.  Nos. C13-04476 CRB et al., 2016 WL 4548924, at *13 (N.D. Cal. Sept. 1, 2016).  The relator argued that the reductions were "per se material" because they affected the price the government would pay, *id.*, and DOJ argued in a statement of interest that the materiality standard was "easily met" because a price reduction clause "dictates how much the government pays" and is thus "manifestly material to the government's payment decision," United States' Statement of Interest, *Knudsen* 4 (N.D. Cal. July 7, 2016), ECF No. 89.  Indeed, DOJ contended that it was "difficult to imagine a violation that more clearly has a natural tendency to affect the government's payment decision."  *Id.*  Judge Breyer, however, dismissed the complaint.  While it might have been possible that the price reduction clause was material, he held, the complaint lacked factual allegations showing that this was *in fact* true.  *Knudsen*, 2016 WL 4548924, at *13.  Merely pointing to the clause's language and *potential* effect on the price the government would have paid, he held, was not enough.  *See id.*  Instead, the complaint had to include factual allegations of the sort that the Supreme Court identified in *Escobar* about the actual effect on the government's behavior.  *See id.*  The exact same thing is true here: DOJ's new First Claim for Relief lacks the necessary allegations that the codes were not just potentially but *actually* material, and therefore should be dismissed along with the rest of DOJ's claims.

## II.    DOJ's First Claim For Relief Does Not Apply To Alleged Overpayments Identified Before The 2009 Amendment To the False Claims Act

DOJ's new First Claim for Relief also has an additional problem.  DOJ appears to assert that claim with respect to conduct as far back as 2005, but the

portion of the False Claims Act on which it relies applies only to overpayments that United allegedly first learned of after May 20, 2009.

A central aspect of DOJ's theory is that when United undertook chart reviews for the purpose of identifying additional diagnosis codes for submission to CMS, those same reviews also put it on notice of codes that previously had been submitted but that lacked adequate chart support. *See, e.g.*, Compl. ¶ 122.  DOJ alleges that based on these chart reviews, United knew as far back as 2005 that it supposedly had been overpaid for those codes, but "knowingly and improperly avoided repaying Medicare" for them.  *Id.*   Until May 20, 2009, however, "retention of overpayment did not create an obligation" and thus was not a basis for liability under the False Claims Act.  *United States ex rel. Yannacopoulos v. Gen. Dynamics*, 636 F. Supp. 2d 739, 752 (N.D. Ill. 2009), *aff'd*, 652 F.3d 818 (7th Cir. 2011).   Even if DOJ otherwise were correct that United received overpayments before then and failed to return them to the government, therefore, that allegation would not state a claim.

As the Complaint describes, Congress amended the False Claims Act in the the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21, 123 Stat. 1617, adding the portion of Section 3729(a)(1)(G) on which the First Claim for Relief relies.  *See* Compl. ¶ 117.  Following that amendment, retention of an overpayment *can* create an obligation, the improper avoidance of which can be a basis for liability under Section 3729(a)(1)(G).   But Congress made that amendment explicitly prospective, stating that it would apply only to "conduct on or after the date of enactment"—*i.e.*, May 20, 2009.  *See* FERA, Pub. L. No. 111-21, § 4(f), 123 Stat. at 1621; *see also, e.g.*, *United States ex rel. Ahumada v. NISH*, 756 F.3d 268, 280 n.7 (4th Cir. 2014) ("[T]he 2009 amendments are generally not

retroactive.")[7]  The FERA amendment did not transform United's past acceptance and knowing retention of alleged overpayments into a retroactive basis for treble damages under the False Claims Act.

Nor can DOJ avoid that result by arguing that retention of pre-May 2009 overpayments suddenly became a *prospective* offense upon FERA's enactment that continues indefinitely until the obligation is repaid.  Courts have squarely rejected that argument on the ground that the "relevant retroactivity event" is "the moment a person comes to know of overpayments it is retaining."  *United States ex rel. Stone v. OmniCare, Inc.*, No. 09 C 4319, 2011 WL 2669659, at *4 (N.D. Ill. July 7, 2011).  If the defendant knowingly retained a given overpayment before FERA's enactment, therefore, then imposing liability for the "ongoing retention of overpayments" after the amendment was adopted "would work an impermissibly retroactive effect."  *Id.*; *see also* John T. Boese, *Civil False Claims and* Qui Tam *Actions* § 5.01[B][3] (online 2017, 4th ed.).

To hold otherwise "would mean that any claim [a] Defendant has ever made on the United States government would be subject to liability under the FCA, so long as some money from that claim is somewhere in their coffers."  *Stone*, 2011 WL 2669659, at *4.  Indeed, construing Section 3729(a)(1)(G) to make retention of past overpayments a continuing offense would effectively abolish the six-year statute of limitations and ten-year statute of repose Congress enacted for the False Claims Act as a whole.  *See* 31 U.S.C. § 3731(b).  That is true not only for the reverse false claims provision itself, but for the other provisions of the False Claims Act as well.  Any time-barred suit under Section 3729(a)(1)(A) concerning the submission of a false claim, for example, could simply be resuscitated and

---

[7]  The only exception is FERA's amendments to Section 3729(a)(1)(B), which Congress made applicable "as if enacted on June 7, 2008."  FERA, Pub. L. No. 111-21, § 4(f)(1), 123 Stat. at 1621.

redrafted as a suit under Section 3729(a)(1)(G) based on the defendant's *retention* of the payment that that claim had generated, regardless of how long ago the allegedly false claim had been paid.  There is no basis in the text of the statute, or the legislative history, for believing that Congress intended that anomalous result—and it is a "fair assumption that Congress is unlikely to intend any radical departures from past practice without making a point of saying so."  *Jones v. United States*, 526 U.S. 227, 234 (1999).  Instead, the "language and design of the statute as a whole," *Household Credit Servs., Inc. v. Pfenning*, 541 U.S. 232, 239 (2004) (citation omitted), show that Congress did not silently add a "continuing offense" provision to the False Claims Act that nullifies its statutes of limitations and repose.

## CONCLUSION

DOJ filed the Amended Complaint in an attempt to cure the deficiencies that led *Swoben* to be dismissed.  It had every incentive to make the necessary allegations about materiality here that had been lacking there.  And yet it failed to do so.  It has failed adequately to allege that United's Risk Adjustment Attestations (Counts 2-4) or the unsupported diagnosis codes themselves (Counts 1, 5, and 6) were material.  And in trying (unsuccessfully) to find a way around that problem that was not already rejected in *Swoben*, it has made the additional error of invoking a legal provision that does not even apply to much of the time period addressed in the Amended Complaint.  For all of these reasons, DOJ's Complaint should be dismissed with prejudice.

Dated:  December 8, 2017          LATHAM & WATKINS LLP

DAVID J. SCHINDLER
DANIEL MERON
ABID R. QURESHI


By /s/ David J. Schindler
David J. Schindler
Attorneys for United Defendants