CHAD A. READLER
Acting Assistant Attorney General, Civil Division
NICOLA T. HANNA
United States Attorney
DOROTHY A. SCHOUTEN
DAVID K. BARRETT
DAVID M. HARRIS
JOHN E. LEE (CBN 128696)
Assistant United States Attorneys
     300 N. Los Angeles Street, Room 7516
     Los Angeles, California 90012
     Tel: (213) 894-3995; Fax: (213) 894-7819
     Email: john.lee2@usdoj.gov
MICHAEL D. GRANSTON
DANIEL R. ANDERSON
CAROL L. WALLACK
JUSTIN DRAYCOTT
PAUL G. FREEBORNE
JESSICA KRIEG
PAUL PERKINS
Attorneys, Civil Division
United States Department of Justice
     P.O. Box 261, Ben Franklin Station
     Washington, D.C. 20044
     Tel: (202) 307-0486; Fax: (202) 307-3852
     Email: carol.wallack@usdoj.gov
JAMES P. KENNEDY, JR.
Acting United States Attorney
KATHLEEN ANN LYNCH
Assistant United States Attorney (Admitted PHV)
     138 Delaware Avenue
     Buffalo, New York 14201
     Tel: (716) 843-5830; Fax: (716) 551-3052
     Email: kathleen.lynch@usdoj.gov
Attorneys for the United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING,<br><br>        Plaintiffs,<br><br>        v.<br><br>UNITEDHEALTH GROUP, INC., *et al.*,<br><br>        Defendants. | No. CV 16-08697 MWF (SSx)<br><br>PLAINTIFF'S OPPOSITION TO UNITED'S MOTION TO DISMISS<br><br><br><br><br><br>Date: January 29, 2018<br>Time: 10:00 a.m.<br>Court: Hon. Michael W. Fitzgerald |

MEMORANDUM OF POINTS AND AUTHORITIES

TABLE OF CONTENTS

INTRODUCTION…………………………………………………………… 1

BACKGROUND ……………………………………………………………….. 3

    I.    The Risk Adjustment Payments Under The Medicare Advantage Program. 3

    II.    Defendants' Legal Obligation To Submit Valid Medical Diagnoses And Delete Invalid Medical Diagnoses ……………………………………5

    III.    Defendants' Violations Of The False Claims Act …………...…….……..8

ARGUMENT ………………………………………………………………9

    I.    The Amended Complaint Adequately Pleads Materiality ……………….9

        A.    The FCA And *Escobar*'s Materiality Requirement ……………….9

        B.    The United States Has Sufficiently Alleged That Defendant's Obligation To Delete Invalid Diagnoses was Material ……..……16

        C.    The Government Has Never Agreed That Defendants Can Keep Risk Adjustment Payments Based On Invalid Diagnoses…………18

        D.    The United States Has Sufficiently Alleged That Defendants' False Risk Adjustment Attestations Were Material …..…………...21

    II.    Section 3729(a)(1)(G) Is Not Being Applied Retroactively In This Case ..22

CONCLUSION ………………………………………………………………25

1

## TABLE OF AUTHORITIES

2  <u>CASES</u>                                                                    <u>PAGE(S)</u>

3  *Bryson v. United States*,
     396 U.S. 64 (1969) ................................................................. 20

4
5  *Cedars-Sinai Medical Center v. Shalala*,
     125 F.3d 765 (9th Cir. 1997) ................................................. 20

6  *City of Chicago v. Purdue Pharma*,
     211 F. Supp. 3d 1058 (N.D. Ill. 2016) ................................. 15

7  *Dennis v. U. S.*,
8    38f U.S. 855 (1966) ................................................................. 20

9  *Knudsen v. Sprint Communications Co.*,
     2016 WL 4548924 (C.D. Cal. Sept. 1, 2016) ........................ 15

10 *Kungys v. United States*,
     485 U.S. 759 (1988) ............................................................... 12
11
12 *Matrixx Initiatives, Inc. v. Siracusano*,
     563 U.S. 27 (2011) ................................................................. 12

13 *United States ex rel. Swoben v. United Healthcare Ins. Co.*,
     848 F.3d 1161 (9th Cir. 2016).......................................... *passim*
14
15 *United States v. Weiss*,
     914 F.2d 1514 (2d Cir.1990) ................................................. 20

16 *United States ex rel. Dresser v. Qualium Corp.*,
     2016 WL 3880763 (N.D. Cal. July 18, 2016) ...................... 10

17 *United States v. BAE Sys. Tactical Vehicle Sys.*,
18   2017 WL 1457493 (E.D. Mich. 2017) ................................. 18

19 *United States ex rel. Campie v. Gilead Sciences, Inc.*,
     862 F.3d 890 (9th Cir. 2017) ........................................... 11, 13

20 *United States ex rel. Escobar v. Universal Health Servs, Inc.*,
     842 F.3d 103 (1st Cir. 2016) (*Escobar II*) ......................... 12, 14
21
22 *United States ex rel. Mateski v. Raytheon Co.*,
     2017 WL 3326452 (C.D. Cal. 2017) ................................. 10, 11

23 *United States ex rel. Onnen v. Sioux Falls Indep. Sch. Dist. No. 49-5*,
     688 F.3d 410 (8th Cir. 2012) ............................................... 14

24 *United States ex rel. Stone v. OmniCare, Inc.*,
25   2011 WL 2669659 at 3-4 (N.D. Ill. July 7, 2011) ................ 22

26 *United States ex rel. Swoben v. United Healthcare Ins. Co.*,
     848 F.3d 1161 (9th Cir. 2016) ........................................... 1, 2

27 *United States v. Bourseau*,
     531 F.3d 1159 (9th Cir. 2008) ............................................... 16
28

*United States v. Lahey Clinic Hosp., Inc.*,
  399 F.3d 1 (1st Cir. 2005) ........................................................... 14

*United States v. Tenet Healthcare Corp.*,
  343 F.Supp.2d 922 (C.D. Cal. 2004) ........................................... 14

*Universal Health Servs.*, Inc. *v. United States ex rel. Escobar*,
  136 S. Ct. 1989 (2016) ........................................................ *passim*

*Wyler Summit P'ship v. Turner Broad. Sys.* Inc.,
  135 F.3d 658 (9th Cir. 1998) ......................................................... 2

<u>Statutes and Regulations</u>

Fraud Enforcement and Recovery Act of 2009, Pub.L. 111-21 ...................... 9

31 U.S.C. § 3729(a)(1)(A) ............................................................. 8

31 U.S.C. § 3729(a)(1)(B) ............................................................. 9

31 U.S.C. § 3729(a)(1)(G) ......................................................... 8, 9

31 U.S.C. § 3729(b)(3) ............................................................... 8

31 U.S.C. § 3729(b)(4) ............................................................ 9, 10

42 U.S.C. § 1395w-22 & (3) ........................................................... 3

42 U.S.C. § 1395w-23(a)(1)(A) ........................................................ 4

42 U.S.C. § 1395w-23(a)(1)(C) ........................................................ 4

42 U.S.C. § 1395w-23(a)(1)(C)(i) ................................................. 4, 19

42 C.F.R. § 422.504(l) ........................................................... 4, 5, 6

<u>Other Authorities</u>

65 Fed. Reg. 40,170 (June 29, 2000) ............................................. 21, 22

26 R. Lord, Willison on Contracts, § 69:12, p. 549 (4th ed. 2003) ............... 10

https://www.justice.gov/opa/pr/justice-department-recovers-over-37-billion-false-claims-act-cases-fiscal-year-2017 ...............................................................13

# INTRODUCTION

In this False Claims Act ("FCA") action, the United States alleges that UnitedHealth Group Inc. and its various subsidiaries ("Defendants") knowingly submitted false claims, made false statements, and improperly avoided their obligations to repay significant sums of money to the Medicare Program.  Over the past decade, Defendants reviewed millions of medical records as part of a concerted effort to identify additional diagnosis codes to increase the payments they received from Medicare by billions of dollars. Am. Compl. ¶¶ 10-13 & 164-177.  Those reviews also revealed that Defendants had submitted numerous invalid diagnoses to Medicare and obtained substantial sums of money based on those invalid diagnoses. *Id*. ¶¶ 13 & 235-38.  But Defendants ignored this information and never returned the money paid them based on the invalid diagnoses.  Although Defendants now attempt to cast themselves as innocent conduits of providers' erroneous diagnostic data, the Amended Complaint details their decade-long scheme to generate and report skewed data to obtain over a billion dollars in improper payments.[1]  Defendants also entered into agreements with many providers that incentivized them to report diagnoses to increase their own revenues.  Defendants then ignored information from their own medical record reviews about the reporting of invalid diagnoses by these incentivized providers. *Id*. ¶¶ 15-18 & 239-92.  Because of Defendants' deliberate ignorance and reckless disregard of information about the invalidity of their payment data, they knowingly submitted false Risk Adjustment Attestations to the Medicare Program each year. *Id*. ¶¶ 5-6 & 293-327.

---

[1] The Ninth Circuit has already rejected Defendants' attempt to miscast similar allegations. *United States ex rel. Swoben v. United Healthcare Ins. Co*., 848 F.3d 1161, 1173 (9th Cir. 2016) ("[T]he defendants mischaracterize Swoben's theory of the case. Swoben does not allege the defendants' certifications are false merely because they passively forwarded to CMS unsupported diagnosis codes they received from their medical providers. . . . Instead, Swoben alleges the defendants took affirmative steps to generate and report skewed data.").

Defendants' motion to dismiss primarily focuses on their argument that the Government insufficiently alleged materiality.  Defendants are incorrect because the Amended Complaint more than sufficiently alleges materiality.[2]  Furthermore, the Ninth Circuit has already recognized the critical role that diagnosis codes play in the Government's payment decision.  *See Swoben*, 848 F.3d at 1167 (explaining that "[t]he risk adjustment methodology relies on enrollee diagnoses").  The Ninth Circuit also recognized that the accompanying Attestations provided a "further bulwark against fraud," *id*. at 1168, enforceable, as here, through the prosecution of an FCA action.  Moreover, the Supreme Court's decision in *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016), recognizes that misrepresentations about violations of contractual or regulatory requirements that are "central" to payment are material.  *Id*. at 2004.  The Amended Complaint, which details Defendants' knowing violation of the "central" requirements to submit valid diagnoses and delete invalid diagnoses, more than satisfies the demands of Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.[3]

---

[2] *See, e.g.,* ¶ 12 ("Government would not have made risk adjustment payments based on these unsupported diagnoses or, if it had already made the payments, it would have recovered them from the Defendant MA Organizations or the other Defendants"); *id*. ¶ 13 ("Government would not have erroneously paid or would have recovered substantial sums of money (e.g., potentially over a billion dollars in risk adjustment payments for four payment years) to which the Defendant MA Organizations were not entitled"); *id*. ¶103 ("the submission of diagnoses that are not supported by the beneficiaries' medical records and, thus, are invalid directly and necessarily causes CMS to make risk-adjustment payments that it would not have made but for the submission of that false data").

[3] In deciding a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pled factual allegations in the Complaint and draw all reasonable inferences in favor of the non-moving party, here, the United States.  *See Wyler Summit P'ship v. Turner Broad. Sys. Inc.*, 135 F.3d 658, 661 (9th Cir. 1998).  Furthermore, a complaint satisfies Rule 9(b) when it provides enough detail to give the defendant notice of the particular misconduct which is alleged to constitute the fraud so that it can defend against the claims and not just deny them.  *Swoben*, 848 F.3d at 1180.  The Amended Complaint more than sufficiently does that here.

Nonetheless, Defendants argue that they were permitted to submit invalid diagnosis codes and falsely certify that their data were accurate and truthful because such misconduct was purportedly necessary for them to achieve "actuarial equivalence" with "fee for service" providers under Parts A and B of Medicare.  But Defendants' tortured construction of this statutory term is not objectively reasonably and would lead to absurd results, such as allowing – perhaps even requiring – Defendants and other Medicare Advantage organizations ("MAOs") to submit invalid diagnosis codes and to falsely certify to their accuracy and truthfulness.  Moreover, even if Defendants' purported grievance with the risk adjustment payment structure had merit (which it does not), it would not provide any basis for Defendants to engage in such "self-help" measures.  Just as a physician who believes she should be paid more for a medical procedure cannot bill for an additional procedure she did not perform and then falsely certify that she performed two procedures, Defendants cannot knowingly fail to delete invalid diagnoses for which they had received payment from Medicare and then certify to the Government that these diagnoses are accurate and truthful.

Defendants' only other argument about retroactive application of § 3729(a)(1)(G) is also incorrect.  The Government is not seeking a retroactive application here.  Accordingly, Defendants' motion to dismiss should be denied in its entirety.

## BACKGROUND

## I.      Risk Adjustment Payments Under The Medicare Advantage Program

Medicare Part C established the Medicare Advantage ("MA") Program, which allows Medicare beneficiaries to receive their benefits through private health insurance plans offered by MAOs, which must provide enrollees the benefits and services (other than hospice care) that are available to beneficiaries under Parts A and B of Medicare and may also offer supplemental benefits approved by the Government.  *See* 42 U.S.C. § 1395w-22(a)(1) & (3).  While the Centers for Medicare and Medicaid Services ("CMS"), the government agency responsible for administering the Medicare Program, pays for medical services under Parts A and B under what has been generally described

3

1   as a "fee-for-service" regime, MAOs are paid a pre-determined monthly sum for each

2   person they cover under Part C, 42 U.S.C. § 1395w-23(a)(1)(A), based in part upon the

3   characteristics of the particular beneficiary.  By statute, the payment depends on such

4   "risk factors" as the age, gender, and "health status" of the beneficiary, "as the Secretary

5   [of the Department of Health and Human Services] determines to be appropriate." *Id.*

6   §1395w-23(a)(1)(C).  Under this "risk adjustment" system, MAOs are paid the expected

7   cost of providing Medicare benefits to a given beneficiary even if they never actually

8   incur those costs.  MAOs receive more for providing benefits to older and sicker people

9   and less for younger and healthier ones.  Adjusting the payments in this way allows the

10  Secretary "to ensure actuarial equivalence," *id.* § 1395w-23(a)(1)(C)(i), between the

11  average payments that CMS would expect to make on behalf of a given beneficiary

12  under fee-for-service Medicare, and the payments made to MAOs for covering an

13  individual with those same characteristics.

14      The Secretary has broad authority to determine how to risk adjust based on health

15  status.  Am. Compl. ¶ 56.  Since 2004, the Secretary has used the Hierarchical Conditions

16  Category ("HCC") model.  *Id.* ¶¶ 58-62.  This model relies on the medical diagnoses

17  submitted by MAOs for beneficiaries enrolled in their plans in order to calculate each

18  beneficiary's risk score using a relative numerical value – a multiplier – for each HCC

19  category.  *Id.* ¶ 60.  The Secretary currently determines the multiplier for each of the

20  HCC categories based on an analysis of the amount that it paid on average in past years

21  under Parts A and B of the Medicare Program for individuals with the medical

22  conditions in each category.  *Id.*

23      Under the HCC model, medical diagnoses are the sole factor used to determine the

24  risk adjustment payments made based on health status.  CMS determines how sick or

25  healthy each beneficiary is – and thus how much Defendants will be paid for that

26  beneficiary – based on the medical diagnoses submitted by Defendants.  Defendants

27  submitted these codes through CMS' Risk Adjustment Processing System ("RAPS") in

28  order to make claims to Medicare for risk adjustment payments.  Am. Compl. ¶ 64.

Each RAPS submission (*i.e.*, each claim) included only a few data fields:  the Medicare beneficiary's identification number, the date of the medical encounter (the "date of service"), the type of provider, and the diagnosis code(s) reported by the provider for that date of service.  *Id.*  CMS relied on the submitted diagnosis code(s) to determine the risk score for each beneficiary, and the risk score, in turn, determined the amount of the adjustment made by CMS to the monthly payments to Defendants for that beneficiary.

## II.   Defendants' Legal Obligation To Submit Valid Medical Diagnoses And Delete Invalid Medical Diagnoses

Defendants were not entitled to risk adjustment payments for diagnoses that were not substantiated by their enrollees' medical records.  *See* Am. Compl. ¶ 87.  MAOs must ensure the "accuracy" and "truthfulness" of the risk adjustment data they submit. 42 C.F.R. § 422.504(*l*).  And, CMS has long made it clear that, in order to be accurate and truthful, a diagnosis must be supported by medical record documentation.  *See Swoben*, 848 F.3d at 1176 (explaining that "CMS requires medical diagnosis codes to be supported by a medical record.").  What Defendants deride as "the premise that MA plans are entitled to risk adjustment payment only for medical conditions that are adequately documented in a patient's medical charts," Defs. Br. 1, has been firmly established for many years.  Defendants themselves referred to their beneficiaries' medical records as the "source of truth."  Am. Compl. ¶¶ 128 & 188.

Defendants were also legally obligated to "delete" or withdraw invalid diagnoses previously submitted by them.  Am. Compl. ¶¶ 103-114.  The RAPS system contained a field called a "Delete Indicator" that enabled Defendants to delete invalid diagnoses that they had previously submitted.  *Id.* ¶ 65.  The deletion of previously submitted invalid diagnoses enabled CMS to recalculate beneficiaries' risk scores and to avoid making improperly inflated risk adjustment payments to Defendants or to recover any improper payments that were already made for those invalid diagnoses.  *Id.* ¶ 111.

Defendants' legal obligation to submit accurate and truthful medical diagnoses and delete inaccurate and untruthful medical diagnoses arose from various sources.

First, Defendants' annual contracts with CMS required them to comply with CMS' policies, instructions, and guidance, including the Medicare Managed Care Manual and the Risk Adjustment Participant Guide.  Am. Compl. ¶¶ 68-72.  Since the early 2000s, the Manual and Participant Guide have memorialized the medical record documentation requirement, and the Participant Guide has expressly required Defendants to delete erroneous diagnoses submitted to RAPS.  *Id*. ¶¶ 89-90 & 104 (bullet point 4) & 107.  Second, when Defendants entered into their annual contracts with the Government, they agreed to attest to the truthfulness of the data they submitted for risk adjustment payments, which gave rise to an obligation to exercise good faith and due diligence to ensure the validity of their data and to delete invalid data.  *Id*. ¶¶ 66-72 (explaining that the contracts included the regulatory requirement that Defendants submit annual Risk Adjustment Attestations, *see* 42 C.F.R. § 422.504(*l*)).  Third, when Defendants executed the Electronic Data Interchange (EDI) Agreements, they agreed to submit truthful risk adjustment data and investigate and correct risk adjustment data discrepancies.  *Id*. ¶¶ 73-82.  Fourth, regulations required Defendants to implement effective compliance programs to ensure the integrity of their payment data and to "detect and correct non-compliance with CMS program requirements as well as … [to] prevent, detect, and correct fraud waste and abuse" **and** to take "corrective actions (for example, the *repayment of overpayments* …)" in response to compliance issues.  *Id*. ¶¶ 95-97.  Fifth, in their annual Risk Adjustment Attestations, Defendants attested to the accuracy and truthfulness of their risk adjustment data, which again gave rise to their obligation to exercise good faith and due diligence to ensure that invalid data was deleted.  *Id*. ¶¶ 98-102.

Defendants could delete invalid diagnoses both before and after the final deadline for RAPS data submissions, which occurs during the year following the payment year at issue.  Am. Compl. ¶ 110.  (For example, for payment year 2013, risk adjustment payments were based on diagnoses from the 2012 date of service year, and the final deadline for submitting diagnoses from the 2012 date of service year was February 14,

2014.)  However, when Defendants possessed or had access to information about the invalidity of diagnoses prior to the final submission deadline, they were required to delete those diagnoses by the deadline in order for their Risk Adjustment Attestations to be truthful and their final reconciliation payments to be correct.  *Id*. ¶¶ 111-14.

The monthly risk adjustment payments made to Defendants during each payment year were interim payments.  After the final submission deadline for each payment year, CMS determined if any adjustments to those interim monthly payments were necessary based on all diagnoses submitted (and not deleted) by Defendants for each beneficiary up until the final submission deadline.  *Id*. ¶ 111.  It did so by re-calculating each beneficiary's risk score for the payment year to determine if it had changed and, if so, by making an appropriate adjustment to the payment for the beneficiary.  If the beneficiary's risk score was higher because Defendants submitted additional diagnoses for that beneficiary, CMS made a payment to Defendants to account for those additional diagnoses as part of the final reconciliation payment process.  Conversely, if the beneficiary's risk score was lower because Defendants deleted diagnoses for that beneficiary prior to the final submission deadline, CMS recovered the payments associated with the deleted diagnoses as part of this final reconciliation process.  *Id*.

Accordingly, if Defendants were in possession of or had access to information about invalid diagnoses before the final submission deadline, they should have deleted the invalid diagnoses to ensure that the final reconciliation payment that they were claiming was correct.  If they had done so, CMS would have adjusted the payment made to Defendants to accurately reflect the risk adjusted status of the beneficiaries enrolled in their plans.  *Id*. ¶ 112.

Even if Defendants came into possession of or had access to information about invalid diagnoses after the final submission deadline, they still had an obligation to delete the invalid diagnoses.  CMS would have recovered the payments as part of additional processes it had in place.  *Id*. ¶ 112.

### III.   Defendants' Violations Of The False Claims Act

The United States' First Claim for Relief is based on Defendants' violation of the second part of 31 U.S.C. § 3729(a)(1)(G), which makes it unlawful to knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) conceal or knowingly and improperly avoid or decrease an obligation to repay payments to which they were not entitled from the Medicare Program. Am. Compl. ¶¶ 341-43. The United States specifically alleges that Defendants knowingly and improperly failed to delete invalid diagnoses that they had submitted for risk adjustment payments or to otherwise return to the Medicare Program the overpayments based on the invalid diagnoses. The second part of § 3729(a)(1)(G) is premised on the intent of Congress that one cannot keep federal money it knows it has an obligation to repay. The FCA defines an "obligation" to mean "an established duty, whether or not fixed, arising from an express or implied contractual . . . relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of an overpayment." 31 U.S.C. § 3729(b)(3). As explained above, Defendants' legal obligation to repay arose from multiple contractual and regulatory sources, as well as from the "retention of an overpayment." Each of these are separate and independent obligations to repay.

The Second Claim for Relief is based on Defendants' violations of § 3729(a)(1)(A) of the FCA, which makes it unlawful to knowingly present or cause to be presented a false or fraudulent claim for payment. Am. Compl. ¶¶ 344-47. The United States specifically alleges that Defendants knowingly presented or caused to be presented to the Medicare Program false Risk Adjustment Attestations claiming risk adjustment payments from the Program. As recognized by the Ninth Circuit in *Swoben*, the attestations themselves were claims for payment. 848 F.3d at 1183. The attestations were submitted after the final submission deadline but before the final reconciliation payments were made. Am. Compl. ¶ 98. As explained above, that timing was meant to ensure that Defendants deleted invalid diagnoses prior to the final submission deadline if they possessed or had access to information about invalid diagnoses at that time. This

was necessary to ensure that the final reconciliation payments were correct based on information available to them.  The United States alleges that Defendants' attestations were factually false because Defendants certified that their risk adjustment data was accurate and truthful even though they had information that many diagnoses were inaccurate and untruthful.  *Id*. ¶¶ 293-327.

The Third Claim for Relief is based on Defendants' violation of § 3729(a)(1)(B) of the FCA, which makes it unlawful to make or use a false record or statement material to a false claim.  Am. Compl. ¶¶ 348-51.  The Fourth Claim for Relief is based on Defendants' violation of the first part of § 3729(a)(1)(G) of the FCA, which makes it unlawful to make or use a false record or statement material to an obligation to pay monies to the Government, including an obligation to repay monies to the Government based on overpayments.  *Id*. ¶¶ 352-55.  In 2009, as part of the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. 111-21, Congress defined "materiality" to mean "having a natural tendency to influence, or capable of influencing the payment or receipt of money."  31 U.S.C. § 3729(b)(4).  The definition applies to the payment or receipt of money by the Government or the payment or receipt of money by the defendant, as the definition applies to both § 3729(a)(1)(B) and (G).  In its Third and Fourth Claims, the United States alleges that Defendants' Risk Adjustment Attestations were false records or statements and that they had a natural tendency to influence or were capable of influencing the amount of the final reconciliation payment.

## ARGUMENT

## I.   The Amended Complaint Adequately Pleads Materiality

### A.   The FCA And *Escobar's* Materiality Requirement

While Defendants contend that the United States' various allegations fail to satisfy the FCA's materiality requirement, Defendants ignore the FCA's definition of materiality.  They do not even cite it.  Rather, they appear to argue that the Supreme Court in *Escobar* rewrote the statutory definition of material to require a "but for" test and an "actual effect."  But, *Escobar* did not do so.  Instead, the Court reaffirmed that the

1  appropriate materiality standard is the "natural tendency" test.  *Id.* at 1996 & 2002
2  (citing the FCA's definition of materiality).  And, even if Defendants' proffered reading
3  were correct, here Defendants' failure to delete invalid diagnosis codes unquestionably
4  had an actual effect on the amount of money that they received.

5       In *Escobar*, the Supreme Court noted that both the FCA and "common-law
6  antecedents" applied in other federal fraud statutes define materiality as "having a
7  natural tendency to influence, or being capable of influencing, the payment or receipt of
8  money or property."  136 S. Ct. at 2002 (quoting 31 U.S.C. § 3729(b)(4)).  The Court
9  then explained that, under any understanding of this concept, "materiality 'look[s] to the
10  effect on the likely or actual behavior of the recipient of the alleged misrepresentation'."
11  *Id.* at 2002 (quoting 26 R. Lord, Williston on Contracts § 69:12, p. 549 (4th ed. 2003)).
12  The Court further indicated that courts should evaluate materiality using a holistic
13  approach that focuses on various non-exclusive factors, including whether the
14  requirement was labeled as a condition of payment, which the Court described as
15  relevant but not dispositive; whether the requirement at issue went to the "essence of the
16  bargain" between the parties; whether the violation was significant or "minor or
17  insubstantial"; and what action the Government would likely undertake if it had actual
18  knowledge of the violation of the requirement at issue.  *Id.* at 2003-04.  The Court also
19  rejected any bright-line rules to sufficiently allege or prove materiality.

20       The Supreme Court's main concern was that FCA liability should not occur
21  "where noncompliance is minor or insubstantial" or be based on "insignificant regulatory
22  or contractual obligations" just because the Government labelled them as conditions of
23  payment and could decline to pay.  *Id.* at 2003-04.[4]  In this case, that concern does not

24       _____
         [4] This is why the courts in *United States ex rel. Dresser v. Qualium Corp.*, 2016
25  WL 3880763 (N.D. Cal. July 18, 2016), and *United States ex rel. Mateski v. Raytheon
   Co.*, 2017 WL 3326452 (C.D. Cal. 2017), dismissed the false certification of compliance
26  theories.  The *Qualium* court held that a misrepresentation could not be material solely
   because payment was conditioned on compliance with all laws and regulations.  2016
27  WL 3880763 at *6.  The *Mateski* court held that the relator had to allege something more

28

exist; the Amended Complaint sufficiently pleads that Defendants' obligations concerning the submission of valid diagnoses and the deletion of invalid diagnoses were "central" to Defendants' entitlement to obtain and retain risk adjustment payments based on those diagnoses, Am. Compl. ¶¶ 87-114, and it further alleges that Defendants' noncompliance with those obligations was substantial. *See*, *e.g*., *id*. ¶ 237 (alleging at least over a billion dollars in damages for just four years). In addition, as recognized by the Ninth Circuit in *Swoben*, accurate and truthful diagnosis data was central to payment and the Attestations were expressly a condition of payment. 848 F.3d 1166-68. And here, the materiality and gravity of Defendants' manipulation of the risk adjustment payment system is such that the Secretary of the Department of Health and Human Services has authorized this FCA action that seeks not only repayment of amounts wrongfully obtained from the Medicare Program, but also multiple damages and penalties. Under such circumstances, a myopic focus on the Government's continued payment should not be used to shield Defendants from liability for their fraud. *See United States ex rel. Campie v. Gilead Sciences, Inc*., 862 F.3d 890, 906 (9th Cir. 2017) (stating that "to read too much into the FDA's continued approval [of the drugs after it learned of certain compliance issues] – and its effect on the government's payment decision – would be a mistake" because it would allow the defendant to "use the allegedly fraudulently-obtained FDA approval as a shield against liability for fraud").

Defendants overlook the various factors set forth in the *Escobar* decision in determining materiality and focus instead on only one. They argue that the Government is required to allege that it would have stopped making payments to them had it known about their one-sided chart review or even if it had "doubts about" the truthfulness of their Attestations. Defs. Br. 14. Defendants' articulation of the required materiality analysis is wrong.

---

than that the defendant's compliance with certain contract provisions was mandatory. 2017 WL 3326452 at *7. Here the Government alleges that the invalid diagnoses codes had a direct, immediate, and substantial impact on the amount Defendants were paid.

First, the Court in *Escobar* did not hold that the relator had to allege or prove that "but for" the defendant's misrepresentation about its compliance with the regulatory requirements, the Medicaid Program (at issue in that case) would not have paid the claim. The Court used the phrase "would not have paid these claims" when describing the relator's allegations in the case, but it did not hold that materiality required such a "but for" allegation or analysis. *See Escobar*, 136 S.Ct. at 2004. To the contrary, the Court explained that no one factor is determinative. *Id*. at 2001 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39 (2011), for the proposition that "materiality cannot rest on 'a single fact or occurrence as always determinative'"). Moreover, the very authorities repeatedly cited by *Escobar* expressly reject any "but for" view of materiality. *Escobar* cited *Kungys v. United States*, 485 U.S. 759 (1988), which rejected the argument that materiality employed a standard of "more likely than not," and indicated that something can be material even if it has less than a 30 percent chance of influencing the decision maker. *Id*. at 2002 *(*citing *Kungys*, 485 U.S. at 771 (stating that "[i]t has never been the test of materiality that the misrepresentation or concealment would *more likely than not* have produced an erroneous decision") (emphasis in the original)). *See also id*. (citing 26 R. Lord, Williston on Contracts § 69:12 (4th ed. 2003) ("it is not necessary to materiality that a misrepresentation have been the paramount or decisive inducement, so long as it was a substantial factor"). Furthermore, courts correctly applying *Escobar* have not mandated any particular "magic words" or made any one factor dispositive of the materiality determination. For example, in *Escobar* itself, the First Circuit on remand had "little difficulty in concluding that Relators . . . sufficiently alleged the [defendant's] misrepresentations were material." *United States ex rel. Escobar v. Universal Health Services, Inc.*, 842 F.3d 103, 110 (1st Cir. 2016) (*Escobar II*). The First Circuit highlighted (1) the relators' allegation that "regulatory compliance was a condition of payment," (2) the "centrality of the licensing and supervision requirements … which go to the very essence of the bargain" between the

1   government and the provider, and (3) the lack of any evidence that the government paid

2   claims "despite knowing of the violations."  *Id*.

3        Second, the issue is not, as Defendants maintain, whether the Government has

4   some reason to believe that providers reported some invalid diagnoses to Defendants or

5   some "doubts about" Defendants' Attestations.  Rather, the inquiry must focus on what

6   the Government's reaction may have been if it had possessed *actual knowledge* (and not

7   merely reason to suspect) that a defendant had violated the requirements at issue.  *See*

8   136 S. Ct. at 2003-04 (twice referring to the Government's "actual knowledge that

9   certain requirements were violated"); *Campie*, 862 F.3d at 906-07 (holding that, in

10  assessing materiality, the inquiry focuses on the Government's actual knowledge of the

11  violations and that the "relators allege more than the mere possibility that the

12  government would be entitled to refuse payment if it were aware of the violations").

13       Third, the issue is also not whether the Government had general knowledge about

14  Defendants' one-way chart review program.  Instead, under *Escobar* and *Campie*, the

15  issue is how the Government may have responded if it had specific knowledge of the

16  violations – here, the pertinent violations are Defendants' knowing failure to delete the

17  invalid diagnoses based on information in their possession or available to them.  It is

18  Defendants' noncompliance with their contractual and regulatory obligations to delete

19  invalid diagnoses that is at issue, not their chart review process more generally.  *See*

20  *Escobar*, 136 S. Ct. at 2003-04 (explaining that the question was whether compliance

21  with the state Medicaid regulatory requirements relating to the provision of mental

22  health services (the facility, licensing, and supervision requirements) was material to the

23  payment decision).

24       Fourth, to satisfy the materiality requirement, CMS was not required to terminate

25  payments to Defendants once the Relator filed his *qui tam* action in 2011.[5]  Nor did any

---

[5] Relators filed over 600 *qui tam* actions in Fiscal Year 2017 alone.
https://www.justice.gov/opa/pr/justice-department-recovers-over-37-billion-false-claims-act-cases-fiscal-year-2017.  Government agencies cannot be expected to stop payment each time a *qui tam* is filed, even before the relators' allegations can be verified.

materiality requirement dictate that CMS terminate payments in response to Defendants'
decision in 2014 that they would no longer delete invalid diagnosis codes based on the
results of their chart reviews.  Am. Compl. ¶¶ 226-34.  In 2014, CMS did not know
which of the millions of codes submitted by Defendants lacked support in the medical
charts, precisely because Defendants kept this information from the Government.  CMS
also had another remedy available to it, which was this FCA action.  Contrary to
Defendants' contention, nothing in the FCA or *Escobar* dictates that the Government
must take both administrative action (which would be required to stop or withhold
payments) *and* file an FCA action.  There is nothing in the text or legislative history to
suggest that Congress intended to require agencies to pursue administrative actions as a
condition of filing an FCA complaint, and courts have rightly rejected any exhaustion
requirement.  *See*, *e.g*., *United States v. Lahey Clinic Hosp., Inc*., 399 F.3d 1, 17 (1st Cir.
2005) (explaining that Congress did not limit the recovery of overpayments to
administrative remedies but allowed them to be recovered under the FCA); *United States
v. Tenet Healthcare Corp*., 343 F.Supp.2d 922, 934-35 (C.D. Cal. 2004) (holding that
where the Government itself decides to pursue a judicial remedy, there is no requirement
that administrative remedies be tried first).  Indeed, "Congress intended to allow the
government to choose among a variety of remedies, both statutory and administrative, to
combat fraud."  *United States ex rel. Onnen v. Sioux Falls Indep. Sch. Dist. No. 49-5*,
688 F.3d 410, 414-15 (8th Cir. 2012).  *Escobar* did not even suggest that the
Government must always take administrative action in order to establish that certain
types of violations are material to payment.  Indeed, in *Escobar*, the fact that the State
chose not to stop, withhold or recoup payment did not compel either the Supreme Court
or the First Circuit on remand to conclude that the alleged violations were not material.
*Escobar*, 136 S. Ct. at 1997; *see also Escobar II*, 842 F.3d at 112.  Moreover, as
previously stated, legal action was the remedy specified by Defendants' Attestations and
the remedy that each of them acknowledged as part of the bargain between the parties:
"[t]he MA Organization acknowledges . . . that misrepresentations to CMS about the

accuracy of such [risk adjustment] information may result in Federal civil action and/or criminal prosecution." This FCA lawsuit is thus the very "result" expressly specified by the Attestations.[6]

In this case, the United States has sufficiently alleged that the Government does not wittingly pay for invalid diagnoses; rather, it recalculates payment rates when it has actual knowledge about specific invalid diagnoses that were submitted for payment. Am. Compl. ¶ 330. Moreover, the Amended Complaint alleges that in 2012, Defendants led the Government to believe that they were complying with their obligations to delete invalid diagnosis codes and that they were not defrauding the Government. *Id*. ¶ 190 (alleging that, in September 2012, Defendants informed the Government that they were developing a Claims Verification Program to ensure the accuracy of the diagnosis data they submitted to CMS and look both ways at the results of their chart reviews). Until the Government pursued its investigation of the allegations in the Amended Complaint, CMS did not have actual knowledge about any specific invalid diagnoses that Defendants should have deleted based on the results of their chart reviews.

Finally, a materiality inquiry focused on the *Government's* payment of a claim does not apply to the United States' First and Fourth Claims for Relief under the reverse false claims provision of the FCA, § 3729(a)(1)(G). *Escobar* did not address materiality under this section of the FCA.[7] Under the first part of § 3729(a)(1)(G), the inquiry

---

[6] *City of Chicago v. Purdue Pharma*, 211 F. Supp. 3d 1058 (N.D. Ill. 2016), did not involve false statements that expressly warned, in the body of the statements themselves, about the material consequence of the false statements: that is, that the false statements may result in civil action or criminal prosecution. In addition, *Purdue* involved allegations that the City had actual knowledge at the time of payment of noncompliance with a regulatory requirement, whereas the Amended Complaint in this case does not allege that CMS had actual knowledge at the time of payment that particular diagnoses were invalid and still paid for them.

[7] Similarly, *Knudsen v. Sprint Communications Co.*, 2016 WL 4548924, at *13 (C.D. Cal. Sept. 1, 2016) – the only other case cited by Defendants in support of their argument relating to the materiality with respect to the United States' First Claim for

focuses on the materiality of the false statement – here, the false Attestations – on *Defendants'* "obligation to pay," which includes repaying for an overpayment. Likewise, under the second part of § 3729(a)(1)(G), an implied materiality requirement logically would also focus on *Defendants'* obligation to repay the overpayment, although it would not be connected to any false statement as a false statement is not an element of a violation of the second part of § 3729(a)(1)(G).  In *United States v. Bourseau*, 531 F.3d 1159 (9th Cir. 2008), the Ninth Circuit addressed the application of the pre-FERA version of the reverse false claims provision (which is also a basis for the United States' Fourth Claim for Relief for the pre-FERA time period).  Similar to this case, that case involved interim payments made to the defendants periodically throughout the year with a final reconciliation payment made based on the defendants' submission of cost reports at the end of each year. *Id*. at 1162.  The Ninth Circuit explained that the inquiry under the reverse false claims provision was whether the false cost reports were material to avoid or decrease paying money owed the Government or repaying the Government for an overpayment. *Id*. at 1170-71.  Moreover, it concluded that the false reports "concealed and decreased amounts that [the defendants] were obligated to repay to Medicare" even though the cost reports were never reviewed by the Government. *Id*.

> ### B.   The United States Has Sufficiently Alleged that Defendants' Obligation To Delete Invalid Diagnoses Was Material

Over the past decade, Defendants have submitted diagnosis codes through the RAPS system in order to claim the billions of dollars of risk adjustment payments that they received each year, and those diagnosis codes are "central" to the risk adjustment payments they received based on health status.  Defendants' argument that the diagnosis codes they submitted were merely ancillary to their claims, *see* Defs. Br. 17 (attempting to analogize diagnosis codes to staplers), is meritless.  Diagnoses codes are the sole

---

Relief (Defs. Br. 18) – did not involve materiality under the reverse false claims provision.  In addition, in that case, the court found that the only allegation in the relator's complaint was conclusory. *Id*.  Knudsen's factually-bereft single paragraph stands in sharp contrast to the numerous and detailed allegations in this case.

1    determinant in the calculation of the risk adjustment payments based on health status.

2    *See Swoben*, 848 F.3d at 1167 (explaining that "[t]he risk adjustment methodology relies

3    on enrollee diagnoses").  Without submitting their diagnoses, Defendants would not have

4    obtained risk adjustment payments based on those diagnoses.

5        The Amended Complaint contains numerous and particularized allegations

6    regarding Defendants' contractual and regulatory obligations to submit valid diagnoses

7    and delete invalid diagnoses.  Contrary to Defendants' assertion, the United States has

8    sufficiently alleged that their contractual and regulatory obligations to delete invalid

9    diagnoses were "actually" material.  For multiple reasons – including Defendants' Parts

10   C and D contracts and EDI agreements with the Government, the compliance and

11   Attestation regulations, and the Manual and Participant Guide (with which Defendants

12   contractually agreed to comply) – Defendants' obligation to delete invalid diagnoses was

13   unquestionably a "central" part of the bargain that they made with the Government when

14   they decided to participate in the MA Program and reap the benefit of billions of dollars

15   of risk adjustment payments annually.

16       The Amended Complaint also alleges that, if Defendants had complied with their

17   obligation to delete invalid diagnoses from RAPS, Medicare would have processed the

18   corrected data, recalculated the risk score for the beneficiaries for whom an invalid

19   diagnosis had been deleted, and adjusted the risk adjustment payments for those

20   beneficiaries.  Am. Compl. ¶ 333.  The system would have done this as part of either the

21   final reconciliation payment process or future reconciliations conducted by CMS for the

22   payment year at issue.  *Id.*  In addition, the Amended Complaint alleges that because

23   Defendants did not comply with their obligation to delete the invalid diagnoses from

24   RAPS, Medicare paid for the invalid diagnoses as part of any future reconciliation

25   payments to Defendants or, if it already paid for the invalid diagnosis as part of the

26   interim payments, did not recover the overpayments as part of the final reconciliation

27   payment process.  *Id.* ¶ 334.  Accordingly, the Amended Complaint more than

28

1  sufficiently addresses the materiality of the validity of diagnoses to Defendants'
2  entitlement to claim and retain risk adjustment payments.

3      Defendants, however, appear to deny that they had any legal obligation to return
4  overpayments based on invalid diagnoses.  Instead, they make the surprising argument
5  that returning overpayments based on invalid diagnoses was voluntary.  Defs. Br. 2-3 &
6  16-18.  The Ninth Circuit has already rejected this argument.  In *Swoben*, the Ninth
7  Circuit ruled that "[e]ach diagnosis code submitted must be supported by a properly
8  documented medical record," 848 F.3d at 1168 (citations omitted), and that Defendants
9  were legally obligated to disclose to the Government information about invalid diagnosis
10  codes (what it referred to as "over-reporting errors") based on the results of their medical
11  record reviews.  *Id*. at 1175.  Otherwise, their Risk Adjustment Attestations would be
12  false.  And even if this were a valid argument, it goes beyond the allegations in the
13  Amended Complaint and is not appropriate at the motion to dismiss stage.

14      Moreover, the Supreme Court's discussion of materiality in *Escobar* compels the
15  conclusion that the invalidity of Defendants' diagnosis codes was material to their
16  obligation to repay.  As discussed, the Supreme Court's over-arching concern in *Escobar*
17  was whether compliance with the regulations at issue was part of the essence of the
18  bargain between the parties.  In this case, the Amended Complaint alleges that the
19  obligation to delete invalid diagnoses was at the core of the parties' bargain as shown by
20  the contracts between the parties, the EDI agreements, and the compliance and
21  Attestation regulations.

22  **C.    The Government Has Never Agreed That Defendants Can Keep Risk**
23            **Adjustment Payments Based On Invalid Diagnoses**

24      Defendants contend that they are, or should be, entitled to keep risk adjustment
25  payments based on the invalid diagnosis codes they submitted.[8]  They argue that the

26

27      [8] The one case cited by Defendants for this argument, *United States v. BAE Sys. Tactical Vehicle Sys.,* 2017 WL 1457493 (E.D. Mich. 2017), has nothing to do with the
28  Medicare Statute or CMS' payment of risk adjustment claims.

statutory requirement that CMS "ensure actuarial equivalence," 42 U.S.C. § 1395w-23(a)(1)(C)(i), between the average payments that it would expect to make for a given beneficiary under a fee-for-service payment system and the payments made to MAOs for covering an individual with the same characteristics and health status, somehow excuses MAOs from deleting diagnoses that they know are invalid and entitles them to keep risk adjustment payments based on the invalid diagnoses.  However, nothing in the Medicare Statute requires such an absurd result or insulates Defendants from FCA liability based on their deliberate or reckless avoidance of their contractual and regulatory obligations to delete invalid diagnoses.  Defendants are not entitled to claim or retain payments based on invalid diagnoses just because they believe that CMS has miscalculated the multipliers for the HCC model.

The Government, including CMS, has never interpreted the term "actuarial equivalence" in the manner that Defendants suggest.  What Defendants characterize as "an industry-wide regulatory discussion," Defs. Br. 1, has consisted of insurers repeatedly making this argument, which CMS has never accepted.  The Part C risk adjustment model, *i.e.*, the HCC model, is designed to satisfy the actuarial equivalence provision by paying MAOs a sum equal to the expected cost of providing traditional Medicare benefits to a given beneficiary.  And that is what "actuarial equivalence" means in this context: an equivalence between an expected cost, on the one hand, and a known payment, on the other, achieved through the application of actuarial principles.  CMS has never interpreted "actuarial equivalence" as entitling Defendants to keep risk adjustment payments for a certain percentage or number of invalid diagnoses submitted by them for such payments.  Nor has CMS accepted Defendants' premise that, if they submitted only valid diagnoses, they would be systematically underpaid.  *See UnitedHealthcare v. Hargan*, No. 16-CV-157, Defs.' Summ. J. Mem., ECF No. 58 at 1-2, 16-18, 37-40 (D.D.C. Dec. 4, 2017).  In addition, contrary to Defendants' contention, in announcing its methodology for its Risk Adjustment Data Validation ("RADV") administrative audits in 2012, CMS did not somehow abandon *sub silentio* the long-

standing requirement that a diagnosis submitted by an MAO for payment purposes must be supported by medical record documentation.  As discussed at greater length in the Government's APA brief, CMS has consistently required medical record documentation for diagnoses submitted for risk adjustment payments, and has never authorized insurers to claim payment on the basis of invalid diagnosis codes.  *Id*. at 1-3, 8-13, 23-27.

Defendants also appear to argue that the use of the term "actuarial equivalence" in the statute means that their obligation to delete and repay Medicare for invalid payment data – the invalid diagnoses – is immaterial.  This argument is similarly baseless. Nothing in the Medicare Statute, the Parts C and D contracts, the EDI Agreements, the compliance and Attestation regulations, the Attestations themselves, the Manual, or Participant Guide excused Defendants from their obligation to delete invalid diagnoses based on their objectively unreasonable interpretation of the term "actuarial equivalence."  Any objection Defendants may have to their compliance obligations or to the multipliers for the various HCC categories does not give them a free pass for a certain percentage or number of invalid claims for risk adjustment payments. Defendants may not improperly retain Medicare funds to which they were never entitled and, having been caught, challenge the method by which it was paid.  *See Bryson v. United States*, 396 U.S. 64, 68 (1969) ("One who elects [fraud] as a means of self-help may not escape the consequences by urging that his conduct be excused because the statute which he sought to evade is [invalid].") (quoting *Dennis v. U. S.*, 384 U.S. 855, 867 (1966)); *Cedars-Sinai Medical Center v. Shalala*, 125 F.3d 765, 769 (9th Cir. 1997) ("If the Hospitals did indeed knowingly submit false claims in order to receive payment for devices not covered under the 1986 rule, the invalidity of the rule will be no defense.") (citing *Bryson*); *United States v. Weiss*, 914 F.2d 1514, 1522-23 (2d Cir.1990) (holding that the fact that a Medicare Manual provision requiring filing of statements had not undergone statutorily required approval procedures was no defense to charge of filing false statements).

20

**D.    The United States Has Sufficiently Alleged That Defendants' False Risk Adjustment Attestations Were Material**

Defendants' Risk Adjustment Attestations, by their very nature, were material as they related directly to the critical data element – diagnoses – that is the sole determinant of risk adjustment payments based on health status. The Amended Complaint contains detailed allegations that the submission of invalid diagnoses and failing to delete them are not minor or insubstantial infractions of Defendants' significant contractual and regulatory obligations to the Medicare Program. It follows that Defendants' Attestations to the accuracy and truthfulness of the diagnoses were also material.

The Amended Complaint alleges that the purpose of the Attestations was, first, to remind Defendants that they may not ignore or disregard information about invalid diagnoses; and, second, to enforce the fundamental program requirement that Defendants delete invalid diagnoses. Am. Compl. ¶ 336 (citing 65 Fed. Reg. 40,170, 40,268 (June 29, 2000) ("certifications would help ensure accurate data submissions"). When Defendants did not comply with these payment data integrity requirements and failed to delete invalid diagnostic data, the result was their submission of false Attestations that the data was truthful and accurate. Because Defendants did this with actual knowledge of information about invalid diagnoses or with deliberate ignorance or reckless disregard of information about invalid diagnoses, they violated the FCA.

As the Government alleges in the Amended Complaint, the Attestation was meant to serve as a powerful deterrent against "knowingly" submitting false claims for payment. As "bulwark[s] against fraud," *Swoben*, 848 F.3d at 1168, the Attestations reminded Defendants of their obligation to submit truthful information to their "best knowledge, information and belief." They also served as reminder that the submission of a knowingly false Attestation could trigger FCA liability. "[A]s under the False Claims Act, a certification is false under § 422.504(*l*) when the Medicare Advantage organization has actual knowledge of the falsity of the risk adjustment data *or* demonstrates either 'reckless disregard' or 'deliberate ignorance' of the truth or falsity of

the data." *Id*. at 1169 (citing 65 Fed. Reg. 40,170, 40,268 (June 29, 2000)).  *See also id*. at 1174.  The Attestation thus warns of the serious legal implications of making false representations about the validity of diagnoses.  It states that "[t]he MA Organization acknowledges . . . that misrepresentations to CMS about the accuracy of such [risk adjustment] information may result in Federal civil action and/or criminal prosecution." *See* Exhibits 16-21 to the Amended Complaint.  For these reasons, it is difficult to envision a false statement that is more material to a claim for payment under 3729(a)(1)(A) and (B) or to an obligation to repay under the first half of § 3729(a)(1)(G).

## II.     Section 3729(a)(1)(G) Is Not Being Applied Retroactively In This Case

Contrary to Defendants' assertion, the United States is not seeking to retroactively apply the second part of § 3729(a)(1)(G), which was added to the FCA by FERA on May 20, 2009.  Under the circumstances of this case, there is no retroactivity issue with respect to the application of the amendment to risk adjustment payments for payment (*i.e.*, calendar) year 2009, based on diagnoses from date of service year 2008, and to all subsequent payment and date of service years.  Defendants' retroactivity argument is limited to when an obligation to repay first arises based on the "retention of an overpayment." Defs. Brf. 18-21.  But, the "obligation" to repay in this case did not arise solely from the "retention of an overpayment."  Defendants' "obligation" to repay also arose from their contractual relationship with CMS and from the compliance and attestation regulations and these contractual and regulatory obligations existed both prior to and after May 20, 2009, FERA's effective date.  Thus, whether the application of the amendment would be retroactive should be determined in light of the established duties imposed by those contracts and regulations to delete invalid codes and repay overpayments. [9]

---

[9] In *OmniCare*, the relator argued that the defendant had an obligation to repay based on the "retention of an overpayment." *United States ex rel. Stone v. OmniCare, Inc.*, 2011 WL 2669659 at **3-4 (N.D. Ill. July 7, 2011).  There was no other basis – no contract or regulation – that gave rise to the obligation to repay.  The court found that

For the 2008 date of service year and 2009 payment, there is also no retroactivity issue because of the contractual and regulatory duties to delete invalid codes.  Take the following example:  On May 18, 2009, Defendants reviewed Mr. Smith's medical records for date of service year 2008.  Based on the results of Defendants' review, a diagnosis for leukemia reported by one of Smith's physicians was not supported by his medical records.  Arguably, Defendants first knowingly failed to delete the invalid diagnosis on May 18 (although, as the facts in this case will show, there was always a lag time, sometimes a significant one, between when a chart review was performed and the date that Defendants added or deleted codes based on it).  But, the obligation to delete the leukemia diagnosis continued to exist on and after May 20, 2009 for several reasons.  One of the most important reasons is that, in March 2010, Defendants were required to execute and submit and did execute and submit Risk Adjustment Attestations as to the validity of their 2008 diagnosis data in order to claim entitlement to the final reconciliation payment for 2009.  And, as explained by the Ninth Circuit in *Swoben*, in order to submit truthful risk adjustment attestations in March 2010, Defendants had to exercise good faith and due diligence and delete invalid 2008 date of service diagnoses based on information in their possession about the invalidity of such data.  Second, after May 18, 2009, Defendants had a contractual obligation under their existing 2009 contracts and EDI agreements with CMS to delete invalid diagnoses.  Third, as previously explained, the monthly risk adjustment payments were interim payments akin to estimated payments under a construction contract.  Defendants' obligation was to delete invalid diagnoses to ensure that the final reconciliation payment was correct.  That is why the Attestations were executed after the final submission deadline but before the final payment.  Thus, it is the retention of overpayment associated with the final

---

OmniCare had knowledge of the overpayments prior to FERA's effective date but had no obligation to repay prior to that date.  *Id*.  In contrast, Defendants' contractual and regulatory obligation to repay existed prior to FERA.  A new obligation to repay is not being applied retroactively in this case.

reconciliation payment that is most relevant and, for payment year 2009, that final payment was not made until after Defendants' submission of their Attestations in March 2010.  In fact, the final payment for payment year 2008 also may have been made after May 20, 2009.[10]

For date of service years after 2008 and payment years after 2009, there is also no retroactivity issue for various reasons.  In particular, there could be no knowing retention of an overpayment prior to May 20, 2009.  For example, for provider-reported diagnoses from the 2009 date of service year, Defendants did not even review charts until after May 20, 2009.  For the same reason, there is also no retroactivity issue with respect to the results of the RACCR (Risk Adjustment Coding Compliance Review) Program, *see* Am. Compl. ¶¶ 239-92, and medical record reviews that Defendants conducted in and after 2010 relating to diagnoses for 2008 and subsequent date of service years.

---

[10] To the extent that there are facts related to the determination of retroactivity that are in dispute or unknown to the United States and the Court at this time, the determination cannot be made on this motion to dismiss and is best presented to the court or jury after discovery is completed.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# CONCLUSION

For the foregoing reasons, United's Motion to Dismiss should be denied.

Respectfully submitted,

Dated:  January 8, 2018

CHAD A. READLER
Acting Assistant Attorney General
NICOLA T. HANNA
United States Attorney
DOROTHY A. SCHOUTEN
DAVID K. BARRETT
DAVID M. HARRIS
Assistant United States Attorneys

MICHAEL D. GRANSTON
DANIEL R. ANDERSON
CAROL L. WALLACK
JUSTIN DRAYCOTT
PAUL G. FREEBORNE
JESSICA KRIEG
PAUL PERKINS
Civil Division, Department of Justice

JAMES P. KENNEDY, JR.
Acting United States Attorney
KATHLEEN ANN LYNCH
Assistant United States Attorney

/S/ John E. Lee
_____
JOHN E. LEE
Assistant United States Attorney
Attorneys for the United States of America

Dated:  January 8, 2018

ERIC R. HAVIAN
HARRY LITMAN
HENRY C. SU
Constantine Cannon LLP

STEVE HASEGAWA
Phillips & Cohen LLP

WILLIAM CHRISTOPHER CARMODY
ARUN SUBRAMANIAN
MATTHEW R. BERRY
JOHN P. LAHAD
Susman Godfrey LLP

/S/ Jessica Moore
_____
JESSICA MOORE
Attorneys for Relator Benjamin Poehling

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>Attestation</u>

I hereby attest that the other signatory listed, on whose behalf the filing is submitted, concurs in the filing's content and has authorized the filing.

Dated:  January 8, 2018

/S/ John E. Lee

_____

JOHN E. LEE
Assistant United States Attorney