1    LATHAM & WATKINS LLP
        David J. Schindler (Bar No. 130490)
2         *david.schindler@lw.com*
     355 South Grand Avenue, Suite 100
3    Los Angeles, California 90071-1560
     Telephone: +1.213.485.1234
4    Facsimile: +1.213.891.8763

5    LATHAM & WATKINS LLP
        Daniel Meron (appearing *pro hac vice*)
6         *daniel.meron@lw.com*
        Abid R. Qureshi (appearing *pro hac vice*)
7         *abid.qureshi@lw.com*
        Kathryn H. Ruemmler (appearing *pro hac vice*)
8         *kathryn.ruemmler@lw.com*
     555 Eleventh Street, NW, Suite 1000
9    Washington, DC 20004-1304
     Telephone: +1.202.637.2200
10   Facsimile: +1.202.637.2201
     Attorneys for UnitedHealth Defendants

11

12                    **UNITED STATES DISTRICT COURT**

13                    **CENTRAL DISTRICT OF CALIFORNIA**

14

15

16   UNITED STATES OF AMERICA *ex rel.*
     BENJAMIN POEHLING,                          CASE NO. CV 16-08697 MWF
                                                 (SSx)
17

18                    Plaintiffs,

19          v.                                   **UNITED'S REPLY IN
                                                 SUPPORT OF ITS MOTION
20   UNITEDHEALTH GROUP, INC., *et al.*,         TO DISMISS UNITED
                                                 STATES' FIRST AMENDED
                                                 COMPLAINT-IN-PARTIAL-**
21                    Defendants.                **INTERVENTION**

22

23                                               Hon. Michael W. Fitzgerald
                                                 Courtroom: 5A
24
                                                 Hearing Date: January 29, 2018
25                                               Hearing Time: 10:00 a.m.

26

27

28

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .............................................................................. iii

INTRODUCTION ............................................................................................1

I.  DOJ Fails Adequately To Allege That The Claimed Violations
    Were Material. ........................................................................................4

    A.  A Violation Is Not Material Under The False Claims Act
        If The Government Would Have Taken The Same Action
        Even If The Violation Had Not Occurred. ..........................................4

    B.  Under Any Reasonable Interpretation Of *Escobar*, The
        Complaint Fails Adequately To Allege Materiality. ...........................9

        1.  DOJ Fails To Allege That CMS "Likely Or
            Actual[ly]" Would Have Withheld Payment If It
            Knew The Attestations Were False. ......................................10

        2.  DOJ Also Fails Adequately To Allege That The
            Unsupported Risk Adjustment Codes Were
            Material. ..............................................................................13

    C.  This Motion Presents No Occasion To Resolve The
        Actuarial Equivalence And Other Questions Currently
        Pending In United's Administrative Procedure Act Suit. ................16

    D.  This Motion Also Presents No Occasion To Resolve The
        Implications Of A Future Decision In The Administrative
        Procedure Act Case. .........................................................................17

II. Congress's 2009 Revisions To The Reverse False Claims
    Provision Do Not Create Retroactive False Claims Act Liability
    For Obligations That Arose Prior To Their Enactment. ..............................19

CONCLUSION .............................................................................................20

REPLY IN SUPPORT OF MOTION TO DISMISS
CASE NO. CV 16-08697-MWF

# TABLE OF AUTHORITIES

Page(s)

## CASES

*A1 Procurement, LLC v. Thermcor, Inc.*,
   No. 2:15cv15, 2017 WL 2881350 (E.D. Va. July 5, 2017) .................................6

*United States ex rel. Campie v. Gilead Scis., Inc.*,
   862 F.3d 890 (9th Cir. 2017).......................................................................7, 8

*Coyne v. Amgen, Inc.*,
   No. 17-1522-CV, 2017 WL 6459267 (2d Cir. Dec. 18, 2017).........................6

*United States ex rel. Escobar v. Universal Health Services, Inc.*,
   842 F.3d 103 (1st Cir. 2017) ..........................................................................7

*Hamilton v. State Farm Fire & Cas. Co.*,
   270 F.3d 778 (9th Cir. 2001) ..........................................................................5

*United States ex rel. Jersey Strong Pediatrics, LLC v. Wanaque
   Convalescent Ctr.*,
   No. CV 14-6651-SDW-SCM, 2017 WL 4122598 (D.N.J. Sept. 18,
   2017) ...............................................................................................................6

*United States ex rel. Kelly v. Serco, Inc.*,
   846 F.3d 325 (9th Cir. 2017).....................................................................1, 8, 9

*Knudsen v. Sprint Communications Co.*,
   Nos. C13-04476 CRB et al., 2016 WL 4548924 (N.D. Cal. Sept. 1,
   2016) .............................................................................................................13

*Kungys v. United States*,
   485 U.S. 759 (1988)........................................................................................8

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)...........................................................................................9

*United States ex rel. Petratos v. Genentech Inc.*,
   855 F.3d 481 (3d Cir. 2017)......................................................................1, 6, 9

*Rubke v. Capitol Bancorp Ltd.*,
   551 F.3d 1156 (9th Cir. 2009).......................................................................16

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

REPLY IN SUPPORT OF MOTION TO DISMISS
CASE NO. CV 16-08697-MWF

*United States ex rel. Ruckh v. Salus Rehabilitation, LLC*,
  No. 8:11-cv-1303-T-23TBM, 2018 WL 375720 (M.D. Fla. Jan. 11,
  2018) ........................................................................................................7

*United States ex rel. Swoben v. Scan Health Plan*,
  CV 09-5013-JFW, 2017 WL 4564722 (C.D. Cal. Oct. 5, 2017).......... 1, 4, 5, 10

*United States v. Bourseau*,
  531 F.3d 1159 (9th Cir. 2008)....................................................................15

*United States v. Catholic Health Sys. of Long Island Inc.*,
  No. 12-CV-4425 (MKB), 2017 WL 1239589 (E.D.N.Y. Mar. 31,
  2017) ........................................................................................................7

*United States v. Fulton Cty., Georgia*,
  No. 1:14-CV-4071-WSD, 2016 WL 4158392 (N.D. Ga. Aug. 5,
  2016) ........................................................................................................6

*United States v. N. Adult Daily Health Care Ctr.*,
  205 F. Supp. 3d 276 (E.D.N.Y. 2016) ......................................................6

*United States v. Sanford-Brown, Ltd.*,
  840 F.3d 445 (7th Cir. 2016).....................................................................9

*UnitedHealthcare Insurance Co. v. Hargan*,
  No. 1:16-cv-00157-RMC (D.D.C.) ....................................................3, 16, 19

*Universal Health Services v. United States ex rel. Escobar*,
  136 S. Ct. 1989 (2016)..................................................................*passim*

## STATUTES

31 U.S.C. § 3729(a)(1)(G) ................................................................15, 19, 20

31 U.S.C. § 3729, *et. seq*..................................................................*passim*

42 U.S.C. § 1395w-23(a)(1)(C)(i) .........................................................3, 4, 17, 18

42 U.S.C. § 1853................................................................................18

REPLY IN SUPPORT OF MOTION TO DISMISS
CASE NO. CV 16-08697-MWF

## OTHER AUTHORITIES

CMS, Announcement of Calendar Year (CY) 2010 Medicare
    Advantage Capitation Rates and Medicare Advantage and Part D
    Payment Policies 20 (Apr. 6, 2009),
    https://www.cms.gov/Medicare/Health-
    Plans/MedicareAdvtgSpecRateStats/downloads/Announcement201
    0.pdf ............................................................................................................17

26 R. Lord, Williston on Contracts § 69:12 (4th ed. 2003).................................4, 5

## INTRODUCTION

DOJ successfully transferred this case to this District for the express purpose of avoiding "inconsistent judicial decisions" between it and the then-pending *Swoben* case, both of which alleged that United violated the False Claims Act by submitting false "Risk Adjustment Attestations" concerning the accuracy of its submissions to CMS.[1]  In light of that background, it is truly astonishing that DOJ never even *acknowledges*, let alone distinguishes, the *Swoben* decision by Judge Walter dismissing DOJ's attestation-based claims due to DOJ's failure to allege that those Attestations affected CMS's payment decisions—the same exact basis for this motion.  *See United States ex rel. Swoben v. Scan Health Plan*, CV 09-5013-JFW (JEMx), 2017 WL 4564722, at *6 (C.D. Cal. Oct. 5, 2017).  Indeed, after taking a month to amend its Complaint here to try to fill that materiality gap, DOJ still offers no allegations about the Attestations that would distinguish the Complaint it defends here from the one dismissed in *Swoben*.

Unable to allege in good faith that CMS would have done anything differently had it known of the supposed falsity of the Attestations, DOJ tries to solve its materiality problem in two other ways.  *First*, it reduces to the point of nothingness the "rigorous" materiality standard the Supreme Court adopted in *Universal Health Services v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016), which *Swoben* correctly applied in dismissing DOJ's claims.  Accepting DOJ's arguments would conflict not only with *Swoben*, but also with "the many other federal courts that have recognized the heightened materiality standard after [*Escobar*]."  *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 492 (3d Cir. 2017) (citing, *inter alia*, *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325 (9th Cir. 2017)).  And even if DOJ's attempts to eviscerate *Escobar* otherwise

---

[1] Mem. of Law In Support of Unopposed Mot. of the United States to Transfer Venue 6, ECF No. 49.

1   had merit, DOJ's allegations about the materiality of the risk adjustment

2   Attestations are so anemic that they *still* would not suffice.

3        *Second*, DOJ tries to redirect attention from the Attestations at issue in

4   *Swoben*—and which form the sole basis for its Second, Third, and Fourth Claims

5   for Relief—to focus on the risk adjustment *codes* on which it bases the reverse

6   false claim theory in its new First Claim for Relief.  At the outset, that pivot could

7   not possibly save its three attestation-based claims.  And even with respect to the

8   sole claim as to which the risk adjustment codes themselves are relevant, the

9   Complaint's allegations are insufficient because they merely allege that CMS

10  automatically would have accepted the return of funds if United had proffered

11  them.  The relevant question under *Escobar*, though, is whether *CMS* would have

12  done anything differently if it had known the facts DOJ asserts in the Complaint.

13  If the threadbare allegation that the government automatically would have accepted

14  a defendant's repayment were enough to establish materiality, that would reduce

15  *Escobar*'s "rigorous" materiality standard to a gutted shell.

16       The parties appear to have found common ground, meanwhile, on the

17  retroactivity problem United identified with DOJ's First Claim for Relief.

18  Although its Complaint alleges that United received overpayments as early as

19  2005, DOJ offers no argument that would allow its First Claim to Relief to extend

20  that far back, and apparently now intends to limit that Claim only to "risk

21  adjustment payments for payment (*i.e.*, calendar) year 2009 . . . and to all

22  subsequent payment and date of service years."  Pl.'s Opp. To United's Mot. To

23  Dismiss 22, ECF No. 194 (hereinafter Opp.).  Accordingly, at a minimum, the

24  Court should dismiss DOJ's allegations from payment years preceding the 2009

25  amendments.

26       Finally, DOJ devotes considerable attention to other issues concerning the

27  structure of the Medicare Advantage program.  But contrary to DOJ's apparent

28  position, those issues are not before the Court.  Instead, cross-motions for summary

1   judgment that will resolve them are pending in *UnitedHealthcare Insurance Co. v.*
2   *Hargan*, No. 1:16-cv-00157-RMC (D.D.C.).[2]   This motion to dismiss on
3   materiality grounds does not raise or depend in any way on the meaning of the
4   Medicare Act's "actuarial equivalence" standard, 42 U.S.C. § 1395w-
5   23(a)(1)(C)(i), or any of the other questions pending in *Hargan* or argued by DOJ
6   in Argument I.C. of its brief.  For purposes of resolving *this* motion, it does not
7   matter which party is right about those distinct legal questions (which would, in
8   any event, require extensive additional briefing to resolve).

9        What matters instead is that, as in *Swoben*, DOJ has not adequately alleged
10   as a matter of *fact* here that CMS would have withheld payment or otherwise
11   altered its behavior if it had known that United's Attestations were supposedly
12   false and that some of its diagnosis codes were supposedly unsupported.
13   Presumably DOJ cannot make that allegation because CMS has known for years
14   that it is "inevitable" that many of the diagnosis codes submitted by health care
15   providers are unsupported (in its own data, as well as the data that MA plans
16   collect and submit), *UnitedHealthcare Insurance Co. v. Hargan*, No. 1:16-cv-
17   00157-RMC (D.D.C. Dec. 4, 2017), ECF No. 58 (Government Cross-Mot. for
18   Summ. J.), and yet has continued to accept Attestations from plans despite that
19   knowledge and has never withheld payments (or taken any other action) as a result
20   of those Attestations' supposed falsity.   But regardless of *why* DOJ has not made
21   the allegation, the dispositive point is that it has not.   DOJ has had several
22   opportunities to make that factual allegation, or even to assert that DOJ *would*
23   make that allegation if granted further leave to amend.   It conspicuously has failed
24   to do so.  Accordingly, the Complaint should be dismissed with prejudice.

25

26   _____
27   [2]   The parties previously referred to this case as *UnitedHealthcare Insurance Co.
     v. Price*, but following the resignation of former Secretary of Health and Human
28   Services Thomas Price, the case has been recaptioned.

1  **I.    DOJ Fails Adequately To Allege That The Claimed Violations Were**
2  **Material.**

3      ***A.    A Violation Is Not Material Under The False Claims Act If The***
       ***Government Would Have Taken The Same Action Even If The***
4      ***Violation Had Not Occurred.***

5          Under *Escobar*, a "complaint must allege that the violations at issue 'are so
6  central . . . that the [Government] would not have paid these claims had it known
7  of these violations.'"  *Swoben*, 2017 WL 4564722 at *6 (quoting *Escobar*, 136 S.
8  Ct. at 2004).  It is not enough merely to show that the government "would have the
9  option to decline to pay."  *Escobar*, 136 S. Ct. at 2003. That flows from the
10  Supreme Court's holding that "[u]nder *any* understanding of the concept,
11  materiality 'look[s] to the effect on the *likely or actual behavior* of the recipient of
12  the alleged misrepresentation.'"  *Id*. at 2002 (quoting 26 R. Lord, Williston on
13  Contracts § 69:12 (4th ed. 2003) (emphasis added)).[3] As the *Williston* treatise the
14  Supreme Court quoted explains, the tests of the effect on "likely or actual"
15  behavior that different jurisdictions use are, respectively, either a "'more likely
16  than not' test, under which a misrepresentation is considered material if it is more
17  likely than not that it would induce action by the recipient," or "a 'but for' test . . .
18  under which a misrepresentation is material if, had it not been made, the party
19  complaining of fraud would not have taken the action alleged to have been induced

20

21  _____

22  [3]  The Court held that this test governs under both the False Claims Act's statutory
23  definition of materiality, which appears in 31 U.S.C. § 3729(b)(4) and applies to
    those parts of the False Claims Act that expressly mention materiality (as relevant
24  here, subsection (B) and the first part of subsection (G)), and the common law
    definition, which applies to those subsections that do not expressly mention
25  materiality (as relevant here, subsection (A) and the second part of subsection (G)).
26  *See Escobar*, 136 S. Ct. at 2002.  DOJ's note (at 9) that United's motion "d[id] not
    even cite" the statutory definition, therefore, misses the point:  United relied on the
27  Supreme Court's authoritative articulation of the standard that applies to *all* of the
28  claims at issue in this case.

by the misrepresentation."   26 R. Lord, Williston on Contracts § 69:12 (4th ed. 2003).

Following *Escobar*, federal courts consistently have maintained this focus on the "likely or actual" effect of the alleged conduct on the government's payment decision.  The most on-point such case is *Swoben* itself.  *See* 2017 WL 4564722, at *6.  In *Swoben,* Judge Walter squarely confronted the exact same arguments DOJ offers here in response to United's motion to dismiss based on DOJ's failure to allege that the supposedly false Attestations were material—and rejected them. The Court held that DOJ failed to allege that CMS's payment decision would have been different if it had known that United's Risk Adjustment Attestations were supposedly false, and thus that DOJ's attestation-based claims must be dismissed. *Id.*  Remarkably, DOJ ignores that on-point holding entirely—an ironic choice at best given its previous argument that this case should be transferred in order to avoid "inconsistent judicial decisions" in the two cases.  Mem. of Law In Support of Unopposed Mot. of the United States to Transfer Venue 6, ECF No. 49; *cf. Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001) ("This court invokes judicial estoppel not only to prevent a party from gaining an advantage by taking inconsistent positions, but also because of 'general consideration[s] of the orderly administration of justice and regard for the dignity of judicial proceedings,' and to 'protect against a litigant playing fast and loose with the courts.'").[4]

---

[4]  DOJ does address the Ninth Circuit's earlier decision in *Swoben*.  *See, e.g.*, Opp. at 18.  United disagrees with DOJ's characterizations about what that decision held, and how it would impact the *other* elements of DOJ's claims.  For present purposes, though, what matters is that the Ninth Circuit clearly did *not* hold that the Attestations were intrinsically material—as the subsequent dismissal of that case on remand shows.

1    *Swoben* is hardly an isolated decision, either.   The Second Circuit, for

2    example, recently held that "to be material the government must have made the

3    payment 'as a result of the defendant's alleged misconduct.'"   *Coyne v. Amgen,*

4    *Inc.*, No. 17-1522-CV, 2017 WL 6459267, at *2 (2d Cir. Dec. 18, 2017) (citation

5    omitted).   The Third Circuit likewise held that if "there are no factual allegations

6    showing that CMS would not have reimbursed [the defendant] had these [alleged

7    reporting] deficiencies been cured," then a complaint is "doomed."   *United States*

8    *ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 490 (3d Cir. 2017).   Numerous

9    district courts similarly have held that materiality is absent unless "the government

10   would 'not have paid the[] claims had it known of the[] violations.'"   *United States*

11   *ex rel. Jersey Strong Pediatrics, LLC v. Wanaque Convalescent Ctr.*, No. CV 14-

12   6651-SDW-SCM, 2017 WL 4122598, at *3 (D.N.J. Sept. 18, 2017) (quoting

13   *Escobar*, 136 S. Ct. at 2004).[5]

14        DOJ argues that *Escobar*'s reference to whether the government "would not

15   have paid the[] claims had it known of the[] violations," 136 S. Ct. at 2004, was

16   merely "describing the relator's allegations in the case," Opp. 12, rather than

17   articulating a legal standard.   But it cites no decision interpreting *Escobar* that way,

---

19   [5] *See also, e.g.*, *A1 Procurement, LLC v. Thermcor, Inc.*, No. 2:15cv15, 2017 WL
20   2881350, at *5 (E.D. Va. July 5, 2017) (finding no materiality where "[t]he
     statements made by Thermcor on the 8(a) renewal applications were not 'so
21   central' to the 8 (a) program that the government 'would not have paid these
     claims had it known' of the statements"); *United States v. Fulton Cty., Georgia*,
22   No. 1:14-CV-4071-WSD, 2016 WL 4158392, at *8 (N.D. Ga. Aug. 5, 2016)
23   (finding materiality lacking where "Relators have not shown that Defendants
     misrepresented matters 'so central' to the Contract that the government 'would not
24   have paid [Defendants'] claims had it known of these violations'" (quoting
     *Escobar*, 136 S. Ct. at 2004)); *cf. United States v. N. Adult Daily Health Care Ctr.*,
25   205 F. Supp. 3d 276, 296 (E.D.N.Y. 2016) ("Relators do not allege, as they are
26   now required to do under [*Escobar*], that . . . the government would have refused
27   reimbursement had it known of Northern Adult's noncompliance with Title VI and
     the cited DOH regulations.")

and as *Jersey Strong Pediatrics* and the cases collected in footnote 5 illustrate, courts instead consistently have recognized that the Court's statement reflected its *holding*, setting out the inquiry for the First Circuit to conduct on remand. *See also, e.g.*, *United States v. Catholic Health Sys. of Long Island Inc.*, No. 12-CV-4425 (MKB), 2017 WL 1239589, at *22 (E.D.N.Y. Mar. 31, 2017) (noting that the Court in *Escobar* had "remanded for a determination of whether the mental health facility requirements were 'so central to the provision of mental health counseling that the Medicaid program would not have paid the[] claims had it known of the[] violations'"). As one representative opinion put it just last week, "*Escobar* indisputably requires that, before a party can employ the False Claims Act to effect a disgorgement of the entire price times three," it must "prove . . . that, if informed [of the violation], the government would have chosen the remedy of a refusal to pay." *United States ex rel. Ruckh v. Salus Rehabilitation, LLC*, No. 8:11-cv-1303-T-23TBM, 2018 WL 375720, at *5 (M.D. Fla. Jan. 11, 2018). Because that showing of materiality had not been made there, the court set aside a $350 million jury verdict against a nursing home defendant that had submitted inaccurate codes regarding the intensity of treatments provided to residents. *Id.* at *1.

Against this crush of unfavorable case law on the governing materiality standard, DOJ relies on a single post-*Escobar* decision—the Ninth Circuit's decision in *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890 (9th Cir. 2017).[6] But that decision is entirely consistent with the other cases just

---

[6] DOJ also invokes the First Circuit's decision on remand in *Escobar*, but as noted, *see supra* at 6-7, the relators there *had* alleged that the government "would not have paid" had it known of the violations, 136 S. Ct. at 2004, and the First Circuit simply determined on remand that their allegation was plausible, *see United States ex rel. Escobar v. Universal Health Services, Inc.*, 842 F.3d 103, 111-12 (1st Cir. 2017). That confirms that the appropriate test is whether the plaintiff has plausibly alleged that the government would have proceeded differently if it had known of the defendant's violation.

discussed.  There, the relators maintained that "had the FDA been aware of these issues [with contamination and adulteration that Gilead allegedly concealed], it would not have approved the use of the Synthetics China manufacturing facility." *Id.* at 896.  And because FDA approval was necessary to obtain government reimbursement, it followed that if the FDA had been aware of the issue from the outset, Gilead would never have received government payments for the pharmaceuticals manufactured there.  *Id.* at 897.[7]  *Campie* thus provides no support for DOJ's watered-down reading of *Escobar*.

DOJ also points to a pre-*Escobar* immigration case, *Kungys v. United States*, 485 U.S. 759 (1988), which *Escobar* cited for the proposition that "the "materiality requirement descends from 'common law antecedents.'"  *Escobar*, 136 S. Ct. at 2002.  DOJ concludes that *Escobar* must *also* have intended to apply to the False Claims Act the same materiality standard that *Kungys* applied in the immigration context, under which (DOJ claims) "something can be material even if it has less than a 30 percent change of influencing the decision maker."  Opp. 12.  There is no way to reconcile that standard with the "likely or actual" effects test *Escobar* itself *actually articulated* for the False Claims Act. 136 S. Ct. at 2002.[8]  Nor does DOJ

_____

[7]  In a parenthetical, DOJ quotes the Ninth Circuit's statement that the relators had "allege[d] more than the mere possibility that the government would be entitled to refuse payment if it were aware of the violations."  Opp. 13 (quoting *Campie*, 862 F.3d at 907).  To the extent DOJ means to suggest that that is the standard *Campie* applied, it is plainly incorrect.  *Campie* was simply distinguishing the claims before it—in which, as noted, the relators had plausibly alleged that the government would not have approved use of the facility and thus would not have paid the defendant's claims if it had known the truth from the outset, 862 F.3d at 896—from the claims in an earlier Ninth Circuit decision where the relator had alleged only the "mere possibility" that the government *could* have refused payment, without alleging that it actually *would* have refused payment, *see United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325 (9th Cir. 2017).

[8]  It is unsurprising that the Court would employ different versions of the materiality test in these different contexts.  To prove the immigration violation at

point to any court anywhere that has read *Escobar* that way.  To the contrary, courts have recognized that *Escobar*'s "rigorous" and "demanding" standard, 136 S. Ct. at 1996, 2003, represented a "heightened" version of the ordinary materiality test.  *Petratos*, 855 F.3d at 492 ("join[ing] the many other federal courts that have recognized the heightened materiality standard after" *Escobar*) (citing, *inter alia*, *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 334 (9th Cir. 2017)); *United States v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016)).[9]  DOJ thus has no persuasive argument for replacing *Escobar*'s "likely or actual" effects test, *Escobar*, 136 S. Ct. at 2002, with a "mere possibility" standard.

### B. Under Any Reasonable Interpretation Of *Escobar*, The Complaint Fails Adequately To Allege Materiality.

In order for its Complaint to go forward in its entirety, DOJ must satisfy *Escobar*'s materiality standard for both of its distinct theories (which DOJ largely melds together).  One theory mirrors the attestation-based theory of the claims dismissed in *Swoben*: DOJ's Second, Third, and Fourth Claims for Relief all state

---

issue in *Kungys*, the government needed to establish its case by clear and convincing evidence.  The Court thus reasoned that "the difficulty of establishing 'but for' causality, by clear, unequivocal, and convincing evidence many years after the fact, is so great that we cannot conceive that Congress intended such a burden to be met before a material misrepresentation could be sanctioned."  485 U.S. at 776-77.  No comparably heightened evidentiary standard applies in a False Claims Act case, and thus the traditional "more likely than not" or "but for" tests of materiality are appropriate.  In any event, the Complaint does not contain sufficient allegations about the real-world possibility that CMS would have refused payment to satisfy even *Kungys*.

[9]  DOJ also relies (at 12) on the Court's statement in *Matrixx Initiatives, Inc. v. Siracusano* that no "single fact or occurrence [i]s always determinative" of materiality.  563 U.S. 27, 39 (2011).  That statement simply reflected the varied facts that can be used to *satisfy* the materiality standard; it did not describe the standard itself.  As United discusses below, the Complaint here does not even allege that the necessary standard has been met, let alone point to facts that could make such an allegation plausible or sufficiently particularized.

that they depend "[s]pecifically" on United's "Risk Adjustment Attestation." United States' Amended Complaint-in-Partial-Intervention, ECF No. 171 (hereinafter Compl.) ¶¶ 345, 346, 349, 350, 353, 354.  DOJ thus must establish that the Attestations were material in order for those claims to proceed.  DOJ also has a separate reverse false claim theory, contained in its new First Claim for Relief, that instead depends "[s]pecifically" on the "diagnoses that had been submitted to the Medicare Program for risk adjustment payments" and the "overpayments based on the invalid diagnosis."  Compl. ¶ 342.[10]  As explained below, DOJ has not satisfied *Escobar*'s materiality standard as to either theory.

>    1.    *DOJ Fails To Allege That CMS "Likely Or Actual[ly]" Would Have Withheld Payment If It Knew The Attestations Were False.*

DOJ's attestation-based claims fail to make adequate allegations of materiality.  As United demonstrated in its motion (at 13-14), the Complaint never alleges that CMS would have withheld payment from United if it had known that United's Risk Adjustment Attestations were supposedly false.  Nor does the Complaint ever allege that CMS *likely* would have withheld payment in that circumstance.  In fact, even though "any understanding" of materiality "look[s] to the effect on the . . . behavior of the recipient of the alleged misrepresentation," *Escobar*, 136 S. Ct. at 2002 (citation and internal quotation marks omitted), the part of DOJ's brief addressing the Attestations' materiality (at 21-22) says *nothing at all* about CMS's behavior in response to them.  The absence of this allegation about the effect of the Attestations' supposed falsity on CMS's decision to pay warrants dismissal of the attestation-based claims.  *See Swoben*, 2017 WL 4564722, at *6.

---

[10]    The common law claims in DOJ's Fifth and Sixth Claims for Relief are less clear about whether they depend on the Attestations, the risk adjustment data itself, or both.  Because DOJ has not pled adequately the materiality of either the Attestations or the risk adjustment data, those claims also should be dismissed.

DOJ suggests that demanding allegations about the "likely" or "actual" effect of the violation is an inappropriate "magic words" approach to *Escobar*. Opp. 12. But the requirement is substantive, not semantic. *Escobar* held that violations are material under the False Claims Act only if their "likely or actual" effect is to cause the government to pay a claim it otherwise would not have paid. *Escobar*, 136 S. Ct. at 2002. Where, as here, a plaintiff is unable to make even a generalized allegation that the claimed violations rise to that level (let alone a plausible and particularized allegation), then its claims should be dismissed. DOJ has had multiple opportunities to make that allegation, or even to indicate that it *would* make that allegation if given the opportunity for further amendment, and yet it has conspicuously failed to do so.

That is no accident. DOJ does not claim that the alleged falsity of United's Attestations had a "likely or actual effect" on CMS's payment decisions because it cannot, in good faith, do so. Indeed, United is not aware of (and DOJ has not identified) any instance in which CMS has *ever* denied payment or terminated any MA plan's contract because it concluded that the plan's Attestation was false in the manner that DOJ alleges United's Attestations were false here.

It is not sufficient to argue, as DOJ does (at 21), that "the Attestation . . . was meant to serve as a powerful deterrent against 'knowingly' submitting false claims . . . [and] as [a] 'bulwark[] against fraud.'" The question here is not the importance of the Attestations in the abstract, but whether the specific alleged falsity in the Attestations was material. For example, an Attestation might be technically false on DOJ's theory if some of the claims it covered included a "date of the medical encounter" (Opp. 5) that was a day different from the date recorded in the corresponding medical chart (while still within the same year). But no one could plausibly claim that CMS would have refused to pay if it learned of that one-day discrepancy. The relevant question, therefore, is not whether the Attestations in the abstract serve important purposes, or whether CMS might have reacted

differently to some other set of facts (like a plan that intentionally *created* inaccurate diagnosis codes that no doctor had ever submitted, in order to increase its payment[11]).  It is instead whether CMS would have "likely" or "actual[ly]" behaved differently had it known the Attestations were false in the particular manner that DOJ alleges here—namely, because the MA plan allegedly knew or should have known that some of the diagnoses codes received from providers and transmitted to CMS could not be verified with medical charts.  DOJ has not made, and cannot make, that indispensable case-specific allegation.

DOJ also misses the mark in asserting (at 11) that the "Secretary of the Department of Health and Human Services has authorized this FCA action." Despite authorizing the action itself, the Secretary and client agencies apparently have not authorized DOJ to allege the necessary fact that CMS would have withheld payment or behaved differently if it had known the Attestations were false in the manner DOJ alleges.  That is why DOJ is left arguing for a legal standard no court in the nation since *Escobar* has adopted, under which DOJ can pursue treble damages and other penalties even if the agency would not have done anything differently had it known of the alleged violations.

DOJ also asserts (at 13) that it is impossible to resolve the materiality inquiry at the pleading stage because it is not clear from the Complaint whether CMS did, *in fact*, have "actual knowledge" of the truth while continuing to pay United's claims.  DOJ appears to suggest that perhaps CMS continued to pay United because it was unsure whether the allegations in DOJ's complaint were true.[12]  But whether CMS *actually believed* that the Attestations were false (on

---

[11]  That fraudulent practice has nothing to do with DOJ's allegations here.

[12]  DOJ also argues that "CMS did not know which of the millions of codes submitted by Defendants lacked support in the medical charts, precisely because Defendants kept this information from the Government."  Opp. 14.  But if the supposed falsity of the Attestations themselves was material, CMS would not have

1   DOJ's understanding of them) does not matter where, as here, DOJ has failed to

2   offer even a conclusory allegation that, *if CMS had*, its "likely or actual behavior"

3   would have been different.  *Escobar*, 136 S. Ct. at 2002.  That necessary allegation

4   is not made at all, so the question whether it is plausible*,* given CMS's continued

5   payments despite knowledge of "inevitable" coding errors in provider submissions,

6   does not even arise here. *Cf. Knudsen v. Sprint Communications Co.*, Nos. C13-

7   04476 CRB et al., 2016 WL 4548924, at *13 (N.D. Cal. Sept. 1, 2016) (dismissing

8   complaint on materiality grounds and noting that "[a]lthough the government

9   might be correct that a PRC violation is material to the government's decision to

10  pay, the issue here is the adequacy of [the] pleading").

11          This Court should evaluate the Complaint as it is written.  And as written,

12  DOJ's Complaint clearly fails to allege that the Attestations on which the Second,

13  Third, and Fourth Claims for Relief rest had any "likely or actual" effect on CMS's

14  decision to pay.  Those claims thus should be dismissed with prejudice.

15          2.      *DOJ Also Fails Adequately To Allege That The Unsupported Risk*
                    *Adjustment Codes Were Material.*
16

17          As discussed above, DOJ added its new First Claim for Relief in an attempt

18  to solve the materiality problem with its attestation-based claims.  Unlike the other

19  False Claims Act counts, the reverse false claim theory in the First Claim for Relief

20  relies on the specific unsupported diagnosis codes United allegedly submitted,

21  rather than the alleged falsity of the Attestations.  *See* Compl. ¶ 342.  And while

22  the bulk of DOJ's *claims* are based on the Attestations, its brief focuses its

23  discussion of materiality predominantly on these diagnosis codes.  *See, e.g.*, Opp. 2

24  n.2 (focusing exclusively on allegations about specific diagnosis codes).

25

26  needed to know which *specific* codes were unsupported; it would have been

27  enough to conclude just that *some* were (which would, under DOJ's theory, have

28  rendered the Attestations false).

While this new attempt to shift the focus from the materiality of United's Attestations to the materiality of specific diagnosis codes avoids any direct conflict with Judge Walter's *Swoben* decision, it still fails to satisfy *Escobar*'s materiality standard.  DOJ alleges only that if United had returned payments to CMS after learning that those payments were based on unsupported codes, CMS would have accepted them.  *See* United Mem. in Support 16-17.  Even if true, that is insufficient.  The relevant question is not whether the government would have effectively accepted a repayment, but whether *CMS* itself would have sought to recover those payments if it had learned that United was retaining them.  *See Escobar*, 136 S. Ct. at 2003.  The Complaint contains no plausible allegations that it would have done so.

DOJ claims that because its First Claim for Relief asserts a *reverse* false claim theory, it makes no difference whether the agency would have sought to recover, because "an implied materiality requirement logically would . . . focus on *Defendants'* obligation to repay the overpayment."  Opp. 16.  That view is impossible to reconcile with *Escobar*'s statement that "[u]nder *any* understanding of the concept," materiality looks to the effect on "the recipient of the alleged misrepresentation."  136 S. Ct. at 2002 (emphasis added).  That view also makes no sense.  After all, how would a defendant-focused materiality inquiry operate?  Would the defendant be asked whether *it* thought that it should be paid notwithstanding the violation in question?

Moreover, if what DOJ really means is that materiality is satisfied whenever a defendant has an obligation to repay, regardless how the government agency would have reacted to a violation of that obligation, it effectively has eliminated the materiality requirement entirely.  As United explained in its opening brief, that would permit the government to convert literally any *immaterial* affirmative false claim into a valid suit for a reverse false claim.  For example, a company with a contract specifying it was required to comply with all contractual obligations in

order to receive payment, including using American-made staplers, would technically have an obligation to return its payment if it used a foreign stapler. Under DOJ's theory, that company then would be liable under 31 U.S.C. § 3729(a)(1)(G) even if it was abundantly clear the government would not actually have denied payment in the first place had it know of the foreign stapler usage. That *cannot* be right.[13]

The only authority DOJ cites to support this extreme position is the pre-*Escobar* decision of *United States v. Bourseau*, 531 F.3d 1159 (9th Cir. 2008). DOJ claims that *Bourseau* supports its view that assessing materiality in reverse false claim cases does not depend on the effect of the alleged violation on the government, because the cost reports in question there "were never reviewed by the Government" and yet were nevertheless found material. Opp. 16. But DOJ omits the crucial fact that the cost reports *were* reviewed by the Medicare intermediary CMS had hired to "facilitate the reimbursement process." *Bourseau*, 531 F.3d at 1162. Just as important, DOJ ignores that if the cost report there *had been* reviewed by the government and found to be false, the government would have demanded the overpayments. *Id.*

Here, the comparable allegations are missing about what CMS would have done differently if it had known that United had failed to delete certain provider-submitted codes that were unsupported by medical records. That warrants dismissal. Moreover, DOJ has not suggested that it could further amend its Complaint to solve those deficiencies, nor requested leave to do so, and dismissal

---

[13]   DOJ also insists that even if the agency itself would not have sought to recover the alleged overpayments, DOJ has established materiality here by simply bringing this False Claims Act suit. *See* Opp. 14. As with its novel defendant-focused materiality standard, however, that proves too much:  If merely bringing a False Claims Act suit were sufficient to establish materiality, then materiality would effectively be a non-element whenever DOJ asserted a claim under the False Claims Act.

on this ground thus should be with prejudice. *See, e.g.*, *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1167 (9th Cir. 2009) (holding that district court's discretion to dismiss complaint without leave to amend "is particularly broad in case such as this, where a plaintiff has previously been granted leave to amend").

### C. This Motion Presents No Occasion To Resolve The Actuarial Equivalence And Other Questions Currently Pending In United's Administrative Procedure Act Suit.

As this Court knows, United filed an Administrative Procedure Act suit challenging a 2014 CMS rule defining "overpayments." Cross-motions for summary judgment are pending in that case that could ultimately have impacts here. *See UnitedHealthcare Insurance Co. v. Hargan*, No. 1:16-cv-00157-RMC (D.D.C. Oct. 17, 2017), ECF No. 47-1 (Mem. in Support of United's Mot. for Summ. J.) (hereinafter United APA Mot. for Summ. J.); *id.* at ECF No. 57-1 (D.D.C. Dec. 4, 2017) (Mem. in Support of Government's Mot. for Summ. J.). One of the issues those motions raise is whether CMS lawfully may require MA plans to delete (and thus not receive payment for) diagnosis codes that lack support in medical charts, while at the same time calculating the per-code payment amounts it pays MA plans using a mix of supported and unsupported codes in its own traditional Medicare data (which, CMS officials have previously recognized, "tends to reduce the estimated average cost of various conditions and therefore [CMS's] risk adjustment factors," *UnitedHealthcare Insurance Co. v. Hargan*, No. 1:16-cv-00157-RMC (D.D.C. Oct. 2, 2017), ECF No. 44-4 at CMS0006190A). United argues there that doing so violates the Medicare Act's "actuarial equivalence" requirement because it results in MA payments that are significantly less than CMS would expect to incur for an identical beneficiary in traditional Medicare. *See* United APA Mot. for Summ. J. at 22-32. Another issue in that case concerns the meaning of "accuracy" in the context of diagnostic coding for risk adjustment purposes. Before the 2014 rule, CMS had explained that "MA

organizations are coding 'accurately' when they are coding in a manner similar to fee-for-service coding used on the beneficiaries to whom MA plan enrollees are being compared."  CMS, Announcement of Calendar Year (CY) 2010 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies 20 (Apr. 6, 2009), https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/downloads/Announcement2010.pdf.  United argues in its APA case that CMS could not lawfully adopt a different understanding of "accuracy" in the 2014 rule, requiring plans to show that all diagnosis codes are supported by charts, without holding itself to the same "accuracy" standard or adjusting its payment practices to account for the difference.  *See* United APA Mot. for Summ. J. at 39-40.

Contrary to DOJ's implication (at 18), however, those legal issues need not be (indeed cannot be) relitigated in this motion, which concerns the distinct pleading-stage failure of DOJ to allege the materiality of any of its claims.  The parties have submitted extensive briefing about the Medicare Act and its implementing regulations in the APA case, and the decision there will by necessity parse the meaning of those provisions based on the voluminous administrative record.  For purposes of this motion, however, those questions—and the litigation concerning them—are relevant only as background to help understand why, notwithstanding DOJ's overstated fraud rhetoric, CMS's real-world conduct (and evident unwillingness to authorize allegations about how that conduct would have changed) instead reflects the existence of a good-faith regulatory and contractual dispute here.

### D.    *This Motion Also Presents No Occasion To Resolve The Implications Of A Future Decision In The Administrative Procedure Act Case.*

This motion likewise presents no occasion to rule on the ultimate implications of the APA court's decision on this case.  DOJ is wrong in its

suggestion—which lacks any citation to United's brief—that United has asked this Court to hold that "the use of the term 'actuarial equivalence' in the statute means that [United's] obligation to delete and repay Medicare for invalid payment data—the invalid diagnoses—is immaterial." Op. 20.   United's motion rests on the absence of crucial factual allegations establishing materiality, not on an application of the Medicare Act's actuarial equivalence requirement.

Once the APA court issues a decision, there may at that point be questions about the implications of its decision for this case (if the case has not been dismissed already).  If the APA court determines that CMS may not require MA plans to delete unsupported codes without first accounting for the unsupported codes in its own data, for example, then this Court would then need to consider the implications of that ruling here.  Before this Court could do so, the parties would need to brief—as DOJ currently ignores—the meaning and significance of United's contracts with CMS, under which CMS is obligated to *pay* United for the very unsupported codes that DOJ claims United was obligated to *delete*.  *See* 42 U.S.C. § 1395w-23(a)(1)(C)(i) (portion of Section 1853 of the Medicare Act requiring CMS to adopt a payment methodology that will "ensure actuarial equivalence"); Ex. 2 to Compl. at 196 (section of United's contract with CMS on "CMS Payment to MA Organization," in which "CMS agrees to pay the MA Organization under this contract in accordance with the provisions of section 1853 of the Act").  A decision by the APA court on the actuarial equivalence standard and the other issues presented there thus could raise a number of significant issues regarding the viability of DOJ's claims here.  But those issues would depend on the scope and substance of the ruling and cannot adequately and efficiently be briefed

at this time.  More to the point, those issues were not raised or argued by United as a basis for its current motion, and are not necessary to decide that motion either.[14]

## II.   Congress's 2009 Revisions To The Reverse False Claims Provision Do Not Create Retroactive False Claims Act Liability For Obligations That Arose Prior To Their Enactment

Because all of DOJ's claims fail on materiality grounds, there is no need to decide which claims also are barred by anti-retroactivity principles.  If the Court reaches that secondary question, however, there appears to be substantial common ground between the parties on it.  DOJ apparently concedes that Congress did not intend its revisions to Section 3729(a)(1)(G) to apply retroactively, and defends its claims only to the extent that they apply to "risk adjustment payments for payment (*i.e.*, calendar) year 2009 . . . and to all subsequent payment and date of service years."  Opp. 22.  DOJ does not defend its claims based on payments from payment year 2008 and earlier, so those should be dismissed.[15]   United,

---

[14]   The government has recognized that the "actuarial equivalence" standard would be a "central" issue in this case, even urging the D.D.C. to enter a stay that would have allowed that issue to be addressed in the first instance here *instead of* in the APA case.  *See UnitedHealthcare Insurance Co. v. Hargan*, No. 1:16-cv-00157-RMC (D.D.C. April 14, 2017), ECF No. 28 at 6 ("[A]bsent a stay, UnitedHealth and the federal government will . . . litigate in both actions the validity of UnitedHealth's 'actuarial equivalence' theory").  That position is impossible to reconcile with DOJ's newly developed view that the "actuarial equivalence" standard is irrelevant to this case.  United, by contrast, has always argued that the actuarial equivalence standard would prevent any ultimate recovery by DOJ in this case and *Swoben*.  It has consistently maintained, though, that the False Claims Act suits might not reach that issue if they were decided on other grounds first, including "the government's inability to prove the materiality of any allegedly false claim"—as *Swoben* already has been, and as this motion urges the Court to do here.  *See UnitedHealthcare Insurance Co. v. Hargan*, No. 1:16-cv-00157-RMC (D.D.C. April 28, 2017), ECF No. 31 at 10.

[15]   DOJ indicates that "the final payment for payment year 2008 also may have been made after May 20, 2009."  Opp. 22.  United has no objection to deferring a

1    meanwhile, does not intend its anti-retroactivity challenge to apply to DOJ's

2    claims based on payment year 2010 and after.

3         What remains is a dispute about payment year 2009. As to claims

4    concerning those payments, United agrees that they depend on factual questions

5    about the dates on which obligations arose. United therefore has no objection to

6    DOJ's suggestion that resolution of those remaining anti-retroactivity questions be

7    deferred until they can be "presented to the court or jury after discovery is

8    completed." *Id.* at 24 n.10[16]

9                              **CONCLUSION**

10        For more than five years, United cooperated with DOJ's extensive

11   investigation of this case. If it continues, the case will continue to demand

12   considerable time, money, and attention for years to come. If United is really to be

13   forced to continue through that process, it should be because the allegations here

14   are about violations that truly made a difference, and that would have caused the

15   officials responsible for oversight of the Medicare Advantage program to make

16   different decisions if they had known about them. But even now, after seeing its

17   claims in *Swoben* dismissed for lacking precisely such allegations, after taking a

18
19   decision on whether the revised reverse false claim provision in Section
     3729(a)(1)(G) applies to that payment until discovery has been completed.

20   [16]  United does not understand DOJ to be defending claims based on payments
21   from payment years before 2009 (with the possible exception of the final payment
     for 2008). *See* Opp. 24. To the extent that DOJ's reference (at 22) to "contractual
22   and regulatory obligations [that] existed both prior to and after May 20, 2009" is
23   intended to somehow preserve such claims, however, it is plainly insufficient.
     Prior to FERA's enactment, failure to repay a known "obligation" to the
24   government was not a violation of the False Claims Act unless the defendant also
25   submitted a false record or statement to conceal the obligation. *See* Compl. ¶ 117
     (describing FERA amendment). For the reasons explained in United's opening
26   brief (at 19-20), the failure to repay an "obligation" that arose before FERA's
27   enactment, unaccompanied by any false record or statement, therefore would not
     give rise to a violation of Section 3729(a)(1)(G).
28

1   month to try to amend its Complaint to fill the gaps *Swoben* identified, and even

2   after having a chance in its brief to say that if given leave to amend *again* it would

3   allege that CMS would have proceeded differently, DOJ does not and cannot make

4   that necessary allegation.  For that fundamental reason, and the others addressed

5   above, the Court should dismiss this case with prejudice.

6

7

8   Dated:  January 16, 2018          LATHAM & WATKINS LLP

9                                     DAVID J. SCHINDLER
                                      DANIEL MERON
10                                    ABID R. QURESHI
                                      KATHRYN H. RUEMMLER
11

12
                                      By /s/ David J. Schindler
13                                       David J. Schindler
                                         Attorneys for United Defendants
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28