UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 16-08697-MWF (SSx)                Date:  February 12, 2018
Title:     United States ex rel. Benjamin Poehling-*v.*- Unitedhealth Group, Inc. et al.

Present:  The Honorable MICHAEL W. FITZGERALD, U.S. District Judge

          Deputy Clerk:                         Court Reporter:
          Rita Sanchez                          Not Reported

          Attorneys Present for Plaintiff:      Attorneys Present for Defendant:
          None Present                          None Present

Proceedings (In Chambers):          ORDER RE MOTION TO DISMISS [182]

    Before the Court is Defendants UnitedHealth Group, Inc., et al.'s (the "Defendants") Motion to Dismiss United States' First Amended Complaint-in-Partial Intervention (the "Motion"), filed on December 8, 2017.  (Docket No. 182).  The Government filed an Opposition on January 8, 2018.  (Docket No. 194).  The United Defendants filed a Reply on January 16, 2018.  (Docket No. 199).  The Court has read and considered the papers filed on the Motion, and held a hearing on **January 29, 2018**.

    For the reasons set forth below, the Motion is **GRANTED *in part with leave to amend***.  The Government has failed to adequately plead the materiality of the misrepresentations at the heart of its Second, Third, and Fourth Claims for Relief under the False Claims Act.  The Motion is **DENIED** as to the First, Fifth, and Sixth Claims for Relief.

## I. BACKGROUND

### A. Procedural Background

    Relator Benjamin Poehling filed this *qui tam* lawsuit in the Western District of New York on March 34, 2011.  (Complaint (Docket No. 1).  The action remained under seal and pending in the Western District of New York for five years while the Department of Justice conducted its investigation.  On November 8, 2016, the Government moved to transfer the sealed action to the Central District of California to

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 16-08697-MWF (SSx)                    Date:  February 12, 2018
Title:        United States ex rel. Benjamin Poehling-*v.*- Unitedhealth Group, Inc. et al.

enable the action to be consolidated with or related to another *qui tam* action captioned *United States ex rel. Swoben v. United Healthcare Ins. Co. et al.*, CV 09-5013 (C.D. Cal.) ("*Swoben* Action"), which the Government claimed contained related or overlapping allegations.  (Motion to Transfer Venue (Docket No. 48)).  After the action was transferred, the Government formally intervened and filed a Complaint-in-Intervention on May 16, 2017.  (*See* Docket No. 114).  The Complaint alleged five claims for relief:  three claims under the False Claims Act, and two asserting common law claims for unjust enrichment and payment by mistake.  (*See id.*).

On September 28, 2017, the Court denied United Defendants' Motion to Transfer the action to the District of Columbia, and ordered United Defendants to respond to the Complaint within 20 days.  (*See* Docket No. 154).  Before United Defendants could respond, the Government's claims against United in the *Swoben* Action were dismissed.  *See United States ex rel. Swoben v. Scan Health Plan*, No. CV 09-5013-JFW (JEMx), 2017 WL 4564722, at *6 (C.D. Cal. Oct. 5, 2017).  The parties in this action therefore agreed that the Government would file an amended complaint.  Accordingly, on November 17, 2017, the Government filed the operative First Amended Complaint-in-Intervention.  ("FAC" (Docket No. 171)).  The FAC adds an additional claim under the False Claims Act that was not directly at issue in recent *Swoben* Action dismissal.  (*See id.*).

### B.      Factual Background

On a motion to dismiss, the Court assumes the facts alleged in the Complaint are true and construes any inferences arising from those facts in the light most favorable to the plaintiff.  *See, e.g.*, *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 704 (9th Cir. 2016) (restating generally-accepted principle that "[o]rdinarily, when we review a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), we accept a plaintiff's allegations as true 'and construe them in the light most favorable' to the plaintiff" (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009)).  Therefore, the Court accepts the following facts as true:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 16-08697-MWF (SSx)                  Date:  February 12, 2018
Title:       United States ex rel. Benjamin Poehling-*v.*- Unitedhealth Group, Inc. et al.

### 1. Medicare Advantage Program

The Centers for Medicare and Medicaid Services ("CMS") administers the Medicare Program, which provides Medicare benefits to elderly and disabled individuals.  (FAC ¶ 1, 43).  Under Parts A and B of the Medicare Program, known as "traditional" Medicare, CMS directly reimburses healthcare providers using a "fee-for-service" ("FFS") payment system, in which providers submit claims to CMS for reimbursement for each service rendered.  (*Id.* ¶¶ 43-44).  Under Part C, Medicare beneficiaries can enroll in Medicare Advantage Plans ("MA Plans"), which are managed by private healthcare insurance organizations ("MA Organizations").  (*Id.* ¶ 45).  MA Organizations' obligations and requirements for participation in the MA Program are set forth in the federal regulations, and each year, MA Organizations agree in writing to comply.  (*Id.* ¶ 49).

Under Part C, CMS pays the MA Organizations a predetermined base monthly payment for each Medicare beneficiary enrolled in their MA Plans.  (FAC ¶ 54).  Since 2000, CMS has adjusted those payments for various risk factors, including health status, to ensure actuarial equivalence.  (*Id.* ¶ 55).  These adjustments mean that that MA Organizations are paid more for beneficiaries have more serious medical conditions, and therefore higher risk scores, than they are paid for beneficiaries who do not have those conditions.  (*Id.*).

Since 2004, the CMS has employed the Hierarchical Conditions Category ("HCC") model to adjust for beneficiaries' health status.  The HHC model is prospective, meaning it relies on diagnosis codes submitted for a beneficiary in one year (the "date of service year") to determine the risk score for the beneficiary for the following year (the "payment year").  (FAC ¶ 58).  For risk adjustment purposes, the medical conditions associated with each diagnosis code submitted to CMS must be supported by the beneficiary's medical record.  (*Id.* ¶ 61).

MA Organizations submit risk adjustment data, such as diagnosis codes, to CMS through CMS's Risk Adjustment Processing System ("RAPS").  Each submission is a claim for payment.  (FAC ¶ 64).  RAPS also allows MA Organizations to delete

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 16-08697-MWF (SSx)                Date:  February 12, 2018
Title:        United States ex rel. Benjamin Poehling-*v.*- Unitedhealth Group, Inc. et al.

previously submitted codes so they can retract unsupported, invalid diagnoses.  (*Id.* ¶ 65).  Each MA Organization must certify that the diagnosis codes submitted for risk adjustment payments are accurate and truthful based on best knowledge, information, and belief, per 42 C.F.R. § 422.504(l)(2).  Per 42 C.F.R. § 422.503(b)(4)(vi), each MA Organization must also adopt and implement an effective compliance program that includes measures to prevent and correct fraud and non-compliance with the MA Program requirements.  (*Id.* ¶ 5).

## 2.  Defendants' Agreements and Integrity Obligations

Defendant UnitedHealth Group ("UHG"), itself and through its business divisions ("UHG Managing Defendants"), manages and operates the other Defendant MA Organizations.  (FAC ¶ 8).  Each year, executives of the UHG Managing Defendants executed agreements by which Defendant MA Organizations were required to comply with CMS' requirements and regulations for participation in the MA Program.  The terms of those agreements remain similar year-to-year.  The terms of the agreements for Part C participation, for example, require the MA Organizations to operate its plans in compliance with the requirements of the contract and applicable federal laws; implement a compliance plan; attest based on best knowledge, information, and belief to the accuracy, completeness, and truthfulness of submitted risk adjustment data, and so on.  (FAC ¶ 68).

MA Organizations are also required to execute Electronic Data Interchange ("EDI") agreements by which the MA Organizations attest to the accuracy of the risk adjustment data submitted by them or on their behalf.  (FAC ¶ 73).  The EDI agreements require MA Organizations to be responsible for all data submitted by themselves or on their behalf; to submit accurate, complete, and truthful data; and to research and correct data discrepancies.  (*Id.*).  Defendants submitted these EDI agreements.  (*Id.* ¶ 74).

Defendant Optum (formerly Ingenix) also entered into internal agreements with Defendants regarding the risk adjustment services that Optum would provide to Defendant MA Organizations.  (FAC ¶ 83).  Those services included submission of risk

_____

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 16-08697-MWF (SSx)                    Date:  February 12, 2018
Title:       United States ex rel. Benjamin Poehling-*v.*- Unitedhealth Group, Inc. et al.

adjustment data to CMS and management of the national Chart Review Program,
which employed chart reviewers to review medical records and mine them for
additional diagnosis codes the medical providers did not originally report, but which
Defendants could submit to CMS for additional risk adjustment payments.  (*Id.* ¶ 10,
83).  Those agreements contain language confirming UHG Managing Defendants'
understanding of their joint and several obligations to the MA Program.  (*Id.* ¶¶ 83–86).

     MA Program manuals and guides provide that MA Organizations are only
entitled to risk adjustment payments based on diagnosis codes that are the result of in-
person medical encounters between beneficiaries and providers during the relevant date
of service year, and if the provider documented the medical conditions identified by the
code.  (FAC ¶ 87).  Risk adjustment claims are only valid if and to the extent the codes
submitted by the MA Organizations are valid and conform to Medicare guidelines.  (*Id.*
¶ 88).  Moreover, all codes must be supported by medical documentation, though that
documentation is not submitted with the codes to CMS.  (*Id.* ¶¶ 89–91).  As mentioned
above, federal regulations also require MA Organizations to implement an effective
compliance program that ensures they submit accurate and truthful information to
CMS.  (FAC ¶ 95).

     After the deadline for submission of risk adjustment data, but before they receive
reconciliation payments for a given payment year, MA Organizations are required to
attest to the validity of their risk adjustment data in a "Risk Adjustment Attestation"
signed by an executive officer or other individual with signature authority.   (FAC ¶
98).  CMS has conveyed to MA Organizations that in order to make these Attestations,
the MA Organizations are obligated to act in good faith based on best knowledge,
information, and belief.  (*Id.* ¶¶ 101–02).

     MA Organizations have an obligation to withdraw, or delete, previously
submitted invalid diagnosis codes.  This obligation arises out of their contractual
relationship with CMS, regulations, and because retention of a payment to which the
MA Organization is not entitled constitutes an obligation to repay the Government
under the FCA.  (FAC ¶¶ 103–04).  Various RAPS guides and instruction manuals

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 16-08697-MWF (SSx)                     Date:  February 12, 2018
Title:       United States ex rel. Benjamin Poehling-*v.*- Unitedhealth Group, Inc. et al.

make clear that deleting invalid codes is mandatory.  (*Id.* ¶¶ 108–09).  Invalid codes
can be deleted before and after the final deadline for RAPS submissions.  (*Id.* ¶ 110).

### 3.  Defendants' Conduct

The Government alleges that since at least 2005, Defendants have known of their
obligations with respect to risk adjustment data, and have also known that many
provider-reported diagnosis codes were not supported by the beneficiaries' medical
records.  They knew they were obligated to make good faith efforts to delete the invalid
codes and engage in Chart Reviews that "looked both ways" to identify both additional
codes to submit and codes to delete.  Nevertheless, Defendants conducted "one-way"
Chart Reviews, ignored unsupported codes UGH Managing Defendants submitted to
CMS on their behalf, and retained risk adjustment payments to which they were not
entitled.  (FAC ¶ 122).

For example, in 2005, when Defendant UHG acquired PacifiCare, it retained
employees of PacifiCare who had extensive knowledge about obligations regarding
submission of valid diagnosis codes and deletion of invalid codes.  (FAC ¶¶ 123–30).
They were also aware that CMS' own medical record reviews demonstrated that
approximately 30 percent of provider-reported diagnoses were invalid.  They shared
this information with UHG.  (*Id.* ¶ 131, 135).  Defendants' own data and audits, as well
as CMS' audits, also confirmed problems with provider-reported diagnoses.  (*Id.* ¶¶
136, 141).  Over the years, UGH Managing Defendants continued to internally
highlight invalid diagnosis codes as a problem that needed resolution.  (*Id.* ¶¶ 147–62).

#### a.  *Chart Review Program*

UHG Managing Defendants started the Chart Review Program in 2005.
Through the program, UHG Managing Defendants hired coders to conduct "blind"
reviews of beneficiaries' medical records.  The coders did not know which, if any,
diagnoses had already been reported by providers.  However, the UHG Managing
Defendants selectively utilized the results of the Chart Reviews to identify diagnoses
codes that the providers had not reported, and to submit those additional codes to CMS.
(FAC ¶¶ 165–66).  The program continued to grow, and by 2011, approximately 1.5

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 16-08697-MWF (SSx)                Date:  February 12, 2018
Title:        United States ex rel. Benjamin Poehling-*v.*- Unitedhealth Group, Inc. et al.

million charts were reviewed in the course of the year.  (*Id.* ¶ 167–69).
Correspondingly, risk adjustment payments made to Defendant MA Organizations also
increased during this period.  (*Id.* ¶ 173).

        Prior to the start of each annual Chart Review Program, UHG Managing
Defendants' senior executive set a revenue target for the program, and if the program
did not appear to be on track to meet that target, they made changes to the program.
(FAC ¶¶ 175–76).   Officers of UnitedHealthcare attested to the validity of all
additional codes submitted.  (*Id.* ¶ 177).

        In 2008, Relator Benjamin Poehling and others began to question the one-sided
Chart Reviews.  (FAC ¶ 178).  Relator Poehling is a former employee of United
HealthCare, and was Director Finance for Ovations, the group that managed the
Defendant MA Organizations until 2010, and after that was Director of Finance for
UnitedHealthcare Medicare & Retirement, which succeeded Ovations in managing the
MA Organizations.  (*Id.* ¶ 23).  Relator Poehling repeatedly addressed the issue in
meetings, and even specifically mentioned the FCA.  (*Id.* ¶¶ 178, 180, 183, 186).  In
2010, senior executives acknowledged that the UHG Managing Defendants should
"look both ways" at the results of the Chart Reviews.  (*Id.* ¶ 185).  As a result, they
began to slowly phase development of the Claims Verification Program over the course
of three years.  (*Id.* ¶¶ 186–86, 202).

        However, codes that were shown to be invalid by the Claims Verification
Program were not automatically deleted, and were instead labeled "potential deletes."
(FAC ¶ 202).  The coders were instructed that the goal of Claims Verification was
primarily to "validate" or "save" the potential deletes by finding other support for the
code.  (*Id.*).  Still, Defendants projected a negative financial impact as a result of
deletes that would need to be made based on the Claims Verification Pilot Program
results.  (*Id.* ¶¶ 209–10, 216–18).  The Claims Verification Program was never fully
implemented, and UnitedHealthcare and Optum changed the program to limit its scope
and avoid as many negative results.  (*Id.* ¶¶ 211–15).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 16-08697-MWF (SSx)                    Date:  February 12, 2018
Title:         United States ex rel. Benjamin Poehling-*v.*- Unitedhealth Group, Inc. et al.

---

In 2014, Defendant UnitedHealthcare projected a budget shortfall, and as part of an effort to eliminate it, reduced compliance efforts.  (FAC ¶ 219–20).  Concerned about the consequences of terminating the Claims Verification Program, though, UHG, UnitedHealthcare, and Optum contacted CMS employees to ask if Defendants had a legal obligation to perform Claims Verification.  (*Id.* ¶¶ 223–24).  CMS told them they had a statutory obligation to report and repay Medicare for erroneous risk adjustments payments, and that there were FCA implications for failure to do so.  CMS also told them that they could not ignore information in their possession that might show diagnosis codes were invalid.  (*Id.* ¶ 226).  CMS indicated that existing laws imposed requirements and responsibilities on MA Organizations, though CMS could not provide advice about the scope of those laws or whether Defendants were required to implement the Claims Verification Program.  (*Id.*  227–28).

Defendants decided to go forward with terminating the Claims Verification Program, and chose not to delete over 100,000 invalid codes of which they had actual knowledge.  After terminating the Claims Verification Program, UnitedHealthcare and Optum reverted to "one way" Chart Reviews. (FAC ¶¶ 231–33).

The Government alleges that the results of the Chart Review Program provided UHG Managing Defendants with information about a large number of invalid provider-reported diagnoses that should not have been submitted to CMS on behalf of Defendant MA Organizations.  UHG Managing Defendants knowingly and improperly failed to delete or repay Medicare for the invalid diagnoses.  (FAC ¶¶ 235–36).

### b. *RACCR Program*

The Government alleges that UHG Managing Defendants negotiated agreements with healthcare provider groups that tied the groups' compensation to their beneficiaries' risk scores.  As a result, providers benefited financially from any increase in risk adjustment payments resulting from diagnoses they reported to the UHG Managing Defendants beneficiaries enrolled in Defendant MA Organizations' Plans.  (FAC ¶¶ 239–40).  UHG Managing Defendants knew this incentivized providers to increase the number and severity of diagnoses they reported.  (*Id.* ¶ 241).

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 16-08697-MWF (SSx)                Date:  February 12, 2018
Title:        United States ex rel. Benjamin Poehling-*v.*- Unitedhealth Group, Inc. et al.

Ovations (later UnitedHealthcare Medicare & Retirement) and Ingenix developed the RACCR Program to minimize the number of invalid diagnoses submitted to CMS.  (FAC ¶ 242).  However, RAACR's efficacy was limited by its structure.  For example, UHG Managing Defendants excluded from the RAACR Program any incentivized providers who cared for fewer than 500 beneficiaries.  (*Id.* ¶¶ 245–46).  Moreover, UHG Managing Defendants did not review provider groups unless the group was an extreme outlier in reporting diagnoses.  As a result of these limitations, in some years, over 80 percent of financially incentivized providers were excluded from the RAACR Program.  (*Id.* ¶ 247).  Then, UHG Defendants purposefully reviewed only small samples of beneficiaries for the providers in the program, and gave providers a "passing grade" if less than 20 percent of their diagnoses were invalid.  (*Id.* ¶¶ 250–52).

Despite the limitations on the RAACR Program, it still demonstrated to UHG Managing Defendants that there were significant problems in diagnoses reported by financially incentivized providers.  (FAC ¶ 254–60).  UHG Managing Defendants' executives were routinely informed of RAACR results.  (*Id.* ¶¶ 262–64).  However, even after the results demonstrated that diagnoses were unsupported by the medical records, UnitedHealthcare Medicare & Retirement did not always delete them. (*Id.* ¶ 280).  The Government cites to several specific examples.  (*Id.*).  In 2014, UnitedHealthcare Medicare & Retirement had Optum restructure RAACR to turn it into another chart review program that was focused on identifying unreported diagnosis codes rather than invalid codes.  (FAC ¶ 282).

### c. *Defendants' Risk Adjustment Attestations*

The Government alleges that UHG Managing Defendants submitted or caused to be submitted, on behalf of Defendant MA Organizations, the annual Risk Adjustment Attestations to the Medicare Program.  (FAC ¶ 293).  The Government further alleges that Defendants knowingly submitted false Attestations.  (*Id.*).

Generally, the Chief Financial Officers of the groups with responsibility for managing the Defendant MA Organizations owned by UHG were the officers who

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 16-08697-MWF (SSx)                    Date:  February 12, 2018
Title:       United States ex rel. Benjamin Poehling -*v.*- Unitedhealth Group, Inc. et al.

executed the Attestations on behalf of the Defendant MA Organizations.  (FAC ¶ 296).
Before they signed the Attestations, a series of internal approval forms were signed by
appropriate officials.  (*Id.*).  The Government alleges that the officials who signed the
internal approval forms deliberately ignored or recklessly disregarded information
available to Defendants about invalid diagnoses.  (*Id.* ¶¶ 298–307).

The Government alleges that in 2009 through 2016, Attestations were submitted
to the Medicare Program on behalf of UHG entities by UHG officers who ignored or
disregarded the negative results of the Chart Review Program, and ignored or
disregarded that Defendants had failed to comply with requirements regarding
submission of diagnoses.  (FAC ¶¶ 309–27).

### d. *Relationship of Diagnosis Codes and Attestations to Risk Adjustment Payments*

The Government alleges that the diagnostic data submitted by MA Organizations
is the sole determinant in the calculation of any risk adjustment payments based on a
beneficiary's health status.  The submissions of diagnoses are themselves claims for
risk adjustment payments.   (FAC ¶ 328).  When MA Organizations delete invalid
diagnoses that were submitted for payment, Medicare recovers the associated
overpayments.  (*Id.* ¶ 330).  Medicare cannot obtain knowledge of an invalid diagnosis
from the face of the Attestation – someone must inform CMS that the diagnosis is
invalid.  (*Id.*).

In the past, when UnitedHealthcare has informed CMS that it possesses
information about invalid diagnoses that were submitted for payment, CMS has worked
with UnitedHealthcare to recover the overpayments.  (FAC ¶ 332).  Likewise, the
Government alleges that if Defendants had complied with their obligations to delete
invalid diagnoses from RAPS, Medicare would have processed the corrected data,
recalculated the risk score for the beneficiaries, and the risk adjustment reconciliation
payment system would have made the corresponding payment adjustment.  (*Id.* ¶ 333).
However, when MA Organizations do not delete invalid diagnoses from RAPS,
Medicare pays for the invalid diagnoses as part of its final reconciliation payment to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 16-08697-MWF (SSx)                    Date:  February 12, 2018
Title:        United States ex rel. Benjamin Poehling-*v.*- Unitedhealth Group, Inc. et al.

the MA Organization.  If Medicare already paid for those invalid diagnoses, it does not recover the overpayment as part of that reconciliation process.  (*Id.* ¶ 334).

### 4.  Claims Alleged

Based on the facts described above, the Government further alleges six claims for relief against all Defendants:

1.  Violation of the second part of 31 U.S.C. § 3729(a)(1)(G) (formerly 31 U.S.C. § 3729(a)(7)), known as the "reverse false claims" provision, by knowingly concealing or knowingly and improperly avoiding an obligation to pay or transmit money to the Government;

2.  Violation of 31 U.S.C. § 3729(a)(1)(A) (formerly 31 U.S.C. § 3729(a)(1)), by knowingly presenting or causing to be presented false or fraudulent claims for payment or approval;

3.  Violation of 31 U.S.C. § 3729(a)(1)(B) (formerly 31 U.S.C. § 3729(a)(2)), by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim;

4.  Violation of the first part of 31 U.S.C. § 3729(a)(1)(G) (formerly 31 U.S.C. § 3729(a)(7)), known as the "reverse false claims" provision, by knowingly making, using, or causing to made or used, a false record or statement material to an obligation to pay or transmit money to the Government;

5.  Unjust Enrichment; and

6.  Payment by Mistake.

The Second, Third, and Fourth Claims for Relief under the FCA target Defendants' alleged submission of false Risk Adjustment Attestations.  The First Claim

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 16-08697-MWF (SSx)                    Date:  February 12, 2018
Title:        United States ex rel. Benjamin Poehling -*v.*- Unitedhealth Group, Inc. et al.

for Relief under the FCA targets Defendants' alleged submission of and failure to
delete invalid diagnosis codes that were submitted for risk adjustment payments.

## II.   **LEGAL STANDARD**

"Dismissal under Rule 12(b) (6) is proper when the complaint either (1) lacks a
cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable
legal theory." *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013).  "Federal Rule
of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim
showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice
of what the . . . claim is and the grounds upon which it rests . . . .'" *Bell Atl. Corp. v.
Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47
(1957)).

In ruling on the Motion under Rule 12(b)(6), the Court follows *Bell Atlantic* and
*Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  "To survive a motion to dismiss, a complaint
must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on
its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  The Court must
disregard allegations that are legal conclusions, even when disguised as facts.  *See id.* at
681 ("It is the conclusory nature of respondent's allegations, rather than their
extravagantly fanciful nature, that disentitles them to the presumption of truth.");
*Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir.
2014).  "Although 'a well-pleaded complaint may proceed even if it strikes a savvy
judge that actual proof is improbable,' plaintiffs must include sufficient 'factual
enhancement' to cross 'the line between possibility and plausibility.'" *Eclectic
Properties*, 751 F.3d at 995 (quoting *Twombly*, 550 U.S. at 556–57) (internal citations
omitted).

The Court must then determine whether, based on the allegations that remain and
all reasonable inferences that may be drawn therefrom, the complaint alleges a
plausible claim for relief.  *See Iqbal*, 556 U.S. at 679; *Cafasso, U.S. ex rel. v. Gen.
Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 (9th Cir. 2011).  "Determining whether a
complaint states a plausible claim for relief is 'a context-specific task that requires the
reviewing court to draw on its judicial experience and common sense.'" *Ebner v.*

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 16-08697-MWF (SSx)                Date:  February 12, 2018
Title:        United States ex rel. Benjamin Poehling-*v.*- Unitedhealth Group, Inc. et al.

*Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679).  Where the facts as pleaded in the complaint indicate that there are two alternative explanations, only one of which would result in liability, "plaintiffs cannot offer allegations that are merely consistent with their favored explanation but are also consistent with the alternative explanation. Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true, in order to render plaintiffs' allegations plausible."  *Eclectic Properties*, 751 F.3d at 996–97; *see also Somers*, 729 F.3d at 960.

## III.  DISCUSSION

The parties essentially dispute whether the Government has adequately alleged that Defendants' alleged regulatory violations were material to CMS' decision to make risk adjustment payments to Defendants.

### A. The FCA's Materiality Requirement

The False Claims Act was originally enacted in 1863 to stop frauds perpetrated on the United States government by large contractors during the Civil War.  Congress has amended the FCA many times since then, but it remains focused on "those who present or directly induce the submission of false or fraudulent claims."  *Universal Health Servs. Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016) ("*Escobar*").

The FCA defines "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).  In *Escobar*, the Supreme Court discussed the scope of the FCA's materiality requirement.  The Court rejected the premise that a misrepresentation could only be material if it was tied to a statutory, regulatory, or contractual requirement, even if such a requirement was labeled as a condition of payment.  *Escobar*, 136 S. Ct. at 2001.  Rather, the FCA's materiality requirement, like its common-law antecedents, "looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation."  *Id.* at 2002 (quoting 26 R. Lord, *Williston on Contracts* § 69.12 (4th ed. 2003)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 16-08697-MWF (SSx)                    Date:  February 12, 2018
Title:        United States ex rel. Benjamin Poehling -v.- Unitedhealth Group, Inc. et al.

The Court in *Escobar* notes that the FCA "materiality standard is demanding." *Id.* at 2003.  As described above, although relevant, it is not dispositive that the Government designates compliance with a particular regulation to be a condition of payment.  Nor is it enough that the Government "would have the option to decline to pay if it knew of the defendant's noncompliance." *Id.*  Nor can materiality be found if noncompliance is insubstantial or minor. *Id.*  That said, it is strong evidence of materiality if a defendant knows that the Government consistently refuses to pay claims based on a noncompliance with a particular requirement. *Id.*  Likewise, it is strong evidence that a requirement is not material if the Government routinely pays a claim despite noncompliance. *Id.*

The Supreme Court rejected the notion that the materiality requirement is too fact-intensive for courts to decide on motions to dismiss, and noted that "False Claims Act plaintiffs must plead . . . facts to support allegations of materiality." *Id.* at 2004 n.6.  Since *Escobar*, district courts have dismissed FCA claims for failure to adequately plead materiality.  Particularly relevant here, of course, is *Swoben*, which was dismissed because the Government failed "to allege that CMS would have refused to make risk adjustment payments to the United Defendants if it had known the facts." 2017 WL 4564722, at *6.  *See also United States ex rel. Dress v. Qualium Corp.*, No. CV 12-745-BLF, 2016 WL 3880763, at *6 (N.D. Cal. July 18, 2016) (dismissing FCA complaint that "allege[d] in several places that the government would not have paid Defendants' claims if they had known of the fraudulent conduct" but did not "explain why"); *United States ex rel. Maetski v. Raytheon Corp.*, No. CV 06-3614-ODW (KSx), 2017 WL 3326452, at *7 (C.D. Cal. Aug. 3, 2017) (holding allegation that United States would not have paid Raytheon's requests for payment if it knew that Raytheon had not complied with contractual specifications was "insufficient" because "it does not show *how* Raytheon's misrepresentations were material").

## B. The Government's Allegations of Materiality

Defendants contend that the Government has failed to make anything other than bare-bones allegations that Defendants' Risk Adjustment Attestations – as opposed to the submitted diagnostic data itself – were material, and that the allegations therefore fall well short of the standard set forth in *Escobar*.  (*See* Mot. at 13-14).  Defendants

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 16-08697-MWF (SSx)                    Date:  February 12, 2018
Title:        United States ex rel. Benjamin Poehling-*v.*- Unitedhealth Group, Inc. et al.

also point to CMS' continued risk adjustment payments to Defendants as evidence that the Attestations cannot be material:  Despite doubts about the validity of Defendants' Attestations, including based on CMS' own audits of Defendants' diagnoses, CMS has continued to pay Defendants based on their submitted Attestations and risk adjustment data.  (*Id.* at 14).

Moreover, Defendants argue United and CMS have been in conversation for years about exactly what obligations MA Organizations have with respect to deleting invalid diagnoses, and in fact are currently litigating that issue in the United States District Court for the District of Columbia.  (*Id.* at 15).  Defendants argue that CMS, not the Department of Justice, is the agency is that should determine whether a regulatory violation is material.  (*Id.*).

### 1.  Materiality of Attestations and Submitted Diagnosis Codes

The FAC alleges not only that the diagnostic data certified by the Attestations is "material", but that it is "the sole determinant in the calculation of any risk adjustment payment based on a beneficiary's health status."  (FAC ¶ 328).  The FAC makes clear that CMS makes reconciliation payments to Defendants based on the diagnostic data submitted, and that those payments are adjusted to account for invalid diagnoses codes that Defendants delete.  The FAC specifically alleges that if Defendants had corrected their invalid diagnoses, CMS would have processed the corrected data to produce accurate risk scores for beneficiaries, which would have changed the risk adjustment payments for those beneficiaries.  (*Id.* ¶ 333).  In other words, not only do various contractual and regulatory materials require Defendants to submit accurate diagnostic data, but that data is central the calculation of the amount of money CMS pays to Defendants.

As the Government highlights, in *Escobar*, the First Circuit on remand concluded that materiality was adequately alleged in similar circumstances.  (Opp. at 12).  The First Circuit highlighted the allegation that "regulatory compliance was a condition of payment", the "centrality of [the requirements] . . . which go to the very essence of the bargain", and the lack of evidence that the government paid claims

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 16-08697-MWF (SSx)                    Date:  February 12, 2018
Title:        United States ex rel. Benjamin Poehling *-v.-* Unitedhealth Group, Inc. et al.

despite knowing of the violations."  *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 110 (1st Cir. 2016) ("*Escobar II*").

However, Defendants are correct that the FAC does not specifically allege anywhere that CMS' risk adjustment payments to Defendants would have changed if CMS knew Defendants' *Attestations* were false.  The FAC amply describes how the payments would change if Defendants submitted only valid diagnoses and deleted previously submitted invalid diagnoses, but does not allege how CMS' conduct would have changed if it knew the Attestations were false.  Instead, the FAC and the Opposition extensively point to the importance of the Attestations as a "reminder" to Defendants of their obligation to submit valid data, and as a "deterrent" against submitting false claims for risk adjustment payments.  (Opp. at 21; FAC ¶¶ 335–40).

The FAC does appear to demonstrate that the Attestations, which require Defendants to undertake due diligence in good faith to ensure the accuracy and completeness of their risk adjustment data, go to the "essence of the bargain" between CMS and Defendants.  *See Escobar*, 136 S. Ct. at 2003 n.6.  The Attestations are assurances that CMS can rely on the data Defendants submitted because Defendants certify based on "best knowledge, information, and belief" that the data is accurate.

However, the key allegation that the Attestations have a direct impact on CMS' risk adjustment payments is missing.  It is not enough to allege that Defendants were obligated by various regulations and contracts to comply with the Attestation requirements.  "[S]tatutory, regulatory, and contractual requirements are not automatically material, even if they are labeled conditions of payment."  *Escobar*, 136 S. Ct. at 2001.  Nor is it sufficient to allege that, had CMS known of Defendants' failure to comply with the Attestation requirements, it would have had "the option to decline to pay."  *Id.* at 2003.

Defendants cite to numerous out-of-circuit cases that, like *Swoben*, articulate the heightened materiality standard framed in *Escobar* and dismiss FCA complaints for failure to meet that standard.  (Reply at 6).  For example, the Second Circuit recently affirmed the district court's dismissal of an FCA complaint where the plaintiff failed to plausibly allege that any misrepresentation materially impacted CMS' payment

---

CIVIL MINUTES—GENERAL                                                        16

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 16-08697-MWF (SSx)                Date:  February 12, 2018
Title:        United States ex rel. Benjamin Poehling-*v.*- Unitedhealth Group, Inc. et al.

decision.  *Coyne v. Amgen, Inc.*, No. CV 17-1522, 2017 WL 6459267, at \*2 (2d Cir. Dec. 18, 2017).  The Second Circuit wrote, "to be material the government must have made the payment as a result of the defendant's alleged misconduct."  *Id.* (quotations and citations omitted).   Likewise, the Third Circuit recently affirmed the district court's dismissal of an FCA complaint where there were no factual allegations showing that CMS would not have reimbursed the claims if the reporting deficiencies had been cured.  *United States ex rel. Petratos v. Grenentech, Inc.*, 855 F.3d 481, 490 (3d Cir. 2017).

Here, unlike in *Swoben*, the Government has pled the materiality of the submitted diagnosis codes themselves.  However, with respect to the Attestations, as in *Swoben*, the Government has failed to allege that CMS would have refused to make risk adjustment payments if it had known the Attestations were false.  2017 WL 4564722, at \*6.  The allegations regarding the diagnostic data itself therefore appear to be material as defined by the FCA:  They "hav[e] a natural tendency to influence, or [are] capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).  But the allegations regarding the Attestations do not suggest they are likely to influence the payment of money.

At the hearing, the Relator argued that the Attestations and the diagnosis codes are inextricably linked, because the false Attestations were one of the ways in which Defendants concealed their fraudulent scheme from the Government.  Therefore, it was argued, the Court cannot logically conclude that the codes themselves are material, but that lying about the codes in the Attestations is not.  The Court acknowledges that the FAC does make the relationship between the Attestations and the diagnosis codes clear.  (*See, e.g.*, FAC ¶ 336 ("The purpose of the Risk Adjustment Attestation is, first, to remind MA Organizations that they may not ignore or disregard information about invalid diagnoses."); *id.* ¶ 340 ("[L]ike UHG and UnitedHealthcare, Optum was aware that the Attestations required it to make deletes based on information available to it about the negative results of chart reviews.")).

As the Court expressed at the hearing, this argument makes logical sense.  Indeed, it is contrary to the spirit of Rule 8 to require plaintiffs to plead any particular "magic words."  However, in light of the clarity of *Escobar* and its progeny regarding

---

CIVIL MINUTES—GENERAL                                                   17

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 16-08697-MWF (SSx)                    Date:  February 12, 2018
Title:        United States ex rel. Benjamin Poehling-*v.*- Unitedhealth Group, Inc. et al.

what is necessary to plead materiality under the FCA, the Government must do more than allege that the Attestations and the diagnosis codes are intertwined.  To the extent the FCA claims are based on violations related to the Attestations, the Government must plead that the Attestations are "material to [the Government's course of action," specifically, to the "Government's payment decision."  *Escobar*, 136 S. Ct. at 2001, 2002.  The Court also notes Defendants' argument that the Government's reluctance to make such an allegation in the FAC, even in light of *Escobar* and the *Swoben* dismissal, suggests that the allegation might in fact be more than just "magic words."

Accordingly, because the Second, Third, and Fourth Claims for Relief depend on the falsity of the Attestations and not the diagnostic data itself, they fail to adequately plead the materiality requirement of the FCA, as described in *Escobar*.

## 2. Government's Claim Based on Submission of Invalid Diagnostic Data

In the Motion, Defendants argue that, although the First Claim for Relief targets the invalid diagnostic data that Defendants submitted, rather than the Attestations, it must still fail.  The Claim alleges that because Defendants failed to delete invalid diagnoses in RAPS, Defendants have failed to return to Medicare the overpayments Defendants received based on the invalid diagnosis codes Defendants submitted.  (FAC ¶ 342).  Defendants argue that this claim depends on ***Defendants'*** hypothetical actions, not ***CMS'***, and therefore eviscerates the materiality requirement.  (Mot. at 17).  In other words, if Defendants had deleted invalid codes, CMS would have "automatically" adjusted payments or received overpayments offered by Defendants.  But, Defendants argued, this would be true regardless of how material the violation actually was.  (*Id.*).

Under that theory, Defendants argue, the materiality requirement would be satisfied anytime a defendant had an obligation to repay, regardless of whether the government agency itself would have withheld payment in the first place or sought repayment had it known of the violation.  (Reply at 14–15).  In support of their argument, Defendants cite to *Knudsen v. Sprint Communications Co.*, in which the district court found that just because a price reduction clause dictated how much the government would pay did not render it automatically material.  2016 WL4548924, at

---

**CIVIL MINUTES—GENERAL**                                                   **18**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 16-08697-MWF (SSx)                    Date:  February 12, 2018
Title:        United States ex rel. Benjamin Poehling-*v.*- Unitedhealth Group, Inc. et al.

*13 (N.D. Cal. Sept. 1, 2016).  The violation could be material, the district court held, but the complaint contained no factual allegations showing that it ***was*** material beyond the conclusory allegation that because the provision existed, it was per se material.  *Id.*

As the Government points out, *Knudsen* is distinguishable.  (Opp. at 15 n.7). Not only does it not address materiality under the Reverse False Claims Provision, as the Government's First Claim for Relief does in this action, but in *Knudsen*, the district court's decision hinged on the adequacy of the pleading:  The complaint contained one conclusory paragraph regarding the materiality of the price reduction clause.  2016 WL 4548924, at *13.  In contrast, the FAC here extensively alleges how central the diagnostic data is to the risk adjustment payments CMS makes to Defendants.

For its part, the Government cites *United States v. Bourseau*, 531 F.3d 1159 (9th Cir. 2008) in support of its position that the materiality requirement of the second part of § 3729(a)(1)(G), under which the Government's First Claim for Relief is brought, logically focuses on Defendants' obligations, not the Government's conduct.  (Opp. at 16).  *Bourseau* concerns a pre-amendment version of the Reverse False Claims Provision (which is also the basis for the Government's Fourth Claim for Relief).  As here, the case involved interim payments made to defendants under Medicare, and defendants' obligation to provide a cost report each year so the government agency could make appropriate reconciliation payments based on those reports.  *Bourseau*, 531 F.3d at 1162.  Although the case is pre-*Escobar*, the Ninth Circuit applied a materiality standard quite similar to the one articulated by the Supreme Court in *Escobar*, and concluded that the cost reports "were material because they had the potential effect, or natural tendency, to decrease the amount [the defendant] owed Medicare in overpayments."  *Id.* at 1171.

At the hearing Defendants argued that the materiality standards articulated by *Escobar* and *Bourseau* are quite different, and that *Escobar*'s standard applies in the Reverse False Claims context as well; in other words, *Escobar* has overruled *Bourseau*. The Court disagrees:

***First***, the Court disagrees that the standards set forth in *Escobar* and *Bourseau* are significantly different.  Both suggest that a claim must be based on a violation that

_____

**CIVIL MINUTES—GENERAL**                                          **19**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 16-08697-MWF (SSx)                Date:  February 12, 2018
Title:        United States ex rel. Benjamin Poehling -v.- Unitedhealth Group, Inc. et al.

is likely to affect whether and how much the Government would have paid to a
defendant.  *Compare Escobar*, 136 S. Ct. at 2002 ("materiality looks to the effect on
the likely or actual behavior of the recipient of the alleged misrepresentation")
(quotations and citations omitted) *with Bourseau*, 531 F.3d at 1171 ("cost report entries
were material because they had the potential effect, or natural tendency, to decrease the
amount CPMS owed Medicare in overpayments").  That said, the Court acknowledges
that the materiality standard in *Bourseau* appears to be somewhat weaker than that
adopted by courts in their applications of *Escobar*.  Those courts, as discussed above,
have specifically required an allegation that a defendant's violations would have
impacted the Government's payment decisions in order for those violations to be
material.

        *Second*, it is not definitive that *Escobar **does*** overrule *Bourseau* with respect to
the materiality standard for Reverse False Claims.  *Escobar* does not explicitly
distinguish claims brought under § 3729(a)(1)(A) from claims brought under §
3729(a)(1)(G), but the circumstances before the Court in *Escobar* did concern only §
3729(a)(1)(A), and the opinion refers only to that provision.  In other words, *Escobar*
did not explicitly address the Reverse Claims Act Provision, and neither do any of the
cases since *Escobar* that the parties cite.

        *Third,* regardless of whether the *Escobar* materiality standard is different and
overrules the standard set forth *Bourseau*, the Court concludes that the Government's
FAC contains enough factual allegations of the effect of the submission of invalid
diagnosis codes on the Government's risk adjustment payments, and on Defendants'
retention of risk adjustment payments to which they are not entitled, to satisfy the
*Escobar* standard.

        Although Defendants' argument regarding materiality as applied to the First
Claim for Relief is logically persuasive, it does not appear to be borne out by the case
law or language of the statute.  The second part of the Reverse False Claims Provision,
under which the First Claim for Relief is brought, establishes liability for anyone who
"knowingly conceals or knowingly and improperly avoids or decreases an obligation to
pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G).
The Government has adequately pled facts showing that the Defendants have

_____

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 16-08697-MWF (SSx)                    Date:  February 12, 2018
Title:        United States ex rel. Benjamin Poehling-*v.*- Unitedhealth Group, Inc. et al.

knowingly avoided obligations to repay CMS by failing to delete invalid diagnosis codes, and that such failure was material.

Accordingly, the Motion as to the First Claim for Relief is **DENIED**, unlike the result as to the Second, Third, and Fourth Claims for Relief.  Because the common law claims for Unjust Enrichment and Payment by Mistake are premised on the invalid diagnosis codes and not the Attestations, they too survive the Motion.  (*See* FAC ¶¶ 357, 360).

### 3.  Government's Continued Payments

That CMS continued to make risk adjustment payments despite generalized knowledge of Defendants' "one-way" Chart Reviews and problematic diagnosis codes does not significantly change this analysis.  As the Government argues, this generalized knowledge does not amount to actual knowledge of specific invalid diagnoses.  Without such actual knowledge, CMS could not know how it should change the risk adjustment payments.  (Opp. at 11, 13).  The Ninth Circuit since *Escobar* has rejected "read[ing] too much into" a government agency's continued payment.  In *United States ex rel. Campie v. Gilead Sciences, Inc.*, 862 F.3d 890, 906 (9th Cir. 2017) ("*Campie*"), the defendant insisted that because the government continued to pay for medications after it knew of FDA violations, those violations must not be material.  The Ninth Circuit warned "that to read too much into the FDA's continued approval – and its effect on the government's payment decision – would be a mistake" because it would "allow [the defendant] to use the allegedly fraudulent-obtained FDA approval as a shield against liability for fraud."

So too here.  The Government may have had general suspicions about whether Defendants were complying with requirements for submitting diagnostic data and truthful Attestations, but because of the allegedly fraudulent representations Defendants made, could not identify which diagnoses were valid and which were not.  As the Government argues, the issue here is not the one-way Chart Review generally, but the specific invalid diagnosis codes that Defendants submitted and failed to delete despite information available to them.  (Opp. at 13).  Indeed, this argument supports the

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.**  CV 16-08697-MWF (SSx)                    **Date:  February 12, 2018**
**Title:**       United States ex rel. Benjamin Poehling-*v.*- Unitedhealth Group, Inc. et al.

Court's conclusion, described above, that the real issue is the actual invalid codes that were submitted and not deleted, not compliance with the Attestation requirements.

### C. Timeliness of Claims Under § 3729(a)(1)(G)

The Court notes that the parties appeared to be in agreement with respect to whether the Congress's 2009 revisions to § 3729(a)(1)(G) were intended to apply retroactively (*see* Reply at 19–20), and thus to what extent the Government's claims under that provision are timely.  The parties affirmed this agreement at the hearing. They agree that the Government is only pursuing claims to the extent they apply to risk adjustment payments for payment year 2009.  (*See* Opp. at 22; Reply at 19). Accordingly, to the extent that any of the Government's claims are premised on Defendants' obligations during payment years 2004 to 2008, they are dismissed.

## III.   CONCLUSION

Accordingly, the Motion **GRANTED *in part with leave to amend***.  The Government may file a Second Amended Complaint-in-Intervention in which it attempts to adequately plead the materiality of the Attestations on or before **February 26, 2018**.  While there may be a Second Amended Complaint, there will be no Third. Any future successful motion to dismiss shall be granted without leave to amend.

IT IS SO ORDERED.