1   LATHAM & WATKINS LLP
        David J. Schindler (Bar No. 130490)
2           david.schindler@lw.com
    355 South Grand Avenue, Suite 100
3   Los Angeles, California 90071-1560
    Telephone: +1.213.485.1234
4   Facsimile: +1.213.891.8763

5   LATHAM & WATKINS LLP
        Daniel Meron (appearing *pro hac vice*)
6           daniel.meron@lw.com
        Kathryn H. Ruemmler (appearing *pro hac vice*)
7           kathryn.ruemmler@lw.com
        Abid R. Qureshi (appearing *pro hac vice*)
8           abid.qureshi@lw.com
    555 Eleventh Street, NW, Suite 1000
9   Washington, DC 20004-1304
    Telephone: +1.202.637.2200
10  Facsimile: +1.202.637.2201

11  Attorneys for United Defendants

12

13              **UNITED STATES DISTRICT COURT**

14              **CENTRAL DISTRICT OF CALIFORNIA**

15  UNITED STATES OF AMERICA *ex rel*.        CASE NO. 2:16-cv-08697-MWF (SSx)
16  BENJAMIN POEHLING,
                                              [Discovery Document: Referred to
17                                            Magistrate Judge Suzanne H. Segal]
                    Plaintiffs,
                                              **UNITED'S NOTICE OF MOTION**
18          v.                                **TO COMPEL THE UNITED**
                                              **STATES TO PRODUCE**
19  UNITEDHEALTH GROUP, INC., *et al.*,       **DOCUMENTS**

20                  Defendants.               [*Joint Stipulation Regarding United's
                                              Motion to Compel, Declaration of
21                                            David J. Schindler, and [Proposed]
                                              Order filed concurrently herewith*]
22
                                              Date: December 11, 2018
23                                            Time: 10:00 a.m.
                                              Courtroom: 590
24                                            Judge: Hon. Suzanne H. Segal

25                                            Discovery Cutoff: TBD
                                              Pre-Trial Conference: TBD
26                                            Trial: TBD

27

28

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

UNITED'S NOTICE OF MOTION TO COMPEL THE
UNITED STATES TO PRODUCE DOCUMENTS
CASE NO. 2:16-cv-08697-MWF(SSx)

1  **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2      PLEASE TAKE NOTICE that pursuant to Local Rule 37, on December 11,

3  2018 in the courtroom of the Honorable Suzanne H. Segal, located at 255 E.

4  Temple St., Los Angeles, CA, 90012, Courtroom 590, 5th Floor, United will and

5  hereby does move for an order granting its Motion to Compel the United States to

6  Produce Documents on the bases set forth in the concurrently filed Joint

7  Stipulation.

8      United's motion is based on this Notice and Motion, the concurrently filed

9  Joint Stipulation, exhibits, and declaration in support; any pleadings, files, and

10  records in this action; and further evidence or argument as this Court may consider.

11      As set forth in the Joint Stipulation, the parties have met and conferred

12  regarding these issues, including via letters and multiple teleconferences.  Despite

13  these extensive meet-and-confer efforts, the parties have been unable to resolve

14  their disputes and, therefore, United seeks the assistance of the Court.

15

16  Dated: November 9, 2018

17

18                              LATHAM & WATKINS LLP

19

20

21                              By:  /s/ David J. Schindler
                                     David J. Schindler

22
                                Attorneys for Defendant
23                              United Defendants

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

1                UNITED'S NOTICE OF MOTION TO COMPEL THE
                 UNITED STATES TO PRODUCE DOCUMENTS
                 CASE NO. 2:16-cv-08697-MWF(SSx)

1   LATHAM & WATKINS LLP
    David J. Schindler (Bar No. 130490)
2       *david.schindler@lw.com*
    355 South Grand Avenue, Suite 100
3   Los Angeles, California 90071-1560
    Telephone: +1.213.485.1234
4   Facsimile: +1.213.891.8763

5   LATHAM & WATKINS LLP
    Daniel Meron (appearing *pro hac vice*)
6       *daniel.meron@lw.com*
    Kathryn H. Ruemmler (appearing *pro hac vice*)
7       *kathryn.ruemmler@lw.com*
    Abid R. Qureshi (appearing *pro hac vice*)
8       *abid.qureshi@lw.com*
    555 Eleventh Street, NW, Suite 1000
9   Washington, DC 20004-1304
    Telephone: +1.202.637.2200
10  Facsimile: +1.202.637.2201

11  Attorneys for United Defendants

12

13              **UNITED STATES DISTRICT COURT**

14              **CENTRAL DISTRICT OF CALIFORNIA**

15  UNITED STATES OF AMERICA *ex rel.*    CASE NO. 2:16-cv-08697-MWF (SSx)
16  BENJAMIN POEHLING,
    [Discovery Document: Referred to
17      Magistrate Judge Suzanne H. Segal]
    Plaintiffs,
18      **JOINT STIPULATION**
    **REGARDING UNITED'S NOTICE**
    v.    **OF MOTION AND MOTION TO**
19      **COMPEL THE UNITED STATES**
    UNITEDHEALTH GROUP, INC., *et al.*,    **TO PRODUCE DOCUMENTS**
20
    Defendants.    [*Notice of Motion, Declaration of David*
21      *J. Schindler, and [Proposed] Order*
    *filed concurrently herewith*]
22
    Date: December 11, 2018
23      Time: 10:00 a.m.
    Courtroom: 590
24      Judge: Hon. Suzanne H. Segal
25      Discovery Cutoff: TBD
    Pre-Trial Conference: TBD
26      Trial: TBD
27
28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

# TABLE OF CONTENTS

Page

I.    INTRODUCTORY STATEMENTS .................................................................. 1

      A.    UNITED .................................................................................................... 1

      B.    GOVERNMENT ....................................................................................... 3

II.   DELIBERATIVE PROCESS PRIVILEGE ASSERTIONS ......................... 6

      A.    UNITED .................................................................................................... 6

            1.    Procedural and Factual Background ............................................ 6

            2.    Argument .................................................................................... 15

      B.    GOVERNMENT ..................................................................................... 35

            1.    The Scope and Sequence of Discovery Under Rule
                  26(b) ........................................................................................... 36

            2.    Defendants Have Moved to Compel the Production
                  of Information Which is Publicly-Available or
                  That the Government Has Agreed to Produce .......................... 41

            3.    United Has Moved to Compel the Production of
                  Irrelevant Material .................................................................... 44

            4.    The Deliberative Process Privilege Shields the
                  Material Sought by United from Discovery in This
                  Case ............................................................................................ 60

III.  PROPOSED RESOLUTION/CONCLUSION .......................................... 68

      A.    UNITED .................................................................................................. 68

      B.    GOVERNMENT ..................................................................................... 69

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

i

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

# I.   INTRODUCTORY STATEMENTS

## A.   United

The government is withholding vast quantities of highly relevant documents based *solely* on unsupportable assertions of the deliberative process privilege.  The government has not remotely made the required showing that *particular* documents are covered by that privilege.  On the contrary, the government instead has adopted boilerplate explanations for withholding literally thousands of documents created over the course of more than a decade.  Not only are those threadbare descriptions inadequate to sustain the privilege, but many of them *undermine* it, suggesting that the documents contain factual matters rather than deliberations about significant agency decisions.  Moreover, it is has become apparent that the Department of Justice failed to consult with the relevant agency before making its sweeping privilege assertions.  For these reasons alone, the Court should compel the production of these documents.

The government expressly committed to providing a declaration from the Centers for Medicare and Medicaid Services ("CMS") by the end of September—more than 6 months after producing its first privilege log and more than 3.5 months after United's request for such a declaration—claiming it would remedy these deficiencies.  Just days before it was supposed to provide the declaration, however, the government reneged on its agreement and is now refusing to provide an agency declaration until Judge Fitzgerald issues rulings on all four of the government's pending motions.  The government is, yet again, improperly attempting to dictate the flow of discovery in direct contradiction to Judge Fitzgerald's standing order, his comments during the scheduling conference, and repeated statements from this Court that the government cannot unilaterally refuse to engage in discovery.

Even before the government's abrupt about-face, the government was unwilling or unable for months to provide any meaningful description of what its declaration would look like or even the categories of documents it would cover,

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

claiming that doing so would not be "efficient or useful" before the end of September. The government provided no meaningful details or assurances that it could, or adequately would, support its expansive assertions of the deliberative process privilege over many thousands of highly relevant documents. The government outright refused to provide any detail regarding any of the individual documents withheld, instead claiming in conclusory fashion that the no-longer-forthcoming declaration would explain how undisclosed categories of documents are both "predecisional" and "deliberative." The government's described declaration merely pays lip service to its privilege assertions and does not satisfy its burden of demonstrating the applicability of the narrow, qualified deliberative process privilege. As this Court has noted previously, the government chose to bring this lawsuit, and it is improper for the government to ignore its discovery obligations or hamstring United's defense by withholding critical documents.

Even if the government's assertions of privilege had merit (and they do not), the privilege is a qualified one and is readily overcome here by United's need for these critical documents. As detailed below, these documents are directly relevant to the government's sole remaining False Claims Act claim (a reverse False Claims Act claim), including to show that: CMS officials themselves believe that conducting one-way reviews is proper; United did not receive an overpayment; United did not knowingly and improperly retain an overpayment; and United's alleged failure to delete codes did not materially impact the government's decision to continue paying and contracting with United. These documents also are directly relevant to the government's two common law claims, Payment by Mistake and Unjust Enrichment, to demonstrate both that (a) the government was not mistaken at the time it paid these claims—rather it is DOJ that is mistaken in pursuing a theory predicated on the notion that CMS somehow did not know that United was performing one-way looks—and (b) United was never unjustly enriched. Finally, the documents that the government is withholding are relevant to interpreting the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

2

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

meaning of the ambiguous contractual and regulatory provisions on which the government relies, as well as to damages.

The government is the sole custodian of this relevant discovery, so United cannot obtain it from a third party. The government's motive for attempting to shield these documents is transparent: the limited evidence in United's possession thus far—some of which the Department of Justice attempted to assert the deliberative process privilege over, despite having produced it in response to a Freedom of Information Act request—directly supports United's position (among others) that CMS officials shared its views that conducting one-way looks was perfectly appropriate.

Therefore, because the government has failed to satisfy its burden of substantiating its privilege claims, and because United's need for these highly relevant and critical materials outweighs any interest the government has in non-disclosure, the Court should grant United's motion and compel the production of all documents that the government is withholding solely on the basis of the deliberative process privilege.

**B.   Government**

This lawsuit alleges that UnitedHealth Group and the affiliated Defendants ("United" or "Defendants") knowingly failed to delete diagnosis codes that its own reviews revealed to be unsupported by the beneficiaries' medical charts. As a result, United retained billions of dollars in risk-adjusted payments from the Medicare Advantage ("MA") program to which it was not entitled.

Despite the large amount of Medicare trust funds at issue, this lawsuit reduces to the question of whether United knowingly failed to comply with its legal obligation to delete unsupported diagnosis codes. United has attempted to distract from this central issue by arguing that a payment disparity could exist based on the manner in which MA plans are paid in comparison to so-called fee-for-service ("FFS") providers. Based upon this contention, United seeks far flung

LATHAM&WATKINS™
ATTORNEYS AT LAW
LOS ANGELES

3

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

discovery in an attempt to obtain evidence that this purported payment disparity exists and entitles United to knowingly refrain from making deletes as part of some "self-help" measure.  Most notably, United improperly seeks access to internal agency discussions about regulatory impact statements, documents relating to medical loss ratios, and draft regulations and policies that do not bear on the obligation to delete unsupported diagnosis codes or have any impact on the direct relationship between diagnosis codes and risk-adjusted payments.

The discovery that United seeks is irrelevant, not to mention burdensome and oppressive.  As with most federal programs, the rules that govern the payment of claims are established by statute, regulation, and in this case, by the MA Contract – which is a written agreement by which participating Medicare Advantage Organizations ("MAOs") promise to comply with "applicable Federal statutes, regulations, and policies," including, for example, the Medicare Managed Care Manual.  Those rules make it clear that MAOs such as United have a legal obligation to delete diagnosis codes known to be unsupported by a beneficiary's medical record.  Any argument about the payments that United and other MA plans received for supported diagnosis codes is irrelevant to the obligation to delete unsupported codes or the damages that resulted from their failure to delete those unsupported codes.

To address the overbreadth of United's discovery, the government has moved for a protective scheduling order seeking to limit the scope of discovery in a manner that comports with the principles of relevance and proportionality set forth in Rule 26, Fed. R. Civ. P.  That motion is now fully briefed and pending with Judge Fitzgerald.  *See* Dkts. 261, 278.  The Court should await a ruling on that motion before taking up United's motion to compel.  United has the threshold burden of demonstrating relevancy before the government is obligated to perfect privilege under Rule 26(b)(5), and that question is now before Judge Fitzgerald. Deferring consideration of the privilege issues until discovery parameters have

been set by Judge Fitzgerald in a Rule 16 or Rule 26 order would thus be the most efficient and appropriate way to proceed at this juncture, given United's threshold burden under Rule 26.

Moreover, contrary to United's assertion, even if United's "self-help" defense were somehow viable, the government is not withholding non-deliberative factual information pertaining to the rate of unsupported diagnosis codes reported by providers in claims submitted to FFS Medicare programs (Parts A and B). Information regarding that subject was recently publicly released by the Centers for Medicare and Medicaid Services ("CMS") and, as with other relevant documents, can be found on its website.

The Court should not countenance United's attempt to turn purely legal issues into factual ones in order to obtain irrelevant material from the government. The legal obligation to delete unsupported diagnosis codes has already been resolved by the Ninth Circuit. And even if that were not the case, the contentions and counter-contentions in this case involve legal questions that are not resolved by what an agency's employees may have recorded in internal, non-public memoranda or emails. Indeed, as for Defendants' scienter, agency documents heretofore unknown to United are not probative of what United knew at the time it was including, or refraining from deleting unsupported codes in its Medicare claims.

Finally, even if the Court were to take up this motion in advance of Judge Fitzgerald's rulings on relevance, as explained in the agency declarations submitted with this stipulation, the government has properly withheld documents from production in full accordance with the principles that govern the deliberative process privilege. United's motion can thus be rejected on that additional, alternative ground.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

5

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

## II.    DELIBERATIVE PROCESS PRIVILEGE ASSERTIONS

### A.    United

#### 1.    *Procedural and Factual Background*

On November 17, 2017, the government filed a 166-page, 364-paragraph Amended Complaint-In-Intervention, alleging violations of the False Claims Act and two common law claims, Payment By Mistake and Unjust Enrichment, and seeking substantial damages and other remedies.  On February 12, 2018, Judge Fitzgerald dismissed the government's three affirmative False Claims Act counts, leaving only a reverse False Claims Act count and the two common law claims.

United served its first document requests on the government in August 2017.  Roughly 13 months later, the government has produced only approximately 47,600 documents but has withheld as privileged over 25,200 documents.  *See* Exs. 1–7, United States' Privilege Logs Nos. 1–7.[1]  Of those 25,200 withheld documents, the government has asserted *solely* the deliberative process privilege over approximately 21,400 documents.[2]    And of those 21,400 documents, the government has only produced about 1,060 documents with redactions—meaning the government is withholding *in full* over 20,300 documents (95%) based solely on the deliberative process privilege.  *Id.*

Rather than provide the requisite level of detail to sustain assertions of the deliberative process privilege, the government instead grouped these documents into incredibly broad categories on its privilege logs, often using identical descriptions for thousands of documents that span over a decade.  None of these descriptions identifies a discrete policy decision, let alone a significant one, about

---

[1] Citations to "Ex." materials refer to exhibits to the Declaration of David J. Schindler filed herewith.

[2] The government has also asserted the deliberative process privilege in conjunction with other privileges over approximately 1,880 documents.  Only approximately 1,980 documents out of the approximately 25,200 that the government is withholding do not involve the deliberative process privilege.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

6

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

which any alleged deliberations took place.   Nor do any of these descriptions describe how the particular documents are part of the deliberative process.   The government has made it effectively impossible to challenge any particular document because there are virtually no descriptions of how a particular document was part of any predecisional or deliberative process.   The below examples highlight the significant flaws in these privilege logs, which are replete with similarly overbroad categories.   *See id.*, United States' Privilege Logs Nos. 1–7. The government is withholding:

- Approximately 6,400 documents "reflecting internal agency deliberations regarding RADV audit methodology."   These documents span from September 2003 to July 2017.

- Approximately 3,320 documents "reflecting internal agency deliberations regarding calculation of RA error rate."   These documents span from September 2004 to April 2017.

- Approximately 2,330 documents "reflecting internal agency deliberations regarding calculation of RA factors/model."   These documents span from January 2003 to April 2017.

- Approximately 1,680 documents "reflecting internal agency deliberations regarding Advance Notice and/or Announcement and Call Letter."   These documents span from January 2003 to April 2017.

- Approximately 1,390 documents "reflecting internal agency deliberations regarding FFS adjuster."   These documents span from January 2004 to May 2017.

- Approximately 1,010 documents "reflecting internal agency deliberations regarding calculation of coding intensity adjuster."   These documents span from November 2004 to March 2017.

- Approximately 970 documents "reflecting internal agency deliberations regarding RA supporting documentation requirements."   These documents span from January 2004 to May 2017.

- Approximately 660 documents "reflecting internal agency deliberations regarding" either "UHG RADV audits" or "non-UHG RADV audits." These documents span from March 2004 to May 2017.

- Approximately 635 documents "reflecting internal agency deliberations regarding medical coding in support of RA payments." These documents span from March 2004 to May 2017.

- Approximately 545 documents "reflecting internal agency deliberations regarding" "UHG RA activities" and "non-UHG RA activities." These documents span from October 2004 to February 2017.

- Approximately 500 documents "reflecting internal agency deliberations regarding RA training materials." These documents span from April 2004 to March 2017.

- Approximately 470 documents "reflecting internal agency deliberations regarding coding guidance." These documents span from June 2005 to April 2016.

- Approximately 215 documents "reflecting internal agency deliberations regarding" "return of overpayments to CMS," "RA overpayment analysis," "recovery of overpayments," "RA overpayment reporting requirements," and "CMS overpayment policy." These documents span from July 2006 to November 2015.

- Approximately 215 documents "reflecting internal agency deliberations regarding coding intensity in MA Program." These documents span from August 2006 to September 2015.

Even a cursory review of these categories demonstrates the impropriety of the government's privilege assertions. It defies credibility to suggest that deliberations over what RA audit methodology to adopt spanned 14 years or that discussions of RA error rates are anything other than purely "factual" discussions that fall far outside the deliberative process. These same temporal defects and attempts to shield purely factual information are readily apparent in each of the categories above.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

8

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

United sent a letter to the government on June 15, 2018 that, among other things, detailed the numerous deficiencies in the government's privilege log descriptions and expressed United's concern that the privilege assertions had been made by lawyers at the Department of Justice without any input from any relevant agency.  Ex. 8, United's June 15, 2018 Ltr.  United requested that the government (1) revise its privilege logs to provide the requisite detail about the information over which the government claimed the privilege applied, and (2) provide a formal claim of privilege by an appropriate agency official who had personally reviewed the relevant documents.  *Id.*  The government refused to re-evaluate or revise its privilege log descriptions, instead insisting that United needed to revise its own logs first—the exact type of "tit-for-tat" discovery that this Court has explained is improper.  *See* Ex. 9, United States' June 29, 2018 Ltr.; Ex. 10, Tr. of Aug. 16, 2018 Hr'g at 22:18–20.

Despite United's commitment during a July 30 meet and confer to revise its privilege logs (as the government requested), the government still refused to address its deficient privilege logs and claimed that it needed to see United's revised logs before it would even consider whether and how to revise its logs.  *See* Ex. 11, United's Aug. 2, 2018 Ltr.; Ex. 12, United's Aug. 9, 2018 Ltr.  The government demanded that United explain how to revise the privilege log descriptions, but United explained that it could not do so because it had no insight into the substance of the underlying documents—though United did point the government to case law in which government agencies provided descriptions that were much more detailed than the government's descriptions here and yet were still found to be insufficient by the court.  *See* Ex. 11, United's Aug. 2, 2018 Ltr.; Ex. 12, United's Aug. 9, 2018 Ltr.  During the July 30 meet and confer, United also reiterated its concern that the Department of Justice had asserted the deliberative process privilege without first consulting CMS.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

9

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

United sought an informal discovery conference before this Court because of the government's continued refusal to take any steps to ameliorate its deficient privilege descriptions or commit to providing an agency declaration, in addition to the government's sudden refusal to continue producing privilege logs.[3]  The Court recommended that the parties come up with ***mutually-agreeable*** categories for the government's assertions of the deliberative process privilege.  Ex. 10, Tr. of Aug. 16, 2018 Hr'g at 28:8–14.

Shortly after the conference, the government informed United that, at some undetermined time in the future, it would provide an agency declaration that purportedly would "perfect" the privilege assertions.  *See* Ex. 13, United States' Aug. 20, 2018 Ltr.  The government provided no meaningful information about the substance of the forthcoming declaration, merely stating that it would explain why the documents were predecisional and deliberative.  *Id.*  The government did not share the categories it intended to use for the agency declaration, despite this Court's recommendation that the parties develop mutually-agreeable categories.  Indeed, the government explicitly declined United's request to discuss the categories as the Court had directed.

The government originally stated that it needed until September 30 to provide the agency declaration—3.5 months after United first made its request for such a declaration.  United also suggested that the government provide an excerpt of the declaration, which would allow United to assess whether the declaration was likely to cure any of the deficiencies with the government's privilege assertions.  The government rejected United's suggestion because it "[did] not believe it would be efficient or useful for the parties for [the government] to provide an excerpt of [its] declaration in advance of September 30."  Ex. 14, A. Likoff Aug. 27, 2018

---

[3] During the conference, this Court explained that the government could not simply refuse to engage in discovery, and the government shortly thereafter began producing privilege logs again—albeit with the same deficiencies as its prior privilege logs.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

10

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

1  Email.  Nevertheless, it "commit[ted] to providing UnitedHealth with a declaration
2  by September 30, 2018."  *Id.*

3       On September 24, just days before it was supposed to provide the agency
4  declaration, the government told United that it was no longer honoring its
5  commitment and now intended to wait until Judge Fitzgerald ruled on all four of
6  the government's pending motions.  *See* Ex. 14, P. Freeborne Sept. 24, 2018
7  Email.  The government claimed that Judge Fitzgerald stated he needed to
8  determine the scope of discovery before this Court could rule on discovery
9  motions, and the government claimed—as it has on multiple occasions—that it
10  would not engage in discovery that might be obviated by future rulings.  *Id.*
11  Contrary to the government's strained interpretation of the September 17 hearing,
12  although Judge Fitzgerald stated he would likely need to confer with this Court
13  about relevant issues, he never stated that he had to issue rulings on all pending
14  motions before this Court could proceed to hear discovery disputes.  *See* Ex. 15,
15  Tr. of Sept. 17, 2018 Hr'g at 54–56.  In fact, he expressly stated that, under the
16  Local Rules, "the matter's entirely up to [Judge Segal]."  *Id.* at 54:14–17.

17       Both Judge Fitzgerald and this Court have repeatedly rejected the
18  government's attempts to skirt its discovery obligations on the grounds that future
19  rulings might alter the scope of discovery.  *See, e.g.*, Ex. 16, Tr. of Dec. 18, 2017
20  Conf. at 13:16–14:2 ("[W]e tend not to halt discovery in the anticipation that [a
21  party] may win their motion for partial summary judgment. . . . [W]e generally let
22  the defendant proceed to address the allegations in the complaint through discovery
23  and we don't [] wait."); Ex. 17, United's Rule 16 Opp'n at 20–21.  Despite these
24  admonitions, the government has persisted with its "pocket veto" strategy.  *See,*
25  *e.g.*, Ex. 17, United's Rule 16 Opp'n at 1, 5–6, 20–21.  The government's sudden
26  refusal to provide an agency declaration flouts Judge Fitzgerald's and this Court's
27  instructions and is nothing more than yet another brazen attempt to prevent United
28  from obtaining highly relevant and critical documents.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

11

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

United has attempted to work cooperatively with the government to minimize the scope of the parties' dispute. But United cannot be expected to simply wait around for the government to engage in discovery whenever it sees fit. The government chose to continue producing privilege logs with the same deficiencies that United raised in its June 15 letter—logging over 18,500 documents after that letter—rather than address the issue. The government refused to revise its privilege logs. It initially refused to provide an agency declaration, then committed to providing one at the end of September, then refused to honor that commitment. It refused to provide an excerpt of the declaration. It refused to share with United what categories it planned to use. The government's unjust refusals to cure the severe deficiencies with its assertions of the deliberative process privilege, as well as its recent refusal to provide an agency declaration, warrant the production of all materials that the government is currently withholding solely on that basis.

a.   *Medicare Advantage and the Risk Adjustment Process*

Under the MA program, s*ee* 42 U.S.C § 1395w-21 et seq., private insurers like United create insurance plans ("MA plans") in which Medicare-eligible individuals may choose to enroll. Under traditional Medicare, CMS directly reimburses health care providers using a "fee-for-service" ("FFS") payment system in which providers submit claims to CMS for reimbursement for services rendered. Under the MA program, CMS makes predetermined monthly payments to MA plans that are based on a value attributed to each diagnosis code submitted by medical providers, adjusted for demographic data. CMS is required to pay MA plans in a manner that ensures "actuarial equivalence" with what Medicare pays directly to care for similar patients in the Medicare program. 42 U.S.C. § 1395w-23(a)(1)(C)(i).

The FFS system covers millions of people, so it is unsurprising that the associated data contains known errors, including diagnosis codes submitted by

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

12

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

providers for patients that do not actually have the illness or condition the diagnosis code indicates. *See, e.g.*, Ex. 18, APA Op. at 7 ("Humans being human, diagnoses in healthcare records may be miscoded, inappropriately added, or otherwise faulty by accident or mal intent."). CMS sets the rates it pays to MA plans according to what CMS itself pays under traditional Medicare to care for patients with those same diagnosis codes—without attempting to correct for those discrepancies by auditing the FFS claims data to confirm that the diagnosis codes are properly supported by charts. *See id.* at 16–17. Thus, the existence of beneficiaries whose provider assigned them a particular diagnosis code but who do not actually have the associated condition is built into the payment model. *Id.* at 7 ("The risk adjustment model is built on unaudited [traditional Medicare] data . . . which must contain errors." (citing CMS Mot.)). Put differently, because CMS's payment model uses unaudited claims data from the traditional Medicare program that contain numerous unsupported codes, the resulting payment amounts that CMS sets for the MA program *already account* for the existence of unsupported codes. *See id.* at 16 ("[T]he rates at which CMS pays Medicare Advantage insurers are based on flawed data across the millions of people in traditional Medicare.").

If an MA plan were required to repay funds associated with every unsupported code, without first determining whether the plan's rate of unsupported codes exceeded the rate already accounted for in the payment model, the government would receive an unfair windfall: the government first would have the benefit of lower payment rates that reflect the existence of its own unsupported codes in the model, and then the government would lower its payments a second time on the back end because of the presence of comparable numbers of unsupported codes within the MA plan's data that had already been accounted for in the model. *See, e.g.*, *id.* at 16–17 ("[W]ithout some kind of adjustment, . . . Medicare Advantage insurers will be paid less to provide the same healthcare

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

13

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

coverage to their beneficiaries than CMS itself pays for comparable patients. This inequity is inevitable because CMS sets Medicare Advantage rates based on costs that are presumed, based on traditional Medicare diagnosis codes, to be associated with particular health status information that is not verified in underlying patient records."). *Id.* at 17; *see* Ex. 19, United's Mot. for Partial Summ. J. Opp'n at 12, 19, 22–26.

A recent decision from the U.S. District Court for the District of Columbia in another lawsuit involving United and the government holds conclusively that CMS must take into account the errors in its own data before it can determine if errors in an MA's data gives rise to an overpayment.[4] *See generally* Ex. 18, APA Op. Put simply, there cannot be an overpayment unless the error rate in an MA plan's data **exceeds** the error rate in CMS's own data. And if United's error rate is less than the government's own error rate, then United likely has been *under*paid. *See id.* at 2, 9–10, 15–22.

At bottom, the government alleges that United submitted diagnosis codes to CMS that United knew were unsupported and failed to correct, which—the government alleges—resulted in United being overpaid. United seeks discovery related to what the government knew about errors in United's data and, more importantly, what the government knew about errors in its own data, because the latter bears directly on whether United was overpaid. However, the government is withholding documents on these very topics by making improperly expansive categorical assertions of the deliberative process privilege, despite (or perhaps because of) the obvious importance of such documents to the claims and defenses in this case. *See supra* at 21–30.

---

[4] United intends to submit appropriate briefing in the future related to the impact of the APA decision. As relevant here, however, the APA decision (1) confirms United's theory that the government must account for errors in its own data when determining whether an overpayment exists, and (2) only bolsters United's arguments about the importance of the discovery it seeks, which the government is attempting to shield.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

14

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

### 2. Argument

The government has failed to meet its burden of establishing the propriety of its deliberative process privilege assertions. First, the privilege logs produced by the government contain threadbare descriptions that do not establish whether any document is predecisional and deliberative, and the agency declaration described in broad strokes by the government—and which the government now refuses to provide—will not cure these deficiencies. Second, even if the government were somehow able to establish the privilege, United's need for the information outweighs any governmental interest in non-disclosure. Accordingly, this Court should grant United's Motion and order the production of all documents that the government is withholding based solely on the deliberative process privilege.[5]

#### a. The Government Fails to Assert Properly the Deliberative Process Privilege

The deliberative process privilege is a qualified privilege that applies only in limited circumstances. *See FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984). Courts construe the privilege strictly and narrowly. *See N. Pacifica, LLC v. City of Pacifica*, 274 F. Supp. 2d 1118, 1122 (N.D. Cal. 2003) ("[T]he [deliberative process] privilege is strictly confined within the narrowest possible limits consistent with the logic of its principles.") (internal quotation and citation omitted); *Cal. Native Plant Soc'y v. U.S. Envtl. Prot. Agency*, 251 F.R.D. 408, 410 (N.D. Cal. 2008) ("[C]ourts should construe the [deliberative process] privilege narrowly and strictly."). Although the privilege is designed to protect the quality of agency decisionmaking by encouraging candid discussion among policymakers and preventing premature disclosure of contemplated agency policies or decisions, the narrow privilege applies only to documents that are both

---

[5] This Motion concerns only documents over which the government has asserted *solely* the deliberative process privilege. The government, however, uses the same deficient privilege log descriptions to support its assertions of other privilege. United reserves its right to challenge these assertions.

1    "predecisional" and "deliberative in nature"—not to purely factual material.  *See*

2    *Warner Commc'ns Inc.*, 742 F.2d at 1161; *Hongsermeier v. Comm'r of Internal*

3    *Revenue*, 621 F.3d 890, 904 (9th Cir. 2010) (quoting *N.L.R.B. v. Sears, Roebuck &*

4    *Co.*, 421 U.S. 132, 150 (1975)).  The government has the burden of establishing

5    that the deliberative process privilege protects the materials at issue.  *See, e.g.*, *N.*

6    *Pacifica, LLC*, 274 F. Supp. 2d at 1121.

7         A document is considered "predecisional" if it was "prepared in order to

8    assist an agency decisionmaker in arriving at his decision."  *Carter v. U.S. Dep't of*

9    *Commerce*, 307 F.3d 1084, 1089 (9th Cir. 2002) (holding that adjusted census data

10   held back based on accuracy concerns was not "predecisional" because it was

11   originally prepared for the purpose of dissemination to the public) (quotations and

12   citation omitted); *Assembly of State of Cal. v. U.S. Dept. of Commerce*, 968 F.2d

13   916, 920 (9th Cir. 1992) (noting that a "predecisional" document is one "prepared

14   in order to assist in an agency decisionmaker in arriving at his decision" and that

15   "documents deemed 'postdecisional' do not enjoy the protection of the deliberative

16   process privilege") (quoting *Sears, Roebuck & Co.*, 421 U.S. at 153).

17        A document or statement is deemed "deliberative" only if it was a direct part

18   of the deliberative process in that it makes recommendations or expresses opinions

19   on significant legal and policy matters.  *See Vaughn v. Rosen*, 523 F.2d 1136, 1144

20   (D.C. Cir. 1975) ("[P]re-decisional materials are not exempt merely because they

21   are pre-decisional; they must also be a part of the agency give-and-take of the

22   deliberative process by which the decision itself is made."); *see also Allen v.*

23   *Woodford*, No. CV-F-05-1104, 2007 WL 309945, at *5, *9 (E.D. Cal. Jan. 30,

24   2007) (stating that the deliberative process privilege only applies to documents

25   relating to a larger policy formulation, not a single, trivial decision, such as

26   whether to fire a single employee).  Indeed, "documents that merely reflect an

27   agency's formal or informal guidelines or understanding of its own policies should

28   be produced, even if they are not final or official agency policy."  *Nat'l*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

16

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

*Immigration Law Ctr. v. U.S. Immigration & Customs Enforcement*, No. CV 14-9632 PSG (MANx), 2015 WL 12684437, at *9 (C.D. Cal. 2015); *see also Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 867 (D.C. Cir. 1980) (finding deliberative process privilege not applicable to agency's interpretations of regulations applied by auditors, noting that "an agency will not be permitted to develop a body of 'secret law,' used by it in the discharge of its regulatory duties and in its dealings with the public, but hidden behind a veil of privilege because it is not designated as 'formal,' 'binding,' or 'final'").

The deliberative process privilege "must satisfy specific, formal requirements for proper invocation," and courts impose heightened requirements for asserting government privileges because "they effectively deny an adversary the opportunity to inquire into perhaps dispositive areas of fact." *Martin v. Albany Bus. Journal*, 780 F. Supp. 927, 932–33 (N.D.N.Y 1992); *see L.H. v. Schwarzenegger*, No. CIV. S-06-2042 LKK/GGH, 2007 WL 2009807, at *3 (E.D. Cal. July 6, 2007) (stating that the privilege "should be narrowly construed because confidentiality may impede full and fair discovery of the truth.") To satisfy its burden, the government must provide: "(1) a formal claim of privilege by the head of the department possessing control over the requested information, (2) an assertion of the privilege based on actual personal consideration by that official, and (3) a detailed specification of the information for which the privilege is claimed, along with an explanation of why it properly falls within the scope of the privilege." *Coleman v. Schwarzenegger*, Nos. CIV S-90-0520 LKK JFM P, C01-1351TEH, 2008 WL 2237046, at *4 (E.D. Cal. & N.D. Cal. May 29, 2008) (internal quotation and citation omitted). Neither the government's privilege logs nor the vague description of the agency declaration—which the government is now refusing to provide—satisfies this burden.

*First*, the privilege logs produced by the government are facially deficient. They contain only "generalized allegations and self-serving, conclusory statements

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

regarding privilege" that are insufficient to sustain the deliberative process privilege. *See Dominguez v. Schwarzenegger*, No. C 09-2306 CW (JL), 2010 WL 3341038, at *4 (N.D. Cal. Aug. 25, 2010). The basic document descriptions provided by the government do not provide a "detailed specification of the information for which the privilege is claimed, along with an explanation of why it properly falls within the scope of the privilege." *Id.* at *5. The government's privilege log descriptions set forth no specific policy decisions, let alone significant policy decisions. *See id.* The descriptions fail to detail how any document fits into the deliberative process. *See, e.g.*, *Cal. Native Plant Soc'y*, 251 F.R.D. at 413 ("Conclusory statements that a document is deliberative do not suffice"). Accordingly, the privilege log descriptions do not satisfy the government's burden of establishing that any documents are both predecisional and deliberative. *Id.*; *Dominguez*, 2010 WL 3341038, at *5 (ordering production of all documents over which the government invoked solely the deliberative process privilege where government failed to identify specific policy decisions at issue) (internal quotation and citation omitted)).[6]

These generic descriptions, which the government has applied in boilerplate fashion to large swaths of documents spanning many years, do not adequately describe the content of the purported deliberations and fail to provide the requisite level of detail to establish that the documents properly fall within the scope of the deliberative process privilege. For example, as previously set forth (*supra* at 5–6), the government is using basic descriptions on its privilege logs such as: "RADV audit methodology" (approximately 6,400 documents withheld); "calculation of RA error rate" (approximately 3,320 documents); "Advance Notice and/or

---

[6] The government should not be withholding in full documents that contain factual (or other) materials that do not qualify for this narrow privilege. This does not appear to be the case, however, considering the government is withholding in full approximately 95% of documents over which it is asserting solely the deliberative process privilege and thus is only redacting approximately 5% of these documents.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

18

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

Announcement and Call Letter" (approximately 1,680 documents); "FFS adjuster" (approximately 1,390 documents); "UHG RADV audits" or "non-UHG RADV audits" (approximately 660 documents); "UHG RA activities" and "non-UHG RA activities" (approximately 545 documents); and "RA training materials" (approximately 500 documents). Many of these categories, such as the calculation of the error rate in the government's own data, the calculation of the RA factors in CMS's payment model, and UHG and non-UHG RADV audits, describe "[p]urely factual material that does not reflect deliberative processes" and to which the deliberative process privilege does not apply—as this Court has already recognized. *See Warner Commnc'ns Inc.*, 742 F.2d at 1161; Ex. 20, Tr. of July 12, 2018 Hr'g at 64:24–65:3 ("[T]he deliberative process privilege . . . applies to things that . . . really reflect deliberations as opposed to a factual finding."). Yet the government is withholding *in full* nearly 95% of the documents over which it is asserting solely the deliberative process privilege.

Furthermore, these broad categories span extended periods of time—some as many as over 14 years—that undermine any notion that all of the documents grouped in the category are both predecisional and deliberative. Coupled with the basic privilege descriptions, the protracted time periods do not identify a specific significant policy decision or provide any insight into how the documents are deliberative. For example, the government is withholding approximately 1,390 documents spanning from January 2004 to May 2017 "reflecting internal agency deliberations regarding FFS adjuster." This description fails to detail any specific significant policy decision related to the FFS adjuster—such as the government's decision in February 2012 to adopt a FFS adjuster—and the "FFS adjuster" description is so generic that it prevents United from assessing whether any particular document is predecisional. Nor does this basic description provide any insight into how any documents were part of the deliberative process.

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
LOS ANGELES

19

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

As another example, the government is withholding nearly 6,400 documents spanning from September 2003 to July 2017 "reflecting internal agency deliberations regarding RADV audit methodology."  This description similarly fails to explain what significant policy decision related to the RADV audit methodology is at issue or how the documents were part of the agency decision-making process.  RADV audits began taking place in 2008, so using such a broad description for a nearly 14-year period provides no detail about how any documents are predecisional or even how the decision spanned 14 years.  The government's assertion of privilege over approximately 1,680 documents "reflecting internal agency deliberations regarding Advance Notice and/or Announcement and Call Letter" from January 2003 to April 2017 suffers from the same infirmities.  The description does not even identify which Advance Notice, Announcement, or Call Letter—documents CMS issues multiple times per year—is at issue, let alone how any particular document fits into the deliberative process.

The government's privilege log deficiencies also prevent United from properly assessing whether any purported deliberations were ultimately adopted by the agency.  This is problematic because ultimate adoption by the agency would obviate any claim of deliberative process privilege.  *See Nat'l Res. Def. Council v. U.S. Dep't of Defense*, 388 F. Supp. 2d 1086, 1098 (C.D. Cal. 2005) ("Even if the document is predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public." (quoting *United States v. Rozet*, 183 F.R.D. 662, 666 (N.D. Cal. 1998)).

The agency declaration that the government has now refused to provide—after refusing for months to provide it, finally committing to provide it by the end of September, and then reneging on that commitment—would not have cured the flaws in the government's privilege assertions.  As an initial matter, it appears that lawyers from the Department of Justice were asserting the deliberative process

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
LOS ANGELES

20

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

privilege without first consulting any agency official.  This is particularly troubling because "a government attorney is precisely who should *not* be asserting a government privilege." *See Chao v. Westside Drywall, Inc.*, 254 F.R.D. 651, 657 (D. Or. 2009) (emphasis added); *Martin*, 780 F. Supp. at 933 ("Only by mandating that an accountable executive official invoke a governmental privilege can the courts be confident that the privilege is responsibly asserted based on agency goals and policies, and is not abused for litigation purposes.").  If the Department of Justice failed to consult first with the agency before asserting the deliberative process privilege over nearly 20,000 documents, that alone is sufficient to order production of all materials withheld as it demonstrates a complete failure to follow the requirements of asserting the deliberative process privilege.  *See Pac. Gas & Elec. Co. v. United States*, 70 Fed. Cl. 128, 143–44 (2006) (finding the government's assertion of the deliberative process privilege prior to obtaining a supporting affidavit from a government official "procedurally deficient").

Moreover, even if the government eventually provides one, the Court should be especially wary of any new agency declaration that serves more as a post-hoc defense of the Department of Justice's privilege assertions than a truly independent claim of privilege by the agency.  The government's extremely broad-brushed description of the agency declaration it now has refused to provide offers no assurance to the Court or United that the government will give sufficient detail to tie thousands of documents that span over a decade to a specific agency decision and adequately detail how they were part of the deliberative process.  *See Cal. Native Plant Soc'y*, 251 F.R.D. at 413 (finding agency declarations insufficient to establish deliberative process privilege where the "statements do not assert the detail required to show the individual documents' role in the decision making process").  Indeed, it is difficult to imagine how an agency declaration could contain sufficiently detailed information to explain how approximately 21,400

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

21

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

1  documents all meet the exacting standard required to assert the deliberative process

2  privilege.

3       Furthermore, United cannot identify particular documents to challenge or

4  submit for potential *in camera* review by this Court because of the government's

5  failure to provide adequate information in support of its privilege assertions.  The

6  government has argued that it would be prohibitively burdensome to conduct a

7  document-by-document review and provide individualized descriptions.  But the

8  government should have conducted such a review prior to asserting the deliberative

9  process privilege—and, if it did not, the assertions are improper.  This Court

10  should not be forced to assume a burden that the very party asserting the privilege

11  is unwilling to undertake.  Accordingly, because this Court "ha[s] insufficient

12  information from [the government] as to why disclosure should not be permitted,"

13  it is likewise "ill-equipped to make any intelligent decisions as to discovery during

14  an *in camera* inspection."  *See Miller v. Pancucci*, 141 F.R.D. 292, 301 (C.D. Cal.

15  1992) ("[S]hould the threshold requirements not appear in the papers, the privilege

16  assertion will be overruled in its entirety and complete disclosure will be ordered.

17  No *in camera* inspection will occur.").

18       In sum, it has been over 13 months since the government received United's

19  first set of document requests and over 3.5 months since United first raised issues

20  related to the government's fundamentally flawed privilege logs and asked for an

21  agency declaration.  Despite United's requests, and despite having a protracted

22  amount of time to cure these deficiencies and provide a sufficient agency

23  declaration, the government has failed to meet its burden of substantiating its

24  privilege claims.  Consequently, the government has waived its right to assert the

25  deliberative process privilege over these materials.  *See, e.g.*, *Dominguez*, 2010

26  WL 3341038, at *6 (finding waiver in light of a party's "repeated failures to

27  substantiate their claims of privilege" and ordering production of all information

28  over which the deliberative process was the sole privilege asserted).  The Court

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

22

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

1  should therefore order the production of all documents that the government is

2  withholding solely on the basis of the deliberative process privilege.  *See, e.g.*,

3  *Coleman*, 2008 WL 2237046, at *5 (ordering production of materials withheld

4  under the deliberative process privilege where neither the government's  privilege

5  logs nor the agency declaration established the privilege).

6  

7          b.    *United's Need for These Relevant Materials Outweighs Any Government Interest in Non-Disclosure*

8      Even if the government had properly invoked the deliberative process

9  privilege—which it has not—the privilege is qualified and can be overcome by a

10  sufficient showing of need outweighing the harm that might result from disclosure.

11  *Warner Commc'ns Inc.*, 742 F. 2d at 1161.  The Ninth Circuit has set forth four

12  non-exclusive factors that courts consider in balancing the competing interests:

13  "(1) the relevance of the evidence; (2) the availability of other evidence; (3) the

14  government's role in the litigation; and (4) the extent to which disclosure would

15  hinder frank and independent discussion regarding contemplated policies and

16  decisions."  *Id.* (citations omitted).[7]   These factors all weigh heavily in favor of

17  requiring disclosure.

18  

19  

20  

21  [7] Some district courts in Ninth Circuit have considered additional factors, such as the interest of the litigants, and ultimately society in accurate judicial fact-finding,

22  and the seriousness of the issues involved. *See e.g., N. Pacifica, LLC*, 274 F. Supp. 2d at 1122; *United States v. Irvin*, 127 F.R.D. 169, 173 (C.D. Cal. 1989)

23  (enumerating the factors and collecting cases).  The parties and society have a clear interest in accurate fact finding, and the government's fraud allegations and

24  magnitude of damages sought are serious.  *See, e.g., Irvin*, 127 F.R.D. at 173 ("The desirability of accurate fact finding argues in favor of disclosure (as it would

25  in every case)."); *United States v. Berkeley Heartlab, Inc.*, No. 9:14-cv-00230-RMG, 11 (D.S.C. June 19, 2017) (concluding in an intervened case involving

26  alleged violations of the federal False Claims Act and federal Anti-Kickback statute, "The Court has no trouble finding that . . . the litigation is serious.").  Other

27  courts also consider the public's interest in government transparency, which weighs heavily in United's favor here.  *See, e.g., Reino De Espana v. Am. Bureau*

28  *of Shipping*, No. 03CIV3573LTSRLE, 2005 WL 1813017, at *12 (S.D.N.Y, Aug. 1, 2005).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

23

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

i.    *The Evidence the Government Is Withholding Is Critical to the Claims and Defenses*

As an initial matter, the standard for relevance in litigation is low, and the Federal Rules of Civil Procedure afford parties broad discovery of relevant evidence.  *See, e.g.*, *In re Allergan, Inc. Sec. Litig.*, No. 14-CV-02004, 2016 WL 5929250, at *2 (C.D. Cal. Oct. 5, 2016) ("The Federal Rules of Civil Procedure provide for broad factual discovery.  A party 'may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . .'" (citing Fed. R. Civ. P. 26(b)(1)).  The documents United has requested are crucial for its defenses to the misconduct that the government has charged.  As detailed below, they bear directly on the remaining reverse False Claims Act count, the government's common law claims of Payment by Mistake and Unjust Enrichment, resolving the meaning of the ambiguous contractual provisions and regulatory requirements at issue, and potential damages.

<u>False Claims Act.</u>  To prevail on its reverse False Claims Act count, the government must establish that United "knowingly conceal[ed] or knowingly and improperly avoid[ed] or decrease[d] an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G); *see id.* § 3729(b)(3) (an "obligation" is "an established duty, whether or not fixed, arising from . . . the retention of any overpayment").  Evidence about the presence and extent of unsupported codes in CMS's own data speaks directly to whether United was overpaid because if CMS's rate of unsupported codes was greater than United's, there cannot have been any overpayment.  Indeed, as Judge Collyer held, requiring United to delete unsupported codes without CMS doing the same in its data would result in a systematic *under*payment and violate the statutory (and contractual) requirement of actuarial equivalence.  *See, e.g.*, Ex. 18, APA Op. at 15–21; Ex. 19 Partial Summ. J. Opp'n at 22–23, 44–46.  United has issued document requests

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

24    JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

seeking evidence on this very point.   For example, United has sought the production of documents related to (1) the Risk Adjustment error rate in CMS's data, (2) a RADV Medicare FFS adjuster, and (3) the RADV audit methodology. *E.g.*, RFPs 1, 2, 6, 7.  These categories of documents are relevant to, among other things, whether United was overpaid merely because it may have received payments based on some unsupported codes.   The government, however, is asserting solely the deliberative process privilege over approximately 3,320 documents related to the "calculation of RA error rate," approximately 1,390 documents related to the "FFS adjuster," and approximately 6,400 documents related to the "RADV audit methodology."  *See* Exs. 1–7, United States' Privilege Logs Nos. 1–7.

The evidence that United has been able to obtain thus far supports its arguments and undermines the government's theories—and highlights not only the relevance of the documents the government is shielding, but also the overbreadth of the government's deliberative process privilege assertions in this case.   For example, the government astonishingly attempted to shield documents in this litigation that it previously produced in response to a FOIA request, with redactions.  *See* Ex. 21, Presentation from Division of Payment Validation; Ex. 22, FOIA Agenda; Ex. 23, Tavenner Dep. Tr. 83:10–84:10; Ex. 24, Grant Dep. Tr. 293:12–23.   These documents contain notes from an internal CMS presentation about the need to account for CMS's own error rate in determining overpayments and state that adopting an FFS adjuster "from a technical point of view is the right thing to do" and would "put[] us in the best position to withstand litigation challenges."  *See* Ex. 22, Agenda at CMS0006201; *see also* Ex. 21, Presentation from Division of Payment Validation.  Evidence like this is crucial to showing that, contrary to the government's core contention, United was not overpaid merely because it failed to delete and may have received payment based on unsupported codes.  As another example, Jeffrey Grant (a CMS official who oversaw the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

25

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

1   creation of the risk adjustment program and one of only two CMS officials
2   deposed in this case to date) testified that, assuming the coding intensity
3   adjustment fully offsets any activities that an MA plan undertakes to code more
4   completely, if a plan were to audit a little as twenty-five percent (or even less) of
5   its members' charts and delete unsupported codes it found—without CMS deleting
6   such codes in the FFS data—the MA plan would be underpaid.  *See* Ex. 24, Grant
7   Dep. Tr. at 274:22–277:25; Ex. 19, United's Partial Summ. J. Opp'n at 44–45.

8        Yet this is the exact type of evidence the government is seeking to prevent
9   United from obtaining through its overly expansive assertion of the deliberative
10  process privilege.  In fact, Judge Collyer rejected the government's over-expansive
11  stance on the deliberative process privilege and entered these very same documents
12  into the administrative record.  Ex. 25, APA Mem. Op. on Mot. to Supplement the
13  Administrative R. at 12.  The government's attempt to invoke the deliberative
14  process privilege on these documents, despite having produced them in response to
15  a FOIA request, illustrates its aggressive and overly broad assertions of this limited
16  privilege over documents at the heart of this case.

17       The documents the government is withholding on the basis of the
18  deliberative process privilege also are relevant to scienter.  The government's
19  interpretations of the requirements imposed on MA plans by CMS statutes, rules,
20  regulations, and guidance, as well as contracts with MA plans—requirements the
21  government now claims United violated—shed light on both the meaning of those
22  requirements and whether United knew that conducting one-way reviews violated
23  them.  *See, e.g.*, Ex. 26, United's Mot. to Strike Opp'n at 17–18; Ex. 17, United's
24  Rule 16 Opp'n at 12–14.  Proving that United improperly retained overpayments
25  requires the government to show that United knew about unsupported codes simply
26  by virtue of its one-way looks and that United knew that unsupported codes
27  necessarily resulted in overpayments.  *See* 31 U.S.C. § 3729(a)(1)(G); *see also In*
28  *re. Pharm. Indus. Average Wholesale Price Litig.*, 254 F.R.D. 35, 42–44 (D. Mass.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

26

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

2008) (ordering the production of several documents protected by the deliberative process privilege because government knowledge could be relevant to both scienter and falsity under the False Claims Act).   That, in turn, requires the government to prove United knew that there was something improper or fraudulent in conducting one-way chart reviews and that United was objectively unreasonable in its belief that there was no overpayment so long as the rate of its unsupported codes did not exceed CMS's.   *See, e.g.*, Ex. 26, Mot. to Strike Opp'n at 17–18; Ex. 17, United's Rule 16 Opp'n at 12.

Documents showing the government's interpretation of MA plans' obligations under applicable statutes, regulations, guidance documents, and contractual requirements thus bear directly on the objective reasonableness of United's interpretations.   *See id.*; *Safeco Ins. Co. v. Burr*, 551 U.S. 47, 69–71 & n.20 (2007) (stating that where multiple "objectively reasonable" interpretations of a provision exist, "it would defy history and current thinking to treat a defendant who merely adopts one such [objectively reasonable] interpretation as a knowing or reckless violator"); *United States ex rel. McGrath v. Microsemi Corp.*, 690 F. App'x 551, 552 (9th Cir. 2017) (applying *Safeco* to scienter requirement of False Claims Act); *see also United States v. Pac. Gas & Elec. Co.*, 178 F. Supp. 3d 927, 963 (N.D. Cal. 2016) (holding that evidence of government's or other regulated entities' interpretation of regulations was relevant to reasonableness of defendant's interpretation, regardless of whether defendant actually knew of that evidence). Additionally, evidence that United's beliefs were reasonable would help a factfinder assess whether United actually held its asserted beliefs:   "[T]he more unreasonable the asserted beliefs or misunderstandings are, the more likely the jury will consider them to be nothing more than simple disagreement with known legal duties," and, conversely, the more *reasonable* the beliefs are, the more likely the jury is to believe that they were genuinely held.   *Cheek v. United States*, 498 U.S.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

27

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

192, 203–04 (1991). Evidence that government officials agreed with United's interpretations are thus relevant even to United's subjective beliefs.

Many of the document requests United has issued also relate to this evidence. For example, United is seeking discovery related to: regulations, rules, guidance, or other pronouncements setting forth the government's standards for evaluating the accuracy of diagnosis codes reported by MA plans; coding for purposes of evaluating the accuracy and adequacy of diagnoses reported by MA plans; and CMS instructions and guidelines regarding coding. *See* RFPs 3, 43, 44. But the government is asserting solely the deliberative process privilege over nearly 2,600 documents related to the "RA supporting documentation requirements," "medical coding in support of RA payments," "RA training materials," and "coding guidance." These types of documents are highly relevant to scienter and should be produced. *See Berkeley Heartlab, Inc.*, No. 9:14-cv-00230, 2017 WL 3608241, at *2 (D.S.C. Aug. 22, 2017) (ordering production of certain documents subject to the deliberative process privilege in part because of their relevance to defendants' argument that they lacked the requisite scienter under the False Claims Act).

The limited evidence United has been able to obtain thus far supports United's argument that its interpretations were objectively reasonable. For example, Jeffrey Grant testified that he believed an MA plan's submission of an unsupported code would be improper only if it was making the "very specific submission of a very specific data element . . . that [it] know[s] is wrong." Ex. 24, Grant Dep. Tr. at 321:21–23. He stated that performing one-way reviews that add diagnosis codes, without looking at whether previously-submitted codes lack such support, would not create the requisite knowledge. *Id.* at 322:18–323:15. He further testified that he did not believe it was "improper" or "fraud" for an MA plan to perform such one-way reviews. *Id.* at 307:11–310:16.

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

28

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

Documents related to the government's knowledge of United's and other MA plans' coding practices are also relevant to *Escobar*'s "demanding" materiality standard, which "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *See United Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016). The government must show that any alleged misrepresentation was material to the government's decision to continue paying and contracting with United. *See, e.g.*, Ex. 17, United's Rule 16 Opp'n at 14. Additionally, evidence of how the government responded to knowledge that other MA plans were engaging in chart reviews similar to the chart reviews at issue in this litigation goes directly to the materiality of any alleged wrongdoing by United. *See id.* at 2003; *United States ex rel. Worthy v. E. Me. Healthcare Sys.*, No. 2:14-cv-00184-JAW, 2017 WL 211609, at *24 (D. Me. Jan. 18, 2017) (evidence regarding government's prior investigations of similar allegations and prior actions to prevent the same type of conduct at issue relevant for materiality purposes); *see also United States ex rel. Scharff v. Camelot Counseling*, No. 13-cv-3791, 2016 WL 5416494, at *17 (S.D.N.Y. Sept. 28, 2016) (complaint failed to allege sufficient facts to support materiality where it did not allege whether the government refused to reimburse clinics that engaged in conduct similar to defendant's).

Many of the documents United seeks and over which the government has asserted the deliberative process privilege are related to the government's knowledge of MA plans' activities. For example, United has requested documents related to the government's knowledge as to whether MA plans were (1) validating the accuracy of diagnosis codes, (2) deleting unsupported diagnosis codes, and (3) looking both ways. *See* RFPs 17–19. The government, however, is asserting solely the deliberative process over approximately 545 documents related to "UHG RA activities" and "non-UHG RA activities." United should be entitled to these

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

29

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

1   documents to help demonstrate that any alleged wrongdoing by United was not

2   material.

3         The government has previously argued that the automated nature of the MA

4   payment system renders diagnostic codes *automatically* material and that United

5   thus should not be entitled to discovery related to CMS's views on and treatment

6   of the submission of unsupported codes.  But United contests this assertion and has

7   demonstrated that certain deletes involve much more than merely submitting

8   "delete files" to CMS—they involve affirmative decisions by CMS officials to

9   process the deletes and adjust prior payments based on CMS's reconciliation of the

10  submitted data.  *E.g.*, Ex. 17, United's Rule 16 Opp'n at 15–16.  In fact, United has

11  requested documents related to the processes, policies, guidance, and procedures

12  relating to deletes and the government's refusal or failure to process deletes

13  submitted by MA plans.  *See* RFP Nos. 2-2–2-4.  But the government is

14  withholding approximately 190 documents related to the "return of overpayments

15  to CMS," "submission of deletes," "processing of overpayments," and "proposed

16  overpayment recovery process" (and many additional documents in similar

17  categories).  The government should not be allowed to withhold documents that are

18  relevant to this issue, including CMS's internal deliberations about whether to

19  process deletes, and whether CMS viewed unsupported codes as inherently

20  improper.

21        <u>Common Law Claims.</u>  The documents that the government is shielding also

22  are directly related to its two common claims, Payment by Mistake and Unjust

23  Enrichment.  *See, e.g.*, Ex. 17, United's Rule 16 Opp'n at 8–9.  Payment by

24  Mistake requires the government to prove what it knew and what it would have

25  done differently if it had the knowledge it claims it lacked.  If the government was

26  aware that United conducted one-way reviews or that other MA plans did the

27  same, but continued to pay and contract with United or those other MA plans, that

28  would tend to undermine any claim by the government that it paid United under a

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

30

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

mistaken understanding of applicable circumstances.  United should be permitted to investigate whether the government in fact labored under a misunderstanding and what actions it took, if any, as a result of that alleged misunderstanding.  Thus, United has issued document requests related to the government's knowledge of MA plans' activities, many of which the government appears to be withholding.  *See, e.g.*, *id.* at 14.  These and other documents related to the government's knowledge of United's and other MA plans' activities contain information at the heart of the government's Payment by Mistake claim.

The documents that the government is withholding are also highly relevant to the its Unjust Enrichment claim.  For example, documents United seeks related to overpayments under the False Claims Act, bear on whether United was entitled to receive money from the Government and whether retention of those funds was improper.  *See, e.g.*, *id.* at 10–11.  As United has argued previously in this case— and as Judge Collyer held in the case before her—requiring plans to repay funds associated with unsupported codes, without first determining whether the plan's rate of unsupported codes exceeds the rate implicit in the payment model, would confer an unfair windfall on the government.  *See* Ex. 18, APA Op.; Ex. 19, United's Partial Summ. J. Opp'n at 26.  Evidence showing that the government's recovery in the instant litigation would produce that inequitable effect would support United's defense that it has not been unjustly enriched.  *See, e.g.*, Ex. 19, United's Partial Summ. J. Opp'n at 2, 19.  Therefore, the government is hampering United's ability to defend against the Unjust Enrichment claim by withholding documents that are directly relevant to these issues.  *See supra* at 5–6.

Contractual and Regulatory Ambiguity.  Furthermore, the documents that the government is withholding are relevant to interpreting the meaning of the ambiguous contractual and regulatory provisions on which the government relies. The regulatory provisions invoked by the government do not state that an MA plan is required to delete all codes it allegedly determines to be unsupported, regardless

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

31

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

1    of the rate of unsupported codes in CMS's own data on which its payments are

2    based, or that it is overpaid every time it receives a payment associated with an

3    unsupported code.  *See* Ex. 19, United's Partial Summ. J. Opp'n at 26–46; Ex. 17,

4    United's Rule 16 Opp'n at 16–17.  At a minimum, extrinsic evidence is necessary

5    to determine the meaning of these provisions.  Additionally, extrinsic evidence is

6    necessary to resolve the meaning of the ambiguous contractual provisions at issue.

7    *See* Ex. 19, United's Partial Summ. J. Opp'n at 43–46; Ex. 17, United's Rule 16

8    Opp'n at 16–17.  Even if the language of the contracts otherwise appeared to

9    support the government's position, the Court still should "consider evidence of

10   course of dealing, trade usage, or course of performance" to determine whether

11   that meaning is, in fact, ambiguous.  *See Mohave Valley Irrigation & Drainage*

12   *Dist. v. Norton*, 244 F.3d 1164, 1166 (9th Cir. 2001).

13   <u>Damages.</u>  Finally, many of the documents the government is withholding

14   are relevant to potential damages calculations.  Documents related to errors in

15   CMS's data and the calculation of a FFS Adjuster, for example, bear directly on

16   the existence and extent of damages in this matter.  Any calculation of damages

17   that failed to take into account the prevalence of unsupported codes in CMS's data,

18   which the FFS Adjuster attempts to approximate, would grossly overestimate any

19   actual injury suffered by the government.  *See* Ex. 19, United's Partial Summ. J.

20   Opp'n at 26–27.  But the government is withholding over 4,700 such documents

21   that span a 13.5-year period.  *See supra* at 5.

22   In sum, the government has asserted the deliberative process privilege over

23   thousands of documents that are central to the remaining False Claims Act count,

24   both common law claims, the meaning of the contracts and regulatory provisions

25   upon which the government relies, and potential damages.  These documents are

26   not simply relevant—they are critical to United's ability to defend itself in this

27   case.  Thus, this factor weighs heavily in favor of disclosure.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

32

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

### ii.    The Government Is the Sole Custodian of This Critical Evidence

The availability of comparable evidence from sources other than the government is "perhaps the most important factor in determining whether the deliberative process privilege should be overcome." *N. Pacifica, LLC*, 274 F. Supp. 2d at 1124.  This factor imposes a high bar for the government: even if some related evidence may be available elsewhere, the availability of evidence from other sources will not suffice unless the evidence is "comparable." *See Cal. State Foster Parent Assn. v. Wagner*, No. C 07-05086 WHA, 2008 WL 2872775, at *5 (N.D. Cal. 2008) (finding that this factor "weigh[ed] heavily in favor of disclosure" where plaintiffs claimed the state had violated a statute and sought "detailed analyses completed by . . . the agency responsible for the enforcement" of the statute, even though "some of the factual information contained in the analyses" might be available elsewhere).

United cannot obtain the crucial evidence described above from other sources.  The government is not only the best and most authoritative source of information about its own knowledge and interpretations of MA requirements—it is the *sole* custodian of that information.  Even if other sources for this evidence existed (and they do not) "the quality and persuasiveness of such evidence w[ould] be substantially inferior to that produced by the agency charged with enforcing and administering the programs at issue in this litigation." *See id*.  This factor— arguably the most important—also weighs heavily in favor of disclosure.

### iii.    The Government Plays a Significant Role in this Litigation

It is difficult to imagine how the government could play a more significant role in this litigation, having affirmatively chosen to file a lawsuit of this scope and magnitude after a five-year investigation.  *See, e.g.*, *Berkeley Heartlab*, No. 9:14-cv-00230-RMG, 11 (D.S.C. June 19, 2017) (finding the government's role

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

33

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

significant where it government filed a complaint-in-intervention in False Claims Act matter); *cf. Wagner,* 2008 WL 2872775, at *6 (noting that, "[o]bviously, as defendant, the government plays a prominent role in this litigation").  The government affirmatively elected to place its internal deliberations, knowledge of MA plans' activities, and interpretations of applicable regulatory, statutory, and contractual MA requirements directly at issue, and it would be unfair for the government to pursue its claims while shielding relevant evidence behind the deliberative process privilege.  *See N. Pacifica*, 274 F. Supp. 2d at 1124 (stating that the government's decisionmaking process 'is not swept up into the case, it *is* the case.'") (quoting *Irvin* 127 F.R.D. at 174); *see also Fed. Deposit Ins. Corp. v. Giancola*, No. 13 C 3230, 2015 WL 5559599, at *6 (N.D. Ill. Sept. 18, 2015) (stating that as a plaintiff, the government played a "considerable role" in the case and that it would be unfair if the government could advance its claims by concealing relevant evidence behind a government privilege).  Accordingly, this factor weighs heavily toward disclosure.

iv.  *Any Governmental Interest in Non-Disclosure Is Sufficiently Protected by a Protective Order*

The risk that disclosure of the documents would chill agency deliberations is minimal because there is a protective order in place.  Courts have repeatedly found that protective orders adequately safeguard the government's interest in non-disclosure.  *See, e.g.*, *In re McKesson Governmental Entities Average Wholesale Price Litig.*, 264 F.R.D. 595, 602–03 (N.D. Cal. 2009) (holding that the protective order in place would sufficiently protect the government's interest); *Noble v. City of Fresno*, No. 1:16-cv-01690, 2018 WL 1381945, at *9 (E.D. Cal. Mar. 19, 2018) (same).

The protective order in this case—which both parties negotiated and agreed to and which this Court approved—sufficiently protects any government interest in non-disclosure.  The government may designate documents "Confidential" or

JOINT STIPULATION REGARDING UNITED'S MOTION FOR ORDER COMPELLING THE UNITED STATES TO PRODUCE DOCUMENTS

1  "Attorneys' Eyes Only" if it is concerned about the documents being disclosed
2  outside of this litigation. *See* Ex. 27, Protective Order ¶¶ 6, 8–13, 21–23.  In
3  addition, "[e]xtremely confidential and/or sensitive" documents that the
4  government appropriately designates "Attorneys' Eyes Only" are not even
5  permitted to be shared with United personnel, including in-house counsel. *See id.*
6  at ¶¶ 9, 22.  Thus, the protective order provides adequate protection over the
7  documents that the government is withholding, such that producing them would
8  not threaten the deliberative process.  Therefore, this factor, like all the others,
9  weighs heavily in favor of disclosure.

10      In sum, all four of the factors set forth in *FTC v. Warner* weigh in favor of
11  disclosure.  Thus, even if the government had properly invoked the deliberative
12  process privilege (which it has not), the privilege would be overcome in this case
13  because United's need for the documents outweighs the government's interest in
14  non-disclosure.

15      **B.    Government**

16      Defendants' motion to compel the production of privileged information that
17  is irrelevant to any claim or valid defense in this case should be denied.  First,
18  under Rule 26 and associated case law, any consideration of agency privilege
19  assertions is premature during the pendency of the government's motion for a
20  protective order, which was filed roughly three months ago and stands fully briefed
21  and under submission.  While the protective order motion is pending with Judge
22  Fitzgerald, any compelled production by this Court with respect to a category of
23  information covered by that motion would, in effect, function as a denial of the
24  relief requested of Judge Fitzgerald by the United States.  Second, Defendants have
25  moved to compel the production of factual information that has been publicly-
26  released or which the government has agreed to produce.  In short, with respect to
27  this category of material – which involves the rates of unsupported diagnosis codes
28  in claims for payments submitted by providers under the FFS Medicare Programs

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

35                          JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

1   and which is the primary focus of the motion to compel, Defendants' motion is

2   unnecessary. Third, with respect to other categories of agency documents,

3   Defendants' briefing fails to establish the relevancy of the material or that

4   Defendants have any genuine need for it. Finally, the internal documents withheld

5   from production by the government are protected by the deliberative process

6   privilege as established by the agency declarations appended to this brief.[8] Each of

7   the foregoing points are addressed in turn, below.

8   **1.    The Scope and Sequence of Discovery Under Rule 26(b)**

9        *a.    Discovery is Permitted Only with Respect to Relevant*

10            *Documents*

11      Under the Federal Rules, the right to request documents is provided by Rule

12

13  [8] As described in the Cheri Rice Declaration, paragraph 10, a review was done by
14  CMS personnel and contractors of certain documents on Privilege Logs 1-7. In
    addition, with CMS' approval, Department of Justice attorneys reviewed a subset
15  of documents, and in some cases suggested revisions to the categorical description
    assigned to the document or identified that the document was not protected under
16  the Deliberative Process Privilege, but should remain on the privilege log pursuant
    to the Attorney-Client Privilege and/or Work Product Doctrine. As described in
17  the Declaration of Patrick J. Cogley, paragraph 21, a similar review was conducted
    by HHS-OIG personnel of the OIG documents. Attached as Exhibit A to the
18  Declaration of John E. Lee is a consolidated privilege log 1-7 that reflects the
    changes to the United States' privilege determinations based on these updated
19  reviews. For completeness sake, Exhibit A contains the remainder of the entries
    that have no changes from the previously produced versions. Therefore,
20  documents that are no longer deemed to fall under the protection of the
    Deliberative Process Privilege remain on Exhibit A based the Attorney-Client
21  Privilege and/or Work Product Doctrine. In addition, documents identified in
    Exhibit A include a revision to the categorical description previously assigned to
22  the document. The revised descriptions more accurately reflect the content of the
    withheld or redacted document. Moreover, after review of the documents
23  identified on Privilege logs 1-7, a total of 57 documents have been removed from
    the log because they were inadvertently marked as responsive during the initial,
24  broad scale document review, when in fact they were not responsive to the
    document requests in this case. Those documents are identified in Exhibit B to the
25  Lee Declaration and can be made available for *in camera* review as necessary.
    While not responsive to this matter, they are nevertheless still protected by
26  privilege. Finally, based on the review of the material in privilege logs 1-7,
    approximately 1,300 documents previously withheld under the Deliberative
27  Process Privilege will be released in full and produced to Defendants in an
    upcoming production. In addition, approximately 100 documents previously
28  withheld in full will be produced to defendants with redactions in an upcoming
    production.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

36                    JOINT STIPULATION REGARDING UNITED'S
                      MOTION FOR ORDER COMPELLING THE UNITED
                      STATES TO PRODUCE DOCUMENTS

34, which provides that "[a]ny party may serve on any other party a request (1) to produce . . . documents . . . which constitute or contain matters within the scope of Rule 26(b) and which are in the possession, custody or control of the party upon whom the request is served."   Rule 26(b) provides that, "[p]arties may obtain discovery regarding any matter, not privileged, *that is relevant to the claim or defense of any party . . . .*"   Fed. R. Civ. P. 26(b)(1) (emphasis added).   Section (b)(2) of Rule 26 places general limitations on the scope of discovery referenced in Section (b)(1) and, in relevant part, provides that  "[t]he frequency or extent of use of the discovery methods otherwise permitted under these rules and by local rule shall be limited by the court if . . . the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues."   Fed. R. Civ. P. 26(b)(2).   And Rule 26(b)(5)(A) makes clear that a claim of privilege need only be made with respect to information that is "otherwise discoverable."

Hence, before privilege questions are addressed in this case, Defendants have the initial burden of demonstrating the relevance of internal, non-public agency deliberative documents to a claim or defense. *See, e.g.*, *Gill v. Gulfstream Park Racing Ass'n Inc.*, 399 F.3d 391, 400 (1st Cir. 2005) ("Discovery of *both privileged and unprivileged information* is subject to the limitations imposed by Rule 26(b).") (emphasis supplied).   Defendants' arguments in their motion to compel fail to meet this burden.   Moreover, these issues have already been briefed as part of the government's motion pursuant to Rules 16(b) and 26(c) for a scheduling order modifying discovery or a protective order. *See* Dkt. Nos. 261 and 278.   Accordingly, the government adopts and incorporates its previous arguments in those briefs as if fully stated herein.   The Court should defer consideration of United's motion until Judge Fitzgerald rules on the United States' pending

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

1    motions.  At a minimum, the Court should address the threshold issue of relevancy
2    before obligating the government to undertake the enormous burden and expense
3    of perfecting the deliberative process privilege of thousands of documents.   To
4    proceed otherwise would allow Defendants to skirt a burden that they have under
5    the Federal Rules and case precedent:  the burden of establishing relevancy.

6            *b.*     *Consideration of the Government's Privilege Assertions Should*
7               *Await Resolution of the Motion for a Protective Order*

8          In  addition  to  imposing  a  relevancy  requirement  with  respect  to  the
9    production obligations that may be imposed on a party, Rule 26 provides a means
10   by  which  a  party  may  limit  or  avoid  the  burden  associated  with  asserting  and
11   perfecting privilege claims.

12         [Rule 26] does not attempt to define for each case what information
13         must be provided when a party asserts a claim of privilege or work
14         product protection.  Details concerning time, place, persons, general
15         subject  matter,  etc.,  may  be  appropriate  if  only  a  few  items  are
16         withheld,  but  may  be  unduly  burdensome  when  voluminous
17         documents are claimed to be privileged or protected, particularly if the
18         items can be described by categories.  *A party can seek relief through*
19         *a  protective  order*  under  subdivision  (c)  if  compliance  with  the
20         requirement  of  providing  this  information  would  be  an  unreasonable
21         burden.

22   Fed. R. Civ. P. 26 advisory committee's note to 1993 amendment (emphasis
23   supplied).

24         In  this  case,  the  District  Judge  has  not  yet  issued  a  scheduling  order  and,
25   thus,  there  are  no  discovery  or  other  deadlines.   As  noted,  in  early  August  of  this
26   year,  the  United  States  moved  to  limit  discovery  under  both  Rule  16(b)  and  Rule
27   26(c).  *See* Dkt. 261-1, at 1.  This was an appropriate means of seeking relief from
28   the  extraordinarily  overbroad  and  unjustified  document  discovery  demands  being

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

38

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

1    imposed by Defendants on the government.  *See* 8A Charles Alan Wright & Arthur

2    R. Miller, *Federal Practice and Procedure* § 2040 (3d ed. April 2018 update)

3    (where Rule 16(b) authorizes the use of scheduling orders to limit discovery to

4    avoid undue burden, "Rule 26(c) Orders have become less important to address

5    these concerns, which may often arise without the filing of a Rule 26(c) motion");

6    *id.* 6A § 1528 (While Rule 16 authorizes a district judge to control and facilitate

7    discovery, "the governing standards by which the court can rule on discovery

8    requests . . . are found in the discovery rules themselves."); Fed. R. Civ. P. 26

9    advisory committee's note to 2015 amendment (consistent with the preference that

10   district judges affirmatively manage case discovery, Rule 26 is "intended to

11   encourage judges to be more aggressive in identifying and discouraging discovery

12   overuse").

13         The United States has done precisely what is contemplated by the Federal

14   Rules and sought relief from having to review for privilege and log thousands of

15   irrelevant privileged documents.  *See* Dkt. Nos. 261, 278.  Moreover, the discovery

16   relief sought pursuant to the motion for a protective order was premised on the

17   government having filed three substantive and partially dispositive motions on core

18   legal issues.  *See* Dkt. Nos. 234, 235, 236, 271, and 272.  A ruling by Judge

19   Fitzgerald on the outstanding motion for a protective order and the three

20   substantive motions should precede any consideration of United's motion to

21   compel the disclosure of privileged documents.  *See Burlington N. & Santa Fe R.R.*

22   *Co. v. U.S. Dist. Court for the Dist. of Mont.*, 408 F.3d 1142, 1149 n.3 (9th Cir.

23   2005) (when subject to "exhaustive" discovery requests covering privileged

24   documents, a litigant "is not without recourse" and may "apply for a discovery or

25   protective order"); *United States v. Philip Morris, Inc.*, 347 F.3d 951, 954 (D.C.

26   Cir. 2003) ("if a party's pending objections [to the scope of discovery] apply to

27   allegedly privileged documents, the party need not log the documents until the

28   court rules on its [scope] objections"); *Freeman v. Seligson*, 405 F.2d 1326, 1338

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

39

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

1   (D.C. Cir. 1968) (stating that matters of privilege are appropriately deferred until

2   after the showing of relevance and good cause has been made).

3       While United has repeatedly assailed the government for attempting to

4   "unilaterally dictate the flow of discovery," in truth, the government has simply

5   done what any party is allowed to do – move for a protective order under Rules 16

6   and 26 seeking to be relieved of irrelevant and burdensome discovery.   The

7   government respectfully requests that this Court refrain from ruling on Defendants'

8   motion to compel if granting the relief sought would have the effect of preempting

9   the District Judge.   Moreover, a key issue implicated by the deliberative process

10  privilege dispute is whether Defendants have established a need for the material

11  sufficient to overcome the federal agency's interest in protecting the confidentiality

12  of internal, deliberative documents.   Accordingly, the question of relevancy is

13  inexorably bound up in any consideration of the deliberative process privilege.

14  This Court already indicated that it would appreciate guidance from the District

15  Judge on this issue[9] – which is certain to come when Judge Fitzgerald rules on the

16  four outstanding motions.

17      Finally, resolving relevancy questions first would expedite resolution of the

18  privilege questions.   Because Defendants' discovery is directed at virtually all

19  payment-related issues under the MA Program, the United States has, as a result,

20  asserted privilege over more than twenty thousand documents.   The unduly broad

21  scope of United's discovery has made consideration of privilege issues by CMS

22  and   the   preparation   of   privilege   logs   inordinately   time-consuming   and

23  cumbersome.   Depending on how the District Judge resolves the pending motions,

24  the diversion of agency resources on the scale that is now occurring on an ongoing

25  basis may well turn out to have been unnecessary.   The same may be true with

26  respect to the time and attention spent by this Court considering subject matter or

27

28  [9] *See, e.g.*, Sept. 17, 2018 Hr'g Tr. at 55 (Dkt. No. 294, Ex. 4).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

40

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

categories of deliberative process privileged documents potentially determined to be irrelevant when the District Judge rules on one or more of the four pending motions.  The merits of this sequential approach have been recognized:

> We agree . . . with the Secretary that matters of privilege can appropriately be deferred for definitive ruling until after the production demand has been adequately bolstered by a general showing of relevance and good cause, and at least the rough dimensions of the Secretary's burden have been set. This technique may, as to particular items, eliminate a 'showdown' on privilege.

*Seligson*, 405 F.2d at 1338.  Resolution of a privilege challenge will be simplified and expedited if the total number of privilege entries is winnowed down based on rulings by the District Court that will establish the law of the case and thereby set parameters for *relevant* discovery.

## 2. *Defendants Have Moved to Compel the Production of Information Which is Publicly-Available or That the Government Has Agreed to Produce*

In addition to being premature, Defendants' motion to compel is unnecessary because it primarily seeks information that is publicly available or that the government has agreed to produce.  Defendants' motion focuses on two main categories of information.   First, Defendants seek FFS coding error rate documents.   They contend that information about the "presence and extent of unsupported codes in CMS's own data" is relevant to the issues of whether or the extent to which they were overpaid as a result of having failed to delete unsupported diagnosis codes submitted by them for Medicare payments.  Second, Defendants seek internal agency documents relating to their legal (contractual and regulatory) obligations to submit valid diagnosis data and to delete invalid diagnosis data or otherwise repay the Medicare Program for payments based on invalid diagnosis data.  Defendants contend that they require access to non-public,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

41

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

1    internal agency information in order for this Court to construe their legal

2    obligations set forth in their contracts with CMS, CMS regulations and CMS

3    program manuals which have been in place over roughly the last decade and a half.

4         With respect to the first category of information involving FFS diagnosis

5    coding error rates, CMS does not possess its "own data." It appears that

6    Defendants are referring to diagnosis codes included by providers (primarily

7    doctors) in claims for payment under the FFS Medicare Programs (Parts A and B

8    of the Medicare Program). Information regarding unsupported diagnosis codes in

9    FFS claims data is now available on CMS' website and is, thus, publicly available.

10   The information was released in a technical paper posted on the website in

11   association with HHS' issuance on October 26, 2018 of proposed revisions to its

12   Medicare Part C Risk Adjustment Data Validation ("RADV") audit regulations

13   along with comments addressing the FFS Adjuster issue. On October 26, 2018,

14   CMS posted the following documents on its website: an Executive Summary

15   entitled Fee for Service Adjuster and Payment Recovery for Contract Level Risk

16   Adjustment Data Validation Audits with an accompanying Technical Appendix.

17   *See* Notice of Recent Proposed Medicare Part C Regulation Relating to Fee-For-

18   Service Adjuster Issue (Dkt. No. 307) ("Notice").[10] The proposed revisions to the

19   regulations can also be found at https://s3.amazonaws.com/public-

20   inspection.federalregister.gov/2018-23599.pdf and at 83 Fed. Reg. 54982 (Nov. 1,

21

22   _____

     [10] The proposed regulations address a number of unrelated issues and the entire
23   document is 362 pages. Exhibit 1 of the Notice (Dkt. No. 307-1) consists of pages
     relating to the proposed revisions to the RADV audit regulations and the FFS
24   Adjuster issue (pages 9,10, 13, 195-211, 236, 279-285, and 316-317). Exhibit 2 of
     the Notice (Dkt. No. 307-2) consists of the FFS Adjuster Executive Summary.
25   Exhibit 3 of the Notice (Dkt. No. 307-3) consists of the FFS Adjuster Technical
     Appendix. Given the Notice of Proposed Rulemaking has now issued and in light
26   of the release of the FFS study, CMS is re-reviewing documents on Exhibit A
     regarding this topic to determine whether additional documents can be released.
27   The publication of the NPRM may impact CMS' analysis of whether disclosure of
     certain documents related to the FFS Adjuster issue will harm the agency.
28   Therefore, CMS believes that the re-review should continue, even though it will
     not be complete by the date of this filing.

2018)).     The   Executive   Summary   and   Technical   Paper   are   at
https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-
Programs/Medicare-Risk-Adjustment-Data-Validation-Program/Resources.html.
The Technical Appendix sets out the error or "discrepancy" rates in FSS claims
data that was reviewed as part of the study of the FFS Adjuster issue.

Moreover, in response to Defendants' discovery requests and in regular
correspondence since then, the government has told United (as well as the District
Court), to the extent the agency has non-privileged factual information about rates
of unsupported codes, the government will produce it.[11]

As for the second category of material, that is, material relating to the legal
requirements that operate in the MA Program, United's contention that it now
requires non-public communications and internal agency memoranda to understand
the legal obligations of the MA Program is implausible.  It is even odd given that
United has participated in the MA Program since 2004.  Since that time, United, by
contract, expressly promised to comply with the regulations and program manuals
which have been in place for the duration of United's participation.  In any event,
there is no shortage of program information available to United and the rest of the
public.  For example, as explained more fully below, federal regulations, Federal
Register Notices, as well as a substantial body of publicly-available program
information, such as the Medicare Managed Care Manual, MA Participant Guides
and other public notices provide extensive detail on program administration and
related issues.   United, therefore, has the information it requires to assert its
defenses without probing the internal agency deliberations implicated by its overly
broad document requests.

---

[11] *See, e.g.* Dkt. No. 278, at 4-5.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

43

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

### *3.* *United Has Moved to Compel the Production of Irrelevant Material*

#### *a.* *Purported Contractual and Regulatory Ambiguity*

Without actually identifying a specific regulation, contract provision, or section of a participant guide, United broadly asserts that these authorities which plainly require MAOs, such as the United Defendants in this case, to correct erroneous diagnosis coding are somehow ambiguous and that the Court should "consider evidence of course of dealing, trade usage, or course of performance" to resolve the purported ambiguity. There are multiple problems with this contention.

First and foremost, the obligation to code correctly, that is, according to information in patient charts, has already been resolved as a matter of law by the Ninth Circuit, as now reflected in two decisions – neither of which found any ambiguity in the program material upon which the appellate court based its decisions. In *United States ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1175 (9th Cir. 2016), the Ninth Circuit held that United had an obligation to correct diagnosis codes that it knew to be invalid. Roughly two years later, the Ninth Circuit reaffirmed *Swoben's* holdings in *United States ex rel. Silingo v. Wellpoint, Inc.*, 904 F.3d 667 (9th Cir. 2018). In *Silingo*, the Ninth Circuit again considered an MAO's legal obligations concerning accurate coding and again stated that a beneficiary's medical record is ultimately determinative of whether a diagnosis code is accurate. *Id*. at 673 ("Every diagnosis code submitted to CMS must be based on a 'face-to-face' visit that is documented in the medical record."). There was no indication, in either *Swoben* or *Silingo,* that the Ninth Circuit found any ambiguity with respect to the obligation to delete invalid diagnoses such that it needed to look to extrinsic evidence to resolve this legal issue. In fact, the Ninth Circuit found these authorities clear. *See id.* at 672-73; *Swoben*, 848 F.3d at 1168-69. The same is true with respect to the decision by which Judge Fitzgerald denied United's motion to dismiss the complaint in this case. *See* Dkt. No. 212, at 5 ("MA Organizations have an obligation to withdraw, or delete, previously

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

44

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

1   submitted invalid diagnosis codes.").

2       Under the doctrine of *stare decisis*, the binding force of *Swoben* and *Silingo*

3   is not diminished because United may wish to pursue new arguments in this case

4   and to re-litigate issues already resolved by Ninth Circuit precedent precisely on

5   point here.  *See, e.g., In re Osborne*, 76 F.3d 306, 309 (9th Cir. 1996) ("under the

6   doctrine of *stare decisis* a case is important only for what it decides -for the 'what,'

7   not for the 'why,' and not for the 'how'"); *Rambus, Inc. v. Hynix Semiconductor,*

8   *Inc.*, 569 F. Supp. 2d 946, 963 (N.D. Cal. 2008) ("a district court must apply the

9   [circuit court's] claim construction even where a non-party to the initial litigation

10   would like to present new arguments"), *aff'd,* 645 F.3d 1336, 1351 (Fed. Cir.

11   2011); *see also Morrow v. Balaski*, 719 F.3d 160, 181 (3d Cir. 2013) ("the very

12   point of *stare decisis* is to forbid us from revisiting a debate every time there are

13   reasonable arguments to be made on both sides"); *E.E.O.C. v. Trabuco*, 791 F.2d 1,

14   4 (1st Cir. 1986) (weak or ineffective presentation in a prior case does not deprive

15   the ruling in that case of precedential effect for purposes of *stare decisis*).

16       Second, even if United were entitled to reopen the issue of whether an MAO

17   is required to code accurately, and to argue that "evidence of course of dealing,

18   trade usage, or course of performance" is relevant to that question, there is no

19   reason to conclude that United requires access to internal, non-public agency

20   documents to defend against the allegations made by the government.  United does

21   not need discovery of non-public, privileged information to elucidate its course of

22   dealing with CMS over the decade and a half during which United MAOs have

23   been, collectively, the largest participant in Medicare Part C.

24       Furthermore, the manner in which CMS has administered the MA Program

25   is a matter of public record. During United's participation, CMS has published

26   abundant guidance relating to the MA Program, including provisions specific to

27   the conduct at issue in this case.  For example, in 2013, the agency stated in the

28   Medicare Managed Care Manual that MAOs must delete erroneous diagnosis

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
LOS ANGELES

45

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

codes.  Pursuant to its MA Contracts, United expressly agreed to comply with the Manual.  *See* Dkt. No. 234, Exhibit 5 at § 40 ("If upon conducting an internal review of submitted diagnosis codes, the plan sponsor [or MAO] determines that any ICD-9-CM diagnosis codes that have been submitted do not meet risk adjustment submission requirements, the plan sponsor [or MAO] is responsible for deleting the submitted ICD-9-CM diagnosis codes as soon as possible"); Section A of Article II and Section A(1) of Article IX of the Part C Contract (Dkt. No. 234, Exhibit 1) (expressly requiring MAOs to operate "in compliance with … [the] Medicare Managed Care Manual").  The requirement of accurate coding has been reflected in other public guidance dating back to 2003.  *See, e.g.,* 2003 Regional Risk Adjustment Training For Medicare+Choice Organizations, Participant Guide, at § 6.12.3 (Dkt. No. 261, Exhibit 16) (stating that M+C organizations must submit delete records when an erroneous diagnosis cluster has been accepted by RAPS and stored in the RAPS Database); 2004 Regional Risk Adjustment Training For Medicare Advantage Organizations, Participant Guide, at § 4.16 (Dkt. No. 261, Exhibit 17) ("M+C organizations must submit delete records when an erroneous diagnosis cluster has been accepted by RAPS and stored in RAS."); 2006 Risk Adjustment Data Basic Training For Medicare Advantage Organizations, Participant Guide, at § 4.16 (Dkt. No. 261, Exhibit 18) ("MA organizations must submit delete records when an erroneous diagnosis cluster has been accepted by RAPS and stored in the RAPS database."); 2008 Risk Adjustment Data Technical Assistance For Medicare Advantage Organizations Participant Guide, at § 4.16 (Dkt. No. 261, Exhibit 19) (same). The foregoing Participant Guides and Manual Section are only examples; they do not come close to representing the full extent of the information and guidance publicly-issued by the government since the inception of the MA Program.

CMS has also published extensive information on the system it uses to process MAO-submitted diagnosis codes and issue risk adjusted payments. *See,*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

46

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

1   *e.g.,* 2008 Risk Adjustment Data Technical Assistance For Medicare Advantage

2   Organizations Participant Guide (Dkt. No. 261, Exhibit 19), Module 2 - "Risk

3   Adjustment Submission Process Overview" and Module 4 - "Data Submission";

4   EDI Agreement (Dkt. No. 34-1, Exhibit 2).  The MA payment system is inexorably

5   based on diagnosis codes submitted by Defendants.

6          Moreover, since the beginning of the MA Program, CMS has issued

7   extensive information on steps it has implemented to promote compliance with the

8   requirement that diagnoses must be substantiated by the beneficiaries' medical

9   records in order to be valid for payment purposes.  As early as 1999, CMS

10  announced that it was undertaking "payment validation activity" that was

11  "intended to improve the accuracy of the risk adjustment data . . . submitted to

12  CMS for payment."  Policy and Technical Changes to the Medicare Advantage

13  Program, 74 Fed. Reg. 54,634; 54,674 (Oct. 22, 2009).  These "risk adjustment

14  data validation (RADV) audits" sought "to confirm the presence of risk adjustment

15  conditions (that is, diagnoses [relevant to risk adjustment]) as reported by MA

16  organizations for their enrollees and confirmed via medical record documentation."

17  *Id*.  These audits were "aimed at validating that a particular Medicare beneficiary

18  indeed has the medical condition for which the MA organization has been paid."

19  75 Fed. Reg. at 19,748; *see* 42 C.F.R. § 422.310(e) (requiring insurers "to submit a

20  sample of medical records for the validation of risk adjustment data"); 2009

21  Proposed Rule, 74 Fed. Reg. at 54,674 (RADV audits are "intended to improve the

22  accuracy of the risk adjustment data . . . submitted to CMS for payment").  These

23  are precisely the types of agency documents upon which the Ninth Circuit relied in

24  the *Swoben* and *Silingo* opinions.  *See Silingo*, 904 F.3d at 672-73; *Swoben*, 848

25  F.3d at 1168- 69.

26         United fails to explain, first, how any of the foregoing regulations or

27  program material is ambiguous.  And even if there were there a live interpretative

28  issue remaining in this case, United fails to cite any legal authority for the

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
LOS ANGELES

47          JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

proposition that this Court should look to evidentiary sources that are wholly absent from the two Ninth Circuit opinions in order to resolve a legal question about Medicare Program requirements.  In short, if the Court were to conclude that an interpretative issue requires resolution, it should follow the Ninth Circuit's approach to resolving the issue.  The Ninth Circuit did not refer to testimony from agency officials to decide the appeals in either of the MA cases that came before it, or remand either case with directions for a district court do so.  This is not surprising given that under well-settled canons of statutory and regulatory interpretation, the opinions of individuals, as distinct from those formally articulated by an agency head in an official capacity, are not relevant to construing a legal term.  *See, e.g., United States v. Lachman*, 387 F.3d 42, 54 (1st Cir. 2004) (holding that any interpretive issue relating to a regulation is resolved through reference to the official public record).  "[N]on-public or informal understandings of agency officials concerning the meaning of a regulation are . . . not relevant." *Id.* Accordingly, discovery of non-public opinions of agency personnel will not be relevant or useful to the resolution of any legal issues that remain or arise in this case.

According to United, error rates in other Medicare programs are purportedly relevant to the question whether MA payment rates are "actuarially equivalent" to Medicare payments in the context of other programs.  The meaning of a statutory term, such as "actuarial equivalence," is a legal question for the court.  *See Oliver v. The Parsons Co.*, 195 F.3d 457, 463 (9th Cir. 1999) (meaning of "technical and complex" regulatory terms in FCA case "is ultimately the subject of judicial interpretation").  It will be resolved pursuant to established canons of statutory construction, not the non-public musings or opinions of agency employees.

The above points have already been stated by the government in briefs taken under submission by the District Court.  Accordingly, the United States adopts and incorporates by reference, as if fully set forth herein, the points and authorities

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

48

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

1   stated in Dkt. No. 234-1, at 6-13, 15-20; Dkt. No. 236-1, at 4-8, 16-20; Dkt. No.

2   261-1, at 7-11; Dkt. No. 272 at 3-6, 11-25; and Dkt. No. 278, at 10, 15.

3              *b.*     *The FCA and Common Law Claims*

4                  *i.*     *Objective Reasonableness and United's Scienter*

5         United also contends that documents reflecting government deliberations are

6   relevant to *Defendants'* scienter.  There is no merit to the argument that United

7   requires agency deliberations to understand whether the government's views on

8   "overpayments" are consistent or inconsistent with unspecified interpretations by

9   unidentified officials at United.  The issue of scienter in this case involves whether

10   United knew that diagnosis codes which it submitted to CMS were unsupported by

11   patient charts.  Evidence pertaining to that issue can come only from United.  None

12   of the discovery against the government will shed light on what the Defendants

13   knew about the diagnosis codes that were unsubstantiated by patient charts *that*

14   *only United had reviewed*.  To the extent that scienter focuses on United's

15   knowledge of its legal obligation to delete unsupported diagnosis codes, United's

16   privileged documents (not those of the agency) are potentially relevant.  *See, e.g.,*

17   *United States ex rel. Wright v. Agip, et al.,* No. 03-Cv-00264 at 7-9 (E.D. Tex. June

18   29, 2007) (denying motion to compel deposition of government personnel in FCA

19   case regarding their understanding of regulations, and holding that "personal

20   opinions of agency employees that were never communicated to a Defendant are

21   simply irrelevant to either issues of falsity or knowledge") (Exhibit D to Lee

22   Decl.).

23         On a related point, whether United's feigned understanding of its obligation

24   to correct known errors in its diagnosis data submissions constitutes an

25   "objectively reasonable" interpretation of law presents *an issue of law* that does not

26   warrant fact discovery.  *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281,

27   288 (D.C. Cir. 2015) ("The interpretive questions whether the term 'regular

28   commissions' is ambiguous and whether MWI's interpretation is objectively

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

49

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

reasonable are legal questions."); *accord United States ex rel. Donegan v. Anesthesia Assocs. of Kansas City, P.C.*, 833 F.3d 874, 879 (8th Cir. 2016) (meaning of medical term "is an issue of law").   Defendants' argument for discovery of agency material relating to the reasonableness of United's idiocratic, self-serving, and post-hoc interpretation of its coding obligations is founded on the proposition that federal regulations and the MA Contracts addressing that obligation are somehow ambiguous, and that United's interpretation of the purportedly ambiguous language is reasonable.   As discussed more fully in the government's motions for partial summary judgment and to dismiss Defendants' counterclaims, and as reflected in the Ninth Circuit's decisions in *Swoben* and *Silingo*, there is nothing ambiguous about the obligation to correct invalid diagnosis data, as set forth in the federal regulations and the MA Contracts. United's argument is thus legally untenable.   *See United States ex rel. Brown v. Celgene Corp.*, 226 F. Supp. 3d 1032, 1052 (C.D. Cal. 2016) ("We do not think Celgene's position was objectively reasonable at the time of the alleged violations. Then, as now, there was a CMS regulation stating that Medicare would only reimburse medically accepted uses. 42 C.F.R. § 423.100. There was no judicial authority to the contrary.").   It bears noting that a judicial assessment of whether a legal obligation allows for more than one reasonable interpretation entails looking at "the statutory [or regulatory] text and *relevant court and agency guidance . . . .*" *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 n.20 (2007) (emphasis added). Here, relevant CMS guidance only reinforces the absence of any ambiguity regarding United's obligation to correct invalid diagnosis data.   Indeed, the *Swoben* decision *expressly rejected* United's argument, made under *Safeco*, that its interpretation could be "objectively reasonable" where its obligation had been made clear.   848 F.3d at 1178 ("We again disagree.").

Even assuming that United were able to make a facially plausible argument regarding the ambiguity of its legal obligation, there would remain a *factual* issue

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

50

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

as to whether United knew that its interpretation was unreasonable.   Even an "objectively" reasonable interpretation of the law can give rise to liability if the evidence demonstrates that the defendant actually knew of, deliberately ignored, or recklessly disregarded the correct interpretation of the law.   *See Brown*, 226 F. Supp. 3d at 1052 ("Celgene makes no effort to show the absence of a material dispute as to this factual question.   This is just as well.   The record includes no fewer than four presentations in which Celgene recognized that Medicare was prohibited from reimbursing uses that were not 'medically accepted.'"); *see also United States v. Kellogg Brown & Root Services, Inc.*, 2014 WL 1282275, at *7 (C.D. Ill. Mar. 31, 2014) ("[A]n objectively reasonable interpretation may be knowingly false if the speaker is cognizant of facts that undermine the basis for that interpretation.") (citing *United States ex. rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 833 (7th Cir. 2011)).   And if a defendant has notice of the possibility that its interpretation is wrong and fails to inquire about the proper interpretation, then the defendant may be found to have acted with deliberate ignorance or reckless disregard.   *See* S. Rep. No. 99-345, at 7, reprinted in 1986 U.S.C.C.A.N. at 5272; *United States ex rel. Williams v. Renal Care Grp., Inc.*, 696 F.3d 518, 530 (6th Cir. 2012) (quoting the FCA's legislative history regarding a limited duty to inquire).

The Ninth Circuit has ruled twice on an MAO's obligation to code accurately based on patient charts.   There is no ambiguity in the regulations, manual, and guides that are expressly part of the MA Contracts with respect to this obligation.   Discovery of internal, non-public, agency material will not and cannot change this situation where this Court and the District Court are bound to follow the law of this Circuit based on the doctrine of *stare decisis*.

The above points above are also stated in Plaintiffs' briefs that are under submission with the District Court.   Accordingly, the United States adopts and incorporates by reference, as if fully set forth herein, the points and authorities

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

51                    JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

1  stated in Dkt. No. 261-1, at 11-14; and Dkt. No. 278, at 7-13.

2                 *ii.*    *Materiality*

3        United also contends that documents reflecting deliberations among agency

4  personnel are relevant to the question of materiality, but that issue too has been

5  decided as a matter of law.  Both the Ninth Circuit and Judge Fitzgerald have

6  recognized the direct link between the invalid diagnoses submitted by Defendants

7  and the risk adjusted payments by Medicare.  *Swoben*, 848 F.3d at 1167-68

8  ("diagnoses codes contribute to an enrollee's risk score, which is used to adjust a

9  base payment rate"); *Silingo* 904 F.3d at 672 ("CMS is unable to confirm

10  diagnoses before calculating capitation rates" and "[i]nstead accepts the diagnoses

11  as submitted . . .."); Order on MTD (Dkt. No. 212) at 15 ("not only do various

12  contractual and regulatory materials require Defendants to submit accurate

13  diagnostic data, but that data is central to the calculation of the amount of money

14  CMS pays to Defendants").

15        The diagnosis data United submitted to CMS is material by design.  As

16  United well knows, CMS uses an automated system (the Risk Adjustment

17  Processing System or "RAPS") to process both the codes and the deletes submitted

18  by MAOs.  There can be no plausible claim that CMS knew that any particular

19  beneficiary-specific diagnosis code submitted by United was inaccurate.  As noted

20  above, in *Silingo*, the Ninth Circuit recognized that the size and breadth of the MA

21  Program made such detailed knowledge impossible.  904 F.3d at 672.  Indeed,

22  Judge Fitzgerald explicitly ruled that CMS' continued payments to United "despite

23  generalized knowledge of 'one-way' Chart Reviews and problematic diagnosis

24  codes" is not relevant to whatever "materiality" issue there might be with respect

25  to United's obligation to delete invalid diagnoses.  Dkt. No. 212, at 21.

26        Judge Fitzgerald's explicit recognition of the appropriate scope of the

27  materiality question is consistent with a substantial body of case law and

28  legislative history.  The issue of materiality, under both the FCA's definition and

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

52

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

common law counts, in a case such as this is ultimately concerned with how a misrepresentation or omission is likely to affect the government *in the context of the relevant transaction*—which misrepresentation in this case is the code submitted as the claim for a risk-adjusted payment based on the medical condition of the beneficiary to whom the diagnosis purportedly applies.  Since 2009, the FCA has defined the term "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).  This codified the longstanding and preexisting common law meaning of "material."  *See United Health Services, Inc. v. United States*, 136 S. Ct. 1989, 2002 (2016) ("*Escobar*") (citing *Neder v. United States*, 527 U.S. 1, 16 (1999); *Kungys v. United States*, 485 U.S. 759, 770 (1988) (illustrating "materiality" requirement equivalent to the FCA's); S. Rep. No. 111-10, at 12 & n.6 (2009) (FCA codified the "materiality" definition from *Neder*, which had applied the definition in *Kungys*); *Marsteller ex rel. United States v. Tilton*, 880 F.3d 1302, 1313 (11th Cir. 2018) (explaining that the statutory definition of materiality has common law antecedents).  Thus, the materiality inquiry here will focus on contemporaneous evidence bearing upon the claim transaction.  In this case, that process is an automated code-based transaction during which CMS does not and cannot verify that a code submitted by an MAO is valid.  Indeed, this is precisely why the MA Program explicitly imposes accuracy and integrity requirements on the participants.  *See Swoben*, 848 F.3d at 1168-69; *Silingo*, 904 F.3d at 672-73.

In discussing materiality, the Supreme Court relied heavily on how various common law and other authorities have traditionally understood materiality requirements.  *See Escobar*, 136 S. Ct. at 2002-03.  Those same authorities make clear that the key question is how the government would have acted at the time of the transaction induced by the misrepresentation or omission—such as paying the specific claim in a case of billing fraud.  The Restatement (Second) of Torts, for

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

example, clarifies that materiality looks at a representation's importance when the recipient is "determining his choice of action *in the transaction in question.*" Restatement (Second) of Torts § 538(2)(a) (emphasis added). Williston on Contracts is to the same effect. *See* 26 R. Lord, Williston on Contracts § 69:12 (explaining that "a misrepresentation is material if it concerns a matter to which a reasonable person would attach importance in determining his or her choice of action *with respect to the transaction involved*") (emphasis added). And in *Kungys* (a case using a definition of materiality that applies to the FCA, as noted above), the Supreme Court examined whether a particular misrepresentation had a natural tendency to influence the specific transaction at issue. 485 U.S. at 771-72.

Furthermore, *Escobar* approvingly cited *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943), in which companies had fraudulently induced government entities to enter into contracts with them. Importantly, *Escobar* stated that fraud is material because "government money would never have been placed in the joint fund for payment" had the government known the truth. 136 S. Ct. at 2003 (quoting *Marcus*, 317 U.S. at 543). That description of *Hess* confirms that materiality is determined as of the time of the initial transaction in question, and makes clear that extraneous events are not dispositive on this point. *See also Marsteller*, 880 F.3d at 1313. In considering an FCA claim about misleading payment requests, the Eleventh Circuit understood *Escobar* to require an inquiry into "whether the Government would have attached importance to the violation in determining *whether to pay the claim*." *Id.* (emphasis added).

Legislative history further demonstrates that materiality is judged with respect to the specific transaction at issue. The Senate Report accompanying the 2009 FCA amendments specifically indicated that Congress was codifying the materiality definition used in certain prior cases, including *United States v. Bourseau*, 531 F.3d 1159, 1171 (9th Cir. 2008); *United States ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1204 (10th Cir. 2006); *United States ex rel. A+*

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

54                JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

*Homecare, Inc. v. Medshares Mgmt. Group, Inc.*, 400 F.3d 428, 446 (6th Cir. 2005); and *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 916-17 (4th Cir. 2003).   *See* S. Rep. No. 111-10 at 12 & n.6.   All four of those cases explained that materiality depends upon the actual or likely effect of misrepresentations or omissions in the context of the transaction in which they were made.

Without any plausible potential that discovery on this point will yield relevant information on materiality, there is no basis for the compelled production of privileged, or non-privileged, documents.   Some, but not all, of the above points and authorities are stated in Plaintiffs' briefs that are under submission with the District Court.   Accordingly, the United States adopts and incorporates by reference, as if fully set forth herein, the points and authorities stated in Dkt. No. 261-1, at 8-11.

       *iii.    Government's Purported Knowledge of United's Chart Review Program Does not Estop the Government From Recovering for Violations of the MA Regulations and Contracts Under the FCA or Common Law Counts*

As noted in the previous section, United cannot contend that CMS had information upon which it could determine that any particular Medicare beneficiary's medical record did not support that he or she had the medical condition associated with the diagnostic code submitted by United at the time its claims for risk-adjusted payments were being processed -- which is the issue at the heart of both the FCA and common law counts in this case.   Rather, Defendants contend that if "the government was aware that United conducted one-way chart reviews or that other plans did the same, but continued to pay and contract with United or those other MA plans, that would tend to undermine any claim by the government that it paid United under a mistaken understanding of applicable circumstances."   This contention mischaracterizes the claims actually asserted by

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

55

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

1   the government in this case, is legally wrong in any event, and has already been
2   rejected by the District Court. *See* Order on MTD (Dkt. No. 212) at 21
3   ("generalized knowledge of Defendants' 'one-way' Chart Reviews and
4   problematic diagnosis codes . . . does not amount to actual knowledge of specific
5   invalid diagnoses" and "[w]ithout such knowledge, CMS could not know how it
6   should change the risk-adjusted payments.").

7       As reflected in Judge Fitzgerald's Order on United's motion to dismiss, the
8   code-based causes of action pled, under both the FCA and common law, focus on
9   the claims for risk-adjusted payments for medical conditions which United, via its
10  chart reviews, had determined were unsupported by the beneficiaries' medical
11  charts. Accordingly, the government's claims are highly particularized in that, not
12  only are they beneficiary-specific, but diagnosis-specific. The mistake from which
13  the inflated risk-adjusted payment resulted was the payment system's assumption
14  that a diagnosis code reported by United for a given beneficiary was actually
15  supported by a medical record. The damages asserted in this case are consistent
16  with the claims that have been pled. By both the FCA and common law counts,
17  the government seeks to recover the amount of the enhanced, risk-adjusted portion
18  of the Medicare payment attributable to the false diagnostic code for an individual
19  beneficiary which United submitted or failed to correct.

20      United's arguments conflate the distinct types of claims that can be subject
21  to FCA liability. This case involves what the Ninth Circuit has characterized as a
22  "factually false claim," which is defined as "one in which the claim for payment is
23  itself literally false or fraudulent." *Silingo,* 904 F.3d at 675. By contrast, a
24  "legally false claim" is one involving a false certification of compliance with a
25  program or contractual requirement. *Id.* In the case of a factually false claim, the
26  focus, as it should be in this case, is on the claim itself – and particularly on
27  whether the claim contains "an incorrect description of goods or services provided
28  or a request for goods or services never provided." *Id.* The relevancy arguments

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

56                    JOINT STIPULATION REGARDING UNITED'S
                     MOTION FOR ORDER COMPELLING THE UNITED
                     STATES TO PRODUCE DOCUMENTS

advanced by United in the motion to compel, at base, are premised on the unstated, but incorrect, idea that the government is contending that all of United's claims are legally false – that the government's claims are predicated on United having implemented, at an administrative level, a chart review program that only "looked one way" and that United thereby was in violation of the regulatory and contractual requirement that it have an effective compliance program.

Whatever hypothetical merit there might be to such a contention based on United's conduct, it is *not* the liability theory pled in the case – as interpreted by the District Court. Here, the allegation is that United's separate claims to Medicare were factually false because, for the particular claims, a beneficiary medical record did not support a diagnosis code submitted by United as the claim for risk-adjusted payment. Accordingly, the evidentiary focus is properly on the factual falsity of those individual, beneficiary-specific, claims – not on whether United was violating, as a matter of corporate policy, the legal requirement that it have an effective compliance program that should have "looked both ways."

United has not and cannot plausibly contend that discovery of internal, deliberative communications within CMS has any potential to reveal that CMS had information from beneficiary medical charts and could have determined that any particular code for any one of the millions of MA claims submitted by United was unsupported by the beneficiary's chart – i.e. precisely the type of claim-specific information that United was, in fact, developing via its chart review program. The only way for CMS to have had such information is if United had provided it – and it does not claim to have done so. Accordingly, United does not and cannot contend that CMS had beneficiary-specific information about the medical conditions actually supported by the medical charts as CMS or its contractors were processing Defendants' risk-adjusted claims – which is the pertinent question in a case which involves allegations that United submitted, or failed to correct, *factually false* claims.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

57                    JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

The same principle applies with respect to the common law claims in this case. United's arguments, as they pertain to the common law claims, are premised on contentions and damages that have not actually been asserted in this case. Although the government concedes that evidence showing that United violated – on an across-the-board scale and pursuant to corporate policy – critical regulatory and contractual obligations to implement genuine compliance programs and to submit only accurate diagnostic information could implicate the question of whether United was entitled to *any* payment under its MA Contracts or whether it should be debarred from contracts with Medicare, such questions are *not* presented by this case nor are the damages asserted by the government so extensive. In short, the government in this case is not seeking to recover *all* Part C and D payments to United, or even *all* risk-adjusted payments to United. Yet, United's arguments in the motion to compel are premised on the contention that the government should have used developing information about corporate-level compliance lapses to either outright suspend payment to United, and to do so without any claim-specific information or, essentially, debar the company from further participation in the MA Program (although, granted, United has not been clear whether the government should have suspended all MA payments for all beneficiaries enrolled with United, or just all payments for claims subject to risk adjustment based on diagnosis coding).

The government's FCA and common law counts are specific to unsupported diagnostic codes submitted for beneficiaries whose medical records were reviewed by United. The basis for the mistaken payments which are the subject of this case involves whether the beneficiaries' medical records support that they have the reported medical conditions, not the contours of United's various chart review programs. United has not and cannot contend that it ever provided CMS with beneficiary- and claim-specific information that would have made the government aware of the type of payment mistakes which are the subject of the common law

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

1   claims in this case.

2   Moreover, United's contentions regarding the common law claims are
3   fundamentally unsound.  By the common law (and FCA) counts, the government is
4   seeking to enforce the most fundamental component of the MA Program's risk-
5   adjusted payment structure – the requirement of accurate diagnostic coding by the
6   MAOs.  As demonstrated in the motions that were heard by the District Court on
7   September 17, the government is enforcing clearly-established program
8   requirements applicable to all MAOs.  There is no basis in logic or the law for this
9   Court to hold that the government is estopped from enforcing, just against United,
10  program-wide legal requirements via common law claims that seek to recover
11  erroneous payments based on United's non-compliance.  In any federal program,
12  when an agency learns of possible regulatory or contractual violations by an entity
13  submitting claims for federal funds, the government is not forced, at that point, to
14  make the choice that it either must take the draconian step of suspending all
15  payments to the claimant or, if it refrains from doing so, accept that it may be
16  estopped from using common law causes of action to recoup overpayments
17  attributable to individual claims that contained inaccurate coding.  Certainly,
18  United has cited no legal authority for the novel proposition that by permitting
19  continued participation by a recalcitrant Medicare participant and continuing to
20  pay other claims arising from the ongoing provision of healthcare coverage to an
21  aged and vulnerable beneficiary population, the government may be estopped from
22  recovering particular amounts paid to an MAO on the mistaken assumption that the
23  beneficiary's medical record documentation substantiated that he or she had the
24  medical condition being claimed.  *Accord,* Order on MTD (Dkt. No. 212) at 21.

25  As explained more fully in the briefs filed in support of Plaintiffs' motion to
26  strike Defendants' affirmative defenses, estoppel against the government does not
27  follow from the type of agency acquiescence or inaction referenced in United's
28  motion to compel and the evidence sought by United cannot be used to defeat the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

59

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

government's attempt to recover public funds as a matter of law. Accordingly, the United States adopts and incorporates by reference, as if fully set forth herein, the points and authorities set out in Dkt. No. 235-1, at 5-13, 16-18; Dkt. No. 271, at 1-13, 16-20. The Court's attention is particularly directed to the section of Plaintiff's reply brief which explains that a ruling on the motion to strike affirmative defenses, particularly the government knowledge and estoppel defenses, "will enable the Magistrate Judge to evaluate the relevance of discovery that Defendants' seek in light of . . . limiting principles . . . ." Dkt. No. 271, at 18-19.

### 4.     *The Deliberative Process Privilege Shields the Material Sought by United from Discovery in This Case*

#### a.     *The United States Has Properly Invoked the Deliberative Process Privilege*

Even if the circumstances in this case did not warrant the exercise of prudence by awaiting the Court's rulings on the four motions now pending before the Court, and even if United could establish the relevancy of the vast quantity of internal agency documents it seeks, United's motion must nevertheless fail because the government has properly invoked the deliberative process privilege in this case.

It is well-established that the deliberative process privilege is a long-standing privilege designed to protect predecisional agency deliberations from public scrutiny. *Hongsermeier v. C.I.R.*, 621 F.3d 890, 904 (9th Cir. 2010). "It was developed to promote frank and independent discussion among those responsible for making government decisions" and "to protect against premature disclosure of proposed agency policies or decisions." *F.T.C. v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984) (internal citations omitted). The privilege shields from disclosure intra-agency communications that are both "predecisional" and "deliberative" to "allow agencies freely to explore possibilities, engage in internal debates, or play devil's advocate without fear of public scrutiny." *Lahr v. National Transp. Safety Bd.*, 569 F.3d 964, 979 (9th Cir.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

60                    JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

1  2009) (internal quotation marks omitted); *see also Carter v. U.S. Dep't of*

2  *Commerce*, 307 F.3d 1084, 1089-90 (9th Cir. 2002) (both predecisional and

3  deliberative).

4  "Predecisional" documents include "recommendations, draft documents,

5  proposals, suggestions, and other subjective documents which reflect the personal

6  opinions of the writer rather than the policy of the agency." *Lahr,* 569 F.3d at 979

7  (internal quotation marks omitted); *see also Carter*, 307 F.3d at 1089-90

8  (predecisional if "prepared in order to assist an agency decisionmaker in arriving at

9  his decision"). A document is part of the "deliberative process" if the disclosure of

10  the materials "would expose an agency's decisionmaking process in such a way as

11  to discourage candid discussion within the agency and thereby undermine the

12  agency's ability to perform its functions." *Lahr*, 569 F.3d at 979-80 (internal

13  quotation marks omitted); *see also Carter*, 307 F.3d at 1089-90 (deliberative if

14  release would "expose an agency's decision-making process in such a way as to

15  discourage candid discussion within the agency and thereby undermine the

16  agency's ability to perform its functions") (internal citations omitted).[12]

17  Although "facts and evidence" are generally not protected by the

18  deliberative process privilege, *Warner Commc'ns Inc*., 742 F.2d at 1161; *see also*

19  *Enviro Tech Int'l, Inc. v. U.S. E.P.A*., 371 F.3d 370, 374-75 (7th Cir. 2004)

20

---

21  [12] Contrary to United's assertion, the distinction between whether the nature of

22  materials is factual or opinion is not dispositive of whether material is deliberative.
    *See Nat. Wildlife Fed'n v. U.S. Forest Serv.,* 861 F.2d 1114, 1118-19 (9th Cir.

23  1988) (holding that opinions or recommendations regarding facts or consequences
    of facts are not automatically ineligible from protection; courts have interpreted the

24  exemption "to protect documents that would reveal the process by which agency
    officials make these determinations, whether or not the documents themselves

25  contain facts or non-binding recommendations regarding law or policy") (emphasis
    in original). And contrary to UnitedHealth's assertion, the adoption of a policy by

26  an agency does not remove privilege protection over pre-decisional deliberations.
    *See Fed. Open Mkt. Comm. of the Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 360

27  (1979) (documents protected by "the privilege for predecisional deliberations . . .
    remain privileged even after the decision to which they pertain may have been

28  effected, since disclosure at any time could inhibit the free flow of advice,
    including analysis, reports, and expression of opinion within the agency.").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

61

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

1   ("deliberative process privilege typically does not justify the withholding of purely

2   factual material, nor of documents reflecting an agency's final policy decisions, but

3   it does apply to predecisional policy discussions, and to factual matters

4   inextricably intertwined with such discussions") (internal citations omitted), factual

5   material that "is so interwoven with the deliberative material that it is not

6   severable" may be encompassed by the privilege, *United States v. Fernandez*, 231

7   F.3d 1240, 1247 (9th Cir. 2000).

8       To properly invoke the privilege, a party must simply (i) "make the claim

9   expressly" and (ii) "describe the nature of the documents . . . not produced . . . in a

10  manner that, without revealing information itself privileged or protected, will

11  enable other parties to assess the claim."   Fed. R. Civ. P. 26(b)(5)(A).   The

12  Advisory Committee Notes particularly explain that a document-level privilege log

13  is not required when preparing such a log may be burdensome based on the volume

14  of material involved.  *See* Fed. R. Civ. P. 26 advisory committee's note to 1993

15  amendment; *see also* 8 Charles Alan Wright & Arthur R. Miller, *Federal Practice*

16  *and Procedure* § 2016.1 (3d ed. April 2018) ("The basic objective [of the rule] is a

17  sufficient description of the matters withheld to satisfy the needs of the case; rigid

18  insistence on certain logging or indexing procedures may go well beyond that,

19  particularly in larger cases.").

20      Rule 26 thus does not set out an express requirement that a party invoke any

21  privilege on a document-by-document basis.   Rather, courts in this circuit and

22  others consistently take a practical approach when construing the obligations

23  imposed on a party with respect to perfection of a privilege claim.  *See Burlington*

24  *N., 408 F.3d at 1149* (when assessing privilege assertions, a district court should

25  apply a "holistic reasonableness analysis" which takes into account: any discovery

26  or protective orders; the magnitude of the document production; other

27  circumstances of the litigation that make responding to discovery unusually easy or

28  unusually hard; the degree to which the objections or assertions allows a litigant

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

1    and court to evaluate privilege; and the timeliness of the objection and information

2    about withheld documents); *United States ex rel. Humane Soc'y of the U.S. v.*

3    *Westland/Hallmark Meat Co.*, 2012 WL 12886501, at *6 (C.D. Cal. Sept. 26,

4    2012) (holding that the government had "properly invoked the deliberative process

5    privilege as to categories of documents."); *SEC v. Thrasher,* 1996 WL 125661, at

6    *1 (S.D.N.Y. Mar. 20, 1996) (rejecting the need for detailed log where material at

7    issue was voluminous and "a document-by-document listing would [have been] a

8    long and fairly expensive project for counsel to undertake"); *Emerson Elec. Co. v.*

9    *Ouellette,* 1998 WL 34088465, at *8 (D. N.H. May 12, 1998) ("the duty to provide

10   a description [of privileged documents] required by Rule 26(b)(5) is flexible and

11   does not arise until there is a good faith challenge to the privilege claim" at which

12   point "a statement asserting that the privilege protects various categories of

13   documents will satisfy Rule 26(b)(5)") (internal citations omitted).

14          Here, the government has provided three declarations, along with a revised

15   privilege log,[13] in support of its invocation of the deliberative process privilege

16   claim.  These are the Declarations of Cheri Rice, George G. Mills, and Patrick J.

17   Cogley.  Ms. Rice is a Deputy Director for the Centers for Medicare and Medicaid

18   Services, with responsibility for Part C Medicare Advantage and Part D Medicare

19   Prescription Drug Plans.  Rice Decl., ¶ 2.  Ms. Rice manages several groups,

20   including the Medicare Plan Payment Group, which is responsible for developing

21   and implementing bidding and payment policies, although she is not responsible

22   for the Center for Program Integrity ("CPI").  *Id.*, ¶¶ 4 & 7.  In that capacity, Ms.

23   Rice oversaw the review by CMS employees and contractors of the documents

24   subject to the deliberative process privilege.  *Id.*, ¶ 10.  Although she herself did

25

26   ───────────────

27   [13] Consistent with this Court's encouragement that the parties "consider whether,
     fairly and objectively, there is a core set of documents that the Government will
     have to produce," Mem. Decision and Order, filed Oct. 23, 2018 (Dkt. No. 304) at

28   21, the government has continued to review its documents and determined that
     additional documents can be disclosed to United.  *See* footnote 8 above.

not personally review all of the documents, she consulted with personnel who conducted or supervised the review and personally reviewed all of the documents described in her declaration.  *Id.*, ¶¶ 9, 10.  Based on her review and consultation, Ms. Rice asserts the deliberative process privilege as to all CMS documents, except CPI documents, explains why various categories of such documents are predecisional and deliberative, and specifies the harm that would result from their disclosure.  In doing so, Ms. Rice describes the nature of both the MA rulemaking process and MA sub-regulatory process, breaks down the documents into the following categories, and explains the predecisional and deliberative nature of these documents:  (i) Emails; (ii) Handwritten Notes; (iii) Issue or Options Papers; (iv) Research Data and Analysis; (v) Briefing Documents; (vi) Talking Points; (vii) Drafts of Rulemaking Documents; (viii) Reviews of Comments on Proposed Rules and Proposed Responses; (ix) Draft Letters; (x) Press Releases; (xi) Questions and Answers for the CMS Office of Communications; (xii) Drafts of Subregulatory Guidance Documents; and (xiii) Reviews of Comments on Policy White Papers Released on the CMS Website.[14]

Mr. Mills is the Deputy Center Director for CPI.  Mills Decl., ¶ 2.  In this capacity, Mr. Mills has responsibilities for leading CPI's program integrity efforts for Medicare Part C, including oversight of the staff that develops policies for and manages much of the operations for the contract-level RADV audits and the study and analysis of whether to apply a FFS Adjuster to extrapolated RADV audit results.  *Id.*, ¶¶ 5, 8.  Mr. Mills oversaw the review of documents falling within CPI's responsibility.  *Id.*, ¶¶ 10, 11.  Although Mr. Mills himself did not personally review all of these documents, he supervised the staff and contract personnel responsible for this review, consulted with them, and personally reviewed all of the

---

[14] Ms. Rice's declaration, as well as that of the other declarants, describes several specific examples of documents that are identified by bates numbers.  These specific documents are in turn indicated by arrows in the margins of the privilege log that is attached as Exhibit A to the Lee Declaration.

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

documents described in his declaration.  *Id.*, ¶¶ 12, 13.  Based on his review and consultation, Mr. Mills asserts the deliberative process privilege as to the RADV and FFS Adjuster documents asserted to be privileged and explains that they are predecisional and deliberative.  *Id.*, ¶¶ 14, 15.  Mr. Mills further breaks down the documents into the following categories, explains in detail why they are predecisional and deliberative, and specifies the harm that would result from their disclosure:  (i) Emails; (ii) Presentations; (iii) RTI Contractor Work Plan; (iv) Handwritten Notes; (v) Spreadsheets Prepared for Internal Use by CMS Personnel; (vi) Talking Points; (vii) Options Papers; (viii) Issue Papers; (ix) Draft Sampling Specifications; and (x) Questions Posed to CMS by the Office of Management and Budget.  *Id.*, ¶¶ 22-26.

Mr. Cogley is a Regional Inspector General for the Office of Audit Services ("OAS") in the Office of Inspector General for the Department of Health and Human Services.  Cogley Decl., ¶ 2.  Mr. Cogley's responsibilities include producing written reports, planning and directing audit work, and ensuring that the work is performed according to professional standards.  *Id.*, ¶ 9.  Mr. Cogley describes the various auditing phases, including the Survey Phase, Data Collecting and Analysis Phase, and Drafting Phase.  *Id.*, ¶¶ 16-19.  Based on his personal review of the audit documents and discussions with agency personnel, Mr. Cogley asserts the deliberative process privilege as to these documents, explaining why they are predecisional and deliberative, and specifying the harm that would result from their disclosure.  *Id.*, ¶¶ 22-35.

Accordingly, the government has sufficiently asserted and shown the applicability of the deliberative process privilege as to the disputed documents.

> b. *United's Need for the Materials Does Not Outweigh the Government's Interest*

Moreover, United improperly exaggerates its purported need for the requested documents, which does not outweigh the government's legitimate

interest in protecting its long-standing privilege as to its internal deliberative material. While the deliberative process privilege is a qualified one and the privilege may be outweighed in some special circumstances, a litigant may obtain deliberative materials only if his or her "need for the materials and the need for accurate fact-finding override the government's interest in non-disclosure." *Warner Commc'ns Inc.*, 742 F.2d at 1161. "Among the factors to be considered in making this determination are: 1) the relevance of the evidence; 2) the availability of other evidence; 3) the government's role in the litigation; and 4) the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions." *Id.* "'Other factors that a court may consider include: (1) the interest of the litigant, and ultimately society, in accurate judicial fact finding, (2) the seriousness of the litigation and the issues involved, (3) the presence of issues concerning alleged governmental misconduct, and (4) the federal interest in the enforcement of federal law.'" *Desert Survivors v. US Dep't of the Interior*, 231 F. Supp. 3d 368, 380 (N.D. Cal. 2017) (quoting *N. Pacifica, LLC v. City of Pacifica*, 274 F. Supp. 2d 1118, 1122 (N.D. Cal. 2003)). Consideration of these factors shows that United's need does not override the government's interest in maintaining the deliberative process privilege.

At the outset, as shown above, United wholly fails to demonstrate any genuine relevancy of the documents it seeks. Rather, United seeks to turn this FCA case on its head and seek internal deliberations of CMS and thereby shift focus from its own fraudulent conduct in failing to delete diagnoses codes it knew were unsupported by medical records and thereby avoid the return of billions of dollars in unwarranted Medicare payments. However, it cannot show any real relevancy of the internal deliberation documents.[15] It can only attempt to do so by

---

[15] Indeed, United even seeks deliberative documents from the HHS Office of Inspector General ("HHS-OIG"). Section 9(a)(2) of the Inspector General Act prohibits the HHS-OIG from involving itself in programmatic issues. United does

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

66

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

seeking to advance a tortured understanding of the concept of "objective reasonableness" that has been rejected not only by the *Safeco* case itself but also numerous FCA cases that have followed it.  United also improperly advances unsupportable notions of materiality that have no place in this case.  In addition, United misconstrues the nature of the government's common law claims for payment by mistake and unjust enrichment by ignoring that, because it never deleted countless diagnosis codes it knew were unsupported by the medical records, no government official knew or could have known any facts that would have any bearing on these common law claims.

Further, there is other much more relevant evidence in this case, including within United's own possession, custody, and control.  This evidence includes internal communications of its management personnel regarding United's decision not to delete unsupported codes, as well as evidence in the hands of third parties and other persons whom United enlisted to assist in its long-standing chart review and other programs designed to pad its Medicare payments.

And while the government is necessarily a party in this case to recoup the billions of dollars improperly retained by United, as testified by Ms. Rice, Mr. Mills, and Mr. Cogley, significant harm would result from the improper dissemination of privileged documents and have a lasting chilling effect on important internal deliberations that are needed for the efficient administration of the MA Program.

Additionally, while there is and can be no suggestion of any government misconduct in this case, there are serious allegations of long-lasting and consequential fraudulent conduct on the part of United and its senior management, encompassing a number of years, in improperly obtaining and retaining billions of dollars in public funds to which United was never entitled.

---

not, and cannot, show that HHS-OIG deliberations are at all relevant to the claims and defenses at issue.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

67

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

1  Finally, the United States, the public, and this Court all have a vested
2 interest in the meaningful enforcement of the FCA and other laws seeking to curb
3 gross fraudulent conduct amongst MAOs that deprive the public of billions of
4 dollars in needed Medicare funds.   Particularly in light of United's improper
5 attempt to burden the government with onerous document requests seeking internal
6 deliberative material after having been caught defrauding the government for
7 years, this interest in meaningful FCA enforcement should be weighed heavily in
8 assessing the deliberative process privilege.

9 **III.**  **PROPOSED RESOLUTION/CONCLUSION**

10   **A.**  **United**

11  The Court should compel the production of all approximately 21,400
12 documents that the government is withholding solely on the basis of the
13 deliberative process privilege.   The government's basic privilege log descriptions
14 are plainly deficient and fail to demonstrate how any document is both
15 predecisional and deliberative.   The agency declaration described by the
16 government does not cure these deficiencies.   The government has had months to
17 rectify these fundamental defects but has failed to do so.   And now, the
18 government has outright refused to honor its commitment to provide an agency
19 declaration by the end of September.

20  Furthermore, even if the government had met its burden of establishing the
21 applicability of the deliberative process privilege, United's need for these vital
22 documents outweighs any interest the government might have in non-disclosure.
23 The government's inappropriately expansive view of the deliberative process
24 privilege stems from its desire to prevent United from obtaining discovery that is
25 critical to the claims and defenses in this case—including the government's only
26 remaining False Claims Act count, its common law claims, and potential damages.
27 The government is the sole custodian of this evidence.  Having chosen to bring a
28 case of this magnitude and to place these purportedly deliberative materials

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

68

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

1  directly at issue, the government cannot now hide behind a narrow, qualified

2  privilege to prevent United from obtaining materials it needs to fully defend itself.

3  **B.     Government**

4  United's motion to compel is ill-considered and ill-timed.  Prudence dictates

5  that this Court await substantive rulings on the four motions that have been briefed,

6  heard, and now await rulings.  Particularly given the overbreadth of United's

7  voluminous requests, the doubtful relevancy of the documents it seeks, and the

8  genuine harm to the internal deliberation process that production would inflict on

9  the government, a reasonable approach at this stage would be to permit Judge

10  Fitzgerald to make substantive rulings that would provide much needed guidance

11  in this case.  Additionally, the government has properly invoked the deliberative

12  process privilege as to a narrow category of documents, establishing by appropriate

13  declarations that they are both predecisonal and deliberative and that harm would

14  result from their disclosure.  Finally, United has failed to show that its purported

15  need for these documents outweighs the government's interest in maintaining

16  privilege.  For the foregoing reasons, United's motion should be denied.

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

69

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

**IT IS SO STIPULATED.**

Dated:  November 9, 2018          LATHAM & WATKINS LLP


                                 By:  /s/ David J. Schindler
                                      David J. Schindler

                                 Attorneys for Defendant
                                 United Defendants


Dated:  November 9, 2018          United States of America


                                 By:  /s/ John E. Lee
                                      John E. Lee

                                 Assistant United States Attorney
                                 Attorneys for the United States of America

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

70

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FILER'S ATTESTATION**

Pursuant to Civil Local Rule 5-4.3.4(a)(2)(i), the undersigned attests that concurrence in the filing of this document was obtained from all parties whose electronic signatures appear above.

Dated:  November 9, 2018          LATHAM & WATKINS LLP


By:  /s/ David J. Schindler
      David J. Schindler

      Attorneys for Defendant
      United Defendants

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

71

JOINT STIPULATION REGARDING UNITED'S
MOTION FOR ORDER COMPELLING THE UNITED
STATES TO PRODUCE DOCUMENTS