JOSEPH H. HUNT
Assistant Attorney General, Civil Division
NICOLA T. HANNA
United States Attorney
DAVID M. HARRIS
DAVID K. BARRETT
ABRAHAM C. MELTZER
JOHN E. LEE (CBN 128696)
Assistant United States Attorneys
    300 N. Los Angeles Street, Room 7516
    Los Angeles, California 90012
    Tel: (213) 894-3995; Fax: (213) 894-7819
    Email: john.lee2@usdoj.gov
MICHAEL D. GRANSTON
DANIEL R. ANDERSON
EDWARD C. CROOKE
CAROL L. WALLACK
JUSTIN DRAYCOTT
PAUL G. FREEBORNE
JESSICA E. KRIEG
ZOILA E. HINSON
AMY L. LIKOFF
ADAM R. TAROSKY
Attorneys, Civil Division, U.S. Department of Justice
    P.O. Box 261, Ben Franklin Station
    Washington, D.C. 20044
    Tel: (202) 307-0486; Fax: (202) 307-3852
    Email:  carol.wallack@usdoj.gov
JAMES P. KENNEDY, JR.
United States Attorney
KATHLEEN ANN LYNCH
Assistant United States Attorney (Admitted PHV)
    138 Delaware Avenue
    Buffalo, New York 14201
    Tel: (716) 843-5830; Fax: (716) 551-3052
    Email: kathleen.lynch@usdoj.gov
Attorneys for the United States of America

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel*. BENJAMIN POEHLING,<br><br>    Plaintiffs,<br><br>    v.<br><br>UNITEDHEALTH GROUP, INC., *et al.*,<br><br>    Defendants. | No. CV 16-08697 MWF (SSx)<br><br>DECLARATION OF CHERI RICE |

## DECLARATION OF CHERI RICE

I, Cheri Rice, declare and state as follows:

1.      My name is Cheri Rice. I am over 21 years of age, and I am competent to make this declaration. My statements in this declaration are based on information personally known to me or conveyed to me by my staff, agency contractors working with my staff who have reviewed the information described in subsequent paragraphs of this declaration, and the Office of Acquisition and Grants Management (OAGM) employees working with my staff who reviewed a subset of the withheld documents that contain potentially acquisition-related materials.

2.      I am a Deputy Director for the Center for Medicare of the Centers for Medicare and Medicaid Services ("CMS"), an agency of the United States Department of Health and Human Services. As Deputy Director, I have responsibility for the Part C Medicare Advantage ("MA") and Part D Medicare Prescription Drug Programs. This includes oversight responsibility, operations, and policy development for the MA and Part D plans that provide coverage to over 40 million Medicare beneficiaries. I have been employed with CMS for approximately 14 years and am familiar with CMS's records relating to Parts C and D of the Medicare Program.

3.      As the Deputy Director of the Center for Medicare ("CM"), I am knowledgeable about the topics pertaining to Part C and Part D policies and operations, including risk adjustment models and other MA payment policies.

4.      The CM side of the house that I manage, which is responsible for Part C, Part D, and other Medicare private health plan policy and operations, has five groups, including the Medicare Plan Payment Group (MPPG).  MPPG is responsible for developing and implementing bidding and payment policies for the Medicare Advantage (MA) and Part D programs, in addition to developing and managing Part C and D payment operations.  The MPPG Director and Deputy Director report to me.  There are 6 divisions within MPPG/CM: the Divisions of Payment Policy, Payment Systems,

Payment Operations, Encounter Data and Risk Adjustment Operations, Payment
Reconciliation, and Payment Validation.  As Deputy Director of CM, I am not
responsible for activities and programs of CMS's Center for Program Integrity.

5.     The six divisions within MPPG manage, with contractor assistance, the
daily payment-related operations of the MA program, the Part D prescription drug
program, and the Retiree Drug Subsidy program. In addition, MPPG develops all
payment policies for these programs, manages all risk-adjustment related projects for
Part C and Part D, and develops the methodologies for and manages implementation of
Part C and Part D payment error estimation reporting to OMB.  Finally, MPPG develops
and manages a number of payment-related systems, including but not limited to the Risk
Adjustment Processing System (intakes one type of diagnosis data for MA payment), the
Encounter Data Processing System (intakes encounter data for MA payment), and the
Medicare Advantage and Prescription Drug (MARx) system (generates monthly
payments to MA organizations and Part D sponsors of over $300 billion a year).

**ASSERTION OF THE DELIBERATIVE PROCESS PRIVILEGE**

6.     I am informed that defendants have issued 107 Requests for Production that
in sum ask CMS to produce documents related to all aspects of the Medicare Advantage
Program reaching back over more than a decade, and in some cases twenty years.

7.     I am informed that documents in the possession of CMS are subject to a
Motion to Compel in the above-captioned litigation.  Specifically, defendants have
requested the production of documents from CMS identified on the United States' First
through Seventh Privilege Log as withheld pursuant to the deliberative process privilege
(DPP).   With the submission of this declaration, Exhibit A includes those documents
which have been determined to be privileged.[1]  Concurrent with my submission of this
declaration, George Mills, the Deputy Center Director, Center for Program Integrity, is
submitting a declaration related to the categories of documents covered by Risk

---

[1] The United States has re-issued the Privilege Logs concurrently with serving
these declarations.  Some documents have been put in updated categories.

Adjustment Data Validation (RADV) audits and methodology and the Fee for Service Adjuster (FFSA) subjects on Exhibit A.  The rest of the categories of issues and the types of documents on Exhibit A fall within subject matter areas for which I am responsible.

8.      I am informed that documents from 64 of the custodians contained on the Privilege Logs include employees within the Center for Medicare.  The Center for Medicare (CM) has two deputy directors:  one for the FFS program, the other for the Medicare private health plan programs including the MA program.  I am the Deputy Director for the private health plan side of CM.  I report to the CM Director, who in turn reports to the CMS Administrator.

9.      Because of the large volume of documents contained in Exhibit A and given my other work responsibilities described above, I did not personally have the time available to review on a document-by-document basis each document on Exhibit A related to the subject areas for which I am responsible.  Based on my experience and training within the agency, I am familiar with the categories of issues that were the subject of agency deliberations related to the Medicare Advantage program and the types of documents within those categories that would reflect those deliberations.  I have personally reviewed all of the documents specifically identified as examples in this declaration, however there may be additional types of documents on Exhibit A that are not included in this declaration.

10.     I have also discussed the categories of issues and the types of documents on Exhibit A which fall within the subject areas for which I am responsible with agency personnel who are familiar with these categories of documents and who have reviewed certain of the documents on the privilege log and identified the applicable ones as deliberative. Because of the large volume of documents requiring agency resources for review, a majority of drafts were not reviewed and are deliberative and pre-decisional in that they represent the personal opinion of the author and may not yet or ever have been adopted as the final position of the agency.  I am informed that either agency staff or

agency contractors have performed a review of each of the non-draft[2] documents on the privilege log and determined them to be deliberative. I am informed that agency contractors performed a review of the non-draft documents identified on the privilege logs and identified certain of these documents to be withheld as deliberative.   I am informed that agency staff also reviewed certain documents identified on the privilege log and determined that certain of those should be withheld as deliberative.[3]  I have personally reviewed the results of the CMS employees' and agency contractors' document review that identifies all the withheld documents as deliberative.

11.     Based on the information available to me, I believe the documents identified on Exhibit A which fall within the subject areas for which I am responsible are privileged. Thus, I am formally invoking the deliberative process privilege over the documents identified on Exhibit A which fall within the subject areas for which I am responsible.

12.     In the paragraphs below, I specify why I believe the information for which I am asserting the deliberative process privilege properly falls within the scope of that privilege. Based on the information shared with me, I have determined that the documents are pre-decisional and deliberative and disclosure will harm the agency.

---

[2] I am informed that a majority of the draft documents were first identified through an eyes on review by the Department of Justice and excluded from review at the agency's request.  The documents then subject to the agency staff or contractor review were then first filtered using email threading.  Email threading is the process of using structured analytics to identify email relationships to one another by gathering all email communications that share an electronic signature/Hash (i.e., initial email, replies, all forwards, and reply-all messages), extracting and normalizing the metadata, and grouping them together.  Then, it identifies the "most inclusive" email communications so that an email can be reviewed only when new information is present.  All end-of-chain "inclusive" emails that include any new text or attachments were reviewed, and non-inclusive emails, those with essentially duplicate content, were set aside.  Additionally, all loose or stand-alone documents on the privilege log were reviewed separately by CMS contractors or staff.

[3] I am informed that the Office of Acquisition and Grants Management reviewed a subset of documents that were identified as acquisition materials as those documents reside within their subject matter expertise.

Therefore, these documents should be withheld from disclosure. Because of the volume of documents identified on Exhibit A, I have divided the documents into general categories, which I will describe in greater detail in the ensuing paragraphs. I will also include citations to examples of documents in each category.

## CATEGORIES OF PRIVILEGED DOCUMENTS

13.    The documents on Exhibit A relate generally to the two general policy-making processes conducted for the MA program: MA rule-making and MA subregulatory guidance production.

14.    Because I am informed that the expansive documents requested in the above captioned litigation touch upon almost the entirety of the MA program, I have endeavored to give in this declaration the background of the program and describe the deliberations involved in the rulemaking and subregulatory processes.  To that end, I have organized the declaration into two sections focused on (1) the MA rulemaking process and (2) the MA subregulatory guidance production.  In each section I describe (a) the organizational process for deliberations and the clearance process and (b) the internal policy deliberations that occur.  I conclude each section with identifying relevant privileged document types, as CMS engages in policy-making deliberations when propounding MA rule-making and MA subregulatory guidance through a number of categories of documents, all internal to the government.

## I.    *Medicare Advantage (MA) Rulemaking Processes, Advance Notices, and Rate Announcements*

15.    MPPG typically produces payment-related content for a regulation on the MA program every one to three years.  In addition, in accordance with Section 1853(b)(2) of the Social Security Act (the Act), MPPG (with the Office of the Actuary) must publish annual notices on CMS' policies regarding federal payments to MA organizations and Part D sponsors, referred to here as the Advance Notice (proposals) and Rate Announcement (final policies).  A number of the documents on Exhibit A relate to MPPG's rulemaking activities, which address changes, clarifications, and/or

updates for a range of payment policies.  MPPG's rulemaking activities include the following:

- Development and implementation of the MA CMS-HCC risk adjustment (RA) model, e.g., changes to hierarchical condition categories (HCCs) and updates to the coding intensity adjuster;

- RA data submission requirements for two formats of RA data:  (1) RAPS data in abbreviated format and (2) encounter data in comprehensive format; and uses of risk adjustment data;

- Risk Adjustment Data Validation (RADV) to audit whether diagnoses submitted by MA organizations are supported by medical record documentation.  CMS conducts both national and contract-specific RA validations;[4]

- Overpayment guidance, where MA organizations delete diagnoses from CMS' systems when they determined they were submitted incorrectly, and MPPG adjusts payment accordingly; and

- Medical Loss Ratio reporting: beginning with the 2014 contract year, each year MA organizations report costs and revenue, and this ratio must be 85 percent or higher.

16.    Examples of Federal Register rules pertaining to MA payment are:

- Clarification on risk adjustment data and encounter data (73 FR 48434, August 19, 2008) and adding uses of risk adjustment data (79 FR 50324, August 22, 2014),

- Establishment of Risk Adjustment Data Validation (RADV) appeals process (75 FR 19806, April 15, 2010; 75 FR 32859, June 10, 2010; 79 FR 29956, May 23, 2014),

- Medical loss ratio requirements (78 FR 31284, May 23, 2013, 81 FR 80170,

[4] From approximately 2007 to 2017, MPPG ran the RADV audit program. From 2017 to the present CPI has run the contract-level RADV audits.

November 15, 2016)

- Proposed but not finalized provision on medical record reviews conducted by MA organizations (79 FR 1918, January 14, 2014, 79 FR 29844, May 23, 2014)

- Reporting and returning of overpayments  (79 FR 29844, May 23, 2014),

- Broaden uses and disclosures of risk adjustment and specify conditions for release of risk adjustment data (79 FR 50324, August 22, 2014).

A. **Organizational Process for Deliberation and Clearance for MA Rule-making**

17.    MPPG typically produces payment-related content for a regulation on the MA program every one to three years.  In addition, in accordance with Section 1853(b)(2) of the Social Security Act (the Act), MPPG (with the Office of the Actuary) must publish annual notices on CMS' policies regarding federal payments to MA organizations and Part D sponsors.  The deliberative and clearance processes described below are essentially the same for Federal Register rules and the annual payment notices. The process begins with MPPG, and moves 'upward' through CM to the CMS Administrator, culminating with HHS and the Office of Management and Budget (OMB).

18.    The annual payment notices and call letters inform all stakeholders in the Part C MA and Part D programs what the rules are for coverage, bidding, and payment for MA and Part D plans, and other Medicare private health plans (e.g., cost plans and PACE organizations) for the upcoming calendar year.  Here, I will refer to these payment notices using the shorthand names Advance Notice (proposed policies) and Rate Announcement (final policies). (Note that a Call Letter with non-payment policies is also published as part of this annual notice process.)  The official titles are:

- Advance Notice of Methodological Changes for Calendar Year (CY) [year] for Medicare Advantage (MA) Capitation Rates, Part C and Part D Payment Policies and [year] Call Letter;

- Advance Notice of Methodological Changes for Calendar Year (CY) [year]

for the Medicare Advantage (MA) CMS-HCC Risk Adjustment Model (a
separate Advance Notice for RA policies was initiated in 2018); and

- Calendar Year (CY) [year] Medicare Advantage Capitation Rates and
Medicare Advantage and Part D Payment Policies and Final Call Letter.

19.    By law, the final Rate Announcement is published the first Monday in April
for the upcoming calendar year.  The payment notices are market-moving, and CMS
always releases to the public the Advance Notice and Rate Announcement after the
markets have closed for the day.  CMS releases the payment notices and Call Letter on
the CMS website, along with a number of excel workbooks containing capitation rates
and risk adjustment factors to be used in implementing the new payment policies.

20.    MPPG begins the process of drafting the Advance Notice about a year in
advance of the statutory publication date for the Rate Announcement (finalized policies).
As part of this process, numerous drafts of the Advance Notice are exchanged across
multiple levels:  among MPPG personnel, between MPPG and CM managers, then CM
and other CMS components, CM and the CMS Administrator, and finally among CMS,
HHS, and OMB.

21.    At each stage of deliberation and drafting, MPPG and CM prepare internal
issue papers (options papers), briefing papers, and talking points, which are discussed
and decided at each level of the clearance process. Often, research data and analyses are
incorporated into all of these papers.  The clearance process requires obtaining approval
to issue the Advance Notice from all levels of CMS management, the HHS Secretary,
and OMB.  During this process, comments are received from all levels of reviewers and
often result in changes made to the proposed Notice. Once all of the required clearances
are obtained, the Advance Notice is issued publicly.

22.    CMS then receives comments from the public on the Advance Notice. CMS
employees review and analyze those comments, engage in internal deliberations over
those comments, and discuss and consider potential changes to be made to the rules in
light of the comments received and other factors.  MPPG employees then draft any

1    necessary revisions to the policies when producing the Rate Announcement, in addition

2    to writing responses to comments.  The final Announcement must then proceed through

3    the same clearance process as the Advance Notice.  Issue papers, talking points, briefing

4    memoranda are again prepared, options are discussed, final policies are determined and

5    the final Announcement is reviewed and approved by multiple levels of CMS

6    management, the HHS Office of the Secretary, and the OMB.

7        23.    A few months after a Rate Announcement is released, the next cycle begins,

8    and MPPG employees analyze data and begin the deliberative process.

9        **B. Policy Deliberations for MA Rule-making**

10       24.    Generally CMS publishes policy guidance on changes and updates to the

11   MA risk adjustment (RA) models and other payment-related guidance such as

12   overpayments and medical loss ratios in the annual Advance Notices and Rate

13   Announcements, which are subject to the rule-making clearance process described in

14   Section 1.A above.  (Initial rule-making on MA risk adjustment was in the Federal

15   Register, e.g., to implement the 1997 Balanced Budget Act that created the

16   Medicare+Choice program and to implement the 2003 Medicare Modernization Act that

17   created the Medicare Advantage program.  Examples of other RA-related rules are in

18   Section 1.B.)

19   *Background:  CMS HCC Risk Adjustment Model.*

20       25.    A central area of MA payment policy is the risk adjustment model.  Risk

21   adjustment adjusts CMS' per person per month payments to plans based on the predicted

22   health status (diagnostic data) and demographic characteristics (such as age and sex) of

23   each enrollee.  As required by law, both the MA and Part D programs include risk

24   adjustment as a component of the bidding and payment processes.

25       26.    The MA CMS-HCC risk adjustment model uses diagnoses from one year to

26   predict costs the following year.  The demographic and disease groupings in the model

27   are used to calculate beneficiary-level risk scores, which predict individuals' health care

28   expenditures, relative to the average beneficiary.  Each disease grouping is called a

1    Hierarchical Condition Category (HCC.)  Diagnosis codes (ICD-9 and ID-10 codes) are

2    mapped to HCCs.  For example HCC19 "Diabetes without Complication" has six ICD-

3    10 codes assigned to it.

4            27.    In order to use the risk adjustment model to calculate risk scores for

5    payment, CMS uses statistical estimation techniques to create a relative cost factor for

6    each demographic factor and HCC in the model. For example, the relative factor for

7    HCC19 for the 2019 community aged non-dually eligible beneficiary is 0.106.  This

8    relative cost factor represents the marginal (additional) cost of that HCC in predicting

9    FFS per capita costs. The applicable relative cost factors that apply to each beneficiary

10   are identified and summed to create that person's risk score.

11           28.    MA organizations must submit diagnosis codes they receive from providers,

12   and MPPG uses this data and the applicable CMS-HCC model factors to calculate

13   beneficiary risk scores.

14           29.    The CMS-HCC model includes several model segments, e.g., segments for

15   aged and disabled community versus long-term institutional residents. CMS created the

16   community versus institutional model segments because for beneficiaries with the same

17   disease profile there are significant cost differences between being community-based and

18   the long-term institutionalized.  In short, adjusting payment for place of residence

19   improves payment accuracy. Additionally, there are new enrollee segments that apply to

20   beneficiaries who are new to Medicare and beneficiaries with less than 12 months of

21   Medicare Part B enrollment during the data collection period.

22           30.    MPPG calibrates the CMS-HCC model using FFS beneficiary diagnosis and

23   claims data because historically there has not been data available on MA encounters.

24   MPPG periodically recalibrates the CMS-HCC model to reflect newer treatment and

25   coding patterns in Medicare FFS, which updates the demographic and HCC coefficients

26   for model segments.  That is, recalibration entails (a) applying more recent FFS claims

27   data (because there can be increases in predicted FFS expenditures between calibration

28   years and changes in the marginal cost of different conditions) and sometimes (b)

1  applying clinical updates to HCCs in the model based on the input of a clinical panel.

2  When CMS recalibrates the CMS-HCC model, one year's diagnoses are used to predict

3  the following year's expenditures.  CMS provides the disease groupings, coefficients,

4  and disease hierarchies for the model through the Advance Notice and Final

5  Announcement process.

6  *Policy example – Recalibration of 2014 CMS-HCC model segments*

7       31.    In 2014, CMS implemented an updated version of the CMS-HCC risk

8  adjustment model, including the coefficients for the community, institutional, new

9  enrollee, and C-SNP new enrollee segments of the model. The 2014 model encompassed

10 updates to (1) the data years used to recalibrate the model and (2) a clinical revision of

11 the diagnoses included in each hierarchical condition category (HCC).

12      32.    In consultation with a panel of outside clinicians, CMS reviewed and

13 grouped clinically similar ICD-9 codes into diagnosis groupings, which are used as the

14 building blocks of the condition categories. These diagnosis groupings were then

15 mapped to condition categories based on similar clinical characteristics and cost

16 implications. Both the panel of clinicians and analyses of cost data informed CMS'

17 creation of condition categories.

18      33.    MPPG (and its contractor) estimated revised coefficients for HCCs and

19 demographic factors by regressing the total expenditure for A/B benefits for each

20 beneficiary onto their demographic factors and HCCs, as indicated by their diagnoses.

21 Changes to HCCs in the model, such as additions, deletions, and revisions, are based on

22 each condition category's ability to predict costs for Medicare Parts A and B benefits.

23 Condition categories that do not predict costs well – because the coefficient was small,

24 the t-value was low, a small number of beneficiaries with a certain condition results in an

25 unstable coefficient, or the condition did not have well-specified diagnostic coding –

26 were not included in the model.

27      34.    The new 2014 model had 79 HCCs, up from 70.  E.g., two new HCCs

28 related to metabolic disorders were added: "Other significant endocrine and metabolic

1    disorders" and "Morbid obesity."  In addition, MPPG added "Fibrosis of the Lung and
2    Other Chronic Lung Disorders" and "Exudative Macular Degeneration."

3        35.    <u>Harm.</u>  CMS-HCC model recalibrations receive a great deal of attention
4    from the industry.  Although recalibrated models retain an average 1.0 risk score,
5    individual beneficiaries' risk scores may change, as may plan average risk scores,
6    depending on each individual beneficiary's combination of diagnoses.  The documents
7    generated while considering CMS-HCC model changes include data analyses of
8    exploratory regression models (an inferential statistical technique) with and without
9    certain variables to discover differential effects, and estimated payment impacts by
10   contract.  These data sets are intertwined with various policy assumptions that the
11   agency decides prior to evaluating the different model calibrations.  For example, MPPG
12   staff (and contractor) have done many dozens of model calibrations over multiple years
13   to identify the most effective models for paying accurately for the millions of
14   beneficiaries who are dually eligible for Medicare and Medicaid ("dual
15   eligibles").  These analyses began with doing comparisons of draft models based on
16   three different ways of incorporating beneficiaries' Medicaid status into the model,
17   which can change month by month and is a complicated status to model.  A layperson
18   would assume that Medicaid status is a "fact" – yes or no.  However, that "fact" can
19   change every month, depending on the program category into which someone falls. This
20   reality of continuous status change may affect risk model coefficients and risk scores
21   produced by the model.   The fact that Medicaid status can change in the middle of the
22   month requires an operational policy decision about how to treat such changes for the
23   MA program, which makes monthly prospective payments.  When a dual eligible
24   beneficiary has undergone a Medicaid redetermination, it varies around the country, and
25   data feeds to CMS from 50 state governments and territories are subject to time lags (a
26   normal system issue).  This also raises the operational question of how to address
27   retroactivity in any data analysis of dual eligibles.  Next, to account for dual
28   eligibles'costs, MPPG tried running separate models versus including factors into the

1   existing model in different ways.  The former approach is the final one.  However, there

2   are multiple dozens of data tables, memos, emails, etc. deliberating the complex findings

3   across different approaches.  A second example is MPPG's extensive multi-year work on

4   adding a variable to the risk adjustment model for a count of the number of conditions a

5   beneficiary has. The 21 Century Cures Act required CMS to add a "count variable" to

6   the regression model.  This can be done in a wide variety of ways.  Which approach is

7   best is a technical and policy decision, not a finding of fact.  Both prior to and after

8   passage of this law, MPPG developed and compared over 20 different regression models

9   searching for an effective and meaningful (predictive) definition of "count of

10   diseases."  Again, there are multiple deliberative documents with figures and text that are

11   predecisional and contain versions never adopted.

12         36.    Disclosure of such sensitive analyses discussed in the privileged document

13   types listed in Section I.C. could lead to the cessation of such analyses, which would

14   undermine the effectiveness and quality of CMS policy-making.  Disclosure would also

15   result in circulation of rough drafts not clearly labeled, which would simply mislead the

16   public.  As a result, CMS would not be able to evaluate the different model calibrations

17   to select the model that improves overall payment accuracy and efficiency within the

18   Medicare Advantage program.

19   *Policy example – MA Coding Intensity Adjustment*

20         37.    CMS calibrates the CMS-HCC risk adjustment model using FFS

21   beneficiary diagnosis and claims data because historically there was no data available on

22   MA encounters.  MA coding patterns differ from those in the FFS program (e.g., FFS

23   physicians are not paid based on diagnoses on their claims).  This program difference is

24   reflected in the RA model factors. Beginning in 2010, CMS instituted a separate

25   payment adjustment – the Coding Intensity Adjuster (CIA) -- to account for differential

26   coding patterns between the MA and FFS programs.

27         38.    In the Deficit Reduction Act of 2005, CMS was directed by Congress to

28   measure and adjust for differential coding between Medicare Advantage and FFS

1   Medicare programs to the extent that the Secretary has identified such differences.

2   Subsequent laws established and then increased the minimum CIA, e.g, the Affordable

3   Care Act and the American Taxpayers Relief Act of 2012.  MPPG, in conjunction with

4   agency contractors, conducts deliberations based on statistical research to develop the

5   CIA.  The annual CIA policy is part of the Advance Notice and Rate Announcement

6   process.

7          39.     The CIA is a methodological adjustment to risk scores to address

8   differential coding patterns in MA and FFS.  The CIA factor is calculated using data

9   collected over a defined set of consecutive years from a cohort of beneficiaries

10  continuously enrolled in MA or continuously enrolled in FFS over the entire collection

11  period, otherwise known as the 'stayer cohort.' The coding adjustment factor also

12  accounts for varying lengths in beneficiary enrollment in MA.

13         40.     An example of a key policy decision regarding the CIA is whether to apply

14  the CIA uniformly and industry wide, or to develop more than one CIA factor in order to

15  adjust by MA plan and geography.  Plan-specific and geographic adjustments have been

16  requested by some MA organizations.  MPPG has conducted extensive analyses on the

17  plan-specific CIA approach, and stated again in the 2016 Rate Announcement that "we

18  have determined that the optimal way to apply the adjustment is to do so uniformly and

19  industry wide."

20         41.     Finally, the CIA factor is not the only approach MPPG has used to take into

21  account differential coding between the MA and FFS programs.  For example, when

22  recalibrating the CMS-HCC model for 2014 (see recalibration policy example above),

23  MPPG also took into account the high rate of coding of certain HCCs by MA

24  organizations, relative to FFS providers, given that the coefficients are calibrated on FFS

25  data. Therefore, we also made changes to several other HCCs to address MA coding

26  intensity.

27         •      Since the clinically-revised CMS-HCC model (for 2014) allowed us to

28                better estimate marginal costs for a wider range of renal disease

15

(specifically, the current HCC131 renal failure is split among a range of
acute and chronic kidney conditions), we removed the lower-severity
kidney disease HCCs, including Chronic Kidney Disease (CKD) stage 3,
CKD stages 1-2, or unspecified; unspecified renal failure; and nephritis.

- We restructured polyneuropathy (HCC 75 in the new model) to remove
diabetic neuropathy. Diabetic neuropathy is still mapped to diabetes with
Chronic Complications (HCC18), while other diagnoses were moved to
non-payment HCCs. The remaining diagnoses remain in HCC75 as
"Myasthenia Gravis/Myoneural Disorders and Guillain-Barre
Syndrome/Inflammatory and Toxic Neuropathy."

- The "Renal Congestive Heart Failure" (CHF) interaction term has been
modified in that "renal disease" now encompasses all the kidney-related
HCCs in the revised model.

42.    <u>Harm.</u>  Disclosure of the underlying research and analyses evaluating the
payment effects of different methodologies for applying the coding adjuster to particular
MA contracts and MA organizations would hinder the annual CIA determinations.
Specifically, the agency would not be able to consider and evaluate alternatives to
identify the most accurate coding intensity adjuster methodology.  Development of the
program-wide CIA requires data analyses to evaluate the impact of the CIA on payments
to particular MA contracts. Disclosure of such information could subject the agency to
litigation from plans dissatisfied about what they interpret in CMS' exploratory, draft,
and final analyses or looking for an opportunity to argue for insertion of or redefinition
of a variable in the model that may benefit their particular plan.  Ultimately disclosure
limits the agency's ability to develop an accurate CIA if it is concerned that the data and
analyses could be disclosed.

*Policy example – Medical record review by MA organizations*

43.    CMS released a rule on January 1, 2014 (79 FR 1918) that included a
proposed amendment to provision to 42 C.F.R. § 422.310 Risk adjustment data. The

16

1  proposal was to add paragraph (e)(1) stating that "Any medical record reviews

2  conducted by an MA organization must be designed to determine the accuracy of

3  diagnoses submitted under § 422.308(c) and § 422.310(g)."

4      44.    As the proposal was summarized in the final rule (79 FR 29925), "Under

5  our proposal, medical record reviews conducted by an MA organization could not be

6  designed only to identify diagnoses that would trigger additional payments by CMS to

7  the MA organization; medical record review methodologies would have to be designed

8  to identify errors in diagnoses submitted to CMS as risk adjustment data, regardless of

9  whether the data errors would result in positive or negative payment adjustments."

10     45.    MA organizations have been subject to the same core requirement before

11 and after this 2014 proposal:  to submit complete and accurate risk adjustment data, and

12 if they wish, to require this in downstream contracts.  (See 42 CFR 422.310 (d)(4): "MA

13 organizations may include in their contracts with providers, suppliers, physicians, and

14 other practitioners, provisions that require submission of complete and accurate risk

15 adjustment data as required by CMS. These provisions may include financial penalties

16 for failure to submit complete data."  In addition see 42 CFR 422.310(g)(3):

17 "Submission of corrected risk adjustment data in accordance with overpayments after the

18 final risk adjustment data submission deadline, as described in paragraph (g)(2) of this

19 section, must be made as provided in §422.326."

20     46.    In their public comments on this proposed provision in the January 1, 2014

21 (79 FR 1918) rule, many MAOs and trade associations stated that this proposal was

22 unclear and confusing because of its overly broad construction. As summarized in the

23 final rule, "Some commenters thought this implied a requirement to verify every

24 diagnosis submitted by every provider, while others thought this implied a restriction on

25 the ability of plans to identify what medical records to review. Other commenters

26 believed the proposed amendment limited plans' ability to review medical records for

27 operational purposes other than risk-adjusted payment, such as focusing on only a

28 portion of a medical record for a subset of beneficiaries in order to enhance HEDIS

1    scores, conduct contract compliance reviews, and validate claims processing and
2    billing."

3        47.    Some commenters framed their objection to proposed paragraph (e)(1) as
4    related to the new section § 422.326 Reporting and returning of overpayments, which
5    was finalized in this same rule. They felt that proposed 422.310(e)(1) implied a
6    continuous obligation to proactively search for overpayments absent information that
7    any overpayment exists, and that it would be extremely burdensome to endlessly search
8    medical records for unknown problems.

9        48.    In light of proposed comments, CMS did not finalize this proposed
10   amendment.  However, in the final rule, CMS noted (79 FR 29926):  "However, we
11   emphasize that our decision to not finalize this regulatory proposal does not change
12   CMS' existing contractual requirement that MA organizations must certify (based on
13   best knowledge, information, and belief) the accuracy, completeness, and truthfulness of
14   the risk adjustment data they submit to CMS. Further, this decision does not change the
15   longstanding risk adjustment data requirement that a diagnosis submitted to CMS by an
16   MA organization for payment purposes must be supported by medical record
17   documentation."

18       49.    <u>Harm.</u>  Disclosure of the written analyses that informed CMS's policy
19   deliberations regarding the initial decision to propose paragraph 422.310(e)(1) and the
20   subsequent decision to not finalize this proposal would hinder frank and independent
21   discussion among agency staff and managers as the agency would not be able to evaluate
22   potential advantages and disadvantages of different policy outcomes. Specifically, in
23   evaluating whether to finalize the medical record review provision, the agency needed to
24   assess the benefits and concerns identified by stakeholders through written analyses.
25   Given the number of comments and stakeholder attention to this proposed provision, fear
26   of potential disclosure of CMS's written analyses would have impaired CMS's
27   deliberations on whether to finalize the policy and in so doing, would have constrained
28   the agency's ability to perform one of its primary functions.

*Policy example – Overpayments*

50.     The Affordable Care Act established section 1128J(d) of the Social Security Act, which requires that MA organizations report and return identified Medicare overpayments.  Section 1128J(d)(4)(B) of the Act defines the term "overpayment" as "any funds that a person receives or retains under title XVIII . . . to which the person, after applicable reconciliation, is not entitled under such title."  Section 1128J(d)(4)(C) defines the term "person" to include an MA organization.  On May 23, 2014, CMS published a final rule that codified the requirements of section 1128J(d). [5]

51.     Two examples of policy decisions MPPG faced regarding implementation of the overpayment statute in the final rule were:

- Length of lookback period. CMS decided that MA organizations and Part D sponsors are required to report and return any overpayment that they identify within the 6 most recent completed payment years.  CMS decided this best balances government's interest in having overpayments returned with entities' interest in finality.

- Whether to allow an appeals process prior to conducting payment recovery or offset for a CMS-identified payment error. CMS made clear that we would be willing to engage in a dialogue with plans in order to resolve data issues prior to implementing the payment offset.

52.     Harm.  Disclosure of internal deliberations regarding policy decisions related to the implementation of section 1128J(d)(4)(B) in the MA program would have hindered frank and independent discussion by agency staff and managers.  CMS's overpayment rules are the subject of litigation by plans, generating national media attention.   CMS staff would have been reluctant to freely and openly engage in written policy assessments if they believed that their ideas would be closely scrutinized in the media or construed by litigants as an official agency position, rather than concepts

---

[5] CMS also issued and finalized a rule for CMS-identified overpayments at 79 Fed. Reg. 40916.

1   generated during the policy development process.

2   *Policy example – Medical Loss Ratio*

3       53.    The Affordable Care Act amended section 1857(e) of the Social Security

4   Act ("the Act") to add a new medical loss ratio (MLR) requirement to the MA program.

5   For contracts beginning in 2014 or later, MA organizations are required to report their

6   MLRs and are subject to financial and other penalties for failure to meet the statutory

7   requirement that they have an MLR of at least 85 percent.

8       54.    In the May 23, 2013 Federal Register (78 FR 31284), CMS published a

9   final rule that codified the MLR requirements for MA organizations in the regulations at

10   42 CFR part 422, subpart X.  In the November 15, 2016 Federal Register (78 FR 31284),

11   CMS published a final rule that authorized the agency to release to the public the MLR

12   data that MA organizations are required to report to CMS on an annual basis.  CMS

13   amended the rules for how MA organizations calculate and report their MLRs in the

14   final rule published in the April 16, 2018 Federal Register (83 FR 16440).

15       55.    In the May 23, 2013 final rule, CMS explained that where appropriate, our

16   general approach would be to align the rules for calculating MLRs in the MA program

17   with the rules that the agency had previously adopted for purposes of determining the

18   MLRs of issuers of employer group and individual market private insurance (referred to

19   as the "commercial MLR program").  In order to determine where cross-program

20   alignment is appropriate, and where it is more appropriate to adopt a different approach

21   based on the unique characteristics of the MA program, MPPG staff engaged in policy

22   discussions both internally and with staff in the Center for Consumer Information and

23   Insurance Oversight (CCIIO), who are responsible for administering the commercial

24   MLR.

25       56.    Below are two examples of issues on which CMS deliberated about when to

26   align MA and commercial MLR policies.  Regarding the level of MLR reporting, MPPG

27   aligned with the commercial policy, but regarding the inclusion of fraud provision

28   expenditures in the MLR numerator, the MA policy decision was revised to differ from

1  the commercial policy.

2      57.   First, CMS required that MA organizations report their MLRs at the
3  contract level, rather than at the plan level or parent organization level.  MA contracts
4  are often executed at the state level, and contract-level reporting therefore "parallels the
5  commercial MLR approach, which aggregates the MLR to the state and market level."

6      58.   Second, while CMS initially aligned with the commercial MLR rules by
7  prohibiting MA organizations from including fraud prevention expenditures in their
8  MLR numerator, this was later changed.  Initially, CMS allowed MA organizations to
9  include in their MLR numerator the amount of claim payments recovered through fraud
10 reduction efforts, up to the amount they spent on fraud reduction efforts.  In the April 16,
11 2018, CMS explained that it had reconsidered its previous policy with respect to the MA
12 MLR program and had concluded that limiting or excluding amounts invested in fraud
13 reduction undermined the federal government's efforts to combat fraud in the Medicare
14 program, and reduced the potential savings to the government, taxpayers, and
15 beneficiaries that robust fraud prevention efforts in the MA program can provide.  Based
16 on this rationale, CMS determined that it was appropriate to adopt different rules for the
17 treatment of fraud reduction expenditures in the MA MLR calculation and the
18 commercial MLR calculation.  CMS therefore amended the rules for the MA MLR
19 program to allow MA organizations to include in the MLR numerator all expenditures
20 related to fraud reduction, including fraud prevention, fraud detection, and fraud
21 recovery.

22     59.   <u>Harm.</u>  If agency staff believed that their internal written evaluations could
23 be disclosed and used inaccurately, the agency would have refrained from a
24 comprehensive policy development process.  In the case of the MLR regulation
25 development, the agency may not have reconsidered their original policy to exclude
26 fraud prevention efforts from the numerator if they believed their internal assessments,
27 including those questioning the agency's original determination, could be disclosed.

28 **C. <u>Privileged Document Types Pertaining to MA Rule-making</u>**

60.     I understand that documents relating to the MPPG rulemaking processes for the MA program, including the Advance Notice, Rate Announcement, and Call Letter production, have been listed on Exhibit A. These include the following categories of documents, identified below, which are generated as part of the deliberative MA rule-making process described in the section above.

61.     I believe the following categories of documents are core deliberative process materials. They are pre-decisional because they predate the final agency action (that is, public issuance of the rule, Advance Notice, Rate Announcement, and Call Letter) to which they relate. They are deliberative because they contain or embody the internal thoughts, opinions, and recommendations of CMS personnel, as well as information from its contractors solicited as part of this process, about the contents to be included in the proposed and final rules before their publication. All of the documents are an integral part of the give and take deliberative process that is an intrinsic element of MA policy-making.

62.     *Emails* containing comments or internal deliberative discussions about the content of subregulatory guidance before finalization and issuance. Audiences are staff to staff, staff to management, and among different levels of management.  See, e.g.:

- USBPPRIV00000329 (Word Document regarding the Advance Notice/Call Letter);
- USBPPRIV00007144 (Email regarding the Coding Intensity Adjuster);
- USBPPRIV00007306 (Email regarding the Coding Intensity Adjuster);
- USBPPRIV00007770 (Email regarding the Coding Intensity Adjuster).

63.     *Handwritten Notes*.  CMS employees may take notes during meetings or phone calls to capture the deliberations that took place and/or any decisions made. The audience for handwritten notes is the individual who took the notes.  See, e.g., USBPPRIV00002710 (Calculation of RA Model).

64.     *Issue Papers, also called Options Papers*.  CM staff prepare memos for review by managers that present the issue at hand:  any background information, a

22

discussion of the issue, perhaps data analysis that can inform deliberations, and at times a series of options for policy decisions.  At times a recommendation on which option to select is included, with a rationale. Audiences for these papers are managers at multiple levels of CMS.  See, e.g.:

- USBPPRIV00013164 (Coding Intensity Adjuster/RA model Calculation)
- USBPPRIV00008237 (Calculation of RA Model);
- USBPPRIV00005441 (Coding Intensity Adjuster);
- USBPPRIV00005442 (Coding Intensity in the MA Program);
- USBPPRIV00006664 (ACA Overpayment Regulation, Medicare Record Review Rule);
- USBPPRIV00008012 (ACA Overpayment Regulation);
- USBPPRIV00005335 (ACA Overpayment Regulation, Medical Record Review Rule).

65.     *Research data and analysis*, including instructions to contractors, datasets, analysis specifications and results, and data summaries comparing options.  Research analyses are used by MPPG to inform emails, issue papers, briefing documents, talking points, draft policy documents, and comment reviews, etc. See, e.g.:

- USBPPRIV00007957 (Coding Intensity in the MA Program)
- USBPPRIV00007437 (Coding Intensity Adjuster);
- USBPPRIV00002808 (Coding Intensity Adjuster).

66.     The process of refining the analysis itself is a deliberative and iterative process.  Many data analyses are run during the rulemaking process as the MPPG staff consider various options, e.g., whether to add new segments to RA models for dually-eligible beneficiaries, as CMS did for 2017.  See, e.g., USBPPRIV00010457 (handwritten notes on draft report regarding Calculation of the RA Model).

67.     Releasing multiple versions of research analyses, which would all be captured in an automated search for documents, could result in misinformation about exactly what analysis CMS used during deliberations because it is unlikely that these

multiple versions (uncorrected and corrected, unused and used) would be understood in context and in sequence. Changes to a more focused research question are common, and result in iterations of analysis, e.g., to answer a particular question about MA utilization, the decision about which Claim Type Code values to include as "outpatient services" may change from only hospital-based outpatient services to include ambulatory centers. Additionally, some of the analyses may not lead to any future policy recommendations, and their release would be misleading. Similarly, the analysis itself may inform a decision not to develop or revise policy, suggesting that either no policy change is necessary or that additional analyses will need to be conducted to fully inform the decision making process. These analyses are used to identify the drivers and causes of a given issue, so that MPPG's recommendations for proposed changes address the issue correctly and often provide an evidence-based approach to policy making.

68.    Further, there are multiple preliminary versions of research data analysis for all MPPG payment-related topics, including risk adjustment; some preliminary version typically contain errors during exploratory stages of research, which are corrected in subsequent versions. It is not possible for a litigant or any outsider to recognize which version of any data analysis culled through a general sampling of documents actually provides the correct findings for a particular policy issue.

69.    *Briefing documents* explain the payment policy change(s) MPPG is proposing and the reasons why they believe those changes should be approved. Audiences are managers at multiple levels of CMS, including the Administrator, and managers and staff with HHS and OMB. See, e.g., USBPPRIV00005583 (includes discussion of options between MPPG staff Overpayments and RA Submission Requirements); USBPPRIV00006096 (responses to OMB on overpayment appeals).

70.    With regard to briefing papers prepared for CMS management, the Secretary and the OMB, these types of documents are used to provide options and recommendations during the hierarchical clearance process, which may be the basis for deciding on a given policy. These papers, therefore, provide frank and unvarnished

guidance and recommendations to agency management. As such, disclosure of the briefing papers would reveal the advice and deliberations of the agency, including policy options that the agency rejected.

71. *Talking Points*. Talking points are short summaries (bullet points) used to summarize an issue and update management at various levels within CMS. See, e.g.:

- USBPPRIV00013315 (Calculation of RA Model);
- USBPPRIV00005540 (Coding Intensity Adjuster);
- USBPPRIV00002552 (Advance Notice/Call Letter);
- USBPPRIV00002653 (FFS Adjuster);
- USBPPRIV00006773 (Coding Intensity Adjuster);
- USBPPRIV00000975 (Coding Intensity Adjuster);
- USBPPRIV00000979 (Coding Intensity Adjuster).

72. *Drafts of rulemaking documents*, including Advance Notices, Rate Announcements, and Call Letters. Regulations on the MA program inform stakeholders of any changes in policies. Annual payment notices and call letters inform all stakeholders in the Part C MA and Part D programs what the rules are for coverage, bidding, and payment for MA and Part D plans, and other Medicare private health plans (e.g., cost plans) for the upcoming calendar year. See, e.g.:

- USBPPRIV00007434 (draft)
- USBPPRIV00011605 (draft).

73. *Reviews of comments on proposed rules and proposed responses*. Once the deadline has passed for public comments on a proposed rule in the Federal Register or on the annual Advance Notice and Call Letter proposals, staff read, categorize, and summarize the comments, and then analyze and draft responses to the comments. Summaries of comments are presented to MPPG and CM management, issues requiring policy decisions are identified, and draft responses are then put into the organizational clearance process described in section I.A. See, e.g. USBPPRIV00011295 (Overpayments).

25

74. *Draft Letters*:  Draft responses to letters received from the Congress or other external parties that communicate CMS' policies pertaining to a rule.  The audiences for draft letters are management within MPPG, or depending on the issue, management at higher levels.  See, e.g., USBPPRIV00010357 (Advance Notice/Call Letter).

75. *Press Releases*.  As part of rulemaking, including payment notice processes, MPPG employees and other HHS personnel also draft press releases. The draft press releases contain MPPG's suggestions for how to describe the announced payment policies, and the significance of those policies. Press releases may also be drafted for different variations of proposed rules, and the releases for variations that are rejected are never issued.  Talking points are also drafted as a part of these press releases.  See, e.g., USBPPRIV00013601 (RADV Audit Methodology/Overpayments).

76. *Questions and Answers (Q&As)* for the CMS Office of Communications. MPPG employees also draft Q&As to accompany public roll-outs of rules related to the MA program, including the payment notices. These offer internal guidance intended to assist CMS management in responding to questions about the rules from the press or Congress. The Q&As list anticipated questions regarding the rule and MPPG's suggested answers to those questions.  The Q&As also provide descriptions of CMS's MA policies and background information on the program. These documents go through a series of iterations before they become final. Drafts of these documents are prepared before the proposed and final rules have been finalized and issued publicly.  See, e.g., USBPPRIV00022767 (RADV audit methodology)

## II.   *MA Subregulatory Guidance Production, including Operational Policies.*

77. A number of the documents on Exhibit A relate to MPPG's development of subregulatory guidance for the MA program, which includes implementation guidance on a range of policies, including the following:

- Part C error rate estimation:  as required by law, MPPG estimates an annual Part C payment error based on RA error found in a sample of beneficiary

medical records and extrapolated to the national population.

- RA data submission requirements for the two formats of RA data:  (1) RAPS data in abbreviated format and (2) encounter data in comprehensive format; and uses of risk adjustment data; and

- Operationalization of overpayment reporting requirements.

78.   Exhibit A encompasses documents related to training manuals and User Group technical supports webinars (with slide decks available to MA organizations). MPPG has issued risk adjustment training and technical assistance materials in the form of Participant Guides, Medicare Managed Care Manual chapters, and an Encounter Data Submission and Processing Guide. MPPG often works with contractors to draft training and technical support materials.

79.   A common type of subregulatory guidance is a HPMS memo, which refers to a memo released to MA organizations through CMS' Health Plan Management System (HPMS). Examples of HPMS memos pertaining to MA payment include the following:

- Requirements for Submitting Risk Adjustment Data to CMS, December 20, 2006

- Encounter Data Submission Implementation and the 90-Day Period of Enforcement Discretion for Compliance with the New HIPAA Transaction Standards, December 14, 2011

- Clarification: Deadline for Sending Public Comments on the Draft Risk Adjustment Chapter of the Medicare Managed Care Manual,  May 9, 2011

- Invitation to Comment on Risk Adjustment Data Validation (RADV) Sampling and Payment Error-Calculation Methodology,   December 22, 2010

- Medicare Advantage Risk Adjustment Data Validation (RADV) Guidance, June 26, 2012

- MAO-004 Report – Encounter Data Diagnoses Eligible for Risk

1     Adjustment,  November 20, 2014

2     • Final Encounter Data Diagnosis Filtering Logic,  December 22, 2015

3     • Medical Loss Ratio (MLR) Report and Attestation for Contract Year 2014 –

4     Submission Reminder and Additional Guidance for Contracts that

5     Terminated, Consolidated or Withdrew in CY 2014, October 27, 2015

6     • Guidance for Reporting and Returning Medicare Advantage Organization

7     and/or Sponsor Identified Overpayments to the Centers for Medicare &

8     Medicaid Services (CMS), February 18, 2015

9     • Reporting and Returning Risk Adjustment Related Overpayments- Remedy

10    Tickets on RAPS Files, June 7, 2016

11    • Final Risk Adjustment Data Submission Deadline Clarification, January 16,

12    2016

13    • 2018 Risk Score Reruns for Purposes of Overpayment Recovery, February

14    09, 2018

15    80.    Examples of subregulatory guidance documents other than HPMS memos

16    are:

17    • Encounter Data Submission and Processing Guide, at

18    www.csscoperations.com

19    • Medicare Managed Care Manual at https://www.cms.gov/Regulations-and-

20    Guidance/Guidance/Manuals/Internet-Only-Manuals-IOMs.html

21    • MA Encounter Data and RAPS Data User Group slides at

22    https://www.csscoperations.com/internet/cssc4.nsf/docsCat/CSSC%20Oper

23    ations~Medicare%20Advantage%20Encounter%20Data%20and%20RAPS

24    %20Data~User%20Group.

25    81.    HPMS memos, manuals, and guides are just three of the types of privileged

26    documents listed in Section II.C below.

27    A. **Description of Organizational Process for Deliberation and Clearance for**

28    **MA Subregulatory Guidance**

82.     Subregulatory guidance documents typically undergo deliberation and clearance within CM, similar to the regulatory process described in Section I.A above. At times, subregulatory guidance continues through deliberation and clearance at higher levels within CMS before being finalized.  In addition, certain subregulatory documents regarding statistical methodologies for an element of MA payment are released on the CMS website to solicit public comment.  The level of clearance depends on whether current policy is addressed or whether operational guidance is at issue.  Subregulatory deliberations also generate the same types of privileged documents, listed in section II.C below.

**B. Policy Deliberations for MA Subregulatory Guidance**

83.     While MPPG produces/updates certain subregulatory guidance on a quarterly schedule (e.g., Plan Communication User Guide), other subregulatory guidance is produced on a flow basis.

84.     Some subregulatory guidance is carried through document updates over many years.  For example, the MA requirement that diagnostic data submitted by MA organizations for purposes of payment must be supported by a medical record has been stated in multiple subregulatory guidance documents, including but not limited to:

- 2004 Medicare Managed Care Manual and the 2004 Regional Risk Adjustment Training for Medicare Advantage Organizations (both now retired);

- 2006 Regional Risk Adjustment Training For Medicare Advantage Organizations (now retired)

- 2013 Risk Adjustment 101 Participant Guide

- Medicare Managed Care Manual Chapter 7 – Risk Adjustment;

- October 31, 2017 HPMS memo Guidance for Encounter Data Submission: "We remind MAOs that established risk adjustment rules apply to diagnoses submitted on EDRs that are used for risk adjustment; for instance, these diagnosis codes must be documented in the medical record

29

and must be documented as a result of a face-to-face visit in the data collection period for the payment year."

- June 11, 2018 Encounter Data Submission and Processing Guide, guidance on chart review records (CRRs): "diagnosis codes added through a CRR must be derived from a face-to-face visit and supported by a medical record...."

*Policy example:  Encounter data submission requirements*

85.    In the last seven years, MPPG has released a number of guidance documents regarding the submission of encounter data (ED) to CMS.  The most recent subregulatory guidance is the June 11, 2018 Encounter Data Submission and Processing Guide, which provides technical support for MA organizations and other organizations such as PACE organizations, on how to submit encounter data to CMS, and can be found at http://www.csscoperations.com

86.    CMS consolidated all encounter data guidance into this guide from several sources.  This Guide replaces the Companion Guides and ED Participant Guide, and it also incorporates information from additional documents, such as User Groups slides, and Questions and Answers from User Groups and mailboxes.

87.    The Guide was subject to the clearance up to the CM level.

88.    A key operational policy decision was whether to introduce a revamped Companion Guide and thus retire the Minimum Data Element list first released in 2011 with the goal of assisting certain MA organizations not experienced with claims processing to manage the required submission format for ED, called the X12 837 5010 format.  There were many internal discussions about this, and disclosure of documents related to these discussions would cause doubt and confusion about prior and current MPPG guidance on encounter data submission.  The revised Companion Guide reflects an alternative analysis by MPPG of how to represent the national implementation guide for the 837 5010 format (called the "TR3" guidelines) in CMS subregulatory guidance.

89.    <u>Harm</u>: Effective policy-making requires the consideration of alternatives for

ways to accomplish the agency's mission. In the case of the development of the

encounter data companion guide, the suggestions and alternatives for the different

processes for the submission of encounter data were the subject of the agency

deliberations. Disclosure of these internal documents and drafts could have been

confused with actual, final, agency policy, creating confusion among stakeholders and

discouraging full agency deliberations. .

*Policy Example:  Operationalizing the Overpayment Regulation*

90.    On June 7, 2016 CMS released an HPMS memo "Reporting and Returning

Risk Adjustment Related Overpayments- Remedy Tickets on RAPs Files."  This memo

rolled back a reporting requirement that had been announced in an HPMS memo on

February 18, 2015 "Guidance for Reporting and Returning Medicare Advantage

Organization and/or Sponsor Identified Overpayments to the Centers for Medicare &

Medicaid Services (CMS)."  Each time CMS releases an HPMS memo, its contents go

through internal deliberation and approval.  Even purely operational changes, such as the

change in how to populate a system record announced in the June 7, 2017 memo,

undergo internal deliberations.

91.    The June 7, 2016 memo announced the following:  that an MA organization

no longer had to include the ticket number of its problem(s) logged into CMS Remedy

system also in a data file called a RAPS file when the MA organization needs to delete a

diagnosis affecting payment that was submitted in error.  "Specifically, organizations can

delete diagnoses through a routine production (PROD) risk adjustment file submission to

RAPS, and do not have to create an overpayment (OPMT) file for submission."

92.    Harm.  There were multiple discussions among MPPG and various

contractors managing systems, and between MPPG and other components about the

effect of no longer requiring the creation of an OPMT file.  These discussions were often

linked to broader discussions on overpayment reporting in general, and how to manage

this in CMS' systems.  MPPG generated many of the types of documents listed in

Section II.C when creating and revising overpayment reporting directions in

subregulatory guidance.  Disclosure of these emails and documents would undermine the quality of administrative decision-making by CMS employees if they believed that their remarks could be subject to discovery in litigation with outside parties.  Further, disclosing agency discussions about overpayments gives potential litigants additional information about overpayment issues, which could compromise the appeals process.

C. Privileged Document Types Pertaining to MA Subregulatory Guidance

93.    I understand that documents relating to the MPPG subregulatory guidance production for the MA program, e.g., drafts of HPMS memos, policy white papers, User Group slide decks, MA manual chapters, and training materials, have been listed on Exhibit A. These include the following categories of documents, which are generated as part of the MA subregulatory guidance deliberative process.

94.    I believe the following categories of documents are core deliberative process materials. They are pre-decisional because they predate the final agency action (public issuance of the HPMS memo or other subregulatory guidance) to which they relate.  They are deliberative because they contain or embody the internal thoughts, opinions, and recommendations of CMS personnel, as well as information from its contractors solicited as part of this process, about the contents to be included in the proposed and final rules before their publication. All of the documents are an integral part of the give and take deliberative process that is an intrinsic element of MA policy-making.

95.    I understand that documents relating to the MPPG guidance process have been listed on Exhibit A. These include the following categories of documents:

96.    *Emails* containing comments or internal deliberative discussions about the content of proposed subregulatory guidance, before finalization and issuance. Audiences are staff to staff, staff to management, and among different levels of management.

- USBPPRIV00002358 (overpayments);
- USBPPRIV00002617 (overpayments);
- USBPPRIV00004420 (overpayments);

32

1        •       USBPPRIV00002619 (overpayments);

2        •       USBPPRIV00002664 (overpayments);

3        •       USBPPRIV00007984 (overpayments);

4        •       USBPPRIV00003864 (Risk Adjustment Training Materials);

5        •       USBPPRIV00007851 (UHG and Non-UHG RA Attestations);

97.   *Handwritten Notes*.  CMS employees may take notes during meetings or phone calls to capture the deliberations that took place and/or any decisions made.  The audience for handwritten notes is the individual who took the notes.

98.   *Meeting notes*: USBPPRIV00018602 (ICD-10)

99.   *Handwritten Notes*:

•       USBPPRIV00002040 (overpayments);

•       USBPPRIV00002000 (overpayments).

100.   *Draft Script for Help Desk*: *See e.g.,* USBPPRIV00007679- Draft of script for help desk dealing with overpayments)

101.   *Issue Papers, also called Options Papers*.  CM staff may prepare memos on subregulatory guidance proposals for review by managers that present any background information, a discussion of the issue, perhaps data analysis that can inform deliberations, and at times a series of options for policy decisions.  At times a recommendation on which option to select is included, with a rationale.  Typically, audiences for these papers on subregulatory guidance proposals are managers at multiple levels of CM.  *See e.g.*:

•       USBPPRIV00006665 (Encounter Data Submissions);

•       USBPPRIV00006075 (overpayments);

•       USBPPRIV00002045 (overpayments);

•       USBPPRIV00007216 (UHG and Non-UHG RA Activities/overpayments);

•       USBPPRIV00002027 (HHS-OIG Pacificare Audit);

•       USBPPRIV00004215 (Calculation of RA Error Rate);

•       USBPPRIV00002270 (Calculation of RA Error Rate);

1        •     USBPPRIV00001118 (Calculation of RA Error Rate);

2        •     USBPPRIV00007891 (UHG and Non-UHG RA Attestations);

3        •     USBPPRIV00003672 (Risk Adjustment Supporting Documentation

4 Requirements).

5      102.   *Research data and analysis*, including instructions to contractors, datasets,

6 analysis specifications and results, and data summaries comparing options.  Research

7 analyses are used by MPPG to inform emails, issue papers, briefing documents, talking

8 points, draft policy documents, and comment reviews, etc.  The process of refining the

9 analysis itself is a deliberative and iterative process.  Many data analyses are run during

10 the development of subregulatory guidance as the MPPG staff consider various options,

11 e.g., the decision to distinguish in CMS' systems between chart review records and other

12 encounter data record submissions.  Many analyses were reviewed to understand

13 industry patterns of the submission of chart review records.

14      103.   *Talking points*. Talking points are short summaries (bullet points) used to

15 summarize an issue pertaining to subregulatory guidance; talking points are used to

16 update management at various levels within CMS. See:

17        •     USBPPRIV00017319 (Medical Coding in support of RA Payments);

18        •     USBPPRIV00017378 (Medical Coding in support of RA Payments);

19        •     USBPPRIV00005981 (Encounter Data Submissions);

20        •     USBPPRIV00016179 (Coding Guidance);

21        •     USBPPRIV00005261 (overpayments);

22        •     USBPPRIV00005145 (overpayments);

23        •     USBPPRIV00002347 (overpayments);

24        •     USBPPRIV00013603 (overpayments);

25        •     USBPPRIV00006194 (Calculation of RA Error Rate)

26      104.   *Drafts of subregulatory guidance documents*, including drafts of HPMS

27 memos, policy white papers released on the CMS website, manual chapters, User Group

28 slide decks, training materials, and other operational guidance.  Subregulatory guidance

typically inform all stakeholders in the Part C MA and Part D programs how to implement the regulation and payment notice rules in place.   Each time CMS releases a memo, its contents go through internal deliberation and approval.  Likewise, even purely operational changes such as those discussed in the June 7, 2016 memo go through internal deliberations. See e.g.:

- USBPPRIV00005799 (Presentation regarding Calculation of RA Error Rate);

- USBPPRIV00005564 (Presentation regarding Calculation of RA Error Rate);

- USBPPRIV00005455 (Presentation regarding Calculation of RA Error Rate);

- USBPPRIV00005444 (Draft Media Q&As regarding Calculation of RA Error Rate).

105.   *Reviews of comments on policy white papers released on the CMS website.* Once the deadline has passed for comment on a methodology, e.g., the 2010 release of a draft methodology for RADV sampling and payment error estimation, staff read, categorize, and summarize comments, and then analyze and draft responses to the comments.  Summaries of comments are presented to MPPG and CM management, issues requiring policy decisions are identified.  Draft responses may be put into organizational clearance to finalize the proposed approach.

106.   *Draft Letters*:  Draft responses to letters received from the Congress or other external parties that communicate CMS' policies pertaining to subregulatory guidance.  The audiences for draft letters are management within MPPG, or depending on the issue, management at higher levels.  See, e.g., USBPPRIV00005608 (Overpayments).

107.   For the reasons stated above, I believe the release of the documents for which we have asserted the deliberative process privilege would be detrimental to CMS deliberations and, thus, contrary to the public interest. I therefore respectfully assert the

35

privilege for government deliberative communications to withhold these documents from

disclosure to the defendants in this matter.

1    I declare under penalty of perjury that the foregoing is true and correct.

2

3    Executed this _6th_ day of November 2018, in _Baltimore, Maryland_ .

4

5

6                                                    Cheri Rice
7                                                    Deputy Director,
                                                     Center for Medicare,
8                                                    Centers for Medicare and
                                                     Medicaid Services
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28