JOSEPH H. HUNT
Assistant Attorney General, Civil Division
NICOLA T. HANNA
United States Attorney
DAVID M. HARRIS
DAVID K. BARRETT
ABRAHAM C. MELTZER
JOHN E. LEE (CBN 128696)
Assistant United States Attorneys
    300 N. Los Angeles Street, Room 7516
    Los Angeles, California 90012
    Tel: (213) 894-3995; Fax: (213) 894-7819
    Email: john.lee2@usdoj.gov
MICHAEL D. GRANSTON
DANIEL R. ANDERSON
EDWARD C. CROOKE
CAROL L. WALLACK
JUSTIN DRAYCOTT
PAUL G. FREEBORNE
JESSICA E. KRIEG
ZOILA E. HINSON
AMY L. LIKOFF
ADAM R. TAROSKY
Attorneys, Civil Division, U.S. Department of Justice
    P.O. Box 261, Ben Franklin Station
    Washington, D.C. 20044
    Tel: (202) 307-0486; Fax: (202) 307-3852
    Email: carol.wallack@usdoj.gov
JAMES P. KENNEDY, JR.
United States Attorney
KATHLEEN ANN LYNCH
Assistant United States Attorney (Admitted PHV)
    138 Delaware Avenue
    Buffalo, New York 14201
    Tel: (716) 843-5830; Fax: (716) 551-3052
    Email: kathleen.lynch@usdoj.gov
Attorneys for the United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING,<br><br>    Plaintiffs,<br><br>    v.<br><br>UNITEDHEALTH GROUP, INC., *et al.*,<br><br>    Defendants. | No. CV 16-08697 MWF (SSx)<br><br>DECLARATION OF GEORGE G. MILLS JR. |

## DECLARATION OF GEORGE G. MILLS JR.

I, George G. Mills Jr., declare and state as follows:

1. My name is George G. Mills Jr. I am over 21 years of age, and I am competent to make this declaration. My statements in this declaration are based on information personally known to me or conveyed to me by my staff, Agency contractors working with my staff who have reviewed the information described in subsequent paragraphs of this declaration, and Office of Acquisition and Grants Management ("OAGM") employees working with my staff who reviewed a subset of the withheld documents that potentially contain acquisition-related materials.

2. I am the Deputy Center Director, Center for Program Integrity ("CPI"), in the Centers for Medicare & Medicaid Services ("CMS" or "Agency") within the United States Department of Health and Human Services ("HHS"). I have been in this position since September 2015.

3. Previously, I was a manager in Office of Financial Management since 1998. I was the Director of the Provider Compliance Group, where I oversaw the Medicare and Medicaid Improper Payment Measurement Programs, the implementation of the national Medicare Fee-for-Service Recovery Audit Program and the Medicare Contractor medical review policy. I was previously the Deputy Director of the Financial Services Group for over five years. As the Deputy Director, I was responsible and accountable for carrying out provider and plan financial audit functions, coordinating Medicare's Secondary Payer program, Medicare banking functions and overpayment collections.

4. CPI promotes the integrity of the Medicare and Medicaid programs and CHIP through provider/contractor audits and policy reviews, identification and monitoring of program vulnerabilities, and providing support and assistance to States.

5. As CPI's Deputy Center Director, my job responsibilities include leading CPI's program integrity efforts for Medicare Part C. This entails oversight of the staff that develops policies for and manages much of the operations for the contract-level Risk Adjustment Data Validation ("RADV") audits CMS undertakes. RADV audits are a

corrective action by HHS's to recoup improper payments under Medicare Part C. From approximately 2007 to 2017, MPPG ran the RADV audit program. From 2017 to the present CPI has run the contract-level RADV audits. We are completing the RADV audits for 2007, 2011, 2012, and 2013, and are overseeing the development of targeted audits, focusing on specific conditions most at risk for improper payments.

6.      CMS began the RADV initiative by conducting two sets of audits starting with the 2007 payment year: Pilot 2007, which involved five Medicare Advantage contracts, and Targeted 2007, which involved 32 contracts. CMS reviewed medical record documentation provided by each audited Medicare Advantage organization to substantiate conditions reported by the Medicare Advantage organization for beneficiaries in each audit sample. The plans can and have appealed the results. The contract level 2007 RADV audits and the overpayments recovered by CMS are publically available at https://www.cms.gov/Medicare/Medicare-Advantage/Plan-Payment/Downloads/MA_RADV_Audit_Fact_Sheet.pdf.   CMS audited UnitedHealth as part of the 2007 RADV.

7.      The next RADV audit commenced in 2013. For the 2011 RADV audits, 30 plan contracts were selected. MAOs have submitted their medical records and CMS is currently reviewing this medical record documentation. Unlike the 2007 audits, the payment error calculated for the sampled beneficiaries in these audits will be extrapolated to the contract population. CMS also included UnitedHealth as part of the 2011 RADV.

8.      I also oversee the study and analysis of whether to apply a Fee for Service Adjuster ("FFSA") to extrapolated RADV audit results. In CMS' February 2012 Notice of Final Payment Error Calculation Methodology for Part C Medicare Advantage RADV Contract-Level audits, CMS agreed to conduct a "RADV-like review of records submitted to support FFS claims data" and to publish an audit-specific adjustment factor after that study was complete. On October 26, 2018 CMS released a Notice of Proposed Rulemaking ("NPRM") regarding FFSA.

## ASSERTION OF THE DELIBERATIVE PROCESS PRIVILEGE

9.     I am informed that defendants in the above captioned litigation have issued 107 Requests for Production that in sum ask CMS to produce documents related to all aspects of the Medicare Advantage Program reaching back more than a decade, and in some cases twenty years.

10.     I am informed that documents in the possession of CMS are subject to a Motion to Compel in the above-captioned litigation.  Specifically, defendants have requested the production of documents from CMS identified on the United States' First through Seventh Privilege Log as withheld pursuant to the deliberative process privilege ("DPP"), which is over 21,000 documents.  These documents have been listed on Exhibit A.[1]  The categories of issues and the types of documents on Exhibit A which fall within the subject areas for which I am responsible as Deputy Director of CPI are those related to RADV audits and methodology as well as the Fee for Service Adjuster.

11.     I am informed that documents from 64 of the custodians contained on the Privilege Logs consist of CMS employees, including those within Medicare Plan Payment Group, Division of Payment Validation, Division of Payment Reconciliation, Division of Payment Policy, Division of Encounter Data & Risk Adjustment Operations, and Division of Payment Systems, and CPI.

12.     Because of the large volume of documents contained in Exhibit A and given my other work responsibilities described above, I did not personally have the time available to review on a document by document basis each document in Exhibit A related to the subject areas for which I am responsible as Deputy Director of CPI.  Based on my experience and training within the agency, I am familiar with the categories of issues relating to the RADV audits and methodology and FFSA that were the subject of agency deliberations and the types of documents within those categories that would

[1]The United States has re-issued the Privilege logs concurrently with serving these declarations.  Some documents have been put in updated categories.

4

reflect those deliberations. I have personally reviewed all of the documents specifically identified in this declaration, however there may be additional types of documents on Exhibit A that are not included in this declaration.

13. I have also discussed the categories of issues and the types of documents on Exhibit A which fall within the subject areas for which I am responsible as Deputy Director of CPI (RADV audits and methodology and FFSA) with agency personnel who are familiar with these categories of documents and who have reviewed certain of the documents on the privilege log and identified applicable ones that should be withheld as deliberative. Because of the large volume of documents requiring agency resources for review, a majority of drafts were not reviewed and are deliberative and pre-decisional in that they represent the personal opinion of the author and may not yet or ever have been adopted as the final position of the agency. I am informed that either agency staff or agency contractors have performed a review of each of the non-draft[2] documents on the privilege log and determined them to be deliberative. I am informed that Agency contractors have performed a review of the non-draft documents identified on the privilege logs and identified certain documents to be withheld as deliberative. I am informed that agency staff also reviewed certain documents identified on the privilege

_____

[2] I am informed that a majority of draft documents were first identified through an eyes on review by the Department of Justice attorneys and excluded from review at the agency's request. The documents then subject to the agency staff or contractor review were then first filtered using email threading. Email threading is the process of using structured analytics to identify email relationships to one another by gathering all email communications that share an electronic signature/Hash (i.e., initial email, replies, all forwards, and reply-all messages), extracting and normalizing the metadata, and grouping them together. Then, it identifies the "most inclusive" email communications so that an email can be reviewed only when new information is present. All end-of-chain "inclusive" emails that include any new text or attachments were reviewed, and non-inclusive emails, those with essentially duplicate content, were set aside. Additionally, all loose or stand-alone documents on the privilege log were reviewed separately by CMS contractors or staff.

log and determined that certain of those should be withheld as deliberative.[3] I have personally reviewed the results of the agency contractors' and CMS employees' document review that identifies all the withheld documents as deliberative.

14.    Based on the information available to me, I believe the documents identified on Exhibit A which fall within the subject areas for which I am responsible reflect the agency's deliberations and are privileged. Thus, I am formally invoking the deliberative process privilege over the documents identified on Exhibit A related to RADV audits and methodology and the FFSA.

15.    In the paragraphs below, I specify why I believe the information for which I am asserting the deliberative process privilege properly falls within the scope of that privilege. Based on the information shared with me, I have determined that the documents are predecisional and deliberative, and disclosure will harm the agency.[4] Therefore, these documents should be withheld from disclosure.

16.    Because there are many documents identified on Exhibit A, I have divided the documents into general categories, which I will describe in greater detail in the ensuing paragraphs. I will also include citations to documents in each category.

17.    Exhibit A encompasses documents regarding RADV audits and methodology and the FFSA.

18.    The RADV process is large and complex, and involves multiple stakeholders, including 16 contractors and their staff, as well as CMS and HHS staff. Designing the RADV methodology requires  input from many of these internal

---

[3] I am informed that the Office of Acquisition and Grants Management reviewed a subset of documents that were identified as acquisition materials as those documents reside within their subject matter expertise.

[4] Given the recent NPRM, CMS is re-reviewing documents on Exhibit A regarding this topic to determine whether any additional documents can be released.  The publication of the NPRM may impact CMS' analysis of whether disclosure of certain documents related to FFSA will harm the agency.  Therefore, CMS believes that the re-review should continue, even though it will not be complete by the date of this declaration.

1  stakeholders, and operating a program of this magnitude likewise involves day-to-day

2  back and forth from these same multitude of internal stakeholders on a variety of

3  operational and policy decision points.

4        19.    CMS is continuously analyzing patterns in payment error to optimize the

5  effectiveness of the audits.  CMS employees and its contractors also engage in internal

6  discussions and deliberations regarding proposed changes to the RADV methodology.

7        20.    CMS takes into consideration public comment regarding proposed

8  methodology for calculating final payment error for RADV audits.  To conduct audits,

9  CMS defines the eligible population, requests medical record documentation, reviews

10 medical records, calculates a payment error for each sampled beneficiary, calculates a

11 payment error rate for the contract's sample, extrapolates sample findings to the contract

12 level and then determines the payment adjustment amount.

13       21.    Beginning at least in 2009, MPPG conducted analyses and engaged in

14 internal deliberations to examine whether to apply a FFSA to extrapolated RADV audit

15 results. This was in response to the Medicare Advantage industry's assertions that

16 diagnosis errors in FFS claims cause a bias in MA payments and government should

17 adjust RADV audits to account for the error.

18       22.    I understand that documents relating to the RADV audits and methodology

19 and FFSA have been listed on Exhibit A. These include the following categories of

20 documents:

21       23.    Emails by and among CMS personnel and its contractors (see e.g.,

22 USBPPRIV00002524 (FFS Adjuster), USBPPRIV00000669 (UHG and Non-UHG

23 RADV Audits)).

24       24.    Presentations made internally within CMS (see e.g., USBPPRIV00002533

25 FFS Adjuster).

26       25.    RTI Contractor work plan (see e.g., USBPPRIV00002472 (FFS Adjuster)).

27       26.    Spreadsheets prepared for internal use by CMS personnel and their

28 contractors (see e.g., USBPPRIV00013994 (UHG and Non-UHG Audits/Coding

Guidance)).

27.     Talking Points (see e.g., USBPPRIV00002653 (FFS Adjuster),
USBPPRIV00013997 (RADV Audit Methodology), USBPPRIV00000837 (UHG and
Non-UHG RADV Audits)).

28.     Options papers shared only within CMS, including different options for the
methodology for performing the audits (see, e.g., USBPPRIV00005563 (RADV Audit
Methodology)).

29.     Issue Papers shared only within CMS (see e.g., USBPPRIV00004120
(RADV Audit Methodology)).

30.     Draft sampling specifications (see, e.g., USBPPRIV00003590 (RADV
Methodology)).

31.     These documents, all internal to the government, reflect preliminary
analyses of the issues, conclusions of staff that reflect personal opinions of the writers,
and may also contain recommendations for future policy decisions or changes that are
clearly pre-decisional in nature.  They do not reflect the final opinion of the agency on
the matters being discussed.

32.     To the extent draft documents are included on the privilege log, they
represent the personal opinion of the author and may not yet or ever have been adopted
as the final position of the agency.  They are deliberative process materials in that they
reflect the pre-decisional, deliberative thoughts and opinions of HHS personnel as well
as information from its contractors solicited as part of these deliberative processes.

33.     Disclosure of these types of documents would inhibit candid discussions
within CMS and the fulsome discussion and assessment of different policy solutions.
Disclosure would compromise policy development as CMS would not be able to fully
evaluate alternatives and identify weaknesses of potential approaches without concern
that external stakeholders would use this information to circumvent or challenge the final
decision. Additionally, if an internal deliberation were interpreted as representative of
CMS' current position, it would impair the agency's ability to effectively communicate

its current position on a topic and generate public confusion as to the agency's official position. Finally, disclosure of the approaches taken to develop particular methodologies in the RADV audit process would limit the usefulness of those approaches in future audits. The disclosure of the information would allow industry to game audits and reduce the effectiveness of the approaches. This would result in a reduced return on investment and the need to use additional agency resources to develop alternative approaches.

34.     For the reasons stated above, I believe the release of the documents for which we have asserted the deliberative process privilege would be detrimental to CMS's ability to operate efficiently and effectively to accomplish its mission and, thus, contrary to the public interest. I therefore respectfully assert the privilege for government deliberative communications to withhold these documents from disclosure to the defendants in this matter.

1    I declare under penalty of perjury that the foregoing is true and correct.

2    Executed this _____ day of November 2018, in _WOODLAWN Mr_.

3

4

5

6    _____
     George G. Mills Jr
7    Deputy Center Director,
     Center for Program Integrity,
8    Centers for Medicare and Medicaid
     Services
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28