# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING,

    Plaintiffs,

v.

UNITEDHEALTH GROUP, INC., *et al.*,

    Defendant.

No. 2:16-cv-08697-MWF (SSx)

## DECLARATION OF PATRICK J. COGLEY

I, Patrick J. Cogley, declare as follows:

1. My name is Patrick J. Cogley. I am over 21 years of age, and I am competent to make this declaration. My statements in this declaration are based on information personally known to me or conveyed to me by agency personnel who have reviewed the information described in subsequent paragraphs of this declaration.

2. I am a Regional Inspector General for the Office of Audit Services (OAS) in the Office of Inspector General (OIG) for the Department of Health and Human Services (HHS or the agency). The OIG for HHS was established through the Inspector General Act of 1978 (IG Act). The IG Act established OIGs to create organizationally independent and objective units. This statutory independence is intended to ensure the integrity and objectivity of OIG activities. The IG Act authorizes Inspectors General (IGs) to conduct such audits and investigations, and issue such reports, as they believe appropriate.

3. The mission of the HHS/OIG is to protect the integrity of HHS programs, as well as the health and welfare of beneficiaries served by those programs. This

statutory mission is carried out through a nationwide network of audits, investigations, and inspections conducted by four components of the OIG. These components are OAS, the Office of Investigations, the Office of Counsel to the Inspector General, and the Office of Evaluations and Inspections. The role and focus of each component is unique.

4. OAS provides auditing services for HHS, either by conducting audits with its own audit resources or by overseeing audit work done by others. The audits examine the performance of HHS programs and/or its grantees and contractors in carrying out their respective responsibilities and are intended to provide independent assessments of HHS programs and operations. These audits help reduce waste, abuse, and mismanagement and promote economy, and efficiency throughout HHS. Our audits often present recommendations for improving program operations and recovery of disallowed costs. The findings on which we base our recommendations are developed from information that OAS collects from a wide variety of sources in accordance with Generally Accepted Government Auditing Standards (GAGAS).

5. The Office of Counsel to the Inspector General (OCIG) provides legal advocacy and counsel to the IG and OIG's other components to advance the integrity, efficiency, and effectiveness of HHS programs. OCIG is comprised of three separate branches which together act as in-house legal counsel, offering advice and representation to OIG on HHS programs and operations, OIG audits and evaluations, imposing program exclusions and civil monetary penalties on health care providers, representing OIG in the settlement of cases arising under the civil False Claims Act (FCA), negotiating and monitoring corporate integrity agreements (CIA), developing compliance program guidance, rendering advisory opinions on OIG authorities and sanctions, and issuing fraud alerts and other industry guidance.

6. Government programs are subject to many provisions of laws, regulations, contracts or grant agreements. At the same time, the relevance of these provisions within the context of the audit objectives varies widely, depending on the

1 objectives of the audit.

2 7. As stated in GAGAS, government "auditors may consult with their own legal counsel to (1) determine those laws and regulations that are significant to the audit objectives, (2) design tests of compliance with laws and regulations, or (3) evaluate the results of those tests. Auditors also may consult with their own legal counsel when audit objectives require testing compliance with provisions of contracts or grant agreements. Depending on the circumstances of the audit, auditors may consult with others, such as investigative staff, other audit organizations or government entities that provided professional services to the audited entity, or applicable law enforcement authorities, to obtain information on compliance matters.

8. OAS has eight regional offices, including Region VII located in Kansas City, Missouri. I am the Regional Inspector General for OAS in Region VII.

9. As Regional Inspector General, my duties and responsibilities include producing clear, concise written reports; planning and directing short-term and long-term audit work of the regional office; and ensuring that my staff analyzes quantitative and qualitative data collected from the audits in accordance with GAGAS. I have been in this position since July 2005. Prior to this position, I was an audit manager beginning in November 2001 and prior to that position I had been a senior auditor with HHS since May 1997. Prior to working for HHS, I was an auditor for the United States General Accounting Office from June 1990 until May 1997. I am a certified public accountant. I have supervised many audits of Medicare Part C, including audits that are similar to the risk adjustment data validation (RADV) audits that are conducted by the Centers for Medicare and Medicaid Services (CMS). Specifically, the audits have included analyses as to whether CMS made correct payments as well as audits designed to determine whether Medicare Advantage (MA) organizations submitted correct data for use in CMS's risk adjustment program.

10. The collection of audit materials is referred to as working papers. The working papers are written and electronically stored records, data, and other

information obtained or created during an audit. Working papers are essential to the integrity of OAS audits. Working paper files contain supporting evidence for findings and recommendations presented in a final report. Audits vary widely in the amount and types of working papers generated.

11. While the report writing process, on the whole, is collaborative and consultative, the privileged working papers specifically reflect the auditors' predecisional deliberations as to the methodology and scope of the planned audit, preliminary analyses and conclusions, and supervisory review.

## I. BACKGROUND

12. OAS follows a deliberative and methodical process in connection with the audits we conduct and the reports we ultimately decide to publish. The process can be divided into four phases - the planning, survey, data collection and analysis, and reporting phases. Sometimes the process is lengthy.

13. <u>Planning Phase.</u> With regard to the planning phase, after the determination has been made to conduct an audit, a discrete OAS audit team is formed to staff the project. The assigned OAS audit team discusses, and sometimes debates, the audit objectives, scope and the methodology that will be followed to conduct the audit. This dialogue includes a discussion of what criteria should serve as the basis for the audit. GAGAS defines criteria as the laws, regulations, contracts, grant agreements, standards, measures, expected performance, defined business practices, and benchmarks against which performance is compared or evaluated. The GAGAS criteria identify the required or desired state or expectation with respect to the program or operation and provide a context for evaluating evidence and understanding the findings. With regard to OAS' audits of information that MA organizations submit to CMS for use in CMS's risk adjustment program, CMS issued guidance to the MA organizations requiring that they submit diagnosis codes according to ICD-9-CM Coding Guidelines.

14. As part of our planning, the OAS audit team drafts and then finalizes an

"audit plan" for each audit which includes how and from which sources data will be collected, and how the data will be analyzed. For OAS audits that are similar to CMS's RADV audits, OAS audit teams obtain information from CMS, identify beneficiaries for whom CMS made an increased payment because of a hierarchical condition category (HCC), and then use this list of beneficiaries to draw a statistical sample. To ensure that the data was reviewed correctly, OAS audit teams verify the results of the methodology with the auditee.

15. To discuss and determine the objectives, internal controls, and the scope of the audit, the OAS audit team also meets with HHS program officials and contractors (in this case, CMS), responsible for administering the programs being audited to discuss our planned review with them. At times, the audit team may meet with OCIG to discuss the audit plan. Furthermore, the OAS audit team holds "entrance conferences" with the auditee. These meetings provide OAS with additional insight and information that is very useful as we conduct our audits.

16. <u>Survey Phase.</u> Phase two of our audit process is the survey phase. After making decisions about the process and data that will be used for the audit, the OAS audit team undertakes the next step to assess, design and implement internal controls and make risk assessments that could affect the audit approach. The outcome of this phase can identify conditions that need to be further developed, and team discussions can include the nature, timing, and extent of the audit work. After preliminary review and analysis, the audit team meets to discuss the results of the survey. This phase may also involve developing a statistical sampling or mathematical calculation plan. During this meeting, a "go / no-go" decision is made about whether to continue the audit and documentation of this decision is included in the audit working papers. If a decision is made to continue the audit, the audit team will prepare an audit program to develop the attributes for a potentially reportable condition.

17. <u>Data Collecting and Analysis Phase.</u> Phase three of OAS' audit process is the data collection and analysis phase, and it can vary depending on the type and

quantity of data being requested. Once the data is collected, OAS analyzes the data, discusses it internally, and begins to form conclusions based on the data collected. OAS personnel often have many conversations about the data, its significance, and what conclusions may appropriately be drawn from it. This audit process is, of course, conducted within the framework of our knowledge about the existing program requirements relating to the topic under review. Some of the OAS audit team's internal discussions occur during meetings, which involve the OAS team members assigned to the project. For OAS audits that are similar to CMS's RADV audits, OAS audit teams contract with medical reviewers to determine whether the medical records support the diagnosis codes that the MA organizations submitted to CMS for use in CMS's risk adjustment program.

18. <u>Drafting Phase.</u> The next phase of the audit is to draft a report that summarizes the audit team's work, conclusions, and recommendations. This phase necessarily involves deliberations among staff. The discussion and debate about conclusions and recommendations that began during the second phase continue during our report-writing phase.

19. After these internal discussions conclude and consensus is reached, we provide the auditee with a copy of the draft report and request written comments. Formal written comments from the auditee are incorporated into the final published version of the report. All OAS audit reports typically summarize and respond to the comments from the auditee. OIG often engages in internal discussions and deliberations about the auditee comments and what the appropriate response should be. Final OIG positions about our audits, our conclusions, and our recommendations are reflected in the language contained in our final reports. Final disposition of the findings and recommendations is the responsibility of the appropriate HHS operating division.

## II. FORMAL ASSERTION OF DELIBERATIVE PROCESS: DOCUMENTS

20. I am informed that documents in the possession of the OIG have been

requested in the course of the above-captioned litigation. I have been provided with copies of the 44 documents that OIG requested be withheld either in full, or in part, because one or more privileges protect them (the Privileged Documents). It is my understanding that OIG has withheld these documents from production on the ground of the deliberative process privilege and the Defendant in this case is challenging the assertion of the deliberative process privilege of the Privileged Documents. I also understand that the Privileged Documents are listed on a Privilege Log that was provided to the Defendant.

21. I hereby assert a formal claim of the deliberative process privilege over the Privileged Documents. This assertion is based on my personal review of these documents or on a discussion of the contents with other agency personnel who have personally reviewed the Privileged Documents. Based on my experience, training within the agency, and my personal work on audits, I am familiar with the documents at issue which have been withheld pursuant to the deliberative process privilege.

22. In the paragraphs below, I specify why I believe that the information for which I am asserting the deliberative process privilege falls within the scope of that privilege. I have determined that the documents are pre-decisional and deliberative and should be withheld from disclosure.

### III. CATEGORIES OF PRIVILEGED DOCUMENTS

23. These core working papers listed in categories below are predecisional and deliberative because they specifically reflect the individual auditors' thoughts and opinions and the audit team's decisions as to the methodology and scope of the planned audit, preliminary analyses and conclusions, and supervisory review.

24. <u>Audit Planning Documents</u>: As part of audit planning, OAS auditors contemplate which plans or providers will be audited in a given year. For example, USBPPRIV00002459 and USBPPRIV00002460 are examples of emails discussing which MA plans to audit in a particular year. Both of these documents are essentially copies of the same document. In addition, USBPPRIV00002204 and

USBPPRIV00002205 are similar copies of an email chain between various OIG components regarding planning for audits, evaluations and inspections in the Medicare Part C context.

25. <u>Audit Status</u>: Summaries of completed audits across OAS are prepared for management-level employees. For example, USBPPRIV00000058, USBPPRIV00000057, and USBPPRIV00000082 are summaries of the recommendations that OAS auditors made for completed audits. Specifically, this document contains the status of ongoing communication with the operating division to adjudicate the OAS recommendations. The vast majority of these documents do not discuss audits of the MA program. These three documents are essentially copies of the same status report.

26. <u>Correspondence and Meeting Notes</u>: As discussed above, the dialogue within the report team, within OAS, within OIG, and also within CMS or HHS at large are critical parts of the overall "give and take" process that produces a quality audit report as audit team members consider and evaluate how to conduct the audit and analyze the data. For example, USBPPRIV00008723 and USBPPRIV00008945 are both copies of minutes from a conference call between CMS and OAS regarding a request for information from CMS related to their RADV data validation process. In addition, USBPPRIV00001043 is an email chain between OAS auditors regarding OAS's audit process and data analysis regarding risk adjustment data.

27. <u>Documents Requesting Legal Advice</u>: Several of the Privileged Documents consist of emails or memoranda between OAS and OCIG requesting or receiving legal advice. The OCIG Advice Branch is the group of attorneys whose role specifically includes reviewing OIG audit and evaluation reports. Often, an Advice Branch attorney is assigned to an audit report, ideally providing critical input on complex legal issues that arise during the audit work. The assigned attorney will verify that the IG has legal jurisdiction to conduct the review, assess the legal sufficiency and accuracy of criteria included in the report, confirm that the legal standards are accurately described and cited, and evaluate the legal sufficiency of OIG

1  recommendations.

2  28.    Additionally, OAS staff may request a legal opinion or answer to a specific legal question at any time during the audit. The audit team may consult OCIG if, for example, they are uncertain or unfamiliar with a legal concept connected with the audit or if audit findings are the subject of investigation or prosecution. For example, USBPPRIV00000947, USBPPRIV00000948, USBPPRIV00000949, USBPPRIV00000950, USBPPRIV00000951, USBPPRIV00000952, and USBPPRIV00000953 are similar copies of the same request from OAS for a legal opinion from OCIG on Medicare Part C risk adjustment data criteria. Similarly, USBPPRIV00000986, USBPPRIV00000987, USBPPRIV00000988, and USBPPRIV00000989 are similar copies of an email from OCIG counsel to OAS providing legal advice regarding substantiation of risk adjustment data under Medicare Part C. The Department of Justice may also occasionally reach out to OAS for assistance in a particular matter. For example, USBPPRIV00000083 is an excerpt from OAS working papers detailing work-in-progress at the request of DOJ related to deletion of United's risk adjustment claims.

29.    <u>Pacificare Audit Documents</u>: In November 2012, OIG issued an audit report entitled Risk Adjustment Data Validation of Payments Made to PacifiCare of California for Calendar Year 2007 (A-09-09-00045) (PacifiCare Report). The working papers for this report contain emails between members of the report team as well as others within OAS or OCIG. As discussed above, this dialogue is a critical part of the overall "give and take" process that produces a quality audit report as audit team members consider and evaluate how to conduct the audit and analyze the data. For example, USBPPRIV00001104, USBPPRIV00001216, USBPPRIV00001091, USBPPRIV00001087, USBPPRIV00001248, USBPPRIV00008747, USBPPRIV00002641, USBPPRIV00001230, USBPPRIV00001219, USBPPRIV00001191, USBPPRIV00001192, USBPPRIV00001193, USBPPRIV00001220, USBPPRIV00001221 are emails among the OAS report team

and, in some instances OAS' medical reviewers, regarding various aspects of the report including, among other things, methodology, data collection, analysis, and recommendations.

30. The working papers also contain draft documents and various iterations of internal working papers containing auditor's notes and thoughts. For example, USBPPRIV00001670, USBPPRIV00002640, USBPPRIV00001568, USBPPRIV00009829, and USBPPRIV00001569 are all similar versions of draft and final reports for two audits of PacifiCare containing auditors' internal notes and thoughts, USBPPRIV00001702 is a final report with comments from the OIG Immediate Office throughout, and USBPPRIV00002638 and USBPPRIV00001034 are working papers containing information obtained during the audit and a discussion of the audit methodology. Both of these documents contain internal notes from members of the audit team.

31. Based on my personal knowledge of the Privileged Documents or on knowledge obtained from a discussion of the contents with other agency personnel who have personally reviewed the Privileged Documents, these documents are pre-decisional and deliberative in nature. OIG has a duty and responsibility to conduct regular and frequent audits of programs. Promoting the internal and intra-agency exchange of information and discussion of our audits and draft reports is a vital part of producing quality reports.

32. The deliberative process documents referenced on the Privilege Log reflect the perspectives of a variety of staff members at various levels within the OIG about our work and how and whether that work should be memorialized in final reports. It is important that the views of all OIG personnel involved in these reports be voiced and considered as the audits were conducted and our reports were written. We have established a history and culture of open dialogue among OIG personnel in connection with our reports, and our reports benefit tremendously from such a free flow of dialogue and ideas. OIG personnel reasonably expect that the substance of their

discussions will be kept confidential and we need to maintain this confidentiality in order to ensure a free flow of candid discussion, deliberation, and analysis.

33. It is also very important to note that work papers, unpublished drafts or unfinished draft reports reflecting the opinions or suggestions of the authors and the comments from other agency staff do not constitute the final position of the OIG on any matter or recommendation in the report unless and until they are embodied in a final report. A report is considered final when all of the necessary audit processes have been completed and the report is signed by the appropriate authorizing individual.

34. I believe that the release of documents, including draft reports, which contain statements or opinions by agency personnel that may have been rejected or revised during later discussions and deliberations could disrupt and undermine the process by which the OIG conducts audits and produces reports.

35. Based on my many years of experience in the OIG, I believe the foregoing concerns about the potential chilling effect on the candid exchange of opinions and recommendations among agency personnel are heightened in the context of litigation, especially any case in which the Government is a party. As a longtime government employee who is now in a management position, I have no doubt that if my staff or others within the OIG expected that their comments, criticisms, suggestions, or proposed edits made during our report process would be publicly displayed in the context of a lawsuit, this would stifle much of the very necessary candid dialogue among us. The OIG's work would suffer as a result, to the ultimate detriment of HHS programs and the public.

36. For the reasons stated above, I consider that the release of the documents for which we asserted the deliberative process privilege on the Privilege Log would be detrimental to OIG deliberations and thus contrary to the public interest. On behalf of HHS-OIG, I am formally asserting the deliberative process privilege over the Privilege Documents.

I declare under penalty of perjury the foregoing is true and correct to the best of my knowledge and belief.

Executed this 5th day of November 2018, in Kansas City, Missouri

Patrick J. Cogley
Regional Inspector General
Office of Audit Services, Region VII
Office of Inspector General