JOSEPH H. HUNT
Assistant Attorney General, Civil Division
NICOLA T. HANNA
United States Attorney
DAVID M. HARRIS
DAVID K. BARRETT
ABRAHAM C. MELTZER
JOHN E. LEE (CBN 128696)
JACK D. ROSS (CBN 265883)
Assistant United States Attorneys
  300 N. Los Angeles Street, Room 7516
  Los Angeles, California 90012
  Tel: (213) 894-3995; Fax: (213) 894-7819
  Email: john.lee2@usdoj.gov
MICHAEL D. GRANSTON
ROBERT McAULIFFE
EDWARD CROOKE
CAROL L. WALLACK
JUSTIN DRAYCOTT
PAUL G. FREEBORNE
JESSICA E. KRIEG
ZOILA E. HINSON
AMY L. LIKOFF
ADAM R. TAROSKY
Attorneys, Civil Division, U.S. Department of Justice
  P.O. Box 261, Ben Franklin Station
  Washington, D.C. 20044
  Tel: (202) 307-0486; Fax: (202) 307-3852
  Email: carol.wallack@usdoj.gov
JAMES P. KENNEDY, JR.
United States Attorney
KATHLEEN ANN LYNCH
Assistant United States Attorney (Admitted PHV)
  138 Delaware Avenue
  Buffalo, New York 14201
  Tel: (716) 843-5830; Fax: (716) 551-3052
  Email: kathleen.lynch@usdoj.gov
Attorneys for the United States of America

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING,<br><br>   Plaintiffs,<br><br>   v.<br><br>UNITEDHEALTH GROUP, INC., *et al.*,<br><br>   Defendants. | No. CV 16-08697 MWF (SSx)<br><br>PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR SCHEDULING ORDER MODIFYING EXTENT OF DISCOVERY<br><br>Date: April 8, 2019<br>Time: 10:00 a.m.<br>Court: 5A, Hon. Michael W. Fitzgerald |

**INTRODUCTION**

In this False Claims Act ("FCA") case, Plaintiffs allege that Defendants knowingly retained payments for millions of *invalid* diagnosis codes submitted to Medicare. Although Plaintiffs' claims are limited to Defendants' knowing failure to delete specific *invalid* diagnosis codes, Defendants have coopted discovery in this case to challenge the payment methodology of the entire Medicare Advantage ("MA") program. They argue that the payments they received over the past decade for *valid* diagnosis codes were too low and that they are entitled to retain payments for *invalid* diagnoses to compensate for this. Alternatively, they claim that the damages to Medicare resulting from their knowing failure to delete *invalid* diagnoses should be reduced to compensate them for the purportedly "too low" payments for *valid* diagnoses.

Defendants' challenge to the MA payment model has no relevance to the legitimate claims or defenses in this action. As the government explained in its recent motion for review of the Magistrate Judge's order compelling production of internal agency deliberations (Dkt. 334), such a challenge (i) is not a valid defense to fraud; (ii) was part of Defendants' Counterclaim, which they have already agreed this Court lacks subject matter jurisdiction to adjudicate; and (iii) is not relevant to damages in this FCA action, which rest only upon the submission of invalid (not valid) diagnoses.

To ensure that discovery proceeds in the manner required by Rule 26(b), Plaintiffs sought a threshold ruling on Defendants' legal obligation to correct claims for risk-adjusted payments which were based on *invalid* diagnosis codes (*i.e.*, false claims) (Dkt. 234). Despite the pendency of Plaintiffs' requests for appropriate limitations, Defendants have significantly expanded their burdensome discovery demands on irrelevant issues not only on the government under Rule 34, but also from third-parties under Rule 45. The need for appropriate limits on discovery was made manifest by Defendants' recent motion to compel the production of privileged material, which forced the Centers for Medicare and Medicaid Services ("CMS") to divert considerable resources from running the Medicare Program to logging internal agency documents and

perfecting privilege with respect to inordinately broad categories of material that are irrelevant to Plaintiffs' claims or any legitimate defense.

Plaintiffs therefore renew their request that the Court set appropriate discovery limits in this case and ask the Court enter the accompanying proposed order. The proposed order forecloses discovery on Defendants' improper challenge to the payment process, which challenge is ever expanding and well outside of the scope of permissible Rule 26 (b) discovery. The order also forecloses certain discovery regarding the materiality of diagnosis codes to the MA payment process and the obligation to delete knowingly invalid diagnosis codes that, as explained in previous briefing, are settled issues under this Court's prior rulings and Ninth Circuit precedent.

## BACKGROUND

Based on the discovery requests that they have propounded to date, Defendants clearly intend to use this action to litigate their program-level grievances over how Medicare calculates payments to every insurer participating in the MA program based on their submission of valid diagnosis data. Much of Defendants' improper discovery relates to their contention that the payment coefficients for certain risk-adjusting medical conditions were "too low" because they were determined based on unaudited diagnosis data in fee-for-service (FFS) claims submitted to Medicare. Defendants appear to seek this discovery in an attempt to prove that they are entitled to keep payments for *invalid* diagnoses as compensation for the purportedly "too low" payments for *valid* diagnoses. Indeed, United has explicitly stated that it will continue its attempts to litigate its underpayment contentions in multiple "other fora."[1]

---

[1] *See* United's Resp. to U.S.' Mot. to Dismiss Counterclaims (Dkt. 249) at 2 ("United . . . has argued that CMS should adopt an 'adjuster' mechanism that would compare the presence of unsupported diagnosis codes in an MA plan's data with the presence of such codes in the traditional Medicare data and account for the difference. . . . It has done so in administrative comments on notice-and-comment rulemakings, in meetings with CMS officials, in its currently pending Administrative Procedure Act challenge to a 2014 CMS regulation, and in its briefs in this case. And United intends to continue asserting that position in other fora, too, because CMS's refusal to adopt an adjuster already has resulted in United being paid less than it should have been under its contracts with CMS and the payment requirements of the Medicare Act.").

3

To date, United has served the United States with 128 document requests. Many of those requests concern the development, implementation, calibration, and evaluation of the payment model from 2004 to present date. United also seeks documents related to the examination of the possible use of a payment error rate adjuster, referred to as an FFS Adjuster, for administrative Risk Adjustment Data Validation ("RADV") audits conducted by CMS. CMS said that it would use such an adjuster when it decided to extrapolate its audit results to determine contract-level overpayments. Defendants further seek all data used over the last 15 years (i) to calibrate and recalibrate the coefficients for the model (and additional data to perform their own calibrations), and (ii) to evaluate the possible use of the FFS Adjuster for extrapolated audits. All told, Defendants are demanding a vast quantity of documents and a huge volume of data relating to these issues. *See* Declaration of Carol L. Wallack (Attachment 1 hereto) at ¶ 2 (identifying Defendants' document requests relating to the FFS Adjuster issue and the development, evaluation, and calibration of the risk adjustment model).[2]

Defendants recently expanded the scope of discovery relating to this actuarial equivalence/FFS Adjuster issue by seeking documents and data relating to a rule recently proposed by CMS relating to RADV audits and to a study supporting the proposed rule.

---

[2] For example, Defendants request all documents regarding:
- "the RADV Medicare fee-for-service ("FFS") error rate adjuster discussed in CMS's Notice of Final Payment Error Calculation Methodology for Part C Medicare Advantage Risk Adjustment Data Validation Contract-Level Audits (Feb. 24, 2012)" (Request for Production ["RFP"] 6);
- "the methodology by which the Government calculates Risk Adjustment Factors [i.e., coefficients]" from 1997 to 2017 (RFP 24);
- "the development and operation of the CMS-HCC Risk Adjustment Model [for payment years 2004 to 2017], including but not limited to Documents identifying and explaining the specific data used to calibrate the CMS-HCC Risk Adjustment Model" (RFP 100);
- "how the data were selected and which records were specifically selected to create the 5% Medicare Standard Analytic files . . . used to develop, calibrate, and recalibrate the CMS-HCC Risk Adjustment Model" for payment years 2004 to 2017 (RFP 101); and
- "All data from all fields included in the 5% Fee-For-Service Medicare file used to develop, calibrate, or recalibrate the CMS-HCC Risk Adjustment Model" for payment years 2004 to 2017 (RFP 102).

In October 2018, CMS published a study finding that, contrary to Defendants' speculative contention, any errors in the FFS diagnosis data did not cause the payments to insurers for valid codes to be "too low." *See* Notice of Recent Proposed Medicare Part C Regulation, Exhibit 2, Dkt. 307-2 (*Fee for Service Adjuster and Payment Recovery for Contract Level Risk Adjustment Data Validation Audits* (Oct. 26, 2018)) at 6 (hereinafter "FFS Adjuster Study") (concluding that "diagnosis error in FFS claims data does not lead to systematic payment error in the MA program."). On November 1, 2018, CMS published a notice of proposed rulemaking in which it summarized the FFS Adjuster Study and proposed "not [to] include an FFS Adjuster" in its methodology for calculating overpayments collected through RADV audits. Policy and Technical Changes to the Medicare Advantage Program for 2020 and 2021 Proposed Rule, 83 Fed. Reg. 54,982-01 at 55,041 (Nov. 1, 2018) ("2018 Proposed Rule").

On November 20, 2018, Defendants sent CMS a letter requesting information and data relating to the FFS Adjuster Study. Thereafter, on December 21, 2018, Defendants served the United States with requests in this case for all conceivable documents and data relating to both the FFS Adjuster Study and the proposed rule. Defendants also issued a third-party subpoena demanding similar information from Research Triangle Institute International ("RTI"), a CMS contractor that assisted the agency in developing the risk adjustment model, calibrating the model, and analyzing the RADV FFS Adjuster issue. In addition to information about the proposed rule, Defendants sought a vast quantity of documents and data in RTI's possession from 2002 to the present relating to the risk adjustment model, the calibration of the model, and the FFS Adjuster issue. See Declaration of Carol L. Wallack (Attachment 1 hereto) at ¶ 3. Defendants have sought similar discovery from another CMS contractor named ARDX.

## ARGUMENT

Defendants' challenge to the payment methodology and coefficients is not a valid defense to fraud. Defendants have known for many years that the FFS data used to calibrate the coefficients is unaudited and may include diagnoses that are unsupported by

5

FFS beneficiaries' medical records (over-reporting) and not include all diagnoses that are supported by their records (under-reporting).  Prior to each payment year (and before MA insurers submitted bids for Part C contracts), CMS publishes the proposed risk adjustment methodology and coefficients for public comment in an "Advanced Notice" and then publishes the final methodology and coefficients in an "Announcement."  42 U.S.C. § 1395w-23(b)(1)-(3).  If Defendants truly objected to the payment model or coefficients, they could have challenged the agency's final Announcements under the Administrative Procedure Act ("APA"), 5 U.S.C. § 700 *et seq*.  *Cf. Minuteman Health, Inc. v. U.S. Dep't of Health & Human Servs.*, 291 F. Supp. 3d 174, 179 (D. Mass. 2018) (APA challenge to HHS' risk adjustment model under the Affordable Care Act); *N. Mex. Health Connections v. U.S. Dep't of Health & Human Servs.*, 340 F. Supp. 3d 1112, 1120-21 (D.N.M. 2018) (same).  But Defendants never did this.  Instead, Defendants voluntarily entered into hundreds of contracts with CMS, agreed to comply with the regulatory and contractual program requirements,[3] and accepted billions of dollars in risk-adjusted payments for years based on the finalized and published coefficients.  Defendants cannot knowingly avoid their obligation to delete invalid diagnosis codes and then escape liability for fraud by challenging the payment model.  *See Cedars-Sinai Med. Ctr. v. Shalala*, 125 F.3d 765, 769 (9th Cir. 1997) (rejecting argument that APA challenge to Medicare payment rule could be heard as a defense in FCA case); *see also* U.S. Mem. in Supp. of Mot. for Review (Dkt. 334-1), at 10-12.  Their payment challenge is not a cognizable defense that can be pursued within the bounds of Rule 26.

In addition, an APA action was the only appropriate means of challenging the

---

[3] The regulatory requirement that medical records substantiate diagnoses is unambiguous.  As discussed at page 12 of Plaintiffs' Reply Memorandum in Support of Joint Motion for Partial Summary Judgment (Dkt. 272), all diagnosis data submitted to CMS for any healthcare programs must comply with the International Classification of Diseases ("ICD") guidelines, 42 C.F.R. § 162.1002(a)(1)(i), (b)(1) & (c)(2)(i), and these guidelines clearly require that the patients' medical records substantiate the diagnoses assigned to them.  A CMS risk adjustment data regulation reiterates this by reminding insurers that they must comply with all national standards for the submission of data, which includes the ICD guidelines.  42 C.F.R. § 422.310(d)(1).

coefficients because such an action would have enabled a court to remand to the agency to modify its methodology and recalibrate the coefficients and avoided unnecessary judicial involvement in a complex payment program for which Congress has given the agency significant discretion. In contrast, the use of this FCA action, which concerns only a specific set of invalid diagnosis codes, to recalibrate the entire model and re-determine the coefficients used to pay every MA insurer over the last decade is inappropriate and would vastly and improperly expand the scope of fact and expert discovery, motion practice, and the trial in this action. Similarly, if Defendants want to challenge the recently proposed RADV audit methodology rule, they can pursue an APA action once the rule is finalized, just like any other MA insurer.

Furthermore, Defendants have been clear that they intend to pursue their claim for damages purportedly resulting from any "too low" payments for valid diagnosis codes in the Court of Federal Claims. Defendants initially attempted to file their counterclaims in this Court. In those counterclaims, Defendants explained that their claim for an FSS adjuster pertains to the "lower payment to an MA plan for a patient who *does* have that condition (and a supported diagnosis code to go with it)." Counterclaim, ¶ 10 (emphasis original). Defendants now concede that this Court "lacks jurisdiction" over those claims. *See* Defs.' Opp. to Mot. to Dismiss (Dkt. 249) at 3:25. And this Court has likewise recognized that payments made for valid diagnoses are not part of Plaintiffs' case. *See* Order (Dkt. 212), at 21-22 ("the real issue is the actual invalid codes that were submitted and not deleted"). Thus, this Court lacks subject matter jurisdiction to adjudicate Defendants' counterclaims or to entertain discovery on the challenge.

The FFS Adjuster issue is also irrelevant to Plaintiffs' FCA claim. Plaintiffs allege that Defendants submitted hundreds of thousands of invalid claims for which they were not entitled to payments and wrongfully retained such payments. Unlike RADV audits (for which a payment error rate is extrapolated to an entire contract), Plaintiffs do not rely on extrapolation or seek contract-level overpayments. Instead, each overpayment alleged in this case is tied to a single corresponding invalid diagnosis code,

or false claim for payment. As a result, each separate submission of an invalid diagnosis code and corresponding knowing avoidance of an obligation to delete that invalid diagnosis code is a separate and freestanding FCA violation. In this context, the concept of actuarial equivalence does not change what constitutes a false claim or a violation of the FCA. *See UnitedHealthcare Ins. Co. v. Azar,* 330 F. Supp. 3d 173, 189 (D.D.C. 2018) ("United does not contend that Medicare Advantage insurers should be permitted knowingly or recklessly to bill CMS for erroneous diagnosis codes."). Even if Defendants were correct that the use of unaudited FFS diagnosis data resulted in some of the coefficients being "too low," that would mean *only* that Defendants may not have been paid sufficiently for *valid* diagnoses – *not* that they can knowingly retain payment for *invalid* diagnoses.

Actuarial equivalence and FFS Adjuster arguments are also irrelevant to the determination of the overpayments or damages in this case. The calculation of overpayments or damages resulting from the failure to delete invalid diagnoses is straightforward and does not implicate the payment process for valid codes. If Medicare paid an increased amount to an insurer based on an invalid diagnosis code, that entire amount must be recovered. *See* Pls.' First Am. Compl. ("FAC") (Dkt. 171) at 235-38. *First*, Plaintiffs will re-calculate each individual beneficiary's risk score without the invalid diagnoses identified through Defendants' chart reviews. *Second*, Plaintiffs will calculate the amount that would have been paid to Defendants for that beneficiary based on the revised risk score and published coefficients. The overpayment or damage is the difference between what was paid and what would have been paid for that individual beneficiary based on his or her revised risk score. Payments for valid codes are not affected or implicated in this analysis.

Finally, there is no merit to Defendants' argument that they need internal agency deliberative documents relating to an FFS Adjuster to show that they had a reasonable good-faith belief that they were entitled to a "free pass" for a certain number of false claims based on invalid diagnoses and knowingly retain the amounts Medicare paid

8

based on these false diagnoses.  (Dkt. 310 at 27.)  Regulations unambiguously establish that medical record documentation must substantiate all diagnosis data submitted to CMS for all healthcare programs.  *See supra* footnote 2.  CMS has always been clear that unsubstantiated diagnosis codes are invalid for payment purposes.  *See* FAC ¶¶ 89-91 (describing manuals and guides CMS has issued publicly since 2003 consistently stating that diagnosis data submitted for risk-adjusted payments must be supported by patients' medical records).  Defendants do not need discovery of internal agency documents to understand their legal obligations, as these obligations were set forth in public documents such as regulations, manuals and guides and incorporated into all of Defendants' Part C contracts.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter the proposed order submitted with this supplemental brief.

Respectfully submitted,

| | |
|---|---|
| Dated: March 20, 2019 | JOSEPH H. HUNT<br>Assistant Attorney General<br>NICOLA T. HANNA<br>United States Attorney<br>DAVID M. HARRIS<br>DAVID K. BARRETT<br>ABRAHAM C. MELTZER<br>JACK D. ROSS<br>Assistant United States Attorneys<br><br>MICHAEL D. GRANSTON<br>ROBERT McAULIFFE<br>EDWARD CROOKE<br>CAROL L. WALLACK<br>JUSTIN DRAYCOTT<br>PAUL G. FREEBORNE<br>JESSICA E. KRIEG<br>ZOILA E. HINSON<br>AMY L. LIKOFF<br>ADAM R. TAROSKY<br>Civil Division, Department of Justice<br><br>JAMES P. KENNEDY, JR.<br>Acting United States Attorney<br>KATHLEEN ANN LYNCH<br>Assistant United States Attorney<br><br>/s/ John E. Lee<br>JOHN E. LEE<br>Assistant United States Attorney<br>Attorneys for the United States of America |
| Dated: March 20, 2019 | ERIC R. HAVIAN<br>HARRY LITMAN<br>JESSICA MOORE<br>Constantine Cannon LLP<br><br>STEVE HASEGAWA<br>Phillips & Cohen LLP<br><br>WILLIAM CHRISTOPHER CARMODY<br>ARUN SUBRAMANIAN<br>WILLIAM R.H. MERRILL<br>JOHN P. LAHAD<br>WESTON O'BLACK<br>GENG CHEN<br>CATRIONA LAVERY<br>Susman Godfrey LLP<br><br>/s/ Henry C. Su<br>HENRY C. SU<br>Attorneys for Relator Benjamin Poehling |

10

<u>Attestation</u>

I hereby attest that the other signatory listed, on whose behalf the filing is submitted, concurs in the filing's content and has authorized the filing.

Dated: March 20, 2019

/s/ John E. Lee
JOHN E. LEE
Assistant United States Attorney