1  LATHAM & WATKINS LLP
       David J. Schindler (Bar No. 130490)
2        *david.schindler@lw.com*
   355 South Grand Avenue, Suite 100
3  Los Angeles, California 90071-1560
   Telephone: +1.213.485.1234
4  Facsimile: +1.213.891.8763

5  LATHAM & WATKINS LLP
       Daniel Meron (appearing *pro hac vice*)
6        *daniel.meron@lw.com*
       Kathryn H. Ruemmler (appearing *pro hac vice*)
7        *kathryn.ruemmler@lw.com*
       Abid R. Qureshi (appearing *pro hac vice*)
8        *abid.qureshi@lw.com*
   555 Eleventh Street, NW, Suite 1000
9  Washington, DC 20004-1304
   Telephone: +1.202.637.2200
10 Facsimile: +1.202.637.2201

11 Attorneys for United Defendants

12

                    **UNITED STATES DISTRICT COURT**
13
                    **CENTRAL DISTRICT OF CALIFORNIA**
14

15

16 | UNITED STATES OF AMERICA *ex rel.* | CASE NO. 2:16-cv-08697-MWF(SSx) |
   | BENJAMIN POEHLING,                |                                 |

17 |                                   | **UNITED'S RESPONSE TO**        |
   |                Plaintiff,          | **PLAINTIFFS' SUPPLEMENTAL**    |
18 |                                   | **BRIEF IN SUPPORT OF MOTION**  |
   |        v.                          | **FOR SCHEDULING ORDER**        |
19 |                                   | **MODIFYING EXTENT OF**         |
   | UNITEDHEALTH GROUP, INC. *et al.*, | **DISCOVERY**                   |
20 |                                   |                                 |

21 |                Defendants.         |                                 |

22 |                                   | [No Hearing On Motion Presently |
   |                                   | Scheduled]                      |
23 |                                   | Judge: Hon. Michael W. Fitzgerald |

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

                    UNITED'S RESPONSE TO SUPPL. BR. IN SUPP. OF
                    MOT. FOR MODIFICATION OF DISCOVERY
                    Case No. 2:16-cv-08697-MWF(SSx)

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

ARGUMENT.........................................................................................................2

I.      DEVELOPMENTS SINCE THE GOVERNMENT FILED ITS
        RULE 16 MOTION ONLY UNDERMINE THAT MOTION ....................2

        A.      United's Recent Discovery Requests Are Consistent
                With Prior Requests And Directly Relevant To United's
                Defenses ........................................................................................2

        B.      The Major Intervening Development Is Judge Collyer's
                Decision—Which Confirms The Relevance Of The
                Requested Discovery .....................................................................6

II.     UNITED IS ENTITLED TO DEFEND ITSELF BY
        INVOKING THE CONTRACTUAL AND STATUTORY
        PROVISIONS GOVERNING PAYMENT.................................................10

III.    THE GOVERNMENT'S "OFFSET" AND JURISDICTIONAL
        ARGUMENTS ARE MERITLESS ...........................................................14

CONCLUSION ..................................................................................................15

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

i

UNITED'S RESPONSE TO SUPPL. BR. IN SUPP. OF
MOT. FOR MODIFICATION OF DISCOVERY
Case No. 2:16-cv-08697-MWF(SSx)

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Cedars-Sinai Meical Center v. Shalala*,
    125 F.3d 765 (9th Cir. 1997)....................................................................10, 12

*United States v. Smith*,
    866 F.2d 1092 (9th Cir. 1989)..........................................................................12

*United States v. Weiss*,
    914 F.2d 1514 (2d Cir. 1990) ...........................................................................12

*UnitedHealthcare Insurance Co. v. Azar*,
    330 F. Supp. 3d 173 (D.D.C. 2018)...........................................................*passim*

*Universal Health Services, Inc. v. United States ex rel. Escobar*,
    136 S. Ct. 1989 (2016) .....................................................................................14

*In re Westgate-California Corp.*,
    642 F.2d 1174 (9th Cir. 1981) ............................................................................9

## STATUTES

28 U.S.C. § 1346....................................................................................................15

31 U.S.C. § 3729(a)(1)(G) .......................................................................... 1, 5, 11, 15

42 U.S.C. § 1395w-23(b)(4)(D) ...............................................................................6

42 U.S.C. § 1320a-7k(d)(2)......................................................................................9

## RULES

Fed. R. Civ. P. 16......................................................................................... 1, 2, 3, 6

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

ii

UNITED'S RESPONSE TO SUPPL. BR. IN SUPP. OF
MOT. FOR MODIFICATION OF DISCOVERY
Case No. 2:16-cv-08697-MWF(SSx)

# INTRODUCTION

The government argues that developments since it filed its Rule 16 motion—specifically, United's discovery requests in the intervening months—have materially changed the complexion of this case in a way that increases the need for the government's proposed severe limits on discovery.  *See* Pls.' Suppl. Br. 1–4, Dkt. 346.  But the recent discovery requests on which the government focuses go to the same actuarial equivalence issues that United has been raising all along, and that the government itself previously argued should be resolved here on the basis of "a full factual record."  Ex. 54 to United's Opp'n to Mot. for Partial Summ. J. 7, Dkt. 254-3 (U.S. Mot. for Stay in *UnitedHealthcare v. Price*).  Nothing has changed that could support the government's motion.  On the contrary, the biggest development that has happened since the government filed its motion is Judge Collyer's decision agreeing with United about the meaning and ramifications of the "actuarial equivalence" and "same methodology" requirements—a development that undermines the government's request.

The government also asserts (again) that United's arguments about the "actuarial equivalence" and "same methodology" requirements are categorically irrelevant to this case.  As United has explained, however, those requirements are central to the structure of the Medicare Advantage ("MA") risk adjustment program, and have implications for virtually every element of the government's remaining statutory and common law claims.  To take just one example, the "actuarial equivalence" and "same methodology" provisions are expressly incorporated into the contracts between United and CMS, and define the parameters of the parties' obligations thereunder.  Evidence about how the contracting parties understood those provisions, and about the implications the provisions have for United's risk adjustment submissions, is thus directly relevant to whether United had an "obligation to pay . . . money" to the government,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

1

UNITED'S RESPONSE TO SUPPL. BR. IN SUPP. OF
MOT. FOR MODIFICATION OF DISCOVERY
Case No. 2:16-cv-08697-MWF(SSx)

31 U.S.C. § 3729(a)(1)(G), and whether United was paid "by mistake" and "unjustly enriched."

The government has also offered in its most recent filings an additional argument—that this Court somehow lacks *jurisdiction* to consider United's "actuarial equivalence" and related arguments, going to central elements of the government's claims, because United has requested a transfer of its counterclaims to the Court of Federal Claims.  There is no basis whatsoever for that position.  The reason for transferring the counterclaims relates solely to this Court's inability to award damages against the government in excess of $10,000 if it turns out that United was *under*paid.  The fact that United could not obtain damages against the government in this Court does not preclude United from defending itself here on the ground that, among other things, it was not *over*paid and had no obligation to delete unsupported diagnosis codes.

## ARGUMENT

## I.   DEVELOPMENTS SINCE THE GOVERNMENT FILED ITS RULE 16 MOTION ONLY UNDERMINE THAT MOTION

### A.   *United's Recent Discovery Requests Are Consistent With Prior Requests And Directly Relevant To United's Defenses*

In the 2014 Overpayment Rule and its litigating papers in this case, the government has taken the position that every unsupported diagnosis code that an MA plan identifies in its risk adjustment data is categorically invalid and necessarily results in an overpayment.  *See, e.g.*, Am. Compl.-In-Intervention ¶ 103, Dkt. 171 (describing government's theory of the "Obligation to Delete Invalid Diagnoses"); *UnitedHealthcare Ins. Co. v. Azar*, 330 F. Supp. 3d 173, 182 (D.D.C. 2018) (describing 2014 Overpayment Rule's theory that "*any* diagnostic code that is inadequately documented in a patient's medical chart results in an 'overpayment'").

United (like other major MA plans) has never accepted that understanding of how the risk adjustment system mandated by statute is supposed to work.  Nor has

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

2

UNITED'S RESPONSE TO SUPPL. BR. IN SUPP. OF
MOT. FOR MODIFICATION OF DISCOVERY
Case No. 2:16-cv-08697-MWF(SSx)

it ever agreed—by contract or otherwise—to comply with program requirements that would *violate* the statute.  Instead, United has maintained that because CMS's risk adjustment model is built using supported and unsupported diagnosis codes from the traditional Medicare (or "Fee-For-Service") program, the model generates payment amounts that are appropriate when—and only when—they are applied in the MA program to data that contains a similar prevalence of unsupported codes.  So long as an MA plan's risk adjustment data is similar to traditional Medicare's data in terms of the rate and type of unsupported diagnosis codes it contains, therefore, United has maintained that the plan is entitled under its contract to be paid on its submitted diagnosis codes, including both the supported and unsupported codes.  Indeed, United has argued that requiring it to delete the unsupported codes and be paid just on the supported codes would violate CMS's contractual and statutory obligations to "ensure actuarial equivalence" between the two programs and use the "same methodology" for measuring risk in both.  *See, e.g.*, United's Opp'n to Mot. for Partial Summ. J. 20–29, Dkt. 250.

The discovery requests that prompted the government's supplemental briefing are all directly relevant to that longstanding defense, just as United's earlier requests (preceding the government's Rule 16 motion) were.  The materials United seeks would help to show that in the past, CMS itself has understood that it could not treat every unsupported code as resulting in an overpayment, and for that reason agreed to use a Fee-For-Service Adjuster to determine whether and to what extent an MA plan's unsupported diagnosis codes had resulted in overpayments.  *See, e.g.*, Request for Production ("RFP") 6.  The requested materials would also help United calculate the rate of unsupported diagnosis codes in CMS's own data and the effects those unsupported codes have on CMS's payment model—and thus show how making United delete comparable diagnosis codes in its own data would violate actuarial equivalence.  *See, e.g.*, RFPs 24, 100, 101, 102.

For example, the government's supplemental brief highlights United's

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

3

UNITED'S RESPONSE TO SUPPL. BR. IN SUPP. OF
MOT. FOR MODIFICATION OF DISCOVERY
Case No. 2:16-cv-08697-MWF(SSx)

request for documents relating to an October 2018 study by several CMS enforcement officials. *See* Pls.' Suppl. Br. 4–5. Assessing data from 2004–2011, the study's authors purported to conclude that CMS's use of both supported and unsupported diagnosis codes to calibrate its risk adjustment model had no downward effect on its cost estimates, such that the resulting payment figures would maintain "actuarial equivalence" even if they were applied, without adjustment, to only *supported* diagnosis codes in the MA program. *See* United's Resp. to Mot. for Review of Disc. Order 18–19, Dkt. 338 (discussing study). Analysis of that sort is directly relevant to this case—a fact the government acknowledged when it submitted the study for the Court's consideration and specifically argued that "[t]he reasons for not applying an adjuster" set out "in the Executive Summary and its Technical Appendix" are "relevant to the 'actuarial equivalence' and other issues currently before this Court." Notice of Proposed Regulation 2, Dkt. 307. Having represented that its own study about the effect of unsupported codes is "relevant," the government cannot persuasively argue here that evidence United could use to *challenge* the study (and the government's broader arguments that the study purports to support) is not relevant. Indeed, United believes that, when analyzed correctly, the data used in the government's study proves United's point, not the government's. Little wonder, then, that the government is so resistant to making a sufficient disclosure.

Similarly misplaced are the government's complaints about discovery related to the Fee-For-Service Adjuster CMS agreed to utilize in audits of plans' risk adjustment data back in 2012. Again, the government's own intervening actions confirm this: In the same filing in which it submitted the CMS study, the government also alerted the Court to a Proposed Rulemaking in which CMS is exploring the possibility of abandoning the Fee-For Service Adjuster—a possibility the government declared "relevant" to this case. *Id.* If the potential *abandonment* of the Fee-For-Service Adjuster in 2019 is relevant to this case about conduct that

UNITED'S RESPONSE TO SUPPL. BR. IN SUPP. OF
MOT. FOR MODIFICATION OF DISCOVERY
Case No. 2:16-cv-08697-MWF(SSx)

occurred years earlier, then it follows that the government's *adoption* of a Fee-For-Service Adjuster during the actual period covered by the suit is certainly relevant, too.  Evidence about that choice would help United show that, during the time in question, CMS recognized the need to account for unsupported codes in the Fee-For-Service data in order to determine which, if any, of the unsupported codes in an MA plan's data could be treated as "invalid" in light of CMS's statutory obligations and contractual commitments.  Moreover, it might allow United to show that a government audit of United's risk adjustment data during the years in question would have concluded *no overpayments* had been made, on a contract-wide basis, after taking account of the Fee-For-Service Adjuster.  Such a showing would be powerful evidence on central issues like whether any of the alleged violations here were material, whether United was unjustly enriched, and whether United "knowingly conceal[ed] or knowingly and improperly avoid[ed] or decreas[ed] an obligation to pay or transmit money" to the government.  31 U.S.C. § 3729(a)(1)(G).

The government's supplemental brief tries to fight this obvious conclusion by implying that CMS adopted the Fee-For-Service Adjuster because of concerns about "extrapolation" that were specific to its audits, not broader concerns about "actuarial equivalence" that would also apply to the government's enforcement theory in this case.  *See* Pls.' Suppl. Br. 7–8.  Even if that were true, evidence about whether a government audit would have required United to return payments would still be relevant.  And in any event, CMS said nothing at all about extrapolation when it adopted the Fee-For-Service Adjuster; instead, CMS adopted the adjuster because it "recognized that actuarial equivalence, mandated by statute, required an FFS Adjuster for purposes of defining overpayments because of dissimilar data for RADV audits."  *Azar*, 330 F. Supp. 3d at 189.  If the government wants to argue that never-expressed concerns about extrapolation really did factor into CMS's decision to adopt the Fee-For-Service Adjuster, it is of

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

5

UNITED'S RESPONSE TO SUPPL. BR. IN SUPP. OF
MOT. FOR MODIFICATION OF DISCOVERY
Case No. 2:16-cv-08697-MWF(SSx)

course free to do so, but that is a *factual* question that can only be resolved after the evidence has been produced—it is not a basis for refusing to produce the evidence in the first place.

### B. The Major Intervening Development Is Judge Collyer's Decision—Which Confirms The Relevance Of The Requested Discovery

The government is thus wrong to argue that intervening developments have bolstered the case for its Rule 16 motion. Indeed, if something material has changed, it is Judge Collyer's decision invalidating CMS's attempt to define an "overpayment" in the 2014 Overpayment Rule. *See Azar*, 330 F. Supp. 3d 173. That development just highlights why the sought discovery is relevant here.

The Overpayment Rule mirrored the government's litigation theory in this lawsuit. Like the government's theory here, it required plans to delete every diagnosis code they knew to be unsupported by a medical record, even if the plan's data was materially indistinguishable from the Fee-For-Service data CMS uses to calibrate its risk adjustment model. *See id.* at 182. Failure to delete the codes, the Overpayment Rule provided, would result in an "overpayment" that the government could pursue under the False Claims Act. *See id.* Judge Collyer held that the Rule's definition of "overpayment" was invalid for three separate reasons.

*First*, it violates the Medicare statute's "actuarial equivalence" mandate: To "subject the diagnosis codes underlying Medicare Advantage payments to a different level of scrutiny than [CMS] applies to its own payments under traditional Medicare"—i.e., to require deletion of unsupported diagnosis codes in MA when CMS does not do so in traditional Medicare—would "impermissibly skew[] the calculus" and "ensure[] that there will *not* be actuarial equivalence between traditional Medicare payments and Medicare Advantage payments for comparable patients." *Id.* at 186.

*Second*, it violates the requirement in 42 U.S.C. § 1395w-23(b)(4)(D) that CMS measure risk in both programs using the "same methodology." This was true

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

6

UNITED'S RESPONSE TO SUPPL. BR. IN SUPP. OF
MOT. FOR MODIFICATION OF DISCOVERY
Case No. 2:16-cv-08697-MWF(SSx)

because "the 'methodology' applied in 'making payments' to the insurers" under the Overpayment Rule would "involve[] reconciliation based strictly on audited diagnosis codes for Medicare Advantage patients, in sharp contrast to unverified diagnosis codes from which payment rates were set." 330 F. Supp. 3d. at 187.

*Third*, the Overpayment Rule is arbitrary and capricious because it is an unexplained departure from the agency's prior position about the need to account for unsupported diagnosis codes in the Fee-For-Service data before determining whether a plan has been overpaid. *See id.* at 187–89.

The government has sought to avoid the devastating and preclusive effects of that decision on its case here by arguing that "the concept of actuarial equivalence does not change what constitutes a false claim or violation of the FCA." Pls.' Suppl. Br. 8. For support, it has seized on Judge Collyer's statement that "UnitedHealth does not contend that Medicare Advantage insurers should be permitted knowingly or recklessly to bill CMS for erroneous diagnosis codes." *Id.* (quoting *Azar*, 330 F. Supp. 3d at 189). But the government wrenches that statement out of context. Judge Collyer's statement—and United's argument that she was referring to—did not come in a discussion of the "concept of actuarial equivalence." *Id.* Rather, it related to United's alternative, *fallback* argument that the 2014 Overpayment Rule was an unexplained departure from the agency's own prior statements about the circumstances in which plans would or would not be required to delete unsupported codes. Specifically, United acknowledged certain CMS statements that plans could not knowingly or recklessly submit inaccurate data, but argued that other CMS statements, from which the Overpayment Rule arbitrarily departed, made clear that the accuracy of a plan's data is assessed *by comparison to* CMS's own data—in other words, that a plan is not submitting "erroneous diagnosis codes" so long as its rate of unsupported codes approximates that in the CMS data used to set the plan's payments. *Azar*, 330 F. Supp. 3d at 189.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

7

UNITED'S RESPONSE TO SUPPL. BR. IN SUPP. OF
MOT. FOR MODIFICATION OF DISCOVERY
Case No. 2:16-cv-08697-MWF(SSx)

The very next sentences of Judge Collyer's decision, which the government tellingly omits, make that clear.   Judge Collyer continued: "Instead, [United] argues that . . . it should not be subject to *lesser payments*, *False Claims Act liability*, or debarment for errors over these huge populations *that are fewer than those errors made by CMS itself*," and then *agreed* with United's position on that point.   *Id.* (emphasis added).   In other words, Judge Collyer recognized that— wholly apart from the actuarial equivalence requirement—it was an arbitrary and capricious departure from prior agency pronouncements to subject MA plans to "lesser payments" or "False Claims Act liability" for diagnosis code "errors . . . that are fewer than those errors made by CMS itself."   *Id.*   Even within the context of the alternative arbitrary-and-capricious argument, therefore, Judge Collyer did not hold—as the government suggests—that the Overpayment Rule would retain its validity whenever the government invoked it in a False Claims Act case.

For similar reasons, the government is also wrong that "it was only in the context of requiring contract-wide perfect coding accuracy that Judge Collyer believed some sort of adjuster was necessary," and thus that "Judge Collyer explained that her decision did not apply to cases involving the FCA and the Overpayment Statute" in which only "knowing" violations would be at issue. Reply in Supp. of Mot. for Review of Disc. Order 8, Dkt. 345.   The government fails to offer any citation for this supposed "expla[nation]." *Id.*   Nor could it: The sections of Judge Collyer's decision holding that CMS's definition of "overpayment" is invalid drew no distinctions whatsoever between the definition of an "overpayment" that would apply in a False Claims Act case and the definition applicable in other cases.

Instead, Judge Collyer distinguished between the False Claims Act's *mens rea* standard and the *mens rea* standard contemplated in the Overpayment Rule only in a distinct, final section of her opinion that was not directed to the definition of "overpayment" at all.   *See Azar*, 330 F. Supp. 3d at 190–92.   That section

1   separately considered the Overpayment Rule's definition of the term "identified"

2   for purposes of a statutory requirement that any overpayment be returned within

3   "60 days after the date on which the overpayment was identified," at pain of False

4   Claims Act liability.   42 U.S.C. § 1320a-7k(d)(2).   Judge Collyer held that the

5   Overpayment Rule's definition of "identified" had unlawfully "impose[d] a

6   negligence standard on Medicare Advantage insurers" that was "inconsistent with

7   the standards of the False Claims Act to which it would otherwise align

8   enforcement."   330 F. Supp. 3d at 190–92.   But the invalidity of the Overpayment

9   Rule's definition of "identified" was *in addition* to the invalidity of its definition of

10  "overpayment," not an alternative to it.   After all, if Judge Collyer had believed

11  that modifying the Overpayment Rule's definition of "identified" to equate with

12  the False Claims Act's "knowing" standard would solve the actuarial equivalence,

13  same methodology, and arbitrary and capricious problems with its definition of

14  "overpayment," then there would have been no reason to address those other issues

15  at all, let alone to address them first.

16         For all those reasons, Judge Collyer's decision makes it even more obvious

17  that evidence about the effect of unsupported diagnosis codes in the Fee-For-

18  Service program is relevant here as part of United's argument that it was paid

19  appropriately and had no obligation to delete unsupported codes.[1]

20

21  _____

    [1] The government has argued that Judge Collyer's "actuarial equivalence" holding

22  is not preclusive here because she held the Overpayment Rule invalid on
    alternative grounds as well.   *See* Reply in Supp. of Objections to Disc. Order 9 n.6.

23  That is incorrect:   The Ninth Circuit follows the "established rule" that where a
    "court rests its judgment alternatively upon two or more grounds," issue preclusion

24  applies with respect to "each adjudicated issue that is necessary to support *any* of
    the grounds upon which the judgment is rested."   *In re Westgate-Cal. Corp.*, 642

25  F.2d 1174, 1176 (9th Cir. 1981) (emphasis added).   United pointed this out in
    briefing on the government's discovery objections, but the government simply

26  ignored it.   *See* United's Resp. to Mot. for Review of Disc. Order 12 n.5.   In any
    event, even if Judge Collyer's decision were *not* preclusive here, or if the Court

27  wanted to hold off on giving it final preclusive effect until the appeal in that case
    has run its course, that would just mean that the actuarial equivalence issues would

28  need to be litigated again here.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

9

UNITED'S RESPONSE TO SUPPL. BR. IN SUPP. OF
MOT. FOR MODIFICATION OF DISCOVERY
Case No. 2:16-cv-08697-MWF(SSx)

## II.    UNITED IS ENTITLED TO DEFEND ITSELF BY INVOKING THE CONTRACTUAL AND STATUTORY PROVISIONS GOVERNING PAYMENT

In addition to its arguments about intervening developments, the government also uses its supplemental brief to rehash its argument that United is trying to "escape liability for fraud by challenging the payment model." Pls.' Suppl. Br. 8 (citing *Cedars-Sinai Med. Ctr. v. Shalala*, 125 F.3d 765, 769 (9th Cir. 1997)). As United has previously explained, the government is attacking a straw man. *See* United's Resp. to Mot. for Review of Disc. Order 21–24.

United's arguments about the payment model, including its arguments about actuarial equivalence, go to whether there was any "fraud" in the first place. CMS agreed in Article IV of its contract with United that it would pay United in a way that complies with the Medicare statute, including the requirement to maintain actuarial equivalence with the Fee-For-Service program. *See* United's Opp'n to Mot. for Partial Summ. J. 26–27. And Article X of the contract provided that if "any provision of this contract conflicts with the provisions of any statute or regulation applicable to an MA Organization, the provisions of the statute or regulation shall have full force and effect." *Id.* at 27 (quoting contract provision). Contrary to the government's arguments, therefore, United has never agreed in its contract (or anywhere else) to take steps that would destroy the actuarial equivalence between the payments CMS makes to United and the costs CMS would expect to incur in the Fee-For-Service program for identical beneficiaries. And the evidence about the payment model's design and composition that United seeks would let United show that deleting unsupported diagnosis codes in *its* data, without accounting for the unsupported codes in the Fee-For-Service data, would do just that (i.e., destroy the actuarial equivalence called for by its contract). Such evidence thus goes to central elements in the government's case, including the need to show an "obligation to pay or transmit money or property to the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

10

UNITED'S RESPONSE TO SUPPL. BR. IN SUPP. OF
MOT. FOR MODIFICATION OF DISCOVERY
Case No. 2:16-cv-08697-MWF(SSx)

1    Government," 31 U.S.C. § 3729(a)(1)(G), and to show that United was paid "by

2    mistake" or "unjustly enriched."

3        The government has tried to side-step the indisputable relevance of the

4    evidence United seeks to issues like the existence of an "overpayment" or an

5    "obligation to pay . . . money" by arguing that its case is "akin to" a case about the

6    affirmative, knowing submission of false claims.   Reply in Supp. of Mot. for

7    Review of Disc. Order 7.   On that basis, it suggests that it should only need to

8    show that "invalid" claims were submitted.  *Id.*  But this argument fails.  For one

9    thing, because of the actuarial equivalence mandate, evidence about the

10   comparative rates of unsupported codes in United's data and the Fee-For-Service

11   data would be relevant to whether any of United's codes were "invalid" in the first

12   place.   And even on the government's theory that every unsupported diagnosis

13   code is "invalid," there is no evidence that United ever knowingly submitted an

14   invalid code—the government's allegation (which United disputes) is that United

15   should have known that some of its diagnosis codes were unsupported *later*, after

16   they had already been submitted.   That is why the government rested its

17   affirmative False Claims Act allegations on United's attestations of data accuracy

18   (rather than individual diagnosis codes), and made no effort to reassert affirmative

19   claims based on the knowing submission of individual, unsupported diagnosis

20   codes after this Court held that it had not adequately alleged the attestations were

21   material.  *See* Order re: Mot. to Dismiss 15–17, Dkt. 212.[2]  Having abandoned its

22   flawed affirmative false claim theory in favor of a reverse false claim theory, the

23   government must satisfy all the elements that alternative theory demands.

24   _____

25   [2] To be clear, United disputes the government's allegations that the attestations
     were false, too.  As CMS itself explained nearly a decade ago, "MA organizations
26   are coding 'accurately' when they are coding in a manner similar to [Fee-For-
     Service] coding used on the beneficiaries to whom MA plan enrollees are being
27   compared."  *See* Ex. 1 to United's Opp'n to Mot. for Partial Summ. J. at AR4335,
     Dkt. 254-1 (CMS 2010 Rate Announcement).  It was on that understanding that
28   United attested that its data were "accurate."

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

11

UNITED'S RESPONSE TO SUPPL. BR. IN SUPP. OF
MOT. FOR MODIFICATION OF DISCOVERY
Case No. 2:16-cv-08697-MWF(SSx)

1      For that reason (among others), cases like *Cedars-Sinai*, *Dennis v. United*
2  *States*, and *United States v. Weiss*—the Second Circuit case on which *Cedars-Sinai*
3  relied—do not help the government.  *See* United's Resp. to Mot. for Review of
4  Disc. Order 23–24.   Those cases hold that where a defendant affirmatively and
5  knowingly makes false statements to the government, it can sometimes be held
6  liable for those false statements even if there are independent problems with the
7  government program in connection with which the false statements were made.
8  *See Cedars-Sinai*, 125 F.3d at 769 ("If the Hospitals did indeed knowingly submit
9  false claims in order to receive payment for devices not covered under the 1986
10 rule, the invalidity of the rule will be no defense."); *United States v. Weiss*, 914
11 F.2d 1514, 1522–23 (2d Cir. 1990) ("[I]t is no defense to a charge of filing false
12 statements that the government document that prescribed the details of filing had
13 not been approved by the Director of the Office of Management and Budget, as the
14 Paperwork Reduction act allegedly required.").   Those cases do *not* hold that a
15 defendant who refuses to comply with obligations imposed by an invalid rule can
16 be subjected to treble damages under a reverse false claim theory even after
17 establishing that those obligations were *unlawful*.  *See Weiss*, 914 F.2d at 1521–22
18 (describing and agreeing with *United States v. Smith*, 866 F.2d 1092 (9th Cir.
19 1989), in which the Ninth Circuit reversed a conviction for failure to file a "Plan of
20 Operations" with the Forest Service because the Forest Service regulation creating
21 the obligation to file was invalid).

22     Even setting aside the inapplicability of cases like *Cedars-Sinai* to the claims
23 the government is pursuing here, there is another problem with the government's
24 invocation of those cases as a basis for cutting off discovery:  The argument *itself*
25 depends on disputed questions of fact.  The government's attempt to analogize this
26 case to *Cedars-Sinai* rests on its claim that United "knew about the invalid
27 diagnosis data *before* it obtained the final payment for each payment year and *still*
28 did not withdraw the invalid diagnoses (that is, the false claims) before it obtained

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

12

UNITED'S RESPONSE TO SUPPL. BR. IN SUPP. OF
MOT. FOR MODIFICATION OF DISCOVERY
Case No. 2:16-cv-08697-MWF(SSx)

1    that final payment." Reply in Supp. of Mot. for Review of Disc. Order 6. But the

2    government offers no evidentiary support for those allegations (nor has it moved

3    for partial summary judgment on them), and United vigorously disputes them.

4    And while the government tries to make it seem like United did not alert CMS to

5    its position about whether and when it is required to delete unsupported diagnosis

6    codes until it was already facing "liability for fraud," Pls.' Suppl. Br. 6, the reality

7    is that United has been telling CMS openly, for years, that it did not believe every

8    unsupported code results in an overpayment or needs to be deleted, and that it

9    therefore was not using its chart review program to perform such deletions.

10   Indeed, when United submitted the annual attestations about its risk adjustment

11   data, it accompanied them with senior-level correspondence making this exact

12   point. *See, e.g.*, Ex. 13 to United's Opp'n to Mot. for Partial Summ. J. at

13   MARA2152278, Dkt. 254-1 (2015 email from UnitedHealthcare Medicare &

14   Retirement CEO to senior CMS official explaining that United did not use its chart

15   review process "to determine whether diagnosis codes submitted through claims

16   are unsupported in the medical record"); Ex. 14 to United's Opp'n to Mot. for

17   Partial Summ. J. at MARA1296259, Dkt. 254-1 (similar email from 2014). And

18   the evidence United is seeking about CMS's decision to abandon a proposed rule

19   that would have required MA plans to use their chart reviews for that purpose is

20   likely to show that CMS officials *agreed* that deletions in such circumstances were

21   not required. All of this just highlights the need to wait until discovery has been

22   completed to resolve these questions, rather than leaping to judgment on an

23   incomplete record or preventing that record from being assembled in the first

24   place—something the government has now spent over 120 pages of briefing trying

25   to do.[3]

26

27   _____

28   [3] The government also includes with its supplemental filing a brand new proposed Order that makes changes beyond anything that it actually addresses in its

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

13

UNITED'S RESPONSE TO SUPPL. BR. IN SUPP. OF
MOT. FOR MODIFICATION OF DISCOVERY
Case No. 2:16-cv-08697-MWF(SSx)

## III.   THE GOVERNMENT'S "OFFSET" AND JURISDICTIONAL ARGUMENTS ARE MERITLESS

Finally, in its recent filings, the government has sought to characterize United's defense as a "*de facto* claim for an offset based on CMS' purported violation of the Medicare Statute," and has argued that this "Court has no jurisdiction or legal authority to grant Defendants the relief they request." Reply in Supp. of Mot. for Leave 2–3, Dkt. 339.   Again, though, the government's arguments depend on a misrepresentation of United's position throughout this litigation.

Contrary to the government's representations, United does not seek to offset claims on which United was overpaid by pointing to separate claims on which it was underpaid.  Instead, United's argument has *always* been that because MA risk adjustment payment amounts are calculated based on a mix of supported and unsupported diagnosis codes from the Fee-For-Service program, MA plans are not overpaid in the first place when they receive payments based on unsupported diagnosis codes, and are not required to delete all such codes from their risk adjustment data, at least where their rate of unsupported codes is comparable to

supplemental brief.  In particular, the new proposed order would deny United "discovery regarding the materiality of diagnosis codes to the MA payment process." Pls.' Suppl. Br. 3.  The government claims that materiality is a "settled issue[] under this Court's prior rulings and Ninth Circuit precedent." *Id.*  But it makes no attempt to explain how the rulings it presumably has in mind—this Court's decision on United's motion to dismiss and the Ninth Circuit's decisions at the motion to dismiss stage in *Swoben* and *Silingo*—could possibly have resolved the issue of materiality as a matter of law.  As the Supreme Court recently held, the government cannot establish materiality merely by showing that "compliance with a particularly statutory, regulatory, or contractual requirement [i]s a condition of payment," and neither "is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2003 (2016).  Instead, establishing "proof of materiality" depends on "evidence" about how the government has treated similar violations in the past. *Id.*  Such questions are resolved at the motion to dismiss stage by looking at whether the complaint adequately "plead[s] facts to support allegations of materiality," *id.* at 2004 n.6, but once the case moves past the pleading stage the defendant is free to *test* those allegations by collecting and presenting evidence of its own.

CMS's.  For example, in briefing on its motion to dismiss, United explained that if it were to prevail on its actuarial equivalence arguments, that would mean that under "United's contracts with CMS, . . . CMS is obligated to *pay* United for the very unsupported codes that DOJ claims United was obligated to *delete*."  Reply in Supp. of United's Mot. to Dismiss 18, Dkt. 199.

That defense is, and always has been, distinct from the relief that United seeks in its counterclaims.  The counterclaims rest, in relevant part, on the fact that if the Fee-For-Service data turns out to have contained an unexpectedly high prevalence of unsupported diagnosis codes (materially higher than in United's data), United may have been *under*paid under the actuarial equivalence standard. Because this Court lacks jurisdiction to award damages against the government in excess of $10,000, *see* 28 U.S.C. § 1346, United asked this Court to transfer those claims to the Court of Federal Claims.  *See* United's Resp. to United States' Mot. to Dismiss Counterclaims 5–6, Dkt. 249.  But the fact that this Court could not provide United with an affirmative damages *remedy* based on United's "actuarial equivalence" and other arguments does not mean that this Court cannot consider those *arguments* in connection with claims as to which the Court indisputably does have jurisdiction.  For example, to the extent that those arguments establish that United was not *over*paid, and had no obligation to delete unsupported diagnosis codes because its rate of such codes did not exceed that in the Fee-For-Service data, the Court would be free to hold that the government had failed to establish a key element of its reverse false claim count.

## CONCLUSION

The Court should deny the government's request to foreclose discovery on issues directly relevant to the government's claims.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

15

UNITED'S RESPONSE TO SUPPL. BR. IN SUPP. OF
MOT. FOR MODIFICATION OF DISCOVERY
Case No. 2:16-cv-08697-MWF(SSx)

1   Dated:  March 27, 2019                LATHAM & WATKINS LLP
                                          DAVID J. SCHINDLER
2                                         DANIEL MERON
                                          KATHRYN H. RUEMMLER
3                                         ABID R. QURESHI

4

5
                                          By  /s/ David J. Schindler
6                                              David J. Schindler
7                                              Attorneys for United Defendants

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

16                UNITED'S RESPONSE TO SUPPL. BR. IN SUPP. OF
                  MOT. FOR MODIFICATION OF DISCOVERY
                  Case No. 2:16-cv-08697-MWF(SSx)