MICHAEL D. GRANSTON
Deputy Assistant Attorney General, Civil Division
TRACY L. WILKISON
Acting United States Attorney
DAVID M. HARRIS
JOHN E. LEE (CBN 128696)
JACK D. ROSS (CBN 265883)
Assistant United States Attorneys
     300 N. Los Angeles Street, Room 7516
     Los Angeles, California 90012
     Tel: (213) 894-7395; Fax: (213) 894-7819
     Email: jack.ross@usdoj.gov
JAMIE ANN YAVELBERG
EDWARD C. CROOKE
ROBERT McAULIFFE
LINDA M. McMAHON
JESSICA KRIEG
AMY L. LIKOFF
GREGORY A. MASON
MARTHA GLOVER
WENDY ZUPAC
Attorneys, Civil Division, U.S. Department of Justice
     P.O. Box 261, Ben Franklin Station
     Washington, D.C. 20044
     Tel: (202) 307-0486; Fax: (202) 307-3852
     Email:  gregory.a.mason@usdoj.gov
JAMES P. KENNEDY, JR.
United States Attorney
DAVID CORIELL
Assistant United States Attorney (Admitted PHV)
     138 Delaware Avenue
     Buffalo, New York 14201
     Tel: (716) 843-5731; Fax: (716) 551-3052
     Email: David.Coriell@usdoj.gov
Attorneys for the United States of America

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING,<br><br>        Plaintiffs,<br><br>        v.<br><br>UNITEDHEALTH GROUP, INC., *et al.*,<br><br>        Defendants. | No. CV 16-08697 FMO<br><br>DECLARATION OF GREGORY MASON IN SUPPORT OF UNITED STATES' MOTION FOR REVIEW OF SPECIAL MASTER'S RULING ON MOTION TO COMPEL DISCOVERY<br><br>DATE:  July 22, 2021<br>TIME:   10:00 a.m.<br>COURT:  Hon. Fernando M. Olguin |

<u>DECLARATION OF GREGORY MASON</u>

I, Gregory Mason, declare:

1. I am a Trial Attorney in the Department of Justice, Civil Division.  Along with Department of Justice Trial Attorneys who are assigned to this matter, I have been assigned to represent the United States in the above-captioned action. I have personal knowledge of the matters set forth herein and, if called to testify, could and would testify competently thereto.

2. Attached hereto as Exhibit 1 is the United States' Notice of Motion and Motion to Compel Discovery as to Interrogatory No. 14 and Request for Production No. 147.

3. Portions of the Joint Stipulation re United States' Motion to Compel Discovery as to Interrogatory No. 14 and Request for Production No. 147 are confidential and subject to the United States' Application for Leave to File Under Seal and will be submitted in accordance with Local Rule 79-5.

4. Attached hereto as Exhibit 2 is the Declaration of Gregory Mason in Support of United States' Motion to Compel Discovery, along with Exhibits A-K.

5. Attached hereto as Exhibit 3 is the Declaration of David Schindler in Support of United's Response to United States' Motion to Compel Discovery, along with Exhibits L-AA, except Exhibits T, U, and V, which are confidential and are being submitted pursuant to Local Rule 79-5.

6. Attached hereto as Exhibit 4 is the Proposed Order re United States' Motion to Compel Discovery.

7. Attached hereto as Exhibit 5 is the United States' Supplemental Memorandum re United States' Motion to Compel Discovery.

8. Attached hereto as Exhibit 6 is United's Supplemental Memorandum re United States' Motion to Compel Discovery.

9. Attached hereto as Exhibit 7 is UnitedHealth's Responses and Objections to the United States' Fifth Set of Requests for Admission.  This document was

referenced at the hearing before the Special Master on the United States' Motion to Compel Discovery.

10. At a clarification hearing on June 14, 2021, the Special Master clarified that under her Order, the government will be entitled to renew its discovery requests after United serves its expert reports and discloses for the first time whether it contends that certain diagnosis codes on the government's list are supported by beneficiary medical records. At that time, the government will be entitled to fact discovery regarding United's contention, including the beneficiary medical records and likely other documents and testimony supporting or refuting that contention.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 22, 2021, at Washington, District of Columbia.

/S/ Gregory Mason

_____

GREGORY MASON

MICHAEL D. GRANSTON
Deputy Assistant Attorney General, Civil Division
TRACY L. WILKISON
Acting United States Attorney
DAVID M. HARRIS
ABRAHAM C. MELTZER
JOHN E. LEE (CBN 128696)
JACK D. ROSS (CBN 265883)
Assistant United States Attorneys
        300 N. Los Angeles Street, Room 7516
        Los Angeles, California 90012
        Tel: (213) 894-3995; Fax: (213) 894-7819
        Email: john.lee2@usdoj.gov
JAMIE A. YAVELBERG
ROBERT McAULIFFE
EDWARD CROOKE
LINDA M. McMAHON
JESSICA E. KRIEG
AMY L. LIKOFF
GREGORY A. MASON
MARTHA N. GLOVER
WENDY ZUPAC
Attorneys, Civil Division, U.S. Department of Justice
        P.O. Box 261, Ben Franklin Station
        Washington, D.C. 20044
        Tel: (202) 307-0486; Fax: (202) 307-3852
        Email: robert.mcauliffe@usdoj.gov
JAMES P. KENNEDY, JR.
United States Attorney
DAVID CORIELL
Assistant United States Attorney (Admitted PHV)
        138 Delaware Avenue
        Buffalo, New York 14201
        Tel: (716) 843-5830; Fax: (716) 551-3052
        Email: david.coriell@usdoj.gov
Attorneys for the United States of America

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel*. BENJAMIN POEHLING,<br><br>Plaintiffs,<br><br>v.<br><br>UNITEDHEALTH GROUP, INC., *et al*.,<br><br>Defendants. | No. CV 16-08697 FMO (SSx)<br><br>UNITED STATES' NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY<br><br>DISCOVERY MATTER<br>Special Master Suzanne H. Segal<br><br>Date:  April 29, 2021<br>Time:  1:00 p.m.<br>Discovery cutoff date:  December 6, 2021<br>Pretrial conference date:  February 3, 2023<br>Trial Date:  February 21, 2023 |

1    PLEASE TAKE NOTICE that, on April 29, 2021, at 1:00 p.m., or as soon
2  thereafter as the matter may be heard, before the Honorable Suzanne H. Segal, Special
3  Master in the above-entitled matter, the United States of America will and hereby does
4  move for an order compelling discovery in this action.
5    This motion is and will be made pursuant to Rule 37(a), Fed. R. Civ. P., and L.R.
6  37-2 on the grounds that defendants have failed to respond to Interrogatory No. 14 and
7  Request for Production No. 147, as requested under Rules 33 and 34, Fed. R. Civ. P.
8    This motion is based upon this notice and the accompanying joint stipulation,
9  declaration, exhibits, and such evidence and argument as may be presented in connection
10 with the hearing of this motion.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2

| | |
|---|---|
| 1 | Dated:  April 16, 2021 |

Respectfully submitted,

MICHAEL D. GRANSTON
Deputy Assistant Attorney General, Civil Division
TRACY L. WILKISON
Acting United States Attorney
DAVID M. HARRIS
ABRAHAM C. MELTZER
JOHN E. LEE
JACK D. ROSS
Assistant United States Attorneys

JAMIE A. YAVELBERG
ROBERT McAULIFFE
EDWARD CROOKE
LINDA M. McMAHON
JESSICA E. KRIEG
AMY L. LIKOFF
GREGORY A. MASON
MARTHA N. GLOVER
WENDY ZUPAC
Civil Division, Department of Justice

JAMES P. KENNEDY, JR.
United States Attorney
DAVID CORIELL
Assistant United States Attorney

GREGORY A. MASON
Trial Attorney, Department of Justice

Attorneys for the United States of America

3

MICHAEL D. GRANSTON
Deputy Assistant Attorney General, Civil Division
TRACY L. WILKISON
Acting United States Attorney
DAVID M. HARRIS
ABRAHAM C. MELTZER
JOHN E. LEE (CBN 128696)
JACK D. ROSS (CBN 265883)
Assistant United States Attorneys
       300 N. Los Angeles Street, Room 7516
       Los Angeles, California 90012
       Tel: (213) 894-3995; Fax: (213) 894-7819
       Email: john.lee2@usdoj.gov
JAMIE A. YAVELBERG
ROBERT McAULIFFE
EDWARD CROOKE
LINDA M. McMAHON
JESSICA E. KRIEG
AMY L. LIKOFF
GREGORY A. MASON
MARTHA N. GLOVER
WENDY ZUPAC
Attorneys, Civil Division, U.S. Department of Justice
       P.O. Box 261, Ben Franklin Station
       Washington, D.C. 20044
       Tel: (202) 307-0486; Fax: (202) 307-3852
       Email:  robert.mcauliffe@usdoj.gov
JAMES P. KENNEDY, JR.
United States Attorney
DAVID CORIELL
Assistant United States Attorney (Admitted PHV)
       138 Delaware Avenue
       Buffalo, New York 14201
       Tel: (716) 843-5830; Fax: (716) 551-3052
       Email: david.coriell@usdoj.gov
Attorneys for the United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel*. BENJAMIN POEHLING, <br><br> Plaintiffs, <br><br> v. <br><br> UNITEDHEALTH GROUP, INC., *et al*., <br><br> Defendants. | No. CV 16-08697 FMO (SSx) <br><br> DECLARATION OF GREGORY MASON IN SUPPORT OF UNITED STATES' MOTION COMPEL DISCOVERY <br><br> DISCOVERY MATTER <br> Special Master Suzanne H. Segal <br><br> Date:  April 29, 2021 <br> Time:  1:00 p.m. <br> Discovery cutoff date:  December 6, 2021 <br> Pretrial conference date:  February 3, 2023 <br> Trial Date:  February 21, 2023 |

Exhibit 2

<u>DECLARATION OF GREGORY A. MASON</u>

I, Gregory A. Mason, declare:

1.      I am a Trial Attorney in the Fraud Section of the Civil Division of the United States Department of Justice.  Along with other Department of Justice Trial Attorneys and Assistant United States Attorneys who are assigned to this matter, I have been assigned to represent the United States in the above-captioned action.  I have personal knowledge of the matters set forth herein and, if called to testify, could and would testify competently thereto.

2.      Attached hereto as Exhibit A is a true and correct copy of UnitedHealth's Responses and Objections to the United States' Fourth Set of Interrogatories, containing the United States' Interrogatory No. 14 and United Health's response thereto, served on December 4, 2020.

3.      Attached hereto as Exhibit B is a true and correct copy of UnitedHealth's Responses and Objections to the United States' Eighth Set of Requests for Production, containing the United States' Request for Production No. 147 and United Health's response thereto, served on December 4, 2020.

4.      In an effort to address the inadequacy of UnitedHealth's responses and to resolve this discovery dispute, the United States sought a meet and confer with UnitedHealth on December 8, 2020.

5.      During the meet and confer process, the United States proposed to resolve the dispute by offering to extend a reasonable period of time for UnitedHealth to substantively answer the Interrogatory during fact discovery, and limiting the document production to only those charts, if any, associated with the diagnoses which UnitedHealth contends were supported.

6.      During the meet and confer process, UnitedHealth indicated that it would produce the responsive medical records in its possession (but not those in its control that are in the possession of UnitedHealth's third party contractors), which would, according to UnitedHealth, amount to an estimated 21 million charts and take approximately 8

2

Exhibit 2

1   months to collect and produce.  UnitedHealth also stated that it would respond to
2   Interrogatory 14 only by referring to those millions  of charts, and would not otherwise
3   supplement its response to the Interrogatory.

4          7.       Following several telephonic conferences and an informal conference with
5   Special Master Segal, the parties have been unable to resolve this discovery dispute.

6          8.       Attached hereto as Exhibit C is a true and correct copy of the United States'
7   First Amended Complaint (ECF No. 171), filed on November 17, 2017.

8          9.       Attached hereto as Exhibit D is a true and correct copy of UnitedHealth's
9   Answer to Amended Complaint (ECF No. 223), filed on March 23, 2018.

10          10.      Attached hereto as Exhibit E is a true and correct copy of UnitedHealth's
11   First Set of Interrogatories, containing UnitedHealth's Interrogatory No. 1, served on
12   January 3, 2020.

13          11.      Attached hereto as Exhibit F is a true and correct copy of a letter from
14   UnitedHealth's counsel Abid Qureshi dated March 17, 2020.

15          12.      Attached hereto as Exhibit G is a true and correct copy of UnitedHealth's
16   Counter-Proposal Regarding UHC of California's First Interrogatory, filed on June 4,
17   2020.

18          13.      Attached hereto as Exhibit H is a true and correct copy of the Court's initial
19   Case Scheduling and Management Order (ECF No. 364), filed on June 5, 2019.

20          14.      Attached hereto as Exhibit I is a true and correct copy of the Court's Order
21   Granting the Parties' Joint Request for a Continuance of Discovery Cut-Off, Pretrial, and
22   Trial Dates (ECF No. 385), filed on October 22, 2019.

23          15.      Attached hereto as Exhibit J is a true and correct copy of the Court's Order
24   Granting the Parties' Joint Request for a Continuance of Discovery Cut-Off, Pretrial, and
25   Trial Dates (ECF No. 399), filed on June 8, 2020.

26          16.      Attached hereto as Exhibit K is a true and correct copy of the Court's Order
27   Granting the Parties' Joint Request for a Continuance of Discovery Cut-Off, Pretrial, and
28   Trial Dates (ECF No. 417), filed on March 23, 2021.

1   I declare under penalty of perjury that the foregoing is true and correct.

2   Executed on April 15, 2021, Washington, D.C.

3

4   _____

5   GREGORY A. MASON

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

LATHAM & WATKINS LLP
   David J. Schindler (Bar No. 130490)
   *david.schindler@lw.com*
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone: +1.213.485.1234
Facsimile: +1.213.891.8763

LATHAM & WATKINS LLP
   Daniel Meron (appearing *pro hac vice*)
   *daniel.meron@lw.com*
   Abid R. Qureshi (appearing *pro hac vice*)
   *abid.qureshi@lw.com*
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
Telephone: +1.202.637.2200
Facsimile: +1.202.637.2201

Attorneys for UnitedHealth Defendants

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING, <br><br> Plaintiff, <br><br> v. <br><br> UNITEDHEALTH GROUP, INC. *et al.*, <br><br> Defendants. | CASE NO. 2:16-cv-08697-FMO-SSx <br><br> **UNITEDHEALTH'S RESPONSES AND OBJECTIONS TO PLAINTIFF UNITED STATES' FOURTH SET OF INTERROGATORIES** |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' FOURTH SET OF INTERROGATORIES
2:16-cv-08697-FMO-SSx

12
Exhibit 2

Exhibit A
Page 5

1   PROPOUNDING PARTY:   PLAINTIFF THE UNITED STATES

2   RESPONDING PARTIES:   UnitedHealth Defendants

3   SET NUMBER:   FOUR (NO. 14)

4         Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure,

5 Defendants UnitedHealth Group Incorporated, United HealthCare Services, Inc.,

6 UnitedHealthcare, Inc., UnitedHealthcare Insurance Company, Ovations, Inc.,

7 Optum, Inc., OptumInsight, Inc., AmeriChoice of New Jersey, Inc., AmeriChoice of

8 New York, Inc., Arizona Physicians IPA, Inc., Care Improvement Plus of Maryland,

9 Inc., Care Improvement Plus of Texas Insurance Company, Care Improvement Plus

10 South Central Insurance Company, Care Improvement Plus Wisconsin Insurance

11 Company, Optum Insurance Co., Citrus Health Care, Inc., Health Plan of Nevada,

12 Inc., Medica HealthCare Plans, Inc., Oxford Health Plans (CT), Inc., Oxford Health

13 Plans (NJ), Inc., Oxford Health Plans (NY), Inc., PacifiCare Life and Health

14 Insurance Company, PacifiCare of Arizona, Inc., PacifiCare of Colorado, Inc.,

15 PacifiCare of Nevada, Inc., Physicians Health Choice of Texas, LLC, Preferred Care

16 Partners, Inc., Rocky Mountain Health Maintenance Organization, Incorporated,

17 Sierra Health and Life Insurance Company, Inc., Symphonix Health Insurance, Inc.,

18 UHC of California (f.k.a. PacifiCare of California), United Health Care Ins. Co. and

19 United New York, Unison Health Plan of Tennessee, Inc., UnitedHealthcare

20 Benefits of Texas, Inc. (f.k.a. PacifiCare of Texas, Inc.), UnitedHealthcare

21 Community Plan of Ohio, Inc. (f.k.a. Unison Health Plan of Ohio, Inc.),

22 UnitedHealthcare Community Plan of Texas, L.L.C. (f.k.a. Evercare of Texas,

23 L.L.C.), UnitedHealthcare Community Plan, Inc. (f.k.a. UnitedHealthcare of the

24 Great Lakes Health Plan, Inc.), UnitedHealthcare Insurance Company of New York,

25 UnitedHealthcare of Alabama, Inc., UnitedHealthcare of Arizona, Inc.,

26 UnitedHealthcare of Arkansas, Inc., UnitedHealthcare of Florida, Inc.,

27 UnitedHealthcare of Georgia, Inc., UnitedHealthcare of New England, Inc.,

28 UnitedHealthcare of New York, Inc., UnitedHealthcare of North Carolina, Inc.,

1    UnitedHealthcare of Ohio, Inc., UnitedHealthcare of Oklahoma, Inc. (f.k.a.
2    PacifiCare of Oklahoma, Inc.), UnitedHealthcare of Oregon, Inc. (f.k.a. PacifiCare
3    of Oregon, Inc.), UnitedHealthcare of Pennsylvania, Inc. (f.k.a. Unison Health Plan
4    of Pennsylvania, Inc.), UnitedHealthcare of Tennessee, Inc., UnitedHealthcare of the
5    Midlands, Inc., UnitedHealthcare of the Midwest, Inc., UnitedHealthcare of Utah,
6    Inc., UnitedHealthcare of Washington, Inc. (f.k.a. PacifiCare of Washington, Inc.),
7    UnitedHealthcare of Wisconsin, Inc., and UnitedHealthcare Plan of the River
8    Valley, Inc. (collectively, "UnitedHealth") hereby provide its responses and
9    objections to Plaintiff United States' Fourth Set of Interrogatories (the
10   "Interrogatories").

11                              **GENERAL OBJECTIONS**

12        The following General Objections apply to each of the United States'
13   Interrogatories and, unless otherwise stated, shall have the same force and effect as
14   if set forth in full in response to each of the Interrogatories.

15        1.    UnitedHealth objects to any Interrogatory, definition, or instruction to
16   the extent that it seeks to impose upon UnitedHealth any obligations greater than
17   those required by the Federal Rules of Civil Procedure, the local rules of the Central
18   District of California, or any other applicable laws or rules.

19        2.    UnitedHealth objects to the Interrogatories to the extent that they are
20   overly broad, unduly burdensome, and/or would require undue expense to answer.

21        3.    UnitedHealth objects to the Interrogatories to the extent that they seek
22   information that is not relevant to any party's claims or defenses and that is not
23   proportional to the needs of this case.

24        4.    UnitedHealth objects to the Interrogatories to the extent that they are
25   vague, ambiguous, or unclear, including the United States' use of terms that are not
26   adequately defined and/or not otherwise susceptible to any single meaning.

27        5.    UnitedHealth objects to the Interrogatories to the extent that they seek
28   to impose obligations to produce publicly available information, or to produce

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

2

UNITEDHEALTH'S OBJECTIONS AND RESPONSES
TO UNITED STATES' FOURTH SET OF INTERROGATORIES
2:16-cv-08697-FMO-SSx

Exhibit A
Page 7

1  information that is equally or more easily available to the United States than it is to
2  UnitedHealth.

3      6.    UnitedHealth objects to the Interrogatories to the extent they seek
4  information, documents, or other things that are not within the possession, custody,
5  or control of UnitedHealth or that can be obtained from other sources that are more
6  convenient, less burdensome, or less expensive.

7      7.    UnitedHealth objects to the Interrogatories as overly broad and unduly
8  burdensome to the extent they seek identification of "each" or "all" documents
9  responsive to the designated category and to the extent that they would require
10  UnitedHealth to identify multiple documents containing duplicative information.

11      8.    UnitedHealth objects to the Interrogatories to the extent they seek
12  information protected by attorney-client privilege, the work product doctrine, joint
13  defense privilege, or any applicable privilege, immunity, or limitation on discovery.
14  UnitedHealth will not produce any such privileged information. UnitedHealth does
15  not intend to waive any of the privileges asserted in this objection by any inadvertent
16  production of protected information. UnitedHealth reserves the right to object to the
17  use or introduction of privileged information or otherwise to seek the return of such
18  information. In the event of inadvertent disclosure, UnitedHealth will proceed
19  pursuant to the Protective Order Governing Non-Waiver of Privilege and Protected
20  Material entered on January 16, 2018 in this matter.

21      9.    To the extent that UnitedHealth produces information, it does not admit
22  that the information is true, accurate, authentic, relevant, or admissible in this action.
23  UnitedHealth reserves the right to challenge on evidentiary grounds any information
24  or documents provided in response to these Interrogatories.

25      10.    UnitedHealth objects to the Interrogatories to the extent that they
26  purport to require UnitedHealth to obtain information from, or to respond on behalf
27  of, persons or entities not currently within UnitedHealth's employ or over whom
28  UnitedHealth has no control.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

3

UNITEDHEALTH'S OBJECTIONS AND RESPONSES
TO UNITED STATES' FOURTH SET OF INTERROGATORIES
2:16-cv-08697-FMO-SSx

15
Exhibit 2

Exhibit A
Page 8

11.     UnitedHealth objects to the Interrogatories, and to each Definition and Instruction for responding thereto, to the extent that they seek documents or information for which UnitedHealth owes a third party an obligation of confidentiality or privacy, whether contractual or under any federal or state laws or regulations.

12.     UnitedHealth objects to the Interrogatories to the extent that they seek information during an arbitrary time period that renders any request overbroad and unduly burdensome. In responding to the Interrogatories, UnitedHealth will provide information from January 1, 2004 to May 16, 2017.

13.     UnitedHealth objects to each Interrogatory to the extent multiple subparts are asserted as a single interrogatory.

14.     UnitedHealth's failure to object to a particular aspect of the Interrogatories should not be construed as an admission that responsive information exists.

16.     UnitedHealth objects to the Interrogatories to the extent they call for materials protected from disclosure by the Order Granting Stipulation Regarding Expert Discovery entered by the Court on May 17, 2018.

17.     UnitedHealth reserves the right to supplement or amend its objections to the Interrogatories if it discovers new, relevant, and responsive information.

18.     UnitedHealth incorporates these General Objections by reference into each and every response below.

**SPECIFIC OBJECTIONS AND RESPONSES TO DEFINITIONS**

1.     UnitedHealth incorporates all General Objections stated above.

2.     UnitedHealth incorporates by reference its Specific Objections to Definitions (listed as objection numbers 1–8) that are set forth in UnitedHealth's Responses and Objections to Plaintiff United States' First Request for Production of Documents to Defendants, dated November 6, 2017.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

4

UNITEDHEALTH'S OBJECTIONS AND RESPONSES
TO UNITED STATES' FOURTH SET OF INTERROGATORIES
2:16-cv-08697-FMO-SSx

16
Exhibit 2

Exhibit A
Page 9

3.      UnitedHealth objects to the definition of "Load Date" included at Definition 2 as vague, ambiguous, and confusing because it is unclear what the phrase "[insert field name]" means in this context. UnitedHealth also objects to this definition as arbitrary to the extent it refers to IRADS only and not to other UnitedHealth Risk Adjustment databases.

4.      UnitedHealth objects to the definition of "Medical Record Review" included at Definition 3 as vague, ambiguous, and overly broad. For the purpose of responding to the Interrogatories, UnitedHealth interprets the term "Medical Record Review" to include reviews of chart(s) in UnitedHealth's Chart Review, Internal Data Validation, RACCR, Claims Verification, and HQ-PAF programs only.

## SPECIFIC OBJECTIONS AND RESPONSES

UnitedHealth incorporates all objections stated above in response to the Interrogatories stated below.

## INTERROGATORY NO. 14:

For each Diagnosis set forth in the United States' Response to Defendants' Interrogatory No. 1[1] that You contend You were not obligated to delete or otherwise return payment received for the Diagnosis to the Medicare Program, identify (A) all documentation in each Chart(s), if any, that You contend supports that Diagnosis, Including for each the Beneficiary (by name, HIC Number, and date of birth), Date(s) of Service, Diagnosis Code(s), HCC(s) and/or RxHCC(s), Provider (by individual name, group name, address, NPI, Tax ID(s), and Provider ID); and (B) each Medical Record Review(s) of the Chart(s) corresponding to that Diagnosis, Including for each its date(s), type(s) (i.e., whether the Medical Record Review was conducted as part of Chart Review, Internal Data Validation, RACCR, Claims Verification, HQ-PAFs, or other UHG Medical Record Review program), Chart

---

[1] Including the United States' First Supplemental Response served on August 17, 2020, the United States' Amended First Supplemental Response served on October 13, 2020, the United States' Second Supplemental Response served on October 30, 2020, and any other subsequent responses.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

5

UNITEDHEALTH'S OBJECTIONS AND RESPONSES
TO UNITED STATES' FOURTH SET OF INTERROGATORIES
2:16-cv-08697-FMO-SSx

Exhibit A
Page 10

17
Exhibit 2

1  Barcode, Load Date(s), and each Diagnosis Code for which support was found,

2  identified, validated, or recorded in the Medical Record Review.

3  **RESPONSE TO INTERROGATORY NO. 14:**

4       UnitedHealth incorporates by reference each of its General Objections and

5  Specific Objections to Definitions set forth above. UnitedHealth objects to this

6  Interrogatory on the grounds that it is overly broad and unduly burdensome to the

7  extent it requires UnitedHealth to identify "all documentation in each Chart(s), if

8  any, that [UnitedHealth] contend[s] supports that Diagnosis." Given the volume of

9  diagnosis codes the government has identified in response to UHC of California's

10  First Interrogatory, identifying all documentation in each chart associated with each

11  of these diagnosis codes amounts to reviewing millions of charts spanning a nine-

12  year time period.

13       UnitedHealth further objects to this Interrogatory as vague and ambiguous

14  because the term "obligated" is undefined, and UnitedHealth lacks knowledge as to

15  the information requested. UnitedHealth further objects to this Interrogatory to the

16  extent it uses terms as if they are defined terms without providing corresponding

17  definitions. This includes terms such as "HIC Number," "Provider ID," "NPI," "Tax

18  ID," and "RxHCC." For the purposes of responding to this Interrogatory,

19  UnitedHealth uses the definitions it provided for these terms in UHC of California's

20  First Interrogatory to the Government dated January 3, 2020.  UnitedHealth objects

21  to the term "Medical Record Review" as defined to the extent the term is vague,

22  ambiguous, and overly broad. For the purpose of responding to this Interrogatory,

23  UnitedHealth interprets the term "Medical Record Review" to include reviews of

24  chart(s) in UnitedHealth's Chart Review, Internal Data Validation, RACCR, Claims

25  Verification, and HQ-PAF programs only. UnitedHealth further objects to the term

26  "Load Date" as vague, ambiguous, and confusing because it is unclear what the

27  phrase "[insert field name]" means in this context. UnitedHealth also objects to this

28  definition as arbitrary to the extent it refers to IRADS only and not to other

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

6

UNITEDHEALTH'S OBJECTIONS AND RESPONSES
TO UNITED STATES' FOURTH SET OF INTERROGATORIES
2:16-cv-08697-FMO-SSx

18
Exhibit 2

Exhibit A
Page 11

1    UnitedHealth Risk Adjustment databases. Without further clarification from the
2    government regarding its meaning and use of the term "Load Date," UnitedHealth
3    lacks sufficient information to respond.

4          UnitedHealth further objects to this Interrogatory because it is an
5    impermissible contention interrogatory in that it seeks to improperly shift the burden
6    of proof for a main element of the government's False Claims Act case to
7    UnitedHealth. A party bearing the burden of proof cannot propound an interrogatory
8    that effectively requires the responding party to prove the propounding party's case
9    by shifting the burden of proof. *See Apple Inc. v. Samsung Elecs. Co.*, No. 12-CV-
10   0630-LHK PSG, 2013 WL 1563253, at *1–2 (N.D. Cal. Apr. 12, 2013); *In re
11   Facebook, Inc.*, No. MDL 12-2389, 2016 WL 5080152, at *4 (S.D.N.Y. July 7,
12   2016). This Interrogatory asks UnitedHealth to identify whether diagnosis codes the
13   government asserts UnitedHealth should have deleted are or are not supported by
14   the underlying medical records. This effectively shifts the burden to UnitedHealth
15   to prove or to rebut falsity, which is an element of the government's False Claims
16   Act case for which the government—and the government alone—bears the ultimate
17   burden of proof.

18         Moreover, UnitedHealth objects to this Interrogatory as an improper
19   contention interrogatory because it seeks expert opinion, not facts, which is outside
20   the scope of a proper contention interrogatory.

21         UnitedHealth also objects to this Interrogatory to the extent that it contains
22   multiple discrete subparts that count as separate Interrogatories. *See Safeco of Am.
23   v. Rawstron*, 181 F.R.D. 441, 445 (C.D. Cal. 1998); *see also Ott v. Mortg. Inv'rs
24   Corp. of Ohio*, No. 3:14-CV-00645-ST, 2015 WL 691643, at *1 (D. Or. Feb. 17,
25   2015) ("[O]nce a subpart of an interrogatory introduces a line of inquiry that is
26   separate and distinct from the inquiry made by the portion of the interrogatory that
27   precedes it, the subpart must be considered a separate interrogatory no matter how it
28   is designated."). The Interrogatory requests that UnitedHealth: (1) identify "all

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

7

UNITEDHEALTH'S OBJECTIONS AND RESPONSES
TO UNITED STATES' FOURTH SET OF INTERROGATORIES
2:16-cv-08697-FMO-SSx

19
Exhibit 2

Exhibit A
Page 12

1  documentation in each Chart(s), if any, that [UnitedHealth] contend[s] supports that
2  Diagnosis"; and (2) identify "each Medical Record Review(s) of the Chart(s)
3  corresponding to that Diagnosis." These are two distinct requests for separate,
4  unrelated information, and accordingly constitute subparts that are properly counted
5  as separate interrogatories. The United States has therefore issued at least eighteen
6  (18) interrogatories. By responding to this Interrogatory, UnitedHealth in no way
7  waives its right to object that the government has exceeded the maximum number of
8  interrogatories permitted under the Federal Rules of Civil Procedure.

9  UnitedHealth also objects to this Interrogatory to the extent it seeks
10  information dated after May 16, 2017, the parties' agreed-upon end date for
11  discovery. For the purposes of responding to this Interrogatory, UnitedHealth
12  interprets this Interrogatory to request information only up to May 16, 2017 or
13  relating to UnitedHealth's chart review data for date of service year 2016.

14  Pursuant to and on the basis of these objections, UnitedHealth responds that
15  this Interrogatory is an improper contention interrogatory that impermissibly seeks
16  to shift the burden of proving an essential element of the government's False Claims
17  Act case on to UnitedHealth and seeks expert opinion. UnitedHealth therefore does
18  not intend to further respond to this Interrogatory.

19

20  Dated: December 4, 2020

LATHAM & WATKINS LLP
DAVID J. SCHINDLER
DANIEL MERON
ABID R. QURESHI

By_____

David J. Schindler
Attorneys for UnitedHealth Defendants

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

8

UNITEDHEALTH'S OBJECTIONS AND RESPONSES
TO UNITED STATES' FOURTH SET OF INTERROGATORIES
2:16-cv-08697-FMO-SSx

20
Exhibit 2

Exhibit A
Page 13

1

## PROOF OF SERVICE

2

3      I am employed in the County of Los Angeles, State of California. I am over the age of 18 years and not a party to this action. My business address is Latham & Watkins LLP, 355 South Grand Avenue, Suite 100, Los Angeles, CA  90071-1560.

4

5      On **December 4, 2020**, I caused the service of a true copy of the following document described as:

6

**UNITEDHEALTH'S RESPONSES AND OBJECTIONS TO PLAINTIFF UNITED STATES' FOURTH SET OF INTERROGATORIES**

7

8      to be served in the following manner:

9

## BY ELECTRONIC MAIL

10      The above-described document was transmitted via electronic mail to the following party pursuant to written consent under Federal Rule of Civil Procedure 5(b)(2)(E) on **December 4, 2020**:

11

12

13

## SEE ATTACHED SERVICE LIST

14      I declare that I am employed in the office of a member of the Bar of, or permitted to practice before, this Court at whose direction the service was made and declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

15

16

17      Executed on **December 4, 2020**, at Los Angeles, California.

18

19

20      _____
                        David J. Schindler

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

9

UNITEDHEALTH'S OBJECTIONS AND RESPONSES
TO UNITED STATES' FOURTH SET OF INTERROGATORIES
2:16-cv-08697-FMO-SSx

21
Exhibit 2

Exhibit A
Page 14

## SERVICE LIST

United States District Court
CASE NO. CV 16-08697 FMO (SSx)

| | |
|---|---|
| John E. Lee<br>john.lee2@usdoj.gov<br>Assistant United States Attorneys<br>300 N. Los Angeles Street, Room 7516<br>Los Angeles, California 90012<br>Tel: 213.894.3995<br><br>Jack Ross<br>jack.ross@usdoj.gov<br>Assistant United States Attorneys<br>300 N. Los Angeles Street, Room 7516<br>Los Angeles, California 90012<br>Tel: 213.894.7395 | Attorneys for the United States of America |
| David M. Coriell<br>david.coriell@usdoj.gov<br>Assistant United States Attorney<br>United States Attorney's Office<br>Western District of New York<br>138 Delaware Avenue<br>Buffalo, New York 14202<br>Tel: 716.843.5731 | Attorneys for the United States of America |
| Jessica Krieg<br>jessica.e.krieg@usdoj.gov<br>Paul Perkins<br>paul.r.perkins@usdoj.gov<br>Maria R. Marsh<br>maria.r.marsh@usdoj.gov<br>United States Department of Justice<br>Civil Division – Fraud Section<br>601 D Street, N.W.<br>Washington, D.C. 20044<br>Tel: 202.307.0486 | Attorneys for the United States of America |
| Edward Crooke<br>edward.crooke@usdoj.gov<br>United States Department of Justice<br>Civil Division<br>175 N Street N.E., Room 10-202<br>Washington, D.C. 20002<br>Tel: 202.353.0426<br><br>Zoila E. Hinson<br>Zoila.e.hinson@usdoj.gov<br>United States Department of Justice<br>Civil Division, Fraud Section<br>175 N Street N.E., Suite 9-1813<br>Washington, D.C. 20002<br>Tel: 202.353.1286 | Attorneys for the United States of America |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

10

UNITEDHEALTH'S OBJECTIONS AND RESPONSES
TO UNITED STATES' FOURTH SET OF INTERROGATORIES
2:16-cv-08697-FMO-SSx

22
Exhibit 2

Exhibit A
Page 15

| | | |
|---|---|---|
| 1 | Amy Likoff<br>*Amy.L.Likoff@usdoj.gov*<br>United States Department of Justice<br>Civil Division<br>175 N Street N.E., Room 10-1813<br>Washington, D.C. 20002<br>Tel: 202.305.3173 | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | Martha N. Glover<br>*martha.n.glover@usdoj.gov*<br>United States Department of Justice<br>Civil Division<br>175 N Street N.E., Room 10-1808<br>Washington, D.C. 20002 | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | Robert McAuliffe<br>*Robert.McAuliffe@usdoj.gov*<br>United States Department of Justice<br>Civil Division<br>175 N Street N.E., Room 9-103<br>Washington, D.C. 20002<br>Tel: 202.514.6832 | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | Gregory A. Mason<br>*gregory.a.mason@usdoj.gov*<br>United States Department of Justice<br>Civil Division; Fraud Section<br>175 N Street N.E., Room 10-224<br>Washington, D.C. 20002<br>Tel: 202.514.9472 | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | Linda M. McMahon<br>*Linda.mcmahon2@usdoj.gov*<br>United States Department of Justice<br>Civil Division<br>175 N Street N.E., Room 10-202<br>Washington, D.C. 20002<br>Tel: 202.307.0448 | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | Wendy Z. Zupac<br>*wendy.z.zupac@usdoj.gov*<br>United States Department of Justice<br>Civil Division<br>175 N Street N.E., Room 10-205<br>Washington, D.C. 20002<br>Tel: 202.353.1102 | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | Eric R. Havian<br>Mary A. Inman<br>Jessica T. Moore<br>Anne Hayes Hartman<br>Henry C. Su<br>Hallie E. Noecker<br>*UHG-RelatorsCounsel@Lists.SusmanGodfrey.com* | Attorneys for Relator Benjamin Poehling |
| 26 | | |
| 27 | | |
| 28 | | |

| | |
|---|---|
| **Constantine Cannon LLP**<br>150 California Street, Suite 1600<br>San Francisco, CA 94111<br>Tel: 415.639.4001<br><br>Harry P. Litman<br>Max Voldman<br>*UHG-*<br>*RelatorsCounsel@Lists.SusmanGodfrey.com*<br>**Constantine Cannon LLP**<br>1001 Pennsylvania Avenue, N.W., Suite 1300<br>Washington, D.C. 20004<br>Tel: 202.204.3500 | |
| Steve Hasegawa<br>*UHG-*<br>*RelatorsCounsel@Lists.SusmanGodfrey.com*<br>**Phillips & Cohen LLP**<br>100 The Embarcadero, Suite 300<br>San Francisco, California 94105<br>Tel: 415.836.9000 | Attorneys for Relator Benjamin Poehling |
| Meng Xi<br>Oleg Elkhunovich<br>Catriona Lavery<br>*UHG-*<br>*RelatorsCounsel@Lists.SusmanGodfrey.com*<br>**Susman Godfrey L.L.P.**<br>1900 Avenue of the Americas, Suite 1400<br>Los Angeles, CA 90067<br>Tel: 310.789.3100<br><br>Arun S. Subramanian<br>William C. Carmody<br>Geng Chen<br>*UHG-*<br>*RelatorsCounsel@Lists.SusmanGodfrey.com*<br>**Susman Godfrey L.L.P.**<br>1301 Avenue of the Americas, 32nd Fl.<br>New York, NY 100 19-6023<br>Tel: 212.336.8330<br><br>John P. Lahad<br>Weston L. O'Black<br>William R. H. Merrill<br>*UHG-*<br>*RelatorsCounsel@Lists.SusmanGodfrey.com*<br>**Susman Godfrey L.L.P.**<br>1000 Louisiana Street, 51st Fl.<br>Houston, TX 77002<br>Tel: 713.654.6666<br><br>Matthew R. Berry<br>*UHG-*<br>*RelatorsCounsel@Lists.SusmanGodfrey.com* | Attorneys for Relator Benjamin Poehling |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

UNITEDHEALTH'S OBJECTIONS AND RESPONSES
TO UNITED STATES' FOURTH SET OF INTERROGATORIES
2:16-cv-08697-FMO-SSx

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Susman Godfrey L.L.P.**
1201 Third Avenue, Suite 3800
Seattle, WA 98101
Tel: 206.373.7394

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

13

UNITEDHEALTH'S OBJECTIONS AND RESPONSES
TO UNITED STATES' FOURTH SET OF INTERROGATORIES
2:16-cv-08697-FMO-SSx

# EXHIBIT B

1    LATHAM & WATKINS LLP
     David J. Schindler (Bar No. 130490)
2      *david.schindler@lw.com*
   355 South Grand Avenue, Suite 100
3    Los Angeles, CA 90071-1560
   Telephone: +1.213.485.1234
4    Facsimile: +1.213.891.8763

5    LATHAM & WATKINS LLP
     Daniel Meron (appearing *pro hac vice*)
6      *daniel.meron@lw.com*
     Abid R. Qureshi (appearing *pro hac vice*)
7      *abid.qureshi@lw.com*
   555 Eleventh Street NW, Suite 1000
8    Washington, DC 20004-1304
   Telephone: +1.202.637.2200
9    Facsimile: +1.202.637.2201

10    Attorneys for Defendants

11

12             **UNITED STATES DISTRICT COURT**

       **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
13

14    UNITED STATES OF AMERICA *ex*    CASE NO. CV 16-08697 (SSx)
   *rel.* BENJAMIN POEHLING,
15                      **UNITEDHEALTH'S RESPONSES**
           Plaintiffs,      **AND OBJECTIONS TO PLAINTIFF**
16                      **UNITED STATES' EIGHTH SET OF**
      v.               **REQUESTS FOR PRODUCTION OF**
17                      **DOCUMENTS TO DEFENDANTS**
   UNITEDHEALTH GROUP, INC. *et*
18    *al.*,

19           Defendants.

20

21        Pursuant to the Federal Rules of Civil Procedure and the Local Rules of this

22 Court, Defendants UnitedHealth Group, Inc., United Healthcare Services, Inc.,

23 United Healthcare, Inc., UnitedHealthcare Insurance Company; UHIC Holdings,

24 Inc., Ovations, Inc., Optum, Inc., OptumInsight, Inc., AmeriChoice of New Jersey,

25 Inc., AmeriChoice of New York, Inc., Arizona Physicians IPA, Inc., Care

26 Improvement Plus of Maryland, Inc., Care Improvement Plus of Texas Insurance

27 Company, Care Improvement Plus South Central Insurance Company, Care

28 Improvement Plus Wisconsin Insurance Company, Optum Insurance of Ohio, Inc.

1  (f.k.a. Catamaran Insurance of Ohio, Inc.), Citrus Health Care, Inc., Health Plan of
2  Nevada, Inc., Medica HealthCare Plans, Inc., Oxford Health Plans (CT), Inc.,
3  Oxford Health Plans (NJ), Inc., Oxford Health Plans (NY), Inc., PacifiCare Life and
4  Health Insurance Company, PacifiCare of Arizona, Inc., PacifiCare of Colorado,
5  Inc., PacifiCare of Nevada, Inc., Physicians Health Choice of Texas, LLC, Preferred
6  Care Partners, Inc., Rocky Mountain Health Maintenance Organization,
7  Incorporated, Sierra Health and Life Insurance Company, Inc., Symphonix Health
8  Insurance, Inc., UHC of California (f.k.a. PacifiCare of California), United Health
9  Care Ins. Co. and United New York, Unison Health Plan of Tennessee, Inc.,
10  UnitedHealthcare Benefits of Texas, Inc. (f.k.a. PacifiCare of Texas, Inc.),
11  UnitedHealthcare Community Plan of Ohio, Inc. (f.k.a. Unison Health Plan of Ohio,
12  Inc.), UnitedHealthcare Community Plan of Texas, L.L.C. (f.k.a. Evercare of Texas,
13  L.L.C.), UnitedHealthcare Community Plan, Inc. (f.k.a. UnitedHealthcare of the
14  Great Lakes Health Plan, Inc.), UnitedHealthcare Insurance Company of New York,
15  UnitedHealthcare of Alabama, Inc., UnitedHealthcare of Arizona, Inc.,
16  UnitedHealthcare of Arkansas, Inc., UnitedHealthcare of Florida, Inc.,
17  UnitedHealthcare of Georgia, Inc., UnitedHealthcare of New England, Inc.,
18  UnitedHealthcare of New York, Inc., UnitedHealthcare of North Carolina, Inc.,
19  UnitedHealthcare of Ohio, Inc., UnitedHealthcare of Oklahoma, Inc. (f.k.a.
20  PacifiCare of Oklahoma, Inc.), UnitedHealthcare of Oregon, Inc (f.k.a. PacifiCare
21  of Oregon, Inc.), UnitedHealthcare of Pennsylvania, Inc. (f.k.a. Unison Health Plan
22  of Pennsylvania, Inc.), UnitedHealthcare of Tennessee, Inc., UnitedHealthcare of the
23  Midlands, Inc., UnitedHealthcare of the Midwest, Inc., UnitedHealthcare of Utah,
24  Inc., UnitedHealthcare of Washington, Inc. (f.k.a. PacifiCare of Washington, Inc.),
25  UnitedHealthcare of Wisconsin, Inc., and UnitedHealthcare Plan of the River
26  Valley, Inc. (collectively, "UnitedHealth") set forth below their collective responses
27  and objections to Plaintiff United States' Eighth Set of Requests for Production of
28  Documents to Defendants ("Requests").

ATTORNEYS AT LAW
LOS ANGELES, CA

2    UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' EIGHTH SET OF REQUESTS
FOR PRODUCTION OF DOCUMENTS

28
Exhibit 2

Exhibit B
Page 20

## **PRELIMINARY STATEMENT**

UnitedHealth has already produced to the United States approximately 600,000 documents, along with responses to several complex interrogatories, and more than twenty individuals for Civil Investigative Demand oral examinations, in the United States' five-year-long expansive investigation in this matter (the "*Poehling* Investigation"). Additionally, UnitedHealth produced over 24,000 documents in the now dismissed *United States ex rel. Swoben v. Secure Horizons*, CV-09-5013-JFW (JEM) (the "*Swoben* Action"), which the United States considered a related case. (*See* United States' Not. of Mot. & Mot. for Consolidated Actions, 271 at 2; Joint Representation Pursuant to Fed. R. Civ. P. 26, Local Rule 26-1, and the Court's Feb. 21, 2017 Order 287, at 8.). Further, UnitedHealth has already produced over 1,356,352 documents and approximately 21 billion records in response to the United States' First, Second, Third, Fourth, Fifth, and Sixth Requests for Production of Documents and First Set of Interrogatories.

The Requests are unduly burdensome and unreasonable in that they seek to require UnitedHealth to collect and produce millions of charts for a nine year time period. The Requests are therefore improper and only seek to harass and unduly burden UnitedHealth.

## **GENERAL OBJECTIONS**

The following objections apply to each and every separately numbered Request and are incorporated by reference to the extent applicable into the response to each Request.

1.    UnitedHealth objects to the Requests as overly broad, vague, ambiguous, unduly burdensome, unreasonably cumulative, not relevant to any party's claims or defenses, and not proportional to the needs of the case.

2.    In responding to the Requests and to the extent UnitedHealth agrees to produce documents responsive to the Requests, UnitedHealth states that it will conduct a diligent search, reasonable and proportionate in scope, of those files in its

Attorneys At Law
Los Angeles, CA

3

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' EIGHTH SET OF REQUESTS
FOR PRODUCTION OF DOCUMENTS

29
Exhibit 2

Exhibit B
Page 21

possession, custody, or control, believed to be the most likely to contain documents responsive to the Requests. UnitedHealth has not and will not, however, undertake to search or review each and every file and record in its possession, custody, or control, because to do so would be unduly burdensome and expensive. To the extent the Requests purport to require UnitedHealth to do more than the foregoing, UnitedHealth objects.

3.    The specific responses set forth below are based on UnitedHealth's interpretation of the language used in the Requests. To the extent UnitedHealth has interpreted language in a manner that differs from the United States' interpretation, UnitedHealth will state its interpretation in its response. UnitedHealth reserves the right to amend or supplement its responses in the event the United States asserts an interpretation that differs from UnitedHealth's interpretation.

4.    UnitedHealth generally responds that no incidental or implied admissions are intended by these responses and no such implications should be made. Except as may be expressly stated, nothing stated in these responses is an admission as to a fact or document referred to or assumed in any Request nor an admission that anything stated in these response is admissible in evidence, nor a waiver of any objection.

5.    Whenever UnitedHealth agrees to produce documents in response to a Request, such a response does not constitute a representation that responsive documents exist, but only that responsive documents will be produced if they exist and can be located with a reasonable and diligent search.

6.    UnitedHealth objects to the Requests, and to each Definition and Instruction for Responding thereto, to the extent that they seek to impose requirements or obligations on UnitedHealth in addition to, beyond the scope of, or different from those imposed by the Federal Rules of Civil Procedure, the Local Rules of the Central District of California, or any other applicable laws or rules.

ATTORNEYS AT LAW
LOS ANGELES, CA

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' EIGHTH SET OF REQUESTS
FOR PRODUCTION OF DOCUMENTS

4

30
Exhibit 2

Exhibit B
Page 22

7.      UnitedHealth objects to each Definition, Instruction, and Request to the extent it seeks documents that are unreasonably cumulative, duplicative, publicly available, or government documents. In particular, UnitedHealth objects to the Requests to the extent they seek "all" documents concerning a particular topic or topics when less than "all" documents are either necessary or material to the prosecution or defense of the action. UnitedHealth further objects to the Requests to the extent they would require UnitedHealth to produce multiple copies of a single document. UnitedHealth will not produce copies of documents already produced in response to another Request.

8.      UnitedHealth objects to the Requests, and to each Definition and Instruction for responding thereto, to the extent that they seek information protected from discovery by the attorney-client privilege, work product doctrine, or any other applicable privilege. Nothing in these responses shall be deemed a waiver of any such privileges and doctrines with respect to any documents, or the subject matter thereof, or the information contained therein, or any other information produced in response to the Requests. Moreover, the production of all documents shall be subject to the protections of the Revised Stipulated Protective Order Governing the Treatment of Protected Information entered by the Court on October 9, 2020 and the Protective Order Governing Non-Waiver of Privilege and Protected Materials entered by the Court on January 12, 2018.

9.      UnitedHealth objects to these Requests, and to each Definition and Instruction for responding thereto, to the extent they seek, assume, or call for legal conclusions or expert opinions.

10.     UnitedHealth objects to the Requests, and to each Definition and Instruction for responding thereto, to the extent they seek private, confidential, proprietary, or other similarly protected confidential materials. Any responses UnitedHealth provides to these Requests shall be subject to the Revised Stipulated Protective Order Governing the Treatment of Protected Information entered by the

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
5     TO UNITED STATES' EIGHTH SET OF REQUESTS
FOR PRODUCTION OF DOCUMENTS

Exhibit B
Page 23

1   Court on October 9, 2020 and the Protective Order Governing Non-Waiver of

2   Privilege and Protected Materials entered by the Court on January 12, 2018.

3   UnitedHealth reserves all of its rights and applicable objections with respect to its

4   private, confidential, proprietary, or other similarly protected confidential

5   information.

6         11.    UnitedHealth objects to the Requests, and to each Definition and

7   Instruction for responding thereto, to the extent they seek documents or information

8   for which UnitedHealth owes a third party an obligation of confidentiality or

9   privacy, whether contractual or under any federal or state laws or regulations.

10        12.    UnitedHealth objects to the Requests, and to each Definition and

11  Instruction for responding thereto, to the extent they seek documents or information

12  that are already in the possession, custody, or control of the United States or are

13  otherwise available to the United States from another source that is more convenient,

14  less burdensome, and less expensive, including to the extent the Requests call upon

15  UnitedHealth to produce documents that are publicly available.

16        13.    By asserting these responses and objections, UnitedHealth does not

17  waive and, to the contrary, expressly reserves: (i) all questions as to competency,

18  relevance, materiality, privilege, and admissibility as evidence for any purpose of

19  the information produce hereunder or the subject matter thereof; (ii) the right to

20  object on any ground to the use of information produced hereunder or the subject

21  thereof at any trial or hearing in this matter or in any related or subsequent action or

22  proceeding; (iii) the right to object on any ground to a demand for further response

23  or document production; and (iv) the right to seek further relief from the Court.

24  **SPECIFIC OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

25        1.    UnitedHealth incorporates all General Objections stated above.

26        2.    UnitedHealth incorporates by reference its Specific Objections to

27  Definitions (listed as objection numbers 1–8) that are set forth in UnitedHealth's

28

Attorneys At Law
Los Angeles, CA

6

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' EIGHTH SET OF REQUESTS
FOR PRODUCTION OF DOCUMENTS

32
Exhibit 2

Exhibit B
Page 24

1   Responses and Objections to Plaintiff United States' First Request for Production of

2   Documents to Defendants, dated November 6, 2017.

3        3.     UnitedHealth incorporates by reference its Specific Objections to

4   Definitions (listed as objection numbers 3–4) that are set forth in UnitedHealth's

5   Responses and Objections to Plaintiff United States' Fourth Set of Interrogatories to

6   Defendants, dated December 4, 2020.

7        4.     UnitedHealth objects to the Requests to the extent that they seek

8   documents after May 16, 2017, the date on which the United States filed its

9   Complaint-in-Partial-Intervention. In responding to the Requests, UnitedHealth will

10  provide information from January 1, 2004 to May 16, 2017 unless noted otherwise

11  below.

12  **SPECIFIC OBJECTIONS TO DOCUMENT REQUESTS**

13  **REQUEST FOR PRODUCTION NO. 147:**

14  All Chart(s) corresponding to, associated with, or related to each Beneficiary,

15  from each DOS Year(s) in which that Beneficiary is listed in the United States'

16  Response to Defendants' Interrogatory No. 1 (Including the United States' First

17  Supplemental Response served on August 17, 2020, the United States' Amended

18  First Supplemental Response served on October 13, 2020, the United States' Second

19  Supplemental Response served on October 30, 2020, and any other subsequent

20  responses).

21  **RESPONSE TO REQUEST FOR PRODUCTION NO. 147:**

22  In addition to the General Objections stated above, UnitedHealth objects to

23  this Request on the grounds that the Request is overly broad, unduly burdensome,

24  and not proportionate to the needs of this case. The Request is overly broad and

25  unduly burdensome in that it would require UnitedHealth to collect and produce

26  every chart associated with each beneficiary for each DOS year the government has

27  identified in response to UHC of California's First Interrogatory. As the government

28  is aware, the government has identified almost 2 million unique beneficiaries in

ATTORNEYS AT LAW
LOS ANGELES, CA

7

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' EIGHTH SET OF REQUESTS
FOR PRODUCTION OF DOCUMENTS

33
Exhibit 2

Exhibit B
Page 25

1   response to UHC of California's First Interrogatory, and this does not yet include

2   any new beneficiaries for dates of service years 2014–2016. For UnitedHealth to

3   produce charts responsive to this Request, UnitedHealth would have to identify,

4   collect, and produce millions of charts associated with all of these beneficiaries. This

5   effort would be excessively burdensome for UnitedHealth to undertake as it would

6   involve considerable cost and time spent identifying, collecting, and producing these

7   millions of charts.

8        UnitedHealth further objects to this Request as vague and ambiguous to the

9   extent it seeks "[a]ll Chart(s)" for all of the beneficiaries the government has

10  identified in response to UHC of California's First Interrogatory.

11       UnitedHealth further objects to this Request to the extent it calls upon

12  UnitedHealth to search for and produce documents not in UnitedHealth's

13  possession, custody, or control. UnitedHealth objects to this Request to the extent it

14  seeks documents outside of the parties' agreed-upon relevant time period of January

15  1, 2004 to May 16, 2017. For the purposes of responding to this Request,

16  UnitedHealth interprets this Request as seeking information only up to May 16, 2017

17  or relating to UnitedHealth's chart review data for date of service year 2016.

18       Based upon its General and Specific Objections, UnitedHealth does not intend

19  to produce documents responsive to this Request.

20

21  Dated:  December 4, 2020

22                                          LATHAM & WATKINS LLP
                                            DAVID J. SCHINDLER
                                            DANIEL MERON
23                                          ABID R. QURESHI

24

25

26                              By
                                    _____
27                                  David J. Schindler
                                    Attorneys for UnitedHealth
28                                  Defendants

ATTORNEYS AT LAW
LOS ANGELES, CA

8   UNITEDHEALTH'S RESPONSES AND OBJECTIONS
    TO UNITED STATES' EIGHTH SET OF REQUESTS
    FOR PRODUCTION OF DOCUMENTS

34
Exhibit 2

Exhibit B
Page 26

## <u>PROOF OF SERVICE</u>

I am employed in the County of Los Angeles, State of California. I am over the age of 18 years and not a party to this action. My business address is Latham & Watkins LLP, 355 South Grand Avenue, Suite 100, Los Angeles, CA 90071-1560.

On **December 4, 2020**, I caused the service of a true copy of the following document described as:

**UNITEDHEALTH'S RESPONSES AND OBJECTIONS TO PLAINTIFF UNITED STATES' EIGHTH SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS**

to be served in the following manner:

## **BY ELECTRONIC MAIL**

The above-described document was transmitted via electronic mail to the following party pursuant to written consent under Federal Rule of Civil Procedure 5(b)(2)(E) on **December 4, 2020**:

## **SEE ATTACHED SERVICE LIST**

I declare that I am employed in the office of a member of the Bar of, or permitted to practice before, this Court at whose direction the service was made and declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.
**December 4, 2020**, at Los Angeles, California.

_____
David J. Schindler

9   UNITEDHEALTH'S RESPONSES AND OBJECTIONS TO UNITED STATES' EIGHTH SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

Exhibit B
Page 27

**SERVICE LIST**

United States District Court
CASE NO. CV 16-08697 FMO (SSx)

| | |
|---|---|
| John E. Lee<br>*john.lee2@usdoj.gov*<br>Assistant United States Attorneys<br>300 N. Los Angeles Street, Room 7516<br>Los Angeles, California 90012<br>Tel: 213.894.3995<br><br>Jack Ross<br>*jack.ross@usdoj.gov*<br>Assistant United States Attorneys<br>300 N. Los Angeles Street, Room 7516<br>Los Angeles, California 90012<br>Tel: 213.894.7395 | Attorneys for the United States of America |
| David M. Coriell<br>*david.coriell@usdoj.gov*<br>Assistant United States Attorney<br>United States Attorney's Office<br>Western District of New York<br>138 Delaware Avenue<br>Buffalo, New York 14202<br>Tel: 716.843.5731 | Attorneys for the United States of America |
| Jessica Krieg<br>*jessica.e.krieg@usdoj.gov*<br>Paul Perkins<br>*paul.r.perkins@usdoj.gov*<br>Maria R. Marsh<br>*maria.r.marsh@usdoj.gov*<br>United States Department of Justice<br>Civil Division – Fraud Section<br>601 D Street, N.W.<br>Washington, D.C. 20044<br>Tel: 202.307.0486 | Attorneys for the United States of America |
| Edward Crooke<br>*edward.crooke@usdoj.gov*<br>United States Department of Justice<br>Civil Division<br>175 N Street N.E., Room 10-202<br>Washington, D.C. 20002<br>Tel: 202.353.0426<br><br>Zoila E. Hinson<br>*Zoila.e.hinson@usdoj.gov*<br>United States Department of Justice<br>Civil Division, Fraud Section<br>175 N Street N.E., Suite 9-1813<br>Washington, D.C. 20002<br>Tel: 202.353.1286 | Attorneys for the United States of America |

ATTORNEYS AT LAW
LOS ANGELES, CA

10

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' EIGHTH SET OF REQUESTS
FOR PRODUCTION OF DOCUMENTS

36
Exhibit 2

Exhibit B
Page 28

| | |
|---|---|
| 1<br>2<br>3<br>4<br><br>5<br>6<br>7<br>8<br><br>9<br>10<br>11<br>12<br><br>13<br>14<br>15<br>16<br><br>17<br>18<br>19<br>20<br><br>21<br>22<br>23<br>24 | Amy Likoff<br>*Amy.L.Likoff@usdoj.gov*<br>United States Department of Justice<br>Civil Division<br>175 N Street N.E., Room 10-1813<br>Washington, D.C. 20002<br>Tel: 202.305.3173<br><br>Martha N. Glover<br>*martha.n.glover@usdoj.gov*<br>United States Department of Justice<br>Civil Division<br>175 N Street N.E., Room 10-1808<br>Washington, D.C. 20002<br><br>Robert McAuliffe<br>*Robert.McAuliffe@usdoj.gov*<br>United States Department of Justice<br>Civil Division<br>175 N Street N.E., Room 9-103<br>Washington, D.C. 20002<br>Tel: 202.514.6832<br><br>Gregory A. Mason<br>*gregory.a.mason@usdoj.gov*<br>United States Department of Justice<br>Civil Division; Fraud Section<br>175 N Street N.E., Room 10-224<br>Washington, D.C. 20002<br>Tel: 202.514.9472<br><br>Linda M. McMahon<br>*Linda.mcmahon2@usdoj.gov*<br>United States Department of Justice<br>Civil Division<br>175 N Street N.E., Room 10-202<br>Washington, D.C. 20002<br>Tel: 202.307.0448<br><br>Wendy Z. Zupac<br>*wendy.z.zupac@usdoj.gov*<br>United States Department of Justice<br>Civil Division<br>175 N Street N.E., Room 10-205<br>Washington, D.C. 20002<br>Tel: 202.353.1102 | |
| 25<br>26<br>27<br>28 | Eric R. Havian<br>Mary A. Inman<br>Jessica T. Moore<br>Anne Hayes Hartman<br>Henry C. Su<br>Hallie E. Noecker<br>*UHG-RelatorsCounsel@Lists.SusmanGodfrey.com* | Attorneys for Relator Benjamin Poehling |

| | | |
|---|---|---|
| 1 | **Constantine Cannon LLP** | |
| 2 | 150 California Street, Suite 1600<br>San Francisco, CA 94111 | |
| 3 | Tel: 415.639.4001 | |
| 4 | Harry P. Litman<br>Max Voldman | |
| 5 | *UHG-*<br>*RelatorsCounsel@Lists.SusmanGodfrey.com* | |
| | **Constantine Cannon LLP** | |
| 6 | 1001 Pennsylvania Avenue, N.W., Suite 1300<br>Washington, D.C. 20004 | |
| 7 | Tel: 202.204.3500 | |
| 8 | Steve Hasegawa | Attorneys for Relator Benjamin Poehling |
| 9 | *UHG-*<br>*RelatorsCounsel@Lists.SusmanGodfrey.com* | |
| | **Phillips & Cohen LLP** | |
| 10 | 100 The Embarcadero, Suite 300<br>San Francisco, California 94105 | |
| 11 | Tel: 415.836.9000 | |
| 12 | Meng Xi<br>Oleg Elkhunovich | Attorneys for Relator Benjamin Poehling |
| 13 | Catriona Lavery | |
| 14 | *UHG-*<br>*RelatorsCounsel@Lists.SusmanGodfrey.com* | |
| 15 | **Susman Godfrey L.L.P.**<br>1900 Avenue of the Americas, Suite 1400 | |
| 16 | Los Angeles, CA 90067<br>Tel: 310.789.3100 | |
| 17 | Arun S. Subramanian<br>William C. Carmody | |
| 18 | Geng Chen | |
| 19 | *UHG-*<br>*RelatorsCounsel@Lists.SusmanGodfrey.com* | |
| 20 | **Susman Godfrey L.L.P.**<br>1301 Avenue of the Americas, 32nd Fl. | |
| 21 | New York, NY 100 19-6023<br>Tel: 212.336.8330 | |
| 22 | John P. Lahad<br>Weston L. O'Black | |
| 23 | William R. H. Merrill | |
| 24 | *UHG-*<br>*RelatorsCounsel@Lists.SusmanGodfrey.com* | |
| 25 | **Susman Godfrey L.L.P.**<br>1000 Louisiana Street, 51st Fl. | |
| 26 | Houston, TX 77002<br>Tel: 713.654.6666 | |
| 27 | Matthew R. Berry | |
| 28 | *UHG-*<br>*RelatorsCounsel@Lists.SusmanGodfrey.com* | |

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' EIGHTH SET OF REQUESTS
FOR PRODUCTION OF DOCUMENTS

12

Exhibit B
Page 30

1

**Susman Godfrey L.L.P.**
1201 Third Avenue, Suite 3800
Seattle, WA 98101
Tel: 206.373.7394

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

13   UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' EIGHTH SET OF REQUESTS
FOR PRODUCTION OF DOCUMENTS

# EXHIBIT C

1  CHAD A. READLER
   Principal Deputy Assistant Attorney General, Civil Division
2  SANDRA R. BROWN
   Acting United States Attorney
3  DOROTHY A. SCHOUTEN
   DAVID K. BARRETT
4  JOHN E. LEE (CBN 128696)
   Assistant United States Attorneys
5        300 N. Los Angeles Street, Room 7516
         Los Angeles, California 90012
6        Tel: (213) 894-3995; Fax: (213) 894-7819
         Email: john.lee2@usdoj.gov
7  MICHAEL D. GRANSTON
   DANIEL R. ANDERSON
8  CAROL L. WALLACK
   JESSICA KRIEG
9  JUSTIN DRAYCOTT
   PAUL PERKINS
10 Attorneys, Civil Division
   United States Department of Justice
11       P.O. Box 261, Ben Franklin Station
         Washington, D.C. 20044
12       Tel: (202) 307-0486; Fax: (202) 307-3852
         E-mail:  carol.wallack@usdoj.gov
13 JAMES P. KENNEDY, JR.
   Acting United States Attorney
14 KATHLEEN ANN LYNCH
   Assistant United States Attorney (Admitted PHV)
15       138 Delaware Avenue
         Buffalo, New York 14201
16       Tel: (716) 843-5830; Fax: (716) 551-3052
         E-mail:  kathleen.lynch@usdoj.gov
17 Attorneys for the United States of America

18              UNITED STATES DISTRICT COURT

19          FOR THE CENTRAL DISTRICT OF CALIFORNIA

20                  WESTERN DIVISION

21 UNITED STATES OF AMERICA *ex*      No. CV 16-08697 MWF (SSx)
   *rel.* BENJAMIN POEHLING,
22                                    UNITED STATES' AMENDED
           Plaintiffs,                COMPLAINT-IN-PARTIAL-
23                                    INTERVENTION AND DEMAND FOR
           v.                         JURY TRIAL
24
   UNITEDHEALTH GROUP, INC., a
25 Delaware corporation; UNITED
   HEALTHCARE SERVICES, INC., a
26 Minnesota corporation; UNITED
   HEALTHCARE, INC., a Delaware
27 corporation; OVATIONS, INC., a
   Delaware corporation; OPTUM, INC., a
28 Delaware corporation;
   OPTUMINSIGHT, INC., a Delaware
   corporation; AMERICHOICE OF NEW

                          41
                      Exhibit 2

Exhibit C
Page 32

1  JERSEY, INC., a New Jersey
corporation; ARIZONA PHYSICIANS
2  IPA, INC., an Arizona corporation;
CARE IMPROVEMENT PLUS OF
3  MARYLAND, INC., a Maryland
corporation; CARE IMPROVEMENT
4  PLUS OF TEXAS INSURANCE
COMPANY, a Texas insurance
5  company; CARE IMPROVEMENT
PLUS SOUTH CENTRAL
6  INSURANCE CO., an Arkansas
insurance company; CARE
7  IMPROVEMENT PLUS WISCONSIN
INSURANCE COMPANY, a Wisconsin
8  insurance company; OPTUM
INSURANCE CO., an Ohio corporation;
9  CITRUS HEALTH CARE, INC., a
Florida corporation; HEALTH PLAN OF
10  NEVADA, INC., a Nevada corporation;
MEDICA HEALTHCARE PLANS,
11  INC., a Florida corporation; OXFORD
HEALTH PLANS (CT), INC., a
12  Connecticut corporation; OXFORD
HEALTH PLANS (NJ), INC., a New
13  Jersey corporation also known as Oxford
Health Plans of New Jersey, Inc.;
14  OXFORD HEALTH PLANS (NY),
INC., a New York corporation;
15  PACIFICARE LIFE AND HEALTH
INSURANCE COMPANY, an Indiana
16  insurance company; PACIFICARE OF
ARIZONA, INC., an Arizona
17  corporation; PACIFICARE OF
COLORADO, INC., a Colorado
18  corporation; PACIFICARE OF
NEVADA, INC., a Nevada corporation
19  also known as PacifiCare/UHC of
Nevada; PHYSICIANS HEALTH
20  CHOICE OF TEXAS, LLC, a Texas
limited liability company; PREFERRED
21  CARE PARTNERS, INC., a Florida
corporation; ROCKY MOUNTAIN
22  HEALTH MAINTENANCE
ORGANIZATION, INC., a Colorado
23  company; SIERRA HEALTH AND
LIFE INSURANCE COMPANY, INC.,
24  a Nevada corporation; SYMPHONIX
HEALTH INSURANCE, INC., an
25  Illinois insurance company;
UNITEDHEALTHCARE OF
26  CALIFORNIA, INC., a California
corporation also known as UHC of
27  California, Inc. and formerly known as
PacifiCare of California, Inc. and
28  PacifiCare of California/Secure
Horizons; UNISON HEALTH PLAN OF

2

1  TENNESSEE, INC., a Tennessee corporation; UNITED HEALTH CARE
2  INS. CO. AND UNITED NEW YORK, a New York insurance company;
3  UNITEDHEALTHCARE BENEFITS OF TEXAS, INC., a Texas corporation
4  formerly known as PacifiCare of Texas, Inc.; UNITEDHEALTHCARE
5  COMMUNITY PLAN OF OHIO, INC., an Ohio corporation formerly known as
6  Unison Health Plan of Ohio, Inc.; UNITEDHEALTHCARE
7  COMMUNITY PLAN OF TEXAS, L.L.C., a Texas limited liability company
8  formerly known as Evercare of Texas, LLC; UNITEDHEALTHCARE
9  COMMUNITY PLAN, INC., a Michigan corporation also known as Great Lakes
10 Health Plan, Inc. and UnitedHealthcare of the Great Lakes Health Plan, Inc.;
11 UNITEDHEALTHCARE INSURANCE COMPANY, a Connecticut insurance
12 company also known as United Healthcare Insurance Company;
13 UNITEDHEALTHCARE INSURANCE COMPANY OF NEW YORK, a New
14 York insurance company also known as United Healthcare Insurance Company of
15 New York; UNITEDHEALTHCARE OF ALABAMA, INC., an Alabama
16 corporation also known as United HealthCare of Alabama, Inc.;
17 UNITEDHEALTHCARE OF ARIZONA, INC., an Arizona
18 corporation also known as United HealthCare of Arizona, Inc.;
19 UNITEDHEALTHCARE OF ARKANSAS, INC., an Arkansas
20 corporation also known as United Healthcare of Arkansas, Inc.;
21 UNITEDHEALTHCARE OF FLORIDA, INC., a Florida corporation
22 also known as United Healthcare of Florida, Inc.; UNITEDHEALTHCARE
23 OF GEORGIA, INC., a Georgia corporation also known as United
24 Healthcare of Georgia, Inc.; UNITEDHEALTHCARE OF NEW
25 ENGLAND, INC., a Rhode Island corporation also known as United
26 HealthCare of New England, Inc. and United Health Plans of New England,
27 Inc.; UNITEDHEALTHCARE OF NEW YORK, INC., a New York corporation
28 also known as AmeriChoice of New York, Inc. and United Healthcare of New

3

Exhibit C
Page 34

1  York, Inc.; UNITEDHEALTHCARE OF
2  NORTH CAROLINA, INC., a North
   Carolina corporation also known as
   United Healthcare of North Carolina,
3  Inc.; UNITEDHEALTHCARE OF
   OHIO, INC., an Ohio corporation also
4  known as United Healthcare of Ohio,
   Inc.; UNITEDHEALTHCARE OF
5  OKLAHOMA, INC., an Oklahoma
   corporation formerly known as
6  PacifiCare of Oklahoma, Inc.;
   UNITEDHEALTHCARE OF OREGON,
7  INC., an Oregon corporation formerly
   known as PacifiCare of Oregon, Inc.;
8  UNITEDHEALTHCARE OF
   PENNSYLVANIA, INC., a
9  Pennsylvania corporation formerly
   known as Unison Health Plan of
10 Pennsylvania, Inc.;
   UNITEDHEALTHCARE OF
11 TENNESSEE, INC., a Tennessee
   corporation also known as United
12 Healthcare of Tennessee, Inc.;
   UNITEDHEALTHCARE OF THE
13 MIDLANDS, INC., a Nebraska
   corporation also known as United
14 Healthcare of the Midlands, Inc.;
   UNITEDHEALTHCARE OF THE
15 MIDWEST, INC., a Missouri
   corporation also known as United
16 Healthcare of the Midwest, Inc.;
   UNITEDHEALTHCARE OF UTAH,
17 INC., a Utah corporation also known as
   United Healthcare of Utah, Inc.;
18 UNITEDHEALTHCARE OF
   WASHINGTON, INC., a Washington
19 corporation formerly known as
   PacifiCare of Washington, Inc.;
20 UNITEDHEALTHCARE OF
   WISCONSIN, INC., a Wisconsin
21 corporation also known as United
   Healthcare of Wisconsin, Inc.;
22 UNITEDHEALTHCARE PLAN OF
   THE RIVER VALLEY, INC., an Illinois
23 corporation also known as United
   Healthcare Plan of the River Valley, Inc.,
24 UnitedHealth Care Plan of the River
   Valley, Inc., and United HealthCare of
25 the River Valley, Inc.,

26         Defendants.

27

28

4

Exhibit C
Page 35

1      This is a civil fraud action brought by the United States of America ("United

2  States" or "Government") to recover treble damages and civil penalties under the False

3  Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, as well as for restitution and common

4  law damages, for monies unlawfully obtained and retained by Defendant UnitedHealth

5  Group Inc. and various of its direct and indirect subsidiaries ("Defendants") involved in

6  Parts C and D of the Medicare Program.  Defendants knowingly submitted false claims

7  and made false statements to the Medicare Program.  Moreover, Defendants have

8  knowingly and improperly avoided their obligations to repay significant sums of money

9  to the Medicare Program.

10     Having filed a notice of intervention pursuant to 31 U.S.C. § 3730(b)(4), the

11  United States alleges for its amended complaint-in-partial-intervention (the "Amended

12  Complaint") as follows:

13                              **<u>INTRODUCTION</u>**

14  1.     Millions of elderly and disabled individuals throughout the United States receive

15  their Medicare benefits through Parts C and D of the Medicare Program, hereinafter

16  referred to as the Medicare Advantage (MA) Program, which is administered by the

17  Government agency called the Centers for Medicare and Medicaid Services ("CMS").  A

18  central, distinguishing feature of the MA Program is the provision of Medicare benefits

19  by private healthcare insurance organizations, which are called Medicare Advantage

20  Organizations ("MA Organizations").  Medicare beneficiaries enroll in managed

21  healthcare insurance plans called Medicare Advantage Plans ("MA Plans") and

22  prescription drug plans ("PD Plans") that are offered by these MA Organizations.  The

23  MA Plans are packages of healthcare insurance benefits and the PD Plans are packages

24  of prescription drug benefits.  Hereinafter MA Plans and PD Plans are collectively

25  referred to as "Plans."

26  2.     The Government pays each MA Organization a fixed monthly payment for each

27  Medicare beneficiary enrolled in its Plans.  The Government adjusts these payments for

28  various risk factors that affect expected healthcare expenditures, including the age,

1    gender, and health status of each beneficiary.  The adjustments are intended to ensure

2    that MA Organizations are paid more for beneficiaries whose healthcare expenses are

3    *expected* to be more and less for beneficiaries whose health care expenses are *expected*

4    to be less.  However, these adjustments to the fixed monthly payments are made

5    regardless of the actual services provided to the beneficiaries and, thus, regardless of

6    whether those beneficiaries expected to need more or more costly services actually

7    obtain more or more costly services, and whether those beneficiaries expected to need

8    less or less costly services actually obtain less or less costly services.

9    3.     To obtain payments based on adjustments for health status, MA Organizations

10   submit diagnosis codes to the Government for the beneficiaries in their Plans.  These

11   diagnosis codes are from the beneficiaries' medical encounters with healthcare providers

12   (*e.g.*, physician office visits and hospital stays) during the year prior to the actual

13   payment year (often referred to as the "data collection" year or the "date of service"

14   year).  Payments are based on diagnoses from the prior year because they are used to

15   predict the *expected* needs of a beneficiary for more or less costly healthcare services

16   during the payment year.  Using these diagnosis codes submitted by or on behalf of MA

17   Organizations, the Government calculates a risk score for each beneficiary.  The

18   beneficiary's risk score is then used to calculate monthly payments to the MA

19   Organization for that beneficiary for the payment year.  In general, the more numerous

20   and severe the conditions identified by the diagnosis codes, the higher the risk score for a

21   beneficiary and, thus, the greater the risk adjustment payments made to the MA

22   Organization for that beneficiary for the payment year.

23   4.     This payment model creates powerful incentives for MA Organizations and their

24   owners and operators to exaggerate the expected healthcare costs for the beneficiaries in

25   their Plans by submitting invalid diagnosis codes and failing to comply with their

26   obligation to retract invalid diagnoses.  In order to combat these incentives and protect

27   the Government from overpaying MA Organizations, the Government requires that

28   submitted diagnoses be unambiguously supported and, thus, validated by the

1    beneficiaries' medical records for medical encounters during the data collection year.

2    Medical records are the "source of truth" for the purpose of receiving and retaining risk

3    adjustment payments.

4    5.      The medical records that must support the diagnosis codes are not provided to the

5    Government as part of the payment process.  Instead, the Government requires that each

6    MA Organization expressly certify that the diagnosis codes it has submitted for risk

7    adjustment payments are accurate and truthful based on best knowledge, information,

8    and belief.  42 C.F.R. § 422.504(*l*)(2).  Each MA Organization must exercise due

9    diligence in order to make this express certification.  Each MA Organization must also

10   "[a]dopt and implement an effective compliance program, which must include measures

11   that prevent, detect, and correct non-compliance with [the Government's] program

12   requirements as well as measures that prevent, detect, and correct fraud, waste, and

13   abuse."  42 C.F.R. § 422.503(b)(4)(vi).

14   6.      As explained by the United States Court of Appeals for the Ninth Circuit, CMS, in

15   2000, made clear that

16            Medicare Advantage organizations have always had "an obligation to take

17            steps to ensure the accuracy, completeness, and truthfulness of the

18            [medical] encounter data" [*i.e.*, diagnoses] and "an obligation to undertake

19            'due diligence' to ensure the accuracy, completeness, and truthfulness of

20            encounter data submitted to [CMS]."  . . .  CMS made perfectly clear that

21            Medicare Advantage organizations would be "held responsible for making

22            good faith efforts to certify the accuracy, completeness, and truthfulness of

23            encounter data submitted."

24   *United States ex rel. Swoben v. UnitedHealthcare Ins. Co.*, 848 F.3d 1161, 1174 (9th Cir.

25   2016) (quoting 65 Fed. Reg. 40,170, 40,268 (June 29, 2000)).  The Ninth Circuit further

26   explained that the requirement that MA Organizations take affirmative steps to address

27   errors in their data is further demonstrated by "§ 422.503, which since 2005 has required

28   Medicare Advantage organizations to have effective compliance programs in place,

7

1   including '[p]rocedures for internal monitoring and auditing' and 'for ensuring prompt
2   response to detected offenses'." *Id*. (quoting 42 C.F.R. § 422.503(b)(4)(vi), (vi)(F),
3   (vi)(G) (2005)).

4   7.      For many years, Defendant UnitedHealth Group Inc. ("UHG") has been the
5   nation's largest owner of MA Organizations.  These organizations offer MA and PD
6   Plans throughout the country.  Millions of elderly and disabled Medicare beneficiaries
7   throughout the United States are enrolled in MA and PD Plans that are offered by UHG
8   and the MA Organizations owned by it.  In March 2017, approximately 229,000
9   Medicare beneficiaries in the Central District of California were enrolled in MA Plans
10  offered by Defendants UnitedHealthcare of California, Inc. (previously known as
11  PacifiCare of California, Inc.) and Sierra Health and Life Insurance Company, Inc.

12  8.      UHG manages and operates the Defendant MA Organizations itself and through
13  its business divisions which, depending on the time period, were or are part of
14  Defendants UnitedHealthcare, Inc.; United HealthCare Services, Inc.; Ovations, Inc.;
15  Optum, Inc.; and OptumInsight, Inc.  Hereinafter, UHG, UnitedHealthcare, Inc.; United
16  HealthCare Services, Inc.; Ovations, Inc.; Optum, Inc.; and OptumInsight, Inc. are
17  sometimes collectively referred to as the "UHG Managing Defendants," based on their
18  roles in managing and operating the Defendant MA Organizations, as described more
19  fully herein.  When the term "UHG Managing Defendants" is used in this Amended
20  Complaint in reference to specific facts (*e.g*., meetings and communications), it refers to
21  those Defendants that managed and operated the Defendant MA Organizations at the
22  time relating to the facts alleged.

23  9.      The Government pays billions of taxpayer dollars each year to the Defendant MA
24  Organizations for the Medicare beneficiaries enrolled in the Defendant MA
25  Organizations' Plans.  Risk adjustment payments account for a substantial percentage of
26  these dollars.  The diagnoses submitted to the Government by the UHG Managing
27  Defendants on behalf of the Defendant MA Organizations drive a large percentage of the
28  payments that the Defendant MA Organizations receive from the Government.

8

1    Accordingly, it is not surprising that the UHG Managing Defendants and the Defendant

2    MA Organizations are not passive conduits of diagnoses from healthcare providers to the

3    Government.  Rather, for many years, the UHG Managing Defendants have conducted

4    programs and engaged in other activities to increase the amount of risk adjustment

5    payments from the Government to the Defendant MA Organizations.  This includes

6    programs and other efforts to directly influence both the number of diagnoses and the

7    severity of the medical conditions reported by providers (such as educating physicians

8    about diagnoses associated with greater risk adjustment payments).  This also includes

9    programs and efforts that do not involve providers but nonetheless materially increase

10   the number of diagnoses submitted to the Government and, thus, the amount of risk

11   adjustment payments to the Defendant MA Organizations.  Since 2005, the UHG

12   Managing Defendants and/or their predecessors have worked jointly to conduct these

13   programs and perform these activities.

14   10.    In particular, since 2005, the UHG Managing Defendants have conducted a very

15   large national Chart Review Program to significantly increase the risk adjustment

16   payments that the Defendant MA Organizations receive from the Government.  For

17   many years, this was their biggest effort aimed at increasing risk adjustment payments.

18   During the last ten years, they significantly increased the amount of risk adjustment

19   payments that the Defendant MA Organizations received from the Government by

20   collecting millions of medical records (also known as "charts") from providers and then

21   employing diagnosis coders (also known as "chart reviewers") to review the medical

22   records in order to mine them for diagnoses that the providers themselves did not report

23   to the Defendant MA Organizations for the beneficiaries in their Plans.  The UHG

24   Managing Defendants then submitted these additional diagnosis codes ("ADDS") to the

25   Government for billions of dollars of additional risk adjustment payments.

26   11.    The UHG Managing Defendants' national Chart Review Program was strictly a

27   one-sided revenue-generating program.  The UHG Managing Defendants did not review

28   the beneficiaries' medical records in good faith in order to obtain a true and accurate

picture of the health status of the beneficiaries in the Defendant MA Organizations'
Plans or to submit truthful and accurate risk adjustment data to the Government.  They
used the results of the chart reviews to only increase payments, *i.e.*, to submit additional
diagnoses not reported by the providers.  At the same time, they systematically ignored
the results of chart reviews that would have led to decreased payments, *i.e.*, results
showing that diagnoses reported by providers to them and then submitted by them to the
Government were not supported by the beneficiaries' medical records.

12.     Moreover, since at least 2005, the UHG Managing Defendants and/or their
predecessors have known that a significant percentage of diagnoses reported by
providers to them (hereinafter "provider-reported diagnoses") are invalid because the
beneficiaries' medical records do not substantiate that the beneficiaries had the medical
conditions identified by the diagnosis codes reported by the providers.  They knew this
from audits conducted by the Government and from their own internal medical record
reviews.  Despite this knowledge, they knowingly avoided "looking both ways" as part
of their national Chart Review Program, except for a very limited time period when they
"looked both ways" at some of the chart review results as part of their Claims
Verification ("CV") Program.  That is, they knowingly and improperly avoided
comparing the diagnoses reported by the providers and submitted by them to the
Government with the results of the coders' chart reviews to identify those provider-
reported diagnoses that were not supported by the beneficiaries' medical records.  They
could and should have done this comparison and withdrawn their prior submission of
these unsupported diagnoses, that is, made "DELETES."  If they had done so, the
Government would not have made risk adjustment payments based on these unsupported
diagnoses or, if it had already made the payments, it would have recovered them from
the Defendant MA Organizations or the other Defendants.

13.     By failing to "look both ways," the UHG Managing Defendants generated and
reported skewed data artificially inflating beneficiaries' risk scores, avoided negative
payment adjustments, and caused the Defendant MA Organizations to retain payments to

10

which they were not entitled.  They did this "knowingly," as that term is defined in the FCA.  The Government has conservatively estimated that, if the UHG Managing Defendants had "looked both ways," they would not have submitted on behalf of the Defendant MA Organizations or, if submitted, they would have withdrawn hundreds of thousands of invalid diagnoses on behalf of the Defendant MA Organizations, and the Government would not have erroneously paid or would have recovered substantial sums of money (*e.g.*, potentially over a billion dollars in risk adjustment payments for four payment years) to which the Defendant MA Organizations were not entitled.

14.     By failing to "look both ways," the UHG Managing Defendants and the Defendant MA Organizations knowingly submitted false certifications about the accuracy and truthfulness of their data and knowingly and improperly avoided or decreased obligations to repay (*i.e.*, return) monies owed to the Government in violation of the FCA.

15.     In addition, Defendants engaged in other conduct (unrelated to their Chart Review Program) that violated the FCA.  Defendants deliberately ignored or recklessly disregarded information from their Risk Adjustment Coding Compliance Review ("RACCR") Program about invalid diagnoses.  This information showed that significant percentages of the diagnoses reported to the UHG Managing Defendants and the Defendant MA Organizations by certain "financially incentivized" providers, including certain capitated and gainsharing providers, were unsubstantiated by their patients' medical records.

16.     The UHG Managing Defendants and the Defendant MA Organizations paid providers who cared for the beneficiaries in the Defendant MA Organizations' MA Plans through a variety of arrangements.  They paid some healthcare providers on a fee-for-service basis for each service (*e.g.*, office visit) they provided to a beneficiary.  However, they negotiated payment arrangements with large provider groups that were intended to more closely align their financial interests.  For example, the UHG Managing Defendants and the Defendant MA Organizations paid many large provider groups a

"fixed" fee for each beneficiary cared for by these providers. These "capitated" fees generally were not dependent on the amount of services rendered by these providers. Instead, the "capitated" fees were often based on a percentage share of the payments that the Defendant MA Organizations received from the Government for the beneficiaries cared for by the providers.  The UHG Managing Defendants and the Defendant MA Organizations also entered into "gainsharing" agreements whereby they made incentive payments to some of their fee-for-service providers.  These incentive payments were based in whole or part on total revenues that the Defendant MA Organizations received from the Government for the beneficiaries cared for by these gainsharing providers.

17.    The UHG Managing Defendants' and the Defendant MA Organizations' agreements with capitated and gainsharing providers incentivized these providers to increase the number of diagnoses that they reported to the UHG Managing Defendants and the Defendant MA Organizations and to report diagnoses for more severe medical conditions.  The more risk adjustment payments obtained by the Defendant MA Organizations for the beneficiaries cared for by these providers, the more money the UHG Managing Defendants and the Defendant MA Organizations paid to these providers pursuant to the capitation and gainsharing agreements.

18.    The UHG Managing Defendants knew that these capitated and gainsharing providers had a financial incentive to report invalid diagnoses in order to increase their own revenues.  In fact, based on the results of their own data analyses and medical record reviews conducted as part of their RACCR Program, they knew which incentivized providers were actually or likely engaged in over-reporting diagnoses, including a significant number of providers located in this District.  But the UHG Managing Defendants knowingly continued to submit diagnoses from these incentivized providers to the Government and knowingly and improperly avoided repaying the Government for risk adjustment payments based on invalid diagnoses from these providers, all in violation of the FCA.

**JURISDICTION AND VENUE**

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1345 because the United States is the Plaintiff.  In addition, the Court has subject

matter jurisdiction over the FCA claims for relief under 28 U.S.C. §§ 1331 and 1345 and

31 U.S.C. § 3732(a)-(b) and supplemental jurisdiction to entertain the common law and

equitable claims for relief under 28 U.S.C. § 1367(a).

20.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C.

§ 3732(a) because at least one of the Defendants can be found in, resides in, transacts

business in, or has committed the alleged acts in the Central District of California.

21.     Venue also lies in this District pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C.

§ 3732(a) because at least one of the Defendants can be found in, resides in, and

transacts business in this District, a substantial part of the events or omissions giving rise

to the claims occurred in this District, and/or all of the Defendants are subject to the

Court's personal jurisdiction under the FCA.

**PARTIES**

**I.      Plaintiffs**

22.     Plaintiff is the United States of America, suing on behalf of the United States

Department of Health and Human Services ("HHS"), which includes its operating

division, the Centers for Medicare and Medicaid Services ("CMS").  At all times

relevant to this Complaint, CMS administered and supervised the MA Program and

made risk adjustment payments to MA Organizations, including the Defendant MA

Organizations in this action, under Parts C and D of the Program.  The United States

filed its notice of partial intervention in this action on February 14, 2017.

23.     The *qui tam* plaintiff ("Relator") is Benjamin Poehling, a former employee of

United HealthCare Services, Inc. who was the Director of Finance for Ovations, the

group that managed the Defendant MA Organizations until approximately 2010 and,

after that, the Director of Finance for UnitedHealthcare Medicare & Retirement, which

was the group at UnitedHealthcare, Inc. that succeeded Ovations in managing the

13

Exhibit C
Page 44

Defendant MA Organizations.  From mid-2007 until he left at the end of 2012, Poehling ran the risk adjustment team at Ovations and then at UnitedHealthcare Medicare & Retirement, where he was one of the management employees responsible for the submission of claims (*i.e.*, diagnoses) by the UHG Managing Defendants to the Government for risk adjustment payments to the Defendant MA Organizations.  He was also one of the management employees responsible for risk adjustment revenue-generating activities, including, but not limited to, the UHG Managing Defendants' national Chart Review Program.  Poehling expressed concerns to fellow executives about the failure of the UHG Managing Defendants' Chart Review Program to "look both ways."  In March 2011, Poehling initiated this action by filing a complaint pursuant to the *qui tam* provisions of the FCA.  31 U.S.C. § 3730(b)(1).

## II.  Defendants

24.     Defendant UnitedHealth Group, Inc. ("UHG") is a publicly traded Delaware corporation.  It is the parent company for all other Defendants in this action.  UHG, the other Defendants, and their affiliates have offices in various locations throughout the United States, including in the Central District of California.  UHG offers a broad spectrum of products and services through two distinct primary direct corporate subsidiaries (each of which has numerous direct and indirect subsidiaries of its own): (1) UnitedHealthcare, Inc., a health benefits (i.e., insurance) company, and (2) Optum, Inc., a health services company.  Accordingly, UHG's healthcare insurance products, including those under Parts C and D of the Medicare Program, are offered by, and UHG's MA and PD Plans are managed by, various entities that are UHG's direct or indirect subsidiaries, including, but not limited to, the other Defendants identified below.  UHG controls all of these entities.

25.     UHG and its direct and indirect subsidiaries and affiliates operate MA Organizations in all fifty states and the District of Columbia.  Each of these MA Organizations offers one or more MA Plans, that is, one or more packages of healthcare insurance benefits under Part C of the Medicare Program.  Many, if not all, of these MA

1    Organizations also offer PD Plans, that is, drug benefit packages under Part D of the

2    Medicare Program.  As of December 31, 2008, UHG had approximately 1.5 million

3    Medicare beneficiaries enrolled in its MA Plans under Part C of the Medicare Program

4    and millions of additional beneficiaries enrolled in its PD Plans.  As of December 31,

5    2009, UHG had approximately 1.8 million Medicare beneficiaries enrolled in its MA and

6    millions of additional beneficiaries enrolled in its PD Plans.  As of December 31, 2010,

7    UHG had approximately 2.1 million beneficiaries in its MA Plans and millions of

8    additional beneficiaries in its PD Plans.  As of December 31, 2011, UHG had 2.2 million

9    beneficiaries in its MA Plans and millions of additional beneficiaries in its PD Plans.  As

10   of December 31, 2012, UHG had approximately 2.6 million beneficiaries in its MA

11   Plans and millions of additional beneficiaries in its PD Plans.  In 2013, 2014, and 2015

12   United had approximately 3 million beneficiaries in its MA Plans and approximately 8

13   million in its PD Plans.  In 2016, UHG had approximately 3.6 million beneficiaries in its

14   MA Plans, and approximately 8.6 million beneficiaries in its PD Plans.  Annually,

15   UHG's revenues from the MA Program have been in the tens of billions of dollars.

16   26.      All Defendant MA Organizations entered into one or more agreements with the

17   Government during the relevant time period to offer MA Plans and/or PD Plans to

18   Medicare beneficiaries under Parts C and D of the Medicare Program, presented or had

19   the UHG Managing Defendants present on their behalf claims to the Government for risk

20   adjustment payments under Parts C and D of the Medicare Program, submitted or had

21   the UHG Managing Defendants submit on their behalf one or more Risk Adjustment

22   Attestations to the Government for risk adjustment payments from the Medicare

23   Program, and received risk adjustment payments from the Government.  These

24   Defendant MA Organizations include all MA Organizations acquired, owned, and

25   controlled directly or indirectly by UHG after 2005, including:

26           a.      AmeriChoice of New Jersey, Inc., a New Jersey corporation, doing

27       business as AmeriChoice Personal Care Plus and UnitedHealthcare Community

28       Plan.

15

Exhibit C
Page 46

b.      Arizona Physicians IPA, Inc., an Arizona corporation, doing business as APIPA Personal Care Plus and UnitedHealthcare Community Plan.

c.      Care Improvement Plus of Maryland, Inc., which is or was a Maryland corporation, doing business as Care Improvement Plus.

d.      Care Improvement Plus of Texas Insurance Company, which is a Texas insurance company, doing business as Care Improvement Plus.

e.      Care Improvement Plus South Central Insurance Co., which is an Arkansas insurance company, doing business as Care Improvement Plus and UnitedHealthcare.

f.      Care Improvement Plus Wisconsin Insurance Company, which is a Wisconsin insurance company, doing business as Care Improvement Plus and UnitedHealthcare.

g.      Optum Insurance Co., which is an Ohio corporation.

h.      Citrus Health Care, Inc., which is or was a Florida corporation.

i.      Health Plan of Nevada, Inc., which is a Nevada corporation.

j.      Medica HealthCare Plans, Inc., which is a Florida corporation.

k.      Oxford Health Plans (CT), Inc., which is a Connecticut corporation, doing business as AARP MedicareComplete from SecureHorizons; Oxford Medicare Advantage; SecureHorizons; SecureHorizons by UnitedHealthCare; and UnitedHealthcare.

l.      Oxford Health Plans (NJ), Inc., which is a New Jersey corporation, also known as Oxford Health Plans of New Jersey, Inc., doing business as AARP MedicareComplete from SecureHorizons; AARP MedicareComplete provided by SecureHorizons; Evercare; Evercare by UnitedHealthcare; Evercare Health Plans; Evercare Plan H; SecureHorizons; SecureHorizons by UnitedHealthCare; and UnitedHealthcare.

16

m.     Oxford Health Plans (NY), Inc. which is a New York corporation, doing business as Oxford Medicare Advantage; SecureHorizons; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

n.     PacifiCare Life and Health Insurance Company, which is an Indiana insurance company, doing business as SecureHorizons Direct and SecureHorizons MedicareDirect.

o.     PacifiCare of Arizona, Inc., which is an Arizona corporation doing business as SecureHorizons Medicare Advantage Plan; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

p.     PacifiCare of Colorado, Inc., which is a Colorado corporation doing business as AARP MedicareComplete from Secure Horizons; AARP MedicareComplete provided by SecureHorizons; Secure Horizons Medicare Advantage Plan; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

q.     PacifiCare of Nevada, Inc., which is a Nevada corporation, also known as PacifiCare/UHC of Nevada, doing business as AARP MedicareComplete provided by SecureHorizons; PacifiCare/UHC of Nevada; Secure Horizons Medicare Advantage Plan; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

r.     Physicians Health Choice of Texas, LLC, which is a Texas limited liability company doing business as Physicians Health Choice.

s.     Preferred Care Partners, Inc., which is a Florida corporation doing business as UnitedHealthcare.

t.     Rocky Mountain Health Maintenance Organization, Inc., which is a Colorado company.

u.     Sierra Health and Life Insurance Company, Inc., which is a Nevada corporation doing business as Erickson Advantage and UnitedHealthcare.

v.     Symphonix Health Insurance, Inc., which is an Illinois insurance company doing business as Symphonix Health.

17

Exhibit C
Page 48

1        w.     UnitedHealthcare of California, Inc., which is a California

2 corporation, also known as UHC of California, Inc. and formerly known as

3 PacifiCare of California, Inc. and PacifiCare of California/Secure Horizons, doing

4 business as SecureHorizons by UnitedHealthcare, Secure Horizons Medicare

5 Advantage Plan, and UnitedHealthcare.

6        x.     Unison Health Plan of Tennessee, Inc., which is a Tennessee

7 corporation doing business as Unison Advantage and UnitedHealthcare

8 Community Plan.

9        y.     United Health Care Ins. Co. and United New York, which is a New

10 York insurance company doing business as UnitedHealthcare.

11       z.     UnitedHealthcare Benefits of Texas, Inc., which is a Texas

12 corporation, formerly known as PacifiCare of Texas, Inc., doing business as

13 SecureHorizons Medicare Advantage Plan; SecureHorizons by UnitedHealthcare;

14 and UnitedHealthcare.

15       aa.    UnitedHealthcare Community Plan of Ohio, Inc., which is an Ohio

16 corporation, formerly known as Unison Health Plan of Ohio, Inc., doing business

17 as Unison Advantage and UnitedHealthcare Community Plan.

18       bb.    UnitedHealthcare Community Plan of Texas, L.L.C., which is a

19 Texas limited liability company, formerly known as Evercare of Texas, LLC,

20 doing business as Evercare by UnitedHealthcare and Evercare Health Plans; and

21 UnitedHealthcare.

22       cc.    UnitedHealthcare Community Plan, Inc., which is a Michigan

23 corporation, also known as Great Lakes Health Plan, Inc. and UnitedHealthcare of

24 the Great Lakes Health Plan, Inc., doing business as Great Lakes Personal Care

25 Plus and UnitedHealthcare Community Plan.

26       dd.    UnitedHealthcare Insurance Company, which is a Connecticut

27 insurance company, also known as United Healthcare Insurance Company, doing

28 business as AARP MedicareComplete from SecureHorizons; Erickson Advantage;

<center>18</center>

Evercare by UnitedHealthcare; Evercare Health Plans; Evercare Senior Care Options; SecureHorizons; SecureHorizons by UnitedHealthcare; SecureHorizons MedicareDirect; United Health Group; UnitedHealthcare; and UnitedHealthcare Community Plan.

ee.    UnitedHealthcare Insurance Company of New York, which is a New York insurance company, also known as United Healthcare Insurance Company of New York, doing business as SecureHorizons; SecureHorizons MedicareDirect; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

ff.    UnitedHealthcare of Alabama, Inc., which is an Alabama corporation, also known as United HealthCare of Alabama, Inc., doing business as SecureHorizons; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

gg.    UnitedHealthcare of Arizona, Inc., which is an Arizona corporation, also known as United HealthCare of Arizona, Inc., doing business as SecureHorizons; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

hh.    UnitedHealthcare of Arkansas, Inc., which is an Arkansas corporation, also known as United Healthcare of Arkansas, Inc., doing business as SecureHorizons; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

ii.    UnitedHealthcare of Florida, Inc., which is a Florida corporation, also known as United Healthcare of Florida, Inc. doing business as AmeriChoice; Evercare at Home; SecureHorizons; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

jj.    UnitedHealthcare of Georgia, Inc., which is a Georgia corporation, also known as United Healthcare of Georgia, Inc., doing business as SecureHorizons; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

kk.    UnitedHealthcare of New England, Inc., which is a Rhode Island corporation, also known as United HealthCare of New England, Inc. and United Health Plans of New England, Inc., doing business as AARP MedicareComplete

19

1    provided by SecureHorizons; AARP MedicareComplete from SecureHorizons;

2    SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

3          ll.    UnitedHealthcare of New York, Inc., which is a New York

4    corporation, also known as AmeriChoice of New York, Inc. and United

5    Healthcare of New York, Inc. doing business as AmeriChoice Personal Care Plus;

6    SecureHorizons; SecureHorizons by UnitedHealthcare; UnitedHealthcare; and

7    UnitedHealthcare Community Plan.

8          mm.   UnitedHealthcare of North Carolina, Inc., which is a North Carolina

9    corporation, also known as United Healthcare of North Carolina, Inc., doing

10   business as SecureHorizons; SecureHorizons by UnitedHealthcare, and

11   UnitedHealthcare.

12         nn.    UnitedHealthcare of Ohio, Inc., which is an Ohio corporation, also

13   known as United Healthcare of Ohio, Inc., doing business as SecureHorizons,

14   SecureHorizons by UnitedHealthcare, and UnitedHealthcare.

15         oo.    UnitedHealthcare of Oklahoma, Inc., which is an Oklahoma

16   corporation, formerly known as PacifiCare of Oklahoma, Inc., doing business as

17   Secure Horizons Medicare Advantage Plan; SecureHorizons by UnitedHealthcare,

18   and UnitedHealthcare.

19         pp.    UnitedHealthcare of Oregon, Inc., which is an Oregon corporation,

20   formerly known as PacifiCare of Oregon, Inc., doing business as AARP

21   MedicareComplete from SecureHorizons; AARP MedicareComplete provided by

22   SecureHorizons; SecureHorizons Medicare Advantage Plan; SecureHorizons by

23   UnitedHealthCare; and UnitedHealthcare.

24         qq.    UnitedHealthcare of Pennsylvania, Inc., which is a Pennsylvania

25   corporation, formerly known as Unison Health Plan of Pennsylvania, Inc., doing

26   business as Unison Advantage; UnitedHealthcare Community Plan; and

27   UnitedHealthcare.

28

1          rr.      UnitedHealthcare of Tennessee, Inc., which is a Tennessee

2   corporation, also known as United Healthcare of Tennessee, Inc., doing business

3   as AARP MedicareComplete from SecureHorizons; AARP MedicareComplete

4   provided by SecureHorizons; SecureHorizons; and SecureHorizons by

5   UnitedHealthcare.

6          ss.      UnitedHealthcare of the Midlands, Inc., which is a Nebraska

7   corporation, also known as United Healthcare of the Midlands, Inc., doing

8   business as SecureHorizons by UnitedHealthcare and UnitedHealthcare.

9          tt.      UnitedHealthcare of the Midwest, Inc., which is a Missouri

10  corporation, also known as United Healthcare of the Midwest, Inc., doing business

11  as SecureHorizons; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

12         uu.      UnitedHealthcare of Utah, Inc., which is a Utah corporation, also

13  known as United Healthcare of Utah, Inc., doing business as SecureHorizons;

14  SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

15         vv.      UnitedHealthcare of Washington, Inc., which is a Washington

16  corporation, formerly known as PacifiCare of Washington, Inc., doing business as

17  AARP MedicareComplete from SecureHorizons; Secure Horizons Medicare

18  Advantage Plan; SecureHorizons by UnitedHealthcare; and UnitedHealthcare.

19         ww.      UnitedHealthcare of Wisconsin, Inc., which is a Wisconsin

20  corporation, also known as United Healthcare of Wisconsin, Inc. doing business as

21  SecureHorizons; SecureHorizons by UnitedHealthcare; UnitedHealthcare

22  Community Plan; UnitedHealthcare Personal Care Plus; and UnitedHealthcare.

23         xx.      UnitedHealthcare Plan of the River Valley, Inc., which is an Illinois

24  corporation, also known as United Healthcare Plan of the River Valley, Inc.,

25  UnitedHealth Care Plan of the River Valley, Inc., and United HealthCare of the

26  River Valley, Inc., doing business as AmeriChoice Secure Plus Complete;

27  SecureHorizons by UnitedHealthcare; UnitedHealthcare; and UnitedHealthcare

28  Community Plan.

1              yy.    Any other MA Organizations acquired, owned, or controlled by UHG

2    since 2005.

3    27.    Defendant United HealthCare Services, Inc. ("United HealthCare Services") is a

4    Minnesota corporation.  It is a direct subsidiary of Defendant UHG.  United HealthCare

5    Services is the successor to PacifiCare Health Systems and PacifiCare Health Plan

6    Administrators, Inc., which managed some of the Defendant MA Organizations.  *See*

7    *infra* paragraph 37.  As previously stated, United HealthCare Services also employed

8    Relator Poehling and, on information and belief, employed other individuals who held

9    titles and positions within the other UHG Managing Defendants and who performed

10    work on behalf of the Defendant MA Organizations.

11    28.    Defendant Ovations, Inc. ("Ovations") is a Delaware corporation.  It is a direct

12    subsidiary of Defendant United HealthCare Services and an indirect subsidiary of

13    Defendant UHG.  Until approximately 2010, one or more of the groups that managed

14    some of the Defendant MA Organizations were located within Defendant Ovations.

15    29.    Defendant UnitedHealthcare, Inc. ("UnitedHealthcare") is a Delaware corporation,

16    and a direct subsidiary of Defendant UHG.  UnitedHealthcare is the UHG business entity

17    which owns, operates, and offers health insurance plans to governmental customers.

18    Various UnitedHealthcare subsidiaries operate health benefit plans and provide

19    healthcare benefits to millions of Medicare beneficiaries under the MA Program.

20    UnitedHealthcare also is the UHG subsidiary which contracts (through its subsidiaries)

21    with the Government to provide insurance benefits to MA beneficiaries, submits the

22    annual Risk Adjustment Attestations to the Government, submits claims for payment to

23    the Government, and receives payment from the Government.

24    30.    Defendants Optum, Inc. and OptumInsight, Inc. are health services companies.

25    They are Delaware corporations.  They are direct or indirect subsidiaries of Defendant

26    UHG.  In 2011, OptumInsight became the successor to Ingenix, Inc. ("Ingenix").

27    Thereafter, OptumInsight operated as part of Optum.  For the purposes of this Amended

28    Complaint, Optum, Inc. and OptumInsight, Inc. will be referred to as "Optum."

1   Furthermore, to the extent that the United States is uncertain whether an act or statement

2   is attributable to Ingenix or its successor, Optum, the United States will refer to the entity

3   as "Ingenix/Optum."  Since 2007, the group within Ingenix and then Optum that

4   performed risk adjustment-related work had various names.  For purposes of this

5   Amended Complaint, it is referred to as the "Risk Adjustment Group."

6   31.    Defendants United HealthCare Services, Ovations, UnitedHealthcare, and Optum

7   (and Optum's predecessor, Ingenix) are or were "Related Entities" under the federal

8   regulations that govern the MA Program.  As explained more fully below, each of them

9   has or had its own legal obligations to the MA Program relating to, among other things,

10  the submission of valid risk adjustment data and the deletion or withdrawal of invalid

11  data.

12  32.    The Defendant MA Organizations were not autonomous and do not appear to have

13  had any management or any other employees who ran them or had any decision-making

14  authority (if they had any of their own management or employees at all).  Instead, UHG

15  had various groups that managed and had oversight responsibilities and decision-making

16  authority for the Defendant MA Organizations.  At various times relevant to this

17  Amended Complaint, these groups were located within Defendants United HealthCare

18  Services (and/or its predecessors), Ovations, and UnitedHealthcare.  Depending on the

19  time period, the groups were known by the names Secure Horizons, Evercare, the Public

20  & Senior Markets Group ("PSMG"), the Public Sector Market Group (also "PSMG"),

21  Ovations, Ovations Part D, and AmeriChoice.  Prior to approximately 2010, these groups

22  were located in Defendants United HealthCare Services (and/or its predecessors) and

23  Ovations.  Since approximately 2010, these groups have been located within Defendant

24  UnitedHealthcare and are referred to as UnitedHealthcare Medicare & Retirement and

25  UnitedHealthcare Community & State.  Among other things, these groups oversaw risk

26  adjustment-related activities such as the submission of risk adjustment data (including

27  diagnoses) to the Government on behalf of the Defendant MA Organizations, the

28  retraction of invalid data that they had submitted to the Government on behalf of the

Defendant MA Organizations, and the Chart Review, Claims Verification, and RACCR Programs that they had conducted on behalf of the Defendant MA Organizations.  As explained more fully below, Defendants United HealthCare Services (and/or its predecessors), Ovations, UnitedHealthcare, and any other UHG entities in which these groups may have been located are "Related Entities" with their own legal obligations relating to, among other things, the submission of valid risk adjustment data to the Government and the deletion or withdrawal of invalid data.

33.    Starting in 2007, the actual risk adjustment data submission work was performed by the Risk Adjustment Group within Ingenix and then within Ingenix's successor, Optum.  First Ingenix and then Optum operated a computer system called the Internal Risk Adjustment Data System ("IRADS") that electronically submitted risk adjustment data (that is, diagnoses) to CMS' Risk Adjustment Processing System ("RAPS") in order for the Defendant MA Organizations to claim and receive risk adjustment payments.  In addition, Ingenix and then Optum helped to manage the Chart Review, Claims Verification, and RACCR Programs and performed the day-to-day activities necessary to conduct these programs.  Ingenix and then Optum performed activities relating to the submission of risk adjustment data and operated the various risk adjustment-related programs from offices in this District and elsewhere.

34.    Similar to the other UHG Managing Defendants, Ingenix was and Optum is a "Related Entity" because Ingenix was and Optum is related to the Defendant MA Organizations by common ownership or control through Defendant UHG and performed some or all of the management functions for the Defendant MA Organizations.  As previously explained, Optum is one of the "UHG Managing Defendants" because of the role that it (and its predecessor, Ingenix) played in managing the Defendant MA Organizations during the relevant time period.  Any reference in this Amended Complaint to the predecessors of the UHG Managing Defendants includes Ingenix.

35.    Ingenix and then Optum also performed risk adjustment-related services for third-parties which owned and operated their own MA Organizations and offered their own

24

Plans.  The UHG Managing Defendants referred to these third-parties as Ingenix's and then Optum's commercial clients.  Ingenix and then Optum submitted risk adjustment data to the Government on behalf of these commercial clients and conducted Chart Review and other programs for them.  Ingenix and then Optum performed this risk adjustment-related work for commercial clients from offices in this District and elsewhere.

36.    UHG became the largest owner of MA Organizations in large part by acquiring them.  For example, in 2005, UHG (directly or through a subsidiary) acquired PacifiCare Health Systems ("PacifiCare") and PacifiCare's and its affiliates' MA Organizations and MA Plans, including the following MA Organization Defendants:  PacifiCare of Arizona, Inc., incorporated in Arizona; PacifiCare of California, incorporated in California; PacifiCare of Colorado, Inc., incorporated in Colorado; PacifiCare of Nevada, Inc., incorporated in Nevada; PacifiCare of Oklahoma, Inc., incorporated in Oklahoma; PacifiCare of Oregon, Inc., incorporated in Oregon; PacifiCare of Texas, Inc. incorporated in Texas; and PacifiCare of Washington, incorporated in Washington.  Both before and after the acquisition, PacifiCare of California and possibly other PacifiCare MA Organizations and MA Plans referred to themselves or to their brand of MA Plans as Secure Horizons.  Since 2005, these PacifiCare MA Organizations have been indirect subsidiaries of and controlled by UHG.  Several years after the acquisition, these PacifiCare plans were renamed or rebranded as UnitedHealthcare MA Organizations or merged into other UHG MA Organizations.  For instance, in 2011, PacifiCare of California became Defendant UnitedHealthcare of California.

37.    Defendant United HealthCare Services is the successor of PacifiCare Health Systems and PacifiCare Health Plan Administrators, Inc., which were the direct or indirect parents of the PacifiCare MA Organizations acquired by UHG in 2005.  United HealthCare Services became their successor sometime after the acquisition.  For a short period of time after the acquisition, PacifiCare Health Systems (and possibly also PacifiCare Health Plan Administrators) was involved in the management of the

<div align="center">25</div>

PacifiCare MA Organizations and perhaps other Defendant MA Organizations, including
the management of risk adjustment-related activities.  All PacifiCare MA Organizations
and other entities and their successors were direct or indirect subsidiaries of Defendant
UHG.  Any reference in this Amended Complaint to United HealthCare Services or the
UHG Managing Defendants includes PacifiCare Health Systems and PacifiCare Health
Plan Administrators.

38.     Before UHG's acquisition of PacifiCare, the PacifiCare employees with
responsibilities relating to the submission of risk adjustment data to the Government and
responsibilities relating to other risk adjustment-related activities worked at a PacifiCare
office in Cypress, California, within this District.  Sometime after the acquisition, this
office moved to Santa Ana, California, within this District, and continued to submit
claims and perform other risk adjustment-related activities.  In 2007, the employees in
this Risk Adjustment Group in this District became employees of Ingenix and then they
became employees of Optum in 2011.  A substantial part of the events or omissions
relevant to this litigation occurred at these and other locations within this District.

39.     As an example of UHG's other acquisitions, UHG (directly or through a
subsidiary) acquired WellMed Medical Management, Inc. ("WMMI") in 2011.  UHG's
acquisition of WMMI included its subsidiaries and affiliates, including, but not limited
to, WMMI's MA Organizations and MA Plans, Physician's Health Choice of Texas,
LLC and Citrus Health Care, Inc., which operated in Texas, Florida, New Mexico and
Arkansas.  Citrus Health Care, Inc. was a Florida corporation and a subsidiary of PHC
Holdings of Florida, Inc.  Sometime after the acquisition, UHG renamed or rebranded
these MA Organizations and MA Plans as UHG MA Organizations or MA Plans or
merged them with or into UHG's other MA Organizations or MA Plans in these states.

40.     Over the last decade, UHG and its subsidiaries have also sought to vertically
integrate in the health care market by acquiring and/or operating large groups or
networks of direct providers of healthcare services and other entities that manage the
provision of such services to beneficiaries enrolled in the Defendant MA Organizations'

26

Exhibit C
Page 57

MA Plans.  For example, UHG vertically integrated in several States when it acquired WMMI in 2011.  For many years, WMMI had subsidiaries and other affiliates that directly managed the provision of or directly provided healthcare services.  These affiliates included WellMed Networks, Inc., WellMed Networks Inc. of Florida, WellMed Medical Management of Florida Inc., and WellMed Medical Group, PA.  After the acquisition, WellMed became part of the group called OptumCare.  After the acquisition, WellMed also significantly expanded by acquiring more than 50 medical practices in Texas and Florida.  WellMed included more than 10,000 physicians that provided healthcare to hundreds of thousands of Medicare beneficiaries in Texas and Florida, including beneficiaries enrolled in Plans owned or operated by one or more Defendant MA Organizations.

41.     All references to "Defendants" in this Complaint include all of the Defendants identified above.

## DEFENDANTS' EXECUTIVES AND OTHER EMPLOYEES

42.     When the job titles of Defendants' executives and other employees are provided in this Amended Complaint, the United States, based on its best knowledge and belief, has provided their titles at the time relating to the facts alleged.  As a reference, the United States also provides, based on its best knowledge and belief, the following list of the job titles of Defendants' executives and other employees who are referenced in this Amended Complaint and the names of the specific business divisions or entities for which they worked during the time period that they were involved in matters relevant to this action (in alphabetical order by last name):

- Kyle Anderson – From 2009 to 2015, Anderson was the Director of Financial Planning and Analysis at UnitedHealthcare.

- Jason Bainbridge – Bainbridge worked for UnitedHealthcare Community & State in 2012.

- Paul Balthazor – From 2011 through 2015, Balthazor was the Chief Financial Officer of UnitedHealthcare Community & State.

27

- Marc Beckmann – Beckmann worked for UnitedHealthcare Medicare & Retirement in the Finance-Risk Adjustment Analysis Section.
- Paul Bihm – At PacifiCare, Bihm was a Vice President and Chief of Staff.  After the acquisition, he worked for Ingenix as Chief Financial Officer and Chief Operating Officer from 2007 to 2010 and then for Optum's Risk Adjustment Group as a Senior Vice President of Client Management.
- Jon Bird – In 2008, Bird was hired to work for Ingenix's Risk Adjustment Group. In 2010, he became the Director of Revenue Projections for this group.  In or about 2011, when the Risk Adjustment Group was moved to Optum, Bird became an employee of Optum.  In or about 2013, Bird assumed significant responsibility for the Chart Review and Claims Verification Programs.  He was also a "decision maker" for the Claims Verification and RACCR Programs and a member of United's Risk Adjustment Advisory Board/Council, which was chaired by Defendant UHG's Chief Executive Officer Steve Hemsley.  By at least March 2014, Bird was the Senior Vice President of Risk and Quality Analytics at Optum.
- Gail Boudreaux – In 2008, Boudreaux became the Executive Vice President of UnitedHealthcare.  From 2011 to 2014, she was the Chief Executive Officer of UnitedHealthcare.  During Boudreaux's time as Chief Executive Officer of UnitedHealthcare, Steve Nelson, John Larsen, and Daniel Schumacher reported to her.  She reported to Steve Hemsley.  According to a 2011 document, Boudreaux was "significantly involved in the oversight and management of" UnitedHealthcare's "Medicare business."
- Tracey Bradberry – From 2008 through 2012, Bradberry was an Operations Manager at Ingenix.  Since 2012, she has been an Associate Director of Operations at Optum.  In that role, she leads diagnosis coding teams for the Chart Review Program.
- Patty Brennan – In 2008, Brennan was hired to work for Ingenix's Risk Adjustment Group.  She was hired as Ingenix's Compliance Manager for Risk

28

Adjustment Programs.  In 2009, Brennan became the Ingenix Director of Retrospective Services relating to risk adjustment.  In or about 2011, when the Risk Adjustment Group was moved to Optum, Brennan became an employee of Optum.  From 2009 to 2013, Brennan oversaw the Chart Review Program.  In 2013, she became the Vice President of Retrospective Services.  Brennan, along with other individuals, was responsible for the development and execution of the Internal Data Validation Program, the RACCR Program, and the Claims Verification Program.  She was also the Program Manager for the Claims Verification Program for several years and had strategic oversight over the RACCR Program from 2009 to 2013.

- Jonathon Bunker – In 2009, Bunker was the President of Sierra Health and Life Insurance Company, Inc. and the President of Health Plan of Nevada, Inc.  Upon the close of the merger between UHG and Sierra Health Services, Bunker was the Chief Executive Officer of the southwest region of UnitedHealthcare.

- Barbara Carlson – In 2011, Carlson was a Senior Regulatory Affairs Analyst at the Regulatory Affairs Department at UnitedHealthcare Medicare & Retirement.

- Shelly Cranley – Cranley served as the Director of Regulatory Affairs for UnitedHealthcare.

- Keith Dobbins – Since 2006, Dobbins has been UnitedHealthcare's Deputy General Counsel.

- Juliet Domb – From 2012 to 2015, Domb was a Strategic Relationship Analyst at Optum.  She has also served as an administrative assistant to Larry Renfro.

- Jeffrey Dumcum – At PacifiCare, Dumcum was the Chief Financial Officer.  After the acquisition, he became a Vice President of Finance for Ovations.  In 2007, Dumcum became a Senior Vice President at Ingenix and oversaw the Risk Adjustment Group at Ingenix and then Optum until approximately 2014.

- Karen Erickson – Since 2011, Erickson has been an Executive Vice President and the Chief Quality Officer at Optum.  In this role, Erickson has reported to the

1    Chief Executive Officer of Optum, Larry Renfro.  Also in 2011, Erickson was the
2    Chief Administrative Officer of Optum, and prior to that she worked for Optum
3    for 12 years in various financial and administrative roles.

4    • Ronnie Grower – From 2008 to 2010 Grower was a Vice President of Market
5      Consultation and a Vice President of Account Management at Ingenix.

6    • Joseph Haferman – Haferman was the Chief Financial Officer of Ovations in 2005
7      and the Chief Financial Officer of Secure Horizons in 2007 and possibly for some
8      time thereafter.  Relator Poehling reported to Haferman from early 2007 to late
9      2008.

10   • Kimberly Halva – In 2009, Halva was an attorney for UnitedHealthcare Medicare
11     & Retirement.  From 2010 to 2013, Halva was the UnitedHealthcare Medicare &
12     Retirement's Finance Compliance Officer.  She also had the title Director of
13     Compliance.  From 2010 to 2103, she reported to Jennifer O'Brien.

14   • Mary Hammond – From 2010 to 2013, Hammond was an Associate Director of
15     Strategy and Support who worked for the risk adjustment team at
16     UnitedHealthcare Medicare & Retirement.  She reported to Relator Poehling until
17     he left at the end of 2012.

18   • Charles Hanson – From 2008 to 2013, Hanson was a Vice President of
19     Underwriting and Finance at UnitedHealthcare Medicare & Retirement.

20   • Steve Hemsley – Hemsley is currently the Executive Chairman of UHG's Board
21     of Directors.  He was the Chief Executive Officer of UHG from 2006 to 2017.
22     According to a 2011 document, Hemsley was "significantly involved in the
23     oversight and management of" UHG's "Medicare business."

24   • James Higgins – Higgins was the Finance Director at PacifiCare.  After the
25     acquisition, Higgins became a Director for Revenue Analytics.

26   • William Hnath – Hnath was the financial controller for UnitedHealthcare
27     Medicare & Retirement.

28

30

Exhibit C
Page 61

- Pam Holt – Holt was a Project Manager for Network Management Operations at PacifiCare. After the acquisition, she became a Manager of Provider Outreach for the Risk Adjustment Program.

- Scott Hughes – Starting in mid-2012, Hughes was a Senior Project Manager at Optum.

- Michael Jacobson – Jacobson was a Program Business Analyst/Project Manager at Optum.

- Donald James – James was a Director of Program Strategy at Optum from 2012 to 2015.

- Thad Johnson – Johnson is an attorney for UnitedHealthcare and is the current Chief Legal Officer for the company.

- Joseph Keen – Keen was a Vice President and Chief Compliance Audit Officer for UnitedHealthcare Medicare & Retirement in 2011.

- Gerald (Jerry) Knutson – Knutson was the Chief Financial Officer of Ovations from 2003 to 2009 and the Chief Financial Officer of OptumInsight from 2009 to 2012.

- John Larsen – Larsen was the Chief Financial Officer of UnitedHealthcare Medicare & Retirement (previously called Ovations-PSMG) until 2010, when Scott Theisen succeeded him in that position. Larsen reported to Larry Renfro when Renfro was the Chief Executive Officer of Ovations-PSMG. Relator Poehling reported to Larsen in 2010. In August 2012, Larsen became the Chief Executive Officer of UnitedHealthcare Medicare & Retirement. In early 2014, Steve Nelson took over that position.

- Pam Leal – Leal was the Executive Director of Provider Training and Development at PacifiCare. After the acquisition, she became a Regional Vice President for Market Consultation at Ingenix.

- Rebecca Martin – In 2010, Martin became the Director of Encounter Operations at Ingenix. From 2011 to 2015, Martin was the Director of Data Remediation at

31

Optum. In 2015, she became the Director of Data Management Strategies at Optum.

- Jay Matushak – From 2013 to 2015, Matushak was a Vice President of Financial Planning and Analysis for UnitedHealthcare Medicare & Retirement. He reported to Brian Thompson.

- Michael McCarthy – Starting in November 2011, McCarthy was the Executive Director of UnitedHealthcare Medicare & Retirement. In 2013, he also served as a Regional Vice President for Southern California for UnitedHealthcare Medicare Solutions.

- Marybeth Meyer – Since 2013, Meyer has been a Vice President of Operations at UnitedHealthcare Medicare & Retirement where she oversees risk adjustment programs and activities. Meyer reported to Theisen and then to Brian Thompson.

- Bill Miller – Miller was the Chief Executive Officer of OptumInsight from 2012 to 2017.

- Eric Murphy – Murphy was the President of Payer Solutions at Optum.

- Randall Myers – Myers worked for PacifiCare and, after the acquisition, for Ingenix and then Optum as a Director of Encounter Operations.

- Timothy Noel – Noel was the Vice President of Finance for Ovations and then UnitedHealthcare Medicare & Retirement from 2007 to 2013 and reported to the Chief Financial Officers of those groups. Poehling reported to Noel from the fall of 2010 until his departure in December 2012.

- Steve Nelson – Since 2017, Nelson has been the Chief Executive Officer of UnitedHealthcare. From 2014 to 2017, he was the Chief Executive Officer of UnitedHealthcare Medicare & Retirement.

- Jennifer O'Brien – O'Brien was the Chief Medicare Compliance Officer of Ovations and then UnitedHealthcare Medicare & Retirement. She reported to David Orbuch. She was part of the UnitedHealthcare Medicare & Retirement "Executive Leadership Team."

32

1    • Karin O'Hara – O'Hara worked at UnitedHealthcare Community & State.

2    • David Orbuch – Orbuch was the Chief Compliance Office for PSMG and

3      UnitedHealthcare Medicare & Retirement.

4    • Thomas Paul – In the 2009 to mid-2010 time period, Paul was the Chief Executive

5      Officer and Chief Operating Office of Ovations and, in the mid-2010 to August

6      2012 time period, Paul was the Chief Executive Officer of UnitedHealthcare

7      Medicare & Retirement.  He reported to Renfro and then to Gail Boudreaux.  He

8      was part of the UnitedHealthcare Medicare & Retirement "Executive Leadership

9      Team."

10   • Karen Petroff – Petroff was the Senior Vice President of Business Development at

11     Optum.

12   • Cindy Polich – Polich was the President of Ovations and then UnitedHealthcare

13     Medicare & Retirement.  She reported to Larry Renfro and Thomas Paul.  She was

14     part of the UnitedHealthcare Medicare & Retirement "Executive Leadership

15     Team."

16   • Patricia Rasmussen – Rasmussen was Manager of Encounter Submissions at

17     Ingenix.

18   • Janice Redmond – Prior to 2012, Redmond was Senior Vice President of Provider

19     Outreach at Optum.  Since 2012, Redmond has been a Vice President of Market

20     Consultation for Optum's Western Region.

21   • Anne Reis – In 2013, Reis was an Associate Director of Revenue for

22     UnitedHealthcare Medicare & Retirement.

23   • Larry Renfro – During the 2009 to 2011 time period, Renfro served in various

24     roles, including the Executive Vice President of Defendant UHG, the Chief

25     Executive Officer of Defendant Ovations, and the Chief Executive Officer of the

26     Public & Senior Markets Group.  Since July 2011, Renfro has been the current

27     Chief Executive Officer of Defendant Optum.  Since November 2014, he has also

28     been Vice Chairman of Defendant UHG.

Exhibit 2

Exhibit C
Page 64

1    • Sandy Rick – Rick was a Senior Regulatory Affairs Analyst at UnitedHealthcare
2       Medicare & Retirement.

3    • Kara Rios – Rios was the Chief Financial Officer of AmeriChoice, one of the
4       groups that managed some of the Defendant MA Organizations.

5    • Justin Roth – Roth was the Chief Financial Officer of Evercare, one of the groups
6       that managed some of the Defendant MA Organizations.

7    • Daniel Schumacher – Since 2017, Schumacher has been the President and Chief
8       Operating Officer of UnitedHealthcare.  Prior to that, he was the Chief Financial
9       Officer of UnitedHealthcare.

10   • Melissa Sedor – Sedor worked in UnitedHealthcare's controller's office, in the
11      area of revenue accounting.  Sedor was an accounting manager and reported to
12      Bill Hnath, the controller for UnitedHealthcare Medicare & Retirement.

13   • Matt Shors – Shors is UHG's Senior Deputy General Counsel.

14   • Marianne Short – Short is UHG's Executive Vice President and Chief Legal
15      Officer.

16   • Andy Slavitt – Slavitt was the Chief Executive Officer for OptumInsight and an
17      Executive Vice President for Optum.

18   • Scott Theisen – From 2010 to 2013, Theisen was the Chief Financial Officer of
19      UnitedHealthcare Medicare & Retirement.  In 2011, he was part of the
20      UnitedHealthcare Medicare & Retirement "Executive Leadership Team" reporting
21      to Tom Paul.  In 2014, Theisen moved to Optum, but, during that year, his
22      responsibilities continued to include the risk adjustment-related work that Optum
23      performed for UnitedHealthcare Medicare & Retirement.

24   • Brian Thompson – Since 2017, Brian Thompson has been the Chief Executive
25      Officer of UnitedHealthcare Medicare & Retirement.  From 2013 to 2017, he was
26      the Chief Financial Officer of UnitedHealthcare Medicare & Retirement.  He was
27      also previously the Chief Financial Officer of UnitedHealthcare Community &
28      State.

Exhibit C
Page 65

- Carol Thompson – Until 2009, Carol Thompson was a National Manager for Risk Adjustment Programs at Ingenix.  From 2009 to 2011, she was a Manager of the ChartSync operations (part of the Chart Review Program) at Ingenix.  From 2011 to 2014, she was a Manager and Analyst of Encounter Operations at Optum.

- Pam Thomsen – Thomsen worked for Optum in Data Validation Operations and Clinical Performance & Compliance.

- Lee Valenta – At various times, Valenta was the Chief Financial Officer, the Chief Operating Officer, the President of Life Sciences, and an Executive Vice President at Ingenix and then OptumInsight.

- Emily Vue – From 2009 to 2014, Vue was a Senior Regulatory Analyst and later a Manager of Regulatory Affairs at Ovations-PSMG and then UnitedHealthcare.

- Karen Wagor – Wagor was the Manager of the National Medical Coder Team and the National Coding Trainer at Ingenix and then Optum.  She previously worked at PacifiCare.

- David Walsh – In 2011, Walsh was the Director for Regulatory Affairs for and, in 2012, became the Senior Director of Regulatory Affairs for UnitedHealthcare Medicare & Retirement.

- John Way – Way was Chief Financial Officer of Secure Horizons.  Relator Poehling reported to Way from late 2008 to early 2010.

- Christopher Webb – Webb worked with Payer Operations at Optum in 2014.

- Timothy Wicks – Wicks served in a senior management position at Optum.

- Stephanie Will – Will had been a Principal Analyst at PacifiCare.  After the acquisition, she joined Ovations as the Program Manager for the national Chart Review Program.  In 2007, she became the Vice President of Risk Adjustment Programs at Ingenix.

35

Exhibit C
Page 66

# THE MEDICARE PROGRAM

## I.   The Medicare Statute

43.   Medicare is a federally-operated health insurance program administered by CMS. Medicare benefits individuals age 65 and older and the disabled. 42 U.S.C. § 1395c *et seq.* Parts A and B of the Medicare Program are known as "traditional" Medicare. Medicare Part A covers inpatient and institutional care. Medicare Part B covers physician, hospital outpatient, and ancillary services and durable medical equipment.

44.   Under Medicare Parts A and B, CMS reimburses healthcare providers (*e.g.,* hospitals and physicians) using what is known as a "fee-for-service" ("FFS") payment system. Under an FFS payment system, healthcare providers submit claims to CMS for reimbursement for each service actually rendered, such as a physician office visit or a hospital stay. CMS then pays the providers directly for each service based on payment rates pre-determined by the Government.

45.   Under Medicare Part C, Medicare beneficiaries can opt out of the traditional Medicare Program (Parts A and B) and instead enroll in MA Plans and receive health care services managed by those MA Plans. MA Plans must provide Medicare beneficiaries all the services that they are entitled to receive from the traditional Medicare Program.

46.   Under Medicare Part D, Medicare beneficiaries can elect to enroll in either a Prescription Drug plan (known as a PD Plan) or an MA Plan that provides prescription drug coverage in addition to the physician office visit and hospital outpatient and inpatient coverage provided under Part C (known as an MAPD Plan). For simplicity, in this Amended Complaint, the Government refers to Parts C and D collectively as the MA Program and refers collectively to MA, PD, and MAPD Plans as Plans.

47.   MA Organizations are "risk-bearing" entities that must be licensed by the State in which they are located. 42 C.F.R. §§ 422.2 & 422.503(b)(2). Each MA Organization agrees to bear the risk that the amount that it pays providers for the health services for a

Exhibit C
Page 67

1    particular beneficiary in one of its Plans may exceed the amount that it was paid to

2    insure the beneficiary.

3    48.    Medicare beneficiaries who enroll in an MA, PD or MAPD Plan are considered

4    members of and enrollees in that Plan.  In this Amended Complaint, the terms

5    beneficiaries, members, enrollees, and patients are used interchangeably, but mean the

6    same thing, that is, individuals enrolled in Plans.

7    49.    MA Organizations' obligations to the MA Program and the requirements for them

8    to participate in the Program are set forth in federal regulations and, each year, the MA

9    Organizations must agree in writing to comply with those regulations and to other terms

10   and conditions in order to participate in the MA Program.  42 C.F.R. §§ 422.504 &

11   422.505 (Part C); 42 C.F.R. §§ 423.504 & 423.505 (Part D).  In addition, MA

12   Organizations must comply with requirements set forth in statutes, such as the FCA, and

13   guidance documents, such as the Medicare Managed Care Manual, the Medicare

14   Prescription Drug Benefit Manual, the Risk Adjustment Participant Guides, and

15   Medicare Advantage operating instructions.

16   50.    Related Entities include those entities that are related to an MA Organization by

17   common ownership or control and perform at least some of the MA Organization's

18   management functions.  42 C.F.R. §§ 422.2 & 422.500.  As previously explained, the

19   UHG Managing Defendants are or were Related Entities.

20   51.    First Tier Entities include those providers or provider groups that enter into a

21   written arrangement with an MA Organization to provide healthcare services to the

22   beneficiaries in the organization's Plan(s).  42 C.F.R. §§ 422.2 & 422.500.  The capitated

23   providers in the RACCR Program were First Tier Entities.

24   52.    The obligations of Related Entities and First Tier Entities to the MA Program are

25   also set forth in the MA Program regulations.  Related Entities and First Tier Entities

26   must, among other things, (i) perform their services in a manner that complies with the

27   MA Organization's contractual obligations to the Government, *id*. at 422.504(*i*)(3)(iii);

28   agree to "comply with all applicable Medicare laws, regulations, and CMS instructions,"

37

1   *id*. at 422.504(*i*)(4)(v); and receive effective compliance training and education relating
2   to preventing fraud, waste, and abuse.  *Id*. at § 422.503(b)(4)(vi)(C)(1).  Furthermore, if
3   a Related Entity or First Tier Entity generates data relating to an MA Organization's
4   claims for payments from the MA Program, it (as well as the MA Organization) must
5   certify the accuracy and truthfulness of the data.  *Id*. at § 422.504(l)(3).

6   53.   An MA Organization, however, cannot evade its legal and contractual obligations
7   to the Government by using Related Entities to manage it or by contracting with First
8   Tier Entities to provide services to its beneficiaries.  An MA Organization "maintains
9   ultimate responsibility for adhering to and otherwise fully complying with all terms and
10  conditions of its contract with CMS."  42 C.F.R. § 422.504(*i*)(1).  Thus, an MA
11  Organization cannot delegate away its ultimate responsibility for its obligations to the
12  Government.

13   **II.     Medicare Parts C and D Risk Adjustment Payments**

14  54.   Under Part C, the Government pays each MA Organization a predetermined base
15  monthly amount for each Medicare beneficiary in its MA Plans.  This monthly payment
16  is known as a "per-member, per-month" payment.  This predetermined base payment
17  varies for each MA Plan depending on various factors, including amounts set forth in the
18  MA Plan's bid submitted to the Government, the scope of medical services covered by
19  the Plan's benefit package (all packages must cover at least those services offered by
20  Parts A and B of the Medicare Program), and the amount of premiums, deductibles, and
21  co-pays for which an enrollee in the Plan is responsible (Plans have different premiums,
22  deductibles and co-pays such that Plans with higher deductibles and co-pays may have
23  lower premiums).

24  55.   Since 2000, Congress has also required that the payments be risk adjusted for each
25  beneficiary based on "such risk factors as age, disability status, gender, institutional
26  status, and *such other factors as [the Secretary of the United States Department of*
27  *Health and Human Services] determines to be appropriate, including adjustment for*
28  *health status* . . . to ensure actuarial equivalence."  42 U.S.C. § 1395w-23(a)(1)(C)

Exhibit C
Page 69

(emphasis added).  By risk adjusting for health status, the Government pays MA Organizations more for beneficiaries with certain serious chronic medical conditions and, thus, higher risk scores than for beneficiaries who do not have those conditions and, thus, have lower risk scores.

56.    Pursuant to 42 U.S.C. § 1395w-23(a)(1)(C), the Secretary has the authority to determine how to adjust for health status.  For example, the Secretary has the authority to decide to risk adjust only for serious chronic medical conditions and to risk adjust by requiring the submission of diagnoses from medical encounters that occurred the year preceding each payment year and projecting the possibility of additional costs for each payment year.  The Secretary also has authority to decide what historical cost and/or utilization data it should consider in projecting how much more it may cost an MA Organization to provide services to a beneficiary who has been assigned a diagnosis relating to a serious chronic medical condition.

57.    From 2000 to 2004, the Secretary employed a Principal Inpatient Diagnostic Cost Group ("PIP-DCG") model that took into account diagnoses from inpatient hospital stays to determine the risk scores of beneficiaries in MA Plans.  The PIP-DCG model was prospective.  Diagnoses for one year were used to determine each beneficiary's risk score for the following payment year.  During the 2000 to 2004 time period, MA Organizations (which were then called Medicare + Choice Organizations) had many of the same obligations that they have had since 2004.  For instance, they had the obligation to design and implement effective systems to monitor and review the accuracy and truthfulness of the diagnoses they submitted for risk adjustment payments in order to certify the accuracy and truthfulness of that data.  *See* Medicare Managed Care Manual, Chapter 7, Section 110.2 (entitled "Certification of Data Accuracy, Completeness, and Truthfulness") (Rev. 2, 10-01-01).

58.    Since 2004, the Secretary has employed the Hierarchical Conditions Category ("HCC") model, which takes into account both demographic factors (such as age and gender) and health status to determine the risk scores for beneficiaries in MA Plans.

Exhibit C
Page 70

1   With respect to health status, the model takes into account diagnoses from physician

2   office visits and hospital outpatient encounters as well as hospital inpatient stays.  Like

3   the PIP-DCG model, the HCC model is prospective, meaning that it relies on diagnoses

4   assigned to a beneficiary in one year (referred to by CMS as the "data collection" year

5   but also generally known as the "date of service" or "DOS" year) to determine the risk

6   score for the beneficiary for the following year (often referred to as the "payment year"

7   or "PY").  The medical conditions included in the model are grouped into HCCs, which

8   are categories of clinically-related medical diagnoses.  *See* 42 C.F.R. § 422.2.  The

9   diagnoses grouped into HCCs include major, severe, and/or chronic illnesses.  Related

10  groups of diagnoses are ranked on the basis of disease severity and the cost associated

11  with their treatment.  Between 2004 and 2013, the CMS-HCC model included 70 HCCs.

12  Starting in 2014, the CMS-HCC model included 79 HCCs.

13  59.     Under Medicare Part D, payments to PD or MAPD Plans for prescription drug

14  benefits are also risk-adjusted based on health status.  As with Part C, Part D employs a

15  health-based risk adjustment model known as the Rx Hierarchical Condition Categories

16  ("RxHCC") model.  Like HCCs, RxHCCs are also groups of clinically-related medical

17  diagnoses that are ranked by disease severity and the cost associated with the

18  pharmaceutical drugs used to treat them.

19  60.     The Government assigns a relative numerical value (also known as a relative

20  factor, multiplier, or coefficient) to each HCC and RxHCC group that correlates to the

21  predicted incremental costs of care associated with treating the medical conditions in

22  each category.  It currently determines the relative values based on an analysis of the

23  additional amounts that it paid on average for the treatment of these major, severe, and

24  chronic medical conditions under Parts A and B of the Medicare Program.  Higher

25  relative values are assigned to HCCs and RxHCCs that include diagnoses with greater

26  disease severity and greater costs associated with their treatment.

27  61.     As previously stated, the HCC and RxHCC risk adjustment models are

28  prospective and a beneficiary's risk score for a particular payment year is determined by

Exhibit C
Page 71

his or her medical conditions during the previous year (*i.e.*, the date of service year).  For risk adjustment payment purposes, these medical conditions must be documented by a qualified healthcare provider (*e.g.*, a doctor) in the beneficiary's medical record during the previous year.  Accordingly, for risk adjustment payment purposes, the diagnosis codes that the healthcare provider, his or her administrative or billing support staff, or anyone else (such as the MA Organization or a Related Entity) assigns to a beneficiary must be supported by the beneficiary's medical record.

62.     Each beneficiary's risk score is calculated anew for each payment year.  For example, a beneficiary's risk score for payment year 2012 is determined by the diagnoses that his or her qualified healthcare providers documented in his or her medical records during medical encounters during date of service year 2011.

63.     MA Organizations obtain diagnosis data from the healthcare providers that treat the beneficiaries in their plans (as well as through other means and sources such as the MA Organizations' own medical record reviews).  Healthcare providers can transmit diagnosis codes to MA Organizations with claims for payment for services rendered, in encounter records reporting the services rendered, or by alternative means.  In this Amended Complaint, the United States refers to diagnosis codes reported by providers through any means as "provider-reported diagnoses."

64.     MA Organizations submit risk adjustment data, including diagnoses, to CMS using CMS' Risk Adjustment Processing System ("RAPS").  Each RAPS submission must include the following information:  the Medicare beneficiary's identification number (called a "HIC number" or "HICN"); the date(s) of the medical encounter (the physician office visit, hospital outpatient visit, or hospital inpatient stay); the type of provider (physician or hospital); and the diagnosis code(s) reported by the provider for the encounter.  Each RAPS submission is a claim for payment.  If the data submitted is invalid, the claim is false.

65.     RAPS also has a field that is called a "Delete Indicator" and allows MA Organizations and Related Entities to comply with their obligation to delete invalid

41

1  diagnoses that they previously submitted in order to withdraw or retract the invalid

2  diagnoses.  That is, the RAPS system enables MA Organizations and Related Entities to

3  withdraw or retract their false claims for risk adjustment payments.

4  <u>**DEFENDANTS' AGREEMENTS**</u>

5  **I.    The Annual Parts C and D Agreements**

6  66.    As previously explained, in order to participate in the MA Program, the Defendant

7  MA Organizations were required to agree in writing to comply with the Part C and D

8  regulations and any other terms and conditions CMS deemed appropriate.  42 C.F.R.

9  §§ 422.504 & 422.505 (Part C); 42 C.F.R. §§ 423.504 & 423.505 (Part D).  Each year

10 during the relevant time period, one or more executives of one or more of the UHG

11 Managing Defendants or their predecessors executed these written agreements or

12 renewals of these written agreements between the Defendant MA Organizations and

13 CMS.

14 67.    The regulations specifying the terms and conditions of the contractual relationship

15 between MA Organizations and CMS have remained the same for many years.

16 Accordingly, from year to year, the terms and conditions of these written agreements

17 between the Defendant MA Organizations and CMS remained very similar, if not

18 identical.

19 68.    The terms and conditions of the Part C agreements are exemplified by the attached

20 contract that Defendant UnitedHealthcare Plan of River Valley, Inc. entered into with

21 CMS relating to its participation in Medicare Part C in 2010.  *See* Exhibit 1, attached

22 hereto.  The terms and conditions of these Part C contracts include, among many other

23 things, that each of the MA Organizations agrees to (i) operate its Plans "in compliance

24 with the requirements of [the] contract and applicable Federal statutes, regulations, and

25 policies (e.g., policies as described in the Call Letter, Medicare Managed Care Manual,

26 etc.)" (Article II, Section A); (ii) "implement a compliance plan in accordance with the

27 requirements of § 422.503(b)(4)(vi)" (Article III, Section F); (iii) "[a]s a condition of

28 receiving a monthly payment under" the contract, "request payment under the contract

on the forms attached" to the contract, including "Attachment B (risk adjustment data) which attest[s] to *(based on best knowledge, information and belief, as of the date specified on the attestation form)* the accuracy, completeness, and truthfulness of the data identified on" Attachment B (Article IV, Section C) (emphasis in the original); (iv) ensure that related entities, contractors, and subcontractors that generated risk adjustment data also attest to the accuracy and truthfulness of the data (Article IV, Section C.2); (v) ensure that all agreements with related entities, contractors, and subcontractors specify that the related entities, contractors, and subcontractors "must comply with all applicable Medicare laws, regulations, and CMS instructions" (Article V, Section D(5)); and (vi) comply with "Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to, applicable provisions of the Federal criminal law [and] the False Claims Act (31 USC 3729 et seq.)" (Article IX, Section A.1). In accordance with 42 C.F.R. § 422.510, the agreements also provided that CMS may terminate the MA Organization's participation in the MA Program if it determines that the organization has submitted false data to it or "fail[ed] to provide CMS with valid risk adjustment data." Article VIII, Section B.1(a)(iv) & (vii).

69. The agreements for other years were very similar, if not identical. For example, in September 2010, Tom Paul, the Chief Executive Office of UnitedHealthcare Medicare & Retirement, executed a new agreement between Defendant UnitedHealthcare of California (the successor to PacifiCare of California) and CMS relating to this MA Organization's participation in Medicare Part C in 2011. *See* Exhibit 2, attached hereto. By executing this contract, UnitedHealthcare of California agreed to, among many other things, (i) operate its Plans "in compliance with the requirements of [the] contract and applicable Federal statutes, regulations, and policies (e.g., policies as described in the Call Letter, Medicare Managed Care Manual, etc.)" (Article II, Section A); (ii) "implement a compliance plan in accordance with the requirements of § 422.503(b)(4)(vi)" (Article III, Section F); (iii) "[a]s a condition of receiving a monthly payment under" the contract, "request payment under the contract on the forms attached"

43

Exhibit C
Page 74

1   to the contract, including "Attachment B (risk adjustment data) which attest[s] to *(based*

2   *on best knowledge, information and belief, as of the date specified on the attestation*

3   *form)* the accuracy, completeness, and truthfulness of the data identified on" Attachment

4   B (Article IV, Section D); (iv) ensure that related entities, contractors, and

5   subcontractors that generated risk adjustment data also attest to the accuracy and

6   truthfulness of the data (Article IV, Section D.2); (v) ensure that all agreements with

7   related entities, contractors, and subcontractors specify that the related entities,

8   contractors, and subcontractors "must comply with all applicable Medicare laws,

9   regulations, and CMS instructions" (Article V, Section D.5); and (vi) comply with

10  "Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse,

11  including, but not limited to, applicable provisions of the Federal criminal law [and] the

12  False Claims Act (31 USC 3729 et seq.)" (Article IX, Section A.1).  The agreement also

13  provided that CMS had the right to terminate the agreement with the MA Organization if

14  it determined that the organization had submitted false data to it or "fail[ed] to provide

15  CMS with valid risk adjustment data."  Article VIII, Section B.1(a)(iv) & (vii).  In

16  September 2010, Paul also executed an agreement with CMS relating to

17  UnitedHealthcare of California's offering of prescription drug benefits under Medicare

18  Part D.  This Part D agreement was, in all respects relevant to this Amended Complaint,

19  very similar to the one described above for the offering of healthcare insurance benefit

20  packages under Part C.  Furthermore, in September 2010, Tom Paul executed the same

21  Part C and D agreements on behalf of other of the Defendant MA Organizations.  All

22  these agreements were very similar, if not identical, to the ones he executed for

23  UnitedHealthcare of California.

24  70.     In September 2011, August 2012, and August 2013, Scott Theisen, the Chief

25  Financial Officer of UnitedHealthcare Medicare & Retirement, executed agreements for

26  many of the Defendant MA Organizations relating to their participation in Medicare

27  Parts C and D for 2012, 2013, and 2014, respectively.  *See, e.g.*, Exhibits 3, 4, & 5,

28  attached hereto (Defendant UnitedHealthcare of California's Parts C agreements for

44

these years).  In August 2014 and 2015, Brian Thompson, the Chief Financial Officer of
UnitedHealthcare Medicare & Retirement, executed agreements for many of the
Defendant MA Organizations relating to their participation in Medicare Parts C and D
for 2015 and 2016.  See, e.g., Exhibits 6 & 7, attached hereto (Defendant
UnitedHealthcare of California's Part C agreements for these years).  These agreements
were, in all respects relevant to this Amended Complaint, very similar, if not identical, to
the agreements described in the preceding paragraphs relating to the agreements for 2010
and 2011 and imposed the same contractual obligations on the Defendant MA
Organizations as the earlier agreements.

71.    The annual Attestations executed in order to renew existing contracts were also
very similar as shown by the following:  In the fall of 2006, Jerry Knutson, the Chief
Financial Officer of Ovations and Jeff Putnam, the Chief Financial Officer of Secure
Horizons, executed Attestations renewing (for calendar year 2007) the existing contract
between PacifiCare of California (the predecessor of Defendant UnitedHealthcare of
California) and CMS.  Knutson and Putnam attested that PacifiCare of California would
"comply with all applicable program guidance that CMS has issued to date and will issue
during the remainder of 2006 and 2007 pursuant to Medicare program authorizing
statutes and regulations, including but not limited to, . . . the CMS memoranda issued
through the Health Plan Management System (HPMS)."  (HPMS is one of the web-
based systems used by CMS to provide program information to MA Organizations and is
used to communicate program requirements.)  In September 2007, Joseph Haferman, the
Chief Financial Officer of Secure Horizons, executed another Attestation renewing the
existing contract for PacifiCare of California (this time for calendar year 2008).
Haferman thereby attested that PacifiCare of California would comply "with all
applicable program authorizing statutes and regulations and program guidance that CMS
has issued to date and will issue during the remainder of 2007 and 2008, including but
not limited to,  . . . the Medicare Managed Care Manual, and CMS memoranda issued
through the Health Plan Management System (HPMS)."  In September 2008, Kenneth

45

Exhibit C
Page 76

1   Burdick, the Chief Executive Officer of Secure Horizons at the time, executed another
2   Attestation renewing the existing contract for PacifiCare of California (this time for
3   calendar year 2009). Burdick thereby attested that PacifiCare of California would
4   comply "with all applicable Medicare program authorizing statutes and regulations and
5   program guidance that CMS has issued to date and will issue during the remainder of
6   2008 and 2009, including but not limited to, . . . the Medicare Managed Care Manual,
7   and the CMS memoranda issued through the Health Plan Management System
8   (HPMS)." In September 2009, both Tom Paul, the Chief Executive Officer of Ovations,
9   and John Way, the Chief Financial Officer of Secure Horizons, executed an Attestation
10  renewing the existing contract for PacifiCare of California (this time for calendar year
11  2010). They thereby attested that PacifiCare of California would comply "with all
12  applicable Medicare program authorizing statutes and regulations and program guidance
13  that CMS has issued to date or will issue during the remainder of 2009 and 2010,
14  including but not limited to, . . . the Medicare Managed Care Manual, and the CMS
15  memoranda issued through the Health Plan Management System (HPMS)."
16  72.    The United States hereby incorporates by reference as if they were recited herein
17  and attached hereto all of the agreements that all of the Defendant MA Organizations
18  entered into with CMS relating to their participation in Medicare Parts C and D for 2007
19  to present date. All of these agreements were, in all respects relevant to this Amended
20  Complaint, very similar, if not identical, to the agreements described in the preceding
21  paragraphs.

22          **II.     The Electronic Data Interchange Agreements**

23  73.    In addition, since at least 2003, MA Organizations and entities that submit risk
24  adjustment data on their behalf have been required to execute Electronic Data
25  Interchange ("EDI") agreements prior to submitting risk adjustment data. These EDI
26  agreements are considered contracts by which the MA Organizations attest to the
27  accuracy of the data submitted. Even if another entity submits the data, the MA
28  Organizations are still responsible for the content of the submissions. *See* 2003 Regional

46

1    Risk Adjustment Training for Medicare+Choice Organizations Participant Guide, §

2    6.1; 2004 Regional Risk Adjustment Training for Medicare+Choice Organizations

3    Participant Guide, § 4.1; 2005 Risk Adjustment Data Basic Training for Medicare

4    Advantage Organizations Participant Guide § 4.1; 2006 Risk Adjustment Data Basic

5    Training for Medicare Advantage Organizations Participant Guide § 4.1; 2007 Risk

6    Adjustment Data Training for Medicare Advantage Organizations Participant Guide §

7    4.1; 2008 Risk Adjustment Technical Assistance for Medicare Advantage Organizations

8    Participant Guide § 4.1; Risk Adjustment 101 Participant Guide § 2.1 (2013). *See* also

9    Medicare Managed Care Manual, Chapter 7, § 111.6.1 (Rev. 57, 08-13-04); *id*. § 120.2.1

10   (Rev. 114, 06-07-13).  By executing these EDI forms, the MA Organizations agree that

11   (i) they will be responsible for all risk adjustment data submitted to CMS by themselves,

12   their employees, and their agents; (ii) they will submit risk adjustment data that is

13   accurate, complete, and truthful based on best knowledge, information, and belief; (iii)

14   *they will research and correct risk adjustment data discrepancies*; and (iv) CMS has the

15   right to audit and confirm the risk adjustment data, including diagnoses, submitted by the

16   MA Organization and the right of access to the beneficiaries' medical records to conduct

17   such audits.

18   74.     Each of the Defendant MA Organizations and Defendants Optum (and its

19   predecessor, Ingenix) and Ovations executed these EDI agreements and submitted them

20   to the MA Program in order to submit risk adjustment data to and receive risk adjustment

21   payments from the MA Program.  Pursuant to the express terms of these EDI

22   agreements, these Defendants promised to submit valid risk adjustment data to the MA

23   Program and *to research and correct any data discrepancies*.

24   75.     For instance, in 2005, Joseph Haferman, the Chief Financial Officer of Defendant

25   Ovations, executed and submitted to CMS an EDI agreement in order to obtain a

26   "submitter ID" permitting Ovations to submit risk adjustment data on behalf of various

27   of the Defendant MA Organizations.  *See* Exhibit 8, attached hereto.  By executing this

28   agreement and submitting it to CMS on behalf of the "eligible organization," which was

1   identified as "United Health Group – Ovations" on the form, Defendants UHG and

2   Ovations and the Defendant MA Organizations each agreed that they would (i) be

3   responsible for all risk adjustment data submitted to CMS by themselves, their

4   employees, or their agents; (ii) submit accurate and truthful risk adjustment data; and

5   (iii) *research and correct discrepancies with its risk adjustment data*.  In addition, each

6   of them agreed that CMS could audit the data and have access to medical records to

7   conduct such audits.

8   76.    Additional examples include the EDI agreements that James Higgins, the Finance

9   Director of PacifiCare Health Systems, executed on behalf of the following Defendant

10  MA Organizations or their predecessors:  On September 14, 2006, Higgins signed EDI

11  agreements for UnitedHealthcare Insurance Company of New York (contract numbers

12  H5515 and R5342); UnitedHealthcare Insurance Company (the name for a number of

13  different MA Organizations with contract numbers R3175, R5287, H1717, H2803,

14  H2001, H2003, H2111, H2408, H0624, H0620, H1303, H1509, H3921, H0319, H5500,

15  H2406, H4106, H3812, H3209, H5918, H5697, H5754, H0315, H2228, H1108, H4522,

16  H5532, H5516, H5507, H5440, H5417, H5424, H5008, H5527, H2226 and H5518);

17  PacifiCare of Nevada, Inc. (contract number H2949); PacifiCare of Arizona, Inc.

18  (contract number H0303); UnitedHealthcare of Alabama, Inc. (contract number H0151);

19  UnitedHealthcare of the Midwest, Inc. (contract number H2654); Oxford Health Plans

20  (CT), Inc. (contract number H0752); Oxford Health Plans (NJ), Inc. (contract numbers

21  H3113 and H3107); UnitedHealthcare of Ohio, Inc. (contract numbers H3659 and

22  H5678); UHC of California, then known as PacifiCare of California (contract number

23  H0543); UnitedHealthcare of Florida, Inc. (contract number H1080 and H9011);

24  UnitedHealthcare Benefits of Texas, Inc. (contract number H4590); UnitedHealthcare of

25  Utah, Inc. (contract number H4604); UnitedHealthcare of Arizona, Inc. (contract number

26  H0316); UnitedHealthcare of Arkansas, Inc. (contract number H0401); UnitedHealthcare

27  of Georgia, Inc. (contract number H1111); UnitedHealthcare of Tennessee, Inc. (contract

28  number H4406); UnitedHealthcare of New England, Inc. (contract number H4102);

48

1    UnitedHealthcare of Oregon, Inc. (contract number H3805); UnitedHealthcare of

2    Oklahoma, Inc. (contract number H3749); UnitedHealthcare of New York, Inc. (contract

3    number H3379); Oxford Health Plans (NY), Inc. (contract number H3307);

4    UnitedHealthcare of the Midlands, Inc. (contract number H2802); UnitedHealthcare of

5    North Carolina, Inc. (contract number H3456); PacifiCare of Colorado, Inc. (contract

6    number H0609); Sierra Health and Life Insurance Company, Inc. (contract number

7    H5652); UnitedHealthcare of Washington, Inc. (contract number H5005);

8    UnitedHealthcare of Wisconsin, Inc. (contract number H5253); and UnitedHealthcare

9    Community Plan of Texas, L.L.C. (contract number H4514).  On November 2, 2006,

10   Higgins signed EDI agreements for UnitedHealthcare of the Midwest, Inc. (contract

11   number H3887), UnitedHealthcare Insurance Company of New York (contract number

12   H4720), and UnitedHealthcare Insurance Company (contract numbers H9418, H8000,

13   and H4779).  On December 13, 2006, Higgins signed EDI agreements for

14   UnitedHealthcare Insurance Company (the name for a number of MA Organizations

15   with contract numbers H0408, H1286, H3435, H7274, H7254, H0410, and H6717) and

16   UnitedHealthcare of Wisconsin, Inc. (contract number H7187).  On January 1, 2007,

17   Higgins signed an EDI agreement for UnitedHealthcare Insurance Company (contract

18   number H5435).  On January 14, 2008, Higgins signed an EDI agreement for

19   UnitedHealthcare Insurance Company (contract numbers H3912 and H0710).  *See, e.g.,*

20   Exhibit 9, attached hereto (September 14, 2006 EDI for PacifiCare of California).

21   Pursuant to these EDI agreements, each of these MA Organizations agreed that it would

22   (i) be responsible for all risk adjustment data submitted to CMS by itself, its employees,

23   or its agents; (ii) submit accurate and truthful risk adjustment data; and (iii) *research and*

24   *correct discrepancies with its risk adjustment data*.  In addition, each of them agreed that

25   CMS could audit the data and have access to medical records to conduct such audits.

26   77.    In addition, on January 14, 2008, Patricia Rasmussen, who worked as a manager

27   for Ingenix, signed EDI agreements for UnitedHealthcare Insurance Company (contract

28   numbers H4971, H0710, H3912, H7698, H4971, H0710, H6793, H5749, and H6228),

49

1    UnitedHealthcare of New England, Inc. (contract number H1944), and UnitedHealthcare

2    Insurance Company of New York (contract number H4720).  On June 18, 2008,

3    Rasmussen signed an EDI agreement for PacifiCare of Nevada, Inc. (contract number

4    H7949).  In January 2009, Rasmussen signed additional EDI agreements for

5    UnitedHealthcare Insurance Company (contract numbers H7444, H8748, H2182, and

6    H1949).  Pursuant to these EDI agreements, each of these MA Organizations agreed that

7    it would (i) be responsible for all risk adjustment data submitted to CMS by itself, its

8    employees, or its agents; (ii) submit accurate and truthful risk adjustment data; and (iii)

9    *research and correct discrepancies with its risk adjustment data*.  In addition, each of

10    them agreed that CMS could audit the data and have access to medical records to

11    conduct such audits.

12    78.    On December 15, 2010, Timothy Noel, who was Vice President of Finance for

13    UnitedHealthcare Medicare & Retirement, signed an EDI agreement for Oxford Health

14    Plans (CT), Inc. (contract number H0755).  On September 22, 2011, Noel signed an EDI

15    agreement for UnitedHealthcare Insurance Company of New York (contract number

16    H1537).  Pursuant to these EDI agreements, each of these MA Organizations agreed that

17    it would (i) be responsible for all risk adjustment data submitted to CMS by itself, its

18    employees, or its agents; (ii) submit accurate and truthful risk adjustment data; and (iii)

19    *research and correct discrepancies with its risk adjustment data*.  In addition, each of

20    them agreed that CMS could audit the data and have access to medical records to

21    conduct such audits.

22    79.    On April 27, 2011, Scott Theisen, the Chief Financial Officer of UnitedHealthcare

23    Medicare & Retirement, submitted an EDI agreement for PacifiCare of California, which

24    included all the same promises.  On October 21, 2013, Theisen also signed EDI

25    agreements for Care Improvement Plus Wisconsin Insurance Company (contract number

26    H3794) and Care Improvement Plus South Central Insurance Co. (contract number

27    H5322).  Accordingly, each of these Defendant MA Organizations also agreed that it

28    would (i) be responsible for all risk adjustment data (which includes encounter data)

50

1  submitted to CMS by itself, its employees, or its agents; (ii) submit accurate and truthful
2  risk adjustment data; and (iii) *research and correct discrepancies with its risk adjustment*
3  *data*.  In addition, each of them agreed that CMS could audit the data and have access to
4  medical records to conduct such audits.

5  80.    Patricia Rasmussen also executed and submitted an EDI agreement so that Ingenix
6  could submit risk adjustment data on behalf of the Defendant MA Organizations.  *See*
7  Exhibit 10, attached hereto.  By doing this, Ingenix also agreed that it would (i) be
8  responsible for all risk adjustment data submitted to CMS by itself, its employees, or its
9  agents; (ii) submit accurate and truthful risk adjustment data; and (iii) *research and*
10  *correct discrepancies with its risk adjustment data*.  In addition, it agreed that CMS
11  could audit the data and have access to medical records to conduct such audits.  When
12  Ingenix became OptumInsight, Rasmussen also notified CMS (that is, CMS' contractor
13  Palmetto, which helped operate RAPS) that its records should be updated to reflect that
14  OptumInsight was making the risk adjustment submissions for the Defendant MA
15  Organizations.  Rasmussen identified OptumInsight as "part of Optum."  See Exhibit 11,
16  attached hereto.

17  81.    Jeffrey Dumcum, a Senior Vice President at Optum, also executed an EDI
18  agreement in May 2011 in order to submit risk adjustment data (also known as encounter
19  data) to the MA Program on behalf of many of the Defendant MA Organizations,
20  including those MA Organizations listed in a letter sent by Theisen to CMS' contractor
21  in April 2011.  By doing this, Dumcum agreed that Optum would be responsible for the
22  data it submitted, submit valid data, and *research and correct data discrepancies*.  *See*
23  Exhibit 12, attached hereto.

24  82.    All EDI agreements executed by the UHG Managing Defendants on their own
25  behalf and on behalf of the Defendant MA Organizations are incorporated by reference
26  in this Amended Complaint as if they were recited in full and attached hereto.

27
28

51

Exhibit C
Page 82

### III.    The Ingenix/Optum Service Agreements

83.    Depending on the time period, Ingenix or Optum entered into internal agreements with Ovations or UnitedHealthcare regarding the risk adjustment-related services that Ingenix or Optum would provide to the Defendant MA Organizations.  These services included, among other things, the submission of risk adjustment data to CMS and the management of the Chart Review, Claims Verification, and RACCR Programs.  These internal agreements further confirm the parties' joint and several obligations to the MA Program to submit accurate and truthful risk adjustment data and to investigate and correct any data discrepancies.  These agreements also exemplify the UHG Managing Defendants' understanding of their joint and several obligations to the MA Program.  All of these agreements are incorporated herein by reference.

84.    By way of example, the Memorandum of Understanding ("MOU") entered into between Optum and UnitedHealthcare for risk adjustment-related services rendered by Optum in 2011 exemplifies the obligations undertaken by Optum not only to UnitedHealthcare but to the MA Program.  That MOU was executed by Jerry Knutson, Chief Financial Officer of Optum, and Scott Theisen, Chief Financial Officer of UnitedHealthcare Medicare & Retirement.  Paul Bihm at Optum, Relator Poehling at UnitedHealthcare Medicare & Retirement, and Jason Bainbridge at UnitedHealthcare Community & State were copied on the MOU.  (The MOU referred to UnitedHealthcare Medicare & Retirement and UnitedHealthcare Community & State collectively as "UnitedHealth Group's Public and Senior Markets Group ("PSMG")."  This is but one of many examples of the confusion that Defendants have created by the way they used names of groups and entities interchangeably.)  Pursuant to the MOU, Optum was compensated for its services through an "intercompany allocation of fees paid pursuant to [a separate] Management Agreement."

85.    Pursuant to this 2011 MOU, Optum provided many risk adjustment-related services to the Defendant MA Organizations, including, but not limited to the submission of risk adjustment data to CMS "pursuant to CMS risk adjustment rules and

requirements" and conducting the Chart Review, Claims Verification, and RACCR

Programs.  Importantly, Optum also agreed to (i) conduct "[p]rovider engagement and

education regarding accurate and complete diagnostic coding and documentation"; (ii)

"[c]ontribute (along with PSMG) to the level of accuracy and completeness of diagnostic

coding for a respective population by identifying opportunities to improve

documentation and coding for accuracy, facilitating improvement in accuracy by

working directly with providers to improve documentation and coding practices, and

executing the timely and accurate submission of claim coding information to CMS,

thereby ensuring appropriate revenues are being paid by CMS for the underlying risk

inherent within the member population;" (iii) "[m]onitor[] the appropriateness and

accuracy of provider coding;" and (iv) conduct "[i]nternal validation testing of outlier

providers, internal validation testing of other sample populations and support CMS

validation requirements."

86.     The 2011 MOU also included a "Medicare Advantage Regulatory Requirements

Appendix." This Appendix included Optum's agreement to (i) "comply with all

applicable federal and Medicare laws, regulations, and CMS instructions, including but

not limited to . . . federal laws and regulations designed to prevent or ameliorate fraud,

waste, and abuse, including but not limited to, applicable provisions of federal criminal

law [and] the False Claims Act (31 U.S.C. § 3729 et seq.);" (ii) "perform services and

provide the products set forth in the MOU in a manner consistent with and in compliance

with [the Defendant MA Organizations'] obligations under the CMS Contact[s]; " and

(iii) certify in writing that the risk adjustment data it submitted to CMS was "accurate,

complete, and truthful, based on [its] best knowledge, information and belief."  The

Appendix further specified that UnitedHealthcare and the Defendant MA Organizations

were accountable to CMS for fulfilling their regulatory and contractual obligations under

the MA Program, including those that they had delegated to Optum under the MOU and,

thus, that they were responsible for overseeing and monitoring Optum's performance

under the MOU.

53

Exhibit C
Page 84

## DEFENDANTS' DATA INTEGRITY OBLIGATIONS

### I.    Obligation to Submit Valid Diagnoses

87.    MA Organizations are entitled to risk adjustment payments based on the diagnosis codes that they submit to CMS *only* if the codes are from face-to-face medical encounters between the Medicare beneficiary and provider, the encounter occurred during the relevant date of service year, the provider was of a type and specialty acceptable for risk adjustment purposes, and at the time of the encounter, the provider documented the medical conditions identified by the diagnosis codes in the medical record based on acceptable documentation.  In addition, codes should be based on documented conditions that require or affect patient care treatment or management.  *See* Medicare Managed Care Manual, Chapter 7, Exhibit 30 (August 13, 2004) (stating that diagnosis codes submitted for risk adjustment payments should be for documented conditions that "require or affect patient care treatment or management").  *See also* 2008 Risk Adjustment Data Technical Assistance for Medicare Advantage Organizations Participant Guide ("2008 RA Participation Guide") at § 6.4.1.

88.    Risk adjustment claims are valid, and the resulting risk adjustment payments are therefore proper and justified, only to the extent that the diagnosis codes submitted by the MA Organizations are valid.  The diagnoses must be coded according to the *International Classification of Diseases (ICD) Clinical Modification Guidelines for Coding and Reporting* ("ICD-9-CM" & "ICD-10-CM") and documented with sufficient clinical specificity.  *See* Medicare Managed Care Manual, Chapter 7, Exhibit 30 (August 13, 2004).  In addition, codes cannot be submitted for diagnoses that are only probable or suspected, for diagnoses that are questionable, or for a condition that the provider is trying to rule out.  *Id*.

89.    Moreover, all diagnosis codes submitted by MA Organizations must be supported by medical record documentation.  The 2004 Medicare Managed Care Manual stated that "M+C organizations [now known as MA Organizations] must submit risk adjustment data that are substantiated by the physician or provider's full medical record."  Medicare

54

1   Managed Care Manual, Chapter 7, § 111.8 (August 13, 2004).  A later version of the

2   Manual similarly states that MA Organizations "must . . . [e]nsure the accuracy and

3   integrity of risk adjustment data to CMS.  All diagnosis codes submitted must be

4   documented in the medical record . . . ." Medicare Managed Care Manual, Chapter 7, §

5   40 (June 2013).  Also similarly, the 2003 Participant Guide stated that MA

6   Organizations "must submit risk adjustment data that are substantiated by the patient's

7   medical record."  2003 Regional Risk Adjustment Training for Medicare+Choice

8   Organizations Participant Guide, § 4.1.  This requirement was reiterated in the following

9   CMS training guides and materials since 2003:  2003 Regional Risk Adjustment

10  Training for Medicare+Choice Organizations Participant Guide, §§ 12.3, 12.6; 2004

11  Regional Risk Adjustment Training for Medicare+Choice Organizations Participant

12  Guide, §§ 5.1, 5.5, 6.1.3; 2005 Risk Adjustment Data Basic Training for Medicare

13  Advantage Organizations Participant Guide §§ 4.1, 5, 5.1, 5.5, 8.7.3, 9.1, 9.2; 2006 Risk

14  Adjustment Data Basic Training for Medicare Advantage Organizations Participant

15  Guide §§ 5.1, 5.4, 5.5, 7.7.3, 8.1, 8.2; 2007 Risk Adjustment Data Training for Medicare

16  Advantage Organizations Participant Guide §§ 6.1, 6.4, 7.1, 7.2, 8.7.3; 2008 Risk

17  Adjustment Technical Assistance for Medicare Advantage Organizations Participant

18  Guide §§ 5.6, 6, 6.1, 6.4, 6.5, 7.1, 7.2; 2012 Regional Technical Assistance Participant

19  Guide § 2.2; Risk Adjustment 101 Participant Guide §§ 3.2.4; 4.3 (2013); Risk

20  Adjustment Webinar at p. 48 (July 1, 2014).  Furthermore, in a 2003 Regional Risk

21  Adjustment Training for Medicare+Choice Organizations presentation, organizations

22  were advised to "[t]ake steps to ensure that medical documentation supports submitted

23  diagnoses."  *Id.* at §8-19.

24  90.    In connection with the requirement that the patient's medical record support the

25  diagnosis(es) reported for him or her, the 2004 Medicare Managed Care Manual also

26  provided that "M+C organizations must maintain sufficient information to trace the

27  submitted diagnosis back to the hospital or physician that originally reported the

28  diagnosis.  Since M+C organizations may submit summary level transactions without a

55

Exhibit C
Page 86

1  link to a specific encounter or claim, establishing an appropriate audit trail to the original

2  source of the data requires diligent information management on the part of the M+C."

3  Medicare Managed Care Manual, Chapter 7, § 111.8 (August 13, 2004).  Again, in the

4  2005 Risk Adjustment Data Basic Training for Medicare Advantage Organizations

5  Participant Guide § 8.7.3, CMS advised that "MA organizations should take steps to

6  ensure that they have, or have access to, the proper medical documentation to support

7  diagnoses being submitted for risk adjustment.  MA organizations are responsible for the

8  accuracy of the data they submit to CMS.  Where necessary, they should obtain the

9  proper documentation to support diagnoses and maintain an efficient system for tracking

10  diagnoses back to medical records."  This requirement was also reiterated in the

11  following CMS training guides:  2003 Regional Risk Adjustment Training for

12  Medicare+Choice Organizations Participant Guide, § 12.2; 2004 Regional Risk

13  Adjustment Training for Medicare+Choice Organizations Participant Guide, § 6.1.3;

14  2004 Regional Risk Adjustment Training for Medicare+Choice Organizations Resource

15  Guide at p. 20; 2005 Risk Adjustment Data Basic Training for Medicare Advantage

16  Organizations Participant Guide §§ 5.1, 9.1.3; 2006 Risk Adjustment Data Basic

17  Training for Medicare Advantage Organizations Participant Guide §§ 5.1, 7.7.3, 8.7.3;

18  2007 Risk Adjustment Data Training for Medicare Advantage Organizations Participant

19  Guide §§ 6.1, 7.1.4, 8.7.3; 2008 Risk Adjustment Technical Assistance for Medicare

20  Advantage Organizations Participant Guide §§ 5.6.3, 6.1; 2012 Regional Technical

21  Assistance Participant Guide § 2.2.

22  91.     Furthermore, the medical record relied on by an MA Organization to support

23  payment cannot be ambiguous.  *See* 2008 RA Participation Guide at § 7.2.4.1 (stating

24  that risk adjustment claims and payments cannot be based on questionable diagnoses).

25  92.     CMS recognizes that risk adjusting based on health status creates a strong

26  incentive for MA Organizations to report invalid diagnoses.  Thus, CMS engages in a

27  variety of program integrity activities, including training MA Organizations about their

28  obligations to submit valid data and withdraw invalid data.  For example, in a 2003

56

1    Regional Risk Adjustment Training for Medicare+Choice Organization Questions &

2    Answers document, CMS stated all information that is submitted must be correct.  "If a

3    plan identifies incorrect or invalid information that has been submitted, it must delete

4    that information."  Likewise, in an August 9, 2005 Regional Training presentation made

5    jointly by CMS and its contractor, Aspen Systems Corporation, called "Risk Adjustment

6    Data Basic Training," MA Organizations were told that they "must . . . Delete a

7    diagnosis cluster [that is, a RAPS submission] when any data in that cluster are in error."

8    93.    In addition, for many years, CMS has conducted audits of diagnoses submitted by

9    MA Organizations, known as Risk Adjustment Data Validation ("RADV") audits.  In

10   2001, when the old PIP-DCG model was in place, CMS alerted M+C organizations that

11   they were "required to submit medical records for validating encounter data" and that

12   "[m]edical record reviews of a sample of hospital encounters may be audited to ensure

13   the accuracy of diagnostic information."  Medicare Managed Care Manual, Chapter 7, §

14   110.3 (October 2001).  In 2004, CMS revised the Manual to provide that "[a] sample of

15   risk adjustment data used for making payments may be validated against hospital

16   inpatient, hospital outpatient, and physician medical records to ensure the accuracy of

17   medical information.  Risk adjustment data will be validated to the extent that the

18   diagnostic information justifies appropriate payment under the risk adjustment model."

19   Medicare Managed Care Manual, Chapter 7, § 111.8 (August 13, 2004).  The Manual

20   further explained that the MA Organizations must be prepared to locate and produce the

21   medical records to support the diagnoses codes that they submitted.  *Id*.  Federal

22   regulations also require MA Organizations and their providers to provide medical

23   records to CMS to validate the diagnoses they submitted for risk adjustment payments.

24   *See* 42 C.F.R. § 422.310(e).

25   94.    When making risk adjustment payments, CMS relies on MA Organizations to

26   exercise due diligence to ensure that provider-reported diagnoses are supported by

27   beneficiaries' medical records and are otherwise accurate and truthful.  This is why

28   insurance companies that want to participate in the MA Program must agree, through

1   their Part C and D agreements and their EDI agreements, to provide valid diagnostic data

2   and investigate and delete invalid data.  Moreover, this is why insurance companies that

3   want to participate in the MA Program must (i) establish and implement effective

4   compliance programs to ensure the integrity of their payment data, 42 CFR

5   § 422.503(b)(4)(vi) (Part C compliance program regulation); 42 C.F.R.

6   § 423.504(b)(4)(vi) (Part D compliance program regulation); (ii) annually attest to the

7   accuracy and truthfulness of the diagnosis data that they submit for risk adjustment

8   payments, 42 C.F.R. § 422.504(*l*) (Part C regulation); 42 C.F.R. § 423.505(k) (Part D

9   regulation); and (iii) "comply with . . . Federal laws and regulations designed to prevent

10  or ameliorate fraud, waste, and abuse, including, but not limited to, applicable provisions

11  of Federal criminal law [and] the False Claims Act (31 USC §§ 3729 et seq.)."  42

12  C.F.R. § 422 (Part C regulation); 42 C.F.R. § 423 (Part D regulation).

13      **II.    Obligation to Implement an Effective Compliance Program**

14  95.    The implementation of an effective compliance program is a prerequisite to an

15  MA Organization's obtaining and retaining payments under both Parts C and D of the

16  Medicare Program.  *Id*. §§ 422.503(a) (Part C) & 423.504(b)(4)(vi) (Part D).  One

17  purpose of requiring a compliance program is to ensure that MA Organizations submit

18  accurate and truthful information to CMS.  65 Fed. Reg. 40170-01 at 40264 (June 29,

19  2000).

20  96.    Specifically, each MA Organization must "[a]dopt and implement an effective

21  compliance program, which must include measures that prevent, detect, and correct non-

22  compliance with CMS' program requirements as well as measures that prevent, detect,

23  and correct fraud, waste, and abuse."  42 C.F.R. § 422.503(b)(4)(vi) (Part C); 42 C.F.R.

24  § 423.504(b)(4)(vi) (Part D).  The compliance program "must, at a minimum, include

25  [certain] core requirements," including (but not limited to):

26          (F)    Establishment and implementation of an effective system for routine

27                 monitoring and identification of compliance risks.  The system

28                 should include internal monitoring and audits and, as appropriate,

58

Exhibit C
Page 89

1    external audits, to evaluate the MA organization['s], including first

2    tier entities', compliance with CMS requirements and the overall

3    effectiveness of the compliance program.

4    (G)   Establishment and implementation of procedures and a system for

5    promptly responding to compliance issues as they are raised,

6    investigating potential compliance problems as identified in the

7    course of self-evaluations and audits, correcting such problems

8    promptly and thoroughly to reduce the potential for recurrence, and

9    ensuring ongoing compliance with CMS requirements.

10   (1)   If the MA organization discovers evidence of

11   misconduct related to payment or delivery of items or services

12   under the contract, it must conduct a timely, reasonable inquiry

13   into that conduct.

14   (2) The MA organization must conduct appropriate corrective

15   actions (for example, repayment of overpayments, disciplinary

16   actions against responsible employees) in response to the

17   potential violation referenced in paragraph (b)(4)(G)(1) of this

18   section.

19   (3) The MA organization should have procedures to voluntarily

20   self-report potential fraud or misconduct related to the MA

21   program to CMS or its designee.

22   97.   A compliance program is not effective unless the MA Organization devotes

23   adequate resources to the program.

24   **III.   Obligation to Attest to Validity of Risk Adjustment Data**

25   98.   After the final deadline for their submission of risk adjustment data but before

26   their receipt of their final reconciliation payments for a given payment year, MA

27   Organizations must attest to the validity of their risk adjustment data, including

28   diagnoses, in a Risk Adjustment Attestation submitted to CMS.  Specifically, the chief

executive officer, chief financial officer, or another individual with delegated authority to sign on behalf of one of these officers, and who reports directly to such an officer, must certify that the risk adjustment data that the MA Organization submitted to CMS was accurate, complete, and truthful.

99.   An MA Organization must request payment on a document that contains this Attestation and the submission of this Attestation to CMS is a condition of receiving Risk Adjustment payments.

100.   The Part D regulations include a similar attestation for risk adjustment data, including diagnoses, submitted for risk adjustment payments under the prescription drug program.  Under the applicable Part D regulation, these attestations are referred to as certifications.  42 C.F.R. § 423.505(k).

101.   Every year, each MA Organization agrees in writing that:

> [a]s a condition for receiving a monthly payment under paragraph B of this article, and 42 CFR Part 422 Subpart G, the MA Organization agrees that its chief executive officer (CEO), chief financial officer (CFO), or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to such officer, must request payment under the contract on the form[] attached hereto as . . . Attachment B (risk adjustment data) which attest to (based on best knowledge, information and belief, as of the date specified on the attestation form) the accuracy, completeness and truthfulness of the data identified on these attachments.
>
> . . .
>
> 2.  Attachment B requires the CEO, CFO, or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to such officer, must attest to (based on best knowledge, information and belief, as of the date specified on the attestation form) that the risk adjustment data it submits to CMS under 42 CFR § 422.310 are accurate, complete, and truthful.  The MA Organization shall make annual

1    attestations to this effect for risk adjustment data on Attachment B and

2    according to a schedule to be published by CMS.  If such risk adjustment

3    data are generated by a related entity, contractor, or subcontractor, then such

4    related entity, contractor, or subcontractor must also attest to (based on best

5    knowledge, information, and belief, as of the date specified on the

6    attestation form) the accuracy, completeness, and truthfulness of the data.

7    [422.504(*l*).]

8    102.   MA Organizations have an obligation to acquire knowledge, information, and

9    belief about their risk adjustment data, including diagnoses, in order to both submit such

10   data and attest to the accuracy and truthfulness of the data.  Nearly 17 years ago, CMS

11   put MA Organizations on notice that they were "responsible for making *good faith*

12   *efforts* to certify the accuracy, completeness, and truthfulness of the encounter [*i.e.,* risk

13   adjustment] data submitted" for payments from the Medicare Program.  65 Fed. Reg.

14   40,170, 40,268 (June 29, 2000) (emphasis added); *see also* Medicare Managed Care

15   Manual, Chapter 7, § 110.2 (October 2001) (stating, under section titled "Certification of

16   Data Accuracy, Completeness, and Truthfulness," that "CMS expects M+C

17   organizations [now known as MA Organizations] to design and implement effective

18   systems to monitor the accuracy, completeness, and truthfulness of encounter data [that

19   is, diagnoses from hospital inpatient stays under the old PIP-DCG risk adjustment

20   model] and to exercise due diligence in reviewing the information provided to CMS");

21   Medicare Managed Care Manual, Chapter 7, § 111.7 (August 2004) (stating, under

22   section titled "Certification of Data Accuracy, Completeness, and Truthfulness," that

23   "CMS expects M+C organizations [now known as MA Organizations] to design and

24   implement effective systems to monitor the accuracy, completeness, and truthfulness of

25   risk adjustment data and to exercise due diligence in reviewing the information provided

26   to CMS").  When MA Organizations fail to act in good faith and deliberately ignore or

27   recklessly disregard information about their submission of inaccurate or untruthful data,

28   their Risk Adjustment Attestations are false.

Exhibit C
Page 92

## IV.   Obligation to Delete Invalid Diagnoses

103.   MA Organizations are obligated to delete invalid diagnoses previously submitted by them to RAPS or to use other available means to return risk adjustment payments based on invalid diagnoses.  Their deletion of invalid diagnoses is the principal mechanism by which CMS is able to recalculate beneficiaries' risk scores and ensure that the Government does not make improper risk adjustment payments to MA Organizations or that it recovers improper payments that were already made.  In particular, the submission of diagnoses that are not supported by the beneficiaries' medical records and, thus, are invalid directly and necessarily causes CMS to make risk-adjustment payments that it would not have made but for the submission of that false data.  Conversely, the "deletion" of previously-submitted diagnoses that are invalid because they are not supported by the beneficiaries' medical records directly and necessarily causes CMS either to avoid paying for previously-submitted false diagnoses or to recover payments it made for those false diagnoses.  As a result, an MA Organization's failure to "DELETE" invalid diagnoses results in that MA Organization's retention of payments to which it was not entitled.  Thus, both the submission of false diagnostic data and the failure to correct false diagnosis data influence CMS' payment, including the amount of the risk-adjustment payment, if any, that it makes for any given beneficiary based on his or her health status.

104.   The obligation to delete invalid diagnoses previously submitted to RAPS or to otherwise return risk adjustment payments based on invalid diagnoses arises from the contractual relationship between MA Organizations and the Government, from regulation, and from the retention of an overpayment and, thus, constitutes an "obligation to pay . . . the Government" under the reverse false claims act provision of the FCA.  31 U.S.C. §§ 3729(a)(1)(G) & (b)(3).  The obligation is imposed on MA Organizations by the following, among other things:

- The MA Organizations' execution of EDI agreements pursuant to which they agree to "research and correct risk adjustment data discrepancies."  *See supra*

62

1   paragraphs 73-82 (describing these agreements). *See also* Exhibits 8-11, attached

2   hereto (examples of EDI agreements that the Defendant MA Organizations

3   executed).

4   • Regulations requiring MA Organizations to implement effective compliance

5   programs and to "detect and correct non-compliance with CMS' program

6   requirements as well as . . . [to] prevent, detect, and correct fraud, waste, and

7   abuse." *See supra* paragraphs 95-97 (describing these regulations). Plus, the MA

8   Organizations' execution of agreements with CMS under Parts C and D pursuant

9   to which they agree to implement effective compliance programs. *See* 42 C.F.R.

10  § 422.504(a) (stating that the agreement between an MA Organization and CMS

11  must include a provision by which the MA Organizations agree to comply with

12  the Part C regulatory requirements and general instructions issued by CMS). *See*

13  *also supra* paragraphs 66-72 (describing the Part C and D agreements); Exhibits 1-

14  7, attached hereto (examples of Part C agreements between the Defendant MA

15  Organizations and CMS by which the Defendant MA Organizations agreed to

16  implement effective compliance programs).

17  • The regulations requiring the submission of the Risk Adjustment Attestations. *See*

18  *supra* paragraphs 98-102 (describing those regulations). Plus, the requirements set

19  forth in the Medicare Managed Care Manual and elsewhere that MA

20  Organizations exercise both good faith and due diligence in order to submit

21  truthful Risk Adjustment Attestations to the Government certifying that their risk

22  adjustment data is accurate and truthful. *See supra* paragraph 102. In addition,

23  the separate contractual requirement to submit Risk Adjustment Attestations and

24  to comply with the Medicare Managed Care Manual. *See, e.g.*, Exhibits 1-7,

25  attached hereto (examples of the Defendant MA Organizations' Parts C

26  agreements with CMS by which they agree to submit such Attestations and to

27  comply with the Medicare Managed Care Manual).

28

1     • The requirement in the CMS' Participant Guides that MA Organizations delete

2        erroneous diagnosis data submitted to CMS. *See* 2003 Regional Risk Adjustment

3        Training for Medicare+Choice Organizations Participant Guide, § 6.1;

4        2004 Regional Risk Adjustment Training for Medicare+Choice Organizations

5        Participant Guide, §§ 4.12 to 4.16; 2005 Risk Adjustment Data Basic Training for

6        Medicare Advantage Organizations Participant Guide §§ 4.12 to 4.16; 2006 Risk

7        Adjustment Data Basic Training for Medicare Advantage Organizations

8        Participant Guide §§ 4.12 to 4.16; 2007 Risk Adjustment Data Training for

9        Medicare Advantage Organizations Participant Guide §§ 4.12 to 4.16; 2008 Risk

10     Adjustment Technical Assistance for Medicare Advantage Organizations

11     Participant Guide §§ 4.12 to 4.16. This requirement is also included in 2014 and

12     2016 CMS training presentations. *See infra* paragraph 108. Plus, the regulatory

13     and contractual requirement that MA Organizations' comply with CMS'

14     instructions and policies. *See* 42 C.F.R. § 422.504(a) (stating that the agreement

15     between an MA Organization and CMS must include a provision by which the

16     MA Organizations agree to comply with the Part C regulatory requirements and

17     general instructions issued by CMS) (emphasis added). *See also, e.g.*, Exhibits 1-

18     7 hereto (examples of the Defendant MA Organization's agreements to comply

19     with the CMS instructions and policies).

20     • The requirement in the Medicare Managed Care Manual that "[i]f upon

21     conducting an internal review of submitted diagnosis codes, the [MA

22     Organization] determines that any ICD-9-CM diagnosis codes that have been

23     submitted do not meet risk adjustment submission requirements [which includes

24     medical record support for all diagnoses], the [MA Organization] is responsible

25     for deleting the submitted ICD-9-CM diagnosis codes as soon as possible."

26     Medicare Managed Care Manual, Chapter 7, § 40 (June 2013). Plus, the

27     regulatory requirement that MA Organizations' comply with the Manual and MA

28     Organizations' contractual agreements to comply with the Manual. *See* 42 C.F.R.

64

§ 422.504(a) (stating that the agreement between an MA Organization and CMS must include a provision by which the MA Organizations agree to comply with the Part C regulatory requirements and general instructions issued by CMS). *See also, e.g.*, Exhibits 1-7 hereto (examples of the Defendant MA Organization's agreements to comply with the Medicare Managed Care Manual).

105.   Related Entities are also obligated to delete invalid diagnoses previously submitted by them to RAPS or to use other available means to return risk adjustment payments based on invalid diagnoses.  Like the MA Organizations to which they are related, they are required to comply with the Part C and D regulations, the Medicare Managed Care Manual, the Participant Guides, and the other general instructions issued by CMS.  In addition, when they submit risk adjustment data to the MA Program on behalf of their related MA Organizations, they are obligated to execute separate EDI agreements and Risk Adjustment Attestations, both of which impose an obligation to delete invalid diagnoses.

106.   As previously explained, RAPS provides a means for MA Organizations and others submitting data on their behalf (such as Ingenix and then Optum) to withdraw or retract invalid diagnoses that they previously submitted to RAPS for risk adjustment payments.  The process of withdrawing or retracting invalid diagnosis codes is often referred to as making "DELETES" because the field in RAPS that enables this to be accomplished is called a "Delete Indicator."  The withdrawal or retraction of a diagnosis codes is also often referred to as a "DELETE."

107.   CMS began instructing MA Organizations on the use of RAPS in the early 2000s in order to facilitate the phase in, during the 2004 to 2007 time period, of the use of diagnoses from physician office visits and hospital outpatient encounters to risk adjust for health status using the HCC model.  It issued Risk Adjustment Training Participant Guides in order to provide instructions relating to, among other things, the use of RAPS to submit and delete data.  The 2003 Risk Adjustment Training Participant Guide stated: "Now that the RAPS system is operational, effective October 1, 2002, the new system

65

Exhibit 2

allows for correction of risk adjustment data via the deletion process." 2003 Regional Risk Adjustment Training for Medicare+Choice Organizations Participant Guide, § 6.11 (titled "Modifying Risk Adjustment Data"). The 2003 Guide listed various reasons why risk adjustment data may need to be deleted, including in order to withdraw an erroneous diagnoses code. *Id*. at § 6.12.1. Finally, it stated that M+C organizations "must submit delete records" to correct erroneous diagnosis data. *Id*. at § 6.12.3. The Guide made very clear that deleting erroneous diagnoses was mandatory. Subsequent versions of the Guide have included the same mandatory deletion requirement and instructions. *See* 2004 Regional Risk Adjustment Training for Medicare+Choice Organizations Participant Guide, §§ 4.12 to 4.16; 2005 Risk Adjustment Data Basic Training for Medicare Advantage Organizations Participant Guide §§ 4.12 to 4.16; 2006 Risk Adjustment Data Basic Training for Medicare Advantage Organizations Participant Guide §§ 4.12 to 4.16; 2007 Risk Adjustment Data Training for Medicare Advantage Organizations Participant Guide §§ 4.12 to 4.16; 2008 Risk Adjustment Technical Assistance for Medicare Advantage Organizations Participant Guide §§ 4.12 to 4.16.

108.   The same mandatory requirement and instructions about deletions of invalid diagnoses were also set forth in other CMS instructional materials used to train MA Organizations. For instance, a 2003 presentation titled "Regional Risk Adjustment Training for Medicare+Choice Organization Questions & Answers" instructed that "all information that is submitted must be correct. If a plan identifies incorrect or invalid information that has been submitted, it must delete that information." These instructions were also provided in CMS' presentation slides for a July 1, 2014 Risk Adjustment Webinar used to provide training to MA Organizations and others about how risk adjustment operates. A training presentation that CMS made to MA Organizations and others on June 23, 2016, also stated that it was the responsibility of each MA Organization to "delete each instance of unsupported diagnoses from" RAPS. All of the above-mentioned Participant Guides and other instructional materials also describe an alternative method for deleting erroneous data using a Direct Data Entry system.

109.   All of the above-mentioned Participant Guides and other instructional materials have been and continue to be available to all MA Organizations and others on a website hosted by a CMS contractor.  *See* www.csscoperations.com.  The 2003 to 2011 material is in the Training subsection under Risk Adjustment Processing System in the Archives and the 2012 to 2016 material is in the Training subsection under Risk Adjustment Processing System on the Home page.

110.   MA Organizations can delete invalid diagnoses both before and after the final deadline for RAPS data submissions, which is sometime during the year following the payment year at issue.  The final deadline is only a submission deadline; it does not pertain to deleting invalid diagnoses in order to withdraw them.  *See* 42 C.F.R. § 422.310(g)(2)(ii) (codifying pre-existing process permitting, after the final deadline, only corrections to delete diagnoses from previously-submitted risk adjustment data). Diagnoses deleted before the deadline for RAPS data submissions for a payment year are known as "open-period deletes" and diagnoses deleted after the deadline for RAPS data submissions for a payment year are known as "closed-period deletes."

111.   Because the final submission deadline is after the completion of the payment year, monthly payments made during the payment year are interim payments.  After the final submission deadline, CMS determines if any adjustments to these interim monthly payments are necessary based on all diagnoses submitted (and not deleted) for each beneficiary up until the final submission deadline and re-calculates each beneficiary's risk score for the payment year to determine if it has changed and whether a plus or minus adjustment to the payment for the beneficiary is necessary.  If the beneficiary's risk score is higher because of the submission of additional diagnoses for that beneficiary, CMS makes a final reconciliation payment of any additional payment owed to the Plan for that beneficiary for that payment year.  Conversely, if the beneficiary's risk score is lower because of the deletion of diagnoses for that beneficiary prior to the final submission deadline, CMS recovers the payments associated with the deleted diagnoses as part of this final reconciliation payment process.

Exhibit C
Page 98

112.   Accordingly, if, prior to the final submission deadline, an MA Organization is in possession of or has access to information about invalid diagnoses, it should delete invalid diagnoses prior to that deadline to ensure that the final reconciliation payment that it is claiming is correct.  If, however, an MA Organization comes into possession or otherwise gains access to information about invalid diagnoses after the final submission deadline, it must still delete the invalid diagnoses, and CMS will still recover the risk adjustment payments associated with the deleted diagnoses as part of additional risk score rerun and reconciliation processes it has in place to recover overpayments.

113.   The UHG Managing Defendants knew how to make deletes in RAPS.  They also knew the difference in making "open-period" and "closed-period" deletes.  The individuals who knew about the delete process and the difference between "open-period" and "closed-period" deletes included, but were not limited to:  Rebecca Martin, the Director of Encounter Operations for Ingenix and then the Director of Data Remediation for Optum; Jon Bird at Optum; and Scott Theisen and Brian Thompson at UnitedHealthcare Medicare & Retirement.

114.   However, Defendants violated the FCA by knowingly and improperly failing to delete many invalid diagnoses and, thus, failing to repay risk adjustment payments to which they were not entitled.

## THE FALSE CLAIMS ACT

115.   The FCA reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government."  S. Rep. No. 99-345, at 1 (1986), available at 1986 U.S.C.C.A.N. 5266.  First, a defendant violates the FCA when it "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1)(A).  Under the FCA, a claim includes a request for money.  *Id*., § 3729(b)(2).  Further, a claim is "false or fraudulent" under the FCA if the entity or person submitting the claim was not entitled to payment.

116.   Second, after the 2009 amendments to the FCA by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub.L. 111-21 (May 20, 2009), a defendant violates

68

the FCA when it "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).  Prior to FERA, a defendant violated this provision of the FCA when it "knowingly [made], use[d], or cause[d] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."

117.   Third, in May 2009, Congress amended the "reverse false claims act" provision of the FCA to provide that a defendant violates the FCA when it "knowingly conceals *or* knowingly and improperly avoids *or* decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G) (emphasis added).  Prior to FERA, this provision of the FCA provided that a defendant violates the FCA when it "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government."  After FERA, a defendant violates this provision of the FCA when it "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, *or* knowingly conceals *or* knowingly and improperly avoids *or* decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G) (emphasis added).

118.   Under the FCA, the terms "knowing" and "knowingly" mean that the defendant had actual knowledge of or acted in deliberate ignorance or reckless disregard of information relating to the truth or falsity of its claims for payment or its false records or statements.  *Id*. § 3729(b)(1)(A).  Proof that the defendant had specific intent to defraud the Government is not required.  *Id*. § 3729(b)(1)(B).  Congress included "deliberate ignorance" in its definition of the terms "knowing" and "knowingly" to hold a defendant accountable for failing to make the inquiry that a reasonable and prudent person or entity would have made under the circumstances to be reasonably certain that he, she, or it was entitled to the money that he, she, or it sought from the Government.  S. Rep. No. 99-345, at 21 (1986), as reprinted in 1986 U.S.C.A.N. 5266, 5286.  The terms "knowing"

Exhibit C
Page 100

1  and "knowingly" used in this Amended Complaint have the meaning ascribed to them by

2  the FCA.  Similarly, the terms "knowledge," "knows" and "knew" are used in this

3  Amended Complaint to have the same meaning.

4  119.   In 2009, Congress also amended the FCA to provide a definition of the term

5  "obligation" for the purpose of the new "reverse false claims act" provision of the

6  statute, section 3729(a)(1)(G).  *See* FERA, Pub. L. 111-21, 123 Stat. 1617, 1621-25

7  (2009).  It defined the term to mean "an established duty, *whether or not fixed*, arising

8  from an express or implied contractual … relationship, from a fee-based or similar

9  relationship, from statute or regulation, or from the retention of any overpayment."  31

10  U.S.C. § 3729(b)(3) (emphasis added).  Congress promulgated this definition to reflect

11  its long-held view that an "obligation" under the FCA's reverse FCA provision, 31

12  U.S.C. § 3729(a)(1)(G), encompasses non-fixed and contingent duties to pay or repay

13  monies to the Government.  S. Rep. 111-10, 14, 2009 U.S.C.C.A.N. 430, 441.

14  120.   Under the FCA, "material" means "having a natural tendency to influence, or

15  capable of influencing, the payment or receipt of money or property."  *Id*. § 3729(b)(4).

16  121.   Under the FCA, the Government is entitled to recover three times the amount of

17  damages which it sustained because of a defendant's violation of the statute and, for each

18  act by the defendant violating the statute, a civil penalty.  For violations that occurred

19  before November 2, 2015, the FCA imposes a penalty for each violation of not less than

20  $5,500 and not more than $11,000.  For violations occurring after November 2, 2015, all

21  civil statutory penalties, including the FCA, are subject to an annual adjustment for

22  inflation pursuant to Section 701 of the Bipartisan Budget Act of 2015, Public Law 114-

23  74 (No. 2, 2015) ("BBA").  At this time, by operation of the BBA, for violations that

24  occurred after November 2, 2015, the FCA imposes a penalty of not less than $10,957

25  and not more than $21,916 per violation, and these amounts are subject to annual

26  adjustment for inflation in future years.  *See* 28 C.R.F. § 85.5 (identifying applicable

27  inflation adjustments on an annual basis).

28

Exhibit C
Page 101

## THE FACTS

122.  Since at least 2005, Defendants knew that diagnoses submitted to Medicare for risk adjustment payments had to satisfy various criteria and be supported and validated by the medical records of the beneficiaries in their MA Plans.  Defendants also knew that many provider-reported diagnoses were not supported and validated by the beneficiaries' medical records and that they were obliged to undertake good faith efforts to identify and delete those unsupported and invalid diagnoses.  Moreover, Defendants knew that they were obligated to "look both ways" at the results of their chart reviews and delete unsupported provider-reported diagnoses.  Nonetheless, Defendants conducted millions of medical record reviews as part of their revenue-generating national Chart Review Program, turned a blind eye to the negative results of those reviews showing hundreds of thousands of unsupported diagnoses that the UHG Managing Defendants had previously submitted to Medicare on behalf of the Defendant MA Organizations, and knowingly and improperly avoided repaying Medicare for at least over a billion dollars in risk adjustment payments to which they were not entitled.  Similarly, Defendants disregarded information from their RACCR Program about invalid coding practices by their incentivized capitated and gain-sharing providers and failed to repay Medicare for additional erroneous payments based on their invalid diagnoses.

I.  **Defendants Knew That Many Provider-Reported Diagnoses Were Invalid And That They Were Obligated To Undertake Good Faith Efforts To Identify And Delete Them**

123.  As part of its 2005 acquisition of PacifiCare, UHG retained the PacifiCare employees with knowledge about the requirements for the submission of valid diagnoses, the obligation to delete invalid diagnoses, and the various problems relating to the invalidity of provider-reported diagnoses.  UHG retained these PacifiCare employees to continue performing work relating to risk adjustment.

124.  For example, Jeffrey Dumcum, Stephanie Will, Pam Holt, and Pam Leal were all former PacifiCare employees knowledgeable about risk adjustment and were retained by

1   UHG to run its risk adjustment programs.  Dumcum had been PacifiCare's Chief

2   Financial Officer and, after the acquisition, became Vice President of Finance for

3   Ovations.  Will had been a Principal Analyst at PacifiCare who designed risk adjustment

4   programs and, after the acquisition, joined Ovations as the Program Manager for the

5   national Chart Review Program.  Holt had been a Project Manager for Network

6   Management Operations at PacifiCare and, after the acquisition, became the Manager of

7   Provider Outreach for the Risk Adjustment Program.  Leal had been an Executive

8   Director of Provider Training and Development for PacifiCare and, after the acquisition,

9   became a Regional Vice President for Market Consultation.

10  125.   From 2005 to 2007, Dumcum, Will, Holt, and Leal worked at the PacifiCare

11  office in the Central District of California.  Thereafter, Holt and Leal continued to work

12  for Ingenix at its office in the Central District of California.

13  126.   The PacifiCare employees obtained their knowledge about risk adjustment from

14  various sources, including CMS.  Will attended CMS training programs focused on the

15  Risk Adjustment Participant Guide and was also familiar with the content of this

16  document based on her reading of it.  Prior to the acquisition, PacifiCare also conducted

17  various risk adjustment programs, including a chart review program, and provided

18  training to healthcare professionals concerning medical record documentation and

19  diagnosis coding.

20  127.   In addition, PacifiCare had been a member of an industry association called the

21  Industry Collaboration Effort ("ICE") and ICE's Risk Adjustment Data Acquisition &

22  Reporting ("RADAR") team.  ICE was an association of MA Organizations and provider

23  groups in California that served beneficiaries in MA Plans.  ICE focused on risk

24  adjustment issues and other matters of particular importance to the managed care

25  industry.  After PacifiCare became part of UHG, the PacifiCare employees continued to

26  participate in ICE and its RADAR team.  During the 2006 and 2007 time period (perhaps

27  longer), Leal was the President and a member of the Board of Directors of ICE.  Leal

28  continued in a leadership role at ICE until 2013.  During that time period, she worked for

72

Ingenix and then Optum.  At the ICE Annual Conferences in 2006 and 2007, Leal made presentations about "[p]rovider coding [being] highly inaccurate and incomplete," CMS reviews showing that 30 percent of the provider-reported diagnoses were not supported by medical records, and the use of chart reviews to generate larger risk adjustment payments.  Furthermore, throughout the time period relevant to this Amended Complaint, one or more of the Defendants were members of ICE and, at various times, employees of Ingenix, Optum, UnitedHealthcare of California, and UnitedHealthcare participated in the activities of the RADAR team.  As reflected in the meeting minutes of the RADAR team, these Defendants included Ingenix (*e.g.,* August 2011), UnitedHealthcare of California (*e.g.,* March 2014), Optum (*e.g.,* November 2014, June 2015, and March 2016), and UnitedHealthcare (*e.g.,* June 2015 and March 2016).

128.   The former PacifiCare employees knew that a beneficiary's medical record was the "source of truth" for purposes of submitting valid diagnostic data to the MA Program for risk adjustment payments.  For example, in a March 2006 email, Will acknowledged that diagnosis data had to be "fully supported by medical record documentation."  As another example, in 2008, Ingenix sent notices to capitated provider groups in California instructing them that they should only report to Ingenix "diagnosis codes that can be supported by the documentation in the medical record."  Furthermore, according to Randall Myers at Ingenix, these providers, when they submitted diagnoses through a web portal referred to as the Alternate Submission Method, were required to attest that their diagnostic data complied with CMS requirements for the submission of valid data.  Other employees of the UHG Managing Defendants also understood these requirements, including Patty Brennan who, when she was Director of Retrospective Services (including chart review services) at Ingenix and then Optum, acknowledged that CMS' Risk Adjustment Participant Guide established that the medical record was the "one source of truth" for MA Organizations to ensure that they were submitting accurate data to CMS for risk adjustment payments.  In addition, Kimberly Halva, the Compliance

Officer for UnitedHealthcare Medicare & Retirement from 2010 to 2013, was aware that "[a] medical record must substantiate all diagnostic information provided to CMS."

129.   In addition, those Defendants and their employees involved in ICE and its RADAR team knew or should have known that enrollees' medical records are the "source of truth" based on guidance documents issued by the RADAR team about this fundamental payment requirement.  In 2010, ICE's RADAR team issued a guidance document highlighting that CMS requires complete and accurate documentation of medical conditions for the submission of diagnoses, that only diagnoses depicting documented medical conditions which required or affected patient care are valid, and that diagnosis codes cannot be submitted "until [the provider] is sure the patient has the condition."  The ICE RADAR Physician Education Work Group also issued a similar document called "Best Practices for Risk Adjustment," which advised that "ICD-9-CM coding requires documentation of the diagnosis in the medical record as well as evaluation and management.  Documentation should indicate how this diagnosis impacted this episode of care."  In 2012, ICE also issued a Medical Record Documentation Tips sheet, which once again warned MA Organizations and providers not to code diagnoses that are probable, suspected, questionable, or "working diagnoses," and also not to code diagnoses when medical records use "other similar terms indicating uncertainty."  More recently, in 2013, ICE issued a "Documentation Newsletter" that repeated earlier advice and also cautioned that "[**c]oding guidelines prohibit coders from making assumptions**" regarding whether a diagnosis is or is not substantiated by a patient's medical record.  (Emphasis in the original.)  That is, the medical record must "clearly reflect" the medical condition.

130.   The former PacifiCare employees also were aware that provider-reported diagnoses often did not comply with CMS requirements and were often inconsistent with the information in their patients' medical records.  According to Dumcum, when he was the Chief Financial Officer of PacifiCare, he and others there knew "in Medicare Advantage that the claims did not always match the medical record documentation.  So

74

1   … we were concerned that it should be a place that we try to improve, that we try to

2   educate and try to identify things to make that better."  In addition, Will, Holt and other

3   former PacifiCare employees were aware of common diagnosis coding errors made by

4   providers.  They learned of these problems from PacifiCare employees working in the

5   field with physicians, reports of physician-coding trends, and reports from PacifiCare-

6   employed certified coders.  For example, a June 2003 PacifiCare PowerPoint

7   Presentation by Will, Holt, and other PacifiCare employees identified diabetes as a

8   medical condition that was often miscoded.

9   131.   In 2005, the PacifiCare employees, including Dumcum, Will, Leal, and Holt, were

10   also aware of a data validation review conducted by the Government of diagnosis codes

11   previously submitted for medical encounters that occurred in 2003 (*i.e.*, encounters with

12   2003 dates of service).  The PacifiCare employees were aware that the results of CMS'

13   medical record reviews showed that approximately 30 percent of the provider-reported

14   diagnoses were invalid and, after UHG acquired PacifiCare, Dumcum, Will, and Leal

15   shared this information with other individuals who worked for various UHG Managing

16   Defendants such as Jerry Knutson, Lee Valenta, Cynthia Polich, Relator Poehling, Paul

17   Bihm, Janice Redmond, and Carol Thompson.  Furthermore, the results from this CMS

18   review also put the former PacifiCare employees on notice that providers were reporting

19   codes that were just plain wrong, were coded from laboratory reports, and did not reflect

20   current medical conditions – all of which was in breach of the fundamental rules that the

21   diagnosis codes submitted to Medicare must be accurate and truthful, based on face-to-

22   face visits (*e.g.*, not lab reports), reflect current conditions, and otherwise be valid.

23   132.   Moreover, the former PacifiCare employees were aware that MA Organizations

24   are not entitled to risk adjustment payments based on diagnoses that are unsupported by

25   the beneficiaries' medical records, and that CMS expected health plans to delete

26   incorrect diagnoses submitted for risk adjustment payments.  They also knew, based on

27   their experiences at PacifiCare, that CMS could audit the diagnoses MA Organizations

28   submitted for risk adjustment payments.

Exhibit C
Page 106

133.   In fact, in April 2005, Holt participated in a "CMS data validation call" in which CMS explained that it expected MA Organizations to correct invalid diagnoses submitted to Medicare for risk adjustment payments.  Holt reported this to Will and suggested creating a spreadsheet to give to providers for providers to use to inform PacifiCare of invalid diagnoses and allow PacifiCare to delete them.  As part of this discussion, Leal explained to Will that, if provider groups "during their chart audits find that physicians have documented rule-out or history-of but coded as if the member had [the medical condition,] they want to be able to fix it so when we get audited again by CMS it is fixed."  Leal further stated that "[o]bviously, as issues are identified there will need to be education to physician[s] on changing their practice of coding incorrectly (as you remember Dr. Norman mentioned habits doctors have, that we will need to break)."  Holt agreed that provider groups

- need something 'standardized and formalized' so they know what fields to report if and when they find any obvious discrepancies.  They are the type of thing that Pam [Leal] stated in her email below, the code of the actual disease when the documentation clearly only supports 'history of' or 'suspected' (and then it was not confirmed), or an obvious miscode; the things that Melissa [Ferron] is finding in the data validation.  Provider groups will find this during their own chart audits.

- and CMS "was very firm that we need to be doing this, so I would expect [CMS] will look for our process when they get around to more formally auditing our oversight of this process."

134.   In addition, in August 2006, a year after the April 2005 CMS validation call, Will and Holt knew that CMS had confirmed, in responses to questions about its RADV audits, that it would invalidate diagnoses submitted to Medicare that were not supported by the beneficiaries' medical records.

135.   After PacifiCare became part of UHG, the former PacifiCare employees began educating others at the UHG Managing Defendants about risk adjustment.  In particular, Dumcum made a series of presentations to various employees, including senior

76

1  management employees of the UHG Managing Defendants such as Ovations' Jerry

2  Knutson, where he explained that "[p]rovider coding is highly inaccurate and

3  incomplete" and that "more than 30% of coded conditions are not supported by CMS

4  validation findings."  Other senior executives or managers of the UHG Managing

5  Defendants that were recipients of the slide presentation with this information included

6  Cynthia Polich at Ovations (who was emailed a copy of the presentation in March 2007),

7  Lee Valenta at Ingenix (to whom Knutson emailed a copy of the presentation in May

8  2007), and Relator Poehling.

9  136.   Furthermore, Defendants' own data revealed and confirmed problems with

10  provider-reported diagnoses.  In September 2006, Will, Holt, Leal, and others generated

11  a list of providers that were outliers, which, at that time, they defined as providers with

12  significantly above average patient risk scores.  This information made them "question

13  the validity" of these providers' codes.  These provider groups included Healthcare

14  Partners Medical Group, Edinger Medical Group, WellMed, and other incentivized

15  provider groups which, based on subsequent reviews conducted as part of the RACCR

16  Program, submitted significant numbers of invalid diagnoses.  After 2006, Ingenix and

17  then Optum continued to track risk scores of beneficiaries cared for by various provider

18  groups and saw risk scores they considered to be outliers.  They also generated

19  prevalence reports that identified the provider groups with abnormally high average risk

20  scores.  These prevalence reports also identified specific medical conditions (or

21  categories of medical conditions, that is, HCCs) that were reported by various provider

22  groups at rates significantly above average.

23  137.   In 2007, Dumcum and other former PacifiCare employees were given the

24  responsibility for creating and then managing a risk adjustment service group within

25  Ingenix, the predecessor to Optum.  This enabled UHG to move the risk adjustment

26  operations to Ingenix.  Ovations and later UnitedHealthcare became Ingenix's internal

27  "client."  This move also enabled Ingenix to offer its risk adjustment services to other

28  MA Organizations which it referred to as its "commercial clients."  Dumcum became

Exhibit C
Page 108

Senior Vice President and Will became Vice President of Risk Adjustment Programs for this new risk adjustment service group within Ingenix.  After 2007, Ingenix hired additional employees and increased the size of the Ingenix risk adjustment group, including the size of the group in this District.  The Ingenix risk adjustment group in this District was responsible for, among other things, risk adjustment data/diagnosis codes submissions, risk adjustment data remediation and the deletion of invalid diagnoses, risk adjustment data analytics and finance (*e.g.*, tracking the results and financial impact of the Chart Review and Claims Verification Programs), provider outreach and programs relating to risk adjustment, and the Chart Review Program operations.

138.   In January 2007, Dumcum made a presentation in which he stated that the validation of provider-reported diagnosis codes had to improve.  Dumcum knew that providers were reporting unsupported diagnoses and that both fee-for-service and capitated providers needed to improve their validation rates.

139.   Prior to this, in 2006, Dumcum, Will, Holt and others had already participated in discussions about conducting an Internal Data Validation ("IDV") Program focused on the validity of provider-reported diagnoses.  The purpose of the IDV Program was to determine whether the physicians' medical records supported the diagnoses they reported to the UHG Managing Defendants, who in turn submitted the diagnoses to Medicare for risk adjustment payments.

140.   In February 2007, Will, Holt, and Patricia Rasmussen, Manager of Encounter Submissions at Ingenix, were informed of specific provider-reported codes that were reported based on "faulty coding."  For example, Sharp Community Medical Group in California submitted a diagnosis tracking to HCC 155 (Major Head Injury) but there was "no documentation to support intracranial injury."  Likewise, Monarch/South Coast, located in this District, submitted a diagnosis tracking to HCC 17 but there was "[n]o documentation of diabetes or diabetic complication[.]"  Will, Holt, and Rasmussen were requested to remove, or delete, these codes before the final submission deadline but Rasmussen replied that they did not have resources and could not do this.

78

141.   In addition, UHG Managing Defendants knew that a significant percentage of provider-reported diagnoses were invalid based on audits performed by CMS and similar internal audits or reviews that they performed.  For example, one such audit was performed on diagnoses submitted for 2004 date of service medical encounters (*e.g.* physician office visits) that mapped to 1,231 HCCs.  The results were reported in a September 2007 Risk Adjustment Programs presentation sent by Dumcum to Relator Poehling.  The presentation showed that no support was found in the beneficiaries' medical records for 32 percent of the HCCs at issue.  That is, the records did not confirm the diagnoses mapping to 32 percent of the HCCs under review.  The same presentation showed the results of another audit of diagnoses submitted for 2005 date of service medical encounters that mapped to 1,160 HCCs.  It showed that, as of the date of the presentation, 18 percent of the HCCs were "NOT supported" and another 8 percent were most likely not supported.

142.   In October 2007, Ingenix also emphasized the fact that more than 30 percent of provider-reported diagnoses were unsupported by the beneficiaries' medical records as a selling point for the risk adjustment services, including data validation services, that it marketed to another MA Organization.

143.   During the 2007 and 2008 time period, Ingenix implemented the IDV Program. The program focused on physicians in California, Missouri, Texas, and Washington who reported more than three times the number of diagnoses than the average.  The program was very small in scope, but the results confirmed that providers reported many invalid diagnoses.  In January 2008, the results for medical encounters in 2006 showed a 30 percent invalidation rate.  That is, approximately 30 percent of provider-reported diagnoses were invalid, which was consistent with what the PacifiCare employees had known since at least 2005.  In January 2008, these results were sent to Will, Holt, and Rasmussen.

144.   Accordingly, by at least 2005, the former PacifiCare employees Dumcum, Will, Holt, and Leal knew that at least 30 percent of provider-reported diagnoses were not

1  supported by the beneficiaries' medical records; by at least 2007, Dumcum had imparted

2  this knowledge to others at the UHG Managing Defendants; and, by at least 2008, the

3  UHG Managing Defendants' own medical record reviews had confirmed that fact.

4  145.    Additional evidence demonstrates that, by at least the 2007 and 2008 time period,

5  the invalidity of provider-reported diagnoses was an ongoing concern.  For example, in

6  September 2008, one of United's own actuarial consulting subsidiaries, Reden &

7  Anders, made a presentation that identified unsupported diagnosis codes as a "Potential

8  Compliance Risk Area" and warned that "[t]here is no such thing as minimally

9  compliant."  Ovations' President Cynthia Polich possessed a copy of this presentation.

10  146.    In addition, by at least 2008, the former PacifiCare employees, then at Ingenix,

11  had also imparted their knowledge that the UHG Managing Defendants were obligated

12  to identify and delete invalid provider-reported diagnoses.  For example, a January 2008

13  training guide entitled "CMS-HCC Risk Adjustment Training Module," created by

14  Ingenix personnel for provider outreach, recognized that it is the accuracy of medical

15  record documentation and coding that supports entitlement to risk adjusted payments

16  from the Medicare Program.  The presentation recognized that accurate medical record

17  documentation is key to accurate risk adjustment payments and necessary to validate

18  payments.  In addition, in June 2008 emails, Patty Brennan, the Compliance Manager for

19  Ingenix, and Karen Wagor, a Senior Coder and National Trainer for Ingenix, both of

20  whom worked at Ingenix's Santa Ana office, recognized that Defendant MA

21  Organizations were not entitled to payment based on diagnoses that were not validated

22  by beneficiaries' medical records and that those entities risked losing revenue based on

23  invalid diagnoses:  "We could be at risk of losing $$ if there isn't another piece in the

24  documentation before or after this date of service for the HCC if it can't be verified with

25  the most accurate validation.  **The medical record must support all diagnoses coded**

26  **for the date of service and must be able to** <u>stand alone</u> **for an audit on those reported**

27  **diagnosis codes.**"  (Emphasis in the original.)

28

147.   Moreover, the UHG Managing Defendants knew they were required to effectively address compliance issues.  For example, a presentation from November 2009 entitled "UnitedHealth Group – Audit Management Overview," made at a Medicare Compliance Oversight Committee meeting, expressly acknowledged the legal obligation to implement an effective compliance program and stated that "[i]n order to have an effective Compliance Program, an organization must have a robust internal monitoring and auditing process in place."  In 2009, Jenny O'Brien, the Chief Medicare Compliance Officer, was a Co-Chair of the Medicare Compliance Oversight Committee, a position she held until approximately 2015.  During this time period, O'Brien worked for Ovations and then UnitedHealthcare Medicare & Retirement.  Her Co-Chair was the Chief Executive Officer or another officer of Ovations and then UnitedHealthcare Medicare & Retirement.  In the 2010-2011 time frame, the Co-Chair was Tom Paul.  And, as another example, in approximately May 2010, Larry Renfro, who was then the Chief Executive Officer of both the Public & Senior Market Group (PSMG) and Defendant Ovations, and David Orbuch, who was then the Executive Vice President and Chief Compliance Officer of PSMG, met with CMS regarding their Medicare compliance program and represented to CMS that they would "meet and exceed" CMS' expectations.

148.   Kimberly Halva, UnitedHealth Medicare & Retirement's Finance Compliance Officer from 2010 to 2013, also was keenly aware that the validity of provider-reported diagnoses needed to be addressed.  Halva understood that MA Organizations had an obligation to identify and delete diagnoses that were not supported by its beneficiaries' medical records.  (Halva was also familiar with the Risk Adjustment Participants Guide.)  In November 2010, she sent a memorandum to Relator Poehling with recommendations for compliance problems focused on identifying and deleting invalid provider-reported diagnoses.  In January 2011, she sent Relator Poehling "a few suggestions for risk mitigation type programs UnitedHealthcare Medicare and Retirement could take to more equally distribute resources between programs dedicated to improper coding or billing

81

Exhibit C
Page 112

1  and those focused on identifying additional reimbursement opportunities through
2  improved coding/documentation."  One of Halva's suggestions was for
3  UnitedHealthcare to perform "General Coding Accuracy Audits," which were essentially
4  "look both ways" medical record reviews that would identify both incomplete coding
5  (which she referred to as "under-coding") and inaccurate coding (which she referred to
6  as "over-coding").  Another of her suggestions was for UnitedHealthcare Medicare &
7  Retirement to "Specifically Identify Traditionally Over-Coded or Incorrectly Coded
8  Conditions," "such as stroke or COPD," and conduct medical record reviews to
9  determine if those traditionally over-coded or incorrectly coded conditions could be
10  validated.  Halva and Scott Theisen, the Chief Financial Officer for UnitedHealthcare
11  Medicare & Retirement from 2010 to 2013, were Co-Chairs of the UnitedHealthcare
12  Medicare & Retirement Finance Compliance Oversight Committee, which was
13  responsible for risk adjustment compliance issues.  Halva also reported to Theisen as
14  well as Jennifer O'Brien.
15  149.   In or around early 2009, Deloitte & Touche, which served as the public
16  accounting firm for UHG (which filed a consolidated financial statement for all of its
17  businesses), sent a memo to Ovations regarding an audit it performed to investigate the
18  appropriateness of an accounting treatment used by Ovations.  In the audit, Deloitte &
19  Touche "looked both ways" when reviewing MA Program beneficiaries' medical records
20  because, according to Auditor Bill Nepple, that was the only way to achieve a full and
21  complete picture of a beneficiary's health status.  The results of this "look both ways"
22  audit were communicated to Relator Poehling in February 2009 and he was aware that
23  both ADDS and DELETES resulted from the audit.
24  150.   In addition, as part of their compliance efforts, the UHG Managing Defendants
25  had, since at least 2008, required financially-incentivized capitated provider groups to
26  submit attestations to them that certified that the diagnoses that they reported to the UHG
27  Managing Defendants were valid and met CMS's requirements.  For example, in or
28  around 2008, Ingenix sent notices to these providers describing these "**CMS DATA**

1    **ACCEPTANCE GUIDELINES**," and stating that **"[a]ll diagnoses must be**

2    **documented at the time of the patient encounter or after receipt and confirmation**

3    **of the diagnosis (i.e. Lab or Radiology report) and must be documented in the**

4    **medical record**," and **"[o]nly report diagnosis codes that can be supported by the**

5    **documentation in the medical record**," and **"[a]ll diagnosis codes should be valid** . . .

6    ." (Emphasis in the original.)

7    151.   In 2010, Holt and Leal were a part of an email chain discussing California

8    provider groups and risk adjustment data validation.  Based on Holt's involvement with

9    ICE's RADAR team (and possibly other sources), Holt noted that California provider

10   groups are "acutely aware of the importance of data validation" and that risk adjustment

11   data validation was "a subject discussed frequently at the ICE meetings."  In the same

12   email chain, Holt also assured Relator Poehling that provider groups in California would

13   understand the importance of CMS's RADV audits.

14   152.   In November 2009, the results of an IDV audit for one of Ingenix's commercial

15   clients, another company that owned and operated MA Plans, further confirmed what the

16   UHG Managing Defendants already knew, that is, that providers were reporting invalid

17   diagnoses at an alarming rate.  The results of the audit showed a 45 percent invalidation

18   rate.  Providers in that commercial client's plans were providers for beneficiaries in one

19   or more of the Defendant MA Organizations' Plans.

20   153.   In mid-2010, the results of IDV reviews once again confirmed an ongoing

21   problem with the validity of provider-reported diagnoses.  The results showed an

22   invalidation rate of approximately 40 percent for California provider groups which cared

23   for beneficiaries enrolled in one of more UHG MA Plans.  Higher than the 30 percent

24   invalidation rate reported in 2005, these results confirmed that a significant percentage of

25   provider-reported diagnoses were invalid.  In mid-2010, these results were shared with

26   Relator Poehling, Keith Dobbins (an attorney for one of the UHG Managing

27   Defendants), Stephanie Will, Patty Brennan, Ronnie Grower, among other individuals

28   working for the UHG Managing Defendants.

83

Exhibit C
Page 114

154.   Also, in June 2010, an Ingenix Health Reform Implementation (HRI) Report
prepared for UHG's then Chief Executive Officer, Steve Hemsley, and other members of
the "UHG executive team" identified compliance as an important issue of immediate
concern to UHG, particularly compliance with the FCA.  This report was sent to
Dumcum, Knutson, Valenta, Andy Slavitt, Timothy Wicks, and other individuals
working for the UHG Managing Defendants at the time.

155.   Furthermore, in 2010, additional Government audits confirmed the problem with
invalid provider-reported diagnoses.  In March 2010, the HHS Office of Inspector
General ("OIG") sent Jack Larsen, the Chief Financial Officer of Ovations, a draft report
of an audit of the risk adjustment data that one of UHG's Texas MA Organizations, then
called PacifiCare of Texas, submitted for payment year 2007.  In July 2010, OIG sent
Thomas Paul, the Chief Executive Officer of Ovations, a draft report of an audit of the
risk adjustment data that UHG's California MA Organization, then called PacifiCare of
California, submitted for payment year 2007.  In the draft reports, the OIG concluded
that the diagnoses for half the beneficiaries in the California audit and 44 percent of the
beneficiaries in the Texas audit were invalid, and that both plans' practices were not
effective for ensuring that the diagnoses they submitted to CMS complied with CMS
requirements.  These draft OIG reports were described as a "top issue" in the third
quarter 2010 Public & Senior Markets Group Medicare Compliance Program Overview
for which Jennifer O'Brien was the Compliance Program Lead and Tom Paul was the
Business Lead.  In May 2010, Paul sent OIG a response about its draft report relating to
PacifiCare of Texas and, in October 2010, Paul (whose job title had then been changed
to Chief Executive Officer of UnitedHealthcare Medicare & Retirement) sent OIG a
response about its draft report relating to PacifiCare of California. After consideration of
Paul's responses to the draft audit reports, the OIG issued final reports concluding that
the health risk scores for 45 percent of the beneficiaries in the California audit and 43
percent of the beneficiaries in the Texas audit were invalid because the diagnoses were
not supported by the beneficiaries' medical records or were uncertain or unconfirmed

84

Exhibit C
Page 115

1   diagnoses.  In both the draft and final reports, the OIG provided examples of
2   unsupported diagnoses.  The OIG also concluded that the MA Organizations should
3   refund the overpayments due to these invalid diagnoses.  In addition to Larsen and Paul,
4   other individuals who were aware of the OIG audit reports during the 2010 and 2011
5   time period included Scott Theisen, Jenny O'Brien, Kimberly Halva, Joseph Keen, and
6   Jeffrey Dumcum.

7   156.   The results of RADV audits were also of concern to UnitedHealthcare.  The third
8   quarter 2010 Public & Senior Markets Group Medicare Compliance Program Overview
9   (for which Jennifer O'Brien was the Compliance Program Lead and Tom Paul was the
10  Business Lead) also stated that CMS was conducting RADV audits of three of the
11  Defendant MA Organizations.  Then, when CMS announced in February 2011 that it
12  planned to extrapolate the sample audit results, Charles Hanson, the then Vice President
13  of Finance and Underwriting at UnitedHealthcare Medicare & Retirement, left a
14  voicemail message for Relator Poehling stating:  "I haven't been close to this for . . .
15  three or four years now probably, but back that far I know the results of our RADV
16  audits were concerning, to say the least.  That we had significant . . . errors or
17  undocumented RAFs [*i.e.*, undocumented diagnoses] in our claim submissions."  He
18  asked Poehling:  "I'm sure we're careful about how we communicate these findings, but
19  can you give me a sense of kind of more recent RADV audits, what impact could this
20  have?  So just generally, are we still sort of, I'll say as bad as we were a few years ago? .
21  . . So, what's the potential impact on revenue of extrapolating these RADV audit
22  findings . . . ?"

23  157.   Because of the problem with provider-reported diagnoses, in 2010, the UHG
24  Managing Defendants started the RACCR Program, as described more fully at
25  paragraphs 239-292 below, and Claims Verification Program, as described more fully at
26  paragraphs 196-234 below.  Mary Hammond, one of the UnitedHealthcare Medicare &
27  Retirement employees who oversaw the RACCR Program, described it as "an important
28  part of Medicare & Retirement's efforts to meet CMS requirements to submit accurate

risk adjustment data." The Claims Verification Program was also supposed to satisfy this basic payment rule.

158.   However, the major effect of the Claims Verification and RACCR Programs was that they highlighted that a significant amount of the risk adjustment payments claimed by the UHG Managing Defendants on behalf of the Defendant MA Organizations and paid to the Defendant MA Organizations by the Medicare Program were unsupported and invalidated by beneficiaries' medical records. For instance, as explained in more detail in paragraph 206 below, in December 2010, the results of the first pilot phase (Phase I) of the CV Program showed that provider-reported diagnoses were unsupported for over 50 percent of the medical records reviewed. Over a year later, as explained in more detail in paragraph 208 below, Optum had completed the second pilot phase (Phase II) of the CV Program on 17,398 charts and the results were even more striking. Phase II identified 4,786 invalid diagnoses to be deleted, which was greater than the number of additional diagnoses (ADDS) identified based reviews of the same medical records. In February 2012, Dumcum, who was responsible for the Claims Verification Program, met with Relator Poehling and Theisen, who was the Chief Financial Officer of UnitedHealthcare Medicare & Retirement at that time, and reported: "I'm deleting as much as I'm adding at the end of the day. And I don't know if—you know, what I want to do." He also stated: "we're getting more and more red here," and that Claims Verification "eats in very substantially" to the revenue from ADDS from chart reviews.

159.   In addition, as explained in more detail below, by February 2012, there were "5,519 bad codes" that were "identified and deleted" as the result of RACCR reviews of the medical records for only 13,451 beneficiaries. On a beneficiary basis, the results showed more than a 40 percent invalidation rate.

160.   Over time, the UHG Managing Defendants also obtained more information about incorrect diagnosis coding by providers, some of which information confirmed what had been known for years. For example, by at least 2013, Tracey Bradberry, an Ingenix and then Optum employee who was a certified coder, was aware of various reasons for

86

Exhibit C
Page 117

1   invalid provider-reported diagnoses, including, for example, the "[c]linical findings
2   and/or treatment does not support the diagnosis" and "[n]ot a current condition."  In
3   addition, in March of 2014, Melissa Ferron, a coding consultant, sent Optum employee
4   Christopher Webb a list identifying various HCC codes and diagnosis codes that were
5   unlikely to validate based on medical record reviews because providers frequently used
6   the codes incorrectly.  These included HCCs 17 (diabetes with acute complications), 96
7   (specified heart arrhythmias), 104 (monoplegia, other paralytic syndromes), and 111
8   (chronic obstructive pulmonary disease).

9   161.   More recently, other employees of the UHG Managing Defendants also have
10  recognized the obligation to ensure the validity of diagnoses submitted for risk
11  adjustment payments.  They also understood that the obligation to correct invalid data
12  provided to Medicare for risk adjustment payments.  For example, in an April 2013
13  email, Marybeth Meyer, the Vice President of Operations for UnitedHealthcare
14  Medicare & Retirement who succeeded Relator Poehling in managing the risk
15  adjustment team for that group, stated that "as a Medicare Advantage Plan, if we become
16  aware of a coding issue that impacted the revenue received from CMS for risk
17  adjustment, we are obligated to investigate and correct the submissions to CMS."  In
18  response to Meyer's email, Halva, then Compliance Officer for UnitedHealthcare
19  Medicare & Retirement, agreed.  She also stated that "[w]e have an obligation to go back
20  to CMS and correct submissions that impact the revenue received for risk adjustment
21  purposes."  Halva did not think that anything was wrong with the requirement that
22  UnitedHealthcare Medicare & Retirement delete unsupported diagnoses.  Moreover, she
23  believed that "arguably" this obligation existed for ten years because of the ten-year
24  statute of limitation for the Government to pursue FCA claims against entities that
25  knowingly fail to delete unsupported diagnoses.

26  162.   As another example, in February 2014, Melissa Sedor who worked in
27  UnitedHealthcare Medicare & Retirement's controller's office, sent an email stating that
28  "it is our responsibility to submit accurate records to CMS.  Even if the provider submits

87

Exhibit C
Page 118

1  bad data to us, the responsibility is on us to be submitting the correct data."  Sedor

2  further explained that this was the reason United implemented compliance programs like

3  RACCR and Claims Verification.  Sedor's email was sent to others at UnitedHealthcare,

4  including Marybeth Meyer and William Hnath.

5  163.   Finally, other employees in addition to Halva were aware of the potential FCA

6  liability for submitting invalid diagnoses to CMS for risk adjustment payments or for

7  failing to delete them.  For example, in 2010, Carol Thompson, then National Manager

8  for Ingenix's Risk Adjustment Programs who worked at the Ingenix office in this

9  District, provided the following reason as justification for funding for a coding vendor

10  who was assisting the UHG Managing Defendants with a CMS RADV audit:  "Politics

11  and Congressional scrutiny put an exclamation point on our need to demonstrate that the

12  data submitted to CMS for risk adjustment payment is valid.  Data that drives payment

13  from the government can be reviewed to determine if the claims are 'valid.'  Improper

14  claims submission can fall under the False Claims Act."  Also, as alleged more fully

15  below, Dumcum informed Relator Poehling that the FCA was a consideration in

16  deciding whether the UHG Managing Defendants should implement the Claims

17  Verification Program and "look both ways" at the results of their Chart Review Program.

18  **II.     Chart Reviews and Claims Verification**

19  **A.     United's "Look One Way" Chart Review Program**

20  164.   Over the last decade, Defendants have obtained billions of dollars of risk

21  adjustment payments from Medicare from its national Chart Review Program because

22  they only looked one way at the results of their coders' chart reviews.  As part of this

23  program, the coders were instructed to perform "blind" reviews of the beneficiaries'

24  medical records.  That is, the coders did not know which, if any, diagnoses had been

25  reported by the providers who treated the beneficiaries and created the medical records.

26  Thus, rather than confirming diagnoses already reported by the providers or identifying

27  only additional diagnoses supported by the records, the coders were instructed to look

28  for all medical conditions purportedly documented in the records, record all diagnosis

88

codes identifying those conditions, and give all of those codes to the UHG Managing
Defendants. But, the UHG Managing Defendants selectively utilized results of these
chart reviews – that is, the coders' list of diagnosis codes – for the sole purpose of
identifying diagnosis codes that the providers had not reported and submitting ADDS for
additional risk adjustment payments. They did not utilize the coders' lists of diagnosis
codes to determine if the providers had reported codes that were not supported by their
own medical records. If the UHG Managing Defendants had looked both ways and
deleted these unsupported and, thus, invalid provider-reported codes, their national Chart
Review Program would have been far less lucrative.

165.   The UHG Managing Defendants' national Chart Review Program was their largest
risk adjustment revenue-generating program. This program was started in 2005 as an
outgrowth of the chart review program that PacifiCare was already conducting.
Dumcum, Will, and other former PacifiCare employees became key participants in
designing, implementing, and managing the United Managing Defendants' revenue-
generating national Chart Review Program. Will was the Program Manager for the
program.

166.   During the first few years of the program, hundreds of thousands of charts were
reviewed each year in order to mine them for additional diagnosis codes. In 2008, The
Coding Source ("TCS"), a chart review/diagnosis coding vendor retained by Ingenix,
reported to Carol Thompson at Ingenix that "[s]ince 2005, TCS has partnered with
PacifiCare-United and Ingenix to support your HHC initiatives. TCS has successfully
completed 460,000 chart reviews for multiple United regions."

167.   In 2009, the UHG Managing Defendants significantly expanded the size of the
national Chart Review Program by providing Ingenix with the funds to acquire a coding
vendor called AIM Healthcare Services, Inc. and integrating Ingenix's operations in
Santa Ana, California, and the AIM coding operations in Tennessee, and by providing
Ingenix with the funds to develop an in-house chart review computer database system
called ChartSync so that Ingenix's in-house coders and third-party coding vendors could

electronically review medical records and electronically record the coding results of their reviews.  At or about the same time, the UHG Managing Defendants also expanded the size of the Chart Review Program by providing Ingenix with the funds to open offices in foreign countries (the Philippines and India) where it could hire foreign workers to review beneficiaries' medical records in order to try to find additional diagnosis codes.

168.   Due to the increased resources devoted to the Chart Review Program, the number of medical records reviewed in the hunt for additional codes significantly increased over time.  For the first few years of the Chart Review Program, between 500,000 and 600,000 charts were reviewed each year.  According to a presentation by Dumcum, 600,000 charts were reviewed in 2006 and, as of September 21, 2007, 400,000 charts had been reviewed so far that year with 200,000 charts remaining for review during the fourth quarter of 2007.

169.   By 2010, the number of chart reviews had increased substantially to approximately 850,000 charts for that year.  For 2011 to 2014, approximately 1.5 million charts were reviewed each year.  The Government believes that, after 2014, the national Chart Review Program was most likely similar in size.

170.   As part of this national Chart Review Program, the UHG Managing Defendants focused primarily on the review of charts from providers paid on a fee-for-service basis.  Ingenix and then Optum or their vendors obtained medical records from thousands of these providers throughout the United States.  They or their vendors sent these medical records to coders that they employed in Tennessee, India, and the Philippines.  They also hired coding vendors to review these medical records.  Those vendors were located in various locations within and outside of the United States.

171.   Physician groups owned by one or more of the UHG Managing Defendants also had chart review programs.  WellMed had a group called DataRaps that conducted reviews of its physicians' medical records for patients in one or more Defendant MA Organizations' MA plans.  Southwest Medical Associates conducted some of its own

reviews though it also relied on Ingenix's/Optum's coding operations in Tennessee and coding vendors for its chart reviews.

172.   In 2006, the Defendant MA Organizations obtained approximately $270 million in additional risk adjustment payments from the ADDS that were submitted on their behalf by the UHG Managing Defendants based on the national Chart Review Program.  The return on investment was substantial (approximately $250 million) as it cost only approximately $18 million to review the charts in 2006.

173.   Not unexpectedly, as the number of medical records reviewed significantly increased over the years, so did risk adjustment payments from ADDS based on the national Chart Review Program.  Defendant MA Organizations received approximately $426 million in additional risk adjustment payments from ADDs the UHG Managing Defendants submitted to Medicare based on the medical record reviews conducted as part of the Chart Review Program for the 2011 payment year, approximately $455 million for the 2012 payment year, approximately $758 million for the 2013 payment year, and approximately $882 million for the 2014 payment year.

174.   For payment years 2010 to 2015 combined, Defendant MA Organizations obtained over $3 billion in additional risk adjustment payments from Medicare due to the ADDs the UHG Managing Defendants submitted on their behalf based on medical record reviews conducted as part of the national Chart Review Program.

175.   United's Chart Review Program was conducted according to an annual cycle.  For example, in the spring of 2012, Optum started its collection and review of medical records relating to medical encounters in 2011 (*i.e.*, with 2011 dates of service).  These efforts then intensified through the remainder of the year until the final deadline for submitting diagnosis codes to Medicare for payment year 2012, which was February 15, 2013.

176.   Prior to the start of each annual cycle, the UHG Managing Defendants' senior executives set a revenue target for the program.  After chart reviews started, these senior executives then closely monitored the progress of the program and, if the forecast did not

Exhibit C
Page 122

1 look like the program would achieve the revenue target, they made changes to the

2 diagnostic coding being performed by the coders.  For instance, when UnitedHealthcare

3 Medicare & Retirement and Optum were not achieving the return on investment

4 expected from chart reviews for the 2012 payment year, they "liberalized" coding

5 policies and engaged in a "Recode Project" consisting of re-reviewing 900,000 charts

6 that had already been mined once for additional diagnoses.  They liberalized the coding

7 policies to enable the coders to identify more diagnosis codes purportedly supported by

8 the beneficiaries' medical records.  In this second-round review, the coders did identify

9 more codes purportedly supported by the records based on the liberalized coding

10 policies, and UnitedHealthcare Medicare & Retirement and Optum submitted those

11 codes to Medicare for additional risk adjustment payments.  Scott Theisen at

12 UnitedHealthcare Medicare & Retirement and Karen Erickson and Jon Bird at Optum

13 were involved in this "Recode Project."

14 177.   Despite their aggressive coding to submit as many ADDS as possible to meet their

15 annual revenue targets for their Chart Review Program, officers of UnitedHealthcare

16 Medicare & Retirement attested to the validity of *all* of these ADDS in the annual Risk

17 Adjustment Attestations submitted to Medicare and various senior management

18 employees of both UnitedHealthcare Medicare & Retirement and Optum attested to the

19 validity of *all* of these ADDS in approving the annual Risk Adjustment Attestations

20 submitted to Medicare.  *See infra* at paragraphs 296-308 (describing this internal

21 approval process).  If the results of these chart reviews were so reliable that they could

22 attest to the validity of all of the ADDS, then the results were of equal reliability for

23 them to have deleted all previously-submitted diagnoses invalidated by the reviews.  To

24 the extent that Defendants call into question the results of their own chart reviews in *not*

25 finding support for and *not* validating hundreds of thousands of diagnoses, they also call

26 into question the overall reliability of the chart reviews and validity of the ADDS.

27 Under those circumstances, Defendants acted with reckless disregard for the truth by

28 submitting the ADDS and attesting to their validity, knowing they were not entitled to

Exhibit C
Page 123

1  payments by Medicare based on such unreliable data and the United States is entitled to

2  recover those payments in this action.

3              **B.    United Knew It Was Obligated To Look Both Ways At The**

4                     **Results Of Its Chart Reviews And Make DELETES As**

5                     **Well As ADDS**

6  178.   By 2008, Relator Poehling and others began to question the practice of ignoring

7  the negative results of blind chart reviews invalidating many provider-reported

8  diagnoses.  In May 2008, Relator Poehling participated in a meeting in which he

9  discussed this issue with Will.  She explained to Relator Poehling that, as part of the

10 Chart Review Program, Ovations and Ingenix did not look at whether provider-reported

11 diagnoses were not substantiated by the results of the coders' blind chart reviews.

12 Poehling and Will discussed the idea of changing this process, comparing the results of

13 the blind chart reviews to the provider-reported diagnoses that Ovations and Ingenix had

14 submitted to CMS, and deleting the unsupported diagnoses.

15 179.   Thereafter, the need to address problems with the diagnoses reported by providers

16 continued to be an issue.  In March 2009, the question of how to address problems with

17 diagnoses reported by fee-for-service providers arose during a discussion among Ingenix

18 employees about the Internal Data Validation Program that Ingenix conducted for

19 Ovations and the Defendant MA Organizations.  During that discussion, Ronnie Grower,

20 Vice President of Market Consultation for Ingenix, noted that the Internal Data

21 Validation Program excluded fee-for-service providers and questioned whether the UHG

22 Managing Defendants would have another program to address diagnoses reported by fee-

23 for-service providers given that "there are common coding errors that get reported across

24 all providers."  In fact, other than its short-lived Claims Verification Program, the UHG

25 Managing Defendants never had a medical record review program like the IDV or

26 RACCR Programs to address the validity (or lack thereof) of diagnoses reported to it by

27 its fee-for-service providers.

28

Exhibit C
Page 124

180.   In 2009, these internal discussions continued.  In early April 2009, Relator Poehling, Dumcum, Will, Kimberly Halva, Janice Redmond (the Senior Vice President of Market Outreach for Ingenix's Risk Adjustment Group, who worked in Santa Ana, California) and others participated in a discussion about compliance risks, including provider over-coding (*i.e.*, invalid coding).  One of the items on the agenda that they discussed included "[a]uditing under & over coded conditions" as part of the chart review process, that is, "looking both ways."  A few weeks later, Relator Poehling again met with Will and others to discuss what to do when provider-reported diagnosis codes were inconsistent with the results of the coders' blind chart reviews of the providers' medical records.  At this second meeting in April 2009, the participants began to design a methodology for "looking both ways."  This led to subsequent discussions about creating a Claims Verification Program in order to look both ways at the coders' blind chart review results and make DELETES as well as ADDS.

181.   A few months later, in August 2009, in an internal presentation, Redmond noted that chart reviews only looked for additional revenue and suggested that the process should also include a certain amount of charts that are reviewed to determine the validity of providers' codes.  Redmond was concerned that providers paid on a fee-for-service basis were not being audited to validate their diagnoses.  Her presentation stated: "Known problematic codes are not audited across plans/providers raising the risk of error."

182.   In early 2010, Will sent Dumcum a presentation proposing the Claims Verification Program.  The stated goal of the program was to improve the accuracy of the diagnosis data that the UHG Managing Defendants submitted to CMS.  Will believed that Claims Verification would achieve this goal.

183.   In May 2010, Relator Poehling discussed the potential creation of the Claims Verification Program with Dumcum.  Dumcum referenced the Department of Justice's enforcement of the FCA as a consideration.

Exhibit C
Page 125

184.   According to Halva, while she was the UnitedHealthcare Medicare & Retirement
Compliance Officer from 2010 to 2013, the "general consensus from the
[UnitedHealthcare Medicare & Retirement] point of view was . . . that any time we
opened a chart we should be looking both ways."

185.    In the fall of 2010, after two years of discussions, senior executives such as
Thomas Paul, Cynthia Polich, and Lee Valenta acknowledged that the UHG Managing
Defendants should "look both ways" at the results of their blind chart reviews.  By at
least that time, however, these Defendants should and could have compared the results of
*all* chart reviews to the provider-reported diagnoses and deleted all of the invalid
provider-reported diagnoses that they previously had submitted to the Medicare
Program.  They also should and could have done this contemporaneously with
submitting ADDS based on the same chart reviews.  Instead, they embarked on a very
slow, phased development of their Claims Verification Program.  The senior executives
authorized only a pilot test program to look at the negative results (*i.e.*, the results
showing that provider-reported diagnoses were invalid) from only a very small sample of
chart reviews.  Moreover, the Claims Verification process was designed to "save" – that
is, avoid deleting – the provider-reported diagnoses invalidated by the blind chart
reviews conducted as a part of the Chart Review Program.  The UHG Managing
Defendants attempted to and sometimes did save some of these invalid codes by re-
reviewing the beneficiaries' medical records, sometimes multiple times, to try to glean
any support, even doubtful or ambiguous support, for the provider-reported diagnoses at
issue.

186.   In August 2011, Relator Poehling made clear to Scott Theisen, then Chief
Financial Officer of UnitedHealthcare Medicare & Retirement, that Poehling did not
believe it was appropriate to conduct chart reviews unless and until Claims Verification
was fully implemented and they were "looking both ways."  Theisen was one of the
senior managers charged with making decisions regarding the implementation and
design of the Claims Verification Program.  At that time, in an email to Paul Bihm at

Optum, Poehling wrote:  "You (and Scott [Theisen]) know where I stand on chart
reviews without full CV in place … I wouldn't do them.  Scott, though, is the decision
maker . . . ."  At that time, Bihm was an Optum Senior Vice President of Client
Management and had responsibilities relating to the Chart Review Program.

187.   In September 2011, Mary Hammond, Associate Director of Strategy and Support
for UnitedHealthcare Medicare & Retirement's risk adjustment team, attended an
industry conference in Washington, D.C. on risk adjustment.  She reported that it was
"great to get a perspective on what the activity in DC may mean for risk adjustment.
More audit protection (*looking both ways compliance programs*), . . . and less reliance
on chart review are the recommendations."  (Emphasis added.)

188.   In approximately November 2011, a "factual and unbiased" presentation was
created for UHG's Chief Executive Officer Steve Hemsley, to provide him information
about Optum's and its competitors' risk adjustment programs and other risk adjustment
services.  The presentation described "Compliance" as "the True Value of Claims
Verification."  The presentation further noted that the medical record is the "source of
truth" and that looking at this "source of truth" had a negative revenue impact because
comparing provider-reported diagnoses with the information in the providers' medical
records resulted in having to delete some of their diagnoses.  In December 2011, a copy
of this presentation was sent by Karen Petroff, the Senior Vice President of Business
Development at Optum, to Dumcum and Eric Murphy at Optum.  Murphy was the
President of Payer Solutions at Optum at the time.

189.   In December 2012, Mike Jacobson, Program Business Analyst/Project
Management at Optum, sent Patty Brennan an updated version of Optum's Business
Vision Document for the marketing of the Claims Verification Program to commercial
clients (*i.e.*, third-party MA Organizations).  Under the section titled "Business Segment
Strategies and Tactics," the document stated that "Optum has an industry compliance
duty and responsibility to ensure that each HCC code is accurate and can be
substantiated within the medical charts."  Under the section titled "Competitive Analysis

96

– Market Research," the document stated:  "The marketplace will soon recognize the need and importance of performing due diligence on HCCs added during the chart review process but also verifying HCCs submitted to CMS can be substantiated within the medical chart according to CMS guidelines.  For HCCs that cannot be substantiated within the medical chart, clients will need to perform the appropriate deletes in order to remain compliant with CMS guidelines."  At this time, Optum had already begun marketing Claims Verification or "looking both ways" chart reviews to commercial clients.

190.   In September 2012, the Chief Executive Officer of OptumInsight, William Miller, informed the Government that the UHG Managing Defendants were developing a Claims Verification Program to ensure the accuracy of the diagnosis data they submitted to CMS and look both ways at the results of the chart reviews conducted as part of the Chart Review Program.  Miller further stated that unsupported diagnoses would be deleted.  The UHG Managing Defendants knew that this information was important to the Government.  They led the Government to believe that they were not deliberately ignoring or recklessly disregarding the negative results of their Chart Review Program showing that numerous provider-reported diagnoses that they had submitted for payment were invalid.

191.   Until 2012, UnitedHealthcare Medicare and Retirement and Optum allowed coders to review medical records at providers' offices if the providers did not want to provide copies of their records.  However, in 2012, in accordance with their acknowledgement of their obligation to "look both ways," these Defendants changed this policy and restricted on-site reviews because they needed copies of the charts in order to conduct Claims Verification.  Mary Hammond, in an April 2012 email, explained this decision:  "M&R has made a decision on the chart reviews where providers are requiring onsite coding.  We will ask the [United] Provider Advocates to talk to the groups to try to talk them out of it.  If they won't budge, then we will allow onsite coding if OptumInsight has a solution for doing claims verification on those charts."

Exhibit C
Page 128

192.   Similarly, at around the same time, a decision was also made that Optum's commercial clients were required to retain Optum to perform Claims Verification (*i.e.*, to "look both ways") if Optum performed chart reviews for them and submitted risk adjustment data, including diagnoses, to CMS on their behalf.  According to Dumcum, Optum decided "that if we did chart review and submissions, that we then must do the two-way look.  It became our policy of how we executed business at the time.  So if they bought both, then we required that piece [*i.e.*, Claims Verification] be implemented."

193.   UnitedHealthcare has also consistently demanded that CMS and HHS OIG, when performing their audits, credit the Defendant MA Organizations for any additional medical conditions that UnitedHealthcare believed were supported by the medical records but that had not been reported by the providers.  UnitedHealthcare took the firm position with the Government that, in order to accurately reflect a patients' true health status, it was necessary to review patients' medical records for both the under-reporting (not reporting diagnoses supported by the beneficiaries' medical records) and over-reporting (the reporting of codes unsubstantiated by the beneficiaries' medical records) of medical conditions by providers.  In fact, CMS RADV audits have historically credited MA Organizations, including UnitedHealthcare, for additional diagnoses found during such audits.

194.   For example, in a February 2011 letter from Thomas Paul, the then Chief Executive Officer of UnitedHealthcare Medicare & Retirement, to CMS concerning the parties' dispute about the preliminary results of CMS' pilot RADV audit of one of the Defendant MA Organizations, UnitedHealthcare argued that the dispute process "incorrectly exclude[d] consideration of additional CMS-HCCs" supported by the beneficiaries' medical records.  The letter stated that UnitedHealthcare identified additional HCCs (*i.e.*, additional diagnoses mapping to additional HCCs) in the medical records and, if CMS refused to give it credit for them, it would challenge CMS legally. In September 2012, in a letter from Theisen, the then Chief Financial Officer of UnitedHealthcare Medicare & Retirement, to CMS about the same RADV audit,

1   UnitedHealthcare continued to complain that the audit incorrectly excluded

2   consideration of additional HCCs and argued that the Defendant MA Organization

3   should receive credit for the additional HCCs.  The letter stated:  "If [the MA

4   Organization] is not credited for these incremental HCCs, then any adjustments made by

5   CMS do not accurately reflect an enrollee's comprehensive medical conditions.  The

6   goal of RADV audits should be to determine the full extent of enrollees' medical

7   conditions, and **make overpayment and underpayment adjustments so that [MA**

8   **Organizations] are paid commensurate with enrollees' health status**."  (Emphasis

9   added.)  Similarly, in a September 2012 letter from Thomas Paul to HHS OIG,

10  UnitedHealthcare stated that "the OIG should correct the invalid HCCs and credit [the

11  MA Organization] with the incidental HCCs documented in the submitted medical

12  records."

13  195.   ICE, the industry group to which several of the Defendants belonged and which

14  they financially supported, also opined that "looking both ways" was a "Best Practice."

15  It issued a Best Practices document encouraging the industry to conduct chart reviews

16  that "looked both ways."  It described the advantages of such chart reviews as

17  "[p]romoting validation functions for diagnostic codes previously submitted by

18  providers" and "[p]roviding the ability to submit code corrections forward (additions and

19  deletions) to health plans upon the completion of review."

20          **C.     United's Short-lived "Look Both Ways" Claims**

21                  **Verification Program**

22  196.   In September 2010, Lee Valenta, then Ingenix's Chief Operating Officer, sent

23  Thomas Paul, then Chief Executive Officer of Ovations, a memorandum "summariz[ing]

24  Ingenix's plans for implementing a claims verification program for charts reviewed by

25  Ingenix on behalf of Ovations Medicare Advantage Plans."  Valenta explained that the

26  "overarching aim" of the Claims Verification Program was "improving the quality of

27  member-level diagnosis information submitted to CMS."  He also explained that the

28  program's purpose was to identify the provider-reported diagnoses that were not

99

1  validated by the blind medical record reviews conducted as part of the Chart Review

2  Program and for another coder to conduct a second non-blind review to determine if the

3  provider-reported diagnoses had been missed by the first blind coder.

4  197.   Valenta's memorandum also set forth a three-phased approach for the

5  development of the Claims Verification Program.  The first phase, Phase I, was supposed

6  to focus on a random sample of 850 beneficiaries in Ovations MA Plans whose medical

7  records for encounters (*i.e.*, provider office visits) in 2009 were included in the Chart

8  Review Program in 2010 and had already been subject to a blind review as part of that

9  Program.  Phase I was supposed to start in October 2010 and be completed by January

10  31, 2011.  The second phase, Phase II, was supposed to focus on a larger sample of

11  beneficiaries and, thus, a larger number of medical records for encounters in 2010.  This

12  group was supposed to include all beneficiaries who had medical encounters with only

13  one provider during 2010.  Phase II was supposed to start by May 2011.  The final phase,

14  Phase III, was supposed to focus on all beneficiaries in Ovations' MA Plans whose

15  medical records for medical encounters in 2011 were included in the national Chart

16  Review Program in 2012 and had already been subject to a blind review as part of that

17  Program.  Phase III was supposed to be implemented in 2012.

18  198.   In October 2010, Cindy Polich, then President of Ovations, which was in the

19  Public and Senior Markets Group ("PSMG") that managed the Defendant MA

20  Organizations at the time, responded to Valenta's memorandum.  Polich agreed to his

21  proposal.  Polich also acknowledged the need to improve PSMG's risk adjustment

22  programs.  She stated that "[w]hile Ingenix is implementing Phase II [of Claims

23  Verification], PSMG will conduct a comprehensive review of its current risk adjustment

24  strategies, including our chart review strategy.  The purpose of this review is to

25  determine the future programs and approaches to be used to improve the accuracy of our

26  risk scores."

27  199.   A Claims Verification project management document, prepared by Optum,

28  Ingenix's successor, described Claims Verification as "[a] risk adjustment chart audit

Exhibit C
Page 131

service designed to ensure that qualified patient diagnoses and conditions are identified and supported in the physician medical record documentation.  This audit service identifies any discrepant coding patterns contained within the medical record documentation and the associated claims and encounters.  This service includes the submission and delete process to CMS, financial reporting, and training/education for providers.  Claims Verification will further supplement our efforts to assess coding accuracy and our ability to drive prospective improvements by engaging and educating providers."

200.   At a meeting in September 2012, Theisen explained to Jason Bainbridge and Karin O'Hara, both of whom worked for UnitedHealthcare Community & State, that UHG decided to "look both ways" and implement Claims Verification in order to defend the Chart Review Program in light of increased scrutiny on risk adjustment.  According to Relator Poehling's notes, the meeting focused on the financial impact of Claims Verification, and Theisen "said historically when we audited we only added codes. UHG has decided from a defensibility standpt, & the increased scrutiny on risk adjustment, that we would begin deleting unsupported codes as well.  Scott [Theisen] explained that [Optum] did a CV pilot on ~ 5k charts.  Scott said we anticipated ~ $100M in give backs related to CV, but the pilot is showing ~ $225M/yr (extrapolating results)."  Other attendees at this meeting included, but were not limited to, Relator Poehling, Jon Bird, William Hnath, and Melissa Sedor.

201.   At some point in 2012, UnitedHealthcare Medicare & Retirement also started to impose a "look both ways" requirement on providers with which it was sharing the cost of chart reviews.  Many, if not all, of these providers were incentivized capitated providers.  UnitedHealthcare Medicare & Retirement sent letters to these providers about this requirement.  Some of the letters expressly stated that UnitedHealthcare Medicare & Retirement was agreeing to share in the cost of the chart reviews based on its understanding that the provider would use the information gathered from the chart reviews to verify the diagnosis data that it previously reported to UnitedHealthcare

Exhibit C
Page 132

1  Medicare & Retirement.  In other of the letters, UnitedHealthcare Medicare &

2  Retirement requested that the provider ensure that it uses the information gathered

3  during the chart reviews to verify the diagnoses that it previously reported to

4  UnitedHealthcare Medicare & Retirement.  All of the letters further instructed the

5  providers on how to submit to UnitedHealthcare Medicare & Retirement (via Optum) a

6  data file of diagnosis codes that should be deleted (as well as those that should be added)

7  as a result of the chart reviews.  In addition, UnitedHealthcare Medicare & Retirement

8  required all of the providers to complete and return a certification.  Pursuant to the

9  certification, the provider had to attest that it had compared diagnoses previously

10  reported to UnitedHealthcare Medicare & Retirement with the charts that it reviewed,

11  and that it had submitted to UnitedHealthcare Medicare & Retirement and Optum a data

12  file of diagnoses that it had determined should be added or deleted.  Pursuant to the

13  certification, the provider also had to certify that the information in the data file was

14  accurate and truthful.  There was an attachment to the letters that specified the fields for

15  the data file that the providers were required to use.  One of the fields was for the

16  providers to identify diagnoses that needed to be deleted because they were not validated

17  by the chart reviews.

18  202.   UnitedHealthcare Medicare & Retirement and Optum, however, took over three

19  years to develop the Claims Verification Program.  Furthermore, the manner in which

20  they developed and then implemented the Program shows that they were never

21  committed to honoring their obligation to undertake good faith efforts to ensure the

22  validity of the risk adjustment data that they submitted to the Medicare Program.  They

23  did not automatically delete the provider-reported diagnoses that were not supported by

24  the medical record reviews conducted as part of the Chart Review Program.  Rather, they

25  considered these invalid diagnoses as mere "potential deletes" and instructed the coders

26  to re-review the medical records to try to avoid deleting them.  Optum also trained the

27  Claims Verification coders that the goal of Claims Verification, above all else, was to

28  "validate" or "save" the potential deletes through finding any support for the diagnosis in

102

1  the beneficiary's chart.  Additionally, Optum instructed its coders to "save" these invalid

2  diagnoses even if the information in the medical records was ambiguous.

3  203.   When performing Claims Verification, Optum also did not consult providers even

4  when medical records were ambiguous concerning whether the beneficiaries actually had

5  the medical conditions corresponding to the diagnosis codes.

6  204.   Optum also saved "potential deletes" by simply accepting the diagnoses reported

7  by providers even when the medical conditions were not unambiguously documented in

8  the beneficiaries' medical records.  Optum characterized this practice as deferring to the

9  judgment of the provider or the provider's administrative staff who assigned the

10  diagnosis codes.  For example, if a chart was unclear, illegible, or missing, and even

11  though Optum could not identify any medical records documenting the medical

12  conditions identified by the provider-reported codes, it just accepted the codes and did

13  not delete them.  Optum did this with either deliberate ignorance or reckless disregard

14  for the truth in light of the mountain of knowledge it possessed about the significant

15  percentage of invalid provider-reported diagnoses.

16  205.   However, despite all its flaws, the Claims Verification Program confirmed what

17  UnitedHealthcare Medicare & Retirement and Optum already knew about the significant

18  error rate associated with provider-reported diagnoses that they submitted to the

19  Medicare Program for risk adjustment payments.

20  206.   At the end of 2010, Ingenix, Optum's predecessor, had conducted the first pilot

21  phase, Phase I, of its development of the Claims Verification Program.  As specified in

22  Valenta's memorandum, Phase I included a very small sample of medical records that

23  Ingenix had reviewed as part of the Chart Review Program for encounters (*e.g.*, office

24  visits) that beneficiaries had with providers in 2009.  A "CV Dashboard" summary from

25  December 2010 shows that out of the many hundreds of thousands of medical records

26  included in the Chart Review Program for 2009 encounters, only 843 records were

27  included in Phase I of the Claims Verification Program.  By December 2010, the review

28  for 728 of those medical records had been completed.  The results showed that 224 of the

103

728 medical records re-reviewed as part of Claims Verification (*i.e.*, reviewed once as part of the Chart Review Program and then again as part of Phase I of the Claims Verification Program) had both at least one ADD (a diagnosis code that the provider had not reported) and at least one DELETE (a diagnosis code that was reported by the provider but not validated by the medical record) and 167 of the 728 medical records re-reviewed as part of Claims Verification had at least one DELETE but no ADDS. Furthermore, of the HCCs and the RxHCCs for which Ingenix looked for validation in these 728 records that it had re-reviewed, 19 percent of the HCCs and 15 percent of the RxHCCs did not validate. At the time that the summary was prepared, Ingenix was conducting "follow-up" on 39 medical records. Of the HCCs and the RxHCCs for which Ingenix looked for validation in these 39 medical records that it had re-reviewed, 47 percent of the HCCs and approximately 45 percent of the RxHCCs did not validate.

207.   As part of Phase I, but only as part of Phase I, Ingenix sometimes contacted the providers who gave it the medical records. It did this when the second non-blind review of the records in Claims Verification failed to validate the diagnoses that the first blinded review had failed to validate as part of the Chart Review Program. For some beneficiaries, the providers responded that they should not have submitted their claims (*i.e.*, the claims which included the diagnoses). Consequently, the diagnoses should not have been submitted to CMS. For some other beneficiaries, the providers did not have additional records or their additional records did not support the diagnoses in question.

208.   In mid-2011, Ingenix/Optum began conducting the second pilot phase, Phase II, of the Claims Verification Program. Phase II began in the summer of 2011 and was completed in early 2012. Out of the many hundreds of thousands of medical records included in the Chart Review Program for 2010 medical encounters, only approximately 17,000 charts were included in Phase II. Coders tried to save as many "potential deletes" as possible when reviewing these medical records as part of Phase II. Nonetheless, the results of their Claims Verification reviews confirmed more invalid diagnoses

1   (DELETES) than the number of additional codes (ADDS) gleaned from the same

2   records.

3   209.   In mid-2012, Optum began conducting a preliminary test or pilot for Phase III of

4   the Claims Verification Program.  This pilot included approximately 5,000 medical

5   records relating to encounters (*e.g.*, office visits) that beneficiaries had with providers

6   during calendar year 2011.  In September 2012, Theisen explained to others including

7   Relator Poehling, that UnitedHealthcare Medicare & Retirement, relying on the results

8   of this sample review, had increased its estimate of the financial impact of Claims

9   Verification deletes.  In October 2012, Theisen sent Daniel Schumacher, the then Chief

10  Financial Officer of Defendant UnitedHealthcare, and others a "CV III analysis – based

11  on 2011-2012 Chart review activity for 2011 DOS."  The document showed validation

12  rates based on the review of HCCs because the coders were instructed to find support for

13  any diagnosis that mapped to the HCC under review even if it was not the same

14  diagnosis reported by the provider that originally mapped to that HCC.  The document

15  showed that the validation rate "[b]ased on results of CV3 pilot (5,000 chart sample)"

16  was 66.4 percent.  In other words, only 66.4 percent of the HCCs reviewed were

17  supported by the beneficiaries' medical records.  That meant that 33.6 percent of the

18  HCCs were unsupported by the beneficiaries' medical records even after

19  UnitedHealthcare Medicare & Retirement and Optum had them reviewed twice, once as

20  part of the Chart Review Program and again as part of the pilot Claims Verification

21  Phase III process.  Based on these results, UnitedHealthcare Medicare & Retirement

22  estimated that the negative financial impact of Claims Verification in 2012 would be

23  $231 million based on the number of estimated "potential deletes" that it could not save

24  and would have to be made.  It estimated that diagnoses mapping to 120,147 HCCs

25  would have to be deleted and that, on average, <u>each</u> delete would result in a $1,924

26  negative financial impact.

27  210.   In or about October 2012, UnitedHealthcare Medicare & Retirement recorded in

28  its financial records a $208 million accrual for potential revenue reductions due to

105

1    deletes that would need to be made as part of the Claims Verification Program

2    (hereinafter referred to as a "CV liability accrual") for payment year 2012.  Relator

3    Poehling and Kyle Anderson were aware of this CV liability accrual.  In late 2012, other

4    individuals at UnitedHealthcare Medicare & Retirement and Optum, including Timothy

5    Noel, Scott Theisen, and Jon Bird, were also aware of the CV liability accrual and/or the

6    estimated negative financial impact of the Claims Verification Program.

7    211.   UnitedHealthcare Medicare & Retirement and Optum did not complete their pilot

8    tests and start to implement their Claims Verification Program for charts relating to 2011

9    medical encounters (*i.e.*, with 2011 dates of service) until late 2012.  Even after that,

10   they never fully implemented the program.  They also continually changed the program

11   in order to limit its scope and created arbitrary rules to avoid looking at the negative

12   results of many of the blind chart reviews conducted as part of the Chart Review

13   Program.  In addition, when they learned that their second review of the medical records

14   in Claims Verification was not saving a significant number of diagnoses from deletion,

15   they created another level of review.  That is, it created a re-re-review or third review of

16   the beneficiaries' medical records in order to keep trying to save the diagnoses from

17   deletion.  They also limited the scope of Claims Verification by excluding certain

18   providers, including providers that they or their affiliates owned and operated.  In 2014,

19   Defendants UHG and UnitedHealthcare then terminated CV without completing the

20   program for charts relating to 2012 medical encounters (with 2012 dates of service).

21   212.   UnitedHealthcare Medicare & Retirement and Optum imposed several arbitrary

22   exclusionary rules to improperly disqualify many medical records reviewed as part of

23   their Chart Review Program from their Claims Verification Program.  For medical

24   records for encounters in 2011 and 2012, they arbitrarily and improperly excluded

25   numerous medical records from Claims Verification.  For example, they excluded

26   numerous charts from Claims Verification because the image of the chart was

27   purportedly "unavailable."  Yet, when making ADDS in the Chart Review Program, the

28   image of the chart or chart itself must have been available.  But, instead of locating the

106

Exhibit C
Page 137

1   images or obtaining the charts for Claims Verification, they decided not to re-review the

2   charts to save those diagnoses invalided by the results of their Chart Review Program.

3   They also did not delete those invalid diagnoses.

4   213.   The re-reviews conducted as part of the Claims Verification Program did not save

5   as many deletes as UnitedHealthcare Medicare & Retirement would have liked and, in

6   2013, Theisen and others at UnitedHealthcare Medicare & Retirement became

7   increasingly concerned about the financial impact of the deletes.  UnitedHealthcare

8   Medicare & Retirement decided that its coders were not saving enough "potential

9   deletes."  Accordingly, sometime in 2013, UnitedHealthcare Medicare & Retirement

10  decided that a third review or a re-re-review of the medical records had to be conducted

11  to try to save more deletes.

12  214.   Thus, if Optum's internal coders were unable, despite their best efforts, to "save" a

13  diagnosis code, Optum sent that code to a coding consultant for re-re-review.  Optum

14  knew, however, that the consultant engaged in a pattern of "saving" diagnoses without

15  supporting medical records in several circumstances, including when the chart was

16  scanned illegibly, when pages were missing from a chart and the diagnosis could not be

17  validated, and when the reported date of service did not appear in the chart.  By

18  accepting validation of these diagnoses without supporting medical records, Optum

19  knowingly and improperly avoided its and UnitedHealthcare Medicare and Retirement's

20  obligation to return monies wrongfully obtained from the Medicare Program.

21  215.   In November 2013, Donald James, then Director of Program Strategy for Optum

22  in Santa Ana, California, reported to senior management that the Claims Verification

23  Program had not yet started for charts reviewed as part of the 2013 Chart Review

24  Program.  In December 2013, Patty Brennan, then also in the Optum Santa Ana office,

25  reported to Dumcum that "[h]alf of the CV volume for 2012 DOS has been completed

26  but deletes are on hold."  She also informed him that UnitedHealthcare Medicare &

27  Retirement "[r]equested all CV deletes be held until further noticed so Ops is not going

28  to complete the second half of the volume at this time."

107

216.    When Steve Nelson became the Chief Executive Officer of UnitedHealthcare Medicare & Retirement in early 2014, he spoke with Steve Hemsley, then Chief Executive Officer of UHG, about whether UnitedHealthcare Medicare & Retirement should continue the Claims Verification Program.  Hemsley encouraged Nelson to look into whether or not it should do so, formulate an opinion, and report back to him.

217.    In February 2014, Marc Beckmann, then in the Finance – Risk Adjustment Analysis Group at UnitedHealthcare Medicare & Retirement, sent information about CV liability accruals to Daniel Schumacher, the Chief Financial Officer of Defendant UnitedHealthcare, and Brian Thompson, the Chief Financial Officer for UnitedHealthcare Medicare & Retirement.  He estimated that the effect of Claims Verification on UnitedHealthcare Medicare & Retirement's revenue would be $208 million for payment year 2012, $125 million for payment year 2013, and either $125 million or $175 million (depending on the number of charts reviewed) for payment year 2014.  This information was also provided to other individuals at UnitedHealthcare Medicare & Retirement including, but not limited to, Jay Matushak, Marybeth Meyer, and Kyle Anderson.

218.    On March 3, 2014, Jon Bird, the Optum Senior Vice President of Risk and Quality Analytics, participated in a meeting with Brian Thompson about the CV liability accrual for 2013.  Thompson wanted to "move toward the more conservative range of the confidence interval (from 50% to 80%) resulting in [a] $29M higher CV estimate" for the liability accrual.  By March 3, 2014, UnitedHealthcare Medicare & Retirement's estimate of its CV liability accrual for 2013 already had been increased by over $50 million dollars from $125 million to $180 million.

219.    Also, in February or March 2014, the financial managers at UnitedHealthcare Medicare & Retirement, including Brian Thompson, performed a comparison of their then-expected revenues for 2014 with the revenue estimated in UnitedHealthcare Medicare & Retirement's annual budget for 2014.  They determined that there was going

Exhibit C
Page 139

1  to be a shortfall in their financial performance relative to that budget and they started to

2  think about ways to eliminate the shortfall.

3  220.   In March 2014, Thompson sent Nelson "a current brain dump of 'shut off/stop

4  doing' that is not yet valued/included in the road back to plan." Part of the "brain dump"

5  was to "shut off" or reduce compliance efforts. Thompson asked others at

6  UnitedHealthcare Medicare & Retirement for other "shut offs."

7  221.   Subsequently in March 2014, Marybeth Meyer, who ran the risk adjustment team

8  at UnitedHealthcare Medicare & Retirement, reported to Thompson that the "CV

9  estimate of $125M may be light (estimate for 2012 DOS/2013 payment year of

10  $167M)."

11  222.   In late March or early April 2014, Nelson met with other Chief Executive Officers

12  at Defendant UnitedHealthcare to discuss UnitedHealthcare Medicare & Retirement's

13  financial performance. A very detailed slide deck was created for that meeting. The

14  slide deck was sent by Schumacher to senior executives at UnitedHealthcare, including

15  Gail Boudreaux (who reported to Hemsley), Nelson, Brian Thompson, and Paul

16  Balthazor. The slide deck highlighted that UnitedHealthcare Medicare & Retirement

17  was projecting that its actual revenues for 2014 were going to miss the target set forth in

18  the annual budget by half of a billion dollars. It stated: "Best estimate of $500 million

19  budget miss." It also stated that, because of that projected miss, UnitedHealthcare

20  Medicare & Retirement's management was making a commitment to the senior

21  executives to "find $250 million to cut miss in half." UnitedHealthcare Medicare &

22  Retirement referred to this "Management Commitment" as a $250M "good guy."

23  223.   Nelson and others, including Boudreaux (who reported to Hemsley), knew that, if

24  UnitedHealthcare Medicare & Retirement terminated the Claims Verification Program, it

25  could reduce the $500 million budget miss by not deleting the provider-reported

26  diagnoses invalidated by its chart reviews and reversing the CV liability accruals. This

27  was their "good guy." But, it appears that UHG, UnitedHealthcare, and Optum were

28  concerned about the consequences of terminating the program and reverting to ignoring

109

1   the negative results of their chart reviews.  They decided to ask CMS about the

2   retroactivity of a proposed regulation requiring MA Organizations to design all medical

3   record reviews to validate diagnoses submitted to CMS.

4   224.   Under Hemsley's direction, Larry Renfro, the Chief Executive Officer of Optum,

5   contacted senior government employees at CMS, including the Administrator of CMS,

6   to ask whether the Defendants had a legal obligation to perform Claims Verification

7   before the effective date of the proposed rule.  These employees were not government

8   attorneys and could not render the requested legal advice.  Renfro, moreover, knew

9   nothing about the UHG Managing Defendants' Chart Review and Claims Verification

10  Programs and could not impart any meaningful information about these programs to the

11  government employees.  Accordingly, Renfro could not and did not provide the senior

12  government employees with any description of the Claims Verification Program or its

13  purpose.  Hemsley and his attorneys, however, continued to push Renfro to make further

14  contacts with these government employees when UHG, UnitedHealthcare, and Optum

15  did not obtain from these government employees the legal opinion they wanted.

16  225.   On or before April 8, 2014, Renfro asked Karen Erickson, an Optum executive

17  who worked directly for him, for speaking points for a call with the Administrator of

18  CMS.  On April 8, 2014, Erickson sent Renfro's assistant, Juliet Domb, "aspirational"

19  talking points, that is, things that they wanted Renfro to get the CMS employees to say,

20  including "CV is not currently required" and that Defendants were "allowed to stop any

21  CV activities (including delete submission) currently underway." (Emphasis in the

22  original.)  In her email, Erickson told Domb:  "I sent this to Marianne [Short] and Matt

23  Shors for editing – they will send final directly, and they know it has to be today."  The

24  same day, Renfro spoke to Hemsley and Short to obtain direction about what he should

25  say to the Administrator of CMS on the call that he had scheduled with the

26  Administrator.  Renfro then purportedly spoke with the CMS Administrator and

27  purportedly dictated notes of the call to Domb, who wrote the notes by hand on Renfro's

28

Exhibit C
Page 141

1    notepad and sent them to Short.  According to Renfro, he dictated these notes from

2    memory and he does not usually take notes, but was asked to do so by Short.

3    226.   On April 26, 2014, Short asked Renfro to again contact the Administrator of CMS.

4    According to Brian Thompson (the Chief Financial Officer of UnitedHealthcare

5    Medicare & Retirement in 2014), Renfro had not obtained the "clarity" they wanted

6    from the Administrator about whether they were obligated to perform Claims

7    Verification.  Accordingly, on April 27, 2014, Renfro sent an email to the Administrator

8    asking the same questions he had purportedly asked her on April 8 and to which she

9    purportedly had responded on April 8.  He also asked for a meeting with other

10   employees at CMS who were responsible for operating the MA Program.  On April 27,

11   2017, Renfro reported to Hemsley and Short that CMS was arranging for the UHG

12   Managing Defendants to meet with these employees.  On April 29, 2014, Hemsley sent

13   UnitedHealthcare's attorney, Thad Johnson, to Washington, D.C. to speak with those

14   CMS employees responsible for the MA Program, including Cheri Rice, the Director of

15   the Medicare Plan Payment Group at CMS.  Nelson, Schumacher, and an Optum

16   executive, Karen Erickson, also attended the meeting.  At the meeting, when the UHG

17   Managing Defendants informed CMS about the possibility of terminating their Claims

18   Verification Program, CMS told them that they had a statutory obligation to report and

19   repay the Medicare Program for erroneous risk adjustment payments and that there were

20   FCA implications if they failed to do so.  CMS also told the UHG Managing Defendants

21   that they could not ignore information in their possession showing that diagnoses may be

22   invalid and that they were obligated to delete invalid diagnoses.  According to Erickson,

23   CMS told the UHG Managing Defendants that "if there was reason to have knowledge

24   that something had been begun and we were [*i.e.*, Defendants were] far enough along

25   that there was knowledge that something might not be supported that we needed to

26   continue the investigation into those numbers, or those codes."  Erickson further recalled

27   CMS stating that, if they had "knowledge of things that might not be supported we [*i.e.*,

28   the Defendants] needed to continue the investigation."  According to Schumacher, CMS

111

Exhibit C
Page 142

1  also told them that CMS did not have sufficient information about the Claims

2  Verification Program to provide further guidance.

3  227.   On April 30, 2014, Nelson sent an email to Cheri Rice at CMS about the meeting

4  between the UHG Managing Defendants and CMS on April 29, 2014.  He stated: "[A]s

5  we discussed yesterday, CMS recently issued a proposed rule that would, if finalized,

6  require MA plans to design any medical record reviews to determine the accuracy of risk

7  adjustment diagnoses associated with those records.  During our conversation yesterday

8  and other recent conversations, CMS confirmed to us that these requirements do not

9  apply until the effective date of the rule, and that MA plans are thus not currently

10  required to design their medical record reviews to determine the accuracy of risk

11  adjustment diagnoses.  We currently have a process through which we review certain

12  medical records to determine the accuracy of risk adjustment diagnoses and submit

13  appropriate deletes.  This process already has resulted in the identification of and, in

14  some instances, the submission of deletes for 2012 dates of service.  But based on the

15  proposed rule, including the preamble, and recent conversations with CMS, we

16  suspended that process for 2012 dates of service while we consider whether to make

17  changes.  Pursuant to our discussion, however, we will soon submit for deletion those

18  diagnosis codes that have undergone a complete review and that we have therefore

19  identified as appropriate deletes.  In the near future, we will determine whether to

20  continue our review process for the diagnosis codes which were still under review at the

21  time we suspended our process.  In the meantime we will not delete these codes."

22  228.   On May 2, 2014, Cheri Rice replied to Nelson's email:  "[R]egardless of the

23  effective date of the proposed requirement related to medical record reviews, there are

24  other laws that do impose standards, requirements and responsibilities on MA plans in

25  connection with the federal payments they receive from CMS.  We cannot provide

26  advice to United about the scope of those other laws.  Nor can we provide advice on

27  whether United's plan[ned] course of action and/or purported limits on the scope of its

28  [Risk Adjustment Attestation, submitted April 30, 2014] are compliant with such other

112

1  laws.  Your statement concerning the data submissions that have already been made and

2  United's plans for future action will be included in our records and we will proceed with

3  our evaluation and use of the risk adjustment data consistent with 42 CFR § 422.308, §

4  422.310, and other applicable law."

5  229.   According to Schumacher and Nelson, Rice's May 2, 2014 email did not say

6  anything that was inconsistent with what CMS said in the meeting on April 29, 2014.

7  After Rice sent her May 2 email, the Department of Justice sent a letter to Defendants'

8  counsel emphasizing that the FCA is one of the "other laws" that imposes standards,

9  requirements, and responsibilities on MA Organizations and Related Entities in

10  connection with the federal payments received from the Medicare Program.

11  230.   On May 5, 2014, Jay Matushak informed Jeffrey Putman, UHG's Controller who

12  reported to Hemsley, and others (including Schumacher and Brian Thompson) that

13  "M&R CV delete, good guy, is ~$250M for the year (note this is just the M&R piece and

14  there is an incremental component at C&S)."  On the same date, Brian Thompson also

15  informed Putnam and others (including Matushak and Schumacher) that

16  UnitedHealthcare Medicare & Retirement had "not made a final determination to our CV

17  policy," "[o]ur RAF counsel will make that determination," and that "determination will

18  not occur until later in May most likely."  According to Schumacher, the $250 million

19  was the estimated amount of the deletes from Claims Verification for 2014 and prior

20  years and, thus, the CV liability accruals that had been recorded for 2014 and prior years.

21  The "good guy" was the hoped-for release or reversal of those accruals.

22  UnitedHealthcare Medicare & Retirement knew the accruals were likely underestimated

23  and the financial impact likely greater if it did not terminate the Claims Verification

24  Program.

25  231.   Despite CMS' warnings in the April 29 meeting and Cheri Rice's May 2 email,

26  Nelson, Schumacher, and Brian Thompson decided to go forward with the idea of

27  terminating the Claims Verification Program.  This decision was reported to Hemsley

28

1    and, according to Nelson, Hemsley could have reversed this decision but instead he

2    supported it.

3    232.   Despite the warnings, UnitedHealthcare Medicare & Retirement also decided not

4    to delete or otherwise report to CMS at least 100,000 invalid diagnoses about which it

5    had *actual* knowledge based on more than one review of the patients' medical records

6    for encounters in 2011 and 2012 (*i.e.*, encounters with 2011 and 2012 dates of service).

7    The single damages to the Medicare Program arising from its submission of and failure

8    to delete just these invalid diagnoses is approximately $190 million under Part C alone.

9    233.   After they terminated the Claims Verification Program, UnitedHealthcare

10    (including UnitedHealthcare Medicare & Retirement and UnitedHealthcare Community

11    & State) and Optum reverted to "looking one way" at the results of their chart reviews,

12    making only ADDS, and knowingly and improperly failing to delete invalid provider-

13    reported diagnoses and repay the Medicare Program for them.

14    234.   At the time they decided to terminate the Claims Verification Program, Steve

15    Nelson, Dan Schumacher, and Brian Thompson knew that their decision would enable

16    UnitedHealthcare Medicare & Retirement to reverse its CV liability accruals by more

17    than $250 million dollars.  Hemsley also was aware that terminating Claims Verification

18    would enable UnitedHealthcare Medicare & Retirement to achieve this financial benefit.

19    This was important to all of them because they wanted to represent to investors that

20    UnitedHealthcare Medicare & Retirement's actual revenues were on target.  An internal

21    document relating to their second quarter 2014 "earnings release" issued in July 2014

22    states:  "Q2 was on track and we are building momentum that will take us through the

23    year and into 2015.  *Internal:  Important to note that 2014 benefits from the one-time*

24    *claims verification policy change which investors are unaware of.*"  (Emphasis in the

25    original.)  On July 11, 2014, this internal document was sent to Nelson and Thompson,

26    among others.

27

28

**D.      United Failed to Delete Diagnoses Invalidated By Its Own**
**Chart Review Program**

235.   The results of the UHG Managing Defendants' national Chart Review Program provided them information about a significant number of invalid provider-reported diagnoses that should not have been, but were, submitted by them on behalf of the Defendant MA Organizations to the Medicare Program for risk adjustment payments. For example, for the 2011 payment year (involving payments based on diagnoses with 2010 dates of service), UnitedHealthcare Medicare & Retirement and Optum submitted at least 197,000 diagnoses that were invalidated by the medical record reviews conducted as part of their Chart Review Program.  But, for that year, they deleted only a very few (only about 1,800) of these invalid diagnoses based on the results of Phase II of the Claims Verification Program.  For the 2012 payment year (involving payments based on diagnoses with 2011 dates of service), UnitedHealthcare Medicare & Retirement and Optum submitted at least 222,329 diagnoses that were invalidated by the medical record reviews conducted as part of their national Chart Review Program.  Based on the results of the Claims Verification Program for charts with 2011 dates of service, they deleted approximately 120,000 of these invalid diagnoses despite their arbitrary exclusionary rules and attempts to save these deletes.  For the 2013 payment year (involving payments based on diagnoses with 2012 dates of service), UnitedHealthcare Medicare & Retirement and Optum submitted at least 285,122 diagnoses that were invalidated by the medical record reviews conducted as part of their national Chart Review Program. Based on the results of the Claims Verification Program for charts with 2012 dates of service, they deleted approximately 27,000 of these invalid diagnoses despite their arbitrary exclusionary rules, multiple attempts to save these deletes, and failure to complete the program.  For the 2014 payment year (involving payments based on diagnoses with 2013 dates of service), UnitedHealthcare Medicare & Retirement and Optum submitted at least 199,039 diagnoses that were invalidated by the medical record reviews conducted as part of their Chart Review Program.  Because UHG,

115

Exhibit C
Page 146

UnitedHealthcare, and Optum terminated the Claims Verification Program, they did not delete any of these invalid diagnoses.  These numbers apply to invalid diagnoses relating to risk adjustment payments under Part C only and not also Part D.

236.   Accordingly, the UHG Managing Defendants knowingly and improperly failed to delete or otherwise repay Medicare for most of the diagnoses invalidated by their national Chart Review Program over the last decade.

237.   For example:  for the 2011 payment year, they failed to repay the Medicare Program at least $377,734,792 by failing to look both ways and delete diagnoses invalidated by the Chart Review Program; for the 2012 payment year, they failed to repay the Medicare Program at least $213,978,134 by failing to look both ways and delete diagnoses invalidated by the Chart Review Program; for the 2013 payment year, they failed to repay the Medicare Program at least $317,329,602 by failing to look both ways and delete diagnoses invalidated by the Chart Review Program; and for the 2014 payment year, they failed to repay the Medicare Program at least $234,159,775 by failing to look both ways and delete diagnoses invalidated by the Chart Review Program. These numbers apply to the failure to make repayments relating to risk adjustment payments under Part C only and not also Part D.

238.   Examples of beneficiaries with invalid diagnoses about which Defendants knew but failed to delete based on its Chart Review Programs for payment years 2011 through 2014 are set forth in Exhibit 13 to this Complaint.

### III.   The RACCR Program

239.   The UHG Managing Defendants (which, in this section, refers to Ingenix or Optum, depending on the time period, and Ovations or UnitedHealthcare Medicare & Retirement, depending on the time period) negotiated agreements with some of the largest healthcare provider groups that tied the provider groups' compensation to their beneficiaries' risk scores.  The UHG Managing Defendants knew that this compensation structure created a financial incentive for the provider groups to increase the number and severity of diagnoses they reported and to report invalid diagnoses.  Nonetheless, while

116

the UHG Managing Defendants were scouring millions of medical records through the Chart Review Program to identify additional diagnoses and increase their revenue, their effort to identify the invalid codes submitted by these incentivized providers was limited to the RACCR Program.  Moreover, the UHG Managing Defendants designed and implemented the RACCR Program to limit its scope and to minimize the number of invalid diagnoses for which the UHG Managing Defendants would have to return overpayments to CMS.  They failed to delete invalid diagnosis codes identified through the RACCR Program, and eventually restructured the RACCR program to become just another program to identify additional diagnoses and to increase revenue, rather than a program to remedy the known problem of invalid coding by incentivized providers.

A.   **Defendants Knew That Their Financially-Incentivized Providers Were Reporting Invalid Codes**

240.   As discussed above, the UHG Managing Defendants entered into financial arrangements with capitated and gainsharing providers that were tied to the risk adjustment payments that the Defendant MA Organizations received from the Medicare Program.  As a result, these providers benefited financially from any increase in risk adjustment payments resulting from the diagnoses they reported to the UHG Managing Defendants for beneficiaries enrolled in the Defendant MA Organizations' Plans.

241.   The UHG Managing Defendants knew that these compensation arrangements created a strong financial incentive for these providers to increase the number and severity of diagnoses they reported for each beneficiary, and in some cases to report invalid diagnosis codes.

242.   Early on, Ingenix implemented the Internal Data Validation ("IDV") reviews discussed earlier in this Amended Complaint.  In or about 2010, Ovations (or its successor, UnitedHealthcare Medicare & Retirement) and Ingenix expanded and changed the name of that program to RACCR.  Ingenix was responsible for conducting the RACCR Program until Optum succeeded it in 2011, after which Optum was responsible for conducting the program.  Likewise, Ovations was responsible for

1   managing the RACCR Program until UnitedHealthcare Medicare & Retirement

2   succeeded it and assumed responsibility for the program in 2010.

3   243.   Although the IDV and RACCR Programs were extremely limited in scope and

4   utility, they confirmed what the UHG Managing Defendants already knew:  that there

5   were serious problems with the diagnoses being reported by a number of the financially-

6   incentivized providers, including WellMed (which UHG acquired in 2011).

7                    **B.      UnitedHealthcare Structured The RACCR Program To**

8                    **Limit The Number Of Invalid Diagnosis Codes It Identified**

9   244.   The UHG Managing Defendants knew they had an obligation to review diagnoses

10  reported by incentivized providers to determine their validity.  In an April 23, 2012

11  email to many United Healthcare executives and managers (including Scott Theisen,

12  Keith Dobbins, Michael McCarthy, and Kimberly Halva), Mary Hammond, one of the

13  UnitedHealthcare employees who oversaw the RACCR program, described RACCR as

14  "an important part of Medicare & Retirement's efforts to meet CMS requirements to

15  submit accurate risk adjustment data."  Later, in a June 22, 2012 agenda for a meeting

16  attended by Keith Dobbins, Kim Halva, Benjamin Poehling, and others, Mary Hammond

17  stated that the answer to "Why RACCRs?" was that "We have an obligation to submit

18  accurate Dx data to CMS."

19  245.   Despite the UHG Managing Defendants' understanding that the RACCR Program

20  was part of UHG's effort to comply with CMS's accuracy requirements, they structured

21  the RACCR Program to limit its utility in identifying invalid diagnosis codes.  There

22  were various fundamental limitations on the RACCR Program.

23  246.   First, the UHG Managing Defendants excluded from their RACCR Program any

24  incentivized providers who cared for fewer than 500 beneficiaries in a Plan.  This

25  resulted in the exclusion of approximately 40 percent of the financially-incentivized

26  providers from the RACCR Program for medical encounters in 2008, 2009, and 2010

27  (*i.e.*, with dates of service in those years).

28

118

Exhibit C
Page 149

247.   Second, for the incentivized provider groups with 500 beneficiaries or more, the UHG Managing Defendants did not review the medical documentation for any diagnoses unless the provider group was an extreme outlier in reporting diagnoses that mapped to one or more HCCs.  For medical encounters in 2008, 2009, and 2010 (*i.e.*, with dates of service in those years), the UHG Managing Defendants defined an outlier as a provider that reported diagnoses mapping to a particular HCC more than three times as often as the average national prevalence rate for that HCC for all beneficiaries in the Defendant MA Organizations' MA Plans.  For example, if 15 percent of the beneficiaries in these MA Plans nationwide were reported by providers to have a diagnosis that mapped to HCC 52 (Drug/Alcohol Dependence), the UHG Managing Defendants did not consider the incentivized provider an outlier unless it reported diagnoses mapping to HCC 52 for more than 45 percent of its patients enrolled in a Defendant MA Organization's Plan. Combined with the exclusion of providers with less than 500 beneficiaries, this resulted in a total exclusion of over 80 percent of the financially-incentivized providers for medical encounters in 2008, 2009, and 2010.

248.   For medical encounters in 2011 and 2012, the UHG Managing Defendants further limited which providers would qualify as outliers in order to reduce the number of providers and HCCs subject to review.  Instead of using a national average prevalence rate for each HCC based on diagnoses reported by *all* of the providers in the Defendant MA Organizations' MA Plans, the UHG Managing Defendants used the average rate at which only financially-incentivized providers reported diagnoses mapping to each HCC. Thus, an incentivized provider was considered an outlier only if it reported diagnoses mapping to an HCC greater than two standard deviations above the rate that the HCC was coded by other incentivized providers, that is, providers who *also* had a financial incentive to invalidly code.

249.   A large percentage of the outliers were located in the Central District of California.  They are listed in Exhibit 14 to this Complaint.

Exhibit C
Page 150

250.   Third, after limiting the program to only extreme outliers, the UHG Managing Defendants conducted an initial review of just a small sample of beneficiaries for whom the provider had reported diagnoses mapping to the outlier HCC or HCCs (as used herein, an "outlier HCC" is one that meets the criteria identified in Paragraphs 246 and 247 above for a particular provider and a particular encounter year).  For medical encounters in 2008, 2009, and 2010, the initial sample size for even the largest provider groups was never more than 30 beneficiaries per outlier HCC, and was often as few as 10 beneficiaries per outlier HCC.  The UHG Managing Defendants purposefully kept the sample size small to ensure the samples were not statistically significant, in the hope of preserving the ability to argue later that they were unable to extrapolate the results of their sample reviews to all of the diagnoses reported by the provider that mapped to the outlier HCC.  For 2011 and 2012 medical encounters, the UHG Managing Defendants increased the initial sample size to 50 beneficiaries per provider for each outlier HCC.

251.   Fourth, after reviewing the medical records for the beneficiaries in the sample to determine if the diagnoses were valid, the UHG Managing Defendants gave a provider a "passing" grade if anything less than 20 percent of the diagnoses were determined to be invalid.  Accordingly, even if 19 percent of the diagnoses in the sample were invalid, the provider passed and no further review was conducted.

252.   Fifth, if a provider failed the initial review for a particular outlier HCC, the UHG Managing Defendants often added only a few additional beneficiaries to the sample (*i.e.*, additional beneficiaries for whom the provider had reported diagnoses mapping to the outlier HCC).  The UHG Managing Defendants called this slightly larger sample an "incremental sample."  If they were successful in decreasing the invalidation rate to below 20 percent based on increasing the sample size, the UHG Managing Defendants considered the provider group to have a passing grade for that HCC.  Accordingly, if 19 percent of the diagnoses in the "incremental sample" were invalid, the provider passed and no further review was conducted.

Exhibit C
Page 151

253.   Sixth, when the UHG Managing Defendants determined that a provider failed the incremental sample review for an outlier HCC, their RACCR policy specified that, with limited exceptions, *all* diagnoses reported by that provider mapping to the outlier HCC should be reviewed.  In other words, once it was established that a provider reported diagnoses mapping to a particular HCC three times or more than the national average *and* that 20 percent or more of the diagnoses in a sample review were not supported by the beneficiaries' medical records *and* that increasing the sample size did not reduce the percentage of unsupported codes, even the UHG Managing Defendants recognized that, with limited exceptions, a complete review of the medical records for all beneficiaries for whom the provider had reported diagnoses mapping to the outlier HCC was essential. But in most cases, the UHG Managing Defendants did not conduct these 100 percent reviews themselves.  Instead, as part of the RACCR Program, the UHG Managing Defendants purported to require the financially incentivized providers – the very providers who had over-reported the diagnoses at issue – to conduct these 100 percent reviews.

### C.   Despite Its Limited Scope, The RACCR Program Confirmed That Financially Incentivized Providers Were Submitting Invalid Diagnosis Codes

254.   Despite the many flaws of the RACCR Program, the UHG Managing Defendants knew from the results of their small sample reviews and the 100 percent reviews that were actually conducted that significant problems existed with diagnoses reported by financially-incentivized providers.

255.   By the end of March 2011, the UHG Managing Defendants were analyzing final results of RACCR sample analyses for encounters in 2008 and 2009, and had determined that a majority of the outlier HCCs analyzed in those years had validation rates below 80 percent, according to a March 29, 2011 email and spreadsheet that Benjamin Poehling sent to Paul Bihm.

256.   By mid-February 2012, the UHG Managing Defendants reviewed samples for encounters in 2010 and, again, found a substantial number of outlier HCCs that had validation rates below 80 percent, according to a February 13, 2012 email and supporting materials that Mary Hammond sent to Benjamin Poehling.

257.   Overall, for the sample reviews for 2008, 2009, and 2010 encounters, nearly half (49.61 percent) of the outlier HCCs reviewed failed the 80 percent validation test.  Over a third (37.01 percent) of all sampled diagnoses were not supported by the beneficiaries' medical records.  On April 23, 2012, Mary Hammond reported to numerous of the employees of the UHG Managing Defendants (including Scott Theisen, Michael McCarthy, Kimberly Halva, Keith Dobbins, and others) that Optum had calculated the final results for samples from encounters in 2008, 2009, and 2010, and had identified the providers who had failed the 80% validation test.

258.   For the sample reviews for 2011 encounters, more than half (57.34 percent) of the outlier HCCs reviewed failed the 80 percent validation test, and over 30 percent of all sampled diagnoses reviewed for that year were not supported by the beneficiaries' medical records, according to an August 8, 2013 email and supporting documentation from Optum's Tracey Bradberry to Scott Hughes at Optum and Melissa Ferron, the President of iCodify, a diagnosis coding consultant.

259.   For the sample reviews for 2012 encounters, more than half of the outlier HCCs failed the 80 percent validation test, and more than a third (38 percent) of all sampled diagnoses were invalid, according to a July 2, 2014 presentation by Marybeth Meyer.

260.   The problems with incentivized providers' invalid diagnoses were not isolated incidents, but in many circumstances reflected a clear pattern of miscoding by provider groups.  Although the UHG Managing Defendants purposefully reviewed only a small sample of medical records each year, they knew that certain provider groups were consistently identified as extreme outliers on certain HCCs and failed the 80 percent sample validation test year after year.  For example:

Exhibit 2

Exhibit C
Page 153

1   • Every year from 2008 through 2011, Edinger Medical Group was an
2   extreme outlier for Spinal Cord Disorders/Injuries (HCC 69). Over those four years,
3   Optum (or its predecessor, Ingenix) reviewed medical records for a total of 126
4   beneficiaries that Edinger diagnosed with Spinal Cord Disorders/Injuries and determined
5   that the medical records of only *two* of those beneficiaries actually supported those
6   diagnoses. (Under the RACCR Program, Edinger or the UHG Managing Defendants
7   should have conducted 100 percent reviews of its diagnoses that mapped to this HCC for
8   the years 2008 through 2011, but they did not do so.)

9   • Every year from 2008 through 2012, HealthCarePartners was an extreme
10   outlier for Drug/Alcohol Psychosis (HCC 51). During those five years,
11   HealthCarePartners's highest sample validation rate for this HCC was 57.14 percent.
12   HealthCarePartners conducted 100 percent reviews for 2008, 2009, and 2011, and even
13   HealthCarePartners recognized that over a third of the diagnoses it reported were not
14   supported by its medical records. (Under the RACCR Program, HealthCarePartners or
15   the UHG Managing Defendants should have conducted 100 percent reviews for 2010
16   and 2012, but they did not do so.)

17   • Every year from 2008 through 2012, a provider named CAIPA was an
18   extreme outlier for Chronic Hepatitis (HCC 27). During those five years, CAIPA's
19   highest sample validation rate for this HCC was 76.92 percent. CAIPA conducted 100
20   percent reviews for 2008 and 2009 encounters, and its highest self-audit validation rate
21   was 56.73 percent. (Under the RACCR Program, CAIPA or the UHG Managing
22   Defendants should have conducted a 100 percent reviews for 2010 through 2012, but
23   they did not do so.)

24   • Every year from 2008 through 2012, Hemet Community Medical Group
25   was an extreme outlier for Spinal Cord Disorders/Injuries (HCC 69). During those five
26   years, Hemet's highest sample validation rate for this HCC was 50 percent. Hemet
27   conducted 100 percent reviews for 2008 through 2011, and its highest self-audit
28   validation rate also was 50 percent. (Under the RACCR Program, Hemet or the UHG

1    Managing Defendants should have conducted a 100 percent review for 2012, but they
2    did not do so.)

3         •    Every year from 2008 through 2012, WellMed was an extreme outlier for
4    Disorders of Immunity (HCC 45).  During those five years, WellMed's highest sample
5    validation rate for this HCC was 56.00 percent.  WellMed conducted 100 percent
6    reviews for 2008, 2009 and 2011, and its highest self-audit validation rate was 63.64
7    percent.  (Under the RACCR Program, WellMed or the UHG Managing Defendants
8    should have conducted a 100 percent review for 2010 and 2012 encounters, but they did
9    not do so.)

10   261.   In those cases in which providers performed 100 percent reviews, the results
11   confirmed that the providers had initially submitted numerous invalid codes.  Marybeth
12   Meyer and Scott Hughes's RACCR tracking spreadsheet indicated that more than 65
13   percent of the HCCs that providers reviewed in conducting 100 percent reviews had
14   validation rates below 80 percent.  The RACCR "master tracking" documents that
15   Hughes updated regularly for Marybeth Meyer from 2013 through 2015 showed that
16   validation rates for problematic HCCs did not improve over time.

17   262.   The UHG Managing Defendants' executives were routinely informed of RACCR
18   results.  Beginning in 2011 and until at least 2014, the UHG Managing Defendants held
19   frequent meetings – usually weekly – concerning the status of the RACCR Program and
20   its results, with regular attendance by those responsible for the RACCR Program
21   (including, at various times, Kim Halva, Keith Dobbins, Marybeth Meyer, Benjamin
22   Poehling, Patty Brennan, Mary Hammond, Scott Hughes, and Pam Thomsen).  During
23   these meetings, participants discussed the status and results of RACCR reviews, coding
24   results for individual practice groups, provider meetings to discuss results and 100
25   percent reviews, how 100 percent reviews would be handled in cases of provider
26   resistance, the financial impact of RACCR reviews, and changes to the RACCR
27   Program.
28

Exhibit C
Page 155

263.   At least as early as February 14, 2012, Scott Theisen, Mary Hammond, and Benjamin Poehling met to discuss the deletion of codes resulting from the IDV and RACCR Programs for encounters in 2008, 2009, and 2010, and whether those deletions had been submitted.  In March 2012, Theisen asked Hammond, Dumcum, Poehling, and Paul Bihm to pull together summary data concerning RACCR sample results for discussions with the incentivized providers.  Theisen continued to be actively involved with some of the large incentivized providers that month, reviewing HealthCarePartners' results with Hammond and asking Hammond to identify the volume of codes that might be reviewed if WellMed were asked to do a 100 percent review so that he could provide a "worst case" scenario to John Way.  In April 2012, Poehling updated Way regarding the status of WellMed's RACCR review, and Kimberly Fadden wrote to a number of employees of the UHG Managing Defendants, including Jeff Dumcum, Stephanie Will, and Jon Bird, noting that, among other things, there were then 40 to 42 provider groups in the 100 percent review process.  The UHG Managing Defendants continued to provide periodic overviews or status updates concerning the RACCR Program to their executives and responsible employees.  For example, in October 2013, Hammond sent Karen Erickson, Jon Bird, Scott Theisen, Jeff Dumcum, Patty Brennan, Marybeth Meyer, and others a "two-page detailed document that outlines the status, by provider group and year, of the 2008-2012 RACCR program."

264.   The UHG Managing Defendants also kept their financial teams apprised of the status of the RACCR Program so that they could monitor, report, and account for its financial impact.  For example, at some time before April 4, 2012, Jon Bird and Scott Theisen began discussing a rough estimate of the financial impact of the deletion of diagnosis codes as a result of RACCR.  Theisen, Jon Bird, Bill Hnath, Melissa Sedor, and others also attended a December 3, 2012 meeting discussing, among other things, the financial effect of the IDV (*i.e.*, RACCR) Program, including the deletion of thousands of diagnosis codes as a result of that program.  As set forth in more detail below, the UHG Managing Defendants' financial teams, including, at various times,

125

1   Theisen, Brian Thompson, Sedor and Hnath, also calculated liability accruals that

2   UnitedHealthcare Medicare & Retirement  took in 2012 and 2013 to account for the

3   financial effect of the diagnosis codes that would have to be deleted as a result of the

4   RACCR Program.

5           **D.      UnitedHealthcare Knew It Was Obligated To Delete**

6                    **Invalid Diagnosis Codes Identified Through The RACCR**

7                    **Reviews**

8   265.   The Managing Defendants knew that they were required to submit accurate

9   diagnosis data to the Medicare Program.  First, as described above, many of those

10  executives understood that RACCR was an important part of UnitedHealthcare Medicare

11  & Retirement's efforts to meet CMS's requirements regarding the submission of

12  accurate risk adjustment data, which necessarily implied the correction of inaccurate data

13  identified through the program.

14  266.   Second, the UHG Managing Defendants' conduct demonstrated their knowledge

15  that they were required to delete invalid diagnosis codes identified through the RACCR

16  Program.  From 2012 through 2015, the Managing Defendants deleted – albeit belatedly

17  – many invalid diagnosis codes submitted to CMS for encounters from 2008 through

18  2013, after determining, through the RACCR Program, that those codes were invalid.

19  267.   Third, UnitedHealthcare Medicare & Retirement's practice of booking contra-

20  revenue accruals for the value of the deletions it had to submit as a result of the RACCR

21  Program demonstrated that the UHG Managing Defendants knew of their obligation to

22  return overpayments discovered through that program to the Government.  Pursuant to

23  Statement of Financial Accounting Standards No. 5, *Accounting for Contingencies*, an

24  estimated loss from a loss contingency shall be accrued by a charge to income if both:

25  (a) a liability or impairment of an asset is "probable"; and (b) the amount of the loss can

26  be reasonably estimated. Thus, the accrual of loss contingencies relating to RACCR

27  reflected an acknowledgement that the return of an overpayment to the Government was

28

126

Exhibit C
Page 157

1    "probable," and that UnitedHealthcare could reasonably estimate the amount of the

2    overpayment to be returned.

3    268.   Beginning in 2012, UnitedHealthcare began taking liability accruals to account for

4    changes in its revenue that it expected to incur as a result of deletion of invalid codes

5    identified through the RACCR Program.  By end of year 2012, it calculated that it would

6    have to reduce its revenue by $79 million to account for its deletion of invalid codes

7    resulting from RACCR reviews (including expected 100 percent reviews) of medical

8    encounters in 2008, 2009, and 2010.  That $79 million was less than the total amount of

9    overpayment that it estimated it owed the United States, since it included both a

10   reduction in revenue resulting from the expected return of the overpayment and an offset

11   for the amount of money that it expected to recover from the incentivized providers,

12   which would have to share a portion of the burden of overpayment.

13   269.   Accordingly, UnitedHealthcare took a liability accrual of $79 million.  It shared

14   this calculation with Deloitte and Touche in connection with that firm's audit of UHG's

15   financial statements, as part of UnitedHealthcare's quarterly RAF Accounting Treatment

16   for Q4 2012 and Risk Adjustment Factor Revenue and Receivable Accounting for 2012.

17   Bill Hnath and Melissa Sedor told UHG's Deloitte auditors that the $79 million liability

18   accrual was "related to overpayments by CMS" that were identified through the RACCR

19   Program.

20   270.   Scott Theisen was aware of the existence of a RACCR liability, and the

21   expectation that UnitedHealthcare would take an accrual for it, at least as early as

22   October 9, 2012, when Melissa Sedor sent him and Bill Hnath an August 2012 RAF

23   Financial Summary showing a $97.5 million exposure (*i.e.*, amount of overpayment to

24   be returned) relating to the RACCR Program for encounters in 2008, 2009, and 2010.

25   271.   In December 2013, Anne Reis, UnitedHealthcare Medicare & Retirement's

26   Associate Director of Revenue, shared risk adjustment accruals with UnitedHealthcare

27   executives, including Scott Theisen, Brian Thompson, Bill Hnath, and Marybeth Meyer.

28   Those accruals included an additional liability accrual of $34.5 million for RACCR

1  overpayments for the 2012 date of service year (2013 payment year), increasing the total

2  liability accrual for the RACCR Program to $90.7 million for the 2008-2012 date of

3  service years (2009-2013 payment years).  In taking a liability accrual for the 2012 date

4  of service year, UnitedHealthcare determined that it was probable that RACCR reviews

5  for the 2012 date of service year would result in the identification of deletes of diagnoses

6  reported by incentivized providers for medical encounters in 2012, as these reviews had

7  done in previous years.

8  272.    The accuracy of the risk adjustment data that UnitedHealthcare and others

9  submitted to CMS on behalf of the Defendant MA Organizations was material to the

10  government's decision to pay and to the amount of risk adjustment payments.  The

11  submission of inaccurate diagnosis data from incentivized providers directly resulted in

12  increases in risk adjustment payments that the Government made to the Defendant MA

13  Organizations.

14  273.    Similarly, when the UHG Management Defendants deleted inaccurate diagnoses –

15  as they did when inaccurate diagnoses were identified in sample RACCR reviews or 100

16  percent reviews under the RACCR Program – the Government was able to offset its

17  subsequent payments to the Defendant MA Organizations by the value of those

18  deletions.  UnitedHealthcare Medicare & Retirement's and Optum's failure to delete

19  unsupported codes because of their failure to conduct or complete 100 percent reviews

20  when their sample reviews identified Provider/HCC combinations with unacceptably

21  high error rates was material because if they had conducted the 100 percent reviews and

22  submitted deletes for the inaccurate diagnosis codes found in those reviews, those

23  deletions would have resulted in further offsets and, thus, reductions of payments to the

24  Defendant MA Organizations.

25        **E.      Defendants Failed To Follow Their Own RACCR Protocol**

26              **Requiring 100 Percent Reviews**

27  274.    As set forth above, the RACCR Program provided that if the sample review of an

28  outlier HCC showed that less than 80 percent of the diagnoses were supported by the

128

1   medical record, the provider would be required to perform a 100 percent review of all

2   instances of that outlier HCC coded by that provider for the date-of-service year at issue.

3   This requirement reflects a recognition by the UHG Managing Defendants that if a

4   provider codes a diagnosis three times as often as the national average rate *and* a sample

5   review shows that more than 1 in 5 diagnoses are not supported by the medical record,

6   then the provider's other uses of the same diagnosis code are highly likely to include

7   invalid diagnoses and must be reviewed for accuracy.  Nonetheless, despite this

8   requirement of the RACCR Program, the UHG Managing Defendants frequently did not

9   require providers to perform 100 percent reviews of problematic HCCs for which sample

10  results showed unacceptably high error rates.

11  275.   Not surprisingly, many providers were very resistant to performing 100 percent

12  reviews.  Sometimes, the providers reviewed the records for only some, but not all,

13  additional beneficiaries for whom they had reported diagnoses mapping to the outlier

14  HCC.  Sometimes, they did nothing.

15  276.   For medical encounters in 2008 to 2010, at least 58 provider groups should have

16  performed 100 percent reviews because they failed the sample validation test for at least

17  one outlier HCC.  Combined, these providers should have conducted 100 percent

18  reviews relating to 192 problematic HCCs.  However, the providers only conducted

19  reviews of 143 of the 192 HCCs.  Thus, a quarter of all outlier HCCs that failed the

20  sample validation test were not further reviewed by either the provider groups or

21  UnitedHealthcare.  Similarly, for 2011 encounters, 100 percent reviews were conducted

22  for only 69 of 82 HCCs that failed Optum's sample validation test.  Because the UHG

23  Managing Defendants did not require provider to perform 100 percent reviews of these

24  high-frequency but low-validating codes, they were able to avoid deleting the invalid

25  codes among them.

26  277.   For example, for 2010 encounters, Edinger Medical Group coded Drug/Alcohol

27  Dependence (HCC 52) at a rate greater than three times the national rate.  Optum (or its

28  predecessor, Ingenix) determined that only 70 percent of the diagnoses in its sample

1  were supported by medical record documentation.  Because 30 percent of the sampled

2  diagnoses were invalid, the UHG Managing Defendants should have required Edinger to

3  review the additional 66 Edinger beneficiaries with a diagnosis mapping to HCC 52 that

4  were not included in the sample (or the UHG Managing Defendants should have

5  performed that review themselves).  Nonetheless, the UHG Managing Defendants did

6  not require Edinger to do this review and they did nothing further to examine Edinger's

7  additional diagnoses mapping to HCC 52 that were not included in the sample.

8  278.   Additional examples of provider groups that failed to conduct 100 percent reviews

9  for particular HCCs are shown in the chart attached as Exhibit 15 to this Complaint.  The

10  UHG Managing Defendants also did not conduct the 100 percent reviews of these

11  problematic HCCs.

12  279.   Moreover, even when a financially incentivized provider group conducted a 100

13  percent review, the UHG Managing Defendants knew they could not rely on the

14  accuracy of that review.  For example, in a draft "WellMed RACCR Audit Status

15  Summary as of 2-9-12" that Mary Hammond circulated to Benjamin Poehling for

16  discussion with John Way in February 2012, Hammond reported that WellMed did a

17  self-audit for eight HCCs, but that the UHG Managing Defendants determined that "70%

18  of the codes [WellMed] indicated were properly documented actually were not supported

19  in the medical record."  Hammond's summary also stated that, based on sample reviews

20  for medical encounters in 2008, 2009, and 2010, "WellMed failed to achieve an

21  acceptable validation rate for multiple HCCs …, as defined by the RACCR audit

22  program policy and procedure."

23              **F.     Even After Identifying Miscoding By Providers,**

24                    **Defendants Failed To Delete Invalid Codes**

25  280.  Even when the UHG Managing Defendants determined that diagnoses in a sample

26  review or 100 percent review were not supported by the medical records,

27  UnitedHealthcare Medicare & Retirement did not always delete them.  For example:

28

130

Exhibit C
Page 161

- For 2008 medical encounters, the UHG Managing Defendants conducted a sample review for Edinger Medical Group of diagnoses mapping to Drug/Alcohol Dependence (HCC 52) and Major Complications of Medical Care & Trauma (HCC 164). Optum's (or Ingenix's) coders determined that "[t]here was no clinical documentation to support the diagnoses" mapping to HCC 52 for six beneficiaries and that the diagnosis mapping to HCC 164 was the "wrong code" for one beneficiary. (For all examples, further information to identify or aid in identifying the beneficiaries will be separately provided to the Defendants.) On January 23, 2013, Mary Hammond recommended to Keith Dobbins and Marybeth Meyer that these results be put "on hold." The UHG Managing Defendants never deleted these codes.

- For 2008 medical encounters, Optum (or its predecessor, Ingenix) conducted a sample review for Family Practice Medical Group's diagnoses mapping to Drug/Alcohol Dependence (HCC 52). For two beneficiaries, Optum's (or Ingenix's) coder concluded there was "no clinical documentation to support the diagnoses." In the Corrective Action Plan for the sample review, the reviewer gave the provider "the benefit of the doubt" for the two diagnoses, despite noting that "if these were submitted for a CMS or OIG audit, they may have been rejected."

- In a sample review for Sharp-Rees Sealy for Vascular Disease (HCC 105) for 2011, the UHG Managing Defendants failed to delete a diagnosis for Beneficiary AA even though Optum's (or Ingenix's) coder, iCodify, determined it was the "wrong code."

- In a sample review for HealthCarePartners for Protein-Calorie Malnutrition (HCC 21) for 2011, the UHG Managing Defendants failed to delete a diagnosis for Beneficiary BB even though Optum's (or Ingenix's) coder, iCodify, determined it was the "wrong code."

131

Exhibit C
Page 162

• In a sample review for Mercy Physicians Medical Group for Protein-Calorie Malnutrition (HCC 21) for 2011, the UHG Managing Defendants failed to delete a diagnosis for Beneficiary CC even though Optum's (or Ingenix's) coders, under the supervision of Tracey Bradberry, an Optum Operations Manager, determined that it was the "wrong code."

• In a sample review for WellMed for Major Complications of Medical Care and Trauma (HCC 164) for 2011, the UHG Managing Defendants did not delete a diagnosis for Beneficiary DD even though Optum's (or Ingenix's) coder noted the "dx [was] not documented" in the record.

• In a sample review for HealthCarePartners for Pneumococcal Pneumonia, Emphysema, Lung Abscess (HCC 112) for 2012, the UHG Managing Defendants did not delete a diagnosis code for Beneficiary EE even though Optum's (or Ingenix's) coder determined the "dx [was] not documented."

• In a sample review for WellMed for Disorders of Immunity (HCC 45) for 2011, the UHG Managing Defendants did not delete a diagnosis code for Beneficiary FF even though Optum's (or Ingenix's) coder determined the diagnosis in the record was "not a current condition."

281. For some providers, the UHG Managing Defendants simply agreed not to delete invalid codes. In January 2013, Keith Dobbins was informed that the UHG Managing Defendants had not yet submitted deletes reflecting invalid codes found in RACCR sample reviews of Edinger and WellMed diagnoses for encounters in 2008, 2009, and 2010. Optum kept those deletes "on hold," meaning that the UHG Managing Defendants did not submit them, despite knowledge that the underlying codes had led to improper payments from CMS.

Exhibit C
Page 163

### G.   UnitedHealthcare Medicare & Retirement Discontinued 100 Percent Reviews And Converted The RACCR Program Into A Revenue Generating Program

282.   By early 2014, UnitedHealthcare Medicare & Retirement knew, based on its observation of the results of the RACCR Program (as set forth above), that many of its large incentivized providers had reported unacceptably high rates of invalid diagnoses for numerous conditions.  However, rather than redoubling its efforts to address invalid coding by incentivized providers, UnitedHealthcare Medicare & Retirement had Optum restructure the RACCR Program to turn it into just another chart review program focused on making ADDS.  By July 2014, Optum made changes to the RACCR Program that effectively terminated the program as a tool for remedying the known problem of invalid coding by incentivized providers and refunding Medicare for risk adjustment payments based on those providers' invalid diagnoses.

283.   First, UnitedHealthcare Medicare & Retirement stopped requiring any 100 percent reviews when the sample reviews failed the 80 percent sample validation test.  At the time it made this decision, it was conducting RACCR sample reviews for 2012 DOS medical encounters.  Accordingly, no 100 percent reviews were conducted for any outlier HCCs associated with 2012 medical encounters.

284.   For 2012 DOS, there were 21 provider groups that had failed the 80 percent sample validation test for at least one outlier HCC.  Optum had determined that the average invalidation rate was 34.73 percent for these 21 providers based on the sample reviews of their outlier HCCs.  The UHG Managing Defendants knew from prior years that 100 percent reviews would result in the identification of more deletes.  Nonetheless, they failed to require 100 percent reviews of the outlier HCCs or perform reviews themselves.

285.   Second, for dates of service years after 2012, the UHG Managing Defendants stopped selecting sample beneficiaries for reviews based on whether the providers had submitted diagnoses for them mapping to outlier HCCs.  Instead, they began selecting

1    beneficiaries and medical records based on what they believed would yield additional

2    codes and result in increased risk adjustment payments.

3    286.   Third, starting with 2013 DOS medical encounters, UnitedHealthcare Medicare &

4    Retirement and Optum reviewed even fewer medical records than in previous years (less

5    than 100 total) for each incentivized provider group.  Thus, they reviewed only several

6    thousand medical records as part of this new program.

7    287.   By making these changes, the UHG Managing Defendants and Optum effectively

8    terminated the RACCR Program as an effort to correct the submission of invalid

9    diagnosis codes.  Instead, they deliberately avoided identifying (and, thus, deleting)

10   invalid diagnoses reported by their financially-incentivized providers and repaying

11   Medicare for risk adjustment payments based on them.

12   288.   Executives at Optum and UnitedHealthcare, including Scott Theisen, Jeff

13   Dumcum, Karen Erickson, Brian Thompson, and Keith Dobbins, were aware that the

14   changes to the RACCR Program for 2013 DOS and future years created a program that

15   no longer targeted outlier HCCs by provider, but instead selected beneficiaries and

16   medical records based on methods that Optum believed would yield additional codes and

17   result in increased risk adjustment payments.  They knew that there was no replacement

18   program put into place to target the outlier HCCs and providers that had previously been

19   identified by the RACCR program. They knew that by stopping its program to look for

20   inaccurate codes, outlier providers who had failed the 80 percent validation tests would

21   continue to submit inaccurate codes to UnitedHealthcare, causing the submission of

22   inaccurate codes to CMS.

23            **H.    RACCR-Related Falsehoods In UnitedHealthcare's And**

24                   **Optum's Attestations**

25   289.   As discussed in more detail below, Defendant UnitedHealthcare, on behalf of the

26   Defendant MA Organizations, submitted a Risk Adjustment Attestation to the Medicare

27   Program each year after the final risk adjustment submission deadline.  *See infra*

28

Exhibit C
Page 165

1  paragraphs 309 to 327.  Defendant Optum approved these Attestations in order for

2  UnitedHealthcare to submit them.  *Id*.

3  290.   In March 2012, Scott Theisen signed an Attestation on behalf of United's

4  Medicare & Retirement health plans certifying to the accuracy of UnitedHealthcare's

5  data for the 2010 date of service year (2011 payment year).  By that date, the members of

6  UHG Management Defendants' RACCR team (including Michael McCarthy, Keith

7  Dobbins, Kim Halva, Benjamin Poehling, and Mary Hammond) knew that the RACCR

8  Program had identified thousands of invalid codes mapping to outlier HCCs from

9  encounters in 2010, that those codes had not yet been deleted, and that efforts were

10  underway to identify the providers that would be required to conduct 100 percent

11  reviews for encounters in 2010 because some of their diagnosis codes did not pass the 80

12  percent sample validation test.

13  291.   In April 2013, Scott Theisen signed an Attestation on behalf of

14  UnitedHealthcare's Medicare & Retirement health plans certifying to the accuracy of

15  UnitedHealthcare's data for the 2011 date of service year (2012 payment year).  By that

16  date, Theisen, along with the members of UHG Management Defendants' RACCR team

17  (including Marybeth Meyer, Keith Dobbins, Kim Halva, Patty Brennan, Benjamin

18  Poehling, and Scott Hughes) knew that the RACCR Program had identified thousands of

19  invalid codes mapping to HCCs from encounters in 2011, that those codes had not yet

20  been deleted, and that efforts were underway to identify the providers that would be

21  required to conduct 100 percent reviews for encounters in 2011 because some of their

22  diagnosis codes did not pass the 80 percent sample validation test.

23  292.   In April 2014, Brian Thompson signed an Attestation on behalf of

24  UnitedHealthcare's Medicare & Retirement health plans certifying to the accuracy of

25  UnitedHealthcare's data for the 2012 date of service year (2013 payment year).  By that

26  date, the members of UHG Management Defendants' RACCR team (including Marybeth

27  Meyer, Keith Dobbins, Kim Halva, Scott Theisen, Scott Hughes, and Tracey Bradberry)

28  knew that the RACCR Program had identified thousands of invalid codes mapping to

Exhibit C
Page 166

1  HCCs from encounters in 2012 through sample reviews, and that those codes had not yet
2  been deleted.  Additionally, Thompson was aware that there was a contra-revenue
3  accrual in the amount of $34.5 million for anticipated RACCR deletes for the 2012 date
4  of service year alone.

5  **IV.   Defendants' False Risk Adjustment Attestations**

6  293.   The UHG Managing Defendants submitted or caused the submission, on behalf of
7  the Defendant MA Organizations, of the annual Risk Adjustment Attestations to the
8  Medicare Program after the final submission deadline but before the final reconciliation
9  payment each year.  Officers of Defendants Ovations and UnitedHealthcare reviewed
10  and signed these Attestations.  Defendant Optum and its predecessor Ingenix reviewed
11  and approved these Attestations.  These Defendants knew that the Defendant MA
12  Organizations were required to submit truthful Risk Adjustment Attestations to the
13  Medicare Program.  Their officers and employees (*e.g.*, Jeffrey Dumcum, Stephanie
14  Will, Jon Bird, Patty Brennan, Rebecca Martin, Scott Theisen, Relator Poehling, Mary
15  Hammond) were aware of the obligations for deleting invalid diagnoses from RAPs or
16  otherwise reporting and repaying risk adjustment overpayments by other means.  Their
17  officers and employees (*e.g.*, Jeffrey Dumcum, Stephanie Will, Jon Bird, Patty Brennan,
18  Rebecca Martin, Scott Theisen, Relator Poehling, Mary Hammond) also knew that, if
19  they deleted or withdrew invalid diagnoses from RAPS prior to the submission of an
20  Attestation, Medicare would not pay for them or would recover any erroneous payments
21  associated with them.  However, Defendants failed to do this and knowingly submitted
22  or caused the submission of false Attestations.  They did this with actual knowledge that
23  the Attestations were false or acted in deliberate ignorance or reckless disregard of the
24  falsity of the Attestations.

25  294.   Starting with the Attestation for payment year 2008 (if not for earlier Attestations)
26  and continuing forward, attorneys for one or more of the UHG Managing Defendants
27  added a footnote to the Attestations which stated that the Attestations were "based on
28  facts reasonably available or made available to" the Defendant MA Organizations as of

<div align="center">136</div>

1   the date of the Attestations.  Optum and its predecessor Ingenix knew about this footnote

2   because its senior management, including Karen Erickson, Jeff Dumcum and Scott

3   Theisen, reviewed the Attestations and approved them prior to their submission to the

4   Medicare Program.  The officers of Ovations and UnitedHealthcare who signed the

5   Attestations also knew about this footnote.  Even without this footnote, the Attestations

6   themselves state that they must be made based on information available to the MA

7   Organizations:  "Based on best knowledge, *information*, and belief as of the date

8   indicated below, all information submitted to CMS in such report [*i.e.*, the risk

9   adjustment data reported for the payment year at issue] and not subsequently deleted

10  prior to the date hereof is accurate, complete, and truthful."  (Emphasis added).

11  295.   Information and facts reasonably available or made available to the Defendant

12  MA Organizations and the groups and entities that managed them at the time the

13  Attestations were submitted included the results of the medical record reviews conducted

14  as part of the Chart Review, Claims Verification, and RACCR Programs.  In particular,

15  the results of the Chart Review Program were available before the final submission

16  deadline each year as the Chart Review Program ended when additional diagnoses could

17  no longer be submitted.  Thus, the results of the Chart Review Program were

18  "information" and "facts reasonably available" before Ingenix and Optum approved the

19  Attestations and before Ovations and UnitedHealthcare executed and submitted the

20  Attestations to CMS on behalf of the Defendant MA Organizations.  However, these

21  Defendants knowingly failed to delete numerous diagnoses that they had previously-

22  submitted that were unsupported and invalidated by their own chart reviews.

23  **A.     Defendants' Internal Attestation Approval Process**

24  296.   Generally, the Chief Financial Officers of the groups with responsibility for

25  managing the Defendant MA Organizations owned by UHG were the officers designated

26  to sign and execute the annual Risk Adjustment Attestations on behalf of the Defendant

27  MA Organizations.  Over the relevant time period, these groups included, but were not

28  limited to, Secure Horizons, the Public & Seniors Markets Group, Ovations,

137

UnitedHealthcare Medicare & Retirement, and UnitedHealthcare Community & States. They were "responsible for establishing and maintaining adequate internal controls over completion of attestations" submitted to the Medicare Program.  They used a form to "confirm that the appropriate legal, regulatory, and business owners" reviewed and approved the attestations.  *Id*.  These legal, regulatory, and business owners were required to sign Internal Approval Forms in order for the designated officials to sign the Risk Adjustment Attestations.

297.   Part C regulation, 42 C.F.R. § 422.504(1), and the agreements between the MA Organizations and CMS required that this internal approval process include any related entity, contractor or subcontractor of the Defendant MA Organizations that generated or submitted risk adjustment data on their behalf.  Furthermore, if a related entity generated data relating to an MA Organization's claims for payments from the Medicare Program, the related entity (as well as the MA Organization) must certify the accuracy and truthfulness of the data.  *Id*. at § 422.504(l)(3).  The contracts stated:  "If such risk adjustment data are generated by a related entity, contractor, or subcontractor of an MA Organization, such entity, contractor, or subcontractor must also attest to (*based on best knowledge, information, and belief, as of the date specified on the attestation form*) the accuracy, completeness, and truthfulness of the data."  *See* Exhibits 1-7, attached hereto (Article IV, Section D.2).  Optum (and its predecessor, Ingenix), Ovations, and UnitedHealthcare Medicare &Retirement understood this requirement as shown by the previously-described MOU that obligated Optum to attest to the validity of the risk adjustment data that it submitted to the Medicare Program on behalf of the Defendant MA Organizations.  *See supra* paragraphs 83-86.

298.   During the time period relevant to this Complaint, the "business owners" that signed off on the Internal Approval Forms were executives of Optum and Ingenix.  One of these business owners was Jeffrey Dumcum, who ran the Risk Adjustment Group at Ingenix and then Optum.  Dumcum's internal attestations stated that he had reviewed the content of the Risk Adjustment Attestations to be submitted by the managing entity (e.g.,

1  Ovations or UnitedHealthcare) to the Medicare Program and confirmed that the

2  Attestations were factually accurate.  For example, on March 26, 2010,  Dumcum sent an

3  email to Emily Vue, a Senior Regulatory Affairs Analyst for "Ovations – PSMG,

4  UnitedHealth Group, Inc.," stating that he approved the Risk Adjustment Attestation for

5  John Larsen, the Chief Financial Officer of the Ovation Public & Senior Markets Group,

6  to submit to Medicare for payment year 2009.  On March 24, 2011, Dumcum sent an

7  email to Barbara Carlson, a Senior Regulatory Affairs Analyst for UnitedHealthcare

8  Medicare & Retirement, stating that he approved the Risk Adjustment Attestation for

9  Scott Theisen, the Chief Financial Officer of UnitedHealthcare Medicare & Retirement,

10  to submit to Medicare for payment year 2010.  On March 8, 2012, Dumcum sent an

11  email to Sandy Rick, a Senior Regulatory Affairs Analyst for UnitedHealthcare

12  Medicare & Retirement, stating that he approved the Risk Adjustment Attestation for

13  Mr. Theisen to submit to Medicare for payment year 2011.

14  299.   Mr. Dumcum approved the Larsen and Theisen Risk Adjustment Attestations after

15  reviewing them and the footnotes added by the attorneys to them, including the footnote

16  stating that the Attestations were based on information available to the Defendant MA

17  Organizations about the accuracy and truthfulness of the diagnosis data that was

18  submitted on their behalf to the Medicare Program for risk adjustment payments.

19  However, Dumcum deliberately ignored or recklessly disregarded information available

20  to the Defendant MA Organizations and the entities that managed them (including

21  Ovations, UnitedHealthcare, Ingenix, and Optum, depending on the time period) about

22  invalid diagnoses, that is, he deliberately ignored and recklessly disregarded the negative

23  results of the medical record reviews conducted as part of the Chart Review, Claims

24  Verification, and RACCR Programs.  Accordingly, Dumcum, as a senior executive of

25  Defendant Optum (and its predecessor, Ingenix), caused false Risk Adjustment

26  Attestations to be submitted to the Medicare Program.

27  300.   For example, in March 2010, when Dumcum approved the Larsen Attestation for

28  payment year 2009, his Risk Adjustment Group at Ingenix possessed information about

Exhibit C
Page 170

1    the negative results of the Chart Review Program focused on the review of medical

2    records for medical encounters in date of service year 2008.  Also, in March 2010,

3    Dumcum knew (or deliberately ignored or recklessly disregarded) that the managing

4    entities were not deleting or withdrawing the diagnoses unsubstantiated and invalidated

5    by those chart reviews.  At that time, Dumcum also knew (or deliberately ignored or

6    recklessly disregarded) that these managing entities and the MA Organizations had an

7    obligation to delete or withdraw those invalid diagnoses.  In fact, in 2009 prior to

8    Dumcum's approval of the Larsen Attestation, Dumcum knew that his Risk Adjustment

9    Group had already started discussing "looking both ways" at the results of chart reviews

10   and the methodology to do so in order to make DELETES as well as ADDS.  *See supra*

11   paragraphs 180-182.  Nonetheless, Dumcum signed the Internal Approval Form and

12   caused Larsen to submit a false Attestation to the Medicare Program.

13   301.   As another example, in March 2011, when Dumcum approved the Theisen

14   Attestation for payment year 2010, his Risk Adjustment Group at Optum possessed

15   information about the negative results of the Chart Review Program focused on the

16   review of medical records for medical encounters in date of service year 2009.  Also, in

17   March 2011, Dumcum knew (or deliberately ignored or recklessly disregarded) that

18   neither Optum nor UnitedHealthcare were deleting or withdrawing the diagnoses

19   invalidated by those chart reviews because they were not supported by the beneficiaries'

20   medical records.  At that time, Dumcum also knew (or deliberately ignored or recklessly

21   disregarded) that both UnitedHealthcare and Optum had an obligation to delete or

22   withdraw those invalid diagnoses.  In fact, in the fall of 2010 prior to Dumcum's

23   approval of the Theisen Attestation, Dumcum knew that senior executives of Ingenix and

24   Ovations had already acknowledged that they should be "looking both ways" at the

25   results of the chart reviews to make DELETES as well as ADDS.  *See supra* paragraphs

26   185 and 196-198.  In December 2010, the results of the first pilot phase (Phase I) of the

27   Claims Verification Program, which showed that provider-reported diagnoses were

28   unsupported for over 50 percent of the medical records reviewed, were also known by or

140

1  available to Dumcum.  *See supra* paragraph 206.  Nonetheless, Dumcum signed the
2  Internal Approval Form and caused Theisen to submit a false Attestation to the Medicare
3  Program.

4  302.   In addition, in March 2012, when Dumcum approved the Theisen Attestation for
5  payment year 2011, his risk adjustment group at Optum possessed information about the
6  negative results of the Chart Review Program focused on the review of medical records
7  for medical encounters in date of service year 2010.  Also, in March 2012, Dumcum
8  knew (or deliberately ignored or recklessly disregarded) that neither Optum nor
9  UnitedHealthcare were deleting or withdrawing the diagnoses invalidated by those chart
10  reviews, *i.e.*, those diagnoses not supported by the beneficiaries' medical records.  At
11  that time, Dumcum also knew (or deliberately ignored or recklessly disregarded) that
12  both UnitedHealthcare and Optum had an obligation to delete or withdraw those invalid
13  diagnoses but were not doing so.  In fact, by the time that Dumcum approved Theisen's
14  Attestation in March 2012, Optum had completed the second pilot phase (Phase II) of the
15  Claims Verification Program on 17,398 charts and the results were striking.  Optum
16  identified 4,786 invalid diagnoses to be deleted, which was greater than the number of
17  additional diagnoses (ADDS) identified by the coders based on their review of the same
18  medical records.  And, as previously stated, in February 2012, Dumcum, who was
19  responsible for the Claims Verification Program, met with Relator Poehling and Theisen
20  and reported:  "I'm deleting as much as I'm adding at the end of the day.  And I don't
21  know if—you know, what I want to do."  He also stated:  "we're getting more and more
22  red here," and that Claims Verification "eats in very substantially" to the revenue from
23  ADDS from chart reviews.  Nonetheless, Dumcum signed the Internal Approval Form
24  and caused Theisen to submit a false Attestation.

25  303.   Another "business owner" who executed the Internal Approval Form was Karen
26  Erickson, an Executive Vice President of Optum.  On April 3, 2013, Erickson approved
27  Risk Adjustment Attestations for Scott Theisen, the Chief Financial Officer of
28  UnitedHealthcare Medicare & Retirement, and Paul Balthazor, the Chief Financial

141

1   Officer of UnitedHealthcare Community & State, to submit to Medicare for payment
2   year 2012.  Erickson's internal attestation stated that she had reviewed the content of the
3   Theisen and Balthazor Risk Adjustment Attestations and confirmed that the Attestations
4   were factually accurate.  Because she reviewed these Risk Adjustment Attestations she
5   knew about the footnotes that UnitedHealthcare included in the Attestations, stating that
6   the Attestations were based on information available to the Defendant MA
7   Organizations.  In April 2013, Erickson knew (or deliberately ignored or recklessly
8   disregarded) that this information included the negative results of the Chart Reviews
9   focused on the review of medical records for medical encounters in date of service year
10  2011.  Also, in April 2013, Erickson knew (or deliberately ignored or recklessly
11  disregarded) that neither Optum nor UnitedHealthcare were deleting or withdrawing all
12  of the diagnoses invalidated by those chart reviews because they were not supported by
13  the beneficiaries' medical records.  At that time, Erickson also knew (or deliberately
14  ignored or recklessly disregarded) that both UnitedHealthcare and Optum had an
15  obligation to delete or withdraw all invalid diagnoses.  In addition, prior to approving the
16  Attestations in 2013, Erickson, who was part of the team that developed the operational
17  plan for Claims Verification, knew and was concerned about the error rates based on
18  chart reviews conducted as part of the Claims Verification Program.  Nonetheless,
19  Erickson signed the Internal Approval Forms and caused Theisen and Balthazor to
20  submit false Attestations.
21  304.   In addition, on April 17 and 21, 2014, Erickson approved Risk Adjustment
22  Attestations for Brian Thompson, the Chief Financial Officer of UnitedHealthcare
23  Medicare & Retirement, and for Paul Balthazor, the Chief Financial Officer of
24  UnitedHealthcare Community & State, to submit to Medicare for payment year 2013.
25  Erickson's internal attestation stated that she reviewed the content of the Thompson and
26  Balthazor Risk Adjustment Attestations and confirmed that the Attestations were
27  factually accurate.  Because she reviewed these Risk Adjustment Attestations she knew
28  about the footnotes that UnitedHealthcare included in the Attestations, stating that the

142

1  Attestations were based on information available to the Defendant MA Organizations.
2  In April 2014, Erickson knew (or deliberately ignored or recklessly disregarded) that this
3  information included the negative results of the Chart Reviews focused on the review of
4  medical records for medical encounters in date of service year 2012. Also, in April
5  2014, Erickson knew (or deliberately ignored or recklessly disregarded) that neither
6  Optum nor UnitedHealthcare were deleting or withdrawing all of the diagnoses
7  invalidated by those chart reviews because they were not supported by the beneficiaries'
8  medical records. At that time, Erickson also knew (or deliberately ignored or recklessly
9  disregarded) that both UnitedHealthcare and Optum had an obligation to delete or
10 withdraw all invalid diagnoses. Nonetheless, Erickson signed the Internal Approval
11 Forms and caused Thompson and Balthazor to submit false Attestations.
12 305.   During the time period relevant to this Complaint, one of the "regulatory owners"
13 that executed the Internal Approval Form was David Walsh, the Senior Director of
14 Regulatory Affairs for UnitedHealthcare. He attested that he had reviewed the content
15 of the Risk Adjustment Attestation "to confirm that it complies with applicable
16 *regulatory* requirements and determined that it is appropriate for the designated
17 executive to proceed with signature." However, Walsh deliberately ignored or recklessly
18 disregarded the negative results of the Chart Review Program. He also ignored and
19 disregarded that Defendants had failed to comply with the requirements that diagnoses
20 must be supported by patients' medical records and those diagnoses that are not
21 supported by the patients' medical records must be deleted from RAPS or otherwise
22 reported to CMS and corrected to repay or avoid any overpayment.
23 306.   During the time period relevant to this Complaint, one of the "legal owners" that
24 executed the Internal Approval Form was UnitedHealthcare's Senior General Counsel
25 Keith Dobbins. For example, on March 26, 2010, Dobbins approved the Risk
26 Adjustment Attestation for John Larsen to submit to the Medicare Program for payment
27 year 2009. Dobbins attested that he had reviewed the content of the Risk Adjustment
28 Attestation to confirm that it complied with "applicable *legal* requirements" and was

143

Exhibit C
Page 174

"appropriate" for Larsen to sign.  (emphasis in the original).  As another example, on

March 25, 2011, Dobbins approved the Risk Adjustment Attestation for Scott Theisen,

the Chief Financial Officer of UnitedHealthcare Medicare & Retirement, to submit to the

Medicare Program for payment year 2010.  Again, Dobbins attested that he reviewed the

content of the Attestation to confirm that it complied with "applicable legal

requirements" and was "appropriate" for Theisen to submit to the Medicare Program for

payment year 2011.  In addition, on March 9, 2012, Dobbins approved the Risk

Adjustment Attestation for Scott Theisen, the Chief Financial Officer of

UnitedHealthcare Medicare & Retirement, to submit to the Medicare Program for

payment year 2011.  Again, Dobbins attested that he reviewed the content of the

Attestation to confirm that it complied with "applicable legal requirements" and was

"appropriate" for Theisen to submit to the Medicare Program for payment year 2011.

On April 30, 2014, Dobbins also approved the Risk Adjustment Attestation for Brian

Thompson, the Chief Financial Officer of UnitedHealthcare Medicare & Retirement, to

submit to Medicare for payment year 2013.  Again, Dobbins attested that he reviewed

the content of the Attestation to confirm that it complied with "applicable legal

requirements" and was "appropriate" for Theisen to submit to the Medicare Program for

payment year 2011.  On information and belief, Dobbins approved other Risk

Adjustment Attestations for other payment years and attested to their accuracy.

307.   Each time Dobbins approved the Attestations, he knew (or deliberately ignored or

recklessly disregarded) that information available to the Defendant MA Organizations

included the negative results of the chart reviews for the date of service years at issue.

Also, he knew (or deliberately ignored or recklessly disregarded) that neither

Ingenix/Optum nor Ovations/UnitedHealthcare (depending on the time period) were

deleting or withdrawing all of the diagnoses invalidated by those chart reviews because

they were not supported by the beneficiaries' medical records.  At that time, he also

knew (or deliberately ignored or recklessly disregarded) that both Ingenix/Optum and

Ovations/UnitedHealthcare had an obligation to delete or withdraw all invalid diagnoses.

144

308.   During the years relevant to his approvals, Dobbins was a member of
UnitedHealthcare's Risk Adjustment Compliance Oversight Committee and Optum's
Clinical Programs and Compliance Oversight Committee.  During those years, Dobbins
also attended various meetings involving the work that Ingenix and then Optum
performed for Ovations and then UnitedHealthcare.  As a member of these committees
and a participant in these meetings, Dobbins was included in numerous discussions
about the validity of the risk adjustment data submitted to the Medicare Program, the
Chart Review Program, the development and results of the Claims Verification Program,
and the RACCR Program.  Dobbins was also one of the individuals who was responsible
for reviewing quarterly compliance scorecards that included detailed information about
the Chart Review, Claims Verification, and RACCR Programs.  Despite these
compliance responsibilities and this knowledge, Dobbins ignored and disregarded that
Ovations, UnitedHealthcare, Optum, and Ingenix had failed to comply with the
requirements that diagnoses must be supported by patients' medical records and that
diagnoses unsupported by patients' medical records must be deleted from RAPS or
otherwise reported to CMS and corrected to repay or avoid any overpayments.

**B.    The False Attestations Submitted To The Government**

309.   On March 19, 2009, John Way executed and submitted or caused to be submitted
to the Medicare Program an "Attestation of Risk Adjustment Data Information Relating
to CMS Payment to a Medicare Advantage Organization."  He submitted this Attestation
"[o]n behalf of the UnitedHealth Group entities listed in Attachment 1."  This Attestation
related to risk adjustment data, that is, diagnoses, which Ovations and/or
UnitedHealthcare and Ingenix submitted on behalf of many of the Defendant MA
Organizations for risk adjustment payments for payment year 2008.  *See* Exhibit 16,
attached hereto.  The Risk Adjustment data, that is, the diagnoses, were related to
medical encounters that occurred in date of service year 2007.  Way signed the
Attestation as "Chief Financial Officer, SecureHorizons."  At this time, March 2009,
SecureHorizons was an internal group within Ovations or UnitedHealthcare.  Way added

145

Exhibit C
Page 176

1  a footnote to the Attestation which stated that the Attestation was "based on facts
2  reasonably available or made available to the MA Organization as of the date of" the
3  Attestation.  The Attestation itself said it was made based on information available to the
4  MA Organizations.  In March 2009, information and facts reasonably available to the
5  Defendant MA Organizations, Ovations and/or UnitedHealthcare, and Ingenix included
6  the negative results of the Chart Review Program for 2007 date of service medical
7  encounters.

8  310.   In March 2009, when Way signed the Attestation, he deliberately ignored or
9  recklessly disregarded the negative results of the Chart Review Program relating to
10  medical encounters with 2007 dates of service.  Way also ignored and disregarded that
11  Defendants had failed to comply with the requirements that diagnoses must be supported
12  by patients' medical records and those diagnoses that are not supported by patients'
13  medical records are invalid and must be deleted from RAPS or otherwise reported to
14  CMS and corrected to repay or avoid any overpayment.  In addition, at this time, Relator
15  Poehling was a direct report to Way, Relator Poehling and Way had numerous
16  conversations about risk adjustment programs, and Relator Poehling voiced his concerns
17  to Way about Ovations failure to "look both ways" at the results of medical record
18  reviews conducted as part of the Chart Review Program.

19  311.   On March 18, 2009, Kara Rios executed and submitted or caused to be submitted
20  to the Medicare Program an "Attestation of Risk Adjustment Data Information Relating
21  to CMS Payment to a Medicare Advantage Organization."  She submitted this
22  Attestation "[o]n behalf of the UnitedHealth Group entities listed in Attachment 1."  This
23  Attestation related to Risk Adjustment data, that is, diagnoses, that Ovations (or the
24  group known as AmeriChoice, which, on information and belief, was located within
25  Ovations at this time) and Ingenix submitted on behalf of certain Defendant MA
26  Organizations for Risk Adjustment payments for payment year 2008.  The Risk
27  Adjustment data, that is, the diagnoses, were related to medical encounters that occurred
28  in date of service year 2007.  Rios signed the Attestation as "Chief Financial Officer,

146

AmeriChoice." Rios added a footnote to the Attestation which stated that the Attestation
was "based on facts reasonably available or made available to the MA Organization as of
the date of" the Attestation. The Attestation itself said it was made based on information
available to the MA Organizations. In March 2009, information and facts reasonably
available to all Defendants included the negative results of the Chart Review Program.

312. On March 2, 2009, Jonathan Bunker executed and submitted or caused to be
submitted to the Medicare Program an "Attestation of Risk Adjustment Data Information
Relating to CMS Payment to a Medicare Advantage Organization." He submitted this
Attestation "[o]n behalf of Sierra Health and Life Insurance Company, Inc.," a
Defendant MA Organization. This Attestation was for payment year 2008. The Risk
Adjustment data, that is, the diagnoses, were related to medical encounters that occurred
in date of service year 2007. Bunker signed the Attestation as President of Sierra Health
and Life Insurance Company, Inc. At this time, March 2009, Sierra Health and Life
Insurance Company, Inc. was an MA Organization owned by UHG and managed by
UnitedHealthcare. The Attestation was submitted to the Medicare Program by Shelly
Cranley, the Director of Regulatory Affairs for UnitedHealthcare.

313. On March 2, 2009, Jonathan Bunker executed and submitted or caused to be
submitted to the Medicare Program another "Attestation of Risk Adjustment Data
Information Relating to CMS Payment to a Medicare Advantage Organization." He
submitted this Attestation "[o]n behalf of Health Plan of Nevada, Inc.," a Defendant MA
Organization, and its MA Plans. This Attestation was for payment year 2008. The Risk
Adjustment data, that is, the diagnoses, were related to medical encounters that occurred
in date of service year 2007. Bunker signed the Attestation as President of Health Plan
of Nevada, Inc. At this time, March 2009, Health Plan of Nevada, Inc. was an MA
Organization owned by UHG and managed by UnitedHealthcare. The Attestation was
submitted to the Medicare Program by Shelly Cranley, the Director of Regulatory
Affairs for UnitedHealthcare.

Exhibit C
Page 178

314.   On March 19, 2009, Justin Roth executed and submitted or caused to be submitted to the Medicare Program another "Attestation of Risk Adjustment Data Information Relating to CMS Payment to a Medicare Advantage Organization."  This Attestation was for payment year 2008.  The Risk Adjustment data, that is, the diagnoses, were related to medical encounters that occurred in date of service year 2007.  Roth signed the Attestation as "Chief Financial Officer of Evercare" and stated that the Attestation was signed "[o]n behalf of the UnitedHealth Group entities listed in Attachment 1," which included various Defendant MA Organizations, including many United Healthcare Insurance Company MA Organizations, Oxford Health Plans of New Jersey, Inc., and Evercare of Texas.  At this time, March 2009, these MA Organizations were owned by UHG and managed by UnitedHealthcare.  The Attestation stated that it was based on information and facts reasonably available or made available to the MA Organizations listed in Attachment 1 at the time the Attestation was submitted.

315.   On March 26, 2010, John Larsen executed and submitted or caused to be submitted to CMS an "Attestation of Risk Adjustment Data Information Relating to CMS Payment to a Medicare Advantage Organization."  He submitted this Attestation "[o]n behalf of the UnitedHealth Group entities listed in Attachment 1."  These entities included numerous Defendant MA Organizations.  This Attestation related to Risk Adjustment data, that is, diagnoses, that Optum (or its predecessors Ingenix) and Ovations and/or UnitedHealthcare submitted on behalf of these MA Organizations to Medicare for Risk Adjustment payments for payment year 2009.  *See* Exhibit 17, attached hereto.  The Risk Adjustment data, that is, the diagnoses, were related to medical encounters that occurred in date of service year 2008.  Larsen signed the Attestation as "Chief Financial Officer, Public & Senior Markets Group."  At this time, the Public & Senior Markets Group included Ovations.  Larsen added a footnote to his Risk Adjustment Attestation which stated that the Attestation was "based on facts reasonably available or made available to the MA Organization as of the date of" the Attestation.  The Attestation itself stated that it was based on information available to the

148

1    MA Organizations.  In March 2010, information and facts reasonably available to the

2    Defendant MA Organizations included the negative results of the Chart Review Program

3    relating to medical encounters that occurred in 2008.

4    316.   When Larsen signed the Attestation, he deliberately ignored or recklessly

5    disregarded the negative results of the Chart Review Program.  Larsen also ignored or

6    disregarded that Defendants had failed to comply with the requirements that diagnoses

7    must be supported by patients' medical records and that diagnoses that are not supported

8    by patients' medical records are invalid and must be deleted from RAPS or otherwise

9    reported to CMS and corrected to repay or avoid any overpayment.  During the relevant

10   time period, Larsen was involved in meetings concerning the Chart Review Program and

11   knew that the Public & Senior Markets Group could have "looked both ways" at the

12   results of the chart reviews but was not doing so and, thus, that the Public & Senior

13   Markets Group was not reporting to CMS those provider-reported codes that were not

14   supported by the beneficiaries' medical records.

15   317.   On March 25, 2011, Scott Theisen executed and submitted or caused to be

16   submitted to CMS an "Attestation of Risk Adjustment Data Information Relating to

17   CMS Payment to a Medicare Advantage Organization."  He submitted this Attestation

18   "[o]n behalf of the UnitedHealth Group entities listed in Attachment 1."  This Attestation

19   related to Risk Adjustment data, that is, diagnoses, that UnitedHealthcare and Optum (or

20   its predecessor Ingenix) submitted on behalf of numerous Defendant MA Organizations

21   to Medicare for risk adjustment payments for payment year 2010.  *See* Exhibit 18,

22   attached hereto.  The risk adjustment data, that is, the diagnoses, were related to medical

23   encounters that occurred in date of service year 2009.  Theisen signed the Attestation as

24   "Chief Financial Officer, UnitedHealthcare Medicare & Retirement."  Theisen added a

25   footnote to his Risk Adjustment Attestation which stated that the Attestation was "based

26   on facts reasonably available or made available to the MA Organization as of the date

27   of" the Attestation.  The Attestation itself stated that it was made based on information

28   available to the Defendant MA Organizations.  In March 2011, information and facts

149

Exhibit C
Page 180

reasonably available to the Defendant MA Organizations, UnitedHealthcare, and Optum (or its predecessor, Ingenix) included the negative results of the Chart Review Program relating to medical encounters in 2009.

318.   On March 9, 2012, Scott Theisen executed and submitted or caused to be submitted to CMS an "Attestation of Risk Adjustment Data Information Relating to CMS Payment to a Medicare Advantage Organization."  He submitted this Attestation "[o]n behalf of the UnitedHealth Group entities listed in Attachment 1."  This Attestation related to Risk Adjustment data, that is, diagnoses, that UnitedHealth and Optum submitted to on behalf of numerous MA Organizations to Medicare for risk adjustment payments for payment year 2011.  *See* Exhibit 19, attached hereto.  The risk adjustment data, that is, the diagnoses, were related to medical encounters that occurred in date of service year 2010.  Theisen signed the Attestation as "Chief Financial Officer, UnitedHealthcare Medicare & Retirement.  The Attestation stated that it was based on information available to the MA Organizations.  It also included a footnote that stated the Attestation was "based on facts reasonably available or made available to the MA Organization as of the date" of the Attestation.  In March 2012, information and facts reasonably available to all Defendants included the negative results of the medical record reviews conducted as part of the Chart Review Program for payment year 2011 (date of service year 2010).

319.   On April 9, 2013, Scott Theisen executed and submitted or caused to be submitted to CMS an "Attestation of Risk Adjustment Data Information Relating to CMS Payment to a Medicare Advantage Organization."  He submitted this Attestation "[o]n behalf of the UnitedHealth Group entities listed in Attachment A."  This Attestation related to Risk Adjustment data, that is, diagnoses, that UnitedHealthcare and Optum submitted on behalf of numerous MA Organizations to Medicare for risk adjustment payments for payment year 2012.  *See* Exhibit 20, attached hereto.  The risk adjustment data, that is, the diagnoses, were related to medical encounters that occurred in date of service year 2011.  Theisen signed the Attestation as "Chief Financial Officer, UnitedHealthcare

150

1   Medicare & Retirement." The Attestation stated that it was based on information

2   available to the MA Organizations and also included a footnote stating that the

3   Attestation was "based on facts reasonably available or made available to the MA

4   Organization as of the date of" the Attestation. In March 2013, information and facts

5   reasonably available to the MA Organizations, UnitedHealthcare, and Optum included

6   the negative results of the medical record reviews conducted as part of the Chart Review

7   Program for payment year 2012 (date of service year 2011).

8   320.   Each time Theisen signed the Attestations, he deliberately ignored or recklessly

9   disregarded the negative results of the Chart Review Program for the 2010, 2011, and

10  2012 payment years and 2009, 2010, and 2011 date of service years at issue. Theisen

11  also ignored or disregarded that the Defendant MA Organizations, UnitedHealthcare,

12  and Optum (or its predecessor, Ingenix) had failed to comply with the requirements that

13  diagnoses must be supported by patients' medical records and that those diagnoses that

14  are not supported by patients' medical records are invalid and must be deleted from

15  RAPS or otherwise reported to CMS and corrected to repay or avoid any overpayments.

16  321.   During the years in which he was Chief Financial Officer of UnitedHealthcare

17  Medicare & Retirement and approved the Attestations, Theisen was co-chair and

18  business lead of UnitedHealthcare Medicare & Retirement's Financial Compliance

19  Oversight Committee. He also attended quarterly meetings with UnitedHealthcare

20  Medicare & Retirement's Compliance Committee, comprised of UnitedHealthcare

21  Medicare & Retirement's executive leadership team; Executive Steering Committee

22  meetings; and meetings to identify and evaluate corporate risks. As a member of these

23  committees, a participant in these meetings, and in fulfilling his duties as

24  UnitedHealthcare Medicare & Retirement's Chief Financial Officer, Theisen was

25  involved in discussions about the Chart Review Program, the implementation and results

26  of the Claims Verification Program, and the RACCR Program. During this time period,

27  Theisen had authority to make decisions on behalf of UnitedHealthcare, including how

28  much to spend on the Chart Review Program, how many charts to include in the Chart

151

1   Review Program, and whether to submit DELETES based on information available to

2   UnitedHealthcare.  He also had authority to make similar decisions about the RACCR

3   Program.

4   322.   In addition, Theisen was aware of the significant number of invalid provider-

5   reported diagnoses based on the results of the Chart Review and Claims Verification

6   Programs.  For example, when Theisen executed the Risk Adjustment Attestation in

7   March 2011, the results of the first pilot phase (Phase I) of the Claims Verification

8   Program were available.  As previously explained, those results showed that provider-

9   reported diagnoses were unsupported for over 50 percent of the medical records

10  reviewed.  *See supra* paragraph 206.  As another example, in February 2012 prior to his

11  signing the March 2012 Attestation, Theisen (as well as Dumcum and Relator Poehling)

12  had actual knowledge of the strikingly negative results of the Claims Verification Phase

13  II pilot program showing that there were more DELETES than ADDS.  *See supra*

14  paragraph 158.  In addition, on April 3, 2013, when Theisen executed and submitted the

15  Risk Adjustment Attestations for payment year 2012, the information available to the

16  Defendants MA Organizations, UnitedHealthcare Medicare & Retirement (including

17  Theisen), and Optum included the results of the chart reviews for 2011 dates of service,

18  which showed that they had submitted at least 100,000 diagnoses that were invalid, but

19  had not been deleted (and never were deleted).  *See supra* paragraph 235.  Yet, Theisen

20  attested that these invalid diagnoses were accurate and truthful.

21  323.   On March 25, 2011, Brian Thompson, the Chief Financial Officer of

22  UnitedHealthcare Community & State, executed and submitted or caused to be

23  submitted an "Attestation of Risk Adjustment Data Information Relating to CMS

24  Payment to a Medicare Advantage Organization."  He submitted this Attestation on

25  behalf of "the UnitedHealth Group entities listed in Attachment 1."  This Attestation

26  related to risk adjustment data, that is, diagnoses, that UnitedHealthcare and Optum (or

27  its predecessor, Ingenix) submitted on behalf of certain of the Defendant MA

28  Organizations to Medicare for payment year 2010.  The data related to the 2009 date of

Exhibit C
Page 183

service year.  The Attestation as based on information and facts reasonably available to the MA Organizations, including the negative results of the Chart Review Program based on medical record reviews for date of service year 2009.  Information and facts available to the MA Organizations, UnitedHealthcare, and Optum (or its predecessor, Ingenix) included the results of the medical record reviews conducted as part of the Chart Review Program for medical encounters during the 2009 date of service year.  However, Thompson and these Defendants deliberately ignored or recklessly disregarded the negative results of these chart reviews.  They also ignored or disregarded that the Defendant MA Organizations, UnitedHealthcare, and Optum (or its predecessor, Ingenix) had failed to comply with the requirements that diagnoses must be supported by patients' medical records and that those diagnoses that are not supported by patients' medical records are invalid and must be deleted from RAPS or otherwise reported to CMS and corrected to repay or avoid any overpayments.

324.   On March 29, 2012, Paul Balthazor, the Chief Financial Officer of UnitedHealthcare Community & State, executed and submitted or caused to be submitted an "Attestation of Risk Adjustment Data Information Relating to CMS Payment to a Medicare Advantage Organization."  He submitted this Attestation on behalf of "the UnitedHealth Group entities listed in Attachment 1."  This Attestation related to risk adjustment data, that is, diagnoses, that UnitedHealthcare and Optum (or its predecessor, Ingenix) submitted on behalf of certain of the Defendant MA Organizations to Medicare for payment year 2011.  The data related to 2010 date of service year.  The Attestation was based on information and facts reasonably available to the MA Organizations, UnitedHealthcare, and Optum including the negative results of the medical record reviews conducted as part of the Chart Review Program for the 2010 date of service year.  However, Balthazor and these Defendants deliberately ignored or recklessly disregarded the negative results of these chart reviews.  They also ignored or disregarded that the Defendant MA Organizations, UnitedHealthcare, and Optum had failed to comply with the requirements that diagnoses must be supported by patients'

Exhibit C
Page 184

1    medical records and that those diagnoses that are not supported by patients' medical

2    records are invalid and must be deleted from RAPS or otherwise reported to CMS and

3    corrected to repay or avoid any overpayments.  In April 2013, Balthazor also executed

4    the Risk Adjustment Attestation for the MA Organizations managed by

5    UnitedHealthcare Community & State for payment year 2012 (date of service year

6    2011).  For this year too, Balthazor and the Defendant MA Organizations,

7    UnitedHealthcare, and Optum ignored the results of the chart reviews and their

8    obligations to delete invalid diagnoses.

9    325.   On April 30, 2014, Brian Thompson executed and submitted or caused to be

10   submitted Risk Adjustment Attestations on behalf of all of the Defendant MA

11   Organizations managed by UnitedHealthcare Medicare & Retirement at that time.  (On

12   the same date, Paul Balthazor executed and submitted or caused to be submitted Risk

13   Adjustment Attestations on behalf of all Defendant MA Organizations managed by

14   UnitedHealthcare Community & State at the time.)  An example of one of Thompson's

15   Attestations includes the Attestation he submitted "[o]n behalf of the UnitedHealth of

16   California."  *See* Exhibit 21, attached hereto.  This Attestation related to risk adjustment

17   data, that is, diagnoses, which UnitedHealthcare and Optum submitted on behalf of

18   UnitedHealthcare of California to the Government for risk adjustment payments for

19   payment year 2013.  The risk adjustment data, that is, the diagnoses, were related to

20   medical encounters that occurred in date of service year 2012.  At the time Thompson

21   signed this Attestation he was the Chief Financial Officer of UnitedHealthcare Medicare

22   & Retirement.  The Attestation was based on information available to the MA

23   Organizations.  UnitedHealthcare could not add a footnote to the Attestation because it

24   was submitted electronically.  However, Steve Nelson, the Chief Executive Officer of

25   UnitedHealthcare Medicare & Retirement, sent CMS an email on April 30, 2014, stating

26   that the Attestation was "based on facts reasonably available or made available to *us* as

27   of the date of" the Attestation.  (Emphasis added).  In April 2014, facts reasonably

28   available to all the Defendant MA Organizations, UnitedHealthcare, and Optum included

154

1  the negative results of the Chart Review and Claims Verification Programs relating to

2  medical encounters in 2012.  Other information and facts that were available included,

3  for instance, millions of dollars of invalid diagnoses about which United had *actual*

4  knowledge but never deleted.  *See supra* paragraph 232.

5  326.   In April 2014, when Thompson signed the Attestation, he deliberately ignored or

6  recklessly disregarded the negative results of the Chart Review Program.  Thompson

7  also ignored that Defendants had failed to comply with the requirements that diagnoses

8  must be supported by patients' medical records and that those diagnoses that are not

9  supported by patients' medical records must be deleted from RAPS or otherwise

10  reported to CMS and corrected to repay or avoid any overpayment.  At the time that

11  Thompson submitted the Attestation on April 30, 2014, he knew about the actual or

12  estimated adverse financial impact of DELTES from the Chart Review and Claims

13  Verification Programs for payment year 2013 (date of service year 2012) and he knew

14  about CV liability accruals.  *See supra* paragraphs 217-221.  Furthermore, on April 30,

15  2014, the date the Attestations were submitted for the 2013 payment year, the

16  information available to the Defendant MA Organizations, UnitedHealthcare Medicare

17  & Retirement (including Thompson), and Optum included  the results of the chart

18  reviews for the date of service year 2012, which showed that at least 250,000 diagnoses

19  were invalid.  *See supra* paragraph 235.  Yet, Thompson certified that this invalid data

20  was accurate and truthful even though the invalid diagnoses had not been deleted (and

21  never have been).

22  327.   On June 26, 2015 and June 7, 2016, Thompson executed and submitted or caused

23  to be submitted Risk Adjustment Attestations on behalf of all of the Defendant MA

24  Organizations managed by UnitedHealthcare Medicare & Retirement on those dates.

25  (On the same dates, UnitedHealthcare Community & State also submitted Risk

26  Adjustment Attestations for the Defendant MA Organizations that it managed.)  These

27  Attestations related to risk adjustment data, that is, diagnoses, which UnitedHealthcare

28  and Optum submitted on behalf of these MA Organizations to the Government for risk

155

1   adjustment payments for payment years 2014 and 2015.  The risk adjustment data, that

2   is, the diagnoses, were related to medical encounters that occurred in date of service

3   years 2013 and 2014.  At the time Thompson signed these Attestations he was the Chief

4   Financial Officer of UnitedHealthcare Medicare & Retirement.  The Attestations were

5   the same as those for prior years (except that they did not have footnotes.)  The

6   Attestations were based on information available to the MA Organizations, including

7   information about diagnoses unsupported and, thus, invalidated by the chart reviews for

8   the dates of service years at issue.  On June 26, 2015, the date the Attestations were

9   submitted for the 2014 payment year, the information available to the Defendant MA

10  Organizations, UnitedHealthcare Medicare & Retirement (including Thompson), and

11  Optum were the results of the chart reviews for date of service year 2013, which showed

12  that at least 199, 039 diagnoses were invalid.  *See supra* paragraph 235.  Yet, Thompson

13  certified that this invalid data was accurate and truthful even though the invalid codes

14  had not been deleted (and never have been).

15      **V.     Diagnoses Solely Determine Risk Adjustment Payments Based**

16              **On Health Status**

17  328.   The diagnostic data submitted by an MA Organizations are not merely ancillary to

18  its claims for risk adjustment payments.  Rather, the diagnoses are the sole determinant

19  in the calculation of any risk adjustment payment based on a beneficiary's health status.

20  The submissions of diagnoses are themselves claims for risk adjustment payments and

21  are inexorably material to any payment based on the beneficiary's health status.  The

22  diagnoses are the *raison d'etre* of RAPS submissions, *i.e.*, risk adjustment claims.

23  329.   As emphasized throughout this Amended Complaint, the Government has never

24  agreed to make risk adjustment payments based on invalid diagnoses, and MA

25  Organizations are required by their contracts with CMS, federal regulations, and CMS

26  instructions (*e.g.*, the Managed Care Manual and Participant Guide) to delete invalid

27  diagnoses.  Moreover, no statute or regulation entitles an MA Organization to risk

28  adjustment payments based on invalid diagnoses, including payments based on

156

Exhibit C
Page 187

diagnoses that are unsubstantiated by the beneficiaries' medical records.  *See Swoben*, 848 F.3d at 1179 (rejecting arguments that MA Organizations are allowed to ignore information about invalid diagnoses based on their own chart reviews and that they are not obligated to delete such invalid diagnoses submitted by them for risk adjustment payments).

330.   When MA Organizations provide CMS with information identifying specific invalid diagnoses that were submitted for payment (such as by deleting the invalid diagnoses in the RAPS system) and, thus, CMS has *actual knowledge* about the specific invalid diagnoses that were submitted for payment (such as because they were deleted in the RAPS system), Medicare recovers the associated overpayments.  *See United States ex rel. Campie v. Gilead Sciences, Inc*., 862 F.3d 890, 906 (9th Cir. 2017) (holding that, in assessing materiality, the court must examine what the agency does when it has *actual knowledge* of the regulatory violation).  There is no way that CMS can obtain this actual knowledge about invalid diagnoses by looking at an Attestation.  The falsity of the Attestation is not apparent on the face of the document.  Someone must inform CMS that the MA Organization has information showing that its diagnoses are invalid and that it failed to delete those invalid diagnoses.

331.   The UHG Managing Defendants and the Defendant MA Organizations knew that they were required to delete invalid diagnoses that they had submitted for payment and, in fact, they did this by making deletes in the RAPS system.  For example, as previously explained, based on their short-lived Claims Verification Program, UnitedHealthcare Medicare & Retirement and Optum deleted diagnoses from the RAPS system.  They also deleted some invalid diagnoses from the RAPS system based on their RACCR reviews.

332.   In addition, in the past, when UnitedHealthcare has informed CMS that it is in possession of information about invalid diagnoses that it had submitted and requested some direction with respect to deleting the invalid diagnoses, CMS has worked with it to recover the overpayments.  In 2010 and 2011, CMS did this when Joseph Keen, the Chief Compliance Audit Officer at UnitedHealthcare, informed it about risk adjustment

Exhibit C
Page 188

1    data that UnitedHealthcare had submitted that included invalid diagnoses.  Importantly,
2    CMS also asked Keen a series of questions to obtain information about the invalid
3    diagnoses, an explanation why the deletes were being made after the final submission
4    deadline for the payment year (because, if made prior to the deadline, CMS would have
5    been able to offset the overpayment as a part of the final reconciliation payment
6    process), and for an explanation of the steps that UnitedHealthcare was taking to ensure
7    that deletes were made in a timely manner.  Keen responded that UnitedHealthcare was
8    "continuing to conduct targeted chart validation reviews to determine if the member-
9    diagnoses reviewed are supported by a medical record.  These reviews continue and we
10   may need to delete certain risk adjustment data in the future.  We will promptly notify
11   CMS of any risk adjustment data determined through these reviews to have been
12   incorrectly submitted."

13   333.   If Defendants had complied with their obligation to delete invalid diagnoses from
14   RAPS, Medicare's Risk Adjustment System ("RAS") would have processed the
15   corrected data and recalculated the risk score for the beneficiaries for whom an invalid
16   diagnosis had been deleted.  The degree of the change in the payment amount for that
17   beneficiary would have depended on the HCC to which the invalid diagnosis was
18   grouped.  The risk adjustment reconciliation payment system would have made these
19   adjustments automatically if the DELETES were made in RAPS.  The system would
20   have done this as part of the final reconciliation payment process or future
21   reconciliations conducted by CMS for the payment year at issue.

22   334.   If an MA Organization does not comply with its express obligation to delete the
23   invalid diagnoses from RAPS prior to the final submission deadline, Medicare pays for
24   the invalid diagnoses as part of its final reconciliation payment to the MA Organization
25   or, if it already paid for the invalid diagnosis, does not recover the overpayment as part
26   of the final reconciliation payment process.  If the MA Organization never deletes the
27   invalid diagnoses from RAPS, Medicare does not recover the overpayment when future
28   payment reconciliations are done for the payment year at issue.  Accordingly, the

1   diagnostic information submitted by an MA Organization is not merely ancillary to its

2   claim for risk adjustment payments, it is the sole determinant in the calculation of the

3   amount (if any) of the risk adjustment payments made by Medicare based on the health

4   status of a beneficiary and, therefore, inexorably material to the amount (if any) paid.

5   335.   A false Risk Adjustment Attestation, by its very nature, is also material as it

6   relates directly to the data element – diagnoses – that is the sole determinant of risk

7   adjustment payments based on health status.  Submission of invalid diagnoses and

8   failing to delete them are not minor or insubstantial infractions of the MA Organization's

9   obligations to Medicare with which they pledge to comply.  Keen, the UnitedHealthcare

10   Chief Compliance Audit Officer, and others at UnitedHealthcare and Optum were aware

11   of these obligations.

12   336.   The purpose of the Risk Adjustment Attestation is, first, to remind MA

13   Organizations that they may not ignore or disregard information about invalid diagnoses,

14   such as (but not limited to) the negative results of chart reviews showing that diagnoses

15   previously submitted for payment are unsupported by the charts; and, second, to enforce

16   the fundamental program requirement that MA Organizations delete invalid diagnoses.

17   *See* 65 Fed. Reg. 40,170, 40,268 (June 29, 2000) (noting that "certifications would help

18   ensure accurate data submissions").  When MA Organizations do not comply with these

19   payment data integrity requirements of the MA Program (which are reiterated and

20   enforced by the Attestations), the result is the submission of and/or failure to delete false

21   diagnostic data and, thus, the submission of false Attestations that the data is accurate

22   and truthful.  When MA Organizations do this by deliberately ignoring or recklessly

23   disregarding information about invalid diagnoses and, thus fail to delete invalid

24   diagnoses, as Defendants here have done, they are unable to represent that their data is

25   accurate, complete, and truthful, as the Attestations require.  Moreover, in that situation,

26   their Attestations are "knowingly" false, as the term knowingly is defined in the FCA.

27   337.   The Risk Adjustment Attestation itself includes language warning about the

28   serious legal implications of making false representations about diagnoses.  It states that

Exhibit C
Page 190

1    "[t]he MA Organization acknowledges . . . that misrepresentations to CMS about the

2    accuracy of such [risk adjustment] information may result in Federal civil action and/or

3    criminal prosecution." *See* Exhibits 15-21.  Risk adjustment Attestations thus are

4    intended to serve as a powerful deterrent against an MA Organization's "knowingly"

5    submitting false claims for payment.  *United States ex rel. Swoben v. UnitedHealthcare*

6    *Insurance Co. et al.*, 848 F.3d 1161, 1168 (9th Cir. 2016) (characterizing certifications

7    "[a]s a further bulwark against fraud").

8    338.   Defendants' knowledge of the importance of the Attestations is demonstrated by

9    the footnotes that UnitedHealthcare and other UHG Managing Defendants added to the

10   Attestations they submitted on behalf of the Defendant MA Organizations, such as the

11   footnotes that stated the Attestations should not be construed as representations that the

12   data may not require subsequent modification should additional information become

13   available.  *See* Exhibits 15-20.  According to Dumcum, UnitedHealthcare's counsel

14   added these footnotes.

15   339.   Defendants' knowledge of the importance of the Attestations is also demonstrated

16   by the meeting they requested with CMS in April 2014.  As previously explained, on

17   April 29, 2014, Steve Hemsley, Defendant UHG's Chief Executive Officer, sent

18   UnitedHealthcare's attorney Thad Johnson, UnitedHealthcare Medicare & Retirement's

19   Chief Executive Officer Steve Nelson, UnitedHealthcare's Chief Financial Officer

20   Daniel Schumacher, and Optum executive Karen Erickson, to meet with CMS

21   employees responsible for the MA Program, including Cheri Rice, the Director of the

22   Medicare Plan Payment Group at CMS.  Defendant UHG and its subsidiaries,

23   UnitedHealthcare and Optum, asked for this meeting on very short (just a few days)

24   notice because the Chief Financial Officer of UnitedHealthcare Medicare & Retirement,

25   Brian Thompson, had to execute and submit the Risk Adjustment Attestations for the

26   Defendant MA Organizations on April 30, 2014.  Defendants UHG, UnitedHealthcare

27   and Optum wanted to disclose to CMS, before the Attestations were submitted, that they

28   were in possession of information ***from chart reviews*** (the nature and mechanics of

160

Exhibit C
Page 191

1  which they did not describe in any detail) about invalid diagnoses (which were not

2  specifically identified to CMS) that they had submitted to the Government but had not

3  deleted.  They apparently believed that this sort of very vague disclosure would

4  somehow render the Attestations truthful even if they did not delete the invalid diagnoses

5  from RAPS.

6  340.   In addition, for many years, Jeffrey Dumcum, the senior executive overseeing all

7  risk adjustment programs and activities at Ingenix and then Optum, was also aware of

8  the FCA implications of ignoring information about invalid diagnoses.  He told Poehling

9  that the Department of Justice's enforcement of the FCA was a consideration in deciding

10  to delete diagnoses when the results of blind chart reviews showed that they were

11  unsupported by the patients' medical records.  In fact, Optum even decided that all of its

12  clients (its commercial clients as well as its internal client, UnitedHealthcare) had to look

13  both ways at the results of blind chart reviews and delete diagnosis codes invalidated by

14  the chart reviews if Optum was responsible for submitting risk adjustment data to CMS

15  on their behalf.  This requirement was most likely imposed by Optum (at least for some

16  period of time) because Optum had to execute the internal attestations certifying the

17  accuracy and truthfulness of the diagnoses it submitted to Medicare on behalf of its

18  clients and, perhaps, it was also concerned about violating the FCA by causing its MA

19  Organization clients to submit false Attestations.  Accordingly, like UHG and

20  UnitedHealthcare, Optum was aware that the Attestations required it to make deletes

21  based on information available to it about the negative results of chart reviews.

22  ## FIRST CLAIM FOR RELIEF

23  ### False Claims Act:  Reverse False Claims

24  ### 31 U.S.C. § 3729(a)(1)(G) (formerly 31 U.S.C. § 3729(a)(7))

25  341.   The United States repeats and re-alleges the allegations contained in Paragraphs 1

26  to 340 above as though they are fully set forth herein.

27  342.   Defendants violated the second part of 31 U.S.C. § 3729(a)(1)(G) as follows:

28  Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) concealed

161

1    or knowingly and improperly avoided or decreased an obligation to pay or transmit

2    money or property to the Government.  Specifically, Defendants knowingly concealed or

3    knowingly and improperly avoided or decreased an obligation to repay risk adjustment

4    payments to which they were not entitled from the Medicare Program.  In particular,

5    Defendants knowingly and improperly failed to delete in the RAPS system the invalid

6    diagnoses that had been submitted to the Medicare Program for risk adjustment

7    payments which were made by the Medicare Program to them or knowingly and

8    improperly failed to otherwise return to the Medicare Program the overpayments based

9    on the invalid diagnoses.

10    343.   By virtue of the said acts of concealment and/or improper avoidance, the United

11    States incurred damages and therefore is entitled to multiple damages under the False

12    Claims Act, plus a civil penalty for each violation of the Act.

13    <div align="center">**SECOND CLAIM FOR RELIEF**</div>

14    <div align="center">**False Claims Act:  Presentation of False or Fraudulent Claims**</div>

15    <div align="center">**31 U.S.C. § 3729(a)(1)(A) (formerly 31 U.S.C. § 3729(a)(1))**</div>

16    344.   The United States repeats and re-alleges the allegations contained in Paragraphs 1

17    to 340 above as though they are fully set forth herein.

18    345.   Defendants violated 31 U.S.C. § 3729(a)(1)(A) as follows:  Defendants knowingly

19    (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) presented or caused to be

20    presented a false or fraudulent claim for payment or approval.  Specifically, Defendants

21    knowingly presented or caused to be presented to the Medicare Program a false or

22    fraudulent Risk Adjustment Attestation claiming risk adjustment payments from the

23    Medicare Program.

24    346.   Defendants violated former 31 U.S.C. § 3729(a)(1) as follows:  Defendants

25    knowingly presented, or caused to be presented, to the Government a false or fraudulent

26    claim for payment or approval.  Specifically, Defendants knowingly presented or caused

27    to be presented to the Medicare Program a false or fraudulent Risk Adjustment

28    Attestation claiming risk adjustment payments from the Medicare Program.

<div align="center">162</div>

Exhibit C
Page 193

347.   By virtue of the said false or fraudulent claim, the United States incurred damages and therefore is entitled to multiple damages under the False Claims Act, plus a civil penalty for each violation of the Act.

## THIRD CLAIM FOR RELIEF

### False Claims Act: Making or Using False Records or Statements

### 31 U.S.C. § 3729(a)(1)(B) (formerly 31 U.S.C. § 3729(a)(2))

348.   The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 340 above as though they are fully set forth herein.

349.   Defendants violated 31 U.S.C. § 3729(a)(1)(B) as follows:  Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim.  Specifically, Defendants knowingly made, used, or caused to be made or used a false Risk Adjustment Attestation material to a false or fraudulent claim for risk adjustment payments from the Medicare Program.

350.   Defendants violated former 31 U.S.C. § 3729(a)(2) as follows:  Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.  Specifically, Defendants knowingly made, used, or caused to be made or used a false Risk Adjustment Attestation to get a false or fraudulent claim for risk adjustment payments paid or approved by the Medicare Program.

351.   By virtue of the said false record or statement, the United States incurred damages and therefore is entitled to multiple damages under the False Claims Act, plus a civil penalty for each violation of the Act.

## FOURTH CLAIM FOR RELIEF

### False Claims Act:  Reverse False Claims

### 31 U.S.C. § 3729(a)(1)(G) (formerly 31 U.S.C. § 3729(a)(7))

352.   The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 340 above as though they are fully set forth herein.

163

Exhibit C
Page 194

353.   Defendants violated the first part of 31 U.S.C. § 3729(a)(1)(G) as follows: Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government.  Specifically, Defendants knowingly made, used, or caused to be made or used a false Risk Adjustment Attestation material to an obligation to repay risk adjustment payments to which they were not entitled from the Medicare Program.

354.   Defendants also violated former 31 U.S.C. § 3729(a)(7) as follows:  Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the Government.  Specifically, Defendants knowingly made, used, or caused to be made or used, a false Risk Adjustment Attestation to conceal, avoid or decrease an obligation to repay risk adjustment payments to which they were not entitled from the Medicare Program.

355.   By virtue of the said false record, statement, and other acts of concealment and improper avoidance, the United States incurred damages and therefore is entitled to multiple damages under the False Claims Act, plus a civil penalty for each violation of the Act.

## FIFTH CLAIM FOR RELIEF

### Unjust Enrichment

356.   The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 340 above as though they are fully set forth herein.

357.   Defendants have received money from the United States to which Defendants were not entitled, which unjustly enriched Defendants, and for which Defendants must make restitution.  Defendants received such money by claiming and retaining Medicare risk adjustment payments based on invalid risk adjustment data.  In equity and good conscience, such money belongs to the United States and to the Medicare Program.

1  358.   The United States is entitled to recover such money from Defendants in an amount

2  to be determined at trial.

3  ## SIXTH CLAIM FOR RELIEF

4  ### Payment by Mistake

5  359.   The United States repeats and re-alleges the allegations contained in Paragraphs 1

6  to 340 above as though they are fully set forth herein.

7  360.   The United States paid money to Defendants as a result of a mistaken

8  understanding.  Specifically, the United States paid Defendants claims for risk

9  adjustment payments under the mistaken understanding that such claims were based on

10  valid risk adjustment data.  Had the United States known the truth, it would not have

11  paid such claims.  Payment was therefore by mistake.

12  361.   As a result of such mistaken payments, the United States has sustained damages

13  for which Defendants are liable in the amount to be determined at trial.

14  ## PRAYER

15      **WHEREFORE**, the United States requests that judgment be entered in its favor

16  and against Defendants as follows:

17  362.   On Claims I, II,  III, and IV (False Claims Act), against all Defendants jointly and

18  severally, for the amount of the United States' damages, trebled as required by law,

19  together with the maximum civil penalties allowed by law, costs, post-judgment interest,

20  and such other and further relief as the Court may deem appropriate;

21  363.   On Claim V (Unjust Enrichment), against all Defendants jointly and severally, for

22  an amount equal to the monies that Defendants obtained from the United States without

23  right and by which Defendants have been unjustly enriched, plus costs, pre- and post-

24  judgment interest, and such other and further relief as the Court may deem appropriate;

25  and

26  364.   On Claim VI (Payment By Mistake), against Defendants for an amount equal to

27  the United States' damages, plus costs, pre- and post-judgment interest, and such other

28  and further relief as the Court may deem appropriate.

Exhibit C
Page 196

1

## **DEMAND FOR JURY TRIAL**

2        The United States of America hereby demands a trial by jury.

3   Dated:  November 17, 2017

4                       Respectfully submitted,

5                       CHAD A. READLER
                        Principal Deputy Assistant Attorney General,

6                       Civil Division
                       SANDRA R. BROWN

7                       Acting United States Attorney
                       DOROTHY A. SCHOUTEN

8                       Chief, Civil Division
                       DAVID K. BARRETT

9                       Chief, Civil Fraud Section
                       Assistant United States Attorneys

10

11                     MICHAEL D. GRANSTON
                     DANIEL R. ANDERSON

12                     CAROL L. WALLACK
                     JESSICA KRIEG

13                     JUSTIN DRAYCOTT
                     PAUL PERKINS

14                     Attorneys, Civil Division
                     United States Department of Justice

15                     JAMES P. KENNEDY, JR.
                     Acting United States Attorney

16                     KATHLEEN ANN LYNCH
                     Assistant United States Attorney

17

18                       /S/ John E. Lee

19                     JOHN E. LEE
                     Assistant United States Attorney

20

                     Attorneys for the

21                     United States of America

22

23

24

25

26

27

28

<div align="center">166</div>

Exhibit C
Page 197

# EXHIBIT D

1   LATHAM & WATKINS LLP
       David J. Schindler (Bar No. 130490)
2       *david.schindler@lw.com*
    355 South Grand Avenue, Suite 100
3   Los Angeles, California 90071-1560
    Telephone: +1.213.485.1234
4   Facsimile: +1.213.891.8763

5   LATHAM & WATKINS LLP
       Daniel Meron (appearing *pro hac vice*)
6       *daniel.meron@lw.com*
       Kathryn H. Ruemmler (appearing *pro hac vice*)
7       *kathryn.ruemmler@lw.com*
       Abid R. Qureshi (appearing *pro hac vice*)
8       *abid.qureshi@lw.com*
    555 Eleventh Street, NW, Suite 1000
9   Washington, DC 20004-1304
    Telephone: +1.202.637.2200
10  Facsimile: +1.202.637.2201

11  Attorneys for UnitedHealth Defendants

12              **UNITED STATES DISTRICT COURT**

13          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

14

15  UNITED STATES OF AMERICA *ex*          CASE NO. 2:16-cv-08697-MWF-SSx
16  *rel*. BENJAMIN POEHLING,
                                           **UNITEDHEALTH'S ANSWER TO**
17              Plaintiff,                 **UNITED STATES' AMENDED**
                                           **COMPLAINT-IN-PARTIAL-**
18         v.                              **INTERVENTION AND**
                                           **COUNTERCLAIM**
19  UNITEDHEALTH GROUP, INC. *et*
    *al.*,
20
                Defendants.
21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

1    Having filed a notice of intervention pursuant to 31 U.S.C. § 3730(b)(4), the
2    United States alleges in its Amended Complaint-In-Partial-Intervention and
3    Demand for Jury Trial (the "Government's Amended Complaint" or "Amended
4    Complaint") the allegations below.  Defendants UnitedHealth Group Incorporated,
5    United HealthCare Services, Inc., UnitedHealthcare, Inc., UnitedHealthcare
6    Insurance Company, Ovations, Inc., Optum, Inc., OptumInsight, Inc.,
7    AmeriChoice of New Jersey, Inc., AmeriChoice of New York, Inc., Arizona
8    Physicians IPA, Inc., Care Improvement Plus of Maryland, Inc., Care
9    Improvement Plus of Texas Insurance Company, Care Improvement Plus South
10   Central Insurance Company, Care Improvement Plus Wisconsin Insurance
11   Company, Optum Insurance Co., Citrus Health Care, Inc., Health Plan of Nevada,
12   Inc., Medica HealthCare Plans, Inc., Oxford Health Plans (CT), Inc., Oxford
13   Health Plans (NJ), Inc., Oxford Health Plans (NY), Inc., PacifiCare Life and
14   Health Insurance Company, PacifiCare of Arizona, Inc., PacifiCare of Colorado,
15   Inc., PacifiCare of Nevada, Inc., Physicians Health Choice of Texas, LLC,
16   Preferred Care Partners, Inc., Rocky Mountain Health Maintenance Organization,
17   Incorporated, Sierra Health and Life Insurance Company, Inc., Symphonix Health
18   Insurance, Inc., UHC of California (f.k.a. PacifiCare of California), United Health
19   Care Ins. Co. and United New York, Unison Health Plan of Tennessee, Inc.,
20   UnitedHealthcare Benefits of Texas, Inc. (f.k.a. PacifiCare of Texas, Inc.),
21   UnitedHealthcare Community Plan of Ohio, Inc. (f.k.a. Unison Health Plan of
22   Ohio, Inc.), UnitedHealthcare Community Plan of Texas, L.L.C. (f.k.a. Evercare of
23   Texas, L.L.C.), UnitedHealthcare Community Plan, Inc. (f.k.a. UnitedHealthcare
24   of the Great Lakes Health Plan, Inc.), UnitedHealthcare Insurance Company of
25   New York, UnitedHealthcare of Alabama, Inc., UnitedHealthcare of Arizona, Inc.,
26   UnitedHealthcare of Arkansas, Inc., UnitedHealthcare of Florida, Inc.,
27   UnitedHealthcare of Georgia, Inc., UnitedHealthcare of New England, Inc.,
28   UnitedHealthcare of New York, Inc., UnitedHealthcare of North Carolina, Inc.,

2

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

209
Exhibit 2

Exhibit D
Page 199

1    UnitedHealthcare of Ohio, Inc., UnitedHealthcare of Oklahoma, Inc. (f.k.a.

2    PacifiCare of Oklahoma, Inc.), UnitedHealthcare of Oregon, Inc. (f.k.a. PacifiCare

3    of Oregon, Inc.), UnitedHealthcare of Pennsylvania, Inc. (f.k.a. Unison Health Plan

4    of Pennsylvania, Inc.), UnitedHealthcare of Tennessee, Inc., UnitedHealthcare of

5    the Midlands, Inc., UnitedHealthcare of the Midwest, Inc., UnitedHealthcare of

6    Utah, Inc., UnitedHealthcare of Washington, Inc. (f.k.a. PacifiCare of Washington,

7    Inc.), UnitedHealthcare of Wisconsin, Inc., and UnitedHealthcare Plan of the River

8    Valley, Inc. (collectively, "UnitedHealth") generally deny each and every

9    allegation except those hereinafter specifically admitted.

10          On February 2, 2018, the Court granted in part and denied in part the

11   UnitedHealth Defendants' motion to dismiss.  Dkt. 212.  This Order dismissed,

12   with leave to amend, the Government's Second, Third, and Fourth Claims for

13   Relief.  On February 26, 2018, the Government notified the Court and the parties

14   that it had "elected not to file a Second Amended Complaint-in-Intervention in this

15   action."  Dkt. 217 at 2.  Therefore, the only surviving claims against the

16   UnitedHealth Defendants are the First, Fifth, and Sixth Claims for Relief.  There

17   are many allegations that clearly relate to the dismissed claims that are now

18   surplusage and do not require a response.  Notwithstanding that and while

19   preserving all of its rights, UnitedHealth denies claims or allegations that do not

20   relate to the Government's First, Fifth, and Sixth Claims for Relief.  UnitedHealth

21   further answers the numbered paragraphs as follows:

22                              **INTRODUCTION**

23          1.     Paragraph 1 contains no allegations with respect to a particular

24   Defendant or claim, and therefore no response is required.  However, to the extent

25   Paragraph 1 purports to summarize and/or describe the provisions of the Medicare

26   program, UnitedHealth states that the Medicare statute and regulations speak for

27   themselves, and to the extent that the allegations in Paragraph 1 vary therefrom or

28

3

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

210
Exhibit 2

Exhibit D
Page 200

1  with other applicable statutory or decisional law, UnitedHealth denies those
2  allegations.

3  　　　　2.　　　Paragraph 2 contains no allegations with respect to a particular
4  Defendant or claim, and therefore no response is required.  However, to the extent
5  Paragraph 2 purports to summarize and/or describe the provisions of the Medicare
6  program, UnitedHealth states that the Medicare statute and regulations speak for
7  themselves, and to the extent that the allegations in Paragraph 2 vary therefrom or
8  with other applicable statutory or decisional law, UnitedHealth denies those
9  allegations.

10  　　　　3.　　　Paragraph 3 contains no allegations with respect to a particular
11  Defendant or claim, and therefore no response is required.  However, to the extent
12  Paragraph 3 purports to summarize and/or describe the provisions of the Medicare
13  program, UnitedHealth states that the Medicare statute and regulations speak for
14  themselves, and to the extent that the allegations in Paragraph 3 vary therefrom or
15  with other applicable statutory or decisional law, UnitedHealth denies those
16  allegations.

17  　　　　4.　　　Paragraph 4 contains no allegations with respect to a particular
18  Defendant or claim, and therefore no response is required.  However, to the extent
19  Paragraph 4 purports to summarize and/or describe the provisions of the Medicare
20  program, UnitedHealth states that the Medicare statute and regulations speak for
21  themselves, and to the extent that the allegations in Paragraph 4 vary therefrom or
22  with other applicable statutory or decisional law, UnitedHealth denies those
23  allegations.

24  　　　　5.　　　Paragraph 5 contains no allegations with respect to a particular
25  Defendant or claim, and therefore no response is required.  However, to the extent
26  Paragraph 5 purports to summarize and/or describe the provisions of the Medicare
27  program, UnitedHealth states that the Medicare statute and regulations speak for
28  themselves, and to the extent that the allegations in Paragraph 5 vary therefrom or

4

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

1  with other applicable statutory or decisional law, UnitedHealth denies those

2  allegations.

3      6.     To the extent that Paragraph 6 contains legal conclusions, no response

4  is required.  Paragraph 6 contains no allegations with respect to a particular

5  Defendant or claim, and therefore no response is required.  However, to the extent

6  Paragraph 6 purports to summarize and/or describe the provisions of the Medicare

7  program or the Ninth Circuit's order in *United States ex rel. Swoben v.*

8  *UnitedHealthcare Ins. Co.*, 848 F.3d 1161 (9th Cir. 2016), UnitedHealth states that

9  the Medicare regulations and the order speak for themselves, and to the extent that

10  the allegations in Paragraph 6 vary therefrom or with other applicable statutory or

11  decisional law, UnitedHealth denies those allegations.

12      7.     UnitedHealth admits that for many years, UnitedHealth Group

13  Incorporated has owned Medicare Advantage ("MA") Organizations that have

14  enrolled more MA beneficiaries than any other entity, and offers Medicare

15  Advantage Plans ("MA Plans") and prescription drug plans ("PD Plans") to

16  millions of elderly and disabled Medicare beneficiaries throughout the United

17  States.  UnitedHealth also admits that in or around March 2017, approximately

18  229,000 Medicare beneficiaries in the Central District of California were enrolled

19  in MA Plans offered by UHC of California and Sierra Health and Life Insurance

20  Company, Inc.  UnitedHealth denies the remaining allegations in Paragraph 7.

21      8.     Paragraph 8 refers to the Complaint, a legal document, which speaks

22  for itself and to which no response is required.  UnitedHealth denies the remaining

23  allegations in Paragraph 8.

24      9.     UnitedHealth admits that some of the UnitedHealth Defendants

25  collectively received billions of dollars from the Medicare program each year in

26  relation to the Medicare beneficiaries enrolled in the Defendant MA

27  Organizations' Plans.  UnitedHealth admits that certain Defendants conducted

28  programs and engaged in activities designed to improve the completeness of risk

5

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

212
Exhibit 2

Exhibit D
Page 202

1  adjustment data submitted on behalf of Defendant MA Organizations.

2  UnitedHealth denies the remaining allegations in Paragraph 9.

3       10.     UnitedHealth admits that certain Defendants have conducted a Chart

4  Review Program since in or about 2005.  UnitedHealth admits that this program

5  improved the completeness of risk adjustment data submitted for Defendant MA

6  Organizations and that risk adjustment payments increased as a result.

7  UnitedHealth denies the remaining allegations in Paragraph 10.

8       11.     To the extent that Paragraph 11 contains legal conclusions, no

9  response is required.  UnitedHealth denies the remaining allegations in Paragraph

10  11.

11       12.     To the extent that Paragraph 12 contains legal conclusions, no

12  response is required.  UnitedHealth denies the remaining allegations in Paragraph

13  12.

14       13.     To the extent that Paragraph 13 contains legal conclusions, no

15  response is required.  UnitedHealth is without knowledge or information sufficient

16  to form a belief as to the truth or falsity of the Government's estimations.

17  UnitedHealth denies the remaining allegations in Paragraph 13.

18       14.     To the extent the allegations in Paragraph 14 relate to claims that have

19  been dismissed, they are surplusage and should be stricken.  Paragraph 14 states

20  legal conclusions to which no response is required.  To the extent that Paragraph

21  14 contains any factual allegations regarding UnitedHealth, such allegations are

22  denied.

23       15.     Paragraph 15 states legal conclusions to which no response is

24  required.  To the extent that Paragraph 15 contains any factual allegations

25  regarding UnitedHealth, such allegations are denied.

26       16.     UnitedHealth admits that some of the UnitedHealth Defendants paid

27  some of its provider groups on a capitated basis and others on a fee-for-service

28  basis.  UnitedHealth also admits that some of the UnitedHealth Defendants entered

6

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

1  into value-based agreements with some of its fee-for-service providers.

2  UnitedHealth denies the remaining allegations in Paragraph 16.

3      17.    UnitedHealth admits that pursuant to some of the UnitedHealth

4  Defendants' contractual arrangements with capitated and certain other providers,

5  some of the UnitedHealth Defendants paid a percentage share of the payments that

6  some of the UnitedHealth Defendants received from the Medicare Program for the

7  beneficiaries under those providers' care.  UnitedHealth denies the remaining

8  allegations in Paragraph 17.

9      18.    Paragraph 18 states legal conclusions to which no response is

10  required.  UnitedHealth denies the remaining allegations in Paragraph 18.

11  **JURISDICTION AND VENUE**

12      19.    Paragraph 19 states legal conclusions to which no response is

13  required.

14      20.    Paragraph 20 states legal conclusions to which no response is

15  required.  To the extent a response is required, UnitedHealth admits that at least

16  one of the Defendants transacts business in the Central District of California.

17      21.    Paragraph 21 states legal conclusions to which no response is

18  required.  To the extent a response is required, UnitedHealth admits that at least

19  one of the Defendants can be found in, resides in, and transacts business in this

20  District.  UnitedHealth denies the remaining allegations in Paragraph 21.

21  **PARTIES**

22  **I.    Plaintiffs**

23      22.    Paragraph 22 refers to the Complaint, a legal document, which speaks

24  for itself and to which no response is required.  To the extent Paragraph 22

25  purports to summarize and/or describe the provisions of the Medicare program,

26  UnitedHealth states that the Medicare statute and regulations speak for themselves,

27  and to the extent that the allegations in Paragraph 22 vary therefrom or with other

28  applicable statutory or decisional law, UnitedHealth denies those allegations.

7

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

214
Exhibit 2

Exhibit D
Page 204

1  UnitedHealth admits that the United States filed its notice of partial intervention in
2  this action on February 14, 2017.

3       23.    UnitedHealth admits that the *qui tam* plaintiff ("Relator"), Benjamin
4  Poehling, initiated this action by filing a complaint under the *qui tam* provisions of
5  the False Claims Act ("FCA") against UnitedHealth in March 2011.  UnitedHealth
6  admits that from 2004 through the end of 2012, Poehling was the Director of
7  Finance for UnitedHealthcare.  UnitedHealth denies the characterization of its
8  Chart Review Program as a "revenue-generating activit[y]."  UnitedHealth is
9  without knowledge or information sufficient to form a belief as to the truth or
10  falsity of the remaining allegations in Paragraph 23; therefore, such allegations are
11  denied.

12  **II.    Defendants**

13       24.    UnitedHealth admits that UnitedHealth Group Incorporated is a
14  publicly traded Delaware corporation and that it, along with some of its affiliates,
15  have offices in various locations throughout the United States, including in the
16  Central District of California.  UnitedHealth denies the remaining allegations in
17  Paragraph 24.

18       25.    UnitedHealth admits that some of its MA Organizations offer one or
19  more MA Plans and some also offer PD Plans.  UnitedHealth admits that in or
20  around 2008, UnitedHealth Group Incorporated had approximately 1.5 million
21  beneficiaries enrolled in MA Plans operated by its affiliate entities and millions of
22  beneficiaries enrolled in PD Plans operated by its affiliate entities.  UnitedHealth
23  admits that in or around 2009, UnitedHealth Group Incorporated had
24  approximately 1.8 million beneficiaries enrolled in MA operated by its affiliate
25  entities and millions of beneficiaries enrolled in PD Plans operated by its affiliate
26  entities.  UnitedHealth admits that in or around 2010, UnitedHealth Group
27  Incorporated had approximately 2.1 million beneficiaries in MA Plans operated by
28  its affiliate entities and millions of beneficiaries in PD Plans operated by its

8

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

1   affiliate entities.  UnitedHealth admits that in or around 2011, UnitedHealth Group

2   Incorporated had approximately 2.2 million beneficiaries in MA Plans operated by

3   its affiliate entities and millions of beneficiaries in PD Plans operated by its

4   affiliate entities.  UnitedHealth admits that in or around 2012, UnitedHealth Group

5   Incorporated had approximately 2.6 million beneficiaries in MA Plans operated by

6   its affiliate entities and millions of beneficiaries in PD Plans operated by its

7   affiliate entities.  UnitedHealth denies the remaining allegations in Paragraph 25.

8         26.    To the extent the allegations in Paragraph 26 relate to claims that have

9   been dismissed, they are surplusage and should be stricken.  UnitedHealth admits

10   that the following entities named as Defendants in this action have had or have

11   previously had one or more agreements with the Government at some point since

12   2005 to offer MA and/or PD Plans to Medicare beneficiaries under Parts C and D

13   of the Medicare Program, and received payments from the Government pursuant to

14   these agreements: Citrus Health Care, Inc., which was a Florida corporation;

15   Health Plan of Nevada, Inc., which is a Nevada corporation; Medica HealthCare

16   Plans, Inc., which is a Florida corporation; and Physicians Health Choice of Texas,

17   LLC, which is a Texas limited liability company doing business as Physicians

18   Health Choice.  UnitedHealth denies the remaining allegations in Paragraph 26.

19         27.    UnitedHealth admits that United HealthCare Services, Inc. is a

20   Minnesota corporation and a direct subsidiary of UnitedHealth Group

21   Incorporated.  UnitedHealth also admits that PacifiCare Health Systems, LLC and

22   PacifiCare Health Plan Administrators, Inc. merged into United HealthCare

23   Services, Inc.  UnitedHealth denies the remaining allegations in Paragraph 27.

24         28.    UnitedHealth admits that Ovations, Inc. is a Delaware corporation and

25   a direct subsidiary of United HealthCare Services, Inc. and an indirect subsidiary

26   of UnitedHealth Group Incorporated.  UnitedHealth denies the remaining

27   allegations in Paragraph 28.

28

9

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

1    29.    UnitedHealth admits that UnitedHealthcare, Inc. is a Delaware

2    corporation.  UnitedHealth admits that various UnitedHealthcare subsidiaries

3    operate health benefit plans and provide healthcare benefits to Medicare

4    beneficiaries under the MA Program.  UnitedHealth denies the remaining

5    allegations in Paragraph 29.

6    30.    UnitedHealth admits that Optum, Inc. and OptumInsight, Inc. are

7    Delaware corporations and indirect subsidiaries of UnitedHealth Group

8    Incorporated.  UnitedHealth admits that in 2011, OptumInsight became the

9    successor to Ingenix, Inc.  Paragraph 30 also refers to the Complaint, a legal

10    document, which speaks for itself and to which no response is required.

11    UnitedHealth denies the remaining allegations in Paragraph 30.

12    31.    Paragraph 31 states legal conclusions to which no response is

13    required.  To the extent Paragraph 31 contains any factual allegations, such

14    allegations are denied.

15    32.    Paragraph 32 states legal conclusions to which no response is

16    required.  UnitedHealth denies the remaining allegations in Paragraph 32.

17    33.    UnitedHealth admits that, starting in 2007, its risk adjustment

18    submission process was primarily performed within Ingenix and then within

19    Ingenix's successor, Optum.  UnitedHealth admits that Ingenix and then Optum

20    submitted risk adjustment data to CMS' Risk Adjustment Processing System

21    (RAPS) via IRADS.  UnitedHealth admits that Ingenix and then Optum performed

22    operational functions for Chart Review, Claims Verification, and Risk Adjustment

23    Coding Compliance Review ("RACCR") programs.  UnitedHealth admits that

24    Ingenix and then Optum performed certain activities relating to risk adjustment

25    from its office in the Central District of California and elsewhere.  UnitedHealth

26    denies the remaining allegations in Paragraph 33.

27

28

10

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

34.     Paragraph 34 states legal conclusions to which no response is required.  Paragraph 34 also refers to the Complaint, a legal document, which speaks for itself and to which no response is required.

35.     UnitedHealth admits that Ingenix and then Optum also performed risk adjustment-related services for third parties, who owned and operated their own MA Organizations and offered their own Plans.  UnitedHealth admits that these third parties were sometimes referred to as Optum's commercial clients. UnitedHealth admits that Ingenix and then Optum submitted risk adjustment data to the Government on behalf of certain commercial clients.  UnitedHealth admits that Ingenix and then Optum conducted Chart Review and other programs for certain commercial clients.  UnitedHealth admits that Ingenix and then Optum performed risk adjustment related work for certain commercial clients from offices in this District and elsewhere.  UnitedHealth denies the remaining allegations in Paragraph 35.

36.     UnitedHealth admits that in or around 2005 it acquired PacifiCare Health Systems, PacifiCare of Arizona, Inc., incorporated in Arizona; PacifiCare of California, incorporated in California; PacifiCare of Colorado, Inc., incorporated in Colorado; PacifiCare of Nevada, Inc., incorporated in Nevada; PacifiCare of Oklahoma, Inc., incorporated in Oklahoma; PacifiCare of Oregon, Inc., incorporated in Oregon; PacifiCare of Texas, Inc. incorporated in Texas; and PacifiCare of Washington, incorporated in Washington.  UnitedHealth also admits that at various points in time, PacifiCare plans were referred to as Secure Horizons. UnitedHealth admits that the aforementioned entities are indirect subsidiaries of UnitedHealth Group Incorporated.  UnitedHealth admits that in or around 2011, PacifiCare of California became UHC of California.  UnitedHealth denies the remaining allegations in Paragraph 36.

37.     UnitedHealth admits that PacifiCare Health Systems, LLC and PacifiCare Health Plan Administrators, Inc. merged into United HealthCare

11

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

1   Services, Inc. in or around 2005.  UnitedHealth admits that all PacifiCare MA

2   Organizations and their successors were direct or indirect subsidiaries of

3   UnitedHealth Group Incorporated.  Paragraph 37 also refers to the Complaint, a

4   legal document, which speaks for itself and to which no response is required.

5   UnitedHealth denies the remaining allegations in Paragraph 37.

6          38.     UnitedHealth admits that prior to its acquisition of PacifiCare,

7   PacifiCare had an office in Cypress, California.  UnitedHealth is without

8   knowledge or information sufficient to form a belief as to the truth or falsity of the

9   remaining allegations in Paragraph 38; therefore, such allegations are denied.

10  Additionally, Paragraph 38 states a legal conclusion to which no response is

11  required.  UnitedHealth denies the remaining allegations in Paragraph 38.

12         39.     UnitedHealth admits that in or around 2011, it acquired a share of

13  WellMed Medical Management, Inc.  In or around 2011, UnitedHealth also

14  acquired entities such as Physician's Health Choice of Texas, LLC and Citrus

15  Health Care, Inc., which operated in Texas, Florida, New Mexico, and Arkansas.

16  UnitedHealth admits that at the time of the acquisition, Citrus Health Care, Inc.

17  was a Florida corporation and a subsidiary of PHC Holdings of Florida, Inc.

18  UnitedHealth denies the remaining allegations in Paragraph 39.

19         40.     UnitedHealth admits that for many years, WMMI had affiliates that

20  directly managed the provision of healthcare services, including WellMed

21  Networks, Inc., WellMed Networks Inc. of Florida, WellMed Medical

22  Management of Florida Inc., and WellMed Medical Group, PA.  UnitedHealth

23  admits that after the acquisition, WMMI became part of the UnitedHealth Group

24  Incorporated group called OptumCare.  UnitedHealth admits that WellMed's

25  integrated health care delivery system includes more than 10,000 contracted

26  physicians who provide healthcare to hundreds of thousands of Medicare

27  beneficiaries in Texas and Florida, including those beneficiaries enrolled in

28

12

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

1  UnitedHealth's MA Plans.  UnitedHealth denies the remaining allegations in

2  Paragraph 40.

3      41.    Paragraph 41 refers to the Complaint, a legal document, which speaks

4  for itself and to which no response is required.  To the extent Paragraph 41

5  contains any factual allegations, such allegations are denied.

6  **<u>DEFENDANTS' EXECUTIVES AND OTHER EMPLOYEES</u>**

7      42.    To the extent Paragraph 42 purports to describe a document or

8  documents, such documents speak for themselves and, as such, no response is

9  required.  UnitedHealth denies the remaining allegations in Paragraph 42 with the

10  exception of those specifically admitted below:

- Kyle Anderson was the Director of Financial Planning and Analysis at UnitedHealthcare from in or around 2009 to 2015.
- Jason Bainbridge worked for UnitedHealthcare in or around 2012.
- From in or around 2011 to 2015, Paul Balthazor was the Chief Financial Officer of UnitedHealthcare Community & State.
- Marc Beckmann worked for UnitedHealthcare Medicare & Retirement.
- In or around 2008, Jon Bird worked for Ingenix's Risk Adjustment Group, became Director of Revenue Projections in or around 2010, and became the Vice President of Risk Adjustment and Quality Analytics at Optum in or around 2013.
- Gail Boudreaux became the Executive Vice President of UnitedHealthcare in or around 2008.
- Tracey Bradberry was an Operations Manager at Ingenix from around 2008 to 2012, and that since 2012, she has served as an Associate Director of Operations at Optum.
- Patty Brennan began working at Ingenix in or around 2008 as a Compliance Manager for Risk Adjustment Programs.  In or around

13

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

220
Exhibit 2

Exhibit D
Page 210

1   2009, Brennan became the Director of Retrospective Services at

2   Ingenix.  In or around 2013, Brennan became the Vice President of

3   Retrospective Services at Optum.

4   • In or around 2009, Jonathan Bunker was the President of Sierra

5   Health and Life Insurance Company, Inc. and the President of Health

6   Plan of Nevada, Inc.  In or around 2013 Bunker became the Chief

7   Executive Officer for UnitedHealthcare's Southwest Region.

8   • Barbara Carlson was a Senior Regulatory Affairs Analyst at

9   UnitedHealthcare in 2011.

10  • Shelly Cranley served as the Director of Regulatory Affairs for

11  UnitedHealthcare.

12  • Keith Dobbins has been UnitedHealthcare's Deputy General Counsel

13  since at least in or around 2014.

14  • From around 2012 to 2015, Juliet Domb was a Strategic Relationship

15  Analyst at Optum.  Domb served as an administrative assistant to

16  Larry Renfro.

17  • Jeffrey Dumcum was the Chief Financial Officer at PacifiCare, and

18  became a Director of Finance at UnitedHealth following PacifiCare's

19  acquisition.  In or around 2007, Dumcum became a Senior Vice

20  President at Ingenix (later Optum).

21  • Karen Erickson has been an Executive Vice President at Optum since

22  in or around 2011, and that she was Optum's Chief Administrative

23  Officer in or around 2011.

24  • Ronnie Grower was a Vice President of Market Consultation at

25  Ingenix from around 2008 to 2009, and a Vice President of Account

26  Management at Ingenix from around 2009 to 2010.

27  • Joseph Hafermann was the Chief Financial Officer of Secure

28  Horizons in or around 2007.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

Exhibit D
Page 211

1   • Kimberly Halva was an attorney for UnitedHealthcare Medicare &
2       Retirement in or around 2009 and served as UnitedHealthcare
3       Medicare & Retirement's Finance and Clinical Compliance Officer
4       from in or around 2010 to 2013.
5   • In or around 2010 to 2013, Mary Hammond was an Associate
6       Director of Strategy and Support at UnitedHealthcare Medicare &
7       Retirement.
8   • In or around 2008 to 2013, Charles Hanson was a Vice President of
9       Underwriting and Finance at UnitedHealthcare Medicare &
10      Retirement.
11  • Steve Hemsley is currently the Executive Chairman of UHG's Board
12      of Directors, and that he was formerly Chief Executive Officer of
13      UHG from in or around 2006 to 2017.
14  • Pam Holt was a Manager of Network Operations at UnitedHealthcare.
15  • Scott Hughes was a Senior Project Manager at Optum beginning in or
16      around 2012.
17  • Michael (Mike) Jacobson was a Business Analyst Consultant at
18      OptumInsight.
19  • Donald James was a Director of Program Strategy at Optum from in
20      or around 2012 to 2015.
21  • Thad Johnson is the current Chief Legal Officer at UnitedHealthcare.
22  • Joseph Keen was a Vice President and Chief Compliance Audit
23      Officer for UnitedHealthcare in or around 2011.
24  • Gerald (Jerry) Knutson was the Chief Financial Officer at Ovations
25      from in or around 2003 to 2009 and the Chief Financial Officer of
26      OptumInsight from in or around 2009 to 2012.
27
28

15

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

- John (Jack) Larsen was the Chief Executive Officer of UnitedHealthcare Medicare & Retirement and at one time was the Chief Financial Officer of UnitedHealthcare Medicare & Retirement.
- In or around 2010, Rebecca Martin became the Director of Encounter Operations at Optum.
- In or around 2013, 2014, and 2015, Jay Matushak was a Vice President of Finance for UnitedHealthcare Medicare & Retirement.
- Michael McCarthy was a Regional Vice President for Southern California for UnitedHealthcare in or around 2013.
- Bill Miller was the Chief Executive Officer of OptumInsight from in or around 2012 to 2017.
- Eric Murphy was President of Payer Solutions at Optum.
- Randall Myers worked for PacifiCare and then for Ingenix and then Optum as a Director of Encounter Operations.
- Steve Nelson has been the Chief Executive Officer of UnitedHealthcare since in or around 2017, and that from in or around 2014 to 2017, he was the Chief Executive Officer of UnitedHealthcare Medicare & Retirement.
- Jennifer O'Brien was the Chief Medicare Compliance Officer of Ovations.
- Karin O'Hara worked at UnitedHealthcare Community & State.
- David Orbuch was the Chief Compliance Officer for PSMG.
- Karen Petroff was the Senior Vice President of Business Development at Optum.
- Cynthia (Cindy) Polich was the President of UnitedHealthcare Medicare & Retirement.

16

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

223
Exhibit 2

Exhibit D
Page 213

1     • Janice Redmond was Senior Vice President of Provider Outreach at
2        Optum until in or around 2012, when she became Vice President of
3        Market Consultation for Optum's Western Region.
4     • In or around 2013, Anne Reis was an Associate Director of Revenue
5        for UnitedHealthcare Medicare & Retirement.
6     • In or around 2009 to 2011, Larry Renfro served as the Chief
7        Executive Officer of Ovations and the Chief Executive Officer of the
8        Public & Senior Markets Group.  Renfro is currently the Chief
9        Executive Officer of Optum and has been in this position since in or
10       around July 2011.  Renfro has been the Vice Chairman of UHG since
11       in or around November 2014.
12     • Sandy Rick was a Senior Regulatory Affairs Analyst at
13        UnitedHealthcare.
14     • Kara Rios was the Chief Financial Officer of AmeriChoice.
15     • Justin Roth was the Chief Financial Officer of Evercare.
16     • Daniel Schumacher was the Chief Financial Officer of
17        UnitedHealthcare.
18     • Melissa Sedor was a Director of Accounting at UnitedHealthcare.
19     • Matt Shors is UHG's Senior Deputy General Counsel.
20     • Marianne Short is UHG's Executive Vice President and Chief Legal
21        Officer.
22     • Andy Slavitt was the Chief Executive Officer for OptumInsight and
23        an Executive Vice President for Optum.
24     • Scott Theisen was the Chief Financial Officer of UnitedHealthcare
25        Medicare & Retirement from in or around 2010 to 2013.
26     • Brian Thompson has been the Chief Executive Officer of
27        UnitedHealthcare Medicare & Retirement since in or around 2017,
28        and that from in or around 2013 to 2017, he was the Chief Financial

17

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

224
Exhibit 2

Exhibit D
Page 214

1    Officer of UnitedHealthcare Medicare & Retirement.  Brian

2    Thompson was also previously the Chief Financial Officer of

3    UnitedHealthcare Community & State.

4    • Carol Thompson was a National Manager for Risk Adjustment

5      Programs at Ingenix until in or around 2009, a Manager of ChartSync

6      operations at Ingenix from in or around 2009 to 2011, a Manager of

7      Encounter Operations at Optum from in or around 2011 to 2013 and

8      an Analyst of Encounter Operations at Optum from in or around 2013

9      to 2014.

10    • Lee Valenta was the Chief Financial Officer, the Chief Operating

11      Officer, the Chief Scientific Officer, and an Executive Vice President

12      at OptumInsight.

13    • Karen Wagor was the Manager of the National Medical Coder Team

14      and the National Coding Trainer at Ingenix and then Optum and that

15      she previously worked at PacifiCare.

16    • John Way was Chief Financial Officer of SecureHorizons.

17    • Timothy Wicks served in a senior management position at Optum.

18    **THE MEDICARE PROGRAM**

19    **I.   The Medicare Statute**

20      43.   Paragraph 43 contains no allegations with respect to a particular

21 Defendant or claim, and therefore no response is required.  However, to the extent

22 Paragraph 43 purports to summarize and/or describe the provisions of the Medicare

23 program, UnitedHealth states that the Medicare statute speaks for itself, and to the

24 extent that the allegations in Paragraph 43 vary therefrom or with other applicable

25 statutory or decisional law, UnitedHealth denies those allegations.  Paragraph 43

26 also states legal conclusions to which no response is required.

27      44.   Paragraph 44 contains no allegations with respect to a particular

28 Defendant or claim, and therefore no response is required.  However, to the extent

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

1  Paragraph 44 purports to summarize and/or describe the provisions of the Medicare

2  program, UnitedHealth states that the Medicare statute speaks for itself, and to the

3  extent that the allegations in Paragraph 44 vary therefrom or with other applicable

4  statutory or decisional law, UnitedHealth denies those allegations.  Paragraph 44

5  also states legal conclusions to which no response is required.

6       45.    Paragraph 45 contains no allegations with respect to a particular

7  Defendant or claim, and therefore no response is required.  However, to the extent

8  Paragraph 45 purports to summarize and/or describe the provisions of the Medicare

9  program, UnitedHealth states that the Medicare statute speaks for itself, and to the

10 extent that the allegations in Paragraph 45 vary therefrom or with other applicable

11 statutory or decisional law, UnitedHealth denies those allegations.  Paragraph 45

12 also states legal conclusions to which no response is required.

13      46.    Paragraph 46 contains no allegations with respect to a particular

14 Defendant or claim, and therefore no response is required.  However, to the extent

15 Paragraph 46 purports to summarize and/or describe the provisions of the Medicare

16 program, UnitedHealth states that the Medicare statute speaks for itself, and to the

17 extent that the allegations in Paragraph 46 vary therefrom or with other applicable

18 statutory or decisional law, UnitedHealth denies those allegations.  Additionally,

19 Paragraph 46 refers to the Complaint, a legal document, which speaks for itself and

20 to which no response is required.  Paragraph 46 also states legal conclusions to

21 which no response is required.

22      47.    Paragraph 47 contains no allegations with respect to a particular

23 Defendant or claim, and therefore no response is required.  However, to the extent

24 Paragraph 47 purports to summarize and/or describe the provisions of the Medicare

25 program, UnitedHealth states that the Medicare statute speaks for itself, and to the

26 extent that the allegations in Paragraph 47 vary therefrom or with other applicable

27 statutory or decisional law, UnitedHealth denies those allegations.  Paragraph 47

28 also states legal conclusions to which no response is required.

19

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

226
Exhibit 2

Exhibit D
Page 216

48.     Paragraph 48 contains no allegations with respect to a particular Defendant or claim, and therefore no response is required.  However, to the extent Paragraph 48 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute speaks for itself, and to the extent that the allegations in Paragraph 48 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations.  Paragraph 48 refers to the Complaint, a legal document, which speaks for itself and to which no response is required.

49.     Paragraph 49 contains no allegations with respect to a particular Defendant or claim, and therefore no response is required.  However, to the extent Paragraph 49 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute, Medicare regulations, Medicare guidance documents, and the FCA speak for themselves, and to the extent that the allegations in Paragraph 49 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations.  Paragraph 49 also states legal conclusions to which no response is required.

50.     To the extent Paragraph 50 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute speaks for itself, and to the extent that the allegations in Paragraph 50 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations.  Paragraph 50 also states legal conclusions to which no response is required.

51.     To the extent Paragraph 51 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute speaks for itself, and to the extent that the allegations in Paragraph 51 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations.  Paragraph 51 also states legal conclusions to which no response is required.

20

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

227
Exhibit 2

Exhibit D
Page 217

1    52.    Paragraph 52 contains no allegations with respect to a particular

2 Defendant or claim, and therefore no response is required.  However, to the extent

3 Paragraph 52 purports to summarize and/or describe the provisions of the Medicare

4 program, UnitedHealth states that the Medicare statute speaks for itself, and to the

5 extent that the allegations in Paragraph 52 vary therefrom or with other applicable

6 statutory or decisional law, UnitedHealth denies those allegations.  Paragraph 52

7 also states legal conclusions to which no response is required.

8    53.    Paragraph 53 contains no allegations with respect to a particular

9 Defendant or claim, and therefore no response is required.  However, to the extent

10 Paragraph 53 purports to summarize and/or describe the provisions of the Medicare

11 program, UnitedHealth states that the Medicare statute speaks for itself, and to the

12 extent that the allegations in Paragraph 53 vary therefrom or with other applicable

13 statutory or decisional law, UnitedHealth denies those allegations.  Paragraph 53

14 also states legal conclusions to which no response is required.

15 **II.    Medicare Parts C and D Risk Adjustment Payments**

16    54.    Paragraph 54 contains no allegations with respect to a particular

17 Defendant or claim, and therefore no response is required.  However, to the extent

18 Paragraph 54 purports to summarize and/or describe the provisions of the Medicare

19 program, UnitedHealth states that the Medicare statute speaks for itself, and to the

20 extent that the allegations in Paragraph 54 vary therefrom or with other applicable

21 statutory or decisional law, UnitedHealth denies those allegations.  Paragraph 54

22 also states legal conclusions to which no response is required.

23    55.    Paragraph 55 contains no allegations with respect to a particular

24 Defendant or claim, and therefore no response is required.  However, to the extent

25 Paragraph 55 purports to summarize and/or describe the provisions of the Medicare

26 program, UnitedHealth states that the Medicare statute speaks for itself, and to the

27 extent that the allegations in Paragraph 55 vary therefrom or with other applicable

28

21

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

1    statutory or decisional law, UnitedHealth denies those allegations.  Paragraph 55

2    also states legal conclusions to which no response is required.

3        56.    Paragraph 56 contains no allegations with respect to a particular

4    Defendant or claim, and therefore no response is required.  However, to the extent

5    Paragraph 56 purports to summarize and/or describe the provisions of the Medicare

6    program, UnitedHealth states that the Medicare statute speaks for itself, and to the

7    extent that the allegations in Paragraph 56 vary therefrom or with other applicable

8    statutory or decisional law, UnitedHealth denies those allegations.  Paragraph 56

9    also states legal conclusions to which no response is required.

10       57.    Paragraph 57 contains no allegations with respect to a particular

11   Defendant or claim, and therefore no response is required.  However, to the extent

12   Paragraph 57 purports to summarize and/or describe the provisions of the Medicare

13   program, UnitedHealth states that the Medicare statute, Medicare regulations, and

14   Medicare guidance documents speak for themselves, and to the extent that the

15   allegations in Paragraph 57 vary therefrom or with other applicable statutory or

16   decisional law, UnitedHealth denies those allegations.  Paragraph 57 also states

17   legal conclusions to which no response is required.

18       58.    Paragraph 58 contains no allegations with respect to a particular

19   Defendant or claim, and therefore no response is required.  However, to the extent

20   Paragraph 58 purports to summarize and/or describe the provisions of the Medicare

21   program, UnitedHealth states that the Medicare statute and regulations speak for

22   themselves, and to the extent that the allegations in Paragraph 58 vary therefrom or

23   with other applicable statutory or decisional law, UnitedHealth denies those

24   allegations.

25       59.    Paragraph 59 contains no allegations with respect to a particular

26   Defendant or claim, and therefore no response is required.  However, to the extent

27   Paragraph 59 purports to summarize and/or describe the provisions of the Medicare

28   program, UnitedHealth states that the Medicare statute speaks for itself, and to the

22

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

229
Exhibit 2

Exhibit D
Page 219

1  extent that the allegations in Paragraph 59 vary therefrom or with other applicable

2  statutory or decisional law, UnitedHealth denies those allegations.

3       60.    Paragraph 60 contains no allegations with respect to a particular

4  Defendant or claim, and therefore no response is required.  However, to the extent

5  Paragraph 60 purports to summarize and/or describe the provisions of the Medicare

6  program, UnitedHealth states that the Medicare statute speaks for itself, and to the

7  extent that the allegations in Paragraph 60 vary therefrom or with other applicable

8  statutory or decisional law, UnitedHealth denies those allegations.

9       61.    Paragraph 61 contains no allegations with respect to a particular

10  Defendant or claim, and therefore no response is required.  However, to the extent

11  Paragraph 61 purports to summarize and/or describe the provisions of the Medicare

12  program, UnitedHealth states that the Medicare statute speaks for itself, and to the

13  extent that the allegations in Paragraph 61 vary therefrom or with other applicable

14  statutory or decisional law, UnitedHealth denies those allegations.

15       62.    Paragraph 62 contains no allegations with respect to a particular

16  Defendant or claim, and therefore no response is required.  However, to the extent

17  Paragraph 62 purports to summarize and/or describe the provisions of the Medicare

18  program, UnitedHealth states that the Medicare statute speaks for itself, and to the

19  extent that the allegations in Paragraph 62 vary therefrom or with other applicable

20  statutory or decisional law, UnitedHealth denies those allegations.

21       63.    Paragraph 63 contains no allegations with respect to a particular

22  Defendant or claim, and therefore no response is required.  However, to the extent

23  Paragraph 63 purports to summarize and/or describe the provisions of the Medicare

24  program, UnitedHealth states that the Medicare statute speaks for itself, and to the

25  extent that the allegations in Paragraph 63 vary therefrom or with other applicable

26  statutory or decisional law, UnitedHealth denies those allegations.  The final

27  sentence of Paragraph 63 describes the Complaint, a legal document, which speaks

28  for itself and to which no response is required.

23

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

230
Exhibit 2

Exhibit D
Page 220

64.     Paragraph 64 contains no allegations with respect to a particular Defendant or claim, and therefore no response is required.  However, to the extent Paragraph 64 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute speaks for itself, and to the extent that the allegations in Paragraph 64 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations.  Paragraph 64 also states legal conclusions to which no response is required.

65.     Paragraph 65 contains no allegations with respect to a particular Defendant or claim, and therefore no response is required.  However, to the extent Paragraph 65 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute speaks for itself, and to the extent that the allegations in Paragraph 65 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations.

## DEFENDANTS' AGREEMENTS

**I.      The Annual Parts C and D Agreements**

66.     Paragraph 66 states legal conclusions to which no response is required.  To the extent Paragraph 66 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute speaks for itself, and to the extent that the allegations in Paragraph 66 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations.  UnitedHealth admits that certain entities named as Defendants in this action entered into one or more agreements with the Government since 2005 to offer MA and/or PD Plans to Medicare beneficiaries under Parts C and D of the Medicare Program.

67.     To the extent Paragraph 67 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute speaks for itself, and to the extent that the allegations in Paragraph 67 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies

24

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

231
Exhibit 2

Exhibit D
Page 221

1  those allegations.  Paragraph 67 also states legal conclusions to which no response

2  is required.

3       68.     To the extent the allegations in Paragraph 68 relate to claims that have

4  been dismissed, they are surplusage and should be stricken.  To the extent

5  Paragraph 68 purports to describe a document or documents, such documents

6  speak for themselves and, as such, no response is required.  UnitedHealth denies

7  the remaining allegations in Paragraph 68.  Paragraph 68 also states legal

8  conclusions to which no response is required.

9       69.     To the extent Paragraph 69 purports to describe a document or

10  documents, such documents speak for themselves and, as such, no response is

11  required.  UnitedHealth denies the remaining allegations in Paragraph 69.

12       70.     To the extent Paragraph 70 purports to describe a document or

13  documents, such documents speak for themselves and, as such, no response is

14  required.  UnitedHealth denies the remaining allegations in Paragraph 70.

15       71.     To the extent the allegations in Paragraph 71 relate to claims that have

16  been dismissed, they are surplusage and should be stricken.  To the extent

17  Paragraph 71 purports to describe a document or documents, such documents

18  speak for themselves and, as such, no response is required.  UnitedHealth denies

19  the remaining allegations in Paragraph 71.

20       72.     Paragraph 72 contains no allegations with respect to a particular

21  Defendant or claim, and therefore no response is required.  To the extent Paragraph

22  72 purports to describe a document or documents, such documents speak for

23  themselves and, as such, no response is required.  UnitedHealth denies the

24  remaining allegations in Paragraph 72.

25  **II.     The Electronic Data Interchange Agreements**

26       73.     To the extent Paragraph 73 purports to summarize and/or describe the

27  provisions of the Medicare program, UnitedHealth states that the Medicare statute

28  and regulations speak for themselves, and to the extent that the allegations in

25

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

232
Exhibit 2

Exhibit D
Page 222

1   Paragraph 73 vary therefrom or with other applicable statutory or decisional law,

2   UnitedHealth denies those allegations.  To the extent Paragraph 73 purports to

3   describe a document or documents, such documents speak for themselves and, as

4   such, no response is required.  Paragraph 73 also states legal conclusions to which

5   no response is required.  UnitedHealth denies the remaining allegations in

6   Paragraph 73.

7        74.    To the extent Paragraph 74 purports to describe a document or

8   documents, such documents speak for themselves and, as such, no response is

9   required.  UnitedHealth denies the remaining allegations in Paragraph 74.

10       75.    To the extent Paragraph 75 purports to describe a document or

11  documents, such documents speak for themselves and, as such, no response is

12  required.  Paragraph 75 also states legal conclusions to which no response is

13  required.  UnitedHealth denies the remaining allegations in Paragraph 75.

14       76.    To the extent Paragraph 76 purports to describe a document or

15  documents, such documents speak for themselves and, as such, no response is

16  required.  Paragraph 76 also states legal conclusions to which no response is

17  required.  UnitedHealth denies the remaining allegations in Paragraph 76.

18       77.    To the extent Paragraph 77 purports to describe a document or

19  documents, such documents speak for themselves and, as such, no response is

20  required.  Paragraph 77 also states legal conclusions to which no response is

21  required.  UnitedHealth denies the remaining allegations in Paragraph 77.

22       78.    To the extent Paragraph 78 purports to describe a document or

23  documents, such documents speak for themselves and, as such, no response is

24  required.  Paragraph 78 also states legal conclusions to which no response is

25  required.  UnitedHealth denies the remaining allegations in Paragraph 78.

26       79.    To the extent Paragraph 79 purports to describe a document or

27  documents, such documents speak for themselves and, as such, no response is

28

26

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

1  required.  Paragraph 79 also states legal conclusions to which no response is
2  required.  UnitedHealth denies the remaining allegations in Paragraph 79.

3      80.    To the extent Paragraph 80 purports to describe a document or
4  documents, such documents speak for themselves and, as such, no response is
5  required.  Paragraph 80 also states legal conclusions to which no response is
6  required.  UnitedHealth denies the remaining allegations in Paragraph 80.

7      81.    To the extent Paragraph 81 purports to describe a document or
8  documents, such documents speak for themselves and, as such, no response is
9  required.  Paragraph 81 also states legal conclusions to which no response is
10 required.  UnitedHealth denies the remaining allegations in Paragraph 81.

11     82.    Paragraph 82 contains no allegations with respect to a particular
12 Defendant or claim, and therefore no response is required.  To the extent Paragraph
13 82 purports to describe a document or documents, such documents speak for
14 themselves and, as such, no response is required.  UnitedHealth denies the
15 remaining allegations in Paragraph 82.

16 **III.   The Ingenix/Optum Service Agreements**

17     83.    To the extent Paragraph 83 purports to describe a document or
18 documents, such documents speak for themselves and, as such, no response is
19 required.  UnitedHealth denies the remaining allegations in Paragraph 83.

20     84.    To the extent Paragraph 84 purports to describe a document or
21 documents, such documents speak for themselves and, as such, no response is
22 required.  UnitedHealth denies the remaining allegations in Paragraph 84.

23     85.    To the extent Paragraph 85 purports to describe a document or
24 documents, such documents speak for themselves and, as such, no response is
25 required.  UnitedHealth denies the remaining allegations in Paragraph 85.

26     86.    To the extent Paragraph 86 purports to describe a document or
27 documents, such documents speak for themselves and, as such, no response is
28 required.  UnitedHealth denies the remaining allegations in Paragraph 86.

27

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

234
Exhibit 2

Exhibit D
Page 224

## **DEFENDANTS' DATA INTEGRITY OBLIGATIONS**

**I.      Obligation to Submit Valid Diagnoses**

87.      Paragraph 87 contains no allegations with respect to a particular Defendant or claim, and therefore no response is required.  However, to the extent Paragraph 87 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute, regulations, and guidance, including the Medicare Managed Care Manual and the 2008 Risk Adjustment Data Technical Assistance for Medicare Advantage Organizations Participant Guide ("2008 RA Participant Guide"), speak for themselves, and to the extent that the allegations in Paragraph 87 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations.  UnitedHealth denies the remaining allegations in Paragraph 87.  Paragraph 87 also states legal conclusions to which no response is required.

88.      Paragraph 88 contains no allegations with respect to a particular Defendant or claim, and therefore no response is required.  However, to the extent Paragraph 88 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute, regulations, and guidance speak for themselves, and to the extent that the allegations in Paragraph 88 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations.  UnitedHealth denies the remaining allegations in Paragraph 88. Paragraph 88 also states legal conclusions to which no response is required.

89.      Paragraph 89 contains no allegations with respect to a particular Defendant or claim, and therefore no response is required.  However, to the extent Paragraph 89 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute, regulations, and guidance speak for themselves, and to the extent that the allegations in Paragraph 89 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies

28

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

1  those allegations.  UnitedHealth denies the remaining allegations in Paragraph 89.

2  Paragraph 89 also states legal conclusions to which no response is required.

3      90.    Paragraph 90 contains no allegations with respect to a particular

4  Defendant or claim, and therefore no response is required.  However, to the extent

5  Paragraph 90 purports to summarize and/or describe the provisions of the Medicare

6  program, UnitedHealth states that the Medicare statute, regulations, and guidance

7  speak for themselves, and to the extent that the allegations in Paragraph 90 vary

8  therefrom or with other applicable statutory or decisional law, UnitedHealth denies

9  those allegations.  UnitedHealth denies the remaining allegations in Paragraph 90.

10 Paragraph 90 also states legal conclusions to which no response is required.

11     91.    Paragraph 91 contains no allegations with respect to a particular

12 Defendant or claim, and therefore no response is required.  However, to the extent

13 Paragraph 91 purports to summarize and/or describe the provisions of the Medicare

14 program, UnitedHealth states that the Medicare statute, regulations, and guidance

15 speak for themselves, and to the extent that the allegations in Paragraph 91 vary

16 therefrom or with other applicable statutory or decisional law, UnitedHealth denies

17 those allegations.  UnitedHealth denies the remaining allegations in Paragraph 91.

18     92.    Paragraph 92 contains no allegations with respect to a particular

19 Defendant or claim, and therefore no response is required.  However, to the extent

20 Paragraph 92 purports to summarize and/or describe a document or documents,

21 such documents speak for themselves and, as such, no response is required.

22 UnitedHealth denies the remaining allegations in Paragraph 92.

23     93.    Paragraph 93 contains no allegations with respect to a particular

24 Defendant or claim, and therefore no response is required.  However, to the extent

25 Paragraph 93 purports to summarize and/or describe the provisions of the Medicare

26 program, UnitedHealth states that the Medicare statute, regulations, and guidance

27 speak for themselves, and to the extent that the allegations in Paragraph 93 vary

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

1   therefrom or with other applicable statutory or decisional law, UnitedHealth denies

2   those allegations.  UnitedHealth denies the remaining allegations in Paragraph 93.

3         94.    Paragraph 94 contains no allegations with respect to a particular

4   Defendant or claim, and therefore no response is required.  However, to the extent

5   Paragraph 94 purports to summarize and/or describe the provisions of the Medicare

6   program, UnitedHealth states that the Medicare statute, regulations, and guidance

7   speak for themselves, and to the extent that the allegations in Paragraph 94 vary

8   therefrom or with other applicable statutory or decisional law, UnitedHealth denies

9   those allegations.  UnitedHealth denies the remaining allegations in Paragraph 94.

10   **II.**    **Obligation to Implement an Effective Compliance Program**

11         95.    Paragraph 95 contains no allegations with respect to a particular

12   Defendant or claim, and therefore no response is required.  However, to the extent

13   Paragraph 95 purports to summarize and/or describe the provisions of the Medicare

14   program, UnitedHealth states that the Medicare statute, regulations, and guidance

15   speak for themselves, and to the extent that the allegations in Paragraph 95 vary

16   therefrom or with other applicable statutory or decisional law, UnitedHealth denies

17   those allegations.  UnitedHealth denies the remaining allegations in Paragraph 95.

18         96.    Paragraph 96 contains no allegations with respect to a particular

19   Defendant or claim, and therefore no response is required.  However, to the extent

20   Paragraph 96 purports to summarize and/or describe the provisions of the Medicare

21   program, UnitedHealth states that the Medicare statute, regulations, and guidance

22   speak for themselves, and to the extent that the allegations in Paragraph 96 vary

23   therefrom or with other applicable statutory or decisional law, UnitedHealth denies

24   those allegations.  UnitedHealth denies the remaining allegations in Paragraph 96.

25         97.    Paragraph 97 contains no allegations with respect to a particular

26   Defendant or claim, and therefore no response is required.  However, to the extent

27   Paragraph 97 purports to summarize and/or describe the provisions of the Medicare

28   program, UnitedHealth states that the Medicare statute, regulations, and guidance

30

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

237
Exhibit 2

Exhibit D
Page 227

1  speak for themselves, and to the extent that the allegations in Paragraph 97 vary

2  therefrom or with other applicable statutory or decisional law, UnitedHealth denies

3  those allegations.  UnitedHealth denies the remaining allegations in Paragraph 97.

4  **III.   Obligation to Attest to Validity of Risk Adjustment Data**

5       98.     To the extent the allegations in Paragraph 98 relate to claims that have

6  been dismissed, they are surplusage and should be stricken.  Paragraph 98 contains

7  no allegations with respect to a particular Defendant or claim, and therefore no

8  response is required.  However, to the extent Paragraph 98 purports to summarize

9  and/or describe the provisions of the Medicare program, UnitedHealth states that

10 the Medicare statute, regulations, and guidance speak for themselves, and to the

11 extent that the allegations in Paragraph 98 vary therefrom or with other applicable

12 statutory or decisional law, UnitedHealth denies those allegations.  Paragraph 98

13 also states legal conclusions to which no response is required.

14      99.     To the extent the allegations in Paragraph 99 relate to claims that have

15 been dismissed, they are surplusage and should be stricken.  Paragraph 99 contains

16 no allegations with respect to a particular Defendant or claim, and therefore no

17 response is required.  However, to the extent Paragraph 99 purports to summarize

18 and/or describe the provisions of the Medicare program, UnitedHealth states that

19 the Medicare statute, regulations, and guidance speak for themselves, and to the

20 extent that the allegations in Paragraph 99 vary therefrom or with other applicable

21 statutory or decisional law, UnitedHealth denies those allegations.  Paragraph 99

22 also states legal conclusions to which no response is required.  UnitedHealth denies

23 the remaining allegations in Paragraph 99.

24      100.    To the extent the allegations in Paragraph 100 relate to claims that have

25 have been dismissed, they are surplusage and should be stricken.  Paragraph 100

26 contains no allegations with respect to a particular Defendant or claim, and

27 therefore no response is required.  However, to the extent Paragraph 100 purports

28 to summarize and/or describe the provisions of the Medicare program,

31

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

238
Exhibit 2

Exhibit D
Page 228

1   UnitedHealth states that the Medicare statute, regulations, and guidance speak for

2   themselves, and to the extent that the allegations in Paragraph 100 vary therefrom

3   or with other applicable statutory or decisional law, UnitedHealth denies those

4   allegations.  Paragraph 100 also states legal conclusions to which no response is

5   required.  UnitedHealth denies the remaining allegations in Paragraph 100.

6       101.   To the extent the allegations in Paragraph 101 relate to claims that

7   have been dismissed, they are surplusage and should be stricken.  Paragraph 101

8   contains no allegations with respect to a particular Defendant or claim, and

9   therefore no response is required.  However, to the extent Paragraph 101 purports

10  to summarize and/or describe the provisions of the Medicare program,

11  UnitedHealth states that the Medicare statute, regulations, and guidance speak for

12  themselves, and to the extent that the allegations in Paragraph 101 vary therefrom

13  or with other applicable statutory or decisional law, UnitedHealth denies those

14  allegations.  Paragraph 101 also states legal conclusions to which no response is

15  required.  UnitedHealth denies the remaining allegations in Paragraph 101.

16      102.   To the extent the allegations in Paragraph 102 relate to claims that

17  have been dismissed, they are surplusage and should be stricken.  Paragraph 102

18  contains no allegations with respect to a particular Defendant or claim, and

19  therefore no response is required.  However, to the extent Paragraph 102 purports

20  to summarize and/or describe the provisions of the Medicare program,

21  UnitedHealth states that the Medicare statute, regulations, and guidance speak for

22  themselves, and to the extent that the allegations in Paragraph 102 vary therefrom

23  or with other applicable statutory or decisional law, UnitedHealth denies those

24  allegations.  Paragraph 102 also states legal conclusions to which no response is

25  required.  UnitedHealth denies the remaining allegations in Paragraph 102.

26  **IV.    Obligation to Delete Invalid Diagnoses**

27      103.   Paragraph 103 contains no allegations with respect to a particular

28  Defendant or claim, and therefore no response is required.  However, to the extent

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

Case 2:16-cv-08697-FMO-SS   Document 422-3   Filed 06/22/21   Page 240 of 1177   Page ID
#:14314
Case 2:16-cv-08697-MWF-SS   Document 223   Filed 03/23/18   Page 33 of 101   Page ID
#:3098

1   Paragraph 103 purports to summarize and/or describe the provisions of the

2   Medicare program, UnitedHealth states that the Medicare statute, regulations, and

3   guidance speak for themselves, and to the extent that the allegations in Paragraph

4   103 vary therefrom or with other applicable statutory or decisional law,

5   UnitedHealth denies those allegations.  Paragraph 103 also states legal conclusions

6   to which no response is required.  UnitedHealth denies the remaining allegations in

7   Paragraph 103.

8        104.   Paragraph 104 contains no allegations with respect to a particular

9   Defendant or claim, and therefore no response is required.  However, to the extent

10   Paragraph 104 purports to summarize and/or describe the provisions of the

11   Medicare program, UnitedHealth states that the Medicare statute, regulations, and

12   guidance speak for themselves, and to the extent that the allegations in Paragraph

13   104 vary therefrom or with other applicable statutory or decisional law,

14   UnitedHealth denies those allegations.  Paragraph 104 also states legal conclusions

15   to which no response is required.  UnitedHealth denies the remaining allegations in

16   Paragraph 104.

17        105.   To the extent the allegations in Paragraph 105 relate to claims that

18   have been dismissed, they are surplusage and should be stricken.  Paragraph 105

19   contains no allegations with respect to a particular Defendant or claim, and

20   therefore no response is required.  However, to the extent Paragraph 105 purports

21   to summarize and/or describe the provisions of the Medicare program,

22   UnitedHealth states that the Medicare statute, regulations, and guidance speak for

23   themselves, and to the extent that the allegations in Paragraph 105 vary therefrom

24   or with other applicable statutory or decisional law, UnitedHealth denies those

25   allegations.  Paragraph 105 also states legal conclusions to which no response is

26   required.  UnitedHealth denies the remaining allegations in Paragraph 105.

27        106.   Paragraph 106 contains no allegations with respect to a particular

28   Defendant or claim, and therefore no response is required.  However, to the extent

<div align="center">33</div>

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

240
Exhibit 2

Exhibit D
Page 230

Paragraph 106 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute, regulations, and guidance speak for themselves, and to the extent that the allegations in Paragraph 106 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations.  Paragraph 106 also states legal conclusions to which no response is required.  UnitedHealth denies the remaining allegations in Paragraph 106.

107.   Paragraph 107 contains no allegations with respect to a particular Defendant or claim, and therefore no response is required.  However, to the extent Paragraph 107 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute, regulations, and guidance speak for themselves, and to the extent that the allegations in Paragraph 107 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations.  Paragraph 107 also states legal conclusions to which no response is required.  UnitedHealth denies the remaining allegations in Paragraph 107.

108.   Paragraph 108 contains no allegations with respect to a particular Defendant or claim, and therefore no response is required.  However, to the extent Paragraph 108 purports to summarize and/or describe a document or documents, such documents speak for themselves and, as such, no response is required.  Paragraph 108 also states legal conclusions to which no response is required.  UnitedHealth denies the remaining allegations in Paragraph 108.

109.   Paragraph 109 contains no allegations with respect to a particular Defendant or claim, and therefore no response is required.  However, to the extent Paragraph 109 purports to summarize and/or describe a document or documents or data archive, such documents and data archive speak for themselves and, as such, no response is required.  Paragraph 109 also states legal conclusions to which no

34

UNITEDHEALTH'S ANSWER TO UNITED STATES' AMENDED COMPLAINT-IN-PARTIAL-INTERVENTION AND COUNTERCLAIM

1  response is required.  UnitedHealth denies the remaining allegations in Paragraph

2  109.

3      110.   Paragraph 110 contains no allegations with respect to a particular

4  Defendant or claim, and therefore no response is required.  However, to the extent

5  Paragraph 110 purports to summarize and/or describe the provisions of the

6  Medicare program, UnitedHealth states that the Medicare statute, regulations, and

7  guidance speak for themselves, and to the extent that the allegations in Paragraph

8  110 vary therefrom or with other applicable statutory or decisional law,

9  UnitedHealth denies those allegations.  Paragraph 110 also states legal conclusions

10  to which no response is required.  UnitedHealth denies the remaining allegations in

11  Paragraph 110.

12      111.   Paragraph 111 contains no allegations with respect to a particular

13  Defendant or claim, and therefore no response is required.  However, to the extent

14  Paragraph 111 purports to summarize and/or describe the provisions of the

15  Medicare program, UnitedHealth states that the Medicare statute, regulations, and

16  guidance speak for themselves, and to the extent that the allegations in Paragraph

17  111 vary therefrom or with other applicable statutory or decisional law,

18  UnitedHealth denies those allegations.  UnitedHealth denies the remaining

19  allegations in Paragraph 111.

20      112.   Paragraph 112 contains no allegations with respect to a particular

21  Defendant or claim, and therefore no response is required.  However, to the extent

22  Paragraph 112 purports to summarize and/or describe the provisions of the

23  Medicare program, UnitedHealth states that the Medicare statute, regulations, and

24  guidance speak for themselves, and to the extent that the allegations in Paragraph

25  112 vary therefrom or with other applicable statutory or decisional law,

26  UnitedHealth denies those allegations.  UnitedHealth denies the remaining

27  allegations in Paragraph 112.

28

35

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

242
Exhibit 2

Exhibit D
Page 232

1    113.    UnitedHealth admits that Rebecca Martin knew how to make deletes
2    in RAPS.  UnitedHealth admits that certain other employees knew the difference
3    between "open-period" and "closed-period" deletes.  UnitedHealth denies the
4    remaining allegations in Paragraph 113.

5    114.    Paragraph 114 states legal conclusions to which no response is
6    required.  To the extent that Paragraph 114 contains any factual allegations
7    regarding UnitedHealth, such allegations are denied.  UnitedHealth denies the
8    remaining allegations in Paragraph 114.

9                            **THE FALSE CLAIMS ACT**

10    115.    To the extent the allegations in Paragraph 115 relate to claims that
11    have been dismissed, they are surplusage and should be stricken.  Paragraph 115
12    contains no allegations with respect to a particular Defendant or claim, and
13    therefore no response is required.  However, to the extent Paragraph 115 purports
14    to summarize and/or describe the provisions of the FCA, UnitedHealth states that
15    the FCA speaks for itself, and to the extent that the allegations in Paragraph 115
16    vary therefrom or with other applicable statutory or decisional law, UnitedHealth
17    denies those allegations.  UnitedHealth denies the remaining allegations in
18    Paragraph 115.  Paragraph 115 also states legal conclusions to which no response
19    is required.

20    116.    To the extent the allegations in Paragraph 116 relate to claims that
21    have been dismissed, they are surplusage and should be stricken.  Paragraph 116
22    contains no allegations with respect to a particular Defendant or claim, and
23    therefore no response is required.  However, to the extent Paragraph 116 purports
24    to summarize and/or describe the provisions of the FCA or the Fraud Enforcement
25    and Recovery Act of 2009 ("FERA"), UnitedHealth states that the FCA and FERA
26    speak for themselves, and to the extent that the allegations in Paragraph 116 vary
27    therefrom or with other applicable statutory or decisional law, UnitedHealth denies
28    those allegations.  UnitedHealth denies the remaining allegations in Paragraph 116.

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

117.   To the extent the allegations in Paragraph 117 relate to claims that have been dismissed, they are surplusage and should be stricken.  Paragraph 117 contains no allegations with respect to a particular Defendant or claim, and therefore no response is required.  However, to the extent Paragraph 117 purports to summarize and/or describe the provisions of the FCA or FERA, UnitedHealth states that the FCA and FERA speak for themselves, and to the extent that the allegations in Paragraph 117 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations.  UnitedHealth denies the remaining allegations in Paragraph 117.

118.   Paragraph 118 contains no allegations with respect to a particular Defendant or claim, and therefore no response is required.  However, to the extent Paragraph 118 purports to summarize and/or describe the provisions of the FCA or FERA, UnitedHealth states that the FCA and FERA speak for themselves, and to the extent that the allegations in Paragraph 118 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations. Paragraph 118 also states legal conclusions to which no response is required. UnitedHealth denies the remaining allegations in Paragraph 118.

119.   Paragraph 119 contains no allegations with respect to a particular Defendant or claim, and therefore no response is required.  However, to the extent Paragraph 119 purports to summarize and/or describe the provisions of the FCA or FERA, UnitedHealth states that the FCA and FERA speak for themselves, and to the extent that the allegations in Paragraph 119 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations. UnitedHealth denies the remaining allegations in Paragraph 119.

120.   Paragraph 120 contains no allegations with respect to a particular Defendant or claim, and therefore no response is required.  However, to the extent Paragraph 120 purports to describe the provisions of the FCA, UnitedHealth states that the FCA speaks for itself, and to the extent that the allegations in Paragraph

37

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

244
Exhibit 2

Exhibit D
Page 234

1  120 vary therefrom or with other applicable statutory or decisional law, such as

2  *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989

3  (2016), UnitedHealth denies those allegations.  UnitedHealth denies the remaining

4  allegations in Paragraph 120.

5      121.   Paragraph 121 contains no allegations with respect to a particular

6  Defendant or claim, and therefore no response is required.  However, to the extent

7  Paragraph 121 purports to summarize and/or describe the provisions of the FCA

8  and the Bipartisan Budget Act of 2015, Public Law 114-74 (No. 2, 2015) ("BBA"),

9  UnitedHealth states that the FCA and BBA speak for themselves, and to the extent

10  that the allegations in Paragraph 121 vary therefrom or with other applicable

11  statutory or decisional law, UnitedHealth denies those allegations.  UnitedHealth

12  denies the remaining allegations in Paragraph 121.

13                              **THE FACTS**

14      122.   UnitedHealth admits that since at least 2005, certain Defendants

15  conducted a Chart Review program in which millions of medical records were

16  reviewed.  To the extent Paragraph 122 purports to describe a document, the

17  document speaks for itself and, as such, no response is required.  UnitedHealth

18  denies the remaining allegations in Paragraph 122.

19  **I.   Defendants Knew That Many Provider-Reported Diagnoses Were**

20  **Invalid And That They Were Obligated To Undertake Good Faith**

21  **Efforts To Identify And Delete Them[1]**

22      123.   UnitedHealth admits that in connection with its acquisition of

23  PacifiCare in 2005, UnitedHealth retained some PacifiCare employees who had

24  experience performing work relating to risk adjustment.  UnitedHealth denies the

25  remaining allegations in Paragraph 123.

26

27  _____

28  [1] The headings and sub-headings throughout the Amended Complaint do not constitute well-pleaded allegations of fact and therefore require no response.

38

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

245

Exhibit 2

Exhibit D
Page 235

124.   UnitedHealth admits that Jeffrey Dumcum, Stephanie Will, Pam Holt, and Pam Leal were former employees of PacifiCare who worked in risk adjustment.  UnitedHealth admits that Dumcum joined UnitedHealth as Director of Finance at UnitedHealthcare; that Will joined UnitedHealth as Manager of Finance; that Holt joined UnitedHealth as Manager of Network Operations at UnitedHealthcare; and that Leal joined UnitedHealth as Director of Network Management at UnitedHealthcare.  UnitedHealth is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 124 regarding Holt and Leal's positions at PacifiCare before they joined UnitedHealth; therefore, such allegations are denied.  UnitedHealth denies the remaining allegations in Paragraph 124.

125.   UnitedHealth admits that from 2005 to 2007, Dumcum and Gardner worked at the PacifiCare office in Santa Ana, California, and Holt and Leal worked at the PacifiCare office in Cypress, California.  UnitedHealth admits that in March 2007, Holt and Leal transferred to an office in Santa Ana, California.  UnitedHealth denies the remaining allegations in Paragraph 125.

126.   To the extent Paragraph 126 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 126; therefore, such allegations are denied.  UnitedHealth denies the remaining allegations in Paragraph 126.

127.   UnitedHealth admits that the Industry Collaboration Effort ("ICE") was a volunteer, multi-disciplinary team of providers, health plans, associations, state and federal agencies, and accrediting bodies working collaboratively to improve healthcare regulatory compliance through education of the public.  UnitedHealth admits that ICE had a Risk Adjustment Data Acquisition & Reporting ("RADAR") team.  UnitedHealth further admits that after UnitedHealth

39

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

246
Exhibit 2

Exhibit D
Page 236

1  acquired PacifiCare, some former PacifiCare employees participated in ICE and its

2  RADAR team.  UnitedHealth admits that Leal was the President and a member of

3  the Board of Directors of ICE around or before 2007.  To the extent Paragraph 127

4  purports to describe a document or documents, such documents speak for

5  themselves and, as such, no response is required.  UnitedHealth denies the

6  remaining allegations in Paragraph 127.

7       128.   To the extent Paragraph 128 purports to describe a document or

8  documents, such documents speak for themselves and, as such, no response is

9  required.  UnitedHealth denies the remaining allegations in Paragraph 128.

10      129.   To the extent Paragraph 129 describes these documents, such

11  documents speak for themselves and, as such, no response is required.

12  UnitedHealth is without knowledge or information sufficient to form a belief as to

13  the truth or falsity of the remaining allegations in Paragraph 129; therefore, such

14  allegations are denied.  UnitedHealth denies the remaining allegations in Paragraph

15  129.

16      130.   To the extent Paragraph 130 purports to describe a document or

17  documents, such documents speak for themselves and, as such, no response is

18  required.  UnitedHealth is without knowledge or information sufficient to form a

19  belief as to the truth or falsity of the remaining allegations in Paragraph 130;

20  therefore, such allegations are denied.  UnitedHealth denies the remaining

21  allegations in Paragraph 130.

22      131.   To the extent Paragraph 131 purports to describe a document or

23  documents, such documents speak for themselves and, as such, no response is

24  required.  UnitedHealth is without knowledge or information sufficient to form a

25  belief as to the truth or falsity of the remaining allegations in Paragraph 131;

26  therefore, such allegations are denied.

27      132.   UnitedHealth admits that the former PacifiCare employees were

28  aware that CMS could audit the diagnoses MA Organizations submitted for risk

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

1  adjustment payments.  UnitedHealth denies the remaining allegations in Paragraph

2  132.

3      133.   To the extent Paragraph 133 purports to describe a document or

4  documents, such documents speak for themselves and, as such, no response is

5  required.  UnitedHealth is without knowledge or information sufficient to form a

6  belief as to the truth or falsity of the remaining allegations in Paragraph 133;

7  therefore, such allegations are denied.  UnitedHealth denies the remaining

8  allegations in Paragraph 133.

9      134.   To the extent Paragraph 134 purports to describe a document or

10  documents, such documents speak for themselves and, as such, no response is

11  required.  UnitedHealth denies the remaining allegations in Paragraph 134.

12      135.   UnitedHealth admits that after UnitedHealth's acquisition of

13  PacifiCare, Jeff Dumcum gave presentations to various UnitedHealth employees

14  regarding provider coding.  To the extent Paragraph 135 purports to describe

15  documents, the documents speak for themselves and, as such, no response is

16  required.  UnitedHealth is without knowledge or information sufficient to form a

17  belief as to the truth or falsity of the remaining allegations in Paragraph 135;

18  therefore, such allegations are denied.  UnitedHealth denies the remaining

19  allegations in Paragraph 135.

20      136.   To the extent Paragraph 136 purports to describe a document or

21  documents, such documents speak for themselves and, as such, no response is

22  required.  UnitedHealth denies the remaining allegations in Paragraph 136.

23      137.   UnitedHealth admits that in or about 2007, certain risk adjustment

24  operations moved to Ingenix.  Additionally, UnitedHealth admits that Ingenix

25  served commercial clients.  To the extent Paragraph 137 purports to describe a

26  document or documents, such documents speak for themselves and, as such, no

27  response is required.  UnitedHealth denies the remaining allegations in Paragraph

28  137.

<div align="center">41</div>

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

138.   To the extent Paragraph 138 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 138; therefore, such allegations are denied.  UnitedHealth denies the remaining allegations in Paragraph 138.

139.   UnitedHealth admits that it implemented an internal data validation program on or about 2007 or 2008.  To the extent Paragraph 139 purports to describe a document or documents, the documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 139.

140.   To the extent Paragraph 140 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 140; therefore, such allegations are denied.  UnitedHealth denies the remaining allegations in Paragraph 140.

141.   UnitedHealth admits that CMS performed RADV audits. UnitedHealth admits that Ingenix and then Optum performed IDV and RACCR to review provider-reported diagnoses.  To the extent Paragraph 141 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 141.

142.   To the extent Paragraph 142 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 142.

143.   UnitedHealth admits that Ingenix implemented an internal data validation program in or around 2007 or 2008.  To the extent Paragraph 143

42

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

249
Exhibit 2

Exhibit D
Page 239

1   purports to describe a document or documents, the documents speak for

2   themselves and, as such, no response is required.  UnitedHealth denies the

3   remaining allegations in Paragraph 143.

4       144.   To the extent Paragraph 144 purports to describe a document or

5   documents, such documents speak for themselves and, as such, no response is

6   required.  UnitedHealth denies the remaining allegations in Paragraph 144.

7       145.   To the extent Paragraph 145 purports to describe a document or

8   documents, such documents speak for themselves and, as such, no response is

9   required.  UnitedHealth denies the remaining allegations in Paragraph 145.

10      146.   To the extent Paragraph 146 purports to describe a document or

11  documents, such documents speak for themselves and, as such, no response is

12  required.  UnitedHealth denies the remaining allegations in Paragraph 146.

13      147.   UnitedHealth admits that Larry Renfro was the Chief Executive

14  Officer of PSMG in or around May 2010.  To the extent Paragraph 147 contains

15  legal conclusions, no response is required.  To the extent Paragraph 147 purports to

16  describe a document or documents, such documents speak for themselves and, as

17  such, no response is required.  Additionally, to the extent Paragraph 147 purports

18  to summarize and/or describe the provisions of the Medicare program,

19  UnitedHealth states that the Medicare statute and regulations speak for themselves,

20  and to the extent that the allegations in Paragraph 147 vary therefrom or with other

21  applicable statutory or decisional law, UnitedHealth denies those allegations.

22  UnitedHealth denies the remaining allegations in Paragraph 147.

23      148.   UnitedHealth admits that Kimberly Halva was UnitedHealth Medicare

24  & Retirement's Finance Compliance Officer from 2010 to 2013.  UnitedHealth

25  admits that Scott Theisen was the Chief Financial Officer of UnitedHealthcare

26  Medicare & Retirement from in or around 2010 to 2013.  To the extent Paragraph

27  148 purports to describe a document or documents, such documents speak for

28  themselves and, as such, no response is required.  To the extent Paragraph 148

43

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

250

Exhibit 2

Exhibit D
Page 240

1  contains legal conclusions, no response is required.  UnitedHealth denies the
2  remaining allegations in Paragraph 148.

3        149.   To the extent Paragraph 149 purports to describe a document or
4  documents, such documents speak for themselves and, as such, no response is
5  required.  UnitedHealth denies the remaining allegations in Paragraph 149.

6        150.   To the extent the allegations in Paragraph 150 relate to claims that
7  have been dismissed, they are surplusage and should be stricken.  To the extent
8  Paragraph 150 purports to describe a document or documents, such documents
9  speak for themselves and, as such, no response is required.  UnitedHealth admits
10  that, since in or around 2008, certain provider groups submitted attestations to
11  some of the UnitedHealth Defendants certifying that the diagnoses that they
12  reported to some of the UnitedHealth Defendants were valid and met CMS's
13  requirements.  UnitedHealth denies the remaining allegations in Paragraph 150.

14        151.   To the extent Paragraph 151 purports to describe a document or
15  documents, such documents speak for themselves and, as such, no response is
16  required.  UnitedHealth denies the remaining allegations in Paragraph 151.

17        152.   To the extent Paragraph 152 purports to describe a document or
18  documents, such documents speak for themselves and, as such, no response is
19  required.  To the extent a response is required, UnitedHealth denies the allegations
20  in Paragraph 152.

21        153.   To the extent Paragraph 153 purports to describe a document or
22  documents, such documents speak for themselves and, as such, no response is
23  required.  UnitedHealth denies the remaining allegations in Paragraph 153.

24        154.   To the extent Paragraph 154 purports to describe a document or
25  documents, such documents speak for themselves and, as such, no response is
26  required.  UnitedHealth denies the remaining allegations in Paragraph 154.

27

28

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

155.   To the extent Paragraph 155 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 155.

156.   To the extent Paragraph 156 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 156.

157.   UnitedHealth admits that UnitedHealthcare Medicare & Retirement implemented the program eventually known as the RACCR program in or about 2009.  To the extent Paragraph 157 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  To the extent Paragraph 157 states a legal conclusion, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 157.

158.   UnitedHealth admits that its Claims Verification ("CV") program was implemented in phases, that Phase I of the CV Program was performed in or around 2010, and that Phase II of the CV Program was performed in or around late 2011 or early 2012.  To the extent Paragraph 158 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 158.

159.   To the extent Paragraph 159 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 159.

160.   To the extent Paragraph 160 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 160.

161.   To the extent that Paragraph 161 contains legal conclusions, no response is required.  To the extent Paragraph 161 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 161.

45

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

252
Exhibit 2

Exhibit D
Page 242

162.   To the extent Paragraph 162 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 162.

163.   To the extent that Paragraph 163 contains legal conclusions, no response is required.  To the extent Paragraph 163 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 163.

**II.    Chart Reviews and Claims Verification**

**A.    United's "Look One Way" Chart Review Program**

164.   UnitedHealth admits that as part of its Chart Review Program, coders reviewed beneficiaries' medical records.  To the extent Paragraph 164 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 164.

165.   UnitedHealth admits that some of the UnitedHealth Defendants have performed some form of Chart Review since 2005.  UnitedHealth admits that Dumcum and Will became key participants in the Chart Review Program and that Will was the Program Manager of the Chart Review Program.  UnitedHealth is without knowledge or information as to the identity of the "other former PacifiCare employees sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 165; therefore, such allegations are denied. UnitedHealth denies the remaining allegations in Paragraph 165.

166.   UnitedHealth admits that hundreds of thousands of charts were reviewed over the first few years of the Chart Review Program.  To the extent Paragraph 166 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 166.

46

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

253
Exhibit 2

Exhibit D
Page 243

167.   UnitedHealth admits that UnitedHealth Group Incorporated acquired AIM Healthcare Services, Inc. in or around 2009.  UnitedHealth admits that in or about 2010, Ingenix developed ChartSync—an in-house chart review computer database system that allowed coders to review medical records electronically—and that in or about 2012 and 2011, Ingenix opened offices in the Philippines and India, respectively, where coders could review codes.  UnitedHealth denies the remaining allegations in Paragraph 167.

168.   To the extent Paragraph 168 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 168.

169.   To the extent Paragraph 169 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 169.

170.   UnitedHealth admits that Ingenix and then Optum or their vendors obtained medical records from fee-for-service providers in numerous places in the United States.  UnitedHealth admits that Ingenix and then Optum or their vendors sent some of these medical records to coders employed in Tennessee, India, and the Philippines.  UnitedHealth admits that Ingenix and then Optum hired coding vendors located in various locations within and outside of the United States to review medical records.  UnitedHealth denies the remaining allegations in Paragraph 170.

171.   UnitedHealth admits chart review was conducted by or on behalf of certain physician groups, including WellMed and Southwest Medical Associates.  UnitedHealth denies the remaining allegations in Paragraph 171.

172.   To the extent Paragraph 172 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 172.

47

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

173.   To the extent Paragraph 173 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 173.

174.   To the extent Paragraph 174 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 174.

175.   UnitedHealth admits that its Chart Review Program was conducted according to an annual cycle.  To the extent Paragraph 175 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 175.

176.   UnitedHealth admits that some of the UnitedHealth Defendants had revenue estimates for the Chart Review Program.  UnitedHealth admits that some of the UnitedHealth Defendants identified more codes supported by records through subsequent reviews.  To the extent Paragraph 176 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 176.

177.   To the extent the allegations in Paragraph 177 relate to claims that have been dismissed, they are surplusage and should be stricken.  To the extent Paragraph 177 states legal conclusions, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 177.

**B.**   **United Knew It Was Obligated To Look Both Ways At The Results Of Its Chart Reviews And Make DELETES As Well As ADDS**

178.   To the extent Paragraph 178 purports to describe a document, the document speaks for itself and, as such, no response is required.  UnitedHealth is without knowledge or information sufficient to form a belief as to the truth or

48

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

255
Exhibit 2

Exhibit D
Page 245

1    falsity of Poehling's discussions and the allegations in Paragraph 178.

2    UnitedHealth denies the remaining allegations in Paragraph 178.

3       179.   UnitedHealth denies that there were problems related to the diagnoses

4    reported by providers paid on a fee-for-service basis. To the extent Paragraph 179

5    purports to describe a document, the document speaks for itself and, as such, no

6    response is required. UnitedHealth is without knowledge or information sufficient

7    to form a belief as to the truth or falsity of the remaining allegations in Paragraph

8    179; therefore, such allegations are denied. UnitedHealth denies the remaining

9    allegations in Paragraph 179.

10       180.   To the extent Paragraph 180 purports to describe a document or

11    documents, such documents speak for themselves and, as such, no response is

12    required. UnitedHealth is without knowledge or information sufficient to form a

13    belief as to the truth or falsity of the allegations in Paragraph 180; therefore, such

14    allegations are denied.

15       181.   To the extent Paragraph 181 purports to describe a document or

16    documents, such documents speak for themselves and, as such, no response is

17    required. UnitedHealth is without knowledge or information sufficient to form a

18    belief as to the truth or falsity of the allegations in Paragraph 181; therefore, such

19    allegations are denied. UnitedHealth denies the remaining allegations in Paragraph

20    181.

21       182.   To the extent Paragraph 182 purports to describe a document or

22    documents, such documents speak for themselves and, as such, no response is

23    required. UnitedHealth denies the remaining allegations in Paragraph 182.

24       183.   To the extent Paragraph 183 purports to describe a document or

25    documents, such documents speak for themselves and, as such, no response is

26    required. UnitedHealth denies the remaining allegations in Paragraph 183.

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

49

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

184.   To the extent Paragraph 184 purports to describe a document, the document speaks for itself and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 184.

185.   To the extent Paragraph 185 purports to describe a document, the document speaks for itself and, as such, no response is required.  To the extent Paragraph 186 states legal conclusions, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 185.

186.   UnitedHealth admits that Paul Bihm was a Vice President of General Management at Optum in or around 2011.  To the extent Paragraph 186 purports to describe a document, the document speaks for itself and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 186.

187.   To the extent Paragraph 187 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 187.

188.   UnitedHealth admits that Eric Murphy was the President of Payer Solutions at Optum in or around December 2011.  To the extent Paragraph 188 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 188.

189.   To the extent Paragraph 189 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 189.

190.   UnitedHealth admits that William Miller was the Chief Executive Officer of OptumInsight in or around September 2012.  To the extent Paragraph 190 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  To the extent Paragraph 190 states legal conclusions, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 190.

50

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

257
Exhibit 2

Exhibit D
Page 247

191.   UnitedHealth admits that prior to 2012, coders reviewed medical records at providers' offices if the coder could not review the records electronically because the provider did not want UnitedHealth to copy the record.  UnitedHealth further admits that UnitedHealthcare Medicare & Retirement made a policy decision to stop this practice.  To the extent Paragraph 191 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 191.

192.   To the extent Paragraph 193 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 193.

193.   To the extent Paragraph 193 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 193.

194.   To the extent Paragraph 194 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 194.

195.   To the extent Paragraph 195 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 195; therefore, such allegations are denied.

C.   **United's Short-lived "Look Both Ways" Claims Verification Program**

196.   To the extent Paragraph 196 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 196.

51

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

258
Exhibit 2

Exhibit D
Page 248

1      197.  To the extent Paragraph 197 purports to describe a document or

2  documents, such documents speak for themselves and, as such, no response is

3  required.  UnitedHealth denies the remaining allegations in Paragraph 197.

4      198.  To the extent Paragraph 198 purports to describe a document or

5  documents, such documents speak for themselves and, as such, no response is

6  required.  UnitedHealth denies the remaining allegations in Paragraph 198.

7      199.  To the extent Paragraph 199 purports to describe a document or

8  documents, such documents speak for themselves and, as such, no response is

9  required.  UnitedHealth denies the remaining allegations in Paragraph 199.

10      200.  To the extent Paragraph 200 purports to describe a document or

11  documents, such documents speak for themselves and, as such, no response is

12  required.  UnitedHealth denies the remaining allegations in Paragraph 200.

13      201.  UnitedHealth admits that in or around 2012, UnitedHealthcare

14  Medicare & Retirement sent letters to capitated providers.  To the extent Paragraph

15  201 purports to describe a document or documents, such documents speak for

16  themselves and, as such, no response is required.  UnitedHealth denies the

17  remaining allegations in Paragraph 201.

18      202.  UnitedHealth admits that UnitedHealthcare Medicare & Retirement

19  and Optum developed and implemented CV in phases over several years.

20  UnitedHealth admits that when there was a discrepancy between the provider-

21  reported diagnoses and the diagnosis codes identified by the coder as part of the

22  Chart Review Program, Optum undertook an additional review of the medical

23  record.  UnitedHealth admits Optum did not delete diagnosis codes that were found

24  to be adequately supported by the medical record.  To the extent Paragraph 202

25  purports to describe a document or documents, such documents speak for

26  themselves and, as such, no response is required.  To the extent Paragraph 202

27  states legal conclusions, no response is required.  UnitedHealth denies the

28  remaining allegations in Paragraph 202.

52

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

203.   UnitedHealth admits that Optum did not generally contact providers during the CV process.  UnitedHealth denies the remaining allegations in Paragraph 203.

204.   To the extent Paragraph 204 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  To the extent Paragraph 204 states legal conclusions, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 204.

205.   UnitedHealth denies the allegations in Paragraph 205.

206.   To the extent Paragraph 206 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 206.

207.   UnitedHealth admits that as part of Phase I, Ingenix sometimes contacted providers to determine whether or not there were additional medical records for particular beneficiaries.  To the extent Paragraph 207 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 207.

208.   UnitedHealth admits that Optum began conducting Phase II of its CV Program in approximately mid-2011 and that Phase II was completed in approximately early 2012.  To the extent Paragraph 208 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  To the extent Paragraph 208 states legal conclusions, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 208.

209.   UnitedHealth admits that Optum began the Phase III pilot in or about mid-2012.  UnitedHealth admits that the Phase III pilot included a review of approximately 5,000 charts relating to encounters that took place in calendar year 2011.  To the extent Paragraph 209 purports to describe a document or documents,

53

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

260
Exhibit 2

Exhibit D
Page 250

1  such documents speak for themselves and, as such, no response is required.

2  UnitedHealth denies the remaining allegations in Paragraph 209.

3      210.   To the extent Paragraph 210 purports to describe a document or

4  documents, such documents speak for themselves and, as such, no response is

5  required.  UnitedHealth denies the remaining allegations in Paragraph 210.

6      211.   UnitedHealth admits that the CV Program continued to evolve after

7  research regarding how to structure the CV Program to best meet the goals of

8  identifying diagnosis codes that were unsupported by the medical record.

9  UnitedHealth admits that, as a result of that research, UnitedHealthcare Medicare

10  & Retirement added an expert-level review to the CV process.  UnitedHealth

11  admits that UnitedHealthcare Medicare & Retirement discontinued its CV Program

12  in 2014.  UnitedHealth denies the remaining allegations in Paragraph 211.

13      212.   UnitedHealth admits that certain eligibility criteria were applied to

14  determine eligibility for inclusion in the CV Program.  To the extent Paragraph 212

15  purports to describe a document, the document speaks for itself and, as such, no

16  response is required.  To the extent Paragraph 213 states legal conclusions, no

17  response is required.  UnitedHealth denies the remaining allegations in Paragraph

18  212.

19      213.   UnitedHealth admits that, in or about 2013, UnitedHealthcare

20  Medicare & Retirement decided to add an expert-level review to the CV process.

21  To the extent Paragraph 213 purports to describe a document, the document speaks

22  for itself and, as such, no response is required. UnitedHealth denies the remaining

23  allegations in Paragraph 213.

24      214.   To the extent Paragraph 214 states legal conclusions, no response is

25  required.  UnitedHealth denies the remaining allegations in Paragraph 214.

26      215.   To the extent Paragraph 215 purports to describe a document or

27  documents, such documents speak for themselves and, as such, no response is

28  required.  UnitedHealth denies the remaining allegations in Paragraph 215.

54

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

216.   To the extent Paragraph 216 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 216.

217.   To the extent Paragraph 217 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 217.

218.   To the extent Paragraph 218 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 218.

219.   To the extent Paragraph 219 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 219.

220.   To the extent Paragraph 220 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 220.

221.   UnitedHealth admits that Marybeth Meyer assumed Mr. Poehling's role after he left the Company.  To the extent Paragraph 221 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 221.

222.   To the extent Paragraph 222 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 222.

223.   UnitedHealth admits that, before UnitedHealthcare Medicare & Retirement discontinued the CV Program, UnitedHealthcare Medicare & Retirement and Optum sought guidance from CMS about the retroactivity of a proposed regulation requiring MA Organizations to design all medical record reviews to validate diagnoses submitted to CMS ("Proposed Rule").  To the extent

55

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

262
Exhibit 2

Exhibit D
Page 252

1   Paragraph 223 purports to describe a document or documents, such documents
2   speak for themselves and, as such, no response is required.  UnitedHealth denies
3   the remaining allegations in Paragraph 223.

4        224.   UnitedHealth admits that Larry Renfro, the Chief Executive Officer of
5   Optum, contacted senior government employees at CMS, including the
6   Administrator of CMS, to ask whether UnitedHealth had an obligation to perform
7   CV before the effective date of the Proposed Rule.  To the extent Paragraph 224
8   purports to describe a document, the document speaks for itself and, as such, no
9   response is required.  UnitedHealth denies the remaining allegations in Paragraph
10  224.

11       225.   UnitedHealth admits that on April 8, 2014, Renfro spoke with the
12  CMS Administrator regarding UnitedHealth's obligation to perform CV in light of
13  the Proposed Rule.  To the extent Paragraph 225 purports to describe a document
14  or documents, such documents speak for themselves and, as such, no response is
15  required.  UnitedHealth denies the remaining allegations in Paragraph 225.

16       226.   UnitedHealth admits that Nelson, Schumacher, Erickson, and Johnson
17  went to Washington, D.C. on April 29, 2014 to speak with CMS employees
18  responsible for the Medicare Advantage Program, including Cheri Rice, the
19  Director of the Medicare Plan Payment Group at CMS.  To the extent Paragraph
20  226 purports to describe a document or documents, such documents speak for
21  themselves and, as such, no response is required.  To the extent Paragraph 226
22  states legal conclusions, no response is required.  UnitedHealth denies the
23  remaining allegations in Paragraph 226.

24       227.   To the extent Paragraph 227 purports to describe a document or
25  documents, such documents speak for themselves and, as such, no response is
26  required.  UnitedHealth denies the remaining allegations in Paragraph 227.

27       228.   To the extent the allegations in Paragraph 228 relate to claims that
28  have been dismissed, they are surplusage and should be stricken.  To the extent

56

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

1  Paragraph 228 purports to describe a document or documents, such documents
2  speak for themselves and, as such, no response is required.  UnitedHealth denies
3  the remaining allegations in Paragraph 228.

4        229.   UnitedHealth admits that the Department of Justice sent a letter to
5  UnitedHealth's counsel after Rice sent her May 2 email.  To the extent Paragraph
6  229 purports to describe a document or documents, such documents speak for
7  themselves and, as such, no response is required.  UnitedHealth denies the
8  remaining allegations in Paragraph 229.

9        230.   To the extent Paragraph 230 purports to describe a document or
10 documents, such documents speak for themselves and, as such, no response is
11 required.  UnitedHealth denies the remaining allegations in Paragraph 230.

12       231.   UnitedHealth admits that UnitedHealthcare Medicare & Retirement
13 decided to discontinue its CV Program on or about May 27, 2014.  To the extent
14 Paragraph 231 purports to describe a document or documents, such documents
15 speak for themselves and, as such, no response is required.  UnitedHealth denies
16 the remaining allegations in Paragraph 231.

17       232.   UnitedHealth denies the allegations in Paragraph 232.

18       233.   UnitedHealth admits that Optum continued performing chart review
19 for UnitedHealthcare after CV was discontinued.  To the extent Paragraph 233
20 states legal conclusions, no response is required.  UnitedHealth denies the
21 remaining allegations in Paragraph 233.

22       234.   To the extent Paragraph 234 purports to describe a document or
23 documents, such documents speak for themselves and, as such, no response is
24 required.  UnitedHealth denies the remaining allegations in Paragraph 234.

25    **D.    United Failed to Delete Diagnoses Invalidated By Its Own Chart**
26           **Review Program**

27       235.   To the extent Paragraph 235 purports to describe a document, the
28 document speaks for itself and, as such, no response is required.  To the extent

<center>57</center>

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

1    Paragraph 235 states legal conclusions, no response is required.  UnitedHealth is

2    without knowledge or information sufficient to form a belief as to the truth or

3    falsity of the allegations in Paragraph 235; therefore, such allegations are denied.

4    UnitedHealth denies the remaining allegations in Paragraph 235.

5         236.   To the extent that Paragraph 236 contains legal conclusions, no

6    response is required.  UnitedHealth denies the remaining allegations in Paragraph

7    236.

8         237.   To the extent that Paragraph 237 contains legal conclusions, no

9    response is required.  UnitedHealth is without knowledge or information sufficient

10   to form a belief as to the truth or falsity of the allegations in Paragraph 237;

11   therefore, such allegations are denied.  UnitedHealth denies the remaining

12   allegations in Paragraph 237.

13        238.   To the extent Paragraph 238 purports to describe the Complaint, the

14   Complaint is a legal document that speaks for itself and, as such, no response is

15   required.  To the extent that Paragraph 238 contains any factual allegations

16   regarding UnitedHealth, such allegations are denied.  UnitedHealth is without

17   knowledge or information sufficient to form a belief as to the truth or falsity of the

18   allegations in Paragraph 238; therefore, such allegations are denied.  To the extent

19   that Paragraph 238 contains legal conclusions, no response is required.

20   UnitedHealth denies the remaining allegations in Paragraph 238.

21   **III.    The RACCR Program**

22        239.   UnitedHealth admits that some of the UnitedHealth Defendants

23   conducted the Chart Review and RACCR Programs.  To the extent Paragraph 239

24   states legal conclusions, no response is required.  UnitedHealth denies the

25   remaining allegations in Paragraph 239.

26

27

28

                                          58

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

265
Exhibit 2

Exhibit D
Page 255

**A.   Defendants Knew That Their Financially-Incentivized Providers Were Reporting Invalid Codes**

240.   UnitedHealth admits that some of the UnitedHealth Defendants have arrangements that are value-based either in full or in part with providers, and to the extent Paragraph 240 purports to describe the contracts underlying these arrangements, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 240.

241.   UnitedHealth admits that UnitedHealthcare Medicare & Retirement implemented RACCR to address and safeguard against potentially inaccurate coding by provider groups whose revenue was tied to risk adjustment revenue from CMS.  To the extent Paragraph 241 states legal conclusions, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 241.

242.   UnitedHealth admits Ingenix implemented an internal data validation program in or about 2007 or 2008.  UnitedHealth admits that UnitedHealthcare Medicare & Retirement implemented the program eventually known as RACCR on or about 2009.  UnitedHealth admits that the stated goal of RACCR is to address and safeguard against potentially inaccurate coding by provider groups whose revenue is tied to risk adjustment revenue from CMS.  UnitedHealth denies the remaining allegations in Paragraph 242.

243.   To the extent Paragraph 243 states legal conclusions, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 243.

**B.   UnitedHealthcare Structured The RACCR Program To Limit The Number Of Invalid Diagnosis Codes It Identified**

244.   To the extent Paragraph 244 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 244.

245.   UnitedHealth denies the allegations in Paragraph 245.

59

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

266
Exhibit 2

Exhibit D
Page 256

246.   To the extent Paragraph 246 purports to describe a document, the document speaks for itself and, as such, no response is required.  UnitedHealth is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 246; therefore, such allegations are denied. UnitedHealth denies the remaining allegations in Paragraph 246.

247.   UnitedHealth admits that for DOS 2008, 2009, and 2010 RACCR reviews, Optum defined outliers as HCCs that provider groups coded with a prevalence frequency of greater than 300% of the Optum National Rate (sometimes referred to as the national prevalence rate).  UnitedHealth is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 247; therefore, such allegations are denied.  To the extent Paragraph 247 purports to describe a document, the document speaks for itself and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 247.

248.   UnitedHealth admits that for DOS 2011 and DOS 2012 RACCR reviews, Optum defined outliers as HCCs that provider groups coded with a prevalence frequency greater than two standard deviations of the Optum National Rate, which for those DOS years was calculated based on data from all providers classified as Tier 1 provider groups.  UnitedHealth denies the remaining allegations in Paragraph 248.

249.   UnitedHealth admits that some of its capitated providers are located in the Central District of California.  UnitedHealth admits that Exhibit 14 lists capitated providers involved in RACCR reviews that are also located in the Central District of California.  UnitedHealth denies the remaining allegations in Paragraph 249.

250.   UnitedHealth admits that the sample size for 2011 and 2012 dates of service RACCR reviews was set at 50 beneficiaries per provider group per HCC selected for review.  To the extent Paragraph 250 purports to describe a document

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

1    or documents, such documents speak for themselves and, as such, no response is

2    required.  UnitedHealth denies the remaining allegations in Paragraph 250.

3         251.   UnitedHealth admits that RACCR reviews focused on provider groups

4    where the HCCs selected for RACCR reviews did not attain a validation rate of

5    greater than 80%.  To the extent Paragraph 251 states legal conclusions, no

6    response is required.  UnitedHealth denies the remaining allegations in Paragraph

7    251.

8         252.   UnitedHealth admits that for DOS 2008 and 2009 RACCR reviews,

9    Optum increased the number of members whose charts were reviewed for HCCs

10   that did not validate at greater than 80% based on the initial sample and that it

11   called this process an "incremental sample."  UnitedHealth admits that RACCR

12   reviews focused on provider groups where the HCCs selected for RACCR reviews

13   did not attain a validation rate of greater than 80%.  To the extent Paragraph 252

14   purports to describe a document or documents, such documents speak for

15   themselves and, as such, no response is required.  To the extent Paragraph 252

16   states legal conclusions, no response is required.  UnitedHealth denies the

17   remaining allegations in Paragraph 252.

18        253.   UnitedHealth admits that for DOS 2008 through DOS 2011,

19   lookbacks focused on instances in which an HCC validated at 80% or less at the

20   provider group level during RACCR sample reviews.  To the extent Paragraph 253

21   purports to describe a document or documents, such documents speak for

22   themselves and, as such, no response is required.  UnitedHealth denies the

23   remaining allegations in Paragraph 253.

24   **C.    Despite Its Limited Scope, The RACCR Program Confirmed That**
25   **       Financially Incentivized Providers Were Submitting Invalid**
26   **       Diagnosis Codes**

27        254.   UnitedHealth denies the allegations in Paragraph 254.

28

61

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

268
Exhibit 2

Exhibit D
Page 258

255.   To the extent Paragraph 255 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 255.

256.   To the extent Paragraph 256 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 256.

257.   To the extent Paragraph 257 purports to describe a document, the document speaks for itself and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 257.

258.   To the extent Paragraph 258 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 258.

259.   To the extent Paragraph 259 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  To the extent Paragraph 259 states legal conclusions, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 259.

260.   To the extent Paragraph 260 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 260; therefore, such allegations are denied.  UnitedHealth denies the remaining allegations in Paragraph 260.

261.   To the extent Paragraph 261 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  To the extent Paragraph 261 states legal conclusions, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 261.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

262.   To the extent Paragraph 262 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 262.

263.   To the extent Paragraph 263 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 263.

264.   To the extent Paragraph 264 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 264.

**D.     UnitedHealthcare Knew It Was Obligated To Delete Invalid Diagnosis Codes Identified Through The RACCR Reviews**

265.   To the extent Paragraph 265 states legal conclusions, no response is required.  To the extent Paragraph 265 purports to describe a document, the document speaks for itself and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 265.

266.   UnitedHealth admits that Optum deleted diagnosis codes for DOS 2008 through DOS 2013 as a result of its RACCR reviews.  To the extent Paragraph 266 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  To the extent Paragraph 266 states legal conclusions, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 266.

267.   To the extent Paragraph 267 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  To the extent Paragraph 267 states legal conclusions, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 267.

268.   To the extent Paragraph 268 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 268.

63

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

270
Exhibit 2

Exhibit D
Page 260

269.   To the extent Paragraph 269 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 269.

270.   To the extent Paragraph 270 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 270.

271.   To the extent Paragraph 271 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 271.

272.   Paragraph 272 states legal conclusions to which no response is required.  To the extent that Paragraph 272 contains any factual allegations, such allegations are denied.  UnitedHealth denies the remaining allegations in Paragraph 272.

273.   Paragraph 273 states legal conclusions to which no response is required.  To the extent Paragraph 273 contains any factual allegations, such allegations are denied.  UnitedHealth denies the remaining allegations in Paragraph 273.

**E.     Defendants Failed To Follow Their Own RACCR Protocol Requiring 100 Percent Reviews**

274.   UnitedHealth admits that for DOS 2008 through DOS 2011, lookbacks focused on instances in which an HCC validated at 80% or less at the provider group level during RACCR sample reviews.  To the extent Paragraph 274 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 274.

275.   Paragraph 275 contains no allegations with respect to a particular Defendant or claim and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 275.

64

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

276.   To the extent Paragraph 276 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  To the extent Paragraph 276 states legal conclusions, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 276.

277.   To the extent Paragraph 277 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  To the extent Paragraph 277 states legal conclusions, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 277.

278.   To the extent Paragraph 278 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 278.

279.   To the extent Paragraph 279 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 279.

## F.   Even After Identifying Miscoding By Providers, Defendants Failed To Delete Invalid Codes

280.   To the extent Paragraph 280 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 280; therefore, such allegations are denied.  UnitedHealth denies the remaining allegations in Paragraph 280.

281.   To the extent Paragraph 281 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  To the extent Paragraph 281 states legal conclusions, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 281.

65

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

**G.    UnitedHealthcare Medicare & Retirement Discontinued 100 Percent Reviews And Converted The RACCR Program Into A Revenue Generating Program**

282.    UnitedHealth admits that during the first half of 2014, UnitedHealthcare Medicare & Retirement made changes to the RACCR Program. To the extent Paragraph 282 states legal conclusions, no response is required. UnitedHealth denies the remaining allegations in Paragraph 282.

283.    UnitedHealth admits that beginning with DOS 2012, UnitedHealthcare Medicare & Retirement refocused RACCR such that it did not require providers to conduct lookback reviews.  UnitedHealth denies the remaining allegations in Paragraph 283.

284.    To the extent Paragraph 284 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 284.

285.    UnitedHealth admits that beginning with DOS 2013 RACCR reviews, UnitedHealthcare Medicare & Retirement used a different methodology to select medical records.  UnitedHealth denies the remaining allegations in Paragraph 285.

286.    To the extent Paragraph 286 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 286.

287.    Paragraph 287 states legal conclusions to which no response is required.  To the extent Paragraph 287 contains any factual allegations, such allegations are denied.  UnitedHealth denies the remaining allegations in Paragraph 287.

288.    UnitedHealth admits that during the first half of 2014, UnitedHealthcare Medicare & Retirement made changes to the RACCR Program. UnitedHealth denies the remaining allegations in Paragraph 288.

66

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

273
Exhibit 2

Exhibit D
Page 263

1    **H.    RACCR-Related Falsehoods In UnitedHealthcare's And Optum's**
2    **Attestations**

3    289.    To the extent the allegations in Paragraph 289 relate to claims that
4    have been dismissed, they are surplusage and should be stricken.
5    UnitedHealthcare admits that it has submitted Risk Adjustment Attestations to the
6    Medicare Program.  UnitedHealth admits that Optum approved these Attestations
7    before they were submitted.

8    290.    To the extent the allegations in Paragraph 290 relate to claims that
9    have been dismissed, they are surplusage and should be stricken.  To the extent
10   Paragraph 290 purports to describe a document or documents, such documents
11   speak for themselves and, as such, no response is required.  To the extent
12   Paragraph 290 states legal conclusions, no response is required.  UnitedHealth
13   denies the remaining allegations in Paragraph 290.

14   291.    To the extent the allegations in Paragraph 291 relate to claims that
15   have been dismissed, they are surplusage and should be stricken.  To the extent
16   Paragraph 291 purports to describe a document or documents, such documents
17   speak for themselves and, as such, no response is required.  To the extent
18   Paragraph 291 states legal conclusions, no response is required.  UnitedHealth
19   denies the remaining allegations in Paragraph 291.

20   292.    To the extent the allegations in Paragraph 292 relate to claims that
21   have been dismissed, they are surplusage and should be stricken.  To the extent
22   Paragraph 292 purports to describe a document or documents, such documents
23   speak for themselves and, as such, no response is required.  To the extent
24   Paragraph 292 states legal conclusions, no response is required.  UnitedHealth
25   denies the remaining allegations in Paragraph 292.

26   **IV.    Defendants' False Risk Adjustment Attestations**

27   293.    To the extent the allegations in Paragraph 293 relate to claims that
28   have been dismissed, they are surplusage and should be stricken.  UnitedHealth

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

1    admits that UnitedHealthcare is required to submit a truthful Risk Adjustment

2    Attestation to the Medicare Program.  UnitedHealthcare admits that it has

3    submitted Risk Adjustment Attestations to the Medicare Program.  UnitedHealth

4    admits that Optum and Ingenix employees reviewed and approved these

5    Attestations and that Ovations and UnitedHealthcare employees reviewed and

6    signed these Attestations.  To the extent Paragraph 293 states legal conclusions, no

7    response is required.  UnitedHealth denies the remaining allegations in Paragraph

8    293.

9        294.    To the extent the allegations in Paragraph 294 relate to claims that

10   have been dismissed, they are surplusage and should be stricken.  To the extent

11   Paragraph 294 purports to describe a document or documents, such documents

12   speak for themselves and, as such, no response is required.  UnitedHealth denies

13   the remaining allegations in Paragraph 294.

14       295.    To the extent the allegations in Paragraph 295 relate to claims that

15   have been dismissed, they are surplusage and should be stricken.  To the extent

16   Paragraph 295 states legal conclusions, no response is required.  To the extent

17   Paragraph 295 purports to describe a document or documents, such documents

18   speak for themselves and, as such, no response is required.  UnitedHealth denies

19   the remaining allegations in Paragraph 295.

20   **A.    Defendants' Internal Attestation Approval Process**

21       296.    To the extent the allegations in Paragraph 296 relate to claims that

22   have been dismissed, they are surplusage and should be stricken.  To the extent

23   Paragraph 296 purports to describe a document or documents, such documents

24   speak for themselves and, as such, no response is required.  UnitedHealth denies

25   the remaining allegations in Paragraph 296.

26       297.    To the extent the allegations in Paragraph 297 relate to claims that

27   have been dismissed, they are surplusage and should be stricken.  To the extent

28   Paragraph 297 purports to describe a document or documents, such documents

68

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

275
Exhibit 2

Exhibit D
Page 265

1   speak for themselves and, as such, no response is required.  To the extent

2   Paragraph 297 purports to summarize and/or describe the provisions of the

3   Medicare program, UnitedHealth states that the Medicare statute and regulations

4   speak for themselves, and to the extent that the allegations in Paragraph 297 vary

5   therefrom or with other applicable statutory or decisional law, UnitedHealth denies

6   those allegations.  To the extent Paragraph 297 states legal conclusions, no

7   response is required.

8         298.   To the extent the allegations in Paragraph 298 relate to claims that

9   have been dismissed, they are surplusage and should be stricken.  To the extent

10   Paragraph 298 purports to describe a document or documents, such documents

11   speak for themselves and, as such, no response is required.  UnitedHealth denies

12   the remaining allegations in Paragraph 298.

13         299.   To the extent the allegations in Paragraph 299 relate to claims that

14   have been dismissed, they are surplusage and should be stricken.  Paragraph 299

15   states legal conclusions to which no response is required.  To the extent Paragraph

16   299 purports to describe a document or documents, such documents speak for

17   themselves and, as such, no response is required.  UnitedHealth denies the

18   remaining allegations in Paragraph 299.

19         300.   To the extent the allegations in Paragraph 300 relate to claims that

20   have been dismissed, they are surplusage and should be stricken.  Paragraph 300

21   states legal conclusions to which no response is required.  To the extent Paragraph

22   300 purports to describe a document or documents, such documents speak for

23   themselves and, as such, no response is required.  UnitedHealth denies the

24   remaining allegations in Paragraph 300.

25         301.   To the extent the allegations in Paragraph 301 relate to claims that

26   have been dismissed, they are surplusage and should be stricken.  Paragraph 301

27   states legal conclusions to which no response is required.  To the extent Paragraph

28   301 purports to describe a document or documents, such documents speak for

69

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

276
Exhibit 2

Exhibit D
Page 266

1  themselves and, as such, no response is required.  UnitedHealth denies the

2  remaining allegations in Paragraph 301.

3       302.   To the extent the allegations in Paragraph 302 relate to claims that

4  have been dismissed, they are surplusage and should be stricken.  Paragraph 302

5  states legal conclusions to which no response is required.  To the extent Paragraph

6  302 purports to describe a document or documents, such documents speak for

7  themselves and, as such, no response is required.  UnitedHealth denies the

8  remaining allegations in Paragraph 302.

9       303.   To the extent the allegations in Paragraph 303 relate to claims that

10  have been dismissed, they are surplusage and should be stricken.  Paragraph 303

11  states legal conclusions to which no response is required.  To the extent Paragraph

12  303 purports to describe a document or documents, such documents speak for

13  themselves and, as such, no response is required.  UnitedHealth denies the

14  remaining allegations in Paragraph 303.

15       304.   To the extent the allegations in Paragraph 304 relate to claims that

16  have been dismissed, they are surplusage and should be stricken.  Paragraph 304

17  states legal conclusions to which no response is required.  To the extent Paragraph

18  304 purports to describe a document or documents, such documents speak for

19  themselves and, as such, no response is required.  UnitedHealth denies the

20  remaining allegations in Paragraph 304.

21       305.   To the extent the allegations in Paragraph 305 relate to claims that

22  have been dismissed, they are surplusage and should be stricken.  Paragraph 305

23  states legal conclusions to which no response is required.  To the extent Paragraph

24  305 purports to describe a document or documents, such documents speak for

25  themselves and, as such, no response is required.  UnitedHealth denies the

26  remaining allegations in Paragraph 305.

27       306.   To the extent the allegations in Paragraph 306 relate to claims that

28  have been dismissed, they are surplusage and should be stricken.  To the extent

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

1  Paragraph 306 purports to describe a document or documents, such documents
2  speak for themselves and, as such, no response is required.  UnitedHealth denies
3  the remaining allegations in Paragraph 306.

4      307.   To the extent the allegations in Paragraph 307 relate to claims that
5  have been dismissed, they are surplusage and should be stricken.  Paragraph 307
6  states legal conclusions to which no response is required.  To the extent Paragraph
7  307 purports to describe a document or documents, such documents speak for
8  themselves and, as such, no response is required.  UnitedHealth denies the
9  remaining allegations in Paragraph 307.

10      308.   To the extent the allegations in Paragraph 308 relate to claims that
11  have been dismissed, they are surplusage and should be stricken.  To the extent
12  Paragraph 308 purports to describe a document or documents, such documents
13  speak for themselves and, as such, no response is required.  UnitedHealth denies
14  the remaining allegations in Paragraph 308.

15      **B.     The False Attestations Submitted To The Government**

16      309.   To the extent the allegations in Paragraph 309 relate to claims that
17  have been dismissed, they are surplusage and should be stricken.  To the extent
18  Paragraph 309 purports to describe a document or documents, such documents
19  speak for themselves and, as such, no response is required.  UnitedHealth denies
20  the remaining allegations in Paragraph 309.

21      310.   To the extent the allegations in Paragraph 310 relate to claims that
22  have been dismissed, they are surplusage and should be stricken.  Paragraph 310
23  states legal conclusions to which no response is required.  UnitedHealth denies the
24  remaining allegations in Paragraph 310.

25      311.   To the extent the allegations in Paragraph 311 relate to claims that
26  have been dismissed, they are surplusage and should be stricken.  To the extent
27  Paragraph 311 purports to describe a document or documents, such documents
28

71

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

1 | speak for themselves and, as such, no response is required.  UnitedHealth denies
2 | the remaining allegations in Paragraph 311.

3 |      312.   To the extent the allegations in Paragraph 312 relate to claims that
4 | have been dismissed, they are surplusage and should be stricken.  To the extent
5 | Paragraph 312 purports to describe a document or documents, such documents
6 | speak for themselves and, as such, no response is required.  UnitedHealth denies
7 | the remaining allegations in Paragraph 312.

8 |      313.   To the extent the allegations in Paragraph 313 relate to claims that
9 | have been dismissed, they are surplusage and should be stricken.  To the extent
10 | Paragraph 313 purports to describe a document or documents, such documents
11 | speak for themselves and, as such, no response is required.  UnitedHealth denies
12 | the remaining allegations in Paragraph 313.

13 |      314.   To the extent the allegations in Paragraph 314 relate to claims that
14 | have been dismissed, they are surplusage and should be stricken.  To the extent
15 | Paragraph 314 purports to describe a document or documents, such documents
16 | speak for themselves and, as such, no response is required.  UnitedHealth denies
17 | the remaining allegations in Paragraph 314.

18 |      315.   To the extent the allegations in Paragraph 315 relate to claims that
19 | have been dismissed, they are surplusage and should be stricken.  To the extent
20 | Paragraph 315 purports to describe a document or documents, such documents
21 | speak for themselves and, as such, no response is required.  UnitedHealth denies
22 | the remaining allegations in Paragraph 315.

23 |      316.   To the extent the allegations in Paragraph 316 relate to claims that
24 | have been dismissed, they are surplusage and should be stricken.  Paragraph 316
25 | states legal conclusions to which no response is required.  UnitedHealth denies the
26 | remaining allegations in Paragraph 316.

27 |      317.   To the extent the allegations in Paragraph 317 relate to claims that
28 | have been dismissed, they are surplusage and should be stricken.  To the extent

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

1 Paragraph 317 purports to describe a document or documents, such documents
2 speak for themselves and, as such, no response is required.  UnitedHealth denies
3 the remaining allegations in Paragraph 317.

4        318.   To the extent the allegations in Paragraph 318 relate to claims that
5 have been dismissed, they are surplusage and should be stricken.  To the extent
6 Paragraph 318 purports to describe a document or documents, such documents
7 speak for themselves and, as such, no response is required.  UnitedHealth denies
8 the remaining allegations in Paragraph 318.

9        319.   To the extent the allegations in Paragraph 319 relate to claims that
10 have been dismissed, they are surplusage and should be stricken.  To the extent
11 Paragraph 319 purports to describe a document or documents, such documents
12 speak for themselves and, as such, no response is required.  UnitedHealth denies
13 the remaining allegations in Paragraph 319.

14        320.   To the extent the allegations in Paragraph 320 relate to claims that
15 have been dismissed, they are surplusage and should be stricken.  Paragraph 320
16 states legal conclusions to which no response is required.  UnitedHealth denies the
17 remaining allegations in Paragraph 320.

18        321.   To the extent the allegations in Paragraph 321 relate to claims that
19 have been dismissed, they are surplusage and should be stricken.  To the extent
20 Paragraph 321 purports to describe a document or documents, such documents
21 speak for themselves and, as such, no response is required.  UnitedHealth denies
22 the remaining allegations in Paragraph 321.

23        322.   To the extent the allegations in Paragraph 322 relate to claims that
24 have been dismissed, they are surplusage and should be stricken.  To the extent
25 Paragraph 322 purports to describe a document or documents, such documents
26 speak for themselves and, as such, no response is required.  To the extent
27 Paragraph 322 states legal conclusions, no response is required.  UnitedHealth
28 denies the remaining allegations in Paragraph 322.

73

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

280
Exhibit 2

Exhibit D
Page 270

1    323.   To the extent the allegations in Paragraph 323 relate to claims that
2    have been dismissed, they are surplusage and should be stricken.  Paragraph 323
3    states legal conclusions to which no response is required.  To the extent Paragraph
4    323 purports to describe a document or documents, such documents speak for
5    themselves and, as such, no response is required.  UnitedHealth denies the
6    remaining allegations in Paragraph 323.

7    324.   To the extent the allegations in Paragraph 324 relate to claims that
8    have been dismissed, they are surplusage and should be stricken.  Paragraph 324
9    states legal conclusions to which no response is required.  To the extent Paragraph
10   324 purports to describe a document or documents, such documents speak for
11   themselves and, as such, no response is required.  UnitedHealth denies the
12   remaining allegations in Paragraph 324.

13   325.   To the extent the allegations in Paragraph 325 relate to claims that
14   have been dismissed, they are surplusage and should be stricken.  To the extent
15   Paragraph 325 purports to describe a document or documents, such documents
16   speak for themselves and, as such, no response is required.  To the extent
17   Paragraph 325 states legal conclusions, no response is required.  UnitedHealth
18   denies the remaining allegations in Paragraph 325.

19   326.   To the extent the allegations in Paragraph 326 relate to claims that
20   have been dismissed, they are surplusage and should be stricken.  Paragraph 326
21   states legal conclusions to which no response is required.  UnitedHealth denies the
22   remaining allegations in Paragraph 326.

23   327.   To the extent the allegations in Paragraph 327 relate to claims that
24   have been dismissed, they are surplusage and should be stricken.  To the extent
25   Paragraph 327 purports to describe a document or documents, such documents
26   speak for themselves and, as such, no response is required.  To the extent
27   Paragraph 327 states legal conclusions, no response is required.  UnitedHealth
28   denies the remaining allegations in Paragraph 327.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

## V.   Diagnoses Solely Determine Risk Adjustment Payments Based On Health Status

328.   Paragraph 328 contains no allegations with respect to a particular Defendant or claim and, as such, no response is required.  To the extent Paragraph 328 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute and regulations speak for themselves, and to the extent that the allegations in Paragraph 328 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations.

329.   Paragraph 329 contains no allegations with respect to a particular Defendant or claim and, as such, no response is required.  To the extent Paragraph 329 states legal conclusions, no response is required.  To the extent Paragraph 329 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute and regulations speak for themselves, and to the extent that the allegations in Paragraph 329 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations.

330.   To the extent the allegations in Paragraph 330 relate to claims that have been dismissed, they are surplusage and should be stricken.  Paragraph 330 contains no allegations with respect to a particular Defendant or claim and, as such, no response is required.  To the extent Paragraph 330 states legal conclusions, no response is required.  To the extent Paragraph 330 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute and regulations speak for themselves, and to the extent that the allegations in Paragraph 330 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations.

331.   UnitedHealth admits that UnitedHealthcare Medicare & Retirement submitted delete transactions to RAPS as a result of its RACCR and CV Programs.  To the extent Paragraph 331 purports to describe a document or documents, such

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

1    documents speak for themselves and, as such, no response is required.  To the

2    extent Paragraph 331 states legal conclusions, no response is required.

3    UnitedHealth denies the remaining allegations in Paragraph 331.

4         332.   To the extent Paragraph 332 purports to describe a document or

5    documents, such documents speak for themselves and, as such, no response is

6    required.  Paragraph 332 states legal conclusions to which no response is required.

7    UnitedHealth denies the remaining allegations in Paragraph 332.

8         333.   UnitedHealth is without knowledge or information sufficient to form a

9    belief as to the truth or falsity of the allegations in Paragraph 333; therefore, such

10   allegations are denied.  To the extent Paragraph 333 states legal conclusions, no

11   response is required.  UnitedHealth denies the remaining allegations in Paragraph

12   333.

13        334.   Paragraph 334 contains no allegations with respect to a particular

14   Defendant or claim and, as such, no response is required.  To the extent Paragraph

15   334 states legal conclusions, no response is required.  To the extent Paragraph 334

16   purports to summarize and/or describe the provisions of the Medicare program,

17   UnitedHealth states that the Medicare statute and regulations speak for themselves,

18   and to the extent that the allegations in Paragraph 334 vary therefrom or with other

19   applicable statutory or decisional law, UnitedHealth denies those allegations.

20        335.   To the extent the allegations in Paragraph 335 relate to claims that

21   have been dismissed, they are surplusage and should be stricken.  Paragraph 335

22   states legal conclusions to which no response is required.  To the extent Paragraph

23   335 purports to summarize and/or describe the provisions of the Medicare

24   program, UnitedHealth states that the Medicare statute and regulations speak for

25   themselves, and to the extent that the allegations in Paragraph 335 vary therefrom

26   or with other applicable statutory or decisional law, UnitedHealth denies those

27   allegations.  UnitedHealth denies the remaining allegations in Paragraph 335.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

336.   To the extent the allegations in Paragraph 336 relate to claims that have been dismissed, they are surplusage and should be stricken.  Paragraph 336 states legal conclusions to which no response is required.  To the extent Paragraph 336 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute and regulations speak for themselves, and to the extent that the allegations in Paragraph 336 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations.  UnitedHealth denies the remaining allegations in Paragraph 336.

337.   To the extent the allegations in Paragraph 337 relate to claims that have been dismissed, they are surplusage and should be stricken.  To the extent Paragraph 337 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  To the extent Paragraph 337 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute and regulations speak for themselves, and to the extent that the allegations in Paragraph 337 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations.

338.   To the extent the allegations in Paragraph 338 relate to claims that have been dismissed, they are surplusage and should be stricken.  To the extent Paragraph 338 states legal conclusions, no response is required.  To the extent Paragraph 338 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 338.

339.   To the extent the allegations in Paragraph 339 relate to claims that have been dismissed, they are surplusage and should be stricken.  To the extent Paragraph 339 states legal conclusions, no response is required.  To the extent Paragraph 339 purports to describe a document or documents, such documents

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

1    speak for themselves and, as such, no response is required.  UnitedHealth denies

2    the remaining allegations in Paragraph 339.

3        340.   To the extent the allegations in Paragraph 340 relate to claims that

4    have been dismissed, they are surplusage and should be stricken.  To the extent

5    Paragraph 340 states legal conclusions, no response is required.  To the extent

6    Paragraph 340 purports to describe a document or documents, such documents

7    speak for themselves and, as such, no response is required.  UnitedHealth denies

8    the remaining allegations in Paragraph 340.

9                    **FIRST CLAIM FOR RELIEF**

10                **False Claims Act: Reverse False Claims**

11            **31 U.S.C. § 3729(a)(1)(G) (formerly 31 U.S.C. § 3729(a)(7))**

12        341.   UnitedHealth incorporates its responses to each and every allegation

13    set forth above as if fully stated herein.

14        342.   Paragraph 342 states legal conclusions to which no response is

15    required.   To the extent Paragraph 342 contains any factual allegations, such

16    allegations are denied.

17        343.   Paragraph 343 states legal conclusions to which no response is

18    required.  To the extent Paragraph 343 contains any factual allegations, such

19    allegations are denied.

20                   **SECOND CLAIM FOR RELIEF**

21        **False Claims Act: Presentation of False or Fraudulent Claims**

22            **31 U.S.C. § 3729(a)(1)(A) (formerly 31 U.S.C. § 3729(a)(1))**

23        344.   The Second Claim for Relief has been dismissed, and therefore no

24    response is required.

25        345.   The Second Claim for Relief has been dismissed, and therefore no

26    response is required.

27        346.   The Second Claim for Relief has been dismissed, and therefore no

28    response is required.

78

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

1    347.   The Second Claim for Relief has been dismissed, and therefore no
2    response is required.

3                      **THIRD CLAIM FOR RELIEF**

4        **False Claims Act: Making or Using False Records or Statements**

5           **31 U.S.C. § 3729(a)(1)(B) (formerly 31 U.S.C. § 3729(a)(2))**

6    348.   The Third Claim for Relief has been dismissed, and therefore no
7    response is required.

8    349.   The Third Claim for Relief has been dismissed, and therefore no
9    response is required.

10   350.   The Third Claim for Relief has been dismissed, and therefore no
11   response is required.

12   351.   The Third Claim for Relief has been dismissed, and therefore no
13   response is required.

14                     **FOURTH CLAIM FOR RELIEF**

15              **False Claims Act: Reverse False Claims**

16           **31 U.S.C. § 3729(a)(1)(G) (formerly 31 U.S.C. § 3729(a)(7))**

17   352.   The Fourth Claim for Relief has been dismissed, and therefore no
18   response is required.

19   353.   The Fourth Claim for Relief has been dismissed, and therefore no
20   response is required.

21   354.   The Fourth Claim for Relief has been dismissed, and therefore no
22   response is required.

23   355.   The Fourth Claim for Relief has been dismissed, and therefore no
24   response is required.

25                      **FIFTH CLAIM FOR RELIEF**

26                        **Unjust Enrichment**

27   356.   UnitedHealth incorporates its responses to each and every allegation
28   set forth above as if fully stated herein.

79

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

286
Exhibit 2

Exhibit D
Page 276

1    357.   Paragraph 357 states legal conclusions to which no response is
2  required.  To the extent Paragraph 357 contains any factual allegations, such
3  allegations are denied.

4    358.   Paragraph 358 states legal conclusions to which no response is
5  required.  To the extent Paragraph 358 contains any factual allegations, such
6  allegations are denied.

7                    **SIXTH CLAIM FOR RELIEF**

8                       **Payment by Mistake**

9    359.   UnitedHealth incorporates its responses to each and every allegation
10  set forth above as if fully stated herein.

11    360.   Paragraph 360 states legal conclusions to which no response is
12  required.  To the extent Paragraph 360 contains any factual allegations, such
13  allegations are denied.

14    361.   Paragraph 361 states legal conclusions to which no response is
15  required.  To the extent Paragraph 361 contains any factual allegations, such
16  allegations are denied.

17                          **PRAYER**

18    **WHEREFORE**, the United States requests that judgment be entered in its
19  favor and against Defendants as follows:

20    362.   Paragraph 362 contains a prayer for relief to which no response is
21  required.  To the extent a response is required, UnitedHealth denies any remaining
22  allegations in the Amended Complaint and denies that the United States is entitled
23  to any relief whatsoever against UnitedHealth.

24    363.   Paragraph 363 contains a prayer for relief to which no response is
25  required.  To the extent a response is required, UnitedHealth denies any remaining
26  allegations in the Amended Complaint and denies that the United States is entitled
27  to any relief whatsoever against UnitedHealth.

28

80

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

364.   Paragraph 364 contains a prayer for relief to which no response is required.  To the extent a response is required, UnitedHealth denies any remaining allegations in the Amended Complaint and denies that the United States is entitled to any relief whatsoever against UnitedHealth.

## GENERAL DENIAL

UnitedHealth denies each and every allegation in the United States' Complaint-In-Partial-Intervention that has not been admitted or responded to specifically.  To the extent any allegations of fact remain unanswered, they are denied by UnitedHealth.  UnitedHealth further denies that the United States entitled to any of the relief sought in the Prayer for Relief, or any relief whatsoever.

## AFFIRMATIVE DEFENSES

UnitedHealth pleads the following affirmative defenses and reserves the right to assert additional affirmative defenses to the extent that such defenses become known as a result of discovery or otherwise:

1.     The United States' claims are barred, in whole or in part, by the statute of limitations.

2.     The United States' claims are barred, in whole or in part, by the doctrine of estoppel.

3.     The United States knew and approved of the particulars of UnitedHealth's claims for payment before such claims were presented but after UnitedHealth had alerted the United States to UnitedHealth's understanding of applicable Medicare Program requirements.

4.     The conduct of the United States negates the materiality of any alleged misrepresentations by Defendants and thus, the United States and Relators cannot recover under the Amended Complaint against Defendants.

5.     UnitedHealth is not vicariously liable for the acts alleged in the Complaint.

81

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

288
Exhibit 2

Exhibit D
Page 278

6.     UnitedHealth is not liable to the extent that the United States failed to take adequate measures to mitigate damages.

7.     The United States ratified, or otherwise consented to, the transactions and occurrences that are the subject of this action.

8.     The United States' claims are barred, in whole or in part, by the doctrines of course of performance, course of dealing, and usage of trade. UnitedHealth's submissions to the United States during contract negotiations and modifications and its compliance efforts were consistent with its course of performance, its course of dealing, and usage of trade.

9.     The United States' claims are barred, in whole or in part, by the existence of an express contract.

10.     The United States' claims are barred, in whole or in part, because of its assumption of risk.

11.     The United States' claims are barred, in whole or in part, because any recovery would result in unjust enrichment.

12.     Every equitable claim is barred by the doctrine of unclean hands.

13.     The United States' claims are barred because UnitedHealth made no express or implied false certification.

14.     The United States at all times relevant to the Amended Complaint knew of the conduct allegedly engaged in by UnitedHealth and thus, the United States and Relators cannot recover under the Amended Complaint.

15.     The services and products reimbursed by the United States under Medicare were worth what the government paid.

16.     The United States' claims based on alleged conduct by UnitedHealth are barred, in whole or in part, by the fact that the United States has suffered no actual injury.  The United States' claims based on alleged conduct by UnitedHealth are barred, in whole or in part, because of the prior public disclosures of the core allegations upon which the Amended Complaint's "false claims" allegations

82

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

289
Exhibit 2

Exhibit D
Page 279

1   purport to be based and/or because Relators are not an "original source" of the

2   information, as defined in the statutes therein, such that they are not entitled to

3   pursue this action or be awarded any recovery, nor the does the Court have

4   jurisdiction.

5        17.   The United States' causes of action and allegations in the Complaint

6   are vague, ambiguous and uncertain.

7        18.   The United States' claims against one or more Defendants are

8   misjoined with the United States' claims against other Defendants and must be

9   severed.

10        19.   Damages and claims for which the United States seeks relief in the

11   Complaint, if any, were caused by the acts, errors or omissions or other fault of

12   third parties and/or contributed to and/or other fault of third parties, for whose

13   conduct UnitedHealth was not responsible.

14        20.   The United States' alleged damages are speculative, uncertain, or

15   contingent and are not recoverable.

16        21.   To the extent any damages are awarded against UnitedHealth, they

17   must be reduced pursuant to 31 U.S.C. § 3729(a)(2).

18        22.   UnitedHealth reserves the right to add additional defenses as

19   discovery progresses.

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

## COUNTERCLAIM

Defendants AmeriChoice of New Jersey, Inc., AmeriChoice of New York, Inc., Arizona Physicians IPA, Inc., Care Improvement Plus of Maryland, Inc., Care Improvement Plus of Texas Insurance Company, Care Improvement Plus South Central Insurance Company, Care Improvement Plus Wisconsin Insurance Company, Optum Insurance Co., Citrus Health Care, Inc., Health Plan of Nevada, Inc., Medica HealthCare Plans, Inc., Oxford Health Plans (CT), Inc., Oxford Health Plans (NJ), Inc., Oxford Health Plans (NY), Inc., PacifiCare Life and Health Insurance Company, PacifiCare of Arizona, Inc., PacifiCare of Colorado, Inc., PacifiCare of Nevada, Inc., Physicians Health Choice of Texas, LLC, Preferred Care Partners, Inc., Rocky Mountain Health Maintenance Organization, Incorporated, Sierra Health and Life Insurance Company, Inc., Symphonix Health Insurance, Inc., United HealthCare of California, Inc., UHC of California (f.k.a. PacifiCare of California), United Health Care Ins. Co. and United New York, Unison Health Plan of Tennessee, Inc., UnitedHealthcare Benefits of Texas, Inc. (f.k.a. PacifiCare of Texas, Inc.), UnitedHealthcare Community Plan of Ohio, Inc. (f.k.a. Unison Health Plan of Ohio, Inc.), UnitedHealthcare Community Plan of Texas, L.L.C. (f.k.a. Evercare of Texas, L.L.C.), UnitedHealthcare Community Plan, Inc. (f.k.a. UnitedHealthcare of the Great Lakes Health Plan, Inc.), UnitedHealthcare Insurance Company, UnitedHealthcare Insurance Company of New York, UnitedHealthcare of Alabama, Inc., UnitedHealthcare of Arizona, Inc., UnitedHealthcare of Arkansas, Inc., UnitedHealthcare of Florida, Inc., UnitedHealthcare of Georgia, Inc., UnitedHealthcare of New England, Inc., UnitedHealthcare of New York, Inc., UnitedHealthcare of North Carolina, Inc., UnitedHealthcare of Ohio, Inc., UnitedHealthcare of Oklahoma, Inc. (f.k.a. PacifiCare of Oklahoma, Inc.), UnitedHealthcare of Oregon, Inc. (f.k.a. PacifiCare of Oregon, Inc.), UnitedHealthcare of Pennsylvania, Inc. (f.k.a. Unison Health Plan of Pennsylvania, Inc.), UnitedHealthcare of Tennessee, Inc., UnitedHealthcare of

84

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES' AMENDED COMPLAINT-IN-PARTIAL-INTERVENTION AND COUNTERCLAIM

291
Exhibit 2

Exhibit D
Page 281

1  the Midlands, Inc., UnitedHealthcare of the Midwest, Inc., UnitedHealthcare of

2  Utah, Inc., UnitedHealthcare of Washington, Inc. (f.k.a. PacifiCare of Washington,

3  Inc.), UnitedHealthcare of Wisconsin, Inc., and UnitedHealthcare Plan of the River

4  Valley, Inc. (collectively, "UnitedHealth MA Plans")[2] state, allege, and request the

5  following in the character of a counterclaim against Plaintiff the United States of

6  America ("United States" or "Government"):

7       1.      The responses and affirmative defenses contained in the Answer to the

8  United States' Amended Complaint-in-Partial-Intervention described above are

9  incorporated by reference in this Counterclaim as if fully set forth herein.

10                          **JURISDICTION AND VENUE**

11      2.      This Court has subject matter jurisdiction over these Counterclaims

12  pursuant to 28 U.S.C. §§ 1331 and 1367, as well as Federal Rule of Civil

13  Procedure 13.  To the extent jurisdiction and venue are proper under the

14  Complaint, jurisdiction and venue are also proper under the Counterclaims, which

15  arise out of the same transactions and occurrences alleged in the Complaint.

16                                **PARTIES**

17      3.      Plaintiff and Counter-Defendant United States of America has sued

18  UnitedHealth on behalf of the United States Department of Health and Human

19  Services ("HHS").

20      4.      The following Defendant and Counter-Plaintiff Medicare Advantage

21  ("MA") Organizations entered into one or more agreements with the Government

22  during the relevant time period to offer MA Plans and/or Medicare Part D Plans to

23  Medicare beneficiaries under Parts C and D of the Medicare Program, presented

24  claims to the Government for risk adjustment payments under Parts C and D of the

25  Medicare Program, and received risk adjustment payments from the Government.

26

27  [2] Should the Government substitute additional MA Plans as parties in this action in the place of erroneously named entities in its Amended Complaint, such additional

28  MA Plans would constitute Counter-Plaintiffs as well.

85

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

292
Exhibit 2

Exhibit D
Page 282

1    a.    Defendant and Counter-Plaintiff AmeriChoice of New Jersey, Inc., a
2    New Jersey corporation.
3    b.    Defendant and Counter-Plaintiff AmeriChoice of New York, Inc., a
4    New York corporation.
5    c.    Defendant and Counter-Plaintiff Arizona Physicians IPA, Inc., an
6    Arizona corporation.
7    d.    Defendant and Counter-Plaintiff Care Improvement Plus of Maryland,
8    Inc., a Maryland corporation.
9    e.    Defendant and Counter-Plaintiff Care Improvement Plus of Texas
10   Insurance Company, a Texas corporation insurance company.
11   f.    Defendant and Counter-Plaintiff Care Improvement Plus South
12   Central Insurance Company, an Arkansas corporation insurance company.
13   g.    Defendant and Counter-Plaintiff Care Improvement Plus Wisconsin
14   Insurance Company, a Wisconsin corporation insurance company.
15   h.    Defendant and Counter-Plaintiff Citrus Health Care, Inc., a Florida
16   corporation.
17   i.    Defendant and Counter-Plaintiff Health Plan of Nevada, Inc., a
18   Nevada corporation.
19   j.    Defendant and Counter-Plaintiff Medica HealthCare Plans, Inc., a
20   Florida corporation.
21   k.    Defendant and Counter-Plaintiff Oxford Health Plans (CT), Inc., a
22   Connecticut corporation.
23   l.    Defendant and Counter-Plaintiff Oxford Health Plans (NJ), Inc., a
24   New Jersey corporation.
25   m.    Defendant and Counter-Plaintiff Oxford Health Plans (NY), Inc., a
26   New York corporation.
27   n.    Defendant and Counter-Plaintiff PacifiCare Life and Health Insurance
28   Company, an Indiana corporation insurance company.

86

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES' AMENDED COMPLAINT-IN-PARTIAL-INTERVENTION AND COUNTERCLAIM

293
Exhibit 2

Exhibit D
Page 283

1     o. Defendant and Counter-Plaintiff PacifiCare of Arizona, Inc., an

2   Arizona corporation.

3     p. Defendant and Counter-Plaintiff PacifiCare of Colorado, Inc., a

4   Colorado corporation.

5     q. Defendant and Counter-Plaintiff PacifiCare of Nevada, Inc., a Nevada

6   corporation.

7     r. Defendant and Counter-Plaintiff Physicians Health Choice of Texas,

8   LLC, a Texas limited liability company.

9     s. Defendant and Counter-Plaintiff Preferred Care Partners, Inc., a

10   Florida corporation.

11     t. Defendant and Counter-Plaintiff Sierra Health and Life Insurance

12   Company, Inc., a Nevada corporation.

13     u. Defendant and Counter-Plaintiff Symphonix Health Insurance, Inc.,

14   an Illinois corporation insurance company.

15     v. Defendant and Counter-Plaintiff United HealthCare of California,

16   Inc., a California corporation.

17     w. Defendant and Counter-Plaintiff UHC of California, a California

18   corporation.

19     x. Defendant and Counter-Plaintiff Unison Health Plan of Tennessee,

20   Inc., a Tennessee corporation.

21     y. Defendant and Counter-Plaintiff UnitedHealthcare Benefits of Texas,

22   Inc., a Texas corporation.

23     z. Defendant and Counter-Plaintiff UnitedHealthcare Community Plan

24   of Ohio, Inc., an Ohio corporation.

25     aa. Defendant and Counter-Plaintiff UnitedHealthcare Community Plan

26   of Texas, L.L.C., a Texas limited liability company.

27     bb. Defendant and Counter-Plaintiff UnitedHealthcare Community Plan,

28   Inc., a Michigan corporation.

87

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

1    cc.    Defendant and Counter-Plaintiff UnitedHealthcare Insurance

2    Company, a Connecticut corporation insurance company.

3    dd.    Defendant and Counter-Plaintiff UnitedHealthcare Insurance

4    Company of New York, a New York corporation insurance company.

5    ee.    Defendant and Counter-Plaintiff UnitedHealthcare of Alabama, Inc.,

6    an Alabama corporation.

7    ff.    Defendant and Counter-Plaintiff UnitedHealthcare of Arizona, Inc., an

8    Arizona corporation.

9    gg.    Defendant and Counter-Plaintiff UnitedHealthcare of Arkansas, Inc.,

10   an Arkansas corporation.

11   hh.    Defendant and Counter-Plaintiff UnitedHealthcare of Florida, Inc., a

12   Florida corporation.

13   ii.    Defendant and Counter-Plaintiff UnitedHealthcare of Georgia, Inc., a

14   Georgia corporation.

15   jj.    Defendant and Counter-Plaintiff UnitedHealthcare of New England,

16   Inc., a Rhode Island corporation.

17   kk.    Defendant and Counter-Plaintiff UnitedHealthcare of New York, Inc.,

18   a New York corporation.

19   ll.    Defendant and Counter-Plaintiff UnitedHealthcare of North Carolina,

20   Inc., a North Carolina corporation.

21   mm.   Defendant and Counter-Plaintiff UnitedHealthcare of Ohio, Inc., an

22   Ohio corporation.

23   nn.    Defendant and Counter-Plaintiff UnitedHealthcare of Oklahoma, Inc.,

24   an Oklahoma corporation.

25   oo.    Defendant and Counter-Plaintiff UnitedHealthcare of Oregon, Inc., an

26   Oregon corporation.

27   pp.    Defendant and Counter-Plaintiff UnitedHealthcare of Pennsylvania,

28   Inc., a Pennsylvania corporation.

88

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

1    qq.    Defendant and Counter-Plaintiff UnitedHealthcare of Tennessee, Inc.,

2    a Tennessee corporation.

3    rr.    Defendant and Counter-Plaintiff UnitedHealthcare of the Midlands,

4    Inc., a Nebraska corporation.

5    ss.    Defendant and Counter-Plaintiff UnitedHealthcare of the Midwest,

6    Inc., a Missouri corporation.

7    tt.    Defendant and Counter-Plaintiff UnitedHealthcare of Utah, Inc., a

8    Utah corporation.

9    uu.    Defendant and Counter-Plaintiff UnitedHealthcare of Washington,

10   Inc., a Washington corporation.

11   vv.    Defendant and Counter-Plaintiff UnitedHealthcare of Wisconsin, Inc.,

12   a Wisconsin corporation.

13   ww.   Defendant and Counter-Plaintiff UnitedHealthcare Plan of the River

14   Valley, Inc., an Illinois corporation.

15                          **FACTUAL ALLEGATIONS**

16   **I.    Medicare Advantage Contracts**

17         **A.    Medicare Advantage and CMS's "Risk Adjustment" Model**

18         5.    The Medicare Act establishes a federal health insurance program for

19   disabled and elderly individuals.  Traditional Medicare beneficiaries are often

20   referred to as fee-for-service ("FFS") beneficiaries because they receive healthcare

21   from a network of healthcare providers, including doctors and hospitals, whom the

22   federal government—through the Centers for Medicare and Medicaid Services

23   ("CMS")—reimburses based on the claims those providers submit for the services

24   they provide.

25         6.    Congress created the Medicare Advantage program to allow

26   individuals eligible for traditional Medicare instead to receive healthcare benefits

27   through private insurance plans like the UnitedHealth MA Plans.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

7.     As with other types of health insurance, it costs more on average to insure individuals who are projected to be sicker during the coverage period than it does to insure individuals who are projected to be healthier during that same period.  Therefore, CMS adjusts the amount it pays to Medicare Advantage organizations to reflect the projected health status of the MA plan's enrollees.

8.     CMS designed and implemented a "risk adjustment" model to determine how much to pay an MA plan in a given year.  The model is designed to predict how much it will cost an MA plan to care for the group of senior citizens who are enrolled in that MA plan, based on an analysis of CMS's costs to care for people with the same health conditions in traditional Medicare.  The model relies on medical diagnosis codes, which are numerical codes that correspond to illnesses or medical conditions diagnosed by medical professionals.  CMS uses the diagnosis codes it receives from the physicians and other medical professionals who treat traditional Medicare beneficiaries on a FFS basis to determine how much it costs CMS to provide care for beneficiaries with a particular medical condition.  CMS then uses that data to predict how much it will cost an MA plan to insure an individual with the same diagnosis code.  CMS assumes that MA plans will see a similar relationship between diagnosis codes and medical costs for the patients enrolled in MA plans, and so it uses the analysis of its own FFS program codes and costs to adjust MA plans' payment amounts as well.

9.     CMS has long known that a substantial number of the diagnosis codes in its own FFS claims data reflect conditions that are not sufficiently documented in patients' corresponding medical charts.  CMS thus has known that if it tried to verify each reported diagnosis code by looking at the underlying medical records, it would not always find specific entries in the medical charts that reflect the specific diagnosis reported to CMS.  It has recognized, however, that attempting to verify all the diagnosis codes would be operationally difficult and, indeed, so

90

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

1    expensive as to be cost prohibitive.  Instead, CMS includes supported and

2    unsupported diagnosis codes alike in its calculations.

3         10.    Using both supported and unsupported diagnosis codes to determine

4    the average costs associated with medical conditions, rather than using just

5    supported diagnosis codes, has the effect of lowering the average costs associated

6    with the conditions.  That reflects, among other things, the fact that patients who

7    do not have a given condition (and whose diagnosis codes for that condition would

8    therefore be unsupported) generally do not require the same level of healthcare

9    services as patients who actually suffer from it.  And because CMS does not

10   distinguish between its supported and unsupported codes, the lower costs that CMS

11   incurs for a FFS patient *without* a given condition (and whose diagnosis code for

12   that condition is therefore unsupported) results on average in a lower payment to

13   an MA plan for a patient who *does* have that condition (and a supported diagnosis

14   code to go with it).  This means that the payments CMS makes to MA plans are

15   lower than they would be if CMS used only supported diagnosis codes in

16   calculating its own average costs for a given condition.

17        11.    Accordingly, by using unverified FFS codes to determine payment

18   amounts, CMS already has reduced its per-code payment *in a way that accounts*

19   *for the presence of unsupported diagnosis codes in claims data*.  If CMS also

20   required MA plans to delete all codes that are not supported in provider-submitted

21   codes, such that they received payments only for supported codes even as CMS

22   continued calculating payment amounts using both its supported and unsupported

23   FFS codes, CMS would receive a windfall and the MA plans would be improperly

24   underpaid.

25   **B.    Medical Chart Reviews**

26        12.    In the MA program, physicians and other healthcare providers submit

27   diagnosis codes to the MA organizations, who in turn submit them to CMS.

28

91

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

298
Exhibit 2

Exhibit D
Page 288

13.    MA organizations are not required or expected to double-check all diagnosis codes they receive from providers in claims submissions.  Doing so would be logistically difficult, if not impossible, for the same reasons CMS chose not to double-check its FFS codes when determining how much to adjust its payments for specific diagnosis codes.  CMS both expects and accepts that some portion of data submitted by MA organizations—like CMS's own FFS data—would not be supported in the medical chart if one were to compare codes submitted in claims to underlying medical records.

14.    MA organizations are permitted to perform their own reviews of certain medical charts if they choose to do so—and often do.  Specialists in coding diagnoses (known as "coders") review the medical charts and determine what codes are supported by the charts.  MA organizations then submit those additional diagnosis codes to CMS to demonstrate that the particular patients may require more care in the successive period.

15.    CMS never has issued any rules or regulations addressing the scope of MA organizations' reviews of medical charts.  For example, there is no rule or regulation requiring that MA plans perform a so-called "two-way look," in which their coders would not only affirmatively identify codes that should be submitted but also validate the diagnosis codes *already* submitted by physicians and other medical professionals.

16.    Instead, CMS fully expects that MA organizations' chart reviews will result in a net increase in the number of diagnosis codes that MA plans submit for risk adjustment purposes.  In fact, *because* CMS anticipates that MA organizations' chart reviews will lead MA plans to identify more codes than they would if they relied just on submissions by doctors and other health professionals (as CMS does in the traditional Medicare program), CMS makes an across-the-board reduction in its payments to MA plans.  In 2018, for example, this reduction—known as the "Coding Intensity Adjustment" because it adjusts for MA

92

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

Exhibit D
Page 289

1  plans' tendency to record diagnosis codes with more "intensity" than FFS

2  providers—will reduce MA plans' payments by 5.91 percent.  CMS has studied the

3  issue and expressly found that the Coding Intensity Adjustment fully accounts for

4  the difference in coding practices between the MA and traditional Medicare

5  programs.

6      **C.    Contract and Bid Process**

7      17.    MA plans enter into annual contracts with CMS in which they agree

8  to provide insurance benefits to patients for the coming year in exchange for

9  payment from CMS.

10      18.    The payment provision of these contracts provides that the MA plans

11  will develop an annual benefit and price bid proposal and submit that information

12  to CMS.

13      19.    An MA plan's bid must reflect the MA organization's estimate of the

14  payment it will require to provide the benefits covered by Medicare Parts A and B

15  to a Medicare enrollee "with a national average risk profile."  This payment

16  estimate must include "all estimated revenue required by the plan, including

17  administrative costs and return on investment."

18      20.    To make these estimates, an MA plan must be able to calculate

19  anticipated revenues and expenses, including the cost of providing care to the

20  beneficiaries enrolled in the MA plan.  In doing so, MA plans take into account

21  CMS's calculations about the relative amount it will cost to care for patients with

22  individual conditions, as well as "actuarial" assumptions, which are projections

23  about the number of beneficiaries with particular conditions that will enroll in the

24  plan during the year.

25      21.    In deciding whether to accept an MA plan's bid, CMS is required by

26  law to determine whether the bid "reasonably and equitably reflects the plan's

27  estimated revenue requirements for providing the benefits under the plan."  If the

28  bid does *not*, CMS cannot accept it.

<div align="center">93</div>

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES' AMENDED COMPLAINT-IN-PARTIAL-INTERVENTION AND COUNTERCLAIM

22. If CMS accepts the bid (after determining that it is reasonable and equitable), CMS then agrees to pay the MA organization under the contract in accordance with the MA organization's bid and based on the submitted risk adjustment data and other amounts published by CMS.

**D.** **CMS Told United and the Industry that MA Plans Are Not Required to Perform Chart Reviews that Include Efforts to Validate Previously Submitted Diagnosis Codes (Two-Way Looks)**

23. As noted above, none of the thousands of rules and regulations issued by CMS requires MA plans to conduct chart reviews that "look both ways" or otherwise make their diagnosis data conform to a higher standard of accuracy than CMS itself utilizes with respect to its FFS data.

24. In fact, CMS told UnitedHealth that just the opposite is true.

25. For example, in 2014 CMS considered and then affirmatively decided *not* to finalize a proposed rule that would have prohibited MA organizations from performing reviews that only looked for additional diagnosis codes (known as "one-way" reviews).

26. In addition, UnitedHealth repeatedly made clear that it was not performing two-way reviews and sought specific guidance on the issue from CMS. CMS consistently confirmed that two-way reviews were not, and are not, required.

27. For example, in 2009, UnitedHealth explained to government auditors that its chart review program did not seek to verify diagnosis codes received from medical providers through the review of medical records. The government auditors never stated or even suggested that UnitedHealth was violating any rule or CMS contract by failing to verify the diagnosis codes UnitedHealth had received from providers, and the resulting audit did not find that UnitedHealth was out of compliance with any rule, regulation or contractual requirement.

28. Moreover, starting in 2011, the UnitedHealth MA Plans informed CMS each year in their bids that they made no effort to validate the diagnosis

94

UNITEDHEALTH'S ANSWER TO UNITED STATES' AMENDED COMPLAINT-IN-PARTIAL-INTERVENTION AND COUNTERCLAIM

1  codes they used in the bids by reviewing medical records: "As part of the

2  preparation of the bids, we did not attempt to validate any actual or projected risk

3  scores through a review of applicable medical records. . . ."

4         29.    CMS did not advise a single UnitedHealth MA Plan that its failure to

5  validate provider-submitted codes was inappropriate or that validation of risk

6  scores based on a review of the medical records was required; rather, CMS

7  accepted these bids and paid the UnitedHealth MA Plans for the services provided.

8         30.    In fact, during conversations between UnitedHealth and CMS over the

9  course of the spring and early summer of 2014, CMS confirmed multiple times that

10  "two-way" looks were not required.

11         31.    Specifically, CMS told UnitedHealth that unless and until a proposed

12  rule governing the review of medical records became final, MA plans did not, and

13  do not, have an affirmative obligation to confirm whether diagnosis codes

14  submitted by physicians are supported in the medical records.

15         32.    The UnitedHealth MA Plans memorialized this understanding,

16  including in subsequent bids and risk adjustment data attestations they provided to

17  CMS under the contracts.

18  **II.**     **The UnitedHealth MA Plans Submitted Bids and Performed Contracts**

19         **In Reliance on the Government's Representations and Conduct**

20         33.    During the relevant period, the UnitedHealth MA Plans based their

21  bids on the understanding that they did not need to perform chart reviews to

22  identify unsupported codes from physicians, just as CMS does not look for

23  unsupported codes when calculating its average costs in the FFS program.

24         34.    The lack of an obligation to perform chart reviews to identify

25  unsupported codes was an assumption underlying the UnitedHealth MA Plans'

26  bids.  The UnitedHealth MA Plans took this lack of an obligation into account in

27  estimating the amounts they would need to bid in order to meet their revenue

28  requirements.  CMS accepted these bids knowing that it had not imposed an

95

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

302
Exhibit 2

Exhibit D
Page 292

1  obligation to perform such reviews and that the assumptions on which the

2  UnitedHealth MA Plans' bids rested—which CMS was required by law to review

3  and, if appropriate, approve—did not include the performance of such two-way

4  looks.

5  **III.    The Department of Justice Files Suit Against UnitedHealth**

6        35.    *Qui tam* relator Benjamin Poehling filed this False Claims Act

7  ("FCA") case in 2011.  The Department of Justice ("DOJ") investigated Poehling's

8  allegations for more than 6 years, during which time the case remained under seal.

9        36.    DOJ formally intervened in the case and filed a Complaint-In-Partial-

10  Intervention on May 16, 2017.  DOJ filed an Amended Complaint on November

11  17, 2017.

12        37.    In its Amended Complaint, DOJ makes assertions directly contrary to

13  the guidance and instructions from CMS regarding the UnitedHealth MA Plans'

14  obligations to review medical records.

15        38.    Despite knowing that CMS considered, and then rejected, a rule that

16  would have required MA plans conducting any review of medical records to

17  validate diagnosis codes previously submitted by providers, DOJ now claims that

18  the UnitedHealth MA Plans "were obligated to 'look both ways' at the results of

19  their chart reviews and delete unsupported provider-diagnoses."  Moreover, despite

20  knowing that CMS told the UnitedHealth MA Plans that they had no obligation to

21  look for unsupported diagnosis codes during the course of any chart review, DOJ

22  now claims that the UnitedHealth MA Plans had a legal obligation to do so.

23                          <u>**CAUSES OF ACTION**</u>

24                      **Count 1: Breach of Contract**

25        39.    The UnitedHealth MA Plans repeat and re-allege the allegations

26  contained in Paragraphs 1 to 38 above as though they are fully set forth herein.

27

28

96

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

303
Exhibit 2

Exhibit D
Page 293

40. During all time periods relevant for the Government's Amended Complaint, CMS and certain UnitedHealth MA Plans had in place contracts relating to the UnitedHealth MA Plans' participation in Medicare Part C.

41. The UnitedHealth MA Plans performed their obligations under their contracts.

42. As part of the contract formation process, the UnitedHealth MA Plans were required to submit bid proposals. CMS approved and accepted those bid proposals, and agreed to pay the UnitedHealth MA plans based on their approved bids.

43. The bids CMS approved and accepted were premised on the understanding, and in some instances specified, that the UnitedHealth MA Plans were not performing medical chart reviews to identify unsupported codes (i.e. "two-way looks").

44. DOJ's Amended Complaint claims that the UnitedHealth MA Plans were required to perform two-way looks, despite the fact that CMS previously advised the UnitedHealth MA Plans that two-way looks were unnecessary and not required. DOJ now seeks, after the fact, to alter fundamental assumptions built into the UnitedHealth MA Plans' bids and, thus, their contracts with CMS.

45. The instant lawsuit improperly seeks to deprive the UnitedHealth MA Plans of compensation they earned in exchange for providing insurance coverage to millions of MA plan beneficiaries, on the ground that the UnitedHealth MA Plans did not perform two-way looks or otherwise validate provider-submitted codes. Depriving the UnitedHealth MA Plans of compensation on that ground constitutes a breach of the terms of the contracts between the UnitedHealth MA Plans and CMS. In addition, DOJ effectively seeks to withhold payment for services already provided by the UnitedHealth MA Plans.

97

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

Case 2:16-cv-08697-FMO-SS   Document 422-3   Filed 06/22/21   Page 305 of 1177   Page ID
#:14379
Case 2:16-cv-08697-MWF-SS   Document 223   Filed 03/23/18   Page 98 of 101   Page ID
#:3163

46.     As a result of such breach, the UnitedHealth MA Plans have suffered damages and are entitled to recover for these damages in an amount to be determined at trial.

### Count 2: Breach of Covenant of Good Faith and Fair Dealing

47.     The UnitedHealth MA Plans repeat and re-allege the allegations contained in Paragraphs 1 to 46 above as though they are fully set forth herein.

48.     During all time periods relevant for the Government's Amended Complaint, CMS and certain of the UnitedHealth MA Plans had in place legally enforceable contracts relating to the UnitedHealth MA Plans' participation in Medicare Part C.  Every contract imposes a duty of good faith and fair dealing upon the parties in performance and enforcement of the contract.

49.     The UnitedHealth MA Plans performed their obligations under their contracts.

50.     In suing the UnitedHealth MA Plans for not performing two-way looks and other measures to review and delete codes, the Government breached the duty of good faith and fair dealing by demanding that the UnitedHealth MA Plans perform functions not required by the contracts or else face significant liability.

51.     The Government further breached the covenant of good faith and fair dealing by continuing to accept benefits from the UnitedHealth MA Plans based on the parties' contracts, while simultaneously pursuing treble-damages recovery for payments it made pursuant to those contracts, in a manner designed to secure the benefits of its contracts with the UnitedHealth MA Plans without paying for those benefits.

52.     As a result of any such breach of the covenant of good faith and fair dealing, the UnitedHealth MA Plans have suffered damages and are entitled to recover for these damages in an amount to be determined at trial.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

**Count 3: Fraudulent Inducement**

53. The UnitedHealth MA Plans repeat and re-allege the allegations contained in Paragraphs 1 to 52 above as though they are fully set forth herein.

54. CMS made representations to the UnitedHealth MA Plans regarding the terms of the UnitedHealth MA Plans' contracts, both in the context of express contract negotiations and otherwise.

55. CMS expressly represented that the UnitedHealth MA Plans were not required to conduct two-way looks to verify and delete diagnosis codes.

56. CMS's past assertions on that point were legally correct. Nevertheless, DOJ now asserts that two-way looks *were* required. If DOJ's assertion is accurate—and the UnitedHealth MA Plans were required to conduct two-way looks when conducting chart reviews—then CMS's prior representations to the UnitedHealth MA Plans were false and lulled the UnitedHealth MA Plans into continuing to enter into contracts with CMS under false pretenses. Indeed, while the UnitedHealth MA Plans continue to believe that two-way looks were not, and are not, required during the course of chart reviews, if CMS knew, or was reckless in not knowing, that the UnitedHealth MA Plans were required to conduct two-way looks, then it deliberately deceived the UnitedHealth MA Plans.

57. CMS knew, and intended, that the UnitedHealth MA Plans would rely on CMS's representations and omissions regarding two-way looks.

58. The UnitedHealth MA Plans justifiably relied on CMS's representations and omissions in preparing their bids and entering into their contracts.

59. If the Government's current assertions are correct, and the UnitedHealth MA Plans were required to perform two-way looks, then CMS's prior representations and omissions fraudulently induced the UnitedHealth MA Plans to enter into their contracts with CMS.

99

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

306
Exhibit 2

Exhibit D
Page 296

60.     As a result of CMS's fraudulent statements and omissions, the UnitedHealth MA Plans have suffered damages and are entitled to recover for these damages in an amount to be determined at trial.

## Count 4: Negligent Misrepresentation

61.     The UnitedHealth MA Plans repeat and re-allege the allegations contained in Paragraphs 1 to 60 above as though they are fully set forth herein.

62.     CMS expressly represented to the UnitedHealth MA Plans on certain occasions that the UnitedHealth MA Plans would not be required under the contracts to conduct two-way looks or take other steps to verify and delete codes that CMS itself does not take.

63.     CMS's past assertions on that point were legally correct. Nevertheless, DOJ now asserts that two-way looks *were* required.  The UnitedHealth MA Plans therefore assert, in the alternative, that if two-way looks were required, then CMS's prior representations were false and negligent, and the UnitedHealth MA Plans were ignorant of the two-way look requirement.

64.     CMS intended that the UnitedHealth MA Plans would rely on CMS's representations that the UnitedHealth MA Plans would not be required under the contracts to conduct two-way looks.

65.     The UnitedHealth MA Plans justifiably relied on CMS's representations in preparing their bids and entering into their contracts.

66.     If the Government's current assertions are correct, and the UnitedHealth MA Plans were required to perform two-way looks, then CMS negligently misrepresented the UnitedHealth MA Plans' medical record review obligations.

67.     As a result of CMS's negligent misrepresentations, the UnitedHealth MA Plans have suffered damages and are entitled to recover for these damages in an amount to be determined at trial.

100

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

307
Exhibit 2

Exhibit D
Page 297

**Count 5: Promissory Estoppel**

1

2        68.     The UnitedHealth MA Plans repeat and re-allege the allegations

3   contained in Paragraphs 1 to 67 above as though they are fully set forth herein.

4        69.     CMS clearly and unambiguously promised the UnitedHealth MA

5   Plans that the UnitedHealth MA Plans would not be required to conduct two-way

6   looks in their chart reviews.

7        70.     The UnitedHealth MA Plans foreseeably and reasonably relied on

8   CMS's representations in preparing their bids, which would have been higher if

9   CMS had not promised that two-way looks would not be required.

10        71.     As a result of CMS's promises, the UnitedHealth MA Plans have

11   suffered damages and are entitled to recover for these damages in an amount to be

12   determined at trial.

13                        **PRAYER FOR RELIEF**

14        **WHEREFORE**, the UnitedHealth MA Plans request that the Amended

15   Complaint be dismissed with prejudice and that the relief sought in same be

16   denied.  The UnitedHealth MA Plans further request that the counterclaims be

17   granted and that the Court grant the relief sought in each of the counterclaims,

18   costs, and disbursements of this litigation including attorney's fees, and such other

19   and further relief in favor of the UnitedHealth MA Plans as this Court deems just

20   and proper.

21   Dated: March 23, 2018              Respectfully submitted,

22
                                       LATHAM & WATKINS LLP
23                                     DAVID J. SCHINDLER
                                       DANIEL MERON
24                                     KATHRYN H. RUEMMLER
                                       ABID R. QURESHI
25

26
                                       By /s/ David J. Schindler
27                                         David J. Schindler
                                           Attorneys for UnitedHealth Defendants
28
                                       101

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

308
Exhibit 2

Exhibit D
Page 298

# EXHIBIT E

1  LATHAM & WATKINS LLP
        David J. Schindler (Bar No. 130490)
2        *david.schindler@lw.com*
   355 South Grand Avenue, Suite 100
3  Los Angeles, CA 90071-1560
   Telephone: +1.213.485.1234
4  Facsimile: +1.213.891.8763

5  LATHAM & WATKINS LLP
        Daniel Meron (appearing *pro hac vice*)
6        *daniel.meron@lw.com*
        Kathryn H. Ruemmler (appearing *pro hac vice*)
7        *kathryn.ruemmler@lw.com*
        Abid R. Qureshi (appearing *pro hac vice*)
8        *abid.qureshi@lw.com*
   555 Eleventh Street NW, Suite 1000
9  Washington, DC 20004-1304
   Telephone: +1.202.637.2200
10 Facsimile: +1.202.637.2201

11 Attorneys for Defendants

12

13              **UNITED STATES DISTRICT COURT**

14          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

15

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING,<br><br>Plaintiffs,<br><br>v.<br><br>UNITEDHEALTH GROUP, INC. *et al.*,<br><br>Defendants. | CASE NO. CV 16-08697 FMO (SSx)<br><br>**DEFENDANT UHC OF CALIFORNIA'S FIRST INTERROGATORY TO THE GOVERNMENT**<br><br>Assigned to Hon. Fernando Manzano Olguin<br><br>DISCOVERY MATTER |

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

UHC OF CALIFORNIA'S FIRST INTERROGATORY
TO THE GOVERNMENT
2:16-cv-08697-FMO (SSx)

310
Exhibit 2

Exhibit E
Page 299

1 PROPOUNDING PARTY:     Defendant UHC of California

2 RESPONDING PARTY:      Plaintiff United States Government

3 SET NO.:               ONE (1)

4 **TO THE RESPONDING PARTY AND TO ITS ATTORNEYS OF RECORD:**

5         Please take notice that pursuant to Rule 33 of the Federal Rules of Civil

6 Procedure and Rule 33-1 of the Local Civil Rules of the United States District Court

7 for the Central District of California, Defendant UHC of California, by and through

8 its undersigned attorneys, submits the following First Interrogatory to the

9 Government ("Interrogatory"). UnitedHealth requests that the Government respond

10 separately in writing to the following Interrogatory within thirty (30) days of service.

11 The Definitions and Instructions set forth below shall govern the following

12 Interrogatory, as well as responses to the Interrogatory.

13                        **DEFINITIONS**

14         As used herein, the following terms and phrases shall have the following

15 meanings:

16     1.    The applicable definitions and rules of construction set forth in the

17 Federal Rules of Civil Procedure and the local rules are incorporated herein by

18 reference.

19     2.    **"Beneficiary"** or **"Member"** shall mean an individual enrolled in a

20 Medicare Advantage Plan.

21     3.    **"CMS HCC"** means an HCC that is used for Medicare Part C.

22     4.    **"Complaint"** shall mean the United States' Amended Complaint-In-

23 Partial Intervention And Demand For Jury Trial filed by the Government in this case

24 on November 17, 2017, and any forthcoming amended complaints filed by the

25 Government in this case.

26     5.    **"Diagnosis Code(s)"** shall mean an ICD-9-CM or ICD-10 CM

27 diagnosis code.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

2

UHC OF CALIFORNIA'S FIRST INTERROGATORY
TO THE GOVERNMENT
2:16-cv-08697-FMO (SSx)

6. **"Date of Service Year(s)"** shall mean the year or years during which a Beneficiary had a medical encounter with a healthcare provider.

7. **"HCC"** shall mean a hierarchical condition category associated with one or more diagnosis codes (ICD-9-CM or ICD-10-CM codes) that represent the disease component of the beneficiary risk scores that are applied to Medicare Advantage payments.

8. **"Date of Service"** shall mean the date of a medical encounter or, if the encounter lasted more than 24 hours, the start and end dates for the encounter.

9. **"Each"** includes the word "every" and **"every"** includes the word "each," **"any"** includes the word "all" and **"all"** includes the word "any," **"and"** includes the word "or" and **"or"** includes the word "and," as necessary to bring within the scope of each Request information that might otherwise be construed to be outside its scope.

10. **"Government"** shall mean the United States, its agencies, departments, components, agents, representatives, contractors, attorneys, consultants, and all other Persons acting on its behalf, including, but not limited to, any component of the United States Department of Justice, the United States Department of Health and Human Services, the Centers for Medicare & Medicaid Services, and all subdivisions and components thereof.

11. **"HIC Number"** shall mean a Beneficiary's Health Insurance Claim Number.

12. **"NPI"** or **"National Provider Identifier"** shall mean the unique 10-digit identification number CMS issues to covered healthcare Providers.

13. **"Person"** shall mean natural persons, proprietorships, corporations, public corporations, municipal corporations, the federal government and all departments and agencies thereof, state governments, local governments, other governmental agencies, political subdivisions, partnerships, groups, associations or organizations.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

3

UHC OF CALIFORNIA'S FIRST INTERROGATORY
TO THE GOVERNMENT
2:16-cv-08697-FMO (SSx)

312
Exhibit 2

Exhibit E
Page 301

14. **"Provider"** shall mean any provider of healthcare services including individual providers such as physicians, physicians assistants, laboratories, medical equipment providers, and nurse practitioners; institutional providers such as hospitals and clinics; provider groups such as groups of physicians or associations of physicians with other provider types; and any other type of providers of healthcare services or items. "Provider" includes fee-for-service Providers, providers with Gainshare Arrangements, and Providers with Capitation arrangements. "Provider" also includes any past or present employee, contractor, or agent of any Provider. The term "Provider" shall be given the broadest possible meaning when responding to these Requests.

15. **"Provider ID"** shall mean the unique identifier(s) used to differentiate the Provider in one or more of UnitedHealth's Risk Adjustment Databases.

16. **"RxHCC"** means an HCC used for Medicare Part D.

17. **"Tax ID"** shall mean the nine-digit identification number used by the Internal Revenue Service (IRS) for tax purposes.

18. **"United"** or **"UnitedHealth"** shall mean all the Defendants listed in Your Complaint.

19. **"You"** and **"Your"** shall mean the Government and all Persons acting on its behalf.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

4

UHC OF CALIFORNIA'S FIRST INTERROGATORY
TO THE GOVERNMENT
2:16-cv-08697-FMO (SSx)

Exhibit E
Page 302

313
Exhibit 2

## INSTRUCTIONS

1.    In accordance with the Federal Rules of Civil Procedure, Your obligation to respond to the Interrogatory is continuing. If you receive or discover information after serving a response to the Interrogatory, You should supplement Your responses promptly.

2.    Whenever appropriate, the singular form of a word shall be interpreted as plural, and vice versa. Similarly, the use of the present tense of a verb shall be considered to include within its meaning the future and past tense, and vice versa.

3.    The Interrogatory should be construed so as to include all time periods relevant to the allegations and claims for damages contained in Your Complaint.

4.    Whenever the conjunction "and" is used, it is also to be interpreted disjunctively, and conversely; whenever the disjunctive 'or' is used, it is also to be interpreted conjunctively.

5.    Each Interrogatory is to be construed independently and not in reference to any other Interrogatory for purposes of limiting the scope of the Interrogatory. The answer to an Interrogatory shall not be supplied by referring to the answer to another interrogatory unless the answer to the referenced interrogatory supplies a complete and accurate answer to the Interrogatory being answered.

6.    You are to produce all responsive information that are in Your possession, custody or control, or in the possession, custody, or control of any of Your agents, representatives, and consultants. Without limiting the term "control," responsive information is deemed to be within Your control if You have ownership, possession, or custody or the information, or the right to secure the information from any person. If You do not have responsive information in Your possession, custody, or control, You must state so and answer the Interrogatory in part if You have part of the responsive information.

7.    If a claim of privilege is asserted in objecting to the Interrogatory, or any sub-part thereof, and an answer is not provided on the basis of such assertion,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

5

UHC OF CALIFORNIA'S FIRST INTERROGATORY
TO THE GOVERNMENT
2:16-cv-08697-FMO (SSx)

314
Exhibit 2

Exhibit E
Page 303

1   furnish the following information with respect to the Interrogatory as to which the

2   claim of privilege is asserted: (a) the nature of the privilege (including work product)

3   that is being claimed; and (b) the general topic of the information claimed to be

4   privileged to the extent possible in a manner consistent with the claimed privilege.

5       8.      Whenever an Interrogatory calls for information with respect to "each"

6   one of a particular type or class of claims, matters, events, persons, or entities, of

7   which there is more than one, You are required to separately list, set forth, or identify

8   for each thereof all of the information requested.

9       9.      If any meaning of any term in any Interrogatory is unclear to You,

10  without waiver of UnitedHealth's right to seek a full and complete response to the

11  Interrogatory, You shall assume a reasonable meaning, state what the assumed

12  meaning is, and respond to the Interrogatory according to the assumed meaning.

13

14                              **INTERROGATORY**

15  **INTERROGATORY NO. 1**

16      Identify for Date of Service Years 2008–2016 the Beneficiary (by name, HIC

17  Number, and date of birth), Date of Service, Diagnosis Code(s), CMS HCC(s) or

18  RxHCC(s), and Provider (by individual name, group name, address, NPI, Tax ID(s),

19  and Provider ID), that corresponds to each and every Diagnosis Code You allege

20  UnitedHealth "knowingly and improperly failed to delete . . . or otherwise return to

21  the Medicare Program [as an] overpayment." United States' Complaint ¶ 342, Dkt.

22  171.

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

6

UHC OF CALIFORNIA'S FIRST INTERROGATORY
TO THE GOVERNMENT
2:16-cv-08697-FMO (SSx)

315
Exhibit 2

Exhibit E
Page 304

Dated:  January 3, 2020

LATHAM & WATKINS LLP
DAVID J. SCHINDLER
DANIEL MERON
KATHRYN H. RUEMMLER
ABID R. QURESHI


By _____
   David J. Schindler
   Attorneys for UnitedHealth
   Defendants

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

7

UHC OF CALIFORNIA'S FIRST INTERROGATORY
TO THE GOVERNMENT
2:16-cv-08697-FMO (SSx)

316
Exhibit 2

Exhibit E
Page 305

1

## **PROOF OF SERVICE**

2

       I am employed in the County of Los Angeles, State of California.  I

3

am over the age of 18 years and not a party to this action.  My business address is Latham & Watkins LLP, 355 South Grand Avenue, Suite 100, Los Angeles, CA 90071-1560.

4

5

       On **January 3, 2020**, I caused the service of a true copy of the following document described as:

6

### **UHC OF CALIFORNIA'S FIRST INTERROGATORY TO THE GOVERNMENT**

7

8

to be served in the following manner:

9

### **BY ELECTRONIC MAIL**

10

       The above-described document was transmitted via electronic mail to the following party pursuant to written consent under Federal Rule of Civil Procedure 5(b)(2)(E) on **January 3, 2020**:

11

12

13

### **SEE ATTACHED SERVICE LIST**

14

       I declare that I am employed in the office of a member of the Bar of,

15

or permitted to practice before, this Court at whose direction the service was made and declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

16

17

       Executed on **January 3, 2020**, at Los Angeles, California.

18

19

20

                        _____

21

                         David J. Schindler

22

23

24

25

26

27

28

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

8

UHC OF CALIFORNIA'S FIRST INTERROGATORY
TO THE GOVERNMENT
2:16-cv-08697-FMO (SSx)

317
Exhibit 2

Exhibit E
Page 306

**SERVICE LIST**

United States District Court
CASE NO. CV 16-08697 FMO (SSx)

| | |
|---|---|
| John E. Lee<br>*john.lee2@usdoj.gov*<br>Assistant United States Attorneys<br>300 N. Los Angeles Street, Room 7516<br>Los Angeles, California 90012<br>Tel: 213.894.3995<br><br>Jack Ross<br>*jack.ross@usdoj.gov*<br>Assistant United States Attorneys<br>300 N. Los Angeles Street, Room 7516<br>Los Angeles, California 90012<br>Tel: 213.894.7395 | Attorneys for the United States of America |
| Jessica Krieg<br>*jessica.e.krieg@usdoj.gov*<br>Paul Perkins<br>*paul.r.perkins@usdoj.gov*<br>Martha N. Glover<br>*martha.n.glover@usdoj.gov*<br>Paul G. Freeborne<br>*paul.g.freeborne2@usdoj.gov*<br>Maria R. Marsh<br>*maria.r.marsh@usdoj.gov*<br>United States Department of Justice<br>P.O. Box 261, Ben Franklin Station<br>Washington, D.C. 20044<br>Tel: 202.307.0486 | Attorneys for the United States of America |
| Edward Crooke<br>*edward.crooke@usdoj.gov*<br>United States Department of Justice<br>Civil Division<br>175 N Street N.E., Room 10-202<br>Washington, D.C. 20002<br>Tel: 202.353.0426<br><br>Zoila E. Hinson<br>*Zoila.e.hinson@usdoj.gov*<br>United States Department of Justice<br>Civil Division, Fraud Section<br>175 N Street N.E., Suite 9-1813<br>Washington, D.C. 20002<br>Tel: 202.353.1286<br><br>Amy Likoff<br>*Amy.L.Likoff@usdoj.gov*<br>United States Department of Justice<br>Civil Division<br>175 N Street N.E., Room 10-1813<br>Washington, D.C. 20002 | Attorneys for the United States of America |

9

318
Exhibit 2

UHC OF CALIFORNIA'S FIRST INTERROGATORY TO THE GOVERNMENT
2:16-cv-08697-FMO (SSx)

Exhibit E
Page 307

| | |
|---|---|
| Tel: 202.305.3173<br><br>Robert McAuliffe<br>*Robert.McAuliffe@usdoj.gov*<br>United States Department of Justice<br>Civil Division<br>175 N Street N.E., Room 9-103<br>Washington, D.C. 20002<br>Tel: 202.514.6832<br><br>Gregory A. Mason<br>*gregory.a.mason@usdoj.gov*<br>United States Department of Justice<br>Civil Division; Fraud Section<br>175 N Street N.E., Room 10-224<br>Washington, D.C. 20002<br>Tel: 202.514.9472<br><br>Linda M. McMahon<br>*Linda.mcmahon2@usdoj.gov*<br>United States Department of Justice<br>Civil Division<br>175 N Street N.E., Room 10-202<br>Washington, D.C. 20002<br>Tel: 202.307.0448 | |
| Eric R. Havian<br>Mary A. Inman<br>Jessica T. Moore<br>Anne Hayes Hartman<br>Henry C. Su<br>Hallie E. Noecker<br>*UHG-RelatorsCounsel@Lists.SusmanGodfrey.com*<br>**Constantine Cannon LLP**<br>150 California Street, Suite 1600<br>San Francisco, CA 94111<br>Tel: 415.639.4001<br><br>Timothy P. McCormack<br>Harry P. Litman<br>Rosie Dawn Griffin<br>Max Voldman<br>*UHG-RelatorsCounsel@Lists.SusmanGodfrey.com*<br>**Constantine Cannon LLP**<br>1001 Pennsylvania Avenue, N.W., Suite 1300<br>Washington, D.C. 20004<br>Tel: 202.204.3500 | Attorneys for Relator Benjamin Poehling |
| Steve Hasegawa<br>Taeva C. Shefler<br>*UHG-RelatorsCounsel@Lists.SusmanGodfrey.com*<br>**Phillips & Cohen LLP** | Attorneys for Relator Benjamin Poehling |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

10

UHC OF CALIFORNIA'S FIRST INTERROGATORY
TO THE GOVERNMENT
2:16-cv-08697-FMO (SSx)

319
Exhibit 2

Exhibit E
Page 308

| | |
|---|---|
| 100 The Embarcadero, Suite 300<br>San Francisco, California 94105<br>Tel: 415.836.9000 | |
| Meng Xi<br>Oleg Elkhunovich<br>Catriona Lavery<br>*UHG-RelatorsCounsel@Lists.SusmanGodfrey.com*<br>**Susman Godfrey L.L.P.**<br>1900 Avenue of the Americas, Suite 1400<br>Los Angeles, CA 90067<br>Tel: (310) 789-3100<br><br>Arun S. Subramanian<br>William C. Carmody<br>Geng Chen<br>*UHG-RelatorsCounsel@Lists.SusmanGodfrey.com*<br>**Susman Godfrey L.L.P.**<br>1301 Avenue of the Americas, 32nd Fl.<br>New York, NY 100 19-6023<br>Tel: (212) 336-8330<br><br>John P. Lahad<br>Weston L. O'Black<br>William R. H. Merrill<br>*UHG-RelatorsCounsel@Lists.SusmanGodfrey.com*<br>**Susman Godfrey L.L.P.**<br>1000 Louisiana Street, 51st Fl.<br>Houston, TX 77002<br>Tel: (713) 654-6666<br><br>Matthew R. Berry<br>*UHG-RelatorsCounsel@Lists.SusmanGodfrey.com*<br>**Susman Godfrey L.L.P.**<br>1201 Third Avenue, Suite 3800<br>Seattle, WA 98101<br>Tel: (206) 373-7394 | Attorneys for Relator Benjamin Poehling |

# EXHIBIT F

Exhibit 2

200 Clarendon Street
Boston, Massachusetts 02116
Tel: +1.617.948.6000 Fax: +1.617.948.6001
www.lw.com

**LATHAM&WATKINS** LLP

| | |
|---|---|
| FIRM / AFFILIATE OFFICES | |
| Beijing | Moscow |
| Boston | Munich |
| Brussels | New York |
| Century City | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Seoul |
| Hong Kong | Shanghai |
| Houston | Silicon Valley |
| London | Singapore |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |
| Milan | |

March 17, 2020

**VIA EMAIL**

Martha Glover
Civil Division, Fraud Section
175 N Street, N.E.
Washington, D.C. 20002

Re:    The Government's Improper and Deficient Responses and Objections to
       Defendant UHC of California's First Set of Interrogatories to the Government

Dear Martha:

We write to address the government's failure to properly respond to UnitedHealth's First Set of Interrogatories ("First Interrogatory"). As detailed below, the government's improper objections and deficient response fail to satisfy its obligations under the Federal Rules of Civil Procedure and applicable case law. UnitedHealth is entitled to know at this stage of the litigation what purported false claims the government contends are at issue, and the government must provide the requested information about the alleged reverse false claims that it has identified to date—not a simple regurgitation of twenty-five examples from the Amended Complaint. However, if after more than five years of investigation and two-and-a-half years of discovery, the government has only identified twenty-five diagnosis codes it contends are at issue, the government must so state.

By March 27, 2020, UnitedHealth requests that the government (1) agree to supplement its Responses and Objections to UHC of California's First Set of Interrogatories ("Response") to fully and properly respond to the First Interrogatory, or (2) confirm that it has not yet identified any other diagnosis codes allegedly at issue. If the government refuses to do so, please provide your availability for a meet and confer the week of March 30.

## I.    THE GOVERNMENT'S OBJECTIONS ARE IMPROPER

### A.    General Objection 2

The government asserted a general objection to the extent UnitedHealth's First Interrogatory requested information regarding to the government's methodology, deliberative processes, or investigative efforts. *See* General Objection 2. This objection is baseless. UnitedHealth's First Interrogatory seeks *factual* information underlying the government's allegations from its Amended Complaint, so it is unclear what information the government is objecting to providing. By March 27 2020, please provide further detail about the nature of this

March 17, 2020
Page 2

**LATHAM&WATKINS**LLP

objection and confirm whether the government is withholding responsive information based on this objection.

> **B.      The Government's Objection that this Interrogatory is Oppressive and Unduly Burdensome is Absurd**

The government's objection that the First Interrogatory is "oppressive and unduly burdensome in that it seeks information that is more readily available to or in the possession, custody, or control of the UnitedHealth defendants concerning their own Beneficiaries and Diagnosis Codes reported on behalf of their own Beneficiaries," Response at 6, is patently absurd. UnitedHealth is seeking basic factual information concerning the claims that the government contends are at issue in this case—claims that the government has been investigating for the better part of a decade—so the government's objection that the First Interrogatory is somehow "oppressive and unduly burdensome" falls flat. This objection is improper for several reasons, including that (1) the government fails to include any evidence in its Response to support its "oppressive and unduly burdensome" objection; and (2) the government's objection that the information is more readily available to UnitedHealth (and citation to UnitedHealth's document productions) is not a valid objection to an interrogatory.

In the Ninth Circuit, "a party alleging that an interrogatory is overly broad, unduly burdensome, or oppressive "must state specifically how . . . each request is overly broad, unduly burdensome, or oppressive by submitting affidavits or offering evidence revealing the nature of the burden." *Big Baboon Corp. v. Dell, Inc.*, 72 F. Supp. 2d 1224, 1229 (C.D. Cal. 2010) (quoting *Thomas v. Hickman*, 2007 WL 4302974, at *6 (E.D. Cal. 2007)). In *Big Baboon*, the court rejected the responding party's objection to an interrogatory as overly burdensome or oppressive because the responding party "failed to offer persuasive evidence in support of its burdensomeness objection." *Big Baboon*, 72 F. Supp. 2d at 1229. Here, the government similarly has failed to provide any evidence, declarations or otherwise, to support its objection that the First Interrogatory is unduly burdensome or oppressive. Nor could it. The government cannot seriously contend that identifying the actual claims at issue is somehow oppressive or unduly burdensome—especially after five years of investigation and two-and-a-half years of discovery. *See, e.g.*, *United States v. Cameron-Ehlen Grp., Inc.*, No. 13-CV-3003 (WMW/DTS), 2019 WL 1453063, at *3 (D. Minn. Apr. 2, 2019) (finding that an interrogatory asking the responding party to identify each alleged false claim was not overly broad or unduly burdensome and stating that "[a]lthough such concerns may be real when the interrogatory seeks the detailed factual basis of a contention when discovery has just begun, such is not a concern here. The Interrogatory does not ask for a complete theory of why the claim is a false claim, but only seek to identify relevant claims"). Thus, the government has no legitimate basis to object to the First Interrogatory as unduly burdensome.

Courts have also made it clear that objections to interrogatories on the basis that information is equally or more readily available to the requesting party are improper. *See, e.g.*, *Peterson v. Sanofi-Aventis U.S. LLC*, No. CV-12-202-LRS, 2013 WL 4215174, at *2 (E.D. Wash. Aug. 15, 2013) (discussing how courts have found objections insufficient where responding party objects to an interrogatory on the grounds that it seeks information equally available to the requesting party); *Davidson v. Goord*, 215 F.R.D. 73, 77 (W.D.N.Y. 2003) ("A requested party

LATHAM&WATKINS LLP

may not refuse to respond to a requesting party's discovery request on the grounds that the requested information is in the possession of the requesting party."). Here, as detailed below, the government has failed to fully respond to the First Interrogatory and has instead inappropriately directed UnitedHealth to its own chart review data-related productions because the government asserts that UnitedHealth can more readily determine the response to the First Interrogatory by examining its own data. This approach is inappropriate and not permitted by applicable case law.

This objection is even more inappropriate in light of the fact that the First Interrogatory is a contention interrogatory, which requests information underlying the government's contention that UnitedHealth allegedly "knowingly and improperly failed to delete" certain diagnosis codes. As the government is aware, UnitedHealth does not agree, and in fact strongly disputes, the government's contentions. Therefore, the government's suggestion that UnitedHealth "more readily" has the information concerning the government's contentions regarding diagnosis codes allegedly at issue is nonsensical and only serves to improperly shift the burden away from the government.

The government cannot hide behind improper objections to avoid disclosing to UnitedHealth the actual claims at issue in this litigation. By March 27, 2020, please confirm whether the government is withholding any responsive information based on its objection that the First Interrogatory is "oppressive and unduly burdensome" and, if so, please let us know if you agree to supplement the Response to properly provide the additional responsive information.

C.      **The Timing of the First Interrogatory is Proper**

The government appears to object that the First Interrogatory is premature because (1) it requests information that the government does not yet have because "fact discovery [is] still ongoing," and (2) it purportedly seeks the disclosure of expert analysis and opinions. Resp. at 7. Neither basis justifies the government's failure to respond fully to UnitedHealth's First Interrogatory.

*First*, although discovery is ongoing, the timing of UnitedHealth's contention interrogatory is entirely proper—and, in fact, the government issued numerous contention interrogatories to UnitedHealth in July 2019. To the extent the government is withholding responsive information on this basis and refusing to fully respond to the First Interrogatory, this objection is inappropriate. *See, e.g.*, *DIRECTV, Inc. v. Puccinelli*, 224 F.R.D. 677, 689 (D. Kan. 2004) ("Plaintiff's objection that 'discovery is ongoing' is not a valid objection. The Court is aware of no rule or case recognizing such a blanket objection."). Given the limited Response the government provided and the mere handful of "representative examples" it cites, UnitedHealth does not believe the government has provided all information responsive to the First Interrogatory.

*Second*, the government's objection that the First Interrogatory is premature because it seeks expert analysis and opinion before expert disclosures are due is based on a fundamental misunderstanding of the information UnitedHealth is seeking. The First Interrogatory seeks information regarding the underlying facts—i.e., the alleged diagnosis codes at issue—that correspond to the government's contentions, not information regarding an expert's opinion about those facts. The government's refusal to respond fully regarding this factual information is

**LATHAM&WATKINS**LLP

contrary to applicable case law. *See, e.g.*, *Amgen Inc. v. Sandoz Inc.*, No. 14-cv-04741-RS (MEJ), 2017 WL 1352052, at *2 (N.D. Cal. Apr. 13, 2017) (ordering Amgen to respond to an interrogatory that sought facts "as opposed to expert testimony").

The fact that the First Interrogatory may seek information that has been provided to an expert or that relates to the subject of expert analysis does not provide the government an excuse to avoid responding to the First Interrogatory in full with the information reasonably available to it at the time of its response. *See, e.g.*, *Menell v. Rialto Unified Sch. Dist.*, No. EDCV 15-2124-VAPKKx, 2016 WL 3452920, at *4 (C.D. Cal. June 20, 2016) ("The Court notes expert analysis does not relieve Defendant of its obligation to investigate and provide information reasonably available to it."). Furthermore, simply because expert reports are not due for many months similarly does not preclude the government from fully responding to the First Interrogatory. *See, e.g.*, *Amgen*, 2017 WL 1352052, at *2 (external citation omitted) ("The fact that expert reports are not due until June 16, 2017 does not excuse Amgen from disclosing responsive information regarding the underlying factual bases of its claim.").

By March 27, 2020, please confirm whether the government is withholding information responsive to the First Interrogatory on the basis of either of its timing-related objections discussed above and, if so, please let us know if you agree to supplement the Response to the First Interrogatory to include the additional responsive information.

> **D.** **The Government's Ability to Fully Respond to the First Interrogatory with Information Known to it was Not Impeded By the Production of UnitedHealth's Chart Review Data**

The government's objection that UnitedHealth has somehow impeded the government's ability to more fully respond to the First Interrogatory because UnitedHealth "improperly refus[ed] to produce" its chart review data for dates of service years 2015 and 2016 until early December 2019, *see* Response at 7, is meritless.[1] While the government may not yet know "each and every" diagnosis code at issue, the government is obligated to respond to the First Interrogatory with the information requested for all of the diagnosis codes the government is currently alleging are at issue, regardless of when UnitedHealth produced the remaining chart review data for dates of service years 2015 and 2016. *See, e.g.*, *Anderson v. Hansen*, No. 1:09-cv-01924-LJO-MJS (PC), 2013 WL 428737, at *2–3 (E.D. Cal. Feb. 1, 2013) ("The responding party is obligated to respond to the interrogatories to the fullest extent possible.").

While the government seems to suggest that not having all of UnitedHealth's chart review data for dates of service years 2015 and 2016 impacted its ability to respond fully to the First Interrogatory, the government curiously failed to respond with any information for diagnosis codes allegedly at issue for dates of service years 2008–2009 or 2014–2016 even though the government has had complete chart review data for dates of service years 2008–2009 and 2014 since September

---

[1] UnitedHealth does not believe it is productive to further debate the issue, but UnitedHealth notes that it did not "improperly refus[e] to produce" chart review data for dates of service 2015 and 2016. The government's bald assertion to the contrary is belied by the record.

March 17, 2020
Page 5

**LATHAM&WATKINS**LLP

and June 2018, respectively, and the majority of UnitedHealth's chart review data for dates of service years 2015 and 2016 since June 2018. Any purported delay in the government obtaining all of UnitedHealth's chart review data for dates of service years 2015 and 2016 did not prevent the government from providing a proper, complete response to the First Interrogatory. While the government may still be in the process of reviewing and analyzing the additional chart review data for dates of service years 2015 and 2016 that the government received on December 6, 2019, this does not preclude the government from responding with the requested information for all other years (as well as any responsive information from dates of service years 2015 and 2016 that the government has identified to date).

By March 27, 2020, UnitedHealth requests that the government inform UnitedHealth whether it plans to supplement its Response to provide additional responsive information or detail why it is unable to do so, including whether the government cannot do so because it has not yet identified any other diagnosis codes it contends are at issue.

## II.     THE GOVERNMENT'S RESPONSE IS DEFICIENT

### A.     The Government's Response and Inclusion of a Limited Number of Examples is Incomplete and Improper

The only actual diagnosis codes the government identified in its Response as being at issue in this matter were purportedly "representative examples." Providing a handful of so-called "representative examples" is an improper response to the First Interrogatory, and it appears nothing more than gamesmanship to prevent UnitedHealth from fully understanding and assessing the government's claims. Courts have ordered responding parties to provide more fulsome responses to interrogatories that seek factual information regarding underlying claims where the responding parties' original responses cited examples or included only partial responsive information. *See, e.g.*, *United States ex rel. Health Dimensions Rehab., Inc. v. Rehabcare Grp. Inc.,* No. 4:12CV00848 AGF, 2013 WL 791808, (E.D. Mo. Mar. 4, 2013) (granting motion to compel government to provide adequate interrogatories regarding factual information underlying the government's claim); *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.,* 235 F.R.D. 521, 524 (D.D.C. 2006) (finding that an interrogatory requesting relator identify factual information underlying alleged kickback violations requested appropriate information and stating that the "Realtor cannot rely on his statement that he has answered the interrogatory with his one sentence restatement of the allegation"); Mem. & Order at 7-8, *United States ex rel. Smith v. Boeing Co.,* No. 6:05-cv-01073-JTM-GEB (D. Kan. June 17, 2008) (granting motion to compel relator to supplement responses to interrogatory requesting information regarding all contract provisions, regulations, and requirements underlying realtor's claim where relator's original response was insufficient and referred only to examples).

The government has had UnitedHealth's complete chart review data for (i) dates of services years 2010–2013 since at least 2016 and (ii) dates of service years 2008–2009 and 2014 since mid-2018, as well as the majority of data for dates of services years 2015–2016 since mid-2018. Yet, armed with this massive amount of data, the government's Response identifies only twenty-five diagnosis codes allegedly at issue. Notably, these are the exact same examples the government cited in its Complaint filed in May 2017 and in its Amended Complaint filed in November 2017—

**LATHAM&WATKINS**LLP

almost two-and-a-half years before UnitedHealth served its First Interrogatory. Unless the government is representing that it has not identified any other diagnosis codes at issue thus far—and, if so, the government should expressly state as much—the Response is deficient.

Accordingly, by March 27, UnitedHealth requests that the government inform UnitedHealth whether it plans to supplement its Response to provide additional responsive information or detail why it is unable to do so, including whether the government cannot do so because it has not yet identified any other diagnosis codes it contends are at issue.

**B.     The Government's Citation to UnitedHealth's Chart Review-Related Data Productions is Improper and Insufficient**

The government responds to the First Interrogatory in part by stating that "[t]he information UnitedHealth seeks is readily available to or in its possession, custody, or control, and can be derived from documents that UnitedHealth has produced including, but not limited to," a list of bates numbers. Response. at 8. These bates numbers appear to correspond with certain of UnitedHealth's chart review data productions in the *Poehling* investigation and in the current litigation. The government's attempt at directing UnitedHealth to root through UnitedHealth's own documents to ascertain what diagnosis codes the government contends are at issue is improper and contrary to the requirements of the Federal Rules and applicable case law. *See Dancy v. Scribner*, No. 1:07-cv-00716-OWW-SMS PC, 2009 WL 3567850, at *2 (E.D. Cal. Oct. 27, 2009) ("This requires Plaintiff to answer Defendants' interrogatories with specificity. Plaintiff may not provide vague information or direct Defendants to comb through his exhibits to answer their own interrogatories.").

This approach is also insufficient because these citations of UnitedHealth documents by themselves are not a substantive response to the First Interrogatory, and the government has provided no explanation for why or how these documents supposedly contain information responsive to the First Interrogatory. Nor has the government provided any information regarding where in the documents UnitedHealth can locate the information supposedly responsive to the First Interrogatory. Leaving aside whether the government's citation of UnitedHealth documents without any description of why they supposedly contain responsive information is proper, the government misleadingly and improperly directs UnitedHealth to a number of documents that do not contain any information actually responsive to the First Interrogatory. For example, the government cites MARA2152926,[2] which is a data dictionary. A data dictionary does not contain any information regarding the diagnosis codes allegedly at issue and therefore does not answer the question posed by the First Interrogatory. There are numerous other examples of documents the government cites that do not contain any information regarding the diagnosis codes allegedly at issue and are similarly misleading and improper to include in a response. *See, e.g.*, MARA1795803 (SQL programming logic); MARA768242 (database schema and data dictionaries); MARA1795523 (column structure and table indices related to IRADS tables); MARA2117312–539 (IRADS Standard Operating Procedure-related documents); MARA2152927–

---

[2] The government's Response cites MARAR2152926, but no such document with this bates label exists. UnitedHealth understands the government to be citing MARA2152926.

**LATHAM&WATKINS**LLP

MARA2152934 (list and description of CV disposition codes); MARA2117122 (chart review exclusion specifications); MARA2160503–MARA2160535 (programming logic); MARA2100499 (overview flowchart); MARA2100500 (flowchart); and MARA2160704–MARA2160725 (IRADS encounter tables).[3] The government's inclusion of information in its Response that is not even responsive to the First Interrogatory is troubling and inappropriate. *See, e.g.*, *Peterson*, 2013 WL4215174, at *2 (finding "sanctions [were] appropriate" where responding party directed requesting party "to a document that did not answer the question posed by the interrogatory").

The government must provide a full, proper response to UnitedHealth's First Interrogatory. By March 27, please inform UnitedHealth whether the government plans to supplement the Response with complete, responsive information. If the government refuses, UnitedHealth will seek judicial intervention. If the government maintains that the documents identified in this section above are in fact responsive to the First Interrogatory, however, please explain how by March 27.

### C.    The Government Has Yet to Provide the Required Verification

Under Federal Rule of Civil Procedure 33 and applicable case law, a party responding to interrogatories must provide the responses under oath and must sign the responses, typically by providing a verification. Fed. R. Civ. P. 33(b)(3) ("Each interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath."); Fed. R. Civ. P. 33(b)(5) "The person who makes the answers must sign them, and the attorney who objects must sign any objections."); s*ee, e.g.*, *Menell*, 2016 WL 3452920, at *5 (discussing how a party must respond to interrogatories under oath). Nearly four weeks after serving its Response, the government still has not yet provided the required verification. Please do so by March 27.

### D.    The Government's Response Does Not Include Any Information Related to UnitedHealth's RACCR Program

The government's Response notably does not include any reference to any data UnitedHealth has provided to the government related to UnitedHealth's Risk Adjustment Coding Compliance Review ("RACCR") program. If the government no longer contends that RACCR-related diagnosis codes are at issue—despite, among other things, RACCR-related allegations in the Amended Complaint, numerous RACCR-related requests for production, and the RACCR-related information sought in the government's First Set of Interrogatories—the government must so state. If the government still contends RACCR-related diagnosis codes are at issue, however, then the Response is either deficient or reflects the government's failure to identify any such diagnosis codes to date.

By March 27, UnitedHealth requests that the government either confirm that its RACCR-related claims are no longer at issue—and agree to stipulate to this effect—supplement the

---

[3] Moreover—putting aside the fact that these types of documents are not responsive to the First Interrogatory—the government excludes certain data dictionaries, programming logic, and other documents similar to the ones above, so it is unclear why the government believes only certain such documents are responsive.

**March 17, 2020**
**Page 8**

# LATHAM&WATKINS LLP

Response to include the remainder of the responsive information the government currently has in its possession, or detail why it is unable to do so, including whether the government cannot do so because it has not yet identified any other diagnosis codes it contends are at issue.

Please do not hesitate to contact me with any questions. Thank you.

Sincerely,

Abid R. Qureshi
of LATHAM & WATKINS LLP

cc: Counsel of Record

# EXHIBIT G

1   LATHAM & WATKINS LLP
       David J. Schindler (Bar No. 130490)
2      *david.schindler@lw.com*
    355 South Grand Avenue, Suite 100
3   Los Angeles, California 90071-1560
    Telephone: +1.213.485.1234
4   Facsimile: +1.213.891.8763

5   LATHAM & WATKINS LLP
       Daniel Meron (appearing *pro hac vice*)
6      *daniel.meron@lw.com*
       Abid R. Qureshi (appearing *pro hac vice*)
7      *abid.qureshi@lw.com*
    555 Eleventh Street, NW, Suite 1000
8   Washington, DC 20004-1304
    Telephone: +1.202.637.2200
9   Facsimile: +1.202.637.2201

10  Attorneys for United Defendants

11              **UNITED STATES DISTRICT COURT**

12              **CENTRAL DISTRICT OF CALIFORNIA**

13

14
    UNITED STATES OF AMERICA *ex*          CASE NO. 2:16-cv-08697-FMO (SSx)
15  *rel*. BENJAMIN POEHLING,

16              Plaintiff,                  **UNITED'S COUNTER-PROPOSAL
                                            REGARDING THE
17        v.                                GOVERNMENT'S TIMING FOR
                                            SUPPLEMENTING ITS RESPONSE
18  UNITEDHEALTH GROUP, INC. *et al.*,      TO DEFENDANT UHC OF
                                            CALIFORNIA'S FIRST
19              Defendants.                 INTERROGATORY

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

UNITED'S COUNTER-PROPOSAL REGARDING THE
GOVERNMENT'S TIMING FOR SUPPLEMENTING RESPONSE
Case No. 2:16-cv-08697-FMO(SSx)

331
Exhibit 2

Exhibit G
Page 318

1   Pursuant to the request of Special Master Segal, United submits this Counter-
2   Proposal regarding the timing of the government's supplementation of its Responses
3   and Objections ("Response") to UHC of California's First Interrogatory ("First
4   Interrogatory").

5   On May 21, 2020, Special Master Segal requested that the parties submit
6   proposals on how best to resolve concerns about the sufficiency of the government's
7   response to United's First Interrogatory. Rather than submit a concrete proposal, the
8   government resorts to rhetoric and argument, alleging that its failure to identify the
9   purportedly false diagnosis codes that it alleges United knew were false and
10  intentionally failed to delete is somehow United's fault. After conducting an
11  investigation that spanned five years, the government filed an Amended Complaint
12  in this case. In its Amended Complaint, the government claims over a billion dollars
13  in damages and contends these damages are attributable to the submission of
14  thousands of diagnosis codes which United allegedly knew to be false, yet
15  affirmatively chose not to delete, in violation of the reverse false claims act provision
16  of the federal False Claims Act. *But, to date, the government has only identified 52*
17  *allegedly false diagnosis codes—the same 52 allegedly false diagnosis codes it*
18  *appended to its Amended Complaint in November 2017.*

19  The time for excuses and delay is over. In order to defend itself, United is
20  entitled to know, with specificity, which diagnosis codes it allegedly knew were false
21  and affirmatively chose not to delete. It is wholly inappropriate, and contrary to the
22  Federal Rules of Civil Procedure, for the government to continue to assert that it is
23  United's burden to figure out which codes the government apparently had in mind
24  when it filed a lawsuit alleging that United knew about a billion dollars in false
25  diagnosis codes that it affirmatively chose not to delete. Put differently, the
26  government cannot continue to hide behind its constant refrain of: "you know what
27  you did." The government must come forward now with evidence to support its
28  claim so United may prepare its defense.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

UNITED'S COUNTER-PROPOSAL REGARDING THE
1   GOVERNMENT'S TIMING FOR SUPPLEMENTING RESPONSE
Case No. 2:16-cv-08697-FMO(SSx)

332
Exhibit 2

Exhibit G
Page 319

1  United respectfully submits the following counter-proposal for the
2  government to supplement its Response to the First Interrogatory:

| DATES OF SERVICE YEARS | GOVERNMENT PROPOSAL | UNITED COUNTER-PROPOSAL |
| --- | --- | --- |
| DOS 2010-2013 | August 31, 2020 | July 31, 2020 |
| DOS 2008-2009 | November 30, 2020 | September 30, 2020 |
| DOS 2014-2016 | January 29, 2021 | October 30, 2020 |

Unlike the government's proposed timeline for supplementing, United requests that the dates proposed above remain firm. The government cannot be permitted to make a non-committal representation that it will supplement its Response to the First Interrogatory *subject to* "the proviso that UnitedHealth cooperates in discovery." Government Proposal at 3. In support of its counter-proposal—and to rebut the mischaracterizations in the government's submission—United highlights (**A**) the importance of the information it seeks in the First Interrogatory; (**B**) the urgency of the information requested; and (**C**) numerous inadequacies in the government's Response.

### A.   United's First Interrogatory Seeks Basic—But Critical—Information Concerning The Government's Contentions

The government alleges, among other things, that United improperly retained payments for diagnosis codes that were not supported in patients' medical records. As the court is aware, CMS designed and implemented a "risk adjustment" model to determine how much to pay an MA plan in a given year, and that model relies on diagnosis codes that correspond to illnesses or medical conditions diagnosed by medical professionals. MA plans submit diagnosis codes to CMS that correspond to specific encounters that beneficiaries have with providers, and then CMS uses these diagnosis codes to determine the amount an MA plan should be paid for providing insurance for these beneficiaries. Here, the government's remaining claim under the False Claims Act relates to United's supposed knowing and improper failure to

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

2   UNITED'S COUNTER-PROPOSAL REGARDING THE
GOVERNMENT'S TIMING FOR SUPPLEMENTING RESPONSE
Case No. 2:16-cv-08697-FMO(SSx)

333
Exhibit 2

Exhibit G
Page 320

1  delete diagnosis codes it purportedly knew were unsupported, resulting in United's

2  alleged improper retention of overpayments. The government alleges that United

3  should have "withdrawn hundreds of thousands of invalid diagnoses" and that "the

4  Government would not have erroneously paid or would have recovered substantial

5  sums of money (e.g., potentially over a billion dollars in risk adjustment payments

6  for four payment years)" based on those purportedly unsupported diagnoses. Exhibit

7  2 at 10–11. The government expounded upon this damages figure in the Amended

8  Joint Rule 26(f) Report, stating that from "2011 to 2014 [United] failed to repay the

9  Medicare Program at least $1.1 billion[.]" Exhibit 3 at 19.

10      On January 3, 2020—after more than 2 years of discovery in this litigation

11  and a more than 5-year investigation—United issued the First Interrogatory, seeking

12  factual information underlying the government's allegations from its Amended

13  Complaint and Joint Rule 26(f) Report. *See* Exhibit 2 at 10–11; Exhibit 3 at 19.

14  Specifically, the First Interrogatory asks the government to identify the diagnosis

15  codes (and related factual information) that the government contends United

16  knowingly and improperly failed to delete. Exhibit 1. Put simply, the First

17  Interrogatory asks the government to identify the actual overpayments it contends

18  are at issue.

19      United is entitled to know the specific diagnosis codes the government alleges

20  are at issue because those allegedly false codes lie at the heart of the government's

21  substantive claim—this is not just an issue of computing damages, as the

22  government repeatedly asserts. The government made clear in its Response that

23  determining which diagnosis codes United allegedly "failed to properly delete" is

24  complex, yet the government continues to assert that United does not need

25  significant time to investigate the facts underlying whichever codes the government

26  ultimately identifies. But the heart of fact discovery is the ability to explore whether

27  the government's allegations are true or false. The simple example the government

28  provided during the May 21, 2020 telephonic conference helps illustrate the point.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

3  UNITED'S COUNTER-PROPOSAL REGARDING THE
GOVERNMENT'S TIMING FOR SUPPLEMENTING RESPONSE
Case No. 2:16-cv-08697-FMO(SSx)

334
Exhibit 2

Exhibit G
Page 321

1   As the government noted, United receives millions (if not billions) of diagnosis
2   codes from a vast array of medical providers who provide treatment to United's
3   beneficiaries. The government referenced its difficulty in determining whether an
4   encounter from a medical group occurred in one state or another and/or was accurate
5   or inaccurate. If the government ultimately includes the codes associated with that
6   encounter in its response to the First Interrogatory, then United will need to
7   undertake a factual investigation surrounding that code to determine if the provider
8   whose chart United reviewed (thereby allegedly learning the code was unsupported)
9   did, in fact, submit the particular codes to United, which were then passed along to
10  CMS. Given the government's claim that there are hundreds of thousands of
11  unsupported codes at issue in this case, United will need sufficient time to investigate
12  each of those allegedly unsupported codes.

13          Moreover, it is not enough for the government to prove that a particular code
14  was unsupported. It also needs to prove that United was aware that a particular code
15  was submitted in error and improperly chose not to delete it to avoid having to repay
16  money to CMS. United is also entitled to adequate time to investigate the
17  government's allegations regarding United's alleged knowledge and alleged failure
18  to delete the specific codes at issue. Even with an anticipated six-month extension
19  to the discovery cut-off, given the complex data and the scope of this case, United
20  will have limited time to conduct discovery into the diagnosis codes and prepare its
21  defense.

22          Accordingly, because United cannot fully assess the government's claims or
23  develop its defenses without knowing which specific diagnosis codes the
24  government contends are at issue, the Court should order the government to
25  supplement its Response according to the schedule above.

26
27
28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

UNITED'S COUNTER-PROPOSAL REGARDING THE
4  GOVERNMENT'S TIMING FOR SUPPLEMENTING RESPONSE
Case No. 2:16-cv-08697-FMO(SSx)

335
Exhibit 2

Exhibit G
Page 322

**B.** **The Government's Response Is Deficient And Does Not Provide Sufficient Information United Needs To Defend Itself**

The government's Response does not provide United with the requested information regarding which diagnosis codes the government alleges United knew were false and improperly failed to delete, even though this is critical information that United needs to defend itself—especially given the government's repeated representations to the Court that there are hundreds of thousands of diagnosis codes at issue that supposedly contribute to over a billion dollars in damages.

Instead, the government's Response merely recites its general allegations and the elements of the False Claims Act, stating "the United States alleges that UnitedHealth Defendants 'knowingly and improperly failed to delete in the RAPS system the invalid diagnoses that had been submitted to the Medicare Program for risk adjustment payments which were made by the Medicare Program to them or knowingly and improperly failed to otherwise return to the Medicare Program the overpayments based on the invalid diagnoses' for each and every Diagnosis Code that was known (as that term is defined by the False Claims Act) to be unsupported by medical records and that affected the amount of payment received by UnitedHealth from the Medicare Program." Government Proposal Exhibit 1 at 17–18. The government also identified in its Response purportedly "representative examples" of diagnosis codes at issue, but these "representative examples" are no more than a simple regurgitation of the 52 examples that the government cited in its Amended Complaint—which it filed in 2017.

The government also included in its Response a list of Bates numbers that correspond to almost every data production United has made during the litigation and the government's investigation of this matter, none of which provides a sufficient response to the First Interrogatory. *See id.* at 17–19. The government's supposed rationale for citing United's data productions in their entirety is that United "more readily" has the information concerning the government's contentions

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

UNITED'S COUNTER-PROPOSAL REGARDING THE
5   GOVERNMENT'S TIMING FOR SUPPLEMENTING RESPONSE
Case No. 2:16-cv-08697-FMO(SSx)

336
Exhibit 2

Exhibit G
Page 323

1   regarding the diagnosis codes allegedly at issue. *See id.* at 16–17. This rationale is

2   nonsensical, however, because United does not agree with, and in fact strongly

3   disputes, the government's contentions. Thus, only the government can identify the

4   precise diagnosis codes it alleges are at issue in this case.

5        The government attempts to justify its citation to United's data productions in

6   their entirety by citing to *United States ex rel. Brown v. Celgene Corporation*,

7   No. CV 10-3165 GHK (SS), 2015 WL 12731923, at *5 (C.D. Cal July 7, 2015)

8   (Segal, J.). The government's reliance on *Celgene*, however, is misplaced. There,

9   Magistrate Judge Segal held that the relator's interrogatory response was adequate

10  because the relator alleged that **every** submission for two specific drugs was false,

11  and thus the defendant was aware of the claims at issue. Here, by contrast, the

12  government concedes it is not alleging that every diagnosis code that United

13  submitted to CMS was false. Rather, the government has represented that a small

14  subset of the millions (if not billions) of diagnosis codes contained in United's data

15  productions is at issue. Yet the government has not identified which diagnosis codes

16  fall into this subset, leaving United completely in the dark about what claims are

17  actually at issue.

18       United has worked in good faith with the government to better understand the

19  supposed diagnosis codes the government contends are at issue, including whether

20  the government's theory of the case and alleged damages figure remain consistent

21  with the government's Amended Complaint. But the government has failed to

22  provide any meaningful response. Instead, the government represented to both

23  United and Special Master Segal during the parties' May 21, 2020 status conference

24  that the government cannot provide the diagnosis codes that support its $1.1-billion

25  damages figure because the government's analysis is ongoing—and apparently has

26  changed in some way since filing the Amended Complaint. Yet, at the same time,

27  the government has represented that its allegations and damages figure have not

28  changed from its Amended Complaint. If the government's allegations and damages

UNITED'S COUNTER-PROPOSAL REGARDING THE
6   GOVERNMENT'S TIMING FOR SUPPLEMENTING RESPONSE
Case No. 2:16-cv-08697-FMO(SSx)

Exhibit G
Page 324

1  figure remain unchanged, then the government should provide United with the

2  diagnosis codes that it contends support these allegations and damages figure. The

3  government's current Response neither provides this information nor makes clear

4  how United could determine this information.

5        Additionally, the government's Response notably does not include any

6  reference to any data United has provided related to United's Risk Adjustment

7  Coding Compliance Review ("RACCR") program. United asked the government if

8  it was still alleging that diagnosis codes related to this program are at issue, but the

9  government failed to provide a meaningful response. If the government contends

10  that diagnosis codes related to United's RACCR program are at issue, then the

11  deadlines imposed by the Court should apply to RACCR as well. If the government

12  is no longer asserting any allegations related to RACCR, however, then the

13  government should so state.

14        Finally, the government's excuses for why it cannot provide basic factual

15  information concerning its claims are unpersuasive. The government's proposal

16  inappropriately attempts to shift blame to United for why the government cannot

17  supplement its Response in a timely manner and raises new purported issues with

18  United's discovery responses. But the government has not previously raised these

19  issues with United, and, in any event, these newly raised purported issues are

20  misleading and based on complete mischaracterizations of the record. United,

21  however, does not believe it is productive or a good use of the Special Master's time

22  to focus on the government's mischaracterizations or for United to refute each and

23  every one.[1] These issues are not the subject of this proposal and are not valid

24  justifications for the government to further delay supplementing its Response.

25

26  _____

   [1] While United does not believe it is productive to refute each of the government's
27  mischaracterizations of discovery to date, United notes that its responses to written
   discovery, including the government's Fifth Interrogatory and Fourth Set of
28  Requests for Admission, satisfy United's obligations. To the extent the government
   is attempting to assert that United's responses—in particular to the Fourth Set of

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

UNITED'S COUNTER-PROPOSAL REGARDING THE
7 GOVERNMENT'S TIMING FOR SUPPLEMENTING RESPONSE
Case No. 2:16-cv-08697-FMO(SSx)

338
Exhibit 2

Exhibit G
Page 325

1    Moreover, the government's assertions that it cannot supplement its Response

2  in a timely manner—even after more than five years of investigation and almost

3  three years of discovery in litigation—ring hollow. The government is seeking more

4  than $1.1 billion in damages—for only four of the dates of service years at issue—

5  and United is entitled to know what diagnosis codes underlie this figure and the

6  government's assertions. The government dictated the nature and scope of this

7  matter, and it cannot now use the complexity of the case as an excuse for failing to

8  provide basic factual information about its claims to United.

9    **C.    United's Proposal Regarding the Timing for the Government to Supplement its Response**

10

11    As explained above, United needs information responsive to the First

12  Interrogatory not only to understand the factual underpinnings of the case, but to

13  conduct meaningful fact discovery to prepare its defense and to properly value the

14  case. The government acknowledges that it could supplement its Response by

15  September 30, 2020, if the Court does not grant the parties' request for an extension

16  of the current discovery cutoff (regardless of how the pandemic has affected the

17  work of its consultants and the complexity of the data). Government Proposal at 3–

18  4. Thus, it is perplexing why the government still seeks an additional four months

19  beyond this date to fully supplement its Response. In the spirit of compromise,

20  however, United's counter-proposal works to balance the government's admission

21  that it could supplement its Response by September 30, 2020 with United's need for

22

23  _____

24  Requests for Admission—are inaccurate or misleading, the government has yet to raise these issues with United, and United disputes these contentions. United

25  responded to the Fourth Set of Requests for Admission as written and provided explanations for its responses, including explaining why certain of the government's

26  requests for admission that take United's previous statements in correspondence to the government during the investigation completely out of context and render

27  themselves unintelligible. Government Proposal Exhibit 2. Despite the government's confusing, vague, and inappropriate requests for admission, United

28  provided complete responses. If the government has issues with United's written responses to discovery requests, it should raise those issues in the proper vehicle—not a proposal designed to resolve its own deficiencies.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

UNITED'S COUNTER-PROPOSAL REGARDING THE
8  GOVERNMENT'S TIMING FOR SUPPLEMENTING RESPONSE
Case No. 2:16-cv-08697-FMO(SSx)

339
Exhibit 2

Exhibit G
Page 326

1    this information as soon as possible to ensure it has sufficient time to conduct

2    discovery and prepare its defense.  Therefore, United proposes:

3         **1.**     ***Date of Service ("DOS") 2010 through 2013***

4         United proposes that the government supplement its Response for diagnosis

5    codes in DOS 2010 through 2013 by July 31, 2020, which is 7 months after United

6    issued the First Interrogatory and over 4 months after United began requesting that

7    the government supplement its Response. Two months is more than adequate,

8    considering that the government has had United's data for DOS 2010 through 2013

9    data since at least 2016 and relies on this data in its Amended Complaint. United is

10   simply asking for the diagnosis codes that the government has been relying on for

11   over 2.5 years to support its allegations, including its $1.1-billion dollar damages

12   figure that the government represents has not changed.

13        **2.**     ***DOS 2008 through 2009***

14        United proposes that the government supplement its Response for diagnosis

15   codes in DOS 2008 through 2009 by September 30, 2020, which is the government's

16   own original proposal for *all* DOS years. United produced all of its chart review data

17   for DOS 2008 through 2009 on September 21, 2018, and thus the government has

18   had this data for almost 2 years. Currently, the government's Response provides no

19   specific diagnosis codes it contends are at issue for these years, and United is

20   therefore unable to conduct any meaningful discovery regarding diagnosis codes that

21   may be at issue.

22        **3.**     ***DOS 2014 through 2016***

23        United proposes that the government supplement its Response for diagnosis

24   codes in DOS 2014 through 2016 by October 30, 2020. United produced its chart

25   review data for DOS 2014 through 2016 on April 27, 2018 and June 15, 2018 and

26   supplemental data for DOS 2015 and 2016 on December 6, 2019. Although the

27   government misleadingly asserts that United delayed in producing this data and

28

UNITED'S COUNTER-PROPOSAL REGARDING THE
9 GOVERNMENT'S TIMING FOR SUPPLEMENTING RESPONSE
Case No. 2:16-cv-08697-FMO(SSx)

1  therefore delayed the government's ability to analyze the data and supplement its

2  Response, the record is clear that United produced data for these years on a rolling

3  basis—some of which was produced over two years ago. The government has had

4  sufficient time to analyze this data and identify the diagnosis codes it alleges are at

5  issue.

6

7

8  Dated:  June 4, 2020                    Respectfully submitted,

9                                          LATHAM & WATKINS LLP
                                           DAVID J. SCHINDLER
                                           DANIEL MERON
10                                         ABID R. QURESHI

11

12                                         By /S/ David J. Schindler
                                               David J. Schindler
13                                             Attorneys for United Defendants

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED'S COUNTER-PROPOSAL REGARDING THE
10 GOVERNMENT'S TIMING FOR SUPPLEMENTING RESPONSE
Case No. 2:16-cv-08697-FMO(SSx)

Exhibit G
Page 328

# EXHIBIT H



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel.<br>BENJAMIN POEHLING,<br><br>            Plaintiffs,<br><br>      v.<br><br>UNITED HEALTH GROUP, INC., <u>et al.</u>,<br><br>            Defendants. | Case No. CV 16-8697 FMO (SSx)<br><br><br>**SCHEDULING AND CASE MANAGEMENT<br>ORDER RE: JURY TRIAL** |

18      Having reviewed the case file and the parties' Rule 26(f) reports, the court hereby **orders**

19   as follows.[1]

20   I.      DISCOVERY.

21           A.      <u>Generally</u>.

22      Discovery is governed by the Federal Rules of Civil Procedure and applicable Local Rules

23   of the Central District of California.  <u>Pro se</u> litigants are entitled to discovery to the same extent as

24   are litigants represented by counsel.  The court allows discovery to commence as soon as the first

25   answer or motion to dismiss is filed.   The parties should note that absent exceptional

26   circumstances, **discovery shall not be stayed** while any motion is pending, including any motion

27   _____

28      [1]  This Order supersedes any prior case management or scheduling order.

Exhibit 2

1  to dismiss or motion for protective order.  **The parties are directed to conduct any necessary**
2  **discovery as soon as possible, as the court is not inclined to grant any extensions of the**
3  **discovery or other case-related deadlines**.

4        Counsel are expected to comply with the Federal Rules of Civil Procedure and all Local
5  Rules concerning discovery.  Whenever possible, the court expects counsel to resolve discovery
6  disputes among themselves in a courteous, reasonable and professional manner.  The court
7  expects that counsel will adhere strictly to the Civility and Professionalism Guidelines (available
8  on the Central District's website under Information for Attorneys > Attorney Admissions).

9        B.  <u>Discovery Cut-Off</u>.

10        The court has established a cut-off date for discovery, including expert discovery, if
11  applicable.  This is not the date by which discovery requests must be served; it is the date by
12  which all discovery, **including all hearings on any related motions**, is to be completed.

13        C.  <u>Discovery Motions</u>.

14        Any motion relating to a deposition or challenging the adequacy of discovery responses
15  must be filed, served, and calendared sufficiently in advance of the discovery cut-off date to permit
16  the responses to be obtained and the deposition to be completed before the discovery cut-off if
17  the motion is granted.  Given the requirements set forth in the Local Rules (<u>e.g.</u>, "meet and confer"
18  and preparation of the Joint Stipulation), any party seeking to file a discovery motion must usually
19  initiate meet and confer discussions at least seven (7) weeks before the discovery cut-off, <u>i.e.</u>, by
20  preparing and serving the letter required by Local Rule 37-1.

21        D.  <u>Expert Discovery</u>.

22        All disclosures must be made in writing.  The parties should begin expert discovery shortly
23  after the initial designation of experts.  The final pretrial conference and trial dates will not be
24  continued because expert discovery is not completed.  Failure to comply with these or any other
25  orders concerning expert discovery may result in the expert being excluded as a witness.

26  II.  MOTIONS.

27        The court has established a cut-off date for the filing and service of motions for the court's
28  law and motion calendar.  Counsel should consult the court's Initial Standing Order and related

1  procedures, located on the Central District's website,[2] to determine the court's requirements

2  concerning motions and other matters.  Any motion that is noticed more than 42 days beyond the

3  date the motion is filed shall be stricken or advanced to an earlier motion date.  If the motion is

4  advanced to an earlier motion date, counsel shall comply with the briefing scheduled dictated by

5  the new hearing date.  See Local Rules 7-9 & 7-10.

6  If documentary evidence in support of or in opposition to a motion exceeds 50 pages, the

7  evidence must be separately bound and tabbed and include an index.  If such evidence exceeds

8  **300 pages**, the documents shall be placed in a **three-ring binder**, with an index and with each

9  item of evidence separated by a tab divider on the right side.  In addition, counsel shall provide

10  an electronic copy (i.e., cd, dvd, or flash drive) of the documents in a single, OCR-scanned PDF

11  file with each item of evidence separated by labeled bookmarks. Counsel shall ensure that all

12  documents are legible.  Counsel are strongly encouraged to cite docket numbers (and sub-

13  numbers) when citing to the record.

14  III.  SETTLEMENT.

15  Pursuant to Local Rule 16-15, the parties must complete a settlement conference. **No case**

16  **will proceed to trial unless all parties, including the principals of all corporate parties, have**

17  **appeared personally at a settlement conference**.

18  If the case settles, counsel shall file a Notice of Settlement no later than 24 hours after the

19  case is settled, stating when they expect to file their dismissal papers.  Otherwise, **the parties**

20  **must, no later than 48 hours after the settlement proceeding is completed, file a Status**

21  **Report Re: Settlement** in accordance with the requirements set forth on the last two pages of this

22  Order.

23  IV.  TRIAL PREPARATION.

24  A.  Final Pretrial Conference.

25  Unless excused for good cause, each party appearing in this action shall be represented

26

27  _____

28  [2] http://www.cacd.uscourts.gov > Judges' Requirements > Judges' Procedures and Schedules > Hon. Fernando M. Olguin (http://www.cacd.uscourts.gov/honorable-fernando-m-olguin).

1  at the final pretrial conference by the attorney who is to serve as lead trial counsel.  Counsel must

2  be prepared to discuss streamlining the trial, including presentation of testimony by deposition

3  excerpts or summaries, time limits, stipulations as to undisputed facts, and qualification of experts

4  by admitted resumes.

5         B.    <u>Pretrial Documents</u>.

6         The filing schedule for pretrial documents is set forth on the last two pages of this Order.

7  **Unless otherwise indicated, compliance with Local Rule 16 is required.  The court does not**

8  **exempt <u>pro se</u> parties from the requirements of this Order or Local Rule 16**.  Carefully

9  prepared memoranda of contentions of fact and law, witness lists, a pretrial exhibit stipulation, and

10  a proposed pretrial conference order shall be submitted in accordance with the Local Rules and

11  the requirements set forth in this Order.  All pretrial document copies shall be delivered to the court

12  "binder-ready" (three-hole punched on the left side, without blue-backs, and stapled only in the top

13  left corner).  Failure to comply with these requirements may result in the imposition of sanctions

14  as well as the pretrial conference being taken off-calendar or continued.

15         1.    **Witness Lists**.

16         In addition to the requirements of Local Rule 16-5, the witness lists must include a brief

17  description (one or two paragraphs) of the testimony and a time estimate for both direct and cross-

18  examination (separately stated).

19         2.    **Pretrial Exhibit Stipulation**.[3]

20         No later than fourteen (14) days before the deadline set forth below to file the Pretrial

21  Exhibit Stipulation, counsel shall conduct a good faith meet and confer in person to discuss all the

22  trial exhibits and each party's position with respect to the admissibility of each exhibit.  The Pretrial

23  Exhibit Stipulation shall contain each party's numbered list of trial exhibits, with objections, if any,

24  to each exhibit, including the basis of the objection and the offering party's brief response.  All

25  exhibits to which there is no objection shall be deemed admitted.  The parties shall stipulate to the

26  authenticity and foundation of exhibits whenever possible, and the Pretrial Exhibit Stipulation shall

27  _____

28         [3]  It is not necessary to file the Joint Exhibit List required by Local Rule 16-6.1.

1  identify any exhibits to which authenticity or foundation have not been stipulated and the specific

2  reasons for the parties' failure to stipulate.

3       The Pretrial Exhibit Stipulation shall be substantially in the following form:

4  **Pretrial Exhibit Stipulation**

5  **Plaintiff(s)'/Defendant(s)' Exhibits**

6  **Exhibit No.   Description        Stip. to Adm.?[4]    Objection      Response to Objection**

7

8       Failure to comply with this section may be deemed a waiver of all objections.  Each

9  objection must include the grounds for the objection (e.g., a Federal Rule of Evidence) and an

10  explanation of why the disputed exhibit is not admissible.  **Do not submit** blanket or boilerplate

11  objections to the opposing  party's exhibits.  These will be disregarded and overruled.

12       3.   **Proposed Pretrial Conference Order**.

13       The format of the proposed final pretrial conference order shall conform to the format set

14  forth in Appendix A to the Local Rules.  In drafting the proposed pretrial conference order, the

15  parties shall attempt to agree on and set forth as many undisputed facts as possible.  The court

16  will usually read the undisputed facts to the jury at the start of trial.  A carefully drafted and

17  comprehensively stated stipulation of facts will reduce the length of trial and increase the jury's

18  understanding of the case.

19       C.   <u>Joint Statement of the Case</u>.

20       No later than the date set forth below, counsel shall file an objective, non-argumentative

21  statement of the case, which the court shall read to all prospective jurors at the beginning of voir

22  dire.  The statement should not exceed one page.

23       D.   <u>Motions in Limine</u>.

24       Each party is allowed a maximum of three motions in limine, which must filed no later than

25  the deadline set forth below.  In the event a party believes that more than three motions in limine

26

27  _____

28     [4] The Pretrial Exhibit Stipulation shall indicate in this column whether an exhibit is admitted for identification purposes only.

Exhibit 2

1    are necessary, the party must obtain leave of court to file additional motions in limine. The court

2    will not hear or resolve motions in limine that are disguised summary judgment motions.

3            Before filing any motion in limine, counsel for the parties shall confer in a good faith effort

4    to eliminate the necessity for the filing of the motion in limine or to eliminate as many of the

5    disputes as possible.   Counsel for the moving party shall be responsible for arranging this

6    conference.  The conference shall take place in person, with a court reporter present, within seven

7    (7) calendar days of service upon opposing counsel of a letter requesting such conference, but

8    in no event later than fourteen (14) days before the deadline for filing motions in limine.   Unless

9    counsel agree otherwise, the conference shall take place at the office of counsel for the moving

10   party.   The moving party's letter shall: identify the testimony, exhibits, or other specific matters

11   alleged to be admissible or inadmissible; state thoroughly with respect to each such matter the

12   moving party's position (and provide any legal authority which the moving party believes is

13   dispositive); and specify the terms of the order to be sought.

14           If counsel are unable to resolve their differences, they shall prepare and file a separate,

15   sequentially numbered joint motion in limine for each issue in dispute.  Each joint motion in limine

16   shall consist of one document signed by all counsel.   The joint motion in limine shall contain a

17   clear identification of the testimony, exhibits, or other specific matters alleged to be admissible or

18   inadmissible, and a statement of the specific prejudice that the moving party will suffer if the

19   motion is not granted.  The identification of the matters in dispute shall be followed by each party's

20   contentions and each party's memorandum of points and authorities.   The title page of the joint

21   motion in limine must contain a clear caption identifying the moving party and the nature of the

22   dispute (e.g., "Plaintiff's Motion in Limine No. 1 to Exclude the Testimony of Defendant's Expert")

23   and state the pretrial conference date, hearing date for the motion, and trial date.

24           Each separately-represented party shall be limited to ten (10) pages, exclusive of tables

25   of contents and authorities.   Repetition shall be avoided and, as always, brevity is preferred.

26   Leave for additional space will be given only in extraordinary cases.   The excessive use of

27   footnotes in an attempt to avoid the page limitation shall not be tolerated.  All substantive material,

28   other than brief argument on tangential issues, shall be in the body of the brief.

1      The moving party must provide its portion of the joint motion in limine to the nonmoving

2  party, via e-mail, no later than nine (9) days before the deadline set forth below for filing motions

3  in limine.  The nonmoving party shall then provide the integrated joint motion in limine, along with

4  any exhibits, to the moving party no later than two (2) days before the filing deadline.  The moving

5  party may not make any further revisions to the joint motion in limine other than finalizing it for

6  filing.  The moving party shall be responsible for filing the joint motion in limine and preparing and

7  filing any supporting exhibits.

8      The moving party may file a reply memorandum of points and authorities no later than the

9  deadline set forth below.  The reply memorandum shall not exceed five pages, unless otherwise

10  ordered by the court.

11      A motion in limine made for the purpose of precluding the mention or display of inadmissible

12  matter in the presence of the jury shall be accompanied by a declaration that includes the

13  following: (A) a clear identification of the specific matter alleged to be inadmissible; (B) a

14  representation to the court that the subject of the motion in limine has been discussed with

15  opposing counsel, and that opposing counsel has either indicated that such matter will be

16  mentioned or displayed in the presence of the jury before it is admitted in evidence or that counsel

17  has refused to stipulate that such matter will not be mentioned or displayed in the presence of the

18  jury unless and until it is admitted in evidence; and (C) a statement of the specific prejudice that

19  will be suffered by the moving party if the motion in limine is not granted.

20      Any challenge to expert testimony pursuant to Daubert v. Merrell Dow Pharm., 509 U.S.

21  579, 113 S.Ct. 2786 (1993), or Federal Rules of Evidence 702-704, must be lodged in the form

22  of a joint motion in limine.  The court generally does not hold Daubert hearings.

23      The mandatory chambers copy of all evidence in support of or in opposition to a motion in

24  limine, including declarations and exhibits to declarations, shall be submitted in a separately bound

25  volume and shall include a Table of Contents.  **The transcript of the meet and confer session**

26  **shall be included as an exhibit to the motion in limine**.  If the supporting evidence exceeds 50

27  pages, then each copy of the supporting evidence shall be placed in a three-ring binder with each

28  item of evidence separated by a tab divider on the right side, and shall include a label on the spine

1  of the binder identifying its contents.

2       The court will not consider any motion in limine in the absence of a joint motion or a

3  declaration from counsel for the moving party establishing that opposing counsel: (A) failed to

4  confer in a timely manner; (B) failed to provide the opposing party's portion of the joint motion in

5  a timely manner; or (C) refused to sign and return the joint motion after the opposing party's

6  portion was added.

7       E.   <u>Jury Instructions and Verdict Forms</u>.

8       1.   No later than thirty-five (35) days before the deadline to file the required jury

9  instructions and verdict forms, the parties shall exchange their respective proposed jury

10 instructions and verdict forms.  No later than twenty-eight (28) days before the filing

11 deadline, each party shall serve objections to the other party's instructions and verdict

12 forms.  No later than twenty-one (21) days before the deadline to file the required jury

13 instructions and verdict forms, lead counsel for the parties shall meet and confer in person

14 at an agreed-upon location within the Central District of California and attempt to come to

15 agreement on the proposed jury instructions and verdict forms.

16      2.   No later than the deadline set forth below, counsel shall submit both general

17 and substantive jury instructions in the form described below.  Counsel must provide the

18 documents described below in WordPerfect (the court's preference) or Word format.  The

19 parties should use the most recent version of the Ninth Circuit's <u>Manual of Model Civil Jury

20 Instructions</u>, which is available on the Ninth Circuit's website,[5] for all applicable jury

21 instructions.  If there is no applicable Ninth Circuit model jury instruction, the parties should

22 consult the current edition of O'Malley, <u>et al.</u>, <u>Federal Jury Practice and Instructions</u>.  If

23 neither the Ninth Circuit nor O'Malley provides an applicable jury instruction, the parties

24 should consult the model jury instructions published by other Circuit Courts of Appeal.

25 Where California law applies, counsel should use the current edition of the <u>Judicial Council

26 of California Civil Jury Instructions</u> ("CACI"), which is available on the California Judicial

27

28

---

[5]  http://www3.ce9.uscourts.gov/jury-instructions/model-civil.

1    Branch website.[6]  **The parties shall not modify or supplement a model instruction's**

2    **statement of applicable law** unless absolutely necessary and strongly supported by

3    controlling case law or other persuasive authority.  Each requested instruction shall: (a) cite

4    the authority or source of the instruction; (b) be set forth in full; (c) be on a separate page;

5    (d) be numbered; (e) cover only one subject or principle of law; and (f) not repeat principles

6    of law contained in any other requested instruction.

7           The proposed jury instructions shall be submitted as follows:

8           a.    **Joint Jury Instructions:** Counsel shall file a **joint set of jury**

9    **instructions** on which the parties agree.  Model jury instructions should be modified

10   as necessary to fit the facts of the case, i.e., inserting names of defendant(s) or

11   witness(es) to whom an instruction applies.  Where language appears in brackets

12   in the model instruction, counsel shall select the appropriate text and eliminate the

13   inapplicable bracketed text. The court expects counsel to agree on the substantial

14   majority of jury instructions, particularly when pattern or model instructions provide

15   a statement of applicable law.  If one party fails to comply with the provisions of this

16   section, the other party must file a unilateral set of jury instructions.

17          b.    **Disputed Jury Instructions:** Counsel shall file a separate **joint set**

18   **of disputed jury instructions** propounded by one party to which another party

19   objects.  On a separate page following each disputed jury instruction, the party

20   opposing the instruction shall briefly state the basis for the objection, any authority

21   in support thereof and, if applicable, an alternative instruction.  On the following

22   page, the party proposing the disputed instruction shall briefly state its response to

23   the objection, and any authority in support of the instruction.  Each requested jury

24   instruction shall be numbered and set forth in full on a separate page, citing the

25   authority or source of the requested instruction.

26          3.    For both the Joint Jury Instructions and Disputed Jury Instructions, counsel

27

28   _____

     [6]  http://www.courts.ca.gov/partners/317.htm/civiljuryinstructions/.

1    must provide an index of all instructions submitted, which must include the following:

2            a.    the number of the instruction;

3            b.    the title of the instruction;

4            c.    the source of the instruction and any relevant case citations; and

5            d.    the page number of the instruction.

6    For example:

7    | Number | Title | Source | Page Number |

8    | 1 | Trademark-Defined (15 U.S.C. § 1127) | 9th Cir. 8.5.1 | 1 |

9

10   F.    Voir Dire.

11         1.    The court will conduct the voir dire.  Counsel may, but are not required to, file

12   a list of proposed case-specific voir dire questions no later than the date set forth below.

13         2.    In most cases, the court will conduct its initial voir dire of 16 prospective jurors

14   who will be seated in the jury box.  Generally, the court will select eight jurors.

15         3.    Each side will have three peremptory challenges.  After all peremptory

16   challenges have been exercised, the eight jurors in the lowest numbered seats will be the

17   jury.  The court will not necessarily accept a stipulation to a challenge for cause.  If one or

18   more challenges for cause are accepted, and all six peremptory challenges are exercised,

19   the court may decide to proceed with six or seven jurors.

20   G.    Trial Exhibits.

21   Exhibits must be placed in three-ring binders indexed by exhibit number with tabs or

22   dividers on the right side.  The spine portion of the binder shall indicate the volume number **and**

23   contain an index of each exhibit included in the volume.   Plaintiff shall be responsible for

24   submitting hard copies of all trial exhibits as follows:

25         1.    On the **first day of trial**, plaintiff shall submit to the Courtroom Deputy Clerk

26   ("CRD") one (1) three-ring binder containing all **original exhibits** to be used at trial (except

27   those to be used for impeachment only) with official exhibit tags attached and bearing the

28   same number shown on the exhibit list.

1        2.    **Plaintiff shall also submit to the CRD** two (2) three-ring binders with **copies**
2  of each exhibit, tabbed with exhibit numbers, for use by the court and the witness.

3        3.    Exhibit tags may be obtained from the Clerk's Office, located on the fourth
4  floor of the First Street Courthouse.  Plaintiff shall use yellow tags and defendant shall use
5  blue tags.  Digital exhibit tags are also available on the Court's website under Court Forms
6  > General forms > Form G-14A (plaintiff) and G-14B (defendant).  Digital exhibit tags may
7  be used in lieu of tags available from the Clerk's Office.  The tags shall be stapled to the
8  upper right-hand corner of each exhibit with the case number, case name, and exhibit
9  number placed on each tag. Exhibits shall be numbered 1, 2, 3, etc., **not** 1.1, 1.2, 1.3, etc.
10  The defense exhibit numbers shall not duplicate plaintiff's numbers.   Counsel shall
11  designate any "blow-up" enlargement of an existing exhibit with the number of the original
12  exhibit followed by an "A."

13        4.    Admitted exhibits will be given to the jury during deliberations.  Counsel shall
14  review all admitted exhibits with the CRD before the jury retires to begin deliberations.

15        5.    Where a significant number of exhibits will be admitted, the court encourages
16  counsel, preferably by agreement, to consider ways in which testimony about exhibits may
17  be made intelligible to the jury while it is presented.  For example, counsel should consider
18  using courtroom technology or other devices, such as jury notebooks for admitted exhibits.
19  Information concerning the availability, training, and use of courtroom technology is
20  available on the Central District's website.   The court does not permit exhibits to be
21  "published" by passing them up and down the jury box.  Exhibits may be displayed briefly
22  using the screens in the courtroom, unless the process becomes too time-consuming.

23  V.    JURY TRIAL.

24      A.    <u>Generally</u>.

25      On the first day of trial, **counsel must appear at 8:45 a.m.** to discuss preliminary matters
26  with the court.  The jury panel will be called when the court is satisfied that the matter is ready for
27  trial.  Jury selection usually takes only a few hours.  Counsel should be prepared to proceed with
28  opening statements and witness examination immediately after jury selection.

1    B.    <u>Advance Notice of Unusual or Difficult Issues</u>.

2    If any counsel have reason to anticipate that a difficult question of law or evidence will

3    necessitate legal argument requiring research or briefing, counsel must give the court advance

4    notice.  Counsel are directed to notify the CRD at the day's adjournment if an unexpected legal

5    issue arises that could not have been foreseen and addressed by a motion in limine.  <u>See</u> Fed.

6    R. Evid. 103.  Counsel must also advise the CRD at the end of each trial day of any issues that

7    must be addressed outside the presence of the jury, so that there is no interruption of the trial.

8    **The court will not keep jurors waiting**.

9    C.    <u>Opening Statements, Examining Witnesses and Summation</u>.

10    1.    Counsel must use the lectern at all times.

11    2.    Counsel shall not discuss the law or argue the case in opening statements.

12    3.    Counsel must not consume time by writing out words, drawing charts or

13    diagrams, etc.  Counsel must prepare such materials in advance.

14    4.    The court will honor (and may establish) reasonable time estimates for

15    opening and closing arguments, examination of witnesses, etc.

16    D.    <u>Objections to Questions</u>.

17    1.    Counsel must not use objections to make a speech, recapitulate testimony,

18    or attempt to guide the witness.

19    2.    When objecting, counsel must rise to state the objection and state only that

20    counsel objects and the legal ground of objection.  If counsel wishes to argue an objection

21    further, counsel must ask for permission to do so.

22    E.    <u>General Decorum</u>.

23    1.    Counsel should not approach the CRD or the witness box, or enter the well

24    of the court, without specific permission and must return to the lectern when the purpose

25    for approaching has been accomplished.

26    2.    Counsel should rise when addressing the court and when the court or the jury

27    enters or leaves the courtroom, unless directed otherwise.

28    3.    Counsel should address all remarks to the court.  Counsel are not to address

the CRD, the court reporter, persons in the audience, or opposing counsel.  If counsel wish to speak with opposing counsel, counsel must ask permission to do so.  Any request for the re-reading of questions or answers or to have an exhibit placed in front of a witness shall be addressed to the court.

4.    Counsel should not address or refer to witnesses or parties by first names alone, with the exception of witnesses under 14 years of age.

5.    Counsel must not offer a stipulation unless counsel have conferred with opposing counsel and have verified that the stipulation will be acceptable.

6.    While court is in session, counsel must not leave the counsel table to confer with any person in the back of the courtroom unless permission has been granted in advance.

7.    Counsel shall not make facial expressions; nod or shake their heads; comment; or otherwise exhibit in any way any agreement, disagreement, or other opinion or belief concerning the testimony of a witness.  Counsel shall admonish their clients and witnesses not to engage in such conduct.

8.    Counsel should not talk to jurors at all, and should not talk to co-counsel, opposing counsel, witnesses, or clients where the conversation can be overheard by jurors.  Each counsel should admonish counsel's own clients and witnesses to avoid such conduct.

9.    Where a party has more than one lawyer, only one may conduct the direct or cross-examination of a particular witness, or make objections as to that witness.

10.    Water is permitted in the courtroom.  Food is not permitted in the courtroom.

F.    Promptness of Counsel and Witnesses.

1.    Promptness is expected from counsel and witnesses.  Once counsel are engaged in trial, this trial is counsel's first priority.  The court will not delay the trial or inconvenience jurors.

2.    If a witness was on the stand at a recess or adjournment, counsel who called the witness shall ensure the witness is back on the stand and ready to proceed when trial resumes.

3.     Counsel must notify the CRD in advance if any witness needs to be accommodated based on a disability or for other reasons.

4.     No presenting party may be without a witness.  If a party's remaining witnesses are not immediately available and there is more than a brief delay, the court may deem that party to have rested.

5.     The court attempts to cooperate with professional witnesses and will, except in extraordinary circumstances, accommodate them by permitting them to be called out of sequence.  Counsel must anticipate any such possibility and discuss it with opposing counsel.  If there is an objection, counsel must confer with the court in advance.

G.     Exhibits.

1.     Each counsel should keep counsel's own list of exhibits and should note when each exhibit has been admitted into evidence (if not already admitted pursuant to the pretrial exhibit stipulation).

2.     Each counsel is responsible for any exhibits that counsel secures from the CRD and must return them before leaving the courtroom at the end of the session.

3.     An exhibit not previously marked should, at the time of its first mention, be accompanied by a request that it be marked for identification.  Counsel must show a new exhibit to opposing counsel before the court session in which it is mentioned.

4.     Counsel are to advise the CRD of any agreements with respect to the proposed exhibits and as to those exhibits that may be received without further motion.

5.     When referring to an exhibit, counsel should refer to its exhibit number.  Witnesses should be asked to do the same.

6.     Counsel must neither ask witnesses to draw charts or diagrams nor ask the court's permission for a witness to do so.  Any graphic aids must be fully prepared before the court session starts.

H.     Depositions.

1.     The parties shall submit to the CRD all depositions that they intend to use as substantive evidence at trial (i.e., not merely for impeachment purposes) **on the first day**

1    **of trial or such earlier date as the court may order**, with all objections noted in the

2    margins.  Counsel should verify with the CRD that the relevant deposition is in the CRD's

3    possession.

4          2.     In using depositions of an adverse party for impeachment, either one of the

5    following procedures may be adopted:

6          a.     If counsel wishes to read the questions and answers as alleged

7    impeachment and ask the witness no further questions on that subject, counsel shall

8    first state the page and line where the reading begins and the page and line where

9    the reading ends, and allow time for any objection.  Counsel may then read the

10    portions of the deposition into the record.

11          b.     If counsel wishes to ask the witness further questions on the subject

12    matter, the deposition shall be placed in front of the witness and the witness shall

13    be told to read the relevant pages and lines silently.  Then counsel may: (a) ask the

14    witness further questions on the matter and thereafter read the quotations; or (b)

15    read the quotations and thereafter ask further questions.  Counsel should have an

16    extra copy of the deposition for this purpose.

17          3.     Where a witness is absent and the witness's testimony is offered by

18    deposition, counsel may: (a) have a reader occupy the witness chair and read the

19    testimony of the witness while the examining lawyer asks the questions; or (b) have

20    counsel read both the questions and answers.

21    I.     <u>Interrogatories and Requests for Admissions</u>.

22    Whenever counsel expects to offer a group of answers to interrogatories or requests for

23    admissions extracted from one or more lengthy documents, counsel must prepare a new

24    document listing each question and answer and identifying the document from which it has been

25    extracted.  Copies of this new document should be given to the court and opposing counsel.

26    VI.    COMPLIANCE WITH THIS ORDER, THE LOCAL RULES, AND THE FEDERAL RULES

27    OF CIVIL PROCEDURE.

28    All parties and their counsel are ordered to become familiar with the Federal Rules of Civil

1  Procedure, the Local Rules of the Central District of California, and the court's standing orders.

2  The failure of any party or attorney to comply with the requirements of this Order, the Local Rules,

3  or the Federal Rules of Civil Procedure may result in sanctions being imposed.

4      Based on the foregoing, IT IS ORDERED THAT:

5      1.  All fact discovery shall be completed no later than **December 5, 2019**.

6      2.  All expert discovery shall be completed by **February 20, 2020**.  The parties must serve

7  their Initial Expert Witness Disclosures no later than **December 19, 2019**.  Rebuttal Expert

8  Witness Disclosures shall be served no later than **January 20, 2020**.  The parties should

9  commence expert discovery shortly after the initial designation of experts, because Local Rules

10  7-3 and 37-1 require ample time to meet and confer as well as brief the matters, and because the

11  final pretrial conference and trial dates will not be continued merely because expert discovery is

12  still underway.

13      3.  The parties shall complete their settlement conference before a private mediator

14  ("settlement officer") no later than **December 5, 2019**.  Plaintiffs' counsel shall contact the

15  settlement officer with enough time so that the settlement conference date is early enough to

16  comply with the settlement completion deadline imposed by this court.  After obtaining available

17  dates from the settlement officer, counsel for the parties shall confer and select one of the

18  proposed dates.  Plaintiffs' counsel shall then advise the settlement officer of the settlement

19  conference date selected by parties.  If the case settles, counsel shall file a Notice of Settlement

20  no later than 24 hours after the case is settled, stating when they expect to file their dismissal

21  papers.  Otherwise, **the parties must, no later than 48 hours after the settlement conference**

22  **is completed, file a Status Report Re: Settlement**.  The Status Report shall not disclose the

23  parties' settlement positions, i.e., the terms of any offers or demands.  The Status Report shall

24  describe the efforts made by the parties to resolve the dispute informally, i.e., the occasions and

25  dates when the parties participated in mediation or settlement conferences.  The Status Report

26  shall also include the name of the settlement officer who assisted the parties with their settlement

27  conference.

28      4.  Any motion for summary judgment or other potentially dispositive motion shall be filed

1   no later than **March 20, 2020**, and noticed for hearing regularly under the Local Rules.  Any

2   untimely or non-conforming motion will be denied.  *All potentially dispositive motions shall comply*

3   *with the requirements set forth in the Court's Order Re: Summary Judgment Motions issued*

4   *contemporaneously with the filing of this Order.*  Each party is allowed one potentially dispositive

5   motion.[7]

6          5.   The parties shall file memoranda of contentions of fact and law; witness lists; the Pretrial

7   Exhibit Stipulation; and joint motions in limine no later than **May 15, 2020**.

8          6.   The parties shall lodge their proposed Pretrial Conference Order and file the Joint Jury

9   Instructions; Disputed Jury Instructions; a joint proposed verdict form; a joint statement of the

10   case; proposed additional voir dire questions, if desired; and reply memoranda to motions in limine

11   no later than **May 22, 2020**.

12          The parties shall also send copies of the proposed Pretrial Conference Order; Joint Jury

13   Instructions; Disputed Jury Instructions; the joint proposed verdict form; the joint statement of the

14   case; and any proposed additional voir dire questions, to the chambers e-mail address

15   (fmo_chambers@cacd.uscourts.gov) in WordPerfect (the court's preference) or Word format.

16          7.   The final pretrial conference and hearing on motions in limine is scheduled for **June 5,**

17   **2020**, at 10:00 a.m.

18          8.   The trial is scheduled to begin on **Tuesday, June 23, 2020**, at 9:00 a.m.  On the first

19   day of trial, **counsel must appear at 8:45 a.m.** to discuss preliminary matters with the court.

20   Dated this 5th day of June, 2019.

21                                                      /s/
                                    Fernando M. Olguin
22                                  United States District Judge

23

24

25

26

27   _____

28   [7]   The parties shall not include any contentions or arguments previously raised in the United
     States' and Relator Poehling's Joint Motion for Partial Summary Judgment (Dkt. 234).

# EXHIBIT I

```
                                          FILED
                                 CLERK, U.S. DISTRICT COURT

                                      10/22/2019

                                 CENTRAL DISTRICT OF CALIFORNIA
                                 BY:      CW          DEPUTY
```

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING, | No. CV 16-08697 FMO (SSx) |
| Plaintiffs, | ORDER GRANTING THE PARTIES' JOINT REQUEST FOR A CONTINUANCE OF DISCOVERY CUT-OFF, PRETRIAL, AND TRIAL DATES |
| v. | |
| UNITEDHEALTH GROUP, INC., *et al.*, | |
| Defendants. | |

Upon stipulation of the parties and the recommendation of the Magistrate Judge, and good cause appearing, IT IS HEREBY ORDERED as follows:

1.    All fact discovery shall be completed no later than December 4, 2020.

2.    All expert discovery shall be completed by April 5, 2021.  The parties must serve their Initial Expert Witness Disclosure no later than December 18, 2020.  Rebuttal Expert Witness Disclosure shall be served no later than February 19, 2021.

3.    The parties shall complete their settlement conference before a private mediator no later than December 4, 2020.

4.    Any motion for summary judgment or other potentially dispositive motion shall be filed no later than June 8, 2021.  The hearing date on any such motion shall be July 15, 2021 at 10:00 a.m.

Exhibit I
Page 346

1        5.    The parties shall file memoranda of contentions of fact and law; witness

2    lists; the Pretrial Exhibit Stipulation; and joint motions in limine no later than August 20,

3    2021.

4        6.    The parties shall lodge their proposed Pretrial Conference Order and file the

5    Joint Jury Instructions; Disputed Jury Instructions; a joint proposed verdict form; a joint

6    statement of the case; proposed additional voir dire questions, if desired; and reply

7    memoranda to motions in limine no later than August 30, 2021.

8        7.    The final pretrial conference and hearing on motions in limine is scheduled

9    for September 10, 2021, at 10:00 a.m.

10       8.    The trial is scheduled to begin on Tuesday, September 28, 2021, at 9:00

11   a.m.

12       9.    All other terms in the Scheduling and Case Management Order re:  Jury

13   Trial, filed June 5, 2019 (Dkt. 364), that are not inconsistent herewith shall remain in

14   effect.

15       IT IS SO ORDERED.

16

17

18   Dated: October 22, 2019                    _____/s/_____

19                                              FERNANDO M. OLGUIN
                                                United States District Judge

20

21

22

23

24

25

26

27

28

Exhibit I
Page 347

# EXHIBIT J

Exhibit 2

1  JOSEPH H. HUNT
   Assistant Attorney General, Civil Division
2  NICOLA T. HANNA
   United States Attorney
3  DAVID M. HARRIS
   DAVID K. BARRETT
4  ABRAHAM C. MELTZER
   JOHN E. LEE (CBN 128696)
5  JACK D. ROSS (CBN 265883)
   Assistant United States Attorneys
6       300 N. Los Angeles Street, Room 7516
        Los Angeles, California 90012
7       Tel: (213) 894-3995; Fax: (213) 894-7819
        Email: john.lee2@usdoj.gov
8  JAMIE YAVELBERG
   ROBERT McAULIFFE
9  EDWARD CROOKE
   LINDA McMAHON
10 JESSICA E. KRIEG
   ZOILA E. HINSON
11 AMY L. LIKOFF
   GREGORY A. MASON
12 MARTHA N. GLOVER
   Attorneys, Civil Division, U.S. Department of Justice
13      P.O. Box 261, Ben Franklin Station
        Washington, D.C. 20044
14      Tel: (202) 307-0486; Fax: (202) 307-3852
        Email: robert.mcauliffe@usdoj.gov
15 JAMES P. KENNEDY, JR.
   United States Attorney
16 KATHLEEN ANN LYNCH
   Assistant United States Attorney (Admitted PHV)
17      138 Delaware Avenue
        Buffalo, New York 14201
18      Tel: (716) 843-5830; Fax: (716) 551-3052
        Email: kathleen.lynch@usdoj.gov
19 Attorneys for the United States of America

20              UNITED STATES DISTRICT COURT
          FOR THE CENTRAL DISTRICT OF CALIFORNIA
21                   WESTERN DIVISION

22 UNITED STATES OF AMERICA *ex*        No. CV 16-08697 FMO
   *rel.* BENJAMIN POEHLING,
23                                      ORDER GRANTING THE PARTIES'
              Plaintiffs,               JOINT REQUEST FOR A
24                                      CONTINUANCE OF DISCOVERY CUT-
              v.                        OFF, PRETRIAL, AND TRIAL DATES
25
   UNITEDHEALTH GROUP, INC., *et al.*,
26
              Defendants.
27

28

                          364
                        Exhibit 2

1    Upon stipulation of the parties and the recommendation of the Special Master, and

2    good cause appearing, IT IS HEREBY ORDERED as follows:

3    1. All fact discovery shall be completed no later than June 4, 2021. Further fact

4    discovery deadlines and requirements shall be as follows:

5    A. The United States shall complete production of remaining Track 1 non-

6    privileged documents by July 15, 2020.

7    B. The United States shall complete production of HHS-OIG documents as

8    proposed by the United States on May 8, 2020 by September 30, 2020.[1]

9    C. The United States shall produce a segment of NexLP responsive, non-

10   privileged documents from Track 2 by September 30, 2020.  The United

11   States provided UnitedHealth with a list of the custodians for such

12   documents on June 1, 2020.[2]

13   D. Both parties shall complete document productions and privilege log

14   productions no later than December 31, 2020.

15   E. The United States shall continue to produce privilege logs, including a

16   comprehensive privilege log, every 30 days along with an accompanying

17   production of documents that had been withheld as potentially privileged

18   but subsequently identified as not privileged or subject to production with

19   redactions or as privileged withheld slipsheets.

20   F. The parties shall submit a status report to the Special Master on June 30,

21   2020 and every 60 days thereafter until the completion of fact discovery.

22

23   [1] There may be a limited number of hard copy documents and documents from non-network data sources (e.g., CDs) from HHS-OIG custodians that cannot be

24   produced by September 30, 2020 due to restrictions on office access due to the COVID-19 pandemic.  The United States shall produce these documents by December 31, 2020.

25   [2] The United States currently does not have the information necessary to determine whether all responsive documents for the custodians on its June 1 list will be

26   produced by September 30, 2020.  Some, if not all, custodians may have additional responsive documents which will be produced between September 30 and December 31,

27   2020.  UnitedHealth reserves the right to seek assistance from the Special Master if it appears that the scope/timing of the government's production will compromise

28   UnitedHealth's ability to defend itself.

1       2.  All expert discovery shall be completed by October 5, 2021. The parties must

2  serve their Initial Expert Witness Disclosure no later than June 18, 2021. Rebuttal Expert

3  Witness Disclosure shall be served no later than August 19, 2021.

4       3.  The parties shall complete their settlement conference before a private

5  mediator no later than December 4, 2020.

6       4.  Any motion for summary judgment or other potentially dispositive motion

7  shall be filed no later than December 8, 2021. The hearing date on any such motion shall

8  be January 20, 2022 at 10:00 a.m. Further deadlines with respect to such motions shall

9  be as follows:

| | | |
|---|---|---|
| 10 | A. Meet and confer deadline: | October 29, 2021 |
| 11 | B. Moving party's portion of joint brief due: | November 5, 2021 |
| 12 | C. Opposing party's portion of joint brief due: | December 3, 2021 |
| 13 | D. Moving party to finalize joint brief: | December 6, 2021 |
| 14 | E. Opposing party to sign and return brief: | December 7, 2021 |
| 15 | F. Supplemental brief due: | January 6, 2022 |

16       5.  The parties shall file memoranda of contentions of fact and law; witness lists;

17  the Pretrial Exhibit Stipulation; and joint motions in limine no later than February 18,

18  2022.

19       6.  The parties shall lodge their proposed Pretrial Conference Order and file the

20  Joint Jury Instructions; Disputed Jury Instructions; a joint proposed verdict form; a joint

21  statement of the case; proposed additional voir dire questions, if desired; and reply

22  memoranda to motions in limine no later than February 28, 2022.

23       7.  The final pretrial conference and hearing on motions in limine is scheduled for

24  March 11, 2022, at 10:00 a.m.

25       8.  The trial is scheduled to begin on Tuesday, March 29, 2022, at 9:00 a.m.

26  ///

27  ///

28

Exhibit 2

Exhibit J
Page 350

1       9.  All other terms in the Scheduling and Case Management Order re: Jury Trial,

2  filed June 5, 2019 (Dkt. 364), that are not inconsistent herewith shall remain in effect.

3

4      IT IS SO ORDERED.

5

6

7      Dated: June 8, 2020                   /s/

                                            FERNANDO M. OLGUIN

8                                    United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

# EXHIBIT K

Exhibit 2

1   MICHAEL D. GRANSTON
    Deputy Assistant Attorney General, Civil Division
2   TRACY L. WILKISON
    Acting United States Attorney
3   DAVID M. HARRIS
    ABRAHAM C. MELTZER
4   JOHN E. LEE (CBN 128696)
    JACK D. ROSS (CBN 265883)
5   Assistant United States Attorneys
        300 N. Los Angeles Street, Room 7516
6       Los Angeles, California 90012
        Tel: (213) 894-3995; Fax: (213) 894-7819
7       Email: john.lee2@usdoj.gov
8   JAMIE A. YAVELBERG
    ROBERT McAULIFFE
    EDWARD CROOKE
9   LINDA M. McMAHON
    JESSICA E. KRIEG
10  AMY L. LIKOFF
    GREGORY A. MASON
11  MARTHA N. GLOVER
    WENDY ZUPAC
12  Attorneys, Civil Division, U.S. Department of Justice
        P.O. Box 261, Ben Franklin Station
13      Washington, D.C. 20044
        Tel: (202) 307-0486; Fax: (202) 307-3852
14      Email:  robert.mcauliffe@usdoj.gov
15  JAMES P. KENNEDY, JR.
    United States Attorney
16  DAVID CORIELL
    Assistant United States Attorney (Admitted PHV)
17      138 Delaware Avenue
        Buffalo, New York 14201
18      Tel: (716) 843-5830; Fax: (716) 551-3052
        Email: david.coriell@usdoj.gov
19  Attorneys for the United States of America

20              UNITED STATES DISTRICT COURT
            FOR THE CENTRAL DISTRICT OF CALIFORNIA
21                  WESTERN DIVISION

22  UNITED STATES OF AMERICA *ex*      No. CV 16-08697 FMO
    *rel.* BENJAMIN POEHLING,
23                                     ORDER GRANTING THE PARTIES'
            Plaintiffs,                JOINT REQUEST FOR A
24                                     CONTINUANCE OF DISCOVERY CUT-
            v.                         OFF, PRETRIAL, AND TRIAL DATES
25
    UNITEDHEALTH GROUP, INC., *et al.*,
26
            Defendants.
27

28

1    Upon stipulation of the parties and the recommendation of the Special Master, and

2  good cause appearing, IT IS HEREBY ORDERED as follows:

3    1.  All fact discovery shall be completed no later than December 6, 2021.

4    2.  All expert discovery shall be completed by September 12, 2022. The parties

5  must serve their Initial Expert Witness Disclosure no later than April 25, 2022. Rebuttal

6  Expert Witness Disclosure shall be served no later than July 25, 2022.

7    4.  Any motion for summary judgment or other potentially dispositive motion

8  shall be filed no later than November 4, 2022. The hearing date on any such motion shall

9  be noticed for hearing pursuant to the Local Rules. Further deadlines with respect to such

10  motions shall be as follows:

11    A.  Meet and confer deadline:            September 23, 2022

12    B.  Moving party's portion of joint brief due:    September 30, 2022

13    C.  Opposing party's portion of joint brief due:  October 31, 2022

14    D.  Moving party to finalize joint brief:        November 2, 2022

15    E.  Opposing party to sign and return brief:     November 3, 2022

16    F.  Supplemental brief due:                November 23, 2022

17    5.  The parties shall file memoranda of contentions of fact and law; witness lists;

18  the Pretrial Exhibit Stipulation; and joint motions in limine no later than January 12,

19  2023.

20    6.  The parties shall lodge their proposed Pretrial Conference Order and file the

21  Joint Jury Instructions; Disputed Jury Instructions; a joint proposed verdict form; a joint

22  statement of the case; proposed additional voir dire questions, if desired; and reply

23  memoranda to motions in limine no later than January 23, 2023.

24    7.  The final pretrial conference and hearing on motions in limine is scheduled for

25  February 3, 2023, at 10:00 a.m.

26    8.  The trial is scheduled to begin on Tuesday, February 21, 2023, at 9:00 a.m.

27  ///

28

1        9.  All other terms in the Scheduling and Case Management Order re: Jury Trial,

2    filed June 5, 2019 (Dkt. 364), that are not inconsistent herewith shall remain in effect.

3

4        IT IS SO ORDERED.

5

6

7    Dated: March 23, 2021                        _____/s/_____

8                                                 FERNANDO M. OLGUIN
                                                  United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

1    LATHAM & WATKINS LLP
         David J. Schindler (Bar No. 130490)
2         *david.schindler@lw.com*
     355 South Grand Avenue, Suite 100
3    Los Angeles, California 90071-1560
     Telephone: +1.213.485.1234
4    Facsimile: +1.213.891.8763

5    LATHAM & WATKINS LLP
         Daniel Meron (appearing *pro hac vice*)
6         *daniel.meron@lw.com*
         Abid R. Qureshi (appearing *pro hac vice*)
7         *abid.qureshi@lw.com*
     555 Eleventh Street, NW, Suite 1000
8    Washington, DC 20004-1304
     Telephone: +1.202.637.2200
9    Facsimile: +1.202.637.2201

10   Attorneys for United Defendants

11                    **UNITED STATES DISTRICT COURT**

12                    **CENTRAL DISTRICT OF CALIFORNIA**

13

14   UNITED STATES OF AMERICA *ex rel.*          CASE NO. 2:16-cv-08697-FMO (SSx)
15   BENJAMIN POEHLING,
                                                  [Discovery Document: Referred to
16                   Plaintiff,                   Special Master Suzanne H. Segal]

17         v.                                     **DECLARATION OF DAVID J.**
                                                  **SCHINDLER IN SUPPORT OF**
18   UNITEDHEALTH GROUP, INC. *et al.*,           **UNITED'S RESPONSE TO THE**
                                                  **UNITED STATES' MOTION TO**
19                                                **COMPEL UNITED TO PRODUCE**
20                   Defendants.                  **DOCUMENTS**

21                                                [*Notice of Motion, Joint Stipulation*
22                                                *and [Proposed] Order filed*
                                                  *concurrently herewith*]
23
                                                  Date: April 29, 2021
24                                                Time: 1:00 p.m.
                                                  Special Master Suzanne H. Segal
25
                                                  Discovery Cutoff: December 6, 2021
26                                                Pre-Trial Conference: February 3, 2023
                                                  at 10:00 a.m.
27                                                Trial: February 21, 2023 at 9:00 a.m
28

LATHAM&WATKINS LLP                                DECLARATION OF DAVID J. SCHINDLER
ATTORNEYS AT LAW                              IN SUPPORT OF UNITED'S RESPONSE TO THE
LOS ANGELES                              UNITED STATES' MOTION TO COMPEL UNITED TO
                                                        PRODUCE DOCUMENTS

**DECLARATION OF DAVID J. SCHINDLER**

I, David J. Schindler, hereby declare as follows:

1.      I am a partner at Latham & Watkins LLP, the law firm which represents Defendant UnitedHealth Group Incorporated and its affiliated entities named as Defendants in this action (collectively, "United"). I submit this Declaration in support of United's Response to the United States' Motion to Compel United to Produce Documents. I have personal knowledge, information, or belief of the facts stated herein and, if called as a witness, I could and would testify competently thereto.

2.      Attached as **Exhibit L** is a true and correct copy of transcript excerpts from the deposition of Jeffrey Grant, taken on May 16, 2018 during the course of this litigation.

3.      Attached as **Exhibit M** is a true and correct copy of United's Notice of Motion and Motion to Dismiss United States' First Amended Complaint-In-Partial-Intervention filed December 8, 2017 (Dkt. 182), during the course of this litigation ("United's Motion to Dismiss").

4.      Attached as **Exhibit N** is a true and correct copy of the United States' Fourth Set of Interrogatories, containing the United States' Interrogatory No. 14, served on November 4, 2020.

5.      Attached as **Exhibit O** is a true and correct copy of the United States' Eighth Set of Requests for Production, containing the United States' Request for Production No. 147, served on November 4, 2020.

6.      Attached as **Exhibit P** is a true and correct copy of email correspondence between David Schindler, Daniel Meron, and Abid Qureshi of Latham & Watkins LLP; Robert McAuliffe, Linda McMahon, and Gregory Mason of the U.S. Department of Justice; Eric Havian of Constantine Cannon LLP and Bill Merrill of Susman Godfrey LLP, dated January 29, 2021.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

2

DECLARATION OF DAVID J. SCHINDLER
IN SUPPORT OF UNITED'S RESPONSE TO THE
UNITED STATES' MOTION TO COMPEL UNITED
TO PRODUCE DOCUMENTS

373
Exhibit 3

7.    Attached as **Exhibit Q** is a true and correct copy of email correspondence between Abid Qureshi, Morgan L. Maddoux, Daniel Meron, David W. Rowe, David Schindler, Kirstin Scheffler Do, and Wistar Wilson of Latham & Watkins LLP;  Edward Crooke, Martha Glover, Zoila Hinson, Jessica Krieg, Amy Likoff, Robert McAuliffe, Linda McMahon, Wendy Zupac, Jessica Sweeney, and Gregory Mason of the U.S. Department of Justice; Jack Ross and John Lee of the U.S. Attorney's Office, Central District of California, and Counsel for Relator, dated November 4, 2020 to December 31, 2020.

8.    Attached as **Exhibit R** is a true and correct copy of email correspondence between Abid Qureshi, Morgan L. Maddoux, Daniel Meron, David W. Rowe, David Schindler, Kirstin Scheffler Do, and Wistar Wilson of Latham & Watkins LLP; Gregory Mason, Edward Crooke, Martha Glover, Zoila Hinson, Jessica Krieg, Amy Likoff, Robert McAuliffe, Linda McMahon, Wendy Zupac, and Jessica Sweeney of the U.S. Department of Justice, John Lee and Jack Ross of the U.S. Attorney's Office, Central District of California, and Counsel for Relator, dated November 4, 2020 to January 21, 2021.

9.    Attached as **Exhibit S** is a true and correct copy of email correspondence between Abid Qureshi, Morgan L. Maddoux, Daniel Meron, David W. Rowe, David Schindler, Kirstin Scheffler Do, and Wistar Wilson of Latham & Watkins LLP; Gregory Mason, Edward Crooke, Martha Glover, Zoila Hinson, Jessica Krieg, Amy Likoff, Robert McAuliffe, Linda McMahon, Wendy Zupac, and Jessica Sweeney of the U.S. Department of Justice, John Lee and Jack Ross of the U.S. Attorney's Office, Central District of California, and Counsel for Relator, dated November 4, 2020 to January 6, 2021.

10.    Attached as **Exhibit T** is a true and correct copy of a memorandum from HHS Office of the Inspector General, Office of Audit Services to Joseph Pirrone, Branch Chief Acquisition Management Services, PSC regarding

3

DECLARATION OF DAVID J. SCHINDLER IN SUPPORT OF UNITED'S RESPONSE TO THE UNITED STATES' MOTION TO COMPEL UNITED TO PRODUCE DOCUMENTS

1  *Justification for Single Award Blanket Purchase Agreement (BPA)*, dated November

2  20, 2015 which I understand was produced to United by the United States. The

3  document is Bates labeled USBP060643694 and is marked Confidential per the

4  terms of the parties' Protective Order in this litigation.

5        11.    Attached as **Exhibit U** is a true and correct copy of email

6  correspondence between Christopher Eisenberg, Brenda Thew, Benjamin Cohen,

7  Paul Lichtenstein, Maricruz Bonfante, Jane Andrews, Kellie Gombeski, Jennifer

8  Harlow, Kathleen Harrington, Jacqueline Vaughn and Jessica Fuller of Centers for

9  Medicare & Medicaid Services (CMS), dated June 13, 2011 to June 15, 2011 which

10  I understand was produced to United by the United States. The document is Bates

11  labeled USBP059844500 and is marked Confidential per the terms of the parties'

12  Protective Order in this litigation.

13        12.    Attached as **Exhibit V** is a true and correct copy of a document entitled

14  *Medicare + Choice Risk Adjustment Data Validation for CY 2001 Payments – Final*

15  *Methods Report* which I understand was produced to United by the United States.

16  The document is Bates labeled USBP059164283 and is marked Attorneys' Eyes

17  Only per the terms off the parties' Protective Order in this litigation.

18        13.    Attached as **Exhibit W** is a true and correct copy of a document

19  published by CMS on June 24, 2019 entitled *2018 Benefit Year Protocols PPACA*

20  *HHS Risk Adjustment Data Validation – Version 7.0* ("2018 Benefit Year

21  Protocols"). The document is available on the HHS website at

22  https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-

23  documents/HRADV_2018Protocols_070319_5CR_070519_9.pdf (last visited April

24  9, 2021).

25        14.    Attached as **Exhibit X** is a true and correct copy of a document entitled

26  *Achieving Coding Consistency* prepared by Chris Dimick dated July 1, 2010. The

27  document is available on the American Health Information Management

28

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

4

DECLARATION OF DAVID J. SCHINDLER
IN SUPPORT OF UNITED'S RESPONSE TO THE
UNITED STATES' MOTION TO COMPEL UNITED
TO PRODUCE DOCUMENTS

1   Association                    (AHIMA)                    website                    at

2   https://library.ahima.org/doc?oid=101092#.YG27gI5KiUl (last visited April 7,

3   2021).

4          15.    Attached as **Exhibit Y** is a true and correct copy of a document

5   published by CMS on September 27, 2017 entitled *Contract-Level Risk Adjustment*

6   *Data Validation - Medical Record Reviewer Guidance* ("CMS RADV Guidance").

7   The        document        is     publicly     available     on     the     CMS     website,     at

8   https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-

9   Programs/Medicare-Risk-Adjustment-Data-Validation-Program/Other-Content-

10  Types/RADV-Docs/Coders-Guidance.pdf (last visited April 7, 2021).

11         16.    Attached as **Exhibit Z** is a true and correct copy of a document entitled

12  *2008 Risk Adjustment Data Technical Assistance for Medicare Advantage*

13  *Organizations Participant Guide* ("RA Participant Guide"). The document is

14  publicly available on the CMS Customer Service and Support Center website, at

15  https://www.csscoperations.com/Internet/Cssc3.Nsf/files/participant-guide-

16  publish_052909.pdf/$File/participant-guide-publish_052909.pdf (last visited April

17  7, 2021).

18         17.    Attached as **Exhibit AA** is a true and correct copy of the Order Granting

19  Stipulation Regarding Expert Discovery issued by the Court on May 17, 2018 (Dkt.

20  233) in this litigation ("Expert Discovery Stipulation").

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

5

DECLARATION OF DAVID J. SCHINDLER
IN SUPPORT OF UNITED'S RESPONSE TO THE
UNITED STATES' MOTION TO COMPEL UNITED
TO PRODUCE DOCUMENTS

1    I declare under penalty of perjury under the laws of the United States that the

2    foregoing is true and correct.

3

4    Executed: April 12, 2021, at Los Angeles, California.

5

6                                                    By:    /s/ David J. Schindler

7                                                           David J. Schindler
                                                            Attorney for United Defendants
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6            DECLARATION OF DAVID J. SCHINDLER
             IN SUPPORT OF UNITED'S RESPONSE TO THE
             UNITED STATES' MOTION TO COMPEL UNITED
             TO PRODUCE DOCUMENTS

# EXHIBIT L

Page 154

1        IN THE UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3            Case No. CV 16 08697 MFW (SSx)

4    _____

5    UNITED STATES OF AMERICA,                )

6    ex rel. BENJAMIN POEHLING,               )

7                    Plaintiffs,              )

8         v.                                  )

9    UNITEDHEALTH GROUP, INC., et al.,        )

10                   Defendants.              )

11   _____  )

12

13

14

15                  (Volume 2)

16        DEPOSITION OF JEFFREY GRANT

17              Washington, D.C.

18              May 16, 2018

19

20

21

22

23

24   Reported by:  Mary Ann Payonk

25   Job No. 140253

Exhibit L
Page 7

379
Exhibit 3

Page 320

1    large degree of unexplained costs built into        03:45

2    it.  Forget errors that go into it.  Even if        03:45

3    you have no errors, you again do not have           03:45

4    unitary costs across a population.                  03:45

5            So every diabetic does not cost the         03:45

6    same amount.  Even every diabetic of the exact      03:45

7    same age does not cost the same amount.  So         03:45

8    you're going to have some explained costs, and      03:45

9    that's what you're trying to get to.  You're        03:45

10   trying to predict large groups of people            03:45

11   accurately.  You're not trying to predict one       03:45

12   individual's cost accurately.  You're trying to     03:45

13   get a reasonable relative risk score for people     03:45

14   that have health conditions, people that don't      03:46

15   have health conditions, people that have a mix      03:46

16   of health conditions.  And you accept the fact      03:46

17   that there is no perfect way to do that and         03:46

18   it's a predictive model in the first place.         03:46

19           So underlying that in addition to all       03:46

20   other errors you have some amount of error in       03:46

21   the model that is induced by fee-for-service        03:46

22   error of an unknown magnitude, and it would         03:46

23   cost I don't even know what to -- to review         03:46

24   over a billion claims to get them 100 percent       03:46

25   accurate, only then to still have a lot of          03:46

Exhibit L
Page 8

380
Exhibit 3

Page 321

```
 1   unexplained variation in the model, that the        03:46
 2   gain is not worth the cost that you had put in       03:46
 3   it because there would still be plenty of            03:46
 4   unexplained variation that doesn't get fixed by      03:46
 5   doing this elaborate study.                          03:46
 6        Q.   Does the existence of error within         03:46
 7   the MA Part C risk adjustment model mean that        03:46
 8   MA providers can submit knowingly incorrect          03:46
 9   data?                                                03:46
10        A.   No.                                        03:46
11        Q.   Have you ever held the opinion that        03:46
12   it does?                                             03:46
13        A.   No.                                        03:46
14        Q.   Have you ever told anybody that the        03:46
15   existence of error within the model means that       03:47
16   MA providers can submit knowingly incorrect          03:47
17   data?                                                03:47
18        A.   And can we define terms?                   03:47
19        Q.   Okay.                                      03:47
20        A.   When you say "knowingly incorrect,"        03:47
21   it is a very specific submission of a very           03:47
22   specific data element saying that I know is          03:47
23   wrong.                                               03:47
24        Q.   A specific diagnosis code that is          03:47
25   known to be wrong.                                   03:47
```

Exhibit L
Page 9

381
Exhibit 3

```
                                                    Page 322
 1      A.    Right.  No.                           03:47

 2      Q.    Does the existence of error within    03:47

 3   the model mean that MA providers can refuse to 03:47

 4   correct errors that they didn't know about when 03:47

 5   they were submitted but that they later learned 03:47

 6   were errors?                                   03:47

 7      A.    No.                                   03:47

 8      Q.    Have you ever told anybody that the   03:47

 9   existence of error within the model means that 03:47

10   MA providers don't need to correct errors that 03:47

11   they know about?                               03:47

12      A.    No.                                   03:47

13         MR. HASEGAWA:  I have nothing            03:47

14      further.                                    03:47

15         MR. QURESHI:  Short redirect.            03:47

16              EXAMINATION                         03:47

17   BY MR. QURESHI:                                03:47

18      Q.    Mr. Grant, if HRP in the instance     03:47

19   that you highlighted did the blinded review and 03:47

20   didn't do a systematic reconciliation with the 03:48

21   provider-submitted codes, is it your           03:48

22   understanding that HRP knew it was submitting  03:48

23   specific bad codes?                            03:48

24         MS. KRIEG:  Object to form.              03:48

25      A.    We were not submitting any bad codes. 03:48
```

Exhibit L
Page 10

Exhibit 3

1    Q.   Were you facilitating the submission        03:48

2  of specific bad codes by the plan in that          03:48

3  instance?                                          03:48

4        MS. KRIEG:  Object to form.                  03:48

5    A.   No.  I think -- that's not how we           03:48

6  looked at it.  We -- the codes were already in.    03:48

7  We were not doing a review to systematically do    03:48

8  a complete audit of a plan and determine the       03:48

9  accuracy of codes.  We were sometimes asked to     03:48

10 do that, and if we were asked to do that, we       03:48

11 could do a very careful review.                    03:48

12       I mean, it's a different style review        03:48

13 when you want to put in the effort that you        03:48

14 need to to absolutely make sure that a code is     03:48

15 backed up.                                         03:49

16   Q.   The calibration of the Part C model         03:49

17 that you were discussing in response to            03:49

18 Mr. Hasegawa's questions, are you aware that       03:49

19 the model is calibrated using a sample?            03:49

20   A.   I believe it's a very large sample,         03:49

21 but I believe it is a sample, yes.                 03:49

22   Q.   Do you know what the percentage size        03:49

23 of the sample is?                                  03:49

24       Is it 25 percent?  30 percent?               03:49

25   A.   I'm not --                                  03:49

Exhibit L
Page 11

383
Exhibit 3

Page 324

```
 1              MS. KRIEG:  Object to form.            03:49
 2              THE WITNESS:  Oh, sorry.               03:49
 3       A.   I'm not sure what the size of the        03:49
 4   sample is.                                        03:49
 5       Q.   I see.  Is it the CERT sample,           03:49
 6   C-E-R-T?                                          03:49
 7       A.   Again, I do not know what sample is      03:49
 8   used to calibrate the model.                      03:49
 9       Q.   Did your responses to Mr. Hasegawa's     03:50
10   questions assume that there was no sampling       03:50
11   occurring?                                        03:50
12              MS. KRIEG:  Object to form.            03:50
13       A.   No.                                      03:50
14       Q.   Have you ever heard that it's -- the     03:50
15   CERT sample is a 5 percent sample?  Have you      03:50
16   ever been made aware of that?                     03:50
17       A.   I've heard of the 5 percent sample.      03:50
18   I haven't heard it called the CERT sample.        03:50
19       Q.   And are you aware that it's the          03:50
20   5 percent sample that's used to calibrate the     03:50
21   model?                                            03:50
22              MR. HASEGAWA:  Object to form.         03:50
23              MS. KRIEG:  Object to form.            03:50
24       A.   I -- it may have been.  I'm not sure     03:50
25   if it always has been.  It may have been.  It     03:50
```

Exhibit L
Page 12

Exhibit 3

Page 326

```
 1        C E R T I F I C A T E

 2     DISTRICT OF COLUMBIA:

 3            I, MARY ANN PAYONK, shorthand reporter,

 4     do hereby certify that the witness whose

 5     deposition is hereinbefore set forth was duly

 6     sworn, and that such deposition is a true,

 7     correct, and full record of the testimony

 8     given.

 9            I further certify that I am not related

10     to any of the parties to this action by blood

11     or by marriage, and that I am in no way

12     interested in the outcome of this matter.

13            IN WITNESS WHEREOF, I have hereunto set

14     my hand this 29th day of May, 2018.

15

16            _____

17            MARY ANN PAYONK, Shorthand Reporter

18

19

20

21

22

23

24

25
```

Exhibit L
Page 13

385
Exhibit 3

# EXHIBIT M

1  LATHAM & WATKINS LLP
       David J. Schindler (Bar No. 130490)
2        *david.schindler@lw.com*
   355 South Grand Avenue, Suite 100
3  Los Angeles, California 90071-1560
   Telephone: +1.213.485.1234
4  Facsimile: +1.213.891.8763

5  LATHAM & WATKINS LLP
       Daniel Meron (appearing *pro hac vice*)
6        *daniel.meron@lw.com*
       Abid R. Qureshi (appearing *pro hac vice*)
7        *abid.qureshi@lw.com*
   555 Eleventh Street, NW, Suite 1000
8  Washington, DC 20004-1304
   Telephone: +1.202.637.2200
9  Facsimile: +1.202.637.2201

10 Attorneys for United Defendants

11                **UNITED STATES DISTRICT COURT**

12                **CENTRAL DISTRICT OF CALIFORNIA**

13

14 UNITED STATES OF AMERICA *ex rel.*           CASE NO. 2:16-cv-08697-
15 BENJAMIN POEHLING,                           MWF(SSx)

16                                              Assigned to Hon. Michael W.
                   Plaintiff,                   Fitzgerald
17
         v.                                     **UNITED'S NOTICE OF**
18                                              **MOTION AND MOTION TO**
   UNITEDHEALTH GROUP, INC. *et al.*,           **DISMISS UNITED STATES'**
19                                              **FIRST AMENDED**
                                                **COMPLAINT-IN-PARTIAL-**
20                 Defendants.                  **INTERVENTION;**
                                                **MEMORANDUM OF POINTS**
21                                              **AND AUTHORITIES IN**
                                                **SUPPORT THEREOF**
22
                                                [*Declaration of David J. Schindler*
23                                              *and [Proposed] Order filed*
                                                *concurrently herewith*]
24
                                                Date:  January 29, 2018
25                                              Time:  10:00 a.m.
                                                Ctrm:  5A
26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES                                     UNITED'S NOTICE OF MOTION AND MOTION TO
                                                DISMISS UNITED STATES' COMPLAINT
                                                2:16-cv-08697-MWF (SSx)

1    TO THE COURT, ALL PARTIES AND THEIR COUNSEL OF RECORD:

2    PLEASE TAKE NOTICE that, on January 29, 2018, at 10:00 a.m., or as

3  soon thereafter as the parties may be heard, in Courtroom 5A of the United States

4  District Court, Central District of California, located at 350 W. 1st Street, Los

5  Angeles, California 90012, Honorable Michael W. Fitzgerald presiding,

6  Defendants UnitedHealth Group Incorporated, United HealthCare Services, Inc.,

7  UnitedHealthcare, Inc., UnitedHealthcare Insurance Company, Ovations, Inc.,

8  Optum, Inc., OptumInsight, Inc., AmeriChoice of New Jersey, Inc., AmeriChoice

9  of New York, Inc., Arizona Physicians IPA, Inc., Care Improvement Plus of

10  Maryland, Inc., Care Improvement Plus of Texas Insurance Company, Care

11  Improvement Plus South Central Insurance Company, Care Improvement Plus

12  Wisconsin Insurance Company, Optum Insurance Co., Citrus Health Care, Inc.,

13  Health Plan of Nevada, Inc., Medica HealthCare Plans, Inc., Oxford Health Plans

14  (CT), Inc., Oxford Health Plans (NJ), Inc., Oxford Health Plans (NY), Inc.,

15  PacifiCare Life and Health Insurance Company, PacifiCare of Arizona, Inc.,

16  PacifiCare of Colorado, Inc., PacifiCare of Nevada, Inc., Physicians Health Choice

17  of Texas, LLC, Preferred Care Partners, Inc., Rocky Mountain Health Maintenance

18  Organization, Incorporated, Sierra Health and Life Insurance Company, Inc.,

19  Symphonix Health Insurance, Inc., UHC of California (f.k.a. PacifiCare of

20  California), United Health Care Ins. Co. and United New York, Unison Health

21  Plan of Tennessee, Inc., UnitedHealthcare Benefits of Texas, Inc. (f.k.a. PacifiCare

22  of Texas, Inc.), UnitedHealthcare Community Plan of Ohio, Inc. (f.k.a. Unison

23  Health Plan of Ohio, Inc.), UnitedHealthcare Community Plan of Texas, L.L.C.

24  (f.k.a. Evercare of Texas, L.L.C.), UnitedHealthcare Community Plan, Inc. (f.k.a.

25  UnitedHealthcare of the Great Lakes Health Plan, Inc.), UnitedHealthcare

26  Insurance Company of New York, UnitedHealthcare of Alabama, Inc.,

27  UnitedHealthcare of Arizona, Inc., UnitedHealthcare of Arkansas, Inc.,

28  UnitedHealthcare of Florida, Inc., UnitedHealthcare of Georgia, Inc.,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

UNITED'S NOTICE OF MOTION AND MOTION TO
DISMISS UNITED STATES' COMPLAINT
2:16-cv-08697-MWF (SSx)

2

Exhibit M
Page 15

388
Exhibit 3

1   UnitedHealthcare of New England, Inc., UnitedHealthcare of New York, Inc.,

2   UnitedHealthcare of North Carolina, Inc., UnitedHealthcare of Ohio, Inc.,

3   UnitedHealthcare of Oklahoma, Inc. (f.k.a. PacifiCare of Oklahoma, Inc.),

4   UnitedHealthcare of Oregon, Inc. (f.k.a. PacifiCare of Oregon, Inc.),

5   UnitedHealthcare of Pennsylvania, Inc. (f.k.a. Unison Health Plan of Pennsylvania,

6   Inc.), UnitedHealthcare of Tennessee, Inc., UnitedHealthcare of the Midlands, Inc.,

7   UnitedHealthcare of the Midwest, Inc., UnitedHealthcare of Utah, Inc.,

8   UnitedHealthcare of Washington, Inc. (f.k.a. PacifiCare of Washington, Inc.),

9   UnitedHealthcare of Wisconsin, Inc., and UnitedHealthcare Plan of the River

10  Valley, Inc. (collectively, "United") will, and hereby do, move the Court for

11  dismissal of this action (the "Motion").

12      This Motion is and will be made on the grounds that (1) the Government

13  fails adequately to plead that United's supposed regulatory violations were

14  material to the Centers for Medicare and Medicaid Services' decision to pay

15  United; and (2) the Government's First Cause of Action does not apply to alleged

16  overpayments that were identified prior to the 2009 Amendment to the False

17  Claims Act.

18      This Motion is based upon the accompanying Memorandum of Points and

19  Authorities, the Declaration of David J. Schindler filed concurrently herewith, the

20  pleadings and other papers on file herein, and such argument and evidence as may

21  be presented in connection with the hearing of this Motion.

22      This Motion is made following the conference of counsel pursuant to L.R. 7-

23  3, which took place on November 21, 2017.

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

3

UNITED'S NOTICE OF MOTION AND MOTION TO
DISMISS UNITED STATES' COMPLAINT
2:16-cv-08697-MWF (SSx)

Exhibit M
Page 16

1  Dated:  December 8, 2017          LATHAM & WATKINS LLP

2                                     DAVID J. SCHINDLER
                                      DANIEL MERON
3                                     ABID R. QURESHI

4

5                                     By /s/ David J. Schindler
                                         _____
6                                        David J. Schindler
                                         Attorneys for United Defendants

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                          UNITED'S NOTICE OF MOTION AND MOTION TO
                                    4        DISMISS UNITED STATES' COMPLAINT
                                                  2:16-cv-08697-MWF (SSx)

                                                        Exhibit M
                                                        Page 17

1
2

# TABLE OF CONTENTS

**Page**

3  TABLE OF AUTHORITIES ...................................................................... ii

4  INTRODUCTION ............................................................................... 1

5  BACKGROUND ................................................................................. 3

6      A.   Medicare Advantage And Risk Adjustment .............................. 3

7      B.   The Government's Initial Complaint ...................................... 9

8      C.   Judge Walter's Dismissal Of The Swoben Complaint And DOJ's Resulting Amendment In This Case .............................. 10

9  

10  ARGUMENT ................................................................................... 11

11  I.    DOJ Still Fails Adequately To Allege That The Challenged Conduct Was Material To The Government's Decision To Pay United ..................................................................................... 11

12  

13      A.   DOJ Was Required To Plead That But For The Supposed Violations, CMS Would Not Have Paid The Relevant Claims ...................................................................... 12

14  

15      B.   DOJ's Complaint Conspicuously Fails To Allege That CMS Would Not Have Paid Had It Known About The Supposed "Falsity" Of United's Attestations ...................... 13

16  

17      C.   DOJ's Allegation That CMS Would Have Accepted Repayments If United Had Deleted Unsupported Codes Cannot Establish The Materiality Of Its Reverse False Claims Allegations ...................................................... 16

18  

19  II.   DOJ's First Claim For Relief Does Not Apply To Alleged Overpayments Identified Before The 2009 Amendment To the False Claims Act ............................................................. 18

20  

21  Conclusion ................................................................................... 21

22
23
24
25
26
27
28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

i

MEM. IN SUPPORT OF MOTION TO DISMISS
CASE NO. CV 16-08697-MWF

Exhibit M
Page 18

391
Exhibit 3

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*City of Chicago v. Purdue Pharma L.P.*,
   211 F. Supp. 3d 1058 (N.D. Ill. 2016) ................................................. 14

*Household Credit Services, Inc. v. Pfenning*,
   541 U.S. 232 (2004) ............................................................................. 21

*Jones v. United States*,
   526 U.S. 227 (1999) ............................................................................. 21

*Knudsen v. Sprint Communications Co.*,
   Nos. C13-04476 CRB et al., 2016 WL 4548924 (N.D. Cal. Sept. 1,
   2016) ..................................................................................................... 18

*United States v. BAE Systems Tactical Vehicle Systems, LP*,
   No. 15-12225, 2017 WL 1457493 (E.D. Mich. Apr. 25, 2017) ........... 15

*United States v. Mead*,
   426 F.2d 118 (9th Cir. 1970) ............................................................... 12

*United States ex rel. Ahumada v. NISH*,
   756 F.3d 268 (4th Cir. 2014) ............................................................... 19

*United States ex rel. Dresser v. Qualium Corp.*,
   No. 5:12-cv-0745-BLF, 2016 WL 3880763 (N.D. Cal. July 18,
   2016) ..................................................................................................... 13

*United States ex rel. Mateski v. Raytheon Corp.*,
   No. 2:06-cv-03614-ODW(KSx), 2017 WL 3326452 (C.D. Cal.
   Aug. 3, 2017) ........................................................................................ 13

*United States ex rel. Stone v. OmniCare, Inc.*,
   No. 09 C 4319, 2011 WL 2669659 (N.D. Ill. July 7, 2011) ................. 20

*United States ex rel. Swoben v. Scan Health Plan*,
   CV 09-5013-JFW, 2017 WL 4564722
   (C.D. Cal. Oct. 5, 2017) .......................................................... 1, 10, 11, 14, 16

*United States ex rel. Swoben v. United Healthcare Insurance Co.*,
   832 F.3d 1084 (9th Cir.), *amended on reh'g*, 848 F.3d 1161 (9th
   Cir. 2016) .......................................................................................... 9, 16

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

ii

MEM. IN SUPPORT OF MOTION TO DISMISS
CASE NO. CV 16-08697-MWF

Exhibit M
Page 19

392
Exhibit 3

**Page(s)**

*United States ex rel. Yannacopoulos v. General Dynamics*,
   636 F. Supp. 2d 739 (N.D. Ill. 2009), *aff'd*, 652 F.3d 818 (7th Cir.
   2011) ..................................................................................................... 19

*Universal Health Services, Inc. v. United States ex rel. Escobar*,
   136 S. Ct. 1989 (2016) ....................................................................*passim*

## STATUTES AND REGULATIONS

31 U.S.C. § 3729(a)(1)(G) .............................................................................. 2, 11

31 U.S.C. § 3731(b) ............................................................................................ 20

42 U.S.C. § 1395c *et seq.* ................................................................................... 3

42 U.S.C. § 1395j *et seq.* .................................................................................... 3

42 U.S.C. § 1395w-21 *et seq.* ............................................................................. 4

42 U.S.C. § 1395w-23 ......................................................................................... 4

42 U.S.C. § 1395w-23(a)(1)(B) .......................................................................... 4

42 U.S.C. § 1395w-24(a)(6)(A) .......................................................................... 4

Pub. L. No. 111-21, 123 Stat. 1617 (2009) ..................................................... 19, 20

42 C.F.R. § 422.254(b)(1) ................................................................................... 4

74 Fed. Reg. 54,634 (Oct. 22, 2009) ................................................................. 7

## OTHER AUTHORITIES

CMS, Notice of Final Payment Error Calculation Methodology (Feb.
   24, 2012), https://www.cms.gov/Research-Statistics-Data-and-
   Systems/Monitoring-Programs/recovery-audit-program-parts-c-
   and-d/Other-Content-Types/RADV-Docs/RADV-
   Methodology.pdf ........................................................................................ 8

John T. Boese, *Civil False Claims and* Qui Tam *Actions* (online 2017,
   4th ed.) ........................................................................................................ 20

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

iii

MEM. IN SUPPORT OF MOTION TO DISMISS
CASE NO. CV 16-08697-MWF

Exhibit M
Page 20

393
Exhibit 3

## INTRODUCTION

On October 5, 2017, Judge Walter dismissed a separate False Claims Act case against UnitedHealth Group, Inc. and certain of its subsidiaries ("United") on the ground that the Department of Justice ("DOJ") failed "to allege that CMS"—the Centers for Medicare and Medicaid Services—"would have refused to make risk adjustment payments to the United Defendants if it had known the facts." *United States ex rel. Swoben v. Scan Health Plan*, CV 09-5013-JFW (JEMx), 2017 WL 4564722, at *6 (C.D. Cal. Oct. 5, 2017). Several days later, United notified DOJ that it intended to move for dismissal on that same ground in this case, which likewise presents questions about CMS risk adjustment payments.

DOJ responded by requesting an extra month to file an amended complaint first, before United filed that motion. Yet, while the Amended Complaint-in-Intervention ("Amended Complaint" or "Compl."), ECF No. 171, includes more than a hundred new paragraphs of allegations, it still suffers from the same fundamental defect: It fails to contain *any* allegation—even a cursory one—"that CMS would have refused to make risk adjustment payments to the United Defendants if it had known the facts." *Swoben*, 2017 WL 4564722, at *6. That omission infects all of DOJ's claims and warrants dismissal.

The omission is no mere oversight, either. DOJ has not made that allegation because it *cannot* do so. DOJ's claims rest on the premise that MA plans are entitled to risk adjustment payments only for medical conditions that are adequately documented in a patient's *medical charts* (as opposed to those conditions that are separately and sometimes incorrectly identified in provider-based coding included in *claims submissions*), notwithstanding the presence of similar discrepancies in CMS's own data. That premise implicates an industry-wide regulatory discussion that has lasted the better part of a decade. During that time, senior officials at CMS have acknowledged that the theory DOJ is pressing here would, if correct, result in Medicare Advantage plans being *under*paid for the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

MEM. IN SUPPORT OF MOTION TO DISMISS
CASE NO. CV 16-08697-MWF

Exhibit M
Page 21

1  insurance risk they assume from CMS.  This motion does not present the merits of

2  that issue, which are pending in an Administrative Procedure Act case United filed

3  in the U.S. District Court for the District of Columbia.  But the issue nevertheless

4  is highly relevant, because it explains why DOJ has been unable to make essential

5  *factual* allegations here.

6        Put simply, the Amended Complaint lacks the essential allegations because

7  DOJ knows the true facts: namely, that CMS has been aware of errors in coding

8  data submitted by United (and every MA insurer) and has never once sought to

9  withhold payment.  And while at times in this litigation DOJ has asserted that it

10  should have the final say about how the Medicare Advantage program operates, it

11  is CMS that has the statutory authority to run that program and decide what kinds

12  of alleged violations warrant withholding payment.  DOJ cannot override that

13  authority by converting an alleged regulatory violation the client agency *itself* has

14  deemed immaterial into a vehicle for imposing draconian penalties and fines under

15  the False Claims Act.  Because DOJ does not and cannot allege that CMS would

16  have withheld payment if it had known the facts, the Amended Complaint should

17  be dismissed in its entirety.

18        Seeking to avoid that outcome, DOJ asserts a *new* "First Claim for Relief" in

19  the Amended Complaint under 31 U.S.C. § 3729(a)(1)(G), the so-called "reverse

20  false claims" provision of the False Claims Act.  DOJ alleges there that even if

21  CMS would not have denied payment if it had known the facts, CMS's computer

22  system would have automatically accepted repayment if *United* had voluntarily

23  cancelled its claims.  As a result, DOJ asserts, United's failure to rescind its claims

24  was "inexorably material."  That novel and unsupported theory ignores that

25  materiality is determined by how the *government* would have responded if it knew

26  the facts, not by what would have happened if the defendant in a False Claims Act

27  case had voluntarily repaid claims.  Otherwise, DOJ could convert literally any

28  alleged regulatory violation, however immaterial, into a reverse false claim case

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

2

MEM. IN SUPPORT OF MOTION TO DISMISS
CASE NO. CV 16-08697-MWF

Exhibit M
Page 22

1  simply by alleging that if the defendant had mailed the government a check for

2  repayment, the government would have cashed it.  To borrow the Supreme Court's

3  recent language, "[t]he False Claims Act does not adopt such an extraordinarily

4  expansive view of liability."  *Universal Health Servs., Inc. v. United States ex rel.*

5  *Escobar*, 136 S. Ct. 1989, 2004 (2016).  This portion of Section 3729(a)(1)(G)

6  does not, in any event, even apply to overpayments DOJ alleges United received

7  and had knowledge of before May 2009, when the language was added to the False

8  Claims Act and made expressly prospective.

9      For these reasons, the Court should dismiss the Amended Complaint.[1]  And

10  given that DOJ was aware of the importance of pleading "that CMS would have

11  refused to make risk adjustment payments to the United Defendants if it had

12  known the facts" yet was unable after a month-long amendment process to make

13  that indispensable allegation in good faith, the dismissal should be with prejudice.

## BACKGROUND

### A.    *Medicare Advantage And Risk Adjustment*

16      The Medicare Act establishes a federal health insurance program for

17  disabled and elderly individuals.  Parts A and B of the Act create the traditional

18  Medicare program.  *See* 42 U.S.C. § 1395c *et seq.*; *id.* § 1395j *et seq.*  Beneficiaries

19  enrolled in traditional Medicare receive healthcare from a network of healthcare

20  providers, including doctors, hospitals, and other medical professionals, whom

21  CMS reimburses based on the claims those professionals submit for the services

---

[1]  The United States has intervened in this case as to all of the claims brought against United, and its Amended Complaint is therefore the operative complaint. Relator Benjamin Poehling has indicated that he does not intend to pursue any claims beyond those asserted by the United States, *see* ECF No. 117 at 2, and has agreed that there is no need for United to respond to his Second Amended Complaint.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

3

MEM. IN SUPPORT OF MOTION TO DISMISS
CASE NO. CV 16-08697-MWF

Exhibit M
Page 23

396
Exhibit 3

1  they render.  For this reason, traditional Medicare beneficiaries are often referred
2  to as fee-for-service ("FFS") beneficiaries.

3        This case concerns the Medicare Advantage program created under Part C of
4  the Medicare Act.  *See id*. § 1395w-21 *et seq*.  Medicare Advantage (sometimes
5  referred to here as "MA") allows individuals eligible for traditional Medicare to
6  receive healthcare benefits through private insurance plans instead.  Under the MA
7  program, private insurers like United are responsible for covering at least the same
8  level of benefits as traditional Medicare, and for ensuring that providers are paid
9  for their services.  In return, CMS makes fixed (or "capitated") per-member-per-
10  month payments to the MA plans—effectively insurance premiums.  *See generally*
11  *id*. § 1395w-23.

12        As with other types of insurance, it costs more to insure sicker beneficiaries
13  or beneficiaries who are projected to be sicker in the near future than healthier
14  beneficiaries.  The Medicare Advantage program addresses that fact through an
15  annual risk adjustment process. Each year, an MA plan signs a contract with CMS
16  in which it agrees on the payment it will require from CMS to provide the benefits
17  covered by Medicare Parts A and B to a Medicare "enrollee with a national
18  average risk profile."   *Id.*  § 1395w-24(a)(6)(A);  *see also*  42  C.F.R.
19  § 422.254(b)(1).  That payment amount generally must be less than or equal to
20  CMS's actual costs for providing healthcare to an average FFS beneficiary in the
21  same area.  42 U.S.C. § 1395w-23(a)(1)(B).  CMS then adjusts that payment
22  amount to reflect the level of risk posed by the MA plan's actual beneficiaries.  If
23  the MA plan's beneficiaries are more risky than average, the plan's payment
24  amount will go up; if they are less risky, it will go down.

25        CMS designed, and implemented, a model to determine how much to pay an
26  MA plan in each year.  It was, and is, predicated on an analysis of medical
27  diagnosis codes, which are numerical codes used by doctors and other medical
28  professionals on  claims  and other  forms  to  designate  a  particular  medical

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

4

MEM. IN SUPPORT OF MOTION TO DISMISS
CASE NO. CV 16-08697-MWF

Exhibit M
Page 24

1   diagnosis.  *See* Compl. ¶ 63.  Using the diagnosis codes and cost data for its own

2   FFS beneficiaries, CMS predicts how much it will cost an MA plan to care for a

3   beneficiary who has a given diagnosis code.[2]  The model might indicate, for

4   example, that Medicare beneficiaries who have a diagnosis code for diabetes cost

5   30 percent more to care for in the FFS program (on average) than they would if

6   they did not have that code.  CMS assumes that MA plans will see a similar

7   relationship between diagnosis codes and medical costs, and so it uses the analysis

8   of its own FFS program codes and costs to adjust MA plans' payment amounts as

9   well.  Thus, roughly speaking, an MA plan would receive an incremental payment

10   of 30 percent of its agreed-upon payment amount for each of its patients with the

11   diabetes code, in order to account for the increased risk associated with that code.

12   CMS's model relies entirely on the codes it receives from third-party providers

13   and, more importantly, CMS knows that a substantial number of those codes are

14   not supported in the underlying medical charts.  Indeed, the projected payments

15   assume that some of the codes reflect conditions that the patient does not actually

16   have.

17       DOJ's allegations here concern United's submission of risk adjustment data

18   generated by the medical professionals who treat United's MA plan members.

19   Although the Complaint is exceedingly detailed in some respects, it boils down to

20   the theory that United submitted risk adjustment codes that did not accurately

21   measure the risk of its patient population because the codes lacked adequate

22   support in the associated *medical charts* of its members.  *See, e.g.*, Compl. ¶¶ 11-

23   12.  In simplest terms, DOJ claims that United knew, or should have known, that

24   the third party coding it passed along to CMS contained errors.  DOJ notes that

25   ─────────────────────────

26   [2]   United's motion for summary judgment in its APA case explains CMS's risk-
      adjustment model in greater detail.  *See* United's Mem. in Supp. of Mot. for

27   Summ. J. 9-12, *UnitedHealthcare Insurance Co. v. Price*, No. 1:16-cv-00157
      (D.D.C. Oct. 17, 2017), ECF No. 47-1.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

5

MEM. IN SUPPORT OF MOTION TO DISMISS
CASE NO. CV 16-08697-MWF

Exhibit M
Page 25

398
Exhibit 3

1  United reviewed the medical charts of some of its plan members to find additional

2  codes that *should* have been submitted (but were not), and claims that this review

3  process put United on notice of the codes that should *not* have been submitted (but

4  were). *See, e.g.*, *id.* ¶¶ 12-13.[3]  DOJ further alleges that United violated the False

5  Claims Act when it submitted Attestations certifying that the codes it had

6  submitted were accurate to the best of its knowledge, information, and belief. *See,*

7  *e.g.*, *id.* ¶¶ 98-102 (allegations about Attestations); *id.* ¶¶ 345-46 (identifying

8  Attestations as basis for Second Claim for Relief); *id.* ¶¶ 349-50 (identifying

9  Attestations as basis for Third Claim for Relief); *id.* ¶¶ 353-54 (identifying

10  Attestations as basis for Fourth Claim for Relief).

11     Long before this False Claims Act suit was filed, CMS and the health

12  insurance industry began a discussion of their own over the existence and

13  implications of unsupported diagnosis codes in their respective sets of data.

14  Insurance providers have argued that unsupported codes submitted by MA plans

15  simply offset the unsupported codes similarly submitted by providers in the FFS

16  program, such that MA plans would actually be *under*paid if they were required to

17  delete codes that lacked support in their members' charts.  DOJ has repeatedly

18  framed its allegations as showing that United has been paid for conditions that its

19  plan members do not have (and will no doubt offer that framing again here).  But

20  the reality is that CMS knew full well that some diagnosis codes reflect conditions

---

21
22  [3]   While United is required to accept DOJ's factual allegations for purposes of this
23  motion, it vigorously disputes the suggestion that merely because a retrospective
   chart reviewer doing a "blind" chart review did not identify every diagnosis code
24  that the provider's own coder had found, the provider's own codes were
   necessarily wrong or suspect.  There are many reasons that the billing staff in a
25  doctor's office might capture a code that a later reviewer would not, such as greater
26  familiarity with the doctor's handwriting or recordkeeping practices.  And given
   that medical charts of Medicare-eligible patients often span dozens, and sometimes
27  even *hundreds*, of pages, it would be remarkable if either the first *or* second coder
28  consistently captured every code that was supported in a given patient's charts.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

6

MEM. IN SUPPORT OF MOTION TO DISMISS
CASE NO. CV 16-08697-MWF

Exhibit M
Page 26

399
Exhibit 3

1    that patients do not have, and it built the presence of those codes into its payment
2    system.

3           The payments that CMS makes to MA plans are lower than they otherwise
4    would be because they already take into account the existence of unsupported
5    diagnosis codes throughout the health system.  When CMS calculates the average
6    incremental cost associated with a given code in the FFS program, it does not
7    confirm that its FFS diagnosis codes seen in claims are supported by associated
8    medical charts.  Some of the patients CMS uses to calculate the average cost
9    associated with a diagnosis code thus do not actually have the condition with
10   which the code is associated.  This reduces the cost associated with the code
11   compared to a hypothetical model in which only patients with *verified* codes were
12   included.  MA plans have argued that it would violate basic principles of actuarial
13   science—and the Medicare Act itself—to use the risk associated with *unverified*
14   codes in the FFS population to determine payment amounts for *verified* codes in
15   the MA population.  More concretely, doing so would result in a windfall to CMS,
16   which reduces its per-code payments in the first place because of the presence of
17   unsupported codes, and would then recover essentially that same money a second
18   time by requiring plans to delete any codes that are not supported.

19          At times, CMS has acknowledged the merit of that position, which is
20   directly contrary to DOJ's theory in this case.  The most notable instance came in
21   connection with CMS's Risk Adjustment Data Validation ("RADV") audits,
22   through which CMS identifies and recovers overpayments it has made to MA
23   plans.  In 2008, CMS announced its intent to use RADV audits on samples of MA
24   plans' diagnosis codes to estimate the plans' overall rates of unsupported codes,
25   and to then reduce the plans' overall payment amounts in a way that would
26   effectively deny them payment for unsupported codes.  *See* 2009 Proposed RADV
27   Rule, 74 Fed. Reg. 54,634, 54,674 (Oct. 22, 2009).  The plans responded that doing
28   so would leave the plans underpaid, for the reasons explained above.  *See, e.g.*,

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

7

MEM. IN SUPPORT OF MOTION TO DISMISS
CASE NO. CV 16-08697-MWF

Exhibit M
Page 27

1  Aetna Inc. Comments on Proposed Payment Error Calculation Methodology for
2  Part C Organizations Selected for Contract-Level RADV Audits at Exhibit 1, p.
3  21-25; Humana Comment on RADV Sampling and Error Calculation Methodology
4  at Exhibit 2, p. 42-45.[4]   And CMS eventually agreed.  Internally, its Division of
5  Payment Validation determined that MA plans would be undercompensated unless
6  CMS accounted for its own use of diagnosis codes from FFS "beneficiaries who
7  don't actually have the disease," which "tends to reduce the estimated average cost
8  of various conditions" that CMS uses to calculate risk adjustment payments.
9  United's Motion to Supplement the Administrative Record 13, *UnitedHealthcare*
10 *Insurance Co. v. Price* ("*UnitedHealthcare v. Price*"), No. 1:16-cv-00157-RMC
11 (D.D.C. Oct. 2, 2017), ECF No. 44 (quoting agency briefing materials released
12 under FOIA attached as Exhibit C thereto, ECF No. 44-4).   Following that
13 determination, CMS announced that it would develop a "FFS adjuster" for use in
14 its RADV audits that would "account[] for the fact that the documentation standard
15 used in RADV audits to determine [an MA] contract's payment error (medical
16 records) is different from the documentation standard used to develop the Part C
17 risk-adjustment model (FFS claims)."   CMS, Notice of Final Payment Error
18 Calculation Methodology (Feb. 24, 2012), https://www.cms.gov/Research-
19 Statistics-Data-and-Systems/Monitoring-Programs/recovery-audit-program-parts-
20 c-and-d/Other-Content-Types/RADV-Docs/RADV-Methodology.pdf.
21      To be sure, CMS has not *always* agreed entirely with the MA plans'
22 approach.  As this Court knows, United brought an administrative lawsuit in the
23
24 [4]   The regulatory comments cited in this brief, which are attached as Exhibits to
25 the accompanying Declaration of David J. Schindler for ease of reference, have all
26 been designated by CMS as part of the administrative record in the pending
   Administrative Procedure Act suit that raises these issues, *UnitedHealthcare*
27 *Insurance Co. v. Price* ("*UnitedHealthcare v. Price*"), No. 1:16-cv-00157-RMC
28 (D.D.C.).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

8

MEM. IN SUPPORT OF MOTION TO DISMISS
CASE NO. CV 16-08697-MWF

Exhibit M
Page 28

1   U.S. District Court for the District of Columbia challenging a 2014 CMS rule that

2   relies on the same theory that DOJ is pursuing here, and wholly fails to account for

3   errors in FFS data when assessing overpayment amounts.  *See UnitedHealthcare v.*

4   *Price*, Order Denying Motion to Transfer 3-4, ECF No. 154 (discussing APA suit).

5   Again, the merits of that dispute are not presently before this Court.[5]  For present

6   purposes, the important point is that CMS has been aware of and engaged in this

7   ongoing debate for a long time—and that its views have, at times, departed sharply

8   from the understanding on which DOJ's theory here rests.  That reality helps to

9   explain why DOJ has been unable to allege that if CMS had known the "truth"

10  about United's risk adjustment data Attestations and the alleged absence of chart

11  support for United's diagnosis codes, it would have refused to pay United's claims.

12      **B.     *The Government's Initial Complaint***

13      *Qui tam* relator Benjamin Poehling filed this False Claims Act case in the

14  Western District of New York in 2011.  *See* First Am. Compl., ECF No. 8.  DOJ

15  then spent more than five years deciding whether to pursue the case, ultimately

16  opting to intervene in late 2016 after the Ninth Circuit reversed the dismissal of a

17  different False Claims Act case against United involving risk adjustment.  *See*

18  *United States ex rel. Swoben v. United Healthcare Ins. Co.*, 832 F.3d 1084 (9th

19  Cir.), *amended on reh'g*, 848 F.3d 1161 (9th Cir. 2016).  Expressly declaring its

20  desire to avoid "inconsistent judicial decisions," DOJ asked the Western District of

21  New York on November 7, 2016 to transfer Poehling's suit to this District.

_____

23  [5]   United and the Secretary of Health and Human Services have already filed
24  lengthy cross-motions for summary judgment in that case, where the District Court
    has before it a 12,000-page Administrative Record that covers the past instances in
25  which CMS has taken differing approaches on the question.  *See UnitedHealthcare*
    *v. Price*, United's Mem. in Supp. of Mot. for Summ. J., ECF No. 47-1;
26  *UnitedHealthcare v. Price*, Defs.' Mem. in Supp. of Cross-Mot. for Summ. J., ECF
27  No. 57-1.  America's Health Insurance Plans is also supporting United in that case
    as an amicus, presenting the views of the insurance industry more widely.
28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

9

MEM. IN SUPPORT OF MOTION TO DISMISS
CASE NO. CV 16-08697-MWF

Exhibit M
Page 29

1  Memorandum of Law In Support of Unopposed Motion of the United States to

2  Transfer Venue 6, ECF No. 49.  The Western District of New York agreed, *see*

3  ECF No. 50, and DOJ thereafter formally intervened in the case and filed a

4  Complaint-In-Intervention on May 16, 2017.  *See* ECF No. 114.  The complaint

5  contained five counts—three counts asserting claims under the False Claims Act,

6  and two asserting tag-along common law claims for Unjust Enrichment and

7  Payment By Mistake.  *Id.* ¶¶ 234-52.

8     In July 2017, United moved to transfer this case to the District of Columbia,

9  where it could be coordinated with United's pending APA action.  *See* ECF No.

10 134.  This Court denied that motion on September 28, 2017, and ordered United to

11 respond to DOJ's Complaint within 20 days.  *See* ECF No. 154 at 12; *see also* ECF

12 No. 133.

13     **C.**     ***Judge Walter's Dismissal Of The* Swoben *Complaint And DOJ's***
14              ***Resulting Amendment In This Case***

15     An intervening event interrupted that schedule.  On October 5, 2017, Judge

16 Walter issued a decision dismissing DOJ's claims against United in *Swoben*—the

17 case that led DOJ to seek a transfer to this District in the first place in order to

18 avoid inconsistent judicial decisions.  *See Swoben*, 2017 WL 4564722, at *1-9.

19 Judge Walter held (among other things) that DOJ's *Swoben* complaint "fail[ed] to

20 allege that CMS would have refused to make risk adjustment payments to the

21 United Defendants if it had known the facts about the United Defendants' alleged

22 involvement with the . . . chart review process" at issue there.  *Id.* at *6.  Under the

23 Supreme Court's decision in *Escobar*, Judge Walter held, that was fatal:  In order

24 to survive a motion to dismiss, DOJ was required to plead "that [CMS] would not

25 have paid these claims had it known of these violations."  *Id.* (quoting *Escobar*,

26 136 S. Ct. at 2004).

27     Judge Walter granted DOJ leave to amend its complaint in order to attempt

28 to plead adequately that CMS would not have paid the claims in question.  *Id.*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

10

MEM. IN SUPPORT OF MOTION TO DISMISS
CASE NO. CV 16-08697-MWF

Exhibit M
Page 30

403
Exhibit 3

1   DOJ instead elected to dismiss its claims against United in the *Swoben* suit in their

2   entirety.  Notice of Dismissal Without Prejudice Pursuant to Federal Rules of Civil

3   Procedure 41(a) or (c), *Swoben* (C.D. Cal. Oct. 12, 2017), ECF No. 341.

4        Following the *Swoben* dismissal, United and DOJ conferred about United's

5   upcoming motion to dismiss in this case.  United expressed its intent to make a

6   nearly identical materiality argument regarding the deficiencies in DOJ's

7   complaint here.  DOJ responded that it planned to file an amended Complaint-in-

8   Intervention.  *See* ECF No. 165 at 1.  The parties thereafter agreed to, and this

9   Court approved, a month-long extension that would allow DOJ adequate time to

10   file an amended complaint.  *See* ECF No. 166.

11        On November 17, 2017, DOJ filed the Amended Complaint, which added a

12   new lead count.  *See* ECF No. 171.  The "First Claim for Relief" in the Amended

13   Complaint now asserts violations of the "second part" of the so-called "Reverse

14   False Claims" provision of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).  *Id.*

15   ¶¶ 341-42.  DOJ appears to have made that provision the basis for its new first

16   count because it was not directly at issue in Judge Walter's recent *Swoben*

17   dismissal (having been waived before the Ninth Circuit) and does not depend—at

18   least according to DOJ—on the materiality of United's Attestations.  *See Swoben,*

19   2017 WL 4564722, at *7-8; Compl. ¶ 342 (making no mention of United's

20   Attestations, unlike the other three False Claims Act counts).

21                     **ARGUMENT**

22   **I.    DOJ Still Fails Adequately To Allege That The Challenged Conduct**

23        **Was Material To The Government's Decision To Pay United**

24        The Amended Complaint fails adequately to allege that United's supposed

25   regulatory violations were material to CMS's decision to pay United.  As with its

26   complaint in *Swoben*, the Amended Complaint here repeatedly affixes the

27   "material" *label* to those alleged violations, *see, e.g.*, Compl. ¶¶ 334-35, but fails

28   ever to allege that CMS would not have paid United's claims if it had known the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

11

MEM. IN SUPPORT OF MOTION TO DISMISS
CASE NO. CV 16-08697-MWF

Exhibit M
Page 31

404
Exhibit 3

1   "truth" (as DOJ alleges it) about the accuracy of United's Risk Adjustment

2   Attestations. As with its complaint in *Swoben*, therefore, the Amended Complaint

3   here should be dismissed in its entirety for that basic pleading deficiency.

4   Moreover, because DOJ was plainly on notice of the need to include such

5   allegations, and took a month to do all it could to shore up its allegations following

6   the *Swoben* dismissal (after a years-long investigation to ascertain the facts), the

7   dismissal should be with prejudice.

8          **A.      DOJ Was Required To Plead That But For The Supposed**
               **Violations, CMS Would Not Have Paid The Relevant Claims**
9

10         The Supreme Court held in *Escobar* that, in order to be actionable under the

11   False Claims Act, a "misrepresentation must be material to the other party's course

12   of action," which generally means "the Government's payment decision." 136 S.

13   Ct. at 2001, 2002.[6] This "materiality standard is demanding." *Id.* at 2003. The

14   fact that the government "would have the option to decline to pay if it knew of the

15   defendant's noncompliance," the Court held, is not "sufficient for a finding of

16   materiality." *Id.* Even where the government has "designate[d] compliance with a

17   particular statutory, regulatory, or contractual requirement as a condition of

18   payment," that is insufficient. *Id.* A complaint must instead allege factually, as a

19   matter of "'likely or actual behavior'" rather than mere legal entitlement, "that the

20   [government] would not have paid these claims had it known of these violations."

21   *Id.* at 2002, 2004 (citation omitted); *see also id.* at 2003 n.5 (recognizing that

22   plaintiff must allege that if the false statement "had . . . not been made, the party

23   complaining of the fraud *would not have taken* the action alleged to have been

24   induced by the misrepresentation" (emphasis added)).

25   _____

26   [6]   The same materiality requirement also applies to DOJ's common law claims for

27   unjust enrichment and payment by mistake. *See, e.g.*, *United States v. Mead*, 426

28   F.2d 118, 124 (9th Cir. 1970).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

MEM. IN SUPPORT OF MOTION TO DISMISS
CASE NO. CV 16-08697-MWF

Exhibit M
Page 32

Exhibit 3

1    The Supreme Court also made clear that this "rigorous materiality
2    requirement" should be enforced vigilantly at the motion-to-dismiss stage,
3    specifically directing that "False Claims Act plaintiffs must . . . plead their claims
4    with plausibility and particularity under Federal Rules of Civil Procedure 8 and
5    9(b) by, for instance, pleading facts to support allegations of materiality."  *Id.* at
6    1996, 2004 n.6.  In the year-and-a-half since *Escobar*, courts have done just that.
7    *Swoben* is one obvious (and directly applicable) example, *see* 2017 WL 4564722,
8    at *6, but there are many others.  In *United States ex rel. Dresser v. Qualium
9    Corp.*, for example, the Northern District of California dismissed a DOJ complaint
10   that "allege[d] in several places that the government would not have paid
11   Defendants' claims had they known of fraudulent conduct" because the complaint
12   "d[id] not explain why."  No. 5:12-cv-0745-BLF, 2016 WL 3880763, at *6 (N.D.
13   Cal. July 18, 2016).  And in *United States ex rel. Mateski v. Raytheon Corp.*, Judge
14   Wright held that an allegation that "'[t]he United States would not have paid
15   Raytheon's Requests for Payment if the United States Government knew . . . that
16   Raytheon had not performed . . . in conformity with the requirements and
17   specifications of the . . . Contract'" was "'insufficient'" because "it does not show
18   *how* Raytheon's misrepresentations were material."  No. 2:06-cv-03614-
19   ODW(KSx), 2017 WL 3326452, at *7 (C.D. Cal. Aug. 3, 2017) (citations omitted).
20   If generic allegations that the government would not have paid are insufficient
21   under *Escobar*, it necessarily follows that the wholesale failure even to make that
22   boilerplate allegation is insufficient as well.

23   **B.    *DOJ's Complaint Conspicuously Fails To Allege That CMS Would
24   Not Have Paid Had It Known About The Supposed "Falsity" Of
         United's Attestations***

25   The Amended Complaint falls well short of *Escobar*'s "demanding" and
26   "rigorous" standard.  While it includes bare-bones assertions that United's Risk
27   Adjustment Attestations were "material," *see, e.g.*, Compl. ¶ 349 ("Defendants

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

13

MEM. IN SUPPORT OF MOTION TO DISMISS
CASE NO. CV 16-08697-MWF

Exhibit M
Page 33

406
Exhibit 3

Case 2:16-cv-08697-FMO-SS   Document 422-3   Filed 06/22/21   Page 407 of 1177   Page ID
#:14481
Case 2:16-cv-08697-MWF-SS   Document 182   Filed 12/08/17   Page 21 of 28   Page ID #:2568

1    knowingly made, used, or caused to be made or used a false Risk Adjustment

2    Attestation material to a false or fraudulent claim . . . ."), it fails to allege (let alone

3    plausibly or with particularity) that CMS would have refused to make risk

4    adjustment payments to United if it had known the "facts" behind those

5    Attestations.

6        This deficiency is especially conspicuous because DOJ took a month to

7    attempt to bolster its allegations on precisely this point following Judge Walter's

8    decision in *Swoben*.  DOJ *knew* that if it hoped to preserve its claims based on the

9    materiality of the Attestations, it needed to allege that CMS would not have paid

10   had it known that the Attestations were false.  *Swoben*, 2017 WL 4564722, at *6.

11   The only explanation for its failure to make that allegation is that it *cannot* make it

12   without running afoul of the good faith pleading requirements of Rule 11.

13       The government has known of Poehling's claims for six years, and has

14   investigated those allegations exhaustively.  Indeed, some of the sources DOJ cites

15   to show that United was on notice of the supposed falsity of its claims were CMS

16   audits.  *See, e.g.*, Compl. ¶ 155.  If those audits were sufficient to put United on

17   notice of the supposed falsity, then they were sufficient to put CMS on notice as

18   well.  And at the very least, it is "difficult[ to] understand[] how the [government]

19   remained unaware that the claims were false after the lawsuit was filed."  *City of*

20   *Chicago v. Purdue Pharma L.P.*, 211 F. Supp. 3d 1058, 1079 (N.D. Ill. 2016).  Yet

21   CMS has continued to make risk adjustment payments to United, without ever

22   once holding back a payment because of doubts about whether United's

23   Attestations are accurate.  DOJ cannot plausibly allege that CMS would not pay

24   United on these claims because it knows full well that CMS *is* paying them.

25       Instead, this case is a clear example of DOJ pressing a theory that is at odds

26   with—or at the very least unsupported by—the government agency that is actually

27   charged with responsibility for deciding whether to pay the claims in question.  *Cf.*

28   *United States v. BAE Sys. Tactical Vehicle Sys., LP*, No. 15-12225, 2017 WL

LATHAM&WATKINS℠
ATTORNEYS AT LAW
LOS ANGELES

14

MEM. IN SUPPORT OF MOTION TO DISMISS
CASE NO. CV 16-08697-MWF

Exhibit M
Page 34

407
Exhibit 3

1457493, at *2 (E.D. Mich. Apr. 25, 2017) (describing DOJ's decision to pursue False Claims Act suit even after Army withdrew underlying contract claim on which False Claims Act allegations were based).  As discussed above, at least some senior CMS officials have long agreed with United's position that MA plans would be underpaid if—as DOJ's theory here would effectively require—they were paid only for *verified* diagnosis codes, but using payment amounts calculated with *unverified* FFS data.  *See supra* at 6-8.  United and CMS are currently litigating that issue in an important APA challenge, and the dispute stretches back to well before Poehling's *qui tam* complaint was first filed in 2011.  *See, e.g.*, American Academy of Actuaries Comment on RADV Sampling and Error Calculation Methodology at Exhibit 3, p. 69-70; Aetna Inc. Comments on Proposed Rule Regarding Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs, at Exhibit 4, p. 89; America's Health Insurance Plans Comment on Proposed Rulemaking Regarding Medicare Program; Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs, at Exhibit 5, p. 141-42.  And United employees have repeatedly discussed these issues with senior leadership at CMS, as the Complaint itself painstakingly acknowledges.  *See* Compl. ¶¶ 224-29.

DOJ has sought to insert itself as the relevant decision-maker in this process.  In its initial complaint, it went so far as to assert that because DOJ was not present at United's meetings with CMS, the senior CMS officials who participated "were not authorized to provide legal advice about United's obligations under the FCA *or any other laws*," including the Medicare Act.  First Complaint-in-Intervention ¶ 183, ECF No. 114 (emphasis added).  But arguments like that one cannot change the fact that it is CMS, not DOJ, that administers the Medicare Advantage program, and thus CMS, not DOJ, that decides whether an asserted regulatory violation is one over which the government will withhold payment.  That is

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

15

MEM. IN SUPPORT OF MOTION TO DISMISS
CASE NO. CV 16-08697-MWF

Exhibit M
Page 35

408
Exhibit 3

1    likewise why DOJ cannot allege consistent with Rule 11 that the government

2    would not have paid United's claims if it had known the facts about United's

3    Attestations that DOJ now asserts.

4        Without that allegation, *Escobar* requires dismissal of DOJ's claims based

5    on the Attestations. *See* 136 S. Ct. at 2004. As in *Swoben*, DOJ's failure to allege

6    adequately that the supposed falsity of United's Attestations was material to

7    CMS's decision to pay dooms each of those Counts. *See* Compl. ¶ 345 (Second

8    Claim for Relief, asserting liability under 31 U.S.C. § 3729(a)(1)(A) and its

9    predecessor provision based on "a false or fraudulent Risk Adjustment

10   Attestation"); *id.* ¶ 349 (Third Claim for Relief, asserting liability under 31 U.S.C.

11   § 3729(a)(1)(B) and its predecessor provision based on "a false Risk Adjustment

12   Attestation"); *id.* ¶ 353 (Fourth Claim for Relief, asserting liability under 31 U.S.C.

13   § 3729(a)(1)(G) and its predecessor provision based on "a false Risk Adjustment

14   Attestation").

15       **C.**    ***DOJ's Allegation That CMS Would Have Accepted Repayments If***

16           ***United Had Deleted Unsupported Codes Cannot Establish The***
           ***Materiality Of Its Reverse False Claims Allegations***

17        Unable to establish that the Attestations' supposed falsity was material, DOJ

18   has tried to reshape its case around a new "reverse false claims" count that was not

19   considered in *Swoben*, by either the Ninth Circuit or in the materiality decision on

20   remand. *See* 848 F.3d at 1172 n.6 (noting that reverse false claims theory had been

21   waived); 2017 WL 4564722, at *7-8 (refusing to consider waived reverse false

22   claims theory on remand). As noted above, the First Claim for Relief of DOJ's

23   Amended Complaint is now a claim under "the second part of 31 U.S.C.

24   § 3729(a)(1)(G)," which DOJ has attempted to plead without reference to the

25   materiality of the Attestations. Compl. ¶ 342. Instead, DOJ focuses that first count

26   on the alleged falsity of *specific* diagnosis codes rather than (as in the other counts)

27   the Attestations. *Id.* And it pleads that the codes are "inexorably material to the

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

16

MEM. IN SUPPORT OF MOTION TO DISMISS
CASE NO. CV 16-08697-MWF

Exhibit M
Page 36

409
Exhibit 3

1    amount (if any) paid" because "[i]f Defendants had complied with their obligation

2    to delete invalid diagnoses . . ., Medicare's Risk Adjustment System . . . would

3    have processed the corrected data and recalculated the risk score . . .

4    automatically." *Id.* ¶¶ 333-34.

5         That novel and unsupported theory, if correct, would eviscerate the False

6    Claims Act's materiality requirement in every case.   As the Supreme Court

7    explained in *Escobar*, a proper materiality analysis focuses on the hypothetical

8    response of "the party complaining of the fraud"—*i.e.*, the government—if it had

9    known of the violations.   136 S. Ct. at 2003 n.5.   DOJ's Complaint, however,

10   focuses instead on hypothetical different actions that the *defendant*, United,

11   allegedly should have taken, and pleads that if United had attempted to return the

12   payments, then of course CMS "automatically" would have accepted them.

13   Compl. ¶¶ 333-34.  But that will always be true, regardless of the agency's view of

14   how important the underlying violation is.

15        *Escobar* itself illustrates the problem with DOJ's approach.   There, the

16   government conceded at oral argument that under its view of materiality, "[i]f the

17   Government contracts for health services and adds a requirement that contractors

18   buy American-made staplers, anyone who submits a claim for those services but

19   fails to disclose its use of foreign staplers violates the False Claims Act" because

20   "the defendant's use of foreign staplers would entitle the Government not to pay

21   the claim in whole or in part."   136 S. Ct. at 2004.   "The False Claims Act," the

22   Court responded, "does not adopt such an extraordinarily expansive view of

23   liability." *Id.*  It simply cannot be that the exact same use of foreign staplers would

24   result in a violation of the *reverse* false claims provision merely because the

25   government pleads that it would accept repayment if a contractor, having realized

26   that it had violated that contractual provision, mailed back a check or rescinded

27   previously submitted claims for payment.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

MEM. IN SUPPORT OF MOTION TO DISMISS
CASE NO. CV 16-08697-MWF

Exhibit M
Page 37

1    DOJ has tried similar arguments before, without success.  In *Knudsen v.*
2  *Sprint Communications Co.*, Judge Breyer considered a relator's allegations that a
3  telephone company had failed to provide discounts to the government required
4  under a "price reduction clause" of the government's contract.  Nos. C13-04476
5  CRB et al., 2016 WL 4548924, at *13 (N.D. Cal. Sept. 1, 2016).  The relator
6  argued that the reductions were "per se material" because they affected the price
7  the government would pay, *id.*, and DOJ argued in a statement of interest that the
8  materiality standard was "easily met" because a price reduction clause "dictates
9  how much the government pays" and is thus "manifestly material to the
10  government's payment decision," United States' Statement of Interest, *Knudsen* 4
11  (N.D. Cal. July 7, 2016), ECF No. 89.  Indeed, DOJ contended that it was "difficult
12  to imagine a violation that more clearly has a natural tendency to affect the
13  government's payment decision." *Id.*  Judge Breyer, however, dismissed the
14  complaint.  While it might have been possible that the price reduction clause was
15  material, he held, the complaint lacked factual allegations showing that this was *in
16  fact* true.  *Knudsen*, 2016 WL 4548924, at *13.  Merely pointing to the clause's
17  language and *potential* effect on the price the government would have paid, he
18  held, was not enough.  *See id.*  Instead, the complaint had to include factual
19  allegations of the sort that the Supreme Court identified in *Escobar* about the
20  actual effect on the government's behavior.  *See id.*  The exact same thing is true
21  here: DOJ's new First Claim for Relief lacks the necessary allegations that the
22  codes were not just potentially but *actually* material, and therefore should be
23  dismissed along with the rest of DOJ's claims.

24  **II.    DOJ's First Claim For Relief Does Not Apply To Alleged Overpayments
        Identified Before The 2009 Amendment To the False Claims Act**
25
26       DOJ's new First Claim for Relief also has an additional problem.  DOJ
27  appears to assert that claim with respect to conduct as far back as 2005, but the
28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

18

MEM. IN SUPPORT OF MOTION TO DISMISS
CASE NO. CV 16-08697-MWF

Exhibit M
Page 38

1    portion of the False Claims Act on which it relies applies only to overpayments

2    that United allegedly first learned of after May 20, 2009.

3        A central aspect of DOJ's theory is that when United undertook chart

4    reviews for the purpose of identifying additional diagnosis codes for submission to

5    CMS, those same reviews also put it on notice of codes that previously had been

6    submitted but that lacked adequate chart support. *See, e.g.*, Compl. ¶ 122.  DOJ

7    alleges that based on these chart reviews, United knew as far back as 2005 that it

8    supposedly had been overpaid for those codes, but "knowingly and improperly

9    avoided repaying Medicare" for them.  *Id.*   Until May 20, 2009, however,

10   "retention of overpayment did not create an obligation" and thus was not a basis

11   for liability under the False Claims Act.  *United States ex rel. Yannacopoulos v.*

12   *Gen. Dynamics*, 636 F. Supp. 2d 739, 752 (N.D. Ill. 2009), *aff'd*, 652 F.3d 818 (7th

13   Cir. 2011).    Even if DOJ otherwise were correct that United received

14   overpayments before then and failed to return them to the government, therefore,

15   that allegation would not state a claim.

16       As the Complaint describes, Congress amended the False Claims Act in the

17   the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21,

18   123 Stat. 1617, adding the portion of Section 3729(a)(1)(G) on which the First

19   Claim for Relief relies.  *See* Compl. ¶ 117.  Following that amendment, retention

20   of an overpayment *can* create an obligation, the improper avoidance of which can

21   be a basis for liability under Section 3729(a)(1)(G).   But Congress made that

22   amendment explicitly prospective, stating that it would apply only to "conduct on

23   or after the date of enactment"—*i.e.*, May 20, 2009.  *See* FERA, Pub. L. No. 111-

24   21, § 4(f), 123 Stat. at 1621; *see also, e.g.*, *United States ex rel. Ahumada v. NISH*,

25   756 F.3d 268, 280 n.7 (4th Cir. 2014) ("[T]he 2009 amendments are generally not

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

19

MEM. IN SUPPORT OF MOTION TO DISMISS
CASE NO. CV 16-08697-MWF

Exhibit M
Page 39

412
Exhibit 3

1   retroactive.").[7]  The FERA amendment did not transform United's past acceptance

2   and knowing retention of alleged overpayments into a retroactive basis for treble

3   damages under the False Claims Act.

4         Nor can DOJ avoid that result by arguing that retention of pre-May 2009

5   overpayments suddenly became a *prospective* offense upon FERA's enactment that

6   continues indefinitely until the obligation is repaid.  Courts have squarely rejected

7   that argument on the ground that the "relevant retroactivity event" is "the moment

8   a person comes to know of overpayments it is retaining."   *United States ex rel.*

9   *Stone v. OmniCare, Inc.*, No. 09 C 4319, 2011 WL 2669659, at *4 (N.D. Ill. July 7,

10   2011).  If the defendant knowingly retained a given overpayment before FERA's

11   enactment, therefore, then imposing liability for the "ongoing retention of

12   overpayments" after the amendment was adopted "would work an impermissibly

13   retroactive effect."  *Id.*; *see also* John T. Boese, *Civil False Claims and* Qui Tam

14   *Actions* § 5.01[B][3] (online 2017, 4th ed.).

15         To hold otherwise "would mean that any claim [a] Defendant has ever made

16   on the United States government would be subject to liability under the FCA, so

17   long as some money from that claim is somewhere in their coffers."  *Stone*, 2011

18   WL 2669659, at *4.  Indeed, construing Section 3729(a)(1)(G) to make retention

19   of past overpayments a continuing offense would effectively abolish the six-year

20   statute of limitations and ten-year statute of repose Congress enacted for the False

21   Claims Act as a whole.  *See* 31 U.S.C. § 3731(b).  That is true not only for the

22   reverse false claims provision itself, but for the other provisions of the False

23   Claims Act as well.  Any time-barred suit under Section 3729(a)(1)(A) concerning

24   the submission of a false claim, for example, could simply be resuscitated and

25

26   _____

27   [7]   The only exception is FERA's amendments to Section 3729(a)(1)(B), which
     Congress made applicable "as if enacted on June 7, 2008."  FERA, Pub. L. No.

28   111-21, § 4(f)(1), 123 Stat. at 1621.

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

20

MEM. IN SUPPORT OF MOTION TO DISMISS
CASE NO. CV 16-08697-MWF

Exhibit M
Page 40

413
Exhibit 3

1    redrafted as a suit under Section 3729(a)(1)(G) based on the defendant's *retention*

2    of the payment that that claim had generated, regardless of how long ago the

3    allegedly false claim had been paid.  There is no basis in the text of the statute, or

4    the legislative history, for believing that Congress intended that anomalous

5    result—and it is a "fair assumption that Congress is unlikely to intend any radical

6    departures from past practice without making a point of saying so."  *Jones v.*

7    *United States*, 526 U.S. 227, 234 (1999).  Instead, the "language and design of the

8    statute as a whole," *Household Credit Servs., Inc. v. Pfenning*, 541 U.S. 232, 239

9    (2004) (citation omitted), show that Congress did not silently add a "continuing

10   offense" provision to the False Claims Act that nullifies its statutes of limitations

11   and repose.

12                                    **CONCLUSION**

13         DOJ filed the Amended Complaint in an attempt to cure the deficiencies that

14   led *Swoben* to be dismissed.  It had every incentive to make the necessary

15   allegations about materiality here that had been lacking there.  And yet it failed to

16   do so.  It has failed adequately to allege that United's Risk Adjustment Attestations

17   (Counts 2-4) or the unsupported diagnosis codes themselves (Counts 1, 5, and 6)

18   were material.  And in trying (unsuccessfully) to find a way around that problem

19   that was not already rejected in *Swoben*, it has made the additional error of

20   invoking a legal provision that does not even apply to much of the time period

21   addressed in the Amended Complaint.  For all of these reasons, DOJ's Complaint

22   should be dismissed with prejudice.

23   Dated:  December 8, 2017          LATHAM & WATKINS LLP

24                                    DAVID J. SCHINDLER
                                      DANIEL MERON
25                                    ABID R. QURESHI

26

27                                    By /s/ David J. Schindler
                                         David J. Schindler
28                                       Attorneys for United Defendants

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

21

MEM. IN SUPPORT OF MOTION TO DISMISS
CASE NO. CV 16-08697-MWF

1    LATHAM & WATKINS LLP
         David J. Schindler (Bar No. 130490)
2          *david.schindler@lw.com*
     355 South Grand Avenue, Suite 100
3    Los Angeles, California 90071-1560
     Telephone: +1.213.485.1234
4    Facsimile: +1.213.891.8763

5    LATHAM & WATKINS LLP
         Daniel Meron (appearing *pro hac vice*)
6          *daniel.meron@lw.com*
         Abid R. Qureshi (appearing *pro hac vice*)
7          *abid.qureshi@lw.com*
     555 Eleventh Street, NW, Suite 1000
8    Washington, DC 20004-1304
     Telephone: +1.202.637.2200
9    Facsimile: +1.202.637.2201

10   Attorneys for United Defendants

11                 **UNITED STATES DISTRICT COURT**

12                 **CENTRAL DISTRICT OF CALIFORNIA**

13

| | |
|---|---|
| 14 | |
| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING, | CASE NO. 2:16-cv-08697-MWF(SSx) |
| 15 | |
| 16 | Assigned to Hon. Michael W. Fitzgerald |
| Plaintiff, | |
| 17 | **DECLARATION OF DAVID J. SCHINDLER IN SUPPORT OF UNITED'S MOTION TO DISMISS** |
| v. | |
| 18 | |
| UNITEDHEALTH GROUP, INC. *et al.*, | |
| 19 | Date:   January 29, 2018 |
| 20 | Time:   10:00 a.m. |
| Defendants. | Ctrm:   5A |
| 21 | |
| 22 | |

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

DECLARATION OF DAVID J. SCHINDLER ISO
UNITED'S MOTION TO DISMISS
2:16-cv-08697-MWF (SSx)

Exhibit M
Page 42

415
Exhibit 3

1    I, David J. Schindler, hereby declare as follows:

2    1.    I am an attorney with the law firm of Latham & Watkins LLP, counsel

3  of record for Defendant UnitedHealth Group Incorporated and its affiliated entities

4  named as Defendants in this action (collectively, "United Defendants").  I am

5  admitted to practice law in the State of California and am a member in good

6  standing of the bar of the United States District Court for the Central District of

7  California.  I submit this Declaration in support of United's Motion to Dismiss,

8  filed concurrently herewith.[1]

9    2.    Attached hereto as Exhibit 1 is a true and correct copy of Aetna Inc.

10  Comments on Proposed Payment Error Calculation Methodology for Part C

11  Organizations Selected for Contract-Level RADV Audits.

12    3.    Attached hereto as Exhibit 2 is a true and correct copy of Humana

13  Comment on RADV Sampling and Error Calculation Methodology.

14    4.    Attached hereto as Exhibit 3 is a true and correct copy of American

15  Academy of Actuaries Comment on RADV Sampling and Error Calculation

16  Methodology.

17    5.    Attached hereto as Exhibit 4 is a true and correct copy of Aetna Inc.

18  Comments on Proposed Rule Regarding Policy and Technical Changes to the

19  Medicare Advantage and the Medicare Prescription Drug Benefit Programs.

20    6.    Attached hereto as Exhibit 5 is a true and correct copy of America's

21  Health Insurance Plans Comment on Proposed Rulemaking Regarding Medicare

22  Program; Policy and Technical Changes to the Medicare Advantage and the

23  Medicare Prescription Drug Benefit Programs.

24

25

26

_____

27  [1] The following materials were submitted by the Centers for Medicare & Medicaid
   Services ("CMS") in the administrative record for *UnitedHealthcare Insurance Co.*
28  *v. Price*, No. 1:16-cv-00157-RMC (D.D.C.).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

2

DECLARATION OF DAVID J. SCHINDLER ISO
UNITED'S MOTION TO DISMISS
2:16-cv-08697-MWF (SSx)

Exhibit M
Page 43

1    I declare under penalty of perjury under the laws of the United States that

2  the foregoing is true and correct.  Executed on December 8, 2017, at Los Angeles,

3  California.

4

5                                                   /s/ David J. Schindler
                                                    _____
6                                                   David J. Schindler

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

3

DECLARATION OF DAVID SCHINDLER ISO
UNITED'S MOTION TO DISMISS
2:16-cv-08697-MWF (SSx)

Exhibit M
Page 44

417
Exhibit 3

# Exhibit 1

Exhibit M
Page 45

**Aetna Inc.'s Comments on Proposed Payment
Error Calculation Methodology for Part C Organizations
Selected for Contract-Level RADV Audits**

January 21, 2011

Aetna Inc. welcomes the opportunity to submit comments on the proposed sampling and error calculation methodology for conducting Risk Adjustment Data Validation ("RADV") audits that the Centers for Medicare & Medicaid Services ("CMS") published for comments on December 20, 2010.  While Aetna agrees that it is important to ensure accurate payments to Medicare Advantage ("MA") organizations, the process proposed by CMS will reduce, not increase, the accuracy of payments.  The proposed methodology is inconsistent with the Medicare Act requirement, as well as CMS's stated purpose for its RADV audits, to ensure that payments to MA organizations are based on the "health status" of the enrollees in their plans.

Aetna is one of the nation's leading diversified health care benefits companies, serving approximately 36.1 million people with information and resources to help them make better informed decisions about their health care.   Through its affiliates and subsidiaries, Aetna offers a broad range of traditional and consumer-directed health insurance products and related services, including HMO and PPO plans for eligible individuals in certain geographic areas through the Medicare Advantage program.  Aetna has offered MA plans since the early years of the program when Medicare Part C (formerly known as "Medicare+Choice") was first established under the Balanced Budget Act of 1997.  Aetna's MA members typically receive enhanced benefits over standard Medicare fee-for-service coverage, including reduced cost-sharing for preventive care,

005036

EXHIBIT 1 - 004

vision, and other services.  As of January 1, 2011, Aetna offered Medicare Advantage HMO and PPO plans in 128 counties and 28 states.

## INTRODUCTION

Under Part C of Title XVIII of the Social Security Act (the "Medicare Act"), the Secretary of Health and Human Services ("HHS") is required to make adjustments in payments to MA organizations based on the "health status" of the enrollees in their plans, to "ensure actuarial equivalence."[1]  This provision requires that, compared to a benchmark payment amount, MA organizations are to be paid a greater amount for an enrollee who is less healthy than the average Medicare beneficiary, and a lesser amount for an enrollee who is healthier than average.  Congress's purpose in requiring greater payments to MA organizations for enrollees who are less healthy than average was to ensure that these enrollees, who typically seek more medical services and incur greater medical costs, receive flexible and robust coverage through the Medicare program.[2]

CMS's methodology of making risk adjustments in payments to MA organizations based on diagnoses by their enrollees' medical providers is intended to fulfill this statutory mandate.  The stated purpose of the agency's RADV audits of those risk-adjusted payments is to verify that this "payment methodology has been applied correctly and the MA organization has received the amount to which it was entitled under this methodology."[3]  In reality, however, CMS's RADV audit process and proposed

---

[1]    42 U.S.C. § 1395w-23(a)(1)(C)(i).

[2]    See HEALTH CARE FINANCING ADMINISTRATION, OFFICE OF STRATEGIC PLANNING, REPORT TO CONGRESS: PROPOSED METHOD OF INCORPORATING HEALTH STATUS RISK ADJUSTERS INTO MEDICARE+CHOICE PAYMENTS 5-6 (Mar. 1, 1999) ("1999 Report"), available at http://www.cms.gov/MedicareAdvtgSpecRateStats/Downloads/RTC_RiskAdjusters1999.pdf.

[3]    Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs, 75 Fed. Reg. 19,678, 19,745 (Apr. 15, 2010) ("April 2010 Regulations").

2

005037

EXHIBIT 1 - 005

Exhibit M
Page 47

420
Exhibit 3

sampling and error calculation methodology would do the opposite, by retroactively adjusting payments to MA organizations based on a unique recordkeeping rule, not the health status of MA plans' members.

1.   **The One Best Medical Record Requirement Violates The Medicare Act And The Administrative Procedure Act.**   The proposed sample and error calculation methodology is flawed from the start because it incorporates the improper "One Best Medical Record" audit rule.[4]   Under the One Best Medical Record rule, numerous false discrepancies are identified in the agency's RADV audits.   A proper diagnosis by a treating physician will be deemed a "discrepancy" by CMS because a coder finds that there is not a single "best medical record" that meets various arbitrary and restrictive documentation standards unilaterally established by CMS specifically for the audit process.   The imposition of the One Best Medical Record requirement is invalid because the rule conflicts with the statutory mandate that MA payments be based on the "health status" of the enrollees in their plans, is inconsistent with current medical recordkeeping practices, and was never subject to proper rulemaking procedures.

2.   **The Proposed Methodology Violates Actuarial Principles By Failing To Ensure Consistency With The Fee-For-Service Program.**   CMS's RADV audit process also fails to consider coding practices in the fee-for-service ("FFS") program,

---

[4]      While CMS's December 20, 2010 notice relates primarily to the agency's proposed methodology for calculating payment error, the validity of that methodology depends on, and is intertwined with, additional features of the agency's RADV audit process.   As the notice acknowledges, for example, the agency's sampling methodology determines which MA enrollees will be subject to audit.   See Medicare Advantage Risk Adjustment Data Validation (RADV) Notice of Payment Error Calculation Methodology for Part C Organizations Selected for Contract-Level RADV Audits, Request for Comment, at 1-2 (Dec. 20, 2010) ("December 2010 Proposed Methodology").   The agency then applies its audit requirements and procedures to make enrollee-level determinations, to which the extrapolation methodology is applied to calculate contract-level payment errors.   Id. at 2-3.   Aetna has therefore included comments on features of CMS's underlying RADV audit process that are incorporated in the payment error calculation methodology, such as the agency's "One Best Medical Record" rule.

3

005038

EXHIBIT 1 - 006

Exhibit M
Page 48

421
Exhibit 3

despite the fact that CMS relies on coding from FFS claims to calibrate its risk-adjusted payments to MA organizations.  Under sound actuarial principles, it is impossible to know whether MA organizations have been paid accurately by conducting a review of the medical records supporting MA coding, without also considering the medical records supporting FFS coding.  CMS is therefore ignoring the statutory "actuarial equivalence" requirement, as well as the basic actuarial premise behind the risk adjustment methodology adopted by CMS.

3.      **The Proposed Sampling And Stratification Methodology Fails To Provide Data That Can Be Extrapolated To Make Payment Adjustments.**  CMS's proposed methodology for calculating payment error would take the agency's audit findings for a small sample of enrollees and extrapolate them to a broader contract-level population, thereby magnifying the impact of CMS's flawed audit requirements and reducing payments to MA organizations for enrollees who are less healthy than average. The application of the proposed methodology is therefore inconsistent with the Medicare Act.  In addition, there are numerous statistical flaws with the proposed sampling and error calculation methodology that are likely to further skew the contract-level error calculations and audit results.

4.      **The Error Calculation Methodology Conflicts With Current MA Contracts.**  If CMS fails to address these concerns, the agency's RADV audits will undermine the financial soundness of the Medicare Advantage program and interfere with existing contracts between MA organizations and CMS.  As Congress has recognized, the viability and proper functioning of Medicare Advantage depends on the principle that MA organizations should be paid accurately for the benefits and services

4

005039

EXHIBIT 1 - 007

Exhibit M
Page 49

422
Exhibit 3

they provide—particularly as to payments with respect to Medicare enrollees with serious medical conditions.  Yet CMS proposes to retroactively reduce those payments through its audit process.  Ultimately, the burden of CMS's invalid rules and methodologies will fall on Medicare beneficiaries, who will bear the increased costs of the new recordkeeping obligations imposed on providers by CMS's RADV audits.  In addition, by undermining the actuarial soundness of the MA program, CMS could even cause some beneficiaries to lose access to the flexible, affordable, and innovative services that the Medicare Advantage program provides.[5]

For these reasons, CMS's RADV audit processes and methodologies are arbitrary, outside the scope of CMS's authority, and inconsistent with the terms of MA organizations' contracts with CMS.  Aetna therefore requests that CMS withdraw the proposed payment error calculation methodology.  At a minimum, CMS should undertake a complete notice-and-comment rulemaking so that these issues may be addressed by all interested stakeholders.

---

[5]     See, e.g., H.R. Rep. No. 105-217, at 585 (1997) (Conf. Rep.) (discussing the enactment of Medicare+Choice, the precursor to Medicare Advantage, and stating that the program would "allow beneficiaries to have access to a wide array of private health plan choices in addition to traditional fee-for-service Medicare" and would "enable the Medicare program to utilize innovations that have helped the private market contain costs and expand health care delivery options"); H.R. Rep. No. 108-391, at 524-25 (2003) (Conf. Rep.) (observing that MA organizations must undergo a competitive bidding process, which "encourage[s] beneficiaries to enroll in the most efficient plan, producing savings for both beneficiaries, through reduced premiums, and for taxpayers, through relatively lower Medicare costs").

5

005040

EXHIBIT 1 - 008

Exhibit M
Page 50

Exhibit 3

<u>**COMMENTS**</u>

1.   <u>**The "One Best Medical Record" Rule Is Invalid And Produces Inaccurate Audit Results.**</u>

The starting point for any methodology designed to calculate payment error is the proper definition of an "error."[6]  Here, CMS's proposed methodology for calculating payment error is flawed because the agency's application of that methodology is premised on invalid and inaccurate determinations of what constitutes an error in the agency's RADV audits.

Specifically, CMS has limited its RADV audits to the consideration of the "One Best Medical Record" supporting each Hierarchical Condition Category ("HCC") submitted to the agency by an MA organization.[7]  According to the audit criteria specified by CMS, the one medical record must: (1) include a diagnosis supporting the HCC; (2) be recorded in a "single encounter for care" in which the physician or practitioner personally saw the member; (3) occur on a date of service within the audit data collection period; (4) include the physician or practitioner's credentials; and (5) be signed by the physician or practitioner who meets CMS criteria.[8]  A record that does not satisfy these requirements will not be considered to validate an HCC for an MA organization's member, whether or not the member is correctly diagnosed with the health condition corresponding to that HCC.  As described further below, CMS's One Best Medical Record rule is both substantively and procedurally deficient.

---

[6]      "Research teams sometimes restrict the role of sampling to the single question of sample size.  To improve the validity and reduce total error, the implications of sampling must be included throughout the study."  G.T. HENRY, PRACTICAL SAMPLING 15-16 (SAGE Publications 1990).

[7]      <u>See</u> 42 C.F.R. § 422.311(c)(2)(i)(B); April 2010 Regulations, 75 Fed. Reg. at 19,742-43, 19,748-49.

[8]      42 C.F.R. § 422.2 (defining "one best medical record"); <u>see also</u> April 2010 Regulations, 75 Fed. Reg. at 19,742-43, 19,748-49.

6

005041

EXHIBIT 1 - 009

Exhibit M
Page 51

424
Exhibit 3

    a)    <u>The One Best Medical Record Rule Results In Inaccurate Determinations Of The Health Status Of MA Enrollees.</u>

The One Best Medical Record rule violates the Medicare Act's requirement that payments to MA organizations accurately reflect enrollee "health status" because it unreasonably limits the types of supporting documentation that MA organizations may submit and that CMS will consider in RADV audits. The One Best Medical Record rule prevents consideration of alternative sources of information that are available to prove that a member has the condition diagnosed. Absent the One Best Medical Record rule, an HCC could be substantiated by a record from a prior year, or a sworn statement from a physician stating that the patient still had the condition during the audit year.

It makes no sense to eliminate these legitimate sources of information inasmuch as the stated purpose of the audit is to determine whether the individual actually had the condition identified by the HCC.[9] It is also arbitrary not to consider data and records that CMS itself maintains, and that can verify the health status of a Medicare beneficiary. For example, every time a Medicare beneficiary receives inpatient hospital treatment, a bill is generated and sent to CMS, even if the hospital is not seeking payment. These bills include diagnoses that CMS could use to verify these beneficiaries' HCCs.

The record before CMS demonstrates that the One Best Medical Record rule prevents consideration of information verifying the HCCs that have been assigned to MA enrollees and therefore results in erroneous adjustments to MA payments. Aetna, in responding to the 2007 RADV pilot audit, submitted additional documentation beyond the One Best Medical Record for many HCCs. These documents demonstrated that most

---

[9]    <u>Cf. Baystate Med. Ctr. v. Leavitt</u>, 545 F. Supp. 2d 20, 40-41 (D.D.C. 2008) (requiring HHS to consult numerous additional sources to satisfy the agency's obligation to calculate payments based on the "best available data").

7

005042

EXHIBIT 1 - 010

Exhibit M
Page 52

425
Exhibit 3

of the HCCs that CMS had challenged were properly assigned based on the providers' diagnoses; yet, under the One Best Medical Record rule, they were not considered by CMS. Indeed, CMS refused to consider numerous attestations by treating physicians that Aetna submitted during the audit process supporting particular HCCs, as well as numerous medical records that did not fit within CMS's overly restrictive rules.

Similarly, MA organizations are not permitted to introduce "new" HCCs in the course of the RADV audit process if the HCCs were not previously assigned to the enrollee being audited, and if the diagnoses supporting the HCCs do not appear on the One Best Medical Record reviewed by CMS.[10] Because random discrepancies between a clinical record and a claim form can result in either undercoding or overcoding on the claim form, a fair audit would allow for correction of all coding discrepancies. By rejecting the assignment of new HCCs that are supported by additional medical records, CMS's audit will not determine whether all of the correct HCCs were assigned to Medicare members, even if the HCCs should be supported by medical records). Instead, CMS's proposed audits will merely eliminate HCCs not validated by the One Best Medical Record. This approach unfairly skews the audit results.

The One Best Medical Record rule therefore undermines the stated purpose of the agency's risk adjustment methodology, to "strengthe[n] the Medicare program by ensuring that accurate payments are made to MA organizations based on the *health status*

---

[10] In the 2007 pilot audit, CMS permitted MA organizations to support HCCs within hierarchies (both higher and lower) if the medical documentation supported such an HCC, but not a different HCC than initially assigned. CMS did allow additional HCCs in the very limited circumstances where an additional HCC was coincidentally also included on the same One Best Medical Record. This limited allowance does not resolve the more significant issue of whether to credit a new HCC supported by other medical records.

005043

EXHIBIT 1 - 011

Exhibit M
Page 53

Exhibit 3

plus demographic characteristics of their enrolled beneficiaries."[11]   Indeed, the agency has justified its RADV audits by arguing that the audits ensure "accurate payment" to MA organizations and "improve the accuracy of the risk adjustment data."[12]   However, the current design of CMS's RADV audits actually ensures inaccurate payments to MA organizations, and is therefore inconsistent with the Medicare Act.   The One Best Medical Record rule tests a novel recordkeeping system rather than verifying the actual "health status" of MA enrollees.[13]

The One Best Medical Record requirement is also inconsistent with Congress's mandate that the Secretary of HHS obtain an evaluation by an outside actuary of the actuarial soundness of the risk adjustment system.[14]   The required report was developed by the Risk Adjustor Work Group of the American Academy of Actuaries and delivered to CMS on January 14, 1999.  The Academy report considered using diagnostic data from administrative sources (typically from claim records or encounter files), from clinical records (such as medical charts), and from surveys.[15]   The Academy report concluded that the administrative sources should be used:

> At this point in time, it is our experience as actuaries that
> clinical information from sources such as medical records

---

[11]     Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs, 74 Fed. Reg. 54,634, 54,673 (Oct. 22, 2009) ("2009 Proposed Rule") (emphasis added).

[12]     Id. at 54,674; April 2010 Regulations, 75 Fed. Reg. at 19,745, 19,747; see also 74 Fed. Reg. at 54,675 (citing § 1853(a)(3) of the Social Security Act (42 U.S.C. § 1395w-23(a)(3)) as authority for issuing RADV audit regulations).

[13]     42 U.S.C. § 1395w-23(a)(1)(C)(i).

[14]     42 U.S.C. § 1395w-23(a)(3)(A).

[15]     AMERICAN ACADEMY OF ACTUARIES, RISK ADJUSTOR WORK GROUP, ACTUARIAL REVIEW OF THE HEALTH STATUS RISK ADJUSTOR METHODOLOGY 30 (Jan. 14, 1999), available at http://www.actuary.org/pdf/medicare/hcfariskadj.pdf ("Based on our experience, there appear to be at least three main classes of models that meet the BBA requirement for health status-based payment," namely "[d]iagnostic-based models with data gained from administrative sources (typically from claim records or encounter files)," "[d]iagnostic information from clinical records, such as medical charts," and "[s]urvey-based health status information.").

005044

EXHIBIT 1 - 012

Exhibit M
Page 54

> and patient charts is nearly impossible to gather, except in the most manpower-intensive manner through actual chart audits, etc. As a result, models in this category are of great theoretical interest but of little practical help for the [MA] program.[16]

CMS, contrary to congressional mandate, has now chosen to ignore the Academy's judgment of the actuarial soundness of risk adjustment using administrative sources, by considering only clinical records and ignoring administrative sources under the agency's One Best Medical Record rule in RADV audits. CMS has not obtained a new independent actuarial report to justify its new rule and its decision to ignore the Academy report. Rather, CMS simply imposed the rule, contravening the clear opinion of the American Academy of Actuaries and the statutory mandate to pay MA plans based on an enrollee's health status.

    b)    The One Best Medical Record Rule Is Inconsistent With Physician Recordkeeping Practices.

The One Best Medical Record rule is also inconsistent with the real-world medical recordkeeping practices of providers and CMS's own rules on claims. Providers do not prepare their medical records to support a diagnostic condition as set forth in CMS's One Best Medical Record rule. Rather, providers write down information in the medical record that they believe is necessary for treatment. The medical record may not even include a diagnosis, much less the "magic words" that a CMS coder may look for as part of the RADV audit process. CMS has not cited any statute, rule, or regulation requiring a physician to maintain clinical records in a way that can later be interpreted by a coder to support an HCC. Instead, providers report diagnoses based on their medical determinations on CMS 1500 Health Insurance Claim Forms that the providers submit for

---

[16]    Id.

10

005045

EXHIBIT 1 - 013

Exhibit M
Page 55

428

Exhibit 3

payment. Yet, under the One Best Medical Record rule, CMS rejects clear diagnoses that are recorded only on claim forms, even if the medical record reports symptoms and conditions consistent with the diagnoses.

Provider recordkeeping practices vary widely, and CMS's rules fail to account for this reality. Providers may not use the narrative description of a diagnosis set forth in the ICD-9 in their medical records. For example, a podiatrist may note that a patient has diabetes and is being treated for foot problems. The medical record may not state that the patient had "[d]iabetes with peripheral circulatory disorders," the specific ICD-9 language, but the claim form will code the patient's condition as ICD-9 250.7, that very diagnosis. Any ambiguity regarding the diagnosis would be removed by considering the diagnosis on the claim form submitted by the provider.

Physicians also may record a diagnosis in a medical record by stating that a patient has a "history of" cancer or has symptoms "consistent with" a heart condition. These diagnoses can be confirmed by other medical records showing treatment for the conditions, or by claim forms. Pharmacy records and prescription drug data can also verify many chronic conditions, such as diabetes. In addition, hospital records may shed light on the member's condition whenever the medical record itself is not sufficiently clear. CMS precludes consideration of all these records in its RADV audits.

The One Best Medical Record rule is also inconsistent with CMS's own instructions. For example, CMS recognizes that a provider may misuse the "history of" description in a way that can cause an error in the diagnosis:

> A physician can make errors in one of two ways with
> respect to these codes. One error is to code a past condition
> as active. The opposite error is to code as "history of" a

11

005046

EXHIBIT 1 - 014

Exhibit M
Page 56

429
Exhibit 3

condition when that condition is still active. Both of these errors can impact risk adjustment.[17]

Yet, in its RADV audits, CMS will reject a physician's diagnosis set out on the claim form stating that the patient presently has the condition if the medical record states the patient has a "history of" the condition, without allowing for additional documentation that would help to verify the proper diagnosis.

Similarly, CMS recognizes the use of "alternative data sources (ADS)" by MA organizations to verify diagnoses for risk adjustment purposes, even though CMS arbitrarily refuses to consider ADS in its RADV audits.[18] CMS's 2008 Participant Guide specifically provided that "MA organizations may use ADS as a **check** to ensure that all required diagnoses have been submitted to CMS for risk adjustment purposes, such as pharmacy records and information provided to national or state cancer registries."[19] While these records alone are not sufficient to verify a diagnosis under CMS's rules, they should be allowed to supplement the record to verify a physician's diagnosis.

Moreover, the ICD Official Guidelines for Coding and Reporting, an authority for coding practices specified by CMS, state that "[t]he entire record should be reviewed to determine the specific reasons for the encounter and the conditions treated."[20] Contrary

---

[17] CENTERS FOR MEDICARE & MEDICAID SERVICES, 2007 RISK ADJUSTMENT DATA TRAINING FOR MEDICARE ADVANTAGE ORGANIZATIONS, PARTICIPANT GUIDE § 6.4.3.

[18] CENTERS FOR MEDICARE & MEDICAID SERVICES, 2008 RISK ADJUSTMENT DATA TECHNICAL ASSISTANCE FOR MEDICARE ADVANTAGE ORGANIZATIONS, PARTICIPANT GUIDE § 3.2.4 ("2008 Participant Guide").

[19] Id. (emphasis in original).

[20] ICD-10-CM OFFICIAL GUIDELINES FOR CODING AND REPORTING 1 (2010), available at https://www.cms.gov/ICD10/Downloads/7_Guidelines10cm2010.pdf; see also ICD-9-CM OFFICIAL GUIDELINES FOR CODING AND REPORTING 1 (2006), available at http://www.cdc.gov/nchs/data/icd9/icdguide10.pdf.

005047

EXHIBIT 1 - 015

Exhibit M
Page 57

to these instructions, CMS mandates a single best medical record be used to verify a diagnosis, rather than the "entire record."

The One Best Medical Record rule is also inconsistent with CMS's requirements in conducting audits under other Medicare programs.  There is no such rule for FFS providers.  To the contrary, a Medicare Part B physician can fill in gaps in his documentation by offering testimony to explain a beneficiary's condition when appealing a payment determination.[21] The One Best Medical Record requirement is simply an arbitrary rule that is inconsistent with current practices and requirements, and will not lead to accurate assignments of HCCs.

<p style="margin-left:2em;">c)   <u>Notice-And-Comment Rulemaking Is Required To Institute The One Best Medical Record Rule.</u></p>

CMS's One Best Medical Record rule is also invalid because the agency has failed to undertake appropriate notice-and-comment rulemaking before implementing the rule.  This rulemaking process is required by statute, and would allow the agency to engage in a proper consideration of statutory requirements, as well as the substantial burdens imposed by the recordkeeping and coding requirements incorporated in the One Best Medical Record rule.

Moreover, allowing for notice and comment would permit all stakeholders to assess and comment fully on CMS's proposed rules.  As President Obama instructed in his recent executive order, "[r]egulations shall be adopted through a process that involves public participation," and "an open exchange of information and perspectives among . . .

---

[21]    <u>See</u> April 2010 Regulations, 75 Fed. Reg. at 19,748; <u>see also</u> CENTERS FOR MEDICARE & MEDICAID SERVICES, MEDICARE PROGRAM INTEGRITY MANUAL, Chapter 3, Verifying Potential Errors and Taking Corrective Action, § 3.4.1.1 (Dec. 2010) (stating that auditors of fee-for-service providers may use "any information they deem necessary," including "soliciting documentation from the provider or other entity," and "documentation related to the patient's condition before and after a service in order to get a more complete picture of the patient's clinical condition"); <u>see also id.</u> § 3.4.1.2.

005048

EXHIBIT 1 - 016

Exhibit M
Page 58

431
Exhibit 3

experts in relevant disciplines, affected stakeholders in the private sector, and the public as a whole."[22]  Here, CMS has failed to allow for "an open exchange of ideas," has created substantial uncertainty, and has threatened to undermine the innovation and competiveness that the Medicare Advantage program provides to enrollees who are most in need of flexible coverage.[23]

Both the Medicare Act and the APA require CMS to issue substantive rules through notice-and-comment rulemaking.  The Medicare Act provides that "[n]o rule, requirement, or other statement of policy (other than a national coverage determination) that establishes or changes a substantive legal standard governing . . . the payment for services . . . under this subchapter shall take effect unless it is promulgated by the Secretary by regulation."[24]  The APA also requires notice-and-comment rulemaking for substantive rules.[25]  As the D.C. Circuit has held, notice-and-comment rulemaking is necessary when a rule carries "'the force and effect of law,'" as opposed to "spell[ing]

---

[22]    Exec. Order No. __, 76 Fed. Reg. __, § 2(a) (Jan. 18, 2011), available at http://www.whitehouse.gov/the-press-office/2011/01/18/improving-regulation-and-regulatory-review-executive-order; see also id. § 2(b) ("To promote that open exchange, each agency, consistent with Executive Order 12866 and other applicable legal requirements, shall endeavor to provide the public with an opportunity to participate in the regulatory process.  To the extent feasible and permitted by law, each agency shall afford the public a meaningful opportunity to comment through the Internet on any proposed regulation, with a comment period that should generally be at least 60 days.  To the extent feasible and permitted by law, each agency shall also provide, for both proposed and final rules, timely online access to the rulemaking docket on regulations.gov, including relevant scientific and technical findings, in an open format that can be easily searched and downloaded.  For proposed rules, such access shall include, to the extent feasible and permitted by law, an opportunity for public comment on all pertinent parts of the rulemaking docket, including relevant scientific and technical findings.").

[23]    Id. § 1(a).

[24]    42 U.S.C. § 1395hh(a)(2).

[25]    5 U.S.C. § 553(d); Lincoln v. Vigil, 508 U.S. 182, 196 (1993); see also Appalachian Power Co. v. EPA, 208 F.3d 1015, 1020 (D.C. Cir. 2000) (lamenting that the problem with broad regulations by agencies is that "[l]aw is made, without notice and comment, without public participation, and without publication in the Federal Register or the Code of Federal Regulations"); id. at 1024-26.

005049

EXHIBIT 1 - 017

Exhibit M
Page 59

Exhibit 3

out a duty fairly encompassed" within an existing statute or regulation.[26]  That is, a rule is substantive if the rule itself "impose[s] duties and obligations on those who are regulated."[27]  Moreover, the D.C. Circuit has held that an agency cannot "make a fundamental change in its interpretation of a substantive regulation without notice and comment."[28]

CMS's application of the One Best Medical Record rule without notice-and-comment rulemaking is improper because that rule is substantive.  The rule is more than just a part of an audit policy or procedure.  Rather, the rule constitutes a "substantive legal standard,"[29] and "carries the force and effect of law" in imposing a duty that did not previously exist under statute or regulation.[30]  The One Best Medical Record rule purports to impose a substantive limitation on the HCCs that an MA organization may assign to its members, based on the documentation an MA organization can use to support those HCCs.  Under the rule, as applied through the proposed payment error methodology, MA organizations that submit HCCs risk substantial clawbacks by CMS with respect to payments for patients with complex conditions that can be validated only by considering multiple medical records.  The rule also requires dramatic changes in the recordkeeping practices of providers, as it necessitates the documentation of every possible diagnosis code for every patient in every medical record.

---

[26]     Paralyzed Veterans of Am. v. D.C. Arena L.P., 117 F.3d 579, 588 (D.C. Cir. 1997) (quoting Am. Mining Cong. v. Mine Safety & Health Admin., 995 F.2d 1106, 1109 (D.C. Cir. 1993)).

[27]     Appalachian Power Co., 208 F.3d at 1027.

[28]     Paralyzed Veterans, 117 F.3d at 586.

[29]     42 U.S.C. § 1395hh(a)(2).

[30]     Paralyzed Veterans, 117 F.3d at 588.

005050

EXHIBIT 1 - 018

Exhibit M
Page 60

Exhibit 3

The D.C. Circuit has recognized that "changing the method of measuring compliance" with a statutory or regulatory limitation constitutes a substantive change if it "affect[s] the stringency of the limitation itself."[31]  CMS's One Best Medical Record rule does just that.  The rule, and its implementation through extrapolation, is a substantial departure from prior practice, and it changes CMS's method for measuring compliance with the risk-adjustment system in a manner that changes the substance of the system.  In previous audits, MA plans were allowed to submit new and clarifying documentation.  The HCC for a given MA member could be verified by multiple documents prepared by various physicians, which verified the HCC when considered together.  In the pilot RADV audit for contract year 2005, for example, MA plans were allowed to submit new and clarifying documentation in disputing CMS's audit findings, and HCCs could be verified by multiple records.[32]  Indeed, in the 2007 pilot audit, CMS has not even provided the coder's basis for rejecting a physician's diagnosis to allow the MA organization and the treating physician to address the coder's concerns.

The purpose of rulemaking is to allow an agency to obtain and consider all the potential information and data necessary to make a determination as to the propriety of any rule or regulation.[33]  "This articulation of the agency's duty is consistent with the repeated recognition in the case law that the agency must use 'the most reliable data

---

[31]   Appalachian Power Co., 208 F.3d at 1027.

[32]   2009 Proposed Rule, 74 Fed. Reg. at 54,674.

[33]   Tripoli Rocketry Ass'n v. BATFE, 437 F.3d 75, 81 (D.C. Cir. 2006); Saint James Hosp. v. Heckler, 760 F.2d 1460, 1468-72 (7th Cir. 1985) (holding that a rule was arbitrary and capricious because the Secretary of HHS relied on a statistically flawed study, refused to investigate "several" important, but ancillary, factors that affected payments and costs related to malpractice lawsuits, and failed to respond to comments adequately).

005051

EXHIBIT 1 - 019

Exhibit M
Page 61

available' to produce figures that can be considered sufficiently 'accurate.'"[34] An agency action is unlawful if it is implemented "without observance of procedures required by law."[35] At a minimum this requires publication of the new rule or guideline for comment.[36] Under this process, an individual would have the right to challenge the rule, based on the administrative record, both administratively and judicially if the rule became finalized.[37] Here, CMS has not allowed an administrative record to be developed.[38]

---

[34] Baystate Med. Ctr. v. Leavitt, 545 F. Supp. 2d 20, 41 (D.D.C. 2008) (quoting Methodist Hosp. of Sacramento v. Shalala, 38 F.3d 1225, 1230 (D.C. Cir. 1994)); Cnty. of Los Angeles v. Shalala, 192 F.3d 1005, 1021-23 (D.C. Cir. 1999); Alvarado Cmty. Hosp. v. Shalala, 155 F.3d 1115, 1125 (9th Cir. 1998).

[35] See 5 U.S.C. § 706(2)(D); accord FLRA v. U.S. Dep't of the Treasury, Fin. Mgmt. Serv., 884 F.2d 1446, 1454 (D.C. Cir. 1989) (an agency's interpretation of its own regulations is not controlling if it is "plainly erroneous or inconsistent" with the language of the regulation); The Honorable David Pryor Chairman, Subcommittee on Federal Services, Post Office, and Civil Service Committee on Governmental Affairs, United States Senate, 1989 WL 240606, at *2 (Comp. Gen.) (letter, dated Feb. 23, 1989, of the Comptroller General, concluding "that OPM's determination is inconsistent with its current FEHBP regulations"); Roman v. CIA, 297 F.3d 1363, 1368-69 (Fed. Cir. 2002) (holding that where the OPM relied on its CSRS and FERS Handbook for Personnel and Payroll Offices and not a regulation, such reliance was not entitled "to the same weight as its reliance on a regulation that was promulgated pursuant to statutory authority and following formal notice and comment proceedings").

[36] Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, No. 00CV0273 (RBW), 2002 WL 33253171, at *10 (D.D.C. June 24, 2002) ("Whether an agency characterizes its own actions as rulemaking is not determinative . . . . [I]t is the substance of what the agency has purported to do and has done which is decisive." (internal quotation and alteration omitted)).

[37] 5 U.S.C. §§ 553, 706.

[38] See 5 C.F.R. § 553(d); Brandt v. Hickel, 427 F.2d 53, 56-57 (9th Cir. 1970) (holding that an agency violated due process by giving an appellant erroneous and ambiguous instructions as to her procedural rights and responsibilities in complying with agency regulations. The importance of providing the opportunity for review and comment was recognized by the Office of Management and Budget ("OMB") in its recent "Final Bulletin for Agency Good Guidance Practices." OFFICE OF MGMT. & BUDGET, EXEC. OFFICE OF THE PRESIDENT, OMB BULL. NO. 07-02, FINAL BULLETIN FOR AGENCY GOOD GUIDANCE PRACTICES (Jan. 18, 2007), available at http://www.whitehouse.gov/sites/default/files/omb/memoranda/fy2007/m07-07.pdf. That report noted that "OMB has been particularly concerned that agency guidance practices should be more transparent, consistent and accountable." Id. at 2. OMB recommended that any changes in procedures include "public participation, including notice-and-comment under the [APA]; . . . justification for the rule, including a statement of basis and purpose under the APA; . . . and judicial review." Id. at 3; see also id. at 13-16, 22. The report recognized that rules "which establish new policy positions that the agency treats as binding must comply with the APA's notice-and-comment requirements, regardless of how they are initially labeled." Id. at 3; see also Appalachian Power Co., 208 F.3d at 1020-24 (same).

CMS's application of its proposed payment error calculation methodology, and the RADV audit requirements incorporated in that methodology, also will result in a denial of MA organizations' constitutional rights to due process. U.S. Const. amend. V.

005052

EXHIBIT 1 - 020

Exhibit M
Page 62

2.       **The Proposed Error Calculation Methodology Violates The Principles Of Actuarial Soundness And Equivalence.**

CMS's proposed error calculation methodology also changes the actuarial assumptions of risk adjustments to MA payments in a way that is inconsistent with the Medicare Act.  To calibrate its system of risk adjustments based on health status, CMS relied on FFS claims to measure the relative costs of providing benefits to Medicare beneficiaries with various medical conditions.  Under a proper actuarial analysis, it is therefore impossible to know whether MA organizations are being "overpaid" based on a methodology that relies on medical records simply by reviewing the medical records supporting the HCCs assigned by MA organizations.  Rather, a similar review of the medical records supporting the FFS claims that were used to calibrate the MA payments should be conducted.[39]

As the Medicare Act emphasizes, in applying risk adjustments based on "health status," CMS is ultimately required to "ensure actuarial equivalence."[40]  Because the statute does not define "actuarial equivalence," that phrase takes its ordinary meaning.[41]  "Actuarial equivalence" ordinarily refers to the principle that two types of payments or benefits with different nominal values may have the same real value when factors such as interest rates and risk are taken into account.[42]  Thus, the statute requires the Secretary to

---

[39]    42 U.S.C. § 1395w-23(a)(1)(C)(i)-(ii); see also April 2010 Regulations, 75 Fed. Reg. at 19,749 ("We recognize that there may be potential merit in further refining the error rate calculation.  We are currently studying this issue [of the FFS coding].")

[40]    42 U.S.C. § 1395w-23(a)(1)(C)(i).

[41]    See Ransom v. FIA Card Servs., N.A., 562 U.S. __, slip op. at 7 (2011).

[42]    See, e.g., Summers v. State St. Bank & Trust Co., 453 F.3d 404, 409 (7th Cir. 2006) ("$10,000 certain [and] a 1 percent chance of obtaining $1 million . . . are actuarial equivalents."); see also AMERICAN ACADEMY OF ACTUARIES, CRITICAL ISSUES IN HEALTH REFORM: ACTUARIAL EQUIVALENCE 1 (May 2009), available at http://www.actuary.org/pdf/health/equivalence_may09.pdf ("Actuarial equivalence is a general term used to describe two or more benefit plan designs that have approximately the same value.").

18

005053

EXHIBIT 1 - 021

Exhibit 3

make adjustments based on "health status" so that the monthly payment to each MA organization accounts for the risk associated with health status.

CMS's RADV audits are inconsistent with this statutory requirement because those audits cannot be reconciled with the agency's own risk adjustment methodology. MA payments are based upon the Medicare payments made to FFS providers under Medicare Parts A and B.[43] CMS used FFS payment data to estimate the costs of providing treatment to a Medicare beneficiary with a condition falling within a given HCC.[44] Using the ICD-9 codes supplied by FFS providers on 1500 Health Insurance Claim Forms—not medical records—CMS calculated the cost incurred for FFS beneficiaries with a given condition.[45] The ICD-9 codes were then used to create an HCC and to identify a "risk factor," or relative increase in cost, associated with that HCC.

In order to pay MA organizations accurately under CMS's methodology, there must be consistency in coding between the FFS population (which is used to establish the risk factors) and the MA population (to which the risk factors will be applied to determine payments). Indeed, given that FFS data were used to develop the risk adjustments to MA payments, Congress recognized that it was essential to "establish[] risk scores that

---

[43]    42 U.S.C. §§ 1395w-23(a)(1)(C)(i)-(ii); 1395w-23(a)(1)(G); 1395w-23(a)(3)(A); 1395w-23(b)(i)(II); 1395w-23(b)(4); 1395w-23(k)(2)(B)(iv).

[44]    See Gregory C. Pope et al., Risk Adjustment for Medicare Capitation Payments Using the CMS-HCC Model, 25 HEALTH CARE FINANCING REVIEW 119, 129 (Summer 2004), https://www.cms.gov/HealthCareFinancingReview/Downloads/04Summerpg119.pdf; 2009 Proposed Rule, 74 Fed. Reg. at 54,674; CTRS. FOR MEDICARE & MEDICAID SERVS., ANNOUNCEMENT OF CALENDAR YEAR (CY) 2010 MEDICARE ADVANTAGE CAPITATION RATES AND MEDICARE ADVANTAGE AND PART D PAYMENT POLICIES 20 (Apr. 6, 2009), https://www.cms.gov/MedicareAdvtgSpecRateStats/Downloads/ Announcement2010.pdf ("CY 2010 Rate Notice"); April 2010 Regulations, 75 Fed. Reg. at 19,748.

[45]    CMS has contradictory definitions of what constitutes a valid basis for assigning an HCC. The diagnostic codes identified in the CMS 1500 Health Insurance Claim Forms by the treating physician in the FFS program are used to set the risk adjustment scores for HCCs used in the Medicare Advantage program. But CMS ignores those forms when auditing the HCCs assigned by MA organizations. Nowhere has CMS provided a single definition of what validates an assigned HCC.

005054

EXHIBIT 1 - 022

Exhibit M
Page 64

Exhibit 3

are consistent across both fee-for-service and Medicare Advantage settings."[46] Accordingly, the Medicare Act mandates that, in performing risk adjustments based on health status in MA payments, the Secretary must "ensure that such adjustment reflects changes in treatment coding practices in the fee-for-service sector and reflects differences in the coding patterns between Medicare advantage plans and providers under Part A and B," and must "annually conduct an analysis of th[ose] differences."[47]   CMS has similarly recognized:

> Given the fact that the MA payment methodology is based on fee-for-service payments, and that the risk adjustment methodology is designed to compare the risk scores of MA plan enrollees to other plan enrollees and beneficiaries not enrolled in MA plans, for this comparison to be valid, MA plans must code the way Medicare Part A and B providers do in order for risk adjustment to be valid.  This means that MA organizations are coding "accurately" when they are coding in a manner similar to fee-for-service coding used on the beneficiaries to whom MA plan enrollees are being compared.[48]

Because "MA organizations are coding 'accurately' when they are coding in a manner similar to fee-for-service coding,"[49] it is impossible to determine whether MA organizations are being overpaid by auditing only the medical records supporting MA claims.   A proper actuarial analysis requires a comparison of MA and FFS documentation.

For example, assume Medicare paid FFS providers a total of $15,000 per month above the average rate for Medicare enrollees with a certain risk condition.  If the FFS

---

[46]     152 Cong. Rec. S438 (daily ed. Feb. 1, 2006) (statement of Sen. Charles Grassley); see also id. at H46 (statement of Rep. Joseph Barton) (similar); id. at H54 (statement of Rep. William Thomas) (similar).

[47]     42 U.S.C. §1395w-23(a)(1)(C)(ii)(I)-(II).

[48]     CY 2010 Rate Notice at 20.

[49]     Id.

005055

EXHIBIT 1 - 023

Exhibit M
Page 65

providers identified ten beneficiaries with that condition, the average monthly cost per beneficiary associated with that condition would be $1,500.  That average cost would be used to pay an MA organization for any of its members that had the same condition.  If, however, the FFS providers mistakenly included two beneficiaries who did not have that condition and thus incurred no costs associated with the condition, then the increase in monthly cost associated with the condition would be spread over eight enrollees, which would increase the average cost for the condition to $1,875 per month.  But if CMS did not audit the underlying FFS medical records, the agency would continue to pay MA organizations only $1,500 per month per enrollee.  As a result, if an MA organization assigned HCCs with 100% accuracy based on a review of medical records, the organization would be *underpaid* by $375 for every Medicare enrollee with the condition, compared to actual costs in the FFS program.  Until an audit of FFS claims is performed, therefore, the presence of invalid HCCs in MA claims does not demonstrate that MA organizations are being overpaid in the aggregate.

CMS's proposed sampling and error-calculation methodology does not take this reality into account.  CMS is effectively assuming that FFS coding is 100% accurate, but the agency has no basis for that assumption.  Indeed, CMS has not, and could not, demonstrate that FFS coding contains no errors (as CMS has defined "errors" in the RADV audit process).  Many FFS providers also provide services to Medicare members enrolled in MA organizations.  It defies logic to believe those providers would list ICD-9 codes with 100% accuracy on the 1500 Health Insurance Claim Forms sent to CMS under the FFS program, but not on the 1500 Health Insurance Claim Forms sent to MA organizations.  CMS has presented no reason to believe this is the case.

21

005056

EXHIBIT 1 - 024

Exhibit M
Page 66

439

Exhibit 3

The sampling and error calculation methodology proposed by CMS does not allow for any evaluation of, or proper comparison with, the FFS program.[50]  Accordingly, CMS's RADV audits fail to "ensure actuarial equivalence" in adjusting payments based on "health status," and therefore violate the Medicare Act.

3.   **CMS's Proposed Sampling And Extrapolation Methodology Is Invalid And Statistically Flawed.**

CMS's proposed methodology for calculating payment error also violates the Medicare Act and is arbitrary and capricious because it suffers from numerous statistical flaws.  As an initial matter, CMS's methodology suffers from the same procedural flaw as the agency's One Best Medical Record rule—CMS failed to follow the proper notice-and-comment rulemaking procedures with respect to its payment error calculation methodology.  Unlike a full notice-and-comment rulemaking under the APA, CMS's notice of its proposed methodology allows for only a brief thirty-day comment period, was not published in the Federal Register, and does not contain a discussion of economic analyses or regulatory alternatives.  Because the payment error calculation methodology is a substantive rule that will impose obligations on MA organizations in the form of substantial payment adjustments, the Medicare Act and the APA require CMS to submit the methodology to full notice and comment before it is applied in CMS's RADV audits.[51]

_____

[50]      If CMS were to audit the medical records supporting FFS claims, the agency would need to apply the same rules in that audit as in its audits of MA organizations to allow for a meaningful comparison.  It would be improper, for example, to apply the One Best Medical Record rule only with respect to the MA program.

[51]      See 42 U.S.C. § 1395hh(a)(2); 5 U.S.C. § 553(d); see also Exec. Order No. __, 76 Fed. Reg. __ (Jan. 18, 2011), available at http://www.whitehouse.gov/the-press-office/2011/01/18/improving-regulation-and-regulatory-review-executive-order (requiring, among other things, "a comment period that should generally be at least 60 days").

22

005057

EXHIBIT 1 - 025

Exhibit M
Page 67

440
Exhibit 3

Moreover, the proposed extrapolation methodology for RADV audits is prohibited because Congress has limited the use of extrapolation to specific circumstances: Medicare contractors may only use extrapolation when the Secretary has found that "there is a sustained or high level of payment error; or . . . documented educational intervention has failed to correct the payment error."[52]  The Secretary has not made such a finding with respect to RADV audits, has no basis to do so, nor is there any basis to do so, and has not undertaken rulemaking to determine these issues.

The need for rulemaking is apparent from the flaws in the proposed sampling and error calculation methodology.  The methodology CMS proposed will not ensure that risk adjustments have "been applied correctly, and [an] MA organization has received the amount to which it was entitled."[53]  As explained below, the sampling and error calculation methodology fails to ensure a statistically valid result because of various design flaws.

a)       The Proposed Stratification Can Produce Inaccurate Results.

CMS's stratification design flaws generate arbitrary results.  CMS proposes to stratify its sample of MA enrollees based on the enrollees' community risk scores.[54]  CMS's notice explains that the enrollees will be divided "into three equal groups based on the total number of eligible enrollees, where the first group will include the third of enrollees with the highest risk scores and the third group will include the third of enrollees with the lowest risk scores. The remaining enrollees will be in the middle

---

[52]       42 U.S.C. § 1395ddd(f)(3).

[53]       April 2010 Regulations, 75 Fed. Reg. at 19,745.

[54]       December 2010 Proposed Methodology at 2.

23

005058

EXHIBIT 1 - 026

stratum."[55]   CMS will then randomly select up to 67 enrollees from each group for a maximum of 201 enrollees in the sample.[56]   For example, CMS's notice of its proposed methodology stated that:

> [I]f a contract has 3,000 enrollees, the enrollees would be ranked by risk score, then divided into three equal groups of 1,000 enrollees each (to represent high, medium, and low strata). An equal number of enrollees will be selected from each group. The weight for each enrollee will equal 14.925 (i.e., 1,000/67).[57]

This stratification raises significant issues.   First, CMS's notice provides no record to support the stratification proposed.   Stratification is employed to deal with variations in the data that need to be taken into account to avoid an unintended bias or that would otherwise skew the results.   CMS has not identified any need for stratification or how the proposed three tier stratification will resolve any data issues.   The failure to include an explanation of the need for the stratification, as required by the Medicare Act and the APA, denies interested parties the opportunity to comment meaningfully on the proposal.   Absent such an analysis, the proposed stratification is arbitrary.[58]

Second, CMS's notice of its proposed methodology provides no discussion of the effects of "stratification cluster," even though the agency's proposal effectively uses a cluster sampling technique.   Although CMS suggests that it will randomly select enrollees from three strata of equal size, divided by rank-ordering enrollees by their community risk scores, CMS does not evaluate documentation error only once for each

---

[55]   Id.

[56]   Id.

[57]   Id.

[58]   Appalachian Power Co. v. EPA, 251 F.3d 1026, 1035 (D.C. Cir. 2001).

24

005059

EXHIBIT 1 - 027

Exhibit M
Page 69

442
Exhibit 3

enrollee.  Rather, CMS will audit all the sample enrollees' HCCs.  The result is a cluster sampling with uneven cluster sizes in each of the strata.

Because community risk scores are devised based on an enrollee's combination of HCCs, the sample selected from the stratum with the higher risk scores is also sampling larger clusters of HCCs that may not be representative of the overall sample enrollee population.  This presents problems that need to be addressed as part of the sampling methodology.[59]  For example, the sample of clusters may not reflect the diversity of all clusters across the community.  The more the population clusters differ, the less the precision of the results based on the sample.[60]

The sampling methodology and the stratification exacerbate the problems arising from sampling enrollees but then testing the assigned HCCs, which adds a non-random element to the sample.  Under CMS's proposed stratification technique, the enrollees in the high stratum are likely to have more HCCs assigned than enrollees in the middle or lower strata.  This may result in the higher stratum having a disproportionate impact on the audit, which in turn may skew the audit results.  In essence, CMS will sample based on observations of HCCs clustered by enrollee within each stratum, thereby adding a potential correlation among the elements of each cluster to its sampling procedure.  The

---

[59]    "[P]eople within a cluster may have very similar survey characteristics to each other, but different from those within different clusters.  Here, not only is one less likely to capture the full sample variation when using a clustered design, but there is likely to be a great deal of uncertainty about what results the non-sampled clusters would have yielded."  Andrew Zelin & Roger Stubbs, Cluster Sampling: A False Economy?, 47 INTERNATIONAL JOURNAL OF MARKET RESEARCH 501-22 (2005), http://www.ijmr.com/MedalWinners/PDF/80562.pdf; HENRY, supra note 6, at 107-109.  "Selecting unequal clusters creates several problems.  First, the size of the sample is not fixed; it becomes a random variable, depending upon the chance selection of larger or smaller clusters.  This augments the uncertainties in planning the cost and variance of the sample.  Second, the ratio mean, though typically a good and practical estimate, is not an unbiased estimate of the population mean.  Third, practical variance formulas are not unbiased estimates of the true variances, but they are good approximations in well designed samples.  Fourth, the variance formulas appear complicated, although this problem is considerably eased with the development of simpler computing forms." LESLIE KISH, SURVEY SAMPLING 183-184 (1995).

[60]    HENRY, supra note 6, at 107.

005060

EXHIBIT 1 - 028

Exhibit M
Page 70

Exhibit 3

selection of each enrollee is independent, but the selection of each HCC is not independent.  This sampling design might introduce some unmeasured factor that affects the records for the enrollee in a systematic way.[61]

Yet, CMS does not provide any discussion of statistical problems due to cluster sampling.  Nor does CMS propose any diagnostic review of the sample to ensure it is representative of the MA organization's enrollment.  At a minimum, CMS should analyze whether the sample is fair and representative.  This would include assessing the average number of HCCs in the sample versus the average number of HCCs per enrollee, and the number of specific HCCs in the sample as compared to the number in the enrollment.  Oversampling a particular HCC could create a disproportionate discrepancy that would be magnified though the proposed extrapolation.   In fact, the 2007 RADV pilot audit suggests that the sampling approach may not produce a representative sample of HCCs in a composition that reflects the sample population.   For example, the percentage of enrollees assigned HCC 15 (diabetes with renal or peripheral circulatory manifestation) in the 2007 pilot audit sample is approximately two times the percentage of enrollees assigned HCC 15 in the population of enrollees who were eligible for the sample.  The same is true for HCC 80 (congestive heart failure).  Since there is a basis to expect that certain HCCs are more likely to give rise to discrepancies, this representation problem will have implications for the estimated payment errors and their extrapolation.

Similarly, CMS does not present any plan to test for, or deal with, outliers in the data.  But outliers can distort the outcome.[62]  A few extreme values larger than expected

---

[61]   Id.

[62]   "[A]n outlier is generally considered to be a data point that is far outside the norm for a variable or population . . . .  [Commentators have] described an outlier as an observation that deviates so much from

26

005061

EXHIBIT 1 - 029

Exhibit M
Page 71

444
Exhibit 3

from a normal distribution will have a greater influence on the mean and the confidence interval than other members of the sample.[63]  With an overstated mean, the lower bound of the confidence interval used to estimate total payment error would be overstated.  Given this distinct possibility, CMS should consider other measures of central tendency such as the geometric mean, the median, or the mode before selecting its methodology, or a non-parametric approach to selecting a lower bound for error.  This issue is significant given the relatively small sample and the potential impact outliers could have on the extrapolation outcome.

In addition, like CMS's stratification methodology, CMS's proposed payment error extrapolation methodology is likely to generate arbitrary results.  The confidence interval proposed by CMS to estimate the extrapolated payment recovery amount assumes that the enrollee payment discrepancies are normally distributed.  If the data are not normally distributed, then the use of the formulas for variance and confidence interval set forth in the proposed methodology will produce invalid results.  But there is no basis in the record for assuming a normal distribution of payment errors, and CMS has not explained what methodology it will apply if the distributions are non-normal or unknown.

Accordingly, CMS's proposed sampling and error calculation methodology has design flaws that may preclude the sample from providing meaningful data to ensure that

---

other observations as to arouse suspicions that is was generated by a different mechanism . . . ."  J.W. Osborne & Amy Overbay, The Power of Outliers (and Why Researchers Should Always Check for Them), PRACTICAL ASSESSMENT, RESEARCH & EVALUATION 9(6) (Jan. 20, 2011), http://pareonline.net/getvn.asp?v=9&n=6 (citations and quotations omitted).  "Outliers can have deleterious effects on statistical analyses.  First, they generally serve to increase error variance and reduce the power of statistical tests.  Second, if non-randomly distributed they can decrease normality . . . .  Third, they can seriously bias or influence estimates that may be of substantive interest . . . ." Id.

[63]     "An outlier is an observation that appears to deviate markedly from other observations in the same sample.  Many statistical techniques – such as regression, analysis of variance, factor analysis – are very sensitive to outliers: the value of these statistics can change drastically due to just one or two errant points." J.L. Rasmussen, Evaluating Outlier Identification Tests: Mahalanobis D Squared and Comrey Dk, MULTIVARIATE BEHAVIORAL RESEARCH, 23(2), 189-202 (1988).

005062

EXHIBIT 1 - 030

Exhibit M
Page 72

445
Exhibit 3

an MA organization is paid correctly based on the health status of its enrollees, as Congress mandated in the Medicare Act.  Courts refuse "to excuse [an agency's] reliance upon a methodology that generates apparently arbitrary results."[64]

    b)    <u>The Sample Includes Only Enrollees With HCCs.</u>

It is well-established that an "agency must use 'the most reliable data available' to produce figures that can be considered sufficiently 'accurate.'"[65]  Here, CMS is not using the most reliable data available to produce sufficiently accurate results.  The proposed sampling methodology samples only enrollees with "[a]t least one risk adjustment diagnosis (ICD-9-CM code) submitted during the data collection period that led to at least one CMS-HCC assignment."[66]  Random discrepancies in assigning HCCs, however, are likely to result in both overstating and understating risk factors.  By excluding from the sample all the Medicare members to whom MA organizations did not assign a high risk factor, the audit will overlook any discrepancies resulting in the understatement of enrollees' health status.[67]   The results of the audit, therefore, will have little relation to the HCC coding errors in the population, even assuming that the audit methodology identifies "discrepancies."  CMS's failure to use the most reliable data likely will produce inaccurate results.

---

[64]    <u>Appalachian Power Co.</u>, 251 F.3d at 1034-35.

[65]    <u>Baystate Med. Ctr. v. Leavitt</u>, 545 F. Supp. 2d 20, 41 (D.D.C. 2008) (quoting <u>Methodist Hosp. of Sacramento v. Shalala</u>, 38 F.3d 1225, 1230 (D.C. Cir. 1994)); <u>see also Cnty. of Los Angeles v. Shalala</u>, 192 F.3d 1005, 1020-23 (D.C. Cir. 1999) (holding that agency must explain why a more recent database it had considered "reliable" for certain purposes was not used in calculating other Medicare payments where "accurately forecasting" payments depended on use of updated hospital stay data).

[66]    December 2010 Proposed Methodology at 2.

[67]    April 2010 Regulations, 75 Fed. Reg. at 19,746-47 (stating that CMS "intended [the audit] to validate the CMS-HCCs that were submitted in order to determine whether the *additional* payment amounts associated with these diagnosis codes were properly made" (emphasis added)).

005063

EXHIBIT 1 - 031

Exhibit M
Page 73

Exhibit 3

Case 2:16-cv-08697-FMO-SS   Document 422-3   Filed 06/22/21   Page 447 of 1177   Page ID
#:14521
Case 2:16-cv-08697-MWF-SS   Document 182-1   Filed 12/08/17   Page 33 of 166   Page ID
#:2608

Courts are "particularly" unlikely to "excuse [an agency's] reliance upon a methodology that generates apparently arbitrary results . . . where, as here, the agency has failed to justify its choice."[68]  Here, the administrative record does not support CMS's decision to exclude from the audit sample enrollees who do not have an HCC assignment. To the contrary, if discrepancies in establishing risk scores are random, MA organizations are also likely to have failed to assign HCCs when such an assignment was warranted. Specifically, the record does not contain any evidence that supports the view that MA plans are likely only to overcode their enrollees with undeserved HCCs.[69]  MA organizations primarily rely on physicians' and providers' claims to assign HCCs.  The physicians and providers identify diagnoses by assigning ICD-9 codes.  These codes are then tracked to HCCs as determined by CMS.  There is no indication that providers will only make mistakes in coding conditions that will result in an HCC assignment on the claim.  The audit is based on a review of medical records.  Potentially, the medical record review during an audit process that included enrollees with no HCC assignment could provide a source of information to indicate that those enrollees should have been assigned HCCs.  The sample, to be valid, must include all enrollees, with and without HCC assignments.

The audit sampling methodology is not only inaccurate, but is also inconsistent with CMS practice with respect to prior Medicare audits.   In auditing providers for Medicare Parts A and B in the Medicare Integrity Program, CMS specifically tasked recovery audit contractors to "review claims, using automated or complex reviews, to

---

[68]     Appalachian Power Co., 251 F.3d at 1035; see also Cnty. of Los Angeles, 192 F.3d at 1020-23 (rejecting agency's use of improper data set and remanding for reasonable explanation or recalculation).

[69]     CMS claims that MA plans have an incentive to do so, see 2009 Proposed Rule, 74 Fed. Reg. at 54,674, but has produced no evidence justifying that speculation.

005064

EXHIBIT 1 - 032

Exhibit M
Page 74

Exhibit 3

identify potential Medicare underpayments."[70]   Here, CMS has deviated from that practice, without explanation.

In addition to being inconsistent with the Medicare Act and past practice, an audit that only allows a downward adjustment is "unconscionable"[71] and will not pay MA organizations based on their enrollees' health status as mandated by the Medicare Act. An adjustment clause must be "a two-way, not a one-way street," allowing for both "an increase in the contract price," and "a decrease in the contract price."[72] Yet, by including only enrollees with "at least one CMS-HCC assignment," CMS excludes from each audit enrollees for whom an MA organization was underpaid because it mistakenly did not assign an appropriate HCC or risk score.   There can be no overcoding with these enrollees.   These enrollees were either properly coded, so there is no overpayment, or they should be assigned an HCC, in which case the MA organization is underpaid.   As a result, the proposed sampling methodology cannot determine whether an MA organization was properly paid, but only whether the organization can validate with a single medical record the HCCs that were assigned.

     c)     <u>CMS's Proposed Methodology Fails To Account For Sources Of "Error" Other Than Incorrect Assignments Of Health Status.</u>

CMS's proposed methodology for calculating payment error also fails to account for the fact that the agency's audits may find "errors" that are unrelated to the health status of an enrollee.   A basic principle in any sampling plan is to define clearly the item

---

[70]   CTRS. FOR MEDICARE & MEDICAID SERVS., STATEMENT OF WORK FOR THE RECOVERY AUDIT CONTRACTOR PROGRAM 27-29, http://www.cms.gov/RAC/Downloads/RACFinSOW.pdf; <u>see also</u> 42 U.S.C. § 1395ddd(h) (authorizing use of RACs).

[71]   <u>GloPak Corp. v. United States</u>, 851 F.2d 334, 338 (Fed. Cir. 1998).

[72]   <u>Id.</u>

005065

EXHIBIT 1 - 033

Exhibit M
Page 75

448
Exhibit 3

to be investigated.[73]   It is essential to identify potential causes of "errors" or "discrepancies," and whether these potential causes might influence the sampling design and estimation.   Different causes of the observed discrepancies might require different sampling approaches.   Discrepancies might be caused by simple random omissions (*e.g.*, the required signature) not associated with any particular HCC.   Alternatively, discrepancies might be due to the presence of certain systematic behavioral traits of providers working with particular types of enrollee conditions.   These different potential causes of discrepancies should be considered not only in developing an investigation of the relevant actuarial equivalence, but also in the design of sampling and estimation methodologies seeking to make reliable inferences about the observed discrepancies.

For example, many supposed discrepancies identified in the RADV audit process result not from improper coding of medical conditions, but from the arbitrary limitations imposed by the One Best Medical Record rule—as the record of the 2007 RADV pilot audit already indicates.   In a number of cases in that audit, the HCC assigned was not allowed because the one best medical record was not signed by the physician.   In other cases, additional medical records verified the HCC, but were not considered by CMS.   These technical discrepancies do not support a conclusion that the patient did not have the condition diagnosed, that an incorrect HCC was assigned, or that the MA organization was improperly paid.

Additional variables unrelated to "health status" also may impact the audit results, such as geographic variations in coding by providers.   Indeed, in CMS's report on the results of its 2004 pilot RADV audit, the agency recognized numerous sources of discrepancies in addition to an incorrect determination by an MA organization of enrollee

---

[73]        HENRY, supra note 6, at 15-16.

005066

EXHIBIT 1 - 034

Exhibit M
Page 76

Exhibit 3

health status, including providers' failure to document a known medical condition, documentation in the medical record that was insufficiently specific, and coding that was incomplete, or "truncated."[74]   CMS's methodology for calculating payment error should recognize and account for the statistical effects of these discrepancies, which do not result from the erroneous submission of HCCs by MA organizations.

**4.      <u>The Proposed Methodology Would Interfere With Current Contracts.</u>**

The proposed sampling and error calculation methodology does not take into account that MA organizations have already submitted their bids and have preexisting contracts with CMS to provide benefits to Medicare beneficiaries who are enrolled in the organizations' plans.  CMS's proposed methodology would impose retroactive, contract-wide adjustments that would be improper because such adjustments (1) would be inconsistent with the actuarial assumptions and data used by MA organizations to determine their annual bids; (2) would violate the Medicare Act and CMS regulations; and (3) would be inconsistent with existing MA contracts.  At most, CMS may be able to use its audit results in its prospective evaluation of risk adjustment factors.

a)      <u>CMS's Proposed Methodology Undermines The Actuarial Basis Of MA Payments.</u>

Inherent in the actuarial processes and assumptions underlying annual bids submitted to CMS by MA organizations is the principle that risk adjustment will be based on a comparison to the Medicare FFS population.  CMS provides this comparison in the form of a risk-adjusted benchmark payment and risk factors in its annual announcement of MA payment rates.  MA organizations compare their bids to the benchmark to

---

[74]      CTRS. FOR MEDICARE & MEDICAID SERVS., MEDICARE ADVANTAGE RISK ADJUSTMENT DATA VALIDATION CMS-HCC PILOT STUDY, REPORT TO MEDICARE ADVANTAGE ORGANIZATIONS 12 (2004), available at http://www.hccblog.com/files/CMS_HCC_validation.pdf.

005067

EXHIBIT 1 - 035

Exhibit M
Page 77

Exhibit 3

determine member premiums, co-pays, and supplemental benefits.[75]   These determinations are inextricably linked to the estimates and assumptions supporting the bid, including the projected risk scores and benchmark.

Failing to maintain consistency with Medicare FFS would undermine the actuarial basis of the MA organizations' bids and resulting payments.  The bid process is complex, and MA organizations must project the cost of providing benefits to an enrolled population in an actuarially sound manner.  To submit a bid, MA organizations must know the applicable rates and actuarial assumptions.   A valid and consistent measurement of the projected risk of a given population is critical to this actuarial analysis.

CMS's methodology for calculating payment discrepancies will have a direct impact on an MA plan's bid submissions, including its premium rates and benefits packages.  It is therefore inappropriate to implement retrospectively a wholesale change in risk adjustment methodology and payments that was unknown at the time bids were developed.  Changing projected risk scores, often based on missing or incomplete records under the One Best Medical Record rule and without reference to FFS error rates, will undermine the actuarial soundness of the original bids.  The bids for years 2007, 2008, 2009, 2010, and 2011 were all developed and submitted prior to CMS's announcement of its proposed methodology for calculating payment error.  Moreover, the bids for 2007 through 2009 were made prior to CMS even announcing its 2007 pilot RADV audit program.  Yet, the proposed RADV audit sampling and error calculation methodology

---

[75]   See 42 U.S.C. § 1395w-24(b).

005068

EXHIBIT 1 - 036

includes factors that were not provided to MA organizations before they submitted their bids.

As a result, MA organizations were unable to anticipate these audits and actuarially include these factors in their bids. Retroactive contract-level payment adjustments based on previously unknown RADV audit procedures will create a fundamental disconnect between MA organizations' payments and the benefits they offered. Moreover, CMS reviews the bids submitted by MA organizations to determine whether "(1) [t]he bid amount and proportions are supported by the actuarial bases provided by MA organizations [and] (2) [t]he bid amount and proportions reasonably and equitably reflect[] the plan's estimated revenue requirements for providing the benefits under that plan."[76] If CMS intended to make contract-level adjustments based on RADV audits, it had both the obligation and the opportunity to advise MA organizations that they needed to make adjustments in their bids based on anticipated RADV audits. CMS cannot now impose such a retroactive adjustment.

   b)   CMS's Proposed Methodology Violates The Medicare Act And CMS Regulations.

The Medicare Act requires the Secretary of HHS to provide advance notice of changes in methodologies and assumptions used to calculate MA payment rates.[77] Congress also mandated that CMS publish annually "[t]he average risk factor for the covered population based on diagnoses reported for Medicare inpatient services, using the same methodology as is expected to be applied in making [monthly risk-adjusted

---

[76]   42 C.F.R. § 422.256(b).

[77]   42 U.S.C. § 1395w-23(b)(2) ("At least 45 days before" announcing capitation rates for the following year, "the Secretary shall provide for notice to [MA] organizations of proposed changes to be made in the methodology from the methodology and assumptions used in the previous announcement and shall provide such organizations an opportunity to comment on such proposed changes.").

005069

EXHIBIT 1 - 037

payments]."[78]  CMS's regulations also require advance notice of changes in methodology and assumptions.[79]   CMS's regulations further provide that the agency "will not implement, other than at the beginning of a calendar year, requirements . . . that impose a new significant cost or burden on MA organizations or plans, unless a different effective date is required by statute."[80]   CMS's application of contract-wide payment adjustments based on RADV audit procedures and methodologies, without advance notice that those procedures and methodologies would be applied, violates these provisions of the Medicare Act and CMS's regulations.

      c)    <u>CMS's Proposed Methodology Violates Preexisting Contracts.</u>

      Although contracts between MA organizations and CMS provide for the submission of risk adjustment data to determine the risk adjustment factors, no provision provides for retroactive payment adjustments.

      The MA contract specifically addresses CMS's right and authority to implement changes during the contract year.  Only statutory changes that Congress requires to be applied during the term of existing contracts (and changes in regulation and policies implementing such statutory changes) are deemed to be incorporated into the contract.[81] There have been no statutory changes made during the term of any existing contracts that could be incorporated into those contracts that allow for retroactive contract-level

---

[78]    42 U.S.C. § 1395w-23(b)(4)(C).

[79]    42 C.F.R. § 422.312(b)(1) ("No later than 45 days before making the announcement [of capitation rates for the following contract year], CMS notifies MA organizations of changes it proposes to make in the factors and the methodology it used in the previous determination of capitation rates.").

[80]    42 C.F.R. § 422.521.

[81]    <u>Id.</u>: Contract with Eligible Medicare Advantage (MA) Organization Pursuant to Sections 1851 through 1859 of the Social Security Act for the Operation of a Medicare Advantage Coordinated Care Plan(s), Articles II.B, II.C.

005070

EXHIBIT 1 - 038

Exhibit M
Page 80

Case 2:16-cv-08697-FMO-SS   Document 422-3   Filed 06/22/21   Page 454 of 1177   Page ID
#:14528
Case 2:16-cv-08697-MWF-SS   Document 182-1   Filed 12/08/17   Page 40 of 166   Page ID
#:2615

payment adjustments.   Therefore, CMS cannot retroactively change payments to MA
organizations based on the agency's new rules and methodologies.

## <u>CONCLUSION</u>

Aetna respectfully requests that CMS:

1.      Withdraw the proposed sampling and error calculation methodology and
conduct full notice-and-comment rulemaking with respect to that methodology;

2.      Institute notice-and-comment rulemaking for the One Best Medical
Record rule;

3.      Institute notice-and-comment rulemaking regarding the need for FFS
auditing; and

4.      Cease any ongoing RADV audit activities until these rulemaking
processes are complete.

Only once such rulemaking is undertaken will MA organizations and other
interested stakeholders have a meaningful opportunity to protect their rights and the
rights of their members.

005071

EXHIBIT 1 - 039

Exhibit M
Page 81

# Exhibit 2



**VIA EMAIL** TO **RADV@CMS.HHS.GOV** AND **FEDERAL EXPRESS**

Ms. Cheri Rice
Acting Director, Medicare Plan Payment Group
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, MD 21244

      Re:    Comment on RADV Sampling and Error Calculation Methodology

Dear Ms. Rice:

      Thank you for the opportunity to comment on the Centers for Medicare & Medicaid Services's ("CMS") draft *Medicare Advantage Risk Adjustment Data Validation ("RADV") Notice of Payment Error Calculation Methodology for Part C Organizations Selected for Contract-Level RADV Audits*, released by CMS on December 20, 2010. Our comments incorporate the attached Exhibits, including the Actuarial Report attached as <u>Exhibit A</u> ("Actuarial Report").

      As one of the largest sponsors of Medicare Advantage plans serving Medicare beneficiaries in the United States, Humana understands the trust that the government has placed with Medicare Advantage contractors as they serve many of the country's most vulnerable beneficiaries, and we are committed to continuing to work with CMS to ensure that Medicare Advantage organizations ("MAOs") are paid accurately. However, we have serious concerns about the draft sampling and payment error calculation methodology ("Proposed Methodology") because it will result in inaccurate payments to MAOs and also would have a real and direct impact on Medicare Advantage members and the health care benefits they receive.

      The Proposed Methodology substantially deviates from the assumptions and methodology that CMS used to set payment rates and that MAOs relied on to submit bids. As a result, it improperly and retroactively changes how MAOs are reimbursed. It is mathematically certain that payments calculated using the Proposed Methodology would not accurately reflect the costs of providing benefits to Medicare Advantage members. In fact, the Proposed Methodology would fundamentally undermine the risk adjustment payment model by significantly underpaying MAOs for the risks they assume.

## I. INTRODUCTION OF KEY ISSUES

      The Proposed Methodology seems to reflect an assumption that MAOs are overpaid whenever a diagnosis relating to a risk adjustment payment is not supported by a medical record. Our comments below and the Actuarial Report describe in more detail why – given the existing actuarial method used to make risk adjustment payments – this assumption is incorrect and why the Proposed Methodology is fundamentally flawed:

005103

EXHIBIT 2 - 040

Exhibit M
Page 83

456
Exhibit 3

Ms. Cheri Rice
Comment on RADV Sampling and Error Calculation Methodology
January 21, 2011

- **The Proposed Methodology disregards the FFS Claims Data used to establish payment rates.** RADV audits review only medical records for MA claims data received by MAOs from providers and submitted to CMS ("MA Claims Data"), but do not review medical records for FFS claims data used to develop the risk adjustment payment model ("FFS Claims Data"). These two sets of data are inextricably linked. CMS cannot adjust one set of data without considering the relationship with the other set of data when both are part of the comprehensive payment model. Using the Proposed Methodology, CMS's payment model will be actuarially unsound for audited organizations because it would simultaneously use two very different sets of data to measure diagnoses – non-validated FFS Claims Data on the front end (the development of payment rates), and validated MA Claims Data on the back end of a risk adjustment data validation ("RADV") audits. Unless CMS modifies the Proposed Methodology to appropriately adjust for this inconsistency, it will undermine the basic fairness of the underlying risk adjustment payment model.

- **The Proposed Methodology improperly deviates from the assumptions and methodology upon which MAOs relied in submitting bids.** MAOs correctly relied on the assumptions and methodology released by CMS to develop the risk scores used in bids, and reasonably assumed that FFS Claims Data and MA Claims Data would be consistently compared. MAOs could not have anticipated that CMS would implement the Proposed Methodology to retroactively recalculate risk scores used to set MAO payment rates by introducing different assumptions and a different methodology from what was employed during the bid process.

We understand that some may argue that the Proposed Methodology is not a change in payment methodology. This is simply not the case as the Proposed Methodology (i) has a direct and substantial impact on the actuarial calculations under the payment model, and (ii) substantially affects the risk scores and payment amounts in a manner that is different from the assumptions and methodology used prior to the bids. As such, it is a substantive change that is subject to the notice-and-comment requirements under the Social Security Act (the "Act") and the Administrative Procedure Act ("APA").

- **The Proposed Methodology would not withstand legal scrutiny.** The Proposed Methodology is arbitrary and capricious and inconsistent with the actuarial equivalence requirement and other requirements of the Act. In addition, implementation of the Proposed Methodology would be inconsistent with advance notice requirements of the Act, and other applicable laws governing the development and implementation of this substantive rule. CMS must respond in a reasoned manner to the legal and actuarial principles discussed herein and previously presented to CMS, and it must propose a solution subject to public comment before implementing any payment error calculation methodology.

- 2 -

005104

EXHIBIT 2 - 041

Exhibit M
Page 84

Ms. Cheri Rice
Comment on RADV Sampling and Error Calculation Methodology
January 21, 2011

- **The Proposed Methodology suffers from additional defects**. The fundamental flaws noted above are compounded and exacerbated by defects in the statistical sampling and extrapolation approach, and by CMS's use of a "one best medical record" requirement to review MA Claims Data.

## II. THE PROPOSED METHODOLOGY IMPROPERLY DISREGARDS THE FFS CLAIMS DATA USED TO SET MAO PAYMENT RATES

### A. CMS Must Address the Data Inconsistency Issue

CMS relies on two interdependent sets of data to set payment rates for MAOs: (1) FFS Claims Data; and (2) MA Claims Data. The Proposed Methodology would review medical records for only one set of data (MA Claims Data), while not performing the same exercise on the other set (FFS Claims Data). However, because these two sets of data are inextricably linked, CMS must audit and validate *both* of them before extrapolating any potential RADV audit results. If it does not, CMS will dramatically underpay MAOs for the benefits they provided to Medicare beneficiaries.

Consider the following simplified example[1] (also set out in a chart below) that illustrates the impact of failing to validate the FFS Claims Data used on the front end:

- Suppose that in XYZ county, FFS Claims Data shows CMS spent an aggregate of $60,000 on treating cancer ("Treatment Costs") in Year 1.

- CMS expects to spend an aggregate of $60,000 on Treatment Costs again in Year 2. This is an anticipated based on FFS Claims Data and not tied to underlying diagnosis records.

- There are 100 people in the county enrolled in the original FFS program ("FFS Program"), and FFS Claims Data indicates that 60 of them have cancer. Assume if CMS were to audit the FFS Claims Data, which it did not, it would find that only 40 people have medical record documentation to validate those diagnoses.

- CMS nevertheless accepts the accuracy of the FFS Claims Data as submitted and calculates the increased risk for cancer patients to be $1,000 per patient, effectively the "Unit Cost." This Unit Cost is analogous to the risk coefficient in the CMS risk adjustment payment model.

- In Year 2, 30 people with cancer in XYZ county enroll in a Medicare Advantage plan. In this scenario, CMS pays the MAO $1,000 in extra revenue per cancer patient to cover the risk for covering the Treatment Costs for the 30 people.

---

[1] This example is simplified in order to illustrate the mathematical of failing to validate FFS Claims Data on the front end. The CMS risk adjustment methodology has additional complexities, and is described more fully in the Actuarial Report at § III.

005105

EXHIBIT 2 - 042

Exhibit M
Page 85

Exhibit 3

Ms. Cheri Rice
Comment on RADV Sampling and Error Calculation Methodology
January 21, 2011

- Two years later, CMS audits the MA Claims Data used to determine the MAO's payments in Year 2 and discovers that only 20 (not 30) of the members had adequate medical record documentation to validate cancer for all periods in question.

- CMS then seeks to recoup $10,000 from the MAO since only 20 members had a cancer diagnosis validated by a medical record. But this recoupment would result in an actuarially unsound and inaccurate payment.

- CMS should have calculated the Unit Cost to be $1,500 per patient ($60,000 / 40), not $1,000. This is because the $60,000 of Treatment Costs paid in Year 1 was accounted for by 40 patients whose medical records support the diagnosis, not 60 patients whose claims reflected that they had cancer. Using the corrected Unit Cost, the aggregate amount if correctly paid to the MAO for assuming the Treatment Costs would be $30,000 ($1,500 x 20).

|  | Year 1 | | Year 2 | |
|---|---|---|---|---|
|  | FFS Claims Data (Unaudited) | FFS Claims Data (if Audited) | MAO Payments (Unaudited) | MAO Payments (Audited) |
| Beneficiaries with Cancer | 60 | 40 | 30 | 20 |
| Payments for Beneficiaries with Cancer | $60,000 | $60,000 | $30,000 | $20,000 |
| Unit Cost per Cancer Patient | $1,000 | **$1,500\*** | $1,000 | **$1,000\*** |

\* Note that $1,000 would be the incorrect Unit Cost for audited MAO payments, which should be $1,500 in order to make a valid comparison.

The above example illustrates that in order to ensure an actuarially sound and accurate payment, both the front end (the development of payment rates) and back end (RADV audit results) must have a mechanism for ensuring comparability. The absence of such a mechanism in the Proposed Methodology will have severe repercussions for beneficiaries, MAOs, and the Medicare Advantage program, as the payment model will not do what CMS actuaries designed it to do – pay MAOs for the benefits they administer under Medicare Advantage. This problem is referred to herein as the "Data Inconsistency Issue." The Actuarial Report provides a more complete discussion and an actuarial analysis of this Data Inconsistency Issue, and should be reviewed as an integral part of these comments.

In other (similar) contexts, CMS has recognized the need to correct for the inconsistencies between FFS Claims Data and MA Claims Data when calculating payments to

- 4 -

005106

EXHIBIT 2 - 043

459

Exhibit 3

Exhibit M
Page 86

Ms. Cheri Rice
Comment on RADV Sampling and Error Calculation Methodology
January 21, 2011

MAOs.[2]  Additionally, Congress's requirement that CMS "adjust the risk scores for differences in coding patterns between Medicare Advantage plans and providers under the original Medicare fee-for-service program under parts A and B" requires the consistent use of data in determining risk adjusted payments to MAOs.[3]  The Proposed Methodology disregards the comparative nature of the risk adjustment payment model and the basic idea that valid comparisons cannot be made when risk scores for the FFS population are developed using unaudited FFS Claims Data, but risk scores for MAO enrollees are developed using MA Claims Data substantiated by medical records.  In short, to ensure a valid comparison, the same type of data must be compared.

### B.  Recommendations for Adjusting for Data Inconsistency

The actuarial principles outlined above do not mean that CMS cannot implement an actuarially sound RADV methodology.  We respectfully suggest, however, that if CMS intends to modify payments based on medical record review, then it must also correct for the Data Inconsistency Issue in an appropriate manner.  To do so, CMS could audit FFS Claims Data and correct the risk (and demographic) coefficients used to establish payment amounts (which are analogous to the "Unit Cost" in the above illustration) using only those diagnoses substantiated in medical records, using the very same methodology that CMS has employed in the RADV audits.  CMS would then apply the corrected coefficients to determine the final risk scores of audited MAO members.  These corrected coefficients, as adjusted for unsubstantiated diagnoses

---

[2] Advance Notice of Methodological Changes for Calendar Year 2008 Medicare Advantage (MA) Payment Rates at 8 (Feb. 16, 2007):

> Because the CMS-HCC model is calibrated on fee-for-service data and the resulting risk scores are adjusted for fee-for-service normalization, MA coding patterns that differ from patterns in fee-for-service may result in risk scores that are not equivalent to the risk scores of the FFS beneficiaries used to calculate the county rates.

Announcement of Calendar Year (CY) 2010 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies at 20 (Apr. 6, 2009) (emphasis added):

> Given the fact that the MA payment methodology is based on fee-for-service payments, and that the risk adjustment methodology is designed to compare the risk scores of MA plan enrollees to other plan enrollees and beneficiaries not enrolled in MA plans, *for this comparison to be valid*, MA plans must code the way Medicare Part A and B providers do in order for risk adjustments to be valid.  This means that MAOs are coding 'accurately' when they are coding in a manner similar to fee-for-service coding used on the beneficiaries to whom MA plan enrollees are being compared.  In this sense, 'differences' in coding patterns, regardless of the source, would make the MA plan coding 'inaccurate' for purposes of implementing risk adjustment.

*Id.* at 26 (emphasis added):

> [T]he risk adjustment methodology is designed *to compare* the risk scores of MA plan enrollees to . . . beneficiaries not enrolled in MA plans.

[3] *See* Social Security Act § 1853(k)(2)(B)(iv)(III), 42 U.S.C. § 1395w-23(k)(2)(B)(iv)(III).

- 5 -

005107

EXHIBIT 2 - 044

Exhibit M
Page 87

460
Exhibit 3

Ms. Cheri Rice
Comment on RADV Sampling and Error Calculation Methodology
January 21, 2011

in FFS Claims Data, would be higher than those previously calculated by CMS.  The post-audit risk scores for all sampled members would be recalculated using the corrected coefficients, and a statistically appropriate extrapolation methodology would then be applied.  The problem with the coefficients and this potential solution are discussed further in the attached Actuarial Report at § VI.

Alternatively, CMS could apply payment adjustments following a comparison of the extent to which diagnoses are not substantiated by medical records in FFS Claims Data, and the extent to which diagnoses are not reflected in medical records in MA Claims Data.  This approach would not, as has been suggested, reimburse MAOs for members whose diagnoses do not validate, or excuse a certain level of payment errors.  To the contrary, it is an alternate mechanism for CMS to correctly calculate the payment impact of its audit and apply an appropriate conversion factor to account for the different sources of diagnostic data used to establish payment rates.  As discussed in the Actuarial Report at § VI, this approach would be another way of achieving the same corrective result as the coefficient recalculation approach.

### III.  The Proposed Methodology Improperly Deviates from the Assumptions and Methodology Upon Which MAOs Relied in Submitting Bids

In addition to the actuarial issues described above, there would be other fundamental problems if CMS implemented the Proposed Methodology without appropriately addressing the Data Inconsistency Issue.  In particular, the Proposed Methodology improperly deviates from the assumptions and methodology considered for calculating the risk scores that MAOs used in submitting bids and by CMS in approving those bids.  The impact on the bidding process is explained in detail in the Actuarial Report at § V, which should be reviewed as an integral part of these comments but the main principles are set forth below.

#### A.  CMS Must Publish the Methodology and Assumptions for Bids Before the Bids are Submitted, and Must Adhere to Those Assumptions and Methodology when Making Payment

The assumptions and methodology provided in advance of bid submission by CMS are critical to MAOs' bids and to the proper functioning of the Medicare Advantage program.  The Act reflects the significance of these assumptions and methodology by requiring advance notice of payment rates and risk coefficients that will apply in the upcoming year.  In addition to notice of payment rates and risk coefficients, the annual notice must also include an "explanation of the *assumptions and changes in* methodology used in such announcement."[4]  Any such changes may be implemented only after CMS publishes and provides an opportunity for MAOs to comment on proposed changes from the "methodology and assumptions used in the previous announcement."[5]

---

[4] Social Security Act § 1853(b)(3), 42 U.S.C. § 1395w-23(b)(3) (emphasis added).

[5] Social Security Act § 1853(b)(2), 42 U.S.C. § 1395w-23(b)(2).

005108

EXHIBIT 2 - 045

Exhibit 3

Exhibit M
Page 88

Ms. Cheri Rice
Comment on RADV Sampling and Error Calculation Methodology
January 21, 2011

These provisions implement a core principle that CMS must give MAOs the assumptions and methodology needed to develop their bids *before* those bids are submitted. Furthermore, all MAOs must submit their bids using the same assumptions and methodology in order to achieve the level playing field that the Medicare Advantage competitive model requires.

## B. The Proposed Methodology Deviates From the Assumptions and Methodology CMS and MAOs Relied on When Submitting and Approving Bids

The Proposed Methodology fundamentally changes the assumptions and methodology MAOs have used to develop risk scores[6] in bids that have already been approved. CMS requires MAOs to project the overall risk score of their enrolled population, which materially affects the MAOs' bid amount. MAOs projected risk scores in their bids using the same methodology that CMS used to develop the risk coefficients. Those coefficients were based on FFS Claims Data, not diagnoses substantiated by medical record review. These coefficients also define the beneficiary with a "national average risk profile."[7] MAOs must submit their bid amounts for providing the standard benefit package to a beneficiary with a "national average risk profile."[8] Similarly, CMS published risk scores for the FFS population based on FFS Claims Data, not diagnoses substantiated by medical record review.[9] MAOs applied the same methodology to project MAO risk scores and determine their bid amounts.

The Proposed Methodology recalculates the MAOs' risk score (and resulting payment) based "on the HCCs that are supported by RADV medical record review findings for the enrollee."[10] This is a different methodology for calculating risk scores from the methodology MAOs properly used in submitting their bids, with substantial and material payment implications.

---

[6] A risk score is a description of the health and demographic status of the enrolled population. A brief summary is as follows: CMS assigns "coefficients" (otherwise known as "risk adjustment factors") for different demographic and health-status conditions. For example, in 2007, the coefficient for a 66 year old non-institutional male enrollee was 0.330. The coefficient for non-institutional diabetes without complications was 0.181. CMS adds the coefficients together to compute a "risk score" for each member; the plan's projected risk score is the anticipated average for a plan's membership. If a plan projects a risk score of 1.05, it is in effect projecting that its enrolled population will have medical costs 5% higher than the national average for a FFS beneficiary.

[7] CMS sets the coefficients in a statistical manner so that a FFS beneficiary with a "national average risk profile," Social Security Act § 1854(a)(6)(A)(i), 42 U.S.C. § 1395w-24(a)(6)(A)(i), is 1.0.

[8] The "bid" amount is "the monthly aggregate bid amount for the provision of all items and services under the plan, which amount shall be based on average revenue requirements . . . in the payment area for an enrollee with a national average risk profile for the factors described in section 1853(a)(1)(C) (as specified by the Secretary)." Social Security Act § 1854(a)(6)(i), 42 U.S.C. § 1395w-24(a)(6)(i).

[9] CMS is required to publish the "average risk factor" [another term for "risk score"] for the FFS program covered population based on diagnoses reported for inpatient and other sites of services. Social Security Act § 1853(b)(4)(D), 42 U.S.C. § 1395w-23(b)(4)(D). In doing so, CMS is required to use "the same methodology as is expected to be applied in making payments" to MAOs. *Id.*

[10] Proposed Methodology, at 2.

005109

EXHIBIT 2 - 046

Exhibit M
Page 89

Exhibit 3

Case 2:16-cv-08697-FMO-SS   Document 422-3   Filed 06/22/21   Page 463 of 1177   Page ID
#:14537
Case 2:16-cv-08697-MWF-SS   Document 182-1   Filed 12/08/17   Page 49 of 166   Page ID
#:2624

Ms. Cheri Rice
Comment on RADV Sampling and Error Calculation Methodology
January 21, 2011

We understand that CMS may have questioned why actuaries did not anticipate that medical record reviews might be conducted or that some MA Claims Data is not accurate. However, even if MAOs and certifying actuaries could have anticipated that CMS would conduct RADV audits, they had no reason to believe that CMS would not address the Data Inconsistency Issue as part of its calculation of any extrapolated payment errors. Indeed, even today it is uncertain how CMS will determine payment error from the RADV audits. It its final rule published in the Federal Register April 15, 2010 regarding RADV, CMS indicated it is reviewing public comments on the Data Inconsistency Issue, but the Proposed Methodology does not address it.[11] As a result, the ultimate effect of RADV extrapolation on MAO risk scores remains unknown. Actuaries could not reasonably have known of or accounted for the Proposed Methodology in preparing bids. Indeed this challenge persists today, as CMS has not issued any notice seeking comments on a proposed change to the methodology for projecting risk scores for future contract years.

### C. Actuaries Would Not Have Certified the Actuarial Soundness of MAO Bids, and CMS Should Not Have Accepted the Soundness of Those Bids, Using the Proposed Methodology's Approach to Calculating Risk Scores

MAOs calculated bid amounts using projected risk scores based on the methodology discussed above. MAOs and their actuaries certified that those bid amounts were actuarially sound, meaning that the required revenue stated in the bid was reasonable in relation to the benefits to be provided. If risk scores were instead based on the approach resulting from the Proposed Methodology, those same bids would not have provided the required revenue. As such, the bids would not have been actuarially sound, and actuaries would not have certified them. Instead, bid amounts would have been substantially higher, resulting in higher member premiums and or fewer supplemental benefits offered to members.

By accepting MAOs' bids, CMS verified the assumptions and methodology the MAOs used. This is because CMS

> may only accept such a bid amount . . .if the Secretary determines that such amount. . .[is] supported by the actuarial bases provided. . .and reasonably and equitably reflects the revenue requirements. . .of benefits provided under that plan.[12]

If the MAOs' assumptions and methodology for projecting risk scores were incorrect, CMS could not lawfully have accepted the bids.

---

[11] Preamble discussion to Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs, 75 Fed. Reg. 19,677, 19,745 (Apr. 15, 2010).
[12] Social Security Act § 1854(a)(6)(B)(iii), 42 U.S.C. § 1395w-24(a)(6)(B)(iii); *see also* 42 C.F.R. § 422.258(b).

- 8 -

005110

EXHIBIT 2 - 047

Exhibit M
Page 90

463
Exhibit 3

Ms. Cheri Rice
Comment on RADV Sampling and Error Calculation Methodology
January 21, 2011

IV.    THE PROPOSED METHODOLOGY WOULD NOT WITHSTAND LEGAL SCRUTINY

A.    The Proposed Methodology Effects an Impermissible Retroactive Change to the Assumptions and Methodologies in the Bids and is Contrary to the Contract

If applied to contract years for which bids have already been submitted, the Proposed Methodology would violate the Act. As noted above in Section III, the Act requires the Secretary to provide, in advance, the assumptions and methodology to be used in each annual announcement. The Act further requires the Secretary to provide advance notice of, and an opportunity to comment on, "proposed changes to be made in the methodology from the methodology and assumptions used in the previous announcement" in the prior contract year.[13] Similarly, CMS committed itself not to "implement, other than at the beginning of a calendar year, requirements under this part that impose a new significant cost or burden on MA organizations or plans, unless a different effective date is required by statute."[14]

Also as described in Section III, CMS obtained bids from MAOs (and approved the soundness of those bids) based on the published methodology for projecting risk scores and estimating bid amounts. The Proposed Methodology would make payments using wholly different methodology. MAOs performed their end of the contract and provided healthcare benefits to their enrollees. The Proposed Methodology changes the assumptions on which the CMS pricing was established based on the MAO bids.

By changing a critical assumption and introducing a new methodology, the Proposed Methodology violates the advance notice requirements in the Act, and breaches the contract between MAOs and CMS. CMS did not provide (and has not otherwise provided)[15] advance notice of this change in assumptions and methodology.[16]

B.    The Proposed Methodology Must Be Promulgated Through Notice-and-Comment Rulemaking

In addition to the specific advance notice requirements discussed in Section IV.A above, the Proposed Methodology may not be applied retroactively because it "takes away or impairs vested rights acquired under existing law, or creates a new obligation, imposes a new duty, or

---

[13] Social Security Act § 1853(b)(2), 42 U.S.C. § 1395w-23(b)(2); *see also* Social Security Act § 1853(b)(3), 42 U.S.C. § 1395w-23(b)(3) (requiring an explanation of assumptions and changes in methodology).

[14] 42 C.F.R. § 422.521.

[15] The Proposed Methodology does not satisfy the notice-and-comment requirement for changes in assumptions and methodology for future contract years, as set forth in the Act. Social Security Act § 1853(b)(2), 42 U.S.C. § 1395w-23(b)(2). Rather, the Proposed Methodology is framed as an audit tool with respect to contracts already entered into. We believe that CMS must carefully consider and provide clear indications if it wishes to change the assumptions and methodology for projecting risk scores and other aspects of the bid process for CY 2012.

[16] Social Security Act § 1853(b)(2), 42 U.S.C. § 1395w-23(b)(2).

005111

EXHIBIT 2 - 048

Exhibit M
Page 91

Exhibit 3

Ms. Cheri Rice
Comment on RADV Sampling and Error Calculation Methodology
January 21, 2011

attaches a new disability in respect to transactions or considerations already past."[17]   The Proposed Methodology would alter the legal landscape that existed when MAOs submitted bids, as described above in Sections II and III, and in Section V below.   Most notably, MAOs had no notice that CMS would attempt to implement the Proposed Methodology, which had not been used or announced.   Nor would the Proposed Methodology be, as CMS has asserted, just "a means for ensuring that payments made to MA organizations comply with substantive rules governing MA payments that are set forth in the statute."[18]   RADV audits that rely on medical record validation alter the risk adjustment payment model because payment rates that were developed using Medicare FFS Claims Data would be retroactively adjusted using a different methodology – MA Claims Data supported by a medical record.

> Moreover, the Act requires that any:

> > rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard governing . . . the payment for services . . . [shall be] promulgated by the Secretary by regulation.[19]

The APA similarly requires notice-and-comment rulemaking before the Proposed Methodology is implemented because it is a substantive "rule" within the meaning of the APA.[20]   As it has not proceeded through this process, it is invalid and void.[21]

> Although Humana appreciates that CMS has provided this opportunity for comment on the Proposed Methodology, this procedure would not satisfy the requirements of notice-and-comment rulemaking even for prospective application.   CMS itself has already identified the Data Inconsistency Issue as a significant issue requiring further study, but has not yet proposed how it intends to address it.   As part of the formal rulemaking process that established appeals rights for RADV audits in April 2010, commenters raised the Data Inconsistency Issue and, as CMS described it, argued that CMS must "account for any error rates inherent in [FFS Claims Data] that affect MA error rates" before CMS can extrapolate alleged overpayments resulting

---

[17] *Nat'l Mining Ass'n v. Dep't of Labor*, 292 F.3d 849, 859 (D.C. Cir. 2002).

[18] Preamble discussion to Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs, 75 Fed. Reg. 19,677, 19,745 (Apr. 15, 2010).  There is no statutory provision that requires risk adjustment payments to be made based solely on validation of diagnoses in medical records.  In fact, the Act requires that CMS address the Data Inconsistency issue as discussed elsewhere in these comments.

[19] Social Security Act § 1871(a)(2), 42 U.S.C. § 1395hh(a)(2); H.R. REP. NO. 100-391, at 430 (1987) ("Policies meeting the definition [of covered policies] that were not issued in compliance with those procedures would be invalid.").

[20] 5 U.S.C. § 551(4); *see also Appalachian Power Co. v. EPA*, 208 F.3d 1015, 102627 (D.C. Cir. 2000) (recognizing that test methods for compliance are substantive rule because "changing the method of measuring compliance with an emission limitation can affect the stringency of the limitation itself").

[21] *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009) (holding that lack of notice and comment is "fundamental flaw that 'normally' requires vacatur of the rule").

005112

EXHIBIT 2 - 049

Exhibit M
Page 92

Ms. Cheri Rice
Comment on RADV Sampling and Error Calculation Methodology
January 21, 2011

from an RADV audit.[22]  CMS acknowledged the importance of the Data Inconsistency Issue, stating: "We recognize that there may be potential merit in further refining the error rate calculation. We are currently studying this issue."[23]  However, CMS has not proposed any mechanism for resolving the issue.  CMS must "respond in a reasoned manner to the comments received, to explain how the agency resolved any significant problems raised by the comments, and to show how that resolution led the agency to the ultimate rule."[24]  CMS must therefore address the Data Inconsistency Issue detailed in the Actuarial Report before implementing the Proposed Methodology, or any other methodology that computes extrapolated payment error amounts based on RADV audit findings.  As a result, we respectfully submit that CMS may not simply "post a final version of the RADV sampling and payment error calculation methodology" on its website, as CMS indicated it intends to do.[25]  Rather, CMS must address the substance of the public comments on the Data Inconsistency Issue that have already been presented and that have been further presented here.  It must publish its analysis and proposed resolution, with a statement of the basis for the proposed resolution.  That must be published for public comment prior to implementation.

        The United States Court of Appeals for the District of Columbia Circuit earlier this month reemphasized the need for the Department of Health and Human Services to follow the relevant rulemaking procedures, and consider and provide a reasoned response to comments submitted to the Agency arguing that the Agency's mathematical computations for implementing payment rates to hospitals were incorrect.[26]  Additionally, the President's recent Executive Order instructs agencies that the public has the right to comment on "all pertinent parts" of rulemaking, including "relevant . . . technical findings," before they are implemented.[27]  Here, CMS has already acknowledged the potential merit of refining the error rate calculation, highlighting the procedural flaw if CMS does not publish an analysis and propose a solution for comment.

        Simply asserting that the Proposed Methodology is designed to assure proper payments[28] does not suffice to meet the substance of the public comments or address the Data Inconsistency.  Nor are these simple assertions a legally sufficient response to the detailed analyses and arguments presented in this letter and the attached Exhibits, which are incorporated by reference.

---

[22] Preamble discussion to Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs, 75 Fed. Reg. 19,677, 19,749 (Apr. 15, 2010).

[23] *Id.*

[24] *Action on Smoking & Health v. C.A.B.*, 699 F.2d 1209, 1216 (D.C. Cir. 1983) (quoting *Rodway v. U.S. Dep't of Agriculture*, 514 F.2d 809, 817 (D.C. Cir. 1975)).

[25] Proposed Methodology, at 3.

[26] *Cape Cod Hosp. v. Sebelius*, No. 1:08-cv-1751, slip op. (D.C. Cir. Jan. 14, 2011).

[27] Exec. Order No. 13,563, 76 Fed. Reg. 3,821, 3,822 (Jan. 21, 2011).

[28] *See, e.g.,* Preamble discussion to Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs, 75 Fed. Reg. 19,677, 19,746–47 ("[T]he RADV is an audit process that is intended to validate the HCCs that were submitted by MAOs in order to determine whether the additional payment amounts associated with these diagnosis codes were properly made.").

- 11 -

005113

EXHIBIT 2 - 050

Exhibit M
Page 93

466
Exhibit 3

Ms. Cheri Rice
Comment on RADV Sampling and Error Calculation Methodology
January 21, 2011

CMS's failure to conduct an analysis of and to address public comments, and publish for public comment a proposed resolution of, the Data Inconsistency Issue would render invalid any extrapolated overpayment amounts calculated through the Proposed Methodology.

### C.   Arbitrary and Capricious and Contrary to Law

By failing to address the Data Inconsistency Issue and other issues identified in these comments, the Proposed Methodology is so internally inconsistent and illogical as to be arbitrary and capricious under the APA.[29]  That is, it fails to consider and address important factors,[30] and lacks a "rational connection between the facts found and the choice made."[31]

The Proposed Methodology is also "not in accordance with law,"[32] because it fails to implement various statutory provisions governing the Medicare Advantage program.  In addition to the important provisions discussed above in Sections III and IV.A relating to the bid process and advance notice requirements, the Proposed Methodology fails to implement the statutory provisions relating to risk adjustment.  Congress required CMS to adjust Medicare Advantage payments for health status "so as to ensure actuarial equivalence,"[33] and to ensure that risk adjusted payments reflect "differences in coding patterns between Medicare Advantage plans and providers under part A and B to the extent that the Secretary has identified such differences."[34]  Congress further required that CMS's method "account for variations in per capita costs based on health status."[35]  By failing to address the Data Inconsistency Issue, the Proposed Methodology would violate these provisions governing risk adjustment.  As discussed in these comments, by failing to address the Data Inconsistency Issue, risk adjustment payments will no longer be comparative with FFS, and would not properly compensate MAOs for the health status of their membership.

---

[29] 5 U.S.C. § 706(2)(a); *see also ABF Freight Sys., Inc. v. NLRB*, 510 U.S. 317, 324 (1994).

[30] *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) ("court must consider whether the decision was based on a consideration of the relevant factors"); *Woods Petroleum Corp. v. Dep't of Interior*, 47 F.3d 1032, 1037 (10th Cir. 1995).

[31] *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins.*, 463 U.S. 29, 42–43 (1983).

[32] 5 U.S.C. § 706(2)(A).

[33] Social Security Act § 1853(a)(1)(C)(i); 42 U.S.C. § 1395w-23(a)(1)(C)(i).  Adoption of the Proposed Methodology would also place CMS in conflict with various other provisions of the Act, including various aspects of the bid process including assuring the actuarial soundness of bids based on the cost of providing benefits to an enrollee with a "national average risk profile" (as defined by the Secretary).  Social Security Act § 1854(a)(6)(A)(i); 42 U.S.C. § 1395w-24(a)(6)(A)(i).

[34] Social Security Act § 1853(a)(1)(C)(ii)(I); 42 U.S.C. § 1395w-23(a)(1)(C)(ii)(I).

[35] Social Security Act § 1853(a)(3); 42 U.S.C. § 1395w-23(a)(3).

- 12 -

005114

EXHIBIT 2 - 051

467
Exhibit 3

Exhibit M
Page 94

Ms. Cheri Rice
Comment on RADV Sampling and Error Calculation Methodology
January 21, 2011

## V.     OTHER ISSUES

### A.   CMS's Proposed Methodology is Statistically Unsound

In addition to the Data Inconsistency described above, CMS's Proposed Methodology fails basic requirements for sampling and extrapolation.  Any authority to recover overpayments through an extrapolation methodology must be exercised consistent with a rigor that is missing in the Proposed Methodology.  Courts routinely scrutinize extrapolation, where it is authorized, to assess whether the extrapolation is statistically sound.[36]  Exhibit B includes a more detailed explanation of the statistical issues raised by the Proposed Methodology.

### B.   The One Best Medical Record

The above issues and concerns related to the Proposed Methodology are further exacerbated by CMS's use of the "one best medical record" requirement in conducting the audits.  The "one best medical record" requirement distorts the RADV audit results, highlights the Data Inconsistency Issue described above, and further undermines the actuarial and statistical validity of the Proposed Methodology.  It excludes relevant and probative evidence of members' conditions for reasons unrelated to probativity – *i.e.*, the ability of the evidence to show a member's "health status" in support of a risk adjustment payment.  In doing so, it effectively changes the statutory inquiry from "health status" to health status as established by only one best medical record.  In addition, it imposes documentation standards not enforced with respect to FFS Claims Data, and thus ensures a lack of both actuarial equivalence and actuarial soundness, as well as a lack of logical consistency.  CMS must also follow proper rulemaking procedures with respect to the "one best medical record" requirement because it is a substantive standard that may be accomplished, if at all, only by rulemaking.[37]  Finally, CMS may not retroactively apply the "one best medical record" requirement to contract years prior to adoption of such a rule.[38]

\*     \*     \*     \*

The above comments and the attached Actuarial Report highlight the economic and legal concerns associated with the Proposed Methodology.  As stated previously, CMS indicated that it would study the issue of FFS Claims Data adjustments, but there is no evidence that it has

---

[36] *See, e.g., John v. Sebelius*, 2010 U.S. Dist. LEXIS 107584, at \*14 (E.D. Ark. Oct. 6, 2010) (FFS Medicare case) ("[W]hen dealing with probability sampling, if a particular probability sample design is properly executed (i.e., defining the universe, the frame, the sampling unit, using proper randomization, accurately measuring the variables of interest, and using the correct formula for estimation) then assertions that the sample and its resulting estimates are not statistically valid, cannot be legitimately made.").

[37] *See* 5 U.S.C. § 551(4); Social Security Act § 1871(a)(2), 42 U.S.C. § 1395hh(a)(2); *see also Appalachian Power Co. v. EPA*, 208 F.3d 1015, 102627 (D.C. Cir. 2000) (test methods for compliance are substantive rule because "changing the method of measuring compliance with an emission limitation can affect the stringency of the limitation itself").

[38] *See Nat'l Mining Ass'n v. Dep't of Labor*, 292 F.3d 849, 859 (D.C. Cir. 2002).

- 13 -

005115

EXHIBIT 2 - 052

468

Exhibit 3

Ms. Cheri Rice
Comment on RADV Sampling and Error Calculation Methodology
January 21, 2011

done so.  While we fully support CMS' interest in ensuring that risk adjustment payments are made accurately, we believe that the Proposed Methodology threatens to fundamentally undermine the risk adjustment payment model.  In doing so, the Proposed Methodology jeopardizes the MAO's ability to provide Medicare beneficiaries with the health care coverage and benefits on which they depend by potentially limiting benefits, increasing premiums, and reducing plan choices.  In allowing comments, we believe that CMS recognizes the potential to significantly disrupt or even displace Medicare Advantage coverage for millions of seniors across the nation.  Accordingly, we respectfully request that CMS reconsider its proposed approach to payment validation and thoughtfully review these comments as well as the detailed discussion and recommendations contained in the Actuarial Report.

Thank you for your consideration of these comments.  Humana would welcome the opportunity to engage in further dialogue with CMS in order to ensure that efforts to accurately reimburse MAOs are actuarially sound, and will not result in any disruption to Medicare Advantage members and the benefits they receive.  Please contact me if I can provide any further information that would assist you in the evaluation of the issues detailed above.

Sincerely,

Heidi Margulis
Senior Vice President, Public Affairs

- 14 -

005116

EXHIBIT 2 - 053

Exhibit M
Page 96

469
Exhibit 3

# EXHIBIT A

005117

EXHIBIT 2 - 054

Exhibit M
Page 97



CONSULTING ACTUARIES & HEALTHCARE SPECIALISTS

BOSTON · CLEARWATER · DENVER · LOUISVILLE

# Actuarial Report on the
# Notice of Payment Error Calculation Methodology for Part C Organizations

This report addresses actuarial principles related to making contract-level adjustments that retrospectively reduce risk scores for Medicare Advantage Organizations (MAOs) by removing diagnoses that are not substantiated by the providers' medical records.  This report is being submitted to CMS in response to the request for comment on the *Notice of Payment Error Calculation Methodology for Part C Organizations* (the "Notice") dated December 20, 2010.

Wakely Consulting Group, Inc. ("Wakely") was retained by Humana, Inc. to provide an independent review and report regarding the Notice.  Wakely has no employment or other related party affiliation with Humana outside of this retainer, nor does it have a relationship with the authors of the Notice.  The report concentrates on the payment error calculation methodology and does not include any report regarding the sampling approach or the impact to the MA program if implemented.  This report is intended for CMS to use in response to the request for comment.  In the event that it is distributed more broadly, it should be distributed in its entirety.

I certify that I am a Member of the American Academy of Actuaries, and am in good standing as an FSA with the Society of Actuaries. I am familiar with the codes of conduct and standards of practice set forth by the professional organizations, and I am familiar with the actuarial concepts integral to MAO payment.

## I. Executive Summary

The Notice is characterized as simply implementing an audit function and validating data.  However, examination of the proposed changes indicates that it has broad actuarial implications.  The Payment Error Calculation Methodology ("Proposed Payment Adjustment") in the Notice would result in a significant change in the risk score system and MAO payment.

Risk adjustment and MAO payment are complex topics which require actuarial review.  The statute, CMS and the American Academy of Actuaries (AAA) all indicate the importance of actuarial principles in various MA matters, including bid development, risk adjustment and payment.  References include:

- Within the last year, the AAA has commissioned a task force to draft an Actuarial Standard of Practice (ASOP) on risk adjustment methodologies.  It has not yet been released.
- The bid submissions, which determine benefits and payment, are required to be certified by actuaries.

EXHIBIT A

005118

EXHIBIT 2 - 055

Exhibit M
Page 98

471
Exhibit 3

Actuarial Report
Page 2

– The Social Security Act specifies that "The Secretary shall adjust the payment amount….including adjustment for health status… so as to ensure actuarial equivalence."

In addition to requiring the risk adjustment methodology to be developed, the BBA required an evaluation of the actuarial soundness of the methodology by an independent actuary.  In response, a work group of the AAA commented on the actuarial soundness of the risk adjustment methodology in 1999.

In the same manner as the 1999 AAA comments, this report addresses how the Proposed Payment Adjustment impacts the actuarial soundness of the risk adjustment methodology, bid submission and payment process.

The Proposed Payment Adjustment is contrary to the following two actuarial principles:
1. The application of a risk model should be consistent with its development.

2. The bid submission process requires that actuaries have advance notice of assumptions and methodology of the MA payment process when calculating the values in the bids.

## II.  Description of the Proposed Payment Adjustment Methodology

Described below is the methodology outlined in the Notice regarding how risk scores and payments will be adjusted.

1. Obtain a statistically significant, stratified sample of enrollees who were continuously enrolled in the MAO during the prior year and had at least one risk adjustment diagnosis.
2. Require the MAO to produce qualifying medical records to substantiate the HCCs in the sample.
3. Evaluate the records and determine the HCCs that are supported by medical record review findings for the enrollee.
4. Revise the risk score based on the HCCs substantiated through the above process and recalculate the risk score and payment for each sampled enrollee.
5. Determine the payment error for each enrollee in the sample as the difference between the original payment and the recalculated payment.
6. Extrapolate the error rate from each stratum to determine an estimated payment error for the MA contract.

## III.  Development of HCC Methodology

The Hierarchical Condition Categories (HCC) model is developed using Medicare FFS (FFS) claims data.  It is a prospective risk adjustment system where the base year's (Year 1) diagnoses are used as predictors of the next year's (Year 2) FFS costs.  Diagnoses are mapped to groupings that CMS has determined to be predictors of medical costs for the subsequent year.  Over 15,000 ICD-9 codes are mapped to one and only one of the 804 diagnostic groups.  Diagnostic groups are further collapsed to about 70 condition categories, HCCs.

EXHIBIT A        005119

EXHIBIT 2 - 056

Exhibit M
Page 99

472
Exhibit 3

Actuarial Report
Page 3

After the categories (i.e. HCCs) are determined, a value of each HCC (a coefficient) is calculated by performing the following major steps:

- First each FFS beneficiary's HCC markers and demographic characteristics (e.g. age/sex) are determined from the enrollment information and diagnoses in Year 1 FFS claims data.
- CMS determines the Year 2 marginal cost of each of these respective HCC and age/sex components.  CMS does so by using a statistical regression analysis to assign the FFS costs of the FFS beneficiaries in Year 2 to the beneficiaries' Year 1 HCCs and demographic characteristics .
- CMS converts the Year 2 marginal costs to relative costs (risk coefficients) for each HCC and demographic cell by dividing the marginal costs for each component by the mean predicted Year 2 expenditure across all FFS beneficiaries.
- A Year 2 risk score for each FFS beneficiary can then be determined by adding the risk coefficients for the beneficiary's demographic characteristics and Year 1 HCCs applicable to that beneficiary.  The average risk score calculated in this manner across all FFS beneficiaries will be 1.0 for Year 2.
- Lastly CMS multiplies the coefficients by factors that adjust the coefficients for 1) expected FFS coding improvements and 2) differences in coding between the FFS and the MA program.
  - The first adjustment is to account for more complete coding in FFS between the Year 1 data and the diagnosis year used to determine MAO payment.  There is typically a lag of 2-3 years between the data used to calibrate the risk coefficients and the MAO payment year.  The first adjustment is intended to ensure that the average risk score across all FFS beneficiaries remains 1.0 as a result of improvements in coding since the model was calibrated.
  - The second adjustment is to account for more complete coding in MA than in FFS.
  - Neither of these adjustments directly considers the accuracy of the data underlying either the FFS data used to determine the risk coefficients or the MA data used to determine payment.

I am not aware of any audit, medical record review, or adjustment of the diagnoses in the FFS claims data used to establish the HCCs.  My understanding is that the diagnoses are used as submitted on the FFS claims by the providers.  Therefore, some diagnoses in the FFS data used to develop the risk adjustment system would not be substantiated in medical records.

Once the risk coefficients are determined, the risk score for a given individual is equal to the sum of their demographic and any HCC condition markers multiplied by the associated risk coefficients (i.e. a 'sum product').

The HCC model was developed for and is applied as part of the MA payment program.  The underlying premise is that the relative risk of the enrolled MA population can be measured and payment to MAOs can be adjusted to reflect expected costs using the HCC model, even though the factors were developed based on FFS data.  For example, suppose a subset of the population in FFS has an average risk score of 0.95; this means they are healthier than the average FFS individual and have health conditions with anticipated medical expenses that are 5% less than the average FFS individual.  When this same group of

EXHIBIT A       005120

EXHIBIT 2 - 057

Actuarial Report
Page 4

members is enrolled in an MAO, the application of the risk model indicates the MAO should be paid 5% less than average to cover the costs of the healthier population.

## IV.  Principle I: The application of a risk model should be consistent with its development.

The documentation of any risk adjustment methodology is generally focused on the concept that – 'the application of the model should be consistent with its development'.  Common topics associated with implementing risk adjustment systems reflect this principle.  These topics include claims runout, exposure periods, inclusion of diagnoses from encounter data when capitations are present, the time period between the experience period and application period, population carve-outs, reinsurance provisions, etc.  The point is always the same – to make the model's application consistent with its development.

In the MA risk adjustment system, the FFS claims data used to develop the HCC model has diagnoses that are not substantiated by medical records.  Therefore, the coefficient values depend on diagnoses that were not always supported in underlying medical record documentation.  The statistical regression technique determining the value of the coefficients and the relative value of the condition incorporates each marker indicated in the FFS data.  Having more or fewer markers in the FFS data would change the relative value (i.e. the coefficient) of each condition.

Because the number of markers are central to the coefficient development process, *as long as the coefficients are applied to similar data (with inherent unsubstantiated diagnoses), the methodology is sound.*  Various CMS documents and the statute confirm that accurate MAO payment depends on the similar coding between the FFS claims data and the MA claims data:

- The most compelling reference is the Social Security Act Section 1853 following the reference to actuarial equivalence which states: "In applying the adjustment under clause (i) for health status to payment amounts, the Secretary shall ensure that such adjustment reflects changes in treatment and coding practices in the fee-for-service sector and reflects differences in coding patterns between Medicare Advantage plans and providers under part A and B to the extent that the Secretary has identified such differences."  In response to questions about the risk score adjustment implementation resulting from this statute, The *Final 2010 Rate Announcement* elaborated on this concept by stating: "MA plans must code the way Medicare Part A and B providers do in order for risk adjustments to be valid.  This means MA organizations are coding 'accurately' when they are coding in a manner similar to fee-for-service coding used on the beneficiaries to whom MA plan enrollees are being compared."

- The *2008 Advance Notice* states: "because the CMS-HCC model is calibrated on [FFS] data and the resulting risk scores are adjusted for [FFS] normalization, MA coding patterns that differ

EXHIBIT A

005121

EXHIBIT 2 - 058

Exhibit M
Page 101

474
Exhibit 3

Actuarial Report
Page 5

from patterns in [FFS] may result in risk scores that are not equivalent to the risk scores of the FFS beneficiaries used to calculate the county rates."

The Proposed Payment Adjustment methodology adjusts the MA organization's payment by determining revised risk scores that reflect only HCCs substantiated by the medical records.[1] The proposed methodology in effect removes unsubstantiated HCCs from the risk score determination.  The Proposed Payment Adjustment methodology adjusts the MA organization's payment by estimating revised risk scores that reflect only HCCs substantiated by the medical records. The Proposed Payment Adjustment in effect removes unsubstantiated HCCs from the risk score determination[i] that were not removed in the initial development of the risk adjustment model. Therefore, the data used to develop the risk adjustment model may be fundamentally and materially different from the data used in the RADV audits to calculate the MAO's revised risk score and payment.

Without adjustment to other components of the payment system, the data inconsistency inherent in the Proposed Payment Adjustment causes a systematic reduction to MA risk scores resulting in a risk adjustment payment methodology that underpays MAOs.    Consider an extreme hypothetical example where the entire FFS population moves to an MA environment.  In theory, the average risk score for the MAOs should be the same as the average FFS beneficiary ( i.e. a "1.0").  However, the Proposed Payment Adjustment reduces the MAO risk score to something less than 1.0, an illogical outcome. The entire FFS population, which by definition characterizes a 1.0 average, should not have a lower risk score when enrolled in an MA environment.  Because MAO payment is based on this lower risk score under the Proposed Payment Adjustment, CMS underpays the MAO for the enrolled populations' risk.

## V.  Principle II: The bid submission process requires that actuaries have advance notice of assumptions and methodology of the MA payment process when calculating the values in the bids.

Any change to assumptions and methodology after the bid submission jeopardizes the actuarial soundness of bids.  The Social Security Act Section 1853 endorses the need for advance notice to the MAOs by requiring that CMS provide notice of assumptions and methodology, in the annual rate letter, and notice of changes at least 45 days in advance of the annual rate letter.

MAO payment rates, benefit plans and member premiums are not predetermined by CMS.  They are the result of a bid submission process in which MAOs must project the cost of providing the proposed benefits to an enrolled population in an actuarially sound manner.  Critical to this process is a valid and

---

[1] The proposed methodology includes both the potential removal of HCCs and a recognition of HCCs that were documented but not submitted by the plan for payment.  We focus on unsubstantiated HCCs in this report and believe this is not a misrepresentation of the overall result of the proposed method.  This belief is based on the indication in the Notice that CMS is seeking "payment recovery", which one would logically conclude means that there are fewer instances of documented but not submitted codes than codes that were submitted but not substantiated.

EXHIBIT A

005122

EXHIBIT 2 - 059

Exhibit M
Page 102

475
Exhibit 3

Actuarial Report
Page 6

consistent definition of a beneficiary with a "national average risk profile" and a consistent method for computing risk scores.  MAOs' correct understanding of the national average risk profile and method for computing risk scores is essential to determining a benefit design, member premiums, and payment rates that are financially viable.

 "The Required Revenue for the National Average Risk Profile" is an amount in the MAO's bid and directly affects the payment to the MAO.  The MAO's estimate of the Required Revenue for the National Average Risk Profile is derived in part from projected risk scores.

CMS pays MAOs for an enrolled member using the formula:

> (Risk Score of the member) times (the 1.0 bid) plus (the rebate.)

This formula shows that payment to MAOs is not only dependent on the member risk score, but also the amount of the  1.0 bid  and rebate, which are both determined via the bid submission process.  The "1.0 bid" is the MAO's estimate of the "Required Revenue for the National Average Risk Profile".

The 1.0 bid is a critical determinant of what MAOs get paid.  To the extent the bid submission under/overestimates the required revenue for a national average risk profile, the MAO will be under/overpaid.   CMS recognizes the significance of the 1.0 bid by requiring an actuarial certification stating that in accordance with Federal law, the bid(s) are based on the "average revenue requirements in the payment area for a Medicare Advantage/Prescription Drug enrollee with a national average risk profile."

Projecting an accurate 1.0 bid through bid submission depends on a thorough understanding of the MAO payment process, including how risk scores will be determined.  Table A at the end of the report demonstrates the relationship between the 1.0 bid and the projected risk score.   The 1.0 bid is the quotient of the "Plan A/B bid" (the projected costs for the expected population) and the projected risk score for the expected population.  An appropriate 1.0 bid requires projecting risk scores in the BPT in the same manner that MAO payment is made.    MAOs and actuaries have been aware that the risk coefficients were determined without medical record substantiation of diagnoses, and CMS has published risk scores for the FFS population that do not incorporate any review of medical record substantiation of diagnoses.

Because the advance and final rate notices for the payment methodologies did not contain any information regarding the Proposed Payment Adjustment, MAOs were not able to raise the issues discussed in this document, project the risk scores in the bids in conformance with the Proposed Payment Adjustment, or appropriately project the required revenue for an enrollee with a national average risk profile. MAOs did not anticipate in their bid submissions potential changes to risk scores resulting from the Proposed Payment Adjustment.

EXHIBIT A

005123

EXHIBIT 2 - 060

Exhibit M
Page 103

476
Exhibit 3

Actuarial Report
Page 7

The Proposed Payment Adjustment changes the how risk scores are calculated,  changes the definition of the required revenue for a national average risk profile enrollee, and renders the original actuarial certification invalid.

Had actuaries known that the MAO risk scores would be adjusted by the Proposed Payment Adjustment via RADV audits at the time of bidding, 1) the actuarial community would have likely raised concerns similar to those outlined in this document, and 2) the bids would have been completed differently. Specifically, the projected risk scores would have been lower.  This would have resulted in a higher bid amount (a higher projected expenditure for a beneficiary with a national average risk profile.  For bids below the benchmarks, there would have been reduced savings, less rebate dollars, and either less benefits or higher premiums for members.  (Table A at the end of this report illustrates the bid changes if MAOs had known that risk scores were going to be calculated on 100% substantiated diagnoses.)

In fact, it is unclear whether actuaries will be able to provide certifications of the 2012 bid submissions without qualifications (exceptions) if CMS adopts the Proposed Payment Adjustment.  ASOP 8, which provides guidance to actuaries submitting regulatory rate filings, states "the actuary should adjust past experience for any known or expected changes that, in the actuary's professional judgment, are likely to materially affect expected future results."  The Proposed Payment Adjustment methodology has very material impact on future results, depending on whether the MAO undergoes a RADV audit.  In the bid submission, the actuary will need to project risk scores and define the revenue requirements for an enrollee with a national average risk profile.  Yet the actuary will not know in advance whether the MAO will be subject to audit.  Depending on whether or not the MAO will undergo a RADV audit, the final risk score could vary significantly.  In short, actuaries will not know which methodology for determining risk scores will apply to the particular MAO – a RADV-adjusted risk score based on medical record substantiation, or the risk score methodology CMS used to calculate the coefficients and report FFS risk scores.  Even if CMS were to specify the plans to be audited, there would still be a mismatch between the coefficients published by CMS and the post-audit MAO risk scores, which could result in plan actuaries being unable to certify bids.

## VI.  Considerations for Appropriately Adjusting Payment for RADV Audits

If CMS is resolute in extrapolating a payment adjustment related to the amount of unsubstantiated diagnoses, it is only possible to remedy Principle I.  Because we cannot now go back and change our historical bids to reflect risk scores that are projected in the same manner as payment is being made, any retrospective change in risk score determination or payment methodology will result in a violation of Principle II.

However, it is possible to consider and propose a payment extrapolation approach that is more compliant with Principle I and may not be a significant violation of Principle II.  Two concepts that CMS could consider:

EXHIBIT A

005124

EXHIBIT 2 - 061

Exhibit M
Page 104

477
Exhibit 3

Actuarial Report
Page 8

    1) Correct the risk coefficients.
    2) Adjust the Proposed Payment Adjustment to reflect the difference in diagnoses substantiation rates of the MAOs versus the FFS program.

**Correct the Risk Coefficients**

Removing unsubstantiated diagnoses from the FFS data set used to develop the HCC model and developing a modified model to correct the coefficients would solve the data inconsistency in Principle I. The revised coefficients would be used when recalculating the risk scores and payments for all members in the sample (including members for whom there were no changes in HCCs). As explained above, risk coefficients include both demographic and HCC components.

If unsubstantiated diagnoses were removed from the FFS data set used to develop the HCC model, the modified model would result in HCCs with higher coefficients. Because the coefficients are determined through regression, this result is somewhat obscure. The explanation for the increase in coefficients depends on whether the diagnoses are truly identified conditions and just not substantiated or if they are errant diagnoses that have no predictive value of cost.

- Assuming that at least some of the unsubstantiated diagnoses are valid indicators of health status, the age/gender coefficients would increase as less variation in cost would be explained by identifiable conditions, and a higher proportion of costs would be assigned to a random component (a flat amount added to all age/gender coefficients) or differences in age and gender (a change in the slope of the age/gender coefficients). The accuracy of the risk adjustment model would decrease, and the HCC risk adjustment model would do a poorer job of fairly compensating MAOs based on differences in morbidity.
- To the extent that the unsubstantiated diagnoses are not valid indicators of health status, the HCC coefficients would increase as more variation in cost would be explained by the substantiated HCCs. The accuracy of the risk adjustment model would increase, and the HCC risk adjustment model would do a better job of fairly compensating MAOs based on differences in morbidity.

Either way, removing unsupported diagnoses from the FFS data used for setting the HCC coefficients would cause the risk coefficients on average to increase.

To illustrate this point, consider a simplified model where a base risk score is allocated to each member unless the member had diabetes, in which case they would get the base risk score plus an additional increase for the additional diabetes risk. Suppose the historical raw data used to set the risk scores looks as follows with 10 identified people with diabetes:

EXHIBIT A

005125

EXHIBIT 2 - 062

Exhibit M
Page 105

478
Exhibit 3

Actuarial Report
Page 9

| Member Type | Members | Ave Monthly Costs | PMPM |
|---|---|---|---|
| Non-Diabetes | 90 | $90,000 | $1,000 |
| Diabetes | 10 | $15,000 | $1,500 |
| Total Members | 100 | $105,000 | $1,050 |

Each person would be assigned the appropriate number of markers, indicating their condition(s). Non-diabetes members would each be assigned one marker, to indicate they would only receive the base component of the payment. Each diabetes member would receive two markers, one for the base component and one for the diabetes component:

| Member Type | Base Marker | Diabetes Markers | Total Markers |
|---|---|---|---|
| Non-Diabetes | 90 | 0 | 90 |
| Diabetes | 10 | 10 | 20 |
| Total Markers | 100 | 10 | 110 |

To calculate the average marginal value of the markers, the total cost is divided by the total markers ($105,000/110=$955). The average marginal value is divided by the average expenditure of $1,050 to find the average coefficient value of 0.909 ($955/$1,050=0.909). Note, that 0.909 is the average coefficient value, and that on average members have 1.1 markers for an average risk score of 1.0.

| Description | Amt |
|---|---|
| a. Total Costs | $105,000 |
| b. Total Markers | 110 |
| c. Average marginal value of each marker (a/b) | $955 |
| d. Average Expenditure | $1,050 |
| e. Average Coefficient Value (c/d) | 0.909 |

Now consider recalculating the average coefficient value assuming some of the diabetes diagnoses were not substantiated and are not valid indicators of diabetes. Suppose two members were found to not have appropriate substantiated claim records. The historical costs are still $105,000, but number of markers would be reduced to 108:

| Member Type | Base Marker | Diabetes Markers | Total Markers |
|---|---|---|---|
| Non-Diabetes | 92 | 0 | 92 |
| Diabetes | 8 | 8 | 16 |
| Total Markers | 100 | 8 | 108 |

Using the same method to calculate the average coefficient as before, the average coefficient value is now 0.926:

EXHIBIT A

005126

EXHIBIT 2 - 063

479
Exhibit 3

Exhibit M
Page 106

Actuarial Report
Page 10

| Description | Amt |
|---|---|
| a. Total Costs | $105,000 |
| b. Total Markers | 108 |
| c.  Average marginal value of each marker (a/b) | $972 |
| d. Average Expenditure | $1,050 |
| e. Average Coefficient Value (c/d) | 0.926 |

Removing the two unsupported diagnosis resulted in an average HCC coefficient increase from 0.909 to 0.926.  In general, removing the unsupported diagnosis in HCC development results in higher risk coefficients.

In summary, the point of this illustration is the following:

- Today's risk coefficients have been developed assuming unsubstantiated diagnoses are valid markers.
- The RADV audits are premised on the fact that unsubstantiated diagnoses are not valid markers and should not result in payment.  This is appropriate only if the HCC developed coefficients were developed on data that also did not include unsubstantiated diagnoses.
- Correcting the HCC development to remove the unsubstantiated diagnoses would result in higher risk coefficients.  In order to maintain appropriate payment, the Proposed Payment Adjustment must use these higher coefficients in calculating the revised payment if the unsubstantiated diagnoses are removed from the MAO data.  Without correcting the coefficients (or making potential other changes like FFS comparisons), the Proposed Payment Adjustment results in understated risk scores.

**Comparison to FFS**

Adjusting the Proposed Payment Adjustment to include a comparison of the MAO substantiation rate to the FFS substantiation rates is an attractive solution for a few reasons:

1) An adjustment reflecting the comparison of the diagnoses substantiation between MA to FFS is similar to the coding intensity adjustment that has already been implemented by CMS.
2) CMS has already established a sampling methodology through the RADV audit that would allow them to assess the substantiation rate in the FFS program.  Because of this, the comparison of the substantiation rates, using the same standards and methodology, would be the easiest method to implement.
3) Compared to correcting the risk coefficients approach above, this approach avoids any concerns that different coefficients may have resulted in revised benchmarks and other changes to the projected risk scores in the BPTs depending on the mix of membership enrolled.

---

EXHIBIT A

005127

EXHIBIT 2 - 064

Exhibit M
Page 107

Actuarial Report
Page 11


Wakely appreciates the opportunity to comment on this significant change in the MAO payment methodology.  If you have any questions regarding this report, please feel free to contact me.


Respectfully,


Julia Lambert, FSA, MAAA
Principal and Consulting Actuary
Wakely Consulting Group, Inc.
727-507-9858 x115


January 21, 2011

EXHIBIT A

005128

EXHIBIT 2 - 065

Exhibit M
Page 108

481
Exhibit 3

Actuarial Report
Page 12

**Table A**

Bid Amounts and Payment Results Under Current Methodology
Versus Assuming Retrospective Payment Adjustment

| Description (Column A) | PMPM Amounts | |
|---|---|---|
| | Current Methodology (Column B) | Retrospective Pmt Adj[1] (Column C) |
| **Bid Development of 1.0 Bid** | | |
| a. Standardized A/B Benchmark | $1,000.00 | $1,000.00 |
| b. Projected Average Risk Score for Plan Population[2] | 1.000 | 0.950 |
| c. Plan A/B Benchmark (a*b) | $1,000.00 | $950.00 |
| d. Plan A/B Bid for 2007 (for expected plan population) | $800.00 | $800.00 |
| e. Standardized A/B Bid  (1.0 Bid) (d/b) | $800.00 | $842.11 |
| f. Savings | $200.00 | $150.00 |
| g. Rebate/Amt Available for Supp Benefits (.75*f) | $150.00 | $112.50 |
| h. Expected payment/required revenue for benefits provided | $950.00 | $912.50 |
| | | |
| **Actual Payment (assuming population as expected)** | | |
| i. Initial Risk score of population (including unsupported diagnoses) | 1.000 | 1.000 |
| j. Initial Payment based on all diagnoses (e*i+g) | $950.00 | $954.61 |
| | | |
| **Adjustment for Payment for Unsupported Diagnosis** | | |
| k. Revised Risk Score | 0.950 | 0.950 |
| l. Payment adjustment (k-i)*e | -$40.00 | -$42.11 |
| m. PMPM Payment | $910.00 | $912.50 |
| n.  Difference from expected payment/required revenue (m-h) | -$40.00 | $0.00 |
| | paid $40 less than benefits provided | paid appropriately for benefits provided |

[1] Retrospective Payment Adjustment assumes risk scores in bids projected based on only supported diagnoses, but no other adjustments to risk coefficients or benchmarks are made.

[2] Average Risk Scores based on only supported diagnosis are assumed to reduce risk scores by 5%.

EXHIBIT A

005129

EXHIBIT 2 - 066

482

Exhibit 3

Exhibit M
Page 109

# EXHIBIT B

005130

EXHIBIT 2 - 067

Exhibit M
Page 110

## Exhibit B

Statistical Issues Related to the RADV Audit Proposed Methodology

CMS's Proposed Methodology fails several elementary requirements for sampling and extrapolation.  There are a number of problems with the Proposed Methodology that could result in biased samples and call into question whether certain aspects of the Proposed Methodology are statistically valid, including the following:

- CMS provides no statistical analysis to support basing its audit adjustments on reviews of 201 members, irrespective of an MAO's plan size.

- The Proposed Methodology fails to facilitate comparisons between MAO plans and, in particular, to facilitate correction of the Data Inconsistency Issue.  There are alternate statistical models that would be more appropriate for comparing plans, for example "Best Linear Unbiased Estimators,"[1] in order to evaluate the impact of non-validation between plans (including Medicare FFS).  (We note that while this may be an appropriate vehicle for doing a comparison of plans, however it would not solve the Data Consistency Issue on its own).

- MAO members in the sample will have varying exposure periods during the payment year.  While it is required that members be enrolled for all 12 months of the data collection year, the same is not true for the payment year.  Accordingly, the sampling must be adjusted to ensure proportionate representation of exposure periods in the sampled population compared to the eligible population.

- Different contracts and plan benefit packages with varying base premium amounts will be represented in the sample.  The sampling must be adjusted to ensure proportionate representation of different base premium amounts.  Bias in the sampling could exist if differences in base premium between the sampled population and eligible population are not recognized.

- The Proposed Methodology improperly computes the alleged overpayment payment based on the average of differences for the sample member's changes in total paid premiums ("Average Dollar Differences").  This convolutes the sample's exposure periods and base premiums into the assessment, although these values are determined for the entire population and do not require auditing.

- The sample also fails to assure proportional representation of all HCCs in the population, and does not represent the variety of providers whose data is being reviewed.

In addition, as a procedural matter, CMS should provide plans with a list of the enrollees eligible for RADV sampling, and the enrollees stratum, for each audit and allow plans to review and comment on the list to ensure that it meets the criteria identified by CMS for the eligible population.

---

[1] Rao, Poduri. *Sampling Methodologies with Applications,* 2000, Chapter 9, §§ 9.7-9.12.

005131

EXHIBIT 2 - 068

Exhibit M
Page 111

484
Exhibit 3

# Exhibit 3

Exhibit M
Page 112



# AMERICAN ACADEMY *of* ACTUARIES

January 21, 2011

Ms. Cheri Rice
Acting Director, Medicare Plan Payment Group
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, MD 21244-1850

**Re: Comment on RADV Sampling and Error Calculation Methodology**

Dear Ms. Rice:

On behalf of the American Academy of Actuaries'[1] Health Practice Council, I appreciate this opportunity to provide comments to the Centers for Medicare & Medicaid Services (CMS) in response to its recent request for comments on the Medicare Advantage (MA) risk adjustment data validation (RADV) payment error calculation methodology. We are concerned that the audit process as currently proposed would apply the risk-adjustment model in a way that is inconsistent with the way it was developed. This letter outlines our concerns.

**The Importance of Risk Adjustment**

In general, risk adjustment is intended to capture differences in morbidity from one cohort of individuals to another. As such, the CMS hierarchical condition categories (HCC) risk adjustment system is an important component of the MA program. Risk-adjusting plan payments can reduce incentives for plans to avoid high-cost enrollees and can help ensure that plan payments are adequate.

Throughout the development and refinement of the MA risk-adjustment model, CMS has sought to ensure that the risk-adjustment system properly reflects the differences in the risk profile of enrollees in a consistent manner. In addition, CMS has sought to recognize appropriate changes in fee-for-service (FFS) coding over time and differences in coding across programs.

Periodically auditing the data is appropriate to ensure that conditions are coded correctly and that risk scores and the resulting risk-adjusted payments properly reflect the underlying health status of MA enrollees. Because improper coding can result in inaccurate payments to MA plans, RADV audits can help improve plan payment accuracy.

**Concerns with Proposed Audit Process**

Our primary concern with the proposed audit process is that it creates an inconsistency between how the risk-adjustment factors were developed and how they now would be applied. An underlying principle of risk-adjustment systems is that there needs to be consistency in the way the model was developed and how it is used. The CMS-HCC risk-adjustment factors were developed with FFS data that, to the best of our knowledge, were not validated or audited for accuracy. The proposed audit process, however,

---

[1] The American Academy of Actuaries is a 17,000-member professional association whose mission is to serve the public on behalf of the U.S. actuarial profession. The Academy assists public policymakers on all levels by providing leadership, objective expertise, and actuarial advice on risk and financial security issues. The Academy also sets qualification, practice, and professionalism standards for actuaries in the United States.

005235

EXHIBIT 3 - 069

Exhibit M
Page 113

486

Exhibit 3

effectively would apply those factors only to MA data that are validated. In other words, the data used in the RADV audit to determine a plan's payment error are fundamentally and materially different from the data used to develop the risk-adjustment model.

If, as a result of the RADV audit, for example, certain lower-cost enrollees no longer are considered diabetic but would have been considered diabetic in the FFS data used to develop the risk scores, then the payment for diabetic members in the payment year could be inadequate. In this example, the risk score factor associated with diabetes would be understated relative to the factor that would have resulted from using only substantiated diagnoses, because the lower-cost patients would have lowered the average spending amounts among those identified as diabetics in the FFS data. When that factor is applied to similarly non-validated data, the total payments for those with diabetes would be adequate. When that same factor is applied only to those with substantiated data, however, the total payments could be too low.

This type of data inconsistency not only creates uncertainty, it also may create systematic underpayment, undermining the purpose of the risk-adjustment system and potentially resulting in payment inequities. In addition, the uncertainty related to a plan's ultimate post-audit risk score could make it difficult for actuaries to estimate the plan's risk score and certify the plan bid.

Extrapolating RADV payment-error calculations to adjust premium payments to MA plans represents a significant change in the risk-adjustment methodology. The Health Practice Council is concerned that the resulting modified payment methodology may not appropriately reflect the relative risk profile of enrollees in the affected MA plans.

********

As you may be aware, per a request from CMS (then the Health Care Financing Administration), the Academy reviewed the risk-adjustment methodology that was developed in response to requirements in the Balanced Budget Act of 1997.[2] We welcome the opportunity to serve as a similar resource to CMS. We would be happy to study more closely the current risk-adjustment and proposed audit processes and to consider potential options for addressing the above concerns. If you have any questions or would like to discuss these comments further, please contact Heather Jerbi, the Academy's senior health policy analyst (202.785.7869; Jerbi@actuary.org).

Sincerely,

Thomas F. Wildsmith, MAAA, FSA
Vice President, Health Practice Council
American Academy of Actuaries

cc: Richard Foster, Chief Actuary, Centers for Medicare & Medicaid Services (CMS)
Paul Spitalnic, Director, Parts C and D Actuarial Group, CMS
Timothy Hill, Deputy Director, Center for Medicare, CMS
Jennifer Harlow, Director, Division of Payment Validation, Medicare Plan Payment Group, CMS

---

[2] American Academy of Actuaries' Risk Adjustor Work Group, *Actuarial Review of the Health Status Risk Adjustor Methodology*, Jan. 14, 1999: http://www.actuary.org/pdf/medicare/hcfariskadj.pdf.

005236

EXHIBIT 3 - 070

Exhibit M
Page 114

487
Exhibit 3

# Exhibit 4

Exhibit M
Page 115

December 8, 2009

Charlene M. Frizzera, Acting Administrator
Centers for Medicare and Medicaid Services
U.S. Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue S.W.
Washington, D.C. 20201

**File Code:  CMS-4085-P, Document ID CMS-2009-0088-0002**

Dear Ms Frizzera:
Aetna Inc. appreciates the opportunity to present comments on the proposed rule regarding Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs.  The following outlines our specific concerns and suggested recommendations.

| Section A.  Changes to Strengthen Our Ability to Distinguish for Approval Stronger Applicants for Part C and D Program Participation and to Remove Consistently Poor Performers | FR Page # | Comments |
|---|---|---|
| II.   Provisions of the Proposed Regulations | 54639 | Related to the eight specific goals on which these proposed regulations are based, we would like to ensure that tangible measures are in place and these measures are communicated in advance to Plan Sponsors so that processes can be instituted to guard against the potential for non-compliance.  As an example, for the goal that reads "Strengthen our ability to distinguish for approval strong applicants for MMA participation and remove consistently poor performers", we request that specific, clear criteria be outlined that will ensure that a level playing field is in place and ask CMS to identify how 'poor performance' will be measured. |
| 3. Deny Contract Qualification applications Based on Past Contract Performance (§422.750 & §423.750) | 54641 | We support CMS' effort to develop a performance evaluation process; however we recommended a 12 month, not 14 month look back at performance data.  We strongly recommend the development of a consistent process that will applied across all contractors "nationally" regardless of their size or geographic location.  The performance measurement criteria developed needs to clearly establish what are considered "open issue" outliers and should be based upon significant proven non-compliance actions, sanctions and/or fines.  Open corrective actions for which an organization is in process of responding and working through with CMS or notices of non-compliance for which an organization has responded and resolved should not included in the criteria.   MAOs and Part D |

Aetna Inc.

608200

EXHIBIT 4 - 071

Exhibit M
Page 116

| | | |
|---|---|---|
| | | sponsors begin planning for expansions and filings in late Spring each year, therefore receiving guidance regarding this new evaluation process to be utilized is critical information for organizations to understand.  In regards to notifying organizations who CMS has determined do not meet the qualifications to file an application, we recommend CMS provide this notification within 15 calendar days of receipt of a written notice of intent, so organizations do not spend resources preparing and submitting applications.  We do not support that a decision to withdraw from a service area would be viewed as an indication of poor performance by an organization, since this type of decision could be result of other factors that are unrelated to performance. |
| 4. Use of Data to Evaluate Continued Ability to Act as a Qualified Sponsoring Organization Under Parts C and D (§422.504 & §423.505) | 54642 | We support the development of a consistent performance data evaluation process. However, we strongly recommend CMS conduct data analysis at the contract verses the PBP level (which could result in diluted data), where as contact level data analysis would provide the performance data required to evaluate contract comparability.  Additionally, we request CMS provide adequate lead time for the implementation of future data collection requirements so that organizations can plan and secure IT resources and funding required for implementation. |
| 5. Compliance Programs under Parts C and D (§422.503(b)(4)(vi) & §423.504(b)(4)(vi)) | 54643 | We supports the to change to section § 422.503(b)(4)(vi)(C) regarding the deeming of FWA training for medical providers as this is consistent with the recommendation made when we met with CMS staff to discuss this regulation earlier in the year.  We do not support the proposal to leave the current regulation "as is" for § 423.504(b)(4)(vi)(C), as it is our opinion based on feedback received that the FWA  training requirement is just as burdensome for contractors and Part D providers as it is for medical providers. We recommend rather than CMS expecting contractors to develop and provide FWA training (which results in inconsistent messaging) that CMS take accountability to develop standardized FWA training that addresses Original Medicare, Medicare Advantage and Part D fraud. The availability of standardized training material from CMS would be the most effective solution and it would ensure consistency while satisfying CMS requirements as to the topics and level of detail expected.  The standardized training could be made available on CMS' website for all providers and contractors to access.

Recommend CMS engage pharmacy associations such as the NACDS and Independent pharmacy associations to establish a registry of pharmacies that have completed training.  Sponsors could search the registry by NCPDP number and get the latest dates of training completion which would relieve the current administrative burdens associated to this existing regulation.  Sponsors should not be responsible for implementing or monitoring FWA activities of other contracted entities. Plan sponsors should be allowed to rely on contractual commitments by subcontractors that they will implement reasonable FWA activities related to their delegated activities and appropriate to their size and organization structure. .

Additionally, recommend organizations have the flexibility to identify and provide the appropriate level of compliance training for internal constituents. |
| 6. Network Adequacy of Coordinated Care and | 54644 | We supports CMS' approach to develop a consistent review process to determine network adequacy |

019200

Aetna Inc.

EXHIBIT 4 - 072

| | | |
|---|---|---|
| Network-Based Private Fee-for-Service Plans Under Part C (§422.112) | | which should help to reduce the inconsistency and subjectivity previously encountered with Regional CMS reviewers.  MAOs and Part D sponsors begin planning for expansion filings in late Spring each year; therefore it is critical for CMS to provide network adequacy guidance by late Spring to allow plans adequate time to conduct required market analysis. It would be beneficial for CMS to share the type of software mapping program that will be utilized to allow organizations the option of purchasing and utilizing this same software in their internal annual analysis of network development.  We recommend CMS provide their application training in early Fall, rather than the current January timeframe which is not beneficial given that applications are due in February.  Suggest that CMS move back the application due date from February to late March as in prior years or allow for a longer period than 10 days for MAOs to provide additional network data to cure identified deficiencies during the application review process.

We appreciate the recent Network Adequacy guidance CMS provided, but there is still the need for additional clarification required for the prevailing patterns of care and when 30 minute verses 30 mile criteria will be applied.  There is also the need for additional information regarding the minimum number requirement and specialty codes for the hospital based providers that will now be required in the HSD tables.  It is important to point out that organizations may not have direct contacts with some of these provider types, therefore given that a minimum number requirement has not been established for hospital based providers; we need to understand the implications for not including these types of providers on the HSD tables.  Recommend CMS establish a quarterly schedule for refreshing provider data on Medicare.gov since it is CMS' recommendation that organizations use this tool in their network analysis and development; however MAOs have expressed concerns with the inaccuracy and inconsistency of the data in this tool.

Additionally, CMS needs to consider that while county data may reflect an adequate number of available providers, there are several factors that could prevent an organization from securing a contract agreement, such as exclusive arrangements, unreasonable payment rates, etc.  CMS needs to also re-evaluate and further clarify some of the required documentation listed on the Exceptions Criteria list such as "claims data and local provider interviews" because as noted above the current 10 day timeframe allowed to cure network deficiencies will create a challenge for MAOs to provide such documentation.  Recommend CMS pilot the use of the automated system with some of the CY2011 applications to work through identified discrepancies and further develop network adequacy guidance to be applied with for use with the CY2012 applications that can be released in Spring of 2010. |
| 7. Deemable Program Requirements under Parts C and D (§422.156(b)(7), §422.156(f), §423.165(b) & §423.165 | 54645 | We support consistency of deemable requirements where permissible. We also encourage the agency to look at additional deemable requirements based on differences in the Part D program. |
| 8. Modify the Corrective Action Plan (CAP) Process as it Relates to Procedures for Termination and Nonrenewal of a Part C or D Contract by CMS (§422.506(b)(3), §422.510(c)(1), §423.507(b)(3), & | 54646 | We support CMS' goal to shift to an outcome-oriented, rather than process-oriented, approach for CAPs. However, in some situations 30 days would not be sufficient time to demonstrate a cure for deficiencies especially if corrective actions will require system changes and testing. We would support the development of a CAP within 30 day, provided that CMS and the organization can come to an agreement on realistic implementation timeframes based on the nature and extent of the |

Aetna Inc.

EXHIBIT 4 - 073

Exhibit M
Page 118

| §423.509(c)(1)) | | deficiencies requiring correction. We do not support a CMS applying a 30 day CAP timeframe or routine or ad-hoc audits. |
|---|---|---|
| 9. Procedures for Imposing Intermediate Sanctions and Civil Money Penalties Under Parts C and D (§422.756 & §423.756) | 54647 | Request further clarification regarding the types of immediate sanctions situations that will require the use of an independent auditor. Also recommend that CMS recognize that many organizations have available internal resources and expertise available to validate if deficiencies have been corrected. Recommend it be at the discretion of the MAO to hire an outside auditor, not make it a requirement. We are supportive of the proposed approach of a test period for marketing and/or enrollment activities. |
| 10. Termination of Contracts Under Parts C and D (§422.510(a) & §423.509(a) | 54648 | We support CMS' authority to take immediate action to terminate a contract if there is the potential for beneficiary harm or if an organization has substantially failed to carry out its contract obligations, however we do not support the inclusion of "failure to meet performance standards" given that CMS in still in the process of developing policies and performance data metrics to for program-wide evaluations and assessments and additional guidance is still expected. CMS states an organization could be out of compliance with a Medicare requirement based on their analysis of data related to that sponsoring organization's performance indicating it is an outlier relative to that of other organizations. Under the proposed language, CMS could terminate on the basis of a single instance in which a particular requirement is not met. The proposed grounds for termination and/or imposition of intermediate sanctions are overly broad and allow too much authority and discretion to CMS.

We recognize and support the importance of protecting the Medicare program against fraudulent or abusive activities, but have concerns with the proposal to amend the regulation to include false, fraudulent, or abusive activities affecting Medicaid, or other State or Federal health care programs. Our concerns have to do with the potential for a specific vendor of one program being at risk when that vendor is not involved with the other program (e.g., contracted vendor for a carrier's Medicaid program that is found to have some employees committing fraudulent acts when these employees have no involvement with the administration of the carrier's Medicare program). This type of situation should not result in contract termination. |
| 12. Burden of Proof, Standard of Proof, Standards of Review, and conduct of Hearing (§422.660, §423.650, §422.676, & §423.658) | 54650 | Request that CMS provide a definition for "preponderance of evidence standard". We are supportive of the extending the appeal determination deadline from July 15th to September 1st and request that CMS consider moving back the application filing deadline to late March to allow organizations more time to adequately prepare applications which could reduce the number of appeals. |
| 14. Time and Place of Hearing Under parts C and D (§422.670 & §423.655) | 54652 | We do not support the 5 day change proposed because this could have a serious impact to travel arrangements scheduled for hearing attendance. The need for a postponement to allow for additional preparation time is something both parties should be able to identify early in the process and should request within 2-3 business days of receiving the hearing notice to ensure all parties are notified timely of a request for postponement. |
| 15. Discovery Under Parts C and D (§422.682 & §423.661) | 54652 | We do not support the deletion of the formal discovery process; recommend the right for discovery be retained. |

Aetna Inc.

EXHIBIT 4 - 074

Exhibit M
Page 119

492
Exhibit 3

| 18. Prohibition of MA and Part D Applications for 2 Years After a Mutual Termination (§422.503(b)(6) & §423.504(b)(5) | 54653 | We do not support the proposal for a 2 year ban. Current market conditions with have necessitated the need for contract terminations and service area reductions. We request CMS allow flexibility on market re-entry based on environmental conditions and appropriate negotiations and approval with the agency. |
|---|---|---|
| **Section B. Changes to Strengthen Beneficiary Protections** | **FR Page #** | **Comments** |
| General Comment | | With the drop in reimbursement this year and over the next few years MAPD organizations budgets are going to become strained. We believe that CMS has an obligation to calculate the implementation costs of proposed regulations and balance these costs against the benefits for the regulation. We believe that these cost benefit analysis should be included in all proposed regulations. |
| 1. Broker and Agent Requirements Under Parts C and D | 54654 | We do not support the proposal to limit the use of brokers to certain times of the year and to a subset of beneficiaries; as there is clearly no values added with this approach. This would not be an effective approach and will only create additional confusion for beneficiaries. We believe that brokers and agents are critical consultants to beneficiaries throughout the year. Beneficiaries who age into Medicare or in special election periods rely on their established relationships with brokers for one on one consultation, advice and recommendations about the best plan based on the beneficiary's specific needs. This approach will also be very problematic for individuals with limited mobility or who cannot easily travel to receive plan information and education. In 2008, over 8,000 beneficiaries purchased an product from brokers of our plan during the off-cycle (non AEP/OE periods). This represents 23% of total sales during off cycle which highlights beneficiaries need and preference for this option.

CMS and the SHIPs should continue to explore methods to effectively educate beneficiaries on the plan options available, however there is concern that the individuals who work for the SHIPs are not licensed agents and the use of SHIPs beyond educational efforts could result in steerage. Recommend CMS review the best practices and oversight processes that organizations have implemented to monitor agent/broker activities, education, complaint tracking, terminations, etc. to develop an oversight module for all organizations to follow for consistency. |
| 2. Beneficiary Communications Materials Under Parts C and D (§422.2260, §422.2262, §423.2260, & §423.2262) | 54655 | We support the new definition of marketing materials for individual plan communication materials, but recommend it expressly exclude forms of communication from marketing materials and CMS should more explicitly define marketing material and enrollee communications.

We recommend CMS apply the operational material definition more broadly to include enrollment/disenrollment, appeals, and other materials for which CMS has provided model documents. Organizations utilizing model documents should be able to attest to this fact, but not have to submit materials via HPMS. Organizations and Sponsors could be expected to make materials readily available for random CMS audits to validate compliance. This recommendation would provide resource and cost savings for CMS, MAOs and Part D Sponsors. Request CMS continue to apply a waiver for employer group materials as well as expanding the employer waiver more broadly with employer enrollment materials. We would be willingly to work closely with the agency to provide issues employers experience w/CMS requirement documents. We also ask at this |

Aetna Inc.

EXHIBIT 4 - 075

Exhibit M
Page 120

| | | opportunity for the agency to exclude employer groups from the ANOC/EOC requirements during annual enrollment. We recommend Group members receive their EOC post plan election. |
|---|---|---|
| 3. Required Use of Standardized Model Materials Under Parts C and D (§422.2262 & §423.2262) | 54656 | We do not support this proposal; it is very broad and does not define which materials would fall into this category.  Organizations need to have flexibility in material development to ensure plan benefits and guidelines are accurately explained to prospective enrollees and existing members.  We continue to receive commentary from CMS model documents that lead to member confusion today.  Standardized materials are not effective for Dual Eligible SNPs which need to have flexibility to incorporate state specific information into standardized materials such as the Summary of Benefits.

Group materials need to continue to be waived from standardization requirements particularly on pre-enrollment because plan sponsors prefer to incorporate the MA plans information in other materials used through-out OE and we receive many requests for customization.

There has been inconsistency with the terms used in CMS' model materials and with the checklists plans area expected to complete. The continued release of untimely or multiple versions of model documents continues to severely impacts MAO and PDP plan material development and compliance with CMS designated mailing dates. |
| 4. Involuntary Disenrollment for Failure to Pay Premiums Under Parts C and D (§422.74 & §423.44) | 54656 | We recommend the 30 day grace period be retained as the minimum, with contractors being permitted to extend timeframe if desired. This would be in order to maintain the current administrative processes and would limit impact on overall plan costs by having to modify policies and procedures and make systems enhancements to support any proposed changes.  We currently extend beyond a 30 day grace period, and exclude low income subsidy eligible members from the non-payment termination process. |
| 5.Maximum Allowable Out-of-Pocket Cost Amount for Medicare Parts A and B Services (§422.100) | 54657 | While we recognize CMS' duty to insure benefit plans are non-discriminatory, it objects to this method of insuring non-discrimination for three main reasons: (1) It creates a discriminatory situation with Original Medicare. Since original Medicare does not have an out-of-pocket Maximum, then by the arguments made by CMS original Medicare would be considered a discriminatory benefit, (2) CMS is not funding this new benefit. Because CMS is proposing to mandate that all plans have an out-pocket-max they are obligated to adjust the underlying FFS prices and (3) Medicare Parts A/B do not have a comparable limit on OOP costs.  Imposing this requirement on MA plans creates an incentive for high utilizing members to join MA plans and discriminates against MA plans.  The resulting adverse selection would jeopardize the MA program's viability.

We generally support this proposal if CMS provides adequate funding to support the benefit enhancement.  Specific concerns about potential impacts of the requirement are:
(1) Inadequate Funding:  Requiring an OOP max as low as $3,400 is a significant enhancement compared to A/B benefits that is not funded as capitations currently paid to MA plans are based on costs incurred to deliver A/B benefits.  While certain MA plans have chosen to enhance their plans by implementing an OOP max, this should not be a requirement unless CMS provides adequate funding to all plans.  Table C2 of Milliman's Over 65 Health Care Cost Guidelines estimates that a $3,400 OOP max adds approximately $38 pmpm to the 2008 OOP costs for a 65+ population.  The added costs in 2010 for the overall Medicare population (including <65) would be ~$50 pmpm. |

Aetna Inc.

EXHIBIT 4 - 076

| | | |
|---|---|---|
| | | (2) <u>Increase in MA Premium/Loss of MA and Part D coverage:</u>  As is noted in the proposed regulations, imposing an OOP Max on all MA plans would result in premium increases in some plans.  This could have the unintended consequence of making the monthly premium for MA plans unaffordable to beneficiaries with modest incomes.  The Kaiser Family Foundation publication, *Examining Sources of Supplemental Insurance and Prescription Drug Coverage Among Medicare Beneficiaries: Findings from the Medicare Current Beneficiary Survey 2007*, includes a chart showing supplemental coverage by income level.  Individuals with incomes between $10,001 and $30,000 had the highest rates of Medicare Advantage.  (Income of $10,001 to $20,000, N=9.1 million and 26% have MA including with Part D).  (Income of $20,001 to $30,000, N=6.6 million and 24% have MA including with Part D).<br>(3) <u>Creates Non-Level Playing Field vs. Government's A/B Plan:</u>  Medicare Parts A/B do not have a comparable limit on OOP costs.  Imposing this requirement on MA plans creates an incentive for high utilizing members to join MA plans and discriminates against MA plans.  The resulting adverse selection would jeopardize the MA program's viability.  Minimum requirements for MA plans should be on a level playing field with A/B benefits.<br>(4) <u>Employer Group Waiver:</u>  If implemented, it is essential that CMS provide a waiver for employer group MA plans.  Employers frequently try to mirror benefits within the pre and post 65 retiree offerings.  Likewise, they also try to mirror overall benefits within their active populations to minimize disruption.  Implementing an OOP max would introduce variability that would impair a plan sponsor's ability to maintain consistency. CMS has alternative methods to achieve its duty with respect to benefits. For example they could continue with their review process as outlined in the proposed rule.  Implementing an OOP max would introduce variability that would impair a plan sponsor's ability to maintain consistency.<br>(5) <u>SNP Waiver:</u>  If implemented, CMS should exempt Dual SNPs from the requirement so that no monthly premium has to be charged related to the OOP Maximum.<br><br>An unintended consequence of imposing a mandatory OOP Max could be to reduce the number of beneficiaries with Medicare Advantage moving them to having "just" FFS Medicare with no supplemental medical and no Part D coverage.  In many markets, beneficiaries can purchase MA-PD plans and obtain Part D coverage at premiums that are less than stand alone PDP.  This makes Part D coverage affordable to some beneficiaries who may not qualify for Part D LIS.<br><br><u>Recommendation:</u>  We supports implementing a Maximum OOP Max as long as CMS funds the enhancement through increases to the capitation rates paid to MA plans (i.e. more than A/B funding should be provided if more than A/B benefits will be required).  If CMS does not explicitly fund an OOP Max, then we feel a Maximum OOP Max requirement should not be implemented.  If an unfunded Maximum OOP Max is required, it should be at least $7,500 so as to limit the impact on the sustainability of the MA program. Recommend that employer group plans and Dual SNPs be exempt from any OOP max requirement. |
| 6. Maximum Allowable Cost sharing Amount for Medicare Parts A and B Services and Prescription Drugs | 54657 | We recommend that CMS establish cost sharing thresholds for discriminatory benefits prior to the June bid, for example in the Call Letter. This will prevent having to refile plans with relatively minor adjustments after the June filing.   It is time consuming to resubmit bids after the June filing and |

002815

Aetna Inc.

EXHIBIT 4 - 077

Exhibit M
Page 122

| | | |
|---|---|---|
| | | delays organizations from producing accurate final member and marketing material.  The proposal is not clear on whether CMS would set cost sharing thresholds for all Medicare A, B and D benefits or only certain benefits identified as potentially discriminatory. We does not support having CMS set cost sharing thresholds for all Part A and B benefits but rather supports continuing to apply the logic in the BPT which assesses overall actuarial equivalence of each plan compared to FFS Medicare. If CMS sets cost sharing thresholds for discriminatory benefits and potentially additional A, B and Part D benefits, then an OOP Maximum is somewhat redundant.

We recognize CMS' duty to insure non-discrimination. However the proposed procedure is not equitable with original Medicare. (1) It creates a discriminatory situation with Original Medicare. To the extent the cost sharing maximums are lower than original Medicare, then by the arguments made by CMS original Medicare would be considered a discriminatory benefit, (2) CMS is not funding this new benefit. Because CMS is proposing to mandate that all plans have an out-pocket-max they are obligated to adjust the underlying FFS prices

We recommend this cost sharing guidance not be extended to MA group offering as it would impair a plan sponsor's ability to mirror coverage of benefits between their pre and post 65 offering and their current commercial offerings. Likewise, plan sponsors also try to mirror overall benefits within their active populations to minimize disruption.  Implementing an OOP max would introduce variability that would impair a plan sponsor's ability to maintain consistency. CMS has alternative methods to achieve its duty with respect to benefits. For example they could continue with their review process as outlined in the proposed rule. Recommend referring to the Social Security Act, Section 1853 (7) as amended. Set maximum cost sharing amounts at Original Medicare levels with Employer sponsored plans being exempt from the requirement.

The proposed rule indicates CMS would review annual Part D bid data to determine acceptable cost sharing tiers for other than defined standard plans, and that this would be based on review of prior year bids. We submit that any such review that excludes consideration of the breadth of formulary would result in an inappropriate maximum cost sharing threshold.  The formulary composition is a critical component in developing overall expected plan costs as it takes into account the actual amount of member cost sharing along with the tier structure of the Part D plan design. A plan design that is associated with a robust formulary should be able to support higher member cost sharing, particular for non-preferred drugs, compared to a formulary that meets minimum requirements and, coupled with low premium may be attractive to those with minimal drug utilization who seek protection from potential future changes in health status.  Formulary must be taken into account in assessing appropriate maximum cost threshold for the various cost sharing tiers. |
| 7. Prohibition on Prior Notification by PPO, PFFS and MSA Plans Under Part C (§422.2, §422.4, & §422.105(b) | 54658 | We do not support this proposal, MAO use pre-notification of plan services to help identify those plan members who may qualify for plan disease management and case management programs. For OON PPO and PFFS, this may be the only vehicle to help us to make this identification in a timely manner so that the plan can help address member health needs and potential impact on health care outcomes. Providing a lower cost sharing for this type of notification, without requiring notification, has helped us receive this timely notification and has promoted care coordination. Implementation of the provisions |

Aetna Inc.

EXHIBIT 4 - 078

Exhibit M
Page 123

496

Exhibit 3

| | | |
|---|---|---|
| | | suggested will significantly impede an MAO's ability to provide quality of care, one of the real value propositions of the MA Program. This process also helps to ensure that beneficiaries do not utilize costly OON services that do not meet medically necessity or Medicare coverage guidelines. We do not support limiting POS service to only HMO plans. We believe that it is appropriate for MA PPO plans to be able to offer incentives such as lower cost sharing for PCP selection, because this engagement with the member helps us to facilitate timely case management which can result in potential cost savings. |
| 9.Enrollment of Full Subsidy Eligible Individuals and Other subsidy Eligible Individuals Under Part D (§423.34) | 54659 | We would like to provide additional comments at a later time. To that end, we remain concerned as well with the amount of members who are re-assigned each year. We support additional diminmus capability as well as waiving premium difference above bench mark in order to remain the member. We are concerned with significant changes would impact the integrity of the bidding process. We recommend an industry work group to strategize directly with the agency on this issue. |
| 11. Transition Process Under Part D (§423.120(b)(3) | 54660 | Proposal is for Part D sponsors to provide for a transition for specified categories; request that CMS define "other coverage" related to the requirement to provide a transition period for 'newly eligible Medicare enrollees from other coverage'. Does this mean that newly eligible Medicare enrollees who don't have 'other coverage' should not qualify for a transition period? Request that CMS clarify that 'newly eligible Medicare enrollee' would not include anyone who had been eligible for Medicare as a result of a disabling condition and moves to being eligible for Medicare as a result of reaching the specified age (i.e., 65).

The proposal to provide a transition period to 'current enrollees remaining in the plan who are affected by formulary changes from one contract year to the next', appears to be eliminating the option to provide existing members the opportunity to request a "formulary exception" in advance of the beginning of the new plan year and implement only a transition fill. We strongly recommend maintaining the current process that allows members impacted by an annual formulary change the option for a formulary exception request to be submitted prior to the start of the subsequent plan year or a transition fill within 90 days of the start of the subsequent plan year. The cost to plans, and ultimately to enrollees, to implement a transition fill as a result of formulary changes from year to year would be expected to be greater than cost to process exception requests in advance of the beginning of a subsequent plan year.

We do not support the proposal about making reasonable efforts to notify prescribers that members cannot get a prescription refill due to transition policy. We are not set up to handle this type of process and have concerns due to errors in physician identification at the pharmacy and potential for PHI issues. The existing exceptions process should be utilized if a prescription cannot be filled. Without CMS issuing a physician mandate, it is unlikely that physicians will take any action upon receiving this type of plan notification until they hear from their patient. This proposal would result in additional administrative costs required to make systems enhancements to capture prescriber information, ensure pharmacies collect accurate prescriber information and modify pharmacy contract language to support this undertaking and also to allow for auditing. As the proposal is to require plan sponsor make "reasonable" efforts to perform this notification, there may be disparity in handling amongst Plan Sponsors as to what could be construed as "reasonable". |

002617

Aetna Inc.

EXHIBIT 4 - 079

Exhibit M
Page 124

| 12. Part D Sponsor Responsibility for Retroactive Claims Adjustment Reimbursements and Recoveries Under Part D(§422.256 & §423.272) | 54662 | Related to electronic transaction standards & timeliness of payment when coordination between carrier is needed: We recommend that a new NCPDP electronic standard(s) needs to be created (a new type of N transaction(s), so it would allow the Medicare Part D Sponsor to trigger this new type of N transaction to the TrOOP Facilitator whenever a correction has been made to the member's Part D cost share.  The information would contain the new copay from the primary Part D carrier (higher or lower than the original due to a correction).  TrOOP Facilitator would trigger this N transaction to be sent to the secondary carrier.  The secondary carrier can choose to update their claim as needed (does not need to be POS).  After the secondary carrier makes a correction, they would trigger a different type of N transaction to be sent to the TrOOP facility which would then send the updated PPA (Patient Paid Amount) back to the Medicare Part D carrier to replace what they had on file. |
| 13. Time Limits for Coordination of Benefits (§423.466) | 54664 | We recommend a 12-18 month time limit, not supportive of the proposed 3 year time limit; this would fall in line better with PDED reconciliation and decrease the need for dated re-opening periods. |
| 14.Use of Standardized Technology under Part D (§423.120) | 54665 | We are opposed to the requirement for Part D sponsors to create and exclusively use RxBIN or a RX BIN/PCN combination for part D members as well as to assign an RX identifier to a part D individual. Pharmacies are currently able to identify plan enrollees based on the required Part D coverage indicators that must be contained on member ID cards (i.e., Medicare Program Mark), in addition to real time processing edits and messages received.  The real time pharmacy point of sale processing systems currently in place allows pharmacies to process claims according to part D rules.

The establishment of Part D specific 4RX data will be a costly operational and systematic undertaking as many of our processes are hard coded, impacting enrollment, on-line processing, member notification (letters), ID card generation etc., and ultimately this recommended proposal will not change the point of sale processing.  This type of change would require Part D sponsors to make major system enhancements to their current systems, therefore the industry would need CMS to begin issuing specific technical guidance in early Spring 2010 to allow sponsors adequate lead time to begin planning, secure IT funding and develop the required system enhancements.  If this requirement becomes final, plans should not be expected to implement until January 1, 2012. Additionally, it is strongly recommended that this type of system change only occur for a January 1 effective date so that it is alignment with the renewal for the bulk of the membership.  We request clarification to the reference to "individual" Part D beneficiaries.  Is this a reference to members of individual (vs. group) plans, or a reference to any person who might have Part D? |
| 15. Absence from Service Area for More Than 12 Months under Part D (§423.44) | 54666 | We oppose extending the temporary absence from PDP plan service area to 12 months.  Instead we suggest either continuing the current policy or institute a similar policy as for MA organizations and allow the Part D organization to have the option to offer "visitor" program for currently enrolled individuals who are consecutively out of the area for up to 12 months, provided that plan has same range of benefits as available to other members.  To help contain costs, Part D organizations may vary Part D plans significantly by region, including varying the formulary, premium and cost share design.  In particular, a member from one service area may have different coverage of drugs than in another service area; therefore, the benefits for the out of area member would not be the same as what is available to other members enrolled in the area.  The extension to 12 months places additional risk to the PD organization for members that enroll in lower cost plan and but then reside in another higher cost area for up to a year. |

Aetna Inc.

EXHIBIT 4 - 080

Exhibit M
Page 125

498
Exhibit 3

| 17. Nonrenewal Beneficiary Notification Requirement under Parts C and D (§422.506 & §423.507) | 54667 | We support proposal to change to 90 day non-renewal notification and eliminate the requirement for public notice.  We continue to stress the importance of timely receipt of CMS' model non-renewal notice that is required as part of this process. |
| 18.  Notice of Alternative Medicare Plans Available to Replace Nonrenewing Plans Under Parts C and D (§422.506(a)(2)(ii) & §423.507(a)(2)(ii)) | 54668 | We recommendation that organizations not be required  to include alternative plan information in the non-renewal letter, rather the letter should contain language that directs impacted members to Medicare.gov Plan Finder for the most current plan information available in their service area.  Plans should have the option to contact impacted members by phone, but it should not be a requirement. |
| 23. Disclosure Requirements Under Parts C and D (§422.111(g) & §423.128(f)) | 54669 | The disclosure requirement whereby CMS may require plans to disclose to enrollees or potential enrollees' compliance deficiencies is a burdensome requirement that should be eliminated.  It is felt that this would cause unnecessary alarm for the existing beneficiaries, who will likely bombard CMS and the plan with calls and disenrollment requests that potentially could not be honored due to enrollment regulations.  It is expected that plans will be focusing resources on correcting the deficiency and should not then refocus those resources to deal with the unnecessary panic caused by the notification to enrollees not understanding the compliance innuendos of a federally mandated provision.  Additionally, we do not believe a satisfied enrollee is served by being provided this kind of notification, even if it would occur during and OEP or AEP, but rather only adds to the churn that CMS has worked diligently to avoid over the last several years. |
| **Section C. Changes to Provide Plan Offerings with Meaningful Differences** | **FR Page #** | **Comments** |
| Changes to Provide Plan Offerings with Meaningful Differences | 54670 | Related to the proposal to revise the nonrenewal regulations to expressly provide as grounds for nonrenewal that the plan has failed to attract more than a small number of enrollees over a sustained period of time:  We request that these factors be well-defined so that we can ensure we understand what a "small number of enrollees over a sustained period of time" might consist of.  This would assist in better managing our product development efforts in considering new service areas or plan revisions. |
| 1.Bid Submissions—Ensuring Significant Differences (§422.254 & §423.265) | 54671 | We supports a requirement for meaningful differentiation between bids provided that CMS implements clear, concise guidance around what constitutes a meaningful difference and that CMS enforces these requirements consistently across all sponsors and service areas.  We believe each organization should be allowed to offer a variety of plans that allow beneficiaries to balance provider access, premiums, and cost sharing levels with their individual needs.  As such, we feel that HMO and Local PPO plans should be viewed as meaningfully different due to the coverage of OON services under Local PPO plans.  MA-Only and MA-PD plans should also be viewed as meaningfully different.  As noted we are supportive of this change, if CMS will provide sufficiently clear guidance regarding meaningful differences between bids since this could simplify an organization's offerings and enable beneficiaries to make better plan choice decisions.

Related to ensuring significant differences in plan characteristics within a service area:  This requirement would seem to offset the need to continue imposing an absolute limit on the number of plans offered (e.g., limit of 3 individual PDP standalone plans per CMS region).  If meaningful differential in benefit offering is the guiding force, then that parameter on its own should be sufficient, rather than imposing an arbitrary limit on the number of plans. Requirements on variations in benefit |

618200

Aetna Inc.

EXHIBIT 4 - 081

| | | design in itself will control the number of plans offered. |
|---|---|---|
| | | Related to the proposed requirement that plans be dropped that do not offer meaningful choices for beneficiaries: We request clear definition of "meaningful" difference be provided far enough in advance of the bid submission due date in order to assist in planning and to avoid submitting bids that would not be approved. We would like to ensure that this be evaluated in a consistent manner amongst all Plan Sponsors in order to maintain a level playing field, so that specified criteria are provided. It would be helpful to understand any steps that CMS might be taking to make the assessment of 'meaningful' differences so they can be built into our own processes in developing plan/product design. |
| 2. Bid Review Process (§422.256 & §423.272) | 54672 | We will support this change if CMS clearly defines the meaning of "substantially different" before bids are due and the review process should be a collaborative effort between CMS and the sponsors in order to avoid unforeseen complications. Bid assumptions and calculations often consider all the plans offered in a given service area, so it is important that sponsors have the opportunity to revisit their assumptions if CMS does not accept all bids submitted by the organization. We recommend CMS provide explicit guidance on what will determine whether two bids are substantially different as part of the annual Call Letter. In the event CMS feels two bids are not substantially different, they should negotiate with the sponsor to come to a mutually acceptable resolution. |
| 3. Transition in cases of Acquisitions and Mergers (§422.256 & §423.272) | 54672 | We are not opposed to this proposal but do recommend that CMS allow and consider for special exceptions to be requested. |
| 4. Non-renewing Low-Enrollment Plans (§422.506(b)(1)(iv) & §423.507(b)(1)(iii)) | 54673 | We recommend a defined member threshold that averages more to a 250-500 enrollment versus a 100 member threshold. To that end, we recommend special considerations as new market entry are taken into consideration and appropriately negotiated with the agency. |
| **Section D. Changes to Improve Payment Rules and Processes** | **FR Page #** | **Comments** |
| 1. Proposed Risk Adjustment Data Validation Appeals Procedures (§§ 422.2 and 422.311) | | **Please refer to our detailed RADV Appeals comments contained at the end of this comment chart.** |
| 4. Calculation of Minimum Percentage Increase Under Part C | 54679 | CMS' interpretation of Section 1852(k) (1)(B); clearly says "Applicable Amount Defined: if such year is not specified under subsection (c)(1)(D)(ii), an amount equal to the amount determined under this paragraph for the area for the previous year (determined without regard to paragraphs (2) and (4)[344]), increased by the national per capita MA growth percentage, described in subsection (c)(6) for that succeeding year, but not taking into account any adjustment under subparagraph (C) of such subsection for a year before 2004" Subparagraph (C) contains the minimum 2% increase requirements. However 1852(k)(1)(B) only removes the minimum increase for years prior to 2004, we would like to understand the basis for CMS' interpretation. We recommend keeping the 2% minimum requirement and recalcute any retroactive payment from prior year. |
| **Section E. Changes to Improve Data Collection for Oversight and Quality Assessment** | **FR Page #** | **Comments** |

00282CO

Aetna Inc.

EXHIBIT 4 - 082

Exhibit M
Page 127

| 1.Requirements for Quality Improvement Programs Under Part C (§422.152, §422.153, & §480.140) | 54680 | We support Chronic Care Improvement projects but do not support any CCIP/QIP project mandate from CMS as this will be a resource drain. MAOs need to have the ability and flexibility to plan ahead and select programs that will be the most effective for their membership, rather than a "one size fits all approach". MAOs have experience in this area and with deeming and accreditation in place; there is not a need for CMS to have to select the project. It will also be problematic for MAOs to have to shift projects every year based on CMS' annual selections. Additionally, Dual SNPs may already be required to conduct required state QI projects.<br><br>We also have concerns about the timeliness of the analysis of the QIO data that CMS is proposing to use and if there will be additional burden placed on deemed plans that don't submit to the QIOs so that some sort of data could be all inclusive from the QIOs.<br>We have the following questions that were not addressed in the proposal:<br>1) Will plans that have passed an NCQA Medicare Deeming review be required to conduct the CMS defined CCIP?<br>2) Will NCQA Medicare Deeming standards, related to CCIP, also be updated to require a plan to conduct the CMS defined CCIP versus a plan selected topic?<br>3) Will NCQA Medicare Deeming standards, related to CCIP, also be updated to require a plan to conduct the CMS defined CCIP versus a plan selected topic? |
| 3. Validation of Part C and Part D Reporting Requirements (§422.516 & §423.514) | 54682 | We do not support placing provisions regarding the reporting requirement validation in regulation at this early stage in its development. There is concern that the validation mechanisms are very preliminary and should be vetted through the sub regulatory process. It is concerning that the validation approach being stipulated in regulation that is placing the full cost burden on the health plan, could be found to not meet CMS's needs related to data consistency/validity and the approach could change. It would be concerning to see this item be stipulated in regulation and these costs continue to be bore by plans, if the approach needs to evolve. Additionally, we have commented strongly that the level of reviews, the tools shared with plans, and the approach continues to require additional levels of revisions and clarity. These items have been shared with the administration through several avenues and commenting opportunities. Recommend CMS provide the audit requirements in sub regulatory guidance that is issued with adequate lead time to allow MAOs time for appropriate planning and funding that will need to be secured. |
| 4. Collection of Additional Part D Claims' Elements for Nonpayment- Related Purposes | 54683 | We request clarification on this proposal. Is this a reference to fields that have already been added to the PDED layout or is this a request for additional data to be sent? |
| **Section F. Changes to Implement New Policy** | **FR Page #** | **Comments** |
| 1. Protected Classes of Concern Under Part D (§423.120(b)(2)(v) | 54685 | Related to the clarification that MIPPA protections do not apply to non-Part D drugs: We appreciate the analysis and consideration that went into the definitions for application of the MIPPA requirements for the classes of clinical concern and support the language as stated in the section. We request that CMS will consider the impact on pricing and potential lost rebate opportunities which can result in lower costs to members when adding classes to those of clinical concern.<br><br>Related to the clarification on exceptions to the inclusion of drugs meeting the criteria under section 176 of MIPPA: We do have concerns about the potential restrictions on utilization management for |

Aetna Inc.

EXHIBIT 4 - 083

501
Exhibit 3

Exhibit M
Page 128

| | | |
|---|---|---|
| | | the current classes and future classes of clinical concern.  There are guidelines for therapy and treatment protocols for many of these drugs.  Currently CMS has put restrictions on the ability to manage to these guidelines in the six protected classes and this has created inconsistencies as to when guidelines are applied and inconsistencies around "all or substantially all". We have concerns that if rules are not applied consistently or if appropriate utilization management cannot be allowed to apply across the board (such as with some HIV drugs), then expansion of this will create inequalities in the benefits.<br><br>Proposal of determining which drug classes meet MIPPA criteria through "data driven" process, including analysis of certain reference materials (such as Part D compendia): This seems inconsistent w/ CMS guidance on how we can develop clinical criteria for use in coverage determination decisions.  We recommend that the same resources be used for making the decisions for which drug classes meet the definition as those that Plan Sponsors must use for management of the formulary.<br><br><u>Related to the options of announcing protected classes:</u> We appreciate the fact that government physicians and pharmacists provide a more efficient and cost effective process for review.  We recommend that input from the field may still needed in order to assess fully the actual impact of the decisions that are being considered.  In addition, Option 1 using the Call Letter will result in a delay in timing of formulary development.  We would support Option 2. |
| **Section G. Changes to Clarify Various Program Participation Requirements** | **FR Page #** | **Comments** |
| 4. Visitor/Traveler Benefit Under Part C for the Purpose of Extending enrollment Up to 12 Months (§422.74) | 54691 | We support providing Medicare covered services under the visitor/travel program, but are opposed to having to include optional supplemental benefits. This change would require organizations to have to adjust plan premiums and could ultimately impact an organizations decision to offer optional supplemental benefits such as dental coverage, if a plan is not able to develop and meet network access requirements in all MA service areas. |
| 5. Medication Therapy Management Programs Under Part D (§423.153(d) | 54692 | Related to the proposed requirement that MTMPs include interventions for both beneficiaries and prescribers:  We recommend that Part D Sponsors have the flexibility to determine if an MTMP intervention should be for member, prescriber or both.  The CMR should continue "to be offered" <u>not</u> "required to include" an interactive, person-to-person consultation.  This requirement may also be more of a hardship for member/caregiver, even if they want to participate.  In addition, there is the possibility that there will be a lack of success in reaching the member/caregiver during the outreach phase. |
| 9. Standard Timeframe and Notice Requirements for Coverage Determinations Under Part D (§423.568) | 54695 | Proposal states that there would be 14 days to make the determination with payment no later than 14 days of the receipt of the request.  In the event that the determination is made after the 9th day, it would be very challenging to send a check and meet the 14 day timeframe.  We recommend making modifications to the proposal as follows: "Make a coverage determination on a request for payment and notify the enrollee of its determination no later than 14 calendar days after receipt of a request for reimbursement, and (2) for favorable coverage determinations, make payment no later than 30 calendar days after receipt of the reimbursement request." |

0026622

Aetna Inc.

EXHIBIT 4 - 084

| 12. Clarify Novation Agreements Under Part D (§423.551) | | In general we support this change to match Medicare Advantage. We do recommend CMS allow special circumstances that may necessitate the need for novations of the Medicare PDP line of business. |
| --- | --- | --- |
| **Section H. Changes to Implement Corrections and Other Technical Changes** | **FR Page #** | **Comments** |
| 3. Revision to Definition of Gross Covered Prescription Drug Costs (§423.308) | 54700 | Related to proposal to change definition of gross covered prescription drug costs at an OON pharmacy: We recommend expanding the definition of gross covered prescription drug costs to reference covered Part D vaccines and their associated vaccine administration fees that can be obtained from non-pharmacy, out-of-network providers such as physicians and clinics. And while the "U&C" price is defined per § 423.124(a) as that which is charged by a pharmacy/provider to patients without insurance coverage, it is more appropriate to pay a vaccine administration fee subject to a scheduled amount, similar to how this would be handled for Part B vaccine administration fees.  We believe that additional flexibility is needed in the definition of gross covered prescription drug costs to account for a scheduled vaccine administration fee rather than an implication of it being subject to U&C to guard against permitting coverage for an excessive amount charged by a provider under a percent copay cost sharing tier. |

### Comments on Proposed Risk Adjustment Data Validation Appeals Procedures

### (§§ 422.2 and 422.311)

We welcome the opportunity to submit comments on the proposed rules governing administrative appeals for Risk Adjustment Data Validation ("RADV") audits that appeared in the October 22, 2009 Federal Register.[1]  While we share CMS's recognition of the need for a dispute and appeal process for audit, it is concerned that the proposed rules are too narrow and do not provide for meaningful appeals beyond correcting clerical errors.  Moreover, the proposed appeals procedures will effectively implement substantive requirements, such as the "One Best Medical Record" rule, that are contrary to Title XVIII of the Social Security Act (the "Medicare Act"), unsupported by the administrative record, and inconsistent with CMS's contractual obligations.  These subsumed

---

[1]      74 Fed. Reg. 54634, II.D.1., at pp. 54673-678, 54716, 54719-720(October 22, 2009).

Aetna Inc.

EXHIBIT 4 - 085

Exhibit 3

rules and limits on appeals may result in RADV audits that distort, not facilitate, the accuracy of payments to Medicare Advantage ("MA") organizations.

The proposed appeals rules raise four major concerns.  Specifically, the proposed rule:  (1) creates a contract-level rate adjustment process for MA organizations that is contrary to the statutory mandate that their rates be comparable to fee-for-service rates and is actuarially unsound; (2) imposes requirements regarding acceptable documentation for data validation and provider recordkeeping rules under the "One Best Medical Record" rule without proper rulemaking or an administrative record supporting such rules; (3) provides no substantive appeal rights and allows only for the correction of clerical errors; and (4) conflicts with current MA contracts.

As explained more fully below, these issues can best be addressed by withdrawing the proposed rules and instituting new rulemaking to determine the appropriate documentation needed to verify the health status of members, the statistical analyses to be used, and a full and fair appeals process for RADV audits.

1.    **Proposed Appeals Rules Need to be Consistent with the Medicare Act**

We are concerned that the underlying premise of CMS's proposed appeals rules is inconsistent with the Medicare Act.  MA payments are based upon the Medicare payments made to the fee-for-service ("FFS") providers under Medicare Part A and B.  The payments for the average FFS Medicare beneficiary provide the baseline for determining payments to MA organizations.  The Medicare members of a MA organization may incur higher or lower medical costs than the average FFS beneficiary depending on the

Aetna Inc.

EXHIBIT 4 - 086

members' health status.[2]  As a result, the Medicare Act requires that the payments to the MA organizations be adjusted for the healthcare status of its members, "that is, less for healthier enrollees expected to incur lower health care costs and more for less healthy enrollees expected to incur higher health care costs."[3]

To identify the healthcare status of Medicare beneficiaries, CMS developed a hierarchical condition category ("HCC" or "risk score") based on "such risk factors as age, disability status, gender, institutional status, and such other factors as the Secretary determines to be appropriate ...."[4]  HCCs reflect diagnosis codes that are clinically related and have similar cost implications.[5]  The HCCs are based on ICD–9–CM guidelines.  The ICD-9 is a complex system that identifies thousands of diagnoses.

There may not be a single ICD-9 that covers a specific chronic condition.  There may be a combination ICD-9 code that identifies the full diagnosis, while other times multiple ICD–9 diagnosis codes will be needed.  For example, an individual with diabetes will have a diagnosis of diabetes, but may also have other chronic conditions such as neurological or ophthalmic manifestations that also must be coded.  The combinations of the ICD–9 codes are used to create the HCCs and reflect the cost of treatment for the diagnoses.  All diagnosis will not necessarily be identified by the treating physician if a diagnosis will not impact the treatment to be provided.

---

[2]     *Id.* at 54673.

[3]     *Id.*

[4]     *Id.; see also* 42 C.F.R. § 42.308(c)(1).

[5]     74 Fed. Reg. at 54674.

Aetna Inc.

EXHIBIT 4 - 087

Exhibit M
Page 132

505

Exhibit 3

002625

The adjustments to MA payments based on HCCs also have "to ensure actuarial equivalence" to the FFS payments.[6]  The Medicare Act mandates that the payments be adjusted to:

> ensure that such adjustment reflects changes in treatment encoding practices in the fee-for-service sector and reflects differences in the coding patterns between Medicare advantage plans and providers under Part A and B to the extent that the Secretary identifies such differences."[7]

To ensure the "actuarial equivalence" that is mandated by the Medicare Act, each "MA enrollee's HCCs are assigned based on risk adjustment diagnoses from FFS claims and ... an enrollee's risk score ... is used to adjust a base payment rate" to the MA organization.[8]  As CMS has recognized:

> Given the fact that the MA payment methodology is based on fee-for-service payments, and that the risk adjustment methodology is designed to compare the risk scores of MA plan enrollees to other plan enrollees and beneficiaries not enrolled in MA plans, for this comparison to be valid, MA plans must code the way Medicare Part A and B providers do in order for risk adjustment to be valid.  This means that MA organizations are coding "accurately" when they are coding in a manner similar to fee-for-service coding used on the beneficiaries to whom MA plan enrollees are being compared.[9]

---

[6]    42 U.S.C. § 1395w-23(a)(1)(C)(i).

[7]    *Id.* at §1395w-23(a)(1)(C)(ii)(I).

[8]    *Id.*

[9]    CY 2010 Rate Notice, April 6, 2009, at 20

Aetna Inc.

EXHIBIT 4 - 088

Exhibit M
Page 133

Concomitantly, payments are accurate when the HCCs for MA organizations are adjusted to be comparable to the HCCs for the FFS sector. Thus, if an MA organization's Medicare members have lower HCC scores than the baseline FFS member, the MA organization is paid less, and if its Medicare members have higher HCC scores, the payment is higher.[10]

CMS's proposed administrative appeals regulations are inconsistent with the statute. Through the proposed RADV audit appeal process, CMS will impose a set of rules regarding physician record keeping that was not anticipated in the ICD-9 coding guidelines, not consistent with standard practices and not enforced on FFS claims. The result will be MA payment adjustments based on recordkeeping discrepancies without an adjustment to FFS risk scores for the same recordkeeping discrepancies.

Auditing only the MA organizations may determine how accurate MA organizations code, but without determining how MA risk scores compare to FFS coding, the audit will lack the appropriate baseline to determine if any payment adjustments should be made for the MA organizations. Even if the audits resulted in 100% accurate coding for the MA organizations, they still may be over- or underpaid. For example, if the FFS sector under-codes Medicare beneficiaries by 10%, then MA organizations that code 100% accurately would be overpaid by 10%. The converse would also be true, that is, if FFS providers over-code by 10% and an MA organization is coding 100% accurately, the MA organization would be underpaid by 10%.

Congress recognized that using the FFS payments as a baseline would hinge on the equivalency of the two sectors, and therefore provided that "[i]n order to ensure payment accuracy, the secretary shall conduct an analysis of the differences" between MA

---

[10]    74 Fed. Reg. at 54674.

Aetna Inc.

EXHIBIT 4 - 089

organizations and FFS coding practices."[11]  Congress understood that the MA payments are based upon the actual dollars paid to the FFS sector.  Absent such an analysis, no meaningful adjustment to MA payments based on an audit of their HCCs can be undertaken.  To require 100% accurate HCCs for the MA organizations when it is not required for the FFS sector will result in inaccurate payment adjustments.  Yet the audit and appeals process proposed by CMS does not allow for any evaluation of or proper comparison with the FFS sector.  The proposed appeals regulations fail to consider the other half of the equation–the risk coding accuracy of the FFS payments.  Moreover, appeals under Medicare Part A and Part B, and PRRB determinations, allow the submission of additional evidence and testimony.

To justify auditing only MA organizations, CMS assert that "there is an incentive for MA organizations to potentially over-report diagnoses so that they can increase their payment."[12]  Yet, MA organizations do not control the medical documentation.  Rather, they rely on physicians and practitioners who may have no stake in payments to MA organizations and therefore have no "incentive ... [to] over-report diagnoses ...."[13]  Even assuming this contention to be true, by failing to assess any "over-report[ing]" by the FFS sector, the MA payments must still be actuarially equivalent to the FFS payments.  That cannot be achieved without also auditing the FFS sectors' compliance with the recordkeeping rules.[14]  Moreover, there is no evidence that physicians providing

---

[11]     42 U.S.C. § 1395w-23(a)(1)(C)(ii)(II).

[12]     74 Fed. Reg. at 54674.

[13]     *Id.*

[14]     The Department of Health and Human Services has recognized in a recent report required by the Improper Payments Information Act that FFS providers do not consistently code diagnoses. "*Medicare Claim Review Programs: MR, NCCI Edits, MUEs, CERT, and RAC*," Centers for Medicare and Medicaid

Aetna Inc.

EXHIBIT 4 - 090

508
Exhibit 3

Exhibit M
Page 135

services to MA organizations' members document diagnoses differently for their FFS patients.  If providers document the diagnoses for all their patients the same, then there is no over-reporting for MA organizations' members as compared to FFS patients.

In addition, the sampling methodology used by CMS may be inconsistent with the Medicare Act.  Although CMS has yet to announce its sampling or extrapolation methodologies, the sampling methodology it used in the 2007 pilot audits undercuts the Medicare Act's mandate that the MA organization rates reflect the actual expectations of losses and benefits to be paid by each organization.[15]  In its 2007 pilot RADV audit, we understand that CMS sampled only enrollees with certain HCCs.  Random errors in assigning HCCs, however, are likely to result in both overstating and understating the risk factors.  By excluding from the sample all the Medicare members to whom MA organizations did not assign a high risk factor, the audit will overlook any errors resulting in the understatement of enrollees' health status.

Moreover, the proposed rule expressly prohibits MA organizations from introducing "new" HCCs in the course of the audit and appeal process if the HCCs were not previously assigned to enrollees.[16]  Since random errors can result in either under- or over-coding, a fair audit would allow for correction of all coding errors.  By precluding assigning a new HCC based on the medical records, CMS's audit will not determine whether correct HCCs were assigned to Medicare members.  Rather, the audits will eliminate HCCs that are not supported by the One Best Medical Record, but not allow new HCCs that are supported by the

---

Services, ICN # 006973 (Oct. 2008)  The Department indicated that it plans to work with FFS practitioners to improve medical record documentation practices.  *Id.*  Yet, MA organizations will be required to comply with the recordkeeping rules when the FFS providers will not be held to the same standard.

[15]    42 U.S.C. § §1395w-23(a)(1)(C).

[16]    74 Fed. Reg. at 54676.

Aetna Inc.

EXHIBIT 4 - 091

509
Exhibit 3

Exhibit M
Page 136

medical records. This will not lead to accurate coding, but under-coding. As a result, the appeals process is inconsistent with the statutory mandate that the MA rates accurately reflect expected losses and benefits paid and be comparable to the FFS payments. In addition to being inconsistent with the Medicare Act, an audit that only allows a downward adjustment is "unconscionable"[17] and will not achieve the "actuarial equivalence" mandated by the Medicare Act.[18]

II.   **The Administrative Appeals Rules Regarding the "One Best Medical Record" Create New Substantive Regulations**

The proposed administrative appeals process incorporates certain underlying requirements that have not been subject to proper rulemaking. Specifically, MA organizations will be limited to submitting One Best Medical Record to validate the HCCs of the beneficiaries in the RADV audit sample. Incorporated within the One Best Medical Record rule are requirements on how physicians and providers must keep records, code conditions, and care for their patients. These rules have yet to be subject to rulemaking and, therefore, there is no administrative record that supports these requirements or provides the courts with a meaningful record to review the requirement. Indeed, in an appropriate rule-making process, we would be able to provide record evidence that the One Best

---

[17]   *C.f. GloPak Corp v. United States*, 851 F.2d 334, 338 (Fed. Cir. 1998) (a market price adjustment clause must be a "two-way, not one-way street," allowing for both "an increase in the contract price,"  ); *also see., United States v. Delta Dental Plan*, 943 F. Supp. 172, 190 (D. R.I. 1996); *accord* Consent to Judgment at *United States v. Delta Dental Plan*, 1997 U.S. Dist. LEXIS 11239 at *3 (D. R.I. July 27, 1997); *United States by and through Woods v. Delta Dental Plan*, 1995 U.S. Dist LEXIS 9752 at *3-4 (D. AZ May 19, 1995).

[18]   It is worth noting that CMS's proposed extrapolation of the RADV is inconsistent with the intent of the Medicare Act. Medicare contractors are allowed to extrapolation "to determine overpayment amounts" only in extraordinary circumstances where " there is a sustained or high level of payment error; or ... documented educational intervention has failed to correct the payment error. 42 U.S.C. § 1395ddd(f)(3).

003500

Aetna Inc.

EXHIBIT 4 - 092

Exhibit M
Page 137

Medical Record rule would improperly exclude hundreds of valid HCCs from its 2007 RADV pilot audit.  The Administrative Procedures Act ("APA") mandates nothing less than such a formal rule-making process.

CMS applied the One Best Medical Record rule for the first time in its 2007 pilot RADV audits,[19]  This rule significantly limits the documentation an MA organization can use to support the HCCs assigned its members and is not consistent with current physician recordkeeping and patient care practices.  To verify an HCC of a Medicare member, CMS will only accept one medical record.[20]  According to the audit criteria specified by CMS, the one medical record has to include a diagnosis supporting the HCC(s) of the member that was recorded at the time the physician or practitioner personally saw the member, for a date of service within the audit data collection period, that includes the physician or practitioner's credentials, and that is signed by the physician or practitioner.[21]  A record that does not meet these requirements will not be considered as supporting an HCC for a MA organization's member.  The sole accommodation in its proposed rulemaking is that an MA plan may submit an attestation from the physician in case the One Best Medical Record failed to include the physician's signature or credentials.[22]

This documentation restriction is a substantial departure from the prior practice.  In previous audits, MA plans were allowed to submit new and clarifying documentation.  The HCC for a given member could be verified by multiple documents prepared by various physicians, all of which added up to and supported the HCC.

---

[19]     2006 Revised Risk Adjustment Data Training for Medicare Advantage Organizations Participation Guide at § 8.2.3.1.

[20]     74 Fed. Reg. at 54716

[21]     *Id.*

[22]     *Id.* at 54675.

Aetna Inc.

EXHIBIT 4 - 093

Exhibit M
Page 138

511
Exhibit 3

1.    The One Best Medical Record Rule

Notwithstanding that CMS has yet to announce the results of the RADV 2007 pilot audits, it has proposed appeal regulations that essentially incorporate the requirements of the pilot audits, including the One Best Medical record rule, as if they were already adopted as a regulation.  Before CMS can impose its One Best Medical Record rule, it needs to follow the basic rulemaking requirements in the APA.[23]  The Medicare Act specifically mandates that:

> No rule, requirement, or other statement of policy, (national coverage determination) that establishes or changes a substantive legal standard governing the…payment for services…under this title shall take effect unless it is promulgated by the Secretary by regulation …."[24]

The One Best Medical Record rule will subject MA organizations to potentially significant payment adjustments.[25]  The result will be payment adjustments that do not primarily correct for MA organizations' mistakes in coding HCCs, but for a MA organization's providers' recordkeeping and patient care practices that do not comply with CMS's One Best Medical Record rule.

Rather than implementing the One Best Medical Record rule through the proposed administrative appeals process, we suggest that CMS provide notice in the Federal Register of the One Best Medical Record requirement, allow interested parties to submit comments, publish a final rule with the statement of the basis of purpose, and grant the right to petition to modify or repeal the rule.[26]

---

[23]    5 U.S.C. § 553(b)(e).

[24]    42 U.S.C. § 1395(hh)(a)(ii).

[25]    74 Fed. Reg. at 54674 (Applying contract level adjustments based on the RADV audits "would result in substantially larger payment error than the previous enrollee-level audits)

[26]    5 U.S.C. § 553(b)-(e).

Aetna Inc.

002832

EXHIBIT 4 - 094

The purpose of the rulemaking is to allow an agency to obtain and consider all the potential information and data necessary to make a determination as to the propriety of any rule or regulation. The absence of such underlying information and data invalidates the rule.[27]

The importance of providing an opportunity for review and comments was recently recognized by the Office of Management and Budgeting ("OMB"). In its "Final Bulletin for Agency Good Governance Practices" Report, OMB stated that it "has been particularly concerned that agency guidance practices should be more transparent, consistent and accountable."[28] OMB acknowledged that any changes in procedures should include "public participation, including notice-and-comment under the [APA]…justification for the rule, including a statement of basis and purpose under the APA" and "judicial review."[29] The report recognized that rules "which establish new policy positions that the agency treats as binding must comply with the APA's notice-and-comment requirements, regardless of how they are initially labeled."[30]

The proposed administrative rule exemplifies why there is a need to submit the One Best Medical Record requirement to appropriate rulemaking. CMS asserts that allowing additional documents is "unlikely to result in any meaningful change in RADV audit results."[31] Yet, CMS in its proposed rule on administrative appeals never provides any of the data or cites to any studies or tests that support this contention.

---

[27]   *Tripoli Rocketry Ass'n v. BATFC*, 437 F.3d 75, (DC Cir. 2006); *Saint James Hosp. Heckler*, 760 F.2d 1460 (7th Cir.) *cert denied*, 474 U.S. 902 (1985).

[28]   OMB Final Bulletin at 2.

[29]   *Id.* at 3, 13-16, 22.

[30]   *Id.* at 3 (*citing Appalachia Power Company v. EPA*, 208 F.3d 1015, 1028 (D.C. Cir. 2000) (striking down admission to monitoring standards as legislative rules requiring notice-and-comment).

[31]   74 Fed. Reg. at 54677.

Aetna Inc.

002833

EXHIBIT 4 - 095

Exhibit M
Page 140

In fact, the proposal ignores the available information and data, all of which undercut the One Best Medical Record rule.  In 2005, CMS acknowledged that it "allowed MA organizations to submit new medical record documentation and clarifying documentation" if MA organizations disputed the audit findings, and CMS would then provide a "revised payment error estimate" if the HCCs were supported by the additional documents.[32]  These additional documents in fact verify the HCCs assigned to the MA organization's Medicare members.  In addition, when responding to the RADV 2007 pilot audit, we submitted additional documentation beyond the One Best Medical Record.  These documents demonstrated the validity of hundreds of the HCCs that CMS had challenged; yet, under the One Best Medical Record rule, they would not be considered by CMS.

The simple facts are that alternative sources of information are available to prove that a member has the condition diagnosed.  HCCs identify chronic healthcare conditions that generally are not curable, such as diabetes, congenital heart decease, paralysis and genetic disorders.  These chronic conditions are always present, but will not necessarily be diagnosed or even noted on every medical record.  Yet, CMS's proposed appeals process precludes submission of anything but a single medical record, even when the balance of the medical record would validate the HCC coding.

The One Best Medical Record Rule is inconsistent with the real-world medical keeping practices of providers.  In fact, multiple records are often needed to verify the accuracy of the HCCs of Medicare members.  There may not be a single medical record that verifies every HCC.  For example, the records of several specialists may be needed to validate the HCC, such as a diagnosis of diabetes with heart complications.  Similarly, pharmacy records and prescription drug data can verify many conditions such as

---

[32]   *Id.* at 54674

Aetna Inc.

EXHIBIT 4 - 096

514
Exhibit 3

Exhibit M
Page 141

diabetes, high blood pressure and other chronic conditions.  In addition, hospital records may shed light on the Member's condition whenever the medical record itself is not sufficiently clear.

In addition, Medicare beneficiaries with a valid HCC may not need to see a physician during the audit period, while others may only see a physician during the audit period for something not specifically related to the HCC diagnosis.  The purpose of medical recordkeeping is to document the patient's condition and treatment as necessary for clinical purposes.  Under standard record-keeping practices, there is no requirement that a patient's underlying diagnosis be "re-documented" in every record every year.  In fact, in the case of chronic conditions, the diagnosis will often not be noted each and every year following the initial diagnosis.  Whether such chronic conditions are recorded depends on the care sought and the treatment rendered during the period in question.  The lack of re-documentation of the underlying medical condition does not mean that the condition has "gone away," nor does it affect the kind and level of care the doctor provides.

For example, after an initial diagnosis of diabetes, a provider might or might not have reason to re-document the patient's diabetes in a subsequent year for clinical purposes.  In such circumstances, a MA organization would not be able to produce a record from the year being audited that included the diabetes diagnosis.  Although diabetes is a chronic condition that does not go away, CMS would conclude that the associated HCC was "invalid" solely because the plan could not produce documentation of the diabetes diagnosis during the audit year.  Under the One Best Medical Record Rule, the MA organization would be prohibited from submitting a record from the prior year with the diabetes diagnosis to substantiate the HCC, or a sworn statement from the physician stating that the

002835

Aetna Inc.

EXHIBIT 4 - 097

Exhibit M
Page 142

patient still had diabetes during the audit year. This makes no sense inasmuch as the stated purpose of the audit is to determine whether the individual actually had the condition identified by the HCC.[33]

The One Best Medical Record rule is also inconsistent with the mandate that MA payment adjustments be actuarially equivalent to the FFS sector.  There is no One Best Medical Record rule for FFS providers.  To the contrary, a Medicare Part B physician can fill in gaps in their own documentation by offering testimony to explain a beneficiary's condition when appealing a payment determination.  MA organizations should also have the ability to supplement medical record documentation.  The need for such additional documentation is even more compelling for MA organizations where the audit results may be extrapolated.

If rulemaking had been undertaken for the One Best Medical Record rule, a complete record could have been submitted to determine whether additional documentation or data would have a significant impact on audit results.  This is significant because the purpose of the audit is to ensure that MA organizations are properly paid.  An MA organization is properly paid if its members' HCCs are correctly validated and then compared to the FFS sector's validated HCC coding baseline.  CMS's limitations on corrective documentation unfairly eliminate from consideration medical information that could verify the HCCs for members.  As a result, CMS's One Best Medical Record rule fails to ensure the integrity and accuracy of the HCCs and could render the audits inaccurate.[34]  In

---

[33] Moreover, given that the stated purpose of the validation audits is to ensure proper HCCs were coded, CMS should look to the "best data available" to see if the HCC is supported before invalidating any HCC. *C.f., Baystate Medical Center v Leavitt* No. 06-1263 (JDB) (D.D.C. Dec. 8, 2008).  This should include data and records CMS maintains.  For example, every time a Medicare beneficiary receives inpatient hospital treatment, a bill is generated and sent to CMS even if the hospital is not seeking payment.  These bills will include diagnoses that CMS can use to verify these beneficiaries' HCCs.

[34] *Tripoli Rocketry Ass'n v. BATFC*, 437 F.3d 75, (DC Cir. 2006); *Saint James Hosp. Heckler*, 760 F.2d 1460 (7th Cir.) *cert denied*, 474 U.S. 902 (1985).

Aetna Inc.

EXHIBIT 4 - 098

Exhibit 3

essence, the One Best Medical Record tests a recordkeeping system rather than verifying that the proper HCCs are assigned to MA organizations' members.

    2.    <u>The Record Keeping and Coding Rules</u>

Similarly, CMS should undertake appropriate rulemaking to consider the recordkeeping and coding requirements incorporated in the One Best Medical Record rule.  These rules are the very bases by which CMS determines whether a health condition exists and whether the one record submitted by MA organizations validates the HCC coding.  Given the potential impact, rulemaking under the APA is required.[35]

Through the proposed appeals process, CMS requires physicians and providers to prepare a single medical document when he or she saw the patient that includes the all diagnoses, and contains the physician's or practitioner's signature and credentials.  Providers will be required to reproduce diagnosis information for chronic conditions every time they see a beneficiary even if the condition had been documented elsewhere in the member's medical records and there is no need to do so from a patient care perspective.  This is different from the current practice and mistakes documenting HCCs are to be anticipated.  Yet, physician diagnosis coding will determine the amount a MA organization is paid.  CMS never solicited comments from the physicians and practitioners as to whether the recordkeeping requirements are consistent with standard medical recordkeeping practices.  CMS never tested whether these requirements are reasonable or will impose undue and unnecessary burdens.

---

[35]    42 U.S.C. § 1395(hh)(a)(ii).

Aetna Inc.

002837

EXHIBIT 4 - 099

Moreover, the proposed appeals rules subsume the ICD–9–CM guidelines and impose record keeping practices that physicians and practitioners must use.  Although these coding guidelines are complicated, CMS seeks to implement them without determining whether the guidelines are reasonable, will impose undue and unnecessary burdens, or are likely to generate coding mistakes.  CMS nonetheless precludes a MA organization from correcting the submission or providing supplemental documents to verify the code on appeal.  To impose such recordkeeping and coding requirements will create discrepancies based solely on the recordkeeping rules, not on whether the member had the condition identified in his or her HCC.  The result will be less accurate payments in contradiction to the stated purpose in the Medicare Act.

Since the Medicare Act mandates that the MA payments be the "actuarial equivalence" of the FFS payments, the coding and document requirements must be equally applied.[36]  It is therefore essential for CMS to create rules for all providers, and not just implement these requirements through the appeals process for RADV audits of MA organizations.  Given the fact that the MA payments are based on FFS payments adjusted for how the risk scores of Medicare beneficiaries enrolled in MA organizations to Medicare beneficiaries serviced by the FFS sector, this comparison is valid only if the same coding and recordkeeping rules apply to both MA organizations FFS providers.  CMS, however, has never tested whether FFS providers comply with these coding and recordkeeping requirements.

Moreover, MA organizations must rely on providers, who may have no stake in payment, to generate the medical records and HCC codes submitted to CMS and face contract-level payment adjustments if providers fail to comply with CMS's recordkeeping

---

[36]     42 U.S.C. § 1395w-23(a)(1)(C)(i).

Aetna Inc.

EXHIBIT 4 - 100

requirements.  Since MA organizations account for only about one quarter of the total Medicare beneficiaries, enforcing the coding and recordkeeping requirements only on MA organizations will not likely change the coding and recordkeeping behavior of Medicare providers.  Rather, CMS must develop coding and recordkeeping rules through proper rulemaking and apply those rules to all Medicare providers.

Without an administrative record developed through rulemaking, CMS has no basis to determine whether these coding and recordkeeping requirements are reasonable or arbitrary and capricious, or whether they create actuarial variations between the FFS and MA payments.  The impact of these rules on the audit results will be significant.[37]  Failure by the physicians and providers to follow these requirements will subject MA organizations to potentially significant payment adjustments.  These payment adjustments will not be the result of improper HCCs, but the result of the failure of providers to comply with CMS's record keeping requirements.  Because these document requirements "establish … a substantive legal standard governing the…payment for services," rulemaking is mandatory under the Medicare Act.[38]

As a result, the proposed administrative appeals process is premature.  The first step is to determine whether the One Best Medical Record and its associated recordkeeping and coding requirements are reasonable by instituting appropriate rulemaking.  Only then will CMS have an appropriate record upon which to determine whether or not these recordkeeping requirements are justified; only then will CMS be able to determine what should be included in an administrative appeal.

---

[37]     74 Fed. Reg. at 54674.

[38]     *Id.* at § 1395(hh)(a)(ii).

Aetna Inc.

EXHIBIT 4 - 101

Exhibit M
Page 146

519
Exhibit 3

III.     **The Proposed Appeals Process is Too Limited**

The proposed rules provide "three RADV-related dispute and appeal procedures that MA organizations could undertake to reduce their RADV payment error to include—[1] Physician/practitioner attestation(s); [2] Documentation dispute; and [3] RADV payment error calculation appeal."[39]  Each of the three proposed appeal processes is so limited, as to preclude any meaningful appeal of a RADV audit findings. Rather, the three appeal procedures provide only a process to correct clerical and calculation errors.

1.     "Physician/practitioner attestation(s)" (Section 422.311(c)(2))

The proposed administrative appeals rule limits MA organizations to providing the "One Best Medical Record," which includes a diagnosis made during the year under audit by a physician or practitioner personally seeing the patient, signed by the physician or practitioner and includes his or her credentials.[40]  The first aspect of the proposed appeal process allows only for the submission of an attestation by a physician or practitioner where his or her signature or credentials was missing or incomplete on the One Best Medical Record that the MA organization submits in response to RADV audits.[41]  The attestation is limited to the one record the MA organization has already submitted in response to the audit.  The proposed rule specifically precludes an MA plan from providing any new or additional documentation supporting the HCCs of any member included in the RADV audit.[42]  Moreover, the attestation cannot

---

[39]      *Id.* at 54675.

[40]      *Id.* at 54675-676, 54716.

[41]      *Id.* at 54675-76.

[42]      *Id.* at 54676.

Aetna Inc.

EXHIBIT 4 - 102

Exhibit M
Page 147

be used to identify other diagnostic information regarding a member of the MA organization's plan.[43]  Simply put, this appeal process is limited to where the physician or practitioner failed to sign the medical record or to include their credentials in the record.  By limiting the attestations to verifying a provider's signature and credentials, CMS's proposed appeals process simply and effectively establishes the One Best Medical Record rule and precludes an administrative appeal of any substantive issues regarding potential RADV audit findings.

CMS also limits the submission of attestations to outpatient care.  CMS contends that "the percentage of payment error associated with signature and credentials for inpatient medical records is relatively small."[44]  Yet, CMS acknowledged that its earlier audits were not extensive and exclusion of attestation for inpatient records based on non-extensive audits is unwarranted.  CMS does not identify the "small percentage" of errors that would be corrected by allowing attestation of inpatient records.  Even a small percentage can be significant if it is extrapolated to make contract wide adjustments as proposed by CMS.  Furthermore, if the attestation corrections for inpatient records amount to a "small percentage," then the burden to submit and review such attestations will be minimal and excluding such corrections is inappropriate.

Finally, the proposed appeals rule limits attestations to those:

> [a]ttestations [that] accompany the medical record at the same time that the medical record is submitted to CMS for RADV audit.  MA organizations may not submit attestations before or after submission of their RADV medical records.[45]

---

[43]   *Id.*

[44]   *Id.* at 54675.

[45]   *Id.*

Aetna Inc.

EXHIBIT 4 - 103

Exhibit M
Page 148

MA organizations will not be permitted to provide attestations as part of an appeal.  Rather it is a requirement regarding the original submission of the medical record supporting an HCC.

This requirement is particularly troublesome since CMS will allow MA organizations only twelve weeks to produce the medical records validating HCCs.[46]  The process for locating and producing the documents for CMS review is highly labor intensive.  MA organizations must reach out to physicians, hospitals and other practitioners to obtain the medical records for members in  the sample identified by CMS and review these records to identify the best record for submission to CMS.  Problems can arise if a practitioner has retired, relocated, or died.  The records may not be readily accessible and the MA organization may need to make additional requests. To develop a meaningful administrative appeals process for the attestations, therefore, CMS needs to allow submission of attestations after the initial response to the RADV audit and to allow attestations that verify the diagnoses rather than just the signature of the provider.

2.   "Documentation dispute" (Section 422.311(c)(2))

Notwithstanding its claim to allow a "documentation dispute process," CMS limits the process to "errors that arise out of operational processing of medical records selected for RADV audit and submitted to CMS by established deadlines."[47]  By way of example, CMS notes that if a two page medical record became unstapled, an MA organization could correct the record by showing

---

[46]   *Id.* at 54676

[47]   *Id.* at 54675

Aetna Inc.

EXHIBIT 4 - 104

Exhibit M
Page 149

that it was in fact a single One Best Medical Record that was submitted to support the HCC.[48] The proposed regulation does not allow the MA organization to dispute any coding discrepancy, to submit new medical records, to provide previously missing medical records or to establish new HCCs for payment consideration.[49] This documentation review will be final and not subject to further administrative review.[50]

CMS's proposed "documentation dispute" appeals process allows an MA organization nothing more than to correct a clerical error, such as a two page document becoming unstapled. The fact that CMS "conduct[s] two rounds of medical record review by two independent contractors" does not alleviate the inadequacies of the proposed RADV audit and appeals process.[51] The inadequacies are not in the number of reviews or the "vigor" of the reviews, but in the limits imposed on what information will be considered during the audit and any subsequent appeals.[52]

The coding guidelines imposed by CMS on physicians and practitioners are complex and mistakes are inevitable. The administrative appeals process needs to allow, not preclude, a MA organization to submit supplemental documents to verify the code.[53] By not allowing the correction of coding mistakes, the result can only result in less accurate MA payments.

---

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *Id.*

Aetna Inc.

EXHIBIT 4 - 105

Exhibit 3

002643

The proposed appeal rule does not provide for a document review process, but a clerical error review that provides no meaningful administrative review for an MA organization to contest the interpretation of the documents submitted or to supplement the record to validate an HCC for a Medicare member of the organization's plan.  Moreover, like the attestation procedure, this limited appeal right effectively establishes the One Best Medical Record rule as a regulation.

>   3.   "RADV payment error calculation appeal" (Section 422.311(c)(3))

While the proposed rule provides three "layers of appeal" for contesting the "payment error calculations,"[54] the process actually amounts to nothing more than whether CMS added, subtracted, multiplied and divided correctly in calculating its audit error rate. Specifically, the proposed rule provides:

> Under the proposed RADV payment error calculation appeal process, we are establishing a three-level appeal process whereby MA organizations may—
>
> - Seek reconsideration;
> - Appeal the reconsideration decision to an independent CMS hearing officer; and
> - Appeal the decision of the independent CMS hearing officer to the CMS Administrator.[55]

This elaborate procedure does not mask the fact that there is no meaningful opportunity to contest the calculations and the underlying premises.

CMS has specifically precluded any challenge to the medical record review errors or attestation rules.[56]  MA organizations cannot submit any additional medical record for consideration in calculating the alleged HCC payment error.[57]  "Furthermore, MA

---

[54]   *Id.* at 54677

[55]   *Id.*

Aetna Inc.

EXHIBIT 4 - 106

002844

organizations cannot appeal the CMS's payment error calculation methodology."[58]   Accordingly, MA organizations will not be allowed to challenge the sampling methodology used in the audit nor will they be able to contest the statistical analyses or challenge the extrapolation methodology.

Instead, CMS asserts that it will annually publish its payment error calculation methodology and allow MA organizations to comment on them.[59]   This procedure is inadequate.   First, it amounts to CMS unilaterally imposing the payment error calculation methodology on MA organizations.   Second, simply allowing the submission of comments without providing a meaningful appeal to contest disputed methodologies forecloses any ability to administratively appeal this essential aspect of the RADV audits.   In fact, CMS specifically provided that, "MA organizations cannot appeal the CMS' payment error calculation methodology."[60]

.      Its only justification for precluding any appeal of the sampling and extrapolation methods is that "the methodology that we employ to calculate RADV payment errors is methodologically sound and academically defensible."[61]   Simply claiming its methodology is "is methodologically sound and academically defensible" does not excuse CMS from precluding any appeal to challenge it.

---

[56]      *Id.*

[57]      *Id.*

[58]      *Id.*

[59]      *Id.*

[60]      *Id.*

[61]      *Id.*

002645

Aetna Inc.

EXHIBIT 4 - 107

Exhibit M
Page 152

First, CMS fails to provide any record of submitting its methodologies to an academic review.  CMS should have included such studies with the proposed rule so that interested parties can review this claimed support and comment on any of these academic studies.

Second, the methodologies should still be subject to review through the administrative appeal process.  The methodology that CMS uses to determine payment adjustments will impact MA Plan bids and premium rates.  It is not clear when the annual notice will be provided to MA organizations, what level of detail will accompany the notice, and whether the notice will be sufficiently in advance of the bid submission process to allow plans to include it in developing bids.  A pre-audit announcement will be inadequate since the bid, benefits and rates have already been actuarially determined by the MA organization.  Post-audit explanations will be even less useful.  Yet, CMS indicated that it will provide an "expanded explanation of methodology as part of each audit report of findings that we send to MA organizations that undergo RADV audit."[62]  That is too late for MA organizations to include the potential results of the extrapolation in its annual bids.  It is therefore critical that MA organizations be able to appeal the methodology and the potential retroactive impact on MA organizations.

Third, if the methodologies are sound, they should be certified by an accredited actuarial organization based on an independent review.  When the risk adjustment system was established, the Medicare Act required the Secretary to submit an actuarial report to Congress[63].  A RADV audit process that will include an extrapolation to make contract-level payment

---

[62]   *Id.*

[63]   Social Security Act §1853 (3) (A)

Aetna Inc.

EXHIBIT 4 - 108

Exhibit M
Page 153

526
Exhibit 3

adjustments impacts the risk adjustment system and the original actuarial review.  A new actuarial report, therefore, is needed.  None of these steps, however, were done or are even allowed.

Even the "several layers of appeal available to MA organizations" in the proposed rules is an illusion.  If a MA organization seeks to appeal the audit finding to "an independent CMS hearing officer," the second layer of appeal, "[t]he Hearing Officer does not recalculate the error and offer either party an alternative RADV payment error."[64]  The hearing officer can only uphold or reverse the audit calculations.[65]  The "third level" of appeal to the CMS Administrator is "discretionary" and the Administrator can simply refuse to accept the appeal.[66]

There is nothing left to the "payment error calculation appeal" other than to contend that CMS has made a mistake in their arithmetic.  Accordingly, the proposed administrative appeals process provides no meaningful appeal.  The proposed rules create an appeal process that appears to be nothing more than an attempt to satisfy CMS's obligations under the APA.  It falls far short of those requirements.

IV.     **The Proposed Rules Should Not Be Retroactive**

The proposed appeals process does not take into account that MA organizations have already submitted their bids and have pre-existing contracts with CMS to provide benefits to Medicare beneficiaries who are a part of the organization's plan.  CMS's

---

[64]     *Id.* at 54678

[65]     *Id.*

[66]     *Id.*

Aetna Inc.

EXHIBIT 4 - 109

Exhibit M
Page 154

proposed appeal rules that implicate contract wide adjustments cannot be retroactively applied because: (1) a contract-level adjustment will be inconsistent with the actuarial assumptions and data used by MA organizations to determine their annual bids and how it would project risk scores; and (2) a contract-level adjustment will be inconsistent with the existing contracts.

1.   Actuarial Basis of MA Payment

Inherent in the actuarial processes and assumptions underlying the bids are that the risk adjustment will be based on a comparison to the Medicare FFS population provided by CMS in its rate letters. MA organizations compare their bids to the corresponding risk-adjusted benchmark to determine member premiums, co-pays and supplemental benefits.[67] MA organizations' payment rates, benefit designs and member premiums are inextricably linked to the estimates and assumptions supporting the bid, including the projected risk scores and benchmark.

If consistency is not maintained with Medicare FFS, the actuarial basis of the MA organizations' bids and resulting payments are undermined. The bid process is complex and MA organizations must project the cost of providing benefits to an enrolled population in an actuarially sound manner. To be able to submit a bid, MA organizations must know the rates and actuarial assumptions. A valid and consistent measurement of the projected risk of a given population is critical to this actuarial analysis. The projected risk impacts the MA organizations' benefit design, member premiums, and payment rates. As a result, the Medicare Act

---

[67]   42 U.S.C. § 1395w-24(b).

Aetna Inc.

EXHIBIT 4 - 110

mandates that CMS provide "[a]dvance notice of changes to be made in the methodology from the methodology and assumptions" to MA organizations.[68]

    The methodologies for calculating payment errors will have a direct impact on an MA Plan's bid submissions, including its premium rates and benefits packages.  It is, therefore, inappropriate to implement retrospectively an adjustment that was unknown at the time the bids were developed to payment rates.  To change the projected risk scores, often based on missing or incomplete records under the One Best Medical Record rule and without reference to fee-for-service error rates, will undermine the actuarial soundness of the original bids.  The bids 2007, 2008, 2009 and 2010 were developed and submitted prior to the proposed regulations.  Moreover, the bids for 2007 through 2009 were made prior to CMS even announcing its 2007 pilot RADV audit program.   The proposed RADV audits appeals rules include factors that were never provided to MA organizations before they submitted their bids.  No MA organization was aware that CMS would institute a One Best Medical Record that would limit the ability to validate HCCs; hold them responsible for the recordkeeping and risk coding of their providers; and adjust contract-level payment based on a yet to be identified extrapolation method.

    As a result, none of the MA organizations were able to anticipate these audits and actuarially include these factors in their bids.  Retroactive contract-level payment adjustments based on previously unknown RADV audits will create a fundamental disconnect between MA organizations' payments and the benefits offered.  Moreover, CMS reviews the bids submitted by MA organizations' bids to determine whether "(1) The bid amount and proportions are supported by the actuarial bases provided by MA [organizations], [and]

---

[68]    42 U.S.C. § 1395w-23(b)(2); 42 C.F.R. § 422.312(b); *see also*, 42 C.F.R. § 422.521 (requirements that impose "a significant new cost or burden" may be implemented only at the beginning of a calendar year).

Aetna Inc.

EXHIBIT 4 - 111

Exhibit 3

Exhibit M
Page 156

(2) The bid amount and proportions reasonably and equitably reflects the plan's estimated revenue requirements for providing the benefits under that plan ... "[69]  If CMS intended to make contract-level adjustments based on RADV audits, it had both the obligation and the opportunity to advise MA organizations that they needed to make adjustments in their bid based on anticipated RADV audits. CMS cannot now impose such a retroactive adjustment.

    2.   <u>Preexisting Contracts</u>

        Although the MA organization contracts with CMS provide for the submission of risk adjustment data to determine the risk adjustment factors, no provision provides for retroactive payment adjustments.  <u>Moreover, the Medicare Act and the applicable regulations require advance notice of changes in assumptions that will impact payments.</u>[70]

        The MA contract specifically addresses CMS's right and authority to implement changes during the contract year.  Only statutory changes that are made during the term of the contract (and changes in regulation and policies implementing such statutory changes) are deemed to be incorporated into the contract.[71]  There have been no statutory changes made during the term of any of the existing contracts that could be incorporated into the MA contracts that allow for any retroactive contract-level adjustment.[72]

---

[69]    42 C.F.R. § 423.256(b).

[70]    <u>42 U.S.C. § 1395w-23(b)(2), 42 C.F.R. § 422.312(b); <em>see also</em>, 42 C.F.R. § 422.521 (requirements that impose "a significant new cost or burden" may be implemented only at the beginning of a calendar year).</u>

[71]    <u>42 C.F.R. § 422.521.</u>

[72]    MA contracts at Articles II.B and II.C.

Aetna Inc.

EXHIBIT 4 - 112

0029500

Exhibit M
Page 157

The MA contract requires CMS to provide the FFS rates to be used to determine the MA rates.  CMS did not announce these audit requirements, the One Best Medical Record, or the limited appeal rights at any time prior to announcing the rates for 2007 through 2010.  Therefore, CMS cannot now retroactively change the payment.

CMS's proposed appeals process does not take these contractual obligations into account.  It does not allow an MA organization to explain how it generated its bid based upon the information provided to it by CMS at the time of bid calculation.  As a result, the process precludes any adjustment to the audit findings based upon contractual obligations.  Hence, it is inconsistent with CMS's current contractual obligations.

**V.**     <u>Conclusion</u>

The proposed administrative review process provides an inadequate review, allowing only for the correction of clerical and mathematical errors in the RADV audits.  It provides no meaningful administrative review of the substantive issues that may be raised in these audits.  Moreover, the appeals process is based upon RADV audit parameters such as the "One Best Medical Record" rule, sampling methodologies, and statistical and extrapolation methodologies, which themselves are invalid because they are inconsistent with the Medicare statute mandating "actuarial equivalence" to the FFS rates and have not been subject to proper rulemaking.

As a result, we respectfully requests that CMS:

1.      Withdraw the Risk Adjustment Data Validation Appeals rule;

2.      Institute rulemaking for the One Best Medical Record rule and the recordkeeping requirements;

002651

Aetna Inc.

EXHIBIT 4 - 113

3.     Institute rulemaking regarding the need for FFS auditing.  Only once such rulemaking is undertaken can an appeal process be developed that offers a meaningful opportunity for MA organizations to protect their rights and the rights of their members.

002652

Aetna Inc.

EXHIBIT 4 - 114

Exhibit M
Page 159

# Exhibit 5

Exhibit M
Page 160

Case 2:16-cv-08697-FMO-SS    Document 422-3    Filed 06/22/21    Page 534 of 1177    Page ID
#:14608
Case 2:16-cv-08697-MWF-SS    Document 182-1    Filed 12/08/17    Page 120 of 166    Page ID
#:2695

**America's Health
Insurance Plans**

601 Pennsylvania Avenue, NW
South Building
Suite Five Hundred
Washington, DC 20004

202.778.3200
www.ahip.org



December 8, 2009

Centers for Medicare & Medicaid Services
Hubert Humphrey Building
200 Independence Avenue, SW, Room 445-G
Washington, DC 20201

<center><b>Re:    CMS-4085-P</b></center>

Dear Sir or Madam:

I am writing on behalf of America's Health Insurance Plans (AHIP) to comment on the notice of
proposed rulemaking titled, "Medicare Program; Policy and Technical Changes to the Medicare
Advantage and the Medicare Prescription Drug Benefit Programs," published by the Centers for
Medicare & Medicaid Services (CMS) in the Federal Register on October 22, 2009 (74 FR
54633).  AHIP is the national association representing 1,300 member companies providing
health coverage to more than 200 million Americans.  These regulations have a direct impact on
AHIP's member organizations many of which participate in the Medicare Advantage, Medicare
Part D prescription drug benefit (Part D), and Medicare Cost Plan programs.

**Specific Comments**

**A.  Changes to Strengthen Our Ability to Distinguish for Approval Stronger Applicants for
Part C and D Program Participation and to Remove Consistently Poor Performers**

    **1.  Require Notice of Intent to Apply Under Part C and D Within application
    Requirements (§422.501 & §423.502; Preamble, p. 54640)**

    Under §422.501(b) and §423.5●2(b), CMS is proposing to require a Notice of Intent to
    Apply by the date specified annually by CMS as a condition for a new or existing MA or
    Part D contractor to be permitted to submit an MA or a Part D application.  We believe
    that the proposed codification of the requirement for submission of a Notice of Intent to
    Apply raises several concerns, because it eliminates flexibility currently exercised by
    CMS to respond to circumstances that may merit permitting submission after the
    established deadline, which in recent years has been three months prior to the due date for
    applications.

    On pages 54640 and 54641 of the preamble, CMS identifies the stated purpose for the
    Notice of Intent as allowing CMS to assign a pending contract number and complete
    CMS User ID connectivity.  Because applications are only submitted electronically,
    AHIP understands the need for the applicant to establish connectivity as a condition of

002718

EXHIBIT 5 - 115

Exhibit M
Page 161

534
Exhibit 3

December 8, 2009
Page 2

submission of the application. However, it is unclear that a three month lead time is necessary to assure that timely connectivity can be established, particularly for existing contractors who already have access to CMS systems. In addition to ensuring that connectivity can be established, it is our understanding that the Notice to Intent has served as an indicator to CMS of the number of applications that may be submitted so that the agency can plan to allocate appropriate resources for their review. However, it appears that this concern will diminish over time.

In the preamble, CMS notes that submission of a Notice of Intent is not binding. While this policy relieves a potential applicant from making a final decision about whether to apply prior to submission of the Notice of Intent, it does not take into consideration the possibility that organizations may not have considered submitting an application at the time the Notices of Intent are due, 14 months prior to the contract period. This might be the case for a variety of reasons. For example, after extended discussions, a state may express interest in contracting with dual eligible SNPs for the contract year at issue subsequent to the submission deadline, or an organization may reach agreement with an integrated delivery system that makes a service area expansion feasible.

For these reasons, AHIP recommends that CMS modify the proposed rule to permit the agency to grant exceptions to the submission deadline for the Notice of Intent to Apply under appropriate circumstances (e.g., when new information becomes available to the potential applicant subsequent to the deadline). We also recommend that in establishing the annual submission deadline in guidance, the agency establish a date that is closer to the application submission deadline.

2. **Application Requirements (§422.501(c) & §423.502(c)) and Evaluation and Determination Procedures for Determining Whether Applicants are Qualified for a Contract Under Parts C and D (§422.502 & §423.503; Preamble, p. 54641)**

- CMS is proposing to modify the regulations at §422.502(c)(2) and §423.503(c)(2) by adding a new paragraph to clarify that applicants must adhere strictly to CMS deadlines for submission of additional or revised information in response to a notice of intent to deny an application. While clarity regarding CMS' intent to enforce the deadline is constructive, there are several important practical issues that we believe should be addressed in order to avoid inappropriate barriers for applicants who are prepared to meet program requirements to serve Medicare beneficiaries.

    + First, AHIP's understanding is that CMS' current policy is to deny an entire application if a single county fails to meet CMS' access requirements and that any decision by an applicant to drop a county from its application must be made prior to the end of the 10 day period following a notice of intent to deny that identifies

002719

EXHIBIT 5 - 116

Exhibit M
Page 162

535
Exhibit 3

December 8, 2009
Page 3

network deficiencies in the county. This result undermines the purpose of the intent to deny process. In a number of cases, we understand that applicants that have disagreed with CMS' network adequacy determinations have been reluctant to seek re-evaluation of their networks in specific counties because of the possibility that CMS will confirm its original finding and deny the entire application. This concern is particularly acute for MA organizations offering PFFS plans that are submitting applications for network-based PFFS plans. Many of these organizations currently have contracts covering a number of states. A denial of one county in one state could result in the denial of an entire application. To address this problem, AHIP recommends that CMS revise its policy to provide that an applicant for a network-based plan or service area expansion may drop a county or portion of its service area that has been identified in an intent to deny notice after receiving CMS' final decision based upon the additional information submitted by the MA organization. In addition, AHIP recommends that CMS review each proposed change to the regulation to assure that this policy result is permissible under the revised language.

+   Second, we understand that in some cases CMS has identified deficiencies in applications subsequent to the issuance of a notice of intent to deny. While we recognize CMS' interest in acting upon deficiencies identified at any point in the application process, we believe that it would be inequitable for CMS to deny an application on this basis, if the agency does not provide notice to the applicant and an opportunity to cure the deficiency, consistent with the rights accorded by the notice of intent to deny process. Accordingly, we recommend that the agency explicitly provide in the regulation for a process to permit applicants to cure deficiencies identified by CMS subsequent to issuance of the notice of intent to deny. If such an opportunity is not provided, CMS should base any Denial Notice only on issues raised in the notice of intent to deny and not on deficiencies that are identified later in the application review process.

+   Third, in past years, applicants have raised concerns about lack of clarity in some of the CMS review criteria (e.g., network access standards and other criteria not explicitly addressed in written guidance), and the flexibility provided by CMS in allowing applicants to cure deficiencies has mitigated the potential for adverse consequences. As CMS moves forward to apply strictly the 10 day time frame following the notice of intent to deny, AHIP believes it is essential that CMS ensure the clarity and transparency of its program requirements and review criteria so that the agency and applicants will have a consistent understanding of the expectations on which CMS bases its contract approvals and denials.

002720

EXHIBIT 5 - 117

Exhibit 3

Exhibit M
Page 163

December 8, 2009
Page 4

- CMS is proposing to revise the regulation at redesignated §422.501(c)(2) and §423.502(c)(2) to provide that applicants for contracts under Part C and Part D must meet all (not substantially all) program requirements. The agency provides the following explanation for this change in the preamble at page 54641:

  > During the first four years of the Medicare Advantage and Part D programs, several unsuccessful applicants contested our denial of their applications for MA organization or Part D sponsor contracts. At hearings, some of those applicants were successful in arguing that the regulations were not clear in stating that an applicant needed to demonstrate that it met all program requirements to qualify for a contract.

  AHIP's understanding is that Hearing Officers interpret this provision quite narrowly and have overturned CMS' denials in a very limited number of cases. For example, of the appeals that were filed in 2008, only three CMS contract denials were overturned for this reason. In addition, we note that CMS is proposing to revise redesignated §422.501(c)(2) to read, "The authorized individual must thoroughly describe how the entity and MA plan meet, or will meet, all the requirements described in this part." (Emphasis added.)

  Since the CMS application does not, in general, call for a narrative description of how requirements will be met but relies principally on completion of a series of attestations and tables, and in light of the extensive, detailed requirements included in the CMS regulations and related subregulatory guidance, we believe that the requirement for a comprehensive showing that all requirements have been met is not practical. We assume that CMS intends that applicants must affirm that they have met or are prepared to meet all of the requirements reflected in the attestations and that they be prepared to demonstrate the basis for their responses to the attestations as part of the application review process. We believe that substantial compliance is the appropriate standard for such a showing, particularly in light of CMS' expectation that in some cases, the applicant must provide assurances that requirements will be met in the future. Accordingly, we recommend that CMS modify the proposed rule by revising redesignated §422.501(c)(2) and §423.502(c)(2) to be consistent with the content of the attestation-based application.

3. **Deny Contract Qualification Applications Based on Past Contract Performance (§422.750 & §423.750; Preamble, p. 54641)**

   CMS is proposing that the agency may deny an application for failure to comply, during the 14 month period preceding the application deadline, with program requirements under a current, as well as a previous contract, or failure to complete a corrective action plan

002721

EXHIBIT 5 - 118

Exhibit M
Page 164

December 8, 2009
Page 5

during that period.  The preamble discusses the approach that CMS will utilize to make such a determination.  AHIP understands CMS' interest in clarifying and providing greater specificity in the regulation concerning the agency's authority to deny an application based on a contractor's past performance.  If CMS adopts the proposed regulatory changes, we have identified two implementation issues that we believe should be addressed.

- First, contractors invest substantial resources in completing and submitting the application and incur ongoing administrative expenses to sustain activities necessary to prepare for implementation of a new contract or service area expansion.  However, by the deadline for the Notice of Intent to Apply, CMS is likely to have most of the information for the evaluation of past performance that could result in disapproval of the application.  Accordingly, AHIP recommends that CMS signal in the preamble to the final rule that the agency will establish a process by which a potential applicant could receive, upon request, a preliminary finding that indicates whether past performance is likely to be a barrier to approval of a new contract, so that the contractor can determine whether to invest in pursuing an application.

- Second, AHIP recommends that the CMS criteria for determining whether an application will be denied based on past performance be issued in detailed subregulatory guidance that is subject to the agency's informal process for review and comment.  We also recommend that the agency allow a four week period for this review to permit a thorough evaluation of the proposed criteria to ensure that the criteria are clear, transparent and can be consistently understood by MA and Part D contractors and CMS and consistently applied by CMS reviewers.  The criteria should also be fair and reasonable.

For example, an organization that has resolved deficiencies that resulted in a corrective action plan or sanction should not have an application denied for this reason absent unusual circumstances.  An organization that holds multiple contracts might have a single deficiency that affects all contracts and therefore results in multiple corrective action plans.  An organization in this situation should not be penalized unduly because of repeat findings stemming from a single deficiency.  In addition, findings that CMS determines warrant a contract denial should be material.

Further, in the past when the agency has utilized an outlier analysis, outlier status has triggered further investigation in order to determine whether circumstances are present that mitigate the finding.  We believe that outlier status alone is inappropriate as a criterion for contract disapproval.  For example, sponsoring organizations that face special challenges because of the populations they serve could inappropriately be identified as outliers on certain performance indicators that may not be suited to the

002722

EXHIBIT 5 - 119

Exhibit M
Page 165

538
Exhibit 3

December 8, 2009
Page 6

characteristics of the sponsoring organization and its members (e.g., SNPs that serve a high proportion of chronically ill beneficiaries). If outlier status is established as one of the criteria for contract disapproval, it will be important for the outlier threshold to be established in such a way that it does not call into question participation by an MA or Part D contractor that is serving its members and the program well.

**4. Use of Data to Evaluate Continued Ability to Act as a Qualified Sponsoring Organization Under Parts C and D (§422.504 & §423.505; Preamble, p. 54642)**

CMS is proposing to add a new paragraph (m) under §422.504 and a new paragraph (n) under §423.505 that would authorize CMS to determine that an organization/sponsor is out of compliance because it has failed to meet performance standards established by CMS or because the organization's performance represents an outlier relative to the performance of other MA organizations. AHIP's comments immediately above also apply to this proposal. Moreover, when, as in this case, CMS is proposing to take away a property right, i.e., the contract with CMS, whether through termination or nonrenewal, AHIP believes it is particularly important that the criteria that CMS follows to evaluate performance be fair, reasonable, and transparent to the organization/sponsor.

**5. Compliance Programs under Parts C and D (§422.503(b)(4)(vi) & §423.504(b)(4)(vi); Preamble, p. 54643)**

CMS is making a number of changes to the compliance program requirements in §422.503 and §423.504. In a number of instances, CMS is proposing to add language making the compliance program requirements more prescriptive. AHIP and our member companies agree that effective compliance program implementation is a high priority, and in general, we believe CMS' proposed changes are integral elements of a good compliance program. However, AHIP has identified two areas in which we have comments and concerns with regard to the proposed amendments to the regulations.

- First, §422.503(b)(4)(vi)(B)(1) and §423.504(b)(4)(vi)(B)(1) would require that a compliance officer, vested with the day to day operations of the compliance program, must be an employee of the MA organization/PDP sponsor. Many MA organizations and PDP sponsors have a number of related entities which may hold separate contracts with CMS. In these circumstances, it is common for the entities to centralize the compliance function for effectiveness and efficiency, so that the compliance officer who is employed by one entity is responsible for the compliance functions of several other affiliated entities. Moreover, these entities may be established for legal rather than operational reasons and may not necessarily be employing staff who are responsible for activities under the MA or Part D contract.

002723

EXHIBIT 5 - 120

Exhibit M
Page 166

December 8, 2009
Page 7

> The accountability and responsibilities of the compliance officer with respect to each entity is maintained, and this structure promotes consistency of compliance program implementation across the contracting entities. Accordingly, AHIP recommends that CMS revise the language of the proposed rule to permit the compliance officer to be employed by the organization/sponsor or their affiliate.

- Second, under the Part C regulation at §422.503(b)(4)(vi)(C)(2), CMS is proposing that first tier, downstream, and related entities who have met the fraud, waste, and abuse certification requirements through enrollment into the Medicare program would be deemed to have met the training and educational requirements for fraud, waste, and abuse. AHIP supports this proposal, which has the effect of applying the same standard across the entire Medicare program. In addition, it is our understanding that, because many pharmacies have Part B supplier numbers, they also complete the Medicare enrollment process. For this reason, AHIP recommends that CMS revise the Part 423 compliance program requirements to include a comparable provision to §422.503(b)(4)(vi)(C)(2) in order to avoid duplicative training under Part D for pharmacies that enrolled into the Medicare program.

**6. Network Adequacy of Coordinated Care and Network-Based Private Fee-for-Service Plans Under Part C (§422.112; Preamble, p. 54644)**

In the preamble at page 54644, CMS explains that the agency is developing an automated system for reviewing the adequacy of provider networks proposed by MA applicants and, for this reason, is proposing to include in the regulation more specific criteria that CMS will apply in defining community patterns of care for the purpose of network adequacy determinations. AHIP supports CMS' effort to make the MA criteria for provider access and availability more transparent. It is our understanding that applicants have raised concerns about their ability to understand the basis for CMS determinations of network adequacy in order to ensure that their contracted networks are compliant with CMS expectations. We anticipate that CMS' initiative to permit potential applicants to utilize an automated system to assess their contracted networks prior to CMS review could help to mitigate this concern. Similarly, we agree that the concept of community patterns of care has the potential to permit CMS to take varying local conditions into consideration in evaluating network adequacy.

However, whether the automated system and the detailed criteria that CMS will apply are sufficiently responsive to unique local provider contracting conditions and MA organization assessments of the number and mix of providers necessary to meet anticipated member needs is unclear. We agree with CMS that these details are more appropriately addressed in subregulatory guidance, particularly because CMS is embarking on an effort to establish explicit criteria which may need to be adjusted over

002724

EXHIBIT 5 - 121

Exhibit 3

Exhibit M
Page 167

December 8, 2009
Page 8

time based upon experience with implementation, for example, to address the unique characteristics of some MA plans, such as dual eligible special needs plans (SNPs).

For this reason, to permit CMS to address unanticipated effects of the community standard of care standard, if CMS incorporates the proposed regulatory changes into the final rule, we recommend that the agency modify the proposed rule to provide for the establishment of an exceptions process that could be utilized at the discretion of CMS. We also urge that CMS establish a dialogue with affected organizations to permit the agency to consider MA organization provider contracting experience as subregulatory guidance is developed, and we would be interested in contributing to such an initiative.

8.  **Modify the Corrective Action Plan (CAP) Process as it Relates to Procedures for Termination and Nonrenewal of a Part C or D Contract by CMS (§422.506(b)(3), §422.510(c)(1), §423.507(b)(3), & §423.509(c)(1); Preamble, p. 54646)**

CMS is proposing to revise its rules governing the process that will be used to permit MA organizations/Part D sponsors to pursue corrective action plans (CAPs) when the agency has identified deficiencies that could be the basis for issuing a notice of intent to non-renew or terminate a Part C or Part D contract. CMS would no longer review and approve CAPs but would make the organization or sponsor solely responsible for the development and implementation of a CAP to correct the deficiencies. The revised regulation would require that CMS provide at least 30 calendar days for this action prior to issuance of a notice of intent to nonrenew or terminate a contract.

AHIP disagrees with the statement in the preamble that conveys that a 30 day period in general provides a sufficiently reasonable opportunity for an organization/sponsor to correct deficiencies that may give rise to a decision to nonrenew or terminate a contract. The current regulation provides 45 days for an organization/sponsor to develop and submit a CAP to CMS and does not establish a time frame for completion of the CAP. Deficiencies of sufficient severity to prompt CMS to issue a deficiency notice that could lead to contract termination or nonrenewal are likely to require more than 30 days for the organization/sponsor to design and complete a CAP.

Therefore, we urge CMS to reconsider establishing a minimum time frame for the completion of corrective action and recommend that CMS require the organization/sponsor to develop a CAP and initiate implementation no later than 30 days following receipt of the deficiency notice. CMS could establish a reasonable time frame for completion of the CAP in consultation with the organization/sponsor based upon the particular deficiencies and plan of action. In addition, we recommend that CMS revise the proposed rule to eliminate the requirement that the time frame for completing the corrective action would be specified by CMS at the time of the deficiency notice. At this

002725

EXHIBIT 5 - 122

Exhibit M
Page 168

541
Exhibit 3

December 8, 2009
Page 9

stage of the process, it is unlikely that CMS will have sufficient information about the operational activities that must be accomplished by the MA organization to establish a reasonable time frame.

**9. Procedures for Imposing Intermediate Sanctions and Civil Money Penalties Under Parts C and D (§422.756 & §423.756; Preamble, p. 54647-54648)**

- **Role of an independent auditor.** CMS is proposing to add §422.756(c)(3)(i) and §423.756(c)(3)(i) to require the sponsor to hire an independent auditor when a sanction is in effect to provide CMS with additional information to determine if deficiencies have been corrected. The agency explains that it has sometimes been difficult for CMS to make the determination to lift a sanction, particularly when the solution implemented by the sponsoring organization involves technical systems changes, and the agency believes an evaluation by an independent auditor can be beneficial to both CMS and the sponsoring organization. CMS is also considering an alternative proposal to grant the sponsoring organization the discretion to hire an independent auditor. AHIP supports this alternative approach and recommends that CMS revise the proposed rule to reflect this policy rather than providing authority for CMS to require the hiring of an outside auditor. As the preamble points out, while hiring an independent auditor may be desirable in some circumstances, CMS does not expect that this step will be needed in all cases. Sponsoring organizations may be interested in providing CMS with documentation of thorough internal reviews to determine if this information would be sufficient evidence of compliance prior to incurring the cost of an independent auditor, which could be substantial. In any event, we believe that the nature and scope of the information necessary for CMS to determine whether compliance issues have been addressed will be resolved informally between CMS and the sponsoring organization during the period the sanctions are in effect.

- **Role of a "test period."** CMS is proposing to add §422.756(c)(3)(ii) and §423.756(c)(3)(ii) to provide CMS with the discretion to subject the sponsoring organization to a "test period" to determine if the bases for sanctions have been corrected when an enrollment and/or marketing suspension has been imposed. AHIP recognizes the practical value of a test period of this nature, and AHIP supports this proposal.

**14. Time and Place of Hearing Under parts C and D (§422.670 & §423.655; Preamble, p. 54652)**

CMS is proposing to allow CMS or the sponsoring organization to automatically obtain a 15 calendar day postponement if the request is made no later than 5 days prior to the

002726

EXHIBIT 5 - 123

Exhibit M
Page 169

542

Exhibit 3

December 8, 2009
Page 10

hearing. Any other extension would be at the discretion of the hearing officer. AHIP has two recommendations regarding this proposal.

+ First, we are concerned that the timing of such an automatic extension could disadvantage sponsoring organizations whose representatives would have invested in travel arrangements and other preparations to participate in the hearing by the time the request is made. We believe that CMS and the Hearing Officer would be similarly affected. Therefore, AHIP recommends that the proposed regulations be revised to provide that an automatic postponement would be granted if the request is made either by CMS or the sponsoring organization within three business days following the date the sponsor and CMS are notified of the hearing date.

+ Second, AHIP believes that there may be instances where an automatic fifteen day delay may not be workable, due to previous commitments of the Hearing Officer or the other party. To address this possibility, AHIP recommends that CMS add language to the rule to allow for an alternative, mutually agreeable hearing date if the Hearing Officer or the non-requesting party is not available on the hearing date that would otherwise result from the postponement.

**15. Discovery Under Parts C and D (§422.682 & §423.661; p. 54652)**

CMS is proposing to remove from the regulation the formal discovery process that is currently provided as part of the procedure for notice and the opportunity for a hearing when CMS makes adverse contract determinations (i.e., denial of an application or nonrenewal or termination of a contract). CMS is proposing to include new language that would require the parties to identify witness lists and documents and exchange them at least 5 calendar days prior to the scheduled hearing. The preamble states that CMS no longer believes a formal discovery process is necessary or appropriate for these kinds of proceedings. AHIP opposes deletion of the requirement for a formal discovery process that permits either CMS or the sponsoring organization to make a request to the other party for the production of documents for inspection and copying that are relevant and material to the issues before the Hearing Officer. We also believe that reduction of the period for review following production of requested documents from 10 days to 5 days undermines the ability of sponsoring organizations to evaluate the information in preparation for the hearing.

AHIP believes that this process is critical to providing the sponsoring organization with information material to the hearing that would not be required to be produced under the CMS proposal. For example, the discovery process permits sponsoring organizations to obtain and review previous decisions by Hearing Officers that are not otherwise readily available. We believe that sponsors should have access to relevant prior decisions to have a fair opportunity to evaluate the reasonableness of CMS' position, as well as to be informed about reasoning and decisions of Hearing Officers in the past.

002727

EXHIBIT 5 - 124

Exhibit M
Page 170

543
Exhibit 3

December 8, 2009
Page 11

The discovery process is also the appropriate forum for the sponsoring organization to learn, if CMS has not otherwise informed the sponsor, of the criteria CMS used in reaching the termination decision. This information is also critical to permitting the sponsoring organization to pursue effectively its hearing right. Moreover, AHIP believes that sponsors have a statutory right under 5 U.S.C. §552 to be informed of the policy that provided the basis for the denial.

AHIP recommends that CMS revise the proposed rule to retain the existing formal discovery process. We also recommend that CMS add a provision to §422.682 & §423.661 stating explicitly that the sponsor has a right to learn the basis for CMS' contract determination and obtain previous Hearing Officer decisions.

## B. Changes to Strengthen Beneficiary Protections

### 1. Broker and Agent Requirements Under Parts C and D (Preamble p. 54654)

In the preamble, CMS highlights that the agency has implemented requirements of the Medicare Improvements for Patients and Providers Act (MIPPA) that are designed to create incentives for agents and brokers to assist beneficiaries in making choices among available plans based on the beneficiaries' health care needs rather than any financial benefit to the agent or broker. While CMS believes agents and brokers play an important role in assisting beneficiaries with their decision making and believes it is too soon to fully evaluate the impact of the MIPAA requirements, the agency remains concerned about inherent financial incentives for independent agents and brokers. CMS invites comments on several approaches that CMS is exploring to identify the most effective means of ensuring that beneficiaries receive assistance focused on selecting the plan that best meets their needs. These approaches include expanding the capacity of State Health Insurance Assistance Programs (SHIPs) and limiting the use of independent agents and brokers by MA organizations to certain times of the year or to a subset of beneficiaries.

AHIP and our member organizations have consistently supported initiatives to strengthen safeguards for beneficiaries to ensure that agent and broker marketing activities serve beneficiary interests. We believe that the strong focus by CMS, MA organizations, and other stakeholders, including many in the agent community, on promoting heightened oversight of marketing activities of independent agents and brokers is providing additional protections that are benefiting Medicare beneficiaries. We are committed to working with CMS and other stakeholders to identify additional opportunities to promote availability of information and assistance to beneficiaries that allows them to make choices that are best for them. Our comments on the new approaches that CMS is exploring are included below.

002728

EXHIBIT 5 - 125

Exhibit M
Page 171

544
Exhibit 3

Case 2:16-cv-08697-FMO-SS   Document 422-3   Filed 06/22/21   Page 545 of 1177   Page ID
#:14619
Case 2:16-cv-08697-MWF-SS   Document 182-1   Filed 12/08/17   Page 131 of 166   Page ID
#:2706

December 8, 2009
Page 12

- **State Health Insurance Assistance Programs (SHIPs).**  AHIP supports increasing
  beneficiary access to the assistance provided by SHIPs.  We understand that to
  increase their capacity to serve beneficiaries SHIPs would require additional funding
  for staff and facilities. These organizations are a trusted source of information
  because their goal is to provide objective information about the full range of
  Medicare options available to beneficiaries, including Original Medicare, Medigap,
  Medicare health plans, and/or stand-alone PDPs.  They are grounded in knowledge of
  the local environment and available choices, and this insight is critical to assisting
  beneficiaries in understanding their options.  SHIPs provide face-to-face individual
  counseling that is a highly valued and effective means of providing information to
  beneficiaries.

  It is important to note that while additional beneficiaries are likely to seek
  information from SHIPs if their capacity is increased, improved access to SHIPs is
  unlikely to obviate the role of agents and brokers.  For example, agents offer in-home
  visits, which can be a valuable service for beneficiaries, who may be homebound,
  lack transportation, or simply prefer this setting.  Some beneficiaries have
  longstanding relationships with agents on whom they rely for advice about a variety
  of insurance products, as well as for assistance in obtaining service and coverage
  under their policies.  Agents are licensed and appointed to carry out marketing and
  sales activities so that they can provide advice, commonly based upon needs
  assessments, about the suitability of available options based on beneficiary needs and
  preferences.  While we understand that this service continues to be a source of
  concern to CMS, it is considered a benefit by many beneficiaries who are well-served
  by ethical agents whose livelihood depends upon maintaining the trust of their clients.
  We assume that expanded availability of SHIPs would not include an extension of
  their activities to encompass recommendations to beneficiaries about the coverage
  they should choose in light of their public funding and the oversight, licensure, and
  other issues this would raise.

- **Independent agents and brokers**.  AHIP agrees that sufficient time has not elapsed
  to fully evaluate the success of the changes implemented as a result of MIPPA and we
  believe that findings concerning their impact should be considered by CMS before
  determining additional steps that should be taken to enhance existing safeguards.
  While no beneficiary should be disadvantaged by the misconduct of agents and
  brokers, most agents and brokers conduct their activities honestly and with integrity.
  We understand that satisfaction surveys administered by MA organizations as one
  element of their evaluation of the performance of independent agents consistently
  indicate high levels of beneficiary satisfaction.  In light of these results and the range
  of services provided by independent agents to the beneficiaries who choose them, as

002729

EXHIBIT 5 - 126

Exhibit 3

Exhibit M
Page 172

December 8, 2009
Page 13

discussed above, we believe that it would not be appropriate for CMS to limit their role to certain times of the year or certain populations. Further, such limitations could result in unintended consequences such as foreclosing the option for beneficiaries to choose Medicare coverage with the assistance of a trusted independent agent upon initial Medicare eligibility. Also, agents may provide year-round assistance to their clients, often explaining claims issues or answering other plan-specific questions that arise after the point of sale. Limitations on the role of independent agents to certain times of the year or populations also have the potential to cause beneficiary confusion or frustration and could potentially disadvantage some beneficiaries (e.g., those with limited mobility who rely upon home visits).

We recommend that CMS continue to closely monitor and evaluate the role and performance of independent agents and that examination of beneficiary experience with their activities under both the MA and Part D programs, include assessment of beneficiary satisfaction with the services they provide to beneficiaries (e.g., including education and customer service), as well as the impact of MIPPA on agent and broker performance.

- **Other potential solutions.** To provide additional assurance that the conduct of independent agents and brokers is subject to effective ongoing oversight to safeguard beneficiary interests, we recommend that CMS consider additional avenues for identifying and disseminating best practices by MA organizations. We also recommend that CMS continue its efforts to provide a stable body of guidance and a systematic mechanism for making available to MA organizations and Part D sponsors responses to questions concerning interpretations of CMS policies that have general applicability. In addition, we recommend that CMS consider further the potential for making available information about agents for whom a high number of serious complaints have been identified or who have been terminated for cause, possibly in collaboration with the NAIC. Such a system would allow MA organizations to avoid unwittingly contracting with agents and brokers whose performance has been consistently problematic.

2. **Beneficiary Communications Materials Under Parts C and D (§422.2260, §422.2262, §423.2260 & §423.2262; Preamble p. 54655-54656)**

- **Claims processing, beneficiary specific, and situational materials.** The preamble explains that CMS is proposing to revise §422.2260 and §423.2260 to exclude materials about claims processing activities from the definition of "marketing materials" and to add a definition of "current enrollee communications materials" to provide that such materials would not be considered marketing materials. The definition would encompass communications targeted to situational or beneficiary-

002730

EXHIBIT 5 - 127

Exhibit M
Page 173

December 8, 2009
Page 14

specific circumstances.  The preamble also indicates that these materials would be subject to a separate review process that would continue to permit CMS to require that they be modified or that their use be discontinued.  AHIP supports this proposal.  However, we believe that the regulatory language as proposed is not aligned with the description in the preamble and recommend that it be revised to accomplish CMS' objective.  Specifically, we recommend that CMS:

+   Revise and renumber §422.2260(5)(vii) and §423.2260(5)(vii) to remove the paragraph from the list of types of marketing materials and clarify that current enrollee communication materials are not marketing materials.

+   Revise §422.2262(d) and §423.2262(d) to explicitly state that current enrollee communication materials are not subject to the review processes required under §422.2262(a) and (b) and §423.2262(a) and (b).

3.  **Required Use of Standardized Model Materials Under Parts C and D (§422.2262 & §423.2262; Preamble p. 54656)**

CMS is proposing to add §422.2262(c) and §423.2262(c) to require, when specified by CMS, that organizations must use standardized formats, and language in model materials.  The preamble explains that CMS intends to require the use of standardized marketing materials, without modification, in every instance in which CMS provides such standardized language and formatting.  In light of the large number of model materials that CMS has issued and the breadth of the proposed new regulatory language which could encompass the full range of such materials, we have several significant concerns regarding CMS' emphasis on the use of standardized documents.  These concerns are discussed in detail below.

- **Variable fields.**  The standardized ANOC/EOC contains language and formatting that must be used as issued and also contains variable sections that permit MA organizations/Part D sponsors to include customized information to ensure that the information provided to beneficiaries accurately reflects plan benefits and rules.  We recommend that CMS utilize this approach in other model documents that the agency may decide to standardize.  In addition, to respond to special circumstances such as those of fully integrated dual eligible SNPs that must meet both state and MA requirements for key member information (e.g., the ANOC/EOC), the agency has made exceptions to the required use of standardized documents.  We recommend that CMS continue to exercise its authority to provide exceptions, as warranted.

- **Timely issuance.**  To permit MA organizations/Part D sponsors to disseminate information to beneficiaries on a timely basis, we recommend that CMS ensure any standardized model documents are issued in final form well in advance of the time that they must be used to disseminate information to beneficiaries.  Revisions or

002731

EXHIBIT 5 - 128

Exhibit 3

Exhibit M
Page 174

December 8, 2009
Page 15

corrections that are issued late in MA organization/Part D sponsor production cycles, particularly when the materials at issue are lengthy and complex (e.g., ANOC/EOC) seriously disrupt production and distribution processes and create significant challenges for sponsoring organizations to ensure that complete and accurate materials can be provided on a timely basis to beneficiaries. CMS indicates in the preamble that the agency intends to issue standardized marketing materials through the annual Call Letter and HPMS notices. We are concerned that the Call Letter is not issued early enough in the year to permit orderly planning and production when materials are standardized, because it may be necessary for sponsoring organizations to implement systems modifications as well as other changes to their materials development and production processes. Accordingly, we recommend that CMS issue standardized model materials as early as possible in the year through separate guidance.

- **Addressing all plan types.** Increased reliance by CMS on standardized materials will necessitate ensuring that the materials appropriately reflect the characteristics of all plan types. This may be accomplished by providing differing versions of the language on specific topics within the documents that are relevant to particular plan types or by identifying portions of the materials that may be customized by sponsoring organizations depending upon the plan type. For example, rules for obtaining services in and out of network differ if the MA plan is an HMO, a PPO or a cost plan. Beneficiaries enrolled in dual eligible SNPs need information about Medicare as well as Medicaid benefits and cost sharing information is affected by the availability of subsidies. SNPs must also be responsive to state requirements concerning, for example, the reading level of beneficiary materials. Differences among plan types also affect a variety of beneficiary notices that are currently model documents.

- **Beneficiary notices.** Currently, MA organizations and Part D sponsors have received CMS approval for a variety of beneficiary notices that do not utilize the language included in CMS models. Enrollees in the plans offered by these sponsoring organizations are accustomed to the language and format of these materials (e.g., Part D EOBs) which in a number of cases have been consumer tested as well as refined based upon experience to provide clear and beneficiary-friendly information. In a number of instances sponsoring organizations have also received enrollee feedback expressing satisfaction with the materials. Efforts by CMS to improve such materials by standardizing them have the potential to cause beneficiary dissatisfaction with the required changes. We also note that while standardization of some types of information across sponsoring organizations can be useful for beneficiaries (e.g., the standardized Summary of Benefits), many other communications are not used to

002732

EXHIBIT 5 - 129

Exhibit M
Page 175

December 8, 2009
Page 16

make comparisons and the value of standardization may be lower than maintaining the stability of materials to which enrollees are accustomed.

For these reasons, AHIP recommends that CMS reconsider whether and to what extent increased standardization of MA organization and Part D sponsor materials is in the best interests of beneficiaries and in making this assessment that CMS seriously consider issues such as those identified above. We recommend that CMS defer the proposed change to the regulations pending completion of this analysis. If the agency moves forward to standardize additional materials that are disseminated by MA organizations/Part D sponsors to beneficiaries, we recommend that CMS staff, rather than contractors on the agency's behalf, do so in consultation with MA and Part D organizations to gain insight concerning their experience with the design and content of non-model materials. We also urge that CMS place a strong emphasis on ensuring that any standardized materials are issued in final form well in advance of the time when they must be provided to beneficiaries, as discussed above.

5. **Maximum Allowable Out-of-Pocket Cost Amount for Medicare Parts A and B Services (§422.100; Preamble, p. 54657)**

CMS is proposing to add §422.100(d)(4) to require that all local MA plans establish an out-of-pocket maximum that must include all Medicare Part A and Part B covered services and that is no greater than the annual limit set by CMS. The preamble discussion explains that CMS believes a maximum cap that is both standard and mandatory for all local MA plan types is necessary to ensure that MA plans are non-discriminatory and transparent. While we believe that out-of-pocket maximums are a valuable supplemental benefit for beneficiaries, we are concerned that a requirement that all MA plans include such a limit at no more than a specified level would require increased premiums that are likely to be a barrier that hinders the opportunity for some beneficiaries to choose an MA plan and makes it difficult for others to remain in an MA plan that they have previously elected.

- The preamble notes that this new requirement "will likely result in increases to premiums and/or cost sharing." According to a recent report, almost half of all MA enrollees have annual incomes below $20,000. An increase in MA premiums and required cost-sharing would likely have a significant effect on the ability of these enrollees to remain enrolled in or choose an MA plan.

- The impact on enrollees in dual eligible SNPs is likely to be especially acute. It is our understanding that most dual eligible SNPs offer a benefit package that reflects cost sharing under FFS Medicare to coordinate with cost sharing subsidies available for enrollees. Under CMS bidding rules, SNPs that utilize this benefit structure are able

002733

EXHIBIT 5 - 130

Exhibit M
Page 176

December 8, 2009
Page 17

to make enrollment accessible to beneficiaries by offering zero premium plans. The effect of the CMS proposal would be to shift beneficiary costs from cost sharing to premium in order to accommodate the out-of-pocket cap. Since dually eligible beneficiaries are unlikely to be able to afford the premiums, the impact of such a change would differentially impact their ability to choose MA plans. However, other lower income beneficiaries are likely to be similarly affected and could find that MA plans are foreclosed as an option because all MA plans must include the same out of pocket cap. The impact would be particularly disruptive for current members who may be unable to keep their MA plans.

- The impact of an out-of-pocket maximum requirement could also adversely affect the availability to beneficiaries of PPOs. The preamble explicitly addresses the application of the cap to local PPOs and states that the cap would be inclusive of all in-network and out-of-network beneficiary cost sharing. To offer the flexibility for beneficiaries to receive covered services in- or out-of-network at their election while keeping these MA plans affordable for beneficiaries, PPOs establish differential cost sharing to encourage enrollees to consider choosing in-network providers with whom the MA organizations works to promote efficient delivery of quality care. A requirement for a single out-of-pocket maximum for all Medicare covered services would seriously weaken the incentives for the use of in-network services that are fundamental to this plan type. This would exacerbate the potential for increased premiums or increased cost sharing that could reduce the value of and accessibility to this plan type for beneficiaries. While still problematic, a requirement that permits establishment of separate in- and out-of-network out of pocket maximums would mitigate this problem.

- Individuals who could benefit from enrollment in a chronic care SNP could also be adversely impacted. These SNPs focus on beneficiaries with high health care needs and a requirement to offer an out-of-pocket cap would mean that premiums for these plans would be differentially higher than for other types of MA plans. As a result, these SNPs would likely be unaffordable for the beneficiaries they are designed to serve.

- AHIP questions whether a requirement for an out-of-pocket maximum is an appropriate exercise of CMS' authority to ensure that benefit designs are non-discriminatory and do not substantially discourage enrollment of subpopulations of beneficiaries. While we agree that CMS has a responsibility to implement effective safeguards for beneficiaries in this important area, we believe that the current approach, which focuses on an evaluation of specific cost sharing designs rather than establishing a standard that applies to all MA plans regardless of the structure of the proposed benefits carries out the statutory requirement. In contrast, we are concerned

002734

EXHIBIT 5 - 131

Exhibit M
Page 177

December 8, 2009
Page 18

that CMS' proposed approach does not appropriately reflect the intent of the statute. Further, as discussed above, we are concerned that the proposed policy may have unintended consequences that could have the effect of limiting beneficiary access to certain MA plans rather than ensuring their broad availability.

AHIP recommends that CMS retain the existing policy which applies criteria that include an out-of-pocket maximum in conjunction with cost sharing rules to serve CMS' goal of guarding against benefit designs that could discourage enrollment of certain beneficiaries. We believe that this policy strikes a balance that provides protection against potentially discriminatory benefit designs, while preserving flexibility that avoids unintended barriers to beneficiary access to the range of plan options contemplated by the MA statute. We support the high priority that CMS places on ensuring that benefit designs are both non-discriminatory and transparent to beneficiaries and would welcome the opportunity to contribute to improvements in beneficiary materials that would increase benefit transparency and the utility of information on which beneficiaries rely in evaluating the Medicare choices available to them. If CMS adopts the change to the regulation that the agency has proposed, we strongly recommend that it be modified in response to the issues raised in our comments above to avoid the potential for disadvantaging certain beneficiaries. In that event, we also recommend that the agency annually announce any mandatory cost sharing maximum well in advance of the deadline for bids submission (e.g., prior to the annual rate announcement) to allow MA organizations to take the requirement into account during the benefit design and bid development process.

6. **Maximum Allowable Cost sharing Amount for Medicare Parts A and B Services and Prescription Drugs (§422.100 & §423.104, p. 54657-54658)**

CMS is proposing to add §422.100(d)(5) and §423.104(d)(2)(iii) to provide authority for CMS to establish cost sharing maximums for Medicare Part A and Part B benefits under the MA program and for tiered cost sharing under the Part D program below which cost sharing would not have a discriminatory effect. The preamble states that the regulation would permit CMS to establish cost sharing thresholds for individual services to afford beneficiaries greater predictability and protection against high out-of-pocket costs in the event of high health care needs and ensure that high needs beneficiaries are not discouraged from enrolling in an MA plan. The CY 2010 Call Letter identified certain Medicare covered services that are of special concern to CMS and required that MA plan cost sharing for each of these services must not exceed the cost sharing that would apply under FFS Medicare, but it is unclear whether CMS intends to follow a similar practice under the proposed rule. We believe that the approach reflected in the CY 2010 Call Letter reflects an appropriate and effective strategy to ensure that cost sharing does not discourage enrollment of subpopulations of beneficiaries. If the proposed rule is intended

002735

EXHIBIT 5 - 132

Exhibit M
Page 178

551
Exhibit 3

December 8, 2009
Page 19

to signal CMS' interest in expanding the establishment of service-specific cost sharing requirements for many or all of Medicare Part A and Part B covered services, we question whether such a sweeping approach is consistent with the intent of the statute or necessary to safeguard beneficiary interests. We are also concerned, as with the proposed requirement for all MA plans to include out-of-pocket cost limits, that there could be unintended consequences that disadvantage rather than help beneficiaries.

We urge CMS to defer including in the regulation broad new authority that could result in establishment of benefit-specific cost sharing levels for many or all Medicare Part A and Part B benefits pending further evaluation of the potential for adverse consequences for the MA plan coverage offered to beneficiaries. We also recommend that, if CMS intends to significantly modify for CY 2011 the approach applicable to cost sharing for CY 2010 benefits, including changes to the cost sharing limits or the benefits to which they apply, the agency issue in draft detailed guidance early in 2010 to provide a sufficient opportunity for review and comment.

In the event that CMS adopts the changes included in the proposed rule, the preamble indicates that the cost sharing limits would be announced at the time of the Call Letter or "through HPMS memoranda during the annual bid and benefit package review process." Benefit and bid development typically begin months in advance of issuance of the final Call Letter and guidance on cost sharing that is issued subsequent to the submission of bids does not provide sponsoring organizations with a full and fair opportunity to take the requirements into consideration. AHIP recommends that CMS release this information in advance of the annual rate announcement to assure that MA organizations have ample time to consider established limits as they design their benefit packages.

7. **Prohibition on Prior Notification by PPO, PFFS and MSA Plans Under Part C (§422.2, §422.4, & §422.105(b); Preamble, p. 54658-54659)**

CMS is proposing to prohibit MA PPOs, PFFS plans, and MSA plans from encouraging enrollees to provide prior notification of services by providing lower cost sharing as an incentive for notification. AHIP opposes this proposal. AHIP believes that allowing prior notification programs serves beneficiary interests because the offer of lower cost sharing encourages the enrollee to voluntarily provide information to the MA organization that permits the organization to alert the beneficiary in advance of receiving the service that it may not be covered (e.g., because it is not medically necessary or is not a covered benefit). It is our understanding that the beneficiary confusion referenced by CMS as a key reason for proposing to prohibit voluntary prior notification arises principally in circumstances in which CMS has determined that MA organizations have mischaracterized the voluntary notification process as a requirement. AHIP recommends that CMS address this issue by identifying additional steps to enforce the existing

002736

EXHIBIT 5 - 133

Exhibit M
Page 179

552
Exhibit 3

December 8, 2009
Page 20

requirement (e.g., requiring greater clarity in enrollee materials). We recommend that the agency defer the proposed change to the regulation pending an assessment of the effectiveness of these steps. This approach would have the advantage of preserving the value of prior notification for beneficiaries and promoting consistent compliance with the requirement that such prior notification must be voluntary.

8. **Requirements for LIS Eligibility under Part D (§423.773; Preamble, p. 54659)**

CMS is proposing to specify the period for which a full-subsidy eligible beneficiary will be deemed eligible for the Part D low-income subsidy (LIS) based upon when in the calendar year the eligibility determination is made. AHIP agrees that this approach adds clarity to the rules surrounding deemed status.

9. **Enrollment of Full Subsidy Eligible Individuals and Other subsidy Eligible Individuals Under Part D (§423.34; Preamble, p. 54659-54660)**

CMS is inviting comment on all aspects of the agency's auto-enrollment and facilitated enrollment procedures for beneficiaries eligible for the Part D low-income subsidy, including ways to better assess the impact of these procedures on the dual eligible and LIS population and ways that the agency can better assist beneficiaries in identifying plan choices that best suit their individual drug needs, and encouraging them to make an active election. Part D sponsors make significant efforts to smooth the transition to Part D plans for full-subsidy eligible beneficiaries who are newly eligible for Part D or who switch plans as a result of reassignment due the calculation of the low-income benchmark each year and its impact on Part D plan premiums. We are aware of the ongoing interest in assisting LIS eligible beneficiaries in enrolling in Part D plans whose formularies are most compatible with the medications they take. However, for beneficiaries with multiple prescriptions such a process would be complex, and in any event formulary issues are only one dimension of coverage since aspects of plan operations such as the responsiveness of member service representatives and availability of medication therapy and disease management programs also materially affect the value of the plan to beneficiaries. Moreover, consideration should be given to assuring that any methodology for auto-assignment would not have the unintended effect of resulting in adverse selection for the recipient PDP sponsors. We would welcome the opportunity to work with CMS and other interested stakeholders on initiatives to improve the auto- and facilitated enrollment processes for LIS eligible beneficiaries.

10. **Special Enrollment Periods Under Part D (§423.380; Preamble, p. 54660)**

002737

EXHIBIT 5 - 134

Exhibit 3

Exhibit M
Page 180

December 8, 2009
Page 21

CMS is proposing to expand the special enrollment period for full-benefit dual eligible individuals so that it will be available to all LIS-eligible individuals. AHIP supports this proposal.

**12. Part D Sponsor Responsibility for Retroactive Claims Adjustment Reimbursements and Recoveries Under Part D (§423.464; Preamble, 54662-54664)**

AHIP agrees with CMS that exploring alternative approaches to improving post-adjudication coordination of benefits due to retroactive Medicare enrollment and low-income subsidy changes is important. At this time, AHIP does not have any suggested recommendations for improvement. However, we would welcome the opportunity to participate in discussions with CMS regarding any proposed changes that CMS may consider in the future.

**13. Time Limits for Coordination of Benefits (§423.466; Preamble, 54664-54665)**

CMS is proposing to establish a three year time limit on Part D coordination of benefits. Thus, Part D sponsors would be required to coordinate benefits with other entities providing prescription drug coverage for a period not to exceed three years from the date on which the prescription for the covered Part D drug was filled.

AHIP recommends that CMS modify this period to be 18 months to coincide with the period that Part D sponsors have to submit PDEs. AHIP believes that an 18 month period is an adequate period of time to assure that all claims are filed. The shorter period allows the Part D sponsors to close their benefit years within a more reasonable period of time.

**14. Use of Standardized Technology under Part D (§423.120; Preamble, p. 54665-54666)**

CMS is proposing to add a new provision to require that sponsors and their intermediary processors establish and exclusively utilize unique RxBIN or RxBIN/RxPCN combinations to identify all Part D member claims, as well as to assign unique RxID identifiers to individual Part D beneficiaries. CMS notes in the preamble that most Part D sponsors assign unique identifiers. AHIP recommends that in establishing the proposed requirements CMS ensure that the agency accommodate continued use of unique identifiers that have already been established by Part D sponsors (e.g., with regard to length of identifiers and combination of characters) to avoid the necessity for resource intensive systems changes.

**16. Prohibition of Mid-Year Mass Enrollment Changes by SPAPS Under Part D (§423.464(e); Preamble, p. 54667)**

002738

EXHIBIT 5 - 135

Exhibit M
Page 181

554
Exhibit 3

December 8, 2009
Page 22

CMS is proposing to prohibit mid-year mass enrollment changes by SPAPs. AHIP agrees with CMS' assessment that such changes outside of the annual election period can be very disruptive, and we support this proposal.

**17. Nonrenewal Beneficiary Notification Requirement Under Parts C and D (§422.506(a)(2)(ii)(A) & §423.507(a)(2)(ii)(A))**

CMS proposes to modify §422.506(a)(2)(ii)(A) and §423.507(a)(2)(ii)(A) to provide beneficiaries affected by plan nonrenewals with notice 90 days, rather than the current 60 days, prior to the effective date of the nonrenewal. The provisions would require that when this notice is provided in written form, it must include a description of alternative plan options. However, in recent years, MA organizations/Part D sponsors have not received information about plan options sufficiently far in advance to enable them to print and disseminate the notice by October 1. For example, CMS did not release plan information for CY 2010 until October 1, 2009 and for CY 2009 until September 25, 2008. AHIP recommends that CMS revise the regulation, as needed, to ensure that the requirement for beneficiary notice is coordinated with the initial availability of the information sponsoring organizations are required to include in the notice.

**18. Notice of Alternative Medicare Plans Available to Replace Nonrenewing Plans Under Parts C and D (§422.506(a)(2)(ii) & §423.507(a)(2)(ii); Preamble, p. 54668)**

CMS is proposing to give the sponsoring organization the option of either providing enrollees of a nonrenewing plan with a written list of alternative MA plan options or placing outbound calls to ensure these enrollees know whom to contact to learn more about their enrollment options. If CMS adopts this proposal, we recommend that the agency clarify in the preamble or the regulation that the written list may be transmitted by mail or by e-mail in the case of beneficiaries who have opted to receive communications electronically.

**19. Timeframes and Responsibility for Making Redeterminations Under Part D (§423.590; Preamble, p. 54668-54669)**

- **Oral and written notice of redeterminations.** CMS is proposing revisions to §423.590 to allow a Part D sponsor to notify an enrollee of an adverse or favorable expedited redetermination orally, with a written confirmation mailed to the enrollee within three calendar days of the oral notification. This change aligns the Part D requirement with the MA requirement and codifies existing subregulatory guidance. AHIP believes that it is helpful for the appeals processes under the Part D and MA programs to be consistent, wherever appropriate, as in this case.

002739

EXHIBIT 5 - 136

December 8, 2009
Page 23

- **Explanation of conditions for approval of a wholly favorable redetermination.** CMS is also proposing to add §423.590(h), which requires that, when there is a completely favorable redetermination, the notice must explain the conditions of the approval in a readable and understandable form. Consistent with our comments concerning a similar requirement for completely favorable standard determinations and completely favorable expedited coverage determinations, while we believe that in the case of a redetermination that is wholly or partially adverse to the enrollee an explanation of a reason for the decision is an important element of the notice, the value of the explanation to the enrollee is unclear when the decision is wholly favorable, and we believe that the cost of providing this information for every wholly favorable redetermination outweighs its benefit. If CMS believes that enrollees may have an interest in this information, it would be more efficient to indicate in the notice that the Part D sponsor will provide the enrollee with an explanation of a wholly favorable redetermination upon request. We recommend that the proposed rule be revised accordingly.

## 23. Disclosure Requirements Under Parts C and D (§422.111(g) & §423.128(f); Preamble, p. 54669)

In §422.111(g) and §423.128(f), CMS is proposing to add a provision that gives the agency the discretion to require a sponsoring organization to disclose to its enrollees and potential enrollees information concerning the sponsoring organization's performance and contract compliance deficiencies in a manner specified by CMS. CMS states that such a disclosure "may be required when a sponsoring organization is sanctioned, or when a sponsoring organization's compliance and/or performance deficiencies rise to a certain level." CMS explains that this kind of transparency will provide additional incentives for sponsoring organizations to make improvements to their operations and also provide relevant information to beneficiaries and the public concerning plan choices. CMS is soliciting comment on whether these disclosure requirements should be imposed only in those circumstances where a beneficiary would be afforded the opportunity to act on them.

While we understand and appreciate the value of making available certain performance indicators to beneficiaries, CMS' intent regarding how beneficiaries would be notified and the purpose of the proposed self-disclosure is unclear. Notification sent to individual enrollees or provided to individual beneficiaries with marketing materials could be interpreted by beneficiaries as a signal that performance deficiencies may seriously impede the ability of the plan to continue to provide coverage and access to services. However, this interpretation would be unjustified because in such cases, CMS has the authority to take strong steps, such as contract termination or non-renewal or suspension

002740

EXHIBIT 5 - 137

Exhibit 3

Exhibit M
Page 183

December 8, 2009
Page 24

of enrollment. If CMS is interested in heightened transparency regarding certain deficiencies that the agency does not believe warrant such action, the relevance of the information to beneficiary decision making about Medicare options unclear. The value of the proposed disclosure is even more unclear, because in some cases, timing of the required disclosure could occur after or a short time before the deficiencies are resolved. Moreover, performance information is already provided through the Plan Finder and CMS CAP postings.

We are concerned that the proposed self-disclosure requirement would not serve beneficiary interests, because it could cause unjustified anxiety and unfairly imply that the plan deficiencies are more serious than CMS has determined. Accordingly, we recommend that CMS defer any self-disclosure requirement pending reevaluation of its value to beneficiaries and alternative means of supplementing the existing performance information available to beneficiaries through the Plan Finder and CMS CAP postings. If CMS nevertheless adopts such a requirement, we recommend that the agency issue subregulatory guidance, after informal review and comment, that identifies the criteria CMS will utilize in determining when self-disclosure will be required and that the agency take steps to ensure consistent application of the criteria.

Finally, we believe that, if CMS' goal is to provide beneficiaries with additional information to consider when they make plan choices, AHIP recommends that this information should only be disseminated during such periods when all beneficiaries have the opportunity to elect or switch plans.

## C.  Changes to Provide Plan Offerings with Meaningful Differences

### 1.  Bid Submissions—Ensuring Significant Differences (§422.254 & §423.265, p. 54671-54672)

CMS explains in the preamble that the agency is proposing to include in the regulation a requirement that MA organizations and Part D sponsors may only submit multiple plan bids in the same area if the plans have meaningful differences in "key benefit or plan characteristics such as premiums, cost-sharing, formulary structure, or benefits." [Emphasis added.] We believe that this policy is workable and is consistent with CMS' existing policy as reflected in the 2010 Call Letter. However, we have noted that the proposed new regulatory provisions include language that is more limiting because it does not appear to reflect CMS' stated policy. Section 422.254(a)(4) requires that MA organization bid submissions must reflect substantial differences in "benefit packages and plan costs". [Emphasis added.] Section 423.265(b)(2) requires that Part D bids must reflect substantial differences in "beneficiary out-of-pocket costs and formulary structures." [Emphasis added.]

002741

EXHIBIT 5 - 138

Exhibit M
Page 184

557

Exhibit 3

December 8, 2009
Page 25

To clarify the regulatory language and conform it to CMS' intent as stated in the preamble, we recommend the following revisions:

- Revise §422.254(a)(4) as follows:

    (4) *Substantial differences between bids.* An MA organization's bid submissions must reflect differences in ~~benefit packages and plan costs~~ terms of key benefit or plan characteristics such as premiums, cost sharing, or benefits offered that CMS determines to represent substantial differences relative to a sponsor's other bid submissions.

- Revise §423.265(b)(2) as follows:

    (2) *Substantial differences between bids.* Potential Part D sponsors' bid submissions must reflect differences in benefit packages and plan costs that CMS determines to represent substantial differences relative to a sponsor's other bid submissions. In order to be considered "substantially different," each bid must be significantly different from the sponsor's other bids with respect to key benefit or plan characteristics such as premiums, cost-sharing, formulary structure, or benefits offered ~~beneficiary out-of-pocket costs and formulary structures.~~

**2. Bid Review Process (§422.256 & §423.272; Preamble, p. 54672)**

CMS is proposing to add §422.256(b)(4)(i) and §423.272(b)(3)(i) to make requirements for bid approval consistent with the requirements for bid submission discussed above. However the structure of these regulatory provisions is somewhat different than from the structure of §422.254(a)(4) and §423.265(b)(2). The revisions we recommended above for §422.254(a)(4) are already reflected in §422.256(b)(4)(i). However, in the Part D regulation, CMS cross-references the language in §423.265(b)(2). Assuming that CMS adopts AHIP's recommendations in the preceding comment, to avoid confusion by making these provisions parallel to one another, AHIP recommends that CMS revise §422.256(b)(4)(i) to cross-reference the language in revised §422.254(a)(4) and retain the cross-reference in §423.272(b)(3)(i) to §423.265(b)(2).

**4. Non-renewing Low-Enrollment Plans (§422.506(b)(1)(iv) & §423.507(b)(1)(iii); Preamble, p. 54673)**

CMS is proposing to add a regulatory requirement providing that a contract must be nonrenewed as to an individual plan if the plan does not have a sufficient number of

002742

EXHIBIT 5 - 139

Exhibit M
Page 185

558
Exhibit 3

December 8, 2009
Page 26

enrollees to establish that it is a viable independent plan option. The preamble language discusses how this requirement would be applied. For example, CMS would consider a waiver of the requirement in special circumstances, such a chronic care SNP which is tailored to a specific category of beneficiaries or employer group waiver plans. CMS solicits comment on the agency's proposed approach and whether CMS has provided sufficient clarity on how the agency will determine whether a low-enrollment plan will not be nonrenewed.

AHIP believes that, in general, the elements of CMS' proposal are reasonable, including establishment of an enrollment threshold that may be waived by CMS if the agency determines that this action is warranted by circumstances such as the type of beneficiary served or geographic location. We offer several recommendations for clarifying and refining the proposal.

- First, we recommend that CMS add to the grounds for considering a waiver the length of time that a plan has been offered. This recommendation reflects the agency's stated intent that in order to warrant nonrenewal, low-enrollment would need to persist over an extended period (e.g., several years).

- Second, consistent with the language in §422.506(b)(1) and §423.507(b)(1), which provides that CMS may nonrenew a contract for the listed reasons, we recommend that that CMS revise the proposed regulatory language in §422.506(b)(1)(iv) and §423.507(b)(1)(iii) by adding at the end of this subparagraph, "CMS may waive this requirement when special circumstances are present, including but not limited to the type of beneficiaries served, geographic location, and when absence of the plan would significantly limit beneficiary health care options in a service area."

- Third, we recommend that CMS announce the annual enrollment threshold for plans that would be subject to nonrenewal as early as possible in the calendar year to permit sponsoring organizations to take impact of this threshold into consideration during their planning and bid development for the subsequent calendar year. While we understand that the Call Letter has been the means of making this announcement, in some years it has been issued later in the spring when preparations for the coming year are well underway.

**D. Changes to Improve Payment Rules and Processes**

    **1. Risk Adjustment Data Validation (RADV) Appeals (§422.310; Preamble, p. 54673-54678)**

002743

EXHIBIT 5 - 140

December 8, 2009
Page 27

CMS is proposing an appeals process (§422.311) for RADV audits and the addition of related definitions to §422.2. CMS' proposal would make three avenues available to MA organizations as possible remedies for findings that result in payment errors. These are: an attestation process, a documentation dispute process, and a RADV payment error calculation appeals process. The preamble includes a discussion of the history of the CMS HCC risk adjustment methodology and CMS' risk adjustment data validation initiatives, as well as CMS' rationale underlying the proposed elements of the appeals process.

AHIP has consistently supported CMS' efforts to ensure that the MA risk adjustment methodology is designed to pay MA organizations appropriately based upon the health status of their members and the resources needed to treat the conditions that they experience. We understand that CMS has a responsibility to ensure payments are calculated accurately under this methodology and that MA organizations are accountable on audit for demonstrating the integrity of the data they submit. However, we have a number of serious concerns about the initial design of the current RADV audits and about the appeals process proposed for inclusion in the regulation. These issues and our related recommendations are discussed in detail below. We are interested in working with CMS as the elements of the risk adjustment data validation audit process continue to evolve.

**b. Risk Adjustment Validation Initiatives (Preamble, p. 54674)**

Under this subheading in the preamble, CMS explains that risk adjustment diagnoses from FFS claims and from MA organization risk adjustment data submitted to CMS are used to assign a risk score to each MA enrollee and that these risk scores are used in the enrollee-level MA payment calculation. The agency audits the MA diagnosis data a few years after submission to ensure they are supported by medical record documentation. CMS indicates that this documentation is the key to accurate payment and successful data validation. While in some past years data discrepancies resulted in payment adjustments on an enrollee-specific basis, the current audit design calls for contract-level payment adjustments and has been initiated for the 2007 payment year because it is the first year in which 100 percent of MA payment amounts were risk adjusted.

We recognize the importance of MA organization submission of reliable diagnosis data for the purpose of risk adjustment and understand that the preamble is intended to provide only a high level description of the MA risk adjustment audit initiative. However, we believe that the emphasis on medical record documentation for MA diagnosis data as "the key to payment accuracy" fails to acknowledge that a comparable evaluation of FFS medical record documentation error rates is critical to

002744

EXHIBIT 5 - 141

December 8, 2009
Page 28

assessing payment accuracy, because of the role data from both sources play in the risk adjustment methodology.  We urge CMS to conduct such an evaluation.

In  addition, we have serious concerns that establishment of an audit methodology that involves retrospective contract-level payment adjustments creates the potential for unpredictable retroactive liability that MA organizations could not have considered in developing bids for affected prior years.  We recommend that CMS take this critical issue into consideration as further decisions are made about the RADV audit methodology.

The uncertainty associated with the unknown extent of potential multi-year retroactive adjustments has been exacerbated by CMS' decision to move forward with the first group of 2007 audits prior to finalizing the audit design, including the methodology for determining any payment adjustments as well as the proposed appeals process.  We recommend that CMS ensure that organizations selected for the pilots or the first group of audits are not disadvantaged in comparison to other MA organizations audited for the same payment year in the event that CMS makes improvements to the audit design in response to comments on the proposed rule or as a result of decisions reflected in subregulatory guidance.

**d. Proposed Addition of Medicare Advantage Organization Risk Adjustment Data Validation—Dispute and Appeal Procedures (§422.311; Preamble, p. 54674-54678)**

As a result of CMS' experience to date in conducting MA RADV audits, which has included MA organization requests for an appeals remedy, the agency is proposing establishment of formal dispute and appeal rights for MA organizations undergoing RADV audits.  We commend CMS for taking this important step, and we support establishment of a RADV audit appeals process.  However, while the CMS proposal focuses on three key avenues for MA organizations to seek relief from potentially erroneous determinations, we believe that the scope of issues that may be raised in each case is too narrow, so that the proposal either fails to provide an opportunity to pursue the issues that are likely to be of greatest importance to organizations experiencing RADV audits or is otherwise unduly limited.  We believe that substantial changes are essential in each area to provide meaningful appeal rights for MA organizations and that it is critical for CMS to provide an appeal right for all issues that could be subject to error or other material, unintended defects at each step of the audit process and payment error calculation.  Our comments below address each of the avenues of appeal CMS has proposed and provide our recommendations.

002745

EXHIBIT 5 - 142

December 8, 2009
Page 29

- **Attestations.** Under CMS' proposal, MA organizations would be permitted to voluntarily submit to CMS pre-populated attestations that address signature and/or credential-related discrepancies from physician or outpatient medical records. Completed attestations must be submitted by the deadline for submission of medical records to substantiate the HCCs selected by CMS for the audit sample. We strongly support CMS' decision to permit the use of attestations, although we have identified several significant issues regarding the details of CMS' proposal that are discussed below.

  + First, CMS states that based upon its experience the agency has reached conclusions regarding the percentage of medical-record-related payment error determinations that are attributable to missing or illegible signature or credentials – a substantial percentage for physician and outpatient records and a relatively small percentage for inpatient records. We believe that these conclusions are premature, because previous CMS RADV reviews have been limited and the pilot audits for the 2007 payment year represent a relatively small sample in comparison to the first audit group that has recently received notice of the enrollee HCCs in the audit sample. Accordingly, we recommend that CMS revise proposed §422.311(c)(1)(ii) and §422.311(c)(1)(iii)(C) to permit attestations for inpatient, as well as physician and outpatient records, to avoid the potential for disadvantaging MA organizations pending additional experience for CMS and affected organizations.

  + Second, proposed timing for submission of attestations is likely to make it difficult for MA organizations to take full advantage of the opportunity for their submission. Following notification by CMS of the HCCs for which medical record documentation must be provided, it is highly labor intensive for MA organizations to identify the medical records that will be submitted for CMS review. Typically, MA organizations must conduct outreach to physicians, hospitals, and other practitioners and providers to request medical records substantially larger in number than the sample of HCCs identified by CMS in order to conduct reviews of these records to identify the best record for submission to CMS. In the event that practitioners cannot be located (e.g., practitioners who have retired, relocated, or died, or whose records have been destroyed, for example, in a fire or flood), initial efforts to obtain a record may be unsuccessful and the MA organization may need to pursue additional requests. These steps are time consuming, and we are concerned that organizations will face significant challenges reaching out to physicians to complete attestations during the same period they are completing data collection and review. Therefore, we recommend that CMS revise the proposed rule by providing that CMS will establish a period subsequent to the

002746

EXHIBIT 5 - 143

Exhibit M
Page 189

December 8, 2009
Page 30

submission deadline for medical records for MA organizations to obtain and submit physician/practitioner attestations. We recommend that the length of this period be established in subregulatory guidance, so that it can be adjusted based upon practical experience with the audit process.

+   Third, CMS is proposing in §422.311(1)(v)(C) that the CMS-generated attestation must be completed, signed, and dated by the physician/practitioner. While we understand that the signature/date must be supplied by the physician/practitioner, we believe that MA organizations should be able to facilitate completion of the attestation by pre-populating other information. MA organization experience has been that physician/practitioner offices may make errors in completing such an attestation or fail to include all required information before returning the attestation to the organization. Additional time and MA organization resources are required to work with physicians/practitioners to address these errors and the burden for physicians/practitioners is increased. This problem is more serious if CMS retains the requirement for submission of attestations by the deadline for medical record submission but is substantial even if a later attestation deadline is established. We urge CMS to play an active role in educating physicians about their obligation to provide medical records for RADV audits and complete attestations fully and accurately when requested to do so by MA organizations.

+   Fourth, as CMS has also observed under the Medicare fee-for-service (FFS) program, practitioner medical record documentation and coding practices vary in the extent and consistency of their compliance with the medical record documentation standards that CMS has established. The Department of Health and Human Services in a recent report required by the Improper Payments Information Act indicated that the agency plans to work with FFS practitioners to improve medical record documentation practices. We continue to recommend, as we have in the past, that CMS engage in collaborative efforts with MA organizations to improve compliance among Medicare participating practitioners. We also recommend that CMS consider broadening the permissible use of attestations under the initial RADV audits to permit the agency and the affected MA organizations to evaluate the implications of such a step. We understand that CMS has also proposed a documentation dispute resolution process but as discussed below, we do not believe it would serve a similar purpose.

•   **Documentation dispute process.** CMS is proposing to permit MA organizations to appeal the operational processing of medical records that are submitted by the

002747

EXHIBIT 5 - 144

Exhibit M
Page 190

563
Exhibit 3

Case 2:16-cv-08697-FMO-SS   Document 422-3   Filed 06/22/21   Page 564 of 1177   Page ID
#:14638
Case 2:16-cv-08697-MWF-SS   Document 182-1   Filed 12/08/17   Page 150 of 166   Page ID
#:2725

December 8, 2009
Page 31

CMS-established deadline. The example provided by CMS of an appealable error
is the inadvertent separation of a two page medical record so that each page is
reviewed as a separate medical record. Further, the proposed approach provides
for CMS review that encompasses only errors that appear in the MA
organization's RADV audit report. We support establishment of a means of
appealing issues related to CMS review of RADV medical record documentation,
but we believe that this appeal opportunity is so narrowly focused that it does not
provide a meaningful avenue for MA organizations to seek resolution of issues
arising from CMS review of medical record documentation.

While we understand that CMS has a number of years of experience conducting
these reviews, and we appreciate CMS' efforts to structure its use of contractors
with expertise in medical record coding to ensure the consistency and fairness of
results, we believe it is unlikely that even the best review process can be
completely free of errors on the fundamental issue of coding in the medical record
that supports a specified HCC. In light of the potential for RADV audits to result
in retroactive payment adjustments, we believe it is critical for CMS to provide
reasonable opportunities for MA organizations to pursue appeals when they
disagree with CMS' determination that a diagnosis is not supported by the
submitted medical record. By foreclosing appeal on this critically important
issue, we believe that this layer of the appeals process is rendered wholly
inadequate to address MA organization concerns that may arise regarding one of
the most important findings resulting from the RADV audit process. We
recommend that CMS revise §422.311(c)(2) to extend the documentation dispute
process to permit MA organizations to appeal potentially erroneous
determinations regarding medical record coding or other documentation issues.

Further, under the limited appeal right CMS has proposed, the proposal restricts
CMS' review to errors that are reflected in the MA organization's audit report. It
appears that this review would not encompass errors arising from omissions from
the report. We believe that this incomplete scope of review undermines the
integrity of the appeals process and recommend that CMS revise
§422.311(c)(2)(iv) to encompass all errors that may have occurred by eliminating
the qualifying language that the errors be "listed in the MA organization's RADV
audit report."

- **RADV payment error calculation appeal process.**
  + CMS is proposing to establish a process that provides an opportunity for
    appeal of the RADV payment error calculations. The agency explains that
    MA organizations may request reconsideration of the RADV payment error

002748

EXHIBIT 5 - 145

Exhibit 3

Exhibit M
Page 191

December 8, 2009
Page 32

calculation and proposes that the following three levels of appeal would be available:

-- The first level would include recalculation of the payment error by a CMS official or contractor not otherwise involved in payment error rate activity who would utilize CMS' RADV payment error rate calculation methodology. The outcome of this review reflecting agreement or disagreement with the result of the original RADV payment calculation would be provided to a CMS reconsideration official who would accept or reject the finding.

-- This first level decision is final and binding unless CMS or the MA organization is dissatisfied with the result of the review in which case, either party may request a hearing on the RADV payment error calculation determination.

-- The second level decision of the Hearing Officer is final and binding unless CMS or the MA organization is dissatisfied with the result of the hearing in which case either party may request discretionary review by the CMS Administrator.

-- If the Administrator agrees to review the case, the decision at this third level of appeal is final and binding.

We support establishment of an avenue for appealing issues that arise as a result of the RADV payment error calculation. While we appreciate that CMS has included such a process in the proposed rule, as with the documentation dispute process, we believe that the limited scope of the appeal right does not permit MA organizations to pursue critical issues that are likely to arise as the payment error calculation methodology is implemented. For example, we do not believe it is reasonable to expect that no errors or other material issues will arise with regard to such elements as the sampling methodology, the determination of the error rates flowing from identified documentation deficiencies, and application of the steps in payment error calculation to specific contracts, including but not limited to the narrow issue that is the focus of the proposed rule. This is particularly true because there is no previous experience with the new methodology that CMS will employ, and the magnitude of the retroactive payment adjustments that may result from its application is unpredictable. In light of the potentially significant implications of the RADV payment error methodology, we believe it is untenable for the appeals process to fail to provide MA organizations with the opportunity to seek resolution of issues arising from implementation of the payment error calculation methodology, including the statistical validity of both the sampling and extrapolation underlying the calculation. We recommend that CMS revise §422.311(c)(3) to provide that the scope of the appeal right would include these critically important issues.

002749

EXHIBIT 5 - 146

Exhibit M
Page 192

565

Exhibit 3



December 8, 2009
Page 33

+ In addition, with respect to the narrow appeal right related to the RADV payment error calculation that is included in the proposed rule, we have identified the issues and recommendations below.

-- We agree that review of the calculation by a third party who is not otherwise involved in the RADV payment error calculation error reviews is the appropriate first step. However, the preamble explains that the findings of the third party reviewer may be accepted or rejected by a CMS reconsideration official. Neither the preamble nor the proposed rule specify the qualifications of this official nor do they specify the criteria that will be used to determine whether the third party's findings will or will not be accepted. If the purpose of the third party review is to provide an objective analysis of the calculation, it appears that this purpose is undermined by providing that the decision to accept the findings rests with the reconsideration official. We recommend that the proposed process be revised to require acceptance of the third party's findings or otherwise ensure that the decision on the findings is not made by an official who has a role in the RADV payment error calculation that is under review.

+ Further, the preamble indicates that CMS intends to provide an annual notice of the methodology that the agency will use to calculate Part C payment errors and that there will be an opportunity for MA organizations to comment on the methodology. We support this annual comment process, but note that the preamble does not explicitly state that CMS intends to provide an opportunity to comment prior to the initial establishment of the payment error calculation methodology. Due to the critical importance of ensuring that this methodology is fair and reasonable, we recommend that CMS provide a process that permits thorough review and comment by MA organizations prior to initial implementation of the methodology and annually thereafter, including for example, a 45 day review period and inclusion in CMS' final announcement of the methodology a discussion of the agency's response to comments. We also recommend that CMS ensure that the announcement of the payment error calculation methodology for RADV audits of data used for risk adjustment in the subsequent payment year takes place sufficiently far in advance of the bid submission deadline for that payment year that MA organizations can take it into consideration as they develop their bids for that year (e.g., well in advance of issuance of the MA payment rates for the payment year).

**3. Determination of Acceptable Administrative Costs by Cost Contracts and Health Care Prepayment Plans (§417.564; Preamble, p. 54679)**

002750

EXHIBIT 5 - 147

December 8, 2009
Page 34

- **Apportionment and allocation of administrative and general costs.**

    + **List of excluded costs.** CMS is proposing to include in the regulations a new §417.564(c), which contains a list of costs that must be excluded from administrative costs. AHIP's understanding is that these costs currently cannot be included in cost reports and that the new provision codifies existing CMS policy regarding the allowability of these costs. AHIP believes that clarification of the treatment of these costs in the regulation is constructive.

    + **Revisions to rules on documentation of administrative and general costs.** CMS is proposing to add a new §417.564(b)(iii) that would require, for the costs included under §417.564(b)(1)(i) - §417.564(b)(1)(iv), that include personnel costs, the cost plan:

        must be able to identify the person hours expended for each administrative task and the rate of pay for those persons performing the tasks. Administrative tasks performed and rate of pay for the persons performing those tasks must match in terms of the skill level needed to accomplish those tasks. This information must be made available to CMS upon request.

AHIP understands the importance of cost plans being able to document and make available to CMS during audit information that supports the costs claimed on their cost reports. AHIP recommends that CMS provide through guidance further clarification regarding CMS' expectations about how cost plans will document this information, including examples of how time should be tracked and how to evaluate the match between skill level and tasks performed. Such guidance will promote a common understanding of the requirements among cost plans and CMS' cost contract auditors. We recommend that CMS provide cost plans an opportunity to comment on this guidance before it is finalized to ensure that operational issues can be fully considered and urge CMS to ensure that the documentation requirements will be reasonable and structured in a manner that is not unduly burdensome to cost plans. In addition, to permit cost plans to take the steps necessary to comply with any new requirements resulting from the proposed change to the regulation, we recommend that such requirement apply to cost years following the year in which the regulation is effective.

E. **Changes to Improve Data Collection for Oversight and Quality Assessment**

1. **Requirements for Quality Improvement Programs Under Part C (§422.152, §422.153 & §480.140; p. 54680-54681)**

002751

EXHIBIT 5 - 148

Exhibit M
Page 194

Exhibit 3

December 8, 2009
Page 35

**a. Quality Improvement Programs (§422.152(a)(1) & §422.152(a)(2); Preamble, p. 54680)**

CMS is proposing to revise §422.152(a)(1) and §422.152(a)(2) to require that MA organizations conduct Chronic Care Improvement Programs (CCIPs) in patient populations and conduct quality improvement projects in areas identified by CMS based on the agency's review of data collected from MA organizations and the population served by the plan. The agency explains in the preamble that CMS intends to provide guidance on specific quality improvement projects that MA organizations must implement based upon an organization's specific quality improvement needs, or quality improvement needs for MA plans generally. CMS also intends to suggest methods and processes by which organizations should manage a quality improvement project, as appropriate.

Quality improvement programs and projects designed to promote quality care and service for health plan members are a hallmark of the MA organization health care delivery systems. The capacity to pursue quality improvement projects focused on strengthening plan and provider performance to positively impact health outcomes and quality of life for plan enrollees is fundamental to the value that they offer their members. Many MA organizations are accredited by the National Committee for Quality Assurance (NCQA) or another accrediting body and are deemed to comply with CMS quality assurance requirements by meeting the comparable standards of these bodies. The standards include reviews to ensure that the organizations pursue quality improvement projects that are meaningful to their members.

While the nature and scope of quality improvement activities is necessarily tailored to the plan type, as well as the characteristics of MA plan enrollees, all MA organizations dedicate substantial resources to quality improvement activities. The concerns that CMS expresses in the preamble about the focus and effectiveness of MA organization quality improvement projects and CCIPs indicate that the agency believes these existing activities should be enhanced and potentially modified. While AHIP member organizations are committed to working to strengthen their programs and performance on an ongoing basis, we have the serious concerns, which are discussed in detail below, that the strategy CMS has proposed to achieve this goal does not take advantage of the longstanding MA organization experience and achievements in the quality arena and may not be sufficiently responsive to the unique circumstances of MA enrollees and the plans that serve them. Further, we believe that the agency's proposed rule could have the unintended consequence of drawing resources away from MA organization priorities that are customized to focus on areas they have determined would be of particular benefit to their enrollees.

002752

EXHIBIT 5 - 149

December 8, 2009
Page 36

We note that while the focus of our comments is on the importance of ensuring that MA organizations can continue to pursue quality initiatives that are integral to their operations in the context of the CMS proposal, there are efforts underway in which AHIP and our member organizations are proactively engaged that are focused on improving health care quality for all Americans and across all public and private product types.  By fostering collaboration across a broad array of stakeholders to focus efforts on consensus measures and projects that address critical national health care quality priorities, these efforts have the potential to raise the performance of the health care system for the benefit of all patients.  AHIP member organizations participating in the MA program are committed to taking part in these nationally focused initiatives, as well as contributing to community-based efforts that may complement the national quality agenda, and we believe that the involvement of the Medicare fee-for-service program is also essential to their success.  AHIP looks forward to working with CMS and the full spectrum of stakeholders in the health care sector as these important efforts continue.

Our issues and recommendations related specifically to CMS' proposed changes to the MA regulation are discussed in detail below:

- **Responsiveness to unique characteristics of MA organization enrollees and delivery systems.**  In selecting their quality improvement projects MA organizations take into consideration detailed internal data as well as the HEDIS, CAHPS and HOS data that are reported to CMS.  They also consider such factors as the demographic and health status mix of their enrollees; short term and longer term goals and the opportunities to pursue organization-wide initiatives that include population-specific evaluations; opportunities to leverage other ongoing and anticipated initiatives in clinical and non-clinical areas; previous project topics and their results, including the evaluation of targeted interventions; strategies most likely to be effective in light of provider relationships and related delivery system characteristics related to plan type and other factors; and a host of other operational considerations.  MA organization decisions about the focus of their chronic care improvement programs similarly take into consideration quality goals and implementation strategies that are informed by a variety of organization and plan-specific operational and other factors related to the populations they serve.

Consequently, if CMS mandates topics for quality improvement topics and specifies populations for CCIPs, these requirements may not be aligned with priorities MA organizations identify to benefit their enrollees and the organizations may face significant challenges in allocating sufficient resources to

002753

EXHIBIT 5 - 150

Exhibit M
Page 196

569
Exhibit 3

December 8, 2009
Page 37

both streams of activities.  Further, in some cases, MA organizations could be required to pursue projects in areas in which they are already performing at a high level rather than focusing their resources in areas they believe should be strengthened.  We believe that these circumstances argue strongly for continued flexibility for MA organizations to identify the focus of their quality initiatives and CCIPs.

If the agency's goal is to address concerns about the performance of specific organizations, we believe the existing regulation provides this authority.  If CMS is interested in comparing performance across MA organizations, the HEDIS, CAHPS, and HOS measures appear to provide a broad range of well-established measures that could be utilized in a manner that would enrich currently available information for beneficiaries.  While we appreciate that community-based quality improvement initiatives can make a valuable contribution to broad-based efforts to heighten health care quality and our member organizations actively participate in such initiatives, we also believe it is critically important to preserve the flexibility of MA organizations to pursue projects of special clinical and operational value to their enrollees.  We are concerned that the proposed rule could hinder these efforts.

- **Deemed Status.**  An additional consideration for MA organizations in selecting and designing their quality improvement projects is to ensure that their initiatives are consistent with the requirements for maintaining their accreditation by NCQA or other accrediting bodies.  We are concerned that if CMS establishes required topics for quality improvement projects and designates populations for CCIPs, these requirements could impinge on the efforts of MA organizations to satisfy accreditation standards.  It is our understanding that one reason for the approach currently reflected in CMS' quality improvement program requirements is to coordinate with and leverage the impact of well-respected private sector accreditation programs as well as to permit MA organizations to pursue organization-wide projects and participate in community projects that offer opportunities to benefit all of the populations served in addition to engaging in targeted initiatives they may implement for MA plan enrollees.  CMS' adoption of Healthcare Effectiveness Data and Information Set (HEDIS) and Consumer Assessment of Health Providers Survey (CAHPS) reporting requirements is evidence of this focus.  We urge CMS to continue to provide the flexibility necessary to facilitate MA organization contributions to broader quality improvement initiatives, particularly in light of the importance of such efforts in the context of health care reform.

002754

EXHIBIT 5 - 151

Exhibit M
Page 197

570
Exhibit 3

December 8, 2009
Page 38

- **Coordination of MA and State Requirements for Dual Eligible Special Needs Plans (SNPs).** Dual eligible SNPs that also have contracts with state Medicaid agencies must comply with state as well as MA requirements to pursue quality improvement projects. We are concerned that dual eligible SNPs will face significant challenges meeting state as well as MA requirements in the event that CMS requirements for specific quality improvement topics differ from the focus of state requirements. Dual eligible SNPs could be required to pursue an increased number of mandated projects which as discussed above could hinder their ability to allocate sufficient resources for required activities as organization-specific priorities. Because they must meet Medicaid as well as Medicare requirements, dual eligible SNPs could also face a higher burden than other MA plan types. We note that CMS has been engaged in the development of SNP-specific quality measures for all SNP types and we believe this initiative has the potential to provide a more effective means of promoting SNP accountability for quality performance based on dimensions that are tailored to their enrollees' characteristics.

AHIP shares CMS' interest in promoting strong MA organization performance in the implementation of quality improvement projects that serve enrollee interests. However, in light of the concerns described above, we believe that the approach reflected in the proposed rule is problematic and we recommend that CMS revise the proposed rule to defer establishment of any general requirement that MA organizations implement CMS-determined quality improvement projects and establish chronic care improvement programs for CMS-identified populations. We recommend that CMS initiate an ongoing dialogue with MA organization staff experts in quality improvement to assist the agency in assessing the operational implications of the proposed approach, explore alternative approaches, and explore avenues for identifying and disseminating best practices for all plan types. AHIP and its member organizations would welcome the opportunity to participate in such a process.

c. **Use of Quality Improvement Organization for Review Information (§422.153 & §480.140; Preamble, p. 54681)**

CMS is proposing to collect quality review study (QRS) information from Quality Improvement Organizations (QIOs). The preamble states that this information could be used to develop a standardized core set of clinical and non-clinical quality measures that could be applied to all MA plans. CMS indicates that the agency plans to use these measures to develop minimum performance levels and requirements that address clinical and non-clinical areas. The agency envisions utilizing these data to

002755

EXHIBIT 5 - 152

Exhibit M
Page 198

571
Exhibit 3

December 8, 2009
Page 39

allow beneficiaries to make better comparisons among plans, ensure compliance, and create a competitive value-based purchasing program based upon quality of care.

While AHIP supports efforts to provide beneficiaries with better information on which to base informed decisions when selecting an MA plan, the value of supplementing HEDIS, CAHPS, and HOS information with QRS information is unclear. Our concerns about the proposed uses of QRS information include:

+ **Consistency of QIO assessments/findings.** HEDIS, CAHPS, and HOS measures have been developed and tested over many years and are standardized so that they are applied in a consistent manner. It is our understanding that QIO assessments of an issue may differ from QIO to QIO, meaning that MA organizations can receive differing assessments of the same issue, depending on the reviewing QIO. Such inconsistency raises a fundamental issue about the appropriateness of using these data for the purposes CMS has identified.

+ **Timeliness of QIO assessments/findings.** We understand that MA organizations have experienced substantial delays in the receipt of QIO study findings, so that MA organizations do not have timely notice of deficiencies, if any, that are identified through these studies nor are the findings available for use in MA organization quality improvement activities. Further, substantial delay in dissemination of findings suggests that this information may not be sufficiently timely for CMS' intended purpose.

In light of these concerns, we recommend that the agency reconsider the proposed use of QRS information and that the agency defer the proposed revision of the MA and QIO regulations to provide authority for CMS to obtain QRS data and utilize it for the purposes specified in the proposed rule. We recommend that CMS include the issues of current MA experience with QIO studies and the potential future uses of QRS information in the dialogue with MA organizations that is proposed in our comment above to inform CMS' further evaluation of this issue.

2. **CAHPS Survey Administration Under Parts C and D (§417.472, §422.152, & §423.156; Preamble, p. 54681)**

- CMS is proposing to codify the requirement announced in the 2010 Call Letter for cost plans, MA organizations and PDP sponsors with 600 or more enrollees in July of the prior year to enter into contracts with CAHPS survey vendors to conduct the satisfaction survey. We have one technical comment. AHIP recommends that CMS revise the proposed regulatory language in §422.152(b)(5) to eliminate the reference to cost plans that has been included in error. Application of the requirement to these

002756

EXHIBIT 5 - 153

Exhibit M
Page 199

Exhibit 3

December 8, 2009
Page 40

> organizations is accomplished through the cross reference proposed for inclusion in the cost plan regulations at §417.472(i).

- CMS is proposing in §417.472(i) to require cost plans to contract with approved Medicare Consumer Assessment of Healthcare Providers and Systems (CAHPS) survey vendors to conduct the Medicare CAHPS satisfaction survey for "MA plan enrollees." We recommend that CMS correct this error by deleting "MA plan enrollees" and inserting "cost plan enrollees." We also recommend that CMS remove references to plan types other than cost plans from the proposed new language in §417.472(j).

3. **Validation of Part C and Part D Reporting Requirements (§422.516 & §423.514; Preamble, p. 54682)**

CMS is proposing to add a paragraph (g) to §422.516 and §423.514 to require each Part C and Part D sponsor to subject information collected under paragraph (a) of those sections to a yearly independent audit to determine their reliability, validity, completeness, and comparability in accordance with specifications developed by CMS. We understand CMS' interest in requiring validation of data that is submitted by sponsoring organizations to CMS and agree that submission of required information that is accurate and complete is an important priority under the MA and Part D programs. CMS is already moving forward with a new initiative to require validation and is in the process of refining detailed guidance on this topic.

We appreciate that the agency is seriously considering operational issues raised by MA organizations and Part D sponsors as the guidance is developed. AHIP believes that the extent and complexity of the validation requirements may necessitate adjustments as implementation occurs to ensure that the initiative makes efficient and effective use of the resources of sponsoring organizations and CMS, while at the same time serving CMS goals. We are concerned that the proposed regulatory language may not provide sufficient flexibility to permit changes that CMS determines are desirable. For example, we understand that CMS may identify a subset of reported information that must be validated for the initial year of the audit, and it is unclear whether the proposed regulatory language would accommodate this approach.

For this reason, we recommend that the proposed new paragraph (g) be revised by striking "Each Part C [Part D] sponsor must" and inserting instead, "CMS may require each Part C [Part D] sponsor to..." Further, to provide additional flexibility, we recommend that CMS strike "independent audit" and insert "audit". We believe these changes will provide the regulatory foundation for the validation requirement while

002757

EXHIBIT 5 - 154

Exhibit M
Page 200

December 8, 2009
Page 41

permitting CMS to refine the design of the initiative or consider alternative approaches in response to issues identified as implementation takes place.

### 4. Collection of Additional Part D Claims' Elements for Nonpayment-Related Purposes (§423.505; Preamble, p. 54683-54684)

CMS is proposing to amend §423.505 to expand to all data elements included in PDE data the authority for these data to be used for non-payment related purposes. CMS is also proposing to revise the regulation to permit the release of data that includes unencrypted Part D plan identifiers to HHS grantees that meet certain criteria in addition to contractors conducting studies on behalf of CMS. It is our understanding that HHS grantees are numerous and diverse, and we do not believe that the preamble provides sufficient information about the subset of grantees that CMS believes should receive these data or the number, scope, and purpose of the studies for which it would be used. We also believe that the criteria proposed for inclusion in §423.505(m)(1)(iii)(C)*(1), (2), (3),* and *(4)* are not sufficiently detailed and specific. For these reasons, AHIP opposes this proposal and recommends that CMS eliminate the changes from the proposed rule because safeguards for use of the data are insufficient.

## F. Changes to Implement New Policy

### 1. Protected Classes of Concern Under Part D (§423.120(b)(2)(v); Preamble, p. 54685-54689)

CMS explains in the preamble that the agency has decided, based upon the comments received, to revisit the January 2009 interim final rule implementing the MIPPA requirement that Part D plans include in their formularies all drugs in categories and classes when the two statutory requirements are met. The agency believes that the statute does not support codification of the existing six classes and believes that various analyses are needed to determine which drug classes meet the MIPPA criteria. CMS also signals that the interpretation of specific terms in the statute is critical to key decisions concerning its implementation, and the preamble provides a detailed discussion of these terms. The analysis included in the preamble also reiterates the agency's intent to balance access to drugs for vulnerable populations with allowing Part D sponsors to undertake beneficial cost containment efforts. Further, CMS indicates an intent to avoid interfering with existing protections implemented by Part D sponsors that are intended to promote safety and efficacy. AHIP commends CMS for revisiting the interim final rule and providing a thoughtful and informative analysis of the MIPPA authority.

CMS invites comment on whether new protected classes should be announced through subregulatory guidance or through a formal rulemaking process. AHIP supports use of

002758

EXHIBIT 5 - 155

Exhibit M
Page 201

Case 2:16-cv-08697-FMO-SS   Document 422-3   Filed 06/22/21   Page 575 of 1177   Page ID
#:14649
Case 2:16-cv-08697-MWF-SS   Document 182-1   Filed 12/08/17   Page 161 of 166   Page ID
#:2736

December 8, 2009
Page 42

subregulatory guidance which gives the agency the flexibility to make refinements, as
necessary, more quickly than if CMS adopts the rules through a formal rulemaking
process.  In making this recommendation, AHIP strongly urges CMS to adopt a process
that provides a meaningful and timely opportunity to comment on the proposed classes.
Designation of protected classes will have a significant effect on the operations of Part D
sponsors and is of great interest to the beneficiaries they serve.  AHIP believes it is of
critical importance that CMS give stakeholders ample opportunity to comment and that
CMS have a similar opportunity to carefully consider and evaluate the comments.

**G.   Changes to Clarify Various Program Participation Requirements**

**3.   Requirement for Sponsoring Organizations Under Part C and D to Report Other
Payer Information to the Coordination of Benefits Contractor (§422.108 &
§423.464; Preamble, p. 54690)**

CMS is proposing to amend the Part C and Part D rules to require the reporting of
coordination of benefits information when there is a payor primary to Medicare.  The
preamble explains that reporting will be limited to information reported to the sponsor as
being inconsistent with existing information in the coordination of benefits (COB) file
and states that:

...we propose to include in regulatory text the requirement that MA organizations
and Part D sponsors, upon being notified of credible new information regarding
other payers or changes to existing other payer information, report this
information to the CMS COB Contractor in accordance with the processes and
timeframes established by CMS.

The preamble also provides the agency's definition of "credible" information.  In light of
the significance accorded this discussion in the preamble, we recommend that, for clarity,
the proposed new regulatory language be revised to reference "credible" information and
that the agency's intent to focus reporting on information inconsistent with that in the
COB file either be incorporated into the regulation or reiterated in the preamble to the
final rule.

**4.   Visitor/Traveler Benefit Under Part C for the Purpose of Extending Enrollment Up
to 12 Months (§422.74; Preamble, p. 54691)**

CMS is proposing to add §§422.74(d)(4)(iii)(D) and (E) to specify that if an MA
organization offers a visitor/traveler option when an individual is out of the service area
for consecutive days of more than 6 months but less than 12 months, the MA

002759

EXHIBIT 5 - 156

Exhibit M
Page 202

December 8, 2009
Page 43

organization may permit the individual to remain enrolled if the visitor/traveler option meets certain new criteria. Specifically, under such an option the MA organization must furnish "all Medicare Part A and Part B services and all mandatory and optional supplemental benefits at the same cost sharing as apply within the plan's service area" and "meets Medicare access and availability requirements at §422.112..." It is our understanding that this proposal is less flexible than the existing rules governing the offering of visitor/traveler options.

We believe that existing programs that offer less comprehensive benefits for enrollees who are absent from the service area for 6 months or less have proven valuable to enrollees. Further, it is our understanding that in the past CMS has permitted the offering of visitor/traveler benefits that include all Medicare Part A and Part B services but not supplemental benefits. Since all MA organizations cover Medicare Part A and Part B benefits, but typically differ in the supplemental benefits offered, it may be more feasible for MA organizations to enter into arrangements with MA contractors in other areas of the country to provide network access Medicare Part A/B benefits than for supplemental benefits. While we believe that additional clarity regarding CMS policy on visitor/traveler benefits could be constructive, in order to avoid hindering the offering of benefits that are less comprehensive than required under CMS' proposal but that can be valuable for beneficiaries, we urge CMS to consider a more flexible approach. We recommend that CMS defer incorporating the proposed changes into the MA regulations and instead issue draft subregulatory guidance for review and comment. Such an approach would permit CMS to adjust or refine the requirements to ensure that the agency goals and beneficiary interests are best served

**5. Medication Therapy Management Programs Under Part D (§423.153(d); Preamble, p. 54692-54693)**

CMS proposes to revise §423.153(d) to codify policy guidance issued in the 2010 Call Letter that CMS believes reflects common practices among Part D Medication Therapy Management Programs (MTMPs). While CMS has documented that several changes reflect a number of widespread practices, the benefit of codifying these practices is unclear. With respect to other proposed new regulatory provisions, we believe there is insufficient experience to include these policies in regulation, for example, the implications of the more detailed criteria for targeting beneficiaries for MTMPs are not yet clear. CMS indicates that codification will promote greater consistency and allow for better evaluation and comparison of MTMPs. However, as with other quality initiatives, over time, the design and implementation of MTMPs can be expected to continue to evolve to take advantage of ongoing experience. We believe that CMS' goals can readily be accomplished through subregulatory guidance, which has the advantage of being more easily modified in the future if it becomes desirable to reflect refinements in the design

002760

EXHIBIT 5 - 157

December 8, 2009
Page 44

and implementation of these important programs. AHIP, therefore, opposes codification of more detailed MTMP requirements. We recommend that CMS remove the MTMP changes from the proposed rule and continue to address MTMP requirements in subregulatory guidance.

9. **Standard Timeframe and Notice Requirements for Coverage Determinations Under Part D (§423.568; Preamble, p. 54695-54696)**

- **Explanation of conditions for approval of a completely favorable determination.** CMS is also proposing to add §423.568(e), which requires that, when there is a completely favorable standard determination, the notice must explain the conditions of the approval in a readable and understandable form. Consistent with our comments concerning a similar requirement for wholly favorable redeterminations and completely favorable expedited coverage determinations, while we believe that in the case of a standard determination that is wholly or partially adverse to the enrollee an explanation of a reason for the decision is an important element of the notice, the value of the explanation to the enrollee is unclear when the decision is completely favorable, and we believe that the cost of providing this information for every completely favorable standard determination outweighs its benefit. If CMS believes that enrollees may have an interest in this information, it would be more efficient to indicate in the notice that the Part D sponsor will provide the enrollee with an explanation of a completely favorable standard determination upon request. We recommend that the proposed rule be revised accordingly.

- CMS is proposing to extend this period for a Part D sponsor to notify an enrollee of a determination regarding a request for payment within 14 calendar days rather than within 72 hours of receiving the request and to require that payment be made within that same 14 day period. We support extending the time period for the Part D sponsor to make the decision and notify the enrollee. We believe this change will continue to serve the interests of enrollees in receiving timely notice while making more efficient use of Part D sponsor resources. Regarding the time frame for payment, we understand that providing payment within 14 days of receipt of the request for payment could raise a practical concern, because it could necessitate manual issuance of payments by contracted PBMs off cycle from their regular check processing schedules, which may be bi-monthly. For efficiency, AHIP recommends that CMS revise the proposed rule to permit payment to be made (when applicable) within 30 days of receipt of the request for payment.

11. **Timeframes and Notice Requirements for Expedited Coverage Determinations (§423.572; Preamble, p. 54696-54697)**

002761

EXHIBIT 5 - 158

December 8, 2009
Page 45

CMS is proposing to add §423.572(c)(1), which requires that, when there is a completely favorable expedited coverage determination, the notice must explain the conditions of the approval in a readable and understandable form. Consistent with our comments concerning a similar requirement for wholly favorable redeterminations and completely favorable standard determinations, while we believe that in the case of an expedited determination that is wholly or partially adverse to the enrollee an explanation of a reason for the decision is an important element of the notice, the value of the explanation to the enrollee is unclear when the decision is completely favorable, and we believe that the cost of providing this information for every completely favorable standard determination outweighs its benefit. If CMS believes that enrollees may have an interest in this information, it would be more efficient to indicate in the notice that the Part D sponsor will provide the enrollee with an explanation of a completely favorable expedited determination upon request. We recommend that the proposed rule be revised accordingly.

### 12. Clarify Novation Agreements Under Part D (§423.551; Preamble, p. 54697)

CMS is proposing to revise the regulatory provision that permits the novation of a PDP sponsor contract in the event of a change of ownership of the PDP sponsor. The proposed change would provide that CMS will only recognize the sale or transfer of the PDP sponsor's entire line of business (e.g., all contracts held by a sponsor with multiple contracts). In the preamble, CMS expresses concern about PDP sponsor requests in recent years to novate a portion of a contract and reiterates the agency's existing policy of not allowing the novation or assignment of one of a PDP sponsor's plans to another sponsoring organization. CMS states that the agency's proposal is designed to address this concern and to create consistency with the MA program.

While AHIP understands the agency's objective in not allowing a single "plan" to be novated, the implications of the novation of a portion of a contract are clearly distinguishable from the novation of an entire contract. We believe that it is unreasonable to require a sponsor to exit the Part D program entirely by novating all PDP contracts in the event that the entity wishes to novate one of several Part D contracts. If the result is the termination of a contract rather than a sale or transfer, we believe this action would be more disruptive to enrollees who would be required to select a new plan rather than remaining enrolled under the previous contract under new ownership. We recommend that CMS revise the proposed rule to recognize the sale or transfer of an entire contract. Our recommendation applies equally to the MA program although we are not aware of instances in which CMS has applied this broad requirement to MA contractors.

002762

EXHIBIT 5 - 159

Exhibit M
Page 205

578
Exhibit 3



December 8, 2009
Page 46

### 13. Cost Contract Program Revisions:  Appeals and Marketing Requirements (§417.428, §417.594, §417.500, & §417.640; Preamble, p. 54697-54698)

- **Electronic Enrollment.**  While this issue was not addressed in the proposed rule, AHIP is recommending that CMS amend the cost plan enrollment regulations to allow beneficiaries the option of electronic enrollment into cost plans in the same manner as MA organizations.  AHIP notes that the statute, Section 1876, does not prescribe the manner in which a beneficiary can enroll in a cost plan.  CMS currently interprets its rules to require cost plans to obtain written signatures from beneficiaries although AHIP notes that the regulation does not explicitly require that the signature be "written".  See §417.430.  We believe it would be in the best interests of beneficiaries, CMS and cost plans for CMS to reconsider this interpretation in order to allow the enrollment mechanisms for the MA program and the cost plan program to be aligned.

### 14. Appeals Processes for Contract Determinations, Intermediate Sanctions, and Civil Monetary Penalties

#### c.  Contract Determinations (§417.492 & §417.494; Preamble, p. 54698)

- **Incorporation by reference into the cost plan regulations of MA provisions on appeals of contract determinations.**  CMS is proposing to provide that the rights, procedures, and requirements for contract determinations under the MA program will also be applicable to cost plans.  The proposed change to the regulation would accomplish this objective by including cross-references in §417.492 and §417.494 to requirements for notice to MA contractors applicable also to cost contractors and by revising §417.640 to state that in Part 422, Subpart N, references to Part 422 should be read as references to Part 417 and references to Medicare Advantage plans should be read as references to HMOs and CMPs.  In reviewing Part 422, AHIP believes that this approach does not provide sufficient clarity to cost plans regarding the requirements that apply to cost plans.  For example, there are provisions of Part 422, Subpart N, that would not apply to Medicare cost plans, and there are termination/non-renewal provisions under Part 417 that are not addressed under Part 422.  Accordingly, AHIP recommends that CMS revise the language in Part 417 to incorporate a structure that is similar to the Part 422 rules and is modified to appropriately apply to Medicare cost plans.

#### b.  Civil Monetary Penalties (§417.500; Preamble, p. 54698)

002763

EXHIBIT 5 - 160

Exhibit M
Page 206

579

Exhibit 3



December 8, 2009
Page 47

- **Intermediate sanctions and civil monetary penalties.** CMS is proposing in §417.500 to replace §417.500(a) with a statement that the "rights, procedures and requirements related to intermediate sanctions and civil monetary penalties set forth in Part 422 subparts O and T of this chapter also apply to Medicare contracts with HMOs and CMPs under Section 1876 of the Act." For clarity, AHIP recommends that CMS revise the intermediate sanctions provisions in Part 417 to incorporate the structure of Part 422, as applicable, rather than utilizing a cross-reference. AHIP makes similar recommendations with regard to the civil monetary penalties provisions in Part 417.

### 15. Extending MA Marketing Requirements to Cost Program Plans (§417.428; Preamble, p. 54698-54700)

CMS is proposing to apply the marketing requirements set forth in subpart V of 42 CFR part 422 to Medicare cost plans, with the exception of section §422.2276. Section 422.2276 exempts from the prior review and approval requirements marketing materials designed for members of an employer group. AHIP recognizes that cost plans are not eligible to offer 800 series plans except for their Part D benefits; however, CMS policy since the Medicare risk program has been that section 1876 contractors have had the discretion to negotiate with employers additional benefits. CMS continues to take the position that such negotiations are not reviewable by CMS. Consistent with this position, AHIP believes that CMS has the discretion to exempt cost plan materials for employer groups from CMS' prior review and approval requirements in the same manner as MA materials for employer groups. AHIP recommends that CMS adopt this change, which would also further align the Medicare cost contract provisions with the MA program requirements.

We have appreciated the opportunity to comment. Please contact me if additional information would be helpful or if you have questions about the issues we have raised. I can be reached at (202) 778-3209 or cschaller@ahip.org.

Sincerely,

Candace Schaller
Senior Vice President, Federal Programs

002764

EXHIBIT 5 - 161

Exhibit M
Page 207

580
Exhibit 3

1  LATHAM & WATKINS LLP
       David J. Schindler (Bar No. 130490)
2        david.schindler@lw.com
   355 South Grand Avenue, Suite 100
3  Los Angeles, California 90071-1560
   Telephone: +1.213.485.1234
4  Facsimile: +1.213.891.8763

5  LATHAM & WATKINS LLP
       Daniel Meron (appearing *pro hac vice*)
6        daniel.meron@lw.com
       Abid R. Qureshi (appearing *pro hac vice*)
7        abid.qureshi@lw.com
   555 Eleventh Street, NW, Suite 1000
8  Washington, DC 20004-1304
   Telephone: +1.202.637.2200
9  Facsimile: +1.202.637.2201

10  Attorneys for United Defendants

11              **UNITED STATES DISTRICT COURT**

12              **CENTRAL DISTRICT OF CALIFORNIA**

13

14

15  UNITED STATES OF AMERICA *ex rel.*    CASE NO. 2:16-cv-08697-
    BENJAMIN POEHLING,                    MWF(SSx)

16                                        Assigned to Hon. Michael W.
                                          Fitzgerald
17              Plaintiff,
                                          **[PROPOSED] ORDER
18      v.                                GRANTING UNITED'S
                                          MOTION TO DISMISS
19  UNITEDHEALTH GROUP, INC. *et al.*,    UNITED STATES' FIRST
                                          AMENDED COMPLAINT-IN-
20              Defendants.               PARTIAL-INTERVENTION

21                                        [*Notice of Motion and Motion,
                                          Memorandum of Points and
22                                        Authorities, and Declaration of
                                          David J. Schindler filed
23                                        concurrently herewith*]

24                                        Date:   January 29, 2018
                                          Time:   10:00 a.m.
25                                        Ctrm:   5A

26

27

28

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

[PROPOSED] ORDER GRANTING UNITED'S
MOTION TO DISMISS
2:16-cv-08697-MWF (SSx)

Exhibit M
Page 208

581
Exhibit 3

1    On December 8, 2017, Defendants UnitedHealth Group Incorporated,

2    United HealthCare Services, Inc., UnitedHealthcare, Inc., UnitedHealthcare

3    Insurance Company, Ovations, Inc., Optum, Inc., OptumInsight, Inc.,

4    AmeriChoice of New Jersey, Inc., AmeriChoice of New York, Inc., Arizona

5    Physicians IPA, Inc., Care Improvement Plus of Maryland, Inc., Care

6    Improvement Plus of Texas Insurance Company, Care Improvement Plus South

7    Central Insurance Company, Care Improvement Plus Wisconsin Insurance

8    Company, Optum Insurance Co., Citrus Health Care, Inc., Health Plan of Nevada,

9    Inc., Medica HealthCare Plans, Inc., Oxford Health Plans (CT), Inc., Oxford

10   Health Plans (NJ), Inc., Oxford Health Plans (NY), Inc., PacifiCare Life and

11   Health Insurance Company, PacifiCare of Arizona, Inc., PacifiCare of Colorado,

12   Inc., PacifiCare of Nevada, Inc., Physicians Health Choice of Texas, LLC,

13   Preferred Care Partners, Inc., Rocky Mountain Health Maintenance Organization,

14   Incorporated, Sierra Health and Life Insurance Company, Inc., Symphonix Health

15   Insurance, Inc., UHC of California (f.k.a. PacifiCare of California), United Health

16   Care Ins. Co. and United New York, Unison Health Plan of Tennessee, Inc.,

17   UnitedHealthcare Benefits of Texas, Inc. (f.k.a. PacifiCare of Texas, Inc.),

18   UnitedHealthcare Community Plan of Ohio, Inc. (f.k.a. Unison Health Plan of

19   Ohio, Inc.), UnitedHealthcare Community Plan of Texas, L.L.C. (f.k.a. Evercare of

20   Texas, L.L.C.), UnitedHealthcare Community Plan, Inc. (f.k.a. UnitedHealthcare

21   of the Great Lakes Health Plan, Inc.), UnitedHealthcare Insurance Company of

22   New York, UnitedHealthcare of Alabama, Inc., UnitedHealthcare of Arizona, Inc.,

23   UnitedHealthcare of Arkansas, Inc., UnitedHealthcare of Florida, Inc.,

24   UnitedHealthcare of Georgia, Inc., UnitedHealthcare of New England, Inc.,

25   UnitedHealthcare of New York, Inc., UnitedHealthcare of North Carolina, Inc.,

26   UnitedHealthcare of Ohio, Inc., UnitedHealthcare of Oklahoma, Inc. (f.k.a.

27   PacifiCare of Oklahoma, Inc.), UnitedHealthcare of Oregon, Inc. (f.k.a. PacifiCare

28   of Oregon, Inc.), UnitedHealthcare of Pennsylvania, Inc. (f.k.a. Unison Health Plan

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

2

[PROPOSED] ORDER GRANTING UNITED'S
MOTION TO DISMISS
2:16-cv-08697-MWF (SSx)

Exhibit M
Page 209

582
Exhibit 3

1   of Pennsylvania, Inc.), UnitedHealthcare of Tennessee, Inc., UnitedHealthcare of

2   the Midlands, Inc., UnitedHealthcare of the Midwest, Inc., UnitedHealthcare of

3   Utah, Inc., UnitedHealthcare of Washington, Inc. (f.k.a. PacifiCare of Washington,

4   Inc.), UnitedHealthcare of Wisconsin, Inc., and UnitedHealthcare Plan of the River

5   Valley, Inc. (collectively, "United") moved this Court to dismiss the claims

6   asserted against them in the United States of America's First Amended Complaint-

7   In-Partial-Intervention ("FAC"), on the grounds that the FAC failed to state a claim

8   for relief pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).  This

9   Court has considered the Motion, the submissions of the parties, and the arguments

10  of counsel for the parties, who appeared before this Court on January 29, 2018.

11  After due deliberation and for good cause shown,

12          IT IS HEREBY ORDERED that United's Motion to Dismiss is GRANTED,

13  and the FAC is dismissed with prejudice.

14

15  Dated: _____          _____

16                                          Honorable Michael W. Fitzgerald
                                            United States District Court Judge
17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS⊔⊔
ATTORNEYS AT LAW
LOS ANGELES

3

[PROPOSED] ORDER GRANTING UNITED'S
MOTION TO DISMISS
2:16-cv-08697-MWF (SSx)

Exhibit M
Page 210

583
Exhibit 3

# EXHIBIT N

Exhibit 3

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General, Civil Division
NICOLA T. HANNA
United States Attorney
DAVID M. HARRIS
DAVID K. BARRETT
ABRAHAM C. MELTZER
JOHN E. LEE (CBN 128696)
JACK D. ROSS (CBN 265883)
Assistant United States Attorneys
        300 N. Los Angeles Street, Room 7516
        Los Angeles, California 90012
        Tel: (213) 894-3995; Fax: (213) 894-7819
        Email: john.lee2@usdoj.gov
JAMIE YAVELBERG
ROBERT McAULIFFE
EDWARD CROOKE
LINDA McMAHON
JESSICA E. KRIEG
ZOILA E. HINSON
AMY L. LIKOFF
GREGORY A. MASON
MARTHA N. GLOVER
Attorneys, Civil Division, U.S. Department of Justice
        P.O. Box 261, Ben Franklin Station
        Washington, D.C. 20044
        Tel: (202) 307-0486; Fax: (202) 307-3852
        Email:  robert.mcauliffe@usdoj.gov
JAMES P. KENNEDY, JR.
United States Attorney
        138 Delaware Avenue
        Buffalo, New York 14201
        Tel: (716) 843-5830; Fax: (716) 551-3052
Attorneys for the United States of America

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING,<br><br>                    Plaintiffs,<br><br>          v.<br><br>UNITEDHEALTH GROUP, INC., *et al.*,<br><br>                    Defendants. | No. CV 16-08697 FMO<br><br>PLAINTIFF UNITED STATES' FOURTH SET OF INTERROGATORIES TO DEFENDANTS |
|---|---|

Exhibit N
Page 211

1    **PLAINTIFF UNITED STATES' FOURTH SET OF**

2    **INTERROGATORIES TO DEFENDANTS**

3    TO DEFENDANTS AND DEFENDANTS' COUNSEL OF RECORD:

4    Pursuant to the provisions of Federal Rule of Civil Procedure 33, Plaintiff United

5    States of America requests that Defendants answer the following interrogatories under

6    oath and serve them upon Plaintiff within 30 days, pursuant to Federal Rule of Civil

7    Procedure 33(b).

8    PROPOUNDING PARTY:  The United States of America

9    RESPONDING PARTIES:  UNITEDHEALTH GROUP, INC., a Delaware

10    corporation, and all other entities listed as Defendants in the Government's First

11    Amended Complaint filed in the above-captioned action on November 17, 2017

12    SET NUMBER:   Four

13    INTERROGATORY:  14

14    **DEFINITIONS AND INSTRUCTIONS**

15    The United States incorporates by reference the Definitions (listed as definition

16    numbers 1-61) and Instructions that are listed in Plaintiff United States' First Request for

17    Production of Documents to Defendants, dated October 5, 2017.  In addition, the

18    following definitions and instructions (both in the singular and in the plural) shall apply

19    to these Interrogatories:

20    1.    "Including" and all forms of the word "Include" encompass all forms of the

21    word "including" and "include" without any limitation and also mean "including, but not

22    limited to."

23    2.    "Load Date" means the date in [insert field name] in IRADs and represents

24    the date for which diagnostic data from a Medical Record Review was loaded into

25    IRADS.

26    3.    "Medical Record Review" means any review of Chart(s) conducted by

27    UHG or its contractors, including Chart Review, Internal Data Validation, RACCR,

28    Claims Verification, HQ-PAFs, or otherwise, to identify diagnosis codes supported by

2

1   medical records, or to validate diagnosis codes previously submitted based on those

2   medical records, or to otherwise review, analyze, assess, or determine diagnosis codes

3   supported by such medical records.

4       4.      Whenever an Interrogatory calls for information with respect to "each" one

5   of a particular type or class of claims, matters, events, persons, or entities, of which there

6   is more than one, You are required to separately list, set forth, or identify for each

7   thereof all of the information requested.

8   **INTERROGATORY**

9   **INTERROGATORY NO. 14**

10      For each Diagnosis set forth in the United States' Response to Defendants'

11  Interrogatory No. 1[1] that You contend You were not obligated to delete or otherwise

12  return payment received for the Diagnosis to the Medicare Program, identify (A) all

13  documentation in each Chart(s), if any, that You contend supports that Diagnosis,

14  Including for each the Beneficiary (by name, HIC Number, and date of birth), Date(s) of

15  Service, Diagnosis Code(s), HCC(s) and/or RxHCC(s), Provider (by individual name,

16  group name, address, NPI, Tax ID(s), and Provider ID); and (B) each Medical Record

17  Review(s) of the Chart(s) corresponding to that Diagnosis, Including for each its date(s),

18  type(s) (i.e., whether the Medical Record Review was conducted as part of Chart

19  Review, Internal Data Validation, RACCR, Claims Verification, HQ-PAFs, or other

20  UHG Medical Record Review program), Chart Barcode, Load Date(s), and each

21  Diagnosis Code for which support was found, identified, validated, or recorded in the

22  Medical Record Review.

23

24

25

26

---

27  [1] Including the United States' First Supplemental Response served on August 17,
    2020, the United States' Amended First Supplemental Response served on October 13,
28  2020, the United States' Second Supplemental Response served on October 30, 2020,
    and any other subsequent responses

3

| | |
|---|---|
| 1 | Dated: __November 4, 2020 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |

Dated: __November 4, 2020

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General, Civil Division
NICOLA T. HANNA
United States Attorney
DAVID M. HARRIS
DAVID K. BARRETT
ABRAHAM C. MELTZER
JACK D. ROSS
Assistant United States Attorneys

JAMIE YAVELBERG
ROBERT McAULIFFE
EDWARD CROOKE
LINDA McMAHON
JESSICA E. KRIEG
ZOILA E. HINSON
AMY L. LIKOFF
GREGORY A. MASON
MARTHA N. GLOVER
Civil Division, Department of Justice

JAMES P. KENNEDY, JR.
United States Attorney

/S/ Gregory A. Mason
_____
GREGORY A. MASON
Attorneys for the United States of America

4

Exhibit N
Page 214

PROOF OF SERVICE BY ELECTRONIC MAIL

I am over the age of 18 and not a party to the action entitled U.S. *ex rel*. Poehling v. UnitedHealth Group, Inc., Claims Verification 16-8697 MWF (SSx).  I am employed by the Department of Justice, Civil Division.  My business address is 175 N Street NE, Room 10.224, Washington, D.C. 20002.

On November 4, 2020, I served the foregoing PLAINTIFF UNITED STATES' FOURTH SET OF INTERROGATORIES TO DEFENDANTS on each person or entity named below by electronic mail, pursuant to written consent under Federal Rule of Civil Procedure 5(b)(2)(E).

Date of e-mailing:   November 4, 2020.

Place of e-mailing:   Washington, D.C.

Person(s) and/or Entity(s) to whom e-mailed:

See attached page

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 4, 2020, at Washington, D.C.

   /S/ Gregory A. Mason
GREGORY A. MASON

5

| David J. Schindler, Esq.<br>david.schindler@lw.com | Eric Havian, Esq.<br>ehavian@constantinecannon.com |
|---|---|
| Daniel Meron, Esq.<br>daniel.meron@lw.com | Jessica Moore, Esq.<br>jmoore@constantinecannon.com |
| Abid, R. Qureshi, Esq.<br>abid.qureshj@lw.com | Henry C. Su, Esq.<br>hsu@constantinecannon.com |
| Anne Robinson, Esq.<br>anne.robinson@lw.com | Anne Hartman, Esq.<br>ahartman@constantinecannon.com |
| Kirstin Scheffler Do, Esq.<br>kirstin.schefflerdo@lw.com | Stephen S. Hasegawa, Esq.<br>shasegawa@phillipsandcohen.com |
| Morgan Maddoux, Esq.<br>Morgan.maddoux@lw.com | Matthew R. Berry, Esq.<br>mberry@susmangodfrey.com |
| David W. Rowe, Esq.<br>david.rowe@lw.com | Arun Subramanian<br>asubramanian@SusmanGodfrey.com |
|  | UHG-RelatorsCounsel@Lists.SusmanGodfrey.Com |

6

# EXHIBIT O

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General, Civil Division
NICOLA T. HANNA
United States Attorney
DAVID M. HARRIS
DAVID K. BARRETT
ABRAHAM C. MELTZER
JOHN E. LEE (CBN 128696)
JACK D. ROSS (CBN 265883)
Assistant United States Attorneys
          300 N. Los Angeles Street, Room 7516
          Los Angeles, California 90012
          Tel: (213) 894-3995; Fax: (213) 894-7819
          Email: john.lee2@usdoj.gov
JAMIE YAVELBERG
ROBERT McAULIFFE
EDWARD CROOKE
LINDA McMAHON
JESSICA E. KRIEG
ZOILA E. HINSON
AMY L. LIKOFF
GREGORY A. MASON
MARTHA N. GLOVER
Attorneys, Civil Division, U.S. Department of Justice
          P.O. Box 261, Ben Franklin Station
          Washington, D.C. 20044
          Tel: (202) 307-0486; Fax: (202) 307-3852
          Email: robert.mcauliffe@usdoj.gov
JAMES P. KENNEDY, JR.
United States Attorney
          138 Delaware Avenue
          Buffalo, New York 14201
          Tel: (716) 843-5830; Fax: (716) 551-3052
Attorneys for the United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING, | No. CV 16-08697 MWF (SSx) |
|---|---|
| Plaintiffs, | PLAINTIFF UNITED STATES' EIGHTH SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS |
| v. | |
| UNITEDHEALTH GROUP, INC. *et al.*, | |
| Defendants. | |

**PLAINTIFF UNITED STATES' EIGHTH SET OF REQUESTS FOR**

**PRODUCTION OF DOCUMENTS TO DEFENDANTS**

Exhibit O
Page 217

592
Exhibit 3

1   PROPOUNDING PARTY:  The United States of America

2   RESPONDING PARTIES:  UNITEDHEALTH GROUP, INC., a Delaware

3   corporation, and all other entities listed as Defendants in the Government's First

4   Amended Complaint filed in the above-captioned action on November 17, 2017

5   SET NUMBER: Eight

6   REQUEST FOR PRODUCTION: 147

7   Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiff, the

8   United States of America, ("United States" or "Government"), by and through its

9   undersigned attorneys, submits the following Request for the Production of Documents

10  ("Requests") to all Defendants named by the United States in its First Amended

11  Complaint-In-Partial-Intervention ("Amended Complaint") in the above-captioned

12  action (collectively referred to as "Defendants" or "UnitedHealth") and to all

13  Counterclaim-Plaintiffs named in the Counterclaim at the end of Defendants' Answer to

14  the Amended Complaint.  Pursuant to Rule 34(b)(2)(B), Defendants and Counterclaim-

15  Plaintiffs shall produce documents responsive to the Requests within thirty (30) days of

16  service of the Requests, using the attached specifications, to the Office of the United

17  States Attorney, 300 North Los Angeles Street, Los Angeles, California 90012, using the

18  Definitions and Instructions provided below.

19  ## DEFINITIONS AND INSTRUCTIONS

20  The United States incorporates by reference the Definitions (listed as definition

21  numbers 1–61) and Instructions that are listed in Plaintiff United States' First Request

22  for Production of Documents to Defendants, dated October 5, 2017, and Plaintiff United

23  States' Fourth Set of Interrogatories to Defendants, dated November 4, 2020, and further

24  instructs as follows:

25  These requests should be construed to include the time period January 1, 2004 to

26  the present.

27

28

2

Exhibit O
Page 218

**REQUESTS**

147.   All Chart(s) corresponding to, associated with, or related to each

Beneficiary, from each DOS Year(s) in which that Beneficiary is listed in the United

States' Response to Defendants' Interrogatory No. 1 (Including the United States' First

Supplemental Response served on August 17, 2020, the United States' Amended First

Supplemental Response served on October 13, 2020, the United States' Second

Supplemental Response served on October 30, 2020, and any other subsequent

responses).


Dated:  November 4, 2020          JEFFREY BOSSERT CLARK
                                  Acting Assistant Attorney General, Civil Division
                                  NICOLA T. HANNA
                                  United States Attorney
                                  DAVID M. HARRIS
                                  DAVID K. BARRETT
                                  ABRAHAM C. MELTZER
                                  JACK D. ROSS
                                  Assistant United States Attorneys

                                  JAMIE YAVELBERG
                                  ROBERT McAULIFFE
                                  EDWARD CROOKE
                                  LINDA McMAHON
                                  JESSICA E. KRIEG
                                  ZOILA E. HINSON
                                  AMY L. LIKOFF
                                  GREGORY A. MASON
                                  MARTHA N. GLOVER
                                  Civil Division, Department of Justice

                                  JAMES P. KENNEDY, JR.
                                  United States Attorney


                                      /S/ Gregory A. Mason
                                  _____
                                  GREGORY A. MASON
                                  Attorneys for the United States of America

3

Exhibit O
Page 219

<u>PROOF OF SERVICE BY ELECTRONIC MAIL</u>

I am over the age of 18 and not a party to the action entitled <u>U.S. *ex rel*. Poehling v. UnitedHealth Group, Inc.</u>, Claims Verification 16-8697 MWF (SSx). I am employed by the Department of Justice, Civil Division. My business address is 175 N Street NE, Room 10.224, Washington, D.C. 20002.

On November 4, 2020, I served the foregoing PLAINTIFF UNITED STATES' EIGHTH SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS on each person or entity named below by electronic mail, pursuant to written consent under Federal Rule of Civil Procedure 5(b)(2)(E).

Date of e-mailing:   November 4, 2020.

Place of e-mailing:   Washington, D.C.

Person(s) and/or Entity(s) to whom e-mailed:

    See attached page

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 4, 2020, at Washington, D.C.


  /S/ Gregory A. Mason
GREGORY A. MASON

4

| | |
|---|---|
| David J. Schindler, Esq.<br>david.schindler@lw.com | Eric Havian, Esq.<br>ehavian@constantinecannon.com |
| Daniel Meron, Esq.<br>daniel.meron@lw.com | Jessica Moore, Esq.<br>jmoore@constantinecannon.com |
| Abid, R. Qureshi, Esq.<br>abid.qureshj@lw.com | Henry C. Su, Esq.<br>hsu@constantinecannon.com |
| Anne Robinson, Esq.<br>anne.robinson@lw.com | Anne Hartman, Esq.<br>ahartman@constantinecannon.com |
| Kirstin Scheffler Do, Esq.<br>kirstin.schefflerdo@lw.com | Stephen S. Hasegawa, Esq.<br>shasegawa@phillipsandcohen.com |
| Morgan Maddoux, Esq.<br>Morgan.maddoux@lw.com | Matthew R. Berry, Esq.<br>mberry@susmangodfrey.com |
| David W. Rowe, Esq.<br>david.rowe@lw.com | Arun Subramanian<br>asubramanian@SusmanGodfrey.com |
| | UHG-RelatorsCounsel@Lists.SusmanGodfrey.Com |

5

# EXHIBIT P

**From:** McAuliffe, Robert (CIV) <Robert.McAuliffe@usdoj.gov>
**Sent:** Friday, January 29, 2021 6:07 PM
**To:** Schindler, David (LA) <David.Schindler@lw.com>; Meron, Daniel (DC) <Daniel.Meron@lw.com>; Qureshi, Abid (DC) <ABID.QURESHI@LW.com>
**Cc:** Eric Havian (ehavian@constantinecannon.com) <ehavian@constantinecannon.com>; Bill Merrill <BMERRILL@SusmanGodfrey.com>; McMahon, Linda M (CIV) <Linda.McMahon2@usdoj.gov>; Mason, Gregory A. (CIV) <Gregory.A.Mason@usdoj.gov>
**Subject:** Proposal

David
Here are the basic points of the proposal we made today to resolve some of the disputes over our RFP 147 and Interrogatory 14.

- UHG agrees to substantively respond to Interrogatory 14A by identifying each and every diagnosis code (from the list of diagnoses in the US response to UHG's interrogatory 1) that UHG contends was supported by medical records, and for each such code identifying the medical record UHG contends provides that support
- If UHG will not be contending in this case that any codes were supported by medical records, it will supplement its response to 14A to say so
- US agrees to narrow RFP 147 to only require production of the medical records associated with the codes that UHG contends were supported
- If UHG intends to identify a subset of codes that it contends were supported by medical records, and to also contend that a larger subset of codes were supported by medical records (because of extrapolation or otherwise), the interrogatory response must state that contention as well
- US may also, and reserves the right to, seek a statistical sample of medical records from the universe responsive to RFP 147
- Parties are at an impasse as to sufficiency of UHG's response to Rog 14B

Please advise if UHG agrees to this proposal, and if so, when UHG estimates it will provide a complete supplemental response and the associated medical records, if any.  Thank you.

Rob

Robert McAuliffe
Assistant Director
U.S. Department of Justice
Civil Division

Exhibit P
Page 222

598
Exhibit 3

Commercial Litigation Branch (Frauds)
202-514-6832

Exhibit P
Page 223

Exhibit 3

# EXHIBIT Q

| From: | Qureshi, Abid (DC) |
|---|---|
| To: | Mason, Gregory A. (CIV); Maddoux, Morgan (DC); Meron, Daniel (DC); Rowe, David W. (BN); Schindler, David (LA); Do, Kirstin Scheffler (CH); Wilson, Wistar (Bay Area) |
| Cc: | Crooke, Edward (CIV); Glover, Martha N. (CIV); Hinson, Zoila E. (CIV); Krieg, Jessica E. (CIV); Lee, John (USACAC); Likoff, Amy L. (CIV); McAuliffe, Robert (CIV); McMahon, Linda M (CIV); Ross, Jack (USACAC) 4; Zupac, Wendy Z. (CIV); Sweeney, Jessica L. (CIV); UHG-RelatorsCounsel@Lists.SusmanGodfrey.com |
| Subject: | Proposal to Respond to Request for Production 147 and Interrogatories 14A-14B |
| Date: | Thursday, December 31, 2020 12:00:53 PM |

Dear Greg –

Detailed below is a proposal to resolve our differences arising from the government's demand for medical records in connection with its Request for Production 147 and Interrogatories 14A-14B.

- **Request for Production 147**:  As we have repeatedly noted RFP 147 is extraordinarily broad, seeking the production of all medical records associated with each beneficiary for each date of service year listed in the government's response to United's Interrogatory 1.  As drafted by the government, the RFP would call for the production of every medical record corresponding with each beneficiary and date of service year on the government's list.  Such a request would involve overwhelming efforts and would likely entail the collection and production of more than 29 million medical records, many of which are not in United's possession.

  The government has not articulated any authority that would require United to search for, collect from third parties, and produce this volume of medical records.  Instead, United proposes to produce all medical records in its possession for 2008-2016 DOS that were subject to Chart Review.  We conservatively estimate that this production will consist of anywhere between 15 to 21 million medical records.

- **Interrogatory 14, Subpart A**:  As detailed in its objections, United has no obligation to "identify" particular documentation in medical records that supports specific diagnoses.  Consistent with its proposed response to RFP 147, United will produce all medical

records in its possession that were subject to Chart Review.

- **Interrogatory 14, Subpart B**:  As noted previously, we understand the government does not view the request in subpart B for the identification of all medical record reviews as dependent on United's identification of all documentation in each medical record as requested by subpart A.  Accordingly, United will treat this subpart as a separate interrogatory.  In accordance with Fed. R. Civ. P. 33(d), United proposes to respond to this request by referring to documents and data already produced or that United will produce, if necessary.  United is not required to perform any analysis in responding to interrogatories.

We look forward to the government's response to this proposal.  If you have questions, I trust you will let me know.

I hope you and your colleagues have a safe and happy new year holiday.
Abid

---

**From:** Mason, Gregory A. (CIV) <Gregory.A.Mason@usdoj.gov>
**Sent:** Tuesday, December 22, 2020 10:57 AM
**To:** Qureshi, Abid (DC) <ABID.QURESHI@LW.com>; Maddoux, Morgan (DC) <Morgan.Maddoux@lw.com>; Meron, Daniel (DC) <Daniel.Meron@lw.com>; Rowe, David W. (BN) <David.Rowe@lw.com>; Schindler, David (LA) <David.Schindler@lw.com>; Do, Kirstin Scheffler (CH) <Kirstin.SchefflerDo@lw.com>; Wilson, Wistar (Bay Area) <Wistar.Wilson@lw.com>
**Cc:** Crooke, Edward (CIV) <Edward.Crooke@usdoj.gov>; Glover, Martha N. (CIV) <Martha.N.Glover@usdoj.gov>; Hinson, Zoila E. (CIV) <Zoila.E.Hinson@usdoj.gov>; Krieg, Jessica E. (CIV) <Jessica.E.Krieg@usdoj.gov>; Lee, John (USACAC) <John.Lee2@usdoj.gov>; Likoff, Amy L. (CIV) <Amy.L.Likoff@usdoj.gov>; McAuliffe, Robert (CIV) <Robert.McAuliffe@usdoj.gov>; McMahon, Linda M (CIV) <Linda.McMahon2@usdoj.gov>; Ross, Jack (USACAC) 4 <Jack.Ross@usdoj.gov>; Zupac, Wendy Z. (CIV) <Wendy.Z.Zupac@usdoj.gov>; Sweeney, Jessica L. (CIV) <Jessica.L.Sweeney2@usdoj.gov>; UHG-RelatorsCounsel@Lists.SusmanGodfrey.com
**Subject:** RE: US ex rel. Poehling v. UHG -- US Fourth Set of Interrogatories and Eighth Set of RFPs

Abid,

In the interest of avoiding any confusion, we are writing to address your statement that "the

government is requesting the production of any medical records United intends to use in this litigation."  We reiterate that our request is not limited to only medical records United intends to use.  As we stated last week on the telephone, allowing UHG to review all relevant medical records, select a subset that it believes helps UHG's defense, and produce only that subset while withholding the remainder of relevant medical records, would prejudice the United States.  We understand from our call that UHG's proposal will offer the production of all medical records that UHG collects and/or analyzes in the course of this litigation, not merely those it intends to "use."  If this is an incorrect understanding of your position, please advise as soon as possible.  We cannot evaluate your proposal until we receive it.  As we noted in our email below, we believe any meaningful proposal would extend beyond medical records that UHG selects unilaterally.

Regards,
Greg

**Gregory A. Mason**
United States Department of Justice
Civil Division, Commercial Litigation Branch, Fraud Section
(202) 514-9472

---

**From:** ABID.QURESHI@LW.com <ABID.QURESHI@LW.com>
**Sent:** Monday, December 21, 2020 4:46 PM
**To:** Mason, Gregory A. (CIV) <Gregory.A.Mason@usdoj.gov>; Morgan.Maddoux@lw.com; Daniel.Meron@lw.com; David.Rowe@lw.com; David.Schindler@lw.com; Kirstin.SchefflerDo@lw.com; Wistar.Wilson@lw.com
**Cc:** Crooke, Edward (CIV) <Edward.Crooke@usdoj.gov>; Glover, Martha N. (CIV) <Martha.N.Glover@usdoj.gov>; Hinson, Zoila E. (CIV) <Zoila.E.Hinson@usdoj.gov>; Krieg, Jessica E. (CIV) <Jessica.E.Krieg@usdoj.gov>; Lee, John (USACAC) <JLee1@usa.doj.gov>; Likoff, Amy L. (CIV) <Amy.L.Likoff@usdoj.gov>; McAuliffe, Robert (CIV) <Robert.McAuliffe@usdoj.gov>; McMahon, Linda M (CIV) <Linda.McMahon2@usdoj.gov>; Ross, Jack (USACAC) 4 <jross4@usa.doj.gov>; Zupac, Wendy Z. (CIV) <Wendy.Z.Zupac@usdoj.gov>; Sweeney, Jessica L. (CIV) <Jessica.L.Sweeney2@usdoj.gov>; UHG-RelatorsCounsel@Lists.SusmanGodfrey.com
**Subject:** RE: US ex rel. Poehling v. UHG -- US Fourth Set of Interrogatories and Eighth Set of RFPs

Dear Greg – As we discussed, United intends to offer a proposal to resolve the impasse regarding the production of medical records.

We understand the government is requesting the production of any medical records United intends to use in this litigation.

But the government's discovery requests are much broader:

- Document Request 147 calls upon United to produce medical records

"corresponding to, associated with or related to each Beneficiary" for each date of service year listed in the government's response to United's Interrogatory 1.

- Subpart A of Interrogatory 14 calls for United to identify all documentation in each medical record that supports a contention United was not obligated to delete particular diagnosis codes.

- Subpart B of that Interrogatory also asks United to identify all medical record reviews United previously conducted of charts that correspond to particular diagnosis codes.

In discussing Interrogatory 14, you explained that the government does not view the request in subpart B for the identification of all medical record reviews as dependent on United's identification of all documentation in each medical record as requested by subpart A.

As I noted, responding to these requests would require the production of millions of medical records.  I also explained that while I could not identify the current location of the millions of medical records United had previously subjected to some review, collecting and producing these materials is burdensome.

Nevertheless, we remain committed to proposing a solution that resolves the dispute on medical records.  As I noted during our discussion, we expect to send you the proposal during the week of December 28.

I hope you and your colleagues have a good holiday.
Abid

---

**From:** Mason, Gregory A. (CIV) <Gregory.A.Mason@usdoj.gov>
**Sent:** Friday, December 18, 2020 3:27 PM
**To:** Maddoux, Morgan (DC) <Morgan.Maddoux@lw.com>; Qureshi, Abid (DC) <ABID.QURESHI@LW.com>; Meron, Daniel (DC) <Daniel.Meron@lw.com>; Rowe, David W. (BN) <David.Rowe@lw.com>; Schindler, David (LA) <David.Schindler@lw.com>; Do, Kirstin Scheffler (CH)

<[Kirstin.SchefflerDo@lw.com](mailto:Kirstin.SchefflerDo@lw.com)>; Wilson, Wistar (Bay Area) <[Wistar.Wilson@lw.com](mailto:Wistar.Wilson@lw.com)>
**Cc:** Crooke, Edward (CIV) <[Edward.Crooke@usdoj.gov](mailto:Edward.Crooke@usdoj.gov)>; Glover, Martha N. (CIV) <[Martha.N.Glover@usdoj.gov](mailto:Martha.N.Glover@usdoj.gov)>; Hinson, Zoila E. (CIV) <[Zoila.E.Hinson@usdoj.gov](mailto:Zoila.E.Hinson@usdoj.gov)>; Krieg, Jessica E. (CIV) <[Jessica.E.Krieg@usdoj.gov](mailto:Jessica.E.Krieg@usdoj.gov)>; Lee, John (USACAC) <[John.Lee2@usdoj.gov](mailto:John.Lee2@usdoj.gov)>; Likoff, Amy L. (CIV) <[Amy.L.Likoff@usdoj.gov](mailto:Amy.L.Likoff@usdoj.gov)>; McAuliffe, Robert (CIV) <[Robert.McAuliffe@usdoj.gov](mailto:Robert.McAuliffe@usdoj.gov)>; McMahon, Linda M (CIV) <[Linda.McMahon2@usdoj.gov](mailto:Linda.McMahon2@usdoj.gov)>; Ross, Jack (USACAC) 4 <[Jack.Ross@usdoj.gov](mailto:Jack.Ross@usdoj.gov)>; Zupac, Wendy Z. (CIV) <[Wendy.Z.Zupac@usdoj.gov](mailto:Wendy.Z.Zupac@usdoj.gov)>; Sweeney, Jessica L. (CIV) <[Jessica.L.Sweeney2@usdoj.gov](mailto:Jessica.L.Sweeney2@usdoj.gov)>; [UHG-RelatorsCounsel@Lists.SusmanGodfrey.com](mailto:UHG-RelatorsCounsel@Lists.SusmanGodfrey.com)
**Subject:** RE: US ex rel. Poehling v. UHG -- US Fourth Set of Interrogatories and Eighth Set of RFPs

Abid,

Thanks for the call yesterday regarding Interrogatory No. 14 and Document Request 147.  We understand that UHG agrees to supplement its responses to the Document Request and both subparts of the Interrogatory, and that before the end of December it will provide us with its proposal to do so.  You acknowledged on our call that the government is entitled to any medical records that United might collect and/or analyze.  Because the United States is entitled to discovery of all relevant records in UHG's custody, possession, or control, any meaningful proposal cannot be limited to medical records that UHG selects unilaterally.

We were surprised that UHG was not prepared to answer whether it currently has custody, possession, or control of any responsive medical records, and in particular the medical records that went through UHG's Chart Review Program.  We understand that UHG will also be providing that information so that we may assess UHG's claim of undue burden as to those records.

Regards,
Greg

**Gregory A. Mason**
United States Department of Justice
Civil Division, Commercial Litigation Branch, Fraud Section
(202) 514-9472

---

**From:** Mason, Gregory A. (CIV)
**Sent:** Monday, December 14, 2020 12:21 PM
**To:** [Morgan.Maddoux@lw.com](mailto:Morgan.Maddoux@lw.com); [ABID.QURESHI@LW.COM](mailto:ABID.QURESHI@LW.COM); [Daniel.Meron@lw.com](mailto:Daniel.Meron@lw.com); [David.Rowe@lw.com](mailto:David.Rowe@lw.com); [David.Schindler@lw.com](mailto:David.Schindler@lw.com); [Kirstin.SchefflerDo@lw.com](mailto:Kirstin.SchefflerDo@lw.com); [Wistar.Wilson@lw.com](mailto:Wistar.Wilson@lw.com)
**Cc:** Crooke, Edward (CIV) <[ECrooke@civ.usdoj.gov](mailto:ECrooke@civ.usdoj.gov)>; Glover, Martha N. (CIV) <[maglover@CIV.USDOJ.GOV](mailto:maglover@CIV.USDOJ.GOV)>; Hinson, Zoila E. (CIV) <[zhinson@CIV.USDOJ.GOV](mailto:zhinson@CIV.USDOJ.GOV)>; Krieg, Jessica E. (CIV) <[jkrieg@CIV.USDOJ.GOV](mailto:jkrieg@CIV.USDOJ.GOV)>; Lee, John (USACAC) <[JLee1@usa.doj.gov](mailto:JLee1@usa.doj.gov)>; Likoff, Amy L. (CIV) <[alikoff@CIV.USDOJ.GOV](mailto:alikoff@CIV.USDOJ.GOV)>; McAuliffe, Robert (CIV) <[rmcaulif@CIV.USDOJ.GOV](mailto:rmcaulif@CIV.USDOJ.GOV)>; McMahon, Linda M (CIV) <[lmcmahon@CIV.USDOJ.GOV](mailto:lmcmahon@CIV.USDOJ.GOV)>; Ross, Jack (USACAC) 4 <[jross4@usa.doj.gov](mailto:jross4@usa.doj.gov)>; Zupac, Wendy Z. (CIV) <[wzupac@CIV.USDOJ.GOV](mailto:wzupac@CIV.USDOJ.GOV)>; Sweeney, Jessica L. (CIV) <[jesweene@CIV.USDOJ.GOV](mailto:jesweene@CIV.USDOJ.GOV)>; UHG-

RelatorsCounsel@Lists.SusmanGodfrey.com
**Subject:** RE: US ex rel. Poehling v. UHG -- US Fourth Set of Interrogatories and Eighth Set of RFPs

Counsel,

We are available on Thursday 12/17 at 4:30pm, and can use the following dial-in info:

[1-877-465-7975 ( Attendee Passcode: 433-632-10]

Regards,
Greg

**Gregory A. Mason**
United States Department of Justice
Civil Division, Commercial Litigation Branch, Fraud Section
(202) 514-9472

---

**From:** Morgan.Maddoux@lw.com <Morgan.Maddoux@lw.com>
**Sent:** Friday, December 11, 2020 3:03 PM
**To:** Mason, Gregory A. (CIV) <grmason@CIV.USDOJ.GOV>; ABID.QURESHI@LW.com;
Daniel.Meron@lw.com; David.Rowe@lw.com; David.Schindler@lw.com;
Kirstin.SchefflerDo@lw.com; Wistar.Wilson@lw.com
**Cc:** Crooke, Edward (CIV) <ECrooke@civ.usdoj.gov>; Glover, Martha N. (CIV)
<maglover@CIV.USDOJ.GOV>; Hinson, Zoila E. (CIV) <zhinson@CIV.USDOJ.GOV>; Krieg, Jessica E.
(CIV) <jkrieg@CIV.USDOJ.GOV>; Lee, John (USACAC) <JLee1@usa.doj.gov>; Likoff, Amy L. (CIV)
<alikoff@CIV.USDOJ.GOV>; McAuliffe, Robert (CIV) <rmcaulif@CIV.USDOJ.GOV>; McMahon, Linda M
(CIV) <lmcmahon@CIV.USDOJ.GOV>; Ross, Jack (USACAC) 4 <jross4@usa.doj.gov>; Zupac, Wendy Z.
(CIV) <wzupac@CIV.USDOJ.GOV>; Sweeney, Jessica L. (CIV) <jesweene@CIV.USDOJ.GOV>; UHG-
RelatorsCounsel@Lists.SusmanGodfrey.com
**Subject:** RE: US ex rel. Poehling v. UHG -- US Fourth Set of Interrogatories and Eighth Set of RFPs

Greg,

Due to scheduling conflicts, UnitedHealth is not available today to meet and confer regarding its
Responses and Objections to the United States' Eighth Set of Requests for Production and Fourth Set
of Interrogatories. UnitedHealth is available for a meet and confer on Thursday, December 17 before
11, 12-1, 3-3:30, or after 4:30 PM ET or Friday, December 18 from 9-11:30, 12-1:30 or 2-4 PM ET.

Thank you,
Morgan

**Morgan L. Maddoux**
Pronouns: she/her/hers

**LATHAM & WATKINS LLP**

555 Eleventh Street, NW | Suite 1000 | Washington, D.C. 20004-1304
D: +1.202.637.3318

---

**From:** Mason, Gregory A. (CIV) <Gregory.A.Mason@usdoj.gov>
**Sent:** Thursday, December 10, 2020 11:41 AM
**To:** Maddoux, Morgan (DC) <Morgan.Maddoux@lw.com>; Qureshi, Abid (DC) <ABID.QURESHI@LW.com>; Meron, Daniel (DC) <Daniel.Meron@lw.com>; Rowe, David W. (BN) <David.Rowe@lw.com>; Schindler, David (LA) <David.Schindler@lw.com>; Do, Kirstin Scheffler (CH) <Kirstin.SchefflerDo@lw.com>; Wilson, Wistar (Bay Area) <Wistar.Wilson@lw.com>
**Cc:** Crooke, Edward (CIV) <Edward.Crooke@usdoj.gov>; Glover, Martha N. (CIV) <Martha.N.Glover@usdoj.gov>; Hinson, Zoila E. (CIV) <Zoila.E.Hinson@usdoj.gov>; Krieg, Jessica E. (CIV) <Jessica.E.Krieg@usdoj.gov>; Lee, John (USACAC) <John.Lee2@usdoj.gov>; Likoff, Amy L. (CIV) <Amy.L.Likoff@usdoj.gov>; McAuliffe, Robert (CIV) <Robert.McAuliffe@usdoj.gov>; McMahon, Linda M (CIV) <Linda.McMahon2@usdoj.gov>; Ross, Jack (USACAC) 4 <Jack.Ross@usdoj.gov>; Zupac, Wendy Z. (CIV) <Wendy.Z.Zupac@usdoj.gov>; Sweeney, Jessica L. (CIV) <Jessica.L.Sweeney2@usdoj.gov>; UHG-RelatorsCounsel@Lists.SusmanGodfrey.com
**Subject:** RE: US ex rel. Poehling v. UHG -- US Fourth Set of Interrogatories and Eighth Set of RFPs

Morgan,

In the interest of moving things along, please see below and let us know when you are available during the following times:

Thursday 12/10: 4-6 ET
Friday 12/11: 12-5 ET
-
**Request for Production No. 147**

In response to the United States' request for medical records relating to the beneficiaries at issue in this case, UHG provides conclusory and unfounded objections and summarily refuses to produce any documents whatsoever.  None of UHG's objections provides any basis for its improper refusal to produce even a single document responsive to the United States' request.

UHG first objects that the request is unduly burdensome, but fails to support this assertion with any substantiation or explanation whatsoever.  *See Big Baboon Corp. v. Dell, Inc.*, 723 F. Supp. 2d 1224, 1229 (C.D. Cal. 2010) (Segal, J.) ("Big Baboon cannot simply invoke generalized objections; rather, with respect to Amazon's discovery requests, Big Baboon 'must state specifically how, despite the broad and liberal construction of federal discovery rules, each [request] is overly broad, unduly burdensome, or oppressive by submitting affidavits or offering evidence revealing the nature of the burden.'") (internal citations omitted).  UHG cannot properly refuse to produce any documents whatsoever on the basis of such a generalized burden.  Nor is UHG's burdensomeness objection well-founded.  The burden of collecting and producing such records is entirely proportionate to the needs of the case.  Indeed, if UHG itself intends to introduce or otherwise rely on medical records in this case, then the United States is certainly entitled to review medical records in UHG's control in discovery.  Moreover, even if UHG could establish that the collection and production of *some* responsive medical records would be unduly burdensome, that does not provide a basis for UHG's

refusal to produce *any* responsive medical records whatsoever.  In particular, it is difficult to see how UHG can establish undue burden as to the production of medical records that UHG itself collected and reviewed as part of its Chart Review program (or other Medical Record Review programs).

UHG's next objection – that the request is vague and ambiguous – is entirely baseless and provides no support for UHG's position that it can refuse to produce any responsive documents.  UHG fails to articulate what is vague and ambiguous about the request, and merely states: "UnitedHealth further objects to this Request vague and ambiguous to the extent it seeks "[a]ll Chart(s)" for all of the beneficiaries the government has identified in response to UHC of California's First Interrogatory." UHG never explains what is vague or ambiguous about the request, which makes it impossible for the United States to respond except to say that the request can clearly be understood and UHG has not provided any basis for its refusal to produce documents on the basis of this objection.

UHG next objects to the request "to the extent it calls upon UnitedHealth to search for and produce documents not in UnitedHealth's possession, custody, or control."  Yet, as set forth in Instruction E to the United States First Set of Requests for Production (incorporated by reference into RFP 147), and in accordance with the Federal Rules of Civil Procedure, the United States' request only seeks documents "within Your possession, custody and control, or in the possession, custody, or control of Your employees or other agents . . ."   UHG's objection is therefore unfounded and provides no basis for its refusal to produce responsive documents.

UHG's only other specific objection is "to the extent it seeks documents outside of the parties' agreed-upon relevant time period of January 1, 2004 to May 16, 2017."  Of course, this objection also provides no basis for UHG's refusal to produce a single responsive document.  Nonetheless, because the United States' request is limited to the "DOS Year(s) in which that Beneficiary is listed in the United States' Response to Defendants' Interrogatory No. 1," this objection is also unfounded.

**Interrogatory No. 14**

In response to the United States' interrogatory seeking UHG's contentions regarding the list of diagnosis codes at issue, UHG provides baseless objections and refuses to respond to the interrogatory.

First, UHG objects that the request is unduly burdensome because it purportedly requires UnitedHealth to "review[] millions of charts spanning a nine-year time period."  But the Interrogatory doesn't *require* UHG to review any charts whatsoever; it only requires UHG to disclose its contentions in this case.  If UHG does not contend that any Charts provide medical record support for the diagnosis codes at issue, it is free to answer the Interrogatory by saying so without reviewing any of the Charts.  But, if UHG does intend to argue that medical records support some or all of the diagnosis codes at issue, the United States is entitled to discover that information.

UHG next objects that terms such as "obligation" and other terms that UHG itself has used in discovery requests are vague and ambiguous.  None of these objections provides any basis for refusing to answer the Interrogatory.  Undefined terms should be given their ordinary meaning, and if UHG asserts that a term such as "obligation" is vague and ambiguous, it must articulate the

definition it is applying and then substantively answer the interrogatory. *Siegmund v. Cty. of Orange*, No. SACV071387CJCPLAX, 2009 WL 10674369, at *2 (C.D. Cal. Aug. 25, 2009) ("Next, while the Court recognizes that in some instances a discovery request may be so vague or ambiguous as to not allow a response (*see, e.g., Dubin v. E.F. Hutton Group Inc.*, 125 F.R.D. 372, 376 (S.D.N.Y. 1989)), such is not the case here. Rather, the Court finds that the terms used by defendants in their Interrogatories are not presented in a vague or ambiguous manner, and can readily be responded to using the common and ordinary meanings of those terms.").

UHG also objects based on the flawed argument that a party may not serve a contention interrogatory on a matter in which the responding party does not bear the burden of proof. "Nowhere in the Federal Rules of Civil Procedure is it required that a party who carries the ultimate burden on an issue at trial must establish a *prima facie* case before it is entitled to discover information the other party may use to rebut the *prima facie* case." *McKesson Information Solutions, LLC v. Epic Systems Corp.*, 242 FRD 689, 692 (N.D. Ga. 2007); *see also Phillies v. Harrison/Erickson, Inc.*, 2020 WL 6482882, at *2 (S.D.N.Y. Nov. 4, 2020); *Monster Energy Co. v. Vital Pharm., Inc.*, 2020 WL 6653583 (C.D. Cal., Jan. 2, 2020); *Amgen Inc. v. Sandoz Inc.*, 2017 WL 1352052, **1-2 (N.D. Cal. Apr. 13, 2017); *SPH America, LLC v. Research In Motion Ltd*, 2016 WL 6305414, * (S.D. Cal. Aug. 16, 2016); *Jackson v. Equifax Inf. Servs. LLC*, 2014 WL 12862681, at *3 (N.D. Ga. Sept. 26, 2014); *GEICO v. Prushanksy*, 2013 WL 12077495, at *3 (S.D. Fla. Jan. 4, 2013); *Linde v. Arab Bank PLC*, 2012 WL 957970, at *2 (E.D.N.Y. Mar. 21, 2012); *Moses v. Halstead*, 236 F.R.D. 667, 674 (D. Kan. 2006). More specifically, contention interrogatories may be used to discover the factual bases of a party's denial of an allegation in a pleading. *GEICO v. Prushanksy*, 2013 WL 12077495, at *3 (S.D. Fla. Jan. 4, 2013); *Am. Gen. Life Ins. Co. v. Billard*, 2011 WL 13136619, at *3 (N.D. Iowa May 2, 2011); *Barkley v. Life Ins. Co. of N. Am.*, 2008 WL 450138, at *1 (N.D. Tex. Feb. 19, 2008); *Fridkin v. Minn. Mut. Life Ins. Co., Inc.*, 1998 WL 42322, at *5 (D. Minn. Jan. 29, 1998); *Schaap v. Exec. Indus., Inc.*, 130 F.R.D. 384, 387-88 (N.D. Ill. 1990).

Finally, UHG objects that the interrogatory improperly seeks expert opinion. This objection fundamentally misunderstands the information the United States is seeking. The interrogatory requests only information regarding the underlying facts—i.e., any related medical records and medical record reviews—that underlie UHG's contention that it has no obligation to delete the alleged diagnosis codes at issue. The United States does not seek information regarding any expert opinion about those facts. UHG's refusal to respond is unfounded. *See Amgen Inc. v. Sandoz Inc.*, 2017 WL 1352052, **1-2 (N.D. Cal. Apr. 13, 2017) (holding that interrogatories "are not improper to the extent they seek only facts, not how an expert would construe those facts"); *D&D Techs. (USA), Inc. v. Safetech Hardware Inc.*, 2013 WL 12142955, at *2 (C.D. Cal. Nov. 8, 2013) (ordering responding party to supplement responses to interrogatories that sought "the legal and factual bases for [d]efendant's contentions . . . ."); *Bayer Healthcare Pharm., Inc. v. River's Edge Pharm., LLC*, 2015 WL 11142425, at *7 (N.D. Ga. July 31, 2015), *report and recommendation adopted*, 2015 WL 11142428 (N.D. Ga. Sept. 22, 2015) (The "[i]nterrogatory ... did not ask for the expert's opinion or a conclusion of law, which, of course, would have been rightfully objectionable. Rather, the interrogatory asked which facts and legal theories Plaintiffs intend to rely on. The fact that an expert would ultimately put the facts together to support the legal theory in an opinion is of no consequence as to whether a responding party must timely supplement such an interrogato[r]y.").

Regards,

**Gregory A. Mason**
United States Department of Justice
Civil Division, Commercial Litigation Branch, Fraud Section
(202) 514-9472

---

**From:** Morgan.Maddoux@lw.com <Morgan.Maddoux@lw.com>
**Sent:** Wednesday, December 09, 2020 7:37 PM
**To:** Mason, Gregory A. (CIV) <grmason@CIV.USDOJ.GOV>; ABID.QURESHI@LW.COM; Daniel.Meron@lw.com; David.Rowe@lw.com; David.Schindler@lw.com; Kirstin.SchefflerDo@lw.com; Wistar.Wilson@lw.com
**Cc:** Crooke, Edward (CIV) <ECrooke@civ.usdoj.gov>; Glover, Martha N. (CIV) <maglover@CIV.USDOJ.GOV>; Hinson, Zoila E. (CIV) <zhinson@CIV.USDOJ.GOV>; Krieg, Jessica E. (CIV) <jkrieg@CIV.USDOJ.GOV>; Lee, John (USACAC) <JLee1@usa.doj.gov>; Likoff, Amy L. (CIV) <alikoff@CIV.USDOJ.GOV>; McAuliffe, Robert (CIV) <rmcaulif@CIV.USDOJ.GOV>; McMahon, Linda M (CIV) <lmcmahon@CIV.USDOJ.GOV>; Ross, Jack (USACAC) 4 <jross4@usa.doj.gov>; Zupac, Wendy Z. (CIV) <wzupac@CIV.USDOJ.GOV>; Sweeney, Jessica L. (CIV) <jesweene@CIV.USDOJ.GOV>; UHG-RelatorsCounsel@Lists.SusmanGodfrey.com
**Subject:** RE: US ex rel. Poehling v. UHG -- US Fourth Set of Interrogatories and Eighth Set of RFPs

Greg,

While UnitedHealth is amenable to a meet and confer regarding its Responses and Objections to the United States' Eighth Set of Requests for Production and Fourth Set of Interrogatories ("Responses"), UnitedHealth believes the government's request for a meet and confer on this issue is premature. UnitedHealth does not agree with the government's characterization of its Responses as "deficient" and believes that its Responses clearly state its objections. As is the parties' customary practice in this litigation, UnitedHealth requests that, prior to scheduling a meet and confer, the government detail in writing why it believes UnitedHealth's Responses are "deficient," including identifying case law the government believes supports its position. This will help ensure a productive and efficient meet and confer. Once the government provides this information, UnitedHealth is happy to schedule a meet and confer with the government to discuss this issue.

Thank you,
Morgan

**Morgan L. Maddoux**
Pronouns: she/her/hers

**LATHAM & WATKINS LLP**
555 Eleventh Street, NW | Suite 1000 | Washington, D.C. 20004-1304
D: +1.202.637.3318

**From:** Mason, Gregory A. (CIV) <Gregory.A.Mason@usdoj.gov>
**Sent:** Tuesday, December 8, 2020 5:50 PM

Exhibit Q
Page 233

**To:** Maddoux, Morgan (DC) <Morgan.Maddoux@lw.com>; Qureshi, Abid (DC) <ABID.QURESHI@LW.com>; Meron, Daniel (DC) <Daniel.Meron@lw.com>; Rowe, David W. (BN) <David.Rowe@lw.com>; Schindler, David (LA) <David.Schindler@lw.com>; Do, Kirstin Scheffler (CH) <Kirstin.SchefflerDo@lw.com>; Wilson, Wistar (Bay Area) <Wistar.Wilson@lw.com>
**Cc:** Crooke, Edward (CIV) <Edward.Crooke@usdoj.gov>; Glover, Martha N. (CIV) <Martha.N.Glover@usdoj.gov>; Hinson, Zoila E. (CIV) <Zoila.E.Hinson@usdoj.gov>; Krieg, Jessica E. (CIV) <Jessica.E.Krieg@usdoj.gov>; Lee, John (USACAC) <John.Lee2@usdoj.gov>; Likoff, Amy L. (CIV) <Amy.L.Likoff@usdoj.gov>; McAuliffe, Robert (CIV) <Robert.McAuliffe@usdoj.gov>; McMahon, Linda M (CIV) <Linda.McMahon2@usdoj.gov>; Ross, Jack (USACAC) 4 <Jack.Ross@usdoj.gov>; Zupac, Wendy Z. (CIV) <Wendy.Z.Zupac@usdoj.gov>; Sweeney, Jessica L. (CIV) <Jessica.L.Sweeney2@usdoj.gov>; UHG-RelatorsCounsel@Lists.SusmanGodfrey.com
**Subject:** RE: US ex rel. Poehling v. UHG -- US Fourth Set of Interrogatories and Eighth Set of RFPs


Counsel,


Minor correction to the below, the times we are offering are:


Wednesday 12/9: 1230-2 or **4:30**-6 ET
Thursday 12/10: 4-6 ET
Friday 12/10: 12-5 ET


**Gregory A. Mason**
United States Department of Justice
Civil Division, Commercial Litigation Branch, Fraud Section
(202) 514-9472


---

**From:** Mason, Gregory A. (CIV)
**Sent:** Tuesday, December 08, 2020 5:14 PM
**To:** Morgan.Maddoux@lw.com; ABID.QURESHI@LW.com; Daniel.Meron@lw.com; David.Rowe@lw.com; David.Schindler@lw.com; Kirstin.SchefflerDo@lw.com; Wistar.Wilson@lw.com
**Cc:** Crooke, Edward (CIV) <ECrooke@civ.usdoj.gov>; Glover, Martha N. (CIV) <maglover@CIV.USDOJ.GOV>; Hinson, Zoila E. (CIV) <zhinson@CIV.USDOJ.GOV>; Krieg, Jessica E. (CIV) <jkrieg@CIV.USDOJ.GOV>; Lee, John (USACAC) <JLee1@usa.doj.gov>; Likoff, Amy L. (CIV) <alikoff@CIV.USDOJ.GOV>; McAuliffe, Robert (CIV) <rmcaulif@CIV.USDOJ.GOV>; McMahon, Linda M (CIV) <lmcmahon@CIV.USDOJ.GOV>; Ross, Jack (USACAC) 4 <jross4@usa.doj.gov>; Zupac, Wendy Z. (CIV) <wzupac@CIV.USDOJ.GOV>; Sweeney, Jessica L. (CIV) <jesweene@CIV.USDOJ.GOV>; UHG-RelatorsCounsel@Lists.SusmanGodfrey.com
**Subject:** RE: US ex rel. Poehling v. UHG -- US Fourth Set of Interrogatories and Eighth Set of RFPs


Counsel,


Please let us know your availability during the following times to meet and confer regarding UHG's deficient responses to the United States' Eighth Set of Requests for Production and Fourth Set of

Interrogatories.

Wednesday 12/9: 1230-2 or 4-6 ET
Thursday 12/10: 4-6 ET
Friday 12/10: 12-5 ET

Regards,
Greg

**Gregory A. Mason**
United States Department of Justice
Civil Division, Commercial Litigation Branch, Fraud Section
(202) 514-9472

---

**From:** Morgan.Maddoux@lw.com <Morgan.Maddoux@lw.com>
**Sent:** Friday, December 04, 2020 6:57 PM
**To:** Mason, Gregory A. (CIV) <grmason@CIV.USDOJ.GOV>; ABID.QURESHI@LW.com; Daniel.Meron@lw.com; David.Rowe@lw.com; David.Schindler@lw.com; Kirstin.SchefflerDo@lw.com; Wistar.Wilson@lw.com
**Cc:** Crooke, Edward (CIV) <ECrooke@civ.usdoj.gov>; Glover, Martha N. (CIV) <maglover@CIV.USDOJ.GOV>; Hinson, Zoila E. (CIV) <zhinson@CIV.USDOJ.GOV>; Krieg, Jessica E. (CIV) <jkrieg@CIV.USDOJ.GOV>; Lee, John (USACAC) <JLee1@usa.doj.gov>; Likoff, Amy L. (CIV) <alikoff@CIV.USDOJ.GOV>; McAuliffe, Robert (CIV) <rmcaulif@CIV.USDOJ.GOV>; McMahon, Linda M (CIV) <lmcmahon@CIV.USDOJ.GOV>; Ross, Jack (USACAC) 4 <jross4@usa.doj.gov>; Zupac, Wendy Z. (CIV) <wzupac@CIV.USDOJ.GOV>; Sweeney, Jessica L. (CIV) <jesweene@CIV.USDOJ.GOV>; UHG-RelatorsCounsel@Lists.SusmanGodfrey.com
**Subject:** RE: US ex rel. Poehling v. UHG -- US Fourth Set of Interrogatories and Eighth Set of RFPs

Counsel,

Please see attached UnitedHealth's Responses and Objections to the United States' Eighth Set of Requests for Production and Fourth Set of Interrogatories.

Thank you,
Morgan

**Morgan L. Maddoux**
Pronouns: she/her/hers

**LATHAM & WATKINS LLP**
555 Eleventh Street, NW | Suite 1000 | Washington, D.C. 20004-1304
D: +1.202.637.3318

---

**From:** Mason, Gregory A. (CIV) <Gregory.A.Mason@usdoj.gov>
**Sent:** Wednesday, November 4, 2020 5:21 PM

**To:** Maddoux, Morgan (DC) <Morgan.Maddoux@lw.com>; Qureshi, Abid (DC) <ABID.QURESHI@LW.com>; Robinson, Anne (DC) <Anne.Robinson@lw.com>; Meron, Daniel (DC) <Daniel.Meron@lw.com>; Rowe, David W. (BN) <David.Rowe@lw.com>; Tolley, David C. (BN) <David.Tolley@lw.com>; Schindler, David (LA) <David.Schindler@lw.com>; Do, Kirstin Scheffler (CH) <Kirstin.SchefflerDo@lw.com>; Wilson, Wistar (Bay Area) <Wistar.Wilson@lw.com>; Koppel, Samantha (SF) <Samantha.Koppel@lw.com>

**Cc:** Crooke, Edward (CIV) <Edward.Crooke@usdoj.gov>; Glover, Martha N. (CIV) <Martha.N.Glover@usdoj.gov>; Hinson, Zoila E. (CIV) <Zoila.E.Hinson@usdoj.gov>; Krieg, Jessica E. (CIV) <Jessica.E.Krieg@usdoj.gov>; Lee, John (USACAC) <John.Lee2@usdoj.gov>; Likoff, Amy L. (CIV) <Amy.L.Likoff@usdoj.gov>; Mason, Gregory A. (CIV) <Gregory.A.Mason@usdoj.gov>; McAuliffe, Robert (CIV) <Robert.McAuliffe@usdoj.gov>; McMahon, Linda M (CIV) <Linda.McMahon2@usdoj.gov>; Ross, Jack (USACAC) 4 <Jack.Ross@usdoj.gov>; Zupac, Wendy Z. (CIV) <Wendy.Z.Zupac@usdoj.gov>; Sweeney, Jessica L. (CIV) <Jessica.L.Sweeney2@usdoj.gov>; UHG-RelatorsCounsel@Lists.SusmanGodfrey.com

**Subject:** US ex rel. Poehling v. UHG -- US Fourth Set of Interrogatories and Eighth Set of RFPs

Counsel,

Please see the attached discovery requests from the United States.

Regards,

**Gregory A. Mason**
United States Department of Justice
Civil Division, Commercial Litigation Branch, Fraud Section
(202) 514-9472

*Mailing Address:*
P.O. Box 261
Ben Franklin Station
Washington, DC 20044

*Delivery Address:*
3CON
175 N Street NE, #10-224
Washington, DC 20002

_____

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient. Any review, disclosure, reliance or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies including any attachments.

Latham & Watkins LLP or any of its affiliates may monitor electronic communications sent or received by our networks in order to protect our business and verify compliance with our policies and relevant legal requirements. Any personal information contained or referred to

Exhibit Q
Page 236

within this electronic communication will be processed in accordance with the firm's privacy
notices and Global Privacy Standards available at www.lw.com.

# EXHIBIT R

**From:** Mason, Gregory A. (CIV) <Gregory.A.Mason@usdoj.gov>
**Sent:** Thursday, January 21, 2021 10:00 AM
**To:** Qureshi, Abid (DC) <ABID.QURESHI@LW.com>; Maddoux, Morgan (DC) <Morgan.Maddoux@lw.com>; Meron, Daniel (DC) <Daniel.Meron@lw.com>; Rowe, David W. (BN) <David.Rowe@lw.com>; Schindler, David (LA) <David.Schindler@lw.com>; Do, Kirstin Scheffler (CH) <Kirstin.SchefflerDo@lw.com>; Wilson, Wistar (Bay Area) <Wistar.Wilson@lw.com>
**Cc:** Crooke, Edward (CIV) <Edward.Crooke@usdoj.gov>; Glover, Martha N. (CIV) <Martha.N.Glover@usdoj.gov>; Hinson, Zoila E. (CIV) <Zoila.E.Hinson@usdoj.gov>; Krieg, Jessica E. (CIV) <Jessica.E.Krieg@usdoj.gov>; Lee, John (USACAC) <John.Lee2@usdoj.gov>; Likoff, Amy L. (CIV) <Amy.L.Likoff@usdoj.gov>; McAuliffe, Robert (CIV) <Robert.McAuliffe@usdoj.gov>; McMahon, Linda M (CIV) <Linda.McMahon2@usdoj.gov>; Ross, Jack (USACAC) 4 <Jack.Ross@usdoj.gov>; Zupac, Wendy Z. (CIV) <Wendy.Z.Zupac@usdoj.gov>; Sweeney, Jessica L. (CIV) <Jessica.L.Sweeney2@usdoj.gov>; UHG-RelatorsCounsel@Lists.SusmanGodfrey.com
**Subject:** RE: Proposal to Respond to Request for Production 147 and Interrogatories 14A-14B

Abid,

Thank you for the call last week regarding UHG's responses to Request for Production No. 147 and Interrogatory No. 14.

Based on our multiple conversations and correspondence, we understand that the parties are at an impasse on the adequacy of UHG's response to the United States' Interrogatory No. 14.  As the parties have satisfied their meet-and-confer obligations, please provide us with UHG's availability next week for an informal conference with Special Master Segal.

Regarding Request for Production No. 147, we can agree to UHG's proposal to produce "all medical records in its possession for 2008-2016 DOS that were subject to Chart Review," provided that UHG agrees to the following terms.  First, because UHG proposes limiting the production to only medical records that went through Chart Review, we would like to know what other responsive medical records (that did not go through Chart Review) are in UHG's possession.  Accordingly, we request that UHG identify all responsive charts that are in UHG's possession that it proposes it will not produce.  Second, because UHG proposes limiting its production to only medical records that are in UHG's possession, and not those in its control, we request that UHG identify all responsive charts

Exhibit R
Page 238

that are not in its possession and state where those charts are located.  In short, for every responsive chart, we should either have the chart itself or know where we can get the chart.  Third, the United States' agreement to these limitations is contingent on the understanding that if UHG collects any responsive medical records from any third parties at any time, it will not do so selectively, but rather will collect all responsive charts in that third party's possession and produce those charts to the United States at the time they are collected from the third party.

Please let us know by Monday whether UHG agrees to these terms, so that we may address it with Special Master Segal next week if necessary.

Regards,
Greg

**Gregory A. Mason**
United States Department of Justice
Civil Division, Commercial Litigation Branch, Fraud Section
(202) 514-9472

---

**From:** ABID.QURESHI@LW.com <ABID.QURESHI@LW.com>
**Sent:** Thursday, January 07, 2021 5:19 PM
**To:** Mason, Gregory A. (CIV) <Gregory.A.Mason@usdoj.gov>; Morgan.Maddoux@lw.com; Daniel.Meron@lw.com; David.Rowe@lw.com; David.Schindler@lw.com; Kirstin.SchefflerDo@lw.com; Wistar.Wilson@lw.com
**Cc:** Crooke, Edward (CIV) <Edward.Crooke@usdoj.gov>; Glover, Martha N. (CIV) <Martha.N.Glover@usdoj.gov>; Hinson, Zoila E. (CIV) <Zoila.E.Hinson@usdoj.gov>; Krieg, Jessica E. (CIV) <Jessica.E.Krieg@usdoj.gov>; Lee, John (USACAC) <JLee1@usa.doj.gov>; Likoff, Amy L. (CIV) <Amy.L.Likoff@usdoj.gov>; McAuliffe, Robert (CIV) <Robert.McAuliffe@usdoj.gov>; McMahon, Linda M (CIV) <Linda.McMahon2@usdoj.gov>; Ross, Jack (USACAC) 4 <jross4@usa.doj.gov>; Zupac, Wendy Z. (CIV) <Wendy.Z.Zupac@usdoj.gov>; Sweeney, Jessica L. (CIV) <Jessica.L.Sweeney2@usdoj.gov>; UHG-RelatorsCounsel@Lists.SusmanGodfrey.com
**Subject:** RE: Proposal to Respond to Request for Production 147 and Interrogatories 14A-14B

Might 4:00 p.m. eastern on Wednesday, January 13 work?

If so, I can circulate an invitation with dial-in information.

---

**From:** Mason, Gregory A. (CIV) <Gregory.A.Mason@usdoj.gov>
**Sent:** Thursday, January 7, 2021 2:05 PM
**To:** Qureshi, Abid (DC) <ABID.QURESHI@LW.com>; Maddoux, Morgan (DC) <Morgan.Maddoux@lw.com>; Meron, Daniel (DC) <Daniel.Meron@lw.com>; Rowe, David W. (BN) <David.Rowe@lw.com>; Schindler, David (LA) <David.Schindler@lw.com>; Do, Kirstin Scheffler (CH) <Kirstin.SchefflerDo@lw.com>; Wilson, Wistar (Bay Area) <Wistar.Wilson@lw.com>

**Cc:** Crooke, Edward (CIV) <Edward.Crooke@usdoj.gov>; Glover, Martha N. (CIV) <Martha.N.Glover@usdoj.gov>; Hinson, Zoila E. (CIV) <Zoila.E.Hinson@usdoj.gov>; Krieg, Jessica E. (CIV) <Jessica.E.Krieg@usdoj.gov>; Lee, John (USACAC) <John.Lee2@usdoj.gov>; Likoff, Amy L. (CIV) <Amy.L.Likoff@usdoj.gov>; McAuliffe, Robert (CIV) <Robert.McAuliffe@usdoj.gov>; McMahon, Linda M (CIV) <Linda.McMahon2@usdoj.gov>; Ross, Jack (USACAC) 4 <Jack.Ross@usdoj.gov>; Zupac, Wendy Z. (CIV) <Wendy.Z.Zupac@usdoj.gov>; Sweeney, Jessica L. (CIV) <Jessica.L.Sweeney2@usdoj.gov>; UHG-RelatorsCounsel@Lists.SusmanGodfrey.com
**Subject:** RE: Proposal to Respond to Request for Production 147 and Interrogatories 14A-14B

Thanks, Abid.  We are available Wednesday anytime from 11am to 5pm ET.  Please let us know a window in there that works for you and we can send a call in number.

Regards,
Greg

**Gregory A. Mason**
United States Department of Justice
Civil Division, Commercial Litigation Branch, Fraud Section
(202) 514-9472

---

**From:** ABID.QURESHI@LW.com <ABID.QURESHI@LW.com>
**Sent:** Wednesday, January 06, 2021 5:27 PM
**To:** Mason, Gregory A. (CIV) <Gregory.A.Mason@usdoj.gov>; Morgan.Maddoux@lw.com; Daniel.Meron@lw.com; David.Rowe@lw.com; David.Schindler@lw.com; Kirstin.ScefflerDo@lw.com; Wistar.Wilson@lw.com
**Cc:** Crooke, Edward (CIV) <Edward.Crooke@usdoj.gov>; Glover, Martha N. (CIV) <Martha.N.Glover@usdoj.gov>; Hinson, Zoila E. (CIV) <Zoila.E.Hinson@usdoj.gov>; Krieg, Jessica E. (CIV) <Jessica.E.Krieg@usdoj.gov>; Lee, John (USACAC) <JLee1@usa.doj.gov>; Likoff, Amy L. (CIV) <Amy.L.Likoff@usdoj.gov>; McAuliffe, Robert (CIV) <Robert.McAuliffe@usdoj.gov>; McMahon, Linda M (CIV) <Linda.McMahon2@usdoj.gov>; Ross, Jack (USACAC) 4 <jross4@usa.doj.gov>; Zupac, Wendy Z. (CIV) <Wendy.Z.Zupac@usdoj.gov>; Sweeney, Jessica L. (CIV) <Jessica.L.Sweeney2@usdoj.gov>; UHG-RelatorsCounsel@Lists.SusmanGodfrey.com
**Subject:** RE: Proposal to Respond to Request for Production 147 and Interrogatories 14A-14B

Thank you Greg – unfortunately, I am not available tomorrow or Friday.

Might you have any times Wednesday through Friday of next week?  In the meantime, we'll evaluate the questions below.

Best regards,
Abid

---

**From:** Mason, Gregory A. (CIV) <Gregory.A.Mason@usdoj.gov>
**Sent:** Wednesday, January 6, 2021 4:18 PM
**To:** Qureshi, Abid (DC) <ABID.QURESHI@LW.com>; Maddoux, Morgan (DC) <Morgan.Maddoux@lw.com>; Meron, Daniel (DC) <Daniel.Meron@lw.com>; Rowe, David W. (BN) <David.Rowe@lw.com>; Schindler, David (LA) <David.Schindler@lw.com>; Do, Kirstin Scheffler (CH) <Kirstin.SchefflerDo@lw.com>; Wilson, Wistar (Bay Area) <Wistar.Wilson@lw.com>
**Cc:** Crooke, Edward (CIV) <Edward.Crooke@usdoj.gov>; Glover, Martha N. (CIV) <Martha.N.Glover@usdoj.gov>; Hinson, Zoila E. (CIV) <Zoila.E.Hinson@usdoj.gov>; Krieg, Jessica E. (CIV) <Jessica.E.Krieg@usdoj.gov>; Lee, John (USACAC) <John.Lee2@usdoj.gov>; Likoff, Amy L. (CIV) <Amy.L.Likoff@usdoj.gov>; McAuliffe, Robert (CIV) <Robert.McAuliffe@usdoj.gov>; McMahon, Linda M (CIV) <Linda.McMahon2@usdoj.gov>; Ross, Jack (USACAC) 4 <Jack.Ross@usdoj.gov>; Zupac, Wendy Z. (CIV) <Wendy.Z.Zupac@usdoj.gov>; Sweeney, Jessica L. (CIV) <Jessica.L.Sweeney2@usdoj.gov>; UHG-RelatorsCounsel@Lists.SusmanGodfrey.com
**Subject:** RE: Proposal to Respond to Request for Production 147 and Interrogatories 14A-14B

Dear Abid,

Thanks for the email and I hope you had a wonderful holiday.

We appreciate that UHG has changed course and agreed to supplement its deficient responses to the United States' Request for Production 147 and Interrogatory 14, but we have some questions and some concerns about UHG's proposal, which we outline below.  We think it would make sense to discuss these over the phone to see if we can resolve them without the need for involving Special Master Segal.  So, could you please let us know if you are available to discuss on Thursday 1/7 or Friday 1/8 any time from 10:30a-5p ET?

**Request for Production 147**

While we agree with UHG's proposal to prioritize the production of the responsive medical records that went through one of UHG's Medical Record Review Programs, we have remaining questions as to what other responsive medical records are in UHG's possession, custody, or control, and whether UHG agrees to produce those as well.

UHG repeats its objection that the United States' request would require UHG to collect and produce documents "not in United's possession."  It is therefore necessary to reiterate, as we stated in our email dated December 10 (and consistent with the Federal Rules of Civil Procedure), that Instruction E to the Eighth Set of Requests for Production limits RFP 147 to documents "within Your possession, custody and control, or in the possession, custody, or control of Your employees or other agents . . ."  We are perplexed why UHG continues to raise this objection given that the documents sought by the request are so limited, so we would like to better understand what medical records are covered by UHG's objection, and whether there are additional responsive medical records (other than those UHG has agreed to produce) that are in UHG's possession, custody, or control.

Moreover, while we are not seeking to impose on UHG the burden of collecting responsive records from third parties, we also want to ensure that the United States has access to all of the medical

records that are within UHG's control.  Thus, if UHG collects, reviews, and/or analyzes medical records in this case pursuant to agreements with third parties, the United States should have the same opportunity to collect.  In other words, we do not want UHG or its representatives, consultants, agents or attorneys to pull records and then cherry-pick the ones they want to use in the litigation.  Accordingly, we would like to better understand whether UHG intends to collect, review, or analyze medical records held by third parties.

Finally, we would like to know by what date UHG proposes to produce the responsive medical records that it has agreed to produce.

**Interrogatory 14**

We are confused by your proposal to supplement your response to Interrogatory 14(A), and would like to further discuss to better understand UHG's position.  You object that UHG "has no obligation to 'identify' particular documentation in medical records that supports specific diagnoses," and will only produce the responsive medical records themselves.  It is not a sufficient response to this Interrogatory for United to state that it will produce all medical records in its possession that were "subject to Chart Review."  Of course, if UHG <u>does not</u> contend that any diagnosis codes at issue were medically supported, then UHG has no obligation to identify particular documentation in medical records.  However, if UHG <u>does</u> contend that any of the diagnosis codes at issue were medically supported, then the United States is entitled to discover the factual basis for that contention.  To the extent UHG is suggesting that it will respond to Interrogatory 14(A) by referencing the medical records it produces in response to RFP 147, it must do so on a diagnosis code by diagnosis code basis.  *See* Fed. R. Civ. P. 33(d) ("the responding party may answer by . . . specifying the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could.").

We are also somewhat unclear on your proposal to supplement your response to Interrogatory 14(B).  We do not understand what is meant by your statement that "the government does not view the request in subpart B for the identification of all medical record reviews as dependent on United's identification of all documentation in each medical record as requested by subpart A."  As the Interrogatory is written, and as we discussed on the phone in December, Interrogatory 14(B) seeks the identification of Medical Record Reviews of charts associated with all diagnosis codes that UHG disputes it was obligated to delete.  Additionally, as with Interrogatory 14(A), if UHG intends to respond to Interrogatory 14(B) through the incorporation of produced documents, it must do so on a diagnosis code by diagnosis code basis.

We look forward to further discussing these concerns and your proposal to supplement UHG's responses to Request for Production 147 and Interrogatory 14.  So, please let us know your availability during the times set forth above.

Happy New Year to you and yours!

Regards,
Greg

**Gregory A. Mason**
United States Department of Justice
Civil Division, Commercial Litigation Branch, Fraud Section
(202) 514-9472

---

**From:** ABID.QURESHI@LW.com <ABID.QURESHI@LW.com>
**Sent:** Thursday, December 31, 2020 12:01 PM
**To:** Mason, Gregory A. (CIV) <Gregory.A.Mason@usdoj.gov>; Morgan.Maddoux@lw.com;
Daniel.Meron@lw.com; David.Rowe@lw.com; David.Schindler@lw.com;
Kirstin.SchefflerDo@lw.com; Wistar.Wilson@lw.com
**Cc:** Crooke, Edward (CIV) <Edward.Crooke@usdoj.gov>; Glover, Martha N. (CIV)
<Martha.N.Glover@usdoj.gov>; Hinson, Zoila E. (CIV) <Zoila.E.Hinson@usdoj.gov>; Krieg, Jessica E.
(CIV) <Jessica.E.Krieg@usdoj.gov>; Lee, John (USACAC) <JLee1@usa.doj.gov>; Likoff, Amy L. (CIV)
<Amy.L.Likoff@usdoj.gov>; McAuliffe, Robert (CIV) <Robert.McAuliffe@usdoj.gov>; McMahon, Linda
M (CIV) <Linda.McMahon2@usdoj.gov>; Ross, Jack (USACAC) 4 <jross4@usa.doj.gov>; Zupac,
Wendy Z. (CIV) <Wendy.Z.Zupac@usdoj.gov>; Sweeney, Jessica L. (CIV)
<Jessica.L.Sweeney2@usdoj.gov>; UHG-RelatorsCounsel@Lists.SusmanGodfrey.com
**Subject:** Proposal to Respond to Request for Production 147 and Interrogatories 14A-14B

Dear Greg –

Detailed below is a proposal to resolve our differences arising from the government's demand for medical records in connection with its Request for Production 147 and Interrogatories 14A-14B.

- **Request for Production 147**:  As we have repeatedly noted RFP 147 is extraordinarily broad, seeking the production of all medical records associated with each beneficiary for each date of service year listed in the government's response to United's Interrogatory 1.  As drafted by the government, the RFP would call for the production of every medical record corresponding with each beneficiary and date of service year on the government's list.  Such a request would involve overwhelming efforts and would likely entail the collection and production of more than 29 million medical records, many of which are not in United's possession.

   The government has not articulated any authority that would require United to search for, collect from third parties, and produce this

volume of medical records.  Instead, United proposes to produce all medical records in its possession for 2008-2016 DOS that were subject to Chart Review.  We conservatively estimate that this production will consist of anywhere between 15 to 21 million medical records.

- **Interrogatory 14, Subpart A**:  As detailed in its objections, United has no obligation to "identify" particular documentation in medical records that supports specific diagnoses.  Consistent with its proposed response to RFP 147, United will produce all medical records in its possession that were subject to Chart Review.

- **Interrogatory 14, Subpart B**:  As noted previously, we understand the government does not view the request in subpart B for the identification of all medical record reviews as dependent on United's identification of all documentation in each medical record as requested by subpart A.  Accordingly, United will treat this subpart as a separate interrogatory.  In accordance with Fed. R. Civ. P. 33(d), United proposes to respond to this request by referring to documents and data already produced or that United will produce, if necessary.  United is not required to perform any analysis in responding to interrogatories.

We look forward to the government's response to this proposal.  If you have questions, I trust you will let me know.

I hope you and your colleagues have a safe and happy new year holiday.
Abid

---

**From:** Mason, Gregory A. (CIV) <Gregory.A.Mason@usdoj.gov>
**Sent:** Tuesday, December 22, 2020 10:57 AM
**To:** Qureshi, Abid (DC) <ABID.QURESHI@LW.com>; Maddoux, Morgan (DC) <Morgan.Maddoux@lw.com>; Meron, Daniel (DC) <Daniel.Meron@lw.com>; Rowe, David W. (BN) <David.Rowe@lw.com>; Schindler, David (LA) <David.Schindler@lw.com>; Do, Kirstin Scheffler (CH)

<[Kirstin.SchefflerDo@lw.com](mailto:Kirstin.SchefflerDo@lw.com)>; Wilson, Wistar (Bay Area) <[Wistar.Wilson@lw.com](mailto:Wistar.Wilson@lw.com)>
**Cc:** Crooke, Edward (CIV) <[Edward.Crooke@usdoj.gov](mailto:Edward.Crooke@usdoj.gov)>; Glover, Martha N. (CIV) <[Martha.N.Glover@usdoj.gov](mailto:Martha.N.Glover@usdoj.gov)>; Hinson, Zoila E. (CIV) <[Zoila.E.Hinson@usdoj.gov](mailto:Zoila.E.Hinson@usdoj.gov)>; Krieg, Jessica E. (CIV) <[Jessica.E.Krieg@usdoj.gov](mailto:Jessica.E.Krieg@usdoj.gov)>; Lee, John (USACAC) <[John.Lee2@usdoj.gov](mailto:John.Lee2@usdoj.gov)>; Likoff, Amy L. (CIV) <[Amy.L.Likoff@usdoj.gov](mailto:Amy.L.Likoff@usdoj.gov)>; McAuliffe, Robert (CIV) <[Robert.McAuliffe@usdoj.gov](mailto:Robert.McAuliffe@usdoj.gov)>; McMahon, Linda M (CIV) <[Linda.McMahon2@usdoj.gov](mailto:Linda.McMahon2@usdoj.gov)>; Ross, Jack (USACAC) 4 <[Jack.Ross@usdoj.gov](mailto:Jack.Ross@usdoj.gov)>; Zupac, Wendy Z. (CIV) <[Wendy.Z.Zupac@usdoj.gov](mailto:Wendy.Z.Zupac@usdoj.gov)>; Sweeney, Jessica L. (CIV) <[Jessica.L.Sweeney2@usdoj.gov](mailto:Jessica.L.Sweeney2@usdoj.gov)>; [UHG-RelatorsCounsel@Lists.SusmanGodfrey.com](mailto:UHG-RelatorsCounsel@Lists.SusmanGodfrey.com)
**Subject:** RE: US ex rel. Poehling v. UHG -- US Fourth Set of Interrogatories and Eighth Set of RFPs

Abid,

In the interest of avoiding any confusion, we are writing to address your statement that "the government is requesting the production of any medical records United intends to use in this litigation."  We reiterate that our request is not limited to only medical records United intends to use.  As we stated last week on the telephone, allowing UHG to review all relevant medical records, select a subset that it believes helps UHG's defense, and produce only that subset while withholding the remainder of relevant medical records, would prejudice the United States.  We understand from our call that UHG's proposal will offer the production of all medical records that UHG collects and/or analyzes in the course of this litigation, not merely those it intends to "use."  If this is an incorrect understanding of your position, please advise as soon as possible.  We cannot evaluate your proposal until we receive it.  As we noted in our email below, we believe any meaningful proposal would extend beyond medical records that UHG selects unilaterally.

Regards,
Greg

**Gregory A. Mason**
United States Department of Justice
Civil Division, Commercial Litigation Branch, Fraud Section
(202) 514-9472

---

**From:** [ABID.QURESHI@LW.com](mailto:ABID.QURESHI@LW.com) <[ABID.QURESHI@LW.com](mailto:ABID.QURESHI@LW.com)>
**Sent:** Monday, December 21, 2020 4:46 PM
**To:** Mason, Gregory A. (CIV) <[Gregory.A.Mason@usdoj.gov](mailto:Gregory.A.Mason@usdoj.gov)>; [Morgan.Maddoux@lw.com](mailto:Morgan.Maddoux@lw.com); [Daniel.Meron@lw.com](mailto:Daniel.Meron@lw.com); [David.Rowe@lw.com](mailto:David.Rowe@lw.com); [David.Schindler@lw.com](mailto:David.Schindler@lw.com); [Kirstin.SchefflerDo@lw.com](mailto:Kirstin.SchefflerDo@lw.com); [Wistar.Wilson@lw.com](mailto:Wistar.Wilson@lw.com)
**Cc:** Crooke, Edward (CIV) <[Edward.Crooke@usdoj.gov](mailto:Edward.Crooke@usdoj.gov)>; Glover, Martha N. (CIV) <[Martha.N.Glover@usdoj.gov](mailto:Martha.N.Glover@usdoj.gov)>; Hinson, Zoila E. (CIV) <[Zoila.E.Hinson@usdoj.gov](mailto:Zoila.E.Hinson@usdoj.gov)>; Krieg, Jessica E. (CIV) <[Jessica.E.Krieg@usdoj.gov](mailto:Jessica.E.Krieg@usdoj.gov)>; Lee, John (USACAC) <[JLee1@usa.doj.gov](mailto:JLee1@usa.doj.gov)>; Likoff, Amy L. (CIV) <[Amy.L.Likoff@usdoj.gov](mailto:Amy.L.Likoff@usdoj.gov)>; McAuliffe, Robert (CIV) <[Robert.McAuliffe@usdoj.gov](mailto:Robert.McAuliffe@usdoj.gov)>; McMahon, Linda M (CIV) <[Linda.McMahon2@usdoj.gov](mailto:Linda.McMahon2@usdoj.gov)>; Ross, Jack (USACAC) 4 <[jross4@usa.doj.gov](mailto:jross4@usa.doj.gov)>; Zupac, Wendy Z. (CIV) <[Wendy.Z.Zupac@usdoj.gov](mailto:Wendy.Z.Zupac@usdoj.gov)>; Sweeney, Jessica L. (CIV) <[Jessica.L.Sweeney2@usdoj.gov](mailto:Jessica.L.Sweeney2@usdoj.gov)>; [UHG-RelatorsCounsel@Lists.SusmanGodfrey.com](mailto:UHG-RelatorsCounsel@Lists.SusmanGodfrey.com)

**Subject:** RE: US ex rel. Poehling v. UHG -- US Fourth Set of Interrogatories and Eighth Set of RFPs

Dear Greg – As we discussed, United intends to offer a proposal to resolve the impasse regarding the production of medical records.

We understand the government is requesting the production of any medical records United intends to use in this litigation.

But the government's discovery requests are much broader:

- Document Request 147 calls upon United to produce medical records "corresponding to, associated with or related to each Beneficiary" for each date of service year listed in the government's response to United's Interrogatory 1.

- Subpart A of Interrogatory 14 calls for United to identify all documentation in each medical record that supports a contention United was not obligated to delete particular diagnosis codes.

- Subpart B of that Interrogatory also asks United to identify all medical record reviews United previously conducted of charts that correspond to particular diagnosis codes.

In discussing Interrogatory 14, you explained that the government does not view the request in subpart B for the identification of all medical record reviews as dependent on United's identification of all documentation in each medical record as requested by subpart A.

As I noted, responding to these requests would require the production of millions of medical records.  I also explained that while I could not identify the current location of the millions of medical records United had previously subjected to some review, collecting and producing these materials is burdensome.

Nevertheless, we remain committed to proposing a solution that resolves the

Exhibit R
Page 246

Exhibit 3

dispute on medical records.  As I noted during our discussion, we expect to send you the proposal during the week of December 28.

I hope you and your colleagues have a good holiday.
Abid

---

**From:** Mason, Gregory A. (CIV) <Gregory.A.Mason@usdoj.gov>
**Sent:** Friday, December 18, 2020 3:27 PM
**To:** Maddoux, Morgan (DC) <Morgan.Maddoux@lw.com>; Qureshi, Abid (DC) <ABID.QURESHI@LW.com>; Meron, Daniel (DC) <Daniel.Meron@lw.com>; Rowe, David W. (BN) <David.Rowe@lw.com>; Schindler, David (LA) <David.Schindler@lw.com>; Do, Kirstin Scheffler (CH) <Kirstin.SchefflerDo@lw.com>; Wilson, Wistar (Bay Area) <Wistar.Wilson@lw.com>
**Cc:** Crooke, Edward (CIV) <Edward.Crooke@usdoj.gov>; Glover, Martha N. (CIV) <Martha.N.Glover@usdoj.gov>; Hinson, Zoila E. (CIV) <Zoila.E.Hinson@usdoj.gov>; Krieg, Jessica E. (CIV) <Jessica.E.Krieg@usdoj.gov>; Lee, John (USACAC) <John.Lee2@usdoj.gov>; Likoff, Amy L. (CIV) <Amy.L.Likoff@usdoj.gov>; McAuliffe, Robert (CIV) <Robert.McAuliffe@usdoj.gov>; McMahon, Linda M (CIV) <Linda.McMahon2@usdoj.gov>; Ross, Jack (USACAC) 4 <Jack.Ross@usdoj.gov>; Zupac, Wendy Z. (CIV) <Wendy.Z.Zupac@usdoj.gov>; Sweeney, Jessica L. (CIV) <Jessica.L.Sweeney2@usdoj.gov>; UHG-RelatorsCounsel@Lists.SusmanGodfrey.com
**Subject:** RE: US ex rel. Poehling v. UHG -- US Fourth Set of Interrogatories and Eighth Set of RFPs

Abid,

Thanks for the call yesterday regarding Interrogatory No. 14 and Document Request 147.  We understand that UHG agrees to supplement its responses to the Document Request and both subparts of the Interrogatory, and that before the end of December it will provide us with its proposal to do so.  You acknowledged on our call that the government is entitled to any medical records that United might collect and/or analyze.  Because the United States is entitled to discovery of all relevant records in UHG's custody, possession, or control, any meaningful proposal cannot be limited to medical records that UHG selects unilaterally.

We were surprised that UHG was not prepared to answer whether it currently has custody, possession, or control of any responsive medical records, and in particular the medical records that went through UHG's Chart Review Program.  We understand that UHG will also be providing that information so that we may assess UHG's claim of undue burden as to those records.

Regards,
Greg

**Gregory A. Mason**
United States Department of Justice
Civil Division, Commercial Litigation Branch, Fraud Section

Exhibit R
Page 247

(202) 514-9472

---

**From:** Mason, Gregory A. (CIV)
**Sent:** Monday, December 14, 2020 12:21 PM
**To:** Morgan.Maddoux@lw.com; ABID.QURESHI@LW.com; Daniel.Meron@lw.com; David.Rowe@lw.com; David.Schindler@lw.com; Kirstin.SchefflerDo@lw.com; Wistar.Wilson@lw.com
**Cc:** Crooke, Edward (CIV) <ECrooke@civ.usdoj.gov>; Glover, Martha N. (CIV) <maglover@CIV.USDOJ.GOV>; Hinson, Zoila E. (CIV) <zhinson@CIV.USDOJ.GOV>; Krieg, Jessica E. (CIV) <jkrieg@CIV.USDOJ.GOV>; Lee, John (USACAC) <JLee1@usa.doj.gov>; Likoff, Amy L. (CIV) <alikoff@CIV.USDOJ.GOV>; McAuliffe, Robert (CIV) <rmcaulif@CIV.USDOJ.GOV>; McMahon, Linda M (CIV) <lmcmahon@CIV.USDOJ.GOV>; Ross, Jack (USACAC) 4 <jross4@usa.doj.gov>; Zupac, Wendy Z. (CIV) <wzupac@CIV.USDOJ.GOV>; Sweeney, Jessica L. (CIV) <jesweene@CIV.USDOJ.GOV>; UHG-RelatorsCounsel@Lists.SusmanGodfrey.com
**Subject:** RE: US ex rel. Poehling v. UHG -- US Fourth Set of Interrogatories and Eighth Set of RFPs

Counsel,

We are available on Thursday 12/17 at 4:30pm, and can use the following dial-in info:

[1-877-465-7975 ( Attendee Passcode: 433-632-10]

Regards,
Greg

**Gregory A. Mason**
United States Department of Justice
Civil Division, Commercial Litigation Branch, Fraud Section
(202) 514-9472

---

**From:** Morgan.Maddoux@lw.com <Morgan.Maddoux@lw.com>
**Sent:** Friday, December 11, 2020 3:03 PM
**To:** Mason, Gregory A. (CIV) <grmason@CIV.USDOJ.GOV>; ABID.QURESHI@LW.com; Daniel.Meron@lw.com; David.Rowe@lw.com; David.Schindler@lw.com; Kirstin.SchefflerDo@lw.com; Wistar.Wilson@lw.com
**Cc:** Crooke, Edward (CIV) <ECrooke@civ.usdoj.gov>; Glover, Martha N. (CIV) <maglover@CIV.USDOJ.GOV>; Hinson, Zoila E. (CIV) <zhinson@CIV.USDOJ.GOV>; Krieg, Jessica E. (CIV) <jkrieg@CIV.USDOJ.GOV>; Lee, John (USACAC) <JLee1@usa.doj.gov>; Likoff, Amy L. (CIV) <alikoff@CIV.USDOJ.GOV>; McAuliffe, Robert (CIV) <rmcaulif@CIV.USDOJ.GOV>; McMahon, Linda M (CIV) <lmcmahon@CIV.USDOJ.GOV>; Ross, Jack (USACAC) 4 <jross4@usa.doj.gov>; Zupac, Wendy Z. (CIV) <wzupac@CIV.USDOJ.GOV>; Sweeney, Jessica L. (CIV) <jesweene@CIV.USDOJ.GOV>; UHG-RelatorsCounsel@Lists.SusmanGodfrey.com
**Subject:** RE: US ex rel. Poehling v. UHG -- US Fourth Set of Interrogatories and Eighth Set of RFPs

Exhibit R
Page 248

Greg,

Due to scheduling conflicts, UnitedHealth is not available today to meet and confer regarding its Responses and Objections to the United States' Eighth Set of Requests for Production and Fourth Set of Interrogatories. UnitedHealth is available for a meet and confer on Thursday, December 17 before 11, 12-1, 3-3:30, or after 4:30 PM ET or Friday, December 18 from 9-11:30, 12-1:30 or 2-4 PM ET.

Thank you,
Morgan

**Morgan L. Maddoux**
Pronouns: she/her/hers

**LATHAM & WATKINS** LLP
555 Eleventh Street, NW | Suite 1000 | Washington, D.C. 20004-1304
D: +1.202.637.3318

---

**From:** Mason, Gregory A. (CIV) <Gregory.A.Mason@usdoj.gov>
**Sent:** Thursday, December 10, 2020 11:41 AM
**To:** Maddoux, Morgan (DC) <Morgan.Maddoux@lw.com>; Qureshi, Abid (DC) <ABID.QURESHI@LW.com>; Meron, Daniel (DC) <Daniel.Meron@lw.com>; Rowe, David W. (BN) <David.Rowe@lw.com>; Schindler, David (LA) <David.Schindler@lw.com>; Do, Kirstin Scheffler (CH) <Kirstin.SchefflerDo@lw.com>; Wilson, Wistar (Bay Area) <Wistar.Wilson@lw.com>
**Cc:** Crooke, Edward (CIV) <Edward.Crooke@usdoj.gov>; Glover, Martha N. (CIV) <Martha.N.Glover@usdoj.gov>; Hinson, Zoila E. (CIV) <Zoila.E.Hinson@usdoj.gov>; Krieg, Jessica E. (CIV) <Jessica.E.Krieg@usdoj.gov>; Lee, John (USACAC) <John.Lee2@usdoj.gov>; Likoff, Amy L. (CIV) <Amy.L.Likoff@usdoj.gov>; McAuliffe, Robert (CIV) <Robert.McAuliffe@usdoj.gov>; McMahon, Linda M (CIV) <Linda.McMahon2@usdoj.gov>; Ross, Jack (USACAC) 4 <Jack.Ross@usdoj.gov>; Zupac, Wendy Z. (CIV) <Wendy.Z.Zupac@usdoj.gov>; Sweeney, Jessica L. (CIV) <Jessica.L.Sweeney2@usdoj.gov>; UHG-RelatorsCounsel@Lists.SusmanGodfrey.com
**Subject:** RE: US ex rel. Poehling v. UHG -- US Fourth Set of Interrogatories and Eighth Set of RFPs

Morgan,

In the interest of moving things along, please see below and let us know when you are available during the following times:

Thursday 12/10: 4-6 ET
Friday 12/11: 12-5 ET

**Request for Production No. 147**

In response to the United States' request for medical records relating to the beneficiaries at issue in this case, UHG provides conclusory and unfounded objections and summarily refuses to produce any documents whatsoever.  None of UHG's objections provides any basis for its improper refusal to

produce even a single document responsive to the United States' request.

UHG first objects that the request is unduly burdensome, but fails to support this assertion with any substantiation or explanation whatsoever. *See Big Baboon Corp. v. Dell, Inc.*, 723 F. Supp. 2d 1224, 1229 (C.D. Cal. 2010) (Segal, J.) ("Big Baboon cannot simply invoke generalized objections; rather, with respect to Amazon's discovery requests, Big Baboon 'must state specifically how, despite the broad and liberal construction of federal discovery rules, each [request] is overly broad, unduly burdensome, or oppressive by submitting affidavits or offering evidence revealing the nature of the burden.'") (internal citations omitted). UHG cannot properly refuse to produce any documents whatsoever on the basis of such a generalized burden. Nor is UHG's burdensomeness objection well-founded. The burden of collecting and producing such records is entirely proportionate to the needs of the case. Indeed, if UHG itself intends to introduce or otherwise rely on medical records in this case, then the United States is certainly entitled to review medical records in UHG's control in discovery. Moreover, even if UHG could establish that the collection and production of *some* responsive medical records would be unduly burdensome, that does not provide a basis for UHG's refusal to produce *any* responsive medical records whatsoever. In particular, it is difficult to see how UHG can establish undue burden as to the production of medical records that UHG itself collected and reviewed as part of its Chart Review program (or other Medical Record Review programs).

UHG's next objection – that the request is vague and ambiguous – is entirely baseless and provides no support for UHG's position that it can refuse to produce any responsive documents. UHG fails to articulate what is vague and ambiguous about the request, and merely states: "UnitedHealth further objects to this Request vague and ambiguous to the extent it seeks "[a]ll Chart(s)" for all of the beneficiaries the government has identified in response to UHC of California's First Interrogatory." UHG never explains what is vague or ambiguous about the request, which makes it impossible for the United States to respond except to say that the request can clearly be understood and UHG has not provided any basis for its refusal to produce documents on the basis of this objection.

UHG next objects to the request "to the extent it calls upon UnitedHealth to search for and produce documents not in UnitedHealth's possession, custody, or control." Yet, as set forth in Instruction E to the United States First Set of Requests for Production (incorporated by reference into RFP 147), and in accordance with the Federal Rules of Civil Procedure, the United States' request only seeks documents "within Your possession, custody and control, or in the possession, custody, or control of Your employees or other agents . . ." UHG's objection is therefore unfounded and provides no basis for its refusal to produce responsive documents.

UHG's only other specific objection is "to the extent it seeks documents outside of the parties' agreed-upon relevant time period of January 1, 2004 to May 16, 2017." Of course, this objection also provides no basis for UHG's refusal to produce a single responsive document. Nonetheless, because the United States' request is limited to the "DOS Year(s) in which that Beneficiary is listed in the United States' Response to Defendants' Interrogatory No. 1," this objection is also unfounded.

**<u>Interrogatory No. 14</u>**

In response to the United States' interrogatory seeking UHG's contentions regarding the list of

diagnosis codes at issue, UHG provides baseless objections and refuses to respond to the interrogatory.

First, UHG objects that the request is unduly burdensome because it purportedly requires UnitedHealth to "review[] millions of charts spanning a nine-year time period."  But the Interrogatory doesn't *require* UHG to review any charts whatsoever; it only requires UHG to disclose its contentions in this case.  If UHG does not contend that any Charts provide medical record support for the diagnosis codes at issue, it is free to answer the Interrogatory by saying so without reviewing any of the Charts.  But, if UHG does intend to argue that medical records support some or all of the diagnosis codes at issue, the United States is entitled to discover that information.

UHG next objects that terms such as "obligation" and other terms that UHG itself has used in discovery requests are vague and ambiguous.  None of these objections provides any basis for refusing to answer the Interrogatory.  Undefined terms should be given their ordinary meaning, and if UHG asserts that a term such as "obligation" is vague and ambiguous, it must articulate the definition it is applying and then substantively answer the interrogatory.  *Siegmund v. Cty. of Orange*, No. SACV071387CJCPLAX, 2009 WL 10674369, at *2 (C.D. Cal. Aug. 25, 2009) ("Next, while the Court recognizes that in some instances a discovery request may be so vague or ambiguous as to not allow a response (*see, e.g., Dubin v. E.F. Hutton Group Inc.*, 125 F.R.D. 372, 376 (S.D.N.Y. 1989)), such is not the case here. Rather, the Court finds that the terms used by defendants in their Interrogatories are not presented in a vague or ambiguous manner, and can readily be responded to using the common and ordinary meanings of those terms.").

UHG also objects based on the flawed argument that a party may not serve a contention interrogatory on a matter in which the responding party does not bear the burden of proof.  "Nowhere in the Federal Rules of Civil Procedure is it required that a party who carries the ultimate burden on an issue at trial must establish a *prima facie* case before it is entitled to discover information the other party may use to rebut the *prima facie* case."  *McKesson Information Solutions, LLC v. Epic Systems Corp.*, 242 FRD 689, 692 (N.D. Ga. 2007); *see also Phillies v. Harrison/Erickson, Inc.*, 2020 WL 6482882, at *2 (S.D.N.Y. Nov. 4, 2020); *Monster Energy Co. v. Vital Pharm., Inc.*, 2020 WL 6653583 (C.D. Cal., Jan. 2, 2020); *Amgen Inc. v. Sandoz Inc.*, 2017 WL 1352052, **1-2 (N.D. Cal. Apr. 13, 2017); *SPH America, LLC v. Research In Motion Ltd*, 2016 WL 6305414, * (S.D. Cal. Aug. 16, 2016); *Jackson v. Equifax Inf. Servs. LLC*, 2014 WL 12862681, at *3 (N.D. Ga. Sept. 26, 2014); *GEICO v. Prushanksy*, 2013 WL 12077495, at *3 (S.D. Fla. Jan. 4, 2013); *Linde v. Arab Bank PLC*, 2012 WL 957970, at *2 (E.D.N.Y. Mar. 21, 2012); *Moses v. Halstead*, 236 F.R.D. 667, 674 (D. Kan. 2006).  More specifically, contention interrogatories may be used to discover the factual bases of a party's denial of an allegation in a pleading.  *GEICO v. Prushanksy*, 2013 WL 12077495, at *3 (S.D. Fla. Jan. 4, 2013); *Am. Gen. Life Ins. Co. v. Billard*, 2011 WL 13136619, at *3 (N.D. Iowa May 2, 2011); *Barkley v. Life Ins. Co. of N. Am.*, 2008 WL 450138, at *1 (N.D. Tex. Feb. 19, 2008); *Fridkin v. Minn. Mut. Life Ins. Co., Inc.*, 1998 WL 42322, at *5 (D. Minn. Jan. 29, 1998); *Schaap v. Exec. Indus., Inc.*, 130 F.R.D. 384, 387-88 (N.D. Ill. 1990).

Finally, UHG objects that the interrogatory improperly seeks expert opinion.  This objection fundamentally misunderstands the information the United States is seeking.  The interrogatory requests only information regarding the underlying facts—i.e., any related medical records and

medical record reviews—that underlie UHG's contention that it has no obligation to delete the alleged diagnosis codes at issue.  The United States does not seek information regarding any expert opinion about those facts. UHG's refusal to respond is unfounded.  *See Amgen Inc. v. Sandoz Inc.*, 2017 WL 1352052, **1-2 (N.D. Cal. Apr. 13, 2017) (holding that interrogatories "are not improper to the extent they seek only facts, not how an expert would construe those facts"); *D&D Techs. (USA), Inc. v. Safetech Hardware Inc.*, 2013 WL 12142955, at *2 (C.D. Cal. Nov. 8, 2013) (ordering responding party to supplement responses to interrogatories that sought "the legal and factual bases for [d]efendant's contentions . . . ."); *Bayer Healthcare Pharm., Inc. v. River's Edge Pharm., LLC*, 2015 WL 11142425, at *7 (N.D. Ga. July 31, 2015), *report and recommendation adopted*, 2015 WL 11142428 (N.D. Ga. Sept. 22, 2015) (The "[i]nterrogatory ... did not ask for the expert's opinion or a conclusion of law, which, of course, would have been rightfully objectionable. Rather, the interrogatory asked which facts and legal theories Plaintiffs intend to rely on. The fact that an expert would ultimately put the facts together to support the legal theory in an opinion is of no consequence as to whether a responding party must timely supplement such an interrogato[r]y.").


Regards,

**Gregory A. Mason**
United States Department of Justice
Civil Division, Commercial Litigation Branch, Fraud Section
(202) 514-9472

---

**From:** Morgan.Maddoux@lw.com <Morgan.Maddoux@lw.com>
**Sent:** Wednesday, December 09, 2020 7:37 PM
**To:** Mason, Gregory A. (CIV) <grmason@CIV.USDOJ.GOV>; ABID.QURESHI@LW.com; Daniel.Meron@lw.com; David.Rowe@lw.com; David.Schindler@lw.com; Kirstin.SchefflerDo@lw.com; Wistar.Wilson@lw.com
**Cc:** Crooke, Edward (CIV) <ECrooke@civ.usdoj.gov>; Glover, Martha N. (CIV) <maglover@CIV.USDOJ.GOV>; Hinson, Zoila E. (CIV) <zhinson@CIV.USDOJ.GOV>; Krieg, Jessica E. (CIV) <jkrieg@CIV.USDOJ.GOV>; Lee, John (USACAC) <JLee1@usa.doj.gov>; Likoff, Amy L. (CIV) <alikoff@CIV.USDOJ.GOV>; McAuliffe, Robert (CIV) <rmcaulif@CIV.USDOJ.GOV>; McMahon, Linda M (CIV) <lmcmahon@CIV.USDOJ.GOV>; Ross, Jack (USACAC) 4 <jross4@usa.doj.gov>; Zupac, Wendy Z. (CIV) <wzupac@CIV.USDOJ.GOV>; Sweeney, Jessica L. (CIV) <jesweene@CIV.USDOJ.GOV>; UHG-RelatorsCounsel@Lists.SusmanGodfrey.com
**Subject:** RE: US ex rel. Poehling v. UHG -- US Fourth Set of Interrogatories and Eighth Set of RFPs


Greg,

While UnitedHealth is amenable to a meet and confer regarding its Responses and Objections to the United States' Eighth Set of Requests for Production and Fourth Set of Interrogatories ("Responses"), UnitedHealth believes the government's request for a meet and confer on this issue is premature. UnitedHealth does not agree with the government's characterization of its Responses as "deficient" and believes that its Responses clearly state its objections. As is the parties' customary practice in this litigation, UnitedHealth requests that, prior to scheduling a meet and confer, the government

detail in writing why it believes UnitedHealth's Responses are "deficient," including identifying case law the government believes supports its position. This will help ensure a productive and efficient meet and confer. Once the government provides this information, UnitedHealth is happy to schedule a meet and confer with the government to discuss this issue.


Thank you,
Morgan


**Morgan L. Maddoux**
Pronouns: she/her/hers

**LATHAM & WATKINS** LLP
555 Eleventh Street, NW | Suite 1000 | Washington, D.C. 20004-1304
D: +1.202.637.3318

---

**From:** Mason, Gregory A. (CIV) <Gregory.A.Mason@usdoj.gov>
**Sent:** Tuesday, December 8, 2020 5:50 PM
**To:** Maddoux, Morgan (DC) <Morgan.Maddoux@lw.com>; Qureshi, Abid (DC) <ABID.QURESHI@LW.com>; Meron, Daniel (DC) <Daniel.Meron@lw.com>; Rowe, David W. (BN) <David.Rowe@lw.com>; Schindler, David (LA) <David.Schindler@lw.com>; Do, Kirstin Scheffler (CH) <Kirstin.SchefflerDo@lw.com>; Wilson, Wistar (Bay Area) <Wistar.Wilson@lw.com>
**Cc:** Crooke, Edward (CIV) <Edward.Crooke@usdoj.gov>; Glover, Martha N. (CIV) <Martha.N.Glover@usdoj.gov>; Hinson, Zoila E. (CIV) <Zoila.E.Hinson@usdoj.gov>; Krieg, Jessica E. (CIV) <Jessica.E.Krieg@usdoj.gov>; Lee, John (USACAC) <John.Lee2@usdoj.gov>; Likoff, Amy L. (CIV) <Amy.L.Likoff@usdoj.gov>; McAuliffe, Robert (CIV) <Robert.McAuliffe@usdoj.gov>; McMahon, Linda M (CIV) <Linda.McMahon2@usdoj.gov>; Ross, Jack (USACAC) 4 <Jack.Ross@usdoj.gov>; Zupac, Wendy Z. (CIV) <Wendy.Z.Zupac@usdoj.gov>; Sweeney, Jessica L. (CIV) <Jessica.L.Sweeney2@usdoj.gov>; UHG-RelatorsCounsel@Lists.SusmanGodfrey.com
**Subject:** RE: US ex rel. Poehling v. UHG -- US Fourth Set of Interrogatories and Eighth Set of RFPs


Counsel,


Minor correction to the below, the times we are offering are:


Wednesday 12/9: 1230-2 or **4:30**-6 ET
Thursday 12/10: 4-6 ET
Friday 12/10: 12-5 ET


**Gregory A. Mason**
United States Department of Justice
Civil Division, Commercial Litigation Branch, Fraud Section
(202) 514-9472

---

**From:** Mason, Gregory A. (CIV)
**Sent:** Tuesday, December 08, 2020 5:14 PM
**To:** Morgan.Maddoux@lw.com; ABID.QURESHI@LW.com; Daniel.Meron@lw.com;

David.Rowe@lw.com; David.Schindler@lw.com; Kirstin.SchefflerDo@lw.com; Wistar.Wilson@lw.com
**Cc:** Crooke, Edward (CIV) <ECrooke@civ.usdoj.gov>; Glover, Martha N. (CIV) <maglover@CIV.USDOJ.GOV>; Hinson, Zoila E. (CIV) <zhinson@CIV.USDOJ.GOV>; Krieg, Jessica E. (CIV) <jkrieg@CIV.USDOJ.GOV>; Lee, John (USACAC) <JLee1@usa.doj.gov>; Likoff, Amy L. (CIV) <alikoff@CIV.USDOJ.GOV>; McAuliffe, Robert (CIV) <rmcaulif@CIV.USDOJ.GOV>; McMahon, Linda M (CIV) <lmcmahon@CIV.USDOJ.GOV>; Ross, Jack (USACAC) 4 <jross4@usa.doj.gov>; Zupac, Wendy Z. (CIV) <wzupac@CIV.USDOJ.GOV>; Sweeney, Jessica L. (CIV) <jesweene@CIV.USDOJ.GOV>; UHG-RelatorsCounsel@Lists.SusmanGodfrey.com
**Subject:** RE: US ex rel. Poehling v. UHG -- US Fourth Set of Interrogatories and Eighth Set of RFPs

Counsel,

Please let us know your availability during the following times to meet and confer regarding UHG's deficient responses to the United States' Eighth Set of Requests for Production and Fourth Set of Interrogatories.

Wednesday 12/9: 1230-2 or 4-6 ET
Thursday 12/10: 4-6 ET
Friday 12/10: 12-5 ET

Regards,
Greg

**Gregory A. Mason**
United States Department of Justice
Civil Division, Commercial Litigation Branch, Fraud Section
(202) 514-9472

---

**From:** Morgan.Maddoux@lw.com <Morgan.Maddoux@lw.com>
**Sent:** Friday, December 04, 2020 6:57 PM
**To:** Mason, Gregory A. (CIV) <grmason@CIV.USDOJ.GOV>; ABID.QURESHI@LW.com; Daniel.Meron@lw.com; David.Rowe@lw.com; David.Schindler@lw.com; Kirstin.SchefflerDo@lw.com; Wistar.Wilson@lw.com
**Cc:** Crooke, Edward (CIV) <ECrooke@civ.usdoj.gov>; Glover, Martha N. (CIV) <maglover@CIV.USDOJ.GOV>; Hinson, Zoila E. (CIV) <zhinson@CIV.USDOJ.GOV>; Krieg, Jessica E. (CIV) <jkrieg@CIV.USDOJ.GOV>; Lee, John (USACAC) <JLee1@usa.doj.gov>; Likoff, Amy L. (CIV) <alikoff@CIV.USDOJ.GOV>; McAuliffe, Robert (CIV) <rmcaulif@CIV.USDOJ.GOV>; McMahon, Linda M (CIV) <lmcmahon@CIV.USDOJ.GOV>; Ross, Jack (USACAC) 4 <jross4@usa.doj.gov>; Zupac, Wendy Z. (CIV) <wzupac@CIV.USDOJ.GOV>; Sweeney, Jessica L. (CIV) <jesweene@CIV.USDOJ.GOV>; UHG-RelatorsCounsel@Lists.SusmanGodfrey.com
**Subject:** RE: US ex rel. Poehling v. UHG -- US Fourth Set of Interrogatories and Eighth Set of RFPs

Counsel,

Please see attached UnitedHealth's Responses and Objections to the United States' Eighth Set of Requests for Production and Fourth Set of Interrogatories.

Thank you,
Morgan


**Morgan L. Maddoux**
Pronouns: she/her/hers

**LATHAM & WATKINS LLP**
555 Eleventh Street, NW | Suite 1000 | Washington, D.C. 20004-1304
D: +1.202.637.3318

---

**From:** Mason, Gregory A. (CIV) <Gregory.A.Mason@usdoj.gov>
**Sent:** Wednesday, November 4, 2020 5:21 PM
**To:** Maddoux, Morgan (DC) <Morgan.Maddoux@lw.com>; Qureshi, Abid (DC) <ABID.QURESHI@LW.com>; Robinson, Anne (DC) <Anne.Robinson@lw.com>; Meron, Daniel (DC) <Daniel.Meron@lw.com>; Rowe, David W. (BN) <David.Rowe@lw.com>; Tolley, David C. (BN) <David.Tolley@lw.com>; Schindler, David (LA) <David.Schindler@lw.com>; Do, Kirstin Scheffler (CH) <Kirstin.SchefflerDo@lw.com>; Wilson, Wistar (Bay Area) <Wistar.Wilson@lw.com>; Koppel, Samantha (SF) <Samantha.Koppel@lw.com>
**Cc:** Crooke, Edward (CIV) <Edward.Crooke@usdoj.gov>; Glover, Martha N. (CIV) <Martha.N.Glover@usdoj.gov>; Hinson, Zoila E. (CIV) <Zoila.E.Hinson@usdoj.gov>; Krieg, Jessica E. (CIV) <Jessica.E.Krieg@usdoj.gov>; Lee, John (USACAC) <John.Lee2@usdoj.gov>; Likoff, Amy L. (CIV) <Amy.L.Likoff@usdoj.gov>; Mason, Gregory A. (CIV) <Gregory.A.Mason@usdoj.gov>; McAuliffe, Robert (CIV) <Robert.McAuliffe@usdoj.gov>; McMahon, Linda M (CIV) <Linda.McMahon2@usdoj.gov>; Ross, Jack (USACAC) 4 <Jack.Ross@usdoj.gov>; Zupac, Wendy Z. (CIV) <Wendy.Z.Zupac@usdoj.gov>; Sweeney, Jessica L. (CIV) <Jessica.L.Sweeney2@usdoj.gov>; UHG-RelatorsCounsel@Lists.SusmanGodfrey.com
**Subject:** US ex rel. Poehling v. UHG -- US Fourth Set of Interrogatories and Eighth Set of RFPs

Counsel,

Please see the attached discovery requests from the United States.

Regards,

**Gregory A. Mason**
United States Department of Justice
Civil Division, Commercial Litigation Branch, Fraud Section
(202) 514-9472

*Mailing Address:*
P.O. Box 261
Ben Franklin Station

Exhibit R
Page 255

633
Exhibit 3

Washington, DC 20044

*Delivery Address:*
3CON
175 N Street NE, #10-224
Washington, DC 20002

_____

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient.  Any review, disclosure, reliance or distribution by others or forwarding without express permission is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies including any attachments.

Latham & Watkins LLP or any of its affiliates may monitor electronic communications sent or received by our networks in order to protect our business and verify compliance with our policies and relevant legal requirements. Any personal information contained or referred to within this electronic communication will be processed in accordance with the firm's privacy notices and Global Privacy Standards available at www.lw.com.

# EXHIBIT S

**From:** Mason, Gregory A. (CIV) <Gregory.A.Mason@usdoj.gov>
**Sent:** Wednesday, January 6, 2021 4:18 PM
**To:** Qureshi, Abid (DC) <ABID.QURESHI@LW.com>; Maddoux, Morgan (DC) <Morgan.Maddoux@lw.com>; Meron, Daniel (DC) <Daniel.Meron@lw.com>; Rowe, David W. (BN) <David.Rowe@lw.com>; Schindler, David (LA) <David.Schindler@lw.com>; Do, Kirstin Scheffler (CH) <Kirstin.SchefflerDo@lw.com>; Wilson, Wistar (Bay Area) <Wistar.Wilson@lw.com>
**Cc:** Crooke, Edward (CIV) <Edward.Crooke@usdoj.gov>; Glover, Martha N. (CIV) <Martha.N.Glover@usdoj.gov>; Hinson, Zoila E. (CIV) <Zoila.E.Hinson@usdoj.gov>; Krieg, Jessica E. (CIV) <Jessica.E.Krieg@usdoj.gov>; Lee, John (USACAC) <John.Lee2@usdoj.gov>; Likoff, Amy L. (CIV) <Amy.L.Likoff@usdoj.gov>; McAuliffe, Robert (CIV) <Robert.McAuliffe@usdoj.gov>; McMahon, Linda M (CIV) <Linda.McMahon2@usdoj.gov>; Ross, Jack (USACAC) 4 <Jack.Ross@usdoj.gov>; Zupac, Wendy Z. (CIV) <Wendy.Z.Zupac@usdoj.gov>; Sweeney, Jessica L. (CIV) <Jessica.L.Sweeney2@usdoj.gov>; UHG-RelatorsCounsel@Lists.SusmanGodfrey.com
**Subject:** RE: Proposal to Respond to Request for Production 147 and Interrogatories 14A-14B

Dear Abid,

Thanks for the email and I hope you had a wonderful holiday.

We appreciate that UHG has changed course and agreed to supplement its deficient responses to the United States' Request for Production 147 and Interrogatory 14, but we have some questions and some concerns about UHG's proposal, which we outline below.  We think it would make sense to discuss these over the phone to see if we can resolve them without the need for involving Special Master Segal.  So, could you please let us know if you are available to discuss on Thursday 1/7 or Friday 1/8 any time from 10:30a-5p ET?

**Request for Production 147**

While we agree with UHG's proposal to prioritize the production of the responsive medical records that went through one of UHG's Medical Record Review Programs, we have remaining questions as to what other responsive medical records are in UHG's possession, custody, or control, and whether UHG agrees to produce those as well.

UHG repeats its objection that the United States' request would require UHG to collect and produce documents "not in United's possession."  It is therefore necessary to reiterate, as we stated in our email dated December 10 (and consistent with the Federal Rules of Civil Procedure), that Instruction E to the Eighth Set of Requests for Production limits RFP 147 to documents "within Your possession, custody and control, or in the possession, custody, or control of Your employees or other agents . . ."

We are perplexed why UHG continues to raise this objection given that the documents sought by the request are so limited, so we would like to better understand what medical records are covered by UHG's objection, and whether there are additional responsive medical records (other than those UHG has agreed to produce) that are in UHG's possession, custody, or control.

Moreover, while we are not seeking to impose on UHG the burden of collecting responsive records from third parties, we also want to ensure that the United States has access to all of the medical records that are within UHG's control. Thus, if UHG collects, reviews, and/or analyzes medical records in this case pursuant to agreements with third parties, the United States should have the same opportunity to collect. In other words, we do not want UHG or its representatives, consultants, agents or attorneys to pull records and then cherry-pick the ones they want to use in the litigation. Accordingly, we would like to better understand whether UHG intends to collect, review, or analyze medical records held by third parties.

Finally, we would like to know by what date UHG proposes to produce the responsive medical records that it has agreed to produce.

### Interrogatory 14

We are confused by your proposal to supplement your response to Interrogatory 14(A), and would like to further discuss to better understand UHG's position. You object that UHG "has no obligation to 'identify' particular documentation in medical records that supports specific diagnoses," and will only produce the responsive medical records themselves. It is not a sufficient response to this Interrogatory for United to state that it will produce all medical records in its possession that were "subject to Chart Review." Of course, if UHG does not contend that any diagnosis codes at issue were medically supported, then UHG has no obligation to identify particular documentation in medical records. However, if UHG does contend that any of the diagnosis codes at issue were medically supported, then the United States is entitled to discover the factual basis for that contention. To the extent UHG is suggesting that it will respond to Interrogatory 14(A) by referencing the medical records it produces in response to RFP 147, it must do so on a diagnosis code by diagnosis code basis. *See* Fed. R. Civ. P. 33(d) ("the responding party may answer by . . . specifying the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could.").

We are also somewhat unclear on your proposal to supplement your response to Interrogatory 14(B). We do not understand what is meant by your statement that "the government does not view the request in subpart B for the identification of all medical record reviews as dependent on United's identification of all documentation in each medical record as requested by subpart A." As the Interrogatory is written, and as we discussed on the phone in December, Interrogatory 14(B) seeks the identification of Medical Record Reviews of charts associated with all diagnosis codes that UHG disputes it was obligated to delete. Additionally, as with Interrogatory 14(A), if UHG intends to respond to Interrogatory 14(B) through the incorporation of produced documents, it must do so on a diagnosis code by diagnosis code basis.

We look forward to further discussing these concerns and your proposal to supplement UHG's

responses to Request for Production 147 and Interrogatory 14.  So, please let us know your availability during the times set forth above.

Happy New Year to you and yours!

Regards,
Greg

**Gregory A. Mason**
United States Department of Justice
Civil Division, Commercial Litigation Branch, Fraud Section
(202) 514-9472

---

**From:** ABID.QURESHI@LW.com <ABID.QURESHI@LW.com>
**Sent:** Thursday, December 31, 2020 12:01 PM
**To:** Mason, Gregory A. (CIV) <Gregory.A.Mason@usdoj.gov>; Morgan.Maddoux@lw.com; Daniel.Meron@lw.com; David.Rowe@lw.com; David.Schindler@lw.com; Kirstin.SchefflerDo@lw.com; Wistar.Wilson@lw.com
**Cc:** Crooke, Edward (CIV) <Edward.Crooke@usdoj.gov>; Glover, Martha N. (CIV) <Martha.N.Glover@usdoj.gov>; Hinson, Zoila E. (CIV) <Zoila.E.Hinson@usdoj.gov>; Krieg, Jessica E. (CIV) <Jessica.E.Krieg@usdoj.gov>; Lee, John (USACAC) <JLee1@usa.doj.gov>; Likoff, Amy L. (CIV) <Amy.L.Likoff@usdoj.gov>; McAuliffe, Robert (CIV) <Robert.McAuliffe@usdoj.gov>; McMahon, Linda M (CIV) <Linda.McMahon2@usdoj.gov>; Ross, Jack (USACAC) 4 <jross4@usa.doj.gov>; Zupac, Wendy Z. (CIV) <Wendy.Z.Zupac@usdoj.gov>; Sweeney, Jessica L. (CIV) <Jessica.L.Sweeney2@usdoj.gov>; UHG-RelatorsCounsel@Lists.SusmanGodfrey.com
**Subject:** Proposal to Respond to Request for Production 147 and Interrogatories 14A-14B

Dear Greg –

Detailed below is a proposal to resolve our differences arising from the government's demand for medical records in connection with its Request for Production 147 and Interrogatories 14A-14B.

- **Request for Production 147**:  As we have repeatedly noted RFP 147 is extraordinarily broad, seeking the production of all medical records associated with each beneficiary for each date of service year listed in the government's response to United's Interrogatory 1.  As drafted by the government, the RFP would call for the production of every medical record corresponding with each beneficiary and date of service year on the government's list.  Such a request would involve

overwhelming efforts and would likely entail the collection and production of more than 29 million medical records, many of which are not in United's possession.

The government has not articulated any authority that would require United to search for, collect from third parties, and produce this volume of medical records.  Instead, United proposes to produce all medical records in its possession for 2008-2016 DOS that were subject to Chart Review.  We conservatively estimate that this production will consist of anywhere between 15 to 21 million medical records.

- **Interrogatory 14, Subpart A**:  As detailed in its objections, United has no obligation to "identify" particular documentation in medical records that supports specific diagnoses.  Consistent with its proposed response to RFP 147, United will produce all medical records in its possession that were subject to Chart Review.

- **Interrogatory 14, Subpart B**:  As noted previously, we understand the government does not view the request in subpart B for the identification of all medical record reviews as dependent on United's identification of all documentation in each medical record as requested by subpart A.  Accordingly, United will treat this subpart as a separate interrogatory.  In accordance with Fed. R. Civ. P. 33(d), United proposes to respond to this request by referring to documents and data already produced or that United will produce, if necessary.   United is not required to perform any analysis in responding to interrogatories.

We look forward to the government's response to this proposal.  If you have questions, I trust you will let me know.

I hope you and your colleagues have a safe and happy new year holiday.
Abid

**From:** Mason, Gregory A. (CIV) <Gregory.A.Mason@usdoj.gov>
**Sent:** Tuesday, December 22, 2020 10:57 AM
**To:** Qureshi, Abid (DC) <ABID.QURESHI@LW.com>; Maddoux, Morgan (DC) <Morgan.Maddoux@lw.com>; Meron, Daniel (DC) <Daniel.Meron@lw.com>; Rowe, David W. (BN) <David.Rowe@lw.com>; Schindler, David (LA) <David.Schindler@lw.com>; Do, Kirstin Scheffler (CH) <Kirstin.SchefflerDo@lw.com>; Wilson, Wistar (Bay Area) <Wistar.Wilson@lw.com>
**Cc:** Crooke, Edward (CIV) <Edward.Crooke@usdoj.gov>; Glover, Martha N. (CIV) <Martha.N.Glover@usdoj.gov>; Hinson, Zoila E. (CIV) <Zoila.E.Hinson@usdoj.gov>; Krieg, Jessica E. (CIV) <Jessica.E.Krieg@usdoj.gov>; Lee, John (USACAC) <John.Lee2@usdoj.gov>; Likoff, Amy L. (CIV) <Amy.L.Likoff@usdoj.gov>; McAuliffe, Robert (CIV) <Robert.McAuliffe@usdoj.gov>; McMahon, Linda M (CIV) <Linda.McMahon2@usdoj.gov>; Ross, Jack (USACAC) 4 <Jack.Ross@usdoj.gov>; Zupac, Wendy Z. (CIV) <Wendy.Z.Zupac@usdoj.gov>; Sweeney, Jessica L. (CIV) <Jessica.L.Sweeney2@usdoj.gov>; UHG-RelatorsCounsel@Lists.SusmanGodfrey.com
**Subject:** RE: US ex rel. Poehling v. UHG -- US Fourth Set of Interrogatories and Eighth Set of RFPs

Abid,

In the interest of avoiding any confusion, we are writing to address your statement that "the government is requesting the production of any medical records United intends to use in this litigation."  We reiterate that our request is not limited to only medical records United intends to use.  As we stated last week on the telephone, allowing UHG to review all relevant medical records, select a subset that it believes helps UHG's defense, and produce only that subset while withholding the remainder of relevant medical records, would prejudice the United States.  We understand from our call that UHG's proposal will offer the production of all medical records that UHG collects and/or analyzes in the course of this litigation, not merely those it intends to "use."  If this is an incorrect understanding of your position, please advise as soon as possible.  We cannot evaluate your proposal until we receive it.  As we noted in our email below, we believe any meaningful proposal would extend beyond medical records that UHG selects unilaterally.

Regards,
Greg

**Gregory A. Mason**
United States Department of Justice
Civil Division, Commercial Litigation Branch, Fraud Section
(202) 514-9472

**From:** ABID.QURESHI@LW.com <ABID.QURESHI@LW.com>
**Sent:** Monday, December 21, 2020 4:46 PM
**To:** Mason, Gregory A. (CIV) <Gregory.A.Mason@usdoj.gov>; Morgan.Maddoux@lw.com; Daniel.Meron@lw.com; David.Rowe@lw.com; David.Schindler@lw.com; Kirstin.SchefflerDo@lw.com; Wistar.Wilson@lw.com

**Cc:** Crooke, Edward (CIV) <Edward.Crooke@usdoj.gov>; Glover, Martha N. (CIV) <Martha.N.Glover@usdoj.gov>; Hinson, Zoila E. (CIV) <Zoila.E.Hinson@usdoj.gov>; Krieg, Jessica E. (CIV) <Jessica.E.Krieg@usdoj.gov>; Lee, John (USACAC) <JLee1@usa.doj.gov>; Likoff, Amy L. (CIV) <Amy.L.Likoff@usdoj.gov>; McAuliffe, Robert (CIV) <Robert.McAuliffe@usdoj.gov>; McMahon, Linda M (CIV) <Linda.McMahon2@usdoj.gov>; Ross, Jack (USACAC) 4 <jross4@usa.doj.gov>; Zupac, Wendy Z. (CIV) <Wendy.Z.Zupac@usdoj.gov>; Sweeney, Jessica L. (CIV) <Jessica.L.Sweeney2@usdoj.gov>; UHG-RelatorsCounsel@Lists.SusmanGodfrey.com
**Subject:** RE: US ex rel. Poehling v. UHG -- US Fourth Set of Interrogatories and Eighth Set of RFPs

Dear Greg – As we discussed, United intends to offer a proposal to resolve the impasse regarding the production of medical records.

We understand the government is requesting the production of any medical records United intends to use in this litigation.

But the government's discovery requests are much broader:

- Document Request 147 calls upon United to produce medical records "corresponding to, associated with or related to each Beneficiary" for each date of service year listed in the government's response to United's Interrogatory 1.

- Subpart A of Interrogatory 14 calls for United to identify all documentation in each medical record that supports a contention United was not obligated to delete particular diagnosis codes.

- Subpart B of that Interrogatory also asks United to identify all medical record reviews United previously conducted of charts that correspond to particular diagnosis codes.

In discussing Interrogatory 14, you explained that the government does not view the request in subpart B for the identification of all medical record reviews as dependent on United's identification of all documentation in each medical record as requested by subpart A.

As I noted, responding to these requests would require the production of millions of medical records.  I also explained that while I could not identify the

current location of the millions of medical records United had previously subjected to some review, collecting and producing these materials is burdensome.

Nevertheless, we remain committed to proposing a solution that resolves the dispute on medical records.  As I noted during our discussion, we expect to send you the proposal during the week of December 28.

I hope you and your colleagues have a good holiday.
Abid

---

**From:** Mason, Gregory A. (CIV) <Gregory.A.Mason@usdoj.gov>
**Sent:** Friday, December 18, 2020 3:27 PM
**To:** Maddoux, Morgan (DC) <Morgan.Maddoux@lw.com>; Qureshi, Abid (DC) <ABID.QURESHI@LW.COM>; Meron, Daniel (DC) <Daniel.Meron@lw.com>; Rowe, David W. (BN) <David.Rowe@lw.com>; Schindler, David (LA) <David.Schindler@lw.com>; Do, Kirstin Scheffler (CH) <Kirstin.SchefflerDo@lw.com>; Wilson, Wistar (Bay Area) <Wistar.Wilson@lw.com>
**Cc:** Crooke, Edward (CIV) <Edward.Crooke@usdoj.gov>; Glover, Martha N. (CIV) <Martha.N.Glover@usdoj.gov>; Hinson, Zoila E. (CIV) <Zoila.E.Hinson@usdoj.gov>; Krieg, Jessica E. (CIV) <Jessica.E.Krieg@usdoj.gov>; Lee, John (USACAC) <John.Lee2@usdoj.gov>; Likoff, Amy L. (CIV) <Amy.L.Likoff@usdoj.gov>; McAuliffe, Robert (CIV) <Robert.McAuliffe@usdoj.gov>; McMahon, Linda M (CIV) <Linda.McMahon2@usdoj.gov>; Ross, Jack (USACAC) 4 <Jack.Ross@usdoj.gov>; Zupac, Wendy Z. (CIV) <Wendy.Z.Zupac@usdoj.gov>; Sweeney, Jessica L. (CIV) <Jessica.L.Sweeney2@usdoj.gov>; UHG-RelatorsCounsel@Lists.SusmanGodfrey.com
**Subject:** RE: US ex rel. Poehling v. UHG -- US Fourth Set of Interrogatories and Eighth Set of RFPs

Abid,

Thanks for the call yesterday regarding Interrogatory No. 14 and Document Request 147.  We understand that UHG agrees to supplement its responses to the Document Request and both subparts of the Interrogatory, and that before the end of December it will provide us with its proposal to do so.  You acknowledged on our call that the government is entitled to any medical records that United might collect and/or analyze.  Because the United States is entitled to discovery of all relevant records in UHG's custody, possession, or control, any meaningful proposal cannot be limited to medical records that UHG selects unilaterally.

We were surprised that UHG was not prepared to answer whether it currently has custody, possession, or control of any responsive medical records, and in particular the medical records that went through UHG's Chart Review Program.  We understand that UHG will also be providing that information so that we may assess UHG's claim of undue burden as to those records.

Regards,
Greg

**Gregory A. Mason**
United States Department of Justice
Civil Division, Commercial Litigation Branch, Fraud Section
(202) 514-9472

---

**From:** Mason, Gregory A. (CIV)
**Sent:** Monday, December 14, 2020 12:21 PM
**To:** Morgan.Maddoux@lw.com; ABID.QURESHI@LW.com; Daniel.Meron@lw.com;
David.Rowe@lw.com; David.Schindler@lw.com; Kirstin.SchefflerDo@lw.com;
Wistar.Wilson@lw.com
**Cc:** Crooke, Edward (CIV) <ECrooke@civ.usdoj.gov>; Glover, Martha N. (CIV)
<maglover@CIV.USDOJ.GOV>; Hinson, Zoila E. (CIV) <zhinson@CIV.USDOJ.GOV>; Krieg, Jessica E.
(CIV) <jkrieg@CIV.USDOJ.GOV>; Lee, John (USACAC) <JLee1@usa.doj.gov>; Likoff, Amy L. (CIV)
<alikoff@CIV.USDOJ.GOV>; McAuliffe, Robert (CIV) <rmcaulif@CIV.USDOJ.GOV>; McMahon, Linda M
(CIV) <lmcmahon@CIV.USDOJ.GOV>; Ross, Jack (USACAC) 4 <jross4@usa.doj.gov>; Zupac, Wendy Z.
(CIV) <wzupac@CIV.USDOJ.GOV>; Sweeney, Jessica L. (CIV) <jesweene@CIV.USDOJ.GOV>; UHG-
RelatorsCounsel@Lists.SusmanGodfrey.com
**Subject:** RE: US ex rel. Poehling v. UHG -- US Fourth Set of Interrogatories and Eighth Set of RFPs

Counsel,

We are available on Thursday 12/17 at 4:30pm, and can use the following dial-in info:

[1-877-465-7975 ( Attendee Passcode: 433-632-10]

Regards,
Greg

**Gregory A. Mason**
United States Department of Justice
Civil Division, Commercial Litigation Branch, Fraud Section
(202) 514-9472

---

**From:** Morgan.Maddoux@lw.com <Morgan.Maddoux@lw.com>
**Sent:** Friday, December 11, 2020 3:03 PM
**To:** Mason, Gregory A. (CIV) <grmason@CIV.USDOJ.GOV>; ABID.QURESHI@LW.com;
Daniel.Meron@lw.com; David.Rowe@lw.com; David.Schindler@lw.com;
Kirstin.SchefflerDo@lw.com; Wistar.Wilson@lw.com
**Cc:** Crooke, Edward (CIV) <ECrooke@civ.usdoj.gov>; Glover, Martha N. (CIV)
<maglover@CIV.USDOJ.GOV>; Hinson, Zoila E. (CIV) <zhinson@CIV.USDOJ.GOV>; Krieg, Jessica E.

(CIV) <jkrieg@CIV.USDOJ.GOV>; Lee, John (USACAC) <JLee1@usa.doj.gov>; Likoff, Amy L. (CIV) <alikoff@CIV.USDOJ.GOV>; McAuliffe, Robert (CIV) <rmcaulif@CIV.USDOJ.GOV>; McMahon, Linda M (CIV) <lmcmahon@CIV.USDOJ.GOV>; Ross, Jack (USACAC) 4 <jross4@usa.doj.gov>; Zupac, Wendy Z. (CIV) <wzupac@CIV.USDOJ.GOV>; Sweeney, Jessica L. (CIV) <jesweene@CIV.USDOJ.GOV>; UHG-RelatorsCounsel@Lists.SusmanGodfrey.com

**Subject:** RE: US ex rel. Poehling v. UHG -- US Fourth Set of Interrogatories and Eighth Set of RFPs

Greg,

Due to scheduling conflicts, UnitedHealth is not available today to meet and confer regarding its Responses and Objections to the United States' Eighth Set of Requests for Production and Fourth Set of Interrogatories. UnitedHealth is available for a meet and confer on Thursday, December 17 before 11, 12-1, 3-3:30, or after 4:30 PM ET or Friday, December 18 from 9-11:30, 12-1:30 or 2-4 PM ET.

Thank you,
Morgan

**Morgan L. Maddoux**
Pronouns: she/her/hers

**LATHAM & WATKINS** LLP
555 Eleventh Street, NW | Suite 1000 | Washington, D.C. 20004-1304
D: +1.202.637.3318

---

**From:** Mason, Gregory A. (CIV) <Gregory.A.Mason@usdoj.gov>
**Sent:** Thursday, December 10, 2020 11:41 AM
**To:** Maddoux, Morgan (DC) <Morgan.Maddoux@lw.com>; Qureshi, Abid (DC) <ABID.QURESHI@LW.com>; Meron, Daniel (DC) <Daniel.Meron@lw.com>; Rowe, David W. (BN) <David.Rowe@lw.com>; Schindler, David (LA) <David.Schindler@lw.com>; Do, Kirstin Scheffler (CH) <Kirstin.SchefflerDo@lw.com>; Wilson, Wistar (Bay Area) <Wistar.Wilson@lw.com>
**Cc:** Crooke, Edward (CIV) <Edward.Crooke@usdoj.gov>; Glover, Martha N. (CIV) <Martha.N.Glover@usdoj.gov>; Hinson, Zoila E. (CIV) <Zoila.E.Hinson@usdoj.gov>; Krieg, Jessica E. (CIV) <Jessica.E.Krieg@usdoj.gov>; Lee, John (USACAC) <John.Lee2@usdoj.gov>; Likoff, Amy L. (CIV) <Amy.L.Likoff@usdoj.gov>; McAuliffe, Robert (CIV) <Robert.McAuliffe@usdoj.gov>; McMahon, Linda M (CIV) <Linda.McMahon2@usdoj.gov>; Ross, Jack (USACAC) 4 <Jack.Ross@usdoj.gov>; Zupac, Wendy Z. (CIV) <Wendy.Z.Zupac@usdoj.gov>; Sweeney, Jessica L. (CIV) <Jessica.L.Sweeney2@usdoj.gov>; UHG-RelatorsCounsel@Lists.SusmanGodfrey.com
**Subject:** RE: US ex rel. Poehling v. UHG -- US Fourth Set of Interrogatories and Eighth Set of RFPs

Morgan,

In the interest of moving things along, please see below and let us know when you are available during the following times:

Thursday 12/10: 4-6 ET
Friday 12/11: 12-5 ET

**Request for Production No. 147**

In response to the United States' request for medical records relating to the beneficiaries at issue in this case, UHG provides conclusory and unfounded objections and summarily refuses to produce any documents whatsoever.  None of UHG's objections provides any basis for its improper refusal to produce even a single document responsive to the United States' request.

UHG first objects that the request is unduly burdensome, but fails to support this assertion with any substantiation or explanation whatsoever.  *See Big Baboon Corp. v. Dell, Inc.*, 723 F. Supp. 2d 1224, 1229 (C.D. Cal. 2010) (Segal, J.) ("Big Baboon cannot simply invoke generalized objections; rather, with respect to Amazon's discovery requests, Big Baboon 'must state specifically how, despite the broad and liberal construction of federal discovery rules, each [request] is overly broad, unduly burdensome, or oppressive by submitting affidavits or offering evidence revealing the nature of the burden.'") (internal citations omitted).  UHG cannot properly refuse to produce any documents whatsoever on the basis of such a generalized burden.  Nor is UHG's burdensomeness objection well-founded.  The burden of collecting and producing such records is entirely proportionate to the needs of the case.  Indeed, if UHG itself intends to introduce or otherwise rely on medical records in this case, then the United States is certainly entitled to review medical records in UHG's control in discovery.  Moreover, even if UHG could establish that the collection and production of *some* responsive medical records would be unduly burdensome, that does not provide a basis for UHG's refusal to produce *any* responsive medical records whatsoever.  In particular, it is difficult to see how UHG can establish undue burden as to the production of medical records that UHG itself collected and reviewed as part of its Chart Review program (or other Medical Record Review programs).

UHG's next objection – that the request is vague and ambiguous – is entirely baseless and provides no support for UHG's position that it can refuse to produce any responsive documents.  UHG fails to articulate what is vague and ambiguous about the request, and merely states: "UnitedHealth further objects to this Request vague and ambiguous to the extent it seeks "[a]ll Chart(s)" for all of the beneficiaries the government has identified in response to UHC of California's First Interrogatory."  UHG never explains what is vague or ambiguous about the request, which makes it impossible for the United States to respond except to say that the request can clearly be understood and UHG has not provided any basis for its refusal to produce documents on the basis of this objection.

UHG next objects to the request "to the extent it calls upon UnitedHealth to search for and produce documents not in UnitedHealth's possession, custody, or control."  Yet, as set forth in Instruction E to the United States First Set of Requests for Production (incorporated by reference into RFP 147), and in accordance with the Federal Rules of Civil Procedure, the United States' request only seeks documents "within Your possession, custody and control, or in the possession, custody, or control of Your employees or other agents . . ."   UHG's objection is therefore unfounded and provides no basis for its refusal to produce responsive documents.

UHG's only other specific objection is "to the extent it seeks documents outside of the parties' agreed-upon relevant time period of January 1, 2004 to May 16, 2017."  Of course, this objection also provides no basis for UHG's refusal to produce a single responsive document.  Nonetheless,

because the United States' request is limited to the "DOS Year(s) in which that Beneficiary is listed in the United States' Response to Defendants' Interrogatory No. 1," this objection is also unfounded.

**Interrogatory No. 14**

In response to the United States' interrogatory seeking UHG's contentions regarding the list of diagnosis codes at issue, UHG provides baseless objections and refuses to respond to the interrogatory.

First, UHG objects that the request is unduly burdensome because it purportedly requires UnitedHealth to "review[] millions of charts spanning a nine-year time period."  But the Interrogatory doesn't *require* UHG to review any charts whatsoever; it only requires UHG to disclose its contentions in this case.  If UHG does not contend that any Charts provide medical record support for the diagnosis codes at issue, it is free to answer the Interrogatory by saying so without reviewing any of the Charts.  But, if UHG does intend to argue that medical records support some or all of the diagnosis codes at issue, the United States is entitled to discover that information.

UHG next objects that terms such as "obligation" and other terms that UHG itself has used in discovery requests are vague and ambiguous.  None of these objections provides any basis for refusing to answer the Interrogatory.  Undefined terms should be given their ordinary meaning, and if UHG asserts that a term such as "obligation" is vague and ambiguous, it must articulate the definition it is applying and then substantively answer the interrogatory.  *Siegmund v. Cty. of Orange*, No. SACV071387CJCPLAX, 2009 WL 10674369, at *2 (C.D. Cal. Aug. 25, 2009) ("Next, while the Court recognizes that in some instances a discovery request may be so vague or ambiguous as to not allow a response (*see, e.g., Dubin v. E.F. Hutton Group Inc.*, 125 F.R.D. 372, 376 (S.D.N.Y. 1989)), such is not the case here. Rather, the Court finds that the terms used by defendants in their Interrogatories are not presented in a vague or ambiguous manner, and can readily be responded to using the common and ordinary meanings of those terms.").

UHG also objects based on the flawed argument that a party may not serve a contention interrogatory on a matter in which the responding party does not bear the burden of proof.  "Nowhere in the Federal Rules of Civil Procedure is it required that a party who carries the ultimate burden on an issue at trial must establish a *prima facie* case before it is entitled to discover information the other party may use to rebut the *prima facie* case."  *McKesson Information Solutions, LLC v. Epic Systems Corp.*, 242 FRD 689, 692 (N.D. Ga. 2007); *see also Phillies v. Harrison/Erickson, Inc.*, 2020 WL 6482882, at *2 (S.D.N.Y. Nov. 4, 2020); *Monster Energy Co. v. Vital Pharm., Inc.*, 2020 WL 6653583 (C.D. Cal., Jan. 2, 2020); *Amgen Inc. v. Sandoz Inc.*, 2017 WL 1352052, **1-2 (N.D. Cal. Apr. 13, 2017); *SPH America, LLC v. Research In Motion Ltd*, 2016 WL 6305414, * (S.D. Cal. Aug. 16, 2016); *Jackson v. Equifax Inf. Servs. LLC*, 2014 WL 12862681, at *3 (N.D. Ga. Sept. 26, 2014); *GEICO v. Prushanksy*, 2013 WL 12077495, at *3 (S.D. Fla. Jan. 4, 2013); *Linde v. Arab Bank PLC*, 2012 WL 957970, at *2 (E.D.N.Y. Mar. 21, 2012); *Moses v. Halstead*, 236 F.R.D. 667, 674 (D. Kan. 2006).  More specifically, contention interrogatories may be used to discover the factual bases of a party's denial of an allegation in a pleading.  *GEICO v. Prushanksy*, 2013 WL 12077495, at *3 (S.D. Fla. Jan. 4, 2013); *Am. Gen. Life Ins. Co. v. Billard*, 2011 WL 13136619, at *3 (N.D. Iowa May 2, 2011); *Barkley v. Life Ins. Co. of N. Am.*, 2008 WL 450138, at *1 (N.D. Tex. Feb. 19,

2008); *Fridkin v. Minn. Mut. Life Ins. Co., Inc.*, 1998 WL 42322, at *5 (D. Minn. Jan. 29, 1998); *Schaap v. Exec. Indus., Inc.*, 130 F.R.D. 384, 387-88 (N.D. Ill. 1990).

Finally, UHG objects that the interrogatory improperly seeks expert opinion. This objection fundamentally misunderstands the information the United States is seeking. The interrogatory requests only information regarding the underlying facts—i.e., any related medical records and medical record reviews—that underlie UHG's contention that it has no obligation to delete the alleged diagnosis codes at issue. The United States does not seek information regarding any expert opinion about those facts. UHG's refusal to respond is unfounded. *See Amgen Inc. v. Sandoz Inc.*, 2017 WL 1352052, **1-2 (N.D. Cal. Apr. 13, 2017) (holding that interrogatories "are not improper to the extent they seek only facts, not how an expert would construe those facts"); *D&D Techs. (USA), Inc. v. Safetech Hardware Inc.*, 2013 WL 12142955, at *2 (C.D. Cal. Nov. 8, 2013) (ordering responding party to supplement responses to interrogatories that sought "the legal and factual bases for [d]efendant's contentions . . . ."); *Bayer Healthcare Pharm., Inc. v. River's Edge Pharm., LLC*, 2015 WL 11142425, at *7 (N.D. Ga. July 31, 2015), *report and recommendation adopted*, 2015 WL 11142428 (N.D. Ga. Sept. 22, 2015) (The "[i]nterrogatory ... did not ask for the expert's opinion or a conclusion of law, which, of course, would have been rightfully objectionable. Rather, the interrogatory asked which facts and legal theories Plaintiffs intend to rely on. The fact that an expert would ultimately put the facts together to support the legal theory in an opinion is of no consequence as to whether a responding party must timely supplement such an interrogato[r]y.").

Regards,

**Gregory A. Mason**
United States Department of Justice
Civil Division, Commercial Litigation Branch, Fraud Section
(202) 514-9472

---

**From:** Morgan.Maddoux@lw.com <Morgan.Maddoux@lw.com>
**Sent:** Wednesday, December 09, 2020 7:37 PM
**To:** Mason, Gregory A. (CIV) <grmason@CIV.USDOJ.GOV>; ABID.QURESHI@LW.com; Daniel.Meron@lw.com; David.Rowe@lw.com; David.Schindler@lw.com; Kirstin.SchefflerDo@lw.com; Wistar.Wilson@lw.com
**Cc:** Crooke, Edward (CIV) <ECrooke@civ.usdoj.gov>; Glover, Martha N. (CIV) <maglover@CIV.USDOJ.GOV>; Hinson, Zoila E. (CIV) <zhinson@CIV.USDOJ.GOV>; Krieg, Jessica E. (CIV) <jkrieg@CIV.USDOJ.GOV>; Lee, John (USACAC) <JLee1@usa.doj.gov>; Likoff, Amy L. (CIV) <alikoff@CIV.USDOJ.GOV>; McAuliffe, Robert (CIV) <rmcaulif@CIV.USDOJ.GOV>; McMahon, Linda M (CIV) <lmcmahon@CIV.USDOJ.GOV>; Ross, Jack (USACAC) 4 <jross4@usa.doj.gov>; Zupac, Wendy Z. (CIV) <wzupac@CIV.USDOJ.GOV>; Sweeney, Jessica L. (CIV) <jesweene@CIV.USDOJ.GOV>; UHG-RelatorsCounsel@Lists.SusmanGodfrey.com
**Subject:** RE: US ex rel. Poehling v. UHG -- US Fourth Set of Interrogatories and Eighth Set of RFPs

Greg,

While UnitedHealth is amenable to a meet and confer regarding its Responses and Objections to the United States' Eighth Set of Requests for Production and Fourth Set of Interrogatories ("Responses"), UnitedHealth believes the government's request for a meet and confer on this issue is premature. UnitedHealth does not agree with the government's characterization of its Responses as "deficient" and believes that its Responses clearly state its objections. As is the parties' customary practice in this litigation, UnitedHealth requests that, prior to scheduling a meet and confer, the government detail in writing why it believes UnitedHealth's Responses are "deficient," including identifying case law the government believes supports its position. This will help ensure a productive and efficient meet and confer. Once the government provides this information, UnitedHealth is happy to schedule a meet and confer with the government to discuss this issue.

Thank you,
Morgan

**Morgan L. Maddoux**
Pronouns: she/her/hers

**LATHAM & WATKINS LLP**
555 Eleventh Street, NW | Suite 1000 | Washington, D.C. 20004-1304
D: +1.202.637.3318

---

**From:** Mason, Gregory A. (CIV) <Gregory.A.Mason@usdoj.gov>
**Sent:** Tuesday, December 8, 2020 5:50 PM
**To:** Maddoux, Morgan (DC) <Morgan.Maddoux@lw.com>; Qureshi, Abid (DC) <ABID.QURESHI@LW.com>; Meron, Daniel (DC) <Daniel.Meron@lw.com>; Rowe, David W. (BN) <David.Rowe@lw.com>; Schindler, David (LA) <David.Schindler@lw.com>; Do, Kirstin Scheffler (CH) <Kirstin.SchefflerDo@lw.com>; Wilson, Wistar (Bay Area) <Wistar.Wilson@lw.com>
**Cc:** Crooke, Edward (CIV) <Edward.Crooke@usdoj.gov>; Glover, Martha N. (CIV) <Martha.N.Glover@usdoj.gov>; Hinson, Zoila E. (CIV) <Zoila.E.Hinson@usdoj.gov>; Krieg, Jessica E. (CIV) <Jessica.E.Krieg@usdoj.gov>; Lee, John (USACAC) <John.Lee2@usdoj.gov>; Likoff, Amy L. (CIV) <Amy.L.Likoff@usdoj.gov>; McAuliffe, Robert (CIV) <Robert.McAuliffe@usdoj.gov>; McMahon, Linda M (CIV) <Linda.McMahon2@usdoj.gov>; Ross, Jack (USACAC) 4 <Jack.Ross@usdoj.gov>; Zupac, Wendy Z. (CIV) <Wendy.Z.Zupac@usdoj.gov>; Sweeney, Jessica L. (CIV) <Jessica.L.Sweeney2@usdoj.gov>; UHG-RelatorsCounsel@Lists.SusmanGodfrey.com
**Subject:** RE: US ex rel. Poehling v. UHG -- US Fourth Set of Interrogatories and Eighth Set of RFPs

Counsel,

Minor correction to the below, the times we are offering are:

Wednesday 12/9: 1230-2 or **4:30**-6 ET
Thursday 12/10: 4-6 ET
Friday 12/10: 12-5 ET

**Gregory A. Mason**
United States Department of Justice
Civil Division, Commercial Litigation Branch, Fraud Section

(202) 514-9472

---

**From:** Mason, Gregory A. (CIV)
**Sent:** Tuesday, December 08, 2020 5:14 PM
**To:** Morgan.Maddoux@lw.com; ABID.QURESHI@LW.com; Daniel.Meron@lw.com; David.Rowe@lw.com; David.Schindler@lw.com; Kirstin.SchefflerDo@lw.com; Wistar.Wilson@lw.com
**Cc:** Crooke, Edward (CIV) <ECrooke@civ.usdoj.gov>; Glover, Martha N. (CIV) <maglover@CIV.USDOJ.GOV>; Hinson, Zoila E. (CIV) <zhinson@CIV.USDOJ.GOV>; Krieg, Jessica E. (CIV) <jkrieg@CIV.USDOJ.GOV>; Lee, John (USACAC) <JLee1@usa.doj.gov>; Likoff, Amy L. (CIV) <alikoff@CIV.USDOJ.GOV>; McAuliffe, Robert (CIV) <rmcaulif@CIV.USDOJ.GOV>; McMahon, Linda M (CIV) <lmcmahon@CIV.USDOJ.GOV>; Ross, Jack (USACAC) 4 <jross4@usa.doj.gov>; Zupac, Wendy Z. (CIV) <wzupac@CIV.USDOJ.GOV>; Sweeney, Jessica L. (CIV) <jesweene@CIV.USDOJ.GOV>; UHG-RelatorsCounsel@Lists.SusmanGodfrey.com
**Subject:** RE: US ex rel. Poehling v. UHG -- US Fourth Set of Interrogatories and Eighth Set of RFPs

Counsel,

Please let us know your availability during the following times to meet and confer regarding UHG's deficient responses to the United States' Eighth Set of Requests for Production and Fourth Set of Interrogatories.

Wednesday 12/9: 1230-2 or 4-6 ET
Thursday 12/10: 4-6 ET
Friday 12/10: 12-5 ET

Regards,
Greg

**Gregory A. Mason**
United States Department of Justice
Civil Division, Commercial Litigation Branch, Fraud Section
(202) 514-9472

---

**From:** Morgan.Maddoux@lw.com <Morgan.Maddoux@lw.com>
**Sent:** Friday, December 04, 2020 6:57 PM
**To:** Mason, Gregory A. (CIV) <grmason@CIV.USDOJ.GOV>; ABID.QURESHI@LW.com; Daniel.Meron@lw.com; David.Rowe@lw.com; David.Schindler@lw.com; Kirstin.SchefflerDo@lw.com; Wistar.Wilson@lw.com
**Cc:** Crooke, Edward (CIV) <ECrooke@civ.usdoj.gov>; Glover, Martha N. (CIV) <maglover@CIV.USDOJ.GOV>; Hinson, Zoila E. (CIV) <zhinson@CIV.USDOJ.GOV>; Krieg, Jessica E. (CIV) <jkrieg@CIV.USDOJ.GOV>; Lee, John (USACAC) <JLee1@usa.doj.gov>; Likoff, Amy L. (CIV) <alikoff@CIV.USDOJ.GOV>; McAuliffe, Robert (CIV) <rmcaulif@CIV.USDOJ.GOV>; McMahon, Linda M

(CIV) <lmcmahon@CIV.USDOJ.GOV>; Ross, Jack (USACAC) 4 <jross4@usa.doj.gov>; Zupac, Wendy Z. (CIV) <wzupac@CIV.USDOJ.GOV>; Sweeney, Jessica L. (CIV) <jesweene@CIV.USDOJ.GOV>; UHG-RelatorsCounsel@Lists.SusmanGodfrey.com

**Subject:** RE: US ex rel. Poehling v. UHG -- US Fourth Set of Interrogatories and Eighth Set of RFPs

Counsel,

Please see attached UnitedHealth's Responses and Objections to the United States' Eighth Set of Requests for Production and Fourth Set of Interrogatories.

Thank you,
Morgan


**Morgan L. Maddoux**
Pronouns: she/her/hers

**LATHAM & WATKINS** LLP
555 Eleventh Street, NW | Suite 1000 | Washington, D.C. 20004-1304
D: +1.202.637.3318

---

**From:** Mason, Gregory A. (CIV) <Gregory.A.Mason@usdoj.gov>
**Sent:** Wednesday, November 4, 2020 5:21 PM
**To:** Maddoux, Morgan (DC) <Morgan.Maddoux@lw.com>; Qureshi, Abid (DC) <ABID.QURESHI@LW.com>; Robinson, Anne (DC) <Anne.Robinson@lw.com>; Meron, Daniel (DC) <Daniel.Meron@lw.com>; Rowe, David W. (BN) <David.Rowe@lw.com>; Tolley, David C. (BN) <David.Tolley@lw.com>; Schindler, David (LA) <David.Schindler@lw.com>; Do, Kirstin Scheffler (CH) <Kirstin.SchefflerDo@lw.com>; Wilson, Wistar (Bay Area) <Wistar.Wilson@lw.com>; Koppel, Samantha (SF) <Samantha.Koppel@lw.com>
**Cc:** Crooke, Edward (CIV) <Edward.Crooke@usdoj.gov>; Glover, Martha N. (CIV) <Martha.N.Glover@usdoj.gov>; Hinson, Zoila E. (CIV) <Zoila.E.Hinson@usdoj.gov>; Krieg, Jessica E. (CIV) <Jessica.E.Krieg@usdoj.gov>; Lee, John (USACAC) <John.Lee2@usdoj.gov>; Likoff, Amy L. (CIV) <Amy.L.Likoff@usdoj.gov>; Mason, Gregory A. (CIV) <Gregory.A.Mason@usdoj.gov>; McAuliffe, Robert (CIV) <Robert.McAuliffe@usdoj.gov>; McMahon, Linda M (CIV) <Linda.McMahon2@usdoj.gov>; Ross, Jack (USACAC) 4 <Jack.Ross@usdoj.gov>; Zupac, Wendy Z. (CIV) <Wendy.Z.Zupac@usdoj.gov>; Sweeney, Jessica L. (CIV) <Jessica.L.Sweeney2@usdoj.gov>; UHG-RelatorsCounsel@Lists.SusmanGodfrey.com
**Subject:** US ex rel. Poehling v. UHG -- US Fourth Set of Interrogatories and Eighth Set of RFPs

Counsel,

Please see the attached discovery requests from the United States.

Regards,

**Gregory A. Mason**
United States Department of Justice

Civil Division, Commercial Litigation Branch, Fraud Section
(202) 514-9472

*Mailing Address:*
P.O. Box 261
Ben Franklin Station
Washington, DC 20044

*Delivery Address:*
3CON
175 N Street NE, #10-224
Washington, DC 20002

_____

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient.  Any review, disclosure, reliance or distribution by others or forwarding without express permission is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies including any attachments.

Latham & Watkins LLP or any of its affiliates may monitor electronic communications sent or received by our networks in order to protect our business and verify compliance with our policies and relevant legal requirements. Any personal information contained or referred to within this electronic communication will be processed in accordance with the firm's privacy notices and Global Privacy Standards available at www.lw.com.

# EXHIBIT W



**Centers for Medicare & Medicaid Services**

**U.S. Department of Health and Human Services**

**Center for Consumer Information and Insurance Oversight**

# 2018 Benefit Year Protocols

# PPACA HHS Risk Adjustment Data Validation

**Version 7.0**

**June 24, 2019**

# Table of Contents

Table of Contents ......................................................................................................................... 2

Preface ...................................................................................................................................... 5

1. Overview ............................................................................................................................... 7

    1.1      Purpose ............................................................................................................. 7

    1.2      Regulatory Requirements ................................................................................. 8

    1.3      External Data Gathering Environment .............................................................. 8

    1.4      Record Retention Policy .................................................................................... 9

    1.5      Securing Protected Health Information .............................................................. 9

    1.6      HHS-RADV Participation ................................................................................... 9

2. Noncompliance Activities and Penalties ............................................................................. 13

    2.1      Noncompliance Activities ................................................................................ 13

    2.2      Noncompliance Penalties ................................................................................ 14

3. Process Timeline ................................................................................................................ 17

    3.1      Introduction ..................................................................................................... 17

    3.2      Definitions ....................................................................................................... 17

4. Roles and Responsibilities ................................................................................................. 19

    4.1      CMS Roles and Responsibilities .................................................................... 19

    4.2      Issuer Roles and Responsibilities .................................................................. 19

    4.3      Initial Validation Audit (IVA) Entities – Roles and Responsibilities ................ 20

    4.4      Second Validation Audit Entity – Roles and Responsibilities ........................ 22

5. Audit Tool Overview ........................................................................................................... 24

    5.1      Purpose ........................................................................................................... 24

6. IVA Entity Selection ........................................................................................................... 27

    6.1      Purpose ........................................................................................................... 27

    6.2      IVA Entity Selection Participants .................................................................... 27

    6.3      IVA Entity Requirements ................................................................................. 28

    6.4      Timeline of IVA Entity Selection .................................................................... 28

    6.5      Criteria for Assessing IVA Entity Capabilities ............................................... 28

    6.6      Additional Reasons for IVA Entity Exclusion ................................................. 30

    6.7      Required Documentation for IVA Entity Selection by an Issuer ..................... 30

    6.8      Implications of Failure to Engage an IVA Entity ............................................. 32

7. Enrollee Sampling Process ................................................................................................ 34

| 7.1 | Purpose | 34 |
|---|---|---|
| 7.2 | Sample Design | 34 |
| 7.3 | Sample Size | 36 |
| 7.4 | Future Sample Size Refinement | 38 |

**8. Sampling Reports** .................................................................................................... **40**

| 8.1 | Purpose | 40 |
|---|---|---|
| 8.2 | RA Report – RADV Population Summary Statistics (RADVPS) Report | 40 |
| 8.3 | RADV Sampling Reports | 40 |
| 8.4 | Steps to Validate the IVA Sample Generated by CMS | 42 |
| 8.5 | Sampling Report Discrepancy Reporting | 46 |

**9. Audit Procedures and Reporting Requirements** ......................................................... **49**

| 9.1 | Purpose | 49 |
|---|---|---|
| 9.2 | Process Overview and Audit Execution | 49 |
| 9.3 | HHS-RADV Documentation Requirements | 50 |
| 9.4 | Phase 1 – Creating Mapping Documentation (Issuer) | 53 |
| 9.5 | Phase 2 – Review and Confirm Mapping | 56 |
| 9.6 | Phase 3 – D&E Data Validation | 56 |
| 9.7 | Phase 4 – RXC Validation | 60 |
| 9.8 | Phase 5 – Health Status Data Validation | 68 |
| 9.9 | Phase 6 – Record Validation Results | 88 |

**10. IVA Inter-Rater Reliability** ...................................................................................... **91**

| 10.1 | Purpose | 91 |
|---|---|---|
| 10.2 | IRR Submission and Documentation | 91 |
| 10.3 | IRR Process | 91 |
| 10.4 | Sample Population | 93 |

**11. Error Estimation** ..................................................................................................... **95**

| 11.1 | Overview | 95 |
|---|---|---|
| 11.2 | Pairwise Test and IVA Sample Adjustment | 95 |
| 11.3 | Error Estimation | 98 |

**12. Discrepancy Reporting and Administrative Appeals** ............................................... **114**

| 12.1 | Overview | 114 |
|---|---|---|
| 12.2 | Attestations | 114 |
| 12.3 | Discrepancy and Appeals Timeline | 115 |
| 12.4 | Error Rate Adjustments during HHS-RADV Final Results Discrepancy and Administrative | |

Exhibit W
Page 338

**Appeals** .......................................................................................................... **115**

**12.5    Attestation and Discrepancy Reporting Process** ........................... **115**

**12.6    Request for Reconsideration** ............................................................. **117**

**12.7    Request for Informal Hearing to CMS Hearing Officer** ................. **118**

**12.8    Appeal to Administrator** ..................................................................... **118**

**13. Appendices** ............................................................................................. **120**

**Appendix A: 2018 Benefit Year D&E Documentation Examples** .................. **120**

**Appendix B: D&E Subsample Data Elements** .............................................. **125**

**Appendix C: Final Drug Diagnosis (RXC-HCC) Pairs for the 2018 Adult Model** ........... **130**

**Appendix D: ICD-10-CM Official Guidelines for Coding and Reporting** ............ **132**

**Appendix E: Lifelong Permanent Conditions** ............................................. **133**

**Appendix F: Guidance to Coders** ................................................................. **137**

**Appendix G: Examples of Applying HHS-HCC Hierarchies** ...................... **148**

**Appendix H: Error Estimation Example** ...................................................... **149**

**Appendix I: IRR Scenarios** ........................................................................... **161**

**Appendix J: Application of Risk Score Error Rates for Exiting Issuers** ......... **164**

**Appendix K: Updates Log** ............................................................................. **165**

**Appendix L: Glossary of Terms, Acronyms and Definitions** .................... **173**

# Preface

The purpose of the Department of Health and Human Services' Risk Adjustment Data Validation (HHS-RADV) program is to validate the accuracy of data submitted by issuers to their External Data Gathering Environment (EDGE) servers for use in risk adjustment (RA) calculations where HHS is operating RA on a state's behalf.[1] It is important for issuers and their Initial Validation Audit (IVA) Entities to understand the EDGE Server Business Rules (ESBR) and understand the data in the HHS-RADV sampling reports. The following resource documents are available in the Registration for Technical Assistance Portal (REGTAP) Library (https://www.regtap.info/):

- EDGE Server Business Rules (ESBR) Version 12.0 (3/25/19)

- EDGE Server XML and XSD Zip File Contents Job Aid (2/21/19)

- Risk Adjustment and Reinsurance (RARI) - Interface Control Document Addendum Version 05.00.23 (3/1/19)

- Job Aid for Validation of RADVPS Reports (5/23/19)

- Job Aid for Validation of RADVPSF Report (5/23/19)

- Job Aid for Validation of RADVIVAS Reports (5/23/19)

---

[1] For the 2018 benefit year, no state elected to operate its own RA program. Therefore, HHS operates RA in all states and the District of Columbia.

# Section 1

# HHS Risk Adjustment Data Validation Protocols

# Overview

Exhibit W
Page 341

# 1. Overview

## 1.1  Purpose

The Risk Adjustment (RA) program is a premium stabilization program established by the Patient Protection and Affordable Care Act (PPACA). The overall goal of RA is to eliminate premium differences among plans based solely on favorable or unfavorable risk selection in the individual and Small Group Markets, both inside and outside of the Exchange(s). RA accomplishes this by transferring funds from issuers with lower risk enrollees to issuers with higher risk enrollees.

To ensure the integrity of the RA program and to validate the accuracy of data submitted by issuers to the EDGE servers for use in RA calculations, the Centers for Medicare & Medicaid Services (CMS) will perform HHS-RADV for each benefit year on behalf of any state that chooses not to implement its own state-operated RA program. HHS-RADV also ensures that issuers' actual actuarial risk is reflected in transfers and that the HHS-operated risk adjustment program assesses charges to issuers with plans with lower-than-average actuarial risk while making payments to issuer with plans with higher-than-average actuarial risk.

HHS-RADV is a six (6) step process:

1. CMS selects a sample of an issuer's enrollee records for audit.

2. Each issuer selects an IVA Entity to validate the demographic and enrollment (D&E) data, Prescription Drug Categories (RXCs) data, and health status data submitted on the issuer's EDGE server for the selected sample enrollees.

3. A Second Validation Audit (SVA) is performed on a subsample of IVA Entity submission data to verify the accuracy of the IVA findings.

4. CMS performs Error Estimation and calculates issuer risk score error rates using the failure rate for each HCC across all issuers' IVA samples (or SVA samples, as applicable).

5. CMS administers the SVA Findings Attestation and Discrepancy Reporting Process, the Error Rate Attestation and Discrepancy Reporting Process, and an Administrative Appeals Process.

6. Final results are used to adjust RA risk scores and the transfers.

The six (6) step process of HHS-RADV is discussed in the following sections.

This document defines Protocols and guidance for the HHS-RADV process, outlines participant roles and responsibilities, and defines activity timelines. Issuers, IVA and SVA Entities are required to be familiar with, and adhere to, all statutes, regulations and guidance governing the HHS-RADV process, including these Protocols.

CMS will also offer guidance and information through HHS-RADV webinars and published materials. To view HHS-RADV webinars and other guidance information, issuers and IVA Entities are encouraged to sign up for access to the REGTAP Library at: https://www.regtap.info/reg_library.php.

CMS will communicate all updates and amendments to these Protocols as they become available. Issuers and IVA Entities with inquiries related to the HHS-RADV program can email CMS at: CCIIOACARADataValidation@cms.hhs.gov. This e-mail address will be utilized for all HHS-RADV communications regarding HHS-RADV policies and operations (excluding charges and payments). Users who submit inquiries to this email address will receive an auto-generated confirmation message upon submission with an assigned case number.

This guidance is effective as of the publication date and is specific to 2018 benefit year HHS-RADV.

## 1.2  Regulatory Requirements

The Secretary of HHS has designated CMS to implement the HHS-RADV program in accordance with regulations at 45 C.F.R. §§ 153.350 and 153.630, as well as the following final rules:

- S*tandards Related to Reinsurance, Risk Corridors, and Risk Adjustment Final Rule, 77 FR 17220 (March 23, 2012);*

- *HHS Notice of Benefit and Payment Parameters for 2014 Final Rule, 78 FR 15410 (March 11, 2013);*

- *HHS PPACA Program Integrity: Exchange, Premium Stabilization Programs, and Market Standards; Amendments to the HHS Notice of Benefit and Payment Parameters for 2014 Part II, Final Rule, 78 FR 65046 (October 30, 2013);*

- *HHS Notice of Benefit and Payment Parameters for 2015 Final Rule (2015 Payment Notice), 79 FR 13744 (March 11, 2014);*

- *HHS Notice of Benefit and Payment Parameters for 2016 Final Rule, 80 FR 10749 (Feb. 27, 2015);*

- *HHS Notice of Benefit and Payment Parameters for 2017 Final Rule, 81 FR 12203 (March 8, 2016);*

- *HHS Notice of Benefit and Payment Parameters for 2018 Final Rule, 81 FR 94056 (Dec. 22, 2016);*

- *HHS Notice of Benefit and Payment Parameters for 2019 Final Rule (2019 Payment Notice), 83 FR 16930 (April 17, 2018); and*

- *HHS Notice of Benefit and Payment Parameters for 2020 Final Rule (2020 Payment Notice), 84 FR 17454 (April 25, 2019).*

To ensure compliance with all regulatory requirements, issuers should be familiar with the regulations found in 45 C.F.R. Part 153 Subparts A, D, G and H.

The regulations governing the process by which an issuer may appeal the findings of the SVA or risk score error rate calculation, can be found at 45 C.F.R. § 156.1220.[2]

## 1.3  External Data Gathering Environment

It is important for issuers and their IVA Entities to understand the ESBR and to understand the data in the HHS-RADV sampling reports. The following resource documents are available in the REGTAP Library (https://www.regtap.info/reg_library.php):

- EDGE Server Business Rules (ESBR) Version 12.0 (3/25/19)

- EDGE Server XML and XSD Zip File Contents Job Aid (2/21/19)

- Risk Adjustment and Reinsurance (RARI) - Interface Control Document Addendum Version 05.00.23 (3/1/19)

- Job Aid for Validation of RADVPS Reports (5/23/19)

- Job Aid for Validation of RADVPSF Report (5/23/19)

- Job Aid for Validation of RADVIVAS Reports (5/23/19)

---

[2] Issuers cannot appeal the results of the IVA as the IVA entity is under contract with the issuer and HHS does not produce the IVA results. See 81 FR 94056 at 94106.

## 1.4   Record Retention Policy

An issuer that offers RA covered plans must maintain documents and records, whether paper, electronic, or in other media, sufficient to enable the evaluation of the issuer's compliance with applicable RA standards (which includes HHS-RADV) for each benefit year for at least ten (10) years, and must make those documents and records available upon request to HHS, the Office of Inspector General (OIG), the Comptroller General, or their designees for purposes of verification, investigation, audit, or other review [See 45 C.F.R. § 153.620(b)].

# 1.5   Securing Protected Health Information

The Health Insurance Portability and Accountability Act (HIPAA) Security Rule requires covered entities and their business associates to implement appropriate administrative, technical, and physical safeguards to protect the confidentiality, integrity, and availability of electronic protected health information (PHI). The HIPAA Privacy Rule requires appropriate safeguards to protect the privacy of medical records and other PHI and limits the permissible uses and disclosures of PHI without patient authorization. The HIPAA Privacy and Security rules, which are found in 45 C.F.R. parts 160 and 164, apply to issuers and certain service providers of issuers, including IVA Entities, to the extent they qualify as covered entities or business associates under HIPAA. The Privacy Act of 1974 governs the collection, maintenance, and use by agencies of the federal government of certain information about individuals that is personally identifiable information (PII). The requirements of the Privacy Act extend to certain governmental contractors through contractual provisions, including the SVA Entity.

CMS will delete any and all PHI or PII information that is transmitted directly to CMS by issuers, IVA Entities, or providers outside of the secure IVA submission process within the HHS-RADV Audit Tool, including any PHI or PII communicated via email or regarding sampling reports.

# 1.6   HHS-RADV Participation

An RA covered plan is defined as any health insurance coverage offered in the individual or Small Group Markets, both inside and outside the Exchanges, with the exception of:

- Grandfathered health plans,

- Excepted benefit health insurance coverage described in 45 C.F.R. § 146.145(b)[3] and § 148.220, and

- Any plan determined not to be a RA covered plan under the applicable federally certified RA methodology.

Issuers of RA covered plans, as defined in 45 C.F.R. § 153.20, must submit all required RA data in accordance with procedures as outlined in this document.

## 1.6.1 Exemption from HHS-RADV

Issuers that do not meet one of the exemptions set forth below are required to comply with the 2018 benefit year HHS-RADV requirements.

Starting with 2018 benefit year HHS-RADV, CMS created a new HHS-RADV Issuer Exemption and DDVC Web Form which must be completed by all issuers meeting one of the exemptions set forth below or who wish to request a default data validation charge (DDVC). CMS will identify issuers meeting certain exemptions and will communicate that exemption status to issuers for the benefit year. Issuers are required to review the CMS-identified exemption reason(s) and confirm exemption from participation in the 2018 benefit year HHS-RADV audit for the specified Health Insurance Oversight System Identification (HIOS ID)(s) within the HHS-RADV Issuer Exemption

---

[3] The 2020 Payment Notice updated this citation (from § 146.145(c)) in the definition of RA covered plan under 45 C.F.R. § 153.20. The amendment is effective June 24, 2019. See 80 FR 17454.

and DDVC Web Form. CMS will provide directions and the web form location to issuers following the determination of exemption status at the start of each HHS-RADV cycle (in May, around the receipt of IVA samples). Issuers can also request an exemption based on liquidation status or request a DDVC through this web form.

An issuer of a RA covered plan will be exempted from HHS-RADV requirements set forth in 45 C.F.R. § 153.630(b) for a given benefit year if the issuer has 500 or fewer billable member months of enrollment in the individual, small group and merged markets (as applicable) for the applicable benefit year, calculated on a statewide basis. These issuers **are not** subject to annual random (and targeted) sampling. The determination of whether an issuer has 500 or fewer billable member months statewide is calculated by combining the issuer's enrollment in all risk pools in a state in a benefit year. (See 45 C.F.R. § 153.630(g)(1)[4]).

An issuer of a RA covered plan will be exempted from the HHS-RADV requirements set forth in 45 C.F.R. § 153.630(b) for a given benefit year if the issuer is at or below the materiality threshold as defined by HHS and is not selected by HHS to participate in HHS-RADV in an applicable benefit year under random and targeted sampling conducted approximately every 3 years (barring any risk-based triggers based on experience that will warrant more frequent audits). Until otherwise amended through rulemaking, HHS defined the materiality threshold as total annual premiums at or below $15 million, based on the premiums of benefit year being validated, calculated on a statewide basis. The determination of whether an issuer has $15 million or fewer in total annual statewide premiums is calculated by combining the issuer's total premiums in all applicable risk pools (individual, small group or merged markets) in a state in a benefit year. (See 45 C.F.R. § 153.630(g)(2)[5]).

An issuer of a RA covered plan will be exempted from the HHS-RADV requirements set forth in 45 C.F.R. § 153.630(b) for a given benefit year if the issuer is in liquidation, or will enter liquidation no later than April 30th of the benefit year that is 2 benefit years after the benefit year being audited, provided that the issuer provides to HHS an attestation to that effect that is signed by an individual with the authority to legally and financially bind the issuer. This exemption will not apply to an issuer that was a positive error rate outlier under the Error Estimation methodology in HHS-RADV for the prior benefit year of HHS-RADV. For purposes of this exemption, "liquidation" means that a state court has issued an order of liquidation for the issuer that fixes the rights and liabilities of the issuer and its creditors, policyholders, shareholders, members, and all other persons of interest. Therefore, to qualify for this exemption for the 2018 benefit year, the issuer must enter liquidation by April 30, 2020 and must not have been a positive error rate outlier in 2017 benefit year HHS-RADV. (See 45 C.F.R. § 153.630(g)(3)[6]).

An issuer receiving a default risk adjustment charge (RADC) pursuant to 45 C.F.R. § 153.740(b) as a result of insufficient EDGE data is exempt for the applicable benefit year from the requirements of HHS-RADV in the state market risk pools for which the issuer is receiving a RADC.

A sole issuer in a state market risk pool in a benefit year is not required to conduct HHS-RADV for that state market risk pool because there are no RA transfers; however, if the sole issuer participates in multiple risk pools in the state during that benefit year where it is not the sole issuer, it would be subject to HHS-RADV for those risk pools where RA transfers are occurring with other issuers.

Lastly, as finalized in the 2020 Payment Notice[7], a small group market issuer with off-calendar year coverage who exits the market in a state but has only carry-over coverage that ends in the next benefit year (that is, carry-over of run-out claims for individuals enrolled in the previous benefit year, with no new coverage being offered or sold) would be considered an exiting issuer and would also be exempt from HHS-RADV for the benefit year with the carry-over coverage. That is, small

---

[4] This regulation is effective June 24, 2019. See the 2020 Payment Notice, 84 FR 17454.
[5] Ibid.
[6] Ibid.
[7] See 84 FR at 17503.

group only issuers with off-calendar coverage years beginning in the 2017 benefit year with no new coverage being offered in the 2018 benefit year would not be subject to 2018 benefit year HHS-RADV requirements. Individual market issuers offering or selling any new individual market coverage in the subsequent benefit year would be subject to HHS-RADV, unless another exemption applied.

An issuer who qualifies for one (1) of the above exemptions, receives a RADC, is the sole issuer in a state market risk pool, or is a small group existing issuer with non-calendar year coverage is not subject to enforcement action for noncompliance with HHS-RADV requirements, nor will the issuer be assessed a DDVC under 45 C.F.R. §153.630(b)(10) for the applicable benefit year.

# Section 2

# HHS Risk Adjustment Data Validation Protocols

# Noncompliance Activities and Penalties

Exhibit W
Page 347

# 2. Noncompliance Activities and Penalties

## 2.1 Noncompliance Activities

Consistent with 45 C.F.R. § 153.630(a), issuers of RA covered plans in states where HHS operates RA must comply with HHS-RADV requirements. Issuers, IVA Entities, and the SVA Entity are required to conform to the criteria set forth in the applicable regulations and HHS-RADV operational guidance. The failure of an issuer to adhere to these criteria may result in enforcement actions related to noncompliance with HHS-RADV requirements. CMS will provide oversight over the HHS-RADV process and may take enforcement actions in cases where issuers and/or their IVA Entity are not following these requirements.

Examples of instances that may result in enforcement actions due to noncompliance with HHS-RADV requirements include:

- Issuer Did Not Register for the Audit Tool – (Section 2.1.1); 45 C.F.R. § 153.630(a)
- Issuer Did Not Engage an IVA Entity or the Designated IVA Entity is Not Capable of Performing the Audit – (Section 2.1.2); 45 C.F.R. § 153.630(b)(2)
- IVA Entity Not Free of Conflict of Interest, or Not in Good Standing – (Section 2.1.3); 45 C.F.R. § 153.630(b)(3) and (5)
- Incomplete Audit Results Submissions – (Section 2.1.4); 45 C.F.R. § 153.630(f)
- Supporting Documentation Not Provided to IVA Entity or SVA Entity – (Section 2.1.5); 45 C.F.R. § 153.630(b)(6)
- Suspected Fraud in Submitted Data, and Follow-Up Actions – (Section 2.1.6); 45 C.F.R. § 156.630(b)(4)

### 2.1.1 Issuer Did Not Register for the Audit Tool

Issuers are required to register in the Audit Tool to perform HHS-RADV required activities. If an issuer does not register, the issuer is non-compliant with HHS-RADV. For additional Audit Tool guidance, refer to Section 5 (Audit Tool Overview).

### 2.1.2 Issuer Did Not Engage an IVA Entity or the Designated IVA Entity is Not Capable of Performing the Audit

According to 45 C.F.R. § 153.630(b)(2), the issuer must ensure that the IVA Entity is reasonably capable of performing an IVA audit according to the standards established by HHS for such audit, and must ensure that the audit is so performed. The issuer is required to engage and designate an IVA Entity to perform the IVA for each HIOS ID for which it offers RA covered plans (barring any applicable exemptions). If an issuer does not engage and designate an IVA Entity, the issuer will be unable to perform the IVA as required by HHS-RADV.

### 2.1.3 IVA Entity Not Free of Conflict of Interest, or Not in Good Standing

As described in 45 C.F.R. § 153.630(b)(3), the issuer must ensure that each IVA Entity is reasonably free of conflicts of interest (COI), such that it is able to conduct the IVA in an impartial manner and its impartiality is not reasonably open to question. Consistent with 45 C.F.R. § 153.630(b)(5), an IVA must be conducted by medical coders certified as such and in good standing by a nationally recognized accrediting agency.

Issuers are responsible for performing due diligence to determine the status of an IVA Entity during the selection process. During this process, issuers are to make every reasonable effort to determine if an IVA Entity has any existing legal issue that has either resulted in the IVA Entity being placed on the OIG exclusion list, HHS exclusion list, or a state exclusion list. Before engaging an IVA Entity, the issuer is expected to verify and document that any key

individuals involved in supervising or performing the IVA have not been excluded from working with either the Medicare or Medicaid program. Issuers must also confirm that the IVA Entity is reasonably free of any COI. CMS may elect to review the IVA Entity's qualifications and confirm that there are no COI. This could include using external sources to assess potential COI and confirm that the IVA Entity has the knowledge, skills, and abilities to conduct a high-quality IVA.

> **Note:** CMS does not comment on COI or determine permissibility of IVA Entity selection outside of the parameters stated within this document. Please refer to Section 6.5 (Criteria for Assessing IVA Entity Capabilities) for additional guidance.

## 2.1.4 Incomplete Audit Results Submission

Consistent with 45 C.F.R. § 153.630(f)(1), the issuer must ensure that the IVA and SVA source documentation are submitted to HHS in a manner and timeframe specified by HHS.

Issuers are required to confirm the completion and submission of their IVA results in the Audit Tool through completion of all required fields and confirmation that all required supporting documentation has been submitted. If an issuer does not confirm submission of their IVA results, the SVA Entity will be unable to perform the SVA, and CMS will reject the IVA submission as incomplete.

## 2.1.5 Supporting Documentation Not Provided to IVA Entity or SVA Entity

According to 45 C.F.R § 153.630(b)(6), the issuer must provide the IVA Entity and SVA Entity with all relevant source enrollment documentation, all applicable Non-EDGE Claim (NEC) and encounter data, and medical record documentation from providers of services to each enrollee in the applicable sample.

Issuers are required to provide their IVA Entity and SVA Entity with the appropriate enrollee demographic, enrollment, applicable NEC, pharmacy and medical claims, and medical record documentation as needed to validate RXCs and HCCs. The IVA Entity should submit this documentation to the SVA Entity through the Audit Tool in a timely manner to support the issuer's compliance with HHS-RADV requirements.

## 2.1.6 Suspected Fraud in Submitted Data, and Follow-Up Actions

Under 45 C.F.R. § 153.630(b)(4), the issuer must ensure validation of the accuracy of RA data for a sample of enrollees selected by CMS.

Issuers must follow the HHS-RADV requirements and refrain from any fraudulent activities when they submit supporting data and source documentation to the IVA Entity and the SVA Entity. If the issuer engages in suspected fraud in regard to the HHS-RADV process, the results from the IVA Entity and the SVA Entity will be inaccurate. If CMS suspects potential fraud, it will refer issuers to the appropriate federal fraud enforcement entity and state agencies.

# 2.2   Noncompliance Penalties

CMS may take enforcement action, including the imposition of civil money penalties (CMPs), in the event of noncompliance by an issuer of a RA covered plan or the issuer's IVA Entity. Section 2.2.1 (Civil Monetary Penalties) and Section 2.2.2 (Default Data Validation Charge) provide information on two (2) penalties that can be imposed for noncompliance with HHS-RADV requirements and standards.

## 2.2.1 Civil Money Penalties

A CMP is a monetary penalty assessed to an issuer in the event of noncompliance. For example, if an issuer does not engage an IVA Entity or submit the results of an IVA to CMS, CMPs may be imposed, as appropriate, under 45 C.F.R. § 153.630(b)(9)(i) or (ii). Additionally, CMPs may be assessed if an issuer engages in misconduct or substantial noncompliance with the HHS-RADV standards and requirements or intentionally or recklessly misrepresents or falsifies information that it furnishes to HHS, under 45 C.F.R. § 153.630(b)(9)(iii) or (iv).

## 2.2.2 Default Data Validation Charge (DDVC)

A DDVC is a charge assessed to an issuer that is noncompliant with certain HHS-RADV requirements. Under 45 C.F.R. § 153.630(b)(10), if an issuer of a RA covered plan fails to engage an IVA Entity, or to submit the results of an IVA to CMS, CMS will impose a DDVC, which is generally calculated in the same manner as the risk adjustment default charge (RADC) but is based on the data of the benefit year being audited.[8] CMS will determine the amount of the DDVC by using the enrollment data from the benefit year for which the issuer fails to engage an IVA Entity or does not submit the results of an IVA.

As stated in the 2020 Payment Notice,[9] CMS will allocate any DDVC collected from noncompliant issuers among the compliant and exempt issuers in the same benefit year risk pool(s) for the applicable benefit year in proportion to their respective market shares and RA transfer amounts for the benefit year being audited for HHS-RADV. CMS will not allocate any DDVC to any other noncompliant issuers in the same benefit year risk pool(s). However, as noted above, issuers in the same benefit year risk pool(s) that are exempt from the HHS-RADV requirement would be eligible to receive an allocation of any DDVC.

> **Note:** 2018 Benefit Year DDVC data will be published in the Summary Report of 2018 Benefit Year Risk Adjustment Data Validation Adjustments to 2019 Benefit Year Risk Adjustment Transfers. The DDVC calculation generally uses the same methodology and benefit year data as the RADC. DDVC calculation details can be found within the 2020 Payment Notice.
>
> The DDVC is separate from the RA transfer amount for the benefit year. Thus, an issuer may owe **both** a **RA charge** and a **DDVC** (for example, an issuer could owe an RA charge for the 2019 benefit year and a DDVC for the 2018 benefit year HHS-RADV). We note that receiving a DDVC for a benefit year of HHS-RADV does not preclude an issuer's subsequent benefit year RA transfers from being affected by other issuers' HHS-RADV results.
>
> Similarly, an issuer may owe a RADC for a given benefit year, alongside a DDVC for the benefit year being audited (for example, an issuer could owe a RADC for the 2019 benefit year, as well as a DDVC for the 2018 benefit year HHS-RADV).

---

[8] As finalized in the 2020 Payment Notice, the DDVC is calculated based on the enrollment in the benefit year being audited rather than the benefit year during which transfers would be adjusted as a result of RADV. See 84 FR at 14796.
[9] See 84 FR at 17496.

# Section 3

# HHS Risk Adjustment Data Validation Protocols

# Process Timeline

Exhibit W
Page 351

# 3. Process Timeline

## 3.1   Introduction

The HHS-RADV timeline for the 2018 benefit year process is posted in the REGTAP library. Note that this timeline is subject to change. Refer to the REGTAP Library (https://www.regtap.info/reg_library.php) for additional information on the timeline of HHS-RADV activities and corresponding deadlines for the applicable benefit year, including any updates.

Package 1 submissions are due January 9, 2020. Package 1 submissions should include the IVA Entity Audit Results Submission XML, RXC data for all sampled enrollees, and all D&E data for enrollees selected by CMS in the D&E Subsample Report. After the Issuer Senior Official (SO) signs off on Package 1 in the Audit Tool, CMS will release the SVA subsample to IVA Entities. Package 1 submission must be successfully completed, including review and sign-off by the Issuer SO, on or before January 9, 2020.

Package 2 submissions must be successfully completed, including review and issuer sign-off, by January 16, 2020. Package 2 submissions should include all medical records and NEC information for enrollees selected in the HHS-RADV SVA subsample. CMS is not requiring Package 2 be submitted immediately after issuer sign-off of Package 1, but strongly encourages IVA Entities to submit Package 2 well before January 16, 2020, to allow time for resolution of any issues that may arise in the submission process.

If CMS requests the submission of Package 3, the IVA Entity and issuer will have seven (7) calendar days to submit the remaining medical records. Note the seven (7) calendar day submission window includes Issuer SO sign-off on the Package 3 submission.

> **Note:** Medical records submitted in both Package 2 and Package 3 must align with the medical records captured in the *IVA Entity Audit Results Submission XML*. Additional medical records not captured on the IVA Entity Audit Results XML are not allowed to be submitted.

## 3.2   Definitions

- Package 1 – refers to the submission of IVA audit findings, which includes workpapers, screenshots, D&E, RXC, and an IVA Entity Audit Results Submission XML.
- Package 2 – refers to the submission of the medical records for enrollees in the SVA subsample for SVA review.
- Package 3 – (as requested by CMS) refers to the submission of all medical records for the remaining enrollees in the IVA Sample that were not submitted during Package 2 submission. Package 3 is requested after executing a pairwise means test when **insufficient agreement** between IVA and SVA findings is determined.  Not all issuers will have a Package 3 submission.

# Section 4

# HHS Risk Adjustment Data Validation Protocols

# Roles and Responsibilities

Exhibit W
Page 353

# 4. Roles and Responsibilities

## 4.1   CMS Roles and Responsibilities

CMS is responsible for the implementation and oversight of HHS-RADV for issuers of RA covered plans in any state that does not implement its own state-operated RA program. CMS develops, implements, and approves actions associated with the EDGE server and Audit Tool in support of HHS-RADV.

CMS monitors and reviews issuer registration, issuer IVA Entity designation, IVA Entity registration, IVA Entity election to participate in HHS-RADV, and notifies the issuer of acceptance or rejection of the designated IVA Entity. See Section 6 (IVA Entity Selection) for detailed guidance on the IVA Entity selection process.

Additionally, CMS is responsible for selecting the SVA Entity and overseeing the completion of the SVA. CMS also evaluates each year's HHS-RADV process and makes updates for future benefit years where applicable.

CMS will also offer guidance and information through HHS-RADV webinars and published materials. CMS monitors and responds to feedback and inquiries related to HHS-RADV submitted through CCIIOACARADataValidation@cms.hhs.gov.

## 4.2   Issuer Roles and Responsibilities

Issuers are insurance companies that are required to be licensed to engage in the business of insurance in a state and are subject to the state's regulatory authority. Issuers are identified by a HIOS ID, which is unique to the issuer and a state. Issuers of RA covered plans in states where HHS operates the RA program are subject to HHS-RADV.

**Issuer's Programmatic Responsibilities**

- Be familiar with, and abide by, regulations regarding HHS-RADV found at 45 C.F.R. Part 153 Subparts A, D, G and H;
- Review and attest to RADV sampling reports, or submit a sampling discrepancy in the manner and timeframe established by CMS;
- Engage an independent auditor (IVA Entity) that is reasonably capable of performing the IVA;
- Attest that the selected IVA Entity is reasonably free of conflicts of interest and able to conduct the IVA in an impartial manner;
- Provide the IVA Entity access to applicable systems, processes, and source documentation for enrollment, premiums, claims and/or medical records, and any required attestations for sampled enrollees;
- Ensure the IVA results and requested supporting source documentation are submitted to CMS in the manner and time frame established by CMS;
- Substantiate results of the IVA;
- Complete necessary actions within the Audit Tool by the applicable deadline(s);
- Review and attest to SVA Findings or attest and submit SVA Findings Discrepancies, as applicable in the manner and timeframe established by CMS;
- Review and attest to RADV Final Results, inclusive of the RADV error rate, or attest and submit RADV error rate discrepancies in the manner and timeframe established by CMS; and
- Read and abide by guidance provided in the HHS-RADV Protocols, Interface Control Document (ICD), Job Aids, and all HHS-RADV related published documents.

Issuers are encouraged to sign up at https://www.regtap.info for access to HHS-RADV webinars and other guidance information.

> **Note:** If an issuer of a RA covered plan fails to engage an IVA Entity or fails to submit IVA results within the designated time, CMS will impose a DDVC, may impose CMPs, or take other action (as appropriate). See 45 C.F.R. §§ 153.630(b)(9) and (10), and 153.740(a). Also see Section 2.2.2 (Default Data Validation Charge) for additional detail.

**Audit Tool**

After registering for and obtaining access to the Audit Tool, issuers must designate and maintain an Issuer Senior Official (SO) and Back-up Issuer SO via the Audit Tool. Issuers also have the ability to select an Issuer RADV Coordinator in the Audit Tool. For additional details on designating Issuer SOs, Back-up SOs, RADV Coordinators and performing Audit Tool responsibilities, see the HHS-RADV IVA Submission Issuer User Manual.

Issuers must also complete the following RADV actions in the Audit Tool by the applicable deadline(s):

- Designate the IVA Entity through the IVA Designation Form in the Audit Tool;
- Review and approve the RADV Population Summary Statistics (RADVPS) Report and submit discrepancies to CMS, as necessary, through the RA EDGE discrepancy process;
- Review and approve the RADV Population Summary Statistics Final (RADVPSF) Report and RADV sampling reports (RADV Initial Validation Sample (RADVIVAS), RADV Medical Claim Extract (RADVMCE), RADV Supplemental Extract (RADVSE), RADV Detail Enrollee (RADVDE), and RADV Pharmacy Extract (RADVPCE)), and submit discrepancies to CMS, as necessary, during the RADV Sampling Report discrepancy window; and
- Confer with the IVA Entity regarding IVA findings prior to submission and complete sign-off, including confirmation of submission of IVA results and all required supporting documentation.

It is the issuers' and IVA Entities' responsibilities to maintain access to and activity in the Audit Tool during the benefit year.

# 4.3   Initial Validation Audit (IVA) Entities – Roles and Responsibilities

An IVA Entity is an independent organization contracted by an issuer to perform a validation audit of D&E data, RXC data, and health status information derived from the diagnoses data submitted to the Issuer's EDGE server for use in RA calculations. Enrollee health status is validated through review of all relevant medical record documentation for sampled enrollees.

Any IVA Entity electing to participate in the HHS-RADV process must complete the HHS-RADV IVA Entity Election Web Form and be registered for the applicable benefit year with CMS in order to be listed as an available IVA Entity in the Audit Tool. Detailed information related to IVA Entity Selection is outlined in Section 6 (IVA Entity Selection) of these Protocols.

> **Note:** CMS is not imposing a deadline for completing the HHS-RADV IVA Entity Designation and Maintenance Form. However, the IVA Entity will not have access to the issuer's sample reports until the IVA Entity is designated by the issuer and accepted by CMS. For additional guidance regarding the HHS-RADV IVA Entity Election Web Form, refer to the corresponding HHS-RADV webinar available in the REGTAP Library (https://www.regtap.info/reg_library.php). CMS encourages issuers and IVA Entities to register on REGTAP for HHS-RADV notifications and to periodically check REGTAP for information on deadlines and updates regarding the 2018 benefit year.

The IVA Entity shall perform an independent audit of the issuer's submitted documentation. Once completed, the IVA Entity shall upload the results of the audit, along with any supporting documentation into the Audit Tool. Guidance for submitting the results of the audit and supporting documentation are provided within Section 9 (Audit Procedures and Reporting Requirements) of these Protocols.

## IVA Entity's Programmatic Responsibilities:

- Ensure and certify that there is an absence of a COI between the issuer and IVA Entity;
- Engage with the issuer to facilitate timeliness with findings and submission of the audit results;
- Ensure that the validation audit is performed independent of the issuer;
- Ensure that personnel are be capable of performing an IVA according to applicable requirements, these Protocols and industry coding standards;
- Ensure that its personnel attend all recommended training related to the HHS-RADV specified by CMS, and review all published HHS-RADV documents, including regulations, Protocols, and guidelines;
- Perform assessment of enrollee health status for all enrollees, review of D&E information for enrollees in the D&E subsample, and review of RXC data for adult enrollees;
- Perform medical Inter-rater Reliability (IRR) quality assurance assessments in accordance with the requirements described within these Protocols;
- Register for and obtain access to the Audit Tool; and
- Designate employees who will act as the IVA Entity SO and a backup SO in the Audit Tool.

## IVA Entity Personnel:

The IVA Entity personnel consists of medical coders, D&E/RXC reviewers, an IVA Entity SO, and an IVA Entity Back-up SO.

### Medical Coders:

- The IVA audit must be conducted by medical coders who are certified and in good standing by a nationally recognized accrediting agency (e.g., American Health Information Management Association (AHIMA) or the American Academy of Professional Coders (AAPC)).
- The IVA Entity must ensure that one (1) or more Primary Coders are available to perform health status data validation activities, who are certified and in good standing by a nationally recognized accrediting agency.
- The IVA Entity must ensure that one (1) or more Senior Coders are available to perform medical records review, with at least 5 years of experience, who are certified and in good standing by a nationally recognized accrediting agency.
- The IVA Entity must ensure that a Senior Coder reviews any enrollee RA error discovered during the IVA.

<u>D&E/RXC Reviewers:</u>

- The IVA Entity must ensure that Primary and Senior Reviewers are available to perform D&E and RXC data validation and conduct medical record intake.
- Errors identified by Primary Reviewers must be confirmed by a Senior Reviewer.

<u>IVA Entity SO and IVA Entity Back-up SO:</u>

- The IVA Entity SO is responsible for ensuring that the IVA findings are signed off properly and completely uploaded into the Audit Tool in a timely manner.
- The IVA Entity SO should engage with the issuer prior to the IVA findings submission signoff deadline.
- The IVA Entity SO must sign-off on discrepancy and attestation processes.
- The IVA Entity SO may designate a Back-up SO to assist with performing these responsibilities.

## 4.4   Second Validation Audit Entity – Roles and Responsibilities

CMS will select a subsample of the RA data validated by the IVA for a SVA. The SVA Entity validates the issuer's D&E data, RXC data, and health status information on a subsample of the IVA sampled enrollees for all IVA submissions as directed by CMS. The SVA validation of health status information for the subsamples follows the steps and requirements outlined in these Protocols.

### SVA Entity's Programmatic Responsibilities:

- Validate and approve RADV Sample Reports;
- Conduct the SVA independently and in accordance with these Protocols; and
- Perform IRR assessments between medical coders as part of quality assurance.

### SVA Entity Personnel:

The SVA Entity personnel consists of medical coders, D&E/RXC reviewers, and administrative staff.

<u>Medical Coders:</u>

- The SVA must be conducted by medical coders who are certified and in good standing by a nationally recognized accrediting agency, e.g., AHIMA or AAPC.
- The SVA Entity must ensure that one (1) or more Primary Coders are available to perform health status data validation activities, who are certified and in good standing by a nationally recognized accrediting agency.
- The SVA Entity must ensure that a Senior Coder is available to perform medical records review, with at least 5 years of experience, who is certified and in good standing by a nationally recognized accrediting agency.
- The SVA Entity must ensure that a Senior Coder reviews any enrollee RA error discovered by the Primary Coder.

<u>D&E/RXC Reviewers:</u>

- The SVA Entity must ensure that Primary and Senior Reviewers are available to perform D&E and RXC data validation and conduct medical record intake.
- The errors identified by Primary Reviewers must be confirmed by a Senior Reviewer.

# Section 5

# HHS Risk Adjustment Data Validation Protocols

# Audit Tool Overview

Exhibit W
Page 358

# 5. Audit Tool Overview

## 5.1   Purpose

The HHS-RADV Audit Tool is built on the Salesforce platform in accordance with CMS Technical Reference Architecture and CMS Information Security (IS) Acceptable Risk Safeguards (ARS)[10] to maintain and protect PHI and PII. The Audit Tool is comprised of externally facing web-based forms (or "Visualforce" pages) and a Salesforce Community area accessed with login credentials.

The Visualforce pages will allow IVA Entities to submit initial registration information related to participation, including identifying IVA Entity SOs, as necessary.

The Salesforce Community provides reporting and dashboard capabilities, hosts a library of programmatic information, and provides issuers and IVA Entities with technical assistance. It allows for the processing of stakeholder inquiries from issuers and IVA Entities, disseminates email messages to issuers and IVA Entities, and provides a secure environment through use of multi-factor authentication and adherence to CMS security protocols.

The Audit Tool will display announcements that may be related to RADV program information on the "Featured Content" tab.

**Featured Content Tab in the Audit Tool**



---

[10] CMS' Information Security and Privacy Library can be found at: https://www.cms.gov/Research-Statistics-Data-and-Systems/CMS-Information-Technology/InformationSecurity/Information-Security-Library.html

The Audit Tool contains a Library tab that includes six (6) sections where various HHS-RADV program materials are available. These sections include Announcements, Education, FAQs, Guidance, Protocols, and HHS-RADV-specific webinars. HHS-RADV webinars are also available on REGTAP (https://www.regtap.info/).

**Library Tab in the Audit Tool**

The SVA Entity will perform the SVA within the Audit Tool, including producing error rates to be provided to issuers and CMS.

Specific instructions on the functionality of the Audit Tool are provided in user guides located within the library of the Audit Tool.



# Section 6

# HHS Risk Adjustment Data Validation Protocols

# IVA Entity Selection

Exhibit W
Page 361

# 6. IVA Entity Selection

## 6.1   Purpose

The purpose of this section is to outline requirements and provide guidance for issuers and IVA Entities regarding the IVA Entity selection process.

## 6.2   IVA Entity Selection Participants

### 6.2.1 Issuers

Issuers in states where HHS is operating the RA program are required to engage an IVA Entity to perform an IVA for HHS-RADV. As stated in Section 2.1.2 (Issuer Did Not Engage an IVA Entity or the Designated IVA Entity is Not Capable of Performing the Audit) and in accordance with 45 C.F.R. § 153.630(b)(2), the issuer must ensure that the IVA Entity is reasonably capable of performing an IVA audit according to the standards established by CMS for such audit, and must ensure that the audit is so performed. Furthermore, as stated in Section 2.1.3 (IVA Entity Not Free of Conflict of Interest or Not in Good Standing) and as described in 45 C.F.R. § 153.630(b)(3), the issuer must ensure that each IVA Entity is reasonably free of conflicts of interest (COI), such that it is able to conduct the IVA in an impartial manner and its impartiality is not reasonably open to question. CMS has defined COI standards between an issuer and IVA Entity in Section 6.5 (Criteria for Assessing IVA Entity Capabilities). CMS also details the protocols the IVA Entity must follow for purposes of performing the IVA under Section 9. These protocols can be used by the issuer to assess a potential IVA Entity's capability to conduct an IVA.

The issuer must register in the Audit Tool and complete the IVA Entity Designation process within the Audit Tool before the applicable deadline. CMS will review and provide a final decision based on § 153.630(b)(1). See Section 6.2.3 (CMS Oversight) for further information regarding CMS's oversight methods and review of the IVA Entity selection.

> **Note:** CMS does not publish a list of approved IVA Entities for HHS-RADV. Issuers should solicit an IVA Entity based on their business needs and advise the IVA Entity to complete the IVA Entity election process to be reviewed by CMS.

### 6.2.2 IVA Entity

Any IVA Entity electing to participate in the current benefit year HHS-RADV process must complete the HHS-RADV IVA Entity Election Web Form and be registered for the applicable benefit year with CMS in order to be listed as an available IVA Entity in the Audit Tool. This will allow issuers to designate the IVA Entity for the current benefit year HHS-RADV audit program.

The IVA Entity must provide an issuer with details regarding their technical capabilities, approach to performing the IVA and submitting its findings in the time frame specified by CMS, and information regarding its independence.

### 6.2.3 CMS Oversight

CMS monitors and reviews IVA Entity registration and election to participate within the Audit Tool by verifying their information against the OIG exclusions list.[11] CMS reviews the issuer's

---

[11] This CMS check does not in any way reduce the issuer's separate obligation to confirm as part of the required COI review that no key individuals involved in supervising or performing the IVA have been excluded from working with either the Medicare or Medicaid program, are on the OIG exclusion list or, to its knowledge, are under investigation with

designation of an IVA Entity, along with the issuer's attestation verifying the IVA Entity and issuer are free of COI. CMS will either accept or reject the issuer's IVA Entity designation within the Audit Tool.

## 6.3   IVA Entity Requirements

Issuers have considerable autonomy in selecting their IVA Entity. In accordance with 45 C.F.R. § 153.630(b)(2), (3), and (5), issuers must ensure that the IVA Entity meets the following criteria:

- Is reasonably capable of performing the IVA and validating the accuracy of the RA data in accordance with CMS defined audit standards;

- Is reasonably free of COI for the entity and the individuals working on the IVA, such that it is able to conduct the IVA in an impartial manner and its impartiality is not reasonably open to question; and

- Employs medical coders to conduct the IVA who are certified and in good standing by a nationally recognized accrediting agency such as the American Health Information Management Association (AHIMA) or the American Academy of Professional Coders (AAPC).

## 6.4   Timeline of IVA Entity Selection

For each benefit year, CMS instructs issuers and IVA Entities to begin preparing for the selection process, and communicates timing requirements via the HHS-RADV Process Timeline available on REGTAP (https://www.regtap.info/). Refer to REGTAP for any updates to the HHS-RADV Timeline and corresponding deadlines for the applicable benefit year, and to Section 3 (Process Timeline).

---

**Note:** CMS is not imposing a deadline for completing the HHS-RADV IVA Entity Designation and Maintenance Form. However, the IVA Entity will not have access to the issuer's sample reports until the IVA Entity is designated by the issuer and accepted by CMS. For additional guidance regarding the HHS-RADV IVA Entity Election Web Form, refer to the corresponding HHS-RADV webinar available in the REGTAP Library (https://www.regtap.info/reg_library.php). CMS encourages issuers and IVA Entities to register on REGTAP for HHS-RADV notifications and to periodically check REGTAP for information on deadlines and updates regarding the 2018 benefit year.

---

## 6.5   Criteria for Assessing IVA Entity Capabilities

The issuer is responsible for ensuring that the IVA Entity is reasonably capable of performing an IVA. IVA Entities may include organizations that perform independent reviews, assessments, validations, and analyses. They are expected to have expertise in medical diagnosis coding and other skills necessary to evaluate the validity of medical records, medical and pharmacy claims, and enrollment data. The issuer must retain documentation from the selection and review process that demonstrates the IVA Entity meets regulatory requirements. CMS may request documentation regarding the issuer's IVA Entity selection process and the IVA Entity's compliance with applicable requirements.

Each year, the issuer will complete and provide CMS with an attestation stating that they have used a documented process to ensure that there is no COI between the issuer (or its owners, directors, officers, or employees) and the IVA Entity (or the members of its audit team, owners, directors, officers, or employees). This attestation can be downloaded from the Audit Tool by the

respect to any HHS programs.

Issuer SO and must be signed by the issuer's chief executive officer (CEO), chief financial officer (CFO), or a person who is authorized to legally and financially bind the organization, for the current benefit year HHS-RADV.

> **Note:** The issuer's CEO does not need to be the individual to submit the attestation into the Audit Tool; however, the attester must be an individual who can legally and financially bind the company, such as the CEO/CFO. The IVA Entity Designation process is not complete until the COI Attestation is signed and submitted through the Audit Tool.

The Issuer's SO must then upload the signed COI Attestation to the Audit Tool. The IVA Entity must certify that there is an absence of COI, at both the organization and staff levels, and must provide signed documentation to the issuer. For additional information on the COI Attestation process, refer to the corresponding HHS-RADV webinar available in the REGTAP Library (https://www.regtap.info/).

In addition to a review of the COI Attestation provided by the issuer's CEO/CFO or other person able to legally and financially bind the company, CMS may gather information through external reporting and analysis of public and private data about any relationship between an issuer and the IVA Entity that may result in a potential COI.

> **Note:** CMS does not comment on COI or determine permissibility of IVA Entity selection. Issuers are responsible for performing due diligence to know the status of an IVA Entity during the selection process and to conduct its own COI review. Issuers can also refer to the corresponding HHS-RADV webinar available in the REGTAP Library (https://www.regtap.info/).

The following section outlines requirements which should be used by issuers to evaluate the IVA Entity's potential COI as stated in the 2015 Payment Notice.[12]

### Conflict of Interest (COI) Requirements:

- The IVA Entity certifies that there is an absence of COI between the issuer and the IVA Entity.

- Neither the IVA Entity nor any member of its management team or data validation audit team (or any member of the immediate family of such a member) may have any material financial or ownership interest in the issuer, such that the financial success of the issuer could be reasonably seen as materially affecting the financial success of the IVA Entity or management team or audit team member (or immediate family member) and the impartiality of the IVA process could reasonably be called into question, or such that the IVA Entity or management or audit team member (or immediate family member) could be seen as having the ability to influence the decision-making of the issuer. Immediate family is defined as a person's smallest family unit, consisting of the closest relatives, such as parents, siblings, and children.

- Neither the issuer nor any member of its management team (or any member of the immediate family of such a member) may have any material financial or ownership interest in the IVA Entity, such that the financial success of the IVA Entity could be seen as materially affecting the financial success of the issuer or management team member (or immediate family member) and the impartiality of the IVA process could reasonably be called into question, or such that the issuer or management team member (or immediate family member) could be reasonably seen as having the ability to influence the decision making of the IVA Entity.

- Owners, directors, and officers of the issuer may not be owners, directors, or officers of the

---

[12] See 79 FR at 13758.

IVA Entity, and vice versa.

- Members of the data validation team of the IVA Entity may not be married to, in a domestic partnership with, or otherwise in the same immediate family as an owner, director, officer, or employee of the issuer.

- The IVA Entity may not have a role in establishing any relevant internal controls for the issuer related to RA or the IVA process or serve in any capacity as an advisor to the issuer regarding the RA process or IVA.

- The IVA Entity may not perform any SVA activities on behalf of CMS.

- Third Party Administrators (TPAs) or any organization/company/entity responsible for reviewing, analyzing, submitting claims or supplemental diagnosis records on behalf of an issuer via their EDGE server for RA calculation is considered to have a COI and may not be designated as an IVA Entity.

## 6.6   Additional Reasons for IVA Entity Exclusion

A potential IVA Entity <u>must</u> be excluded from conducting an IVA for any of the following reasons:

- The IVA Entity, its owners, or staff engaged to work on the IVA are listed on the HHS OIG Exclusions List;

- The IVA Entity has been declared ineligible to receive federal contracts and is on the Office of Federal Contract Compliance Programs (OFCCP) list of federally debarred entities, as identified per the instructions; and/or

- The IVA Entity is listed on a state's OIG Exclusions List.

## 6.7   Required Documentation for IVA Entity Selection by an Issuer

Issuers are required to select and designate their IVA Entity by completing the HHS-RADV IVA Entity Designation and Maintenance Form within the Audit Tool. For additional Audit Tool guidance, refer to the BY18 HHS-RADV Issuer Participation Requirement and IVA Entity Designation Webinar available in the REGTAP Library (https://www.regtap.info/reg_library.php). If the IVA Entity cannot be located in the Audit Tool, issuers should contact the IVA Entity directly to ensure they have completed the HHS-RADV IVA Entity Election Web Form for the current benefit year.

By completing this form in the Audit Tool, the issuer will also confirm compliance with the following criteria, listed in Table 2.

**Table 2: Criteria Categories for IVA Entity Selection**

| 1. | Ensure IVA Entity is Reasonably Capable of Performing Risk Adjustment Data Validation and has Certified Medical Coders [45 C.F.R. § 153.630(b)(2) and (b)(5)-(8)]: | a) | The designated IVA Entity is reasonably capable of performing HHS-RADV in accordance with CMS defined audit standards under [45 C.F.R. § 153.630(b)(2) and (b)(5)-(8)], and in accordance with HHS-RADV audit Protocols. |
|---|---|---|---|
| | | b) | The designated IVA Entity has medical coders with relevant skills as demonstrated through certification after examination by a nationally recognized accrediting agency for medical coding, such as the AHIMA or the AAPC, in addition to relevant professional experience. A medical coder can have other certifications besides AHIMA or AAPC, but other certifications must meet the same standards. The IVA Entity cannot utilize coders who are only certified through Practice Management Institute (PMI) or a similar certifying entity. |
| | | c) | The IVA Entity must ensure that the coders are able to perform work on inpatient, outpatient, and/or professional records. If a coder is only certified for inpatient or outpatient coding, then the coder can only review files for the setting for which they are certified. The issuer will be providing medical records and claims on both inpatient and outpatient/professional encounters. The IVA Entity must have coders trained and certified for inpatient, outpatient, and professional settings. |
| 2. | Ensure IVA Entity is Free of COI, IVA Entity is not excluded from Medicare or Medicaid, and IVA Entity is not the Issuer's Third-Party Administrator (TPA) [45 C.F.R. § 153.630(b)(3)] | a) | The designated IVA Entity is reasonably free of COI, such that it is able to conduct the IVA in an impartial manner and its impartiality is not reasonably open to question (refer to HHS-RADV Conflict of Interest Guidelines). The issuer attests they have performed a reasonable investigation into COI and they have obtained equivalent representation from the IVA Entity regarding conflicts of interest. |
| | | b) | No key individuals involved in supervising or performing the initial validation audit have been excluded from working with either the Medicare program or the Medicaid program, are on the Federal OIG exclusion list, or are under investigation with respect to any CMS program. |
| | | c) | The IVA Entity designated did not have a role in establishing any relevant internal controls for the issuer organization related to the HHS-RADV process or serves in any capacity as an advisor to the issuer organization regarding the IVA. Additionally, the nominated IVA Entity is not the issuer's TPA or an organization/company/entity, responsible for reviewing, analyzing, submitting claims or supplemental diagnosis records on behalf of an issuer via their EDGE server for RA calculations. |
| 3. | Ensure Performance of HHS-RADV Audit [45 C.F.R. § 153.630(b)(1), (2), and (4)] | a) | The issuer of a RA covered plan engages one (1) or more independent auditors to perform the IVA of a sample of its RA data selected by CMS. |
| | | b) | The issuer ensures that the IVA Entity auditors are reasonably capable of performing the IVA according to the standards established by CMS and ensures that the audit is performed according to those standards. |
| | | c) | The issuer ensures validation of the accuracy of the RA data for a sample of enrollees selected by CMS. |
| | | d) | The issuer ensures that the IVA findings are submitted to CMS in a manner and timeframe specified by CMS. |

In addition to the COI Attestation, the issuer should detail the scope or duties of the IVA Entity in a written agreement with the IVA Entity, and it must maintain a copy of the documentation that the IVA Entity submitted to CMS according to CMS regulations and guidance.

CMS will review the issuer's IVA Entity designation in the Audit Tool and either accept or reject the designation within the Audit Tool. CMS may reject a designation or exclude an IVA Entity based on the criteria above. In the event that CMS has rejected an issuer's designation or excluded an IVA Entity, the issuer must procure the services of a different IVA Entity that meets all applicable requirements. CMS will communicate to the issuer the outcome of the review in order to assist the issuer in selecting an eligible IVA Entity. Refer to the HHS-RADV Process Timeline located on REGTAP (https://www.regtap.info/) for a timeline of activities and corresponding deadlines for the applicable benefit year, and to Section 3 (Process Timeline).

## 6.8   Implications of Failure to Engage an IVA Entity

If an issuer of an RA covered plan fails to engage an IVA Entity in accordance with the requirement stated within this section by the applicable deadline, CMS will impose a DDVC under 45 C.F.R. § 153.630(b)(10) and may take other action (as appropriate). This DDVC is generally calculated based on the same methodology as the RADC (see Section 2.2.2 (Default Data Validation Charge).

# Section 7

# HHS Risk Adjustment Data Validation Protocols

# Enrollee Sampling Process

Exhibit W
Page 368

# 7. Enrollee Sampling Process

## 7.1 Purpose

CMS will select a sample of 200 enrollees for each issuer[13] participating in the applicable benefit year of HHS-RADV. The enrollee sampling process will help ensure that the HHS-RADV process reviews an adequate sample of enrollees for each issuer so that estimated risk score errors will be statistically sound and the sample will adequately cover applicable subpopulations.

## 7.2 Sample Design

To design the sampling approach for the initial years of HHS-RADV, CMS applied proxy sampling assumptions for error rates and population statistics as described in the following subsections:

- Stratification – discusses how and why CMS stratified the sample;

- Proxy Issuer Population – discusses how CMS initially created an assumed average issuer population;

- Actual Population – discusses what assumptions will change as CMS gathers actual issuer populations and RADV payment years' data.

### 7.2.1 Stratification

To account for variation in risk scores, each issuer population is divided into mutually exclusive groups or "strata" based on recorded risk scores, age, and presence of HCCs. This achieves sampling efficiencies by dividing the issuer population into homogeneous groups. Statistical theory indicates that for a given level of confidence and precision, stratification of a population into homogeneous groups (or strata) results in a smaller sample size, relative to a simple random sample for which no stratification is performed. Based on the available data, CMS will calculate the sample size for a given benefit year by dividing the relevant population into a number of strata, representing different demographic and risk score bands.

Each issuer's enrollee population will be grouped into 10 strata based on presence of HCCs (or RXCs for adults), RA age model, and risk level. Table 3 provides a listing of assigned strata by risk level for each age group with the presence of at least one (1) HCC (or RXC for adults). Note that stratum 10 (no HCCs (or RXCs for adults)) is not stratified by age or risk level because it is assumed to have a uniformly low error rate. Beginning in the 2018 benefit year, note that the adult strata (strata one (1) through three (3)) include enrollees with at least one HCC or RXC. Only the adult RA model includes RXCs so the child and infant strata (strata four (4) through six (6) and seven (7) through nine (9), respectively) will not include RXCs.

**Table 3: Stratification Mapping**

| HCC Stratum | Age | Risk Level | Stratum |
|---|---|---|---|
| 1 or More HCC(s) (or RXCs for adults) | Adult | Low | 1 |
| | | Medium | 2 |
| | | High | 3 |
| | Child | Low | 4 |
| | | Medium | 5 |
| | | High | 6 |

---

[13] Lower sample sizes may be calculated for issuers with a small number of enrollees. See Section 7.3.2 (Alternate Sample Sizes)

| HCC Stratum | Age | Risk Level | Stratum |
|---|---|---|---|
| | Infant | Low | 7 |
| | | Medium | 8 |
| | | High | 9 |
| No HCCs (or RXCs for adults) | All | N/A | 10 |

## 7.2.2 Proxy Issuer Population

This section discusses the processes and data used to develop estimated risk scores for an assumed issuer population to determine an acceptable sample size.

CMS originally used 2014 summary data from the EDGE server as a proxy population for the sample design. The EDGE server summary data included the stratified populations of each issuer. CMS performed subsequent sample size analyses using the 2015, 2016, and 2017 benefit years' EDGE data to assess precision for small, medium, and large issuers. The sample sizes were approximately in-line with the original proxy populations. For additional detail on how CMS determines an acceptable sample size for issuer populations see Section 7.3 (Sample Size).

## 7.2.3 No-HCC (or RXC for Adults) Assumptions

CMS will use the lowest error rate and variance across all HCC (or RXC) strata as the error rate and variance assumption for the No-HCC (or RXC) stratum. A fundamental assumption is that risk score errors in the HCC population are likely to be over-statements, meaning the HCC risk scores should be adjusted downward. With the No-HCC (or RXC) population, the risk score errors will likely be under-statements, meaning the No-HCC (or RXC) risk scores should be adjusted upward, as any identification of any new conditions for enrollees in the No-HCC population would reflect under-reported risk.

Given that the No-HCC population will make up the vast majority of the expected enrollee population (79% of the total population for the 2017 benefit year), there is potential sampling risk in this population if enrollees in this stratum are misclassified as being No-HCC (or RXC) when they should have been included in the HCC strata (as determined after the HHS-RADV process).

Consequently, there is some risk that CMS may be understating the error rate, variance, and risk score assumptions for the No-HCC stratum.

CMS performed a sensitivity analysis with the No-HCC population establishing more conservative assumptions for the risk score, error rate, and variance. The resulting sampling precision remained within an acceptable range (<10 percent at a two (2)-sided 95 percent confidence level), even under the more conservative assumptions.

## 7.2.4 Sampling Assumptions

The sampling assumptions used for the 2018 benefit year HHS-RADV are held constant from the 2017 benefit year and are expected to approximate the average issuer size and the issuer population distributions for the HCC versus No-HCC groups, and achieve the targeted precision levels.

CMS continues to evaluate the sampling methodology used for each benefit year and measure the precision of Error Estimation results. Findings of the 2017 benefit year HHS-RADV process were consistent with assumptions and precision targets established for the 2017 benefit year. CMS will continue to evaluate sampling assumptions for subsequent benefit years.

## 7.3   Sample Size

45 C.F.R. § § 153.350(a) and 153.630 require that a statistically valid sample of enrollees from each issuer be validated every year. For the initial years of HHS-RADV, as well as the 2018 benefit year, the enrollee sample selected for the IVA will include 200 enrollees from each issuer to estimate a risk score error rate related to RA. The assumptions discussed above in Section 7.2 (Sample Design) support the sample size of 200 enrollees per issuer. Note that a lower sample size may be calculated for issuers with a small number of enrollees by using a Finite Population Correction (FPC) factor described in Section 7.3.2 (Alternate Sample Sizes).

The sample of 200 enrollees is selected from all state risk pool markets in which the issuer had enrollment in RA covered plans for the applicable benefit year. However, as finalized in the 2019 Payment Notice[14], the IVA sample will only include enrollees from state risk pool markets in which there was more than one (1) issuer.

## 7.3.1 Precision and Confidence Level

CMS utilizes an enrollee sample size to target a 10 percent relative sampling precision (or margin of error) at a two (2)-sided 95 percent confidence level (CL). The use of a 10 percent targeted precision was selected based on a survey of guidance from the Office of Management and Budget (OMB), the Internal Revenue Service (IRS), and the CMS-developed Payment Error Rate Measurement (PERM) program.[15] This target will be re-evaluated in subsequent years based on actual results.

## Neyman Allocation

Once the overall sample size is determined, the individual sample size per stratum ($n_h$) will be determined using the Neyman optimal allocation method. The Neyman allocation method calculates the optimal number to be sampled from each stratum, proportional to each stratum's contribution to the total standard deviation of the population (i.e., more variable strata should be sampled more intensely).

To calculate the sample size for each stratum, consider the following notations:

The sample size for each stratum is calculated from:

$$n_h = n \times \frac{N_h S_h}{\sum_{h=1}^{H} N_h S_h}$$

On average, two-thirds of the total sample size will be allocated to the HCC (or RXC for adults) strata [strata one (1) through nine (9)] using the Neyman optimal allocation method, with the remaining one-third assigned to the "No-HCC or RXC" stratum ten (10).

---

[14] See 83 FR at 16967.

[15] For additional information on the sampling guidance surveyed by CMS for this purpose, see Section 4.3.1 of the 2016 Benefit Year Protocols PPACA HHS-Operated Risk Adjustment Data Validation Version 14.00.00 (October 20, 2017), available at: https://www.regtap.info/reg_librarye.php?i=2104.

Based on population characteristics for some issuers, there could be instances in which the original HCC target sample size for a stratum - determined using the Neyman optimal allocation method - is larger than the actual sample size allocated to that stratum. This situation could occur if an issuer has a stratum with a small number of enrollees with highly variable risk scores. In these cases, the Neyman allocation weight for that stratum could be relatively high, leading to a Neyman allocation-calculated sample size that exceeds the total number of enrollees in that stratum. If this occurs, the actual sample size must be used in place of the target sample size for that stratum, but as a result, the total sample size may not meet the minimum number of enrollees required to achieve the target precision threshold referenced above. In these instances, an incremental factor equal to one (1) will be added to the total target HCC sample size and the Neyman allocation for strata one (1) through nine (9) will be re-executed. This will allow for an increase in the target sample size of all the strata, making it possible to meet the minimum total sample size required, even if the actual sample size for a particular stratum is used instead of the target sample size. This process continues until the target sample size is reached or exceeded across strata one (1) through nine (9), or until the number of iterations reaches 100. If a sample size equal to or larger than the original HCC target sample size is not generated after 100 iterations, then the selected sample will be used.

## 7.3.2 Alternate Sample Sizes

While a sample size of 200 is adequate, based on the assumptions presented above, a smaller

| Variable | Description |
|----------|-------------|
| $n$ | Overall sample size |
| $H$ | Number of strata |
| $N_h$ | Population size of the $h^{th}$ stratum |
| $S_h$ | Standard deviation of risk score error amount for the $h^{th}$ stratum |

sample size will be calculated for issuers with a small enrollee population. In such cases, a Finite Population Correction (FPC) factor will be used to adjust the sample size:[16]

$$FPC = \frac{N - n}{N}$$

FPC is used when sampling without replacement from a finite population and the sample size, n, is significant in comparison with the population size, N, so that n/N > 0.05 [i.e., more than five (5) percent of the population is sampled]. Consequently, any issuer with an enrollee population size fewer than 4,000 (as 200 / 4,000 = 0.05) will use an FPC to adjust the sample size, by multiplying the original sample size by its FPC factor. Note that the calculated sample size should be rounded up to the nearest whole number. As an example, assume an issuer has a population of 1,400 enrollees; the FPC would be calculated and applied to adjust the sample size down from 200 as follows:

$$FPC = \frac{1400 - 200}{1400} = 0.8571$$

This issuer's sample size will now be 172, rather than 200 (0.8571 * 200 = 171.43). If the application of an FPC results in a sample size smaller than 50 enrollees, that issuer should sample a minimum of 50 enrollees. In rare cases where an issuer has fewer than 50 enrollees in

---

[16] The Finite Population Correction formula can be found in Section 2.6: *Cochran, William G., Sampling Techniques, third edition, John Wiley & Sons*, 1977.

its population, all enrollees in the population will be reviewed.

## 7.3.3 SVA Subsample Sizes

While the IVA sample size is 200, there will be multiple incremental samples used for the purposes of the SVA process. The SVA sample sizes will consist of an initial sample of 12 enrollees and expand, if necessary, to include 24, 50, 100, and up to the full IVA sample of 200 in the event of failure of pairwise means testing. Since pairwise means testing will be performed on all SVA initial subsamples, comparing them to their corresponding enrollees in the IVA sample of 100 during the sample review portion of the HHS-RADV process (discussed in Section 9 – Audit Procedures and Reporting Requirements), the SVA subsamples must be large enough to validate testing results. In cases where pairwise means testing of the SVA subsample of 12 enrollees fails, CMS will increase the SVA subsample by 12 enrollees for a total of 24 enrollees, then to a total of 50 enrollees, then to the full 100 SVA subsample.

If the pairwise means testing fails at 100, the SVA subsample may be expanded up to a total of 200 enrollees, so that the final SVA results would replace the IVA results based on a sample large enough to extrapolate. A sample size of 200 for SVA testing is approximated by the precision analysis mentioned above. Issuers that have to apply a FPC for the IVA sample size will use the initial subsample size of 12 and an expanded SVA subsample size that may be equivalent to the IVA sample size (depending on the results of the pairwise means testing).

# 7.4   Future Sample Size Refinement

CMS will assess summary-level data and RADV results from prior years to support refinement of sampling assumptions needed for future years. Changes to the stratification and/or size and allocation of the sample among each stratum may be refined, based on average issuer HCC failure rate distributions, once more data becomes available.

CMS will obtain snapshots of issuer populations throughout the first few RADV payment adjustment years and may refine the sampling assumptions and strategy by using a combination of the best available data and the initial years' assumptions. As HHS-RADV progresses, CMS will gain experience that may improve the reliability of the error estimates by more effectively estimating areas at high-risk for error.

As the program matures over time, the quality of data will improve and the sampling plan assumptions will become more reliable.

# Section 8

# HHS Risk Adjustment Data Validation Protocols

# Sampling Reports

Exhibit W
Page 374

# 8. Sampling Reports

## 8.1   Purpose

The following sections outline the suite of reports used to determine the issuer's RADV population. These reports include the RADV Population Summary Statistics (RADVPS) Report, which contains the population statistics of the issuer's total population, and the seven (7) RADV Sampling Reports described in Section 8.3 (RADV Sampling Reports). It is critical that issuers review their RA reports and RADV sampling reports to verify and attest to the accuracy of the data, as well as to report any discrepancies to CMS, which is discussed in greater detail in Section 8.5 (EDGE Report Discrepancy Reporting). See Section 8.3 (RADV Sampling Reports) for an overview of EDGE server RADV Report resources.

## 8.2   RA Report – RADV Population Summary Statistics (RADVPS) Report

The RADVPS Report is generated during the RA report run. Issuers are encouraged to regularly review their RADVPS Report prior to the EDGE server data submission deadline. If an issuer identifies data that was inaccurately submitted to their EDGE server prior to the EDGE server data submission deadline, then the issuer should update the EDGE server with the correct information.

The RADVPS Report contains population statistics for the issuer's total population separated into sub-categories, or "strata," based on enrollee age (infant, child, adult) and risk score (low, medium, high). The RADVPS Report provides issuer level data, including total enrollees and plans, number of enrollees in each risk pool market (individual, small group, merged or catastrophic), strata-level data (including number of enrollees in each of the specific stratum), and summary statistics for each of the specific strata, including mean (average), minimum (min), and maximum (max) risk scores for enrollees in the stratum. New for 2018, the RADVPS Report will also include RXC specific data elements. Issuers should review this report to ensure that the data contained in it is accurate, as compared to their knowledge of their enrolled populations, and that the stratification is representative of their total population.

If an issue is identified in the RADVPS Report generated by the RA final report command, issuers must communicate that issue to CMS through the RA formal discrepancy reporting process described in Section 8.5 (EDGE Report Discrepancy Reporting) for additional detail. However, issues related to data incorrectly submitted by an issuer to their EDGE server are not considered a discrepancy on the RADVPS Report (although an issuer can report such errors to CMS as part of the EDGE/RA Attestation and Discrepancy Reporting process).

> **Note:** The EDGE/RA formal discrepancy window is different from the RADV Sampling Discrepancy Reporting Period.

It is essential that issuers review the RADVPS Report because the sample size will be applied to the entire population. For more detailed information about the RADVPS Report, refer to the *Job Aid for Validation of RADVPS Reports (5/22/19),* available in the REGTAP Library (https://www.regtap.info/reg_librarye.php?i=2039).

## 8.3   RADV Sampling Reports

After the final RA report run and RA transfer run related to the calculation of RA transfers for the applicable benefit year, CMS transmits the HHS-RADV command to the EDGE servers to generate the RADV sample reports, which are sent to CMS for validation. CMS reviews the

sample reports to determine if the sample is representative of the issuer's population by comparing the RADV IVA Statistics (RADVIVAS) Report to the RADV Population Summary Statistics Final (RADVPSF) Report. After CMS approves the samples, the final RADV report command is sent to the EDGE servers to generate the RADV sampling reports including the IVA sample, which are released to issuers via their EDGE servers and accessible to IVA Entities via the Audit Tool. Issuers should review their HHS-RADV sampling reports to ensure they are representative of the issuer's population in the risk pool markets included in HHS-RADV.

The HHS-RADV sampling reports consist of seven (7) reports generated by the issuer's EDGE server:

- **RADV Population Summary Statistics Final (RADVPSF) Report**
  - Contains population statistics for an issuer's population included in RADV broken into sub-categories, known as "strata," which are based on enrollee age (infant, child, adult) and risk score (low, medium, high).

  - Contains only enrollees in a risk pool market where a RA transfer occurs and excludes enrollees in a risk pool market if the issuer is the only issuer in that risk pool market.

  - Generated by the RADV Report command after the final RA report run and the RA transfer calculation run.

  - The RADVPSF Report has the same data elements as the RADVPS Report; however, the RADVPSF Report will include only enrollees in a risk pool market where a RA transfer occurs, and excludes enrollees in a risk pool market if the issuer is the sole issuer in that risk pool market.[17]

The RADVPSF Report should be utilized when reviewing the RADV population, as the RADVPS Report reflects statistics of the issuer's total population, prior to the removal of risk pool markets not subject to RADV.

- **RADV IVA Statistics (RADVIVAS) Report**
  - Contains the sample statistics calculated at the strata-level for the enrollees selected for the RADV IVA sample.

  - Similar in layout to the RADVPS and RADVPSF Reports, but limited to the enrollees selected for the IVA sample.

For more detailed information about the RADVIVAS Report, see the Job Aid for Validation of RADVIVAS Reports (5/22/19), available in the REGTAP Library (https://www.regtap.info/reg_librarye.php?i=2552).

The RADVIVAS Report contains only the information on the sampled enrollees, unlike RADVPS which contains information on the issuer's entire population or the RADVPSF Report that contains information on the issuer's population only in the risk pool markets included in RADV.

- **RADV Detailed Enrollee (RADVDE) Report**
  - Identifies the issuer's enrollees selected for the RADV IVA sample.

  - Contains enrollee-level data for each enrollee selected for the RADV IVA sample, such

---

[17] As described in Section 1.6.1 (Exemption from HHS-RADV), in the event an issuer is the sole issuer in a state across all market risk pools in a state for a given benefit year, then that issuer will be excluded from RA payments and charges, and also excluded from HHS-RADV for that benefit year.

as the sampled enrollee's risk score, demographic, and health status information.

- **RADV Enrollee Extract (RADVEE) Report**
  - Contains all active enrollment data that was submitted by the issuer for each enrollee included in the RADV IVA sample.

- **RADV Medical Claims Extract (RADVMCE) Report**
  - Contains all active RA eligible and RXC eligible medical claims that were submitted by the issuer for each enrollee included in the RADV IVA sample.

- **RADV Pharmacy Claims Extract (RADVPCE) Report (new beginning in the 2018 benefit year)**
  - Contains all active RXC eligible pharmacy claims that were submitted by the issuer in the pharmacy claim XML for each adult enrollee with RXCs included in the RADV IVA sample.

- **RADV Supplemental Extract (RADVSE) Report**
  - Contains all active supplemental records for active RA eligible medical claims that were submitted by the issuer for each enrollee included in the RADV IVA sample.

For further information about the RADV sampling reports, see the **Risk Adjustment and Reinsurance (RARI) - Interface Control Document Addendum Version 05.00.23 (3/1/19)** and the **EDGE Server XML and XSD Zip File Contents Job Aid (2/21/19)** available in the REGTAP Library (https://www.regtap.info/reg_library.php). Additionally, the following Job Aids for validation of RA Reports and RADV Reports are located in the REGTAP Library:

- **Job Aid for Validation of RADVPS Reports (5/23/19),**

- **Job Aid for Validation of RADVPSF Report (5/23/19)**

- **Job Aid for Validation of RADVIVAS Reports (5/23/19)**

See **XML/XSD Outbound Files** in the REGTAP Library (https://www.regtap.info/reg_library.php) for the latest EDGE server outbound report XML examples and XSDs.

# 8.4   Steps to Validate the IVA Sample Generated by CMS

Issuers are able to validate the IVA sample generated by CMS, based on the RADVPSF Report, by following the 10 steps outlined in the section below. With these steps, issuers can confirm that the HHS-RADV process has selected a statistically valid sample size of enrollees that is representative of the issuer's RADV population, including the expected number of enrollees assigned to each of the ten (10) strata. The calculation steps are as follows:

**Step 1: Calculate Risk Score for Each Enrollee**

The issuer should calculate the risk score for each enrollee in their RADV population:

The enrollment period-level risk score from the risk score process will be weighted by member months to generate one (1) average risk score for each enrollee, across all the enrollee's plans, within the issuer's enrollee population. The formula below is used to calculate the weighted risk score.

$$\overline{rs} = \frac{\sum_i M_{mi} * RS_i}{\sum_i M_{mi}}$$

- $\overline{rs}$ is the weighted average risk score
- $M_{mi}$ is the member month (months in the enrollment period)
- $RS_i$ is the enrollee level risk score for that enrollment period

The risk score used should include demographic factors, enrollment duration factors, HCC factors, and Cost-sharing Reduction (CSR) factors (if applicable). Note that the risk scores on the Risk Adjustment Risk Score Details (RARSD) Report cannot be used in this step, since they are calculated at the rating area level. This step requires the enrollee risk scores at the issuer level.

**Step 2: Determine IVA Sample Size**

The issuer can determine the IVA target sample size by using the total number of enrollees from the RADVPSF Report and applying the following criteria:

- If the issuer population is zero (0) to 50 enrollees, the sample size will be all enrollees.

- If the issuer population is greater than or equal to 4,000, a sample size of 200 enrollees is used;

- If the issuer population is greater than 50 and fewer than 4,000, then the larger of 50 or the result of the FPC is used. The FPC formula is defined as:

$$Sample\_Size = FPC * n = \left(\frac{N - n}{N}\right) * n$$

- N is the issuer's population size; and

- n is the default sample size (200).

Note: The calculated value should be rounded up to the next whole number. For example, 183.2 would be rounded to 184.

**Step 3: Calculate the HCC (or RXC) Target Sample Size (Strata 1-9)**

The HCC (or RXC) target sample size for strata one (1) through nine (9) is two-thirds of the total IVA sample size calculated in Step 2. The target sample size for strata one (1) through nine (9) can be calculated by using the following formula:

$$HCC\ (or\ RXC)\ Target\ Sample\ Size\ for\ Strata\ 1 - 9\ = Target\ IVA\ Sample\ Size * \left(\frac{2}{3}\right)$$

> **Note:** The calculated value should be rounded up to the next whole number. For example, 133.3 would be rounded to 134.

**Step 4: Execute Neyman Formula for Strata 1-9**

The issuer should execute the Neyman formula for strata one (1) through nine (9) using the HCC target sample size. Use the following Neyman formula to calculate how many enrollees should be assigned to each stratum from 1 to 9 ($n_h$):

$$n_h = (Target\ HCC\ Sample + i) * \frac{N_h S_h}{\sum_{h=1}^{H} N_h S_h}$$

The following are the parameter definitions:

- $i$ is the +1 incremental value when re-executing the Neyman formula, e.g., 0, 1,2,3,4.

- $n_h$ is the sample size (# of enrollees) of each individual stratum $h$ that should be calculated.

- $N_h$ is the issuer's population size (# of enrollees) in each individual stratum $h$.

- H is the total number of strata (1-9) excluding the No-HCC (or RXC) stratum.

- $S_h$ represents the standard deviation of risk score error for the $h^{th}$ stratum. The standard deviation of risk score error is the square root of the variance of risk score error (Estimated variance for initial years of HHS-RADV). The risk score calculated for RADV is based on the demographic, CSR, enrollment duration, RXC (and interaction) and HCC (and interaction) factors.

---

**Note:** The calculated value should be rounded to the nearest whole number. For example, 133.1 will be rounded to 133 and 133.5 will be rounded to 134.

---

### Step 5: Calculate the Standard Deviation of Risk Score Error

The standard deviation ($S_h$) of risk score error is calculated as:

$$S_h = \sqrt{Var} \times Inflation\ factor\ \times \overline{RS}$$

Where $Var$ is the variance of net error (from the table shown below), *Inflation factor* is a 3x factor, and $\overline{RS}$ is the mean risk score for stratum $h$.

The variance of net error is shown in the following table. CMS derived the variance of error solely for purposes of developing samples and error estimates for HHS-RADV using data that included Medicare Advantage RADV error rates and MarketScan data used to calibrate the HHS-operated RA models.

| Risk Stratum | Variance of Error |
|---|---|
| Low | 0.095 |
| Medium | 0.201 |
| High | 0.654 |

While CMS does not anticipate the expected variance of net error to be uniform across all age groups, age-level data to determine variance will not be available for the initial years. Thus, the values above are merely an assumption for the initial years of HHS-RADV. Adult, Child, and Infant age groups will utilize the same variance of net error rates in the calculation of standard deviation of risk score error for their respective low, medium, and high-risk strata, while the lowest variance of net error is assumed for the No HCC stratum. CMS may update these assumptions for future benefit years after sufficient data is collected from the initial years of HHS-RADV.

An example calculation of Issuer ABCDE's Adult Low Risk stratum standard deviation, with a mean risk score of 4.500 is as follows:

$$Sh_1 = \sqrt{9.5\%} \times 3\ \times 4.500$$
$$Sh_1 \approx 4.161$$

An inflation factor of 3x, a conservative base standard deviation assumption, is used for risk score estimates during the program's initial years.

**Step 6: Calculate the Number of IVA Sampled Enrollees to Assign to Each Stratum**

The issuer should then determine the number of enrollees to include in each stratum based on the steps below:

- If population of the stratum is 1, then sample size = 1

- If population of the stratum is 2, then sample size = 2

- If population of the stratum is > 2, use Neyman to calculate stratum sample size and:

    – If Neyman output is < 2, then use 2

    – If Neyman output is < or = to the population, then use Neyman output

    – If Neyman output is > total population of the stratum, use the population of the stratum.

**Step 7: Calculate Total Actual Sample Size for Strata 1-9**

The issuer should sum the sample size for each stratum (one (1) through nine (9)) to confirm if a large enough sample size was selected for the HCC (or RXC) strata (e.g., sample size in strata one (1) through nine (9) should be at least 2/3 x Target Sample Size).

Table 4 contains an example of the resulting sample size per stratum. Note that the issuer population is greater than 4,000, so the IVA sample size will be 200 enrollees. The HCC target sample size is two-thirds of the IVA target sample size, so the HCC target sample size is 134.

**Table 4: Example of IVA Sample**

| Age | Risk Level | Stratum | Population (N) | Calculated # of IVA Enrollees |
|---|---|---|---|---|
| Adult | Low | 1 | 1200 | 15 |
| | Med | 2 | 300 | 32 |
| | High | 3 | 100 | 60 |
| **Total Adult** | | | **1,600** | **107** |
| | Low | 4 | 200 | 5 |
| Child | Med | 5 | 20 | 4 |
| | High | 6 | 10 | 5 |
| **Total Child** | | | **230** | **14** |
| | Low | 7 | 90 | 5 |
| Infant | Med | 8 | 15 | 4 |
| | High | 9 | 5 | 4 |
| **Total Infant** | | | **110** | **13** |
| No HCCs (or RXCs) | Low (assumed) | 10 | 9,560 | 66 |
| **Total IVA (1-9)** | | | **1,940** | **134** |
| **Total IVA (1-10)** | | | **11,500** | **200** |

**Step 8: Compare Actual Sample Size to Original Target Sample Size for Strata 1-9**

Decision Point: The issuer should determine if the actual sample selected is smaller, larger, or equal to the original HCC target sample size. If the original HCC target sample size is reached, skip Step 9 and go on to Step 10. If the actual HCC sample selected is smaller than the original HCC target sample, follow the instructions in Step 9 to re-execute the Neyman Allocation until the original HCC target sample size is reached, or you have completed 100 iterations.

**Step 9: Re-Execute Neyman Allocation for Strata 1-9 if Sample Selected is Smaller than the Original Target for Strata 1-9**

The issuer should add one (1) to the target HCC sample size and re-execute the Neyman allocation for strata one (1) through nine (9) if the actual sample size selected is smaller than the original HCC target sample size. If a sample size equal to or larger than the original HCC target sample size is not generated after 100 iterations, then the selected sample will be used.

**Step 10: Calculate the Number of IVA Sample Enrollees to Assign to Stratum 10**

The issuer should determine the number of enrollees to assign to stratum 10.

For stratum 10, the issuer should use the following formula to calculate how many enrollees should be assigned ($n_{10}$):

$$n_{10} = (Target\ Sample\ Size) - (Actual\ Sample\ Size\ for\ strata\ 1\ through\ 9)$$

$$n_{10} = (190) - (127)$$

$$n_{10} = 63$$

Note: If $n_{10}$ > No-HCC population, then use the population.

# 8.5   Sampling Report Discrepancy Reporting

Once CMS has notified issuers that the RADVPS Report and RADV sampling reports are available for review, the attestation and discrepancy reporting process begins for these reports. Issuers must review the reports and either attest to the accuracy of the reports or qualify that attestation by submitting a discrepancy. If issuers identify a discrepancy between the data they believe should be present and what is reflected in their RADVPS Report or RADV sampling reports, they should qualify their attestation with a discrepancy.

More specifically, if an issuer identifies an issue with the RADVPS Report or any of the RADV sampling reports, they may file a discrepancy with CMS using the appropriate discrepancy reporting process as outlined in Table 5, which depicts the reports included in each report run (RA versus RADV) and the process for reporting discrepancies for each report. Both the RA Report discrepancies and RADV Sampling discrepancies must be reported within fifteen (15) calendar days. Once the fifteen (15) calendar day discrepancy window has closed, the population statistics are not subject to further dispute or appeals. **While these reporting windows may overlap, they are two (2) separate processes.** Refer to the HHS-RADV Activities Timeline located on REGTAP (https://www.regtap.info/) for a timeline of activities and corresponding deadlines for the applicable benefit year, and to Section 3 (Process Timeline).

**Table 5: HHS-RADV Reports and Discrepancy Reporting Processes**

| Report Run | Report Name | Discrepancy Reporting Process |
|---|---|---|
| RA Reports | RADVPS | If an issuer identifies an issue with the RADVPS Report, they may file a discrepancy with CMS using the formal EDGE/RA attestation and discrepancy reporting process. The discrepancy must be submitted using the EDGE Attestation and Discrepancy Reporting web form (a link will be sent when the submission window opens).<br><br>**Note**: The formal EDGE Attestation and discrepancy reporting period is 15 days and will generally open shortly after the April 30th data submission deadline, ahead of the RADV sampling discrepancy reporting period.<br><br>**Note**: Issuers should submit a workpaper to outline any data inaccuracies that occurred during EDGE server submission and reported as a RA discrepancy. For workpaper guidelines refer to Appendix A (2018 Benefit Year D&E Documentation Examples) |
| RADV Sampling Reports | RADVPSF<br><br>RADVIVAS<br><br>RADVDE<br><br>RADVEE<br><br>RADVMCE<br><br>RADVPCE<br><br>RADVSE | If an issuer identifies an issue with any of the HHS-RADV sampling reports, they may file a discrepancy with CMS during the HHS-RADV discrepancy reporting window. The issuer may submit the discrepancy in the Audit Tool.<br><br>**Note**: The discrepancy reporting window is 15 days beginning the date the final RADV command is pushed to issuers' EDGE servers. |

# Section 9

# HHS Risk Adjustment Data Validation Protocols

# Audit Procedures and Reporting Requirements

Exhibit W
Page 383

# 9.  Audit Procedures and Reporting Requirements

## 9.1   Purpose

CMS has selected data elements required for IVA Entity and SVA Entity validation based on their impact on risk score calculations and RA transfer calculations.

IVA Entities will document the validation results of these data elements and submit the results to CMS using an eXtensible Markup Language (XML) file format with additional supporting documents including workpapers, mapping documents, screenshots, and medical records.

In the following sections of this document, "*IVA Entity Audit Results Submission XML"* refers to the XML file that will be submitted containing the IVA findings.

Some data elements from D&E data validation, such as "Premium Amount," are not used in the enrollee risk score calculation, but are used during RA payment transfer calculations, and are therefore subject to validation.

## 9.2   Process Overview and Audit Execution



The initial step of the HHS-RADV audit process requires issuers to create documentation, or gather existing documentation, that maps issuer source system data to EDGE server data submissions (Section 9.4 – Phase 1 – Creating Mapping Documentation (Issuer)). Issuers are required to provide source system mapping documentation for D&E and RXC data elements (if subject to RXC validation). Issuers and IVA Entities must then review and confirm the accuracy of the mapping evidence (Section 9.5 – Phase 2 – Review and Confirm Mapping). This mapping documentation will be used in the review and validation of D&E data elements for a subsample of enrollees from the IVA Sample (Section 9.6 – Phase 3 – D&E Data Validation). See **Appendix A** (2018 Benefit Year D&E Documentation Examples)

RXC data is then validated (Section 9.7 – Phase 4 – RXC Validation), a new process beginning with the 2018 benefit year. Subsequently, in Section 9.8 (Phase 5 – Health Status Data Validation), medical records are matched to the enrollees in the IVA sample and valid diagnosis codes are abstracted. In the final audit phase described in Section 9.9 (Phase 6 – Record Validation Results), audit results are entered into the *IVA Entity Audit Results Submission XML* and submitted to CMS.

### 9.2.1   Audit Timing Considerations

CMS recognizes the rigorous documentation requirements of the audit process, specifically in relation to the time necessary to procure screenshot documentation and medical records from providers. While CMS does not require specific milestones to be met within the IVA execution window (apart from submission deadlines), general guidance regarding order of audit operations is detailed below:

- D&E data validation and RXC validation is **not** required to be completed prior to heath status data validation.
- If a medical record linked to a NEC is provided as part of the IVA, the claim should be validated prior to review of the associated medical record utilizing a screenshot with mapping documentation. This will be discussed in Section 9.3 (HHS-RADV Documentation Requirements).

## 9.2.2   Issuer and IVA Entity Correspondence

During D&E Data Validation (Phase 3), RXC Validation (Phase 4), and Health Status Data Validation (Phase 5), IVA Entities will review and validate documentation provided by the issuer in order to validate the accuracy of issuer-submitted EDGE server data.

Throughout the course of the validation process, IVA Entity reviewers may encounter documentation, processes, or source information which may be unclear or appear to reflect an error when compared to the values in the EDGE server.

If an error or issue is identified during the course of the validation process, issuers and IVA Entities are encouraged to communicate about the validity of the finding. The IVA Entity is encouraged to interact with the issuer when potential errors have been identified, and the issuer is encouraged to present evidence which mitigates the findings.

Additional documentation generated for these purposes must always be documented in workpapers and submitted along with the audit results. Refer to Section 9.3 (HHS-RADV Documentation Requirements) for additional detail on screenshot and workpaper requirements.

# 9.3   HHS-RADV Documentation Requirements

During the IVA process, the IVA Entity will review the supporting audit documentation for the sampled enrollees to validate the issuer's EDGE server data, as well as document their own audit validation methods and findings. The four (4) key documentation types are listed below. The key documentation types are:

- Mapping Documentation;
- Source System Documentation (Screenshots);
- Audit Workpapers;
- Medical Record Documentation.

An example of mapping documentation, screenshots, and workpapers, as well as tick-marking of evidence, is demonstrated within **Appendix A** (2018 Benefit Year D&E Documentation Examples).

## 9.3.1 Mapping Documentation

CMS requires issuers to provide IVA Entities with a set of documents that map to the issuer's or Pharmacy Benefit Manager's (PBM) source system data to EDGE server data submissions. Often, data from a source system is transformed to comply with EDGE server data submission business rules. This required mapping documentation allows both the IVA Entity and the SVA Entity to gain an understanding of the path of data from source systems into the EDGE server.

CMS requires that mapping documentation be captured for D&E Data Elements, RXC Data Elements, and NECs. Mapping documentation created by issuers for IVA Entities must be identified and recorded in the *IVA Entity Audit Results Submission XML* and submitted during the IVA Data Submission process. The mapping documents must be clear and legible for the SVA

Entity's comprehension or may result in a data element validation error.

CMS requirements for issuer source system mapping documentation and corresponding data validation activities are detailed within Section 9.3.2 (Source System Documentation - Screenshots), and Section 9.7.3 (RXC Documentation).

## 9.3.2 Source System Documentation (Screenshots)

IVA Entities must work with issuers to obtain evidence from the issuer's source systems that include D&E Data Elements and RXC Data Elements for selected enrollees in the issuer's sample, as well as any data necessary for NEC validation. This evidence is expected to be in the form of screenshots of the actual data in the issuer's source system(s). In order to validate the required D&E and RXC Data Elements, screenshots from various source systems may be necessary, including membership or enrollment, premium billing, claims adjudication, and Pharmacy Benefit Manager's (PBM) system(s).

Source documentation requirements are defined in Table 6.

**Table 6: Source Documentation**

| Source documentation is expected to: |
|---|
| • Capture all required HHS-RADV data elements. <br>    – *The eleven (11) required D&E Data Elements are identified in Section 9.4.* <br>    – *If required, the six (6) RXC RADVPCE data elements, and/or the four (4) RXC RADVMCE data elements identified in Section 9.7.3.1.* |
| • Be in the form of screenshots of the actual data in the issuer source system(s). <br>    – *Any data elements that exist in an issuer's source system must be documented from that source system using the screenshot requirements as stated.* |
| • Be understandable in the context of an audit. <br>    – *The screenshots should provide sufficient information to allow a reviewer the ability to confirm the accuracy of the data being validated with no additional inquiry required.* <br>    – *Tick-marking screenshots is encouraged to achieve this requirement and is discussed further in Section 9.3.3.1.* |
| • Reflect the most recent enrollment file or claim data submission to the EDGE server for the 2018 benefit year. |
| • Be accompanied by workpapers in the event that a data element has been manipulated or differs from that which was submitted to EDGE. <br>    – *These workpapers should be based directly on supporting documentation provided by the issuer to substantiate the manipulation of the source data.* <br>    – *Refer to Section 9.3.3 for additional information regarding workpaper documentation.* |
| **NOTE: Source documentation shall not be in the form of a data extract or report query.** |

The IVA Entity is not required to have physical or logical access to issuer systems or to oversee the screenshot process in real time. However, all screenshots taken, whether by the issuer or IVA Entity, must be understandable in the context of an audit and meet all criteria as specified in Table 6. Both IVA and SVA Entities will rely upon screenshot documentation to abstract data values and compare them to data submitted to the EDGE server.

## 9.3.2.1 Screenshot Automation

Though not required, CMS will allow issuers and IVA Entities to use an automated/scripted process for capturing screenshots to reduce the manual burden of capturing screenshots from source systems. CMS is permitting the automation of the screenshot generation process only and is not permitting other means of "extracting" source data for validation (e.g., screen scraping or data warehouse extracts).

For the purposes of HHS-RADV, an automated screenshot process is defined as "the implementation of a data capturing process which utilizes an automated tool to emulate a user's interaction with the source system's screens."

The outputs of an automated screenshot process are screenshots saved with time and date stamps and saved in a PDF format. If an automated process is utilized, the IVA Entity should evaluate the processes used for generating the screenshot.

If the issuer and IVA Entity elect to utilize an automated screenshot process, the below listed guidelines are recommended but not required:

- Issuer creates scripts using an automated tool;
- Scripts are executed by the issuer or IVA Entity;
- Script and script parameters are validated by the IVA Entity, along with script logs for successful/unsuccessful execution;
- Screenshots captured should be stored in a system folder with system date and time and in a PDF format.

The IVA Entity should understand and validate script parameters, execution results, and log review, if these guidelines are used.

## 9.3.3 Audit Workpapers

To assist in a comprehensive and logical audit, issuers may provide workpapers to IVA Entities, and IVA Entities may submit workpapers to CMS and the SVA Entity. Workpapers provide a means to communicate HHS-RADV program-related matters that would not otherwise be documented in the *IVA Entity Audit Results Submission XML*, and play a critical role in allowing the SVA to evaluate and interpret the findings of the IVA Entity.

Workpapers will be drafted as required throughout the D&E validation, RXC validation, and health status validation phases of the HHS-RADV process by the IVA Entity. Workpapers should document the IVA Entity's procedural steps taken to validate issuer data using the screenshot documentation and any accompanying mapping documentation. IVA Entities will validate the workpapers with the issuer to ensure the procedures align with the issuer's systems and processes.

IVA Entities will combine workpaper documentation with source system documentation (screenshots), and/or medical records to capture evidence of their validation process. Documentation of validation procedures in workpapers is important and should be prepared so that an experienced auditor, having no previous connection to the audit, can re-perform the validation. Note that workpapers are not required, but are strongly encouraged by CMS in all phases of the Audit Process.

Additionally, issuers can use workpapers to outline any data inaccuracies that occurred during EDGE server submission and were reported as a RA discrepancy. For workpaper guidelines and

sample documentation refer to **Appendix A** (2018 Benefit Year D&E Documentation Examples).

### 9.3.3.1 Tick-Marking Source System Documentation

Tick-marking (adding numeric or symbol indicators to a document to assist in interpretation) is an effective method of improving the consistency and clarity of audit documentation. Tick-marking source system screenshot documentation, and explaining these tick-marks in mapping documents or accompanying workpaper documents, is strongly encouraged.

### 9.3.4 Medical Record Documentation

Issuers and IVA Entities are required to obtain medical record documentation for enrollees in the IVA sample.

For the purpose of HHS-RADV, medical record documentation must originate from the provider of the services and align with dates of service for the medical diagnoses, and reflect permitted providers, observations, notes, therapies, assessment, clinical impression, diagnosis, tests, and services. "Medical record documentation" means clinical documentation of hospital inpatient or outpatient treatment or professional medical treatment from which enrollee health status is documented and related to accepted RA services that occurred during a specified time period. Medical record documentation must be generated under a face-to-face or telehealth visit documented and authenticated by a permitted provider of services within the state. See **Appendix F** (Guidance to Coders), for examples of acceptable and unacceptable provider signatures.

IVA Entities must review medical record documentation and submit diagnosis findings during the IVA results submission process for all enrollees. After signoff of submitted findings by both the IVA Entity and issuer, CMS will notify both parties of the enrollees selected for SVA review. For these enrollees, the IVA Entity must upload the corresponding medical record documentation files listed in the IVA Entity Audit Results Submission (XML) to the Audit Tool.

## 9.4   Phase 1 – Creating Mapping Documentation (Issuer)

Issuers are required to provide IVA Entities with a set of documents that map the issuer's source system data to EDGE server data submissions. The mapping documents must be clear and legible for the SVA Entity's comprehension or may result in a data element validation error. This section provides details specific to D&E mapping documentation requirements. Details specific to mapping documentation requirements for RXC validation are discussed in Section 9.7.3.1 (RXC Mapping Documentation).

The documentation provided from issuers must indicate:

- Which screens in their source systems contain the information necessary to validate specific EDGE data elements;
- Navigational steps necessary to understand how EDGE server data was derived from source system data;
- Any internal code sets used for any relevant data elements.

Screen references and internal code sets should provide sufficient information to substantiate how data elements in the EDGE server are derived from source system data. Navigational steps (referenced above) should be captured to allow the IVA and SVA Entities to connect these pieces of information, by providing a step-by-step understanding of how a source system data value is linked, transformed, manipulated, and then submitted to the EDGE server. To demonstrate this understanding, documentation must include:

- A detailed process narrative, which may include supporting documentation such as process flows, data mapping tables, screenshots, or other information that would allow a third party to understand the processes and to map the data without additional inquiry.
- Mapping documentation linking each data element (and their EDGE server acceptable values) to the corresponding element in the issuer's source systems via screenshots. The EDGE server data elements that must be mapped to source systems/processes are listed in Table 7.

Column one (1) outlines the data elements required to be mapped.

Column two (2) is the corresponding XML element in the HHS-RADV sampling reports.

Column three (3) indicates the EDGE Sampling Report where that data element is located.

**Table 7: EDGE Enrollment Data Elements**

| Enrollment Data Elements (ICD) | XML Element Reference | EDGE Sampling Report Reference |
|---|---|---|
| Unique Enrollee Identification (UID) | insuredMemberIdentifier | RADVEE |
| Member ID | N/A | N/A - IVA Entity to Identify |
| Enrollee First Name | N/A | N/A - IVA Entity to Identify |
| Enrollee Last Name | N/A | N/A - IVA Entity to Identify |
| Enrollee Date of Birth (DOB) | insuredMemberBirthDate | RADVEE |
| Enrollee Gender | insuredMemberGenderCode | RADVEE |
| Plan ID, which includes: • HIOS ID • CSR Factor | insurancePlanIdentifier | RADVEE |
| Enrollment Start Date | coverageStartDate | RADVEE |
| Enrollment End Date | coverageEndDate | RADVEE |
| Premium Amount | insurancePlanPremiumAmount | RADVEE |
| Rating Area | ratingAreaIdentifier | RADVEE |

CMS requires a specific mapping document to be created and uploaded, containing the data elements referenced in Table 7. For the 2018 benefit year, CMS requires that issuers create and IVA Entities submit at minimum of one (1) mapping document. If issuers and IVA Entities choose to submit only one (1) mapping document, this document should contain all data elements identified in Table 7 and their mapping information. IVA Entities may elect to submit additional "Other" mapping documents to provide additional information related to mapping of source system data to EDGE. Note that enrollee demographic information and EDGE server UIDs must be submitted, providing the IVA Entity and the SVA the ability to map UIDs to the corresponding enrollee. Additional detail regarding this mapping document can be found in Section 9.4.1 (Mapping EDGE Unique Enrollee ID to Source System Member ID & Demographic Information).

Content required for submission within the consolidated mapping documentation is specified below:

UID / Member ID / Name / DOB / Gender Mapping – Refer to Section 9.4.1 (Mapping EDGE Unique Enrollee ID to Source System Member ID & Demographic Information) for additional detail;

Plan ID Mapping;

Rating Area Mapping;

Premium Mapping;

Enrollment Period Mapping;

Other Mapping *(Optional).*

Within the mapping documentation, issuers are required to define how source system data corresponds to submitted EDGE server data. In the event source system data does not exactly match an EDGE server field definition, the issuer must document any interim steps or transformations performed to change the data (e.g., DOB 1/1/40 changed to DOB 1940-01-01). The issuer must also document the process of creating and linking UIDs between their EDGE server and their source data systems.

Note that RXC mapping documentation may be consolidated with D&E mapping documentation content and submitted as a single document in the IVA submission process. RXC specific mapping documentation and the RXC required data elements to be included are detailed in Section 9.7.3.1 (RXC Mapping Documentation). Mapping documentation will be used in the analysis and validation of D&E and RXC data elements, and is essential for both the IVA and SVA Entities to complete audit activities.

## 9.4.1 Mapping EDGE Unique Enrollee ID to Source System Member ID & Demographic Information

The issuer and/or IVA Entity must include in their mapping documentation the details necessary to provide a crosswalk between the EDGE server UID and the issuer's Member ID, DOB, Gender, and First Name and Last Name for each enrollee in the complete IVA Sample. **<u>Each enrollee in the IVA Sample must be included in the document. This is an essential step required for all enrollees in the complete IVA sample</u>**. This is required to link EDGE server data to key information not found in the EDGE server (Source system Member ID, Enrollee First Name, Enrollee Last Name).

This crosswalk should provide an IVA Entity reviewer or SVA Entity reviewer the ability to identify the corresponding enrollee when provided with the EDGE UID. Screenshots are not required for the documentation of this mapping.

---

**Note:** For example, a table populated by the issuer with values "EDGE Unique Enrollee ID" and "Enrollment Source System – Member ID", "Enrollment Source System – First Name", "Enrollment Source System – Last Name", "EDGE Date of Birth", and "EDGE Gender" would be an acceptable form of mapping for the D&E system.

---

## 9.4.2 Mapping of Supplemental Diagnoses

CMS recognizes that there are limited circumstances where relevant diagnoses may be missed or omitted during claim or encounter submission. In cases where diagnosis codes were missed or omitted during EDGE data submission, issuers have been provided specific business rules for submitting supplemental diagnosis codes for RA data submission. If supplemental diagnosis files are used to reflect enrollees' diagnoses, the issuer must document how those additional diagnosis codes were identified, linked to submitted claims, and submitted to EDGE, in compliance with the

applicable business rules.

## 9.5  Phase 2 – Review and Confirm Mapping

Once the issuer has provided documentation mapping the source system elements to the EDGE server elements, the next step is for the IVA Entity to review and discuss with the issuer the contents of the issuer's mapping documentation, so the IVA Entity can gain an understanding of the issuer's environment, as well as the D&E, premium, and claims source systems for RXCs and/or NECs.

Workpapers must be drafted by the IVA Entity as required throughout D&E data validation, RXC validation, and NEC data validation to supplement mapping documentation. Workpapers must combine issuer documentation (source system documentation and mapping documentation) with the IVA Entity's procedural steps taken to validate the issuer data. The IVA Entity will review the workpapers with the issuer to ensure the procedures align with the issuer's systems and processes.

## 9.6  Phase 3 – D&E Data Validation

During the D&E data validation process, source system documentation must be obtained to enable the validation of key D&E Data Elements by the IVA and SVA Entities for enrollees in the IVA sample. IVA Entities need to validate that the data submitted to the EDGE server matches D&E data stored within the issuer's source systems. The information that is gathered from the D&E data review is subsequently used to verify the identity of an enrollee during the Health Status Data Validation phase of the IVA process.

During each benefit year HHS-RADV audit program, CMS will select a subsample of randomly selected enrollees from the IVA sample for D&E validation. Enrollees eligible for the D&E validation subsample must be enrolled with the issuer for 30 continuous days in a calendar month. If the targeted D&E sample size of 50 enrollees cannot be achieved based on the CMS selection criteria, a smaller sample of enrollees may be selected by CMS. IVA Entities will need to perform the D&E process on only the enrollees in the selected D&E subsample.

CMS will not use D&E errors identified during the HHS-RADV audit in the risk score error calculation. Rather, CMS will use the findings from the D&E validation as a data quality control measure. CMS will conduct data analysis to determine if any issuers are outside of the norm related to each of the D&E Data Elements and will conduct outreach as needed.

As set forth in the 2019 Payment Notice[18], CMS will use HHS-RADV as a method of discovering materially incorrect EDGE server data submissions and making adjustments pursuant to 45 C.F.R. § 153.630(e).[19] D&E errors discovered during HHS-RADV will be the basis for adjustments to the applicable benefit year transfer amount, rather than the subsequent benefit year risk score, as underlying errors in diagnoses contributing to risk scores are treated.

For example, in cases where there is a material impact on RA transfers for that particular market as a result of incorrect EDGE server premium data discovered through HHS-RADV or otherwise, CMS would calculate the dollar value of differences in RA transfers, and, where the difference is detrimental to one (1) or more issuers in the state market risk pool, adjust the other issuers' RA

---

[18] 83 FR at 16970.
[19] This guidance is also included in the Evaluation of EDGE Data Submissions for the 2018 Benefit Year, released on November 15, 2018, available at https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/EDGE-2018.pdf.

transfer amounts by that calculation, and increase the RA charge (or decrease the RA payment) to the issuer that made the data error, in order to balance the market. CMS will evaluate all D&E Data Elements required for validation similarly.

Issuers identified as having D&E errors will receive outreach from CMS to evaluate the prevalence of these errors. These issuers may require EDGE data correction through the discrepancy process if material errors are identified.

## 9.6.1 Audit Steps

The steps that should be taken when performing D&E data validation for the enrollees in the IVA sample are described in this section and consist of the two (2) primary steps:

**Step 1:** Linking the enrollee in the IVA sample to the enrollee in the issuer's source system (required for the full IVA sample);
**Step 2:** Validating enrollee data elements (required for D&E subsample only)

The D&E data validation process begins once the EDGE server RADV sample reports and the source documents are obtained for the sampled enrollees. The EDGE server Unique Enrollee ID used in the IVA sample reports will likely not be found in the issuer's source system screenshots, as it is an EDGE server specific data value.

Therefore, the issuer must map the UIDs for each enrollee in the complete IVA sample (RADVEE Report) to the actual enrollee in the issuer's source enrollment system. The UID mapping documentation must include the UID from the RADVEE Report and the Member ID, first name, last name, DOB, and gender for the matched enrollee from the issuer's source system. The UID mapping documentation will be needed by both the IVA and SVA Entities to link submitted medical records to the proper enrollee in the IVA sample. The UID mapping documentation must be submitted as part of IVA Package 1.

**Step 1: Linking the Enrollee to the IVA Sample (required for the complete IVA sample)**

| Sub-step | Description | Additional Details |
|---|---|---|
| 1 | IVA Entity confirms Unique Enrollee IDs from the RADVEE Report are mapped to correct enrollees from the issuer's source system. | Reviewer obtains the Unique Enrollee ID mapping document from the issuer and compares the date of birth and gender to the date of birth and gender for the same Unique Enrollee ID in the RADVEE Report to verify the enrollee mapping provided by the issuer. |

It is important to note that, as stated in Section 9.4.1 (Mapping EDGE Unique Enrollee ID to Source System Member ID & Demographic Information) the linking of source system data to the enrollee in the IVA sample is done by linking the masked UID from the EDGE server to the actual enrollee Member ID within the issuer's source system, and this is required for all enrollees in the IVA sample. Without this linkage, the IVA and SVA Entities will not have the ability to verify the enrollee in the IVA sample or verify that the medical records are linked to the correct enrollee.

**Step 2: Validating Enrollee D&E Data Elements (required for D&E subsample only)**

| Sub-step | Description | Additional Details |
|---|---|---|
| 1 | IVA Entity gathers source system documentation **including screenshots** for the enrollees in the D&E subsample. | Reviewer gathers issuer mapping documentation and enrollment screenshots to perform D&E data review for the enrollees in the D&E subsample. |
| 2 | IVA Entity obtains EDGE server data element values and performs D&E data review. | The reviewer performs D&E data review for EDGE server data elements based on screenshot evidence. These data elements are:<br>- DOB<br>- Gender<br>- Plan ID<br>- Enrollment Start Date<br>- Enrollment End Date<br>- Premium Amount (for subscriber enrollees only)<br>- Rating Area (for subscriber enrollees only)<br><br>Reviewers identify the corresponding data element in the source system screenshot documentation and consult with the issuer to determine an accurate value (i.e., what should have been submitted to the EDGE server, based on the source system).<br><br>Once identified, this value is compared to the RADVEE Report data value. |
| 3 | IVA Entity drafts workpaper documentation as needed. | In the event that the source system data does not match the EDGE server data, or requires data transformation, the reviewer will document the correct value or data transformation in an accompanying workpaper.<br><br>**Note:** CMS review is constrained to EDGE data for the benefit year being audited, including the evaluation of enrollment coverage dates. In the event an enrollment coverage date extends past the end of the benefit year, CMS evaluates if the dates indicated are consistent with coverage through the last day of the benefit year being audited. CMS encourages the IVA Entity and issuer to coordinate on the findings and any discrepancy identified. |
| 4 | IVA Entity records results. | The reviewer records the results found from the issuer's source system for the enrollee in the *IVA Entity Audit Results Submission XML*. |
| 5 | IVA Entity repeats for the next enrollee in the D&E subsample. | The reviewer repeats the steps for the next enrollee in the D&E subsample. |

An example of mapping documentation, screenshots, and workpapers, is demonstrated within

**Appendix A** (2018 Benefit Year D&E Documentation Examples).

Refer to **Appendix B** (D&E Subsample Data Elements), for detailed validation guidance regarding the 2018 benefit year HHS-RADV D&E subsample data elements.

## 9.6.2 Validation of D&E Information for Enrollees with System-Generated Enrollment Periods

For the purposes of D&E review specific to enrollees with system-generated enrollment records associated with cross-year claims, IVA Entities should validate the 2017 benefit year enrollment period which led to the creation of the 2018 benefit year system-generated enrollment period.

For these enrollees, the IVA Entity or issuer should substantiate the latest enrollment information from the prior year via screenshots and workpapers and document that the enrollee was appropriately enrolled prior to creation of the system-generated enrollment period. Issuers should provide IVA Entities with the applicable 2017 benefit year plan enrollment screenshots to confirm that the system-generated enrollment period was appropriately created for the individual. IVA Entity workpapers should indicate how the source system enrollment period corresponds to the system-generated enrollment record. IVA Entities should submit this documentation as part of their IVA Entity Audit Results Submission (XML) and Package 1 Submission for CMS and SVA review.

> **Note**: Premium Amount and Rating Area are only required to be validated for Subscriber enrollees.

### Newborn Verifications with No Source System Support

Newborns may not have complete data within the issuer's source system. Some states require issuers to cover a newborn under the mother's enrollment for a specific period of time. Additionally, some hospital claims for childbirth include both the mother's record and the newborn infant's record on the same claim. In these situations, it is acceptable for an issuer to not have created a separate enrollment for the newborn in their systems, but rather handled all claims related to the newborn under the mother's policy. Note that in order for a risk score to be assigned to the newborn for purposes of the RA program, the newborn must have its own enrollment record, must appear separately from the mother's in the issuer's EDGE server data submission, and the newborn's claims must have been unbundled from the mother's claim.

IVA Entities should only evaluate medical record documentation for enrollees in the IVA Sample. In the event the newborn information was not separated and unbundled from the mother, in accordance with the ESBR, the newborn information should not be evaluated as part of the mother's health status. Detailed information related to unbundling of newborn and mother data is captured in the **ESBR Version 12.0**, which can be found in the REGTAP Library (https://www.regtap.info/).

The IVA Entity must confirm that the guidance contained in **ESBR Version 12.0** was followed appropriately for handling newborn coverage. The issuer must provide evidence of newborn coverage through workpaper documentation, if there are no screenshots.

### Changes to Enrollment Records Following RA Data Submission

In certain circumstances, it is possible that enrollee information is updated following final data submission for RA (e.g., gender changes from Male to Female). In the event issuers can adequately support these situations with documentation from source systems, IVA Entity

reviewers will document the post-submission updated enrollment data value as stored in the issuer's source system, along with workpaper documentation providing a clear explanation of the steps taken to validate the issuer's information.

**Documentation of Enrollment Periods**

For enrollees in the D&E subsample, CMS will provide the Plan ID and enrollment period that is required to be validated. If an enrollee has multiple enrollment periods, only the enrollment period identified by CMS needs to be validated.

# 9.7   Phase 4 – RXC Validation

Beginning with the 2018 benefit year, CMS will incorporate the validation of RXCs into the HHS-RADV IVA and SVA processes to validate the prescription drug component of adult enrollees' risk scores. All issuers are required to participate in the HHS-RADV RXC validation for the 2018 benefit year.

As finalized in the 2020 Payment Notice[20], the 2018 benefit year HHS-RADV RXC validation will be treated as a pilot year, in that CMS will not use RXC validation results to adjust enrollee risk scores as a result of findings from the claim-based validation. Rather, CMS will use the findings from the RXC data element validation as a data quality control measure and will evaluate the findings of the 2018 benefit year to inform future decisions specific to error application, sampling, and reporting for RXC data. In order to have an informative pilot year, CMS will implement all aspects of the RXC validation process in 2018 benefit year HHS-RADV, including outreach to issuers with identified errors; however, CMS will not use RXC validation results to adjust enrollee risk scores or transfers as a result of findings from the claim-based validation.

The three (3) primary objectives of RXC validation are as follows:

- Validate that the prescription was filled (RXC Source: Pharmacy Claim);
- Validate that the RXC eligible Product/Service ID is on a pharmacy claim paid by the issuer;
- Validate that the RXC eligible Service Code is on a medical claim paid by the issuer.

RXC validation will be conducted as a claim-based review process. For each enrollee's RXC, an RXC-eligible[21] claim on the RADVPCE or RADVMCE Report must be identified and validated. Issuers and IVA Entities must validate that the claim in the issuer source system supports the claim submitted to the EDGE server.

## 9.7.1 RXC Sample Size

The total population of issuers' enrollees with RXCs is expected to be relatively low compared to the population of enrollees with HCCs. Only adult enrollees (a subset of IVA sampled enrollees) can have an RXC, and the observed frequency of RXCs among adult enrollees is relatively low.

All adult enrollees with at least one (1) RXC in the IVA sample constitute the RXC sample for an issuer. CMS **will not** separately communicate an RXC sample to the issuer. The issuer's HHS-

---

[20] 84 FR at 17501.
[21] RXC eligible medical claims are identified in the RADVMCE Report by the 'RXC Eligible Flag' data element, where 'Y' indicates that the RADVMCE claim is RXC eligible. RXC eligible pharmacy claims are listed in the RADVPCE Report.

RADV sampling reports must be used to determine the applicable RXC sample.

> **Note:** If an issuer has no adult enrollees in the IVA sample with an RXC, the issuer is not subject to any of the RXC validation requirements.

To determine the enrollees in the RXC sample, IVA Entities should review the RADVDE Report to identify all enrollees with at least one (1) RXC. All RXCs for the RXC sample enrollees must be validated by the IVA Entity. As a result, CMS encourages issuers and IVA Entities to communicate to identify the unique RXCs for each sampled adult enrollee with RXCs which are required for validation.[22]

## 9.7.2 Identifying RXC Source

To support the validation of sampled adult enrollees' RXCs, issuers and IVA Entities must first determine the source of the RXC. The RXC source includes the following:

- The National Drug Code (NDC), submitted on a pharmacy claim, and
- The Healthcare Common Procedure Coding System (HCPCS)/Service Code submitted on a medical claim.

To identify the source of each enrollee's RXC, issuers and IVA Entities should use 'Table 10a' and 'Table 10b' of the 2018 Benefit Year HHS-Developed RA Model Algorithm "Do It Yourself (DIY)" Software (4/4/2019).

> **Note:** The 2018 Benefit Year HHS-Developed RA Model Algorithm "Do It Yourself (DIY)" Software (4/4/2019) and instructions can be found on the CCIIO website or by using the following links:
> - **Instructions:** https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/Updated-CY2018-DIY-instructions.pdf
> - **Technical Details (tables):** https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/Updated-DIY-Tables-2018.xlsx

DIY Table 10a provides a crosswalk for NDCs to RXCs and DIY Table 10b provides a crosswalk for HCPCS service codes to RXCs. Issuers and IVA Entities can use these tables to identify the RXC source for each unique RXC for an enrollee in the RXC sample by crosswalking an enrollee's pharmacy claim NDCs from the RADVPCE Report to the RXCs identified in DIY Table 10a. Similarly, a HCPCS code from an RXC-eligible medical claim on the RADVMCE Report can be crosswalked to the RXCs identified in DIY Table 10b.

If an RXC can be linked to both a RADVPCE and a RADVMCE claim, the IVA Entity is only required to validate one (1) of the corresponding linked claims to substantiate the RXC for the enrollee. For example, when both a pharmacy claim NDC and a RXC-eligible medical claim HCPCS service code correspond to 'RXC 1' per DIY Tables 10a and 10b, then only one (1) claim is required to be validated. However, if the claim selected for validation cannot be validated by the IVA Entity, issuers and IVA Entities are encouraged to identify other claims on the RADVPCE or RADVMCE reports to substantiate the RXC.

---

[22] RXCs are only associated with adult enrollees in the RA model. In HHS-RADV, enrollees in strata 1-3 (Adult: High, Adult: Medium, and Adult: Low) are the only enrollees who may be assigned an RXC.

Once the RXC source is determined (pharmacy claim NDC or RXC-eligible medical claim HCPCS service code), issuers must identify the corresponding source system claim to facilitate the IVA Entity (and SVA) review activities, as described in Section 9.7.3 (RXC Documentation).

## 9.7.3 RXC Documentation

The documentation requirement for the RXC validation process is similar to that of the D&E process, and includes:

- **Mapping Documentation** (Section 9.7.3.1) – Issuer documentation enabling the linking of source system data to EDGE data identified in the RADVPCE or RADVMCE Reports

- **Source System Documentation – Screenshots** (Section 9.7.3.2) – Source system documentation of positively adjudicated pharmacy or RXC-eligible medical claims. For the purposes of RXC validation, one (1) of the following source system submissions are acceptable:
  - o Issuer system screenshot(s) containing the required validation data elements.
    - ▪ This includes screenshot(s) from the issuer's system following the ingest of data files obtained from a Pharmacy Benefit Manager (PBM).
  - o PBM system screenshot containing the required data elements.
- **Workpapers** (Section 9.7.3.3) **–** IVA Entity documentation explaining details of audit steps performed

---

**Note:** IVA Entities and issuers are **not** required to engage with or retrieve supporting documentation from dispensing providers or medical providers to validate RXCs.

---

## 9.7.3.1 RXC Mapping Documentation

Issuers are required to provide IVA Entities with documentation which maps the issuer's source system data to submitted EDGE server data. This mapping documentation must contain information specific to the RXC linked claims and must be sufficient to allow the IVA and SVA Entities to interpret claim source system screenshots and validate claims data.[23]

All RXC mapping documentation may be compiled into one (1) mapping document that contains all elements (inclusive of those in Tables 8 and 9), and may also be consolidated with D&E mapping documentation (see Section 9.4 – Phase 1 - Creating Mapping Documentation). Additional mapping document files may be submitted with the 'Other Mapping' file type in the XML Submission.

The data elements included in RXC mapping documentation must correspond to the claim type (RADVPCE or RADVMCE) being used to validate the RXCs.

- If pharmacy claims from the RADVPCE Report are utilized, RADVPCE data elements must be documented in the mapping documentation.

- If RXC-eligible medical claims from the RADVMCE Report are utilized, RADVMCE data elements must be documented in the mapping documentation.

- If both are used, RADVPCE and RADVMCE data elements must be documented within the

---

[23] See Section 9.4 – Phase 1 – Creating Mapping Documentation for additional detail

mapping documentation.

Mapping documentation provided must enable the linking of each RADVPCE or RADVMCE data element to the corresponding element in the issuer's source systems.

## RADVPCE Data Elements

The RADVPCE Report data elements listed in Table 8 must be validated when an RXC is associated with a National Drug Class (NDC) 'Product/Service ID' on a pharmacy claim. If a RADVPCE claim is utilized, each data element below must be documented in mapping documentation.

Note the following for Table 8:

- The left column lists the data elements required to be mapped to the issuer's source system.

- The right column lists the corresponding XML element in the RADVPCE Report.

**Table 8: RADVPCE Data Elements**

| Claim Data Elements (ICD) | XML Element Reference[24] |
|---|---|
| Unique Enrollee Identification (UID) | insuredMemberIdentifier |
| Source System Claim ID[25] | N/A |
| Claim ID | claimIdentifier |
| Claim Processed Date Time | claimProcessedDateTime |
| Fill Date | prescriptionFillDate |
| Dispensing Provider ID | dispensingProviderIdentifier |
| Product/Service ID | nationalDrugCode |

## RADVMCE Data Elements

The RADVMCE Report data elements listed in Table 9 must be validated when an RXC is associated with a Healthcare Common Procedure Coding System (HCPCS) service code on an RXC-eligible medical claim. If a RADVMCE claim is utilized, each data element below must be documented in mapping documentation.

Note the following for Table 9:

- The left column lists the data elements required to be mapped to the issuer's source system.

- The right column lists the corresponding XML element in the RADVMCE Report.

**Table 9: RADVMCE Data Elements**

| Claim Data Elements (ICD) | XML Element Reference |
|---|---|
| Unique Enrollee Identification (UID) | insuredMemberIdentifier |

---

[24] See the Interface Control Document – Risk Adjustment Data Validation (RADV) Addendum posted in the REGTAP Library

[25] The Source System Claim ID is not in the RADVPCE Report but rather the claim ID from the issuer's source system that maps to the claim submitted to the EDGE server which is represented by the Claim ID in the RADVPCE Report

| Claim Data Elements (ICD) | XML Element Reference |
|---|---|
| Source System Claim ID[26] | N/A |
| Claim ID | claimIdentifier |
| Claim Processed Date Time | claimProcessedDateTime |
| Service Code | serviceCode |

**Mapping Documentation – Mapping EDGE Claim IDs to Source System Claim IDs**

To support the IVA Entity in determining the claim in the issuer's source system to validate, issuers may choose to provide the IVA and SVA Entities with a crosswalk of RADVPCE or RADVMCE Claim ID and Source System Claim ID reference information. The crosswalk can be developed by establishing a table within the mapping documentation to include the RADVPCE or RADVMCE Claim ID and the corresponding Source System Claim ID. This information enables the IVA and SVA Entities to link the source system claim to the EDGE Claim ID on the RADVPCE or RADVMCE Report.

## 9.7.3.2 RXC Source System Documentation (Screenshots)

For the RXC claims-based review process, source system documentation (screenshots) must be provided to enable the audit steps defined in Section 9.7.4 (RXC Validation Steps) by IVA Entities and the SVA Entity. Source system screenshot documentation must be provided for all required RXC Data Elements found on the RADVMCE and RADVPCE Reports.

The source system screenshot provided for each RXC claim data element must be sufficient to allow the IVA and SVA Entities to determine the appropriate RADVPCE or RADVMCE data value when reviewed in conjunction with mapping and workpaper documentation. This documentation should enable an independent reviewer to reproduce validation activities and arrive at the same conclusion (i.e., the same determined data value).

### Documenting Enrollee Details for RXC Linked Claims

When obtaining source system documentation (screenshots) of Source System Claim IDs for each RXC linked claim, issuers and IVA Entities must include in these screenshots any associated enrollee identifying information for the claim, including DOB, Gender, First Name, and Last Name if available in the source system. The IVA and SVA Entities will utilize this information in conjunction with issuer provided mapping documentation to confirm that the source system claim data can be linked to sampled enrollee for which it is submitted. This activity is detailed in Section 9.7.4 (RXC Validation Steps), Step 3, Sub-step 2.

## 9.7.3.3 RXC Workpaper Documentation

CMS encourages IVA Entities to develop workpaper documentation to capture any details specific to the interpretation, calculation, or correlation of source system data to EDGE data. Additionally, workpaper documentation may be used to identify steps taken to reconcile source system documentation (screenshots) with mapping documentation in order to verify RADVPCE or RADVMCE data for RXC linked claims.

26 The Source System Claim ID is not in the RADVMCE Report but rather the claim ID from the issuer's source system that maps to the claim submitted to the EDGE server which is represented by the Claim ID in the RADVMCE Report

## 9.7.4 RXC Validation Steps

The steps taken when performing RXC validation for the adult enrollees in the RXC sample consist of the following:

- **Step 1:** Use the RADVDE Report to determine the adult enrollees in the RXC sample and the list of unique RXCs to be validated for each enrollee;

- **Step 2:** Use DIY Tables 10a and 10b to determine the source for each RXC to be validated (NDC code from a pharmacy claim or HCPCS from an RXC-eligible medical claims);

- **Step 3:** Use issuer mapping documentation to identify the RXC linked claim on the RADVMCE or RADVPCE Report;

- **Step 4:** Use screenshots to validate issuer source system claim data and determine values for each RADVPCE or RADVMCE data element; and

- **Step 5:** Record results and assess if all adult enrollee RXCs have been validated by the IVA Entity.

**Step 1:** Use the RADVDE Report to determine adult enrollees in the RXC sample and the list of unique RXCs to be validated for each enrollee.

| Sub-step | Description | Additional Details |
|---|---|---|
| 1 | Determine enrollees included in the RXC sample | Reviewer references the RADVDE Report to determine all adult enrollees with RXCs that require validation. Enrollees where RADVDE data element 'Total Payment RXCs' is one (1) or greater, indicates that RXCs were attributed to the enrollee. |
| 2 | Determine the RXCs for each enrollee to be validated | For each adult enrollee where RADVDE data element 'Total Payment RXCs' is one (1) or greater, reference the RADVDE data element 'RXC' to determine the unique RXCs requiring validation. |

**Step 2:** Use DIY Table 10a or 10b to determine the source for each RXC to be validated (NDC code from a pharmacy claim or HCPCS from an RXC-eligible medical claim).

| Sub-step | Description | Additional Details |
|---|---|---|
| 1 | Determine the source of the enrollee RXC | Reviewer determines the source of the unique RXC that requires validation. The source for a unique RXC can be from the following:<br><br>- NDC code submitted on a pharmacy claim (RADVPCE Report) or<br>- HCPCS/Service Code submitted on an RXC-eligible medical claim (RADVMCE Report). |
| 2 | IVA Entity references the 2018 DIY Tables 10a and 10b for RXC crosswalk | Reviewer references the 2018 DIY Tables 10a and 10b to determine the appropriate crosswalk for each enrollee RXC in the RXC sample.<br><br>- Crosswalking an enrollee's RXC identified in the RADVDE Report to an NDC identified in DIY Table 10a<br>- Crosswalking an enrollee's RXC identified in the RADVDE Report to a HCPCS code identified in DIY Table 10b |

**Step 3:** Use issuer mapping documentation to identify the RXC linked claim on the RADVMCE or RADVPCE Report.

| Sub-step | Description | Additional Details |
|---|---|---|
| 1 | For each unique enrollee RXC, the IVA Entity and issuer select a linked claim on the RADVPCE or RADVMCE Report which corresponds to the enrollee's RXC | Once the RXC source is determined (NDC/pharmacy claim or HCPCS/RXC-eligible medical claim), reviewers must identify the corresponding source system claim within the issuer provided mapping documentation.<br><br>Reviewers are only required to validate a unique RXC once, with the appropriate data elements corresponding to the report which they are using to substantiate the RXCs.<br><br>***Example:*** *The RADVDE Report identifies an enrollee has RXC 4. RXC 4 maps to NDC code '00024107501' from a pharmacy claim for the enrollee on the RADVPCE report. The same RXC 4 also maps to HCPCS 'J0881' code which is found on an RXC-eligible medical claim for the enrollee found on the RADVMCE Report.*<br><br>Selecting one (1) claim for validation (either the RADVPCE or RADVMCE claim) and submitting the appropriate data elements related to the claim will result in a successful validation of the RXC. |
| 2 | IVA Entity confirms that the linked claim is for the sampled enrollee | Reviewer confirms that the EDGE Unique Enrollee ID on the RADVDE report corresponds to the Unique Enrollee ID in the RADVPCE or RADVMCE report associated with the linked pharmacy or medical claim.<br><br>Next, the Reviewer identifies the Source System Claim ID in the issuer's RXC mapping documentation that corresponds to the linked Claim ID from the RADVPCE or RADVMCE report.<br><br>Next, the Reviewer confirms that in the claim source system, data elements including DOB, Gender, First Name, and Last Name correspond to the DOB and Gender for the enrollee as identified in the RADVEE report and the First Name and Last Name of the enrollee as documented in the UID mapping documentation referenced in Section 9.4.1 - Mapping EDGE Unique Enrollee ID to Source System Member ID & Demographic Information).<br><br>If, using professional judgement, the Reviewer determines that source system claim DOB, Gender, First Name, and Last Name corresponds to the DOB and Gender on the RADVEE report and the First Name and Last Name identified in the UID mapping documentation, the Reviewer may continue to Step 4. |

**Step 4:** Use screenshots to validate issuer's source system claim data and determine values for each RADVPCE or RADVMCE data element.

| Sub-step | Description | Additional Details |
|---|---|---|
| 1 | For each unique enrollee RXC linked claim, the IVA Entity gathers source system documentation **including screenshots** to support the data elements selected for review | Reviewer gathers issuer mapping documentation that contains claim specific data elements for the selected claim to be validated (RADVPCE and RADVMCE) and claim screenshots to perform the RXC validation for all enrollees' RXCs in the RXC sample as determined in Step 1. |
| 2 | IVA Entity obtains EDGE server data element values and performs RXC data review | The reviewer performs RXC data review for EDGE server data elements based on screenshot evidence. For each linked claim, the IVA Entity shall review and evaluate screenshot documentation to determine if source system data corresponds to EDGE server data for the linked claim.

If the linked claim is a RADVPCE Report claim, the following data elements are required to be validated:
- Source System Claim ID
- Claim Processed Date/Time
- Fill Date
- Dispensing Provider ID
- Product/Service ID

If the linked claim is a RADVMCE Report claim, the following data elements are required to be validated:
- Source System Claim ID
- Claim Processed Date/Time
- Service Code |
| 3 | IVA Entity drafts workpaper documentation as needed | In the event that the source system data does not match the EDGE server data on the RADVPCE or RADVMCE report and/or requires data transformation, the reviewer will document the correct value or data transformation in an accompanying workpaper.

If the IVA Entity determines that the EDGE value for the data element under review is different than the EDGE value on the RADVPCE or RADVMCE report or is unable to substantiate the applicable data element, this information should be documented within the results submission documentation and workpapers. |

**Step 5:** Record results and assess if all enrollee RXCs have been validated by the IVA Entity

| Sub-step | Description | Additional Details |
|----------|-------------|--------------------|
| 1 | IVA Entity records results | The reviewer records the results found from the issuer's source system for the enrollee in the *IVA Entity Audit Results Submission XML*. |
| 2 | IVA Entity repeats these steps for the next enrollee in the RXC sample | The reviewer repeats the steps for the next enrollee RXC in the RXC sample.<br><br>**Note:** Detailed Audit Tool procedures and guidance, including IVA Entity Audit Results Submission XML data elements, will be provided via webinar guidance, documented within the IVA Submission XML ICD, and subsequently retained within REGTAP. |

Refer to **Appendix C** (Final Drug Diagnosis (RXC-HCC) Pairs for the 2018 Adult Models) for additional details regarding the final drug diagnosis pairs for the 2018 Adult Model.

## 9.8   Phase 5 – Health Status Data Validation

Health status data validation will be performed on all enrollees in the IVA Sample in order to substantiate diagnoses in accordance with the International Classification of Diseases (ICD) Clinical Modification (CM) Tenth edition coding guidelines, hereafter referred to as ICD-10-CM. See **Appendix D** (ICD-10-CM Official Guidelines for Coding and Reporting) for additional resources and guidance.

### Figure 1: Health Status Data Validation



*Figure 1 illustrates the IVA and SVA Entity health status data validation process.*

The issuer or IVA Entity will link medical records for the enrollee with at least one (1) RA eligible claim per medical record, and the issuer will provide the medical records to the IVA Entity to evaluate. The linked claim for each medical record must be a claim on the RADVMCE report where the claims statement covers from/through date aligns to at least one (1) of the dates of service found on the medical record. Alternatively, if applicable, the medical record can be linked to a RA eligible paid/positively adjudicated NEC submitted via the NEC section of the *IVA Entity Audit Results Submission XML*. If this criterion is met, the medical record is permissible for review for the purposes of the 2018 benefit year HHS-RADV audit program. All diagnoses within the benefit year from a permissible medical record may be abstracted, independent of the enrollee's plan enrollment.

For 2018 benefit year HHS-RADV, CMS has revised HHS-RADV specific guidance for the abstraction of lifelong permanent health conditions. The 'Chronic Condition HCC' list of the 2017 benefit year HHS-RADV protocols is no longer valid.  CMS has revised the 2018 Protocols document to include a simplified list of health conditions which share similar characteristics of being lifelong, permanent conditions. Conditions selected by CMS for inclusion in the 'Lifelong Permanent Conditions' list may be abstracted if documented in any of the documentation provided for an enrollee's medical history. Refer to **Appendix E** (Lifelong Permanent Conditions) for

additional information.

CMS encourages the utilization of the ICD-10-CM Official Guidelines for Coding and Reporting, the American Hospital Association (AHA) Coding Clinic, and the HHS-RADV 2018 benefit year Protocols, along with professional judgment to make final determinations when abstracting diagnoses related to all conditions not contained within this list.

> **Note:** At a minimum, medical records are needed to substantiate each HCC reported in the RADVDE Report for the enrollees in the IVA Sample. If there are medical records associated with a RA eligible paid/positively adjudicated NECs, then those records should be provided as well.

CMS will allow medical records to be submitted that do not have an associated EDGE server claim, but for which the issuer did bear a financial risk. The IVA Entity should ensure that all required EDGE server data elements for these NECs are documented in the *IVA Entity Audit Results Submission XML* and that evidence of the source systems, including adjudication, is provided with the results.

Additionally, screenshot documentation of NECs must be provided along with the medical record for the purposes of health status validation.

## 9.8.1 Medical Record and Chart Retrieval

The health status validation phase begins when the IVA or SVA Entity obtains medical records. Issuers and contracted IVA Entities should attempt to retrieve medical records and documentation sufficient to provide evidence of HCCs from providers. This request for medical records from providers should begin as soon as the IVA sample is released to each issuer and IVA Entity.

Failure to retrieve a medical record will impact audit results in the event an HCC is unable to be substantiated. A legitimate medical record may both validate an existing diagnosis and provide evidence of an unreported RA eligible diagnosis or new HCC for the enrollee.

If the provided medical record does not contain sufficient medical documentation to abstract the intended diagnosis, the issuer and IVA Entity should work with the provider to obtain sufficient documentation. If the SVA Entity is not provided with sufficient medical documentation needed to support the diagnosis, the SVA Entity may not be able to abstract the diagnosis.

A HHS-RADV Provider Medical Record Request Memo, on CMS letterhead, will be provided via the Audit Tool for issuers and/or IVA Entities to send to relevant providers to support a medical record request. The memo will identify the purpose of the request and underscore the necessity that providers respond to the medical record request in a timely manner and at minimum submit all progress notes and discharge summary, if applicable, for the enrollee under review **to the issuer**. This memo shall not be altered in any way and shall not be used by the issuer or IVA Entity for any purpose other than retrieval of documentation to support HHS-RADV. Please note that the Provider Medical Record Request Memo should not be submitted with the accompanying medical record as part of the IVA results submission.

It is the issuer's responsibility to assist its IVA Entity in the retrieval of medical records and documentation sufficient to provide evidence of HCCs from providers; <u>CMS cannot provide assistance</u>. It is the issuer's responsibility to ensure all medical record requests contain the necessary information for the provider to fulfill the request, including the sampled patients' names, information about the date(s) of service being audited, and the corresponding address for medical record submission, so that providers can provide the relevant medical record documentation. The

HHS-RADV Provider Medical Record Request Memo can be accessed in the Audit Tool by selecting the "Library" tab and then clicking the "Guidance" section.

The timely and thorough retrieval of medical records from providers is a key component of the Health Status Data Validation procedures. Without access to the relevant medical records, the ability of IVA Entities to accurately validate submitted EDGE server data will be hindered. Failure to obtain a specific medical record may result in an HCC failure that will be recorded during the diagnosis abstraction process in the event that a specific medical record, reflecting the only source of a diagnosis mapping to an HCC, is unavailable for the IVA Entity to review.

## 9.8.2 Medical Record Review and Diagnosis Abstraction – Overview

After obtaining the medical records and claims documentation, the IVA and SVA Entities will compare data from the medical records to validated elements and the EDGE server report.

Enrollee medical record review consists of the following steps:

- Medical record intake;
- Validation of acceptable medical record dates of service;
- Validation of acceptable medical record signatures;
- Diagnosis Abstraction.

Medical record intake ensures that the medical record can be affirmatively linked to a sampled enrollee. Medical record intake can be completed by the Primary or Senior Reviewer, or by certified medical coders.

Medical record review and diagnosis abstraction involves linking the medical record to one (1) of the enrollee's claims identified in the EDGE server RADVMCE Report, or as documented in the source system evidence.

The medical record is then reviewed to identify any ICD-10-CM diagnoses and ensure it meets CMS requirements for acceptable dates of service, facility type, bill type, service code, service type, provider credentials, and signature. See **Appendix D** for additional information on ICD-10-CM Official Guidelines for Coding and Reporting. CMS is not requiring IVA Entities to document or submit specific signature and credentialing data, but IVA Entities are required to validate this information identified on the medical record in accordance with coding guidelines. This is in order to verify that the medical record meets CMS requirements to validate the issuer-submitted data for enrollee risk scores. Certified medical coders must verify that the medical record originates from the provider of the medical service(s) and that the medical record reflects acceptable providers and services. This step requires a Senior Coder to review the medical record if discrepancies are found by the Primary Coder.

IVA Entity Senior Coders shall also perform IRR on a sample of records for all Primary Coders and record the results of any revalidation. This process is detailed in Section 10 (IVA Inter-Rater Reliability).

## 9.8.3 Medical Record Intake

The purpose of medical record intake is to ensure that submitted medical records are for the appropriate sampled enrollee and that the dates of service align with an issuer-adjudicated and paid RA eligible claim. Medical records that cannot be linked to a sampled enrollee, or to a RA eligible paid claim, should be determined non-eligible.

Medical record intake can be completed by the Primary or Senior Reviewer, or by certified

723 of 1177   Page ID

medical coders. Medical record intake is not required to be completed by certified medical coders.
If discrepancies are found by the Primary Reviewer, medical record intake does require a Senior
Reviewer to review the medical record to confirm the discrepancies. The roles of these individuals
involved in the health status validation medical record intake process are as follows:

- **Primary Reviewer:** The Primary Reviewer verifies that the enrollee name, DOB, and
  gender documented on the medical record matches the enrollee data on the UID mapping
  documentation provided by the issuer and confirmed by the IVA Entity. If there is a
  discrepancy, the issuer or IVA Entity may engage providers to verify that the correct
  medical record was provided, or to obtain the correct record if the provider supplied an
  incorrect record. If no provider errors are identified and discrepancies persist between the
  medical record and the enrollee, the Primary Reviewer will flag the medical record as an
  error. After review, files marked as errors will be sent to a Senior Reviewer.
- **Senior Reviewer:** The Senior Reviewer revalidates the steps for medical records that did
  not link to enrollee data on the UID mapping documentation provided by the issuer and
  confirmed by the IVA Entity. If the Senior Reviewer is unable to link the medical record to
  an enrollee in the IVA Sample, the Senior Reviewer will reject the record.

The Medical Record Intake Testing process consists of the following three (3) steps further
described in Table 10.

**Step 1:** Gather medical record documentation;
**Step 2:** Primary Reviewer compares medical record data to the Unique Enrollee ID content in
the mapping document;
**Step 3:** Senior Reviewer compares medical record data to the Unique Enrollee ID content in
the mapping document.

**Table 10: Medical Record Intake Testing**

| Step | Description | Additional Details |
|------|-------------|--------------------|
| 1 | Gather medical record documentation. | Primary Reviewer gathers enrollee medical record documentation from the issuer to identify linking data element values on the medical record (First Name, Last Name, DOB, Gender). |
| 2 (a-c) | Primary Reviewer – Compare medical record data to the Unique Enrollee ID mapping document. | The Primary Reviewer compares the demographic data from the medical record to the UID mapping documentation provided by the issuer and confirmed by the IVA Entity to determine, using professional judgment, that the fields recorded reasonably match. |
| | | a) If there is agreement or the Primary Reviewer determines, using professional judgment, that the fields reasonably match, then the Primary Reviewer records the results as final in the *IVA Entity Audit Results Submission XML*. No additional review is necessary. |
| | | b) If there are differences, the Primary Reviewer marks the inconsistent findings and submits the record to the Senior Reviewer for confirmation. |

| Step | Description | Additional Details |
|---|---|---|
| | | c) Chart Request Feedback Loop. For enrollee medical records for which inconsistent findings are initially identified, the IVA Entity reviewer should confirm with the issuer that the appropriate medical record requested was provided. This step may be performed either by the Primary Reviewer, prior to Senior Reviewer review, or by the Senior Reviewer once the files marked as containing errors are allocated for senior review. If performed by the Senior Reviewer, this process step would relocate within the table. |
| 3 (a-b) | Senior Reviewer – Compare medical record data to the Unique Enrollee ID mapping document. | The Senior Reviewer compares the results from the medical record to the UID mapping documentation provided by the issuer and confirmed by the IVA Entity to ensure that all fields recorded reasonably match. <br><br> a) If there is agreement and the Senior Reviewer determines, using professional judgment, that the fields reasonably match, then the medical record should be passed along for diagnosis abstraction. <br><br> b) If there is a difference and if the *Chart Request Feedback Loop* has been completed, the Senior Reviewer should reject the medical record. |

## 9.8.4 Key Considerations of Medical Record Intake

**Evaluating Match Between Medical Record and Demographics and Enrollment Data**

In this process, the enrollee's first name, last name, DOB, and gender should reasonably match between the medical record and the issuer provided UID mapping documentation. If a complete match between the medical record and the UID mapping documentation is not found, the IVA Entity may use professional judgment to support the verification of the step. If professional judgment is used, the IVA Entity should submit a medical record workpaper detailing why and how professional judgment was employed. The medical record workpaper should provide sufficient information for the SVA Entity to arrive at the same conclusion, as determined by the IVA Entity.

**Note:** The reasonability of a match is based upon the IVA Entity reviewer's professional judgment. For example, one (1) source may show the enrollee's name as Michael Smith, whereas the second source may show Mike Smith – based on a reviewer's professional judgment, this scenario may be determined to be acceptable. In the event that the enrollee name, DOB, and gender cannot be corroborated between the UID mapping documentation and the data on the medical record, the IVA Entity must perform necessary due diligence to contact

issuers or providers and determine if the correct medical record was provided.

If the Primary Reviewer is unable to reasonably conclude that the medical record is for the corresponding sampled enrollee, the reviewer will forward to the Senior Intake Reviewer to determine if the inconsistent finding is final.

## 9.8.5 Documentation of Claims Not Accepted in EDGE

CMS will allow issuers to submit medical records for which no claim was accepted into the EDGE server. If issuers wish to have medical records reviewed with no associated EDGE server claim, they must allow the IVA Entity to view and document these claims within the source system and record their results in the *IVA Entity Audit Results Submission XML*. CMS refers to these claims as "NECs."

For each NEC, a screenshot from the issuer's claims adjudication system must be submitted along with the medical record for the SVA Entity to review. The screenshot must include the claim source, dates of service claimed, the service code, and bill type (if applicable), as well as a paid/positive adjudication status.

IVA Entity reviewers must document all claims data elements within the issuer source system via a screenshot. However, these values will not be compared to EDGE server values (as no EDGE server values for these additional claims will exist).

**Cross-Year Claims**

For 2018 benefit year HHS-RADV, CMS has updated the RADVMCE Report claim logic to be inclusive of "cross-year claims" or claims with dates of service spanning across two (2) benefit years. "Cross-year claims" should not be submitted as NECs.

## 9.8.6 Acceptable Date of Medical Record or Claim

The medical record date of service (DOS) defines when an enrollee received medical treatment from a physician, permitted provider, medical facility, or telehealth visit (as described in Section 9.3.4 Medical Record Documentation). For medical records to be permissible for HHS-RADV, the criteria listed below must be confirmed by IVA Entities. If the below criteria are met, then those medical records are permissible for review for the 2018 benefit year HHS-RADV audit:

1. All authenticated medical records from inpatient hospital, outpatient, and professional sources must match the demographic data for the sampled enrollee on the UID mapping documentation.

2. The medical record must be linked to either one (1) EDGE server accepted RA eligible claim from the RADVMCE Report where the claims statement covers from/through date aligns to at least one (1) of the dates of service found on the medical record. Alternatively, the medical record can be linked to a RA eligible paid/positively adjudicated NEC for the specified sampled enrollee, if applicable.

If a medical record meets these two (2) requirements, the record is deemed to be permissible for abstraction as part of the HHS-RADV process, and all diagnoses may be abstracted within the benefit year according to ICD-10-CM guidelines (see **Appendix D**), including other DOS and associated diagnosis codes found on the medical record.

## 9.8.6.1 Inpatient Considerations

For inpatient records, when linking the medical record to a claim, the dates of service or admission and discharge dates on a medical record should align with the statement covers from/through dates on the claim. The statement covers through date and the discharge date MUST fall within the benefit year being audited. For example, if an enrollee is admitted to a hospital in December 2018 and is discharged in January 2019, the services performed that occurred in both December 2018 and January 2019 are considered in the 2019 benefit year for calculation of enrollee risk scores, and therefore are not eligible for the 2018 benefit year HHS-RADV.

**Professional Service Claims Documented within Inpatient Stays**

If an inpatient medical record spans multiple benefit years, the reviewer should ensure the discharge date is within the benefit year being audited. An inpatient medical record with an admission date in the benefit year being reviewed and the inpatient status extending into the next benefit year, is not considered valid in the benefit year being audited. An exception to this restriction is noted below.

If an inpatient medical record spanning multiple benefit years contains professional services that were paid/positively adjudicated separately as professional claims within the benefit year, CMS is providing amended guidance to allow issuers and IVA Entities to abstract diagnoses from the dates of service for these professional claims.

In this situation, a workpaper may be submitted to allow the abstraction of diagnoses associated with the professional service claims that were paid and positively adjudicated within the benefit year. IVA Entities should submit a medical record workpaper documenting the professional services claims evidenced within the inpatient record but claimed separately. This workpaper will enable the SVA to evaluate the professional services claims independently, despite the discharge date on the inpatient medical record being in the subsequent benefit year. Note that the SVA will only evaluate those professional claims identified within this workpaper document.

Additionally, for the purposes of linking the medical record to a RA accepted claim for submission of IVA Entity audit results, the medical record must be linked to a professional claim on the RADVMCE report or to a NEC professional claim. If the medical record is only linked to an inpatient hospital claim that crosses into the subsequent benefit year, then the professional services may not be abstracted separately.

For example: An enrollee is admitted to a hospital in December 2018 and the inpatient medical record indicates a discharge date in January 2019. However, there is a paid/positively adjudicated claim for professional services provided in December 2018. The IVA Entity should submit a medical record workpaper with the following information captured for the professional service claim:

- RADVMCE linked claim identifier
- RADVMCE statement covers from/through dates
- Professional or institutional indicator

If this workpaper is submitted, the SVA Entity will only abstract the diagnoses associated with the RADVMCE claims noted in the medical record workpaper (i.e., the professional service claims).

> **Note:** If a medical record workpaper is not submitted and the medical record contains a discharge date outside of the benefit year under review, the SVA Entity will not abstract diagnoses from the medical record.

## 9.8.6.2 Outpatient and Physician/Professional Services

For outpatient and physician/professional services, the "from" and "through" dates should be identical due to the services being performed on a single day. However, there are exceptions where the provider may bill for multiple encounters together. For example, an outpatient physical therapy treatment "from" and "through" dates may not be performed on a single day, but instead span over a prescribed period of time. The IVA Entity must use professional judgment to determine if the outpatient physical therapy treatment is permissible for review for the benefit year being audited. If the IVA Entity determines, based on its professional judgment, that the service or treatment is eligible for review for the benefit year being audited, the IVA Entity must explain this determination in workpapers accompanying the medical record.

The medical record intake portion of the health status validation process may be performed by Primary or Senior Reviewers. Detailed steps for reviewing acceptable dates in a medical record are defined in Table 11:

**Table 11: Acceptable Date of Medical Record Testing**

| Step | Description | Additional Details |
|---|---|---|
| 1 (a-b) | Primary Reviewer – Record medical record dates of service | The Primary Reviewer identifies that the "statement covers from" (for inpatient claims, this is the admission date) and "statement covers through" (for inpatient claims, this is the discharge date) from the medical record links to a claim in the RADVMCE Report where the claims statement covers from/through date aligns to at least one (1) of the dates of service found on the medical record. Alternatively, the medical record can be linked to a RA eligible, paid/positively adjudicated NEC, if applicable. |
| | | a) The Primary Reviewer determines if the "statement covers from" (admission date) "and through" (discharge date) from the medical records are linked to a claim in the RADVMCE Report and documents the associated RADVMCE claim number in the *IVA Entity Audit Results Submission XML*. |
| | | b) The Primary Reviewer reviews the NEC (if applicable) to determine if valid RA services were provided within the "statement covers from/through" dates on the claim. |

| Step | Description | Additional Details |
|---|---|---|
| 2(a-b) | Primary Reviewer – Compare medical record dates of service to linked claim on the RADVMCE Report or to a RA eligible, paid/positively adjudicated NEC to identify inconsistent findings | The Primary Reviewer compares the results of the medical record to the RADVMCE Report or a RA eligible, paid/positively adjudicated NEC to ensure that all fields recorded match using professional judgment. If the IVA Entity determines, based on its professional judgment, that the service or treatment is eligible for review for the benefit year being audited, the IVA Entity must explain this determination in a workpaper accompanying the medical record. |
| | | a. If there is agreement, document results in the IVA Entity Audit Results Submission XML, and no additional review is necessary. |
| | | b. If there is a difference, the Primary Reviewer marks the enrollee file as an inconsistent finding and forwards the record to the Senior Reviewer to review. |
| 3 | Senior Reviewer – Record medical record dates of service | The Senior Reviewer identifies that the "statement covers from" (for inpatient claims, this is the admission date) and "statement covers through" (for inpatient claims, this is the discharge date) from the medical record links to a claim on the RADVMCE Report where the claims statement covers from/through date aligns to at least one (1) of the date of service found on the medical record. Alternatively, the medical record can be linked to a RA eligible, paid/positively adjudicated NEC, if applicable. |
| 4 (a-b) | Senior Reviewer – Compare medical record dates of service to linked claim on the RADVMCE report to identify final inconsistent findings | The Senior Reviewer compares the results of the medical record to the EDGE server RADVMCE Report or the NEC to ensure that all fields recorded match, using professional judgment. |
| | | a) If there is agreement, document results in the *IVA Entity Audit Results Submission XML,* and no additional review is necessary. |

| Step | Description | Additional Details |
|------|-------------|--------------------|
| | | a. If there is a difference, the Senior Reviewer should use professional judgment to determine if the difference is a result of a claims submission error from the provider and the IVA entity may need to reach out to the issuer for clarification. However, a claim with dates prior to the medical record dates of service should be carefully scrutinized before consideration. |
| | | If the reviewer <u>is able</u> to reasonably determine that a date discrepancy exists only as a result of a billing error, then the Senior Reviewer *IVA Entity Audit Results Submission XML* should record the correct date, but should NOT note a final inconsistent finding. |
| | | If the reviewer <u>is not able</u> to reasonably determine that a date discrepancy exists only as a result of a billing error, then the Senior Reviewer will reject the record. This may result in the medical record not being coded. |

## 9.8.6.3 Key Considerations for Professional Judgment in Evaluating Dates of Service

If a single date of service between a medical record and claim do not agree, the Senior Reviewer, using his or her professional judgment, may determine that the discrepancy is a result of a provider billing error; this applies to inpatient, outpatient, or professional claims. The intent is to not fail a medical record for not aligning to claim dates due to provider billing errors.

For the purposes of HHS-RADV, a provider attestation is not required when professional judgment is used to determine date of service issues. However, the IVA Entity and its reviewers must perform necessary due diligence before making such a determination. **The IVA Entity must also explain this determination in workpapers.**

## 9.8.7 Documentation of Capitated Encounter Data

Issuer capitated encounter data may need to be used during the IVA process for medical records linked to RA eligible, paid/positively adjudicated NECs. In Section 9.5 (Phase 2 – Review and Confirm Mapping), the IVA Entity must document the path of capitated encounter data to the EDGE server. The issuer must provide a clear description of how the issuer determined if claims/encounter data submitted was covered by a capitated arrangement. Capitated encounter data may require the documentation of additional workpapers to demonstrate the mapping between EDGE server claims data elements and the encounter data in the issuer system(s). These workpapers should document how the EDGE data was populated for the encounter and how the encounter was allowable within RA criteria.

The issuer must provide documentation as to how the issuer converted encounter data into EDGE claims and if any of the validated fields were derived. This documentation should be

documented in a workpaper and identified within the *IVA Entity Audit Results Submission XML.*

Note: Claim dollar values are not validated and, therefore, derived claim paid values are not subject to validation in HHS-RADV.

## 9.8.8 Acceptable Medical Record Source

IVA Entities and the SVA Entity determine if the claim and the associated medical record are from an acceptable source by reviewing the claim form type to determine if it is an institutional (for example, a hospital inpatient or outpatient facility) or professional (for example, an individual physician or group practice) claim.

For institutional claims, IVA Entities and the SVA Entity review the bill type code to determine if the claim is allowable. For professional claims, IVA Entities and the SVA Entity note that the claim is a professional claim and **no additional review is necessary**. See Tables 12 and 13 for the allowable and non-allowable bill type codes for RA data submission specific to institutional. Note that issuers should follow the ESBR when submitting bill type codes to their respective the EDGE servers. Refer to the **ESBR Version 12.0** located in the REGTAP Library (https://www.regtap.info/).

**Table 12: Allowable Bill Type Codes for Institutional Claims**

| Stay Type | Description | Bill Type Code | Allowable? |
|-----------|-------------|----------------|------------|
| Inpatient | Inpatient admit through discharge | 111 | Yes |
| Inpatient | Inpatient replacement of prior claim | 117 | Yes |
| Outpatient | Hospital outpatient admit through discharge | 131 | Yes |
| Outpatient | Hospital outpatient replacement of prior claim | 137 | Yes |
| Outpatient | Rural health clinic admit through discharge | 711 | Yes |
| Outpatient | Rural health replacement of prior claim | 717 | Yes |
| Outpatient | Community mental health center admit through discharge | 761 | Yes |
| Outpatient | Community mental health replacement of prior claim | 767 | Yes |
| Outpatient | Federally qualified health center admit through discharge | 771 | Yes |
| Outpatient | Federally qualified health center replacement of prior claim | 777 | Yes |
| Outpatient | Critical access hospital admit through discharge | 851 | Yes |
| Outpatient | Critical access hospital replacement of prior claim | 857 | Yes |

**Table 13: Not Allowable Bill Type Codes for Institutional Claims**

| Stay Type | Description | Bill Type Code | Allowable? |
|---|---|---|---|
| Inpatient | Religious Non-Medical Health Care Institutions (formerly Christian Science Sanatoria) | 4XX | No |
| Inpatient | Medical Assistance Facilities/Critical Access Hospitals | 85X | No |
| Inpatient | Skilled Nursing Facilities | 21X | No |
| Inpatient | Hospital Swing Bed Components | 18X | No |
| Inpatient | Intermediate Care Facilities | 15X or 16X | No |
| Inpatient | Hospice | 81X or 82X | No |
| Outpatient | Rehabilitation Hospitals | 74X or 75X | No |
| Outpatient | Ambulatory Surgical Centers | 83X | No |
| Outpatient | Home Health Care | 33X | No |
| Outpatient | Renal Dialysis Facilities | 72X | No |
| Outpatient | Religious Non-Medical Health Care Institutions (formerly Christian Science Sanatoria) | 3XX | No |

**Note for HHS-RADV and Mental Health or Behavioral Health Records**: As set forth in 45 C.F.R. § 153.630(b)(6), as amended by the 2019 Payment Notice, a qualified provider that is licensed to diagnose mental illness by the state and that is prohibited from furnishing a complete medical record by applicable state privacy laws concerning any enrollee's treatment for one (1) or more mental or behavioral health conditions may furnish a signed mental or behavioral health assessment that, to the extent permissible under applicable federal and state privacy laws, should contain: (1) the enrollee's name; (2) sex; (3) DOB; (4) current status of all mental or behavioral health diagnoses; **and** (5) dates of service. The mental or behavioral health assessment should be signed by the provider and submitted with an attestation that the provider is prohibited from furnishing a complete medical record by applicable state privacy laws. Psychotherapy notes are not required for RADV.[27]

## 9.8.8.1 Key Considerations for Validating Medical Records without Bill Types or Service Codes

In the instance where the medical record does not contain the specific information or detail necessary to link a medical record to an acceptable claim (e.g. a Service Code/Bill Type not in a medical record, but on a claim form), RADVMCE Report data may be utilized to satisfy the validation step. Obtaining additional claim documentation or billing documentation is not required for health status validations. IVA Entities may utilize the RADVMCE Report to identify the associated information (e.g., a service code) for the claim linked to the medical record under review.

---

[27] "Psychotherapy notes" is defined as notes recorded (in any medium) by a health care provider who is a mental health professional documenting or analyzing the contents of conversation during a private counseling session or a group, joint, or family counseling session and that are separated from the rest of the individual's medical record. The term excludes medication prescription and monitoring, counseling session start and stop times, the modalities and frequencies of treatment furnished, results of clinical tests, and any summary of the following items: Diagnosis, functional status, the treatment plan, symptoms, prognosis, and progress to date. See 45 C.F.R. § 164.501.

In this case, the IVA Entity should reference the RADVMCE Report and, using professional judgment, review the medical record in conjunction with the information contained on the RADVMCE Report to determine if the validation can be confirmed. Alternatively, for NECs not identified in the RADVMCE Report, a claim data file may be used for evaluation when the information being validated is not present in the medical record. For health status validations, procedure steps referencing the "claim" may be replaced with the RADVMCE Report reference.

## 9.8.9 Recommended Documents for Medical Record Abstraction Submission

It is imperative that all medical records necessary to substantiate an enrollee's diagnoses be submitted into the Audit Tool during the IVA Submission Process. The submitted medical records must be able to independently substantiate the diagnoses found on the RADVMCE Report or NEC. CMS recommends providing the complete medical record of an inpatient stay. If a history and physical and/or discharge summary is the only submission for an inpatient stay, diagnoses may not be able to be substantiated if they are listed in a summary list or bullet point style without including the entire inpatient stay (progress notes and consults).

As with any diagnosis validation, it is incumbent upon the issuer and IVA Entity to provide sufficient medical record documentation for demonstrating the disease process and/or treatment plan of care. If the provided medical record does not contain sufficient medical documentation to abstract the intended diagnosis, the issuer and IVA Entity should work with the provider to obtain sufficient documentation. RADV stakeholders should reference the ICD-10-CM Official Coding Guidelines for Coding and Reporting, the AHA Coding Clinic, and the 2018 benefit year HHS-RADV Protocols for coding guidance.

Certain medical records on their own **cannot** be used to substantiate a diagnosis. However, the following may be used in conjunction with a valid medical record to help substantiate a diagnosis:

- Pathology Reports;
- Physician Orders;
- Radiology Reports;
- List of Current Medications

Diagnosis codes will **not** be captured from the following sources of documentation and therefore should be **excluded from submission**:

- Nurse notes;
- Flow sheets;
- Photos (including photos of wounds or infants);
- Labs;
- Discharge instructions;
- Medication Administration Records (MAR).

## 9.8.10 Acceptable Service Code Validation (Outpatient and Professional Medical Records Only)

The purpose of Service Code Validation is to determine if the Service Code assigned is RA Acceptable. The service code is validated from the medical record to ensure that the service code is acceptable per the ESBR. The service code qualifier, found on the RADVMCE Report, identifies if the code is Current Procedural Code/Healthcare Common Procedure Coding System (CPT/HCPCS).

For hospital outpatient bill types and physician/professional services, the service code displays the code that was used for the procedure performed during the visit for the enrollee. Medical records may not contain the CPT/HCPCS, in which case the IVA Entity must gain an understanding of how those codes were obtained, such as evidence of a claim submission. IVA coders must determine if the medical record confirms that a valid RA service was performed.

No other validation of the service code is required to be performed (i.e., if the correct management level code was appropriately assigned).

**Table 14: Acceptable Service Code Validation Steps**

| Step | Description | Additional Details |
|---|---|---|
| 1 | Primary Coder – Identify service | The Primary Coder identifies the service code on the medical record. |
| 2 | Primary Coder – Compare service code data to EDGE server data | The Primary Coder compares the service code from the medical record to the service code on the associated claim in the RADVMCE report, or to the NEC if applicable. |
| 3 (a) | Primary Coder – Identify errors and document errors | The Primary Coder determines if the service provided per the analysis of the medical record is a valid RA service and record the findings in the IVA Entity Audit Results Submission XML. <br> a. If the Primary Coder finds a discrepancy between the service documented in the medical record and the service code in the RADVMCE report or the NEC, then the record is flagged for review by the Senior Coder for a final determination. |
| 4 | Senior Coder – Identify service code data. | The Senior Coder identifies the service code on the medical file. |
| 5 | Senior Coder – Compare service code data to the EDGE server. | The Senior Coder compares the service code from the medical record to the service code on the associated claim in the RADVMCE report, or to the NEC if applicable. |
| 6 (a-b) | Senior Coder – Identify errors and document final errors. | The Senior Coder determines if the service provided per the analysis of the medical record or claim is a valid RA service and documents the findings in the *IVA Entity Audit Results Submission XML*. |
| | | a.   The results from the Senior Coder's review are considered the final determination. |
| | | b.   If the Senior Coder is unable to validate the service is RA eligible than the medical record is rejected. |

## 9.8.11 Acceptable Medical Record Signature

When gathering medical records from providers to substantiate a HCC, issuers and IVA Entities must be aware of the various provider types that are acceptable for the HHS-RADV testing.

A provider is defined as a physician, or any qualified healthcare practitioner, who is legally accountable for establishing the patient's diagnosis in a state.

All medical records must have an acceptable provider signature and credentials displayed on the medical record within 180 days of the date of service. Signatures dated greater than 180 calendar days from the date of service or absent from the medical record, must include a valid attestation in

order for medical record review to continue. For example, an unsigned medical record, a signed medical record signature dated greater than 180 days without a valid attestation, a stamped signature, or a signed medical record missing credentials is considered incomplete and may result in a RA error.

Refer to **Appendix F** (Guidance to Coders) for specific criteria and examples of acceptable and unacceptable provider signatures.

## 9.8.11.1 Medical Record Attestations

CMS will also accept attestations to authenticate medical documentation that was not authenticated at the date of service. Signature attestation forms can be sent to providers and electronically populated, signed, and returned to the IVA Entity, issuer, or other party requesting the record on behalf of the issuer.

Issuers and IVA Entities should establish a process to resolve conflicts if a medical record does not contain a valid signature and/or credentials. Part of the resolution should include issuers and/or IVA Entities requesting an attestation from the provider affirming the medical documentation that was not authenticated properly at the date of service. Signature attestations allow diagnoses to be abstracted and coded from medical records that do not contain acceptable signatures or credentials.

IVA Entities may still abstract diagnoses from the medical record with signature or credential issues while attestations are being sought.

> **Note:** If an attestation **cannot be sent** to validate the medical record, the medical record and abstracted diagnoses remain invalid, and therefore should not be submitted via the *IVA Entity Audit Results Submission XML* for use in the enrollee's risk score calculation.

The issuer or IVA Entity should include a medical record signature attestation, grouped under the medical record ID it corresponds to, in the *IVA Entity Audit Results Submission XML.*

CMS will allow for the attestation document to be submitted as a separate file or consolidated with the medical record PDF. At a minimum, the attestation statement must contain the signature and date. DO NOT include the issuer name. See **Appendix F** (Guidance to Coders) for guidance regarding attestations.

## 9.8.11.2 Key Considerations for Telehealth

For the purposes of RA data submission, and subsequent data validation under HHS-RADV, any service provided through telehealth that is reimbursable under the state law of the issuer's state of licensure that otherwise meets RA data submission standards may be submitted. As such, IVA Entities should also apply these verification steps when encountering telehealth services during the IVA for HHS-RADV.

| Step | Description |
|------|-------------|
| 1 | Confirm that the applicable state insurance law regarding telehealth services requires or permits issuer reimbursement for telehealth services. The applicable state insurance law would be the law of the state of licensure of the issuer. |

| Step | Description |
|---|---|
| 2 | Confirm that the provider is a valid telehealth provider under state insurance law in the state of licensure of the issuer. Telehealth rules typically specify those providers that are allowed, such as physicians, certain categories of nurses, and certain mental health professionals. A telehealth provider should also meet any applicable licensing requirements in the state in which he or she practices and the state in which the patient is located. |
| 3 | Verify the diagnosis and procedure code(s) for which the telehealth service was rendered and follow all applicable coding guidelines. |

## 9.8.12 Abstraction Coding

The final step in the Health Status Data Validation process is to review the medical records and abstract substantiated diagnoses. The previous test steps ensure that the medical record is signed appropriately and that an acceptable type of physician or non-physician provider has performed the diagnosis.

In this step, the coder reviews a medical record to abstract diagnosis codes which are used to validate the enrollee's HCCs.

ICD-10-CM diagnosis codes are used to describe the clinical reason for a patient's treatment. ICD-10-CM codes do not describe the service performed, only the patient's medical condition. Coders will first code all medical records for the applicable enrollee per the applicable ICD-10-CM code set. Once the ICD-10-CM codes are abstracted from all the enrollee's medical records, the codes need to be mapped to HHS-HCCs using the 2018 Benefit Year HHS-Developed RA Model Algorithm "Do It Yourself (DIY)" Software to allow for error identification versus EDGE server data. As a reference, the HHS DIY Software instructions, and Technical Details, which includes the ICD-10 to HHS-HCC mappings, can be found on the CCIIO homepage.[28]

Enrollee HCCs validated by the IVA Entity are then compared to enrollee level EDGE server detail report data found in the RADVDE Report. The RADVDE Report contains all diagnoses and HCCs for each enrollee in the IVA sample. The Primary Coder will indicate the following:

- Diagnoses mapping to supported HCCs;
- Newly identified diagnoses that map to new HCCs;
- Diagnoses mapping to unsupported HCCs.

Newly identified diagnoses that map to HCCs are HCCs that are not on the RADVDE Report, as identified by the Primary Coder. Unsupported HCCs are characterized as HCCs that are on the RADVDE Report, but are not identified/validated on medical documentation via a diagnosis, after review by the Primary Coder. The below table outlines the steps for diagnosis validation. Note that IVA Entities have the option to choose whether to escalate the single medical record that contains a newly identified HCC or escalate all medical records for an enrollee to Senior Coders for re-review.

> **Note:** CMS cannot provide specific coding guidance beyond what has been released in these Protocols. CMS encourages the utilization of the ICD-10-CM Official Guidelines for Coding and

---

[28] 2018 Benefit Year DIY Software Instructions https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/2018-RA-Model-DIY-Instructions.pdf and 2018 Benefit Year DIY Software Technical Details https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/2018-RA-Model-DIY-Tables.xlsx

> Reporting (See **Appendix D**), the AHA Coding Clinic, and the HHS-RADV 2018 benefit year
> Protocols 'Lifelong Permanent Conditions' list (See **Appendix E**) along with professional
> judgment to make final determinations when abstracting diagnoses.

Historical best practice utilizes inpatient guidelines for an inpatient record and outpatient guidelines
for an outpatient record.

CMS is only requiring final IVA Entity diagnoses be recorded in the *IVA Entity Audit Results
Submission XML*. If an enrollee's medical records are reviewed by both a Primary and Senior
Coder, only the final diagnoses are required to be submitted to CMS. The RADV XML Data
Elements Job Aid[29] located in the Audit Tool library provides further detail on the technical
requirements for submission.

### Table 15: Diagnosis Validation

| Step | Description | Additional Details |
|---|---|---|
| 1 | Primary Coder – Abstract diagnoses. | The Primary Coder identifies the ICD-10-CM diagnoses from the medical record, for all of the enrollee's medical records, and records the diagnoses in the *IVA Entity Audit Results Submission XML\**. |
| 2 | Primary Coder – Map diagnoses to HCCs. | The Primary Coder maps the identified ICD-10-CM diagnoses from the medical records to their assigned HCCs. |
| 3 | Primary Coder – Collate enrollee HCCs across medical records. | The Primary Coder collates HCCs for each enrollee and removes duplicate HCCs identified. IVA Entities should use these identified HCCs as the basis of comparison to EDGE HCCs, as outlined in Step 4 (a-c). |
| 4 (a-c) | Primary Coder – Compare IVA abstracted HCCs to EDGE server HCCs and identify errors and document results. | The Primary Coder compares the HCCs determined from medical record diagnosis abstraction to the enrollee's HCCs identified in the EDGE server RADVDE Report. |
| | | a. The Primary Coder identifies supported HCCs (HCCs in the RADVDE Report which are supported by abstracted diagnoses from the medical record assigned to HCCs). A supported HCC is considered an agreement. |
| | | b. The Primary Coder identifies newly identified HCCs (diagnoses assigned to HCCs following medical record abstraction, but which are not present in the EDGE server RADVDE Report). Newly identified HCCs are considered a New Finding. |
| | | c. The Primary Coder identifies unsupported HCCs (HCCs which are present in the EDGE server RADVDE Report but were not assigned to abstracted diagnoses identified during the review of the enrollee's medical records). Unsupported HCCs are considered an error. |

---

[29] The RADV XML Data Elements Job Aid for the 2018 benefit year is anticipated to be released in June 2019.

| Step | Description | Additional Details |
|------|-------------|-------------------|
| 5 (a-c) | Primary Coder – Determine requirement of Senior Coder review. | The Primary Coder determines next steps based on the results in Step 4. |
| | | a. If there is agreement between the HCCs identified by the Primary Coder and the EDGE server RADVDE Report, no additional review of the enrollee's medical records is necessary. |
| | | b. If a newly identified diagnosis that maps to a HCC is found, the IVA Entity has the option to have the Primary Coder escalate either the individual medical record that contains the newly identified diagnosis that maps to a HCC or all medical records for the enrollee to Senior Coders for re-review. |
| | | c. If, after all medical records have been reviewed for the enrollee, and an HCC found on the RADVDE Report has not been substantiated, then all the medical records for the enrollee must be escalated to Senior Coders for re-review.<br><br>**Note**: If the Primary Coder abstracts all supported diagnoses that are assigned HCCs, and there is no difference between the RADVDE Report and the Primary Coder's findings, then the Primary Coder may record the final medical record diagnoses in the *IVA Entity Audit Results Submission XML.* |
| 6 | Senior Coder – Abstract diagnoses | For those enrollees for which an unsupported or newly identified HCC were noted:<br>The Senior Coder identifies the ICD-10-CM diagnoses for all of the enrollee's medical records and records all final diagnoses in the *IVA Entity Audit Results Submission XML.*<br><br>**Note:** Only final medical record diagnoses, regardless of Primary or Senior Coder review, are required to be recorded in the *IVA Entity Audit Results Submission XML.* |
| 7 | Senior Coder – Map diagnoses to | The Senior Coder maps the identified ICD-10-CM diagnoses from the medical records to their assigned HCCs. |
| 8 | Senior Coder – Collate enrollee HCCs across medical records | The Senior Coder collates HCCs for each enrollee, removes duplicate HCCs identified. IVA Entities should use these identified HCCs as the basis of comparison to EDGE HCCs. |
| 9 (a-d) | Senior Coder – Compare IVA abstracted HCCs to EDGE server HCCs and identify final errors | The Senior Coder compares the HCCs to the EDGE server RADVDE Report. |
| | | a. The Senior Coder identifies supported HCCs (HCCs in the RADVDE Report that are supported by HCCs assigned to diagnoses abstracted from the medical record). A supported HCC is considered an agreement. |

| Step | Description | Additional Details |
|------|-------------|--------------------|
|      |             | b.  The Senior Coder identifies newly identified HCCs (HCCs that are determined as valid based on identified diagnosis codes, but which are not present in the EDGE server RADVDE Report). Newly identified HCCs are considered a New Finding. |
|      |             | c.  The Senior Coder identifies unsupported HCCs (HCCs that are present in the EDGE server RADVDE Report, but were not identified during the review of the enrollee's medical records through a diagnosis). |
|      |             | **Note:** Only final diagnoses, regardless of Primary or Senior Coder review, are required to be submitted via the *IVA Entity Audit Results Submission XML*. No additional indicators regarding errors identified, new HCCs, or unsupported HCCs are required. CMS and the SVA will utilize diagnoses to determine enrollee HCCs and compare to EDGE server HCCs from the RADVDE Report. |

For all health status and diagnosis validations performed over sampled enrollees, Primary and Senior Coders are required to work in tandem to identify, validate, and review errors, and to complete IRR (Section 10). While a Senior Coder may act as a Primary Coder, the results of this Senior Coder's review must be reviewed by another Senior Coder so that all errors are always given a second review by a Senior Coder. Additionally, any Senior Coder who acts as the Primary Coder will be subject to IRR testing to ensure that they are meeting IRR consistency measure requirements, as required for all Primary Coders.

Senior Coders may identify additional findings when reviewing sample enrollee records identified as containing errors by the Primary Coder. In these instances, the newly identified findings (identified in addition to the initial Primary Coder errors) do not require additional review and are accepted.

## 9.8.13 Key Considerations for Medical Record Abstraction

**Blind Coding**

Blind Coding occurs when Primary and Senior Coders conduct the medical record review and diagnosis abstraction without prior knowledge of an enrollee's diagnoses or HCC(s). CMS believes that the practice of blind coding provides a greater potential to identify new diagnoses not previously submitted to the EDGE server, for an enrollee, than coding with prior knowledge of the enrollee's previously identified HCCs. While blind coding has the potential to yield new diagnoses that map to HCCs, it does place a greater burden on the IVA Entity and, potentially, a greater cost to the issuer. Therefore, CMS believes the issuer may decide whether the IVA Entity must conduct the medical record review using a blind coding approach.

**New HCC Findings with Positive Risk Score Impact**

To more effectively assist CMS in assessing an issuer's outlier status related to validation of diagnoses and their assigned HCCs used in enrollees' risk scores, IVA Entities are encouraged to prioritize the validation of diagnoses attributable to HCCs submitted to EDGE and used in RA risk score calculations.

Under the HCC Failure Rate Methodology for Error Estimation which CMS implemented beginning with benefit year 2017 HHS-RADV, the addition of a new diagnosis from medical record documentation that maps to an HCC not previously identified on the RADVDE Report (a non-EDGE HCC) may impact an issuer's failure rate calculation within an HCC group and thus, the issuer's determination of outlier status.

The impact of new diagnosis codes is dependent upon the underlying enrollee EDGE HCCs and how any new diagnosis code interacts with other abstracted diagnoses. For example, if a diagnosis abstracted during the IVA process results in an additional enrollee HCC, and all EDGE HCCs are substantiated by the IVA Entity's final HCC results, this will have a favorable impact on the calculation of the issuer's HCC group failure rate in the HCC group in which the new HCC was found.

However, if a diagnosis is abstracted which results in a final IVA HCC that does not correspond to an existing EDGE HCC, and the EDGE HCC is not otherwise substantiated by the IVA Entity's final HCC results, two (2) outcomes occur: the failure rate of the unsubstantiated EDGE HCC would increase, and the failure rate for the newly found IVA HCC would decrease. This process is illustrated below:

- The issuer enrollee has HCC 21 (Diabetes without complications) in EDGE.

- IVA Entity abstracts both Dx E8021 (Diabetes mellitus due to underlying condition with diabetic nephropathy) and E119 (Type 2 diabetes mellitus without complications) which in isolation would map to HCCs 21 and 20 in isolation. Because these HCCs are within a HHS-HCC Hierarchy, the final IVA HCC for the enrollee would be reflected as HCC 20 (Diabetes with Chronic Complications).

- HCC group failure rates would then be calculated using only the final IVA HCC of HCC 20. All other results held constant, the failure rate for HCC 21 would increase, and the failure rate for HCC 20 would decrease.

Refer to Section 11 (Error Estimation) for additional details regarding the HCC Failure Rate Methodology. IVA Entities are encouraged to prioritize the validation of diagnoses that map to HCCs identified on the RADVDE Report rather than searching for newly identified diagnoses. However, it is at the discretion of the issuer and IVA Entity to determine practices and policies related to validation of non-EDGE HCCs and targeting of HCCs identified in the RADVDE Report to validate.

**Addressing HCC Errors and Additional Medical Record Chart Requests**

When the diagnoses that are abstracted during the IVA process are compared to corresponding HCCs on the RADVDE Report, the IVA Entity may determine that an enrollee's EDGE HCCs have not been validated. In these situations, additional records may need to be retrieved in order to fully validate all RADVDE Report HCCs.

In the event the comparison to the EDGE server RADVDE Report HCCs reveals HCCs not substantiated, the issuer or IVA Entity is permitted to coordinate with the issuer to request additional medical records to substantiate these HCCs, as long as the records are associated with a paid/positively adjudicated claim on the RADVMCE Report, or a RA eligible claim, or a paid/positively adjudicated NEC from the issuer's source system or 2018 benefit year HHS-RADV.

Additional medical records provided in these situations are still subject to all validation requirements in the HHS-RADV process, including medical record intake, abstraction, and collation of results for comparison to the enrollee's HCCs listed in the RADVDE Report.

**SOAP Notes Acceptability**

For the purposes of HHS-RADV, Subjective, Objective, Assessment, and Plan (SOAP) notes are acceptable as a stand-alone medical record **only** if they meet all criteria of an acceptable medical record for RA, as defined in 45 C.F.R. § 153.630.

**Discharge/Death Summaries**

Discharge/Death summaries are allowable forms of medical record documentation for HHS-RADV based on the death of an enrollee within the IVA sample. A discharge/death summary is, as the term states, a summation and may not include every diagnosis during a hospital stay or adequately support patient diagnoses. Often times, discharge/death summaries contain a 'listing' of diagnoses without addressing or evaluating the diagnosis(es), which is a requirement to substantiate a diagnosis for RADV.

A discharge/death summary submitted for HHS-RADV must sufficiently support the diagnoses submitted to the EDGE server if it is intended to be utilized as a stand-alone medical record document to substantiate an HCC. If a submitted discharge/death summary does not support the diagnoses submitted to the EDGE server, then the medical record detailing the entire stay is needed in order to properly code for the inpatient stay.

# 9.9   Phase 6 – Record Validation Results

At the conclusion of the Demographics and Enrollment Data Validation and the Health Status Data Validation processes, results will be documented in the *IVA Entity Audit Results Submission XML*. Supporting documentation and workpapers generated during D&E data validation and NEC data validation must be submitted in the Package 1 submission along with the *IVA Entity Audit Results Submission XML* at the conclusion of the IVA. All mapping documentation utilized during these processes will also be submitted as part of Package 1.

Medical record documentation utilized during the Health Status Data Validation process is part of Package 2 submission process and will not be submitted with Package 1 submission. After IVA results submission of Package 1, CMS will identify specific enrollees for whom medical records are to be submitted for the SVA subsample.

As described in Section 11 (Error Estimation), CMS may require the submission of medical records for all additional enrollees in the event significant differences are identified between IVA submitted findings and SVA findings for enrollees in the SVA subsample. In these situations, CMS will request Package 3 submission of the medical records for the balance of enrollees in the IVA sample that were not submitted during Package 2 submission. If CMS requests the submission of Package 3, IVA Entities and issuers will have seven (7) calendar days to complete the submission of medical records, inclusive of Issuer SO sign-off.

## 9.9.1 Key Considerations for Recording Validation Results

**Diagnosis Validation Submission**

IVA Entities are required to follow all audit steps as indicated in Section 9.8.12 (Abstraction Coding) but only final Coder diagnoses are required to be submitted in the *IVA Entity Audit Results Submission XML*. CMS is not requiring that both Primary Coder and Senior Coder diagnosis codes be submitted in the *IVA Entity Audit Results Submission XML*. Instead, IVA Entities are to determine the final diagnosis codes and submit those final diagnosis codes in the *IVA Entity Audit Results Submission XML*.

**File Naming and Submission Considerations**

All files submitted during the IVA submission process must be uniquely named. The Audit Tool does not distinguish case sensitivity in the file name. For example, "RADV123.pdf" and "radv123.pdf" would be recognized as the same file name. CMS recommends naming files with a comprehensible link to each IVA submission package (for example, a HIOS ID in the file name for all files submitted for a single HIOS ID), but this is not required. **File names should not contain PHI/PII or the issuer name.**

**Medical Record Documentation Submission**

Issuers and IVA Entities should submit only the medical records needed to substantiate each diagnosis and assigned HCC reported in the RADVDE Report for the enrollees in the IVA Sample. Issuers and IVA Entities should not submit duplicate medical records for an enrollee multiple times in the *IVA Entity Audit Results Submission XML*. Only unique medical records for an enrollee should be captured in the *IVA Entity Audit Results Submission XML*. Refer to the HHS-RADV IVA Submission Process User Manual located in the Audit Tool file library for information regarding acceptable file sizes.

**Documenting Strata 1-9 Enrollees without Medical Records**

If an issuer is unable to obtain any medical records for an enrollee in the IVA sample that was expected to have one (1) or more HCCs based on their EDGE server data, issuers or IVA Entities may provide a mapping document to CMS to document their inability to obtain any medical records for the specified enrollees. This document is not a requirement and is optional for submission. Note, this document process does not replace the necessity to validate an HCC and may impact failure rate calculations.

The mapping document would identify Strata 1-9 enrollees impacted and provide supporting rationale for why the medical records were not or could not be obtained and were therefore not included in the *IVA Entity Audit Results Submission XML*. Enrollees in Stratum 10 do not have EDGE HCCs and therefore should not be included in this document.

If the mapping document is utilized it should contain the following elements:

| Components of the "Strata 1-9 Enrollees Without Medical Records" Document |
|---|
| Unique Enrollee ID of Strata 1-9 enrollees for whom no medical records were obtained |
| Written confirmation that, for the enrollees identified, no medical records were submitted despite being in the IVA Sample with diagnoses and HCCs on the EDGE server. |
| Explanation of why the enrollee's medical record was not reviewed. Example: "Unable to obtain record from provider." |

If the issuer decides to submit a mapping document, the IVA Entity should record the document under the 'mappingDocumentItem' tag and utilize the 'fileType' of 'Other Map' in the *IVA Entity Audit Results Submission XML*. If issuers and IVA Entities utilize this mapping document, CMS encourages the use of a descriptive file name (e.g. *EnrolleesWithMissingMRs.pdf*) for the title of this document.

# Section 10

## HHS Risk Adjustment Data Validation Protocols

## Inter-Rater Reliability

Exhibit W
Page 425

# 10. IVA Inter-Rater Reliability

## 10.1 Purpose

IRR is quality control measure to determine the accuracy of the abstraction diagnoses by Primary Coders when compared to Senior Coders. Medical records reviewed by the Primary Coder and sampled for IRR are then re-reviewed by a Senior Coder. The comparison of HCCs assigned to diagnoses found between the Primary Coder and the Senior Coder are then used to determine the Primary Coder's IRR consistency measure. CMS requires that IVA Entities achieve a consistency measure of at least 95% for all Primary Coder review outcomes.

IRR determinations provide assurance to CMS and issuers that certified medical coders are consistent in their performance of the Health Status Data Validation process. IRR results are calculated and submitted for an IVA Entity and are not specific to a HIOS ID. IRR results are submitted independent from issuer IVA findings.

## 10.2 IRR Submission and Documentation

CMS will permit IVA Entities to use their own standard practices for executing IRR, in lieu of the CMS recommended IRR methodology, as long as the following requirements are satisfied by the IVA Entity's existing process:

- the IVA Entity's procedural process for IRR is documented and included with the IRR submission;

- the IVA Entity calculates the consistency measure for all Primary Coders;

- the IVA Entity requires a consistency measure of 95% for all Primary Coders;

- the IVA Entity requires Senior Coder review of a sample of Medical Records, re-performing the IRR for any Primary Coder with a consistency measure of fewer than 95%, until the 95% consistency threshold is met;

- the IVA Entity uses a continuous monitoring process to ensure that the Primary Coders who achieve the consistency measure of 95% maintain this level throughout the entirety of the review;

- the IVA Entity calculates the consistency measure using the appropriate secondary review process, in accordance with all experience requirements for Senior Coders; and

- the IVA Entity maintains evidence that IRR reviews are being executed and evaluated in accordance with these guidelines.

IVA Entities who elect to use the CMS recommended IRR methodology, documented in Sections 10.3 (IRR Process), 10.4 (Sample Population), and 10.5 (Sample Selection and Review), will not be required to submit a summarization of their IRR procedural processes to CMS during IRR submission.

## 10.3 IRR Process

Independent of the IRR methodology used, IVA Entities will be required to submit Primary Coder results to CMS, including final consistency measures, at the conclusion of the IVA process. CMS will require that the IVA Entity indicate the IRR methodology used ('CMS recommended' or 'Other'), along with a written summarization of the IVA Entity's IRR process if the 'Other' option is chosen. This written summarization must be included with the IRR submission to the Audit Tool. IVA Entities will be required to attest to the methods used as well as to the consistency measures communicated for Primary Coders in their results to CMS, independent of the IRR methodology

utilized ('CMS recommended' or 'Other'). All IVA Entities must also attest that Primary Coders who are unable to meet IRR consistency measure requirements had all medical records re-reviewed by a Senior Coder.

The five (5) steps of the CMS recommended IRR process are described in Table 16.

**Table 16: CMS Recommended IRR Process Steps**

| Step | Description | Additional Details |
|------|-------------|--------------------|
| 1 | Primary Coder Performs Health Status Data Validation | Primary Coders perform health status data validations, and the number of medical records evaluated by each Primary Coder is monitored. The IRR sample selection process is initiated once 25 medical records have been evaluated by the Primary Coder. |
| 2 | IRR Sample Selection | Once 25 medical records have been evaluated by the Primary Coder, the initial sample of 25 medical records are evaluated by the Senior Coder. |
| 3 | Senior Coder Performs Health Status Data Validation | The Senior Coder performs health status data validations, including diagnosis coding and abstraction for each medical record in the sample. Once Senior Coders complete the health status data validation for all 25 sampled medical records, the consistency measure for the Primary Coder is calculated, as seen in Step Four (4).<br>**Note:** CMS does not require one (1) senior coder to review all primary coder records for IRR purposes. Multiple senior coders can be utilized to review a primary coder's IRR eligible records. |
| 4 | Calculate Primary Coder Consistency Measure | Following Primary Coder and Senior Coder review, HCCs are assigned to abstracted ICD-10-CM diagnoses to enable calculation of the Primary Coder consistency measure. The Primary Coder consistency measure ($CM_{PC}$) for the sample of 25 medical records is calculated using the following formula:<br><br>$$CM_{PC} = \frac{Count\ of\ Primary\ Coder\ and\ Senior\ Coder\ HCC\ Matches}{Count\ of\ Unique\ HCCs\ (Primary\ Coder\ \&\ Senior\ Coder)}$$<br><br>The numerator term 'Count of Primary Coder and Senior Coder HCC Matches' indicates the instances of HCC agreement between the Primary and Senior Coders as they perform medical record abstraction. An HCC match is counted when both coders record diagnoses that result in identical HCCs for the same enrollee. Note that each Primary Coder and Senior Coder HCC match for a unique HCC will be counted as a single match for each enrollee.<br><br>The denominator term 'Count of Unique HCCs (Primary Coder & Senior Coder)' indicates the total universe of unique enrollee HCCs identified by both Primary and Senior Coders as they perform medial record abstraction. This value is calculated by totaling the number of unique enrollee HCCs identified within the 25 medical record sample by both the Primary Coder and Senior Coder. Note that the same HCC for a single enrollee should not be counted more than once; however, the same HCC identified for different enrollees should be considered unique for each enrollee for the purposes of calculating the denominator.<br><br>For example, if one (1) enrollee has 25 medical records and HCC 8 is identified on all medical records, HCC 8 would be counted once in the denominator value of the calculated consistency measure. Assuming the Senior Coder also identified only HCC 8 on the medical records, both terms 'Count of Primary Coder and Senior Coder HCC Matches' and 'Count of Unique HCCs (Primary & Senior Coder)' would be one (1). That is, HCC 8 would be counted once in the numerator and once in the denominator. |

| Step | Description | Additional Details |
|------|-------------|--------------------|
| | | Alternatively, if one (1) enrollee has 10 medical records and a second enrollee has 15 medical records and HCC 8 was identified on both enrollee's medical records, HCC 8 would be counted once in both the numerator and denominator <u>for each enrollee</u>, assuming no other HCCs were identified. That is, HCC 8 would be counted twice in both the numerator and the denominator (if recorded by the primary and senior coder) |
| | | The Count of Primary Coder and Senior Coder HCC Matches is calculated across all 25 medical records, along with the count of unique HCCs identified by both the Primary Coder and Senior Coder(s). The calculated Primary Coder consistency measure is used to determine if the IRR threshold of 95% is met or if an additional sample of medical records is needed. |
| 5 (a-b) | Finalize IRR or Adjust Sample | The last step in the IRR process is to either finalize IRR results or adjust the sample size.<br><br>a) If the Primary Coder's calculated consistency measure meets or exceeds the required 95%, the Primary Coder has completed the requirements for IRR evaluation.<br><br>b) If the Primary Coder's calculated consistency measure fails to meet the required 95%, the Primary Coder has not completed the requirements for IRR evaluation, and the IVA is required to re-perform the IRR assessment of the Primary Coder, re-performing steps 1 – 5. This process must be re-performed until the acceptable consistency measure is achieved or until no additional medical records reviewed by the Primary Coder remain. |

# 10.4 Sample Population

All medical records reviewed by Primary Coders are subject to sampling (or complete re-review), without restriction. CMS believes that the sample size of 25 medical records is sufficient such that medical records without diagnoses abstracted will not substantially impact the calculation of the consistency measure for the Primary Coder.

IVA Entities are not required to obtain all medical records prior to initiating the IRR process, nor are they required to complete all medical record reviews before performing IRR. The IRR process for a Primary Coder may be initiated once the sample size requirement of 25 medical records is met. If the Primary Coder does not complete reviews of the necessary 25 medical records required to initiate the IRR sampling process, all medical records reviewed by the Primary Coder must be reviewed by a Senior Coder.

Senior Coders responsible for IRR review of Primary Coder sampled medical records are not required to be blind to Primary Coder findings; that is, Senior Coders are permitted to review Primary Coder findings for the medical record under review, including abstracted diagnoses and HCCs assigned to these diagnoses prior to or during their review. Senior Coders are permitted to review results of Primary Coder Health Status Data Validation steps prior to re-review as part of the IRR process.

# Section 11

# HHS Risk Adjustment Data Validation Protocols

# Error Estimation

.

Exhibit W
Page 429

# 11. Error Estimation

## 11.1 Overview

The objectives of the pairwise and Error Estimation processes are to verify the accuracy of the IVA results, calculate HCC failure rates, identify issuers with EDGE data validation rates that are statistically different than national validation rates, determine if risk score adjustments are required, and calculate risk score error rates to be applied to issuers' PLRS.

Without viewing the actual IVA results, the SVA Entity re-performs the validation steps executed by the IVA Entity on a sample of enrollees validated by the IVA Entity to verify the accuracy of the IVA results. The initial SVA sample must be sufficiently large enough to determine sufficient similarity between the IVA and SVA results by pairwise means testing.[30] At the conclusion of the SVA review, CMS identifies the issuers that are statistical outliers in their health status submission inaccuracies and applies an adjustment to those issuers' risk scores.

Details regarding the Pairwise Analysis Process and the Error Estimation process are provided in the following sections.

## 11.2 Pairwise Test and IVA Sample Adjustment

CMS will conduct a pairwise means test to either accept or replace the IVA's results based on the results of the SVA sampled records.

### 11.2.1 Pairwise Test between SVA and IVA

During the pairwise means test, the SVA Entity will compare the SVA results to the IVA results to determine if the results are sufficiently similar. The SVA sample sizes consist of an initial subsample of 12 enrollees and expands, if necessary, based on insufficient pairwise agreement to IVA results, to 24, 50, then 100 enrollees. If sufficient agreement is not found after reviewing all 100 enrollees in the SVA subsample, the SVA Entity requests the medical records for the remaining enrollees in the IVA sample. All enrollees in the IVA sample that were not initially selected as part of the SVA subsample of 100 are included as part of Package 3. CMS will conduct a precision analysis on error rates calculated at the conclusion of the SVA process to determine whether to use a HIOS ID's SVA 100 level findings for the 100 SVA subsample enrollees[31] (a result of acceptable precision) or expand to the full SVA 200 level inclusive of all enrollees in the IVA sample (a result of unacceptable precision) for the HIOS ID. If unacceptable precision is found at the SVA 100 level, the medical records for Package 3 enrollees will be reviewed by the SVA.

CMS will prioritize enrollees with medical records in the initial subsample groups, such that enrollees with medical records are reviewed prior to those without medical records.

If the results from the initial pairwise means test or the pairwise means test from any of the incremental SVA subsample expansions are found to demonstrate sufficient agreement to the IVA findings, then the IVA results will be used for the calculation of HCC failure rates, the calculation of HCC Group Failure Rates, and any applicable adjustments.

If there is insufficient agreement between the IVA results and the results of the expanded SVA sample, the SVA results will be used in the calculation of HCC failure rates, the calculation of HCC Group Failure Rates, and any applicable adjustments.

---

[30]Pairwise Means Test: A statistical means test, which is a hypothesis-testing procedure to determine if two (2) population means are different when there is a one-to-one (1:1) correspondence between the values in the two (2) samples.

[31] In the event the SVA subsample is expanded to the full IVA sample of 200, we will still refer to the SVA sampled enrollees as the SVA subsample to distinguish the SVA sample from the IVA sample.

For the 2018 benefit year HHS-RADV, CMS will use the demographic data from the EDGE server reports for risk score calculations used in the pairwise means test rather than the demographic results of the IVA or SVA D&E data validation. Additionally, for the 2018 benefit year HHS-RADV, CMS will use EDGE server enrollee RXCs for risk score calculations used in the pairwise means test rather than the RXC results of the IVA or SVA RXC data validation. Therefore, any pairwise differences will be the result of health status variance between the IVA and SVA.

To illustrate the pairwise means statistical test, consider the following notations where $i$ stands for sampled enrollee $i$:

| | |
|---|---|
| $\tilde{x}_i$ | is the $i$th IVA risk score observation in the SVA subsample of $\boldsymbol{n}$ observations |
| $\tilde{y}_i$ | is the $i$th SVA risk score observation in the SVA subsample of $\boldsymbol{n}$ observations |
| $d_i$ | is the difference between $\tilde{y}_i$ and $\tilde{x}_i$ within the SVA subsample $$d_i = \tilde{y}_i - \tilde{x}_i$$ |
| $S_d$ | is the standard deviation of $d_i$ |
| $\bar{d}$ | is the mean of $d_i$ in all $\boldsymbol{n}$ observations within the SVA subsample $$\bar{d} \pm t_{1-\infty,y}\left(\frac{S_d}{\sqrt{n}}\right)$$ |
| $N$ | is the number of IVA sampled enrollee records. |
| $n$ | is the number of observations in the SVA subsample |
| $t_{1-\infty,y}$ | is the critical t-value associated with a two-sided 95% confidence level |

From the N IVA records (N=200), CMS will select a small subsample of n SVA records (n=12). For each SVA selected record, CMS will calculate the difference, as shown be the formula for d_i. CMS will then conduct a pairwise means test to determine whether the mean difference is statistically different than zero (0) at a 95% confidence level [two (2)-sided]. Specifically, CMS will test if zero (0) is contained within the bound, $\bar{d} \pm t_{1-\infty,y}\left(\frac{S_d}{\sqrt{n}}\right)$ where $t_{1-\infty,y}$ is the critical t-value associated with a two (2)-sided 95% confidence level.[32]

If zero (0) is contained, CMS will conclude that there is no statistically significant difference between the IVA and SVA results for the sampled enrollees and accept the results of the IVA review.

However, if zero (0) is not contained within this bound (i.e., the difference is statistically significant), CMS will incrementally expand the SVA subsample from 12, to 24, to 50, and finally 100, reviewing the enrollee files and conducting an alternate pairwise means test using the larger SVA subsample at each expansion. This difference may be positive or negative depending on the direction and magnitude of each difference found between the IVA and SVA results. If the pairwise means test shows no statistically significant difference, CMS will accept the results of the IVA review. If the pairwise means test shows that there is a statistically significant difference between the IVA and SVA results, after expanding the SVA subsample to 100, CMS will conduct a precision analysis for evaluating the SVA findings to determine if selecting a larger subset of the 200 total IVA sampled enrollees can be justified.

CMS uses a nonparametric bootstrap technique for estimating properties of the error estimate

---

[32] The critical t-value $1-\alpha$ = 1.96, when the sample is large enough, approaching infinity α represents the significance level and γ represents the degrees of freedom of the critical t-value associated with a two (2)-sided 95 percent confidence level. CMS assumes that α = 0.05 for 95% confidence and γ = $n$-1.

because the approach requires no assumptions to be made about the parent distribution. [33] This approach is used to determine standard errors and confidence intervals when the underlying distribution is unknown, when sample sizes may be too small, and/or when no formula may exist for the complex calculation. Due to the complexity of the Error Estimation method, the mathematical derivation of standard errors and confidence intervals cannot otherwise be derived as a formula.

The bootstrap resampling technique will allow CMS to derive precision metrics such as standard error and confidence intervals for the point estimate of the error rate of each issuer when the IVA failed pairwise at SVA 100 review (n=100). If the confidence interval or standard error of the error rate for any of these issuers is large enough to lose confidence in the quality of results (e.g. using CMS established precision targets of 10% and in comparison to other issuers with 200 samples), then CMS will conclude that the precision for the estimated error rate is poor and the SVA will expand and use the full SVA reviewed sample of 200 enrollees (n=200). However, if these metrics (standard error or confidence interval) fall in a similar range compared to other issuers, then the SVA subsample will not be expanded to 200. [34]

CMS will implement the bootstrap procedure on each issuer's sample of enrollees to determine the standard error and confidence interval for an issuer's error rate estimate:

1. For issuer i, draw N (or n) enrollees from the list of all sampled enrollees with replacement (i.e., select a random enrollee from the sample and return the enrollee back into the sample prior to the next enrollee being selected), where N (or n) is the number of IVA or SVA sampled enrollees.

2. Calculate the issuer's error rate using the method, described above, by assuming the resampled enrollees create a bootstrap sample. The estimated error rate for issuer i and the bootstrap sample is recorded as $\widehat{ErrorRate}_{i,1}$.

3. Repeat Step 1 and 2 at minimum 1,000 times. [35] Each time, a new error rate is estimated based on a resampled data set. At the end of the resampling experiment, a set of error rate estimates are collected as

$$\widehat{ErrorRate}_{i,1}, \dots \widehat{ErrorRate}_{i,B}$$

where B is the times the resampling experiment repeats.

4. Calculate the sample standard deviation of all the B re-sampled error rates. This standard deviation is an approximation of the bootstrapped standard error (SE) of the error rate estimate for issuer i.

5. Obtain the 2.5th, and 97.5th percentiles of all the B re-sampled error rates. This is the bootstrapped two (2)-sided 95% confidence interval boundary for the error rate estimate for issuer i.

The standard error is one (1) way to indicate how precise the estimate of an issuer's error rate is. If an issuer's standard error is large enough to lose confidence in the quality of results, the issuer's SVA Findings will be assessed as having poor precision. The precision test and the calculated precision values are used to resolve the following scenarios:

---

[33] Bootstrap Resampling: A non-parametric resampling procedure used to estimate the sampling distribution based on independent observations.

[34] A standard IVA Sample Size is 200 enrollees. For additional information regarding alternate sample sizes, refer to Section 7.3.2 Alternative Sample Size and Section 7.3.3 SVA Subsample Sizes.

[35] Statistical standards note that 1,000 iterations of bootstrap resampling adequately captures the range of variability produced as a results of random sampling.

- If the SVA100 findings were utilized in the calculation of an issuer's error rate and the findings of the bootstrap procedure indicates poor precision, CMS will increase the SVA sample size to 200 enrollees (i.e., the full IVA sample). In the event the SVA sample increases to 200 enrollees, the SVA200 findings will be used as the issuer's final results and the Error Estimation calculation will be re-run.

- If the SVA100 findings were utilized in the calculation of an issuer's error rate and the findings of the bootstrap procedure indicates acceptable precision, CMS will not increase the SVA sample. The findings of the SVA100 will be used as the issuer's final results in the Error Estimation calculation.

The Error Estimation results are finalized once all HIOS ID SVA sample expansions are exhausted, including increases to SVA200 for issuers for which low precision was determined.

Note that CMS intends to use bootstrap resampling techniques to measure the precision of the finalized error rate estimates and inform future sampling methods.

# 11.3 Error Estimation

Under § 153.350, HHS may adjust RA payments and charges to all issuers of RA covered plans based on adjustments to the average actuarial risk of a RA plan due to errors discovered during HHS-RADV.[36] Under the original HHS-RADV Error Estimation approach, all issuers of RA covered plans would have received risk score adjustments impacting payment transfers in the subsequent benefit year based on HHS-RADV audit results and using the audit-confirmed, issuer-specific risk score error rate. However, as recognized in the 2019 Payment Notice,[37] CMS believes that some variation and error should be expected in the compilation of data for risk scores.

To avoid adjusting all issuers' risk scores for expected variation and error, CMS finalized an approach in the 2019 Payment Notice of using failure rates specific to HCC groups and subsequently adjusting the issuer's risk score when the issuer's failure rate for a group of HCCs is statistically different from the weighted mean failure rate, or total failure rate, for that group of HCCs for all issuers that submitted IVA results. This approach is described in more detail below. CMS believes that determining outlier failure rates based on HCC groups yields a more equitable measure to evaluate issuers' HCC failure rates impacting an issuer's error rate than an approach based on an overall failure rate. Further, this approach should streamline the HHS-RADV process, improve issuers' ability to predict RA transfers, and promote confidence and stability in the budget-neutral payment transfer methodology while ensuring the integrity and quality of data provided by issuers.

The major changes that stem from this approach are the HCC Group level analysis, no adjustment to issuers' risk scores whose HCC failure rates are within a confidence interval, and a partial risk score adjustment for all HCCs in an HCC Group where the issuer has outlier failure rates (as opposed to losing the full value of the coefficient for a missing HCC under the prior method).

CMS will estimate adjusted risk scores based on the weighted mean failure rate of the sampled enrollees' validated HCCs. HCC failures may be the result of any findings that cause a change to the health status components of an enrollee's risk score; this may include findings such as:

- invalid documentation (as described in Section 9.8 – Phase 5 - Health Status Data Validation);

- missing or insufficient medical record documentation; or

---

[36] Consistent with 45 C.F.R. §153.630(e), HHS also may adjust payments and charges for issuers that do not comply with HHS-RADV requirements and standards.

[37] 83 FR 16961.

- incorrect diagnosis coding.

For error rate estimation, HCC failure rates are defined as the probability that an issuer's HCC for a sampled enrollee reflected on the EDGE server and in RA calculations is found to be inaccurate or unsubstantiated in the IVA and/or SVA review. The percent of the risk score that is incorrect due to audit findings (that is, due to HCCs that could not be validated through audit), is considered to be the issuer's risk score error rate. Because the EDGE server frequency of a unique HCC for a given issuer's enrollees in its IVA sample will be relatively small, HCCs are categorized into groups for evaluation. The HCC groups are determined by ordering HCCs from lowest to highest failure rates and weighting each HCC by its total frequency in the EDGE server for all IVA/SVA validated sample enrollees across all issuers. CMS will perform statistical analysis to determine those issuers whose Group Failure Rate is outside of the norm within an HCC Group related to the overall sample of issuers' Group Failure Rates for a particular HCC Group.

CMS will apply HCC hierarchies to all submitted diagnoses on the IVA Entity Audit Results Submission XML to determine final IVA HCCs for each audited enrollee. HCC hierarchies are similarly applied to SVA results to determine final SVA HCCs for an enrollee. HCCs for an enrollee are determined only after the hierarchies are applied to documented diagnoses, and HCC failure rates are calculated using only these final HCCs. See Section 11.3.1.1 (Applying HCC Hierarchies) as well as **Appendix G** (Examples of Applying HCC Hierarchies) for additional guidance and examples associated with applying HCC hierarchies.

Upon completion of the IVA and SVA audits, CMS will calculate an issuer-level risk score error rate for identified outliers. This risk score error rate will generally be applied to an issuer's RA plan-level risk scores in the subsequent benefit year to the benefit year being audited.[38] The risk score error rate represents the percent of an issuer's EDGE risk scores that are estimated to be in error after applying risk score adjustments to sampled enrollees identified as outliers in the HCC Groups and extrapolating the impact of those adjustments to the issuer's RA population. For issuers that are not outliers, they will have no error rate ($ErrorRate_i = 0$). A positive error rate means an issuer's EDGE risk scores are higher than the adjusted risk scores found during the audit ($ErrorRate_i = Positive\ Value\ (e.g.,\ 10\%)$). A negative error rate indicates that an issuer's EDGE risk scores are lower than the adjusted risk scores found during the audit ($ErrorRate_i = Negative\ Value\ (e.g.,\ -10\%)$).

The one (1) exception to this general rule is for issuers who are determined to have had a positive error rate[39] and exit the market; for these issuers, risk score error rates will be applied to the RA risk scores for the issuer's final benefit year in which they participated (i.e., issuer had membership) in the state market risk pool, which is the same RA benefit year as the benefit year being audited. By "exit," CMS means that the issuer is claiming that no new coverage is being offered in any state market risk pools in the benefit year they "exit." If an issuer only exits some of the markets or risk pools in the state, but continues to sell or offer new plans in other states, then it would not be considered an exiting issuer. Small Group Market Issuers with off-calendar year coverage who exit the market and do not offer any individual market coverage in the state but only have carry-over small group coverage that ends in the next benefit year (that is, carry-over of claims for individuals enrolled in the previous benefit year, with no new coverage being offered or sold), would be considered an exiting issuer and would be exempt from HHS-RADV for the benefit year with only carry-over coverage. Refer to **Appendix J** (Application of Risk Score error rates for Issuers Exiting the Market) for guidance and examples of the application of risk score error rates for issuers exiting the market in a given benefit year. CMS plans to provide each issuer with enrollee-level audit results and their issuer-level error

---

[38] For example, an issuer who is an outlier in the 2018 benefit year HHS-RADV results would have its risk score adjusted for its 2019 benefit year RA transfers based on its 2018 benefit year HHS-RADV error rate.

[39] As finalized in the 2020 Payment Notice, adjustments will not be made if an exiting issuer is found to be a negative error rate outlier. See 84 FR at 17503.

rate.

The next four (4) sections further explain and illustrate the Error Estimation process.

- Section 11.3.1 (Categorize HCCs into Groups) describes how sampled enrollees' EDGE server data and IVA sample results will be used to group HCCs into categories.

- Section 11.3.2 (Calculation of Adjustments based on Group Failure Rates) describes how the comparison of sampled enrollees' EDGE server data to IVA results (or SVA results when a pairwise test concludes that significant differences exist) will be used to identify issuers that are statistically different from their peers.

- Section 11.3.3 (Calculation of Error Rates to Adjust Issuer Plan Risk Scores) describes how the sample results are projected to an issuer level adjusted risk score.

- Section 11.3.4 (Illustration of the Pairwise and Error Estimation Processes) shows an example illustrating the pairwise and Error Estimation process. Note that error rates calculated in the 2018 benefit year HHS-RADV will generally be used to adjust 2019 benefit year RA risk scores and RA transfers.[40]

## 11.3.1 Categorize HCCs into Groups

Since the IVA samples are stratified random samples based on enrollee risk score and age model, the underlying unique HCCs or an issuer's distribution of HCCs are not considered during the sample selection. At the issuer level, the sample size of each unique HCC would be too small to provide a sufficient amount of data for statistical analysis, especially for rare diseases. Therefore, to increase the HCC sample size for an issuer, CMS will categorize all HCCs into one (1) of three (3) Groups based upon the magnitude of their failure rates ($FR^h$) and EDGE server frequencies ($Freq\_EDGE^h$) across all issuers creating a hierarchical order of "Low", "Medium," and "High" groups of failure rates with approximately equal number of HCC frequencies across all HHS-RADV issuers' sampled enrollees in each Group.

To illustrate the categorization of HCCs into Groups, consider the following notations:

| Term | Definition |
|---|---|
| h | Is the $h_{th}$ HCC code |
| $Freq\_EDGE^h$ | Is the frequency of an HCC $h$ occurring on EDGE, which is the number of sampled enrollees recording HCC $h$ in EDGE across all issuers |
| $Freq\_IVA^h$ | Is the frequency of an HCC $h$ occurring in IVA results (or SVA results when pairwise test concludes that significant differences exist), which is the number of sampled enrollees with HCC $h$ in IVA results across all issuers |
| $FR^h$ | Is the failure rate of HCC $h$ across all issuers |

The HCC failure rate ($FR^h$) is the probability of all issuers coding an HCC incorrectly and is defined as one (1) minus the ratio of HCC frequencies in issuer audit results (IVA or SVA) to the EDGE server: $\left(FR^h = 1 - \frac{Freq\_IVA^h}{Freq\_EDGE^h}\right)$. The HCCs are ordered by their failure rates and assigned to their

---

[40] CMS will adjust 2018 benefit year risk scores and recalculate transfers if an issuer exiting all of the market risk pools in a state in 2019 is found to be a positive error rate outlier in 2018 benefit year HHS-RADV.

Groups through the following process:

1. Add the HCC with the lowest failure rate into Group One (1); update the size of Group One (1) as $Freq\_EDGE^{h1}$

2. Add the next HCC from the ordered list into Group One (1); update the group size as $Freq\_EDGE^{h1} + Freq\_EDGE^{h2}$

3. Repeat until the group size (the cumulative sum of frequencies) reaches approximately 33.3% of the total frequencies of HCCs recorded on EDGE ($\sum Freq\_EDGE^h$).

   Note: If an HCC crosses the 33.3% boundary, it will be assigned to the group where the inclusion of the frequencies of the HCC best allows the Group's total frequencies to approximate 33.3% (Group One [1] or Group Two [2], depending on the preponderance of the HCCs).

4. Select the HCCs for Group Two (2) by repeating Steps 1 – 3 using the remaining HCCs in the ordered list, until the size of Group One (1) plus Group Two (2) reaches 66.7% of the total frequencies of HCCs recorded on the EDGE server ($\sum Freq\_EDGE^h$).

   Note: if an HCC crosses the 66.7% boundary it will be assigned to Group Three (3).

5. The remaining HCCs are placed in Group Three (3).

At the conclusion of this step, each HCC is assigned to only one (1) of three (3) Groups with an approximately equal number of observed HCCs. Note that the categorization process creates groups based on all sampled enrollees on the EDGE server, across all issuers. Because this categorization process aims to categorize HCCs based on their frequency so that each HCC Group has a relatively equal frequency of total HCCs across all issuers, the number of unique HCCs will not necessarily be distributed evenly per Group.

## 11.3.1 Applying HCC Hierarchies

The Error Estimation methodology supports the HHS-RADV program's purpose to validate the accuracy of data submitted by issuers to their EDGE servers for use in RA calculations, as well as the objective of determining the accurate health status of the sampled enrollees.

HCCs for an enrollee are determined only after the HHS-HCC hierarchy is applied to all final diagnoses for the individual, be it during EDGE data submission, or following submission of IVA findings. Only those HCCs present after imposing hierarchies will be considered in the calculation of EDGE and IVA/SVA HCC frequencies. See **Appendix H** (Examples of Applying HHS-HCC Hierarchies) for a description of examples of applying HHS-HCC hierarchies.

## 11.3.2 Calculation of Adjustments based on Group Failure Rates

CMS will apply adjustment factors to sampled enrollees' HCC component of their risk scores when one (1) or more of an issuer's Group Failure Rates statistically differs from the weighted mean of the Group Failure Rate across all issuers. An issuer's Group Failure Rate is the probability of an issuer coding HCCs incorrectly across all HCCs in the same Group. CMS approximates that an issuer's Group Failure Rate follows a normal distribution and uses the weighted mean as the measure of central tendency and the standard deviation as the measure for dispersion. The standard deviation is used to identify the two (2)-sided confidence interval, 1.96 standard deviations on each side of the weighted mean failure rate for each Group. When an issuer's Group Failure Rate falls outside this boundary, an adjustment is applied to all sampled enrollees' HCCs from the same Group.

To illustrate the calculation of adjustment factors based on Group Failure Rates, consider the following notations, where *i* stands for issuer *i* and *G* represents the *Gth* Group:

| Term | Definition |
|---|---|
| $i$ | The ith issuer |
| $G$ | The Gth (1-3) HCC group |
| $Freq\_EDGE_i^G$ | The frequency of HCCs recorded on EDGE in Group G in the IVA sample of issuer i |
| $Freq\_IVA_i^G$ | The frequency of HCCs found by the IVA in Group G of the IVA sample of issuer i |
| $GFR_i^G$ | The issuer i's Group Failure Rate for the HCC Group G |
| $\mu(GFR^G)$ | The mean of $GFR_i^G$ of all issuers for the HCC Group G |
| $Sd(GFR^G)$ | The sampled standard deviation of $GFR_i^G$ of all issuers for the HCC Group G |
| $Sigma\_cutoff$ | The parameter used to set the threshold for outlier detection as the number of standard deviations away from the mean |
| $LB^G$ and $UB^G$ | The lower and upper thresholds to classify issuers as outliers and not outliers for Group G |
| $Freq\_SVA_i^G$ | The number of HCCs in Group G in the IVA sample of issuer i adjusted from the SVA review |
| $Group\ Adjustment_i^G$ | The calculated adjustment factor to adjust issuer i's EDGE risk scores for all sampled HCCs in Group G |

CMS will determine each issuer's frequency of HCCs in Group G that occurred across all sampled enrollees from the EDGE server ($Freq\_EDGE_i^G$) and the IVA ($Freq\_IVA_i^G$), then compute their Group Failure Rate for the HCC Group G as:

$$GFR_i^G = 1 - \frac{Freq\_IVA_i^G}{Freq\_EDGE_i^G}$$

Based on the result of the Pairwise Test described above (Sections 11.2.1 – Pairwise Test Between IVA and SVA), issuers who fail the pairwise test require a modified Group Failure Rate per HCC Group that takes the SVA results into consideration. The new $GFR_i^G$ equation becomes:

$$GFR_i^G = 1 - \frac{Freq\_SVA_i^G}{Freq\_EDGE_i^G}$$

The Group Failure Rate for the HCC Group G is used to determine the confidence interval for each HCC Group. Confidence intervals, constructed from the mean and standard deviation, provide the range of values between which a parameter is expected to lie. The Sigma cutoff sets the threshold for the confidence interval and CMS selects to set the cutoff at 1.96.

$$LB^G = \mu(GFR^G) - Sigma\_cutoff * Sd(GFR^G)$$
$$UB^G = \mu(GFR^G) + Sigma\_cutoff * Sd(GFR^G)$$

CMS will establish the confidence interval by computing 1.96 standard deviations on each side of the mean Group Failure Rate for each HCC Group. By using the sample mean and standard deviation statistics, CMS assumes that the observed issuer failure rates within each HCC Group approximately follow a normal distribution. When calculating the mean and standard deviation of all issuers' Group Failure Rate, CMS also assumes issuers are not equal and are weighted by their Group EDGE HCC frequency to ensure an equitable contribution, thus making the equation, $w_i = Freq\_EDGE_i^G$.

$$w_i = Freq\_EDGE_i^G.$$

$$\mu(GFR^G) = \frac{\sum_i \left(w_i * GFR_i^G\right)}{\sum_i w_i}$$

$$Sd(GFR^G) = \sqrt{\frac{\sum_i \left(w_i * \left(GFR_i^G - \mu(GFR^G)\right)^2\right)}{\sum_i w_i}}$$

Each issuer's Group Failure Rate for HCC Group G is compared against Group G's corresponding lower and upper boundaries. If an issuer's Group Failure Rate falls outside of these boundaries, then an adjustment is calculated as the difference between the issuer's Group Failure Rate and Group G's weighted mean. The adjustment to the mean provides an explicit correction back to the central tendency from the sample of issuers.

$$Group\ Adjustment_i^G = \begin{cases} GFR_i^G - \mu(GFR^G) & if\ GFR_i^G > UB^G\ OR\ GFR_i^G < LB^G \\ 0 & if\ GFR_i^G \leq UB^G\ AND\ GFR_i^G \geq LB^G \end{cases}$$

At the conclusion of this step, each issuer with a Group Failure Rate outside of the upper and lower boundaries is assigned up to three (3) adjustment factors, one (1) for each Group for which the issuer's Group Failure Rate is outside of the upper and lower boundaries. These Group adjustment factors will be weighted and used to compute the enrollee-level adjusted risk score.

## 11.3.3 Calculation of Error Rates to Adjust Issuer Plan Risk Scores

An enrollee-level adjustment to sampled enrollees' risk scores will only be computed when the following conditions are satisfied simultaneously:

1. An issuer has at least one (1) HCC Group Failure Rate that falls outside of its corresponding two (2)-sided 1.96 standard deviation confidence interval (described in Section 11.3.2 – Calculation of Adjustments based on Group Failure Rates).

2. A sampled enrollee has an HCC recorded on EDGE that falls in an outlier HCC Group for which the issuer incurs a non-zero adjustment [i.e., a non-zero (0) Group from Condition One (1)].

CMS will calculate the enrollee-level adjusted risk scores for the sample based on the adjustment factors calculated in Section 11.3.2 for the three (3) HCC Groups. CMS will then estimate the issuer-level error rates using the deviation from adjusted sample risk scores to original risk scores. The issuer's error rate is first calculated at the stratum level and then combined to a single value by weighing in the stratum size in the issuer's population and sample.

To clarify the description in the 2019 Payment Notice (83 FR 1693) that the adjusted risk score will not include enrollees without HCCs, we note the following:

- All enrollees (Strata 1-10) contribute to the calculation of the overall issuer error rate

- All enrollee HCCs identified by the IVA or SVA as applicable (including for Stratum 10 enrollees) will be used in determining HCC failures rates for the issuer in the HCC Groups (Low, Medium, High)

- Newly identified HCCs by the IVA (or SVA as applicable) will not contribute to enrollee risk score adjustments for enrollees, but will be used to calculate national and issuer-specific HCC failure rates

- Adjustment of enrollees' risk scores is performed only for sampled enrollees with EDGE HCCs

(Strata 1-9), when the EDGE HCCs for these enrollees are in an HCC Group for which the issuer is an outlier

To illustrate the calculation of error rates to adjust issuer plan risk scores, consider the following notations:

| Term | Definition |
|---|---|
| i | The ith issuer |
| e | The eth enrollee |
| G | The Gth HCC group |
| $RS_{i,e}^{hcc,G}$ | The risk score component of a single HCC for the enrollee |
| $Enrollee\ Adjustment_{i,e}$ | The calculated adjustment factor to adjust Enrollee e of issuer i's sample risk score |
| $EdgeRS_{i,e}$ | The sampled Enrollee e of issuer i's risk score recorded on EDGE |
| $AdjRS_{i,e}$ | The sampled Enrollee e of issuer i's adjusted risk score |
| $ErrorRate_i$ | The final Error Rate for Issuer i based on the sampled enrollees |
| $w_e$ | The stratum weight used to compute the Error Rate |

CMS will first use the HCC Group level adjustment factor calculated in Section 11.3.2 to determine the enrollee-level adjustment factor for all samples. The enrollee adjustment factor will be calculated as the weighted average of all HCCs' associated Group level adjustment factor(s), where the weight is assigned as the risk score component contributed by the single HCC along $(RS_{i,e}^{hcc,G})$

$$Enrollee\ Adjustment_{i,e} = \frac{\sum_{hcc}(RS_{i,e}^{hcc,G} * Group\ Adjustment_i^G)}{\sum_{hcc}(RS_{i,e}^{hcc,G})}$$

Next, for sampled enrollees, the adjustment factor is applied to the enrollee's EDGE server risk score to obtain their adjusted risk score $(AdjRS_{i,e})$.

$$AdjRS_{i,e} = EdgeRS_{i,e} * (1 - Enrollee\ Adjustment_{i,e})$$

Then, the issuer's error rate is estimated using the total stratum weighted risk scores on EDGE and the adjusted risk scores from the sampled enrollees. The stratum weight is the ratio of the stratum size in the population to the number of sampled enrollees from the stratum.

$$ErrorRate_i = 1 - \frac{\sum_e(w_e * AdjRS_{i,e})}{\sum_e(w_e * EdgeRS_{i,e})}$$

$$, where\ w_e = \frac{stratum\ size\ in\ population}{number\ of\ sample\ enrollees\ of\ the\ stratum}$$

The risk score component of a single HCC $(RS_{i,e}^{hcc,G})$ is calculated based on the logic defined in the applicable HHS RA Model table.[41] This calculation for the enrollee adjustment only considers the

---

[41] 2018 Benefit Year DIY Software Instructions https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/2018-RA-Model-DIY-Instructions.pdf and 2018 Benefit Year DIY Software Technical Details https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/2018-RA-Model-DIY-Tables.xlsx

risk factors related to HCCs and ignores any other risk factors (demographic factors, enrollee RXCs, etc.). This assumption only applies to the calculation of enrollee-level adjustment factors. CMS applies calculated enrollee adjustment factors to enrollees' EDGE server risk scores, which include all EDGE server risk score components, to calculate adjusted risk scores for enrollees.

## 11.3.4 Illustration of the Pairwise and Error Estimation Processes

To illustrate the pairwise and Error Estimation processes described above, assume that a sample of 200 enrollees is selected for IVA review for a particular issuer. From this sample, a subsample of 12 enrollees is selected for SVA review. Assume the issuer's average recorded population (EDGE Server) risk score is 1.60.

**Step One (1):** The Pairwise process will determine if the IVA results should be replaced based on the SVA review or accepted.

1. CMS performs a pairwise means test to compare the difference between the IVA risk scores and SVA risk scores for the subsample of twelve (12) enrollees. (See Section 11.2.1 – Pairwise Test between SVA and IVA)

2. Assume the average recorded IVA risk score is 1.50 (post-validation) and the average recorded SVA risk score is 1.25 in the SVA sample of 12 enrollees, resulting in a difference ($d_i$) between the IVA risk score and SVA risk score as ' -0.25;

$$d_i = 1.25 - 1.5 = -0.25$$

For this example, assume the pairwise means test results yield insufficient agreement between the IVA and SVA [i.e., there is a statistically significant difference between the IVA and SVA subsample of twelve (12) risk scores].

3. The SVA will incrementally review the remaining 88 enrollees to increase the SVA subsample to 100 enrollees. CMS performs the pairwise means test again where the average recorded IVA risk score is 1.65, and average recorded SVA risk score is 1.42 in the SVA sample of 100 enrollees.

$$d_i = 1.42 - 1.65 = -0.23$$

For this example, assume the pairwise means test results yield insufficient agreement between the IVA and SVA (i.e., there is a statistically significant difference between the IVA and SVA sample of 100).

**Step Two (2):** CMS will replace the IVA inconsistent HCCs with the SVA validated HCCs for all 100 enrollees in the IVA subsample reviewed by the SVA. Then, CMS will use the SVA validated HCCs and HCC failure rates – replacing the HCC failure rates from the IVA findings – to calculate HCC Group Failure Rates, any applicable adjustments, and the risk score error rate.

**Step Three (3):** CMS will categorize each HCC into one (1) of three (3) groups using the failure rates and EDGE HCC frequencies across all issuers. Since there are over one hundred (100) HCCs, for simplicity in this example we will assume from the RADV sample of issuers that ten (10) HCCs were recorded on the EDGE servers across all issuers. (See Section 11.3.1 – Categorize HCCs into Groups).

| CMS determines the frequencies for the EDGE HCCs and the IVA HCCs respectively, then calculates their HCC failure rates ($FR^h$). The below IVA HCC frequencies are inclusive of the SVA validated HCCs that replaced the IVA HCCs that failed their pairwise test.**HCC** | $Freq\_EDGE^h$ | $Freq\_IVA^h$ | $FR^h$ |
|---|---|---|---|
| 30 | 200 | 180 | 10.0% |
| 115 | 700 | 607 | 13.3% |
| 138 | 1,200 | 1,020 | 15.0% |
| 248 | 4,000 | 3,340 | 16.5% |
| 1 | 2,200 | 1,833 | 16.7% |
| 125 | 2,700 | 2,237 | 17.1% |
| 130 | 3,000 | 2,300 | 23.3% |
| 12 | 2,500 | 1,700 | 32.0% |
| 36 | 2,000 | 1,100 | 45.0% |
| 57 | 1,500 | 500 | 66.7% |
| **Total** | **20,000** | **14,817** | **25.9%** |

4. The HCCs are placed in ascending order, and two (2) boundaries are selected such that the size of the first two (2) Groups are comprised of approximately 33.3% of HCC frequencies each, for a combined total of 66.7% of the total EDGE frequency.

   a. The two (2) boundaries to cut the list of ten (10) HCCs into three (3) Groups are 6,660 (20,000 * 33.3%), and 13,340 (20,000 * 66.7%) respectively.

   b. HCC one (1) and HCC 12 are crossing the boundary line so they will be categorized in the higher Group in order to create balanced 33.3% EDGE frequency Groups. See the table below, along with Image 11.3.4.1 for a visual of the categorization.

| HCC | $Freq\_EDGE^h$ | $Freq\_IVA^h$ | $FR^h$ | $Freq\_EDGE^h$ Cumulative Probability | Boundary | Group |
|---|---|---|---|---|---|---|
| 30 | 200 | 180 | 10.0% | 1.0% | | G1 |
| 115 | 700 | 607 | 13.3% | 4.5% | | G1 |
| 138 | 1,200 | 1,020 | 15.0% | 10.5% | | G1 |
| 248 | 4,000 | 3,340 | 16.5% | 30.5% | 33.3% | G1 |
| 1 | 2,200 | 1,833 | 16.5% | 41.5% | | G2 |
| 125 | 2,700 | 2,237 | 17.1% | 55.0% | | G2 |
| 130 | 3,000 | 2,300 | 23.3% | 70.0% | 66.7% | G2 |
| 12 | 2,500 | 1,700 | 32.0% | 82.5% | | G3 |
| 36 | 2,000 | 1,100 | 45.0% | 92.5% | | G3 |
| 57 | 1,500 | 500 | 66.7% | 100.0% | 100% | G3 |
| **Total** | **20,000** | **14,817** | **25.9%** | | | |



**Image 11.3.4.1:** In the image above (Image 11.3.4.1), the x-axis is the sorted list of HCCs in an increasing order of their failure rates. The bar height (and the text in each box) represents Freq_EDGE of each HCC. The bar on the right shows the total Freq_EDGE is 20,000. The two (2) boundaries to cut the list of 10 HCCs into three (3) groups are $(20,000 * 0.333)$, and $(20,000 * 0.667)$ respectively, which are shown as the two (2) horizontal dashed lines. The two (2) horizontal lines cut all ten (10) boxes (one (1) for each HCC) into three (3) groups. If a box is crossing a boundary line (e.g., HCC 1 and HCC 130), such box will be added to the Group to achieve equitable boundary cutoffs of 33.3% EDGE frequency allocation. The final grouping result is shown as three (3) colors in the chart.

**Step Four (4):** CMS will evaluate each issuer's Group Failure Rate and assess if it statistically differs from the weighted mean of the sampled issuer's Group Failure Rates (See Section 11.3.2 – Calculation of Adjustments based on Group Failure Rates).

1. CMS will first determine the frequency of HCCs in each Group and calculate the Group Failure Rate across each issuer.

| HCC Group | Issuer | Freq_EDGE$^G$ | Freq_IVA$^G$ | GFR$^G$ |
|---|---|---|---|---|
| G1 | 10001 | 133 | 104 | 21.8% |
| | 10002 | 96 | 87 | 9.4% |
| | ⋮ | ⋮ | ⋮ | ⋮ |
| G2 | 10001 | 171 | 128 | 25.1% |
| | 10002 | 111 | 86 | 22.5% |
| | ⋮ | ⋮ | ⋮ | ⋮ |
| G3 | 10001 | 131 | 96 | 26.7% |
| | 10002 | 96 | 79 | 17.7% |
| | ⋮ | ⋮ | ⋮ | ⋮ |

2. For each Group, the weighted mean and standard deviations for the Group Failure Rates are calculated using column GFR$^G$ by each HCC Group. They will be used to create a 1.96 standard deviation confidence interval. Since the entire universe of participating

issuers are necessary to compute the Group Failure Rate for each HCC Group, for simplicity, we assume here the weighted mean Group Failure Rates for G1, G2, and G3 are 11.8%, 17.1%, and 25.9% respectively in the table below; and the weighted standard deviations are 3.0%, 3.4%, and 4%, respectively).

*Note: The Group Failure Rate values of 11.8%, 17.1%, and 25.9% referenced in this step, and used in the following steps, do not correspond to data in Step 2 (e.g. Image 11.3.4.1 and the associated data table).*

| HCC Group | Issuer | Freq_EDGE$^G$ | Freq_IVA$^G$ | GFR$^G$ | μ(GFR$^G$) | Sd(GFR$^G$) | Sigma_cutoff | UB$^G$ | LB$^G$ |
|---|---|---|---|---|---|---|---|---|---|
| G1 | 10001 | 133 | 104 | 21.8% | 11.8% | 3.0% | 1.96 | 17.7% | 5.9% |
| | 10002 | 96 | 87 | 9.4% | | | | | |
| | ⋮ | ⋮ | ⋮ | ⋮ | | | | | |
| G2 | 10001 | 171 | 128 | 25.1% | 17.1% | 3.4% | 1.96 | 23.8% | 10.4% |
| | 10002 | 111 | 86 | 22.5% | | | | | |
| | ⋮ | ⋮ | ⋮ | ⋮ | | | | | |
| G3 | 10001 | 131 | 96 | 26.7% | 25.9% | 4.0% | 1.96 | 33.7% | 18.1% |
| | 10002 | 96 | 79 | 17.7% | | | | | |
| | ⋮ | ⋮ | ⋮ | ⋮ | | | | | |

3. Each issuer's Group Failure Rate for HCCs is compared against the corresponding Group's lower and upper boundaries of the confidence interval. If the issuer Group Failure Rate falls outside of the confidence interval, then an issuer's Group adjustment is calculated.

   a. The Group adjustment is the difference between the issuer's Group Failure Rate and the Group mean.

   b. For Issuer 10001, the Group G1 and G2 failure rates fell outside of the upper boundary of the confidence interval introducing positive adjustment factors. Issuer 10002's Group G3 failure rate fell outside the lower boundary of the confidence interval introducing a negative adjustment factor. Note that the sign of the adjustment corresponds to the opposite impact on the risk score in samples in the next step (i.e., a positive adjustment will reduce the risk score, while a negative adjustment will increase the risk score). In the examples below, the issuer's adjustments and error rate would result in a negative impact to the issuer's risk score, despite being positive numbers.

| HCC Group | Issuer | Freq_EDGE$^G$ | Freq_IVA$^G$ | GFR$^G$ | μ(GFR$^G$) | Sd(GFR$^G$) | sigma_cutoff | UB$^G$ | LB$^G$ | Group Adjustment$^G$ |
|---|---|---|---|---|---|---|---|---|---|---|
| G1 | 10001 | 133 | 104 | 21.8% | 11.8% | 3.0% | 1.96 | 17.7% | 5.9% | 10% |
| | 10002 | 96 | 87 | 9.4% | | | | | | 0 |
| | ⋮ | ⋮ | ⋮ | ⋮ | | | | | | … |
| G2 | 10001 | 171 | 128 | 25.1% | 17.1% | 3.4% | 1.96 | 23.8% | 10.4% | 8% |
| | 10002 | 111 | 86 | 22.5% | | | | | | 0 |
| | ⋮ | ⋮ | ⋮ | ⋮ | | | | | | … |
| G3 | 10001 | 131 | 96 | 26.7% | 25.9% | 4.0% | 1.96 | 33.7% | 18.1% | 0 |
| | 10002 | 96 | 79 | 17.7% | | | | | | -8.2% |
| | ⋮ | ⋮ | ⋮ | ⋮ | | | | | | … |

**Step Five (5):** CMS will use the issuer's Group adjustment to correct enrollee-level risk scores and project a finalized risk score to the population as noted in Section 11.3.3 (Calculation of Error Rates to Adjust Issuer Plan Risk Scores). Note, Issuer 10001's Group adjustment factors for G1, G2, and G3 are 10%, 8%, and 0% respectively [derived in Step Four (4)], and assume the issuer enrollees have the following profile:

| Issuer | Enrollee | Stratum Size in Population | Sample Enrollees from the Stratum | Stratum Level | HCCs | Maturity | Severity | $EdgeRS_{i,e}$ |
|--------|----------|---------|---------|---------|---------|---------|---------|---------|
| 10001 | 10001-1 | 352 | 67 | Infant-Medium | 125,130,138,248 | PREMATURE MULTIPLES | 5 | 126.158 |
| 10001 | 10001-2 | 1418 | 37 | Adult-High | 1,12,30, 36,57,115 | | | 12.880 |
| 10001 | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ |

1. CMS will calculate the adjustment factor that will be applied to each enrollee in a sample using the three (3) adjustment factors calculated at HCC Group level.

    a. Calculate the adjustment factor for Enrollee 10001-1. See table below for reference. Enrollee 10001-1 is under the Silver metal plan and is age zero (0).

        i. This enrollee has four (4) HCCs recorded on the EDGE server. For EDGE HCCs [125,130,138,248]. Compute the risk score for a single HCC using the logic defined in HHS RA Model table. For an infant enrollee in the sample, the computation of the single HCC risk score takes into consideration the enrollee's actual maturity and severity levels.

        ii. Assume the four (4) HCC codes [138,248,125,130] were categorized in HCC Groups G1, G1, G2, and G2 respectively [the result of Step Three (3)]. They are associated with the Group level adjustment factors of 10%, 10%, 8% and 8% (the result of Step Four (4)].

        iii. Compute the enrollee adjustment factor as the weighted average of group level adjustment factors, weighting by the risk score of the HCCs. The four (4) HCC codes have HCC risk scores of 8.008, 125.632, 49.916 and 49.916 with group level adjustment factors of 10%, 10%, 8%, and 8% respectively. This results in a weighted enrollee adjustment factor of 9.1% (i.e.,

$$\frac{8.008*10\% + 125.632*10\% + 49.916*8\% + 49.916*8\%}{8.008+125.632+49.916+49.916}).$$

    b. Calculate the adjustment factor for Enrollee 10001-2. See table below for reference. Enrollee 10001-2 is under the Silver metal plan.

        i. This enrollee has six (6) HCCs recorded on the EDGE server. For EDGE HCCs [1, 12, 30, 36, 57, 115], compute the risk score of a single HCC using the logic defined in HHS RA Model table.

        ii. Assume the six (6) HCCs [30,115,1,12,36,57] were categorized in HCC groups G1, G1, G2, G3, G3, and G3 respectively (the result of Step Three {3}). They are associated with the Group level adjustment factors of 10%, 10%, 8%, 0%, 0%, and 0% (the result of Step Four [4]).

        iii. Compute the enrollee adjustment factor as the weighted average of Group level adjustment factors, weighting by the risk score of the HCCs. The six (6) HCC codes have HCC risk scores of 1.947, 4.903, 0.33, 2.451, 1.963, and 0.864 with group level adjustment factors of 10%, 10%, 8%, 0%, 0%, and 0%% respectively. This results in a weighted enrollee adjustment factor of 5.7%

$$(i.e., \frac{1.947*10\% + 4.903*10\% + 0.33*8\% + 2.451*0\% + 1.963*0\% + 1.0660.864*0\%}{1.947+4.903+0.33+2.451+1.963+0.864}).$$

| Enrollee | Stratum Level | Plan Metal Level | Age Last | HCC Failure Group | HCC | Severity Associated with HCC | Maturity Associated with HCC | $RS_{i,e}^{hcc,G}$ | $Group\ Adjustment_i^G$ | $Enrollee\ Adjustment_{i,e}$ |
|---|---|---|---|---|---|---|---|---|---|---|
| **10001-1** | Infant-Medium | Silver | 0 | G1 | 138 | 4 | Age 1 | 8.008 | **10.00%** | 9.1% |
| | | | | | 248 | | PREMATURE MULTIPLES | 125.632 | | |
| | | | | G2 | 125 | 5 | AGE 1 | 49.916 | **8.00%** | |
| | | | | | 130 | 5 | AGE 1 | 49.916 | | |
| **10001-2** | Adult-High | Silver | N/A | G1 | 30 | | | 1.947 | **10.00%** | 5.7% |
| | | | | | 115 | | | 4.903 | | |
| | | | | G2 | 1 | | | 0.330 | **8.00%** | |
| | | | | G3 | 12 | | | 2.451 | **0.00%** | |
| | | | | | 36 | | | 1.963 | | |
| | | | | | 57 | | | 0.864 | | |

c.  Use the enrollees' adjustment factors to correct (adjust) the EDGE risk score for samples.

   i.  Apply the enrollee level adjustment factor to the EDGE risk scores of the sampled enrollees. Enrollees 10001-1 and 10001-2 have 9.1% and 5.7% adjustment factors applied to their EDGE risk scores, respectively.

| Issuer | Enrollee | EDGE HCCs | $EdgeRS_{i,e}$ | $Enrollee\ Adjustment_{i,e}$ | $AdjRS_{i,e}$ |
|---|---|---|---|---|---|
| 10001 | 10001-1 | 125,130,138,248 | 126.158 | 9.1% | 114.678 |
| 10001 | 10001-2 | 1,12,30,36,57,115 | 12.880 | 5.7% | 12.146 |

d.  Calculate the issuer's risk score error rate. Since there are one hundred enrollees, for simplicity, we assume here the stratum weighted summation of the EDGE risk score is 20,751 and the stratum weighted summation of adjusted risk score is 20,538.

   i.  Compute the risk score error rate of Issuer 10001 using the EDGE risk scores and adjusted risk scores for all sampled enrollees.

   ii.  Compute the stratum weight as the ratio of stratum size in population to the number of sampled enrollees from the stratum.

   iii.  Finally, we calculate the issuer-level risk score error rate for Issuer 10001 of 1.03%.

| Issuer | Enrollee | Stratum Level | $EdgeRS_{i,e}$ | $AdjRS_{i,e}$ | $w_e$ | $w_e * EdgeRS_{i,e}$ | $w_e * AdjRS_{i,e}$ | $\sum w_e * EdgeRS_{i,e}$ | $\sum w_e * AdjRS_{i,e}$ | Error Rate |
|---|---|---|---|---|---|---|---|---|---|---|
| 10001 | 10001-1 | Infant-Medium | 126.158 | 114.678 | 5.25 | 662.33 | 602.06 | 20751 | 20538 | **1.03%** |
| 10001 | 10001-2 | Adult-High | 12.880 | 12.146 | 38.32 | 493.56 | 465.43 | | | |
| 10001 | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | | | |

**Step Six (6):** For IVA samples that indicate a statistically significant difference between IVA and SVA100 results following a pairwise means test, the SVA100 results will be used to calculate the issuer's HCC failure rates, enrollee adjustment factors, and error rate. CMS will use bootstrap resampling to determine the standard errors and confidence intervals for the issuers' error rate calculated in Step Five (5). The bootstrap procedure is used to determine if expansion to SVA200 is required.

1. Draw a sample with replacement of enrollees equal to the number of SVA subsample enrollees from issuer 10001. When performing a bootstrap resampling to determine precision after insufficient pairwise agreement after the SVA100, there will be 100 enrollees in the SVA subsample. Repeat drawing a sample of enrollees (100) with replacement at minimum 1,000 times and determine the error rate for each sample.

   a. The error rates are determined by repeating the above-mentioned steps using the enrollee details corresponding to the bootstrap sample (i.e., 1-1000).

| Bootstrap Sample Enrollee | 1 | 2 | ... | 1,000 |
|---|---|---|---|---|
| 1 | 10001-27 | 10001-12 | ... | 10001-32 |
| 2 | 10001-1 | 10001-92 | ... | 10001-67 |
| ⋮ | ⋮ | ⋮ | ⋮ | ⋮ |
| 100 | 10001-43 | 10001-85 | ... | 10001-67 |
| Error Rate: | 0.96% | 1.17% | ... | 1.09% |

2. Compute the bootstrapped standard error by calculating the sample standard deviation across the 1,000 resampled error rates (i.e., the 1,000 error rates from the above table). This results in a standard error of 0.12%.

3. Determine the bootstrapped confidence intervals by identifying the $2.5^{th}$ and $97.5^{th}$ percentiles of the 1,000 resampled error rates (i.e., the 1,000 error rates from the above table). This results in a confidence interval of [0.83%, 1.23%].

4. At the conclusion of this process, CMS reviews the confidence interval to determine if the error rate is statistically accurate and reliable, in order to determine whether the full review of SVA200 is required, or if the SVA100 can be used for calculating the error rate and subsequent payment adjustments. If the result concludes that the precision of the error rate estimate is unacceptable (poor precision) for SVA100 results, CMS will expand the issuer's sample to SVA200. The entire Error Estimation process would be re-performed [starting with Step One (1)] to include these new samples and the associated HCCs since the overall HCC failure distribution changes after some issuers revise their samples.

| Issuer | Error Rate | Standard Error | Confidence Interval | |
|---|---|---|---|---|
| | | | Lower | Upper |
| 10001 | 1.03% | 0.12% | 0.83% | 1.23% |

At the conclusion of the HHS-RADV process, including the Discrepancy Reporting and Administrative Appeals process as described in Section 12 (Discrepancy Reporting and Administrative Appeals), the issuer's risk score error rate will be used to calculate the issuer's adjusted plan liability risk score during the RA payment transfer process, using the formula below:

$$(1 - (error\ rate)) * (plan\ liability\ risk\ score) = Adjusted\ Plan\ Liability\ Risk\ Score$$

The issuer's adjusted plan liability risk scores will then be used in RA transfer calculations to calculate RA payments and charges for the subsequent benefit year.

See **Appendix H** (Error Estimation Example) for an additional example of the Error Estimation process.

# Section 12

# HHS Risk Adjustment Data Validation Protocols

# Discrepancy Reporting and Administrative Appeals

Exhibit W
Page 448

# 12. Discrepancy Reporting and Administrative Appeals

## 12.1 Overview

Consistent with 45 C.F.R. § 153.630(d)(2), within 30 calendar days of the notification by CMS of the findings of a SVA (if applicable) or the calculation of a risk score error rate, an issuer must confirm the findings of the SVA (if applicable) or the calculation of the risk score error rate as a result of HHS-RADV, or file a discrepancy report to dispute the findings of a SVA (if applicable) or the calculation of a risk score error rate as a result of HHS-RADV.[42] These attestation and discrepancy reporting processes occur annually for each benefit year and consist of two (2) discrepancy windows.

Discrepancy Window #1 – HHS-RADV SVA Findings Attestation and Discrepancy Reporting Process: At the conclusion of the SVA, CMS will distribute to each issuer its respective pairwise means test analysis results. If there is **insufficient** agreement between the IVA and SVA pairwise means test analysis, CMS will use the SVA findings for the error rate calculation and the issuer will receive a *HHS-RADV SVA Findings Report*. The issuer will then have 30 calendar days to attest to the *HHS-RADV SVA Findings Report* or qualify that attestation with a discrepancy.

> **Note:** Only issuers who have insufficient agreement between the IVA and SVA as a result of the pairwise means test analysis need to complete the Discrepancy Window #1 – HHS-RADV SVA Findings Attestation and Discrepancy Reporting Process. Issuers who have sufficient agreement between the IVA and SVA as a result of the pairwise means test analysis are not subject to this attestation and discrepancy reporting process.

> **Note:** CMS will release to issuers a *HHS-RADV SVA Findings Report* for the HIOS IDs that have insufficient pairwise means test agreement. Only HIOS IDs for which CMS generated a HHS-RADV SVA Findings Report are required to complete the Discrepancy Window #1 – HHS-RADV SVA Findings Attestation and Discrepancy Reporting Process.

Discrepancy Window #2 – HHS-RADV Error Rate Calculation Attestation and Discrepancy Reporting Process: At the conclusion of the risk score error rate calculation, CMS will distribute the HHS-RADV 2018 Benefit Year Results Memo and Issuer and Enrollee Specific Metrics Reports to all issuers who participate in 2018 benefit year HHS-RADV. Issuers will then have 30 calendar days to attest to these final results reports or qualify that attestation with a discrepancy. **Note: All issuers who participate in 2018 benefit year HHS-RADV must complete this attestation and discrepancy reporting process.**

Issuer risk score error rates determined by CMS and communicated to issuers are generally applied to issuers' RA covered plans' subsequent benefit year risk scores. For example, the 2018 issuer error rates will generally be applied to the 2019 RA risk scores and resulting transfers.[43]

## 12.2 Attestations

As applicable, issuers are required to either attest to their *HHS-RADV SVA Findings Report*, or qualify that attestation by filing a discrepancy during the applicable discrepancy window, within 30

---

[42] Issuers cannot appeal the results of the IVA as the IVA Entity is under contract with the issuer and HHS does not produce the IVA results. See 81 FR 94056 at 94106.

[43] As noted in Section 11.3 (Error Estimation), CMS will adjust 2018 benefit year risk scores and recalculate 2018 RA transfers if an issuer that is exiting all of the market in a state in 2019 is found to be a positive error rate outlier in 2018 benefit year HHS-RADV.

calendar days of the date of the *HHS-RADV SVA Findings Report*.

All issuers are required to either attest to their HHS-RADV Final Results Reports, or qualify that attestation by filing a discrepancy during the applicable discrepancy window, within 30 calendar days of the date of the HHS-RADV Final Results Reports. The HHS-RADV Final Results Reports includes the Issuer Specific Metrics Report and the Enrollee Level Metrics Report.

All attestations must be provided by an individual who can legally and financially obligate the company.

## 12.3 Discrepancy and Appeals Timeline

Refer to REGTAP (https://www.regtap.info/) for any updates to the HHS-RADV Timeline and corresponding discrepancy and appeals deadlines for the applicable benefit year. Note that this timeline is subject to change.

## 12.4 Error Rate Adjustments during HHS-RADV Final Results Discrepancy and Administrative Appeals

CMS will apply the 2018 issuer risk score error rates to 2019 RA risk scores and resulting 2019 RA transfers for issuers who remain in the state risk pool market and to 2018 RA risk scores and resulting 2018 RA transfer for issuers who exited all of the market risk pools in a state in 2019 and are a positive error rate outlier.[44] These adjustments will be announced without regard to any pending discrepancy or appeal.

## 12.5 Attestation and Discrepancy Reporting Process

The annual HHS-RADV Attestation and Discrepancy Reporting processes consists of two (2) discrepancy windows and a Request for Reconsideration process, all of which are outlined in Table 17.

**Table 17: Attestation and Discrepancy Reporting Process**

| Discrepancy Window | Purpose | Issuers Eligible to Participate | Action Required by Eligible Issuers |
|---|---|---|---|
| HHS-RADV SVA Findings Attestation and Discrepancy Reporting Process (Attestation and Discrepancy Window #1) | Resolve HCC specific discrepancies between the IVA and SVA results (if applicable) prior to calculating the risk score error rate for all issuers. | Issuers who have insufficient pairwise means test agreement between the IVA and SVA results.<br><br>*Note: Attestation and Discrepancy Window #1 is not available for issuers that have sufficient pairwise agreement, since IVA findings will be used for Error Estimation and issuers have already attested those IVA results during the IVA submission process.* | Attest to the *HHS-RADV SVA Findings Report* or qualify the attestation with a discrepancy through a form in the Audit Tool.<br><br>Issuers with insufficient pairwise agreement must attest or file a discrepancy specific to the *HHS-RADV SVA Findings Report* during the Attestation and Discrepancy Window #1. |
| HHS-RADV Error Rate Calculation Attestation and Discrepancy | Resolve discrepancies related to risk score error rate calculation and | All issuers who participate in 2018 benefit year HHS-RADV. | Attest to the 2018 Benefit Year HHS-RADV Results Reports or qualify the |

[44] In the 2020 Payment Notice, we finalized a policy to provide that if an exiting issuer is found to be a negative error rate outlier, we would not make adjustments as a result of the negative error rate outlier finding. See 84 FR at 17503 – 17504.

| Discrepancy Window | Purpose | Issuers Eligible to Participate | Action Required by Eligible Issuers |
|---|---|---|---|
| Reporting Process (Attestation and Discrepancy Window #2) | methodology. | | attestation with a discrepancy through a form in the Audit Tool.<br><br>All issuers who participate in 2018 benefit year HHS-RADV must attest during the Attestation and Discrepancy Window #2. |
| Request for Reconsideration | Provide issuers the opportunity to request a reconsideration to CMS, including review of any discrepancy decision issued by CMS. | All issuers who participate in 2018 benefit year HHS-RADV.<br><br>*Note: Issuers are required to file a discrepancy prior to filing a reconsideration request, in the event that the issue was identifiable at the time of discrepancy reporting.* | Complete the HHS-RADV Reconsideration Request form in the Audit Tool.<br><br>Note: Eligible issuers are not required to take any action if they do not wish to request reconsideration. |
| Appeal to CMS Hearing Officer | Provide issuers the opportunity to request review by the CMS Hearing Officer of CMS's reconsideration decision. | Issuers who filed a request for reconsideration. | Follow the instructions on submitting an appeal to the CMS Hearing Officer included in the Reconsideration Decision.<br><br>Note: Eligible Issuers are not required to take any action if they do not wish to appeal to the CMS Hearing Officer. |
| Appeal to the CMS Administrator (or delegate) | Provide issuers or CMS the opportunity to request review by the CMS Administrator (or delegate) of the CMS Hearing Officer's decision. | Issuers who filed an appeal with the CMS Hearing Officer; or CMS to appeal the decision of the CMS Hearing Officer | Follow the instructions on submitting an appeal to the CMS Administrator (or delegate) included in the CMS Hearing Officer's Decision.<br><br>Note: Eligible Issuers are not required to take any action if they do not wish to appeal to the CMS Administrator. |

**Guidance for Submitting a Discrepancy**

CMS will provide a unique attestation and discrepancy reporting form in the Audit Tool for each discrepancy window. Issuers must utilize the form to submit an attestation or an attestation qualified by a discrepancy during the applicable attestation and discrepancy reporting window.

When filing a discrepancy, the issuer must provide a detailed description and sufficient evidence in support of the discrepancy filed to allow CMS to appropriately identify the issue or finding being disputed, the document location or associated reference to which the dispute is linked, and the evidence or support necessary to evaluate the discrepancy provided.

CMS will not accept additional documentation that was not provided during the IVA Results Submission process to CMS and the SVA Entity, such as additional medical records or screenshots as part of the discrepancy reporting process. Upon review of a reported discrepancy,

CMS may request that additional documentation, reference material, or other supplemental evidence be submitted in support of the discrepancy. Issuers should only submit additional documentation at the request of CMS.

CMS will review all discrepancies and provide the issuer with a Discrepancy Resolution Decision, containing the Discrepancy ID and CMS' final decision.

For more information on completing the attestation and discrepancy reporting processes, see the applicable attestation and discrepancy reporting user guides made available with each attestation and discrepancy reporting form in the Audit Tool.

| **Issuers may only file a discrepancy regarding:** |
|---|
| • HHS-RADV SVA Findings Report – which includes the HCCs found by the IVA but not the SVA or HCCs found by the SVA but not the IVA (during Window #1) <br> • Risk score error rate calculation (during Window #2) |
| **Issuers are <u>not</u> permitted to file a discrepancy during these Windows to dispute:** |
| • IVA Results determined by their contracted IVA Entity <br> • HHS-RADV sampling reports[45] |

# 12.6 Request for Reconsideration

*45 C.F.R. § 156.1220 sets forth a three-step administrative appeal process available to issuers.*

*45 C.F.R. § 156.1220(a) provides that an issuer may file a request for reconsideration to contest a processing error by HHS, HHS's incorrect application of the relevant methodology, or HHS's mathematical error only with respect to the findings of a SVA as a result of HHS-RADV; or the calculation of a risk score error rate. 45 C.F.R. § 156.1220(a) sets forth the process and procedure to request reconsideration. Issuers must be familiar with, and abide the rules set out in the regulation. Failure to comply with the regulation, including failure to timely file for reconsideration, may bar the request.*

An issuer must complete the HHS-RADV Reconsideration Request Form available in the Audit Tool to file a request for reconsideration. A request for reconsideration must specify the findings or issues that the issuer challenges, and the reasons for the challenge. The issuer must provide sufficient evidence in support of the request for reconsideration to allow CMS to appropriately identify the issue or finding being disputed, the document location or associated reference to which the dispute is linked, and the evidence or support necessary to evaluate the dispute provided. All requests for reconsideration must link back to the original documents submitted during the IVA Submission process, and no new data (i.e., medical record or supplemental documentation) may be submitted to support the request for reconsideration.

In reviewing the reconsideration request, CMS will review the appropriate SVA findings or risk score error rate calculation being challenged, the evidence and findings upon which the determination was based, and any additional documentary evidence submitted by the issuer. CMS may also review any other evidence it believes to be relevant in deciding the reconsideration, which will be provided to the issuer with a reasonable opportunity to review and

---

[45] See Section 8.5: Sampling Report Discrepancy Reporting above for information on the separate attestation and discrepancy reporting process for HHS-RADV sampling reports.

rebut the evidence. The issuer must prove its case by a preponderance of the evidence with respect to issues of fact.

## 12.7 Request for Informal Hearing to CMS Hearing Officer

An issuer may request an informal hearing before a CMS hearing officer to appeal CMS' Reconsideration Decision. 45 C.F.R. § 156.1220(b) sets forth the process and procedure to request an informal hearing before a hearing officer. Failure to comply with the regulation, including failure to timely request an informal hearing, may bar the request. We note that instructions on how to submit an appeal to the CMS hearing officer will be included in the Reconsideration Decision.

After receiving a request for informal hearing, the hearing officer will acknowledge the request and issue a scheduling order.

The issuer may be represented by counsel in the informal hearing, and must prove its case by clear and convincing evidence with respect to issues of fact. The CMS hearing officer will send the informal hearing decision and the reasons for the decision to the issuer and CMS.

## 12.8 Appeal to Administrator

Either the issuer or CMS may request review by the CMS Administrator (or delegate) of the CMS hearing officer's decision. 45 C.F.R. § 156.1220(c) sets forth the process and procedure to request a review by the CMS Administrator (or delegate). The CMS Administrator (or delegate) has the discretion to elect to review the CMS hearing offi'er's decision or to decline to review the CMS hearing officer's decision. Failure to comply with the regulation, including failure to timely request the CMS Administrator (or delegate) to review the CMS hearing officer's decision, may bar the request. We note that instructions on how to submit an appeal to the CMS Administrator (or delegate) will be included in the CMS hearing officer's decision.

If the CMS Administrator (or delegate) elects to review the CMS hearing officer's decision, the Administrator (or delegate) will also review the statements of the issuer and CMS, and any other information included in the record of the CMS hearing officr's decision, and will determine whether to uphold, reverse, or modify the CMS hearing officer's decision.

The issuer or CMS must prove its case by clear and convincing evidence for issues of fact. The CMS Administrator (or delegate) will send the decision and the reasons for the decision to the issuer and CMS. The decision of the CMS Administrator (or delegate) is final and binding.

# Section 13

# HHS Risk Adjustment Data Validation Protocols

# Appendices

Exhibit W
Page 454

# 13. Appendices

## Appendix A: 2018 Benefit Year D&E Documentation Examples

**In this appendix, the following subsections 1) Mapping Documentation Example, 2) Source System Screenshot Example, and 3) Workpaper Example are provided for <u>informational purposes only</u>, and are not intended to fully detail documentation requirements and responsibilities of IVA Entities. This format is <u>not required</u> and is intended to serve only as an <u>example</u> of clearly expressed D&E documentation.**

Issuers are required to provide IVA Entities with a set of documents that map the issuer's source system data to EDGE server data submissions. Issuers are required to provide mapping documentation and source system screenshots. Issuers may also provide workpapers documenting any deviations or steps taken that will assist the IVA Entity in performing the validation steps.

The examples below show how a mapping document is used to validate the information on a source system screenshot. Additionally, the example provides cases where a workpaper may be required to document validation steps used to determine a final value for the data element.

---

**Note:** The examples of mapping documentation, screenshots, and workpapers in the sections below are specific to the D&E validation process and the corresponding D&E data elements.

For mapping documentation, screenshots, and workpapers developed for the purposes of RXC validation, the examples provided in this appendix can be similarly applied. However, RXC data elements would replace those D&E data elements captured in the examples. Since the 2018 benefit year HHS-RADV RXC validation will be treated as a pilot year, CMS will evaluate the documentation submitted by issuers and IVA Entities for the purposes of RXC validation for the 2018 benefit year and will revisit RXC validation documentation examples to include in this appendix for subsequent benefit years.

---

# 1.    Mapping Document Example

Figure 1 provides an example of mapping documentation required for submission as outlined in Section 9.4 (Phase 1 – Creating Mapping Documentation – Issuer) of the 2018 benefit year HHS-RADV Protocols.

The tick-marks in Figure 1 below correlate to the location of each data element within the source system screenshot provided by the issuer.

Data elements with "Format Change from EDGE?" marked "X" indicate that the system captures the data elements differently vs. the EDGE Server. Additional information and mapping documentation references, indicated next to each data element, should list all transformational steps applied across enrollees for that specified element.

**Figure 1: Tick-Mark and Mapping Reference Table for D&E Data Elements**

In this example we are using Tick-Marks (A – J). IVA Entities may use any identifiers as tick marks.

| Tick-Mark | Data Element | Format Change from EDGE? | Additional Information | Mapping Document Reference |
|---|---|---|---|---|
| A | Member ID | | | |
| B | First Name | | | |
| C | Last Name | | | |
| D | DOB | | | |
| E | Gender | X | 0 = male, 1 = female | |
| F | Plan ID | X | On-screen Plan ID maps to EDGE Plan Table, found in the mapping document reference. | 61110_Mapping Document.pdf – Page 1 |
| G | Enrollment Start Date | | | |
| H | Enrollment End Date | | Source system end dates of 2999-12-31 are used to indicate ongoing enrollment. For purposes of EDGE Submission, enrollment end-dated to end of the benefit year (2018-12-31). | 61110_Mapping Document.pdf – Page 3 |
| I | Premium Amount | | | |
| J | Rating Area | X | | 61110_Mapping Document.pdf – Page 5 |

# 2.    Source System Screenshot Example

The source system screenshot in Figure 2 contains both primary and dependent information. The primary information is **tick-marked in red by the auditor** to assist SVA in identifying the correct enrollee and associated data values for validation. Tick-marks (A – J) in Figure 1 have been added to Figure 2 to link the screenshot data to the required data elements.

**Figure 2: Source Enrollment System Example Screenshot**



## 3.    Workpaper Example

To assist in a comprehensive and logical audit, issuers may provide workpapers to IVA Entities, and IVA Entities may submit workpapers to CMS and the SVA Entity along with screenshots and mapping documentation.

Figure 3 is an example of a workpaper which provides additional information to substantiate the data seen in the screenshot (Figure2), which would assist the SVA Entity in understanding the process of determining a final value.

**Figure 3: Additional IVA Explanation Workpaper Example**



This is an example of additional information provided to substantiate the data seen in the screenshot, which would assist the SVA in understanding the process of determining a final value.

| Tick Mark | Data Element | Enrollee | D&E Document Reference |
|---|---|---|---|
| I | Premium Amount | 12343 | 613420_D&E Doc.pdf |

**Example of EDGE Agreement:** CMS selected the month of April (2016-04) for purposes of premium validation. Enrollee is a subscriber, as such the premium was validated. Monthly premium consistent throughout the benefit year at $501.95.

**Example of Difference Identified:** Per the mandate, a newborn can't be billed until the first of the month following 30 days from birth. A newborn was added on 6/28/2017 and wouldn't be billed for the first time as of August 2017. The July 2017 screenshot will show a premium of $501.95. Included for this enrollee is a screenshot for the month of July 2017. It highlights the addition of the dependent for $299.99, so the member total now equals $501.95 + $299.99 = $705.98.

**Example of Difference Identified:** The screenshot will show a premium of $501.95. EDGE data submission shows a premium of $1,001.95. The IVA Entity contacted the issuer to obtain additional documentation to support the difference between EDGE and the source system screenshot. The issuer was unable to provide additional information regarding the root cause of the differences.

| Tick Mark | Data Element | Enrollee | D&E Document Reference |
|---|---|---|---|
| J | Rating Area | 12343 | 613420_D&E Doc.pdf |

**Example of EDGE Agreement:** Enrollee is a subscriber, as such Rating Area was validated. The issuer indicated that the Rating Area is determined using the County Code Mapping. We noted that the issuer uses City and Zip to identify County Code, which then corresponds to the Rating Area. See mapping document indicated above for City/Zip to County Code to Rating Area look-up.

**Example of Differences Identified:** Based on our review, it appears that we correctly submitted the Rating Area as one (1); however, in our system it is incorrectly captured as

Rating Area 4. For the coverage period from 12/1/16 to 11/30/17 (first screenshot on page one [1], the member rating in our system was incorrectly coded as 4; however, for 12/1/17 to 11/30/18 (second screenshot on page one [1]), the Rating Area is one (1). This is also supported by the fact that we submitted Rating Area 1 for both coverage periods.

**Example of Differences Identified:** To validate the Rating Area per the Source System, we utilized the "Area" field on the screenshot. In each case, the screenshot includes 'RA' along with the 4-digit code. We have mapped each Rating Area to the proper rating area in the provided mapping document. Page 5 explains you can map the data from the screenshot to the EDGE submission value used by eliminating the 'RA' and the first digit. For this enrollee, it looks as though the data was incorrectly submitted. The screenshot shows a value of RA1001, but EDGE submission shows 003. The correct Rating Area should be 001. By using the zip code in field 'ZIP' in the screenshot along with the mapping document, it is evident that the enrollee's zip code is aligned to Rating Area 003.

| Tick Mark | Data Element | Enrollee | D&E Document Reference |
|---|---|---|---|
| F | Plan ID | 12343 | 613420_D&E Doc.pdf |

**Example of EDGE Agreement:** Enrollee Plan Identifier is indicated in the source system, evidenced by tick-mark F. In mapping documentation, issuer processes specific to the mapping and determination of EDGE Plan ID components (HIOS Issuer ID + State Code + HIOS Product ID + HIOS Component ID + Variant) are described in detail and support the characteristics for the enrollee selected. EDGE Plan Table also included, supports this crosswalk. EDGE Plan ID value of '12345VA001999901' for the enrollee is confirmed.

**Example of Differences Identified:** The IVA Entity was unable to map the Plan ID to the selected enrollee. The IVA Entity contacted the issuer to obtain additional documentation to support the Plan ID that was linked to the enrollee. The issuer was unable to provide additional information regarding the plan enrollment for the specified enrollee. The IVA Entity was unable to verify the correct plan was submitted to EDGE for the enrollee.

**Example of Differences Identified:** The IVA Entity determined the screenshots did not indicate the plan for the enrollee. During the XML submission, we submitted the plan as indicated on the D&E Subsample Report, however, the screenshots provided by the issuer do not indicate a plan. The mapping document provides a list of the enrollees with the plan ID as listed on the D&E Subsample Report but no further mapping to the screenshots. The IVA Entity was unable to verify the correct plan was submitted to EDGE for the enrollee.

# Appendix B: D&E Subsample Data Elements

This appendix provides guidance regarding the 2018 benefit year HHS-RADV D&E subsample data elements and the business data elements associated with the D&E Subsample Report.

### Data Element – Date of Birth

An enrollee's DOB is used to determine the enrollee's assignment to a RA model (infant, child, or adult) and to further assign the enrollee to a specific age band within the child or adult models. An error in an enrollee's DOB may cause assignment to the wrong RA model and/or age band within a model, which may cause an enrollee risk score error.

The IVA Entity must validate the DOB of the enrollee in the D&E subsample against the DOB for the enrollee in the issuer's source system. Screenshots of the enrollment system showing the enrollee's DOB are required for this validation. Additionally, the issuer must provide the IVA Entity with the source system format used for DOB and provide any mapping used to transform the data to the EDGE server submission format of year, month, date (YYYY-MM-DD). If the DOB in the issuer source system does not match the month, date, and year of birth for the enrollee in the RADVEE Report, the IVA Entity shall record the DOB from the issuer's source system in the *IVA Entity Audit Results Submission XML.*

### Data Element – Gender

IVA Entities must validate the gender of the enrollee in the D&E subsample against the issuer's source system. Screenshots of the enrollment system showing the enrollee's gender are required for this validation. Additionally, the issuer must provide the IVA Entity with the source system format used for enrollee gender and provide any mapping used to transform the data to the EDGE server submission format of M=male, F=female, or U=unknown. If the gender in the issuer source system does not match the gender identified for the enrollee in the RADVEE Report, the IVA Entity shall record the gender from the issuer's source system in the *IVA Entity Audit Results Submission XML.*

### Data Element – Plan ID

The 16-digit Plan ID was created solely for the purpose of EDGE server data submission and is not expected to exist in issuer source systems. Therefore, it is necessary for the issuer to provide the IVA Entity with a mapping document explaining how the enrollee's policy/plan/product ID is transformed to the 16-digit Plan ID used for EDGE server data submission.

For each enrollee in the D&E subsample, IVA Entities must validate that the 16-digit Plan ID in the RADVEE Report is the appropriate Plan ID based on a comparison of the issuer-provided Plan ID mapping document and screenshots from the issuer's source system showing the policy/plan/product in which the enrollee is enrolled. If an enrollee in the D&E subsample is enrolled in multiple plans during the benefit year, only the Plan ID and enrollment period identified in the D&E subsample is required to be validated. CMS will provide the specific Plan ID and enrollment start and end dates to be validated.

IVA Entities must also validate that the CSR factor in the 16-digit Plan ID in the RADVEE Report is the appropriate CSR factor for the specified enrollee based on review of screenshot data from the issuer's source system where CSR information is stored.

If the IVA Entity determines that an enrollee is enrolled in a plan that does not match the Plan ID indicated on the D&E Subsample Report, the issue must be documented in a separate workpaper for the enrollee. Plan ID mapping must be captured in the workpaper narrative, including specific explanations of all provided source screenshots to enable the SVA Entity to clearly understand the mapping allocation.

**Data Element – Rating Area (required for subscriber enrollees only)**

The Market Rules and Rate Review Final Rule (45 C.F.R. Part 147) provides that each state will have a set number of geographic rating areas that all issuers in the state must uniformly use as part of their rate setting. Information about each state's market rating areas in the individual and Small Group Markets, and methodology for dividing the state into rating areas, has been made available to issuers for the 2018 benefit year by CMS[46].

Issuers must provide the IVA Entity an address, zip code, and/or county information for Rating Area validation. Issuers should provide the IVA Entity with documentation that maps the state rating areas to the counties and zip codes in those rating areas. IVA Entities will only need to validate the Rating Area for enrollees who appear in the D&E subsample and who are identified in the RADVEE Report as a subscriber. It is not necessary to validate the rating area for non-subscribers/dependents in the D&E subsample.

Rating area is only required to be validated for a subscriber's Plan ID in the D&E subsample and only for the single month provided. If the subscriber enrollee is enrolled in multiple plans during the benefit year, only one (1) random month for one (1) of the Plan IDs will be selected by CMS for validation. CMS will provide the specific enrollment period and month of rating area to be validated along with the D&E subsample.

To validate the rating area for a subscriber enrollee in the D&E subsample, you must first determine if the enrollee is in an individual or small group plan. For individual plans, the rating area is based on the subscriber's address. For small group plans, the rating area is based on the employer's business address.

To validate rating area for **individual plans**, the IVA Entity must verify that the rating area assigned to the subscriber enrollee maps to the subscriber enrollee's home address zip code or county code, based on how the rating area is assigned in that state.

To validate rating area for **small group plans**, the IVA Entity must verify that the rating area assigned to the subscriber enrollee map to the employer's business address zip code or county code, based on how the rating area is assigned in that state.

**Data Element – Premium Amount (required for subscriber enrollees only)**

The premium amount submitted to the EDGE server and reported on a subscriber enrollee's enrollment record for their enrollment period is defined as the total monthly rated premium charged for a subscriber's policy, including the Advanced Premium Tax Credit (APTC) amount, if applicable. As such, the premium amount may include more than the amount billed directly to a subscriber.

IVA Entities need to validate the "Premium Amount" for only the enrollees who appear in the D&E subsample who are identified in the RADVEE Report as a subscriber. It is not necessary to validate the premium amount for non-subscriber/dependents in the D&E subsample.

Additionally, IVA Entities will only need to validate one (1) month's premium for a subscriber enrollee. If the subscriber enrollee is enrolled in multiple plans during the benefit year, only one (1) random month will be selected by CMS and validated. CMS will provide the specific enrollment period and month of premium to be validated along with the D&E subsample.

To determine if a D&E subsample enrollee is a subscriber, see the Subscriber Indicator

---

[46] https://www.cms.gov/cciio/programs-and-initiatives/health-insurance-market-reforms/state-gra.html

(XML tag 'subscriberIndicator') data element in the Enrollment Period Category of the RADVEE Report. If the value in the data field is an "s," then the enrollee is identified as a subscriber. If the XML data element is "null", then the enrollee is not the subscriber.

The issuer must explain to the IVA Entity, in mapping documents, how the premium amount submitted to the EDGE server was derived. If there are multiple members under one (1) subscriber's policy, the premium is equal to the sum of all individual rates for all rated members on a policy and not the rate associated with the subscriber. Normally, these rates are only derived during policy initiation or renewal and are not carried forward to premium billing systems, which normally have the full premium less any APTC. The sum of the billed premium and APTC must be aggregated and submitted under the subscriber to the EDGE server. This aggregated premium amount will then be validated.

To validate the premium amount in the RADVEE Report, the IVA Entity must obtain screenshots of the premium billing system and screen shots of the APTC values if APTC information is not captured in the premium billing system screenshots. The IVA Entity must then use this information to perform the validation of the policy premium amount submitted and document their work and methodology in a workpaper.

### Clarification of APTC Validation

As stated above, CMS requires the IVA Entity to validate the premium amount that is reported to the EDGE server, which should be inclusive of the APTC amount (if applicable). However, CMS is not requiring the IVA Entity to validate the amount of the APTC for a sampled enrollee, but only to report it if it is included in the premium amount submitted to the EDGE server in cases where the sampled enrollee is a subscriber. If the sampled enrollee is not a subscriber, then IVA Entities may leave the APTC amount ('aptcAmount') on the IVA Entity Audit Results Submission (XML) blank (i.e., no data entered).

If the sampled enrollee is a subscriber, but there is no APTC on the policy, a value of '0' is to be entered and no further documentation is required. 'OMITTED' is not an acceptable value.

If the sampled enrollee is a subscriber and the policy has an APTC amount, the issuers should capture in mapping documentation how APTC amounts are recorded in the source system. IVA Entities should reference the issuer provided mapping documentation to determine how premium amounts are calculated in the issuer's source system. Screenshots that capture the premium amount as evidence should capture all data required to define the APTC.

In cases where the issuer's system captures premium not inclusive of APTC, the issuer should record the premium not inclusive of APTC in the 'policyPremiumAmount' tag and record the APTC amount in the 'aptcAmount' tag of the IVA Entity Audit Results submission (XML). In cases where the issuer's system captures premium inclusive of APTC, the IVA Entity should record the full premium about in the 'policyPremiumAmount' tag, record '0' for the APTC amount in the 'aptcAmount' tag, and document the APTC amount in workpapers, in addition to capturing any calculations performed to arrive at the APTC amount for the sampled subscriber enrollee.

Examples:

1. For subscriber enrollees selected in the D&E subsample, if the premium amount in the issuer's source system is not inclusive of the APTC amount, the APTC amount, if applicable, should be recorded in the APTC amount ('aptcAmount') on the IVA Entity Audit Results Submission (XML).

   For example, the premium amount in the issuer's source system is not inclusive of

APTC. The issuer reported a total premium of $1,400 to EDGE and $400 of the premium amount is APTC. The IVA Entity would record '1000' for the premium amount ('policyPremiumAmount' tag) and '400' for the APTC amount ('aptcAmount' tag) in the IVA Entity Audit Results Submission (XML).

2. The subscriber's premium amount is reflected in the issuer's source system and is inclusive of the APTC amount. The IVA Entity should record the value '0' for the APTC amount ('aptcAmount' tag) and record the actual premium amount (inclusive of APTC) to be validated against the issuer's EDGE server in the 'policyPremiumAmount' tag of the IVA Entity Audit Results Submission (XML).

   For example, assuming the premium amount in the issuer's source system is inclusive of APTC, the issuer reported $1,400 total premium on their EDGE server and $400 of the premium amount is APTC. The IVA Entity would record '1400' for the premium amount ('policyPremiumAmount' tag) and '0' for the APTC amount ('aptcAmount' tag) in the IVA Entity Audit Results Submission (XML).

   In this case, it is important to note that IVA Entities must separately document the APTC amount for each sampled subscriber enrollee, if applicable, in workpapers in addition to capturing any calculations performed to arrive at the APTC amount for the sampled subscriber enrollee.

**Validating Premium Amount for Subscriber Enrollees in Small Group Plans**

The issuer will need to provide the IVA Entity with the necessary mapping of the enrollee's premium to the group premium in their source system. If the issuer uses composite premiums or average enrollee premium amounts, then that methodology must be explained in mapping documents as well. The issuer must make clear if it is the composite premium/average enrollee premium or the individual enrollee's portion of the small group plan's premium that is submitted to the EDGE server. The issuer must also provide the necessary screenshots to determine how the premium submitted to the EDGE server for the subscriber enrollee in the D&E subsample was derived from the premium billed to the group.

**Premium Validation – Non-Subscriber Enrollees**

Validation of premium amount is not required when a non-subscriber/dependent is the sampled enrollee.

**Data Element – Enrollment Start and End Dates**

The issuer must explain how enrollment start and end dates are determined in their source system. Findings must be recorded in the *IVA Entity Audit Results Submission XML* in the format YYYY-MM-DD using the month, day, and year as it appears in the issuer's source system. If no enrollment end date is present, or the end date is beyond December 31st (20XX-12-31) of the benefit year, the issuer must demonstrate in the mapping documentation whether the enrollee is still enrolled or if the end date is in a subsequent benefit year.

Examples:

1. If the enrollee's Enrollment Start Date, as indicated in the issuer's source system screenshot, contains an Enrollment Start Date prior to the start of the 2018 benefit year audit, the IVA Entity must record the month, day, and year from the issuer's source system screenshot.

2.  The Enrollment End Date value is 'blank' or no data is captured in the issuer's source system, as observed in the source system screenshots. If the issuer confirmed in the mapping document that a 'Blank' value indicates that the enrollee is enrolled through the current benefit year the IVA entity must capture the 'enrollmentEndDateSourceSystem' as the last day of the current benefit year. For benefit year 2018, the date captured would be: 2018-12-31.

3.  The Enrollment End Date value is captured in the issuer's source system, as observed in the source system screenshots, and is past the last day of the benefit year being audited (post 12/31/2018 for the 2018 benefit year) then the value should be recorded in the IVA Entity Audit Results Submission (XML) in the format YYYY-MM-DD using the month, date, and year (as seen in the issuer's source system).

# Appendix C: Final Drug Diagnosis (RXC-HCC) Pairs for the 2018 Adult Model

| RXC | RXC label | HCC | HCC label | RXC use |
|---|---|---|---|---|
| 1 | Hepatitis C Antivirals | 037C, 036, 035, 034 | Chronic Hepatitis C, Cirrhosis of Liver, End-Stage Liver Disease, and Liver Transplant Status/Complications | imputation/severity |
| 2 | HIV/AIDS Antivirals | 001 | HIV/AIDS | imputation/severity |
| 3 | Antiarrhythmics | 142 | Specified Heart Arrhythmias | imputation/severity |
| 4 | End Stage Renal Disease (ESRD) Phosphate Binders | 184, 183, 187, 188 | End Stage Renal Disease, Kidney Transplant Status, Chronic Kidney Disease, Stage 5, Chronic Kidney Disease, Severe (Stage 4) | imputation/severity |
| 5 | Anti-inflammatories for inflammatory bowel disease (IBD) | 048, 041 | Inflammatory Bowel Disease, Intestine Transplant Status/Complications | imputation/severity |
| 6a | Anti-Diabetic Agents, Except Insulin and Metformin Only | 019, 020, 021, 018 | Diabetes with Acute Complications, Diabetes with Chronic Complications, Diabetes without Complication, Pancreas Transplant Status/Complications | imputation/severity |
| 6b | Insulin | 019, 020, 021, 018 | Diabetes with Acute Complications; Diabetes with Chronic Complications; Diabetes without Complication, Pancreas Transplant Status/Complications | imputation/severity |
| 7 | Multiple Sclerosis Agents | 118 | Multiple Sclerosis | imputation/severity |
| 8 | Immune Suppressants and Immunomodulators | 056, 057, 048, 041 | Rheumatoid Arthritis and Specified Autoimmune Disorders, Systemic Lupus Erythematosus and Other Autoimmune Disorders, Inflammatory Bowel Disease, Intestine Transplant Status/Complications | imputation/severity |
| 9 | Cystic Fibrosis Agents | 159, 158 | Cystic Fibrosis, Lung Transplant Status/Complications | imputation/severity |

| RXC | RXC label | HCC | HCC label | RXC use |
|---|---|---|---|---|
| 10 | Ammonia Detoxicants | 036, 035, 034 | Cirrhosis of Liver, End-Stage Liver Disease, Liver Transplant Status/Complications | severity-only |
| 11 | Diuretics, Loop and Select Potassium-Sparing | 130, 129, 128 | Congestive Heart Failure, Heart Transplant, Heart Assistive Device/Artificial Heart | severity-only |

# Appendix D: ICD-10-CM Official Guidelines for Coding and Reporting

See CMS.gov for the latest ICD-10-CM guidelines at the following link:

https://www.cms.gov/Medicare/Coding/ICD10/Downloads/2018-ICD-10-CM-Coding-Guidelines.pdf

# Appendix E: Lifelong Permanent Conditions

For the 2018 benefit year HHS-RADV, CMS has implemented new HHS-RADV specific guidance related to chronic/lifelong conditions by updating and replacing the 'Chronic Condition HCC' list from the 2017 benefit year HHS-RADV Protocols with a simplified list of Lifelong Permanent Conditions. The list of Lifelong Permanent Conditions shares similar characteristics of being lifelong, permanent conditions which last for multiple years, require ongoing medical attention, and are typically unresolved once diagnosed.

Conditions selected by CMS and included in the 'Lifelong Permanent Conditions' list may be abstracted if documented in any of the documentation provided in an enrollee's medical history included in a medical record for the applicable benefit year (2018). As noted in the ICD-10-CM Official Guidelines for Coding and Reporting, Section IV, J. Code all documented conditions that coexist at the time of the encounter / visit, and require or affect patient care treatment or management can be abstracted. **If a Lifelong Permanent Condition is identified in the medical record and exists at the time of the encounter/visit within the benefit year (2018), the diagnosis should be abstracted. For these Lifelong Permanent Conditions to be abstracted, no other supporting documentation is required.** If a Lifelong Permanent Condition is identified in the enrollee's medical history included in a medical record for the applicable benefit year, the condition does not require additional documentation / validation in order to substantiate the diagnosis, as noted in the steps below.

If a condition, which may be considered by some to be chronic, is identified in the medical record and is **not** on the Lifelong Permanent Conditions list, **IVA Entities should utilize in sequential order the following coding resources when abstracting diagnoses from a medical record:** ICD-10-CM Official Guidelines for Coding and Reporting, the AHA Coding Clinic, and the HHS-RADV 2018 benefit year Protocols, along with exercising professional judgment to make final determinations when abstracting diagnoses.

Below are some recommended steps to follow:

| Step | Description | Detail |
|---|---|---|
| 1 | Determine if the condition identified is on the 'Lifelong Permanent Condition' list in the enrollee's medical history for the medical record documentation provided | The condition may be referenced from multiple sources in the record including:<br>- Past Medical History (PMH)<br>- Problem Lists<br>- Progress Notes<br>- Assessment and Plan<br>- History of Present Illness (HPI) |
| 1a | The condition is present on the 'Lifelong Permanent Condition' list | The associated diagnosis should be abstracted by the medical coder and entered into the *IVA Entity Audit Results Submission (XML)* |

| Step | Description | Detail |
|------|-------------|--------|
| 1b | The condition is **not** present on the 'Lifelong Permanent Condition' list | If the condition is **not** on the 'Lifelong Permanent Condition' list, the diagnosis should be treated as any other diagnosis. Additional documentation, outlined in Section 9.8.9, is required to substantiate the diagnosis. Without the additional documentation, the diagnosis should not be abstracted by the medical coder.<br><br>Note, if a diagnosis is identified on the following sources in the record, the medical coder should follow ICD-10-CM Official Guidelines for Coding and Reporting, the AHA Coding Clinic, and the HHS-RADV 2018 benefit year Protocols:<br>- Progress Notes<br>- Assessment and Plan<br>- History of Present Illness (HPI) |

See below for examples on how to utilize the 'Lifelong Permanent Conditions' list:

**Example 1:** Multiple Sclerosis, a Lifelong Permanent Condition, diagnosed in 2013 is identified in the PMH section of the medical record. The provider does not address Multiple Sclerosis in the progress notes or anywhere else in the medical record for the current encounter in the benefit year (2018). Multiple Sclerosis **can be** abstracted by the medical coder since the HCC is listed on the 'Lifelong Permanent Condition' list and the diagnosis is listed in the PMH section of the medical record.

**Example 2:** Asthma is identified in the problem list and the PMH of the enrollee's medical record. The provider **does not** address Asthma in the HPI or progress notes in the medical record for the current encounter in the benefit year (2018). Without additional documentation from the provider addressing Asthma, the medical coder **cannot** abstract the Asthma diagnosis as it is not found on the 'Lifelong Permanent Condition' list.

**Example 3:** Bipolar Disorder is only documented under the active problem list in the Emergency Room medical record. Bipolar disorder **can be** abstracted by the medical coder because the condition is listed on the "Lifelong Permanent Condition List" and the diagnosis is listed in the active problem list.

**Example 4:** Diabetes and polyneuropathy are documented in the HPI. The primary care physician orders laboratory test, refills medication and schedules a follow-up visit in three months. Although diabetes is only documented in the HPI, it **can be** abstracted by the medical coder as the patient received treatment and care for the condition.

At a minimum, all medical records must meet the following requirements to avoid the record being

deemed invalid:

- Acceptable risk adjustment provider type, source, and physician specialty.

- Dates of service and/or discharge date must fall within the benefit year being audited (2018).

- Linked to an EDGE server accepted RA eligible claim from the RADVMCE Report where the claims statement covers from/through date aligns to at least one (1) of the dates of service found on the medical record, or to a RA eligible paid/positively adjudicated NEC for the specified sampled enrollee.

- Contain valid signatures and credentials for the provider in the state which they are practicing, or a valid attestation for the encounter.

- Correct enrollee.

- Medical coders should **utilize in sequential order the following coding resources** when abstracting diagnoses from a medical record: Coded according to the official conventions and instructions provided within ICD-10-CM Official Guidelines for Coding and Reporting, the AHA Coding Clinic, and the 2018 benefit year HHS-RADV Protocols. Refer only to issue dates effective at the time of encounter.

Listed below are the conditions selected by CMS and included in the 'Lifelong Permanent Conditions' list.

### Lifelong Permanent Conditions List:

| HHS-HCC | HHS-HCC Label |
|---------|---------------|
| 26 | Mucopolysaccharidosis |
| 27 | Lipidoses & Glycogenosis |
| 28 | Congenital Metabolic Disorders, NEC |
| 29 | Amyloidosis, Porphyria & Other Metabolic Orders |
| 46 | Chronic Pancreatitis |
| 57 | Systemic Lupus Erythematosus and Other Autoimmune Disorders |
| 61 | Osteogenesis Imperfecta & Other Osteodystrophies |
| 62 | Congenital /Developmental Skeletal & Connective Tissue Disorders |
| 66 | Hemophilia |
| 70 | Sickle Cell Anemia (Hb-SS) |
| 71 | Thalassemia Major |
| 73 | Combined & Other Severe Immunodeficiencies |
| 87 | Schizophrenia |
| 88 | Major Depressive & Bipolar Disorders |
| 90 | Personality Disorders |
| 96 | Prader-Willi, Patau, Edwards, & Autosomal Deletion Syndromes |
| 97 | Down Syndrome, Fragile X, Other Chromosomal Anomalies, & Congenital Malformation Syndromes |
| 102 | Autistic Disorder |
| 103 | Pervasive Developmental Disorders, Except Autistic Disorder |
| 107 | Quadriplegia |
| 109 | Paraplegia |
| 111 | Amyotrophic Lateral Sclerosis & Other Anterior Horn Cell Disease |
| 112 | Quadriplegic Cerebral Palsy |

| HHS-HCC | HHS-HCC Label |
|---------|---------------|
| 114 | Spina Bifida & Other Brain/Spinal/Nervous System Congenital Anomalies |
| 117 | Muscular Dystrophy |
| 118 | Multiple Sclerosis |
| 119 | Parkinson's, Huntingson's, Spinocerebellar Disease & Other Neurodegenerative Disorders |
| 128 | Heart Assistive Device/Artificial Heart |
| 159 | Cystic Fibrosis |

**NOTE: CMS realizes the above list is not all encompassing and intends to re-assess this list of permanent lifelong conditions on an annual basis. If a condition is not listed in the above table, additional documentation is required to substantiate the diagnosis. Refer to Section 9.8 for additional information on Health Status Data Validation.**

# Appendix F: Guidance to Coders

The HHS-RADV Guidance to Coders document was created as a tool to facilitate medical record review and coding. This document is intended to assist IVA Entity and SVA Entity coders in reaching consistent decisions when faced with medical records with similar documentation anomalies. At the end of the evaluation process, each medical record submitted for medical record review has been determined to be valid or invalid. **This document is intended as guidance only**. Nothing herein mandates the manner in which medical records are coded. Medical record coders are expected to comply with the professional standards for coding as held by the AAPC or AHIMA.

As noted above in Appendix E, at a minimum, all medical records must meet the following requirements to avoid the record being deemed invalid:

- Acceptable risk adjustment provider type, source, and physician specialty.

- Dates of service and/or discharge date must fall within the benefit year being audited (2018).

- Linked to an EDGE server accepted RA eligible claim from the RADVMCE Report where the claims statement covers from/through date aligns to at least one (1) of the dates of service found on the medical record, or to a RA eligible paid/positively adjudicated NEC for the specified sampled enrollee.

- Contain valid signatures and credentials for the provider in the state which they are practicing, or a valid attestation for the encounter.

- Correct enrollee.

- Medical coders **should utilize in sequential order the following coding resources** when abstracting diagnoses from a medical record: Coded according to the official conventions and instructions provided within ICD-10-CM, Official Guidelines for Coding and Reporting, and guidance provided in the "Coding Clinic for ICD-10-CM" published quarterly by the American Hospital Association and the 2018 benefit year HHS-RADV Protocols. Refer only to issue dates effective at the time of encounter.

**The following guidance topics are included in this appendix.**

   A. Medical Record Attestations
   B. Attestation to MR linkage Issues
   C. Signatures and Credentials
   D. Consultation Notes
   E. Date Issues
   F. Provider Type
   G. Documentation Issues

## A. Medical Record Attestations

CMS will accept attestations to authenticate medical documentation that was not authenticated at the date of service. Specifically, if a signature is missing, the IVA Entity may consider evidence in an attestation statement to determine the identity of the author of a medical record entry. Note, signatures dated greater than 180 calendar days from the date of service must include a valid attestation in order for the medical record to be considered valid.

Issuers and IVA Entities should establish a process to resolve conflicts if a medical record does not contain a valid signature and/or credentials for the physician/practitioner in the state which they are practicing. Part of the resolution should include issuers and/or IVA Entities requesting an attestation from the provider affirming the medical documentation that was not authenticated properly at the date of service. Signature attestations allow diagnoses to be abstracted and coded from medical records that do not contain acceptable signatures or credentials.

IVA Entities should still abstract diagnoses from the medical record with signature or credential issues while attestations are being sought. However, if an attestation cannot be obtained to validate the medical record, the medical record and abstracted diagnoses remain invalid, and therefore should not be submitted via the IVA Entity Audit Results Submission XML for use in the enrollee's risk score calculation.

The issuer or IVA Entity should include a medical record signature attestation, grouped under the medical record ID it corresponds to, in the IVA Entity Audit Results Submission XML.

CMS will allow for the attestation document to be submitted as a separate file or consolidated with the medical record PDF. At a minimum, the attestation statement must contain the signature and date. DO NOT include the issuer name.

Coders will not consider attestation statements where there is no associated medical record entry or from someone other than the author of the medical record entry in question. Even in cases where two (2) individuals are in the same group, one (1) provider may not sign for the other in medical record entries or attestation statements.

## B. Common Attestation Issues

The following table represents examples of various attestation issues and how to evaluate them.

| What the Reviewer May Encounter | Examples | Attestation Acceptable Yes/No |
|---|---|---|
| a. Physician/Practitioner signed the record for another practitioner, or a signature stamp was used. | 1. Jane Doe, M.D. signing for James Smith, M.D. <br> 2. Jane Doe, M.D. as Power of Attorney for James Smith, M.D. <br> 3. Signed by Jane Doe, M.D. in the absence of James Smith, M.D. | No |
| b. Date of service is marked through. | March ~~16~~, 2018 (4 is written above or below the incorrect 16th date. | Yes |
| c. Information missing from attestation. | Name, date of service, signature, or credential is missing. | No |

| What the Reviewer May Encounter | Examples | Attestation Acceptable Yes/No |
|---|---|---|
| d. Handwriting error/strikethrough. | Date of service, signature, or credential strikethrough and correction rewritten. | Yes |
| e. Date of service outside of the benefit year being audited. | 12/30/17 or 1/2/19. | No |
| f. Partially illegible date of service. | 01/H/2018 – It could be 4 or 11. Check the medical record to confirm and use the date on the medical record. | Yes |
| g. Date range. | Jan. 4, 2018 – Oct. 10, 2018. | Yes/No<br><br>Pass only if medical record matches the first or last date |
| h. Invalid risk adjustment physician/practitioner credentials. | Medical Assistant, LPN, Dietician | No |
| i. Multiple, individual dates of service. | March 4, 2018, June 30, 2018, Dec. 16, 2018<br>Jan. 1–8, May 2, Oct. 4 | Yes/No<br><br>Accept only the date matching the medical record date of service. |

C. <u>Signatures and Credentials</u>

IVA and SVA coders are certified coders who are familiar with acceptable medical record layouts and handwriting techniques. Signature issues must often be evaluated on a case-by-case basis since each one (1) is a little different. Do not hesitate to escalate the case to senior coders in the event of any question/doubt regarding valid signatures. The following table presents issues that may require reviewer discretion and guidance to evaluate and resolve the issue.

**Note**: EMR formats are not standardized and the industry changes rapidly. Both the acceptable and unacceptable provider signature lists are not exhaustive and are intended to offer guidance only.

---

**Provider Specialty and Credentials**

- Medical records submitted for HHS-RADV must be from an acceptable physician specialty type and must be authenticated by the provider. Issuers must ensure that the provider of service for face-to-face encounters is appropriately identified on medical records via signature and specialty credentials, and that the physician/practitioner's credential is acceptable within the state. This means that the credentials must appear somewhere on the medical record, i.e., next to the physician/practitioner's signature (handwritten or electronic) or pre-printed with the physician/practitioner's name on the stationary of the practice.

- For the purposes only of attesting to the provider's credentials, a **signature log** or a **provider directory** of a private practice may be attached to a medical record that is signed with initials or a signature. The practice's signature log must be on the practice's stationary and **<u>must</u>** contain the provider's signature, and full credentials.

- While CMS is not requiring IVA Entities to document or submit specific signature and credentialing data, IVA Entities are required to validate this information identified on the medical record in accordance with coding guidelines. This is in order to verify that the medical record meets CMS requirements to validate the issuer-submitted data for enrollee risk scores. Certified medical coders must verify that the medical record originates from the provider of the medical service(s) and reflects acceptable providers and services specific to the state in which they are practicing.

---

**Acceptable Provider Signatures:**

Acceptable physician/practitioner authentication comes in the form of handwritten signatures and electronic signatures.

- Transcribed reports – Electronic signatures are an acceptable form of medical record authentication so long as the system requires the provider to authenticate the signature on the note. In all cases, the signature must contain the practitioner's name and credentials. Examples of acceptable electronic signatures include:

  o Electronically signed by

  o Authenticated by

  o Approved by

  o Authored by

  o Completed by

  o Finalized by

  o Verified by

  o Validated by

  o Performed by

- Electronic Medical Records – Electronic point of service type medical record entries are typically considered authenticated at login since the physician/practitioner is directly entering the content into a template and populating from other sections of the EMR. Often only the provider name will be documented at the beginning or end of the note, without the "electronically signed by" dated notation. This format is acceptable. Since EMR formats differ, the presence and significance to HHS-RADV of a signature authentication statement and a date in a signature line depends on the structure of the EMR. Escalate to a Senior Coder if any uncertainty in authentication.

- Handwritten provider signatures on paper medical records need not have an accompanying signature date. CMS attempts to associate each signature with a date of service on the record. Accordingly, please be sure that each signature is clearly associated with a date of service for the note in question.

- All medical record entries must be complete and must be authenticated by the physician or practitioner who was responsible for ordering, providing, or evaluating the service furnished.

- Copies of dictated consultations from physician/practitioner office and hospital outpatient visits are often released prior to obtaining a consultant's signature. These reports then are filed in another physician/practitioner's record in an "acceptable" form. Diagnoses from these reports will be coded and abstracted from a physician/practitioner record when either of the following conditions applies: 1) the physician/practitioner has referenced the report diagnosis as part of his/her documentation in the office record; or 2) the consultation to which the physician/practitioner is referring is signed and valid as a standalone encounter in the data collection period. If the corresponding medical record has a missing physician/practitioner signature and/or credential, an attestation must be attached.

- For Hospital Inpatient discharges: For hospital records a typed signature alone is not acceptable. All records must be signed and authenticated by the treating physician/practitioner. Within a lengthy inpatient record, there may be a few unsigned progress notes or unsigned consultation reports. In this case, the inpatient medical record must contain sufficient signed documentation to validate any of the audited HCC(s). The coder will review only the signed documentation when coding the principal and secondary diagnoses for the enrollee's discharge; unsigned documentation will not be used for coding. Auditors must determine on a case-by-case basis if a record suffices to substantiate the HCC

being validated.

- It is unusual for a provider to sign a medical record entry at the beginning of a transcribed or handwritten note. Traditionally, the signature follows the medical record entry but there could be circumstances where the signature is in an unusual place and the evaluator can relate it to the encounter. For example, many providers are using bedside EMRs whereby upon login the entry date, time and provider are electronically stamped at the beginning of the note. A final authentication is not always programmed into specific EMR software.

- Although a signature may appear illegible, (squiggles, etc.) if it is located in an appropriate section of the medical record it is acceptable.

**Unacceptable Provider Signatures**

- Unacceptable electronic signatures:
  - o  Administratively signed by
  - o  Dictated, but not signed
  - o  Electronic signature on file
  - o  Electronically signed to expedite delivery
  - o  Proxy signature – Signed with approval by …
  - o  "Electronically signed by" where there is no provider name noted
  - o  Electronically signed by, but not authenticated
  - o  Electronically signed by, but not verified
  - o  Auto-authenticated

  In these cases, an attestation for the Physician/Practitioner face-to-face encounter is required.

- Stamped signatures are <u>not</u> acceptable.
- Signature log may <u>not</u> be attached to correct records that have a missing signature.

**D.** **Consultation Notes**

| Possible Issue Requiring Reviewer Discretion | Explanation/Comments | Guidance |
|---|---|---|
| Consultation report without a signature as part of an authenticated inpatient provider type medical record – consultation report is not submitted as standalone documentation. | A consultation report within an inpatient medical record is a typed (usually dictated) report detailing the evaluation of a condition and performed at the request of the attending physician. There is typically an associated progress note signed by the consultant on the date of the patient evaluation. | Unless the attending physician disagrees with the consultant's findings, the coder should code all reportable conditions documented in a signed consultation report per ICD-10 CM guidelines. |
| Inpatient consultant/specialist unconfirmed diagnoses not mentioned by attending physician. | The attending physician will generally refer to the consultant's diagnosis in subsequent progress notes and her/his final summary. There may be instances where disagreement or further work-up eliminates the consultant's diagnosis from consideration. As in all medical record documents, the consultation report is expected to be authenticated by the consultant. However, the absence of a consultant's signature does not preclude the attending physician from including the consultant's findings in her/his final diagnosis. | If the final assessment by the consultant/specialist includes an unconfirmed diagnosis/statement (rule-out, suspected, likely, etc.) and the diagnosis is not eliminated elsewhere in the record yet not mentioned in the final discharge diagnosis, consider escalating this to a Senior Coder for review as the diagnosis may have been ruled-out. |
| Consultant report submitted as a standalone provider document/ with no other documentation submitted with the report. | The documentation is typed, usually dictated, and submitted as a standalone document. The report is submitted on the provider's letterhead and a typed name at the end of the report but does not have the consultant's signature. | Code only the unsigned record that is covered by an attestation. |
| Signed office or hospital outpatient note that references signed or unsigned transcribed report. | Hospitals/Specialists often release copies of dictated reports prior to obtaining the dictator's signature. These reports are filed in another provider's record in an "acceptable" form.<br><br>A provider's note including a statement such as "see discharge summary from <date> hospitalization" or "see consultation report <date>", would be sufficient to link the current visit/progress note to the dictated summary without having to rewrite all of the findings. | The circumstances of the current encounter would determine which diagnoses from the hospitalization or other visit are still applicable, i.e., acute, chronic, status post. |

E. <u>Date Issues</u>

| Possible Issue Requiring Reviewer Discretion | Explanation/Comments |
|---|---|
| Inpatient Record | Inpatient records must have both **admission** and **discharge date** documented at least one (1) place in the record (face sheet, summary, discharge orders etc.). An exception may be applicable on a case-by-case basis when a discharge or transfer summary contains the admission date but lacks the discharge date and the medical record links to an accepted RA eligible claim from the RADVMCE Report or a RA eligible paid or positively adjudicated NEC.

For details specific to professional service claims documented within inpatient stays, please refer to Section 9.8.6.1 (Inpatient Considerations). |
| Inpatient dates of service continuing outside the benefit year being reviewed. | For an inpatient medical record with an admission date in the benefit year being reviewed and the inpatient status extending into the next benefit year, **is not considered valid in the benefit year being audited.**

Example: Admission date is December 19, 2018 with a discharge date of January 3, 2019, the care and treatment that was provided in both Dec. 2018 and Jan. 2019 are considered in the 2019 benefit year audit. |
| Outpatient/physician | **Outpatient/physician:** A medical record submitted is from a physician office or a hospital outpatient medical record, must be dated to be acceptable. |
| Physician follow up/consult in letter format and
Date of Service on Letter | The documentation submitted is a typed, signed and dated letter (within data collection period) from a provider describing the treatment and evaluation of a patient. If the date of service is referenced by the specialist in the body of the letter, use that date**.** If there is no date of service mentioned in the letter, assume the date of the letter is the face-to-face date of service. |
| Date of Service on the medical record does not agree with the claim on the RADVMCE Report. | Assume there is a date of service billing error if it can be determined through investigation that the facts regarding the services rendered are consistent between the medical record and the RADVMCE Report or the NEC. Note, a workpaper should be submitted to explain the claim linkage error. |
| Addressograph or other type of demographic "stamp" with date of service. | An addressograph type stamp or other electronic demographic identification typically notes the patient's name, birth date, patient number, and physician and admission date. This date may be interpreted as the date of service for emergency room records or other hospital outpatient single date records. |

**F.** **Provider Type**

| Possible Issue Requiring Reviewer Discretion | Explanation/Comments |
|---|---|
| Face-to-Face Visit | The submitted record documents a face-to-face encounter with the enrollee from an acceptable HHS-RADV provider type and data source. The three (3) acceptable RA provider types are: Hospital inpatient, Hospital Outpatient, and Professional.<br><br>**Note:** that there are specific facility sources not included as acceptable inpatient and outpatient facilities; however, acceptable provider type documentation may occur in most any facility, including the patient home. The HHS-RADV process does not include determining the type of claim supporting the original RA data submission. |
| Standalone Discharge Summary | A standalone discharge summary is considered an acceptable provider type face-to-face visit for the date of inpatient discharge or the date of service documented.<br><br>**Inpatient Note:** An appropriately detailed discharge summary that documents at least one (1) reportable condition and includes the admission and discharge date indicating inpatient provider type is acceptable for review as an inpatient record. |
| Face-to-face encounter with an acceptable provider specialty with a reference to non-acceptable practitioner specialty documentation. | Unacceptable provider specialty findings or impressions such as diagnostic radiologist, dietitians, or lab results must be acknowledged or referenced in the acceptable provider's note in order to be coded. The acknowledgement or reference will need to be considered on a case-by-case basis. |
| Emergency room (ER) as a standalone document | Medical record for an ER visit. ER records often consist of multiple check-off sheets from various members of the treatment team with signatures not always on the same page as the documentation.<br><br>Coders should review all pages of the ER record whether dated or not. Coders should report only conditions either documented by or clearly reviewed and signed off by an acceptable provider type.<br><br>Conditions ruled out during the ER testing or conflicting with the ER acceptable provider type's final note should not be reported. |
| Skilled Nursing Facility (SNF) – An acceptable provider specialty encounter medical record documentation | The issuer submits an acceptable provider's visit from a SNF record that indicates that the enrollee is a resident of the SNF. Although CMS does not accept risk adjustment data from nursing home facilities (as an inpatient provider type), some beneficiaries who reside in a nursing home will have a nursing home medical record (single acceptable provider type specialty encounter) as the only source to support their diagnostic data. The acceptable provider type's encounter must have been face-to-face with the enrollee. |
| Home Health – An acceptable provider type specialty encounter medical record documentation | The issuer submits an acceptable provider's home visit record. Although CMS does not accept risk adjustment data from home health agencies, some beneficiaries will have a home visit medical record (single acceptable provide type specialty encounter) as the only source to support their diagnostic data. The acceptable provider type's encounter must have been face-to-face with the enrollee. |

## G. Documentation Issues

| Possible Issue Requiring Reviewer Discretion | Explanation/Comments |
|---|---|
| Illegible diagnosis due to handwriting | A.  The *only* diagnoses in the medical record submitted are illegible due to handwriting.<br><br>B.  Some illegible (or non-English or both) words that are possibly a diagnosis. Be careful of illegible negative findings (e.g., [No or R/O] CHF) where the preceding word is illegible.<br><br>Steps:<br><br>If after review of context, similar words, medications, etc., the coder is not able to decipher an illegible word that is documented in areas typically containing diagnoses or with other legible diagnoses:<br><br>1.  Escalate to senior coder for another opinion.<br><br>2.  Senior coder should review the medical record to determine if that condition is legible.<br><br>3.  If the coders agree with the outcome, or agree the words are not diagnoses or not pertinent HCC related diagnoses, proceed with coding the interpreted and legible findings. |
| Illegible diagnosis due to a document image issue | If the only diagnoses in the medical record submitted are illegible due to a document image that is too light, too dark, or distorted, the record is deemed invalid. |
| Non-English documentation | The record submitted includes diagnoses, but the words are not English. Access resources for medical translation of pertinent sections of the medical record. |
| Abbreviations with multiple meanings. | Several common abbreviations have more than one (1) meaning.<br>**EXAMPLES:** MD – major depression, muscular dystrophy, macular degeneration<br><br>CRF – chronic renal failure, chronic respiratory failure<br><br>If more than one (1) meaning applies and documentation is too limited to discern the meaning, coder must use discretion to code based using other notations in the record. If coder/senior coder is unable to determine the meaning of the abbreviation using the entirety of the record, the record must fail. |
| Medical Record amendments submitted as part of the original record. | An amendment must be completed in a timely manner; however, there could be exceptions such as extended specialized or revised lab/path results or autopsies, legal cases sequestered before completing record, natural disasters, or physician called to military service. In most instances an amendment is based on an observation of the patient, by a supervising physician, on the date of service, or a diagnostic test ordered and test results received subsequent to the patient visit.<br>Sufficient information must be contained in the amendment to verify the documentation was completed in a timely manner by the attending or treating physician. |
| Missing pages | In some instances, it is possible to identify missing pages from a pre-numbered medical record, or a partial record submission.<br>**EXAMPLE:** A History & Physical (H&P) with pages 1 and 3, however page 2 is missing.<br><br>**EXAMPLE:** First line of a document submitted appears to be a continuation from a previous page. |

| Possible Issue Requiring Reviewer Discretion | Explanation/Comments |
|---|---|
| | If possible, code from available pages. If unable to code from the pages submitted, the record is invalid. |
| Medical record documentation is distorted or obscured | In some instances, the record documentation is obscured by sticky notes or other markings on the document. |
| | If possible, code from available pages. If unable to code from the pages submitted, the record is invalid. |
| Medical record documentation is too light or too dark. | Some medical record documentation is of poor image quality and the coder is unable to identify key elements. This is common in photographed records. |
| | If possible, code from available pages. If unable to code from the pages submitted, the record is invalid. |
| Pages or margins of the medical record are cut off | Some medical record documentation can have portions of the record text cut off during the submission. |
| | If possible, code from available pages. If unable to code from the pages submitted, the record is invalid. |

# Appendix G: Examples of Applying HHS-HCC Hierarchies

This section outlines general examples of applying HHS-HCC hierarchies.

**Example 1:** An issuer's EDGE data reflects multiple diagnoses linking to both CC 9 and CC 10 for a particular enrollee. When HHS-HCC hierarchies are imposed, HCC 9 is determined to be the final HCC for the enrollee on EDGE. The HCC failure rate would be impacted by the IVA Entity's ability to validate HCC 9. In this example, if the IVA Entity abstracted a diagnosis that mapped to HCC 10 only, HCC 10 would be considered as the final IVA HCC for the enrollee. Because the IVA Entity abstracted no diagnoses that map to HCC 9, two (2) outcomes occur: 1) The HCC 9 failure rate increases as the IVA Entity did not substantiate the HCC determined as final for the enrollee in EDGE; and 2) HCC 10 failure rate would decrease as the IVA Entity has identified a new occurrence of HCC 10 that was not on EDGE. Note that HCC 9 and HCC 10 may be assigned to different HCC Failure Rate Groups.

**Example 2:** An issuer's EDGE data reflects multiple diagnoses linking to both CC 9 and CC 10 for a particular enrollee. When HHS-HCC hierarchies are imposed, HCC 9 is determined to be the final HCC for the enrollee on EDGE. The HCC failure rate would be impacted by the IVA Entity's ability to validate HCC 9. In this example, the IVA Entity abstracts diagnoses that in isolation, map to CC 8, CC 9, and CC 10. Like the EDGE server, CMS applies HCC hierarchies to all IVA Entity abstracted diagnoses to determine final IVA HCCs for the enrollee. After applying the HHS-HCC hierarchies, only HCC 8 would be considered as the final IVA HCC for the enrollee. In this situation, two outcomes occur: 1) The EDGE HCC 9 failure rate increases as the IVA Entity did not substantiate the HCC determined as final for the enrollee in EDGE; and 2) HCC 8 failure rate would decrease as the IVA Entity has identified a new occurrence of HCC 8 that was not on EDGE. Note that HCC 8 and HCC 9 may be assigned to different HCC Failure Rate Groups.

Exhibit W
Page 483

# Appendix H: Error Estimation Example

The purpose of this section is to provide stakeholders with an additional example of the Error Estimation process, supplemental to the information provided in Section 11 of these Protocols. All examples are for illustrative purposes only and are not based on real HHS-RADV data.

Note that the detailed issuer and enrollee information provided below may vary across examples. The information is intended to provide details of the components of the HCC Failure Rate methodology calculations.

**1)  Establish Final Enrollee Results**



- Example 1: Outcome – Use IVA Results

  – Issuer 10001 has 200 IVA sampled enrollees

  – Issuer 10001 has passed the pairwise means test based on the 24 SVA sample, after failing at pairwise SVA 12 review

**Compare IVA and SVA results**

**Outcome -**
**Use IVA results**

| IVA Results | |
|---|---|
| **Enrollee ID** | **IVA HCC** |
| 10001-001 | [1,2,3] |
| 10001-002 | [4,5,6] |
| ... | ... |
| 10001-024 | [1,4] |
| ... | ... |
| 10001-200 | [2,5] |

| SVA Results | |
|---|---|
| **Enrollee ID** | **SVA HCC** |
| 10001-001 | [1,2] |
| 10001-002 | [4,5,6] |
| ... | ... |
| 10001-024 | [1,4] |

| IVA Results | |
|---|---|
| **Enrollee ID** | **IVA HCC** |
| 10001-001 | [1,2,3] |
| 10001-002 | [4,5,6] |
| ... | ... |
| 10001-024 | [1,4] |
| ... | ... |
| 10001-200 | [2,5] |

- Example 2: Outcome – Use SVA Results
  - Issuer 10002 has 200 IVA sampled enrollees
  - The pairwise test results in a significant difference between IVA and SVA results for the 100 enrollees reviewed and the SVA determined the precision to be high[47]



### 2) Determine HCC Groups, Calculate Issuer Group Failure Rates and Adjustments, and Determine Final Issuer Error Rates

- Example 3: Introduction
  - Assume there are 50,000 total enrollees sampled during one (1) year's HHS-RADV process, across all issuers
  - The EDGE HCCs and adjusted IVA HCCs are stored as shown in the table

| Enrollee ID | EDGE HCC | Adjusted IVA HCC |
|---|---|---|
| 1 | [30, 115, 138] | [30, 115] |
| 2 | [1, 30] | [1, 30] |
| ... | ... | ... |
| 50,000 | [30, 57] | [57] |

---

[47] In the event that the IVA fails pairwise 100, a precision analysis will be conducted to determine whether to use the SVA100 level findings (a result of high precision) or expand to the full IVA sample of enrollees, which would then be evaluated by the SVA, and utilized for Error Estimation purposes.

- <u>Example 3 (a): Determine total HCC frequencies and calculate HCC failure rates</u>

$$1 - (Freq\_IVA \, / \, Freq\_EDGE) = Failure \, Rate^h$$

Ex: $1 - (180 \, / \, 200) = \mathbf{10.0\%}$

| HCC | $Freq\_EDGE^h$ | $Freq\_IVA^h$ | $Failure \, Rate^h$ |
|---|---|---|---|
| 30 | 200 | 180 | 10.0% |
| 115 | 700 | 607 | 13.3% |
| 138 | 1,200 | 1,020 | 15.0% |
| 248 | 4,000 | 3,340 | 16.5% |
| 1 | 2,200 | 1,833 | 16.7% |
| 125 | 2,700 | 2,237 | 17.1% |
| 130 | 3,000 | 2,300 | 23.3% |
| 12 | 2,500 | 1,700 | 32.0% |
| 36 | 2,000 | 1,100 | 45.0% |
| 57 | 1,500 | 500 | 66.7% |
| **Total** | **20,000** | **14,817** | **25.9%** |

*Freq_EDGE = Total number of enrollees containing such HCC on EDGE

**Freq_IVA = Total number enrollees containing such HCC in the adjusted IVA results

- <u>Example 3 (b): Tier HCCs nationally into Low, Medium, and High failure rate groups</u>
  - The first boundary to segment Low and Medium failure HCCs is drawn between HCCs 248 and 1, because the total EDGE frequencies of the first four (4) HCCs from the list (30, 115, 138, 248) makes the Group size close to 33.33% of all EDGE frequencies

    - The second boundary to segment Medium and High failure HCCs is drawn between HCC 130 and HCC 12, because the Group size is close to 67% of all EDGE frequencies

| HCC | $Freq\_EDGE^h$ | $Freq\_IVA^h$ | $FR^h$ | $Freq\_EDGE^h$ Cumulative Probability | Boundary | Group |
|---|---|---|---|---|---|---|
| 30 | 200 | 180 | 10.0% | 1.0% | | Low |
| 115 | 700 | 607 | 13.3% | 4.5% | | Low |
| 138 | 1,200 | 1,020 | 15.0% | 10.5% | | Low |
| 248 | 4,000 | 3,340 | 16.5% | 30.5% | **33.33%** | Low |
| 1 | 2,200 | 1,833 | 16.7% | 41.5% | | Medium |
| 125 | 2,700 | 2,237 | 17.1% | 55.0% | | Medium |
| 130 | 3,000 | 2,300 | 23.3% | 70.0% | **66.7%** | Medium |
| 12 | 2,500 | 1,700 | 32.0% | 82.5% | | High |
| 36 | 2,000 | 1,100 | 45.0% | 92.5% | | High |
| 57 | 1,500 | 500 | 66.7% | 100.0% | 100% | High |
| **Total** | **20,000** | **14,817** | **25.9%** | | | |

| HCC | Group |
|---|---|
| 30 | Low |
| 115 | Low |
| 138 | Low |
| 248 | Low |
| 1 | Medium |
| 125 | Medium |
| 130 | Medium |
| 12 | High |
| 36 | High |
| 57 | High |

- Example 4: Introduction
  - Assume Issuers 10001 and 10002 each had 200 sampled enrollees
  - The EDGE HCCs and adjusted IVA HCCs are stored as shown in the left table
  - Recall the output of sub-process in Example 3 as shown in the right table

| HIOS ID | Enrollee ID | EDGE HCC | Adjusted IVA HCC |
|---|---|---|---|
| 10001 | 10001-001 | [30, 115, 138] | [30, 115] |
| 10001 | 10001-002 | [1, 30] | [1, 30] |
| ... | ... | ... | ... |
| 10001 | 10001-200 | [248, 125] | [125] |
| 10002 | 10002-001 | [30, 57] | [57] |
| 10002 | 10002-002 | [125] | [125] |
| ... | ... | ... | ... |
| 10002 | 10002-200 | [36] | [36] |

| HCC | Group |
|---|---|
| 30 | Low |
| 115 | Low |
| 138 | Low |
| 248 | Low |
| 1 | Medium |
| 125 | Medium |
| 130 | Medium |
| 12 | High |
| 36 | High |
| 57 | High |

- Example 4 (a): Determine Group Failure Rate

  – Notice that Issuers 10001 and 10002 enrollee HCCs have been replaced by their appropriate HCC Groups (Low, Medium, High) in the table below (left hand side)

  – Gather enrollee HCC Group level data to determine Freq_EDGE and Freq_IVA for each issuer

    o The issuer's HCC group frequency is determined by counting the instances of HCCs associated with each HCC Group for all enrollees for that issuer

    o For example, in the table below (left hand side), there are three (3) HCCs that are associated with the 'Low' HCC Group for HIOS ID 10001, Enrollee 10001-001 in EDGE, and two (2) HCCs associated with the 'Low' HCC Group in the adjusted IVA findings

    o After counting all instances across the issuer's enrollees, the total frequency recorded is shown in the table below (right hand side)

| HIOS ID | Enrollee ID | EDGE HCC | Adjusted IVA HCC |
|---|---|---|---|
| 10001 | 10001-001 | [Low, Low, Low] | [Low, Low] |
| 10001 | 10001-002 | [Medium, Low] | [Medium, Low] |
| ... | ... | ... | ... |
| 10001 | 10002-200 | [Low, Medium] | [Medium] |
| 10002 | 10002-001 | [Low, High] | [High] |
| 10002 | 10002-002 | [Medium] | [Medium] |
| ... | ... | ... | ... |
| 10002 | 10002-200 | [High] | [High] |

| HCC Group | Issuer | Freq_EDGE$^G$ | Freq_IVA$^G$ |
|---|---|---|---|
| Low | 10001 | 133 | 104 |
| | 10002 | 96 | 87 |
| | ⋮ | ⋮ | ⋮ |
| Medium | 10001 | 171 | 128 |
| | 10002 | 111 | 86 |
| | ⋮ | ⋮ | ⋮ |
| High | 10001 | 131 | 96 |
| | 10002 | 96 | 79 |
| | ⋮ | ⋮ | ⋮ |

  – Using the Freq_EDGE and Freq_IVA data collected above, calculate Group Failure Rate for each issuer's HCC Groups:

$$1 - (Freq\_IVA) / (Freq\_EDGE) = \text{Group Failure Rate (GFR)}$$

Ex: $1 - (104 / 133) = \textbf{21.8\%}$ for Issuer 100001 *(Group Low)*

| HCC Group | Issuer | Freq_EDGE$^G$ | Freq_IVA$^G$ | GFR$^G$ |
|---|---|---|---|---|
| **Low** | 10001 | 133 | 104 | **21.8%** |
| | 10002 | 96 | 87 | 9.4% |
| | ⋮ | ⋮ | ⋮ | ⋮ |
| **Medium** | 10001 | 171 | 128 | 25.1% |
| | 10002 | 111 | 86 | 22.5% |
| | ⋮ | ⋮ | ⋮ | ⋮ |
| **High** | 10001 | 131 | 96 | 26.7% |
| | 10002 | 96 | 79 | 17.7% |
| | ⋮ | ⋮ | ⋮ | ⋮ |

- Example 4 (b): Calculate weighted mean and standard deviation
  - For each HCC Group, calculate the weighted mean μ(GFR) and standard deviation Sd(GFR) using all individual issuers nationwide:

    o HCC Group G1 has a weighted mean of **11.8%** and a standard deviation of **3.0%**

    o HCC Group G2 has a weighted mean of **17.1%** and a standard deviation of **3.4%**

    o HCC Group G3 has a weighted mean of **25.9%** and a standard deviation of **4.0%**

| HCC Group | HIOS ID | Freq_EDGE$^G$ | Freq_IVA$^G$ | GFR$^G$ | μ(GFR$^G$) | Sd(GFR$^G$) |
|---|---|---|---|---|---|---|
| G1 | 10001 | 133 | 104 | 21.8% | | |
| | 10002 | 96 | 87 | 9.4% | **11.8%** | **3.0%** |
| | ⋮ | ⋮ | ⋮ | ⋮ | | |
| G2 | 10001 | 171 | 128 | 25.1% | | |
| | 10002 | 111 | 86 | 22.5% | **17.1%** | **3.4%** |
| | ⋮ | ⋮ | ⋮ | ⋮ | | |
| G3 | 10001 | 131 | 96 | 26.7% | | |
| | 10002 | 96 | 79 | 17.7% | **25.9%** | **4.0%** |
| | ⋮ | ⋮ | ⋮ | ⋮ | | |

- Example 4 (c): Create a confidence interval
  - Use the HCC Group weighted mean and standard deviation calculated in step (b) to create a two (2)-sided 1.96 confidence interval:

    Weighted Mean – Sigma Cutoff * Standard Deviation = Confidence Interval Lower Boundary
    11.8% - 1.96 * 3% = **5.9%** for G1

    Weighted Mean + Sigma Cutoff * Standard Deviation = Confidence Interval Upper Boundary
    11.8% + 1.96 * 3% = **17.7%** for G1

| HCC Group | HIOS ID | Freq_EDGE$^G$ | Freq_IVA$^G$ | GFR$^G$ | μ(GFR$^G$) | Sd(GFR$^G$) | sigma_cutoff | UB$^G$ | LB$^G$ |
|---|---|---|---|---|---|---|---|---|---|
| G1 | 10001 | 133 | 104 | 21.8% | 11.8% | 3.0% | 1.96 | **17.7%** | **5.9%** |
| | 10002 | 96 | 87 | 9.4% | | | | | |
| | ⋮ | ⋮ | ⋮ | ⋮ | | | | | |
| G2 | 10001 | 171 | 128 | 25.1% | 17.1% | 3.4% | 1.96 | 23.8% | 10.4% |
| | 10002 | 111 | 86 | 22.5% | | | | | |
| | | | | | | | | | |
| G3 | 10001 | 131 | 96 | 26.7% | 25.9% | 4.0% | 1.96 | 33.7% | 18.1% |
| | 10002 | 96 | 79 | 17.7% | | | | | |
| | ⋮ | ⋮ | ⋮ | ⋮ | | | | | |

G1 Group Distribution Example:





- **Example 4 (d): Calculate adjustments for Group outliers**
  - If the issuer's Group Failure Rate falls outside of the confidence interval, then an issuer's Group adjustment factor is calculated:

$$\text{GFR} - \mu(\text{GFR}^G) = \text{Group Adjustment}$$

21.8% - 11.8% = **10%** for G1 (Issuer 10001)

25.1%-17.1% = **8%** for G2 (Issuer 10001)

17.7% -25.9% = **-8.2%** for G3 (Issuer 10002)

| HCC Group | Issuer | Freq_EDGE$^G$ | Freq_IVA$^G$ | GFR$^G$ | μ(GFR$^G$) | Sd(GFR$^G$) | sigma_cutoff | UB$^G$ | LB$^G$ | Group Adjustment$^G$ |
|---|---|---|---|---|---|---|---|---|---|---|
| G1 | 10001 | 133 | 104 | 21.8% | 11.8% | 3.0% | 1.96 | 17.7% | 5.9% | **10%** |
| | 10002 | 96 | 87 | 9.4% | | | | | | 0 |
| | ⋮ | | | | | | | | | ... |
| G2 | 10001 | 171 | 128 | 25.1% | 17.1% | 3.4% | 1.96 | 23.8% | 10.4% | **8%** |
| | 10002 | 111 | 86 | 22.5% | | | | | | 0 |
| | ⋮ | | | | | | | | | ... |
| G3 | 10001 | 131 | 96 | 26.7% | 25.9% | 4.0% | 1.96 | 33.7% | 18.1% | 0 |
| | 10002 | 96 | 79 | 17.7% | | | | | | **-8.2%** |
| | ⋮ | | | | | | | | | ... |

- – If an issuer's HCC Group Failure Rate falls outside of its corresponding confidence interval, it will receive a non-zero adjustment

  - o A positive (+) adjustment will reduce the risk score:

    - ➢ Ex: **8%** for G2 (Issuer 10001)

  - o A negative (-) adjustment will increase the risk score:

    - ➢ Ex: **-8.2%** for G3 (Issuer 10002)

- – If an issuer's HCC Group Failure Rate does not fall outside of its corresponding confidence interval, it will receive no adjustment

  - o Ex: 0 for G1 (Issuer 10002) → No calculation necessary because the GFR does not lie beyond the Confidence Interval Upper or Lower Boundaries

- • Example 5: Introduction

  - – As a result of Example 4, Issuer 10001 received the adjustment factors of 10%, 8%, and 0% for the three (3) HCC Failure Groups (1 - Low, 2 - Medium, 3 - High), respectively

  - – Assume the first two (2) sampled enrollees of Issuer 10001 have the detailed information in the table below:

| Issuer | Enrollee | Stratum Size in Population | Sample Enrollees from the Stratum | Stratum Level | Plan Metal Level | Age Last (Infant or No HCCs) | EDGE HCCs |
|--------|----------|---------------------------|-----------------------------------|---------------|------------------|------------------------------|-----------|
| **10001** | 10001-1 | 352 | 67 | Infant-Medium | Silver | O | 125,130,138,248 |
| **10001** | 10001-2 | 1418 | 37 | Adult-High | Silver | - | 1,12,30,36,57,115 |
| **10001** | … | … | … | … | | | … |

- • Example 5 (a): Determine enrollee-level adjustments

  - – Enrollee level adjustment factors are calculated using the weighted average from its issuer's Group level adjustment factors

    - o Enrollee 10001-1 has four (4) HCCs recorded on EDGE [125, 130, 138, 248]

    - o For each EDGE HCC, compute the risk score for a single HCC using the logic defined in HHS RA Model table. Since the enrollee is an infant, the computation of the single HCC risk score takes into consideration the enrollee's actual maturity and severity levels. This results in risk scores for a single HCC as **8.008, 125.632, 49.916, and 49.916** respectively:

| Enrollee | Stratum Level | Plan Metal Level | Age Last | HCC Failure | HCC | Severity Associated with HCC | Maturity Associated with HCC | Enrollee's Severity | Enrollee's Maturity | Variable Used for Risk Score Calculation | $RS_{i,e}^{hcc,G}$ |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10001-1 | Infant-Medium | Silver | 0 | G1 | 138 | 4 | Age 1 | 5 | PREMATURE MULTIPLE | AGE1_X_SEVERITY4 | 8.008 |
| | | | | | 248 | | PREMATURE MULTIPLE | | | PREMATURE_MULTIPLES_X_SEVERITY5 | 125.632 |
| | | | | G2 | 125 | 5 | Age 1 | | | AGE1_X_SEVERITY5 | 49.916 |
| | | | | | 130 | 5 | Age 1 | | | AGE1_X_SEVERITY5 | 49.916 |

- o Enrollee's Severity is the highest Severity Associated with HCC among all HCCs

- o Enrollee's Maturity is the highest Maturity Associated with HCC among all HCCs

- o Variable Used for Risk Score Calculation is the variable used to identify coefficient in HHS RA Model table

  - ➢ For HCCs associated with Severity level (e.g., 138, 125, 130), the variable is Enrollee's Maturity X Severity Associated with HCC

  - ➢ For HCCs associated with Maturity level (e.g., 248), but with no associated severity level, the "Enrollee's Severity" is used, and the variable is Maturity Associated with HCC X Enrollee's severity

- Enrollee level adjustment factors are calculated using the weighted average from its issuer's Group level adjustment factors

  - o Enrollee 10001-1 HCCs are categorized in HCC Groups G1, G1, G2, and G2 respectively. They are associated with the Group level adjustment factors of 10%, 10%, 8% and 8%

  - o Compute the enrollee adjustment score as the weighted average of Group level adjustment factors, weighting by the risk score of the HCCs. This results in a weighted adjustment score of **9.1%**

| Enrollee | Stratum Level | HCC Failure Group | HCC | $RS_{i,e}^{hcc,G}$ | Group Adjustment$_i^G$ | Enrollee Adjustment$_{i,e}$ |
|---|---|---|---|---|---|---|
| 10001-1 | Infant-Medium | G1 | 138 | 8.008 | 10.00% | 9.1% |
| | | | 248 | 125.632 | | |
| | | G2 | 125 | 49.916 | 8.00% | |
| | | | 130 | 49.916 | | |

- Enrollee level adjustment factors are calculated using the weighted average from its issuer's Group level adjustment factors

  - o Enrollee 10001-2 has six (6) HCCs recorded on EDGE [30, 115, 1, 12, 36, 57]

  - o For each EDGE HCC, compute the risk score of a single HCC using the logic defined in HHS RA Model. This results in risk scores for a single HCC as listed in the last column of the table:

| Enrollee | Stratum Level | Plan Metal Level | HCC Failure Group | HCC | $RS_{i,e}^{hcc,G}$ |
|---|---|---|---|---|---|
| **10001-2** | Adult-High | Silver | G1 | 30 | **1.947** |
| | | | | 115 | **4.903** |
| | | | G2 | 1 | **0.330** |
| | | | G3 | 12 | **2.451** |
| | | | | 36 | **1.963** |
| | | | | 57 | **0.864** |

- Enrollee level adjustment factors are calculated using the weighted average from its issuer's Group level adjustment factors

  o Enrollee 10001-2 HCCs are categorized in HCC groups G1, G1, G2, G3, G3, and G3 respectively. They are associated with the Group level adjustment factors of 10%, 10%, 8%, 0%, 0%, and 0%

  o Compute the enrollee adjustment score as the weighted average of Group level adjustment factors, weighting by the risk score of the HCCs. This results in a weighted adjustment score of 5.7%

| Enrollee | Stratum Level | HCC Failure Group | HCC | $RS_{i,e}^{hcc,G}$ | $Group\ Adjustment_i^G$ | $Enrollee\ Adjustment_{i,e}$ |
|---|---|---|---|---|---|---|
| **10001-2** | Adult - High | G1 | 30 | **1.947** | 10.00% | **5.7%** |
| | | | 115 | **4.903** | | |
| | | G2 | 1 | **0.330** | 8.00% | |
| | | G3 | 12 | **2.451** | 0% | |
| | | | 36 | **1.963** | | |
| | | | 57 | **0.864** | | |

- Example 5 (b): Adjust EDGE risk scores

  - Use the enrollees' adjustment factors to adjust the EDGE risk score for samples

    o Apply the enrollee level adjustment factor to the EDGE risk score of the sampled enrollee. Enrollees 10001-1 and 10001-2 have 9.1% and 5.7% adjustment factors applied to their EDGE risk scores, respectively:

Enrollee 10001-1 has an adjusted risk score of

$(126.16 * (1 - 9.1\%)) = $ **114.678**

Enrollee 10001-2 has an adjusted risk score of

$(12.88 * (1 - 5.7\%)) = $ **12.146**

| Issuer | Enrollee | EDGE HCCs | $EdgeRS_{i,e}$ | $Enrollee\ Adjustment_{i,e}$ | $AdjRS_{i,e}$ |
|---|---|---|---|---|---|
| 10001 | 10001-1 | 125,130,138,248 | 126.158 | 9.1% | 114.678 |
| 10001 | 10001-2 | 1,12,30,36,57,115 | 12.88 | 5.7% | 12.146 |

- Example 5 (c): Determine issuer Error Rate
  - For Issuer 10001, sum the EDGE risk scores and adjusted risk scores for all enrollees in the sample
  - For each stratum, compute the stratum weight as the ratio of stratum size in the issuer population on EDGE to the number of sampled enrollees from the stratum
  - Compute the issuer-level error rate for Issuer 10001 as one (1) minus the stratum weighted sum of adjusted risk scores (20,538) over the EDGE risk scores (20,751).

Issuer 10001 has a final error rate of

$(1 - 20{,}538/20{,}751) =$ **1.03%**

| Issuer | Enrollee | Stratum Level | $EdgeRS_{i,e}$ | $AdjRS_{i,e}$ | $w_e$ | $w_e * EdgeRS_{i,e}$ | $w_e * AdjRS_{i,e}$ | $\sum_e w_e * EdgeRS_{i,e}$ | $\sum_e w_e * AdjRS_{i,e}$ | Error Rate |
|---|---|---|---|---|---|---|---|---|---|---|
| 10001 | 10001-1 | Infant-Medium | 126.158 | 114.678 | 5.25 | 662.33 | 602.06 | 20751 | 20538 | 1.03% |
| 10001 | 10001-2 | Adult-High | 12.88 | 12.146 | 38.32 | 493.56 | 465.43 | | | |
| 10001 | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | | | |

  - The table below depicts the results for HIOS ID 10001 calculated in the steps above, alongside additional example information for other HIOS IDs (10002; 10003).

| Issuer | Enrollee | Stratum Level | $EdgeRS_{i,e}$ | $AdjRS_{i,e}$ | $w_e$ | Error Rate |
|---|---|---|---|---|---|---|
| **10001** | 10001-1 | Infant-Medium | 126.158 | 114.678 | 5.25 | |
| **10001** | 10001-2 | Adult-High | 12.88 | 12.146 | 38.32 | 1.03% |
| **10001** | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | |
| **10002** | 10002-1 | Child-Medium | 101.834 | 98.459 | 50.1 | |
| **10002** | 10002-2 | Adult-Low | 1.064 | 1.037 | 1.32 | 1.50% |
| **10002** | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | |
| **10003** | 10003-1 | Adult-Medium | 28.325 | 28.325 | 15.53 | |
| **10003** | 10003-2 | Adult-High | 119.468 | 119.468 | 10.11 | 0% |
| **10003** | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | |

- Example 6: Introduction
  - Output from Example 5 – enrollee level EDGE risk scores, adjusted risk scores, and stratum weightings
  - Assume Issuer 10001 pairwise test results indicated statistically significant differences between IVA and SVA100 findings

- Example 6 (a): Execute bootstrap resampling
  - Draw 100 enrollees from Issuer 10001's sample of 100 enrollees with replacement at least 1,000 times and calculate the error rate for each sample.

| Sample Enrollee | 1 | 2 | ... | 1,000 |
|---|---|---|---|---|
| 1 | 10001-27 | 10001-12 | ... | 10001-32 |
| 2 | 10001-1 | 10001-92 | ... | 10001-67 |
| ⋮ | ⋮ | ⋮ | ⋮... | ⋮ |
| 100 | 10001-43 | 10001-85 | | 10001-67 |
| Error Rate: | 0.96% | 1.17% | ... | 1.09% |

- Example 6 (b): Calculate standard errors and confidence intervals for issuers
  - Compute the bootstrapped standard error by calculating the sample standard deviation across the 1,000 samples
    - This results in a standard error of 0.12%
    - Standard Error: Standard deviation divided by the square root of the sample size
  - Determine the bootstrapped confidence intervals by identifying the 2.5th and 97.5th percentiles of the 1,000 samples of resampled error rates
    - This results in a confidence interval of [0.83%, 1.23%]
  - CMS assesses the standard error and confidence intervals calculated and will expand the SVA sample size to SVA200 in the event the bootstrap precision indicates poor precision. In the event the sample increases to 200 enrollees in this way, SVA200 findings will be used as final and the Error Estimation calculation will be re-run

| Issuer | Error Rate | Standard Error | Confidence Interval | |
|---|---|---|---|---|
| | | | Lower | Upper |
| 10001 | 1.03% | 0.12% | 0.83% | 1.23% |
| 10002 | 1.50% | 0.27% | 1.19% | 1.78% |
| ⋮ | ⋮ | ⋮ | ⋮ | ⋮ |

- Following the conclusion of the HHS-RADV process, including the Discrepancy Reporting and Administrative Appeals process as described in Section 12 (HHS-RADV Discrepancy Reporting and Administrative Appeals), the issuer's error rate will be used to calculate the issuer's adjusted risk score during the RA payment transfer process, using the formula below:

(1- (error rate))*(plan liability risk score) = Adjusted Risk Score

- The issuer's adjusted risk score will then be used in the RA process to calculate RA payments and charges for the following benefit year

# Appendix I: IRR Scenarios

This section outlines example scenarios for calculating the consistency measure for the Primary Coder and the steps associated with finalization or additional evaluation.

**Scenario 1** – Primary Coder First Iteration – Pass

| Step | Description | Scenario 1 |
|------|-------------|------------|
| 1 | Primary Coder Performs Health Status Data Validation | The Primary Coder performs health status data validations and is selected for IRR evaluation following the review of 25 medical records. |
| 2 | IRR Sample Selection | 25 completed medical records are selected and allocated to Senior Coders for review. |
| 3 | Senior Coder Performs Health Status Data Validation | The 25 medical records are allocated to Senior Coders for review. Senior Coders performs health status data validations and records diagnoses abstracted for each of the evaluated medical records. |
| 4 | Calculate Primary Coder Consistency Measure | After completing the review of the 25 medical records, the abstracted diagnoses are mapped to HCCs and the Primary Coder findings are used with the Senior Coder findings to calculate the Primary Coder's consistency measure. <br><br> Within the 25 medical records, the Primary Coder identified diagnoses mapping to four (4) HCCs, which were also found by Senior Coders for the same enrollees. The Senior Coder found no other diagnoses assigned to additional HCCs. <br><br> The Primary Coder consistency measure ($CM_{PC}$) for the sample of 25 medical records is calculated using the following formula: <br><br> $$CM_{PC} = \frac{Count\ of\ Primary\ Coder\ and\ Senior\ Coder\ HCC\ Matches}{Count\ of\ Unique\ HCCs\ (Primary\ Coder\ \&\ Senior\ Coder)}$$ <br><br> $$CM_{PC} = \frac{4}{4} = 100\%$$ <br><br> **NOTE:** Senior Coder results are captured as final for all medical records reviewed if deviations are identified, even when the calculated consistency measure meets the required 95%. See Scenario Two (2) for additional detail. |
| 5 | Finalize IRR or Adjust Sample | The Primary Coder's calculated consistency measure meets the required 95%. The Primary Coder has completed the requirements for IRR evaluation. |

**Scenario 2** – Primary Coder First Iteration – Fail; Second Iteration – Pass

| Step | Description | Scenario 2 |
|------|-------------|------------|
| 1 | Primary Coder Performs Health Status Data Validation | The Primary Coder performs health status data validations and is selected for IRR evaluation following the review of 25 medical records. |
| 2 | IRR Sample Selection | 25 completed medical records are selected and allocated to Senior Coders for review. |
| 3 | Senior Coder Performs Health Status Data Validation | The 25 medical records are allocated to Senior Coders for review. Senior Coders performs health status data validations and records diagnoses abstracted for each of the evaluated medical records. |
| 4 | Calculate Primary Coder Consistency Measure | After completing the review of the 25 medical records, the abstracted diagnoses are mapped to HCCs and the Primary Coder findings are used with the Senior Coder findings to calculate the Primary Coder's consistency measure. <br><br> Within the 25 medical records, the Primary Coder identified diagnoses mapping to seven (7) HCCs. Four (4) of the seven (7) HCCs were also assigned to diagnoses abstracted by the Senior Coder for the same enrollees, and three (3) HCCs were unsubstantiated. Additionally, the Senior Coder found additional diagnoses which were assigned to two (2) HCCs not found by the Primary Coder. <br><br> The Primary Coder consistency measure ($CM_{PC}$) for the sample of 25 medical records is calculated using the following formula: <br><br> $$CM_{PC} = \frac{Count\ of\ Primary\ Coder\ and\ Senior\ Coder\ HCC\ Matches}{Count\ of\ Unique\ HCCs\ (Primary\ Coder\ \&\ Senior\ Coder)}$$ <br><br> $$CM_{PC} = \frac{4}{9} = 44.44\%$$ <br><br> Senior Coder results are captured as final for all medical records reviewed with deviations identified. |
| 5 | Finalize IRR or Adjust Sample | The Primary Coder's calculated consistency measure does not meet the required 95%. The Primary Coder is required to re-perform the IRR assessment, re-performing steps 1 – 5. |

| Step | Description | Scenario 2 |
|------|-------------|------------|
| 1-5 | IRR Iteration 2 – Sample Selection, Execution, and Finalization | The Primary Coder continues to review medical records until 25 additional medical records have been reviewed. The second iteration of the IRR process initiates, and Steps One (1) through Four (4) are performed. Following the completion of Primary Coder and Senior Coder review for the second iteration of IRR, the Primary Coder consistency measure is calculated. |

Within the second set of 25 medical records, the Primary Coder identified diagnoses mapping to 19 HCCs which were also assigned to diagnoses abstracted by the Senior Coder for the same enrollee. The Senior Coder also identified a diagnosis which mapped to one (1) additional HCC which was not found by the Primary Coder.

The Primary Coder consistency measure ($CM_{PC}$) for the sample of 25 medical records is calculated using the following formula:

$$CM_{PC} = \frac{Count\ of\ Primary\ Coder\ and\ Senior\ Coder\ HCC\ Matches}{Count\ of\ Unique\ HCCs\ (Primary\ Coder\ \&\ Senior\ Coder)}$$

$$CM_{PC} = \frac{19}{20} = 95\%$$

Senior Coder results are captured as final for all medical records reviewed with deviations identified.

The Primary Coder's calculated consistency measure meets the required 95%. The Primary Coder has completed the requirements for IRR evaluation.

Had the Primary Coder not achieved the required consistency measure of 95%, the process would restart and a third iteration of IRR would be executed.

# Appendix J: Application of Risk Score Error Rates for Exiting Issuers

**Example 1**: Issuer offers coverage in a state in the 2018 benefit year and exits all the markets in a state for the 2019 benefit year (i.e., no membership in the state in the 2019 benefit year). The issuer is not subject to risk adjustment for that state in the 2019 benefit year, but it was identified as a positive error rate outlier during 2018 HHS-RADV. As a result, CMS will apply the issuer's resulting risk score error rate to its 2018 benefit year risk score and recalculate its 2018 benefit year RA transfers. Other issuers in the same state market risk pools in the 2018 benefit year will see their 2019 risk scores and transfers adjusted as a result of the exiting issuer's positive error rate outlier finding.

**Example 2**: Using the same scenario in Example 1, if the same issuer decides to re-enter the market in the 2020 benefit year, after exiting in the 2019 benefit year, the base period used for RADV would be the benefit year for which that issuer re-entered (the 2020 benefit year in this example). Assuming the issuer does not exit all of the markets in the state for the 2021 benefit year, any HHS-RADV adjustments would generally be applied to the issuer's average plan-level risk scores and RA transfers for the benefit year subsequent to the benefit year being audited.

# Appendix K: Updates Log

| CMS RADV Protocols Updates Log – Major Updates | | | | |
|---|---|---|---|---|
| Item | Subject | Protocols Section Reference | Page # | Summarized Update |
| 1 | **Delete all PHI and PII** | Section 1.5 (Securing Protected Health Information) | P. 9 | • Clarified that CMS will delete any and all PHI or PII information that is transmitted directly to CMS by issuers, IVA Entities, or providers outside of the secured IVA submission process and within the Audit Tool, including any PHI or PII communicated via email or regarding sampling reports. |
| 2 | **HHS-RADV exemption** | Section 1.6.1 (Exemption from HHS-RADV) | P. 9 – 11 | • Updated the definition of the materiality threshold as total annual premiums at or below $15 million statewide. Beginning with the 2018 benefit year HHS-RADV, the materiality threshold exemption would apply. The random and targeted sampling would however apply to issuers below the materiality threshold. These issuers would be subject to random and targeted sampling every three (3) years (barring any risk-based triggers based on experience that will warrant more frequent audits). Issuers below 500 billable member months remain exempt from random (and targeted) sampling. <br>• Beginning with the 2018 benefit year, CMS created a new HHS-RADV Issuer Exemption and DDVC Web Form, which must be completed by all issuers meeting one of the exemptions or who wish to request a DDVC. Issuers can also request an exemption based on liquidation status or DDVC through this web form. <br>• Based on the 2020 Payment Notice, updated the liquidation exemption guidance and definition for liquidation. <br>• Provided updated guidance indicating that a sole issuer in a state market risk pool in a benefit year is not required to conduct HHS-RADV for that state market risk pool; however, if the sole issuer participates in multiple risk pools in the state during that benefit year where it is not the sole issuer, it would be subject to HHS-RADV for those risk pools where RA transfers are occurring with other issuers. <br>• Based on the 2020 Payment Notice, added and defined the exiting issuer exemption for small group market issuers with off-calendar year coverage who exit the market, and where carry-over coverage ends in the next benefit year |

| CMS RADV Protocols Updates Log – Major Updates | | | | |
|---|---|---|---|---|
| Item | Subject | Protocols Section Reference | Page # | Summarized Update |
| 3 | **IVA Entity conflict of interest** | Section 2.1.3 (IVA Entity Not Free of Conflict of Interest (COI) or Not in Good Standing)<br><br>Section 6.5 (Criteria for Assessing IVA Entity Capabilities) | P. 13 – 14<br>P. 28 – 30 | • Clarified that CMS does not comment on COI or determine permissibility of IVA Entity selection outside of the parameters stated in the HHS-RADV Protocols<br>• Updated language to indicate that Third Party Administrators (TPAs) or any organization/company/entity responsible for reviewing, analyzing, submitting claims or supplemental diagnosis records on behalf of an issuer via their EDGE server for RA calculation is considered to be in COI and may not be designated as an IVA Entity |
| 4 | **Issuer responsibility** | Section 2.1.4 (Incomplete Audit Results Submission) | P. 14 | • Clarified issuer responsibility and requirement to confirm the completion and submission of their IVA results in the Audit Tool |
| 5 | **Determining the amount and allocation for DDVC** | Section 2.2.2 (Default Data Validation Charge) | P. 15 | • Established that a Default Data Validation Charge (DDVC) will be assessed to issuers who fail to engage an IVA Entity or fail to submit the results of an IVA within the designated time to CMS<br>• Based on the final decision from the 2020 Payment Notice, CMS will allocate any DDVC collected from noncompliant issuers among the compliant and exempt issuers in the same benefit year risk pool(s) in proportion to their respective market shares and RA transfer amounts for the benefit year being audited for HHS-RADV |
| 6 | **DDVC publication and clarification** | Section 2.2.2 (Default Data Validation Charge) | P. 15 | • Clarified that CMS will publish DDVC data in the August 1 report<br>• Clarified that the DDVC is separate from the RA transfer amount for the benefit year, and an issuer may owe both a RA charge and a DDVC |

| Item | Subject | Protocols Section Reference | Page # | Summarized Update |
|------|---------|---------------------------|--------|-------------------|
| 7 | **IVA Entities roles and responsibilities** | Section 4.3 (IVA Entities– Roles and Responsibilities) | P. 20 – 22 | • Updated to include IVA Entity's responsibility to perform RXC validation activities<br>• Clarified that CMS is not imposing a deadline for the issuer to complete the IVA Entity Designation Form and noted that the IVA Entity will not have access to the issuer's sample reports until the IVA Entity is designated by the issuer and accepted by CMS<br>• Described the responsibilities of the IVA Entity's "Medical Coders", "D&E/RXC Reviewers", and "IVA Entity SO and Backup SO" |
| 8 | **SVA Entity roles and responsibilities** | Section 4.4 (SVA Entity – Roles and Responsibilities) | P. 22 | • Updated to include SVA Entity's responsibility to perform RXC validation activities<br>• Described the responsibilities of the SVA Entity's "Medical Coders" and "D&E/RXC Reviewers" |
| 9 | **RADVPCE description** | Section 8.3 (RADV Sampling Reports)<br><br>Appendix L (Glossary of Terms, Acronyms, and Definitions) | P. 40 – 42<br>P. 175 – 180 | • Added a description of the RADV Pharmacy Claims Extract (RADVPCE) Report, new for the 2018 benefit year, which contains all active RXC eligible pharmacy claims that were submitted by the issuer for each adult enrollee with RXCs included in the RADV IVA sample |
| 10 | **RXC validation** | Section 1.1 (Purpose)<br><br>Section 9.2 (Process Overview and Audit Execution)<br><br>Section 9.7 (Phase 4 – RXC Validation) | P. 7<br>P. 49 – 50<br>P. 60– – 67 | • Defined and inserted the RA Prescription Drug Categories (RXC) data validation into the audit process<br>• Added new guidance for validating enrollee RXC data elements and indicated that beginning with the 2018 benefit year HHS-RADV, IVA Entities will be required to validate the RXCs of enrollees in the IVA sample |
| 11 | **Screenshot automation** | Section 9.3.2.1 (Screenshot Automation) | P. 52 | • Updated guidance to indicate that if the issuer and IVA Entity elect to utilize an automated screenshot process, the listed guidelines in the Protocols would be recommended but not required for the 2018 benefit year |
| 12 | **Single file mapping documentation** | Section 9.4 (Phase 1 – Creating Mapping Documentation – Issuer) | P.53 – 56 | • Updated to require that issuers create and IVA Entities submit at minimum one (1) mapping document containing all required data elements. |

| CMS RADV Protocols Updates Log – Major Updates | | | | |
|---|---|---|---|---|
| Item | Subject | Protocols Section Reference | Page # | Summarized Update |
| 13 | **Medical record claim linkage and statement covers from/ through dates** | Section 9.8 (Phase 5 – Health Status Data Validation)<br><br>Section 9.8.6 (Acceptable Date of Medical Record Claim) | P. 68 – 89<br>P. 73 | • Updated all references to the medical record claim linkage to indicate that the claims statement covers from/through date must align to at least one (1) of the dates of service found on the medical record |
| 14 | **Professional Judgment** | Section 9.8.4 (Key Considerations of Medical Record Intake) | P. 72 – 73 | • Clarified guidance on situations where the IVA Entity should submit a medical record workpaper detailing the professional judgment used |
| 15 | **Medical record chart retrieval** | Section 9.8.1 (Medical Record Chart Retrieval) | P. 69 – 70 | • Updated Provider Medical Record Request Memo guidance to emphasize the need for providers to submit all progress notes and discharge summaries, if applicable, for the enrollee under review to the issuer<br>• Clarified that the Medical Record Request Memo should not be submitted with the enrollee's medical record as part of the IVA results submission |
| 16 | **Inpatient cross-year medical record workpaper** | Section 9.8.6.1 (Inpatient Considerations) | P. 74 | • Clarified guidance related to professional claims documented within inpatient medical records and a discharge date outside of the benefit year<br>• Guidance provided to allow issuers and IVA Entities to identify standalone professional service claims and how to identify and document these claims to allow diagnoses to be abstracted and considered within the current benefit year |
| 17 | **Updated list of recommended documents for abstraction** | Section 9.8.9 (Recommended Documents for Medical Record Abstraction) | P. 80 | • Added clarifying language to indicate that certain medical records on their own **cannot** be used to substantiate a diagnosis and that the listed reports in conjunction with a valid medical record can help substantiate a diagnosis |

| Item | Subject | Protocols Section Reference | Page # | Summarized Update |
|---|---|---|---|---|
| 18 | **Electronically sent signature attestations** | Section 9.8.11.1 (Medical Record Attestations) | P. 82 | • Updated guidance to indicate that signature attestation forms can be sent to a provider and electronically populated, signed, and returned to the IVA Entity, issuer or other party requesting the record on behalf of the issuer |
| 19 | **Abstraction coding** | Section 9.8.12 (Abstraction Coding) | P. 83 – 86 | • Explained that CMS cannot provide specific coding guidance beyond what is in the Protocols<br>• Added reference to Appendix D (ICD-10-CM Official Guidelines for Coding and Reporting) and Appendix E (Lifelong Permanent Conditions) for additional coding guidance and considerations |
| 20 | **Key Considerations for Medical Record Abstraction** | Section 9.8.13 (Key Considerations for Medical Record Abstraction – New HCC Findings with Positive Risk Score Impact) | P. 86 – 89 | • Updated to clarify the impact of new diagnosis codes on the calculation of an issuer's HCC group failure rates |
| 21 | **Senior coder requirements to review primary coder records** | Section 10.3 (IRR Process) | P. 91 – 93 | • Defined that CMS does not require one (1) senior coder to review all of a single primary coder's records for IRR purposes<br>• Clarified that multiple senior coders can be utilized to review a primary coder's IRR eligible records |
| 22 | **Pairwise Test** | Section 11.2.1 (Pairwise Test between SVA and IVA) | P. 95 – 98 | • Provided additional detail concerning pairwise means test results from incremental SVA subsample expansion<br>• Clarified that if the issuer is found to be an outlier, the results will also be used to calculate the issuer's risk score error rate, which will be applied to the issuer's RA covered plan data |

The table title spanning top: **CMS RADV Protocols Updates Log – Major Updates**

| CMS RADV Protocols Updates Log – Major Updates | | | | |
|---|---|---|---|---|
| Item | Subject | Protocols Section Reference | Page # | Summarized Update |
| 23 | Exiting issuers | Section 11.3 (Error Estimation) | P. 98 – 100 | • Provided additional detail to describe positive and negative outlier status<br>• Provided clarifying verbiage to define "exiting issuer" in accordance with 2020 Payment Notice. Indicated that if an issuer only exits some of the markets or risk pools in the state, but continues to sell or offer new plans in other states, then it would not be considered an exiting issuer |
| 24 | Applying HHS-HCC Hierarchies | Section 11.3.1.1 (Applying HHS-HCC Hierarchies) | P. 101 | • Described the process of applying HHS-HCC hierarchies to all final diagnoses |
| 25 | Error Estimation Example refresh | Section 11.3.4 (Illustration of the Pairwise and Error Estimation Processes) | P. 106 – 113 | • Updated the example with HCC data and aligned to example data to be consistent with the 2018 DIY software tables |
| 26 | Discrepancy Reporting and Administrative Appeals | Section 12 | P. 114 – 118 | • Updated guidance, timeline, and process details for the 2018 benefit year to align with payment year activities and requirements<br>• Provided process detail for the 1st Discrepancy Window: *HHS-RADV SVA Findings Attestation and Discrepancy Reporting Process*. Clarified that only issuers who have insufficient agreement between the IVA and SVA pairwise means test analysis need to complete this attestation and discrepancy reporting process during the first discrepancy window<br>• Provided process detail for the 2nd Discrepancy Window: *HHS-RADV Error Rate Calculation Attestation and Discrepancy Reporting Process*. Clarified that all issues must complete the attestation and discrepancy reporting process during the 2nd discrepancy window<br>• Updated the Attestation and Discrepancy Reporting Process Table to describe the issuers eligible to participate and the action required by eligible issuers for each discrepancy window and major process |
| 27 | D&E Documentation Examples | Appendix A (2018 Benefit Year D&E Documentation Examples) | P. 120 – 124 | • Provides D&E documentation examples including mapping documentation, source system screenshot, and workpaper |

| \multicolumn{5}{c}{CMS RADV Protocols Updates Log – Major Updates} |
|---|---|---|---|---|
| Item | Subject | Protocols Section Reference | Page # | Summarized Update |
| 28 | D&E Subsample Data Elements | Appendix B (D&E Subsample Data Elements) | P. 125 – 129 | • Lists sampling D&E subsample data elements listed in Section 5.5.1.1 (Validating Data Elements – Additional Detail) of the 2017 Benefit Year HHS-RADV Protocols |
| 29 | Final Drug Diagnosis Pairs for the 2018 RXC Adult Model | Appendix C (Final Drug Diagnosis (RXC-HCC) Pairs for the 2018 Adult Model | P. 130 – 131 | • Provides drug diagnosis (RXC-HCC) pairs chosen for the hybrid RA Models |
| 30 | Lifelong Permanent Conditions | Appendix E (Lifelong Permanent Conditions) | P. 133 – 136 | • New for the 2018 benefit year HHS-RADV, CMS has provided specific guidance for the abstraction of lifelong permanent health conditions, and has eliminated the 'Chronic Condition HCC' list of the 2017 benefit year HHS-RADV Protocols |
| 31 | Guidance to Coders | Appendix F (Guidance to Coders) | P. 137 – 142 | • Expanded on acceptable medical record signature guidance from Table 6 - Allowable Provider Signature Types and Table 7 - Allowable Signature Types from Section 5.6.10 (Acceptable Medical Record Signature)<br>• Updated to remove National Provider Identifier (NPI) verbiage and update guidance for attesting the provider's credentials |
| 32 | Examples of Applying HHS-HCC Hierarchies | Appendix G (Examples of Applying HHS-HCC Hierarchies) | P. 148 | • New appendix providing examples of applying HHS-HCC hierarchies |
| 33 | Error Estimation Examples | Appendix H (Error Estimation Examples) | P. 149 – 160 | • Updated examples with HCC data and aligned to example data to be consistent with the HHS-RADV 2018 DIY table |
| 34 | IRR Scenarios | Appendix I (IRR Scenarios) | P. 161 – 163 | • Lists IRR scenarios from Section 6.5 (IRR Scenarios) from the 2017 Benefit Year HHS-RADV Protocols |
| 35 | Application of Risk Score Error Rates for Issuers Exiting the Market | Appendix J (Application of Risk Score Error Rates for Issuers Exiting the Market) | P. 164 | • New appendix providing examples explaining the impact on risk score adjustments for issuers exiting the market |
| 36 | Updates Log | Appendix K (Updates Log) | P. 165 – 172 | • New appendix providing a list of major updates in the 2018 Benefit Year HHS-RADV Protocols |

| CMS RADV Protocols Updates Log – Major Updates | | | | |
|---|---|---|---|---|
| Item | Subject | Protocols Section Reference | Page # | Summarized Update |
| 37 | Provider Signature Attestation Date | 9.8.11.1 and Appendix F (Medical Record Attestation) | P. 82 & 137 – 147 | • Clarified signature attestation date requirement |
| 38 | RXC Data Element | 9.7.4 RXC Validation Steps | P. 65 – 68 | • Removed service code qualifier from the RADVMCE required data elements |
| 39 | Lifelong Permanent Conditions | Appendix E | P. 133 – 136 | • Clarified Lifelong Permanent Conditions requirement |
| 40 | Diagnosis Validation | 9.8.9 Recommended Documents for Medical Record Abstraction Submission | P. 80 | • Clarified requirement |
| 41 | Medical Record and Chart Retrieval | 9.8.1 Medical Record and Chart Retrieval | P. 69 – 70 | • Clarified requirement |
| 42 | Medical Record Signature | 9.8.11 Acceptable Medical Record Signature | p. 81 & 82 | • Clarified requirement |

# Appendix L: Glossary of Terms, Acronyms and Definitions

| Term | Acronym | Definition |
|------|---------|------------|
| Acceptable Risk Standards | ARS | CMS guidance to its contractors as to the minimum level of required security controls that they must implement to protect CMS information and information systems. |
| Advanced Premium Tax Credit | APTC | Eligible consumers may use an Advanced Premium Tax Credit through the Exchange to lower their monthly health insurance premium. |
| Agency for Healthcare Research and Quality | AHRQ | The Agency for Healthcare Research and Quality is the lead federal agency charged with improving the safety and quality of America's health care system. |
| American Academy of Professional Coders | AAPC | The American Academy of Professional Coders is a national medical coding training and certification association. |
| American Health Information Management Association | AHIMA | The American Health Information Management Association is an association of health information management professionals. |
| American Hospital Association | AHA | The American Hospital Association is the national organization that represents and serves all types of hospitals, health care networks, and their patients. |
| Center for Consumer Information and Insurance Oversight | CCIIO | The Center for Consumer Information and Insurance Oversight is charged with helping implement many reforms of the Affordable Care Act, the historic health reform bill that was signed into law March 23, 2010. CCIIO oversees the implementation of the provisions related to private health insurance. In particular, CCIIO is working with states to establish new Health Insurance Marketplaces. CCIIO works closely with the state regulators, consumers, and other stakeholders to ensure the Affordable Care Act best serves the American people. |
| Centers for Medicare & Medicaid Services | CMS | Centers for Medicare and Medicaid Services is a federal agency within the United States Department of Health and Human Services that administers the Medicare program and works in partnership with state governments to administer Medicaid, the State Children's Health Insurance Program, and health insurance portability standards. |
| Chief Executive Officer | CEO | A chief executive officer is the highest-ranking person in a company, organization or other institution that is ultimately responsible for managerial decisions. |
| Chief Financial Officer | CFO | A chief financial officer is a senior executive with responsibility for the financial affairs of a company, organization or other institution. |
| Chronic Obstructive Pulmonary Disease | COPD | Chronic Obstructive Pulmonary Disease is a medical condition involving the constriction of the airways and difficulty or discomfort in breathing. |
| Civil Money Penalties | CMP | A civil monetary penalty is a monetary penalty the Centers for Medicare & Medicaid Services may impose for noncompliance. |

| Term | Acronym | Definition |
|---|---|---|
| Coordinator | CO | Issuers and Initial Validation Audit Entities identify a representative within their organization to conduct certain HHS_RADV activities. |
| Conflict of Interest | COI | A situation that has the potential to undermine the impartiality of a person, company or organization because of the possibility of a clash between the person's self-interest and professional interest or public interest. |
| Confidence Level | CL | The confidence level is the probability that the value of a parameter falls within a specified range of values. |
| Congestive Heart Failure | CHF | Congestive Heart Failure is a medical condition involving weakness of the heart that leads to a buildup of fluid in the lungs and surrounding body tissues. |
| Cost-sharing Reduction | CSR | Cost-sharing Reductions are discounts for eligible consumers through the Exchange that lowers the dollar amount of health insurance deductibles, copayments, and coinsurance. |
| Current Procedural Terminology/ Healthcare Common Procedure Coding System | CPT/HCPCS | CPT/HCPS® codes are the United States' standard for how medical professionals document and report medical, surgical, radiology, laboratory, anesthesiology, and evaluation and management (E/M) services. |
| Date of Birth | DOB | The month, day and year a person was born. |
| Date of Service | DOS | A medical record date of service defines when an enrollee received medical treatment from a physician, permitted provider, medical facility, or telehealth visit |
| Demographic & Enrollment | D&E | Demographic & Enrollment data describes an enrollee's demographics and enrollment status. |
| Diabetes Mellitus | DM | Diabetes Mellitus is a medical condition is which the body's ability to produce or respond to the hormone insulin is impaired, resulting in abnormal metabolism of carbohydrates and elevated levels of glucose in the blood and urine. |
| Do It Yourself | DIY | The Do It Yourself Software is a tool that includes SAS software and the Department of Health and Human Services Developed RA Model Algorithm. The software instructs issuers how to simulate their enrollee populations' benefit year risk scores within the RA model. This software is only as supplemental guidance for issuers to better understand and simulate the calculation of plan liability risk scores for their enrollees. |
| Extensible Markup Language | XML | A markup language that defines a set of rules for encoding documents in a format that is both human-readable and machine readable. |
| External Data Gathering Environment | EDGE | Issuers in states where HHS operates a RA program are required to submit enrollment, pharmaceutical claims and medical claim information on enrollees from issuers' proprietary systems to an issuer-distributed data collection server (also known as an EDGE server). An EDGE server runs HHS-developed software designed to verify submitted data, execute RA processes and submit summary reports to CMS. |
| EDGE Server Business Rules | ESBR | The EDGE Server Business Rules defines the rules under which data is submitted to EDGE servers. |

| Term | Acronym | Definition |
|------|---------|------------|
| Finite Population Correction | FPC | The Finite Population Correction factor is used to define both the standard error of the mean and the standard error of the proportion. |
| Health and Human Services | HHS | The U.S. Department of Health & Human Services mission is to enhance and protect the health and well-being of all Americans. We fulfill that mission by providing for effective health and human services and fostering advances in medicine, public health, and social services. |
| Health Insurance Oversight System ID | HIOS ID | ID assigned by HIOS to a validated insurance issuer. HIOS was created to facilitate several types of data collections from the Department of Insurance for states/territories as well as insurance issuers that sell health insurance coverage. The collected data is aggregated with other data sources and made public on the consumer-facing website. |
| Health Insurance Portability and Accountability Act | HIPPA | The Health Insurance Portability and Accountability Act is a federal law that was enacted in 1996 that protects continuity of health coverage when a person changes or loses a job, that limits health plan exclusions for preexisting medical conditions, that requires patient medical information be kept private and secure, that standardizes electronic transactions involving health information, and that permits tax deduction of health insurance premiums by the self-employed. |
| Hierarchical Condition Category | HCC | Hierarchical Condition Category coding is a payment model that identifies health conditions documented by health professionals and assigns a risk score factor. |
| History of Present Illness | HPI | The History of Present Illness refers to a detailed interview prompted by a presenting symptom that documents the history of that presenting symptom. |
| Human Immunodeficiency Virus | HIV | Human Immunodeficiency Virus is a medical condition that damages the immune system and can lead to acquired immunodeficiency syndrome. |
| Information Security | IS | Information security is the practice of preventing unauthorized access, use, disclosure, disruption, modification, inspection, recording or destruction of information. It is a general term that can be used regardless of the form the data may take (e.g. electronic, physical). |
| Initial Validation Audit | IVA | Validation audit of enrollment and health status data submitted by the issuer to HHS for RA-covered plans. This audit is conducted by an independent audit entity hired by the issuer. Findings from the IVA must be submitted to CMS for review during the Second Validation Audit. |
| International Classification of Diseases, Clinical Modification, Tenth edition | ICD-10-CM | The National Center for Health Statistics is a federal agency responsible for the use of The International Classification of Diseases, Clinical Modification, Tenth Edition and has developed a clinical modification of the classification for morbidity purposes. |
| Internal Revenue Service | IRS | The Internal Revenue Service is the nation's tax collection agency and administers the Internal Revenue Code enacted by Congress. |
| Inter-Rater Reliability | IRR | Inter-Rater Reliability is a process to determine the accuracy of the abstraction diagnoses by Primary Coders when compared to Senior Coders. |

| Term | Acronym | Definition |
|---|---|---|
| Medication Administration Record | MAR | The Medication Administration Record serves as a legal medical record of drugs administered to a patient. |
| National Center for Health Statistics | NCHS | The National Center for Health Statistics is a federal agency within the United States Centers for Disease Control. |
| National Drug Code | NDC | The National Drug Code or NDC is a unique numeric identifier given to each medication listed under the Drug Listing Act of 1972 |
| Non-EDGE Claim | NEC | A claim that is not present in the RA Data Validation Medical Claim Extract Report generated by the EDGE server. |
| Office of Federal Contract Compliance Programs | OFCCP | The Office of Federal Contract Compliance Programs is part of the U.S. Department of Labor. OFCCP is responsible for ensuring that employers doing business with the federal government comply with the laws and regulations requiring nondiscrimination. |
| Office of Inspector General | OIG | The Office of Inspector General's protects the integrity of Department of Health & Human Services programs as well as the health and welfare of program beneficiaries. |
| Office of Management and Budget | OMB | The Office of Management and Budget serves the President of the United States in overseeing the implementation of his vision across the Executive Branch. Specifically, OMB's mission is to assist the President in meeting his policy, budget, management and regulatory objectives and to fulfill the agency's statutory responsibilities. |
| Past Medical History | PMH | In a medical encounter, a past medical history is the total sum of a patient's health status prior to the presenting problem. |
| Patient Protection and Affordable Care Act | PPACA | The PPACA reforms certain aspects of the private health insurance industry and public health insurance programs, including increasing insurance coverage of pre-existing conditions and expanding access to insurance to Americans. |
| Payment Error Rate Measurement | PERM | The Payment Error Rate Measurement program measures and reports a national improper payment rate for Medicaid and the Children's Health Insurance Program. |
| Personally Identifiable Information | PII | Personally Identifiable Information is information that identifies or describes an individual, including but not limited to name, address, telephone number, social security number, credit card number, and personal characteristics that make the individual's identity easily discoverable. |
| Portable Document Format | PDF | A Portable Document Format is a file format that provides an electronic image of text, or text and graphics that looks like a printed document and can be viewed, printed, and electronically transferred. |
| Protected Health Information | PHI | Any information about health status, provision of health care, or payment for health care that is created or collected by "Covered Entity" and can be linked to a specific individual. |
| Registration for Technical Assistance Portal | REGTAP | The Registration for Technical Assistance Portal is used by the Centers for Medicare & Medicaid Services to provide technical assistance and training related to Exchange and Premium Stabilization program guidance and operations. |

| Term | Acronym | Definition |
|------|---------|------------|
| Risk Adjustment | RA | The Risk Adjustment program is a premium stabilization program established by the Patient Protection and Affordable Care Act. The overall goal of RA is to eliminate premium differences among plans based solely on favorable or unfavorable risk selection in the individual and Small Group Markets both inside and outside of the Marketplace. RA accomplishes this by transferring funds from issuers with lower risk enrollees to plans with higher risk enrollees. |
| Risk Adjustment Default Charge | RADC | Under 45 CFR §153.740(b), if an issuer of a RA covered plan fails to establish an EDGE server or fails to provide HHS with access to the required data on the EDGE server, such that CMS cannot apply the federally certified RA methodology, a default risk adjustment charge will be assessed. |
| Risk Adjustment Data Validation | RADV | Risk Adjustment Data Validation is an HHS-established data validation process to validate a statistically valid sample of enrollment and health status data submitted by issuers of risk adjustment covered plans. |
| Risk Adjustment Risk Score Details | RARSD | The Risk Adjustment Risk Score Details Report contains the risk score result. |
| Risk Adjustment Data Validation Detailed Enrollee Report | RADVDE | Risk Adjustment Data Validation Detailed Enrollee Report contains enrollee-level data for each enrollee selected for the RADV IVA sample such as the sampled enrollee's risk score, demographic, and health status information. |
| Risk Adjustment Data Validation Enrollment Extract Report | RADVEE | Risk Adjustment Data Validation Enrollment Extract Report contains all active enrollment data that was submitted by the issuer for each enrollee included in the RADV IVA sample. |
| Risk Adjustment Data Validation Initial Validation Audit Statistics | RADVIVAS | The Risk Adjustment Data Validation Initial Validation Audit Statistics Report contains the sample statistics calculated at the strata-level for the enrollees selected for the Risk Adjustment Data Validation Initial Validation Audit sample. The report is similar in layout to the Risk Adjustment Data Validation Population Summary Statistics Report, but limited to the enrollees selected for the IVA sample. |
| Risk Adjustment Data Validation Medical Claims Extract Report | RADVMCE | The Risk Adjustment Data Validation Medical Claims Extract Report contains all active RA eligible and/or RXC eligible medical claims that were submitted by the issuer for each enrollee included in the RADV IVA sample. The report contains claim line information of the active RA eligible claims from sampled enrollees. |
| Risk Adjustment Data Validation Supplemental Extract | RADVSE | The Risk Adjustment Data Validation Supplemental Extract Report contains all active supplemental records for active Risk Adjustment eligible medical claims that were submitted by the issuer for each enrollee included in the Risk Adjustment Data Validation Initial Validation Audit sample. |

| Term | Acronym | Definition |
|------|---------|------------|
| Risk Adjustment Data Validation Population Summary Statistics | RADVPS | The Risk Adjustment Data Validation Population Summary Statistics Report contains population statistics for the issuer's total population separated into sub-categories, or "strata," based on enrollee age (infant, child, adult) and risk score (low, medium, high). The RADVPS Report provides issuer level data, including total enrollees and plans, number of enrollees in each risk pool market (individual, small group, catastrophic), strata-level data (including number of enrollees in each of the specific stratum), and summary statistics for each of the specific stratum, including mean (average), minimum (min), and maximum (max) risk scores for enrollees in the stratum. |
| Risk Adjustment Data Validation Population Summary Statistics Final | RADVPSF | The Risk Adjustment Data Validation Population Summary Statistics Final Report contains the same data elements as the Risk Adjustment Data Validation Population Summary Statistics Report (as listed above), but is generated by the Risk Adjustment Data Validation Report command after the RA transfer calculation and the Issuer Reference Table is populated with risk pool markets included in the RADV sampling logic (RADV population). The new report removes markets in which the issuer is the only issuer in that risk pool market within a state, limiting the report to risk pool markets that are included in the RADV population. |
| Risk Adjustment Data Validation Pharmacy Claims Extract | RADVPCE | This report contains all active RA eligible pharmacy claims that were submitted by the issuer in the pharmacy claim XML for each enrollee included in the RADV IVA sample. |
| Risk Adjustment Prescription Drug Categories | RXC | Beginning with the 2018 benefit year, RXCs will be utilized in the risk adjustment (RA) program to calculate an adult enrollee's risk score. As a result, IVA Entities will be required to validate the RXCs of sampled enrollees. |
| Second Validation Audit | SVA | CMS contracts with an approved vendor which performs an independent, third-party audit for CMS of the IVA Entity Audit results. |
| Senior Official | SO | Issuers and Initial Validation Audit Entities identify a representative Senior Official within their organization to conduct certain HHS-RADV activities. |
| Subjective, Objective, Assessment, and Plan | SOAP | The SOAP note is an optional method for medical record documentation utilized by some clinicians. |
| Third-Party Administrator | TPA | A third-party administrator is an organization that processes insurance claims or certain aspects of employee benefit plans for a separate entity. |
| Unique Enrollee Identification | UID | The unique enrollee identification is a number associated with a specific enrollee to use as an identifier without sharing personally identifiable information. |

# EXHIBIT X



# Achieving Coding Consistency

By Chris Dimick

---

*Even small departments may never experience complete harmony in their assignment of codes, but they have good motivation for achieving as much consistency as they can. Training, communication, monitoring, and coding reviews help reach that goal, HIM experts say.*

---

Coding manager Julie Bajer recently asked six different coders on her team the same coding question-and got six different answers. Each of the answers was correct.

Coding professionals know that the act of coding is not black and white-there is room for interpretation. A coder's background and training, among other factors, will greatly influence the way he or she assigns codes.

"Coding is much more of an art than it is a science," says Bajer, MSA, RHIA, CCS-P, the HIM operations coding manager at Group Health Cooperative, based in Seattle, WA. "So [coding professionals] definitely have a lot of room for interpretation."

And while varying interpretations may each be legitimate, maintaining consistency in the way individuals code is a high priority in coding departments. If coders get out of synch in the logic they apply in coding, the inconsistency can lead to lowered facility reimbursement, possible audits, and even affect patient care.

Achieving consistency can be a struggle for small facilities and large enterprises alike. Whether six coders work side by side within a department or 26 coders work remotely across several facilities, training, communication, monitoring, and reviews will help keep coding consistent, say HIM experts.

## The Persistency of Inconsistency

Coder interpretation is a large factor in inconsistency.

"There is some subjectivity in coding, so I think you can have two coders code the same encounter differently," says Kathy Dorale, RHIA, CCS, CCS-P, the vice president of health information management at Avera Health, based in Sioux Falls, SD. "It disturbs me when people think they are a coder after learning a little bit about it. They tend to think it's like using a dictionary-not that difficult.

"However, a coder doesn't just use books and resources, they also have to use their head, use their logic, their common sense, to make some decisions." Other factors that cause coders in a department to code inconsistently are their exposure to different methods of training in school, habits they picked up at previous jobs, and a lack of understanding certain updates or rule changes.

Copyright © 2010 by The American Health Information Management Association. All Rights Reserved.

Exhibit X
Page 514

Subjectivity aside, the biggest reason for inconsistency is a lack of universal education on certain aspects of coding.

For example, if a coder is unclear on coding rules or does not feel the need to seek additional information when necessary, inconsistency can occur, according to Carolynn Childs, BA, RHIT, coding manager at Mercy Medical Center in Des Moines, IA.

In this case, the coder is not coding to the more specific diagnosis, which can affect reimbursement, quality measurement, and patient care. "Consistency is a high priority [at Mercy] because we don't want denials," Childs says. "We want everyone coding consistently and having the same information so that our bills get paid accurately."

Inconsistent coding could be an indication that a facility's coders are not assigning the proper codes or are undercoding, which leads to lower reimbursement.

Reviewers who find inconsistent coding within a facility may be more apt to investigate further and deny claims, Dorale says. For example, if coders are using modifiers incorrectly, that could raise a red flag to Centers for Medicare and Medicaid Services auditors, Bajer says.

From a managerial perspective, coders who code accurately and consistently can better help each other in their work, Bajer says.

"If they are all coding the same way they can answer each other's questions the same way, or I can answer their questions and know they are all getting the same information," she says.

---

### Computer-assisted Coding Improves Consistency

Coding automation tools such as computer-assisted coding (CAC) can be used to improve coding consistency.

Without CAC, coders code off the chart from scratch. With CAC, the application selects codes that coders then review and possibly edit. The coders take on more of an auditing role.
Since the CAC system offers consistent codes, there is less room for human error and diversion, says Kozie Phibbs, MS, RHIA, the territory sales manager with CAC vendor Digital Voice Systems, based in Tampa, FL.

Of course, auditing CAC-suggested codes is an integral part of using CAC. Judgment calls made by coding professionals are still a factor in determining correct codes, but CAC makes the automated code referral process more consistent within a coding department.

CAC also enables coders to expand their auditing capabilities, Phibbs notes. CAC can be used to analyze vast amounts of coded data and look for trends in coding inconsistency. The system can show managers how coders are changing or auditing computer-recommended codes. If upon review these changes are determined to be errors, the manager can pull the electronic information and use it to train the entire department.

Having watched the technology in use over time, Phibbs has seen a trend of fewer inconsistencies in coding. "[Users of CAC] are getting fewer denials, fewer charts are being bounced back from the billing department, and auditing is coming in and they are seeing that the numbers just aren't as skewed as they used to be," she says.

---

Copyright © 2010 by The American Health Information Management Association. All Rights Reserved.

Exhibit X
Page 515

## Ensure Consistent Training

The best way to ensure coding consistency is through the even and routine disbursement of information and education among a coding team, as well as regular audits and coding reviews, Dorale says.

If all coders receive the same education and training, in theory they will all approach coding in the same way and remain consistent.

Avera Health is a large integrated health system in the northern Midwest, consisting of dozens of clinics and 28 hospitals across five states. Dorale works in the system's central office, providing HIM and coding support to Avera's healthcare facilities.

As part of their corporate services, Dorale and her staff work with Avera's 72 hospital coders and dozens of clinic coders to provide compliance reviews and ensure they remain consistent in their coding.

Maintaining consistency across a multistate healthcare system can be challenging, Dorale admits. Her main tools are organization-wide education sessions, compliance reviews, and open communication.

Each year Dorale's staff educates the entire system on coding changes, such as CPT updates and ICD-9 revisions. If any coding rule changes pop up throughout the year, Dorale will compile them and send off an educational update to Avera's coders.

The system-wide training sessions ensure all coders receive updated information at the same time, therefore maintaining consistency.

Throughout the year as coding and billing guidelines change, Dorale will send out e-mail blasts informing HIM directors, business office staff, compliance officers, and coders of the changes.

Maintaining coding consistency sometimes requires one-on-one training. Stumped Avera coders can send coding questions to Dorale's central office staff, which strives to provide an answer within 24 hours. Centralizing answers in this way ensures the same responses are given when similar questions come in from across the system.

If Dorale's team remains consistent in the training and information they provide, by extension so will the coders when it comes time to use that training on the job.

When inconsistency between coders is the result of one person coding incorrectly, proper education can close the gap.

Audio seminars are a big part of the training at Mercy Medical Center. Coding staff are required to attend the sessions, which Mercy purchases about seven times a year. These updates keep staff consistent by ensuring everyone has the most up-to-date information, Childs says.

## Audit to Identify Inconsistencies

An important tool for ensuring coding consistency at Avera has been regular site visits conducted by Dorale and the central office staff. The corporate HIM department reviewers visit Avera hospitals and clinics on a routine basis to review chart documentation, coding, and billing practices.

Copyright © 2010 by The American Health Information Management Association. All Rights Reserved.

Exhibit X
Page 516

834
Exhibit 3

At the end of a review, the reviewers meet with the facility coders to provide guidance on how to improve their coding. A written report is also sent, which coding managers can use to further guide their staff. Since every facility is reviewed, reviewers get a sense of the common inconsistencies and mistakes made among coders in various states. If a trend is identified, Avera central office staff will put out a system-wide communication instructing all facilities on how to correct the problem.

"If I come back to a facility on a follow-up visit and see the same error over and over again, I will know the coder is not grasping the coding rule. At that point, I will take the opportunity to spend more time with the coders to ensure they understand the rationale behind the coding rule," Dorale says. "The mere fact that we share across all facilities, across different states, and across different contractors who might have different rules, I think helps us be consistent and code correctly."

Site visits are particularly important when Avera contracts to manage a new facility. Regular reviews are conducted to ensure the coding is consistent and on par with the rest of the Avera facilities. The reviews "are there to help them learn and make sure they are doing things right," Dorale says. "We don't want them to be afraid when we come into their hospital. We want them to say, 'Oh, they are here to help us. Here are our questions. Have you been seeing this in other facilities?'"

Focused reviews are also conducted at Avera to ensure all coders are consistent. If the central office learns that a specific code or DRG is being heavily scrutinized by federal entities, they will pull records from each facility and see how that code is being processed. Central office staff will then produce a report on the results of the audit and share it with the affected hospitals and the entire system.

Providing widespread feedback helps reach staff who may have had a similar case in the past and wondered what to do, Dorale says.

Routine coding audits are a common way facilities check for coding consistency.

Quarterly coding audits are conducted at Group Health and West Boca Medical Center, based in Boca Raton, FL. Any inconsistencies or common mistakes that are revealed by the audits are shared at the organization's monthly coding meetings.

At Mercy Medical Center, a recent coding audit revealed that outpatient coders were not being consistent enough in identifying patient histories in their codes. For example, in coding for cardiac or coronary type diseases, coders were not picking up on patient history factors listed in the chart, such as smoking and diabetes.

As a result, Mercy developed informational training on the documents coders need to seek out in order to assign those particular codes consistently. A few months after the training, the audit was again conducted and showed coders had greatly improved, Childs says.

## Check Educational Sources

Some inconsistency between coders can be attributed to bad information.

Dorale notes that in the past, coding workshops run by unqualified coders have come to the South Dakota area. The information discussed there can be faulty, and if Avera coders attend, they may bring inaccurate information back to the system.

Staff from Dorale's department have attended seminars to monitor the guidance being shared. If something incorrect

Copyright © 2010 by The American Health Information Management Association. All Rights Reserved.

Exhibit X
Page 517

835
Exhibit 3

is promoted at the event, Dorale's staff will know to watch system-wide for the mistake to show up in their coders work.

Coding managers should monitor the sources their staffs use to obtain coding advice.

If staff is using untrustworthy resources for coding help, it could both throw off the coding consistency of their department and negatively impact reimbursement. "We always back up our guidance with rationale that comes from trusted and official resources," Dorale says.

At Group Health, which has 25 coders in the department, Bajer stresses to staff the importance of using credible references for coding. If one coder uses the Centers for Medicare and Medicaid Services Web site for coding guidance while another uses a coder's personal Web site, the information they will receive could be inconsistent, Bajer says.

## Keep Cheat Sheets Current

When Bajer started as coding manager at Group Health earlier this year, one of the first things she did was check the coding staff's personal "cheat sheets" to ensure they contained accurate, up-to-date, and consistent information.

Coders often keep coding rules, tips, and advice on a sheet they can readily access for help in coding. But if these sheets contain inaccurate information or vary between coders in a department, then coding will be both inaccurate and inconsistent. "All coders love their cheat sheets," Bajer says. "So I took a look at those to make sure they were correct."

Upon first review, many of the sheets contained out-of-date or inconsistent information, Bajer says. Correcting the sheets with the coders was a quick way to ensure more consistent coding among them.

Bajer's department is currently developing authorized cheat sheets that will be distributed to all coders, each specific to their area of coding. A staff member will be appointed to update the sheets as coding requirements change, as well as add additional information upon request.

At Mercy Medical Center, which has 17 coders, informational cheat sheets were inserted into the facility coding manual to help coders consistently interpret the code suggestions and documentation from specific staff physicians. This type of cheat sheet is especially useful in CPT coding, says Childs, Mercy's coding director, which relies on heavy interpretation of physician reports.

## Gather Staff for Discussions

Periodic staff meetings are a great way to ensure coding consistency, Bajer says. The meeting can be used to discuss common questions and relay advice the entire team can use.

Coding meetings take place every month at Group Health, where various topics are discussed. In March, a physician discussed evaluation and management documentation, which gave the staff shared insight into how documentation reflects actual clinical care.

At Mercy Medical Center, bimonthly coding roundtables are used to address coders' questions and ensure coding consistency. The meetings serve as a forum where coders can get perspective from their peers by asking questions such as "I've coded this case this way-is that correct? Do you code it in a different way?" Childs says.

Copyright © 2010 by The American Health Information Management Association. All Rights Reserved.

Exhibit X
Page 518

836
Exhibit 3

Outside of the meeting, staff members are encouraged to discuss questions with each other and send feedback on the unfamiliar issues they experience. Childs then shares these experiences, along with commentary on the right way to code, with the entire group.

## Promote Open Communication, Centralize Answers

Open communication might be the simplest way to ensure coders in a healthcare facility remain consistent. Outside of staff meetings, coding departments find other ways to share questions and answers.

At Group Health, Bajer sends out a weekly coding newsletter to staff. In addition to general department information, she highlights common coding mistakes she has witnessed.

"If I see one or two coders making a mistake with their encoders, I will put it in the newsletter and say, 'Just keep in mind, when you are coding this type of chart, you need this code.'"

Monitoring questions helps disseminate consistent answers. When a coder comes upon some gray area in assigning codes, the urge may be to ask a coworker for advice. However, even though the coworker may provide the correct information, the information is only being passed from one person to another. Bajer encourages her staff to send all coding questions to her first. That way, she can ensure the advice given is consistent and based on official coding resources.

This reporting up of coding questions also allows the coding manager to monitor education needs. If many people have the same question, the coding manager can work the information into department-wide training.

Good communication is especially important when coders work remotely. Of the 25 coders at Group Health, 21 work from home. When coders are in-house, a coder with a question can stand up and ask their next-cube neighbor or walk into the manager's office for an answer. But staff working remotely often e-mail their questions, which may not convey a complete picture of the situation and the question, Bajer says. In addition, questions and answers exchanged via e-mail may not be passed along to other coders in the department.

Communication with physicians through queries is also essential to maintaining consistent coding, says Kristi Calin, CCS, a coder at West Boca Medical Center in Boca Raton, FL. One of 10 coders at her facility, Calin admits that "I can take my chart, code it one way one day and then the next day, code [it] a different way." The reason could be incomplete chart documentation.

For example, Calin says, take a chart documenting congestive heart failure and hypertension. There are different levels of congestive heart failure and different levels of hypertension that could change the code assigned, she says. "If there is not complete documentation, it can put that [code] on either side of the fence. That is where physician documentation really is what maintains our consistency with the coding."

When the coders at West Boca Medical Center come across a coding gray area, they are quick to query physicians for additional documentation or information. "I don't usually allow gray areas in coding, just because that is where we would get audited," Calin says.

This process gives the group a consensus on the proper code.

"Communication is a big part of being consistent," Calin says.

Copyright © 2010 by The American Health Information Management Association. All Rights Reserved.

Exhibit X
Page 519

837
Exhibit 3

---

**Tips for Keeping Consistent**

- **Ensure Consistent Training**
  Provide all coders with the same education and training; roll out information on updates to all staff at the same time
- **Audit to Identify Inconsistencies**
  Conduct regular audits or reviews; address inconsistencies and errors with focused training
- **Check Educational Sources**
  Monitor the sources staff use to obtain coding advice; ensure all coders use credible, official sources for guidance
- **Keep Cheat Sheets Current**
  Ensure staff's personal "cheat sheets" contain up-to-date and accurate information; consider creating authorized sheets for the facility's coding manual
- **Gather Staff for Discussions**
  Use periodic staff meetings to discuss common questions and relay consistent advice the entire team can use
- **Promote Open Communication, Centralize Answers**
  Encourage staff to send all questions to the coding manager, who can monitor trends and share the answers with the entire staff through newsletters, meetings, and specialized training if necessary

---

Chris Dimick (chris.dimick@ahima.org) is staff writer at *Journal of AHIMA*.

---

**Article citation**:
Dimick, Chris. "Achieving Coding Consistency" *Journal of AHIMA* 81, no.7 (July 2010): 24-28.

Copyright © 2010 by The American Health Information Management Association. All Rights Reserved.

Exhibit X
Page 520

# EXHIBIT Y



**Contract-Level Risk Adjustment Data Validation**

# Medical Record Reviewer Guidance

# As of 09/27/2017*

\* This guidance will be used for audits commencing after 09/27/2017.

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 521

## Contract-Level RADV Medical Record Reviewer Guidance

# Table of Contents

*Table of Contents* ................................................................................................................ 2

*Introduction* ...................................................................................................................... 5

   **Purpose** ............................................................................................................... 5

   **MA Organization Pre-Review of Submissions** .......................................................... 7

   **Submission Review upon Receipt for RADV** ............................................................. 7

      Table 1: Attestation Issues ............................................................................ 9

      Table 2: Submission Intake Issues .................................................................. 10

      Enrollee name does not match medical record .................................................... 11

      Multiple medical records submitted in a single medical record file ......................... 11

*Medical Record Review* ................................................................................................... 12

   **Signature and Credential Issues** ............................................................................. 12

      Table 3: Signature and Credential Issues .......................................................... 13

      No Signature  (or Initials) .............................................................................. 14

      Electronic Signatures ................................................................................... 15

      Unacceptable Electronic Signatures ................................................................ 16

      Point of Service EMR ................................................................................... 17

      Incomplete Electronic Signature ..................................................................... 17

      Other Signature Verification Documents ........................................................... 18

      Consultation Reports ................................................................................... 19

      Office Note Referencing Unsigned Dictated Report .............................................. 20

      Signature Stamp ......................................................................................... 20

      Signature Location ...................................................................................... 20

      Physician Initials ........................................................................................ 21

      Illegible Signature without Legible Credential .................................................... 21

      Other Credentials ....................................................................................... 22

   **Date Issues** ........................................................................................................ 23

      Table 4: Date Issues .................................................................................... 23

      Undated Visit ............................................................................................. 24

      Signature Date ........................................................................................... 24

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

## Contract-Level RADV Medical Record Reviewer Guidance

Lack of Discharge Date ................................................................................................................................. 24

Dictation Date ............................................................................................................................................... 24

Dates of Service outside Data Collection Period ......................................................................................... 25

Date Located On Encounter Label ............................................................................................................... 25

Referral Responses ....................................................................................................................................... 25

**Provider/Record Type Issues ................................................................................................................... 26**

Table 5: Provider Type/Record Issues ......................................................................................................... 26

Face to Face Visit ......................................................................................................................................... 27

Stand-alone Discharge Summary ................................................................................................................. 27

Non-face to face Visit .................................................................................................................................. 28

Diagnostic Testing (with or without interventional procedures) with acceptable provider interpretation ... 29

Technical Component Only ........................................................................................................................... 30

Clinical Laboratory Test Results .................................................................................................................. 31

Pathology Reports-with pathologist interpretation ....................................................................................... 31

Pathology Reports-laboratory test only ........................................................................................................ 32

Telephone or Telemedicine/Video Contact .................................................................................................. 32

Emergency Department (ED) ........................................................................................................................ 32

Observation Visits ........................................................................................................................................ 33

Problem Lists (within a medical record) ....................................................................................................... 34

Skilled Nursing Facility (SNF) .................................................................................................................... 35

Health Risk Assessments (HRAs) ................................................................................................................ 35

Referral Authorization Forms ...................................................................................................................... 35

Order Forms Documenting an Encounter ..................................................................................................... 36

Prescription Forms ....................................................................................................................................... 36

Certified Clinical Nurse Specialist .............................................................................................................. 37

Therapists ..................................................................................................................................................... 38

Other Specialties or Credentials .................................................................................................................. 38

Other Unacceptable Source Documents ....................................................................................................... 39

- List of ICD-9-CM codes ....................................................................................................................... 39

- Claim forms ........................................................................................................................................... 39

- Hospice care ........................................................................................................................................... 39

- Home Health .......................................................................................................................................... 39

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 523

842

Exhibit 3

## Contract-Level RADV Medical Record Reviewer Guidance

***Other Documentation Issues*** ............................................................................................................ **41**

   **Chronic and other additional diagnoses** ....................................................................................... **41**

      Underlying Conditions ........................................................................................................................ 42

      Previous Conditions .......................................................................................................................... 43

      Abnormal Findings ............................................................................................................................ 43

      Uncertain Diagnoses ......................................................................................................................... 43

      Other Physician Documentation ........................................................................................................ 44

      Table 6: Documentation Issues ......................................................................................................... 46

      No Exam, Reason for the Encounter, or Condition Documented ...................................................... 46

      Illegible Diagnosis – Handwriting ..................................................................................................... 47

      Illegible Diagnosis – Document Image .............................................................................................. 47

      Non-English Documentation ............................................................................................................. 47

      Abbreviation with Multiple Meanings ............................................................................................... 48

      Medical Record Amendments ........................................................................................................... 49

      Query Forms ...................................................................................................................................... 49

      Missing Pages .................................................................................................................................... 50

      Medical Record Documentation is Distorted or Obscured ................................................................ 50

      Medical Record Documentation is Too Dark or Too Light ................................................................ 50

      Pages or Margins of the Medical Record are Cut Off......................................................................... 50

***Appendix A: What Makes a Medical Record Invalid for RADV?*** ....................................................... **51**

***Appendix B1: Acceptable Physician Specialty Types Program Year (PY) 2014 – Numeric*** ................. **53**

***Appendix B2: Acceptable Physician Specialty Types PY 2014 – Alphabetic*** ..................................... **54**

***Appendix C: Glossary and Abbreviations*** .......................................................................................... **55**

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 524

# Contract-Level RADV Medical Record Reviewer Guidance

## Introduction

The Contract-Level Risk Adjustment Data Validation (RADV) Medical Record Reviewer Guidance has been created to provide information on the RADV medical record process. These guidelines are used by coders to evaluate the medical records submitted by plans to validate audited diagnoses. Centers for Medicare & Medicaid Services (CMS) is legislatively mandated to risk adjust Medicare Part C payments and report a Medicare Part C payment error rate. By regulation, CMS conducts annual RADV audits to ensure risk-adjusted payment integrity and accuracy. CMS' Contract-Level RADV audit initiative is the agency's primary strategy to address the payment error rate for the Medicare Advantage (MA) program. The RADV audit is conducted pursuant to regulations under 42 CFR § 422.310 – Risk adjustment data, section 422.310(e): "MA organizations and their providers and practitioners will be required to submit a sample of medical records for the validation of risk adjustment data, as required by CMS. There may be penalties for submission of false data."

CMS selects a subset of Part C contracts for each annual RADV audit cycle. Enrollees are sampled from each selected MA contract to estimate payment error related to risk adjustment. Once the enrollees have been selected, the MA Organization is required to submit medical records to support all CMS-Hierarchical Condition Categories (HCCs) in the sampled beneficiaries' risk scores for the payment year. For risk adjustment purposes, CMS refers to the MA model of disease groups as HCCs. The CMS-HCC assigned to a disease is determined by the International Classification of Diseases, Ninth Revision, Clinical Modification (ICD-9-CM) diagnosis codes submitted during the data collection period. Only selected diagnosis codes are included in the CMS-HCC model. The term "hierarchical" in HCC refers to the ranking of these disease groups, or "hierarchies," based on the relative factor (weight) assigned to the HCC. Hierarchies allow CMS to pay for only the most severe manifestation of a disease when diagnoses for less severe manifestations of a disease are also present in a beneficiary during the data collection year. A chart showing the HCCs involved in hierarchies for the 2014 calendar year, along with an example of how payments were made with a disease hierarchy, can be found on page 73 of the 2014 Rate Announcement.

MA Organizations may appeal eligible medical record review determinations and RADV payment error calculations for their selected contracts via an administrative appeals process. CMS regulations require MA Organizations to adhere to established RADV audit procedures and RADV appeals requirements. Failure to follow CMS rules regarding the RADV medical record review audit procedures and RADV appeals requirements may render the MA Organization's request for appeal invalid.

To validate the audited CMS-HCCs for sampled enrollees, the MA Organization must request medical records from hospitals (for Hospital Inpatient and Hospital Outpatient records) and physicians/practitioners (for Physician records) that provided services to the selected enrollees; this document will refer to those hospitals, physicians, and practitioners collectively as "providers."

## Purpose

This guidance focuses on areas impacting those RADV submissions with apparent documentation issues that could impact the validity of the medical record when submitting it to confirm an audited CMS-HCC. The lack of these validity elements will result in an error under the RADV medical record review process leading to a discrepancy for the audited CMS-HCC findings.

Each medical record correctly submitted with a matching sampled enrollee CMS coversheet is evaluated independent of all other submissions and is reviewed for both validity and diagnosis coding. The entire medical record is reviewed before making a final decision on validity and coding. Only coding results from valid medical record submissions are used in payment error calculations. It is critical to understand all guidance pertaining to these difficult documentation issues has to be considered on a case-by-case basis. The guidance and examples are not exhaustive in content. Topics, guidance, and actions have been included based on experience of prior RADV samples, but every medical record is unique in format, legibility, content, organization, etc.

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 525

844
Exhibit 3

# Contract-Level RADV Medical Record Reviewer Guidance

The reviewers must first apply their expertise in documentation and official coding guidelines to each scenario. This guidance is organized in tables addressing the validity of medical record submission and attestations regarding enrollee name, signature, credentials, date of service, provider type, and other documentation issues. This guidance does not give advice for specific diagnosis coding; it does not contradict the *ICD-9-CM Official Guidelines for Coding and Reporting*.

---

"These guidelines have been developed to assist both the healthcare provider and the coder in identifying those diagnoses and procedures that are to be reported. The importance of consistent, complete documentation in the medical record cannot be overemphasized. Without such documentation the application of all coding guidelines is a difficult, if not impossible, task." *ICD-9-CM Official Guidelines for Coding and Reporting, page 1.*

---

Important Resource: *ICD-9-CM Official Guidelines for Coding and Reporting* are found at https://www.cdc.gov/nchs/data/icd/icd9cm_guidelines_2011.pdf. This document includes ICD-9-CM Conventions (definitions of abbreviations, punctuations, symbols and terms), guidelines for each code range (primarily by body system) chapter, Reporting of Additional Diagnoses, and Diagnostic Coding and Reporting Guidelines for Outpatient Services.

CMS reiterates the purpose of those official guidelines.

At a minimum, medical records must meet the following requirements to avoid a discrepant finding:

- Correct beneficiary as provided on the CMS RADV coversheet
- Acceptable risk adjustment provider type, source, and physician specialty providing the face to face encounter
- Dates of service within the data collection period under review
- Valid signatures and credentials
  - For outpatient or physician encounters, a CMS-Generated RADV Attestation form may be submitted to authenticate (with signature and credential) the entries. The RADV Attestation form is provided with the MA Organization enrollee sample file. The attestation form is not for validating dates or diagnoses.
- Coded according to the official conventions and instructions provided within ICD-9-CM, the ICD-9-CM Official Guidelines for Coding and Reporting, and guidance provided in the "AHA Coding Clinic for ICD-9-CM" published quarterly by the American Hospital Association. Refer only to issue dates effective at the time of encounter.

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

## Contract-Level RADV Medical Record Reviewer Guidance

## MA Organization Pre-Review of Submissions

Once medical records are received from the providers, the MA Organization should review the records internally to determine if the record meets Risk Adjustment (RA) policies and if the documentation supports one or more of the audited CMS-HCCs. The MA Organization does not have the option to change or amend any medical record documentation at the time of the RADV. Requesting the provider change or amend a medical record at the time of the audit does not meet requirements for timely medical record completion made at or near to the provider encounter and may have legal implications. CMS understands the constraint when provider medical records are received incomplete or documented inadequately. Therefore, the RADV process, which is described in detail in submission instructions sampled MA Organizations receive, allows for multiple medical record submissions from multiple approved providers from any encounter date in the data collection period, even if that encounter was not previously submitted to Medicare.

The MA Organization must select at least one medical record to support each audited CMS-HCC being validated. For the purposes of RADV, a medical record is a single face to face encounter for physician/practitioner office and hospital outpatient visits or a single admission for hospital inpatient. The medical records must be selected from an inpatient (IP) hospital, outpatient (OP) hospital, or physician specialty that is acceptable for risk adjustment (see Appendix B: *CMS-HCCs and Physician Specialties*). The CMS Centralized Data Abstraction Tool (CDAT) generates a Medical Record Coversheet for each of the sampled enrollees. The coversheet includes pre-populated contract information and enrollee identification plus sections to designate the CMS-HCC(s) and date of service for the attached medical record. If the MA Organization finds more than one medical record (from multiple provider types and/or dates of service) to support a given audited CMS-HCC, a separate Medical Record Coversheet in CDAT must be completed for each medical record (i.e., a single date of service [Physician or Hospital Outpatient] or a single admission [Hospital Inpatient]).

When MA Organizations receive records from providers, they should:

* Verify both the CMS RADV Medical Record Coversheet enrollee name and date of birth for every record received
* Confirm all pages of every record are for the correct enrollee; if any page contains protected health information (PHI)/personally identifiable information (PII) of another person, remove that portion before attaching the medical record for submission into CDAT
* Confirm the date of service is clearly documented and within the data collection year
* Confirm the provider type, specialty, and face to face requirement is clearly documented
* If no attestation was received and the provider name and credential are not clear on the medical record, re-request the provider legibly indicate their name and credential and include another CMS RADV attestation form in the follow-up request

## Submission Review upon Receipt for RADV

Once the coversheets and medical records are submitted through CDAT, there is a process to perform an initial check on the submissions. This process is referred to as the intake process. The RADV intake reviewers will initially check that:

* The medical record submission is not completely blank
* The name on the Medical Record Coversheet matches the name on the medical record:
  ◦ If the name on each page of the medical record does not match the coversheet, this could mean a possible PHI/PII data breach. Further submission review is suspended if escalated for potential PHI/PII breach.

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

# Contract-Level RADV Medical Record Reviewer Guidance

- Each submission contains one **Medical Record Coversheet**:
  - ◦ Medical Record Coversheet is correctly labeled "CY 201X (review year) Contract-Level RADV" on all pages
  - ◦ All data fields in Section I contain data
  - ◦ All data fields in Section II contain enrollee data that matches the name on the medical record submitted. The birth date may be used as a secondary identifier for common shortened names if it is present on the medical record. Note if the correction area has been populated to explain any name variance.
  - ◦ Section III, IV, and V are populated as directed with one radio button selection and at least one CMS-HCC indicated. If any unusual format or population issues are noted, the RADV intake reviewer may escalate the case for confirmation to a Senior Evaluator (SE) who will submit a support ticket if indicated. For CON14 reviews:
    - ▪ The Discharge Date Year of Review field for a Hospital Inpatient record is populated with "2013"
    - ▪ The Year of Review field for a Physician/Specialist/Hospital Outpatient/Observation record is populated with "2013"
    - ▪ All fields in the *Medical Record Submission Information* section (File Name, Submitted By, and Submission Date) contain data
  - ◦ On page 2, the Coversheet displays the ICD-9-CM codes that correspond to the audited CMS-HCCs selected within Section IV of the Coversheet
- The CMS Attestation, if indicated, as attached is present and valid:
  - ◦ Attestation is in the CMS Attestation format
  - ◦ The CMS-Generated Attestation must be completed, signed, and dated by the physician/practitioner who provided those services. No other forms of an attestation will be accepted. The completed fields must include the printed physician/practitioner's name, the date of service of the medical record to which they are attesting, the physicians/practitioner's specialty or credential, and must be signed and dated by the physician/practitioner that encountered the face to face visit.
  - ◦ Date ranges or multiple dates of service cannot be entered on a Medical Record Coversheet from an outpatient record. A CMS-Generated Attestation may be completed by the attending physician/practitioner for a single date of service. If the date of service on the submitted CMS-Generated Attestation does not match the medical record submitted by the MA Organization with the Medical Record Coversheet, it will be deemed invalid and will result in an error under the CMS RADV medical record review process if the medical record lacks the necessary physician/practitioner signature and/or credentials.

    If the attestation is invalid, the reviewer will flag for Invalid Attestation and select the appropriate invalid reason. Multiple reasons can be selected.

    Invalid Attestation Reasons in CDAT include:

    1. *Attestation Altered*
    2. *Attestation Incomplete*
    3. *Date of Service Mismatch*
    4. *Incorrect Enrollee* – Enrollee name does not match both coversheet and medical record
    5. *Inpatient Record*
    6. *Non-CMS Generated Attestation*
    7. *Other* – Include specific comment

8

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*
*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 528

847
Exhibit 3

# Contract-Level RADV Medical Record Reviewer Guidance

8. *Unacceptable Credentials*
9. *Unacceptable Signature* – this includes attestation signed by someone other than the physician/practitioner with or without explanation (retired, expired, Power of Attorney, etc.)

The following table presents examples of various attestation issues and how they are evaluated. Date examples are for audits that will be conducted on payment year 2014 (CON14), dates of service in 2013.

### Table 1: Attestation Issues

| What the Reviewer Might Encounter | Examples/Comments | Acceptable for CON14 (Y/N) |
|---|---|---|
| A. Physician/practitioner signed for another or signature stamp used | 1. I, John Smith signed by Jane Doe, MD.<br>2. "I am completing this form because John Doe is not available."<br>3. Name does not match the record without any explanation. Compare handwriting to the extent possible, denying only blatant differences when no printed name is available in the medical record.<br>4. If first name matches but last name does not, escalate to Quality Assurance (QA) Panel for guidance.<br>5. John Smith, Power of attorney for Jane Doe, MD.<br><br>Include a comment "attesting name does not match physician/ practitioner name." | N |
| B. Marked through physician/practitioner name attesting to his/her own record. | John Doe is marked through. James Dean is entered, and the attestation is signed James Dean, MD. The medical record is assumed to be that of James Dean, not that James Dean is signing for John Doe. | Y |
| C. Marked through date of service | Jan. 01/31/2013 (21 is written above or below the incorrect day 31). | Y |
| D. Blank form | Name, Date of Service, or signature line is blank. For blank credential line, see letter L. below. | N |
| E. Date of service handwriting error | (Date of Service is written over.) | Y |
| F. Date of service outside the data collection period | 12/30/2012 or 01/25/2014. | N |
| G. Partially illegible date of service | 01/H/2013 It could be "4" or "11." (Choose the one that matches the medical record.) | Y |

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 529

848
Exhibit 3

## Contract-Level RADV Medical Record Reviewer Guidance

| What the Reviewer Might Encounter | Examples/Comments | Acceptable for CON14 (Y/N) |
|---|---|---|
| H. Date range | Jan. 1–Dec. 31, 3/4/13–5/6/13 (a date range). | Y/N<br><br>Pass only if Medicare Record (MR) matches the first or last date. |
| I. Invalid risk adjustment physician/practitioner credentials | Medical Assistant, Licensed Practical Nurse (LPN), Dietician. | N |
| J. Multiple individual dates of service | 1.  May 1, May 10, May 15, 2013<br>2.  May 1–3, May 6, May 12, 2013 | Y/N<br><br>(Only accept the date that matches MR date of service.) |
| K. Wording of attestation crossed out or added to | Attestation becomes invalid | N |
| L. Credential area is blank, illegible, or not a common credential | MSN (Master of Science in Nursing), "Provider." | Escalate to a more senior coder for review. |

The following table presents scenarios the submission reviewers may encounter and what actions are indicated. See Appendix A for the complete list of invalid (INV) flags with definitions.

### Table 2: Submission Intake Issues

| What the Reviewer Might Encounter | Actions |
|---|---|
| One Medical Record Coversheet 'erroneously' submitted with incorrect medical record. The whole medical record or document within the medical record clearly is not for the same enrollee designated on the coversheet.<br>A.  Entire medical record does not match.<br>B.  A portion or one document within correct submission is for a different person.<br>C.  The name matches but the date of birth is significantly different (not a likely data entry error and no correction indicated on coversheet). | •   The coversheet correction area is reviewed to see if the difference has been identified by the MA Organization.<br>•   PHI/PII breach protocol is followed. If the PHI/PII breach is confirmed, the submission will be removed during the next CDAT maintenance window.<br>If no breach, comment is entered regarding the acceptable name difference. |

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 530

## Contract-Level RADV Medical Record Reviewer Guidance

| What the Reviewer Might Encounter | Actions |
|---|---|
| **Enrollee name does not match medical record.** The name (and DOB when available) on the coversheet does not match the medical record or portions of the medical record.<br><br>*Examples:*<br>Lack of a name on a full report such as inpatient progress notes, multi-part emergency department (ED) record forms, single or multi-page transcribed reports.<br>A multi-part continuous form with the enrollee identification on at least one page. | • Check the coversheet correction area. If correction area is filled in, note the change in the variation of name comment.<br>• If the name is completely different, escalate to initiate PHI/PII protocol.<br>• If the name is the same but birthdate is completely different (not just a typo), escalate to initiate PHI/PII protocol.<br>• If the name appears to be a nickname or other variation, escalate and enter comment regarding acceptance decision in the comment area so all levels will be able to view the decision.<br>• Generally, any report within a multiple page record without a name will not be reviewed, but these are handled on a case-by-case basis.<br>• If the documentation flows to each page and the reviewer can reasonably determine it is the same patient, it can be reviewed. |
| **Multiple medical records submitted in a single medical record file** (with one Medical Record Coversheet). | • If all medical records are not dated in the data collection year, the record is flagged invalid for date of service outside data collection period (INV14=NO).<br>• Whenever a submission contains multiple records with dates of service <u>in the data collection period</u>, the submission is reviewed to determine 1) which date of service to review and 2) which pages to review.<br>   ◦ The coversheet date and validity (selecting a date of service that documents signature, credential, etc.) of each of the medical records will be considered in the decision.<br>• The reviewer will note the date of service selected for review in the date validity comment area (INV4=YES).<br>• During coding, if the HCC can only be validated from another valid encounter with a date not indicated on the Cover Sheet or in the INV4 comment, the submission will be reset to intake and the new date will reviewed. |

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 531

## Contract-Level RADV Medical Record Reviewer Guidance

# Medical Record Review

Medical record pre-review should be performed on all records received by the MA Organization from their providers. A cursory review of the first page by someone not experienced in medical record documentation and coding is not sufficient. CMS RADV reviewers are certified coders, experienced in risk adjustment data validation that are familiar with a variety of medical record layouts, electronic medical record entries, and handwritten medical record documentation. Each of these validity issues often must be evaluated on a case-by-case basis since each one is a little different.

The following table presents issues that may impact the MA Organization's decision to submit the medical record, potential follow-up with the provider to obtain an attestation or additional documentation, and guidance on the action auditors may use to evaluate and resolve the issue. The listed examples and guidance are not exhaustive and all are continuously evaluated for consistency in interpretation and application.

## Signature and Credential Issues

| Instructions Received by the MA Organization |
|---|
| **Excerpt from CY 2013 Contract-Level RADV CMS Submission Instructions (Chapter 3, Section 2).** |
| Medical records submitted for RADV must be from an acceptable physician specialty type (*see* Appendix 3: *Reference Materials: CMS-HCCs and Physician Specialties*) and must be authenticated by the provider. MA Organizations must ensure the provider of service for face to face encounters is appropriately identified on medical records via signature and physician specialty credentials. This means the credentials for the provider must appear somewhere on the medical record (e.g., next to the physician/practitioner's signature or pre-printed with the physician/practitioner's name on the practice's stationery). If the credentials of the physician/practitioner are not listed on the stationery, then the credentials must be part of the signature for that physician/practitioner. |
| Acceptable physician/practitioner authentication comes in the form of handwritten signatures and electronic signatures. Stamped signatures are not acceptable. Signature logs may not be attached to correct records that have a missing or illegible signature. In these cases, please use the CMS-Generated Attestation for the Physician/Practitioner office or Hospital Outpatient visit. |
| • Transcribed reports – Electronic signatures are an acceptable form of medical record authentication so long as the system requires the provider to authenticate the signature at the end of each note. Examples of acceptable electronic signatures include: "Electronically signed by," "Authenticated by," "Approved by," "Completed by," "Finalized by," and "Validated by." In all cases, the signature must contain the physician's or practitioner's name and credentials along with the date signed, which must be within 180 calendar days of the encounter. Electronic signatures dated greater than 180 calendar days from the encounter date must include a valid CMS-Generated Attestation in order for medical record review to continue. (Note: CMS-Generated Attestations can be submitted for Physician/Practitioner and Hospital Outpatient medical records only.) |
| • Electronic Medical Records (EMRs) – Electronic point of service type medical record entries are typically considered authenticated at login since the physician/practitioner is directly entering the content into a template and populating from other sections of the EMR. Often only the provider name will be documented at the beginning or end of the note, without the "electronically signed by" dated notation. Since EMR formats differ, the presence and significance to RADV of a signature authentication statement and a date in a signature line depends on the structure of the EMR. |
| • Handwritten provider signatures on paper medical records need not have an accompanying signature date. CMS attempts to associate each signature with a date of service on the record. Accordingly, please be sure each signature is clearly associated with a date of service for the note in question. |

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

## Contract-Level RADV Medical Record Reviewer Guidance

| Instructions Received by the MA Organization |
|---|

- All medical record entries must be complete and must be authenticated by the physician or practitioner who was responsible for ordering, providing, or evaluating the service furnished. The author of each entry must be clearly identified and must authenticate his or her entry. Regardless of the provider type, a consultation report with the typed name of the dictating physician/practitioner should be signed by that physician/practitioner. For purposes of this RADV, "promptly" is defined as within 180 calendar days of the encounter. Electronic signatures or EMR authentication dated greater than 180 calendar days must include a valid CMS-Generated Attestation for the review to continue.

- In addition:

  ◦ *For physician/practitioner office and hospital outpatient visits*: Hospitals often release copies of dictated reports prior to obtaining a consultant's signature. These reports then are filed in another physician/practitioner's record in an "acceptable" form. Diagnoses from these reports will be coded and abstracted from a physician/practitioner record when either of the following conditions applies: 1) the physician/practitioner has referenced the report diagnosis as part of his/her documentation in the office record; or 2) the consultation to which the physician/practitioner is referring is signed and valid as a stand-alone encounter in the data collection period. If the corresponding medical record has a missing or illegible physician/practitioner signature and/or credential, the MA Organization may wish to consider using the CMS-Generated Attestation provided in the CDAT Enrollee Data Package.

  ◦ *For hospital inpatient discharges*: For hospital records or records from any risk adjustment-covered inpatient facility, a typed signature alone is not acceptable. All records must be signed and authenticated by the treating physician/practitioner. Within a lengthy inpatient record, there may be a few unsigned progress notes or unsigned consultation reports. In this case, the inpatient medical record must contain sufficient signed documentation to validate any of the audited CMS-HCC(s). The coder will review only the signed documentation when coding the principal and secondary diagnoses for the enrollee's discharge; since each provider is required to authenticate their own entries, in most cases unsigned documentation will not be used for coding. MA Organizations must determine on a case-by-case basis if a record suffices to substantiate the CMS-HCC being validated.

**Other Signature Guidance from CMS:**

**CMS Office of Hearings (OH) appeals case decisions 2016/2017** – "Under the RADV instructions, an inpatient medical record that contains both signed and unsigned entries is properly considered as a whole. Such entries, when read in conjunction, may be sufficient to substantiate a diagnosis in an inpatient medical record."

"A handwritten signature on a medical record may be authenticated by a signature log that appears on the provider's practice stationery when the signature log has been accepted by the Initial Validation Contractor (IVC) as part of an outpatient medical record."

### Table 3: Signature and Credential Issues

| What the Reviewer May Encounter | Explanation/Example | Reviewer Guidance | RADV Auditor Action |
|---|---|---|---|

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 533

## Contract-Level RADV Medical Record Reviewer Guidance

| What the Reviewer May Encounter | Explanation/Example | Reviewer Guidance | RADV Auditor Action |
|---|---|---|---|
| **No Signature (or Initials)** | The MA Organization submits an inpatient, physician office, or a hospital outpatient visit medical record.<br><br>Inpatient – entire document unsigned:<br>No physician/practitioner authentication is on <u>any</u> of the submitted documents for which relevant conditions are identified.<br><br>Inpatient – parts unsigned:<br>Unsigned documents within acceptable Inpatient record. | Inpatient:<br>Submit conditions from only signed documents. Note that documents may continue to another page or several pages where a valid signature is located.<br><br>Outpatient:<br>Request a CMS attestation.<br><br>Multiple handwritten encounters in the same handwriting, on the same page will be reviewed and, therefore, should be submitted if one of the encounters is signed even if the date is different from the coversheet date. | INV2 – Invalid or lack of signature<br><br>Notes on the same page (or sections, such as continuous progress notes) are signed in the same handwriting will be evaluated on a case-by-case basis to determine if provider authentication occurred. |
| **No Signature (or Initials)** | Outpatient/physician:<br>The selected visit note is not signed or initialed by a valid physician/practitioner. | **Transcribed Reports** – Dictated reports either standard or through **voice recognition** software, must be signed by the physician/practitioner (either handwritten or with acceptable electronic signature). The physician/practitioner's typed name with transcriptionist's identification only is not acceptable. | INV2 – Invalid or lack of signature |

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 534

## Contract-Level RADV Medical Record Reviewer Guidance

| What the Reviewer May Encounter | Explanation/Example | Reviewer Guidance | RADV Auditor Action |
|---|---|---|---|
| **Electronic Signatures** | Medical record has an electronic signature with the physician/ practitioner's discipline indicated within the record. [See list of Acceptable Physician Specialty Types (Attachments B1 and B2)]. Acceptable Electronic Signatures: Accepted by – Acknowledged by – Approved by– Authenticated by – Charted by – Closed by – Completed by – Confirmed by – Created by – Digitally signed by – Electronically authored by – Electronically signed by – Entered by – Entered data sealed by – Finalized by – Generated by – Read by – Released by – Reviewed by – Sealed by – – signature on file {date/time signed} – Signed by – Validated by – Verified by – Written by – Performed by (when meaning the exam and related documentation are being performed by the same physician/practitioner). Note that this example would apply also to notes specified as dictated using Voice Recognition software with associated "signature" by an acceptable physician/practitioner. If there is any question if the voice recognition document does not appear properly edited and reviewed by the dictator, escalate for another opinion. | There is no standard format for electronic signatures. This guidance is intended for **dictated** reports that require a separate review and dated signature/authentication. The date signed should be within 180 days. | Exceptions to the 180 days guidance will be evaluated on a case-by-case basis for those signed within the data collection year and not as a response to the audit request. |

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 535

## Contract-Level RADV Medical Record Reviewer Guidance

| What the Reviewer May Encounter | Explanation/Example | Reviewer Guidance | RADV Auditor Action |
|---|---|---|---|
| **Unacceptable Electronic Signatures** | Electronic signatures are an acceptable form of authentication, but there are exceptions. Unacceptable Electronic Signatures:<br>• Administratively signed by<br>• Dictated, but not signed<br>• Electronic signature on file [with no other indication of a date/time]<br>• Electronically signed to expedite delivery<br>• Proxy signature-Signed via approval letter or statement, such as:<br>　◦ I authorize my name to be electronically affixed by using my unique dictation computer key<br>　◦ Signature on File or Manually Signed by (The meaning of this is unknown. In some transcription/EMR systems, this might be acceptable but is seems to mean the physician/practitioner will hand sign the document after review.) | EMR formats are not standardized, and the industry is changing rapidly. Both the acceptable and unacceptable lists are not exhaustive.<br>Request a CMS attestation for unacceptable electronic signatures. | If the RADV reviewer notes the HCC is only documented on an unsigned page of the EMR, the case will be evaluated on a case-by-case basis.<br>Reviewer will refer new electronic signature formats to supervisor for evaluation on a case-by-case basis to determine if provider authentication occurred. |

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 536

855
Exhibit 3

## Contract-Level RADV Medical Record Reviewer Guidance

| What the Reviewer May Encounter | Explanation/Example | Reviewer Guidance | RADV Auditor Action |
|---|---|---|---|
| **Point of Service EMR** | Many physician/practitioners are now using "bedside" EMRs whereby upon physician/practitioner login, the entry date, time, and writer are electronically stamped at the beginning of the note. A final authentication at the end of the encounter is not always programmed into the specific EMR software. | Electronic point of service type medical record entries are typically considered authenticated at login since the physician/practitioner is directly entering the content into a template and populating from other sections of the EMR. Often only the name will be documented at the beginning or end of the note without the "electronically signed by" dated notation. Since EMR formats differ, the presence and significance to RADV of a signature authentication statement and a date in a signature line depends on the structure of the EMR. | In some cases, the record submitted is a point of service (POS) type EMR that also has an electronic signature notation by either the physician/practitioner or some other person responding to the audit request. The late dated or secondary signature does not make the original POS entry invalid. |
| **Incomplete Electronic Signature** | Transcribed reports followed by the phrase "electronically signed by" or "signed before import" where there is no physician/practitioner name are not valid. The phrase "electronically signed, but not authenticated," "signed but not read/reviewed," or "electronically signed but not verified" indicates the physician/practitioner has not reviewed and signed off on the electronic version of the document. Likewise, "auto-authorization" EMR signature programs that add a signature after a specified number of days are not acceptable. | Request a CMS attestation. | RADV reviewer will code the unsigned physician/practitioner record portions covered by the valid CMS-Generated Attestation. |

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 537

## Contract-Level RADV Medical Record Reviewer Guidance

| What the Reviewer May Encounter | Explanation/Example | Reviewer Guidance | RADV Auditor Action |
|---|---|---|---|
| **Other Signature Verification Documents** | No signature and/or credentials with, signature log, business card, blank prescription pad sheet, or other document not considered part of the patient medical record.<br><br>Unrequested documentation submitted as a means to verify the physician/practitioner's signature and credential will not be accepted for review. These methods of verification were likely introduced into the medical record solely for the purposes of validation and not at the time of the encounter.<br><br>Signature logs that are part of inpatient record documentation procedures are recorded at the time of the encounter and are, therefore, acceptable as signature/credential verification. | Request a CMS attestation. | Cases with any unusual signature logs will be researched on a case-by-case basis if there is no valid CMS-Generated Attestation.<br><br>Code only the unsigned record portions that are covered by the valid CMS-Generated Attestation. |

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 538

## Contract-Level RADV Medical Record Reviewer Guidance

| What the Reviewer May Encounter | Explanation/Example | Reviewer Guidance | RADV Auditor Action |
|---|---|---|---|
| **Consultation Reports** | Inpatient:<br><br>Consultation report submitted without signature, as part of an authenticated inpatient provider type medical record (consultation report is not submitted as stand-alone documentation). The full inpatient record may be valid for signature, but individual reports within the inpatient record need to be evaluated on a case-by-case basis for valid authentication prior to coding.<br><br>Outpatient:<br><br>The document submitted is a typed (usually dictated) consultation report only. The report may be on the consultant's or hospital's letterhead. The report has the consultants name typed at the conclusion. The submitted report does not have a valid electronic or handwritten signature. | The consultation report within the inpatient medical record is a typed (usually dictated) report detailing evaluation of a condition and included at the request of the attending physician. There is typically an associated progress note signed by the consultant on the date of the patient evaluation.<br><br>The attending physician **generally** will refer to the consultant's diagnosis in subsequent progress notes and his/her final summary. There may be instances where disagreement or further work up eliminates the consultant's diagnosis from consideration. As in all medical record documents, the consultation report is expected to be authenticated by the consultant; however, the absence of a consultant's signature does not preclude the attending physician from including the consultant's findings in his/her final diagnosis.<br><br>Unless the attending physician explicitly disagrees with the consultant's findings, the documented condition should be submitted for RADV. | If the final assessment by the specialist consultant includes an unconfirmed diagnosis statement (rule-out, suspected, likely, etc.) impacting the audited CMS-HCC, and the diagnosis or any related diagnosis is not eliminated elsewhere in the record yet not mentioned in the final discharge diagnoses, a decision will be made on a case-by-case basis, in accordance with ICD-9-CM Official Guidelines for Coding and Reporting. |

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 539

## Contract-Level RADV Medical Record Reviewer Guidance

| What the Reviewer May Encounter | Explanation/Example | Reviewer Guidance | RADV Auditor Action |
|---|---|---|---|
| **Office Note Referencing Unsigned Dictated Report** | Coder Guidance: Hospitals/Specialists often release copies of dictated reports prior to obtaining the dictator's signature. These reports then are filed in another physician's record in an "acceptable" form.<br><br>A signed physician's note, including a statement such as "see discharge summary from <date> hospitalization" or "see specialist consultation report <date>," would be sufficient to link the current visit/progress note to the dictated summary without having to re-write all of the findings. | The circumstances of the current encounter would determine which diagnoses from the hospitalization or other visit are still applicable (i.e., acute, chronic, or status post). | The entire record is reviewed to determine the context of any conditions listed as status post to determine the correct coding. |
| **Signature Stamp** | Acceptable physician authentication comes in the form of handwritten and electronic signatures. Stamped signatures as the only authentication on a document, are not acceptable.<br><br>Effective April 28, 2008, signature stamps will no longer be permitted. Source: Medicare Program Integrity Manual, Publication 100-8, chapter 3, section 3.4.2.1, CR 5971, Transmittal 248. | Request a CMS attestation. | RADV reviewer will code the unsigned, stamped record portions only if covered by the valid CMS-Generated Attestation.<br><br>If the signature looks like a stamp but could also be a digital signature, a decision will be made on a case-by-case basis to determine if provider authentication occurred. |
| **Signature Location** | Beginning of note: It is unusual for a physician/practitioner to sign a medical record entry at the beginning of a transcribed or handwritten note. Traditionally the signature follows the medical record entry, but there could be circumstances where the signature is in an unusual place and the evaluator can relate it to the encounter. | Confirm the signature relates to the encounter that documents the condition and not a prior encounter. Request a CMS attestation if not clear. | RADV reviewers will only code the unsigned record portions that are covered by the valid CMS-Generated Attestation.<br><br>In the unusual instance of an electronic signature statement inserted into a handwritten document, it shall be regarded as equivalent to a "signature on file" statement, which is not acceptable. These will be evaluated on a case-by-case basis to determine if provider authentication occurred. |

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 540

859
Exhibit 3

## Contract-Level RADV Medical Record Reviewer Guidance

| What the Reviewer May Encounter | Explanation/Example | Reviewer Guidance | RADV Auditor Action |
|---|---|---|---|
| **Physician Initials** | The MA Organization submits a dated handwritten or typed (non-electronic) physician office or a hospital outpatient medical record for the enrollee, and the selected medical note is initialed by hand. The physician/practitioner's name and credentials appear in the heading. It is obvious the initials are **not** those of the treating physician. | Do not confuse a provider's initials with other office staff initialing orders completed or receipt of a record copy.<br><br>Illegible initials are difficult to attribute to a provider. Request a CMS attestation. | It is common for non-clinical (clerical) employees to initial records upon receipt or that the record has been coded. In addition, there may be clinical staff members not from an acceptable physician specialty that have initialed the record. In this scenario, the medical record would be deemed invalid.<br><br>Code only the unsigned record portions that are covered by the valid CMS-Generated Attestation. |
| **Illegible Signature without Legible Credential** | The MA Organization submits a medical record with illegible physician/practitioner credentials and no CMS attestation. The type of physician/practitioner specialty is not apparent (i.e., no form heading, office letterhead, or title included in the signature line). It is questionable whether the face to face encounter was conducted by a valid risk adjustment physician data source.<br><br>Although a signature may appear illegible, (squiggles, etc.), if it is located in an appropriate section of the medical record, it will be evaluated on a case-by-case basis since each form and authentication areas are designed differently. | The term "provider" on a signature line or form heading is not sufficient to infer one of the acceptable physician specialties.<br><br>MA Organizations should re-request the medical record legibly identify the provider. Include another CMS attestation with instructions. | INV7 – Lack of credential<br><br>Code all reportable diagnoses from illegibly signed physician/practitioner documents covered by a CMS attestation. |

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 541

## Contract-Level RADV Medical Record Reviewer Guidance

| What the Reviewer May Encounter | Explanation/Example | Reviewer Guidance | RADV Auditor Action |
|---|---|---|---|
| **Other Credentials** | Often the credential acronym is difficult to match with one on the acceptable Physician Specialty list and requires additional research. | LPC – licensed professional counselor. Do not assume this is a psychologist or a LCSW. Not valid for review.<br><br>PhD – acceptable when the note is a mental health encounter. In counseling notes, the PhD is likely a Psychologist.<br><br>Resident, Post Graduate Medical Students (PGY-1, PGY-2), Hospitalists – Assume each of these titles implies a Medical Doctor (MD) or Doctor of Osteopathy (DO). Valid for review. | Unusual credentials will be researched and a decision made on a case-by-case basis.<br><br>MSN, RN – Unless there are further credentials after research indicating Nurse Practitioner or other Clinical Nurse Specialist, this is invalid. |

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 542

Exhibit 3

## Contract-Level RADV Medical Record Reviewer Guidance

## Date Issues

| Instructions Received by the MA Organization |
|---|
| **Excerpt from CY 2013 Contract-Level RADV CMS Submission Instructions (Chapter 3, Section 2)**<br><br>All medical records that are submitted must display a clear date of service and be signed by a physician/practitioner with a risk adjustment-eligible physician specialty. Sometimes a medical record may contain the necessary diagnosis information to validate the audited CMS-HCC(s) but be missing the signature or credential from the treating physician/practitioner. The lack of these elements will result in an error under the CON13 RADV medical record review process, leading to a discrepancy for the audited CMS-HCC. (See Section 3 of this chapter for information about CMS-Generated Attestations, which may be submitted with a record to correct certain deficiencies; note that Attestations are for Physician and Hospital Outpatient records only, however.)<br><br>**Dates of Service**<br><br>• Medical records submitted for this RADV must have a clear date of service within the data collection period. Once again, a medical record submitted for CON13 RADV need not match the date of service previously submitted to the Risk Adjustment Processing System (RAPS) for the audited CMS-HCC.<br><br>• If a medical record is missing a date of service, then that medical record will be deemed invalid, resulting in an error under the CON13 RADV medical record review process.<br><br>• If the date of service (Physician/Specialist/Hospital Outpatient/Observation record) or admission date to discharge date (Hospital Inpatient record) on the submitted medical record does not match the designation made by the MA Organization on the Medical Record Coversheet, the medical record may be deemed invalid and result in an error determination under the CON13 RADV medical record review process. Examples of invalid dates: fax date, dictation date, review date, missing year of service, date partially cut off.<br><br>• Although medical records with discharge date after 12/31/2012 are not acceptable for submission for CON13 RADV, you have the option to submit any physician encounters that occurred during an inpatient visit with discharge date in the range 1/1/2012–12/31/2012 separately as physician records. Accordingly, documentation such as the admit note, history and physical, consultations, operative reports, or progress notes that (a) validate the audited CMS-HCC, (b) meet risk adjustment criteria for signature/credential, (c) are clearly dated in the range 1/1/2012–12/31/2012, and (d) are from an acceptable provider specialty may be submitted each with a corresponding Medical Record Coversheet for one Physician or Hospital Outpatient date of service, up to the maximum number of medical records allowed.<br><br>• If a chart note has multiple dates of service on the same page, your MA Organization must complete a separate Medical Record Coversheet in CDAT for each medical record (i.e., each single date of service) submitted in support of the audited CMS-HCC(s). If only one medical record (i.e., one date of service) is being submitted, you should still submit the whole page; coders will review the one date of service indicated on the Medical Record Coversheet. |

### Table 4: Date Issues

| What the Reviewer May Encounter | Explanation/Examples | Reviewer Guidance | RADV Auditor Action |
|---|---|---|---|

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 543

Exhibit 3

## Contract-Level RADV Medical Record Reviewer Guidance

| What the Reviewer May Encounter | Explanation/Examples | Reviewer Guidance | RADV Auditor Action |
|---|---|---|---|
| Undated Visit<br><br>Signature Date<br><br>Lack of Discharge Date | **Outpatient/physician:** The MA Organization submits a physician office or a hospital outpatient medical record, and the selected medical record is not dated.<br>The only date on the medical record is a signature date. There is no separate indication of the encounter date. Inpatient records must have both **admission** and **discharge date.** | Do not submit medical records that do not support a date of service within the data collection period.<br>Depending on the document format, if the only date on the record is a signature date, it is not assumed to be the date of service.<br>The inpatient dates of service must be documented at least one place in the record (face sheet, summary, discharge orders etc.). | INV4 – Invalid for date of service<br>Evaluated on a case-by-case basis if admission date is in December and content may indicate a discharge not in 2013 for CON14.<br>An exception may be applicable on a case-by-case basis when a discharge or transfer summary contains the admission date but lacks the discharge date. |
| Dictation Date | The medical record submitted is a transcribed consultation report or discharge summary. The report does not indicate the date of consultation, admission date, or discharge visit. The report has **only** the **dictation date**, and the dictation date is within the data collection period.<br>Dictated consultation/medical record with dictation date and other supporting documentation:<br><br>• The medical record submitted is a transcribed consultation report. The report does not indicate the date of service. The report has the dictation date, and the dictation date is within the data collection period; AND<br><br>• The MA Organization has submitted a diagnostic service report that is dated for a service that is referenced in the typed undated report and matches the Coversheet date of service (DOS).<br><br>BOTH CONDITIONS MUST BE MET. | It is not acceptable to submit conditions from documents with date of dictation only.<br>Submit the document(s) for the DOS indicated including results data for pre/post visit testing ordered/ performed on that date. | INV4 – Invalid for date of service<br>When there are other documents to possibly support the date of service, these will be evaluated on a case-by-case basis. This advice is intended for orders/testing and follow-up closely linked, not months apart or occurring in a different data collection year. |

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 544

## Contract-Level RADV Medical Record Reviewer Guidance

| What the Reviewer May Encounter | Explanation/Examples | Reviewer Guidance | RADV Auditor Action |
|---|---|---|---|
| **Dates of Service outside Data Collection Period** | **Inpatient:** The inpatient documentation submitted contains an admission date (within the data collection period) and a discharge date (outside the data collection period). *Example:* The History and Physical dated in the data collection year 2013, submitted as a physician record, though IP discharge date is in 2014. For inpatient records, the **discharge date** must be within the audit's data collection period. The admission (from) date may be in a prior year. **Outpatient & Physician**: For physician and hospital outpatient records, the date of service must be within the audit's data collection period. *Example:* A discharge summary dated 1/3/2014, which is outside the data collection year 2013, submitted as a physician record is invalid. | Do not submit records with a discharge date outside the data collection period as an inpatient provider type. Locate any physician portions documenting the CMS-HCC within the data collection period and submit separate coversheets for each. | INV14 – Invalid for date not within data collection period. In the case of an admission date in the prior year, but discharge in the current data year, the entire inpatient record is reviewed as one encounter. |
| **Date Located On Encounter Label** | An addressograph type stamp or other electronic demographic identification typically notes the patient's name, birth date, patient number, physician, and admission date. In ambulatory surgery, the date may be a registration date prior to the surgery date. | The label date may be interpreted as the date of service for ED records or other hospital outpatient single date records. For ambulatory surgery, use the surgery date. Include any pre-operative reports. | The reviewer will confirm the date on the label is consistent with the content entries. Ambulatory surgery pre-op history and physical and testing may note a prior date but are included in the review of the surgery record. |
| **Referral Responses** | The document describes an outpatient consultation in response to a referral from another provider. The medical record may be in a letter format to the requesting provider or handwritten on a referral form. | Enter the date of service of the encounter on the Coversheet. This date should be documented at the beginning of the referral response and may be different than the date of the letter or date of request for referral. | The content of the document will be reviewed to determine if it is a referral response vs. a non-medical record letter that is not valid for RADV. |

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 545

## Contract-Level RADV Medical Record Reviewer Guidance

## Provider/Record Type Issues

| Instructions Received by the MA Organization |
|---|
| **Excerpt CY 2013 Contract-Level RADV CMS Submission Instructions (Chapter 3, Section 2)**<br>**Inpatient Requirements**<br>• Hospital Inpatient medical records must display an admission date and discharge date and include a signed Discharge Summary (or a Discharge Note for admissions less than 48 hours).<br><br>**Physician Specialty and Credentials**<br>• Medical records submitted for RADV must be from an acceptable physician specialty type (*see Appendix 3: Reference Materials: CMS-HCCs and Physician Specialties*) and must be authenticated by the provider. MA Organizations must ensure the provider of service for face to face encounters is appropriately identified on medical records via signature and physician specialty credentials. This means the credentials for the provider must appear somewhere on the medical record (e.g., next to the physician/practitioner's signature or pre-printed with the physician/practitioner's name on the practice's stationery). If the credentials of the physician/practitioner are not listed on the stationery, then the credentials must be part of the signature for that physician/practitioner. |

**Table 5: Provider Type/Record Issues**

| What the Reviewer May Encounter | Explanation/Examples | Reviewer Guidance | RADV Auditor Action |
|---|---|---|---|

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 546

865
Exhibit 3

## Contract-Level RADV Medical Record Reviewer Guidance

| What the Reviewer May Encounter | Explanation/Examples | Reviewer Guidance | RADV Auditor Action |
|---|---|---|---|
| **Face to Face Visit** | The submitted record documents a face to face encounter with the enrollee from an acceptable RADV provider type and data source. The three acceptable RA provider types are: Hospital Inpatient, Hospital Outpatient, and Physician.<br><br>Note that specific facility sources are not included as acceptable inpatient and outpatient facilities; however, acceptable physician provider type documentation may occur in most any facility, including the patient home.<br><br>The RADV process does not include determining the type of claim supporting the original RA data submission. Outpatient and Physician provider types are combined on the coversheet, so unless the documentation is clearly made by an employee from a non-acceptable source, the coder assumes a physician provider type based on the acceptable specialty list. | Unacceptable physician/practitioner specialty findings or impressions, such as diagnostic radiologist, dietitians, or lab results, must be acknowledged or referenced in the valid provider's note to be submitted for the condition. See abnormal findings section. | INV 5 – Invalid source, provider type<br><br>Inpatient record submissions without a discharge summary or discharge note (for under 48 hour admissions) will be evaluated on a case-by-case basis for provider type validity. |
| **Stand-alone Discharge Summary** | A stand-alone discharge summary is considered an acceptable physician provider type face to face visit for the date of discharge <u>or</u> the date of service documented (if done earlier) as indicated on the summary and Medical Record Coversheet.<br><br>**Inpatient Note:** An appropriately detailed discharge summary that documents at least one reportable condition and includes the admission and discharge date with a Medical Record Coversheet indicating inpatient provider type is acceptable for review as an inpatient record. An exception for the lack of or noting a different discharge date may be granted by the QA Panel/CMS if the content indicates the actual date was likely within 2012. | Report the conditions documented in the stand-alone discharge summary (submitted as IP or OP) keeping in mind any procedures done during the admission (i.e., amputations, ostomies, acute dialysis) are not reported as a "status" V code. Review the content carefully to determine if conditions listed as "status post" (i.e., MI, CVA) were acutely active during the current admission or an earlier one. | Submission of an inpatient record lacking a discharge summary that does not appear to contain sufficient documentation for coding will be handled on a case-by-case basis. |

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 547

866
Exhibit 3

## Contract-Level RADV Medical Record Reviewer Guidance

| What the Reviewer May Encounter | Explanation/Examples | Reviewer Guidance | RADV Auditor Action |
|---|---|---|---|
| **Non-face to face Visit** | Although RA submission requires a face to face visit (with the exception of pathology), RADV outpatient/physician medical records may include **interpretations** of diagnostic tests or related interventional, minimally invasive procedures that do not involve a face to face visit with the interpreting physician specialist. Even if the services are not acceptable to submit diagnoses for risk adjustment (e.g., non-hospital based outpatient services), RADV allows the interpreted reports to support CMS-HCCs in the data year when interpreted by valid RA provider specialties.<br><br>As in all coding, the Official Guidelines for Coding and Reporting must be applied. For inpatient provider type, do not report abnormal findings of diagnostic results unless the physician/practitioner indicates the clinical significance. | Do not submit records that do not support a face to face visit. | INV 5 – Invalid source, non-face to face |

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 548

867
Exhibit 3

## Contract-Level RADV Medical Record Reviewer Guidance

| What the Reviewer May Encounter | Explanation/Examples | Reviewer Guidance | RADV Auditor Action |
|---|---|---|---|
| Diagnostic Testing (with or without interventional procedures) with acceptable provider interpretation | **Acceptable Examples include:**<br><br>• **Cardiology and Vascular Surgeons**<br>  ◦ Echocardiogram (including Doppler, Duplex, Color flow of the heart vessels)<br>  ◦ EKG (electrocardiogram) – Stress test, Cardiac catheterization<br>  ◦ Myocardial perfusion and other nuclear medicine imaging of the heart<br>  ◦ Pacemaker analysis (non-telephonic)<br>  ◦ Vascular Doppler Study interpretation- not performed by Diagnostic Radiologists<br>  ◦ Percutaneous transluminal coronary angioplasty (PTCA)<br><br>• **Interventional Radiology**<br>  ◦ Catheter angiography – Coronary Computed tomography angiography (CTA)<br>  ◦ Endoscopic retrograde cholangio-pancreatography (ERCP)<br>  ◦ Embolization procedures<br>  ◦ Extracorporeal shock wave lithotripsy (ESWL)<br>  ◦ Magnetic resonance arteriogram (MRA)<br>  ◦ Fluoroscopic Guidance<br>  ◦ Genitourinary vascular flow imaging (nuclear medicine)<br>  ◦ Radiofrequency ablation<br>  ◦ Radiation Therapy – Ultrasound Guidance | Reviewers should only submit diagnoses documented in the physician interpretation, not the technical report. Do not submit records of diagnostic radiologist only.<br><br>**Standalone/outpatient/physician encounters:**<br>If an exact diagnosis is not reported, and the record is identified as **outpatient**, apply outpatient coding guidelines to code the condition to the level of certainty documented. Often the reason for the test is listed as symptom or abnormal findings on another test.<br>If the reason for the test is to rule out a diagnosis, do not report the diagnosis if the exam is normal or does not indicate the rule out diagnosis.<br>The reviewer must use judgment based on the type of procedure/test or other documentation available when determining if a chief complaint or reason for a test is a current diagnosis or was a condition to be ruled out.<br>*Example:* MRA, reason for test: non-healing ulcer. MRA studies rule out vascular or heart disease, not ulcers. The ulcer would be reported as a current condition along with any abnormal findings of the study.<br><br>**Interpreted diagnostic testing within inpatient records:**<br>See guidance for **Other Physician Documentation**. Generally, interpretations from acceptable provider specialties are acceptable as long as there is no contradiction with the attending physician diagnosis. Diagnoses documented in EKGs, MRA, Doppler studies, and other testing must be addressed by the attending physician or consulting provider to submit for condition validation. | Researched on a case-by-case basis to determine if study is performed by a Diagnostic Radiologist or a valid physician specialist, such as Vascular Surgeon or Cardiologist.<br>Stand-alone/outpatient EKG interpretations are considered for reporting on a case-by-case basis. The cardiologist signature must be present and the results supported in the clinical notes. Findings are often "suggestive of" and not confirmed diagnoses. This is especially true for "Old MI (myocardial Infarction)" findings since false positive findings are not uncommon. |

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 549

## Contract-Level RADV Medical Record Reviewer Guidance

| What the Reviewer May Encounter | Explanation/Examples | Reviewer Guidance | RADV Auditor Action |
|---|---|---|---|
| **Diagnostic Testing (with or without interventional procedures) with acceptable provider interpretation (continued)** | **Acceptable Examples include (continued):**<br>• **Neurology**<br>　◦ Electroencephalography (EEG)<br>　◦ Electromyography (EMG)<br>　◦ Nerve Conduction Studies<br>　◦ Nuclear Medicine Brain imaging<br>　◦ Sleep Studies (Polysomnography)<br>• **Pulmonology**<br>　◦ Pulmonary Function Tests (PFT)<br>Pulmonary perfusion and ventilation imaging | * | * |
| **Technical Component Only** | Diagnostic testing and infusion type encounters are generally performed by technical staff not included on the list of acceptable physician specialties. If there is no accompanying interpretation or consultation by a physician specialist, other than diagnostic radiology, the provider type is invalid for RADV. ***Examples:*** pacemaker analysis, INR (International normalized ratio) blood coagulation (clotting) checks. | Do not submit studies only documented by non-physician technicians or nurses. | INV5 – Invalid source |

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 550

869
Exhibit 3

## Contract-Level RADV Medical Record Reviewer Guidance

| What the Reviewer May Encounter | Explanation/Examples | Reviewer Guidance | RADV Auditor Action |
|---|---|---|---|
| **Clinical Laboratory Test Results** (e.g., "blood test" results, urinalysis results, etc.) submitted as stand-alone medical record | Clinical lab test results, when submitted alone, are not acceptable for RADV purposes. If the only medical record documentation submitted is a clinical lab report, the medical record is considered "Invalid." Examples of the types of documentation that are unacceptable, when submitted alone, include the following:<br><br>• CBC blood count report; Chemistry profile report<br>• Hepatitis antigen/antibody tests<br>• Pleural fluid analysis report<br>• Rheumatoid factor<br>• Urinalysis report, Urine culture report<br>• Urine pregnancy test<br>• Wound culture report<br><br>**NOTE:** The above list is not all inclusive. | Do not submit lab results to validate conditions. Request the office visit where the results were ordered or results reviewed with the patient. | INV5 – Invalid source |
| **Pathology Reports- with pathologist interpretation** (including surgical pathology, cytopathology, etc.) with an interpretation by a pathologist | The **interpretation of the findings by a pathologist** as an acceptable physician specialty is acceptable. This is an exception to the face to face requirement.<br><br>Examples of pathology reports include the following:<br><br>• Pathology report from a tissue biopsy (e.g., lung biopsy, bone biopsy, etc.)<br>• Cell block report<br>• Cytopathology report of fluids/brushings<br>• PAP (Papanicolaou) smear report<br>• Chromosome analysis | Enter date of collection as the date of service. The interpretation and findings are may be submitted to validate conditions. | Locate "collection date" or "results date" to match with DOS being reviewed. Either is acceptable. |

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 551

## Contract-Level RADV Medical Record Reviewer Guidance

| What the Reviewer May Encounter | Explanation/Examples | Reviewer Guidance | RADV Auditor Action |
|---|---|---|---|
| **Pathology Reports- laboratory test only** (including surgical pathology, cytopathology, etc.) without an interpretation by a pathologist | Pathology reports, when submitted as a laboratory test alone, are **not acceptable** for risk adjustment purposes. | Do not submit lab results to validate conditions. Request the office visit where the results were ordered or results reviewed with the patient. | INV5 – Invalid source |
| **Telephone or Telemedicine/Video Contact** | The MA Organization submits a medical record, and the selected visit note is documentation of a telephone/video contact with the enrollee or is documentation of lab values received over the telephone. Medicare policies for telemedicine apply. The medical record of the origin site must include documentation by a valid risk adjustment provider specialty. The remote consultation report should be mentioned and included in that origin site encounter record. Video chat type encounters that are not face to face with a valid risk adjustment provider are not valid. Telephone encounters are not valid. | Do not submit documentation of telephone contacts to validate conditions. Telemedicine documentation is allowable in only limited situations. | INV5 – Invalid source |
| **Emergency Department (ED)** | The MA Organization submits a medical record for an ED visit. ED records often consist of multiple check-off sheets from various members of the treatment team with signatures not always on the same page as the documentation. The ED record date of service is considered part of the inpatient date range when followed by a direct admission. | Review all pages of the ED record whether dated or not. MA Organizations should report only conditions either documented by or clearly reviewed and signed off by an acceptable RA physician/practitioner specialty. Conditions ruled out during the ED testing or conflicting with the Emergency Room (ER) physician/practitioner's (i.e., MD, Physician Assistant [PA], Nurse Practitioner [NP]) final note should not be submitted. Only submit diagnoses from the ER records not overturned by IP documentation. | If from date is next day after ED date, date may pass validity. |

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

## Contract-Level RADV Medical Record Reviewer Guidance

| What the Reviewer May Encounter | Explanation/Examples | Reviewer Guidance | RADV Auditor Action |
|---|---|---|---|
| **Observation Visits** | Observation "admissions" are typically under 24 hours. Longer observations are possible, and in those cases, the MA Organization is instructed to enter the first date of observation status as the DOS on the coversheet and reflected in CDAT. Any of the observation dates selected at intake for review within the data collection period are acceptable.<br><br>Observation encounters submitted as IP provider type on the face sheet. | Confirm the observation status was clearly documented and not later changed to inpatient. Check the face sheet patient status, orders, ED disposition, and final progress notes for documentation or mention of Observation Status, 24 hour hold, or similar terminology.<br><br>Submit the observation encounter as an outpatient for any conditions documented within the entire observation stay. | INV15 – Invalid provider type if observation is submitted as an inpatient<br><br>If status is inconsistently documented in the record resulting in a discrepancy in provider type, the decision will be handled on a case-by-case basis. The RADV reviewer will code from the entire observation range of dates. |

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 553

872
Exhibit 3

## Contract-Level RADV Medical Record Reviewer Guidance

| What the Reviewer May Encounter | Explanation/Examples | Reviewer Guidance | RADV Auditor Action |
|---|---|---|---|
| **Problem Lists (within a medical record)** | See related topic of **Chronic and Other Additional Diagnoses**. Lists of diagnoses (conditions, problems) may be numbered, bulleted, or separated by commas. A list may be documented in the patient history, assessment, discharge summary, or other areas of a medical record. When conditions commonly associated are listed under the same number or bullet, the conditions can assume to be linked. These diabetes examples are effective for ICD-9-CM and will be updated for ICD-10-CM. *Example 1:* 1. Hypertension 2. DM, neuropathy (link diabetes and neuropathy) *Example 2:* 1. Hypertension 2. DM 3. Neuropathy (do not link diabetes and neuropathy) *Example 3:* 1. Diabetes with hypertension (Although these conditions could occur together and be related, unless the documentation clearly shows a cause and effect relationship, do not link diabetes and other condition if not typically a known manifestation of diabetes.) | Evaluate the problem list for evidence of whether the conditions are chronic or past and if they are consistent with the current encounter documentation (i.e., have they been changed or replaced by a related condition with different specificity). Evaluate conditions listed for chronicity and support in the full medical record, such as history, medications, and final assessment. Do not submit conditions from lists labeled as PERTINENT NEGATIVES. | Problem lists are evaluated on a case-by-case basis when the problem list is not clearly dated as part of the face to face encounter indicated on the coversheet or there are multiple dates of conditions both before and after the DOS. Lists of conditions written by the patient are not acceptable. Lists of code numbers without narratives are not acceptable. Mention or EMR population of diagnoses in a list will be considered on a case-by-case basis for RADV once all other coding rules and checks for consistency have been applied. |

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

## Contract-Level RADV Medical Record Reviewer Guidance

| What the Reviewer May Encounter | Explanation/Examples | Reviewer Guidance | RADV Auditor Action |
|---|---|---|---|
| Skilled Nursing Facility (SNF) | The MA Organization submits a SNF record as an <u>inpatient</u> provider type. SNF record with no physician specialty encounter documentation. *Example*: Nursing Home case management conference summaries. The submission is a **physician/practitioner visit** that indicates the enrollee is a resident of the SNF. Although CMS does not accept risk adjustment data from nursing home facilities (as an inpatient provider type), some beneficiaries who reside in a nursing home will have a nursing home medical record (single acceptable physician specialty encounter) as the only source to support their diagnostic data. The physician/practitioner's encounter must have been face to face with the beneficiary. | Do not submit SNF records as an inpatient provider type. Do not submit portions or SNF records unless the encounter is documented by a valid RA specialty. Locate physician note for DOS. Often MD visit documentation is part of the orders template. Review progress notes for Physical Therapists or other types of acceptable outpatient therapists that may support the condition and could be submitted separately as an OP encounter. | INV5 – Invalid for inpatient provider type RA source. Notes are reviewed for documentation of a separate valid provider, not an employee of the SNF. |
| Health Risk Assessments (HRAs) | HRA forms must be completed by a valid risk adjustment provider specialty. Those completed by the patient are not acceptable. The documentation must support that the provider was present with the patient. Problem lists documented on the HRA are understood to not be under the care of the provider conducting the assessment. Conditions listed are evaluated for chronicity and support in the full medical record, such as history, medications, and final assessment. Results of HRA screening portions are not considered confirmed diagnoses unless supported by the final assessment documentation. | Do not submit HRA forms that do not document a face to face encounter. The provider documentation of dated patient vitals is one element that supports a face to face encounter. | HRA forms that do not appear to be a face to face encounter will be evaluated on a case-by-case basis. Since the HRA is primarily a question and answer form that can be created online or over the phone, the physician signature is not always sufficient to validate the provider was present. |
| Referral Authorization Forms | The MA Organization submits a signed and dated referral authorization form (not documenting a face to face encounter). | Do not submit conditions documented only on referral authorization forms. Request instead the office visit/consult in which the patient was evaluated. | INV5 – Invalid source |

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 555

## Contract-Level RADV Medical Record Reviewer Guidance

| What the Reviewer May Encounter | Explanation/Examples | Reviewer Guidance | RADV Auditor Action |
|---|---|---|---|
| **Order Forms Documenting an Encounter** | The MA Organization submits a signed and dated order form with evidence of a face to face encounter. Order forms often have as much clinical information as a progress note or are used as a combined progress note and order.<br>***Examples:***<br>1. Inpatient order sheet stating date of service, diagnosis, and treatment submitted with other confirmed inpatient documentation.<br>2. Inpatient order sheet submitted as a stand-alone physician provider type for one date of service.<br>3. Outpatient or physician order form (often on a prescription pad form) stating date of encounter, diagnosis, and treatment ordered. | Submit conditions only to the level confirmed in the documentation. The reason for the test may be to rule out a condition not yet diagnosed.<br>Do not use prescription drug information on the order form to report conditions. The condition must be documented. | These will be evaluated on a case-by-case basis. Not all order forms are valid for review. |
| **Prescription Forms** | For drugs that <u>do not</u> contain a diagnosis or other evidence of a face to face visit:<br>The MA Organization submits a signed and dated prescription form ordering a diabetic medication or other condition-specific medication.<br>Prescription forms for drugs that <u>do</u> contain a diagnosis or other evidence of a face to face visit:<br>Outpatient or physician order form (often on a prescription pad form) stating date of encounter, diagnosis, and treatment ordered. | CMS does not accept prescriptions as a form of validation.<br>Prescription forms documenting only a drug order are not acceptable as a stand-alone document, even if the drug named is used only for one condition.<br>Review carefully that a separate face to face encounter is clearly identified. | INV5 – Invalid source<br>Evaluated on a case-by-case basis. |

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 556

875
Exhibit 3

## Contract-Level RADV Medical Record Reviewer Guidance

| What the Reviewer May Encounter | Explanation/Examples | Reviewer Guidance | RADV Auditor Action |
|---|---|---|---|
| **Certified Clinical Nurse Specialist** | The MA Organization submits medical record documentation signed and dated by a Certified Clinical Nurse Specialist (CNS), Advanced Practice Registered Nurse (APRN), APR-CNS, or Psych CNS.<br><br>For RADV, the approved specialties of Certified Clinical Nurse Specialist, Nurse Practitioner, Certified Nurse Midwife, and Certified Registered Nurse Anesthetist all fall in the sometimes used blanket designation of Advanced Practice Registered Nurse (APRN, APN, or APR-CNS), so these credential terms are also acceptable. | It is acceptable to submit documentation from nurse practitioners. | MSN-RN without further specialty noted will be researched on a case-by-case basis. |

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 557

876
Exhibit 3

## Contract-Level RADV Medical Record Reviewer Guidance

| What the Reviewer May Encounter | Explanation/Examples | Reviewer Guidance | RADV Auditor Action |
|---|---|---|---|
| **Therapists**<br>Physical Therapy (PT)<br>Occupational Therapy<br>Speech and Language Pathology<br>Clinical Licensed Social Worker (stand-alone evaluation and treatment)<br><br>**Other Specialties or Credentials** | **Outpatient Provider Type:**<br>These therapists are included in the acceptable physician specialties for RA. Therapy evaluations typically include the patient's past and current conditions, including chronic conditions not related to the therapy.<br>**Inpatient Provider Type:**<br>Ancillary services are typically provided by employees of the facility and their findings are under the responsibility of the attending physician. Therefore, these services are not considered separate professional specialists as is the case in outpatient encounters.<br>Clinical Research Professionals – CPI. This is a designation by a physician/practitioner responsible for clinical trials. The professional would have another acceptable physician/ practitioner specialty of MD, PA, or other.<br>Note that Radiologists or other medical professionals may be performing in the capacity of a general practitioner for purposes of face to face HRAs. This is acceptable as long as the physician/practitioner's credentials are MD, DO, PA, or NP.<br>"Adult Medicine" notes or clinics are generally staffed by general practice or internal medicine physician/practitioners (MD, DO, PA, NP) and notes from these acceptable physician/practitioners may be reviewed.<br>Note that RADV team does not update the specialty list. We can only provide examples of credentials on the list until the next CMS RA policy release. | Submit all reportable diagnoses from all RADV approved specialty therapy outpatient/physician submissions.<br>For inpatient coding, reportable diagnoses must be documented by the attending or consulting doctor specialists. Conditions documented only in inpatient ancillary service notes should not be submitted for validation.<br>Make sure the documentation supports an acceptable specialty or credential. | When submitted as a stand-alone outpatient/physician document, the reviewer may consider the medical record submission as valid for review. Diagnoses documented on the authenticated therapy document are valid for coding according to outpatient coding rules.<br>If the coder comes across other credentials or unusual circumstances of specialists performing home visits or HRA, the case may be evaluated on a case-by-case basis. |

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

## Contract-Level RADV Medical Record Reviewer Guidance

| What the Reviewer May Encounter | Explanation/Examples | Reviewer Guidance | RADV Auditor Action |
|---|---|---|---|
| **Other Unacceptable Source Documents** | Other types of unacceptable medical record documentation include:<br><br>• **List of ICD-9-CM codes**<br>• Ambulance<br>• **Claim forms**-may possibly be used to verify dates, credential, or legibility issues but not for coding purposes<br>• Claims data pre-populated conditions (case-by-case basis due to EMR differences)<br>• Durable medical equipment<br>• **Hospice care** in a hospice designated unit or facility<br>• Hospital inpatient swing bed components also called Transitional Care Units<br>• **Home Health** Facility agency staff documentation or certifications (CMS 485 forms) that do not document a face to face visit with the physician/practitioner. DO NOT CONFUSE physician provider type HOME VISITS, HRA done in the home by a health plan or their contracted service, OR HOUSE CALLS with HOME HEALTH AGENCY encounter sources<br>• Intermediate care facilities<br>• List or check list of patient conditions without evidence of a face to face visit (see also problem list section)<br>• Orthotics<br>• Print outs of claim screens<br>• Prosthetics<br>• Respite care facilities | Lists of ICD-9-CM codes <u>with narratives</u> are acceptable when included as part of a documented face to face office visit/exam. These need to be reviewed on a case-by-case basis and questioned when accompanied by notation of "pre-populated from claims data" or similar terminology.<br><br>ICD-9-CM codes without narrative are not acceptable to report in place of a diagnosis to support a CMS-HCC. It is the codes that are being validated by medical record written documentation.<br><br>AHA *Coding Clinic* 1Q 2012 p. 6* states "**Question:** Since our facility has converted to an electronic health record, providers have the capability to list the ICD-9-CM diagnosis code instead of a descriptive diagnostic statement. Is there an official policy or guideline requiring providers to record a written diagnosis in lieu of an ICD-9-CM code number?<br><br>(Answer listed in the next row.) | INV5 – Invalid source |

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 559

# Contract-Level RADV Medical Record Reviewer Guidance

| What the Reviewer May Encounter | Explanation/Examples | Reviewer Guidance | RADV Auditor Action |
|---|---|---|---|
| **Other Unacceptable Source Documents (continued)** | Other types of unacceptable medical record documentation include (continued):<br>• Super bills<br>• Supplies<br><br>Repetitive encounter flow sheets without physician note for the date of treatment (e.g., dialysis, infusion/injections, chemotherapy, radiation, Coumadin/INR/Protime). | **Answer:** Yes, there are regulatory and accreditation directives that require providers to supply documentation to support code assignment. Providers need the ability to specifically document the patient's diagnosis, condition, and/or problem. **Therefore, it is not appropriate for providers to list the code number or select a code number from a list of codes in place of a written diagnostic statement.** ICD-9-CM is a statistical classification, per se; it is not a diagnosis. Some ICD-9-CM codes include multiple different clinical diagnoses, and it can be of clinical importance to convey these diagnoses specifically in the record. Also some diagnoses require more than one ICD-9- CM code to fully convey. **It is the provider's responsibility to provide clear and legible documentation of a diagnosis, which is then translated to a code for external reporting purposes."**<br><br>© Copyright 1984-2017, American Hospital Association ("AHA"), Chicago, Illinois* | INV5 – Invalid source (continued) |

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 560

879
Exhibit 3

## Other Documentation Issues

This section includes other documentation issues involving the support of diagnoses within a valid medical record. Policies may differ depending on the provider type. Review of the entire medical record, including all terms directly attributed to the condition and who documented the condition, are important in making these reporting decisions. Conditions, diagnoses, or "problems" can be listed in various sections of a medical record. With an EMR, conditions from previous encounters are often brought forward/cut and pasted/auto-filled into the current encounter template by various methods. The question is whether these conditions should be reported for the current encounter and how to interpret "treatment and care" and "affect patient management" in the *Official Guidelines for Coding and Reporting* quoted below. Section numbers are indicated after each quote. Conversely, some conditions are listed as a current condition, but the content of the full record indicates the condition is no longer present. Therefore, reviewers should evaluate all listed conditions for consistency within the full provider documentation with the understanding that specific management and treatment of every chronic condition is not always going to be clearly documented in the one record submitted to validate the CMS-HCC. Mention of EMR population of diagnoses in a list will be considered on a case-by-case basis for RADV once all other coding rules and checks for consistency have been applied.

## Chronic and other additional diagnoses

### ICD-9-CM Official Guidelines for Coding and Reporting – Outpatient Services

Chronic diseases treated on an ongoing basis may be coded and reported as many times as the patient receives treatment and care for the conditions(s). (Section IV, J)

Code all documented conditions that coexist at the time of the encounter/visit, and require or affect patient care treatment or management. (Section IV, K)

### ICD-9-CM Official Guidelines for Coding and Reporting – Inpatient Services

GENERAL RULES FOR OTHER (ADDITIONAL) DIAGNOSES (Section III)

For reporting purposes the definition for "other diagnoses" is interpreted as additional conditions that affect patient care in terms of requiring:

- clinical evaluation; or
- therapeutic treatment; or
- diagnostic procedures; or
- extended length of hospital stay; or
- increased nursing care and/or monitoring.

The Uniform Hospital Discharge Data Set (UHDDS) item #11-b defines Other Diagnoses as "all conditions that coexist at the time of admission, that develop subsequently, or that affect the treatment received and/or the length of stay. Diagnoses that relate to an earlier episode which have no bearing on the current hospital stay are to be excluded." UHDDS definitions apply to inpatients in acute care, short-term care, long-term care, and psychiatric hospital setting. The UHDDS definitions are used by acute care short-term hospitals to report inpatient data elements in a standardized manner. These data elements and their definitions can be found in the July 31, 1985, Federal Register (Vol. 50, No, 147), pp. 31038–40.

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

## Contract-Level RADV Medical Record Reviewer Guidance

Since the application of the UHDDS, definitions have been expanded to include all non-outpatient settings (acute care, short-term care, long-term care, and psychiatric hospitals; home health agencies; rehabilitation facilities; nursing homes, etc.).

**AHA *Coding Clinic for ICD-9-CM* © 3rd Qtr, 2007, p. 13–14\***

**Question:**

We need to get clarification on the coding of chronic conditions. One of the quality improvement organizations (QIOs) will not allow the inclusion of chronic obstructive pulmonary disease (COPD) as a secondary diagnosis when it is only mentioned as a history of COPD and no active treatment is documented. Am I correct in stating the presence of a documented history of COPD in the physician's history and physical on an inpatient record is enough to code COPD as a secondary diagnosis since this is a chronic condition that always affects the patient's care and treatment to some extent?

**Answer:**

As stated in Coding Clinic, July–August 1985, page 10, the criteria for selection of the conditions to be reported as "other diagnoses" include the severity of the condition, use or consideration of alternative measures in the treatment of the principal diagnosis due to a coexisting condition, increased nursing care required in the care of patients due to the disabling features of the coexisting condition, use of diagnostic or therapeutic services for the particular coexisting condition, the need for close monitoring of medications, or modifications of nursing care plans.

If there is documentation in the medical record to indicate the patient has COPD, it should be coded. Even if this condition is listed only in the history section with no contradictory information, the condition should be coded. Chronic conditions such as, but not limited to, hypertension, Parkinson's disease, COPD, and diabetes mellitus are chronic systemic diseases that ordinarily should be coded even in the absence of documented intervention or further evaluation. Some chronic conditions affect the patient for the rest of his or her life and almost always require some form of continuous clinical evaluation or monitoring during hospitalization, and therefore should be coded. This advice applies to inpatient coding.

The following guidelines are to be applied in designating "other diagnoses" for both inpatient and outpatient when neither the Alphabetic Index nor the Tabular List in ICD-9-CM provides direction. **The listing of the diagnoses in the patient record is the responsibility of the attending provider.**

### *ICD9-CM Official Guidelines for Coding and Reporting*

**Underlying Conditions**

**Conditions that are an integral part of a disease process** "Signs and symptoms that are associated routinely with a disease process should not be assigned as additional codes, unless otherwise instructed by the classification." (Section I, B. 7)

**Conditions that are not an integral part of a disease process** "Additional signs and symptoms that may not be associated routinely with a disease process should be coded when present." (Section I, B. 8)

**Office of Hearings appeals ruling 2016** "In a medical record that reflects *[\*specifically documents the term "unknown cause"]* that the underlying cause of a condition is unknown, the diagnosis may properly be coded with the abbreviation 'NOS (not otherwise specified)' for determining the appropriate CMS-HCC." *Clarification added to not conflict with ICD-9-CM coding conventions excludes notes or index inclusions. ICD-9-CM Official Coding Guidelines state NOS is only used "when the information in the medical record is insufficient to assign a more specific code."

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

# Contract-Level RADV Medical Record Reviewer Guidance

**Previous Conditions**

If the provider has included a diagnosis in the final diagnostic statement, such as the discharge summary or the face sheet, it should ordinarily be coded. Some providers include in the diagnostic statement resolved conditions or diagnoses and status-post procedures from previous admission that have no bearing on the current stay. Such conditions are not to be reported and are coded only if required by hospital policy.

However, ICD-9-CM personal history codes (codes V10-V19) may be used as secondary codes if the historical condition or family history has an impact on current care or influences treatment. (Section III, A) [For example, the Official Coding Guidance regarding neoplasms states:

*When a primary malignancy has been previously excised or eradicated from its site and there is no further treatment directed to that site and there is no evidence of any existing primary malignancy, a code from category V10, Personal history of malignant neoplasm, should be used to indicate the former site of the malignancy. Any mention of extension, invasion, or metastasis to another site is coded as a secondary malignant neoplasm to that site. The secondary site may be the principal or first-listed with the V10 code used as a secondary.* (Section I, C. 2d)]

**Abnormal Findings**

**Inpatient**: Abnormal findings (laboratory, X-ray, pathologic, and other diagnostic results) are not coded and reported unless the provider indicates their clinical significance. If the findings are outside the normal range and the attending provider has ordered other tests to evaluate the condition or prescribed treatment, it is appropriate to ask the provider whether the abnormal finding should be added. Please note this differs from the coding practices in the outpatient setting for coding encounters for diagnostic tests that have been interpreted by a provider. (Section III, B)

**Outpatient**: For outpatient encounters for diagnostic tests that have been interpreted by a physician, and the final report is available at the time of coding, code any confirmed or definitive diagnosis(es) documented in the interpretation. Do not code related signs and symptoms as additional diagnoses. (Section IV, L)

**Uncertain Diagnoses**

**Inpatient:** If the diagnosis documented at the time of discharge is qualified as "probable," "suspected," "likely," "questionable," "possible," "still to be ruled out," or other similar terms indicating uncertainty, code the condition as if it existed or was established. The bases for these guidelines are the diagnostic workup, arrangements for further workup or observation, and initial therapeutic approach that correspond most closely with the established diagnosis. (Section III, C)

**Outpatient**: Do not code diagnoses document as "probably," "suspected," "questionable," "rule out," "working diagnosis," or other similar terms indicating uncertainty. Rather, code the condition(s) to the highest degree of certainty for that encounter/visit, such as symptoms, signs, abnormal test results, or other reasons for the visit. (Section IV, I)

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 563

882
Exhibit 3

# Contract-Level RADV Medical Record Reviewer Guidance

**AHA *Coding Clinic for ICD-9-CM* © 1st Qtr, 1999, p. 5\***

**Question:**

A patient comes into the hospital with a fracture of the femur. On discharge, the physician lists in his final diagnostic statement, fracture of femur. However, when reviewing the medical record, the X-ray report states the site of fracture is the shaft of the femur. Is it appropriate to use the X-ray results to provide further specificity to this diagnosis for coding purposes?

**Answer:**

Assign code 821.01, Fracture of other and unspecified parts of femur, Shaft. Coders should always review the entire medical record to ensure complete and accurate coding. If the physician does not list the specific site of the fracture, but there is an X-ray report in the medical record that does, it is appropriate for the coder to assign the more specific code without obtaining concurrence from the physician. However, if there is any question as to the appropriate diagnosis, the coder should consult with the physician before assigning a diagnosis code.

## Other Physician Documentation

Medical records often contain documentation from more than one acceptable RA provider specialty. Inpatient records especially require careful review to determine if conditions documented by providers other than the attending physician are confirmed, relevant, and consistent with the final diagnoses.

**AHA *Coding Clinic for ICD-9-CM* © 1st Qtr 2004, p. 18\***

**Question:**

Please provide clarification regarding the appropriateness of code assignments based on the documentation in the medical record by a physician other than the attending physician. Previously published *Coding Clinic* advice has allowed using documentation from the anesthesia report. Our coders have interpreted the lack of contrary documentation from the attending can be perceived as concurrence with the anesthesiologist. We have recently been advised we cannot use a consultant's note without "confirmation" from the attending physician. Our coders tell us it is operationally impossible to confirm every single diagnosis or condition the consultant writes. Of course, if there is conflicting information, we will query the attending physician for clarification. Can you comment on whether our interpretation of coding instructions is correct?

**Answer:**

Code assignment may be based on other physician (i.e., consultants, residents, anesthesiologist, etc.) documentation as long as there is no conflicting information from the attending physician. Medical record documentation from any physician involved in the care and treatment of the patient, including documentation by consulting physicians, is appropriate for the basis of code assignment. A physician query is not necessary if a physician involved in the care and treatment of the patient, including consulting physicians, has documented a diagnosis, and there is no conflicting documentation from another physician. If documentation from different physicians conflicts, seek clarification from the attending physician, as he or she is ultimately responsible for the final diagnosis. This information is consistent with the American Health Information Management Association's (AHIMA) documentation guidelines.

\*For all AHA *Coding Clinic for ICD-9-CM* references the following statement applies:

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

## Contract-Level RADV Medical Record Reviewer Guidance

*© Copyright 1984–2017, American Hospital Association ("AHA"), Chicago, Illinois. Reproduced with permission for the express purpose of instructions for responding to this federally mandated audit validating Medicare payment. No portion may be copied without the express, written consent of AHA. Individual answers within AHA Coding Clinic® are available for reproduction by hospitals and health systems for the purpose of responding to payor audit requests. The answer needs to be reproduced in its entirety, and not edited or altered in any way. Payors, consultants, and other for-profit, commercial entities may only use AHA Coding Clinic® content as an internal reference and for audit purposes. AHA Coding Clinic® content may not be utilized for commercial, for-profit purposes and may not be re-sold, repackaged or distributed without the consent of the American Hospital Association Central Office. The Content may not be compiled, shared, or distributed in a way that circumvents the need for an individual or entity to access, purchase, or obtain a license to utilize Coding Clinic content. AHA Coding Clinic is an official resource for Medicare Risk Adjustment coding. Subscription and licensing information can be viewed at http://www.ahacentraloffice.org/codes/products.shtml#CodingClinic*

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 565

## Contract-Level RADV Medical Record Reviewer Guidance

**Table 6: Documentation Issues**

| What the Reviewer May Encounter | Explanation/Examples | Reviewer Guidance | RADV Auditor |
|---|---|---|---|
| **No Exam, Reason for the Encounter, or Condition Documented** | Coder Guidance: The medical record for the one visit or admission selected by the MA Organization does not contain any documentation of the type of exam or other reason for the visit (e.g., the record only documents the enrollee's vital signs and height and weight). | Do not submit the medical record if no conditions are documented. | Reviewer will assign applicable V code if possible or flag as "No ICD-9." |
| **No Documented Findings, Symptoms, or Conditions** | The medical record documentation includes a type of exam or screening with no positive findings, symptoms, or conditions. Examples include:<br>• Annual check up<br>• Adult physical exam (APE)<br>• Blood pressure check<br>• Cholesterol check<br>• Prostate Specific Antigen (PSA)<br>• Therapy session<br>• Follow-up (F/U) exam<br>• Pre-op exam<br>• Well visit | Do not submit the medical record if no conditions are documented. | Reviewer will assign applicable V code if possible or flag as "No ICD-9." |

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

## Contract-Level RADV Medical Record Reviewer Guidance

| What the Reviewer May Encounter | Explanation/Examples | Reviewer Guidance | RADV Auditor |
|---|---|---|---|
| **Illegible Diagnosis – Handwriting** | The *only* diagnoses in the medical record submitted are illegible due to handwriting.<br>Some illegible (or non-English or both) words that are possibly a diagnosis. | Unless there is no other record available, do not submit medical records that cannot support the CMS-HCC due to illegibility.<br>Be careful of illegible negative finding (e.g., [No or R/O] CHF) where the preceding word is illegible. | If, after review of context, similar words, medications, etc., the coder is not able to decipher an illegible word that is documented in areas typically containing diagnoses or with other legible diagnoses, the CMS-HCC to be validated is checked to determine if that condition is legible and already validated on the record or is possibly the illegible word.<br>If a second review still indicates the condition is illegible, it will not be coded. |
| **Illegible Diagnosis – Document Image** | The only diagnoses in the medical record submitted are illegible due to a document image that is too light, too dark, or distorted. | Do not submit the record. Request a clear copy from the provider. | Medical record cannot be coded |
| **Non-English Documentation** | Coder Guidance: The record submitted includes diagnoses but the words are not English. | Identify the documentation that validates the CMS-HCC. If it is legible and can be translated, then it is acceptable to submit. | Refer to Medical Record Review Contractor (MRRC) Project Manager regarding resources for medical translation of pertinent sections of the medical record. |

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 567

## Contract-Level RADV Medical Record Reviewer Guidance

| What the Reviewer May Encounter | Explanation/Examples | Reviewer Guidance | RADV Auditor |
|---|---|---|---|
| **Abbreviation with Multiple Meanings** | Coder Guidance: Several common abbreviations have more than one meaning.<br><br>*Examples:* MD – major depression, muscular dystrophy, macular degeneration<br><br>CRF – chronic renal failure, chronic respiratory failure | Evaluate the abbreviation within the context of the full medical record before submitting to support the condition. | If more than one meaning applies or documentation is too limited to differentiate, and this is the only diagnosis listed within the record, evaluate on a case-by-case basis.<br><br>Otherwise, use discretion to report or not based on other circumstances in the record. |

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 568

887
Exhibit 3

## Contract-Level RADV Medical Record Reviewer Guidance

| What the Reviewer May Encounter | Explanation/Examples | Reviewer Guidance | RADV Auditor |
|---|---|---|---|
| Medical Record Amendments | **Acceptable Amendment:** An amendment must be based on an observation of the patient on the date of service and signed by the physician. Only the attending physician can amend the medical record. The most common example is for follow-up notes based on a diagnostic test ordered and related test results received subsequent to the patient visit.  Sufficient information must be contained in the amendment to verify the documentation was completed in a timely manner by the attending or treating physician. For RADV "timely manner" generally means up to 90 days from the encounter but there could be exceptions such as extended specialized or revised lab/path results or autopsies, legal cases sequestered before completing record, natural disasters, or delays due to physicians called to military service.<br><br>**Unacceptable Amendment** – It is **unacceptable** for a third party that was not involved in the treatment and evaluation of the patient (e.g., coder, reviewer) to amend the medical record or query the provider for additional diagnoses or clarifications not documented in the original medical record in response to the RADV request. | It is not appropriate to add diagnoses to the medical record that have been identified by a source other than the treating physician (e.g., identifying diabetes from a disease management program).<br><br>If the unacceptable amendment is the only source of the CMS-HCC, select a different record for submission. | RADV reviewer will code reportable diagnoses from acceptable amendments.<br><br>Reviewers will ignore unacceptable amendments for coding. |
| Query Forms | When submitted with the associated medical record, query forms that are completed, signed, and dated in a timely manner (i.e., within 90 days of the date of service) by the physician/practitioner and became part of the official medical record will be reviewed for validity and clinical consistency with the medical record documentation. | Query forms generated by the MA Organization at the time of the audit are not acceptable for review as part of the medical record. They are considered extraneous data.<br><br>If the unacceptable query form is the only source of the HCC, select a different record for submission. | Query forms will be considered on a case-by-case basis.<br><br>RADV reviewer will not code from query forms not generated at the time of the encounter. |

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

## Contract-Level RADV Medical Record Reviewer Guidance

| What the Reviewer May Encounter | Explanation/Examples | Reviewer Guidance | RADV Auditor |
|---|---|---|---|
| **Missing Pages** | In some instances, it is possible to identify missing pages from a pre-numbered medical record or a partial record submission.<br><br>***Example:*** A History and Physical (H&P) with pages 1 and 3; however, page 2 is missing.<br><br>***Example:*** First line of a document submitted appears to be a continuation from a previous page. | Consider re-requesting the full medical record from the provider. | Reviewer will code from available pages if the record meets other validity criteria (signature, credential, etc.). If no condition is present to code, then it will be evaluated on a case-by-case basis. |
| **Medical Record Documentation is Distorted or Obscured** | In some instances, the record documentation is obscured by sticky notes or other markings on the document. | Do not submit documents with obscured portions. | Reviewer will code from legible pages. |
| **Medical Record Documentation is Too Dark or Too Light** | Some medical record documentation is of poor image quality, and the Senior Evaluator (SE) is unable to identify key elements.<br><br>This is common in photographed records. | Check that scanned images are readable. If needed, re-request the medical record. | Reviewer will code from legible pages. |
| **Pages or Margins of the Medical Record are Cut Off** | Some medical record documentation can have portions of the record text cut off during the submission. | Check that scanned images are readable. If needed, re-request the medical record. | Reviewer will code from legible pages. |

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 570

# Appendix A: What Makes a Medical Record Invalid for RADV?

During Intake Evaluation, the MRRC SE answers all of the following questions relative to each medical record. Only results from valid medical records are used for the payment error calculation.

- **Question 1 (INV1) = Does the medical record correctly identify the sampled beneficiary?** Senior evaluator fails this check if the medical record name and identifying information is completely different from the name on the Medical Record Coversheet (sampled beneficiary CMS-HCC). If INV1= NO, SE will evaluate if name is a derivative as in INV3 and change to YES. The SE may escalate this record to request a query with CDAT support to determine if enrollee is in the sample. See related INV3 and INV 20. If INV3=YES, the system WILL NOT move the record forward for coding unless the SE changes INV1 to YES also.

- **Question 2 (INV2) = Is the medical record signed?** The SE fails this check if the medical record submitted is not signed at all. The signature does not have to be complete or legible. Note: The SE does not answer this based on the presence of an attestation, only the medical record document.

- **Question 3 (INV3) = Is the name on the medical record an acceptable variance of the name of the sampled beneficiary?** SE fails this check when the name on the medical record is similar but does not match the Medical Record Coversheet. The SE may decide the name is acceptable or not and, if not acceptable, fail both INV3 and INV1. Examples of possible scenarios include reported Health Insurance Claim Number (HICN) is spouse's number, use of middle name as first name, maiden name, and father/son mix up with same name but different birth date. The SE may escalate this record to query further. INV3 should never = NO without INV1=NO also. If name was corrected on the coversheet, SE will assign INV3=YES with a comment describing the difference.

- **Question 4 (INV4) = Is there a date on the medical record?** Does the medical record contain a valid date of service? The SE fails this check if the date is missing completely or only partially there and the year cannot be confirmed.

- **Question 5 (INV5) = Is the medical record from a valid source?** The SE fails this check for invalid sources, which are not on the acceptable sources list, such as: hospice, home health, lab only, super-bill, and non-face to face. The SE also fails this check if the physician/practitioner credential/specialty is not on the ACCEPTABLE PHYSICIAN SPECIALTY TYPES list (see attachment B1 and B2).

  NOTE: If the source is on the acceptable sources list, and the only issue is the lack of a credential/specialty, then INV5 passes, but INV7 should fail.

- **Question 7 (INV7) = Are you able to confirm an acceptable credential/specialty (e.g., MD, PA, DPM, Cardiology, Internal Medicine)?** The SE fails this check if the medical record is signed but there is no credential in the signature <u>and</u> no credential (MD, DO, NP) or specialty reference (Renal, Cardiology, PCP, Hospitalist, Attending, etc.) to the one specific physician/practitioner named on the document (heading, defined provider type in signature line). The INV is evaluated on a case-by-case basis in situations where the credential is implied in a pre-printed note designation (doctors/provider notes). Note the SE does not answer this based on the presence of an attestation, only the medical record document.

- **Question 14 (INV14) = Is the date on the medical record within the data collection period?** The SE fails this check if the medical record date of service is not within the date collection period. If date cannot be determined (blank or illegible), question 14 passes as unknown, but INV4 fails.

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

## Contract-Level RADV Medical Record Reviewer Guidance

- **Question 15 (INV15) = Does the Provider Type of the medical record match the Provider Type selected on the Medical Record Coversheet?** SE fails this check if the medical record provider type doesn't match the Medical Record Coversheet provider type. For example, the provider type is marked as Inpatient but only a physician or outpatient record is attached. An exception is made for several pages of an inpatient record, which the plan has identified as a physician/outpatient record on the Coversheet. The presence of the additional documentation in the inpatient is helpful to set the context for assigning accurate codes for the one date of service selected. INV15 would not be failed in this case.

- **Question 17 (INV17) = Is acceptable Medical Record documentation included?** This is assigned when the submission includes a coversheet but the attached document is not a medical record. When INV 17 applies, all other INV flags are automatically assigned "no." When plan checks no record attached, the record does not move to intake, so no INV is flagged.

- **Question 20 (INV20) = Miscellaneous INV: Is the record free from invalid issues not otherwise addressed through existing INV checks?** SE fails this check if there is a medical record issue that hasn't already been identified in any of the INV questions.

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 572

**Contract-Level RADV Medical Record Reviewer Guidance**

## Appendix B1: Acceptable Physician Specialty Types Program Year (PY) 2014 – Numeric

| Code | Specialty | Code | Specialty | Code | Specialty | Code | Specialty |
|---|---|---|---|---|---|---|---|
| 1 | General Practice | 19 | Oral Surgery | 40 | Hand Surgery | 79 | Addiction Medicine |
| 2 | General Surgery | 20 | Orthopedic Surgery | 41 | Optometry | 80 | Licensed Clinical Social Worker |
| 3 | Allergy/Immunology | 21 | Cardiac Electrophysiology | 42 | Certified Nurse Midwife | 81 | Critical care (intensivists) |
| 4 | Otolaryngology | 22 | Pathology | 43 | Certified Registered Nurse Anesthetist | 82 | Hematology |
| 5 | Anesthesiology | 23 | Sports Medicine | 44 | Infectious Disease | 83 | Hematology/Oncology |
| 6 | Cardiology | 24 | Plastic and Reconstructive Surgery | 46* | Endocrinology | 84 | Preventive Medicine |
| 7 | Dermatology | 25 | Physical Medicine and Rehabilitation | 48* | Podiatry | 85 | Maxillofacial Surgery |
| 8 | Family Practice | 26 | Psychiatry | 50* | Nurse Practitioner | 86 | Neuropsychiatry |
| 9 | Interventional Pain Management (IPM) | 27 | Geriatric Psychiatry | 62* | Psychologist | 89* | Certified Clinical Nurse Specialist |
| 10 | Gastroenterology | 28 | Colorectal Surgery | 64* | Audiologist | 90 | Medical Oncology |
| 11 | Internal Medicine | 29 | Pulmonary Disease | 65 | Physical Therapist | 91 | Surgical Oncology |
| 12 | Osteopathic Manipulative Medicine | 33* | Thoracic Surgery | 66 | Rheumatology | 92 | Radiation Oncology |
| 13 | Neurology | 34 | Urology | 67 | Occupational Therapist | 93 | Emergency Medicine |
| 14 | Neurosurgery | 35 | Chiropractic | 68 | Clinical Psychologist | 94 | Interventional Radiology |
| 15 | Speech Language Pathologist | 36 | Nuclear Medicine | 72* | Pain Management | 97* | Physician Assistant |
| 16 | Obstetrics/Gynecology | 37 | Pediatric Medicine | 76* | Peripheral Vascular Disease | 98 | Gynecologist/Oncologist |
| 17 | Hospice and Palliative Care | 38 | Geriatric Medicine | 77 | Vascular Surgery | 99 | Unknown Physician Specialty |
| 18 | Ophthalmology | 39 | Nephrology | 78 | Cardiac Surgery | C0 | Sleep Medicine |

* Indicates that a number has been skipped.

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Contract-Level RADV Medical Record Reviewer Guidance

## Appendix B2: Acceptable Physician Specialty Types PY 2014 – Alphabetic

| Specialty | Specialty | Specialty | Specialty | Specialty |
|---|---|---|---|---|
| Addiction Medicine | Emergency Medicine | Internal Medicine | Ophthalmology | Podiatry |
| Allergy/Immunology | Endocrinology | Interventional Pain Management | Optometry (Optometrist) | Preventive Medicine |
| Anesthesiology | Family Practice | Interventional Radiology | Oral Surgery (Dentists only) | Psychiatry |
| Audiologist | Gastroenterology | Licensed Clinical Social Worker | Orthopedic Surgery | Psychologist |
| Cardiac Electrophysiology | General Practice | Maxillofacial Surgery | Osteopathic Manipulative Medicine | Pulmonary Disease |
| Cardiac Surgery | General Surgery | Medical Oncology | Otolaryngology | Radiation Oncology |
| Cardiology | Geriatric Medicine | Nephrology | Pain Management | Rheumatology |
| Certified Clinical Nurse Specialist | Geriatric Psychiatry | Neurology | Pathology | Sleep Medicine |
| Certified Nurse Midwife | Gynecologist/Oncologist | Neuropsychiatry | Pediatric Medicine | Speech Language Pathologist |
| Certified Registered Nurse Anesthetist | Hand Surgery | Neurosurgery | Peripheral Vascular Disease | Sports Medicine |
| Chiropractic | Hematology | Nuclear Medicine | Physician Assistant | Surgical Oncology |
| Clinical Psychologist | Hematology/Oncology | Nurse Practitioner | Physical Medicine and Rehabilitation | Thoracic Surgery |
| Colorectal Surgery | Hospice and Palliative Care | Obstetrics/Gynecology | Physical Therapist | Urology |
| Critical Care (Intensivists) | Infectious Disease | Occupational Therapist | Plastic and Reconstructive Surgery | Vascular Surgery |
| Dermatology | * | * | * | Unknown Specialty |

* Left blank.

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 574

# Appendix C: Glossary and Abbreviations

**AHA –** American Hospital Association

**Attestation –** A CMS-generated document that allows a physician to attest to his/her signature and/or credentials for a specific date of service for outpatient/physician records only. Attestations are not accepted for inpatient records.

**CDAT –** Central Data Abstraction Tool

**CMS –** Centers for Medicare & Medicaid Services

**CNS –** Clinical Nurse Specialist

**CON13, CON14 –** Contract level RADV payment year 2013, 2014

**DOB –** Date of birth

**DOS –** Date of service

**DS –** Discharge Summary

**ED –** Emergency Department

**EMR –** Electronic Medical Record

**H&P –** History and Physical

**HCC –** Hierarchical Condition Category

**HIPAA –** Health Insurance Portability and Accountability Act

**HRA –** Health risk assessment

**ICD-9-CM, ICD-9 –** International Classification of Disease, Ninth Revision, Clinical Modification

**IP –** Inpatient

**MA –** Medicare Advantage

**N/A –** Not applicable

**NP, APRN, ACNP, ANP, FNP, GNP –** Nurse Practitioner credentials

**OP –** Outpatient

**PHI/PII –** Personal health information/personal identifiable information

**PA –** Physician assistant

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*
*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

## Contract-Level RADV Medical Record Reviewer Guidance

**Physician –** The term "physician" is generally used throughout this document to refer to any of the acceptable physician data sources for risk adjustment (see Attachment B1 and B2). Understand that several of these physician specialties (i.e., nurse practitioners, physician assistants, physical therapists, licensed clinical social workers, etc.), are not physicians but are considered acceptable provider types/physicians specialties for RADV.

**POS –** Point of service. A type of EMR where the provider logs in and enters notes directly into the patient's medical record during the encounter.

**QTR –** Quarter (1, 2, 3 or 4), the publication yearly quarter for AHA Coding Clinic issues.

**RADV –** Risk Adjustment Data Validation

RAPS – Risk Adjustment Processing System

**SE –** Senior Evaluator. RADV medical record review contractor senior coder tasked with researching questions, confirming invalid cases from initial levels of coders, and conducting a second level of coding.

**SNF –** Skilled Nursing Facility

*INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW*

*This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated, distributed, or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.*

Exhibit Y
Page 576

Exhibit 3

# EXHIBIT Z



# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... I-1

MODULE 1 – RISK ADJUSTMENT METHODOLOGY ....................................... 1-1
1.1        Risk Adjustment History .................................................................... 1-1
1.2        Calculating Payments ........................................................................ 1-4
1.2.1      Payments for 2004 and 2005 ............................................................ 1-4
1.2.2      MA Capitation Rates for 2006 through 2008 ..................................... 1-6
1.2.3      Risk Ratebook .................................................................................... 1-6
1.2.3.1    Adjustment for Budget Neutrality ...................................................... 1-7
1.2.3.2    Change in the Budget Neutrality Calculation to Account for Different Payment
           Methodologies for Local MA Plans Versus Regional MA Plans ......... 1-8
1.2.3.3    Phase Out of Budget Neutrality .......................................................... 1-8
1.2.4      Payment Blends .................................................................................. 1-8
1.2.5      Fee-for-Service Normalization Adjustment ....................................... 1-10
1.2.6      Payments for 2006 and Beyond ......................................................... 1-11
1.2.6.1    Bidding Background ............................................................................ 1-11
1.2.7      Intra-Service Area Rate (ISAR) Adjusted County Payment Rates ..... 1-11
1.2.8      Plan Payments .................................................................................... 1-12
1.3        Risk Adjustment Payment Models for Payment ................................. 1-13
1.3.1      Components of the Risk Score in the CMS-HCC Model .................... 1-16
1.3.1.1    Demographic Factors ......................................................................... 1-16
1.3.1.2    Disease Groups/HCCs ....................................................................... 1-16
1.3.1.3    Disease Hierarchies ........................................................................... 1-17
1.3.1.4    Disease Interactions ........................................................................... 1-17
1.3.1.5    Disabled/Disease Interactions ........................................................... 1-18
1.3.2      New Enrollee Factors ......................................................................... 1-18
1.3.3      Community and Long-Term Institutional Model Distinctions............... 1-19
1.3.4      Frailty Adjuster ................................................................................... 1-21
1.3.4.1    Why is There a Frailty Adjuster? ........................................................ 1-21
1.3.4.2    Which Organizations Are Currently Being Paid Under Frailty Adjustment? ... 1-21
1.3.4.3    How Does the Frailty Adjuster Work Under the CMS-HCC Model?..... 1-22
1.3.4.4    Frailty Model Development ................................................................. 1-22
1.3.4.5    Frailty Payment Implementation ......................................................... 1-23
1.3.4.6    ADL Information Collection and Frailty Adjuster Development ........... 1-24
1.3.4.7    Calculating the Frailty Score for Payment .......................................... 1-25
1.3.5      Payment Methodology for ESRD Enrollees ....................................... 1-26
1.3.5.1    Risk Adjustment Model for Dialysis Patients ..................................... 1-27
1.3.5.2    Transplant Model ................................................................................ 1-27
1.3.5.3    Functioning Graft Model ..................................................................... 1-27
1.3.5.4    Model Comparison of Coefficients ..................................................... 1-28
1.3.5.5    New Enrollee Factor ........................................................................... 1-28
1.3.5.6    Reporting of ESRD Status .................................................................. 1-28
1.3.6      Medicare Part D .................................................................................. 1-28
1.3.6.1    Part D Risk Adjustment Model ........................................................... 1-29
1.3.6.2    Low Income and Long Term Institutionalization Multipliers............... 1-30

Exhibit Z
Page 577



**2008 Risk Adjustment Data Technical Assistance For Medicare Advantage Organizations Participant Guide**

**TABLE OF CONTENTS**

1.4       Parts C and D Final Submission of Risk Adjustment Data (Reconciliation) ...................... 1-32
1.4.1     Parts C and D Risk Adjustment Schedule & Elimination of the Payment Lag.................. 1-32
1.5       Updating Diagnosis Codes in the Parts C and D Risk Adjustment Models ....................... 1-33

**MODULE 2– RISK ADJUSTMENT SUBMISSION PROCESS OVERVIEW**.................................... 2-1
2.1       Common Risk Adjustment Terms ...................................................................................... 2-1
2.2       Risk Adjustment Process Overview .................................................................................. 2-2
2.2.1     Risk Adjustment Data Requirements ................................................................................ 2-2
2.2.2     Risk Adjustment Data Collection ...................................................................................... 2-2
2.2.3     Risk Adjustment Data Submission .................................................................................... 2-3
2.2.4     Risk Adjustment Dataflow ................................................................................................ 2-4
2.2.5     Important Information About Risk Adjustment Processing................................................. 2-5
2.3       Submission Schedule ....................................................................................................... 2-6
2.4       Training and Support ........................................................................................................ 2-7

**MODULE 3 – DATA COLLECTION**................................................................................................ 3-1
3.1       Required Risk Adjustment Data Elements ........................................................................ 3-1
3.1.1     HIC Number ...................................................................................................................... 3-1
3.1.2     ICD-9-CM Diagnosis Code ............................................................................................... 3-2
3.1.2.1   Description of Diagnosis Code Files
3.1.3     Service From and Through Dates...................................................................................... 3-2
3.1.4     Provider Type ................................................................................................................... 3-2
3.2       Data Sources .................................................................................................................... 3-3
3.2.1     Hospital Inpatient .............................................................................................................. 3-3
3.2.2     Hospital Outpatient ........................................................................................................... 3-4
3.2.2.1   Determining Whether Facilities Are Acceptable for Risk Adjustment ............................... 3-5
3.2.2.2   National Provider Identifier................................................................................................ 3-6
3.2.3     Physician Data ................................................................................................................ 3-10
3.2.4     Alternative Data Sources ................................................................................................ 3-12
3.2.5     Excluded Providers ......................................................................................................... 3-12
3.3       Data Collection Formats and Considerations.................................................................. 3-12
3.3.1     Data Collection Formats ................................................................................................. 3-12
3.3.2     Collection Format Features ............................................................................................. 3-13
3.3.3     Collecting Data from Physicians Using a Superbill ......................................................... 3-13
3.3.4     Factors Affecting Data Collection Method....................................................................... 3-17
3.3.4.1   Contractual Relationships and Implications for Data Collection ...................................... 3-17
3.4       Health Information Portability and Accountability Act (HIPAA) ....................................... 3-18
3.5       Provider Communication and Risk Adjustment................................................................ 3-18
3.5.1     Key Messages ................................................................................................................ 3-18
3.5.2     Characteristics of Effective Communication ................................................................... 3-19
3.5.3     Communication Methods................................................................................................. 3-20

**MODULE 4 – DATA SUBMISSION** ............................................................................................... 4-1
4.1       Submission Process Requirements .................................................................................. 4-1
4.2       Connectivity Options......................................................................................................... 4-2
4.3       Relevant Diagnosis........................................................................................................... 4-2
4.4       Submission Formats ......................................................................................................... 4-3
4.5       Submission File Layout Logic ........................................................................................... 4-3

Exhibit Z
Page 578



| | | |
|---|---|---|
| 4.6 | Diagnosis Cluster | 4-5 |
| 4.7 | Provider Type | 4-5 |
| 4.8 | From and Through Dates | 4-5 |
| 4.9 | Diagnosis Code | 4-6 |
| 4.10 | RAPS Format | 4-6 |
| 4.11 | Filtering Risk Adjustment Data | 4-11 |
| 4.12 | Modifying Risk Adjustment Data | 4-11 |
| 4.13 | Deleting Diagnosis Clusters | 4-12 |
| 4.14 | Reasons to Delete a Diagnosis Cluster | 4-12 |
| 4.15 | Steps for Deleting a Diagnosis Cluster | 4-12 |
| 4.16 | MA Organization Responsibilities Regarding Deletions | 4-13 |
| 4.17 | Direct Data Entry | 4-13 |
| | | |
| **MODULE 5 – EDITS AND REPORTS** | | 5-1 |
| 5.1 | Data Flow and Reporting | 5-1 |
| 5.2 | FERAS System | 5-5 |
| 5.2.1 | FERAS Error Code Logic | 5-5 |
| 5.2.2 | FERAS Error Code Ranges | 5-6 |
| 5.2.3 | FERAS Response Report | 5-9 |
| 5.3 | RAPS System | 5-11 |
| 5.3.1 | RAPS Edits Rules | 5-12 |
| 5.3.2 | RAPS Processing Reports | 5-16 |
| 5.3.2.1 | RAPS Return File | 5-16 |
| 5.3.2.2 | RAPS Transaction Error Report | 5-18 |
| 5.3.2.3 | RAPS Transaction Summary Report | 5-20 |
| 5.3.2.4 | Relationships Between Values in Report | 5-22 |
| 5.3.2.5 | Informational Error Messages | 5-23 |
| 5.3.2.5.1 | Duplicate Diagnosis Cluster Error and 5 Percent Benchmark | 5-24 |
| 5.3.2.6 | RAPS Duplicate Diagnosis Cluster Report | 5-24 |
| 5.4 | Resolving Errors | 5-27 |
| 5.4.1 | Resolution Steps | 5-27 |
| 5.4.2 | Common Errors | 5-29 |
| 5.4.2.1 | File Name Duplicates Another File Accepted Within Last 12 Months | 5-29 |
| 5.4.2.2 | Delete Error, Diagnosis Cluster Previously Deleted | 5-29 |
| 5.4.2.3 | Diagnosis Cluster Not Successfully Deleted. Another Diagnosis Cluster With the Same Attributes Was Already Deleted From the RAPS Database On This Date | 5-30 |
| 5.4.2.4 | Service From Date is Not Within MA Organization Enrollment | 5-31 |
| 5.4.2.5 | Beneficiary is Not Enrolled In Plan On or After Service From Date | 5-32 |
| 5.5 | RAPS Management Reports | 5-33 |
| 5.5.1 | RAPS Monthly Plan Activity Report | 5-33 |
| 5.5.2 | RAPS Cumulative Plan Activity Report | 5-41 |
| 5.5.3 | Correcting Rejected Data | 5-46 |
| 5.5.4 | RAPS Error Frequency Reports | 5-46 |
| 5.6 | Analysis of Reports | 5-50 |
| 5.6.1 | Collecting Sufficient Accurate Data | 5-50 |
| 5.6.2 | External Issues Affecting Data Collection | 5-51 |
| 5.6.3 | Internal Processes Supporting Data Submissions | 5-52 |
| 5.7 | Report Naming Conventions | 5-52 |

Exhibit Z
Page 579



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| 5.8 | Plan Monitoring Process | 5-53 |

**MODULE 6 – DIAGNOSIS CODES & RISK ADJUSTMENT** ........................................ 6-1
6.1        Introduction ........................................................................................................ 6-1
6.1.1      Benefit to the MA Organization and Physician ................................................ 6-2
6.2        Structure and Terminology of ICD-9-CM ......................................................... 6-2
6.2.1      Special Notes and Abbreviations ...................................................................... 6-3
6.2.2      Supplemental Classifications and Tables .......................................................... 6-3
6.3        ICD-9-CM Updates ............................................................................................ 6-4
6.3.1      Diagnosis Codes Phase-in Schedule ................................................................. 6-4
6.3.2      International Classification of Diseases 10th Revision, Clinical Modification (ICD-10-CM) ..... 6-5
6.4        Coding Guidelines Impacting the CMS-HCC Model ....................................... 6-5
6.4.1      Co-Existing and Related Conditions ................................................................. 6-5
6.4.1.1    Combination Codes ............................................................................................ 6-6
6.4.2      Unconfirmed Diagnoses .................................................................................... 6-7
6.4.3      Clinical Specificity in Documentation .............................................................. 6-8
6.4.3.1    History and Physical (H&P), and Lab and Pathology Reports – Guidance ....... 6-9
6.4.4      Coding to the Highest Specificity-Fourth and Fifth Digits .............................. 6-11
6.4.5      V Codes ............................................................................................................. 6-11
6.4.6      E Codes ............................................................................................................. 6-11
6.5        Supporting Documentation Summary ................................................................ 6-12
6.6        Provider and Staff Training ............................................................................... 6-12

**MODULE 7 – RISK ADJUSTMENT DATA VALIDATION** ........................................ 7-1
7.1        Risk Adjustment Data Validation (RADV) ....................................................... 7-1
7.1.1      RADV – Purpose, Method, and Objectives ....................................................... 7-1
7.1.2      RADV – New Approaches .................................................................................. 7-2
7.1.3      RADV – 2007 Parameters .................................................................................. 7-2
7.1.4      RADV – Core Concept ...................................................................................... 7-3
7.1.5      RADV – Guiding Principle ................................................................................ 7-3
7.1.6      Risk Adjustment Discrepancy ........................................................................... 7-3
7.1.7      Medical Record Review Overview .................................................................... 7-3
7.1.8      RADV – Process ................................................................................................ 7-4
7.2        RADV Stages ..................................................................................................... 7-6
7.2.1      Sampling Selection and Medical Record Request STAGE 1 ............................ 7-6
7.2.1.1    Sampling ............................................................................................................ 7-6
7.2.1.2    Medical Record Request .................................................................................... 7-6
7.2.2      Medical Record Submission .............................................................................. 7-9
7.2.3      Medical Record Receipt by the MRRC and Reimbursement ............................ 7-12
7.2.4      Medical Record Review STAGE 2 .................................................................... 7-12
7.2.4.1    Unacceptable Documentation ............................................................................ 7-15
7.2.4.2    Physician Signatures, Physician Credentials, and Dates of Service ................. 7-15
7.2.4.3    Additional Guidance .......................................................................................... 7-17
7.2.4.4    Risk Adjustment Discrepancies ......................................................................... 7-19
7.3        MRR Findings and Contract-Level Payment Adjustments STAGE 3 ............... 7-21
7.4        Documentation Disputes STAGE 4 ................................................................... 7-21
7.5        Post Documentation Dispute – Payment Adjustment  STAGE 5 ...................... 7-22
7.6        Appeals STAGE 6 .............................................................................................. 7-22

Exhibit Z
Page 580



2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide

**TABLE OF CONTENTS**

7.7 Recommendations & Lessons Learned to Date ............ 7-22
7.8 Technical Assistance ............ 7-23
7.9 CMS Data Validation Team Contacts ............ 7-23
7.10 Next Steps ............ 7-23

**MODULE 8 – VERIFYING RISK SCORES** ............ 8-1
8.1 Calculating Risk Scores ............ 8-1
8.2 Risk Score Verification Tools ............ 8-4
8.2.1 RAPS Return File/RAPS Transaction Error Report ............ 8-5
8.2.2 RAPS Management Reports ............ 8-7
8.2.3 CMS-HCC Risk Adjustment Model Software ............ 8-9
8.2.4 Monthly Membership Reports (MMR) ............ 8-10
8.2.4.1 Monthly Membership Summary Reports ............ 8-11
8.2.4.2 Monthly Membership Detail Reports ............ 8-11
8.2.4.2.1 Non-Drug Monthly Membership Report ............ 8-11
8.2.4.2.2 Drug Monthly Membership Report ............ 8-11
8.2.5 Risk Adjustment Model Output Reports (MOR) ............ 8-20
8.2.5.1 Part C Risk Adjustment MOR ............ 8-20
8.2.5.2 RAS RxHCC MOR ............ 8-21

Exhibit Z
Page 581



**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

**TABLE OF CONTENTS**

## LIST OF TABLES

| | | |
|---|---|---|
| Table A | Training Tools | I-2 |
| Table B | Organization Description | I-3 |
| Table C | Risk Adjustment Process Points of Contact | I-4 |
| Table 1A | Risk Adjustment Model Implementation for Payment | 1-7 |
| Table 1B | Phase-Out Schedule for Budget Neutral Risk Adjustment Payments | 1-8 |
| Table 1C | Risk Adjustment Implementation Schedule for MA Organizations and for MA-PDs and PDPs for Drug Benefit | 1-9 |
| Table 1D | Payment Blend Schedule for Specialty Organizations | 1-9 |
| Table 1E | Dialysis and Transplant Risk Score Normalization Phase-in Schedule | 1-10 |
| Table 1F | Characteristics of the Risk Adjustment Models | 1-15 |
| Table 1G | Which Risk Adjustment Factors Apply to Payment | 1-19 |
| Table 1H | Community Versus Long-Term Institutionalized Populations | 1-20 |
| Table 1I | Plans Receiving Frailty Adjustment | 1-21 |
| Table 1J | 2008 and 2009 Frailty Factors | 1-23 |
| Table 1K | Frailty Payment Implementation Schedule for PACE and Dual Demonstration Organizations | 1-24 |
| Table 1L | Range of Frailty Score by Type of Organization | 1-24 |
| Table 1M | New ESRD Dialysis and Transplant Payment Transition | 1-27 |
| Table 1N | Definition of the Low Income Multipliers for Part D Benefit | 1-31 |
| Table 2A | Risk Adjustment Common Terms | 2-1 |
| Table 2B | Submission Timetable | 2-6 |
| Table 2C | Training and Support | 2-7 |
| Table 3A | Structure of HIC Numbers | 3-2 |
| Table 3B | Hospital Inpatient | 3-4 |
| Table 3C | Hospital Outpatient | 3-5 |
| Table 3D | Determining Covered Hospital Entity Provider Numbers | 3-6 |
| Table 3E | Provider Number State Assignments | 3-7 |
| Table 3F | Hospital Inpatient Covered Entities | 3-8 |
| Table 3G | Hospital Outpatient Covered Entities | 3-8 |
| Table 3H | Acceptable Physician Specialties | 3-11 |
| Table 3I | Data Collection Formats | 3-12 |
| Table 3J | Collection Format Features | 3-13 |
| Table 3K | Contractual Payment Relationships | 3-17 |
| Table 4A | Connectivity Options | 4-2 |
| Table 4B | Provider Types | 4-5 |
| Table 4C | From and Through Dates | 4-6 |
| Table 4D | RAPS File Layout | 4-7 |
| Table 5A | Accessing and Printing Reports | 5-3 |
| Table 5B | Reports Overview | 5-4 |
| Table 5C | FERAS Error Code Logic | 5-6 |
| Table 5D | Error Code Ranges | 5-6 |
| Table 5E | FERAS Error Codes | 5-7 |
| Table 5F | Explanation of Error and Consequences | 5-14 |
| Table 5G | RAPS Error Codes | 5-14 |
| Table 5H | Informational Edits | 5-15 |
| Table 5I | Duplicate Diagnosis Cluster Edit | 5-16 |

Exhibit Z
Page 582



**2008 Risk Adjustment Data Technical Assistance For Medicare Advantage Organizations Participant Guide**

**TABLE OF CONTENTS**

Table 5J    RAPS Record Layout ................................................................................. 5-17
Table 5K    Informational Message Codes ................................................................... 5-23
Table 5L    502 Benchmark Comparison Examples ...................................................... 5-24
Table 5M    Tips for Ensuring Compliance With the 5 Percent Benchmark for Duplicate
            Diagnosis Cluster Error Guidance ........................................................... 5-26
Table 5N    Report Naming Conventions ..................................................................... 5-53
Table 6A    Benefits to MA Organizations and Physicians............................................ 6-2
Table 6B    Risk Adjustment Phase-In Schedule for New Lists of Diagnosis Codes ............ 6-5
Table 6C    Documentation Considerations ................................................................. 6-12
Table 6D    Documentation and Coding Resources ...................................................... 6-13
Table 7A    Enrollee List ........................................................................................... 7-8
Table 7B    Types of Acceptable Physician Signatures and Credentials............................ 7-16
Table 7C    Types of Unacceptable Physician Signatures and Credentials........................ 7-17
Table 7D    CMS Staff .............................................................................................. 7-23
Table 8A    Risk Score Calculation Steps.................................................................... 8-3
Table 8B    Risk Score Verification Tools ................................................................... 8-5
Table 8C    Software-Provided Files............................................................................ 8-10
Table 8D    User Supplied Files ................................................................................. 8-10
Table 8E    Summary of the MMR Detail Record Layout Field Ranges............................. 8-11
Table 8F    Monthly Membership Report (MMR) (Drug and Non-Drug Fields) ................... 8-12
Table 8G    Part C Risk Adjustment MOR Field Summary .............................................. 8-21
Table 8H    RxHCC MOR Field Summary .................................................................... 8-21
Table 8I    Part C Risk Adjustment Model Output Data File........................................... 8-22
Table 8J    RAS RxHCC MOR Record Format............................................................. 8-32

Exhibit Z
Page 583

903
Exhibit 3



## LIST OF FIGURES

Figure 1A    Calculation of Risk Adjusted Payment for Plans ........................................................ 1-13
Figure 1B    Frailty Adjustment Calculation ...................................................................................... 1-25
Figure 1C    Calculation of Part D Direct Subsidy ............................................................................ 1-32
Figure 2A    Risk Adjustment Dataflow .............................................................................................. 2-4
Figure 3A    WPC-EDE.COM ............................................................................................................. 3-9
Figure 3B    American Hospital Directory ......................................................................................... 3-10
Figure 3C    Sample Fee-for-Service Superbill.................................................................................. 3-15
Figure 3D    Sample Risk Adjustment Superbill ............................................................................... 3-16
Figure 3E    Communication Methods .............................................................................................. 3-21
Figure 4A    RAPS File Structure Summary ....................................................................................... 4-4
Figure 4B    DDE 1 ............................................................................................................................ 4-14
Figure 4C    DDE 2 ............................................................................................................................ 4-14
Figure 4D    DDE 3 ............................................................................................................................ 4-15
Figure 4E    DDE 4 ............................................................................................................................ 4-15
Figure 4F    DDE 5 ............................................................................................................................ 4-16
Figure 4G    DDE 6 ............................................................................................................................ 4-16
Figure 5A    Data Flow ........................................................................................................................ 5-2
Figure 5B    Rejected FERAS Response Report .............................................................................. 5-10
Figure 5C    FERAS Response Report............................................................................................... 5-11
Figure 5D    Flow of Data for Eligibility Checks ............................................................................... 5-13
Figure 5E    RAPS Return File ........................................................................................................... 5-18
Figure 5F    RAPS Transaction Error Report .................................................................................... 5-19
Figure 5G    RAPS Transaction Error Report .................................................................................... 5-20
Figure 5H    RAPS Transaction Summary Report ............................................................................ 5-21
Figure 5I     Transaction Summary Report ...................................................................................... 5-23
Figure 5J    Duplicate Diagnosis Cluster Report ............................................................................. 5-25
Figure 5K    Resolution Steps ........................................................................................................... 5-27
Figure 5L    Analysis of Management Reports ................................................................................. 5-33
Figure 5M    RAPS Monthly Plan Activity Report Layout ................................................................ 5-34
Figure 5N    RAPS Monthly Plan Activity Report ............................................................................. 5-37
Figure 5O    RAPS Cumulative Plan Activity Report Layout ........................................................... 5-41
Figure 5P    RAPS Cumulative Plan Activity Report ........................................................................ 5-43
Figure 5Q    RAPS Monthly Error Frequency Report Layout ........................................................... 5-47
Figure 5R    RAPS Monthly Error Frequency Report ....................................................................... 5-49
Figure 5S    Analysis of Cumulative Plan Activity Report ................................................................ 5-51
Figure 7A    Data Validation Process.................................................................................................. 7-5
Figure 8A    Risk Score Calculation Process ..................................................................................... 8-2
Figure 8B    RAPS Return File ............................................................................................................ 8-6
Figure 8C    Internal Diagnosis Cluster Database .............................................................................. 8-6
Figure 8D    RAPS Cumulative Plan Activity Report ......................................................................... 8-8
Figure 8E    MMR Report Format – Non-Drug ................................................................................. 8-18
Figure 8F    MMR Report Format – Drug......................................................................................... 8-19
Figure 8G    Part C MOR Report Format .......................................................................................... 8-48
Figure 8H    RAS RxHCC MOR Report Format ................................................................................ 8-49

Exhibit Z
Page 584



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**INTRODUCTION**

# INTRODUCTION

## Purpose (Slide 3)

The purpose of this training is to provide participants who are new to risk adjustment the support necessary to understand risk adjustment. This information will enable new participants to collect and submit risk adjustment data in accordance with Centers for Medicare & Medicaid Services (CMS) requirements.

## About This Training

This technical assistance session is organized into eight modules:

| ICON KEY | |
|---|---|
| Example | ⊠ |
| Reminder | 🖊 |
| Resource | 📖 |

1. **Risk Adjustment Methodology**
   *Provides an understanding of CMS' Risk Adjustment models and payment methodologies.*

2. **Risk Adjustment Process Overview**
   *Identifies the systems and timeline for the risk adjustment data collection, submission, editing, and reporting processes.*

3. **Data Collection**
   *Describes the acceptable sources of risk adjustment data and data collection formats.*

4. **Data Submission**
   *Describes the acceptable formats for submitting risk adjustment data.*

5. **Edits and Reports**
   *Identifies data integrity logic and error codes, error resolution, and suggestions for avoiding errors. In addition, describes risk adjustment reports, and defines their uses in monitoring data collection and submission processes.*

6. **Diagnosis Codes & Risk Adjustment**
   *Provides important medical record documentation and coding guidelines related to risk adjustment.*

7. **Data Validation (Medical Record Review)**
   *Identifies the data validation approach under the CMS' Risk Adjustment models, including responding to CMS medical record requests.*

8. **Verifying Risk Scores**
   *Describes the process for calculating the risk score and its impact on risk adjusted payment.*

Exhibit Z
Page 585



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**INTRODUCTION**

This participant guide is designed as the foundation of the training program. The presentation slides complement the participant guide and both will be used extensively throughout this training. The participant binder includes the participant guide, presentation slides, a resource guide, and job aids. Collectively, these tools enhance the learning experience. Sections of the binder are described in Table A.

**TABLE A – TRAINING TOOLS**

| SECTION | DESCRIPTION |
|---|---|
| **Participant Guide** | • Detailed description of relevant risk adjustment information<br>• Case studies<br>• Exercises<br>• Answer keys |
| **Slides** | • Organized by module<br>• Printed two slides per page |
| **Resource Guide** | • List of common acronyms<br>• Risk adjustment instructions<br>• Contact information<br>• Other source documents |

### Future Use of This Participant Guide

The participant guide, slides, and resource guide are designed for use when participants return to their organizations. Additional copies of the training materials are available at www.csscoperations.com. CMS revises training materials, when required. An appropriate label will appear in the footer of the replacement pages affected by the revisions. Organizations are encouraged to register at www.csscoperations.com to receive notification for these revisions.

### Audience

This technical assistance program is designed for individuals new to the risk adjustment process. The primary audiences for this program are:

• Staff of new Medicare Advantage (MA) and Medicare Advantage – Prescription Drug (MA-PD) organizations, Regional and Employer Group Health plans, demonstration projects, Program of All-Inclusive Care for the Elderly (PACE) organizations, Cost Plans and specialty plans.
• Existing staff unable to attend previous training sessions.
• New staff at the existing organizations mentioned above.
• Third party submitters contracted to submit data on behalf of MA Risk Adjustment organizations.

The organizations listed in Table B will be used throughout this session.

Exhibit Z
Page 586



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**INTRODUCTION**

**TABLE B – ORGANIZATION DESCRIPTION**

| NAME | DESCRIPTIONS |
|---|---|
| MA Organizations | Organizations, including Health Maintenance Organizations with or without Prescription Drug Programs, Employer Group Health and Medical Savings Account organizations, private fee-for-service organizations, preferred provider organizations, and provider sponsored organizations that receive capitated payments to provide comprehensive medical services to Medicare beneficiaries. |
| PACE | Program of All-Inclusive Care for the Elderly (PACE) that serves a community of frail and elderly individuals who are eligible for nursing home placement based on State Medicaid criteria. |
| MSHO/ MnDHO | Minnesota Senior Health Options (MSHO) and Minnesota Disability Health Options (MnDHO) are managed care products in a ten-county area in Minnesota, including the Twin Cities. They integrate Medicare and Medicaid financing of acute and long-term care service delivery for dually eligible and Medicaid eligible physically disabled adults and elderly. MnDHO is approved for Carver, Scott, Washington, Hennepin, Ramsey, Dakota, and Anoka counties. |
| S/HMO | Social Health Maintenance Organizations (SHMO) offer seniors an expanded care benefits package that may include prescription drugs and community-based services, which enables them to maintain independence and avoid nursing home placement. |
| WPP | Wisconsin Partnership Program (WPP) is a comprehensive program for Medicaid and Medicare beneficiaries who are elderly or disabled and meet the State's nursing home criteria. WPP integrates health and long-term support services, and includes home and community-based waiver services (HCBS), physician services, and all other medical care. |
| SCO | The MassHealth Senior Care Option (SCO) is a dual eligible demonstration that CMS and the Division of Medical Assistance for the Commonwealth of Massachusetts developed. The contractors provide care through managed care organizations to beneficiaries who enroll voluntarily. SCOs serve community-well, community-frail, and institutionalized beneficiaries age 65 and older. SCOs are required to contract with State Aging Services Access Point providers as part of the SCO care management team, which deliver home and community-based services as part of an integrated model of care. |
| Capitated Demonstration Projects | Capitated demonstration projects use alternative capitated financing to allow the provider to offer comprehensive medical service. |
| Cost Plans | A Health Maintenance Organization (HMO) or Competitive Medical Plan (CMP) that operates in accordance with a cost reimbursement contract under Section 1876(h) of the Act. These contracts provide the full Medicare benefit packages. Payment is based on the reasonable cost of providing services. Beneficiaries are not restricted to the HMO or CMP to receive covered Medicare services (i.e., services may be received through non-HMO/CMP sources and are reimbursed by Medicare intermediaries and carriers). |



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**INTRODUCTION**

## Learning Objectives (Slide 6)

At the completion of this training, participants will be able to:

• Identify Risk Adjustment and payment methodologies.
• Describe the requirements for data collection.
• Determine the process for submitting data to CMS.
• Explain the process for validating risk adjustment data.
• Interpret the editing rules and reports for monitoring RAPS data.
• Demonstrate how to verify risk scores.

The roles and contact information for important resources are provided in Table C.

**TABLE C – RISK ADJUSTMENT PROCESS POINTS OF CONTACT**

| ORGANIZATION | ROLE | CONTACT INFORMATION |
|---|---|---|
| **CMS Center for Beneficiary Choices** | Develops and implements the risk adjustment payment methodology for the MMA program. Monitors plans to improve the quality of data. | Sean Creighton<br>sean.creighton@cms.hhs.gov<br>Henri Thomas<br>henry.thomas@cms.hhs.gov<br>Louis Johnson<br>louis.johnson@cms.hhs.gov<br>Stephen Calfo<br>stephen.calfo@cms.hhs.gov |
| **CMS Regional Offices** | Provide assistance to Risk Adjustment organizations and beneficiaries regarding various issues related to the Medicare program. | Contact your plan manager. |
| **Palmetto Government Benefits Administration (Palmetto GBA)** | Manages the Front-End Risk Adjustment System (FERAS) and the Customer Service and Support Center (CSSC). | www.csscoperations.com |
| **Leading Through Change, Inc. (LTC, Inc.)** | Training Contractor responsible for risk adjustment training initiatives, including regional training programs and User Group meetings. | TAregistration@tarsc.info |

Exhibit Z
Page 588



# MODULE 1 – RISK ADJUSTMENT METHODOLOGY

## Purpose (Slide 2)

To provide information on risk adjusted data submission and payment under the risk payment models. The goal of risk adjustment is to pay applicable Parts C and D organizations accurately and fairly by adjusting payment for enrollees based on demographics and health status. Changes to risk adjustment under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA) are also provided in this module.

## Learning Objectives (Slide 3)

At the completion of this module, participants will be able to:

- Define the purpose of risk adjustment.
- Identify the components of risk adjusted payments.
- Describe the Part C community model.
- Describe how to calculate the frailty adjuster.
- Describe Part C Community and Long-term institutional models.
- Describe how to calculate a risk factor.
- Recognize the components of the Part C End-Stage Renal Disease (ESRD) model.
- Describe the Part D Prescription Drug Risk Adjustment model.
- Identify the new enrollee factors.



## 1.1    Risk Adjustment History (Slides 4-9)

The following is a list of key dates that have occurred during the process of implementing a risk adjustment payment methodology.

- Balanced Budget Act of 1997 (BBA) (42 CFR 422).
    - Created the Medicare+Choice (M+C) program.
    - Mandated risk adjustment payment methodology to increase payment accuracy.
    - Mandated the implementation of a frailty adjuster for the Program for All-Inclusive Care for the Elderly (PACE) organizations.

- August 1998
    - Hospital inpatient encounter data collection began.



- January 2000 – Principal Inpatient Diagnostic Cost Group (PIP-DCG) Payment Model implemented.
  - Gradual phase-in of risk adjustment based on principal inpatient diagnosis and demographic factors (age, sex, Medicaid status, original reason for Medicare entitlement).
  - Implemented at 10 percent PIP-DCG and 90 percent demographic.
  - The PIP-DCG model is based on hospital inpatient diagnoses only.

- Benefits Improvement and Protection Act of 2000 (BIPA) (December).
  - Established the current implementation schedule to achieve 100 percent risk adjusted payment in 2007.
  - Mandated the incorporation of ambulatory data.

- May 2001 – Secretary of the Department of Health and Human Services suspended collection of ambulatory data to seek burden reduction for M+C organizations.

- January 2002 – CMS announced new risk adjustment data processing system—RAPS (Risk Adjustment Processing System).

- March 2002 – Draft CMS-HCC Payment Model selected.
  - New risk adjustment model needed to accommodate other types of data (hospital outpatient and physician)
  - Included approximately 70 condition groups with reduced number of diagnostic codes.
  - Proposed for implementation in calendar year 2004.

- February 3, 2003 – CMS presented a draft CMS-HCC model discussed at national public meeting and addressed the elimination of the data lag for payment.

- March 28, 2003 – Advanced Notice of Methodological Changes (i.e., 45-Day notice) published the proposed CMS-HCC model, ESRD model, frailty adjuster, and elimination of the data lag.

- May 12, 2003 – Published final M+C rates for 2004 payment.
  - Announced final CMS-HCC model, including the institutional and community models.
  - Provided risk adjustment new enrollee factors.
  - Delayed implementation of ESRD model for M+C until 2005.
  - Described process for elimination of the data lag.

- 📖 See 2004 45-Day Notice at http://www.cms.hhs.gov/MedicareAdvtgSpecRateStats/Downloads/Advance2004.pdf and May 12, 2003 Announcement of Rates for 2004 at: http://www.cms.hhs.gov/MedicareAdvtgSpecRateStats/Downloads/Announcement2004.pdf

- December 8, 2003 – Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA) Enacted (P.L. 108-173).
  - Created MA program to replace M+C program.
  - Retained many M+C provisions while introducing new plan types and new payment rules.
  - Created Medicare drug benefit to begin in 2006.
  - Established bidding methodology for MA organizations and drug plans 2006.



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT METHODOLOGY**

- January 16, 2004-New ratebook for 2004 published.
  - Revised ratebook took into account changes from MMA, including introduction of a new rate - 100% of average FFS costs.
  - 2004 was a transitional year for the capitation rate setting – the FFS rate was the 4th prong to the previous "highest of three rates" methodology so for 2004 each county capitation rate was the higher of its FFS amount, minimum percentage increase rate, floor rate, or blended rate. (See Section 1.2.1 below.) Also, the MMA changed the calculation of the for 2004 and modifying the minimum percentage increase rate for 2004 and beyond.
  - Under the MMA, for 2005 and onward capitation rates are the minimum percentage increase rate, except in years when CMS retabulates "(rebases") the FFS amounts, and in rebasing years the rate is the higher of the two.

&#x1F4D6;  See January 16, 2004 cover letter regarding revised MA rates at:
http://www.cms.hhs.gov/MedicareAdvtgSpecRateStats/Downloads/Announcement2004b.pdf

- March 26, 2004-Advanced Notice of Methodological Changes for 2005 (i.e., 45-Day notice) published.
  - Announcement of MMA-required, ratebook transitions to "highest of 2."
  - Proposes ESRD model for implementation in 2005.

&#x1F4D6;  See 2005 45-Day Notice for additional details at:
http://www.cms.hhs.gov/MedicareAdvtgSpecRateStats/Downloads/Advance2005.pdf

- May 2004-Announcement of draft diagnoses collected for drug risk adjustment model for payment beginning in 2006 and additional codes for CMS-HCC risk adjustment models.

- May 10, 2004-Announcement of rates for 2005.
  - Announced MA county capitation rates.
  - Announced final ESRD CMS-HCC risk adjustment model.

- February 18, 2005-Advanced Notice of Methodological Changes for 2006 (i.e., 45-Day notice) published.
  - Proposed changes in the MA capitation rate methodology due to implementation of MMA bidding and proposed changes to risk adjustment methodology under Part C.
  - Proposed the health status risk adjustment methodology for Part D [Draft Prescription Drug (RxHCC) Model].
  - Proposed payment methodologies for the direct, low income, and reinsurance subsidies, and risk sharing.

&#x1F4D6;  See 2006 45-Day Notice for additional details at:
http://www.cms.hhs.gov/MedicareAdvtgSpecRateStats/Downloads/Advance2006.pdf

&#x1F4D6;  April 4, 2005-Announcement of rates for 2006.
  - Announced final Part D risk adjustment model.
  - Rolled back proposed changes to MA risk adjustment model outlined in February 18, 2005 Advance Notice.
  - April 8, 2005-Updated regional rates.
  - April 13, 2005-Updated ratebook.



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT METHODOLOGY**

📖 See Final 2006 Notice for additional details at:
http://www.cms.HHS.gov/MedicareAdvtgSpecRateStats/Downloads/Announcement2006.pdf

April 7, 2005- Risk Adjustment models and ICD-9/HCC crosswalks posted at
http://www.cms.hhs.gov/MedicareAdvtgSpecRateStats/06_Risk_adjustment.asp

📖 April 3, 2006-Announcement of 2007 Payments posted at
http://www.cms.hhs.gov/MedicareAdvtgSpecRateStats/Downloads/Announcement2007.pdf.

— Announced recalibrated version of the CMS-HCC model for 2007
— Announced updated normalization factor for CMS-HCC models

📖 April 2, 2007—Announcement of 2008 Payments posted at
http://www.cms.hhs.gov/MedicareAdvtgSpecRateStats/Downloads/Announcement2008.pdf.

— Announced recalibrated versions of ESRD models for 2008
— Announced normalization factor for Part D risk adjustment model
— Announced updated normalization factor for Part C CMS-HCC and functioning graft models
— Announced normalization factor for ESRD dialysis and transplant models
— Announced recalibrated frailty model
— Announced new frailty payment implementation for PACE and certain demonstration organizations

📖 April 7, 2008—Announcement of 2009 Payments posted at
http://www.cms.hhs.gov/MedicareAdvtgSpecRateStats/Downloads/Announcement2009.pdf.

— Announced recalibrated version of the Part C CMS-HCC model for 2009
— Announced updated normalization factors for Part C CMS-HCC, ESRD Dialysis model, and the functioning graft model
— Announced updated normalization factor for the Part D risk adjustment model
— Announced recalibrated frailty factors for 2009
— Announced standard set of ICD-9 Diagnosis codes for Risk Adjustment

## 1.2    Calculating Payments

### 1.2.1  Payments for 2004 and 2005

Traditionally, payments to MA organizations were based solely on demographic information. Risk adjustment provides more accurate payments for MA organizations. Payments are higher for less healthy enrollees and lower for more healthy enrollees.  For 2004 and 2005, MA risk payment calculations involved two steps:
1.  Identify the county risk rate for the enrollee's county of residence , and
2.  Multiply by the enrollee's individual risk factor.

---

1-4



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT METHODOLOGY**

CMS derived county risk rates for Part A and Part B by multiplying the unadjusted Part A and Part B demographic county rates (used for demographic payments) by a rescaling factor, based on the CMS-HCC risk factor of the FFS enrollees in that county. The demographic rates were used in the older payment method where the county rate was standardized by the county average FFS demographic factor (based on age, sex, Medicaid, institutional, disabled, and working aged statuses) and payment equaled the county rate multiplied by the individual demographic factor, which was a proxy for expected health risk.) Under the new risk adjustment method being phase-in beginning in 2000, this county risk rate was then multiplied by the individual's CMS-HCC risk factor to determine the appropriate payment amount. The schedule from 2004-2007 for phasing-out the demographic payment method and phasing-in the risk-adjustment payment method was as follows:

- For 2004, MA organizations were paid using 70 percent of the demographic payments and 30 percent of the CMS-HCC payments.
- For 2005, MA organizations were paid using 50 percent of the demographic payments and 50 percent of the CMS-HCC payments.
- For 2006, MA organizations were paid using 25 percent of the demographic payments and 75 percent of the CMS-HCC payment.
- For 2007 and beyond, MA organizations are paid using 100 percent of the CMS-HCC payment.

Prior to the passage of the MMA, the 2004 MA (then M+C) rates for each county were defined as the highest of three rates: the blended capitation rate, minimum "floor" amount, or minimum two percent increase rate. With the enactment of the MMA in December 2003, the original 2004 payment methodology changed and required CMS to issue revised capitation rates for CY 2004.

The MMA mandated that a new rate type, 100 percent of projected average fee-for-service Medicare costs (with adjustments to exclude direct medical education and include a VA/DOD adjustment) be added to the payment methodology. Introducing the 100% FFS reconnects the link between managed care payment rates and fee-for-service spending at the county level that had existed prior to the BBA. For 2004 only (a transition year under the MMA rate-setting rules), the county capitation rate was this highest of four rates:  blended rate, floor amount, minimum increase rate, and FFS rate.

For 2005 and subsequent years, the MA capitation rate for a county is the minimum percentage increase rate, except for years when CMS re-tabulates ("rebases") the FFS rates. In rebasing years, the county capitation rate is the higher of the minimum percentage increase rate or the FFS rate.

In addition, from 2004 onward, the MMA modifies the methodology for calculating the minimum percentage increase. The previous year's rate is increased by the larger of:

- 2 percent

or

- the Medicare growth percentage, - with no adjustments to this growth trend for over/under projections for years before 2004.

The Deficit Reduction Act of 2005 redefined the minimum percentage increase rate to be the previous year's rate increased by the Medicare growth percentage, with no adjustments for over/under projections for years before 2004.



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT METHODOLOGY**

### 1.2.2  MA Capitation Rates for 2006 through 2008

CY 2006 was the first year that MAOs were paid based on the MMA bid-based methodology. Thus, the capitation rates are no longer the same as payment rates. Capitation rates are used to establish benchmarks, and payment rates are plan-specific per capita monthly bids (adjusted).

For 2006, the final estimate of the increase in the National Per Capita Medicare Advantage Growth Percentage for aged beneficiaries was 4.8 percent, which is greater than 2 percent. Therefore, 4.8 percent was used as the minimum update percentage in calculating the 2006 rates. For 2006, all capitation rates are the 2005 rate increased by 4.8 percent. Per the MMA, CMS is not required to rebase the county fee-for-service rate every year and did not do so for 2006. In addition, for 2006, MA organizations were paid using 25 percent of the demographic payments and 75 percent of the CMS-HCC risk payments.

For 2007, the final estimate of the National Per Capita Medicare Advantage Growth Percentage was 7.1 percent. Because fee-for-service rates were rebased (to reflect more recent county growth trends in fee-for-service expenditures), counties where the FFS rate is greater than the minimum percentage increase rate received the FFS rate. For 2007, 6 percent of the counties received the FFS rates. For 2007 and beyond, payments to MA organizations will be at 100 percent of the CMS-HCC risk rate.

For 2008, the final estimate of the National Per Capita MA Growth Percentage is 5.7%. This final estimate includes 4.3 percent for the 2008 underlying trend change and 1.3 percent due to corrections to prior years' estimates, as required by law. CMS did not re-tabulate the FFS rates for 2008, so all MA capitation rate are minimum percentage increase rates.

For 2009, the final estimate of the National Per Capita MA Growth Percentage is 4.2%. This final estimate includes 0.48 percent due to corrections to prior years' estimates, as required by law.

### 1.2.3  Risk Ratebook

For payments years through 2006, a rescaling factor has been used to convert the demographic capitation rates to the risk adjusted capitation rates for each county. This is referred to a restandardizing the ratebook. The rescaling factor is defined as the county rate properly standardized to the new risk adjustment factors divided by the demographic county rate. In addition to restandardizing the ratebook, a budget neutrality factor is applied to make risk adjustment budget neutral. (see below for more information)

Section 5301 of the Deficit Reduction Act (DRA) changes the way CMS develops its capitation rates, beginning in 2007. The DRA established a single risk ratebook for monthly capitation rates, because the statutory transition for MA plans from payment based on the demographic rates and demographic adjustment factors to payment based on risk adjustment rates and risk adjustment factors were completed in 2006. Effective 2007, MA capitation rates are risk rates. Capitation risk rates are used to determine the plan benchmarks for virtually all MA plans and MAOs set their bids in relation to their benchmarks.

The DRA defines the risk rates as the base ratebook, so CMS will now publish two sets of rates – risk and demographic rates. CMS will continue to publish the demographic rates because they are used in budget neutrality (BN) factor calculations. Also, the demographic rates will be used in 2007 to determine

---

Exhibit Z
Page 594



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT METHODOLOGY**

payments to certain demonstrations and PACE organizations, which lag one year in the transition blend so that 25 percent of their payments will be based on demographic rates.

In addition, the FFS normalization factor, which was applied in the rate book prior to 2007, is instead applied to the risk scores starting in 2007. The result of these two approaches is mathematically the same.

Table 1A shows the risk adjustment models and updates implemented for payments beginning with 2004. Note that all models are implemented with their associated new enrollee models.

**TABLE 1A – RISK ADJUSTMENT MODEL IMPLEMENTATION FOR PAYMENT (Slides 16, 17, & 42)**

| PAYMENT YEAR | RISK ADJUSTMENT MODEL IMPLEMENTED FOR PAYMENT | CALIBRATION YEARS | NORMALIZATION FACTOR |
|---|---|---|---|
| 2004-2006 | CMS-HCC Community & Institutional | 1999-2000 | 1.05 |
| 2005-2007 | ESRD Functioning Graft | 1999-2000 | 1.05 |
| | ESRD Dialysis and Transplant | 1999-2000 | N/A |
| 2006-current | RxHCC | 2002-2006 | N/A |
| 2007-current | Recalibrated CMS-HCC Community & Institutional | 2002-2003 | 1.029 |
| 2008 | Recalibrated ESRD Functioning Graft | 2002-2003 | 1.04 |
| | Recalibrated ESRD Dialysis and Transplant | 2002-2003 | 1.010 |
| | Recalibrated CMS-HCC Community and Institutional | 2002-2003 | 1.04* |
| | RxHCC | 2002-2006 | 1.065** |
| 2009 | Recalibrated ESRD Functioning Graft | 2002-2003 | 1.058 |
| | Recalibrated ESRD Dialysis and Transplant | 2002-2003 | 1.019 |
| | Recalibrated CMS-HCC Community and Institutional | 2004-2005 | 1.03 |
| | RxHCC | 2002-2006 | 1.085 |

*The 2008 normalization factor for the CMS-HCC community and institutional models was updated from 2007 to include one additional year of FFS data. Note that the 2007 recalibrated model did not change for 2008 payments.
**The 2008 normalization factor for the RxHCC model will be first implemented in 2008. Note that the 2006 model did not change for 2008 payments.

**1.2.3.1   Adjustment for Budget Neutrality**

While risk adjustment (without the implementation of budget neutrality) would reduce aggregate payments to the MA program, compared to aggregate payments under the older demographic method, budget neutrality redistributes these payments as a constant percentage to organizations affected by risk adjustment (including MA organizations, PACE, and certain demonstrations). In other words, under

Exhibit Z
Page 595



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT METHODOLOGY**

budget neutrality, savings that would have accrued to the Medicare Trust Fund due to the application of risk adjustment are instead redistributed among MA organizations. The budget neutrality factor is calculated as the difference between payments under 100 percent of the risk adjustment method (i.e., under the CMS-HCC model) versus payment under 100 percent of the demographic only method.

The following sections discuss recent changes in the application of budget neutrality policy.

### 1.2.3.2    Change in the Budget Neutrality Calculation to Account for Different Payment Methodologies for Local MA Plans Versus Regional MA Plans

Because of the difference in payment methods for local MA plans versus regional MA plans beginning in 2006, CMS will modify the budget neutrality calculation. Budget neutrality is calculated as the difference between aggregate MA payments at the local MA benchmark rate that would have been made using the demographic method for 100 percent of payments and the aggregate payments that would be made using 100 percent of risk adjusted payments. Budget neutrality will be applied to both local and regional MA plans. For regional plans, this means that the budget neutrality factor will be applied to the statutory component of the benchmark.

### 1.2.3.3    Phase Out of Budget Neutrality

The DRA mandates the phase-out schedule for the BN factor from 2007 through 2010. The phase out schedule is shown in Table 1B. Under the budget neutrality methodology, in 2006, 100 percent of the difference between payment under the demographic method and payment under risk adjustment was added back to the risk payment rates via a rescaling factor. However, due to the payment blend for 2006 this will result in 75 percent of the budget neutrality amount being added back to the blended benchmark. For 2007, 55 percent of the BN factor was applied to every risk rate. The percentage applied will decrease each year until 2011, when it is 0 percent (see Table 1B).

**TABLE 1B – PHASE-OUT SCHEDULE FOR BUDGET NEUTRAL RISK ADJUSTMENT PAYMENTS**

| YEAR | BUDGET NEUTRALITY PERCENTAGE |
|---|---|
| 2006 | 100% [1/] |
| 2007 | 55% |
| 2008 | 40% |
| 2009 | 25% |
| 2010 | 5% |
| 2011 | 0% |

[1/] 100 percent of the difference between payment under the demographic method and the payment under the risk adjusted method will be added to the risk adjusted payment rates. However, due to the payment blend for 2006 of 25 percent demographic and 75 percent risk adjustment the net effect is a 75 budget neutrality adjustment.

### 1.2.4  Payment Blends

The schedule for implementing risk adjusted payments based on the CMS-HCC model and the blended transitional approach is shown below. In 2004, the CMS-HCC model was implemented at a 30 percent risk adjusted payment, with the remaining 70 percent represented by the demographic payment. The

Exhibit Z
Page 596



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT METHODOLOGY**

portion of risk adjusted payment will increase to 50 percent in 2005, to 75 percent in 2006, and finally to 100 percent in 2007. There was not blended payment transition for the Part C ESRD and Part D models. Payments under these models were implemented at 100 percent risk adjustment from the beginning. The CMS-HCC implementation schedule is shown in Table 1C. The Part C blended payment transition schedule for PACE and certain demonstration organizations is on a one year lag from the payment transition for MA organizations. Table 1D shows that CMS-HCC implementation schedule for specialty organizations.

**TABLE 1C – RISK ADJUSTMENT IMPLEMENTATION SCHEDULE FOR MA ORGANIZATIONS AND FOR MA-PDS AND PDPS FOR DRUG BENEFIT**

| PAYMENT YEAR | CMS-HCC MODEL -COMMUNITY -INSTITUTIONAL | ESRD CMS-HCC MODEL | DRUG BENEFIT MODEL |
|---|---|---|---|
| 2004 | 70% Demographic 30% CMS-HCC Model | N/A | N/A |
| 2005 | 50% Demographic 50% CMS-HCC Model | 100% | N/A |
| 2006 | 25% Demographic 75% CMS-HCC Model | 100% | 100% |
| 2007 | 100% CMS-HCC Model | 100% | 100% |

**TABLE 1D – PAYMENT BLEND SCHEDULE FOR SPECIALTY ORGANIZATIONS**

| TYPE OF HEALTH PLAN | PART C TRANSITION BLEND* | | | | |
|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2007 | 2008 |
| PACE | 90/10% | 70/30% | 50/50% | 25/75% | 100% |
| WPP | 90/10% | 70/30% | 50/50% | 25/75% | 100% |
| MSHO and MnDHO | 90/10% | 70/30% | 50/50% | 25/75% | 100% |
| S/HMOs | 90/10% | 70/30% | 50/50% | 25/75% | 100% |
| SCO | 90/10% | 70/30% | 50/50% | 25/75% | 100% |

*Represents percentage of original demographic payment methodology (specific to each plan type) versus CMS-HCC risk adjusted portion of payment. ESRD and Part D risk adjustment were implemented at 100 percent risk.

Exhibit Z
Page 597



## 1.2.5  Fee-for-Service Normalization Adjustment (Slide 42)

The purpose of the fee-for-service normalization adjustment is so that CMS payments are based on a population with an average risk score of 1.0.  The CMS-HCC models are calibrated with FFS claims data. Because average predicted FFS expenditures increase after the model calibration year due to coding and population changes, CMS applies a normalization factor to adjust beneficiaries' risk scores so that the average risk score is 1.0 in subsequent years. Through 2006, CMS adjusted the restandardized ratebook to the appropriate denominator for the payment year. The denominator represented the national average predicted fee-for-service expenditures per beneficiary in that year. Every year there are shifts in the Medicare population. Specifically, fee-for-service coding across all sites of service, coding has not yet stabilized as much as inpatient hospital coding. Therefore, it has been necessary to apply a fee-for-service normalization factor to adjust for changes in coding patterns.

The DRA required CMS to apply the fee-for-service normalization factor to the risk scores. For 2007 the Part C normalization factor for the recalibrated CMS-HCC model is 1.029, and 1.05 for the ESRD functioning graft models. The functioning graft normalization factor remained unchanged from the previous year since the ESRD models were not recalibrated for 2007. There was no normalization factor applied to the dialysis and transplant risk scores for 2007. For 2008, the normalization factor is 1.04 for the CMS-HCC and ESRD functioning graft risk scores. The Part D normalization factor is 1.065.

CMS will implement a four-year normalization phase-in of the Part C - ESRD dialysis and transplant risk scores. For 2008 (Y1) through 2011 (Y4), CMS will calculate a yearly normalization factor. The calculated normalization factor for each year will be adjusted using the specified phase-in percentage for that year. The risk scores will then be divided by the resulting adjusted normalization factor for that year. For example, in 2008 (Y1), dialysis and transplant risk scores will be divided by 25% of the calculated 2008 normalization factor. The normalization factor calculated for 2008 is .039 (or 3.9%). This factor will be multiplied by 25% to get the adjusted normalization factor. Therefore, the ESRD dialysis and transplant risk score normalization formula is [risk score/(1+(the adjusted factor))], which is 1.010 (i.e., 1+(.039 *25%)) (See Table 1E).

Beneficiary risk scores are divided by a normalization factor. The fee-for-service normalized risk scores will appear on the MMRs. If plans calculate their own raw risk scores using the CMS-provided software, they will need to divide these raw risk scores by the respective normalization factors to obtain the risk scores used for payment.

**TABLE 1E — DIALYSIS AND TRANSPLANT RISK SCORE NORMALIZATION
PHASE-IN SCHEDULE**

| YEAR | ADJUSTED NORMALIZATION FACTOR PHASE-IN PERCENTAGE |
|---|---|
| 2008 (Y1) | 1+ (.039*25%) |
| 2009 (Y2) | 1+ (Calculated Normalization Factor * 50%) |
| 2010 (Y3) | 1+ (Calculated Normalization Factor * 75%) |
| 2011 (Y4) (forward) | 1+ (Calculated Normalization Factor * 100%) |

For a complete explanation of the derivation of the demographic and risk adjusted ratebook, see the following: http://www.cms.hhs.gov/manuals/Downloads/mc86c08.pdf



## 1.2.6  Payments for 2006 and Beyond

### 1.2.6.1    Bidding Background

Beginning in 2006, CMS' payments for plan enrollees are based on the plan bid relative to the plan benchmark. An MA organization's combined bid for its service area, for both local and regional organizations (and service area segment, in the case of a local organization), will have three parts:

- An amount for the provision of Medicare Parts A and B medical benefits. (This is the standardized A/B bid, and does not include beneficiary cost-sharing.)

- An amount for basic coverage of Medicare prescription drug benefits (if any).

- An amount for the provision of supplemental medical and prescription drug benefits (if any).

Benchmarks. For both local and regional MA plans, the plan A/B benchmark, when compared against the plan A/B bid, determines whether a plan will have savings and rebates to offer additional benefits, or whether the MA organization will have to charge a basic premium for the plan's coverage of Part A and B benefits.

For local plans, the plan A/B benchmark is determined according to formulas established in the MMA. For a single-county plan (or segment), the plan A/B benchmark is the capitation rate for that county, adjusted to reflect the plan's projected risk profile to allow comparison to the plan A/B bid.

For local plans serving more than one county, the plan A/B benchmark is the enrollment-weighted average of all the county capitation rates in the plan's service area (or segment), adjusted by the projected risk profile of the plan. (In determining the enrollment-weighted average, the weights are based on the plan's projected enrollment in each county of its service area.)

The standardized benchmark for each MA region is a blend of two components: a statutory component consisting of the weighted average of the county capitation rates across the region; and, a competitive component consisting of the weighted average of all of the standardized A/B bids for regional plans in the region. The weighting for the statutory component is based on MA eligible individuals in the region. "MA eligibles" refers to all Medicare beneficiaries in the FFS and MA programs. The weighting for the competitive component (which includes each regional plan's bid) is based on the projected enrollment of the regional plans competing in the region. The blend of the two components will reflect the market share of traditional Medicare (for the statutory component) and the market share of all MA organizations (for the competitive component) in the Medicare population nationally.

## 1.2.7  Intra-Service Area Rate (ISAR) Adjusted County Payment Rates

In 2006 and beyond, payments to MA organizations must be adjusted to account for variations in MA local payment rates among the different MA local areas included in the MA plan's service area. For each MA plan, CMS will apply an ISAR adjustment based on the variation among MA capitation rates in the counties of a MA plan's service area. The ISAR is used to convert the plan's service-area bid into plan-specific county rates.

Exhibit Z
Page 599



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT METHODOLOGY**

The ISAR factor is calculated as the ratio of a county rate to the weighted average of all county rates for the service area, using plan projected county enrollment as the weights. For example, a plan with a service area of three counties (X, Y, and Z) could have ISAR factors of 0.98 for county X, 1.12 for county Y, and 0.9 for county Z. The weighted average of all the plan's county ISAR factors for that plan's service area must equal 1.0. Thus, for each county in the plan's service area, there will be a plan-specific county rate derived from the bid and the ISAR factor. Each county's ISAR factor is multiplied by the plan's standardized bid amount to derive the plan-specific payment rate for each county in the plan's service area.

## 1.2.8  Plan Payments

Plan payments Part C benefits are based on the relationship of the plan's bid with the plan benchmark.

(a) If the plan bid is less than the plan benchmark, monthly payment from CMS for an enrollee is:

> ISAR-adjusted county rate × enrollee risk factor + rebate

(b) If the plan bid is equal to the plan benchmark, monthly payment from CMS for an enrollee is:

> ISAR-adjusted county rate × enrollee risk factor

> There is no rebate and no basic beneficiary premium.

(c) If the plan bid is greater than the plan benchmark, monthly payment from CMS for an individual is:

> ISAR-adjusted county rate × enrollee risk factor + government premium adjustment

> There is no rebate and the enrollee pays a basic premium. The combined payment from CMS and the enrollee will on average equal the organization's bid (based on enrollment assumed in the bid submission).

For enrollees who are out of the service area, the base payment will be the 1.0 bid (with individual-level risk adjustment for demographic and health status factors). (Note that for plans with bids above benchmarks, the base payment for out-of-area enrollees is the benchmark because the beneficiary premium is subtracted from CMS' payment.) The rebate amount is not geographically or otherwise adjusted. It is a fixed amount determined through comparison of the plan A/B bid to the plan A/B benchmark based on the plan's projected enrollment.

⊠ **Example: Plan with a Rebate**

- Mr. Jones' plan:
  - Standardized  ("1.0") A/B bid = $600
  - Rebate = $54
  - His plan's county ISAR factor = .98
  - His risk factor = 1.2
- ISAR–adjusted payment rate for Mr. Jones' county for his plan: ($600 X .98) = $588
- Monthly Part C  payment for Mr. Jones for his plan:
  - ($588 X 1.2) + 54 = $759.60

---

Exhibit Z
Page 600

**Exhibit 3**



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT METHODOLOGY**

Figure 1A illustrates the calculation of Risk Adjusted Payment for Plans.

**Figure 1A – Calculation of Risk Adjusted Payment for Plans**



**\*\* Rebate applied to buy down the Part D basic premium is reflected in the part D
payment; and rebate applied to buy-down the Part B premium is foregone revenue.**

## 1.3    Risk Adjustment Payment Models for Payment (Slide 13)

In 2003, after public comment, the CMS-HCC model was finalized as the risk adjustment payment model. The goal was to select a clinically sound risk adjustment model that improved payment accuracy while minimizing the administrative burden on MA organizations.

The model is a revision of the Hierarchical Condition Category model, originally developed by Health Economics Research, Inc. The CMS-HCC model functions by categorizing *International Classification of Diseases, 9th Edition, Clinical Modification* (ICD-9-CM) codes into separate groups of clinically related codes, (e.g., diabetes, cancer, ischemic heart disease, infections, etc.) that have similar cost implications.

In order to improve payment further, CMS has developed separate models for different populations who have different cost patterns than the general Medicare population. There are four CMS-HCC models used to calculate risk scores for MA plans: a community model, a long-term institutional model, an ESRD



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT METHODOLOGY**

model, and a new enrollee model. The new enrollee model is different than the other models in that it is not disease based.

CMS implemented the Prescription Drug (RxHCC) model in 2006 for payment under Part D. The RxHCC model is also a disease based model similar to the CMS-HCC model. However, it varies in that there is a base model and there are separate multipliers for the long term institutionalized (LTI) and low income beneficiaries which are applied to payment outside the model. The RxHCC model is described in detail towards the end of this module.

CMS has updated all of its Part C models and the frailty adjustment model, which is used for Non-ESRD $\geq$55 community residents. The result of the model recalibrations also yields updated normalization factors. Application of the normalization factors is described later in this module.

In 2007, CMS implemented updated versions of the CMS-HCC community and institutional risk adjustment models. Fee-for-service (FFS) claims data for the years 2002 and 2003 were used in the recalibrated model. Diagnosis data for 2002 predict 2003 expenditures. As these data are more current than the 1999 and 2000 data used for the original CMS-HCC model, the updated models reflect newer treatment and coding patterns in Medicare FFS.

For 2008, CMS recalibrated the original Part C ESRD models, and refined the frailty adjustment factors that are applied to the Part C community model risk scores. Similar to the community and institutional recalibration efforts, the ESRD models were recalibrated using 2002 and 2003 FFS claims data for ESRD enrollees. The frailty factors are used to calculate frailty scores applied to the payments to PACE organizations and certain demonstration plans. For PACE plans, CMS will transition from using the frailty factors used in 2007 to the revised frailty factors over five years. CMS will apply the current frailty adjustment factors to MA demonstration organization's payments on a phased-out schedule (described in the frailty section).

CMS' suite of payment models share common conceptual framework in general; however, the purpose for each is distinct to the expenditure patterns for specific Medicare populations.

Table 1F describes the characteristics of the Part C (CMS-HCC) and Part D (RxHCC) models.



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT METHODOLOGY**

### TABLE 1F – CHARACTERISTICS OF THE RISK ADJUSTMENT MODELS

| CHARACTERISTIC | DESCRIPTION |
|---|---|
| **SIMILAR MODEL CHARACTERISTICS (PART C AND PART D)** | |
| Selected Significant Disease (SSD) Model | • Serious manifestations of a condition are considered rather than all levels of severity of a condition.<br>• Models are additive.<br>• Include most body systems and conditions. |
| Prospective Model | • Uses diagnostic information from a base year to predict total costs for the following year. |
| Site Neutral | • Models do not distinguish payment based on a site of care. |
| Diagnostic Sources | • Models recognize diagnoses from hospital inpatient, hospital outpatient, and physician settings. |
| Multiple Chronic Diseases Considered | • Risk adjusted payment is based on assignment of diagnoses to disease groups, also known as HCCs.<br>• Model is most heavily influenced by Medicare costs associated with chronic diseases. |
| Disease Interactions and Hierarchies Included | • Interactions allow for additive factors based on chronic conditions and disabled status to increase payment accuracy.<br>• Hierarchies allow for payment based on the most serious conditions when less serious conditions also exist. |
| Demographic Variables | • Models include four demographic factors: age, sex, disabled status, and original reason for entitlement.<br>• These factors are typically measured as of the data collection period. |

| PART C SPECIFIC CHARACTERISTICS | |
|---|---|
| Frailty Adjuster | • Frailty add-on is used for PACE and certain demonstration plans with a frail elderly population in the community. |
| Medicaid Eligibility | • Medicaid status for full risk enrollees is prospective and always determined based on the data collection period.<br>• Medicaid status for new enrollees is concurrent and based on Medicaid status during the payment year (during final payment). |
| Community-Based and Long-Term Institutionalized Enrollees Distinguished | • Long-term institutionalized is defined as enrollees with 90 days or greater of residence in a nursing home.<br>• Institutional model is not based on institutional factor demographic-only model.<br>• Separate models account for higher treatment costs of similarly-ill community residents.<br>• Community and institutional models both include 70 disease groups. |
| ESRD CMS-HCC Model | • Model addresses disparate treatment costs structures related to ESRD enrollee status.<br>• The model includes specific payments for individuals with dialysis, transplant, and functioning graft.<br>• The ESRD model includes 67 disease groups. |
| **PART D SPECIFIC CHARACTERISTICS** | |
| LTI Multiplier | • Long term institutional (LTI) factor – gets assigned to the risk scores of beneficiaries with 90 days of residence or greater in a nursing home.<br>• LTI status is determined based on the data collection period. |
| LIS Multiplier | • Two low income status (LIS) factors (full subsidy, and partial subsidy) – one or the other gets assigned to the risk score for enrollees based on their Part D determined LIS status.<br>• LIS status is determined during the payment year. |

Exhibit Z
Page 603

**Exhibit 3**



### 1.3.1   Components of the Risk Score in the CMS-HCC Model

CMS uses diagnoses from Medicare fee-for-service and/or from RAPS for determining the HCCs for each enrollee. Medicare fee-for-service data are utilized for risk adjusted payment when an enrollee joins an MA organization (or PACE/demonstration) after opting out of traditional Medicare fee-for-service coverage. That is, if an enrollee new to an MA organization enrolls in January of a calendar year, then CMS will use up to 12-months of prior fee-for-service data within the data collection period (both Part A and Part B) to obtain diagnostic data. Where data for a person have been submitted via RAPS, those data are also used in calculating the risk score for a person.

The risk score used in calculating payments under the CMS-HCC model includes demographics as part of the risk model as well as different disease groups or HCCs. The model allows for the recognition of coexisting diseases when calculating payment by recognizing multiple chronic conditions listed for the beneficiary. Interactions (i.e., combinations) are used to account for expected costs that are higher because, for example, multiple coexisting diseases cause additional complications. Hierarchies are imposed to provide payments only for the most severe manifestation of a certain disease.

#### 1.3.1.1   Demographic Factors (Slide 19)

The risk score uses five demographic factors in calculating the risk score under the CMS-HCC model, including age, sex, Medicaid status, disability, and original reason for Medicare entitlement (i.e., disability).

***Age and Sex***:  Based upon the enrollee's age and sex, risk adjusted demographic factors are assigned for the calculation of the enrollee's risk factor.

Under the CMS-HCC model, CMS bases payments for the entire payment year upon the age an enrollee attains as of February 1st of each year with one exception, when an enrollee ages in to Medicare. (i.e., Beneficiaries are treated as age 65 for risk adjustment purposes when they attained 65 years of age in the payment year and the reason for entitlement is age.)

***Disabled Status***:  The disabled factors for enrollees under 65 years old are labeled as "disabled" and those over 65 years old are labeled as "aged." Under the CMS-HCC model, additional payments are made for Medicaid eligible disabled individuals.

***Original Reason for Medicare Entitlement (OREC)***:  The factors labeled "originally disabled" apply to enrollees that are 65 years old or over who were originally entitled for Medicare due to disability. Under the CMS-HCC model, additional payments are made for OREC individuals with Medicaid based on age and sex.

***Medicaid Status:***  The Medicaid factor applies to enrollees who are entitled to Medicaid under Title XIX of the Social Security Act. A Medicaid factor is applied based on the "aged", "disabled", or "originally disabled" status of the Medicaid enrollee.

#### 1.3.1.2   Disease Groups/HCCs (Slide 20)

Disease groups contain major diseases and are broadly organized into body systems. For risk adjustment purposes, CMS refers to disease groups as HCCs. The HCC assigned to a disease is determined by the



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

## RISK ADJUSTMENT METHODOLOGY

ICD-9-CM diagnosis codes submitted during a data collection period. Only selected diagnosis codes are included in the CMS-HCC model. There are 70 distinct disease groups for payment for community and long-term institutionalized residents. The ESRD model has approximately 67 disease groups, depending on the subpart of the model.

 **Example 1**

| DISEASE GROUP/HCC | DESCRIPTION |
|---|---|
| HCC92 | Specified Heart Arrhythmia |
| HCC158 | Hip Fracture/Dislocation |

### 1.3.1.3   Disease Hierarchies (Slide 22)

Finally, the CMS-HCC model incorporates disease hierarchies. These hierarchies are used to provide payments for only the most severe manifestation of a disease, even when diagnoses for less severe manifestations of a disease are also present in the beneficiary during the data collection year. For example, an individual with diabetes that progresses over a year from having no complications (HCC19) to having acute complications (HCC17) would trigger the payments for HCC17 but not for HCC19. (Note that payments for HCC17 are higher than for HCC19.)

 **Example 2**

Cancer

| CMS-HCC DISEASE HIERARCHIES | | | |
|---|---|---|---|
| **If the Disease Group is Listed in This Column…** | | **…Then Drop the Associated Disease Group(s) Listed in This Column** | |
| **HCC** | **Disease Group Label** | **HCC** | **Disease Group Label** |
| 9 | Lymphatic, head & neck, brain & other major cancers | 10 | Breast, prostate, colorectal & other cancers & tumors |

### 1.3.1.4   Disease Interactions (Slide 23 & 24)

Certain combinations of coexisting diagnoses for an individual can increase their medical costs. The CMS-HCC model recognizes these higher costs through incorporating payments for disease interactions.

There are six disease interactions in the community model and five in the institutional model. Examples of the disease interactions include a two-way combination of diabetes mellitus (DM) and congestive heart failure (CHF) or a three-way combination of chronic obstructive pulmonary disease (COPD), cerebrovascular disease (CVD), and coronary artery disease (CAD).



In calculating this part of the risk score for an individual, the individual score for each HCC is added and then the disease interaction score is added. In the example below, the risk adjusted payment would include an additional factor when an enrollee has both diabetes mellitus and congestive heart failure.

 **Example 3**

Two-disease Interaction for Community-Based Enrollee
    Factor 1: Diabetes Mellitus (DM), HCC15 = 0.508
    Factor 2: Congestive Heart Failure (CHF), HCC80 = 0.410
    Factor 3: Interaction:  DM*CHF = 0.154

    Risk Score = (demographics) + 0.508 + 0.410 + 0.154

In this case, the enrollee receives an additional interaction instead of only two factors for HCC15 and HCC80.

## 1.3.1.5  Disabled/Disease Interactions

Another type of interaction accounted for in the CMS-HCC model involves certain diseases and the disabled status for an enrollee. There are five disabled/disease interactions in the community model and four in the institutional model.

Below is an example of an individual who is disabled and has been diagnosed with rheumatoid arthritis and an opportunistic infection.

 **Example 4**

Disabled/Disease Interaction for Community-Based Enrollee
    Factor 1: Rheumatoid Arthritis, HCC38 = 0.346
    Factor 2: Opportunistic Infection, HCC5 = 0.300
    Factor 2: Disabled * Opportunistic Infection, D HCC5 = 0.623

    Risk Score = (demographics) + 0.346 + 0.300 + 0.623

## 1.3.2  New Enrollee Factors

For purposes of risk adjustment, new enrollees are defined as newly eligible disabled or age-in beneficiaries (including "ever-disabled" age-in beneficiaries) with less than 12 months of Medicare Part B entitlement during the data collection year. Note that payments based on Medicaid eligibility will be made retroactively for all new enrollees, once enrollment can be established and verified.

As indicated in Table 1G, beneficiaries with 12 or more months of Medicare Part B enrollment during the data collection period (previous calendar year) are considered full risk enrollees. The new enrollee factors do not apply.

Beneficiaries with less than 12 months of entitlement to benefits under Part A and less than 12 months of Part B enrollment during the data collection period will be treated as new enrollees.



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT METHODOLOGY**

Previously, beneficiaries with 12 or more months of entitlement to benefits under Part A and less than 12 months of Part B enrollment during the data collection period (referred to as "Part A-only" enrollees) are considered new enrollees for the purpose of risk adjusted payments. Because of concerns expressed by some demonstrations that "Part A only" enrollees are always considered to be new enrollees, CMS has created an option for determining payments for this category of enrollees. Effective for 2006 payments, organizations may elect to have CMS determine payments for all "Part A-only" enrollees using either new enrollee factors or full risk adjustment factors. The organization's decision will be applied to **all** "Part A-only" enrollees in the plan. Plans may not elect to move some eligible "Part A-only" enrollees into risk adjustment, while retaining others as new enrollees.

This option elected by the organization will remain turned "on" until CMS is notified otherwise prior to August 31st of any successive year. CMS will apply this option during reconciliation for a payment year only (that is, it will not be applied prospectively). Plans interested in this option must contact: Henry Thomas at Henry.Thomas@cms.hhs.gov by 8/31/2008 to elect this option.

**TABLE 1G – WHICH RISK ADJUSTMENT FACTORS APPLY TO PAYMENT\***

| Time Period Beneficiary Has Been Enrolled in Part B Medicare\*\* | Time Period Beneficiary Has Been Entitled to Benefits under Part A Medicare\*\* | |
|---|---|---|
| | 0 - 11 months | ≥ 12 months |
| 0 – 11 months | new enrollee factors | Plan's option: new enrollee or full risk adjustment factors |
| ≥ 12 months | full risk adjustment factors | full risk adjustment factors |

\*Applies to Part C and D payments for MA plans, demonstrations, and PACE organizations. Note that MA enrollees must be entitled to benefits under Part A and enrolled in Part B.
\*\* During data collection period (previous calendar year).

During the payment year, a new enrollee factor will also be assigned to any beneficiary whose risk score is not available. In this case, the beneficiary's correct risk score will be determined during the next reconciliation.

   The new enrollee factors for Part C are available at:
http://www.cms.hhs.gov/MedicareAdvtgSpecRateStats/Downloads/Announcement2009.pdf

### 1.3.3   Community and Long-Term Institutional Model Distinctions

The CMS risk adjustment approach for Part C uses separate models for non-ESRD community and long-term institutional residents. Separate models were necessary because there are significant cost differences between the traditional community-based MA beneficiary population and the long-term institutionalized beneficiary population with the same disease profile. An adjustment for place of residence improves the payment accuracy of risk adjustment.

A long-term institutionalized MA enrollee is defined as someone who resides in an institution for more than 90 days as identified using the Minimum Data Set (MDS). The costs of the short term institutionalized (less than 90 days) are recognized in the community model.

Table 1H lists the considerations for community and long-term institutionalized populations.



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT METHODOLOGY**

**TABLE 1H – COMMUNITY VERSUS LONG-TERM INSTITUTIONALIZED POPULATIONS**

| CMS-HCC MODEL CONSIDERATIONS FOR COMMUNITY AND LONG-TERM INSTITUTIONALIZED POPULATIONS | |
|---|---|
| **Community-Based** | **Long-Term Institutionalized** |
| • Disease-related incremental payments for the community population are generally higher.<br>• Community-based payment includes costs for the short term institutionalized (i.e., less than 90 days in an institution).<br>• Community-based population payment would over predict costs for long-term institutionalized population, even with the same health status.<br>• Currently, most MA organizations have a small proportion of long-term institutionalized enrollees (less than **10** organizations have more than 5% long-term institutionalized enrollees).<br>• For 2004 and 2005, CMS paid all enrollees in most MA organizations as community based. Beginning in 2006, CMS will make prospective payments based on the beneficiaries' statuses (i.e., community or institutional).<br>• The final reconciliation for a payment year will incorporate the correct institutional status for each enrollee for each month. | • Age and sex payment factors are generally higher for the long-term institutionalized population.<br>• Many of the costs of the long-term institutionalized population are not paid for by Medicare.<br>• Institutional model merges a number of disease groups to assure stable coefficients for this population.<br>• Long-term institutional status will be recognized in the payment year.<br>• MDS collected from nursing homes will be used to identify long-term institutionalized enrollees.<br>• The presence of a 90-day assessment and current residence in an institution = long-term institutionalized enrollee.<br>• No additional reporting by MA organizations is required.<br>• Enrollees remain in long-term institutionalized status until discharged to the community for more than 14 days. |

As described above in Table 1H, institutional status will be determined from information included in the MDS that is reported by Medicare certified nursing homes. Under the CMS-HCC model, MA organizations **will not report** the institutional status of their enrollees.

   **Example 5**

Below is an example of the different HCC factors for community versus long-term institutional enrollees.

| DISEASE GROUP | DESCRIPTION | COMMUNITY FACTOR | INSTITUTIONAL FACTOR |
|---|---|---|---|
| HCC1 | HIV/AIDS | 0.945 | 0.967 |
| HCC8 | Lung, Upper Digestive Tract, and Other Severe Cancers | 1.053 | 0.470 |



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT METHODOLOGY**

## 1.3.4  Frailty Adjuster (Slides 27-30)

The frailty adjuster is included as part of risk adjusted payments for A and B services to PACE and certain demonstration organizations. The purpose of the frailty adjuster is to predict Medicare expenditures that are unexplained by the risk adjustment methodology alone. The CMS-HCC model uses diagnoses to adjust the payments to MA organizations. This model was calibrated based on the general Medicare population that has an average level of functional impairment. The frailty model further adjusts payment based on whether an organization's enrollees are more or less frail than the average.

Under frailty adjustment, the relative frailty of an organization is measured in terms of the number of functional limitations as represented by the Activities of Daily Living (ADL) scale. There are six ADLs:  1) bathing and showering; 2) dressing; 3) eating; 4) getting in or out of bed or chairs; 5) walking; and 6) using the toilet. A sample of individuals in each organization is surveyed to determine the relative frailty of the organization. Frailty adjustment lowers risk scores for individuals with 0 ADLs and increases risk scores for all of the categories of ADLs.

### 1.3.4.1   Why is There a Frailty Adjuster?

- The Balanced Budget Act of 1997 (BBA) mandated that Medicare capitated payments to PACE organizations be based on MA payment rates, adjusted to account for the comparative frailty of PACE enrollees.

- The CMS-HCC model does not explain all of the variation in expenditures for the frail, community-based population. The frailty adjuster is used to project the Medicare expenditures of community populations age 55 and over that are unexplained by risk adjustment.

### 1.3.4.2   Which Organizations Are Currently Being Paid Under Frailty Adjustment?

Table 1I lists the types of health plans being paid under frailty adjustment.

**TABLE 1I — PLANS RECEIVING FRAILTY ADJUSTMENT**

| TYPE OF HEALTH PLAN | FRAILTY ADJUSTER IS PART OF RISK ADJUSTED PAYMENT |
|---|---|
| MA | NO |
| PACE | YES |
| Wisconsin Partnership Program (WPP) | YES |
| Minnesota Senior Care Options (MSHO) and Disability Health Options (MnDHO) | YES |
| Social Health Maintenance Organizations (S/HMOs) | YES |
| Massachusetts Senior Options (SCO) | YES |

Exhibit Z
Page 609



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT METHODOLOGY**

### 1.3.4.3    How Does the Frailty Adjuster Work Under the CMS-HCC Model?

The frailty adjustment factors were designed to explain (or predict) the Medicare expenditures that are unexplained by risk adjustment for groups with similar functional impairments. Therefore, frailty adjustment was designed to be applied in conjunction with the CMS-HCC model. Since the CMS-HCC model adequately predicts the Medicare expenditures of the long-term institutionalized and the under-55 disabled population, frailty adjustment is only applied to non-ESRD community residents who are 55 and over.

CMS calculates an organization-level frailty score based on the difficulties in activities of daily living (ADLs) that are reported by enrollees. The organization-level frailty score is then added to the risk score for each 55 and over community resident.

### 1.3.4.4    Frailty Model Development (Slide 27)

The current frailty factors were calibrated using ADL limitation information from the Medicare Current Beneficiary Survey (MCBS) -- which is a face-to-face survey. Annual frailty factors were calculated using the Health Outcomes Survey – Modified (HOS-M) -- which is an anonymous mail-in survey with telephone follow-up.

For 2008 payments, CMS has changed its source for calibrating the frailty model from the MCBS to the FFS CAHPS data. The change has the advantage of using two surveys with similar methodologies for calibrating the model and for calculating annual frailty scores -- both the HOS-M and FFS CAHPS collect ADL information via mail surveys with telephone follow-up. CMS added questions regarding ADLs to the FFS CAHPS surveys collected between March 2003 and February 2004, used claims data for the beneficiaries in the sample, and recalibrated the frailty factors with these data. For 2009 payments, CMS will continue to use the FFS CAHPS data as the data source for calibrating the frailty model.

The revised frailty factors are also generally lower because:
1.  Through mail versus face-to-face survey, beneficiaries more accurately report their functional impairments. Researchers have recognized that written surveys capture more accurate accounts of personal reporting than surveys that are conducted face-to-face. The changes in reporting of ADL limitations resulted in more accurate accounting of the residual expenditures from the CMS-HCC model; and

2.  The decrease in home health payments mandated by BBA—as frailty is highly correlated with home health expenditures in a community setting. CMS will continue to use the current frailty methodology to transition frailty payment for PACE organizations and phase-out frailty payments for certain demonstration organization. This implementation schedule is provided in Section 1.3.4.5.

The CAHPS frailty calibration sample is much larger than the MCBS sample. These data have helped to better determine the relationship between frailty and costs given Medicaid and non-Medicaid status in the general Medicare population. For this reason, CMS is able to reliably estimate separate frailty factors for Medicaid and non-Medicaid frail Medicare beneficiaries—because the Medicaid and non-Medicaid frail populations show differences in the relationships between unexplained expenditures (in the CMS-HCC model) and functional impairments. Table 1J provides the Current and Revised Frailty Factors by ADL distribution.

Exhibit Z
Page 610

930
Exhibit 3



CMS has considered the impact of applying a program wide frailty adjuster and the effect of this on the current bidding methodology. CMS decided that the frailty adjuster will not be applied across all MA organizations. Methodologically, a program-wide adjustment does not improve payment accuracy for two reasons:

1. The HOS data used currently to determine frailty scores for payment is sampled only at the contract level, and therefore, does not allow for accurate calculation of frailty scores at the plan benefit package (PBP) level--thus, contract level frailty scores would lead to inconsistent payments across plans and beneficiaries; and

2. MA organizations would need to project frailty scores in their bids. Due to the changing nature of the marketplace and the different enrollment profiles of plans from year to year, this creates a risk that the level of frailty assumed by a plan in its bid would not reflect its actual score in the payment year.

**TABLE 1J – 2008 AND 2009 FRAILTY FACTORS**

| ADL LIMITATIONS | 2008 FRAILTY FACTORS | | 2009 FRAILTY FACTORS | |
|---|---|---|---|---|
| | NON-MEDICAID | MEDICAID | NON-MEDICAID | MEDICAID |
| 0 | -0.089 | -0.183 | -.093 | -0.180 |
| 1-2 | +0.110 | +0.024 | +0.112 | +0.035 |
| 3-4 | +0.200 | +0.132 | +0.201 | +0.155 |
| 5-6 | +0.377 | +0.188 | +0.381 | +0.200 |

## 1.3.4.5    Frailty Payment Implementation

In 2008, CMS will begin transitioning PACE organization payments to 100 percent of the revised frailty factors over a 5-year period through 2012. In each year, the monthly PACE organizations payment would be based on the A/B risk score plus the established frailty transition amount. CMS will also begin a four year phase-out of frailty payments using the current methodology through 2011 for the dual demonstration organizations-- Social Health Maintenance Organizations (S/HMOs), Minnesota Senior Health Options (MSHO)/Minnesota Disability Health Options (MnDHO), Wisconsin Partnership Program (WPP), and Massachusetts Senior Care Options (SCO). Table 1K shows the frailty payment implementation schedule for PACE and demonstration organizations. The percentage (%) represents the percent of the contract-level frailty factor (current and/or revised) that will be added to the monthly A/B risk scores for payment.



**TABLE 1K – FRAILTY PAYMENT IMPLEMENTATION SCHEDULE FOR PACE AND DUAL DEMONSTRATION ORGANIZATIONS**

| TYPE OF CONTRACT | 2008 FRAILTY PAYMENT SCHEDULE | 2009 FRAILTY PAYMENT SCHEDULE | 2010 FRAILTY PAYMENT SCHEDULE | 2011 FRAILTY PAYMENT SCHEDULE | 2012 FRAILTY PAYMENT SCHEDULE |
|---|---|---|---|---|---|
| % current frailty factor  /  % revised frailty factor | | | | | |
| PACE | 90 / 10 | 70 / 30 | 50 / 50 | 25 / 75 | 0 / 100 |
| Wisconsin Partnership Program (WPP) | 75 / 0 | 50 / 0 | 25 / 0 | 0 / 0 | |
| Minnesota Senior Care Options (MSHO) and Disability Health Options (MnDHO) | 75 / 0 | 50 / 0 | 25 / 0 | 0 / 0 | |
| Social Health Maintenance Organizations (S/HMOs) | 75 / 0 | 50 / 0 | 25 / 0 | 0 / 0 | |
| Massachusetts Senior Options (SCO) | 75 / 0 | 50 / 0 | 25 / 0 | 0 / 0 | |

The range of frailty scores varies considerably among the organizations to which frailty adjustment applies (i.e., "frailty" plans). Table 1L shows a range of frailty scores by type of organizations for the current frailty methodology conducted using the MCBS and the new frailty calibration methodology using the FFS CAHPS data.

**TABLE 1L – RANGE OF FRAILTY SCORE BY TYPE OF ORGANIZATION**

| ORGANIZATION TYPE | CURRENT MODEL FRAILTY SCORE (MCBS DATA) | RECALIBRATED—MEDICAID/ NON-MEDICAID FRAILTY SCORE (FFS CAHPS DATA) |
|---|---|---|
| PACE | 0.375 – 0.791 | 0.064-0.226 |
| S/HMOs | 0.057 – 0.122 | 0.008-0.039 |
| WPP | 0.371 – 0.574 | 0.091-0.162 |
| MnDo | 0.583 | 0.143 |
| MSHO | 0.176 – 0.263 | -0.017-0.009 |
| SCO | 0.166 – 0.414 | -0.033-0.053 |

### 1.3.4.6    ADL Information Collection and Frailty Adjuster Development

CMS will continue to calculate annual contract-level frailty scores using results from the HOS-M survey. The revised frailty adjuster that will be used for PACE organization payments will include eight factors (instead of four factors under the current model): Medicaid eligible ADL limitations 0, 1-2, 3-4, and 5-6; and Non-Medicaid ADL limitations 0, 1-2, 3-4, and 5-6. The weighted factors will be summed to get the



contract-level frailty score for payment. Demonstration organizations stated in Section 1.3.4.4 will continue to receive frailty payments based on the single frailty factor that is calculated using the current methodology (i.e., MCBS).

### 1.3.4.7   Calculating the Frailty Score for Payment

The organization-level frailty score is calculated as the weighted average frailty factor across all 55 and over community survey respondents for that organization.

The first step is to determine the number of ADLs with which each respondent has difficulty or is unable to do. Then the number of respondents in each ADL category (0 ADLs, 1 to 2 ADLs, 3 to 4 ADLs and 5 to 6 ADLs) is counted. These counts are multiplied by the corresponding frailty factor for each ADL category. The resulting products are then summed for each organization. This sum is divided by the number of 55 and over community respondents, yielding a weighted average factor (or frailty score) for each organization. The same frailty score is used for all 55 and over respondents and non-respondents of a plan who reside in the community.

This frailty score is added to the risk score of each 55 and over community enrollee in the organization (including new enrollees), resulting in a risk+frailty score for each individual. Payments to these plans are the product of this combined score and the risk adjusted county rate. Figure 1B illustrates this calculation and includes the ADL-based frailty factors.

**Figure 1B – Frailty Adjustment Calculation**





**Note:** For new PACE organizations not yet participating in the survey, their frailty score is the weighted average factor across all community respondents of all PACE organizations.

### 1.3.5  Payment Methodology for ESRD Enrollees (Slides 30-32)

In order to further improve payment accuracy, CMS implemented the ESRD risk adjustment model. Effective January 2005, MA enrollees with ESRD were incorporated into diagnosis-based risk adjustment using a different version of the CMS-HCC model. This ESRD models were re-estimated for payments beginning in 2007 and ESRD risk score normalization of dialysis and transplant risk scores will be implemented in 2008. Section 605 of BIPA required CMS to adjust its approach to computing ESRD payment rates to reflect the method used in the ESRD S/HMO demonstration then in place.
The three parts of the ESRD CMS-HCC model are:

**Dialysis Status–**A risk adjustment model that is calibrated for people on dialysis, so the payment weights are unique to these beneficiaries. The State ratebook used for dialysis payments was rebased with more recent data.

**Transplant Status–**Kidney or Kidney/Pancreas – CMS calculates the payment amount by calculating the cost of services during the month of the transplant and for the two succeeding months. CMS makes different payments for those who have a kidney transplant and for those who have a pancreas transplant simultaneous with the kidney transplant. However, because the initial data system used for payment will not be able to distinguish individuals with a double transplant in a timely manner, all transplants will initially be paid at the kidney transplant rate. The rarer double transplant will be taken into account in reconciliation. CMS also differentiates payments for months close to the transplant period from those further out.

**Functioning Graft Status–**A modified version of the CMS-HCC model for people who have functioning kidney grafts, i.e., that they have received a kidney transplant or kidney/pancreas transplant at least three months ago and did not return to  dialysis status since the transplant. The model has an additional term to recognize the extra costs of immunosuppressive drugs and higher intensity of care for this group.

CMS developed this three-part model in response to the findings on expenditure patterns for ESRD beneficiaries. Dialysis patients have high ongoing costs, while transplant patients incur a very high one-time cost. Functioning graft patients are much more similar to the general population than they are to dialysis patients except for the cost of immunosuppressive drugs. Using the same payment weights for all three groups would lead to over- or underpayments to MA organizations.

CMS updated the state ratebook used to make payments for enrollees in dialysis and transplant status. CMS will phase-in the revised State rates by blending payments based on the current ratebook and the ratebook using the dialysis-only trend. Over a 4-year period, CMS will apply the payment blend according to the schedule described below in Table 1M.

Exhibit Z
Page 614



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT METHODOLOGY**

**TABLE 1M – NEW ESRD DIALYSIS AND TRANSPLANT PAYMENT TRANSITION**

| YEAR | CURRENT RATEBOOK PERCENTAGE | REVISED RATEBOOK PERCENTAGE |
|---|---|---|
| 2008 | 75% | 25% |
| 2009 | 50% | 50% |
| 2010 | 25% | 75% |
| 2011 | 0 | 100% |

### 1.3.5.1    Risk Adjustment Model for Dialysis Patients

The dialysis model has the same HCC categories used for the CMS-HCC model. The exception is that the HCCs representing dialysis status and kidney failure are excluded (HCC130 to HCC131). This means that the ESRD model has only 68 HCC categories. The model is calibrated only on dialysis patients, so the disease weights used for payment recognize disease and expenditure patterns are unique to this population.

The data used for calibrating the ESRD models were 2002 (diagnostic) and 2003 (program payment) data on fee-for-service ESRD beneficiaries. For example, expenditures for a fee-for-service beneficiary on dialysis from January through August 2003 who received a transplant in September 2003 are included in the dialysis group for eight months, but then are excluded. From September through November 2003, this beneficiary's costs are included in the transplant data to determine estimated average transplant costs. As of December 2003, this beneficiary is included in the functioning graft model.

### 1.3.5.2    Transplant Model

To accommodate the high one-time cost of a transplant, CMS will make payments over three months to cover the costs for this transplant and payments for the immediate subsequent services. CMS calibrated the payments by using fee-for-service hospital stay payments for the transplant, and physician and other services rendered for the hospital stay and the two months after discharge. The national average was converted to a relative factor by dividing by the national average payment for dialysis patients. For example, the factor for month 1 is calculated as: $32,558 (average transplant costs in month 1) divided by $5,039 (mean monthly dialysis costs, i.e., $60,471/12). The relative factors for transplant reflect the costs in each month; therefore, the 1st month has a substantially higher factor (6.45) than months 2 and 3 (1.01). The transplant factor is applied to the dialysis state ratebook to provide a transplant payment. Payment will be made in practice by determining the month of transplant and paying the amount over the three-month period starting with the transplant month.

### 1.3.5.3    Functioning Graft Model

The model for functioning graft enrollees is based on the model for the general population, except that HCCs for kidney transplant status, dialysis status, and renal failure are excluded. For their members with functioning grafts, as for dialysis members, MA organizations will be paid in 2008 based on the diseases reported from all risk adjustment sources in the prior year. However, functioning graft status is recognized in the payment year. In the adapted general population model, almost all of the HCC disease

Exhibit Z
Page 615





coefficients have been held to their general population values. A few HCCs have been removed and extra terms have been added specific to being in functioning graft status.

The values for the add-on terms have been estimated with data specific to this population and recognize the Medicare coverage of immunosuppressive drugs and the added intensity of services required by this population. They are identified as “graft factors” in the functioning graft model. The graft factors include two sets of coefficients. One set is used between the fourth and the end of the ninth month after a transplant and the second set is used for tenth month and all months thereafter. The functioning graft payment automatically begins the month after the third transplant payment unless the ESRD Network reports that the member has returned to dialysis or had to have another transplant. Anytime a functioning graft patient returns to dialysis, payment is made using the dialysis model.

#### 1.3.5.4 Model Comparison of Coefficients (Slide 33)

The ESRD dialysis model has a higher base factor (age/sex) and lower factors associated with diagnoses than does the CMS-HCC model. This is because Medicare costs for ESRD beneficiaries are much higher than they are for the average Medicare beneficiary, but they are relatively uniform. This means that the Medicare costs for ESRD beneficiaries do not vary as much as the Medicare costs for Medicare beneficiaries in general. Hence, diseases do not explain as much of the cost variation among ESRD beneficiaries and therefore, these costs are retained in the age/sex coefficient in the ESRD dialysis model.

#### 1.3.5.5 New Enrollee Factor

The dialysis and functioning graft models have new enrollee factors for enrollees whose risk scores are not available. New enrollees with transplants receive the normal transplant model factors.

#### 1.3.5.6 Reporting of ESRD Status

In implementing the new ESRD risk adjustment method, CMS will utilize the existing systems for identification of enrollees receiving dialysis services. Currently, MA enrollees are assigned ESRD status as a result of a physician certifying their ESRD status on CMS Form 2728, the End-Stage Renal Disease Medical Evidence Report. The ESRD facility sends Form 2728 to the Renal Network, which then transmits the status to CMS systems where various databases are updated to record the ESRD status. Payments for dialysis are triggered by this system.

### 1.3.6 Medicare Part D

**Medicare Part D Drug Benefit**. In Title I, in addition to the creation of the MA program in Title II of the MMA, Congress added a voluntary prescription drug benefit to Medicare (known as Part D) to be made available for all Medicare beneficiaries through either the MA program or the prescription drug plans. To that end, MA organizations will be required to provide at least one MA plan that provides a “required drug coverage” in each of its service areas. MA plans that offer drug coverage are called MA prescription drug plans (MA-PDs). Beneficiaries receiving health care benefits through fee-for-service Medicare will have the option of accessing prescription drug coverage through sponsors of prescription drug plans (PDPs). Unlike PDPs which can offer supplemental drug coverage only when they offer a standard package in an area, MA-PDs can offer plans with supplemental coverage that qualify as “required prescription drug coverage.” Similar to the MA program, CMS established regions (34) through which PDP sponsors will offer Part D drug coverage. To the extent practicable, CMS designed the PDP

**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

**RISK ADJUSTMENT METHODOLOGY**

regions to overlap with the MA regions. Payments to PDP plans for eligible low-income Medicare beneficiaries will be subsidized at different levels depending upon the income and asset of the enrollee.

The MMA requires organizations intending to offer MA plans with original Medicare Parts A and B benefits and/or Part D benefits to submit bids in early June of each year for their basic, supplemental, and/or Part D benefit packages. Each bid must reflect a plan's actual revenue requirements to provide the benefits offered in the proposed benefit packages. Benchmarks will be created for local and/or regional plans for bid-benchmark comparisons. Monthly capitated payments will be made based on each plan's bid risk adjusted for health status minus the beneficiary premium amount. The MMA mandates MA organizations and PDPs to provide basic prescription drug coverage as one of their benefit plans.

### 1.3.6.1     Part D Risk Adjustment Model (Slides 34-37)

The Part D model is similar to the CMS-HCC risk adjustment model. The model includes 113 coefficients: 84 disease groups, 24 age-sex adjustments, 3 interactions between age and disease, and 2 sex-age-originally disabled status interactions. The model was developed assuming an unlimited drug benefit, and was then adjusted for the plan's liability under the Medicare standard Part D benefit.

CMS announced the final Part D risk adjustment on April 4, 2005. The model is published at: http://www.cms.hhs.gov/MedicareAdvtgSpecRateStats/06_Risk_adjustment.asp

The Part D risk adjustment model shares most of the characteristics of the CMS-HCC model. That is, the model is: prospective, additive, hierarchical, and contains demographic new enrollee model.

The key differences are:

- The Part D model is designed to predict plan liability for prescription drugs under the Medicare drug benefit rather than Medicare Part A/B costs.

- Different diseases predict drug costs than Part A/B costs.

- Incremental costs of low-income (LI) and long term institutional (LTI) beneficiaries are multipliers to the base RxHCC model score.

As in the CMS-HCC model, some of the disease groups fall into hierarchies. Drug regimens may intensify and more drugs added in cases where a disease has a higher severity. In such an instance, the highest cost category of the related diseases is triggered and the lower cost category does not increase the Part D risk score.

Like the CMS-HCC model, the Part D model uses the presence of particular demographic characteristics and diagnoses to predict costs in the following year for an individual. The model clusters a set of ICD-9-CM diagnoses within groups that are similar clinically and in terms of their expected costs. The groupings used to predict drug spending are variants of the groups used to predict Part A and B spending, and the data sources for diagnoses are the same as those used in Part C. Disease groups and draft coefficients for the Part D risk adjustment can be found on the CMS web site at: http://www.cms.hhs.gov/MedicareAdvtgSpecRateStats/06_Risk_adjustment.asp



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT METHODOLOGY**

In development of the model, drug spending in dollars is used as the dependent variable of a regression model that estimates the marginal or incremental spending related to each of the explanatory variables (demographics and conditions) in the model. The model is ultimately expressed not in dollars, but as relative factors. The incremental dollars associated with each variable in the model are divided by the mean predicted dollars to produce a "relative costliness" or risk factor. Summing the risk factors for an individual yields a total risk adjustment factor that, when multiplied by a base rate, yields an individualized capitation rate.

Recent research has found that the variation in drug expenditures that can be explained is primarily driven by chronic conditions persisting from year to year. The research suggests many of the diagnoses used by CMS for the CMS-HCC model could be used in the Part D risk adjustment model in addition to new diagnosis codes collected. For example, the findings indicated that certain chronic conditions such as congestive heart failure and schizophrenia (CMS-HCC model diagnoses) are good predictors of drug expenditures. However, this research also shows that hypertension and glaucoma, not currently in the model, are also key predictors of drug expenditures. Hence, such findings lead to the conclusion that additional diagnoses, beyond those in the current CMS-HCC model, need to be collected to properly develop a drug risk adjustment model. It is equally true that some conditions currently included in the CMS-HCC model are predictive of Medicare Part A and B medical costs, but not predictive of Part D costs. As such, these diseases could decrease drug expenditures.

Using a similar methodology to that used for the development of the CMS-HCC risk adjustment model, CMS created a list of diagnoses for the drug risk adjuster and, in April 2005, announced the final list of conditions for inclusion in the drug risk adjustment model. Some of the diagnoses overlap with the current CMS-HCC model and others do not. In particular, there are 1,540 ICD-9 codes unique to the CMS-HCC model, 1,940 ICD-9 codes unique to the Part D risk adjustment model, and 1,622 ICD-9 codes included in both models. Collection of the diagnoses for the CMS drug risk adjustment model from current MA organizations began in July 2004 and will begin payment in January 2006.

Beneficiaries with less than 12 months of Part B enrollment prior to the payment year and who do not have a complete diagnostic record in the Medicare files will be classified as new enrollees. These individuals will receive the new enrollee factor for the RxHCC model.

### 1.3.6.2   Low Income and Long Term Institutionalization Multipliers (Slides 36-37)

Base Part D risk factors are incremented by either a LI or a LTI multiplier to account for the additional costs of beneficiaries in these categories. See Table 1N for the definition of LI multipliers for the Part D benefit.



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**


**RISK ADJUSTMENT METHODOLOGY**

**TABLE 1N – DEFINITION OF THE LOW INCOME MULTIPLIERS FOR PART D BENEFIT**

|  | GROUP 1 | GROUP 1 | GROUP 2 | GROUP 2 |
|---|---|---|---|---|
| Income test | Medicaid Dual <100% FPL | <135% FPL | <135% FPL | 135-150% FPL |
| Asset test | <2× SSI | <3× SSI | >3× SSI & <$10,000 single $20,000 couple | <$10,000 single $20,000 couple |
| Deductible | $0 | $0 | $50 | $50 |
| Copay for generic drugs up to catastrophic threshold | $1 | $2 | — | — |
| Copay for brand-name drugs up to catastrophic threshold | $3 | $5 | — | — |
| Coinsurance up to catastrophic threshold | — | — | 15% | 15% |
| Coinsurance above catastrophic threshold | 0% | 0% | 0% | 0% |
| Copay for generic drugs above catastrophic threshold | $0 | $0 | $2 | $2 |
| Copay for brand-name drugs above catastrophic threshold | $0 | $0 | $5 | $5 |
| Premium subsidy | 100% | 100% | 100% | Sliding scale |

The LI multiplier is estimated to be 1.08 for Group 1 LI individuals (as defined above) and 1.05 for Group 2 individuals (as defined above). This multiplier is defined on a concurrent basis. (For example, if an individual were not defined as LI for January 2007 but was determined to be a Group 1 beneficiary for February 2007, the plan would receive the LI multiplier for February (and beyond) but not for January.)

An enhancement was also computed for the predicted spending by persons institutionalized in nursing facilities for more than 90 days. Spending for this group is expected to be higher because prices for the specific packages of drugs they receive are somewhat higher than the same drugs in the community. (An analysis of drug data done by IMS Health shows that the price differences in the claims were small, particularly for brand name drugs that dominate the spending.) There are also effects related to compliance in acquiring and taking drugs in the institutional environment. On the other side, often patients take fewer drugs because of more careful monitoring of interactions.

An analysis was done for the spending by the institutionalized by first using the base model to predict for this population and then comparing the actual spending and liability to the predicted. For the case of spending, there was a significant positive effect for the aged and the disabled who are in institutions. The effect for the disabled is greater than for the aged. It was also observed that average spending for both groups was in the 100 percent coinsurance range. The disabled mean was quite close to the catastrophic limit. The implications of additional demand being, to a large extent, in the range in which plans do not have incremental liability means that the effect on plan liability is much smaller than the effect on spending. The final payment adjustments for the institutionalized are smaller for the aged than for the

Exhibit Z
Page 619



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT METHODOLOGY**

disabled and smaller perhaps than some people expect because the final measure is plan liability rather than spending.

Figure 1C illustrates the calculation of the Part D Direct Subsidy.

**Figure 1C – Calculation of Part D Direct Subsidy**



## 1.4    Parts C and D Final Submission of Risk Adjustment Data (Reconciliation)

Reconciliation is used to complete the implementation of payments, with CMS calculating final risk adjustment factors and beneficiary status based on complete data. CMS continues to allow a period (approximately 13 months after the data collection year) for submitting final RAPS data for the appropriate data collection period. Data not received or submitted by the initial submission deadline for a data collection period can be submitted by the final submission deadline (reconciliation). In addition to incorporating new RAPS and fee-for-service diagnoses, reconciliation takes into account necessary adjustments to institutional status and demographic data for enrollees.

**Note:** CMS reconciles risk-adjusted payments for a calendar year only one time. When submitting risk adjustment data for reconciliation, plans may submit as well as correct data that was previously submitted.

## 1.4.1   Parts C and D Risk Adjustment Schedule & Elimination of the Payment Lag

Risk adjusted payments were originally implemented with a 6-month payment lag from the end of the collection period to the start of revised payments, based on the data collected.

Exhibit Z
Page 620



**☒**     **Example: 6**

Data Collection Period: July 1, 2006 through June 30, 2007
Data Collection End Date: June 30, 2007
CY2007:  First payment made based on this collection period = January 1, 2008
As you can see, payments began 6 months after the end of the data collection period.

**Note:** The purpose of eliminating the lag between the end of the data collection period and the payment based on that year's data is to use the most recent data for more accurate payment.

Data Collection Period: January 1, 2007 through December 31, 2007
Data Collection End Date: December 31, 2007
CY2007:  Updated payment made based on the non-lagged data collection period = July, 2008

- CMS calculates a preliminary risk factor based on lagged data. For 2008, it will be based on data from July 2006 through June 2007. Payments from January 2008 through June 2008 will be based on this factor.

- In July 2008 CMS will use a risk factor based on non-lagged data (i.e., from calendar year 2007) for calculating payments. That factor will be used for the remainder of the year.

- By eliminating the lag, the collection period will change from July 1 through June 30 to January 1 through December 31 (or a calendar year).

## 1.5    Updating Diagnosis Codes in the Parts C and D Risk Adjustment Models

CMS updates the risk adjustment models to reflect the annual updates to the ICD-9 diagnostic code set. After clinical review, new ICD-9 diagnosis codes are added to the appropriate diagnostic categories and included in the CMS-HCC model. A comprehensive listing of the ICD-9 codes that MA organizations are required to submit for all risk adjustment models can be found at http://www.cms.hhs.gov/MedicareAdvtgSpecRateStats/06_Risk_adjustment.asp#TopOfPage. This list will be updated annually to take into account new codes that are required for risk adjustment.



2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide

**RISK ADJUSTMENT SUBMISSION PROCESS OVERVIEW**

# MODULE 2 – RISK ADJUSTMENT SUBMISSION PROCESS OVERVIEW

## Purpose

The success of Medicare Advantage (MA) risk adjustment is dependent upon organizations understanding the process of collecting and submitting accurate risk adjustment data. The purpose of this module is to provide participants with important terms, key resources, and schedule information that will provide the foundation for this training.

## Learning Objectives

At the completion of this module, participants will be able to:

- Define common risk adjustment terminology.
- Demonstrate knowledge in interpreting key components of the risk adjustment process.
- Interpret the risk adjustment schedule.
- Identify the Centers for Medicare & Medicaid Services (CMS) outreach efforts available to organizations.



| ICON KEY | |
|---|---|
| Example | |
| Reminder | |
| Resource | |

## 2.1    Common Risk Adjustment Terms (Slide 7)

Table 2A provides descriptions of common risk adjustment terminology.

**TABLE 2A – RISK ADJUSTMENT COMMON TERMS**

| TERM | DESCRIPTION |
|---|---|
| FERAS | Risk adjustment submitters send data to Palmetto through the **Front-End Risk Adjustment System**. |
| RAPS | Risk adjustment data are processed by the **Risk Adjustment Processing System.** |
| RAS | The **Risk Adjustment System** calculates the risk score. |
| MARx | The **Medicare Advantage Prescription Drug System** calculates the risk payment. |
| Common UI | The **Common UI** maintains Medicare beneficiary eligibility data. |
| HPMS | The **Health Plan Management System** is a CMS MA information system that contains health plan-level data. |
| Required Diagnosis | ICD-9-CM diagnosis codes required to be submitted for the CMS-Hierarchical Condition Category (HCC) model and for future model development. |



## 2.2    Risk Adjustment Process Overview

Hospital inpatient, hospital outpatient, and physician risk adjustment data must be submitted at least quarterly. Risk adjustment data are processed through RAPS.

### 2.2.1   Risk Adjustment Data Requirements (Slide 8)

- The data required under the risk adjustment process include:

    - Health Insurance Claim (HIC) number.
    - Diagnosis code.
    - Service from date.
    - Service through date.
    - Provider type (hospital inpatient, hospital outpatient, physician).

- MA organizations must submit data at least quarterly to CMS.

- Each quarterly submission should represent approximately one-fourth of the data that the MA organization will submit during a data collection year. MA organizations will be monitored to ensure compliance.

- All beneficiary ICD-9-CM diagnosis codes required for the CMS-HCC risk adjustment model must be reported at least once per enrollee in the data collection period.

### 2.2.2   Risk Adjustment Data Collection (Slide 9)

- MA organizations may choose to collect data from providers in a variety of formats:

    - Standard fee-for-service claim or encounter formats
        - Uniform Billing Form (UB-04)
        - HCFA 1500
        - National Standard Format (NSF) v3.01
        - American National Standards Institute (ANSI) X12 837 v30.51 or v40.10. Health Insurance Portability and Accountability Act (HIPAA) mandated transactions must use v40.10.

    - Superbill

    - RAPS format
        - HIC number
        - Provider type
        - Diagnosis code
        - Service from date
        - Service through date



**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

**RISK ADJUSTMENT SUBMISSION PROCESS OVERVIEW**

### 2.2.3 Risk Adjustment Data Submission (Slide 10)

- MA organizations must submit data to CMS through FERAS (Palmetto GBA) utilizing the following formats:

  - RAPS format (all types of data)
  - Direct Data Entry Screen (all types of data)

Figure 2A illustrates the risk adjustment dataflow.



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

---

**RISK ADJUSTMENT SUBMISSION PROCESS OVERVIEW**

---

### 2.2.4  Risk Adjustment Dataflow (Slide 11)

- Hospital/physician submits data to MA organization via:
  - Full or abbreviated UB-04, HCFA 1500, NSF v3.01, ANSI x837 v30.51 or v40.10, Superbill or RAPS format.

- The MA organization submits these data at least quarterly to Palmetto GBA.

- The MA organization submits the data via Direct Data Entry or in the RAPS format.

- The data are sent to FERAS for processing where the file-level data, batch-level data, and first and last detail records are checked.

- If any data are rejected, then data are reported on the FERAS Response Report.

- After passing the FERAS checks, the file is submitted to RAPS where detail editing is performed.

- The RAPS Return File is returned daily and shows all records approved and where errors occurred.

- The RAPS Transaction Error Report displays records on which errors occurred.

- The RAPS Transaction Summary Report is sent to the MA organization daily and identifies data that have been finalized in RAPS database.

- The Duplicate Diagnosis Cluster Report identifies diagnosis clusters submitted with information that duplicates a stored cluster.

- The RAPS Monthly Plan Activity Report and Cumulative Plan Activity Report provides a summary of all diagnoses stored for a given time period.

- Distributed monthly and quarterly, the Error Frequency Report provides an overview of all errors associated with files submitted in test and production.

- RAPS database stores all finalized diagnosis clusters.

- RAS calculates the Risk Adjuster Factors by executing the CMS-HCC model.

- MARx is used in the calculation of payments and determination of plan payments. MARx replaced Medicare Managed Care System (MMCS) on November 15, 2005.

**Figure 2A – Risk Adjustment Dataflow**



---

Exhibit Z
Page 625



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT SUBMISSION PROCESS OVERVIEW**

## 2.2.5  Important Information About Risk Adjustment Processing

- MA organizations transmit data to FERAS at Palmetto GBA.

- FERAS performs format and face validity checks on the file- and batch- level as well as formatting verification on the first and last detail record (CCC) in the file.

- If the data fail the front-end checks, the complete file is rejected at the front end.

- The FERAS Response Report identifies whether the file is accepted or rejected up front.

- Once the file has passed front-end checks, it moves to RAPS. All validity edits on detail-level data are performed in this system.

- Processing time from beginning to end should take approximately 1 to 2 days.

- After the file has processed through RAPS, the MA organization will receive a RAPS Return File and RAPS Transaction Error Report identifying any errors.

- All ICD-9-CM diagnoses that pass validity edits are stored in the RAPS database.

- The MA organization will also receive a RAPS Transaction Summary Report reflecting all finalized data sent to the RAPS database along with all rejected data.

- The MA organization also receives two monthly risk adjustment management reports: 1) the RAPS Monthly Plan Activity Report and 2) the RAPS Cumulative Plan Activity Report.

- All data are converted to the RAPS format and returned in the RAPS Return File.

- Interim bills (112 and 113 bill types) are not accepted. If a MA organization receives interim bills, do not submit the hospital inpatient diagnoses on receipt of the final bill (114 bill type).



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT SUBMISSION PROCESS OVERVIEW**

## 2.3    Submission Schedule (Slide 12)

The elimination of the payment lag changes the submission schedule. This requires MA organizations to meet three submission deadlines—the first Friday in September, the first Friday in March of each year, and a reconciliation (final submission) deadline of January 31. The schedule is illustrated in Table 2B.

**TABLE 2B – SUBMISSION TIMETABLE**

| CY | DATES OF SERVICE | INITIAL SUBMISSION DEADLINE | FIRST PAYMENT DATE | FINAL SUBMISSION DEADLINE |
|----|-----------------|-----------------------------|--------------------|---------------------------|
| 2008 | July 1, 2006 through June 30, 2007 | September 7, 2007 | January 1, 2008 | NA |
| 2008 | January 1, 2007 through December 31, 2007 | March 7, 2008 | July 1, 2008 | January 31, 2009 |
| 2009 | July 1, 2007 through June 30, 2008 | September 5, 2008 | January 1, 2009 | NA |
| 2009 | January 1, 2008 through December 31, 2008 | March 6, 2009 | July 1, 2009 | January 31, 2010 |
| 2010 | July 1, 2008 through June 30, 2009 | September 4, 2009 | January 1, 2010 | N/A |
| 2010 | January 1, 2009 through December 31, 2009 | March 5, 2010 | July 1, 2010 | January 31, 2011 |



**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

---

**RISK ADJUSTMENT SUBMISSION PROCESS OVERVIEW**

---

## 2.4    Training and Support (Slide 13)

To ensure that participating organizations have the necessary tools and information to be successful with the risk adjustment process, CMS has planned the following outreach efforts, as described in Table 2C.

**TABLE 2C – TRAINING AND SUPPORT**

| INITIATIVE | DESCRIPTION |
|---|---|
| **Customer Service & Support Center (CSSC)** | This toll free help line (1-877-534-2772) is available Monday – Friday, 9:00 a.m. to 7:00 p.m. Eastern Time (ET) (with the exception of corporate observed holidays) to provide assistance.<br><br>The support center provides ongoing assistance.<br><br>The FERAS system is available to submit risk adjustment data 24 hours a day, 7 days a week regardless of holidays. The only exception is from 5:00 PM EST - 10:00 PM EST on Sunday when systems and equipment undergo routine maintenance. |
| **www.csscoperations.com** | The CSSC website, www.csscoperations.com is the gateway to RAPS. Visitors to the site can access information about RAPS/FERAS, including opportunities to register for service, enroll to submit risk adjustment data, and obtain comprehensive information about data entry and report layouts. In addition, the site provides valuable links to CMS instructions and other official resources. Monthly User Group and other training information are regularly posted. Finally, the site provides up-to-date system status alerts and answers to frequently asked questions (FAQs) about risk adjustment.<br><br>To register for email updates, go to www.csscoperations.com, click on Risk Adjustment Processing System (RAPS), and then click on "Register for Medicare Advantage". Afterwards, click on "new registrations only" and complete the registration form. |
| **User Groups** | Conducted once each month from 1:30 – 2:30 p.m. ET. The purpose of the User Group meeting is to share information among participants, distribute new information, and identify issues for future resolution. Meeting notes and Q&As are provided.<br><br>To register online for User Groups, go to ugregistration@tarsc.info. |
| **Onsite Consultation** | On-site consultation visits provide MA organizations with the opportunity to gain valuable information about risk adjustment data submission and data validation processes. These consultations generally occur between April and May. Each visit includes a review of the MA organization's system. |
| **www.tarsc.info** | The website, www.tarsc.info is the website for risk adjustment training and User Group information. The website includes information about trainings and user groups, training dates, locations, online registration, and training FAQs. |



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**DATA COLLECTION**

# MODULE 3 – DATA COLLECTION

## Purpose (Slide 2)

For the purpose of risk adjustment, Medicare Advantage (MA) organizations must collect data from hospital inpatient facilities, hospital outpatient facilities, and physicians. The collection of data from the appropriate risk adjustment sources and formats is critical for accurate risk adjusted payment. This module is designed to offer participants an opportunity to apply data collection principles in accordance with Centers for Medicare & Medicaid Services (CMS) requirements.

## Learning Objectives (Slide 3)

At the completion of this module, participants will be able to:

- Identify the data elements required for risk adjustment.
- List the three sources of risk adjustment data.
- Describe the data collection formats.
- Discuss factors to consider when determining the method for collection of diagnostic data.
- Apply Health Insurance Portability and Accountability Act (HIPAA) transaction standards for purposes of risk adjustment data collection.



## 3.1    Required Risk Adjustment Data Elements (Slide 5)

MA organizations must collect certain data elements from the sources (providers/physicians) of risk adjustment data described in this module. The minimum data elements that must be collected are:

- Health Insurance Claim (HIC) Number
- ICD-9-CM Diagnosis Codes
- Service From Date
- Service Through Date
- Provider Type

### 3.1.1  HIC Number (Slides 6-7)

A HIC number is a Medicare beneficiary's identification number. Both CMS and the Railroad Retirement Board (RRB) issue Medicare HIC numbers. The format of a HIC number issued by CMS is a Social Security number followed by an alpha or alphanumeric Beneficiary Identification Code (BIC). RRB numbers issued before 1964 are 6-digit numbers preceded by an alpha prefix. After 1964, the RRB began using Social Security numbers as Medicare beneficiary identification numbers preceded by an alpha prefix. Table 3A shows the characteristics for each HIC type.



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**DATA COLLECTION**

TABLE 3A – STRUCTURE OF HIC NUMBERS

| HIC TYPE | CHARACTERISTICS |
|----------|-----------------|
| **CMS** | • 9-Digit Social Security number<br>• alpha suffix<br>  - "A" beneficiary<br>  - "B" spouse<br>  - "C" children<br>  - "D" divorced spouse, widow, widower<br>• alpha-numeric suffix<br>  - indicates number of children (e.g., "C1" first child) |
| **RRB pre-1964** | • alpha prefix<br>• 6-digit random numbers |
| **RRB post-1964** | • alpha prefix<br>• 9-digit Social Security number |

**Note:** MA organizations are not required to collect HIC numbers from physicians and providers, but must identify beneficiaries using the HIC number when submitting data to CMS.

### 3.1.2  ICD-9-CM Diagnosis Code (Slide 8)

International Classification of Diseases-9[th] Edition-Clinical Modification (ICD-9-CM) codes are 3- to 5-digit codes used to describe the clinical reason for a patient's treatment. ICD-9-CM codes do not describe the service performed, just the patient's medical condition. Diagnosis codes drive the risk scores, which drive the risk adjusted reimbursement from CMS to MA organizations.

### 3.1.2.1 Description of Diagnosis Code Files

**Current model diagnoses.xls:**
Comprehensive list of all risk adjustment model diagnoses used for risk adjustment payments in 2004-2009.

Specifically, the file:
- Contains all diagnoses used in the CMS-HCC models and the RxHCC (prescription Drug Risk Adjustment Model)
- Indicates whether or not the diagnosis code is used for payment for 2004-2009.
- Includes the associated condition category for the RxHCC model and/or the CMS-HCC model, and
- Indicates the diagnosis code effective date.

Please see
http://www.cms.hhs.gov.MedicareAdvtgSpecRateStats/06_Risk_adjustment.asp#TopOfPage and click on "Risk model diagnosis codes" for more information about model diagnosis codes.

Exhibit Z
Page 630



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**DATA COLLECTION**

**Future model diagnoses.xls:**
Comprehensive list of all additional model diagnoses that plans are required to collect and submit. These diagnoses, while not used for payment, are needed so that CMS can conduct analyses of future models that may include these diagnoses. Please note that these codes are sometimes referred to as "Non-model" diagnosis codes. Please see http://www.cms.hhs.gov.MedicareAdvtgSpecRateStats/06_Risk_adjustment.asp#TopOfPage and click on "Future model diagnoses" for more information regarding future model diagnoses codes.

### 3.1.3  Service From and Through Dates (Slide 9)

The dates of service define when a beneficiary received medical treatment from a physician or medical facility. For outpatient and physician services, the From Date and Through Date may be identical. For inpatient services, these dates are different from each other, and reflect the dates of admission to and discharge from a facility.



Date span is the number of days between the From Date and Through Date for a reported diagnosis. For risk adjustment, the date span is important to determine if the reported diagnosis cluster falls within the data reporting period.

### 3.1.4  Provider Type (Slide 10)

For the purpose of risk adjustment, MA organizations must collect data from the following provider types:

- Hospital inpatient facilities
- Hospital outpatient facilities
- Physicians

These are the three principal sources of data. MA organizations are responsible for determining provider type based on the source of the data.

### 3.2    Data Sources

MA organizations are responsible for ensuring that the data they collect comes from acceptable sources. These sources are hospital inpatient facilities, hospital outpatient facilities, and physicians.

### 3.2.1  Hospital Inpatient (Slide 11)

A hospital inpatient service is one provided by a hospital during which a patient is admitted to the facility for at least one overnight stay.

Inpatient hospital data should be differentiated based on whether it is received from within or outside of the MA organization's provider network. Effective May 1, 2007, a network hospital should have a National Provider Identifier (NPI) number as a hospital inpatient facility. Table 3B identifies covered and non-covered facilities with regard to risk adjustment data collection.



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**DATA COLLECTION**

TABLE 3B – HOSPITAL INPATIENT

| PROVIDER TYPE | COVERED FACILITIES | NON-COVERED FACILITIES* |
|---|---|---|
| **Hospital Inpatient** | • Short-term (general and specialty) Hospitals<br>• Religious Non-Medical Health Care Institutions (formerly Christian Science Sanatoria)<br>• Long-term Hospitals<br>• Rehabilitation Hospitals<br>• Children's Hospitals<br>• Psychiatric Hospitals<br>• Medical Assistance Facilities/ Critical Access Hospitals | • Skilled Nursing Facilities (SNFs)<br>• Hospital Inpatient Swing Bed Components<br>• Intermediate Care Facilities<br>• Respite Care<br>• Hospice |

\* These are examples of non-covered facilities and not a comprehensive list.

 When submitting hospital inpatient data, MA organizations must make a distinction between the principal diagnosis and other diagnoses. The Data Submission Module covers the details of submitting data.

### 3.2.2  Hospital Outpatient (Slide 12)

Hospital outpatient services are therapeutic and rehabilitative services provided for sick or injured persons who do not require inpatient hospitalization or institutionalization.

Data must be collected from hospital outpatient departments. As with hospital inpatient facilities, the MA organization must determine which facility is Medicare certified, network, or non-network. Table 3C identifies covered and non-covered hospital outpatient facilities.



### TABLE 3C – HOSPITAL OUTPATIENT

| PROVIDER TYPE | COVERED FACILITIES | NON-COVERED FACILITIES* |
|---|---|---|
| **Hospital Outpatient** | • Short-term (general and specialty) Hospitals<br>• Medical Assistance Facilities/Critical Access Hospitals<br>• Community Mental Health Centers 1**<br>• Federally Qualified Health Centers 2/ Religious Non-Medical Health Care Institutions (formerly Christian Science Sanatoria) **<br>• Long-term Hospitals<br>• Rehabilitation Hospitals<br>• Children's Hospitals<br>• Psychiatric Hospitals<br>• Rural Health Clinic (Free-standing and Provider-Based) 3** | • Free-standing Ambulatory Surgical Centers (ASCs)<br>• Home Health Care<br>• Free-standing Renal Dialysis Facilities |
| | **NON-COVERED SERVICES** | |
| | • Laboratory Services<br>• Ambulance<br>• Durable Medical Equipment<br>• Prosthetics | • Orthotics<br>• Supplies<br>• Radiology Services |

\*    These are examples of non-covered facilities and are not to be considered a comprehensive list.
\*\*   Facilities use a composite bill that covers both the physician and the facility component of the services, and services rendered in these facilities do not result in an independent physician claim.
1. <u>Community Mental Health Centers (CMHCs)</u> provide outpatient services, including specialized outpatient services for children, the elderly, individuals who are chronically ill, and residents of the CMHC's mental health services area who have been discharged from inpatient treatment at an inpatient facility.
2. <u>Federally Qualified Health Centers (FQHCs)</u> are facilities located in a medically underserved area that provide Medicare beneficiaries with preventive primary medical care under the general direction of a physician.
3. <u>Rural Health Clinics (RHCs)</u> are Medicare certified facilities that are located in a rural, medically underserved area that provide ambulatory primary medical care under the general direction of a physician.

It is important for MA organizations to note that regardless of the type of diagnostic radiology bill (outpatient department or physician component), the services are not acceptable for risk adjustment. Diagnostic radiologists typically do not document confirmed diagnoses. The diagnosis confirmation comes from referring physicians or physician extenders and therefore not assigned in the medical record documentation from diagnostic radiology services alone.

### 3.2.2.1    Determining Whether Facilities Are Acceptable for Risk Adjustment (Slide 13)

MA organizations are responsible for ensuring data collected and submitted are acceptable for the risk adjustment process. In the past, the provider number has been used to assist in this. However, CMS is in the process of implementing a new provider identifier, the National Provider Identification (NPI) number.



**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

**DATA COLLECTION**

As will be discussed below, the CMS will continue to allow the use of the legacy provider number along with the new NPI for a transition time. However, the NPI does not have intelligence, so a new code called the "taxonomy code" was developed to help identify types of providers. Both the legacy provider number and the taxonomy code can be used in determining the appropriateness of the covered hospital entities for the purposes of risk adjustment data collection. Table 3D illustrates the steps MA organizations may use to identify the provider numbers or taxonomy codes for facilities.

**TABLE 3D – DETERMINING COVERED HOSPITAL ENTITY PROVIDER NUMBERS**

| SITUATION | ISSUE | ACTION |
|---|---|---|
| **Situation 1** | The provider number or taxonomy code is identified. | Determine if the number is in an acceptable range for risk adjustment. If in the acceptable range, submit the data. |
| **Situation 2** | An in-network provider submitted a claim but did not include the provider number or taxonomy code. | Obtain the provider number or taxonomy code and determine if the number is in an acceptable range for risk adjustment. If in the acceptable range, submit the data.<br><br>**NOTE:** All network providers are required to have certified Medicare provider numbers or taxonomy codes; therefore, do not submit risk adjustment data for this provider until these numbers are obtained. |
| **Situation 3** | An out-of-network provider submits a claim without a provider number. | Try to obtain a provider number or taxonomy code, if possible. If not available, check the list of Veterans Administration and Department of Defense (VA/DoD) listings published on csscoperations.com. If the provider is listed there, submit the data.<br><br>If the provider is not on the VA/DoD list, the organization may need to contact CMS to determine if the provider is acceptable for risk adjustment.<br><br>**NOTE:** All network providers are required to have certified Medicare provider numbers or taxonomy codes; therefore, do not submit risk adjustment data for this provider until these numbers are obtained. |

**3.2.2.2      National Provider Identifier**

CMS has recently issued contingency guidance for National Provider Identifier implementation. This contingency guidance provides that, for a period of 12 months after the NPI Rule compliance date of May 23, 2007, CMS will not impose civil money penalties on covered entities that deploy contingency plans, including (in order to ensure the smooth flow of payments) continuing to use and accept legacy identifiers on HIPAA transactions, if they have made reasonable and diligent efforts to become compliant



and, in the case of health plans (that are not small health plans), in order to facilitate the compliance of their trading partners.

MA organizations should verify that diagnoses are collected from Medicare certified hospitals/facilities and that data from all Medicare certified network hospital/facilities include the associated Medicare provider identifiers (NPI and taxonomy code; and in the interim the legacy provider number). They should also verify that the Medicare certified hospitals/facilities providing the data are from acceptable facilities and services. As stated above, plans may use either the legacy Medicare provider numbers or the taxonomy code to determine if facilities and services are acceptable for risk adjustment.

MA organizations may wish to create a system for checking if the data are from acceptable facilities and for acceptable services. They may check the legacy provider number against the provider number ranges or check the taxonomy code against the taxonomy code ranges, both of which identify what type of service has been rendered.

If using the provider number, please note that it has six characters. The first two characters are numerals and represent the state/territory as illustrated in Table 3E.

### TABLE 3E – PROVIDER NUMBER STATE ASSIGNMENTS

| STATE | CODE | STATE | CODE | STATE | CODE |
|---|---|---|---|---|---|
| Alabama | 01 | Kentucky | 18 | Oklahoma | 37 |
| Alaska | 02 | Louisiana | 19 | Oregon | 38 |
| American Samoa | 64 | Maine | 20 | Palau | N/A |
| Arizona | 03 | Maryland | 21 | Pennsylvania | 39 |
| Arkansas | 04 | Massachusetts | 22 | Puerto Rico | 40 |
| California | 05 | Michigan | 23 | Rhode Island | 41 |
| Colorado | 06 | Minnesota | 24 | South Carolina | 42 |
| Connecticut | 07 | Mississippi | 25 | South Dakota | 43 |
| Delaware | 08 | Missouri | 26 | Tennessee | 44 |
| District of Columbia | 09 | Montana | 27 | Texas | 45 |
| Florida | 10 | Nebraska | 28 | Utah | 46 |
| Georgia | 11 | Nevada | 29 | Vermont | 47 |
| Guam | 65 | New Hampshire | 30 | Virgin Islands | 48 |
| Hawaii | 12 | New Jersey | 31 | Virginia | 49 |
| Idaho | 13 | New Mexico | 32 | Washington | 50 |
| Illinois | 14 | New York | 33 | West Virginia | 51 |
| Indiana | 15 | North Carolina | 34 | Wisconsin | 52 |
| Iowa | 16 | North Dakota | 35 | Wyoming | 53 |
| Kansas | 17 | Ohio | 36 | | |

    States and territories are included in the list of Medicare provider numbers.

The third character may be a numeral or a letter. Provider numbers with a **U, W, Y, Z, 5** or **6** in the third character indicate that the service was provided in a swing bed component of a hospital or a skilled

---



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**DATA COLLECTION**

nursing facility, which, are not covered entities. The last three characters are numerals unique to the facility.

If using the taxonomy code, the bill type will be needed to identify if the service was provided in non-covered entity such as a swing bed component of a hospital or a skilled nursing facility.

As an additional check, refer to Tables 3F and 3G, which provide the only acceptable ranges for hospital facilities. The tables reflect the range of provider numbers for risk adjustment covered hospital entities. Risk Adjustment data are not acceptable when received from facilities with numbers outside the ranges.

 Skilled nursing facilities, home health care and hospital inpatient swing bed components are not covered entities for risk adjustment data.

**TABLE 3F – HOSPITAL INPATIENT COVERED ENTITIES**

| TYPE OF HOSPITAL INPATIENT FACILITY | PROVIDER NUMBER RANGE | TAXONOMY CODE/ TYPE OF BILL(TOB) |
|---|---|---|
| Short-term (General and Specialty) Hospital | XX0001-XX0899 XXS001-XXS899 XXT001-XXT899 | 282N00000X 273R00000X 273Y00000X |
| Medical Assistance Facilities/Critical Access Hospitals | XX1225-XX1399 | 282NC0060X |
| Religious Non-Medical Health Care Institutions | XX1990-XX1999 | TOB 4XX |
| Long-term Hospitals | XX2000-XX2299 | 282E00000X |
| Rehabilitation Hospitals | XX3025-XX3099 | 283X00000X |
| Children's Hospitals | XX3300-XX3399 | 282NC2000X |
| Psychiatric Hospitals | XX4000-XX4499 | 283Q00000X |

**TABLE 3G – HOSPITAL OUTPATIENT COVERED ENTITIES**

| TYPE OF HOSPITAL OUTPATIENT FACILITY | PROVIDER NUMBER RANGE | TAXONOMY CODE/ TYPE OF BILL (TOB) |
|---|---|---|
| Short-term (General and Specialty) Hospital | XX0001-XX0899 XXS001-XXS899 XXT001-XXT899 | 282N00000X 273R00000X 273Y00000X |
| Medical Assistance Facilities/Critical Access Hospitals | XX1225-XX1399 | 282NC0060X |
| Community Mental Health Centers | XX1400-XX1499 XX4600-XX4799 XX4900-XX4999 | TOB 76X |
| Federally Qualified Health Centers/Religious Non-Medical Health Care Institutions | XX1800-XX1999 | TOB 73X for FQHC TOB 4XX for RNHCI |
| Long-term Hospitals | XX2000-XX2299 | 282E00000X |
| Rehabilitation Hospitals | XX3025-XX3099 | 283X00000X |
| Children's Hospitals | XX3300-XX3399 | 282NC2000X |
| Rural Health Clinics, Freestanding and Provider-Based | XX3400-XX3499 XX3800-XX3999 XX8500-XX8999 | TOB 71X |
| Psychiatric Hospitals | XX4000-XX4499 | 283Q00000X |

Exhibit Z
Page 636



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**DATA COLLECTION**

The implementation of the NPI did not change the valid Hospital Inpatient and Outpatient facilities for submission of risk adjustment data nor eliminate the process for receiving and verifying information from Medicare health care providers that are in network. Institutional providers that currently bill Medicare using more than one legacy identifier in order to identify subparts of their facility are required to submit a taxonomy code on all of the claims they submit to Medicare.

The following web site serves as a reference to types of facilities and taxonomy codes.

http://www.wpc-edi.com/codes/taxonomy

Figure 3A is a screen shot of the wpc-edi.com website which serves as a reference tool to determine types of facilities and taxonomy codes.

**Figure 3A – WPC-EDE.COM**



The following website serves as a reference for hospital provider numbers:
http://www.ahd.com/freesearch.php3

Figure 3B is a screenshot of the search page on the American Hospital Directory website. This web-based search database allows MA organizations the opportunity to access Medicare provider number by entering key words, city, state, zip code, or area code. When using the search tool, users need to be aware of the following:

- The most effective search option is to select the state where the provider is located.
- When entering the hospital name, users should be aware that the official name of the hospital may be different then what is included in the database.
- Avoid entering abbreviations.

---

3-9

Exhibit Z
Page 637

**Exhibit 3**



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**DATA COLLECTION**



**Figure 3B – American Hospital Directory**



📖    See Resource Guide for more information about Medicare provider numbers.

### 3.2.3  Physician Data (Slide 14)

The collection of physician data for risk adjustment is associated with the physician's specialty. That is, all ICD-9-CM diagnoses that are required for the risk adjustment models and rendered as a result of a physician face-to-face visit must be collected by the MA organization. This includes data collected from non-network as well as network physicians.

Only those physician specialties and other clinical specialists identified in Table 3H are acceptable for risk adjustment.

Exhibit Z
Page 638



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**DATA COLLECTION**

### TABLE 3H – ACCEPTABLE PHYSICIAN SPECIALTIES

| CODE | SPECIALTY | CODE | SPECIALTY | CODE | SPECIALTY |
|---|---|---|---|---|---|
| 01 | General Practice | 29 | Pulmonary Disease | 70* | Multispecialty Clinic or Group Practice |
| 02 | General Surgery | 33* | Thoracic Surgery | 72* | Pain Management |
| 03 | Allergy/Immunology | 34 | Urology | 76* | Peripheral Vascular Disease |
| 04 | Otolaryngology | 35 | Chiropractic | 77 | Vascular Surgery |
| 05 | Anesthesiology | 36 | Nuclear Medicine | 78 | Cardiac Surgery |
| 06 | Cardiology | 37 | Pediatric Medicine | 79 | Addiction Medicine |
| 07 | Dermatology | 38 | Geriatric Medicine | 80 | Licensed Clinical Social Worker |
| 08 | Family Practice | 39 | Nephrology | 81 | Critical Care (Intensivists) |
| 10* | Gastroenterology | 40 | Hand Surgery | 82 | Hematology |
| 11 | Internal Medicine | 41 | Optometry (specifically means optometrist) | 83 | Hematology/Oncology |
| 12 | Osteopathic Manipulative Therapy | 42 | Certified Nurse Midwife | 84 | Preventive Medicine |
| 13 | Neurology | 43 | Certified Registered Nurse Anesthetist | 85 | Maxillofacial Surgery |
| 14 | Neurosurgery | 44 | Infectious Disease | 86 | Neuropsychiatry |
| 16* | Obstetrics/Gynecology | 46* | Endocrinology | 89* | Certified Clinical Nurse Specialist |
| 18* | Ophthalmology | 48* | Podiatry | 90 | Medical Oncology |
| 19 | Oral Surgery (Dentists only) | 50* | Nurse Practitioner | 91 | Surgical Oncology |
| 20 | Orthopedic Surgery | 62* | Psychologist | 92 | Radiation Oncology |
| 22* | Pathology | 64* | Audiologist | 93 | Emergency Medicine |
| 24* | Plastic and Reconstructive Surgery | 65 | Physical Therapist | 94 | Interventional Radiology |
| 25 | Physical Medicine and Rehabilitation | 66 | Rheumatology | 97* | Physician Assistant |
| 26 | Psychiatry | 67 | Occupational Therapist | 98 | Gynecologist/Oncologist |
| 28* | Colorectal Surgery | 68 | Clinical Psychologist | 99 | Unknown Physician Specialty |

\* Indicates that a number has been skipped.

 Qualified physician data for risk adjustment requires a face-to-face visit with the exception of pathology services (professional component only).

Exhibit Z
Page 639



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**DATA COLLECTION**

### 3.2.4  Alternative Data Sources

Alternative data sources (ADS) include diagnostic data from sources other than hospital inpatient, hospital outpatient, and physician services. MA organizations may use ADS as a ***check*** to ensure that all required diagnoses have been submitted to CMS for risk adjustment purposes, such as pharmacy records and information provided to national or state cancer registries. The MA organization may not, however, use ADS as substitutes for documenting diagnoses from a hospital/physician. As in all diagnoses submitted, there must be medical record documentation to support the diagnosis as having been documented as a result of a hospital inpatient stay, a hospital outpatient visit, or a physician face-to-face visit during the data collection period.

For example, a prescription for an ACE inhibitor, alone, is not considered sufficient for the sole data source of "clinical evidence" of congestive heart failure (CHF); instead, the medical record needs to document an appropriate clinician's diagnosis of CHF during the data collection period (e.g., where an "appropriate clinician" is a physician/nurse practitioner/physician assistant). A laboratory test showing one reading of high blood sugar is not considered sufficient "clinical evidence" of diabetes–the medical record needs to document a clinician's diagnosis of diabetes during the data collection period.

### 3.2.5  Excluded Providers

Medicare will not pay for items or services rendered to beneficiaries and recipients by an excluded provider or by entities owned or managed by an excluded provider. Providers are excluded for the following reasons: a program related crime, patient abuse or neglect, health care fraud in any health care program, and convictions relating to controlled substances.

&#x1F4D6;    The HHS monthly exclusion notification can be found at http://oig.hhs.gov/fraud/exclusions.html.

### 3.3    Data Collection Formats and Considerations

There are several formats that MA organizations can accept when collecting data from medical providers. Table 3I lists the formats by provider type.

### 3.3.1  Data Collection Formats (Slide 16)

For facility services, the standard billing format is UB-04 (Uniform Billing Form–2004 version). The HCFA 1500 form is the standard format for physician services.

**TABLE 3I – DATA COLLECTION FORMATS**

| HOSPITAL INPATIENT/HOSPITAL OUTPATIENT | <ul><li>UB-04</li><li>ANSI X12 837 4010</li><li>RAPS Format</li></ul> |
|---|---|
| PHYSICIAN | <ul><li>HCFA 1500</li><li>NSF 3.01</li><li>ANSI X12 837 4010</li><li>RAPS Format</li><li>Superbill</li></ul> |

Exhibit Z
Page 640



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**DATA COLLECTION**

### 3.3.2  Collection Format Features

MA organizations need to carefully consider decisions regarding data collection tools, as they may impact the volume and accuracy of data received from physicians and providers. When examining the data collection options, the organization's management should consider the features of each of the approved data collection tools. Table 3J describes key features of each data collection tools.

**TABLE 3J – COLLECTION FORMAT FEATURES**

| FORMAT | FEATURE | | | | | |
|---|---|---|---|---|---|---|
| | PHYSICIAN SERVICES | HOSPITAL INPATIENT/ OUTPATIENT SERVICES | MINIMUM DATA SET | FULL CLAIMS DATA | PAPER FORMAT | ELECTRONIC |
| HCFA 1500* | ● | | | ● | ● | |
| UB-04* | | ● | | ● | ● | |
| NSF* | ● | | | ● | ● | ● |
| ANSI X12 837 | ● | ● | | ● | | ● |
| Superbill | ● | | ● | | ● | |
| RAPS Format | ● | ● | ● | | | ● |

*These data collection formats are not HIPAA compliant transactions. However, if your plan is HIPAA compliant and your trading partners are not HIPAA compliant, CMS is allowing receipt of non-HIPAA formats until such time as your trading partners are prepared to submit the HIPAA transaction sets.

The data collection options provided by CMS offer the MA organization the ability to determine which format works best for each of the plan's providers. A variety of collection formats may be used for different providers. If an organization plans to use multiple collection formats, consideration should be given to the complexity and costs associated with supporting these formats (e.g., systems, processes, staffing, etc.).

### 3.3.3  Collecting Data from Physicians Using a Superbill

The superbill is a data collection option for risk adjustment. The superbill is a common physician office claim form that lists standard ICD-9-CM codes, CPT (Current Procedural Terminology) codes, and beneficiary information. Typically, physicians use the superbill to record clinical information with the appropriate codes to aid in preparing claims or encounter data for submission. MA organizations may develop superbills for use by their capitated physicians for capturing diagnostic information for risk adjustment.

---

Exhibit Z
Page 641



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**DATA COLLECTION**

 If the MA organization currently utilizes a superbill that works well for its data collection needs, then it is not necessary to create a new format for risk adjustment data collection. Additionally, if a physician group has a superbill that will capture all relevant risk adjustment diagnoses, it is not necessary for the MA organization to replace that superbill with one that is specific to risk adjustment requirements.

 **Examples**

**Examples of Superbills**

Two examples of superbills are provided in Figures 3C and 3D. The first example is a typical fee-for-service superbill for an internist. This superbill contains both ICD-9-CM diagnosis codes and CPT procedure codes. For illustrative purposes, the required risk adjustment diagnoses have been bolded.

The second example illustrates what the same superbill might look like if used specifically for collection of risk adjustment data. The ICD-9-CM code list provided by CMS is used to develop the list of common internist ICD-9-CM diagnoses codes on the superbill. These are codes that are relevant diagnoses for the risk adjustment model, related conditions that are not specific to risk adjustment, as well as other common internists' diagnoses. A space was left for the internist to enter diagnoses that are not on the list. Note that there are no CPT procedure codes on the superbill because they are not required for risk adjustment.

Exhibit Z
Page 642



## FIGURE 3C – SAMPLE FEE-FOR-SERVICE SUPERBILL

**JOHN E. DOE, M.D.**
***Internal Medicine***
*Board Certified*

123 Main Street
Anytown, UL 99999
Office (555) 555-5555
Billing (555) 555-5550
TAX I.D. #12345678

PATIENT NAME | INSURANCE

OFFICE PATIENT NUMBER **847** | ADMIT DATE | DIAGNOSIS

DR# | ACCIDENT TYPE ☐ Work Comp ☐ Auto ☐ Other | DATE OF ACCIDENT _____/_____/_____ | 1) | 2) | 3) | 4)

### OFFICE SERVICE

| | New | Mod | Fee | DX | Est. | Mod | Fee | DX |
|---|---|---|---|---|---|---|---|---|
| Level 1 | 99201 | ___ | 48 | ___ | 99211 | ___ | 27 | ___ |
| Level 2 | 99202 | ___ | 82 | ___ | 99212 | ___ | 48 | ___ |
| Level 3 | 99203 | ___ | 121 | ___ | 99213 | ___ | 67 | ___ |
| Level 4 | 99204 | ___ | 176 | ___ | 99214 | ___ | 105 | ___ |
| Level 5 | 99205 | ___ | 222 | ___ | 99215 | ___ | 155 | ___ |

### PHYSICALS

| | New | Mod | Fee | DX | Est. | Mod | Fee | DX |
|---|---|---|---|---|---|---|---|---|
| 2-17yrs | 99354 | ___ | 168 | ___ | 99394 | ___ | 133 | ___ |
| 18-39yrs | 99385 | ___ | 182 | ___ | 99385 | ___ | 140 | ___ |
| 40-64yrs | 99386 | ___ | 189 | ___ | 99396 | ___ | 147 | ___ |
| >65yrs | 99387 | ___ | 203 | ___ | 99397 | ___ | 154 | ___ |

### INITIAL HOSPITAL CARE

| | | | | |
|---|---|---|---|---|
| Level 1 | 99221 | ___ | 95 | ___ |
| Level 2 | 99222 | ___ | 156 | ___ |
| Level 3 | 99223 | ___ | 213 | ___ |

### DAILY HOSPITAL CARE

Level 1 98231 ___ ___ ___
From _____ To _____ @ $55
Level 2 99232 ___ ___ ___
From _____ To _____ @ $87
Level 3 99[illegible] ___ ___ ___
From _____ To _____ @$145
Discharge 98238 ___ [illegible] ___
Discharge-over 30 [illegible] 99239 ___ [illegible]2 ___

### NURSING HOME CARE

| | | | | |
|---|---|---|---|---|
| Partial Detailed | 99302 | ___ | [illegible]3 | ___ |
| Partial Comprehensive | 99303 | ___ | [illegible] | ___ |
| Follow Up Level 1 | 99311 | ___ | [illegible] | ___ |
| Follow Up Level 2 | 99312 | ___ | 71 | ___ |
| Follow Up Level 3 | 99313 | ___ | 99 | ___ |
| Discharge-30 minutes or less | 99315 | ___ | ___ | ___ |
| Discharge-over 30 minutes | 99316 | ___ | ___ | ___ |

### PROCEDURES

| | | | | |
|---|---|---|---|---|
| Venipuncture | 38415 | ___ | 17 | ___ |
| Ear Irrigation | 69210 | ___ | 44 | ___ |
| ECG With Interpretation & Report | 93000 | ___ | 39 | ___ |
| ECG Only | 93005 | ___ | 25 | ___ |
| ID Abcess | 10060 | ___ | 119 | ___ |
| ID | 86580 | ___ | 12 | ___ |
| Stool WBC | 82270 | ___ | 6 | ___ |
| Analysis with Micro | 81000 | ___ | 9 | ___ |
| Analysis without Micro | 81002 | ___ | 7 | ___ |

### IMMUNIZATIONS & INJECTIONS

| | | | | |
|---|---|---|---|---|
| B-12 | J3420 | ___ | 3 | ___ |
| Hepatitis A, Adult | 90632 | ___ | 70 | ___ |
| Hepatitis B, Adult | 90746 | ___ | 70 | ___ |
| Hepatitis B, adolescent | 90744 | ___ | 60 | ___ |
| Influenza-Whole | 90550 | ___ | 15 | ___ |
| MMR | 90707 | ___ | 57 | ___ |
| Pneumovax | 90732 | ___ | 40 | ___ |
| Tetanus | 90703 | ___ | 26 | ___ |
| Other _____________ | _____ | ___ | | ___ |
| Other _____________ | _____ | ___ | | ___ |

**NOT INTENDED FOR REPRODUCTION**

☐ MCR PAP SMEAR
992__-25 E&M
Q0091 Pap $50
G0101 P&B Exam $60
V15.80 High Risk Dx
V76.2 Routine Dx

☐ FLU SHOT
90659 Flu Shot
90471 Admin
V04.8 Flu Vaccine Dx

☐ MCR FLU SHOT
90859 Flu Shot
G0008 Admin
V04.8 Flu Vaccine Dx

☐ PNEUMOVAX
80732 Shot
90471 Admin
V03.82 Vaccine Dx

☐ MCR PNEUMOVAX
90732 Shot
G0008 Admin
V03[illegible] Vacc[illegible]

[illegible] HEPATIT[illegible]
[illegible]074[illegible] [illegible]ult Sh[illegible]
9074[illegible] [illegible]ld Sh[illegible]
90[illegible] [illegible]in
V08[illegible] [illegible]ine Dx

☐ HEPATITIS A
90632 Shot
90471 Admin
V08.3 Vaccine Dx

☐ TETANUS
90707 Shot
90471 Admin
906.5 Vaccine Dx

☐ B-12 INJECTION
J3420 Shot
80782 Admin
266.2 B-12 Dx

Next Visit

Total: $ _______________
Amt Pd $ _____________
11 ☐ Check # _______
43 ☐ Co-Pay Not Collected

Physician Signature Date

### DIAGNOSIS CODES: ICD-9-CM

__789.00 Abdominal Pain, NEC
__796.4 Abnor Unexpl Tst
__762.3 Adema
**__427.31 A. Fib.**
__285.9 Anemia NOS
**__413.9 Angina**
__V58.61 Anticoag Med
__300.00 Anxiety
__427.9 Arythmia NOS
__719.40 Arthralgia
__716.00 Arthritis Acu Chron
**__714.0 Arthritis, Rheum**
__429.2 ASCVD
__493.90 Asthma
__724.2 Back Pain
__578.1 Blood in Stool
__726.91 Bone Spur
**__174.9 Breast CA, Female**
__611.72 Breast Lump
__490 Bronchitis
__727.3 Bursitis
__ 682.9 Cellulitis, NOS
__767.99 Chg/Bowel/Habits
__780.9 Chg
__786.50 Chest Pain
**__428.0 CHF**
__574.20 Cholellthlasis, NOS
__153.9 Colon C[illegible]
__564.0 Constipatio[illegible]
**__496 COPD**
**__436 CVA**
__799.4 Decondition[illegible]
__276.5 Dehydratio[illegible]
__294.8 Dementia
__311 Depression
__692.9 De[illegible]atitis
**__250.92 [illegible]abete[illegible]tle**
**__[illegible]ab[illegible]**
**__250.62 Diab Neuropathy**
**__250.00 Diabetes, NIDDM**
**__250.50 Diabs, Retinopathy**
**__250.00 Diabetes, Type II**
**__250.32 Diabetic Coma**
__787.91 Diarrhea
__562.11 Diverticulitis
__780.4 Dizziness/Vertigo
**__453.8 DVT**
__787.2 Dysphagia
__780.7 Fatigue
__610.1 Fibrocystic Breast Dis
__729.1 Fibromyalgia
__558.9 Gastroenteritis
__530.81 GERD
__578.9 GI Bleeding
__240.9 Goiter
__274.9 Gout
__242.0 Graves Disease
__245.2 Hashimotos
__307.81 Headache, Tension
__784.0 Headache
__V70.0 Health Maint
__V43.2 Heart Valve Repl
__455.6 Hemorrhoids
__573.3 Hepatitis, NOS
__070.1 Hepatitis A
__070.30 Hepatitis B
__070.61 Hepatitis C, Acute
**__070.54 Hepatitis, C, Chron**
__V05.3 Hepatitis Viral, Vac

__704.1 Hirsutism
__276.7 Hyperka
__272.4 Hyper
__276.0 Hyper
__252.0 Hyperparathyroid
__401.9 Hypertension
__242.90 Hyperthyroid
__276.8 Hypokalemia
__276.1 Hyponatremus
__244.9 Hypothyroid
__788.30 Incon Urinary
__487.1 Influenza
__V04.8 Influenza Vac
__780.52 Insomnia
__564.1 Irrit Bowel Syn
__386.30 Labyrinthitis
**__710.0 Lupus**
**__263.9 Malnutrition**
__995.2 Med Side Effect
**__410.9 MI, Acu, Unspec**
__412 MI, Old 8+ wks
__424.0 Vive Pro
__728.85 Muscle Spasm
__355.9 Neuropathy
__278.00 Obesity
__110.0 Onychomycosis
__733.00 Osteopotasin
__388.70 Otalgia
__362.9 Otitis Media
__V15.89 Pap High Risk
__V76.2 Pap Rout MCR
__625.9 Pelvic Pain, Fem
__281.0 Perrouout Anem
__462. Pharyngitis
__486 Pneumonia
__V03.82 Pneumonia Vac
__627.2 Post Meno Synd
__V72.84 Preop Exam
**__185 Prostate Cancer**
__600.0 Prostate Hyper
__601.9 Prostatis
__896.1 Psoriasis
**__415.19 Pulmon Embol**
__569.3 Rectal Bleeding
__592.9 Renal Lithisis
__477.9 Rhinitis, Allergic
__473.9 Sinusitis
__709.9 Skin Lesion
__305.10 Smoker
__848.9 Strain/Spasm, NOS
__780.2 Syncope/Collapse
__079.89 System Vrt Infect
__451.9 Thrombophlebitia
**__193 Thyroid CA**
__241.0 Thyroid Nodule
__245 Thyroiditis
__533.9 Ulcer, Peptic
**__411.1 Unstable Angina**
__465.9 URI
__599.0 UTI
__616.10 Vaginitis
__286.2 Vit B-12 Deficiency
__380.4 Wax in Ears
__783.2 Weight Loss
__V72.3 Well Woman

SAMPLE



**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

**DATA COLLECTION**

### FIGURE 3D – SAMPLE RISK ADJUSTMENT SUPERBILL

| JOHN E. DOE, M.D.<br>*Internal Medicine*<br>Board Certified<br><br>123 Main Street<br>Anytown, UL  99999<br>Office  (555) 555-5555<br>Billing (555) 555-5550<br>TAX I.D.  #12345678 | PATIENT NAME | | | INSURANCE |
|---|---|---|---|---|
| | | | | |
| | DR# | ACCIDENT TYPE<br>☐  Work Comp<br>☐  Auto<br>☐  Other | DATE OF ACCIDENT<br><br>____/____/____ | |

DIAGNOSIS CODES:  ICD-9-CM

| | |
|---|---|
| __427.3 | A. Fib/flutter |
| __427.9 | Arrythmia |
| __285.9 | Anemia,NOS |
| __284 | Aplastic Anemia |
| __413 | Angina |
| __300.00 | Anxiety |
| __716.90 | Arthritis, NOS |
| __714 | Arthritis, Rheumatoid |
| __427.9 | Arrythmia,NOS |
| __429.2 | ASCVD |
| __ | |
| __493.2 | Asthma w/ COPD |
| __174 | Breast Ca, female |
| __611.72 | Breast Lump |
| __190 | Bronchitis, NOS |
| __166.0 | Bronchitis, acute |
| __191 | Bronchitis, chronic |
| __82.9 | Bronchitis, NOS |
| __786.50 | Chest pain |
| __428 | CHF |
| __574.20 | Cholelithiasis, NOS |
| __153 | Colon CA |
| __496 | COPD |
| __436 | CVA |
| __276.5 | Dehydration |
| __294.8 | Dementia |
| __311 | Depression |
| __296 | Depression, major |
| __692.9 | Dermatitis |
| __250 | Diabetes |
| __250.9 | Diabetes, Brittle |
| __250.3 | Diabetic Coma |
| __250.1 | Diabetic Keto |
| __250.4 | Diabetic Nephrosis |
| __250.6 | Diabetic Neuropathy |
| __250.0 | Diabetes,NIDDM |
| __250.7 | Diabetic PVD |
| __250.5 | Diabetic Retinopathy |
| __562.11 | Diverticulitis |
| __453.8 | DVT |
| __610.1 | Fibrocystic Breast |
| __729.1 | Fibromyalgia |
| __558.9 | Gastroenteritis |
| __530.81 | GERD |
| __578.9 | GI Bleeding |
| __240.9 | Goiter |
| __274.9 | Gout |
| __242.0 | Graves' Disease |

| | |
|---|---|
| __573.3 | Hepatitis,NOS |
| __070.1 | Hepatitis A |
| __070.30 | Hepatitis B |
| __070.51 | Hepatitis C, Acute |
| __070.54 | Hepatitis C, Chronic |
| __401.9 | Hypertension |
| __242.90 | Hyperthyroidism |
| __276.8 | Hypokalemia |
| __276.0 | Hyponatremia |
| __244.9 | Hypothyroidism |
| __487.1 | Influenza |
| __564.1 | Irrit. Bowel Syn |
| __386.30 | Labyrinthitis |
| __710 | Lupus |
| __263 | Malnutrition |
| __995.2 | Medicine Side Effect |
| __410 | MI |
| __424.0 | Mitral Valve |
| __356.9 | Neuropathy |
| __110.0 | Onychomycosis |
| __715.90 | Osteoarthritis |
| __733.00 | Osteoporosis |
| __427.0 | PAT |
| __427.1 | PVT |
| __427.2 | Parox Tachycardia |
| __462 | Pharyngitis |
| __486 | Pneumonia |
| __48_ | Pneumonia, specified |
| __185 | Prostate Cancer |
| __600.00 | Prostate Hypertrophy |
| __415.19 | Pulmonary Embolism |
| __592.0 | Renal Lithiasis |
| __477.9 | Rhinitis, Allergic |
| __473.9 | Sinusitis |
| __079.89 | Systemic Viral Infec |
| __451.9 | Thrombophlebitis |
| __193 | Thyroid Cancer |
| __241.0 | Thyroid Nodule |
| __245.9 | Thyroiditis |
| __533.9 | Ulcer, Peptic |
| __53_._ | Ulcer, perforated |
| __411 | Unstable Angina |
| __465.9 | URI |
| __599.0 | UTI |

Other:
_____
_____
_____
_____
_____

| Next Visit |
|---|
| Total:  $ _____ |
| Amt Pd  $ _____ |
| 12  ☐ Check # _____ |
| 44  ☐ Co-Pay Not Collected |
| Physician Signature          Date |

SAMPLE

NOT INTENDED FOR REPRODUCTION

3-16



### 3.3.4  Factors Affecting Data Collection Method (Slide 17)

The risk adjustment model requires that MA organizations collect a subset of data from their providers/physicians. While CMS requires that only the minimum data are collected for risk adjustment, MA organizations should also consider their business needs.

- The organization may decide to collect full claims data for a variety of reasons:

  - The organization has fee-for-service contracts and pays providers and physicians based on the specific service provided to patients.

  - The organization is earning or maintaining National Committee for Quality Assurance (NCQA) accreditation and is therefore required to collect Health Employers Data Information Set (HEDIS) data used to evaluate the plan's performance in areas of customer service, access to care, and claims processing.

  - The organization has established an internal process for credentialing purposes that requires evidence of compliance with regulatory and other standards of practice such as Joint Commission on Accreditation of Health Care Organizations (JCAHO) or American College of Surgeons. The JCAHO certification requires extensive onsite review to evaluate the health organization's performance in areas that impact healthcare.

- The organization may decide to collect the minimum data set for a variety of reasons:

  - The organization has capitated payment arrangement with physicians and providers, and pays a fixed amount for services provided.

  - The organization's physicians are paid employees of the managed care plan.

### 3.3.4.1  Contractual Relationships and Implications for Data Collection (Slide 18)

There are several types of contractual payment relationships that MA organizations have with network physicians. These relationships include: fee-for-service, capitated, staff model, and mixed services. These contractual relationships affect how MA organizations collect data from physicians. Table 3K describes the contractual payment relationships.

**TABLE 3K – CONTRACTUAL PAYMENT RELATIONSHIPS**

| FEE-FOR-SERVICE | In a fee-for-service contract, the physician is paid based on the specific services provided to each patient. |
|---|---|
| CAPITATED | The physician is paid a fixed amount per patient per month, regardless of the types of services provided. |
| STAFF MODEL | Physicians are paid employees of the managed care plan. Physicians generally provide services in a clinic setting. |
| MIXED SERVICES MODEL | In a mixed services model environment, managed care organizations use a combination of contractual arrangements. |

Exhibit Z
Page 645



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**DATA COLLECTION**

## 3.4    Health Information Portability and Accountability Act (HIPAA) (Slide 19)

Effective October 16, 2003, when HIPAA transaction standards became mandatory, all *electronic* claims/encounters sent from providers/physicians to MA organizations (health plans) constitute a HIPAA-covered transaction. Any MA organization that receives an electronic claim/encounter from a provider/physician must use the ANSI X12 837 v.40.10 format. This means that after the MA organization receives electronic data in HIPAA format, it cannot request that the physician resubmit the identical information (same patient, same diagnosis) in a different format (e.g., HCFA 1500) for purposes of risk adjustment data collection.

However, if needing to clarify original information or to obtain additional information, MA organizations may use an abbreviated data collection instrument for the sole purpose of collecting supplemental diagnostic information.

UB-92 and NSF are the old data collection formats and are not HIPAA compliant transactions. However, if your plan is HIPAA compliant and your trading partners are not HIPAA compliant, CMS is allowing receipt of the non-HIPAA formats until such time as your trading partners are prepared to submit the HIPAA transaction sets. This allowance is not an extension of the mandatory date of HIPAA (October 2003), and all organizations must be able to accept the HIPAA transactions. This extension simply allows plans to continue electronic commerce while their trading partners work toward compliance.

 **If** the transaction is from a provider to an MA organization (i.e., data collection) **and** the transaction is a claim or an encounter, **then** data must be used for risk adjustment **and** the same data cannot be requested in a different format from the provider.

## 3.5    Provider Communication and Risk Adjustment

Communicating risk adjustment requirements to physicians and providers can help to improve the quality and quantity of the data submitted by MA organizations. It can also help physicians and providers understand the importance of accurate coding and medical record documentation, and their role in data validation. This section describes key messages to include in provider communications, characteristics of effective communication with physicians and providers, and communication methods to consider when sending messages about risk adjustment.

### 3.5.1   Key Messages

Physicians and providers receive many messages from MA and other managed care organizations. It is easy for a message about risk adjustment to get lost in the stream of communications sent to physicians and providers. To help ensure that messages about risk adjustment get the attention of the provider community, it is important that organizations routinely include basic information about risk adjustment in a variety of provider communications. The key messages to reinforce are:

- **What is the purpose of risk adjustment?**
  Risk adjustment strengthens the Medicare program by ensuring that accurate payments are made to MA organizations based on the health status of their enrolled beneficiaries. Accurate payments to MA organizations help ensure that providers are paid appropriately for the services they provide to MA beneficiaries. Finally, risk adjustment provides MA organizations with incentives to enroll and treat less healthy individuals.

Exhibit Z
Page 646

Exhibit 3



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**DATA COLLECTION**

- **Why is risk adjustment important to physicians and providers?**
  The risk adjustment model relies on the ICD-9-CM diagnosis codes to prospectively reimburse MA organizations based on the health status of their enrolled beneficiaries. Physicians and providers must focus attention on complete and accurate diagnosis reporting according to the official ICD-9-CM coding guidelines.

- **What are the responsibilities of physicians and providers?**
  Physicians must report the ICD-9-CM diagnosis codes to the highest level of specificity and report these codes accurately. This requires accurate and complete medical record documentation. They are required to alert the MA organization of any erroneous data submitted and to follow the MA organization's procedures for correcting erroneous data. Finally, they must report claims and encounter information in a timely manner, generally within 30 days of the date of service (or discharge for hospital inpatient facilities).

 Organizations may also want to include information about the correct data collection formats available to them, as well as any information revealed through analysis of data collection trends uncovered through monitoring of the risk adjustment process.

### 3.5.2 Characteristics of Effective Communication

Physicians and providers tend to respond more positively to communications from MA organizations when the messages are considered reliable, accurate, timely, and helps them make their organization or practice more efficient. For this reason, it may be helpful to consider the following characteristics when developing provider communications:

- **Authoritative**
  Make the "look and feel" of provider communications conservative, official, and factual. Be certain all information is accurate. Grammar, spelling, and punctuation must be perfect, or the errors will undercut the reader's level of confidence in the message.

- **Current**
  Ensure that risk adjustment information is the most recent available. Update provider handbooks, websites, job aids, and training materials routinely so all information is current. Physicians and providers will not spend time reading information they know is outdated.

- **Timely**
  Provide information to providers when they need to know it. For example, if MA organizations need physicians and providers to send their diagnostic data via a specific format by a certain date, send that message to them with enough lead-time to allow them to prepare for and meet the deadline for the change.

- **Consistent**
  Send consistent messages about risk adjustment. MA organizations can contact the Customer Service and Support Center (CSSC) anytime to confirm that information they are about to send out to providers is correct. Physicians and providers appreciate receiving the right information the first time and every time.

Exhibit Z
Page 647



- **Practical, relevant, and well organized**
  Delete "background noise" from your physician and provider messages. That is, identify the primary message you want to send and provide the key information necessary to make the point. That is, focus the message. Identify any specific actions that are required in clear, easy-to-read language.

- **Accessible**
  Create materials for physicians and providers that are easy to access. Information that physicians and providers can locate quickly helps to ensure compliance with risk adjustment requirements, whether that information is available on the Internet, or in a paper document.

### 3.5.3  Communication Methods

Many MA organizations indicate that communicating to physicians and providers through a single medium, like a newsletter, is not effective. A multimodal approach is more successful at reaching the provider community because it reaches a broader audience and reinforces the message in a number of different formats.

When deciding the methods to communicate with physicians and providers, consider the following steps:

- **Identify the methods that tend to work best for the organization.** Many MA organizations indicate that the organization's provider Web page and newsletters reach audiences, but small and large group training sessions are most successful for causing a change in action.

- **Determine the goal of the message.** If the message's intent is to raise awareness about a topic, then broad-based communication methods may be appropriate. However, if the message is intended to change the way physicians and providers do something, then group meetings, followed up by emails, and provider handbook and contract updates may be excellent options.

- **Consider the physician's and provider's response.** If the message is likely to provoke a negative reaction from the provider community, then meetings with them can be helpful in addressing and clarifying issues, and discussing possible solutions to problems.

There are a number of methods MA organizations may use to communicate risk adjustment messages to the provider community. These are illustrated in Figure 3E. Understand that, once your organization establishes a communication channel, physicians and providers will rely on that channel to receive information. Any new channels MA organizations use may not be as effective as established ones.



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**DATA COLLECTION**

**Figure 3E – Communication Methods**



Exhibit Z
Page 649



# MODULE 4 – DATA SUBMISSION

## Purpose (Slide 2)

Medicare Advantage (MA) organizations must submit accurate diagnostic data when submitting risk adjustment data. This module describes the file layout for risk adjustment process submissions.

## Learning Objectives (Slides 3-4)

At the completion of this module, participants will be able to:

- Understand the submission process requirements, connectivity options, and Risk Adjustment Processing System (RAPS) file layout.
- Identify the data elements required to submit risk adjustment data.
- Locate and describe the diagnosis clusters in the RAPS format.
- Understand the Direct Data Entry (DDE) process.
- Describe the filtering process.
- Describe the diagnoses deletion process.



## 4.1    Submission Process Requirements (Slide 6)

New MA organizations must complete an Electronic Data Interchange (EDI) Agreement with the Centers for Medicare & Medicaid Services (CMS) and submit that Agreement to the Customer Service and Support Center (CSSC) prior to submitting risk adjustment data. The EDI Agreement is a contract between the MA organization and CMS attesting to the accuracy of the data submitted. An officer (e.g., CEO) that represents the MA organization must sign this document.  New Plans must submit the EDI Agreement within 1 month of the HPMS effective date.

MA organizations must make special arrangements to use a third party submitter. If the submitter is an entity other than an MA organization, the submitter must complete the Submitter ID Application Form, and an EDI Agreement form.  MA organization must complete, sign, and return the EDI Agreement for each plan number submitting data. CMS holds the MA organization accountable for the content of submissions regardless of who submits the data.

New MA organizations must submit test data within 3 months of the HPMS effective date and a production file must be submitted within 4 months of the effective date.

If a new contract number is assigned, the MA organization must submit a new EDI agreement.  If the submitter's system successfully submitted test data previously, CMS does not require additional testing.



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**DATA SUBMISSION**

   MA organizations must submit during each calendar quarter, at a minimum, approximately one-fourth of their total risk adjustment data submission for the collection period. More frequent submissions are recommended and may benefit MA organizations in identifying data collection and submission issues early.

## 4.2   Connectivity Options (Slide 7)

Connectivity refers to the electronic connection between the MA organization and CMS. MA organizations use the electronic connection to submit risk adjustment data to CMS and receive information in return. All third party submitters and large plans that submit their own data must establish a connection to the Front End Risk Adjustment System (FERAS) through the Medicare Data Communication Network (MCDN) that AT&T Global Network Services (AGNS) provides.  The MCDN is the secure network linking RAPS data processing entries.  Table 4A describes the three connectivity options.

**TABLE 4A – CONNECTIVITY OPTIONS**

| **Connect:Direct** (File transfer software Product) | Formerly Network Data Mover (NDM). Mainframe-to-mainframe connection. Next day receipt of FERAS response. |
|---|---|
| **File Transfer Protocol (FTP)** | Modem-to-modem (dial-up) or lease line connection. Requires password and phone line. Same day receipt of FERAS response. |
| Gentran (CMS Enterprise File Transfer) | Two connectivity options: -Secure File Transfer Protocol (SFTP); standards based protocol via a vender. -Secure Hyper Text Transfer Protocol (HTTPS), secure web interface. |

Small plans with less then or equal to 100,000 members may submit data using the Gentran Mailbox. For technical support questions regarding Gentran mailbox, users may contact the Customer Support for Medicare Modernization (CSMM) by calling (800) 927-8069, emailing mmahelp@cms.hhs.gov, or viewing the website at http://www.cms.hhs.gov/mmahelp.

## 4.3   Required Diagnosis (Slide 8)

Valid diagnosis codes are ICD-9-CM codes that CMS accepts as valid, but may not be included in the CMS-HCC Model.  Required diagnosis codes are ICD-9-CM codes that CMS accepts as valid, and are included in the current or future CMS HCC Models.

MA organizations must submit each required diagnosis at least once during a reporting period for each enrolled beneficiary.

   For payments beginning on January 1, 2009, the initial submission deadline is September 5, 2008 for the reporting period July 1, 2007 through June 30, 2008. For payments beginning on July 1, 2009, March 6, 2009 is the submission deadline for reporting data with dates of service January 1, 2008 through December 31, 2008. **Refer to the Risk Adjustment Process Overview module, Table 2B.**

Exhibit Z
Page 651



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**DATA SUBMISSION**

A required (model) diagnosis must meet the following criteria:

- The diagnosis is included in the current or future CMS-Hierarchical Condition Category (CMS-HCC), Prescription Drug (RxHCC) or End Stage Renal Disease (ESRD) risk adjustment models.
- The diagnosis must be received from one of the three provider types (hospital inpatient, hospital outpatient, and physician) covered by the risk adjustment requirements.
- The diagnosis must be collected according to the risk adjustment data collection instructions.

MA organizations may elect to submit a diagnosis more than once during a data collection period for any given beneficiary, as long as that recorded diagnosis was from a face-to-face visit with one of the three provider types covered under risk adjustment. MA organizations may submit any diagnoses received from the three covered provider types, including diagnoses that are not in the CMS-HCC risk adjustment model. Diagnoses that are in the model, but not collected from one of the three provider types cannot be submitted as risk adjustment data.



A list of valid ICD-9-CM codes for the risk adjustment models for any given payment year includes a list of published NCHS/CMS codes that are valid for the payment year. The list is posted on the CMS website at http://www.cms.hhs.gov/MedicareAdvtgSpecRateStats/06_Risk_adjustment.asp#TopOfPage, listed under "Risk Model Diagnosis Codes (ZIP, 340 KD) – Updated 10/04/2008 for current model codes, and future model codes are listed under "Future Model Diagnoses."  Please be aware that both models (i.e., **Current Model** and **Future Model**) are required.



Do not submit risk adjustment diagnoses based on any diagnostic radiology services, regardless of the type of diagnostic radiology bill (outpatient department or physician component). Diagnostic radiologists typically do not document confirmed diagnoses. Confirmed diagnoses come from referring physician or physician extenders.

## 4.4 Submission Formats (Slide 9)

Effective October 1, 2007, MA organizations must submit data electronically using one of two formats:

- RAPS format (all provider types)
- DDE screen (all provider types)

## 4.5 Submission File Layout Logic (Slide 10)

Submissions are organized into three levels of data:

- File-level information—identifies the submitter
- Batch-level information—identifies the MA organization
- Detail-level information—identifies the beneficiary

Figure 4A illustrates a summary of the RAPS file structure.



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**DATA SUBMISSION**

**Figure 4A – RAPS File Structure Summary**



**RT AAA – FILE HEADER (Submitter Info)**
Always the first record on the file, and must be followed by Record Type (RT) BBB.
- Record ID
- Submitter ID
- File ID
- Transaction Date
- Production/Test Indicator
- Filler

**RT BBB – BATCH HEADER (MA Organization Info)**
Must follow RT AAA or RT YYY and must be followed by RT CCC.
- Record ID
- Sequence Number
- Plan Number
- Filler

**RT CCC – DETAIL RECORD (Beneficiary Info)**
Must follow RT BBB or RT CCC and may be followed by another RT CCC.
- Record ID
- Sequence Number
- Sequence Number Error
- Patient Control Number (optional)
- HIC Number
- HIC Error Code
- Patient Date of Birth (optional)
- Date of Birth Error Code
- Diagnosis Cluster (10 Occurrences)
  - Provider Type
  - From Date
  - Through Date
  - Delete Indicator
  - Diagnosis Code
  - Diagnosis Code – Filler
  - Diagnosis Cluster – Error 1
  - Diagnosis Cluster – Error 2
- Corrected HIC Number
- Filler

**RT YYY – BATCH TRAILER**
Must follow RT CCC and may be followed by another RT BBB or RT ZZZ.
- Record ID
- Sequence Number
- Plan Number
- CCC Record Total
- Filler

**RT ZZZ – FILE TRAILER**
Must follow RT YYY, and must be the last record on the file.
- Record ID
- Submitter ID
- File ID
- BBB Record Total
- Filler

DETAIL LEVEL

BATCH LEVEL

FILE LEVEL

---

4-4

Exhibit Z
Page 653

Exhibit 3



**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

**DATA SUBMISSION**

## 4.6     Diagnosis Cluster

The diagnosis cluster contains the core information used to calculate a risk adjustment factor. The following components are included in the cluster:

• Provider Type
• From Date
• Through Date
• Diagnosis Code

A maximum of 10 diagnosis clusters are allowed per CCC record. Each cluster must include the items identified above. If any of these attributes are submitted more than once for the same HIC number, a duplicate diagnosis cluster error will occur.

## 4.7     Provider Type

MA organizations must submit risk adjustment data for hospital inpatient, hospital outpatient, and physician services. MA organizations may submit all provider types in the same CCC record. The provider type must be coded accurately. There is one provider type per diagnosis cluster. Table 4B shows the provider types and their codes.

Type of Bill (TOB), which is coded on the UB-04 during the collection of hospital data, may be used to assist in translating the correct provider type. Table 4B also shows the TOB and provider type correlation.

**TABLE 4B – PROVIDER TYPES**

| PROVIDER TYPE | CODE | TYPE OF BILL |
|---|---|---|
| Principal Hospital Inpatient (principal diagnosis) | 01 | 111 or 11Z |
| Hospital Inpatient Other (other diagnosis) | 02 | 111 or 11Z |
| Hospital Outpatient | 10 | 131, 13Z, 141 or 14Z |
| Physician | 20 | N/A |

Interim bills (112 and 113 bill types) are not accepted. If an MA organization receives interim bills, do not submit the hospital inpatient diagnoses until the receipt of the final interim bill (114 bill type).

## 4.8     From and Through Dates

• CCYYMMDD is the correct submission format for the "From and Through" dates of service.
• The "Through Date" defines the data used in the data collection year for risk adjustment purposes.

⊠     June 30, 2006 is submitted as 20060630.
Table 4C shows the "From" and "Through Dates" for each provider type.



**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

**DATA SUBMISSION**

**TABLE 4C – FROM AND THROUGH DATES**

| PROVIDER TYPE | FROM DATE | THROUGH DATE |
|---|---|---|
| Hospital Inpatient | Admission Date | Must have a through date and must be the discharge date |
| Hospital Outpatient | Exact date of patient visit or the first date service began for a series of services | Exact date of patient visit or the last date of service for a series of services |
| Physician | | |



When a submitter submits a "From Date" that does not include a "Through Date" for physician or hospital outpatient services, RAPS automatically copies the "From Date" into the "Through Date" field.

## 4.9   Diagnosis Code

- Each required diagnosis code must be submitted at least once during a reporting period.
- The decimal is implied in the format.

## 4.10   RAPS Format

Table 4D describes each field of the RAPS file layout.

- The shaded fields in the table represent where the RAPS Return File provides new information after data processes through RAPS.
- There are two diagnosis cluster error fields because MA organizations can receive up to two errors on any diagnosis cluster.

### TABLE 4D – RAPS FILE LAYOUT

| RAPS RECORD AAA – FILE HEADER | | | | |
|---|---|---|---|---|
| **FIELD NO** | **POSITION** | **SUBMISSION STATUS** | **FIELD NAME** | **EXPLANATION** |
| 1 | 1-3 | Required | Record ID | File-level information that identifies the submitter. This field should always be populated with "AAA." |
| 2 | 4-9 | Required | Submitter ID | Identifies the submitter and should be populated with the six-digit alphanumeric SH# assigned by CSSC. |
| 3 | 10-19 | Required | File ID | 10-digit alphanumeric character identifying the specific file submitted. This file name may not be repeated within a 12-month period. |
| 4 | 20-27 | Required | Transaction Date | Specifies the date that the file was submitted to Palmetto and formatted as CCYYMMDD. |
| 5 | 28-31 | Required | Production Test Indicator | Must be populated with "PROD" or "TEST." Submission test data proceeds through the entire process. |
| 6 | 32-512 | Spaces | Filler | Must be populated with 481 spaces. The "Filler" field allows for additional fields in the future. |

| RAPS RECORD BBB – BATCH HEADER | | | | |
|---|---|---|---|---|
| **FIELD NO** | **POSITION** | **SUBMISSION STATUS** | **FIELD NAME** | **EXPLANATION** |
| 1 | 1-3 | Required | Record ID | Batch-level information that identifies the MA organization is populated with "BBB." |
| 2 | 4-10 | Required | Sequence Number | This field identifies the batch submitted. The first batch in a file must begin with 0000001. All successive batch sequence numbers in the file must be incremented by one. This is a numeric field. |
| 3 | 11-15 | Required | Plan Number | Identifies the MA organization and should be populated with the five-digit alphanumeric contract assigned by CMS. (H#, R#, etc.) |
| 4 | 16-512 | Spaces | Filler | Must be populated with 497 spaces. The "Filler" field allows for additional fields in the future. |



**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

**DATA SUBMISSION**

**TABLE 4D – RAPS FILE LAYOUT (CONTINUED)**

| | | | | |
|---|---|---|---|---|
| **RAPS RECORD CCC – DETAIL LEVEL** | | | | |
| **FIELD NO** | **POSITION** | **SUBMISSION STATUS** | **FIELD NAME** | **EXPLANATION** |
| 1 | 1-3 | Required | Record ID | Detail-level information that identifies the beneficiary information. This field should always be populated with "CCC." |
| 2 | 4-10 | Required | Sequence Number | This field identifies the detail record submitted. The first detail record in a batch must begin with 0000001. All successive detail sequence numbers in the batch must be incremented by one. This is a numeric field. Limited to 1,000,000 per day. |
| 3 | 11-13 | RAPS RETURN | Sequence Number Error Code | This field must be submitted with spaces. Upon return, this field is populated with an error code if RAPS finds an error in the sequence number, or will remain blank if no errors were detected in the sequence number. |
| 4 | 14-53 | Optional | Patient Control Number | This optional field may be used by the MA organization to identify the claim submitted. The field allows up to 40 alphanumeric characters. |
| 5 | 54-78 | Required | HIC | The Health Insurance Claim number for the beneficiary. This is a 25-digit alphanumeric field. Enter spaces, not zeros, in unused spaces. |
| 6 | 79-81 | RAPS RETURN | HIC Error Code | This should be submitted with spaces. Upon return, this field is populated with an error code if RAPS finds an error in the HIC number, or remains blank if no errors were detected in the HIC number. |
| 7 | 82-89 | Optional | Patient DOB | This optional field may be populated with the patient's date of birth and is used to verify that the correct beneficiary identification was submitted. If the field is populated, it must be formatted as CCYYMMDD, and CMS edits this field against the information on file at the MBD. If no DOB is submitted, fill with spaces. |
| 8 | 90-92 | RAPS RETURN | DOB Error Code | This field must be submitted with spaces. Upon return, this field is populated with an error code if RAPS finds an error with DOB, or remains blank if no errors were detected in the DOB. |

Exhibit Z
Page 657

977
**Exhibit 3**



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**DATA SUBMISSION**

**TABLE 4D – RAPS FILE LAYOUT (CONTINUED)**

| FIELD NO | POSITION | SUBMISSION STATUS | FIELD NAME | EXPLANATION |
|---|---|---|---|---|
| 9 | 93-412 | DIAGNOSIS-CLUSTER (10 occurrences) | | The following 8 fields (9.0-9.7) may be repeated 10 times in the same "CCC" record with one diagnosis per cluster. Each diagnosis cluster must contain 32 characters or spaces. Plans must not skip clusters when submitting active diagnosis codes. If there are less than 10 diagnosis clusters the remaining clusters are space filled. If there are more than 10 diagnoses, a new "CCC" record must be established. |
| 9.0 | | Required | Provider Type | This 2-digit alphanumeric field identifies the site of service provided (01,02,10,20). |
| 9.1 | | Required | From Date | For hospital inpatient this describes the admission date. For physician and hospital outpatient this describes the date of service. Must be formatted as CCYYMMDD. |
| 9.2 | | Required | Through Date | For hospital inpatient this describes the discharge date. For physician and hospital outpatient this may be left blank and the system will fill with the "From Date." Must be formatted as CCYYMMDD. |
| 9.3 | | Conditional | Delete Indicator | This field allows the MA organization to delete a diagnosis, for correction purposes, that has been stored in the RAPS database. Enter a "D" or space. |
| 9.4 | | Required | Diagnosis Code | This field is populated with the three-to-five-digit ICD-9-CM diagnosis code. The decimal is implied and should not be included (e.g., 42732). |
| 9.5 | | SPACE | Diagnosis Code Filler | This field is designed to allow space for future ICD-10-CM codes and any other growth in the diagnosis cluster. This field must be populated with spaces. |
| 9.6 | | RAPS RETURN | Diagnosis Cluster Error 1 | This field must be submitted with spaces. Upon return, this field is populated with one error code if RAPS finds an error in the diagnosis cluster, or remains blank if no errors were detected in the diagnosis cluster. |
| 9.7 | | RAPS RETURN | Diagnosis Cluster Error 2 | This field must be submitted with spaces. Upon return, this field is populated with one error code if RAPS finds an error in the diagnosis cluster, or remains blank if no errors were detected in the diagnosis cluster. |
| 19 | 413-437 | RAPS RETURN | Corrected HIC number | This field must be submitted with spaces. If the MA organization has submitted an outdated HIC, upon return, this field is populated with the most current HIC number and the "HIC Error" field contains an information error code. |
| 20 | 438-512 | Spaces | Filler | Must be populated with 75 spaces. The "Filler" field allows for additional fields in the future. |

4-9



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**DATA SUBMISSION**

**TABLE 4D – RAPS FILE LAYOUT (CONTINUED)**

| FIELD NO | POSITION | SUBMISSION STATUS | FIELD NAME | EXPLANATION |
|---|---|---|---|---|
| | | **RAPS RECORD YYY – BATCH TRAILER** | | |
| 1 | 1-3 | Required | Record ID | Batch trailer information should be populated with "YYY." |
| 2 | 4-10 | Required | Sequence Number | A 7-digit numeric character identifying the batch submitted. Must match the "BBB" record. |
| 3 | 11-15 | Required | "H" Number | "H" number assigned by CMS to identify the MA organization. Must match the "H" number in the corresponding "BBB" record (i.e., the "BBB" record with the same sequence number). |
| 4 | 16-22 | Required | CCC Record Total | This field should total the number of CCC records in the batch. This field is numeric and should be filled with leading zeroes (e.g., 0000001). Limited to 1,000,000 per day. |
| 5 | 23-512 | Spaces | Filler | Must be populated with 490 spaces. The "Filler" field allows for additional fields in the future. |

| FIELD NO | POSITION | SUBMISSION STATUS | FIELD NAME | EXPLANATION |
|---|---|---|---|---|
| | | **RAPS RECORD ZZZ – FILE TRAILER** | | |
| 1 | 1-3 | Required | Record ID | File Trailer Information should be populated with "ZZZ." |
| 2 | 4-9 | Required | Submitter ID | Identifies the submitter and must match the 6-digit alphanumeric SH# in the AAA records. |
| 3 | 10-19 | Required | File ID | 10-digit alphanumeric character identifying the specific file submitted. Must match the File ID in the "AAA" record. |
| 4 | 20-26 | Required | BBB Record Total | This field should total the number of batches in the file. This field is numeric and should be filled with leading zeros (e.g., 0000001). |
| 5 | 27-512 | Required | Filler | Must be populated with 486 spaces. The "Filler" field allows for additional fields in the future. |

Exhibit Z
Page 659



## 4.11    Filtering Risk Adjustment Data (Slides 13-14)

MA organizations are required to filter risk adjustment data to ensure that they submit data from only appropriate data sources (e.g., hospital inpatient, hospital outpatient, and physician provider types). A filtering process is used to identify the correct provider types in claims and encounter data. CMS further recommends the following filtering guidelines:

- Hospital inpatient data require admission and discharge dates of service from appropriate facilities. **Refer to the Data Collection module** for examples of covered facilities.
- Physician data require face-to-face visits with a professional listed on the CMS specialty list. **Refer to the Data Collection module** for the list of acceptable physician data sources.
- Hospital outpatient data require the most demanding or accurate filtering. Data requirements include diagnoses from appropriate facilities and covered services contained on the CMS covered outpatient listings. **Refer to the Data Collection module** for examples of covered facilities and non-covered services/facilities.

The following over-filtering and under-filtering examples may be useful:

a) Hospital Inpatient:
- Over-filtering - Failing to submit data from specialized facilities (e.g., Rehabilitation and Psychiatric Hospitals).
- Under-filtering - Submitting data from interim bills or from non-covered institutional stays (e.g., nursing facility data).
b) Hospital Outpatient:
- Over-filtering - Failing to submit data from specialized facilities, particularly those that do not appear on the inpatient provider list (e.g., Rural Health Clinics, Federally Qualified Health Centers) excluding bills with both covered and non-covered procedure codes.
- Under-filtering - Submitting data from non-covered facilities or submitting non-covered services from covered facilities (e.g., laboratory only or radiology only claims).
c) Physicians:
- Over-filtering - Failing to capture data from non-physician practitioners that appear on the physician specialty list (e.g., nurse practitioners, physician assistants, etc.).
- Under-filtering - Submitting all paid claims from the claims database, including laboratory, Durable Medical Equipment (DME), ambulance, etc.

 For those plans that use CPT codes to screen diagnosis codes that are submitted to CMS, please note that the CPT range for radiology is 70000 through 79999. The following CPT codes indicate diagnostic radiology and other diagnoses that should not be submitted as risk adjustment data: 70010 through 76999 and 78000 through 78999.  Plans should update these codes annually.

## 4.12    Modifying Risk Adjustment Data (Slide 15)

RAPS allows for the correction of risk adjustment data submitted to CMS. This correction process is based on the concept that the incorrect cluster must be deleted from the system before the correct cluster is added. For this reason, data correction is at least a two-step process.



## 4.13 Deleting Diagnosis Clusters (Slide 16)

Each diagnosis cluster ("Diagnosis Code," "From Date," "Through Date," and "Provider Type") is stored separately as a unique cluster associated with a beneficiary's HIC number. If a diagnosis was submitted in error and needs to be corrected, the original diagnosis cluster must be resubmitted with a delete indicator in the appropriate field. **Delete transactions may only be submitted using the RAPS format or the DDE function.** When a delete record is received, CMS maintains the original diagnosis cluster on file and adds a delete indicator to it and the date of the deletion.

## 4.14 Reasons to Delete a Diagnosis Cluster (Slide 17)

There are three reasons MA organizations may delete a diagnosis cluster:

- Diagnosis cluster submitted erroneously (e.g., data from an interim bill was submitted for hospital inpatient).
- Incorrect HIC number used for submission of a beneficiary's diagnostic information.
- An error in a diagnosis cluster field (i.e., "Provider Type," "Dates of Service," "Diagnosis Code").

MA organizations submit deletions within a file, batch, or record containing previously submitted risk adjustment data.

## 4.15 Steps for Deleting a Diagnosis Cluster (Slides 18-20)

Before deleting an error, verify that the diagnosis cluster appears on the RAPS Return File. Only diagnosis clusters accepted by RAPS and stored in the RAPS database may be deleted.

There are two methods for deleting diagnosis clusters:

**Method 1 for Deleting Clusters**

1. Submit RAPS format using normal submission process with appropriate HIC number included.
2. Enter information in the diagnosis cluster fields (9.0, 9.1, 9.2, 9.4, 9.5) exactly as it appeared in the original submission.
3. In field 9.3 enter a "D" for delete.
4. Enter the appropriate information in all other records to ensure the submission file is complete.
5. Transmit the file to FERAS. (See www.csscoperations.com for details.)

**Method 2 for Deleting Clusters**

1. Create a file using the DDE screens available through FERAS at Palmetto (detailed information about the DDE process is located in Section 4.20).
2. Enter information exactly as it appeared in the original submission.
3. In the DDE "CCC" record screen, hit the down arrow key and select "D."
4. Proceed with entering all appropriate information.
5. Upload the file created in DDE to FERAS at Palmetto.

**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

**DATA SUBMISSION**

## 4.16   MA Organization Responsibilities Regarding Deletions (Slide 21)

• MA organizations must submit delete records when an erroneous diagnosis cluster has been accepted by RAPS and stored in the RAPS database.

• If a diagnosis cluster is deleted for the purpose of correcting data, the MA organization is responsible for submitting the correct diagnosis cluster. Conversely, if the MA organization submits corrected data, the MA organization must submit the appropriate deletion record. That is, if the correct diagnosis cluster is submitted, the erroneous diagnosis cluster cannot be ignored.

• If a correction applies to the same beneficiary as the deletion, the correction may be included in the same "CCC" record as the deletion. (Do not exceed 10 diagnosis clusters per "CCC" record.)

• If only one of several clusters within the CCC record requires modification, do not resubmit all other associated clusters.  If clusters are resubmitted exactly the same without the delete indicator, the plans will generate a duplicate cluster error.

• If the corrected diagnosis cluster belongs to a different beneficiary than the deleted diagnosis cluster, the correct diagnosis cluster may be submitted in the same file as the deletion.

   MA organizations should not delete a diagnosis code or record repeatedly on the same day and on the same record. MA organizations should implement a process to ensure that only one instance of a specific diagnosis cluster (either add or delete) is submitted on a given day.

## 4.17   Direct Data Entry (Slide 22)

MA organizations have the option of manually entering diagnostic information via the DDE application offered by Palmetto. DDE instructions are illustrated in the screen shots below. DDE is available in FERAS at Palmetto via the Medicare Data Communications Network (MDCN).

• DDE entries allow for deletion of records for corrections even if another submission format was used.
• The DDE screens, as shown in Figures 4B through 4G, automatically prevent the placement of incorrect data characters (e.g., alpha characters will not be accepted in the "From" or "Through Date" fields).
• After the user has entered all relevant data, the user will click on the "Create File" button in FERAS. This will create a file on the user's local PC.
• After the file is created on the local PC, the user must upload the file to FERAS in order to complete the process.
• Files created in DDE and uploaded to FERAS will receive a FERAS Response Report, which may be downloaded from the MA organization's electronic mailbox.



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**DATA SUBMISSION**

**Figure 4B – DDE 1**



**LOGIN PAGE – Submitters are assigned a User Name and
Password to access the DDE application.**

**Figure 4C – DDE 2**



**WELCOME PAGE – Submitters are provided instructions
on the use of the DDE.**



2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide

**DATA SUBMISSION**

**Figure 4D – DDE 3**



The file-level information is entered and must begin with RT AAA.

**Figure 4E – DDE 4**



The batch-level information is entered and must begin with RT BBB.

---

4-15

## 2008 Risk Adjustment Data Technical Assistance For Medicare Advantage Organizations Participant Guide

### DATA SUBMISSION

**Figure 4F – DDE 5**



The CCC Record allows up to 10 diagnostic clusters.

**Figure 4G – DDE 6**



The file has been uploaded to FERAS.

4-16

Exhibit Z
Page 665

985
Exhibit 3



# MODULE 5 – EDITS AND REPORTS

## Purpose (Slide 2)

The risk adjustment process includes an editing stage to ensure the accuracy of the data prior to storing the data for risk adjustment calculation and the status of submitted diagnosis clusters via reports. This module introduces participants to the Front-End Risk Adjustment System (FERAS) and the Centers for Medicare & Medicaid Services (CMS) Risk Adjustment Processing System (RAPS) data logic and editing processes and provides insights on the appropriate use of the risk adjustment reports to manage data collection, data submission, and error resolution processes.

## Learning Objectives (Slide 3)

At the completion of this module, participants will be able to:

- Interpret the FERAS and the RAPS data integrity logic and error codes.
- Describe the FERAS and RAPS editing processes.
- Explain the purpose of the FERAS and RAPS reports in monitoring RAPS data.
- Analyze risk adjustment reports to identify and submit corrections.



## 5.1    Data Flow and Reporting

After MA organizations submit data to Palmetto, FERAS performs format and integrity checks on the file and batch levels, as well as on the first and last detail (CCC) record. After the data pass the checks, they are sent to RAPS for complete editing of all detail records before they are stored in the RAPS database.

Files submitted in Test and Production are processed through FERAS and RAPS, and all edits are performed. Test files, however, are not stored in the RAPS database. Figure 5A illustrates the flow of data for edit processing.



**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

**EDITS AND REPORTS**

**Figure 5A – Data Flow**



Both the FERAS and RAPS systems generate reports that provide the results of the edit checks in each stage of processing. Some reports present summary-level data, others present details about individual diagnosis clusters, including whether or not a cluster generated an error in RAPS. In addition, RAPS generates a series of management reports to assist plans with managing data collection and submission. It is essential that the appropriate staff at MA organizations understand how to read the reports and resolve any issues identified.

Table 5A provides basic information about accessing and printing reports. Table 5B summarizes the content and general information about each of the reports.

Exhibit Z
Page 667



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**EDITS AND REPORTS**

TABLE 5A – ACCESSING AND PRINTING REPORTS

| Accessing Reports | |
|---|---|
| Methods of Access | • File Transfer Protocol (FTP)<br>• Connect:Direct<br>• Gentran |
| Report Receipt following File Submission | FTP Users:<br>• Receive FERAS reports typically within 15 minutes of submission<br>• Receive RAPS transaction processing reports the day after submission<br><br>Connect:Direct and Gentran Users:<br>• Receive FERAS reports the following business day if the file transfer is complete by 5:00 p.m. Eastern Time (ET)<br>• Receive FERAS reports 2 business days after submission if the file transfer is complete after 5:00 p.m. ET<br>• Receive RAPS transaction processing reports the day after submission |
| Report Distribution | • Reports are sent to the mailbox identified on the submitter application.<br>• Since the processing systems generate the reports out of CMS and then send to Palmetto for distribution, the systems cannot duplicate reports and send to multiple mailboxes.<br>• MA organizations may request reports in zip format. To avoid difficulties opening zip reports, users should:<br>  - Rename the file with the ".zip" extension.<br>  - Change the command to binary when using the FTP command line. |
| Report Retention | • The processing systems, FERAS and RAPS, send the reports to the submitter's mailbox, where they remain for 14 days.<br>• The systems automatically delete reports from the mailbox after 14 days, but MA organizations can access reports through the Customer Service and Support Center (CSSC).<br>• For Gentran users CSSC restores reports from the date of mailbox setup to the current date only. |
| **Printing Reports** | |
|  | • All risk adjustment reports are delivered as text reports, with the exception of the RAPS Return File.<br>• Organizations may download reports in Note Pad and should change the print orientation to landscape to ensure that all information on the report prints on one page.<br>• Reports opened in Note Pad, automatically include page breaks for printing.<br>• Users should avoid opening reports in Microsoft Word to avoid the default programming that occurs. |

Exhibit Z
Page 668



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**EDITS AND REPORTS**

**TABLE 5B – REPORTS OVERVIEW**

| FERAS Report | |
|---|---|
| **FERAS Response Report** | • Indicates file is accepted or rejected<br>• Identifies reasons for rejection<br>• Report layout<br>• FTP users receive reports the same business day<br>• Connect:Direct and Gentran users receive reports the next business day |
| **RAPS Reports** | |
| **RAPS Return File** | • Contains the entire submitted transaction<br>• Identifies 300-, 400-, and 500-level errors<br>• Flat file layout<br>• Received the next business day after submission |
| **RAPS Transaction Error Report** | • Communicates errors found in CCC records during processing<br>• Displays only 300-, 400-, and 500-level error codes<br>• Report layout<br>• Received the next business day after submission |
| **RAPS Transaction Summary Report** | • Summarizes the disposition of diagnosis clusters<br>• Report layout<br>• Received the next business day after submission |
| **RAPS Duplicate Diagnosis Cluster Report** | • Identifies diagnosis clusters with 502-error message<br>• Clusters accepted, but not stored<br>• Report layout<br>• Received the next business day after submission |
| **RAPS Management Reports** | |
| **RAPS Monthly Plan Activity Report** | • Provides monthly summary of the status of submissions by Submitter ID and Plan Number<br>• Report layout<br>• Available for download the second business day of the month |
| **RAPS Cumulative Plan Activity Report** | • Provides cumulative summary of the status of submissions by Submitter ID and Plan Number<br>• Report layout<br>• Available for download the second business day of the month |
| **RAPS Monthly Error Frequency Report** | • Provides a monthly summary of all errors associated with files submitted in test and production<br>• Report layout<br>• Available for download the second business day of the month |
| **RAPS Quarterly Error Frequency Report** | • Provides a quarterly summary of all errors on all file submissions within the 3-month quarter<br>• Report layout<br>• Available for download the second business day of the month following each quarter |



## 5.2    FERAS System

MA organizations submit data to FERAS, which performs the format and integrity checks.

- FERAS performs format and integrity checks on file- and batch-level data.
- FERAS checks the first and last detail records in each batch.
- FERAS accepts or rejects the entire file.
- FERAS ensures that all accepted transactions contain the following correct data:
  - AAA and ZZZ record.
  - At least one BBB record for each YYY record.
  - Following each BBB record, at least one CCC record with at least one diagnosis cluster populated.
  - Valid submitter ID and plan numbers.
  - Valid record and file totals.
  - The first and last CCC record will be edited to ensure that the submitted data are in the correct location on the record (i.e., spaces are where they should be located).
  - Record Type CCC must be present in the first field.
  - The first sequence number must equal 0000001.
  - The last sequence number must equal the total CCC record count in the YYY record.
  - The "HIC (Health Insurance Claim) Error Code" and "Diagnosis Code – Filler" fields contain spaces. Do not fill fields with zeros.

If all checks pass, the transaction processing continues in RAPS. If any of the data fail, FERAS rejects the complete file and generates the FERAS Response Report. The FERAS Response Report identifies the errors discovered during the edit check.

    **Example: 1**

> **Scenario**: The MA organization submitted a file and entered "AA1" in record type AAA, field 1.
>
> **Results:** FERAS will reject the entire file with error message 100. The field must always be populated with "AAA".

Generally, FERAS errors occur during the initial establishment of the system and risk adjustment process in MA organizations. After data are processed, automated formats are programmed, and FERAS errors occur less frequently.

### 5.2.1  FERAS Error Code Logic

When a FERAS check fails, an associated error code is created. Table 5C describes the error code logic. If any errors occur in FERAS, the complete file is rejected and returned to the submitter after all checks are completed.



**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

**EDITS AND REPORTS**

**TABLE 5C – FERAS ERROR CODE LOGIC**

| SERIES | EXPLANATION |
|---|---|
| **100** | File-level errors on the AAA or ZZZ records. |
| **200** | Batch-level errors on the BBB or YYY records. |
| **300-400** | Check performed on first and last CCC records. |

- The 100- and 200- series error codes are assigned based on the level of checks that are performed, as well as the location of the edit.
- The entire file is returned to the submitter.

## 5.2.2   FERAS Error Code Ranges

Error code ranges are explained in Table 5D.

**TABLE 5D - ERROR CODE RANGES**

| SERIES | EXPLANATION |
|---|---|
| **100** | Indicates that the system could not determine the record type; all editing stopped at that point. |
| **101-109** | Indicates a failure of a face-validity edit on the AAA record (file-level header). The last digit indicates the specific field in which the error was found. For example, the 101-error code refers to an error found in field 1 on the AAA record. |
| **111-125** | Indicates a failure of a cross-reference edit between a field on the AAA (file-level header) record and a look-up table, a field on another record, or a value calculated from another record. The last digit will indicate the specific AAA field against which the cross-check was performed. For example, the 112-error code indicates that the submitter ID in field 2 did not appear on a look-up table of valid submitter IDs. |
| **151-159** | Indicates a failure of a face-validity edit on the ZZZ record (file-level trailer). The last digit indicates the specific field in which the error was found. For example, the 151-error code refers to an error found in field 1 on the ZZZ record. |
| **161-175** | Indicates a failure of a cross-reference edit between a field on the ZZZ (file-level trailer) record and a look-up table, a field on another record, or a value calculated from another record. The last digit will indicate the specific ZZZ field against which the cross-check was performed. For example, the 162-error code indicates that the submitter ID, field 2 in ZZZ record, does not match the submitter ID on the AAA record. |
| **201-209** | Indicates a failure of a face-validity edit on the BBB (batch-level header) record. The last digit indicates the specific field in which the error was found. For example, the 201-error code refers to an error found in field 1 on the BBB record. |

Exhibit Z
Page 671



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**EDITS AND REPORTS**

TABLE 5D - ERROR CODE RANGES (CONTINUED)

| 211-225 | Indicates a failure of a cross-reference edit between a field on the BBB (batch-level header) record and a look-up table, a field on another record, or a value calculated from another record. The last digit will indicate the specific BBB field against which the cross-check was performed. For example, the 213-error code indicates that the submitter ID, field 3 in BBB record, is not authorized to submit for the plan ID. |
|---|---|
| 251-259 | Indicates a failure of a face-validity edit on the YYY (batch-level trailer) record. The last digit indicates the specific field in which the error was found. For example, the 251-error code refers to an error found in field 1 in the YYY record. |
| 261- 275 | Indicates a failure of a cross-reference edit between a field on the YYY (batch-level header) record and a look-up table, a field on another record, or a value calculated from another record. The last digit will indicate the specific YYY field against which the cross-check was performed. For example, the 262-error code indicates that the sequence number in the YYY record field 2 does not match the sequence number in field 2. |
| 301-489 | Indicates a format problem with the first or last CCC record. The problem is either with the face validity of the data in specific fields or the presence of data in fields that are required to be blank. In either circumstance, the basic CCC record format is assumed to be in error and the entire file is rejected. |

**Note**:  FERAS checks the validity and format of an individual field before performing checks between fields. For example, the system first checks that there is a valid submitter ID on the AAA record before it checks that the submitter ID reported in the YYY record is identical. Table 5E describes FERAS file-level, batch-level, and detail-level error codes.

TABLE 5E – FERAS ERROR CODES

FILE-LEVEL ERROR CODES

| ERROR CODE | RECORD ID | ERROR DESCRIPTION |
|---|---|---|
| 100 | AAA | INVALID RECORD TYPE |
| 101 | AAA | AAA RECORD MISSING FROM TRANSACTION |
| 102 | AAA | MISSING / INVALID SUBMITTER-ID ON AAA RECORD |
| 103 | AAA | MISSING FILE-ID ON AAA RECORD |
| 104 | AAA | MISSING / INVALID TRANSACTION DATE ON AAA RECORD |
| 105 | AAA | MISSING / INVALID PROD-TEST-INDICATOR ON AAA RECORD |
| 112 | AAA | SUBMITTER ID NOT ON FILE |
| 113 | AAA | FILE NAME DUPLICATES ANOTHER FILE ACCEPTED WITHIN LAST 12 MONTHS |
| 114 | AAA | TRANSACTION DATE IS GREATER THAN CURRENT DATE |
| 151 | ZZZ | ZZZ RECORD MISSING FROM TRANSACTION |
| 152 | ZZZ | MISSING / INVALID SUBMITTER-ID ON ZZZ RECORD |
| 153 | ZZZ | MISSING / INVALID FILE-ID ON ZZZ RECORD |
| 154 | ZZZ | MISSING / INVALID BBB-RECORD-TOTAL |
| 162 | ZZZ | ZZZ SUBMITTER-ID DOES NOT MATCH SUBMITTER-ID ON AAA RECORD |
| 163 | ZZZ | FILE ID DOES NOT MATCH FILE ID ON AAA RECORD |
| 164 | ZZZ | ZZZ VALUE IS NOT EQUAL TO THE NUMBER OF BBB RECORDS |

Exhibit Z
Page 672

992
Exhibit 3



**TABLE 5E – FERAS ERROR CODES (CONTINUED)**

**BATCH-LEVEL ERROR CODES**

| ERROR CODE | RECORD ID | ERROR DESCRIPTION |
|---|---|---|
| 201 | BBB | BBB RECORD MISSING FROM TRANSACTION |
| 202 | BBB | MISSING / INVALID SEQUENCE NUMBER ON BBB RECORD |
| 203 | BBB | MISSING / INVALID PLAN NUMBER ON BBB RECORD |
| 212 | BBB | SEQUENCE NUMBER ON BBB RECORD IS OUT OF SEQUENCE |
| 213 | BBB | SUBMITTER ID NOT AUTHORIZED TO SUBMIT FOR THIS PLAN ID |
| 251 | YYY | YYY RECORD MISSING FROM TRANSACTION |
| 252 | YYY | MISSING / INVALID SEQUENCE NUMBER ON YYY RECORD |
| 253 | YYY | MISSING / INVALID PLAN NUMBER ON YYY RECORD |
| 254 | YYY | MISSING / INVALID CCC-RECORD-TOTAL |
| 262 | YYY | LAST YYY SEQUENCE NUMBER IS NOT EQUAL TO NUMBER OF YYY RECORDS |
| 263 | YYY | PLAN NUMBER DOES NOT MATCH PLAN NUMBER IN BBB RECORD |
| 264 | YYY | YYY VALUE IS NOT EQUAL TO THE NUMBER OF CCC RECORDS |
| 272 | YYY | SEQUENCE NUMBER ON YYY RECORD IS OUT OF SEQUENCE |

**DETAIL-LEVEL ERROR CODES**

| ERROR CODE | RECORD ID | ERROR DESCRIPTION |
|---|---|---|
| 301 | CCC | CCC RECORD MISSING FROM TRANSACTION |
| 302 | CCC | MISSING / INVALID SEQ-NO ON CCC RECORD |
| 303 | CCC | SEQUENCE-ERROR-CODE FILLER NOT EQUAL TO SPACES |
| 304 | CCC | HIC-ERROR-CODE FILLER NOT EQUAL TO SPACES |
| 305 | CCC | DOB-ERROR-CODE FILLER NOT EQUAL TO SPACES |
| 306 | CCC | DIAGNOSIS CODE-FILLER NOT EQUAL TO SPACES |
| 307 | CCC | DIAGNOSIS-CLUSTER-ERROR-1 NOT EQUAL TO SPACES |
| 308 | CCC | DIAGNOSIS-CLUSTER-ERROR-2 NOT EQUAL TO SPACES |
| 309 | CCC | SEQUENCE-NUMBER ON CCC RECORD IS OUT OF SEQUENCE |
| 310 | CCC | MISSING / INVALID HIC-NO ON CCC RECORD |
| 311 | CCC | AT LEAST ONE DIAGNOSIS CLUSTER REQUIRED ON TRANSACTION |
| 313 | CCC | DELETE-INDICATOR MUST BE BLANK OR EQUAL TO "D" |
| 314 | CCC | INVALID DIAGNOSIS CODE FORMAT ON CCC RECORD |
| 315 | CCC | CORRECTED HIC NOT EQUAL TO SPACES |
| 350 | CCC | INVALID PATIENT-DOB ON CCC RECORD |
| 400 | CCC | MISSING / INVALID PROVIDER-TYPE ON CCC RECORD |
| 401 | CCC | INVALID FROM-DATE ON CCC RECORD |
| 402 | CCC | INVALID THRU-DATE ON CCC RECORD |



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**EDITS AND REPORTS**

   **Example: 2**

---

**Scenario**: The MA organization submitted a file with a 2.0 in the "Diagnosis Code – Filler" field on the first CCC record.

**Results:** FERAS would reject the complete file due to data being placed in the "Diagnosis Code – Filler" field of the diagnosis cluster, because the "Diagnosis Code – Filler" must be populated with spaces. FERAS would identify this error, since it occurred in the first CCC

---

   FERAS errors rarely occur after MA organizations program file layouts and adequately test the formats before submission to CMS.

## 5.2.3   FERAS Response Report

The FERAS Response Report reflects FERAS checks (format, integrity, and validity) that occur in the file, batch, and first and last detail-level records. It indicates if the file has been accepted or rejected by the front-end system. If accepted, the report specifies that the file is completely accepted. If the file is rejected, the report identifies the reason(s) for the rejection. Figure 5B illustrates the fields on the FERAS Response Report and describes these fields.

   The report is available in a report layout file in each submitter's mailbox. FTP users typically receive their reports within 15 minutes of submission. Connect:Direct and Gentran users receive their reports the next business day.

Exhibit Z
Page 674



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**EDITS AND REPORTS**

**Figure 5B – Rejected FERAS Response Report**

```
[1]REPORT: FERAS-RESP    [2]FRONT END RISK ADJUSTMENT SYSTEM
[3]RUN DATE: 20030407         FERAS RESPONSE REPORT

[4]SUBMITTER ID: SH7777
[5]FILE ID: 0000000001

[6]FILE STATUS:    REJECTED  PROD

[7]        [8]     [9]       [10]
RECORD   SEQ     ERROR     ERROR DESCRIPTION
TYPE     NO      CODE
AAA              113       DUPLICATE FILE ID ACCEPTED WITHIN 12 MONTHS
END OF REPORT
```

| Field No. | Field Name | Field Description |
|---|---|---|
| 1 | Report Name | Name of the report as it appears in submitter's mailbox. |
| 2 | Report Full Name | Full name of the report. |
| 3 | Report Run Date | Date the report was generated by Palmetto (CCYYMMDD format). |
| 4 | Submitter ID | Report is grouped by submitter identification number. A submitter may submit for more than one plan. A different report is generated for each plan. |
| 5 | File ID | The 10-character alphanumeric field identifying the specific file submitted. |
| 6 | File Status | Identifies whether the file was completely accepted or completely rejected. This field also identifies if the file is TEST or PRODUCTION. |
| 7 | Record Type | Identifies the level of the error (file-, batch-, or detail-record level). |
| 8 | Sequence Number | Identifies the batch or detail-level record where the error occurred. |
| 9 | Error Code | Identifies the 3-digit number error message that caused the file to reject. |
| 10 | Error Code Description | Explains the error code. |

**NOTE:** There are three reasons why users would not receive the FERAS Response Report:

- The AAA record is not included on the file. Submitters receive an "INVALID_FILE_HDR" message.

- No Submitter ID on the AAA record.

- The login ID used to submit data to FERAS does not match the submitter ID. Submitters receive a "SUBMITTER ID IN FILE DOES NOT MATCH THE LOGIN ID" message (FTP and Secure Website users only).



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**EDITS AND REPORTS**

 **Example: 3**

The MA organization submitted a file containing a File ID already used within the last twelve months. The second batch did not include a plan number i.e., an H number. The first detail record was missing a Health Insurance Claim (HIC) number, and the fourth YYY batch trailer plan number did not match the plan number in the fourth BBB batch header. Figure 5C illustrates this example.

**Figure 5C – FERAS Response Report**

| REPORT: FERAS-RESP | | | **FRONT END RISK ADJUSTMENT SYSTEM** |
|---|---|---|---|
| RUN DATE: 20040304 | | | **FERAS RESPONSE REPORT** |
| | | | |
| SUBMITTER ID: SH9999 | | | |
| FILE-ID: 0000000001 | | REJECTED  PROD | |
| | | | |
| **RECORD TYPE** | **SEQ NO** | **ERROR CODE** | **ERROR CODE DESCRIPTION** |
| AAA | | 113 | FILE NAME DUPLICATES ANOTHER FILE ACCEPTED WITHIN LAST 12 MONTHS |
| BBB | 0000002 | 203 | MISSING/INVALID PLAN NUMBER ON BBB RECORD |
| CCC | 0000001 | 310 | MISSING/INVALID HIC NUMBER ON CCC RECORD |
| YYY | 0000004 | 263 | PLAN NUMBER DOES NOT MATCH PLAN NUMBER IN BBB RECORD |

   The FERAS Response Report indicates errors in the first and last detail-level (CCC) record.

**5.3    RAPS System**

After data pass the FERAS checks, the file is sent via Connect:Direct to the CMS data center for RAPS processing.

- As a precautionary measure, RAPS performs balancing checks to ensure that the complete file was received from Palmetto prior to editing data.

- The RAPS system performs editing on the CCC transactions.

- The data elements edited include HIC Number, Provider Type, Diagnosis Code, From Date, and Through Date.

- If Date of Birth is submitted, RAPS performs an edit on that field.



### 5.3.1  RAPS Edits Rules

The RAPS editing process takes place in four logical stages.

### Stage 1- Field Validity and Integrity Edits

RAPS performs format and integrity checks on all CCC-level fields as a first level of editing. If there are data in the "HIC Error Code" or "Diagnosis Code - Filler" fields, the entire detail record is rejected with no further editing performed. If a record fails this stage of editing, it is assumed that the data are corrupt.

The dates also are checked at this stage. If the dates within a diagnosis cluster are not valid dates, then RAPS stops the editing process for that diagnosis cluster because all other data edits within a diagnosis cluster depend upon the validity of the dates.

### Stage 2 - Field-to-Field Edits

After RAPS checks format and integrity of the fields, the field-to-field editing takes place.

- RAPS ensures that the from date is equal or prior to the through date.

- RAPS also checks all diagnosis clusters for hospital outpatient and physician provider types to ensure compliance with the 31-day span rule.

- RAPS checks all data to make certain that MA organizations submit the reconciliation data properly. See Submission Timetable in Module 2 (Risk Adjustment Process Overview) for dates of service included in each data submission period.

### Stage 3 - Eligibility Edits

The next stage of editing cross-checks the appropriate fields against the common tables in MBD and MARx. MA organizations may access MBD through the common user interface, Medicare Advantage & Part D Inquiry System. For risk adjustment purposes, these common tables are the authoritative source of beneficiary information, and supports managed care enrollments to MA organizations.

In this editing stage, the HIC number, date of birth, and Medicare entitlement are checked. For example, in Stage 1 editing, the system ensured that a valid HIC number was present in field 5 of the CCC record. In Stage 3 editing, the system makes certain that the HIC number exists on the common tables.

Exhibit Z
Page 677



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**EDITS AND REPORTS**

Figure 5D illustrates the flow of data between MARx and MBD and RAPS.

**Figure 5D –Flow of Data for Eligibility Checks**



The HIC number is a common way to begin researching data in the common tables.

- The common tables store historical data on file, so if a beneficiary's HIC number changed, the common tables will cross-reference the old and new numbers.
- Railroad Retirement Board (RRB) beneficiary numbers are cross-referenced automatically. This allows users to research demographic and eligibility information for beneficiaries with RRB and HIC numbers.

**Stage 4 - Diagnosis Code Edits**

After RAPS edits the integrity of the individual fields and validates the HIC number and eligibility, it edits the diagnosis code against the Diagnosis Lookup Table in RAPS. In this stage, the system first ensures that each diagnosis code is valid. Then the system checks each diagnosis code against service dates and gender. If any of these edits fail, the diagnosis cluster is not stored in the RAPS database. The edits at this stage also include an edit to check if the diagnosis code is in the risk adjustment model. If the diagnosis code is not in the model, an information error is returned. The diagnosis cluster is stored if an information-only error is returned, and no further action by the MA organization is required.

Explanations of error codes and their consequences, RAPS error codes, informational edits, and duplicate diagnosis cluster edit are presented in Tables 5F, 5G, 5H, and 5I, respectively.



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**EDITS AND REPORTS**

**TABLE 5F – EXPLANATION OF ERROR AND CONSEQUENCES**

| SERIES | EXPLANATION OF ERROR AND CONSEQUENCES |
|--------|----------------------------------------|
| 300-349 | Record-level error. The record was bypassed and all editing was discontinued. No diagnosis clusters from this record were stored. |
| 350-399 | Record-level error. All possible edits were performed, but no diagnosis clusters from this record were stored. |
| 400-489 | Diagnosis cluster error. All possible diagnosis edits were performed, but the diagnosis cluster is not stored. |
| 490-499 | Diagnosis delete error; diagnosis was not deleted. |
| 500-599 | Informational message, all edits were performed; diagnosis cluster was stored unless some other error is noted. |

**TABLE 5G – RAPS ERROR CODES**

| ERROR CODE | RECORD ID | ERROR DESCRIPTION |
|------------|-----------|-------------------|
| 301 | CCC | CCC RECORD MISSING FROM TRANSACTION |
| 302 | CCC | MISSING / INVALID SEQUENCE-NUMBER ON CCC RECORD |
| 303 | CCC | SEQUENCE-ERROR-CODE FILLER NOT EQUAL TO SPACES |
| 304 | CCC | HIC-ERROR-CODE FILLER NOT EQUAL TO SPACES |
| 305 | CCC | DOB-ERROR-CODE FILLER NOT EQUAL TO SPACES |
| 306 | CCC | DIAGNOSIS CODE FILLER NOT EQUAL TO SPACES |
| 307 | CCC | DIAGNOSIS-CLUSTER-ERROR-1 NOT EQUAL TO SPACES |
| 308 | CCC | DIAGNOSIS-CLUSTER-ERROR-2 NOT EQUAL TO SPACES |
| 309 | CCC | SEQUENCE-NUMBER ON CCC RECORD IS OUT OF SEQUENCE |
| 310 | CCC | MISSING / INVALID HIC-NUMBER ON CCC RECORD |
| 311 | CCC | AT LEAST ONE DIAGNOSIS CLUSTER REQUIRED ON TRANSACTION |
| 313 | CCC | DELETE-INDICATOR MUST EQUAL SPACE OR "D" FOR DELETE |
| 314 | CCC | INVALID DIAGNOSIS CODE FORMAT ON CCC RECORD |
| 315 | CCC | CORRECTED HIC NOT EQUAL TO SPACES |
| 350 | CCC | INVALID PATIENT-DOB ON CCC RECORD |
| 353 | CCC | HIC NUMBER DOES NOT EXIST ON MBD |
| 354 | CCC | PATIENT DOB DOES NOT MATCH WITH MBD DOB |

Exhibit Z
Page 679



**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

**EDITS AND REPORTS**

**TABLE 5G – RAPS ERROR CODES (CONTINUED)**

| ERROR CODE | RECORD ID | ERROR DESCRIPTION |
|---|---|---|
| 400 | CCC | MISSING / INVALID PROVIDER-TYPE CODE ON CCC RECORD |
| 401 | CCC | INVALID SERVICE FROM-DATE ON CCC RECORD |
| 402 | CCC | INVALID SERVICE THROUGH-DATE ON CCC RECORD |
| 403 | CCC | SERVICE THROUGH-DATE MUST BE GREATER THAN 12/31/2004 |
| 404 | CCC | SERVICE FROM-DATE MUST BE LESS THAN OR EQUAL TO THROUGH-DATE |
| 405 | CCC | DOB IS GREATER THAN SERVICE FROM-DATE |
| 406 | CCC | SERVICE FROM-DATE IS NOT WITHIN MEDICARE ENTITLEMENT PERIOD |
| 407 | CCC | SERVICE THROUGH-DATE IS NOT WITHIN MEDICARE ENTITLEMENT PERIOD |
| 408 | CCC | SERVICE FROM-DATE IS NOT WITHIN MA ORG ENROLLMENT PERIOD |
| 409 | CCC | SERVICE THROUGH-DATE IS NOT WITHIN MA ORG ENROLLMENT PERIOD |
| 410 | CCC | BENEFICIARY IS NOT ENROLLED IN PLAN ON OR AFTER SERVICE FROM-DATE |
| 411 | CCC | SERVICE THROUGH-DATE IS GREATER THAN DATE OF DEATH |
| 412 | CCC | SERVICE FROM-DATE GREATER THAN TRANSACTION DATE |
| 413 | CCC | SERVICE THROUGH-DATE GREATER THAN TRANSACTION DATE |
| 450 | CCC | DIAGNOSIS DOES NOT EXIST FOR THIS SERVICE THROUGH-DATE |
| 451 | CCC | SERVICE THROUGH-DATE IS GREATER THAN DIAGNOSIS END DATE |
| 453 | CCC | DIAGNOSIS CODE IS NOT APPROPRIATE FOR PATIENT SEX |
| 454 | CCC | DIAGNOSIS IS VALID, BUT IS NOT SUFFICIENTLY SPECIFIC FOR RISK ADJUSTMENT GROUPING |
| 455 | CCC | DIAGNOSIS CLUSTER NOT EDITED DUE TO RECORD FORMAT ERROR |
| 460 | CCC | SERVICE FROM- AND THROUGH-DATE SPAN IS GREATER THAN 31 DAYS |
| 490 | CCC | COULD NOT DELETE, DIAGNOSIS CLUSTER NOT IN RAPS DATABASE BENEFICIARY RECORD |
| 491 | CCC | DELETE ERROR, DIAGNOSIS CLUSTER PREVIOUSLY DELETED |
| 492 | CCC | DELETE ERROR, DIAGNOSIS CLUSTER WAS NOT DELETED. A DIAGNOSIS CLUSTER WITH THE SAME ATTRIBUTES WAS ALREADY DELETED FROM THE RAPS DATABASE ON THIS DATE |

**TABLE 5H – INFORMATIONAL EDITS**

| ERROR CODE | RECORD ID | ERROR DESCRIPTION |
|---|---|---|
| 500 | CCC | BENEFICIARY HIC NUMBER HAS CHANGED ACCORDING TO CMS RECORDS; USE CORRECT HIC NUMBER FOR FUTURE SUBMISSIONS |
| 501 | CCC | VALID DIAGNOSIS BUT NOT INCLUDED IN THE CURRENT RISK ADJUSTMENT MODEL DURING THIS SERVICE PERIOD |



**TABLE 5I – DUPLICATE DIAGNOSIS CLUSTER EDIT**

| ERROR CODE | RECORD ID | ERROR DESCRIPTION |
|---|---|---|
| 502 | CCC | DIAGNOSIS CLUSTER WAS ACCEPTED BUT NOT STORED. A DIAGNOSIS CLUSTER WITH THE SAME ATTRIBUTES IS ALREADY STORED IN THE RAPS DATABASE |

 **Example: 4**

> **Scenario:**  The Low Rest Insurance Company submitted a risk adjustment transaction for Susan Doe who was admitted into the hospital. The principal diagnosis submitted was 601.0 for acute prostatitis.
>
> **Results:**  The error code 453 would occur. The system checked that the diagnosis field was complete. Next, the system verified that the HIC number was entered. RAPS then verified that the HIC number was on the common tables and the beneficiary was eligible. The diagnosis was determined to be a valid diagnosis. However, the diagnosis was not valid for the sex. This diagnosis cluster was rejected and not stored in the RAPS database.

## 5.3.2   RAPS Processing Reports

Generally, the RAPS processing reports allow MA organizations to see all records and diagnosis clusters submitted. They also communicate existing errors and report any exact duplicate clusters. Organizations use these reports to determine if they need to correct and resubmit their data.

### 5.3.2.1      RAPS Return File

The RAPS Return File contains all transactions submitted by the MA organization. If there are errors or informational edits, they appear next to the field in which the error was found. The file is delivered in the same flat file format used for the RAPS input. It may be downloaded and imported into Microsoft Access or Excel. The data can then be converted to display the necessary fields.

      MA organizations receive the RAPS Return File the next business day following a submission.

Table 5J represents the RAPS record layout and the information contained in a flat file format for the RAPS Return File. The shaded areas on the CCC record represent fields where RAPS can report error information.



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**EDITS AND REPORTS**

**Table 5J – RAPS Record Layout**
**RECORD AAA – FILE HEADER**

| FIELD NO | FIELD NAME |
|----------|------------|
| 1 | Record ID |
| 2 | Submitter ID |
| 3 | File-ID |
| 4 | Transaction Date |
| 5 | Production-Test-Indicator |
| 6 | Filler |

**RECORD BBB – BATCH HEADER**

| FIELD NO | FIELD NAME |
|----------|------------|
| 1 | Record ID |
| 2 | Sequence Number |
| 3 | Plan Number |
| 4 | Filler |

**RECORD CCC – DETAIL LEVEL**

| FIELD NO | FIELD NAME |
|----------|------------|
| 1 | Record ID |
| 2 | Sequence Number |
| 3 | Sequence Number Error Code |
| 4 | Patient Control Number |
| 5 | HICN |
| 6 | HICN Error Code |
| 7 | Patient DOB |
| 8 | DOB Error Code |
| 9.0 | Provider Type |
| 9.1 | From Date |
| 9.2 | Through Date |
| 9.3 | Delete-Indicator |
| 9.4 | Diagnosis Code |
| 9.5 | Diagnosis Code Filler |
| 9.6 | Diagnosis Cluster Error 1 |
| 9.7 | Diagnosis Cluster Error 2 |
| 19 | Corrected HICN |
| 20 | Filler |

Exhibit Z
Page 682

1002
Exhibit 3



**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

**EDITS AND REPORTS**

**TABLE 5J – RAPS RECORD LAYOUT (CONTINUED)**

**RECORD YYY – BATCH TRAILER**

| FIELD NO | FIELD NAME |
|---|---|
| 1 | Record ID |
| 2 | Sequence Number |
| 3 | Plan Number |
| 4 | CCC-Record-Total |
| 5 | Filler |

**RECORD ZZZ – FILE TRAILER**

| FIELD NO | FIELD NAME |
|---|---|
| 1 | Record ID |
| 2 | Submitter ID |
| 3 | File-ID |
| 4 | BBB Record Total |
| 5 | Filler |

 **Example: 5**

The MA organization submitted a file and included the date of birth (DOB) for the beneficiary. RAPS determined a discrepancy between the DOB submitted on the file and what is stored in the Medicare Advantage Prescription Drug System (MARx). The submitter received a RAPS Return File. Figure 5E illustrates the portion of the RAPS Return File that contains the DOB, as well as an error code indicating that the submitted DOB is incorrect.

**Figure 5E – RAPS Return File**

```
AAASH7777000000000120030411PROD
BBB0000001H9999
CCC0000001  7321430              123456789A   19350305354012003031420030318 4359
YYY0000001H99990000003
ZZZSH7777000000000010000003
```

DOB and

 RAPS reports include the sequence number of the file, batch, and detailed record as submitted by the organization.

**5.3.2.2    RAPS Transaction Error Report**

The RAPS Transaction Error Report displays only those detail-level (CCC) records where errors were found during RAPS processing. Every record with errors is displayed in full with the appropriate error code next to the field in error. The report is available in a report layout file in each submitter's mailbox. It is organized by H number, and may prove useful to MA organizations that use a manual tracking process. Figure 5F illustrates the RAPS Transaction Error Report and describes the report's fields.



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**EDITS AND REPORTS**

    Submitters receive a RAPS Transaction Error Report the next business day after submitting a file.

**Figure 5F – RAPS Transaction Error Report**

```
[1]REPORT   : RAPS002          [2]RISK ADJUSTMENT PROCESSING SYSTEM              [3]PAGE:      1
[4]RUN DATE : 20030411                  TRANSACTION ERROR REPORT          [5]TRANS DATE: 20030411
[6]SUBMITTER ID  SH7777    [7]FILE ID:  0000000005   [8]PLAN ID: H7777  [9]BATCH NUMBER: 0000001
[10]    [11]     [12]        [13]    [14]    [15]   [16]  [17]   [18]    [19]    [20]  [21]  [22] [23]   [24]
SEQ     SEQ  PATIENT CONTROL  HIC    HIC     DOB    DOB   PVDR   FROM    THRU    DEL  DGNS  DGNS DGNS  CORRECTED
NUM     ERR      NUM                 ERR            ERR   TYPE   DATE    DATE    IND  CODE  ERR1 ERR2    HIC

0000002                     123456789A   19350305 354   01   20030314 20030318   4359 501
          12345676878812347654165464515

END OF FILE
```

| Field No. | Field Name | Field Description |
|---|---|---|
| 1 | Report Name | Name of the report as it appears in the Submitter's mailbox. |
| 2 | Report Full Name | Full name of the report. |
| 3 | Page Number | Page number of the report. |
| 4 | Report Run Date | Date CMS generated the report (CCYYMMDD) |
| 5 | MCO Transmit Date | Date the MA organization created the transaction. |
| 6 | Submitter ID | Report is grouped by submitter identification number. A submitter may submit for more than one organization. |
| 7 | File ID | The 10-character alphanumeric field identifying the specific file submitted. |
| 8 | Plan Number | The H-number assigned by CMS; A different report is printed for each organization (H-number). |
| 9 | Batch ID | The 7-digit batch identification number. |
| 10 | Sequence Number | Detail-level record where the error occurred. |
| 11 | Sequence Number Error Code | The 3-digit error code associated with the sequence number. |
| 12 | MCO Patient Control Number | Patient control number assigned by the MA organization, if any. |
| 13 | HIC Number | The 10-character (alpha-numeric) Health Insurance Claim (HIC) Number of the beneficiary. |
| 14 | HIC Number Error Code | The 3-digit error code associated with the HIC Number. |
| 15 | Date of Birth | Patient's date of birth (CCYYMMDD format). |
| 16 | Date of Birth Error Code | The 3-digit error code associated with the patient's date of birth. |
| 17 | Provider Type | The 2-digit code identifying the provider type (01, 02, 10, or 20). |
| 18 | Service From Date | Date of admission (inpatient) or date of treatment (outpatient facility or physician). |
| 19 | Service Through Date | Date of discharge (inpatient) or date of treatment (outpatient facility or physician). |
| 20 | Delete Indicator | The 1-character place holder that identifies diagnosis clusters that will be or are deleted. This field is populated with a "D" if the cluster was deleted. If no deletion has occurred, the space will be blank. |
| 21 | Diagnosis Code | The 5-character ICD-9-CM diagnosis code. |
| 22 | Diagnosis Code Error 1 | Error code associated with submitted diagnosis code, if any. |
| 23 | Diagnosis Code Error 2 | Error code associated with submitted diagnosis code, if any. |
| 24 | Corrected HIC Number | If an error code indicates there is a corrected HIC number, it is listed here. |

    When RAPS identifies no errors, the system sends a Transaction Error Report with the message "ALL DIAGNOSES PROCESSED WITHOUT ERRORS."

Exhibit Z
Page 684



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**EDITS AND REPORTS**

   **Example: 6**

The MA organization submitted a batch that included eight records (Figure 5G). Since errors occurred in records three, five, and seven, only those sequence numbers are reflected on the report. In record three, the plan submitted a HIC that does not appear on the common tables. The plan received a 353-error for this record, and the diagnosis was not stored. The fifth record included three clusters for a hospital inpatient stay, two of which received errors due to the beneficiary not being enrolled in a health plan on the date that the beneficiary was admitted to the hospital. The hospital inpatient clusters received the 408-error message, but no 409-error message. Hospital inpatient rules hold the MA organization responsible for reporting patient admissions for all enrollees. The submission rules also require that the entire stay be reported, even if the patient was not enrolled in the health plan on the discharge date.

On the seventh record, the health plan attempted to delete one diagnosis cluster and replace that cluster with one containing the same diagnosis and different service dates. This record had errors for both actions. The original cluster had previously been deleted and received a 491-error code. The new cluster received 408- and 409-errors because the beneficiary was not enrolled in the plan on or after the dates of service.

**Figure 5G – RAPS Transaction Error Report**

| REPORT: RAPS002 | | | | | **RISK ADJUSTMENT PROCESSING SYSTEM** | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RUN DATE: 20040523 | | | | | **TRANSACTION ERROR REPORT** | | | | | | PAGE: 22 | |
| | | | | | | | | | | | TRANS DATE: 20040521 | |

SUBMITTER ID: SH9999    FILE ID: 0000000001    PLAN: H9999 BATCH NUMBER: 0000001

| SEQ NO | SEQ ERR | PATIENT CONTROL NUMBER | HIC NUMBER | HIC ERR | DOB | DOB ERR | PVDR TYPE | FROM DATE | THRU DATE | DEL IND | DGNS CODE | DGNS ERR1 | DGNS ERR2 | CORRECTED HIC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0000003 | | | 999999999A | 353 | 19301206 | | 01 | 20040101 | 20040105 | | 4823 | | | |
| | | 000000000000000001234567890 | 1234567890 | | | | | | | | | | | |
| 0000005 | | | 888888888A | | 19260217 | | 01 | 20040212 | 20040225 | | 486 | 408 | | |
| | | 000000000000000001234567567 | 5675675 | | | | | | | | | | | |
| | | | | | | | 02 | 20040212 | 20040225 | | 2508 | 408 | | |
| | | | | | | | 02 | 20040312 | 20040325 | | 496 | | | |
| 0000007 | | | 666666666D | | 19301206 | | 20 | 20040101 | 20040105 | D | 25004 | 491 | | |
| | | | | | | | 20 | 20040411 | 20040422 | | 25004 | 408 | 409 | |

**END OF FILE**

### 5.3.2.3    RAPS Transaction Summary Report

The MA organization receives the RAPS Transaction Summary Report each time RAPS processes a submitted file. This report identifies the number of clusters received for each provider type, and summarizes the disposition of all diagnosis clusters that were present on the submitted file. Figure 5H illustrates the RAPS Transaction Summary Report and describes its fields.

   Submitters receive a RAPS Transaction Summary Report the next business day after submitting files.

Exhibit Z
Page 685



**Figure 5H – RAPS Transaction Summary Report**

**RISK ADJUSTMENT PROCESSING SYSTEM
TRANSACTION SUMMARY REPORT**

[1]REPORT: RAPS001
[2]RUN DATE: 20030412                [3]TRANS DATE:20030411

[4]SUBMITTER ID  SH7777    [5]PLAN ID: H7777    [6]FILE ID:    0000000001

| [7]PROVIDER TYPE | PRINCIPAL INPATIENT | OTHER INPATIENT | OUTPATIENT | PHYSICIAN | [8]UNIDENTIFIED | TOTAL |
|---|---|---|---|---|---|---|
| [9]TOTAL SUBMITTED | 207 | 1,213 | 0 | 0 | 0 | 1,420 |
| [10]TOTAL REJECTED | 9 | 49 | 0 | 0 | 0 | 58 |
| [11]TOTAL ACCEPTED | 198 | 1,164 | 0 | 0 | 0 | 1,362 |
| [12]TOTAL STORED | 189 | 1,099 | 0 | 0 | 0 | 1,288 |
| [13]TOTAL MODEL STORED | 103 | 368 | 0 | 0 | 0 | 471 |
| [14]TOTAL DELETE ACPTD | 0 | 0 | 0 | 0 | 0 | 0 |
| [15]TOTAL DELETE RJCTD | 0 | 0 | 0 | 0 | 0 | 0 |

| Field No. | Field Name | Field Description |
|---|---|---|
| 1 | Report Name | Name of the report as it appears in the submitter's mailbox. |
| 2 | Report Run Date | Date CMS generated the report. |
| 3 | MCO Transmit Date | Date the submitter created the transmission. |
| 4 | Submitter ID | Report is grouped by submitter identification number. A submitter may submit for more than one organization. |
| 5 | Plan Number | H-number assigned by CMS; a different report is printed for each organization (H-number). |
| 6 | File ID | The 10-character alphanumeric field identifying the specific file submitted. |
| 7 | Provider Type | This header row identifies the provider sources for which data are listed: principal inpatient, other inpatient, outpatient, physician, unidentified, and total. |
| 8 | Unidentified Provider Type | Indicates the number of diagnosis clusters in transactions that did not include a valid provider type. Valid provider types are "01," "02," "10," and "20." |
| 9 | Total Submitted | The total number of clusters submitted in the file. |
| 10 | Total Rejected | The total number of clusters submitted in the file and rejected. |
| 11 | Total Accepted | The total number of clusters submitted in the file and accepted. |
| 12 | Total Stored | The total number of clusters stored in the risk adjustment database – includes all accepted clusters that are non-duplicates. |
| 13 | Total Model Stored | The total number of required clusters that were stored, and are included in the CMS-HCC model) |
| 14 | Total Delete Accepted | The total number of deletes submitted for the file that were accepted in the database. |
| 15 | Total Delete Rejected | The total number of deletes submitted, but rejected, for the file. |

Exhibit Z
Page 686



**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

**EDITS AND REPORTS**

## 5.3.2.4    Relationships Between Values in Report

The relationships between values found on various lines of the report are illustrated using the following formulas:

- The sum of total rejected, total accepted, total deletes accepted, and total deletes rejected equal total submitted. Line 10 + Line 11 + Line 14 + Line 15 = Line 9.

- The total stored (Line 12) is less than or equal to the total accepted (Line 11). The Risk Adjustment Database stores all required diagnosis clusters, including diagnoses that are not used in the current risk adjustment model. The difference between total accepted and total stored reflects the number of exact duplicate diagnosis clusters.

- The total stored in the model (Line 13) is less than or equal to the total diagnosis clusters stored (Line 12).

  **Example: 7**

Based on the information displayed in Figure 5H, the MA organization can make the following conclusions:

- About four percent of the clusters were rejected due to error.
- Seventy-four duplicates were submitted (total accepted minus total stored).
- About one-third of the diagnoses submitted were in the model.

  MA organizations can use the reports not only to correct errors, but to track the errors and implement automated or manual systems to prevent the same errors from occurring in the future.

  **Example:  8**

In Figure 5I, the MA organization submitted a file that included 72 duplicate diagnosis clusters, and 3,299 diagnosis codes that were not relevant. The RAPS Transaction Summary Report also indicates that clusters were submitted with missing or invalid provider types. In addition, the organization had 12 deletes rejected, meaning the organization attempted to perform the delete function against a diagnosis cluster that was already deleted, or tried to delete a cluster that never stored. The RAPS Return File or the RAPS Transaction Error Report communicates the specific reason for each rejection.

Exhibit Z
Page 687



**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

**EDITS AND REPORTS**

**Figure 5I – Transaction Summary Report**

| RISK ADJUSTMENT PROCESSING SYSTEM TRANSACTION SUMMARY REPORT | | | | | | |
|---|---|---|---|---|---|---|
| REPORT: RAPS001 | | | | | | |
| RUN DATE: 20040503 | | TRANS DATE:20040430 | | | | |
| | | | | | | |
| SUBMITTER ID  SH7777 | PLAN ID: H9999 | | FILE ID:   0000000001 | | | |
| | | | | | | |
| PROVIDER TYPE | Principal Inpatient | Other Inpatient | Outpatient | Physician | Unidentified | Total |
| TOTAL SUBMITTED | 870 | 3480 | 629 | 348 | 2 | 5329 |
| TOTAL REJECTED | 26 | 104 | 18 | 13 | 2 | 163 |
| TOTAL ACCEPTED | 842 | 3367 | 606 | 333 | 0 | 5148 |
| TOTAL STORED | 840 | 3335 | 581 | 320 | 0 | 5076 |
| TOTAL MODEL STORED | 295 | 1167 | 203 | 112 | 0 | 1777 |
| TOTAL DELETE ACPTD | 2 | 2 | 0 | 2 | 0 | 6 |
| TOTAL DELETE RJCTD | 0 | 7 | 5 | 0 | 0 | 12 |

 The sum of total rejected, total accepted, total deletes accepted, and total deletes rejected is equal to the total submitted.

 The values in the "Unidentified" column on the report represent the number of clusters for which RAPS is unable to identify a provider type. These clusters are reflected only in the "Total Submitted" and "Total Rejected" rows of the report.

**5.3.2.5     Informational Error Messages**

RAPS generates informational messages that do not stop processing of data, i.e., no immediate action is necessary. However, these messages, illustrated in Table 5K, provide MA organizations with information to improve future submissions.

**TABLE 5K – INFORMATIONAL MESSAGE CODES**

| ERROR CODE | RECORD ID | ERROR DESCRIPTION | PROCESS IMPROVEMENT |
|---|---|---|---|
| 500 | CCC | BENEFICIARY HIC NUMBER HAS CHANGED ACCORDING TO CMS RECORDS; USE CORRECT HIC NUMBER FOR FUTURE SUBMISSIONS. | USE UPDATED HIC NUMBER ON ALL FUTURE SUBMISSIONS FOR THIS BENEFICIARY. |
| 501 | CCC | VALID DIAGNOSIS BUT NOT INCLUDED IN THE CURRENT RISK ADJUSTMENT MODEL DURING THIS SERVICE PERIOD. | DETERMINE IF FILTERING SHOULD BE INCORPORATED INTO SUBMISSION PROCESS TO REDUCE NUMBER OF 501 MESSAGES. |

Exhibit Z
Page 688



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**EDITS AND REPORTS**

#### 5.3.2.5.1    Duplicate Diagnosis Cluster Error and 5 Percent Benchmark

CMS has put a 5 percent benchmark requirement in place for 502 errors, "Diagnosis cluster was accepted but not stored. A diagnosis cluster with the same attributes is already stored in the RAPS database," CMS monitors plans with error rates that exceed the benchmark. CMS defines a duplicate submission as a diagnosis cluster with the same attributes (provider type, from date, through date, diagnosis code, and HIC number) that are already stored in the RAPS database.

Each duplicate cluster that receives a 502-error code counts toward the 5 percent benchmark. For example, if a record included 10 diagnosis clusters and each one was a duplicate of another cluster, there would be 10 502-error codes and all 10 would count towards the 5 percent benchmark.

CMS will look at the overall metrics per file, as this is the easiest way to measure the benchmark. CMS will look at files on a weekly basis to determine volume and the number of duplicates the plan receives to determine if a compliance letter needs to be sent.

If the submitter is a third party and the file contains records for multiple plans, the review will occur at the plan level within the file. Table 5L provides examples of how CMS reviews plan submissions against the benchmark.

**TABLE 5L – 502 BENCHMARK COMPARISON EXAMPLES**

| EXAMPLE NUMBER | EXAMPLE DESCRIPTION |
|---|---|
| 1 | If a plan submitted one file in a given week with two records and they were duplicates, the plan would have a 100% duplicate rate, but with only two records. |
| 2 | Afterwards, the plan submitted additional files that had 10,000 records and a 2% duplicate rate. In this case, CMS would not send this plan a compliance letter. |
| 3 | If, on the other hand, a plan submitted a file with 2 million records and 1 million of them were duplicates, CMS would send a compliance letter. |

#### 5.3.2.6    RAPS Duplicate Diagnosis Cluster Report

This report lists diagnosis clusters with a 502-error information message (diagnosis cluster was accepted but not stored) appearing on the RAPS Return File and the RAPS Transaction Error Report. Clusters appearing on this report had been submitted previously to CMS; that is, a cluster with the same HIC number, provider type, from and through dates, and diagnosis are already stored in the RAPS database. Figure 5J illustrates the file layout and provides a key to the fields.

Organizations are notified through a www.csscoperations.com update when this report is available.

 MA organizations that submit using Connect:Direct do not have to obtain the Duplicate Diagnosis Cluster Report. Connect:Direct submitters are usually large-volume users, and they can reference the RAPS Return File to review 502 informational messages.

Exhibit Z
Page 689



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**EDITS AND REPORTS**

**Figure 5J – Duplicate Diagnosis Cluster Report**

| (1) REPORT: RAPS002 | | (2) RISK ADJUSTMENT PROCESSING SYSTEM | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (4) RUN DATE: 20030523 | | DUPLICATE DIAGNOSIS CLUSTER REPORT | | | | | | | | | (3) PAGE: 22 | | |
| | | | | | | | | | (5) TRANS DATE: 20030521 | | | | |

(6) SUBMITTER ID:SH9999   (7) FILE ID: 0000000001   (8) PLAN: H9999 (9) BATCH NUMBER: 0000001

| (10) SEQ NO | (11) SEQ ERR | (12) PATIENT CONTROL NUMBER | (13) HIC NUMBER | (14) HIC ERR | (15) DOB | (16) DOB ERR | (17) PVDR TYPE | (18) FROM DATE | (19) THRU DATE | (20) DEL IND | (21) DGNS CODE | (22) DGNS ERR1 | (23) DGNS ERR2 | (24) CORRECTED HIC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0000003 | | 999999999A | 19301206 | | | | 01 | 20030101 | 20030105 | | 4823 | 502 | | |
| | | 0000000000000000012345678901234567890 | | | | | | | | | | | | |

| Field No. | Field Name | Field Description |
|---|---|---|
| 1 | Report Name | Name of the report as it appears in the submitter's mailbox. |
| 2 | Report Full Name | Full name of the report. |
| 3 | Page Number | Page number of the report. |
| 4 | Report Run Date | Date CMS generated the report (CCYYMMDD). |
| 5 | MCO Transmit Date | Date the submitter created the transaction. |
| 6 | Submitter ID | Report is grouped by submitter identification number. A submitter may submit for more than one organization (H-number). |
| 7 | File ID | The 10-character alphanumeric field identifying the specific file submitted. |
| 8 | Plan Number | H-number assigned by CMS; a different report is printed for each MA organization (H-number). |
| 9 | Batch ID | The 7-digit batch identification number. |
| 10 | Sequence Number | Detail-level record where the error occurred. |
| 11 | Sequence Number Error Code | The 3-digit error code associated with the sequence number. |
| 12 | MCO Patient Control Number | Patient control number assigned by the MA organization, if any. |
| 13 | HIC Number | The 10-digit (alpha-numeric) HIC Number of the beneficiary. |
| 14 | HIC Number Error Code | The 3-digit error code associated with the HIC Number. |
| 15 | Date of Birth | Patient's date of birth (CCYYMMDD format). |
| 16 | Date of Birth Error Code | The 3-digit error code associated with the patient's date of birth. |
| 17 | Provider Type | The 2-digit code identifying the provider type (01, 02, 10, or 20). |
| 18 | Service From Date | Date of admission (inpatient) or date of treatment (outpatient facility or physician). |
| 19 | Service Through Date | Date of discharge (inpatient) or date of treatment (outpatient facility or physician). |
| 20 | Delete Indicator | The 1-character place holder identifies diagnosis clusters that will be or are deleted. This field is populated with a "D" if the cluster was deleted. If no deletion has occurred, the space will be blank. |
| 21 | Diagnosis Code | The 5-character ICD-9-CM diagnosis code. |
| 22 | Diagnosis Code Error 1 | Error code associated with submitted diagnosis code, if any. |
| 23 | Diagnosis Code Error 2 | Error code associated with submitted diagnosis code, if any. |
| 24 | Corrected HIC Number | If an error code indicates there is a corrected HIC number, it is listed here. |

Exhibit Z
Page 690

**Exhibit 3**



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**EDITS AND REPORTS**

Submitters should consider establishing an automated system or a process that checks previously submitted files for accepted diagnosis clusters in order to minimize or eliminate the resubmission of duplicate diagnosis clusters.

While this is an informational error and does not require action in terms of correcting an error, it is critical that plans self-monitor their submissions so that they do not exceed the 5 percent benchmark requirement on 502 errors. Table 5M provides tips to ensure plans are compliant with the guidance on the 5 percent benchmark for duplicate diagnosis cluster errors.

**TABLE 5M – TIPS FOR ENSURING COMPLIANCE WITH THE 5 PERCENT BENCHMARK
FOR DUPLICATE DIAGNOSIS CLUSTER ERROR GUIDANCE**

| TIP | DESCRIPTION |
|---|---|
| **Tip 1:**<br>**Identify a Duplicate Diagnosis Cluster** | CMS defines a Duplicate Diagnosis Cluster as one that shares all of the same attributes (HIC Number, Provider Type, From and Through Dates and Diagnosis) as one previously submitted and stored in the RAPS database. |
| **Tip 2:**<br>**Review Your Reports** | Review your current and previous RAPS Return Files to determine which clusters were stored. If the cluster was stored, do not resubmit. |
| **Tip 3:**<br>**Understand Error Resolution** | If you are resolving an error, you do not necessarily need to resubmit all clusters included in the record. If you are resolving a 300-level error, this indicates that none of the diagnosis clusters were stored because there was a record level error. If this is the case, you will need to resubmit all clusters associated with the record. This would not create a duplicate diagnosis because none of the records were previously stored. If you are resolving a 400-level error, this indicates that a specific diagnosis cluster was not stored. You should only resubmit the specific cluster that resulted in the 400-level error message. *Do not* resubmit all clusters within the record. If there were ten clusters within the record, but you received a 400-level error message on only two of the clusters, you should only resubmit the two clusters where the error occurred. |
| **Tip 4:**<br>**Understanding Modifying Data** | In the case of self-identified errors, those not reported as an error on the RAPS reports, you should be careful to only resubmit the diagnosis clusters that require a modification. If you submit a record with eight clusters, but the following week you realize that the date of service was incorrect in one of the clusters, you would submit that specific cluster with a "D" in the delete indicator field, and submit a new cluster with the correct date. Resubmitting all of the remaining seven clusters would create seven duplicates. |

Use the tips above to assist your plan in reducing or eliminating the submission of duplicate diagnosis clusters to avoid implications that may result in suspension of data submission privileges and ultimately impact your payments.



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**EDITS AND REPORTS**

 **Example:  9**

> **Scenario:**
> Blue Health Plan submitted a CCC record with seven diagnosis clusters in which the sixth diagnosis cluster received an error indicating the diagnosis was not appropriate for the patient sex.
>
> **Results:**
> The CCC record with the seven diagnosis clusters received a cluster level error, error code 453 on the sixth cluster. The only cluster not accepted and stored from this CCC record is the sixth cluster. Therefore, the only cluster that should be resubmitted by Blue Health Plan is the sixth cluster, the one that received the error. Resubmitting the other diagnosis clusters that were accepted and stored would result in the Blue Health Plan receiving error code 502 for submitting duplicate diagnosis clusters. This would count against the plan's 5% benchmark.

## 5.4    Resolving Errors

CMS began accepting risk adjustment data in FERAS and processing data through RAPS in October 2002. While the error rate is less than one percent, there are several errors that represent the majority of the common errors seen.

### 5.4.1  Resolution Steps

It is the MA organization's responsibility to resolve errors that CMS identifies. Described below in Figure 5K are the basic steps required to resolve errors. If inaccurate data are the cause of the error, the organization must submit a new record with corrected information to resolve the error.

**Figure 5K – Resolution Steps**

| Determine the error level of the code to identify the nature of the problem.  See Tables 5D and 5F – Explanation of Error and Consequences. | Look up the error code and read the associated message.  See FERAS and RAPS Error Code Job Aids. | Based on error message, determine the next step. | Take steps to resolve the error. |
| --- | --- | --- | --- |

System problems may occur when MA organizations submit and delete the same diagnosis cluster several times on the same day. Error code 492 occurs if the organization tries to delete the same cluster more than once.



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**EDITS AND REPORTS**

   **Example:  10**

---

**Scenario:**  John Smart at BaseCare Health Plan deleted a diagnosis cluster. Later the same day, he mistakenly added the same cluster using Direct Data Entry (DDE). Realizing his mistake, John immediately attempted to delete this cluster using DDE.

**Results:**  The error code 492 occurs, indicating that (1) the diagnosis cluster was not successfully deleted and (2) that the cluster is already stored as a delete and another delete is not necessary.

---

Effective January 3, 2006, CMS added error code 455 to the RAPS Error Codes list. The message reads "Diagnosis cluster not edited due to record format error." The diagnosis cluster is not stored. A plan will receive this error if the plan leaves a cluster blank within a CCC record, and then populates the next cluster. Error code 455 clusters may occur with, or after, the first blank diagnosis cluster. Blank clusters will not receive a 455 error.

When a submitter receives a 455-error code, "Diagnosis Cluster Not Edited Due to Record Format Error," apply the resolution steps outlined in Figure 5K:

- Since this is a 400-level error code message, the submitter will refer to the diagnosis cluster.

- The error code series 400-489 indicates that all possible diagnosis edits were performed but the diagnosis cluster is not stored.

- The submitter should ensure that the CCC record contains valid clusters, left justified in the record, followed by blank clusters.

- Resubmit following correction.

   **Example:  11**

---

**Scenario:** Horizon Valley Health Plan submitted eight diagnosis clusters. However, the fifth diagnosis cluster was a blank cluster.

**Results:** Error code 455 occurs. All of the diagnosis clusters following the blank cluster received the error code 455. All possible diagnosis edits were performed, but the diagnosis clusters were not stored.

---

Exhibit Z
Page 693



2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide

**EDITS AND REPORTS**

## 5.4.2  Common Errors

In an effort to prevent common errors, the next section describes the errors and steps that MA organizations may take to minimize their occurrence.

### 5.4.2.1       File Name Duplicates Another File Accepted Within Last 12 Months

To identify the unique file that has been accepted, CMS requires that all files include a 10-digit alpha-numeric file ID. This file ID is required when submitting test or production data. Once a file ID has been submitted and accepted in test or production, the same file ID may not be submitted on any other files within 12 months.

   **Example:  12**

SenCare Health Plan submitted a risk adjustment inpatient transaction file in August 2002 and a risk adjustment physician transaction test file in August 2002. The plan cannot submit both files with the same file ID within 12 consecutive months (between August 2002 and August 2003).

**Prevention**

Submitters should consider establishing an automated system to assign a file sequence number during the establishment of the data file.

**Correction**

When a submitter receives a 113-error code, "File name duplicates another file accepted within the last 12 months", the following steps should be taken:

- Since this is a 100-level error code message, the submitter will refer to the AAA record.
- The error code 11**3**, describes the field within the AAA record that must be corrected.
- The submitter must enter a valid 10-digit file ID in AAA 3.
- The file must be resubmitted following correction.

   Since this file was rejected by FERAS, it will not be processed in RAPS until the data are corrected.

### 5.4.2.2       Delete Error, Diagnosis Cluster Previously Deleted

When a plan submits a delete and RAPS accepts it, the cluster is not physically deleted from the RAPS database. The RAPS database stores a "D" in the delete indicator and enters a delete date to indicate when the diagnosis was deleted. If a plan tries to delete the exact same diagnosis cluster at a later time, the system will generate a 491-error code, informing the plan that the cluster was already deleted.

Exhibit Z
Page 694



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**EDITS AND REPORTS**

## Prevention

This issue normally occurs when plans delete all clusters from a previously submitted file, and the original file included duplicate diagnosis clusters. One way to prevent the errors is to check for duplicate diagnosis clusters prior to submitting the file with the deletes on it.

## Correction

There is no corrective action necessary because the 491-error code indicates that the cluster has already been deleted.

### 5.4.2.3   Diagnosis Cluster Not Successfully Deleted. Another Diagnosis Cluster With the Same Attributes Was Already Deleted From the RAPS Database On This Date

When plans submit delete records, the "D" indicator and the delete date become part of the unique database key for the diagnosis cluster. Diagnosis clusters must have one unique attribute in the database key in order to be stored. The 492-error code occurs when a plan deletes, adds, and then attempts to delete the exact same cluster during a single processing day. The delete will successfully process, as will the following add transaction. The add transaction will create a new record for this diagnosis cluster. The second delete cannot process, since accepting the second delete will cause the creation of a duplicate record in the RAPS database. This error is different from the 491 in that the last record on file will be the add record; that is, the diagnosis cluster has not been successfully deleted.

## Prevention

Again, this error normally occurs when plans submit large files of correction records. Plans should check when deleting records that they are not adding the exact same cluster in the same file, or on different files on the same day. If a plan detects multiple submissions of the same diagnosis cluster, the plan should determine the final status of the cluster, deleted or active, and take appropriate action.

## Correction

When a submitter receives a 492-error code, "Diagnosis Cluster Not Successfully Deleted", the following steps should be taken:

- Since this is a 400-level error code message, the submitter will refer to the CCC record.

- The error code series 490-499 indicates that it is a deletion problem.

- The submitter must determine if the diagnosis cluster should be deleted or active as a final action.

- If the cluster should be active, no further action is required.

- If the diagnosis is supposed to be deleted, the plan must submit one delete record. Since any future submissions will have a different delete date than any other clusters on file, a single delete record will successfully process.



**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

**EDITS AND REPORTS**

## 5.4.2.4       Service From Date Is Not Within MA Organization Enrollment

MA organizations can reduce the numbers of errors that are returned due to invalid eligibility by accessing the common user interface to determine eligibility and other demographic information stored on the common tables. Implementing the following procedures can reduce time spent on resolving errors.

- Develop a monthly validation protocol verifying eligibility of MA organization enrollees.
- Program internal information systems that cross check the common tables before submitting data to FERAS.

The Beneficiary Eligibility and Beneficiary Detail screens in the common user interface provide information that supports the MA risk adjustment requirements. The information includes:

- Date of birth.
- HIC Number.
- Medicare effective date.
- Medicare termination date.

**Note:** MA organizations can manually research each beneficiary online or electronically research beneficiaries in batches using the Batch Eligibility Query Request File.

The beneficiary receiving services under the MA program must be enrolled in Medicare during the service period. The dates of service reported in the diagnosis clusters must be within the enrollment dates that are posted on the common tables. RAPS cross-references the common tables to verify that the beneficiary was covered during the identified from and through dates of service. Prior to March 2003, MA organizations received the 408- and 409-error codes to reflect data inconsistencies between various CMS systems.

    The 408-error code occurs with all data. The 409-error code occurs only with hospital outpatient and physician data.

**Prevention**

Submitters should check the from and through dates of service against internal enrollment records. Remember that for hospital outpatient and physician data, both the from and through dates must be within MA enrollment periods. For hospital inpatient data, only the from dates must be within MA enrollment periods. Performing these pre-edits will minimize the number of errors received regarding enrollment information.

**Correction**

When a submitter receives a 408-error code "Service from date is not within MA organization enrollment period", or a 409-error code "Service through date is not within MA organization enrollment period", the following steps should be taken:

- Since this is a 400-level error code message, the submitter will refer to the diagnosis cluster.

- The submitter must ensure that the correct service from date was entered in CCC 9.1.

Exhibit Z
Page 696



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**EDITS AND REPORTS**

- The submitter must ensure that the correct service through date was entered in CCC 9.2.

- The submitter should check these dates against the plan enrollment dates in the common tables.

- If the submitter determines that there are discrepancies in the data in CMS systems, contact CSSC.

- If the CSSC determines that the common tables require updated plan enrollment data, contact the MMA Help Desk.

- After the data have been corrected, resubmit.

 Since this is not a format or integrity edit, this error will not be detected in FERAS; therefore, DDE users may encounter this error. When this is detected in RAPS, the problem must be corrected in order to store any diagnosis clusters associated with this record.

### 5.4.2.5    Beneficiary Is Not Enrolled In Plan On or After Service From Date

Beneficiaries must be enrolled in the plan on or after the date of the service provided.

**Prevention**

Using information from the monthly membership report and internal enrollment files, submitters should be knowledgeable regarding the enrollment and eligibility of their beneficiaries. Establishing a systematic beneficiary enrollment tracking system will reduce the number of errors associated with this edit.

 The 408- and 409-error code messages indicate that the service occurred while the beneficiary was not participating in *any* MA program. The 410-error code message indicates that the service occurred while the beneficiary was not enrolled in *your* organization.

**Correction**

When a submitter receives a 410-error code "Beneficiary is not enrolled in 'your' plan on or after service from date", the following steps should be taken:

- Since this is a 400-level error code message, the submitter will refer to the diagnosis cluster.

- The submitter must ensure that the correct service from date was entered in CCC 9.1.

- The submitter should check the service from date against the plan enrollment dates to confirm that the beneficiary was enrolled in their plan on or after the from date.

- If the submitter determines that there are discrepancies in the beneficiary's enrollment data in CMS systems, contact the MMA Help Desk.

- After the data have been corrected, resubmit.



Exhibit Z
Page 697



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**EDITS AND REPORTS**

Since this is not a format or integrity edit, this error will not be detected in FERAS; therefore, DDE users may encounter this error. When this is detected in RAPS, the problem must be corrected in order to store any diagnosis clusters associated with this record.

## 5.5   RAPS Management Reports

CMS developed four management reports that provide detail on the amount of data submitted and stored for each provider type and any error codes associated with processing. The reports are delivered to the user on the second business day of the month.

When reviewing the management reports, it is helpful to read the report from left to right and then from top to bottom as illustrated in Figure 5L.

**Figure 5L – Analysis of Management Reports**



### 5.5.1   RAPS Monthly Plan Activity Report

The RAPS Monthly Plan Activity Report provides a summary of the status of all submissions by the submitter ID and plan number (H number). It allows MA organizations to validate the diagnoses submitted for a 1-month period. The report is arrayed by provider type and month (determined by through date of service). The report displays information by submitter ID and H number, and displays six months of data on each page. Figure 5M illustrates the report and its fields.

   Delivered to users on the second business day of the month.

This report allows MA organizations to validate submitted diagnoses during a 1-month period, based on the date of service (through date). MA organizations can determine the number of clusters sent and

Exhibit Z
Page 698



**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

**EDITS AND REPORTS**

processed during the month, and the status of that data (accepted, rejected, stored, model stored, and accepted and rejected deletes) by source. By analyzing this report, the MA organization can determine if they are receiving and submitting sufficient data from sources, and the rejection rates for each data source. All this information is helpful in managing the data collection, data submission, and error resolution processes.

 The total diagnosis clusters stored includes all non-duplicate clusters accepted, while the total model stored includes only diagnosis clusters identified in the CMS-Hierarchical Condition Category (HCC) model.

**Figure 5M – RAPS Monthly Plan Activity Report Layout**

| [1]REPORT: RAPS0010 | | CMS RAPS ADMINISTRATION | | | [2]PAGE: | 2 |
|---|---|---|---|---|---|---|
| [3]RUN DATE: 20040503 | | [4] RAPS MONTHLY PLAN ACTIVITY REPORT | | | [5] SERVICE YEAR: 2003 | |

[6]SUBMITTER ID: SH7777        [7]FOR THE MONTH OF APRIL, 2004
[8]PLAN ID:      H7777

| PROVIDER TYPE/TOTALS | [9]JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER | TOTAL |
|---|---|---|---|---|---|---|---|
| PRINCIPAL INPATIENT | | | | | | | |
| [10]TOTAL SUBMITTED | 19 | 25 | 28 | 73 | 404 | 1704 | 2253 |
| [11]TOTAL REJECTED | 10 | 7 | 11 | 19 | 106 | 426 | 579 |
| [12]TOTAL ACCEPTED | 9 | 18 | 17 | 54 | 298 | 1248 | 1674 |
| [13]TOTAL STORED | 9 | 18 | 17 | 54 | 298 | 1248 | 1674 |
| [14]TOTAL MODEL STORED | 5 | 8 | 12 | 27 | 158 | 646 | 856 |
| [15]TOTAL DELETE ACPTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| [16]TOTAL DELETE RJCTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | |
| OTHER INPATIENT | | | | | | | |
| [10]TOTAL SUBMITTED | 103 | 113 | 143 | 407 | 244 | 10561 | 13774 |
| [11]TOTAL REJECTED | 49 | 44 | 55 | 112 | 638 | 2634 | 3532 |
| [12]TOTAL ACCEPTED | 54 | 69 | 88 | 295 | 1809 | 7927 | 10242 |
| [13]TOTAL STORED | 54 | 69 | 88 | 295 | 1809 | 7927 | 10242 |
| [14]TOTAL MODEL STORED | 18 | 24 | 26 | 95 | 575 | 2574 | 3312 |
| [15]TOTAL DELETE ACPTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| [16]TOTAL DELETE RJCTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | |
| OUTAPTIENT | | | | | | | |
| [10]TOTAL SUBMITTED | 329 | 490 | 761 | 1691 | 9526 | 33693 | 46490 |
| [11]TOTAL REJECTED | 115 | 179 | 219 | 531 | 2523 | 8769 | 12336 |
| [12]TOTAL ACCEPTED | 214 | 311 | 542 | 1160 | 7003 | 24924 | 34154 |
| [13]TOTAL STORED | 214 | 311 | 542 | 1160 | 7003 | 24924 | 34154 |
| [14]TOTAL MODEL STORED | 35 | 82 | 135 | 244 | 1779 | 5305 | 7580 |
| [15]TOTAL DELETE ACPTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| [16]TOTAL DELETE RJCTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | |
| PHYSICIAN | | | | | | | |
| [10]TOTAL SUBMITTED | 2450 | 3221 | 4812 | 12429 | 31573 | 130564 | 185049 |
| [11]TOTAL REJECTED | 224 | 206 | 527 | 928 | 2039 | 6026 | 9950 |
| [12]TOTAL ACCEPTED | 2226 | 3015 | 4285 | 11501 | 29534 | 124538 | 175099 |
| [13]TOTAL STORED | 2226 | 3015 | 4285 | 11501 | 29534 | 124538 | 175099 |
| [14]TOTAL MODEL STORED | 608 | 721 | 1116 | 2797 | 7426 | 29413 | 42117 |
| [15]TOTAL DELETE ACPTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| [16]TOTAL DELETE RJCTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

**FIELD DESCRIPTIONS ON NEXT PAGE**

Exhibit Z
Page 699



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**EDITS AND REPORTS**

**Figure 5M– RAPS Monthly Plan Activity Report Layout (continued)**

| Field No. | Field Name | Field Description |
|---|---|---|
| 1 | Report Name | Name of the report as it appears in submitter's mailbox. |
| 2 | Page Number | Page number of the report. Six months arrayed per page. |
| 3 | Report Run Date | Date CMS generated the report. |
| 4 | Report Full Name | Full name of the report. |
| 5 | Service Year | The year of the service through date. |
| 6 | Submitter ID | Report is grouped by submitter identification number. A submitter may submit for more than one organization (H number). |
| 7 | Report Year and Date | Month and year of the submission. |
| 8 | Plan Number | H number assigned by CMS; a different report is printed for each organization (H number). |
| 9 | Month | The month of the service through date. |
| 10 | Total Submitted | The total number of clusters submitted during the report period by the MA organization. |
| 11 | Total Rejected | The total number of clusters submitted during the report period by the MA organization rejected due to errors. |
| 12 | Total Accepted | The total number of clusters submitted during the report period by the MA organization accepted without errors. |
| 13 | Total Stored | The total number of clusters submitted by the MA organization and accepted by RAPS during the report period, and stored in the database (does not include duplicates if identical clusters already stored in the database). |
| 14 | Total Model Stored | The total number of *required* diagnosis clusters submitted by the MA organization and accepted by RAPS during the report period, and stored in the database. |
| 15 | Total Deletes Accepted | The total number of deleted clusters submitted by the MA organization during the report period that were accepted with no errors. |
| 16 | Total Deletes Rejected | The total number of deleted clusters submitted by the MA organization during the report period that were rejected with errors. |

**Example: 13**

An MA organization's management can determine how effectively it has submitted data by reviewing the number of clusters submitted and stored on a monthly basis. Figure 5N illustrates that the submissions for service year 2004 are going relatively well. There is an error rate of approximately three percent during the period identified on page 2 of the April 2004 report. The error rate is calculated by dividing the total records rejected into the total submitted; for example, April 2004 principal inpatient has 26 rejected out of 824 submitted, a three percent error rate. There is very little lag between the date of the visit or stay and the date those data were collected and submitted. For every inpatient principal diagnosis on page 2 of the March 2004 report, there are four secondary diagnoses, which is appropriate.

An area of concern may be the number of physician services. In the April 2004 report, no data for physicians were submitted with dates of service between July 2003 and December 2003. However, 350 clusters with dates of service between January 2004 and April 2004 were submitted. For all data with dates of service between January 2004 and April 2004, only seven percent of the data were from physicians. It is typical for about three-quarters of the data submitted to be from physicians, so this finding might be indicative of a problem. However, this may be explainable if the organization simply

Exhibit Z
Page 700



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**EDITS AND REPORTS**

submitted its physician data before April 1 or after April 30, (i.e., the organization is submitting sufficient data, but did not send any physician data in April). Management should compare the data submitted during the previous month and take the MA organization's enrollment into account when interpreting this report and resolving potential issues.

During the month of April there was a group of clusters submitted for services performed in September 2003. One explanation for this could be difficulty collecting from particular providers. The error rate for the September 2003 data was 92 percent. Management should consider identifying the sources of that data and offering outreach or training to prevent this problem from occurring in the future.



**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

**EDITS AND REPORTS**

**Figure 5N – RAPS Monthly Plan Activity Report**

```
REPORT:   RAPS0010                          CMS RAPS ADMINISTRATION                    PAGE:     2
RUN DATE: 20040402                   RAPS MONTHLY PLAN ACTIVITY REPORT              SERVICE YEAR: 2003

SUBMITTER ID:    SH7777                    FOR THE MONTH OF MARCH, 2004
PLAN NO:         H7777
```

| PROVIDER TYPE/TOTALS | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER | TOTAL |
|---|---|---|---|---|---|---|---|
| **PRINCIPAL INPATIENT** | | | | | | | |
| TOTAL SUBMITTED | 20915 | 17891 | 1739 | 1365 | 1721 | 2837 | 46468 |
| TOTAL REJECTED | 209 | 93 | 33 | 27 | 35 | 55 | 452 |
| TOTAL ACCEPTED | 20706 | 17798 | 1706 | 1338 | 1686 | 2782 | 46016 |
| TOTAL STORED | 20706 | 17798 | 1706 | 1338 | 1686 | 2782 | 46016 |
| TOTAL MODEL STORED | 17186 | 14772 | 599 | 455 | 573 | 946 | 34531 |
| TOTAL DELE ACPTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL DELE RJCTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | |
| **OTHER INPATIENT** | | | | | | | |
| TOTAL SUBMITTED | 69458 | 47939 | 19020 | 14618 | 14264 | 20945 | 186244 |
| TOTAL REJECTED | 695 | 240 | 381 | 293 | 274 | 419 | 2302 |
| TOTAL ACCEPTED | 68763 | 47699 | 18639 | 14325 | 13990 | 20526 | 183942 |
| TOTAL STORED | 68763 | 47699 | 18639 | 14325 | 13990 | 20526 | 183942 |
| TOTAL MODEL STORED | 57073 | 39114 | 5965 | 4584 | 4285 | 6568 | 117589 |
| TOTAL DELE ACPTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL DELE RJCTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | |
| **OUTPATIENT** | | | | | | | |
| TOTAL SUBMITTED | 60838 | 59543 | 11621 | 21381 | 23879 | 47758 | 225020 |
| TOTAL REJECTED | 61 | 30 | 175 | 321 | 359 | 717 | 1663 |
| TOTAL ACCEPTED | 60777 | 59513 | 11446 | 21060 | 23520 | 47041 | 223357 |
| TOTAL STORED | 60777 | 59513 | 11446 | 21060 | 23520 | 47041 | 223357 |
| TOTAL MODEL STORED | 50445 | 48801 | 3892 | 7161 | 7997 | 15994 | 134290 |
| TOTAL DELE ACPTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL DELE RJCTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | |
| **PHYSICIAN** | | | | | | | |
| TOTAL SUBMITTED | 172301 | 101277 | 179713 | 173688 | 214495 | 129995 | 971469 |
| TOTAL REJECTED | 1723 | 1013 | 3595 | 3474 | 4290 | 2600 | 16695 |
| TOTAL ACCEPTED | 170578 | 100264 | 176118 | 170214 | 210205 | 127395 | 954774 |
| TOTAL STORED | 170578 | 100264 | 176118 | 170214 | 210205 | 127395 | 954774 |
| TOTAL MODEL STORED | 141580 | 83219 | 61642 | 59575 | 73572 | 44589 | 464177 |
| TOTAL DELE ACPTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL DELE RJCTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Exhibit Z
Page 702

1022
Exhibit 3



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**EDITS AND REPORTS**

**Figure 5N – RAPS Monthly Plan Activity Report (continued)**

```
REPORT:   RAPS0010                        CMS RAPS ADMINISTRATION                    PAGE:    1
RUN DATE: 20040402                     RAPS MONTHLY PLAN ACTIVITY REPORT          SERVICE YEAR: 2004

SUBMITTER ID:    SH7777                   FOR THE MONTH OF MARCH, 2004
PLAN NO:         H7777

PROVIDER TYPE/TOTALS     JANUARY    FEBRUARY     MARCH      APRIL      MAY       JUNE      TOTAL
PRINCIPAL INPATIENT
   TOTAL SUBMITTED        1297       1301        293         0         0         0       2891
   TOTAL REJECTED           26         26          0         0         0         0         52
   TOTAL ACCEPTED         1261       1275        288         0         0         0       2824
   TOTAL STORED           1235       1269        283         0         0         0       2787
   TOTAL MODEL STORED      432        444         99         0         0         0        975
   TOTAL DELE ACPTD         10          0          5         0         0         0         15
   TOTAL DELE RJCTD          0          0          0         0         0         0          0

OTHER INPATIENT
   TOTAL SUBMITTED        8431      13489        411         0         0         0      22331
   TOTAL REJECTED          169        270          3         0         0         0        442
   TOTAL ACCEPTED         8262      13219        405         0         0         0      21886
   TOTAL STORED           8261      13216        404         0         0         0      21881
   TOTAL MODEL STORED     2891       4625        141         0         0         0       7657
   TOTAL DELE ACPTD          0          0          1         0         0         0          1
   TOTAL DELE RJCTD          0          0          2         0         0         0          2

OUTPATIENT
   TOTAL SUBMITTED       23415      17342         84         0         0         0      40841
   TOTAL REJECTED          351        260          3         0         0         0        614
   TOTAL ACCEPTED        23064      17081         81         0         0         0      40226
   TOTAL STORED          20989      15199         77         0         0         0      36265
   TOTAL MODEL STORED     7346       5320         27         0         0         0      12693
   TOTAL DELE ACPTD          0          0          0         0         0         0          0
   TOTAL DELE RJCTD          0          1          0         0         0         0          1

PHYSICIAN
   TOTAL SUBMITTED      111207     189171          0         0         0         0     300378
   TOTAL REJECTED         2224       3783          0         0         0         0       6007
   TOTAL ACCEPTED       108983     185388          0         0         0         0     294371
   TOTAL STORED         108978     164995          0         0         0         0     273973
   TOTAL MODEL STORED    38142      57748          0         0         0         0      95890
   TOTAL DELE ACPTD          0          0          0         0         0         0          0
   TOTAL DELE RJCTD          0          0          0         0         0         0          0
```

Exhibit Z
Page 703



**Figure 5N – RAPS Monthly Plan Activity Report (continued)**

```
REPORT:    RAPS0010                      CMS RAPS ADMINISTRATION                    PAGE:    2
RUN DATE: 20040503                    RAPS MONTHLY PLAN ACTIVITY REPORT          SERVICE YEAR: 2003

SUBMITTER ID:    SH7777                   FOR THE MONTH OF APRIL, 2004
PLAN NO:         H7777
```

| PROVIDER TYPE/TOTALS | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER | TOTAL |
|---|---|---|---|---|---|---|---|
| PRINCIPAL INPATIENT | | | | | | | |
| TOTAL SUBMITTED | 0 | 0 | 74 | 0 | 0 | 0 | 74 |
| TOTAL REJECTED | 0 | 0 | 60 | 0 | 0 | 0 | 60 |
| TOTAL ACCEPTED | 0 | 0 | 14 | 0 | 0 | 0 | 14 |
| TOTAL STORED | 0 | 0 | 14 | 0 | 0 | 0 | 14 |
| TOTAL MODEL STORED | 0 | 0 | 6 | 0 | 0 | 0 | 6 |
| TOTAL DELE ACPTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL DELE RJCTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | |
| OTHER INPATIENT | | | | | | | |
| TOTAL SUBMITTED | 0 | 0 | 296 | 0 | 0 | 0 | 296 |
| TOTAL REJECTED | 0 | 0 | 280 | 0 | 0 | 0 | 280 |
| TOTAL ACCEPTED | 0 | 0 | 16 | 0 | 0 | 0 | 16 |
| TOTAL STORED | 0 | 0 | 7 | 0 | 0 | 0 | 7 |
| TOTAL MODEL STORED | 0 | 0 | 2 | 0 | 0 | 0 | 2 |
| TOTAL DELE ACPTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL DELE RJCTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | |
| OUTPATIENT | | | | | | | |
| TOTAL SUBMITTED | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL REJECTED | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL ACCEPTED | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL STORED | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL MODEL STORED | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL DELE ACPTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL DELE RJCTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | |
| PHYSICIAN | | | | | | | |
| TOTAL SUBMITTED | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL REJECTED | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL ACCEPTED | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL STORED | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL MODEL STORED | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL DELE ACPTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL DELE RJCTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Exhibit Z
Page 704



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**EDITS AND REPORTS**

**Figure 5N – RAPS Monthly Plan Activity Report (continued)**

```
REPORT:   RAPS0010                    CMS RAPS ADMINISTRATION              PAGE:    1
RUN DATE: 20040503                 RAPS MONTHLY PLAN ACTIVITY REPORT       SERVICE YEAR: 2004

SUBMITTER ID:    SH7777                 FOR THE MONTH OF APRIL, 2004
PLAN NO:         H7777

PROVIDER TYPE/TOTALS      JANUARY    FEBRUARY     MARCH      APRIL      MAY       JUNE      TOTAL
PRINCIPAL INPATIENT
   TOTAL SUBMITTED          100        435        200        89         0         0        824
   TOTAL REJECTED             0          4         20         2         0         0         26
   TOTAL ACCEPTED           100        429        180        87         0         0        796
   TOTAL STORED              90        420        180        80         0         0        770
   TOTAL MODEL STORED        30        152         52        26         0         0        260
   TOTAL DELE ACPTD           0          2          0         0         0         0          2
   TOTAL DELE RJCTD           0          0          0         0         0         0          0

OTHER INPATIENT
   TOTAL SUBMITTED          400       1740        696       348         0         0       3184
   TOTAL REJECTED            12         52         21        10         0         0         95
   TOTAL ACCEPTED           388       1688        666       338         0         0       3080
   TOTAL STORED             386       1668        661       333         0         0       3048
   TOTAL MODEL STORED       135        583        232       117         0         0       1067
   TOTAL DELE ACPTD           0          0          2         0         0         0          2
   TOTAL DELE RJCTD           0          0          7         0         0         0          7

OUTPATIENT
   TOTAL SUBMITTED            0        377        252         0         0         0        629
   TOTAL REJECTED             0         10          8         0         0         0         18
   TOTAL ACCEPTED             0        362        244         0         0         0        606
   TOTAL STORED               0        350        231         0         0         0        581
   TOTAL MODEL STORED         0        123         80         0         0         0        203
   TOTAL DELE ACPTD           0          0          0         0         0         0          0
   TOTAL DELE RJCTD           0          5          0         0         0         0          5

PHYSICIAN
   TOTAL SUBMITTED          308         40          0         0         0         0        350
   TOTAL REJECTED             9          4          0         0         0         0         13
   TOTAL ACCEPTED           299         36          0         0         0         0        335
   TOTAL STORED             284         36          0         0         0         0        320
   TOTAL MODEL STORED        99         13          0         0         0         0        112
   TOTAL DELE ACPTD           2          0          0         0         0         0          2
   TOTAL DELE RJCTD           0          0          0         0         0         0          0
```

Exhibit Z
Page 705

1025
Exhibit 3



**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

**EDITS AND REPORTS**

### 5.5.2  RAPS Cumulative Plan Activity Report

The RAPS Cumulative Plan Activity Report provides a cumulative summary of the status of submissions. The report is arrayed by provider type and month (determined by through date of service), and reports information by submitter ID and H number. Figure 5O illustrates the report and its fields.

 The Cumulative Plan Activity Report is delivered to users on the second business day of each month.

**Figure 5O – RAPS Cumulative Plan Activity Report Layout**

```
[1]REPORT:     RAPS0010              CMS RAPS ADMINISTRATION              [2]PAGE:           2
[3]RUN REPORT:   DATE: 20040503   [4] RAPS CUMULATIVE PLAN ACTIVITY REPORT   [5]SERVICE YEAR: 2003

[6]SUBMITTER ID:     SH7777           [7]FOR PERIOD ENDING APRIL 30, 2004
[8]PLAN NO:          H7777

PROVIDER TYPE/TOTALS       [9]JULY   AUGUST   SEPTEMBER   OCTOBER   NOVEMBER   DECEMBER   TOTAL

PRINCIPAL INPATIENT
[10]TOTAL SUBMITTED          22       25         40         29         39         61       216
[11]TOTAL REJECTED            0        0          2          0          3          1         6
[12]TOTAL ACCEPTED           22       25         38         29         36         60       210
[13]TOTAL STORED             22       25         38         29         36         60       210
[14]TOTAL MODEL STORED       18       24         26         23         33         44       168
[15]TOTAL DELETE ACPTD        0        0          0          0          0          0         0
[16]TOTAL DELETE RJCTD        0        0          0          0          0          0         0

OTHER INPATIENT
[10]TOTAL SUBMITTED          56       92        157        108         99        178       690
[11]TOTAL REJECTED            0        0          8          0         15          4        27
[12]TOTAL ACCEPTED           56       92        149        108         84        174       663
[13]TOTAL STORED             56       92        149        108         84        174       663
[14]TOTAL MODEL STORED       29       67         66         58         51        104       375
[15]TOTAL DELETE ACPTD        0        0          0          0          0          0         0
[16]TOTAL DELETE RJCTD        0        0          0          0          0          0         0

OUTAPTIENT
[10]TOTAL SUBMITTED           7        4          3         19          8         16        57
[11]TOTAL REJECTED            0        0          0          0          0          0         0
[12]TOTAL ACCEPTED            7        4          3         19          8         16        57
[13]TOTAL STORED              7        4          3         19          8         16        57
[14]TOTAL MODEL STORED        7        4          3         19          8         16        57
[15]TOTAL DELETE ACPTD        0        0          0          0          0          0         0
[16]TOTAL DELETE RJCTD        0        0          0          0          0          0         0

PHYSICIAN
[10]TOTAL SUBMITTED          14       28         14         13         37         16       122
[11]TOTAL REJECTED            0        0          4          6          1          0        11
[12]TOTAL ACCEPTED           14       28         10          7         36         16       111
[13]TOTAL STORED             13       26         10          7         31         14       101
[14]TOTAL MODEL STORED       13       26         10          7         31         14       101
[15]TOTAL DELETE ACPTD        0        0          0          0          0          0         0
[16]TOTAL DELETE RJCTD        0        0          0          0          0          0         0
```

**FIELD DESCRIPTIONS ON NEXT PAGE**



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**EDITS AND REPORTS**

**Figure 5O – RAPS Cumulative Plan Activity Report Layout (continued)**

| Field No. | Field Name | Field Description |
|---|---|---|
| 1 | Report Name | Name of the report as it appears in submitter's mailbox. |
| 2 | Page Number | Page number of the report. Six months arrayed per page. |
| 3 | Report Run Date | Date CMS generated the report. |
| 4 | Report Full Name | Full name of the report. |
| 5 | Service Year | The year of the service through date. |
| 6 | Submitter ID | Report is grouped by submitter identification number. A submitter may submit for more than one MA organization (H-number). |
| 7 | Report Year and Date | Month and year of the submission. |
| 8 | Plan Number | H-number assigned by CMS; a different report is printed for each organization (H-number). |
| 9 | Month | The month of the service through date. |
| 10 | Total Submitted | The total number of clusters submitted during the report period. |
| 11 | Total Rejected | The total number of clusters submitted during the report period that were rejected due to errors. |
| 12 | Total Accepted | The total number of clusters submitted during the report period that were accepted without errors. |
| 13 | Total Stored | The total number of required diagnosis clusters submitted, accepted, and stored and were not duplicates. |
| 14 | Total Model Stored | The total number of *required,* diagnosis clusters submitted, accepted stored and included in the current risk adjustment model during the report period. |
| 15 | Total Deletes Accepted | The total number of deleted clusters submitted during the report period that were accepted without errors. |
| 16 | Total Deletes Rejected | The total number of deleted clusters submitted during the report period that were rejected with errors. |

A service year of 9999 on a Monthly or Cumulative Plan Activity Report indicates that the data submitted have not been appropriately stored and have been rejected. The RAPS Return File will list error codes 402 (invalid service through date on CCC record) and 403 (service through date must be greater than December 31, 2002). With each of these error codes, the system cannot recognize and properly file the rejected data since the dates of service are either outside of the reporting period or unrecognizable. Data that cannot be associated with one of the years on the Monthly and Cumulative Plan Activity Reports must be filed in the service year of 9999.

  **Example: 14**

Using the RAPS Cumulative Plan Activity Report, the MA organization can effectively monitor the quantity of data submitted for each provider type. The submission numbers are higher for previous months than the more current dates of service months, which indicate a lag between the dates of service provided, collected, and submitted. Comparing Figure 8K to the Cumulative Plan Activity Report (Figure 8M) illustrates April transactions accounted for very few of the January, February, and March numbers indicating collection and submission problems in the month of April. This can be explained by new staff, competing internal priorities, or system implications. Management should consider the root cause of this decline to prevent this in the future.

  The third page of this report indicates diagnosis clusters submitted where the service dates could not be identified. These are reported on the service year 9999.

Exhibit Z
Page 707



**Figure 5P – RAPS Cumulative Plan Activity Report**

```
RAPS0020                              CMS RAPS ADMINISTRATION                      PAGE:       2
RUN REPORT:     DATE: 20040503     RAPS CUMULATIVE PLAN ACTIVITY REPORT         SERVICE YEAR: 2003

  SUBMITTER ID:      SH7777            FOR PERIOD ENDING APRIL 30, 2004
  PLAN NO:           H7777
```

| PROVIDER TYPE/TOTALS | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER | TOTAL |
|---|---|---|---|---|---|---|---|
| PRINCIPAL INPATIENT | | | | | | | |
| TOTAL SUBMITTED | 62747 | 53673 | 5389 | 4096 | 5162 | 8517 | 139584 |
| TOTAL REJECTED | 627 | 278 | 108 | 82 | 103 | 170 | 1368 |
| TOTAL ACCEPTED | 62120 | 53395 | 5281 | 4014 | 5059 | 8347 | 138216 |
| TOTAL STORED | 62120 | 53395 | 5281 | 4014 | 5059 | 8347 | 138216 |
| TOTAL MODEL STORED | 51560 | 44316 | 1796 | 1365 | 1720 | 2838 | 103595 |
| TOTAL DELE ACPTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL DELE RJCTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | |
| OTHER INPATIENT | | | | | | | |
| TOTAL SUBMITTED | 208372 | 143816 | 57058 | 43852 | 40989 | 62833 | 556920 |
| TOTAL REJECTED | 2084 | 719 | 1141 | 877 | 820 | 1257 | 6898 |
| TOTAL ACCEPTED | 206288 | 143097 | 55917 | 42975 | 40169 | 61576 | 550022 |
| TOTAL STORED | 206288 | 143097 | 55917 | 42975 | 40169 | 61576 | 550022 |
| TOTAL MODEL STORED | 171219 | 117340 | 17893 | 13752 | 12854 | 19704 | 352762 |
| TOTAL DELE ACPTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL DELE RJCTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | |
| OUTPATIENT | | | | | | | |
| TOTAL SUBMITTED | 182512 | 178628 | 34860 | 64142 | 71635 | 143270 | 675047 |
| TOTAL REJECTED | 183 | 89 | 523 | 962 | 1075 | 2149 | 4981 |
| TOTAL ACCEPTED | 182329 | 178539 | 34337 | 63180 | 70560 | 141121 | 670066 |
| TOTAL STORED | 182329 | 178539 | 34337 | 63180 | 70560 | 141121 | 670066 |
| TOTAL MODEL STORED | 151333 | 146402 | 11675 | 21481 | 23990 | 47981 | 402862 |
| TOTAL DELE ACPTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL DELE RJCTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | |
| PHYSICIAN | | | | | | | |
| TOTAL SUBMITTED | 516903 | 303829 | 539136 | 521062 | 643485 | 389984 | 2914399 |
| TOTAL REJECTED | 5169 | 3038 | 10783 | 10421 | 12870 | 7799 | 50080 |
| TOTAL ACCEPTED | 511734 | 300791 | 528353 | 510641 | 630615 | 382185 | 2864319 |
| TOTAL STORED | 511734 | 300791 | 528353 | 510641 | 630615 | 382185 | 2864319 |
| TOTAL MODEL STORED | 424739 | 249657 | 184924 | 178724 | 220715 | 133765 | 1392524 |
| TOTAL DELE ACPTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL DELE RJCTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Exhibit Z
Page 708



**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

**EDITS AND REPORTS**

**Figure 5P – RAPS Cumulative Plan Activity Report (continued)**

```
REPORT:    RAPS0020                          CMS RAPS ADMINISTRATION                    PAGE:    1
RUN DATE: 20040503                    RAPS CUMULATIVE PLAN ACTIVITY REPORT           SERVICE YEAR: 2004

SUBMITTER ID:   SH7777                      FOR PERIOD ENDING APRIL 30, 2004
PLAN NO:        H7777

PROVIDER TYPE/TOTALS        JANUARY      FEBRUARY      MARCH       APRIL        MAY        JUNE        TOTAL
PRINCIPAL INPATIENT
    TOTAL SUBMITTED          3891         3905         879          91          0           0         8766
    TOTAL REJECTED             77           78           2           2          0           0          159
    TOTAL ACCEPTED           3784         3825         863          89          0           0         8561
    TOTAL STORED             3704         3808         849          80          0           0         8441
    TOTAL MODEL STORED       1296         1333         297          26          0           0         2952
    TOTAL DELE ACPTD           30            2          14           0          0           0           46
    TOTAL DELE RJCTD            0            0           0           0          0           0            0

OTHER INPATIEN
    TOTAL SUBMITTED         25292        40467        1234         348          0           0        67341
    TOTAL REJECTED            506          809           9          10          0           0         1334
    TOTAL ACCEPTED          24786        39658        1216         338          0           0        65998
    TOTAL STORED            24784        39648        1211         333          0           0        65976
    TOTAL MODEL STORED       8674        13876         423         117          0           0        23090
    TOTAL DELE ACPTD            0            0           2           0          0           0            2
    TOTAL DELE RJCTD            0            0           7           0          0           0            7

OUTPATIENT
    TOTAL SUBMITTED         70246        52027         252           0          0           0       122525
    TOTAL REJECTED           1053          780           8           0          0           0         1841
    TOTAL ACCEPTED          69193        51242         244           0          0           0       120679
    TOTAL STORED            62966        45598         231           0          0           0       108795
    TOTAL MODEL STORED      22038        15959          80           0          0           0        38077
    TOTAL DELE ACPTD            0            0           0           0          0           0            0
    TOTAL DELE RJCTD            0            5           0           0          0           0            5

PHYSICIAN
    TOTAL SUBMITTED        333621       567512           0           0          0           0       901133
    TOTAL REJECTED           6672        11350           0           0          0           0        18022
    TOTAL ACCEPTED         326949       556162           0           0          0           0       883111
    TOTAL STORED           326934       494984           0           0          0           0       821918
    TOTAL MODEL STORED     114426       173244           0           0          0           0       287670
    TOTAL DELE ACPTD            2            0           0           0          0           0            2
    TOTAL DELE RJCTD            0            0           0           0          0           0            0
```

5-44

Exhibit Z
Page 709



### Figure 5P – RAPS Cumulative Plan Activity Report (continued)

```
REPORT:   RAPS0020              CMS RAPS ADMINISTRATION                PAGE:    1
RUN DATE: 20040503                     RAPS CUMULATIVE PLAN ACTIVITY REPORT            SERVICE YEAR: 9999

SUBMITTER ID:      SH7777                  FOR PERIOD ENDING APRIL 30, 2004
PLAN NO:           H7777
```

| PROVIDER TYPE/TOTALS | JANUARY | FEBRUARY | MARCH | APRIL | MAY | JUNE | TOTAL |
|---|---|---|---|---|---|---|---|
| PRINCIPAL INPATIENT | | | | | | | |
| TOTAL SUBMITTED | 25 | 0 | 0 | 0 | 0 | 0 | 25 |
| TOTAL REJECTED | 25 | 0 | 0 | 0 | 0 | 0 | 25 |
| TOTAL ACCEPTED | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL STORED | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL MODEL STORED | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL DELE ACPTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL DELE RJCTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | |
| OTHER INPATIENT | | | | | | | |
| TOTAL SUBMITTED | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL REJECTED | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL ACCEPTED | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL STORED | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL MODEL STORED | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL DELE ACPTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL DELE RJCTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | |
| OUTPATIENT | | | | | | | |
| TOTAL SUBMITTED | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL REJECTED | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL ACCEPTED | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL STORED | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL MODEL STORED | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL DELE ACPTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL DELE RJCTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | |
| PHYSICIAN | | | | | | | |
| TOTAL SUBMITTED | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL REJECTED | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL ACCEPTED | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL STORED | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL MODEL STORED | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL DELE ACPTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL DELE RJCTD | 0 | 0 | 0 | 0 | 0 | 0 | 0 |



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**EDITS AND REPORTS**

### 5.5.3   Correcting Rejected Data

When MA organizations correct data that originally received errors in RAPS, the originally rejected data are still reflected on the cumulative totals for the appropriate month, and in the number of total rejections. After a diagnosis cluster is counted as stored, it remains part of the stored count on the RAPS Cumulative Plan Activity Report even if it is later deleted. When MA organizations delete a cluster, the number is included in the total stored as well as the total deleted.

   **Example: 15**

The April RAPS Cumulative Plan Activity Report (Figure 5P) displays a high reject rate in the data submitted for dates of service July – September (page 2 of the report). The report shows the plan corrected the previously submitted errors and began submitting data more accurately. The April Cumulative Report reflects that the rate of rejection (Total Rejected) remained high for July – September, but decreased for October – December.

### 5.5.4   RAPS Error Frequency Reports

The two RAPS Error Frequency Reports, Monthly and Quarterly, provide a summary of the number of errors submitted during the reporting period. This includes files submitted in test and production arrayed by error code and provider type. The reports are generated by submitter ID and plan number (H number). These reports are an effective tool that MA organizations can use to analyze error codes and frequency and reconcile data submissions. In addition, the reports include the total number of CCC records, total diagnoses, and total accepted and rejected diagnosis clusters.

Both the Monthly and Quarterly RAPS Error Frequency Reports utilize the report layout illustrated in Figure 5Q, however the report names differ as follows:

- RAPS Monthly Error Frequency Report: RAPS04M
- RAPS Quarterly Error Frequency Report: RAPS04Q

The monthly report provides summary information for a month; the quarterly report provides summary information for a 3-month period.

   The Monthly RAPS Error Frequency Report is delivered to users on the second business day of the month.

   The Quarterly RAPS Error Frequency Report is delivered to users on the second business day of the month following each quarter's end date.



**Figure 5Q - RAPS Monthly Error Frequency Report Layout**

```
[1]REPORT:   RAPS04M                        PALMETO GBA                      [2]PAGE:      1
[3]RUN TIME: 10.06.09                   [4]RISK ADJUSTMENT PROCESSING        [5]RUN DATE:20050502
                                            ERROR FREQUENCY SUMMARY

 [6]SUBMITTER ID:      SH9999          [7] FOR THE MONTH OF APRIL, 2005
 [8] PLAN NO:          H9999

[9]TOTAL CCC RECORDS: 7,831[10] TOTAL DIAGNOSIS: 16,465 [11]TOTAL ACCEPTED: 14,517 [12]TOTAL REJECTED:1,948
```

| [13] | [14] | [15] | [16] | [17] | [18] |
|---|---|---|---|---|---|
| ERROR | <==PROVIDER TYPE XX==> | <==PROVIDER TYPE 01==> | <==PROVIDER TYPE 02==> | <==PROVIDER TYPE 10==> | <==PROVIDER TYPE 20==> |
| CODE | <=UNKNOWN PROV TYPE=> | <PRINCIPAL INPATIENT> | <==OTHER INPATIENT==> | <=====OUTPATIENT=====> | <======PHYSICIAN =====> |
| 353 | 81 | 0 | 0 | 0 | 0 |
| 354 | 0 | 4 | 32 | 105 | 581 |
| 408 | 0 | 10 | 73 | 120 | 883 |
| 409 | 0 | 0 | 0 | 120 | 883 |
| 410 | 0 | 10 | 73 | 114 | 845 |
| 460 | 0 | 0 | 0 | 1 | 14 |
| 500 | 6 | 0 | 0 | 0 | 0 |
| 501 | 0 | 17 | 140 | 875 | 3,927 |
| 502 | 0 | 7 | 51 | 79 | 1,272 |

**FIELD DESCRIPTIONS ON NEXT PAGE**

Exhibit Z
Page 712



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**Figure 5Q – RAPS Monthly Error Frequency Report Layout (continued)**

| Field No. | Field Name | Field Description |
|---|---|---|
| 1 | Report Name | Name of the report as it appears in the Submitter's mailbox. |
| 2 | Page Number | Page number of the report. |
| 3 | Run Time | Time report was generated. |
| 4 | Full Name | Full name of the report. |
| 5 | Report Run Date | Date CMS generated the report. |
| 6 | Submitter ID | Report is grouped by submitter identification number. A submitter may submit for more than one organization. |
| 7 | Month | The month of the service through date. |
| 8 | Plan Number | H-number assigned by CMS; a different report is printed for each organization (H-number). |
| 9 | Total CCC Records | Total number of detailed records submitted during the report period. |
| 10 | Total Diagnosis | Total number of diagnosis clusters submitted during the report period |
| 11 | Total Accepted | The total number of diagnosis clusters submitted during the report period and accepted without errors. |
| 12 | Total Rejected | The total number of diagnosis clusters submitted during the report period and rejected with errors. |
| 13 | Error Code | Message sent back by CMS indicating there is an error in the data submitted during the report period. |
| 14 | Provider Type – Unknown | Indicates the number of errors associated with an unknown provider type. The transactions did not include a valid provider type. Valid provider types are "01", "02", "10", and "20". |
| 15 | Provider Type – Principal Inpatient | Identifies the principal inpatient provider source and the quantity of each error code associated with principal inpatient during the report period. |
| 16 | Provider Type – Other Inpatient | Identifies the other inpatient provider source and the quantity of each error code associated with other inpatient during the report period. |
| 17 | Provider Type – Outpatient | Identifies the outpatient provider source and the quantity of each error code associated with outpatient during the report period. |
| 18 | Provider Type – Physician | Identifies the physician provider source and the quantity of each error code associated with physician during the report period. |

**Example: 16**

The sample RAPS Monthly Error Frequency Report (Figure 5R) indicates that the error occurring most frequently was an informational error code (501). However, error code, 410 accounted for the most rejected clusters. There were also high counts of rejected clusters associated with error codes 408 and 409. These error codes are all related to beneficiary enrollment in a specific MA plan or any MA plan in Medicare. Management should investigate possible discrepancies between their internal enrollment systems and the common tables.



**Figure 5R – RAPS Monthly Error Frequency Report**

```
REPORT:   RAPS004M                    PALMETO GBA                      ]PAGE:     1
RUN TIME: 13.31.06               RISK ADJUSTMENT PROCESSING       RUN DATE:20050219
                                 ERROR FREQUENCY SUMMARY

  SUBMITTER ID:      SH9999            FOR THE MONTH OF APRIL, 2005
  PLAN NO:           H9999

TOTAL CCC RECORDS: 4,647 TOTAL DIAGNOSIS: 17,660 TOTAL ACCEPTED: 15,403  TOTAL REJECTED:2,257


    ERROR <==PROVIDER TYPE XX==><==PROVIDER TYPE 01==><==PROVIDER TYPE 02==><==PROVIDER TYPE 10==><==PROVIDER TYPE 20==>
    CODE  <==UNKNOWN PROV TYPE=> <PRINCIPAL INPATIENT> <==OTHER INPATIENT==> <=====OUTPATIENT=====><======PHYSICIAN =====>
    353   75                     0                     0                     0                     0
    354   0                      7                     38                    108                   618
    403   0                      1                     0                     0                     0
    408   0                      14                    79                    132                   859
    409   0                      0                     0                     116                   782
    410   0                      12                    67                    110                   980
    460   0                      0                     0                     5                     12
    500   6                      0                     0                     0                     0
    501   0                      18                    148                   578                   2,297
    502   0                      5                     63                    97                    1,741
```



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**EDITS AND REPORTS**

## 5.6    Analysis of Reports

When analyzing the monthly RAPS management reports, CMS urges MA organizations to consider the following questions:

- "Is my organization collecting enough data from physicians and providers?"
- "Is my organization collecting the correct data from physicians and providers?"
- "Are external issues affecting data collection?"
- "Are internal processes supporting data submissions?"

Each question is discussed below.

### 5.6.1  Collecting Sufficient Accurate Data

The Monthly Plan Activity Report is a good place to start the analysis. Because this report provides a summary of the status of data submitted for each month, it allows organizations to check, on a monthly basis, the number of diagnosis clusters submitted overall, the number of clusters submitted by data source (hospital inpatient, hospital outpatient, and physician), and the status of those clusters.

Reading the report from left to right, the report identifies the number of clusters submitted in the reporting month (April 2004 in Figure 5P) for every month in the data collection period.

   **Example: 17**

Figure 5S on the next page illustrates a Cumulative Plan Activity Report for April 2004. It reports the number of diagnoses submitted from July 2003 through March 2004. Analysis of this report might begin with a review of the number of clusters submitted by provider (source) type. This plan is doing well because it is submitting the vast majority of its hospital inpatient data for service through dates within 90 days of the report date. If the organization is submitting data at about the same pace received, then the number of clusters seems appropriate, at least for hospital inpatient.

   CMS recommends MA organizations collect data from providers and physicians within 90 days of the service through date. Consistent collection lags of more than 90 days may cause problems in submitting data in a timely manner.

The average rate of rejected data is below one percent for MA organizations. The plan in this example has a rejection rate for hospital inpatient services at about nine percent during April. If the other provider type information reflects a similar rate of rejected data, it is higher than it should be and a cause for investigation.



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**EDITS AND REPORTS**

**Figure 5S – Analysis of Cumulative Plan Activity Report**



On the Cumulative Report, MA organizations should review the data across the collection period, ensuring that the number of data for each month is consistent. Low submission months or significant spikes in the data submitted for a month may indicate a problem in either data collection from providers and physicians, or issues related to data submission. Generally, each quarter of data should reflect about 25 percent of the expected data for the collection period.

## 5.6.2  External Issues Affecting Data Collection

When reviewing the management reports, MA organizations should consider external issues that affect data collection. The Cumulative Report is a good place to start analysis because it gauges the number of data collected and submitted over the course of the collection year. For an organization just starting operations, a steady increase in data submissions from month to month is expected. However, an MA organization that has a relatively stable population should have consistent numbers from month to month. Significant fluctuations from month to month may be cause for investigation.

The risk adjustment rules require that for each quarter MA organizations submit approximately 25 percent of the total expected data for the year for each provider type (source). Meeting or exceeding this standard (e.g., submitting monthly or weekly) helps organizations avoid "playing catch up" at the end of the collection year and helps ensure accurate risk adjustment calculation. If data are not submitted in a timely and consistent manner, there may be a data collection issue. Provider education may be necessary to remedy the problem. Also, it may be necessary to check that third party billers used by providers (especially large volume providers) are current on risk adjustment procedures and the importance of timely filing.

Exhibit Z
Page 716



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**EDITS AND REPORTS**

### 5.6.3   Internal Processes Supporting Data Submissions

The RAPS management reports can help MA organizations identify internal processes negatively affecting data collection and submission. Organizations should check to make certain that data, as it is collected, is properly translated for submission.

MA organizations should take steps to ensure they have, or have access to, the proper medical documentation to support diagnoses being submitted for risk adjustment. MA organizations are responsible for the accuracy of the data submitted to CMS. When necessary, they should obtain the proper documentation to support diagnoses and maintain an efficient system for tracking diagnoses back to medical records.

   **Example: 18**

If the appropriate amount of data are collected from providers and physicians for a month or quarter, but only a fraction of the data are submitted, there may be an over filtering issue, i.e., the plan may not be submitting all required data. Also, the plan should check for higher than normal rejection rates, possibly indicating a problem with the data submission system (bad formatting, assigning the wrong HIC, etc.).

If an organization is submitting well above the benchmark levels, it should check to see if proper filtering occurred before submission. Many plans collect data from provider types not covered by the risk adjustment instructions. Submitting data from these non-covered provider types violates the instructions and will probably cause the diagnostic-to-beneficiary ratios to be high.

### 5.7   Report Naming Conventions

Table 5N provides the naming conventions for reports placed in the submitter's mailbox.



**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

**EDITS AND REPORTS**

**TABLE 5N – REPORT NAMING CONVENTIONS**

| REPORT NAME | MAILBOX IDENTIFICATION |
|---|---|
| FERAS Response Report | RSP#9999.RSP.FERAS_RESP_<br>RSP#9999.ZIP.FERAS RESP (zip format) |
| RAPS Return File | RPT#9999.RPT.RAPS_RETURN_FLAT_<br>RPT#9999.ZIP.RAPS ERROR RPT (zip format) |
| RAPS Transaction Error Report | RPT#9999.RPT.RAPS_ERROR_RPT_<br>RPT#9999.ZIP.RAPS ERROR RPT (zip format) |
| RAPS Transaction Summary Report | RPT#9999.RPT.RAPS_SUMMARY_<br>RPT#9999.ZIP.RAPS SUMMARY (zip format) |
| RAPS Duplicate Diagnosis Cluster Report | RPT#9999.RPT.RAPS_DUPDX_RPT_<br>RPT#9999.ZIP.RAPS DUPDX RPT (zip format) |
| RAPS Monthly Plan Activity Report | RPT#9999.RPT.RAPS_MONTHLY_<br>RPT#9999.ZIP.RAPS MONTHLY (zip format) |
| RAPS Cumulative Plan Activity Report | RPT#9999.RPT.RAPS_CUMULATIVE_<br>RPT#9999.ZIP.RAPS CUMULATIVE (zip format) |
| RAPS Monthly Error Frequency Report | RPT#9999.RAPS_ERRFREQ_MNTH_<br>RPT#9999.ZIP.RAPS ERRFREQ MNTH (zip format) |
| RAPS Quarterly Error Frequency Report | RPT#9999.RAPS_ERRFREQ_QTR_<br>RPT#9999.ZIP.RAPS ERRFREQ QTR (zip format) |

## 5.8   Plan Monitoring Process

The Plan Monitoring Process allows CMS to monitor MA organization submission rates and ensure that they are submitted accurately and paid appropriately. The process is designed to assist MA organizations and to provide guidance to meet risk adjustment data collection and submission requirements. The process is administered as follows:

- CSSC contacts the identified MA organizations to address problems, discuss specific issues, offer technical assistance, and develop an action plan.

- The CMS Compliance Division may contact MA organizations that are not responsive to the risk adjustment team's assistance.



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**DIAGNOSIS CODES & RISK ADJUSTMENT**

# MODULE 6 – DIAGNOSIS CODES & RISK ADJUSTMENT

## Purpose

It is neither the intention of this module nor the purpose of this training to provide diagnostic coding training. However, this module does provide Risk Adjustment organizations with an introduction to diagnosis coding and stresses the importance of accurate diagnosis documentation and coding for risk adjustment. The module first explains the structure and layout of the official Centers for Medicare & Medicaid Services (CMS) diagnosis coding set-- the International Classification of Diseases, 9th Revision, Clinical Modification (ICD-9-CM). The module also discusses the diagnosis coding guidelines that apply to the ICD-9-CM, and how following these guidelines ensures accurate risk adjustment payments. The module demonstrates how verification of compliance with coding guidelines depends upon accurate documentation in the medical record. Finally, the module provides information to assist MA organizations in communicating with their physicians regarding proper documentation and diagnosis coding.

## Learning Objectives

At the completion of this module, participants will be able to:

- Identify the background, key terms, and organization of ICD-9-CM.
- Describe the coding update process, recent and proposed changes impacting risk adjustment, and the status of ICD-10-CM.
- Apply official coding guidelines to common Medicare diagnoses and understand the impact on associated Hierarchical Condition Category (HCC) assignment.
- Define and identify V codes and E codes in the HCC model.
- Describe the importance of ICD-9-CM and medical record documentation to risk adjustment.
- Identify resources available for additional training and policy formation regarding documentation and coding.



## 6.1   Introduction

Medicare uses ICD-9-CM as the official diagnosis code set for all lines of business including determination of risk adjustment factors. MA organizations must:

- Implement procedures to ensure that diagnoses are coming from physician, hospital inpatient, or hospital outpatient provider types.

- Submit all required ICD-9-CM diagnosis codes for each beneficiary.

- Submit required diagnoses at least once during the risk adjustment data reporting period.



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**DIAGNOSIS CODES & RISK ADJUSTMENT**

The source medical record documentation that supports each coded diagnosis must be obtainable and demonstrate adherence to official coding guidelines.

 Required diagnoses are defined as those diagnoses collected from one of the three provider types that are used in the Risk Adjustment models (i.e., CMS-HCC, ESRD, and RxHCC models), and those diagnoses required for payment simulation.

This module emphasizes physician documentation and reporting of diagnosis codes. Historically, physician reimbursement in fee-for-service is primarily based on procedures or services rather than diagnoses, and physicians are very familiar with documentation guidelines for procedures and services. Physicians generally are not as familiar with diagnosis codes and their associated documentation guidelines as they are with procedure coding rules. The Risk Adjustment models depend upon accurate diagnosis coding, which means that physicians must fully understand and comply with documentation and coding guidelines for reporting diagnoses.

### 6.1.1   Benefit to the MA Organization and Physician

Benefits to the MA organization and physician are illustrated in Table 6A.

**TABLE 6A – BENEFITS TO MA ORGANIZATIONS AND PHYSICIANS**

| **A basic understanding of ICD-9-CM process and guidelines assists MA organizations in:** |
|---|
| • Interpreting and designing management reports. |
| • Determining possible causes of ICD-9-CM errors. |
| • Communicating diagnosis-related collection issues to the provider staff. |
| Developing and maintaining information systems that meet the clinical data collection needs of the organization. |
| • Understanding clinical issues important to beneficiaries. |
| • Planning for future MA organization services. |
| **Medical record documentation and coding impact several issues important to the physician and MA organization including:** |
| • Accurate reimbursement. |
|   – ICD-9-CM codes are the basis of the Risk Adjustment models. |
|   – Accurate diagnosis codes are a result of clear, consistent, and complete documentation. |
|   – CMS may verify the accuracy of the diagnoses submitted relative to the medical record documentation. |
| • Communication among all members of the health care team. |
| • Evaluation of the care provided. |
| • Research and education. |
| • Practice patterns. |

### 6.2   Structure and Terminology of ICD-9-CM

ICD-9-CM diagnosis codes are 3- to 5-digit codes used to describe the clinical reason for a patient's treatment. They do not describe the service performed, just the patient's medical condition. For any

Exhibit Z
Page 720



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

---

**DIAGNOSIS CODES & RISK ADJUSTMENT**

---

classification system to be reliable, the application of the codes must be consistent across users. Therefore, CMS, the American Hospital Association (AHA), the American Health Information Management Association (AHIMA), and the National Center for Health Statistics (NCHS) together have developed official coding guidelines. These guidelines are available on: http://www.cdc.gov/nchs/datawh/ftpserv/ftpicd9/icdguide07.pdf. The diagnosis portion of ICD-9-CM consists of two volumes: the Disease Tabular and the Disease Index.

- **The Disease Tabular (Numeric)** is also known as Volume I of ICD-9-CM. It is a numeric listing of codes organized primarily by body system. The Disease Tabular provides much more detail than the Alphabetic Index on conditions included and excluded in the code selected. Another code in the same category may represent the diagnostic description better than the one indicated in the Disease Index.

- **The Disease Index (Alphabetic)** is also known as Volume II of ICD-9-CM. It is an index of all diseases and injuries categorized in ICD-9-CM. When a code is listed after the description, it means the reader should look up that code in the Disease Tabular section to determine if that is the most specific code to describe the diagnosis. The index is organized by main terms and subterms that further describes or specifies the main term. In general, the main term is the condition, disease, symptom, or eponym (i.e., disease named after a person), not the organ or body system involved.

## 6.2.1   Special Notes and Abbreviations

Throughout the ICD-9-CM publication, there are notes and cross references to assist the coder in arriving at the most accurate code according to official coding guidelines. Examples include:

*Excludes* notes: Informs the coder which diagnosis codes are not included in the code selected.

*Use Additional Code* notes:  Informs the coder that more than one code is needed to fully describe the condition and gives examples of common associated conditions.

*Not otherwise specified (NOS)*: Basically means "unspecified." The documentation does not provide additional information to assign a more specific code in the particular category. In many (but not all) code categories, the fourth digit "9" signifies an unspecified code.

*Not elsewhere classified (NEC)*: Also is present in ICD-9-CM. It is used when the medical record documents a condition to a level of specificity not identified by a specific ICD-9-CM code. In some cases the fifth digit "8" represents an NEC code.

## 6.2.2   Supplemental Classifications and Tables

Included in Volumes I and II are supplemental classifications and special tables that provide additional guidance in determining the most accurate code.

- **V codes** are a section of ICD-9-CM diagnosis codes that represent factors that influence health status or describe contact with health services. They are used to describe those circumstances or reasons for encounter other than for disease or injury. Selected V codes are included in the Risk Adjustment models and are described later in this module.

---

Exhibit Z
Page 721



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**DIAGNOSIS CODES & RISK ADJUSTMENT**

- **E codes** are a supplemental classification included in ICD-9-CM and are used for reporting external causes of injuries and poisonings. The Risk Adjustment models include codes E950-E959, describing suicide or self-inflicted injuries.

- **Neoplasm Table** located in the Alphabetic Index (see *Neoplasm*) lists all cancer codes by site and nature of the disease (e.g. malignant primary or secondary, benign, or unspecified behavior).

- **Table of Drugs and Chemicals** is located at the end of the Alphabetic Index. It lists drug classifications; as well as specific names of drugs; identifies the code for poisoning by that drug; and the associated E code to specify if the poisoning was accidental, an adverse effect (therapeutic use), suicide attempt, assault, or undetermined.

## 6.3    ICD-9-CM Updates

To assist users of ICD-9-CM in interpreting and clarifying the guidelines, as well as publishing updated codes and applications, the AHA Central Office on ICD-9-CM publishes quarterly official code advice in *Coding Clinic for ICD-9-CM*. The *Coding Clinic for ICD-9-CM* is the approved resource to update and clarify the use of ICD-9-CM. The small volumes (typically about 20 pages) include clarifications of previous advice and guidelines, or new information on a specific diagnosis coding practice by means of articles and a question and answer section.

The ICD-9-CM diagnosis code listing is updated on October 1 and April 1 (beginning April 2005). The ICD-9-CM Coordination and Maintenance Committee holds a public forum for requested updates and publishes a transcript of their recommendations on the CMS website and in the *Federal Register*. Revisions discussed at the April and December meetings generally become effective in October the following year. A complete listing and description of annual updates are available in *Coding Clinic for ICD-9-CM* during the fourth quarter of each year. More information on the process for updating ICD-9 codes may be found at http://www.cms.hhs.gov/ICD9ProviderDiagnosticCodes/.

    **Note:** The annual ICD-9-CM diagnosis codes update may result in updates to the list of diagnosis codes used in the Risk Adjustment models. CMS posts a list of new codes in the CMS-HCC model annually, prior to the codes taking effect on October 1.

    The ICD-9-CM coding guidelines are not updated as frequently as the list of diagnosis codes. The most recent official guideline revision is published on the National Center for Health Statistics website (http://www.cdc.gov/nchs/datawh/ftpserv/ftpicd9/icdguide07.pdf) and is effective October 2007.

### 6.3.1  Valid Diagnosis Codes Phase-in Schedule

Prior to 2009, CMS did not impose strict validity checks on diagnosis codes submitted for risk adjustment.

As described in Table 6B below, starting with 2008 payment, the list of acceptable ICD-9-CM codes for the CMS-HCC, ESRD, and RxHCC risk adjustment models for risk adjustment for any given payment year will comprise the list of published NCHS/CMS codes that are valid for the payment year.



**TABLE 6B – RISK ADJUSTMENT PHASE-IN SCHEDULE FOR
NEW LISTS OF DIAGNOSIS CODES**

| YEAR OF PAYMENT | DATE COLLECTION PERIOD | DESCRIPTION/SOURCE OF CODES |
|---|---|---|
| 2007 | 1/06 – 12/06 | The list of codes is published on our website at: http:\www.cms.hhs.gov/MedicareAdvtgSpecRateStats/06_Risk_adjustment.asp#TopOfPage, which lists acceptable codes by years. |
| 2008 | 1/07 – 12/07 | The list of codes is published on our website at: http:\www.cms.hhs.gov/MedicareAdvtgSpecRateStats/06_Risk_adjustment.asp#TopOfPage |
| 2009 | 1/08 – 12/08 | Valid diagnoses in Fiscal Years 2008, 2009 |
| 2010 | 1/09 – 12/09 | Valid diagnoses in Fiscal Years 2009, 2010 |
| 2011 | 1/10 – 12/10 | Valid diagnoses in Fiscal Years 2010, 2011 |

## 6.3.2   International Classification of Diseases 10th Revision, Clinical Modification (ICD-10-CM)

ICD-10-CM is the clinical modification of ICD-10, which was adopted by the World Health Organization in July 2000. In 1994, the NCHS began a comprehensive evaluation of ICD-10-CM to determine if it is a significant improvement over ICD-9-CM and should be implemented in the United States. The new system was tested and results were favorable. In November 2003, the National Committee on Vital and Health Statistics recommended that the Secretary of the Department of Health and Human Services (HHS) approve ICD-10-CM for all lines of business. The Secretary of HHS is currently studying this recommendation. To implement this new coding system as part of the Health Insurance Portability and Accountability Act (HIPAA), the Secretary published a notice of proposed rule-making, and requested public comment on the new policy.

## 6.4   Coding Guidelines Impacting the CMS-HCC Model

Standard ICD-9-CM coding practices support the CMS-HCC model. In all cases, the documentation must support the code selected and substantiate that the proper coding guidelines were followed. Data validation ensures that both are appropriate. Upcoding or changing diagnoses to obtain higher reimbursement without supporting source documents is fraudulent. However, thoroughly reviewing documentation and coding practices through internal auditing procedures ensure that data have been reported correctly and that appropriate reimbursement is received. This benefits both the MA organization and physician/provider. Several guidelines that impact physician documentation and reporting of diagnosis data are listed in the following sections.

## 6.4.1   Co-Existing and Related Conditions

The instructions for risk adjustment implementation refer to the official coding guidelines for ICD-9-CM, published at www.cdc.gov/nchs/icd9.htm and in the *Coding Clinic*. Physicians should code all documented conditions that co-exist at the time of the encounter/visit, and require or affect patient care treatment or management. Do not code conditions that were previously treated and no longer exist. However, history



2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide

**DIAGNOSIS CODES & RISK ADJUSTMENT**

codes (V10-V19 not in HCC model) may be used as secondary codes if the historical condition or family history has an impact on current care or influences treatment.

Co-existing conditions include chronic, ongoing conditions such as diabetes (250.XX, HCCs 15-19), congestive heart failure (428.0, HCC 80), atrial fibrillation (427.31, HCC 92), chronic obstructive and pulmonary disease (496, HCC 108). These diseases are generally managed by ongoing medication and have the potential for acute exacerbations if not treated properly, particularly if the patient is experiencing other acute conditions. It is likely that these diagnoses would be part of a general overview of the patient's health when treating co-existing conditions for all but the most minor of medical encounters.

Co-existing conditions also include ongoing conditions such as multiple sclerosis (340, HCC 72), hemiplegia (342.9X, HCC 100), rheumatoid arthritis (714.0, HCC 38) and Parkinson's disease (332.0, HCC 73). Although they may not impact every minor healthcare episode, it is likely that patients having these conditions would have their general health status evaluated within a data reporting period, and these diagnoses would be documented and reportable at that time.

 MA organizations must submit each required diagnosis at least once during a risk adjustment reporting period. Therefore, these co-existing conditions should be documented by one of the allowable provider types at least once within the data reporting period.

Another type of co-existing conditions is symptoms. Symptoms that are integral to an underlying condition should not be coded.

 **Example: 1**

Initial myocardial infarction (410.91, HCC 81) is a specific condition that, when coded, would eliminate the need to code symptoms of that condition. For example, unstable angina (411.1, HCC 82) or angina pectoris (413.9, HCC 83) are symptoms of initial myocardial infarction and various other cardiovascular conditions and would not typically be coded in addition to the underlying problem.

### 6.4.1.1  Combination Codes

Often ICD-9-CM combines two or more conditions into one code when both conditions occur together or when one is a manifestation of the other. When a combination code fully describes the encounter, the combination code is reported, not the separate component codes. However, when ICD-9-CM instructions include "Code also" notes, follow the directions to fully describe the encounter.

 **Example: 2**

Hypertension (401.9) is not in the risk adjustment model; however it may be associated with other conditions resulting in combination codes that are in the model. The documentation must specifically and directly connect the conditions using terms such as "due to" or "associated with" hypertension. The mere listing of the diseases in the same paragraph or diagnosis list does not assume the connection. For example "congestive heart failure *due to* hypertension" is coded 402.91 (hypertensive heart disease with CHF, HCC 80). Other examples include hypertensive renal disease with renal failure (403.91, HCC 131) and hypertensive heart and renal disease with heart failure and renal failure (404.93, HCC 131 & 80).

Exhibit Z
Page 724



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

---

**DIAGNOSIS CODES & RISK ADJUSTMENT**

---

**Code also combinations** - some codes have suggestions of related codes that might further explain the exact nature of the condition. While these codes are not required to be present, in many cases a second code is appropriate and should be utilized.

   **Example: 3**

Some diabetes codes carry "Code also" instructions that impact directly on the Risk Adjustment models.

- If a patient has diabetic retinopathy (250.50, HCC 18), the tabular section requires a code for also the manifestation (if known). The ICD-9-CM offers several different manifestations, such as blindness (369.00-369.9, not in the CMS-HCC model) or proliferative diabetic retinopathy (362.02, HCC 119). Here, coding the correct manifestation is essential to correct HCC assignment.

- Diabetic ulcers are one of the conditions covered under diabetes with other specified manifestations (250.80, HCC 16). If ulcers are the specific manifestation, the guidelines say to code also the site of the ulcer, such as lower extremity (707.10, HCC 149). If the specific manifestation is diabetic bone changes (731.8), that code is not in the CMS-HCC model, but should be coded as instructed in the tabular section. Again, coding the correct specific manifestation ensures appropriate HCC assignment.

## 6.4.2  Unconfirmed Diagnoses

Physicians and hospital outpatient departments shall not code diagnoses documented as "probable," "suspected," "questionable," "rule out," or "working." Rather, the condition(s) shall be coded to the highest degree of certainty known for that encounter/visit, such as symptoms, signs, abnormal test results, or other reason for the visit. CMS recognizes that this is an area where the physician-reported diagnosis and hospital inpatient diagnosis for the same encounter may disagree, particularly since hospital inpatient rules allow for coding of suspected conditions as if they were confirmed.

It also is understood that the physician record is not a static document. Positive test results and notations regarding contact with the patient for a revised plan of treatment often are added to the record several days after the patient encounter. When these addenda are made, corrections or additions to the diagnoses reported to MA organizations may be recommended, particularly if the HCC assignment is impacted.

   **Example: 4**

A physician removes a mole during an office visit and sends the specimen for pathology. The diagnoses documented are "suspicious skin lesion" (709.9, not in model) and "rule out melanoma." At this point, the diagnosis 709.9 may be submitted, but the diagnosis of melanoma may not. The pathology report is returned several days later and confirms malignant melanoma (172.9, HCC 10). The physician reviews the findings, initials the report, and documents in the record the results and notification to the patient. Since the removal of the mole was done during the office visit, the new code (172.9, melanoma) should be submitted with that date of service.

Exhibit Z
Page 725



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**DIAGNOSIS CODES & RISK ADJUSTMENT**

### 6.4.3  Clinical Specificity in Documentation

Clinical specificity involves having a diagnosis fully documented in the source medical record instead of routinely defaulting to a general term for the diagnosis. It is important to understand medical terminology in order to identify terms in the medical record that may be a more specific description of a general term. Communication with the physician is perhaps one of the key elements in improving documentation skills that allow for more specific coding. The following examples are guidelines and specific conditions selected from various chapters of ICD-9-CM (e.g., Circulatory, Respiratory, Neoplasm, etc.) that are representative of documentation and coding decisions that impact HCCs.

The first three examples involve situations in which a physician may use the most common code for all forms of a disease and conditions. Remember, this practice has had no impact in the past on physician reimbursement. With the Risk Adjustment models, physicians must be careful to code the correct forms and manifestations of diseases and conditions.

  **Example: 5**

Anemia (285.9) is the most commonly coded form of anemia in physician offices. However, there are many types of anemia. Some are in the models and some are not. If the term "neutropenia" is used to describe the anemia, it must be coded to the more specific diagnosis code 288.0 (agranulocytosis), which groups to HCC 45. "Refractory" anemia is coded 238.7 (HCC 44). It is important that physicians code these types of anemia accurately.

  **Example: 6**

Pneumonia (486) unspecified is not in the model. If the organism responsible for the pneumonia (HCC 111-112) is known or if the physician documents that the patient aspirated prior to developing pneumonia (507.0 HCC 111), the more specific code should be reported.

  **Example: 7**

**Mental disorders in the HCC models require particular attention to specific wording in documentation and coding**. Episodic mood disorders (296.XX, HCC 55) are mental diseases that include mood disturbances such as major depression (296.2X-296.3X). Physicians are encouraged to carefully document the characteristics of the mood disturbance (e.g., mania, depression, single episode, recurrent episode, circular) and use specific mental disorder terminology in the final diagnosis. The coder is cautioned to exactly code only the narrative provided by the physician in the final diagnosis and not make any further assumptions based on the patient work-up. For example, in coding depression, careful use of the ICD-9-CM index directs the coder to the correct type documented. If the physician does not document specific descriptor terms such as "major" or "recurrent", then code 311 (depression, not otherwise specified, not in the model) is used.

**Use of "history of."** In ICD-9-CM, "history of" means the patient no longer has the condition and the diagnosis often indexes to a V code not in the HCC models. A physician can make errors in one of two ways with respect to these codes. One error is to code a past condition as active. The opposite error is to code as "history of" a condition when that condition is still active. Both of these errors can impact risk adjustment.

Exhibit Z
Page 726



2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide

**DIAGNOSIS CODES & RISK ADJUSTMENT**

 **Example: 8**

The diagnosis statement "history of hip fracture" is not coded as a current hip fracture (820.8, HCC 158), but with a V code for orthopedic aftercare (V54.XX) or history of injury (V15.5), if appropriate. Neither "history of" code is in the HCC models. If a patient has a current acute condition, then the "history of" wording should not be used to describe the recent occurrence.

 **Example: 9**

The physician may actually intend to communicate that a condition is ongoing, but note the "history of" a condition. An example of this is "history of Hepatitis C" (V12.09 personal history of other infectious disease). Hepatitis C generally presents as a chronic condition (070.54, HCC 27) that is rarely fully eradicated. While assigning V12.09 is not necessarily an example of incorrect coding, it may indicate that the physician office is not coding correctly. Again, communication and clear documentation are essential to make the appropriate determination.

**Correct use of associated terms**. Some conditions are described by more than one term depending on the clinical presentation and medical terminology practices of the physician. Coders must be careful not to assign a diagnosis to conditions that are not specified by the physician and cannot be validated by the medical record.

 **Example: 10**

**Cancer coding requires detailed specificity**. Several different HCCs exist for cancer, and assigning the appropriate HCC requires closely following the cancer coding guidelines. The HCC varies depending on whether the cancer is a primary site or a secondary site. Coding guidelines state that if the malignant status is not specified, then code to the primary site, except for the following: bone, brain, diaphragm, heart, liver, lymph nodes, mediastinum, meninges, peritoneum, pleura, retro peritoneum, and spinal cord. Applying this rule assures that the correct HCC for secondary malignant neoplasm is assigned rather than an HCC for primary malignant neoplasms. [For example, bone cancer (primary) (170.9, HCC 9) vs. bone cancer (secondary) (198.5, HCC 7). Since the cancer is not specified as primary or secondary, and bone is one of the sites listed above, the correct HCC is 7.]

 Cancer codes are part of a multi-category HCC hierarchy. It is not unusual for a patient to have more than one type of cancer. However, only the most severe and costly form of cancer is recognized in the HCC models. Even if the type of cancer included in HCC 7 is of a different site or origin than any other cancer the patient has and is included in HCCs 8, 9, and 10, the HCC models drop it.

 Complete Neoplasm guidelines are included in the Resource Guide.

### 6.4.3.1   History and Physical (H&P), and Lab and Pathology Reports – Guidance

Some organizations have inquired about the use of the History and Physical (H&P), and Lab and Pathology Reports for data submission and medical record review. If an organization decides to use either as a source for justify ICD-9-CM code submission and/or subsequent medical record review, the



following guidance must be taken into account when considering the appropriate ICD-9-CM coding guidelines to be used.

### Inpatient Documentation – History and Physical (H&P) Guidance

CMS recommends submitting diagnoses and medical records documentation based on a complete inpatient medical record for a hospital inpatient stay. If an organization chooses to use H&P as stand-alone documentation for submitting ICD-9 codes or medical record documentation for validation, the following guidance applies:

- **H&P as part of the inpatient full medical record**
  - Will **not** contain reportable final/confirmed diagnoses
  - Typically contains
    - Admission symptoms and co-existing conditions as well as
    - Admission/working diagnoses, which may or may not be one of the final diagnoses for the inpatient admission

  Note that upon medical record review, discharge/final diagnoses– not the H&P alone –will be reviewed in accordance with the Inpatient ICD-9 coding guidelines

- H&P representing an independent physician visit from an inpatient stay
  If a physician submits a separate claim/encounter to the organization based on his/her evaluation of the patient as reflected on the H&P
  - H&P (face-to-face encounter) is viewed as a physician visit
  - Reportable diagnoses documented in the H&P
    - Could be used as final
    - Could be used for risk adjustment; HOWEVER,
    - The medical record documentation will be reviewed in accordance with the Outpatient ICD-9 coding guidelines

- H&P Conclusion
  The following applies for both data submission and data validation requirements
  - Risk Adjustment is based on final/confirmed diagnoses.
  - Risk adjustment diagnoses should only be submitted based on the H&P alone when there is an independent physician claim associated with the diagnosis.
  - Upon validation, if an organization submits an H&P as stand-alone documentation, the Outpatient guidelines will be applied to determine if there is a confirmed diagnosis.

### Lab and Pathology Reports

The following guidance must be taken into account when considering data or medical record submission from lab and pathology sources.
- Official Guidelines for Coding and Reporting (Section III, B. Abnormal Findings)
- "Abnormal findings (laboratory, x-ray, pathologic, and other diagnostic results) are not coded and reported unless the physician indicated their clinical significance."
- Coders should not arbitrarily assign a final ICD-9 code based solely on an abnormal finding
- Written interpretation (alone) of a tissue biopsy is not equivalent to the attending/referring physician's complete clinical assessment used to assign a diagnosis.
- If submitting risk adjustment data or medical records based on pathology, note the following:
  - Outpatient pathology facilities are unacceptable risk adjustment provider sources



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**DIAGNOSIS CODES & RISK ADJUSTMENT**

- Physician pathology (i.e., specialty code 22) is acceptable for risk adjustment. When submitting risk adjustment diagnoses or medical records based on physician specialty code 22 refer to the guidance stated in this section.

AND

- Medical records submitted as stand-alone documentation from these sources will be reviewed in accordance with the <u>Outpatient</u> guidelines and will likely result in a risk adjustment discrepancy since these source do not typically render confirmed diagnoses.

### 6.4.4 Coding to the Highest Specificity-Fourth and Fifth Digits

ICD-9-CM codes have three, four, or five digits. Diagnoses should be reported to the highest level of code available for that category. In selected cases, the fifth digit may impact whether the code is in the models, but at a different HCC level, which may impact reimbursement.

 **Example: 11**

Myocardial infarction (MI) (heart attack, 410.XX) is unspecified or subsequent episode fifth digits 0 and 2 are in HCC 82. All initial care for a new MI (from physician office to emergency room to hospital) should have the fifth digit of "1" and group to HCC 81.

 **Example: 12**

Diabetes (250.XX) codes group into HCCs 15, 16, 17, 18, or 19 depending on the fourth digit applied. The fourth digit designates manifestations or complications of diabetes such as neurological conditions, eye disorders, or diabetic ulcers.

 At a minimum, the submitted ICD-9-CM codes must be sufficiently specific to allow appropriate grouping of the diagnoses in the risk adjustment model. CMS encourages MA organizations to use the full level of specificity in submitting data to provide the most accurate coding and grouping of codes in the model.

### 6.4.5 V Codes

Health status situations that should be described by V codes are common in physician documentation. Those that impact risk adjustment include HIV status, transplant status, artificial opening status or maintenance, dialysis status or encounter, and amputation status. These V codes are used in several HCCs.

### 6.4.6 E Codes

The HCC models include codes E950-E959 describing suicide or self inflicted injuries (HCC 55, Major Depressive Disorders). Therefore, it is important that the physician documents and codes the appropriate external cause of all self-inflicted injuries and poisonings so the MA organization can report them as diagnoses appropriately.

Exhibit Z
Page 729



2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide

**DIAGNOSIS CODES & RISK ADJUSTMENT**

## 6.5    Supporting Documentation Summary

Accurate coding begins with complete documentation. Characteristics of effective documentation include quality documentation as a team effort that may require some intervention by the MA organization. Table 6C lists documentation considerations.

**TABLE 6C – DOCUMENTATION CONSIDERATIONS**

| Documentation Guidelines |
|---|
| • Reported diagnoses must be supported with medical record documentation.<br>• Medical records and codes are subject to CMS validation.<br>• Characteristics of acceptable documentation include:<br>  – Clear.<br>  – Concise.<br>  – Consistent.<br>  – Complete.<br>  – Legible. |
| **Physician Documentation and Communication Tips** |
| • Document and report co-existing diagnoses.<br>• Communicate issues regarding inadequate documentation.<br>• Adhere to proper methods for appending (late entries) or correcting inaccurate data entries.<br>  – Lab/Radiology results.<br>  – Strike through, initial, and date. Do not obliterate.<br>• Use only standard abbreviations.<br>• Identify patient and date on each page of the record. |
| **SOAP Notes** |
| • SOAP note format assists both the physician and record reviewer/coder in identifying key documentation elements. SOAP stands for:<br>  – **S**ubjective:  How the patients describe their problem or illness.<br>  – **O**bjective:  Data obtained from examinations, lab results, vital signs, etc.<br>  – **A**ssessment:  Listing of the patient's current condition and status of all chronic conditions. How the objective data relate to the patient's acute problem.<br>  – **P**lan:  Next steps in diagnosing problem further, prescriptions, consultation referrals, patient education, and recommended time to return for followup. |

## 6.6    Provider and Staff Training

Remaining current on medical record documentation and coding guidelines is important to ensure accurate risk adjustment payment. Table 6D provides examples of resources available for medical record documentation and coding guidelines.

Exhibit Z
Page 730



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**DIAGNOSIS CODES & RISK ADJUSTMENT**

TABLE 6D – DOCUMENATION AND CODING RESOURCES

| TRAINING SOURCES | DESCRIPTION |
|---|---|
| **Official Coding Guidelines on CDC Website**<br>Available at www.cdc.gov/nchs/icd9.htm | The Official ICD-9-CM Coding Guidelines are available as an Adobe .pdf file, or as a CD-ROM. The CDC site has the .pdf file for download, as well as information to order the CD-ROM from the Government Printing Office. |
| ***Coding Clinic for ICD-9-CM***<br>Available through AHA. | Published quarterly by the AHA. It is the official publication for ICD-9-CM coding guidelines and advice as designated by the AHA, AHIMA, CMS, and the NCHS. |
| **American Health Information Management Association (AHIMA)**<br>www.ahima.org | AHIMA is a professional association for health information management professionals. Members make information accessible to healthcare providers and work in the healthcare industry and in the public sector by managing, analyzing, and using data that are critical to patient care. The AHIMA Catalog online offers tools for coders such as audio seminars, books, and continuing education courses. |
| **American Academy of Professional Coders (AAPC)**<br>www.aapc.com | AAPC provides education and certification for professional medical coders. Certifications focus on physician practice (CPC) and hospital outpatient facility (CPC-H) coding. Students learn Current Procedural Terminology (CPT) Codes, diagnosis codes (ICD-9-CM), and Healthcare Common Procedure Coding System (HCPCS) while focusing on HIPAA, Office of Inspector General (OIG), and Medicare compliance. |
| **American Medical Association (AMA)**<br>www.ama-assn.org | AMA is an advocate of physician and patient rights. Coders may access the AMA Press Online Catalog to find current resources on medical record documentation and the medical record review process. |
| **American Hospital Association (AHA)**<br>www.aha.org | AHA is a national organization that serves and represents hospitals, healthcare networks, and their patients. The AHA Online Store offers coders online reference materials including ICD-9-CM, HCPCS, and testing and certification for HIPAA. |
| **Local Colleges**<br>Check local community and 4-year colleges for courses. | These provide online courses in clinical coding and guidelines. |

Exhibit Z
Page 731



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT DATA VALIDATION**

# MODULE 7 – RISK ADJUSTMENT DATA VALIDATION (MEDICAL RECORD REVIEW)

## Presentation Purpose (Slide 2)

To provide participants with an understanding of:
- The risk adjustment data validation (RADV) process AND
- CMS' approaches for:
  - Identifying risk adjustment discrepancies,
  - Estimating payment error, and
  - Conducting contract-level payment adjustments

## Presentation Objectives (Slide 3)

Define
- Purpose and objectives of risk adjustment data validation (RADV)
- New RADV policies and parameters
- RADV stages and requirements
- Documentation Dispute
- Payment adjustment implementation approach
- Appeals



| ICON KEY | |
|---|---|
| Example | ⊠ |
| Reminder | 🔑 |
| Resource | 📖 |

## 7.1    Risk Adjustment Data Validation (RADV)

## 7.1.1   RADV – Purpose, Method, and Objectives (Slide 4)

Risk adjustment data validation (RADV) occurs after the final risk adjustment data submission deadline for the MA contract payment year. The purpose of RADV is to ensure risk adjusted payment integrity and accuracy. CMS reviews medical records from hospital (inpatient and outpatient) and physician providers to validate enrollee CMS-HCCs that were assigned based on risk adjustment diagnoses submitted by MA organizations for payment. As a basic risk adjustment rule, all risk adjustment diagnosis codes submitted by MA organizations must be supported by medical record documentation.

The primary objectives of RADV are to:
- Verify enrollee CMS-HCCs used for payment
- Identify risk adjustment discrepancies
- Calculate enrollee-level payment error
- Estimate national and contract-level payment errors
- Implement contract-level payment adjustments

Exhibit Z
Page 732

Exhibit 3



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT DATA VALIDATION**

## 7.1.2   RADV - New Approaches (Slide 5)

In its *Announcement of Calendar Year (CY) 2009 Medicare Advantage (MA) Capitation Rates and Medicare Advantage and Part D Payment Policies* (available at http://www.cms.hhs.gov/MedicareAdvtgSpecRateStats/AD/list.asp#TopOfPage), CMS informed Part C sponsors of its decision to  establish payment adjustment policies based on RADV findings beginning with CY 2007 payments.

The following new approaches will be incorporated into the RADV activities beginning with CY 2007 payments:

- CMS will make contract-level payment adjustments based on statistical findings from enrollee samples. This is a change from previous years when, although statistically valid samples were selected, CMS adjusted payments only for those sampled enrollees whose risk scores were not supported by medical record review

- Medical records will not be accepted after CMS' official deadline

- A Documentation Dispute process will be available for organizations to dispute enrollee-level HCC findings

- New documentation for missing medical records will not be allowed during the Documentation Dispute process

- An Appeals process will be facilitated by the CMS Office of Hearings and will occur after the Documentation Dispute process

## 7.1.3   RADV – 2007 Parameters (Slide 6)

The 2007 RADV project parameters will be based on the following:

- Eligible contracts will include all MA Contracts, PACE, and dual demonstration organizations that were active in January 2007 (all of which received risk adjustment payments for 2007). CMS may exclude contracts (from these groups) that terminated prior to the start of the 2007 RADV process.

- Within each eligible contract a statistical enrollee sample will be selected from all eligible enrollees – defined as enrollees with at least one HCC. Eligible enrollees are identified as either "continuously enrolled" or "non-continuously enrolled". Continuously enrolled beneficiaries are those who were in the same eligible contract from January 2006 through January 2007. Non-continuously enrolled beneficiaries are those who switched between contracts and/or MA and Medicare fee-for-service (FFS) between January 2006 and January 2007. Note the non-continuously enrolled beneficiaries will not be included in the contract-level payment error estimate that will be used for contract-level payment adjustments.

- Data collection period will include dates of service that occurred from January 2006 through December 2006 for the eligible enrollee population.

Exhibit Z
Page 733



### 7.1.4   RADV – Core Concept (Slide 7)

The guidelines for risk adjustment data validation reflect the purpose and objectives described above. Beginning with CY2007 payments, the RADV functions will expand to include contract-level payment adjustments.

<u>RADV Core Concept</u> – Enrollee HCCs are assigned based on risk adjustment diagnoses that were present on FFS claims, or submitted by MA organizations via RAPS. The CMS-HCCs contribute to payment increases for enrollees. As a principal risk adjustment rule, risk adjustment diagnoses submitted for enrollees must be supported by medical record documentation and based on a face-to-face encounter. CMS uses RADV activities to confirm the presence of risk adjustment conditions (i.e., diagnoses that map to HCCs) for enrollees. Therefore, all CMS-HCCs for sampled enrollees will be reviewed and for these HCCs, CMS will review medical record records and abstract ICD-9-CM codes to confirm HCCs that contributed to enrollee payments.

### 7.1.5   RADV – Guiding Principle (Slide 8)

The risk adjustment guiding principle states that all diagnoses submitted for payment (i.e., used for HCCs) must be:

- Documented in a medical record that was based on a face-to-face health service encounter between a patient and a healthcare provider
- Coded in accordance with the *ICD-9-CM Guidelines for Coding and Reporting*
- Assigned based on dates of service within the data collection period AND
- From an acceptable RA provider type and RA physician specialty

This guiding principle is what's used as the key guideline for medical records review.

### 7.1.6   Risk Adjustment Discrepancy (Slides 9)

The primary focus of medical record review is on the HCC because any change to an enrollee's HCC profile will impact payment at the enrollee-level. For medical record review, ICD-9 codes abstracted from the medical record are mapped to HCCs. The HCCs based on medical record review are then compared to the HCCs based on submitted risk adjustment data.

Risk adjustment discrepancies are identified when the HCC(s) assigned based on risk adjustment data submitted by the MA organization differs from the HCC(s) assigned after validation. Risk adjustment discrepancies affect the beneficiary risk score because of the change in the HCC(s).

### 7.1.7   Medical Record Review Overview (Slide 10)

The RADV process involves coordination between multiple entities such as CMS, MA organizations, and CMS contractors. CMS will use a number of contractors to support the RADV efforts. These contractors will have defined roles for the RADV project, and will collaborate, and work in cooperation with CMS to achieve the overall project goals.

Exhibit Z
Page 734



The Core Project Contractors include:

- A Lead Analytic Contractor (LAC) to coordinate the overall analytic approach and process for the RADV activities. This will involve facilitating all project mechanisms to accomplish sampling, analysis reporting, estimating national and contract-level payment errors, policy and process decision tracking, and overall tracking and management of the RADV project data.

- Medical Record Review Contractors (MRRCs) to conduct the initial and second independent reviews to confirm risk adjustment discrepancies. Both MRRC processes include inter-rater reliability (IRR) reviews to ensure coding consistency and accuracy. The MRRCs use certified coders to abstract diagnosis codes and validate provider type, physician specialty, and date(s) of service.

The MRRCs will serve as CMS' primary entity responsible for communicating with the MA organizations throughout the RADV process, and limited communication will take place between the LAC and the MA contracts. The MRRC will facilitate the medical record requests, reviews, and Documentation Disputes processes (Stages 1, 2, and 4), while the LAC will facilitate the sampling and payment analysis for payment adjustments (Stages 3, and 5). Note that the LAC and the MRRCs will have shared functions for the MRR findings under Stage 3. CMS also uses other support contractors throughout the RADV process for purposes of reviewing statistical, analytic, and technical data approaches.

## 7.1.8  RADV- Process  (Slide 11)

The core RADV process begins with MA organizations and enrollee selection, and ends with a second round of payment adjustments after MA organization submission of HCC-level disputes for sampled enrollees. After the core process, an Appeals stage will be implemented by the CMS Office of Hearings. Figure 7A illustrates the overall data validation process. The RADV process stages are as follows and described in detail in this module:

☞ **STAGE 1**     **Sampling and Medical Record Request**
☞ **STAGE 2**     **Medical Record Review (MRR)**
☞ **STAGE 3**     **MRR Findings and Contract-level Payment Adjustments**
☞ **STAGE 4**     **Documentation Dispute**
☞ **STAGE 5**     **Post Documentation Dispute Payment Adjustments**
☞ **STAGE 6**     **Appeals**

Exhibit Z
Page 735



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT DATA VALIDATION**

**Figure 7A – Data Validation Process**



Exhibit Z
Page 736



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT DATA VALIDATION**

## 7.2     RADV Stages

### 7.2.1  Sampling Selection and Medical Record Request --  STAGE 1 (Slides 12-19)

#### 7.2.1.1          Sampling

Organizations and enrollees will be sampled for national and contract-specific payment error estimates. The **national** enrollee sample will be used to estimate national annual payment error. For 2007, CMS will select the national sample from the eligible January 2007 contracts (based on the RADV parameters). The sample will consist of continuously and non-continuously enrolled beneficiaries with at least one CMS-HCC.

**Contract-specific** enrollee samples will be used to estimate annual payment error at the contract level. CMS will target or randomly select contracts. The group of targeted contracts will be chosen from among MA contracts included in the MA Coding Intensity Study, which was conducted to analyze differences in risk score changes (and risk score disease component changes) over time between MA and FFS. The group of randomly selected contracts will be chosen from all active eligible contracts. Contracts selected via the targeting criteria will not be eligible for random selection. Statistical enrollee samples will be selected from among the continuously-enrolled populations within each targeted and randomly selected contract.

All active contracts will be eligible for contributing enrollees to the national sample. CMS is considering a stratified random enrollee sampling approach for the national and contract-specific samples. Note that some organizations may be requested to contribute medical records for only the national sample.

#### 7.2.1.2   Medical Record Request

Upon completion of the sampling, the MRRCs will request medical records from the selected organizations. The Medical Record Request is defined by three distinct segments: 1) medical record request; 2) medical record submission (contract response); and 3) medical record receipt.

1. The medical record request includes the initial notification of RADV selection, the enrollee list, and the official medical record request instructions.
2. Medical record submission refers to the MA organization's response to the medical record request and addresses medical record obtainment and submission requirements.
3. Medical record receipt refers to the process used by the MRRC for receiving, logging and tracking of medical records.

### Medical Record Request - Initial Contact Letter

The MRRC will send a CMS Notification Letter to the Medicare Compliance Officer (MCO) for each MA organization selected for validation. The purpose of the initial contact letter is to: 1) inform the MCO that its contract was selected for data validation; and 2) request primary and secondary points of contact (either the compliance officer or a designee) to be responsible for facilitating the medical record request process for the organization. The Compliance Officer is given approximately 5-days to respond to the initial request.



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT DATA VALIDATION**

## Medical Record Request - Enrollee List

A list of enrollees selected from each organization will be sent to the confirmed primary and secondary contact persons for the MA organization. The list will be provided to MA organizations either in advance of or in conjunction with the medical record request instructions package. The purpose of the list is to provide organizations the opportunity to easily identify the selected enrollees in their systems, and start establishing contact with the specific provider(s) of services for those enrollees. CMS does not require or store provider identification numbers as part of risk adjustment data. Therefore, the MA organization must use its data systems that can:

* Track and locate dates of service.
* Link a specific diagnosis to a specific provider.

The enrollee list is provided in an electronic spreadsheet format, which displays:

* Organization's name,
* Enrollee ID,
* Current Contract ID (H-number), and
* Previous Contract ID (H-number)—this information is furnished if the contract ID used during the data collection period differs from the current contract ID.

For each selected enrollee the following information is included in the beneficiary list:

* Coversheet ID number (A masked ID tracking number that can be found on the bottom left of each HCC coversheet)
* Enrollee Last Name
* Enrollee First Name
* Enrollee Date of Birth
* Enrollee HIC Number
* Validation HCC
* ICD-9-CM code(s) related to the validation HCC

**<u>ABOUT YOUR LISTED ENROLLEES</u>**

The enrollee list will contain a line for each enrollee's unique HCC. This means that if an enrollee has multiple different HCCs, each line for the enrollee will comprise a unique HCC and all associated risk adjustment diagnoses that were stored for that HCC. Therefore, a complete enrollee HCC profile could comprise multiple lines on the beneficiary list. Table 7A displays an example request sample beneficiary list. The information shown on the line with each beneficiary HCC reflects all ICD-9 codes stored that HCC. Each enrollee will have at least one HCC and one corresponding risk adjustment ICD-9 code(s) stored for that HCC.

The listed enrollees are those who spent at least one month in your contract during the data collection period.

* If your organization is selected for one of the contract-specific samples, your list will contain all enrollees with continuous enrollment status (i.e., continuously enrolled) who were selected for your contract-level estimate.

Exhibit Z
Page 738



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT DATA VALIDATION**

- If your organization has enrollees selected from the national sample, your list may include enrollees with continuous enrollment status and/or enrollees with non-continuous enrollment status (i.e. non-continuously enrolled).

Enrollees with non-continuous enrollment status are those who were either 1) enrolled in your contract in January 2007, but were not enrolled (in your contract) for all twelve (12) months during the data collection period, or 2) not enrolled in your contract in January 2007, but were enrolled (in your contract) for at least one month during the data collection period.

The Enrollee List will include the complete HCC and stored risk adjustment diagnosis profile for all selected enrollees. For enrollees with non-continuous enrollment status, the organization must identify, via its internal systems, whether it submitted risk adjustment diagnoses (during the data collection period) for any of the HCCs listed for these enrollees. If the organization submitted diagnoses data for at least one of the HCCs, the organization must identify providers (and date(s) of service) from which the data were collected, and request a medical record for the HCC(s).

If the organization did not submit any risk adjustment data for a non-continuously enrolled enrollee the organization must immediately notify the MRRC of this finding.

   **Example 1**

For beneficiary Joe K. Smith - HCCs 38, 80 and 16 will be validated. For HCC 38, the MA organization may rely on one of the five ICD-9 codes associated with that HCC to identify the date of service, provider, and **"one best medical record"** for review. The organization could also opt to identify a provider that rendered a diagnosis that is not on the list, but will map to HCC 38. Contracts should take advantage of whichever approach yields the most efficient results. Table 7A provides an enrollee list for the example.

**TABLE 7A – ENROLLEE LIST**

| MA Organization Name – Health Plan for People with Medicare | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Current Contract ID: H1111<br>Previous Contract ID: H0000 | | | | | | | | | | | |
| Coversheet ID # | ENROLLEE ID | LAST NAME | FIRST NAME | MI | DOB | HIC | HCC | ICD-9 CODE | ICD-9 CODE | ICD-9 CODE | ICD-9 CODE | ICD-9 CODE |
| H1111-10005-HCC38 | 6225841 | Smith | Joe | K | 09/02/1925 | 12345678A | HCC 38 | 7101 | 446 | 4460 | 4465 | 71430 |
| H1111-10005-HCC80 | | | | | | | HCC 80 | 40201 | 40491 | 416 | | |
| H1111-10005-HCC16 | | | | | | | HCC 16 | 2506 | 25062 | 2508 | 25080 | |
| H1111-10006-HCC16 | 5457845 | Johnson | James | | 8/16/1937 | 12345679A | HCC 16 | 2506 | 2508 | | | |
| H1111-10007-HCC2 | 1545154 | Mumford | Anne | A | 03/15/1933 | 12345670A | HCC 2 | 0382 | 0389 | | | |
| H1111-10007-HCC79 | | | | | | | HCC 79 | 42741 | 51883 | | | |

**Medical Record Request - Instructions and Coversheets**

An instructions package is sent to MA organizations to facilitate the request for submitting medical records. This package will at a minimum include the following:
- Detailed instructions for requesting records from providers and submitting to the MRRC
- Guidance and best practices to further assist organizations with the request process
- A list of the selected enrollees (as previously described) and their HCCs
- CMS-signed cover provider letters
- HIPAA Fact Sheet to discuss HIPAA privacy AND



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT DATA VALIDATION**

- A coversheet for each unique enrollee HCC

## 7.2.2  Medical Record Submission

MA organizations must submit medical records and all corresponding coversheets for each enrollee HCC to the MRRC. In responding to the medical record request, MA organizations must select the "one best medical record" to support the enrollee HCC.

### Medical Record Submission and Coversheets

**REQUEST MEDICAL RECORDS FROM PROVIDERS**

Organizations must request medical records from hospital inpatient, hospital outpatient, or physician providers. When requesting medical records from your providers, be sure to attach the HIPAA fact sheet, your MA organization contact, and as appropriate, the CMS-signed and sample provider letters. This will facilitate the provider's contact with your organization in the event the provider has questions with regard to the medical record request.

**When requesting medical records from providers, the organization must make every effort to limit disclosure of beneficiary health information to the minimum necessary as it pertains to the specific diagnosis(es) as rendered by the provider. This means that if the organization finds a date of service for which one provider rendered specific diagnoses then the organization should request medical record documentation from that provider for only those specific diagnoses, and the organization must not disclose of any additional health information from the enrollee HCC profile.**

**SELECT THE "ONE BEST MEDICAL RECORD" AND SUBMIT WITH COMPLETED COVERSHEET(S)**

The coversheet is where the concept of the "one best medical record" is applied. The coversheet will at a minimum provide enrollee demographic information and stored risk adjustment data (HCC and ICD-9 codes). The MA organization must select and submit the best medical record and indicate on the coversheet the provider type and date(s) of service to be reviewed for the HCC. The date(s) of service could include a range of consecutive dates if the record is from a hospital inpatient provider or one date if the record is from a hospital outpatient or physician provider.

One coversheet will be generated and provided for each HCC being validated for each selected enrollee. Each coversheet shows every risk adjustment diagnosis that was stored by CMS and generated the HCC. A hierarchy (Y/N) indicator is included on the coversheet to identify if a specific HCC is part of a hierarchy. Where the HCC is part of a hierarchy, the HCC listed on the coversheet will be that which led to the most severe manifestation for the condition based on stored risk adjustment data. Only one coversheet will be issued for the general hierarchy condition, and within that condition only the most severe manifestation based on stored diagnoses will be displayed. Note that there may be other risk adjustment data that were stored and led to less severe manifestations for a condition. Attachment A provides a sample beneficiary HCC coversheet with directions for completion.

If one enrollee has two or more different HCCs, the contract will receive a separate HCC coversheets for each unique enrollee HCC; however, ,one medical record could be used to support multiple HCCs. If you identify a medical record that supports more than one HCC selected for validation, then complete each HCC coversheet, and attach them to that one medical record. For HCCs that are part of a  hierarchy

Exhibit Z
Page 740



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT DATA VALIDATION**

(described above), the MA organization could submit a medical record for either the HCC hierarchy level listed on the coversheet, or a different level (higher or lower) within the hierarchy, but only one medical record should be submitted for the general condition.

 All coversheets must be returned regardless of whether a medical record is submitted to support the HCC. MA organizations must complete the coversheets to identify the information being submitted. Complete medical record coversheets are essential for timely medical record review.

 If an MA organization is unable to submit the required medical record(s) to support the enrollee HCC(s), it must complete the coversheet as per the instructions package prior to submitting the coversheet to the MRRC. This will inform the MRRC that no medical record could be obtained to support the HCC.



---

**Guidance for Submitting Medical Records to the MRRC**

1.  Do not submit medical records for date(s) of service that occurred outside of the data collection period.

2.  Do not submit medical records without provider signature and credentials.

3.  Submit medical records from acceptable risk adjustment providers and physician specialties only.

4.  If you select an inpatient discharge to substantiate the HCC(s), submit the entire inpatient medical record. Do not just submit parts of the record that may state the diagnosis; doing so would likely result in the record being reviewed in accordance with outpatient guidelines, which differ from inpatient depending on the type of diagnosis. The organizations should opt to submit the entire inpatient record if it's available.

5.  Several organizations choose to submit medical record documentation that reflects only the physician face-to-face portion of an inpatient record when the entire inpatient record is not available. When this is the case, complete the coversheet to reflect a "physician" provider type and the date of service in the medical record for which the physician visit occurred during the inpatient stay. Only submit the medical record page(s) for the selected physician face-to-face.

6.  In order to prevent medical record information from inadvertently being attached to the wrong coversheet(s), be sure that all coversheets are attached (e.g., rubber banded, paper clipped, or stapled) to the record. Do not clip together medical records for multiple different enrollees and enrollee HCCs.

7.  If you are submitting for multiple organizations (i.e., those with different "H" numbers), separate the records for the different organizations.

8.  Submit only one medical record per enrollee HCC being validated. Only one medical record–the first received for each HCC—will be accepted.

9.  If you are unsure whether a record substantiates an HCC, you must determine whether to submit it or wait for another record. When in doubt about the clinical documentation in a medical record and you have no viable substitute, send the medical record even if you do not believe the record supports the HCC. We may find that the record does support the HCC being validated

10. **SUBMIT ALL MEDICAL RECORDS AND COMPLETED COVERSHEETS BY THE OFFICIAL DEADLINE. MEDICAL RECORDS WILL NOT BE ACCEPTED AFTER CMS' OFFICIAL DEADLINE.**

---



**MEDICAL RECORD SUBMISSION METHODS AND SECURITY REQUIREMENTS**

Extreme caution must be utilized when sending medical records and coversheets to the MRRC because of the protected health information (PHI), and/or personal identifiable information (PII) included in these documents. Medical records may be sent via electronic media (e.g., CD or USB), fax, or hardcopy. CMS prefers electronic media whenever feasible for medical record submission. **Do not e-mail medical records to the MRRC.**

All medical record submission packets must include a manifest of its contents, and records being sent via hardcopy or electronic media must be sent in tamper-proof packaging via U.S. Postal Service (USPS) certified mail with return receipt. Electronic media files must be encrypted. Faxed medical records must be sent using secured faxing procedures outline in the Medical Record Request Instructions packet. Organizations must follow all policies defined in the Instructions packet for submitting medical records.

### 7.2.3  Medical Record Receipt by the MRRC and Reimbursement

Once medical records are selected by the organization, the records must be submitted to the MRRC for medical record review. Upon receipt, the MRRC will log medical records into a chart-tracking database on the basis of the coversheet ID on each medical record coversheet. The date the medical record was received for a given HCC will be recorded.

When the coversheet and medical record are received by the MRRC, the following intake process is initiated:

- Administrative check—confirms beneficiary demographic information, including name, HIC number, and service date within or outside of the collection period.

- Clinical check—determines whether the:
  - Record is from an appropriate provider type.
  - Pertinent components needed for coding are included in the record.
  - Record is dated and signed.

Based on the administrative and clinical checks, the MRRC may elect to contact (telephone call or email message) the MA organization to request clarification or additional information.

CMS reimburses MA organizations for each medical record submitted per beneficiary HCC; however, only one medical record per beneficiary HCC will be accepted for reimbursement. If one record supports more than one beneficiary HCC, then the contract will receive reimbursement for one record. **This rule applies regardless of the method chosen for medical record submission.** Reimbursement checks are sent by the MRRC after completion of data validation activities.

### 7.2.4. Medical Record Review    STAGE 2    (Slides 20-27)

CMS uses medical record review to validate risk adjusted payments. The process involves the review of submitted medical record documentation by a certified coder. The coders abstract all diagnosis codes –in accordance with the *ICD-9-CM Coding Guidelines*—based on the medical record documentation.



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT DATA VALIDATION**

During medical record review, the certified coder specifically checks for the following:

- The service was provided by an acceptable risk adjustment provider type and physician specialty.
- Dates of service are within the data collection period.
- A provider signature and credentials for each note.
- Acceptable documentation based on documentation guidance.
- Diagnoses supported by medical record documentation.

Proper medical record documentation is the key to accurate payment and successful data validation. The accurate assignment of ICD-9-CM diagnosis codes is based on thorough medical record documentation. Therefore, risk adjusted payment accuracy also relies on medical record documentation. Remember, beneficiary HCCs are assigned based on plan reported or FFS submitted risk adjustment diagnoses. Below are some general guidelines for medical record documentation, based on the sources of the documentation.

## General Guidelines for Hospital Inpatient Medical Record Documentation

Hospital inpatient medical records are generally considered to be the most reliable source of diagnostic coding because hospitals employ certified professional coders.

### CODING

According to the *ICD-9-CM Official Guidelines for Coding and Reporting,* for hospital inpatient stays a medical record reviewer should code the principal diagnosis and:

> ...all conditions that coexist at the time of admission, that develop subsequently, or that affect the treatment received and/or length of stay. Diagnoses that relate to an earlier episode which have no bearing on the current hospital stay are to be excluded.

The required medical record documentation should include, but is not limited to, the following:

- Face sheet
- History and physical exam
- Physician orders
- Progress notes
- Operative and pathology reports
- Consultation reports
- Diagnostic (radiology, cardiology, etc.) testing reports
- Discharge summary.

## General Guidelines for Hospital Outpatient and Physician Medical Record Documentation

Hospital outpatient and physician office medical records should include, but are not limited to, the following:

- Face sheet
- History and physical exam

---

7-13



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT DATA VALIDATION**

- Physician orders
- Progress notes
- Diagnostic reports (to support documentation)
- Consultation reports



Submit all relevant medical record components needed to validate the date of service, beneficiary, the HCC, and ICD-9 code selected. When you submit medical record documentation to support only the physician face-to-face visit that occurred during an inpatient stay, the same medical components are needed; however, the medical record documentation will be reviewed in accordance with *Diagnostic Coding and Reporting Guidelines for Outpatient Services*.

Only services that occurred on the date of service are reviewed. The overall guidelines for medical record documentation from hospital outpatient sites and physician offices are:

- A coder can determine from the documentation that an evaluation of the patient was performed by a physician or an acceptable physician extender (e.g., physician assistant, nurse practitioner).

- An ICD-9-CM code can be assigned on the basis of the evaluation and clinical findings/treatment.

- Physician signature, physician credentials and date entries are present.

**CODING**

Per the *ICD-9-CM Official Guidelines for Coding and Reporting* (October 1, 2003):

> Code all documented conditions that coexist at time of the encounter/visit, and require or affect patient care treatment or management. Do not code conditions that were previously treated and no longer exist. However, history codes (V10-V19) may be used as secondary codes if the historical condition or family history has an impact on current care or influences treatment.

Per *Section IV Diagnostic Coding and Reporting Guidelines for Outpatient Services,* Part C of the *ICD-9-CM Official Guidelines for Coding and Reporting* (October 1, 2003):

> For accurate reporting of ICD-9-CM diagnosis codes, the documentation should describe the patient's condition, using terminology which includes specific diagnoses as well as symptoms, problems, or reasons for the encounter. There are ICD-9-CM codes to describe all of these.



*"Probable," "suspected," "questionable," "rule out," or "working" diagnoses cannot be reported to CMS as valid diagnoses by a physician.*

In some cases, additional guidance is needed when relying on certain types of hospital outpatient and physician office medical record documentation. (For additional information, see the *Guidance for Problem Lists*, *Guidance for Radiology Reports*, and *Guidance for Nursing Home Resident Medical Records* sections of this module.)

Exhibit Z
Page 745



### 7.2.4.1    Unacceptable Documentation

Several sources of medical records and types of documentation are **not acceptable** for risk adjustment data validation.

**Unacceptable Sources of Medical Records**

- Skilled nursing facility (SNF) (See *Additional Guidance*)
- Diagnostic Radiology
- Freestanding ambulatory surgical center (ASC)
- Alternative data sources (e.g., pharmacy)
- Unacceptable physician extenders (e.g., nutritionist)
- Durable medical equipment (DME)

**Unacceptable Types of Medical Record Documentation**

- Superbill
- Physician-signed attestation
- A list of patient conditions
- A diagnostic report that has not been interpreted
- Any documentation for dates of service outside the data collection period

**Unacceptable Types of Diagnoses (outpatient hospital and physician settings)**

- Probable
- Suspected
- Questionable
- Rule out
- Working

For additional information about unacceptable types of risk adjustment diagnoses, see Module 5 of the Participant's Guide.

### 7.2.4.2    Physician Signatures, Physician Credentials, and Dates of Service

As stated in CMS' 2008 Call Letter (available on the CMS web site at
http://www.cms.hhs.gov/PrescriptionDrugCovContra/Downloads/CallLetter.pdf):

> For purposes of risk adjustment data submission and validation, the MA organizations must ensure that the provider of service for face-to-face encounters is appropriately identified on medical records via their signature and physician specialty credentials. (Examples of acceptable physician signatures are: handwritten signature or initials; signature stamp that complies with state regulations; and electronic signature with authentication by the respective provider.) This means that the credentials for the provider of services must be somewhere on the medical record—either next to the provider's signature or pre-printed with the provider's name on the group practice's stationery. If the provider of services is not listed on the stationery, then the credentials must be part of the signature for that provider. In these instances, the coders are able to determine that the beneficiary was evaluated by a physician or an acceptable physician

Exhibit Z
Page 746



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT DATA VALIDATION**

specialty. (For additional information on acceptable physician specialties, see the above section titled *Filtering for Acceptable Provider Types and Physician Specialties*.)

We have identified medical records where it is unclear if the beneficiary is actually evaluated by a physician, physician extender, or other. In several cases, we have found encounters that are documented on physician's stationery but appear to be signed by a non-physician provider. For example, a medical record appears on group stationery for a given date of service. The medical record is signed but the provider's name and credentials are not furnished on the stationery. Thus, the coders are unable to determine whether the beneficiary was evaluated by a physician, medical student, nurse practitioner, registered nurse, or other provider. This type of medical record documentation is incomplete and unacceptable for risk adjustment and, therefore, will be counted as a risk adjustment discrepancy.

Thus, all dates of service that are identified for review must be signed (with credentials) and dated by the physician or an appropriate physician extender (e.g., nurse practitioner). The physician must authenticate each note for which services were provided. Acceptable physician authentication comes in the forms of handwritten signatures, signature stamps, and electronic signature. Signature stamps must comply with state regulations for authentication. For example, some states may require provider initials in conjunction with the stamped signature.

If electronic signatures are used as a form of authentication, the system must authenticate the signature at the end of each note. **Some examples of acceptable electronic signatures are: "Electronically signed by," "Authenticated by," "Approved by," "Completed by," "Finalized by," or "Validated by," and include the practitioner's name and credentials and the date signed.**

 *Medical records will be reviewed if there is dated medical record documentation (e.g., handwritten or transcribed consultation report, discharge summary) with a physician signature and credentials.*

 *A medical record that lacks a date or physician signature and credentials is invalid and will not be reviewed.*

Tables 7B and 7C identify types of acceptable and unacceptable physician signatures and credentials.

**TABLE 7B – TYPES OF ACCEPTABLE PHYSICIAN SIGNATURES AND CREDENTIALS**

| TYPE | ACCEPTABLE |
|---|---|
| • Hand-written signature or initials, including credentials | • Mary C. Smith, MD; or MCS, MD |
| • Signature stamp, including credentials | • Must comply with state regulations for signature stamp authorization |
| • Electronic signature, including credentials | • Requires authentication by the responsible provider (for example but not limited to "Approved by," "Signed by," "Electronically signed by") |
| | • Must be password protected and used exclusively by the individual physician |

Exhibit Z
Page 747



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT DATA VALIDATION**

**TABLE 7C – TYPES OF UNACCEPTABLE PHYSICIAN SIGNATURES AND CREDENTIALS**

| TYPE | UNACCEPTABLE unless… |
|---|---|
| • Typed name | • Authenticated by the provider |
| • Non-physician or non-physician extender (e.g., medical student) | • Co-signed by acceptable physician |
| • Provider of services' signature without credentials | • Name is linked to provider credentials or name on physician stationery |

### 7.2.4.3    Additional Guidance

To further assist MA organizations in determining the "one best medical record", below is guidance on radiology reports, problem lists, nursing home resident medical records. Information about medical record documentation resources is also furnished.

---

**Guidance for Nursing Home Resident Medical Records**

Although CMS does not accept risk adjustment data from nursing home facilities, some beneficiaries who reside in a nursing home will have a nursing home medical record as the only source to support their diagnostic data (i.e., there is no other medical record that documents the diagnosis submitted for risk adjusted payment; the nursing home record is the record of last resort). Only in certain circumstances will CMS accept nursing home medical records for purposes of data validation. We will accept a medical record from a nursing home providing it is the only medical record for the enrollee that documents the diagnosis submitted for risk adjustment and:
1. The provider's encounter must have been face-to-face with the beneficiary;
2. The clinical provider rendering the services must be an acceptable physician specialty for risk adjustment;
3. The medical record must clearly document the provider's signature and  credentials; and
4. The beneficiary must be identified in the Minimum Data Set (MDS) as a long-term institutional resident.

---

**Guidance for Problem Lists**

Although the term "problem list" is commonly used with regard to ambulatory medical record documentation, a universal definition does not exist. The problem list is generally used by a coder to gain an overall clinical picture of a patient's condition(s). Problem lists are usually supported by other medical record documentation such as SOAP notes (subjective, objective, assessment, plan), progress notes, consultation notes, and diagnostic reports.

For CMS' risk adjustment data validation purposes, an acceptable problem list must be comprehensive and show evaluation and treatment for each condition that relates to an ICD-9 code on the date of service, and it must be signed and dated by the physician or physician extender.

---

7-17



**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

**RISK ADJUSTMENT DATA VALIDATION**

---

**Inpatient Documentation – History and Physical (H&P) Guidance**
As previously mentioned CMS recommends submitting the complete inpatient medical record for a hospital inpatient stay. Some organizations have inquired about the use of the H&P as stand-alone documentation when submitting risk adjustment and medical records. The following guidance must be taken into account if organizations are considering these options.

- H&P submitted as part of the complete inpatient medical record
  - Will **not** contain reportable final/confirmed diagnoses
    - Typically contains
    - Admission symptoms and co-existing conditions as well as
    - Admission/working diagnoses, which may or may not be one of the final diagnoses for the inpatient admission
  Note that discharge/final diagnoses– not the H&P alone –will be reviewed in accordance with the Inpatient ICD-9 coding guidelines.

- H&P submitted as an independent physician visit from an inpatient stay
  If a physician submits a separate claim/encounter based on his/her evaluation of the patient as reflected on the H&P
  - H&P (face-to-face encounter) is viewed as a physician visit
  - Reportable diagnoses documented in the H&P
    - Could be used as final
    - Could be used for risk adjustment; HOWEVER,
    - The medical record documentation will be reviewed in accordance with the Outpatient ICD-9 coding guidelines
- H&P Conclusion
  - Risk Adjustment is based on final/confirmed diagnoses.
  - Risk adjustment diagnoses should only be submitted based H&P alone when there is an independent physician claim associated with the diagnosis.
  - Upon validation, if an organization submits the H&P as stand-alone documentation, the Outpatient guidelines will be applied to determine if there is a confirmed diagnosis.

---



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT DATA VALIDATION**

---

**Lab and Pathology Reports – Guidance**

Some organizations have inquired about the use of Lab and Pathology Reports for data submission and medical record review. The following guidance must be taken into account when considering data or medical record submission from these sources.

- Official Guidelines for Coding and Reporting (Section III, B. Abnormal Findings)
- "Abnormal findings (laboratory, x-ray, pathologic, and other diagnostic results) are not coded and reported unless the physician indicated their clinical significance."
- Coders should not arbitrarily assign a final ICD-9 code based solely on an abnormal finding.
- Written interpretation (alone) of a tissue biopsy is not equivalent to the attending/referring physician's complete clinical assessment used to assign a diagnosis.
- If submitting risk adjustment data or medical records based on pathology, note the following:
  - Outpatient pathology facilities are unacceptable risk adjustment provider sources.
  - Physician pathology (i.e., specialty code 22) is acceptable for risk adjustment. When submitting risk adjustment diagnoses for data submission or as a stand-alone medical record for RADV refer to the guidance stated in this section. AND
  - Medical records submitted as stand-alone documentation from these sources will be reviewed in accordance with the <u>Outpatient</u> guidelines, and will likely result in a risk adjustment discrepancy since these sources do not typically render confirmed diagnoses.

---

**Medical Record Documentation Resources**

- *ICD-9-CM Official Guidelines for Coding and Reporting*, October 1, 2003 (Section IV is specific to ambulatory coding), http://www.cdc.gov/nchs/data/icd9/icdguide.pdf
- *ICD-9 Coding Clinic Guidelines*
- *CMS 2004 Physicians and Medicare Advantage Risk Adjustment CD*
- American Health Information Management Association, http://www.ahima.org/
- American Medical Association, http://www.ama-assn.org/
- *Bates Guide to the Physical Examination and History Taking*, 7th Edition, Chapter 21 (The Patient's Record)
- *Fundamentals of Clinical Practice*, Mengel, Holleman, and Fields (Eds.), Kluwer Academic/Plenum Publishers, Chapter 12 (Record Keeping and Presentation)

---

## 7.2.4.4    Risk Adjustment Discrepancies

As previously stated, a risk adjustment discrepancy occurs when the enrollee HCC(s) assigned after medical record review differs from the enrollee HCC(s) assigned based on submitted risk adjustment data. To give a general understanding of the types of discrepancies that may be identified, the following descriptions are provided:

- Invalid
  - The medical record documentation submitted for review is from an unacceptable provider type and physician specialty for risk adjustment (e.g., SNF).
  - The date of service (visit date) for the medical record documentation submitted does not fall within the risk adjustment data collection period.



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT DATA VALIDATION**

- The medical record is missing provider signature and credentials.

- Missing
  - Incomplete—an ICD-9 diagnosis code cannot be assigned as per ICD-9 Coding Clinic Guidelines for the date of service if the documentation is insufficient or incomplete (i.e., the record is missing components that are required to code in accordance with ICD-9 Coding Clinic Guidelines).
  - Never sent—no medical record documentation was received for a beneficiary HCC selected for data validation.

- Coding Discrepancies
  - The ICD-9 code abstracted from the medical record does not match the risk adjustment diagnosis code at the 3rd, 4th, or 5th digit level.

Some risk adjustment discrepancy examples are provided below.

### ☒ Example 2
Risk Adjustment Discrepancy – Example (Non-Hierarchical CMS-HCC)

Reported Diagnosis Data:      0031 Septicemia Shock (HCC2)
Data Validation Findings:      HCC2 was not supported by the submitted medical record

The CMS-HCC Community Factor for HCC2 is .887. The submitted medical record documentation was reviewed and the abstracted diagnoses **did not** support HCC2. This finding results in a risk adjustment discrepancy because the enrollee HCC was not supported; thus, the associated factor should not be included in the enrollee's risk score. The enrollee's corrected (MRR) risk score will not reflect .887 for HCC2.

### ☒ Example 3
Risk Adjustment Discrepancy – Example (Hierarchy CMS-HCC)

Reported Diagnosis Data:      4824 Staphylococcal Pneumonia (HCC111)
Data Validation Findings:      4823 Streptococcal Pneumonia (HCC112)

The medical record documentation supports the code 482.3 streptococcal pneumonia, not 482.4 staphylococcal pneumonia. The CMS-HCC Community Factor associated with HCC 111 is .761. The factor associated with HCC112 (the final HCC) is .233. This will result in a risk adjustment discrepancy finding because the enrollee HCC changed levels within the hierarchy. The enrollee's corrected (MRR) risk score will reflect a change from .761 (HCC111) to .233 (HCC112) based on this MRR finding.

All risk adjustment discrepancies identified by the initial MRRC are referred to a second independent MRRC for confirmation. Each independent MRRC implements an inter-rater reliability (IRR) process to ensure coding consistency and accuracy across coders. Risk adjustment discrepancies that are confirmed by both independent MRRCs will contribute to the payment error estimate and resulting contract-level payment adjustment for your organizations. (See *Stage 3* of this module.)



**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

**RISK ADJUSTMENT DATA VALIDATION**

## 7.3 MRR Findings and Contract-Level Payment Adjustments    STAGE 3 (Slide 28)

Once all enrollee-level HCC findings are confirmed through two independent levels of review, CMS will provide each selected organization with the RADV findings. This communication will be sent as a report to the selected organizations and include 1) detailed enrollee information relating to the enrollee HCC discrepancies, 2) the contract-level payment adjustment amount (in absolute dollars) to be made, 3) an approximate timeframe for the payment adjustment, and 4) the requirements for the Documentation Dispute process if your organization decides to dispute enrollee HCC discrepant findings.

## 7.4 Documentation Disputes  STAGE 4    (Slide 29)

A Documentation Dispute process will be implemented to address organization disputes regarding interpretation of the ICD-9-CM guidelines used by the MRRCs to assigned ICD-9 codes. The process will be facilitated by the MRRC and has some similarities to CMS' prior RADV Appeals processes where:

- Only enrollee HCC-level discrepancy findings will be allowed for dispute.

- MA organizations may dispute the application of the ICD-9-CM guidelines for the particular medical record date of service submitted during the Medical Record Request Stage (Stage 1).

- MA organizations will be given 60 days to submit a documentation dispute.

- An expert coding panel reviews every dispute. The panel is typically comprised of a senior medical reviewer, a senior coder, and a physician. The physician assesses whether any clinical factors may change the outcome of the appeals determination.

The Documentation Dispute process will not be used to address missing medical records of any kind, or additional medical record documentation of any kind. This means that MA organizations cannot use Documentation Dispute as a forum for first time submission of medical records and any additional medical record documentation to support their dispute(s). To clarify, the following information will not be accepted for Documentation Disputes:

- Medical records that were originally missing (i.e., the organization submitted no medical record) for an HCC, which resulted in Risk Adjustment Discrepancy Type = "Missing (never sent)".

- Medical records that resulted in a Risk Adjustment Discrepancy Type = "Missing (invalid)".

- Additional medical record documentation for HCCs that resulted in a Risk Adjustment Discrepancy Type = "Coding Discrepancy". The organization must submit the dispute based solely on the information that was originally submitted for the HCC during the Medical Record Request Stage.

- Additional medical record documentation for HCCs that were not originally assigned for 2007 payments for an enrollee.

When submitting a dispute, an MA organization must offer a clearly documented reason for disagreement with the MRRC regarding the ICD-9 code assignment and a different interpretation of the *ICD-9-CM Coding Guidelines*.



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT DATA VALIDATION**

## 7.5     Post Documentation Dispute -- Payment Adjustment  STAGE 5  (Slide 30)

The enrollee-level findings will be re-calculated based on findings from the Documentation Dispute process (Stage 4) and contract-level level payment error will be re-estimated. Additional payment adjustments will be made based on these findings. Organization will be notified of the revised payment error estimate and resulting payment adjustment.

## 7.6     Appeals  STAGE 6 (Slide 31)

**This concludes the CORE Stages of the RADV Process.  STAGES 1- 6**

Following the core RADV process stages 1-5, CMS will implement a formal Appeals process, which will be facilitated by the CMS Office of Hearings. This process and the requirements will be announced prior to the Appeals process being implemented.

## 7.7     Recommendations & Lessons Learned to Date (Slides 32-33)

Recommendations and lessons learned about the medical record request process that may assist contracts in planning and implementing their contract's activities include the following:

- **CMS-related Validation Activities**
  - Adhere to the submission deadline and plan accordingly.
  - Organize an internal validation team (e.g., Medicare compliance officer, information technology, quality, compliance, coding) to conduct internal validation activities.
  - Involve in-house quality assurance staff/medical record reviewers/medical director to identify the "one best medical record."
  - Query your data based on the beneficiary list that is furnished by the MRRC.
  - Establish communications with the providers prior to sending the medical record request.
  - Identify a contact person at the physician's office.
  - Send complete request information to providers.
  - Use newsletters and CMS training tools to inform physicians about risk adjustment.
  - Determine whether providers require payment in advance of sending medical records.
  - Follow up with the physician's office after the medical record request is sent.
  - Plan accordingly to ensure that you receive the medical records you need. It may require more effort to obtain medical records from—
    - Specialists
    - Non-contracted providers
    - Hospital outpatient or primary care provider settings.
  - Ensure that medical record documentation is signed (with physician credentials) and dated by an appropriate provider type and physician specialty.
  - Ensure that medical record documentation is complete.
  - Submit medical records on an on-going basis as you receive them from providers.

- **Conduct Ongoing Independent (non-CMS) Data Validation Activities**
MA organizations may choose to undertake data validation activities independent of CMS' efforts. When this is the case, CMS encourages organizations to clearly emphasize to their providers that the activity is **not** a CMS-sponsored activity. As a courtesy to providers, we ask that MA organizations limit to distribution of enrollee confidential health information to the minimum information necessary to accomplish the purpose of their activity. This means that an organization should not provide enrollee

Exhibit Z
Page 753



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT DATA VALIDATION**

diagnoses data to providers who were not responsible for rendering specific treatment for enrollees. For example, if a provider submitted diabetes on a claim for an enrollee, the MA organization should only disclose diabetes to that provider and no other diagnoses as determined by other providers. In other words, the organization should not provide universal lists of enrollee diagnoses to multiple providers. Doing so, may raise concerns about the organization's compliance with the Privacy Rules.

If undertaking independent data validation activities, below are some additional considerations:
* Conduct ongoing internal processes to confirm the accuracy of risk adjustment diagnoses from providers.
* Organize an internal validation team (e.g., Medicare compliance officer, information technology, quality, compliance, coding) to conduct internal validation activities.
* Use newsletters and CMS training tools to inform physicians about risk adjustment.

## 7.8    Technical Assistance

To improve the quality of risk adjustment data, CMS has technical assistance contractors available for any MA organization that needs help with CMS data validation processes, data completeness and accuracy, documentation requirements, and areas of concern identified by medical record review. Technical assistance may include site visits and teleconferences. To discuss your technical assistance needs, please contact the appropriate CMS staff member as identified in the *Current Validation Activitie*s section below.

## 7.9    CMS Data Validation Team Contacts (Slide 34)

Table 7D lists the CMS staff for the RADV project.

### TABLE 7D – CMS STAFF

| CMS CONTACT | CONTACT INFORMATION | ROLE |
|---|---|---|
| Jennifer Harlow | jennifer.harlow@cms.hhs.gov | Director, Division of Payment Validation |
| Lateefah Hughes | lateefah.hughes@cms.hhs.gov | RADV Project Team Lead Project Officer - LAC |
| Mary Guy | mary.guy@cms.hhs.gov | Project Officer- MRRC |

## 7.10   Next Steps

As risk adjustment data validation activities continue, CMS will consider other techniques for monitoring risk adjustment data submissions to improve the sampling selection and receipt of quality medical record documentation.

Exhibit Z
Page 754

This page intentionally left blank.

Exhibit Z
Page 755

## Attachment A –Medical Record Request Coversheet

**INSTRUCTIONS**: When completing this coversheet, please refer to the *Instructions Packet* that was mailed with your medical record request packet. Complete all applicable sections.

| MA Organization Name: | |
|---|---|
| 2008 Contract ID (E- or H-Number): | 2006 Contract ID (E- or H-number): |

**Name of Health Plan**
**Designee Submitting Coversheet: _____**
**Date: __ __/__ __/2008**

### I. ENROLLEE DEMOGRAPHIC INFORMATION—Provide corrected information as necessary.

| PRE-POPULATED INFORMATION | CORRECTED INFORMATION |
|---|---|
| HIC #: | |
| Last Name: | |
| First Name: | |
| DOB: | |

### II. STORED RISK ADJUSTMENT (RA) DATA[1]

| ENROLLEE CMS-HCC FOR VALIDATION | ICD-9-CM CODE(S) SUBMITTED FOR PAYMENT THAT MAP TO THE ENROLLEE CMS-HCC FOR VALIDATION | | | | | | | | CMS-HCC HIERARCHY (YES/NO)? |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

### III. MEDICAL RECORD NON-SUBMISSION—Prior to completing this section, please thoroughly review the footnote that appears at the bottom of this coversheet regarding hierarchies.

☐ Check here if not submitting a medical record.

### IV. MEDICAL RECORD SUBMISSION—If submitting a medical record, complete this section.

| SERVICE DATES[2] | | PROVIDER TYPE (CHECK ONLY ONE BOX) |
|---|---|---|
| START (MM/DD/YYYY) | END (MM/DD/YYYY) | |
| __ __/ __ __/ 2006 | __ __/ __ __/ 2006 | ☐ Hospital Inpatient<br>☐ Hospital Outpatient<br>☐ Physician/Specialist |

[1] In Section II we provide:
- Enrollee CMS-HCC for Validation—this is the CMS-HCC that was assigned based on the stored RA data;
- ICD-9-CM Code(s) Submitted for Payment that Map to the Enrollee CMS-HCC for Validation—displays the ICD-9-CM code(s) used to assign the "Enrollee CMS-HCC for Validation"; and
- CMS-HCC Hierarchy (YES/NO)?—identifies whether the "Enrollee CMS-HCC for Validation" is part of a hierarchy. If you cannot provide supporting medical record documentation for the Enrollee CMS-HCC specified, you may submit medical record documentation with this coversheet that supports another CMS-HCC within the same hierarchy. The *Instructions Packet* provides a full list of CMS-HCCs, CMS-HCC hierarchies, and the ICD-9-CM codes.

  Note CMS-HCCs that are not supported by medical record documentation will result in a payment adjustment.

[2] Applicable service dates must have occurred between January 1, 2006 and December 31, 2006.



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**VERIFYING RISK SCORES**

# MODULE 8– VERIFYING RISK SCORES

## Purpose (Slide 2)

The risk score calculation is based on data captured from a variety of systems. To ensure that accurate payments are made, Medicare Advantage (MA) organizations may verify the components of the risk score calculation throughout the year. This module is designed to explain the systems involved in the risk score calculations and introduce MA organizations to a variety of verification tools available to them.

## Learning Objectives (Slide 3)

At the completion of this module, participants will:

- Understand the systems and processes used to calculate the risk scores.
- Determine how the organization can use risk adjustment processing and management reports to ensure the accuracy of payment.
- Identify the components and uses of the Non-Drug and Drug Monthly Membership Reports (MMRs).
- Explain the Part C Risk Adjustment and New RXHCC Model Output Report (MOR).



| ICON KEY | |
|---|---|
| Example | ⊠ |
| Reminder | 🗝 |
| Resource | 📖 |

## 8.1   Calculating Risk Scores (Slides 5-7)

The risk score used in calculating payments under the Centers for Medicare & Medicaid Services (CMS)-HCC model includes demographics as part of the risk model as well as different disease groups or HCCs. The risk score calculation gathers the critical data from a variety of systems, including risk adjustment data from the Risk Adjustment Processing System (RAPS) database, Fee-For-Service (FFS) information from the National Medicare Utilization Database (NMUD), and demographic data captured from the Common Tables.

The risk score calculation considers the following:

- Demographics
- Disease groups
- Disease interactions
- Disease hierarchies
- Disabled indicators
- Residence in a long-term care institution
- End-Stage Renal Disease (ESRD) Status



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**VERIFYING RISK SCORES**

Figure 8A illustrates the flow of data used to calculate the risk score.

**Figure 8A - Risk Score Calculation Process**



Exhibit Z
Page 758



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**VERIFYING RISK SCORES**

Table 8A describes the eight steps in the risk score calculation.

**TABLE 8A - RISK SCORE CALCULATION STEPS**

| STEP | DESCRIPTION |
|------|-------------|
| **1**<br>**Define Cohort** | Each year CMS defines a cohort of beneficiaries for whom risk scores will be calculated and used for making payments beginning the following January. Typically, CMS calculates scores for all Medicare beneficiaries. |
| **2**<br>**Obtain Beneficiary Specific Information** | For this cohort, CMS obtains beneficiary-specific information from Medicare's enrollment databases. Beneficiary information includes the months of enrollment in Part A and Part B, age, sex, original reason for Medicare entitlement, etc. for each beneficiary in the cohort. Medicaid information is obtained from the third party payor file. In addition, plan-submitted Medicaid status information is included and beneficiaries with an ESRD flag are identified. CMS ensures that all Health Insurance Claim (HIC) numbers associated with each individual in the file have been identified. CMS uses all of this information to create a beneficiary demographic input file. |
| **3**<br>**Extract Long-term Institutional Information from MDS** | Next, for this cohort, CMS extracts assessments from the Minimum Data Set (MDS). CMS identifies the beneficiaries who have resided in a long-term institution for 90 days or more and classifies these individuals as long-term institutional beneficiaries. CMS passes beneficiary long-term institutional file to the RAS system. |
| **4**<br>**Obtain Diagnosis Information** | Next, CMS obtains all diagnostic information from Medicare data files for the cohort. These data include all diagnoses for the data collection period from the three types of data sources: physician services, hospital outpatient, and hospital inpatient. These diagnoses come from the RAPS database as well as Medicare fee-for-service files. From these data, CMS creates a beneficiary diagnosis input file. |
| **5**<br>**Run the Model** | The beneficiary demographic and beneficiary diagnosis input files are used to run the CMS-HCC and ESRD models and the Prescription Drug HCC (RxHCC) model. The ESRD model is run only on those beneficiaries with ESRD flags from the Common Tables. Each model determines a new enrollee factor for individuals who had fewer than 12 months of Part B enrollment during the data collection period. The model filters out diagnoses that do not correlate, such as ovarian cancer in a male patient. For individuals with 12 months of Part B enrollment, the software produces two risk scores: one based on the community model and one on the institutional model. In addition, for individuals with ESRD, the ESRD model will create additional risk scores appropriate to that model. The software also shows which HCC group (as well as which demographics, interactions, etc.) is associated with the risk scores. Only the most severe disease classification within a hierarchy is shown in the output. Based on this information, an output file is created and sent to the payment system. |



**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

**VERIFYING RISK SCORES**

**TABLE 8A – RISK SCORE CALCULATION STEPS (CONTINUED)**

| STEP | DESCRIPTION |
|------|-------------|
| **6**<br>**Send Model Output to MARx** | The output from the CMS-HCC model is provided to MARx for use in making payments to plans. In addition, the model output serves as the basis for the MMR reports provided to plans and the risk adjustment MOR. |
| **7**<br>**Apply Additional Payment Factors** | Plan-level instructions are provided to MARx to determine which factors should be used in actually making payments. |
| **8**<br>**Calculate Payment** | MARx identifies individuals enrolled in an organization for a particular month. Then it accesses the risk factor file to retrieve the appropriate risk factor for each individual. MARx uses the individual's state and county code to determine the correct county capitation rate and then multiplies the risk factor by that rate. After calculating the correct demographic payment for the same individual, MARx then calculates the correct payment by blending the appropriate proportion of risk and demographic payments. Then the demographic and risk adjusted amounts are totaled. |

**Note**: For each risk adjustment model run, the process is repeated, updating the data used for the model to include new diagnoses received for the data collection period, as well as changes in any of the demographic factors. During final reconciliation, long-term institutional status is determined for each month during the payment year, and ESRD status is reconciled to obtain the most precise month-by-month status.

## 8.2    Risk Score Verification Tools (Slide 8)

CMS offers a variety of tools that MA organizations can use at various stages in the risk adjustment process to ensure that the risk score reported by CMS is in close alignment with the score that the organization expects to receive. This section of the training module describes each of the tools, identifies the method of access and timeframe, and provides information on how an organization can use the tool to increase the accuracy of payment projections.

The verification tools include:

- RAPS Return File/RAPS Transaction Error Report
- RAPS Monthly and Cumulative Plan Activity Reports
- SAS CMS-HCC Model Program
- MMR
- Part C MOR (Non-Drug) and the new RAS RxHCC MOR

Information on the tools are illustrated in Table 8B

Exhibit Z
Page 760



**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

**VERIFYING RISK SCORES**

**TABLE 8B – RISK SCORE VERIFICATION TOOLS**

| REPORT NAME | ACCESS | AVAILABLE |
|---|---|---|
| RAPS Return File/RAPS Transaction Error Report | RAPS Mailbox<br>RPT####.RPT.RAPS_RETURN_FLAT<br>RPT#####.ZIP.RAPS RETURN FLAT (zip format)<br>RPT#####.RPT.RAPS_ERROR_RPT<br>RPT#####.ZIP.RAPS ERROR RPT (zip format) | Next business day following data submission |
| RAPS Monthly and Cumulative Plan Activity Reports | RAPS Mailbox<br>RPT####.RPT.RAPS_MONTHLY<br>RPT#####.ZIP.RAPS MONTHLY (zip format)<br>RPT####.RPT.RAPS_CUMULATIVE<br>RPT#####.ZIP.RAPS CUMULATIVE (aip format) | Second business day of the month |
| Risk Adjustment SAS Programs | http://cms.hhs.gov/MedicareAdvtgSpecRateStats<br>*Ratebooks & Supporting Data, 2004 Mar-Dec, Downloads* | 2003-present |
| MMR Non-Drug and Drug Reports | Through MARx | Refer to the 2006 MARx Monthly Schedule |
| MOR HCC Part C and RAS RxHCC MOR | Through MARx | Refer to the 2006 MARx Monthly Schedule |

Locate the 2008 MARx Monthly Schedule from: http://www.cms.hhs.gov/MMAHelp/.
For applicable diagnoses by payment years (2004-2009) for CMS-HCC and RxHCC models see
http://www.cms.hhs.gov/MedicareAdvtgSpecRateStats/06_Risk_adjustment.asp#TopOfPage.

### 8.2.1   RAPS Return File/RAPS Transaction Error Report (Slide 9)

The RAPS Return File contains all transactions submitted by the MA organization. Any errors identified during the RAPS process will appear next to the field in which the error was found. This indicates that the diagnosis was not stored. The file is delivered in the same flat file format used for the RAPS input. Unique diagnosis clusters that are returned without an error are stored in the RAPS database at CMS. CMS uses the diagnosis clusters that contain relevant diagnosis codes to calculate risk adjustment factors when running the CMS-HCC model or ESRD model. Since this report is a flat file, MA organizations may download the file into a Microsoft Access or Excel database, and establish a record of each diagnosis that was stored in the CMS-HCC model for each enrollee. Larger organizations also use this file in mainframe databases. Organizations that employ automated update processes for their databases typically use the Return File.

The RAPS Transaction Error Report contains only those records that contain errors, causing one or more diagnosis clusters to be rejected. The RAPS Transaction Error Report is typically used by organizations that employ a non-automated update process when maintaining their diagnosis files. To use this report, an individual at the health plan normally downloads the report, prints it, and then manually updates their diagnosis records to indicate which diagnoses were rejected.

The database will serve several purposes:

Exhibit Z
Page 761



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**VERIFYING RISK SCORES**

1. The MA organization will have a history of all diagnosis clusters submitted and stored, which can be used to prevent future submissions of duplicate diagnosis clusters.
2. The MA organization will have the data required to determine which diagnoses were stored for each beneficiary for the payment period.

3. CMS requires plans to submit all required diagnoses, and recommends maintaining an accurate record of all data submitted and stored.

 MA organizations must submit each required diagnosis at least once during a reporting period for each enrolled beneficiary.

 **Example: 1**

The MA organization received a RAPS Return File that included three records and one cluster within each record. Using the data communicated on the RAPS Return File, the organization captured information that could be used later to verify the risk score. The plan developed an internal database that captured each HIC number and each relevant diagnosis that is stored in the RAPS database for that beneficiary. Based on the RAPS Return File (see Figure 8B), the plan captured the 70710 (ulcer of the lower limb) and 311 (depression) diagnoses, since both were accepted to RAPS. Figure 8C illustrates the database content based on the results of this RAPS Return File.

**Note:** The plan should maintain 311 in its database. 311 is a required diagnosis that was stored in the RAPS database even though is not a model diagnosis. 250, in the third CCC record, is a model diagnosis, however it was returned with an error code (i.e., 354). Therefore, the plan should not maintain this diagnosis in its database until the error has been successfully addressed.

**Note:** Figure 8B is an abbreviated version of the RAPS Return File due to space limitations on the page.

**Figure 8B – RAPS Return File**



**Figure 8C – Internal Diagnosis Cluster Database**

| HIC | Dx | From Date | Thru Date | Provider Type | Date Submitted |
|---|---|---|---|---|---|
| 123456789A | 70710 | 20030314 | 20030318 | 01 | 20030411 |
| 123456788A | 311 | 20030314 | 20030318 | 01 | 20030411 |

---

8-6



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**VERIFYING RISK SCORES**

**Note:** The MA organization may include other fields, such as Patient Control Number (PCN), in the database for a variety of reasons. The PCN can help the plan find the original source document for the diagnosis. This sample database includes only the minimal components required for verifying the accuracy of the number of clusters stored for risk score calculation and elements that define a duplicate cluster.

### 8.2.2   RAPS Management Reports (Slide 11)

The RAPS Monthly and Cumulative Plan Reports (Figure D) are available the second business day of the month. These reports assist in the confirmation of the total number of diagnoses stored in the CMS-HCC model.

The reports are delivered in report layout format. MA organizations can compare their internal database developed from the RAPS Return File to the number of diagnoses stored on the report. The cumulative report reflects the total number of diagnoses stored to date for the H number. The database should reflect all diagnosis clusters stored for the health plan for the data collection period



**Figure 8D – RAPS Cumulative Plan Activity Report**

```
RAPS0020                          CMS RAPS ADMINISTRATION                    PAGE:      1
RUN REPORT:    DATE: 20070203     RAPS CUMULATIVE PLAN ACTIVITY REPORT       SERVICE YEAR: 2006

  SUBMITTER ID:    SH7777             FOR PERIOD ENDING January 30, 2004
  PLAN NO:         H7777

  PROVIDER TYPE/TOTALS       JULY      AUGUST    SEPTEMBER    OCTOBER    NOVEMBER    DECEMBER     TOTAL
  PRINCIPAL INPATIENT
     TOTAL SUBMITTED           22        35         29         19          27         25          157
     TOTAL REJECTED             2         4          7          5           3          3           24
     TOTAL ACCEPTED            20        31         22         14          24         22          133
     TOTAL STORED              20        31         22         16          24         24          137
     TOTAL MODEL STORED         0         0          2          0           2          0            4
     TOTAL DELE ACPTD           0         0          0          0           0          0            0
     TOTAL DELE RJCTD           0         0          0          0           0          0            0

  OTHER INPATIENT
     TOTAL SUBMITTED           64        83         51         48          40         60          346
     TOTAL REJECTED             8        10         11          6           5          4           44
     TOTAL ACCEPTED            56        73         40         42          35         56          302
     TOTAL STORED              56        73         40         42          35         56          302
     TOTAL MODEL STORED         0         0          0          1           0          0            1
     TOTAL DELE ACPTD           0         0          0          0           0          0            0
     TOTAL DELE RJCTD           0         0          0          0           0          0            0

  OUTPATIENT
     TOTAL SUBMITTED           98        87         43         37          44         76          385
     TOTAL REJECTED             7         5          3          4           5          4           28
     TOTAL ACCEPTED            91        82         40         33          39         72          357
     TOTAL STORED              91        82         40         33          39         72          357
     TOTAL MODEL STORED         0         0          3          3           1          0            7
     TOTAL DELE ACPTD           0         0          0          0           0          0            0
     TOTAL DELE RJCTD           0         0          0          0           0          0            0

  PHYSICIAN
     TOTAL SUBMITTED           99        77         92         90          97         79          534
     TOTAL REJECTED             5         5          8          6           8          5           37
     TOTAL ACCEPTED            94        72         84         84          89         74          497
     TOTAL STORED              94        72         84         84          89         74          497
     TOTAL MODEL STORED         0         0          2          1           0          1            4
     TOTAL DELE ACPTD           0         0          0          0           0          0            0
     TOTAL DELE RJCTD           0         0          0          0           0          0            0
```

8-8

Exhibit Z
Page 764



### 8.2.3   CMS-HCC Risk Adjustment Model Software (Slide 12)

The software is a SAS program that allows the organization to verify and predict risk scores. Click on HCC Software (ZIP 49KB), open the zip file, and double click on "hccsoftdescription.rtf." CMS published the ESRD model on the web after publication of the final payment notice for 2005. Users must have a SAS license to use the SAS program.

MA organizations may access the CMS-HCC Risk Model software at **http://cms.hhs.gov/**.

- Select:
    - Medicare
    - Health Plans
    - Medicare Advantage Rates & Statistics
    - Risk Adjustment
    - Downloads
    - 2007 CMS-HCC software (ZIP 53KB)

The software includes an HCCSOFT SAS program that uses several SAS Macros to create HCC score variables using coefficients from the following regression models:

- Community
- Institutional
- New enrollee

The HCCSOFT software supplies user parameters to the main SAS Macro program MACROSFT. This macro program takes user-provided files and assigns HCCs for each person. The program follows these major steps when calculating risk scores.

1. The program assigns each beneficiary to an appropriate age/sex grouping, and adds in the interactions for Medicaid, disabled, and previously disabled.

2. The program crosswalks diagnoses to Condition Categories using SAS formats that were previously stored in the FORMAT library.

3. The program then creates HCCs by imposing hierarchies on the Condition Categories.

4. The program creates the interactions.

5. The program computes predicted scores from three regression models.

**Note:**  For beneficiaries without relevant diagnoses from RAPS or FFS claims data, zeros are assigned to all HCCs.



Table 8C lists the software-provided files.

**TABLE 8C – SOFTWARE-PROVIDED FILES**

| FILE NAME | DESCRIPTIONS |
|---|---|
| V1206D4P | Main program that supplies user parameters to the main SAS macro program. |
| V1206D4M | Main macro that creates HCC and Score variables by calling other external macros. |
| AGESEXVR | Creates age/sex, originally disabled, disabled variables. |
| EDITICD9 | Performs edits to International Classification of Diseases, 9th Revision, Clinical Modification (ICD-9-CM) code. |
| V12H70M | Assigns ICD-9-CM diagnosis code to multiple CCs where required. |
| V12H70L | Assigns labels to HCCS. |
| V12H70H | Sets HCC=0 according to hierarchies. |
| SCOREVR | Calculates a score variable. |
| F1206D4Y | Format library that has a crosswalk from ICD-9-CM codes to CC categories that are transformed to HCC categories by the software. |
| C1206D4Y | Coefficients for three regression models. |

Table 8D provides a list of user supplied files.

**TABLE 8D – USER SUPPLIED FILES**

| FILE NAME | DESCRIPTION |
|---|---|
| Person File | A person-level file of demographic and enrollment information |
| Diagnosis File | A diagnosis-level input file of diagnoses |

### 8.2.4   Monthly Membership Reports (MMR) (Slides 13-16)

The MMR provides information to reconcile the Medicare membership and payment record to the records maintained by CMS. The MMR is available in two formats – report and data file, which are posted monthly. The report and data file formats provide summary and detail-level information on beneficiaries belonging to the MA organization.

**Summary:**  This format presents a summary of the payments and adjustments applicable to the MA organization's Medicare membership. This format shows the total number of beneficiaries for whom a hospice, ESRD, or institutionalized payment was received.

**Detail:**  This format contains a detailed list of beneficiaries for whom a payment was made to the MA organization for that month: either a monthly or an adjustment payment. This allows the MA organization to compare its beneficiary records with those maintained by CMS.

      The MMR Reports communicate information on a beneficiary level.

Questions regarding accessing and understanding the MMR should be directed to the plan's regional contact at the CMS Central Office.



**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

**VERIFYING RISK SCORES**

### 8.2.4.1    Monthly Membership Summary Reports (Slide 13)

The MMR Summary is available in both data file and report layout format. Both the data file and the report include summaries of drug and non-drug data.

### 8.2.4.2    Monthly Membership Detail Reports (Slide 13)

The MMR Detail is available in a data file that includes both drug and non-drug data. CMS extracts data from the data file and generates two formatted reports, one for drug data and one for non-drug data. The reports display payment information as it relates to the appropriate payment model. The two detail reports are described below.

### 8.2.4.2.1    Non-Drug Monthly Membership Report (Slide 14)

The Non-Drug MMR contains information such as rebates, payments and adjustments, Part A and Part B information, risk adjustment factors for Part A and Part B, and other detailed beneficiary information.

### 8.2.4.2.2    Drug Monthly Membership Report (Slide 15)

The Drug MMR contains information such as basic premiums, estimated reinsurance, payments and adjustments, low-income cost sharing percentage, low-income cost sharing subsidy, risk adjustment factors, and other detailed beneficiary information.

Table 8E describes the MMR field ranges. Table 8F provides the complete record layout for the MMR.

**TABLE 8E – SUMMARY OF THE MMR DETAIL RECORD LAYOUT FIELD RANGES**

| FIELD RANGE | GENERAL DESCRIPTION OF FIELD RANGE |
|---|---|
| 1-3 | Managed Care Organization Information |
| 4-11 | Beneficiary Identification |
| 12-13 | Entitlement |
| 14-21 | Health Status |
| 22-34 | Risk Adjustment/Demographic Payment Adjustment Information |
| 35 | Low Income Subsidy Premium Amount |
| 36 | ESRD MSP Flag |
| 37-46 | Additional Indicators |
| 47 | Risk Adjustment Factor Type Code |
| 48 | Frailty Indicator |
| 49 | Original Reason for Entitlement Code (OREC) |
| 50 | Lag Indicator |
| 51 | Segment ID for Part D |
| 52 | Enrollment Resource |
| 53 | EGHP Flag |
| 54-66 | Risk Adjustment Premium/Rebate/Payment Information |
| 67 | Part D Risk Factor |
| 68-78 | Fields supporting the Part D Benefit |
| 79-80 | PACE related fields |

**Note:** In 2006, CMS added a Low-Income Subsidy (LIS) Premium Amount field to filler field #35. This field contains the amount of Part D premium paid to MA organizations on behalf of affected members.



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**VERIFYING RISK SCORES**

**TABLE 8F – MONTHLY MEMBERSHIP REPORT (MMR) (DRUG AND NON-DRUG FIELDS)**

**MMR FLAT FILE LAYOUT**

| # | Field Name | Len | Pos | Description |
|---|---|---|---|---|
| 1 | MCO Contract Number | 5 | 1-5 | MCO Contract Number |
| 2 | Run Date of the File | 8 | 6-13 | YYYYMMDD |
| 3 | Payment Date | 6 | 14-19 | YYYYMM |
| 4 | HIC Number | 12 | 20-31 | Member's HIC # |
| 5 | Surname | 7 | 32-38 | First 7 letters of the member's surname |
| 6 | First Initial | 1 | 39-39 | First initial of the member's first name |
| 7 | Sex | 1 | 40-40 | M = Male, F = Female |
| 8 | Date of Birth | 8 | 41-48 | YYYYMMDD |
| 9 | Age Group | 4 | 49-52 | BBEE<br>BB = Beginning Age<br>EE = Ending Age |
| 10 | State & County Code | 5 | 53-57 | |
| 11 | Out of Area Indicator | 1 | 58-58 | Y = Out of Contract-level service area<br>Always Spaces on Adjustment |
| 12 | Part A Entitlement | 1 | 59-59 | Y = Entitled to Part A |
| 13 | Part B Entitlement | 1 | 60-60 | Y = Entitled to Part B |
| 14 | Hospice | 1 | 61-61 | Y = Hospice |
| 15 | ESRD | 1 | 62-62 | Y = ESRD |
| 16 | Aged/Disabled MSP | 1 | 63-63 | Y = Working Aged |
| 17 | Institutional | 1 | 64-64 | Y = Institutional (monthly) |
| 18 | NHC | 1 | 65-65 | Y = Nursing Home Certifiable |
| 19 | Medicaid Beneficiary Medicaid Status Flag | 1 | 66-66 | Y = Default Part C risk factor used, Medicaid Beneficiary<br>N = Default Part C risk factor used, non-Medicaid beneficiary<br>Blank = No Part C default factor used or the beneficiary is Part D only |
| 20 | LTI Flag | 1 | 67-67 | Y = Part C Long Term Institutional |
| 21 | Medicaid Indicator | 1 | 68-68 | Y = Medicaid Add-on to beneficiary RAS factor<br>Blank = No Medicaid Add-on |
| 22 | PIP-DCG | 2 | 69-70 | PIP-DCG Category - Only on pre-2004 adjustments |
| 23 | Default Indicator | 1 | 71-71 | Y = default RA factor in use<br>• For pre-2004 adjustments, a 'Y' indicates that a new enrollee RA factor is in use<br>• For post-2003 payments and adjustments, a 'Y' indicates that a default factor was generated by the system due to lack of a RA factor. |



**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

**VERIFYING RISK SCORES**

## MMR FLAT FILE LAYOUT (CONTINUED)

| # | Field Name | Len | Pos | Description |
|---|---|---|---|---|
| 24 | Risk Adjuster Factor A | 7 | 72-78 | NN.DDDD |
| 25 | Risk Adjuster Factor B | 7 | 79-85 | NN.DDDD |
| 26 | Number of Paymt/Adjustmt Months Part A | 2 | 86-87 | 99 |
| 27 | Number of Paymt/Adjustmt Months Part B | 2 | 88-89 | 99 |
| 28 | Adjustment Reason Code | 2 | 90-91 | FORMAT: 99 Always Spaces on Payment and MSA Deposit or Recovery Records |
| 29 | Paymt/Adjustmt Start Date | 8 | 92-99 | FORMAT: YYYYMMDD |
| 30 | Paymt/Adjustmt End Date | 8 | 100-107 | FORMAT: YYYYMMDD |
| 31 | Demographic Paymt/ Adjustmt Rate A | 9 | 108-116 | FORMAT: -99999.99 |
| 32 | Demographic Paymt/ Adjustmt Rate B | 9 | 117-125 | FORMAT: -99999.99 |
| 33 | Risk Adjuster Paymt/ Adjustmt Rate A | 9 | 126-134 | Part A portion for the beneficiary's payment or payment adjustment dollars. For MSA Plans, the amount does not include any lump sum deposit or recovery amounts. It is the Plan capitated payment only, which includes the MSA monthly deposit amount as a negative term. FORMAT: -99999.99 |
| 34 | Risk Adjuster Paymt/ Adjustmt Rate B | 9 | 135-143 | Part B portion for the beneficiary's payment or payment adjustment dollars. For MSA Plans, the amount does not include any lump sum deposit or recovery amounts. It is the Plan capitated payment only, which includes the MSA monthly deposit amount as a negative term. FORMAT: -99999.99 |
| 35 | LIS Premium Subsidy | 8 | 144-151 | FORMAT: -9999.99 |
| 36 | ESRD MSP Flag | 1 | 152-152 | Format X. Values = 'Y' or 'N'(default) Indicates if Medicare is the Secondary Payer for an ESRD member |
| 37 | MSA Part A Deposit/ Recovery Amount | 8 | 153-160 | Medicare Savings Account (MSA) lump sum Part A dollars to be deposited/recovered. Deposits are positive values and recoveries are negative. FORMAT: -9999.99 |
| 38 | MSA Part B Deposit/ Recovery Amount | 8 | 161-168 | Medicare Savings Account (MSA) lump sum Part B dollars to be deposited/recovered. Deposits are positive values and recoveries are negative. FORMAT: -9999.99 |
| 39 | MSA Deposit/Recovery Months | 2 | 169-170 | Number of months associated with MSA deposit or recovery dollars |

Exhibit Z
Page 769



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**VERIFYING RISK SCORES**

### MMR FLAT FILE LAYOUT (CONTINUED)

| # | Field Name | Len | Pos | Description |
|---|---|---|---|---|
| 40 | FILLER | 1 | 171-171 | SPACES |
| 41 | Risk Adjuster Age Group (RAAG) | 4 | 172-175 | BBEE<br>BB = Beginning Age<br>EE = Ending Age |
| 42 | Previous Disable Ratio (PRDIB) | 7 | 176-182 | NN.DDDD<br>Percentage of Year (in months) for Previous Disable Add-On – Only on pre-2004 adjustments |
| 43 | De Minimis | 1 | 183-183 | 'N' = "de minimis" does not apply<br>'Y' = "de minimis" applies |
| 44 | FILLER | 2 | 184-184 | SPACES |
| 45 | Plan Benefit Package Id | 3 | 185-187 | Plan Benefit Package Id<br>FORMAT 999 |
| 46 | Race Code | 1 | 188-188 | Format X<br>Values:<br>0 = Unknown<br>1 = White<br>2 = Black<br>3 = Other<br>4 = Asian<br>5 = Hispanic<br>6 = N. American Native |
| 47 | RA Factor Type Code | 2 | 189-190 | Type of factors in use (see Fields 24-25):<br>C = Community<br>C1 = Community Post-Graft I (ESRD)<br>C2 = Community Post-Graft II (ESRD)<br>D = Dialysis (ESRD)<br>E = New Enrollee<br>ED = New Enrollee Dialysis (ESRD)<br>E1 = New Enrollee Post-Graft I (ESRD)<br>E2 = New Enrollee Post-Graft II (ESRD)<br>G1 = Graft I (ESRD)<br>G2 = Graft II (ESRD)<br>I = Institutional<br>I1 = Institutional Post-Graft I (ESRD)<br>I2 = Institutional Post-Graft II (ESRD) |
| 48 | Frailty Indicator | 1 | 191-191 | Y = MCO-level Frailty Factor Included |
| 49 | Original Reason for Entitlement Code (OREC) | 1 | 192-192 | 0 = Beneficiary insured due to age<br>1 = Beneficiary insured due to disability<br>2 = Beneficiary insured due to ESRD<br>3 = Beneficiary insured due to disability and current ESRD |

Exhibit Z
Page 770



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**VERIFYING RISK SCORES**

### MMR FLAT FILE LAYOUT (CONTINUED)

| # | Field Name | Len | Pos | Description |
|---|---|---|---|---|
| 50 | Lag Indicator | 1 | 193-193 | Y = Encounter data used to calculate RA factor lags payment year by 6 months. |
| 51 | Segment ID | 3 | 194-196 | Identification number of the segment of the PBP. Blank if there are no segments. |
| 52 | Enrollment Source | 1 | 197 | The source of the enrollment. Values are A = Auto-enrolled by CMS, B = Beneficiary election, C = Facilitated enrollment by CMS, D = Systematic enrollment by CMS (rollover) , E = Auto-enrolled by Plans, F = Facilitated enrollment by Plans, G = POS submitted enrollment, H = Re-assignment enrollment by CMS or Plans and I = Enrollments submitted by Plans with enrollment source other that B, E, F, G, H and blank. |
| 53 | EGHP Flag | 1 | 198 | Employer Group flag; Y = member of employer group, N = member is not in an employer group |
| 54 | Part C Basic Premium – Part A Amount | 8 | 199-206 | The premium amount for determining the MA payment attributable to Part A. It is subtracted from the MA plan payment for plans that bid above the benchmark. -9999.99 |
| 55 | Part C Basic Premium – Part B Amount | 8 | 207-214 | The premium amount for determining the MA payment attributable to Part B. It is subtracted from the MA plan payment for plans that bid above the benchmark. -9999.99 |
| 56 | Rebate for Part A Cost Sharing Reduction | 8 | 215-222 | The amount of the rebate allocated to reducing the member's Part A cost-sharing. This amount is added to the MA plan payment for plans that bid below the benchmark. -9999.99 |
| 57 | Rebate for Part B Cost Sharing Reduction | 8 | 223-230 | The amount of the rebate allocated to reducing the member's Part B cost-sharing. This amount is added to the MA plan payment for plans that bid below the benchmark. -9999.99 |
| 58 | Rebate for Other Part A Mandatory Supplemental Benefits | 8 | 231-238 | The amount of the rebate allocated to providing Part A supplemental benefits. This amount is added to the MA plan payment for plans that bid below the benchmark. -9999.99 |
| 59 | Rebate for Other Part B Mandatory Supplemental Benefits | 8 | 239-246 | The amount of the rebate allocated to providing Part B supplemental benefits. This amount is added to the MA plan payment for plans that bid below the benchmark. -9999.99 |

Exhibit Z
Page 771



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**VERIFYING RISK SCORES**

## MMR FLAT FILE LAYOUT (CONTINUED)

| # | Field Name | Len | Pos | Description |
|---|---|---|---|---|
| 60 | Rebate for Part B Premium Reduction – Part A Amount | 8 | 247-254 | The Part A amount of the rebate allocated to reducing the member's Part B premium. This amount is retained by CMS for non- ESRD members and it is subtracted from ESRD member's payments.<br>-9999.99 |
| 61 | Rebate for Part B Premium Reduction – Part B Amount | 8 | 255-262 | The Part B amount of the rebate allocated to reducing the member's Part B premium. This amount is retained by CMS for non- ESRD members and it is subtracted from ESRD member's payments.<br>-9999.99 |
| 62 | Rebate for Part D Supplemental Benefits – Part A Amount | 8 | 263–270 | Part A Amount of the rebate allocated to providing Part D supplemental benefits.<br>-9999.99 |
| 63 | Rebate for Part D Supplemental Benefits – Part B Amount | 8 | 271–278 | Part B Amount of the rebate allocated to providing Part D supplemental benefits.<br>-9999.99 |
| 64 | Total Part A MA Payment | 10 | 279–288 | The total Part A MA payment.<br>-999999.99 |
| 65 | Total Part B MA Payment | 10 | 289–298 | The total Part B MA payment.<br>-999999.99 |
| 66 | Total MA Payment Amount | 11 | 299-309 | The total MA A/B payment including MMA adjustments. This also includes the Rebate Amount for Part D Supplemental Benefits<br>-9999999.99 |
| 67 | Part D RA Factor | 7 | 310-316 | The member's Part D risk adjustment factor.<br>NN.DDDD |
| 68 | Part D Low-Income Indicator | 1 | 317 | An indicator to identify if the Part D Low-Income multiplier is included in the Part D payment. Values are 1 (subset 1), 2 (subset 2) or blank. |
| 69 | Part D Low-Income Multiplier | 7 | 318-324 | The member's Part D low-income multiplier.<br>NN.DDDD |
| 70 | Part D Long Term Institutional Indicator | 1 | 325 | An indicator to identify if the Part D Long-Term Institutional multiplier is included in the Part D payment. Values are A (aged), D (disabled) or blank. |
| 71 | Part D Long Term Institutional Multiplier | 7 | 326-332 | The member's Part D institutional multiplier.<br>NN.DDDD |
| 72 | Rebate for Part D Basic Premium Reduction | 8 | 333-340 | Amount of the rebate allocated to reducing the member's basic Part D premium.<br>-9999.99 |

Exhibit Z
Page 772

**Exhibit 3**



**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

**VERIFYING RISK SCORES**

### MMR FLAT FILE LAYOUT (CONTINUED)

| # | Field Name | Len | Pos | Description |
|---|---|---|---|---|
| 73 | Part D Basic Premium Amount | 8 | 341-348 | The plan's Part D premium amount. -9999.99 |
| 74 | Part D Direct Subsidy Payment Amount | 10 | 349-358 | The total Part D Direct subsidy payment for the member. -999999.99 |
| 75 | Reinsurance Subsidy Amount | 10 | 359-368 | The amount of the reinsurance subsidy included in the payment. -999999.99 |
| 76 | Low-Income Subsidy Cost-Sharing Amount | 10 | 369-378 | The amount of the low-income subsidy cost-sharing amount included in the payment. -999999.99 |
| 77 | Total Part D Payment | 11 | 379-389 | The total Part D payment for the member -999999.99. |
| 78 | Number of Paymt/Adjustmt Months Part D | 2 | 390-391 | 99 |
| 79 | PACE Premium Add On | 10 | 392-401 | Total Part D PACE Premium Add-on amount -999999.99 |
| 80 | PACE Cost Sharing Add on | 10 | 402-411 | Total Part D PACE Cost Sharing Add-on amount -999999.99 |

Exhibit Z
Page 773

**Exhibit 3**



Plans may access the MMR Report format. Figure 8E illustrates an example of the MMR for Non-Drug.

**Figure 8E – MMR REPORT FORMAT – NON-DRUG**

```
RUN DATE:20050115                        MONTHLY MEMBERSHIP REPORT - NON DRUG                    PAGE:        1
PAYMENT MONTH:200502              PLAN(H4444) PBP(nnn) SEGMENT(mmm) IRIS INSURANCE OF INDIANA

                         --------------------------------------------- REBATES ----------------------------------------------
            BASIC PREMIUM  | COST SHR REDUC    MAND SUPP BENEFIT    PART D SUPP BENEFIT     PART B BAS PRM REDUC    PART D BAS PRM REDUC
    PART A $$$$9.99      |      N/A               N/A                 N/A                      N/A                     N/A
    PART B $$$$9.99      |      N/A               N/A                 N/A                      N/A                     N/A

                   S            ----------    FLAGS  -----------              --------------------- PAYMENTS/ADJUSTMENTS ------------------
CLAIM              E AGE  STATE     P P             M F    A D    S A MTHS              DATES        LAG   FTYPE
NUMBER             X GRP  CNTY      A A H E I       C R O D E E O D A B      START   END
-----------        - ---- -----    O R R O S N N A A R D F G U M           -------------
   SURNAME F       DMG  BIRTH       O T T S R S H I I E O A H R S PIP  ADJ
           I       RA   DATE        A A B P D T C D L C N U P C P DCG  REA FCTR-A FCTR-B    PART A      PART B      TOTAL PAYMENT
-----------        - ---- -----    - - - - - - - - - - - - - - -               -------------
1234567890AB F 8084 33800                                        200405 200405   Y        C
   LEONARD G    8084 19200206 Y Y N      Y                Z9Z9  ZZ 1.0650 1.0650 $$$$$$$9.99 $$$$$$$9.99  $$$$$$$$9.99
0987654321AB M 8084 33800                                        200405 200405   Y        C
   MARION   H    8084 19251008 Y Y Y       N             Z9Z9  ZZ 1.0650 1.0650 $$$$$$$9.99 $$$$$$$9.99  $$$$$$$$9.99
```

Source: Plan Communications User's Guide Appendices, Version 3.1 (April 18, 2008). Centers for Medicare & Medicaid Services.



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**VERIFYING RISK SCORES**

Plans may access the MMR Report format. Figure 8F illustrates an example of the MMR report for Drug.

**Figure 8F —MMR REPORT FORMAT – DRUG**

```
1RUN DATE:20061027                    MONTHLY MEMBERSHIP REPORT - DRUG                          PAGE:1
 PAYMENT MONTH:200601               PLAN(H9999) PBP(999) SEGMENT(000) ACME HEALTH SERVICES
0                                         BASIC PREMIUM | ESTIMATED REINSURANCE
                                     PART D      $10.60   |        $0.00
0           S          --- FLAGS ---  ----------------- PAYMENTS/ADJUSTMENTS -------------------------
 CLAIM      E AGE STATE   P P  S L L D  ADJ RA FCTR    DATES      LOW-INCOME COST    LOW-INCOME COST
 NUMBER     X GRP CNTY    A A E 0 O I E  REA       START  END   SHARING PERCENTAGE  SHARING SUBSIDY
 ---------- - ---- ----   O R R G U I N M ----
    SURNAME F  DMG  BIRTH  O T T H R N S I MTHS DIRECT SUBSIDY       PACE           PACE COST
         I  - ---  DATE   A A B P C C T N D  PAYMENT AMT    PREMIUM ADD-0N   SHARING ADD-ON    TOTAL PAYMENT
 ---------- - ---- -----  - - - --- - - - -
 123456789A  F 5559 33700             1.9770 200601 200601     000                 $0.00
    FIRST   S  5559 19491130       B        N  1   $129.17        $0.00            $0.00              $129.17
 987654321A  F 8084 10050             1.0300 200601 200601     000                 $0.00
    SECOND  M  8084 19240306       B        Y  1    $62.22        $0.00            $0.00               $62.22
```

Source: Plan Communications User's Guide Appendices, Version 3.1 (April 18, 2008). Centers for Medicare & Medicaid Services.



2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide

**VERIFYING RISK SCORES**

## 8.2.5 Risk Adjustment Model Output Reports (MOR) (Slides 17-19)

CMS has developed two reports to support the MMR – the Part C Risk Adjustment MOR and the new RxHCC MOR. The MORs are used in conjunction with the MMR and beneficiary-specific information (residence-community vs. institution, Medicaid status, disability, etc.) to verify risk scores.

The reports are available monthly through MARx in flat file and report layout.

## 8.2.5.1 Part C Risk Adjustment MOR (Slide 18)

The Part C Risk Adjustment MOR displays the HCCs used by RAS to calculate risk adjustment factors for each beneficiary. This report displays the HCC Disease Groups used by the CMS-HCC model and disease and demographic interactions.

The Part C Risk Adjustment MOR provides detailed beneficiary level information on:

- Enrollee identifiers (HICs, name, date of birth).

- The appropriate sex and age group, as well as other demographic factors for an individual (if applicable).

- The specific disease groups (HCCs) triggered.

- Disease interactions.

The Part C Risk Adjustment MOR provides detailed information on the specific disease groups and disease interactions triggered for an enrollee. Disease hierarchies are not identified separately. If a hierarchy exists, only the most severe manifestation in the hierarchy is displayed on the report.

 **Example: 3**

If a beneficiary triggered HCC 7 (Metastatic Cancer and Acute Leukemia) and HCC 9 (Lymphatic, Head and Neck, Brain, and Other Major Cancers), the report will reflect HCC 7, not HCC 9 because HCC7 is the most severe manifestation of the disease.

Organizations receiving frailty adjustment should review their overall risk score, which represents the output of the CMS-HCC model and the frailty score. Beneficiaries under the age of 55 and beneficiaries who have an institutional factor do not receive frailty scores. Organizations receiving frailty adjustment can find their plan level frailty score on HPMS. PACE organizations must then determine whether the score is a new enrollee or institutional score and determine which factors on a given HCC apply. The report includes Medicaid information, individual HCCs, and the interaction of HCCs. PACE organizations should also review the values associated with each individual condition and the appropriate community or institutional numbers. A final reconciliation of HCCs may prove useful in the analysis.

Table 8G provides descriptions of the fields in the Part C MOR, and Table 8I provides the complete record layout for the Part C MOR.

Exhibit Z
Page 776



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**VERIFYING RISK SCORES**

### TABLE 8G – PART C RISK ADJUSTMENT MOR FIELD SUMMARY

| REPORT BODY = 162 bytes | |
|---|---|
| **Fields** | **Description** |
| 1 | Record Type |
| 2-8 | Beneficiary Identifying Information. |
| 9-20 | The sex and age group for the female beneficiary. |
| 21-32 | The sex and age group for the male beneficiary. |
| 33-34 | Medicaid indicators for Female Beneficiary. |
| 35-36 | Medicaid indicators for Male Beneficiary. |
| 37 | Originally Disabled Female. |
| 38 | Originally Disabled Male. |
| 39-108 | Disease Coefficients. Field 38 represents HCC 1. Field 107 represents HCC 177. |
| 109-113 | Disabled Disease HCC. Field 108 represents HCC 5. Field 112 represents HCC 107. |
| 114-119 | Disease Interactions. |

### 8.2.5.2   RAS RxHCC MOR (Slide 19)

With the implementation of Part D, CMS created the RxHCC model for Prescription Drug Plans. The Part D model predicts plan liability for prescription drugs, uses different diseases to predict drug costs, and includes multipliers for incremental costs related to low-income and long term institutional beneficiaries.

The Part D model, like the CMS-HCC model, provides for some disease groups to fall into hierarchies. Diseases with higher levels of severity may include intensified drug regimens or additional drug needs for treatment. The hierarchies for the Part D model are triggered by the highest cost category of the related diseases. Lower cost categories do not increase the Part D risk score.

The RAS RxHCC MOR displays the RxHCCs for each beneficiary. The report is formatted similarly to the Part C Risk Adjustment MOR. The RxHCCs can be used by plans to verify the beneficiaries risk factors provided in the MMR. Summing the risk factors for an individual beneficiary yields a total risk adjustment factor.

Table 8H provides a sample description of the fields in the RxHCC MOR, and Table 8J provides the complete record layout for the RxHCC MOR.

### TABLE 8H – RXHCC MOR FIELD SUMMARY

| REPORT BODY = 164 bytes | |
|---|---|
| **Fields** | **Description** |
| 1 | Record Type |
| 2-8 | Beneficiary Identifying Information. |
| 9-20 | The sex and age group for the female beneficiary. |
| 21-32 | The sex and age group for the male beneficiary. |
| 33 | Originally Disabled Female. |
| 34 | Originally Disabled Male. |
| 35-119 | Disease Coefficients RxHCCs. Field 35 represents RxHCC1. Field 119 represents RxHCC 187. |
| 120-122 | Disabled Disease RxHCC. Field 120 represents RxHCC 65. Field 122 represents RxHCC 108. |

Exhibit Z
Page 777



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**VERIFYING RISK SCORES**

### TABLE 8I – PART C RISK ADJUSTMENT MODEL OUTPUT DATA FILE

**Header Record Format**

| # | Field Name | Len | Pos | Description |
|---|---|---|---|---|
| 1 | Record Type | 1 | 1 | Set to '1' |
| 2 | Contract Number | 5 | 2 – 6 | Managed Care Organization (MCO) identification number |
| 3 | Run Date | 8 | 7 – 14 | Date when file was created, YYYYMMDD |
| 4 | Payment Year and Month | 6 | 15 – 20 | Identifies the risk adjustment payment year and month for the model run |
| 5 | Filler | 142 | 21 – 162 | Spaces |

**Detail/Beneficiary Record Format**

| # | Field Name | Len | Pos | Description |
|---|---|---|---|---|
| 1 | Record Type | 1 | 1 | Set to '2' |
| 2 | Health Insurance Claim Number | 12 | 2 – 13 | This is the Health Insurance Claim Number (known as HICN) identifying the primary Medicare Beneficiary under the SSA or RRB programs. The HICN consist of Beneficiary Claim Number (BENE_CAN_NUM) along with the Beneficiary Identification Code (BIC_CD) uniquely identifies a Medicare Beneficiary. For the RRB program, the claim account number is a 12 bytes account number. |
| 3 | Beneficiary Last Name | 12 | 14 – 25 | First 12 bytes of the Beneficiary Last Name |
| 4 | Beneficiary First Name | 7 | 26 – 32 | First 7 bytes of the Beneficiary First Name |
| 5 | Beneficiary Initial | 1 | 33 | Beneficiary Initial |
| 6 | Date of Birth | 8 | 34 – 41 | The date of birth of the Medicare Beneficiary. Format as YYYYMMDD. |
| 7 | Sex | 1 | 42 | Represents the sex of the Medicare Beneficiary. Examples include Male and Female. 0=unknown, 1=male, 2=female |
| 8 | Social Security Number | 9 | 43 – 51 | The beneficiary's current identification number that was assigned by the Social Security Administration. |
| 9 | Age Group Female0_34 | 1 | 51 | The sex and age group for the beneficiary base on a given as of date. Female between ages of 0 through 34. Set to "1" if existed, otherwise '"0". |
| 10 | Age Group Female35_44 | 1 | 52 | The sex and age group for the beneficiary base on a given as of date. Female between ages of 35 through 44. Set to "1" if existed, otherwise '"0". |

Exhibit Z
Page 778



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**VERIFYING RISK SCORES**

**TABLE 8I – PART C RISK ADJUSTMENT MODEL OUTPUT DATA FILE (CONTINUED)**

**Detail/Beneficiary Record Format**

| # | Field Name | Len | Pos | Description |
|---|---|---|---|---|
| 11 | Age Group Female45_54 | 1 | 54 | The sex and age group for the beneficiary base on a given as of date. Female between ages of 45 through 54. Set to "1" if existed, otherwise "0". |
| 12 | Age Group Female55_59 | 1 | 55 | The sex and age group for the beneficiary base on a given as of date. Female between ages of 55 through 59. Set to "1" if existed, otherwise "0". |
| 13 | Age Group Female60_64 | 1 | 56 | The sex and age group for the beneficiary base on a given as of date. Female between ages of 60 through 64. Set to "1" if existed, otherwise "0". |
| 14 | Age Group Female65_69 | 1 | 57 | The sex and age group for the beneficiary base on a given as of date. Female between ages of 65 through 69. Set to "1" if existed, otherwise "0". |
| 15 | Age Group Female70_74 | 1 | 58 | The sex and age group for the beneficiary base on a given as of date. Female between ages of 70 through 74. Set to "1" if existed, otherwise "0". |
| 16 | Age Group Female75_79 | 1 | 59 | The sex and age group for the beneficiary base on a given as of date. Female between ages of 75 through 79. Set to "1" if existed, otherwise "0". |
| 17 | Age Group Female80_84 | 1 | 60 | The sex and age group for the beneficiary base on a given as of date. Female between ages of 80 through 84. Set to "1" if existed, otherwise "0". |
| 18 | Age Group Female85_89 | 1 | 61 | The sex and age group for the beneficiary base on a given as of date. Female between ages of 85 through 89. Set to "1" if existed, otherwise "0". |
| 19 | Age Group Female90_94 | 1 | 62 | The sex and age group for the beneficiary base on a given as of date. Female between ages of 90 through 94. Set to "1" if existed, otherwise "0". |
| 20 | Age Group Female95_GT | 1 | 63 | The sex and age group for the beneficiary base on a given as of date. Female between age of 95 and greater. Set to "1" if existed, otherwise "0". |
| 21 | Age Group Male0_34 | 1 | 64 | The sex and age group for the beneficiary base on a given as of date. Male between ages of 0 through 34. Set to "1" if existed, otherwise "0". |
| 22 | Age Group Male35_44 | 1 | 65 | The sex and age group for the beneficiary base on a given as of date. Male between ages of 35 through 44. Set to "1" if existed, otherwise "0". |
| 23 | Age Group Male45_54 | 1 | 66 | The sex and age group for the beneficiary base on a given as of date. Male between ages of 45 through 54. Set to "1" if existed, otherwise "0". |

Exhibit Z
Page 779

1099
Exhibit 3



**TABLE 8I – PART C RISK ADJUSTMENT MODEL OUTPUT DATA FILE (CONTINUED)**

**Detail/Beneficiary Record Format**

| # | Field Name | Len | Pos | Description |
|---|---|---|---|---|
| 24 | Age Group Male55_59 | 1 | 67 | The sex and age group for the beneficiary base on a given as of date. Male between ages of 55 through 59. Set to "1" if existed, otherwise "0". |
| 25 | Age Group Male60_64 | 1 | 68 | The sex and age group for the beneficiary base on a given as of date. Male between ages of 60 through 64. Set to "1" if existed, otherwise "0". |
| 26 | Age Group Male65_69 | 1 | 69 | The sex and age group for the beneficiary base on a given as of date. Male between ages of 65 through 69. Set to "1" if existed, otherwise "0". |
| 27 | Age Group Male70_74 | 1 | 70 | The sex and age group for the beneficiary base on a given as of date. Male between ages of 70 through 74. Set to "1" if existed, otherwise "0". |
| 28 | Age Group Male75_79 | 1 | 71 | The sex and age group for the beneficiary base on a given as of date. Male between ages of 75 through 79. Set to "1" if existed, otherwise "0". |
| 29 | Age Group Male80_84 | 1 | 72 | The sex and age group for the beneficiary base on a given as of date. Male between ages of 80 through 84. Set to "1" if existed, otherwise "0". |
| 30 | Age Group Male85_89 | 1 | 73 | The sex and age group for the beneficiary base on a given as of date. Male between ages of 85 through 89. Set to "1" if existed, otherwise "0". |
| 31 | Age Group Male90_94 | 1 | 74 | The sex and age group for the beneficiary base on a given as of date. Male between ages of 90 through 94. Set to "1" if existed, otherwise "0". |
| 32 | Age Group Male95_GT | 1 | 75 | The sex and age group for the beneficiary base on a given as of date. Male between age of 95 and greater. Set to "1" if existed, otherwise "0". |
| 33 | Medicaid Female Disabled | 1 | 76 | Beneficiary is a female disabled and also entitled to Medicaid. Set to "1" if existed, otherwise "0". |
| 34 | Medicaid Female Aged | 1 | 77 | Beneficiary is a female aged (> 64) and also entitled to Medicaid. Set to "1" if existed, otherwise "0". |
| 35 | Medicaid Male Disabled | 1 | 78 | Beneficiary is a male disabled and also entitled to Medicaid. Set to "1" if existed, otherwise "0". |
| 36 | Medicaid Male Aged | 1 | 79 | Beneficiary is a male aged (> 64) and also entitled to Medicaid. Set to "1" if existed, otherwise "0". |

Exhibit Z
Page 780



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**VERIFYING RISK SCORES**

**TABLE 8I – PART C RISK ADJUSTMENT MODEL OUTPUT DATA FILE (CONTINUED)**

**Detail/Beneficiary Record Format**

| # | Field Name | Len | Pos | Description |
|---|---|---|---|---|
| 37 | Originally Disabled Female | 1 | 80 | Beneficiary is a female and original Medicare entitlement was due to disability. Set to "1" if existed, otherwise '"0". |
| 38 | Originally Disabled Male | 1 | 81 | Beneficiary is a male and original Medicare entitlement was due to disability. Set to "1" if existed, otherwise "0". |
| 39 | Disease Coefficients HCC1 | 1 | 82 | HIV/AIDS. Set to "1" if existed, otherwise '"0". |
| 40 | Disease Coefficients HCC2 | 1 | 83 | Septicemia/Shock. Set to "1" if existed, otherwise '"0". |
| 41 | Disease Coefficients HCC5 | 1 | 84 | Opportunistic Infections. Set to "1" if existed, otherwise '"0". |
| 42 | Disease Coefficients HCC7 | 1 | 85 | Metastatic Cancer and Acute Leukemia. Set to "1" if existed, otherwise '"0". |
| 43 | Disease Coefficients HCC8 | 1 | 86 | Lung, Upper Digestive Tract, and Other Severe Cancers. Set to "1" if existed, otherwise '"0". |
| 44 | Disease Coefficients HCC9 | 1 | 87 | Lymphatic, Head and Neck, Brain, and Other Major Cancers. Set to "1" if existed, otherwise '"0". |
| 45 | Disease Coefficients HCC10 | 1 | 88 | Breast, Prostate, Colorectal and Other Cancers and Tumors. Set to "1" if existed, otherwise '"0". |
| 46 | Disease Coefficients HCC15 | 1 | 89 | Diabetes with Renal or Peripheral Circulatory Manifestation. Set to "1" if existed, otherwise "0". |
| 47 | Disease Coefficients HCC16 | 1 | 90 | Diabetes with Neurologic or Other Specified Manifestation. Set to "1" if existed, otherwise "0". |
| 48 | Disease Coefficients HCC17 | 1 | 91 | Diabetes with Acute Complications. Set to "1" if existed, otherwise '"0". |
| 49 | Disease Coefficients HCC18 | 1 | 92 | Diabetes with Ophthalmologic or Unspecified Manifestation. Set to "1" if existed, otherwise "0". |

Exhibit Z
Page 781

**Exhibit 3**



**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

**VERIFYING RISK SCORES**

**TABLE 8I – PART C RISK ADJUSTMENT MODEL OUTPUT DATA FILE (CONTINUED)**

**Detail/Beneficiary Record Format**

| # | Field Name | Len | Pos | Description |
|---|---|---|---|---|
| 50 | Disease Coefficients HCC19 | 1 | 93 | Diabetes without Complication. Set to "1" if existed, otherwise '"0". |
| 51 | Disease Coefficients HCC21 | 1 | 94 | Protein-Calorie Malnutrition. Set to "1" if existed, otherwise '"0". |
| 52 | Disease Coefficients HCC25 | 1 | 95 | End-Stage Liver Disease. Set to "1" if existed, otherwise '"0". |
| 53 | Disease Coefficients HCC26 | 1 | 96 | Cirrhosis of Liver Set to "1" if existed, otherwise '"0". |
| 54 | Disease Coefficients HCC27 | 1 | 97 | Chronic Hepatitis. Set to "1" if existed, otherwise '"0". |
| 55 | Disease Coefficients HCC31 | 1 | 98 | Intestinal Obstruction/Perforation. Set to "1" if existed, otherwise '"0". |
| 56 | Disease Coefficients HCC32 | 1 | 99 | Pancreatic Disease. Set to "1" if existed, otherwise '"0". |
| 57 | Disease Coefficients HCC33 | 1 | 100 | Inflammatory Bowel Disease. Set to "1" if existed, otherwise '"0". |
| 58 | Disease Coefficients HCC37 | 1 | 101 | Bone/Joint/Muscle Infections/Necrosis. Set to "1" if existed, otherwise '"0". |
| 59 | Disease Coefficients HCC38 | 1 | 102 | Rheumatoid Arthritis and Inflammatory Connective Tissue Disease. Set to "1" if existed, otherwise '"0". |
| 60 | Disease Coefficients HCC44 | 1 | 103 | Severe Hematological Disorders. Set to "1" if existed, otherwise '"0". |
| 61 | Disease Coefficients HCC45 | 1 | 104 | Disorders of Immunity. Set to "1" if existed, otherwise '"0". |
| 62 | Disease Coefficients HCC51 | 1 | 105 | Drug/Alcohol Psychosis. Set to "1" if existed, otherwise '"0". |

Exhibit Z
Page 782



**TABLE 8I – PART C RISK ADJUSTMENT MODEL OUTPUT DATA FILE (CONTINUED)**

**Detail/Beneficiary Record Format**

| # | Field Name | Len | Pos | Description |
|---|---|---|---|---|
| 63 | Disease Coefficients HCC52 | 1 | 106 | Drug/Alcohol Dependence. Set to "1" if existed, otherwise '"0". |
| 64 | Disease Coefficients HCC54 | 1 | 107 | Schizophrenia. Set to "1" if existed, otherwise '"0". |
| 65 | Disease Coefficients HCC55 | 1 | 108 | Major Depressive, Bipolar, and Paranoid Disorders. Set to "1" if existed, otherwise '"0". |
| 66 | Disease Coefficients HCC67 | 1 | 109 | Quadriplegia, Other Extensive Paralysis. Set to "1" if existed, otherwise '"0". |
| 67 | Disease Coefficients HCC68 | 1 | 110 | Paraplegia. Set to "1" if existed, otherwise '"0". |
| 68 | Disease Coefficients HCC69 | 1 | 111 | Spinal Cord Disorders/Injuries. Set to "1" if existed, otherwise '"0". |
| 69 | Disease Coefficients HCC70 | 1 | 112 | Muscular Dystrophy. Set to "1" if existed, otherwise '"0". |
| 70 | Disease Coefficients HCC71 | 1 | 113 | Polyneuropathy. Set to "1" if existed, otherwise '"0". |
| 71 | Disease Coefficients HCC72 | 1 | 114 | Multiple Sclerosis. Set to "1" if existed, otherwise '"0". |
| 72 | Disease Coefficients HCC73 | 1 | 115 | Parkinson's and Huntington's Diseases. Set to "1" if existed, otherwise '"0". |
| 73 | Disease Coefficients HCC74 | 1 | 116 | Seizure Disorders and Convulsions. Set to "1" if existed, otherwise '"0". |
| 74 | Disease Coefficients HCC75 | 1 | 117 | Coma, Brain Compression/Anoxic Damage. Set to "1" if existed, otherwise '"0". |
| 75 | Disease Coefficients HCC77 | 1 | 118 | Respirator Dependence/Tracheostomy Status. Set to "1" if existed, otherwise '"0". |



**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

**VERIFYING RISK SCORES**

**TABLE 8I – PART C RISK ADJUSTMENT MODEL OUTPUT DATA FILE (CONTINUED)**

**Detail/Beneficiary Record Format**

| # | Field Name | Len | Pos | Description |
|---|---|---|---|---|
| 76 | Disease Coefficients HCC78 | 1 | 119 | Respiratory Arrest. Set to "1" if existed, otherwise '"0". |
| 77 | Disease Coefficients HCC79 | 1 | 120 | Cardio-Respiratory Failure and Shock. Set to "1" if existed, otherwise '"0". |
| 78 | Disease Coefficients HCC80 | 1 | 121 | Congestive Heart Failure. Set to "1" if existed, otherwise '"0". |
| 79 | Disease Coefficients HCC81 | 1 | 122 | Acute Myocardial Infarction. Set to "1" if existed, otherwise '"0". |
| 80 | Disease Coefficients HCC82 | 1 | 123 | Unstable Angina and Other Acute Ischemic Heart Disease. Set to "1" if existed, otherwise '"0". |
| 81 | Disease Coefficients HCC83 | 1 | 124 | Angina Pectoris/Old Myocardial Infarction. Set to "1" if existed, otherwise '"0". |
| 82 | Disease Coefficients HCC92 | 1 | 125 | Specified Heart Arrhythmias. Set to "1" if existed, otherwise '"0". |
| 83 | Disease Coefficients HCC95 | 1 | 126 | Cerebral Hemorrhage. Set to "1" if existed, otherwise '"0". |
| 84 | Disease Coefficients HCC96 | 1 | 127 | Ischemic or Unspecified Stroke. Set to "1" if existed, otherwise '"0". |
| 85 | Disease Coefficients HCC100 | 1 | 128 | Hemiplegia/Hemiparesis. Set to "1" if existed, otherwise '"0". |
| 86 | Disease Coefficients HCC101 | 1 | 129 | Cerebral Palsy and Other Paralytic Syndromes. Set to "1" if existed, otherwise '"0". |
| 87 | Disease Coefficients HCC104 | 1 | 130 | Vascular Disease with Complications. Set to "1" if existed, otherwise '"0". |
| 88 | Disease Coefficients HCC105 | 1 | 131 | Vascular Disease. Set to "1" if existed, otherwise '"0". |

Exhibit Z
Page 784



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**VERIFYING RISK SCORES**

**TABLE 8I – PART C RISK ADJUSTMENT MODEL OUTPUT DATA FILE (CONTINUED)**

**Detail/Beneficiary Record Format**

| # | Field Name | Len | Pos | Description |
|---|---|---|---|---|
| 89 | Disease Coefficients HCC107 | 1 | 132 | Cystic Fibrosis. Set to "1" if existed, otherwise "0". |
| 90 | Disease Coefficients HCC108 | 1 | 133 | Chronic Obstructive Pulmonary Disease. Set to "1" if existed, otherwise "0". |
| 91 | Disease Coefficients HCC111 | 1 | 134 | Aspiration and Specified Bacterial Pneumonias. Set to "1" if existed, otherwise "0". |
| 92 | Disease Coefficients HCC112 | 1 | 135 | Pneumococcal Pneumonia, Empyema, Lung Abscess. Set to "1" if existed, otherwise "0". |
| 93 | Disease Coefficients HCC119 | 1 | 136 | Proliferative Diabetic Retinopathy and Vitreous Hemorrhage. Set to "1" if existed, otherwise "0". |
| 94 | Disease Coefficients HCC130 | 1 | 137 | Dialysis Status. Set to "1" if existed, otherwise "0". |
| 95 | Disease Coefficients HCC131 | 1 | 138 | Renal Failure. Set to "1" if existed, otherwise "0". |
| 96 | Disease Coefficients HCC132 | 1 | 139 | Nephritis. Set to "1" if existed, otherwise "0". |
| 97 | Disease Coefficients HCC148 | 1 | 140 | Decubitus Ulcer of Skin. Set to "1" if existed, otherwise "0". |
| 98 | Disease Coefficients HCC149 | 1 | 141 | Chronic Ulcer of Skin, Except Decubitus. Set to "1" if existed, otherwise "0". |
| 99 | Disease Coefficients HCC150 | 1 | 142 | Extensive Third-Degree Burns. Set to "1" if existed, otherwise "0". |
| 100 | Disease Coefficients HCC154 | 1 | 143 | Severe Head Injury. Set to "1" if existed, otherwise "0". |
| 101 | Disease Coefficients HCC155 | 1 | 144 | Major Head Injury Set to "1" if existed, otherwise "0". |

Exhibit Z
Page 785



**TABLE 8I – PART C RISK ADJUSTMENT MODEL OUTPUT DATA FILE (CONTINUED)**

**Detail/Beneficiary Record Format**

| # | Field Name | Len | Pos | Description |
|---|---|---|---|---|
| 102 | Disease Coefficients HCC157 | 1 | 145 | Vertebral Fractures without Spinal Cord Injury. Set to "1" if existed, otherwise '"0". |
| 103 | Disease Coefficients HCC158 | 1 | 146 | Hip Fracture/Dislocation. Set to "1" if existed, otherwise '"0". |
| 104 | Disease Coefficients HCC161 | 1 | 147 | Traumatic Amputation. Set to "1" if existed, otherwise '"0". |
| 105 | Disease Coefficients HCC164 | 1 | 148 | Major Complications of Medical Care and Trauma. Set to "1" if existed, otherwise '"0". |
| 106 | Disease Coefficients HCC174 | 1 | 149 | Major Organ Transplant Status. Set to "1" if existed, otherwise '"0". |
| 107 | Disease Coefficients HCC176 | 1 | 150 | Artificial Openings for Feeding or Elimination. Set to "1" if existed, otherwise '"0". |
| 108 | Disease Coefficients HCC177 | 1 | 151 | Amputation Status, Lower Limb/Amputation Complications. Set to "1" if existed, otherwise '"0". |
| 109 | Disabled Disease HCC5 | 1 | 152 | Disabled*Opportunistic Infections. Set to "1" if existed, otherwise '"0". |
| 110 | Disabled Disease HCC44 | 1 | 153 | Disabled*Severe Hematological Disorders. Set to "1" if existed, otherwise '"0". |
| 111 | Disabled Disease HCC51 | 1 | 154 | Disabled*Drug/Alcohol Psychosis. Set to "1" if existed, otherwise '"0". |
| 112 | Disabled Disease HCC52 | 1 | 155 | Disabled*Drug/Alcohol Dependence. Set to "1" if existed, otherwise '"0". |
| 113 | Disabled Disease HCC107 | 1 | 156 | Disabled*Cystic Fibrosis. Set to "1" if existed, otherwise '"0". |
| 114 | Disease Interactions INT1 | 1 | 157 | DM_CHF. Set to "1" if existed, otherwise '"0". |
| 115 | Disease Interactions INT2 | 1 | 158 | DM_CVD. Set to "1" if existed, otherwise '"0". |

Exhibit Z
Page 786

1106
Exhibit 3



**TABLE 8I – PART C RISK ADJUSTMENT MODEL OUTPUT DATA FILE (CONTINUED)**

**Detail/Beneficiary Record Format**

| # | Field Name | Len | Pos | Description |
|---|---|---|---|---|
| 116 | Disease Interactions INT3 | 1 | 159 | CHF_COPD. Set to "1" if existed, otherwise '"0". |
| 117 | Disease Interactions INT4 | 1 | 160 | COPD_CVD_CAD. Set to "1" if existed, otherwise '"0". |
| 118 | Disease Interactions INT5 | 1 | 161 | RF_CHF. Set to "1" if existed, otherwise '"0". |
| 119 | Disease Interactions INT6 | 1 | 162 | RF_CHF_DM. Set to "1" if existed, otherwise '"0". |

**Trailer Record Format**

| # | Field Name | Len | Pos | Description |
|---|---|---|---|---|
| 1 | Record Type | 1 | 1 | Set to '3' |
| 2 | Contract Number | 5 | 2 – 6 | Managed Care Organization (MCO) identification number |
| 3 | Total Record Count | 9 | 7 – 15 | Record count in display format 9(9).  Includes header and trailer records. |
| 4 | Filler | 147 | 16 – 162 | Spaces |



**TABLE 8J – RAS Rx-HCC MOR RECORD FORMAT**

**Header Record Format**

| # | Field Name | Data Type | Starting Position | Ending position | Field Length | Comment | Field Description |
|---|---|---|---|---|---|---|---|
| 1 | Record Type Code | Char(1) | 1 | 1 | 1 | Set to "1" | 1 = Header, 2 = Details, 3 = Trailer |
| 2 | Contract Number | Char(5) | 2 | 6 | 5 | | Unique identification for a Medicare Advantage or stand-alone Prescription Drug Plan contract. |
| 3 | Run Date | Char(8) | 7 | 14 | 8 | Format as yyyymmdd | The run date when this file was created. |
| 4 | Payment Year and Month | Char(6) | 15 | 20 | 6 | Format as yyyymm | This identifies the risk adjustment payment year and month for the model run. |
| 5 | Filler | Char(142) | 21 | **164** | **144** | Spaces | |

**Detail/Beneficiary Record Format**

| # | Field Name | Data Type | Starting Position | Ending position | Field Length | Comment | Field Description |
|---|---|---|---|---|---|---|---|
| 1 | Record Type Code | Char(1) | 1 | 1 | 1 | Set to "2" | 1 = Header, 2 = Details, 3 = Trailer |
| 2 | Health Insurance Claim Account Number | Char(12) | 2 | 13 | 12 | Also known as HICAN | This is the Health Insurance Claim Account Number (known as HICAN) identifying the primary Medicare Beneficiary under the SSA or RRB programs.  The HICAN consist of Beneficiary Claim Number (BENE_CAN_NUM) along with the Beneficiary Identification Code (BIC_CD) uniquely identifies a Medicare Beneficiary. For the RRB program, the claim account number is a 12-byte account number. |

Exhibit Z
Page 788



**TABLE 8J – RAS Rx-HCC MOR RECORD FORMAT (CONTINUED)**

**Detail/Beneficiary Record Format**

| # | Field Name | Data Type | Starting Position | Ending position | Field Length | Comment | Field Description |
|---|------------|-----------|-------------------|-----------------|--------------|---------|-------------------|
| 3 | Beneficiary Last Name | Char(12) | 14 | 25 | 12 | First 12 bytes of the Bene Last Name | Beneficiary Last Name |
| 4 | Beneficiary First Name | Char(7) | 26 | 32 | 7 | First 7 bytes of the bene First Name | Beneficiary First Name |
| 5 | Beneficiary Initial | Char(1) | 33 | 33 | 1 | 1 byte Initial | Beneficiary Initial |
| 6 | Date of Birth | Char(8) | 34 | 41 | 8 | Formatted as yyyymmdd | The date of birth of the Medicare Beneficiary |
| 7 | Sex | Char(1) | 42 | 42 | 1 | 0=unknown, 1=male, 2=female | Represents the sex of the Medicare Beneficiary. Examples include Male and Female. |
| 8 | Social Security Number | Char(9) | 43 | 51 | 9 | Also known as SSN_NUM | The beneficiary's current identification number that was assigned by the Social Security Administration. |
| 9 | Age Group Female 0-34 | Char(1) | 52 | 52 | 1 | Set to "1" if applicable, otherwise '"0" | The sex and age group for the beneficiary based on a given as of date. Female between ages of 0 through 34. |
| 10 | Age Group Female35_44 | Char(1) | 53 | 53 | 1 | Set to "1" if applicable, otherwise "0" | The sex and age group for the beneficiary based on a given as of date. Female between ages of 35 through 44. |
| 11 | Age Group Female45_54 | Char(1) | 54 | 54 | 1 | Set to "1" if applicable, otherwise '"0" | The sex and age group for the beneficiary based on a given as of date. Female between ages of 45 through 54. |



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**VERIFYING RISK SCORES**

**TABLE 8J – Rx-HCC HCC MOR RECORD FORMAT (CONTINUED)**

**Detail/Beneficiary Record Format**

| # | Field Name | Data Type | Starting Position | Ending position | Field Length | Comment | Field Description |
|---|---|---|---|---|---|---|---|
| 12 | Age Group Female55_59 | Char(1) | 55 | 55 | 1 | Set to "1" if applicable, otherwise '"0" | The sex and age group for the beneficiary based on a given as of date. Female between ages of 55 through 59. |
| 13 | Age Group Female60_64 | Char(1) | 56 | 56 | 1 | Set to "1" if applicable, otherwise '"0" | The sex and age group for the beneficiary based on a given as of date. Female between ages of 60 through 64. |
| 14 | Age Group Female65_69 | Char(1) | 57 | 57 | 1 | Set to "1" if applicable, otherwise "0" | The sex and age group for the beneficiary based on a given as of date. Female between ages of 65 through 69. |
| 15 | Age Group Female70_74 | Char(1) | 58 | 58 | 1 | Set to "1" if applicable, otherwise "0" | The sex and age group for the beneficiary based on a given as of date. Female between ages of 70 through 74. |
| 16 | Age Group Female75_79 | Char(1) | 59 | 59 | 1 | Set to "1" if applicable, otherwise "0" | The sex and age group for the beneficiary based on a given as of date. Female between ages of 75 through 79. |
| 17 | Age Group Female80_84 | Char(1) | 60 | 60 | 1 | Set to "1" if applicable, otherwise "0" | The sex and age group for the beneficiary based on a given as of date. Female between ages of 80 through 84. |
| 18 | Age Group Female85_89 | Char(1) | 61 | 61 | 1 | Set to "1" if applicable, otherwise "0" | The sex and age group for the beneficiary based on a given as of date. Female between ages of 85 through 89. |
| 19 | Age Group Female90_94 | Char(1) | 62 | 62 | 1 | Set to "1" if applicable, otherwise "0" | The sex and age group for the beneficiary based on a given as of date. Female between ages of 90 through 94. |

Exhibit Z
Page 790



**TABLE 8J – RAS Rx-HCC MOR RECORD FORMAT (CONTINUED)**

**Detail/Beneficiary Record Format**

| # | Field Name | Data Type | Starting Position | Ending position | Field Length | Comment | Field Description |
|---|---|---|---|---|---|---|---|
| 20 | Age Group Female95_GT | Char(1) | 63 | 63 | 1 | Set to "1" if applicable, otherwise "0" | The sex and age group for the beneficiary based on a given as of date. Female between ages of 95 and greater. |
| 21 | Age Group Male0_34 | Char(1) | 64 | 64 | 1 | Set to "1" if applicable, otherwise "0" | The sex and age group for the beneficiary based on a given as of date. Male between ages of 0 through 34. |
| 22 | Age Group Male35_44 | Char(1) | 65 | 65 | 1 | Set to "1" if applicable, otherwise "0" | The sex and age group for the beneficiary based on a given as of date. Male between ages of 35 through 44. |
| 23 | Age Group Male45_54 | Char(1) | 66 | 66 | 1 | Set to "1" if applicable, otherwise "0" | The sex and age group for the beneficiary based on a given as of date. Male between ages of 45 through 54. |
| 24 | Age Group Male55_59 | Char(1) | 67 | 67 | 1 | Set to "1" if applicable, otherwise "0" | The sex and age group for the beneficiary based on a given as of date. Male between ages of 55 through 59. |
| 25 | Age Group Male60_64 | Char(1) | 68 | 68 | 1 | Set to "1" if applicable, otherwise "0" | The sex and age group for the beneficiary based on a given as of date. Male between ages of 60 through 64. |
| 26 | Age Group Male65_69 | Char(1) | 69 | 69 | 1 | Set to "1" if applicable, otherwise "0" | The sex and age group for the beneficiary based on a given as of date. Male between ages of 65 through 69. |
| 27 | Age Group Male70_74 | Char(1) | 70 | 70 | 1 | Set to "1" if applicable, otherwise "0" | The sex and age group for the beneficiary based on a given as of date. Male between ages of 70 through 74. |

Exhibit Z
Page 791



**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

**VERIFYING RISK SCORES**

**TABLE 8J – RAS Rx-HCC MOR RECORD FORMAT (CONTINUED)**

**Detail/Beneficiary Record Format**

| # | Field Name | Data Type | Starting Position | Ending position | Field Length | Comment | Field Description |
|---|---|---|---|---|---|---|---|
| 28 | Age Group Male75_79 | Char(1) | 71 | 71 | 1 | Set to "1" if applicable, otherwise "0" | The sex and age group for the beneficiary based on a given as of date. Male between ages of 75 through 79. |
| 29 | Age Group Male80_84 | Char(1) | 72 | 72 | 1 | Set to "1" if applicable, otherwise "0" | The sex and age group for the beneficiary based on a given as of date. Male between ages of 80 through 84. |
| 30 | Age Group Male85_89 | Char(1) | 73 | 73 | 1 | Set to "1" if applicable, otherwise "0" | The sex and age group for the beneficiary based on a given as of date. Male between ages of 85 through 89. |
| 31 | Age Group Male90_94 | Char(1) | 74 | 74 | 1 | Set to "1" if applicable, otherwise "0" | The sex and age group for the beneficiary based on a given as of date. Male between ages of 90 through 94. |
| 32 | Age Group Male95_GT | Char(1) | 75 | 75 | 1 | Set to "1" if applicable, otherwise "0" | The sex and age group for the beneficiary based on a given as of date. Male between ages of 95 and greater. |
| 33 | Originally Disabled Female | Char(1) | 76 | 76 | 1 | Set to "1" if applicable, otherwise "0" | Beneficiary is a female aged (age>64) and original Medicare entitlement was due to disability. |
| 34 | Originally Disabled Male | Char(1) | 77 | 77 | 1 | Set to "1" if applicable, otherwise "0" | Beneficiary is a male aged (age>64) and original Medicare entitlement was due to disability. |
| 35 | Disease Coefficients RXHCC1 | Char(1) | 78 | 78 | 1 | Set to "1" if applicable, otherwise "0" | HIV/AIDS |

Exhibit Z
Page 792



**TABLE 8J – RAS Rx-HCC MOR RECORD FORMAT (CONTINUED)**

**Detail/Beneficiary Record Format**

| # | Field Name | Data Type | Starting Position | Ending position | Field Length | Comment | Field Description |
|---|---|---|---|---|---|---|---|
| 36 | Disease Coefficients RXHCC2 | Char(1) | 79 | 79 | 1 | Set to "1" if applicable, otherwise "0" | Opportunistic Infections |
| 37 | Disease Coefficients RXHCC3 | Char(1) | 80 | 80 | 1 | Set to "1" if applicable, otherwise "0" | Infectious Diseases |
| 38 | Disease Coefficients RXHCC8 | Char(1) | 81 | 81 | 1 | Set to "1" if applicable, otherwise "0" | Acute Myeloid Leukemia |
| 39 | Disease Coefficients RXHCC9 | Char(1) | 82 | 82 | 1 | Set to "1" if applicable, otherwise "0" | Metastatic Cancer, Acute Leukemia, and Severe Cancers |
| 40 | Disease Coefficients RXHCC10 | Char(1) | 83 | 83 | 1 | Set to "1" if applicable, otherwise "0" | Lung, Upper Digestive Tract, and Other Severe Cancers |
| 41 | Disease Coefficients RXHCC17 | Char(1) | 84 | 84 | 1 | Set to "1" if applicable, otherwise "0" | Diabetes with Specified Complications |
| 42 | Disease Coefficients RXHCC18 | Char(1) | 85 | 85 | 1 | Set to "1" if applicable, otherwise "0" | Diabetes without Complication |
| 43 | Disease Coefficients RXHCC19 | Char(1) | 86 | 86 | 1 | Set to "1" if applicable, otherwise "0" | Disorders of Lipoid Metabolism |
| 44 | Disease Coefficients RXHCC20 | Char(1) | 87 | 87 | 1 | Set to "1" if applicable, otherwise "0" | Other Significant Endocrine and Metabolic Disorders |

Exhibit Z
Page 793



**TABLE 8J – RAS Rx-HCC MOR RECORD FORMAT (CONTINUED)**

**Detail/Beneficiary Record Format**

| # | Field Name | Data Type | Starting Position | Ending position | Field Length | Comment | Field Description |
|---|---|---|---|---|---|---|---|
| 45 | Disease Coefficients RXHCC21 | Char(1) | 88 | 88 | 1 | Set to "1" if applicable, otherwise "0" | Other Specified Endocrine/Metabolic/ Nutritional Disorders |
| 46 | Disease Coefficients RXHCC24 | Char(1) | 89 | 89 | 1 | Set to "1" if applicable, otherwise "0" | Chronic Viral Hepatitis |
| 47 | Disease Coefficients RXHCC31 | Char(1) | 90 | 90 | 1 | Set to "1" if applicable, otherwise "0" | Chronic Pancreatic Disease |
| 48 | Disease Coefficients RXHCC33 | Char(1) | 91 | 91 | 1 | Set to "1" if applicable, otherwise "0" | Inflammatory Bowel Disease |
| 49 | Disease Coefficients RXHCC34 | Char(1) | 92 | 92 | 1 | Set to "1" if applicable, otherwise "0" | Peptic Ulcer and Gastrointestinal Hemorrhage |
| 50 | Disease Coefficients RXHCC37 | Char(1) | 93 | 93 | 1 | Set to "1" if applicable, otherwise "0" | Esophageal Disease |
| 51 | Disease Coefficients RXHCC39 | Char(1) | 94 | 94 | 1 | Set to "1" if applicable, otherwise "0" | Bone/Joint/Muscle Infections/Necrosis |
| 52 | Disease Coefficients RXHCC40 | Char(1) | 95 | 95 | 1 | Set to "1" if applicable, otherwise "0" | Bechets Syndrome and Other Connective Tissue Disease |
| 53 | Disease Coefficients RXHCC41 | Char(1) | 96 | 96 | 1 | Set to "1" if applicable, otherwise "0" | Rheumatoid Arthritis and Other Inflammatory Polyarthropathy |



**TABLE 8J – RAS Rx-HCC MOR RECORD FORMAT (CONTINUED)**

**Detail/Beneficiary Record Format**

| # | Field Name | Data Type | Starting Position | Ending position | Field Length | Comment | Field Description |
|---|---|---|---|---|---|---|---|
| 54 | Disease Coefficients RXHCC42 | Char(1) | 97 | 97 | 1 | Set to "1" if applicable, otherwise "0" | Inflammatory Spondylopathies |
| 55 | Disease Coefficients RXHCC43 | Char(1) | 98 | 98 | 1 | Set to "1" if applicable, otherwise "0" | Polymyalgia Rheumatica |
| 56 | Disease Coefficients RXHCC44 | Char(1) | 99 | 99 | 1 | Set to "1" if applicable, otherwise "0" | Psoriatic Arthropathy |
| 57 | Disease Coefficients RXHCC45 | Char(1) | 100 | 100 | 1 | Set to "1" if applicable, otherwise "0" | Disorders of the Vertebrae and Spinal Discs |
| 58 | Disease Coefficients RXHCC47 | Char(1) | 101 | 101 | 1 | Set to "1" if applicable, otherwise "0" | Osteoporosis and Vertebral Fractures |
| 59 | Disease Coefficients RXHCC48 | Char(1) | 102 | 102 | 1 | Set to "1" if applicable, otherwise "0" | Other Musculoskeletal and Connective Tissue Disorders |
| 60 | Disease Coefficients RXHCC51 | Char(1) | 103 | 103 | 1 | Set to "1" if applicable, otherwise "0" | Severe Hematological Disorders |
| 61 | Disease Coefficients RXHCC52 | Char(1) | 104 | 104 | 1 | Set to "1" if applicable, otherwise "0" | Disorders of Immunity |
| 62 | Disease Coefficients RXHCC54 | Char(1) | 105 | 105 | 1 | Set to "1" if applicable, otherwise "0" | Polycythemia Vera |

Exhibit Z
Page 795



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**VERIFYING RISK SCORES**

**TABLE 8J – RAS Rx-HCC MOR RECORD FORMAT (CONTINUED)**

**Detail/Beneficiary Record Format**

| # | Field Name | Data Type | Starting Position | Ending position | Field Length | Comment | Field Description |
|---|---|---|---|---|---|---|---|
| 63 | Disease Coefficients RXHCC55 | Char(1) | 106 | 106 | 1 | Set to "1" if applicable, otherwise "0" | Coagulation Defects and Other Specified Blood Diseases |
| 64 | Disease Coefficients RXHCC57 | Char(1) | 107 | 107 | 1 | Set to "1" if applicable, otherwise "0" | Delirium and Encephalopathy |
| 65 | Disease Coefficients RXHCC59 | Char(1) | 108 | 108 | 1 | Set to "1" if applicable, otherwise "0" | Dementia with Depression/Behavioral Disturbance |
| 66 | Disease Coefficients RXHCC60 | Char(1) | 109 | 109 | 1 | Set to "1" if applicable, otherwise "0" | Dementia/Cerebral Degeneration |
| 67 | Disease Coefficients RXHCC65 | Char(1) | 110 | 110 | 1 | Set to "1" if applicable, otherwise "0" | Schizophrenia |
| 68 | Disease Coefficients RXHCC66 | Char(1) | 111 | 111 | 1 | Set to "1" if applicable, otherwise "0" | Other Major Psychiatric Disorders |
| 69 | Disease Coefficients RXHCC67 | Char(1) | 112 | 112 | 1 | Set to "1" if applicable, otherwise "0" | Other Psychiatric Symptoms/Syndromes |
| 70 | Disease Coefficients RXHCC75 | Char(1) | 113 | 113 | 1 | Set to "1" if applicable, otherwise "0" | Attention Deficit Disorder |
| 71 | Disease Coefficients RXHCC76 | Char(1) | 114 | 114 | 1 | Set to "1" if applicable, otherwise "0" | Motor Neuron Disease and Spinal Muscular Atrophy |

Exhibit Z
Page 796



**TABLE 8J – RAS Rx-HCC MOR RECORD FORMAT (CONTINUED)**

**Detail/Beneficiary Record Format**

| # | Field Name | Data Type | Starting Position | Ending position | Field Length | Comment | Field Description |
|---|---|---|---|---|---|---|---|
| 72 | Disease Coefficients RXHCC77 | Char(1) | 115 | 115 | 1 | Set to "1" if applicable, otherwise "0" | Quadriplegia, Other Extensive Paralysis, and Spinal Cord Injuries |
| 73 | Disease Coefficients RXHCC78 | Char(1) | 116 | 116 | 1 | Set to "1" if applicable, otherwise "0" | Muscular Dystrophy |
| 74 | Disease Coefficients RXHCC79 | Char(1) | 117 | 117 | 1 | Set to "1" if applicable, otherwise "0" | Polyneuropathy, Except Diabetic |
| 75 | Disease Coefficients RXHCC80 | Char(1) | 118 | 118 | 1 | Set to "1" if applicable, otherwise "0" | Multiple Sclerosis |
| 76 | Disease Coefficients RXHCC81 | Char(1) | 119 | 119 | 1 | Set to "1" if applicable, otherwise "0" | Parkinson's Disease |
| 77 | Disease Coefficients RXHCC82 | Char(1) | 120 | 120 | 1 | Set to "1" if applicable, otherwise "0" | Huntington's Disease |
| 78 | Disease Coefficients RXHCC83 | Char(1) | 121 | 121 | 1 | Set to "1" if applicable, otherwise "0" | Seizure Disorders and Convulsions |
| 79 | Disease Coefficients RXHCC85 | Char(1) | 122 | 122 | 1 | Set to "1" if applicable, otherwise "0" | Migraine Headaches |
| 80 | Disease Coefficients RXHCC86 | Char(1) | 123 | 123 | 1 | Set to "1" if applicable, otherwise "0" | Mononeuropathy, Other Abnormal Movement Disorders |



**TABLE 8J – RAS Rx-HCC MOR RECORD FORMAT (CONTINUED)**

**Detail/Beneficiary Record Format**

| # | Field Name | Data Type | Starting Position | Ending position | Field Length | Comment | Field Description |
|---|---|---|---|---|---|---|---|
| 81 | Disease Coefficients RXHCC87 | Char(1) | 124 | 124 | 1 | Set to "1" if applicable, otherwise "0" | Other Neurological Conditions/Injuries |
| 82 | Disease Coefficients RXHCC91 | Char(1) | 125 | 125 | 1 | Set to "1" if applicable, otherwise "0" | Congestive Heart Failure |
| 83 | Disease Coefficients RXHCC92 | Char(1) | 126 | 126 | 1 | Set to "1" if applicable, otherwise "0" | Acute Myocardial Infarction and Unstable Angina |
| 84 | Disease Coefficients RXHCC98 | Char(1) | 127 | 127 | 1 | Set to "1" if applicable, otherwise "0" | Hypertensive Heart Disease or Hypertension |
| 85 | Disease Coefficients RXHCC99 | Char(1) | 128 | 128 | 1 | Set to "1" if applicable, otherwise "0" | Specified Heart Arrhythmias |
| 86 | Disease Coefficients RXHCC102 | Char(1) | 129 | 129 | 1 | Set to "1" if applicable, otherwise "0" | Cerebral Hemorrhage and Effects of Stroke |
| 87 | Disease Coefficients RXHCC105 | Char(1) | 130 | 130 | 1 | Set to "1" if applicable, otherwise "0" | Pulmonary Embolism and Deep Vein Thrombosis |
| 88 | Disease Coefficients RXHCC106 | Char(1) | 131 | 131 | 1 | Set to "1" if applicable, otherwise "0" | Vascular Disease |
| 89 | Disease Coefficients RXHCC108 | Char(1) | 132 | 132 | 1 | Set to "1" if applicable, otherwise "0" | Cystic Fibrosis |

Exhibit Z
Page 798



**TABLE 8J – RAS Rx-HCC MOR RECORD FORMAT (CONTINUED)**

**Detail/Beneficiary Record Format**

| # | Field Name | Data Type | Starting Position | Ending position | Field Length | Comment | Field Description |
|---|---|---|---|---|---|---|---|
| 90 | Disease Coefficients RXHCC109 | Char(1) | 133 | 133 | 1 | Set to "1" if applicable, otherwise "'0" | Asthma and COPD |
| 91 | Disease Coefficients RXHCC110 | Char(1) | 134 | 134 | 1 | Set to "1" if applicable, otherwise "'0" | Fibrosis of Lung and Other Chronic Lung Disorders |
| 92 | Disease Coefficients RXHCC111 | Char(1) | 135 | 135 | 1 | Set to "1" if applicable, otherwise "'0" | Aspiration and Specified Bacterial Pneumonias |
| 93 | Disease Coefficients RXHCC112 | Char(1) | 136 | 136 | 1 | Set to "1" if applicable, otherwise "'0" | Empyema, Lung Abscess, and Fungal and Parasitic Lung Infections |
| 94 | Disease Coefficients RXHCC113 | Char(1) | 137 | 137 | 1 | Set to "1" if applicable, otherwise "'0" | Acute Bronchitis and Congenital Lung/Respiratory Anomaly |
| 95 | Disease Coefficients RXHCC120 | Char(1) | 138 | 138 | 1 | Set to "1" if applicable, otherwise "'0" | Vitreous Hemorrhage and Vascular Retinopathy, Except Diabetic |
| 96 | Disease Coefficients RXHCC121 | Char(1) | 139 | 139 | 1 | Set to "1" if applicable, otherwise "'0" | Macular Degeneration and Retinal Disorders, Except Detachment and Vascular Retinopathies |
| 98 | Disease Coefficients RXHCC122 | Char(1) | 140 | 140 | 1 | Set to "1" if applicable, otherwise "'0" | Open-angle Glaucoma |
| 99 | Disease Coefficients RXHCC123 | Char(1) | 141 | 141 | 1 | Set to "1" if applicable, otherwise "'0" | Glaucoma and Keratoconus |

**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**VERIFYING RISK SCORES**

**TABLE 8J – RAS Rx-HCC MOR RECORD FORMAT (CONTINUED)**

**Detail/Beneficiary Record Format**

| # | Field Name | Data Type | Starting Position | Ending position | Field Length | Comment | Field Description |
|---|---|---|---|---|---|---|---|
| 100 | Disease Coefficients RXHCC126 | Char(1) | 142 | 142 | 1 | Set to "1" if applicable, otherwise "0" | Larynx/Vocal Cord Diseases |
| 101 | Disease Coefficients RXHCC129 | Char(1) | 143 | 143 | 1 | Set to "1" if applicable, otherwise "0" | Other Diseases of Upper Respiratory System |
| 102 | Disease Coefficients RXHCC130 | Char(1) | 144 | 144 | 1 | Set to "1" if applicable, otherwise "0" | Salivary Gland Diseases |
| 103 | Disease Coefficients RXHCC132 | Char(1) | 145 | 145 | 1 | Set to "1" if applicable, otherwise "0" | Kidney Transplant Status |
| 104 | Disease Coefficients RXHCC134 | Char(1) | 146 | 146 | 1 | Set to "1" if applicable, otherwise "0" | Chronic Renal Failure |
| 105 | Disease Coefficients RXHCC135 | Char(1) | 147 | 147 | 1 | Set to "1" if applicable, otherwise "0" | Nephritis |
| 106 | Disease Coefficients RXHCC137 | Char(1) | 148 | 148 | 1 | Set to "1" if applicable, otherwise "0" | Urinary Obstruction and Retention |
| 107 | Disease Coefficients RXHCC138 | Char(1) | 149 | 149 | 1 | Set to "1" if applicable, otherwise "0" | Fecal Incontinence |
| 108 | Disease Coefficients RXHCC139 | Char(1) | 150 | 150 | 1 | Set to "1" if applicable, otherwise "0" | Incontinence |

Exhibit Z
Page 800

1120
Exhibit 3



**2008 Risk Adjustment Data Technical Assistance**
**For Medicare Advantage Organizations**
**Participant Guide**

**VERIFYING RISK SCORES**

**TABLE 8J – RAS Rx-HCC MOR RECORD FORMAT (CONTINUED)**

**Detail/Beneficiary Record Format**

| # | Field Name | Data Type | Starting Position | Ending position | Field Length | Comment | Field Description |
|---|---|---|---|---|---|---|---|
| 109 | Disease Coefficients RXHCC140 | Char(1) | 151 | 151 | 1 | Set to "1" if applicable, otherwise "0" | Impaired Renal Function and Other Urinary Disorders |
| 110 | Disease Coefficients RXHCC144 | Char(1) | 152 | 152 | 1 | Set to "1" if applicable, otherwise "0" | Vaginal and Cervical Diseases |
| 111 | Disease Coefficients RXHCC145 | Char(1) | 153 | 153 | 1 | Set to "1" if applicable, otherwise "0" | Female Stress Incontinence |
| 112 | Disease Coefficients RXHCC157 | Char(1) | 154 | 154 | 1 | Set to "1" if applicable, otherwise "0" | Chronic Ulcer of Skin, Except Decubitus |
| 113 | Disease Coefficients RXHCC158 | Char(1) | 155 | 155 | 1 | Set to "1" if applicable, otherwise "0" | Psoriasis |
| 114 | Disease Coefficients RXHCC159 | Char(1) | 156 | 156 | 1 | Set to "1" if applicable, otherwise "0" | Cellulitis and Local Skin Infection |
| 115 | Disease Coefficients RXHCC160 | Char(1) | 157 | 157 | 1 | Set to "1" if applicable, otherwise "0" | Bullous Dermatoses and Other Specified Erythematous Conditions |
| 116 | Disease Coefficients RXHCC165 | Char(1) | 158 | 158 | 1 | Set to "1" if applicable, otherwise "0" | Vertebral Fractures without Spinal Cord Injury |
| 117 | Disease Coefficients RXHCC166 | Char(1) | 159 | 159 | 1 | Set to "1" if applicable, otherwise "0" | Pelvic Fracture |

Exhibit Z
Page 801



**2008 Risk Adjustment Data Technical Assistance
For Medicare Advantage Organizations
Participant Guide**

**VERIFYING RISK SCORES**

### TABLE 8J – RAS Rx-HCC MOR RECORD FORMAT (CONTINUED)

**Detail/Beneficiary Record Format**

| # | Field Name | Data Type | Starting Position | Ending position | Field Length | Comment | Field Description |
|---|---|---|---|---|---|---|---|
| 118 | Disease Coefficients RXHCC186 | Char(1) | 160 | 160 | 1 | Set to "1" if applicable, otherwise '"0" | Major Organ Transplant Status |
| 119 | Disease Coefficients RXHCC187 | Char(1) | 161 | 161 | 1 | Set to "1" if applicable, otherwise "0" | Other Organ Transplant/Replacement |
| 120 | Disabled Disease RXHCC65 | Char(1) | 162 | 162 | 1 | Set to "1" if applicable, otherwise "0" | Disabled (Age<65) and Schizophrenia |
| 121 | Disabled Disease RXHCC66 | Char(1) | 163 | 163 | 1 | Set to "1" if applicable, otherwise "0" | Disable (Age<65) and Other Major Psychiatric Disorders |
| 122 | Disabled Disease RXHCC108 | Char(1) | 164 | 164 | 1 | Set to "1" if applicable, otherwise "0" | Disabled (Age<65) and Cystic Fibrosis |
| | | | 164 | 164 | 164 | | |

Exhibit Z
Page 802



**TABLE 8J – RAS Rx-HCC MOR RECORD FORMAT (CONTINUED)**

**Trailer Record Format**

| # | Field Name | Data Type | Starting Position | Ending Position | Field Length | Comment | Field Description |
|---|---|---|---|---|---|---|---|
| 1 | Record Type Code | Char(1) | 1 | 1 | 1 | Set to "3" | 1 = Header, 2 = Details, 3 = Trailer |
| 2 | Contract Number | Char(5) | 2 | 6 | 5 | | Unique identification for a Medicare Advantage or stand-alone Prescription Drug Plan contract. |
| 3 | Total Record Count | Char(9) | 7 | 15 | 9 | Includes all header and trailer records | Record count in display format 9(9). |
| 4 | Filler | Char(151) | 16 | 164 | 149 | Spaces | |

Exhibit Z
Page 803

Exhibit 3



Figure 8G illustrates an example of a Part C MOR report. Figure 8H illustrates an example of a RAS RxHCC MOR report.

**Figure 8G – Part C MOR Report Format**

```
1***GROUP=H8888,CONTRACT=H8888,
1RUN DATE: 20031219               RISK ADJUSTMENT MODEL OUTPUT REPORT
PAGE:     1
PAYMENT MONTH: 200401             PLAN: H8888 CHAMPION INSURANCE
RAPMORP1
0          LAST         FIRST                          DATE OF
  HIC      NAME         NAME          I                BIRTH   SEX & AGE GROUP
------------ -------------- --------------- -          -------- ---------------

  123456789A  WOOD         CHARLES       W              19250225  Male75-79

  123456789B  TREE         LILLIAN       L              19270418  Female75-79

  123456789A  GRASS        ALBERT        A              19421213  Male60-64
  HCC DISEASE  GROUPS:  HCC019 Diabetes without Complication
                        HCC080 Congestive Heart Failure
                        HCC092 Specified Heart Arrhythmias
  INTERACTIONS:         INTI01 DM_CHF
```

Source: Plan Communications User's Guide Appendices, Version 3.1 (April 18, 2008). Centers for Medicare & Medicaid Services.

Exhibit Z
Page 804



**Figure 8H - RAS RxHCC MOR Report Format**

```
1RUN DATE: 20060124                    RISK ADJUSTMENT MODEL OUTPUT REPORT
PAGE:      1
PAYMENT MONTH: 200602                  PLAN: H9999 ACME INSURANCE COMPANY
RAPMORP2
0             LAST                          FIRST                          DATE OF
  HIC         NAME                          NAME                         I BIRTH   SEX & AGE GROUP
  ----------- ---------                     ------------------           - -------- ------

  123456789A  TWO                           RUTH                         M 19181122 Female85-89
  RXHCC DISEASE  GROUPS:  RXHCC019 Disorders of Lipoid Metabolism
                          RXHCC048 Other Musculoskeletal and Connective Tissue Disorders
                          RXHCC092 Acute Myocardial Infarction and Unstable Angina
                          RXHCC098 Hypertensive Heart Disease or Hypertension
                          RXHCC159 Cellulitis, Local Skin Infection

  123456789A  BREEZE                        WINDY                        T 19620730 Female35-44
  RXHCC DISEASE  GROUPS:  RXHCC045 Disorders of the Vertebrae and Spinal Discs
                          RXHCC085 Migraine Headaches
                          RXHCC098 Hypertensive Heart Disease or Hypertension
                          RXHCC113 Acute Bronchitis and Congenital Lung/Respiratory Anomaly
                          RXHCC129 Other Diseases of Upper Respiratory System
                          RXHCC144 Vaginal and Cervical Diseases
```

Source: Plan Communications User's Guide Appendices, Version 3.1 (April 18, 2008). Centers for Medicare & Medicaid Services.

# EXHIBIT AA

1  CHAD A. READLER
   Acting Assistant Attorney General, Civil Division
2  NICOLA T. HANNA
   United States Attorney
3  DOROTHY A. SCHOUTEN
   DAVID K. BARRETT
4  DAVID M. HARRIS
   JOHN E. LEE (CBN 128696)
5  Assistant United States Attorneys
        300 N. Los Angeles Street, Room 7516
6        Los Angeles, California 90012
         Tel: (213) 894-3995; Fax: (213) 894-7819
7        Email: john.lee2@usdoj.gov
   MICHAEL D. GRANSTON
8  DANIEL R. ANDERSON
   CAROL L. WALLACK
9  JUSTIN DRAYCOTT
   PAUL G. FREEBORNE
10 JESSICA KRIEG
   PAUL PERKINS
11 Attorneys, Civil Division
   United States Department of Justice
12      P.O. Box 261, Ben Franklin Station
        Washington, D.C. 20044
13      Tel: (202) 307-0486; Fax: (202) 307-3852
        Email:  carol.wallack@usdoj.gov
14 JAMES P. KENNEDY, JR.
   United States Attorney
15 KATHLEEN ANN LYNCH
   Assistant United States Attorney (Admitted PHV)
16      138 Delaware Avenue
        Buffalo, New York 14201
17      Tel: (716) 843-5830; Fax: (716) 551-3052
        Email: kathleen.lynch@usdoj.gov
18 Attorneys for the United States of America

19              UNITED STATES DISTRICT COURT

20          FOR THE CENTRAL DISTRICT OF CALIFORNIA

21                   WESTERN DIVISION

22 UNITED STATES OF AMERICA *ex*          No. CV 16-08697 MWF (SSx)
   *rel.* BENJAMIN POEHLING,
23                                        ORDER GRANTING STIPULATION
            Plaintiffs,                   REGARDING EXPERT DISCOVERY
24
                 v.                       [Filed Concurrently with Joint Stipulation
25                                        Regarding Expert Discovery]
   UNITEDHEALTH GROUP, INC., *et al.*,
26                                        [Discovery Document: Referred to
            Defendants.                   Magistrate Judge Suzanne H. Segal]
27

28

                              ORDER GRANTING STIP. RE EXPERT DISCOVERY
                              Case No. CV 16-08697 MWF (SSx)

Exhibit AA
Page 806

1    Upon stipulation of the parties, and for good cause appearing, the Court hereby
2    orders as follows:
3    1.    To facilitate expert discovery in this matter and to minimize the number of
4    potential discovery issues relating to experts, the parties have agreed to certain aspects
5    concerning the scope of expert-related discovery in this matter.  The disclosures of
6    documents, data, and information required by paragraph 2 of this Stipulation are not
7    meant to be exclusive, however, and the parties reserve their rights to seek disclosure or
8    discovery of additional documents, data, and information relating to any disclosed
9    expert, consistent with the objectives of Rule 26(a)(2)(A) and Rule 26(b)(1) of the
10   Federal Rules of Civil Procedure.  In addition, paragraphs 5 and 6 of this Stipulation are
11   not meant to prevent the parties from seeking disclosure or discovery of documents, data,
12   or information not otherwise protected from disclosure by those paragraphs.
13   2.    For each expert witness required to be disclosed by Rule 26(a)(2)(A) of the
14   Federal Rules of Civil Procedure, the parties will make the following disclosures:
15        a.    On the due dates set by the Court:  All final initial and rebuttal
16              report(s) required for experts designated under Rule 26(a)(2)(B)
17              (complying with all six subparts) and all disclosures required for
18              experts designated under Rule 26(a)(2)(C) (complying with both
19              subparts).
20        b.    Within three business days after the due dates set by the Court for
21              reports and disclosures under paragraph 2(a):  A list by production
22              numbers or other sufficient description of all documents (including
23              all data) relied upon by the disclosed expert as a basis for an opinion
24              rendered in this litigation and, if not previously produced in discovery
25              and not readily available to the opposing party, copies of the
26              documents (including all data) relied upon by the disclosed expert as
27              a basis for an opinion rendered in this litigation.
28

**ORDER GRANTING STIP. RE EXPERT DISCOVERY**
**Case No. CV 16-08697 MWF (SSx)**
2

     c.     Within three business days after the due dates set by the Court for reports and disclosures under paragraph 2(a):  Copies of expert reports prepared by the expert in other cases, if the reports were provided to the opposing parties in the other cases and the reports directly relate to the subject matter(s) of any of the expert's opinions in this action (unless the reports are protected from disclosure by court order).

     d.     To the extent that any report or disclosure will include or reference calculations, exhibits, information, or data processed or modeled by a computer program and relied upon by the expert in forming his or her opinions, the party providing the report or disclosure shall (i) produce electronically readable copies of the final processed or modeled data, and (ii) disclose complete formulas, computer programs, scripts, technical instructions, and data fields sufficient to recreate the calculations, exhibits, information, or data.  The timing of the production and disclosure required by this subsection shall be determined by the parties and/or Court in a future stipulation entered into by the parties and/or future order entered by the Court prior to the commencement of expert discovery in this action.

3.     All electronic data, together with instructions, field descriptions and work product shall be hand-delivered, electronically transmitted, or shipped overnight to opposing counsel or a person designated by opposing counsel.

4.     For initial expert disclosures, to the extent the parties need to supplement their disclosures because of developments occurring after their disclosures were made pursuant to paragraph 2 above, they agree to do so for any given disclosed expert at least 10 business days prior to that expert's deposition.  If developments occurring within the 10 business days prior to the expert's deposition require the supplementation of his or

**ORDER GRANTING STIP. RE EXPERT DISCOVERY**
**Case No. CV 16-08697 MWF (SSx)**

3

Exhibit AA
Page 808

her disclosures, the party making the disclosures shall (i) immediately notify the opposing party; (ii) provide the supplemental disclosures within 5 business days; and (iii) at the opposing party's option, agree to reschedule the deposition to a date not more than 10 business days from when it was initially scheduled.  For the purpose of this paragraph, developments that may justify supplementation include the production of new documents or data, new fact witness testimony, or the discovery of new facts.  In addition to and notwithstanding the provisions in this paragraph, the parties must comply with Federal Rule of Civil Procedure 26(e) relating to the supplementation of disclosures.

     5.    The following categories of documents, information, or data do not need to be disclosed by any party, and are outside the scope of permissible discovery (including deposition questions):

     a.    Any form of oral or written communication or correspondence that is not being relied upon by a disclosed expert in forming any opinions in his or her final report(s), and that was exchanged or shared between that expert (or any of his or her agents or employees) and:

     i.    Any person assisting that expert, including but not limited to clerical or support staff;

     ii.    Counsel for any party offering that expert's testimony, including counsel's agents or employees;

     iii.    Another testifying expert, including that expert's agents or employees; and

     iv.    Any non-testifying expert, including that expert's agents or employees.

     b.    Any work product, such as notes or recordings, created by a disclosed expert (or any of his or her agents or employees) that relates to any communication or correspondence described under subparagraph (a)

**ORDER GRANTING STIP. RE EXPERT DISCOVERY**
**Case No. CV 16-08697 MWF (SSx)**

4

1         and that is not being relied upon by a disclosed expert in forming any

2         opinions in his or her final report(s).

3     c.     All draft reports and affidavits, draft studies, or draft work papers;

4         preliminary or intermediate calculations, computations, data

5         formulations, data runs, or database operations; and any other

6         preliminary, intermediate or draft materials prepared by, for, or at the

7         direction of a disclosed expert (or any of his or her agents or

8         employees).

9     6.     In addition to the limitations on discovery set forth in paragraph 5 above,

10 the parties agree that any documents, information, or data that may have been considered

11 by a disclosed expert but ultimately were not relied upon by that expert in forming any

12 opinions in his or her final report(s) do not need to be disclosed or produced. Nothing in

13 paragraph 5 or this paragraph, however, shall be construed to prevent substantive

14 deposition questions with respect to any data or other non-privileged information that

15 may be relevant to the substance of a disclosed expert's opinions (including alternative

16 theories, methodologies, variables, or assumptions that the expert might or could have

17 considered in formulating his or her opinions or in preparing his or her report).

18     7.     No subpoenas for deposition need to be served on any disclosed expert.

19 Instead, the party or parties offering that expert's testimony shall make the expert

20 available for deposition at a time and place mutually agreed to by the parties.

21     8.     The parties agree to comply with this Stipulation pending the Court's

22 approval and entry of the accompanying proposed Order.

23     It is SO ORDERED.

24 Dated:  5/17/18

25

26              **/S/ SUZANNE H. SEGAL**

27              UNITED STATES MAGISTRATE JUDGE

28

                       **ORDER GRANTING STIP. RE EXPERT DISCOVERY**
                            **Case No. CV 16-08697 MWF (SSx)**

5

Exhibit AA
Page 810

1  MICHAEL D. GRANSTON
   Deputy Assistant Attorney General, Civil Division
2  TRACY L. WILKISON
   Acting United States Attorney
3  DAVID M. HARRIS
   ABRAHAM C. MELTZER
4  JOHN E. LEE (CBN 128696)
   JACK D. ROSS (CBN 265883)
5  Assistant United States Attorneys
           300 N. Los Angeles Street, Room 7516
6          Los Angeles, California 90012
           Tel: (213) 894-3995; Fax: (213) 894-7819
7          Email: john.lee2@usdoj.gov
   JAMIE A. YAVELBERG
8  ROBERT McAULIFFE
   EDWARD CROOKE
9  LINDA M. McMAHON
   JESSICA E. KRIEG
10 AMY L. LIKOFF
   GREGORY A. MASON
11 MARTHA N. GLOVER
   WENDY ZUPAC
12 Attorneys, Civil Division, U.S. Department of Justice
           P.O. Box 261, Ben Franklin Station
13         Washington, D.C. 20044
           Tel: (202) 307-0486; Fax: (202) 307-3852
14         Email: robert.mcauliffe@usdoj.gov
   JAMES P. KENNEDY, JR.
15 United States Attorney
   DAVID CORIELL
16 Assistant United States Attorney (Admitted PHV)
           138 Delaware Avenue
17         Buffalo, New York 14201
           Tel: (716) 843-5830; Fax: (716) 551-3052
18         Email: david.coriell@usdoj.gov
   Attorneys for the United States of America
19
                 UNITED STATES DISTRICT COURT
20        FOR THE CENTRAL DISTRICT OF CALIFORNIA
                      WESTERN DIVISION
21

22 | UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING, | No. CV 16-08697 FMO (SSx) |
|---|---|
23 | Plaintiffs, | [PROPOSED] ORDER GRANTING UNITED STATES' MOTION TO COMPEL DISCOVERY |
24 | v. | |
25 | UNITEDHEALTH GROUP, INC., *et al.*, | DISCOVERY MATTER Special Master Suzanne H. Segal |
26 | Defendants. | Date: April 29, 2021 Time: 1:00 p.m. |
27 | | Discovery cutoff date: December 6, 2021 Pretrial conference date: February 3, 2023 |
28 | | Trial Date: February 21, 2023 |

1    Pursuant to the motion to compel filed by the United States on April 16, 2021, and
2    upon good cause appearing, it is HEREBY ORDERED that the United States' motion is
3    GRANTED.  Accordingly, by no later than _____, United Health shall:
4        (1) answer United States' Interrogatory No. 14; and
5        (2) produce all non-privileged documents that are responsive to United States'
6        Request for Production No. 147, for all medical charts associated with any
7        diagnosis codes UnitedHealth contends are supported by medical records.
8
9    Dated: _____        _____
10                                          HON. SUZANNE SEGAL (Ret.)
                                            Special Master
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2

Exhibit 4

MICHAEL D. GRANSTON
Deputy Assistant Attorney General, Civil Division
TRACY L. WILKISON
Acting United States Attorney
DAVID M. HARRIS
ABRAHAM C. MELTZER
JOHN E. LEE (CBN 128696)
JACK D. ROSS (CBN 265883)
Assistant United States Attorneys
        300 N. Los Angeles Street, Room 7516
        Los Angeles, California 90012
        Tel: (213) 894-3995; Fax: (213) 894-7819
        Email: john.lee2@usdoj.gov
JAMIE A. YAVELBERG
ROBERT McAULIFFE
EDWARD CROOKE
LINDA M. McMAHON
JESSICA E. KRIEG
AMY L. LIKOFF
GREGORY A. MASON
MARTHA N. GLOVER
WENDY ZUPAC
Attorneys, Civil Division, U.S. Department of Justice
        P.O. Box 261, Ben Franklin Station
        Washington, D.C. 20044
        Tel: (202) 307-0486; Fax: (202) 307-3852
        Email: robert.mcauliffe@usdoj.gov
JAMES P. KENNEDY, JR.
United States Attorney
DAVID CORIELL
Assistant United States Attorney (Admitted PHV)
        138 Delaware Avenue
        Buffalo, New York 14201
        Tel: (716) 843-5830; Fax: (716) 551-3052
        Email: david.coriell@usdoj.gov
Attorneys for the United States of America

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING,<br><br>Plaintiffs,<br><br>v.<br><br>UNITEDHEALTH GROUP, INC., *et al.*,<br><br>Defendants. | No. CV 16-08697 FMO (SSx)<br><br>UNITED STATES' SUPPLEMENTAL MEMORANDUM RE UNITED STATES' MOTION TO COMPEL DISCOVERY<br><br>DISCOVERY MATTER<br>Special Master Suzanne H. Segal<br><br>Date:  April 29, 2021<br>Time:  1:00 p.m.<br>Discovery cutoff date:  December 6, 2021<br>Pretrial conference date:  February 3, 2023<br>Trial Date:  February 21, 2023 |

1    UnitedHeathcare ("United") devotes much of its brief to arguing that the

2  government's case has "fundamental defects" and that United "disputes the

3  government's underlying factual theory of 'falsity.'"   Joint Stip. at 4, 12.  But this is a

4  discovery dispute, not a motion for summary judgment.  The question before the Court is

5  only whether United must disclose its contentions and their factual basis before the close

6  of fact discovery.  United's "vigorous" dispute of the merits does not excuse it from

7  stating its own contentions about the diagnosis codes central to this case.  United cannot

8  wait until after fact discovery to disclose which diagnosis codes (if any) it contends are

9  supported by medical documentation and the factual basis for that contention.

10    The discovery sought here is consistent with the government's theory of the case

11  as pled in the Amended Complaint:  United improperly failed to delete diagnosis codes it

12  previously submitted to CMS to increase Medicare Part C risk adjustment submissions,

13  after its own medical record review indicated that those diagnoses were unsupported.  At

14  United's insistence, the government identified each and every diagnosis that it contends

15  is unsupported, and it has simply asked United to identify its contentions about those

16  very same diagnosis codes.  United's argument that seeking its contentions is somehow a

17  "thinly veiled attempt" to overcome a "fundamental flaw" in the government's case

18  makes no sense.  Interrogatory 14 is a straightforward contention interrogatory seeking

19  information that the government is entitled to learn during fact discovery, and which

20  could substantially narrow the issues for trial and avoid undue surprise.

21    In its brief, United casts doubt on whether it will even make such a contention

22  about medical support in this case: "United has not reviewed the relevant medical

23  records to determine whether the codes on the government's list are, or are not,

24  supported by those medical records, *and indeed may never do so*."  Joint Stip. at 38

25  (emphasis added).  The first part of this statement is simply not true.  As part of its Chart

26  Review Program, United's coders reviewed the medical records associated with each of

27  the diagnoses identified by the government, and United's coders did not find support for

28  those diagnoses.  And the second part of this statement smacks of gamesmanship.

<center>1</center>

1  United cannot avoid answering an interrogatory by demurring that it "may never" make
2  such a contention and then later surprise the government by making that very contention
3  after the close of fact discovery.[1]  The point of contention interrogatories is to remove
4  uncertainty about what the parties contend, allow the parties to explore those contentions
5  during fact discovery, narrow issues for trial, and avoid unfair surprise.  If United does
6  not contend – and will not contend – that any of the diagnoses are supported by medical
7  records – a decision wholly up to United regardless of any discovery by the government
8  – it need not conduct any analysis whatsoever and the issues for discovery and trial will
9  be substantially focused.  On the other hand, if United *does* contend that, despite the
10 results of its own Chart Review Program, some of these diagnoses were supported by
11 medical records – either the records it already reviewed through its Chart Review
12 Program or some other medical records – then it is obligated under the Federal Rules to
13 answer the interrogatory by identifying those diagnosis codes (and associated medical
14 records).  Either way, United must tell the United States what its contentions are.

15       United also claims that compelling it to answer Interrogatory 14 would "reverse
16 the burden of proof and require United to prepare the government's case for it." Joint
17 Stip. at 38.  United's argument ignores extensive caselaw that the burden of proof is not
18 determinative, and parties routinely are compelled to answer contention interrogatories
19 on issues which they do not bear the burden of proof.  *Id.* at 21-23.  United brushes these
20 authorities aside without engaging them, but it remains true that "[n]owhere in the
21 Federal Rules of Civil Procedure is it required that a party who carries the ultimate
22 burden on an issue at trial must establish a prima facie case before it is entitled to
23 discover information the other party may use to rebut the prima facie case." *McKesson*
24 *Info. Sols., LLC v. Epic Sys. Corp.*, 242 FRD 689, 692 (N.D. Ga. 2007).

25       United mischaracterizes the government's position and Interrogatory 14 –
26
27 [1] Moreover, United's assertion that it "may never do so" is at odds with its statements
28 throughout the case and elsewhere in its portion of the Joint Stipulation.  Joint Stip. at 13
   ("United certainly denies that all of the codes are unsupported."); *id.* at 39 ("United
   believes that each code, taken by itself, is presumptively valid . . . .").

2

1  claiming that the government seeks to compel United to retain expert coders to find

2  support for each of the diagnosis codes in the associated medical records.  Joint Stip. at

3  30.  But Interrogatory 14 simply seeks to discover United's contentions (whether it

4  contends any diagnoses are supported by medical records), the factual basis for those

5  contentions (which medical records provide such support) as known to United, and the

6  facts surrounding United's prior review of those medical records (whether they went

7  through United's Chart Review Program).  This is not "requiring" United to "retain

8  expert coders" or conduct "burdensome and extensive analysis"; it is merely asking

9  United to disclose its contentions, whatever they may be, about a core issue in this case,

10  as all civil litigants must do.  No extra work is required.

11       United's further argument that Interrogatory 14 impermissibly seeks expert

12  testimony is based on a distortion of caselaw and should be rejected.  Remarkably, to

13  support its position, United fundamentally misrepresents the holding in *Amgen Inc. v.*

14  *Sandoz Inc.*, No. 14-CV-04741, 2017 WL 1352052 (N.D. Cal. Apr. 13, 2017).  *Id.* at 30.

15       In *Amgen,* the defendant in a patent infringement case propounded two

16  interrogatories that – like Interrogatory 14 – asked Amgen to identify its contentions and

17  the factual bases for those contentions.  Specifically, the interrogatories asked Amgen (a)

18  to describe its bases for contending that patent claims at issue were invalid and (b) to

19  detail all "secondary considerations of nonobviousness . . . including all facts, documents

20  and evidence supporting your contention that a nexus exists between each secondary

21  consideration of nonobviousness and the claimed invention."  *Amgen*, 2017 WL

22  1352052, at *1.  In refusing to respond, Amgen argued – as United does here – that the

23  interrogatories impermissibly shifted the burden of proof and impermissibly sought

24  expert testimony.  *Id.*  The court rejected both arguments and ordered Amgen to respond

25  to the interrogatories:  "Interrogatory Nos. 15 and 16 are not improper to the extent they

26  seek only facts, not how an expert would construe those facts."  *Id.* at *2.  The court

27  acknowledged that "considerations of obviousness or nonobviousness may require expert

28  testimony," but nevertheless held that "to the extent Interrogatory No. 16 seeks facts, as

<div align="center">3</div>

1    opposed to expert testimony, Amgen must respond." *Id.*  However, according to United,

2    the *Amgen* court held that "a contention interrogatory, which required the respondent to

3    show why the patented mechanism was nonobvious, ***impermissibly required expert***

4    ***testimony***" – the very argument that the court rejected.  *Id.* (emphasis added).  *Amgen*

5    supports the United States' position and provides no support for United's.

6         United similarly distorts *Qualcomm Inc. v. Apple Inc.*, No. 17-CV-02398, 2018

7    WL 5829940 (S.D. Cal. Nov. 7, 2018).  Joint Stip. at 34.  United notes that *Qualcomm*

8    denied a motion to compel on expert opinion grounds, but United entirely omits that the

9    Court based that holding on the fact that the responding party ***had already responded*** to

10   the interrogatory by identifying its contentions and supporting facts.  *Qualcomm Inc.*,

11   2018 WL 5829940, at *2 ("If Apple refused entirely to respond to this Interrogatory it

12   would be one thing, but that is not the case. Apple has identified certain relevant licenses

13   . . . [which] provide the factual information that is required in response to this contention

14   interrogatory.").  Here, in contrast to *Qualcomm*, United has "refused entirely to respond

15   to this Interrogatory."

16        The reasoning of *Amgen* and *Qualcomm*, cases cited by United, dictates that

17   United must disclose its factual contentions and any facts supporting those contentions,

18   *even if* those contentions may ultimately be presented with the aid of expert testimony at

19   trial.  That United may rely on experts to analyze facts supporting its legal theory "is of

20   no consequence" as to whether it must provide its contentions and their factual basis in

21   discovery.  *See id.* (quoting *Bayer Healthcare, Inc. v. River's Edge Pharm., LLC*, 2015

22   WL 11142425, at *7 (N.D. Ga. July 31, 2015) ("The fact that an expert would ultimately

23   put the facts together to support the legal theory in an opinion is of no consequence as to

24   whether a responding party must timely supplement such an interrogato[r]y.")).

25        United also argues that it should not have to disclose the facts relating to Chart

26   Reviews that United conducted on the diagnosis codes at issue, because doing so would

27   "require United to undertake new, complex analysis," and "undertake an extensive and

28   difficult matching exercise that it has not conducted in order to prepare the government's

1  case for it."  Joint Stip. at 5, 41. But with respect to Chart Reviews, the government
2  merely asks United to identify which diagnosis codes are associated with medical
3  records that went through United's Chart Review Program, and what were the results of
4  each such Chart Review.  This is precisely the "matching exercise" that United insisted
5  that the government undertake (using United's data) prior to the close of fact discovery
6  so that United could explore the basis for the government's contentions with respect to
7  each diagnosis code.  United has not articulated with any specificity why it would be
8  unduly burdensome to disclose facts in its possession.  *See Big Baboon Corp. v. Dell,*
9  *Inc.*, 723 F. Supp. 2d 1224, 1229 (C.D. Cal. 2010) (Segal, J.) (parties claiming undue
10  burden "cannot simply invoke generalized objections" but rather "must state specifically
11  how . . . each [request] is overly broad, unduly burdensome, or oppressive by submitting
12  affidavits or offering evidence revealing the nature of the burden.").  Nor does United's
13  claim that it would take "extensive analysis" withstand any scrutiny – United certainly
14  *knows* which medical records went through its Chart Review Program and what the
15  results of those Chart Reviews were.  It simply refuses to tell the government.  United's
16  superficial claim of burden gives no basis for its refusal to divulge these facts, nor does
17  its baseless claim that doing so would somehow reverse the burden of proof.
18        United again misrepresents caselaw in relying on *City of Las Cruces v. United*
19  *States*, CV 17-809, 2021 WL 330062 (D.N.M. Feb. 1, 2021), which United argues held
20  that interrogatories may not require a responding party to do "extensive analysis."  Joint
21  Stip. at 37, 41.  But United neglects to mention that the *Las Cruces* court rejected that
22  argument as a "strawman" and ordered a response to the interrogatories in question.  *City*
23  *of Las Cruces*, 2021 WL 330062, at *16 ("Defendant argues that caselaw does not
24  obligate it 'to undertake a sweeping investigation for additional relevant information that
25  it did not possess at the time the case was filed or discovery was served.'  This argument
26  is a strawman. . . . [C]aselaw does require Defendant to answer Plaintiffs' interrogatories
27  based on the information available to it.").  Likewise, United should be compelled to
28  answer Interrogatory 14 "based on the information available to it."

<div align="center">5</div>

| | | |
|---|---|---|
| 1 | Dated:  April 28, 2021 | MICHAEL D. GRANSTON |
| | | Deputy Assistant Attorney General, Civil Division |
| 2 | | TRACY L. WILKISON |
| | | Acting United States Attorney |
| 3 | | DAVID M. HARRIS |
| | | ABRAHAM C. MELTZER |
| 4 | | JOHN E. LEE |
| | | JACK D. ROSS |
| 5 | | Assistant United States Attorneys |
| 6 | | JAMIE A. YAVELBERG |
| | | ROBERT McAULIFFE |
| 7 | | EDWARD CROOKE |
| | | LINDA M. McMAHON |
| 8 | | JESSICA E. KRIEG |
| | | AMY L. LIKOFF |
| 9 | | GREGORY A. MASON |
| | | MARTHA N. GLOVER |
| 10 | | WENDY ZUPAC |
| | | Civil Division, Department of Justice |
| 11 | | |
| | | JAMES P. KENNEDY, JR. |
| 12 | | United States Attorney |
| | | DAVID CORIELL |
| 13 | | Assistant United States Attorney |
| 14 | | |
| | | /S/ Gregory A. Mason |
| 15 | | _____ |
| 16 | | GREGORY A. MASON |
| | | Trial Attorney, Department of Justice |
| 17 | | Attorneys for the United States of America |
| 18 | Dated:  April 28, 2021 | ERIC R. HAVIAN |
| | | HARRY LITMAN |
| 19 | | JESSICA MOORE |
| | | Constantine Cannon LLP |
| 20 | | |
| | | STEVE HASEGAWA |
| 21 | | Phillips & Cohen LLP |
| 22 | | WILLIAM CHRISTOPHER CARMODY |
| | | ARUN SUBRAMANIAN |
| 23 | | WILLIAM R.H. MERRILL |
| | | CHANLER A. LANGHAM |
| 24 | | GENG CHEN |
| | | Susman Godfrey LLP |
| 25 | | |
| 26 | | /S/ Henry C. Su |
| 27 | | _____ |
| | | HENRY C. SU |
| 28 | | Attorneys for Relator Benjamin Poehling |

6

1  LATHAM & WATKINS LLP
    David J. Schindler (Bar No. 130490)
2      *david.schindler@lw.com*
   355 South Grand Avenue, Suite 100
3  Los Angeles, California 90071-1560
   Telephone: +1.213.485.1234
4  Facsimile: +1.213.891.8763

5  LATHAM & WATKINS LLP
    Daniel Meron (appearing *pro hac vice*)
6      *daniel.meron@lw.com*
    Abid R. Qureshi (appearing *pro hac vice*)
7      *abid.qureshi@lw.com*
   555 Eleventh Street, NW, Suite 1000
8  Washington, DC 20004-1304
   Telephone: +1.202.637.2200
9  Facsimile: +1.202.637.2201

10 Attorneys for United Defendants

11

12                 **UNITED STATES DISTRICT COURT**

13                 **CENTRAL DISTRICT OF CALIFORNIA**

14 | UNITED STATES OF AMERICA *ex rel.* | CASE NO. 2:16-cv-08697-FMO (SSx)
15 | BENJAMIN POEHLING, |
   | | [Discovery Document: Referred to
16 | Plaintiffs, | Special Master Suzanne H. Segal]
17 | v. | **SUPPLEMENTAL**
   | | **MEMORANDUM IN SUPPORT OF**
18 | UNITEDHEALTH GROUP, INC., *et al.*, | **UNITED'S RESPONSE TO THE**
   | | **UNITED STATES' MOTION TO**
19 | Defendants. | **COMPEL DISCOVERY**
20 | | [*Declaration of David J. Schindler filed concurrently herewith*]
21 | | Date: May 10, 2021
   | | Time: 1:00 p.m.
22 | | Special Master Suzanne H. Segal
23 | | Discovery Cutoff: December 6, 2021
   | | Pre-Trial Conference: February 3, 2023
24 | | at 10:00 a.m.
   | | Trial: February 21, 2023 at 9:00 a.m.
25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

UNITED'S SUPPLEMENTAL MEMORANDUM ISO
UNITED'S RESPONSE TO THE UNITED STATES'
MOTION TO COMPEL DISCOVERY
CASE NO. 2:16-cv-08697-FMO(SSx)

Exhibit 6

The government's case and its motion to compel are predicated on myriad false premises including: (a) that United's coding reviews "indicated that diagnoses [United] had previously submitted to CMS were, in fact, not supported by medical records," Apr. 16, 2021 Joint Stip. ("Joint Stip.") at 1; and (b) that "the rules and regulations governing Medicare Part C, require Medicare Advantage Organizations ("MAOs") such as UnitedHealth" to "only submit diagnosis codes that are 'unambiguously' supported by the beneficiaries' medical records." *Id.* The government knows that both premises are false for several reasons.

First, the government knows that United employed blind one-way coding reviews where the reviewers were never told what codes the provider had originally submitted and, more importantly, were never asked to attempt to validate (or invalidate) any code previously submitted by a provider. The government further knows that CMS knows that Medicare Advantage ("MA") plans like United conduct "blind one-way coding reviews" and has expressly acknowledged—and approved of the fact—that such reviews are appropriate and legal.[1] Moreover, the only

---

[1] As the government knows, CMS officials told United in a series of calls, correspondence, and in-person meetings in 2014 that United had no obligation to conduct two-way look chart reviews. For example, Larry Renfro, former CEO of Optum (a United affiliate), testified that then-Deputy Administrator of CMS Jonathan Blum told him in a call in 2014 that unless and until CMS adopted a regulation requiring MA plans to perform two-way chart reviews, there was no obligation for plans to do so. *See* Ex. A, Renfro Dep. 134:1–137:6. CMS Administrator Marilyn Tavenner told Renfro the same thing in a subsequent conversation. *Id.* 150:21–151:10; 160:9–163:17. And shortly after that, during a meeting other United executives had with then-Director of the Medicare Plan Payment Group Cheri Rice and four other CMS officials, United was again told that unless the new regulation was adopted, MA plans had no affirmative obligation to design their chart reviews to measure overall, absolute accuracy. *See* Ex. B, MARA2157039 (Confidential); *see also* Ex. C, USBP000548071 (Apr. 29, 2014 notes from the custodial file of Cynthia Tudor at CMS discussing the meeting between United and CMS that appear to state "[n]o proactive resp. to confirm accuracy of dx").

1    UNITED'S SUPPLEMENTAL MEMORANDUM ISO
UNITED'S RESPONSE TO THE UNITED STATES'
MOTION TO COMPEL DISCOVERY
CASE NO. 2:16-cv-08697-FMO(SSx)

1   government witness deposed on this topic made clear that such reviews do not give

2   an MA plan requisite knowledge that codes are unsupported. *See* Joint Stip. at 12,

3   n.1.; *see also* Joint Stip., Ex. L, Grant Dep. 322:18–323:15. Therefore, it is

4   disingenuous for the government to contend that United had rendered any judgment

5   about codes previously submitted by providers, let alone determined that any code

6   previously submitted, was not supported.

7           Second, the government seeks to create a standard for the submission of

8   diagnosis codes that does not exist in any rule or regulation and which is illusory on

9   its face: namely, the notion that an MAO may submit diagnosis codes only if those

10  codes are "unambiguously" supported by the beneficiaries' medical record. Joint

11  Stip. at 1. As set forth below, the applicable CMS rules and regulations do not contain

12  any reference to codes being "unambiguously" supported because CMS

13  recognizes that coding inherently requires judgment and further recognizes that

14  expert coders can often reach different conclusions precisely because coding

15  requires some level of subjectivity. The government cites Paragraph 4 of its own

16  Amended Complaint as support for the statement that codes must be

17  "unambiguously" supported, *see* Joint Stip. at 1, yet Paragraph 4 contains no

18  references to any CMS rules or regulations (or any other source) as support. *See* Joint

19  Stip., Ex. C at 37–38. The only other reference related to unambiguous support in

20  the Amended Complaint—Paragraph 91—references a different standard that has a

21  far different meaning than what the government asserts. Paragraph 91 cites to the

22  2008 RA Participation Guide for the unremarkable proposition that "the medical

23  record relied on by an MA Organization to support payment cannot be ambiguous."

24  *Id.* at 87 (citing 2008 RA Participation Guide at § 7.2.4.1). This section, however,

25  discusses an entirely different concept than the one the government is alleging—

26  namely that diagnoses the provider specifically noted in a medical record as

27  "questionable," "probable," "suspected," or "working" cannot be coded. *See* Joint

28  Stip., Ex. Z at 746. There is no dispute that a provider or a coder cannot code a

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

2

UNITED'S SUPPLEMENTAL MEMORANDUM ISO
UNITED'S RESPONSE TO THE UNITED STATES'
MOTION TO COMPEL DISCOVERY
CASE NO. 2:16-cv-08697-FMO(SSx)

1143
Exhibit 6

1  diagnoses a provider has specifically identified as "questionable" because it is
2  unclear if the condition even exists. But Section 7.2.4.1 does not say or imply in any
3  way that every code must be "unambiguously" supported to be coded. And, in fact,
4  such a statement would be completely at odds with all of the government documents
5  and guidance that acknowledges that coding is not so clear cut, that it involves
6  judgment, and that two coders may disagree about whether a code is or is not
7  supported by a medical record. *See* Joint Stip. at 31–33.

8      The government advances these false premises as part of a misguided effort
9  to persuade the Court that Interrogatory 14 seeks only "facts" that are allegedly
10 known to United and, more importantly, that the exercise of answering Interrogatory
11 14 would not require expert analysis and expert opinion. Yet the government knows
12 that Interrogatory 14 seeks far more than "facts" and has acknowledged as much in
13 its response to United's Interrogatory No. 2—which asks the government to identify
14 the evidence and material facts on which it intends to rely to support its contention
15 that any of the 28 million diagnosis codes are not supported by a medical record,
16 false, or invalid. *See* Ex. D. at 7. Tellingly, the government responded, in part, by
17 asserting that to determine whether any or all of the 28 million codes are
18 unsupported, false, or invalid would require "expert opinion testimony . . . outside
19 the scope of a proper contention interrogatory" and information "protected by the
20 attorney work product doctrine." Ex. E at 10–12.[2] The government cannot have it
21 both ways.

22     The government further seeks to ignore the reality that every code on its list
23 of 28 million was originally submitted by a beneficiary's original provider (or his/her
24

---

25  [2] While the government responded that it intends to attempt to prove that a
   code was unsupported by relying on United's prior chart reviews (as United
26  anticipated when it propounded the interrogatory), it simultaneously objected that
   providing further information to support that the codes were unsupported would
27  require expert analysis and opinion. *See* Ex. E at 11–12 (responding in part that "[f]or
   every Diagnosis Code included in the United States' response to Interrogatory 1,
28  UnitedHealth's Chart Review did not identify that Diagnosis Code as one that was
   supported by that medical record after review").

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

3

UNITED'S SUPPLEMENTAL MEMORANDUM ISO
UNITED'S RESPONSE TO THE UNITED STATES'
MOTION TO COMPEL DISCOVERY
CASE NO. 2:16-cv-08697-FMO(SSx)

1144
Exhibit 6

1    coder) who determined, in the first instance, that the diagnosis code was supported

2    by the beneficiary's medical record. Second guessing those submissions is not

3    information readily, or reasonably, available to United. Indeed, the government fails

4    entirely to articulate how United would undertake to answer Interrogatory 14A

5    without hiring expert coders to review all 28 million codes and then to review all

6    medical records related to those 28 million codes. The government also ignores that,

7    having created the list of 28 million codes, it is equally well-suited to perform the

8    expert review it seeks to compel United to perform. Indeed, it should have done so

9    before filing suit.

10         Finally, the government attempts to cast Interrogatory 14A as an effort simply

11    to ferret out United's contentions and its potential defenses at trial. Yet, the cases the

12    government cites are inapplicable principally because Interrogatory 14A goes far

13    beyond simply seeking United's actual contentions. United has already informed the

14    government of its primary contention: namely, that it denies the government's

15    allegation that all 28 million codes are unsupported. Second, while United may

16    contend at trial that the diagnosis codes at issue are generally supported since they

17    reflect the independent coding decisions of providers, United has no obligation or

18    burden to prove that point and certainly has no obligation to prove that contention

19    by undertaking the extensive expert analysis the government demands and recently

20    conceded is required to answer whether a code is supported or unsupported.

21    Furthermore, United is not required to choose today how it plans to rebut the

22    government's falsity claim and whether it will rebut the government's claims that

23    these codes are unsupported by showing, through expert analysis, that some or all of

24    the codes at issue may be supported by reference to underlying medical records.

25         In short, the government's interrogatory does not seek information regarding

26    United's contentions, which have been plainly stated on multiple occasions. Rather,

27    the government seeks to compel United to undertake expert work in order to compel

28    United to commit, today, to an avenue of defense that United may, or may not,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

4

UNITED'S SUPPLEMENTAL MEMORANDUM ISO
UNITED'S RESPONSE TO THE UNITED STATES'
MOTION TO COMPEL DISCOVERY
CASE NO. 2:16-cv-08697-FMO(SSx)

1145
Exhibit 6

1  ultimately choose to pursue. In the same vein, the government seeks to force United

2  to forego its option of simply challenging whatever evidence the government may

3  present to support its claim that all 28 million codes are unsupported. The

4  government's interrogatory is therefore improper because it seeks to require United

5  to arbitrarily develop a rebuttal argument now simply because the government has

6  asked United to do so and because the government refuses to do the work itself. *See,*

7  *e.g.*, *United States ex rel. Tyson v. Amerigroup Ill., Inc.*, 230 F.R.D. 538, 544–45

8  (N.D. Ill. 2005) (holding that a contention interrogatory that sought for the defendant

9  to identify "a damage theory that may never come into being, and that is to be used

10  essentially for rebuttal" was improper, "premature and outside the ambit of what a

11  contention interrogatory is designed to do" because it did not inquire about a

12  contention the defendant was making but rather, "[u]nlike a plaintiff's damage

13  theory, which is necessarily in the case," asked about "a defendant's potential or

14  tentative counter-damage theory that has not been selected and may never be"). As

15  the court in *Amerigroup* recognized, a defendant "is not required to arbitrarily select

16  one [rebuttal theory] or to speculate which theory it might ultimately choose, simply

17  because they have been asked to do so." *Id.* at 545. Similarly, United cannot be

18  required to speculate today whether it will contend that the codes at issue are

19  supported and, if so, which specific codes it may contend are supported.

20      While the government has decided how it wants to present its case, it cannot—

21  through Interrogatory 14—dictate or limit the way United may defend the case. As

22  the defendant, United can decide how to defend this case. It is sufficient for United

23  to deny that all 28 million codes are unsupported and, more importantly, to deny that

24  it has been overpaid even if any of the codes turn out to be unsupported.

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

5

UNITED'S SUPPLEMENTAL MEMORANDUM ISO
UNITED'S RESPONSE TO THE UNITED STATES'
MOTION TO COMPEL DISCOVERY
CASE NO. 2:16-cv-08697-FMO(SSx)



Dated: April 28, 2021

LATHAM & WATKINS LLP
DAVID J. SCHINDLER
DANIEL MERON
ABID R. QURESHI


By: /s/ David J. Schindler
David J. Schindler
Attorneys for United Defendants

6        UNITED'S SUPPLEMENTAL MEMORANDUM ISO
UNITED'S RESPONSE TO THE UNITED STATES'
MOTION TO COMPEL DISCOVERY
CASE NO. 2:16-cv-08697-FMO(SSx)

1   LATHAM & WATKINS LLP
       David J. Schindler (Bar No. 130490)
2       *david.schindler@lw.com*
    355 South Grand Avenue, Suite 100
3   Los Angeles, CA 90071-1560
    Telephone: +1.213.485.1234
4   Facsimile: +1.213.891.8763

5   LATHAM & WATKINS LLP
       Daniel Meron (appearing *pro hac vice*)
6       *daniel.meron@lw.com*
       Abid R. Qureshi (appearing *pro hac vice*)
7       *abid.qureshi@lw.com*
    555 Eleventh Street NW, Suite 1000
8   Washington, DC 20004-1304
    Telephone: +1.202.637.2200
9   Facsimile: +1.202.637.2201

10  Attorneys for Defendants

11                 UNITED STATES DISTRICT COURT

12               CENTRAL DISTRICT OF CALIFORNIA

13                     WESTERN DIVISION

14

15  UNITED STATES OF AMERICA *ex*          CASE NO. CV 16-08697 FMO (SSx)
    *rel.* BENJAMIN POEHLING,
16                                          UNITEDHEALTH'S RESPONSES AND
                  Plaintiffs,               OBJECTIONS TO PLAINTIFF UNITED
17                                          STATES' FIFTH SET OF REQUESTS
           v.                               FOR ADMISSION TO ALL
18                                          DEFENDANTS
    UNITEDHEALTH GROUP, INC. *et*
19  *al.*,
20                Defendants.

21

22        Pursuant to the Federal Rules of Civil Procedure and the Local Rules of this

23  Court, Defendants UnitedHealth Group, Inc., United Healthcare Services, Inc.,

24  United Healthcare, Inc., UnitedHealthcare Insurance Company, UHIC Holdings,

25  Inc., Ovations, Inc., Optum, Inc., OptumInsight, Inc., AmeriChoice of New Jersey,

26  Inc., AmeriChoice of New York, Inc., Arizona Physicians IPA, Inc., Care

27  Improvement Plus of Maryland, Inc., Care Improvement Plus of Texas Insurance

28  Company, Care Improvement Plus South Central Insurance Company, Care

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' FIFTH RFAS
2:16-CV-08697-FMO-SSX

1147
Exhibit 7

1 Improvement Plus Wisconsin Insurance Company, Optum Insurance of Ohio, Inc.
2 (f.k.a. Catamaran Insurance of Ohio, Inc.), Citrus Health Care, Inc., Health Plan of
3 Nevada, Inc., Medica HealthCare Plans, Inc., Oxford Health Plans (CT), Inc.,
4 Oxford Health Plans (NJ), Inc., Oxford Health Plans (NY), Inc., PacifiCare Life and
5 Health Insurance Company, PacifiCare of Arizona, Inc., PacifiCare of Colorado,
6 Inc., PacifiCare of Nevada, Inc., Physicians Health Choice of Texas, LLC, Preferred
7 Care Partners, Inc., Rocky Mountain Health Maintenance Organization,
8 Incorporated, Sierra Health and Life Insurance Company, Inc., Symphonix Health
9 Insurance, Inc., UHC of California (f.k.a. PacifiCare of California), United Health
10 Care Ins. Co. and United New York, Unison Health Plan of Tennessee, Inc.,
11 UnitedHealthcare Benefits of Texas, Inc. (f.k.a. PacifiCare of Texas, Inc.),
12 UnitedHealthcare Community Plan of Ohio, Inc. (f.k.a. Unison Health Plan of Ohio,
13 Inc.), UnitedHealthcare Community Plan of Texas, L.L.C. (f.k.a. Evercare of Texas,
14 L.L.C.), UnitedHealthcare Community Plan, Inc. (f.k.a. UnitedHealthcare of the
15 Great Lakes Health Plan, Inc.), UnitedHealthcare Insurance Company of New York,
16 UnitedHealthcare of Alabama, Inc., UnitedHealthcare of Arizona, Inc.,
17 UnitedHealthcare of Arkansas, Inc., UnitedHealthcare of Florida, Inc.,
18 UnitedHealthcare of Georgia, Inc., UnitedHealthcare of New England, Inc.,
19 UnitedHealthcare of New York, Inc., UnitedHealthcare of North Carolina, Inc.,
20 UnitedHealthcare of Ohio, Inc., UnitedHealthcare of Oklahoma, Inc. (f.k.a.
21 PacifiCare of Oklahoma, Inc.), UnitedHealthcare of Oregon, Inc. (f.k.a. PacifiCare
22 of Oregon, Inc.), UnitedHealthcare of Pennsylvania, Inc. (f.k.a. Unison Health Plan
23 of Pennsylvania, Inc.), UnitedHealthcare of Tennessee, Inc., UnitedHealthcare of the
24 Midlands, Inc., UnitedHealthcare of the Midwest, Inc., UnitedHealthcare of Utah,
25 Inc., UnitedHealthcare of Washington, Inc. (f.k.a. PacifiCare of Washington, Inc.),
26 UnitedHealthcare of Wisconsin, Inc., and UnitedHealthcare Plan of the River
27 Valley, Inc. (collectively, "UnitedHealth") set forth below their collective responses
28

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES, CA

2

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' FIFTH RFAS
2:16-CV-08697-FMO-SSX

1148
Exhibit 7

1  and objections to Plaintiff United States' Fifth Set of Requests for Admission to all

2  Defendants (the "<u>RFA</u>s").

3  ## PRELIMINARY STATEMENT

4      The Federal Rules of Civil Procedure contemplate that requests for admission

5  will facilitate proof on issues that are central to the litigation and to narrow the

6  dispute between the parties. *See* Fed. R. Civ. P. 36 Advisory Committee's Note. The

7  government's RFAs do no such thing. To the contrary, the RFAs are merely a

8  continuation of the government's inappropriate demands in its Interrogatory 14 that

9  UnitedHealth undertake complex expert analysis to make the government's case for

10  it. UnitedHealth is vigorously challenging these requests before the Special Master,

11  but rather than awaiting judicial resolution, the government presses forward with

12  further inappropriate discovery requests.

13      As with many of the government's prior RFAs, these requests seek

14  information regarding complex topics that are better suited to other forms of

15  discovery, including depositions and interrogatories. Of note, the government seeks

16  admissions regarding UnitedHealth's own contentions – hardly the sort of

17  information that would narrow the issues for trial or that is subject to a

18  straightforward response.

19      Although UnitedHealth has responded properly to each of the RFAs, it will

20  seek appropriate relief from abusive discovery tactics that violate the Federal Rules

21  of Civil Procedure and the Local Rules of the United States District Court for the

22  Central District of California.

23  ## GENERAL OBJECTIONS

24      The following General objections apply to each of the United States' RFAs

25  and, unless otherwise stated, shall have the same force and effect as if set forth in

26  full in response to each of the RFAs.

27      1.    UnitedHealth objects to any RFA, definition, or instruction to the extent

28  that it seeks to impose upon UnitedHealth any obligations greater than those required

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

3

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' FIFTH RFAS
2:16-CV-08697-FMO-SSX

1149
Exhibit 7

1  by the Federal Rules of Civil Procedure, the Local Rules of the United States District

2  Court for the Central District of California, or any other applicable laws or rules.

3      2.      UnitedHealth objects to the RFAs to the extent that they are overly

4  broad, unduly burdensome, and/or would require undue expense to answer.

5      3.      UnitedHealth objects to the RFAs to the extent that they seek

6  information that is not relevant to any party's claims or defenses and is not

7  proportional to the needs of this case.

8      4.      UnitedHealth objects to the RFAs to the extent that they are vague,

9  ambiguous, or unclear, including the United States' use of terms that are not

10  adequately defined and/or not otherwise susceptible to any single meaning.

11      5.      UnitedHealth objects to the RFAs, and to each Definition and

12  Instruction for responding thereto, to the extent they seek documents or information

13  that are already in the possession, custody, or control of the United States or are

14  otherwise available to the United States from another source that is more convenient,

15  less burdensome, and less expensive.

16      6.      UnitedHealth objects to the RFAs to the extent they seek information

17  protected by attorney-client privilege, the work product doctrine, joint defense

18  privilege, or any applicable privilege, immunity, or limitation on discovery.

19  UnitedHealth will not produce any such privileged information. UnitedHealth does

20  not intend to waive any of the privileges asserted in this objection by any inadvertent

21  production of protected information. UnitedHealth reserves the right to object to the

22  use or introduction of privileged information or otherwise to seek the return of such

23  information. In the event of inadvertent disclosure, UnitedHealth will proceed

24  pursuant to the Revised Protective Order Governing Non-Waiver of Privilege and

25  Protected Material entered on January 15, 2021 in this matter.

26      7.      UnitedHealth objects to the RFAs, and to each Definition and

27  Instruction for responding thereto, to the extent they seek private, confidential,

28  proprietary, or other similarly protected confidential materials. Any responses

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

4

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' FIFTH RFAS
2:16-CV-08697-FMO-SSX

UnitedHealth provides to these RFAs shall be subject to the Second Revised Stipulated Protective Order Governing the Treatment of Protected Information, entered by the Court on March 12, 2021, and the Revised Protective Order Governing Non-Waiver of Privilege and Protected Materials, entered by the Court on January 15, 2021. UnitedHealth reserves all of its rights and applicable objections with respect to its private, confidential, proprietary, or other similarly protected confidential information.

8.      In providing a response to the RFAs, UnitedHealth does not admit that the RFAs, or any answer thereto, is relevant or admissible. All responses are provided without a waiver of, and with the express reservation of: (a) all objections as to competency, relevancy, materiality, and admissibility of the responses and the subject matter thereof as evidence for any purpose in any further proceedings in this action; (b) the right to object on any ground to the use of information produced hereunder or the subject thereof at any trial or hearing in this matter or in any related or subsequent action or proceeding; (c) the right to object on any ground to a demand for further response; (d) the right to seek further relief from the Court; (e) all privileges and the work product doctrine; and (f) the right to the use of such responses, or the subject matter thereof, on any ground or any further responses to these or any other requests or discovery proceedings.

9.      UnitedHealth objects to the RFAs to the extent that they purport to require UnitedHealth to obtain information from, or to respond on behalf of, persons or entities not currently within UnitedHealth's employ or over whom UnitedHealth has no control.

10.     UnitedHealth objects to these RFAs, and to each Definition and Instruction for responding thereto, to the extent they seek, assume, or call for legal conclusions or expert opinions.

11.     The specific responses set forth below are based on UnitedHealth's interpretation of the language used in the RFAs. To the extent UnitedHealth has

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

5

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' FIFTH RFAS
2:16-CV-08697-FMO-SSX

1151
Exhibit 7

1  interpreted language in a manner that differs from the United States' interpretation,

2  UnitedHealth will state its interpretation in its response. UnitedHealth reserves the

3  right to amend or supplement its responses in the event the United States asserts an

4  interpretation that differs from UnitedHealth's interpretation.

5      12.    UnitedHealth objects to these RFAs on the grounds that they violate

6  United States District Court for the Central District of California L.R. 36-1 in that

7  they are not sequentially numbered and repeat the numbers used on prior sets of

8  requests for admission.

9      13.    UnitedHealth objects to the extent these RFAs are improper under

10  Federal Rule of Civil Procedure 36 and applicable case law because they demand

11  that UnitedHealth admit the truth of a legal conclusion. *See Asarco LLC v. Union*

12  *Pac. R.R. Co.*, No. 212CV00283EJLREB, 2016 WL 1755241, at *11–12 (D. Idaho

13  May 2, 2016) (quoting *Tuvalu v. Woodford*, 2006 WL 3201096, *7 (E.D. Cal. Nov.

14  2, 2006) ("'[R]equests for admission should not be used to . . . demand that the other

15  party admit the truth of a legal conclusion, even if the conclusion is attached to

16  operative facts.'")).

17      14.    UnitedHealth further objects to these RFAs to the extent they are

18  improper under Federal Rule of Civil Procedure 36 and applicable case law because

19  they seek to establish facts which are obviously in dispute. *See, e.g., K.C.R. v. Cnty.*

20  *of Los Angeles*, No. CV 13-3806 PSG (SSx), 2014 WL 3433925, at *4 (C.D. Cal.

21  July 14, 2014) (Segal, Mag. J.) ("[R]equests for admission should not be used to

22  establish facts which are obviously in dispute[.]") (external citations omitted); *Vaden*

23  *v. Summerhill*, No. Civ S-06-1836 GEB KJM P., 2008 WL 822152, at *2 (E.D. Cal.

24  Mar. 27, 2008) (same).

25      15.    UnitedHealth reserves the right to supplement or amend its objections

26  to the RFAs if it discovers new, relevant, and responsive information in accordance

27  with Fed. R. Civ. P. 26(e).

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

6

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' FIFTH RFAS
2:16-CV-08697-FMO-SSX

1152
Exhibit 7

16.    UnitedHealth incorporates these General Objections by reference into each and every response below.

**SPECIFIC OBJECTIONS TO THE DEFINITIONS AND INSTRUCTIONS**

1.    UnitedHealth incorporates all General Objections stated above.

2.    UnitedHealth incorporates by reference its Specific Objections to Definitions (listed as objection numbers 1–8) that are set forth in UnitedHealth's Responses and Objections to Plaintiff United States' First Request for Production of Documents to Defendants, dated November 6, 2017.

3.    UnitedHealth incorporates by reference its Specific Objections to Instructions (listed as objection numbers 1–10) that are set forth in UnitedHealth's Responses and Objections to Plaintiff United States' First Request for Production of Documents to Defendants, dated November 6, 2017.

4.    UnitedHealth incorporates by reference its Specific Objections to Definitions (listed as objection numbers 3–4) that are set forth in UnitedHealth's Responses and Objections to Plaintiff United States' Fourth Set of Interrogatories to Defendants, dated December 4, 2020.

5.    UnitedHealth objects to the government's definition of "Chart Review" from Plaintiff United States' First Request for Production of Documents to Defendants, to the extent the term "Chart Review," as defined and as used in these RFAs, is overly broad and unduly burdensome as it potentially refers to any review of any charts for any purpose whatsoever.

6.    UnitedHealth objects to the government's definition of "Risk Adjustment Payments" from Plaintiff United States' First Request for Production of Documents to Defendants, to the extent the term "Risk Adjustment Payments," as defined and as used in these RFAs, is incomplete, vague, ambiguous, misrepresents or mischaracterizes the facts. For the purposes of responding to these RFAs, UnitedHealth interprets the term "Risk Adjustment Payments" to mean "payments to Medicare Advantage Organizations and their health Plans based on enrollees'

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

7

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' FIFTH RFAS
2:16-CV-08697-FMO-SSX

1153
Exhibit 7

1   demographic factors and health status to ensure actuarial equivalence under Parts C

2   and Part D of the Medicare Program, as described in 42 U.S.C. § 1395w-23 and 42

3   C.F.R. § 422.308(c)(l)."

4        7.     UnitedHealth objects to the government's definition of "Relevant Time

5   Period" from Plaintiff United States' First Request for Production of Documents to

6   Defendants because it seeks information after May 16, 2017, the parties' agreed-

7   upon end date for discovery. For the purposes of responding to these RFAs,

8   UnitedHealth interprets these RFAs to request information only up to May 16, 2017

9   or relating to UnitedHealth's chart review data for date of service 2016.

10        8.     UnitedHealth objects to the government's definition of "Risk

11   Adjustment Submissions" included at Definition 4 to the extent it implies Medicare

12   Advantage Organizations ("MAOs") are paid at the diagnosis code level and to the

13   extent it implies every diagnosis code submitted by an MAO (i) results in a payment

14   and/or (ii) is submitted in order to receive a payment.

15        9.     UnitedHealth objects to the government's definition of "Support" or

16   "Supported" included at Definition 5 to the extent it is improperly narrow,

17   misleading, and serves to mischaracterize the facts in that it implies there is one

18   single source that provides comprehensive coding guidance for Medicare Advantage

19   Organizations, that CMS recognizes or allows the use of no other industry-accepted

20   coding guidance, and that coding guidance applicable to Medicare Advantage

21   Organizations is clear and unambiguous. UnitedHealth also objects to the definition

22   of "Support" or "Supported" to the extent it calls for any conclusion regarding

23   alleged legal obligations and/or serves to distort or mischaracterize alleged legal

24   obligations. Further, UnitedHealth objects to the definition of "Support" or

25   "Supported" to the extent the reference to "the ICD-9/ICD-10 Guidelines" is vague

26   and ambiguous as there are multiple versions of the ICD-9 and ICD-10 guidelines

27   that may apply during the relevant time period. UnitedHealth also objects to the

28   definition of "Support" or "Supported" to the extent it implies Medicare Advantage

8

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' FIFTH RFAS
2:16-CV-08697-FMO-SSX

Organizations are paid at the diagnosis code level and to the extent it implies every diagnosis code submitted by a Medicare Advantage Organization (i) results in a payment and/or (ii) is submitted in order to receive a payment. Given the numerous deficiencies with the government's definition of "Support" or "Supported," UnitedHealth lacks knowledge as to the information being requested.

## SPECIFIC OBJECTIONS AND RESPONSES TO REQUESTS FOR ADMISSION

UnitedHealth incorporates all objections stated above in response to the Requests below.

**REQUEST FOR ADMISSION NO. 1:**

Admit that You made Risk Adjustment Submissions of every Diagnosis set forth in the United States' Response to Defendants' Interrogatory No. 1.

**RESPONSE TO REQUEST FOR ADMISSION NO. 1:**

UnitedHealth incorporates by reference each of its General Objections and Specific Objections to Definitions set forth above.

UnitedHealth objects to this RFA to the extent it implies or calls for any legal conclusion regarding any alleged legal obligations.

UnitedHealth further objects to this RFA to the extent that it calls for information that is already in the government's possession, custody, or control, or otherwise available to the government.

UnitedHealth objects to the government's definition of "Risk Admission Submissions" to the extent it implies MAOs are paid at the diagnosis code level, and to the extent it implies every diagnosis code submitted by an MAO (i) results in a payment and/or (ii) is submitted in order to receive a payment. UnitedHealth also objects to this RFA to the extent the term "every" is overly broad and unduly burdensome in that it requires UnitedHealth to analyze information associated with the approximately 28 million diagnosis codes the government identified in its response to UHC of California's First Interrogatory.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

9

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' FIFTH RFAS
2:16-CV-08697-FMO-SSX

1155
Exhibit 7

1   Subject to and without waiving the foregoing General and Specific

2   Objections, UnitedHealth admits RFA 1.

3   **REQUEST FOR ADMISSION NO. 2:**

4   Admit that You received Risk Adjustment Payments for every Diagnosis set

5   forth in the United States' Response to Defendants' Interrogatory No. 1.

6   **RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

7   UnitedHealth incorporates by reference each of its General Objections and

8   Specific Objections to Definitions set forth above.

9   UnitedHealth further objects to this RFA to the extent it is improper under

10  Federal Rule of Civil Procedure 36 and applicable case law because it seeks to

11  establish facts which are obviously in dispute. *See, e.g., K.C.R.,* 2014 WL 3433925,

12  at *4 ("[R]equests for admission should not be used to establish facts which are

13  obviously in dispute[.]") (external citations omitted); *Vaden,* 2008 WL 822152, at

14  *2 (same).

15  UnitedHealth further objects to this RFA to the extent that it calls for

16  information that is already in the government's possession, custody, or control, or

17  otherwise available to the government.

18  UnitedHealth further objects to this RFA to the extent the terms "Support" or

19  "Supported" are improperly narrow, misleading, and serve to mischaracterize the

20  facts in that they imply there is one single source that provides comprehensive

21  coding guidance for Medicare Advantage Organizations, that CMS recognizes or

22  allows the use of no other industry-accepted coding guidance, and that coding

23  guidance applicable to Medicare Advantage Organizations is clear and

24  unambiguous. UnitedHealth also objects to the RFA to the extent the terms

25  "Support" or "Supported" call for any conclusion regarding alleged legal obligations

26  and/or serve to distort or mischaracterize alleged legal obligations. Further,

27  UnitedHealth further objects to the RFA to the extent the terms "Support" or

28  "Supported" are vague and ambiguous in that the definition references "the ICD-

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

10

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' FIFTH RFAS
2:16-CV-08697-FMO-SSX

1156
Exhibit 7

9/ICD-10 Guidelines" when there are multiple versions of the ICD-9 and ICD-10 guidelines that may apply during the relevant time period. UnitedHealth also objects to the definition of "Support" or "Supported" to the extent it implies Medicare Advantage Organizations are paid at the diagnosis code level and to the extent it implies every diagnosis code submitted by a Medicare Advantage Organization (i) results in a payment and/or (ii) is submitted in order to receive a payment. Given the numerous deficiencies with the government's definition of "Support" or "Supported" and use of those terms in this RFA, UnitedHealth lacks knowledge as to the information being requested.

UnitedHealth further objects to this RFA to the extent that the term "Risk Adjustment Payments" as defined and as used in this RFA, is incomplete, vague, ambiguous, misrepresents or mischaracterizes the facts. For the purposes of responding to this RFA, UnitedHealth interprets the term "Risk Adjustment Payments" to mean "payments to Medicare Advantage Organizations and their health Plans based on enrollees' demographic factors and health status to ensure actuarial equivalence under Parts C and Part D of the Medicare Program, as described in 42 U.S.C. § 1395w-23 and 42 C.F.R. § 422.308(c)(l)." UnitedHealth also objects to this RFA to the extent the term "every" is overly broad and unduly burdensome in that it requires UnitedHealth to analyze information associated with the approximately 28 million diagnosis codes the government identified in its response to UHC of California's First Interrogatory.

UnitedHealth also objects to this RFA to the extent it implies or calls for any legal conclusion regarding any alleged legal obligations.

Subject to and without waiving the foregoing General and Specific Objections, UnitedHealth denies RFA 2.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

11

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' FIFTH RFAS
2:16-CV-08697-FMO-SSX

1157
Exhibit 7

**REQUEST FOR ADMISSION NO. 3:**

Admit that You or Your Vendor(s) conducted a Chart Review of the Chart(s) associated with every Diagnosis set forth in the United States' Response to Defendants' Interrogatory No. 1.

**RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

UnitedHealth incorporates by reference each of its General Objections and Specific Objections to Definitions set forth above.

UnitedHealth also objects to this RFA to the extent the term "Chart Review," as defined is overly broad and unduly burdensome as it potentially refers to any review of any charts for any purpose whatsoever.

UnitedHealth further objects to this RFA to the extent it is improper under Federal Rule of Civil Procedure 36 and applicable case law because it seeks to establish facts which are obviously in dispute. *See, e.g., K.C.R.,* 2014 WL 3433925, at *4 ("[R]equests for admission should not be used to establish facts which are obviously in dispute[.]") (external citations omitted); *Vaden,* 2008 WL 822152, at *2 (same). UnitedHealth also objects to this RFA to the extent it implies or calls for any legal conclusion regarding any alleged legal obligations. UnitedHealth also objects to this RFA to the extent the term "every" is overly broad and unduly burdensome in that it requires UnitedHealth to analyze information associated with the approximately 28 million diagnosis codes the government identified in its response to UHC of California's First Interrogatory.

UnitedHealth further objects to this RFA to the extent the phrase "Chart(s) associated with every Diagnosis" is vague, ambiguous, overly broad and implies that UnitedHealth has knowledge regarding which charts are associated with each of the approximately 28 million diagnosis codes the government identified in its response to UHC of California's First Interrogatory.

Subject to and without waiving the foregoing General and Specific Objections, UnitedHealth denies RFA 3.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

12

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' FIFTH RFAS
2:16-CV-08697-FMO-SSX

1158
Exhibit 7

**REQUEST FOR ADMISSION NO. 4:**

Admit that none of Your and/or Your Vendors' Chart Review(s) found Support for any of the Diagnoses set forth in the United States' Response to Defendants' Interrogatory No. 1.

**RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

UnitedHealth incorporates by reference each of its General Objections and Specific Objections to Definitions set forth above.

UnitedHealth also objects to this RFA to the extent the term "Chart Review," as defined is overly broad and unduly burdensome as it potentially refers to any review of any charts for any purpose whatsoever. UnitedHealth further objects to this RFA to the extent the terms "Support" or "Supported" are improperly narrow, misleading, and serve to mischaracterize the facts in that they imply there is one single source that provides comprehensive coding guidance for Medicare Advantage Organizations, that CMS recognizes or allows the use of no other industry-accepted coding guidance, and that coding guidance applicable to Medicare Advantage Organizations is clear and unambiguous. UnitedHealth also objects to the RFA to the extent the terms "Support" or "Supported" call for any conclusion regarding alleged legal obligations and/or serve to distort or mischaracterize alleged legal obligations. Further, UnitedHealth further objects to the RFA to the extent the terms "Support" or "Supported" are vague and ambiguous in that the definition references "the ICD-9/ICD-10 Guidelines" when there are multiple versions of the ICD-9 and ICD-10 guidelines that may apply during the relevant time period. UnitedHealth also objects to the definition of "Support" or "Supported" to the extent it implies Medicare Advantage Organizations are paid at the diagnosis code level and to the extent it implies every diagnosis code submitted by a Medicare Advantage Organization (i) results in a payment and/or (ii) is submitted in order to receive a payment. Given the numerous deficiencies with the government's definition of

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
LOS ANGELES, CA

UNITEDHEALTH'S RESPONSES AND OBJECTIONS TO UNITED STATES' FIFTH RFAS
2:16-CV-08697-FMO-SSX

1  "Support" or "Supported" and use of those terms in this RFA, UnitedHealth lacks

2  knowledge as to the information being requested.

3  UnitedHealth further objects to this RFA to the extent it is improper under

4  Federal Rule of Civil Procedure 36 and applicable case law because it seeks to

5  establish facts which are obviously in dispute. *See, e.g., K.C.R.,* 2014 WL 3433925,

6  at *4 ("[R]equests for admission should not be used to establish facts which are

7  obviously in dispute[.]") (external citations omitted); *Vaden*, 2008 WL 822152, at

8  *2 (same). UnitedHealth also objects to this RFA to the extent it implies or calls for

9  any legal conclusion regarding any alleged legal obligations.

10  UnitedHealth also objects to this RFA to the extent it calls for any legal

11  conclusion regarding alleged knowledge or falsity.

12  Subject to and without waiving the foregoing General and Specific

13  Objections, UnitedHealth denies RFA 4.

14  **REQUEST FOR ADMISSION NO. 5:**

15  Admit that You did not submit Risk Adjustment Deletions of any of the

16  Diagnoses set forth in the United States' Response to Defendants' Interrogatory No.

17  1.

18  **RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

19  UnitedHealth incorporates by reference each of its General Objections and

20  Specific Objections to Definitions set forth above.

21  UnitedHealth objects to this RFA to the extent it implies or calls for any legal

22  conclusion regarding any alleged legal obligations. UnitedHealth further objects to

23  this RFA to the extent that it calls for information that is already in the government's

24  possession, custody, or control, or otherwise available to the government.

25  Subject to and without waiving the foregoing General and Specific

26  Objections, UnitedHealth responds that, after a reasonable inquiry of the information

27  known or readily obtainable by UnitedHealth, it lacks sufficient information to

28  respond to this RFA and therefore denies RFA 5.

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES, CA

14

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' FIFTH RFAS
2:16-CV-08697-FMO-SSX

1160
Exhibit 7

**REQUEST FOR ADMISSION NO. 6:**

Admit that You did not return to the Medicare Program the Risk Adjustment Payments You received for any of the Diagnoses set forth in the United States' Response to Defendants' Interrogatory No. 1.

**RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

UnitedHealth incorporates by reference each of its General Objections and Specific Objections to Definitions set forth above.

UnitedHealth also objects to this RFA to the extent it implies or calls for any legal conclusion regarding any alleged legal obligations. UnitedHealth further objects to this RFA to the extent it is improper under Federal Rule of Civil Procedure 36 and applicable case law because it seeks to establish facts which are obviously in dispute. *See, e.g., K.C.R.,* 2014 WL 3433925, at *4 ("[R]equests for admission should not be used to establish facts which are obviously in dispute[.]") (external citations omitted); *Vaden,* 2008 WL 822152, at *2 (same). UnitedHealth also objects to this RFA to the extent it calls for any legal conclusion regarding alleged knowledge, falsity, or legal obligations.

UnitedHealth further objects to this RFA to the extent that it calls for information that is already in the government's possession, custody, or control, or otherwise available to the government. UnitedHealth objects to this RFA to the extent it implies MAOs are paid at the diagnosis code level.

Subject to and without waiving the foregoing General and Specific Objections, UnitedHealth denies RFA 6.

**REQUEST FOR ADMISSION NO. 7:**

Admit that every Diagnosis set forth in the United States' Response to Defendants' Interrogatory No. 1 is not Supported by any Chart(s) in Your possession.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

15

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' FIFTH RFAS
2:16-CV-08697-FMO-SSX

1161
Exhibit 7

**RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

UnitedHealth incorporates by reference each of its General Objections and Specific Objections to Definitions set forth above. UnitedHealth further objects to this RFA to the extent the terms "Support" or "Supported" are improperly narrow, misleading, and serve to mischaracterize the facts in that they imply there is one single source that provides comprehensive coding guidance for Medicare Advantage Organizations, that CMS recognizes or allows the use of no other industry-accepted coding guidance, and that coding guidance applicable to Medicare Advantage Organizations is clear and unambiguous. UnitedHealth also objects to the RFA to the extent the terms "Support" or "Supported" call for any conclusion regarding alleged legal obligations and/or serve to distort or mischaracterize alleged legal obligations. Further, UnitedHealth further objects to the RFA to the extent the terms "Support" or "Supported" are vague and ambiguous in that the definition references "the ICD-9/ICD-10 Guidelines" when there are multiple versions of the ICD-9 and ICD-10 guidelines that may apply during the relevant time period. UnitedHealth also objects to the definition of "Support" or "Supported" to the extent it implies Medicare Advantage Organizations are paid at the diagnosis code level and to the extent it implies every diagnosis code submitted by a Medicare Advantage Organization (i) results in a payment and/or (ii) is submitted in order to receive a payment. Given the numerous deficiencies with the government's definition of "Support" or "Supported" and use of those terms in this RFA, UnitedHealth lacks knowledge as to the information being requested.

UnitedHealth further objects to this RFA to the extent it is improper under Federal Rule of Civil Procedure 36 and applicable case law because it seeks to establish facts which are obviously in dispute. *See, e.g., K.C.R.,* 2014 WL 3433925, at \*4 ("[R]equests for admission should not be used to establish facts which are obviously in dispute[.]") (external citations omitted); *Vaden*, 2008 WL 822152, at \*2 (same). UnitedHealth also objects to this RFA to the extent it implies or calls for

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

16

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' FIFTH RFAS
2:16-CV-08697-FMO-SSX

1162
Exhibit 7

1   any legal conclusion regarding any alleged legal obligations. UnitedHealth also

2   objects to this RFA to the extent it calls for any legal conclusion regarding alleged

3   knowledge or falsity. UnitedHealth objects to this RFA to the extent it calls for

4   expert opinion and/or analysis. As UnitedHealth explained in its portion of the April

5   16, 2021 Joint Stipulation Regarding the United States' Motion to Compel

6   Discovery ("Joint Stipulation"), determining whether or not diagnosis codes are

7   supported by underlying medical records requires expert review of the medical

8   records and a subsequent opinion. RFAs requiring a party to undertake expert

9   analysis and opinions are improper.  *See Emerson v. Lab. Corp. of Am.*, Civ. A. No.

10  1:11-CV-01709-RWS, 2012 WL 1564683, at *3-*4 (N.D. Ga. May 1, 2012);

11  *Williamson v. Correctional Med. Servs.*, Civ. No. 06-379-SLR, 2009 WL 1364350,

12  at *3 (D. Del. May 14, 2009).

13          Subject to and without waiving the foregoing General and Specific

14  Objections, UnitedHealth denies RFA 7.

15  **REQUEST FOR ADMISSION NO. 8:**

16          Admit that every Diagnosis set forth in the United States' Response to

17  Defendants' Interrogatory No. 1 is not Supported by any Chart(s) in Your possession

18  or custody.

19  **RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

20          UnitedHealth incorporates by reference each of its General Objections and

21  Specific Objections to Definitions set forth above. UnitedHealth further objects to

22  this RFA to the extent the terms "Support" or "Supported" are improperly narrow,

23  misleading, and serve to mischaracterize the facts in that they imply there is one

24  single source that provides comprehensive coding guidance for Medicare Advantage

25  Organizations, that CMS recognizes or allows the use of no other industry-accepted

26  coding guidance, and that coding guidance applicable to Medicare Advantage

27  Organizations is clear and unambiguous. UnitedHealth also objects to the RFA to

28  the extent the terms "Support" or "Supported" call for any conclusion regarding

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

17

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' FIFTH RFAS
2:16-CV-08697-FMO-SSX

1163
Exhibit 7

1    alleged legal obligations and/or serve to distort or mischaracterize alleged legal
2    obligations. Further, UnitedHealth further objects to the RFA to the extent the terms
3    "Support" or "Supported" are vague and ambiguous in that the definition references
4    "the ICD-9/ICD-10 Guidelines" when there are multiple versions of the ICD-9 and
5    ICD-10 guidelines that may apply during the relevant time period. UnitedHealth also
6    objects to the definition of "Support" or "Supported" to the extent it implies
7    Medicare Advantage Organizations are paid at the diagnosis code level and to the
8    extent it implies every diagnosis code submitted by a Medicare Advantage
9    Organization (i) results in a payment and/or (ii) is submitted in order to receive a
10   payment. Given the numerous deficiencies with the government's definition of
11   "Support" or "Supported" and use of those terms in this RFA, UnitedHealth lacks
12   knowledge as to the information being requested.

13          UnitedHealth further objects to this RFA to the extent it is improper under
14   Federal Rule of Civil Procedure 36 and applicable case law because it seeks to
15   establish facts which are obviously in dispute. *See, e.g., K.C.R.*, 2014 WL 3433925,
16   at *4 ("[R]equests for admission should not be used to establish facts which are
17   obviously in dispute[.]") (external citations omitted); *Vaden*, 2008 WL 822152, at
18   *2 (same). UnitedHealth also objects to this RFA to the extent it implies or calls for
19   any legal conclusion regarding any alleged legal obligations. UnitedHealth also
20   objects to this RFA to the extent it calls for any legal conclusion regarding alleged
21   knowledge or falsity. UnitedHealth objects to this RFA to the extent it calls for
22   expert opinion and/or analysis. As UnitedHealth explained in its portion of the Joint
23   Stipulation, determining whether or not diagnosis codes are supported by underlying
24   medical records requires expert review of the medical records and a subsequent
25   opinion.  RFAs requiring a party to undertake expert analysis and opinions are
26   improper.  *See Emerson v. Lab. Corp. of Am.*, Civ. A. No. 1:11-CV-01709-RWS,
27   2012 WL 1564683, at *3-*4 (N.D. Ga. May 1, 2012); *Williamson v. Correctional
28   Med. Servs.*, Civ. No. 06-379-SLR, 2009 WL 1364350, at *3 (D. Del. May 14, 2009).

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
LOS ANGELES, CA

18

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' FIFTH RFAS
2:16-CV-08697-FMO-SSX

1164
Exhibit 7

1    Subject to and without waiving the foregoing General and Specific

2  Objections, UnitedHealth denies RFA 8.

3  **REQUEST FOR ADMISSION NO. 9:**

4    Admit that every Diagnosis set forth in the United States' Response to

5  Defendants' Interrogatory No. 1 is not Supported by any Chart(s) in Your

6  possession, custody, or control.

7  **RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

8    UnitedHealth incorporates by reference each of its General Objections and

9  Specific Objections to Definitions set forth above. UnitedHealth further objects to

10 this RFA to the extent the terms "Support" or "Supported" are improperly narrow,

11 misleading, and serve to mischaracterize the facts in that they imply there is one

12 single source that provides comprehensive coding guidance for Medicare Advantage

13 Organizations, that CMS recognizes or allows the use of no other industry-accepted

14 coding guidance, and that coding guidance applicable to Medicare Advantage

15 Organizations is clear and unambiguous. UnitedHealth also objects to the RFA to

16 the extent the terms "Support" or "Supported" call for any conclusion regarding

17 alleged legal obligations and/or serve to distort or mischaracterize alleged legal

18 obligations. Further, UnitedHealth further objects to the RFA to the extent the terms

19 "Support" or "Supported" are vague and ambiguous in that the definition references

20 "the ICD-9/ICD-10 Guidelines" when there are multiple versions of the ICD-9 and

21 ICD-10 guidelines that may apply during the relevant time period. UnitedHealth also

22 objects to the definition of "Support" or "Supported" to the extent it implies

23 Medicare Advantage Organizations are paid at the diagnosis code level and to the

24 extent it implies every diagnosis code submitted by a Medicare Advantage

25 Organization (i) results in a payment and/or (ii) is submitted in order to receive a

26 payment. Given the numerous deficiencies with the government's definition of

27 "Support" or "Supported" and use of those terms in this RFA, UnitedHealth lacks

28 knowledge as to the information being requested.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

19

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' FIFTH RFAS
2:16-CV-08697-FMO-SSX

1165
Exhibit 7

UnitedHealth further objects to this RFA to the extent it is improper under Federal Rule of Civil Procedure 36 and applicable case law because it seeks to establish facts which are obviously in dispute. *See, e.g., K.C.R.,* 2014 WL 3433925, at *4 ("[R]equests for admission should not be used to establish facts which are obviously in dispute[.]") (external citations omitted); *Vaden*, 2008 WL 822152, at *2 (same). UnitedHealth also objects to this RFA to the extent it implies or calls for any legal conclusion regarding any alleged legal obligations. UnitedHealth also objects to this RFA to the extent it calls for any legal conclusion regarding alleged knowledge or falsity. UnitedHealth objects to this RFA to the extent it calls for expert opinion and/or analysis. As UnitedHealth explained in its portion of the Joint Stipulation, determining whether or not diagnosis codes are supported by underlying medical records requires expert review of the medical records and a subsequent opinion.  RFAs requiring a party to undertake expert analysis and opinions are improper.  *See Emerson v. Lab. Corp. of Am.*, Civ. A. No. 1:11-CV-01709-RWS, 2012 WL 1564683, at *3-*4 (N.D. Ga. May 1, 2012); *Williamson v. Correctional Med. Servs.*, Civ. No. 06-379-SLR, 2009 WL 1364350, at *3 (D. Del. May 14, 2009).

Subject to and without waiving the foregoing General and Specific Objections, UnitedHealth denies RFA 9.

**REQUEST FOR ADMISSION NO. 10:**

Admit that You do not contend that any Diagnosis set forth in the United States' Response to Defendants' Interrogatory No. 1 is Supported by any Chart(s) in Your possession.

**RESPONSE TO REQUEST FOR ADMISSION NO. 10:**

UnitedHealth incorporates by reference each of its General Objections and Specific Objections to Definitions set forth above. UnitedHealth further objects to this RFA to the extent the terms "Support" or "Supported" are improperly narrow, misleading, and serve to mischaracterize the facts in that they imply there is one single source that provides comprehensive coding guidance for Medicare Advantage

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' FIFTH RFAS
2:16-CV-08697-FMO-SSX

1   Organizations, that CMS recognizes or allows the use of no other industry-accepted
2   coding guidance, and that coding guidance applicable to Medicare Advantage
3   Organizations is clear and unambiguous. UnitedHealth also objects to the RFA to
4   the extent the terms "Support" or "Supported" call for any conclusion regarding
5   alleged legal obligations and/or serve to distort or mischaracterize alleged legal
6   obligations. Further, UnitedHealth further objects to the RFA to the extent the terms
7   "Support" or "Supported" are vague and ambiguous in that the definition references
8   "the ICD-9/ICD-10 Guidelines" when there are multiple versions of the ICD-9 and
9   ICD-10 guidelines that may apply during the relevant time period. UnitedHealth also
10  objects to the definition of "Support" or "Supported" to the extent it implies
11  Medicare Advantage Organizations are paid at the diagnosis code level and to the
12  extent it implies every diagnosis code submitted by a Medicare Advantage
13  Organization (i) results in a payment and/or (ii) is submitted in order to receive a
14  payment. Given the numerous deficiencies with the government's definition of
15  "Support" or "Supported" and use of those terms in this RFA, UnitedHealth lacks
16  knowledge as to the information being requested.

17      UnitedHealth also objects to this RFA on the grounds that "possession" is
18  undefined. UnitedHealth interprets "possession" consistent with applicable Ninth
19  Circuit law. UnitedHealth objects to this RFA to the extent it calls for expert opinion
20  and/or analysis. UnitedHealth objects to this RFA on the grounds that it does not
21  serve to sharpen issues for trial regarding factual issues, but rather seeks information
22  about UnitedHealth's legal contentions and relates to issues pending before the
23  Special Master. *See, e.g.*, Joint Stipulation at 13, 39 ("UnitedHealth certainly denies
24  all of the codes are unsupported;" "UnitedHealth believes that each code, taken by
25  itself, is presumptively valid"). UnitedHealth objects to this RFA to the extent that
26  it calls for information that is protected by the attorney-client privilege and/or work
27  product protection. UnitedHealth objects to this RFA to the extent it calls for expert
28  opinion and/or analysis. As UnitedHealth explained in its portion of the Joint

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

21

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' FIFTH RFAS
2:16-CV-08697-FMO-SSX

1167
Exhibit 7

1   Stipulation, determining whether or not diagnosis codes are supported by underlying

2   medical records requires expert review of the medical records and a subsequent

3   opinion.   RFAs requiring a party to undertake expert analysis and opinions are

4   improper.   *See Emerson v. Lab. Corp. of Am.*, Civ. A. No. 1:11-CV-01709-RWS,

5   2012 WL 1564683, at *3-*4 (N.D. Ga. May 1, 2012); *Williamson v. Correctional*

6   *Med. Servs.*, Civ. No. 06-379-SLR, 2009 WL 1364350, at *3 (D. Del. May 14, 2009).

7          Subject to and without waiving the foregoing General and Specific

8   Objections, UnitedHealth denies RFA 10.

9   **REQUEST FOR ADMISSION NO. 11:**

10         Admit that You do not contend that any Diagnosis set forth in the United

11   States' Response to Defendants' Interrogatory No. 1 is Supported by any Chart(s) in

12   Your possession or custody.

13   **RESPONSE TO REQUEST FOR ADMISSION NO. 11:**

14         UnitedHealth incorporates by reference each of its General Objections and

15   Specific Objections to Definitions set forth above. UnitedHealth incorporates by

16   reference each of its General Objections and Specific Objections to Definitions set

17   forth above. UnitedHealth further objects to this RFA to the extent the terms

18   "Support" or "Supported" are improperly narrow, misleading, and serve to

19   mischaracterize the facts in that they imply there is one single source that provides

20   comprehensive coding guidance for Medicare Advantage Organizations, that CMS

21   recognizes or allows the use of no other industry-accepted coding guidance, and that

22   coding guidance applicable to Medicare Advantage Organizations is clear and

23   unambiguous. UnitedHealth also objects to the RFA to the extent the terms

24   "Support" or "Supported" call for any conclusion regarding alleged legal obligations

25   and/or serve to distort or mischaracterize alleged legal obligations. Further,

26   UnitedHealth further objects to the RFA to the extent the terms "Support" or

27   "Supported" are vague and ambiguous in that the definition references "the ICD-

28   9/ICD-10 Guidelines" when there are multiple versions of the ICD-9 and ICD-10

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

22

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' FIFTH RFAS
2:16-CV-08697-FMO-SSX

1168
Exhibit 7

1  guidelines that may apply during the relevant time period. UnitedHealth also objects
2  to the definition of "Support" or "Supported" to the extent it implies Medicare
3  Advantage Organizations are paid at the diagnosis code level and to the extent it
4  implies every diagnosis code submitted by a Medicare Advantage Organization (i)
5  results in a payment and/or (ii) is submitted in order to receive a payment. Given the
6  numerous deficiencies with the government's definition of "Support" or
7  "Supported" and use of those terms in this RFA, UnitedHealth lacks knowledge as
8  to the information being requested.

9      UnitedHealth also objects to this RFA on the grounds that "possession or
10 custody" is undefined. UnitedHealth interprets "possession" and "custody"
11 consistent with applicable Ninth Circuit law. UnitedHealth objects to this RFA to
12 the extent it calls for expert opinion and/or analysis. UnitedHealth objects to this
13 RFA on the grounds that it does not serve to sharpen issues for trial regarding factual
14 issues, but rather seeks information about UnitedHealth's legal contentions and
15 relates to issues pending before the Special Master. *See, e.g.*, Joint Stipulation at 13,
16 39 ("UnitedHealth certainly denies all of the codes are unsupported;" "UnitedHealth
17 believes that each code, taken by itself, is presumptively valid"). UnitedHealth
18 objects to this RFA to the extent that it calls for information that is protected by the
19 attorney-client privilege and/or work product protection. UnitedHealth objects to
20 this RFA to the extent it calls for expert opinion and/or analysis. As UnitedHealth
21 explained in its portion of the Joint Stipulation, determining whether or not diagnosis
22 codes are supported by underlying medical records requires expert review of the
23 medical records and a subsequent opinion.  RFAs requiring a party to undertake
24 expert analysis and opinions are improper.  *See Emerson v. Lab. Corp. of Am.*, Civ.
25 A. No. 1:11-CV-01709-RWS, 2012 WL 1564683, at *3-*4 (N.D. Ga. May 1, 2012);
26 *Williamson v. Correctional Med. Servs.*, Civ. No. 06-379-SLR, 2009 WL 1364350,
27 at *3 (D. Del. May 14, 2009).
28

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES, CA

23

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' FIFTH RFAS
2:16-CV-08697-FMO-SSX

1169
Exhibit 7

1    Subject to and without waiving the foregoing General and Specific

2    Objections, UnitedHealth denies RFA 11.

3    **REQUEST FOR ADMISSION NO. 12:**

4    Admit that You do not contend that any Diagnosis set forth in the United

5    States' Response to Defendants' Interrogatory No. 1 is Supported by any Chart(s) in

6    Your possession, custody, or control.

7    **RESPONSE TO REQUEST FOR ADMISSION NO. 12:**

8    UnitedHealth incorporates by reference each of its General Objections and

9    Specific Objections to Definitions set forth above. UnitedHealth further objects to

10   this RFA to the extent the terms "Support" or "Supported" are improperly narrow,

11   misleading, and serve to mischaracterize the facts in that they imply there is one

12   single source that provides comprehensive coding guidance for Medicare Advantage

13   Organizations, that CMS recognizes or allows the use of no other industry-accepted

14   coding guidance, and that coding guidance applicable to Medicare Advantage

15   Organizations is clear and unambiguous. UnitedHealth also objects to the RFA to

16   the extent the terms "Support" or "Supported" call for any conclusion regarding

17   alleged legal obligations and/or serve to distort or mischaracterize alleged legal

18   obligations. Further, UnitedHealth further objects to the RFA to the extent the terms

19   "Support" or "Supported" are vague and ambiguous in that the definition references

20   "the ICD-9/ICD-10 Guidelines" when there are multiple versions of the ICD-9 and

21   ICD-10 guidelines that may apply during the relevant time period. UnitedHealth also

22   objects to the definition of "Support" or "Supported" to the extent it implies

23   Medicare Advantage Organizations are paid at the diagnosis code level and to the

24   extent it implies every diagnosis code submitted by a Medicare Advantage

25   Organization (i) results in a payment and/or (ii) is submitted in order to receive a

26   payment. Given the numerous deficiencies with the government's definition of

27   "Support" or "Supported" and use of those terms in this RFA, UnitedHealth lacks

28   knowledge as to the information being requested.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES, CA

24

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' FIFTH RFAS
2:16-CV-08697-FMO-SSX

1170
Exhibit 7

1   UnitedHealth also objects to this RFA on the grounds that "possession,
2   custody, or control" is undefined. UnitedHealth interprets "possession," "custody,"
3   and "control" consistent with applicable Ninth Circuit law. UnitedHealth objects to
4   this RFA to the extent it calls for expert opinion and/or analysis. UnitedHealth
5   objects to this RFA on the grounds that it does not serve to sharpen issues for trial
6   regarding factual issues, but rather seeks information about UnitedHealth's legal
7   contentions and relates to issues pending before the Special Master. *See, e.g.*, Joint
8   Stipulation at 13, 39 ("UnitedHealth certainly denies all of the codes are
9   unsupported;" "UnitedHealth believes that each code, taken by itself, is
10  presumptively valid"). UnitedHealth objects to this RFA to the extent that it calls for
11  information that is protected by the attorney-client privilege and/or work product
12  protection. UnitedHealth objects to this RFA to the extent it calls for expert opinion
13  and/or analysis. As UnitedHealth explained in its portion of the Joint Stipulation,
14  determining whether or not diagnosis codes are supported by underlying medical
15  records requires expert review of the medical records and a subsequent opinion.
16  RFAs requiring a party to undertake expert analysis and opinions are improper. *See*
17  *Emerson v. Lab. Corp. of Am.*, Civ. A. No. 1:11-CV-01709-RWS, 2012 WL
18  1564683, at *3-*4 (N.D. Ga. May 1, 2012); *Williamson v. Correctional Med. Servs.*,
19  Civ. No. 06-379-SLR, 2009 WL 1364350, at *3 (D. Del. May 14, 2009).
20      Subject to and without waiving the foregoing General and Specific
21  Objections, UnitedHealth denies RFA 12.
22
23
24
25
26
27
28

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
LOS ANGELES, CA

25

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' FIFTH RFAS
2:16-CV-08697-FMO-SSX

1171
Exhibit 7

Dated: May 10, 2021

LATHAM & WATKINS LLP
DAVID J. SCHINDLER
DANIEL MERON
ABID R. QURESHI

By _____
David J. Schindler
Attorneys for UnitedHealth
Defendants

26

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' FIFTH RFAS
2:16-CV-08697-FMO-SSX

1

## **PROOF OF SERVICE**

2

  I am employed in the County of Los Angeles, State of California. I am over
the age of 18 years and not a party to this action. My business address is Latham &
Watkins LLP, 355 South Grand Avenue, Suite 100, Los Angeles, CA 90071-1560.

3

4

  On **May 10, 2021**, I caused the service of a true copy of the following
document described as:

5

6

**UNITEDHEALTH'S RESPONSES AND OBJECTIONS TO PLAINTIFF
UNITED STATES' FIFTH SET OF REQUESTS FOR ADMISSION TO ALL
DEFENDANTS**

7

to be served in the following manner:

8

9

## **BY ELECTRONIC MAIL**

10

  The above-described document was transmitted via electronic mail to the
following party pursuant to written consent under Federal Rule of Civil Procedure
5(b)(2)(E) on **May 10, 2021**:

11

12

13

## **SEE ATTACHED SERVICE LIST**

14

  I declare that I am employed in the office of a member of the Bar of, or
permitted to practice before, this Court at whose direction the service was made
and declare under penalty of perjury under the laws of the State of California that
the foregoing is true and correct.

15

16

**May 10, 2021**, at Los Angeles, California.

17

18

19

20

_____
    David J. Schindler

21

22

23

24

25

26

27

28

27

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' FIFTH RFAS
2:16-CV-08697-FMO-SSX

| | |
|---|---|
| 1 | **SERVICE LIST** |
| 2 | United States District Court<br>CASE NO. CV 16-08697 FMO (SSx) |

| | |
|---|---|
| John E. Lee<br>*john.lee2@usdoj.gov*<br>Assistant United States Attorneys<br>300 N. Los Angeles Street, Room 7516<br>Los Angeles, California 90012<br>Tel: 213.894.3995<br><br>Jack Ross<br>*jack.ross@usdoj.gov*<br>Assistant United States Attorneys<br>300 N. Los Angeles Street, Room 7516<br>Los Angeles, California 90012<br>Tel: 213.894.7395 | Attorneys for the United States of America |
| David M. Coriell<br>*david.coriell@usdoj.gov*<br>Assistant United States Attorney<br>United States Attorney's Office<br>Western District of New York<br>138 Delaware Avenue<br>Buffalo, New York 14202<br>Tel: 716.843.5731 | Attorneys for the United States of America |
| Jessica Krieg<br>*jessica.e.krieg@usdoj.gov*<br>Paul Perkins<br>*paul.r.perkins@usdoj.gov*<br>Maria R. Marsh<br>*maria.r.marsh@usdoj.gov*<br>United States Department of Justice<br>Civil Division – Fraud Section<br>601 D Street, N.W.<br>Washington, D.C. 20044<br>Tel: 202.307.0486 | Attorneys for the United States of America |
| Edward Crooke<br>*edward.crooke@usdoj.gov*<br>United States Department of Justice<br>Civil Division<br>175 N Street N.E., Room 10-202<br>Washington, D.C. 20002<br>Tel: 202.353.0426<br><br>Amy Likoff<br>*Amy.L.Likoff@usdoj.gov*<br>United States Department of Justice<br>Civil Division<br>175 N Street N.E., Room 10-1813<br>Washington, D.C. 20002<br>Tel: 202.305.3173 | Attorneys for the United States of America |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' FIFTH RFAS
2:16-CV-08697-FMO-SSX

1174
Exhibit 7

| | |
|---|---|
| 1 | Martha N. Glover |
| 2 | martha.n.glover@usdoj.gov |
| 3 | United States Department of Justice |
|   | Civil Division |
|   | 175 N Street N.E., Room 10-1808 |
| 4 | Washington, D.C. 20002 |
| 5 | Robert McAuliffe |
| 6 | Robert.McAuliffe@usdoj.gov |
|   | United States Department of Justice |
|   | Civil Division |
| 7 | 175 N Street N.E., Room 9-103 |
|   | Washington, D.C. 20002 |
| 8 | Tel: 202.514.6832 |
| 9 | Gregory A. Mason |
| 10 | gregory.a.mason@usdoj.gov |
|   | United States Department of Justice |
|   | Civil Division; Fraud Section |
| 11 | 175 N Street N.E., Room 10-224 |
|   | Washington, D.C. 20002 |
| 12 | Tel: 202.514.9472 |
| 13 | Linda M. McMahon |
| 14 | Linda.mcmahon2@usdoj.gov |
|   | United States Department of Justice |
|   | Civil Division |
| 15 | 175 N Street N.E., Room 10-202 |
|   | Washington, D.C. 20002 |
| 16 | Tel: 202.307.0448 |
| 17 | Wendy Z. Zupac |
| 18 | wendy.z.zupac@usdoj.gov |
|   | United States Department of Justice |
|   | Civil Division |
| 19 | 175 N Street N.E., Room 10-205 |
|   | Washington, D.C. 20002 |
| 20 | Tel: 202.353.1102 |
| 21 | Eric R. Havian |
| 22 | Mary A. Inman |
|   | Jessica T. Moore |
| 23 | Anne Hayes Hartman |
|   | Henry C. Su |
| 24 | Hallie E. Noecker |
|   | UHG- |
| 25 | RelatorsCounsel@Lists.SusmanGodfrey.com |
|   | **Constantine Cannon LLP** |
| 26 | 150 California Street, Suite 1600 |
|   | San Francisco, CA 94111 |
| 27 | Tel: 415.639.4001 |
| 28 | Harry P. Litman |
|   | Max Voldman |

Attorneys for Relator Benjamin Poehling

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

29

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' FIFTH RFAS
2:16-CV-08697-FMO-SSX

1175
Exhibit 7

| | |
|---|---|
| *UHG-RelatorsCounsel@Lists.SusmanGodfrey.com*<br>**Constantine Cannon LLP**<br>1001 Pennsylvania Avenue, N.W., Suite 1300<br>Washington, D.C. 20004<br>Tel: 202.204.3500 | |
| Steve Hasegawa<br>*UHG-RelatorsCounsel@Lists.SusmanGodfrey.com*<br>**Phillips & Cohen LLP**<br>100 The Embarcadero, Suite 300<br>San Francisco, California 94105<br>Tel: 415.836.9000 | Attorneys for Relator Benjamin Poehling |
| Oleg Elkhunovich<br>*UHG-RelatorsCounsel@Lists.SusmanGodfrey.com*<br>**Susman Godfrey L.L.P.**<br>1900 Avenue of the Americas, Suite 1400<br>Los Angeles, CA 90067<br>Tel: 310.789.3100<br><br>Arun S. Subramanian<br>William C. Carmody<br>Geng Chen<br>*UHG-RelatorsCounsel@Lists.SusmanGodfrey.com*<br>**Susman Godfrey L.L.P.**<br>1301 Avenue of the Americas, 32nd Fl.<br>New York, NY 100 19-6023<br>Tel: 212.336.8330<br><br>John P. Lahad<br>Weston L. O'Black<br>William R. H. Merrill<br>Meng Xi<br>*UHG-RelatorsCounsel@Lists.SusmanGodfrey.com*<br>**Susman Godfrey L.L.P.**<br>1000 Louisiana Street, Suite 5100<br>Houston, TX 77002<br>Tel: 713.654.6666<br><br>Matthew R. Berry<br>*UHG-RelatorsCounsel@Lists.SusmanGodfrey.com*<br>**Susman Godfrey L.L.P.**<br>1201 Third Avenue, Suite 3800<br>Seattle, WA 98101<br>Tel: 206.373.7394 | Attorneys for Relator Benjamin Poehling |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

30

UNITEDHEALTH'S RESPONSES AND OBJECTIONS
TO UNITED STATES' FIFTH RFAS
2:16-CV-08697-FMO-SSX

1176
Exhibit 7