MICHAEL D. GRANSTON
Deputy Assistant Attorney General, Civil Division
TRACY L. WILKISON
Acting United States Attorney
DAVID M. HARRIS
ABRAHAM C. MELTZER
JOHN E. LEE (CBN 128696)
JACK D. ROSS (CBN 265883)
Assistant United States Attorneys
    300 N. Los Angeles Street, Room 7516
    Los Angeles, California 90012
    Tel: (213) 894-3995; Fax: (213) 894-7819
    Email: john.lee2@usdoj.gov
JAMIE A. YAVELBERG
ROBERT McAULIFFE
EDWARD CROOKE
LINDA M. McMAHON
JESSICA E. KRIEG
AMY L. LIKOFF
GREGORY A. MASON
MARTHA N. GLOVER
WENDY ZUPAC
Attorneys, Civil Division, U.S. Department of Justice
    P.O. Box 261, Ben Franklin Station
    Washington, D.C. 20044
    Tel: (202) 307-0486; Fax: (202) 307-3852
    Email: robert.mcauliffe@usdoj.gov
JAMES P. KENNEDY, JR.
United States Attorney
DAVID CORIELL
Assistant United States Attorney (Admitted PHV)
    138 Delaware Avenue
    Buffalo, New York 14201
    Tel: (716) 843-5830; Fax: (716) 551-3052
    Email: david.coriell@usdoj.gov
Attorneys for the United States of America

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING,<br><br>Plaintiffs,<br><br>v.<br><br>UNITEDHEALTH GROUP, INC., *et al.*,<br><br>Defendants. | No. CV 16-08697 FMO<br><br>**UNITED STATES' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR REVIEW OF SPECIAL MASTER'S ORDER DENYING WITHOUT PREJUDICE MOTION TO COMPEL DISCOVERY; DECLARATION; EXHIBIT**<br><br>DATE: August 12, 2021<br>TIME: 10:00 a.m.<br>COURT: Hon. Fernando M. Olguin |

**TABLE OF CONTENTS**

I.   Introduction .......................................................................................................... 2

II.  Case Background and the Relevance of the Discovery Sought ............................. 3

III. UHG Should be Compelled to Respond to Interrogatory 14B ............................... 8

IV.  UHG Should be Compelled to Respond to Request 147 ..................................... 12

V.   This Motion Does Not Raise a "Wholly New Argument" and the United
     States Has Complied with its Meet-and-Confer Obligations ............................... 14

VI.  Conclusion .......................................................................................................... 16

# TABLE OF AUTHORITIES

**Federal Cases**   **Page(s)**

*Big Baboon Corp. v. Dell, Inc.*,
723 F. Supp. 2d 1224 (C.D. Cal. 2010) .................................................... 11

*Blankenship v. Hearst Corp.*,
519 F.2d 418 (9th Cir. 1975) ..................................................................... 11

*Iacono v. Int'l Bus. Machs. Corp., No. CV 17-8083-FMO*,
2018 WL 6112608 (C.D. Cal. Apr. 16, 2018) ........................................... 11

*United States v. Int'l Union of Petrol. & Indus. Workers*,
870 F.2d 1450 (9th Cir. 1989) ................................................................... 14

**Federal Statutes**

42 U.S.C. § 1395w-23(a)(1)(C) ......................................................................... 3

**Rules**

42 C.F.R. § 422.308(c)(1) (2020) ...................................................................... 3

42 C.F.R. § 422.310(g) (2020) .......................................................................... 4

FED. R. CIV. 26(b)(1)) ..................................................................................... 14

I.     Introduction

The discovery sought by this Motion goes to the heart of the government's case. The government contends that UHG received increased payments from the Medicare Advantage (MA) program based on beneficiary diagnoses that UHG reported to CMS, and UHG then retained the payments even after it reviewed those beneficiaries' medical records and found no support for the diagnoses. And the government is now seeking (a) the medical records underlying the specific diagnosis codes that the government alleges are unsupported; and (b) information about when UHG reviewed those medical records and what it found from those reviews. In its Opposition to this motion, UHG makes no argument that the medical records and information sought by the government are not relevant to its claims. Instead, UHG argues that it is entitled to submit unsupported diagnosis codes to CMS and to retain payment for those diagnosis codes. But UHG's asserted defenses do not limit the scope of discovery. Regardless of what arguments UHG might make in defending this case, it cannot deny the United States the documents and information that directly relate to the government's claims.

Request for Production No. 147 ("Request 147") asks UHG to produce the beneficiary medical records corresponding to the specific diagnosis codes UHG submitted to CMS for risk adjustment that the United States contends UHG improperly failed to delete. Interrogatory 14, Subpart B ("Interrogatory 14B") seeks information about which medical records UHG reviewed as part of its Chart Review program. The basis for the Special Master's Order, which is reviewed *de novo* here, was that Interrogatory 14, Subpart A ("Interrogatory 14A") required the work of an expert. But UHG has never argued that either Request 147 or Interrogatory 14B require the work of an expert. And, contrary to UHG's argument, Request 147 and Interrogatory 14B are <u>not</u> "inextricably linked" <u>or dependent in any way on</u> Interrogatory 14A. Interrogatory 14A sought the identification of specific diagnosis codes UHG contends were supported by medical records. That information about UHG's medical support contention is not at all necessary for UHG to produce the relevant medical records (Request 147) and

1  disclose factual information about the Chart Reviews UHG previously conducted
2  (Interrogatory 14B).  Nor has UHG provided any other basis for its refusal to provide
3  discovery of relevant information and documents that are in its control.  UHG's
4  Opposition advances its own theories of the case and defenses to the government's case,
5  but those arguments as to the merits of these allegations do not provide a basis for
6  refusing discovery of relevant information and documents in UHG's control.
7      For these reasons, the Special Master's Order erred and should be reversed.
8  **II.   Case Background and the Relevance of the Discovery Sought**
9      It is ironic that UHG accuses the United States of setting up strawmen, when
10 UHG's entire approach to these discovery requests – like its general defense to this case
11 – is an act of smoke and mirrors.  Time and again, UHG has attempted to overly
12 complicate, or worse yet disguise, its fraud in the complexities of a federal healthcare
13 program in which it has chosen to participate, and pursuant to which it has profited to the
14 tune of billions of dollars.  In the current briefing before this Court, UHG misstates the
15 premise of the United States' case and then attempts to distract with myriad fictionalized
16 responses to assertions the United States has never made.  In order to dispel some of
17 UHG's hyperbole, it is important to understand how CMS compensates private insurers
18 like UHG (known as MA Organizations, or MAOs) that choose to participate in the MA
19 program, as well as the United States' actual theory in this case.
20     A central, distinguishing feature of the MA program is that private insurers
21 provide health coverage to Medicare beneficiaries who enroll in their plans in exchange
22 for capitated payments from the government (i.e., fixed monthly payments for each
23 enrollee).  Recognizing that some beneficiaries cost more to care for than others, CMS
24 adjusts the capitated payments it makes to MAOs to account for various "risk" factors
25 that affect expected healthcare expenditures, including the relative health of a plan's
26 enrollees.  *See* 42 U.S.C. § 1395w-23(a)(1)(C); 42 C.F.R. § 422.308(c)(1) (2020).  In
27 general, CMS pays MAOs more for "sicker" beneficiaries expected to incur higher
28 healthcare costs and less for "healthier" beneficiaries expected to incur lower costs.  To

make this adjustment, CMS collects data from MAOs, including diagnosis codes the plans receive from healthcare providers after "medical encounters" with enrollees. An example of a medical encounter would be an office visit with a healthcare provider, where the provider creates a medical record that documents the beneficiary's illness or medical condition and includes a diagnosis code associated with that illness or medical condition. The healthcare provider submits those diagnosis codes to the MAO, and the MAO then submits the diagnosis codes to CMS through its risk adjustment data reporting systems. Using these past diagnosis codes, CMS calculates a risk score for each beneficiary that is used prospectively to calculate monthly payments. *See* 42 C.F.R. § 422.310(g) (2020).

To calculate the beneficiary risk scores, CMS uses a "risk adjustment" model known as the "HCC Model."[1] The HCC Model is designed to approximate the relative risk of insuring each beneficiary taking into account both demographic factors correlated with a beneficiary's relative risk (*i.e.*, age, disability status, gender, institutional status), as well as the specific health status of the beneficiary. CMS then correlates each HCC to the predicted cost of medical expenditures associated with that set of medical conditions. CMS predicts these costs based on data the agency has from administering the traditional Medicare, Fee-For-Service (Parts A and B) program. CMS assigns a numeric value to each demographic and health status factor annually by evaluating the financial value of the factor within traditional Medicare populations. Higher numeric values are assigned to HCCs that include diagnoses with greater disease severity and higher expected treatment costs. CMS then calculates a risk score for every beneficiary (the sum of weighted risk factors, including age, disability status, gender, institutional status and health status), which the agency then uses to calculate the per-member, per-month

---

[1] HCCs (or Hierarchical Condition Categories) are simply categories of related medical diagnoses. For example, HCC 19 (Diabetes without complications) encompasses a group of diagnoses related to diabetes, included diagnoses such as "diabetes mellitus due to underlying condition without complications" and "drug or chemical induced diabetes mellitus without complications." A single beneficiary may have none, one, or multiple HCCs associated with them. This impacts the risk adjustment payment that the MAO will receive for that beneficiary.

4

1  payment to the MAO for that beneficiary.

2  Importantly, MAOs can impact the risk score – and thus the MA payments – for
3  any beneficiary by submitting additional diagnosis codes to CMS or by withdrawing or
4  "deleting" diagnosis codes that the MAO had previously submitted to CMS. For
5  example, when an MAO submits additional diagnosis codes to CMS for a given
6  beneficiary, it can increase the beneficiary's risk score and correspondingly increase the
7  monthly payment that the MAO receives from CMS for that beneficiary. Conversely,
8  when an MAO deletes diagnosis codes from its data submissions to CMS for a given
9  beneficiary, it can decrease the beneficiary's risk score and correspondingly decrease the
10  monthly payment that the MAO received from CMS for that beneficiary. Thus, the HCC
11  model creates powerful financial incentives for MAOs to exaggerate the expected
12  healthcare costs for their enrollees by "over-reporting" diagnosis codes.

13  In this case, UHG developed a Chart Review program in order to identify
14  additional diagnosis codes to submit to CMS for the purpose of increasing its risk
15  adjustment payments. Through its Chart Review program, UHG collected medical
16  records and charts from the healthcare providers that cared for beneficiaries enrolled in
17  its health plans and deployed teams of professional medical coders to review those
18  medical charts to mine for additional diagnosis codes that had not previously been
19  submitted to CMS. UHG designed its Chart Review program to be "blind" – in other
20  words, the coders did not know which, if any, diagnoses had been reported by the
21  providers who treated the beneficiaries and created the medical records. Thus, rather
22  than simply confirming diagnoses that had already been reported by the providers, the
23  coders were instructed to review the entire medical records and find <u>all</u> medical
24  conditions purportedly documented in the records and record <u>all</u> diagnosis codes
25  identifying those conditions. UHG then undertook an analysis to identify which, if any,
26  of the medical conditions identified by the Chart Review professional coders constituted
27  a "new and unique" diagnosis code that UHG could submit to CMS for additional
28  payment. In other words, UHG compared the list of diagnosis codes identified by its

professional coders to the list of diagnosis codes already submitted by the providers and identified every diagnosis code that had not been previously submitted by a provider to UHG (and had not been submitted by UHG to CMS for payment). UHG then submitted those additional diagnosis codes to CMS, resulting, of course, in additional risk adjustment payments.

The heart of this case revolves around what UHG <u>did not do</u> with the results of its Chart Review. Despite understanding that its professional coders were obtaining different results than those identified by the healthcare providers, UHG did not utilize the list of diagnosis codes identified by its professional coders to find the diagnosis codes the providers had reported (and UHG had submitted) that were <u>not</u> supported by the beneficiaries' medical records. In other words, UHG did not compare the list of diagnosis codes identified by its professional coders to the list of diagnosis codes already submitted by the providers in order to identify diagnosis codes that had been previously submitted by a provider to UHG (and by UHG to CMS for payment) but were not found to be supported by UHG's professional coders. To do so, of course, would have decreased UHG's risk adjustment payments.

The decision to design its Chart Reviews to ignore information about diagnosis codes that should have been deleted, while utilizing those results to the extent they identified diagnosis codes that could have been added, was in no way a trivial act. UHG, through its Chart Review program, reviewed hundreds of thousands – to millions – of medical charts each year during the relevant time period. For 2010 to 2015 alone, the additional diagnosis codes that UHG identified through its Chart Review program caused CMS to make additional risk adjustment payments to UHG totaling over $3 billion. And yet, UHG simply ignored information from its Chart Review program that would have revealed diagnosis codes that were originally submitted, but were not supported by the medical record and should have been deleted.

The United States' case rests on the theory that UHG cannot simply bury its head in the sand and improperly retain monies to which it was not entitled when it avoided

1  correcting (by way of deletions) the diagnosis codes after its professional coders
2  conducting blind medical record reviews did not find any support for those codes in the
3  underlying medical records.  When UHG completed its Chart Reviews and submitted
4  any new and unique diagnosis codes for payment, it had all the information it needed to
5  identify and correct the diagnosis codes previously submitted by providers but that its
6  own professional coders did not find support for.  The United States contends that UHG
7  is liable for the risk adjustment payments it received for each diagnosis code that it
8  submitted to CMS, to the extent the medical record underlying that diagnosis code was
9  later reviewed as part of UHG's Chart Review program and the diagnosis code was <u>not</u>
10 <u>identified</u> by UHG's professional coders as being supported by that medical record.

11      Based on the data and other discovery provided by UHG, the government has
12 identified each diagnosis code submitted to CMS by UHG that emanated from a medical
13 record that went through UHG's Chart Review program, but that was not identified as a
14 valid diagnosis code that could be submitted to CMS.  To do this, the government
15 compared the list of diagnosis codes submitted to CMS based on a specific medical
16 record to the list of diagnosis codes that UHG's professional coders determined to be
17 documented by the medical record.  And based on that comparison, the government
18 identified the diagnosis codes that UHG had submitted to CMS and that UHG's coders
19 did not find to be supported by the medical record.  That effort resulted in a list of 28
20 million diagnosis codes, which the government produced to UHG in response to its
21 Interrogatory No. 1.

22      The discovery at issue here directly relates to the medical records associated with
23 those 28 million diagnosis codes at the heart of the government's claims.  Request No.
24 147 asks United to produce the beneficiary medical records corresponding to the
25 diagnosis codes that the United States contends are not supported.  As discussed above,
26 United already collected and reviewed these medical records as part of its Chart Review
27 program.  Interrogatory 14B seeks information about which medical records UHG
28 reviewed as part of its Chart Review program.  UHG devotes much of its Opposition to

explaining the defenses it intends to assert in this case and why it believes that insurers are entitled to submit invalid diagnosis codes to CMS and retain the associated payments even after they have information that the codes are unsupported. However, while UHG may well dispute the underpinnings of the United States' case, it cannot refuse to provide discovery that goes to the heart of the government's case simply because of that disagreement.

**III.   UHG Should be Compelled to Respond to Interrogatory 14B**

Notwithstanding UHG's efforts to confuse the issue in front of the Special Master and this Court, Interrogatory 14B is a straightforward contention interrogatory seeking factual information about UHG's Chart Review program. Specifically, if UHG contends that it was not required to delete or otherwise return payment for any diagnosis code identified by the United States in response to UHG's Interrogatory No. 1, Interrogatory 14B requires UHG to provide factual information about which medical records associated with that diagnosis code were reviewed as part of UHG's Chart Review program and the results of those reviews. Since UHG claims it was not required to delete or otherwise return payment for <u>any</u> of the diagnosis codes on the United States' list, *see* Dkt. 428-1, p. 40, fn. 7, it has already answered the *contention* part of Interrogatory 14B and is simply refusing to provide the requested factual information supporting its contentions – information the United States is entitled to learn during fact discovery.

Interrogatory 14B seeks essential factual information about the diagnosis codes that are at the heart of this case. For each diagnosis code that the United States identified in response to UHG's Interrogatory No. 1, the United States contends that (a) UHG submitted the diagnosis code to CMS to increase its risk adjustment payments; and (b) UHG later reviewed the underlying medical record as part of its Chart Review program and did not find support for the diagnosis code. Thus, a central issue in this case is whether the medical records underlying the diagnosis codes identified by the United States were reviewed as part of UHG's Chart Review program and whether, in that Chart

8

Review, UHG's coders found support for the diagnosis codes. If an underlying medical record was *not* reviewed in UHG's Chart Review program or if UHG's coders found support for the diagnosis code, then the diagnosis code does not fall within the scope of the United States' allegations. Thus, requiring a code-by-code response to Interrogatory 14B could narrow the scope of any factual dispute between the parties.

Interrogatory 14B is also relevant to UHG's knowledge about whether there was support for each diagnosis code in the underlying medical record. Whether UHG reviewed a medical record associated with a particular diagnosis code and what UHG found in that review is directly relevant to UHG's knowledge about the validity of that diagnosis code. Moreover, many of the medical records associated with diagnosis codes on the United States' list were reviewed multiple times in UHG's various Chart Review programs. The United States is entitled to learn how many times UHG reviewed the underlying medical records without finding support for the diagnosis codes at issue in this case.

In its briefing, UHG attempts to muddle the information covered by Interrogatory 14B with the information covered by Interrogatory 14A, which is not at issue in this appeal.[2] Both parts are premised on whether UHG contends that it was not obligated to delete or otherwise return payments for the diagnosis codes on the United States' list, but Interrogatory 14A includes an additional contention question. Specifically, Interrogatory 14A asks UHG to identify which of the listed diagnosis codes, if any, it contends were supported by a medical record. The Special Master determined that a review of medical records to answer 14A's second contention question required the work of an expert. However, UHG has never argued – either before the Special Master or in connection with this appeal – that answering Interrogatory 14B requires the work of an expert. *See*

---

[2] As we acknowledge in the instant motion – and as was recognized by UHG at various points in their briefing, despite their constant merging of the two concepts when confusion serves their efforts – we are not here appealing Special Master Segal's ruling regarding Interrogatory 14A. We accept her ruling that the government will get fact discovery (even if it is after fact discovery has closed) if and when UHG affirmatively contends as part of this litigation that certain of the diagnosis codes the government claims are unsupported have support in the beneficiary's underlying medical records.

9

1 Dkt. 429 at p. 19 ("Nor does United argue that Interrogatory 14B would require expert
2 analysis . . . .").

3      Moreover, the United States is not requesting UHG produce *new* data in response
4 to Interrogatory 14B. Indeed, UHG admits that it has everything it needs to answer
5 Interrogatory 14B in its own business records. *See* Dkt. 429 at p. 19 ("Nor does United
6 argue that . . . United does not possess sufficient information to conduct the analysis.").
7 Like any business, UHG keeps records of incoming and outgoing payments. UHG's
8 databases contain the claim and encounter data submitted by providers, as well as an
9 indicator showing whether a diagnosis code from that claim and encounter data was
10 submitted to CMS for payment. And UHG's databases contain information about each
11 medical record reviewed in its Chart Review program, including information about the
12 provider associated with a reviewed medical record, the dates of service reviewed in the
13 medical record, and the number of times the specific medical record was reviewed in a
14 UHG medical record review (or Chart Review) program. To answer Interrogatory 14B,
15 UHG simply needs to follow its own data trails to connect the medical record underlying
16 the diagnosis code submitted to CMS to the *same* medical record collected for its Chart
17 Review program and then provide the United States with the requested information
18 about the reviews it conducted on that record.

19      Importantly, it is evident that UHG has *already* engaged in this exact analysis. In
20 answer to a recent Request for Admission ("RFA"), UHG denied that it or its vendors
21 "conducted a Chart Review of the Chart(s) associated with every Diagnosis set forth in
22 the United States' Response to Defendants' Interrogatory No. 1." *See* Declaration of
23 John E. Lee, Ex. 1, UHG's Responses and Objections to the United States' Fifth Set of
24 Requests for Admission, Response to RFA 3. To deny the RFA, UHG must have
25 followed its data trails to determine that at least one of the medical records associated
26 with a diagnosis code on the United States' list was not reviewed in its Chart Review
27 program. In its brief, UHG speculates that for certain diagnosis codes, its databases may
28 not "contain information that would allow a one-to-one, straightforward matching of the

diagnosis codes and any corresponding medical records for that same patient, provider, and date of service." But for those particular codes, UHG could simply answer for that specific code that, after a reasonable investigation, it does not know whether the chart associated with that diagnosis code was reviewed in its Chart Review program. The fact that UHG might not have sufficient information about the medical records underlying certain diagnosis codes does not absolve UHG of providing the information it does possess.

Despite the ease with which it *could* answer Interrogatory 14B, UHG's central argument appears to be that answering the interrogatory is unduly burdensome. But the time has passed for UHG to make this objection, and the Court should not countenance such objections now. In order to make a burden objection, UHG should have – but did not – submit evidence of that burden to the Special Master for review and consideration. *See Big Baboon Corp. v. Dell, Inc.*, 723 F. Supp. 2d 1224, 1229 (C.D. Cal. 2010) (Segal, J.) (parties claiming undue burden "cannot simply invoke generalized objections" but rather "must state specifically how . . . each [request] is overly broad, unduly burdensome, or oppressive by submitting affidavits or offering evidence revealing the nature of the burden."). Interrogatory 14B was issued in November 2020, and in all of the intervening time since then, UHG has never offered any evidence in support of its claims of burden. Because UHG failed to support its claim of burden with affidavits, declarations, or *any* concrete evidence for the Court to probe that might "reveal the nature of the burden" and because it is UHG's burden to demonstrate why the discovery should be permitted, *see Iacono v. Int'l Bus. Machs. Corp.*, No. CV 17-8083-FMO, 2018 WL 6112608, at *8 n.2 (C.D. Cal. Apr. 16, 2018) (citing *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975)), the Court should disregard UHG's objection to responding to Interrogatory 14B on the grounds of undue burden.[3]

---

[3] While UHG claims in its Opposition brief to this Court that it does not "merely" argue undue burden, *see* Dkt. 429 at p. 19, the only other argument it appears to address is a resurrection of an argument, albeit in a somewhat disguised fashion, *see id.* at 19-22,
*(footnote cont'd on next page)*

11

The Court should therefore modify the Special Master's Order and grant the United States' Motion to Compel a response to Interrogatory 14B.

**IV.  UHG Should be Compelled to Respond to Request 147**

At UHG's insistence, the United States has provided UHG with a list of every diagnosis code that it alleges are not supported by a medical record.  These are the diagnosis codes that the United States contends are invalid and that UHG should have deleted.  The payments that CMS made based on the diagnosis codes on the United States' list are the basis for its damages calculations.  Request 147 seeks all medical records associated with these diagnosis codes.  These medical records are at the heart of the parties' dispute.  They are relevant to the government's claims that diagnosis codes submitted by UHG were not supported by any medical records.  And to the extent UHG contends any diagnosis codes on the United States' list were supported by those medical records, they are also relevant to UHG's defenses.  UHG cannot credibly argue that the medical records sought in Request 147 are irrelevant, unreasonable, or disproportionality burdensome under the Federal Rules.  In fact, nowhere in its Opposition does UHG suggest – because it cannot – that the discovery sought is not relevant to the claims and defenses in this case.

As the United States made clear to both the Special Master and UHG, "Request 147, as written, requests all medical records associated with the diagnosis codes on the United States' list."  Dkt. 428-1 at 3.  That is, Request 147 on its face seeks the medical records that UHG collected or reviewed as part of its Chart Review program that underlay the diagnosis codes on the United States' list, without any limitation by United

---

that it originally made before the Special Master (and in meet and confer discussions between the parties) that forcing it to respond to Interrogatory 14 would amount to unwarranted burden shifting and that a party cannot be forced to respond to an interrogatory for which it does not carry the burden of proof – a position the government, of course, disputed.  Because the Special Master did not adopt UHG's position and did not mention burden shifting in her order as a basis for denying the government's Motion to Compel, *see* Dkt. 419, the United States does not address that argument in this motion.  To the extent this Court considers UHG's arguments on this point, the United States requests the Court likewise consider the government's refutation of this argument at Dkt. 428-1, pp. 21-24, of the Special Master briefing.

States' Interrogatory 14. When UHG refused to respond to either Interrogatory 14 or produce any documents in response to Request 147, the United States entered into a good faith discovery negotiation during a series of meet and confers in an effort to reach a compromise. During those negotiations, the United States took the compromise position that, should UHG agree to respond to Interrogatory 14, it could correspondingly narrow its production of medical records in response to Request 147. The proposed compromise makes sense: If UHG does not contend that a particular diagnosis code is supported by a medical record, then the United States would not require UHG to produce any medical records underlying that diagnosis codes. In making such a proposal, the United States *never* waived its right to seek a full production in response to Request 147.[4] *See* Dkt. 428-1 at 29 ("[t]he United States is entitled to the production of medical records associated with all of the diagnosis codes at issue in this case and Request 147 is thus a proper document request."). Contrary to UHG's arguments, the United States should not be penalized for attempting to find a collaborative and narrowing solution to a discovery dispute. The Court should therefore find that the Special Master erred in adopting UHG's argument that the United States' good faith, compromise position regarding Request 147 and Interrogatory 14 supersedes the written discovery served.

Moreover, UHG – for the first time in its opposition to this motion – asserts that it cannot produce material in response to Request 147 unless it performs "much" of the matching exercise requested in Interrogatory 14B. Dkt. 429 at 24-25. UHG never raised this argument in front of the Special Master and it should be disregarded on that ground alone. Moreover, Request 147 does not call for UHG to perform any matching exercise or to provide information to the United States regarding which of the beneficiaries on the

---

[4] The government never suggested otherwise to the Special Master – as UHG falsely suggests by quoting, out of context, the government's arguments related to Interrogatory 14A – *not* Request 147. Dkt. 429 at 12. It is correct that, when discussing Interrogatory 14A (not Request 147), the government sought relief tailored to that Interrogatory Request, and did not seek a larger universe of medical records. It is not correct that the government suggested to the Special Master that it waived or "does not want a larger universe of medical records not tied to Interrogatory 14A" *in response to Request 147,* as UHG misrepresents. *Id.*

13

United States' list went through chart review or the results of those chart reviews, it simply requests all medical records associated with the diagnosis codes on the United States' list.

Because it cannot contest the relevancy of the discovery sought, in a single, cursory paragraph, UHG tells the Court that Request 147 is overbroad and therefore the Special Master's decision denying the United States' motion to compel must be affirmed. But, as the United States has demonstrated in this motion, the burdens imposed by Request 147 are both reasonable and proportional under the Federal Rules. Motion for Review at 11 (citing FED. R. CIV. 26(b)(1)). Production under Request 147 is both reasonable and not disproportionally burdensome because: (a) the medical records provide direct evidence concerning a key issue at the heart of this case, i.e., whether the diagnosis codes identified by the government have any medical record support; and (b) the United States seeks the production of medical records for which only UHG has possession, custody, or control. Further, UHG's suggestion that the United States has failed to offer a compromise position is disingenuous given the negotiating history addressed above – if UHG is willing to identify the diagnosis codes for which it contends medical support exists, the government remains willing to limit this document production to only the medical records that pertain to that subset of diagnosis codes.[5]

## V. This Motion Does Not Raise a "Wholly New Argument" and the United States Has Complied with its Meet-and-Confer Obligations

In opposition to this Motion, UHG offers two procedural arguments, neither of which has any merit. First, UHG argues that the United States initially sought before the Special Master a limited subset of medical records under RFP 147, namely, only those medical records responsive to Interrogatory 14A that are associated with diagnosis codes

---

[5] UHG's perceived confusion as to whether the United States seeks charts in the "possession" of third party vendors is not compelling. Dkt. 429 at 13. As UHG itself has argued before the Special Master, the Ninth Circuit has found a party to have control over materials that it has the "legal right to obtain [] upon demand." *United States v. Int'l Union of Petrol. & Indus. Workers,* 870 F.2d 1450, 1452 (9th Cir. 1989). Request 147 seeks all medical charts in UHG's possession, custody or *control* under Rule 34, regardless of whether they are held by a contractor or vendor hired by UHG.

14

that UHG contends are supported, while now ostensibly seeking a larger category of records, namely, all medical records matching the diagnoses codes at issue in this case. UHG Opposition at 23. This argument is untrue. UHG misrepresents the United States' suggested compromise proposal to resolve this discovery dispute as being the United States' position.

Contrary to UHG's contention that the United States "never presented" to the Special Master its request for all medical records under RFP 147, the United States repeatedly argued before the Special Master that it was entitled to a full response to RFP 147. *See, e.g.,* Dkt. 428-1 at 3 ("Therefore, the Court should grant the United States' Motion and *order a full response* to Interrogatory No. 14 and Request 147.") (emphasis added); *id*. at 29 ("[t]he United States is entitled to the production of medical records associated with *all of the diagnosis codes at issue in this case*"). As described above, in an effort to reach a compromise, the United States suggested, in its "Proposed Resolution/Conclusion" section of its Joint Stipulation, that the Special Master, at a minimum, could issue an order requiring "production of all medical charts associated with any diagnosis codes UnitedHealth contends are supported by medical records, in response to Request for Production No. 147" or, alternatively, "an Order foreclosing UnitedHealth from later introducing such evidence on the ground that it failed to produce it during fact discovery." Dkt. 428-1 at 45-46. The suggestion of a compromise is not the same as the position consistently taken by the United States before the Special Master, namely, that UHG should be compelled to provide a full response to RFP 147.[6]

Second, UHG argues that the United States did not engage in a meaningful meet and confer, by failing to disclose that it intended to seek new and different relief and failing to wait seven days before filing its motion. UHG Opposition at 2. This argument

---

[6] UHG also falsely attempts to suggest that the Special Master agreed with its position that the United States was raising a new argument. See UHG Opposition at 23 n.7 (citing Order at 10). To the contrary, the Special Master was merely commenting about whether a response to RFP 147 would be "meaningful" without a response to Interrogatory 14A. *See* Order (Dkt. 419) at 10. This statement does not reflect on the scope of the relief sought by the United States.

is likewise meritless.  As stated above, this motion seeks the same relief that the United States sought before the Special Master.  Moreover, the parties thoroughly discussed this motion before its filing.  *See* Lee Decl., ¶ 10.  Under this Court's Standing Order, the United States' motion was required to be filed within 14 days of the Special Master's Order.  The Order was entered on the docket on June 9, 2021, making this motion due by June 23, 2021, a timeline that UHG does not dispute.  The United States timely requested a meet and confer on June 15, 2021, *id*., ¶ 7, leaving the United States more than seven days before filing.  However, UHG delayed meeting for seven days – until June 22, 2021 – and then advised the United States to violate the Court's 14-day filing deadline by unnecessarily waiting further to file this motion.  *Id*., ¶¶ 8-11.

Tellingly, UHG does not otherwise contend that the parties failed to thoroughly discuss both Interrogatory 14 and RFP 147 prior to the filing of this motion, or that any further discussions might have obviated this motion.  Because the parties did not dispute that their positions were thoroughly discussed, it was clear that a motion for review could not be obviated, there was nothing further to be gained from delaying the filing of the motion, and waiting further would unnecessarily violate the Court's filing deadline, the United States filed its motion on June 22, 2021, in order to comply with the Court's 14-day filing requirement.  *Id*., ¶ 12.  Accordingly, UHG's procedural arguments lack merit.

## VI.  Conclusion

For the foregoing reasons, the Special Master's Order denying the United States' Motion to Compel responses to Interrogatory 14B and Request 147 should be rejected, and UHG should be compelled to provide the discovery responses requested.

| | |
|---|---|
| Dated: July 29, 2021 | MICHAEL D. GRANSTON<br>Deputy Assistant Attorney General, Civil Division<br>TRACY L. WILKISON<br>Acting United States Attorney<br>DAVID M. HARRIS<br>ABRAHAM C. MELTZER<br>JOHN E. LEE<br>JACK D. ROSS<br>Assistant United States Attorneys |
| | JAMIE A. YAVELBERG<br>ROBERT McAULIFFE<br>EDWARD CROOKE<br>LINDA M. McMAHON<br>JESSICA E. KRIEG<br>AMY L. LIKOFF<br>GREGORY A. MASON<br>MARTHA N. GLOVER<br>WENDY ZUPAC<br>Civil Division, Department of Justice |
| | JAMES P. KENNEDY, JR.<br>United States Attorney<br>DAVID CORIELL<br>Assistant United States Attorney |
| | /S/ Gregory A. Mason |
| | GREGORY A. MASON<br>Trial Attorney, Department of Justice |
| | Attorneys for the United States of America |