1    LATHAM & WATKINS LLP
         David J. Schindler (Bar No. 130490)
2        *david.schindler@lw.com*
         Manuel A. Abascal (Bar No. 171301)
3        *manny.abascal@lw.com*
     355 South Grand Avenue, Suite 100
4    Los Angeles, California 90071-1560
     Telephone: +1.213.485.1234
5    Facsimile: +1.213.891.8763

6    LATHAM & WATKINS LLP
         Daniel Meron (appearing *pro hac vice*)
7        *daniel.meron@lw.com*
         Abid R. Qureshi (appearing *pro hac vice*)
8        *abid.qureshi@lw.com*
     555 Eleventh Street, NW, Suite 1000
9    Washington, DC 20004-1304
     Telephone: +1.202.637.2200
10   Facsimile: +1.202.637.2201

11   Attorneys for UnitedHealth Defendants

12

13                 **UNITED STATES DISTRICT COURT**

14                 **CENTRAL DISTRICT OF CALIFORNIA**

15   UNITED STATES OF AMERICA *ex*          CASE NO. CV 16-08697 FMO (SSx)
     *rel.* BENJAMIN POEHLING,
16                                          **UNITED'S OPPOSITION TO**
17                  Plaintiffs,             **PLAINTIFFS' JOINT MOTION**
                                            **FOR REVIEW**
18            v.
                                            Date:    July 28, 2022
19   UNITEDHEALTH GROUP, INC., *et*         Time:    10:00 a.m. PT
     *al.*,                                 Judge:   Hon. Fernando M. Olguin
20                  Defendants.

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION.............................................................................................1

II.  BACKGROUND................................................................................................4

    A.  The MA Payment System And United's Chart Reviews....................4

    B.  The Government's Remaining FCA Count And United's Defenses .................................................................................................5

    C.  United's Lay Testimony Supporting Its Defenses.............................7

    D.  The Government's Motion To Compel And Judge Segal's Ruling Denying The Motion ......................................8

III.  ARGUMENT ...................................................................................................10

    A.  Judge Segal Correctly Held That Non-Privileged Lay Testimony About A Party's Understanding Of Contractual And Regulatory Provisions Is Not An Affirmative Act Triggering Waiver ....................................................10

    B.  Judge Segal Correctly Ruled In the Alternative That Introducing Evidence To Rebut An Essential Element of the Plaintiff's Case Does Not Qualify as an "Affirmative Act" That Triggers Waiver ......................................................20

    C.  Judge Segal Correctly Rejected The Government's Alternative Claim That United's Assertion Of Reliance On Statements By HHS Results In A Waiver Of Privilege.............24

IV.  CONCLUSION ...............................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abromavage v. Deutsche Bank Sec., Inc.*,
2019 WL 6790513 (S.D.N.Y. Dec. 11, 2019) ................................................... 19

*Bittaker v. Woodford*,
331 F.3d 715 (9th Cir. 2003) ........................................................................... 11

*Bodega Investments, LLC v. United States*,
2009 WL 2634765 (S.D.N.Y. Aug. 21, 2009) ............................................ 24, 25

*United States ex rel. Calilung v. Ormat Indus., Ltd.*,
2016 WL 4107682 (D. Nev. Aug. 1, 2016) ....................................................... 22

*Chevron Corp. v. Pennzoil Co.*,
974 F.2d 1156 (9th Cir. 1992) .................................................................*passim*

*In re County of Erie*,
546 F.3d 222 (2d Cir. 2008) .............................................................. 15, 16, 19

*Cox v. Admin. U.S. Steel & Carnegie*,
17 F.3d 1386 (11th Cir. 1994) .................................................................... 9, 15

*Fox v. Cal. Sierra Fin. Servs.*,
120 F.R.D. 520 (N.D. Cal. 1988) ..................................................................... 21

*Hearn v. Rhay*,
68 F.R.D. 574 (E.D. 1975) ....................................................................... 10, 17

*Hernandez v. Creative Concepts*,
2013 WL 1182169 (D. Nev. Mar. 19, 2013) .................................................... 22

*In re Itron, Inc.*,
883 F.3d 553 (5th Cir. 2018) ..................................................................... 15, 16

*KCC v. Aetna, Inc.*,
2019 WL 8060670 (C.D. Cal. 2019) ................................................................ 13

*In re Lidoderm Antitrust Litig.*,
2016 WL 4191612 (N.D. Cal. Aug. 9, 2016) ................................................... 22

*Lorenz v. Valley Forge Insurance Co.*,
   815 F.2d 1095 (7th Cir. 1987)........................................................................22, 23

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*,
   2012 WL 2568972 (S.D.N.Y. July 3, 2012) ................................................ 19

*McLaughlin v. Lunde Truck Sales, Inc.*,
   714 F. Supp. 916 (N.D. Ill. 1989)..........................................................24, 25

*Minebea Co. Ltd. v. Papst*,
   355 F. Supp. 2d 518 (D.D.C. 2005) ............................................................ 25

*Natural-Immunogenics Corp. v. Newport Trial Grp.*,
   2018 WL 6138160 (C.D. Cal. Jan 24, 2018).......................................... 21

*Phelps v. MC Communications, Inc.*,
   2013 WL 3944268 (D. Nev. July 22, 2013) .......................................... 22

*Rambus Inc. v. Samsung Electronics Co. Ltd.*,
   2007 WL 3444376 (C.D. Cal. Nov. 13, 2007) ...................................... 22

*Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*,
   32 F.3d 851 (3d Cir. 1994) ........................................................................ 14

*Rich v. Bank of America, N.A.*,
   666 F. App'x 635 (9th Cir. 2016)...............................................*passim*

*In re Schlumberger Tech. Corp.*,
   818 F. App'x 304 (5th Cir. 2020)..........................................................14, 15

*SEC v. Honig*,
   2021 WL 5630804 (S.D.N.Y. Nov. 30, 2021) .................................... 19

*Sedco Int'l S.A. v. Cory*,
   683 F.2d 1201 (8th Cir. 1982)................................................................ 16

*Synalloy Corp. v. Gray*,
   142 F.R.D. 266 (D. Del. 1992)..........................................................24, 25

*United States v. Amlani*,
   169 F.3d 1189 (9th Cir. 1999).....................................................10, 11, 15

*United States v. Bilzerian*,
   926 F.2d 1285 (2d Cir. 1981) ..........................................................10, 18, 19

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

iii

UNITED'S OPPOSITION TO PLAINTIFFS' JOINT
MOTION FOR REVIEW

*United States v. Doe (In re Grand Jury Proceedings)*,
  219 F.3d 175 (2d Cir. 2000) ................................................................. 18

*United States v. Exxon Corp.*,
  94 F.R.D. 246 (D.D.C. 1981) ............................................................... 25

## STATUTES

31 U.S.C.
  § 3729(a)(1)(G) .................................................................................... 5
  § 3729(b)(3) ......................................................................................... 5

42 U.S.C. § 1395w-23 ................................................................................ 4

## TREATISES

Black's Law Dictionary (5th Ed. 1979) .................................................. 21

## REGULATIONS

42 C.F.R. § 422.504(l) ............................................................................... 7

# I.     INTRODUCTION

Judge Segal's thorough and thoughtful order denying the government's motion to compel production of United's privileged documents should be affirmed. *See* Dkt. 499-1 ("Order").  As shown below, the government's extreme positions in support of its motion have no support in Ninth Circuit case law and would do profound violence to the attorney-client privilege and work product doctrine.

To prevail in this reverse False Claims Act ("FCA") action, the government must prove, as an essential element of its case, that United knowingly violated a known legal obligation to repay money.  Against this backdrop, the government argues that United cannot offer *any* evidence about its subjective state of mind—such as the testimony of lay business executives as to their understanding of the pertinent contracts and CMS pronouncements—without necessarily waiving its attorney-client and work product privileges.  That is so, the government claims, even though United has expressly stated it will not rely on privileged communications or assert an affirmative defense of good faith reliance on advice of counsel.

The government's radical position has no support at all in Ninth Circuit precedent.  Contrary to the government's repeated misstatements, the Ninth Circuit has *never* held that a party's "intent to offer testimony" from executives as to their lay understanding of their contractual and regulatory obligations "thereby . . . waive[s] any privilege that otherwise applied to those matters." Mot. at 2.  In every case in which the Ninth Circuit has found an implied waiver, the party had relied on privileged communications in support of its claim or defense or had brought a claim about the attorney-client relationship.  Indeed, the government's principal Ninth Circuit case—the *Chevron* decision that it claims "suppl[ies] the applicable principles for implied waiver in the specific circumstances at issue here"—involved a party raising an advice of counsel defense. *Id.* at 2, 7, 13 & n.10 (citing *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156 (9th Cir. 1992)).  And far from endorsing the government's position, *Chevron* actually held—consistent with Judge Segal's

ruling—that the defendant impliedly waived privilege "**to the extent** that [the defendant] claims that its tax position is reasonable **because it was based on advice of counsel**." *Chevron*, 974 F.2d at 1162-63 (emphasis added).  The logical corollary of that holding is undeniable: to the extent that the defendant had not claimed its position was based on the advice of counsel, it would not have waived privilege.

Lest there were any doubt, the Ninth Circuit subsequently held in *Rich v. Bank of America, N.A.*, that where a defendant testified that it made a good faith mistake about the meaning of a contract to rebut allegations of fraudulent intent, but did not rely on the *contents* of privileged communications, the defendant did not commit an "affirmative act" that interjected the privileged communications in the case and did not waive privilege.  666 F. App'x 635, 641 (9th Cir. 2016).  Although unpublished, *Rich* provides "relevant" and "persuasive" authority as to how the Ninth Circuit applies binding law.  Order at 12.  All but one of the in-circuit district court cases on which the government relies pre-date *Rich*, and as Judge Segal explained (at 17 n.5), that sole exception is readily distinguishable because the party—unlike United— expressly reserved its right to introduce privileged communications at trial.

Judge Segal's ruling also accords with the overwhelming weight of authority from other courts of appeals.  Three circuits—the Third, Fifth, and Second—have held that a party impliedly waives its privileges only when it intends to expressly rely on or introduce evidence that describes the *substance* of *privileged* communications.  A party does not impliedly waive privilege merely by introducing the testimony of lay witnesses as to their understanding of a contract or regulation. In arguing to the contrary, the government badly distorts the rule adopted in the Second Circuit, and relies heavily on an outlier decision from the Eleventh Circuit that pre-dates the contemporary decisions by other circuits rejecting such a rule.

The government's alternative argument—that United does in fact intend to rely on privileged communications because its executives who may testify "had communications with counsel," Mot. at 16—is baseless and not the proper basis for

finding a waiver.  A party relies on privileged communications for purposes of implied waiver only when the party intends to *proffer* or describe the privileged communications *at trial*.  United is doing no such thing here.

As Judge Segal correctly reasoned, showing that a witness's state of mind may have been influenced by privileged advice from an attorney is plainly insufficient to trigger waiver under the case law.  Order at 17-18.  If it were otherwise, "then waiver of the privilege would occur every time a client discussed a regulation with counsel and later attempted to defend a lawsuit by claiming a good faith understanding of the regulation"—a "result [that] would discourage parties from consulting counsel and undermine the purpose of the privilege." *Id.*

Moreover, a threshold requirement for finding an implied waiver is that the party voluntarily interjected the privilege by raising its state of mind on a legal question as a *new issue*, such as by bringing a lawsuit, asserting a counterclaim, or raising an affirmative defense.  Here, the government had an obligation, as part of its prima facie case, to prove that United knowingly violated its contractual and/or legal obligations.  The government therefore made United's state of mind an issue when it chose to bring its FCA claim in this case.  United simply wishes to put the government to its proof on that issue and to present its own evidence on the issue.  Unlike an affirmative defense, which comes into play after the plaintiff has proven the elements of its case, and thus introduces a new issue, introducing evidence merely to address an element of the plaintiff's case does not.

Thus, every district court decision from this Circuit on which the government relies (at 13) that did not involve a defendant relying on the content of a privileged communication involved a defendant introducing its state of mind as a new issue in the case by raising an affirmative defense, bringing a counterclaim, or filing suit. The government cannot identify any case in this Circuit concluding that a defendant who introduced non-privileged testimony to address an element of the plaintiff's case thereby commits an "affirmative act" impliedly waiving privilege.

## II.     BACKGROUND

### A.     The MA Payment System And United's Chart Reviews

This case centers on the Medicare Advantage ("MA") program, which provides an alternative to traditional Medicare.  Under traditional Medicare, CMS directly reimburses providers (e.g., doctors) for the medical services they render to eligible individuals.  That payment model is known as fee-for-service ("FFS").  Under the MA program, by contrast, CMS makes fixed monthly payments to private insurers like United, who must provide at least the same benefits as traditional Medicare.  *See generally* 42 U.S.C. § 1395w-23.  Unlike in traditional Medicare, CMS's payments in the MA program do not compensate for medical services; rather, the payments compensate MA plans for the risk they take on by agreeing to pay for the future medical costs their beneficiaries incur.

The cost of insuring a beneficiary in the MA program is significantly affected by whether the beneficiary is sicker or healthier than average.  To account for that, CMS's payment model uses demographic information and diagnosis codes from traditional Medicare to calculate the expected future healthcare costs of a beneficiary with a particular condition.  CMS then sets the MA payment rates based on the assumption that an MA beneficiary with the same health condition would impose the same costs.

Here, the government's allegations pertain to United's chart review process, a standard industry practice where coders review medical records and identify diagnosis codes related to beneficiaries' medical conditions.  MA plans conduct such reviews because healthcare providers use imperfect coding practices that result in the submission of incomplete codes.  The chart review process improves the completeness of the data submitted to CMS and helps to ensure that MA plans are paid appropriately for the level of risk they assume.  United's chart review is typically conducted "blind," meaning its coders are unaware of what diagnosis codes the provider may have already reported for the beneficiary.  The government claims

1   that whenever United's chart reviewers failed to independently identify a code

2   submitted by a provider, the provider's diagnosis code must have been an error and

3   resulted in an overpayment.  United strongly disputes this allegation.

4   **B.    The Government's Remaining FCA Count And United's Defenses**

5          The government's sole remaining FCA count requires it to prove that United

6   "knowingly and improperly avoid[ed] or decrease[d] an obligation to pay or transmit

7   money or property to the Government."  31 U.S.C. § 3729(a)(1)(G).  By bringing

8   this claim, the government has taken on the burden of proving, among other things,

9   that United acted with the requisite scienter—that is, that United "knowingly"

10  violated a legal "obligation."  *Id.* § 3729(b)(3).  The government alleges (at 3) that

11  United's blinded chart reviews gave the company knowledge that certain submitted

12  codes were unsupported by medical charts, and that by not deleting those codes,

13  United "knowingly" violated its duty to submit only "accurate" data to CMS.

14         United's defenses seek to hold the government to its burden of proof on each

15  element of its FCA claim, including its burden of proving scienter.  One such defense

16  is based on the meaning of "accurate" coding data, given the comparative design of

17  the MA payment model.  Because traditional Medicare data contain errors, and

18  because CMS calculates its payment rates to MA plans based on those data, the

19  model accounts for a degree of coding error in the payment rates.  Thus, coding data

20  are "accurate" in the MA program when they reflect the same pattern of coding—

21  including the same level of unsupported codes—as in traditional Medicare.

22         CMS itself has publicly agreed that, given the comparative nature of the MA

23  payment system, coding accuracy in the MA program is measured in relative rather

24  than absolute terms:

25         Given the fact that the MA payment methodology is based on fee-for-
           service payments, and that the risk adjustment methodology is designed
26         to compare the risk scores of MA plan enrollees to … beneficiaries not
           enrolled in MA plans, for this comparison to be valid, MA plans must
27         code the way [traditional Medicare] does.  This would result in the MA
           plans' coding "accurately" reflecting the fee-for-service coding used on
28         the beneficiaries to whom MA plan enrollees are being compared.

1    Rate Announcements for CY 2009 (at 20) and CY 2010 (at 20-21) (Dkt. 505-3, Tab
2    7, Exs. C, D).

3           Likewise, when establishing the methodology CMS uses to audit MA plans,
4    CMS agreed that it must "account[] for the fact that the documentation standard used
5    in [CMS's MA] audits to determine a contract's payment error (medical records) is
6    different from the documentation standard used to develop the [MA] risk-adjustment
7    model (FFS claims)."  Notice of Final Payment Error Calculation Methodology, Feb.
8    24, 2012 (Dkt. 505-3, Tab 7, Ex. E).  Under the CMS's audit methodology, an MA
9    plan is deemed to be overpaid only if its rate of unsupported codes is higher than the
10   rate in CMS's own FFS data that is used to establish the MA payment rates.  *Id.*

11          In depositions, a number of CMS officials have agreed with key aspects of
12   United's defenses.  *See, e.g.*, Foster Dep. Tr. at 150:22-25 (Dkt. 505-3, Tab 7, Ex.
13   F) (former chief CMS actuary) (agreeing that if MA plans code the same way as
14   providers in traditional Medicare, the plans' data are "sufficiently accurate[] for the
15   purpose at hand."); 113:23-114:12 (agreeing that given how MA payments are
16   calculated, payments to a plan would likely "work out okay" even if "some plan
17   members are being paid as diabetics when in fact they're not diabetics"); Lazio Dep.
18   Tr. at 139:5-8 (Dkt. 505-3, Tab 7, Ex. G) (current CMS chief actuary for MA)
19   ("[T]he risk adjustment model is designed to capture the diagnosis coding that's
20   consistent with the coding in the fee-for service program."); Hutchinson Dep. Tr. at
21   126:3-127:5 (Dkt. 505-3, Tab 7, Ex. H) (former head of CMS's Plan Payment
22   Group) (agreeing that if an MA plan reviewed 100%, 50%, or even 25% of its
23   members' records and deleted unsupported codes, the plan would be underpaid);
24   Grant Dep. Tr. at 276:7-277:8 (Dkt. 505-3, Tab 7, Ex. I) (similar); *id.* at 208:14-19
25   (stating that CMS told MA plans that "if they submitted data like fee for service,
26   they would be paid equivalent to the calibration" payment model); *id.* at 298:5-14
27   (acknowledging that underlying errors in FFS data are "baked into" the MA payment
28   rates).

United has also been clear about the defenses that it is *not* raising.  United has never asserted an advice of counsel defense or any affirmative defense like good faith.  Instead, United intends to hold the government to its burden of proof on each element of its FCA claim with evidence including CMS's public statements and testimony from CMS officials that agree with United's comparative understanding of "accuracy," as well as testimony of United's own lay witnesses as to their understanding of the contracts they signed and programmatic obligations under this payment model.  That evidence will be introduced to rebut the government's allegation that United knew it had an obligation to delete every unsupported code it identified, regardless of the corresponding errors in CMS's FFS data, and that United knowingly violated that obligation.  United will not rely on or introduce any privileged communications in rebutting the government's case.

## C.    United's Lay Testimony Supporting Its Defenses

Consistent with these defenses, two of United's officers—Brian Thompson and Scott Theisen—have testified about their understanding of United's obligations. Thompson and Theisen both previously served as CFO of United's Medicare & Retirement business, which required them to be personally familiar with how the MA payment model works, the impact of errors in CMS's own data, the comparative basis for MA payment, and what data "accuracy" means in this context.  CMS rules require the CEO or CFO of MA plans to certify that the data the plan submits are accurate, *see* 42 C.F.R. § 422.504(l), and thus CMS expects CFOs like Thompson and Theisen to have an understanding of what accurate data means.  And that lay understanding is precisely what Thompson and Theisen testified about.

Thompson testified about the basis for his understanding that United would have no obligation to delete a specific unsupported code, unless it knew its overall rate of unsupported codes materially exceeded CMS's rate of such codes and by how much.  Thompson Dep. Tr. at 357-69 (Dkt. 505-3, Tab 7, Ex. J, filed under seal). He described discussions with other non-legal personnel on these topics, including

1  non-privileged discussions on the relationship between the error rate in MA data and

2  the inherent error rate in FFS data, the lack of a requirement for MA plans to look

3  for unsupported codes, and when deletes were required.  *Id.* at 108, 142-150, 319,

4  345-48.

5       Theisen testified, among other things, that the basis of his understanding of

6  accuracy came from discussions with relator Ben Poehling and other non-lawyer

7  employees of United and Optum.  Theisen Dep. Tr. at 74-76 (Dkt. 505-3, Tab 7, Ex.

8  K, filed under seal).  Theisen further explained that this understanding grew out of

9  his professional background, discussions with business colleagues, pronouncements

10 by CMS in connection with the Coding Intensity Adjuster, the FFS Adjuster, and

11 common sense—and although he also noted he discussed the issue with counsel, he

12 never described the content of those discussions.  *Id.* at 157, 251.  Theisen also

13 testified at length about the bases of his understanding of risk adjustment, including

14 that his education on the topic was largely informal, but that he learned by "getting

15 deeper into the-day-to-day" of the business.  *Id.* at 75:12-14.

16     **D.     The Government's Motion To Compel And Judge Segal's Ruling
                Denying The Motion**

17

18     The government's motion to compel relates to United's responses to the

19 government's fifteenth and sixteenth interrogatories.  There, United stated that it

20 intends to negate the government's showing of scienter by introducing evidence that

21 United reasonably relied on statements and advice from HHS, as well as by

22 introducing testimony from certain United officers as to their lay understanding of

23 what it means for data to be accurate under the MA payment model.  *See* United's

24 Objections and Resps. to Pl.'s Fifth Set of Interrogs. at 6-7 (Dkt. 505-3, Tab 7, Ex.

25 L).  In responding to both interrogatories, United made clear that it is not waiving

26 any privileges, is not asserting an advice of counsel defense, will not rely on the

27 content of any privileged communications in its defense, and is not asserting an

28 affirmative defense of good faith.  Instead, United merely intends to rebut the

1   government's burden of proof as to scienter.  The government then filed a motion to
2   compel before Judge Segal, seeking a ruling that United waived the attorney-client
3   privilege or work product doctrine by indicating an intention to offer testimony as
4   to United's understanding of the contractual and regulatory provisions and its
5   reliance on HHS statements, as well by providing deposition testimony that
6   mentioned conversations with counsel.

7         After briefing and a hearing, Judge Segal denied the government's motion.
8   The Order first reviewed the parties' contentions, Order at 2-7, and the relevant
9   factual background, *id.* at 7-10.   As Judge Segal explained, the government's
10   position was that after it brought suit, "UnitedHealth was left with only two choices:
11   either (1) decline to put on evidence . . . to negate the government's burden of
12   proving scienter, thereby ceding a key part of the government's case; or (2) waive
13   its attorney-client and work product privileges."  *Id.* at 9-10.  But the government
14   lacked support for its position.  Instead, it invoked cases showing that "waiver may
15   occur when a party [1] affirmatively asserts the advice of counsel or [2] the substance
16   of an attorney-client communication as a 'sword' in litigation."  *Id.* at 11.  But that
17   simply "fails to address the specific circumstances" at issue here, which involve "the
18   limited testimony of two UnitedHealth witnesses."  *Id.*  The government also relied
19   "primarily on an older Eleventh Circuit decision, *Cox v. Admin. U.S. Steel &*
20   *Carnegie*, 17 F.3d 1386 (11th Cir. 1994)," but Judge Segal found that "the
21   overwhelming majority of published circuit decisions apply a more focused rule than
22   the one adopted in *Cox*."  *Id.*

23         Judge Segal then carefully considered the available precedent from the Ninth
24   Circuit.  In *Rich v. Bank of America, N.A.*, 666 F. App'x 635 (9th Cir. 2016), a
25   decision that Judge Segal found both "relevant" and "persuasive," the Ninth Circuit
26   rejected an implied waiver argument where the defendant had "discussed the
27   existence" of privileged communications but had not "used their contents as a basis
28   for any claims or defenses."  Order at 11-12 (quoting 666 F. App'x at 641-42).  Like

the defendant in *Rich*, Judge Segal concluded that "UnitedHealth did not engage in the type of affirmative act necessary for waiver." *Id.* at 15.  The same result obtained under other relevant precedent, including *United States v. Amlani*, 169 F.3d 1189 (9th Cir. 1999) and the three-part test described in *Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D. 1975), because the contested testimony merely "reflected UnitedHealth's response to the government's burden to prove scienter." *Id.* at 14-15.

Judge Segal also found that the government "misinterpreted" an out-of-circuit case that it relied upon, *United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1981). *Id.* at 13.  Contrary to the government's position, *Bilzerian* does *not* stand for the rule that a defendant who "refers to conversations with counsel while discussing a good faith defense has waived privilege."  Instead, Judge Segal found that *Bilzerian* stood for the more modest principle that a criminal defendant could not obtain *blanket* protection from implied waiver because "if the defendant offered specific testimony about legal advice on direct examination, that testimony <u>might</u> provide grounds for cross-examination into privileged material." Order at 13-14.[1]

In sum, Judge Segal found that the government's position lacked support in the case law, "would discourage parties from consulting counsel," and would "undermine the purpose of the privilege." *Id.* at 18.

## III.   ARGUMENT

### A.   Judge Segal Correctly Held That Non-Privileged Lay Testimony About A Party's Understanding Of Contractual And Regulatory Provisions Is Not An Affirmative Act Triggering Waiver

The government's principal claim in its Motion is that Judge Segal's ruling defied "controlling Ninth Circuit law."  Mot. at 1.  Specifically, it claims that Judge Segal's holding—that asserting a "good faith understanding of the regulations as a defense" without raising an advice of counsel defense or "inject[ing] the actual

---

[1] Before Judge Segal the government also unsuccessfully argued that United waived privilege by producing certain attorney notes.  The government's Motion does not challenge Judge Segal's rejection of that claim.

1  privileged communications" into the case does *not* impliedly waive privilege, Order

2  at 15, 17—is "irreconcilably at odds with controlling Ninth Circuit law," Mot. at 1.

3  Judge Segal's ruling in fact correctly applied both Ninth Circuit law and the

4  overwhelming weight of circuit precedent.  The government's claims to the contrary

5  are based on selective quotations of the key decisions and distortions of their

6  reasoning.

7         The government's claim that Ninth Circuit law "clearly" establishes its

8  extreme waiver rule is outlandish.  The Ninth Circuit has *never* addressed a case in

9  which a party was argued to have waived privilege merely by offering non-

10 privileged testimony as to its subjective understanding of legal provisions.  And

11 *every* case in which the Ninth Circuit has found such a waiver involved a party either

12 invoking advice of counsel or raising a claim about the attorney-client relationship

13 itself.  *See Chevron*, 974 F.2d at 1162 (invoking "advice from counsel" defense

14 based on "advice given by tax counsel"); *Bittaker v. Woodford*, 331 F.3d 715 (9th

15 Cir. 2003) (habeas petitioner raising ineffective assistance of counsel as basis for

16 relief); *United States v. Amlani*, 169 F.3d 1189, 1191-92 (9th Cir. 1999) (claim of

17 "attorney disparagement" that required proving why party fired its attorney).

18        The principal Ninth Circuit case on which the government relies (at 1, 7-11,

19 13)—*Chevron*—does not provide the broad waiver rule the government seeks, but

20 rather adopted the narrower waiver analysis that Judge Segal correctly applied.  In

21 that case, Pennzoil defended against a claim that its securities disclosure was

22 misleading by claiming that its actions were based on its "belief that its tax position

23 was reasonable and sound."  *Chevron*, 974 F.2d at 1162.  Pennzoil supported that

24 defense with a declaration stating that its position was "made in reliance upon the

25 advice of tax counsel."  *Id*.  The Ninth Circuit concluded that by affirmatively basing

26 its claim on advice of counsel, but then invoking privilege to block further discovery,

27 Pennzoil was improperly using "attorney-client communications … both as a sword

28 and a shield."  *Id*.

Although the government quotes *Chevron*'s verbatim quotation of *Bilzerian* in support of the sword-and-shield principle, the government *omits* the very next sentence where the Ninth Circuit set forth its analysis and holding: "Similarly, **to the extent that** Pennzoil *claims* that its tax position is reasonable *because it was based on advice of counsel*, Pennzoil puts at issue the tax advice it received." *Id.* at 1162-63 (emphasis added). The Ninth Circuit thus did not rule that Pennzoil had waived privilege by proffering testimony as to its understanding of tax law; it held only, consistent with Judge Segal's ruling, that Pennzoil had waived privilege "*to the extent*" that it "claim[ed]" that its tax position was reasonable "because it was based on advice of counsel." The necessary corollary of that holding is that there would have been no waiver had Pennzoil's executive proffered testimony as to his belief without invoking advice of counsel as its basis. *Chevron* is thus inconsistent with the government's position and offers no support for its extreme waiver rule.

The Ninth Circuit's decision in *Rich v. Bank of America*, 666 F. App'x 635 (9th Cir. 2016), which Judge Segal thoroughly analyzed, confirms that its implied waiver analysis depends on whether a party has proffered privileged communications or raised a claim about the attorney client relationship itself. *Rich* involved fraud allegations by borrowers who claimed that the bank and its attorneys misled them about the terms in their loan modification, including in a letter sent to them by a lawyer representing the bank. Br. of Appellants at 15, No. 14-17190 (9th Cir. filed Sept. 9, 2015) (Dkt. 505-3, Tab 7, Ex. M). The defendants admitted that they had provided erroneous information, but claimed a lack of fraudulent intent, testifying in their depositions that neither the lawyer nor her client had understood the meaning of certain contractual terms. *Id.* at 15, 53-58; *Rich*, 666 F. App'x at 641. On appeal, the plaintiffs argued that the defendants had waived privilege by raising a state of mind defense and placing their knowledge of the law at issue, relying on *Chevron* and *Bilzerian*. Br. of Appellants at 56 (Dkt. 505-3, Tab 7, Ex. M). Contrary to the government's claim (at 14), the plaintiff in *Rich* did not base its

1   claim of waiver simply on the placement of two attorneys on the witness list, but on

2   the witnesses' deposition testimony that showed the basis for their likely trial

3   testimony.  Although the government's brief ellipses the key language, the Ninth

4   Circuit rejected the waiver argument, even though defendant had "discussed the

5   existence of these [attorney-client] communications," precisely because the

6   defendant "did not use their *contents* as a basis for any claims or defenses." *Rich*,

7   666 F. App'x at 641-42 (emphasis added).  Although unpublished, as Judge Segal

8   noted, *Rich* is "relevant here as persuasive Ninth Circuit authority."  Order at 12.

9          Indeed, this Court recently applied *Rich* and squarely rejected the same waiver

10   argument pressed by the government here.  In *KCC v. Aetna, Inc.*, 2019 WL 8060670

11   (C.D. Cal. 2019), *Aetna* pled as an affirmative defense that it had a "good faith

12   belief" that its actions "would [not] constitute a violation of any of KCC's [] rights"

13   and that its conduct conformed to all laws and regulations "based upon the state of

14   knowledge existing at the time." *Id.* at *2.  KCC argued that by pleading this good

15   faith belief as to its legal obligations and knowledge of the law, Aetna waived

16   privilege.  Applying both the "federal common law" *Hearn* test as well as California

17   law this Court rejected the argument on the basis of *Rich*:  "The Court *reject[s] any*

18   *interpretation of Hearn that does not require affirmative reliance on the contents of*

19   *privileged communications for waiver*." *Id.* at *1 (emphasis added) (citing *Rich*, 666

20   F. App'x at 641).  The government's claim (at 15) that *KCC* was applying California

21   law which differed from federal common law is incorrect; to the contrary, *KCC*

22   agreed with the "California Supreme Court [] that federal courts [under *Hearn*]

23   applied a similar standard regarding implied waiver" as did California, and on that

24   basis found there was no waiver "under Ninth Circuit or California law." *Id.* at *2.[2]

25

26

27   [2] The government is thus wrong to say that *KCC*'s analysis was dicta, but the
     argument is irrelevant anyways.  District courts are not bound by decisions of other
28   district court judges.  The importance of *KCC* is that it shows that other judges
     understand the significance of *Rich* in the same way as Judge Segal.

Not only is Judge Segal's ruling fully consistent with Ninth Circuit law, but as Judge Segal also explained (at 12), the overwhelming majority of other circuits have likewise rejected the government's extreme waiver argument.  In *Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851 (3d Cir. 1994), the Third Circuit squarely addressed this issue.  There, the plaintiffs brought an action against their insurer for denying coverage.  The district court held that the plaintiffs waived privilege because their coverage suit placed at issue their knowledge of potential legal claims they may not have disclosed at the time they purchased their policies. The Third Circuit granted mandamus, holding that the district court committed clear legal error because the "advice of counsel is placed in issue where the client asserts a claim or defense, and attempts to prove that claim or defense *by disclosing or describing an attorney client communication*." *Id.* at 863 (emphasis added). "Advice is not in issue merely because … the attorney's advice might affect the client's state of mind in a relevant manner." *Id*. The Third Circuit noted that cases finding a waiver of privilege "to test the client's contentions" when "the client's state of mind may be in issue in the litigation" are "of dubious validity," because "[r]elevance is not the standard for determining whether or not evidence should be protected from disclosure as privileged, and that remains the case even if one might conclude the facts to be disclosed are vital, highly probative, directly relevant or even go to the heart of an issue." *Id.* at 864.  Accordingly, the Third Circuit held that there was no waiver because the plaintiffs had not "interjected the advice of counsel" in support of their claim, even though they had affirmatively brought suit and their "state of mind is put in issue in the action." *Id.*

The Fifth Circuit follows the Third Circuit.  In a recent decision, the Fifth Circuit held that a defendant does not waive privilege even when pleading an affirmative defense of "good-faith efforts to comply with the [law]." *In re Schlumberger Tech. Corp.*, 818 F. App'x 304, 306 (5th Cir. 2020).  After the district court granted the plaintiff's motion to compel privileged materials relevant to the

defendant's good faith affirmative defense, the Fifth Circuit granted mandamus and reversed.  Relying on its prior decision *In re Itron, Inc*., 883 F.3d 553, 567 (5th Cir. 2018), which *Schlumberger* made clear fully applied to federal cases, 818 F. App'x at 307, the Court reasoned that "[w]hile privileged communications may have some bearing on [defendant's] beliefs about its compliance, [the defendant] has not 'relied on attorney-client communications' to establish its good faith defense.'"  *Id.* at 307-08 (quoting *In re Itron*, 883 F.3d at 558).

The Second Circuit has likewise adopted the same approach to implied waiver as Judge Segal.  For example, in *In re County of Erie*, the court first surveyed its prior case law, including *Bilzerian*, to provide "clarification of the scope of the at-issue waiver and the circumstances under which it should be applied," agreeing that "district courts within this Circuit have reached conflicting decisions in the application of the *Hearn* balancing test."  546 F.3d 222, 228 (2d Cir. 2008). Rejecting a test that lacks "*the essential element of reliance on privileged advice in the assertion of the claim or defense* in order to effect a waiver," *id.* at 229 (emphasis added), the Second Circuit announced a clear rule: "We hold that a party must *rely* on privileged advice from his counsel to make his claim or defense" for assertion of the defense to result in waiver.  *Id.* at 229 (emphasis in original); *Schlumberger*, 818 F. App'x at 307 (reading *Erie* the same way).

Only one circuit court has taken a contrary view.  In *Cox v. Admin. U.S. Steel & Carnegie*, the Eleventh Circuit found an implied waiver even though the defendant denied any intent to rely on privileged information in its defense.  17 F.3d at 1418-19 (11th Cir. 1994).  *Cox*, however, pre-dates the decisions of the Third and Fifth Circuits, as well as the Second Circuit's ruling in *County of Erie*, and represents an outlier view among the courts of appeals.

The government incorrectly claims (at 12) that the majority rule followed by Judge Segal cannot be squared with the Ninth Circuit's decision in *United States v. Amlani*, 169 F.3d 1189 (9th Cir. 1999).  In *Amlani*, a criminal defendant challenged

his conviction by asserting "attorney disparagement"—claiming that he had fired his more competent attorney because of improper disparagement by the government. That claim necessarily required examination of the defendant's relationship with his attorney and his motivation for terminating that relationship. *Amlani* thus falls squarely within the majority rule for waiver. As the Second Circuit explained in rejecting the far looser relevance-based test advocated by the government here, traditionally "[c]ourts have found waiver by implication when a client testifies concerning portions of the attorney-client communication, ... *when a client places the attorney-client relationship directly at issue*, ... and when a client asserts reliance on an attorney's advice as an element of a claim or defense." *Erie*, 546 F.3d at 228 (emphases added) (quoting *Sedco Int'l S.A. v. Cory*, 683 F.2d 1201, 1206 (8th Cir. 1982)). In adopting the traditional approach to implied waiver that requires express reliance on privileged communications, the Second Circuit obviously did not imply rejection of the second category. *Amlani* is thus a case where the privilege was waived even under the majority rule followed by Judge Segal.[3]

The government's argument that Judge Segal's ruling conflicts with the general three-part *Hearn* test that the Ninth Circuit used in *Amlani* is equally baseless. As the government acknowledges (at 13 n.10), the three factor test is very "general." After surveying numerous cases and treatises, the Fifth Circuit recently concluded that the "meaning of this '*Hearn* test' in the eye of the beholder," *In re Itron*, 883 F.3d at 564, and that "[s]ome courts have read *Hearn* to require the client's affirmative reliance on privileged communications" in support of the claim or defense, while other courts have not. *Id.* In its brief, the government relies on district court cases that read *Hearn* as not requiring affirmative reliance on privileged communication for implied waiver. But the relevant question here—which the government fails to address—is how the *Ninth Circuit* would apply the *Hearn* test

---

[3] Judge Segal had no occasion to address this second category because United has not brought a claim or defense about its attorney-client relationship.

1    in the implied "good faith" waiver context.  And the best answer to that question is

2    *Rich*.  In *Rich*, the Ninth Circuit applied the three-part *Hearn* test, which Arizona

3    law had adopted.  The first prong of that test asks whether the assertion of the

4    privilege was the result of some "affirmative act," and in *Rich* the Ninth Circuit itself

5    concluded that the affirmative act requirement was not satisfied because the

6    defendant had not disclosed the contents of any privileged communications.  *Rich*,

7    666 F. App'x at 641; *Hearn,* 68 F.R.D. at 581.  In other words, in *Rich* the Ninth

8    Circuit joined those courts that read *Hearn* to require reliance on privileged

9    communication for implied waiver, harmonizing any potential tension between the

10   vague *Hearn* test and the majority rule for waiver followed by the Second, Third,

11   and Fifth Circuits and at least strongly implied by the Ninth Circuit in *Chevron*.  It

12   is thus no coincidence that all but one of the district court cases from within the

13   Ninth Circuit on which the government relies (at 8-10; 13-14) that found a waiver

14   "even when the waiving party does not disclose or expressly rely on privileged

15   communications," pre-date *Rich*.   And in the sole exception (*Natural-*

16   *Immunogenics*) neither party's briefs informed the court of *Rich* and the opinion does

17   not address it.[4]

18         Implicitly admitting the weakness of its claim that Judge Segal's ruling is

19   irreconcilable with "controlling Ninth Circuit law," the government devotes the

20   opening argument of its brief to addressing *Bilzerian*—a *Second Circuit* decision that

21   obviously is not Ninth Circuit law at all.  Contrary to the government, *Chevron*'s

22   quotation of *Bilzerian* in support of the uncontroversial sword-and-shield principle

23   plainly does not mean that the Ninth Circuit "endorsed" every statement in *Bilzerian*.

24   And it certainly does not mean that the Ninth Circuit endorsed *the government*'s

25   reading of *Bilzerian*.   On the contrary, *Chevron* read *Bilzerian* narrowly.

26

27   [4] As Judge Segal pointed out (at 17 n.3), the government's reliance on *Natural-*
     *Immunogenics* is in any event misplaced because defendants in that case—unlike
28   United—"expressly reserved the right to introduce privileged information in support
     of their defenses at trial."

Immediately after quoting *Bilzerian*, the Ninth Circuit applied that case by holding: "*Similarly*, *to the extent that* Pennzoil" relies on the advice of counsel, it waived privilege.  974 F.2d at 1162-63 (emphasis added).  *Chevron*'s use of "[s]imilarly" shows that it read *Bilzerian* as turning on "the extent that" the party had affirmatively relied on the advice of counsel, which is precisely how the *Second Circuit itself* reads *Bilzerian*.  In *United States v. Doe (In re Grand Jury Proceedings)*, the Second Circuit explained its holding as follows:  "In *Bilzerian* … we held that a defendant who intended to testify as to his 'good faith' reliance on legal advice could not prevent the government from cross-examining him on advice received from counsel. Because the defendant raised the advice-of-counsel defense and sought to rely on privileged information in a judicial setting, the court found that if defendant so testified a broad waiver would be appropriate."  219 F.3d 175, 183 (2d Cir. 2000). *Chevron's* adoption of this reading of *Bilzerian* does nothing to support the government's argument.

In any event, Judge Segal's conclusion (at 13) that *Bilzerian* holds only that a defendant's testimony in support of his good faith defense *might* result in a waiver is clearly correct.   *Bilzerian* involved allegations of securities fraud, and the defendant filed a motion *in limine* seeking a ruling that he could testify at trial about his belief in the lawfulness of his actions without being subjected to cross-examination on communications he had with his attorney.  *Chevron*, 974 F.2d at 1291.  The district court declined to rule on the issue "in the abstract," and the defendant opted not to take the stand and was ultimately convicted.  *Id.*  On appeal, the Second Circuit held that the district court did not abuse its discretion by refusing to grant the defendant "blanket protection from an implied waiver."  *Id.* at 1293.

Contrary to the government's assertion, *Bilzerian* did not hold that a defendant who elicits evidence in support of a good faith defense waives privilege.  On the contrary, the Court stressed that "[d]efendant was free . . . to argue his good faith defense by means of defense counsel's opening and closing statements *and by his*

1   *examination of witnesses*"without waiving privilege.  *Id.* at 1293 (emphasis added).

2   *Bilzerian* held only that a defendant's "own testimony as to his good faith would

3   open the door to cross examination, *possibly* including inquiry into otherwise

4   privileged communications," depending on the particulars of his testimony.  *Id.*

5   (emphasis added).  The Second Circuit emphasized that the "district court took great

6   pains to point out that application of the privilege would hinge on the testimony

7   elicited on direct examination," and that depending on the defendant's specific

8   testimony "[i]t may be that the government would be bound by the answer of the

9   witness."  *Id.*   The government's brief (at 7-8) selectively quotes *Bilzerian*'s

10  description of a portion of the district court holding and of defendant's argument,

11  but amazingly fails to quote or discuss this key language.[5]  And in *County of Erie*,

12  the Second Circuit itself—whose views on *Bilzerian* are obviously authoritative—

13  twice described *Bilzerian* in the exact same way as Judge Segal.  546 F.3d at 228

14  (emphases added) ("[w]e agreed … that if Bilzerian testified as to good faith, the

15  door would be opened to cross-examination that *might* require him to divulge

16  otherwise privileged communications"); ("the assertion of a good faith defense …

17  calls forth *the possibility* of implied waiver").[6]

18

19  [5] The government highlights (Mot. at 8) *Bilzerian's* statement that certain testimony

20  regarding the defendant's view that his actions were legal would make his "conversations with counsel …. directly relevant."  But that statement was only one step in the court's analysis—not its final holding.  Even the government does not

21  claim that relevance *alone* is sufficient to trigger waiver.

22  [6] Remarkably, the government fails even to acknowledge the Second Circuit's two authoritative opinions explaining *Bilzerian* (*Doe* and *Erie*).  Instead it relies on three

23  unpublished opinions from one district within the Second Circuit to support its assertion that Second Circuit courts "unanimously" apply *Bilzerian* to find waiver

24  even absent reliance on or disclosure of privileged advice.  Mot. at 10.  Two of those cases are fundamentally distinct because the defendants affirmatively invoked

25  advice of counsel.  *See SEC v. Honig*, 2021 WL 5630804, at *14 (S.D.N.Y. Nov. 30, 2021); *Abromavage v. Deutsche Bank Sec., Inc.*, 2019 WL 6790513, at *4 (S.D.N.Y.

26  Dec. 11, 2019).  That leaves the government with a single unpublished, out-of-circuit district court case that acknowledges *Erie* but strangely declines to follow the

27  controlling precedent.  *See MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 2012 WL 2568972, at *7 (S.D.N.Y. July 3, 2012).  Even if this Court were to follow

28  Second Circuit law, it should follow the published decisions of the Court of Appeals—not an anomalous unpublished decision by a single district court.

The government half-heartedly suggests that "[e]ven if reliance on privileged communications was required to trigger waiver," that reliance exists here because "the two witnesses whose testimony United intends to offer to support its contention had communications with counsel." This argument is frivolous. Courts applying the majority rule require for a waiver that the party rely on privileged communication *to support its claim or defense.* It is irrelevant whether the witnesses' state of mind might have been impacted by conversations with counsel. *See supra* at 3, 14. As Judge Segal correctly explained, adopting this argument would deter parties from consulting counsel and is contrary to public policy. The two cases cited by the government are of no avail because (as the government elsewhere itself stresses (Mot. at 18, 19)) they are decisions *rejecting* the need to show reliance on privileged communications to trigger a waiver.[7]

## B. Judge Segal Correctly Ruled In the Alternative That Introducing Evidence To Rebut An Essential Element of the Plaintiff's Case Does Not Qualify as an "Affirmative Act" That Triggers Waiver

Although the Ninth Circuit has never found a waiver in the absence of reliance on a privileged communication, some district courts in this Circuit have found waiver in those circumstances. To be clear, United submits that those cases, which are not binding on this Court, are wrongly decided for the reasons set forth in Judge Segal's thoughtful opinion: a party that does not rely on the existence or contents of privileged communications to support its claim or defense, and is not bringing a claim about its attorney-client relationship, does not commit an affirmative act waiving its privilege. *See supra* Part III.A. In any event, none of those cases support the government's motion, because in every one of those cases (unlike here) the party had affirmatively interjected its good faith understanding of the law as a new issue

---

[7] The government's statement that United's executive "could not point to any written materials from CMS" as informing the basis of his understanding of accuracy is simply false. Theisen specifically pointed both to CMS's written discussion of accuracy in announcing its Coding Intensity Adjuster and its written adoption of the FFS adjuster, both of which recognized the comparative nature of accuracy in this payment model. Theisen Tr. at 251 (Dkt. 505-3, Tab 7, Ex. K, filed under seal).

into the case by bringing suit, pleading an affirmative defense, or bringing a counterclaim.  None of those cases involved the facts here, where a defendant intends to introduce evidence solely to rebut an essential element of the plaintiff's claim.  Judge Segal's alternative holding that, in any event, introducing non-privileged evidence to rebut a state-of-mind issue that the *plaintiff* had already inserted in the case is not an "affirmative act" that would trigger a waiver is clearly correct.

A threshold condition for a finding of "implied waiver" is that the "assertion of the privilege was a result of some affirmative act, such as filing suit [or raising an affirmative defense]."  *Rich*, 666 F. App'x at 641 (brackets in original).  That affirmative-act requirement is critical to assuring the voluntariness of any implied waiver.  Thus, a defendant does not waive the attorney client privilege by "merely denying a plaintiff's allegations," but most go further by "voluntarily injecting" a "new factual or legal issue into the case."  *Fox v. Cal. Sierra Fin. Servs.*, 120 F.R.D. 520, 530 (N.D. Cal. 1988) (second emphasis in original) (citation omitted).  And that "[m]ost often this occurs through the use of an *affirmative defense*."  *Id.*

Pleading an affirmative defense is critically distinct from merely negating an element of the plaintiff's case.  An affirmative defense is a "new matter which, assuming the complaint to be true, constitutes a defense to it."  Black's Law Dictionary (5th Ed. 1979).  An affirmative defense applies only after the plaintiff has already proven all of the elements of its claim, and the defendant then assumes the burden of proving a defense based on a new factual or legal issue that it introduces into the case.  By contrast, a defendant who merely introduces evidence to rebut an element of the plaintiff's case does not interject a new issue into the case.

It is thus no coincidence that every district court case within this Circuit cited by the government (Mot. at 8-9 & n.5) that did not involve reliance on a privileged communication, involved a defendant pleading an affirmative defense or a counter-plaintiff asserting counterclaims (and in some cases involved both).  *See Natural-Immunogenics Corp. v. Newport Trial Grp.*, 2018 WL 6138160, at *5-6 (C.D. Cal.

1  Jan 24, 2018) ("affirmative defense" of "good faith"); *In re Lidoderm Antitrust*

2  *Litig.,* 2016 WL 4191612, at *4 (N.D. Cal. Aug. 9, 2016) (same); *United States ex*

3  *rel. Calilung v. Ormat Indus., Ltd.,* 2016 WL 4107682, at *4 (D. Nev. Aug. 1, 2016)

4  (same); *Phelps v. MC Communications, Inc.*, 2013 WL 3944268, at *19 (D. Nev.

5  July 22, 2013) (same); *Hernandez v. Creative Concepts*, 2013 WL 1182169, at *6

6  (D. Nev. Mar. 19, 2013) (same); *Rambus Inc. v. Samsung Electronics Co. Ltd.*, 2007

7  WL 3444376, at *2 (C.D. Cal. Nov. 13, 2007) (counterclaim).  The government

8  points to no case from this Circuit finding that a defendant who did not rely on a

9  privileged communication committed an affirmative act triggering an implied

10  waiver simply by introducing evidence to rebut the plaintiff's case.[8]

11      The Seventh Circuit's decision in *Lorenz v. Valley Forge Insurance Co.*, 815

12  F.2d 1095 (7th Cir. 1987), relied on by *Fox*, is precisely on point.  In *Lorenz*, the

13  plaintiffs sued their insurer, claiming it was tortious bad faith for the insurer to insist

14  that two claims be packaged together for settlement.  To rebut the allegation of bad

15  faith, the insurer submitted evidence of its settlement offer and testimony about its

16  non-bad faith reasons for insisting on conditioning settlement on resolution of both

17  claims.   The district court ruled that this defense amounted to interjecting the

18  insurer's good faith into the case and resulted in waiver of privilege.  On appeal, the

19  Seventh Circuit reversed.  Distinguishing an "affirmative defense" which raises "a

20  'matter outside the scope of the plaintiff's *prima facie* case,'" the Court explained

21  that the insurer "did not assert that the offer to settle was made in good faith—it did

22  not have to."  The "settlement offer is merely a new form of evidence to counter an

23  issue injected by the plaintiffs" and the "testimony … does not inject a new legal

24  issue, but is merely another method of proof.  *Therefore, neither … can provide a*

25

26

27  [8] Even if the government could find an isolated district court decision finding waiver
where the defendant had neither interjected its state of mind as a new issue nor relied
on privileged communications or advice of counsel, that decision would still be
28  contrary to the overwhelming weight of authority and would not establish any error
in Judge Segal's ruling.

*basis for finding waiver under the 'voluntary injection' doctrine.*"  815 F.2d at 1098 (emphasis added; citation omitted).

Just as in *Lorenz*, United has not asserted an affirmative defense and has not interjected its understanding of the contract and any rules into the case.  It is the *government* that has injected the issue of scienter, as an essential element of *its* case, that United knowingly violated its legal obligations.  United is merely defending against the government's burden to prove scienter and thus did not commit an affirmative act impliedly waiving privilege.  As United has explained, *supra* at 8, it intends to address the scienter element by introducing non-privileged evidence that it reasonably relied on statements from HHS as well as testimony from its executives about their lay understanding of payment accuracy in the MA program.

As the government begrudgingly admits (at 19 n.13), the only three cases that it can find in this Circuit where a defendant was held to have committed an affirmative act triggering a waiver by introducing evidence to rebut the plaintiff's case without pleading an affirmative defense all involved defendants who expressly relying on privileged communications, which Judge Segal's opinion agreed would be an affirmative act that could trigger a waiver.  The government's argument that reliance on or disclosure of privileged communications "has no relevance" to the "affirmative act" prong of the *Hearn* test is absurd.  Introducing privileged communications or relying on advice of counsel is the classic type of affirmative, voluntary, act that results in waiver.  And like its broader argument, the government's position cannot be squared with *Rich*:  in holding that the defendant had not committed an affirmative act under the *Hearn* test because it had not relied on the contents of privileged communications, the Ninth Circuit clearly indicated that reliance on the contents of privileged communications *would* have qualified as an affirmative act.

1   **C.      Judge Segal Correctly Rejected The Government's Alternative
2           Claim That United's Assertion Of Reliance On Statements By HHS
            Results In A Waiver Of Privilege**

3           Judge Segal correctly ruled (at 16) that United's "reliance on statements by

4    HHS representatives to UnitedHealth representatives has no bearing whatsoever on

5    the alleged waiver of privilege."  Indeed, the government's claim that this aspect of

6    Judge Segal's ruling is "at odds with controlling Ninth Circuit law" is particularly

7    specious.  The government cannot identify a single decision within the Ninth Circuit

8    that has ever held that a party waives privilege by asserting reliance on the statements

9    of regulators.  On the contrary, the government relied below (and here) on only five

10   out-of-circuit district court cases.  None establishes Ninth Circuit law, and the Court

11   should reject this aspect of the government's motion on that ground alone.  In any

12   event, Judge Segal's ruling was clearly correct.

13           *First*, as Judge Segal correctly held, "[i]n three of the five cases on which the

14   government relies for this particular argument, the party asserting the privilege relied

15   on the content of privileged communications in support of its reliance defense."

16   Order at 16.  *See Bodega Investments, LLC v. United States*, 2009 WL 2634765, at

17   *2 (S.D.N.Y. Aug. 21, 2009) (plaintiff claimed reliance on a representation of an

18   IRS agent "as communicated to him by his lawyer" making "the substance of what

19   his lawyer told him about the representation" a necessary element of plaintiff's case);

20   *Synalloy Corp. v. Gray*, 142 F.R.D. 266, 268, 270 (D. Del. 1992) (counterclaim

21   plaintiff claimed fraudulent representation in formation of an agreement that had

22   been negotiated entirely by its outside counsel, and thus could not prove its

23   understandings without introducing the content of its conversations with counsel);

24   *McLaughlin v. Lunde Truck Sales, Inc.*, 714 F. Supp. 916, 919-20 (N.D. Ill. 1989)

25   (defendant submitted "their counsel's affidavit as proof of their good faith," and

26   cannot "control which of their counsel's interpretations are discoverable").  Here,

27   "UnitedHealth is not relying on any privileged communication," Order at 17, so

28

1  those cases are inapposite.[9]

2  *Second*, as Judge Segal also correctly reasoned, in all five of the cases relied

3  on by the government the party asserting privilege had interjected the issue

4  *affirmatively* by bringing a suit or counterclaim or raising an affirmative defense.

5  *See Minebea Co. Ltd. v. Papst*, 355 F. Supp. 2d 518 (D.D.C. 2005) (bringing suit);

6  *United States v. Exxon Corp.*, 94 F.R.D. 246 (D.D.C. 1981) (affirmative defense);

7  *McLaughlin*, 714 F. Supp. at 917 (affirmative defense); *Bodega*, 2009 WL 2634765,

8  at *1 (bringing suit); *Synalloy*, 142 F.RD. at 267 (counterclaim).  In none of those

9  cases was a party found to waive privilege by raising reliance on statements merely

10  to rebut an essential element of a claim the plaintiff chose to bring, as would be

11  required in the Ninth Circuit to establish the threshold condition for waiver.  Here,

12  United is not raising an affirmative defense and its intent to introduce testimony to

13  rebut the government's burden of proving scienter does not waive privilege.

14  **IV.   CONCLUSION**

15  Although the larger body of case law on implied waiver is complex, this is an

16  easy case—both as a matter of precedent and common sense.  In this case, the

17  government initiated an FCA lawsuit that requires it to prove the element of

18  scienter—namely, that United *knew* it was violating its contractual and legal

19  obligations.  United's mere defense against that claim, and against the scienter

20  element specifically, plainly cannot result in a waiver of its attorney-client privilege.

21  To hold otherwise would impermissibly force defendants to choose between

22  upholding the confidentiality of their communications with counsel or ceding an

23  important element of the case against them.  That obvious unfairness is why courts

24  have overwhelmingly rejected that position.  This Court should do the same and

25  affirm Judge Segal's ruling.

---

[9] The government (at 23 n.14) misconstrues the significance of the "defendant's attorney declaration" in *Mclaughlin*.  That declaration did more than just document non-privileged conversations with the government; the court found that the affidavit (which is not reproduced in full) also conveyed the lawyer's "interpretations and understanding of DOL actions."  That is a revelation of privileged attorney opinion.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Dated: June 28, 2022

Respectfully submitted,

LATHAM & WATKINS LLP
DAVID J. SCHINDLER
MANUEL A. ABASCAL
DANIEL MERON
ABID R. QURESHI


By      /s/ Daniel Meron
        Daniel Meron
        Attorneys for UnitedHealth
        Defendants

BARTLIT BECK LLP
Sean W. Gallagher (appearing *pro hac vice*)
sean.gallagher@bartlitbeck.com
Brian S. Prestes (appearing *pro hac vice*)
brian.prestes@bartlitbeck.com
Cindy L. Sobel (appearing *pro hac vice*)
cindy.sobel@bartlitbeck.com
54 W. Hubbard Street, Suite 300
Chicago, Illinois 60654-8174
Telephone: +1.312.494.4400
Facsimile: +1.312.494.4440

BARTLIT BECK LLP
Andrew C. Baak (appearing *pro hac vice*)
andrew.baak@bartlitbeck.com
1801 Wewatta Street, Suite 1200
Denver, Colorado 80202-6318
Telephone: +1.303.592.3100
Facsimile: +1.303.592.3140

Attorneys for UnitedHealth Defendants