LATHAM & WATKINS LLP
  David J. Schindler (Bar No. 130490)
  *david.schindler@lw.com*
  Manuel A. Abascal (Bar No. 171301)
  *manny.abascal@lw.com*
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone: +1.213.485.1234
Facsimile: +1.213.891.8763

*Attorneys for United Defendants*

MICHAEL D. GRANSTON
Deputy Assistant Attorney General, Civil Division
E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
ROSS M. CUFF
JACK D. ROSS (CBN 265883)
HUNTER B. THOMSON (CBN 330533)
Assistant United States Attorneys
300 N. Los Angeles Street, Room 7516
Los Angeles, California 90012
Tel: (213) 894-6379; Fax: (213) 894-7819
Email: hunter.thomson@usdoj.gov

*Attorneys for the United States of America*

[Additional Counsel Listed on Signature Page]

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING,<br><br>Plaintiff,<br><br>v.<br><br>UNITEDHEALTH GROUP, INC. *et al.*,<br><br>Defendants. | CASE NO. 2:16-cv-08697-FMO-PVCx<br><br>**STATEMENT OF UNCONTROVERTED FACTS**<br><br>Hon. Fernando M. Olguin<br><br>Hearing Date:  September 5, 2024<br>Hearing Time:  10:00 a.m.<br>Courtroom:  6D |

Pursuant to Local Rule 56-1 and the Order re Summary Judgment Motions (ECF No. 365), UnitedHealth Group Incorporated and its affiliated entities named as Defendants in this action ("United" and "Defendants") and Plaintiff United States of America ("Plaintiff") hereby submit the following Joint Statement of Uncontroverted Facts in connection with the Joint Brief regarding the Cross Motions for Summary Judgment.

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
|  | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
| D1 | For purposes of this litigation, the Defendants are collectively referred to as "United" or "UnitedHealth." | *See, e.g.*, Ex. D-1, Am. Compl. at 2-3 | Undisputed. | |
| D2 | Medicare is a federal health insurance program established under the Medicare and Medicaid Act for the elderly and disabled administered by the Centers for Medicare and Medicaid Services ("CMS"). | 42 U.S.C. § 1395c *et seq.* (federal statute noting the Medicare Part A program provides protection for those over the age of 65 and individuals under 65 who are disabled); *id.* § 1395j *et seq.* (federal statute providing that Medicare Part B is an insurance program is established "for aged and disabled individuals"); Ex. D-3, Dkt. No. 250-1 (Statement of Genuine Disputes and Additional Uncontroverted Facts ("Original SUF")) at A.1 (asserting that all parties to this litigation agree that "Medicare is a federal health insurance program for the elderly and disables . . . administered by . . . CMS") | Undisputed. | |
| D3 | Medicare Part A covers medical services furnished | *See* 42 U.S.C. § 1395c *et seq.* (federal statute describing | Undisputed that Medicare Part A covers | *See, e.g.*, Ex. P-41, 42 U.S. Code § 1395d(d) (describing hospice |

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | by hospitals and other institutional doctors. | Medicare part A that states it provides protections for costs of "hospital, related post-hospital, home health services, and hospice care"); Ex. D-3, Original SUF at A.2 (noting that all parties to this litigation agree that Medicare Part A "covers medical services furnished by hospitals and other institutional care providers") | medical services furnished by hospitals and other institutional providers. Otherwise disputed, mischaracterizes cited evidence. | coverage under Medicare Part A), Ex. P-42, 42 U.S. Code § 1395x(dd)(1) and (3)(B) (an attending physician for a hospice program may be a Physician, Nurse Practitioner, or a Physician's Assistant) |
| D4 | Medicare Part B is an optional supplemental insurance program that pays for items and services not covered by Part A, including outpatient physician services, clinical laboratory tests, and durable medical equipment, among other things. | 42 U.S.C. § 1395l *et seq.* (federal statute describing coverage for Medicare Part B benefits); Ex. D-3, Original SUF at A.3 (noting that all parties to this litigation agree that Medicare Part B "is an optional supplemental insurance program that pays for items and services not covered by part A, including outpatient physician services, . . . clinical laboratory tests, and durable medical equipment, among other things" (internal quotations omitted)) | Undisputed. | |
| D5 | As a general matter, Medicare Parts A and B | Ex. D-143, Tee Dep. 19:11-44:11 (CMS employee | Undisputed. | |

**DEFENDANTS' UNCONTROVERTED FACTS**

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
|---|---|---|---|---|---|
| | **No.** | **Statement of Fact** | **Citation** | **Response** | **Citation** |
| | | ("Traditional Medicare") compensate providers on a fee-for-service ("FFS") basis. | describing his role as CMS Director of the Division of Practitioner Services (2018-present) and former roles as the Director of the Division of Encounter Data and Risk Adjustment Operations (2014-2018) and Deputy Director of the Division of Encounter Data and Risk Adjustment Operations (2013-2014)), 49:16-50:1 (defining Traditional Medicare); Ex. D-103, Duggan Dep. 223:8-9 (United expert explaining that "Traditional Medicare is fee for service and reimbursement is based on services"); Ex. D-3, Original SUF at A.7 (asserting that CMS pays providers directly for medical services under Parts A and B) | | |
| | D6 | This matter concerns Part C and Part D of the Medicare Act. | Ex. D-1, Am. Compl. ¶¶ 54-65 (describing Medicare Parts C and D Risk Adjustment Payments) | Undisputed. | |
| | D7 | Medicare Part C, now known as Medicare Advantage (or the "Medicare | *See* 42 U.S.C. § 1395w-21 *et seq.* (federal statute outlining that Medicare+Choice | Undisputed. | |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | | | | |
|---|---|---|---|---|
| DEFENDANTS' UNCONTROVERTED FACTS | | | | |
| No. | Statement of Fact | Citation | Response | Citation |
| | Advantage program"), allows people to opt out of Parts A and B and instead enroll in health insurance plans offered by private insurers ("Medicare Advantage plans"). | individuals can enroll either in Medicare fee-for-service or a Medicare+Choice plan); Ex. D-143, Tee Dep. 26:23-27:4 (CMS employee describing that Medicare Advantage is an alternative to traditional Medicare); Ex. D-1, Am. Compl. ¶ 45 (same); Ex. D-3, Original SUF at A.4 (asserting that Medicare Part C is known as Medicare Advantage) | | |
| D8 | Medicare Part D allows people to obtain prescription drug coverage through Medicare Advantage plans. | Ex. D-1, Am. Compl. ¶ 46 | Undisputed. | |
| D9 | CMS pays the Medicare Advantage plans a fixed amount per month for each member that they insure, based in part on the relative health of the individual members. | Ex. D-57, Garthwaite Rep. (9/29/2023) ¶ 21 (government expert describing the per member, per month payments CMS makes to Medicare Advantage plans); Ex. D-52, Amended Acevedo Rep. (4/5/2024) ¶¶ 24-25 (government expert describing monthly premiums paid to Medicare Advantage plans); Ex. D-56, Duggan Rep. (9/29/2023) | Undisputed. | |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
|---|---|---|---|---|---|
| **No.** | **Statement of Fact** | **Citation** | **Response** | **Citation** | |
| | | ¶ 16 (United expert explaining how CMS compensates Medicare Advantage plans) | | | |
| D10 | Paying Medicare Advantage plans based on the relative health of their members is called "risk adjustment." | Ex. D-149, 2004 Advanced Notice Attachment 2 ("The Balanced Budget Act of 1997 (BBA) mandated that a risk adjustment payment methodology, incorporating information on beneficiaries' health status, be implemented in the Medicare+Choice (M+C) program no later than January 2000") | Undisputed. | | |
| D11 | Medicare Advantage plans may provide supplemental benefits to their members consisting of benefits that Traditional Medicare does not provide to its beneficiaries. | 42 U.S.C. § 1395w-22(a)(3) (federal statute noting that Medicare+Choice plans may provide supplemental benefits to enrollees); *Matthews v. Leavitt*, 452 F.3d 145, 146 n.1 (2d Cir. 2006) (noting that Part C plans must provide the same benefits under Parts A and B and may also provide supplemental benefits); Ex. D-3, Original SUF at A.5 (same); Ex. D-56, Duggan Rep. (9/29/2023) ¶¶ 45, 53-54, 58, 91 (United expert | Undisputed. | | |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | | describing supplemental benefits Medicare Advantage plans may offer); Ex. D-127, Limmer 30(b)(6) Dep. 149:9-150:2 (CMS corporate representative agreeing that Medicare Advantage plans are required to use their rebate to provide supplemental benefits) | | |
| D12 | The supplemental benefits that Medicare Advantage plans can provide to their members include vision care. | Ex. D-56, Duggan Rep. (9/29/2023) ¶¶ 45, 58, 91 (United expert providing examples of supplemental benefits like vision care); Ex. D-99, Creighton Dep. (3/23/2022) 33:7-34:6 (former CMS employee Sean Creighton describing his prior role as the CMS Director for the Division of Payment Policy from 2007-2012), 41:21-45:23 (describing the additional benefits Medicare Advantage plans offer their beneficiaries, including vision care) | Undisputed. | |
| D13 | The supplemental benefits that Medicare Advantage plans can provide to their | Ex. D-56, Duggan Rep. (9/29/2023) ¶¶ 53, 58, 91 (United expert providing | Undisputed. | |

**DEFENDANTS' UNCONTROVERTED FACTS**

| DEFENDANTS' UNCONTROVERTED FACTS | | | | |
|---|---|---|---|---|
| **No.** | **Statement of Fact** | **Citation** | **Response** | **Citation** |
| | members include dental care benefits. | examples of supplemental benefits like dental care); Ex. D-99, Creighton Dep. (3/23/2022) 41:21-45:23 (former CMS employee describing the additional benefits Medicare Advantage plans offer their beneficiaries, including dental care) | | |
| D14 | Medicare Advantage plans can provide these supplemental benefits to their members at no additional cost to those members. | Ex. D-56, Duggan Rep. (9/29/2023) ¶¶ 33,45, 54, 58 (United expert describing reduced costs in Medicare Part C); Ex. D-99, Creighton Dep. (3/23/2022) 23:12–26:11 (describing role as former CMS Deputy Administrator and Director of the Center for Medicare), 41:21-45:23 (describing reduced costs in Medicare Part C) | Undisputed. | |
| D15 | The Medicare Advantage program is intended to pay Medicare Advantage plans more per month for the risk of insuring sicker beneficiaries and less per month for the risk of | Ex. D-86, Kronick Dep. Ex. 1535 at 3 (noting CMS pays MA plans more for older and sicker enrollees); Ex. D-127, Limmer 30(b)(6) Dep. 75:20-23 (CMS corporate representative describing that risk scores are | Undisputed. | |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|---|
| **No.** | **Statement of Fact** | **Citation** | **Response** | **Citation** | |
| | insuring healthier beneficiaries. | calculated based demographic variables and health conditions) | | | |
| D16 | CMS uses hierarchical condition categories ("HCCs") to determine the payment that is received by the Medicare Advantage plan for the plan's beneficiaries. | Ex. D-97, Cavanaugh Dep. 49:22-50:17 (former CMS employee describing how HCCs are used to calculate costs for beneficiaries); Ex. D-18, 88 Fed. Reg. 6643, 6644 (Feb. 1, 2023) (describing HCCs and how those are used to calculate risk scores); Ex. D-73, Lara Dep. Ex. 1133-2 at 803-04 (same) | Undisputed. | | |
| D17 | Diagnosis codes are alphanumerical codes that represent a patient's health conditions. | Ex. D-132, Paul Dep. 16:1-29:1 (CMS employee Rebecca Paul describing her role as CMS Director for the Division of Plan Policy in the Medicare Plan Payment Group (2012-Present) and Senior Health Policy Analyst (2005-2012)), 31:21-32:5 (describing diagnosis codes and their use); Ex. D-67, Acevedo Dep. Ex. 1582 (government expert describing medical codes) | Disputed as to the description of Ex. D-67 in the citation parenthetical, mischaracterizes cited evidence. Otherwise, undisputed. | | |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
|  | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
| D18 | HCCs are made up of groups of diagnosis codes that are related clinically and have similar cost implications. | Ex. D-18, 88 Fed. Reg. 6643, 6644 (Feb. 1, 2023) (describing HCCs); 42 C.F.R. § 422.2 (federal regulation noting that HCCs are groups of disease codes) | Undisputed. | |
| D19 | After a patient visits a doctor, the doctor is expected to document the encounter, including the patient's diagnoses, in a medical chart. | Ex. D-54, Blair Rep. (9/29/2023) ¶ 7 (United expert describing what CMS uses to calculate payments to plans, including diagnosis codes reported by providers after patient visits); *see, e.g.*, Ex. D-150, MAPL006426592 (example of a medical chart) | Disputed to the extent the fact implies a doctor documents a diagnosis code in the medical record, conflicting evidence presented. Disputed to the extent that the fact states a doctor documents a diagnosis in the medical record, mischaracterizes cited evidence and conflicting evidence presented. Otherwise, undisputed. | Ex. D-54, Blair (United Expert) Rep. (Sept. 29, 2023), ¶ 7 ("After a patient visit, a provider submits the claim to the patient's MA Plan, which contains information about the patient visit, such as the services provided and relevant diagnosis codes. A provider may identify the diagnosis code(s) to submit on the claim or the provider may rely on coders to review the information documented in a patient's medical record and translate this information into diagnosis codes. The MA Plan then, in turn, submits the diagnosis codes for all its beneficiaries to CMS, and CMS uses this information (along with other characteristics of the beneficiary, including demographic information) to determine payment to the MA Plan for providing health coverage to this beneficiary."); Ex. D-150, |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
|---|---|---|---|---|---|
| **No.** | **Statement of Fact** | **Citation** | **Response** | | **Citation** |
| | | | | | MAPL006426592 at MAPL006426612-6614 (medical record does not include a diagnosis code); Ex. P-4, Dickey Tr. 49:22-50:24 (Optum Coding Director testifying that a diagnosis is documented in a medical record and a coder translates the diagnosis into an ICD-9 and 10 diagnosis code); Ex. P-5, United 30(b)(6) (Sedor) Tr. 120:21-122:21 (Corporate representative confirming that, to submit a diagnosis code for payment, the diagnosis must be a confirmed and current diagnosis that is documented in the medical record); Ex. P-82, Ferron Tr. 190:25-193:22 (United's coding consultant agreeing Physician queries are necessary "when clinical indications are noted in the medical record that raise the possibility that a condition may be present, but is not stated as a diagnosis.") |
| D20 | After a doctor documents an encounter with a patient in a medical chart, the doctor or the doctor's coder then identifies one or more diagnosis codes that they | Ex. D-54, Blair Rep. (9/29/2023) ¶¶ 7-9 (describing provider coding and chart review of codes reported by providers); Ex. D-106, Ferron Dep. 219:15-220:19 (iCodify | Disputed to the extent fact implies that only a doctor or a certified medical coder assigns diagnosis codes, mischaracterizes | | Ex. D-53, Acevedo (US Expert) Rebuttal Rep. (Jan. 29, 2024) ¶ 72 (US Expert: "In all but the largest physician practices and academic |

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| **No.** | **Statement of Fact** | **Citation** | **Response** | **Citation** |
| | determine match the conditions documented in the medical chart. | employee noting that the physician, medical provider, or coder could provide the diagnostic coding) | evidence. Otherwise, undisputed. | medical centers, provider coders may not hold coding certifications.") |
| D21 | After a patient visits a doctor and the doctor or the doctor's coder identifies one or more diagnosis codes that they determine match the conditions documented in the medical chart, the doctor then submits that information on a claim form to a Medicare Advantage plan (if the beneficiary is in the Medicare Advantage program). | Ex. D-54, Blair Rep. (9/29/2023) ¶ 7 (United expert noting that providers submit claims to MA Plans after patient visits); Ex. D-40, Claim Form 1500 (available at: https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms1500.pdf) (example claim form) | Disputed to the extent that fact implies that only a doctor or a certified medical coder assigns diagnosis codes, mischaracterizes evidence. Otherwise, undisputed. | Ex. D-53, Acevedo (US Expert) Rebuttal Rep. (Jan. 29, 2024) ¶ 72 (US Expert: "In all but the largest physician practices and academic medical centers, provider coders may not hold coding certifications.") |
| D22 | When submitting the claim form, doctors certify that the information on the claim form, including diagnosis codes, is correct. | Ex. D-126, Leonard 30(b)(6) Dep. 204:21-205:15 (CMS corporate representative noting providers agree to submit accurate claims); Ex. D-113, Higgins Dep. 132:2-133:2 (former United employee stating that providers were required to attest that the information they | Undisputed. | |

| | | DEFENDANTS' UNCONTROVERTED FACTS | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | | provided was accurate, complete, and truthful) | | |
| D23 | There are thousands of possible diagnosis codes that map to HCCs. | Ex. D-18, 88 Fed. Reg. 6643, 6647 (Feb. 1, 2023) (federal regulation noting "[t]here are approximately 9,875 diagnoses mapped to 86 HCCs in the CMS-HCC Risk Adjustment Model for 2022"); *see* Ex. D-43, Kimberly O'Malley *et al.*, Measuring Diagnoses: ICD Code Accuracy, 40 Health Servs. Res. 1620, 1621, 1629 (2005) (noting ICD-10-CM has 120,000 total codes) | Undisputed. | |
| D24 | Many different diagnosis codes map to the same HCC. | Ex. D-64, Renjilian Rep. (12/3/2023) ¶ 106 & n.145 (United expert stating that "[m]ore than 9,500 unique ICD-10-CM diagnosis codes mapped to just 79 unique HCC codes"); Ex. D-18, 88 Fed. Reg. 6643, 6647 (Feb. 1, 2023) (federal regulation noting that there may be multiple diagnoses that substantiate the same HCC) | Disputed to the extent the fact implies that every HCC has many diagnosis codes mapping to it, conflicting evidence presented. Otherwise, undisputed. | *See, e.g.*, Ex. P-43, Risk Model Diagnoses for FY 2012, available at https://www.cms.gov/medicare/health-plans/medicareadvtgspecratestats/risk-adjustors-items/risk2012 (last visited July 2, 2024) (showing that only one diagnosis code, ICD-9-CM 7991 Respiratory Arrest, mapped to HCC 78 for FY 2012) |

| | | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation | |
| D25 | For dates of service in 2016, the diagnosis code for "type 2 diabetes mellitus without complications" maps to HCC 19. | Ex. D-64, Renjilian Rep. (12/3/2023) ¶ 115 | Undisputed. | | |
| D26 | For dates of service in 2016, the diagnosis code "other diabetes mellitus without complications" maps to HCC 19. | Ex. D-64, Renjilian Rep. (12/3/2023) ¶ 115 | Undisputed. | | |
| D27 | For dates of service in 2016, other diagnosis codes map to HCC 19. | Ex. D-64, Renjilian Rep. (12/3/2023) ¶ 115 | Disputed.  Incomplete fact, not supported by cited evidence. | | |
| D28 | For dates of service in 2012, many diagnosis codes for many different forms of malignant cancer would each map to HCC 7. | Ex. D-64, Renjilian Rep. (12/3/2023) ¶¶ 113-115 | Undisputed. | | |
| D29 | If at least one diagnosis code corresponding to a particular HCC is supported by at least one medical chart for the beneficiary for the year, | *See, e.g.*, Ex. D-15, CMS-4085-F – 75 Fed. Reg. 19678, 19748 (describing the one best medical record policy for RADV audits); *see also, e.g.*, Ex. D-145, Tudor Dep. 18:5-31:4 (former CMS | Disputed. Conflicting evidence presented. | Ex. P-6, Renjilian (United Expert) Tr. 32:8-36:8 (UnitedHealth's expert witness agreeing that in the regular payment process, every diagnosis submitted to CMS for payment must be supported by medical record | |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | | DEFENDANTS' UNCONTROVERTED FACTS | | |
|---|---|---|---|---|
| **No.** | **Statement of Fact** | **Citation** | **Response** | **Citation** |
| | payments associated with that HCC are appropriate. | employee Cynthia Tudor describing her former roles as the CMS Deputy Director (2014-2017) and Director of the Medicare Drug Benefit and C & D Group (2004-2013), and employee in the office of Research and Demonstrations (1994-2005), 212:23-213:7 (agreeing that there could be multiple medical records to support one diagnosis code); 221:15-223:7 (agreeing that a plan would not be overpaid if a diagnosis code was deleted that had no impact on risk adjustment); Ex. D-64, Renjilian Rep. (12/3/2023) ¶¶ 113-115 (United expert describing instances where deletion of diagnosis codes would not change the HCC, and therefore no impact on payment); Ex. D-60, Ingber Rep. at 19 (government expert explaining that it "does not matter how many times a condition is coded through the year or whether more than one ICD-10 code in an HCC is reported"); Ex. D-141, Stark Dep. 67:20-68:10 (government expert describing | | associated with a face-to-face encounter on a specific date of service); Id at 68:17-70:7 (United expert testifying that the CMS payment process will not account for diagnosis codes that have not been submitted to CMS and diagnosis code must be submitted to CMS in order to be considered in the risk score calculation for a given beneficiary); Ex. D-64, Renjilian (United Expert) Updated Rep. (Dec. 3, 2023), p. 11 at ¶ 31 and p. 12 at ¶ 34 (same); Ex. P-6, Renjilian (United Expert) Tr. 50:19-51:7 (United expert testifying that he would advise clients to delete diagnosis codes that were not supported by the medical record even if the client did not know if the deletion of the diagnosis codes would have a financial impact); Ex. P-10, Rice Tr. 84:13-85:1 (CMS Deputy Director of Medicare testifying that plans need to correct inaccurate date regardless of whether the diagnosis code has a payment impact if deleted); *id.* at 147:14-148:3 (same); Ex. P-5, United 30(b)(6) (Sedor) Tr. 85:8-86:22 (UnitedHealth Corporate Representative confirming "The expectation is that every diagnosis |

| | | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation | |
| | | that "only a single instance of each HCC matters"); Ex. D-57, Garthwaite Rep. (9/29/2023) ¶ 31 (government expert describing that a beneficiary's risk score doesn't depend on which diagnosis code was reported that maps to the same HCC) | | code we submit is supported by a medical record, so we would expect to only get paid on a diagnosis supported by a medical record."); Ex. D-66, Dep. Ex. 164, Medicare+Choice Program, 65 Fed. Reg 40,170, 40,268 (proposed June 29, 2000) (to be codified at 42 C.F.R. pt. 422) (CMS stating that submission of a diagnosis code is considered a claim for payment without distinguishing whether the diagnosis code is the only one submitted for the year that maps to a given HCC); Ex. P-9, Medicare Managed Care Manual, Ch. 7, Exhibit 30 (Aug. 13, 2004) (". . . a medical record must substantiate all diagnostic information provided to CMS."); Ex. P-8, Medicare Managed Care Manual, Rev. 118 (September 19, 2014), Ch.7 § 40 (requiring every diagnosis code submitted to CMS to be derived from face-to-face encounters and supported by documentation in the medical record underlying the encounter) | |
| D30 | Dr. Garthwaite explained that if a Medicare Advantage plan "submits multiple | Ex. D-57, Garthwaite Rep. (9/29/2023) ¶ 31 | Undisputed. | | |

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | diagnosis codes mapping to the same HCC for a beneficiary, the beneficiary's risk score does not depend on which specific diagnosis code was reported. Nor does the risk score depend on how many times a particular diagnosis code is reported during a service year." | | | |
| D31 | A health plan is not overpaid for a particular health condition (HCC) when that HCC is supported by documentation in the medical record for the beneficiary for the year. | Ex. D-117, Hornsby 30(b)(6) Dep. (11/21/2023) 55:14-56:20 (CMS corporate representative stating that if CMS confirms a diagnosis code submitted during RADV, then the MA plan is not overpaid); Ex. D-145, Tudor Dep. 212:23-213:7 (former CMS employee agreeing that a plan is not overpaid if a code that is deleted was supported by another medical record) | Disputed. Mischaracterizes cited evidence and conflicting evidence presented. | Ex. P-6, Renjilian (United Expert) Tr. 68:17-70:7 (testifying that the CMS payment process will not account for diagnosis codes that have not been submitted to CMS); Ex. D-66, Dep. Ex. 164, Medicare+Choice Program, 65 Fed. Reg 40,170, 40,268 (proposed June 29, 2000) (to be codified at 42 C.F.R. pt. 422) (CMS stating that submission of a diagnosis code is considered a claim for payment without distinguishing whether the diagnosis code is the only one submitted for the year that maps to a given HCC); Ex. P-9, Medicare Managed Care Manual, Ch. 7, Exhibit 30 (Aug. 13, 2004) (". . . a medical record must substantiate all diagnostic information provided to CMS."); Ex. P-8, Medicare |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | | | | Managed Care Manual, Rev. 118 (September 19, 2014), Ch.7 § 40 (requiring every diagnosis code submitted to CMS to be derived from face-to-face encounters and supported by documentation in the medical record underlying the encounter); Ex. P-5, United 30(b)(6) (Sedor) Tr. 85:8-86:22 (UnitedHealth Corporate Representative confirming "The expectation is that every diagnosis code we submit is supported by a medical record, so we would expect to only get paid on a diagnosis supported by a medical record."); *id.* at 94:14-95:4 (United corporate representative testifying that diagnosis codes is one of the data elements an MAO must submit to CMS in order to receive payment); Ex. P-6, Renjilian (United Expert) Tr. 32:8-36:8 (UnitedHealth's expert witness agreeing that in the regular payment process, every diagnosis submitted to CMS for payment must be supported by medical record associated with a face-to-face encounter on a specific date of service); Ex. D-64, Renjilian (United Expert) Updated Rep. (Dec. 3, 2023), p. 11 at ¶ 31 and p. 12 at ¶ 34 (same); Ex. P-10, Rice Tr. 84:13-85:1 (CMS |

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| — **DEFENDANTS' UNCONTROVERTED FACTS** | | | | |
| | | | | Deputy Director of Medicare testifying that plans need to correct inaccurate date regardless of whether the diagnosis code has a payment impact if deleted); *id.* at 147:14-148:3 (same); Ex. P-6, Renjilian (United Expert) Tr. 50:19-51:7 (United expert testifying that he would advise clients to delete diagnosis codes that were not supported by the medical record even if the client did not know if the deletion of the diagnosis codes would have a financial impact) |
| D32 | Diagnosis codes that are not supported in the beneficiary's medical charts are sometimes submitted on the claim form when treating doctors are submitting claims to Medicare Advantage plans. | Ex. D-44, Medicare Payment Advisory Commission, Issues for Risk Adjustment in Medicare Advantage at 103-04, in Report to Congress: Medicare and Health Care Delivery System (Chapter 4), Washington, DC (June 2012) (describing that coding for various HCCs between 2007 and 2008 were not consistently coded by MA plans in those years) | Undisputed. | |

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| D33 | Diagnosis codes that are not supported in the beneficiary's medical charts are sometimes submitted on the claim form when treating doctors are submitting claims to CMS directly. | Ex. D-122, Kapustij Dep. (8/25/2022) 15:21-20:22 (former CMS employee Carolyn Kapustij describing her role in the CMS Division of Payment Validation from 2009-2012), 39:22-40:4 (stating there was coding error in FFS claims data); Ex. D-44, Medicare Payment Advisory Commission, *Issues for Risk Adjustment in Medicare Advantage* at 103-04, in Report to Congress: Medicare and Health Care Delivery System (Chapter 4), Washington, DC (June 2012) (describing that coding for various HCCs between 2007 and 2008 were not consistently coded by MA plans in those years); Ex. D-48, Richard Kronick & W. Pete Welch, *Measuring Coding Intensity in the Medicare Advantage Program*, Medicare & Medicaid Research Review, 4(2), at E5 (2014) (stating FFS coding is "often incomplete"); Ex. D-119, Hutchinson Dep. 18:12-22 (testifying about his role as Director of the Medicare Plan | Undisputed to the extent this fact is referring to providers in the Medicare Part A and Part B programs, who submit claims to CMS directly. Otherwise disputed, not supported by cited evidence. | |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | | **DEFENDANTS' UNCONTROVERTED FACTS** | | |
| | | Payment Group from September 2006 to June 2010), 32:21-33:4 (former government employee stating there was coding error in FFS claims data); Ex. D-120, Ingber Dep. (6/14/2022) 21:19-23:14 (former CMS employee Melvin Ingber describing his former role as Director of Division of Payment Research within CMS), 32:12-21 (stating that FFS data had "all kinds" of errors) | | |
| D34 | Diagnosis codes that are supported in the beneficiary's medical charts are sometimes left off the claim forms when the treating doctors are submitting claims to Medicare Advantage plans. | Ex. D-117, Hornsby 30(b)(6) Dep. 144:4-145:4 (11/21/2023) (CMS corporate representative noting that MA plans discovered that providers were not coding completely); Ex. D-54, Blair Rep. (9/29/2023) ¶ 18 (United expert stating that coders conducting chart review for MA plans may find diagnosis codes that are submitted by the medical record but were not submitted on the claim); Ex. D-111, Grower Dep. 113:17-114:3 (former United employee noting that there was | Undisputed. | |

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | | some encounter data that was not fully reported) | | |
| D35 | Diagnosis codes that are supported in the beneficiary's medical charts are sometimes left off the claim forms when the treating doctors are submitting claims to CMS directly. | Ex. D-120, Ingber Dep. (6/14/2022) 32:12-21 | Disputed to the extent fact is not supported by cited evidence and disputed to the extent that providers do not submit directly to CMS in Medicare Advantage, conflicting evidence presented. Otherwise, undisputed. | Ex. P-5, United 30(b)(6) (Sedor) Tr. 59:19-63:1 (Corporate representative describing the timing of the Part C and D data submission process and testifying that all UnitedHealth had to submit all additional data for a beneficiary by the final submission deadline); Ex. P-1, Joint Stipulation Re EDI Agreements, MA Contracts, MA-PD Addenda, and Attestations and Related Entities, ¶¶ 3, 5, 6 (Optum and the Defendant MAOs were authorized pursuant to an EDI agreement to submit data to CMS on behalf of the UnitedHealth MAOs and "Each of the diagnosis codes listed on Attachment 1 to Dr. Garthwaite's expert report is associated with a UnitedHealth MAO that executed an applicable MA Contract, MA-PD Addendum, EDI Agreement and an Attestation, and for which Optum executed an EDI Agreement.") |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
|---|---|---|---|---|---|
| **No.** | **Statement of Fact** | **Citation** | **Response** | **Citation** | |
| D36 | Doctors are generally paid based on procedures, not based on diagnosis codes. | Ex. D-54, Blair Rep. (9/29/2023) ¶ 18 (United expert stating that provider reimbursement is more commonly derived from procedures, rather than documentation of diagnoses); Ex. D-48, Richard Kronick & W. Pete Welch, *Measuring Coding Intensity in the Medicare Advantage Program*, Medicare & Medicaid Research Review, 4(2), at E3 (2014) (noting physicians billing under FFS is paid based on procedures); Ex. D-87, Acevedo Dep. 118:8-15 (government expert noting that providers are paid on procedures, and therefore they often fail to submit a complete set of diagnosis codes); Ex. D-42, Gregory C. Pope et al., *Risk Adjustment of Medicare Capitation Payments Using the CMS-HCC Model*, Health Care Finance Review 25, at 129 (Summer 2004) ("Concern about the quality of diagnostic reporting is the greatest in physician offices, where | Disputed. Conflicting evidence presented. | Ex. P-44, CMS 30(b)(6) (Leonard) Tr. 241:4-242:9 (describing the impact a diagnosis code that is not supported by medical record documentation has on payments to providers in traditional Medicare); Ex. P-46, Ingber (US Expert) Tr. 74:15-75:14 (US Expert describing how certain providers in traditional Medicare can also receive payments based on principal diagnosis identified with the service); Ex. P-33, United 30(b)(6) (Theisen) Tr. 93:15-94:18 (Corporate representative describing how Medicare Advantage capitated provider groups are paid on a "on a capitated percentage of revenue basis for the members they served."); Ex. P-45, Redmond Tr. 80:22-81:22 (defining capitated providers as providers paid on a per member per month basis to care for beneficiaries and fee-for-service providers as providers paid based on every encounter with the provider has with a beneficiary); Ex. P-5, United 30(b)(6) (Sedor) Tr. 133:9-134:17 (Corporate representative describing provider types with an | |

| | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | | diagnoses have not heretofore affected payment, and recording of diagnoses is less rigorously practiced than in hospitals."). | | incentive to oversubmit diagnosis codes) |
| D37 | To be paid, doctors only need to submit on a claim form one diagnosis code that they attest is true and accurate. | Ex. D-107, Foster Dep. 21:9-19 (former CMS employee Richard Foster testifying he was CMS Chief Actuary for 18 years from 1995 through January 2013), 62:12-20 (noting that providers are not supposed to submit every diagnosis that a patient has); Ex. D-99, Creighton Dep. (3/23/2022) 95:7-18 (former CMS employee stating that physicians can submit amended claim forms if their first claim was missing a diagnosis but there is no incentive to do so); Ex. D-98, Chaudhuri Dep. 30:5–18 (describing prior role as Deputy Director of CMS Division of Payment Policy from 2012 to 2015), 168:5-169:15 (agreeing that a claim may not indicate the diagnosis code but the costs are still accurately captured); Ex. D-40, Claim Form 1500 (available at: https://www.cms.gov/Medicare/ | Undisputed to the extent this fact applies to non-audited Medicare Part A and B claims. Otherwise disputed for Medicare Part A and B claims that are later audited and Part C and D submissions, conflicting evidence presented. | Ex. P-44, CMS 30(b)(6) (Leonard) Tr. at 241:4-242:9 (describing the impact a diagnosis code that is not supported by medical record documentation has on payments to providers in traditional Medicare, including a statement that an auditor may downgrade the code to one that has not been submitted but is supported by the medical record); Ex. P-33, United 30(b)(6) (Theisen) Tr. 93:15-94:18 (Corporate representative describing how Medicare Advantage capitated provider groups are paid on a "on a capitated percentage of revenue basis for the members they served."); Ex. P-45, Redmond Tr. 80:22-81:22 (defining capitated providers as providers paid on a per member per month basis to care for beneficiaries and fee-for-service providers as providers paid based on every encounter with the provider has with a beneficiary); Ex. P-5, United 30(b)(6) (Sedor) Tr. 127:9-17 |

| | | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|---|
| **No.** | **Statement of Fact** | **Citation** | **Response** | **Citation** |
| | | CMS-Forms/CMS-Forms/downloads/cms1500.pdf) (example claim form including an attestation) | | (Corporate representative explaining that capitated providers do not submit claims or diagnosis codes to United because they are paid under a different arrangement) |
| D38 | Doctors do not generally have an incentive to list all supported diagnosis codes on the claim form submitted to CMS. | Ex. D-152, AAPC, *Risk Adjustment—Predictive Modeling, Documentation & Capture of Diagnosis Code* at 19-20 (2014) (noting that "[i]f one were to ask any coder, biller, or provider how a diagnosis code is chosen for a particular visit, the answer will likely be the diagnosis code that will get the procedure code paid"); Ex. D-48, Richard Kronick & W. Pete Welch, *Measuring Coding Intensity in the Medicare Advantage Program*, Medicare & Medicaid Research Review, 4(2), at E3 (2014) (describing that physicians billing FFS are paid based on procedures, not on the number of diagnoses, and therefore will not submit all diagnoses on the claim to CMS) | Undisputed to the extent this fact is limited to Medicare Parts A and B but disputed to the extent it applies to Medicare Parts C and D, conflicting evidence provided. | Ex. P-33, United 30(b)(6) (Theisen) Tr. 93:15-94:18 (Corporate representative describing how capitated provider groups are paid on a "on a capitated percentage of revenue basis for the members they served."); Ex. P-45, Redmond Tr. 80:22-81:22 (defining capitated providers as providers paid on a per member per month basis to care for beneficiaries and fee-for-service providers as providers paid based on every encounter with the provider has with a beneficiary); Ex. P-5, United 30(b)(6) (Sedor) Tr. 127:9-17 (Corporate representative explaining that capitated providers do not submit claims or diagnosis codes to United because they are paid under a different arrangement); *id.* at 133:9-134:17 (describing providers with an incentive to oversubmit diagnosis codes) |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
| D39 | Doctors do not generally have an incentive to list all supported diagnosis codes on the claim form submitted to the Medicare Advantage plan. | Ex. D-87, Acevedo Dep. 118:8-15 (government expert noting that providers are paid on procedures, and therefore they often fail to submit a complete set of diagnosis codes); Ex. D-54, Blair Rep. (9/29/2023) ¶ 18 (United expert stating that provider reimbursement is more commonly derived from procedures, rather than documentation of diagnoses) | Disputed. Conflicted evidence presented. | Ex. P-33, United 30(b)(6) (Theisen) Tr. 93:15-94:18 (Corporate representative describing how capitated provider groups are paid on a "on a capitated percentage of revenue basis for the members they served."); Ex. P-45, Redmond Tr. 80:22-81:22 (defining capitated providers as providers paid on a per member per month basis to care for beneficiaries and fee-for-service providers as providers paid based on every encounter with the provider has with a beneficiary); Ex. P-5, United 30(b)(6) (Sedor) Tr. 127:9-17 (Corporate representative explaining that capitated providers do not submit claims or diagnosis codes to United because they are paid under a different arrangement); *id.* at 133:9-134:17 (Corporate representative describing providers with an incentive to oversubmit diagnosis codes) |
| D40 | One reason that not all diagnosis codes that correspond to a patient's medical chart are submitted on the claim forms is | Ex. D-87, Acevedo Dep. 118:515 (government expert noting that providers are paid on procedures, and therefore they often fail to submit a complete | Disputed. Conflicting evidence presented. | Ex. P-46, Ingber (US expert) Tr. 74:15-85:13 (US Expert describing Medicare Advantage provider incentives to submit diagnosis codes to increase payments from CMS or |

| | | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|---|
| **No.** | **Statement of Fact** | **Citation** | **Response** | **Citation** | |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | because the doctors do not have an incentive to list them all. | set of diagnosis codes); Ex. D-133, Poehling Dep. 218:24-220:9 (former United employee noting one reason doctors do not have an incentive to code completely is that only one code is required to justify a procedure in a Medicare claim) | | increase bonus payments from an MAO); Ex. P-33, United 30(b)(6) (Theisen) Tr. 93:15-94:18 (Corporate representative describing how Medicare Advantage capitated provider groups are paid on a "on a capitated percentage of revenue basis for the members they served."); Ex. P-45, Redmond Tr. 80:22-81:22 (defining Medicare Advantage capitated providers as providers paid on a per member per month basis to care for beneficiaries and fee-for-service providers as providers paid based on every encounter with the provider has with a beneficiary); Ex. P-5, United 30(b)(6) (Sedor) Tr. 127:9-17 (Corporate representative explaining that Medicare Advantage capitated providers do not submit claims or diagnosis codes to United because they are paid under a different arrangement); *id.* at 133:9-134:17 (describing provider types with an incentive to oversubmit diagnosis codes) |
| D41 | It is common practice for Medicare Advantage plans to conduct reviews of patient medical charts to improve | Ex. D-119, Hutchinson Dep. 78:17-79:11 (former CMS employee noting that CMS knew about MA plans | Disputed to the extent fact claims chart reviews are a "common practice", not supported | |

| | | DEFENDANTS' UNCONTROVERTED FACTS | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | the completeness of diagnoses submitted to CMS. | conducting chart reviews and therefore having more codes); Ex. D-99, Creighton Dep. (3/23/2022) 127:13-25 (former CMS employee noting CMS understood MA plans conducted reviews of medical records to look for additional codes); Ex. D-54, Blair Rep. (9/29/2023) ¶ 17 (United expert stating MA plans often conduct chart reviews to determine whether additional diagnoses are documented in medical records); Ex. D-89, Baker 30(b)(6) Dep. (5/30/2023) 34:13-16 (United corporate representative stating that chart review was trying to provide a more complete health status); Ex. D-125, Lambert Dep. 189:6-15 (United expert stating that adding unsubmitted codes in their expert analysis would result in more complete coding, similar to MA coding) | by cited evidence. Otherwise, undisputed. | |
| D42 | The practice of reviewing medical charts to identify diagnosis codes that are supported by documentation | Ex. D-54, Blair Rep. (9/29/2023) ¶ 17 (United expert stating MA plans often conduct chart reviews to determine | Undisputed. | |

| DEFENDANTS' UNCONTROVERTED FACTS | | | | |
|---|---|---|---|---|
| **No.** | **Statement of Fact** | **Citation** | **Response** | **Citation** |
| | in those charts is sometimes called "chart review." | whether additional diagnoses are documented in medical records); Ex. D-138, Schumacher Dep. 38:1-22 (United employee describing chart review); Ex. D-92, Bird Dep. (8/10/2022) 229:11-22 (same) | | |
| D43 | Medicare Advantage plans conduct these chart reviews because doctors do not always submit all the applicable diagnosis codes for a patient on the claim form even though those diagnosis codes are supported by documentation in the patient's medical chart. | Ex. D-54, Blair Rep. (9/29/2023) ¶¶ 16-18 (United expert describing that providers do not have incentives to report all applicable diagnoses); Ex. D-123, Kessler Dep. 69:5-14 (United expert noting plans conduct chart reviews to have diagnoses that better reflect a patient's true medical records); Ex. D-111, Grower Dep. 113:17-114:3 (Optum employee noting that there was encounter data that was not fully reported, so chart review could be used to validate other diagnoses that could be submitted to CMS) | Disputed to the extent fact fails to present other reasons why MA plan performs chart reviews, mischaracterizes evidence. Otherwise, undisputed. | Ex. P-11, Dep. Ex. 381, United response to US Interrogatory (Set Six, Jul. 19, 2022), at Response to Interrogatory 18 (United estimated that for Date of Service Years 2009-2016, CMS paid it more than $7.2 billion in additional risk adjustment payments or codes United added during chart review that were not previously submitted by providers) |
| D44 | Medicare Advantage plans often use medical coders to review patients' medical | Ex. D-145, Tudor Dep. 110:3-17 (former CMS employee describing chart review and | Disputed as to whether Medicare Advantage plans "often" use | |

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| **No.** | **Statement of Fact** | **Citation** | **Response** | **Citation** |
| | charts to identify diagnosis codes that are supported by documentation in those charts. | noting a reason for chart review is to look for diagnoses that a provider failed to include); Ex. D-54, Blair Rep. (9/29/2023) ¶ 16 (United expert noting that MA plans may conduct chart reviews using medical coders to determine diagnoses codes that are supported by documentation) | medical coders to review patients' medical charts, not supported by cited evidence. Otherwise, undisputed. | |
| D45 | United conducted chart reviews. | Ex. D-147, Meyer Dep. 145:24-146:14 (United employee describing chart review); Ex. D-95, Brennan Dep. 131:21-133:13 (former United employee describing chart review and noting Optum performed chart review for UnitedHealthcare Medicare & Retirement); Ex. D-91, Bird 30(b)(6) Dep. (6/22/2023) 50:23-51:10 (United employee stating Optum performed chart review for UnitedHealthcare) | Undisputed. | |
| D46 | As part of its chart review program, United retrieved available patient medical | Ex. D-111, Grower Dep. 120:17-24 (former United employee agreeing that part of chart review included collecting | Disputed. Mischaracterizes evidence. | Ex. P-7, United 30(b)(6) (Baker, May 30, 2023) Tr. 221:19-222:2 (Corporate representative testifying that a medical record collected by |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | records from doctors for a given date of service. | medical records from providers); Ex. D-95, Brennan Dep. 131:21-132:5 (former Optum employee agreeing that part of chart review included collecting medical records from providers) | | United for review in Chart Review could contain multiple dates of service, reflecting multiple encounters a beneficiary had with a provider) |
| D47 | United's "Chart Review Program" "identified and collected Charts from certain providers who had reported encounters with beneficiaries to Defendants, and for which Defendants had submitted diagnosis codes to CMS." | Ex. D-57, Garthwaite Rep. (9/29/2023) ¶ 47 | Undisputed. | |
| D48 | United hired medical coders to review the available medical charts retrieved from the doctors to identify diagnosis codes that were supported by documentation in those charts. | Ex. D-88, Baker Dep. 93:21-94:3 (Optum employee noting that Optum employed medical coders); Ex. D-109, Gardner Dep. 98:17-24 (United employee noting that PacifiCare collected medical records from providers and used vendors to review those records); Ex. D-111, Grower Dep. 113:17-114:3 (former Optum employee noting that a benefit of chart review was to validate that there were | Undisputed. | |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | | diagnosis codes that could be submitted to CMS) | | |
| D49 | The medical coders that United hired to conduct its chart review were typically based in India or the Philippines. | Ex. D-1, Am. Compl. ¶¶ 167, 170 (stating United employed coders in India and the Philippines); Ex. D-2, Answer ¶¶ 167, 170 (agreeing that United employed coders in India and the Philippines); Ex. D-88, Baker Dep. 37:4-18 (Optum employee noting Optum had offshore coders in India and the Philippines) | Disputed. Mischaracterizes evidence. | Ex. P-47, Am. Compl. (Dkt. 171), ¶ 170 (alleging that United and its vendors utilized coders in Tennessee as well as in India and the Philippines without indicating where coders were "typically" located); Ex. D-2, Answer (Dkt. 223), ¶ 170 (admitting that United and its vendors utilized coders in Tennessee as well as in India and the Philippines); *see also* Ex. P-7, United 30(b)(6) (Baker, May 30, 2023) Tr. 93:18-95:9 (Corporate representative noting that there were "onshore/offshore restrictions" and "not all charts could be sent offshore for coding") |
| D50 | As part of its Chart Review Program, United generally did not compare the diagnosis codes identified through its chart reviews to those diagnosis codes submitted by doctors on the | Ex. D-92, Bird Dep. 230:22-231:15 (Optum employee noting that for chart review, there was no comparison between diagnosis codes found through chart review and those submitted by providers); Ex. D-57, Garthwaite Rep. (9/29/2023) ¶¶ 47, 50 (government expert | Undisputed. | |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| DEFENDANTS' UNCONTROVERTED FACTS | | | | |
|  | claim form for that same date of service. | describing chart review and noting reviews were generally done in a "blind" fashion) |  |  |
| D51 | United's medical coders generally reviewed medical charts in a "blind" manner, meaning the coder did not know what diagnosis codes the doctor had submitted. | Ex. D-89, Baker 30(b)(6) Dep. (5/30/2023) 260:18-260:22, 298:17-299:14 (United corporate representative agreeing that Optum coded charts using blind coding and that a coder would not be informed about diagnoses previously submitted by a provider); Ex. D-102, Dickey Dep. 76:18-77:17 (Optum employee describing blind review and noting the coder has no information about diagnoses a provider has submitted) | Undisputed. |  |
| D52 | United's Chart Review Program "generally conducted reviews in a 'blind' fashion, meaning that the Coder did not know which diagnosis codes the provider had initially reported." | Ex. D-57, Garthwaite (9/29/2023) Rep. ¶ 40 | Undisputed. |  |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| DEFENDANTS' UNCONTROVERTED FACTS | | | | |
| D53 | During the "blind" reviews, medical coders were not reviewing charts for the purpose of determining whether doctor-submitted diagnosis codes were supported by documentation in the medical charts. | Ex. D-89, Baker 30(b)(6) Dep. (5/30/2023) 48:6-19 (United corporate representative stating that chart review was not designed to see what the provider may have coded in the medical record); Ex. D-104, Erickson Dep. 107:2-8 (United employee stating that for blind review, coders did not know what was previously submitted by providers); Ex. D-92, Bird Dep. 230:8-231:15 (Optum employee noting that for chart review, there was no comparison between diagnosis codes found through chart review and those submitted by providers); Ex. D-54, Blair Rep. (9/29/2023) ¶ 16 (United expert noting that for blind reviews, coders review medical records without knowledge of codes submitted by providers) | Disputed to the extent the fact implies "blind" reviews would not reveal whether doctor-submitted diagnosis codes were supported by documentation in the medical charts, mischaracterizes evidence. Otherwise, undisputed. | Ex. P-14, Dep. Ex. 34B, MARA1546907, at 14 ("All ICD-9s that map to medical and/or Rx HCC will be coded for every date of service for that patient. . . . OptumInsight coding practice instructs those coding on its behalf to code all medical and Rx HCCs for every date of service of each patient."); P-15, United 30(b)(6) (Baker) Tr. 422:12– 22 (Corporate representative confirming United's coders were instructed to identify all diagnosis codes supported by documentation in the medical record); Ex. P-13, Dep. Ex. 33B, MARA1262848, Coding Guide at 7 (Optum's coders had to achieve quality standards in order to successfully complete training) |
| D54 | There are a number of reasons why two different medical coders may reach different coding results when | Ex. D-87, Acevedo Dep. 153:21-155:2 (government expert describing reasons that coders reach different conclusions on coding); Ex. D- | Disputed to the extent the fact implies initial disagreements among coders are not resolved in coding projects, | Ex. P-30, Acevedo (US expert) Tr. 173:6-178:14 (US Expert describing process used at Acevedo Consulting to resolve rare disagreements among medical coders in chart reviews, |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | | **DEFENDANTS' UNCONTROVERTED FACTS** | | |
| | reviewing the same medical chart. | 65, Renjilian Rebuttal Rep. (3/18/2024) ¶ 34 (United expert providing reasons a coder may fail to independently identify a diagnosis on a medical record); Ex. D-54, Blair Rep. (9/29/2023) ¶¶ 26-29, 34, 36, 42-44, 48-55 (same); Ex. D-53, Acevedo Rebuttal Rep. (1/29/2024) ¶ 54 (government expert describing that mistakes in coding may occur); Ex. D-88, Baker Dep. 257:18-262:6 (Optum employee describing various reasons a coder may not identify diagnoses documented in a medical record) | conflicting evidence presented. Otherwise undisputed that there may be initial disagreements between two coders before they resolve the disagreement. | including through dialogue, consulting resources such as a more senior medical coder or the Coding Clinic, or querying the provider); *see also* Ex. D-53, Acevedo (US Expert) Rebuttal Rep. (1/29/2024), ¶ 27-28 (US Expert: "For any content in the medical record that is unclear, ambiguous, or subject to interpretation and disagreement, the coder must ignore that portion of the medical record, unless the coder obtains definitive clarity (for instance, through a physician query). . . That coders may disagree on the proper code assignment also does not mean coding itself lacks objectively correct or incorrect answers."); Ex. P-31, Blair (United expert) Tr. 169:24-170:2 (testifying that she could not think of any instance in which a coder disagreement was not able to be resolved); Ex. P-6, Renjilian (United Expert) Tr. 219:7-220:4 (describing process he uses in government audits to convene coders to resolve any initial disagreements in the coding of a medical record); Ex. P-13, Dep. Ex. 33B, MARA1262848, Coding Guide at 7 (Optum's coders had to achieve |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | | | | quality standards in order to successfully complete training) |
| D55 | There are a number of reasons why a medical coder may not identify a diagnosis code submitted on a claim form by a doctor. | Ex. D-54, Blair Rep. (9/29/2023) ¶¶ 56-62 (United expert describing reasons a coder may not identify a diagnosis code submitted by a provider); Ex. D-89, Baker 30(b)(6) Dep. (Day 1) 36:10-37:20 (United corporate representative describing why Optum may not be able to submit complete diagnosis data for MA members to CMS) | Disputed. Conflicting evidence presented and mischaracterizes evidence. | Ex., P-4, Dickey Tr. 145:10–12 (Optum Coding Director stating that the "golden rule of coding [is] that if it's not documented, then you don't code it."); Ex. P-31, Blair (United expert) Tr. 108-5-7 (coders can only assign diagnosis codes supported in the medical records); Ex. D-53, Acevedo (US Expert) Rebuttal Rep. (Jan. 29, 2024) ¶¶ 70-85 (US Expert rebutting United's expert's reasons a coder may not identify a diagnosis code, describing why MA chart review medical coders tend to be more reliable and accurate than provider coders, and explaining that provider-submitted codes without support in medical record are improper and MA chart review coders are correct not to code them); Ex. P-12, Dep. Ex. 265-1, MAPL000814082 (United's chart review policy mandated use of certified coders and initial and ongoing coding training as well as accuracy reviews of coding staff); Ex. P-7, United 30(b)(6) (Baker, May 30, 2023) Tr. 41:3–9 (Corporate |

**DEFENDANTS' UNCONTROVERTED FACTS**

| | | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation | |

representative: "As part of the retrospective chart review program we have quality assurance[] programs that look at what our coders code and ensure – to ensure or work towards a 95 percent industry standard, which is what we all do."); Ex. P-30, Acevedo (US Expert) Tr. 234:19-235:10 (US Expert rejecting United counsel's proposition that a coder can "infer" documentation exists for a code and noting a code is "not supported until you provide me with the documentation"); Ex. D-53, Acevedo (US Expert) Rebuttal Rep. (Jan. 29, 2024) ¶¶ 34-36 (US Expert stating that notwithstanding issues of incomplete or unavailable provider documentation "coding rules require that a coder rely on the medical record before it. The coder cannot assume that a 'theoretical' medical record or portion of a medical record not yet retrieved or accessible exists to support the code."); Ex. P-31, Blair (United expert) Tr. 108:5-7 ("As I said before, to assign a diagnosis code, it must be in the medical record that you've received") (emphasis added); Ex. D-53, Acevedo (US Expert) Rebuttal Rep. (Jan. 29, 2024) ¶ 27-28 (US

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
| | | | | Expert:  "For any content in the medical record that is unclear, ambiguous, or subject to interpretation and disagreement, the coder must ignore that portion of the medical record, unless the coder obtains definitive clarity (for instance, through a physician query). . . That coders may disagree on the proper code assignment also does not mean coding itself lacks objectively correct or incorrect answers."); *id.* at ¶¶ 37-38 (disputing United expert's claim that a code is "in fact, properly supported by documentation in the medical record" when that record is not legible except to those uniquely familiar with a provider's handwriting.); Ex. P-3, Dep. Ex. 30B, MARA1576299, 2008 Risk Adjustment Data Technical Assistance For Medicare Advantage Organizations Participant Guide, § 6.5 at Table 6C ( Table 6C requiring that acceptable documentation supporting code assignment is documentation that is: "legible."); Ex. P-48, ICD-10-CM Official Guidelines for Coding and Reporting, at p. 1 ("consistent, complete documentation" is required and "[w]ithout such documentation |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | | | | accurate coding cannot be achieved."); Ex. P-49, Dep. Ex. 815, at p. 2, AAPC Article entitled "Medical Record Entries What Is Timely and Reasonable" (AAPC Knowledge Center: "The medical record must be legible to an individual who is not familiar with the provider's handwriting."); Ex. D-53, Acevedo (US Expert) Rebuttal Rep. (Jan. 29, 2024) ¶ 54 (US Expert: "Blair provides no evidence or explanation why human error is more likely to cause undercoding rather than overcoding."); P-69, Higgins Tr. 116:18-19 ("Our basic mantra was, if it wasn't in the medical record, it didn't happen."); Ex. P-13, Dep. Ex. 33B, MARA1262848, Coding Guide at 7 (Optum's coders had to achieve quality standards in order to successfully complete training) |
| D56 | There are a number of reasons why a medical coder reviewing a patient's medical chart may not identify a diagnosis code that is in fact supported by | Ex. D-54, Blair Rep. (9/29/2023) ¶¶ 56-58 (United expert describing reasons a coder may not identify a diagnosis code submitted by a provider); Ex. D-87, Acevedo Dep. 132:13-136:16 | Disputed. Conflicting evidence presented. | Ex. P-30, Acevedo (US Expert) Tr. 234:19-235:10 (US Expert rejecting United counsel's proposition that a coder can "infer" documentation exists for a code and noting a code is "not supported until you provide me with the documentation"); Ex. D-53, |

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | documentation in the medical chart. | (government expert describing reasons certified coders may come to different conclusions on the appropriate diagnosis code) | | Acevedo (US Expert) Rebuttal Rep. (Jan. 29, 2024) ¶¶ 34-36 (US Expert stating that notwithstanding issues of incomplete or unavailable provider documentation "coding rules require that a coder rely on the medical record before it. The coder cannot assume that a 'theoretical' medical record or portion of a medical record not yet retrieved or accessible exists to support the code."); Ex. P-31, Blair (United expert) Tr. 108:5-7 ("As I said before, to assign a diagnosis code, it must be in the medical record that you've received") (emphasis added); Ex. D-53, Acevedo (US Expert) Rebuttal Rep. (Jan. 29, 2024) ¶ 27-28 (US Expert: "For any content in the medical record that is unclear, ambiguous, or subject to interpretation and disagreement, the coder must ignore that portion of the medical record, unless the coder obtains definitive clarity (for instance, through a physician query). . . That coders may disagree on the proper code assignment also does not mean coding itself lacks objectively correct or incorrect answers."); *id.* at ¶¶ 37-38 (disputing United expert's claim that a code is "in fact, properly |

**DEFENDANTS' UNCONTROVERTED FACTS**

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | | | | supported by documentation in the medical record" when that record is not legible except to those uniquely familiar with a provider's handwriting.);  Ex. P-3, Dep. Ex. 30B, MARA1576299, 2008 Risk Adjustment Data Technical Assistance For Medicare Advantage Organizations Participant Guide, § 6.5 at Table 6C (Table 6C requiring that acceptable documentation supporting code assignment is documentation that is: "legible.");  Ex. P-48, ICD-10-CM Official Guidelines for Coding and Reporting, at p. 1 ("consistent, complete documentation" is required and "[w]ithout such documentation accurate coding cannot be achieved."); Ex. P-49, Dep. Ex. 815, at p. 2, AAPC Article entitled "Medical Record Entries What Is Timely and Reasonable" (AAPC Knowledge Center: "The medical record must be legible to an individual who is not familiar with the provider's handwriting.");  Ex. D-53, Acevedo (US Expert) Rebuttal Rep. (Jan. 29, 2024) ¶ 54 (US Expert:  "Blair provides no evidence or explanation why human error is more likely to cause undercoding |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | | DEFENDANTS' UNCONTROVERTED FACTS | | |
| | | | | rather than overcoding."); Ex. P-13, Dep. Ex. 33B, MARA1262848, Coding Guide at 7 (Optum's coders had to achieve quality standards in order to successfully complete training) |
| D57 | One reason a medical coder may not identify a diagnosis that is in fact supported by documentation in the medical chart is because of human error. | Ex. D-87, Acevedo Dep. 153:21-155:2 (government expert agreeing that ability to read handwriting may be a reason coders might reach different conclusions on a medical record); Ex. D-108, Fry Dep. 23:20-27:3 (testifying about her role as a former CMS sub-contractor and contractor providing training and guidance on coding), 98:15-99:5 (describing various reasons a coder may miss diagnosis codes supported in a medical record); Ex. D-54, Blair Rep. (9/29/2023) ¶ 29 (United expert describing that legibility of documentation may affect a coders ability to identify diagnosis codes) | Disputed. Mischaracterizes evidence. | Ex. D-53, Acevedo (US Expert) Rebuttal Rep. (Jan. 29, 2024) ¶ 54 (US Expert: "Blair provides no evidence or explanation why human error is more likely to cause undercoding rather than overcoding."); Ex. P-31, Blair (United expert) Tr. 214:2-19 (unable to provide any evidence regarding the prevalence of human error in medical record coding); *id.* at 215:21-216:12 (agreeing that human error can lead to reporting diagnosis codes not supported in the medical record); Ex. P-13, Dep. Ex. 33B, MARA1262848, Coding Guide at 7 (Optum's coders had to achieve quality standards in order to successfully complete training) |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
| D58 | One reason a medical coder may not identify a diagnosis that is in fact supported by documentation in the medical chart is because of differences in medical coder experience levels. | Ex. D-65, Renjilian Rebuttal Rep. (3/18/2024) ¶ 34 (United expert describing factors that "make it difficult to identify diagnosis codes from a medical record"); Ex. D-87, Acevedo Dep. 154:4-155:2 (government expert explaining that different levels of experience affect whether a coder identifies a diagnosis code in a medical record); Ex. D-54, Blair Rep. (9/29/2023) ¶¶ 23, 25 (explaining that differences in levels of coding experience affects whether a coder identifies a diagnosis code in a medical record) | Disputed. Mischaracterizes evidence. | Ex. P-50, Acevedo (US expert) Amended Rep. (Apr. 5, 2024), ¶¶ 50-51 (US Expert:  explaining that coder experience can impact coding, but there are objectively correct results); *see also* Ex. D-53, Acevedo (US Expert) Rebuttal Rep. (Jan. 29, 2024), ¶¶ 30-33 (same), ¶¶  73 (explaining well-established Medicare Advantage industry best practices for achieving complete and accurate coding); Ex. P-12, Dep. Ex. 265-1, MAPL000814082 (United's chart review policy mandated use of certified coders and initial and ongoing coding training as well as accuracy reviews of coding staff); Ex. P-7, United 30(b)(6) (Baker, May 30, 2023) Tr. 41:3–9 (Corporate representative:  "As part of the retrospective chart review program we have quality assurance[] programs that look at what our coders code and ensure – to ensure or work towards a 95 percent industry standard, which is what we all do."); Ex. P-13, Dep. Ex. 33B, MARA1262848, Coding Guide at 7 (Optum's coders had to achieve |

| | | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | | | | quality standards in order to successfully complete training) |
| D59 | One reason a medical coder may not identify a diagnosis that is in fact supported by documentation in the medical chart is because the record being reviewed by the medical coder is incomplete. | Ex. D-65, Renjilian Rebuttal Rep. (3/18/2024) ¶ 34 (United expert describing factors that "make it difficult to identify diagnosis codes from a medical record"); Ex. D-54, Blair Rep. (9/29/2023) ¶¶ 26-28 (United expert describing how the availability of medical records affects whether a coder identifies a diagnosis code in a medical record); Ex. D-89, Baker 30(b)(6) Dep. (5/30/2023) 119:13-121:6 (United corporate representative describing an example where a coder may not have the complete medical charts for a beneficiary); Ex. D-93, Blair Dep. 181:10-182:1 (United expert stating that getting a complete medical record is one of the most challenging aspects of chart review); Ex. D-87, Acevedo Dep. 188:1-189:5 (government expert testifying that it "could happen" that providers might not have the | Disputed. Conflicting evidence presented. | Ex. D-53, Acevedo (US Expert) Rebuttal Rep. (Jan. 29, 2024), ¶¶ 34-36 (US Expert stating that, notwithstanding issues of incomplete or unavailable provider documentation "coding rules require that a coder rely on the medical record before it. The coder cannot assume that a 'theoretical' medical record or portion of a medical record not yet retrieved or accessible exists to support the code."); Ex. P-30, Acevedo (US Expert) Tr. 234:19-235:10 (US Expert rejecting United counsel's proposition that a coder can "infer" documentation exists for a code and noting a code is "not supported until you provide me with the documentation"); Ex. P-31, Blair (United expert) Tr. 108:5-7 ("As I said before, to assign a diagnosis code, it must be in the medical record that you've received") (emphasis added) |

| | | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|---|
| **No.** | **Statement of Fact** | **Citation** | **Response** | **Citation** | |
| | | full medical record and agreeing that a coder would not be able to draw conclusions about diagnosis codes supported in medical records they were not provided) | | | |
| D60 | One reason a medical coder may not identify a diagnosis that is in fact supported by documentation in the medical chart is because of the legibility of handwritten entries in the medical charts. | Ex. D-87, Acevedo Dep. 153:21-154:3 (government expert testifying that two coders might reach different conclusions from the same medical record due to legibility of handwriting); Ex. D-108, Fry Dep. 89:17-90:8 (government coding contractor testifying that legibility would impact a coder's ability to identify a diagnosis code); Ex. D-54, Blair Rep. (9/29/2023) ¶ 29 (United expert stating that clarity and legibility of documentation impacts a coder's ability to identify diagnosis codes); Ex. D-93, Blair Dep. 182:10-183:3 (United expert testifying to the same) | Disputed. Conflicting evidence presented. | Ex. D-53, Acevedo (US Expert) Rebuttal Rep. (Jan. 29, 2024), ¶¶ 37-38 (US Expert disputing United expert's claim that a code is "in fact, properly supported by documentation in the medical record" when that record is not legible except to those uniquely familiar with a provider's handwriting.); Ex. P-3, Dep. Ex. 30B, MARA1576299, 2008 Risk Adjustment Data Technical Assistance For Medicare Advantage Organizations Participant Guide, § 6.5 at Table 6C (requiring that acceptable documentation supporting code assignment is documentation that is: "legible."); Ex. P-48, Dep. Ex. 1581 ICD-10-CM Official Guidelines for Coding and Reporting, at p. 1 ("consistent, complete documentation" is required and "[w]ithout such documentation accurate coding cannot be achieved."); Ex. P-49, Dep. Ex. 815, | |

| | | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation | |
| | | | | at p. 2, AAPC Article entitled "Medical Record Entries What Is Timely and Reasonable" ("The medical record must be legible to an individual who is not familiar with the provider's handwriting.") | |
| D61 | One reason a medical coder may not identify a diagnosis that is in fact supported by documentation in the medical chart is because of insufficient time to review the medical chart. | Ex. D-108, Fry Dep. 128:3-7 | Disputed. Mischaracterizes evidence. | Ex. P-51, Fry Tr. 128:3-7 (discussing program review steps to avoid "potential" coder error due to "productivity standards"); Ex. P-50, Acevedo (US expert) Amended Rep. (Apr. 5, 2024) ¶54 (US Expert opining that any coding accuracy and completeness issues are more likely to be avoided when an organization's policies and procedures encompass elements described in report); Ex. P-12, Dep. Ex. 265-1, MAPL000814082 (United's chart review policy mandated use of certified coders and initial and ongoing coding training as well as accuracy reviews of coding staff); Ex. P-7, United 30(b)(6) (Baker, May 30, 2023) Tr. 41:3–9 (Corporate representative:  "As part of the retrospective chart review program we have quality assurance[] programs that look at what our coders code and ensure – to ensure or | |

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | | | | work towards a 95 percent industry standard, which is what we all do.") |
| D62 | Even in government-conducted audits, there are instances when two government-hired coders disagree. | Ex. D-96A, Bresette (OIG) 30(b)(6) Dep. (8/9/2023) 31:10-32:9 (OIG corporate representative testifying that in OIG contract-level audits a second coder could find support for a specific diagnosis code that a first coder did not find support for); Ex. D-108, Fry Dep. 84:15-85:4 (government coding contractor testifying that in RADV audits a senior coder may disagree with a junior coder's determination about support for a diagnosis code); Ex. D-94, Bonner Dep. 19:18-20:8 (describing current role as CMS Communications Specialist previously involved in RADV), 84:20-25 (stating that in RADV audits disagreements occurred between certified coders); Ex. D-118, Hughes Dep. 25:4-16 (former CMS employee testifying about her role as Team Leader for Risk Adjustment Data Validation from 2006 to 2012), | Disputed. Not supported by cited evidence and conflicting evidence presented. | Ex. P-94, HHS-OIG 30(b)(6) (Bresette, Aug. 9, 2023) Tr. 30:19-32:9 (responding "I'm not going to say that it did or did not happen" in response to question about whether there were instances when first senior coder determined that an HCC was not validated but OIG ultimately determined it was validated; testifying also that there were instances when coders requested assistance from a physician reviewer); Ex. P-51, Fry Tr. 86:21-25 (testifying that in discussions between herself and other professional coders on the quality assurance panel "we could typically come up with a good decision as far as what the medical record documented"); Ex. D-94, Bonner Tr. 84:20-25 (testifying "I don't remember specific instances [of disagreements between two certified coders], but I do know that, yes, there could be disagreements about coding."); Ex. P-6, Renjilian (United Expert) Tr. 219:7-220:4 (describing process he uses in government audits |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | | 39:2-41:16 (noting that in RADV audits there were "levels of coders disagreement" as coding was a "subjective activity") | | to convene coders to resolve any initial disagreements in the coding of a medical record) |
| D63 | The government uses an independent medical reviewer to conduct a second level review of instances in which two coders disagree. | Ex. D-96A, Bresette (OIG) 30(b)(6) Dep. (8/9/2023) 31:10-32:9 (OIG corporate representative testifying that in OIG contract-level audits a second coder could find support for a specific diagnosis code that a first coder did not find support for); Ex. D-108, Fry Dep. 84:15-85:4 (testifying that in RADV audits a senior coder may disagree with a junior coder's determination about support for a diagnosis code); Ex. D-118, Hughes Dep. 39:2-41:16 (noting that in RADV audits there were "levels of coders disagreement" as coding was a "subjective activity"); *see* Ex. D-94, Bonner Dep. 90:3-91:25 (describing accuracy standards for coders) | Disputed. Not supported by cited evidence. | Ex. P-52, HHS-OIG 30(b)(6) (Bresette, Aug. 9, 2023) Tr. 31:10-32:9 (noting that there were instances when a physician reviewer consulted with coder to make a determination); Ex. P-51, Fry Tr. 84:15-85:4 (cited testimony does not discuss independent medical reviewer at all); Ex. D-118, Lateefah Hughes Tr. 39:2-41:16 (cited testimony does not discuss independent medical reviewer at all); see Ex. D-94, Bonner Tr. 90:3-91:25 (cited testimony does not discuss independent medical reviewer at all) |

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| D64 | Determining whether the health condition submitted by the doctor on the claim form is supported by documentation in the medical chart requires a review of the medical record. | Ex. D-132, Paul Dep. 42:10-43:4 (CMS employee distinguishing coding from diagnosing); Ex. D-106, Ferron Dep. 227:4-19 (United coding consultant describing process of coding charts); Ex. D-96, Bresette (OIG) 30(b)(6) Dep. (5/31/2023) 168:15-24 (OIG corporate representative describing need "to review the medical records supporting them to determine whether they are accurate or not") | Undisputed except to the extent fact implies a medical record review has not already occurred with respect to the deletes identified by Dr. Garthwaite, in which case, disputed, conflicting evidence presented. | Ex. D-57, Garthwaite (US Expert) Rep. (Sept. 29, 2023) ¶ 13 (US Expert: "According to my analysis, Defendants reviewed the medical records that were the source of these diagnosis codes as part of their Chart Review Program and their review found no support for these diagnosis codes or their associated Hierarchical Condition Categories or Rx Hierarchical Condition Categories"); Ex. P-6, Renjilian (United Expert) Tr. 94:4-25 (testifying that he does not have an expert opinion as to whether Dr. Garthwaite correctly identified Reviewed Encounters); *id.* at 96:1-99:2 (United's expert does not opine whether Dr. Garthwaite incorrectly identified diagnosis codes that were recorded in Chart Review nor that Dr. Garthwaite incorrectly compared codes identified in Chart Review to those submitted by providers.) |
| D65 | During the time period covered by this case, CMS knew that Medicare Advantage plans conducted | Ex. D-116, Hornsby 30(b)(6) Dep. (5/25/2023) at 175:11-16 (CMS corporate representative testifying "[i]n general, CMS understood, through informal | Disputed. Not supported by cited evidence in Ex. D-39, conflicting evidence presented, and | Ex. P-26, CMS 30(b)(6) (Hornsby, May 19, 2023) Tr. 104:3-8 ("What I said is there wasn't a general awareness in -- among CM leadership -- and Cynthia Tutor [sic] |

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | | | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | chart reviews that sought to add diagnosis codes. | networks, that looking just for additionals in medical records was going on."); Ex. D-140, Spitalnic Dep. 17:4-14 (CMS employee Paul Spitalnic describing his current role as Chief Actuary (2017-present) and his prior role as Former Director of Parts C and D Actuarial Group), 89:11-90:2 (government expert acknowledging awareness of United's Chart Review Program); Ex. D-39, 2009 Advance Notice at 12 ("CMS understands that MA plans have made efforts to identify enrollees' conditions and may be coding more completely than FFS.") | mischaracterizes the evidence. | also said this in her deposition. There wasn't a general awareness that plans were -- were going to medical records and only looking for additionals."); Ex. P-91, CMS 30(b)(6) (Hornsby, Nov. 21, 2023) Tr. 131:22-134:1 (testifying CMS did not have knowledge in 2014 that MA plans were conducting chart reviews to add diagnoses but had "informal network information but nothing that would rise to the level of knowledge because CMS cannot see what's inside an MAO in terms of its data and due diligence activities."); Ex. P-79, Spitalnic (US Expert) Tr. 89:11-90:15 ("Q. by the way, do you know what "chart reviews" are? A. I'm familiar with the term. Q. You understand that United had a chart review program in place during the period relevant to this case? A. I understand United takes a number of actions with respect to supporting or developing or -- related to the diagnoses they submit for plan payment. Q. And would those actions include a chart review program? A. That is my understanding. Q. When did you first become aware that United had a chart review program? A. I don't think I was ever aware that |

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
| | | | | there was a specific program. I know that United and other MAOs, Medicare Advantage organizations, do various -- have various initiatives in support of their diagnosis submission. Q. So you have no specific information about how United may have conducted its chart review program during the period relevant to this case? A. I do not) (Outside Counsel Only); Ex. P-23, Blum Tr. 95:6-12 ("Q. Right. And one of those behaviors was one-way chart review, correct? MS. LIKOFF: Objection to form. Asked and answered. Vague. A. I cannot speak to the operations that a plan had. I can speak to the policy that CMS set.") |
| D66 | Current CMS officials have confirmed that CMS knew not all diagnosis codes submitted by doctors to Medicare Advantage plans were supported by medical records. | Ex. D-155, Blum Dep. 154:11-22 (former CMS employee acknowledging that by 2010, he was aware of "diagnosis codes that were submitted that weren't documented by medical record"); Ex. D-46, OIG, Medicare Advantage Compliance Audit of Cigna at 23 (Mar. 2023) ("We recognize as well that . . . there is no CMS | Disputed. Not supported by cited evidence. | |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | | requirement that MA organizations verify every diagnosis submitted by providers."); Ex. D-66, Higgins Dep. Ex. 164 (Medicare Program; Medicare+Choice Program, 65 Fed. Reg 40,170, 40,268 (proposed June 29, 2000) (to be codified at 42 C.F.R. pt. 422) (noting that "M+C organizations cannot reasonably be expected to know that every piece of data is correct, nor is that the standard that HCFA, the OIG, and DoJ believe is reasonable to enforce") | | |
| D67 | Former CMS officials who worked at CMS during the time period covered by this case confirmed that CMS knew during those officials' times of service that not all diagnosis codes submitted by doctors to Medicare Advantage plans were supported by medical records. | Ex. D-119, Hutchinson Dep. 32:21-33:4 (former CMS employee describing unsupported codes in FFS data); Ex. D-97, Cavanaugh Dep. 64:9-65:8 (former CMS Director describing awareness of unsupported codes in both MA and FFS Medicare); Ex. D-117, Hornsby 30(b)(6) Dep. (11/21/2023) 130:14-131:7 (CMS corporate representative | Disputed. Conflicting evidence presented. | Ex. P-21, CMS 30(b)(6) (Hornsby, Nov. 21, 2023) Tr. 105:15-22 (clarifying CMS's understanding of provider submitted codes in RADV: "Q. Is RADV, the RADV process that CMS is performing, is it designed to separate inaccurate codes that originate with providers as opposed to inaccurate codes that were potentially added by the plans themselves? A. That is not CMS's intention. And as I've explained, CMS cannot make that distinction in |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | | stating CMS was aware of unsupported codes in MA data) | | any systematic way."); *id.* at 106:20-107:2 ("Q. And CMS is making no distinction in that process between codes that originated with the providers themselves versus codes that were added downstream by the plans through chart review; correct? A. CMS doesn't have that information so it would not be possible to incorporate it in the sampling frame."); Ex. D-119, Hutchinson Tr. 32:21-33:10 (limiting testimony cited in D67 to 2009 and to FFS providers); Ex. P-20, Cavanaugh Tr. 64:9-65:8 (testifying that he was aware during time as director that there was overcoding and undercoding in both traditional FFS data and MA data; no testimony regarding CMS's knowledge of source of inaccuracies in MA plan data) |
| D68 | The Department of Health and Human Services, Office of the Inspector General has also confirmed that they knew not all diagnosis codes submitted by doctors to Medicare Advantage plans | Ex. D-46, OIG, Medicare Advantage Compliance Audit at 23 (Mar. 2023) | Disputed as to HHS-OIG's knowledge within relevant timeframe for this matter, not supported by the cited evidence. | |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | | | **DEFENDANTS' UNCONTROVERTED FACTS** | | |
| | were supported by medical records. | | | |
| D69 | CMS has acknowledged that Medicare Advantage plans have no obligation to audit all of their data to ensure the accuracy of diagnosis codes. | Ex. D-116, Hornsby 30(b)(6) Dep. (5/25/2023) 236:6-10 (CMS corporate representative stating that "CMS doesn't have a requirement that tells MAOs they must audit medical records."); Ex. D-137, Rice Dep. 16:2-20:17 (CMS employee Cheri Rice describing her current role as CMS's Deputy Director of the Center for Medicare, Medicare Advantage and Part D (2017-present), and her prior roles as CMS Director of Medicare Plan Payment Group (2010-2017) and Deputy Director Medicare Plan Payment Group (2004-2010), 69:10-15 (confirming no obligation to audit all diagnoses); Ex. D-46, 2023 OIG, Medicare Advantage Compliance Audit of Cigna (Mar. 2023) at 23 ("We recognize as well that . . . there is no CMS requirement that MA organizations verify every diagnosis submitted by | Disputed. Conflicting evidence presented. | Ex. D-66, Dep. Ex. 164, Medicare+Choice Program, 65 Fed. Reg 40,170, 40,268 (proposed June 29, 2000) (to be codified at 42 C.F.R. pt. 422) (CMS stating that "encounter data will be used as a factor in calculating payments to [MAOs]. Therefore, encounter data submissions, like enrollment data and ACR information, represent a ''claim'' for payment. As such, [MAOs] have an obligation to take steps to ensure the accuracy, completeness, and truthfulness of the encounter data. We acknowledge that encounter data come into M+C organizations in great volume and from a number of sources, presenting significant verification challenges for the organizations. However, we believe that M+C organizations have an obligation to undertake ''due diligence'' to ensure the accuracy, completeness, and truthfulness of encounter data submitted to HCFA. Therefore, they will be held to a ''best knowledge, information, and belief'' standard. Therefore, M+C |

| | | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
|---|---|---|---|---|---|
| **No.** | **Statement of Fact** | **Citation** | **Response** | **Citation** | |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | | providers"); Ex. D-100, Creighton Dep. (10/4/2022) 63:10-65:5 (former CMS employee stating no rule requiring chart reviews also validate provider-submitted diagnoses); Ex. D-97, Cavanaugh Dep. 74:15-21 (former CMS Director testifying no obligation to proactively audit diagnoses codes), 153:12-17 (similar), 155:9-23 (similar) | | organizations will be held responsible for making good faith efforts to certify the accuracy, completeness, and truthfulness of encounter data submitted."); Ex. P-10, Rice Tr. 76:19-79:1 (CMS Deputy Director for the Center for Medicare discussing MAOs' responsibilities relating to data submitted to CMS, stating "that their plan has to do -- has some proactive responsibilities to take a good faith effort to make sure that -- that the data that they're submitting are correct."); Ex. P-1B, MAPL007637301, Optum EDI Agreement, at § A5 (Optum agreeing that "[b]ased on best knowledge, information, and belief that it will submit encounter data that is accurate, complete, and truthful"); Ex. P-1C, MAPL008081457, Defendant MAO EDI Agreement, at § A5 (Defendant MAOs agreeing to the same); Ex. P-1A, USBP009418488, 2017 PY Contract, at Art. IV(D) (Contract requiring MAOs to annually attest that the data they submit is accurate, complete, and truthful based on best knowledge, information, and belief); *e.g.*, Ex. P-1G, USBP009417433, |

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
| | | | | 2017 PY Attestation (United attestation stating that "Based on best knowledge, information, and belief as of the date indicated below, all information submitted to CMS in this report is accurate, complete, and truthful.") |
| D70 | Medicare Advantage plans do not have a general obligation to audit doctor-submitted diagnosis codes. | Ex. D-100, Creighton Dep. (10/4/2022) 63:10-65:5 (former CMS employee stating no rule requiring chart reviews also validate provider-submitted diagnoses); Ex. D-136, Renshaw Dep. 98:13-99:6 (OIG employee testifying "I don't think that it would be reasonable to expect a Medicare Advantage organization to determine whether every single diagnosis submitted to CMS is supported to have a good -- I mean, I don't think a good compliance program would require that level of review."); Ex. D-137, Rice Dep. 69:10-15 (CMS employee confirming no obligation to audit all diagnoses); Ex. D-116, Hornsby 30(b)(6) Dep. (5/25/2023) 236:6-10 (CMS corporate | Disputed. Conflicting evidence presented. | Ex. D-66, Dep. Ex. 164, Medicare+Choice Program, 65 Fed. Reg 40,170, 40,268 (proposed June 29, 2000) (to be codified at 42 C.F.R. pt. 422) (to be codified at 42 C.F.R. pt. 422) (CMS stating that "encounter data will be used as a factor in calculating payments to [MAOs]. Therefore, encounter data submissions, like enrollment data and ACR information, represent a ''claim'' for payment. As such, [MAOs] have an obligation to take steps to ensure the accuracy, completeness, and truthfulness of the encounter data. We acknowledge that encounter data come into [MAOs] in great volume and from a number of sources, presenting significant verification challenges for the organizations. However, we believe that [MAOs] have an obligation to undertake ''due diligence'' to ensure |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | | representative stating that "CMS doesn't have a requirement that tells MAOs they must audit medical records"); Ex. D-46, 2023 OIG, Medicare Advantage Compliance Audit of Cigna (Mar. 2023) at 23 ("We recognize as well that . . . there is no CMS requirement that MA organizations verify every diagnosis submitted by providers"); | | the accuracy, completeness, and truthfulness of encounter data submitted to HCFA. Therefore, they will be held to a ''best knowledge, information, and belief'' standard. Therefore, [MAOs] will be held responsible for making good faith efforts to certify the accuracy, completeness, and truthfulness of encounter data submitted."); Ex. P-10, Rice Tr. 76:19-79:1 (CMS Deputy Director for the Center for Medicare discussing MAOs' responsibilities relating to data submitted to CMS, stating "that their plan has to do -- has some proactive responsibilities to take a good faith effort to make sure that -- that the data that they're submitting are correct."); *id.* at 55:11-56:5 (describing requirements for MAOs to have a compliance program in place and exercise good faith efforts to verify the accuracy of data submissions) |
| D71 | CMS conducts periodic Risk Adjustment Validation ("RADV") Audits to determine whether the Medicare Advantage plans | Ex. D-15, 75 Fed. Reg. 19,678, 19742 (April 15, 2010) ("Under the RADV audit process we plan to recover the overpayments identified during | Undisputed. | |

**DEFENDANTS' UNCONTROVERTED FACTS**

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | selected for audits received "overpayments." | the RADV audit."); Ex. D-98, Chaudhuri Dep. 24:16-25:9 (CMS employee discussing RADV audit process); Ex. D-122A, Kapustij 30(b)(6) Dep. 41:24-42:2 (CMS corporate representative discussing same); Ex. D-80, Kapustij 30(b)(6) Dep. (8/25/2023) Ex. 1497-10 at 1 (describing purpose of RADV audits as "recovery of overpayments"); Ex. D-117, Hornsby 30(b)(6) Dep. (11/21/2023) 58:23-59:13 (CMS corporate representative discussing same) | | |
| D72 | CMS developed its RADV sampling and extrapolation methodology to target Medicare Advantage plans and enrollees' HCCs that are more likely to result in payment error. | Ex. D-18, 88 Fed. Reg. 6643, 6651-52 (Feb. 1, 2023) (noting that RADV audits would be focused on MA plans and beneficiaries' HCCs "identified as being at high risk for improper payments"); Ex. D-122A, Kapustij 30(b)(6) Dep. 53:1-7 (CMS corporate representative testifying that MA plans with increase in coding were selected for RADV audits because CMS viewed them as being indicative of | Disputed. Not supported by cited evidence and conflicting evidence presented. | Ex. D-18, 88 Fed. Reg. 6643, 6651-52 (Feb. 1, 2023) (noting that sampling and extrapolation methodologies adopted by CMS "will be" focused on contracts and HCCs that are at highest risk for improper payments in a modification to CMS's prior approach); Ex. P-56, CMS 30(b)(6) (Kapustij, Aug. 25, 2023) Tr. 53:1-54:9 (testifying that there was a "hypothesis that an increase in coding might be indicative of larger probability for error" but that plans were selected |

The header row **DEFENDANTS' UNCONTROVERTED FACTS** spans the full table above the column headers.

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
| | | "probability for an error"), 53:23-54:22 (testifying that CMS hypothesized that MA plans with increase in coding were more likely to have higher rates of payment errors) | | from the high, medium, and low coding intensity groups, and responding "I'm not sure, and none of the documentation supported that" in response to question whether CMS's goal in selecting MA plans for the CY 2011-2013 RADV audits was to identify plans that were more likely to have payment errors) |
| D73 | In contract-level RADV audits, CMS targets contracts that it believes are most likely to contain errors. | Ex. D-122A, Kapustij 30(b)(6) Dep. 52:2-54:9 (CMS corporate representative describing how CMS identified which MA plans to audit for payment years 2011-2013); *id.* at 205:17-206:3 (identifying plans selected due to their "coding intensity") | Disputed. Not supported by cited evidence and conflicting evidence presented. | Ex. D-18, 88 Fed. Reg. 6643, 6651-52 (Feb. 1, 2023) (noting that sampling and extrapolation methodologies adopted by CMS "will be" focused on contracts and HCCs that are at highest risk for improper payments in a modification to CMS's prior approach); Ex. P-56, CMS 30(b)(6) (Kapustij, Aug. 25, 2023) Tr. 53:1-54:9 (testifying that there was a "hypothesis that an increase in coding might be indicative of larger probability for error" but that plans were selected from the high, medium, and low coding intensity groups, and responding "I'm not sure, and none of the documentation supported that" in response to question whether CMS's goal in selecting MA plans for the CY 2011-2013 RADV audits |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
| | | | | was to identify plans that were more likely to have payment errors) |
| D74 | To conduct a RADV audit, CMS selects a sample of Medicare Advantage plans and beneficiaries within those Medicare Advantage plans for review. | Ex. D-18, 88 Fed. Reg. 6643, 6647 (Feb. 1, 2023) (describing selection of Medicare Advantage plans and beneficiaries); Ex. D-122A, Kapustij 30(b)(6) Dep. 84:15-19 (CMS corporate representative testifying that in a RADV audit, CMS audits every HCC for the sampled beneficiaries selected from a MA plan); Ex. D-74, Bonfante Dep. Ex. 1143-1 (AEO) at 4 ("sample beneficiaries enrolled in MA plans" listed as a step in RADV audit methodology) | Undisputed. | |
| D75 | After the beneficiaries for the RADV audit are selected, Medicare Advantage plans submit medical records for those beneficiaries to CMS. | Ex. D-18, 88 Fed. Reg. 6643, 6647 (Feb. 1, 2023) (citing 42 C.F.R. 442.310(e)) (noting that MA plans submit sample of medical records for RADV audits); Ex. D-122A, Kapustij 30(b)(6) Dep. 84:15-19 (CMS corporate representative acknowledging that after a sample of beneficiaries is | Undisputed. | |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
| | | selected, the next step is request and submission of medical records), *id.* at 89:22-90:7 (testifying similarly as to the submission of medical records by MA plans); Ex. D-74, Bonfante Dep. Ex. 1143-1 (AEO) at 4 (noting that CMS requests medical records from MA plans) | | |
| D76 | In conducting RADV audits, CMS reviews the medical records that the Medicare Advantage plans submitted for purposes of identifying whether the documentation in the medical charts supports the HCCs for that beneficiary for that year. | Ex. D-122A, Kapustij 30(b)(6) Dep. 84:20-85:10 (CMS corporate representative testifying that after MA plans submit medical records, CMS oversees review of those records); Ex. D-15, 75 Fed. Reg. 19678, 19742 (Apr. 14, 2010) (noting that medical records are reviewed "to determine whether they support diagnosis codes (known as Hierarchical Condition Codes, or HCCs)" submitted to CMS) | Undisputed. | |
| D77 | In conducting RADV audits, if CMS finds support in at least one of the medical charts for at least one | Ex. D-122A, Kapustij 30(b)(6) Dep. 90:2-91:19 (CMS corporate representative describing how an HCC can be | Undisputed. | |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
| | diagnosis code that corresponds to the HCC for that member for that year, the HCC is found to be supported. | supported by more than one record); Ex. D-153, 83 Fed. Reg. 54982, 55040 at FN 30 (Nov. 1, 2018) (acknowledging that only one instance of medical record support was necessary to make the diagnosis valid for that year); Ex. D-36, 2007 Risk Adjustment Data Training Participant Guide (acknowledging the difference between a data discrepancy that does not affect payment and a risk adjustment discrepancy that does affect payment); Ex. D-141, Stark Dep. 39:14-21, 48:13-23 (government expert testifying that in RADV, MA plans are to provide documentation to support specific HCCs, and that if at least one chart that year supported the HCC, then the HCC is validated) | | |
| D78 | If the HCC is found to be supported, CMS has determined that the Medicare Advantage plan | Ex. D-117, Hornsby 30(b)(6) Dep. (11/21/2023) 55:14-56:20 (CMS corporate representative testifying that if CMS confirmed that a code was supported there was no | Disputed to the extent this fact is not limited to the RADV context. Otherwise, undisputed. | |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| **DEFENDANTS' UNCONTROVERTED FACTS** | | | | |
| | was not overpaid based on that HCC. | overpayment to the plan); Ex. D-145, Tudor Dep. 221:14-223:7 (former CMS employee acknowledging that there is no overpayment where a diagnosis code eligible for risk adjustment and mapping to an HCC is supported by at least one provider record) | | |
| D79 | During a contract-level RADV audit, CMS coders also identify diagnosis codes that are supported by documentation in the medical chart, but were not submitted to CMS for payment. | Ex. D-15, 75 Fed. Reg. 19678, 19746 (Apr. 15, 2010) (noting that the RADV process "addresses under-coding" by identifying diagnoses not submitted for payment); Ex. D-122A, Kapustij 30(b)(6) Dep. 148:24-149:5 (CMS corporate representative testifying that during the RADV process, CMS coders also reported additional HCCs a plan did not submit for payment); Ex. D-130, Morse Dep. 17:9-39:25 (former CMS official Jonathan Morse describing his role as Acting Deputy Administrator and Center Director for the CMS (2016-2018) and Deputy Center Director for the Center for Program Integrity), 122:2-13 | Undisputed. | |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | | (testifying that during RADV medical records were also reviewed for "adds" that were supported in the medical records but not submitted to CMS) | | |
| D80 | Based on the results of its medical record review, CMS determines the corrected net payment for each of the sampled beneficiaries, considering both additions and deletions of HCCs. | Ex. D-77, Kapustij Dep. Ex. 1306 at 23-27 (describing the calculation of the corrected risk score and payment); Ex. D-130, Morse Dep. 122:14-19 (former CMS employee describing how net payment error determination is made); Ex. D-122A, Kapustij 30(b)(6) Dep. 142:3-12 (CMS corporate representative describing how corrected risk score and payment are calculated) | Disputed. Mischaracterizes evidence and conflicting evidence presented. | Ex. D-77, Kapustij Dep. Ex. 1306 at 23-27 (description of process for extrapolating error rate to contract; does not say CMS will calculate "corrected net payment for each of the sampled beneficiaries, considering both additions and deletions of HCCs"); Ex. D-130, Morse Dep. 122:14-123:7 (former CMS employee testifying about his understanding of calculations in the context of an extrapolated RADV Audit); Ex. P-56, CMS 30(b)(6) (Kapustij, Aug. 25, 2023) Tr. 147:18-150:6, 153:3 (testifying that, under the 2012 RADV audit methodology, accounting for additional codes identified in the course of a RADV audit was constrained to zero in the RADV Audit process and that CMS did not make additional payments to a plan based on the results of a RADV Audit that, when extrapolated, made it appear as if there was a net underpayment due to |

| | **DEFENDANTS' UNCONTROVERTED FACTS** | | | | |
|---|---|---|---|---|---|
| **No.** | **Statement of Fact** | **Citation** | **Response** | **Citation** | |
| | | | | the plan.); Ex. P-32, Declaration of Steven Ferraina (Jul. 12, 2024), ¶ 8 ("The RADV Audits for CY 2011 through CY 2015 are not final.") | |
| D81 | CMS initiated contract-level RADV audits on United contracts for contract years 2011, 2012, 2013, 2014 and 2015. | Ex. D-82, Kapustij 30(b)(6) Dep. Ex. 1498 (OCO) at 19 (reflecting United contracts audited for contract year 2011), 20 (same for 2012), 21 (same for 2013); Exs. D-84 & D-85, Hornsby 30(b)(6) Dep. 11/21/2023) Exs. 1521 (same for 2014), 1522 (same for 2015) | Undisputed. | | |
| D82 | For contract years 2011-2013, CMS initiated contract-level RADV audits on 15 United contracts. | Ex. D-122A, Kapustij 30(b)(6) Dep. 203:3-203:11 (CMS corporate representative agreeing that 4 United plans were audited for contract year 2011), 241:10-241:13 (agreeing that 5 United plans were audited for contract year 2012), 242:3-242:7 (agreeing that 6 United plans were audited for contract year 2013); Ex. D-82, Kapustij 30(b)(6) Dep. Ex. 1498 (OCO) at 19 (reflecting 4 United contracts audited for contract year 2011), at 20 (reflecting 5 | Undisputed. | | |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| **DEFENDANTS' UNCONTROVERTED FACTS** | | | | |
| | | United contracts audited for contract year 2012), at 21 (reflecting 6 United contracts audited for contract year 2013); Ex. D-81, Kapustij 30(b)(6) Dep. Ex. 1497-18 at 19-21 (listing summary of plans); Ex. D-83, Kapustij 30(b)(6) Dep. Ex. 1501 (listing United contracts) | | |
| D83 | In the contract-level RADV audits for contract years 2011-2013, CMS contractors preliminarily determined that nearly 87% of the HCCs that were audited in the United contracts were supported ("validated") by documentation in the medical records that the CMS contractors reviewed. | Ex. D-64, Updated Renjilian Rep. (12/3/2023) ¶ 166, Figure 15 (reflecting that 86.6% of the HCCs submitted by United and reviewed during RADV were supported); Ex. D-141, Stark Dep. 36:13-37:22 (government expert agreeing with Renjilian calculation of HCC validation rate for RADV audits in contracts years 2011-2013); Ex. D-63, Stark Rep. (3/28/2024) ¶ 30 (government expert testifying to same) | Disputed. Mischaracterizes evidence and conflicting evidence presented. | Ex. P-32, Declaration of Steven Ferraina (Jul. 12, 2024), ¶ 8 ("The RADV Audits for CY 2011 through CY 2015 are not final. The initial results of medical record reviews and estimates of the portion of the audited HCCs that were found to be supported by medical records, provided to plans in the PFRs and through the portal, are not yet final and are subject to change. The portion of audited HCCs that were initially found to be supported by medical records submitted by a given plan may increase or decrease before the RADV Audits are finalized.") |
| D84 | The preliminary RADV medical record review | Ex. D-122A, Kapustij 30(b)(6) Dep. 230:15-22 (CMS corporate | Disputed. Mischaracterizes evidence and | Ex. P-32, Declaration of Steven Ferraina (Jul. 12, 2024), ¶ 8 ("The |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| **DEFENDANTS' UNCONTROVERTED FACTS** | | | | |
| | results showed that the rate of validation for United HCCs was higher than other plans that went through RADV audits in contract year 2011. | representative testifying that United had the lowest discrepancy rate among the other major MA plans audited for payment year 2011); Ex. D-75, Paul Dep. Ex. 1187-1 at 10 (showing a 12.3% discrepancy rate for United for contract year 2011 audit) | conflicting evidence presented. | RADV Audits for CY 2011 through CY 2015 are not final. The initial results of medical record reviews and estimates of the portion of the audited HCCs that were found to be supported by medical records, provided to plans in the PFRs and through the portal, are not yet final and are subject to change. The portion of audited HCCs that were initially found to be supported by medical records submitted by a given plan may increase or decrease before the RADV Audits are finalized.") |
| D85 | Preliminary RADV audit results that CMS calculated showed that United had among the lowest recovery amount (i.e. amount CMS expected to recover from an MA plan) of all major MA organizations for contract years 2011-2013. | Ex. D-122A, Kapustij 30(b)(6) Dep. 223:10-225:2 (CMS corporate representative testifying that, of the major Medicare Advantage plans audited for contract year 2011, United had the lowest payment error); *id.* at 226:12-229:3 (same); 238:8-239:10 (identifying payment error rates for United plans for payment years 2012 and 2013); Ex. D-82, Kapustij 30(b)(6) Dep. Ex. 1498 at slide 4 (reflecting preliminary RADV recovery amounts for contract years 2011-2013 and | Disputed. Mischaracterizes evidence and conflicting evidence presented. | Ex. P-56, CMS 30(b)(6) (Kapustij, Aug. 25, 2023) Tr. 182:20-184:7 (testifying that no preliminary audit reports have been issued; further testifying "That was the process as designed," but "these results have not been issued, so I'm being kind of speculative."); Ex. P-21, CMS 30(b)(6) (Hornsby, Nov. 21, 2023) Tr. 22:12-23:7 (Preliminary results of RADV audits have not been released); *id.* 34:14-20 (testifying that there were no preliminary RADV results for contract years 2014 and 2015); Ex. P-32, Declaration of Steven Ferraina (Jul. |

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | | **DEFENDANTS' UNCONTROVERTED FACTS** | | |
| | | reflecting that United had a lower error rate than Aetna, Humana, and Cigna for 2011, than Cigna and Humana for 2012, and than Humana and Cigna for 2013) | | 12, 2024), ¶ 8 ("The RADV Audits for CY 2011 through CY 2015 are not final. The initial results of medical record reviews and estimates of the portion of the audited HCCs that were found to be supported by medical records, provided to plans in the PFRs and through the portal, are not yet final and are subject to change. The portion of audited HCCs that were initially found to be supported by medical records submitted by a given plan may increase or decrease before the RADV Audits are finalized."); D-82, Dep. Ex. 1498 at slide 4 (cited slide provides that "[r]ecovery amount is the extrapolated payment error amount based on the lower bound of the 99% confidence interval for the total"); D-18, 88 Fed. Reg. 6643, 6654 (Feb. 1, 2023) (CMS announcing that RADV payment recoveries for payment years 2011-2017 would be limited to "enrollee-level adjustments" rather than extrapolated recoveries) |
| D86 | For contract years 2014 and 2015, CMS initiated RADV audits pertaining to members | Ex. D-64, Renjilian Updated Rep. (12/3/2023)¶ 154 | Undisputed. | |

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | enrolled in 97 United Medicare Advantage plans. | | | |
| D87 | For contract years 2014 and 2015, CMS made United's preliminary RADV medical record review results available to United via the CMS RADV Report Portal. | Ex. D-64, Renjilian Updated Rep. (12/3/2023)¶153, n.220 | Disputed to the extent the fact characterizes the medical record review feedback for RADV Contract Years 2014-2015 as "preliminary . . . results", conflicting evidence presented. Otherwise undisputed that initial feedback of medical record reviews was made available to MAOs through a portal. | Ex. P-21, CMS 30(b)(6) (Hornsby, Nov. 21, 2023) Tr. 22:12-23:7 (Preliminary results of RADV audits have not been released); *id.* 34:14-20 (testifying that there were no preliminary RADV results for contract years 2014 and 2015); Ex. P-32, Declaration of Steven Ferraina (Jul. 12, 2024), ¶ 8 ("The RADV Audits for CY 2011 through CY 2015 are not final. The initial results of medical record reviews and estimates of the portion of the audited HCCs that were found to be supported by medical records, provided to plans in the PFRs and through the portal, are not yet final and are subject to change. The portion of audited HCCs that were initially found to be supported by medical records submitted by a given plan may increase or decrease before the RADV Audits are finalized.") |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| D88 | In the RADV audits for contract years 2014-2015, CMS contractors validated approximately 88% of the HCCs pertaining to members in United's Medicare Advantage plans. | Ex. D-64, Renjilian Updated Rep. (12/3/2023) ¶ 166, Figure 15. | Disputed. Mischaracterizes evidence and conflicting evidence presented. | Ex. P-32, Declaration of Steven Ferraina (Jul. 12, 2024), ¶ 8 ("The RADV Audits for CY 2011 through CY 2015 are not final. The initial results of medical record reviews and estimates of the portion of the audited HCCs that were found to be supported by medical records, provided to plans in the PFRs and through the portal, are not yet final and are subject to change. The portion of audited HCCs that were initially found to be supported by medical records submitted by a given plan may increase or decrease before the RADV Audits are finalized.") |
| D89 | In the RADV audits CMS initiated for contract years 2011-2015, CMS contractors validated approximately 88% of the member-HCCs pertaining to members in United's Medicare Advantage plans. | Ex. D-64, Renjilian Updated Rep. (12/3/2023) ¶ 166, Figure 15 (reflecting that 87.8% of United HCCs audited in RADV for contract years 2011-2015 were supported); Ex. D-141, Stark Dep. 82:7-87:23 (government expert calculating an 88.8% validation rate for United HCCs audited in RADV for contract years 2011-2015) | Disputed. Mischaracterizes evidence and conflicting evidence presented. | Ex. P-32, Declaration of Steven Ferraina (Jul. 12, 2024), ¶ 8 ("The RADV Audits for CY 2011 through CY 2015 are not final. The initial results of medical record reviews and estimates of the portion of the audited HCCs that were found to be supported by medical records, provided to plans in the PFRs and through the portal, are not yet final and are subject to change. The portion of audited HCCs that were initially found to be supported by |

| | | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation | |
| | | | | medical records submitted by a given plan may increase or decrease before the RADV Audits are finalized.") | |
| D90 | Medicare Advantage plans have the opportunity to appeal the results of CMS's review of the medical charts in RADV audits. | Ex. D-122A, Kapustij 30(b)(6) Dep. 85:22-86:3 (CMS corporate representative testifying that once the RADV report was provided to MA plans, they had the opportunity to seek reconsideration of HCCs that CMS did not validate), 180:4-13 (describing the reconsideration process in RADV audits); Ex. D-101, Davis Dep. 37:7-41:10 (former CMS employee describing role as CMS Health Insurance Specialist for Medicare Plan Payment Group from October 2013 to January 2017), 47:3-8 (testifying that MA plans can seek reconsideration of the RADV audit findings) | Undisputed that Medicare Advantage plans will have the opportunity to appeal the results of CMS's review of the medical charts in RADV audits. | Ex. P-56, CMS 30(b)(6) (Kapustij, Aug. 25, 2023) Tr. 182:20-184:7 (testifying that no preliminary audit reports have been issued; further testifying "That was the process as designed," but "these results have not been issued, so I'm being kind of speculative."); Ex. P-32, Declaration of Steven Ferraina (Jul. 12, 2024), ¶ 8 ("The RADV Audits for CY 2011 through CY 2015 are not final. The initial results of medical record reviews and estimates of the portion of the audited HCCs that were found to be supported by medical records, provided to plans in the PFRs and through the portal, are not yet final and are subject to change. The portion of audited HCCs that were initially found to be supported by medical records submitted by a given plan may increase or decrease before the RADV Audits are finalized.") | |
| D91 | Preliminary results of CMS-initiated RADV audits for | Ex. D-122A, Kapustij 30(b)(6) Dep. 243:13-22 (CMS corporate | Disputed. Mischaracteri zes evidence and | Ex. P-32, Declaration of Steven Ferraina (Jul. 12, 2024), ¶ 8 ("The | |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | contract years 2011-2013 revealed net underpayments to at least 13 of those 15 United contracts. | representative testifying that of the 15 United plans audited for contract years 2011, 2012, and 2013, 13 of them had net underpayments); Ex. D-81, Kapustij 30(b)(6) Dep. Ex. 1497-18 at 19-21 (showing recovery amounts for each plan for contract years 2011, 2012, and 2013); Ex. D-83, Kapustij 30(b)(6) Dep. Ex. 1501 (showing recovery amounts for United contracts for contract years 2011, 2012, and 2013) | conflicting evidence presented. | RADV Audits for CY 2011 through CY 2015 are not final. The initial results of medical record reviews and estimates of the portion of the audited HCCs that were found to be supported by medical records, provided to plans in the PFRs and through the portal, are not yet final and are subject to change. The portion of audited HCCs that were initially found to be supported by medical records submitted by a given plan may increase or decrease before the RADV Audits are finalized."); Ex. P-56, CMS 30(b)(6) (Kapustij, Aug. 25, 2023) Tr. 147:18-150:6, 150:23-153:3 (testifying that, under the 2012 RADV audit methodology, accounting for additional codes identified in the course of a RADV audit was constrained to zero in the RADV Audit process and that CMS did not make additional payments to a plan based on the results of a RADV Audit that, when extrapolated, made it appear as if there was a net underpayment due to the plan. Further testifying that CMS's application of a 99 percent confidence interval taken at the lower bound in the extrapolation process could explain why some initial |

**DEFENDANTS' UNCONTROVERTED FACTS**

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
| | | | | extrapolated results appeared to go below zero) |
| D92 | "Preliminary" RADV audit results are recovery amounts that have not yet been appealed. | Ex. D-122A, Kapustij 30(b)(6) Dep. 85:6-86:3 (CMS corporate representative describing preliminary result calculations subject to medical record review reconsideration), 181:4-16 (agreeing that preliminary audit results do not account for appeals), 214:9-215:5 (same); Ex. D-75, Paul Dep. Ex. 1187-1 ("Preliminary recovery amounts are subject to change based on the FFSA and appeals, which are triggered by regulation upon release of the audit reports.") | Undisputed that "Preliminary" RADV audit results will be recovery amounts that have not yet been appealed.  Otherwise disputed, mischaracterizes evidence. | Ex. P-56, CMS 30(b)(6) (Kapustij, Aug. 25, 2023) Tr. 182:20-184:7 (testifying that no preliminary audit reports have been issued; further testifying "That was the process as designed," but "these results have not been issued, so I'm being kind of speculative.") |
| D93 | "Preliminary" RADV medical record review results are HCC validation determinations that have not yet been appealed. | Ex. D-122A, Kapustij 30(b)(6) Dep. 85:6-86:3 (CMS corporate representative describing preliminary result calculations subject to medical record review reconsideration), 179:15-180:13 (describing appeal of the preliminary RADV medical record review results) | Disputed. Conflicting evidence presented. | Ex. P-32, Declaration of Steven Ferraina (Jul. 12, 2024), ¶ 8 ("The RADV Audits for CY 2011 through CY 2015 are not final. The initial results of medical record reviews and estimates of the portion of the audited HCCs that were found to be supported by medical records, provided to plans in the PFRs and through the portal, are not yet final and are subject to change. The |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | | | | portion of audited HCCs that were initially found to be supported by medical records submitted by a given plan may increase or decrease before the RADV Audits are finalized."); Ex. P-56, CMS 30(b)(6) (Kapustij, Aug. 25, 2023) Tr. 182:20-184:7 (testifying that no preliminary audit reports have been issued; further testifying "That was the process as designed," but "these results have not been issued, so I'm being kind of speculative.") |
| D94 | Preliminary RADV audit recovery amounts cannot increase and will only decrease (if they change at all) when they become final, after appeals. | Ex. D-122A, Kapustij 30(b)(6) Dep. 85:6-86:3 (CMS corporate representative describing preliminary result calculations), 181:4-16 (agreeing that preliminary audit results do not account for appeals), 214:9-215:5 (same); Ex. D-75, Paul Dep. Ex. 1187-1 ("Preliminary recovery amounts are subject to change based on the FFSA and appeals, which are triggered by regulation upon release of the audit reports.") | Disputed. Conflicting evidence presented. | Ex. P-32, Declaration of Steven Ferraina (Jul. 12, 2024), ¶ 8 ("The RADV Audits for CY 2011 through CY 2015 are not final. The initial results of medical record reviews and estimates of the portion of the audited HCCs that were found to be supported by medical records, provided to plans in the PFRs and through the portal, are not yet final and are subject to change. The portion of audited HCCs that were initially found to be supported by medical records submitted by a given plan may increase or decrease before the RADV Audits are finalized."); Ex. P-56, CMS 30(b)(6) (Kapustij, |

**DEFENDANTS' UNCONTROVERTED FACTS**

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
| | | | | Aug. 25, 2023) Tr. 182:20-184:7 (testifying that no preliminary audit reports have been issued; further testifying "That was the process as designed," but "these results have not been issued, so I'm being kind of speculative.") |
| D95 | Preliminary rates of HCC validation calculated from RADV audit medical record reviews cannot decrease and will only increase (if they change at all) when they become final, after appeals. | Ex. D-122A, Kapustij 30(b)(6) Dep. 179:15-184:5 (CMS corporate representative describing plan's ability to argue that an HCC is in fact supported) | Disputed. Conflicting evidence presented. | Ex. P-32, Declaration of Steven Ferraina (Jul. 12, 2024), ¶ 8 ("The RADV Audits for CY 2011 through CY 2015 are not final. The initial results of medical record reviews and estimates of the portion of the audited HCCs that were found to be supported by medical records, provided to plans in the PFRs and through the portal, are not yet final and are subject to change. The portion of audited HCCs that were initially found to be supported by medical records submitted by a given plan may increase or decrease before the RADV Audits are finalized."); Ex. P-56, CMS 30(b)(6) (Kapustij, Aug. 25, 2023) Tr. 182:20-184:7 (testifying that no preliminary audit reports have been issued; further testifying "That was the process as designed," but "these results have not |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | | **DEFENDANTS' UNCONTROVERTED FACTS** | | |
| | | | | been issued, so I'm being kind of speculative.") |
| D96 | Preliminary rates of validation calculated on HCCs submitted by United cannot decrease and will only decrease (if they change at all) when they become final after United has the opportunity to appeal. | Ex. D-122A, Kapustij 30(b)(6) Dep. 179:15-184:5 (CMS corporate representative describing plan's ability to argue that an HCC is in fact supported) | Disputed. Conflicting evidence presented. | Ex. P-32, Declaration of Steven Ferraina (Jul. 12, 2024), ¶ 8 ("The RADV Audits for CY 2011 through CY 2015 are not final. The initial results of medical record reviews and estimates of the portion of the audited HCCs that were found to be supported by medical records, provided to plans in the PFRs and through the portal, are not yet final and are subject to change. The portion of audited HCCs that were initially found to be supported by medical records submitted by a given plan may increase or decrease before the RADV Audits are finalized."); Ex. P-56, CMS 30(b)(6) (Kapustij, Aug. 25, 2023) Tr. 182:20-184:7 (testifying that no preliminary audit reports have been issued; further testifying "That was the process as designed," but "these results have not been issued, so I'm being kind of speculative.") |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| D97 | "[T[here is a strong, statistically significant association between a [Diagnosis] instance having financial impact if deleted . . . and that instance not being supported by the RADV audit." | Ex. D-63, Stark Rep. (3/28/2024) ¶ 33 | Disputed. Mischaracterizes cited evidence and conflicting evidence presented. | Ex. D-63, Stark (US Expert) Updated Rep. (Mar. 28, 2024) (ellipsis excludes "according to Renjilian's Opinion 3" thereby changing the meaning of the quote), ¶ 33; Ex. P-57, Stark (US Expert) Tr. 34:5-35:6 (US Expert explaining that his analyses were relying on United expert's results that he does not know to be independently correct) |
| D98 | CMS coders sometimes miss codes supported by documentation in the medical charts when reviewing charts in contract-level RADV audits. | Ex. D-65, Renjilian Rebuttal Rep. (3/18/2024) ¶ 34 (United expert stating "[I]t would not be surprising for a Chart Review coder to fail to identify a diagnosis code that was actually supported by the member's record."); Ex. D-54, Blair Rep. (9/29/2023) ¶¶ 26-28, 29, 34, 36, 42-44, 48-55 (United expert describing reasons coders may miss supported codes); Ex. D-53, Acevedo Rebuttal Rep. (1/29/2024) ¶ 54 (government expert stating in report that "[h]uman error is inevitable"); Ex. D-87, Acevedo Dep. 153:21-155:2 (government expert agreeing to reasons why | Disputed to the extent fact implies that coders are conducting medical record reviews to identify all diagnosis codes supported by the medical record in the RADV audit context and further disputed to the extent fact fails to acknowledge that plans are given credit for HCCs as long as one coder finds support for that HCC in the medical record review, not supported by cited | Ex. P-56, CMS 30(b)(6) (Kapustij, Aug. 25, 2023) Tr.118:8-19 (testifying "I would not necessarily say that the coder misses it. . . . there are certain circumstances where one coder would find evidence for it and the other coder would feel no, that that was not sufficient."); id. at 98:5-12 ("Q. And isn't it also true that the individuals doing the focused review were blind as to which HCCs the MA plan had submitted for payment for a given sampled enrollee? A. Based on my conversations, it was my understanding that the coders did have knowledge to see what is called the cover sheet which indicated what HCCs were submitted for payment."); id. at 121:17-122:1 |

| | | DEFENDANTS' UNCONTROVERTED FACTS | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | | coders may miss diagnosis codes); *see* Ex. D-94, Bonner Dep. 75:17-77:16 (former CMS employee describing accuracy thresholds for RADV coders); Ex. D-112, Guy Dep. 29:5-30:17 (CMS employee testifying that she worked from 2006 to the present in the Medicare Plan Payment Group, Division of Risk Adjustment Operations), 75:23-77:14 (CMS employee testifying "[y]ou have some tests that give you false positives and some tests that give you false negatives. That's why you repeat it. You have more than one person looking at it."); Ex. D-122A, Kapustij 30(b)(6) Dep. 119:4-11, 120:2-8 (CMS corporate representative stating that CMS employed two levels of coders in case the first missed a supported code) | evidence and conflicting evidence presented. | (testifying that "the HCC was considered validated if either of the coders abstracted it."); Ex. P-31, Blair (United Expert) Tr. 87:19-21 (testifying she has never done work for CMS) |
| D99 | In RADV audits, CMS reviews up to five medical charts for each beneficiary before making the determination that an HCC is not supported by | Ex. D-122A, Kapustij 30(b)(6) Dep. 90:2-91:14 (CMS corporate representative describing policy for submission of up to five medical records); Ex. D-41, CMS, *Notice of Final* | Undisputed to the extent that the RADV process for Contract Years 2011-2015 included a review of all medical records submitted by a Medicare | Ex. P-56, CMS 30(b)(6) (Kapustij, Aug. 25, 2023) Tr. 91:9-14, 97:7-14 (testifying that starting in payment year 2011, CMS allowed plans to submit up to five medical records to support a particular HCC for a |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| **No.** | **Statement of Fact** | **Citation** | **Response** | **Citation** |
| | documentation in the medical charts. | *Payment Error Calculation Methodology for Part C Medicare Advantage Risk Adjustment Data Validation Contract-Level Audits*, Feb. 24, 2012, at 3 (describing submission of multiple records); Ex. D-64, Renjilian Rep. (12/3/2023) ¶ 44 ("CMS has allowed audited MA contracts to submit up to five records for each HCC being validated.") | Advantage Organization, which could include up to five medical records for a particular HCC for a particular enrollee. Otherwise disputed, mischaracterizes evidence. | particular sampled enrollee, and further that "the focused review process resulted in a review of all the medical records submitted") |
| D100 | In RADV audits, CMS reviews up to five medical charts for each HCC before making the determination that an overpayment exists. | Ex. D-41, CMS, *Notice of Final Payment Error Calculation Methodology for Part C Medicare Advantage Risk Adjustment Data Validation Contract-Level Audits*, Feb. 24, 2012, at 3 (describing submission of multiple records); Ex. D-64, Renjilian Rep. (12/3/2023) ¶ 44 ("CMS has allowed audited MA contracts to submit up to five records for each HCC being validated.") | Undisputed to the extent that the RADV process for Contract Years 2011-2015 included a review of all medical records submitted by a Medicare Advantage Organization, which could include up to five medical records for a particular HCC for a particular enrollee. Otherwise disputed, mischaracterizes evidence. | Ex. P-56, CMS 30(b)(6) (Kapustij, Aug. 25, 2023) Tr. 91:9-14, 97:7-14 (testifying that starting in payment year 2011, CMS allowed plans to submit up to five medical records to support a particular HCC for a particular sampled enrollee, and further that "the focused review process resulted in a review of all the medical records submitted") |

| | | DEFENDANTS' UNCONTROVERTED FACTS | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| D101 | In RADV audits, CMS reviews a selection of medical charts that the Medicare Advantage plan identifies. | Ex. D-122A, Kapustij 30(b)(6) Dep. 97:7-14 (CMS corporate representative stating that "the focused review process resulted in a review of all the medical records submitted"); *see, e.g.,* Ex. D-36, 2007 Risk Adjustment Data Training Participant Guide at 7-8—7-9 (7.2.2.2 Medical Record Request, Example 1) (describing selection process) | Undisputed to the extent that the RADV process for Contract Years 2011-2015 included a review of all medical records submitted by a Medicare Advantage Organization, which could include up to five medical records for a particular HCC for a particular enrollee.  Otherwise disputed, mischaracterizes evidence. | Ex. P-56, CMS 30(b)(6) (Kapustij, Aug. 25, 2023) Tr. 91:9-14, 97:7-14 (testifying that starting in payment year 2011, CMS allowed plans to submit up to five medical records to support a particular HCC for a particular sampled enrollee, and further that "the focused review process resulted in a review of all the medical records submitted") |
| D102 | The selection of medical charts that the Medicare Advantage plan identifies are selected because the Medicare Advantage plan believes they contain documentation that would support the sampled health condition. | Ex. D-122A, Kapustij 30(b)(6) Dep. 91:9-19 (CMS corporate representative describing medical record submission process); Ex. D-135, Renjilian Dep. 77:4-20 (United expert stating "That's my understanding is that they submit what they think are the -- you know, five best records to support that HCC."); Ex. D-141, Stark Dep. 39:22-40:10 (government expert stating that RADV involves "asking the | Undisputed. | |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | | MAO for support for the HCCs that were assigned to that beneficiary that year, that the MAO is allowed to provide up to five pieces of information -- I think their chart specifically, but five pieces of information to support each HCC, and that support might or might not be from the diagnosis instance that was originally submitted") | | |
| D103 | The Medicare Advantage plan identifies those medical charts from the full set of medical charts for the beneficiary for that year. | Ex. D-141, Stark Dep. 39:22-40:10 (government expert stating that RADV involves "asking the MAO for support for the HCCs that were assigned to that beneficiary that year, that the MAO is allowed to provide up to five pieces of information -- I think their chart specifically, but five pieces of information to support each HCC, and that support might or might not be from the diagnosis instance that was originally submitted"); Ex. D-135, Renjilian Dep. 77:4-20 (United expert stating "That's my understanding is that they submit what they think are the -- | Undisputed. | |

**DEFENDANTS' UNCONTROVERTED FACTS**

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | | you know, five best records to support that HCC") | | |
| D104 | Medicare Advantage plans are required to annually attest to the accuracy, completeness, and truthfulness of the diagnosis data submitted for risk adjustment payments based on their best knowledge, information, and belief. | 42 C.F.R. § 422.504(l) ("As a condition for receiving a monthly payment under subpart G of this part, the MA organization agrees that its chief executive officer (CEO), chief financial officer (CFO), or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to such officer, must request payment under the contract on a document that certifies (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of relevant data that CMS requests."); Ex. D-1, Am. Compl. ¶ 5 ("[T]he Government requires that each MA Organization expressly certify that the diagnosis codes it has submitted for risk adjustment payments are accurate and truthful based on best | Undisputed. | |

| | | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | | Citation |
| | | knowledge, information, and belief.") | | | |
| D105 | CMS has not promulgated any rules specifying how Medicare Advantage plans should perform chart reviews. | Ex. D-116, Hornsby 30(b)(6) Dep. (5/25/2023) at 169:18-170:8 (CMS corporate representative stating that "CMS never told MAOs how to design their medical record reviews. They -- the MAOs are responsible for developing their own protocols."); Ex. D-114, Hornsby Dep. 73:10-15 (former CMS employee agreeing that, prior to the proposed medical record review rule, CMS did not specify in any regulation that MA plans were required to design their chart reviews to identify overpayments) | Disputed. Mischaracterizes evidence. | | Ex. P-10, Rice Tr. 134:2-137:24 (CMS Deputy Director for the Center for Medicare describing data accuracy requirements that apply should an MAO opt to perform a Chart Review, stating that "you can't just do nothing. You have to do something."); Ex. D-66, Dep. Ex. 164, Medicare+Choice Program, 65 Fed. Reg 40,170, 40,268 (proposed June 29, 2000) (to be codified at 42 C.F.R. pt. 422) (MAOs are responsible for ensuring data submitted to CMS is accurate, complete, and truthful based on best knowledge, information and belief and the submission of a diagnosis code to CMS is considered a claim for payment); D-17, 79 Fed. Reg. 29844, 29926 (May 23, 2014) (when CMS decided not to finalize a rule that would dictate the precise format a Chart Review must take, CMS emphasized that MAOs' still had a contractual requirement to certify based on best knowledge, information and belief the accuracy, completeness, and truthfulness of the |

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | | | | risk adjustment data they submit to CMS and further reiterated the requirement that a diagnosis submitted to CMS must be supported by medical record documentation); Ex. P-19, CMS 30(b)(6) (Hornsby, May 25, 2023) Tr. 74:14-75:11 ("[CMS is] not providing a detailed series of steps or a recipe for how to conduct and organize and design a chart review program. CMS requires that diagnoses be accurate, complete, and truthful. It's the MAO's responsibility to figure out how to make that truth which allows them to certify every year.") |
| D106 | CMS has not issued any subregulatory guidance specifying how Medicare Advantage plans should perform chart reviews. | Ex. D-116, Hornsby 30(b)(6) Dep. (5/25/2023) at 170:22-171:22 (CMS corporate representative stating "That is correct. CMS never set out any guidance telling MAOs how to design medical record reviews."); Ex. D-137, Rice Dep. 206:3-206:16 (CMS employee stating "[I]n terms of a specific procedure that plans were to follow to -- to meet their obligations to submit correct data, no, we did not have | Disputed. Not supported by cited evidence and conflicting evidence presented. | Ex. D-100, Creighton (Oct. 4, 2022) Tr. 66:19-67:5 (former CMS employee discussing the Affordable Care Act, not Medicare Advantage chart review programs); Ex. P-10, Rice Tr. 134:2-137:24 (CMS Deputy Director for the Center for Medicare describing certain subregulatory data accuracy requirements that apply should an MAO opt to perform a Chart Review); Ex. P-9, Medicare Managed Care Manual, Ch. 7, Exhibit 30 (Aug. 13, 2004) (". . . a medical record must substantiate all |

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | | specific procedures that we were telling plans to follow."); Ex. D-100, Creighton Dep. (10/04/2023) at 66:19-67:5 (former CMS employee confirming no subregulatory guidance requiring plans to design their chart review programs in a fashion that validates previously-submitted diagnosis codes) | | diagnostic information provided to CMS."); Ex. P-8, Medicare Managed Care Manual, Rev. 118 (Sept. 19, 2014), Ch.7, § 40 (diagnosis codes must be supported by medical record documentation and unsupported diagnosis codes must be deleted); *id.* at § 120.2.1 (MAOs and anyone submitting data on behalf of an MAO must first sign an EDI agreement); Ex. P-59, MAPL001126483 (UnitedHealth employee, Patty Brennan, noting chart review guidance included in the 2012 Encounter Data Participant Guide, which she attached to the email); Ex. P-59A, MAPL001126484, 2012 Encounter Data Participant Guide, § 2.4.3 ("Chart reviews may be performed by MAOs and other entities for the purpose of diagnosis code validation.  Because diagnoses drive risk adjustment, all chart review encounters must be supported by the medical record.") and § 2.5.4 ("MAOs and other entities are responsible for the accuracy of all encounter data submitted and must ensure that every submission can be supported by an original source document (i.e., a medical record).  MAOs and other entities must also |

**DEFENDANTS' UNCONTROVERTED FACTS**

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | | | | attest that the data submitted is based on best knowledge, information, and belief and be accurate and truthful."); Ex. P-3, Dep. Ex. 30B, MARA1576299, 2008 Risk Adjustment Data Technical Assistance For Medicare Advantage Organizations Participant Guide, § 4.16 (stating that MAOs must delete erroneous diagnosis clusters and further that "if the MA organization submits corrected data, the MA organization must submit the appropriate deletion record. That is, if the correct diagnosis cluster is submitted, the erroneous diagnosis cluster cannot be ignored."), § 3.2.4 (diagnosis codes must be supported by medical record documentation), § 6.5 at Table 6C (same); Ex. P-5, United 30(b)(6) (Sedor) Tr. 98:1-99:3 (Corporate representative confirming that UnitedHealth understood that if it corrected a diagnosis cluster representing a given encounter, UnitedHealth knew they also had to delete a cluster that was previously submitted erroneously); *see* Ex. P-1, Joint Stipulation Re EDI Agreements, MA Contracts, MA-PD Addenda, and Attestations and Related Entities, ¶ 5, *see also*, |

**DEFENDANTS' UNCONTROVERTED FACTS**

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | | | | Ex. P-1C, MAPL008081457, §§ A5 and A11 (UnitedHealth agreed "Based on best knowledge, information, and belief, that it will submit risk adjustment data that are accurate, complete, and truthful[]" and further agreed to "research and correct risk adjustment data discrepancies"), Ex. P-1B, MAPL007637301, Optum EDI Agreement (Optum agreeing to the same); Ex. P-1G, USBP009417433, 2017 PY Attestation (United attestation stating that "Based on best knowledge, information, and belief as of the date indicated below, all information submitted to CMS in this report is accurate, complete, and truthful."); Ex. P-93, Tudor Tr. 25:4-6 (Former Deputy Director for the Center for Medicare stating: "A. In general -- in general, I would say that you have to design medical record review to look for both adds and deletes.") |
| D107 | In 2009, CMS had not proposed any rule that required Medicare Advantage plans to design their chart review programs | Ex. D-97, Cavanaugh Dep. 74:15-21, 153:12-17, 155:9-23 (former CMS employee stating no known requirement that plans design their chart review | Disputed. Conflicting evidence presented. | Ex. D-66, Dep. Ex. 164, Medicare+Choice Program, 65 Fed. Reg 40,170, 40,268 (proposed June 29, 2000) (to be codified at 42 C.F.R. pt. 422) (MAOs are responsible for |

**DEFENDANTS' UNCONTROVERTED FACTS**

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | to assess whether doctor-submitted diagnosis codes were supported in the medical charts. | programs to assess whether doctor-submitted diagnosis codes were supported in the medical charts); Ex. D-116, Hornsby 30(b)(6) Dep. (5/25/2023) at 170:22-171:22 (CMS corporate representative stating "That is correct. CMS never set out any guidance telling MAOs how to design medical record reviews.") | | ensuring data submitted to CMS is accurate, complete, and truthful based on best knowledge, information and belief and the submission of a diagnosis code to CMS is considered a claim for payment.  Also, stating that MAOs must act in good faith and exercise due diligence in the submission of diagnosis data to CMS); Ex. P-19, CMS 30(b)(6) (Hornsby, May 25, 2023) Tr. 74:14-75:11 ("[CMS is] not providing a detailed series of steps or a recipe for how to conduct and organize and design a chart review program. CMS requires that diagnoses be accurate, complete, and truthful. It's the MAO's responsibility to figure out how to make that truth which allows them to certify every year.") |
| D108 | United attempted to implement a program to investigate whether certain doctor-submitted diagnosis codes not identified in chart reviews were supported by documentation in the | Ex. D-95, Brennan Dep. 148:10-18 (former United employee describing Claims Verification Program); Ex. D-128, Martinez Dep. 28:23-29:21 (same) | Disputed to the extent fact says United "attempted" to implement a Claims Verification program, conflicting evidence presented.  Otherwise, undisputed | Ex. P-11, Dep. Ex. 381, United response to US Interrogatory (Set Six, Jul. 19, 2022), Response to Interrogatories 19 and 20 (describing the volume of deletes empirically made through the claims verification program); Ex. P-16, United 30(b)(6) (Bird, Jun. 22, 2023) Tr.102:11-14 (Corporate representative:  "Q. Mr. |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | | | | |

| | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
|---|---|---|---|---|
| **No.** | **Statement of Fact** | **Citation** | **Response** | **Citation** |
| | patients' medical charts ("Claims Verification"). | | | Bird, another risk adjustment program that Optum performed for UnitedHealthcare was called claims verification; right? A. Correct."); *id.* at 109:1-110:6 (Corporate representative explaining that the program examined HCCs) |
| D109 | "Claims Verification" is a program Defendants conducted between 2010 and 2014 in which they reviewed "some [medical c]harts from some of the [c]hart [r]eview [p]rogram for service years 2009-2012" to determine "if there were any provider-reported diagnosis codes that had been submitted to CMS, but were not supported by the [medical c]hart." | Ex. D-57, Garthwaite Rep. (9/29/2023) ¶ 55-56 (government expert describing Claims Verification Program); Ex. D-91, Bird 30(b)(6) Dep. 102:15-103:21 (United corporate representative stating that Claims Verification "was a program that we operated during a certain time frame that identified and reviewed exclusive HCCs that were submitted by providers that were part of the chart review program."). | Undisputed. | |
| D110 | United's Claims Verification Program "applied only to a subset of Charts that had been reviewed in the Chart Review Program. For example, a Chart was only | Ex. D-57, Garthwaite (9/29/2023) Rep. ¶ 56 | Undisputed. | |

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | eligible for inclusion in the" Claims Verification Program "if it was associated with" an "'exclusive HCC.' ... [A]n exclusive HCC is one that was included in a beneficiary's record solely on the basis of a diagnosis code (or diagnosis codes) reported by one provider in the service year" but United's coders "in the Chart Review Program identified no diagnosis codes mapping to that HCC in the review of that provider's Chart." | | | |
| D111 | United attempted to implement the Claims Verification program in phases between 2010 to 2013. | Ex. D-91, Bird 30(b)(6) Dep. 102:25-103:21 | Disputed to the extent fact says United "attempted" to implement a Claims Verification program, conflicting evidence presented. Also, disputed as to timeframe for Claims Verification, conflicting evidence presented. Otherwise, undisputed. | Ex. P-11, Dep. Ex. 381, United response to US Interrogatory (Set Six, Jul. 19, 2022), Response to Interrogatories 19 and 20 (describing the volume of deletes empirically made through the claims verification program); Ex. P-16, United 30(b)(6) (Bird, Jun. 22, 2023) Tr. 102:11-14 (Corporate representative: "Q. Mr. Bird, another risk adjustment program that Optum performed for UnitedHealthcare was called claims verification; right? A. Correct."); *id.* at 109:1-110:6 (Corporate |

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | | | | representative explaining that the program examined HCCs); Ex. D-57, Garthwaite (US Expert) Rep. (Sept. 29, 2023) ¶¶ 55-56 (US Expert stating that United conducted CV through April 2014) |
| D112 | United witnesses testified that the Claims Verification program was a complex process in terms of "whether you got the right medical record, whether you got the entire medical record" and to "overturn[] what a provider has actually submitted for their patient." | Ex. D-92, Bird Dep. 47:10-48:9 | Disputed to the extent that the fact claims multiple witnesses made this statement, but Defendants only cite to the testimony of one witness, mischaracterizes cited evidence. Otherwise, undisputed. | |
| D113 | United witnesses testified that the Claims Verification program was time consuming and could take "a year . . . to process." | Ex. D-92, Bird Dep. 47:10-48:9 | Disputed to the extent that the fact claims multiple witnesses made this statement, but Defendants only cite to the testimony of one witness, mischaracterizes cited evidence. Otherwise, undisputed. | |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| **DEFENDANTS' UNCONTROVERTED FACTS** | | | | |
| D114 | United witnesses testified that the Claims Verification program was an attempt to perform "a very complex process to try and link provider information" with "data that existed within the various claims systems." | Ex. D-92, Bird Dep. 84:25-85:11 | Disputed. Mischaracterizes cited evidence and conflicting evidence presented. | Ex. P-61, Dumcum Tr. 205:15-207:17 (describing the comparison of diagnosis codes on claims with data from chart review as "easy enough."); Ex. P-62, Martinez Tr. 67:19-70:13 (United witness describing the process of matching claims to chart review results.) |
| D115 | United "receiv[ed] complaints from providers" that diagnoses "were being deleted inappropriately" when United attempted to review doctor-submitted codes. | Ex. D-147, Meyer Dep. 160:5-16 | Disputed. Not supported by cited evidence. | Ex. P-90, Meyer Tr. 160:15-16 (Describing a program other than CV: "We received those complaints through the RACCR program specifically") |
| D116 | CMS "does not prescribe" to MA plans how to conduct chart review programs, because "[t]here's no one-size-fits-all for a review program." | Ex. D-115, Hornsby 30(b)(6) Dep. (5/19/2023) at 222:7-15 (CMS corporate representative describing CMS requirements); *see also* Ex. D-97, Cavanaugh Dep. 74:15-21, 153:12-17, 155:9-23 (former CMS director failing to identify any rule or regulation prior to the proposed medical record review rule describing how MA plans should conduct chart review); | Undisputed. | |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | DEFENDANTS' UNCONTROVERTED FACTS | | | | |
|---|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | | Ex. D-145, Tudor Dep. 173:12-174:13 (former CMS employee stating that CMS was "thinking about proposing" a rule requiring MA plans to conduct chart review to identify both over- and under-payments in 2013); Ex. D-119, Hutchinson Dep. 150:9-16 (former CMS employee testifying that he did not have knowledge of CMS telling MA plans that they would also have to examine whether diagnosis codes submitted by providers were supported during chart review) | | |
| D117 | On January 10, 2014, CMS solicited public comment on a proposed rule that would have established that "medical record review methodologies must be designed to identify errors in diagnoses submitted to CMS as risk adjustment data, regardless of whether the data errors would result in positive or negative payment adjustments." | Ex. D-16, 79 Fed. Reg. 1918, 2000 (Jan. 10, 2014) (proposing rule that would require MA plans to design their chart review to verify accuracy of diagnosis codes submitted by providers); Ex. D-119, Hutchinson Dep. 150:9-16 (former CMS employee testifying that he did not have knowledge of CMS telling MA plans that they would also have to examine whether diagnosis codes submitted by providers | Undisputed. | |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | | were supported during chart review) | | |
| D118 | In response to the January 10, 2014 proposed Medical Record Review Rule, CMS received comments from the Medicare Advantage industry expressing concerns about the clarity of the proposed rule. | Ex. D-17, 79 Fed. Reg. 29844, 29848 (May 23, 2014) (noting comments from the industry about vagueness and potential for operational instability); *id.* at 29925-26 (noting comments received from the industry regarding the "overly broad" nature of the proposed medical review rule); Ex. D-114, Hornsby Dep. 77:23-78:18 (former CMS employee testifying that there was an "uproar" in the industry after the proposed medical record review rule); Ex. D-137, Rice Dep. 159:20-160:12 (CMS employee stating that the proposed medical record review rule was not finalized because of "stakeholder concern and pushback") | Disputed to the extent not supported by cited evidence in Ex. D-114 and Ex. D-137. Otherwise, undisputed. | |
| D119 | In response to the January 10, 2014 proposed Medical Record Review Rule, CMS received comments from the | Ex. D-17, 79 Fed. Reg. 29844, 29848 (May 23, 2014) (noting comments from the industry about vagueness and potential | Disputed to the extent not supported by cited evidence in Ex. D-17 | |

The header of the table (repeated context):

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
|---|---|---|---|---|---|
| **No.** | **Statement of Fact** | **Citation** | **Response** | | **Citation** |
| | Medicare Advantage industry expressing concerns about how burdensome it would be to implement it. | for operational instability); *id.* at 29925-26 (noting comments received from the industry regarding the "vagueness" of the proposed medical review rule); Ex. D-114, Hornsby Dep. 77:23-78:18 (former CMS employee testifying that there was an "uproar" in the industry after the proposed medical record review rule); Ex. D-137, Rice Dep. 159:20-160:12 (CMS employee stating that the proposed medical record review rule was not finalized because of "stakeholder concern and pushback") | and Ex. D-137. Otherwise, undisputed. | | |
| D120 | United witnesses testified that the proposed Medical Record Review Rule "led to a lot of confusion on our part inside UnitedHealthcare" because "we had a claims verification process in place at the time." | Ex. D-154, Thompson Dep. 151:8-21 (United employee testifying that it seemed "contradictory" to introduce a proposed rule containing a requirement similar to that fulfilled by the claims verification process); *see also* Ex. D-144, Theisen 30(b)(6) Dep. 130:8-132:18 (United corporate representative testifying that United stopped claims verification after | Undisputed. | | |

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | | discussions with CMS regarding the proposed medical record review rule) | | |
| D121 | United witnesses testified that before the April 29, 2014 meeting, United was confused about whether it was required to construct its medical record reviews to validate doctor-submitted HCCs. | Ex. D-131, Nelson Dep. 284:17-285:24 (former United employee testifying that one of the reasons United wanted the April 29, 2014 meeting with CMS was clarity regarding whether its claims verification was required); Ex. D-144, Theisen 30(b)(6) Dep. 130:8-132:18 (United corporate representative testifying that one of the reasons United wanted the April 29, 2014 meeting with CMS was clarity regarding whether its claims verification was required) | Disputed to the extent cited evidence relates to Claims Verification rather than Chart Review, mischaracterizes cited evidence and conflicting evidence presented. Otherwise, undisputed. | Ex. P-35, Schumacher Tr. 200:23-201:1 ("And we were clear to say that, you know, "Chart program is one thing. It has its own QA process. We're not asking about that right now. We're asking you about our claims verification process."); Ex. P-64, Gardner Tr. 149:14-22 ("Q. Okay. Did you believe, during the period that you worked at United, that if data was incorrectly submitted, you had an obligation to notify CMS? A. My understanding was that if we were aware that a -- a condition was not -- incorrectly submitted, as in not supported by the medical record documentation, then that we should proceed with deleting it."); Ex. P-5, United 30(b)(6) (Sedor) Tr. 92:11-15 (Corporate representative: "If as an organization we had knowledge that we submitted a risk -- I'm sorry, a diagnosis code that was in error, if we had knowledge that the diagnosis code was in error and unsupported, we would submit a delete."); Ex. P-65, |

**DEFENDANTS' UNCONTROVERTED FACTS**

| | | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation | |
| | | | | Halva Tr. 309:8-25 ("Q. All right. If M&R opened a given medical record to look for all diagnosis codes that were supported by documentation in that record, but did not find documentation to support a diagnosis that had been previously submitted - A. Okay.  Q. -- do you believe that M&R had an obligation to delete that code?  MR. SCHINDLER: Same objection.  Vague and ambiguous as framed. Calls for a legal conclusion as well.  A. My general thought is if the circumstances were correct, yes. I mean, as we discussed before, there's potentially some one-offs that wouldn't require the deletion of that code. But, in general, yes, I believe it should be deleted.") | |
| D122 | United sought clarification from CMS about whether its Claims Verification program was already required. | Ex. D-9, United States' Responses and Objections to Request for Admission No. 36 (admitting it was possible that United raised the topic of claims verification on a phone call between Larry Renfro and Jonathan Blum); Ex. D-9, United States' Responses and Objections to Request for Admission No. 48; Ex. D-142, | Disputed.  Not supported by cited evidence. | | |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | | Tavenner Dep. 27:7-33:14 (former CMS employee Marilyn Tavenner describing her role as Administrator (2013-2015) and CMS Chief Deputy Administrator (2010-2013)), 110:3-13 (testifying that she recalled being approached by Larry Renfro to discuss concern about the process for reviewing charts) | | |
| D123 | On April 29, 2014, there was a meeting between United and CMS officials. | Ex. D-9, United States' Responses and Objections to Request for Admission No. 79 | Undisputed. | |
| D124 | The stated purpose of the April 29, 2014 meeting was to discuss the proposed Medical Record Review Rule. | Ex. D-9, United States' Responses and Objections to Request for Admission No. 81 | Undisputed. | |
| D125 | The April 29, 2014 meeting was attended by Sean Cavanaugh, Cynthia Tudor, Cheri Rice, Dan Farmer, and Julia Uebersax (née Grover) from CMS. | Ex. D-22, MARA2157039 (United's Thad Johnson's notes from April 29, 2014 meeting listing CMS attendees); Ex. D-10, United States' Responses and Objections to Request for Admission No. 117 (admitting | Undisputed that the April 29, 2014 meeting was attended by Sean Cavanaugh, Cynthia Tudor, Cheri Rice, Dan Farmer, and Julie | |

**DEFENDANTS' UNCONTROVERTED FACTS**

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | | that Sean Cavanaugh, Cheri Rice, Cynthia Tudor, Dan Farmer, and Julia Uebersax were the only attendees from CMS at the April 29, 2014 meeting) | Uebersax (née Grover) from CMS. | |
| D126 | The April 29, 2014 meeting was attended by Dan Schumacher, Steve Nelson, Karen Erickson, and Thad Johnson from United. | Ex. D-22, MARA2157039 (United's Thad Johnson's notes from April 29, 2014 meeting listing United attendees); Ex. D-9, United States' Responses and Objections to Request for Admission No. 90 (admitting that Karen Erickson, Thad Johnson, Steve Nelson, and Dan Schumacher from United attended the April 29, 2014 meeting) | Undisputed. | |
| D127 | United's witnesses testified that during the meeting, CMS told United that unless the proposed Medical Record Review Rule became final, Medicare Advantage plans did not have an affirmative obligation to confirm whether doctor-submitted diagnosis codes | Ex. D-131, Nelson Dep. 284:17-285:24 (former United employee testifying that United "got a very clear answer" from CMS at the April 29, 2014 meeting that there was no need to continue claims verification); Ex. D-138, Schumacher Dep. 194:24-195:10 (United employee testifying that CMS | Disputed to the extent that fact is not supported by Ex. D-22 and Ex. D-24, not supported by cited evidence. Also, disputed to the extent the testimony in Ex. D-131 and Ex. D-138 relates to Claims Verification rather than Chart | |

The table header that spans the page:

**DEFENDANTS' UNCONTROVERTED FACTS**

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| **DEFENDANTS' UNCONTROVERTED FACTS** | | | | |
|  | are supported by documentation in the medical records. | told United at the April 29, 2014 meeting that United did not have an obligation to perform claims verification until the proposed medical record review rule was finalized); Ex. D-22, MARA2157039 (United's notes from the April 29, 2014 meeting noting that CMS confirmed that until the proposed medical record review rule was finalized, MA plans did not have an obligation to confirm that diagnoses submitted by doctors were accurate); Ex. D-24, USBP000548071 (CMS notes from April 29, 2014 meeting stating "no proactive resp. to confirm accuracy of dx") | Review, mischaracterizes cited evidence.  Otherwise, undisputed. |  |
| D128 | Four of the five CMS personnel who attended the April 29, 2014 meeting between United and CMS did not recall what was said at the meeting. | Ex. D-137, Rice Dep. 189:11-189:18 (CMS employee stating she did not remember what was discussed at the April 29, 2014 meeting), 190:18-191:5 (testifying she did not remember what she or others said at the April 29, 2014 meeting and that nothing she reviewed refreshed her recollection); Ex. D-145, | Disputed.  Conflicting evidence presented. | Ex. P-10, Rice Tr. 200:21-201:12 (CMS Deputy Director for the Center for Medicare recalls "reminding United about the False Claims Act" during the April 29, 2014 videoconference); *id.* at 201:21-202:8 (same) |

| | | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | | Tudor Dep. 89:25-90:2 (former CMS employee stating she did not recall meeting with United on April 29, 2014), 92:25-94:16 (testifying she did not recall what was said at the April 29, 2014 meeting); Ex. D-105, Farmer Dep. 31:20–37:8 (describing role as special assistant to Sean Cavanaugh, Deputy Administrator of CMS and Director of the Center for Medicare), 68:2-69:3 (testifying he did not recall any statements made or topics discussed at the April 29, 2014 meeting); Ex. D-146, Uebersax Dep. 16:13-28:11 (CMS employee describing her current role as a Senior Advisor/ Health Insurance Specialist to Deputy Director (2019-present) and former roles as a CMS Health Insurance Specialist (2015-2019), Special Assistant to Group Director for the Medicare Plan Payment Group (2012-2015), and CMS Health Insurance Specialist (2010-2012), 92:8-94:25 (testifying she did not remember specific | | |

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | | discussions at the April 29, 2014 meeting). | | |
| D129 | One CMS attendee of the April 29, 2014 meeting between United and CMS, Sean Cavanaugh, had a limited recollection. | Ex. D-97, Cavanaugh Dep. 180:22-181:3 (testifying that he recalled United describing its Claims Verification program), 183:2-183:18 (former CMS employee testifying he did not recall anyone stating that MA plans did not have a proactive obligation to confirm whether diagnosis codes submitted by providers were accurate) | Disputed. Conflicting evidence presented. | Ex. P-20, Cavanaugh Tr. 177:14-178:2 (recalling CMS saying at the videoconference something along the lines of "yes, there's a proposed regulation. It may or may not be finalized. We can't tell you one way or the other. However, if you're solely focused on that, you should be aware there are other statutes, regulations, requirements that apply to your obligation to submit complete and accurate data. You should make sure you're aware of them, and if you're asking us questions about how to specifically comply with the law, that's more appropriately posed to your own counsel."); *id.* at 176:8-24 (same); *id.* at 182:5-25 (referencing his recollection of repeating the same response given in previous testimony over and over and denying "saying anything else about what their obligations were under either the probes reg or existing requirements."); *id.* at 191:14-25 ("Q. And do you see the sentence that reads, near the end of that paragraph, 'Sean Cavanaugh stated |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
| | | | | that, under current rules, if UHG doesn't know codes are inaccurate the company would not have to delete them. He went on to state that if UHC does not know until the end of its claims verification process that a code is incorrect then there is no requirement to delete the code until the effective date of CMS's final rule.' Do you see that? A. I see that. Q. You -- you deny saying that?  A. I deny it, absolutely."); *id.* at 202:13-22 ("Q. All right. Mr. Nelson writes that 'CMS confirmed to us that these requirements do not apply until the effective date of the rule, and that Medicare Advantage plans are thus not currently required to design their medical record reviews to determine the accuracy of risk adjustment diagnoses.' Do you see that? A. I see that.  Q. And you deny saying that anybody from CMS said that at the meeting, right?  A. Absolutely.") |
| D130 | Certain attendees of the April 29, 2014 Meeting, including from United and from CMS, memorialized the meeting in notes. | Ex. D-22, MARA2157039 (United's Thad Johnson's notes from the April 29, 2014 meeting); Ex. D-24, USBP000548071 (CMS's | Disputed as to D-24, conflicting evidence presented.  Otherwise, undisputed. | Ex. P-27, Tudor Tr. 91:22-92:8 (calling the words written in her daytimer at the time of the meeting a "vague" piece of paper); *id.* at 100:15-101:11 (questioning whether the words written in her daytimer are |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | | Cynthia Tudor's notes from the April 29, 2014 meeting) | | "accurate" or "even close to being right") |
| D131 | Cynthia Tudor memorialized her recollection of the April 29, 2014 meeting in notes. | Ex. D-24, USBP000548071 (CMS's Cynthia Tudor's notes from the April 29, 2014 meeting) | Disputed. Conflicting evidence presented. | Ex. P-27, Tudor Tr. 91:22-92:8 (calling the words written in her daytimer at the time of the meeting a "vague" piece of paper); *id.* at 100:15-101:11 (questioning whether the words written in her daytimer are "accurate" or "even close to being right") |
| D132 | Thad Johnson memorialized his recollection of the April 29, 2014 meeting in notes. | Ex. D-22, MARA2157039 (United's Thad Johnson's notes from the April 29, 2014 meeting) | Disputed. Conflicting evidence presented. | Ex. P-20, Cavanaugh Tr. 202:13-203:7 (disputing United's understanding of the April 29, 2014 videoconference: "Q. All right. Mr. Nelson writes that 'CMS confirmed to us that these requirements do not apply until the effective date of the rule, and that Medicare Advantage plans are thus not currently required to design their medical record reviews to determine the accuracy of risk adjustment diagnoses.' Do you see that? A. I see that. Q. And you deny saying that anybody from CMS said that at the meeting, right? A. Absolutely. Q. All right. So let's -- let's look at -- because you had agreed to deliver the mantra, and |

**DEFENDANTS' UNCONTROVERTED FACTS**

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | | | | that's all you did, as you recall it? A. But also, as phrased here, the reason why my memory is so crystal clear, none of us would say, if you're doing a medical record review, you shouldn't -- you wouldn't be held to a standard of trying to be accurate. Like that -- that's just not a posture CMS would take."); Ex. P-66, USBP0061943 (June 26, 2015 Cavanaugh e-mail to Rice in response to Nelson email to Rice disagreeing that CMS stated that "M[edicare ]A[dvantage] plans are [ ] not currently required to design their medical record reviews to determine the accuracy of risk adjustment diagnoses.") |
| D133 | United memorialized its understanding of the April 29, 2014 meeting in an email to CMS stating "M[edicare ]A[dvantage] plans are [ ] not currently required to design their medical record reviews to determine the accuracy of risk adjustment diagnoses and submit appropriate deletes." | Ex. D-71, Cavanaugh Dep. Ex. 1063 (USBP000197069, 70) (April 30, 2014 email from United to CMS stating that CMS had confirmed to United that MA plans were not required to design their chart review to verify the accuracy of provider-submitted diagnosis codes) | Disputed. Conflicting evidence presented. | Ex. P-20, Cavanaugh Tr. 202:13-203:7 (disputing United's understanding of the April 29, 2014 videoconference: "Q. All right. Mr. Nelson writes that 'CMS confirmed to us that these requirements do not apply until the effective date of the rule, and that Medicare Advantage plans are thus not currently required to design their medical record reviews to determine the accuracy of risk adjustment diagnoses.' Do you |

**DEFENDANTS' UNCONTROVERTED FACTS**

| | | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation | |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | | | | see that? A. I see that. Q. And you deny saying that anybody from CMS said that at the meeting, right? A. Absolutely. Q. All right. So let's -- let's look at -- because you had agreed to deliver the mantra, and that's all you did, as you recall it? A. But also, as phrased here, the reason why my memory is so crystal clear, none of us would say, if you're doing a medical record review, you shouldn't -- you wouldn't be held to a standard of trying to be accurate. Like that -- that's just not a posture CMS would take."); Ex. P-66, USBP0061943 (June 26, 2015 Cavanaugh e-mail to Rice in response to Nelson email to Rice disagreeing that CMS stated that "M[edicare ]A[dvantage] plans are [ ] not currently required to design their medical record reviews to determine the accuracy of risk adjustment diagnoses.") |
| D134 | There was internal support at CMS for the proposed Medical Record Review Rule. | Ex. D-137, Rice Dep. 156:1-10 (CMS employee testifying that CMS supported the proposed Medical Record Review rule because "it would be helpful to be more specific"), 159:20- | Disputed. Not supported by cited evidence. | |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | | 161:23 (discussing why the rule was not finalized); *see* Ex. D-17, 79 Fed. Reg. 29,844, 29,925-26 (May 23, 2014) (describing CMS's proposed Medical Record Review Rule) | | |
| D135 | The Medicare Advantage plan industry expressed concerns with the proposed Medical Record Review Rule. | Ex. D-114, Hornsby Dep. 77:23-78:18 (former CMS employee testifying that there was an "uproar" in the industry after the proposed medical record review rule); Ex. D-124, Kornfield Dep. 20:21–22:4, 25:17-32:21 (former CMS official Thomas Kornfield describing his prior roles as a Health Insurance Specialist in the Division of Payment Systems (2014-2015), Director of the Division of Payment Systems (2012-2014), and Health Insurance Specialist in the Centers for Medicare and Medicaid Innovation (2014-2015)), 183:5-183:16 (stating that CMS had received "significant pushback" from the MA industry regarding the proposed medical record review rule); Ex. D-137, Rice Dep. | Undisputed. | |

The table is titled **DEFENDANTS' UNCONTROVERTED FACTS**

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
| | | 159:20-160:12 (CMS employee stating that the proposed medical record review rule was not finalized because of "stakeholder concern and pushback"); Ex. D-17, 79 Fed. Reg. 29844, 29848 (May 23, 2014) (noting comments from the industry about vagueness and potential for operational instability); *id.* at 29925-26 (noting comments received from the industry regarding the "vagueness" and "overly broad" nature of the proposed medical review rule) | | |
| D136 | CMS decided to not finalize the proposed Medical Record Review Rule. | Ex. D-17, 79 Fed. Reg. 29844, 29925–26 (May 23, 2014) (noting CMS decision to finalize the proposed medical record review rule) | Undisputed. | |
| D137 | Shortly after CMS declined to finalize the Medical Record Review Rule, United told CMS that it had ceased its Claims Verification program. | Ex. D-71, Cavanaugh Dep. Ex. 1063 (USBP000197069, 70) (April 30, 2014 email from United to CMS stating that CMS had confirmed to United that MA plans were not required to design their chart review to | Disputed to the extent that parenthetical for Ex. D-71 mischaracterizes evidence. Otherwise, undisputed. | Ex. P-20, Cavanaugh Tr. 202:13-23 (denying CMS told United that MA plans are not required to design their medical review to verify the accuracy of risk adjustment diagnosis); Ex. P-66, USBP0061943 (June 26, 2015) |

| | | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | | verify the accuracy of provider-submitted diagnosis codes and therefore United was suspending its claims verification program); Ex. D-137, Rice Dep. 197:14-198:7 (CMS employee testifying United sent an email on April 30, 2014 informing CMS that it had suspended its claims verification program) | | (Cavanaugh email to Rice, denying the same) |
| D138 | On September 27, 2013, several CMS employees exchanged emails about whether to define "reasonable diligence" in connection with its regulations." | Ex. D-35, USBP066819447 | Disputed to the extent that Ex. D-35 discusses a single regulation (not "regulations"), mischaracterizes cited evidence.  Otherwise, undisputed. | Ex. D-17, 79 Fed. Reg. 29844, 29923-24 (May 23, 2014) (discussing in final rule what is required under "reasonable diligence") |
| D139 | On September 27, 2013, CMS employee John Scott sent an email to Jennifer Harlow and other CMS employees suggesting that their division of CMS "deliberately cho[o]se not to define" reasonable diligence in its proposed regulations. | Ex. D-35, USBP066819447 | Disputed to the extent that Ex. D-35 discusses a single regulation (not "regulations"), mischaracterizes cited evidence.  Also, disputed to the extent the fact implies cited material reflects CMS policy, mischaracterizes | Ex. D-17, 79 Fed. Reg. 29844, 29923-24 (May 23, 2014) (discussing in final rule what is required under "reasonable diligence"); Ex. P-19, CMS 30(b)(6) (Hornsby, May 25, 2023) Tr. 199:21-200:5 (staff opinions "not particularly meaningful" to CMS point of view") |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | | | evidence. Otherwise, undisputed. | |
| D140 | On September 27, 2013, CMS employee Ilina Chaudhuri sent an email to Jennifer Harlow and other CMS employees that she "like[d]" the approach of "deliberately choosing not to define the term" reasonable diligence. | Ex. D-35, USBP066819447 | Disputed. Mischaracterizes evidence. Otherwise, undisputed that CMS employee sent this email on September 27, 2013. | Ex. D-17, 79 Fed. Reg. 29844, 29923-24 (May 23, 2014) (discussing in final rule what is required under "reasonable diligence"); Ex. P-19, CMS 30(b)(6) (Hornsby, May 25, 2023) Tr. 199:21-200:5 (staff opinions "not particularly meaningful" to CMS point of view") |
| D141 | On September 27, 2013 CMS employee Maricruz Bonfante sent an email to Jennifer Harlow and other CMS employees that she "agree[d]" with the approach to "hold on trying to create a standard" for reasonable diligence, "especially if [CMS] want[s] to lessen plan burden and also not create an affirmative obligation to 'identify'" unsupported HCCs. | Ex. D-35, USBP066819447 | Disputed. Mischaracterizes evidence. Otherwise, undisputed that CMS employee sent this email on September 27, 2013. | Ex. D-17, 79 Fed. Reg. 29844, 29923-24 (May 23, 2014) (discussing in final rule what is required under "reasonable diligence"); Ex. P-19, CMS 30(b)(6) (Hornsby, May 25, 2023) Tr. 199:21-200:5 (staff opinions "not particularly meaningful" to CMS point of view") |

The table above is titled **DEFENDANTS' UNCONTROVERTED FACTS**.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| DEFENDANTS' UNCONTROVERTED FACTS | | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| D142 | After 2007, Jennifer Harlow became the Deputy Director of the Medicare Plan Payment Group within CMS. | Ex. D-76, Harlow Dep. Ex. 1253 (listing Jennifer Harlow as Deputy Director of CM/MPPG from July 2012); Ex. D-156, Harlow Dep. 18:1-11 (CMS employee testifying she became Deputy Director "at some point" after 2007) | Disputed. Mischaracterizes cited evidence. | Ex. D-76, Dep. Ex. 1253, Feb. 11, 2022 United States' Custodians Employment Chart (listing Jennifer Harlow as Deputy Director of CM/MPPG from July 2012 and showing that she held a Division Director position from 2007-2012); Ex. D-156, Harlow Tr. 18:1-11 (CMS employee testifying the Division Director position she held starting in February of 2007 was the Director of the Division of Payment Validation and confirming that she held her role as Deputy Director of MPPG "subsequently") |
| D143 | Between approximately 2010 and 2016, Maricruz Bonfante was a health insurance specialist within the Medicare Plan Payment Group within CMS's Center for Medicare. | Ex. D-157, Bonfante Dep. 19:7-16 | Undisputed. | |
| D144 | Between 2012 and 2015, Ilina Chaudhuri was the Deputy Director for the Division of Payment Policy, | Ex. D-98, Chaudhuri Dep. 30:5-12 | Undisputed. | |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | within the Medicare Plan Payment Group of CMS. | | | |
| D145 | John Scott was a special assistant to the group director in the Medicare Plan Payment Group within CMS. | Ex. D-157, Bonfante Dep. 137:10-20 | Disputed. Mischaracterizes evidence. Otherwise, undisputed that John Scott was a special assistant to the group director in the Medicare Plan Payment Group for a limited period of time. | Ex. P-68, Medicare Advantage & Prescription Drug Plan Fall Conference & Webcast, Conference Guide (Sept. 7, 2017), at p. 11, https://www.cms.gov/outreach-and-education/training/cteo/downloads/2017-fall-conference/cms-ma-pdpconffall2017guidefinalpdf.pdf (last visited July 9, 2024) (description of John Scott's various roles at CMS, which only included a role as special assistant to the group director in the Medicare Plan Payment Group within CMS for a certain time period) |
| D146 | On October 26, 2015, Cheri Rice wrote in an email to Sean Cavanaugh, Jennifer Harlow, and Cynthia Tudor that CMS "regs say that plans must use reasonable diligence to identify overpayments" but that CMS "ha[s] not yet defined what that means. [CMS] could, through regulation define | Ex. D-72, Cavanaugh Dep. Ex. 1067 (USBP001891973) | Undisputed that Cheri Rice sent the October 26, 2015 email. Disputed to the extent fact excludes Rice testimony regarding the same email, mischaracterizes evidence. | Ex. D-17, 79 Fed. Reg. 29844, 29923-24 (May 23, 2014) (discussing in final rule what is required under "reasonable diligence"); Ex. P-10, Rice Tr. 54:22-56:5 (clarifying that October 26, 2015 email referred to defining "specific steps" that CMS would "prescribe" for plans to meet reasonable diligence obligation.) |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | specific steps a plan must take, at a minimum, to meet that requirement. For example, [CMS] could require them to self-audit (i.e., their own RADV audits). [CMS] could also revive the NPRM proposal we had that if a plan is checking a medical record for underpayments, they must also look for overpayments. . . . Another thought is getting more help supporting DOJ whistleblower activity. The volume of these cases is increasing and they often need technical assistance from [CMS] to evaluate whether to intervene and to support cases they choose to prosecute. We think the whistleblower activity could be as effective – or even more effective – than CMS audits in getting plans to do more to prevent and identify risk adjustment overpayments." | | | |

**DEFENDANTS' UNCONTROVERTED FACTS**

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
|---|---|---|---|---|
| **No.** | **Statement of Fact** | **Citation** | **Response** | **Citation** |
| D147 | Between 2010 and 2017, Cheri Rice was the Director of the Medicare Plan Payment Group within CMS. | Ex. D-137, Rice Dep. 16:22-17:4 | Undisputed. | |
| D148 | Between March or April 2014 and January 2017, Sean Cavanaugh was the Deputy Administrator and Director for the Center for Medicare within CMS. | Ex. D-97, Cavanaugh Dep. 23:12-26:16, *id.* at 30:5-22 | Undisputed. | |
| D149 | Between approximately 2014 and July 2017, Cynthia Tudor was the Deputy Director of the Center for Medicare within CMS. | Ex. D-145, Tudor Dep. 26:4-11 | Undisputed. | |
| D150 | CMS knew that United did not seek to validate doctor-submitted codes through its Chart Review Program. | Ex. D-32, USBP009417619 (external attestation for 2013 DOS submitted June 26, 2015); Ex. D-21, MARA2152278 (June 26, 2015 email from United to CMS communicating that United "did not use [its] previous process to determine whether diagnosis codes submitted through claims are | Disputed. Not supported by cited evidence and conflicting evidence presented. | Ex. P-19, CMS 30(b)(6) (Hornsby, May 25, 2023) Tr. 266:11-15 ( "So when an MAO is doing chart reviews or medical record reviews, they have a protocol, presumably. CMS knows nothing about the MAO chart review protocols, but they have a protocol presumably which gives them results."); Ex. P-20, Cavanaugh Tr. 163:14-18 (Q: . . . Did you know that |

| | | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |

| | | unsupported in the medical record" and qualifying attestation for 2013 DOS); Ex. D-31, USBP009417534 (external attestation for 2014 DOS, submitted June 7, 2016); Ex. D-23, USBP000498420 (June 7, 2016 email from United to CMS communicating that United "did not use [its] previous process to determine whether diagnosis codes submitted through claims are unsupported in the medical record" and qualifying attestation for 2014 DOS); Ex. D-30, USBP009417526 (external attestation for 2015 DOS, submitted October 12, 2018); Ex. D-29, USBP009417442 (external attestation for 2016 DOS submitted October 12, 2018); Ex. D-33, USBP058101090 (October 12, 2018 email from United to CMS qualifying attestation for DOS 2015 and 2016); Ex. D-137, Rice Dep. 239:21-240:14 (CMS employee testifying that she understood United's June 26, 2015 email to be informing her that it was not | | in 2014? That medical -- Medicare Advantage plans were conducting medical record reviews, and for the most part, not looking for deletes? A. I did not know that.); Ex. P-27, Tudor Tr. 112:1-11 ("I understood they were doing chart reviews. To the extent to which [MAO] were only adding and not -- not validating, if you will, to what they had already submitted, I was not aware."); Ex. P-24, Dep. Ex. 324, MAPL000497870 (email from Steve Nelson, UHC M&R CEO, to Cheri Rice regarding Claims Verification); P-10, Rice Tr. at 197:1-198:7 (CMS Deputy Director for the Center for Medicare testifying that she read the 2014 Nelson email as referring to Claims Verification); id. at 239:2-12 (recognizes June 26, 2015 email as the same language as was in the 2014 Nelson email), |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | | performing the same type of medical record review for DOS 2013 as it had for DOS 2012); Ex. D-10, United States' R&Os to United's RFA No. 147 (admitting that CMS received United's June 26, 2015 email) | | |
| D151 | In 2015, United emailed CMS and stated that United had decided to discontinue its process of reviewing certain medical records to determine the accuracy of doctor-submitted diagnoses and submit appropriate deletes based on United's 2014 conversations with CMS, CMS's withdrawal of the proposed Medical Record Review Rule, and CMS's ongoing consideration of an adjustment to account for unsupported codes in the FFS data used to calibrate the CMS-HCC risk adjustment model ("FFS Adjuster"). | Ex. D-32, USBP009417619 (external attestation for DOS 2013 submitted June 26, 2015); Ex. D-27, USBP001354165, 66 (June 26, 2015 email from United to CMS communicating that United "did not use [its] previous process to determine whether diagnosis codes submitted through claims are unsupported in the medical record" and qualifying attestation for DOS 2013); Ex. D-137, Rice Dep. 239:21-240:14 (CMS employee testifying that she understood United's June 26, 2015 email to be informing her that it was not performing the same type of medical record review for DOS 2013 as it had for DOS 2012); Ex. D-10, United States' R&Os to United's RFA No. 147 | Disputed to the extent the fact suggests cited portion of email is about a program other than Claims Verification, mischaracterizes evidence. Otherwise, undisputed. | Ex. P-1D, USBP001354165, at USBP001354166 (July 30, 2015 Rice email to Nelson stating "there are laws and contractual provisions that impose standards, requirements and responsibilities on MA organizations in connection with federal payments . . . MA organizations are required to implement effective compliance programs that prevent, detect and correct non-compliance with CMS program requirements, to exercise reasonable diligence in identifying overpayments, and to report and return such overpayments to the Medicare Program within 60 days."); Ex. P-10, Rice Tr. 239:2-12 (CMS Deputy Director for the Center for Medicare recognizes June 26, 2015 email as the same language as was in the 2014 Nelson email); id. at 197:1-198:7 (testifying that she read the 2014 Nelson email as referring to |

| | | | DEFENDANTS' UNCONTROVERTED FACTS | | |
|---|---|---|---|---|---|
| | No. | Statement of Fact | Citation | Response | Citation |
| | | | (admitting that CMS received United's June 26, 2015 email). | | Claims Verification); Ex. P-26, CMS 30(b)(6) (Hornsby, May 19, 2023) Tr. 219:1-24 ("A. My understanding is that CMS' entire discussion with United, with Steve Nelson in particular, started with that April 2014 meeting and is still continuing here, and CMS still doesn't know exactly what United was doing. You know, were they targeting a population? Were they doing blind coding or not, you know? Who knows what that claims verification program was? Who knows if there are other parts of United, other MAOs that are still doing some kind of review? So CMS doesn't give specific recommendations to MAOs in meetings like that. CMS will restate CMS' position, and -- and that's it") |
| | D152 | In 2016, United emailed CMS and stated United had decided to discontinue its process of reviewing certain medical records to determine the accuracy of doctor-submitted diagnoses and submit appropriate deletes based on United's 2014 | Ex. D-26, USBP001354107 (June 7, 2016 email from United to CMS communicating that United "did not use [its] previous process to determine whether diagnosis codes submitted through claims are unsupported in the medical record" and qualifying | Disputed to the extent the fact suggests cited portion of email is about a program other than Claims Verification, mischaracterizes evidence. Otherwise, undisputed. | Ex. P-1F, USBP009866579 (May 28, 2020 Shapiro Letter to Thompson regarding all of United's risk adjustment correspondence to date and stating "the decision in 2014 by CMS not to finalize the proposed amendment to 42 CFR § 422.310(e) did "not change CMS' existing contractual requirement that MA |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | | | **DEFENDANTS' UNCONTROVERTED FACTS** | |
| | conversations with CMS, CMS's withdrawal of the proposed Medical Record Review Rule, and CMS's ongoing consideration of a FFS Adjuster. | attestation for DOS 2014); Ex. D-31, USBP009417534 (external attestation for DOS 2014, submitted June 7, 2016) | | organizations must certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the risk adjustment data they submit to CMS." 79 Fed. Reg. 29,844, 29,926 (May 23, 2014). Nor did it change the requirement that all diagnosis codes submitted for risk adjustment payments must be documented in the beneficiaries' medical records pursuant to the ICD-9 and -10 Guidelines for Coding and Reporting with which HHS and Medicare regulations require compliance. CMS has not stated otherwise to United.") |
| D153 | In 2018, United emailed CMS and stated United had decided to discontinue its process of reviewing certain medical records to determine the accuracy of doctor-submitted diagnoses and submit appropriate deletes based on United's 2014 conversations with CMS, CMS's withdrawal of the proposed Medical Record Review Rule, and CMS's | Ex. D-30, USBP009417526 (external attestation for DOS 2015, submitted October 12, 2018); Ex. D-29, USBP009417442 (external attestation for DOS 2016 submitted October 12, 2018); Ex. D-33, USBP058101090 (October 12, 2018 email from United to CMS qualifying attestation for DOS 2015 and 2016) | Disputed to the extent the fact suggests cited portion of email is about a program other than Claims Verification, mischaracterizes evidence. Otherwise, undisputed. | Ex. P-1F, USBP009866579 (May 28, 2020 Shapiro Letter to Thompson regarding all of United's risk adjustment correspondence to date and stating "the decision in 2014 by CMS not to finalize the proposed amendment to 42 CFR § 422.310(e) did "not change CMS' existing contractual requirement that MA organizations must certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the risk adjustment data they submit to |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | ongoing consideration of a FFS Adjuster. | | | CMS." 79 Fed. Reg. 29,844, 29,926 (May 23, 2014). Nor did it change the requirement that all diagnosis codes submitted for risk adjustment payments must be documented in the beneficiaries' medical records pursuant to the ICD-9 and -10 Guidelines for Coding and Reporting with which HHS and Medicare regulations require compliance. CMS has not stated otherwise to United.") |
| D154 | In its bid documentation for Contract Years 2015 and 2016, United stated that, based on conversations with CMS and CMS's treatment of medical record review in its 2014 rulemaking process, United had ceased one of its processes of reviewing certain medical records to determine the accuracy of doctor-submitted diagnoses and submit deletes. | Ex. D-25, USBP000674257, 64 (June 2, 2014 MA Supporting Documentation for CY 2015 bid stating that United had decided to "cease one of its prior processes that identified and deleted certain diagnoses codes through the medical record review process"); Ex. D-34, USBP062135635, 42 (similar language in August 4, 2015 MA Supporting Documentation for CY 2016 bid); Ex. D-127, Limmer 30(b)(6) Dep. 217:11-19 (CMS corporate representative agreeing that the bid documentation language stated that United had decided to end its process that identified | Disputed. Mischaracterizes evidence. | See Ex. D-25, USBP000674257, 64 (June 2, 2014 MA Supporting Documentation for CY 2015 bid stated that "based on multiple conversations with CMS and CMS's treatment of medical record review in its recent rulemaking process, the health plan has decided to cease one of its prior processes that identified and deleted certain diagnoses codes through the medical record review process[]" without mentioning that the prior process was focused on the review of doctor submitted diagnosis codes for accuracy); Ex. D-34, USBP062135635, 42 (August 4, 2015 MA Supporting Documentation for CY 2016 bid stated that "based on multiple conversations with CMS |

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | | and deleted certain diagnoses codes) | | and CMS's treatment of medical record review in its 2014 rulemaking process, beginning in 2014, the health plan ceased one of its prior processes that identified and deleted certain diagnoses codes through the medical record review process" without mentioning that the prior process was focused on the review of doctor-submitted diagnosis codes for accuracy); Ex. P-79, Spitalnic (US Expert) Tr. 214:10-215:18 (US Expert and CMS Chief Actuary explaining that CMS bid review does not involve reading "every word" of a bid submission); *id.* at 217:12-219:14 (Chief actuary of CMS noting that neither he nor anyone on his staff were aware of the specific language in United's bid supporting documentation.); Ex. P-38, Limmer 30(b)(6) Dep. 217:11-19 (CMS 30(b)(6) only acknowledging that the statement "says they've decided to cease one of its prior processes that identified and deleted certain diagnoses codes[]" but does not testify that the statement referenced the review and deletion of doctor-submitted diagnosis codes.); *id.* at Tr. 218:4-20, 222:19-224:13 (stating that the statement included in United's |

**DEFENDANTS' UNCONTROVERTED FACTS**

| | | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
|---|---|---|---|---|
| **No.** | **Statement of Fact** | **Citation** | **Response** | **Citation** |
| | | | | bid documentation has "very little information in here in terms -- to make an assessment on what -- you know, the -- the entirety of what's happening here[]" and further testifying that, despite efforts to confirm, CMS was not able to identify anyone who read the statement United included in the documentation supporting its bid.) |
| D155 | In 2020, United's First Interrogatory asked the government to identify each diagnosis code the government alleged United "knowingly and improperly failed to delete . . . or otherwise return to the Medicare Program [as an] overpayment." | Ex. D-7, Defendant UHC Of California's First Interrogatory to the Government (Jan. 3, 2020) | Undisputed. | |
| D156 | In its First Interrogatory Response, the government identified 27,937,651 "invalid diagnoses" that it claimed United knew were "unsupported by medical records" and that United allegedly either "'knowingly | Ex. D-11A, United States' Responses and Objections to UHC of California's First Interrogatory (Feb. 3, 2020) (explaining basis for determining the "invalid diagnoses"); Ex. D-11B, United States' First Supplemental | Undisputed. | |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| **No.** | **Statement of Fact** | **Citation** | **Response** | **Citation** |
| | and improperly failed to delete in the RAPS system' or 'knowingly and improperly failed to otherwise return to the Medicare Program.'" | Responses and Objections to UHC of California's First Interrogatory (Aug. 17, 2020) (same and identifying approximately 28 million codes); Ex. D-141, Stark Dep. 104:15-105:1 (government expert confirming the number of diagnostic instances in the First Interrogatory Response) | | |
| D157 | The government explained to the court that its list of approximately 28 million diagnosis codes in its First Interrogatory Response contained "every diagnosis code . . . UnitedHealth submitted to CMS to increase its risk adjustment payments, and then improperly failed to delete when UnitedHealth's own reviewers found no support for the diagnosis code in the member's medical records." | Ex. D-5, Joint Stipulation Re United States' Motion to Compel Discovery at 2 (Apr. 16, 2021) | Undisputed. | |
| D158 | The government explained to the Court that, "[f]or each diagnosis code on the United | Ex. D-5, Joint Stipulation Re United States' Motion to | Undisputed. | |

| | | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|---|
| **No.** | **Statement of Fact** | **Citation** | **Response** | **Citation** | |
| | States' [First Interrogatory Response] list: (1) the diagnosis code was submitted by UnitedHealth to CMS . . . ; (2) that medical record went through UnitedHealth's medical record review program; and (3) UnitedHealth's own reviewers did not find the diagnosis code to be supported by medical records." | Compel Discovery at 2 (Apr. 16, 2021) | | | |
| D159 | The government's response to United's Interrogatory No. 12 accused United of "failing to delete or otherwise retract diagnosis codes" in the First Interrogatory Response that were (in the government's words) "previously submitted by UnitedHealth to CMS that its Chart Review program revealed were not supported by medical record documentation." | Ex. D-12, United States' Responses and Objections to Defendant UHC of California's Interrogatory No. 12 (June 23, 2022) | Disputed as to the use of "accused," mischaracterizes cited evidence.  Otherwise, undisputed. | | |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | | DEFENDANTS' UNCONTROVERTED FACTS | | |
| D160 | Doctors submitted every diagnosis code listed in the Government's First Interrogatory Response on a claim form. | Ex. D-113, Higgins Dep. 132:2-133:2 (former United employee testifying that he relied on providers signing an attestation that the diagnoses codes were true, complete, and accurate); Ex. D-40, Claims Form 1500 (available at: https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms1500.pdf) | Disputed. Not supported by cited evidence, mischaracterizes evidence, and conflicting evidence presented. | Ex. P-69, Higgins Tr. 282:20-25 (Higgins stopped working for UnitedHealth in August, 2007, before the date of service years at issue); Ex. D-11B, US Responses and Objections to UnitedHealth's First Interrogatory (First Supplemental), p. 2 (Interrogatory seeking diagnosis codes from Date of Service Years 2008-2016, post-dating Mr. Higgins' time at UnitedHealth); Ex. P-5, United 30(b)(6) (Sedor) Tr. 127:9-17 (Corporate representative explaining that capitated providers do not submit claims or diagnosis codes to United because they are paid under a different arrangement); Ex. P-3, Dep. Ex. 30B, MARA1576299, 2008 Risk Adjustment Data Technical Assistance For Medicare Advantage Organizations Participant Guide, § 2.2.2 (identifying formats "MA organizations may choose to collect data from providers," only one of which is the Claim Form 1500); Ex. P-7, United 30(b)(6) (Baker, May 30, 2023) Tr. 76:13-20 (Corporate representative confirming face-to-face encounters could include encounters with nurse practitioners); |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | | **DEFENDANTS' UNCONTROVERTED FACTS** | | |
| | | | | P-4, Dickey Tr. 32:10-18 (Optum Coding Director testifying that she had experience as a medical coder in a provider office before she worked for Optum); *id.* at 165:3-19 (Optum Coding Director describing work performed by providers' in-office coders); Ex. D-53, Acevedo (US Expert) Rebuttal Rep. (Jan. 29, 2024) ¶ 72 (US Expert: "In all but the largest physician practices and academic medical centers, provider coders may not hold coding certifications.") |
| D161 | The claims forms on which the doctors submitted the diagnosis codes listed in the First Interrogatory Response stated that the doctor was certifying that the diagnosis codes were truthful and accurate. | Ex. D-113, Higgins Dep. 132:2-133:2 (former United employee testifying that he relied on providers signing an attestation that the diagnoses codes were true, complete, and accurate); Ex. D-40, Claims Form 1500 (available at: https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms1500.pdf) | Disputed. Not supported by cited evidence, mischaracterizes evidence, and conflicting evidence presented. | Ex. P-69, Higgins Tr. 282:20-25 (Higgins stopped working for UnitedHealth in August, 2007, before the date of service years at issue); Ex. D-11B, US Responses and Objections to UnitedHealth's First Interrogatory (First Supplemental), p. 2 (Interrogatory seeking diagnosis codes from Date of Service Years 2008-2016, post-dating Mr. Higgins' time at UnitedHealth); Ex. P-5, United 30(b)(6) (Sedor) Tr. 127:9-17 (Corporate representative explaining that capitated providers do not submit claims or diagnosis codes to |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | | | DEFENDANTS' UNCONTROVERTED FACTS | |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | | | | United because they are paid under a different arrangement); Ex. P-3, Dep. Ex. 30B, MARA1576299, 2008 Risk Adjustment Data Technical Assistance For Medicare Advantage Organizations Participant Guide, § 2.2.2 (identifying formats "MA organizations may choose to collect data from providers," only one of which is the Claim Form 1500); Ex. P-7, United 30(b)(6) (Baker, May 30, 2023) Tr. 76:13-20 (Corporate representative confirming face-to-face encounters could include encounters with nurse practitioners); P-4, Dickey Tr. 32:10-18 (Optum Coding Director testifying that she had experience as a medical coder in a provider office before she worked for Optum); *id.* at 165:3-19 (Optum Coding Director describing work performed by providers' in-office coders); Ex. D-53, Acevedo (US Expert) Rebuttal Rep. (Jan. 29, 2024) ¶ 72 (US Expert: "In all but the largest physician practices and academic medical centers, provider coders may not hold coding certifications.") |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| D162 | United accurately submitted to CMS the diagnosis codes that United had received from doctors on claims forms. | Ex. D-147, Meyer Dep. 26:22-27:8, 27:11-28:8 (former United employee testifying that United was responsible to submit codes as they were received from the providers); Ex. D-134, Polich Dep. 124:7-21 (former United employee testifying that United would accurately submit codes received from providers) | Disputed. Not supported by cited evidence and conflicting evidence presented. | Ex. P-7, United 30(b)(6) (Baker, May 30, 2023) Tr. 76:13-20 (Corporate representative testifying that face-to-face encounters could include "Physician encounters, in-office encounters or provider encounters, let's say, like if it's a nurse practitioner, and then, like, hospital reviews like you were just describing. Those are some of the examples."); Ex. P-4, Dickey Tr. 32:10-18 (Optum Coding Director testifying that she had experience as a medical coder in a provider office before she started working for Optum); *id.* at 165:3-19 (describing work performed by providers' in-office coders); Ex. P-3, Dep. Ex. 30B, MARA1576299, 2008 Risk Adjustment Data Technical Assistance For Medicare Advantage Organizations Participant Guide, 2.2.2 (identifying formats "MA organizations may choose to collect data from providers," only one of which is the Claim Form 1500); Ex. P-55, Rasmussen Tr. 44:12-45:14 (testifying that, at times, UnitedHealth modified or otherwise corrected data received from |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
| | | | | providers when submitting that data to CMS) |
| D163 | The government has produced only one expert report—that of Dr. Craig Garthwaite—that attempts to identify the set of diagnosis codes that the government alleges are allegedly unsupported. | Ex. D-57, Garthwaite Rep. (9/29/2023) ¶ 13 | Disputed as to the use of the word "attempted" in the fact, mischaracterizes cited evidence.  Otherwise, undisputed. | |
| D164 | The government has produced only one expert report—that of Dr. Craig Garthwaite—that attempts to identify the set of diagnosis codes that the government alleges were allegedly overpayments. | Ex. D-57, Garthwaite (9/29/2023) Rep. ¶ 13 | Disputed as to the use of the word "attempted" in the fact, mischaracterizes cited evidence.  Otherwise, undisputed. | |
| D165 | Dr. Garthwaite did not review any medical charts. | Ex. D-110, Garthwaite Dep. 133:21-134:3 | Undisputed. | |
| D166 | Dr. Garthwaite did not opine as to whether a single diagnosis code was in fact unsupported. | Ex. D-110, Garthwaite Dep. 133:21-134:3 (government expert stating that Dr. Garthwaite did not look at any medical records to determine | Disputed. Mischaracterizes cited evidence and conflicting evidence presented. | Ex. D-57, Garthwaite (US Expert) Rep. (Sept. 29, 2023) ¶ 13 (US Expert:  "According to my analysis, Defendants reviewed the medical records that were the source of the[] |

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | | whether the diagnoses were unsupported); Ex. D-57, Garthwaite Rep. (9/29/2023) ¶¶ 44-45 ("I consider an instance of a given diagnosis code from a provider-reported encounter to be supported if, and only if, the same diagnosis code is included in the chart review record of that encounter . . . Otherwise, I consider that particular diagnosis code instance to be unsupported.") | | diagnosis codes [on Attachment 1 - approximately 1.97 million codes] as part of their Chart Review Program and their review found no support for these diagnosis codes or their associated Hierarchical Condition Categories or Rx Hierarchical Condition Categories."); Ex. P-6, Renjilian (United Expert) Tr. 94:4-25 (Mr. Renjilian testifying that he does not have an expert opinion as to whether Dr. Garthwaite correctly identified Reviewed Encounters); *id.* at 96:1-99:2 (United's expert does not opine whether Dr. Garthwaite incorrectly identified diagnosis codes that were recorded in Chart Review nor that Dr. Garthwaite incorrectly compared codes identified in Chart Review to those submitted by providers.) |
| D167 | In his deposition, Dr. Garthwaite disclaimed that he had any opinion about the percentage of codes that would be found supported in the relevant medical record after a medical record review. | Ex. D-110, Garthwaite Dep. 165:12-23 | Disputed. Mischaracterizes cited evidence and conflicting evidence presented. | Ex. D-57, Garthwaite (US Expert) Rep. (Sept. 29, 2023) ¶ 13 (US Expert: "According to my analysis, Defendants reviewed the medical records that were the source of the[] diagnosis codes [on Attachment 1 - approximately 1.97 million codes] as part of their Chart Review Program and their review found no support for |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
| | | | | these diagnosis codes or their associated Hierarchical Condition Categories or Rx Hierarchical Condition Categories."); Ex. P-6, Renjilian (United Expert) Tr. 94:4-25 (Mr. Renjilian testifying that he does not have an expert opinion as to whether Dr. Garthwaite correctly identified Reviewed Encounters); *id.* at 96:1-99:2 (United's expert does not opine whether Dr. Garthwaite incorrectly identified diagnosis codes that were recorded in Chart Review nor that Dr. Garthwaite incorrectly compared codes identified in Chart Review to those submitted by providers.) |
| D168 | In his deposition, Dr. Garthwaite disclaimed that he would express at trial any opinion about the rate at which the diagnosis codes at issue were in fact unsupported. | Ex. D-110, Garthwaite Dep. 165:12-166:11 | Disputed. Mischaracterizes cited evidence and conflicting evidence presented. | Ex. D-57, Garthwaite (US Expert) Rep. (Sept. 29, 2023) ¶ 13 (US Expert: "According to my analysis, Defendants reviewed the medical records that were the source of the[] diagnosis codes [on Attachment 1 - approximately 1.97 million codes] as part of their Chart Review Program and their review found no support for these diagnosis codes or their associated Hierarchical Condition Categories or Rx Hierarchical Condition Categories."); Ex. P-6, |

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| **DEFENDANTS' UNCONTROVERTED FACTS** | | | | |
| | | | | Renjilian (United Expert) Tr. 94:4-25 (Mr. Renjilian testifying that he does not have an expert opinion as to whether Dr. Garthwaite correctly identified Reviewed Encounters); *id.* at 96:1-99:2 (Mr. Renjilian does not opine whether Dr. Garthwaite incorrectly identified diagnosis codes that were recorded in Chart Review nor that Dr. Garthwaite incorrectly compared codes identified in Chart Review to those submitted by providers.) |
| D169 | Dr. Garthwaite in his expert report "considers" a diagnosis code to be unsupported if a diagnosis code submitted by a doctor is not identified by a United chart reviewer during their blind review as part of the Chart Review Program. | Ex. D-57, Garthwaite Rep. (9/29/2023) Appendix D ¶ 44 | Undisputed, except to the extent Dr. Garthwaite refers to a "provider" instead of a "doctor," mischaracterizes cited evidence, in which case, disputed, conflicting evidence presented. | Ex. D-57, Garthwaite (US Expert) Rep. (Sept. 29, 2023), Appendix D ¶ 44 (US Expert refers to "provider-reported encounter"); *id.* at ¶ 13 ("According to my analysis, Defendants reviewed the medical records that were the source of the[] diagnosis codes [on Attachment 1 - approximately 1.97 million codes] as part of their Chart Review Program and their review found no support for these diagnosis codes or their associated Hierarchical Condition Categories or Rx Hierarchical Condition Categories."); Ex. P-6, Renjilian (United Expert) Tr. 94:4-25 (Mr. Renjilian testifying that he does |

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | | | | not have an expert opinion as to whether Dr. Garthwaite correctly identified Reviewed Encounters); *id.* at 96:1-99:2 (United's expert does not opine whether Dr. Garthwaite incorrectly identified diagnosis codes that were recorded in Chart Review nor that Dr. Garthwaite incorrectly compared codes identified in Chart Review to those submitted by providers.); *id.* at 96:1-99:2 (United's expert does not opine whether Dr. Garthwaite incorrectly identified diagnosis codes that were recorded in Chart Review nor that Dr. Garthwaite incorrectly compared codes identified in Chart Review to those submitted by providers.) |
| D170 | Dr. Garthwaite identifies a set of what he calls "Potential Deletes," which are "all diagnosis codes that are Submitted Diagnosis Codes but not Supported Diagnosis Codes (*i.e.*, all diagnosis codes from Reviewed Encounters that were submitted to CMS but were not found to be | Ex. D-57, Garthwaite Rep. (9/29/2023) ¶ 104 | Disputed. Mischaracterizes evidence and conflicting evidence presented. | Ex. P-74, Garthwaite (US expert) Tr. 51:1-16 (US Expert: "There was no actual list of potential deletes, but it's a way we describe it in the report conceptually."); Ex. D-57, Garthwaite (US Expert) Rep. (Sept. 29, 2023), ¶ 85, fn. 123 ("The method summarized herein provides an overview of the analytical steps I have undertaken. Further technical detail is provided in Appendix D, which along with the programs I |

The table header appears at the top:

**DEFENDANTS' UNCONTROVERTED FACTS**

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | | DEFENDANTS' UNCONTROVERTED FACTS | | |
|---|---|---|---|---|
| **No.** | **Statement of Fact** | **Citation** | **Response** | **Citation** |
| | supported in the Chart Review Program)." | | | have provided can be used to replicate my results."); |
| D171 | Dr. Garthwaite's "Reviewed Encounters" do not include any "encounters for which the data from the Chart Review Program is potentially incomplete because the Coder was 'informed.'" | Ex. D-57, Garthwaite Rep. (9/29/2023) ¶ 100 | Undisputed. | |
| D172 | All of Dr. Garthwaite's Potential Deletes are diagnosis codes that United coders did not identify during a blind chart review. | Ex. D-57, Garthwaite Rep. (9/29/2023) ¶¶ 100, 104 | Undisputed except to the extent fact indicates there was only one blind chart review of the medical records associated with Dr. Garthwaite's Deletes, in which case, disputed, mischaracterizes evidence. | Ex. D-57, Garthwaite (US Expert) Rep. (Sept. 29, 2023) ¶ 51 (US Expert stating that two blind chart reviews were performed for medical records that went through the Second Level Review process); *id.* at ¶ 92, fn. 124 ("Of the $997,051,302 total financial impact for Part C and Part D in service years 2014-2016 shown in Exhibit 10, $799,407,848 is associated with diagnosis codes submitted by Defendants to CMS associated with Charts that were reviewed in Defendants' Second Level Review program.") |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| DEFENDANTS' UNCONTROVERTED FACTS | | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| D173 | All of Dr. Garthwaite's Deletes are codes that were not identified by United coders during a blind chart review. | Ex. D-57, Garthwaite Rep. (9/29/2023) ¶¶ 100, 104 | Undisputed except to the extent fact indicates there was only one blind chart review of the medical records associated with Dr. Garthwaite's Deletes, in which case, disputed, mischaracterizes evidence. | Ex. D-57, Garthwaite (US Expert) Rep. (Sept. 29, 2023) ¶ 51, 92 (US Expert describing a process called "second level review") |
| D174 | Dr. Garthwaite's list of "Potential Deletes" is conceptually the same codes included in the government's First Interrogatory Response. | Ex. D-57, Garthwaite Rep. (9/29/2023) Appendix D ¶ 44 (government expert explaining methodology used to identify Potential Deletes); Ex. D-11A, United States' Responses and Objections to UHC of California's First Interrogatory (Feb. 3, 2020) (explaining basis for determining the "invalid diagnoses"); Ex. D-11B, United States' First Supplemental Responses and Objections to UHC of California's First Interrogatory (Aug. 17, 2020) (same and identifying approximately 28 million codes) | Disputed. Not supported by cited evidence and conflicting evidence presented. | Ex. P-74, Garthwaite (US expert) Tr. 54:13-58:18 (US Expert explaining how his analysis is conceptually different from what he understands is included in the United States' First Interrogatory Response) |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| DEFENDANTS' UNCONTROVERTED FACTS | | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| D175 | To identify Potential Deletes, Dr. Garthwaite identifies "all diagnosis codes from Reviewed Encounters that were submitted to CMS but were not found to be supported in the Chart Review Program." | Ex. D-57, Garthwaite Rep. (9/29/2023) ¶ 104 | Undisputed. | |
| D176 | Dr. Garthwaite's report treats every doctor-submitted diagnosis code not found by a United chart reviewer in a blind review as unsupported. | Ex. D-57, Garthwaite Rep. (9/29/2023) ¶ 104 | Disputed, mischaracterizes evidence and conflicting evidence presented. | Ex. D-57, Garthwaite (US Expert) Rep. (Sept. 29, 2023) ¶ 94 (US Expert explaining that he only identifies codes as potential deletes if he first matches the Chart Review encounter to the provider-reported encounter); Ex. P-6, Renjilian (United Expert) Tr. 94:4-25 (Mr. Renjilian testifying that he does not have an expert opinion as to whether Dr. Garthwaite correctly identified Reviewed Encounters); *id.* at 96:1-99:2 (United's expert does not opine whether Dr. Garthwaite incorrectly identified diagnosis codes that were recorded in Chart Review nor that Dr. Garthwaite incorrectly compared codes identified in Chart Review to those submitted by providers.) |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | | DEFENDANTS' UNCONTROVERTED FACTS | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| D177 | From the Potential Deletes, Dr. Garthwaite identified "those diagnosis codes on the Potential Deletes list that do not share an HCC with any other submitted diagnosis code, do not share an HCC with any other risk adjustment-eligible but unsubmitted diagnosis code, *and* do not map to an HCC recorded in the Claims Verification program." | Ex. D-57, Garthwaite Rep. (9/29/2023) ¶ 116 | Undisputed. | |
| D178 | In other words, to identify the "Deletes" Dr. Garthwaite attempted to determine the subset of the "Potential Deletes" that impacted United's payment from CMS, which Dr. Garthwaite called the "Deletes." | Ex. D-57, Garthwaite Rep. (9/29/2023) ¶¶ 116-118 | Disputed. Mischaracterizes evidence and conflicting evidence presented. | Ex. D-57, Garthwaite (US Expert) Rep. (Sept. 29, 2023) ¶¶ 13, 110-114 (US Expert listing steps he applied to identify Deletes) |
| D179 | The Garthwaite Deletes number approximately 1.97 million codes, or roughly 7% of the 28 million codes the | Ex. D-65, Renjilian Rebuttal Rep. (3/18/2024) ¶¶ 30, 32 & Figures 4, 5 (United expert explaining the Garthwaite Deletes number); Ex. D-110, Garthwaite Dep. 321:18-23 | Undisputed. | |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| **DEFENDANTS' UNCONTROVERTED FACTS** |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | government included in the First Interrogatory Response. | (government expert stating that he identified the Garthwaite Deletes) | | |
| D180 | The Garthwaite Deletes correspond to approximately 0.5% of the total diagnosis codes submitted by United during the period relevant to this case for the members with medical records that underwent Chart Review. | Ex. D-65, Renjilian Rebuttal Rep. (3/18/2024) ¶ 59, Figure 9 | Undisputed. | |
| D181 | Doctors submitted every diagnosis code in the Garthwaite Deletes on a claims form. | Ex. D-113, Higgins Dep. 132:2-133:2 (former United employee testifying that he relied on providers signing an attestation that the diagnoses codes were true, complete, and accurate); Ex. D-40, Claims Form 1500 (available at: https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms1500.pdf) | Disputed. Not supported by cited evidence, mischaracterizes evidence, and conflicting evidence presented. | Ex. P-69, Higgins Tr. 282:20-25 (Testifying that he stopped working for UnitedHealth in August, 2007); *see* Ex. D-57, Garthwaite (US Expert) Rep. (Sept. 29, 2023) at ¶ 137, Exhibit 10 (showing US Expert, Dr. Garthwaite's, analysis was limited to diagnosis codes from Date of Service Years 2008-2016, post-dating Mr. Higgins' time at UnitedHealth); Ex. P-5, United 30(b)(6) (Sedor) Tr. 127:9-17 (Corporate representative explaining that capitated providers do not submit claims or diagnosis codes to United because they are paid under a different arrangement); Ex. P-3, Dep. |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | | | | Ex. 30B, MARA1576299, 2008 Risk Adjustment Data Technical Assistance For Medicare Advantage Organizations Participant Guide, 2.2.2 (identifying formats "MA organizations may choose to collect data from providers," only one of which is the Claim Form 1500); Ex. P-7, United 30(b)(6) (Baker, May 30, 2023) Tr. 76:13-20 (Corporate representative confirming face-to-face encounters could include encounters with nurse practitioners); P-4, Dickey Tr. at 32:10-18 (Optum Coding Director testifying that she had experience as a medical coder in a provider office before she started working for Optum); *id.* at 165:3-19 (describing work performed by providers' in-office coders); Ex. D-53, Acevedo (US Expert) Rebuttal Rep. (Jan. 29, 2024) ¶ 72 (US Expert: "In all but the largest physician practices and academic medical centers, provider coders may not hold coding certifications.") |
| D182 | The claims form on which doctors submitted the diagnosis codes in the Garthwaite's Deletes stated | Ex. D-113, Higgins Dep. 132:2-133:2 (former United employee testifying that he relied on providers signing an attestation | Disputed. Not supported by cited evidence, mischaracterizes | Ex. P-69, Higgins Tr. 282:20-25 (Testifying that he stopped working for UnitedHealth in August, 2007); *see* Ex. D-57, Garthwaite (US |

The heading row at top, spanning all columns:

**DEFENDANTS' UNCONTROVERTED FACTS**

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | that the doctor was certifying that the diagnosis codes were truthful and accurate. | that the diagnoses codes were true, complete, and accurate); Ex. D-40, Claims Form 1500 (available at: https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms1500.pdf) | evidence, and conflicting evidence presented. | Expert) Rep. (Sept. 29, 2023) at ¶ 137, Exhibit 10 (showing US Expert, Dr. Garthwaite's, analysis was limited to diagnosis codes from Date of Service Years 2008-2016, post-dating Mr. Higgins' time at UnitedHealth); Ex. P-5, United 30(b)(6) (Sedor) Tr. 127:9-17 (Corporate representative explaining that capitated providers do not submit claims or diagnosis codes to United because they are paid under a different arrangement); Ex. P-3, Dep. Ex. 30B, MARA1576299, 2008 Risk Adjustment Data Technical Assistance For Medicare Advantage Organizations Participant Guide, 2.2.2 (identifying formats "MA organizations may choose to collect data from providers," only one of which is the Claim Form 1500); Ex. P-7, United 30(b)(6) (Baker, May 30, 2023) Tr. 76:13-20 (Corporate representative confirming face-to-face encounters could include encounters with nurse practitioners); P-4, Dickey Tr. at 32:10-18 (Optum Coding Director testifying that she had experience as a medical coder in a provider office before she started working for Optum); *id.* at 165:3-19 (Optum Coding Director describing |

The header row for the whole table reads:

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation | |
| | | | | work performed by providers' in-office coders); Ex. D-53, Acevedo (US Expert) Rebuttal Rep. (Jan. 29, 2024) ¶ 72 (US Expert: "In all but the largest physician practices and academic medical centers, provider coders may not hold coding certifications.") | |
| D183 | Based on Garthwaite's analysis, more than 93% of the codes in the government's First Interrogatory Response did not affect the payment United received from CMS and did not lead to an overpayment. | Ex. D-65, Renjilian Rebuttal Rep. (3/18/2024) ¶¶ 29-33, Figure 5 | Disputed. Mischaracterizes cited evidence. | Ex. P-74, Garthwaite (US expert) Tr. 54:13-55:3 (US Expert testifying that he was not involved in the First Interrogatory Response and is only aware of it, meaning that he could not have done analysis with respect to the First Interrogatory Response) | |
| D184 | During RADV audits, CMS coders reviewed approximately 6,500 health conditions that correspond to diagnoses included in the government's First Interrogatory Response. | *See* Ex. D-64, Renjilian Rep. (12/3/2023) ¶¶ 164-167 & Figure 15 | Undisputed. | | |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| D185 | CMS validated approximately 89% of the approximately 6,500 health conditions corresponding to the diagnosis codes included in the United States' Response to Interrogatory No. 1. | Ex. D-64, Renjilian Rep. (12/3/2023) ¶¶ 164-167 & Figure 15 (United expert describing analysis of Interrogatory 1 diagnosis codes); Ex. D-63, Stark Rep. (3/28/2024) ¶ 30 (government expert agreeing with the left side of Figure 15 in the Renjilian Report); Ex. D-141, Stark Dep. at 36:13-37:2 (same) | Disputed. Conflicting evidence presented. | Ex. P-56, CMS 30(b)(6) (Kapustij, Aug. 25, 2023) Tr. 182:20-184:7 (testifying that no preliminary audit reports have been issued; further testifying "That was the process as designed," but "these results have not been issued, so I'm being kind of speculative."); Ex. P-21, CMS 30(b)(6) (Hornsby, Nov. 21, 2023) Tr. 22:12-23:7 (Preliminary results of RADV audits have not been released); *id.* 34:14-20 (testifying that there were no preliminary RADV results for contract years 2014 and 2015); Ex. P-32, Declaration of Steven Ferraina (Jul. 12, 2024), ¶ 8 ("The RADV Audits for CY 2011 through CY 2015 are not final. The initial results of medical record reviews and estimates of the portion of the audited HCCs that were found to be supported by medical records, provided to plans in the PFRs and through the portal, are not yet final and are subject to change. The portion of audited HCCs that were initially found to be supported by medical records submitted by a given plan may |

| | | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | | | | increase or decrease before the RADV Audits are finalized."); |
| D186 | Extrapolating RADV audit results to any portion of diagnosis codes identified in the First Interrogatory Response may have considerable statistical bias. | Ex. D-141, Stark Dep. 141:7-144:13 (government expert discussing statistical bias); Ex. D-135, Renjilian Dep. 132:9-132:17 (United expert discussing how the RADV audit results cannot be statistically extrapolated to any population); *id.* at 190:16-190:24 (United expert discussing how the RADV audit results cannot be statistically extrapolated to any population); Ex. D-63, Stark Rep. (3/28/2024) ¶ 53 (government expert stating that RADV validation rates should not be extrapolated) | Disputed. Mischaracterizes cited evidence and conflicting evidence presented. | Ex. P-57, Stark (US Expert) Tr. 142:13-16, 144:8-13 (US Expert describing "unknown bias" and "bias of unknown magnitude"); Ex. P-56, CMS 30(b)(6) (Kapustij, Aug. 25, 2023) Tr. 182:20-184:7 (testifying that no preliminary audit reports have been issued; further testifying "That was the process as designed," but "these results have not been issued, so I'm being kind of speculative."); Ex. P-21, CMS 30(b)(6) (Hornsby, Nov. 21, 2023) Tr. 22:12-23:7 (Preliminary results of RADV audits have not been released); *id.* 34:14-20 (testifying that there were no preliminary RADV results for contract years 2014 and 2015); Ex. Ex. P-32, Declaration of Steven Ferraina (Jul. 12, 2024), ¶ 8 ("The RADV Audits for CY 2011 through CY 2015 are not final. The initial results of medical record reviews and estimates of the portion of the audited HCCs that were found to be supported by medical records, provided to plans in the PFRs and through the portal, are not yet final |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | | | | and are subject to change. The portion of audited HCCs that were initially found to be supported by medical records submitted by a given plan may increase or decrease before the RADV Audits are finalized.") |
| D187 | Extrapolating RADV audit results to any portion of diagnosis codes identified in the Garthwaite Deletes may have considerable statistical bias. | Ex. D-141, Stark Dep. 141:7-144:13 (government expert discussing statistical bias); Ex. D-135, Renjilian Dep. 132:9-132:17 (United expert discussing how the RADV audit results cannot be statistically extrapolated to any population); *id.* at 190:16-190:24 (United expert discussing how the RADV audit results cannot be statistically extrapolated to any population); Ex. D-63, Stark Rep. (3/28/2024) ¶ 53 (government expert stating that RADV validation rates should not be extrapolated) | Disputed. Mischaracterizes cited evidence and conflicting evidence presented. | Ex. P-57, Stark (US Expert) Tr. 142:13-16, 144:8-13 (US Expert describing "unknown bias" and "bias of unknown magnitude"); Ex. P-56, CMS 30(b)(6) (Kapustij, Aug. 25, 2023) Tr. 182:20-184:7 (testifying that no preliminary audit reports have been issued; further testifying "That was the process as designed," but "these results have not been issued, so I'm being kind of speculative."); Ex. P-21, CMS 30(b)(6) (Hornsby, Nov. 21, 2023) Tr. 22:12-23:7 (Preliminary results of RADV audits have not been released); *id.* 34:14-20 (testifying that there were no preliminary RADV results for contract years 2014 and 2015); Ex. Ex. P-32, Declaration of Steven Ferraina (Jul. 12, 2024), ¶ 8 ("The RADV Audits for CY 2011 through CY 2015 are not final. The initial results of medical record reviews and estimates of the portion of the |

The table header (repeated at top of the page):

**DEFENDANTS' UNCONTROVERTED FACTS**

| No. | Statement of Fact | Citation | Response | Citation |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation | |
| | | | | audited HCCs that were found to be supported by medical records, provided to plans in the PFRs and through the portal, are not yet final and are subject to change. The portion of audited HCCs that were initially found to be supported by medical records submitted by a given plan may increase or decrease before the RADV Audits are finalized.") | |
| D188 | The RADV medical record review results, including the medical record review results of the codes reviewed that are also on the First Interrogatory Response list, are the results as determined prior to United's appeals. | Ex. D-117, Hornsby 30(b)(6) Dep. (11/21/2023) 65:22-66:3 (CMS corporate witness noting that CMS has not released final CON11-13 results); *id.* at 81:2-9 (no preliminary findings as to CON 14 or CON 15); Ex. D-64, Renjilian Updated Initial Rep. (12/3/2023) ¶ 154 n.221 (United expert explaining the disclaimer associated with the coding results that state they are not final); Ex. D-135, Renjilian Dep. 238:17-239:15 (United expert stating that the results were not final) | Disputed. Conflicting evidence presented. | Ex. P-56, CMS 30(b)(6) (Kapustij, Aug. 25, 2023) Tr. 182:20-184:7 (testifying that no preliminary audit reports have been issued; further testifying "That was the process as designed," but "these results have not been issued, so I'm being kind of speculative."); Ex. P-21, CMS 30(b)(6) (Hornsby, Nov. 21, 2023) Tr. 22:12-23:7 (discussion of the preliminary RADV results for contract years 2011-2013); *id.* 34:14-20 (testifying that there were no preliminary RADV results for contract years 2014 and 2015); Ex. P-32, Declaration of Steven Ferraina (Jul. 12, 2024), ¶ 8 ("The RADV Audits for CY 2011 through CY 2015 are not final. The initial results of medical record reviews and | |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
| | | | | estimates of the portion of the audited HCCs that were found to be supported by medical records, provided to plans in the PFRs and through the portal, are not yet final and are subject to change. The portion of audited HCCs that were initially found to be supported by medical records submitted by a given plan may increase or decrease before the RADV Audits are finalized.") |
| D189 | The RADV medical record review results, including the medical record review results of the codes reviewed that are also on the Garthwaite Deletes, are the results as determined prior to United's appeals. | Ex. D-117, Hornsby 30(b)(6) Dep. (11/21/2023) 65:22-66:3 (CMS corporate witness noting that CMS has not released final CON11-13 results); *id.* at 81:2-9 (no preliminary findings as to CON 14 or CON 15); Ex. D-64, Renjilian Updated Initial Rep. (12/3/2023) ¶ 154 n.221 (United expert explaining the associated with the coding results that state they are not final); Ex. D-135, Renjilian Dep. 238:17-239:15 (United expert stating that the results were not final) | Disputed. Conflicting evidence presented. | Ex. P-56, CMS 30(b)(6) (Kapustij, Aug. 25, 2023) Tr. 182:20-184:7 (testifying that no preliminary audit reports have been issued; further testifying "That was the process as designed," but "these results have not been issued, so I'm being kind of speculative."); Ex. P-21, CMS 30(b)(6) (Hornsby, Nov. 21, 2023) Tr. 22:12-23:7 (discussion of the preliminary RADV results for contract years 2011-2013); *id.* 34:14-20 (testifying that there were no preliminary RADV results for contract years 2014 and 2015); Ex. P-32, Declaration of Steven Ferraina (Jul. 12, 2024), ¶ 8 ("The RADV Audits for CY 2011 through CY 2015 are not final. The initial results |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
| | | | | of medical record reviews and estimates of the portion of the audited HCCs that were found to be supported by medical records, provided to plans in the PFRs and through the portal, are not yet final and are subject to change. The portion of audited HCCs that were initially found to be supported by medical records submitted by a given plan may increase or decrease before the RADV Audits are finalized.") |
| D190 | The RADV audits were not conducted based on a random sample of member-HCCs that are at issue in this case. | Ex. D-63, Stark Rep. (3/28/2024) ¶¶ 52-53 (government expert explaining RADV audits sample frame); Ex. D-64, Renjilian Updated Initial Rep. (12/3/2023) ¶ 161 n.233 (United expert explaining RADV audit sample frame) | Undisputed. | |
| D191 | The RADV audits were not conducted based on a random sample of diagnosis codes that are at issue in this case. | Ex. D-63, Stark Rep. (3/28/2024) ¶¶ 52-53 (government expert explaining RADV audits sample frame); Ex. D-141, Stark Dep. 142:9-16 (government expert explaining RADV audits sample frame) | Undisputed. | |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| D192 | The RADV audits were not conducted based on a representative sample of member-HCCs that are at issue in this case. | Ex. D-141, Stark Dep. 142:17-143:12 (government expert explaining RADV audit sampling); Ex. D-63, Stark Rep. (3/28/2024) ¶¶ 42-45 (explaining that RADV audits are not conducted based on a "simple random sample of member-HCC-years"), ¶¶ 52–53 (government expert explaining RADV audit sampling methodology) | Undisputed. | |
| D193 | The RADV audits were not conducted based on a representative sample of diagnosis codes that are at issue in this case. | Ex. D-141, Stark Dep. 142:17-143:12 (government expert explaining RADV audit sampling); Ex. D-63, Stark Rep. (3/28/2024) ¶¶ 42–45 (government expert describing RADV audits as not having been conducted on the member-HCC-years at issue in this case), ¶¶ 52–53 (government expert explaining RADV audit sampling methodology) | Undisputed. | |
| D194 | The RADV audit results cannot be extrapolated to identify the payment | Ex. D-141, Stark Dep. 145:13-146:11 (government expert explaining that RADV audits | Undisputed to the extent that the 2011-2015 CY RADV audit results | |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| **No.** | **Statement of Fact** | **Citation** | **Response** | **Citation** |
| | associated with any allegedly mis-coded HCCs at issue in this case. | cannot be extrapolated "to any larger group"); Ex. D-63, Stark Rep. (3/28/2024) ¶¶ 53 (government expert explaining RADV audits sample frame) | cannot be extrapolated to identify the payment associated with any diagnosis codes at issue in this case. Otherwise disputed, not supported by cited evidence. | |
| D195 | The RADV audit results cannot be extrapolated to identify the actual rate of unsupported diagnosis codes at issue in this case. | Ex. D-141, Stark Dep. 145:5-9 (government expert explaining that it not be appropriate to extrapolate RADV findings to codes at issue in this case because of how the sample was drawn); Ex. D-63, Stark Rep. (3/28/2024) ¶¶ 53 (government expert explaining RADV audits sample frame) | Undisputed. | |
| D196 | The government's statistical expert, Dr. Philip Stark independently confirmed that CMS auditors validated approximately 89% of the health conditions corresponding to the diagnosis codes included in the United States' Response to Interrogatory No. 1. | Ex. D-63, Stark Rep. (3/28/2024) ¶¶ 30, 36 (government expert confirming his results match United's experts' results); Ex. D-64, Renjilian Rep. (12/3/2023) Figure 15 (United expert figure showing that CMS audits validated 89% of the health conditions corresponding to diagnosis codes on the First | Disputed. Not supported by cited evidence, mischaracterizes evidence, and conflicting evidence presented. | Ex. P-56, CMS 30(b)(6) (Kapustij, Aug. 25, 2023) Tr. 182:20-184:7 (testifying that no preliminary audit reports have been issued; further testifying "That was the process as designed," but "these results have not been issued, so I'm being kind of speculative."); Ex. P-21, CMS 30(b)(6) (Hornsby, Nov. 21, 2023) Tr. 22:12-23:7 (Preliminary results of RADV audits have not been |

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | | Interrogatory Response); Ex. D-141, Stark Dep. 36:13-25 (government expert confirming results of Renjilian analysis) | | released); *id.* 34:14-20 (testifying that there were no preliminary RADV results for contract years 2014 and 2015); Ex. P-32, Declaration of Steven Ferraina (Jul. 12, 2024), ¶ 8 ("The RADV Audits for CY 2011 through CY 2015 are not final. The initial results of medical record reviews and estimates of the portion of the audited HCCs that were found to be supported by medical records, provided to plans in the PFRs and through the portal, are not yet final and are subject to change. The portion of audited HCCs that were initially found to be supported by medical records submitted by a given plan may increase or decrease before the RADV Audits are finalized."); Ex. P-57, Stark (US Expert) Tr. 36:13-37:20 US Expert explaining that his work only involved checking Mr. Renjilian's arithmetic, not verifying his assumptions); Ex. D-63, Stark (US Expert) Updated Rep. (Mar. 28, 2024), ¶¶ 25-30; Ex. P-57, Stark (US Expert) Tr. 35:7-22 (US Expert describing his starting point for the relevant opinion was using Mr. Renjilian's determination"); Ex. P-6, Renjilian (United Expert) Tr. 123:3- |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | | | | 13 (testifying that the United States' First Interrogatory Response included approximately 28 million diagnosis code instances); *id.* at 126:4-130:12 (UnitedHealth's expert testifying about the meaning of "overlap" between the HCCs audited by CMS auditors and the United States' First Interrogatory Response); *see* Ex. D-64, Renjilian (United Expert) Updated Rep. (Dec. 3, 2023), ¶¶ 159 and 160 (UnitedHealth's expert determined that 8,215 diagnosis codes identified on the United States' First Interrogatory Response mapped to HCCs that were reviewed in a CMS RADV Audit) |
| D197 | Not all of the diagnosis codes identified by the government in their First Interrogatory Response are in fact unsupported. | Ex. D-64, Renjilian Rep. (12/3/2023) ¶¶ 152-161 (United expert analyzing the diagnosis codes on the government's First Interrogatory Response), Figure 13 (identifying supported diagnosis codes); Ex. D-63, Stark Rep. (3/28/2024) ¶ 30 (government expert confirming his results match United's experts' results); Ex. D-141, Stark Dep. 38:23-39:8 (government expert explaining | Disputed. Not supported by cited evidence and conflicting evidence presented. | Ex. P-57, Stark (US Expert) Tr. 39:5-8 (Q. And out of those 1,119 instances, the RADV auditors found 980 of them to be supported, right? A. Not of the diagnosis instances, but of the resulting HCC for that beneficiary for that year."); *id.* at 63:22-64:10 ("Q. So just because a United chart review coder did not find a provider-submitted code, that does not mean that the associated member-HCC-year is unsupported, assuming RADV is correct? You 1 |

The table is titled **DEFENDANTS' UNCONTROVERTED FACTS**

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | | **DEFENDANTS' UNCONTROVERTED FACTS** | | |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | | that all not diagnoses codes identified by the government in the First Interrogatory Response were found to be supported by RADV auditors) | | agree with that, right? A. Yes, the -- just because chart review did not find support for a diagnosis code submitted for a particular diagnosis instance, there might be somewhere -- there still might be somewhere support for the HCC that that diagnosis code maps to or an HCC higher in the hierarchy, possibly in the chart that was reviewed by the United chart reviewers and possibly in some other chart for that member for that year"); Ex. P-6, Renjilian (United Expert) Tr. 136:18-137:5 (testifying that it is unknown "which specific diagnosis was found by the RADV auditors to be supported, but it's just that the HCC was supported."); *id.* at 148:5-149:7 ("We can't know or don't know which specific diagnoses the RADV auditors reviewed to get to their conclusion that a given HCC was supported; so we don't know, one way or the other.") |
| D198 | Not all of the 1.97 million diagnosis codes in the Dr. Garthwaite Deletes are in fact unsupported. | Ex. D-65, Renjilian Rebuttal Rep. (3/18/2024) ¶ 60 | Disputed. Not supported by cited evidence and conflicting evidence presented. | Ex. P-6, Renjilian (United Expert) Tr. 129:4-15 (explaining RADV audits were done at the HCC level); *id.* at 148:5-149:7 ("We can't know or don't know which specific |

| No. | Statement of Fact | Citation | Response | Citation |
|-----|------------------|----------|----------|----------|
| | | **DEFENDANTS' UNCONTROVERTED FACTS** | | |
| | | | | diagnoses the RADV auditors reviewed to get to their conclusion that a given HCC was supported; so we don't know, one way or the other."); Ex. D-57, Garthwaite (US Expert) Rep. (Sept. 29, 2023) ¶ 13 (US Expert:  "According to my analysis, Defendants reviewed the medical records that were the source of these diagnosis codes as part of their Chart Review Program and their review found no support for these diagnosis codes or their associated Hierarchical Condition Categories or Rx Hierarchical Condition Categories"); Ex. P-6, Renjilian (United Expert) Tr. 94:4-25 (Mr. Renjilian testifying that he does not have an expert opinion as to whether Dr. Garthwaite correctly identified Reviewed Encounters); *id.* at 96:1-99:2 (United's expert does not opine whether Dr. Garthwaite incorrectly identified diagnosis codes that were recorded in Chart Review nor that Dr. Garthwaite incorrectly compared codes identified in Chart Review to those submitted by providers.) |
| D199 | Not all of the diagnosis codes identified by the | Ex. D-64, Renjilian Rep. (12/3/2023) ¶161, Figure 13 | Disputed. Not supported by cited evidence and | Ex. P-6, Renjilian (United Expert) Tr. 129:4-15 (explaining RADV |

| | | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|---|
| **No.** | **Statement of Fact** | **Citation** | **Response** | **Citation** | |
| | government in their First Interrogatory Response would be unsupported if the beneficiary's corresponding medical charts were reviewed. | (United expert showing validation rates for diagnosis codes reviewed in RADV that were also identified by the government in their First Interrogatory Response) | conflicting evidence provided. | audits were done at the HCC level); *id.* at 148:5-149:7 ("We can't know or don't know which specific diagnoses the RADV auditors reviewed to get to their conclusion that a given HCC was supported; so we don't know, one way or the other.") | |
| D200 | Not all of the 1.97 million diagnosis codes Dr. Garthwaite called "Deletes" would be unsupported if the beneficiary's medical charts were reviewed. | Ex. D-65, Renjilian Rebuttal Rep. (3/18/2024) ¶ 32 (United expert describing Garthwaite Deletes), ¶ 60 (United expert analyzing if possible to determine how many of the Garthwaite Deletes would be unsupported) | Disputed. Not supported by cited evidence and conflicting evidence provided. | Ex. P-6, Renjilian (United Expert) Tr. 129:4-15 (explaining RADV audits were done at the HCC level); *id.* at 148:5-149:7 ("We can't know or don't know which specific diagnoses the RADV auditors reviewed to get to their conclusion that a given HCC was supported; so we don't know, one way or the other."); Ex. D-57, Garthwaite (US Expert) Rep. (Sept. 29, 2023) ¶ 13 (US Expert: "According to my analysis, Defendants reviewed the medical records that were the source of these diagnosis codes as part of their Chart Review Program and their review found no support for these diagnosis codes or their associated Hierarchical Condition Categories or Rx Hierarchical Condition Categories"); Ex. P-6, Renjilian (United Expert) Tr. 94:4-25 (Mr. | |

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| **DEFENDANTS' UNCONTROVERTED FACTS** | | | | |
| | | | | Renjilian testifying that he does not have an expert opinion as to whether Dr. Garthwaite correctly identified Reviewed Encounters); *id.* at 96:1-99:2 (United's expert does not opine whether Dr. Garthwaite incorrectly identified diagnosis codes that were recorded in Chart Review nor that Dr. Garthwaite incorrectly compared codes identified in Chart Review to those submitted by providers.) |
| D201 | The government had the ability to review a statistically valid sample of United's medical records corresponding to the First Interrogatory Response list to estimate the portion of them that are unsupported. | Ex. D-18, 88 Fed. Reg. 6643, 6648 (Feb. 1, 2023) (indicating that CMS will review a sample for RADV audits); Ex. D-38, 71 DOJ J. Fed. L. & Prac. 4, 196-97 (2023) (describing examples of government use of extrapolation in cases and providing an example from 1999) | Disputed.  Not supported by cited evidence and conflicting evidence presented. | Ex. P-78, Order Denying Without Prejudice Plaintiff's Motion to Compel Re Interrogatories No. 14 and Request for Production 147 (Dkt. 419), May 28, 2021 (Special Master denying United States' Motion to Compel production of underlying medical records); Ex. P-54, Order Re: Objections to Special Master's Order (Dkt. 437), Sept. 10, 2021 (Order denying United States' Motion for Review of Dkt. 419) |
| D202 | The government had the ability to review a statistically valid sample of United's medical records corresponding to | Ex. D-18, 88 Fed. Reg. 6643, 6648 (Feb. 1, 2023) (stating that sampling and extrapolation have been used in Medicare Parts A and B for decades); Ex. D-38, | Disputed.  Not supported by cited evidence and conflicting evidence presented. | Ex. P-78, Order Denying Without Prejudice Plaintiff's Motion to Compel Re Interrogatories No. 14 and Request for Production 147 (Dkt. 419), May 28, 2021 (Special Master |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|---|
| **No.** | **Statement of Fact** | **Citation** | **Response** | **Citation** | |
| | Garthwaite's Deletes to estimate the portion of them that are unsupported. | 71 DOJ J. Fed. L. & Prac. 4, 196-97 (2023) (describing examples of government use of extrapolation in cases and providing an example from 1999) | | denying United States' Motion to Compel production of underlying medical records); Ex. P-54, Order Re: Objections to Special Master's Order (Dkt. 437), Sept. 10, 2021 (Order denying United States' Motion for Review of Dkt. 419) | |
| D203 | Dr. Stark's would have been qualified and able to design a statistically valid sample of either the diagnoses on the First Interrogatory Response list or the Garthwaite Deletes. | Ex. D-63, Stark Rep. (3/28/2024) ¶¶ 41-53 | Undisputed that Dr. Stark is a qualified statistician. Disputed to the extent that Dr. Stark testified that there is no such thing as a "statistically valid sample" as a term of art in Statistics, conflicting evidence presented. Disputed to the extent that drawing a statistically valid sample of either the diagnoses on the First Interrogatory Response list or the Garthwaite Deletes, mischaracterizes evidence and is not relevant. | Ex. D-63, Stark (US Expert) Updated Rep. (Mar. 28, 2024), ¶ 78 (US Expert stating, "For instance, paragraph 3 of the Salve Report states, '[m]y study began with drawing a statistically valid sample of HCC markers found in the 2013 HCC Dataset referenced above.' There is no such thing as 'statistically valid sample' as a term of art in Statistics."); *see*, *id.* at ¶¶ 12-16 (assignment does not include drawing a statistically valid sample); Ex. P-78, Order Denying Without Prejudice Plaintiff's Motion to Compel Re Interrogatories No. 14 and Request for Production 147 (Dkt. 419), May 28, 2021 (Special Master denying United States' Motion to Compel production of underlying medical records); Ex. P-54, Order Re: Objections to Special Master's Order (Dkt. 437), Sept. 10, 2021 | |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | | DEFENDANTS' UNCONTROVERTED FACTS | | |
| | | | | (Order denying United States' Motion for Review of Dkt. 419) |
| D204 | Dr. Stark admitted that the hypothesis that "every time a United chart review coder fail[ed] to find a diagnosis code submitted by a" doctor the HCC associated with that code for that member for the year is not supported, is a false hypothesis. | Ex. D-141, Stark Dep. at 57:9-14 (government expert agreeing with the fact that the hypothesis "every time a United chart review coder fail[ed] to find a diagnosis code submitted by a" doctor the HCC associated with that code for that member for the year is not supported, is a false hypothesis); *see also id.* 61:15-62:25 (government expert explaining that it is possible that there is support for a HCC even if a RADV reviewer did not find support for a code); *see also id.* at 75:18-79:6 (government expert explaining whether or not a chart review coder found support for a diagnosis code in a particular chart does not mean that there may be support for the particular HCC) | Disputed.  Not supported by cited evidence and mischaracterizes evidence. | Ex. P-57, Stark (US Expert) Tr. 57:24-58:3 (US Expert limiting his testimony to HCCs found supported in the RADV Audit context); *id.* at 39:22-40:10, 42:2-18, 57:17-64:10 (Dr. Stark testifying that his understanding is that UnitedHealth could submit additional medical records to support an HCC in the context of a RADV Audit and that the review in the RADV Audit may not be of the encounter associated with the medical record reviewed in UnitedHealth's Chart Review Program and may not be for a diagnosis code that was ever submitted to CMS) |
| D205 | The government's coding expert, Jean Acevedo, testified that she would have been qualified to perform a | Ex. D-87, Acevedo Dep. 97:1-10 | Disputed. Mischaracterizes evidence. | Ex. P-78, Order Denying Without Prejudice Plaintiff's Motion to Compel Re Interrogatories No. 14 and Request for Production 147 (Dkt. |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
| | medical record review of a sample of relevant diagnosis codes and associated medical records at issue in this case but was not asked to do so. | | | 419), May 28, 2021 (Special Master denying United States' Motion to Compel production of underlying medical records); Ex. P-54, Order Re: Objections to Special Master's Order (Dkt. 437), Sept. 10, 2021 (Order denying United States' Motion for Review of Dkt. 419) |
| D206 | The government uses statistical methods to extrapolate from a random sample of reviewed records on a regular basis. | Ex. D-18, 88 Fed. Reg. 6643 (Feb. 1, 2023) (stating that sampling and extrapolation have been used in Medicare Parts A and B for decades); Ex. D-47, OIG, Medicare Advantage Compliance Audit of Specific Diagnosis Codes that Healthfirst Health Plan, Inc., (Contract H3359) Submitted to CMS (Jan. 2022) (noting the sampling used for this audit); Ex. D-38, 71 DOJ J. Fed. L. & Prac. 4, 196-97 (2023) (describing examples of government use of extrapolation in cases and providing an example from 1999) | Undisputed. | |
| D207 | The government chose not to estimate the portion of the | Ex. D-4, Amended Joint Rule 26(f) Report at 18 (Apr. 2, | Disputed, mischaracterizes | Ex. P-78, Order Denying Without Prejudice Plaintiff's Motion to |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
| | diagnosis codes at issue in this case that are unsupported by reviewing a random sample of diagnoses and relevant medical records. | 2018) (noting plaintiff's damages calculation does not include sampling or extrapolation); Dkt. No. 317, United States' Supplemental Memorandum in Opposition to United's Motion to Compel Production of Documents, at 3 (Nov. 30, 2018) (same); *id.* at 12-13 (alleging that documents related to RADV are irrelevant because damages "are not based on sampling, extrapolation, or contract-level payment error rates"); Ex. D-6, Order Denying Motion to Compel responses to Interrogatory No. 14 and Request for Production No. 147 (5/28/2021), at 9-10 (noting that the government refused to review every medical record that United reviewed in chart review) | evidence. Otherwise, undisputed. | Compel Re Interrogatories No. 14 and Request for Production 147 (Dkt. 419), May 28, 2021 (Special Master denying United States' Motion to Compel production of underlying medical records); Ex. P-54, Order Re: Objections to Special Master's Order (Dkt. 437), Sept. 10, 2021 (Order denying United States' Motion for Review of Dkt. 419) |
| D208 | It is a complex exercise to identify provider submitted diagnosis codes that are associated with charts that went through Chart Review | Ex. D-57, Garthwaite Rep. (9/29/2023) ¶ 81 (government expert explaining process to identify provider submitted codes which went through chart review); Ex. D-92, Bird Dep. 47:10-48:4; 84:25-85:15 | Disputed. Conflicting evidence presented. | Ex. P-61, Dumcum Tr. 205:15-207:17 (United witness describing the comparison of diagnosis codes on claims with data from chart review as "easy enough."); Ex. P-62, Martinez Tr. 67:19-70:13 (United witness |

| No. | Statement of Fact | Citation | Response | Citation |
|-----|------------------|----------|----------|----------|
| | and were not identified during Chart Review. | (8/10/2022) (United witness explaining the matching process to link provider information from chart review data and claims data); Ex. D-65, Renjilian Rebuttal Rep. (3/18/2024) ¶¶ 53-54 (United expert explaining difficulty of identifying codes that were submitted for risk adjustment, associated with the charts that went through chart review, and not independently verified in chart review) | | describing the process of matching claims to chart review results.) |
| D209 | It took Dr. Garthwaite and his support team months and multiple attempts to try to match doctor-submitted diagnosis codes found in claims to particular medical records reviewed by United's chart reviewers. | Ex. D-59, Errata to Garthwaite Rep. (3/11/2024) ¶ 1 (government export explaining that he submitted multiple iterations of his report); Ex. D-65, Renjilian Rebuttal Rep. (3/18/2024) ¶ 10 (United expert explaining process by which Dr. Garthwaite to identify the diagnosis codes that were not supported in the Chart Review program); Ex. D-110, Garthwaite Dep. 45:10–46:5 (government expert explaining process for creating report) | Disputed. Not supported by cited evidence. | |

**DEFENDANTS' UNCONTROVERTED FACTS**

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| D210 | Dr. Garthwaite agrees that the diagnosis codes on the government's approximately 28 million long First Interrogatory Response list that are not on his list of approximately 1.97 million deletes—roughly 26 million diagnosis codes—did not result in overpayment to United because United's data contained other support for the health condition. | Ex. D-57, Garthwaite Rep. (9/29/2023) ¶¶ 106-118 (government expert describing classification of Potential Deletes), Exs. D-11A & D-11B, United States' Response to UHG First Interrogatory & First Supplemental Response to UHC of California's First Interrogatory (identifying diagnosis codes); Ex. D-65, Renjilian Rebuttal Rep. (3/18/2024) ¶ 30 (identifying the 1.97 diagnosis codes) | Disputed. Not supported by cited evidence, mischaracterizes evidence, and conflicting evidence presented. | Ex. P-74, Garthwaite (US expert) Tr. 54:13-55:3 (US Expert describing lack of familiarity with the United States' Response to UnitedHealth's First Interrogatory) |
| D211 | Dr. Stark agreed that on the basis of the data he had available and reviewed, there is no basis on which to reliably estimate what portion of the Garthwaite final deletes universe correspond to health conditions that are unsupported in any of the members' charts for the year. | Ex. D-141, Stark Dep. 166:11-22 | Disputed. Not supported by cited evidence and mischaracterizes evidence. | Ex. P-57, Stark (US Expert) Tr. 166:11-22 (US Expert limiting his comments to whether the HCC would be found supported in a RADV Audit); *id.* at 39:22-40:10, 42:2-18 ,57:17-64:10 (Dr. Stark testifying that his understanding is that UnitedHealth could submit additional medical records to support an HCC in the context of a RADV Audit and that the review in the RADV Audit may not be of the encounter associated with the medical record reviewed in UnitedHealth's Chart Review |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | | | **DEFENDANTS' UNCONTROVERTED FACTS** | | |
|---|---|---|---|---|---|
| | **No.** | **Statement of Fact** | **Citation** | **Response** | **Citation** |
| | | | | | Program and may not be for a diagnosis code that was ever submitted to CMS) |
| | D212 | Dr. Stark testified that he was "not aware of any data" that "would allow one to estimate what fraction of the diagnosis … events in the final deletes list map to an HCC-member-year that RADV would have found support for…" | Ex. D-141, Stark Dep. 165:24-166:22 | Undisputed. | |
| | D213 | Dr. Stark testified that "payments are based on the . . . HCCs that the diagnosis for that member map to for the year and that only a single instance of each HCC matters" for purposes of analyzing whether a Medicare Advantage plan has been overpaid. | Ex. D-141, Stark Dep. 67:20-68:10 | Disputed. Not supported by cited evidence and conflicting evidence presented. | Ex. P-57, Stark (US Expert) Tr. 64:24-68:15 (US Expert testifying in response to the question "Do you understand that if a member-HCC-year is unsupported, that would be considered an overpayment?" that he does not know how the term "overpayment" is used and if it is a legal term of art. Counsel for UnitedHealth responds that "That's fair. I am not trying to play gotcha or suggest a term or trick you with a term of art" and counsel for UnitedHealth further represents: "I understand you're not an expert in RADV, and I am not trying to |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | | | | suggest that anything you say would bind the government on its interpretation of RADV." Dr. Stark also testifying that there may be distinctions between the RADV Audit process, and the regular payment process agreed to under the MAO's contract with CMS.) |
| D214 | Dr. Stark agrees that there is "no way to reliably estimate" what portion of the Garthwaite final deletes in fact represent overpayments. | Ex. D-141, Stark Dep. 166:11-18 | Disputed. Not supported by cited evidence and mischaracterizes evidence. | Ex. P-57, Stark (US Expert) Tr. 166:11-22 (US Expert specifically testifying about what portion of the Garthwaite deletes would be found supported by RADV Auditors and not testifying about the portion of the Garthwaite deletes that result in overpayments); *id.* at 57:17-64:10 (Dr. Stark testifying that his understanding is that UnitedHealth could submit additional medical records to support an HCC in the context of a RADV Audit and that the review in the RADV Audit may not be of the encounter associated with the medical record reviewed in UnitedHealth's Chart Review Program) |
| D215 | United's Chart Review Program reviewed medical | Ex. D-88, Baker Dep. 252:11-254:17 (Optum employee noting | Undisputed. | |

The table is headed:

**DEFENDANTS' UNCONTROVERTED FACTS**

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | records retrieved from certain doctors encompassing specific visits to doctors on specific dates of service. | chart retrieval vendors did not obtain all charts); Ex. D-89, Baker 30(b)(6) Dep. (5/30/2023) 68:10-71:11 (United corporate representative explaining chart review process), 93:18-95:9 (explaining chart targeting process); Ex. D-69, Baker 30(b)(6) Dep. Ex. 608 at 19-20 (presentation explaining the chart review process) | | |
| D216 | United's Chart Review Program did not encompass all medical charts for a beneficiary during the date of service year. | Ex. D-88, Baker Dep. 252:11-254:17 (Optum employee explaining chart retrieval); Ex. D-89, Baker 30(b)(6) Dep. (5/30/2023) 68:10-71:11 (United corporate representative explaining chart review process), 93:18-95:9 (explaining chart targeting process); Ex. D-69, Baker 30(b)(6) Dep. Ex. 608 at 19-20 (presentation explaining the chart review process) | Disputed. Not supported by cited evidence. | Ex. P-88, Baker (Jul. 12, 2022) Tr. 252:11-254:17 (cited testimony does not establish that United never reviewed all of the charts for any beneficiary in any date of service year in chart review); Ex. P-7, United 30(b)(6) (Baker, May 30, 2023) Tr. 68:10-71:11 (same); *id.* at 93:18-95:9 (same); Ex. D-69, Dep. Ex. 608 at 19-20 (cited document does not establish that United never reviewed all of the charts for any beneficiary in any date of service year in chart review) |

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| D217 | As part of its Chart Review Program, United did not collect all medical charts for all doctors' visits that a beneficiary had during the date of service year. | Ex. D-88, Baker Dep. 252:11-254:17 (Optum employee explaining chart retrieval); Ex. D-89, Baker 30(b)(6) Dep. (5/30/2023) at 68:10-71:11 (United corporate representative explaining chart review process), 93:18–95:9 (explaining chart targeting process); Ex. D-69, Baker 30(b)(6) Dep. Ex. 608, at 19-20 (presentation explaining the chart review process) | Disputed. Not supported by cited evidence. | Ex. P-88, Baker (Jul. 12, 2022) Tr. 252:11-254:17 (cited testimony does not establish that United never reviewed all of the charts for any beneficiary in any date of service year in chart review); Ex. P-7, United 30(b)(6) (Baker, May 30, 2023) Tr. 68:10-71:11 (same); *id.* at 93:18-95:9 (same); Ex. D-69, Dep. Ex. 608 at 19-20 (cited document does not establish that United never reviewed all of the charts for any beneficiary in any date of service year in chart review) |
| D218 | United's Chart Review Program did not encompass a complete set of charts for a beneficiary during the date of service year because the provider may not provide a complete medical record. | Ex. D-54, Blair Rep. (9/29/2023) ¶ 26 (United expert explaining provider documentation provided to coders during chart review); Ex. D-87, Acevedo Dep. 188:8-14 (government expert explaining how it can be difficult to get a full set of paper records) | Disputed. Not supported by cited evidence and conflicting evidence presented. | Ex. P-30, Acevedo (US Expert) Tr. 189:6-12 ("Q. Do you have any experience with what -- or do you track what percentage of time in the chart retrieval process you're able to obtain a complete set of the patient's medical records? A. I don't track it, but I will tell you that it's the overwhelming majority of the time with electronic medical records."); *id.* at 95:14-18; 96:5-8 (testifying she has no opinion on and is not familiar with United's chart review program); Ex. P-31, Blair (United expert) Tr. 41: 10-22 (acknowledging she has no |

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | | | | familiarity with United's chart review program) |
| D219 | A provider may not provide a complete medical record because they may struggle to obtain offsite records. | Ex. D-54, Blair Rep. (9/29/2023) ¶ 26 (United expert stating that a provider may have difficulty pricing offsite records); Ex. D-90, Baker 30(b)(6) Dep. (5/31/2023) 552:15-553:18 ("And when we go to retrieve that chart, not all dates of services or encounters for that provider or provider group are able to be picked up. When the -- some other items could also include if the provider themselves sent us the chart, they could have not included all of the dates of services. And a member has multiple different charts across different locations and we may not have all that information.") | Disputed. Conflicting evidence presented. | Ex. P-30, Acevedo (US Expert) Tr. 193:20-194:11 ("Q. Is it the case that providers always respond to every request for medical records that you make? MS. KRIEG: Object to form. A. The overwhelming majority of the time, yes. Most definitely, yes. BY MR. BAAK: Q. But not always? Not all providers respond to all requests for medical records, right? A. No, but it's probably about 99 percent. I mean, it's really rare that we don't have a provider that provides to us what we need, even if what we need, they say let me get you access to the EMR and we find it ourselves. So yeah.") |
| D220 | United chart review medical coders only reviewed the available medical records retrieved from a doctor that | Ex. D-88, Baker Dep. 252:11-255:10 (Optum employee describing difficulty accessing all medical records); Ex. D-90, Baker 30(b)(6) Dep. (5/31/2023) 552:15-553:18 | Disputed to the extent this fact implies that United attempted to collect all available charts from providers who had a face-to-face | Ex. D-69, Dep. Ex. 608, pp. 19-23 (internal Optum presentation discussing chart targeting and retrieval, including prioritizing charts based on chart score groups and excluding approximately 1.3 million |

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | saw the beneficiary during the date of service year. | ("And when we go to retrieve that chart, not all dates of services or encounters for that provider or provider group are able to be picked up.  When the -- some other items could also include if the provider themselves sent us the chart, they could have not included all of the dates of services.  And a member has multiple different charts across different locations and we may not have all that information.") | encounter with a beneficiary during the date of service year. Conflicting evidence presented.  Otherwise, undisputed. | charts from the list of targeted charts to pursue); Ex. P-7, United 30(b)(6) (Baker, May 30, 2023) Tr. 69:7-71:11 (Corporate representative testifying about Optum's "suspecting" and "targeting" processes to identify "member-provider combinations [to look for] based upon health statuses, based upon their -- their health risk status"); Ex. P-30, Acevedo (US expert) Tr. 189:6-12 (US Expert testifying that she is able to obtain a complete set of a patient's medical records "the overwhelming majority of the time with electronic medical records") |
| D221 | CMS staff wrote in a memorandum advocating for the adoption of the Medical Record Review Rule that: "Under existing regulation, there is no requirement for plans to audit medical records for overpayments. If a plan is conducting medical record reviews to identify underpayments, we recommend that they be | Ex. D-79, Hornsby 30(b)(6) Dep. Ex. 1460 (CMS memorandum); Ex. D-116, Hornsby 30(b)(6) Dep. (5/25/2023) 218:19-221:13 (CMS corporate representative testifying about memorandum) | Disputed as to the use of "advocated" to characterize the memo, mischaracterizes evidence. | Ex. P-19, CMS 30(b)(6) (Hornsby, May 25, 2023) Tr. 199:21-200:5 ("This is just my memo done with Jennifer that just reflects two people of the many people within MPPG to present some approaches to heri, the di- -- the group director. So this memo is really not particularly meaningful from CMS's point of view. It's -- you know, it's just a little staff memo.") |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
| | required to audit as well for overpayments." | | | |
| D222 | The government's OIG toolkit identifies particular HCCs that are at "high risk of being miscoded." | Ex. D-45, OIG Toolkit at 1 | Disputed as to HHS-OIG's knowledge within relevant timeframe for this matter, not supported by the cited evidence. | |
| D223 | All HCCs listed in the toolkit have estimated error rates of 70% to 90%. | Ex. D-45, OIG Toolkit at 1 | Disputed as to HHS-OIG's knowledge within relevant timeframe for this matter, not supported by the cited evidence. | |
| D224 | The approximately 89% validation rate in RADV of the healthcare conditions (HCCs) associated with the diagnosis codes on the government's First Interrogatory Response list is higher than the rate of validation of all the remaining healthcare conditions (HCCs) in | Ex. D-64, Renjilian Rep. (12/3/2023) ¶¶ 164-167 & Figure 15 (United expert noting validation rate of 89% for RADV-audited health conditions not associated with codes on the First Interrogatory Response list); Ex. D-141, Stark Dep. 43:21-44:4 (government expert confirming same) | Disputed. Mischaracterizes evidence and conflicting evidence presented. | Ex. P-57, Stark (US Expert) Tr. 36:13-37:20 (US Expert explaining that his work only involved checking Mr. Renjilian's arithmetic, not verifying his assumptions); Ex. P-56, CMS 30(b)(6) (Kapustij, Aug. 25, 2023) Tr. 182:20-184:7 (testifying that no preliminary audit reports have been issued; further testifying "That was the process as designed," but "these results have not been issued, so I'm being kind of speculative."); |

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | United's data that were reviewed in RADV. | | | Ex. P-21, CMS 30(b)(6) (Hornsby, Nov. 21, 2023) Tr. 22:12-23:7 (Preliminary results of RADV audits have not been released); *id.* 34:14-20 (testifying that there were no preliminary RADV results for contract years 2014 and 2015); Ex. P-32, Declaration of Steven Ferraina (Jul. 12, 2024), ¶ 8 ("The RADV Audits for CY 2011 through CY 2015 are not final. The initial results of medical record reviews and estimates of the portion of the audited HCCs that were found to be supported by medical records, provided to plans in the PFRs and through the portal, are not yet final and are subject to change. The portion of audited HCCs that were initially found to be supported by medical records submitted by a given plan may increase or decrease before the RADV Audits are finalized.") |
| D225 | The validation rate for the healthcare conditions in United's data that were reviewed in RADV for contract years 2011-2015 that are not associated with diagnosis codes on the | Ex. D-64, Renjilian Rep. (12/3/2023) ¶¶ 164-167 & Figure 15 (United expert noting validation rate of 87.6% for RADV-audited health conditions not associated with codes on First Interrogatory | Disputed. Conflicting evidence provided. | Ex. P-57, Stark (US Expert) Tr. 36:13-37:20 (US Expert explaining that his work only involved checking Mr. Renjilian's arithmetic, not verifying his assumptions); Ex. P-56, CMS 30(b)(6) (Kapustij, Aug. 25, 2023) Tr. 182:20-184:7 (testifying |

The table header above reads:

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|

**DEFENDANTS' UNCONTROVERTED FACTS**

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
| | government's First Interrogatory Response list is 87.6%. | Response list); Ex. D-141, Stark Dep. 43:21-44:4 (government expert confirming same) | | that no preliminary audit reports have been issued; further testifying "That was the process as designed," but "these results have not been issued, so I'm being kind of speculative."); Ex. P-21, CMS 30(b)(6) (Hornsby, Nov. 21, 2023) Tr. 22:12-23:7 (Preliminary results of RADV audits have not been released); *id.* 34:14-20 (testifying that there were no preliminary RADV results for contract years 2014 and 2015); Ex. P-32, Declaration of Steven Ferraina (Jul. 12, 2024), ¶ 8 ("The RADV Audits for CY 2011 through CY 2015 are not final. The initial results of medical record reviews and estimates of the portion of the audited HCCs that were found to be supported by medical records, provided to plans in the PFRs and through the portal, are not yet final and are subject to change. The portion of audited HCCs that were initially found to be supported by medical records submitted by a given plan may increase or decrease before the RADV Audits are finalized.") |
| D226 | The government's expert, Dr. Stark, performed a | Ex. D-141, Stark Dep. 36:13-37:22 (government expert | Disputed. Not supported by cited evidence and | Ex. P-56, CMS 30(b)(6) (Kapustij, Aug. 25, 2023) Tr. 182:20-184:7 |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | DEFENDANTS' UNCONTROVERTED FACTS | | | |
| --- | --- | --- | --- | --- |
| | **Statement of Fact** | **Citation** | **Response** | **Citation** |
| | calculation at his deposition confirming that the higher rate of validation of the healthcare conditions associated with the diagnosis codes on the government's First Interrogatory Response list that overlap with the healthcare conditions reviewed in RADV for contract years 2011-2015 as compared to the validation rate of the health conditions that were reviewed in RADV is statistically significant but were not on the government's First Interrogatory Response list. | confirming independent calculations matched those of Renjilian); Ex. D-63, Stark Rep. (3/28/2024) ¶¶ 30, 36 (same) | conflicting evidence presented. | (testifying that no preliminary audit reports have been issued; further testifying "That was the process as designed," but "these results have not been issued, so I'm being kind of speculative."); Ex. P-21, CMS 30(b)(6) (Hornsby, Nov. 21, 2023) Tr. 22:12-23:7 (Preliminary results of RADV audits have not been released); *id.* 34:14-20 (testifying that there were no preliminary RADV results for contract years 2014 and 2015); Ex. P-32, Declaration of Steven Ferraina (Jul. 12, 2024), ¶ 8 ("The RADV Audits for CY 2011 through CY 2015 are not final. The initial results of medical record reviews and estimates of the portion of the audited HCCs that were found to be supported by medical records, provided to plans in the PFRs and through the portal, are not yet final and are subject to change. The portion of audited HCCs that were initially found to be supported by medical records submitted by a given plan may increase or decrease before the RADV Audits are finalized."); Ex. P-57, Stark (US Expert) Tr. 36:13-37:20 (US Expert explaining that his work only involved checking Mr. |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | | | | Renjilian's arithmetic, not verifying his assumptions) |
| D227 | CMS performs a thorough review of Medicare Advantage plans' bid submissions prior to execution of the final contract. | Ex. D-140, Spitalnic Dep. 214:19-215:8 (government expert who "certainly believe[s] that it's reasonable for a plan to expect that CMS is going to do a thorough review of their bid submission. And [who] think[s] many of the actuaries that go through the bid review procedure would agree that there is a thorough review of the bid submission -- of their bid submissions."); Ex. D-62, Lambert Rep. (9/29/2024) at 5 (United expert describing CMS review and approval of bids) | Disputed to the extent that the fact includes an implication that a thorough review necessarily includes a review of the language that United included in some of its bid submissions that "[t]he health plan has decided to cease one of its prior processes that identified and deleted certain diagnosis codes through the medical record review process," mischaracterizes evidence. Otherwise, undisputed. | Ex. P-79, Spitalnic (US Expert) Tr. 214:19-216:12 (US Expert and CMS Chief Actuary, Paul Spitalnic, clarifies that the Office of the Actuary ("OACT") does "as thorough and comprehensive a job in reviewing those bids that have been submitted as possible, given the various time and other constraints placed upon us." Mr. Spitalnic further states that he "would also expect that actuaries [submitting the bids] would not be surprised that every word of their submission is not reviewed or necessarily relied upon in drawing ultimate conclusions" but that OACT does specifically rely on "the actuary to -- that that's -- that CMS places on the actuary to ensure that there is compliance with the laws, regulations and instructions and the various Actuarial Standards of Practice."); *id.* at 217:12-219:14 (Chief actuary of CMS noting that neither he nor anyone on his staff were aware of the specific language in United's bid supporting documentation.); Ex. P-38, Limmer |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | | | | 30(b)(6) Dep. Tr. at 218:4-20, 222:19-224:13 (stating that, despite efforts to confirm, CMS was not able to identify anyone who read the statement United included in the documentation supporting its b*id.*) |
| D228 | CMS continued to accept bids for contract years 2015, 2016, and 2017 after United disclosed that it had discontinued its Claims Verification program. | Ex. D-8, United States' Responses and Objections to United's Second Set of Interrogatories, No. 5 (stating that the government had not identified any CMS individual who believed or expressed in writing that CMS would have stopped payment to United or would have terminated contracts with United and stopped entering into new contracts with United); Ex. D-131, Nelson Dep. 311:812 (former United employee stating that CMS did not tell United to reinstate Claims Verification or risk a lawsuit) | Disputed. Not supported by cited evidence, mischaracterizes evidence, and conflicting evidence presented. | Ex. D-8, United States' Responses and Objections to United's Second Set of Interrogatories, No. 5 (does not confirm fact); Ex. P-25, Nelson Tr. 311:8-12 (does not confirm fact); Ex. P-79, Spitalnic (US Expert) Tr. 214:19-216:12 (US Expert and CMS Chief Actuary, Paul Spitalnic, clarifies that the Office of the Actuary ("OACT") does "as thorough and comprehensive a job in reviewing those bids that have been submitted as possible, given the various time and other constraints placed upon us." Mr. Spitalnic further states that he "would also expect that actuaries [submitting the bids] would not be surprised that every word of their submission is not reviewed or necessarily relied upon in drawing ultimate conclusions" but that OACT does specifically rely on "the actuary to -- that that's -- that CMS places on the actuary to ensure |

The table title row reads: **DEFENDANTS' UNCONTROVERTED FACTS**

| | | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
|---|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | | Citation |
| | | | | | that there is compliance with the laws, regulations and instructions and the various Actuarial Standards of Practice."); *see*, Ex. P-26, CMS 30(b)(6) (Hornsby, May 19, 2023) Tr. 219:1-24 (testifying that there was a lot of information CMS did not know about United's process during and following the April 29, 2014 video teleconference CMS had with United.); Ex. P-10, Rice Tr. 236:12-237:2 12 (CMS Deputy Director for the Center for Medicare: "And so we didn't know all the details of their program, and all the details of the work that they had done in terms of the review of the diagnoses that they had -- at least initially -- identified as not being supported in the medical record, so we didn't have enough information to say, at that point, it definitively is or is not in compliance with these other laws and regulations."); *id.* at 232:20-233:7 (same); Ex. P-28, Dep. Ex. 317, MARA2156615 (April 29, 2014 handwritten notes of Daniel Schumacher taken during video teleconference with CMS employees where he notes that Cheri Rice said she did not know enough about |

| | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | | | | United's process to make "judgments") |
| D229 | CMS did not take any remedial action against United following United's disclosure that it had ceased its Claims Verification program. | Ex. D-8, United States' Responses and Objections to United's Second Set of Interrogatories, No. 5 (stating that the government had not identified any CMS individual who believed or expressed in writing that CMS would have stopped payment to United or would have terminated contracts with United and stopped entering into new contracts with United); Ex. D-131, Nelson Dep. 311:8-12 (former United employee stating that CMS did not tell United to reinstate Claims Verification or risk a lawsuit) | Disputed. Conflicting evidence presented. | Ex. P-75, Dep. Ex. 328, Letter from DOJ to Latham & Watkins (Oct. 22, 2014) (attorney representing CMS in investigation of UnitedHealth sending letter to UnitedHealth about UnitedHealth's decision to end its Claims Verification program, reminding UnitedHealth of the False Claims Act); Ex. P-47, Am. Compl. (Dkt. 171), ¶¶ 196-238 (Nov. 17, 2017) (Dkt. 171) (CMS filing a lawsuit against UnitedHealth, alleging over $1 Billion in damages, based in part on UnitedHealth's decision to terminate its Claims Verification program); Ex. P-37, Spitalnic (US Expert) Tr. 214:19-216:12 (US Expert and CMS Chief Actuary, Paul Spitalnic, clarifies that the Office of the Actuary ("OACT") does "as thorough and comprehensive a job in reviewing those bids that have been submitted as possible, given the various time and other constraints placed upon us." Mr. Spitalnic further states that he "would also expect that actuaries [submitting the bids] would not be |

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | | | | surprised that every word of their submission is not reviewed or necessarily relied upon in drawing ultimate conclusions" but that OACT does specifically rely on "the actuary to -- that that's -- that CMS places on the actuary to ensure that there is compliance with the laws, regulations and instructions and the various Actuarial Standards of Practice."); Ex. P-26, CMS 30(b)(6) (Hornsby, May 19, 2023) Tr. 219:1-24 (testifying that there was a lot of information CMS did not know about United's process during and following the April 29, 2014 video teleconference CMS had with United.); Ex. P-10, Rice Tr. 236:12-237:2 12 (CMS Deputy Director for the Center for Medicare: "And so we didn't know all the details of their program, and all the details of the work that they had done in terms of the review of the diagnoses that they had -- at least initially -- identified as not being supported in the medical record, so we didn't have enough information to say, at that point, it definitively is or is not in compliance with these other laws and regulations."); *id.* at 232:20-233:7 (same); Ex. P-28, Dep. Ex. 317, |

| | | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation | |
| | | | | MARA2156615 (April 29, 2014 handwritten notes of Daniel Schumacher taken during video teleconference with CMS employees where he notes that Cheri Rice said she did not know enough about United's process to make "judgments") | |
| D230 | CMS did not impose any sanctions against United following United's disclosure that it had ceased its Claims Verification program. | Ex. D-8, United States' Responses and Objections to United's Second Set of Interrogatories, No. 5 (stating that the government had not identified any CMS individual who believed or expressed in writing that CMS would have stopped payment to United or would have terminated contracts with United and stopped entering into new contracts with United); Ex. D-131, Nelson Dep. 311:8-311:12 (former United employee stating that CMS did not tell United to reinstate Claims Verification or risk a lawsuit) | Disputed. Conflicting evidence presented. | Ex. P-47, Am. Compl. (Dkt. 171) (CMS filing a lawsuit against UnitedHealth, alleging over $1 Billion in damages, based in part on UnitedHealth's decision to terminate its Claims Verification program); Ex. P-79, Spitalnic (US Expert) Tr. 214:19-216:12 (US Expert and CMS Chief Actuary, Paul Spitalnic, clarifies that the Office of the Actuary ("OACT") does "as thorough and comprehensive a job in reviewing those bids that have been submitted as possible, given the various time and other constraints placed upon us." Mr. Spitalnic further states that he "would also expect that actuaries [submitting the bids] would not be surprised that every word of their submission is not reviewed or necessarily relied upon in drawing ultimate conclusions" but | |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | | | | that OACT does specifically rely on "the actuary to -- that that's -- that CMS places on the actuary to ensure that there is compliance with the laws, regulations and instructions and the various Actuarial Standards of Practice."); Ex. P-26, CMS 30(b)(6) (Hornsby, May 19, 2023) Tr. 219:1-24  (testifying that there was a lot of information CMS did not know about United's process during and following the April 29, 2014 video teleconference CMS had with United.); Ex. P-10, Rice Tr. 236:12-237:2 12 (CMS Deputy Director for the Center for Medicare:  "And so we didn't know all the details of their program, and all the details of the work that they had done in terms of the review of the diagnoses that they had -- at least initially -- identified as not being supported in the medical record, so we didn't have enough information to say, at that point, it definitively is or is not in compliance with these other laws and regulations."); *id.* at 232:20-233:7 (same); Ex. P-28, Dep. Ex. 317, MARA2156615 (April 29, 2014 handwritten notes of Daniel Schumacher taken during video teleconference with CMS employees |

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | | | | where he notes that Cheri Rice said she did not know enough about United's process to make "judgments") |
| D231 | CMS continued to pay United in full under its contracts. | Ex. D-8, United States' Responses and Objections to United's Second Set of Interrogatories, No. 5 (stating that the government had not identified any CMS individual who believed or expressed in writing that CMS would have stopped payment to United or would have terminated contracts with United and stopped entering into new contracts with United); Ex. D-131, Nelson Dep. 311:8-311:12 (former United employee stating that CMS did not tell United to reinstate Claims Verification or risk a lawsuit) | Undisputed. | |
| D232 | The government's expert, Dr. Garthwaite, stated in his expert report that if a Medicare Advantage plan "submits multiple diagnosis codes mapping to the same | Ex. D-57, Garthwaite Rep. (9/29/2023) ¶ 31 | Undisputed. | |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | HCC for a beneficiary, the beneficiary's risk score does not depend on which specific diagnosis code was reported" or "how many times a particular diagnosis code is reported within a year." | | | |
| D233 | CMS has acknowledged that, without more, the mere existence of unsupported diagnosis codes or payment discrepancies does not equate to fraud. | Ex. D-122A, Kapustij 30(b)(6) Dep. 208:5-8 | Disputed. Not supported by cited evidence and mischaracterizes evidence. | Ex. P-56, CMS 30(b)(6) (Kapustij, Aug. 25, 2023) Tr. 208:5-18 (statements are limited to RADV and witness clarifies that "CMS is not conducting RADV Audits to determine if there is fraud."); Ex. P-10, Rice Tr. at 77:4-79:1 (CMS Deputy Director for the Center for Medicare testifying that if a plan has information that a diagnosis code that was previously submitted to CMS is not supported by the medical record when reviewing that record, they need to look into it and delete the code if they cannot find support for it); *see*, Ex. P-47, Am. Compl. (Dkt. 171) (CMS filing a lawsuit against UnitedHealth for failing to delete diagnosis codes that UnitedHealth's coders did not find as having sufficient support in the medical record associated with the instance of |

The heading row of the table reads:

**DEFENDANTS' UNCONTROVERTED FACTS**

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | | | | the diagnosis code); Ex. D-66, Dep. Ex. 164, Medicare+Choice Program, 65 Fed. Reg 40,170, 40,268 (proposed June 29, 2000) (to be codified at 42 C.F.R. pt. 422) (adopting the knowledge standard from the False Claims Act and stating "We acknowledge that encounter data come into M+C organizations in great volume and from a number of sources, presenting significant verification challenges for the organizations. However, we believe that M+C organizations have an obligation to undertake ''due diligence'' to ensure the accuracy, completeness, and truthfulness of encounter data submitted to HCFA. Therefore, they will be held to a ''best knowledge, information, and belief'' standard. Therefore, M+C organizations will be held responsible for making good faith efforts to certify the accuracy, completeness, and truthfulness of encounter data submitted.") |
| D234 | United and the government entered into contracts related | Ex. D-1, Am. Compl. ¶¶ 66-86, Ex. 1 | Undisputed. | |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | to the Medicare Advantage program. | | | |
| D235 | The government argued to the United States Supreme Court last year that "companies that seek funds from the government (particularly on a recurring basis) often have ready avenues for resolving ambiguity about payment rules—for example, by consulting their contacts in state Medicaid agencies, or contractual intermediaries like pharmacy benefit managers." | Ex. D-148, Brief for United States at *24 n.4, *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 751 (2023); *id.* at *31-32 | Undisputed. | |
| D236 | When United representatives met with CMS on April 29, 2014, there were a number of DOS 2011 and 2012 diagnosis codes associated with encounters for which the multi-stage Claims Verification program had begun but was not completed ("In Process Codes"). | Ex. D-64, Renjilian Rep. (12/3/2023) ¶ 67 (United expert discussing encounters that were in-process when Claims Verification was discontinued); Ex. D-70, Cavanaugh Dep. Ex. 1062 (former CMS employee notifying CMS of decision to suspend Claims Verification and discussing in-process | Undisputed. | |

The table has a title row above it reading:

**DEFENDANTS' UNCONTROVERTED FACTS**

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| header: **DEFENDANTS' UNCONTROVERTED FACTS** |||||

| DEFENDANTS' UNCONTROVERTED FACTS | | | | |
|-----|-------------------|----------|----------|----------|
| No. | Statement of Fact | Citation | Response | Citation |
| | | encounters); Ex. D-131, Nelson Dep. 198:14-199:9 (same) | | |
| D237 | After the April 29, 2014 meeting and CMS's decision not to implement the proposed Medical Record Review Rule, United submitted for deletion only those diagnosis codes associated with encounters that had already completed the multi-stage Claims Verification program and had been identified as not supported by documentation in the medical record. | Ex. D-68, Nelson Dep. Ex. 324 (former United employee describing submission of codes that completed Claims Verification and were found to be unsupported); Ex. D-154, Thompson Dep. 294:12-23 (United employee recalling stopping "mid-process" on in-review codes) | Disputed to the extent that fact implies United deleted all diagnosis codes that completed the multistage CV process, conflicting evidence presented. Otherwise, undisputed. | Ex. P-16, United 30(b)(6) (Bird, Jun. 22, 2023) Tr. 102:15-105:11 (Corporate representative explaining that the CV program was in operation until April 2014, when the deletes process was suspended, and the program was terminated in May 2014); Ex. P-5, United 30(b)(6) (Sedor) Tr. 187:17-198:11 (Corporate representative discussing accruals and reserves made in anticipation of CV deletes prior to April 2014); Ex. P-85, Brennan Tr. 267:9-269:16 (United witness discussing CV deletes being placed on hold); *id.* 186:9-24 (Discussion of the CV analyst step of the CV program); Ex. P-62, Martinez Tr. 83:21-84:10 (same); Ex. P-89, Dep. Ex. 348, ICODIFY-0170934 (Email chain between ICodify, the company performing the final step in United's CV process, and United indicating which HCCs ICodify identified as "unlikely to validate in our second level review" including, *e.g.*, diagnosis code 3369); Ex. P-82, Ferron Tr. 134:15-135:15 (United's |

| | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
|---|---|---|---|---|
| **No.** | **Statement of Fact** | **Citation** | **Response** | **Citation** |
| | | | | coding consulting confirming that for the diagnoses identified in Ex. P-89, Dep. Ex. 348, ICODIFY-0170934, "one level of review was sufficient to determine that these codes should be deleted."); *see also* Ex. P-86, Dep. Ex. 726, Mar. 27, 2016 Letter from Latham & Watkins to DOJ (Identifying MARA2160501 as a complete list of CV cancelled deletes for DOS 2012); Ex. P-87, Dep. Ex. 727, MARA2160501 (excerpt of a spreadsheet of DOS 2012 cancelled deletes, which include, *e.g.*, an instance of Diagnosis Code 3369) |
| D238 | 64.2% of the In Process Codes that correspond to health conditions (HCCs) that were reviewed by CMS during RADV audits were validated by CMS auditors. | Ex. D-64, Renjilian Rep. (12/3/3023) ¶ 163, Figure 14 (United expert showing 64.2% validation rate for In-Process Codes); Ex. D-65, Renjilian Rebuttal Rep. (3/18/2024) ¶ 58 (same) | Disputed. Conflicting evidence presented. | Ex. P-56, CMS 30(b)(6) (Kapustij, Aug. 25, 2023) Tr. 182:20-184:7 (testifying that no preliminary audit reports have been issued; further testifying "That was the process as designed," but "these results have not been issued, so I'm being kind of speculative."); Ex. P-21, CMS 30(b)(6) (Hornsby, Nov. 21, 2023) Tr. 22:12-23:7 (Preliminary results of RADV audits have not been released); *id.* 34:14-20 (testifying that there were no preliminary RADV results for contract years 2014 and 2015); Ex. P-32, |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | | | | Declaration of Steven Ferraina (Jul. 12, 2024), ¶ 8 ("The RADV Audits for CY 2011 through CY 2015 are not final. The initial results of medical record reviews and estimates of the portion of the audited HCCs that were found to be supported by medical records, provided to plans in the PFRs and through the portal, are not yet final and are subject to change. The portion of audited HCCs that were initially found to be supported by medical records submitted by a given plan may increase or decrease before the RADV Audits are finalized."); Ex. D-64, Renjilian (United Expert) Updated Rep. (Dec. 3, 2023), ¶ 154 n.221 (explaining the disclaimer associated with the coding results that state they are not final); Ex. P-6, Renjilian (United Expert) Tr. 238:17-239:15 (stating that the results were not final) |
| D239 | 58.8% of the In Process Codes that are listed on the government's First Interrogatory Response that correspond to health conditions (HCCs) that were | Ex. D-64, Renjilian Rep. (12/3/3023) ¶ 163, Figure 14 | Disputed. Conflicting evidence presented. | Ex. P-56, CMS 30(b)(6) (Kapustij, Aug. 25, 2023) Tr. 182:20-184:7 (testifying that no preliminary audit reports have been issued; further testifying "That was the process as designed," but "these results have not |

The table header row above:

| DEFENDANTS' UNCONTROVERTED FACTS |
|---|

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | reviewed by CMS during RADV audits were validated by CMS auditors. | | | been issued, so I'm being kind of speculative."); Ex. P-21, CMS 30(b)(6) (Hornsby, Nov. 21, 2023) Tr. 22:12-23:7 (Preliminary results of RADV audits have not been released); *id.* 34:14-20 (testifying that there were no preliminary RADV results for contract years 2014 and 2015); Ex. P-32, Declaration of Steven Ferraina (Jul. 12, 2024), ¶ 8 ("The RADV Audits for CY 2011 through CY 2015 are not final. The initial results of medical record reviews and estimates of the portion of the audited HCCs that were found to be supported by medical records, provided to plans in the PFRs and through the portal, are not yet final and are subject to change. The portion of audited HCCs that were initially found to be supported by medical records submitted by a given plan may increase or decrease before the RADV Audits are finalized."); Ex. D-64, Renjilian (United Expert) Updated Rep. (Dec. 3, 2023) ¶ 154 n.221 (explaining the disclaimer associated with the coding results that state they are not final); Ex. P-6, Renjilian (United Expert) Tr. 238:17- |

The heading row above the table reads: **DEFENDANTS' UNCONTROVERTED FACTS**

| | | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
|---|---|---|---|---|---|
| | No. | Statement of Fact | Citation | Response | Citation |
| | | | | | 239:15 (stating that the results were not final) |
| | D240 | Dr. Garthwaite separately calculated the alleged financial impact on Medicare Part C and Part D payments from a set of "diagnosis codes included on two spreadsheets produced by Defendants, which contain diagnosis codes that [United] identified as having been included in their Claims Verification program but not having completed all the steps of the program" ("CV Pipeline List"). | Ex. D-57, Garthwaite Rep. (9/29/2023) ¶ 8 | Undisputed that Dr. Garthwaite separately calculated the financial impact on Medicare Part C and Part D payments from a set of "diagnosis codes included on two spreadsheets produced by Defendants, which contain diagnosis codes that [United] identified as having been included in their Claims Verification program but not having completed all the steps of the program" ("CV Pipeline List"). | |
| | D241 | Only 85.8% of the total CV Pipeline List diagnosis codes are in the First Interrogatory Response. | Ex. D-65, Renjilian Rebuttal Rep. (3/18/2024) ¶ 58 | Undisputed. | |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation | |
| D242 | Only 54.4% of the total CV Pipeline List diagnosis codes are in the Garthwaite Deletes. | Ex. D-65, Renjilian Rebuttal Rep. (3/18/2024) ¶ 58 | Undisputed. | | |
| D243 | As part of United's Chart Review Program, United conducted Second Level Reviews for certain charts in date of service years 2014-2016. | Ex. D-57, Garthwaite Rep. (9/29/2023) ¶ 51 (government expert noting second blind review of certain charts in service years 2014-2016); Ex. D-65, Renjilian Rebuttal Rep. (3/18/2024) ¶¶ 22-24 (United expert confirming same) | Undisputed. | | |
| D244 | During RADV audits, CMS auditors validated 89.5% of health conditions associated with codes on the government's First Interrogatory Response list whose charts underwent review by two United coders (so-called "Second Level Review"). | Ex. D-65, Renjilian Rebuttal Rep. (3/18/2024) ¶ 26 | Disputed. Conflicting evidence presented. | Ex. P-6, Renjilian (United Expert) Tr. 129:4-15 (explaining RADV audits were done at the HCC level); *id.* at 148:5-149:7 ("We can't know or don't know which specific diagnoses the RADV auditors reviewed to get to their conclusion that a given HCC was supported; so we don't know, one way or the other."); Ex. P-56, CMS 30(b)(6) (Kapustij, Aug. 25, 2023) Tr. 182:20-184:7 (testifying that no preliminary audit reports have been issued; further testifying "That was the process as designed," but "these | |

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | | | | results have not been issued, so I'm being kind of speculative."); Ex. P-21, CMS 30(b)(6) (Hornsby, Nov. 21, 2023) Tr. 22:12-23:7 (Preliminary results of RADV audits have not been released); *id.* 34:14-20 (testifying that there were no preliminary RADV results for contract years 2014 and 2015); Ex. P-32, Declaration of Steven Ferraina (Jul. 12, 2024), ¶ 8 ("The RADV Audits for CY 2011 through CY 2015 are not final. The initial results of medical record reviews and estimates of the portion of the audited HCCs that were found to be supported by medical records, provided to plans in the PFRs and through the portal, are not yet final and are subject to change. The portion of audited HCCs that were initially found to be supported by medical records submitted by a given plan may increase or decrease before the RADV Audits are finalized.") |
| D245 | During RADV audits, CMS auditors validated 92.2% of health conditions associated with codes on the government's First | Ex. D-65, Renjilian Rebuttal Rep. (3/18/2024) ¶ 26 | Disputed. Conflicting evidence presented. | Ex. P-6, Renjilian (United Expert) Tr. 129:4-15 (explaining RADV audits were done at the HCC level); *id.* at 148:5-149:7 ("We can't know or don't know which specific |

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | Interrogatory Response list whose charts underwent chart review by only one coder (so-called one level of review). | | | diagnoses the RADV auditors reviewed to get to their conclusion that a given HCC was supported; so we don't know, one way or the other."); Ex. P-56, CMS 30(b)(6) (Kapustij, Aug. 25, 2023) Tr. 182:20-184:7 (testifying that no preliminary audit reports have been issued; further testifying "That was the process as designed," but "these results have not been issued, so I'm being kind of speculative."); Ex. P-21, CMS 30(b)(6) (Hornsby, Nov. 21, 2023) Tr. 22:12-23:7 (Preliminary results of RADV audits have not been released); *id.* 34:14-20 (testifying that there were no preliminary RADV results for contract years 2014 and 2015); Ex. P-32, Declaration of Steven Ferraina (Jul. 12, 2024), ¶ 8 ("The RADV Audits for CY 2011 through CY 2015 are not final. The initial results of medical record reviews and estimates of the portion of the audited HCCs that were found to be supported by medical records, provided to plans in the PFRs and through the portal, are not yet final and are subject to change. The portion of audited HCCs that were initially found to be supported by |

| | | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation | |
| | | | | medical records submitted by a given plan may increase or decrease before the RADV Audits are finalized.") | |
| D246 | Three of the government experts—Dr. Stark, Dr. Acevedo, and Dr. Garthwaite—agreed that medical coders almost certainly miss some codes that are supported by documentation in the medical chart due to human error. | Ex. D-141, Stark Dep. 31:25-33:2 (government expert stating "[w]ell, I understand that coders don't always find the same answer.  So it seems that there's some variation and, therefore, some uncertainty."),  41:6-41:16 (stating with respect to RADV coders: "I mean, any process involving humans reading printed materials, some error rate.  I just don't know -- I haven't seen attempts to quantify it.  I don't have an independent basis for knowing what the accuracy would be."); Ex. D-110, Garthwaite Dep. 120:6-7 (government expert stating "I would imagine that like all processes in life, there are error rates."); Ex. D-87, Acevedo Dep. 154:12-18 (government expert agreeing that human error is a reason coders will miss supported codes) | Disputed.  Not supported by cited evidence. | *See* Ex. D-141, Stark Dep. 31:25-33:2, *id.* at 41:6-41:16; Ex. D-110, Garthwaite Dep. 120:6-7; Ex. D-87, Acevedo Dep. 154:12-18 (cited material does not discuss errors resulting in missed codes) | |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| **DEFENDANTS' UNCONTROVERTED FACTS** | | | | |
| D247 | In Part C and Part D of Medicare, changes in risk score for one member do not affect risk scores for other members. | Ex. D-110, Garthwaite Dep. 181:24-182:6 | Undisputed. | |
| D248 | When conducting Claims Verification, United's coders reviewed only the same charts as those reviewed for that member in chart review. | Ex. D-91, Bird 30(b)(6) Dep. (6/22/2023) 102:21-103:21 (United corporate representative describing review of exclusive HCCs), 109:1-18 (same); Ex. D-57, Garthwaite Rep. (9/29/2023) ¶¶ 55-56 (government expert noting "CV utilized Charts previously reviewed in the Chart Review Program to determine if there were any provider-reported diagnosis codes that had been submitted to CMS, but were not supported by the Chart."); Ex. D-139, Sedor 30(b)(6) Dep. 115:9-18 (United corporate representative noting "[w]hat [Claims Verification] did was to, when a medical record was looked at for chart review purposes to identify diagnosis codes that were not on the claim, it would also utilize those medical records to | Undisputed to the extent that, when conducting Claims Verification, United's coders reviewed the same charts as those reviewed for that member in chart review. Otherwise disputed to the extent the fact says "only," conflicting evidence presented. | Ex. P-16, United 30(b)(6) (Bird, Jun. 22, 2023) Tr. 179:19-181:4 (Corporate representative testifying that Ex. P-84, Exhibit 712-4, MARA161485 was accurate at the time it was written); Ex. P-84, Exhibit 712-4, MARA161485, at P. 13 (CV process document showing that part of the CV process included querying other medical records already collected by United to attempt to identify support for an HCC) |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | DEFENDANTS' UNCONTROVERTED FACTS | | |
|---|---|---|---|---|
| | | Citation | Response | Citation |
| | | compare against the claim submitted by the provider to see if there were any codes submitted on the claim that were not supported by the medical records.") | | |
| D249 | When conducting Claims Verification, United's coders did not review all medical charts for each beneficiary for each year. | Ex. D-91, Bird 30(b)(6) Dep. (6/22/2023) 102:15-103:21(United corporate representative stating that Claims Verification "was a program that we operated during a certain time frame that identified and reviewed exclusive HCCs that were submitted by providers that were part of the chart review program."), 109:1-18 (describing exclusive HCCs in-scope for Claims Verification as an "HCC or diagnoses that mapped to an HCC and that HCC is submitted by one and only one provider"); Ex. D-57, Garthwaite Rep. (9/29/2023) ¶¶ 55-56 (government expert noting "[t]he CV program applied only to a subset of Charts that had been reviewed in the Chart Review Program."); | Disputed. Not supported by cited evidence. | |

| | | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | | Ex. D-139, Sedor 30(b)(6) Dep. 115:9-18 (United corporate representative describing HCCs eligible for Claims Verification) | | |
| D250 | The existence of an unsupported diagnosis code, alone, does not necessarily mean that a Medicare Advantage plan has been overpaid. | Ex. D-125, Lambert Dep. 198:22-199:6 (United expert testifying that "unsupported diagnoses do not necessarily result in overpayments"); Ex. D-62, Lambert Rep. (9/29/2023) at 1, 14 (existence of unsupported code cannot necessarily be an overpayment under actuarial principle of Data Consistency); Ex. D-123, Kessler Dep. 114:10-115:16 (United expert noting that the fact that "there are unsupported -- so the fact that there are unsupported codes in Medicare Advantage doesn't tell you whether Medicare Advantage plans in general are overpaid or underpaid"); Ex. D-61, Kessler Rep. (9/29/2023) ¶ 50 ("the presence of unsupported codes in any particular plan's data is insufficient to establish that CMS has 'overpaid' or 'underpaid' it."); Ex. D-116, | Disputed. Mischaracterizes evidence. | Ex. P-10, Rice Tr. 84:4-85:1 and 147:6-148:3 (CMS Deputy Director for the Center for Medicare testifying that MAOs are required to correct previously submitted diagnosis data and they do not need to make an overpayment determination before deleting a diagnosis code that is not supported by a medical record since the payment system automatically makes that determination.); Ex. P-6, Renjilian (United Expert) Tr. 50:19-51:7 (testifying that he would advise clients to delete diagnosis codes that were not supported by the medical record even if the client did not know if the deletion of the diagnosis codes would have a financial impact); *id.* at 68:17-70:7 (testifying that his understanding is that the CMS payment process will not account for diagnosis codes that have not been submitted to CMS); Ex. D-66, Dep. Ex. 164, Medicare+Choice Program, 65 Fed. Reg 40,170, 40,268 (proposed June 29, 2000) (to be |

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | | Hornsby 30(b)(6) Dep. (5/25/2023) 281:2-18 (CMS corporate representative agreeing that existence of an unsupported code does not necessarily mean plan is overpaid); Ex. D-145, Tudor Dep. 212:23-213:7 (former CMS employee agreeing to the same); Ex. D-137, Rice Tr. 80:24-84:7 (CMS employee admitting deletion of certain codes would not affect payment) | | codified at 42 C.F.R. pt. 422) (CMS stating that submission of a diagnosis code is considered a claim for payment) |
| D251 | Between at least 2010 and 2018, CMS considered how to adjust RADV-audit results to account for unsupported codes present in the FFS data used to calibrate the CMS-HCC risk adjustment model using a FFS Adjuster. | Ex. D-129, Mills 30(b)(6) Dep. 59:5-70:10 (CMS corporate representative describing CMS consideration of the FFS Adjuster between January 2010 through 2018), Ex. D-41, CMS, *Notice of Final Payment Error Calculation Methodology for Part C Medicare Advantage Risk Adjustment Data Validation Contract-Level Audits*, Feb. 24, 2012, at 4-5 (same) | Undisputed. | |

The table above has the header row:

**DEFENDANTS' UNCONTROVERTED FACTS**

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| D252 | During this time, individuals within CMS believed that the existence of unsupported codes in FFS data used to calibrate the model affected whether payments to Medicare Advantage plans were accurate. | Ex. D-129, Mills 30(b)(6) Dep. 78:1-80:2 (CMS corporate representative describing CMS recommendation to implement FFS Adjuster), *id.* at 157:6-19 (same); *id.* at 150:18-152:8 (describing Notice of Final Payment Error Calculation Methodology that proposed FFS Adjuster); Ex. D-41, CMS, *Notice of Final Payment Error Calculation Methodology for Part C Medicare Advantage Risk Adjustment Data Validation Contract-Level Audits*, Feb. 24, 2012, at 4-5 (same) | Disputed. Mischaracterizes cited evidence, not supported by cited evidence, and conflicting evidence presented. | Ex. D-129, Mills 30(b)(6) Dep. 78:1-80:2 (discussion is limited to application of an FFS Adjuster in the context of an extrapolated RADV Audit and witness does not confirm that "individuals within CMS believed that the existence of unsupported codes in FFS data used to calibrate the model affected whether payments to Medicare Advantage plans were accurate"); *id.* at 157:6-19 (same); *id.* at 150:18-152:8 (same); D-41, CMS, Notice of Final Payment Error Calculation Methodology for Part C Medicare Advantage Risk Adjustment Data Validation Contract-Level Audits, Feb. 24, 2012, at 4-5 (same) |
| D253 | According to one of CMS's 30(b)(6) witnesses, during this time, some officials within CMS believed that some type of accounting for the errors in the data used to calibrate the CMS-HCC risk adjustment model, akin to the FFS Adjuster, needed to be applied outside of RADV in determining plan- | Ex. D-129, Mills 30(b)(6) Dep. 181:19-187:7 | Disputed. Mischaracterizes cited evidence and conflicting evidence presented. | Ex. D-129, CMS 30(b)(6) (Mills) Tr. 184:2-7; 186:17-187:20 (clarifies that the discussion was in the context of RADV Audits and referring to an Notice of Proposed Rulemaking where CMS decided not to apply a FFS Adjuster in the context of an extrapolated RADV Audit); Ex. P-70, Rebecca Paul Tr. 181:23-182:13, 250:3-15, (the FFS Adjuster concept was linked to RADV Audits); Ex. P- |

| | | | | |
|---|---|---|---|---|
| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
| No. | Statement of Fact | Citation | Response | Citation |
| | identified overpayments on the grounds that overpayments in RADV are "very similar" to self-identified overpayments. | | | 10, Rice Tr. 109:8-111:4 (CMS Deputy Director for the Center for Medicare testifying that the FFS Adjuster was only considered within the context of extrapolated RADV Audits); Ex. P-83, Kapustij (Aug. 25, 2022) Tr. 16:6-19 (witness testifying she worked at CMS from 2009-2021, which included work on the FFS Adjuster, stating: "So the fee-for-service adjuster was a concept that was put forward by the MA industry and taken up by CMS as a means to offset recoveries for risk adjustment data validation audits."); Ex. P-53, Kornfield Tr. 106:13-109:1 (testifying that an FFS Adjuster only makes sense in the context of an extrapolated RADV Audit) |
| D254 | A government expert—Dr. Ingber—admitted that the relative factors estimated by the CMS-HCC risk adjustment model would increase if you remove unsupported HCCs from the data used to develop the CMS-HCC risk adjustment model and hold everything | Ex. D-121, Ingber Dep. (3/14/2024) 59:13-61:17 (government expert describing knowledge of unsupported codes in the FFS data used to develop the CMS-HCC risk adjustment model), 160:5-162:6 (calculating what would happen to the weighted average of the relative factors in an exemplar CMS-HCC risk adjustment | Disputed. Not supported by cited evidence and conflicting evidence presented. | Ex. D-60, Ingber (US Expert) Rebuttal Report (Jan. 26, 2024), at p. 27 (US Expert: "In the estimation for relative risk factors, because all the beneficiary costs used in the model estimation are accounted for, irrespective of the presence of the unsupported codes, the unsupported codes have only small effects on the average estimated risk factors. Some go up and some go down, and the net |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
| | else, including costs, constant. | model when unsupported codes are removed), 166:7-172:2 (agreeing that the weighted average of the relative factors goes up when you take out the unsupported codes from the exemplar CMS-HCC risk adjustment model) | | effect on large group risk scores is much smaller than the effect on risk scores in the payment phase. If the result of an unsupported code for a beneficiary is to reduce a relative factor, the value for everyone in the same demographic group or some related HCC would be slightly increased.") |
| D255 | A government expert—Dr. Ingber—admitted that the relative factors estimated by the CMS-HCC risk adjustment model are lower than they otherwise would have been as a result of the inclusion of unsupported HCCs in the data used to develop the CMS-HCC risk adjustment model. | Ex. D-121, Ingber Dep. (3/14/2024) 59:13-61:17 (government expert describing knowledge of unsupported codes in the FFS data used to develop the CMS-HCC risk adjustment model), 160:5-162:6 (calculating what would happen to the weighted average of the relative factors in an exemplar CMS-HCC risk adjustment model when unsupported codes are removed), 166:7-172:2 (agreeing that the weighted average of the relative factors goes up when you take out the unsupported codes from the exemplar CMS-HCC risk adjustment model)2 | Disputed. Not supported by cited evidence and conflicting evidence presented. | Ex. D-60, Ingber (US Expert) Rebuttal Report (Jan. 26, 2024), p. 24 (US Expert describing the impact of accounting for both unsubmitted and unsupported diagnosis codes on relative factors and concluding the result may be to "minimize or cancel out impacts on the relative risk factors." Dr. Ingber also criticizes Ms. Julia Lambert, for failing to consider the impact of unsubmitted codes in her analysis.); Ex. P-67, Lambert (United Expert) Tr. 181:14-182:22 (confirming that if CMS accounts for both unsubmitted diagnosis codes and unsupported codes when re-calibrating the CMS HCC Risk Adjustment model, as a matter of math, the average of the risk factors "can go up, the average can go down, or the average can stay |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | | **DEFENDANTS' UNCONTROVERTED FACTS** | | |
| | | | | the same."); Ex. P-37, Spitalnic (US Expert) Rebuttal Report (Jan. 25, 2024), ¶ 5 (US Expert and CMS Chief Actuary stating that "even if there were data inconsistencies resulting from the reliance on unaudited diagnosis data used in the development of the risk adjustment model, this potential inconsistency would not result in an underpayment to Medicare Advantage plans" and opining that an audit of the FFS data would review for both unsubmitted codes and unsupported codes and that "it is uncertain if this would lead to a net increase or decrease in cumulative diagnoses codes as the audit would result in some codes being added and others being deleted.".) |
| D256 | CMS's deadline for risk adjustment data submissions for 2008 dates of service was January 31, 2010. | *See* Ex. D-14, Medicare Program, 73 Fed. Reg. 48434, 48651 (Aug. 19, 2008) (noting that the deadline for risk adjustment submissions was being moved from December 31 to January 31); Ex. D-158, 2010 Call Letter at 100 (March 30, 2009) (listing submission | Undisputed. | |

| | | | DEFENDANTS' UNCONTROVERTED FACTS | | |
|---|---|---|---|---|---|
| | No. | Statement of Fact | Citation | Response | Citation |
| 3 4 | | | deadline for DOS 2008 as January 31, 2010) | | |
| 5 6 7 8 9 10 11 12 13 14 15 | D257 | For Payment Year 2009, Justin Roth signed an attestation on March 19, 2009 on behalf of specified UnitedHealth entities certifying that based on UnitedHealth's best knowledge, information, and belief as of the date the attestation was signed, all risk adjustment information submitted to CMS for 2008 dates of service as of December 31, 2008 and not subsequently deleted prior to the date of signature was accurate, complete, and truthful. | Ex. D-159, USBP060624234 at -24253 | Undisputed. | |
| 16 17 18 19 20 | D258 | Justin Roth's March 19, 2009 attestation included a footnote explaining that the certification was based on "based on facts reasonably available or made available to the MA Organization as of the date of this | Ex. D-159, USBP060624234 at -24253 | Undisputed. | |

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | Certification," and that "best knowledge, information, and belief means based on normal business practices." | | | |
| D259 | All attestations signed by United for Payment Year 2009 contained identical terms to the attestation signed by Justin Roth on March 19, 2009 and were signed in or around March 2009. | Ex. D-160, Joint Stipulation on Contracts and Related Entities | Disputed to the extent that D-160 does not include a stipulation as to the timing of all attestation signatures for 2009, not supported by cited evidence. Otherwise, undisputed. | |
| D260 | CMS's deadline for risk adjustment data submissions for 2009 dates of service was January 31, 2011. | *See* Ex. D-158, 2010 Call Letter at 101 (March 30, 2009) (listing submission deadline for DOS 2009 as January 31, 2011) | Undisputed. | |
| D261 | For Payment Year 2010, John Larsen signed an attestation on March 26, 2010 on behalf of specified UnitedHealth entities certifying that based on UnitedHealth's best knowledge, information, and belief as of the date the attestation was signed, all | Ex. D-28, USBP008083511 | Undisputed. | |

The table title above (spanning all columns): **DEFENDANTS' UNCONTROVERTED FACTS**

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| | risk adjustment information submitted to CMS for 2009 dates of service as of December 31, 2009 and not subsequently deleted prior to the date of signature was accurate, complete, and truthful. | | | |
| D262 | John Larsen's March 26, 2010 attestation included a footnote explaining that the certification was based on "based on facts reasonably available or made available to the MA Organization as of the date of this Certification," and that "best knowledge, information, and belief means based on normal business practices." | Ex. D-28, USBP008083511 | Undisputed. | |
| D263 | All attestations signed by United for Payment Year 2010 contained identical terms to the attestation signed by John Larsen on March 26, 2010 and were | Ex. D-160, Joint Stipulation on Contracts and Related Entities | Disputed to the extent that D-160 does not include a stipulation as to the timing of all attestation signatures for 2010, not supported by | |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
|---|---|---|---|---|
| **No.** | **Statement of Fact** | **Citation** | **Response** | **Citation** |
| | signed in or around March 2010. | | cited evidence. Otherwise, undisputed. | |
| D264 | Dr. Garthwaite has not and is not offering an opinion about what would happen in a but-for world in which United had performed the analysis that Dr. Garthwaite performed in his report and had changed its submission of codes accordingly. | Ex. D-110, Garthwaite Dep. 77:10-79:3 | Disputed. Not supported by cited evidence and conflicting evidence presented. | Ex. D-57, Garthwaite (US Expert) Rep. (Sept. 29, 2023) ¶ 86(iii) (US Expert explaining that he calculated a "change in payment, which reflects the amount by which Defendants' risk adjustment payments would have been reduced had they submitted the Deletes to CMS."); Ex. P-74, Garthwaite (US expert) Tr. 78:16-22 (US Expert: "the question we are trying to answer is how would the flow of funds have changed if as of the time period we're asking the question, the code that lacks support in United's chart review and risk adjustment data were removed from the system."); Ex. P-6, Renjilian (United Expert) Tr. 253:7-10 ("So, in other words, modeling -- I think in Dr. Garthwaite's work he's modeled what he believes reimbursement might have looked like had these things been deleted.") |
| D265 | Dr. Garthwaite has not and is not offering an opinion about | Ex. D-110, Garthwaite Dep. 77:10-79:3 | Disputed. Not supported by cited evidence and | Ex. D-57, Garthwaite (US Expert) Rep. (Sept. 29, 2023) ¶ 86(iii) (US Expert explaining that he calculated a |

| | | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|---|
| **No.** | **Statement of Fact** | **Citation** | **Response** | **Citation** | |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | but for damages. | | conflicting evidence presented. | "change in payment, which reflects the amount by which Defendants' risk adjustment payments would have been reduced had they submitted the Deletes to CMS."); Ex. P-74, Garthwaite (US expert) Tr. 78:16-22 (US Expert: "the question we are trying to answer is how would the flow of funds have changed if as of the time period we're asking the question, the code that lacks support in United's chart review and risk adjustment data were removed from the system."); Ex. P-6, Renjilian (United Expert) Tr. 253:7-10 ("So, in other words, modeling -- I think in Dr. Garthwaite's work he's modeled what he believes reimbursement might have looked like had these things been deleted.") |
| D266 | Dr. Garthwaite has not and is not offering an opinion about how United would have contemporaneously changed their other behaviors if United had deleted the codes on the Garthwaite deletes list. | Ex. D-110, Garthwaite Dep. 77:10-79:3 | Undisputed. | |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|
| No. | Statement of Fact | Citation | Response | Citation |
| D267 | After a patient visits a doctor and the doctor or the doctor's coder identifies one or more diagnosis codes that they determine match the conditions documented in the medical chart, the doctor then submits that information on a claim form to CMS (if the beneficiary is in FFS). | Ex. D-122, Kapustij Dep. (8/25/2022) 39:22-40:4 (government employee stating there was coding error in FFS claims data); Ex. D-44, Medicare Payment Advisory Commission, *Issues for Risk Adjustment in Medicare Advantage* at 103-04, in Report to Congress: Medicare and Health Care Delivery System (Chapter 4), Washington, DC (June 2012) (describing that coding for various HCCs between 2007 and 2008 were not consistently coded by MA plans in those years); Ex. D-48, Richard Kronick & W. Pete Welch, *Measuring Coding Intensity in the Medicare Advantage Program*, Medicare & Medicaid Research Review, 4(2), at E5 (2014) (stating FFS coding is "often incomplete"); Ex. D-119, Hutchinson Dep. 32:21-33:4 (former CMS employee stating there was coding error in FFS claims data); Ex. D-120, Ingber Dep. (6/14/2022) 32:12-21 (government employee stating | Disputed. Not supported by cited evidence. | |

| No. | Statement of Fact | Citation | Response | Citation |
|---|---|---|---|---|
| | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
| | that FFS data had "all kinds" of errors) | | | |
| D268 | DOJ alleges that United received money from CMS to which it was "not entitled, which unjustly enriched Defendants," because United "received such money by claiming and retaining Medicare risk adjustment payments based on invalid risk adjustment data." | Ex. D-1, Am. Compl. ¶ 357 | Undisputed. | |
| D269 | DOJ alleges that CMS "paid money to Defendants as a result of a mistaken understanding" because it paid United's "claims for risk adjustment payments under the mistaken understanding that such claims were based on valid risk adjustment data." | Ex. D-1, Am. Compl. ¶ 360 | Undisputed. | |
| D270 | For 2008-2016 DOS years, Optum targeted charts to review in part based on suspect logic intended to | *See* Ex. D-89, Baker 30(b)(6) Dep. (5/30/2023) 68:14-71:11, 93:18-101:19 | Undisputed. | |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

| | | DEFENDANTS' UNCONTROVERTED FACTS | | | |
|---|---|---|---|---|---|
| | No. | Statement of Fact | Citation | Response | Citation |
| | | identify patients with medical conditions for which corresponding diagnosis codes were not already reflected in the claims data submitted by the patients' providers for the relevant year. | | | |
| | D271 | In 2009, as part of the official OIG RADV audit process, United informed HHS-OIG officials that its chart review program did not seek to determine whether codes previously reported to CMS were documented in the medical record. | Ex. D-151, Lara Dep. Ex. 1124-2 (Pacificare Response to OIG Questions), at USBP064584717 ("[A] chart review involved review of the diagnoses reflected in a selected provider's patient charts to determine if any documented diagnoses had not been reported to CMS. Following a chart review, we submitted to CMS any new codes documented in the medical chart but did not determine whether the codes previously reported to CMS were documented in the medical record…"); Ex. D-136, Renshaw (Assistant Regional Inspector General of Audit Services at the Office of Audit Services in HHS's OIG) Dep. 103:23-104:6 ("Q. So is it fair to | Disputed. Conflicting evidence presented. | Ex. D-151, Dep. Ex. 1124-2, USBP064584712 at USBP064584717 (the same 2009 Pacificare Response to Questions communicated that United's "chart validation" process "involved the review of a provider's patient charts to determine whether they supported certain codes that the provider had reported" and that "[c]odes found to be inaccurate or incomplete through chart validations were deleted"); Ex. P-58, Lara Tr. 60:14-61:11 (agreeing that Pacificare stated that in addition to Chart Review, United had a Chart Validation program that "involved the review of a provider's patient charts to determine whether they supported certain codes that the provider had reported" and where "[c]odes found to be inaccurate or |

| No. | Statement of Fact | Citation | Response | Citation |
|-----|-------------------|----------|----------|----------|
| | **DEFENDANTS' UNCONTROVERTED FACTS** | | | |
| | | say that PacifiCare explained to OIG here that as part of its chart review, it was not also determining whether codes previously reported to CMS were documented in the medical record? MS. GLOVER: Objection to form. THE WITNESS:  That's clear—yeah, that's clear. That's sort of— that's been my understanding of this all along."). | | incomplete through chart validations were deleted.") |

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx

Case 2:16-cv-08697-FMO-PVC    Document 616-1    Filed 08/06/24    Page 209 of 211
Page ID #:18877


1    Dated: August 6, 2024             Respectfully submitted,

2                              LATHAM & WATKINS LLP
                                 DAVID J. SCHINDLER

3                              MANUEL A. ABASCAL
                             DANIEL MERON

4                              ABID R. QURESHI

5

6                By: _/s/ David J. Schindler_

                             David J. Schindler

7                              Attorneys for United Defendants

8                              LATHAM & WATKINS LLP

9                              Daniel Meron (appearing pro hac vice)
                             *daniel.meron@lw.com*

10                             Abid R. Qureshi (appearing pro hac vice)
                             *abid.qureshi@lw.com*

11                             555 Eleventh Street, NW, Suite 1000
                            Telephone: +1.202.637.2200

12                             Facsimile: +1.202.637.2201

13                             BARTLIT BECK LLP
                            Philip S. Beck (appearing *pro hac vice*)

14                             *philip.beck@bartlitbeck.com*
                            Sean W. Gallagher (appearing *pro hac vice*)

15                             *sean.gallagher@bartlitbeck.com*
                            Cindy L. Sobel (appearing *pro hac vice*)

16                             *cindy.sobel@bartlitbeck.com*
                            Nicolas Martinez (appearing *pro hac vice*)

17                             *nicolas.martinez@bartlitbeck.com*
                            Benjamin R. Montague

18                             *benjamin.montague@bartlitbeck.com*
                            54 W. Hubbard Street, Suite 300

19                             Chicago, Illinois 60654-8174
                            Telephone: +1.312.494.4400

20                             Facsimile: +1.312.494.4440

21                             BARTLIT BECK LLP
                            Andrew C. Baak (appearing *pro hac vice*)

22                             *andrew.baak@bartlitbeck.com*
                            Jameson R. Jones (appearing *pro hac vice*)

23                             *jameson.jones@bartlitbeck.com*
                            1801 Wewatta Street, Suite 1200

24                             Denver, Colorado 80202-6318
                            Telephone: +1.303.592.3100

25                             Facsimile: +1.303.592.3140

26                             Attorneys for United Defendants

27                             MICHAEL D. GRANSTON
                            Deputy Assistant Attorney General, Civil Division

28                             E. MARTIN ESTRADA

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx
207

United States Attorney
DAVID M. HARRIS
ROSS M. CUFF
JACK D. ROSS
HUNTER B. THOMSON
PAUL LA SCALA
Assistant United States Attorneys

JAMIE ANN YAVELBERG
ROBERT McAULIFFE
EDWARD CROOKE
LINDA McMAHON
JESSICA E. KRIEG
AMY L. LIKOFF
GREGORY A. MASON
MARTHA N. GLOVER
WENDY ZUPAC
Civil Division, Department of Justice

TRINI E. ROSS
United States Attorney
DAVID CORIELL
Assistant United States Attorney

_Linda McMahon_

Linda McMahon
Attorneys for the United States of America

JAMIE ANN YAVELBERG
ROBERT McAULIFFE
EDWARD CROOKE
LINDA McMAHON
JESSICA E. KRIEG
AMY L. LIKOFF
GREGORY A. MASON
MARTHA N. GLOVER
WENDY ZUPAC
Attorneys, Civil Division, U.S. Department of
Justice
P.O. Box 261, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-0486; Fax: (202) 307-3852
Email:  robert.mcauliffe@usdoj.gov

TRINI E. ROSS
United States Attorney
DAVID CORIELL
Assistant United States Attorney
138 Delaware Avenue
Buffalo, New York 14201
Tel: (716) 843-5830; Fax: (716) 551-3052
Email:  david.coriell@usdoj.gov

Attorneys for the United States of America

1                                       <u>**ATTESTATION**</u>

2        I hereby attest that the other signatories listed, on whose behalf this filing is

3 submitted, concur in its content and have authorized its filing.

4 Dated:  August 6, 2024

5                                  *<u>/s/ David J. Schindler</u>*
                                  David J. Schindler

STATEMENT OF UNCONTROVERTED FACTS
CASE NO. 2-16-CV-08697-FMO-PVCx