LATHAM & WATKINS LLP
  David J. Schindler (Bar No. 130490)
   *david.schindler@lw.com*
  Manuel A. Abascal (Bar No. 171301)
   *manny.abascal@lw.com*
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone: +1.213.485.1234;
Facsimile: +1.213.891.8763

*Attorneys for United Defendants*

MICHAEL D. GRANSTON
Deputy Assistant Attorney General, Civil Division
E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
ROSS M. CUFF
JACK D. ROSS (CBN 265883)
HUNTER B. THOMSON (CBN 330533)
Assistant United States Attorneys
300 N. Los Angeles Street, Room 7516
Los Angeles, California 90012
Tel: (213) 894-6379; Fax: (213) 894-7819
Email: *hunter.thomson@usdoj.gov*

*Attorneys for the United States of America*

[Additional Counsel Listed on Next page]

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING, <br><br> Plaintiff, <br><br> v. <br><br> UNITEDHEALTH GROUP, INC. *et al.*, <br><br> Defendants. | CASE NO. 2:16-cv-08697-FMO-PVCx <br><br> **JOINT EVIDENTIARY APPENDIX** <br><br> **VOLUME 2 OF 14** <br> **EXHIBITS D-1 THROUGH D-15** <br> **PAGES 0001 THROUGH 0634** <br><br> Hon. Fernando M. Olguin <br><br> Hearing Date: September 5, 2024 <br> Hearing Time: 10:00 a.m. <br> Courtroom: 6D |

LATHAM & WATKINS LLP
　　Daniel Meron (appearing *pro hac vice*)
　　　daniel.meron@lw.com
　　Abid R. Qureshi (appearing *pro hac vice*)
　　　abid.qureshi@lw.com
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
Telephone: +1.202.637.2200
Facsimile: +1.202.637.2201

BARTLIT BECK LLP
　　Philip S. Beck (appearing *pro hac vice*)
　　　philip.beck@bartlitbeck.com
　　Sean W. Gallagher (appearing *pro hac vice*)
　　　sean.gallagher@bartlitbeck.com
　　Cindy L. Sobel (appearing *pro hac vice*)
　　　cindy.sobel@bartlitbeck.com
　　Nicolas Martinez (appearing *pro hac vice*)
　　　nicolas.martinez@bartlitbeck.com
　　Benjamin R. Montague (appearing *pro hac vice*)
　　　benjamin.montague@bartlitbeck.com
54 W. Hubbard Street, Suite 300
Chicago, Illinois 60654-8174
Telephone: +1.312.494.4400
Facsimile: +1.312.494.4440

BARTLIT BECK LLP
　　Andrew C. Baak (appearing *pro hac vice*)
　　　andrew.baak@bartlitbeck.com
　　Jameson R. Jones (appearing *pro hac vice*)
　　　jameson.jones@bartlitbeck.com
1801 Wewatta Street, Suite 1200
Denver, Colorado 80202-6318
Telephone: +1.303.592.3100
Facsimile: +1.303.592.3140

*Attorneys for United Defendants*

JAMIE ANN YAVELBERG
ROBERT McAULIFFE
EDWARD CROOKE
LINDA McMAHON
JESSICA E. KRIEG
AMY L. LIKOFF
GREGORY A. MASON
MARTHA N. GLOVER
WENDY ZUPAC
Attorneys, Civil Division, U.S. Department of Justice
　　　P.O. Box 261, Ben Franklin Station
　　　Washington, D.C. 20044
　　　Tel: (202) 307-0486; Fax: (202) 307-3852
　　　Email:  robert.mcauliffe@usdoj.gov
TRINI E. ROSS
United States Attorney

DAVID CORIELL
Assistant United States Attorney
    138 Delaware Avenue
    Buffalo, New York 14201
    Tel: (716) 843-5830; Fax: (716) 551-3052
    Email:  david.coriell@usdoj.gov

*Attorneys for the United States of America*

**EXHIBIT D-1**

1  CHAD A. READLER
   Principal Deputy Assistant Attorney General, Civil Division
2  SANDRA R. BROWN
   Acting United States Attorney
3  DOROTHY A. SCHOUTEN
   DAVID K. BARRETT
4  JOHN E. LEE (CBN 128696)
   Assistant United States Attorneys
5       300 N. Los Angeles Street, Room 7516
        Los Angeles, California 90012
6       Tel: (213) 894-3995; Fax: (213) 894-7819
        Email: john.lee2@usdoj.gov
7  MICHAEL D. GRANSTON
   DANIEL R. ANDERSON
8  CAROL L. WALLACK
   JESSICA KRIEG
9  JUSTIN DRAYCOTT
   PAUL PERKINS
10 Attorneys, Civil Division
   United States Department of Justice
11      P.O. Box 261, Ben Franklin Station
        Washington, D.C. 20044
12      Tel: (202) 307-0486; Fax: (202) 307-3852
        E-mail:  carol.wallack@usdoj.gov
13 JAMES P. KENNEDY, JR.
   Acting United States Attorney
14 KATHLEEN ANN LYNCH
   Assistant United States Attorney (Admitted PHV)
15      138 Delaware Avenue
        Buffalo, New York 14201
16      Tel: (716) 843-5830; Fax: (716) 551-3052
        E-mail:  kathleen.lynch@usdoj.gov
17 Attorneys for the United States of America

18              UNITED STATES DISTRICT COURT

19          FOR THE CENTRAL DISTRICT OF CALIFORNIA

20                   WESTERN DIVISION

21 | UNITED STATES OF AMERICA *ex* | No. CV 16-08697 MWF (SSx)
   | *rel.* BENJAMIN POEHLING, |
22 | | UNITED STATES' AMENDED
   |              Plaintiffs, | COMPLAINT-IN-PARTIAL-
23 | | INTERVENTION AND DEMAND FOR
   |              v. | JURY TRIAL
24 | |
   | UNITEDHEALTH GROUP, INC., a |
25 | Delaware corporation; UNITED |
   | HEALTHCARE SERVICES, INC., a |
26 | Minnesota corporation; UNITED |
   | HEALTHCARE, INC., a Delaware |
27 | corporation; OVATIONS, INC., a |
   | Delaware corporation; OPTUM, INC., a |
28 | Delaware corporation; |
   | OPTUMINSIGHT, INC., a Delaware |
   | corporation; AMERICHOICE OF NEW |

1  JERSEY, INC., a New Jersey
   corporation; ARIZONA PHYSICIANS
2  IPA, INC., an Arizona corporation;
   CARE IMPROVEMENT PLUS OF
3  MARYLAND, INC., a Maryland
   corporation; CARE IMPROVEMENT
4  PLUS OF TEXAS INSURANCE
   COMPANY, a Texas insurance
5  company; CARE IMPROVEMENT
   PLUS SOUTH CENTRAL
6  INSURANCE CO., an Arkansas
   insurance company; CARE
7  IMPROVEMENT PLUS WISCONSIN
   INSURANCE COMPANY, a Wisconsin
8  insurance company; OPTUM
   INSURANCE CO., an Ohio corporation;
9  CITRUS HEALTH CARE, INC., a
   Florida corporation; HEALTH PLAN OF
10 NEVADA, INC., a Nevada corporation;
   MEDICA HEALTHCARE PLANS,
11 INC., a Florida corporation; OXFORD
   HEALTH PLANS (CT), INC., a
12 Connecticut corporation; OXFORD
   HEALTH PLANS (NJ), INC., a New
13 Jersey corporation also known as Oxford
   Health Plans of New Jersey, Inc.;
14 OXFORD HEALTH PLANS (NY),
   INC., a New York corporation;
15 PACIFICARE LIFE AND HEALTH
   INSURANCE COMPANY, an Indiana
16 insurance company; PACIFICARE OF
   ARIZONA, INC., an Arizona
17 corporation; PACIFICARE OF
   COLORADO, INC., a Colorado
18 corporation; PACIFICARE OF
   NEVADA, INC., a Nevada corporation
19 also known as PacifiCare/UHC of
   Nevada; PHYSICIANS HEALTH
20 CHOICE OF TEXAS, LLC, a Texas
   limited liability company; PREFERRED
21 CARE PARTNERS, INC., a Florida
   corporation; ROCKY MOUNTAIN
22 HEALTH MAINTENANCE
   ORGANIZATION, INC., a Colorado
23 company; SIERRA HEALTH AND
   LIFE INSURANCE COMPANY, INC.,
24 a Nevada corporation; SYMPHONIX
   HEALTH INSURANCE, INC., an
25 Illinois insurance company;
   UNITEDHEALTHCARE OF
26 CALIFORNIA, INC., a California
   corporation also known as UHC of
27 California, Inc. and formerly known as
   PacifiCare of California, Inc. and
28 PacifiCare of California/Secure
   Horizons; UNISON HEALTH PLAN OF

2

0003

Case 2:16-cv-08697-FMO-PVC   Document 616-3   Filed 08/06/24   Page 7 of 637   Page
ID #:21105
Case 2:16-cv-08697-MWF-SSC   Document 71   Filed 11/17/17   Page 3 of 186   Page ID #:18901

1  TENNESSEE, INC., a Tennessee
   corporation; UNITED HEALTH CARE
2  INS. CO. AND UNITED NEW YORK, a
   New York insurance company;
3  UNITEDHEALTHCARE BENEFITS
   OF TEXAS, INC., a Texas corporation
4  formerly known as PacifiCare of Texas,
   Inc.; UNITEDHEALTHCARE
5  COMMUNITY PLAN OF OHIO, INC.,
   an Ohio corporation formerly known as
6  Unison Health Plan of Ohio, Inc.;
   UNITEDHEALTHCARE
7  COMMUNITY PLAN OF TEXAS,
   L.L.C., a Texas limited liability company
8  formerly known as Evercare of Texas,
   LLC; UNITEDHEALTHCARE
9  COMMUNITY PLAN, INC., a Michigan
   corporation also known as Great Lakes
10 Health Plan, Inc. and UnitedHealthcare
   of the Great Lakes Health Plan, Inc.;
11 UNITEDHEALTHCARE INSURANCE
   COMPANY, a Connecticut insurance
12 company also known as United
   Healthcare Insurance Company;
13 UNITEDHEALTHCARE INSURANCE
   COMPANY OF NEW YORK, a New
14 York insurance company also known as
   United Healthcare Insurance Company of
15 New York; UNITEDHEALTHCARE OF
   ALABAMA, INC., an Alabama
16 corporation also known as United
   HealthCare of Alabama, Inc.;
17 UNITEDHEALTHCARE OF
   ARIZONA, INC., an Arizona
18 corporation also known as United
   HealthCare of Arizona, Inc.;
19 UNITEDHEALTHCARE OF
   ARKANSAS, INC., an Arkansas
20 corporation also known as United
   Healthcare of Arkansas, Inc.;
21 UNITEDHEALTHCARE OF
   FLORIDA, INC., a Florida corporation
22 also known as United Healthcare of
   Florida, Inc.; UNITEDHEALTHCARE
23 OF GEORGIA, INC., a Georgia
   corporation also known as United
24 Healthcare of Georgia, Inc.;
   UNITEDHEALTHCARE OF NEW
25 ENGLAND, INC., a Rhode Island
   corporation also known as United
26 HealthCare of New England, Inc. and
   United Health Plans of New England,
27 Inc.; UNITEDHEALTHCARE OF NEW
   YORK, INC., a New York corporation
28 also known as AmeriChoice of New
   York, Inc. and United Healthcare of New

3

Case 2:16-cv-08697-FMO-SS   Document 616-3   Filed 08/06/24   Page 8 of 637   Page
ID #:18902
Case 2:16-cv-08697-MWF-SS   Document 171   Filed 11/17/17   Page 4 of 196   Page ID #:2106

1  York, Inc.; UNITEDHEALTHCARE OF
   NORTH CAROLINA, INC., a North
2  Carolina corporation also known as
   United Healthcare of North Carolina,
3  Inc.; UNITEDHEALTHCARE OF
   OHIO, INC., an Ohio corporation also
4  known as United Healthcare of Ohio,
   Inc.; UNITEDHEALTHCARE OF
5  OKLAHOMA, INC., an Oklahoma
   corporation formerly known as
6  PacifiCare of Oklahoma, Inc.;
   UNITEDHEALTHCARE OF OREGON,
7  INC., an Oregon corporation formerly
   known as PacifiCare of Oregon, Inc.;
8  UNITEDHEALTHCARE OF
   PENNSYLVANIA, INC., a
9  Pennsylvania corporation formerly
   known as Unison Health Plan of
10 Pennsylvania, Inc.;
   UNITEDHEALTHCARE OF
11 TENNESSEE, INC., a Tennessee
   corporation also known as United
12 Healthcare of Tennessee, Inc.;
   UNITEDHEALTHCARE OF THE
13 MIDLANDS, INC., a Nebraska
   corporation also known as United
14 Healthcare of the Midlands, Inc.;
   UNITEDHEALTHCARE OF THE
15 MIDWEST, INC., a Missouri
   corporation also known as United
16 Healthcare of the Midwest, Inc.;
   UNITEDHEALTHCARE OF UTAH,
17 INC., a Utah corporation also known as
   United Healthcare of Utah, Inc.;
18 UNITEDHEALTHCARE OF
   WASHINGTON, INC., a Washington
19 corporation formerly known as
   PacifiCare of Washington, Inc.;
20 UNITEDHEALTHCARE OF
   WISCONSIN, INC., a Wisconsin
21 corporation also known as United
   Healthcare of Wisconsin, Inc.;
22 UNITEDHEALTHCARE PLAN OF
   THE RIVER VALLEY, INC., an Illinois
23 corporation also known as United
   Healthcare Plan of the River Valley, Inc.,
24 UnitedHealth Care Plan of the River
   Valley, Inc., and United HealthCare of
25 the River Valley, Inc.,

26              Defendants.

27

28

4

1        This is a civil fraud action brought by the United States of America ("United

2  States" or "Government") to recover treble damages and civil penalties under the False

3  Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, as well as for restitution and common

4  law damages, for monies unlawfully obtained and retained by Defendant UnitedHealth

5  Group Inc. and various of its direct and indirect subsidiaries ("Defendants") involved in

6  Parts C and D of the Medicare Program.  Defendants knowingly submitted false claims

7  and made false statements to the Medicare Program.  Moreover, Defendants have

8  knowingly and improperly avoided their obligations to repay significant sums of money

9  to the Medicare Program.

10        Having filed a notice of intervention pursuant to 31 U.S.C. § 3730(b)(4), the

11  United States alleges for its amended complaint-in-partial-intervention (the "Amended

12  Complaint") as follows:

13  <div align="center">**<u>INTRODUCTION</u>**</div>

14  1.    Millions of elderly and disabled individuals throughout the United States receive

15  their Medicare benefits through Parts C and D of the Medicare Program, hereinafter

16  referred to as the Medicare Advantage (MA) Program, which is administered by the

17  Government agency called the Centers for Medicare and Medicaid Services ("CMS").  A

18  central, distinguishing feature of the MA Program is the provision of Medicare benefits

19  by private healthcare insurance organizations, which are called Medicare Advantage

20  Organizations ("MA Organizations").  Medicare beneficiaries enroll in managed

21  healthcare insurance plans called Medicare Advantage Plans ("MA Plans") and

22  prescription drug plans ("PD Plans") that are offered by these MA Organizations.  The

23  MA Plans are packages of healthcare insurance benefits and the PD Plans are packages

24  of prescription drug benefits.  Hereinafter MA Plans and PD Plans are collectively

25  referred to as "Plans."

26  2.    The Government pays each MA Organization a fixed monthly payment for each

27  Medicare beneficiary enrolled in its Plans.  The Government adjusts these payments for

28  various risk factors that affect expected healthcare expenditures, including the age,

<div align="center">5</div>

gender, and health status of each beneficiary. The adjustments are intended to ensure that MA Organizations are paid more for beneficiaries whose healthcare expenses are *expected* to be more and less for beneficiaries whose health care expenses are *expected* to be less. However, these adjustments to the fixed monthly payments are made regardless of the actual services provided to the beneficiaries and, thus, regardless of whether those beneficiaries expected to need more or more costly services actually obtain more or more costly services, and whether those beneficiaries expected to need less or less costly services actually obtain less or less costly services.

3.     To obtain payments based on adjustments for health status, MA Organizations submit diagnosis codes to the Government for the beneficiaries in their Plans. These diagnosis codes are from the beneficiaries' medical encounters with healthcare providers (*e.g.*, physician office visits and hospital stays) during the year prior to the actual payment year (often referred to as the "data collection" year or the "date of service" year). Payments are based on diagnoses from the prior year because they are used to predict the *expected* needs of a beneficiary for more or less costly healthcare services during the payment year. Using these diagnosis codes submitted by or on behalf of MA Organizations, the Government calculates a risk score for each beneficiary. The beneficiary's risk score is then used to calculate monthly payments to the MA Organization for that beneficiary for the payment year. In general, the more numerous and severe the conditions identified by the diagnosis codes, the higher the risk score for a beneficiary and, thus, the greater the risk adjustment payments made to the MA Organization for that beneficiary for the payment year.

4.     This payment model creates powerful incentives for MA Organizations and their owners and operators to exaggerate the expected healthcare costs for the beneficiaries in their Plans by submitting invalid diagnosis codes and failing to comply with their obligation to retract invalid diagnoses. In order to combat these incentives and protect the Government from overpaying MA Organizations, the Government requires that submitted diagnoses be unambiguously supported and, thus, validated by the

beneficiaries' medical records for medical encounters during the data collection year. Medical records are the "source of truth" for the purpose of receiving and retaining risk adjustment payments.

5.     The medical records that must support the diagnosis codes are not provided to the Government as part of the payment process.  Instead, the Government requires that each MA Organization expressly certify that the diagnosis codes it has submitted for risk adjustment payments are accurate and truthful based on best knowledge, information, and belief.  42 C.F.R. § 422.504(*l*)(2).  Each MA Organization must exercise due diligence in order to make this express certification.  Each MA Organization must also "[a]dopt and implement an effective compliance program, which must include measures that prevent, detect, and correct non-compliance with [the Government's] program requirements as well as measures that prevent, detect, and correct fraud, waste, and abuse."  42 C.F.R. § 422.503(b)(4)(vi).

6.     As explained by the United States Court of Appeals for the Ninth Circuit, CMS, in 2000, made clear that

> Medicare Advantage organizations have always had "an obligation to take steps to ensure the accuracy, completeness, and truthfulness of the [medical] encounter data" [*i.e.*, diagnoses] and "an obligation to undertake 'due diligence' to ensure the accuracy, completeness, and truthfulness of encounter data submitted to [CMS]."  . . .  CMS made perfectly clear that Medicare Advantage organizations would be "held responsible for making good faith efforts to certify the accuracy, completeness, and truthfulness of encounter data submitted."

*United States ex rel. Swoben v. UnitedHealthcare Ins. Co.*, 848 F.3d 1161, 1174 (9th Cir. 2016) (quoting 65 Fed. Reg. 40,170, 40,268 (June 29, 2000)).  The Ninth Circuit further explained that the requirement that MA Organizations take affirmative steps to address errors in their data is further demonstrated by "§ 422.503, which since 2005 has required Medicare Advantage organizations to have effective compliance programs in place,

## THE MEDICARE PROGRAM

### I.    The Medicare Statute

43.    Medicare is a federally-operated health insurance program administered by CMS. Medicare benefits individuals age 65 and older and the disabled. 42 U.S.C. § 1395c *et seq.* Parts A and B of the Medicare Program are known as "traditional" Medicare. Medicare Part A covers inpatient and institutional care. Medicare Part B covers physician, hospital outpatient, and ancillary services and durable medical equipment.

44.    Under Medicare Parts A and B, CMS reimburses healthcare providers (*e.g.,* hospitals and physicians) using what is known as a "fee-for-service" ("FFS") payment system. Under an FFS payment system, healthcare providers submit claims to CMS for reimbursement for each service actually rendered, such as a physician office visit or a hospital stay. CMS then pays the providers directly for each service based on payment rates pre-determined by the Government.

45.    Under Medicare Part C, Medicare beneficiaries can opt out of the traditional Medicare Program (Parts A and B) and instead enroll in MA Plans and receive health care services managed by those MA Plans. MA Plans must provide Medicare beneficiaries all the services that they are entitled to receive from the traditional Medicare Program.

46.    Under Medicare Part D, Medicare beneficiaries can elect to enroll in either a Prescription Drug plan (known as a PD Plan) or an MA Plan that provides prescription drug coverage in addition to the physician office visit and hospital outpatient and inpatient coverage provided under Part C (known as an MAPD Plan). For simplicity, in this Amended Complaint, the Government refers to Parts C and D collectively as the MA Program and refers collectively to MA, PD, and MAPD Plans as Plans.

47.    MA Organizations are "risk-bearing" entities that must be licensed by the State in which they are located. 42 C.F.R. §§ 422.2 & 422.503(b)(2). Each MA Organization agrees to bear the risk that the amount that it pays providers for the health services for a

0009

particular beneficiary in one of its Plans may exceed the amount that it was paid to insure the beneficiary.

48.     Medicare beneficiaries who enroll in an MA, PD or MAPD Plan are considered members of and enrollees in that Plan.  In this Amended Complaint, the terms beneficiaries, members, enrollees, and patients are used interchangeably, but mean the same thing, that is, individuals enrolled in Plans.

49.     MA Organizations' obligations to the MA Program and the requirements for them to participate in the Program are set forth in federal regulations and, each year, the MA Organizations must agree in writing to comply with those regulations and to other terms and conditions in order to participate in the MA Program.  42 C.F.R. §§ 422.504 & 422.505 (Part C); 42 C.F.R. §§ 423.504 & 423.505 (Part D).  In addition, MA Organizations must comply with requirements set forth in statutes, such as the FCA, and guidance documents, such as the Medicare Managed Care Manual, the Medicare Prescription Drug Benefit Manual, the Risk Adjustment Participant Guides, and Medicare Advantage operating instructions.

50.     Related Entities include those entities that are related to an MA Organization by common ownership or control and perform at least some of the MA Organization's management functions.  42 C.F.R. §§ 422.2 & 422.500.  As previously explained, the UHG Managing Defendants are or were Related Entities.

51.     First Tier Entities include those providers or provider groups that enter into a written arrangement with an MA Organization to provide healthcare services to the beneficiaries in the organization's Plan(s).  42 C.F.R. §§ 422.2 & 422.500.  The capitated providers in the RACCR Program were First Tier Entities.

52.     The obligations of Related Entities and First Tier Entities to the MA Program are also set forth in the MA Program regulations.  Related Entities and First Tier Entities must, among other things, (i) perform their services in a manner that complies with the MA Organization's contractual obligations to the Government, *id*. at 422.504(*i*)(3)(iii); agree to "comply with all applicable Medicare laws, regulations, and CMS instructions,"

37

0010

1   *id*. at 422.504(*i*)(4)(v); and receive effective compliance training and education relating

2   to preventing fraud, waste, and abuse. *Id*. at § 422.503(b)(4)(vi)(C)(1). Furthermore, if

3   a Related Entity or First Tier Entity generates data relating to an MA Organization's

4   claims for payments from the MA Program, it (as well as the MA Organization) must

5   certify the accuracy and truthfulness of the data. *Id*. at § 422.504(l)(3).

6   53.     An MA Organization, however, cannot evade its legal and contractual obligations

7   to the Government by using Related Entities to manage it or by contracting with First

8   Tier Entities to provide services to its beneficiaries. An MA Organization "maintains

9   ultimate responsibility for adhering to and otherwise fully complying with all terms and

10  conditions of its contract with CMS." 42 C.F.R. § 422.504(*i*)(1). Thus, an MA

11  Organization cannot delegate away its ultimate responsibility for its obligations to the

12  Government.

13              **II.    Medicare Parts C and D Risk Adjustment Payments**

14  54.     Under Part C, the Government pays each MA Organization a predetermined base

15  monthly amount for each Medicare beneficiary in its MA Plans. This monthly payment

16  is known as a "per-member, per-month" payment. This predetermined base payment

17  varies for each MA Plan depending on various factors, including amounts set forth in the

18  MA Plan's bid submitted to the Government, the scope of medical services covered by

19  the Plan's benefit package (all packages must cover at least those services offered by

20  Parts A and B of the Medicare Program), and the amount of premiums, deductibles, and

21  co-pays for which an enrollee in the Plan is responsible (Plans have different premiums,

22  deductibles and co-pays such that Plans with higher deductibles and co-pays may have

23  lower premiums).

24  55.     Since 2000, Congress has also required that the payments be risk adjusted for each

25  beneficiary based on "such risk factors as age, disability status, gender, institutional

26  status, and *such other factors as [the Secretary of the United States Department of*

27  *Health and Human Services] determines to be appropriate, including adjustment for*

28  *health status* . . . to ensure actuarial equivalence." 42 U.S.C. § 1395w-23(a)(1)(C)

(emphasis added). By risk adjusting for health status, the Government pays MA Organizations more for beneficiaries with certain serious chronic medical conditions and, thus, higher risk scores than for beneficiaries who do not have those conditions and, thus, have lower risk scores.

56.     Pursuant to 42 U.S.C. § 1395w-23(a)(1)(C), the Secretary has the authority to determine how to adjust for health status. For example, the Secretary has the authority to decide to risk adjust only for serious chronic medical conditions and to risk adjust by requiring the submission of diagnoses from medical encounters that occurred the year preceding each payment year and projecting the possibility of additional costs for each payment year. The Secretary also has authority to decide what historical cost and/or utilization data it should consider in projecting how much more it may cost an MA Organization to provide services to a beneficiary who has been assigned a diagnosis relating to a serious chronic medical condition.

57.     From 2000 to 2004, the Secretary employed a Principal Inpatient Diagnostic Cost Group ("PIP-DCG") model that took into account diagnoses from inpatient hospital stays to determine the risk scores of beneficiaries in MA Plans. The PIP-DCG model was prospective. Diagnoses for one year were used to determine each beneficiary's risk score for the following payment year. During the 2000 to 2004 time period, MA Organizations (which were then called Medicare + Choice Organizations) had many of the same obligations that they have had since 2004. For instance, they had the obligation to design and implement effective systems to monitor and review the accuracy and truthfulness of the diagnoses they submitted for risk adjustment payments in order to certify the accuracy and truthfulness of that data. *See* Medicare Managed Care Manual, Chapter 7, Section 110.2 (entitled "Certification of Data Accuracy, Completeness, and Truthfulness") (Rev. 2, 10-01-01).

58.     Since 2004, the Secretary has employed the Hierarchical Conditions Category ("HCC") model, which takes into account both demographic factors (such as age and gender) and health status to determine the risk scores for beneficiaries in MA Plans.

0012

With respect to health status, the model takes into account diagnoses from physician office visits and hospital outpatient encounters as well as hospital inpatient stays. Like the PIP-DCG model, the HCC model is prospective, meaning that it relies on diagnoses assigned to a beneficiary in one year (referred to by CMS as the "data collection" year but also generally known as the "date of service" or "DOS" year) to determine the risk score for the beneficiary for the following year (often referred to as the "payment year" or "PY"). The medical conditions included in the model are grouped into HCCs, which are categories of clinically-related medical diagnoses. *See* 42 C.F.R. § 422.2. The diagnoses grouped into HCCs include major, severe, and/or chronic illnesses. Related groups of diagnoses are ranked on the basis of disease severity and the cost associated with their treatment. Between 2004 and 2013, the CMS-HCC model included 70 HCCs. Starting in 2014, the CMS-HCC model included 79 HCCs.

59. Under Medicare Part D, payments to PD or MAPD Plans for prescription drug benefits are also risk-adjusted based on health status. As with Part C, Part D employs a health-based risk adjustment model known as the Rx Hierarchical Condition Categories ("RxHCC") model. Like HCCs, RxHCCs are also groups of clinically-related medical diagnoses that are ranked by disease severity and the cost associated with the pharmaceutical drugs used to treat them.

60. The Government assigns a relative numerical value (also known as a relative factor, multiplier, or coefficient) to each HCC and RxHCC group that correlates to the predicted incremental costs of care associated with treating the medical conditions in each category. It currently determines the relative values based on an analysis of the additional amounts that it paid on average for the treatment of these major, severe, and chronic medical conditions under Parts A and B of the Medicare Program. Higher relative values are assigned to HCCs and RxHCCs that include diagnoses with greater disease severity and greater costs associated with their treatment.

61. As previously stated, the HCC and RxHCC risk adjustment models are prospective and a beneficiary's risk score for a particular payment year is determined by

40

his or her medical conditions during the previous year (*i.e.*, the date of service year).  For risk adjustment payment purposes, these medical conditions must be documented by a qualified healthcare provider (*e.g.*, a doctor) in the beneficiary's medical record during the previous year.  Accordingly, for risk adjustment payment purposes, the diagnosis codes that the healthcare provider, his or her administrative or billing support staff, or anyone else (such as the MA Organization or a Related Entity) assigns to a beneficiary must be supported by the beneficiary's medical record.

62.     Each beneficiary's risk score is calculated anew for each payment year.  For example, a beneficiary's risk score for payment year 2012 is determined by the diagnoses that his or her qualified healthcare providers documented in his or her medical records during medical encounters during date of service year 2011.

63.     MA Organizations obtain diagnosis data from the healthcare providers that treat the beneficiaries in their plans (as well as through other means and sources such as the MA Organizations' own medical record reviews).  Healthcare providers can transmit diagnosis codes to MA Organizations with claims for payment for services rendered, in encounter records reporting the services rendered, or by alternative means.  In this Amended Complaint, the United States refers to diagnosis codes reported by providers through any means as "provider-reported diagnoses."

64.     MA Organizations submit risk adjustment data, including diagnoses, to CMS using CMS' Risk Adjustment Processing System ("RAPS").  Each RAPS submission must include the following information:  the Medicare beneficiary's identification number (called a "HIC number" or "HICN"); the date(s) of the medical encounter (the physician office visit, hospital outpatient visit, or hospital inpatient stay); the type of provider (physician or hospital); and the diagnosis code(s) reported by the provider for the encounter.  Each RAPS submission is a claim for payment.  If the data submitted is invalid, the claim is false.

65.     RAPS also has a field that is called a "Delete Indicator" and allows MA Organizations and Related Entities to comply with their obligation to delete invalid

41

0014

diagnoses that they previously submitted in order to withdraw or retract the invalid diagnoses. That is, the RAPS system enables MA Organizations and Related Entities to withdraw or retract their false claims for risk adjustment payments.

## DEFENDANTS' AGREEMENTS

### I.    The Annual Parts C and D Agreements

66.    As previously explained, in order to participate in the MA Program, the Defendant MA Organizations were required to agree in writing to comply with the Part C and D regulations and any other terms and conditions CMS deemed appropriate. 42 C.F.R. §§ 422.504 & 422.505 (Part C); 42 C.F.R. §§ 423.504 & 423.505 (Part D). Each year during the relevant time period, one or more executives of one or more of the UHG Managing Defendants or their predecessors executed these written agreements or renewals of these written agreements between the Defendant MA Organizations and CMS.

67.    The regulations specifying the terms and conditions of the contractual relationship between MA Organizations and CMS have remained the same for many years. Accordingly, from year to year, the terms and conditions of these written agreements between the Defendant MA Organizations and CMS remained very similar, if not identical.

68.    The terms and conditions of the Part C agreements are exemplified by the attached contract that Defendant UnitedHealthcare Plan of River Valley, Inc. entered into with CMS relating to its participation in Medicare Part C in 2010. *See* Exhibit 1, attached hereto. The terms and conditions of these Part C contracts include, among many other things, that each of the MA Organizations agrees to (i) operate its Plans "in compliance with the requirements of [the] contract and applicable Federal statutes, regulations, and policies (e.g., policies as described in the Call Letter, Medicare Managed Care Manual, etc.)" (Article II, Section A); (ii) "implement a compliance plan in accordance with the requirements of § 422.503(b)(4)(vi)" (Article III, Section F); (iii) "[a]s a condition of receiving a monthly payment under" the contract, "request payment under the contract

42

0015

on the forms attached" to the contract, including "Attachment B (risk adjustment data) which attest[s] to *(based on best knowledge, information and belief, as of the date specified on the attestation form)* the accuracy, completeness, and truthfulness of the data identified on" Attachment B (Article IV, Section C) (emphasis in the original); (iv) ensure that related entities, contractors, and subcontractors that generated risk adjustment data also attest to the accuracy and truthfulness of the data (Article IV, Section C.2); (v) ensure that all agreements with related entities, contractors, and subcontractors specify that the related entities, contractors, and subcontractors "must comply with all applicable Medicare laws, regulations, and CMS instructions" (Article V, Section D(5)); and (vi) comply with "Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to, applicable provisions of the Federal criminal law [and] the False Claims Act (31 USC 3729 et seq.)" (Article IX, Section A.1). In accordance with 42 C.F.R. § 422.510, the agreements also provided that CMS may terminate the MA Organization's participation in the MA Program if it determines that the organization has submitted false data to it or "fail[ed] to provide CMS with valid risk adjustment data." Article VIII, Section B.1(a)(iv) & (vii).

69. The agreements for other years were very similar, if not identical. For example, in September 2010, Tom Paul, the Chief Executive Office of UnitedHealthcare Medicare & Retirement, executed a new agreement between Defendant UnitedHealthcare of California (the successor to PacifiCare of California) and CMS relating to this MA Organization's participation in Medicare Part C in 2011. *See* Exhibit 2, attached hereto. By executing this contract, UnitedHealthcare of California agreed to, among many other things, (i) operate its Plans "in compliance with the requirements of [the] contract and applicable Federal statutes, regulations, and policies (e.g., policies as described in the Call Letter, Medicare Managed Care Manual, etc.)" (Article II, Section A); (ii) "implement a compliance plan in accordance with the requirements of § 422.503(b)(4)(vi)" (Article III, Section F); (iii) "[a]s a condition of receiving a monthly payment under" the contract, "request payment under the contract on the forms attached"

43

to the contract, including "Attachment B (risk adjustment data) which attest[s] to *(based on best knowledge, information and belief, as of the date specified on the attestation form)* the accuracy, completeness, and truthfulness of the data identified on" Attachment B (Article IV, Section D); (iv) ensure that related entities, contractors, and subcontractors that generated risk adjustment data also attest to the accuracy and truthfulness of the data (Article IV, Section D.2); (v) ensure that all agreements with related entities, contractors, and subcontractors specify that the related entities, contractors, and subcontractors "must comply with all applicable Medicare laws, regulations, and CMS instructions" (Article V, Section D.5); and (vi) comply with "Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to, applicable provisions of the Federal criminal law [and] the False Claims Act (31 USC 3729 et seq.)" (Article IX, Section A.1).  The agreement also provided that CMS had the right to terminate the agreement with the MA Organization if it determined that the organization had submitted false data to it or "fail[ed] to provide CMS with valid risk adjustment data."  Article VIII, Section B.1(a)(iv) & (vii).  In September 2010, Paul also executed an agreement with CMS relating to UnitedHealthcare of California's offering of prescription drug benefits under Medicare Part D.  This Part D agreement was, in all respects relevant to this Amended Complaint, very similar to the one described above for the offering of healthcare insurance benefit packages under Part C.  Furthermore, in September 2010, Tom Paul executed the same Part C and D agreements on behalf of other of the Defendant MA Organizations.  All these agreements were very similar, if not identical, to the ones he executed for UnitedHealthcare of California.

70.     In September 2011, August 2012, and August 2013, Scott Theisen, the Chief Financial Officer of UnitedHealthcare Medicare & Retirement, executed agreements for many of the Defendant MA Organizations relating to their participation in Medicare Parts C and D for 2012, 2013, and 2014, respectively.  *See, e.g.*, Exhibits 3, 4, & 5, attached hereto (Defendant UnitedHealthcare of California's Parts C agreements for

44

these years).  In August 2014 and 2015, Brian Thompson, the Chief Financial Officer of UnitedHealthcare Medicare & Retirement, executed agreements for many of the Defendant MA Organizations relating to their participation in Medicare Parts C and D for 2015 and 2016.  See, e.g., Exhibits 6 & 7, attached hereto (Defendant UnitedHealthcare of California's Part C agreements for these years).  These agreements were, in all respects relevant to this Amended Complaint, very similar, if not identical, to the agreements described in the preceding paragraphs relating to the agreements for 2010 and 2011 and imposed the same contractual obligations on the Defendant MA Organizations as the earlier agreements.

71.     The annual Attestations executed in order to renew existing contracts were also very similar as shown by the following:  In the fall of 2006, Jerry Knutson, the Chief Financial Officer of Ovations and Jeff Putnam, the Chief Financial Officer of Secure Horizons, executed Attestations renewing (for calendar year 2007) the existing contract between PacifiCare of California (the predecessor of Defendant UnitedHealthcare of California) and CMS.  Knutson and Putnam attested that PacifiCare of California would "comply with all applicable program guidance that CMS has issued to date and will issue during the remainder of 2006 and 2007 pursuant to Medicare program authorizing statutes and regulations, including but not limited to, . . . the CMS memoranda issued through the Health Plan Management System (HPMS)."  (HPMS is one of the web-based systems used by CMS to provide program information to MA Organizations and is used to communicate program requirements.)  In September 2007, Joseph Haferman, the Chief Financial Officer of Secure Horizons, executed another Attestation renewing the existing contract for PacifiCare of California (this time for calendar year 2008).  Haferman thereby attested that PacifiCare of California would comply "with all applicable program authorizing statutes and regulations and program guidance that CMS has issued to date and will issue during the remainder of 2007 and 2008, including but not limited to,  . . . the Medicare Managed Care Manual, and CMS memoranda issued through the Health Plan Management System (HPMS)."  In September 2008, Kenneth

0018

Burdick, the Chief Executive Officer of Secure Horizons at the time, executed another Attestation renewing the existing contract for PacifiCare of California (this time for calendar year 2009).  Burdick thereby attested that PacifiCare of California would comply "with all applicable Medicare program authorizing statutes and regulations and program guidance that CMS has issued to date and will issue during the remainder of 2008 and 2009, including but not limited to, . . . the Medicare Managed Care Manual, and the CMS memoranda issued through the Health Plan Management System (HPMS)."  In September 2009, both Tom Paul, the Chief Executive Officer of Ovations, and John Way, the Chief Financial Officer of Secure Horizons, executed an Attestation renewing the existing contract for PacifiCare of California (this time for calendar year 2010).  They thereby attested that PacifiCare of California would comply "with all applicable Medicare program authorizing statutes and regulations and program guidance that CMS has issued to date or will issue during the remainder of 2009 and 2010, including but not limited to, . . . the Medicare Managed Care Manual, and the CMS memoranda issued through the Health Plan Management System (HPMS)."

72.     The United States hereby incorporates by reference as if they were recited herein and attached hereto all of the agreements that all of the Defendant MA Organizations entered into with CMS relating to their participation in Medicare Parts C and D for 2007 to present date.  All of these agreements were, in all respects relevant to this Amended Complaint, very similar, if not identical, to the agreements described in the preceding paragraphs.

## II.     The Electronic Data Interchange Agreements

73.     In addition, since at least 2003, MA Organizations and entities that submit risk adjustment data on their behalf have been required to execute Electronic Data Interchange ("EDI") agreements prior to submitting risk adjustment data.  These EDI agreements are considered contracts by which the MA Organizations attest to the accuracy of the data submitted.  Even if another entity submits the data, the MA Organizations are still responsible for the content of the submissions.  *See* 2003 Regional

46

0019

Risk Adjustment Training for Medicare+Choice Organizations Participant Guide, § 6.1; 2004 Regional Risk Adjustment Training for Medicare+Choice Organizations Participant Guide, § 4.1; 2005 Risk Adjustment Data Basic Training for Medicare Advantage Organizations Participant Guide § 4.1; 2006 Risk Adjustment Data Basic Training for Medicare Advantage Organizations Participant Guide § 4.1; 2007 Risk Adjustment Data Training for Medicare Advantage Organizations Participant Guide § 4.1; 2008 Risk Adjustment Technical Assistance for Medicare Advantage Organizations Participant Guide § 4.1; Risk Adjustment 101 Participant Guide § 2.1 (2013). *See* also Medicare Managed Care Manual, Chapter 7, § 111.6.1 (Rev. 57, 08-13-04); *id*. § 120.2.1 (Rev. 114, 06-07-13). By executing these EDI forms, the MA Organizations agree that (i) they will be responsible for all risk adjustment data submitted to CMS by themselves, their employees, and their agents; (ii) they will submit risk adjustment data that is accurate, complete, and truthful based on best knowledge, information, and belief; (iii) *they will research and correct risk adjustment data discrepancies*; and (iv) CMS has the right to audit and confirm the risk adjustment data, including diagnoses, submitted by the MA Organization and the right of access to the beneficiaries' medical records to conduct such audits.

74.     Each of the Defendant MA Organizations and Defendants Optum (and its predecessor, Ingenix) and Ovations executed these EDI agreements and submitted them to the MA Program in order to submit risk adjustment data to and receive risk adjustment payments from the MA Program. Pursuant to the express terms of these EDI agreements, these Defendants promised to submit valid risk adjustment data to the MA Program and *to research and correct any data discrepancies*.

75.     For instance, in 2005, Joseph Haferman, the Chief Financial Officer of Defendant Ovations, executed and submitted to CMS an EDI agreement in order to obtain a "submitter ID" permitting Ovations to submit risk adjustment data on behalf of various of the Defendant MA Organizations. *See* Exhibit 8, attached hereto. By executing this agreement and submitting it to CMS on behalf of the "eligible organization," which was

1  identified as "United Health Group – Ovations" on the form, Defendants UHG and

2  Ovations and the Defendant MA Organizations each agreed that they would (i) be

3  responsible for all risk adjustment data submitted to CMS by themselves, their

4  employees, or their agents; (ii) submit accurate and truthful risk adjustment data; and

5  (iii) *research and correct discrepancies with its risk adjustment data*.  In addition, each

6  of them agreed that CMS could audit the data and have access to medical records to

7  conduct such audits.

8  76.    Additional examples include the EDI agreements that James Higgins, the Finance

9  Director of PacifiCare Health Systems, executed on behalf of the following Defendant

10  MA Organizations or their predecessors:  On September 14, 2006, Higgins signed EDI

11  agreements for UnitedHealthcare Insurance Company of New York (contract numbers

12  H5515 and R5342); UnitedHealthcare Insurance Company (the name for a number of

13  different MA Organizations with contract numbers R3175, R5287, H1717, H2803,

14  H2001, H2003, H2111, H2408, H0624, H0620, H1303, H1509, H3921, H0319, H5500,

15  H2406, H4106, H3812, H3209, H5918, H5697, H5754, H0315, H2228, H1108, H4522,

16  H5532, H5516, H5507, H5440, H5417, H5424, H5008, H5527, H2226 and H5518);

17  PacifiCare of Nevada, Inc. (contract number H2949); PacifiCare of Arizona, Inc.

18  (contract number H0303); UnitedHealthcare of Alabama, Inc. (contract number H0151);

19  UnitedHealthcare of the Midwest, Inc. (contract number H2654); Oxford Health Plans

20  (CT), Inc. (contract number H0752); Oxford Health Plans (NJ), Inc. (contract numbers

21  H3113 and H3107); UnitedHealthcare of Ohio, Inc. (contract numbers H3659 and

22  H5678); UHC of California, then known as PacifiCare of California (contract number

23  H0543); UnitedHealthcare of Florida, Inc. (contract number H1080 and H9011);

24  UnitedHealthcare Benefits of Texas, Inc. (contract number H4590); UnitedHealthcare of

25  Utah, Inc. (contract number H4604); UnitedHealthcare of Arizona, Inc. (contract number

26  H0316); UnitedHealthcare of Arkansas, Inc. (contract number H0401); UnitedHealthcare

27  of Georgia, Inc. (contract number H1111); UnitedHealthcare of Tennessee, Inc. (contract

28  number H4406); UnitedHealthcare of New England, Inc. (contract number H4102);

0021

1   UnitedHealthcare of Oregon, Inc. (contract number H3805); UnitedHealthcare of

2   Oklahoma, Inc. (contract number H3749); UnitedHealthcare of New York, Inc. (contract

3   number H3379); Oxford Health Plans (NY), Inc. (contract number H3307);

4   UnitedHealthcare of the Midlands, Inc. (contract number H2802); UnitedHealthcare of

5   North Carolina, Inc. (contract number H3456); PacifiCare of Colorado, Inc. (contract

6   number H0609); Sierra Health and Life Insurance Company, Inc. (contract number

7   H5652); UnitedHealthcare of Washington, Inc. (contract number H5005);

8   UnitedHealthcare of Wisconsin, Inc. (contract number H5253); and UnitedHealthcare

9   Community Plan of Texas, L.L.C. (contract number H4514).  On November 2, 2006,

10  Higgins signed EDI agreements for UnitedHealthcare of the Midwest, Inc. (contract

11  number H3887), UnitedHealthcare Insurance Company of New York (contract number

12  H4720), and UnitedHealthcare Insurance Company (contract numbers H9418, H8000,

13  and H4779).  On December 13, 2006, Higgins signed EDI agreements for

14  UnitedHealthcare Insurance Company (the name for a number of MA Organizations

15  with contract numbers H0408, H1286, H3435, H7274, H7254, H0410, and H6717) and

16  UnitedHealthcare of Wisconsin, Inc. (contract number H7187).  On January 1, 2007,

17  Higgins signed an EDI agreement for UnitedHealthcare Insurance Company (contract

18  number H5435).  On January 14, 2008, Higgins signed an EDI agreement for

19  UnitedHealthcare Insurance Company (contract numbers H3912 and H0710).  *See, e.g.,*

20  Exhibit 9, attached hereto (September 14, 2006 EDI for PacifiCare of California).

21  Pursuant to these EDI agreements, each of these MA Organizations agreed that it would

22  (i) be responsible for all risk adjustment data submitted to CMS by itself, its employees,

23  or its agents; (ii) submit accurate and truthful risk adjustment data; and (iii) *research and*

24  *correct discrepancies with its risk adjustment data*.  In addition, each of them agreed that

25  CMS could audit the data and have access to medical records to conduct such audits.

26  77.    In addition, on January 14, 2008, Patricia Rasmussen, who worked as a manager

27  for Ingenix, signed EDI agreements for UnitedHealthcare Insurance Company (contract

28  numbers H4971, H0710, H3912, H7698, H4971, H0710, H6793, H5749, and H6228),

0022

UnitedHealthcare of New England, Inc. (contract number H1944), and UnitedHealthcare Insurance Company of New York (contract number H4720).  On June 18, 2008, Rasmussen signed an EDI agreement for PacifiCare of Nevada, Inc. (contract number H7949).  In January 2009, Rasmussen signed additional EDI agreements for UnitedHealthcare Insurance Company (contract numbers H7444, H8748, H2182, and H1949).  Pursuant to these EDI agreements, each of these MA Organizations agreed that it would (i) be responsible for all risk adjustment data submitted to CMS by itself, its employees, or its agents; (ii) submit accurate and truthful risk adjustment data; and (iii) *research and correct discrepancies with its risk adjustment data*.  In addition, each of them agreed that CMS could audit the data and have access to medical records to conduct such audits.

78.     On December 15, 2010, Timothy Noel, who was Vice President of Finance for UnitedHealthcare Medicare & Retirement, signed an EDI agreement for Oxford Health Plans (CT), Inc. (contract number H0755).  On September 22, 2011, Noel signed an EDI agreement for UnitedHealthcare Insurance Company of New York (contract number H1537).  Pursuant to these EDI agreements, each of these MA Organizations agreed that it would (i) be responsible for all risk adjustment data submitted to CMS by itself, its employees, or its agents; (ii) submit accurate and truthful risk adjustment data; and (iii) *research and correct discrepancies with its risk adjustment data*.  In addition, each of them agreed that CMS could audit the data and have access to medical records to conduct such audits.

79.     On April 27, 2011, Scott Theisen, the Chief Financial Officer of UnitedHealthcare Medicare & Retirement, submitted an EDI agreement for PacifiCare of California, which included all the same promises.  On October 21, 2013, Theisen also signed EDI agreements for Care Improvement Plus Wisconsin Insurance Company (contract number H3794) and Care Improvement Plus South Central Insurance Co. (contract number H5322).  Accordingly, each of these Defendant MA Organizations also agreed that it would (i) be responsible for all risk adjustment data (which includes encounter data)

submitted to CMS by itself, its employees, or its agents; (ii) submit accurate and truthful risk adjustment data; and (iii) *research and correct discrepancies with its risk adjustment data*. In addition, each of them agreed that CMS could audit the data and have access to medical records to conduct such audits.

80. Patricia Rasmussen also executed and submitted an EDI agreement so that Ingenix could submit risk adjustment data on behalf of the Defendant MA Organizations. *See* Exhibit 10, attached hereto. By doing this, Ingenix also agreed that it would (i) be responsible for all risk adjustment data submitted to CMS by itself, its employees, or its agents; (ii) submit accurate and truthful risk adjustment data; and (iii) *research and correct discrepancies with its risk adjustment data*. In addition, it agreed that CMS could audit the data and have access to medical records to conduct such audits. When Ingenix became OptumInsight, Rasmussen also notified CMS (that is, CMS' contractor Palmetto, which helped operate RAPS) that its records should be updated to reflect that OptumInsight was making the risk adjustment submissions for the Defendant MA Organizations. Rasmussen identified OptumInsight as "part of Optum." See Exhibit 11, attached hereto.

81. Jeffrey Dumcum, a Senior Vice President at Optum, also executed an EDI agreement in May 2011 in order to submit risk adjustment data (also known as encounter data) to the MA Program on behalf of many of the Defendant MA Organizations, including those MA Organizations listed in a letter sent by Theisen to CMS' contractor in April 2011. By doing this, Dumcum agreed that Optum would be responsible for the data it submitted, submit valid data, and *research and correct data discrepancies*. *See* Exhibit 12, attached hereto.

82. All EDI agreements executed by the UHG Managing Defendants on their own behalf and on behalf of the Defendant MA Organizations are incorporated by reference in this Amended Complaint as if they were recited in full and attached hereto.

0024

Case 2:16-cv-08697-FMO-SS Document 616-3 Filed 08/06/24 Page 28 of 637
Case 2:16-cv-08697-MWF-SS Document 171 Filed 11/17/19 Page 52 of 166 Page ID
Page #:4541
#:18922

### III. The Ingenix/Optum Service Agreements

83.     Depending on the time period, Ingenix or Optum entered into internal agreements with Ovations or UnitedHealthcare regarding the risk adjustment-related services that Ingenix or Optum would provide to the Defendant MA Organizations.  These services included, among other things, the submission of risk adjustment data to CMS and the management of the Chart Review, Claims Verification, and RACCR Programs.  These internal agreements further confirm the parties' joint and several obligations to the MA Program to submit accurate and truthful risk adjustment data and to investigate and correct any data discrepancies.  These agreements also exemplify the UHG Managing Defendants' understanding of their joint and several obligations to the MA Program.  All of these agreements are incorporated herein by reference.

84.     By way of example, the Memorandum of Understanding ("MOU") entered into between Optum and UnitedHealthcare for risk adjustment-related services rendered by Optum in 2011 exemplifies the obligations undertaken by Optum not only to UnitedHealthcare but to the MA Program.  That MOU was executed by Jerry Knutson, Chief Financial Officer of Optum, and Scott Theisen, Chief Financial Officer of UnitedHealthcare Medicare & Retirement.  Paul Bihm at Optum, Relator Poehling at UnitedHealthcare Medicare & Retirement, and Jason Bainbridge at UnitedHealthcare Community & State were copied on the MOU.  (The MOU referred to UnitedHealthcare Medicare & Retirement and UnitedHealthcare Community & State collectively as "UnitedHealth Group's Public and Senior Markets Group ("PSMG")."  This is but one of many examples of the confusion that Defendants have created by the way they used names of groups and entities interchangeably.)  Pursuant to the MOU, Optum was compensated for its services through an "intercompany allocation of fees paid pursuant to [a separate] Management Agreement."

85.     Pursuant to this 2011 MOU, Optum provided many risk adjustment-related services to the Defendant MA Organizations, including, but not limited to the submission of risk adjustment data to CMS "pursuant to CMS risk adjustment rules and

0025

1   requirements" and conducting the Chart Review, Claims Verification, and RACCR

2   Programs.  Importantly, Optum also agreed to (i) conduct "[p]rovider engagement and

3   education regarding accurate and complete diagnostic coding and documentation"; (ii)

4   "[c]ontribute (along with PSMG) to the level of accuracy and completeness of diagnostic

5   coding for a respective population by identifying opportunities to improve

6   documentation and coding for accuracy, facilitating improvement in accuracy by

7   working directly with providers to improve documentation and coding practices, and

8   executing the timely and accurate submission of claim coding information to CMS,

9   thereby ensuring appropriate revenues are being paid by CMS for the underlying risk

10  inherent within the member population;" (iii) "[m]onitor[] the appropriateness and

11  accuracy of provider coding;" and (iv) conduct "[i]nternal validation testing of outlier

12  providers, internal validation testing of other sample populations and support CMS

13  validation requirements."

14  86.    The 2011 MOU also included a "Medicare Advantage Regulatory Requirements

15  Appendix." This Appendix included Optum's agreement to (i) "comply with all

16  applicable federal and Medicare laws, regulations, and CMS instructions, including but

17  not limited to . . . federal laws and regulations designed to prevent or ameliorate fraud,

18  waste, and abuse, including but not limited to, applicable provisions of federal criminal

19  law [and] the False Claims Act (31 U.S.C. § 3729 et seq.);" (ii) "perform services and

20  provide the products set forth in the MOU in a manner consistent with and in compliance

21  with [the Defendant MA Organizations'] obligations under the CMS Contact[s]; " and

22  (iii) certify in writing that the risk adjustment data it submitted to CMS was "accurate,

23  complete, and truthful, based on [its] best knowledge, information and belief."  The

24  Appendix further specified that UnitedHealthcare and the Defendant MA Organizations

25  were accountable to CMS for fulfilling their regulatory and contractual obligations under

26  the MA Program, including those that they had delegated to Optum under the MOU and,

27  thus, that they were responsible for overseeing and monitoring Optum's performance

28  under the MOU.

0026

## DEFENDANTS' DATA INTEGRITY OBLIGATIONS

### I.    Obligation to Submit Valid Diagnoses

87.    MA Organizations are entitled to risk adjustment payments based on the diagnosis codes that they submit to CMS *only* if the codes are from face-to-face medical encounters between the Medicare beneficiary and provider, the encounter occurred during the relevant date of service year, the provider was of a type and specialty acceptable for risk adjustment purposes, and at the time of the encounter, the provider documented the medical conditions identified by the diagnosis codes in the medical record based on acceptable documentation.  In addition, codes should be based on documented conditions that require or affect patient care treatment or management.  *See* Medicare Managed Care Manual, Chapter 7, Exhibit 30 (August 13, 2004) (stating that diagnosis codes submitted for risk adjustment payments should be for documented conditions that "require or affect patient care treatment or management").  *See also* 2008 Risk Adjustment Data Technical Assistance for Medicare Advantage Organizations Participant Guide ("2008 RA Participation Guide") at § 6.4.1.

88.    Risk adjustment claims are valid, and the resulting risk adjustment payments are therefore proper and justified, only to the extent that the diagnosis codes submitted by the MA Organizations are valid.  The diagnoses must be coded according to the *International Classification of Diseases (ICD) Clinical Modification Guidelines for Coding and Reporting* ("ICD-9-CM" & "ICD-10-CM") and documented with sufficient clinical specificity.  *See* Medicare Managed Care Manual, Chapter 7, Exhibit 30 (August 13, 2004).  In addition, codes cannot be submitted for diagnoses that are only probable or suspected, for diagnoses that are questionable, or for a condition that the provider is trying to rule out.  *Id*.

89.    Moreover, all diagnosis codes submitted by MA Organizations must be supported by medical record documentation.  The 2004 Medicare Managed Care Manual stated that "M+C organizations [now known as MA Organizations] must submit risk adjustment data that are substantiated by the physician or provider's full medical record."  Medicare

0027

codes identifying those conditions, and give all of those codes to the UHG Managing Defendants. But, the UHG Managing Defendants selectively utilized results of these chart reviews – that is, the coders' list of diagnosis codes – for the sole purpose of identifying diagnosis codes that the providers had not reported and submitting ADDS for additional risk adjustment payments. They did not utilize the coders' lists of diagnosis codes to determine if the providers had reported codes that were not supported by their own medical records. If the UHG Managing Defendants had looked both ways and deleted these unsupported and, thus, invalid provider-reported codes, their national Chart Review Program would have been far less lucrative.

165. The UHG Managing Defendants' national Chart Review Program was their largest risk adjustment revenue-generating program. This program was started in 2005 as an outgrowth of the chart review program that PacifiCare was already conducting. Dumcum, Will, and other former PacifiCare employees became key participants in designing, implementing, and managing the United Managing Defendants' revenue-generating national Chart Review Program. Will was the Program Manager for the program.

166. During the first few years of the program, hundreds of thousands of charts were reviewed each year in order to mine them for additional diagnosis codes. In 2008, The Coding Source ("TCS"), a chart review/diagnosis coding vendor retained by Ingenix, reported to Carol Thompson at Ingenix that "[s]ince 2005, TCS has partnered with PacifiCare-United and Ingenix to support your HHC initiatives. TCS has successfully completed 460,000 chart reviews for multiple United regions."

167. In 2009, the UHG Managing Defendants significantly expanded the size of the national Chart Review Program by providing Ingenix with the funds to acquire a coding vendor called AIM Healthcare Services, Inc. and integrating Ingenix's operations in Santa Ana, California, and the AIM coding operations in Tennessee, and by providing Ingenix with the funds to develop an in-house chart review computer database system called ChartSync so that Ingenix's in-house coders and third-party coding vendors could

0028

Case 2:16-cv-08697-FMO-SS   Document 616-3   Filed 08/06/24   Page 90 of 166   Page ID
#:21528
Case 2:16-cv-08697-MWF-SS   Document 171   Filed 11/17/17   Page 32 of 637   Page
#:8926

electronically review medical records and electronically record the coding results of their reviews. At or about the same time, the UHG Managing Defendants also expanded the size of the Chart Review Program by providing Ingenix with the funds to open offices in foreign countries (the Philippines and India) where it could hire foreign workers to review beneficiaries' medical records in order to try to find additional diagnosis codes.

168. Due to the increased resources devoted to the Chart Review Program, the number of medical records reviewed in the hunt for additional codes significantly increased over time. For the first few years of the Chart Review Program, between 500,000 and 600,000 charts were reviewed each year. According to a presentation by Dumcum, 600,000 charts were reviewed in 2006 and, as of September 21, 2007, 400,000 charts had been reviewed so far that year with 200,000 charts remaining for review during the fourth quarter of 2007.

169. By 2010, the number of chart reviews had increased substantially to approximately 850,000 charts for that year. For 2011 to 2014, approximately 1.5 million charts were reviewed each year. The Government believes that, after 2014, the national Chart Review Program was most likely similar in size.

170. As part of this national Chart Review Program, the UHG Managing Defendants focused primarily on the review of charts from providers paid on a fee-for-service basis. Ingenix and then Optum or their vendors obtained medical records from thousands of these providers throughout the United States. They or their vendors sent these medical records to coders that they employed in Tennessee, India, and the Philippines. They also hired coding vendors to review these medical records. Those vendors were located in various locations within and outside of the United States.

171. Physician groups owned by one or more of the UHG Managing Defendants also had chart review programs. WellMed had a group called DataRaps that conducted reviews of its physicians' medical records for patients in one or more Defendant MA Organizations' MA plans. Southwest Medical Associates conducted some of its own

0029

347.   By virtue of the said false or fraudulent claim, the United States incurred damages and therefore is entitled to multiple damages under the False Claims Act, plus a civil penalty for each violation of the Act.

### THIRD CLAIM FOR RELIEF

**False Claims Act: Making or Using False Records or Statements**

**31 U.S.C. § 3729(a)(1)(B) (formerly 31 U.S.C. § 3729(a)(2))**

348.   The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 340 above as though they are fully set forth herein.

349.   Defendants violated 31 U.S.C. § 3729(a)(1)(B) as follows:  Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim.  Specifically, Defendants knowingly made, used, or caused to be made or used a false Risk Adjustment Attestation material to a false or fraudulent claim for risk adjustment payments from the Medicare Program.

350.   Defendants violated former 31 U.S.C. § 3729(a)(2) as follows:  Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.  Specifically, Defendants knowingly made, used, or caused to be made or used a false Risk Adjustment Attestation to get a false or fraudulent claim for risk adjustment payments paid or approved by the Medicare Program.

351.   By virtue of the said false record or statement, the United States incurred damages and therefore is entitled to multiple damages under the False Claims Act, plus a civil penalty for each violation of the Act.

### FOURTH CLAIM FOR RELIEF

**False Claims Act:  Reverse False Claims**

**31 U.S.C. § 3729(a)(1)(G) (formerly 31 U.S.C. § 3729(a)(7))**

352.   The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 340 above as though they are fully set forth herein.

0030

1   353.   Defendants violated the first part of 31 U.S.C. § 3729(a)(1)(G) as follows:

2   Defendants knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) made,

3   used, or caused to be made or used, a false record or statement material to an obligation

4   to pay or transmit money or property to the Government.  Specifically, Defendants

5   knowingly made, used, or caused to be made or used a false Risk Adjustment Attestation

6   material to an obligation to repay risk adjustment payments to which they were not

7   entitled from the Medicare Program.

8   354.   Defendants also violated former 31 U.S.C. § 3729(a)(7) as follows:  Defendants

9   knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) made, used, or caused

10  to be made or used, a false record or statement to conceal, avoid or decrease an

11  obligation to pay or transmit money or property to the Government.  Specifically,

12  Defendants knowingly made, used, or caused to be made or used, a false Risk

13  Adjustment Attestation to conceal, avoid or decrease an obligation to repay risk

14  adjustment payments to which they were not entitled from the Medicare Program.

15  355.   By virtue of the said false record, statement, and other acts of concealment and

16  improper avoidance, the United States incurred damages and therefore is entitled to

17  multiple damages under the False Claims Act, plus a civil penalty for each violation of

18  the Act.

19                       **FIFTH CLAIM FOR RELIEF**

20                          **Unjust Enrichment**

21  356.   The United States repeats and re-alleges the allegations contained in Paragraphs 1

22  to 340 above as though they are fully set forth herein.

23  357.   Defendants have received money from the United States to which Defendants

24  were not entitled, which unjustly enriched Defendants, and for which Defendants must

25  make restitution.  Defendants received such money by claiming and retaining Medicare

26  risk adjustment payments based on invalid risk adjustment data.  In equity and good

27  conscience, such money belongs to the United States and to the Medicare Program.

28

0031

358.   The United States is entitled to recover such money from Defendants in an amount to be determined at trial.

### SIXTH CLAIM FOR RELIEF

### Payment by Mistake

359.   The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 340 above as though they are fully set forth herein.

360.   The United States paid money to Defendants as a result of a mistaken understanding.  Specifically, the United States paid Defendants claims for risk adjustment payments under the mistaken understanding that such claims were based on valid risk adjustment data.  Had the United States known the truth, it would not have paid such claims.  Payment was therefore by mistake.

361.   As a result of such mistaken payments, the United States has sustained damages for which Defendants are liable in the amount to be determined at trial.

### PRAYER

**WHEREFORE**, the United States requests that judgment be entered in its favor and against Defendants as follows:

362.   On Claims I, II,  III, and IV (False Claims Act), against all Defendants jointly and severally, for the amount of the United States' damages, trebled as required by law, together with the maximum civil penalties allowed by law, costs, post-judgment interest, and such other and further relief as the Court may deem appropriate;

363.   On Claim V (Unjust Enrichment), against all Defendants jointly and severally, for an amount equal to the monies that Defendants obtained from the United States without right and by which Defendants have been unjustly enriched, plus costs, pre- and post-judgment interest, and such other and further relief as the Court may deem appropriate; and

364.   On Claim VI (Payment By Mistake), against Defendants for an amount equal to the United States' damages, plus costs, pre- and post-judgment interest, and such other and further relief as the Court may deem appropriate.

0032

Case 2:16-cv-08697-FMO-PVC   Document 616-3   Filed 08/06/24   Page 36 of 637   Page ID
#:28930
Case 2:16-cv-08697-MWF-SS   Document 171   Filed 11/17/17   Page 166 of 168   Page ID
#:2768

# **DEMAND FOR JURY TRIAL**

The United States of America hereby demands a trial by jury.

Dated:  November 17, 2017

Respectfully submitted,

CHAD A. READLER
Principal Deputy Assistant Attorney General,
Civil Division
SANDRA R. BROWN
Acting United States Attorney
DOROTHY A. SCHOUTEN
Chief, Civil Division
DAVID K. BARRETT
Chief, Civil Fraud Section
Assistant United States Attorneys

MICHAEL D. GRANSTON
DANIEL R. ANDERSON
CAROL L. WALLACK
JESSICA KRIEG
JUSTIN DRAYCOTT
PAUL PERKINS
Attorneys, Civil Division
United States Department of Justice

JAMES P. KENNEDY, JR.
Acting United States Attorney
KATHLEEN ANN LYNCH
Assistant United States Attorney


/S/ John E. Lee
_____
JOHN E. LEE
Assistant United States Attorney

Attorneys for the
United States of America

0033

# EXHIBIT 1

Contract with Eligible Medicare Advantage (MA) Organization Pursuant to
Sections 1851 through 1859 of the Social Security Act for the Operation
of a Medicare Advantage Coordinated Care Plan(s)


CONTRACT (# H0251 )

Between

Centers for Medicare & Medicaid Services (hereinafter referred to as CMS)

and

UNITEDHEALTHCARE PLAN OF THE RIVER VALLEY, INC.
(hereinafter referred to as the MA Organization)

CMS and the MA Organization, an entity which has been determined to be an eligible Medicare
Advantage Organization by the Administrator of the Centers for Medicare & Medicaid Services
under 42 CFR 422.503, agree to the following for the purposes of sections 1851 through 1859 of
the Social Security Act (hereinafter referred to as the Act):

(NOTE: Citations indicated in brackets are placed in the text of this contract to note the
regulatory authority for certain contract provisions. All references to Part 422 are to 42 CFR
Part 422.)

| | |
|---|---|
| **You must check off AND initial each required Addendum type to reflect the coverage offered under the H (or R) number associated with this contract** | |
| **Addendum Type** | **Initials** |
| _X_ **Part D Addendum** | _____ |
| ____ **EGWP ( "800 Series" ) MA-PD Addendum** | _____ |
| ____ **EGWP ("800 Series" ) MA-Only Addendum** | _____ |
| ____ **Variances/Waivers (Provided directly to Demonstration Organizations by CMS)** | _____ |
| ____ **Regional Preferred Provider Organization Addendum (Provided directly to RPPOs by CMS)** | _____ |

Final: August 21, 2009

CONFIDENTIAL AND PROPRIETARY

MARA262965

## Article I

### Term of Contract

The term of this contract shall be from the date of signature by CMS' authorized representative through December 31, 2010, after which this contract may be renewed for successive one-year periods in accordance with 42 CFR 422.505(c) and as discussed in Paragraph A in Article VII below. **[422.505]**

This contract governs the respective rights and obligations of the parties as of the effective date set forth above, and supersedes any prior agreements between the MA Organization and CMS as of such date. MA organizations offering Part D also must execute an Addendum to the Medicare Managed Care Contract Pursuant to Sections 1860D-1 through 1860D-42 of the Social Security Act for the Operation of a Voluntary Medicare Prescription Drug Plan (hereafter the "Part D Addendum"). For MA Organizations offering MA-PD plans, the Part D Addendum governs the rights and obligations of the parties relating to the provision of Part D benefits, in accordance with its terms, as of its effective date.

## Article II

### Coordinated Care Plan

A. The Medicare Advantage Organization agrees to operate one or more coordinated care plans as defined in 42 CFR 422.4(a)(1)(iii)), including at least one MA-PD plan as required under 42 CFR 422.4(c), as described in its final Plan Benefit Package (PBP) bid submission (benefit and price bid) proposal as approved by CMS and as attested to in the Medicare Advantage Attestation of Benefit Plan and Price, and in compliance with the requirements of this contract and applicable Federal statutes, regulations, and policies  (e.g., policies as described in the Call Letter, Medicare Managed Care Manual, etc.).

B. Except as provided in paragraph (C) of this Article, this contract is deemed to incorporate any changes that are required by statute to be implemented during the term of the contract and any regulations or policies implementing or interpreting such statutory provisions.

C. CMS will not implement, other than at the beginning of a calendar year, requirements under 42 CFR Part 422 that impose a new significant cost or burden on MA organizations or plans, unless a different effective date is required by statute. **[422.521]**

D. This contract is in no way intended to supersede or modify 42 CFR, Part 422. Failure to reference a regulatory requirement in this contract does not affect the applicability of such requirements to the MA organization and CMS.

E. The MA organization must comply with all applicable requirements as described in CMS regulations and guidance implementing the Medicare Improvements for Patients and Providers Act of 2008.

## Article III

Final: August 21, 2009

2

0036

CONFIDENTIAL AND PROPRIETARY

MARA262966

## Functions To Be Performed By Medicare Advantage Organization

### A. PROVISION OF BENEFITS

1. The MA Organization agrees to provide enrollees in each of its MA plans the basic benefits as required under §422.101 and, to the extent applicable, supplemental benefits under §422.102 and as established in the MA Organization's final benefit and price bid proposal as approved by CMS and listed in the MA Organization Plan Attestation of Benefit Plan and Price, which is attached to this contract. The MA Organization agrees to provide access to such benefits as required under subpart C in a manner consistent with professionally recognized standards of health care and according to the access standards stated in §422.112.

2. The MA Organization agrees to provide post-hospital extended care services, should an MA enrollee elect such coverage, through a skilled nursing home facility according to the requirements of section 1852(l) of the Act and §422.133. A skilled nursing home facility is a facility in which an MA enrollee resided at the time of admission to the hospital, a facility that provides services through a continuing care retirement community, a facility in which the spouse of the enrollee is residing at the time of the enrollee's discharge from the hospital, or hospital, or wherever the enrollee resides immediately before admission for extended care services. **[422. 133; 422.504(a)(3)]**

### B. ENROLLMENT REQUIREMENTS

1. The MA Organization agrees to accept new enrollments, make enrollments effective, process voluntary disenrollments, and limit involuntary disenrollments, as provided in subpart B of part 422.
2. The MA Organization shall comply with the provisions of §422.110 concerning prohibitions against discrimination in beneficiary enrollment, other than in enrolling eligible beneficiaries in a CMA-approved special needs plan that exclusively enrolls special needs individuals as consistent with §§422.2, 422.4(a)(1)(iv) and 422.52.
**[422.504(a)(2)]**

### C. BENEFICIARY PROTECTIONS

1. The MA Organization agrees to comply with all requirements in subpart M of part 422, governing coverage determinations, grievances, and appeals. **[422.504(a)(7)]**
2. The MA Organization agrees to comply with the confidentiality and enrollee record accuracy requirements in §422.118.
3. <u>Beneficiary Financial Protections</u>. The MA Organization agrees to comply with the following requirements:

   (a) Each MA Organization must adopt and maintain arrangements satisfactory to CMS to protect its enrollees from incurring liability for payment of any fees that are the legal obligation of the MA Organization. To meet this requirement the MA Organization must--

   (i) Ensure that all contractual or other written arrangements with providers prohibit the Organization's providers from holding any beneficiary enrollee liable for payment of any fees that are the legal obligation of the MA Organization; and

Final: August 21, 2009

3

CONFIDENTIAL AND PROPRIETARY

0037

MARA262967

(ii) Indemnify the beneficiary enrollee for payment of any fees that are the legal obligation of the MA Organization for services furnished by providers that do not contract, or that have not otherwise entered into an agreement with the MA Organization, to provide services to the organization's beneficiary enrollees. **[422.504(g)(1)]**

(b) The MA Organization must provide for continuation of enrollee health care benefits-

(i) For all enrollees, for the duration of the contract period for which CMS payments have been made; and

(ii) For enrollees who are hospitalized on the date its contract with CMS terminates, or, in the event of the MA Organization's insolvency, through the date of discharge. **[422.504(g)(2)]**

(c) In meeting the requirements of this section (C), other than the provider contract requirements specified in paragraph (C)(3)(a) of this Article, the MA Organization may use--

(i) Contractual arrangements;

(ii) Insurance acceptable to CMS;

(iii) Financial reserves acceptable to CMS; or

(iv) Any other arrangement acceptable to CMS. **[422.504(g)(3)]**

## D. PROVIDER PROTECTIONS

1. The MA Organization agrees to comply with all applicable provider requirements in 42 CFR Part 422 Subpart E, including provider certification requirements, anti-discrimination requirements, provider participation and consultation requirements, the prohibition on interference with provider advice, limits on provider indemnification, rules governing payments to providers, and limits on physician incentive plans. **[422.504(a)(6)]**

2. Prompt Payment.

(a) The MA Organization must pay 95 percent of "clean claims" within 30 days of receipt if they are claims for covered services that are not furnished under a written agreement between the organization and the provider.

(i) The MA Organization must pay interest on clean claims that are not paid within 30 days in accordance with sections 1816(c)(2) and 1842(c)(2) of the Act.

(ii) All other claims from non-contracted providers must be paid or denied within 60 calendar days from the date of the request. **[422.520(a)]**

(b) Contracts or other written agreements between the MA Organization and its providers must contain a prompt payment provision, the terms of which are developed and agreed to by both the MA Organization and the relevant provider. **[422.520(b)]**

(c) If CMS determines, after giving notice and opportunity for hearing, that the MA Organization has failed to make payments in accordance with subparagraph (2)(a) of this section, CMS may provide--

(i) For direct payment of the sums owed to providers; and

(ii) For appropriate reduction in the amounts that would otherwise be paid to the MA Organization, to reflect the amounts of the direct payments and the cost of making those payments. **[422.520(c)]**

## E. QUALITY IMPROVEMENT PROGRAM

4

CONFIDENTIAL AND PROPRIETARY

MARA262968

1. The MA Organization agrees to operate, for each plan that it offers, an ongoing quality improvement program as stated in accordance with Section 1852(e) of the Social Security Act and 42 CFR 422.152.

2. Chronic Care Improvement Program

    (a) Each MA organization must have a chronic care improvement program and must establish criteria for participation in the program. The CCIP must have a method for identifying enrollees with multiple or sufficiently severe chronic conditions who meet the criteria for participation in the program and a mechanism for monitoring enrollees' participation in the program.

    (b) Plans have flexibility to choose the design of their program; however, in addition to meeting the requirements specified above, the CCIP selected must be relevant to the plan's MA population. MA organizations are required to submit annual reports on their CCIP program to CMS.

3. <u>Performance Measurement and Reporting</u>: The MA Organization shall measure performance under its MA plans using standard measures required by CMS, and report (at the organization level) its performance to CMS. The standard measures required by CMS during the term of this contract will be uniform data collection and reporting instruments, to include the Health Plan and Employer Data Information Set (HEDIS), Consumer Assessment of Health Plan Satisfaction (CAHPS) survey, and Health Outcomes Survey (HOS). These measures will address clinical areas, including effectiveness of care, enrollee perception of care and use of services; and non-clinical areas including access to and availability of services, appeals and grievances, and organizational characteristics. **[422.152(b)(1), (e)]**

4. <u>Utilization Review</u>:

    (a) An MA Organization for an MA coordinated care plan must use written protocols for utilization review and policies and procedures must reflect current standards of medical practice in processing requests for initial or continued authorization of services and have in effect mechanisms to detect both underutilization and over utilization of services. **[422.152(b)]**

    (b) For MA regional preferred provider organizations (RPPOs) and MA local preferred provider organizations (PPOs) that are offered by an organization that is not licensed or organized under State law as an HMOs, if the MA Organization uses written protocols for utilization review, those policies and procedures must reflect current standards of medical practice in processing requests for initial or continued authorization of services and include mechanisms to evaluate utilization of services and to inform enrollees and providers of services of the results of the evaluation. **[422.152(e)]**

5. <u>Information Systems</u>:

    (a) The MA Organization must:

    (i) Maintain a health information system that collects, analyzes and integrates the data necessary to implement its quality improvement program;

    (ii) Ensure that the information entered into the system (particularly that received from providers) is reliable and complete;

    (iii) Make all collected information available to CMS. **[422.152(f)(1)]**

6. <u>External Review</u>

5

CONFIDENTIAL AND PROPRIETARY

MARA262969

The MA Organization will comply with any requests by Quality Improvement Organizations to review the MA Organization's medical records in connection with appeals of discharges from hospitals, skilled nursing facilities, and home health agencies.

## F. COMPLIANCE PLAN

The MA Organization agrees to implement a compliance plan in accordance with the requirements of §422.503(b)(4)(vi). **[422.503(b)(4)(vi)]**

## G. COMPLIANCE DEEMED ON THE BASIS OF ACCREDITATION

CMS may deem the MA Organization to have met the quality improvement requirements of §1852(e) of the Act and §422.152, the confidentiality and accuracy of enrollee records requirements of §1852(h) of the Act and §422.118, the anti-discrimination requirements of §1852(b) of the Act and §422.110, the access to services requirements of §1852(d) of the Act and §422.112, and the advance directives requirements of §1852(i) of the Act and §422.128, the provider participation requirements of §1852(j) of the Act and 42 CFR Part 422, Subpart F, and the applicable requirements described in §423.165, if the MA Organization is fully accredited (and periodically reaccredited) by a private, national accreditation organization approved by CMS and the accreditation organization used the standards approved by CMS for the purposes of assessing the MA Organization's compliance with Medicare requirements. The provisions of §422.156 shall govern the MA Organization's use of deemed status to meet MA program requirements.

## H. PROGRAM INTEGRITY

1. The MA Organization agrees to provide notice based on best knowledge, information, and belief to CMS of any integrity items related to payments from governmental entities, both federal and state, for healthcare or prescription drug services. These items include any investigations, legal actions or matters subject to arbitration brought involving the MA Organization (or MA Organization's firm if applicable) and its subcontractors (excluding contracted network providers), including any key management or executive staff, or any major shareholders (5% or more), by a government agency (state or federal) on matters relating to payments from governmental entities, both federal and state, for healthcare and/or prescription drug services. In providing the notice, the sponsor shall keep the government informed of when the integrity item is initiated and when it is closed. Notice should be provided of the details concerning any resolution and monetary payments as well as any settlement agreements or corporate integrity agreements.

2. The MA Organization agrees to provide notice based on best knowledge, information, and belief to CMS in the event the MA Organization or any of its subcontractors is criminally convicted or has a civil judgment entered against it for fraudulent activities or is sanctioned under any Federal program involving the provision of health care or prescription drug services.

## I. MARKETING

1. The MA Organization may not distribute any marketing materials, as defined in 42 CFR 422.80(b) and in the Marketing Materials Guidelines for Medicare Advantage-Prescription Drug Plans and Prescription Drug Plans (Medicare Marketing Guidelines), unless they have been filed

6

CONFIDENTIAL AND PROPRIETARY

MARA262970

with and not disapproved by CMS in accordance with §422.80. The file and use process set out at §422.80(a)(2) must be used, unless the MA organization notifies CMS that it will not use this process.

2. CMS and the MA Organization shall agree upon language setting forth the benefits, exclusions and other language of the Plan. The MA Organization bears full responsibility for the accuracy of its marketing materials. CMS, in its sole discretion, may order the MA Organization to print and distribute the agreed upon marketing materials, in a format approved by CMS. The MA Organization must disclose the information to each enrollee electing a plan as outlined in 42 CFR 422.111.

3. The MA Organization agrees that any advertising material, including that labeled promotional material, marketing materials, or supplemental literature, shall be truthful and not misleading. All marketing materials must include the Contract number. All membership identification cards must include the Contract number on the front of the card.

4. The MA Organization must comply with the Medicare Marketing Guidelines, as well as all applicable statutes and regulations, including and without limitation Section 1851(h) of the Act and 42 CFR §§422.80, 422.111 and 423.50. Failure to comply may result in sanctions as provided in 42 CFR Part 422 Subpart O.

Article IV

CMS Payment to MA Organization

A. The MA Organization agrees to develop its annual benefit and price bid proposal and submit to CMS all required information on premiums, benefits, and cost sharing, as required under 42 CFR Part 422 Subpart F. **[422.504(a)(10)]**

B. Methodology. CMS agrees to pay the MA Organization under this contract in accordance with the provisions of section 1853 of the Act and 42 CFR Part 422 Subpart G. **[422.504(a)(9)]**

C. Attestation of payment data (Attachments A, B, and C).
As a condition for receiving a monthly payment under paragraph B of this article, and 42 CFR Part 422 Subpart G, the MA Organization agrees that its chief executive officer (CEO), chief financial officer (CFO), or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to such officer, must request payment under the contract on the forms attached hereto as Attachment A (enrollment attestation) and Attachment B (risk adjustment data) which attest to *(based on best knowledge, information and belief, as of the date specified on the attestation form)* the accuracy, completeness, and truthfulness of the data identified on these attachments. The Medicare Advantage Plan Attestation of Benefit Plan and Price must be signed and attached to the executed version of this contract.

1. Attachment A requires that the CEO, CFO, or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to such officer, must attest based on best knowledge, information, and belief that each enrollee for whom the MA Organization is requesting payment is validly enrolled, or was validly enrolled during the period for which payment is requested, in an MA plan offered by the MA Organization. The MA Organization

7

CONFIDENTIAL AND PROPRIETARY

shall submit completed enrollment attestation forms to CMS, or its contractor, on a monthly basis. (NOTE: The forms included as attachments to this contract are for reference only. CMS will provide instructions for the completion and submission of the forms in separate documents. MA Organizations should not take any action on the forms until appropriate CMS instructions are made available.)

2. Attachment B requires that the CEO, CFO, or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to such officer, must *attest to (based on best knowledge, information and belief, as of the date specified on the attestation form)* that the risk adjustment data it submits to CMS under §422.310 are accurate, complete, and truthful. The MA Organization shall make annual attestations to this effect for risk adjustment data on Attachment B and according to a schedule to be published by CMS. If such risk adjustment data are generated by a related entity, contractor, or subcontractor of an MA Organization, such entity, contractor, or subcontractor must <u>also</u> *attest to (based on best knowledge, information, and belief, as of the date specified on the attestation form)* the accuracy, completeness, and truthfulness of the data. **[422.504(l)]**

3. The Medicare Advantage Plan Attestation of Benefit Plan and Price (an example of which is attached hereto as Attachment C) requires that the CEO, CFO, or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to such officer, must attest *(based on best knowledge, information and belief, as of the date specified on the attestation form)* that the information and documentation comprising the bid submission proposal is accurate, complete, and truthful and fully conforms to the Bid Form and Plan Benefit Package requirements; and that the benefits described in the CMS-approved proposed bid submission agree with the benefit package the MA Organization will offer during the period covered by the proposed bid submission. This document is being sent separately to the MA Organization and must be signed and attached to the executed version of this contract, and is incorporated herein by reference. **[422.504(l)]**

Article V

MA Organization Relationship with Related Entities, Contractors, and Subcontractors

A. Notwithstanding any relationship(s) that the MA Organization may have with related entities, contractors, or subcontractors, the MA Organization maintains full responsibility for adhering to and otherwise fully complying with all terms and conditions of its contract with CMS. **[422.504(i)(1)]**

B. The MA Organization agrees to require all related entities, contractors, or subcontractors to agree that--

    (1) HHS, the Comptroller General, or their designees have the right to inspect, evaluate, and audit any pertinent contracts, books, documents, papers, and records of the related entity(s), contractor(s), or subcontractor(s) involving transactions related to this contract; and

    (2) HHS, the Comptroller General, or their designees have the right to inspect, evaluate, and audit any pertinent information for any particular contract period for 10 years from the final

8

CONFIDENTIAL AND PROPRIETARY

MARA262972

date of the contract period or from the date of completion of any audit, whichever is later. **[422.504(i)(2)]**

C.  The MA Organization agrees that all contracts or written arrangements into which the MA Organization enters with providers, related entities, contractors, or subcontractors (first tier and downstream entities) shall contain the following elements:

(1) Enrollee protection provisions that provide--

(a) Consistent with Article III(C), arrangements that prohibit providers from holding an enrollee liable for payment of any fees that are the legal obligation of the MA Organization; and

(b) Consistent with Article III(C), provision for the continuation of benefits.

(2) Accountability provisions that indicate that the MA Organization may only delegate activities or functions to a provider, related entity, contractor, or subcontractor in a manner consistent with requirements set forth at paragraph D of this article.

(3)  A provision requiring that any services or other activity performed by a related entity, contractor or subcontractor in accordance with a contract or written agreement between the related entity, contractor, or subcontractor and the MA Organization will be consistent and comply with the MA Organization's contractual obligations to CMS.

**[422.504(i)(3)]**

D.  If any of the MA Organization's activities or responsibilities under this contract with CMS is delegated to other parties, the following requirements apply to any related entity, contractor, subcontractor, or provider:

(1) Written arrangements must specify delegated activities and reporting responsibilities.

(2) Written arrangements must either provide for revocation of the delegation activities and reporting requirements or specify other remedies in instances where CMS or the MA Organization determine that such parties have not performed satisfactorily.

(3) Written arrangements must specify that the performance of the parties is monitored by the MA Organization on an ongoing basis.

(4) Written arrangements must specify that either--

(a) The credentials of medical professionals affiliated with the party or parties will be either reviewed by the MA Organization; or

(b) The credentialing process will be reviewed and approved by the MA Organization and the MA Organization must audit the credentialing process on an ongoing basis.

(5) All contracts or written arrangements must specify that the related entity, contractor, or subcontractor must comply with all applicable Medicare laws, regulations, and CMS instructions.

**[422.504(i)(4)]**

E.  If the MA Organization delegates selection of the providers, contractors, or subcontractors to another organization, the MA Organization's written arrangements with that organization must state that the MA Organization retains the right to approve, suspend, or terminate any such arrangement. **[422.504(i)(5)]**

F.  As of the date of this contract and throughout its term, the MA Organization

<center>9</center>

CONFIDENTIAL AND PROPRIETARY

(1) Agrees that any physician incentive plan it operates meets the requirements of §422.208, and

(2) Has assured that all physicians and physician groups that the MA Organization's physician incentive plan places at substantial financial risk have adequate stop-loss protection in accordance with §422.208(f). **[422.208]**

Article VI

Records Requirements

A. MAINTENANCE OF RECORDS

1. The MA Organization agrees to maintain for 10 years books, records, documents, and other evidence of accounting procedures and practices that--

(a) Are sufficient to do the following:

(i) Accommodate periodic auditing of the financial records (including data related to Medicare utilization, costs, and computation of the benefit and price bid) of the MA Organization.

(ii) Enable CMS to inspect or otherwise evaluate the quality, appropriateness and timeliness of services performed under the contract, and the facilities of the MA Organization.

(iii) Enable CMS to audit and inspect any books and records of the MA Organization that pertain to the ability of the organization to bear the risk of potential financial losses, or to services performed or determinations of amounts payable under the contract.

(iv) Properly reflect all direct and indirect costs claimed to have been incurred and used in the preparation of the benefit and price bid proposal.

(v) Establish component rates of the benefit and price bid for determining additional and supplementary benefits.

(vi) Determine the rates utilized in setting premiums for State insurance agency purposes and for other government and private purchasers; and

(b) Include at least records of the following:

(i) Ownership and operation of the MA Organization's financial, medical, and other record keeping systems.

(ii) Financial statements for the current contract period and six prior periods.

(iii) Federal income tax or informational returns for the current contract period and six prior periods.

(iv) Asset acquisition, lease, sale, or other action.

(v) Agreements, contracts (including, but not limited to, with related or unrelated prescription drug benefit managers) and subcontracts.

(vi) Franchise, marketing, and management agreements.

(vii) Schedules of charges for the MA Organization's fee-for-service patients.

(viii) Matters pertaining to costs of operations.

(ix) Amounts of income received, by source and payment.

(x) Cash flow statements.

(xi) Any financial reports filed with other Federal programs or State authorities.

**[422.504(d)]**

10

CONFIDENTIAL AND PROPRIETARY

MARA262974

2. <u>Access to facilities and records</u>. The MA Organization agrees to the following:

(a) The Department of Health and Human Services (HHS), the Comptroller General, or their designee may evaluate, through inspection or other means--

(i) The quality, appropriateness, and timeliness of services furnished to Medicare enrollees under the contract;

(ii) The facilities of the MA Organization; and

(iii) The enrollment and disenrollment records for the current contract period and ten prior periods.

(b) HHS, the Comptroller General, or their designees may audit, evaluate, or inspect any books, contracts, medical records, documents, papers, patient care documentation, and other records of the MA Organization, related entity, contractor, subcontractor, or its transferee that pertain to any aspect of services performed, reconciliation of benefit liabilities, and determination of amounts payable under the contract, or as the Secretary may deem necessary to enforce the contract.

(c) The MA Organization agrees to make available, for the purposes specified in section (A) of this article, its premises, physical facilities and equipment, records relating to its Medicare enrollees, and any additional relevant information that CMS may require, in a manner that meets CMS record maintenance requirements.

(d) HHS, the Comptroller General, or their designee's right to inspect, evaluate, and audit extends through 10 years from the final date of the contract period or completion of audit, whichever is later unless-

(i) CMS determines there is a special need to retain a particular record or group of records for a longer period and notifies the MA Organization at least 30 days before the normal disposition date;

(ii) There has been a termination, dispute, or fraud or similar fault by the MA Organization, in which case the retention may be extended to 10 years from the date of any resulting final resolution of the termination, dispute, or fraud or similar fault; or

(iii) HHS, the Comptroller General, or their designee determines that there is a reasonable possibility of fraud, in which case they may inspect, evaluate, and audit the MA Organization at any time. **[422.504(e)]**

## B. REPORTING REQUIREMENTS

1. The MA Organization shall have an effective procedure to develop, compile, evaluate, and report to CMS, to its enrollees, and to the general public, at the times and in the manner that CMS requires, and while safeguarding the confidentiality of the doctor-patient relationship, statistics and other information as described in the remainder of this section (B). **[422.516(a)]**

2. The MA Organization agrees to submit to CMS certified financial information that must include the following:

(a) Such information as CMS may require demonstrating that the organization has a fiscally sound operation, including:

(i) The cost of its operations;

(ii) A description, submitted to CMS annually and within 120 days of the end of the fiscal year, of significant business transactions (as defined in §422.500) between the MA Organization and a party in interest showing that the costs of the transactions listed in paragraph (2)(a)(v) of

11

CONFIDENTIAL AND PROPRIETARY

MARA262975

this section do not exceed the costs that would be incurred if these transactions were with
someone who is not a party in interest; or

(iii) If they do exceed, a justification that the higher costs are consistent with prudent
management and fiscal soundness requirements.

(iv) A combined financial statement for the MA Organization and a party in interest if
either of the following conditions is met:

(aa) Thirty-five percent or more of the costs of operation of the MA Organization go to a
party in interest.

(bb) Thirty-five percent or more of the revenue of a party in interest is from the MA
Organization. **[422.516(b)]**

(v)Requirements for combined financial statements.

(aa) The combined financial statements required by paragraph (2)(a)(iv) must display in
separate columns the financial information for the MA Organization and each of the parties in
interest.

(bb) Inter-entity transactions must be eliminated in the consolidated column.

(cc) The statements must have been examined by an independent auditor in accordance
with generally accepted accounting principles and must include appropriate opinions and notes.

(dd) Upon written request from the MA Organization showing good cause, CMS may
waive the requirement that the organization's combined financial statement include the financial
information required in paragraph (2)(a)(v) with respect to a particular entity. **[422.516(c)]**

(vi) A description of any loans or other special financial arrangements the MA
Organization makes with contractors, subcontractors, and related entities.

(b) Such information as CMS may require pertaining to the disclosure of ownership and
control of the MA Organization. **[422.504(f)(1)(ii)]**

(c) Patterns of utilization of the MA Organization's services.

3. The MA Organization agrees to participate in surveys required by CMS and to submit to CMS
all information that is necessary for CMS to administer and evaluate the program and to
simultaneously establish and facilitate a process for current and prospective beneficiaries to
exercise choice in obtaining Medicare services.  This information includes, but is not limited to:

(a) The benefits covered under the MA plan;

(b) The MA monthly basic beneficiary premium and MA monthly supplemental
beneficiary premium, if any, for the plan.

(c) The service area and continuation area, if any, of each plan and the enrollment
capacity of each plan;

(d) Plan quality and performance indicators for the benefits under the plan including --

(i) Disenrollment rates for Medicare enrollees electing to receive benefits through the
plan for the previous 2 years;

(ii) Information on Medicare enrollee satisfaction;

(iii) The patterns of utilization of plan services;

(iv) The availability, accessibility, and acceptability of the plan's services;

(v) Information on health outcomes and other performance measures required by CMS;

(vi) The recent record regarding compliance of the plan with requirements of this part, as
determined by CMS; and

12

CONFIDENTIAL AND PROPRIETARY                                                    MARA262976

(vii) Other information determined by CMS to be necessary to assist beneficiaries in making an informed choice among MA plans and traditional Medicare;

(e) Information about beneficiary appeals and their disposition;

(f) Information regarding all formal actions, reviews, findings, or other similar actions by States, other regulatory bodies, or any other certifying or accrediting organization;

(g) Any other information deemed necessary by CMS for the administration or evaluation of the Medicare program. **[422.504(f)(2)]**

4.  The MA Organization agrees to provide to its enrollees and upon request, to any individual eligible to elect an MA plan, all informational requirements under §422.64 and, upon an enrollee's, request, the financial disclosure information required under §422.516. **[422.504(f)(3)]**

5.  Reporting and disclosure under ERISA.

(a) For any employees' health benefits plan that includes an MA Organization in its offerings, the MA Organization must furnish, upon request, the information the plan needs to fulfill its reporting and disclosure obligations (with respect to the MA Organization) under the Employee Retirement Income Security Act of 1974 (ERISA).

(b) The MA Organization must furnish the information to the employer or the employer's designee, or to the plan administrator, as the term "administrator" is defined in ERISA. **[422.516(d)]**

6.  Electronic communication. The MA Organization must have the capacity to communicate with CMS electronically. **[422.504(b)]**

7.  Risk Adjustment data. The MA Organization agrees to comply with the requirements in §422.310 for submitting risk adjustment data to CMS. **[422.504(a)(8)]**

Article VII

Renewal of the MA Contract

A.  Renewal of contract: In accordance with §422.505, following the initial contract period, this contract is renewable annually only if-

(1) The MA Organization has not provided CMS with a notice of intention not to renew; **[422.506(a)]**

(2) CMS and the MA Organization reach agreement on the bid under 42 CFR Part 422, Subpart F; and **[422.505(d)]**

(3) CMS informs the MA Organization that it authorizes a renewal.

B.  Nonrenewal of contract

(1) Nonrenewal by the Organization.

(a) In accordance with §422.506, the MA Organization may elect not to renew its contract with CMS as of the end of the term of the contract for any reason, provided it meets the time frames for doing so set forth in subparagraphs (b) and (c) of this paragraph.

(b) If the MA Organization does not intend to renew its contract, it must notify--

(i) CMS, in writing, by the first Monday in June of the year in which the contract would end, pursuant to §422.506

13

CONFIDENTIAL AND PROPRIETARY

MARA262977

(ii) Each Medicare enrollee, at least 90 days before the date on which the nonrenewal is effective. This notice must include a written description of all alternatives available for obtaining Medicare services within the service area including alternative MA plans, Medigap options, and original Medicare and prescription drug plans and must receive CMS approval prior to issuance.

(iii) The general public, at least 90 days before the end of the current calendar year, by publishing a CMS-approved notice in one or more newspapers of general circulation in each community located in the MA Organization's service area.

(c) CMS may accept a nonrenewal notice submitted after the applicable annual non-renewal notice deadline if --

(i) The MA Organization notifies its Medicare enrollees and the public in accordance with subparagraph (1)(b)(ii) and (1)(b)(iii) of this section; and

(ii) Acceptance is not inconsistent with the effective and efficient administration of the Medicare program.

(d) If the MA Organization does not renew a contract under subparagraph (1), CMS will not enter into a contract with the Organization for 2 years from the date of contract separation unless there are special circumstances that warrant special consideration, as determined by CMS. **[422.506(a)]**

(2) <u>CMS decision not to renew.</u>

(a) CMS may elect not to authorize renewal of a contract for any of the following reasons:

(i) The MA Organization's level of enrollment, growth in enrollment, or insufficient number of contracted providers is determined by CMS to threaten the viability of the organization under the MA program and or be an indicator of beneficiary dissatisfaction with the MA plan(s) offered by the organization.

(ii) For any of the reasons listed in §422.510(a) [Article VIII, section (B)(1)(a) of this contract], which would also permit CMS to terminate the contract.

(iii) The MA Organization has committed any of the acts in §422.752(a) that would support the imposition of intermediate sanctions or civil money penalties under 42 CFR Part 422 Subpart O.

(iv) The MA Organization did not submit a benefit and price bid or the benefit and price bid was not acceptable **[422.505(d)]**

(b) <u>Notice.</u> CMS shall provide notice of its decision whether to authorize renewal of the contract as follows:

(i) To the MA Organization by May 1 of the contract year, except in the event of (2)(a)(iv) above, for which notice will be sent by September 1.

(ii) To the MA Organization's Medicare enrollees by mail at least 90 days before the end of the current calendar year.

(iii) To the general public at least 90 days before the end of the current calendar year, by publishing a notice in one or more newspapers of general circulation in each community or county located in the MA Organization's service area.

14

0048

CONFIDENTIAL AND PROPRIETARY

MARA262978

Case 2:16-cv-08697-FMO-PVC   Document 616-3   Filed 08/06/24   Page 52 of 637
Case 2:16-cv-08697-MWF-SS   Document 71-12   Filed 11/17/17   Page 16 of 23   Page ID
Page #:284
#:18946

(c) <u>Notice of appeal rights</u>. CMS shall give the MA Organization written notice of its right to reconsideration of the decision not to renew in accordance with § 422.644. **[422.506(b)]**

Article VIII

Modification or Termination of the Contract

A. Modification or Termination of Contract by Mutual Consent
1. This contract may be modified or terminated at any time by written mutual consent.
    (a) If the contract is modified by written mutual consent, the MA Organization must notify its Medicare enrollees of any changes that CMS determines are appropriate for notification within time frames specified by CMS. **[422.508(a)(2)]**
    (b) If the contract is terminated by written mutual consent, except as provided in section (A)(2) of this Article, the MA Organization must provide notice to its Medicare enrollees and the general public as provided in section B(2)(b)(ii) and B(2)(b)(iii) of this Article. **[422.508(a)(1)]**
2. If this contract is terminated by written mutual consent and replaced the day following such termination by a new MA contract, the MA Organization is not required to provide the notice specified in section B of this article.
**[422.508(b)]**

B. Termination of the Contract by CMS or the MA Organization
1. <u>Termination by CMS</u>.
    (a) CMS may terminate a contract for any of the following reasons:
    (i) The MA Organization has failed substantially to carry out the terms of its contract with CMS.
    (ii) The MA Organization is carrying out its contract with CMS in a manner that is inconsistent with the effective and efficient implementation of 42 CFR Part 422.
    (iii) CMS determines that the MA Organization no longer meets the requirements of 42 CFR Part 422 for being a contracting organization.
    (iv) There is credible evidence that the MA Organization committed or participated in false, fraudulent or abusive activities affecting the Medicare program, including submission of false or fraudulent data.
    (v) The MA Organization experiences financial difficulties so severe that its ability to make necessary health services available is impaired to the point of posing an imminent and serious risk to the health of its enrollees, or otherwise fails to make services available to the extent that such a risk to health exists.
    (vi) The MA Organization substantially fails to comply with the requirements in 42 CFR Part 422 Subpart M relating to grievances and appeals.
    (vii) The MA Organization fails to provide CMS with valid risk adjustment data as required under §422.310 and 423.329(b)(3).
    (viii) The MA Organization fails to implement an acceptable quality improvement program as required under 42 CFR Part 422 Subpart D.

15

CONFIDENTIAL AND PROPRIETARY

(ix) The MA Organization substantially fails to comply with the prompt payment requirements in §422.520.

(x) The MA Organization substantially fails to comply with the service access requirements in §422.112.

(xi) The MA Organization fails to comply with the requirements of §422.208 regarding physician incentive plans.

(xii) The MA Organization substantially fails to comply with the marketing requirements in 422.80.

(b) <u>Notice</u>. If CMS decides to terminate a contract for reasons other than the grounds specified in section (B)(1)(a) above, it will give notice of the termination as follows:

(i) CMS will notify the MA Organization in writing 90 days before the intended date of the termination.

(ii) The MA Organization will notify its Medicare enrollees of the termination by mail at least 30 days before the effective date of the termination.

(iii) The MA Organization will notify the general public of the termination at least 30 days before the effective date of the termination by publishing a notice in one or more newspapers of general circulation in each community or county located in the MA Organization's service area.

(c) <u>Immediate termination of contract by CMS</u>.

(i) For terminations based on violations prescribed in paragraph (B)(1)(a)(v) of this article, CMS will notify the MA Organization in writing that its contract has been terminated effective the date of the termination decision by CMS. If termination is effective in the middle of a month, CMS has the right to recover the prorated share of the capitation payments made to the MA Organization covering the period of the month following the contract termination.

(ii) CMS will notify the MA Organization's Medicare enrollees in writing of CMS' decision to terminate the MA Organization's contract. This notice will occur no later than 30 days after CMS notifies the plan of its decision to terminate this contract. CMS will simultaneously inform the Medicare enrollees of alternative options for obtaining Medicare services, including alternative MA Organizations in a similar geographic area and original Medicare.

(iii) CMS will notify the general public of the termination no later than 30 days after notifying the MA Organization of CMS' decision to terminate this contract. This notice will be published in one or more newspapers of general circulation in each community or county located in the MA Organization's service area.

(d) <u>Corrective action plan</u>

(i) <u>General</u>. Before terminating a contract for reasons other than the grounds specified in section (B)(1)(a)(v) of this article, CMS will provide the MA Organization with reasonable opportunity, not to exceed time frames specified at 42 CFR Part 422 Subpart N, to develop and receive CMS approval of a corrective action plan to correct the deficiencies that are the basis of the proposed termination.

(ii) <u>Exception</u>. If a contract is terminated under section (B)(1)(a)(v) of this article, the MA Organization will not have the opportunity to submit a corrective action plan.

16

CONFIDENTIAL AND PROPRIETARY

MARA262980

Case 2:16-cv-08697-FMO-SS   Document 616-3   Filed 08/06/24   Page 54 of 637   Page ID
#2256
Case 2:16-cv-08697-MW-SS   Document 171-16   Filed 11/17/17   Page 18 of 23   Page ID
#2256

(e) <u>Appeal rights</u>. If CMS decides to terminate this contract, it will send written notice to the MA Organization informing it of its termination appeal rights in accordance with 42 CFR Part 422 Subpart N. **[422.510]**

2. Termination by the MA Organization

(a) <u>Cause for termination</u>. The MA Organization may terminate this contract if CMS fails to substantially carry out the terms of the contract.

(b) <u>Notice</u>. The MA Organization must give advance notice as follows:

(i) To CMS, at least 90 days before the intended date of termination. This notice must specify the reasons why the MA Organization is requesting contract termination.

(ii) To its Medicare enrollees, at least 60 days before the termination effective date. This notice must include a written description of alternatives available for obtaining Medicare services within the service area, including alternative MA and MA-PD plans, PDP plans, Medigap options, and original Medicare and must receive CMS approval.

(iii) To the general public at least 60 days before the termination effective date by publishing a CMS-approved notice in one or more newspapers of general circulation in each community or county located in the MA Organization's geographic area.

(c) <u>Effective date of termination</u>. The effective date of the termination will be determined by CMS and will be at least 90 days after the date CMS receives the MA Organization's notice of intent to terminate.

(d) <u>CMS' liability</u>. CMS' liability for payment to the MA Organization ends as of the first day of the month after the last month for which the contract is in effect, but CMS shall make payments for amounts owed prior to termination but not yet paid.

(e) <u>Effect of termination by the organization</u>. CMS will not enter into an agreement with the MA Organization for a period of two years from the date the Organization has terminated this contract, unless there are circumstances that warrant special consideration, as determined by CMS. **[422.512]**

Article IX

Requirements of Other Laws and Regulations

A. The MA Organization agrees to comply with--

(1) Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law, the False Claims Act (31 USC 3729 et seq.) , and the anti-kickback statute (section 1128B(b) of the Act): and

(2) HIPAA administrative simplification rules at 45 CFR parts 160, 162, and 164. **[422.504(h)]**

B. The MA Organization maintains ultimate responsibility for adhering to and otherwise fully complying with all terms and conditions of its contract with CMS, notwithstanding any relationship(s) that the MA organization may have with related entities, contractors, or subcontractors. **[422.504(i)]**

17

0051
CONFIDENTIAL AND PROPRIETARY                                                                    MARA262981

C.  In the event that any provision of this contract conflicts with the provisions of any statute or regulation applicable to an MA Organization, the provisions of the statute or regulation shall have full force and effect.

Article X

Severability

The MA Organization agrees that, upon CMS' request, this contract will be amended to exclude any MA plan or State-licensed entity specified by CMS, and a separate contract for any such excluded plan or entity will be deemed to be in place when such a request is made.  **[422.504(k)]**

Article XI

Miscellaneous

A.  Definitions.  Terms not otherwise defined in this contract shall have the meaning given to such terms in 42 CFR Part 422.
B.  Alteration to Original Contract Terms.  The MA Organization agrees that it has not altered in any way the terms of this contract presented for signature by CMS.  The MA Organization agrees that any alterations to the original text the MA Organization may make to this contract shall not be binding on the parties.
C.  Approval to Begin Marketing and Enrollment.  The MA Organization agrees that it must complete CMS operational requirements prior to receiving CMS approval to begin Part C marketing and enrollment activities.  Such activities include, but are not limited to, establishing and successfully testing connectivity with CMS systems to process enrollment applications (or contracting with an entity qualified to perform such functions on the MA Organization's Sponsor's behalf) and successfully demonstrating capability to submit accurate and timely price comparison data.  To establish and successfully test connectivity, the MA Organization must, 1) establish and test physical connectivity to the CMS data center, 2) acquire user identifications and passwords, 3) receive, store, and maintain data necessary to perform enrollments and send and receive transactions to and from CMS, and 4) check and receive transaction status information.
D.  Incorporation of Applicable Addenda.  All addenda checked off and initialed on the cover sheet of this contract by the MA Organization are hereby incorporated by reference.

18

185

EXHIBIT 1

0052

CONFIDENTIAL AND PROPRIETARY

MARA262982

Case 2:16-cv-08697-FMO-PVC Document 616-3 Filed 08/06/24 Page 56 of 637
Case 2:16-cv-08697-MWF-SS Document 171-11 Filed 11/17/17 Page 20 of 25 Page ID
Page #:2288
#:8950

In witness whereof, the parties hereby execute this contract.

FOR THE MA ORGANIZATION

_____          _____
Printed Name                         Title


_____          _____
Signature                            Date


_____          _____
Organization                         Address


FOR THE CENTERS FOR MEDICARE & MEDICAID SERVICES


_____          _____
Teresa DeCaro, R.N., MS              Date
Acting Director
Medicare Drug and Health Plan Contract
  Administration Group
Center for Drug and Health Plan Choice

19

EXHIBIT 1

0053

CONFIDENTIAL AND PROPRIETARY                                    MARA262983

Case 2:16-cv-08697-FMO-PVC   Document 616-3   Filed 08/06/24   Page 57 of 637
Page ID #:2588
Case 2:16-cv-08697-MWF-SS   Document 71-1   Filed 11/07/18   Page 21 of 23   Page ID
#:1283

## ATTACHMENT A

## ATTESTATION OF ENROLLMENT INFORMATION
## RELATING TO CMS PAYMENT
## TO A MEDICARE ADVANTAGE ORGANIZATION

Pursuant to the contract(s) between the Centers for Medicare & Medicaid Services (CMS) and (UNITEDHEALTHCARE PLAN OF THE RIVER VALLEY, INC.), hereafter referred to as the MA Organization, governing the operation of the following Medicare Advantage plans (H0251), the MA Organization hereby requests payment under the contract, and in doing so, makes the following attestation concerning CMS payments to the MA Organization. The MA Organization acknowledges that the information described below directly affects the calculation of CMS payments to the MA Organization and that misrepresentations to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution. This attestation shall not be considered a waiver of the MA Organization's right to seek payment adjustments from CMS based on information or data which does not become available until after the date the MA Organization submits this attestation.

1. The MA Organization has reported to CMS for the month of (INDICATE MONTH AND YEAR) all new enrollments, disenrollments, and appropriate changes in enrollees' status with respect to the above-stated MA plans. Based on best knowledge, information, and belief as of the date indicated below, all information submitted to CMS in this report is accurate, complete, and truthful.

2. The MA Organization has reviewed the CMS monthly membership report and reply listing for the month of (INDICATE MONTH AND YEAR) for the above-stated MA plans and has reported to CMS any discrepancies between the report and the MA Organization's records. For those portions of the monthly membership report and the reply listing to which the MA Organization raises no objection, the MA Organization, through the certifying CEO/CFO, will be deemed to have attested, based on best knowledge, information, and belief as of the date indicated below, to its accuracy, completeness, and truthfulness.


_____
(INDICATE TITLE [CEO, CFO, or delegate])

on behalf of

UNITEDHEALTHCARE PLAN OF THE RIVER VALLEY, INC.
(INDICATE MA ORGANIZATION)


_____
DATE

20

0054

CONFIDENTIAL AND PROPRIETARY

MARA262984

Case 2:16-cv-08697-FMO-PVC   Document 616-3   Filed 08/06/24   Page 58 of 637
Page ID #:18952
Case 2:16-cv-08697-MW-SS   Document 71-11   Filed 11/17/20   Page 22 of 23   Page ID #:2250

**ATTACHMENT B**

**ATTESTATION OF RISK ADJUSTMENT DATA INFORMATION RELATING TO
CMS PAYMENT TO A MEDICARE ADVANTAGE ORGANIZATION**

Pursuant to the contract(s) between the Centers for Medicare & Medicaid Services (CMS) and (UNITEDHEALTHCARE PLAN OF THE RIVER VALLEY, INC.), hereafter referred to as the MA Organization, governing the operation of the following Medicare Advantage plans (H0251), the MA Organization hereby requests payment under the contract, and in doing so, makes the following attestation concerning CMS payments to the MA Organization. The MA Organization acknowledges that the information described below directly affects the calculation of CMS payments to the MA Organization or additional benefit obligations of the MA Organization and that misrepresentations to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution.

The MA Organization has reported to CMS during the period of (INDICATE DATES) all (INDICATE TYPE - DIAGNOSIS/ENCOUNTER) risk adjustment data available to the MA Organization with respect to the above-stated MA plans. Based on best knowledge, information, and belief as of the date indicated below, all information submitted to CMS in this report is accurate, complete, and truthful.


_____

(INDICATE TITLE [CEO, CFO, or delegate])

on behalf of

UNITEDHEALTHCARE PLAN OF THE RIVER VALLEY, INC.
_____
(INDICATE MA ORGANIZATION)


_____
DATE

21

CONFIDENTIAL AND PROPRIETARY

0055

MARA262985

CONFIDENTIAL AND PROPRIETARY

**[SAMPLE - DO NOT USE - THIS DOCUMENT WILL BE SENT DIRECTLY TO THE MAO THROUGH HPMS]**
**ATTACHMENT C –** Medicare Advantage Plan Attestation of Benefit Plan and Price

<Legal Entity Name>
<Contract # >

Date: <XX/XX/XXXX>

I attest that the following plan numbers as established in the final Plan Benefit Package (PBP) will be operated by the above-stated organization and made available to eligible Medicare beneficiaries in the approved service area during program year 2010

| Plan ID | Segment ID | Version | Plan Name | Plan Type | Transaction Type | MA Premium | Part D Premium | CMS Approval Date | Effective D... |
|---|---|---|---|---|---|---|---|---|---|
| <xxx> | <x> | <x> | <Plan Name> | <Plan Type> | <Transaction Type> | $<Plan Premium> | $<Part D Premium> | <xx/xx/xx> | <xx/xx/xx... |
| <xxx> | <x> | <x> | <Plan Name> | <Plan Type> | <Transaction Type> | $<Plan Premium> | $<Part D Premium> | <xx/xx/xx> | <xx/xx/xx... |
| <xxx> | <x> | <x> | <Plan Name> | <Plan Type> | <Transaction Type> | $<Plan Premium> | $<Part D Premium> | <xx/xx/xx> | <xx/xx/xx... |

CEO _____ Date        CFO _____ Date

<Name of CEO>        <Name of CFO>
<Title>              <Title>
<Address 1>          <Address 1>
<Address 2>          <Address 2>
<City, State Zip>    <City, State Zip>
<Phone #>            <Phone #>

22

189
EXHIBIT 1

0056
MARA2629986

**EXHIBIT D-2**

Case 2:16-cv-08697-MWF-SS Document 223 Filed 03/23/18 Page 1 of 1029 Page ID #:3066
Case 2:16-cv-08697-FMO-PVC Document 616-3 Filed 08/06/24 Page 61 of 637
Page ID #:18955

LATHAM & WATKINS LLP
   David J. Schindler (Bar No. 130490)
      *david.schindler@lw.com*
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone: +1.213.485.1234
Facsimile: +1.213.891.8763

LATHAM & WATKINS LLP
   Daniel Meron (appearing *pro hac vice*)
      *daniel.meron@lw.com*
   Kathryn H. Ruemmler (appearing *pro hac vice*)
      *kathryn.ruemmler@lw.com*
   Abid R. Qureshi (appearing *pro hac vice*)
      *abid.qureshi@lw.com*
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
Telephone: +1.202.637.2200
Facsimile: +1.202.637.2201

Attorneys for UnitedHealth Defendants

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING,<br><br>Plaintiff,<br><br>v.<br><br>UNITEDHEALTH GROUP, INC. *et al.*,<br><br>Defendants. | CASE NO. 2:16-cv-08697-MWF-SSx<br><br>**UNITEDHEALTH'S ANSWER TO UNITED STATES' AMENDED COMPLAINT-IN-PARTIAL-INTERVENTION AND COUNTERCLAIM** |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM
0058

1    Having filed a notice of intervention pursuant to 31 U.S.C. § 3730(b)(4), the

2    United States alleges in its Amended Complaint-In-Partial-Intervention and

3    Demand for Jury Trial (the "Government's Amended Complaint" or "Amended

4    Complaint") the allegations below.  Defendants UnitedHealth Group Incorporated,

5    United HealthCare Services, Inc., UnitedHealthcare, Inc., UnitedHealthcare

6    Insurance Company, Ovations, Inc., Optum, Inc., OptumInsight, Inc.,

7    AmeriChoice of New Jersey, Inc., AmeriChoice of New York, Inc., Arizona

8    Physicians IPA, Inc., Care Improvement Plus of Maryland, Inc., Care

9    Improvement Plus of Texas Insurance Company, Care Improvement Plus South

10   Central Insurance Company, Care Improvement Plus Wisconsin Insurance

11   Company, Optum Insurance Co., Citrus Health Care, Inc., Health Plan of Nevada,

12   Inc., Medica HealthCare Plans, Inc., Oxford Health Plans (CT), Inc., Oxford

13   Health Plans (NJ), Inc., Oxford Health Plans (NY), Inc., PacifiCare Life and

14   Health Insurance Company, PacifiCare of Arizona, Inc., PacifiCare of Colorado,

15   Inc., PacifiCare of Nevada, Inc., Physicians Health Choice of Texas, LLC,

16   Preferred Care Partners, Inc., Rocky Mountain Health Maintenance Organization,

17   Incorporated, Sierra Health and Life Insurance Company, Inc., Symphonix Health

18   Insurance, Inc., UHC of California (f.k.a. PacifiCare of California), United Health

19   Care Ins. Co. and United New York, Unison Health Plan of Tennessee, Inc.,

20   UnitedHealthcare Benefits of Texas, Inc. (f.k.a. PacifiCare of Texas, Inc.),

21   UnitedHealthcare Community Plan of Ohio, Inc. (f.k.a. Unison Health Plan of

22   Ohio, Inc.), UnitedHealthcare Community Plan of Texas, L.L.C. (f.k.a. Evercare of

23   Texas, L.L.C.), UnitedHealthcare Community Plan, Inc. (f.k.a. UnitedHealthcare

24   of the Great Lakes Health Plan, Inc.), UnitedHealthcare Insurance Company of

25   New York, UnitedHealthcare of Alabama, Inc., UnitedHealthcare of Arizona, Inc.,

26   UnitedHealthcare of Arkansas, Inc., UnitedHealthcare of Florida, Inc.,

27   UnitedHealthcare of Georgia, Inc., UnitedHealthcare of New England, Inc.,

28   UnitedHealthcare of New York, Inc., UnitedHealthcare of North Carolina, Inc.,

2

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

1  UnitedHealthcare of Ohio, Inc., UnitedHealthcare of Oklahoma, Inc. (f.k.a.

2  PacifiCare of Oklahoma, Inc.), UnitedHealthcare of Oregon, Inc. (f.k.a. PacifiCare

3  of Oregon, Inc.), UnitedHealthcare of Pennsylvania, Inc. (f.k.a. Unison Health Plan

4  of Pennsylvania, Inc.), UnitedHealthcare of Tennessee, Inc., UnitedHealthcare of

5  the Midlands, Inc., UnitedHealthcare of the Midwest, Inc., UnitedHealthcare of

6  Utah, Inc., UnitedHealthcare of Washington, Inc. (f.k.a. PacifiCare of Washington,

7  Inc.), UnitedHealthcare of Wisconsin, Inc., and UnitedHealthcare Plan of the River

8  Valley, Inc. (collectively, "UnitedHealth") generally deny each and every

9  allegation except those hereinafter specifically admitted.

10    On February 2, 2018, the Court granted in part and denied in part the

11  UnitedHealth Defendants' motion to dismiss.  Dkt. 212.  This Order dismissed,

12  with leave to amend, the Government's Second, Third, and Fourth Claims for

13  Relief.  On February 26, 2018, the Government notified the Court and the parties

14  that it had "elected not to file a Second Amended Complaint-in-Intervention in this

15  action."  Dkt. 217 at 2.  Therefore, the only surviving claims against the

16  UnitedHealth Defendants are the First, Fifth, and Sixth Claims for Relief.  There

17  are many allegations that clearly relate to the dismissed claims that are now

18  surplusage and do not require a response.  Notwithstanding that and while

19  preserving all of its rights, UnitedHealth denies claims or allegations that do not

20  relate to the Government's First, Fifth, and Sixth Claims for Relief.  UnitedHealth

21  further answers the numbered paragraphs as follows:

22  ## INTRODUCTION

23    1. Paragraph 1 contains no allegations with respect to a particular

24  Defendant or claim, and therefore no response is required.  However, to the extent

25  Paragraph 1 purports to summarize and/or describe the provisions of the Medicare

26  program, UnitedHealth states that the Medicare statute and regulations speak for

27  themselves, and to the extent that the allegations in Paragraph 1 vary therefrom or

28

3

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

0060

1   with other applicable statutory or decisional law, UnitedHealth denies those

2   allegations.

3          2.      Paragraph 2 contains no allegations with respect to a particular

4   Defendant or claim, and therefore no response is required.  However, to the extent

5   Paragraph 2 purports to summarize and/or describe the provisions of the Medicare

6   program, UnitedHealth states that the Medicare statute and regulations speak for

7   themselves, and to the extent that the allegations in Paragraph 2 vary therefrom or

8   with other applicable statutory or decisional law, UnitedHealth denies those

9   allegations.

10         3.      Paragraph 3 contains no allegations with respect to a particular

11  Defendant or claim, and therefore no response is required.  However, to the extent

12  Paragraph 3 purports to summarize and/or describe the provisions of the Medicare

13  program, UnitedHealth states that the Medicare statute and regulations speak for

14  themselves, and to the extent that the allegations in Paragraph 3 vary therefrom or

15  with other applicable statutory or decisional law, UnitedHealth denies those

16  allegations.

17         4.      Paragraph 4 contains no allegations with respect to a particular

18  Defendant or claim, and therefore no response is required.  However, to the extent

19  Paragraph 4 purports to summarize and/or describe the provisions of the Medicare

20  program, UnitedHealth states that the Medicare statute and regulations speak for

21  themselves, and to the extent that the allegations in Paragraph 4 vary therefrom or

22  with other applicable statutory or decisional law, UnitedHealth denies those

23  allegations.

24         5.      Paragraph 5 contains no allegations with respect to a particular

25  Defendant or claim, and therefore no response is required.  However, to the extent

26  Paragraph 5 purports to summarize and/or describe the provisions of the Medicare

27  program, UnitedHealth states that the Medicare statute and regulations speak for

28  themselves, and to the extent that the allegations in Paragraph 5 vary therefrom or

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

1   with other applicable statutory or decisional law, UnitedHealth denies those

2   allegations.

3          6.     To the extent that Paragraph 6 contains legal conclusions, no response

4   is required.  Paragraph 6 contains no allegations with respect to a particular

5   Defendant or claim, and therefore no response is required.  However, to the extent

6   Paragraph 6 purports to summarize and/or describe the provisions of the Medicare

7   program or the Ninth Circuit's order in *United States ex rel. Swoben v.*

8   *UnitedHealthcare Ins. Co.*, 848 F.3d 1161 (9th Cir. 2016), UnitedHealth states that

9   the Medicare regulations and the order speak for themselves, and to the extent that

10  the allegations in Paragraph 6 vary therefrom or with other applicable statutory or

11  decisional law, UnitedHealth denies those allegations.

12         7.     UnitedHealth admits that for many years, UnitedHealth Group

13  Incorporated has owned Medicare Advantage ("MA") Organizations that have

14  enrolled more MA beneficiaries than any other entity, and offers Medicare

15  Advantage Plans ("MA Plans") and prescription drug plans ("PD Plans") to

16  millions of elderly and disabled Medicare beneficiaries throughout the United

17  States.  UnitedHealth also admits that in or around March 2017, approximately

18  229,000 Medicare beneficiaries in the Central District of California were enrolled

19  in MA Plans offered by UHC of California and Sierra Health and Life Insurance

20  Company, Inc.  UnitedHealth denies the remaining allegations in Paragraph 7.

21         8.     Paragraph 8 refers to the Complaint, a legal document, which speaks

22  for itself and to which no response is required.  UnitedHealth denies the remaining

23  allegations in Paragraph 8.

24         9.     UnitedHealth admits that some of the UnitedHealth Defendants

25  collectively received billions of dollars from the Medicare program each year in

26  relation to the Medicare beneficiaries enrolled in the Defendant MA

27  Organizations' Plans.  UnitedHealth admits that certain Defendants conducted

28  programs and engaged in activities designed to improve the completeness of risk

                                                5

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

0062

Case 2:16-cv-08697-MWF-SS Document 223 Filed 08/23/18 Page 6 of 1029 Page ID #:3071
Case 2:16-cv-08697-FMO-PVC Document 616-3 Filed 08/06/24 Page 66 of 637
Page ID #:18960

adjustment data submitted on behalf of Defendant MA Organizations.
UnitedHealth denies the remaining allegations in Paragraph 9.

10.     UnitedHealth admits that certain Defendants have conducted a Chart Review Program since in or about 2005.  UnitedHealth admits that this program improved the completeness of risk adjustment data submitted for Defendant MA Organizations and that risk adjustment payments increased as a result.
UnitedHealth denies the remaining allegations in Paragraph 10.

11.     To the extent that Paragraph 11 contains legal conclusions, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 11.

12.     To the extent that Paragraph 12 contains legal conclusions, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 12.

13.     To the extent that Paragraph 13 contains legal conclusions, no response is required.  UnitedHealth is without knowledge or information sufficient to form a belief as to the truth or falsity of the Government's estimations.
UnitedHealth denies the remaining allegations in Paragraph 13.

14.     To the extent the allegations in Paragraph 14 relate to claims that have been dismissed, they are surplusage and should be stricken.  Paragraph 14 states legal conclusions to which no response is required.  To the extent that Paragraph 14 contains any factual allegations regarding UnitedHealth, such allegations are denied.

15.     Paragraph 15 states legal conclusions to which no response is required.  To the extent that Paragraph 15 contains any factual allegations regarding UnitedHealth, such allegations are denied.

16.     UnitedHealth admits that some of the UnitedHealth Defendants paid some of its provider groups on a capitated basis and others on a fee-for-service basis.  UnitedHealth also admits that some of the UnitedHealth Defendants entered

6

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

1  into value-based agreements with some of its fee-for-service providers.

2  UnitedHealth denies the remaining allegations in Paragraph 16.

3       17.    UnitedHealth admits that pursuant to some of the UnitedHealth

4  Defendants' contractual arrangements with capitated and certain other providers,

5  some of the UnitedHealth Defendants paid a percentage share of the payments that

6  some of the UnitedHealth Defendants received from the Medicare Program for the

7  beneficiaries under those providers' care.  UnitedHealth denies the remaining

8  allegations in Paragraph 17.

9       18.    Paragraph 18 states legal conclusions to which no response is

10  required.  UnitedHealth denies the remaining allegations in Paragraph 18.

11  **JURISDICTION AND VENUE**

12       19.    Paragraph 19 states legal conclusions to which no response is

13  required.

14       20.    Paragraph 20 states legal conclusions to which no response is

15  required.  To the extent a response is required, UnitedHealth admits that at least

16  one of the Defendants transacts business in the Central District of California.

17       21.    Paragraph 21 states legal conclusions to which no response is

18  required.  To the extent a response is required, UnitedHealth admits that at least

19  one of the Defendants can be found in, resides in, and transacts business in this

20  District.  UnitedHealth denies the remaining allegations in Paragraph 21.

21  **PARTIES**

22  **I.    Plaintiffs**

23       22.    Paragraph 22 refers to the Complaint, a legal document, which speaks

24  for itself and to which no response is required.  To the extent Paragraph 22

25  purports to summarize and/or describe the provisions of the Medicare program,

26  UnitedHealth states that the Medicare statute and regulations speak for themselves,

27  and to the extent that the allegations in Paragraph 22 vary therefrom or with other

28  applicable statutory or decisional law, UnitedHealth denies those allegations.

7

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

0064

1  UnitedHealth admits that the United States filed its notice of partial intervention in

2  this action on February 14, 2017.

3        23.    UnitedHealth admits that the *qui tam* plaintiff ("Relator"), Benjamin

4  Poehling, initiated this action by filing a complaint under the *qui tam* provisions of

5  the False Claims Act ("FCA") against UnitedHealth in March 2011.  UnitedHealth

6  admits that from 2004 through the end of 2012, Poehling was the Director of

7  Finance for UnitedHealthcare.  UnitedHealth denies the characterization of its

8  Chart Review Program as a "revenue-generating activit[y]."  UnitedHealth is

9  without knowledge or information sufficient to form a belief as to the truth or

10  falsity of the remaining allegations in Paragraph 23; therefore, such allegations are

11  denied.

12  **II.    Defendants**

13        24.    UnitedHealth admits that UnitedHealth Group Incorporated is a

14  publicly traded Delaware corporation and that it, along with some of its affiliates,

15  have offices in various locations throughout the United States, including in the

16  Central District of California.  UnitedHealth denies the remaining allegations in

17  Paragraph 24.

18        25.    UnitedHealth admits that some of its MA Organizations offer one or

19  more MA Plans and some also offer PD Plans.  UnitedHealth admits that in or

20  around 2008, UnitedHealth Group Incorporated had approximately 1.5 million

21  beneficiaries enrolled in MA Plans operated by its affiliate entities and millions of

22  beneficiaries enrolled in PD Plans operated by its affiliate entities.  UnitedHealth

23  admits that in or around 2009, UnitedHealth Group Incorporated had

24  approximately 1.8 million beneficiaries enrolled in MA operated by its affiliate

25  entities and millions of beneficiaries enrolled in PD Plans operated by its affiliate

26  entities.  UnitedHealth admits that in or around 2010, UnitedHealth Group

27  Incorporated had approximately 2.1 million beneficiaries in MA Plans operated by

28  its affiliate entities and millions of beneficiaries in PD Plans operated by its

8

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

0065

1  affiliate entities.  UnitedHealth admits that in or around 2011, UnitedHealth Group

2  Incorporated had approximately 2.2 million beneficiaries in MA Plans operated by

3  its affiliate entities and millions of beneficiaries in PD Plans operated by its

4  affiliate entities.  UnitedHealth admits that in or around 2012, UnitedHealth Group

5  Incorporated had approximately 2.6 million beneficiaries in MA Plans operated by

6  its affiliate entities and millions of beneficiaries in PD Plans operated by its

7  affiliate entities.  UnitedHealth denies the remaining allegations in Paragraph 25.

8       26.     To the extent the allegations in Paragraph 26 relate to claims that have

9  been dismissed, they are surplusage and should be stricken.  UnitedHealth admits

10  that the following entities named as Defendants in this action have had or have

11  previously had one or more agreements with the Government at some point since

12  2005 to offer MA and/or PD Plans to Medicare beneficiaries under Parts C and D

13  of the Medicare Program, and received payments from the Government pursuant to

14  these agreements: Citrus Health Care, Inc., which was a Florida corporation;

15  Health Plan of Nevada, Inc., which is a Nevada corporation; Medica HealthCare

16  Plans, Inc., which is a Florida corporation; and Physicians Health Choice of Texas,

17  LLC, which is a Texas limited liability company doing business as Physicians

18  Health Choice.  UnitedHealth denies the remaining allegations in Paragraph 26.

19       27.     UnitedHealth admits that United HealthCare Services, Inc. is a

20  Minnesota corporation and a direct subsidiary of UnitedHealth Group

21  Incorporated.  UnitedHealth also admits that PacifiCare Health Systems, LLC and

22  PacifiCare Health Plan Administrators, Inc. merged into United HealthCare

23  Services, Inc.  UnitedHealth denies the remaining allegations in Paragraph 27.

24       28.     UnitedHealth admits that Ovations, Inc. is a Delaware corporation and

25  a direct subsidiary of United HealthCare Services, Inc. and an indirect subsidiary

26  of UnitedHealth Group Incorporated.  UnitedHealth denies the remaining

27  allegations in Paragraph 28.

28

9

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

0066

Case 2:16-cv-08697-FMO-SS   Document 616-31   Filed 08/06/24   Page 70 of 637
Case 2:16-cv-08697-MWF-SS   Document 228   Filed 03/23/18   Page 10 of 101   Page ID
Page #:3075
#:3964

29.     UnitedHealth admits that UnitedHealthcare, Inc. is a Delaware corporation.  UnitedHealth admits that various UnitedHealthcare subsidiaries operate health benefit plans and provide healthcare benefits to Medicare beneficiaries under the MA Program.  UnitedHealth denies the remaining allegations in Paragraph 29.

30.     UnitedHealth admits that Optum, Inc. and OptumInsight, Inc. are Delaware corporations and indirect subsidiaries of UnitedHealth Group Incorporated.  UnitedHealth admits that in 2011, OptumInsight became the successor to Ingenix, Inc.  Paragraph 30 also refers to the Complaint, a legal document, which speaks for itself and to which no response is required. UnitedHealth denies the remaining allegations in Paragraph 30.

31.     Paragraph 31 states legal conclusions to which no response is required.  To the extent Paragraph 31 contains any factual allegations, such allegations are denied.

32.     Paragraph 32 states legal conclusions to which no response is required.  UnitedHealth denies the remaining allegations in Paragraph 32.

33.     UnitedHealth admits that, starting in 2007, its risk adjustment submission process was primarily performed within Ingenix and then within Ingenix's successor, Optum.  UnitedHealth admits that Ingenix and then Optum submitted risk adjustment data to CMS' Risk Adjustment Processing System (RAPS) via IRADS.  UnitedHealth admits that Ingenix and then Optum performed operational functions for Chart Review, Claims Verification, and Risk Adjustment Coding Compliance Review ("RACCR") programs.  UnitedHealth admits that Ingenix and then Optum performed certain activities relating to risk adjustment from its office in the Central District of California and elsewhere.  UnitedHealth denies the remaining allegations in Paragraph 33.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT IN PARTIAL-
INTERVENTION AND COUNTERCLAIM
0067

Case 2:16-cv-08697-FMO-SS   Document 616-3   Filed 08/06/24   Page 71 of 637
Case 2:16-cv-08697-MWF-SS   Document 223   Filed 03/23/18   Page 11 of 101   Page ID
Page #:3078
#:8965

34.     Paragraph 34 states legal conclusions to which no response is required.  Paragraph 34 also refers to the Complaint, a legal document, which speaks for itself and to which no response is required.

35.     UnitedHealth admits that Ingenix and then Optum also performed risk adjustment-related services for third parties, who owned and operated their own MA Organizations and offered their own Plans.  UnitedHealth admits that these third parties were sometimes referred to as Optum's commercial clients.  UnitedHealth admits that Ingenix and then Optum submitted risk adjustment data to the Government on behalf of certain commercial clients.  UnitedHealth admits that Ingenix and then Optum conducted Chart Review and other programs for certain commercial clients.  UnitedHealth admits that Ingenix and then Optum performed risk adjustment related work for certain commercial clients from offices in this District and elsewhere.  UnitedHealth denies the remaining allegations in Paragraph 35.

36.     UnitedHealth admits that in or around 2005 it acquired PacifiCare Health Systems, PacifiCare of Arizona, Inc., incorporated in Arizona; PacifiCare of California, incorporated in California; PacifiCare of Colorado, Inc., incorporated in Colorado; PacifiCare of Nevada, Inc., incorporated in Nevada; PacifiCare of Oklahoma, Inc., incorporated in Oklahoma; PacifiCare of Oregon, Inc., incorporated in Oregon; PacifiCare of Texas, Inc. incorporated in Texas; and PacifiCare of Washington, incorporated in Washington.  UnitedHealth also admits that at various points in time, PacifiCare plans were referred to as Secure Horizons.  UnitedHealth admits that the aforementioned entities are indirect subsidiaries of UnitedHealth Group Incorporated.  UnitedHealth admits that in or around 2011, PacifiCare of California became UHC of California.  UnitedHealth denies the remaining allegations in Paragraph 36.

37.     UnitedHealth admits that PacifiCare Health Systems, LLC and PacifiCare Health Plan Administrators, Inc. merged into United HealthCare

11

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

Case 2:16-cv-08697-FMO-SS Document 616-3 Filed 08/06/24 Page 72 of 637
Case 2:16-cv-08697-MWF-SS Document 223 Filed 03/23/18 Page 12 of 101 Page ID
Page #:3071 #:8966

Services, Inc. in or around 2005.  UnitedHealth admits that all PacifiCare MA

Organizations and their successors were direct or indirect subsidiaries of

UnitedHealth Group Incorporated.  Paragraph 37 also refers to the Complaint, a

legal document, which speaks for itself and to which no response is required.

UnitedHealth denies the remaining allegations in Paragraph 37.

38.     UnitedHealth admits that prior to its acquisition of PacifiCare,

PacifiCare had an office in Cypress, California.  UnitedHealth is without

knowledge or information sufficient to form a belief as to the truth or falsity of the

remaining allegations in Paragraph 38; therefore, such allegations are denied.

Additionally, Paragraph 38 states a legal conclusion to which no response is

required.  UnitedHealth denies the remaining allegations in Paragraph 38.

39.     UnitedHealth admits that in or around 2011, it acquired a share of

WellMed Medical Management, Inc.  In or around 2011, UnitedHealth also

acquired entities such as Physician's Health Choice of Texas, LLC and Citrus

Health Care, Inc., which operated in Texas, Florida, New Mexico, and Arkansas.

UnitedHealth admits that at the time of the acquisition, Citrus Health Care, Inc.

was a Florida corporation and a subsidiary of PHC Holdings of Florida, Inc.

UnitedHealth denies the remaining allegations in Paragraph 39.

40.     UnitedHealth admits that for many years, WMMI had affiliates that

directly managed the provision of healthcare services, including WellMed

Networks, Inc., WellMed Networks Inc. of Florida, WellMed Medical

Management of Florida Inc., and WellMed Medical Group, PA.  UnitedHealth

admits that after the acquisition, WMMI became part of the UnitedHealth Group

Incorporated group called OptumCare.  UnitedHealth admits that WellMed's

integrated health care delivery system includes more than 10,000 contracted

physicians who provide healthcare to hundreds of thousands of Medicare

beneficiaries in Texas and Florida, including those beneficiaries enrolled in

12

Case 2:16-cv-08697-FMO-SS   Document 616-3   Filed 08/06/24   Page 73 of 637
Case 2:16-cv-08697-MWF-SS   Document 223   Filed 03/23/18   Page 13 of 107   Page ID
#:3078

1   UnitedHealth's MA Plans.  UnitedHealth denies the remaining allegations in
2   Paragraph 40.

3       41.    Paragraph 41 refers to the Complaint, a legal document, which speaks
4   for itself and to which no response is required.  To the extent Paragraph 41
5   contains any factual allegations, such allegations are denied.

6   **DEFENDANTS' EXECUTIVES AND OTHER EMPLOYEES**

7       42.    To the extent Paragraph 42 purports to describe a document or
8   documents, such documents speak for themselves and, as such, no response is
9   required.  UnitedHealth denies the remaining allegations in Paragraph 42 with the
10  exception of those specifically admitted below:

11  - Kyle Anderson was the Director of Financial Planning and Analysis at
12    UnitedHealthcare from in or around 2009 to 2015.
13  - Jason Bainbridge worked for UnitedHealthcare in or around 2012.
14  - From in or around 2011 to 2015, Paul Balthazor was the Chief
15    Financial Officer of UnitedHealthcare Community & State.
16  - Marc Beckmann worked for UnitedHealthcare Medicare &
17    Retirement.
18  - In or around 2008, Jon Bird worked for Ingenix's Risk Adjustment
19    Group, became Director of Revenue Projections in or around 2010,
20    and became the Vice President of Risk Adjustment and Quality
21    Analytics at Optum in or around 2013.
22  - Gail Boudreaux became the Executive Vice President of
23    UnitedHealthcare in or around 2008.
24  - Tracey Bradberry was an Operations Manager at Ingenix from around
25    2008 to 2012, and that since 2012, she has served as an Associate
26    Director of Operations at Optum.
27  - Patty Brennan began working at Ingenix in or around 2008 as a
28    Compliance Manager for Risk Adjustment Programs.  In or around

13

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT IN PARTIAL-
INTERVENTION AND COUNTERCLAIM

2009, Brennan became the Director of Retrospective Services at Ingenix. In or around 2013, Brennan became the Vice President of Retrospective Services at Optum.

- In or around 2009, Jonathan Bunker was the President of Sierra Health and Life Insurance Company, Inc. and the President of Health Plan of Nevada, Inc. In or around 2013 Bunker became the Chief Executive Officer for UnitedHealthcare's Southwest Region.

- Barbara Carlson was a Senior Regulatory Affairs Analyst at UnitedHealthcare in 2011.

- Shelly Cranley served as the Director of Regulatory Affairs for UnitedHealthcare.

- Keith Dobbins has been UnitedHealthcare's Deputy General Counsel since at least in or around 2014.

- From around 2012 to 2015, Juliet Domb was a Strategic Relationship Analyst at Optum. Domb served as an administrative assistant to Larry Renfro.

- Jeffrey Dumcum was the Chief Financial Officer at PacifiCare, and became a Director of Finance at UnitedHealth following PacifiCare's acquisition. In or around 2007, Dumcum became a Senior Vice President at Ingenix (later Optum).

- Karen Erickson has been an Executive Vice President at Optum since in or around 2011, and that she was Optum's Chief Administrative Officer in or around 2011.

- Ronnie Grower was a Vice President of Market Consultation at Ingenix from around 2008 to 2009, and a Vice President of Account Management at Ingenix from around 2009 to 2010.

- Joseph Hafermann was the Chief Financial Officer of Secure Horizons in or around 2007.

14

- Kimberly Halva was an attorney for UnitedHealthcare Medicare & Retirement in or around 2009 and served as UnitedHealthcare Medicare & Retirement's Finance and Clinical Compliance Officer from in or around 2010 to 2013.
- In or around 2010 to 2013, Mary Hammond was an Associate Director of Strategy and Support at UnitedHealthcare Medicare & Retirement.
- In or around 2008 to 2013, Charles Hanson was a Vice President of Underwriting and Finance at UnitedHealthcare Medicare & Retirement.
- Steve Hemsley is currently the Executive Chairman of UHG's Board of Directors, and that he was formerly Chief Executive Officer of UHG from in or around 2006 to 2017.
- Pam Holt was a Manager of Network Operations at UnitedHealthcare.
- Scott Hughes was a Senior Project Manager at Optum beginning in or around 2012.
- Michael (Mike) Jacobson was a Business Analyst Consultant at OptumInsight.
- Donald James was a Director of Program Strategy at Optum from in or around 2012 to 2015.
- Thad Johnson is the current Chief Legal Officer at UnitedHealthcare.
- Joseph Keen was a Vice President and Chief Compliance Audit Officer for UnitedHealthcare in or around 2011.
- Gerald (Jerry) Knutson was the Chief Financial Officer at Ovations from in or around 2003 to 2009 and the Chief Financial Officer of OptumInsight from in or around 2009 to 2012.

15

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT IN PARTIAL-
INTERVENTION AND COUNTERCLAIM

00-12

- John (Jack) Larsen was the Chief Executive Officer of UnitedHealthcare Medicare & Retirement and at one time was the Chief Financial Officer of UnitedHealthcare Medicare & Retirement.
- In or around 2010, Rebecca Martin became the Director of Encounter Operations at Optum.
- In or around 2013, 2014, and 2015, Jay Matushak was a Vice President of Finance for UnitedHealthcare Medicare & Retirement.
- Michael McCarthy was a Regional Vice President for Southern California for UnitedHealthcare in or around 2013.
- Bill Miller was the Chief Executive Officer of OptumInsight from in or around 2012 to 2017.
- Eric Murphy was President of Payer Solutions at Optum.
- Randall Myers worked for PacifiCare and then for Ingenix and then Optum as a Director of Encounter Operations.
- Steve Nelson has been the Chief Executive Officer of UnitedHealthcare since in or around 2017, and that from in or around 2014 to 2017, he was the Chief Executive Officer of UnitedHealthcare Medicare & Retirement.
- Jennifer O'Brien was the Chief Medicare Compliance Officer of Ovations.
- Karin O'Hara worked at UnitedHealthcare Community & State.
- David Orbuch was the Chief Compliance Officer for PSMG.
- Karen Petroff was the Senior Vice President of Business Development at Optum.
- Cynthia (Cindy) Polich was the President of UnitedHealthcare Medicare & Retirement.

16

Case 2:16-cv-08697-FMO-SS Document 616-3 Filed 03/06/24 Page 17 of 637
Case 2:16-cv-08697-MWF-SS Document 223 Filed 03/23/18 Page 17 of 101 Page ID
Page #:3082 #:8971

1    • Janice Redmond was Senior Vice President of Provider Outreach at

2      Optum until in or around 2012, when she became Vice President of

3      Market Consultation for Optum's Western Region.

4    • In or around 2013, Anne Reis was an Associate Director of Revenue

5      for UnitedHealthcare Medicare & Retirement.

6    • In or around 2009 to 2011, Larry Renfro served as the Chief

7      Executive Officer of Ovations and the Chief Executive Officer of the

8      Public & Senior Markets Group.  Renfro is currently the Chief

9      Executive Officer of Optum and has been in this position since in or

10     around July 2011.  Renfro has been the Vice Chairman of UHG since

11     in or around November 2014.

12   • Sandy Rick was a Senior Regulatory Affairs Analyst at

13     UnitedHealthcare.

14   • Kara Rios was the Chief Financial Officer of AmeriChoice.

15   • Justin Roth was the Chief Financial Officer of Evercare.

16   • Daniel Schumacher was the Chief Financial Officer of

17     UnitedHealthcare.

18   • Melissa Sedor was a Director of Accounting at UnitedHealthcare.

19   • Matt Shors is UHG's Senior Deputy General Counsel.

20   • Marianne Short is UHG's Executive Vice President and Chief Legal

21     Officer.

22   • Andy Slavitt was the Chief Executive Officer for OptumInsight and

23     an Executive Vice President for Optum.

24   • Scott Theisen was the Chief Financial Officer of UnitedHealthcare

25     Medicare & Retirement from in or around 2010 to 2013.

26   • Brian Thompson has been the Chief Executive Officer of

27     UnitedHealthcare Medicare & Retirement since in or around 2017,

28     and that from in or around 2013 to 2017, he was the Chief Financial

17

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

0074

Case 2:16-cv-08697-FMO-SS Document 616-3 Filed 08/06/24 Page 78 of 637
Case 2:16-cv-08697-MWF-SS Document 223 Filed 03/23/18 Page 18 of 101 Page ID
Page #:3058
#:8972

Officer of UnitedHealthcare Medicare & Retirement. Brian Thompson was also previously the Chief Financial Officer of UnitedHealthcare Community & State.

- Carol Thompson was a National Manager for Risk Adjustment Programs at Ingenix until in or around 2009, a Manager of ChartSync operations at Ingenix from in or around 2009 to 2011, a Manager of Encounter Operations at Optum from in or around 2011 to 2013 and an Analyst of Encounter Operations at Optum from in or around 2013 to 2014.

- Lee Valenta was the Chief Financial Officer, the Chief Operating Officer, the Chief Scientific Officer, and an Executive Vice President at OptumInsight.

- Karen Wagor was the Manager of the National Medical Coder Team and the National Coding Trainer at Ingenix and then Optum and that she previously worked at PacifiCare.

- John Way was Chief Financial Officer of SecureHorizons.

- Timothy Wicks served in a senior management position at Optum.

## THE MEDICARE PROGRAM

### I. The Medicare Statute

43.     Paragraph 43 contains no allegations with respect to a particular Defendant or claim, and therefore no response is required. However, to the extent Paragraph 43 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute speaks for itself, and to the extent that the allegations in Paragraph 43 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations. Paragraph 43 also states legal conclusions to which no response is required.

44.     Paragraph 44 contains no allegations with respect to a particular Defendant or claim, and therefore no response is required. However, to the extent

18

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

00175

Case 2:16-cv-08697-FMO-SS Document 616-3 Filed 08/06/24 Page 79 of 637
Case 2:16-cv-08697-MWF-SS Document 223 Filed 03/23/18 Page 19 of 101 Page ID
Page #:6054 #:18973

Paragraph 44 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute speaks for itself, and to the extent that the allegations in Paragraph 44 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations. Paragraph 44 also states legal conclusions to which no response is required.

45. Paragraph 45 contains no allegations with respect to a particular Defendant or claim, and therefore no response is required. However, to the extent Paragraph 45 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute speaks for itself, and to the extent that the allegations in Paragraph 45 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations. Paragraph 45 also states legal conclusions to which no response is required.

46. Paragraph 46 contains no allegations with respect to a particular Defendant or claim, and therefore no response is required. However, to the extent Paragraph 46 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute speaks for itself, and to the extent that the allegations in Paragraph 46 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations. Additionally, Paragraph 46 refers to the Complaint, a legal document, which speaks for itself and to which no response is required. Paragraph 46 also states legal conclusions to which no response is required.

47. Paragraph 47 contains no allegations with respect to a particular Defendant or claim, and therefore no response is required. However, to the extent Paragraph 47 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute speaks for itself, and to the extent that the allegations in Paragraph 47 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations. Paragraph 47 also states legal conclusions to which no response is required.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

00176

48.     Paragraph 48 contains no allegations with respect to a particular Defendant or claim, and therefore no response is required.  However, to the extent Paragraph 48 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute speaks for itself, and to the extent that the allegations in Paragraph 48 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations.  Paragraph 48 refers to the Complaint, a legal document, which speaks for itself and to which no response is required.

49.     Paragraph 49 contains no allegations with respect to a particular Defendant or claim, and therefore no response is required.  However, to the extent Paragraph 49 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute, Medicare regulations, Medicare guidance documents, and the FCA speak for themselves, and to the extent that the allegations in Paragraph 49 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations.  Paragraph 49 also states legal conclusions to which no response is required.

50.     To the extent Paragraph 50 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute speaks for itself, and to the extent that the allegations in Paragraph 50 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations.  Paragraph 50 also states legal conclusions to which no response is required.

51.     To the extent Paragraph 51 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute speaks for itself, and to the extent that the allegations in Paragraph 51 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations.  Paragraph 51 also states legal conclusions to which no response is required.

20

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT IN PARTIAL-
INTERVENTION AND COUNTERCLAIM

00-17

52. Paragraph 52 contains no allegations with respect to a particular Defendant or claim, and therefore no response is required. However, to the extent Paragraph 52 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute speaks for itself, and to the extent that the allegations in Paragraph 52 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations. Paragraph 52 also states legal conclusions to which no response is required.

53. Paragraph 53 contains no allegations with respect to a particular Defendant or claim, and therefore no response is required. However, to the extent Paragraph 53 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute speaks for itself, and to the extent that the allegations in Paragraph 53 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations. Paragraph 53 also states legal conclusions to which no response is required.

**II.    Medicare Parts C and D Risk Adjustment Payments**

54. Paragraph 54 contains no allegations with respect to a particular Defendant or claim, and therefore no response is required. However, to the extent Paragraph 54 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute speaks for itself, and to the extent that the allegations in Paragraph 54 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations. Paragraph 54 also states legal conclusions to which no response is required.

55. Paragraph 55 contains no allegations with respect to a particular Defendant or claim, and therefore no response is required. However, to the extent Paragraph 55 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute speaks for itself, and to the extent that the allegations in Paragraph 55 vary therefrom or with other applicable

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

Case 2:16-cv-08697-FMO-SS Document 616-3 Filed 08/06/24 Page 82 of 637
Case 2:16-cv-08697-MWF-SS Document 223-61 Filed 03/23/18 Page 22 of 101 Page ID
Page #:3057
#:8976

1 | statutory or decisional law, UnitedHealth denies those allegations. Paragraph 55
2 | also states legal conclusions to which no response is required.

3 |      56.    Paragraph 56 contains no allegations with respect to a particular
4 | Defendant or claim, and therefore no response is required. However, to the extent
5 | Paragraph 56 purports to summarize and/or describe the provisions of the Medicare
6 | program, UnitedHealth states that the Medicare statute speaks for itself, and to the
7 | extent that the allegations in Paragraph 56 vary therefrom or with other applicable
8 | statutory or decisional law, UnitedHealth denies those allegations. Paragraph 56
9 | also states legal conclusions to which no response is required.

10 |      57.    Paragraph 57 contains no allegations with respect to a particular
11 | Defendant or claim, and therefore no response is required. However, to the extent
12 | Paragraph 57 purports to summarize and/or describe the provisions of the Medicare
13 | program, UnitedHealth states that the Medicare statute, Medicare regulations, and
14 | Medicare guidance documents speak for themselves, and to the extent that the
15 | allegations in Paragraph 57 vary therefrom or with other applicable statutory or
16 | decisional law, UnitedHealth denies those allegations. Paragraph 57 also states
17 | legal conclusions to which no response is required.

18 |      58.    Paragraph 58 contains no allegations with respect to a particular
19 | Defendant or claim, and therefore no response is required. However, to the extent
20 | Paragraph 58 purports to summarize and/or describe the provisions of the Medicare
21 | program, UnitedHealth states that the Medicare statute and regulations speak for
22 | themselves, and to the extent that the allegations in Paragraph 58 vary therefrom or
23 | with other applicable statutory or decisional law, UnitedHealth denies those
24 | allegations.

25 |      59.    Paragraph 59 contains no allegations with respect to a particular
26 | Defendant or claim, and therefore no response is required. However, to the extent
27 | Paragraph 59 purports to summarize and/or describe the provisions of the Medicare
28 | program, UnitedHealth states that the Medicare statute speaks for itself, and to the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

Case 2:16-cv-08697-FMO-SS   Document 616-3   Filed 08/06/24   Page 83 of 637
Case 2:16-cv-08697-MWF-SS   Document 223   Filed 03/23/18   Page 23 of 101   Page ID
Page #:3888
#:3977

1   extent that the allegations in Paragraph 59 vary therefrom or with other applicable

2   statutory or decisional law, UnitedHealth denies those allegations.

3          60.    Paragraph 60 contains no allegations with respect to a particular

4   Defendant or claim, and therefore no response is required.  However, to the extent

5   Paragraph 60 purports to summarize and/or describe the provisions of the Medicare

6   program, UnitedHealth states that the Medicare statute speaks for itself, and to the

7   extent that the allegations in Paragraph 60 vary therefrom or with other applicable

8   statutory or decisional law, UnitedHealth denies those allegations.

9          61.    Paragraph 61 contains no allegations with respect to a particular

10  Defendant or claim, and therefore no response is required.  However, to the extent

11  Paragraph 61 purports to summarize and/or describe the provisions of the Medicare

12  program, UnitedHealth states that the Medicare statute speaks for itself, and to the

13  extent that the allegations in Paragraph 61 vary therefrom or with other applicable

14  statutory or decisional law, UnitedHealth denies those allegations.

15         62.    Paragraph 62 contains no allegations with respect to a particular

16  Defendant or claim, and therefore no response is required.  However, to the extent

17  Paragraph 62 purports to summarize and/or describe the provisions of the Medicare

18  program, UnitedHealth states that the Medicare statute speaks for itself, and to the

19  extent that the allegations in Paragraph 62 vary therefrom or with other applicable

20  statutory or decisional law, UnitedHealth denies those allegations.

21         63.    Paragraph 63 contains no allegations with respect to a particular

22  Defendant or claim, and therefore no response is required.  However, to the extent

23  Paragraph 63 purports to summarize and/or describe the provisions of the Medicare

24  program, UnitedHealth states that the Medicare statute speaks for itself, and to the

25  extent that the allegations in Paragraph 63 vary therefrom or with other applicable

26  statutory or decisional law, UnitedHealth denies those allegations.  The final

27  sentence of Paragraph 63 describes the Complaint, a legal document, which speaks

28  for itself and to which no response is required.

<center>23</center>

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

0080

Case 2:16-cv-08697-FMO-SS Document 616-3 Filed 08/06/24 Page 84 of 637
Case 2:16-cv-08697-MWF-SS Document 223 Filed 03/23/18 Page 24 of 103 Page ID
Page #:3688 #:3978

64.  Paragraph 64 contains no allegations with respect to a particular Defendant or claim, and therefore no response is required.  However, to the extent Paragraph 64 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute speaks for itself, and to the extent that the allegations in Paragraph 64 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations.  Paragraph 64 also states legal conclusions to which no response is required.

65.  Paragraph 65 contains no allegations with respect to a particular Defendant or claim, and therefore no response is required.  However, to the extent Paragraph 65 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute speaks for itself, and to the extent that the allegations in Paragraph 65 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations.

## DEFENDANTS' AGREEMENTS

### I.      The Annual Parts C and D Agreements

66.  Paragraph 66 states legal conclusions to which no response is required.  To the extent Paragraph 66 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute speaks for itself, and to the extent that the allegations in Paragraph 66 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations.  UnitedHealth admits that certain entities named as Defendants in this action entered into one or more agreements with the Government since 2005 to offer MA and/or PD Plans to Medicare beneficiaries under Parts C and D of the Medicare Program.

67.  To the extent Paragraph 67 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute speaks for itself, and to the extent that the allegations in Paragraph 67 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies

24

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

Case 2:16-cv-08697-FMO-SS   Document 616-3   Filed 08/06/24   Page 85 of 637
Case 2:16-cv-08697-MWF-SS   Document 223   Filed 03/23/18   Page 25 of 103   Page ID
Page #:3090
#:8979

1   those allegations.  Paragraph 67 also states legal conclusions to which no response

2   is required.

3       68.    To the extent the allegations in Paragraph 68 relate to claims that have

4   been dismissed, they are surplusage and should be stricken.  To the extent

5   Paragraph 68 purports to describe a document or documents, such documents

6   speak for themselves and, as such, no response is required.  UnitedHealth denies

7   the remaining allegations in Paragraph 68.  Paragraph 68 also states legal

8   conclusions to which no response is required.

9       69.    To the extent Paragraph 69 purports to describe a document or

10  documents, such documents speak for themselves and, as such, no response is

11  required.  UnitedHealth denies the remaining allegations in Paragraph 69.

12      70.    To the extent Paragraph 70 purports to describe a document or

13  documents, such documents speak for themselves and, as such, no response is

14  required.  UnitedHealth denies the remaining allegations in Paragraph 70.

15      71.    To the extent the allegations in Paragraph 71 relate to claims that have

16  been dismissed, they are surplusage and should be stricken.  To the extent

17  Paragraph 71 purports to describe a document or documents, such documents

18  speak for themselves and, as such, no response is required.  UnitedHealth denies

19  the remaining allegations in Paragraph 71.

20      72.    Paragraph 72 contains no allegations with respect to a particular

21  Defendant or claim, and therefore no response is required.  To the extent Paragraph

22  72 purports to describe a document or documents, such documents speak for

23  themselves and, as such, no response is required.  UnitedHealth denies the

24  remaining allegations in Paragraph 72.

25  **II.    The Electronic Data Interchange Agreements**

26      73.    To the extent Paragraph 73 purports to summarize and/or describe the

27  provisions of the Medicare program, UnitedHealth states that the Medicare statute

28  and regulations speak for themselves, and to the extent that the allegations in

25

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT IN PARTIAL-
INTERVENTION AND COUNTERCLAIM

0082

Case 2:16-cv-08697-FMO-SS Document 616-3 Filed 08/06/24 Page 86 of 637
Case 2:16-cv-08697-MWF-SS Document 223 Filed 03/23/18 Page 26 of 101 Page ID
Page #:3691

Paragraph 73 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations. To the extent Paragraph 73 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. Paragraph 73 also states legal conclusions to which no response is required. UnitedHealth denies the remaining allegations in Paragraph 73.

74. To the extent Paragraph 74 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 74.

75. To the extent Paragraph 75 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. Paragraph 75 also states legal conclusions to which no response is required. UnitedHealth denies the remaining allegations in Paragraph 75.

76. To the extent Paragraph 76 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. Paragraph 76 also states legal conclusions to which no response is required. UnitedHealth denies the remaining allegations in Paragraph 76.

77. To the extent Paragraph 77 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. Paragraph 77 also states legal conclusions to which no response is required. UnitedHealth denies the remaining allegations in Paragraph 77.

78. To the extent Paragraph 78 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. Paragraph 78 also states legal conclusions to which no response is required. UnitedHealth denies the remaining allegations in Paragraph 78.

79. To the extent Paragraph 79 purports to describe a document or documents, such documents speak for themselves and, as such, no response is

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

Case 2:16-cv-08697-FMO-PVC Document 616-3 Filed 08/06/24 Page 87 of 637
Page ID #:18981
Case 2:16-cv-08697-MWF-SS Document 223 Filed 03/23/18 Page 27 of 101 Page ID
#:3691

1     required. Paragraph 79 also states legal conclusions to which no response is

2     required. UnitedHealth denies the remaining allegations in Paragraph 79.

3          80.     To the extent Paragraph 80 purports to describe a document or

4     documents, such documents speak for themselves and, as such, no response is

5     required. Paragraph 80 also states legal conclusions to which no response is

6     required. UnitedHealth denies the remaining allegations in Paragraph 80.

7          81.     To the extent Paragraph 81 purports to describe a document or

8     documents, such documents speak for themselves and, as such, no response is

9     required. Paragraph 81 also states legal conclusions to which no response is

10     required. UnitedHealth denies the remaining allegations in Paragraph 81.

11          82.     Paragraph 82 contains no allegations with respect to a particular

12     Defendant or claim, and therefore no response is required. To the extent Paragraph

13     82 purports to describe a document or documents, such documents speak for

14     themselves and, as such, no response is required. UnitedHealth denies the

15     remaining allegations in Paragraph 82.

16     **III.**     **The Ingenix/Optum Service Agreements**

17          83.     To the extent Paragraph 83 purports to describe a document or

18     documents, such documents speak for themselves and, as such, no response is

19     required. UnitedHealth denies the remaining allegations in Paragraph 83.

20          84.     To the extent Paragraph 84 purports to describe a document or

21     documents, such documents speak for themselves and, as such, no response is

22     required. UnitedHealth denies the remaining allegations in Paragraph 84.

23          85.     To the extent Paragraph 85 purports to describe a document or

24     documents, such documents speak for themselves and, as such, no response is

25     required. UnitedHealth denies the remaining allegations in Paragraph 85.

26          86.     To the extent Paragraph 86 purports to describe a document or

27     documents, such documents speak for themselves and, as such, no response is

28     required. UnitedHealth denies the remaining allegations in Paragraph 86.

27

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

Case 2:16-cv-08697-FMO-SS Document 616-3 Filed 08/06/24 Page 88 of 637
Case 2:16-cv-08697-MWF-SS Document 223 Filed 03/23/18 Page 28 of 103 Page ID
Page #:3695 #:3982

## DEFENDANTS' DATA INTEGRITY OBLIGATIONS

**I.    Obligation to Submit Valid Diagnoses**

87.    Paragraph 87 contains no allegations with respect to a particular Defendant or claim, and therefore no response is required.  However, to the extent Paragraph 87 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute, regulations, and guidance, including the Medicare Managed Care Manual and the 2008 Risk Adjustment Data Technical Assistance for Medicare Advantage Organizations Participant Guide ("2008 RA Participant Guide"), speak for themselves, and to the extent that the allegations in Paragraph 87 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations.  UnitedHealth denies the remaining allegations in Paragraph 87.  Paragraph 87 also states legal conclusions to which no response is required.

88.    Paragraph 88 contains no allegations with respect to a particular Defendant or claim, and therefore no response is required.  However, to the extent Paragraph 88 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute, regulations, and guidance speak for themselves, and to the extent that the allegations in Paragraph 88 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations.  UnitedHealth denies the remaining allegations in Paragraph 88. Paragraph 88 also states legal conclusions to which no response is required.

89.    Paragraph 89 contains no allegations with respect to a particular Defendant or claim, and therefore no response is required.  However, to the extent Paragraph 89 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute, regulations, and guidance speak for themselves, and to the extent that the allegations in Paragraph 89 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

Case 2:16-cv-08697-FMO-SS Document 616-3 Filed 08/06/24 Page 89 of 637
Case 2:16-cv-08697-MWF-SS Document 223 Filed 03/23/18 Page 29 of 103 Page ID
Page #:3994 #:918983

those allegations.  UnitedHealth denies the remaining allegations in Paragraph 89.

Paragraph 89 also states legal conclusions to which no response is required.

90.  Paragraph 90 contains no allegations with respect to a particular

Defendant or claim, and therefore no response is required.  However, to the extent

Paragraph 90 purports to summarize and/or describe the provisions of the Medicare

program, UnitedHealth states that the Medicare statute, regulations, and guidance

speak for themselves, and to the extent that the allegations in Paragraph 90 vary

therefrom or with other applicable statutory or decisional law, UnitedHealth denies

those allegations.  UnitedHealth denies the remaining allegations in Paragraph 90.

Paragraph 90 also states legal conclusions to which no response is required.

91.  Paragraph 91 contains no allegations with respect to a particular

Defendant or claim, and therefore no response is required.  However, to the extent

Paragraph 91 purports to summarize and/or describe the provisions of the Medicare

program, UnitedHealth states that the Medicare statute, regulations, and guidance

speak for themselves, and to the extent that the allegations in Paragraph 91 vary

therefrom or with other applicable statutory or decisional law, UnitedHealth denies

those allegations.  UnitedHealth denies the remaining allegations in Paragraph 91.

92.  Paragraph 92 contains no allegations with respect to a particular

Defendant or claim, and therefore no response is required.  However, to the extent

Paragraph 92 purports to summarize and/or describe a document or documents,

such documents speak for themselves and, as such, no response is required.

UnitedHealth denies the remaining allegations in Paragraph 92.

93.  Paragraph 93 contains no allegations with respect to a particular

Defendant or claim, and therefore no response is required.  However, to the extent

Paragraph 93 purports to summarize and/or describe the provisions of the Medicare

program, UnitedHealth states that the Medicare statute, regulations, and guidance

speak for themselves, and to the extent that the allegations in Paragraph 93 vary

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

Case 2:16-cv-08697-FMO-SS Document 616-3 Filed 03/06/24 Page 90 of 637
Case 2:16-cv-08697-MWF-SS Document 223 Filed 03/23/18 Page 30 of 102 Page ID
Page #:3695
#:3984

1  therefrom or with other applicable statutory or decisional law, UnitedHealth denies

2  those allegations.  UnitedHealth denies the remaining allegations in Paragraph 93.

3       94.    Paragraph 94 contains no allegations with respect to a particular

4  Defendant or claim, and therefore no response is required.  However, to the extent

5  Paragraph 94 purports to summarize and/or describe the provisions of the Medicare

6  program, UnitedHealth states that the Medicare statute, regulations, and guidance

7  speak for themselves, and to the extent that the allegations in Paragraph 94 vary

8  therefrom or with other applicable statutory or decisional law, UnitedHealth denies

9  those allegations.  UnitedHealth denies the remaining allegations in Paragraph 94.

10  **II.    Obligation to Implement an Effective Compliance Program**

11       95.    Paragraph 95 contains no allegations with respect to a particular

12  Defendant or claim, and therefore no response is required.  However, to the extent

13  Paragraph 95 purports to summarize and/or describe the provisions of the Medicare

14  program, UnitedHealth states that the Medicare statute, regulations, and guidance

15  speak for themselves, and to the extent that the allegations in Paragraph 95 vary

16  therefrom or with other applicable statutory or decisional law, UnitedHealth denies

17  those allegations.  UnitedHealth denies the remaining allegations in Paragraph 95.

18       96.    Paragraph 96 contains no allegations with respect to a particular

19  Defendant or claim, and therefore no response is required.  However, to the extent

20  Paragraph 96 purports to summarize and/or describe the provisions of the Medicare

21  program, UnitedHealth states that the Medicare statute, regulations, and guidance

22  speak for themselves, and to the extent that the allegations in Paragraph 96 vary

23  therefrom or with other applicable statutory or decisional law, UnitedHealth denies

24  those allegations.  UnitedHealth denies the remaining allegations in Paragraph 96.

25       97.    Paragraph 97 contains no allegations with respect to a particular

26  Defendant or claim, and therefore no response is required.  However, to the extent

27  Paragraph 97 purports to summarize and/or describe the provisions of the Medicare

28  program, UnitedHealth states that the Medicare statute, regulations, and guidance

30

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM
0087

Case 2:16-cv-08697-FMO-SS Document 616-3 Filed 08/06/24 Page 91 of 637
Case 2:16-cv-08697-MWF-SS Document 223 Filed 03/23/18 Page 31 of 101 Page ID
Page #:3098
#:8985

1    speak for themselves, and to the extent that the allegations in Paragraph 97 vary

2    therefrom or with other applicable statutory or decisional law, UnitedHealth denies

3    those allegations.  UnitedHealth denies the remaining allegations in Paragraph 97.

4    **III.**    **Obligation to Attest to Validity of Risk Adjustment Data**

5        98.    To the extent the allegations in Paragraph 98 relate to claims that have

6    been dismissed, they are surplusage and should be stricken.  Paragraph 98 contains

7    no allegations with respect to a particular Defendant or claim, and therefore no

8    response is required.  However, to the extent Paragraph 98 purports to summarize

9    and/or describe the provisions of the Medicare program, UnitedHealth states that

10    the Medicare statute, regulations, and guidance speak for themselves, and to the

11    extent that the allegations in Paragraph 98 vary therefrom or with other applicable

12    statutory or decisional law, UnitedHealth denies those allegations.  Paragraph 98

13    also states legal conclusions to which no response is required.

14        99.    To the extent the allegations in Paragraph 99 relate to claims that have

15    been dismissed, they are surplusage and should be stricken.  Paragraph 99 contains

16    no allegations with respect to a particular Defendant or claim, and therefore no

17    response is required.  However, to the extent Paragraph 99 purports to summarize

18    and/or describe the provisions of the Medicare program, UnitedHealth states that

19    the Medicare statute, regulations, and guidance speak for themselves, and to the

20    extent that the allegations in Paragraph 99 vary therefrom or with other applicable

21    statutory or decisional law, UnitedHealth denies those allegations.  Paragraph 99

22    also states legal conclusions to which no response is required.  UnitedHealth denies

23    the remaining allegations in Paragraph 99.

24        100.    To the extent the allegations in Paragraph 100 relate to claims that

25    have been dismissed, they are surplusage and should be stricken.  Paragraph 100

26    contains no allegations with respect to a particular Defendant or claim, and

27    therefore no response is required.  However, to the extent Paragraph 100 purports

28    to summarize and/or describe the provisions of the Medicare program,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UnitedHealth states that the Medicare statute, regulations, and guidance speak for

themselves, and to the extent that the allegations in Paragraph 100 vary therefrom

or with other applicable statutory or decisional law, UnitedHealth denies those

allegations.  Paragraph 100 also states legal conclusions to which no response is

required.  UnitedHealth denies the remaining allegations in Paragraph 100.

101.   To the extent the allegations in Paragraph 101 relate to claims that

have been dismissed, they are surplusage and should be stricken.  Paragraph 101

contains no allegations with respect to a particular Defendant or claim, and

therefore no response is required.  However, to the extent Paragraph 101 purports

to summarize and/or describe the provisions of the Medicare program,

UnitedHealth states that the Medicare statute, regulations, and guidance speak for

themselves, and to the extent that the allegations in Paragraph 101 vary therefrom

or with other applicable statutory or decisional law, UnitedHealth denies those

allegations.  Paragraph 101 also states legal conclusions to which no response is

required.  UnitedHealth denies the remaining allegations in Paragraph 101.

102.   To the extent the allegations in Paragraph 102 relate to claims that

have been dismissed, they are surplusage and should be stricken.  Paragraph 102

contains no allegations with respect to a particular Defendant or claim, and

therefore no response is required.  However, to the extent Paragraph 102 purports

to summarize and/or describe the provisions of the Medicare program,

UnitedHealth states that the Medicare statute, regulations, and guidance speak for

themselves, and to the extent that the allegations in Paragraph 102 vary therefrom

or with other applicable statutory or decisional law, UnitedHealth denies those

allegations.  Paragraph 102 also states legal conclusions to which no response is

required.  UnitedHealth denies the remaining allegations in Paragraph 102.

## IV.   Obligation to Delete Invalid Diagnoses

103.   Paragraph 103 contains no allegations with respect to a particular

Defendant or claim, and therefore no response is required.  However, to the extent

32

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT IN PARTIAL-
INTERVENTION AND COUNTERCLAIM

0080

1   Paragraph 103 purports to summarize and/or describe the provisions of the

2   Medicare program, UnitedHealth states that the Medicare statute, regulations, and

3   guidance speak for themselves, and to the extent that the allegations in Paragraph

4   103 vary therefrom or with other applicable statutory or decisional law,

5   UnitedHealth denies those allegations. Paragraph 103 also states legal conclusions

6   to which no response is required. UnitedHealth denies the remaining allegations in

7   Paragraph 103.

8       104. Paragraph 104 contains no allegations with respect to a particular

9   Defendant or claim, and therefore no response is required. However, to the extent

10   Paragraph 104 purports to summarize and/or describe the provisions of the

11   Medicare program, UnitedHealth states that the Medicare statute, regulations, and

12   guidance speak for themselves, and to the extent that the allegations in Paragraph

13   104 vary therefrom or with other applicable statutory or decisional law,

14   UnitedHealth denies those allegations. Paragraph 104 also states legal conclusions

15   to which no response is required. UnitedHealth denies the remaining allegations in

16   Paragraph 104.

17       105. To the extent the allegations in Paragraph 105 relate to claims that

18   have been dismissed, they are surplusage and should be stricken. Paragraph 105

19   contains no allegations with respect to a particular Defendant or claim, and

20   therefore no response is required. However, to the extent Paragraph 105 purports

21   to summarize and/or describe the provisions of the Medicare program,

22   UnitedHealth states that the Medicare statute, regulations, and guidance speak for

23   themselves, and to the extent that the allegations in Paragraph 105 vary therefrom

24   or with other applicable statutory or decisional law, UnitedHealth denies those

25   allegations. Paragraph 105 also states legal conclusions to which no response is

26   required. UnitedHealth denies the remaining allegations in Paragraph 105.

27       106. Paragraph 106 contains no allegations with respect to a particular

28   Defendant or claim, and therefore no response is required. However, to the extent

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

Case 2:16-cv-08697-FMO-SS Document 616-3 Filed 08/06/24 Page 94 of 637
Case 2:16-cv-08697-MWF-SS Document 223 Filed 03/23/18 Page 34 of 102 Page ID
Page #:3698
#:8988

1  Paragraph 106 purports to summarize and/or describe the provisions of the

2  Medicare program, UnitedHealth states that the Medicare statute, regulations, and

3  guidance speak for themselves, and to the extent that the allegations in Paragraph

4  106 vary therefrom or with other applicable statutory or decisional law,

5  UnitedHealth denies those allegations.  Paragraph 106 also states legal conclusions

6  to which no response is required.  UnitedHealth denies the remaining allegations in

7  Paragraph 106.

8      107.   Paragraph 107 contains no allegations with respect to a particular

9  Defendant or claim, and therefore no response is required.  However, to the extent

10 Paragraph 107 purports to summarize and/or describe the provisions of the

11 Medicare program, UnitedHealth states that the Medicare statute, regulations, and

12 guidance speak for themselves, and to the extent that the allegations in Paragraph

13 107 vary therefrom or with other applicable statutory or decisional law,

14 UnitedHealth denies those allegations.  Paragraph 107 also states legal conclusions

15 to which no response is required.  UnitedHealth denies the remaining allegations in

16 Paragraph 107.

17     108.   Paragraph 108 contains no allegations with respect to a particular

18 Defendant or claim, and therefore no response is required.  However, to the extent

19 Paragraph 108 purports to summarize and/or describe a document or documents,

20 such documents speak for themselves and, as such, no response is required.

21 Paragraph 108 also states legal conclusions to which no response is required.

22 UnitedHealth denies the remaining allegations in Paragraph 108.

23     109.   Paragraph 109 contains no allegations with respect to a particular

24 Defendant or claim, and therefore no response is required.  However, to the extent

25 Paragraph 109 purports to summarize and/or describe a document or documents or

26 data archive, such documents and data archive speak for themselves and, as such,

27 no response is required.  Paragraph 109 also states legal conclusions to which no

28

34

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM
0091

1  response is required.  UnitedHealth denies the remaining allegations in Paragraph

2  109.

3       110.   Paragraph 110 contains no allegations with respect to a particular

4  Defendant or claim, and therefore no response is required.  However, to the extent

5  Paragraph 110 purports to summarize and/or describe the provisions of the

6  Medicare program, UnitedHealth states that the Medicare statute, regulations, and

7  guidance speak for themselves, and to the extent that the allegations in Paragraph

8  110 vary therefrom or with other applicable statutory or decisional law,

9  UnitedHealth denies those allegations.  Paragraph 110 also states legal conclusions

10  to which no response is required.  UnitedHealth denies the remaining allegations in

11  Paragraph 110.

12       111.   Paragraph 111 contains no allegations with respect to a particular

13  Defendant or claim, and therefore no response is required.  However, to the extent

14  Paragraph 111 purports to summarize and/or describe the provisions of the

15  Medicare program, UnitedHealth states that the Medicare statute, regulations, and

16  guidance speak for themselves, and to the extent that the allegations in Paragraph

17  111 vary therefrom or with other applicable statutory or decisional law,

18  UnitedHealth denies those allegations.  UnitedHealth denies the remaining

19  allegations in Paragraph 111.

20       112.   Paragraph 112 contains no allegations with respect to a particular

21  Defendant or claim, and therefore no response is required.  However, to the extent

22  Paragraph 112 purports to summarize and/or describe the provisions of the

23  Medicare program, UnitedHealth states that the Medicare statute, regulations, and

24  guidance speak for themselves, and to the extent that the allegations in Paragraph

25  112 vary therefrom or with other applicable statutory or decisional law,

26  UnitedHealth denies those allegations.  UnitedHealth denies the remaining

27  allegations in Paragraph 112.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

0092

113.   UnitedHealth admits that Rebecca Martin knew how to make deletes in RAPS.  UnitedHealth admits that certain other employees knew the difference between "open-period" and "closed-period" deletes.  UnitedHealth denies the remaining allegations in Paragraph 113.

114.   Paragraph 114 states legal conclusions to which no response is required.  To the extent that Paragraph 114 contains any factual allegations regarding UnitedHealth, such allegations are denied.  UnitedHealth denies the remaining allegations in Paragraph 114.

## **THE FALSE CLAIMS ACT**

115.   To the extent the allegations in Paragraph 115 relate to claims that have been dismissed, they are surplusage and should be stricken.  Paragraph 115 contains no allegations with respect to a particular Defendant or claim, and therefore no response is required.  However, to the extent Paragraph 115 purports to summarize and/or describe the provisions of the FCA, UnitedHealth states that the FCA speaks for itself, and to the extent that the allegations in Paragraph 115 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations.  UnitedHealth denies the remaining allegations in Paragraph 115.  Paragraph 115 also states legal conclusions to which no response is required.

116.   To the extent the allegations in Paragraph 116 relate to claims that have been dismissed, they are surplusage and should be stricken.  Paragraph 116 contains no allegations with respect to a particular Defendant or claim, and therefore no response is required.  However, to the extent Paragraph 116 purports to summarize and/or describe the provisions of the FCA or the Fraud Enforcement and Recovery Act of 2009 ("FERA"), UnitedHealth states that the FCA and FERA speak for themselves, and to the extent that the allegations in Paragraph 116 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations.  UnitedHealth denies the remaining allegations in Paragraph 116.

36

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

117.    To the extent the allegations in Paragraph 117 relate to claims that
have been dismissed, they are surplusage and should be stricken.  Paragraph 117
contains no allegations with respect to a particular Defendant or claim, and
therefore no response is required.  However, to the extent Paragraph 117 purports
to summarize and/or describe the provisions of the FCA or FERA, UnitedHealth
states that the FCA and FERA speak for themselves, and to the extent that the
allegations in Paragraph 117 vary therefrom or with other applicable statutory or
decisional law, UnitedHealth denies those allegations.  UnitedHealth denies the
remaining allegations in Paragraph 117.

118.    Paragraph 118 contains no allegations with respect to a particular
Defendant or claim, and therefore no response is required.  However, to the extent
Paragraph 118 purports to summarize and/or describe the provisions of the FCA or
FERA, UnitedHealth states that the FCA and FERA speak for themselves, and to
the extent that the allegations in Paragraph 118 vary therefrom or with other
applicable statutory or decisional law, UnitedHealth denies those allegations.
Paragraph 118 also states legal conclusions to which no response is required.
UnitedHealth denies the remaining allegations in Paragraph 118.

119.    Paragraph 119 contains no allegations with respect to a particular
Defendant or claim, and therefore no response is required.  However, to the extent
Paragraph 119 purports to summarize and/or describe the provisions of the FCA or
FERA, UnitedHealth states that the FCA and FERA speak for themselves, and to
the extent that the allegations in Paragraph 119 vary therefrom or with other
applicable statutory or decisional law, UnitedHealth denies those allegations.
UnitedHealth denies the remaining allegations in Paragraph 119.

120.    Paragraph 120 contains no allegations with respect to a particular
Defendant or claim, and therefore no response is required.  However, to the extent
Paragraph 120 purports to describe the provisions of the FCA, UnitedHealth states
that the FCA speaks for itself, and to the extent that the allegations in Paragraph

37

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

0094

Case 2:16-cv-08697-FMO-SS Document 616-3 Filed 08/06/24 Page 98 of 637
Page ID #:18992
Case 2:16-cv-08697-MWF-SS Document 223 Filed 03/23/18 Page 38 of 101 Page ID
#:3108

1  120 vary therefrom or with other applicable statutory or decisional law, such as

2  *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989

3  (2016), UnitedHealth denies those allegations.  UnitedHealth denies the remaining

4  allegations in Paragraph 120.

5      121.  Paragraph 121 contains no allegations with respect to a particular

6  Defendant or claim, and therefore no response is required.  However, to the extent

7  Paragraph 121 purports to summarize and/or describe the provisions of the FCA

8  and the Bipartisan Budget Act of 2015, Public Law 114-74 (No. 2, 2015) ("BBA"),

9  UnitedHealth states that the FCA and BBA speak for themselves, and to the extent

10  that the allegations in Paragraph 121 vary therefrom or with other applicable

11  statutory or decisional law, UnitedHealth denies those allegations.  UnitedHealth

12  denies the remaining allegations in Paragraph 121.

13  <div align="center">**THE FACTS**</div>

14      122.  UnitedHealth admits that since at least 2005, certain Defendants

15  conducted a Chart Review program in which millions of medical records were

16  reviewed.  To the extent Paragraph 122 purports to describe a document, the

17  document speaks for itself and, as such, no response is required.  UnitedHealth

18  denies the remaining allegations in Paragraph 122.

19  **I.  Defendants Knew That Many Provider-Reported Diagnoses Were**

20  **Invalid And That They Were Obligated To Undertake Good Faith**

21  **Efforts To Identify And Delete Them[1]**

22      123.  UnitedHealth admits that in connection with its acquisition of

23  PacifiCare in 2005, UnitedHealth retained some PacifiCare employees who had

24  experience performing work relating to risk adjustment.  UnitedHealth denies the

25  remaining allegations in Paragraph 123.

26

27

28  _____

[1] The headings and sub-headings throughout the Amended Complaint do not
constitute well-pleaded allegations of fact and therefore require no response.

<div align="center">38</div>

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

0095

124. UnitedHealth admits that Jeffrey Dumcum, Stephanie Will, Pam Holt, and Pam Leal were former employees of PacifiCare who worked in risk adjustment. UnitedHealth admits that Dumcum joined UnitedHealth as Director of Finance at UnitedHealthcare; that Will joined UnitedHealth as Manager of Finance; that Holt joined UnitedHealth as Manager of Network Operations at UnitedHealthcare; and that Leal joined UnitedHealth as Director of Network Management at UnitedHealthcare. UnitedHealth is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 124 regarding Holt and Leal's positions at PacifiCare before they joined UnitedHealth; therefore, such allegations are denied. UnitedHealth denies the remaining allegations in Paragraph 124.

125. UnitedHealth admits that from 2005 to 2007, Dumcum and Gardner worked at the PacifiCare office in Santa Ana, California, and Holt and Leal worked at the PacifiCare office in Cypress, California. UnitedHealth admits that in March 2007, Holt and Leal transferred to an office in Santa Ana, California. UnitedHealth denies the remaining allegations in Paragraph 125.

126. To the extent Paragraph 126 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. UnitedHealth is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 126; therefore, such allegations are denied. UnitedHealth denies the remaining allegations in Paragraph 126.

127. UnitedHealth admits that the Industry Collaboration Effort ("ICE") was a volunteer, multi-disciplinary team of providers, health plans, associations, state and federal agencies, and accrediting bodies working collaboratively to improve healthcare regulatory compliance through education of the public. UnitedHealth admits that ICE had a Risk Adjustment Data Acquisition & Reporting ("RADAR") team. UnitedHealth further admits that after UnitedHealth

39

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

0096

1   acquired PacifiCare, some former PacifiCare employees participated in ICE and its

2   RADAR team.  UnitedHealth admits that Leal was the President and a member of

3   the Board of Directors of ICE around or before 2007.  To the extent Paragraph 127

4   purports to describe a document or documents, such documents speak for

5   themselves and, as such, no response is required.  UnitedHealth denies the

6   remaining allegations in Paragraph 127.

7       128.   To the extent Paragraph 128 purports to describe a document or

8   documents, such documents speak for themselves and, as such, no response is

9   required.  UnitedHealth denies the remaining allegations in Paragraph 128.

10      129.   To the extent Paragraph 129 describes these documents, such

11  documents speak for themselves and, as such, no response is required.

12  UnitedHealth is without knowledge or information sufficient to form a belief as to

13  the truth or falsity of the remaining allegations in Paragraph 129; therefore, such

14  allegations are denied.  UnitedHealth denies the remaining allegations in Paragraph

15  129.

16      130.   To the extent Paragraph 130 purports to describe a document or

17  documents, such documents speak for themselves and, as such, no response is

18  required.  UnitedHealth is without knowledge or information sufficient to form a

19  belief as to the truth or falsity of the remaining allegations in Paragraph 130;

20  therefore, such allegations are denied.  UnitedHealth denies the remaining

21  allegations in Paragraph 130.

22      131.   To the extent Paragraph 131 purports to describe a document or

23  documents, such documents speak for themselves and, as such, no response is

24  required.  UnitedHealth is without knowledge or information sufficient to form a

25  belief as to the truth or falsity of the remaining allegations in Paragraph 131;

26  therefore, such allegations are denied.

27      132.   UnitedHealth admits that the former PacifiCare employees were

28  aware that CMS could audit the diagnoses MA Organizations submitted for risk

<center>40</center>

adjustment payments.  UnitedHealth denies the remaining allegations in Paragraph 132.

133.   To the extent Paragraph 133 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 133; therefore, such allegations are denied.  UnitedHealth denies the remaining allegations in Paragraph 133.

134.   To the extent Paragraph 134 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 134.

135.   UnitedHealth admits that after UnitedHealth's acquisition of PacifiCare, Jeff Dumcum gave presentations to various UnitedHealth employees regarding provider coding.  To the extent Paragraph 135 purports to describe documents, the documents speak for themselves and, as such, no response is required.  UnitedHealth is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 135; therefore, such allegations are denied.  UnitedHealth denies the remaining allegations in Paragraph 135.

136.   To the extent Paragraph 136 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 136.

137.   UnitedHealth admits that in or about 2007, certain risk adjustment operations moved to Ingenix.  Additionally, UnitedHealth admits that Ingenix served commercial clients.  To the extent Paragraph 137 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 137.

41

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

0098

138.   To the extent Paragraph 138 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 138; therefore, such allegations are denied.  UnitedHealth denies the remaining allegations in Paragraph 138.

139.   UnitedHealth admits that it implemented an internal data validation program on or about 2007 or 2008.  To the extent Paragraph 139 purports to describe a document or documents, the documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 139.

140.   To the extent Paragraph 140 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 140; therefore, such allegations are denied.  UnitedHealth denies the remaining allegations in Paragraph 140.

141.   UnitedHealth admits that CMS performed RADV audits. UnitedHealth admits that Ingenix and then Optum performed IDV and RACCR to review provider-reported diagnoses.  To the extent Paragraph 141 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 141.

142.   To the extent Paragraph 142 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 142.

143.   UnitedHealth admits that Ingenix implemented an internal data validation program in or around 2007 or 2008.  To the extent Paragraph 143

42

1    purports to describe a document or documents, the documents speak for

2    themselves and, as such, no response is required. UnitedHealth denies the

3    remaining allegations in Paragraph 143.

4       144. To the extent Paragraph 144 purports to describe a document or

5    documents, such documents speak for themselves and, as such, no response is

6    required. UnitedHealth denies the remaining allegations in Paragraph 144.

7       145. To the extent Paragraph 145 purports to describe a document or

8    documents, such documents speak for themselves and, as such, no response is

9    required. UnitedHealth denies the remaining allegations in Paragraph 145.

10       146. To the extent Paragraph 146 purports to describe a document or

11    documents, such documents speak for themselves and, as such, no response is

12    required. UnitedHealth denies the remaining allegations in Paragraph 146.

13       147. UnitedHealth admits that Larry Renfro was the Chief Executive

14    Officer of PSMG in or around May 2010. To the extent Paragraph 147 contains

15    legal conclusions, no response is required. To the extent Paragraph 147 purports

16    to describe a document or documents, such documents speak for themselves and, as

17    such, no response is required. Additionally, to the extent Paragraph 147 purports

18    to summarize and/or describe the provisions of the Medicare program,

19    UnitedHealth states that the Medicare statute and regulations speak for themselves,

20    and to the extent that the allegations in Paragraph 147 vary therefrom or with other

21    applicable statutory or decisional law, UnitedHealth denies those allegations.

22    UnitedHealth denies the remaining allegations in Paragraph 147.

23       148. UnitedHealth admits that Kimberly Halva was UnitedHealth Medicare

24    & Retirement's Finance Compliance Officer from 2010 to 2013. UnitedHealth

25    admits that Scott Theisen was the Chief Financial Officer of UnitedHealthcare

26    Medicare & Retirement from in or around 2010 to 2013. To the extent Paragraph

27    148 purports to describe a document or documents, such documents speak for

28    themselves and, as such, no response is required. To the extent Paragraph 148

<center>43</center>

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

1 contains legal conclusions, no response is required. UnitedHealth denies the

2 remaining allegations in Paragraph 148.

3      149. To the extent Paragraph 149 purports to describe a document or

4 documents, such documents speak for themselves and, as such, no response is

5 required. UnitedHealth denies the remaining allegations in Paragraph 149.

6      150. To the extent the allegations in Paragraph 150 relate to claims that

7 have been dismissed, they are surplusage and should be stricken. To the extent

8 Paragraph 150 purports to describe a document or documents, such documents

9 speak for themselves and, as such, no response is required. UnitedHealth admits

10 that, since in or around 2008, certain provider groups submitted attestations to

11 some of the UnitedHealth Defendants certifying that the diagnoses that they

12 reported to some of the UnitedHealth Defendants were valid and met CMS's

13 requirements. UnitedHealth denies the remaining allegations in Paragraph 150.

14      151. To the extent Paragraph 151 purports to describe a document or

15 documents, such documents speak for themselves and, as such, no response is

16 required. UnitedHealth denies the remaining allegations in Paragraph 151.

17      152. To the extent Paragraph 152 purports to describe a document or

18 documents, such documents speak for themselves and, as such, no response is

19 required. To the extent a response is required, UnitedHealth denies the allegations

20 in Paragraph 152.

21      153. To the extent Paragraph 153 purports to describe a document or

22 documents, such documents speak for themselves and, as such, no response is

23 required. UnitedHealth denies the remaining allegations in Paragraph 153.

24      154. To the extent Paragraph 154 purports to describe a document or

25 documents, such documents speak for themselves and, as such, no response is

26 required. UnitedHealth denies the remaining allegations in Paragraph 154.

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

155.   To the extent Paragraph 155 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 155.

156.   To the extent Paragraph 156 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 156.

157.   UnitedHealth admits that UnitedHealthcare Medicare & Retirement implemented the program eventually known as the RACCR program in or about 2009.  To the extent Paragraph 157 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  To the extent Paragraph 157 states a legal conclusion, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 157.

158.   UnitedHealth admits that its Claims Verification ("CV") program was implemented in phases, that Phase I of the CV Program was performed in or around 2010, and that Phase II of the CV Program was performed in or around late 2011 or early 2012.  To the extent Paragraph 158 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 158.

159.   To the extent Paragraph 159 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 159.

160.   To the extent Paragraph 160 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 160.

161.   To the extent that Paragraph 161 contains legal conclusions, no response is required.  To the extent Paragraph 161 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 161.

45

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

162. To the extent Paragraph 162 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 162.

163. To the extent that Paragraph 163 contains legal conclusions, no response is required. To the extent Paragraph 163 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 163.

## II. Chart Reviews and Claims Verification

### A. United's "Look One Way" Chart Review Program

164. UnitedHealth admits that as part of its Chart Review Program, coders reviewed beneficiaries' medical records. To the extent Paragraph 164 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 164.

165. UnitedHealth admits that some of the UnitedHealth Defendants have performed some form of Chart Review since 2005. UnitedHealth admits that Dumcum and Will became key participants in the Chart Review Program and that Will was the Program Manager of the Chart Review Program. UnitedHealth is without knowledge or information as to the identity of the "other former PacifiCare employees sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 165; therefore, such allegations are denied. UnitedHealth denies the remaining allegations in Paragraph 165.

166. UnitedHealth admits that hundreds of thousands of charts were reviewed over the first few years of the Chart Review Program. To the extent Paragraph 166 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 166.

46

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT IN PARTIAL-
INTERVENTION AND COUNTERCLAIM

0103

Case 2:16-cv-08697-FMO-SS Document 616-3 Filed 08/06/24 Page 47 of 61 Page ID
Case 2:16-cv-08697-MWF-SS Document 223 Filed 05/23/18 Page 47 of 104 Page
#:7417
#:9001

167.   UnitedHealth admits that UnitedHealth Group Incorporated acquired AIM Healthcare Services, Inc. in or around 2009.  UnitedHealth admits that in or about 2010, Ingenix developed ChartSync—an in-house chart review computer database system that allowed coders to review medical records electronically—and that in or about 2012 and 2011, Ingenix opened offices in the Philippines and India, respectively, where coders could review codes.  UnitedHealth denies the remaining allegations in Paragraph 167.

168.   To the extent Paragraph 168 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 168.

169.   To the extent Paragraph 169 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 169.

170.   UnitedHealth admits that Ingenix and then Optum or their vendors obtained medical records from fee-for-service providers in numerous places in the United States.  UnitedHealth admits that Ingenix and then Optum or their vendors sent some of these medical records to coders employed in Tennessee, India, and the Philippines.  UnitedHealth admits that Ingenix and then Optum hired coding vendors located in various locations within and outside of the United States to review medical records.  UnitedHealth denies the remaining allegations in Paragraph 170.

171.   UnitedHealth admits chart review was conducted by or on behalf of certain physician groups, including WellMed and Southwest Medical Associates.  UnitedHealth denies the remaining allegations in Paragraph 171.

172.   To the extent Paragraph 172 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 172.

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

173.   To the extent Paragraph 173 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 173.

174.   To the extent Paragraph 174 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 174.

175.   UnitedHealth admits that its Chart Review Program was conducted according to an annual cycle.  To the extent Paragraph 175 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 175.

176.   UnitedHealth admits that some of the UnitedHealth Defendants had revenue estimates for the Chart Review Program.  UnitedHealth admits that some of the UnitedHealth Defendants identified more codes supported by records through subsequent reviews.  To the extent Paragraph 176 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 176.

177.   To the extent the allegations in Paragraph 177 relate to claims that have been dismissed, they are surplusage and should be stricken.  To the extent Paragraph 177 states legal conclusions, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 177.

**B.    United Knew It Was Obligated To Look Both Ways At The Results Of Its Chart Reviews And Make DELETES As Well As ADDS**

178.   To the extent Paragraph 178 purports to describe a document, the document speaks for itself and, as such, no response is required.  UnitedHealth is without knowledge or information sufficient to form a belief as to the truth or

48

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

falsity of Poehling's discussions and the allegations in Paragraph 178. UnitedHealth denies the remaining allegations in Paragraph 178.

179. UnitedHealth denies that there were problems related to the diagnoses reported by providers paid on a fee-for-service basis. To the extent Paragraph 179 purports to describe a document, the document speaks for itself and, as such, no response is required. UnitedHealth is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 179; therefore, such allegations are denied. UnitedHealth denies the remaining allegations in Paragraph 179.

180. To the extent Paragraph 180 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. UnitedHealth is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 180; therefore, such allegations are denied.

181. To the extent Paragraph 181 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. UnitedHealth is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 181; therefore, such allegations are denied. UnitedHealth denies the remaining allegations in Paragraph 181.

182. To the extent Paragraph 182 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 182.

183. To the extent Paragraph 183 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 183.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

184. To the extent Paragraph 184 purports to describe a document, the document speaks for itself and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 184.

185. To the extent Paragraph 185 purports to describe a document, the document speaks for itself and, as such, no response is required. To the extent Paragraph 186 states legal conclusions, no response is required. UnitedHealth denies the remaining allegations in Paragraph 185.

186. UnitedHealth admits that Paul Bihm was a Vice President of General Management at Optum in or around 2011. To the extent Paragraph 186 purports to describe a document, the document speaks for itself and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 186.

187. To the extent Paragraph 187 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 187.

188. UnitedHealth admits that Eric Murphy was the President of Payer Solutions at Optum in or around December 2011. To the extent Paragraph 188 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 188.

189. To the extent Paragraph 189 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 189.

190. UnitedHealth admits that William Miller was the Chief Executive Officer of OptumInsight in or around September 2012. To the extent Paragraph 190 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. To the extent Paragraph 190 states legal conclusions, no response is required. UnitedHealth denies the remaining allegations in Paragraph 190.

50

191.   UnitedHealth admits that prior to 2012, coders reviewed medical records at providers' offices if the coder could not review the records electronically because the provider did not want UnitedHealth to copy the record.  UnitedHealth further admits that UnitedHealthcare Medicare & Retirement made a policy decision to stop this practice.  To the extent Paragraph 191 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 191.

192.   To the extent Paragraph 193 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 193.

193.   To the extent Paragraph 193 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 193.

194.   To the extent Paragraph 194 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 194.

195.   To the extent Paragraph 195 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 195; therefore, such allegations are denied.

C.     **United's Short-lived "Look Both Ways" Claims Verification Program**

196.   To the extent Paragraph 196 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 196.

51

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

197. To the extent Paragraph 197 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 197.

198. To the extent Paragraph 198 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 198.

199. To the extent Paragraph 199 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 199.

200. To the extent Paragraph 200 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 200.

201. UnitedHealth admits that in or around 2012, UnitedHealthcare Medicare & Retirement sent letters to capitated providers. To the extent Paragraph 201 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 201.

202. UnitedHealth admits that UnitedHealthcare Medicare & Retirement and Optum developed and implemented CV in phases over several years. UnitedHealth admits that when there was a discrepancy between the provider-reported diagnoses and the diagnosis codes identified by the coder as part of the Chart Review Program, Optum undertook an additional review of the medical record. UnitedHealth admits Optum did not delete diagnosis codes that were found to be adequately supported by the medical record. To the extent Paragraph 202 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. To the extent Paragraph 202 states legal conclusions, no response is required. UnitedHealth denies the remaining allegations in Paragraph 202.

52

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

203.   UnitedHealth admits that Optum did not generally contact providers during the CV process.  UnitedHealth denies the remaining allegations in Paragraph 203.

204.   To the extent Paragraph 204 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  To the extent Paragraph 204 states legal conclusions, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 204.

205.   UnitedHealth denies the allegations in Paragraph 205.

206.   To the extent Paragraph 206 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 206.

207.   UnitedHealth admits that as part of Phase I, Ingenix sometimes contacted providers to determine whether or not there were additional medical records for particular beneficiaries.  To the extent Paragraph 207 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 207.

208.   UnitedHealth admits that Optum began conducting Phase II of its CV Program in approximately mid-2011 and that Phase II was completed in approximately early 2012.  To the extent Paragraph 208 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  To the extent Paragraph 208 states legal conclusions, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 208.

209.   UnitedHealth admits that Optum began the Phase III pilot in or about mid-2012.  UnitedHealth admits that the Phase III pilot included a review of approximately 5,000 charts relating to encounters that took place in calendar year 2011.  To the extent Paragraph 209 purports to describe a document or documents,

53

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

1  such documents speak for themselves and, as such, no response is required.

2  UnitedHealth denies the remaining allegations in Paragraph 209.

3      210.   To the extent Paragraph 210 purports to describe a document or

4  documents, such documents speak for themselves and, as such, no response is

5  required.  UnitedHealth denies the remaining allegations in Paragraph 210.

6      211.   UnitedHealth admits that the CV Program continued to evolve after

7  research regarding how to structure the CV Program to best meet the goals of

8  identifying diagnosis codes that were unsupported by the medical record.

9  UnitedHealth admits that, as a result of that research, UnitedHealthcare Medicare

10  & Retirement added an expert-level review to the CV process.  UnitedHealth

11  admits that UnitedHealthcare Medicare & Retirement discontinued its CV Program

12  in 2014.  UnitedHealth denies the remaining allegations in Paragraph 211.

13      212.   UnitedHealth admits that certain eligibility criteria were applied to

14  determine eligibility for inclusion in the CV Program.  To the extent Paragraph 212

15  purports to describe a document, the document speaks for itself and, as such, no

16  response is required.  To the extent Paragraph 213 states legal conclusions, no

17  response is required.  UnitedHealth denies the remaining allegations in Paragraph

18  212.

19      213.   UnitedHealth admits that, in or about 2013, UnitedHealthcare

20  Medicare & Retirement decided to add an expert-level review to the CV process.

21  To the extent Paragraph 213 purports to describe a document, the document speaks

22  for itself and, as such, no response is required. UnitedHealth denies the remaining

23  allegations in Paragraph 213.

24      214.   To the extent Paragraph 214 states legal conclusions, no response is

25  required.  UnitedHealth denies the remaining allegations in Paragraph 214.

26      215.   To the extent Paragraph 215 purports to describe a document or

27  documents, such documents speak for themselves and, as such, no response is

28  required.  UnitedHealth denies the remaining allegations in Paragraph 215.

54

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

216.   To the extent Paragraph 216 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 216.

217.   To the extent Paragraph 217 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 217.

218.   To the extent Paragraph 218 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 218.

219.   To the extent Paragraph 219 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 219.

220.   To the extent Paragraph 220 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 220.

221.   UnitedHealth admits that Marybeth Meyer assumed Mr. Poehling's role after he left the Company.  To the extent Paragraph 221 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 221.

222.   To the extent Paragraph 222 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 222.

223.   UnitedHealth admits that, before UnitedHealthcare Medicare & Retirement discontinued the CV Program, UnitedHealthcare Medicare & Retirement and Optum sought guidance from CMS about the retroactivity of a proposed regulation requiring MA Organizations to design all medical record reviews to validate diagnoses submitted to CMS ("Proposed Rule").  To the extent

55

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

1    Paragraph 223 purports to describe a document or documents, such documents

2    speak for themselves and, as such, no response is required. UnitedHealth denies

3    the remaining allegations in Paragraph 223.

4        224.   UnitedHealth admits that Larry Renfro, the Chief Executive Officer of

5    Optum, contacted senior government employees at CMS, including the

6    Administrator of CMS, to ask whether UnitedHealth had an obligation to perform

7    CV before the effective date of the Proposed Rule. To the extent Paragraph 224

8    purports to describe a document, the document speaks for itself and, as such, no

9    response is required. UnitedHealth denies the remaining allegations in Paragraph

10    224.

11        225.   UnitedHealth admits that on April 8, 2014, Renfro spoke with the

12    CMS Administrator regarding UnitedHealth's obligation to perform CV in light of

13    the Proposed Rule. To the extent Paragraph 225 purports to describe a document

14    or documents, such documents speak for themselves and, as such, no response is

15    required. UnitedHealth denies the remaining allegations in Paragraph 225.

16        226.   UnitedHealth admits that Nelson, Schumacher, Erickson, and Johnson

17    went to Washington, D.C. on April 29, 2014 to speak with CMS employees

18    responsible for the Medicare Advantage Program, including Cheri Rice, the

19    Director of the Medicare Plan Payment Group at CMS. To the extent Paragraph

20    226 purports to describe a document or documents, such documents speak for

21    themselves and, as such, no response is required. To the extent Paragraph 226

22    states legal conclusions, no response is required. UnitedHealth denies the

23    remaining allegations in Paragraph 226.

24        227.   To the extent Paragraph 227 purports to describe a document or

25    documents, such documents speak for themselves and, as such, no response is

26    required. UnitedHealth denies the remaining allegations in Paragraph 227.

27        228.   To the extent the allegations in Paragraph 228 relate to claims that

28    have been dismissed, they are surplusage and should be stricken. To the extent

56

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

Paragraph 228 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 228.

229.   UnitedHealth admits that the Department of Justice sent a letter to UnitedHealth's counsel after Rice sent her May 2 email.  To the extent Paragraph 229 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 229.

230.   To the extent Paragraph 230 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 230.

231.   UnitedHealth admits that UnitedHealthcare Medicare & Retirement decided to discontinue its CV Program on or about May 27, 2014.  To the extent Paragraph 231 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 231.

232.   UnitedHealth denies the allegations in Paragraph 232.

233.   UnitedHealth admits that Optum continued performing chart review for UnitedHealthcare after CV was discontinued.  To the extent Paragraph 233 states legal conclusions, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 233.

234.   To the extent Paragraph 234 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 234.

**D.     United Failed to Delete Diagnoses Invalidated By Its Own Chart Review Program**

235.   To the extent Paragraph 235 purports to describe a document, the document speaks for itself and, as such, no response is required.  To the extent

57

Paragraph 235 states legal conclusions, no response is required.  UnitedHealth is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 235; therefore, such allegations are denied.  UnitedHealth denies the remaining allegations in Paragraph 235.

236.  To the extent that Paragraph 236 contains legal conclusions, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 236.

237.  To the extent that Paragraph 237 contains legal conclusions, no response is required.  UnitedHealth is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 237; therefore, such allegations are denied.  UnitedHealth denies the remaining allegations in Paragraph 237.

238.  To the extent Paragraph 238 purports to describe the Complaint, the Complaint is a legal document that speaks for itself and, as such, no response is required.  To the extent that Paragraph 238 contains any factual allegations regarding UnitedHealth, such allegations are denied.  UnitedHealth is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 238; therefore, such allegations are denied.  To the extent that Paragraph 238 contains legal conclusions, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 238.

## III.    The RACCR Program

239.  UnitedHealth admits that some of the UnitedHealth Defendants conducted the Chart Review and RACCR Programs.  To the extent Paragraph 239 states legal conclusions, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 239.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES' AMENDED COMPLAINT-IN-PARTIAL-INTERVENTION AND COUNTERCLAIM

Case 2:16-cv-08697-MWF-SS Document 616-3 Filed 08/06/24 Page 119 of 637
Page ID #:24903
Case 2:16-cv-08697-MWF-SS Document 223 Filed 05/29/18 Page 59 of 101 Page ID
Page #:19013

**A. Defendants Knew That Their Financially-Incentivized Providers Were Reporting Invalid Codes**

240. UnitedHealth admits that some of the UnitedHealth Defendants have arrangements that are value-based either in full or in part with providers, and to the extent Paragraph 240 purports to describe the contracts underlying these arrangements, such documents speak for themselves and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 240.

241. UnitedHealth admits that UnitedHealthcare Medicare & Retirement implemented RACCR to address and safeguard against potentially inaccurate coding by provider groups whose revenue was tied to risk adjustment revenue from CMS. To the extent Paragraph 241 states legal conclusions, no response is required. UnitedHealth denies the remaining allegations in Paragraph 241.

242. UnitedHealth admits Ingenix implemented an internal data validation program in or about 2007 or 2008. UnitedHealth admits that UnitedHealthcare Medicare & Retirement implemented the program eventually known as RACCR on or about 2009. UnitedHealth admits that the stated goal of RACCR is to address and safeguard against potentially inaccurate coding by provider groups whose revenue is tied to risk adjustment revenue from CMS. UnitedHealth denies the remaining allegations in Paragraph 242.

243. To the extent Paragraph 243 states legal conclusions, no response is required. UnitedHealth denies the remaining allegations in Paragraph 243.

**B. UnitedHealthcare Structured The RACCR Program To Limit The Number Of Invalid Diagnosis Codes It Identified**

244. To the extent Paragraph 244 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 244.

245. UnitedHealth denies the allegations in Paragraph 245.

59

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

Case 2:16-cv-08697-MWF-SS Document 223 Filed 05/23/18 Page 60 of 104 Page ID Page #:9014

246. To the extent Paragraph 246 purports to describe a document, the document speaks for itself and, as such, no response is required. UnitedHealth is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 246; therefore, such allegations are denied. UnitedHealth denies the remaining allegations in Paragraph 246.

247. UnitedHealth admits that for DOS 2008, 2009, and 2010 RACCR reviews, Optum defined outliers as HCCs that provider groups coded with a prevalence frequency of greater than 300% of the Optum National Rate (sometimes referred to as the national prevalence rate). UnitedHealth is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 247; therefore, such allegations are denied. To the extent Paragraph 247 purports to describe a document, the document speaks for itself and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 247.

248. UnitedHealth admits that for DOS 2011 and DOS 2012 RACCR reviews, Optum defined outliers as HCCs that provider groups coded with a prevalence frequency greater than two standard deviations of the Optum National Rate, which for those DOS years was calculated based on data from all providers classified as Tier 1 provider groups. UnitedHealth denies the remaining allegations in Paragraph 248.

249. UnitedHealth admits that some of its capitated providers are located in the Central District of California. UnitedHealth admits that Exhibit 14 lists capitated providers involved in RACCR reviews that are also located in the Central District of California. UnitedHealth denies the remaining allegations in Paragraph 249.

250. UnitedHealth admits that the sample size for 2011 and 2012 dates of service RACCR reviews was set at 50 beneficiaries per provider group per HCC selected for review. To the extent Paragraph 250 purports to describe a document

60

1   or documents, such documents speak for themselves and, as such, no response is

2   required.  UnitedHealth denies the remaining allegations in Paragraph 250.

3       251.   UnitedHealth admits that RACCR reviews focused on provider groups

4   where the HCCs selected for RACCR reviews did not attain a validation rate of

5   greater than 80%.  To the extent Paragraph 251 states legal conclusions, no

6   response is required.  UnitedHealth denies the remaining allegations in Paragraph

7   251.

8       252.   UnitedHealth admits that for DOS 2008 and 2009 RACCR reviews,

9   Optum increased the number of members whose charts were reviewed for HCCs

10  that did not validate at greater than 80% based on the initial sample and that it

11  called this process an "incremental sample."  UnitedHealth admits that RACCR

12  reviews focused on provider groups where the HCCs selected for RACCR reviews

13  did not attain a validation rate of greater than 80%.  To the extent Paragraph 252

14  purports to describe a document or documents, such documents speak for

15  themselves and, as such, no response is required.  To the extent Paragraph 252

16  states legal conclusions, no response is required.  UnitedHealth denies the

17  remaining allegations in Paragraph 252.

18      253.   UnitedHealth admits that for DOS 2008 through DOS 2011,

19  lookbacks focused on instances in which an HCC validated at 80% or less at the

20  provider group level during RACCR sample reviews.  To the extent Paragraph 253

21  purports to describe a document or documents, such documents speak for

22  themselves and, as such, no response is required.  UnitedHealth denies the

23  remaining allegations in Paragraph 253.

24  **C.    Despite Its Limited Scope, The RACCR Program Confirmed That**

25  **Financially Incentivized Providers Were Submitting Invalid**

26  **Diagnosis Codes**

27      254.   UnitedHealth denies the allegations in Paragraph 254.

28

61

255.   To the extent Paragraph 255 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 255.

256.   To the extent Paragraph 256 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 256.

257.   To the extent Paragraph 257 purports to describe a document, the document speaks for itself and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 257.

258.   To the extent Paragraph 258 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 258.

259.   To the extent Paragraph 259 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  To the extent Paragraph 259 states legal conclusions, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 259.

260.   To the extent Paragraph 260 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 260; therefore, such allegations are denied.  UnitedHealth denies the remaining allegations in Paragraph 260.

261.   To the extent Paragraph 261 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  To the extent Paragraph 261 states legal conclusions, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 261.

62

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT IN PARTIAL-
INTERVENTION AND COUNTERCLAIM

262. To the extent Paragraph 262 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 262.

263. To the extent Paragraph 263 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 263.

264. To the extent Paragraph 264 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 264.

**D. UnitedHealthcare Knew It Was Obligated To Delete Invalid Diagnosis Codes Identified Through The RACCR Reviews**

265. To the extent Paragraph 265 states legal conclusions, no response is required. To the extent Paragraph 265 purports to describe a document, the document speaks for itself and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 265.

266. UnitedHealth admits that Optum deleted diagnosis codes for DOS 2008 through DOS 2013 as a result of its RACCR reviews. To the extent Paragraph 266 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. To the extent Paragraph 266 states legal conclusions, no response is required. UnitedHealth denies the remaining allegations in Paragraph 266.

267. To the extent Paragraph 267 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. To the extent Paragraph 267 states legal conclusions, no response is required. UnitedHealth denies the remaining allegations in Paragraph 267.

268. To the extent Paragraph 268 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 268.

63

269.    To the extent Paragraph 269 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 269.

270.    To the extent Paragraph 270 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 270.

271.    To the extent Paragraph 271 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 271.

272.    Paragraph 272 states legal conclusions to which no response is required.  To the extent that Paragraph 272 contains any factual allegations, such allegations are denied.  UnitedHealth denies the remaining allegations in Paragraph 272.

273.    Paragraph 273 states legal conclusions to which no response is required.  To the extent Paragraph 273 contains any factual allegations, such allegations are denied.  UnitedHealth denies the remaining allegations in Paragraph 273.

**E.    Defendants Failed To Follow Their Own RACCR Protocol Requiring 100 Percent Reviews**

274.    UnitedHealth admits that for DOS 2008 through DOS 2011, lookbacks focused on instances in which an HCC validated at 80% or less at the provider group level during RACCR sample reviews.  To the extent Paragraph 274 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 274.

275.    Paragraph 275 contains no allegations with respect to a particular Defendant or claim and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 275.

64

276.   To the extent Paragraph 276 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  To the extent Paragraph 276 states legal conclusions, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 276.

277.   To the extent Paragraph 277 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  To the extent Paragraph 277 states legal conclusions, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 277.

278.   To the extent Paragraph 278 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 278.

279.   To the extent Paragraph 279 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 279.

### F.   Even After Identifying Miscoding By Providers, Defendants Failed To Delete Invalid Codes

280.   To the extent Paragraph 280 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 280; therefore, such allegations are denied.  UnitedHealth denies the remaining allegations in Paragraph 280.

281.   To the extent Paragraph 281 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  To the extent Paragraph 281 states legal conclusions, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 281.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

**G.     UnitedHealthcare Medicare & Retirement Discontinued 100 Percent Reviews And Converted The RACCR Program Into A Revenue Generating Program**

282.    UnitedHealth admits that during the first half of 2014, UnitedHealthcare Medicare & Retirement made changes to the RACCR Program. To the extent Paragraph 282 states legal conclusions, no response is required. UnitedHealth denies the remaining allegations in Paragraph 282.

283.    UnitedHealth admits that beginning with DOS 2012, UnitedHealthcare Medicare & Retirement refocused RACCR such that it did not require providers to conduct lookback reviews.  UnitedHealth denies the remaining allegations in Paragraph 283.

284.    To the extent Paragraph 284 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 284.

285.    UnitedHealth admits that beginning with DOS 2013 RACCR reviews, UnitedHealthcare Medicare & Retirement used a different methodology to select medical records.  UnitedHealth denies the remaining allegations in Paragraph 285.

286.    To the extent Paragraph 286 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 286.

287.    Paragraph 287 states legal conclusions to which no response is required.  To the extent Paragraph 287 contains any factual allegations, such allegations are denied.  UnitedHealth denies the remaining allegations in Paragraph 287.

288.    UnitedHealth admits that during the first half of 2014, UnitedHealthcare Medicare & Retirement made changes to the RACCR Program. UnitedHealth denies the remaining allegations in Paragraph 288.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES' AMENDED COMPLAINT IN PARTIAL-INTERVENTION AND COUNTERCLAIM

**H. RACCR-Related Falsehoods In UnitedHealthcare's And Optum's Attestations**

289. To the extent the allegations in Paragraph 289 relate to claims that have been dismissed, they are surplusage and should be stricken. UnitedHealthcare admits that it has submitted Risk Adjustment Attestations to the Medicare Program. UnitedHealth admits that Optum approved these Attestations before they were submitted.

290. To the extent the allegations in Paragraph 290 relate to claims that have been dismissed, they are surplusage and should be stricken. To the extent Paragraph 290 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. To the extent Paragraph 290 states legal conclusions, no response is required. UnitedHealth denies the remaining allegations in Paragraph 290.

291. To the extent the allegations in Paragraph 291 relate to claims that have been dismissed, they are surplusage and should be stricken. To the extent Paragraph 291 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. To the extent Paragraph 291 states legal conclusions, no response is required. UnitedHealth denies the remaining allegations in Paragraph 291.

292. To the extent the allegations in Paragraph 292 relate to claims that have been dismissed, they are surplusage and should be stricken. To the extent Paragraph 292 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. To the extent Paragraph 292 states legal conclusions, no response is required. UnitedHealth denies the remaining allegations in Paragraph 292.

**IV. Defendants' False Risk Adjustment Attestations**

293. To the extent the allegations in Paragraph 293 relate to claims that have been dismissed, they are surplusage and should be stricken. UnitedHealth

67

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

1 admits that UnitedHealthcare is required to submit a truthful Risk Adjustment

2 Attestation to the Medicare Program. UnitedHealthcare admits that it has

3 submitted Risk Adjustment Attestations to the Medicare Program. UnitedHealth

4 admits that Optum and Ingenix employees reviewed and approved these

5 Attestations and that Ovations and UnitedHealthcare employees reviewed and

6 signed these Attestations. To the extent Paragraph 293 states legal conclusions, no

7 response is required. UnitedHealth denies the remaining allegations in Paragraph

8 293.

9     294. To the extent the allegations in Paragraph 294 relate to claims that

10 have been dismissed, they are surplusage and should be stricken. To the extent

11 Paragraph 294 purports to describe a document or documents, such documents

12 speak for themselves and, as such, no response is required. UnitedHealth denies

13 the remaining allegations in Paragraph 294.

14     295. To the extent the allegations in Paragraph 295 relate to claims that

15 have been dismissed, they are surplusage and should be stricken. To the extent

16 Paragraph 295 states legal conclusions, no response is required. To the extent

17 Paragraph 295 purports to describe a document or documents, such documents

18 speak for themselves and, as such, no response is required. UnitedHealth denies

19 the remaining allegations in Paragraph 295.

20     **A.**    **Defendants' Internal Attestation Approval Process**

21     296. To the extent the allegations in Paragraph 296 relate to claims that

22 have been dismissed, they are surplusage and should be stricken. To the extent

23 Paragraph 296 purports to describe a document or documents, such documents

24 speak for themselves and, as such, no response is required. UnitedHealth denies

25 the remaining allegations in Paragraph 296.

26     297. To the extent the allegations in Paragraph 297 relate to claims that

27 have been dismissed, they are surplusage and should be stricken. To the extent

28 Paragraph 297 purports to describe a document or documents, such documents

68

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

speak for themselves and, as such, no response is required.  To the extent Paragraph 297 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute and regulations speak for themselves, and to the extent that the allegations in Paragraph 297 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations.  To the extent Paragraph 297 states legal conclusions, no response is required.

298.    To the extent the allegations in Paragraph 298 relate to claims that have been dismissed, they are surplusage and should be stricken.  To the extent Paragraph 298 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 298.

299.    To the extent the allegations in Paragraph 299 relate to claims that have been dismissed, they are surplusage and should be stricken.  Paragraph 299 states legal conclusions to which no response is required.  To the extent Paragraph 299 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 299.

300.    To the extent the allegations in Paragraph 300 relate to claims that have been dismissed, they are surplusage and should be stricken.  Paragraph 300 states legal conclusions to which no response is required.  To the extent Paragraph 300 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 300.

301.    To the extent the allegations in Paragraph 301 relate to claims that have been dismissed, they are surplusage and should be stricken.  Paragraph 301 states legal conclusions to which no response is required.  To the extent Paragraph 301 purports to describe a document or documents, such documents speak for

69

1   themselves and, as such, no response is required.  UnitedHealth denies the

2   remaining allegations in Paragraph 301.

3       302.   To the extent the allegations in Paragraph 302 relate to claims that

4   have been dismissed, they are surplusage and should be stricken.  Paragraph 302

5   states legal conclusions to which no response is required.  To the extent Paragraph

6   302 purports to describe a document or documents, such documents speak for

7   themselves and, as such, no response is required.  UnitedHealth denies the

8   remaining allegations in Paragraph 302.

9       303.   To the extent the allegations in Paragraph 303 relate to claims that

10  have been dismissed, they are surplusage and should be stricken.  Paragraph 303

11  states legal conclusions to which no response is required.  To the extent Paragraph

12  303 purports to describe a document or documents, such documents speak for

13  themselves and, as such, no response is required.  UnitedHealth denies the

14  remaining allegations in Paragraph 303.

15      304.   To the extent the allegations in Paragraph 304 relate to claims that

16  have been dismissed, they are surplusage and should be stricken.  Paragraph 304

17  states legal conclusions to which no response is required.  To the extent Paragraph

18  304 purports to describe a document or documents, such documents speak for

19  themselves and, as such, no response is required.  UnitedHealth denies the

20  remaining allegations in Paragraph 304.

21      305.   To the extent the allegations in Paragraph 305 relate to claims that

22  have been dismissed, they are surplusage and should be stricken.  Paragraph 305

23  states legal conclusions to which no response is required.  To the extent Paragraph

24  305 purports to describe a document or documents, such documents speak for

25  themselves and, as such, no response is required.  UnitedHealth denies the

26  remaining allegations in Paragraph 305.

27      306.   To the extent the allegations in Paragraph 306 relate to claims that

28  have been dismissed, they are surplusage and should be stricken.  To the extent

70

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

0127

Paragraph 306 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 306.

307. To the extent the allegations in Paragraph 307 relate to claims that have been dismissed, they are surplusage and should be stricken. Paragraph 307 states legal conclusions to which no response is required. To the extent Paragraph 307 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 307.

308. To the extent the allegations in Paragraph 308 relate to claims that have been dismissed, they are surplusage and should be stricken. To the extent Paragraph 308 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 308.

**B.    The False Attestations Submitted To The Government**

309. To the extent the allegations in Paragraph 309 relate to claims that have been dismissed, they are surplusage and should be stricken. To the extent Paragraph 309 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 309.

310. To the extent the allegations in Paragraph 310 relate to claims that have been dismissed, they are surplusage and should be stricken. Paragraph 310 states legal conclusions to which no response is required. UnitedHealth denies the remaining allegations in Paragraph 310.

311. To the extent the allegations in Paragraph 311 relate to claims that have been dismissed, they are surplusage and should be stricken. To the extent Paragraph 311 purports to describe a document or documents, such documents

71

Case 2:16-cv-08697-FMO-SS Document 616-3 Filed 08/06/24 Page 132 of 637
Page ID #:17926
Case 2:16-cv-08697-MWF-SS Document 223 Filed 05/23/18 Page 72 of 104 Page ID
#:3137

1  speak for themselves and, as such, no response is required.  UnitedHealth denies
2  the remaining allegations in Paragraph 311.

3      312.   To the extent the allegations in Paragraph 312 relate to claims that
4  have been dismissed, they are surplusage and should be stricken.  To the extent
5  Paragraph 312 purports to describe a document or documents, such documents
6  speak for themselves and, as such, no response is required.  UnitedHealth denies
7  the remaining allegations in Paragraph 312.

8      313.   To the extent the allegations in Paragraph 313 relate to claims that
9  have been dismissed, they are surplusage and should be stricken.  To the extent
10  Paragraph 313 purports to describe a document or documents, such documents
11  speak for themselves and, as such, no response is required.  UnitedHealth denies
12  the remaining allegations in Paragraph 313.

13      314.   To the extent the allegations in Paragraph 314 relate to claims that
14  have been dismissed, they are surplusage and should be stricken.  To the extent
15  Paragraph 314 purports to describe a document or documents, such documents
16  speak for themselves and, as such, no response is required.  UnitedHealth denies
17  the remaining allegations in Paragraph 314.

18      315.   To the extent the allegations in Paragraph 315 relate to claims that
19  have been dismissed, they are surplusage and should be stricken.  To the extent
20  Paragraph 315 purports to describe a document or documents, such documents
21  speak for themselves and, as such, no response is required.  UnitedHealth denies
22  the remaining allegations in Paragraph 315.

23      316.   To the extent the allegations in Paragraph 316 relate to claims that
24  have been dismissed, they are surplusage and should be stricken.  Paragraph 316
25  states legal conclusions to which no response is required.  UnitedHealth denies the
26  remaining allegations in Paragraph 316.

27      317.   To the extent the allegations in Paragraph 317 relate to claims that
28  have been dismissed, they are surplusage and should be stricken.  To the extent

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

Paragraph 317 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 317.

318. To the extent the allegations in Paragraph 318 relate to claims that have been dismissed, they are surplusage and should be stricken. To the extent Paragraph 318 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 318.

319. To the extent the allegations in Paragraph 319 relate to claims that have been dismissed, they are surplusage and should be stricken. To the extent Paragraph 319 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 319.

320. To the extent the allegations in Paragraph 320 relate to claims that have been dismissed, they are surplusage and should be stricken. Paragraph 320 states legal conclusions to which no response is required. UnitedHealth denies the remaining allegations in Paragraph 320.

321. To the extent the allegations in Paragraph 321 relate to claims that have been dismissed, they are surplusage and should be stricken. To the extent Paragraph 321 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 321.

322. To the extent the allegations in Paragraph 322 relate to claims that have been dismissed, they are surplusage and should be stricken. To the extent Paragraph 322 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. To the extent Paragraph 322 states legal conclusions, no response is required. UnitedHealth denies the remaining allegations in Paragraph 322.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES' AMENDED COMPLAINT-IN-PARTIAL-INTERVENTION AND COUNTERCLAIM

323. To the extent the allegations in Paragraph 323 relate to claims that have been dismissed, they are surplusage and should be stricken. Paragraph 323 states legal conclusions to which no response is required. To the extent Paragraph 323 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 323.

324. To the extent the allegations in Paragraph 324 relate to claims that have been dismissed, they are surplusage and should be stricken. Paragraph 324 states legal conclusions to which no response is required. To the extent Paragraph 324 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 324.

325. To the extent the allegations in Paragraph 325 relate to claims that have been dismissed, they are surplusage and should be stricken. To the extent Paragraph 325 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. To the extent Paragraph 325 states legal conclusions, no response is required. UnitedHealth denies the remaining allegations in Paragraph 325.

326. To the extent the allegations in Paragraph 326 relate to claims that have been dismissed, they are surplusage and should be stricken. Paragraph 326 states legal conclusions to which no response is required. UnitedHealth denies the remaining allegations in Paragraph 326.

327. To the extent the allegations in Paragraph 327 relate to claims that have been dismissed, they are surplusage and should be stricken. To the extent Paragraph 327 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. To the extent Paragraph 327 states legal conclusions, no response is required. UnitedHealth denies the remaining allegations in Paragraph 327.

74

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

Case 2:16-cv-08697-MWF-SS Document 223 Filed 05/23/18 Page 75 of 143 Page #:3146

## V.   Diagnoses Solely Determine Risk Adjustment Payments Based On Health Status

328.   Paragraph 328 contains no allegations with respect to a particular Defendant or claim and, as such, no response is required.  To the extent Paragraph 328 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute and regulations speak for themselves, and to the extent that the allegations in Paragraph 328 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations.

329.   Paragraph 329 contains no allegations with respect to a particular Defendant or claim and, as such, no response is required.  To the extent Paragraph 329 states legal conclusions, no response is required.  To the extent Paragraph 329 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute and regulations speak for themselves, and to the extent that the allegations in Paragraph 329 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations.

330.   To the extent the allegations in Paragraph 330 relate to claims that have been dismissed, they are surplusage and should be stricken.  Paragraph 330 contains no allegations with respect to a particular Defendant or claim and, as such, no response is required.  To the extent Paragraph 330 states legal conclusions, no response is required.  To the extent Paragraph 330 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute and regulations speak for themselves, and to the extent that the allegations in Paragraph 330 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations.

331.   UnitedHealth admits that UnitedHealthcare Medicare & Retirement submitted delete transactions to RAPS as a result of its RACCR and CV Programs. To the extent Paragraph 331 purports to describe a document or documents, such

75

1  documents speak for themselves and, as such, no response is required.  To the

2  extent Paragraph 331 states legal conclusions, no response is required.

3  UnitedHealth denies the remaining allegations in Paragraph 331.

4      332.   To the extent Paragraph 332 purports to describe a document or

5  documents, such documents speak for themselves and, as such, no response is

6  required.  Paragraph 332 states legal conclusions to which no response is required.

7  UnitedHealth denies the remaining allegations in Paragraph 332.

8      333.   UnitedHealth is without knowledge or information sufficient to form a

9  belief as to the truth or falsity of the allegations in Paragraph 333; therefore, such

10  allegations are denied.  To the extent Paragraph 333 states legal conclusions, no

11  response is required.  UnitedHealth denies the remaining allegations in Paragraph

12  333.

13      334.   Paragraph 334 contains no allegations with respect to a particular

14  Defendant or claim and, as such, no response is required.  To the extent Paragraph

15  334 states legal conclusions, no response is required.  To the extent Paragraph 334

16  purports to summarize and/or describe the provisions of the Medicare program,

17  UnitedHealth states that the Medicare statute and regulations speak for themselves,

18  and to the extent that the allegations in Paragraph 334 vary therefrom or with other

19  applicable statutory or decisional law, UnitedHealth denies those allegations.

20      335.   To the extent the allegations in Paragraph 335 relate to claims that

21  have been dismissed, they are surplusage and should be stricken.  Paragraph 335

22  states legal conclusions to which no response is required.  To the extent Paragraph

23  335 purports to summarize and/or describe the provisions of the Medicare

24  program, UnitedHealth states that the Medicare statute and regulations speak for

25  themselves, and to the extent that the allegations in Paragraph 335 vary therefrom

26  or with other applicable statutory or decisional law, UnitedHealth denies those

27  allegations.  UnitedHealth denies the remaining allegations in Paragraph 335.

28

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

336.    To the extent the allegations in Paragraph 336 relate to claims that have been dismissed, they are surplusage and should be stricken.  Paragraph 336 states legal conclusions to which no response is required.  To the extent Paragraph 336 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute and regulations speak for themselves, and to the extent that the allegations in Paragraph 336 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations.  UnitedHealth denies the remaining allegations in Paragraph 336.

337.    To the extent the allegations in Paragraph 337 relate to claims that have been dismissed, they are surplusage and should be stricken.  To the extent Paragraph 337 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  To the extent Paragraph 337 purports to summarize and/or describe the provisions of the Medicare program, UnitedHealth states that the Medicare statute and regulations speak for themselves, and to the extent that the allegations in Paragraph 337 vary therefrom or with other applicable statutory or decisional law, UnitedHealth denies those allegations.

338.    To the extent the allegations in Paragraph 338 relate to claims that have been dismissed, they are surplusage and should be stricken.  To the extent Paragraph 338 states legal conclusions, no response is required.  To the extent Paragraph 338 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required.  UnitedHealth denies the remaining allegations in Paragraph 338.

339.    To the extent the allegations in Paragraph 339 relate to claims that have been dismissed, they are surplusage and should be stricken.  To the extent Paragraph 339 states legal conclusions, no response is required.  To the extent Paragraph 339 purports to describe a document or documents, such documents

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

speak for themselves and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 339.

340. To the extent the allegations in Paragraph 340 relate to claims that have been dismissed, they are surplusage and should be stricken. To the extent Paragraph 340 states legal conclusions, no response is required. To the extent Paragraph 340 purports to describe a document or documents, such documents speak for themselves and, as such, no response is required. UnitedHealth denies the remaining allegations in Paragraph 340.

<div align="center">

**<ins>FIRST CLAIM FOR RELIEF</ins>**

**False Claims Act: Reverse False Claims**

**31 U.S.C. § 3729(a)(1)(G) (formerly 31 U.S.C. § 3729(a)(7))**

</div>

341. UnitedHealth incorporates its responses to each and every allegation set forth above as if fully stated herein.

342. Paragraph 342 states legal conclusions to which no response is required. To the extent Paragraph 342 contains any factual allegations, such allegations are denied.

343. Paragraph 343 states legal conclusions to which no response is required. To the extent Paragraph 343 contains any factual allegations, such allegations are denied.

<div align="center">

**<ins>SECOND CLAIM FOR RELIEF</ins>**

**False Claims Act: Presentation of False or Fraudulent Claims**

**31 U.S.C. § 3729(a)(1)(A) (formerly 31 U.S.C. § 3729(a)(1))**

</div>

344. The Second Claim for Relief has been dismissed, and therefore no response is required.

345. The Second Claim for Relief has been dismissed, and therefore no response is required.

346. The Second Claim for Relief has been dismissed, and therefore no response is required.

<div align="center">78</div>

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

347.   The Second Claim for Relief has been dismissed, and therefore no response is required.

## THIRD CLAIM FOR RELIEF

### False Claims Act: Making or Using False Records or Statements

### 31 U.S.C. § 3729(a)(1)(B) (formerly 31 U.S.C. § 3729(a)(2))

348.   The Third Claim for Relief has been dismissed, and therefore no response is required.

349.   The Third Claim for Relief has been dismissed, and therefore no response is required.

350.   The Third Claim for Relief has been dismissed, and therefore no response is required.

351.   The Third Claim for Relief has been dismissed, and therefore no response is required.

## FOURTH CLAIM FOR RELIEF

### False Claims Act: Reverse False Claims

### 31 U.S.C. § 3729(a)(1)(G) (formerly 31 U.S.C. § 3729(a)(7))

352.   The Fourth Claim for Relief has been dismissed, and therefore no response is required.

353.   The Fourth Claim for Relief has been dismissed, and therefore no response is required.

354.   The Fourth Claim for Relief has been dismissed, and therefore no response is required.

355.   The Fourth Claim for Relief has been dismissed, and therefore no response is required.

## FIFTH CLAIM FOR RELIEF

### Unjust Enrichment

356.   UnitedHealth incorporates its responses to each and every allegation set forth above as if fully stated herein.

79

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

01136

357.   Paragraph 357 states legal conclusions to which no response is required.  To the extent Paragraph 357 contains any factual allegations, such allegations are denied.

358.   Paragraph 358 states legal conclusions to which no response is required.  To the extent Paragraph 358 contains any factual allegations, such allegations are denied.

## SIXTH CLAIM FOR RELIEF

### Payment by Mistake

359.   UnitedHealth incorporates its responses to each and every allegation set forth above as if fully stated herein.

360.   Paragraph 360 states legal conclusions to which no response is required.  To the extent Paragraph 360 contains any factual allegations, such allegations are denied.

361.   Paragraph 361 states legal conclusions to which no response is required.  To the extent Paragraph 361 contains any factual allegations, such allegations are denied.

## PRAYER

**WHEREFORE**, the United States requests that judgment be entered in its favor and against Defendants as follows:

362.   Paragraph 362 contains a prayer for relief to which no response is required.  To the extent a response is required, UnitedHealth denies any remaining allegations in the Amended Complaint and denies that the United States is entitled to any relief whatsoever against UnitedHealth.

363.   Paragraph 363 contains a prayer for relief to which no response is required.  To the extent a response is required, UnitedHealth denies any remaining allegations in the Amended Complaint and denies that the United States is entitled to any relief whatsoever against UnitedHealth.

80

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

364.   Paragraph 364 contains a prayer for relief to which no response is required.  To the extent a response is required, UnitedHealth denies any remaining allegations in the Amended Complaint and denies that the United States is entitled to any relief whatsoever against UnitedHealth.

## GENERAL DENIAL

UnitedHealth denies each and every allegation in the United States' Complaint-In-Partial-Intervention that has not been admitted or responded to specifically.  To the extent any allegations of fact remain unanswered, they are denied by UnitedHealth.  UnitedHealth further denies that the United States entitled to any of the relief sought in the Prayer for Relief, or any relief whatsoever.

## AFFIRMATIVE DEFENSES

UnitedHealth pleads the following affirmative defenses and reserves the right to assert additional affirmative defenses to the extent that such defenses become known as a result of discovery or otherwise:

1.   The United States' claims are barred, in whole or in part, by the statute of limitations.

2.   The United States' claims are barred, in whole or in part, by the doctrine of estoppel.

3.   The United States knew and approved of the particulars of UnitedHealth's claims for payment before such claims were presented but after UnitedHealth had alerted the United States to UnitedHealth's understanding of applicable Medicare Program requirements.

4.   The conduct of the United States negates the materiality of any alleged misrepresentations by Defendants and thus, the United States and Relators cannot recover under the Amended Complaint against Defendants.

5.   UnitedHealth is not vicariously liable for the acts alleged in the Complaint.

81

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

0138

6.     UnitedHealth is not liable to the extent that the United States failed to take adequate measures to mitigate damages.

7.     The United States ratified, or otherwise consented to, the transactions and occurrences that are the subject of this action.

8.     The United States' claims are barred, in whole or in part, by the doctrines of course of performance, course of dealing, and usage of trade. UnitedHealth's submissions to the United States during contract negotiations and modifications and its compliance efforts were consistent with its course of performance, its course of dealing, and usage of trade.

9.     The United States' claims are barred, in whole or in part, by the existence of an express contract.

10.     The United States' claims are barred, in whole or in part, because of its assumption of risk.

11.     The United States' claims are barred, in whole or in part, because any recovery would result in unjust enrichment.

12.     Every equitable claim is barred by the doctrine of unclean hands.

13.     The United States' claims are barred because UnitedHealth made no express or implied false certification.

14.     The United States at all times relevant to the Amended Complaint knew of the conduct allegedly engaged in by UnitedHealth and thus, the United States and Relators cannot recover under the Amended Complaint.

15.     The services and products reimbursed by the United States under Medicare were worth what the government paid.

16.     The United States' claims based on alleged conduct by UnitedHealth are barred, in whole or in part, by the fact that the United States has suffered no actual injury.  The United States' claims based on alleged conduct by UnitedHealth are barred, in whole or in part, because of the prior public disclosures of the core allegations upon which the Amended Complaint's "false claims" allegations

82

1  purport to be based and/or because Relators are not an "original source" of the

2  information, as defined in the statutes therein, such that they are not entitled to

3  pursue this action or be awarded any recovery, nor the does the Court have

4  jurisdiction.

5       17.    The United States' causes of action and allegations in the Complaint

6  are vague, ambiguous and uncertain.

7       18.    The United States' claims against one or more Defendants are

8  misjoined with the United States' claims against other Defendants and must be

9  severed.

10       19.    Damages and claims for which the United States seeks relief in the

11  Complaint, if any, were caused by the acts, errors or omissions or other fault of

12  third parties and/or contributed to and/or other fault of third parties, for whose

13  conduct UnitedHealth was not responsible.

14       20.    The United States' alleged damages are speculative, uncertain, or

15  contingent and are not recoverable.

16       21.    To the extent any damages are awarded against UnitedHealth, they

17  must be reduced pursuant to 31 U.S.C. § 3729(a)(2).

18       22.    UnitedHealth reserves the right to add additional defenses as

19  discovery progresses.

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

01140

# COUNTERCLAIM

Defendants AmeriChoice of New Jersey, Inc., AmeriChoice of New York, Inc., Arizona Physicians IPA, Inc., Care Improvement Plus of Maryland, Inc., Care Improvement Plus of Texas Insurance Company, Care Improvement Plus South Central Insurance Company, Care Improvement Plus Wisconsin Insurance Company, Optum Insurance Co., Citrus Health Care, Inc., Health Plan of Nevada, Inc., Medica HealthCare Plans, Inc., Oxford Health Plans (CT), Inc., Oxford Health Plans (NJ), Inc., Oxford Health Plans (NY), Inc., PacifiCare Life and Health Insurance Company, PacifiCare of Arizona, Inc., PacifiCare of Colorado, Inc., PacifiCare of Nevada, Inc., Physicians Health Choice of Texas, LLC, Preferred Care Partners, Inc., Rocky Mountain Health Maintenance Organization, Incorporated, Sierra Health and Life Insurance Company, Inc., Symphonix Health Insurance, Inc., United HealthCare of California, Inc., UHC of California (f.k.a. PacifiCare of California), United Health Care Ins. Co. and United New York, Unison Health Plan of Tennessee, Inc., UnitedHealthcare Benefits of Texas, Inc. (f.k.a. PacifiCare of Texas, Inc.), UnitedHealthcare Community Plan of Ohio, Inc. (f.k.a. Unison Health Plan of Ohio, Inc.), UnitedHealthcare Community Plan of Texas, L.L.C. (f.k.a. Evercare of Texas, L.L.C.), UnitedHealthcare Community Plan, Inc. (f.k.a. UnitedHealthcare of the Great Lakes Health Plan, Inc.), UnitedHealthcare Insurance Company, UnitedHealthcare Insurance Company of New York, UnitedHealthcare of Alabama, Inc., UnitedHealthcare of Arizona, Inc., UnitedHealthcare of Arkansas, Inc., UnitedHealthcare of Florida, Inc., UnitedHealthcare of Georgia, Inc., UnitedHealthcare of New England, Inc., UnitedHealthcare of New York, Inc., UnitedHealthcare of North Carolina, Inc., UnitedHealthcare of Ohio, Inc., UnitedHealthcare of Oklahoma, Inc. (f.k.a. PacifiCare of Oklahoma, Inc.), UnitedHealthcare of Oregon, Inc. (f.k.a. PacifiCare of Oregon, Inc.), UnitedHealthcare of Pennsylvania, Inc. (f.k.a. Unison Health Plan of Pennsylvania, Inc.), UnitedHealthcare of Tennessee, Inc., UnitedHealthcare of

84

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

the Midlands, Inc., UnitedHealthcare of the Midwest, Inc., UnitedHealthcare of Utah, Inc., UnitedHealthcare of Washington, Inc. (f.k.a. PacifiCare of Washington, Inc.), UnitedHealthcare of Wisconsin, Inc., and UnitedHealthcare Plan of the River Valley, Inc. (collectively, "UnitedHealth MA Plans")[2] state, allege, and request the following in the character of a counterclaim against Plaintiff the United States of America ("United States" or "Government"):

1.  The responses and affirmative defenses contained in the Answer to the United States' Amended Complaint-in-Partial-Intervention described above are incorporated by reference in this Counterclaim as if fully set forth herein.

## JURISDICTION AND VENUE

2.  This Court has subject matter jurisdiction over these Counterclaims pursuant to 28 U.S.C. §§ 1331 and 1367, as well as Federal Rule of Civil Procedure 13. To the extent jurisdiction and venue are proper under the Complaint, jurisdiction and venue are also proper under the Counterclaims, which arise out of the same transactions and occurrences alleged in the Complaint.

## PARTIES

3.  Plaintiff and Counter-Defendant United States of America has sued UnitedHealth on behalf of the United States Department of Health and Human Services ("HHS").

4.  The following Defendant and Counter-Plaintiff Medicare Advantage ("MA") Organizations entered into one or more agreements with the Government during the relevant time period to offer MA Plans and/or Medicare Part D Plans to Medicare beneficiaries under Parts C and D of the Medicare Program, presented claims to the Government for risk adjustment payments under Parts C and D of the Medicare Program, and received risk adjustment payments from the Government.

---

[2] Should the Government substitute additional MA Plans as parties in this action in the place of erroneously named entities in its Amended Complaint, such additional MA Plans would constitute Counter-Plaintiffs as well.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

a.      Defendant and Counter-Plaintiff AmeriChoice of New Jersey, Inc., a New Jersey corporation.

b.      Defendant and Counter-Plaintiff AmeriChoice of New York, Inc., a New York corporation.

c.      Defendant and Counter-Plaintiff Arizona Physicians IPA, Inc., an Arizona corporation.

d.      Defendant and Counter-Plaintiff Care Improvement Plus of Maryland, Inc., a Maryland corporation.

e.      Defendant and Counter-Plaintiff Care Improvement Plus of Texas Insurance Company, a Texas corporation insurance company.

f.      Defendant and Counter-Plaintiff Care Improvement Plus South Central Insurance Company, an Arkansas corporation insurance company.

g.      Defendant and Counter-Plaintiff Care Improvement Plus Wisconsin Insurance Company, a Wisconsin corporation insurance company.

h.      Defendant and Counter-Plaintiff Citrus Health Care, Inc., a Florida corporation.

i.      Defendant and Counter-Plaintiff Health Plan of Nevada, Inc., a Nevada corporation.

j.      Defendant and Counter-Plaintiff Medica HealthCare Plans, Inc., a Florida corporation.

k.      Defendant and Counter-Plaintiff Oxford Health Plans (CT), Inc., a Connecticut corporation.

l.      Defendant and Counter-Plaintiff Oxford Health Plans (NJ), Inc., a New Jersey corporation.

m.      Defendant and Counter-Plaintiff Oxford Health Plans (NY), Inc., a New York corporation.

n.      Defendant and Counter-Plaintiff PacifiCare Life and Health Insurance Company, an Indiana corporation insurance company.

86

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT IN PARTIAL-
INTERVENTION AND COUNTERCLAIM

US-0123

o. Defendant and Counter-Plaintiff PacifiCare of Arizona, Inc., an Arizona corporation.

p. Defendant and Counter-Plaintiff PacifiCare of Colorado, Inc., a Colorado corporation.

q. Defendant and Counter-Plaintiff PacifiCare of Nevada, Inc., a Nevada corporation.

r. Defendant and Counter-Plaintiff Physicians Health Choice of Texas, LLC, a Texas limited liability company.

s. Defendant and Counter-Plaintiff Preferred Care Partners, Inc., a Florida corporation.

t. Defendant and Counter-Plaintiff Sierra Health and Life Insurance Company, Inc., a Nevada corporation.

u. Defendant and Counter-Plaintiff Symphonix Health Insurance, Inc., an Illinois corporation insurance company.

v. Defendant and Counter-Plaintiff United HealthCare of California, Inc., a California corporation.

w. Defendant and Counter-Plaintiff UHC of California, a California corporation.

x. Defendant and Counter-Plaintiff Unison Health Plan of Tennessee, Inc., a Tennessee corporation.

y. Defendant and Counter-Plaintiff UnitedHealthcare Benefits of Texas, Inc., a Texas corporation.

z. Defendant and Counter-Plaintiff UnitedHealthcare Community Plan of Ohio, Inc., an Ohio corporation.

aa. Defendant and Counter-Plaintiff UnitedHealthcare Community Plan of Texas, L.L.C., a Texas limited liability company.

bb. Defendant and Counter-Plaintiff UnitedHealthcare Community Plan, Inc., a Michigan corporation.

87

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

0144

cc.     Defendant and Counter-Plaintiff UnitedHealthcare Insurance Company, a Connecticut corporation insurance company.

dd.     Defendant and Counter-Plaintiff UnitedHealthcare Insurance Company of New York, a New York corporation insurance company.

ee.     Defendant and Counter-Plaintiff UnitedHealthcare of Alabama, Inc., an Alabama corporation.

ff.     Defendant and Counter-Plaintiff UnitedHealthcare of Arizona, Inc., an Arizona corporation.

gg.     Defendant and Counter-Plaintiff UnitedHealthcare of Arkansas, Inc., an Arkansas corporation.

hh.     Defendant and Counter-Plaintiff UnitedHealthcare of Florida, Inc., a Florida corporation.

ii.     Defendant and Counter-Plaintiff UnitedHealthcare of Georgia, Inc., a Georgia corporation.

jj.     Defendant and Counter-Plaintiff UnitedHealthcare of New England, Inc., a Rhode Island corporation.

kk.     Defendant and Counter-Plaintiff UnitedHealthcare of New York, Inc., a New York corporation.

ll.     Defendant and Counter-Plaintiff UnitedHealthcare of North Carolina, Inc., a North Carolina corporation.

mm.   Defendant and Counter-Plaintiff UnitedHealthcare of Ohio, Inc., an Ohio corporation.

nn.     Defendant and Counter-Plaintiff UnitedHealthcare of Oklahoma, Inc., an Oklahoma corporation.

oo.     Defendant and Counter-Plaintiff UnitedHealthcare of Oregon, Inc., an Oregon corporation.

pp.     Defendant and Counter-Plaintiff UnitedHealthcare of Pennsylvania, Inc., a Pennsylvania corporation.

qq.     Defendant and Counter-Plaintiff UnitedHealthcare of Tennessee, Inc., a Tennessee corporation.

rr.     Defendant and Counter-Plaintiff UnitedHealthcare of the Midlands, Inc., a Nebraska corporation.

ss.     Defendant and Counter-Plaintiff UnitedHealthcare of the Midwest, Inc., a Missouri corporation.

tt.     Defendant and Counter-Plaintiff UnitedHealthcare of Utah, Inc., a Utah corporation.

uu.     Defendant and Counter-Plaintiff UnitedHealthcare of Washington, Inc., a Washington corporation.

vv.     Defendant and Counter-Plaintiff UnitedHealthcare of Wisconsin, Inc., a Wisconsin corporation.

ww.   Defendant and Counter-Plaintiff UnitedHealthcare Plan of the River Valley, Inc., an Illinois corporation.

## FACTUAL ALLEGATIONS

**I.     Medicare Advantage Contracts**

   **A.     Medicare Advantage and CMS's "Risk Adjustment" Model**

5.     The Medicare Act establishes a federal health insurance program for disabled and elderly individuals.  Traditional Medicare beneficiaries are often referred to as fee-for-service ("FFS") beneficiaries because they receive healthcare from a network of healthcare providers, including doctors and hospitals, whom the federal government—through the Centers for Medicare and Medicaid Services ("CMS")—reimburses based on the claims those providers submit for the services they provide.

6.     Congress created the Medicare Advantage program to allow individuals eligible for traditional Medicare instead to receive healthcare benefits through private insurance plans like the UnitedHealth MA Plans.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

7.      As with other types of health insurance, it costs more on average to insure individuals who are projected to be sicker during the coverage period than it does to insure individuals who are projected to be healthier during that same period.  Therefore, CMS adjusts the amount it pays to Medicare Advantage organizations to reflect the projected health status of the MA plan's enrollees.

8.      CMS designed and implemented a "risk adjustment" model to determine how much to pay an MA plan in a given year.  The model is designed to predict how much it will cost an MA plan to care for the group of senior citizens who are enrolled in that MA plan, based on an analysis of CMS's costs to care for people with the same health conditions in traditional Medicare.  The model relies on medical diagnosis codes, which are numerical codes that correspond to illnesses or medical conditions diagnosed by medical professionals.  CMS uses the diagnosis codes it receives from the physicians and other medical professionals who treat traditional Medicare beneficiaries on a FFS basis to determine how much it costs CMS to provide care for beneficiaries with a particular medical condition.  CMS then uses that data to predict how much it will cost an MA plan to insure an individual with the same diagnosis code.  CMS assumes that MA plans will see a similar relationship between diagnosis codes and medical costs for the patients enrolled in MA plans, and so it uses the analysis of its own FFS program codes and costs to adjust MA plans' payment amounts as well.

9.      CMS has long known that a substantial number of the diagnosis codes in its own FFS claims data reflect conditions that are not sufficiently documented in patients' corresponding medical charts.  CMS thus has known that if it tried to verify each reported diagnosis code by looking at the underlying medical records, it would not always find specific entries in the medical charts that reflect the specific diagnosis reported to CMS.  It has recognized, however, that attempting to verify all the diagnosis codes would be operationally difficult and, indeed, so

90

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT IN PARTIAL-
INTERVENTION AND COUNTERCLAIM

1   expensive as to be cost prohibitive.  Instead, CMS includes supported and

2   unsupported diagnosis codes alike in its calculations.

3        10.    Using both supported and unsupported diagnosis codes to determine

4   the average costs associated with medical conditions, rather than using just

5   supported diagnosis codes, has the effect of lowering the average costs associated

6   with the conditions.  That reflects, among other things, the fact that patients who

7   do not have a given condition (and whose diagnosis codes for that condition would

8   therefore be unsupported) generally do not require the same level of healthcare

9   services as patients who actually suffer from it.  And because CMS does not

10  distinguish between its supported and unsupported codes, the lower costs that CMS

11  incurs for a FFS patient *without* a given condition (and whose diagnosis code for

12  that condition is therefore unsupported) results on average in a lower payment to

13  an MA plan for a patient who *does* have that condition (and a supported diagnosis

14  code to go with it).  This means that the payments CMS makes to MA plans are

15  lower than they would be if CMS used only supported diagnosis codes in

16  calculating its own average costs for a given condition.

17       11.    Accordingly, by using unverified FFS codes to determine payment

18  amounts, CMS already has reduced its per-code payment *in a way that accounts*

19  *for the presence of unsupported diagnosis codes in claims data*.  If CMS also

20  required MA plans to delete all codes that are not supported in provider-submitted

21  codes, such that they received payments only for supported codes even as CMS

22  continued calculating payment amounts using both its supported and unsupported

23  FFS codes, CMS would receive a windfall and the MA plans would be improperly

24  underpaid.

25  **B.**    **Medical Chart Reviews**

26       12.    In the MA program, physicians and other healthcare providers submit

27  diagnosis codes to the MA organizations, who in turn submit them to CMS.

28

91

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

US 128

13.     MA organizations are not required or expected to double-check all diagnosis codes they receive from providers in claims submissions.  Doing so would be logistically difficult, if not impossible, for the same reasons CMS chose not to double-check its FFS codes when determining how much to adjust its payments for specific diagnosis codes.  CMS both expects and accepts that some portion of data submitted by MA organizations—like CMS's own FFS data— would not be supported in the medical chart if one were to compare codes submitted in claims to underlying medical records.

14.     MA organizations are permitted to perform their own reviews of certain medical charts if they choose to do so—and often do.  Specialists in coding diagnoses (known as "coders") review the medical charts and determine what codes are supported by the charts.  MA organizations then submit those additional diagnosis codes to CMS to demonstrate that the particular patients may require more care in the successive period.

15.     CMS never has issued any rules or regulations addressing the scope of MA organizations' reviews of medical charts.  For example, there is no rule or regulation requiring that MA plans perform a so-called "two-way look," in which their coders would not only affirmatively identify codes that should be submitted but also validate the diagnosis codes *already* submitted by physicians and other medical professionals.

16.     Instead, CMS fully expects that MA organizations' chart reviews will result in a net increase in the number of diagnosis codes that MA plans submit for risk adjustment purposes.  In fact, *because* CMS anticipates that MA organizations' chart reviews will lead MA plans to identify more codes than they would if they relied just on submissions by doctors and other health professionals (as CMS does in the traditional Medicare program), CMS makes an across-the-board reduction in its payments to MA plans.  In 2018, for example, this reduction—known as the "Coding Intensity Adjustment" because it adjusts for MA

92

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

01126

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT IN PARTIAL-
INTERVENTION AND COUNTERCLAIM

1    plans' tendency to record diagnosis codes with more "intensity" than FFS

2    providers—will reduce MA plans' payments by 5.91 percent.  CMS has studied the

3    issue and expressly found that the Coding Intensity Adjustment fully accounts for

4    the difference in coding practices between the MA and traditional Medicare

5    programs.

6            **C.     Contract and Bid Process**

7            17.    MA plans enter into annual contracts with CMS in which they agree

8    to provide insurance benefits to patients for the coming year in exchange for

9    payment from CMS.

10           18.    The payment provision of these contracts provides that the MA plans

11   will develop an annual benefit and price bid proposal and submit that information

12   to CMS.

13           19.    An MA plan's bid must reflect the MA organization's estimate of the

14   payment it will require to provide the benefits covered by Medicare Parts A and B

15   to a Medicare enrollee "with a national average risk profile."  This payment

16   estimate must include "all estimated revenue required by the plan, including

17   administrative costs and return on investment."

18           20.    To make these estimates, an MA plan must be able to calculate

19   anticipated revenues and expenses, including the cost of providing care to the

20   beneficiaries enrolled in the MA plan.  In doing so, MA plans take into account

21   CMS's calculations about the relative amount it will cost to care for patients with

22   individual conditions, as well as "actuarial" assumptions, which are projections

23   about the number of beneficiaries with particular conditions that will enroll in the

24   plan during the year.

25           21.    In deciding whether to accept an MA plan's bid, CMS is required by

26   law to determine whether the bid "reasonably and equitably reflects the plan's

27   estimated revenue requirements for providing the benefits under the plan."  If the

28   bid does *not*, CMS cannot accept it.

<div align="center">93</div>

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

22.     If CMS accepts the bid (after determining that it is reasonable and equitable), CMS then agrees to pay the MA organization under the contract in accordance with the MA organization's bid and based on the submitted risk adjustment data and other amounts published by CMS.

**D.     CMS Told United and the Industry that MA Plans Are Not Required to Perform Chart Reviews that Include Efforts to Validate Previously Submitted Diagnosis Codes (Two-Way Looks)**

23.     As noted above, none of the thousands of rules and regulations issued by CMS requires MA plans to conduct chart reviews that "look both ways" or otherwise make their diagnosis data conform to a higher standard of accuracy than CMS itself utilizes with respect to its FFS data.

24.     In fact, CMS told UnitedHealth that just the opposite is true.

25.     For example, in 2014 CMS considered and then affirmatively decided *not* to finalize a proposed rule that would have prohibited MA organizations from performing reviews that only looked for additional diagnosis codes (known as "one-way" reviews).

26.     In addition, UnitedHealth repeatedly made clear that it was not performing two-way reviews and sought specific guidance on the issue from CMS. CMS consistently confirmed that two-way reviews were not, and are not, required.

27.     For example, in 2009, UnitedHealth explained to government auditors that its chart review program did not seek to verify diagnosis codes received from medical providers through the review of medical records.  The government auditors never stated or even suggested that UnitedHealth was violating any rule or CMS contract by failing to verify the diagnosis codes UnitedHealth had received from providers, and the resulting audit did not find that UnitedHealth was out of compliance with any rule, regulation or contractual requirement.

28.     Moreover, starting in 2011, the UnitedHealth MA Plans informed CMS each year in their bids that they made no effort to validate the diagnosis

94

codes they used in the bids by reviewing medical records: "As part of the preparation of the bids, we did not attempt to validate any actual or projected risk scores through a review of applicable medical records. . . ."

29.     CMS did not advise a single UnitedHealth MA Plan that its failure to validate provider-submitted codes was inappropriate or that validation of risk scores based on a review of the medical records was required; rather, CMS accepted these bids and paid the UnitedHealth MA Plans for the services provided.

30.     In fact, during conversations between UnitedHealth and CMS over the course of the spring and early summer of 2014, CMS confirmed multiple times that "two-way" looks were not required.

31.     Specifically, CMS told UnitedHealth that unless and until a proposed rule governing the review of medical records became final, MA plans did not, and do not, have an affirmative obligation to confirm whether diagnosis codes submitted by physicians are supported in the medical records.

32.     The UnitedHealth MA Plans memorialized this understanding, including in subsequent bids and risk adjustment data attestations they provided to CMS under the contracts.

## II.     The UnitedHealth MA Plans Submitted Bids and Performed Contracts In Reliance on the Government's Representations and Conduct

33.     During the relevant period, the UnitedHealth MA Plans based their bids on the understanding that they did not need to perform chart reviews to identify unsupported codes from physicians, just as CMS does not look for unsupported codes when calculating its average costs in the FFS program.

34.     The lack of an obligation to perform chart reviews to identify unsupported codes was an assumption underlying the UnitedHealth MA Plans' bids.  The UnitedHealth MA Plans took this lack of an obligation into account in estimating the amounts they would need to bid in order to meet their revenue requirements.  CMS accepted these bids knowing that it had not imposed an

95

UNITEDHEALTH'S ANSWER TO UNITED STATES' AMENDED COMPLAINT-IN-PARTIAL-INTERVENTION AND COUNTERCLAIM

1  obligation to perform such reviews and that the assumptions on which the

2  UnitedHealth MA Plans' bids rested—which CMS was required by law to review

3  and, if appropriate, approve—did not include the performance of such two-way

4  looks.

5  **III.    The Department of Justice Files Suit Against UnitedHealth**

6  35.    *Qui tam* relator Benjamin Poehling filed this False Claims Act

7  ("FCA") case in 2011.  The Department of Justice ("DOJ") investigated Poehling's

8  allegations for more than 6 years, during which time the case remained under seal.

9  36.    DOJ formally intervened in the case and filed a Complaint-In-Partial-

10 Intervention on May 16, 2017.  DOJ filed an Amended Complaint on November

11 17, 2017.

12 37.    In its Amended Complaint, DOJ makes assertions directly contrary to

13 the guidance and instructions from CMS regarding the UnitedHealth MA Plans'

14 obligations to review medical records.

15 38.    Despite knowing that CMS considered, and then rejected, a rule that

16 would have required MA plans conducting any review of medical records to

17 validate diagnosis codes previously submitted by providers, DOJ now claims that

18 the UnitedHealth MA Plans "were obligated to 'look both ways' at the results of

19 their chart reviews and delete unsupported provider-diagnoses."  Moreover, despite

20 knowing that CMS told the UnitedHealth MA Plans that they had no obligation to

21 look for unsupported diagnosis codes during the course of any chart review, DOJ

22 now claims that the UnitedHealth MA Plans had a legal obligation to do so.

23 <div align="center">**CAUSES OF ACTION**</div>

24 <div align="center">**Count 1: Breach of Contract**</div>

25 39.    The UnitedHealth MA Plans repeat and re-allege the allegations

26 contained in Paragraphs 1 to 38 above as though they are fully set forth herein.

27

28

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

40.     During all time periods relevant for the Government's Amended Complaint, CMS and certain UnitedHealth MA Plans had in place contracts relating to the UnitedHealth MA Plans' participation in Medicare Part C.

41.     The UnitedHealth MA Plans performed their obligations under their contracts.

42.     As part of the contract formation process, the UnitedHealth MA Plans were required to submit bid proposals.  CMS approved and accepted those bid proposals, and agreed to pay the UnitedHealth MA plans based on their approved bids.

43.     The bids CMS approved and accepted were premised on the understanding, and in some instances specified, that the UnitedHealth MA Plans were not performing medical chart reviews to identify unsupported codes (i.e. "two-way looks").

44.     DOJ's Amended Complaint claims that the UnitedHealth MA Plans were required to perform two-way looks, despite the fact that CMS previously advised the UnitedHealth MA Plans that two-way looks were unnecessary and not required.  DOJ now seeks, after the fact, to alter fundamental assumptions built into the UnitedHealth MA Plans' bids and, thus, their contracts with CMS.

45.     The instant lawsuit improperly seeks to deprive the UnitedHealth MA Plans of compensation they earned in exchange for providing insurance coverage to millions of MA plan beneficiaries, on the ground that the UnitedHealth MA Plans did not perform two-way looks or otherwise validate provider-submitted codes.   Depriving the UnitedHealth MA Plans of compensation on that ground constitutes a breach of the terms of the contracts between the UnitedHealth MA Plans and CMS.  In addition, DOJ effectively seeks to withhold payment for services already provided by the UnitedHealth MA Plans.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

46.     As a result of such breach, the UnitedHealth MA Plans have suffered damages and are entitled to recover for these damages in an amount to be determined at trial.

### Count 2: Breach of Covenant of Good Faith and Fair Dealing

47.     The UnitedHealth MA Plans repeat and re-allege the allegations contained in Paragraphs 1 to 46 above as though they are fully set forth herein.

48.     During all time periods relevant for the Government's Amended Complaint, CMS and certain of the UnitedHealth MA Plans had in place legally enforceable contracts relating to the UnitedHealth MA Plans' participation in Medicare Part C.  Every contract imposes a duty of good faith and fair dealing upon the parties in performance and enforcement of the contract.

49.     The UnitedHealth MA Plans performed their obligations under their contracts.

50.     In suing the UnitedHealth MA Plans for not performing two-way looks and other measures to review and delete codes, the Government breached the duty of good faith and fair dealing by demanding that the UnitedHealth MA Plans perform functions not required by the contracts or else face significant liability.

51.     The Government further breached the covenant of good faith and fair dealing by continuing to accept benefits from the UnitedHealth MA Plans based on the parties' contracts, while simultaneously pursuing treble-damages recovery for payments it made pursuant to those contracts, in a manner designed to secure the benefits of its contracts with the UnitedHealth MA Plans without paying for those benefits.

52.     As a result of any such breach of the covenant of good faith and fair dealing, the UnitedHealth MA Plans have suffered damages and are entitled to recover for these damages in an amount to be determined at trial.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

## Count 3: Fraudulent Inducement

1    53.    The UnitedHealth MA Plans repeat and re-allege the allegations

contained in Paragraphs 1 to 52 above as though they are fully set forth herein.

54.    CMS made representations to the UnitedHealth MA Plans regarding

the terms of the UnitedHealth MA Plans' contracts, both in the context of express

contract negotiations and otherwise.

55.    CMS expressly represented that the UnitedHealth MA Plans were not

required to conduct two-way looks to verify and delete diagnosis codes.

56.    CMS's past assertions on that point were legally correct.

Nevertheless, DOJ now asserts that two-way looks *were* required.  If DOJ's

assertion is accurate—and the UnitedHealth MA Plans were required to conduct

two-way looks when conducting chart reviews—then CMS's prior representations

to the UnitedHealth MA Plans were false and lulled the UnitedHealth MA Plans

into continuing to enter into contracts with CMS under false pretenses.  Indeed,

while the UnitedHealth MA Plans continue to believe that two-way looks were not,

and are not, required during the course of chart reviews, if CMS knew, or was

reckless in not knowing, that the UnitedHealth MA Plans were required to conduct

two-way looks, then it deliberately deceived the UnitedHealth MA Plans.

57.    CMS knew, and intended, that the UnitedHealth MA Plans would rely

on CMS's representations and omissions regarding two-way looks.

58.    The UnitedHealth MA Plans justifiably relied on CMS's

representations and omissions in preparing their bids and entering into their

contracts.

59.    If the Government's current assertions are correct, and the

UnitedHealth MA Plans were required to perform two-way looks, then CMS's

prior representations and omissions fraudulently induced the UnitedHealth MA

Plans to enter into their contracts with CMS.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

60.     As a result of CMS's fraudulent statements and omissions, the UnitedHealth MA Plans have suffered damages and are entitled to recover for these damages in an amount to be determined at trial.

**Count 4: Negligent Misrepresentation**

61.     The UnitedHealth MA Plans repeat and re-allege the allegations contained in Paragraphs 1 to 60 above as though they are fully set forth herein.

62.     CMS expressly represented to the UnitedHealth MA Plans on certain occasions that the UnitedHealth MA Plans would not be required under the contracts to conduct two-way looks or take other steps to verify and delete codes that CMS itself does not take.

63.     CMS's past assertions on that point were legally correct. Nevertheless, DOJ now asserts that two-way looks *were* required. The UnitedHealth MA Plans therefore assert, in the alternative, that if two-way looks were required, then CMS's prior representations were false and negligent, and the UnitedHealth MA Plans were ignorant of the two-way look requirement.

64.     CMS intended that the UnitedHealth MA Plans would rely on CMS's representations that the UnitedHealth MA Plans would not be required under the contracts to conduct two-way looks.

65.     The UnitedHealth MA Plans justifiably relied on CMS's representations in preparing their bids and entering into their contracts.

66.     If the Government's current assertions are correct, and the UnitedHealth MA Plans were required to perform two-way looks, then CMS negligently misrepresented the UnitedHealth MA Plans' medical record review obligations.

67.     As a result of CMS's negligent misrepresentations, the UnitedHealth MA Plans have suffered damages and are entitled to recover for these damages in an amount to be determined at trial.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

## Count 5: Promissory Estoppel

68.     The UnitedHealth MA Plans repeat and re-allege the allegations contained in Paragraphs 1 to 67 above as though they are fully set forth herein.

69.     CMS clearly and unambiguously promised the UnitedHealth MA Plans that the UnitedHealth MA Plans would not be required to conduct two-way looks in their chart reviews.

70.     The UnitedHealth MA Plans foreseeably and reasonably relied on CMS's representations in preparing their bids, which would have been higher if CMS had not promised that two-way looks would not be required.

71.     As a result of CMS's promises, the UnitedHealth MA Plans have suffered damages and are entitled to recover for these damages in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the UnitedHealth MA Plans request that the Amended Complaint be dismissed with prejudice and that the relief sought in same be denied.  The UnitedHealth MA Plans further request that the counterclaims be granted and that the Court grant the relief sought in each of the counterclaims, costs, and disbursements of this litigation including attorney's fees, and such other and further relief in favor of the UnitedHealth MA Plans as this Court deems just and proper.

Dated: March 23, 2018                    Respectfully submitted,

                                         LATHAM & WATKINS LLP
                                         DAVID J. SCHINDLER
                                         DANIEL MERON
                                         KATHRYN H. RUEMMLER
                                         ABID R. QURESHI

                                         By /s/ David J. Schindler
                                            David J. Schindler
                                            Attorneys for UnitedHealth Defendants

101

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

UNITEDHEALTH'S ANSWER TO UNITED STATES'
AMENDED COMPLAINT-IN-PARTIAL-
INTERVENTION AND COUNTERCLAIM

**EXHIBIT D-3**

1  LATHAM & WATKINS LLP
      David J. Schindler (Bar No. 130490)
2       *david.schindler@lw.com*
   355 South Grand Avenue, Suite 100
3  Los Angeles, California 90071-1560
   Telephone: +1.213.485.1234
4  Facsimile: +1.213.891.8763

5  LATHAM & WATKINS LLP
      Daniel Meron (appearing *pro hac vice*)
6       *daniel.meron@lw.com*
      Kathryn H. Ruemmler (appearing *pro hac vice*)
7       *kathryn.ruemmler@lw.com*
      Abid R. Qureshi (appearing *pro hac vice*)
8       abid.qureshi@lw.com
   555 Eleventh Street, NW, Suite 1000
9  Washington, DC 20004-1304
   Telephone: +1.202.637.2200
10 Facsimile: +1.202.637.2201

11 Attorneys for United Defendants

12                    **UNITED STATES DISTRICT COURT**

13             **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

14

15

16 UNITED STATES OF AMERICA *ex*          CASE NO. 2:16-cv-08697-MWF (SSx)
   *rel.* BENJAMIN POEHLING

17            Plaintiffs,                  **STATEMENT OF GENUINE
                                           DISPUTES OF MATERIAL FACT
18        v.                               IN OPPOSITION TO PLAINTIFFS'
                                           MOTION FOR PARTIAL
19 UNITEDHEALTH GROUP, INC., *et*          SUMMARY JUDGMENT**
   *al.*,
20            Defendants.                  Date: September 17, 2018
                                           Time: 10:00 a.m.
21                                         Courtroom: 5A
                                           Judge: Hon. Michael W. Fitzgerald
22

23

24

25

26

27

28

LATHAM&WATKINS
ATTORNEYS AT LAW
LOS ANGELES

STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
2:16-cv-08697-MWF (SSx)

0160

UnitedHealth Group, Inc. ("United" or "UnitedHealth") submits this

Statement of Genuine Disputes and Additional Uncontroverted Facts under Local

Rule 56-2 in response to the United States' and relator Benjamin Poehling's

[Proposed] Statement of Uncontroverted Facts and Conclusions of Law.

| PLAINTIFFS' UNCONTROVERTED FACTS | UNITED'S RESPONSE |
|---|---|
| **A.    Medicare Parts A, B, and C** | |
| 1.    Medicare is a federal health insurance program for the elderly and disabled, *see* 42 U.S.C. § 1395 *et seq.*, administered by the Centers for Medicare and Medicaid Services ("CMS"), an agency of the United States Department of Health and Human Services ("HHS"). | **Undisputed.** |
| 2.    Medicare Part A "covers medical services furnished by hospitals and other institutional care providers." *Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 2 (D.C. Cir. 2011) (citing 42 U.S.C. §§ 1395c to 1395i-5). | **Undisputed.** |
| 3.    Medicare Part B "is an optional supplemental insurance program that pays for items and services not covered by Part A, including outpatient physician services," as well as "clinical laboratory tests, and durable medical equipment," among other things. *Id.* at 2 (citing 42 U.S.C. §§ 1395j to 1395w-4). | **Undisputed.** |
| 4.    Medicare Part C, now known as Medicare Advantage, allows people to opt out of Parts A and B and instead enroll in health insurance plans offered by private insurers, the Medicare | **Undisputed.** |

| PLAINTIFFS' UNCONTROVERTED FACTS | UNITED'S RESPONSE |
|---|---|
| Advantage Organizations ("MAOs"). *See* 42 U.S.C. §§ 1395w-21 to 1395w-29. | |
| 5.     MAOs "must provide enrollees the benefits and services (other than hospice care) that are available to people . . . under Medicare Parts A and B, *see* 42 U.S.C. § 1395w-22(a)(1), and may also offer supplemental benefits approved by the Secretary of [HHS], *see* 42 U.S.C. § 1395w-22(a)(3)." *Matthews v. Leavitt*, 452 F.3d 145, 146 n.1 (2d Cir. 2006). | **Undisputed.** |
| 6.     Pursuant to contracts with CMS, MAOs receive monthly payments from Medicare for each beneficiary enrolled in their Medicare Advantage (MA or Part C) plans and Prescription Drugs (PD or Part D) plans. *See, e.g.* Medicare Advantage Contract Between United Healthcare of California and CMS ("MA Contract"), 2011, Article IV, CMS Payment to MA Organization (Exhibit 1).[1] | **Undisputed.** |
| 7.     Under Parts A and B, CMS pays providers directly for medical services rendered to beneficiaries under a "fee-for-service" regime. *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1227 (D.C. Cir. 1994). | **Undisputed.** |

---

[1] "United" is used herein to refer to all of the United Defendants in this action.  Exhibits 1-8 are attached to the Declaration of Cheri Rice.  Exhibits 9-15 are attached to the United States' and Relator Poehling's Request for Judicial Notice.

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
LOS ANGELES

3

STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
2:16-cv-08697-MWF (SSx)

0162

| PLAINTIFFS' UNCONTROVERTED FACTS | UNITED'S RESPONSE |
|---|---|
| 8. In contrast, under Part C, MAOs contract with providers to render services to the beneficiaries enrolled in their plans and pay those providers. For each beneficiary in a MA plan, CMS pays the MAO a monthly base amount (which CMS and the MAO agree to before the start of the payment year) which is adjusted for each beneficiary based on that beneficiary's risk score. 42 U.S.C. § 1395w-23(a)(1)(A). | **Undisputed.** |
| 9. The adjusted amount is based on the characteristics of each beneficiary, including "such risk factors as age, … gender, … and such other factors as the Secretary determines to be appropriate, including adjustment for health status." *Id.* § 1395w-23(a)(1)(C)(i). | **Undisputed.** |
| 10. Under this "risk adjustment" system, MAOs are paid the predicted cost of providing benefits to a given beneficiary (regardless of the services, if any, actually provided to the beneficiary). | **Disputed.** Plaintiffs have failed to provide any support for this purported uncontroverted fact as required by Local Rule 56-3. Although it is undisputed that "risk adjustment" payments are not made to cover services already provided to the beneficiary, United disputes the remainder of the statement as incomplete. In determining the "predicted cost of providing benefits to a given beneficiary," CMS' objective is to obtain "[r]isk scores [that] are consistent across both fee-for-service and Medicare Advantage settings," Declaration of David J. Schindler, July 23, 2018 ("Schindler Decl.") Ex. 1, |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

4

STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
2:16-cv-08697-MWF (SSx)

0163

| PLAINTIFFS' UNCONTROVERTED FACTS | UNITED'S RESPONSE |
|---|---|
| | 2010 Rate Announcement, at AR4336, such that "[r]isk scores for beneficiaries with the same diagnoses and characteristics should be identical" in the MA and traditional Medicare programs, Schindler Decl. Ex. 2, GAO, *Medicare Advantage: Substantial Excess Payments Underscore Need for CMS to Improve Accuracy of Risk Score Adjustments*, at AR12043 (January 2013); *see also* Schindler Decl. Ex. 3, Gregory C. Pope et al., *Evaluation of the CMS-HCC Risk Adjustment Model: Final Report*, at AR011889, AR011892 (March 2011) (explaining that the CMS-HCC model is intended to "pay plans appropriately for their expected *relative* costs" and that "[t]he predicted costs from the risk adjustment models are . . . converted to relative risk factors so that payment adjustments can be made *relative* to the average Medicare beneficiary") (emphasis added); *see also id.* at AR011892 (explaining that the cost predictions are designed to be accurate at the group level rather than for an individual beneficiary). |
| 11. MAOs thus receive more for providing benefits to older and sicker people, and less for younger and healthier ones. | **Disputed.** Plaintiffs have failed to provide any support for this purported uncontroverted fact as required by Local Rule 56-3. United does not dispute that the risk adjustment system was designed to pay MAOs more for caring for older and sicker people and less for younger and healthier people, as compared to the average FFS beneficiary in the same area. However, |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

5

STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
2:16-cv-08697-MWF (SSx)

0164

| PLAINTIFFS' UNCONTROVERTED FACTS | UNITED'S RESPONSE |
|---|---|
| | MAOs do not always receive more money for providing benefits to sicker people in practice because patients' diagnoses are not always fully captured in the data reported to CMS. *See, e.g.*, Schindler Decl. Ex. 4, Medicare Payment Advisory Commission, Issues for Risk Adjustment in Medicare Advantage at 103-04, in *Report to Congress: Medicare and Health Care Delivery System* (Chapter 4), Washington, DC (June 2012) (finding inconstant coding of chronic conditions from year to year in both FFS and MA data); Schindler Decl. Ex. 5, Richard Kronick & W. Pete Welch, Measuring Coding Intensity in the Medicare Advantage Program, *Medicare & Medicaid Research Review*, 4(2), at E5 (2014) ("FFS coding is known to be both incomplete and variable. . . . [as] evidenced by lack of persistence in coding of chronic conditions"); Schindler Decl. Ex. 6, Deposition of Jeffrey Grant at 88:11–24 (March 20, 2018) ("March Grant Dep.")) (**Q:** "Okay, and have you formed your own opinion?" **A:** "I have." **Q:** "And what is that opinion? . . ." THE WITNESS **[A]**: "That there is a degree of error in doctors' coding, that the codes on claims are not perfect." **Q:** "In the sense that the codes on claims do not capture everything in the medical chart? . . ." THE WITNESS **[A]**: "That is one potential problem"). To the extent this statement suggests otherwise, it is disputed. |

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

6

STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
2:16-cv-08697-MWF (SSx)

0165

Case 2:16-cv-08697-MWF-SS Document 616-3 Filed 08/06/24 Page 169 of 637
Page ID #:17906
Case 2:16-cv-08697-FMO-PVC Document 2016-3 Filed 07/29/18 Page 7 of 62 Page ID
Page #:79063

| PLAINTIFFS' UNCONTROVERTED FACTS | UNITED'S RESPONSE |
|---|---|
| 12. Adjusting the monthly payments based on risk factors is the Secretary's method of ensuring "actuarial equivalence" between the average payments that CMS would expect to make under fee-for-service Medicare, and the payments that CMS makes to MAOs for covering an individual with the same characteristics. *Id.* | **Disputed.** This statement is argumentative and a legal conclusion that requires no response. To the extent a response is required, however, United disputes as incomplete Plaintiffs' characterization of the risk factor-based payment adjustments as the Secretary's method of ensuring "actuarial equivalence." Although 42 U.S.C. § 1395w-23(a)(1)(C)(i) imposes a requirement that the Secretary adjust the risk factor-based payments "so as to ensure actuarial equivalence," United disputes that the risk adjustment factors (coefficients) calculated by the Secretary comply with the statutory mandate, or that the Secretary's calculated risk adjustment factors would be legally compliant if plans had to delete unsupported codes when CMS does not audit its own data and has not implemented a mechanism to account for its own errors. *See* Opp. to Mot. for Part. Sum. J. at 3-4, 14, 21-26. |
| **B. The Risk Adjustment Payment System** | |
| 13. When Congress established Part C, it directed the Secretary of HHS to implement "a risk adjustment methodology that accounts for variations in per capita costs based on | **Undisputed.** |

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

7

STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
2:16-cv-08697-MWF (SSx)

0166

| PLAINTIFFS' UNCONTROVERTED FACTS | UNITED'S RESPONSE |
|---|---|
| health status and other demographic factors." *Id.* § 1395w-23(a)(3)(C)(i).[2] | |
| 14. The Secretary has broad discretion under this provision to adopt a methodology and determine how to adjust payment levels based on the health status of Medicare beneficiaries. | **Disputed.** Plaintiffs have failed to provide any support for this purported uncontroverted fact as required by Local Rule 56-3. This statement is also argumentative and a legal conclusion that requires no response. United disputes as inaccurate Plaintiffs' legal characterization regarding the Secretary's alleged discretion with respect to her ability to deviate from the requirement of actuarial equivalence. *See* Opp. to Mot. for Part. Sum. J. at 3-4, 14, 21-22, 24-25. |
| 15. Since 2004, the Secretary has used the Hierarchical Condition Category (HCC) model to determine these amounts under Part C. | **Undisputed,** except that this model was only fully applicable to payments beginning in 2007. |
| 16. The Secretary has used a similar model (the RxHCC model) to risk adjust for health status under Part D. *See* 42 C.F.R. § 423.329(b)(1), (2). | **Undisputed.** |
| 17. HCC is a complex regression model that collects and analyzes payment data in order to assign estimated costs to certain characteristics of Medicare beneficiaries such as age, gender, and health status. | **Undisputed,** provided that "payment data" refers to CMS's unaudited FFS claims data. |
| 18. The model includes a set of | **Undisputed.** |

---

[2] Part C was established by the Balanced Budget Act of 1997, Pub. L. No. 105-33, 111 Stat. 251, 299 (Aug. 25, 1997).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

8

STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
2:16-cv-08697-MWF (SSx)

0167

| PLAINTIFFS' UNCONTROVERTED FACTS | UNITED'S RESPONSE |
|---|---|
| multipliers – that is, "coefficients" – used to determine "the marginal (additional) cost" of each medical "condition or demographic factor (*e.g.*, age/sex group, Medicaid status, disability status)." Medicare Managed Care Manual, Pub. 100-16, Chapter 7, § 70.1 (June 7, 2013) (Exhibit 5). | |
| 19. The multipliers are determined based on data included in claims submitted to CMS by providers for payments for their services to beneficiaries under Parts A and B of the Medicare Program. *See* Advance Notice of Methodological Changes for Calendar Year (CY) 2014 for Medicare Advantage (MA) Capitation Rates, Part C and Part D Payment Policies and 2014 Call Letter, at 17 (Feb. 15, 2013) (Exhibit 6). | **Undisputed.** |
| 20. For each Part C beneficiary, the multipliers are added to form a "risk score" and then computed against the negotiated base (fixed) monthly rate to determine how much CMS will pay an MAO for insuring that beneficiary.[3] | **Disputed.** The CMS-HCC risk adjustment model does not purport to predict the precise medical expenses for a given beneficiary in any given year. The model's explanatory power (as measured by R-squared) of |

[3] For example, a 72-year-old woman living independently without a disability would have "demographic" characteristics (*i.e.,* age, sex, institutional and disability statuses) assigned a coefficient of 0.348 in 2014. Announcement of Calendar Year (CY) 2014 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies, Table 1, at 67 (Exhibit 7). If the woman had no diagnosed conditions, an MAO would be paid 34.8% of its base rate. If the beneficiary had diabetes without complications, another 0.118 would be added to her score, which would become 0.466 (0.348 + 0.118). *Id.* Her expected healthcare costs would be 46.6% as much as the average beneficiary, and an MAO would thus be paid 46.6% of its base rate for covering her. A diagnosis of multiple sclerosis would add another 0.556 to her risk score, for a total of 1.022 (0.348 for demographics + 0.118 for diabetes without complications + 0.556 for

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

9

STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:16-cv-08697-MWF (SSx)

0168

| PLAINTIFFS' UNCONTROVERTED FACTS | UNITED'S RESPONSE |
|---|---|
| | individual variation in beneficiaries' expenditures was approximately 11 percent for the v12 model. Schindler Decl. Ex. 3, Evaluation of the CMS-HCC Risk Adjustment Model: Final Report, at AR011892-895; Schindler Decl. Ex. 7, Deposition of Jeffrey Grant at 320: 9–16 (May 16, 2018) ("May Grant Dep.") (**A:** "You're trying to predict large groups of people accurately. You're not trying to predict one individual's cost accurately. You're trying to get a reasonable relative risk score for people that have health conditions, people that don't have health conditions, people that have a mix of health conditions.") |
| 21. MAOs submit diagnosis codes to CMS so the agency can apply the multipliers for each beneficiary's health status. | **Disputed.** Plaintiffs have failed to provide any support for this purported uncontroverted fact as required by Local Rule 56-3. United disputes the suggestion that MAOs submit diagnosis codes only for the purpose of CMS's applying "multipliers" for each beneficiary's health status. MAOs submit diagnoses codes to CMS for a variety of reasons. Per 42 C.F.R. § 422.310(f)(1), CMS may use risk adjustment data, which includes |

multiple sclerosis). *Id.* at 68. Her expected healthcare costs would now be 102.2% as much as the average beneficiary, and an MAO would receive 102.2% of its base rate for covering her. Thus, when an MAO submits a diagnosis code that maps to an HCC for a beneficiary, that code increases the amount paid to the MAO for coverage. *See* 2000 Rule, 65 Fed. Reg. at 40268 (explaining that the diagnosis data is a claim for payment); *see generally* Defendants' Mem. in Support of Cross-Mot. for Summ. J. and in Opp'n to Plaintiff's Mot. for Summ. J., *United Healthcare Ins. Co. v. Hargan*, CV 16-157-RMC, Dkt. 57-1, at 14-16 (D.D.C. filed Dec. 4, 2017) ("APA case") (Exhibit 13).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

10

STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
2:16-cv-08697-MWF (SSx)
0169

| PLAINTIFFS' UNCONTROVERTED FACTS | UNITED'S RESPONSE |
|---|---|
| | diagnosis codes, for a range of purposes described in § 422.310(f)(1)(i)-(ix), including but not limited to "conduct[ing] quality review and improvement activities," and "update[ing] risk adjustment models." Only one of the nine purposes listed is "[t]o determine the risk adjustment factors used to adjustment payments. . . ." Additionally, the risk scores of beneficiaries who switch from Medicare FFS to MA in a given year are not determined from data submitted by the MA plan. *Cf.* Schindler Decl. Ex. 8, Brad Piper & Hillary Millican, Medicare Advantage Risk Score Primer: What You Need to Know About Diagnoses Supporting Risk Scores and Revenue Payment Timing at 2, *Milliman White Paper*, (Oct. 2017). |
| 22. Since 2004, they have submitted the codes through CMS's Risk Adjustment Processing System ("RAPS"). | **Undisputed.** |
| 23. In the last several years, they submit the codes through RAPS and CMS' Encounter Data System ("EDS"). | **Undisputed.** |
| 24. Each RAPS submission includes only a few data fields: the beneficiary's identification number, the date of the medical encounter, the type of healthcare provider, and the diagnosis code(s) reported by the provider for that encounter. *See, e.g.,* 2013 | **Disputed.** United disputes this statement to the extent that it implies that providers are the only acceptable source of diagnosis codes reported on RAPS submissions. MAOs are permitted to submit diagnosis code(s) not reported by the provider. *See, e.g.,* |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

11

STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:16-cv-08697-MWF (SSx)
0170

| PLAINTIFFS' UNCONTROVERTED FACTS | UNITED'S RESPONSE |
|---|---|
| Medicare Managed Care Manual, Pub. 100-16, chapter 7 at § 120.2.3 (Exhibit 5). | Schindler Decl. Ex. 9, CMS, *2012 Regional Technical Assistance Participant Guide: Encounter Data*, §§ 2.4.3, 3.5.7, 3.5.7.1, 3.5.7.2 (Aug. 6-7, 2012); *see also* Schindler Decl. Ex. 7, May Grant Dep. at 163: 14–18 (**Q:** "Okay. The same question with respect to pulling charts for review. Is that an appropriate activity for MA plans to engage in?" MS. KRIEG: "Object to the question." **A:** "Yes").<br><br>The remainder of the statement is undisputed. |
| 25. RAPS also has a field called a "Delete Indicator" that allows MAOs to delete invalid diagnosis codes that were previously submitted and thereby retract the claim for payment for those invalid diagnoses. *Id.* | **Undisputed.** |
| 26. A diagnosis that has been deleted in RAPS will not cause an increase in the risk score or risk adjusted payment that otherwise would have been based on the deleted diagnosis code. | **Disputed.** Plaintiffs have failed to provide any support for this purported uncontroverted fact as required by Local Rule 56-3. United disputes this statement to the extent it implies that every diagnosis code submitted in RAPs affects payment. Not all diagnosis codes submitted in RAPs affect risk scores and thereby payments.<br><br>The rest of the statement is undisputed. |
| 27. When an MAO acquires information about invalid diagnoses after payment is made, it can still delete the invalid diagnosis codes through RAPS, and CMS will reconcile | **Disputed.** United disputes the suggestion that it is always possible for an MAO to delete diagnosis codes submitted through RAPs. Until 2014, there was no formal process in place |

| PLAINTIFFS' UNCONTROVERTED FACTS | UNITED'S RESPONSE |
|---|---|
| its payments as part of a routine process. 42 C.F.R. § 422.310(g)(2)(ii). | for deleting diagnosis codes during the closed period. *See* Schindler Decl., Ex. 10, CMS, *Guidance for Reporting and Returning Medicare Advantage Organization and/or Sponsor Identified Overpayments to the Centers for Medicare & Medicaid Services (CMS)*, (Feb. 18, 2015) (announcing the process for reporting and returning overpayments beginning on January 1, 2015). United also disputes that CMS consistently reconciles or otherwise adjusts payments when plans do submit deletions. |
| 28. EDS works much the same way with respect to the deletion of invalid diagnosis codes. *See* CMS 2012 Regional Technical Assistance Participant Guide, Encounter Data, at 3-32 to 3-33 (Exhibit 8). | **Disputed.** This statement is unclear as to what is meant by "much the same way" such that United cannot meaningfully assess the statement. For purposes of this motion the statement is disputed. |
| **C. Part C and D Payment Data Integrity Requirements and Obligations** | |
| 29. MAOs have a financial incentive to submit as many risk-adjusting diagnoses as possible to generate as much payment as possible. | **Disputed.** Plaintiffs have failed to provide any support for this purported uncontroverted fact as required by Local Rule 56-3. United does not dispute that MAOs are paid in part based on the risk-adjusting diagnoses they submit to CMS and that they therefore have a financial incentive to submit complete risk adjustment data reflecting all of the diagnoses supported by the medical record. However, United disputes that MAOs have a financial incentive to submit "as |

| PLAINTIFFS' UNCONTROVERTED FACTS | UNITED'S RESPONSE |
|---|---|
| | many risk-adjusting codes as possible." |
| 30. Accordingly, to ensure that payments are based on valid diagnosis data and are not improperly inflated, payment integrity requirements and obligations are imposed on MAOs. | **Disputed.** Plaintiffs have failed to provide any support for this purported uncontroverted fact as required by Local Rule 56-3. The alleged "fact" is also argumentative and a legal conclusion that requires no response. |
| 31. These requirements and obligations are contractual as well as regulatory, and apply to all United MAOs and to entities related to these MAOs, including, the non-MAO United Defendants in this action. *See* Section D(5) of Article V of the MA Contract (Exhibit 1) (if any MAO responsibility is delegated to another entity, "all contracts or written agreements must specify that the related entity, contractor or subcontractor must comply with all applicable Medicare laws, regulations, and CMS instructions"); *see also* 42 C.F.R. §422.504(*i*)(3)(iii), (4)(v) (Part C) (requiring related entities and contractors to comply with the MAO's contractual obligations to CMS and to comply with all applicable Medicare laws, regulations, and CMS instructions); 42 C.F.R. § 423.505(*i*)(3)(iii), (iv) (Part D) (same). | **Disputed.** The alleged "fact" is argumentative and a legal conclusion that requires no response. United also objects on the grounds that the term "These requirements" is vague. |
| 32. One of the most fundamental payment integrity requirements is that diagnoses must be substantiated by the beneficiaries' medical records to be valid and one of the most important | **Disputed.** Plaintiffs have failed to provide any support for this purported uncontroverted fact as required by Local Rule 56-3. The alleged "fact" is also argumentative and a legal |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

14

STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
2:16-cv-08697-MWF (SSx)

0173

| PLAINTIFFS' UNCONTROVERTED FACTS | UNITED'S RESPONSE |
|---|---|
| payment integrity obligations is that MAOs and their related entities and contractors delete unsubstantiated diagnoses when they have information, knowledge or a belief about them. | conclusion that requires no response. |
| 33.    In order to participate in the Part C and Part D programs, the Defendant MAOs were required to agree in writing to comply with Part C and D regulations and other terms and conditions.    42 C.F.R. §§ 422.503, 422.504 (Part C); 42 C.F.R. §§ 423.504, 423.505 (Part D). | **Disputed.**    The alleged "fact" is argumentative and a legal conclusion that requires no response. |
| 34.    Each year, one or more executives of defendant UnitedHealthcare, Inc. or its affiliates or predecessors entered into these contracts with CMS on behalf of the Defendant MAOs. *See e.g.* Signature Attestation page at the end of Exhibit 1. | **Disputed.** United does not dispute that its executives signed Risk Adjustment Attestations. However, United objects on the grounds that the term "Each year" and "these contracts" is vague. Although unclear what Plaintiffs mean by "these contracts," United also disputes that its "executives . . . entered into these contracts with CMS on behalf of the Defendant MAOs." |
| 35.    During the payment years at issue in this case, the contracts obligated defendants to operate their Part C and D plans "in compliance with the requirements of [the] contract[s] and applicable Federal statutes, regulations, and policies (e.g., policies as described in the Call Letter, Medicare Managed Care Manual, etc.)" and to comply with "Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse," including the False Claims Act. *See,* | **Disputed.** United does not dispute that the language that appears in quotation marks appears in the cited contract. However, the interpretation of the contract is a legal conclusion that United disputes and that requires no response. This statement is also disputed as incomplete and misleading. The portion of the contracts only partially quoted by the government deals with MA plans' agreements to operate a particular type of MA plan (a coordinated care plan, as opposed to |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

15

STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:16-cv-08697-MWF (SSx)

0174

| PLAINTIFFS' UNCONTROVERTED FACTS | UNITED'S RESPONSE |
|---|---|
| *e.g.*, Section A of Article II and Section A(1) of Article IX of the Part C contract, which is part of Exhibit 1.[4] | one of two other categories of MA plans – private FFS plans or MSA plans, *see* Schindler Decl. Ex. 11, 2017 Manual Chapter 1, §§ 20.1, 20.2; 42 C.F.R. § 422.4(a)) and the provision of services to beneficiaries as part of that "Coordinated Care Plan." Ex. 1 to Decl. of Cheri Rice, at 6. That "coordinated care plan" governs the medical services that the plan is required to provide to its members, the conditions under which those services must be available, the providers through whom the plan will provide them, and so forth, and various requirements that apply to coordinated care type MA plans in particular. *See* 42 C.F.R. 422.4(a)(1); Schindler Decl. Ex. 11, 2017 Manual Chapter 1, § 20.2. It does not extend, however, to the manner in which CMS will pay the plan. The terms governing that issue are instead set out in Article IV, governing "CMS Payment to MA Organization." *See* Opp. to Mot. for Part. Sum. J. at 33-36. |
| 36. The contracts also required defendants to implement an effective compliance program in accordance with the Part C and D compliance regulations. *See, e.g.,* Section F of Art. III of the MA Contract and Section J of Art. II of the Part D Addendum, also | **Disputed.** United does not dispute that pursuant to the referenced MA Contract, the MAO defendants agreed to implement a compliance program in accordance with Part C and D compliance regulations. However, the interpretation of the contract is a legal |

---

[4] The Attestation of Benefit Plan, which is part of the contract, also requires compliance with the Medicare Managed Care Manual and other documents issued by CMS. This Attestation is included as part of Exhibit 1.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

16

STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:16-cv-08697-MWF (SSx)

0175

| | PLAINTIFFS' UNCONTROVERTED FACTS | UNITED'S RESPONSE |
|---|---|---|
| | part of Exhibit 1. | conclusion that United disputes and that requires no response. *See* Opp. to Mot. for Part. Sum. J. at 30. |
| | 37. Since 2005, the Part C compliance regulation itself has obligated United to monitor for noncompliance with CMS requirements, identify compliance risks, and respond to and correct compliance problems, including taking "affirmative steps to address errors" in the data it submitted for payments. *United States ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1174 (9th Cir. 2016) (citing 42 C.F.R. § 422.503(b)(4)(vi), (vi)(F), (vi)(G) (2005)); *see also* 42 C.F.R., § 423.504(b)(4)(vi), (vi)(F), (vi)(G) (2007) (Part D compliance regulation setting forth same requirements). | **Disputed**. United does not dispute that the language that appears in quotation marks appears in the sources that are cited. However, the interpretation of these regulations and case law is a legal conclusion that United disputes and that requires no response. *See* Opp. to Mot. for Part. Sum. J. at 46-49. |
| | 38. The compliance regulations state that the MAO "must conduct appropriate corrective actions (for example, repayment of overpayments . . .)." 42 C.F.R. § 422.503(b)(4)(vi)(G)(2); s*ee also* 42 C.F.R., § 423.504(b)(4)(vi)(G)(2) (Part D) (same). | **Disputed**. United does not dispute that the language that appears in quotation marks appears in the cited source. However, the interpretation of these regulations is a legal conclusion that United disputes and that requires no response. Further, this factual allegation is disputed as incomplete. 42 C.F.R. § 422.503(b)(4)(vi)(G)(2) states that an MAO "must conduct appropriate corrective actions (for example, repayment of overpayments, disciplinary actions against responsible employees) in response to the potential violation referenced in paragraph (b)(4)(vi)(G)(1) of this section." 42 C.F.R. § 422.503(b)(4)(vi)(G)(1) states, |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

17

STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:16-cv-08697-MWF (SSx)

0176

| PLAINTIFFS' UNCONTROVERTED FACTS | UNITED'S RESPONSE |
|---|---|
| | "If the MA organization discovers evidence of misconduct related to payment or delivery of items or services under the contract, it must conduct a timely, reasonable inquiry into that conduct." The analogous Part D regulations provide similarly.

To the extent Plaintiffs' statement suggests otherwise, the cited regulations do not impose an obligation on MAOs to delete unsupported codes. *See* Opp. to Mot. for Part. Sum. J. at 30. |
| 39. In 2013, the obligation to withdraw erroneous risk adjustment data was also reiterated in the Medicare Managed Care Manual, which, as noted above, was expressly incorporated into all of the contracts. *See, e.g.,* 2013 Medicare Managed Care Manual, Pub. 100-16, chapter 7 at § 40 (Exhibit 5) (stating: "If upon conducting an internal review of submitted diagnosis codes, the plan sponsor [or MAO] determines that any ICD-9-CM diagnosis codes that have been submitted do not meet risk adjustment submission requirements, the plan sponsor [or MAO] is responsible for deleting the submitted ICD-9-CM diagnosis codes as soon as possible"). | **Disputed.** United does not dispute that the language that appears in quotation marks appears in the cited Medicare Managed Care Manual. However, the interpretation of the contract and Medicare Managed Care Manual is a legal conclusion that United disputes and that requires no response.

Further, Plaintiffs mischaracterize the meaning of the cited provisions, which describe a responsibility to delete codes *if* a plan chooses to undertake an internal review of previously submitted codes *and* that review determines that submitted codes do not meet the risk adjustment submission requirements. *See* Opp. to Mot. for Part. Sum. J. at 40. To the extent Plaintiffs' statement suggests otherwise, the cited Manuals do not impose an obligation on MAOs to delete unsupported codes.

Finally, the Manual is a guidance |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

18

STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:16-cv-08697-MWF (SSx)

0177

| PLAINTIFFS' UNCONTROVERTED FACTS | UNITED'S RESPONSE |
|---|---|
| | document that does not impose any legal obligations on plans and that United did not agree to comply with in its contract with CMS. *See* Opp. to Mot. for Part. Sum. J. at 32-33. |
| 40. In addition, in accordance with 42 C.F.R. § 422.504(l) (Part C), the contracts obligated an officer of each United MAO to annually attest to the accuracy, completeness, and truthfulness of the diagnosis data submitted for risk adjustment payments based on best knowledge, information, and belief. *See* Section D.2 of Article IV of the MA Contract (Exhibit 1).[5] | **Disputed.** Plaintiffs mischaracterize the cited regulation and contracts. The contracts and applicable regulation provide that a chief executive officer, a chief financial officer, "or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to such officer" can sign. 42 C.F.R. § 422.504(l); Pls.' Mem. of P. & A. in Supp. of Pls.' Mot. for Partial Summ. J., ECF No. 234-1 ("Mem.") Ex. 1 at 11, ECF No. 234-3. |
| 41. This regulatory and contractual obligation also applied to each related entity and contractor that generated (that is, submitted) risk adjustment data for the United MAOs, including defendant Optum (and its predecessor, Ingenix). *Id.* | **Disputed.** The alleged "fact" is a legal conclusion that that requires no response. |
| 42. Importantly, this contractual and regulatory attestation requirement imposed affirmative duties on the MAOs and their related entities and contractors. | **Disputed.** Plaintiffs have failed to provide any support for this purported uncontroverted fact as required by Local Rule 56-3. The alleged "fact" is also argumentative and a legal conclusion that requires no response. United further objects on the grounds that the term "affirmative duties" is |

[5] The Part D regulations include a similar attestation requirement for diagnoses submitted for risk adjustment payments under the prescription drug program. Under the applicable Part D regulation, these attestations are referred to as certifications. 42 C.F.R. § 423.505(k).

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

19

STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
2:16-cv-08697-FMO (SSx)

0178

| PLAINTIFFS' UNCONTROVERTED FACTS | UNITED'S RESPONSE |
|---|---|
| | vague and ambiguous. |
| 43. As explained by the Ninth Circuit and "as CMS has long made clear," to attest to the accuracy, completeness, and truthfulness of their risk adjustment data submitted to CMS, MAOs have always had a duty to take actions to ensure the accuracy, completeness, and truthfulness of the data and are responsible for "making good faith efforts" to certify the accuracy, completeness, and truthfulness of the data. *Swoben*, 848 F.3d at 1174 (citing 65 Fed. Reg. at 40,268); *see also* 2004 Manual (Exhibit 4), § 111.7 (discussing this requirement). | **Disputed.** United does not dispute that the language that appears in quotation marks appears in the cited source. However, the interpretation of case law and the underlying regulations and Managed Care Manual are legal conclusions that United disputes and that requires no response. *See* Opp. to Mot. for Part. Sum. J. at 31-33, 46-49. Further, in each year since 2014, United has submitted its risk adjustment data attestations subject to certain clarifications, including the understanding that it was not obligated to perform two-ways looks. In 2014, United explained that it had suspended the "process through which [it] review[s] certain medical records to determine the accuracy of risk adjustment diagnoses and submit[s] appropriate deletes" while it considered whether to make changes. *See* Schindler Decl. Ex. 12, Email from Steve Nelson to Cheri Rice dated April 30, 2014, produced at MARA1296259. In 2015 and 2016, United clarified that it "previously had a process through which [it] reviewed certain medical records to determine the accuracy of risk adjustment diagnoses and submitted appropriate deletes" but that it "ended this process and informed [CMS] of that decision." Schindler Decl. Ex. 13, Email from Steve Nelson to Cheri Rice dated June 26, 2015, produced at MARA2152278; Schindler |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

20

STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:16-cv-08697-FMO (SSx)

0179

| PLAINTIFFS' UNCONTROVERTED FACTS | UNITED'S RESPONSE |
|---|---|
| | Decl. Ex. 14, Email from Cheri Rice to Johanna Kreisel dated June 7, 2016, produced at USBP000498420. It further clarified that the decision remained operative and explicitly communicated that United "did not use [its] previous process to determine whether diagnosis codes submitted through claims are unsupported in the medical record." *See* Schindler Decl. Ex. 13, Email from Steve Nelson to Cheri Rice dated June 26, 2015, produced at MARA2152278; Schindler Decl. Ex. 14, Email from Cheri Rice to Johanna Kreisel dated June 7, 2016, produced at USBP000498420. United also made similar qualifications in its bid assumptions that CMS reviewed and approved prior to the parties executing the contracts here at issue. *See, e.g.*, Schindler Decl. Ex. 49, MA Supporting Documentation for CY2015 Bid, UHC of California, Inc., Contract No. H0543-001-000, dated Aug. 5, 2014 (emphasis added) (providing: "We . . . adjusted projected risk scores to account for changes in our medical record review processes. Specifically, *based on multiple conversations with CMS and CMS's treatment of medical record review in its recent rulemaking process, the health plan has decided to cease one of its prior processes that identified and deleted certain diagnoses codes through the medical record review process*"); *see also* Opp. to Mot. for Part. Sum. J. at 36-38. |
| 44. Thus, MAOs and their related | **Disputed.** The alleged "fact" is a legal |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

21

STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
2:16-cv-08697-MWF (SSx)

0180

| PLAINTIFFS' UNCONTROVERTED FACTS | UNITED'S RESPONSE |
|---|---|
| entities and contractors cannot turn blind eyes to information about the invalidity of their diagnosis data or act with reckless disregard or deliberate ignorance of the falsity of the data and one of the affirmative duties or actions that MAOs and their related entities and contractors must undertake because of the attestation requirement is to correct or withdraw erroneous data. *Id*. at 1174. | conclusion that United disputes and that requires no response. |
| 45. The Medicare Managed Care Manual has long specified that diagnosis data must be substantiated by the beneficiaries' medical records – a requirement that has been in every version of the Manual since at least 2001. *See, e.g.,* 2001 Manual (Exhibit 3), §§ 110.3, 110.4 (requiring diagnosis data to "be substantiated by the hospital's medical record"); 2004 Manual (Exhibit 4), §§ 111.1, 111.4, 111.8 and Exhibit 30 [to the Manual] (Aug. 13, 2004) ("a medical record must substantiate all diagnostic information provided to CMS"); 2013 Manual (Exhibit 5), § 40 ("All diagnosis codes submitted must be documented in the medical record"). | **Disputed.** United does not dispute that the language that appears in quotation marks appears in the cited sources. However, the rest of the statement, including the interpretation of the Medicare Managed Care Manuals, is a legal conclusion that United disputes and that requires no response. *See* Opp. to Mot. for Part. Sum. J. at 32-36, 39. |
| 46. The Manual, in accordance with federal regulation, also has long specified that diagnoses be coded according to *International Classification of Diseases (ICD) Clinical Modification Guidelines for Coding and Reporting* and the ICD Guidelines have long specified that the | **Disputed.** The effect and interpretation of the Manual and ICD Guidelines are legal conclusions that United disputes and that require no response. Further, United disputes the contention that "the ICD Guidelines have long specified that the medical record must substantiate the diagnosis coding." In |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

22

STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:16-cv-08697-MWF (SSx)

0181

| PLAINTIFFS' UNCONTROVERTED FACTS | UNITED'S RESPONSE |
|---|---|
| medical record must substantiate the diagnosis coding. *See, e.g.*, 2013 Manual § 40 (Exhibit 5); *see also* 45 C.F.R. §§ 162.103, 162.1000(a) and 162.1002(a)(1), (b)(1), (c)(2)(i) (by which the Secretary of HHS adopted certain "code sets as the standard medical data code sets[,]" including the ICD-9-CM (Ninth Edition) until it was superseded in October 2015 by the ICD-10-CM (Tenth Edition), and made their use mandatory for "covered entities," which includes health plans and providers). | addition, the Manuals do not impose legal obligations and United did not contractually agree to comply with the Manuals in connection with submission of risk adjustment data or payment. *See* Opp. to Mot. for Part. Sum. J. at 32-41. |
| 47. The Ninth Edition of the ICD Guidelines (effective during many of the years at issue here), "published by the United States Government" and "required for reporting diagnoses and diseases to all . . . [CMS] programs," included the requirement of medical record documentation to substantiate diagnosis coding. Joint Appendix of Rulemaking Record Excerpts from APA case, ICD-9-CM Coding Guidelines, Preface at 1 (Exhibit 15); *see also id.* at 5 (explaining "[t]he importance of consistent, complete documentation in the medical record," without which accurate diagnosis coding "is a difficult, if not impossible, task"). | **Disputed**. United does not dispute that the language that appears in quotation marks appears in the source that is cited. However, the effect and interpretation of the ICD Guidelines are legal conclusions that United disputes and that require no response. Further, United disputes Plaintiff's contention that "[t]he Ninth Edition of the ICD Guidelines . . . included the requirement of medical record documentation to substantiate diagnosis coding." *See* Opp. to Mot. for Part. Sum. J. at 39. |
| 48. The Tenth Edition of the ICD Guidelines does the same. ICD-10-CM Official Guidelines for Coding and Reporting FY 2018, at 1 (Exhibit 16) ("importance of consistent, complete | **Disputed.** United does not dispute that the language that appears in quotation marks appears in the cited source. However, the effect and interpretation of the ICD Guidelines are legal |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

23

STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
2:16-cv-08697-FMO (SSx)

0182

| PLAINTIFFS' UNCONTROVERTED FACTS | UNITED'S RESPONSE |
|---|---|
| documentation in the medical record cannot be overemphasized"). | conclusions that United disputes and that require no response. Further, United disputes Plaintiff's contention that the Tenth Edition of the ICD Guidelines included a requirement of medical record documentation to substantiate diagnosis coding. *See* Opp. to Mot. for Part. Sum. J. |
| 49.    Moreover, pursuant to their MA Contracts, the Defendant MAOs agreed "to comply with the requirements in § 422.310 for submitting risk adjustment data to CMS" and could be terminated if they "fail[ed] to provide CMS with valid risk adjustment data as required under § 422.310 and 423.329(b)(3)." *See* Section B.7 of Art. VI and Section B.1(a)(vii) of Article VIII of the MA Contract.[6] | **Disputed.** United does not dispute that the language that appears in quotation marks appears in the MA Contract. However, the interpretation of the contract is a legal conclusion that United disputes and that requires no response. |
| 50.    One of the requirements of § 422.310 (a Part C regulation) pertains to the "[v]alidation of risk adjustment data." | **Disputed.** United does not dispute that the language that appears in quotation marks appears in 42 C.F.R. § 422.310. However, the interpretation of the regulation is a legal conclusion that United disputes and that requires no response. *See* Opp. to Mot. for Part. Sum. J. at 30-31. |
| 51.    Section 422.310(e) also establishes the medical record as the source for determining the validity of risk adjustment data: "MA | **Disputed.** United does not dispute that the language that appears in quotation marks appears in 42 C.F.R. § 422.310(e). However, the |

[6] The contracts are also subject to termination when "[t]here is credible evidence that the MA Organization committed or participated in false, fraudulent or abusive activities affecting the Medicare program, including the submission of false or fraudulent data." *See, e.g.*, Section B.1(a)(iv) of Article VIII of the MA Contract (Exhibit 1).

LATHAM&WATKINS
ATTORNEYS AT LAW
LOS ANGELES

24

STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:16-cv-08697-MWF (SSx)

0183

| PLAINTIFFS' UNCONTROVERTED FACTS | UNITED'S RESPONSE |
|---|---|
| organizations and their providers and practitioners will be required to submit a sample of medical records for the validation of risk adjustment data, as required by CMS." | interpretation of the regulation is a legal conclusion that United disputes and that requires no response. *See* Opp. to Mot. for Part. Sum. J. at 30-31. |
| 52. "There may be penalties for submission of false data." 42 C.F.R. § 422.310(e).[7] | **Disputed.** United does not dispute that the language that appears in quotation marks appears in 42 C.F.R. § 422.310(e). However, the interpretation of the regulation is a legal conclusion that United disputes and that requires no response. *See* 30-31. |
| 53. Similarly, the regulation relating to CMS' risk adjustment data validation (RADV) audits refers to the medical records as the source for validating diagnoses in order "to ensure risk adjusted payment integrity and accuracy." 42 C.F.R. § 422.311(a). | **Disputed.** United does not dispute that the language that appears in quotation marks appears in 42 C.F.R. § 422.311(a). However, the interpretation of the regulation is a legal conclusion that United disputes and that requires no response. This "fact" is also disputed as incomplete and potentially misleading. The provision Plaintiffs' cite discusses data validation in the specific context of Risk Adjustment Data Validation (RADV) audits rather than a general obligation to validate risk adjustment data. *See* Opp. to Mot. for Part. Sum. J. at 30-31. The entirety of the quoted subsection states: "In accordance with § 422.2 [Definitions] and § 422.310(e), the Secretary annually conducts RADV audits to ensure risk adjusted payment |

---

[7] Section 423.329(b)(3) addresses the collection of data for Part D risk adjustment based on health status. It references the requirements of section 422.310.

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

25

STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:16-cv-08697-MWF (SSx)

0184

| PLAINTIFFS' UNCONTROVERTED FACTS | UNITED'S RESPONSE |
|---|---|
| | integrity and accuracy." 42 C.F.R. § 422.311(a).<br><br>To the extent Plaintiffs' statement suggests otherwise, it is disputed. |
| 54. And, because the medical record is the "source of truth" for the determining the validity of risk adjustment data, United's MA Contracts, in accordance with 42 C.F.R. § 422.504(e)(2), provided the government with the right to audit, evaluate, and inspect "medical records," "patient care documentation, and other records" in the possession or control of the United MAOs, related entities, and contractors that relate to the "determination of amounts payable under the contract[s]." *See, e.g.,* Section A.2(b), (d) of Article VI of the MA Contract (Exhibit 1). | **Disputed.** United does not dispute that the language that appears in quotation marks appears in the cited contract and regulation. The rest of the statement is argumentative and a legal conclusion that United disputes and requires no response. Additionally, Plaintiffs have mischaracterized the meaning of the quoted language; the cited contract does not give "the government" a right; rather it provides that "HHS, the Comptroller General, or their designees may audit, evaluate, or inspect. . . medical records. . . patient care documentation, and other records of the MA Organization, . . .and determination of amounts payable under the contract. . . ." Mem. Ex. 1 at 13, ECF No. 234-3; 42 C.F.R. § 422.504(e)(2) (providing similarly). |
| 55. During the relevant time period, 2009-2017, the United Defendants were also bound by the terms and conditions of Electronic Data Interchange ("EDI") Agreements. | **Disputed.** This statement is a legal conclusion that United disputes and requires no response. |
| 56. The United MAOs and any related entity or contractor that submitted risk adjustment data on their behalf (here Optum and its predecessor, Ingenix) were required to execute these agreements in order to submit the data, | **Disputed.** This statement is a legal conclusion that United disputes and requires no response. |

| PLAINTIFFS' UNCONTROVERTED FACTS | UNITED'S RESPONSE |
|---|---|
| including diagnoses, to CMS' RAPS and EDS and to receive payments. *See, e.g.*, Electronic Data Interchange Agreement Between United and CMS (Exhibit 2); *see also* 2004 Manual (Exhibit 4), § 111.6.1 (discussing this requirement). | |
| 57. Pursuant to the EDI Agreements, the defendant MAOs and Optum (and its predecessor, Ingenix) agreed that they were responsible for all risk adjustment data submitted by themselves, their employees, and agents and that "[b]ased on best knowledge, information, and belief, [they would] submit risk adjustment data that are accurate, complete, and truthful." *Id.* at Sections A.1 and 5. | **Disputed.** Plaintiffs have misquoted the language in the cited EDI Agreements. The EDI Agreements state that the MAO will be responsible "for all Medicare encounter data submitted to CMS by itself, its employees, or its agents," and that, "Based on best knowledge, information, and belief, [the MAO] will submit encounter data that are accurate, complete, and truthful." Mem. Ex. 2 at 43. Further, the interpretation of the EDI Agreements is a legal conclusion that United disputes and that requires no response. *See* Opp. to Mot. for Part. Sum. J. at 42. |
| 58. Moreover, they agreed to "correct risk adjustment data discrepancies." *Id.* at Section A.11. | **Disputed.** Plaintiffs have misquoted the language in cited EDI Agreements. The source refers to "research[ing] and correct[ing] encounter data discrepancies." Mem. Ex. 2 at 43. Further, the interpretation of the EDI Agreements is a legal conclusion that United disputes and that requires no response. *See* Opp. to Mot. for Part. Sum. J. at 42. |
| 59. Of equal significance, pursuant to the EDI Agreements, they also agreed that the government had the | **Disputed.** United does not dispute that the language that appears in quotation marks appears in the EDI Agreements. |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

27

STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
2:16-cv-08697-MWF (SSx)

0186

| PLAINTIFFS' UNCONTROVERTED FACTS | UNITED'S RESPONSE |
|---|---|
| right to "audit and confirm" the data submitted by them and that they would provide the government with access to "medical records related to the eligible organization's submissions" in order for the government to audit data and confirm that the submitted-diagnosis were supported by the medical records. *Id*. at Section A.4. | However, the interpretation of the EDI Agreements is a legal conclusion that United disputes and that requires no response. *See* Opp. to Mot. for Part. Sum. J. at 42. |
| 60.    Thus, the EDI Agreements also established the medical records as the "source of truth" for validating diagnosis data and Defendants' entitlement to payments. | **Disputed**.    Plaintiffs have failed to provide any support for this purported uncontroverted fact as required by Local Rule 56-3.    Plaintiffs' interpretation of the EDI Agreements is a legal conclusion that United disputes and that requires no response. *See* Opp. to Mot. for Part. Sum. J. at 42. |
| 61.    Any conclusion of law that is deemed a finding of fact is incorporated herein by this reference. | **Disputed.**    To the extent any conclusion of law is deemed a finding of fact, United objects. |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

28

STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:16-cv-08697-FMO-SSx (SSx)

0187

# ADDITIONAL MATERIAL FACTS AND EVIDENCE THAT PRECLUDES PARTIAL SUMMARY JUDGMENT

United presents the following additional material facts and evidence in opposition to the United States' and Ben Poehling's Motion for Partial Summary Judgment. As set forth in the Declaration of Abid R. Qureshi submitted pursuant to Federal Rule of Civil Procedure 56(d), filed concurrently, United expects to develop additional evidence on many of the factual matters that support the arguments in its Opposition through ongoing discovery in this litigation. *See* Declaration of Abid R. Qureshi, July 23, 2018.

| UNITED'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE: | |
| --- | --- |
| **A. Additional Material Facts Establishing the Impact of Diagnosis Coding Discrepancies on the Payment Rates Calculated by CMS** | |
| 62. In determining the predicted cost of providing benefits to a given beneficiary, CMS' objective is to obtain "[r]isk scores [that] are consistent across both fee-for-service and Medicare Advantage settings, Schindler Decl. Ex. 1, 2010 Rate Announcement, at AR4336, such that "[r]isk scores for beneficiaries with the same diagnoses and characteristics should be identical" in the MA and traditional Medicare programs, Schindler Decl. Ex. 2, GAO, *Medicare Advantage: Substantial Excess Payments Underscore Need for CMS to Improve Accuracy of Risk Score Adjustments*, at AR12043. | |
| 63. In both traditional Medicare and Medicare Advantage providers sometimes submit diagnosis codes that | |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

29

STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
2:16-cv-08697-MWF (SSx)

0188

| UNITED'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE: | |
|---|---|
| do not correspond perfectly with patients' medical charts. *See, e.g.,* Schindler Decl. Ex. 15, Presentation from Division of Payment Validation at CMS0005886 (internal CMS presentation acknowledging that "In FFS Medicare, some portion of diagnoses on FFS claims are not documented in medical records."); Schindler Decl. Ex. 7, May Grant Dep. at 233:4-17 ("**Q:** So you are aware that there are errors [in FFS data], but you don't know the amount or extent because you believe there's no systematic study evaluating this issue? … **A:** Again, 'aware' is a strong term. I would say it is my firm belief, having processed data for years, that any data set has errors in it. My experience with data would say that every data set you ever deal with that is a very large data set has some degree of error and the only question is what that degree of error is. And unless you study it, it is not knowable what that degree of error is.") | |
| 64.    CMS has acknowledged that the FFS claims data it collects in the traditional Medicare program contains unsupported diagnosis codes. *See supra* 63. | : |
| 65.    Yet, when CMS calibrates the CMS-HCC risk adjustment model, it does not attempt to correct for those discrepancies by auditing the FFS claims data to confirm that the | |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

30

STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:16-cv-08697-FMO (SSx)

0189

| | UNITED'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE: | |
|---|---|---|
| | diagnosis codes are properly supported by medical records. *See* Schindler Decl. Ex. 15, Presentation from Division of Payment Validation at CMS0005887; Schindler Decl. Ex. 16, FOIA Agenda at CMS0006200 ("…we've got another documentation standard for risk adjustment, which reflects a certain level of codes that aren't documented in a medical record"). | |
| | 66. Instead, when CMS uses its own data to calculate the average incremental relative cost of having a particular condition, it assumes that every diagnosis code in its claims data represents who actually has the condition in question. *See* Schindler Decl. Ex. 17, Pope et al., Risk Adjustment of Medicare Capitation Payments Using the CMS-HCC Model, at AR11867, *Health Care Financing Review*, 25(4) (Summer 2004); Schindler Decl. Ex. 18, 2010 RADV Rule, at AR2826. | |
| | 67. The existence of these "zero cost" conditions affects the overall average, incremental risk coefficient that the model calculates for that particular condition. *See* Schindler Decl. Ex. 7, May Grant Dep. at 229:3-231:15 (**Q:** "Mr. Grant, is that sort of what the purpose is of slide 2? You're referencing a healthy personal mistakenly coded as sick and then assigning the relative cost to that | |

LATHAM&WATKINS
ATTORNEYS AT LAW
LOS ANGELES

31

STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
2:16-cv-08697-MWF (SSx)

0190

| **UNITED'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE:** | |
|---|---|
| individual?" . . ."**A**. Yes. So this is again, with the God-like power to know everybody's cost, I know that these healthy people coded as sick cost the same as all the other healthy people and I magically already know they all cost $500, an unknowable fact when running a risk adjustment calibration, but in this world I've created I know this. And so I have two people thrown into the sick category from a coding perspective, but from a cost perspective appropriately residing in the healthy category . . . And as you see from this -- and this is only -- by the way, it's a one-directional look at this, I will point out too, just looking at the incorrect coding, not going the other direction. The incorrectly -- incorrectly coded as sick, not healthy, incorrectly coded as healthy. It's not a robust presentation that has both sides. It's a one sided -- . . . And then we just walk through it and say we haven't thrown any sick people into the healthy category erroneously, so healthy people still cost 500 bucks apiece. But by virtue [sic] adding two healthy people into the sick population, you lower the perceived average cost of the sick population…. **Q:** "So what is the principle that you're illustrating with this example?" **A:** "That if there is a pattern of overreporting of diagnosis codes in fee for service, then that pattern would result in a underprediction of the disease-related factors in the | |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

32

STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
2:16-cv-08697-FMO-SSx (SSx)

0191

| | UNITED'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE: | |
|---|---|---|
| 4 | model . . . .") | |
| 5 | 68.    CMS's own Division of Payment Validation used a simplified hypothetical to explain this concept internally to senior CMS leaders.   In the slide presentation attached as Schindler Decl. Ex. 15, they hypothesized a scenario in which, when calibrating the CMS-HCC model, CMS identifies four FFS beneficiaries with the diagnosis code for diabetes and determines that the aggregate incremental healthcare costs for the four beneficiaries the following year were $12,000. *Id.* at CMS0005888. In that scenario, CMS would conclude that the average per-patient cost associated with diabetes is $3,000, and it would set the diabetes risk coefficient accordingly. *Id.* But, the presentation explained, suppose further that one of these diagnosis codes was a false positive; the beneficiary did not in fact have diabetes.   That means that the $12,000 was in reality attributable to just three beneficiaries, such that the true per-patient cost of diabetes was actually   $4,000   ($12,000   ÷   3 beneficiaries). *Id.* at CMS0005888-89. By averaging the cost over the four beneficiaries with the diagnosis code, rather than just the three beneficiaries who actually have diabetes, CMS's model   produces   a   lower   average incremental cost (and associated risk coefficient) than it would have done if the diagnosis codes in the FFS data had | |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

33

STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
2:16-cv-08697-MWF (SSx)

0192

| | UNITED'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE: | |
|---|---|---|
| 1 2 3 | | |
| 4 5 6 7 | been perfectly accurate. As the CMS presentation put it, "Inclusion of undocumented diagnoses [in the FFS data] tends to reduce risk adjustment values." *Id.* at CMS0005888. | |
| 8 9 10 11 12 13 14 15 16 | 69. Jeffrey Grant, one of CMS's risk adjustment experts, used a similar hypothetical when explaining to senior CMS officials that "Plans must submit like FFS to be paid full costs of sick population." Schindler Decl. Ex. 19, PowerPoint Presentation at 3, produced by UnitedHealth at USBP000011428; *see also* Schindler Decl. Ex. 20, Email from Jeffrey Grant to Thomas E. Hutchison dated May 29, 2009, produced at USBP000011424, attaching Schindler Decl. Ex. 19. | |
| 17 18 19 20 21 22 23 24 25 26 27 | 70. In addition to recognizing the impact of coding discrepancies on payment rates internally, CMS also orally instructed MA plans that "if they stuck to how the data comes in to FFS, they would be paid correctly." Schindler Decl. Ex. 20 at USBP000011426 ("Plans were told that if they stuck to how the data comes in to FFS, they would be paid correctly."); Schindler Decl. Ex. 7, May Grant Dep. at 207:20-208:17 (testifying that CMS provided oral instructions to MA plans stating that "if they submitted data like fee for service, they would be paid equivalent to the calibration.") | |
| 28 | **B. Additional Material Facts Establishing CMS Recognition Of The Need** | |

LATHAM&WATKINS™
ATTORNEYS AT LAW
LOS ANGELES

34

STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:16-cv-08697-FMO (SSx)

0193

| **UNITED'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE:** | |
|---|---|
| **To Assess MA Plans' Diagnosis Codes In Light Of The Codes Submitted In Traditional Medicare** | |
| *1. The Coding Intensity Adjustment* | |
| 71.    Because MA risk adjustment is based on diagnosis codes, MA plans have an incentive "to find and report as many diagnoses as can be supported by the medical record"—to code with high "intensity."    Schindler Decl. Ex. 5, Kronick & Welch, *supra*, at E3-E4. | |
| 72.    By    contrast,    reimbursement under    traditional    FFS    Medicare generally is not tied to diagnoses, so the incentive for comprehensive coding is weaker. *See id.* at E3. | |
| 73.    MA plans therefore arrange for "chart reviews" to look for diagnoses documented in their beneficiaries' charts that a provider failed to code in claims data. | |
| 74.    CMS has long known that MA plans engage in chart review activities and, in effect, code more completely. *See, e.g.,* Schindler Decl. Ex. 21, 2009 Advance    Notice    at    AR004229-31 ("CMS    understands    that    MA    plans have made efforts to identify enrollees' conditions and may be coding more completely than FFS.") | |
| 75.    Although    CMS    officials    have recognized that this is "an appropriate activity for MA plans to engage in," *see, e.g.,* Schindler Decl. Ex. 7, May | |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

35

STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
2:16-cv-08697-FMO (SSx)

0194

| **UNITED'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE:** | |
|---|---|
| Grant Dep. at 163:14-18, CMS also recognized that the divergent financial incentives between MA and traditional Medicare can lead to different coding patterns that affect risk adjustment payments. | |
| 76. Medicare experts have long recognized that "for the purposes of creating an equitable MA payment system, the relevant question is whether MA risk scores are systematically different than those risk scores would be in FFS, and not which set of scores is more accurate" in an absolute sense. Schindler Decl. Ex. 5, Kronick & Welch, at E4 (emphasis added); Schindler Decl. Ex. 7, May Grant Dep. at 174:21 – 175:8 ("[T]hey are using accuracy not to talk about whether any specific diagnosis code in fee-for-services or managed care is accurate. It is to compare – to have comparable diagnoses. So it is accuracy of risk adjustment, really, not accuracy of coding . . . when they say "inaccurate" they are not referring to the accuracy or inaccuracy of any specific code on any specific claim or any specific RAP submission. They're talking about comparable types of data."); *id.* at 182:6-8 ("[T]he definition of accuracy here," is that MA plans "would be paid consistently with how the model is calibrated.") | |
| 77. Congress understands this, too, and in 2006 it instructed CMS to | |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

36

STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
2:16-cv-08697-FMO-SS WF (SSx)

0195

| | UNITED'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE: | |
|---|---|---|
| | analyze any "*differences* in coding patterns between Medicare Advantage plans and providers under part A and B [i.e., traditional FFS Medicare]." Schindler Decl. Ex. 22, Pub. L. No. 109-171, § 5301(b)(2), 120 Stat. 4, 51 (2006) (emphasis added). | |
| | 78. Congress further said that, "to ensure payment accuracy," CMS should adjust MA beneficiaries' risk scores in light of those different coding patterns. *Id.* | |
| | 79. As recognized by the United States Government Accountability Office ("GAO"): "Risk scores for beneficiaries with the same diagnoses and characteristics should be identical, regardless of whether the beneficiaries are in an MA plan or Medicare FFS." Schindler Decl. Ex. 2, GAO, *Substantial Excess Payments Underscore Need for CMS to Improve Accuracy of Risk Score Adjustments*, at AR012043; *see also* Schindler Decl. Ex. 6, March Grant Dep. at 117:7-18 (agreeing with this statement). | |
| | 80. In other words, "the implicit assumption in the design of the MA payment system" is that if "Jane Doe would have a risk score of 1.0 if she were in FFS," then "she would have had the same risk score of 1.0 if she were enrolled in MA." Schindler Decl. Ex. 5, Kronick & Welch, at E4; *See also* Schindler Decl. Ex. 6, March | |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

37

STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
2:16-cv-08697-FMO-SS (SSx)
0196

| UNITED'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE: | |
|---|---|
| Grant Dep. at 122:2-23 (agreeing with this statement). | |
| 81. Requiring MA plans to delete diagnosis codes that are unsupported even though CMS does not do the same for its FFS population would violate this fundamental risk adjustment requirement: it would result in an MA beneficiary having a lower risk score than an identical FFS beneficiary, resulting in a lower payment. *See, generally,* Schindler Decl. Ex. 19, USBP000011428 at 3 ("Plans must submit like FFS to be paid full costs of sick populations"); *see also* Schindler Decl. Ex. 7, May Grant Dep. at 274:22-277:16 | |
| 82. CMS began imposing a downward adjustment to MA plans' risk scores in 2010, calculated to replicate the risk score-adjusted payments that would have resulted had plans not engaged in different coding activities. Schindler Decl. Ex. 1, 2010 Rate Announcement, at AR4334. | |
| 83. CMS explained that, because the risk adjustment model is calibrated on FFS data, MA plans must code the way Medicare Part A and B providers do in order for risk adjustments to be valid. This means that MA *organizations are coding "accurately" when they are coding* | |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

38

STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:16-cv-08697-MWF (SSx)

0197

| UNITED'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE: | |
|---|---|
| *in a manner similar to fee-for-service coding* used on the beneficiaries to whom MA plan enrollees are being compared. In this sense, *"differences" in coding patterns, regardless of the source, would make the MA plan coding "inaccurate" for purposes of implementing risk adjustment.*<br><br>*Id.* at AR4335 (emphases added). | |
| 84. CMS noted that several members of Congress had expressly recognized this relative notion of accuracy. Senator Grassley, for instance, had explained that the intensity adjustment provision was intended to address "coding that is inaccurate or incomplete for the purpose of establishing risk scores that are consistent across both fee-for-service and Medicare Advantage settings, even if such coding is accurate or complete for other purposes." *Id.* at AR4336. | |
| 85. CMS has applied the Coding Intensity Adjustment in every year since 2010. 42 U.S.C. § 1395w-23(a)(1)(C)(ii). | |
| 86. CMS has never found that higher MA coding intensity reflects the inclusion of codes unsupported by medical records; to the contrary, it has said the data "fail[] to show a systematic correlation between coding pattern differences and errors in the | |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

39

STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:16-cv-08697-FMO-AGWF (SSx)
0198

| | UNITED'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE: | |
|---|---|---|
| 4, 5 | reporting of documented coding." Schindler Decl. Ex. 1, 2010 Rate Announcement, at AR4337. | |
| 6–10 | 87. Nevertheless, CMS continues to recognize that "to ensure payment accuracy," it must account for "differential coding patterns in MA and FFS." Schindler Decl. Ex. 23, 2014 Rate Announcement, at AR4865. | |
| 11–20 | 88. Each year, CMS reduces by a certain percentage the risk adjustment payments that an MA plan would otherwise have received based on the diagnosis codes it had submitted, in order to account for the MA plans' more complete coding. In 2017, for example, United expects that CMS will reduce its payment to United by approximately $2.9 billion through its application of the Coding Intensity Adjustment. *See* Schindler Decl. Ex. 24, Declaration of Mary Murley ¶ 9 (July 23, 2018). | |
| 21–24 | 89. CMS has found that "our methodology results in an accurate measure of the coding differential between FFS and MA." Schindler Decl. Ex. 25, 2013 Rate Announcement, at AR4712. | |
| 25–28 | 90. Jeffrey Grant, one of only two CMS officials deposed in this case to date, testified that assuming the coding intensity adjustment fully offsets any activities that the plan undertakes to | |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

40

STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:16-cv-08697-MWF (SSx)

0199

| **UNITED'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE:** | |
|---|---|
| code more completely, an MA plan would be *under*paid if it were to audit just 25 percent of its members' charts (or even fewer) and delete any unsupported codes it found, while CMS continued its policy of not deleting such codes in the FFS data that it uses to calibrate its model. *See* Schindler Decl. Ex. 7, May Grant Dep. at 274:22-277:22 (**Q:** "Well, I want you now to assume, sir, in this hypothetical world that the coding intensity adjuster that we talked about earlier, I want you to assume that it fully offsets any activities that the plan undertakes to code more completely, chart reviews, home visits, whatever, but they're completely offset by the coding intensity adjuster. If the plan were to submit only the codes of people who are truly sick, to use your presentation example [Exhibit 1017], then that plan would be underpaid." **A:** "In a hypothetical word that you are creating . . . in that world, in theory, yes . . ." **Q:** "Mr. Grant, I want you to again assume that the coding intensity adjuster fully offsets all the activities that a plan might undertake to code more fully. I also want you to assume that a plan audits every one of its charts and deletes every unsupported code. The problem that you highlight in your slide presentation, Exhibit 1017, would still exist in that scenario?" **A:** "In my opinion, if you could have that scenario, yes." **Q:** "The problem | |

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

41

STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
2:16-cv-08697-MWF (SSx)

0200

| | UNITED'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE: | |
|---|---|---|
| | would still exist?" **A:** "The problem would still exist if you have that scenario." **Q:** "Okay. Now I'd like to change the assumption slightly. Once again, the coding intensity adjuster fully offsets all activities that the plan undertakes that code more fully, but now the plan audits 50 percent of a chart, of its charts, and deletes the unsupported codes in that set. Would the problem still exist?" **A:** "Okay, we have multiple assumptions right? So we have the assumption that overcoding is the bias in the data. We have the assumption of perfect adjustment for plan coding activities. To a degree, it exists. It exists to a smaller amount." **Q:** "Same assumption regarding the coding intensity adjuster, but now the plan is auditing 25 percent of its charts and deleting the unsupported codes. Does the problem still exist? . . . " **A:** "Again, assumption of overcoding, endemic in fee for service, and assumption of plan – plan coding activities being 100 percent offset in theory it exists to the degree that diagnosis codes are deleted.") | |
| | 91.     United performed chart reviews that covered significantly more than 25 percent of United's beneficiaries in 2009-2017.    Schindler Decl. Ex. 52, Declaration of Jon Bird ¶ 6 (July 23, 2018). | |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

42

STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
2:16-cv-08697-MWF (SSx)

0201

| | |
|---|---|
| **UNITED'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE:** | |
| 92.    Jeffrey Grant also testified that in his view he did not believe it was "improper" or "fraud" for a plan to perform one-way reviews that add additional diagnosis codes supported in the charts, without looking at whether previously submitted coded lack such support.  Schindler Decl. Ex. 7, May Grant Dep. at 307:11-310:16 (**Q:** "Mr. Grant, I believe you testified earlier there was at least one plan for which you recall HRP performed a chart review while you were there; is this correct?" **A:** "Well there's . . . more than one plan that we performed chart reviews for, yes." **Q:** "Yeah. For the purpose of adding codes, you recall at least one plan?" **A:** "Yes." **Q:** "And do you recall the identity of the plan?" **A:** "I do." **Q:** "Okay. What is the identity?"  A: "It was Coventry." **Q:** "And in connection with that project, were you the relationship manager with Coventry?" **A:** "I was the overall relationship manager for Coventry, like all clients . . ." **Q:** "Is it fair to say that you were involved in that engagement?"    **A:** "Right. And I oversaw all of our client engagements. I was the senior vice president for client services.  I had client services that did the day-to-day for any client, and then if it was a special project that involved special skills, we might have people that were further managing the relationship with respect to that skill set because it required specialized | |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

43

STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
2:16-cv-08697-MWF (SSx)
0202

| UNITED'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE: | |
|---|---|
| skill." **Q:** "Understood. The one instance in which you recalled in which there were review of charts to add codes, do you recall whether there were any efforts to reconcile those codes against previously submitted claims data?" **A:** "So from a coding perspective, we did totally blind coding, so the coders had no idea what was previously submitted. We did have the capacity not to duplicate submit [sic] diagnoses. We weren't going one for one and trying to look at claims data and see if every claim was one-for-one backed by a diagnosis on that date." **Q:** "As part of this effort, did HRP compare the codes identified in the blind coding effort against the claims data that was submitted by providers and delete codes that HRP's coders did not identify?" . . . **A:** "I'm not sure. I believe we may have done – not systematically, not on a large-scale basis, but I believe there were cases where we did." **Q:** "And at that time, did you have a belief that not engaging in such a systematic effort was improper?" . . . **A:** "At that time, no." **Q:** "Okay. At that time, do you think it was fraud?" **A:** "No, I did not knowingly participate in [a] fraudulent activity [laughter]."[8] | |

---

[8] The prepared transcript of Mr. Grant's deposition states: "No, I did not knowingly participate in the fraudulent activity." United believes the transcript contains an error: Mr. Grant's oral testimony on this issue did not contain the word "the" in describing "fraudulent activity." Instead United understands Mr. Grant testified "I did not knowingly participate in a fraudulent

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

44

STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:16-cv-08697-MWF (SSx)
0203

| | UNITED'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE: | |
|---|---|---|
| 93. | Mr. Grant explained that in his view, an MA plan's submission of an unsupported code would be improper only if it was making the "very specific submission of a very specific data element ... that [it] know[s] is wrong.") *See id.* at 321:21-23. | |

### 2. The RADV FFS Adjuster

| | | |
|---|---|---|
| 94. | The purpose of Risk Adjustment Data Validation ("RADV") audits is to recover "overpayments." *See* Schindler Decl. Ex. 18, 2010 RADV Rule, at AR2819 ("Under the RADV audit process we plan to recover the **overpayments** identified during the RADV audit.") (emphasis added). | |
| 95. | When CMS initiates a RADV audit for a plan, it selects a sample of the plan's enrollees for the audited year, collects those enrollees' medical | |

activity." On July 21, 2018, United requested that the court reporter review the video and revise the transcript to correct the error. The court reporter, however, declined to do so. United respectfully disagrees with the court reporter's decision not to revise the transcript. Prior to this statement and based on his experience at Health Risk Partners ("HRP")–a company Mr. Grant described as akin to "a risk adjustment support company" and where Mr. Grant worked from 2008-2010, Schindler Decl. Ex. 6, March Grant Dep. at 27:4-9–Mr. Grant testified that when HRP performed chart reviews for at least one MA plan whose relationship Grant managed, HRP did not engage in a systematic effort to compare the codes identified during chart review against the claims data submitted by providers and delete codes that HRP's coders did not identify. Mr. Grant further testified that he did not find this improper, which United believes implies he did not think it was fraudulent. Mr. Grant was not discussing a specific fraudulent incident. United therefore believes that Mr. Grant's oral testimony only makes sense given the context if he testified that he "did not knowingly participate in a fraudulent activity." For the Court's convenience and determination, United is submitting excerpts of Mr. Grant's video-taped deposition testimony at Schindler Decl. Ex. 59.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

45

STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:16-cv-08697-MWF (SSx)
0204

| | | |
|---|---|---|
| **UNITED'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE:** | | |
| records, and then assesses whether those records adequately support the enrollees' diagnosis codes. Schindler Decl. Ex. 26, Final RADV Methodology, at AR5312-13. | | |
| 96. In 2008, CMS announced that it would eventually start using its RADV audit findings to make "plan-level payment adjustments," meaning that it would extrapolate the results from the audited sample of the plan's beneficiaries to all of a plan's enrollees producing payment adjustment for the plan's entire contract with CMS. Schindler Decl. Ex. 43, Announcement of CY 2009 Parts C and D Rates and Policies, at 22 (Apr. 7, 2008). | | |
| 97. MA plans objected, and by 2010, CMS acknowledged a possible problem with defining "overpayment[s]" to include all payments resulting from unsupported diagnosis codes submitted by MA plans—namely, that the FFS data used to calibrate the risk adjustment model contained coding discrepancies of its own, meaning that MA payment amounts already accounted for the existence of some unsupported codes. *See* Schindler Decl. Ex. 18, 2010 RADV Rule, at AR2826. | | |
| 98. As commenters pointed out, CMS needed to assess the discrepancy rate in the FFS data and compare it to the discrepancy rate of a given MA | | |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

46

STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:16-cv-08697-MWF (SSx)
0205

| | |
|---|---|
| **UNITED'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE:** | |
| plan before it could determine whether the plan had been overpaid. *See, e.g.,* Schindler Decl. Ex. 27, Public Comments of Aetna on the Proposed 2009 RADV Rule at AR2627; Schindler Decl. Ex. 28, Public Comments of AHIP on the Proposed 2009 RADV Rule at AR2744-45. | |
| 99.   Jeffrey Grant made this same point to CMS officials in 2009, while working at Health Risk Partners. *See* Schindler Decl. Ex. 19, USBP000011428 at 3 ("Plans must submit like FFS to be paid full costs of sick populations). | |
| 100.  CMS acknowledged that there was "potential merit" in this concern and said it was "currently studying this issue."  Schindler Decl. Ex. 18, 2010 RADV Rule, at AR2826. | |
| 101.  The issue received intensified scrutiny after CMS proposed a RADV sampling and adjustment-calculation methodology that did not account for unsupported FFS codes.   Schindler Decl. Ex. 29, Proposed RADV Methodology, at AR5020-22. | |
| 102.  Numerous commenters pointed out that this omission was a serious flaw. *See, e.g.,* Schindler Decl. Ex. 30, Public Comments of Aetna on the Proposed RADV Methodology, at AR5053-57; Schindler Decl. Ex. 31, Public Comments of Humana on the | |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

47

STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:16-cv-08697-AWF (SSx)

0206

| | **UNITED'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE:** | |
|---|---|---|
| | Proposed RADV Methodology, at AR5105-08; Schindler Decl. Ex. 32, Public Comments of United on the Proposed RADV Methodology, at AR5205-07. | |
| | 103. Among them was the American Academy of Actuaries, which stated that it was inappropriate to develop risk coefficients "with FFS data that . . . were not validated or audited for accuracy" but then "apply those factors only to MA data that are validated." Schindler Decl. Ex. 33, Public Comments of the American Academy of Actuaries on the Proposed RADV Methodology, at AR5235-36. Doing so, it said, could result in "systematic underpayment." *Id.* at AR5236. | |
| | 104. Multiple commenters also noted that this approach would violate the statutory requirement that risk adjustment ensure "actuarial equivalence." *See, e.g.,* Schindler Decl. Ex. 30, Public Comments of Aetna at AR5053-54; Schindler Decl. Ex. 31, Public Comments of Humana, at AR5114 (Humana); see also 42 U.S.C. § 1395w-23(a)(1)(C)(i). | |
| | 105. CMS officials acknowledged that the commenters were right, stating in internal CMS documents: "The industry has argued that in the RADV audits we are holding them to a standard of perfection for diagnosis coding but that | |

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

48

STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
2:16-cv-08697-MWF (SSx)

0207

| | |
|---|---|
| **UNITED'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE:** | |
| physician claims in FFS Medicare often include diagnoses that aren't supported in the medical record. And this wouldn't matter except that we use FFS claims data to develop our risk adjustors for Medicare Advantage. So when we estimate the relative cost of any given condition, we use diagnosis and cost data from FFS Medicare. So implicit in all of the adjustments we make to plans payments to account for the relative risk of their populations, are the factors that we developed using FFS data. … [f]**or our payments to be as accurate as possible, we should be using the same standard for both…** To answer this issue, we can incorporate a FFS adjuster that estimates how much higher the plans payment would be if the model had been built using perfect data. This factor would reduce the estimated RADV overpayments due from each plan. **We think this approach makes sense and from a technical point of view is the right thing to do."**) | |
| Schindler Decl. Ex. 16, FOIA Agenda, at CMS0006200-01 (emphasis added). | |
| 106. When CMS published a revised RADV methodology in February 2012, | |

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

49

STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
2:16-cv-08697-MWF (SSx)
0208

| | | |
|---|---|---|
| **UNITED'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE:** | | |
| it said that in determining any contract-level payment adjustments, it would apply a "FFS adjuster." Schindler Decl. Ex. 26, Final RADV Methodology, at AR5314. | |
| 107. CMS explained that "[t]he FFS adjuster" would "account[] for the fact that the documentation standard used in RADV audits to determine [an MA] contract's payment error (medical records) is different from the documentation standard used to develop the Part C risk-adjustment model (FFS claims)." *Id.* at AR5314-15. | |
| 108. If the effect of the unsupported codes in CMS's data is greater than or equal to the effect of the unsupported codes in the plan's data, the audit will conclude with a finding that there has been no overpayment such that "the final recovery amount is equal to zero." *Id.* at AR5314. | |
| 109. CMS stated that the "amount of the adjuster" would "be calculated by CMS based on a RADV-like review of records submitted to support FFS claims data." *Id.* at AR5315. | |
| 110. CMS has not yet published a FFS adjuster or the FFS payment error rate, despite publishing the relevant methodology over six years ago. *See Id.* at AR5314 | |
| **C. Additional Material Facts Establishing the Link Between This Motion** | |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

50

STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
2:16-cv-08697-MWF (SSx)

0209

| UNITED'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE: | |
|---|---|
| and United's Pending Administrative Challenges To The Government's Current Overpayment Theory | |
| 111. In 2014, in connection with CMS's proposal of regulations about the "Reporting and returning of overpayments," multiple MA plans urged CMS to make explicit in its overpayment regulation the point that it had already recognized in its audit regulation: That "an overpayment cannot exist for an MA organization's particular contract unless CMS's payments to the [plan] as a whole are inaccurate in light of an appropriate Fee-for-Service Adjuster that is applied to the entire contract." Schindler Decl. Ex. 34, Public Comments of Humana on the Overpayment Rule, at AR907. | |
| 112. United explained to the agency that, "[u]nder the Proposed Rule, [MA plans] will be undercompensated for the relative risk of their membership if they delete diagnosis codes from claims that are unsupported in a medical record and CMS does not simultaneously account for the equivalent diagnoses in FFS data." Schindler Decl. Ex. 35, Public Comments of United on the Overpayment Rule, at AR1041. | |
| 113. CMS refused, announcing in its final rule (known as the "Overpayment Rule") that any undocumented diagnosis code would result in an overpayment to an MA plan: "[A] risk adjustment diagnosis that has been | |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

51

STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
2:16-cv-08697-MWF (SSx)

0210

| UNITED'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE: | |
|---|---|
| submitted for payment but is found to be invalid because it does not have supporting medical record documentation would result in an overpayment," regardless of the errors in the agency's own FFS data. Schindler Decl. Ex. 36, Overpayment Rule, at AR1313. | |
| 114.  The agency made no attempt to reconcile that view with its prior recognition of the need for a FFS adjuster when identifying overpayments through RADV audits. Instead, it argued that MA plans' contracts with CMS required them to "certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the risk adjustment data they submit to CMS." *Id.*; see 42 C.F.R. § 422.504(l). It also asserted that the agency had a "long-standing risk adjustment data requirement that a diagnosis submitted to CMS by an MA organization for payment purposes must be supported by medical record documentation." Schindler Decl. Ex. 36, Overpayment Rule, at AR1314-15. | |
| 115.  United subsequently brought an Administrative Procedure Act suit challenging the Overpayment Rule in the U.S. District Court for the District of Columbia.  United has argued there that unless CMS implements a mechanism to account for unsupported diagnosis codes in CMS's own FFS | |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

52

STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:16-cv-08697-MWF (SSx)
0211

| | UNITED'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE: | |
|---|---|---|
| | data, requiring MA plans to delete unsupported codes in their provider-submitted data would violate CMS's statutory obligation under 42 U.S.C. § 1395w-23(a)(1)(C)(i) to "ensure actuarial equivalence" between the MA and traditional Medicare programs. *See* Schindler Decl. Ex. 37, APA United Opening Br. at 8 (ECF 47-1). | |
| | 116. In addition, United has argued that requiring deletions by MA plans without comparable adjustments in the FFS data would violate CMS's statutory obligation to "us[e] the same methodology" when calculating risk scores of patients in the traditional Medicare program that it "expect[s] to be applied in making payments to MA plans. 42 U.S.C. § 1395w-23(b)(4). *See* Schindler Decl. Ex. 37, APA United Opening Br. | |
| | 117. In response, CMS has argued that the Overpayment Rule does not present a proper opportunity to challenge its present view that every unsupported diagnosis code submitted by an MA plan results in an overpayment and must therefore be deleted. Schindler Decl., Ex. 40, APA CMS Reply Br., at 5-9 (ECF 64). | |
| | 118. Relying on the same contractual, regulatory, and sub-regulatory provisions the government has invoked here, CMS has argued there that MA plans have long been required to delete | |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

53

STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:16-cv-08697-MWF (SSx)

0212

| | UNITED'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE: | |
|---|---|---|
| | all unsupported codes they identified, and that the Overpayment Rule therefore changed nothing. *Id.* | |
| | 119.  United has argued in turn that the contracts, manuals, and regulations are at best ambiguous, that they can and should be read in a manner consistent with CMS's adoption of a FFS Adjuster, and that if they are not read that way—and instead read to require deletion of all unsupported codes in MA data without any adjustment for the FFS data—then the provisions at issue would be unlawful in light of the statutory provisions discussed above.  Schindler Decl. Ex. 39, APA United Resp. Br., at 28-39 (ECF 60). | |
| | 120.  The parties completed summary judgment briefing in February (totaling over 200 pages), and Judge Collyer has scheduled argument for August 8, 2018. | |
| | **D. Additional Material Facts Demonstrating that CMS Communicated to United that Two-Way Looks Were Not Required** | |
| | 121.  Given the "volume and variety" of diagnosis codes, CMS has recognized that the presence of at least some unsupported codes is "inevitable."  Schindler Decl. Ex. 41, 2001 Medicare Managed Care Manual § 110.2, at AR5349. | |
| | 122.  In 2014, CMS considered and | |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

54

STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:16-cv-08697-MWF (SSx)
0213

| | UNITED'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE: | |
|---|---|---|
| 1 2 3 | | |
| 4 5 6 7 8 9 10 11 | then affirmatively decided not to finalize a proposed rule that would have prohibited MA organizations from performing reviews that only looked for additional diagnosis codes (known as "one-way" reviews). *See* Schindler Decl. Ex. 42, 79 Fed Reg 1918, 2000 (January 10, 2014) (proposed medical record review rule); Schindler Decl. Ex. 36, 79 Fed Reg 29844, 29926 (May 23, 2014) (finalized rule without medical record review component). | |
| 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28 | 123. During conversations between United and CMS over the course of the spring and early summer of 2014, CMS confirmed multiple times that "two-way" looks were not required. *See* Schindler Decl. Ex. 44, Deposition of Larry Renfro at 134:1 – 137:6 (May 6, 2016) ("Renfro Dep.") (describing a conversation between Larry Renfro, the CEO of Optum, and then-Deputy Administrator of CMS Jonathan Blum); Renfro Dep. at 150:21 – 151:10 (describing a telephone conversation between Mr. Renfro and Marilyn Tavenner, then-Administrator of CMS, on April 8, 2014); Schindler Decl. Ex. 45, MARA2160500 (reflecting the same April 8, 2014 conversation between Ms. Tavenner and Mr. Renfro regarding the implications of the proposed rule); Schindler Decl. Ex. 46, MARA1998459 (coordinating by email an in-person meeting between senior officials at CMS and United regarding United's obligations in light of the | |

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

55

STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:16-cv-08697-MWF (SSx)
0214

| UNITED'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE: | |
|---|---|
| proposed medical record review rule); Schindler Decl. Ex. 47, MARA2157039 (T. Johnson notes from April 29, 2014 meeting between United and CMS officials). | |
| 124. Specifically, in March 2014, Deputy Administrator of CMS Jonathan Blum told Larry Renfro, CEO of Optum (a United affiliate), that unless and until CMS adopted a regulation requiring MA plans to use their chart reviews to look both ways, there was no obligation for plans to do so. Schindler Decl. Ex. 44, Renfro Dep. at 134:1 – 137:6 (including testimony by Mr. Renfro that Mr. Blum "told me that at this point [the proposed rule]'s not in effect. As a result of not being in effect, we shouldn't be doing it," referring to United's claims verification program). | |
| 125. CMS Administrator Marilyn Tavenner told Mr. Renfro the same thing in a subsequent telephone conversation. See id. at 150:21 – 151:10; 160:9 – 163:17 (including testimony by Mr. Renfro paraphrasing Ms. Tavenner's telling him that "If the proposed rule goes into effect January 1, 2015, [United] should be doing normal business, which means [United] d[id] not have to be doing claims verification"); see also Schindler Decl. Ex. 45, MARA2160500 (reflecting the same April 8, 2014 conversation between Ms. Tavenner and Mr. Renfro | |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

56

STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
2:16-cv-08697-MWF (SSx)

0215

| | UNITED'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE: | |
|---|---|---|
| regarding the implications of the proposed rule). | | |
| 126. On April 29, 2014, UnitedHealth sent four executives to meet with no fewer than five top officials from CMS: the new Deputy Administrator and Director of the Center for Medicare, Sean Cavanaugh; the Director of the Medicare Plan Payment Group, Cheri Rice; the Deputy Director of Medicare Parts C and D, Cynthia Tudor; the Special Assistant at CMS, Dan Farmer; and the Director of the Division of Capitated Plan Audits, Financial Services Group. Schindler Decl. Ex. 47, MARA2157039 (T. Johnson notes from April 29, 2014 meeting between United and CMS officials). | | |
| 127. As Ms. Tavenner acknowledged during her deposition, Mr. Renfro set up this meeting between United and CMS to obtain clarification regarding United's obligations in light of the proposed rule. . *See* Deposition of Marilyn B. Tavenner at 126:15-127:10 (February 28, 2018) ("Tavenner Dep.") (**Q:** You testified a moment ago you said "I understand your concern," okay? What was the concern that you understood Mr. Renfro to be expressing to you? **A:** It's basically what's written here. He was getting ready to sign an attestation. He was unclear about what to do with the records that he had reviewed, and it didn't really get into as much detail as was in this email, but it | | |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

57

STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:16-cv-08697-MWF (SSx)

0216

| | UNITED'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE: | |
|---|---|---|
| | was enough where the proposed rule, the fact that he wanted to sign for validation, he needed an answer. I referred him to the staff. **Q:** And he needed an answer about whether it was appropriate for United to cease looking for diagnosis codes to delete, correct? MR. FREEBORNE: Objection to form. **A:** He was looking for an answer about what he was supposed to do with the records he had reviewed, because he wanted to sign the attestation, and he wanted to make sure he did it correctly."); *see also* Schindler Decl. Ex. 46, MARA1998459 (coordinating by email an in-person meeting between senior officials at CMS and United to "confirm [United's] understanding"). | |
| | 128. During that meeting, CMS told United that unless and until a proposed rule governing the review of medical records became final, MA plans did not, and do not, have an affirmative obligation to confirm whether diagnosis codes submitted by physicians are supported in the medical records. *See* Schindler Decl. Ex. 47, MARA2157039 (T. Johnson notes from April 29, 2014 meeting between United and CMS officials, noting that "CMS representatives reiterated that, under CMS regulations, MA plans were not required to design their chart review programs for overall accuracy until the proposed rule is finalized" and that Cheri Rice of CMS stated that "until the proposed rule relating to | |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

58

STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
2:16-cv-08697-MWF (SSx)
0217

| | |
|---|---|
| **UNITED'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE:** | |
| medical records review was finalized, MA plans do not have a proactive responsibility to confirm whether diagnoses submitted by physicians are correct"). | |
| 129. United MA Plans memorialized this understanding, including in subsequent bids and risk adjustment data attestations they provided to CMS under the contracts. *See, e.g.,* Schindler Decl. Ex. 12, MARA1296259 (April 30, 2014 email from S. Nelson to C. Rice (CMS) regarding 2012 DOS risk adjustment data attestation, noting that CMS confirmed "that MA plans are . . . not currently required to design their medical record reviews to determine the accuracy of risk adjustment diagnoses"); Schindler Decl. Ex. 13, MARA2152278 (June 26, 2015 email from S. Nelson to C. Rice regarding 2013 DOS risk adjustment data attestation, noting "During our conversations last year before the proposed rule was withdrawn, CMS confirmed to us that the proposed requirements would not apply until the effective date of the rule, and that MA plans were thus not required to design their medical record reviews to determine the accuracy of risk adjustment diagnoses); Schindler Decl. Ex. 20, USBP000498420 (June 7, 2016 email from S. Nelson to C. Rice regarding 2014 risk adjustment data attestation, providing similarly); | |

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

59

STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
2:16-cv-08697-MWF (SSx)

0218

| **UNITED'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE:** | |
|---|---|
| Schindler Decl. Ex. 49, MA Supporting Documentation for CY2015 Bid, UHC of California, Inc., Contract No. H0543-001-000, at 8, dated Aug. 5, 2014 (emphasis added) (providing: "We . . . adjusted projected risk scores to account for changes in our medical record review processes. Specifically, *based on multiple conversations with CMS and CMS's treatment of medical record review in its recent rulemaking process, the health plan has decided to cease one of its prior processes that identified and deleted certain diagnoses codes through the medical record review process*"). | |

**E. Additional Material Facts Demonstrating That Under the Government's Reading of the Contract, United's Bid Limitations Stating that United Was Not Validating Codes Were Incorporated Into the Contract's Payment Scheme As Well**

| 130. Article II of the MA contracts incorporates the "final Plan Benefit Package (PBP) bid submission (benefit and price bid proposal as approved by CMS. Rice Decl. Ex. 1, at 6. | |
|---|---|
| 131. CMS requires MAOs to explain the assumptions underlying their bids, provide supporting documentation for theirbids, and have an actuary certify that the assumptions are reasonable. *See, e.g.*, Schindler Decl. Ex. 51, Instructions for Completing the Medicare Advantage Bid Pricing Tools for Contracy Year 2014, at 95-110 (Apr. 5, 2013). | |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

60

STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:16-cv-08697-MWF (SSx)
0219

| **UNITED'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE:** | |
|---|---|
| 132. Starting at least as early as 2011, United's final Plan Benefit Package each year explicitly stated: "[C]onsistent with our prior year activities … [a]s part of the preparation of the bids, we did not attempt to validate any actual or projected risk scores through a review of applicable medical records or of the systems used to submit RAF data to CMS." Schindler Decl. Ex. 50, MA Supporting Documentation for CY2012 Bid, Pacificare of California, Inc., Contract No. H0543-007-000, at 5, dated June 5, 2011; *see also* Schindler Decl. Ex. 49, MA Supporting Documentation for CY2015 Bid, UHC of California, Inc., Contract No. H0543-001-000, at 8, dated Aug. 5, 2014 (stating in 2015 bid submission that "the health plan has decided to cease one of its prior processes that identified and deleted certain diagnosis codes through the medical record review process"). | |
| 133. CMS reviewed and approved United's bid submission prior to execution of the final contract. *See* 42 C.F.R. 422.256(b). | |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

61

STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
2:16-cv-08697-MWF (SSx)

0220

1  Dated: July 23, 2018

LATHAM & WATKINS LLP
DAVID J. SCHINDLER
2
DANIEL MERON
KATHRYN H. RUEMMLER
3
ABID R. QURESHI

4

5  By /s/ David J. Schindler
   David J. Schindler
6  Attorneys for United Defendants

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

62

STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
2:16-cv-08697-FMO-SS (SSx)
0221

**EXHIBIT D-4**

CHAD A. READLER
Acting Assistant Attorney General, Civil Division
NICOLA T. HANNA
United States Attorney
DOROTHY A. SCHOUTEN
Chief, Civil Division
DAVID K. BARRETT
Chief, Civil Fraud Section
DAVID M. HARRIS
Deputy Chief, Civil Fraud Section
JOHN E. LEE (CBN 128696)
Assistant United States Attorneys
    300 N. Los Angeles Street, Room 7516
    Los Angeles, California 90012
    Tel: (213) 894-3995; Fax: (213) 894-7819
    Email: john.lee2@usdoj.gov
MICHAEL D. GRANSTON
DANIEL R. ANDERSON
EDWARD CROOKE
JUSTIN DRAYCOTT
PAUL G. FREEBORNE
JESSICA KRIEG
PAUL PERKINS
CAROL L. WALLACK
Attorneys, Civil Division
United States Department of Justice
    P.O. Box 261, Ben Franklin Station
    Washington, D.C. 20044
    Tel: (202) 307-0486; Fax: (202) 307-3852
    Email: carol.wallack@usdoj.gov
JAMES P. KENNEDY, JR.
United States Attorney
KATHLEEN ANN LYNCH
Assistant United States Attorney (Admitted PHV)
    138 Delaware Avenue
    Buffalo, New York 14201
    Tel: (716) 843-5830; Fax: (716) 551-3052
    Email: kathleen.lynch@usdoj.gov
Attorneys for the United States of America

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING, <br><br> Plaintiffs, <br><br> v. <br><br> UNITEDHEALTH GROUP, INC. *et al.*, <br><br> Defendants. | No. CV 16-08697 MWF (SSx) <br><br> AMENDED JOINT RULE 26(f) REPORT <br><br> DATE: April 9, 2018 <br> TIME: 11 a.m. <br> COURTROOM: 5A |

0223

1    The Parties submit this amended Joint Report to the Court regarding the

2    Rule 26(f) conference that counsel for the Parties conducted by telephone on

3    December 8, 2017.  At the Rule 26(f) conference, the Parties discussed the topics

4    set forth in Rule 26(f), along with the topics set forth in the Court's February 28,

5    2018 Order Setting Scheduling Conference.  The Parties then submitted a Joint

6    Report on December 22, 2017 (Dkt. No. 191), which this Report updates and

7    supersedes.  The Parties' respective positions regarding each topic are set forth in

8    detail below.

9    **A.    Statement of the Case**

10   _United States and Relator's Position_:  This is a civil fraud action under the

11   False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, as well as for restitution and

12   common law damages, for monies unlawfully obtained and retained by Defendant

13   UnitedHealth Group, Inc. and various of its direct and indirect subsidiaries

14   ("Defendants") involved in Parts C and D of the Medicare Program.[1]  Pursuant to

15   its First Claim for Relief set forth in its First Amended Complaint ("FAC"), filed

16   on November 17, 2017 (Dkt. No. 171), the United States alleges that Defendants

17   violated 31 U.S.C. § 3729(a)(1)(G), known as the "reverse false claims" provision,

18   by knowingly (as "knowingly" is defined by 31 U.S.C. § 3729(b)(1)) concealing or

19   knowingly and improperly avoiding their obligations to repay significant sums of

20   money to the Medicare Program.[2]  Specifically, for over a decade, Defendants have

21   been knowingly concealing and knowingly and improperly avoiding their

22   contractual and regulatory obligations to repay risk adjustment payments to which

23   they were not entitled from the Medicare Program.  In particular, Defendants failed

24

25   [1] On February 12, 2018, this Court issued an Order granting Defendants' motion to dismiss the United States' Second, Third, and Fourth Claims for Relief under the False Claims Act but denying the motion as to the United States' First, Fifth, and

26   Sixth Claims for Reliefs.  (Dkt. No. 212)  Accordingly, this statement about the case focuses on the First, Fifth, and Sixth Claims for Relief.

27   [2] On May 16, 2017, Plaintiff-Relator Benjamin Poehling filed his Second Amended

28   Complaint (Dkt. No. 117) against Defendants.  He is not pursuing any claims beyond those asserted by the United States.

to comply with their well-established contractual and regulatory obligations to delete, withdraw, retract, or correct invalid diagnoses submitted by them to the Medicare Program for risk adjustment payments based on the health status of beneficiaries in their Medicare Advantage plans or to otherwise return to the Medicare Program the overpayments based on the invalid diagnoses. On information and belief, Defendants continue to engage in this unlawful conduct.

Pursuant to its Fifth Claim for Relief, the United States alleges that, based on the same wrongful conduct, Defendants have been unjustly enriched by receiving risk adjustment payments to which they were not entitled and must make restitution. Pursuant to the Sixth Claim for Relief, the United States seeks to recover the overpayments because they were paid by the United States based on the mistaken belief that Defendants' diagnosis data was valid.

The United States' claims relate in part to Defendants' very large national Chart Review Program, which they have conducted annually since 2005. The United States alleges that Defendants systematically ignored the negative results of their chart reviews, *i.e.*, results showing that diagnoses submitted by them for risk adjustment payments were not supported by their beneficiaries' medical records, and failed to comply with their obligations to delete the unsubstantiated diagnoses. The United States Court of Appeals for the Ninth Circuit, in *United States ex rel. Swoben v. UnitedHealthcare Ins. Co.*, 848 F.3d 1161, 1175-76 (9th Cir. 2016), held that this type of conduct – turning a blind eye to information about unsupported diagnoses – constitutes reckless disregard and deliberate ignorance toward the truth or falsity of the data submitted to the Medicare Program. On information and belief, Defendants have continued to ignore the negative results of their Chart Review Program and, thus, have continued to avoid repaying the Medicare Program overpayments based on invalid diagnoses. The United States seeks to recover all overpayments due to Defendants' violation of the FCA.

0225

Case 2:16-cv-08697-FMO-PVC   Document 616-3   Filed 08/06/24   Page 229 of 637
Page ID #:3170
Case 2:16-cv-08697-MWF-SSP   Document 22-1   Filed 04/02/18   Page 4 of 57   Page ID #:19123

In addition, the United States' claims relate to Defendants' disregard of information from their Risk Adjustment Coding Compliance Review ("RACCR") Program about invalid diagnoses reported to them by their financially-incentivized capitated and gainsharing providers.  The United States alleges that Defendants knew that these providers had a financial incentive to report invalid diagnoses to increase risk adjustment payments and, based on the results of the RACCR Program, that the providers actually or likely over-reported diagnoses, but Defendants nonetheless continued to submit diagnoses from these providers and knowingly and improperly avoided repaying Medicare for risk adjustment payments based on invalid diagnoses from these providers.

*UnitedHealth's Position*:  This case arises from the United States' and Relator's effort to change the rules governing obligations of Medicare Advantage ("MA") plans to verify data submitted by third-party healthcare providers.  The United States claims that UnitedHealth was obligated to undertake efforts to verify diagnostic data from third-party healthcare providers that the government itself does not undertake with respect to beneficiaries it insures under traditional Medicare.  UnitedHealth believes that the United States is seeking to impose obligations that simply did not, and do not, exist.  UnitedHealth submitted bids to care for a population of beneficiaries based on a set of statutory and regulatory rules administered by the Centers for Medicare and Medicaid Services ("CMS").  Those rules include CMS's risk adjustment methodology, which already reduces the amount that UnitedHealth and other MA plans receive in a way that builds in and reflects the existence of unsupported diagnosis codes.  In addition, CMS applies a statutory coding intensity adjustor, reducing payments to MA plans, to account for Chart Review activities and other differences in coding patterns between MA plans and CMS FFS data.  UnitedHealth has not been overpaid, unjustly enriched, or paid by mistake under those rules; to the contrary, requiring

1   UnitedHealth to delete unsupported diagnosis codes would result in UnitedHealth

2   being *under* paid.

3          Furthermore, UnitedHealth was transparent with CMS about the extent to

4   which it was reviewing diagnosis codes submitted to it by providers, and CMS

5   officials confirmed it was not required to do so-called "two-way looks" to double-

6   check provider submissions.  This suit is a misguided attempt to second guess that

7   CMS guidance and oversight of the MA program, pursuing a windfall for the

8   United States and Relator by forcing UnitedHealth to suffer a loss for playing by

9   the rules CMS originally set up more than a decade after the fact.  UnitedHealth

10  has therefore asserted counterclaims for (1) Breach of Contract; (2) Breach of

11  Covenant of Good Faith and Fair Dealing; (3) Fraudulent Inducement; (4)

12  Negligent Misrepresentation; and (5) Promissory Estoppel.

13  **B.     Subject Matter Jurisdiction**

14         *United States and Relator's Position*:  This Court has subject matter

15  jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331, 1345, & 1367(a)

16  and 31 U.S.C. § 3732(a)-(b).  The Court does not possess subject matter

17  jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367 or Federal Rule of Civil

18  Procedure 13 over Defendants' counterclaims.

19         *UnitedHealth's Position*:  As to the counterclaims, this Court has subject

20  matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367, as well as Federal

21  Rule of Civil Procedure 13.  To the extent jurisdiction is proper under the

22  Complaint, it is also proper under the counterclaims, which arise out of the same

23  transactions and occurrences alleged in the Complaint.

24  **C.     Legal Issues**

25         *United States and Relator's Position*:  Many, if not most, of the key legal

26  issues presented by this case have already been decided by the Ninth Circuit in its

27  opinion in *Swoben*, including that (1) Defendants were not entitled to risk

28  adjustment payments for diagnoses unsubstantiated by their beneficiaries' medical

Case 2:16-cv-08697-FMO-PVC   Document 616-3   Filed 08/06/24   Page 231 of 637
Case 2:16-cv-08697-MWF-SS   Document 222   Filed 04/02/18   Page 6 of 57   Page ID #:3172
Page ID #:19125

1   records, 848 F.3d at 1168 ("Each diagnosis code submitted must be supported by a

2   properly documented medical record") (citations omitted); (2) Defendants were

3   obligated to exercise due diligence to ensure the validity of the diagnosis data they

4   submitted for risk adjustment payments and to take affirmative steps to address

5   errors in the diagnosis data they submitted for such payments, *id*. at 1174 ("The

6   defendants' contention that they were under no obligation to take affirmative steps

7   to address errors . . . ignores § 422.503, which since 2005 has required Medicare

8   Advantage organizations to have effective compliance programs in place,

9   including 'procedures for internal monitoring and auditing" and for 'ensuring

10  prompt response to detected offenses'") (citing 42 C.F.R. § 422.503(b)(4)(vi),

11  (vi)(F), (vi)(G) (2005)); (3) Defendants were obligated to withdraw diagnoses

12  unsupported by their beneficiaries' medical records, *id*. at 1185 n. 8 ("[I]f a

13  Medicare Advantage organization relied on medical record X to justify submitting

14  a particular diagnosis code to CMS initially, and the retrospective reviewer

15  concludes X does not support that diagnosis, then the code should be withdrawn");

16  and (4) Defendants acted with actual knowledge that the diagnoses they submitted

17  were false when they withheld known errors from CMS and acted with reckless

18  disregard and deliberate ignorance about the falsity of the data submitted to CMS

19  when they turned a blind eye to the errors and did not withdraw them, *id*. at 1175-

20  76.  The Court also rejected Defendants' argument that, because CMS does not

21  verify diagnoses submitted under different parts of the Medicare Program (which

22  pay providers based on services rendered, not diagnoses submitted), Defendants

23  are entitled to risk adjustment payments based on diagnoses unsubstantiated by

24  their beneficiaries' medical records.  848 F.3d at 1179 (rejecting this so-called

25  "actuarial equivalence" argument for "multiple reasons").

26          In addition, in its February 12, 2018 opinion on Defendants' Motion to

27  Dismiss ("MTD") (Dkt. No. 212), this Court held that the United States' FAC

28  adequately and "extensively alleges how central the diagnostic data is to the risk

0228

Case 2:16-cv-08697-MWF-SSP Document 616-3 Filed 04/02/18 Page 7 of 57 Page ID #:3173
Case 2:16-cv-08697-FMO-PVC Document 222 Filed 08/06/24 Page 232 of 637
Page ID #:19126

1    adjustment payments CMS makes to Defendants" and "that the Government's

2    FAC contains enough factual allegations of the effect of the submission of invalid

3    diagnosis codes on the Government's risk adjustment payments, and on

4    Defendants' retention of risk adjustment payment to which they are not entitled, to

5    satisfy the *Escobar* [materiality] standard." Order on MTD at 19-20. This Court

6    further held that, with respect to the Government's claims based on the second part

7    of the reverse false claims provision, 31 U.S.C. § 3729(a)(1)(G), "[t]he

8    Government has adequately pled facts showing that the Defendants have

9    knowingly avoided obligations to repay CMS by failing to delete invalid diagnosis

10   codes, and that such failure was material" and that "the issue here is . . . the

11   specific invalid diagnosis codes that Defendants submitted and failed to delete

12   despite information available to them." *Id*. at 20-21. Accordingly, both the Ninth

13   Circuit and this Court have recognized the direct link between the invalid

14   diagnoses submitted by Defendants and the risk adjusted payments by Medicare.

15   *Swoben*, 848 F.3d at 1167-68 ("diagnoses codes contribute to an enrollee's risk

16   score, which is used to adjust a base payment rate"); Order on MTD at 15 ("not

17   only do various contractual and regulatory materials require Defendants to submit

18   accurate diagnostic data, but that data is central to the calculation of the amount of

19   money CMS pays to Defendants"). Moreover, the Government believes that,

20   consistent with the Ninth Circuit in *Swoben*, this Court has recognized that

21   Defendants had a legal obligation to repay CMS by deleting invalid diagnosis

22   codes, including diagnoses unsubstantiated by the beneficiaries' medical records.

23   *Id*.

24          Very recently, on March 23, 2018, Defendants filed an Answer to the FAC.

25   The Answer includes 21 enumerated affirmative defenses, some of which raise

26   new legal and factual issues. For example, Defendants contend that the wrongful

27   conduct alleged in the FAC was the fault of third parties (affirmative defense 19)

28   and that they are "not vicariously liable for the acts alleged in the" FAC

1   (affirmative defense 5), although Defendants also contend that they made a

2   voluntary disclosure to the Department of Justice of their wrongful conduct

3   pursuant to 31 U.S.C. § 3729(a)(2) (affirmative defense 21) and, thus, if they are

4   liable, their liability is limited to only double (not treble) damages.  Defendants

5   also contend that the Government failed to mitigate damages (affirmative defense

6   6) although Defendants, in 2012, represented to the Department of Justice that they

7   were developing a program to delete unsubstantiated diagnoses and would do so

8   (FAC ¶ 190) and despite the fact that Defendants never informed CMS about the

9   specific unsubstantiated diagnoses that they failed to delete.  *See* Order on MTD at

10  21 ("[G]eneralized knowledge does not amount to actual knowledge of specific

11  invalid diagnoses.  Without such actual knowledge, CMS could not know how it

12  should change the risk adjustment payments.")  Other new issues raised by

13  Defendants' affirmative defenses include, but are not limited to, that the "services

14  and products reimbursed by the United States under Medicare were worth what the

15  government paid" (affirmative defense 15), the Court does not possess subject

16  matter jurisdiction because the Relator is not an "original source" (affirmative

17  defense 16), and the Government's claims against one or more Defendants are

18  improperly joined with its claims against other Defendants and must be severed

19  (affirmative defense 17).  Plaintiffs are currently evaluating all 21 affirmative

20  defenses and presently anticipates moving to strike some of them under Rule

21  12(f)(2).  Plaintiffs will need to conduct discovery relating to at least some of

22  Defendants' affirmative defenses (depending on which remain), which may add

23  significantly to the amount of discovery that they need to conduct in this action.

24  For example, one of Defendants' affirmative defenses is that "[t]he services and

25  products reimbursed by the United States under Medicare were worth what the

26  government paid" (affirmative defense 15).  If the Court does not strike this

27  defense, then Plaintiffs would have to conduct extensive discovery about the

28

services and products that Defendants provided and whether they were worth what the Government paid.

Moreover, on March 23, 2018, Defendants filed five counterclaims against the Government. Defendants' counterclaims appear to be based in large part on their meritless "actuarial equivalence" argument. Defendants seek to avoid their legal obligations to delete diagnoses unsubstantiated by their chart reviews and to retain payments for the invalid diagnoses. This is based on their legally erroneous and entirely unreasonable interpretation of the terms "actuarial equivalence" and "same methodology" in that part of the Medicare Statute relating to payments to Medicare Advantage organizations ("MAOs"). There is nothing in the Medicare Statute, including the use of those terms in the Statute, which entitles Defendants to risk adjustment payments based on invalid diagnosis data. Defendants were never entitled to payments based on invalid data and had longstanding contractual and regulatory obligations to delete invalid diagnoses submitted by them for such payments. Their attempt to avoid their obligations and keep substantial sums (at least over one billion dollars for just four years) of Medicare funds and taxpayer dollars to which they were never entitled should be summarily rejected by this Court.

Plaintiffs believe that an early ruling by the Court on this "actuarial equivalence" legal issue will streamline discovery and resolution of this case. Alternatively, if Defendants are not asserting their "actuarial equivalence" argument in this case as they appear to represent in their statement of the legal issues (below), then they should stipulate that they are not asserting this argument here and withdraw their numerous and burdensome document requests relating to this issue.

The counterclaims also appear to be based on Defendants' contention that, in 2014, CMS purportedly misled them to believe that they could ignore the negative results of their chart reviews – the results showing the diagnoses that were

1   unsubstantiated by the beneficiaries' charts – and avoid their obligation to delete

2   the invalid diagnoses.  The Ninth Circuit, in *Swoben*, already rejected this

3   argument.  It explained that, although CMS decided in 2014 not to finalize the

4   proposed rule prohibiting MAOs from designing chart reviews to only identify

5   diagnoses for additional payments, CMS made clear that MAOs remained

6   responsible for ensuring the validity of their data to avoid receiving or retaining

7   overpayments.  848 F.3d at 1169-70.  The Ninth Circuit further explained that, in

8   2014, CMS finalized a regulation that had the same effect as the proposed

9   regulation because it required the return of overpayments resulting from the

10  submission of diagnoses that are unsupported by the beneficiaries' medical

11  records.  *Id*. at 1185 n.4.[3]  Furthermore, according to Defendants' own senior

12  executives, in 2014, CMS told them that they could not ignore information about

13  invalid diagnoses from their reviews of medical records and that CMS could not

14  advise Defendants about their compliance with laws regarding their overpayment

15  obligations.  (FAC ¶ 226 & 228-29).

16       The Government presently anticipates moving to dismiss the counterclaims.

17  Among other deficiencies with these counterclaims, it appears that Defendants'

18  alleged damages are anticipatory, contingent, and unripe in that they are premised

19  on this Court issuing a judgment requiring Defendants to repay the overpayments

20  due to their failure to delete invalid diagnosis data.  The primary intent of

---

22  [3] The regulation that CMS finalized in 2014 is often referred to as the
    Overpayment Rule, 42 C.F.R. § 422.326.  It is the regulation that Defendants
23  challenge in their Administrative Procedure Act ("APA") case.  That regulation
    was issued pursuant to the Patient Protection and Affordable Care Act ("ACA"),
24  42 U.S.C. § 1320a-7k(d), which requires MAOs to report and return overpayments
    no later than 60 days after their identification of the overpayments; otherwise, their
25  late overpayments become "obligations" under the FCA and the MAOs are subject
    to liability under the reverse false claims provision of the FCA even if they
26  returned the overpayments after 60 days.  The resolution of the APA case will not
    resolve this FCA case.  *See UnitedHealthcare Ins. Co. v. Price*, 2017 WL 2623783,
27  at 2-3 (D.D.C. June 14, 2017).  This case does not involve the Overpayment Rule
    because Defendants were not just late in returning the overpayments; they never
28  returned the overpayments.  Nonetheless, in this case, Defendants are demanding
    the production of documents relating to the Overpayment Rule.

1   Defendants' meritless counterclaims appears to be to divert the Government's

2   resources from focusing on its document production and other efforts in this

3   matter.

4         Pursuant to Rule 12(a)(2), the Government's response to the counterclaims

5   is due within 60 days after service of the counterclaims on the United States

6   Attorney, to and including May 22, 2018.  The Government and Relator also seek

7   the same 60 days to move to strike some or all of the affirmative defenses.

8   Plaintiffs recently sent Defendants a proposed stipulation that Plaintiffs will file

9   their motions to dismiss and to strike by May 22, 2018; Defendants may file their

10  oppositions by June 11, 2018; Plaintiffs may file their replies by June 25, 2018;

11  and the motions shall be heard on July 9, 2018.  If Defendants do not agree to this

12  stipulation, Plaintiffs will file an application with this Court seeking this relief.

13        In addition to issues identified elsewhere in this Report, including Section

14  M, Plaintiffs anticipate that other legal issues may arise as discovery continues.

15        _UnitedHealth's Position_:  This case centers on a dispute about the reciprocal

16  contractual, regulatory, and statutory obligations of MA plans and CMS in the MA

17  program.  As the Parties, as well as this Court, have previously recognized, the

18  "central" issues in the dispute are currently being litigated in an Administrative

19  Procedures Act suit in the District of Columbia.  _See_ Order Denying Motion to

20  Transfer at 4, ECF No. 154 (noting the government's agreement that "'identical

21  arguments'. . . are 'central' to the cases"); _see also UnitedhealthCare Ins. Co. v._

22  _Hargan_, No. CV-16-RMC (D.D.C.).[4]  Those issues include whether MA plans are

23  required to attempt to delete all unsupported diagnosis codes submitted to them by

24  providers, even though the model CMS uses to determine payment amounts is

25  based in part on unsupported codes that CMS itself collects in the Medicare Part A

26  and B programs.  CMS has acknowledged in the APA suit that it knowingly uses

27

28  [4] Upon the resignation of former Secretary of Health and Human Services Thomas
    Price, UnitedHealth's APA action was automatically re-captioned with the name of
    Acting Secretary Eric Hargan.

1   unsupported diagnosis codes to estimate its expected costs for Medicare patients

2   whose care it pays for directly under Medicare Parts A and B. UnitedHealth has

3   argued that CMS' choice has direct implications for the types of risk adjustment

4   data it collects from MA plans. Specifically, Congress has required CMS to use

5   the "same methodology" to determine payment amounts in the MA program, 42

6   U.S.C. § 1395w-23(b)(4), and has directed CMS to "ensure actuarial equivalence"

7   between the two programs, 42 U.S.C. § 1395w-23(a)(1)(C)(i). In light of those

8   statutory requirements, UnitedHealth believes that CMS cannot require MA plans

9   to use a different approach to the diagnosis codes they submit than the one CMS

10  itself uses, such as by requiring MA plans to delete all unsupported codes, unless

11  CMS also provides a means of adjusting for the different methodologies.

12          UnitedHealth and the United States have already fully briefed cross-motions

13  for summary judgment in the APA case addressing those issues. UnitedHealth

14  believes it would be inappropriate, inefficient, and a waste of judicial resources to

15  attempt to litigate those same issues here while they are already pending before the

16  APA court. If the APA court upholds the validity of the regulation there based on

17  a rejection of UnitedHealth's arguments described above, UnitedHealth will not

18  seek to re-litigate the regulation's validity here. If the APA court finds the

19  regulation *in*valid, then at that point the Parties will be able to address the

20  implications of such a decision for the United States' claims here. The extent to

21  which the "actuarial equivalence" and "same methodology" requirements will need

22  to be addressed by this Court, and the timing of any such consideration by this

23  Court, thus depends on the outcome in the APA case. UnitedHealth remains

24  willing to discuss those issues with the United States in an attempt to avoid

25  unnecessary and inefficient briefing on the United States' contemplated motion for

26  partial summary judgment on this issue (and has been open to such discussions

27  since the United States first raised the prospect of a motion for partial summary

28  judgment on this issue in November 2017).

Case 2:16-cv-08697-MWF-SS  Document 224  Filed 04/02/18  Page 13 of 579  Page ID #:3179
Case 2:16-cv-08697-FMO-PVC  Document 616-3  Filed 08/06/24  Page 238 of 637
Page ID #:19132

1    Depending on how the APA case is resolved, there may also be other FCA-
2  and fact-specific issues to resolve in this case, including:

3    (i)    Whether a physician's subjective clinical judgment regarding
4  diagnostic coding may give rise to a false claim under the FCA;

5    (ii)    Whether any regulatory or contractual violations UnitedHealth did
6  commit were committed "knowingly," in light of the regulatory landscape and the
7  government's knowledge and approval of UnitedHealth's chart review processes;

8    (iii)    Whether any alleged noncompliance was material to payment under
9  the FCA or the United States' unjust enrichment or payment by mistake claims;

10    (iv)    Whether the acts of UnitedHealth resulted in damages actionable
11  under the FCA or claims of unjust enrichment and payment by mistake; and

12    (v)    Whether the United States can sustain claims for unjust enrichment
13  and payment by mistake when valid contracts between the parties existed.

14    The United States has taken the position here, as it did on remand in
15  *Swoben*, that the Ninth Circuit's *Swoben* decision resolves many of these questions
16  in the United States' favor.  That is incorrect.  The Ninth Circuit's decision arose
17  following a dismissal on Rule 8 and 9(b) grounds, and resolved only the narrow set
18  of issues that were actually at issue there.  Specifically, the Parties there disputed
19  the extent of detail that Rule 9(b) requires at the pleading stage in a case like this
20  one, and also the extent of the verification obligations imposed by the "best
21  knowledge, information, and belief" standard contained in the contractual
22  attestation.  *See Swoben*, 848 F.3d 1178-79.  The Ninth Circuit expressly *declined*
23  to address whether the United States' allegations stated a claim under the reverse
24  false claims provision.  *Id.* at 1172 n.6.  Accordingly, *Swoben* is of minimal
25  guidance now that this Court has dismissed the United States' attestation-based
26  claims (Dkt. 212), and the only FCA claim remaining is based on a theory that was
27  not addressed by the Ninth Circuit.

28

Case 2:16-cv-08697-FMO-PVC   Document 616-34   Filed 08/06/24   Page 44 of 579   Page ID #:3180
Case 2:16-cv-08697-MWF-SS   Document 224   Filed 04/02/18   Page 14 of 23   Page ID #:19133
Page ID #:19133

In addition, contrary to the United States' contention, in granting in part UnitedHealth's motion to dismiss on February 12, 2018 (Dkt. 212), the Court did not "recognize[] that [UnitedHealth] had a legal obligation to repay CMS by deleting invalid diagnosis codes"—the Court merely held that, at this stage (where factual allegations must be accepted as true), the FAC contained sufficient allegations to plead materiality under the United States' remaining causes of action.  (Order on MTD at 20-21.)

The United States also fundamentally misconstrues UnitedHealth's counterclaims and affirmative defenses.  UnitedHealth's counterclaims and affirmative defenses do not rely on the actuarial equivalence issues being separately litigated in the APA case.  Rather, UnitedHealth's counterclaims are based on the fact that CMS failed to issue any rule or otherwise make clear any requirement to perform two-way looks, affirmatively represented to UnitedHealth that two-way looks were not required, knew that UnitedHealth understood it was not under an obligation to perform two-way looks and relied on that understanding in calculating its bids and entering into MA contracts with CMS, and continued to enter into and pay UnitedHealth under such contracts.  Yet the United States, years after the fact, seeks to alter the fundamental assumptions built into UnitedHealth's bids, and thus, their contracts with CMS.  The United States' conduct under these circumstances gives rise to UnitedHealth's valid assertion of counterclaims consisting of breach of contract, breach of the covenant of good faith and fair dealing, fraudulent inducement, negligent misrepresentation, and promissory estoppel.  UnitedHealth is prepared to litigate any motions to dismiss and/or strike its counterclaims and affirmative defenses.

**D.    Parties, Evidence, etc.**

      **1.    Parties**

The Parties are Plaintiff United States of America, Relator Benjamin Poehling, and Defendants UnitedHealth Group Incorporated, United HealthCare

Case 2:16-cv-08697-MWF-SS   Document 224   Filed 08/06/24   Page 240 of 637   Page ID #:8181
Case 2:16-cv-08697-MWF-SS   Document 616-3   Filed 04/02/18   Page 15 of 579   Page ID #:19134
Page ID #:19134

1  Services, Inc., UnitedHealthcare, Inc., Ovations, Inc., Optum, Inc., and

2  OptumInsight, Inc., as well as the numerous Medicare Advantage Organizations

3  identified in paragraph 26 of the FAC.  The full list of Defendants' parents and

4  subsidiaries is available in UnitedHealth's Corporate Disclosure Statement, Dkt.

5  No. 129, and UnitedHealth's Notice of Interested Parties, Dkt. 130.

6        **2.     Percipient Witnesses**

7        *United States and Relator's Position*:  Plaintiffs, at this early stage of the

8  litigation and subject to the factual record developed during discovery, identify the

9  following potential percipient witnesses in this case:  The individuals identified in

10  Plaintiffs' Initial Disclosures (served on Defendants on December 22, 2017) as

11  individuals likely to have discoverable information that the Government and

12  Relator may use to support their claims; Relator Benjamin Poehling; the current

13  and former executives and employees of Defendants identified in paragraph 42 of

14  the FAC; the individuals identified and/or described in the Declaration of Carol

15  Wallack in Support of the United States' Opposition to United's Motion to

16  Transfer, Dkt. No. 138-1; the current and former employees of the incentivized

17  providers listed in Exhibits 14 and 15 of the FAC; the chart reviewers and

18  diagnosis coders who reviewed charts and coded diagnoses as part of Defendants'

19  Chart Review, Claims Verification, and RACCR Programs; certain current and

20  former employees of CMS and its contractors, including Palmetto and ARDX; and

21  certain current and former participants in a managed care industry group called the

22  Industry Collaboration Effort ("ICE").

23        *UnitedHealth's Position*:  In addition to the witnesses identified by the

24  United States and the individuals identified in UnitedHealth's Initial Disclosures

25  (served on the United States on December 22, 2017) as those likely to have

26  discoverable information that UnitedHealth may use to support its claims and

27  defenses, UnitedHealth anticipates, subject to the factual record developed during

28  discovery, that the following may be key witnesses in this action:  (1) Marilyn

Tavenner, the former Administrator of CMS; (2) Jonathan Blum, the former

Principal Deputy Administrator and Director of CMS; (3) Sean Cavanaugh, the

former Deputy Administrator and Director of CMS; (4) Cheri Rice, the Acting

Deputy Director of the Center for Medicare at CMS; (5) Jeffrey Grant, the former

Division Director, Capitated Payment; (6) Dan Farmer, the former Special

Assistant at CMS; (7) Julia Gorner, Director, Division of Capitated Plan Audits at

CMS; (8) Cynthia Tudor, Deputy Center Director, Parts C and D at CMS; (9)

Lateefah Hughes, the former Acting Deputy Group Director of Payment Policy and

Financial Management at CMS; (10) Tom Hutchinson, the former Director of the

Medicare Plan Payment Group at CMS; (11) Sean Creighton, the former Deputy

Group Director of Payment Policy and Financial Management at CMS; (12)

Jennifer Harlow, the Acting Director and Deputy Director of Medicare Plan

Payment Group, Division of Payment Systems at CMS; (13) Jonathan Smith, the

Director of the Medicare Plan Payment Group, Division of Retiree Drug Subsidy at

CMS; (14) current and former government officials who (a) devised the MA risk

adjustment methodology; (b) reviewed UnitedHealth's annual MA plan bids

setting forth its proposed capitated payment amounts; (c) established CMS'

average cost and risk calculations within specific geographic regions; (d)

developed the methodology CMS uses for its own audits of MA plans; and (e) set

forth diagnosis coding and medical documentation criteria used by the government

itself in auditing health plans; and (15) UnitedHealth employees who will testify to

the fact that they believed, and still believe, that UnitedHealth was paid properly

and never submitted false statements or claims and did not knowingly and

improperly retain any overpayments or avoid or decrease any obligations.

### 3.  Key Documents

*United States and Relator's Position*:  Plaintiffs, at this early stage of the

litigation and subject to the factual record developed during discovery, identify the

following potential key categories of documents in this case:  The documents and

Case 2:16-cv-08697-MWF-SS  Document 616-34  Filed 08/06/24  Page 242 of 637  Page ID #:19136
Case 2:16-cv-08697-MWF-SS  Document 224  Filed 04/02/18  Page 17 of 579  Page ID #:3183
Page ID #:19136

electronically stored information ("ESI") identified in Plaintiffs' Initial Disclosures as documents and ESI that the Government and Relator may use to support their claims; the documents referenced in the FAC; documents relating to Defendants' Chart Review, Claims Verification, and RACCR Programs; documents relating to Defendants' knowledge (as that term is defined by the FCA) about inaccurate or untruthful diagnoses submitted by providers, including diagnoses unsubstantiated by the providers' medical records; documents relating to Defendants' obligation to submit accurate and truthful risk adjustment data to Medicare for risk adjustment payments, including the obligation to submit diagnoses substantiated by beneficiaries' medical records; documents relating to Defendants' obligation to retract, withdraw, or delete inaccurate or untruthful risk adjustment data submitted to Medicare, including the obligation to retract, withdraw, or delete diagnoses unsubstantiated by beneficiaries' medical records; documents relating to Defendants' submission of inaccurate or untruthful risk adjustment data to Medicare; documents relating to Defendants' failure to retract, withdraw, or delete inaccurate or untruthful risk adjustment data; documents relating to Defendants' contracts and other agreements with CMS and their attestations; medical records from the RACCR "financially incentivized" providers relating to the beneficiaries whose diagnoses are at issue; documents regarding liability accruals and reserves that one or more of the Defendants took relating to their Chart Review, Claims Verification, and RACCR Programs; documents relating to Defendants' communications with CMS about the above-mentioned issues; and documents related to damages.

*UnitedHealth's Position*:  UnitedHealth anticipates, subject to the factual record developed during discovery, that the key categories of documents in this action include:  (1) the documents and electronically stored information ("ESI") identified in UnitedHealth's Initial Disclosures as documents and ESI that UnitedHealth may use to support its claims and defenses; (2) documents

1  demonstrating that UnitedHealth was transparent with the government about its

2  claims verification program; (3) documents demonstrating that there was no

3  statutory or regulatory requirement for MA plans to "look both ways"; (4)

4  documents demonstrating that UnitedHealth did not knowingly retain any alleged

5  overpayments; and (5) documents demonstrating that the allegedly fraudulent

6  conduct was not material to payment.

7  **E.    Damages**

8      *United States and Relator's Position*:  At this time, Plaintiffs' damages

9  calculations for both its Chart Review and RACCR damages analyses do not

10  involve sampling or extrapolation.  Rather, at this time, Plaintiffs intend to identify

11  the specific diagnoses that Defendants failed to delete.  In addition, Defendants'

12  contention below that the FCA damages in this case should be reduced by an

13  undefined "benefit" conferred by them to the Medicare Program is unfounded.

14  There was no benefit to the Medicare Program from Defendants' receipt and

15  retention of payments based on invalid data.

16      Furthermore, contrary to Defendants assertion below, Plaintiffs do not seek

17  Defendants' assistance in determining their damages theories.  However, Plaintiffs

18  do seek and have a right to obtain the data and related information in Defendants'

19  possession that Plaintiffs need to calculate all of the damages to the Medicare

20  Program.

21      Chart Review Damages:  In this action, the Government seeks to recover its

22  damages for the 2009 payment year and all subsequent years during which

23  Defendants knowingly avoided their obligation to delete diagnoses invalidated by

24  their own chart reviews.  To date, the Government has data to determine its

25  damages for payment years 2011 to 2014.  Assuming that the Court will schedule

26  this action for trial for early 2020, the Government will limit its damages claim for

27  purpose of that trial to five additional payment years:  2009, 2010, and 2015 to

28

2017.[5]  Accordingly, the Government is now seeking to obtain from Defendants the data for those additional payment years.  Based on experience from the investigation, as recounted below, it will take Defendants a significant amount of time to produce the data for the other five years and, thus, for the Government to perform the damages analyses.

In the investigation of this matter, Defendants produced data and other information for the Government to assess its damages for four of the years at issue, the 2011 to 2014 payment years.  The Government requested this data from Defendants in July 2015.  It took Defendants one year, until July 2016, to produce the data for all four years.  In addition, after July 2016, Defendants continued to provide supplement data and information necessary to perform the damages analysis.  According to a December 2, 2016 letter from Defendants to the Government, for those four years, Defendants' initial production included 47 files containing 828 million rows of data and totaling 150 GB of data and subsequent productions included 60 supplemental and replacement files totaling an additional 150 GB of data.  This was not surprising as Defendants have conducted millions of chart reviews.  (FAC ¶ 169)

As alleged in paragraph 237 of the FAC, the Government determined that, for 2011 to 2014, Defendants failed to repay the Medicare Program at least $1.1 billion by failing to look both ways and delete diagnoses invalidated by their Chart Review Program.  These damages are based on (1) a comparison of the results of Defendants' chart reviews for those four years with the diagnoses they submitted for payment for those years in order to identify the unsubstantiated diagnoses that should have been deleted, as alleged in paragraph 235 of the FAC, and (2) a computation of the overpayments made to Defendants based on those invalid diagnoses.

---

[5] To the extent that Defendants are continuing to ignore the negative results of their current chart reviews and failing to delete the invalid diagnoses, the Government reserves its right to recover the damages for payment years after 2017.

On October 5, 2017, the United States served Defendants with its First Request for Production of Documents, which includes specific requests for the chart review and other data required to conduct the damages analyses for the 2009, 2010, and 2015 to 2017 payment years. To date, Defendants have not produced any of the requested data. In a letter dated March 7, 2018, Defendants stated that they anticipate producing data for 2015 to 2017 payment years by April 27, 2018, but that they reserve their right to modify what years are included and the data that Defendants will produce for the 2016 and 2017 payment years will not be complete. Defendants have not stated when they will produce the data for the 2009 and 2010 payment years.

Defendants are refusing to provide complete chart review and other data for the later payment years and to comply with Rule 26(e)'s requirement that discovery responses be supplemented or corrected if they are incomplete or incorrect. In a recent letter, Defendants state that they will not produce any chart review and other data necessary to assess damages after January 31, 2018. However, for the 2016 payment year, pursuant to a deadline set by CMS, Defendants (and other MAOs) are allowed to submit diagnoses to the Medicare Program until August 2, 2018. Thus, for that year, Defendants currently may be performing chart reviews in order to submit additional diagnoses to increase payments and they may continue to perform chart reviews and submit those additional diagnoses until August 2, 2018. Similarly, for the 2017 payment year, Defendants (and other MAOs) are allowed to submit diagnoses until September 14, 2018. Thus, for that year, Defendants also currently may be performing chart reviews in order to submit additional diagnoses to increase payments and they may continue to perform chart review and submit the additional codes until September 14, 2018. Accordingly, in order to obtain complete and accurate data to assess damages for payment years 2016 and 2017, Defendants must provide the Government with (i) the results of and other information about any chart reviews

relating to those years that were performed after January 31, 2018 and (ii) any
supplemental or corrected data relating to the beneficiaries whose charts were
reviewed for those years (for example, supplemental data would include any
additional diagnoses submitted by providers for those beneficiaries for those
years).  Because Defendants have refused to do this, the Government will move to
compel the production of complete and accurate data for the 2016 and 2017
payment years.

   In addition, since at least 2014, Defendants have submitted diagnoses
through two separate systems to CMS, the Risk Adjustment Processing System
(RAPS) and the Encounter Data Processing System (EDPS).  Defendants have two
separate databases that they use to report into each system.  Defendants' database
that submits diagnoses to RAPS is called IRADS.  It includes data about all of the
beneficiaries in Defendants' MA Plans, including the beneficiaries whose charts
were reviewed in Defendants' Chart Review Program.  This data includes, among
many other things, the dates of services of the medical encounters that the
beneficiaries had with providers, information identifying the providers, and the
diagnoses submitted by the providers.  Defendants' database that submits
diagnoses to EDPS includes additional information about the beneficiaries, the
providers, and the beneficiaries' health status.  That additional data is likely to be
very useful in assessing damages.

   In its October 2017 Document Request, the Government requested data from
both of Defendants' databases, IRADS and the database that submits to EDPS, in
order to ensure that it has complete and accurate data to perform its damages
analyses.  So far, Defendants have not agreed to provide the data from their
database that submits to EDPS.  Accordingly, the Government will move to
compel its production.

   After the requested documents and data are produced, the Government will
conduct the damages analyses for the 2009, 2010, 2015 to 2017 payment years.

The Government will present its damages pursuant to Rule 26(a)(2) relating to the disclosure of expert testimony.

For the Government to even attempt to make its initial damages expert disclosures by June 28, 2019 (the date proposed by Plaintiffs for initial expert disclosures), Defendants need to complete their production of the chart review and other data necessary to compute damages by September of 2018.  In order for their productions to be deemed complete, Defendants must provide all information necessary for the Government to understand and interpret the data that they produce.  It is the Government's understanding that Defendants will insist that the Government obtain this explanatory information through formal discovery (interrogatories and depositions).  Obtaining this information through formal discovery will significantly add to the time and effort necessary for the Government to make its initial damages expert disclosures.

RACCR Damages:  Defendants themselves estimated the amount of the overpayments they would have to return to the United States as a result of the RACCR Program in the tens of millions of dollars per year during the time period before they started phasing out the program.  In December 2017, Plaintiffs served Defendants with interrogatories to obtain the information necessary to conduct the first phase of their determination of these overpayments.  The interrogatories seek information necessary to identify which financially-incentivized (capitated and gainsharing) providers coded excessive numbers of diagnoses (more than three times the average rate), including those providers who were included in the RACCR Program and failed Defendants' sample validation test.  The interrogatories also seek information about the diagnoses that these providers coded at these excessively high rates and the beneficiaries for whom they coded these diagnoses.  Defendants have not yet provided all of the information requested by the interrogatories.  After Defendants complete their provision of this information (and assuming the information that Defendants provide is sufficient),

1    Plaintiffs plan to conduct the second phase of their overpayment analysis, which
2    will require obtaining medical records from the outlier providers and conducting
3    medical record reviews to determine the invalid diagnoses that Defendants should
4    have deleted.  Defendants have not stated when they will complete their responses
5    to these interrogatories.

6        <u>Defendants' Alleged Damages</u>:  Based on Defendants' counterclaims, it
7    appears that their purported damages are contingent entirely on their paying
8    damages to the Government in this action.  Accordingly, at this time, Plaintiffs do
9    not believe that there will be a need to conduct separate damages analyses
10   pertaining to Defendants' counterclaims.  However, because Defendants have
11   failed to provide any description of their purported damages or even a description
12   of their theory of damages either in their pleading setting forth their counterclaims
13   or in this report, Plaintiffs do not know whether their belief is correct.  If it is
14   incorrect, Plaintiffs will need additional time to conduct fact and expert witness
15   discovery relating to Defendants' damages.  Pursuant to Rule 26(e)(1)(B), the
16   Court should order Defendants to supplement their Rule 26(a)(1)(A) initial
17   disclosures to describe their damages as well as to list the witnesses and documents
18   supporting their counterclaims.

19       <u>*UnitedHealth's Position*</u>:  UnitedHealth denies that it owes any damages
20   alleged in the FAC.  UnitedHealth will have an alternate theory as to how damages
21   should be calculated if liability is established in light of the contracts and
22   reimbursement methodology and the FCA measure of damages, which take into
23   account the benefit already conferred on the government.  UnitedHealth anticipates
24   challenging the propriety of sampling and extrapolation and asserting that a fee-
25   for-service adjustor must be applied to account for unsupported codes in the
26   diagnostic data of fee-for-service beneficiaries.

27

28

At this point in the litigation, UnitedHealth does not have sufficient information to estimate damages associated with its counterclaims against the United States regarding its obligations under the MA program.

UnitedHealth notes that the United States and Relator's position above on Damages details discovery-related issues instead of setting forth "[t]he realistic range of provable damages," as required by the Court's Order Setting Scheduling Conference. UnitedHealth addresses the United States' mischaracterization of these discovery issues below in the proper section, Status of Discovery (Section I). The notion that the United States needs significantly more time to conduct routine discovery in a case it brought—despite the advantages of a multi-year investigation, detailed responses to dozens of complex (and sometimes improper and nonsensical) interrogatories, more than 20 Civil Investigative Demand oral examinations, over 630,000 documents produced by UnitedHealth during the investigation and in *Swoben*, 6 document productions totaling nearly 66,000 documents already in this litigation, and 5 spreadsheets of over 125,000 lines of data produced by UnitedHealth in response to the United States' First Set of Written Interrogatories to Defendants—rings hollow.

The United States chose to bring this lawsuit, and it cannot now complain about conducting routine discovery to which UnitedHealth is entitled and that UnitedHealth needs to defend itself. The United States effectively is seeking UnitedHealth's assistance in not only determining what their theory of damages is, but also in determining whether there are any damages (there are not). This is wholly improper and does not justify the United States delaying discovery or failing to meet its discovery obligations.

## F.    Insurance

Coverage is available to UnitedHealth for certain claims in the FAC under UnitedHealth's insurance policies, and UnitedHealth has agreed to make certain documents relating to those policies available to Plaintiffs.

## G.     Motions

*The United States and Relator's Position*:  As explained in Section C (Legal Issues), the Government presently anticipates filing a motion to dismiss Defendants' counterclaims.  In addition, the Government and the Relator presently anticipate filing a separate motion to strike certain of Defendants' affirmative defenses.  As explained in Sections E (Damages) and I (Status of Discovery), Defendants refuse to produce certain very relevant documents and Plaintiffs presently anticipate moving to compel the production of these documents.

In addition, the Government reserves the right to seek leave to (i) add any Medicare Advantage Organizations (or Part D Sponsors) directly or indirectly owned, affiliated with, or controlled by UnitedHealth Group that should be included in the list of such organizations set forth in paragraph 26 of the FAC; and, (ii) if necessary to recover its damages, to add any other entities affiliated with UnitedHealth Group that owned, controlled, or managed the Medicare Advantage Organizations. Information that has recently come to Plaintiffs attention indicates that some Medicare Advantage Organizations (or Part D Sponsors) directly or indirectly owned, affiliated with, or controlled by UnitedHealth Group may not have been expressly named in the FAC or may have been identified incorrectly. As needed, Plaintiffs will seek to stipulate with Defendants to amend the FAC to address these types of issues.

In addition to the motions identified in Section M, Plaintiffs anticipate considering additional motions as issues arise throughout the litigation.  Plaintiffs may also file motions to exclude certain documents as evidence for use both in supporting summary judgment motions and at trial.

*UnitedHealth's Position*:  UnitedHealth has engaged in good-faith discussions and negotiations on all issues raised by the United States during the course of discovery either to resolve or narrow any areas of disagreement between the Parties.  Those discussions and negotiations are ongoing, and UnitedHealth is

committed to working with the United States to avoid or limit the necessity for seeking intervention from the Court.

In addition, UnitedHealth reserves the right to seek leave to amend its counterclaims to add or substitute any Medicare Advantage Organizations (or Part D sponsors) that may subsequently be added or substituted by the United States in its FAC.

Both Parties reserve the right to file non-dispositive pretrial motions, including but not limited to motions related to discovery disputes, motions *in limine*, and motions to exclude experts. Dispositive motions are addressed below.

**H.** **Manual for Complex Litigation**

The Parties do not believe the Manual for Complex Litigation should be utilized in this case.

**I.** **Status of Discovery**

*The United States and Relator's Statement*:

In July 2017, the Court provided that "the Parties may engage in written discovery (document requests and interrogatories) and may do so before a Rule 26(f) conference." (Dkt. No. 133) Defendants have served the Government with two sets of document requests and the Relator with one set of document requests. The Government has also served Defendants with two sets of document requests. The Government has also served Defendants with several interrogatories to which Defendants are responding by producing documents.

*Government's Production of Documents*: The Government fully appreciates that Defendants have a right to obtain documents and other information relevant to the claims and defenses that are appropriately a part of this case. The Government has been and will continue to be fully cooperative with Defendants in that regard.

The Government has been working cooperatively with Defendants in responding to their 97 separate document requests (the total number in both sets), which cover a very wide range of documents on many subject matters. The

Government spent many hours working with Defendants in the drafting of mutually-agreeable proposed protective orders relating to the treatment of confidential documents and other information and relating to the non-waiver of privilege and protected documents. These protective orders were entered by the Court on January 16, 2018. (Dkt. Nos. 197 & 198) In addition, on a regular basis over the last six months, the Government has been in contact with Defendants about their document collection and production activities through emails, letters, telephone calls, and meetings. The Government spent many hours providing Defendants with an extensive amount of information about its document collection efforts and document review protocols and discussing these efforts and protocols with Defendants' counsel. The Government identified its numerous document custodians and multi-access email accounts from which it has collected documents, and the Parties have agreed to provide titles and dates of employment for each of their document custodians. The Government also identified the search terms used to collect potentially responsive documents in the custodians' electronic files. In addition, the Government provided Defendants with detailed information about its Technology Assisted Review methodology being used to identify the responsive documents in its enormous collection of electronic documents.

The Government also has spent many hours responding to Defendants' requests that it expand its efforts to locate and collect documents, revise its search terms for collecting electronic documents, and revise its Technology Assisted Review methodology. The Government has complied with many of these requests. The Government has also compromised and tried to minimize the burden of discovery disputes needed to be resolved by the Court by agreeing to produce documents relating to various issues that are irrelevant to this case, including, for example, documents relating to CMS' methodology for conducting administrative audits and the calculation of the statutory coding intensity adjustment that applies

0249

1  to all MAOs.  (However, the Government may still file one or more motions as

2  necessary to limit or prevent such wasteful discovery.)

3      The Government has also agreed to produce documents and privilege logs

4  on a rolling basis.  In addition, it has agreed to prioritize the production of various

5  documents at Defendants' request so long as it is given reasonable notice and

6  Defendants' also agree to requests by the Government to prioritize the production

7  of certain documents such as the production of the data necessary to perform the

8  Government's damages analyses.

9      In response to Defendants' document requests, the United States has so far

10  collected over four terabytes of data, constituting over five million documents,

11  from more than 150 custodians at CMS and other parts of the Department of

12  Health and Human Services ("HHS").  The United States is still in the process of

13  collecting documents in response to Defendants' requests that it expand the search

14  terms that it is using to collect potentially responsive documents and expects to

15  collect a substantial amount of additional documents within the next several

16  months.  In response to other requests made by Defendants, the United States is

17  also continuing to identify additional document custodians, including custodians at

18  the Office of the Secretary of HHS.

19      The United States must review all of the documents that it has collected and

20  will collect over the next several months.  It must review these documents for

21  responsiveness, confidentiality (for example, for patient identifiable data and

22  information relating to other insurance companies which participate in the

23  Medicare Advantage Program), and privilege.  To expedite the task of reviewing

24  and producing responsive, non-privileged documents, the United States is utilizing

25  targeted searches, Technology Assisted Review, and manual review.  Even

26  utilizing these methods, however, the task of identifying responsive, non-

27  privileged documents and determining which of those are confidential is enormous.

28  The Government currently estimates that there are at least 500,000 documents that

1  its attorneys must manually review for privilege and this does not include the

2  manual, eyes-on privilege review that will need to be conducted for documents that

3  the Government has not yet collected.  Contrary to Defendants' assertion below,

4  Relator's counsel cannot perform this privilege review of Government documents.

5  Government attorneys must exclusively perform this review.  Furthermore,

6  contrary to Defendants' assertion below, the Government is not inappropriately

7  relying on the deliberative process privilege or applying the privilege too broadly.

8  *See NLRB v. Sears, Roebuck & Co*., 421 U.S. 132, 150 (1975) (privilege protects

9  documents that "reflect[] advisory opinions, recommendations and deliberations

10 comprising part of a process by which governmental decisions and policies are

11 formulated"); *Hongsermeier v. Commissioner of Internal Revenue*, 621 F.3d 890,

12 904 (9th Cir. 2010) (privilege protects documents that are "predecisional" and

13 "deliberative").

14      The Government's initial goal was to make rolling productions of

15 documents on a regular basis throughout 2018 and to substantially complete its

16 production by the end of 2018.  This goal was premised on the hope that

17 Defendants would agree to withdraw at least some of its requests for irrelevant

18 documents, but they have not.  In addition, this goal was premised on the hope that

19 the Court would agree with the Government's proposal that fact witness

20 depositions by both Parties commence after both Parties substantially complete

21 their document productions.  However, over the last several months, Defendants

22 diverted the Government's resources because of their insistence that they conduct

23 expedited depositions of certain Government witnesses.  This was exacerbated by a

24 change in Defendants' position in insisting that the Government also produce

25 documents relating to these witnesses on an expedited basis even though neither

26 Defendants' deposition notice nor subpoena relating to these witnesses had

27 requested such documents.  In order to accommodate the noticed depositions of

28 two senior Government witnesses (including a former Administrator of CMS),

1    which went forward notwithstanding the Government's objection that they were

2    premature, the Government had to interrupt its document collection and review

3    efforts in response to Defendants' 97 document requests (sets one and two) in

4    order to prioritize the collection, review and production of documents relating to

5    these two deponents. This has impeded the Government's document review and

6    production efforts.

7        Furthermore, the Government's resources are now being diverted by

8    responding to Defendants' counterclaims and affirmative defenses. Government

9    counsel is now focused on preparing motions to dismiss the counterclaims and

10   strike some of the affirmative defenses.

11       To date, the Government has produced approximately 10,000 documents.

12   The tasks of identifying responsive documents and conducting manual, "eyes-on"

13   privilege and confidentiality reviews have consumed and will continue to consume

14   significant Government's resources until these reviews are completed. The

15   Government proposes that phased discovery, with fact witness depositions

16   commencing in November 2018, would significantly facilitate its completion of the

17   production of documents. If Defendants continue to expedite the depositions of

18   Government witnesses, the Government's resources will be diverted to defending

19   those depositions and producing attendant documents and, thus, discovery will

20   proceed in a piecemeal fashion. This diversion will be in addition to the diversion

21   caused by moving to dismiss Defendants' counterclaims and strike their

22   affirmative defenses. This diversion will further delay the Government's

23   completion of its production of documents.

24       It should not be surprising to Defendants that it would require significant

25   time for the Government to produce documents in response to their numerous and

26   broad requests. In the investigation, the approximately 600,000 documents

27   produced by Defendants were produced over a 4 year time period, from December

28   2012 to December 2016. Furthermore, the Government also believes that

1    Defendants will not substantially complete their document production in this action

2    until at least the end of 2018.

3        _Relator's Production of Documents_:  Relator has served his responses and

4    objections to Defendants' document requests and is in the process of making a

5    relatively small production of non-privileged, relevant documents.  Following his

6    departure from UnitedHealth in 2012, Relator gave UnitedHealth all non-

7    privileged documents in his possession generated in the course of and directly

8    related to his work at UnitedHealth (that is, UnitedHealth's documents).

9    Moreover, pursuant to agreements between UnitedHealth and Relator, he destroyed

10   all such UnitedHealth documents in his possession other than his performance

11   reviews.

12       _Defendants' Production of Documents_:  Plaintiffs presently anticipate

13   moving to compel Defendants' production of various documents that they have

14   refused to produce.  As explained in Section E (Damages), this includes chart

15   review and other data that is necessary to assess damages for payment years 2016

16   and 2017.  As another example, this includes documents from the electronic and

17   hard copy files of Steve Hemsley, the Chief Executive Officer of UnitedHealth

18   Group from 2006 to 2017, and Janis Leafgren, Mr. Hemsley's Administrative

19   Assistant, who (for instance) sent and received emails on behalf of Mr. Hemsley.

20   On March 27, 2018, Defendants sent the Government a letter stating that it needs

21   some undefined amount of additional time to decide whether it will produce

22   documents from these relevant custodians' files.  However, Mr. Hemsley engaged

23   in activities relevant to this case.  Among other things, Mr. Hemsley chaired

24   Defendants' Risk Adjustment Advisory Board (FAC ¶ 42); the executives who

25   managed Defendants' Medicare Advantage Plans regularly reported to Mr.

26   Hemsley with respect to risk adjustment payment-related issues (_id._); according to

27   a 2011 documents produced by Defendants, Mr. Hemsley was "significantly

28   involved in the oversight and management of" Defendants' "Medicare business"

1    (*id.*); and, Mr. Hemsley was aware of risk adjustment payment compliance issues

2    (*id.* at ¶¶ 154 & 188).  Moreover, Mr. Hemsley was intimately involved in the

3    decision to terminate Defendants' Claims Verification Program and revert to

4    ignoring the negative results of Defendants' chart reviews and failing to delete the

5    diagnoses invalidated by those reviews.  Mr. Hemsley is the one who directed

6    Messrs. Renfro, Johnson, Nelson, and Schumacher and Ms. Erickson to speak with

7    CMS about Defendants' termination of their Claims Verification Program.  (FAC

8    ¶¶ 224-26, 230-31, & 234)  Defendants have provided no valid justification for not

9    searching these custodians' files.

10        Plaintiffs also anticipate that they may challenge many of Defendants'

11   privilege assertions, including privilege assertions pertaining to the rendering of

12   non-legal advice, the attendance of Defendants' attorneys at business meetings to

13   shield those meetings from discovery, and the participation of Defendants'

14   attorneys in non-legal communications to shield those communications from

15   discovery.

16   *UnitedHealth's statement*:

17        *UnitedHealth's statement on the collection and production of documents*:

18   The United States opted to bring this lawsuit, yet it now balks at the notion of

19   meeting its discovery obligations and allowing UnitedHealth to pursue discovery

20   to which UnitedHealth is entitled so that it may properly and effectively defend

21   itself.  The United States complains about its resources being "diverted" by other

22   standard litigation matters—such as defending depositions and responding to

23   counterclaims and affirmative defenses—and attempts to justify its failure to meet

24   its original document production deadline because of these "diverted resources."

25   Despite the advantage of conducting a multi-year investigation related to this

26   matter, the United States curiously now appears to claim that it lacks the resources

27   to properly litigate this matter and to meet its discovery deadlines.  The notion that

28   Plaintiffs—which currently have thirteen government attorneys and twenty active

1   attorneys for Relator (including twelve partners)—lack the resources to conduct

2   routine discovery in a timely manner is absurd.

3       Prior to filing the FAC, DOJ investigated this matter for more than five

4   years.  During that time, UnitedHealth produced over 600,000 documents,

5   compiled detailed responses to dozens of complex interrogatories, and produced

6   more than twenty witnesses for Civil Investigative Demand oral examinations.  In

7   *United States ex rel. Swoben v. Secure Horizons*, Case No. CV-09-5013 JFW

8   (JEMx), UnitedHealth produced over 34,000 documents, which are also responsive

9   in this case.  The United States, in contrast, made two small productions totaling

10  less than 600 documents, the majority of which were publically available and re-

11  produced from another action.

12      In response to the United States' Complaint in this case, UnitedHealth has

13  been collecting documents from 118 custodians and 7 email distribution lists and

14  has collected approximately 70 million documents to date.  In addition to the more

15  than 634,000 documents produced during the investigation and the *Swoben*

16  litigation, UnitedHealth has produced over 65,845 documents in this litigation.  On

17  January 29, 2018, UnitedHealth produced 5 spreadsheets of over 125,000 lines of

18  data requested by the United States in its First Set of Written Interrogatories to

19  Defendants.  UnitedHealth has also produced two privilege logs thus far—in

20  addition to the more than ten it produced during the investigation—and intends to

21  continue producing privilege logs on a monthly basis.

22      In contrast, the United States failed to produce a single document until late

23  February 2018—and only did so at the direction of Magistrate Judge Segal after

24  initially refusing to comply with its discovery obligations related to the depositions

25  of Marilyn Tavenner and Jeffrey Grant.  The United States' first two productions

26  consisted of 893 documents total.  Although the United States' deadline for its first

27  Technology Assisted Review production was the week of March 19, it failed to

28  make its production until March 28, when it produced approximately 9,500

1  documents—approximately one-sixth of the number of documents produced by

2  UnitedHealth in this litigation alone.  UnitedHealth also notes that Relator has yet

3  to produce a single document in this matter, despite UnitedHealth serving

4  document requests on Relator on January 19, 2018.

5       UnitedHealth has already agreed that the United States need not log certain

6  categories of likely privileged documents (such as communications with the

7  Department of Justice or the Office of General Counsel), so the United States'

8  assertion that it will have to review over 500,000 documents (and counting) for

9  privilege is not primarily tied to attorney-client or work product privilege concerns.

10  Rather, it is the product of the United States' inappropriately broad view of the

11  qualified deliberative process privilege, as demonstrated by the United States' first

12  privilege log that it produced on March 30, 2018.  The United States has asserted

13  deliberative process privilege over every single document on that log for which

14  CMS is a custodian—approximately eighty percent of the entire log.  This

15  specious, over-expansive view is nothing more than a strategic attempt to yet again

16  deprive UnitedHealth of key information that UnitedHealth needs to defend itself

17  in a lawsuit that the United States chose to bring.  For example, the United States

18  brazenly attempts to assert deliberative process privilege over documents the

19  government itself produced previously in response to a FOIA request.  In response

20  to that request, these documents were produced partially redacted, suggesting they

21  had already undergone review by the relevant government agency outside of this

22  litigation and deemed appropriate for public disclosure.

23       UnitedHealth has also provided the United States with information regarding

24  its document collection efforts and document review protocols and will continue to

25  work cooperatively with the United States on discovery.  UnitedHealth engaged in

26  good-faith negotiations with the United States and exchanged detailed information

27  about its Technology Assisted Review protocol, and the Parties have now agreed

28  on respective Technology Assisted Review protocols.  While UnitedHealth

0256

1  proposed that the Parties exchange additional information, including custodians'

2  job titles and employment history, regarding custodians on December 20, 2017, the

3  United States was not prepared to do so.

4      *UnitedHealth's statement regarding data productions:*  The United States'

5  Damages section (Section E, above) is replete with inaccuracies and misleading

6  statements, and it is highly inappropriate for a Rule 26(f) Joint Report.  To avoid

7  any prejudice resulting from the United States' tactics, UnitedHealth will briefly

8  respond to set the record straight, but UnitedHealth does not believe this Joint

9  Report is the proper vehicle to respond to each and every one of the United States'

10  assertions.

11      UnitedHealth has been working diligently and devoting substantial

12  resources—in addition to the overlapping resources it is expending to respond to

13  other document requests and interrogatories, deposing witnesses, moving to

14  dismiss the FAC, answering the United States' 364-paragraph FAC, and

15  developing its counterclaims, among other things—to collect and produce data

16  responsive to various requests by the United States.  UnitedHealth agreed to the

17  United States' request that UnitedHealth prioritize dates of service years 2014

18  through 2016 and will be making a significant production on April 27, 2018, the

19  government's unilaterally imposed deadline.  Per the United States' request,

20  UnitedHealth also agreed to produce the requested data for dates of service years

21  2008 and 2009 after April 27, 2018.  UnitedHealth has been transparent with the

22  United States about its data productions, and the United States' claim otherwise is

23  preposterous.  The United States appears to be dictating how much time

24  UnitedHealth is going to require to produce responsive data to its extremely broad

25  data requests, but UnitedHealth clearly is better positioned to make that

26  determination.  Accordingly, UnitedHealth has in good-faith proposed a discovery

27  schedule that not only meets the United States' unilaterally imposed April 27, 2018

28

1   deadline but also gives UnitedHealth sufficient time to satisfy its discovery

2   obligations.

**J.      Discovery Plan**

    **1.      Rule 26(a) Initial Disclosures – Rule 26(f)(3)(A)**

       The Parties made their initial disclosures on December 22, 2017.

       <u>*United States and Relator's Position*</u>:  In their initial disclosures, Plaintiffs

provided Defendants with the results of their estimation of damages for the four

payment years (2011 to 2014) for their violations of the FCA relating to their chart

reviews.  These results are also described in paragraphs 235 and 237 of the FAC.

At this time, Plaintiffs claim a work product privilege with respect to the analyses

underlying this damages estimate.  In accordance with Rule 26(a)(2), the United

States and Relator will make their expert damages disclosures at the time set forth

in the Schedule entered by the Court.

       As previously explained, Defendants have not produced documents and data

required to compute damages due to their one-way chart reviews for payment years

2009, 2010, 2015, 2016, and 2017.[6]  In addition, Defendants have agreed to

provide certain information responsive to the Government's interrogatories

concerning Defendants' RACCR program, but have not yet done so.  Once

Defendants have completed their provision of information responsive to the

Government's interrogatories, Plaintiffs will use that information to propound

subpoenas to third-party providers who participated in Defendants' RACCR

program, to enable Plaintiffs to obtain and review medical records in the

possession of those third-party providers.

       The United States proposes that it will comply with the requirements

imposed by Rule 26(a)(1)(A)(iii) when it makes its damages expert witness(es)

disclosures pursuant to Rule 26(a)(2)(B).  The United States needs sufficient time

---

[6] If Defendants' unlawful one-way Chart Review Program has continued past payment year 2017, the United States reserves its right to recover the additional damages.

0258

(approximately nine months) to perform all the work, including, but not limited to, the document review and data analyses, necessary in order to compute damages and make its damages expert witness(es) disclosures after Defendants complete their production of the required documents and data (assuming that the Defendants also cooperate in producing the data in a usable format).

*UnitedHealth's Position*:  The United States' discussion in this section is once again largely unnecessary and inappropriate in a Joint Report.  The Parties exchanged initial disclosures on December 22, 2017 and will revise or supplement as required as the matter moves forward.

UnitedHealth continued to work diligently and to devote substantial resources to collect and produce data sought by the United States, and UnitedHealth will be making a significant production of data on April 27, 2018.  Again, the notion that the United States needs significantly more time to conduct routine discovery and develop its damages theory and analysis is baseless.  The United States chose to file this lawsuit after the benefit of a multi-year investigation, detailed responses to dozens of complex interrogatories, numerous Civil Investigative Demand oral examinations, and UnitedHealth's production of hundreds of thousands of documents.  The United States must now engage in timely discovery and cannot continue to delay meeting its obligations.

## 2. Subjects and Timing of Discovery – Rule 26(f)(3)(B)

The Parties' positions as to the specific dates for Non-Expert and Expert Discovery Cut-Off are set forth below and in Exhibit A.  The Parties' positions as to the subjects on which discovery may be needed, and whether discovery should be conducted in phases or be limited to or focused on particular issues, are as follows:

*United States and Relator's Position*:  Certain key issues in this case are purely legal issues because the underlying facts are undisputed and most of those legal issues have already been decided by the Ninth Circuit in *Swoben*.  Discovery

is therefore unnecessary to resolve these legal issues.  In particular, the "materiality" of Defendants' submission of false risk adjustment data is a purely legal issue as are Defendants' legal obligations to delete unsubstantiated diagnoses. In addition, Defendants' "actuarial equivalence" argument (if Defendants are making it in this case) raises a purely legal issue about the meaning of that term as used in Part C of Medicare Statute.  Accordingly, discovery relating to the "materiality" issue, Defendants' contractual and regulatory obligations to delete invalid diagnoses, and the "actuarial equivalence" issue should be precluded or, at a minimum, limited by the Court pursuant to Rule 26(b)(1).

Plaintiffs believe that discovery, including third party discovery, should focus on the results of Defendants' medical record reviews conducted as part of their Chart Review, Claims Verification, and RACCR Programs; Defendants' knowledge (as that term is defined by the FCA) about inaccurate or untruthful diagnoses submitted by providers, including diagnoses unsubstantiated by the providers' medical records; Defendants' knowledge (as that term is defined by the FCA) about their obligation to submit accurate and truthful risk adjustment data to Medicare for risk adjustment payments, including the obligation to submit diagnoses substantiated by beneficiaries' medical records; Defendants' knowledge (as that term is defined by the FCA) about their obligation to retract, withdraw, or delete inaccurate or untruthful risk adjustment data submitted to Medicare, including the obligation to retract, withdraw, or delete diagnoses unsubstantiated by beneficiaries' medical records; Defendants' submission of inaccurate or untruthful risk adjustment data to Medicare; Defendants' processes and procedures for submitting risk adjustment data to CMS and for withdrawing, retracting, or deleting such data; Defendants' failure to retract, withdraw, or delete inaccurate or untruthful risk adjustment data; Defendants' communications with CMS about the above-mentioned issues; Defendants' contractual and financial relationship with their "incentivized" capitated and gainsharing providers; the unsubstantiated and

1   invalid diagnoses that incentivized providers reported to Defendants and

2   Defendants submitted to CMS for risk adjustment payments; any affirmative

3   defenses that remain after the government and relator's motion to strike; and

4   damages.

5        Plaintiffs propose that discovery proceed in phases and we describe these

6   phases in detail below.  Both Rules 16(c)(2)(F) and 26(d)(3) and the Court's

7   February 28, 2018 Order Setting Scheduling Conference contemplate the use of

8   phased discovery.  Phased discovery is particularly appropriate in very large and

9   complex cases such as this.

10        Plaintiffs believe that this approach is warranted to ensure that this very

11   large case be conducted in the manner most efficient for the Court, the Parties,

12   third parties, and witnesses.  Plaintiffs also strongly believe that fact witness

13   depositions should begin after (i) the Court resolves the Government's motion to

14   dismiss Defendants' counterclaims, the Plaintiffs' motion to strike Defendants'

15   affirmative defenses, and the motion for partial summary judgment on Defendants'

16   "actuarial equivalence" argument (unless Defendants stipulate that they are not

17   making this argument in this case); (ii) the Parties produce substantially all

18   relevant documents to each other relating to the fact witnesses; and (iii) privilege

19   issues and issues relating to the appropriate scope of discovery are resolved.

20   Otherwise, there is a significant risk that (i) significant time will be spent deposing

21   witnesses about issues relating to counterclaims that are later dismissed on legal

22   grounds by the Court and/or defenses that the Court strikes or disposes of on the

23   Government's motion for partial summary judgment; (ii) the Parties will seek to

24   depose the same witnesses multiple times because, subsequent to their depositions,

25   additional documents relating to the witnesses (or the topics on which they were

26   deposed) were collected and produced; and (iii) the Court will be unnecessarily

27   burdened with multiple motions for protective orders and motions to compel.  By

28   making this request for phased discovery, the Government does not seek to prevent

1    Defendants from obtaining any needed and relevant evidence, as Defendants may

2    pursue all reasonable discovery efforts they desire.  The Government simply seeks

3    to ensure that discovery is conducted in the most efficient manner possible as

4    appropriate for litigation of this magnitude.

5          In addition, Defendants' proposal that non-expert discovery be cut-off on

6    January 28, 2019 is not realistic and is extremely prejudicial to Plaintiffs.  This

7    deadline will force Plaintiffs to take depositions of fact witnesses before

8    Defendants produce documents relevant to their depositions.  It will also force the

9    Government to focus on defending depositions rather than completing its

10   document production.  In addition, this January 28, 2019 deadline will not provide

11   the Government with sufficient time to analyze the chart review and other data that

12   Defendants produce in order for the Government to assess damages and to obtain

13   the additional information it needs to understand and interpret the data.  As

14   previously stated, the Government will need to obtain this information by deposing

15   fact witnesses and serving interrogatories on Defendants.  This deadline also will

16   not provide Plaintiffs with sufficient time to determine the overpayments due to the

17   incentivized providers' invalid diagnoses, which, as previously stated, requires that

18   Plaintiffs subpoena medical records and other documents from these providers and

19   then review the medical records.

20         Furthermore, Defendants' argument that Magistrate Judge Segal already

21   decided that phased discovery should not occur in this case is incorrect.  Magistrate

22   Judge Segal allowed Defendants to conduct the depositions of only two

23   Government witnesses over the Government's objection that the depositions were

24   premature.  Defendants represented to Magistrate Judge Segal that they would not

25   re-depose those witnesses a second time in this matter.  Magistrate Judge Segal did

26   not hold a Rule 16(b) Scheduling Conference or consider the phased discovery

27   plan set forth by Plaintiffs below.

28

0262

<u>Phase One</u>:

- The Parties should focus on the completion of production of documents; the resolution of objections to the production of documents based on relevancy, burden, etc.; and the resolution of privileges being asserted to withhold the production of documents.  It is likely that the Court's intervention may be required to resolve objections and privilege issues and, thus, that the Parties will need to brief these issues.  Resolution of these objections and privilege issues before fact witness depositions will streamline such depositions and ensure that they are conducted appropriately.

- By April 30, 2018, Defendants must disclose in writing whether they will rely on an advice of counsel, and/or good faith reliance defense, and describe their defense(s) in sufficient detail to permit Plaintiffs to conduct relevant discovery.  Disclosure of this information under the proposed deadline will permit Plaintiffs to seek additional discovery on these issues during phase one, including documents over which Defendants waive privilege, as applicable, through assertion of the defense(s).

- By September 30, 2018, Defendants must complete their production of documents and data responsive to the one-way chart review damages-related discovery requests that have been served.  After the production of the data, Defendants should work cooperatively with Plaintiffs to explain and answer questions concerning the data produced, including explaining the format and source of the data, and any abbreviations.  The Court's imposition of this intermediate deadline on Defendants ensures that Plaintiffs will have sufficient time to review Defendants' production of documents and data needed to compute damages, to clarify or resolve any issues, to take depositions of fact witnesses knowledgeable about such documents and data, to propound and receive answers to interrogatories about such documents and data, and to prepare the required disclosures of damages expert

1    witness(es) before opening expert reports are due.

2    • The Parties may take discovery relating to the preservation, collection, and

3       production of documents, including the Defendants' production of data

4       requested by Plaintiffs in order to compute damages.

5    • The Parties may serve subpoenas on third parties in order to obtain

6       documents from them.  Plaintiffs have already done so.  For example,

7       Defendants objected to producing documents and data about the results of

8       their chart reviews on the ground that the results were in the possession of

9       third-parties.  Consequently, Plaintiffs served third party subpoenas on three

10      companies that Defendants employed to review medical records as part of its

11      Chart Review Program in order to obtain the results of these reviews.  But

12      then, two of the companies responded that Defendants directed them to

13      provide the documents and data to Defendants and the companies have not

14      yet produced the chart review results to Plaintiffs.  In addition, Plaintiffs will

15      seek medical records from incentivized providers who were outliers (i.e.,

16      diagnosed certain medical conditions at unusually high rates) and whose

17      diagnoses had high invalidation rates based on the results of Defendants'

18      RACCR reviews.  Plaintiffs have sought information (through

19      interrogatories) from Defendants identifying the beneficiaries whom those

20      incentivized providers diagnosed with those conditions in order to serve the

21      providers with subpoenas for those beneficiaries' medical records, and

22      Defendants have agreed to provide certain information responsive to those

23      interrogatories.  Until Defendants complete their provision of information

24      necessary to identify these beneficiaries, Plaintiffs cannot serve the

25      providers with the subpoenas requesting their medical records.  Review of

26      those medical records will enable the Plaintiffs to identify the

27      unsubstantiated diagnoses that Defendants submitted to the Medicare

28      Program but deliberately ignored or recklessly disregarded.

Case 2:16-cv-08697-MWF-SS   Document 224   Filed 04/02/18   Page 43 of 579   Page ID #:3209
Case 2:16-cv-08697-FMO-PVC   Document 616-3   Filed 08/06/24   Page 268 of 637
Page ID #:19162

- The Parties may also propound interrogatories on each other. Plaintiffs propose that each side may, without seeking leave of Court, serve up to 30 interrogatories relating to the Government's claims in this action. Plaintiffs further state that they will seek the Court's permission to serve additional interrogatories relating to Defendants' counterclaims that are not dismissed and the affirmative defenses that remain after the Court rules on their motions.

- The Parties may also serve requests for admissions, which number should not be limited.

- Plaintiffs anticipate that Phase I will be the principal phase for written and document discovery, although the Parties will not be precluded, prior to the close of fact discovery, from submitting additional discovery requests to address discrete issues that arise or become clear later in the litigation, or to establish the authenticity and admissibility of documentary evidence if those evidentiary issues cannot be resolved cooperatively.

Phase Two:

- During this phase, the Parties should focus on conducting fact witness depositions. Plaintiffs estimate that, with respect to their claims (not Defendants counterclaims or affirmative defenses), they will need at least 100 hours for depositions of fact witnesses and at least an additional 14 hours for depositions of corporate entities conducted pursuant to Rule 30(b)(6) (such depositions and topics may be the subject of more than one notice) and propose that this phase of discovery start November 1, 2018 and end by May 31, 2019. This estimate of the number of hours for and the time it will take for fact witness depositions is based on the assumptions that (i) Defendants will work informally and cooperatively with Plaintiffs to provide the information necessary for Plaintiffs to understand Defendants' data relating to damages (otherwise additional time would be needed to depose

1  fact witnesses knowledgeable about the data; and (ii) there are no major

2  issues concerning the authenticity and admissibility of documents (which

3  would also require additional time to depose fact witnesses). This estimate

4  also does not include fact witness depositions relating to Defendants'

5  counterclaims or affirmative defenses. In addition, if Defendants fail to

6  work informally and cooperatively with Plaintiffs to provide the information

7  necessary for Plaintiffs to understand and interpret the chart review and

8  other data Defendants provide to determine damages, Plaintiffs seek an

9  additional 25 hours for depositions of witnesses who can provide this

10  information.

11  • Plaintiffs agree that the customary limitations regarding the duration of

12  depositions (seven hours) should remain, and that no individual will be

13  deposed more than once without a showing of good cause and leave of court.

14  However, Plaintiffs believe that, on the whole, fact witness depositions

15  should be limited by the number of total hours and not by the number of

16  witnesses. Plaintiffs need to depose many fact witnesses, but we believe that

17  many of them can be deposed in less than a full day. Defendants' request

18  that the Court limit the number of fact witness depositions to ten deponents

19  (with the Parties having the option to stipulate to more) is unreasonable.

20  The Government's use of the testimony it took during the investigation is

21  limited to impeachment and Defendants are currently producing additional

22  documents relating to those deponents. Accordingly, Plaintiffs must re-

23  depose many of those fact witnesses in this litigation. Furthermore, there are

24  many important fact witnesses that the Government did not depose during

25  the investigation. Defendants' proposed ten-deponent limit is also

26  undermined by the Parties' estimate that each of them will call numerous

27  witnesses at trial.

28

Phase Three:

- By June 28, 2019, approximately four weeks after the close of fact witness depositions, the Parties should make expert testimony disclosures pursuant to Rule 26(a)(2) addressing issues on which they bear the burden of proof. At this time, Plaintiffs anticipate that their disclosures will include experts on risk adjustment under Parts C and D of the Medicare Program; experts on diagnosis coding; and damages experts. However, because the Court has not yet had the opportunity to rule on various issues, Plaintiffs' disclosures may include other types of experts. Because of this uncertainty, it is also difficult to estimate the amount of time needed to conduct expert discovery, but Plaintiffs' current estimate is that responsive expert reports would be due by July 31, 2019, approximately four weeks after the opening expert reports, and expert depositions would be completed by September 30, 2019, approximately a month before summary judgment briefing. Accordingly, at this time, Plaintiffs estimate that expert discovery can be completed by September 30, 2019. Expert depositions should also be limited to 7 hours for each expert. In addition, as previously stated, Plaintiffs' ability to make their initial damages expert disclosures will depend on Defendants' timely production of the requested documents and data.

*UnitedHealth's Position*: The staged discovery process proposed by the United States appears intended to prevent UnitedHealth from obtaining the evidence it believes necessary to defend this case: the proposed restrictions and controls on discovery advocated by the United States will frustrate UnitedHealth from securing relevant and necessary evidence promptly. In this case, the United States already possesses a vast amount of documentary and testimonial information it obtained from UnitedHealth and other sources. UnitedHealth anticipates needing extensive discovery from the United States in order to prepare its defenses and counterclaims, including discovery relating to: the manner in which risk

0267

Case 2:16-cv-08697-FMO-PVC   Document 616-3   Filed 08/06/24   Page 46 of 579   Page ID #:3212
Case 2:16-cv-08697-MWF-SS   Document 224   Filed 04/02/18   Page 46 of 570   Page ID #:19165
Page ID #:19165

adjustment factors are calculated; CMS' knowledge of UnitedHealth's and other MA Plans' chart reviews and its awareness of industry-wide diagnostic coding error rates and data verification practices during the relevant time period; any attempts by the United States to calculate a Medicare fee-for-service error rate; information concerning what those error rates are and their impact on payment calculations; the United States' analysis of the assumptions and disclosures contained in UnitedHealth's bids; the meaning of the "reasonable diligence" standard; the decision not to finalize the medical record review rule; meetings and communications between UnitedHealth and CMS regarding its obligations to perform a "two-way-look" in light of this proposed rule; and the May 2014 overpayment rule.  UnitedHealth will also seek discovery, including third-party discovery, to identify what information, if any, Relator possesses, how Relator obtained that information, and the source of that information.  UnitedHealth expressly reserves the right to conduct discovery on additional subjects and from additional persons or entities as necessary and appropriate, and to make appropriate objections to discovery requests.

UnitedHealth does not believe that phasing of discovery is necessary or appropriate in this case and respectfully submits that it is an improper attempt by the United States to impede UnitedHealth's efforts to defend itself.  Rather than lead to a more efficient discovery process, the United States' proposal would prejudice UnitedHealth, and lead to both protracted discovery and increased costs.  For example, if UnitedHealth is unable to depose certain witnesses at the outset, it will suffer delay in its attempt to effectively outline the scope of necessary documents and other materials it may need.

Moreover, phased discovery would further delay UnitedHealth's access to key fact witnesses and prejudice its ability to mount an effective defense in this action.  As noted above, for over five years, UnitedHealth has produced over 600,000 documents, compiled detailed responses to dozens of complex

interrogatories, and produced more than twenty witnesses for Civil Investigative
Demand oral examinations.  While document productions are ongoing,
UnitedHealth requires the ability to take testimony of a number of current and
former government executives to effectively begin the defense of this action and to
identify potential other sources of documents and relevant information.  However,
by the United States' proposal, UnitedHealth would be precluded from doing so for
another *seven months*.  Such an imbalance in the Parties' access to witnesses is
antithetical to the spirit and purpose of the discovery rules, which advocate for
liberal and expeditious discovery and mutual knowledge of all relevant facts.  For
similar reasons, Judge Segal noted during the Parties' informal discovery
conference on November 20, 2017, that there is no such rule in the Federal Rules
that says a party is entitled to complete written discovery or to resolve written
discovery prior to the beginning of depositions.  And, indeed, the Federal Rules of
Civil Procedure do not contemplate the proposed phasing of discovery the United
States advocates.  During the Parties' informal discovery conference on February
8, 2018, Judge Segal again noted that delayed or phased discovery is not "built-in"
in federal court and, when it is permitted, it is usually "with both parties'
agreement about the usefulness of phasing."  *See* February 8, 2018 Telephonic
Conf. Tr. 25:16-20.  Otherwise, if one side is able to dictate the phasing of
discovery, it "can be used as a strategy point in a case" and gamesmanship.  *See id*.
25:21-23.

The United States' suggestion that depositions should only begin after the
Court resolves its forthcoming motion to dismiss UnitedHealth's counterclaims,
motion to strike UnitedHealth's affirmative defenses, and motion for partial
summary judgment is similarly unjustified.  The United States in essence seeks a
stay of depositions during the pendency of the motions, which is not provided for
in the Federal Rules—otherwise, a case could be pending for months before
significant progress in the litigation is made.  Similarly, the United States'

1    conclusory and generalized assertion that there will be privilege issues does not

2    justify postponing the commencement of depositions.  Privilege issues exist in

3    most cases, yet most cases do not stall the commencement of depositions for close

4    to a year and a half after a complaint is filed, particularly where one side has

5    already had access to more than twenty witnesses.  The propriety of a privilege

6    assertion cannot be addressed in a vacuum; it is typically best addressed in the

7    context of a specific question and the assertion of privilege in response.  The

8    ordinary course is to resolve questions about the assertion of privilege in the

9    specific contexts in which they arise, so that the Court has a specific topic to

10   address.

11        UnitedHealth has only recently been afforded the opportunity to conduct

12   affirmative discovery to defend itself from the United States' baseless claims.

13   UnitedHealth is entitled to continue the process of reaching symmetry in the

14   discovery of factual information through depositions.  During the December 18,

15   2017 telephonic conference before Judge Segal regarding The United States'

16   Motion for a Protective Order, Judge Segal stated that the United States had not

17   made a showing of undue burden or good cause sufficient to prevent UnitedHealth

18   from proceeding with depositions as laid out in the Federal Rules of Civil

19   Procedure.  Judge Segal also stated that a pending motion for partial summary

20   judgment generally does not justify postponing depositions and that would be "the

21   exception and not the common practice."  *See* December 18, 2017 Telephonic

22   Conf. Tr. 14:11-16.  During the Parties' informal discovery conference on

23   February 8, 2018, Judge Segal again stated that UnitedHealth "ha[s] a right to

24   notice depositions" and reiterated that she likely would not enter a protective order

25   because there is "nothing in the rules that would justify it here."  *See* February 8,

26   2018 Telephonic Conf. Tr. 26:23-27:1.  Consistent with Judge Segal's admonition

27   that "given the complexity of this case . . . [it is not] inappropriate for a defendant

28   to be moving quickly to try and gather information and prepare its defenses"

1    UnitedHealth should be permitted to continue deposing government witnesses.  *See*
2    *id*. 27:8-10.

3            Phased discovery would also introduce significant disputes regarding
4    whether certain discovery should or should not have been conducted during a
5    particular phase – disputes for which there is no case law or guidance in the
6    Federal Rules.  Moreover, UnitedHealth does not agree to disclose whether it will
7    rely on any specific defense by any date unilaterally imposed by the United States.
8    Such a deadline is not mandated by the Federal Rules of Civil Procedure.

9            Finally, the United States' proposed imposition of a unilateral deadline on
10   UnitedHealth to complete production of documents responsive to damages-related
11   discovery requests by September 2018 is unreasonable and inequitable, particularly
12   in light of the fact that the United States has only just begun to produce documents
13   in this matter.  UnitedHealth is willing to work cooperatively with the United
14   States to engage in mutual exchanges of information and to comply with its
15   obligations under the Federal Rules.

16       **3.      Electronically Stored Information – Rule 26(f)(3)(C)**

17           The Parties are aware of their duties regarding the preservation of
18   discoverable information.  The Parties have taken reasonable measures to comply
19   with those duties as required by the Federal Rules of Civil Procedure and the Local
20   Rules.  The Parties have met and conferred pursuant to Federal Rule of Civil
21   Procedure 26(f), and each represented that steps have been taken to preserve
22   evidence relevant to this litigation.  The Parties have agreed to a protocol for the
23   exchange of Electronically Stored Information.

24       **4.      Privilege Issues – Rule 26(f)(3)(D)**

25           The Parties negotiated a protective order governing non-waiver of privilege
26   and protected material.  Magistrate Judge Segal entered the order on January 16,
27   2018.  (Dkt. No. 198)

28

**5.      Changes to Federal and Local Rules – Rule 26(f)(3)(E)**

*United States and Relator's Position*:  The changes that we propose are set forth in our proposed discovery plan set forth in Section J.2 above.

*UnitedHealth's Position*:  UnitedHealth reiterates that phased discovery is inappropriate in this case.  Exhibit A, and Subsections K and L below, address UnitedHealth's position on the timing of discovery and proposed discovery deadlines.  UnitedHealth disagrees with the United States' hour-based calculation of depositions.  UnitedHealth's position is that each side will likely need more than the 10 depositions permitted by the Federal Rules without leave, and that the Parties should meet-and-confer as the need for additional depositions matures.  UnitedHealth agrees with the United States' proposal of 30 interrogatories by the United States and Relator jointly and 30 interrogatories by UnitedHealth.

**6.      Other Orders – Rule 26(f)(3)(F)**

*United States and Relator's Position*:  As discussed above, Plaintiffs request that the Court issue an order, pursuant to Rule 16(b)(3)(B)(i) and 16(c)(2)(F), modifying the timing of initial disclosures under Rule 26(a)(1)(A)(iii) relating to damages.  The Government also provided Defendants with a proposed stipulation and order relating to the scope of expert disclosures and discovery in order to streamline that part of the case.  The Government hopes that Defendants will agree to this.

Pursuant to Rule 16(b)(3(B)(ii), Plaintiffs also request that the Court limit the scope of discovery to only factual issues and preclude discovery relating to purely legal issues, including materiality, Defendants' legal obligations to delete invalid diagnoses, and actuarial equivalence.  In addition, pursuant to Rule 16(c)(2)(C), Plaintiffs believe it may benefit the case to make rulings in advance on the authenticity and admissibility of certain evidence.  This would include evidence that may be relied upon for summary judgment motions as well as trial.

1    Accordingly, Plaintiffs request that the Parties be permitted to file motions relating

2    to authenticity and admissibility of documents at any time.

3        *UnitedHealth's Position*:  UnitedHealth objects to the limiting of discovery

4    pursuant to Rule 16(b)(3)(B)(ii).  UnitedHealth believes that CMS would not have

5    acted differently or sought repayment from UnitedHealth had it learned that

6    UnitedHealth allegedly retained overpayments and is entitled to discovery on this

7    topic, including discovery of facts which are relevant to UnitedHealth's ability to

8    establish this and other defenses, including the views of CMS employees about the

9    ambiguous regulatory requirements here at issue, which is relevant to scienter.

10   **K.    Discovery Cut-Off**

11       *United States and Relator's Position*:

12       Plaintiffs propose that the non-expert discovery cut-off date be May 31,

13   2019.

14       *UnitedHealth's Position*:

15       UnitedHealth proposes that the non-expert discovery cut-off date be January

16   28, 2019.

17   **L.    Expert Discovery**

18       The Parties agree to disclose expert witnesses consistent with the Federal

19   Rules of Civil Procedure, the Local Rules, and any order entered by this Court.

20   Plaintiffs' position with respect to the timing of expert witness disclosures (June

21   28, 2019 for initial disclosures and July 31, 2019 for rebuttal disclosures) and the

22   expert discovery cut-off date (September 30, 2019) are set forth in Section J.2

23   above (its discovery plan) and Exhibit A.

24       UnitedHealth proposes the following dates for expert witness disclosures

25   and expert discovery cut-off under Rule 26(a)(2).

26       Expert Disclosure – Initial              February 25, 2019

27       Expert Disclosure – Rebuttal             March 25, 2019

28       Completion of Expert Discovery           April 22, 2019

1   **M.    Dispositive Motions**

2      *The United States and Relator's Statement*: The United States presently

3   anticipates filing a motion to dismiss Defendants' counterclaims and the United

4   States and Relator presently anticipate filing a motion to strike some of

5   Defendants' affirmative defenses. The United States also intends to file a motion

6   for partial summary judgment on Defendants' "actuarial equivalence" argument

7   (unless Defendants stipulate that they are not asserting it in this case) because it

8   presents a purely legal issue which can be adjudicated at this time and should be

9   adjudicated at this time to avoid wasteful discovery. The United States may file

10   other motions, including motions for summary judgment or partial summary

11   judgment, on other issues concerning liability, damages, and issues raised in

12   Defendants' Answer to the FAC. Plaintiffs may also file motions *in limine*

13   because certain issues or defenses may be determined earlier on by such motions,

14   especially with respect to the authenticity and/or admissibility of certain

15   documents created by Defendants for purposes of litigation.

16      Plaintiffs propose that the last date to hear summary judgment motions be

17   November 4, 2019.

18      *UnitedHealth's Statement*: UnitedHealth will oppose the United States'

19   motion to dismiss and motion to strike. As noted above in Section C,

20   UnitedHealth and the United States have already fully briefed cross-motions for

21   summary judgment in the APA case addressing "actuarial equivalence" and it

22   would be inappropriate, inefficient, and a waste of judicial resources to attempt to

23   litigate those same issues here. In addition, as noted above in Section J, the United

24   States has only recently begun to produce documents in this case. Accordingly, the

25   filing of any summary judgment motion is drastically premature at this point in the

26   litigation. UnitedHealth anticipates filing motions or cross motions for summary

27   judgment, at the appropriate time and after the Parties have had the opportunity to

28   conduct meaningful discovery.

1    UnitedHealth proposes the last date to hear summary judgment motions be

2    May 20, 2019.

3    **N.    Settlement/Alternative Dispute Resolution (ADR)**

4        *The United States' Statement*:  In October 2016, pursuant to a request made

5    by Defendants, the United States made a presentation to Defendants about their

6    liability under the False Claims Act.  After this presentation, Defendants' counsel

7    notified the United States that it was not interested in discussing a settlement of

8    this matter.

9        *UnitedHealth's Position*:  In October 2016, the United States made a

10   presentation concerning this case in which it refused even to acknowledge

11   UnitedHealth's myriad defenses and asserted no formal settlement demand;

12   accordingly, UnitedHealth did not make any settlement offer either.  Based on the

13   one-sided presentation the United States made in October 2016 and other

14   discussions, UnitedHealth respectfully believes that settlement discussions are

15   unlikely to be productive at this time.

16       A Notice to the Parties of Court-Directed ADR Program was entered on

17   November 22, 2016, when this action was transferred to this Court.  Dkt. No. 54.

18   Pursuant to Local Rule 16-15.2, the Parties are filing concurrently a Request:

19   ADR Procedure Selection.  The Parties have agreed on ADR Procedure No. 3

20   (private dispute resolution).

21   **O.    Trial Estimate**

22       *The United States and Relator's Position*:  Plaintiffs estimate that their

23   presentation of their claims at trial will take approximately 10-15 days and include

24   approximately 25-30 witnesses (including experts), depending on whether the

25   Court agrees that certain key issues are purely legal issues, the Court's resolution

26   of dispositive motions, the Court's resolution of evidentiary issues prior to trial, the

27   Parties' stipulation to the authenticity and admissible of documents, and the

28   Parties' admission of undisputable facts.  Plaintiffs estimate that Defendants'

0275

1    presentation of their defenses should take an equal or less number of days.

2    Accordingly, Plaintiffs have estimated a total of 20-30 days.

3         If the Court does not dismiss all of Defendants' counterclaims prior to trial,

4    Plaintiffs request that any trial relating to any of those claims be severed and

5    separate from the trial of their claims against Defendants, especially considering

6    their apparent contingent nature.  At this time, Plaintiffs do not have an estimate

7    for the duration of a trial relating to the counterclaims.

8         *UnitedHealth's Position*:  UnitedHealth estimates that the trial will take 24

9    to 32 days, including presentations by both sides.  UnitedHealth anticipates calling

10   25-30 witnesses at trial, including experts.

11        UnitedHealth opposes the United States' request to sever or bifurcate

12   UnitedHealth's counterclaims at trial.  The United States fails to provide any

13   substantive basis for its premature request to sever and bifurcate.

14        The Parties reserve their rights to modify these estimates as the case

15   progresses and to ask for additional time for rebuttal witnesses.

16   **P.    Trial Counsel**

17        United States:  Edward Crooke, Carol Wallack, Justin Draycott, Paul

18   Freeborne, John Lee, Jessica Krieg, and Paul Perkins from the U.S. Department of

19   Justice.

20        Relator:  Eric R. Havian, Jessica T. Moore, Henry C. Su, from Constantine

21   Cannon; William Christopher Carmody, Arun Subramanian, from Susman

22   Godfrey; and Stephen S. Hasegawa from Phillips & Cohen.

23        Defendants:  David J. Schindler, Daniel Meron, Kathryn H. Ruemmler, and

24   Abid R. Qureshi.

25   **Q.    Independent Expert or Master**

26        At this time, the Parties do not anticipate a need for an independent expert or

27   master.

28

1    **R.    Timetable**

2          The Parties' completed Schedule of Pretrial and Trial Dates is attached as

3    Exhibit A.

4    **S.    Other Issues**

5          At this time, the Parties do not have other issues.

6                                    Respectfully submitted,

7    Dated:  April 2, 2018           CHAD A. READLER
                                     Acting Assistant Attorney General
8                                    NICOLA T. HANNA
                                     United States Attorney
9                                    DOROTHY A. SCHOUTEN
                                     Chief, Civil Division
10                                   DAVID K. BARRETT
                                     Chief, Civil Fraud Section
11                                   DAVID M. HARRIS
                                     Deputy Chief, Civil Fraud Section
12                                   Assistant United States Attorneys

13                                   MICHAEL D. GRANSTON
                                     DANIEL R. ANDERSON
14                                   EDWARD CROOKE
                                     JUSTIN DRAYCOTT
15                                   PAUL G. FREEBORNE
                                     JESSICA KRIEG
16                                   PAUL PERKINS
                                     CAROL L. WALLACK
17                                   Attorneys, Civil Division
                                     United States Department of Justice
18
                                     JAMES P. KENNEDY, JR.
19                                   United States Attorney
                                     KATHLEEN ANN LYNCH
20                                   Assistant United States Attorney

21                                        /S/ John E. Lee
                                     _____
22                                   JOHN E. LEE
                                     Assistant United States Attorney
23
                                     Attorneys for the United States of America

24

25

26

27

28

Case 2:16-cv-08697-MWF-SS  Document 224  Filed 04/02/18  Page 56 of 57  Page ID #:3222
Case 2:16-cv-08697-FMO-PVC  Document 616-3  Filed 08/06/24  Page 281 of 637
Page ID #:19175

1  Dated:  April 2, 2018          ERIC R. HAVIAN
                                  HARRY LITMAN
2                                 JESSICA T. MOORE
                                  HENRY C. SU
3                                 Constantine Cannon LLP
                                  STEPHEN HASEGAWA
4                                 Phillips & Cohen LLP
                                  WILLIAM CHRISTOPHER CARMODY
5                                 ARUN SUBRAMANIAN
                                  MATTHEW R. BERRY
6                                 JOHN P. LAHAD
                                  MENG XI
7                                 Susman Godfrey LLP

8                                  /S/ Jessica Moore
                                  JESSICA MOORE
9
                                  Attorneys for Relator Benjamin Poehling
10

11  Dated:  April 2, 2018          DAVID J. SCHINDLER
                                   DANIEL MERON
12                                 KATHRYN H. RUEMMLER
                                   ABID R. QURESHI
13                                 Latham & Watkins LLP

14                                  /S/ David J. Schindler
                                   DAVID J. SCHINDLER
15
                                  Attorneys for Defendants UnitedHealth
16                                 Group, Inc.; United Healthcare Services,
                                  Inc.; United Healthcare, Inc.;
17                                 UnitedHealthcare Insurance Company;
                                  UHIC Holdings, Inc.; Ovations, Inc.;
18                                 Optum, Inc.; and OptumInsight, Inc.

19

20

21

22

23

24

25

26

27

28

0278

<div align="right">1</div>

<div align="center">Attestation</div>

2      I hereby attest that the other signatories listed, on whose behalf the filing is

3   submitted, concur in the filing's content and have authorized the filing.

4   Dated:  April 2, 2018

5                                                      /S/ John E. Lee

6                                                JOHN E. LEE
                                                 Assistant United States Attorney

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## JUDGE MICHAEL W. FITZGERALD
## <u>SCHEDULE OF PRETRIAL AND TRIAL DATES WORKSHEET</u>

| Case No. | 16-08697 |
|---|---|
| Case Name | United States ex rel. Poehling v. UnitedHealth Group, Inc. et al. |

| Matter | **Plaintiff(s)' Date mo / day | Defendant(s)' Date mo / day / year | Court Order |
|---|---|---|---|
| [ X] Jury Trial *or* [ ] Court Trial **(Tuesday at 8:30 a.m.)** Duration Estimate:_____ Days | 2/18/2020; duration estimate = 20-30 days | 8/27/2019; duration estimate = 24-32 days | |
| Final Pretrial Conference [LR 16] and Hearing on Motions *In Limine* **(Monday at 11:00 a.m. -- three (3) weeks before trial date)** Motions *In Limine* must be filed **three (3) weeks** before this date; oppositions are due **two (2) weeks** before this date; no reply briefs. | 1/27/2020 | 8/5/2019 | |

| Event | Weeks Before Trial | Plaintiff(s)' Date mo / day / year | Defendant(s)' Date mo / day / year | Court Order |
|---|---|---|---|---|
| Last Date to Hear Motion to Amend Pleadings / Add Parties | | 10/29/2018 | 10/29/2018 | |
| Non-Expert Discovery Cut-Off (at least 4 weeks before last date to hear motions) | 18 | 5/31/2019 | 1/28/2019 | |
| Expert Disclosure (Initial) | | 6/28/2019 | 2/25/2019 | |
| Expert Disclosure (Rebuttal) | | 7/31/2019 | 3/25/2019 | |
| Expert Discovery Cut-Off | 14 * | 9/30/2019 | 4/22/2019 | |
| Last Date to *Hear* Motions **(Monday at 10:00 a.m.)** | 14 | 11/4/2019 | 5/20/2019 | |
| Last Date to Conduct Settlement Conference | 12 | 12/26/2019 | 6/3/2019 | |
| For Jury Trial<br>• File Memorandum of Contentions of Fact and Law, LR 16-4<br>• File Exhibit and Witness Lists, LR 16-5.6<br>• File Status Report Regarding Settlement<br>• File Motions *In Limine* | 6 | 1/6/2020 | 7/15/2019 | |
| For Jury Trial<br>• Lodge Pretrial Conference Order, LR 16-7<br>• File Agreed Set of Jury Instructions and Verdict Forms<br>• File Statement Regarding Disputed Instructions, Verdicts, etc.<br>• File Oppositions to Motions *In Limine* | 5 | 1/13/2020 | 7/22/2019 | |
| For Court Trial<br>• Lodge Findings of Fact and Conclusions of Law, LR 52, and Summaries of Direct Testimony | 3 | | | |

\* The parties may choose to cut off expert discovery prior to MSJ briefing.
\*\* If the Court dismisses Defendants' counterclaims, Plaintiffs may revise their proposed dates and estimated trial duration.

ADR [LR 16-15] Selection:

☐ Attorney Settlement Officer Panel    ☒ Private Mediation    ☐ Magistrate Judge (with Court approval)

**EXHIBIT A**

0280

**EXHIBIT D-5**

MICHAEL D. GRANSTON
Deputy Assistant Attorney General, Civil Division
TRACY L. WILKISON
Acting United States Attorney
DAVID M. HARRIS
ABRAHAM C. MELTZER
JOHN E. LEE (CBN 128696)
JACK D. ROSS (CBN 265883)
Assistant United States Attorneys
    300 N. Los Angeles Street, Room 7516
    Los Angeles, California 90012
    Tel: (213) 894-3995; Fax: (213) 894-7819
    Email: john.lee2@usdoj.gov
JAMIE A. YAVELBERG
ROBERT McAULIFFE
EDWARD CROOKE
LINDA M. McMAHON
JESSICA E. KRIEG
AMY L. LIKOFF
GREGORY A. MASON
MARTHA N. GLOVER
WENDY ZUPAC
Attorneys, Civil Division, U.S. Department of Justice
    P.O. Box 261, Ben Franklin Station
    Washington, D.C. 20044
    Tel: (202) 307-0486; Fax: (202) 307-3852
    Email: robert.mcauliffe@usdoj.gov
JAMES P. KENNEDY, JR.
United States Attorney
DAVID CORIELL
Assistant United States Attorney (Admitted PHV)
    138 Delaware Avenue
    Buffalo, New York 14201
    Tel: (716) 843-5830; Fax: (716) 551-3052
    Email: david.coriell@usdoj.gov
Attorneys for the United States of America

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING,<br><br>        Plaintiffs,<br><br>        v.<br><br>UNITEDHEALTH GROUP, INC., *et al.*,<br><br>        Defendants. | No. CV 16-08697 FMO (SSx)<br><br>JOINT STIPULATION RE UNITED STATES' MOTION TO COMPEL DISCOVERY<br><br>DISCOVERY MATTER<br>Special Master Suzanne H. Segal<br><br>Date:  April 29, 2021<br>Time:  1:00 p.m.<br>Discovery cutoff date:  December 6, 2021<br>Pretrial conference date:  February 3, 2023<br>Trial Date:  February 21, 2023 |

0282

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

I.    INTRODUCTORY STATEMENTS ...................................................... 1

    A.    United States........................................................................... 1

    B.    UnitedHealth........................................................................... 4

II.   PROCEDURAL AND FACTUAL BACKGROUND ...................................... 6

    A.    United States........................................................................... 6

        1.    The United States' Requests.................................................. 6

        2.    UnitedHealth's Response..................................................... 8

    B.    UnitedHealth........................................................................... 9

        1.    Procedural and Factual Background ........................................ 9

            a.    The Government's Theory of the Case, United's
Defenses, and the Government's Response to United's
First Interrogatory ................................................ 9

            b.    Interrogatory 14 and RFP 147................................. 14

            c.    United's Efforts to Avoid This Dispute......................... 16

III.  ARGUMENT ................................................................................ 19

    A.    United States......................................................................... 19

        1.    Interrogatory 14................................................................ 19

            a.    Interrogatory 14 Is a Proper Contention Interrogatory......... 19

            b.    UnitedHealth's Objections That Interrogatory 14
Improperly Shifts the Burden of Proof Is Meritless............ 21

            c.    UnitedHealth's Objection That Interrogatory 14
Improperly Requests the Early Production of
UnitedHealth's Expert Opinions Is Meritless. .................... 24

            d.    UnitedHealth's Proposed Response Under Fed. R. Civ.
P. 33(d) is Improper. ............................................ 25

            e.    Compelling A Response to Interrogatory No. 14
Promotes Fairness and Efficiency.............................. 27

        2.    Request 147..................................................................... 29

    B.    UnitedHealth......................................................................... 29

        1.    The Government's Motion to Compel on Interrogatory 14A
Should Be Denied............................................................. 29

a.    Interrogatory 14A is an Improper Attempt to Use a Contention Interrogatory to Compel United to Perform the Expert Analysis that the Government Failed to Perform Before Filing Suit ................................................. 29

b.    Interrogatory 14A is Improper Because it Would Require United to Conduct New and Time-Consuming Analysis that it Has Not and May Never Undertake and Reverses the Burden of Proof. ........................................... 37

2.    The Government's Motion to Compel a Response to Interrogatory 14B Should Be Denied ........................................... 39

3.    The Government's Motion to Compel Regarding RFP 147 Should Be Denied ........................................................................ 42

4.    The Government's Claims of Sandbagging and Unfair Surprise Are Baseless ................................................................................ 42

5.    The Government's Alternative Request that United Be Foreclosed From Introducing Evidence at Trial Lacks Any Foundation ............................................................................................ 44

IV.    PROPOSED RESOLUTION/CONCLUSION ................................................. 45

A.    United States ........................................................................................ 45

B.    UnitedHealth ........................................................................................ 46

0284

TABLE OF AUTHORITIES

**CASES**

*Acosta-Huerta v. Estelle*,
7 F.3d 139, (9th Cir. 1992)....................................................................... 44

*Am. Gen. Life Ins. Co. v. Billard*,
No. C10-1012, 2011 WL 13136619, (N.D. Iowa May 2, 2011) ...................... 23

*Amgen Inc. v. Sandoz Inc.*,
No. 14-cv-04741, 2017 WL 1352052, (N.D. Cal. Apr. 13, 2017)..... 24, 25, 30, 35

*Barkley v. Life Ins. Co. of N. Am.*,
No. 3-07-CV-1498-M, 2008 WL 450138, (N.D. Tex. Feb. 19, 2008).............. 23

*Bayer Healthcare Pharm., Inc. v. River's Edge Pharm., LLC*,
No.: 1:11-cv-1634-HLM, 2015 WL 11142425, (N.D. Ga. July 31, 2015) ...24, 25

*Behrazfar v. Unisys Corp.*,
No. SACV 08-0850-AG(RCX), 2009 WL 10673197, (C.D. Cal. June 3, 2009) 37

*Boston v. ClubCorp USA, Inc.*,
No. CV 18-3746 PSG (SS), 2019 WL 1873293, (C.D. Cal. Mar. 11, 2019)
(Segal, M.J.)............................................................................... 19, 20

*City of Las Cruces v. United States*,
No. CV 17-809 JCH/GBW, 2021 WL 330062, (D.N.M. Feb. 1, 2021)....... 37, 41

*Counts v. Pollock*,
No. 3:18-cv-1072-J-39JBT, 2020 WL 5534444, (M.D. Fla. Aug. 21, 2020)...... 34

*D&D Techs. (USA), Inc. v. Safetech Hardware Inc.*,
2013 WL 12142955, (C.D. Cal. Nov. 8, 2013).......................................... 24

*Dancy v. Scribner*,
No. 1:07-cv-00716-OWW-SMS PC, 2009 WL 3567850, (E.D. Cal. Oct. 27, 2009) 27

*Erwin v. Shinseki*,
No. 09-1530, 2011 WL 1563942 (Vet. App. Apr. 27, 2011) .......................... 45

*Fabricant v. United States*,
No. CR 03-01257-RSWL-1, 2015 WL 5923481, (C.D. Cal. Oct. 8, 2015)........ 44

*Finjan, Inc. v. ESET, LLC*,
No. 17CV183 CAB (BGS), 2018 WL 4772124, (S.D. Cal. Oct. 3, 2018).......... 30

*Ford Motor Co. DPS6 Powershift Transmission Prod. Liab. Litig.*,
No. 2:18-ML-02814 AB (FFM), 2019 WL 6486048, (C.D. Cal. Oct. 17, 2019) 27

*Fridkin v. Minn. Mut. Life Ins. Co., Inc.*,
No. 97 C 0332, 1998 WL 42322, (N.D. Ill. Jan. 29, 1998)............................ 22

*GEICO v. Prushanksy*,
   12-80556-Civ, 2013 WL 12077495, (S.D. Fla. Jan. 4, 2013)........................... 22

*In re Facebook, Inc.*,
   No. MDL 12-2389, 2016 WL 5080152, (S.D.N.Y. July 7, 2016).............. 38, 41

*Jackson v. Equifax Inf. Servs. LLC*,
   No. 1:13-cv-02382-CC-RGV, 2014 WL 12862681, (N.D. Ga. Sept. 26,
   2014) 21

*Johnson Marcraft, Inc v. W. Sur. Co.*,
   No. 3:15-CV-01482, 2016 WL 3655299, (M.D. Tenn. July 8, 2016).............. 27

*Linde v. Arab Bank PLC*,
   No. CV–04–2799 (NG)(VVP), 2012 WL 957970, (E.D.N.Y. Mar. 21, 2012).... 22

*Martinez-Serrano v. I.N.S.*,
   94 F.3d 1256,  (9th Cir. 1996)................................................................. 44

*McKesson Information Solutions, LLC v. Epic Systems Corp.*,
   242 FRD 689, (N.D. Ga. 2007)............................................................ 21, 39

*Melder v. Allstate Corp.*,
   No. CV 03-2499, 2007 WL 9777975, (E.D. La. Nov. 5, 2007).................. 38, 39

*Menell v. Rialto Unified Sch. Dist.*,
   No. EDCV 15-2124-VAP (KKx), 2016 WL 3452920, (C.D. Cal. June 20,
   2016) 25

*Moeller v. Taco Bell Corp.*,
   No. C 02-5849 PJH (JL), 2008 WL 11454816, (N.D. Cal. Aug. 28, 2008)........ 27

*Montgomery v. Wal-Mart Stores, Inc.*,
   No. 12cv3057-JLS (DHB), 2015 WL 11233384, (S.D. Cal. July 17, 2015)....... 30

*Moses v. Halstead*,
   236 F.R.D. 667, (D. Kan. 2006)................................................................ 22

*Qualcomm Inc. v. Apple Inc.*,
   No. 3:17-CV-02398-DMS-MDD, 2018 WL 5829940, (S.D. Cal. Nov. 7,
   2018) 30, 34

*Schaap v. Exec. Indus., Inc.*,
   130 F.R.D. 384, (N.D. Ill. 1990)............................................................... 23

*SPH America, LLC v. Research In Motion Ltd*,
   No. 13-CV-2320 CAB (KSC), 2016 WL 6305414, (S.D. Cal. Aug. 16,
   2016) 21

*U.S. S.E.C. v. Elfindepan, S.A.*,
   206 F.R.D. 574, (M.D. N.C. 2002).......................................................... 26

*United States ex rel. Armfield v. Gills*,
   No. 8:07–cv–2374–T–27TBM, 2012 WL 12918274, (M.D. Fla. July 6,
   2012) 34

*United States ex rel. Desrosiers v. Thaller,*
   No. 12-22445-CIV-LENARD/SELTZER, 2016 U.S. Dist. LEXIS 151220,
   (S.D. Fla. Nov. 1, 2016)................................................................. 33

*United States ex rel. Dougherty v. Guild Mortg. Co.,*
   No. 16cv2909-JAH(BLM), 2020 WL 3542391, (S.D. Cal. June 30, 2020)........ 26

*United States ex rel. Landis v. Tailwind Sports Corp.,*
   317 F.R.D. 592, (D.D.C. 2016)...................................................... 27

*United States v. Mateo-Mendez,*
   215 F.3d 1039, (9th Cir. 2000)...................................................... 44

## OTHER AUTHORITIES

7 Moore's Federal Practice - Civil § 33.102 (2021) ............................... 37

8B Wright, Miller & Marcus, Federal Practice and Procedure § 2174 (3d ed. 2013).... 37

## RULES

Fed. R. Civ. P. 26(a)(2)........................................................... 43

Fed. R. Civ. P. 26(a)(3)........................................................... 44

Fed. R. Civ. P. 26(b)(1)........................................................... 21

Fed. R. Civ. P. 33 (Advisory Committee Notes)..................................... 19

Fed. R. Civ. P. 33(b)............................................................. 19

Fed. R. Civ. P. 33(d)............................................................. 26

# I.    INTRODUCTORY STATEMENTS

## A.    United States

This dispute arises out of UnitedHealth Group's ("UnitedHealth" or "UHG") refusal to reasonably respond to two discovery requests served by the United States that address central issues of this case.  The United States' Interrogatory No. 14 ("Interrogatory 14") and Request for Production No. 147 ("Request 147") together seek to discover UnitedHealth's contentions about the diagnosis codes that the United States alleges UnitedHealth improperly failed to delete.

The central issue in this case is whether UnitedHealth improperly failed to delete diagnosis codes from its Medicare Part C risk adjustment submissions, after its own medical record reviews indicated that diagnoses it had previously submitted to CMS were, in fact, not supported by medical records.  Pursuant to the rules and regulations governing Medicare Part C, Medicare Advantage Organizations ("MAOs") such as UnitedHealth submit to CMS diagnosis codes associated with every beneficiary, which adjust that beneficiary's risk score.  As alleged in the Amended Complaint, the diagnosis codes that MAOs submit determine the payment that MAOs receive from CMS, and CMS requires that MAOs only submit diagnosis codes that are unambiguously supported by the beneficiaries' medical records.  (Declaration of Gregory Mason ("Mason Decl."), Ex. C, United States' Am. Compl., ECF No. 171, at ¶ 4).  Because MAOs submit only diagnosis data, not the underlying medical records, MAOs must exercise due diligence and expressly certify that the diagnosis codes they have submitted for risk adjustment payments are accurate and truthful.  *Id.* at ¶ 5.  When an MAO discovers that a previously submitted diagnosis code was not supported by medical records, it is required to delete it in CMS's risk adjustment payment system.  *Id.* at ¶ 103.

As alleged in this case, UnitedHealth significantly increased the amount of risk adjustment payments it received from CMS by implementing medical record review programs, through which it collected millions of medical records from providers and employed coders to review those medical records and mine them for additional diagnosis

codes that the providers themselves did not report or record. *Id.* at ¶ 10. Although UnitedHealth relied on its medical record reviews to submit additional diagnosis codes and increase its risk adjustment payment from CMS, it systematically ignored medical record reviews when they indicated that diagnosis codes UnitedHealth had previously submitted to CMS were not supported by beneficiaries' medical records. *Id.* at ¶ 12.

In response to UnitedHealth's Interrogatory No. 1, the United States has identified every diagnosis code that it contends UnitedHealth submitted to CMS to increase its risk adjustment payments, and then improperly failed to delete when UnitedHealth's own reviewers found no support for the diagnosis code in the beneficiary's medical records. For each diagnosis code on the United States' list: (1) the diagnosis code was submitted by UnitedHealth to CMS and was required, by regulation, to be supported by an underlying medical record; (2) that medical record went through UnitedHealth's medical record review program; and (3) UnitedHealth's own reviewers did not find the diagnosis code to be supported by medical records. That is, each diagnosis code on the United States' list is associated with a medical chart that UnitedHealth has already thoroughly reviewed, and in none of those reviews found support for the diagnosis code in question. However, UnitedHealth never deleted any of these diagnosis codes.

After the United States identified its list of all diagnosis codes it contends are at issue, it served Interrogatory 14 and Request 147 to discover UnitedHealth's contentions about the very same diagnosis codes. In particular, the United States seeks to discover whether UnitedHealth contends that any of the diagnosis codes on the United States' list were supported by medical records, despite not being found during any of UnitedHealth's reviews of the associated medical records. The United States further seeks to discover factual information related to UnitedHealth's medical record reviews.

Interrogatory 14 asks UnitedHealth to, with respect to every diagnosis code on the United States' list: (A) identify which of those diagnosis codes, if any, UnitedHealth contends were supported by a medical record, as well as the specific medical record UnitedHealth contends provides such support, and (B) identify every medical record

review that UnitedHealth conducted (and the results of that review) for every code that UnitedHealth contends it was not obligated to delete or otherwise return payment for, regardless of whether the basis for UnitedHealth's contention is claimed support in an underlying medical record or some other defense. (Mason Decl., Ex. A, UHG's Resps. and Objs. to Interrog. 14). Request 147, as written, relatedly requests all medical records associated with the diagnosis codes on the United States' list. (Mason Decl., Ex. B, UHG's Resps. and Objs. to Req. 147). Importantly, as a result of the meet and confer process following UnitedHealth's responses and objections to Request 147, the United States agreed to limit its request for medical records to only those records associated with the diagnosis codes that UnitedHealth contends were supported (*i.e.*, the medical records UnitedHealth identifies in response to Part A of Interrogatory 14).

This discovery is an appropriate use of contention interrogatories, seeks factual information regarding UnitedHealth's contentions and defenses, will substantially narrow the issues for trial and the scope of document discovery, avoid wasteful trial preparation, and possibly expedite the resolution of this case.

UnitedHealth initially refused to provide any response to either Interrogatory 14 or Request 147. (Mason Decl., Ex. A; Mason Decl., Ex. B). Subsequently, UnitedHealth agreed to produce some (but not all) of the underlying medical records, but that offer is hollow without identifying which codes UnitedHealth contends are supported by medical records (*i.e.,* responding to Interrogatory 14). Simply producing millions of medical records alone does nothing to illuminate UnitedHealth's contentions.

UnitedHealth's position is unreasonable, would undermine the utility of contention interrogatories, and would cause wasteful inefficiencies in discovery. Because Interrogatory 14 is an appropriate contention interrogatory, UnitedHealth should be compelled to answer it. Furthermore, UnitedHealth should be compelled to produce all medical records associated with the diagnosis codes that UnitedHealth contends were supported. Therefore, the Court should grant the United States' Motion and order a full response to Interrogatory No. 14 and Request 147.

0290

### B. UnitedHealth

The government's motion to compel seeks to require United to conduct burdensome and extensive analysis United itself has not conducted, and may never conduct, much of it expert, in order to make the government's case for it. The government should have conducted this analysis while the matter was under investigation and *before* it filed its complaint, but the government failed to do so. The government should not now be permitted to abuse the discovery process in an ill-conceived attempt to cure fundamental defects in its case.

The core of this dispute centers on whether, under the guise of a contention interrogatory (Interrogatory 14A), the government may compel United to: (a) retain coding experts to review the list of approximately 28 million diagnosis codes the government alleges United knew were unsupported and was required to delete; (b) identify which medical records in United's possession, if any, correspond to those diagnosis codes; (c) direct the coding experts to review the resulting tens of millions of medical records to search for entries that correspond to the diagnosis codes on the government's list; and (d) provide the government now with the results of the coding experts' conclusions as to which codes among the 28 million are in fact supported – and thus necessarily (by omission) also which codes the experts conclude are *not* supported by the medical charts.

The Federal Rules, and numerous cases, make clear that the government cannot compel United to undertake this work. First, despite the government's strenuous insistence that Interrogatory 14A only seeks "facts" underlying United's defense, the reality is that only an expert can reach a conclusion as to which of the codes on the government's list are supported. The government's interrogatory thus does not seek disclosure of some underlying facts, it unabashedly seeks the *results* of that expert analysis, long in advance of when expert reports would be due, despite the fact that United might choose never to perform the expert analysis that the government now seeks. Second, aside from seeking to compel United to perform expert analysis, the government's interrogatory improperly seeks to shift the burden of proof in this case by requiring United to conduct extensive

analysis it has not undertaken in order to determine which of the 28 million diagnosis codes on the government's list are supported, when it is the government's burden to prove that all 28 million diagnosis codes are unsupported. United has repeatedly offered to produce all the medical records in its possession to the government, which will allow the government to conduct the expert analysis it seeks to compel United to perform. That is all that is required under the Federal Rules.

Moreover, while United may contend at trial that the diagnosis codes on the government's list are generally supported since they reflect the independent coding decisions of medical providers, United has no obligation or burden to prove that point. United is perfectly entitled simply to contest whatever evidence the government intends to present to support its contention that all 28 million diagnosis codes are unsupported. To the extent that United chooses to proffer expert testimony regarding any of diagnosis codes on the government's list, it will make that disclosure when required by the scheduling order in this case—not during fact discovery.

Interrogatory 14B is likewise improper. That interrogatory seeks to compel United to conduct new, complex, analysis to help fill another hole in the government's case – its allegation that United allegedly *knew* that the codes on the government's list were unsupported. The government alleges that United possessed this knowledge because United's coders allegedly reviewed the medical records that correspond to the 28 million diagnosis codes on the government's list. In order to prove this allegation for the government, Interrogatory 14B asks United, with respect to each of the 28 million codes, to determine whether a United coder in fact reviewed the corresponding medical chart, match the chart to the corresponding code on the government's list, and provide the results of that chart review. United has not conducted such an analysis, and this analysis in no way relates to any contention United is making or any defense United intends to advance in this case. It is the government, not United, that alleges that United reviewed the medical records corresponding to these 28 million codes, and it is the government that must conduct the analysis to prove it. United has already produced to the government all the

datasets that contain the relevant information that United would need to conduct this analysis; hence, the government already has all the information necessary to analyze that data for itself. The Federal Rules require nothing more.

In response to RFP 147, United has offered to produce all the medical records in its possession from the relevant time period that were subject to United's chart review, and that offer remains open. Instead, the government asks United to produce only those medical charts that correspond to codes United contends are supported in its response to Interrogatory 14A. As recrafted, RFP 147 thus stands or falls with this Court's ruling as to that interrogatory. If the court agrees with United that it need not respond to Interrogatory 14A, then there will be no responsive records to produce.

United's positions are neither novel nor unfair. The relevant rules provide deadlines for expert disclosures, witness lists, and pretrial exchange of exhibits. But even in complex cases with millions of documents, parties are not required to identify during fact discovery the specific evidence they intend to introduce at trial, much less on cross-examination, nor to provide expert disclosures in response to alleged contention interrogatories. These rules apply equally to the government, and there is no unfairness in requiring the government to adhere to them.

## II.   PROCEDURAL AND FACTUAL BACKGROUND

### A.   United States

#### 1.   The United States' Requests

Interrogatory 14 is a contention interrogatory requesting that UnitedHealth identify factual information regarding its contentions about the diagnosis codes at issue in this case.

> **INTERROGATORY NO. 14:** For each Diagnosis set forth in the United States' Response to Defendants' Interrogatory No. 11 that You contend You were not obligated to delete or otherwise return payment received for the Diagnosis to the Medicare Program, identify (A) all documentation in each Chart(s), if any, that You contend supports that Diagnosis, Including for each the Beneficiary (by name, HIC Number,

6

0293

and date of birth), Date(s) of Service, Diagnosis Code(s), HCC(s) and/or RxHCC(s), Provider (by individual name, group name, address, NPI, Tax ID(s), and Provider ID); and (B) each Medical Record Review(s) of the Chart(s) corresponding to that Diagnosis, Including for each its date(s), type(s) (i.e., whether the Medical Record Review was conducted as part of Chart Review, Internal Data Validation, RACCR, Claims Verification, HQ-PAFs, or other UHG Medical Record Review program), Chart Barcode, Load Date(s), and each Diagnosis Code for which support was found, identified, validated, or recorded in the Medical Record Review.

(Mason Decl., Ex. A). That is, for every diagnosis code on the United States' list of diagnosis codes UnitedHealth improperly failed to delete that UnitedHealth disputes it was obligated to delete, it must identify: (A) "all documentation in each Chart(s), if any, that You contend supports that Diagnosis" and (B) "each Medical Record Review(s) of the Chart(s) corresponding to that Diagnosis." *Id.* Part B effectively asks UnitedHealth to identify every medical record review it conducted of any charts associated with every code on the United States' list – assuming, of course, that UnitedHealth disputes it was obligated to delete, regardless of the basis for that dispute, each of the codes. *Id.*

Request 147 seeks the production of all medical records associated with the diagnosis codes on the United States' list:

**REQUEST FOR PRODUCTION NO. 147:**

All Chart(s) corresponding to, associated with, or related to each Beneficiary, from each DOS Year(s) in which that Beneficiary is listed in the United States' Response to Defendants' Interrogatory No. 1 (Including the United States' First Supplemental Response served on August 17, 2020, the United States' Amended First Supplemental Response served on October 13, 2020, the United States' Second Supplemental Response served on October 30, 2020, and any other

1    subsequent responses).

2    (Mason Decl., Ex. B).  As indicated above, the United States has agreed to limit this

3    request to production of only those medical records UnitedHealth contends support a

4    diagnosis code on the United States' list.

5            2.    <u>UnitedHealth's Response</u>

6    In its Response, UnitedHealth refused to answer the Interrogatory:

7         Pursuant to and on the basis of these objections, UnitedHealth responds

8         that this Interrogatory is an improper contention interrogatory that

9         impermissibly seeks to shift the burden of proving an essential element

10        of the government's False Claims Act case on to UnitedHealth and

11        seeks expert opinion. UnitedHealth therefore does not intend to further

12        respond to this Interrogatory.

13   (Mason Decl., Ex. A).  UnitedHealth also refused to produce any documents responsive

14   to Request 147:

15        Based upon its General and Specific Objections, UnitedHealth does

16        not intend to produce documents responsive to this Request.

17   (Mason Decl., Ex. B).

18   In an effort to resolve this discovery dispute, the United States sought a meet and

19   confer with UnitedHealth.  *See* Mason Decl., ¶ 4.  UnitedHealth indicated that it would

20   produce the responsive medical records in its possession (but not those in its control that

21   are in the possession of UnitedHealth's third party contractors), which would, according

22   to UnitedHealth, amount to an estimated 21 million charts and take approximately 8

23   months to collect and produce. (Mason Decl., ¶ 6).  UnitedHealth also stated that it would

24   respond to Interrogatory 14 only by referring to those millions of charts, and would not

25   otherwise supplement its response to the Interrogatory.  *Id.*

26   During the meet and confer process, the United States proposed to resolve the

27   dispute by offering a reasonable period of time during fact discovery for UnitedHealth to

28   substantively answer the Interrogatory by identifying the diagnosis codes it contends were

supported by medical records, and limiting the document production to only those charts, if any, associated with the diagnosis codes that UnitedHealth contends were supported. (Mason Decl., ¶ 5).

UnitedHealth's position is that it is entitled to present evidence at trial – through percipient witnesses or expert opinion testimony – that certain diagnosis codes on the United States' list were supported by a medical record, without ever answering Interrogatory 14 or otherwise identifying which diagnosis codes it believes are supported by medical records during fact discovery.

**B.    UnitedHealth**

      1.   <u>Procedural and Factual Background</u>

         *a.    The Government's Theory of the Case, United's Defenses, and the Government's Response to United's First Interrogatory*

This case centers around the government's contention that United failed to delete diagnosis codes that providers treating United beneficiaries had transmitted to United and that United passed on to CMS, but that United allegedly subsequently came to know were unsupported by the corresponding medical charts. In simplest terms, the government alleges that United retained monies it was not entitled to retain, knew that it had thereby received overpayments from the government, and then failed to return those monies.

The instant dispute centers on a list of 28 million diagnosis codes that this Court ordered the government to create in order to comply with its obligation to identify, with specificity, the diagnosis codes it contends United knew were "invalid" (i.e. unsupported by any medical record), and thus represented overpayments that United was required to return by deleting the codes. Each of the diagnosis codes set forth on the government's list of 28 million allegedly false diagnosis codes was originally submitted by providers to United on claim forms. For each diagnosis code, a coder in the provider's office, who is familiar with the provider's documentation practices and handwriting, the particular medical conditions that the provider may specialize in, and often the patient herself, made an affirmative determination that the code at issue was in fact supported by the patient's medical record.

Providers have no incentive to identify all of the appropriate diagnosis codes for a patient because providers are generally not paid based on diagnosis codes (rather, they are paid for rendering a particular service or providing treatment). In recognition of the fact that provider coding is incomplete and does not fully reflect the complete health status of a patient, United and other Medicare Advantage Plans have chart review programs that look for codes to submit that are supported in the medical record. No one, including the government, claims that chart reviews themselves are improper. To avoid biasing its coders, United instructs its chart review coders to review a medical record "blind," meaning the coder does not have any knowledge regarding what diagnosis codes a provider submitted on a claims form for that same patient. Chart review coders have a finite amount of time to review what often amounts to very lengthy medical records and do their best to identify the codes they see supported by the medical record they are reviewing.

In some cases, a chart review coder reviewing a medical record for a particular beneficiary may not identify a diagnosis code that the provider or provider's coder submitted on the claim form. Contrary to the government's assertion, in none of those instances is the United chart review coder making an affirmative determination that the provider submitted a code that was not supported in the medical record. The coder cannot make such a determination as the coder does not have any knowledge as to which codes the provider originally submitted on the claim. At worst, the government might argue that a chart review coder's failure to list a diagnosis code creates an *implication* that the code *might* not be supported by the particular chart the coder reviewed. At best, the code is supported in the medical record and simply was overlooked by the United coder.

There are many reasons why a chart review coder conducting a "blind" review of a medical record may not identify a diagnosis code submitted on the claim when that diagnosis code is, in fact, supported in the medical record. To take a simple example, a United coder may not be familiar with the provider's handwriting, and thus may miss perfectly valid diagnosis codes identified by the provider's own staff. More than that,

coding requires judgment and interpretation of both the medical record and the complex and myriad coding rules. Two coders may look at the same chart and observe different things. The fact that a second coder does not identify all of the codes originally identified by an initial coder thus does not render the original codes false or unsupported. Alternatively, the second coder may well have made an error and missed some entry in the medical record that documents the diagnosis code at issue. Nevertheless, the government's theory is that every single time there is a discrepancy between an affirmative coding decision by the provider that a code is supported and the coding results of United's blind chart reviews, the provider's decision to code that particular code was necessarily incorrect and the code was not supported.

In addition to proving that the diagnosis codes at issue were false, the government also has to prove that United *knew* that the 28 million codes at issue were unsupported. The government's list of codes, of course, did not exist prior to this litigation. Hence, the government cannot allege that anyone at United had allegedly reviewed that list and determined it contained unsupported codes. Instead, the government's theory of knowledge appears to rest on its allegation that with respect to each of the 28 million codes at issue, a United coder had reviewed the very medical chart associated with the specific diagnosis code and by not identifying the code in that coder's coding results, thereby knew the provider's code on the list was unsupported. As the government itself describes the factual underpinning of this theory, "each diagnosis code on the United States' list is associated with a medical chart that UnitedHealth has already thoroughly reviewed." *United States' Portion, Section I.A. at 2.*

United has made clear throughout this matter that it vigorously disputes the government's theory of the case, both as a legal and factual matter. As the Special Master is aware, one of United's legal defenses, based on the statutory "actuarial equivalence" mandate, is that it cannot be required to delete codes that it knows are unsupported unless it knows that its rate of unsupported codes exceeds the rate in CMS's data. And as a factual matter, United argues that for many reasons, including that the payment amounts to

Medicare Advantage Plans that CMS calculates already account for the existence of unsupported codes, the presence of unsupported codes in a Medicare Advantage Plan's data does not necessarily result in overpayment. *See* United Motion to Compel Medical Records, concurrently filed on April 12, 2021. Hence, even if United somehow had knowledge that a particular code on the government's list was unsupported, that would not translate into knowledge that United was overpaid or was improperly retaining monies it was not entitled to retain.

But United also disputes the government's underlying factual theory of "falsity"— that simply because a United coder conducting a "blind" review did not identify a code that a provider submitted on a claim form, the code must be unsupported and thus "invalid."[1,2] This should come as no surprise to the government. As early as its Motion to Dismiss (Dkt. 182), United "vigorously dispute[d] the suggestion that merely because a retrospective chart reviewer doing a 'blind' chart review did not identify every diagnosis code that the provider's own coder had found, the provider's own codes were necessarily wrong or suspect." Ex. M, Dkt. 182 at 6, n.3. United further explained that it would be "remarkable" if a chart review coder conducting a "blind" review "consistently captured every code that was supported in a given patient's chart." *Id.* To be sure, given the sheer number of codes at issue here and the prevalent level of unsupported diagnosis codes industry wide (including in CMS's own data) some number of the 28 million codes are undoubtedly unsupported. But because each of the codes the government alleges United

---

[1] The only government witness deposed on this topic to date made clear that he agreed with United's position. Jeffrey Grant, a senior CMS official who oversaw creation of the risk adjustment program, explained that even in his view, an MA plan's submission of an unsupported code would be improper only if it was making the "very specific submission of a very specific data element . . . that [it] know[s] is wrong." Ex. L, Grant Dep. 321:21–23. He further stated that performing one-way reviews that add diagnosis codes supported in the charts, without looking at whether previously submitted codes lack such support, would not create the requisite knowledge. *Id.* at 322:18–323:15.

[2] Starting with Exhibit L, citations to "Ex." materials refer to exhibits to the Declaration of David J. Schindler filed herewith.

0299

was required to delete was submitted to United by a provider who treated the patient, United believes that the majority of the codes are likely supported by medical charts, and that each code individually is, as a matter of probability, more likely to be supported than not. United certainly denies that *all* of the codes are unsupported.

On January 3, 2020, United issued its First Interrogatory to the government, which asked the government to identify each diagnosis code for the relevant payment years that the government alleged United "knowingly and improperly failed to delete . . . or otherwise return to the Medicare Program [as an] overpayment." Ex. E. United issued that interrogatory because the government had failed to allege in the Complaint which codes were allegedly unsupported and United needed to know which codes, as a factual matter, are at issue. After being ordered to do so, the government ultimately made four productions of data collectively identifying 28 million diagnosis codes the government alleges are false. The most recent production, completing this list, was in December 2020.

The government did not review a single medical record to create its list of 28 million diagnosis codes at issue, and it does not know whether the diagnosis codes on its list are in fact unsupported. Instead, as the government candidly admits in its portion of the Joint Stipulation, *see United States' Portion, Section I.A. at 2*, the government created its list by simply comparing the codes that United had received from providers and submitted to CMS to the codes identified by United's chart review coders who allegedly reviewed the medical charts corresponding to those codes, and then listing all of the codes that the provider had submitted but which the chart reviewer did not identify. In responding to United's First Interrogatory, the government set forth allegations only of historical facts: it is a list of codes that the government alleges a United chart reviewer did not identify when coding a chart. Not having reviewed a single medical record, the government's response did not reflect any medical coding analysis or conclusions as to whether either the provider's coding, or the results of United chart review coding, was in fact correct under applicable coding guidelines.

b.    *Interrogatory 14 and RFP 147*

On November 4, 2020, the government issued the instant discovery requests, both of which relate to medical records that correspond to the approximately 28 million diagnosis codes the government alleges represent overpayments that United was required to delete.

*Interrogatory 14*

Interrogatory 14 has two subparts, A and B,[3] both of which apply to "each Diagnosis set forth in the United States' Response to Defendants' Interrogatory No. 1 that you contend you were not obligated to delete or otherwise return payment received for the Diagnosis to the Medicare Program." Ex. N, United States' Fourth Set of Interrogatories. For the universe of diagnosis codes United contends it was not obligated to delete, Subpart 14A asks United to identify "all documentation in each Chart(s), if any, that You contend supports that Diagnosis, Including for each the Beneficiary (by name, HIC Number, and date of birth), Date(s) of Service, Diagnosis Code(s), HCC(s) and/or RxHCC(s), Provider (by individual name, group name, address, NPI, Tax ID(s), and Provider ID)." *Id.* As the Special Master knows, United contends that it was not obligated to delete *any* of the 28 million diagnosis codes on the government's list, regardless of whether some of those codes are not supported by a medical record. Hence, Interrogatory 14A requires United to identify and gather the over 20 million medical records corresponding to each of the 28 million codes on the government's list and then to hire expert coders to review those tens of millions of charts to determine whether each code on the government's list is or is not supported by the medical chart, and if it is, to point the government to the relevant portions of the medical record containing that documentation.

Subpart 14B requests that, for the universe of diagnosis codes United contends it

---

[3] While not at issue in the current Joint Stipulation, United notes for the record and has made clear to the government that Interrogatory 14 contains two discrete subparts, A and B, which are separate lines of inquiry and therefore separate interrogatories.

14                                          0301

was not obligated to delete, United identify "each Medical Record Review(s) of the Chart(s) corresponding to that Diagnosis, Including for each its date(s), type(s) (i.e., whether the Medical Record Review was conducted as part of Chart Review, Internal Data Validation, RACCR, Claims Verification, HQ-PAFs, or other UHG Medical Record Review program), Chart Barcode, Load Date(s), and each Diagnosis Code for which support was found, identified, validated, or recorded in the Medical Record Review." *Id.* As with Interrogatory 14A, this request requires United to engage in a massive and complex matching analysis for the government to look for every instance in which any of the government's 28 million codes might have been the subject of a Medical Record Review, and to set forth the results of such chart reviews. The government seeks to have United perform this matching exercise to create evidence to buttress the government's claim that United had knowledge that the 28 million diagnosis codes on the government's list were unsupported and, therefore, constituted overpayments.

*RFP 147*

RFP 147 seeks "[a]ll Chart(s) corresponding to, associated with, or related to each Beneficiary, from each DOS Year(s) in which that Beneficiary is listed in the United States' Response to Defendants' Interrogatory No. 1." Ex. O, United States' Eighth Set of Requests for Production. As written, this request encompassed every medical chart relating to every beneficiary who appears on the government's list from the years in question – regardless of whether that chart had ever been reviewed by United or was even associated with the particular diagnosis code submission that the government alleges should have been deleted. On its face, RFP 147 would have required the production of many tens of millions of medical charts. On January 29, 2021, the government attempted to "narrow RFP 147 to only require production of the medical records associated with the codes that UHG contends were supported." *See* Ex. P, Jan. 29, 2021 email correspondence between counsel for United and counsel for the United States and Relator. Specifically, as the government clarifies its position in its portion of this Joint Stipulation, its request is

now limited to those medical records "UnitedHealth identifies in response to Part A of Interrogatory 14." *United States' Portion, Section I.A. at 3.* RFP 147 is, therefore, dependent entirely on whether United is required to respond to Interrogatory 14A; if the Court agrees that United is not required to hire experts to engage in the coding reviews that responding to Interrogatory 14A would require, then there would be no medical records responsive to RFP 147 as now recrafted by the government.

On December 4, 2020, United issued its Responses & Objections to Interrogatory 14 and RFP 147 ("Responses"). *See* Exs. A, B. United objected to Interrogatory 14 and RFP 147 on several grounds, including most importantly that Interrogatory 14 is an impermissible contention interrogatory because (1) it seeks to improperly shift the burden of proof for a main element of the government's False Claims Act case to United and (2) it seeks expert opinion, which is outside the scope of a proper contention interrogatory. *See id.*

### c.    United's Efforts to Avoid This Dispute

Since December 4, 2020, the parties have engaged in four meet and confers and exchanged numerous correspondence regarding United's Responses. Despite the parties' best efforts, the parties have been unable to reach a resolution regarding the discovery requests.

With respect to Interrogatory 14, United stood on its objection that it is not required to conduct new and burdensome analysis for the government that United has not done for itself, especially since the government has the burden of proving that the 28 million codes are unsupported and that United knew they were unsupported. United has also reiterated that Interrogatory 14A, in particular, is an improper attempt to require United to disclose expert opinion and conclusions in the guise of fact discovery.

At the same time, United explained that it has either already produced, or is willing to produce, all of the information that would allow the government to undertake each of these analyses for itself. With respect to Interrogatory 14A, United has offered to produce to the government every single medical record in United's possession that United reviewed

as part of its chart review program, to allow the government to determine for itself which of the codes on its list are or are not supported. *See* Ex. Q, Dec. 31, 2020 email correspondence from A. Qureshi to counsel for the United States and Relator. With respect to Interrogatory 14B, United offered to point the government to all of the data that United has already produced that the government can use to attempt to match the codes on its list to charts that United reviewed, and to the results of those reviews. *Id.* That would be the very same data that United itself would use were it compelled to conduct this analysis for the government. The government has turned down both proposals, insisting that United conduct the complex analyses required to respond to Interrogatories 14A and 14B for the government. *See* Exs. R, P, Jan. 21, 2021 and Jan. 29, 2021 email correspondence between counsel for United and counsel for the United States and Relator.

With respect to RFP 147, the government's positions have vacillated dramatically over time. As written, RFP 147 required United to produce all medical records in its possession, custody, or control pertaining to any of the beneficiaries whose codes appear on the government's list for the year in question – regardless of whether United reviewed or possessed those records, and regardless of whether the charts corresponded to the diagnosis codes appearing on the government's list. That request would have required United to gather tens of millions of records, many from third party providers and many with little to no relevance to this case. United therefore has proposed to the government that instead it will produce all medical records in its possession that were subject to a chart review. United's proposal would provide the government with all the materials necessary to perform the expert coding analysis the government wishes United to perform for it. United estimated and informed the government that even this proposal would entail producing between 15 and 21 million medical records. *See* Ex. Q, Dec. 31, 2020 email correspondence counsel for United and counsel for the United States and Relator.

When United originally proposed to produce all medical records in its possession, the government expressed concern that United's proposal was too *narrow* because it did not include medical records that may be in United's custody or control rather than in its

possession. *See* Ex. S, Jan. 6, 2021 email correspondence between counsel for United and counsel for the United States and Relator. United explained in response that it did not currently intend to collect medical records from third parties but that, if it did in the future, it would provide those to the government.

On January 29, 2021, the government made an about face, this time suggesting that United's offer was *too broad*.[4] Ex. P, Jan. 29, 2021 email correspondence between counsel for United and counsel for the United States and Relator. As the government describes its current position, the government now asks that United produce "only those records associated with the diagnosis codes that UnitedHealth contends were supported (i.e., the medical records UnitedHealth identifies in response to Part A of Interrogatory 14)." *United States' Portion, Section I.A. at 3.* Producing the subset of medical records now requested by the government would therefore require United to first conduct the coding review of the 28 million codes on the government's list that Interrogatory 14A would require.

Unfortunately, despite numerous meet and confers and the informal conference

---

[4] In its portion of the Joint Stipulation, the government writes that "as a result of the meet and confer process following UnitedHealth's responses and objections to RFP 147, the United States *agreed to limit* its request for medical records to only those records associated with the diagnosis codes that UnitedHealth contends were supported (i.e., the medical records UnitedHealth identifies in response to Part A of Interrogatory 14)." *United States' Portion, Section I.A. at 3* (emphasis added). The government mischaracterizes the facts. While the government's January 29 counter-proposal in theory does limit RFP 147, the government proposed to limit the RFP at its own initiative and not in response to any request by United. In fact, United is more than prepared to and has already agreed to produce all of the medical records in its possession that were subject to a chart review for the relevant time period. United does not need the government to narrow RFP 147 further. And the government's suggestion that doing so is less burdensome to United is disingenuous. The government is really attempting to narrow RFP 147, not because it wants to create less burden for United, but because it wants United to go through the exercise of identifying which charts United contends support the diagnosis codes at issue so the government does not have to review any medical records. If anything, this narrowing of RFP 147 is more burdensome for United because it requires United to have an expert conduct extensive analysis in order to respond.

held before the Court, the parties remain at an impasse.

## III.  ARGUMENT

### A.  United States

#### 1.  Interrogatory 14

The United States is entitled to discover UnitedHealth's contentions about the diagnosis codes at issue in this case during fact discovery.  The United States is likewise entitled to discover the facts surrounding each medical record review that UnitedHealth conducted associated with every diagnosis code on the United States' list that UnitedHealth contends it was not obligated to delete, regardless of which specific defense it is relying on for that contention.  Because Interrogatory 14 is a proper contention interrogatory and UnitedHealth has asserted no proper objections supporting its refusal to respond, the Court should compel UnitedHealth to answer fully Interrogatory 14.  The United States is likewise entitled to discover the facts surrounding each medical record review that UnitedHealth conducted associated with every diagnosis code that UnitedHealth disputes.

##### a.  *Interrogatory 14 Is a Proper Contention Interrogatory.*

Interrogatory 14 is a proper interrogatory because it seeks factual information relating to UnitedHealth's contentions about issues central to this case.  *See* Fed. R. Civ. P. 33(b) ("An interrogatory is not objectionable merely because it asks for an opinion or contention that relates to fact or the application of law to fact . . . .").  Contention interrogatories "can be most useful in narrowing and sharpening the issues, which is a major purpose of discovery."  Fed. R. Civ. P. 33 (Advisory Committee Notes); *see also Boston v. ClubCorp USA, Inc.*, No. CV 18-3746 PSG (SS), 2019 WL 1873293, at *8 (C.D. Cal. Mar. 11, 2019) (Segal, M.J.) ("Courts generally approve of appropriately-timed contention interrogatories because they may serve several beneficial purposes, including narrowing the issues, avoiding wasteful preparation, and, it is hoped, expedit[ing] a resolution of the litigation.") (internal citations omitted).

Interrogatory 14 is a straightforward contention interrogatory that asks

UnitedHealth to identify its contentions about the diagnosis codes on the United States' list, *i.e.*, the diagnosis codes that the United States has put in issue through its affirmative allegations. Each diagnosis code on the United States' list previously went through UnitedHealth's medical record review program, and UnitedHealth's own reviewers did not find support for the diagnosis code in the associated medical records. The United States is entitled to discover if UnitedHealth now contends that there is support in a medical record for any of the diagnosis codes on the United States' list. And for each diagnosis code that UnitedHealth contends is supported by medical records, the United States is entitled to discover the documentation and medical records that UnitedHealth contends support that diagnosis code. (Interrogatory 14(A)). Furthermore, for every diagnosis code on the United States' list (*i.e.*, every diagnosis code the United States alleges UnitedHealth was obligated to delete because, in part, UnitedHealth subjected it to a comprehensive medical record review), that UnitedHealth contends it was not obligated to delete, the United States is entitled to discover the facts surrounding those medical record reviews (Interrogatory 14(B)).

If UnitedHealth does not contend that any of the diagnosis codes on the United States' list were supported by medical records or will not otherwise dispute its obligation to delete specific codes, it should say so in response to Interrogatory 14. That would not only be burden-free, it would substantially narrow the issues in the case. However, if UnitedHealth seeks to present evidence or argue that certain diagnosis codes on the United States' list were supported by medical records, it must disclose those contentions and their factual basis during fact discovery. (Interrogatory 14(A)). Similarly, if UnitedHealth disputes its obligation to delete any of the diagnosis codes at issue, the United States is entitled to the factual information regarding the medical record reviews UnitedHealth conducted with respect to those diagnosis codes. (Interrogatory 14(B)). *ClubCorp USA, Inc.*, 2019 WL 1873293, at *7 ("The purpose of interrogatories is to facilitate trial preparation, to provide facts, to narrow the issues, ***and to reduce the chance of surprise.***") (emphasis added). UnitedHealth is not permitted to surprise the United States at trial by

arguing that certain diagnosis codes were in fact supported by medical records, or disputing the results of its own medical record reviews, without ever disclosing those contentions or the facts supporting them during fact discovery.

> b.  *UnitedHealth's Objections That Interrogatory 14 Improperly Shifts the Burden of Proof Is Meritless.*

UnitedHealth's principal rationale for refusing to respond to Interrogatory 14 is its baseless objection that a plaintiff may not propound a contention interrogatory on a matter in which the defendant does not bear the burden of proof at trial.  (Mason Decl., Ex. A, UHG's Resps. and Objs. to Interrog. 14 ("A party bearing the burden of proof cannot propound an interrogatory that effectively requires the responding party to prove the propounding party's case by shifting the burden of proof.")).  According to UnitedHealth, Interrogatory 14 is improper "in that it seeks to improperly shift the burden of proof for a main element of the government's False Claims Act case to UnitedHealth."  *Id.*

The question of burden of proof does not determine whether information is discoverable, nor whether an interrogatory is proper.  On the contrary, "the ultimate burden . . . does not dictate the scope of discovery."  *SPH America, LLC v. Research In Motion Ltd*, No. 13-CV-2320 CAB (KSC), 2016 WL 6305414, *2 (S.D. Cal. Aug. 16, 2016).  "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim **or defense** and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1) (emphasis added).  UnitedHealth wrongly seeks to rewrite Rule 26(b)(1) to only allow a plaintiff to discover information relevant to a defense upon which the defendant bears the burden of proof.

Furthermore, "[n]owhere in the Federal Rules of Civil Procedure is it required that a party who carries the ultimate burden on an issue at trial must establish a prima facie case before it is entitled to discover information the other party may use to rebut the prima facie case."  *McKesson Information Solutions, LLC v. Epic Systems Corp.*, 242 FRD 689, 692 (N.D. Ga. 2007); *see also Jackson v. Equifax Inf. Servs. LLC*, No. 1:13-cv-02382-CC-RGV, 2014 WL 12862681, at *3 (N.D. Ga. Sept. 26, 2014) ("contention interrogatories are properly used to narrow and sharpen the issues before the Court and may be used to

0308

discover the legal and factual bases of an opposing party's defenses, even if the party does not bear any burden of proof on the issues to which those defenses relate"); *Linde v. Arab Bank PLC*, No. CV–04–2799 (NG)(VVP), 2012 WL 957970, at *2 (E.D.N.Y. Mar. 21, 2012) (rejecting "the proposition that contention interrogatories may only explore a party's 'contentions' concerning issues on which the party bears the burden of proof"); *Moses v. Halstead, 236 F.R.D. 667*, 674 (D. Kan. 2006) ("This Court has noted that such interrogatories are helpful in that they may narrow and define the issues for trial and enable the propounding party to determine the proof required to rebut the responding party's claim or defense.").

Because Interrogatory 14 asks for the factual basis of UnitedHealth's defenses in this case, it is a proper contention interrogatory notwithstanding that it is the United States' burden of proof to establish that UnitedHealth improperly failed to delete the diagnosis codes on its list. Interrogatory 14(A) simply requires UnitedHealth to state whether it intends to present evidence, as one of its defenses, that certain of the diagnosis codes on the United States' list are supported in those codes' underlying medical records and identify the records that support that contention. Likewise, Interrogatory 14(B) only asks for factual information about medical record reviews UnitedHealth has already conducted; it does not require any additional analysis by UnitedHealth whatsoever.

Moreover, contention interrogatories are routinely permitted where they seek to discover the factual basis for a party's denial of an allegation in a pleading. *See, e.g., GEICO v. Prushanksy*, 12-80556-Civ, 2013 WL 12077495, at *3 (S.D. Fla. Jan. 4, 2013) ("The Court overrules the objection as the interrogatory simply seeks the factual basis for GEICO's denial of paragraph 31 of the Counterclaim, which paragraph states how GEICO allegedly breached its duty of good faith. There is no burden shifting, and this is a proper contention interrogatory."); *Fridkin v. Minn. Mut. Life Ins. Co., Inc.*, No. 97 C 0332, 1998 WL 42322, at *5 (N.D. Ill. Jan. 29, 1998) (compelling a response to a contention interrogatory that sought "the bases for Minnesota Mutual's denial of certain allegations in Plaintiffs' Amended Complaint"); *Am. Gen. Life Ins. Co. v. Billard*, No. C10-1012,

2011 WL 13136619, at *3 (N.D. Iowa May 2, 2011) (ordering a full response to a contention interrogatory and related requests for production seeking "'the factual basis for the denial of those paragraphs of the Complaint that are denied by the Billard Answer'" and the production of any document "'which proves or disproves any fact upon which Defendant bases its denial'"); *Barkley v. Life Ins. Co. of N. Am.*, No. 3-07-CV-1498-M, 2008 WL 450138, at *1 (N.D. Tex. Feb. 19, 2008) (ordering a response to a contention interrogatory seeking "the basis for each of the denials expressed in Defendant's Original Answer"), *as modified* (N.D. Tex. Mar. 12, 2008); *Schaap v. Exec. Indus., Inc.*, 130 F.R.D. 384, 388 (N.D. Ill. 1990) (ordering responses to contention interrogatories inquiring into the basis of Executive's denials of certain allegations of the complaint, so as to "clarify, narrow, and sharpen the issues" and "ensure mutual access to all relevant facts").

Just as in the cases cited above, Interrogatory 14 seeks the factual basis for the denial of an allegation in a pleading, specifically UnitedHealth's denial of Paragraph 342 of the United States' Amended Complaint.  (Mason Decl., Ex. D, UnitedHealth's Answer to Amend. Compl., ECF No. 223, at ¶ 342 ("Paragraph 342 states legal conclusions to which no response is required. To the extent Paragraph 342 contains any factual allegations, such allegations are denied.")).  UnitedHealth denied the factual allegations in the United States' contention that UnitedHealth "knowingly and improperly failed to delete . . . the invalid diagnoses that had been submitted to the Medicare Program for risk adjustment payments which were made by the Medicare Program or knowingly and improperly failed to otherwise return to the Medicare Program the overpayments based on the invalid diagnoses." *Id*.  Moreover, UnitedHealth's Interrogatory No. 1 (which sought and elicited the United States' list of diagnosis codes that are the subject of this litigation), specifically sought the factual bases for the United States' contention in Paragraph 342 of the Amended Complaint. (Mason Decl., Ex. E, UnitedHealth's Interrog. No. 1).  Because the United States' Interrogatory 14 asks for the factual basis regarding which diagnosis codes on that list UnitedHealth contends were supported, it asks for UnitedHealth's factual basis for denying the allegations in Paragraph 342.  The United States is entitled to discover the

23

0310

factual basis for UnitedHealth's denial of Paragraph 342 of the Complaint, and Interrogatory 14 is therefore a proper contention interrogatory.

        *c.*    *UnitedHealth's Objection That Interrogatory 14 Improperly Requests the Early Production of UnitedHealth's Expert Opinions Is Meritless.*

The other objection that UnitedHealth relies on to support its refusal to answer Interrogatory 14 is equally meritless. UnitedHealth contends that Interrogatory 14 is an "improper contention interrogatory because it seeks expert opinion, not facts, which is outside the scope of a proper contention interrogatory." (Mason Decl., Ex. A, UHG's Resps. And Objects. to Interrog. 14).

This objection fundamentally misapprehends the information the United States is seeking. Interrogatory 14 is a proper contention interrogatory because it requests only information regarding the underlying facts (*i.e.*, the existence and source of medical record support, as contended by UnitedHealth, for any of the diagnosis codes identified by the United States), not any expert opinion about those facts. *See Amgen Inc. v. Sandoz Inc.*, No. 14-cv-04741, 2017 WL 1352052, *2 (N.D. Cal. Apr. 13, 2017) (holding that interrogatories "are not improper to the extent they seek only facts, not how an expert would construe those facts"); *D&D Techs. (USA), Inc. v. Safetech Hardware Inc.*, 2013 WL 12142955, at *2 (C.D. Cal. Nov. 8, 2013) (ordering responding party to supplement responses to interrogatories that sought "the legal and factual bases for [d]efendant's contentions . . . ."); *Bayer Healthcare Pharm., Inc. v. River's Edge Pharm., LLC*, No.: 1:11-cv-1634-HLM, 2015 WL 11142425, at *7 (N.D. Ga. July 31, 2015), *report and recommendation adopted*, 2015 WL 11142428 (N.D. Ga. Sept. 22, 2015) (The "[i]nterrogatory ... did not ask for the expert's opinion or a conclusion of law, which, of course, would have been rightfully objectionable. Rather, the interrogatory asked which facts and legal theories Plaintiffs intend to rely on.").

Here, the interrogatory asks for UnitedHealth to identify facts – which diagnosis codes it contends are supported by medical records, which medical records provide such support, and the medical record reviews that UnitedHealth previously conducted of those

records.  Contrary to UnitedHealth's meritless objection, the interrogatory does not ask UnitedHealth to describe "how an expert would construe those facts."  *See Amgen Inc.*, at *2.  Nor does it ask for UnitedHealth to describe "expert's opinion or a conclusion of law." *See Bayer Healthcare Pharm., Inc.*, at *7.  "The fact that an expert would ultimately put the facts together to support the legal theory in an opinion is of no consequence as to whether a responding party must timely supplement such an interrogato[r]y."  *Id.*

UnitedHealth itself previously argued regarding its Interrogatory No. 1 that "[t]he fact that the . . . Interrogatory may seek information that has been provided to an expert or that relates to the subject of expert analysis does not provide . . . an excuse to avoid responding . . . in full with the information reasonably available to it at the time of its response." (Mason Decl., Ex. F, Ltr. From A. Qureshi dated March 17, 2020 at p. 4 (citing *Menell v. Rialto Unified Sch. Dist.,* No. EDCV 15-2124-VAP (KKx), 2016 WL 3452920, at *4 (C.D. Cal. June 20, 2016) ("The Court notes expert analysis does not relieve Defendant of its obligation to investigate and provide information reasonably available to it.")).

For these same reasons, any potential expert analysis UnitedHealth may propound related to the issue of whether underlying medical records support specific diagnosis codes, or related expert conclusions about any impact of that support, does not relieve UnitedHealth of its obligation to timely investigate and provide during fact discovery information reasonably available to it.  In that same vein, Interrogatory 14(B) merely asks UnitedHealth to identify every medical record review it conducted of any charts associated with the diagnosis codes on the United States' list that UnitedHealth disputes.

Interrogatory 14 is therefore a proper contention interrogatory that does not call for expert opinion.

> d.    *UnitedHealth's Proposed Response Under Fed. R. Civ. P.*
>         *33(d) is Improper.*

During the party's meet and confer process and the informal conference with Special Master Segal, UnitedHealth suggested that, notwithstanding its initial Interrogatory Response, it would respond to Interrogatory 14 by generally referencing

some tens of millions of medical records that it would eventually produce to the United States. Not only does this not even address the response requested by Interrogatory 14(B), but with respect to 14(A), this is an unreasonable position and does not satisfy UnitedHealth's discovery obligations, because UnitedHealth's **contentions** cannot possibly be found in underlying medical records. The documents do not speak for themselves and do not contain any discernible clue as to what UnitedHealth's contentions might be. Only UnitedHealth can say what its contentions are.

A party may answer interrogatories by reference to underlying documents only "if the burden of deriving or ascertaining the answer will be substantially the same for either party" and only if the responding party "specif[ies] the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could." Fed. R. Civ. P. 33(d). Neither of those conditions are satisfied here, where the United States has asked for UnitedHealth's **contentions**, and UnitedHealth proposes responding with a blanket reference to tens of millions of underlying medical records, without identifying, importantly, which of those tens of millions of medical records it contends support one or more of the diagnosis codes on the United States' list. UnitedHealth's proposed elaborate guessing game does not comport with its discovery obligations.

For this very reason, Fed. R. Civ. P. 33(d) does not permit a party to respond to contention interrogatories by reference to underlying documents. "[D]ocuments themselves rarely, if ever, reveal contentions of fact or law . . . Only plaintiff can identify its own contentions and the burden on defendants to try and divine plaintiff's contentions from documents obviously imposes a greatly unequal burden on defendants . . . [and] a mixture of contention interrogatories and requests for statements of fact . . . do not lend themselves to answer by use of Rule 33(d)." *U.S. S.E.C. v. Elfindepan, S.A.*, 206 F.R.D. 574, 576-77 and n. 5 (M.D. N.C. 2002); *see also United States ex rel. Dougherty v. Guild Mortg. Co.*, No. 16cv2909-JAH(BLM), 2020 WL 3542391, at *5 (S.D. Cal. June 30, 2020) ("Merely directing Defendant to hundreds of loan records and citing to the general HUD

underwriting and origination requirements does not suffice to alert Defendant to what the Government's allegations are or what evidence it has to support its claims."); *Moeller v. Taco Bell Corp.*, No. C 02-5849 PJH (JL), 2008 WL 11454816, at *2 (N.D. Cal. Aug. 28, 2008) (party cannot rely on the document production option of FRCP 33(d) to respond to a contention interrogatory); *United States ex rel. Landis v. Tailwind Sports Corp.*, 317 F.R.D. 592, 594 (D.D.C. 2016) (same); *In re Ford Motor Co. DPS6 Powershift Transmission Prod. Liab. Litig.*, No. 2:18-ML-02814 AB (FFM), 2019 WL 6486048, at *2 (C.D. Cal. Oct. 17, 2019) (same); *Johnson Marcraft, Inc v. W. Sur. Co.*, No. 3:15-CV-01482, 2016 WL 3655299, at *2 (M.D. Tenn. July 8, 2016) (same).

UnitedHealth itself previously argued regarding its Interrogatory No. 1 that it is improper to answer a contention interrogatory by reference to documents: "The government's attempt at directing UnitedHealth to root through UnitedHealth's own documents to ascertain what diagnosis codes the government contends are at issue is improper and contrary to the requirements of the Federal Rules and applicable case law." (Mason Decl., Ex. F, Ltr. From A. Qureshi dated March 17, 2020 at p. 6 (citing *See Dancy v. Scribner*, No. 1:07-cv-00716-OWW-SMS PC, 2009 WL 3567850, at *2 (E.D. Cal. Oct. 27, 2009) ("This requires Plaintiff to answer Defendants' interrogatories with specificity. Plaintiff may not provide vague information or direct Defendants to comb through his exhibits to answer their own interrogatories.")).  For these same reasons, UnitedHealth's proposal under Fed. R. Civ. P. 33(d) is improper.

Therefore, UnitedHealth may not properly respond to Interrogatory 14 simply by referring to tens of millions of medical records.

e.    *Compelling A Response to Interrogatory No. 14 Promotes Fairness and Efficiency.*

A response to Interrogatory 14 will promote efficiency, because it will potentially narrow the issues in the case.  If UnitedHealth is not defending this case by arguing that the diagnosis codes at issue were supported by medical records, it is wasteful for UnitedHealth to withhold that information now and force the parties and the Court to expend resources litigating that aspect of the case.  It will also streamline document

discovery – UnitedHealth's proposal to produce 21 million medical records in response to Request 147 is not only unnecessary, but would unreasonably and exponentially expand the scope of discovery and the schedule set in this case. If UnitedHealth responds to Interrogatory 14(A), then the parties can agree to the production of only the subset of those medical records, if any, associated with the diagnosis codes UnitedHealth contends were supported. It makes no sense to require the production of 21 million records (which UnitedHealth estimates will take approximately 8 months), when only a subset of those records may ultimately be relevant to this litigation. More importantly, even if UnitedHealth produced all 21 million records, that production is meaningless if it refuses to identify which of those records it contends supports one of the diagnosis codes at issue in this case.

Likewise, compelling an answer to Interrogatory 14 will avoid unfair surprise not contemplated by the Federal Rules. UnitedHealth's position is that it may (or may not) present percipient witnesses and expert opinion testimony at trial to show that certain diagnosis codes were supported by medical records, without ever identifying those diagnosis codes or the associated medical records during fact discovery. This would put the United States in the untenable position of having to rebut a defense that it never had an opportunity to probe or otherwise prepare for during fact discovery. That is trial by ambush, and not how civil discovery works. For this reason, it is not sufficient to wait until UnitedHealth eventually provides this information in pretrial disclosures or expert reports, which come long after the close of fact discovery.

Finally, compelling an answer to Interrogatory 14 would be consistent with Court's prior ruling on UnitedHealth's Interrogatory No. 1, which required the United States to expend extraordinary efforts to compile a list of each and every diagnosis code that the United States contends is at issue in this case. In support of its position on Interrogatory No. 1, UnitedHealth argued that "[i]n order to defend itself, United is entitled to know, with specificity, which diagnosis codes it allegedly knew were false and affirmatively chose not to delete." (Mason Decl., Ex. G, UnitedHealth's Counter-Proposal Regarding

UHC of California's First Interrogatory, at 1). Just as the United States was required to disclose which diagnosis codes it contends are unsupported, UnitedHealth should be required to disclose which codes it contends are supported by the medical records. This is not tit for tat; it is simply what discovery properly requires in this case. It would not only be inconsistent to require that the United States identify each diagnosis code at issue, and then not allow the United States to learn UnitedHealth's position as to those very same codes, but it would eviscerate the very purpose of what discovery was designed to do in a case, namely, narrow the issues for trial and eliminate the opportunity for the presentation of surprise evidence.

### 2. Request 147

The United States is entitled to the production of medical records associated with all of the diagnosis codes at issue in this case and Request 147 is thus a proper document request. UnitedHealth has asserted no proper basis for refusing to produce documents in its possession, custody, or control.

Because UnitedHealth has now agreed to produce *all* responsive documents in its possession, the parties' dispute at this point is much narrower. The United States continues to believe that it is unnecessary to incur the burden and delay of producing all records, when only a subset of the responsive records may be relied upon by UnitedHealth. Accordingly, the United States submits that, after UnitedHealth answers Interrogatory 14 and identifies every diagnosis code that it contends was supported by medical records, it must produce all medical records in its possession, custody, or control, that relate to the diagnosis codes that UnitedHealth contends were supported by medical records.

### B.    UnitedHealth

#### 1.    The Government's Motion to Compel on Interrogatory 14A Should Be Denied

##### a.    *Interrogatory 14A is an Improper Attempt to Use a Contention Interrogatory to Compel United to Perform the Expert Analysis that the Government Failed to Perform Before Filing Suit*

Interrogatory 14A does not seek to ferret out United's contentions of fact in this

case. Interrogatory 14A instead seeks to compel United to perform expert analysis in a thinly veiled attempt to overcome a fundamental flaw in the government's case: namely, having created and advanced a list of 28 million diagnosis codes it claims were unsupported (and, therefore, "false"), the government now realizes that it failed to do the work necessary to support that allegation. Instead of doing the work, under the guise of a contention interrogatory, the government seeks to compel United to retain expert coders to review the list of 28 million codes the government created and to endeavor to find support for each of those diagnosis codes in the medical records pertaining to the underlying beneficiaries corresponding to diagnosis codes on the government's list. Put simply, the government seeks to compel United to do the expert work the government should have done before filing this case and before promulgating a list of 28 million codes it contends are unsupported.

It is well settled that contention interrogatories "are improper [when] they ask the respondent to provide an expert opinion." *Amgen Inc. v. Sandoz Inc.*, No. 14-cv-04741-RS (MEJ), 2017 WL 1352052, at *2 (C.D. Cal. Apr. 13, 2017); *Montgomery v. Wal-Mart Stores, Inc.*, No. 12cv3057-JLS (DHB), 2015 WL 11233384, at *6 (S.D. Cal. July 17, 2015); *Finjan, Inc. v. ESET, LLC*, No. 17CV183 CAB (BGS), 2018 WL 4772124, at *4 (S.D. Cal. Oct. 3, 2018). Courts in the Ninth Circuit have specifically held that while interrogatories are proper "to the extent they seek only facts," interrogatories cannot require a responding party to demonstrate "how an expert would construe those facts." *See Amgen Inc.*, 2017 WL 1352052, at *2 (a contention interrogatory, which required the respondent to show why the patented mechanism was nonobvious, impermissibly required expert testimony*); *Qualcomm Inc. v. Apple Inc.*, No. 3:17-CV-02398-DMS-MDD, 2018 WL 5829940, at *1 (S.D. Cal. Nov. 7, 2018).

The government does not appear to dispute this legal proposition. Instead, it insists that Interrogatory 14A seeks only "facts." That claim grossly mischaracterizes the complex, expert-driven process required to determine that a code is supported by a medical record. To generate the list the government commands, United will need to retain expert

coders to review each of the 28 million diagnosis codes and then to compare those codes to any of the medical records corresponding to the beneficiaries (patients) at issue. Determining whether any or all of the 28 million codes are supported by a particular entry in any of the relevant medical records cannot be done by lay people or lawyers. It must be done by someone with specialized training and experience in risk adjustment coding: namely, an expert. Put simply, interrogatory 14A falls squarely and unquestionably in the realm of expert analysis and expert opinion, and any answer to Interrogatory 14A will be expert opinion governed by Fed. R. Evid. 702. Interrogatory 14A is therefore procedurally and substantively improper.

(A)    Whether a Diagnosis Code Is Supported in a Medical Record Requires Expert Opinion

Whether a diagnosis code is or is not supported in a medical record is an opinion, not a fact, and, in any event, is a determination that only a coder can make.

To begin with, as the government's own documents recognize, coding involves the exercise of judgment as to which different coders may disagree; whether a particular diagnosis code is supported or not by a medical chart *is not a fact*. For example, in a November 20, 2015 memorandum from the U.S. Department of Health and Human Services ("HHS") Office of the Inspector General, HHS recognized that "[m]edical record review consists of evaluating risk adjustment data to see if it supports the reported CMS-HCC. While criteria does exist, in some cases, the medical reviewer must use their judgment to make a decision." Ex. T, USBP060643694 (Confidential) at 1. The government has also recognized that "[i]t is entirely possible for two different reviewers to look at a medical record and come to opposite conclusions." *Id.*; *see also* Ex. U, USBP059844500 (Confidential) at 2 (June 2011 email exchange in which a CMS employee discusses appeals related to "RADV reviews of medical records" and states: "everything stands or falls on what each side asserts is in the record (note, I didn't say—what IS in the record. It is much more nuanced than that since coding is far from bench science . . . it's fairly subjective at times"); Ex. V, USBP059164283 (AEO) at 12 (February 2004 draft report regarding "Medicare+Choice Risk Adjustment Data Validation for CY

2001 Payments," acknowledging the existence of "coding differences" that can be due to many factors, including "differences in interpretation of clinical documentation, differences in interpreting coding guidelines and judgment between coders"); Ex. W, 2018 Benefit Year Protocols at 91 (explaining that, in its Risk Adjustment Data Validation ("RADV") audits, CMS employs a process called "Inter-Rater Reliability" or "IRR," which is a "quality control measure to determine the accuracy of the abstraction diagnoses by Primary Coders when compared to Senior Coders. Medical records reviewed by the Primary Coder and sampled for IRR are then re-reviewed by a Senior Coder. The comparison of HCCs assigned to diagnoses found between the Primary Coder and the Senior Coder are then used to determine the Primary Coder's IRR consistency measure").[5]

Moreover, regardless of whether properly characterized as "art" or "science," determining whether a particular diagnosis code is properly abstracted from a medical record undoubtedly requires expertise and specialized training. The government knows this. Each year, as part of its RADV audits, the government retains expert coders to conduct medical record reviews on behalf of the government to determine whether a diagnosis code submitted by a Medicare Advantage Plan is supported in a medical record. As part of this process, CMS provides these RADV coders with guidance for reviewing the underlying medical record documentation to identify potential support for a diagnosis code. This guidance provides that the "reviewers must first apply their expertise in documentation and official coding guidelines to each scenario." Ex. Y, CMS RADV

_____

[5] Numerous experts within the healthcare industry have likewise recognized that coding is an art not a science and requires the exercise of judgment. *See* Ex. X, *Achieving Coding Consistency* at 1 ("[c]oding professionals know that the act of coding is not black and white-there is room for interpretation. A coder's background and training, among other factors, will greatly influence the way he or she assigns codes"); *see id.* (quoting a coding manager as saying: "'Coding is much more of an art than it is a science . . . So [coding professionals] definitely have a lot of room for interpretation.'"); *see id.* (quoting a vice president of health information management at a healthcare company as saying: "'[A] coder doesn't just use books and resources, they also have to use their head, use their logic, their common sense, to make some decisions.'").

0319

Guidance at 6. The "reviewers" are certified and trained coding experts CMS retains to conduct these RADV audits. *See* Ex. Z, RA Participant Guide at 159 (describing how CMS uses "Medical Record Review Contractors (MRRCs)" in RADV that utilize "certified coders to abstract diagnosis codes"). They are not lay people.

The application of expertise and guidance to interpret a medical record is necessarily analysis, not fact. Moreover, this is expertise a lay person does not possess and guidance a lay person does not understand and cannot interpret. One could not hand a lay person a voluminous medical record and ask them to determine whether the record adequately supports coding pythorax without fistula (ICD 10 code J86.9) or amyotrophic lateral sclerosis (ICD-10 code G12.21) because the lay person has no training in reading highly technical medical charts and would have no understanding of the "official coding guidelines" that apply to the abstraction and selection from among thousands of possible diagnosis codes.[6]

Numerous courts have thus recognized that only a coder qualified as an expert by the court can testify as to whether a diagnosis code is supported in the record. *See, e.g., United States ex rel. Desrosiers v. Thaller*, No. 12-22445-CIV-LENARD/SELTZER, 2016 U.S. Dist. LEXIS 151220, at *6–7, *12–13 (S.D. Fla. Nov. 1, 2016) (holding that professionally certified coder expert opinion that "57 of the 121 cases lacked sufficient documentation to support the procedure coded" was not outside the expert's area of

---

[6] In fact, there is no single comprehensive source of "official coding guidelines" that detail how to accurately code diagnoses in the risk adjustment context. Rather, there are multiple organizations and industry-accepted sources regarding risk adjustment coding. For instance, CMS in-part relies upon official ICD Coding guidance as well as the views of certifying bodies. Common sources of risk adjustment coding guidance include the American Academy of Professional Coders ("AAPC"), which educates coders primarily in physician-based settings, including AAPC Certified Risk Adjustment Coder course guidance, and the American Health Information Association ("AHIMA"), which educates coders primarily in hospital settings. CMS guidance expressly directs Medicare Advantage plans to industry organizations for risk adjustment coding guidance. *See* Ex. Z, RA Participant Guide at 155.

expertise in False Claims Act case concerning allegedly unnecessary and up coded medical procedures); *United States ex rel. Armfield v. Gills*, No. 8:07–cv–2374–T–27TBM, 2012 WL 12918274, at *2 (M.D. Fla. July 6, 2012) (party advancing a coding expert—and court agreeing she was qualified—to testify regarding improperly coded claims because she was a certified professional coder and had twenty-five years of experience in medical coding and billing); *Counts v. Pollock*, No. 3:18-cv-1072-J-39JBT, 2020 WL 5534444, at *2 (M.D. Fla. Aug. 21, 2020) (party advancing an expert—and court agreeing he was qualified—to testify regarding whether plaintiff's medical bills were properly coded because "[h]e has numerous credentials, certifications, and recognitions in the field of medical billing and coding"); *see also id.*, at *3 (finding that the coding expert's testimony is proper opinion testimony and would aid the jury because "[t]he ordinary juror is not expected to have knowledge regarding [certain medical] codes, meaning expert testimony regarding [medical] coding is appropriate").

(B)    Interrogatory 14A Asks for Expert Analysis and Conclusions

Because responding to Interrogatory 14A would require expert analysis, it is not a proper contention interrogatory. *Qualcomm* is persuasive on this point. In a patent licensing dispute brought by Apple against Qualcomm, Qualcomm requested that Apple "identify all patent license agreements concerning any of the Apple Accused Functionalities that Apple contends are comparable to a license Apple would have taken in a hypothetical negotiation in this case including certain details regarding those comparable licenses." *Qualcomm Inc.*, 2018 WL 5829940, at *1. Concluding that "[w]hether a particular patent license is comparable to one that might be taken in a hypothetical negotiation is considered to be a matter of expert opinion" and would therefore be outside the scope of a contention interrogatory, the court held that Apple would "not be required, in connection with this dispute, to provide the *opinions of its experts* regarding the comparability of these licenses to that which may be taken in the hypothetical negotiation." *Id.* at 2 (emphasis added).

The government argues that an interrogatory that seeks "only information regarding

the underlying facts" and not "'how an expert would construe those facts'" is proper. *United States' Portion, Section III.A.1.c. at 25* (quoting *Amgen Inc.*, 2017 WL 1352052, *2). But Interrogatory 14A does no such thing. Interrogatory 14A clearly seeks disclosure of a coding expert's ultimate opinion and conclusion: whether a diagnosis code is supported by the medical chart under applicable coding guidelines, and if so, by which entry. Use of a contention interrogatory for that purpose is improper.

(C)    The Government's Attempt to Equate Interrogatory 14A with United's First Interrogatory is Meritless

Lacking a persuasive argument that Interrogatory 14A does not seek the results of expert analysis and conclusions, the government attempts to equate Interrogatory 14A with United's First Interrogatory, to which this Court required the government to respond. *See United States' Portion, Section III.A.1.e. at 28–29*. In fact, there is no similarity whatsoever between the information sought by the government in its interrogatory and the information it was required to disclose in response to United's.

United's First Interrogatory asked the government, as the plaintiff that brought this action, to identify the diagnosis codes that it alleges constituted overpayments that United knew of but failed to delete. In responding to United's interrogatory, the government did not review a single medical record to determine for itself whether any of the diagnosis codes at issue are in fact supported by the medical chart in accordance with applicable coding guidelines. Indeed, the government had not even requested a single medical chart from United prior to undertaking its response to United's Interrogatory. RFP 147, also at issue in this motion, is its first such request. Instead, as the government acknowledges in its portion of the Joint Stipulation, consistent with the flawed theory of liability it pled in its complaint, the government's response to United's interrogatory consists of a list of codes that the government claims that United submitted for payment but that its chart review coders did not identify when conducting a chart review. *See United States' Portion, Section III.A.1.a. at 20.* While the government may have used expert data analysts to assist in creating its list, its response consists of its allegations regarding historical facts: the subset of previously submitted codes that United's coders allegedly did not identify when

performing their chart reviews. United's interrogatory did not ask the government to review medical charts or engage in diagnosis coding, and the government's response did not disclose any expert opinions or conclusions.

Interrogatory 14A, by contrast, expressly asks United to identify which codes on the government's list are in fact supported by the underlying medical records. As explained above, only a trained coder can make that determination, and Interrogatory 14A thus requires the disclosure of an expert's conclusions. There is no parallelism whatsoever between the government's response to United's interrogatory and the government's Interrogatory 14A.

The government's argument also overlooks the different obligations imposed on plaintiffs and defendants. The government chose to bring this case and alleges that United has retained billions of dollars in overpayments. A plaintiff cannot avoid informing the defendant of the alleged overpayments it is seeking to recover. No countervailing duty is imposed on defendants, who are fully entitled to put the government to its proof and to wait to make its decisions about whether to conduct potential expert analysis for the time when expert disclosures are required.

<center>(D)    United will Make Any Expert Analysis it Conducts Available to the Government Through Expert Discovery</center>

Because Interrogatory 14A improperly seeks expert discovery, United cannot be compelled to respond to it, now or in the future. Interrogatories may not be used to seek expert disclosures. As United has made clear to the government on multiple occasions, however, to the extent that United has an expert conduct analysis of medical records to identify whether support for any of the diagnosis codes at issue exists that it plans to use at trial, United will disclose this analysis according to the Order Granting Stipulation Regarding Expert Discovery entered by the Court on May 17, 2018 (Dkt. 233). That Order sets forth the parties obligations with respect to expect disclosures, and the government cannot require United to make expert disclosures during fact discovery. *See* Ex. AA, Expert Discovery Stipulation.

> **b.** *Interrogatory 14A is Improper Because it Would Require United to Conduct New and Time-Consuming Analysis that it Has Not and May Never Undertake and Reverses the Burden of Proof.*

Interrogatory 14A is also improper because it impermissibly seeks to require United to undertake extensive investigation and analysis it has not conducted and would shift the government's burden of proving falsity onto United. Interrogatory 14A is entirely inconsistent with United's discovery obligations and antithetical to the basic tenet of civil litigation: the plaintiff must prove its own case and cannot force the defendant to meet this burden instead. Therefore, United should not be required to respond.

It is well settled that a party cannot craft "interrogatories that require a party to make extensive investigations, research, or compilation or evaluation of data for the opposing party." 8B Wright, Miller & Marcus, Federal Practice and Procedure § 2174 (3d ed. 2013). Likewise, a party does not have a "duty to search out new information in response to interrogatories." *See* 7 Moore's Federal Practice - Civil § 33.102 (2021); *see also*, *City of Las Cruces v. United States,* No. CV 17-809 JCH/GBW, 2021 WL 330062, at *8 (D.N.M. Feb. 1, 2021) ("A party responding to an interrogatory 'is not required to make an extensive investigation'" (citation omitted); *Behrazfar v. Unisys Corp.,* No. SACV 08-0850-AG(RCX), 2009 WL 10673197, at *4 (C.D. Cal. June 3, 2009) (party need not respond to an interrogatory that would require extensive analysis that would include "at least 10 hours per employee . . . and cost more than $600,000.00").

It is equally well established that in responding to an interrogatory "a party cannot ordinarily be forced to prepare its opponent's case," 8B Wright, Miller & Marcus, Federal Practice and Procedure § 2174 (3d ed. 2013), or "'do the interrogating party's investigation for him.'" *City of Las Cruces*, 2021 WL 330062, at *8 (citations omitted). An interrogatory thus cannot be used to compel the responding party to create analysis that would prove elements of the case as to which the propounding party has the burden.

Interrogatory 14A runs afoul of these principles. Responding to the interrogatory would undoubtedly require United to undertake an extensive investigation and analysis for the government that United has not performed already (and may very well never perform),

and create new information. United has not reviewed the relevant medical records to determine whether the codes on the government's list are, or are not, supported by those medical records, and indeed may never do so. Yet, in order to respond to the government's interrogatory, United would now have to retain hundreds of coders to review approximately 20 million charts and to determine which of the codes on the government's list of 28 million codes is or is not supported. If that is not an extensive investigation, nothing is, and United cannot be compelled to undertake this work for the government. *See Melder v. Allstate Corp.*, No. CV 03-2499, 2007 WL 9777975, at *4 (E.D. La. Nov. 5, 2007) (denying motion to compel Allstate to disclose insurance scores and credit scores by "zip code, policy type [and] policy form," because Allstate did not keep that information in that form and responding would require Allstate to undertake extensive analysis and prepare its opponent's case for it.)

The analysis the government wishes to compel United to undertake would likewise reverse the burden of proof and require United to prepare the government's case for it. The government admits that "it is the United States' burden of proof to establish that UnitedHealth improperly failed to delete the diagnosis codes on its list," *United States' Portion, Section III.A.1.b. at 22*, and that includes first proving that the codes on its list are in fact unsupported. Instead of accepting United's proposal to produce all medical records in its possession so that the government can review them, Interrogatory 14A would require United to review all of the codes on the government's list and identify for the government which codes are supported. In doing so, United would thus necessarily be also identifying (by the codes not included on its list) which codes were *not* supported, thereby potentially producing evidence that the government could use to prove one element of the government's case for it. The government cannot compel United to do this. *See In re Facebook, Inc.*, No. MDL 12-2389, 2016 WL 5080152, at *4 (S.D.N.Y. July 7, 2016) (ruling that defendant in a securities case did not have to respond to an interrogatory on a "complicated matter" that "would amount to a collection of information akin to Defendants' affirmative defense," reasoning that "[i]t would be inappropriate to require

Plaintiffs to devise a theory for an element which is not required for their prima facie case"); *Allstate Corp.*, 2007 WL 9777975, at *4 (interrogatory cannot require the defendant to undertake analysis that would prepare the plaintiff's case for it).

It would be no answer to argue that Interrogatory 14A requires United to undertake a coding review only as to those diagnostic codes that it contends are supported. To begin with, because all of the diagnosis codes were submitted by providers, United believes that *each* code, taken by itself, is presumptively valid and more likely than not supported by the underlying medical record. Moreover, because the list of codes is not something that United created, the only way that United could determine which of the 28 million codes on the government's list are or are not in fact supported would be by reviewing every single one of them. And if United responded to Interrogatory 14A by reviewing only a partial list of codes, it risks the government later attempting to prevent United from introducing evidence at trial that other codes, too, are supported. As a practical matter, therefore, responding to Interrogatory 14A would require United to review every single code on the government's list.

The cases relied on by the government, *United States' Portion, Section III.A.1.b. at 21–22*, merely stand for the unremarkable proposition that a party may be required by an interrogatory to provide reasonably available facts, even if those facts are relevant to an issue as to which the propounding party has the burden. *See, e.g.*, *McKesson Info. Sols., LLC v. Epic Sys. Corp.*, 242 F.R.D. 689, 692 (N.D. Ga. 2007) (requiring party to disclose the date of its invention). None of those cases reject, or even discuss, the rule that a party responding to an interrogatory request may not be compelled to conduct new time-consuming *analysis* that it has not already conducted in order to prepare the other party's case for it.

2. The Government's Motion to Compel a Response to Interrogatory 14B Should Be Denied

As with Interrogatory 14A, Interrogatory 14B also seeks to require United to undertake new, complex analysis, this time to assist the government in proving a different

element of its case – knowledge. The government's theory of the case is that not only are all the diagnosis codes on its list of 28 million codes unsupported, but that United *knew* the codes were unsupported. And the government's theory is that United knew the codes were unsupported because with respect to each code on the government's list, one of United coders had allegedly reviewed the medical chart corresponding to the same beneficiary, same date of service, and same provider, and yet had not identified the code in the coder's blinded coding results. In order to prove this theory, the government needs to properly match a specific diagnosis code submitted by a provider on a claim to its corresponding medical record reviewed by a United chart review coder and to the results of that review. United for its part denies that its coders necessarily reviewed the medical records, or portions of medical records, corresponding to the provider-submitted codes on the government's list. Moreover, establishing that a United coder reviewed a medical chart that may have been the same chart relied upon by the provider when submitting the initial code is not a premise of any aspect of United's defense and does not form the basis of any contention United may advance in this case.

In order to establish this critical and disputed aspect of the government's theory of liability, Interrogatory 14B requires United to take every single diagnosis code in the government's list of 28 million codes, and undertake the complex exercise, which United has not conducted already, of matching the codes on the list to the charts reviewed by United's coders, and for ones that match, to report the results of the coding review (among other details). As the government admits, *United States' Portion, Section I.A. at 3*, the Interrogatory requires United to do this for every code on its list, "regardless of whether the basis for UnitedHealth's contention [that it was not required to delete the code] is claimed support in an underlying medical record or some other defense."[7] Interrogatory

_____

[7] Although this request relates to those codes that United contends "it was not obligated to delete or otherwise return payment received for," as the Court is aware United's legal position in this case is that it was not obligated to delete *any* of the codes on the government's list. Interrogatory 14B thus requires United to conduct this matching analysis for every one of the 28 million codes listed by the government.

14B is an improper interrogatory to which United should not be compelled to respond.

To begin with, although the government's portion of the Joint Stipulation repeatedly refers to Interrogatory 14 as a "contention interrogatory," *see, e.g., United States' Portion, Section I.A. at 3*, that characterization is wholly inapplicable to Interrogatory 14B. It is the government who contends that United reviewed the medical charts corresponding to all the codes on the government's list. United has not made any such contention, and no defense United has raised or would raise in this case would depend on United proving that the codes on the government's list correspond to the precise charts that United's coders reviewed. Even if Interrogatory 14B had sought only existing factual information, that information would be the facts underlying *the government's* contention, not United's contention. Interrogatory 14B is thus not a valid contention interrogatory – it is simply a naked attempt to get United to undertake an extensive and difficult matching exercise that it has not conducted in order to prepare the government's case for it.

Even if Interrogatory 14B were actually a contention interrogatory, it is improper for the same reasons that Interrogatory 14A is improper: it impermissibly forces United to perform the government's analysis for it and shifts the burden of proving knowledge, according to the government's theory, onto United. As discussed above, an interrogatory cannot affirmatively force a responding party to perform a complicated analysis on behalf of the propounding party. *See City of Las Cruces*, 2021 WL 330062, at *8 ("A party responding to an interrogatory 'is not required to make an extensive investigation' or 'do the interrogating party's investigation for him.'" (citations omitted)). If United is forced to match diagnosis codes at issue to medical record reviews of records for the same date of service, it would have to perform analysis it otherwise would not perform and has no need to perform. Nor can the government shift the burden of proving an element of the government's case—in this instance, knowledge—onto United. *See In re Facebook, Inc.*, 2016 WL 5080152, at *4.

United has repeatedly offered to respond to Interrogatory 14B by pointing the government to the data that United has already produced and that the government can use

to conduct the matching analysis for itself. Tellingly, despite the fact that it has all the tools and data necessary to perform the matching exercise it seeks to compel United to perform, the government does not wish to perform that analysis itself. The government bears the burden of proving its case and cannot compel United to create new information, and conduct new and complicated analysis and investigations, in order to prepare the government's case for it. That is particularly true where the government could do the work on its own, yet apparently refuses to do so.

3.    The Government's Motion to Compel Regarding RFP 147
Should Be Denied

The government has repeatedly rejected United's good-faith proposals to respond to RFP 147. Specifically, United has offered to produce all of the medical charts in its possession that went through United's chart reviews. After months of insisting that this proposal, which United estimates would result in producing approximately 20 million charts, was too *narrow*, the government now complains that this offer is too *broad* and that United should produce only those "medical records UnitedHealth identifies in response to Part A of Interrogatory 14." *United States' Portion, Section I.A. at 3.*

As now recast by the government, RFP 147 stands or falls with the Court's ruling as to Interrogatory 14A. Because the government's proposal makes United's obligation to respond to RFP 147 dependent on United's response to Interrogatory 14A, if the Court agrees that United is not required to respond to that interrogatory then there would be no medical records responsive to the government's recast version of RFP 147.

4.    The Government's Claims of Sandbagging and Unfair Surprise
Are Baseless

United is not trying to hide the ball from the government and has no intention of putting the government in the position of "having to rebut a defense that it never had an opportunity to probe or otherwise prepare for." *United States' Portion, Section III.A.1.e. at 28.* With respect to Interrogatory 14B, the government has all the information it needs to perform the analysis, and derive the information, it seeks. In that regard, there is no

risk of surprise—provided the government is willing to do the work. Similarly, with respect to Interrogatory 14A, United is prepared to produce all the medical records in its possession, which would allow the government to perform the expert analysis of determining which of its 28 million codes is supported or unsupported. In that way, the government would certainly be prepared to rebut any defense United might mount that was predicated on an analysis of the 28 million codes and/or a review of medical records corresponding to the 28 million codes. Yet, here again, the government simply does not want to do the work now that it should have done before bringing this case.

In any event, United simply has not determined whether and to what extent it will introduce evidence at trial demonstrating that certain of the codes on the government's list are supported as part of its defense, and so has not done the expert analysis that would be required to respond to Interrogatory 14A.

To be completely clear, should United retain an expert to testify at trial that some, or all, of the 28 million codes on the government's list are supported by specific medical records that the expert reviews, that information will be produced during expert discovery in a manner that provides the government sufficient time to prepare a rebuttal, consistent with its obligations under the relevant discovery rules and under the Order Granting Stipulation Regarding Expert Discovery. See, e.g., Fed. R. Civ. P. 26(a)(2); see also Ex. AA, Expert Discovery Stipulation.

United's agreement to produce all the medical records in its possession also disposes of the government's fear that a percipient witness might refer to one or more medical charts as part of his/her testimony. Not surprisingly, given that the trial in this case is nearly 2 years out, and given that fact discovery is still ongoing, United has not endeavored to compile a list of exhibits it intends to use at trial. Yet, as long as United's ultimate exhibits have been produced to the government during discovery, the government has no basis to claim unfair surprise. This is true even though there are millions of charts potentially at issue. For example, even in complex cases with millions of produced documents, the parties have no obligation to disclose in advance of pretrial disclosures

which particular emails they intend to introduce at trial, especially those that will be used during cross-examination. *See* Fed. R. Civ. P. 26(a)(3). The parties instead bear their own responsibilities for developing their own cases based on their own review of the documents produced. These rules apply equally to medical records as they do to emails. Moreover, the government cannot complain about the massive scope of discovery in this case since it is the government alone that framed the size of the case and who has put 28 million codes at issue.

5. The Government's Alternative Request that United Be Foreclosed From Introducing Evidence at Trial Lacks Any Foundation

Finally, the Court should reject outright the government's request that "if UnitedHealth is not compelled" to respond to the government's requests, the Court should issue an "Order foreclosing UnitedHealth from later introducing such evidence" at trial. *United States' Portion, Section IV at 46.*

To begin with, the government makes this request only in one sentence of the Conclusion section of its portion of the Joint Stipulation. It does not address this request in the body of its brief and provides literally no legal authority to support it. Under well-established principles, the request is thus not adequately presented and the Court should not address it on the merits. As the Central District has summarized the Ninth Circuit's treatment of analogous briefing deficiencies, "issues raised in a brief that are not supported by argument are deemed abandoned." *Fabricant v. United States*, No. CR 03-01257-RSWL-1, 2015 WL 5923481, at *4 (C.D. Cal. Oct. 8, 2015) (citing *Martinez-Serrano v. I.N.S.*, 94 F.3d 1256, 1259 (9th Cir. 1996) (citing *Acosta-Huerta v. Estelle*, 7 F.3d 139, 144 (9th Cir. 1992))). "Furthermore, issues referred to in the appellant's statement of the case but not discussed in the body of the brief are waived." *Id*. "The Ninth Circuit has even refused to consider constitutional matters that were neither briefed nor argued, but merely asserted in conclusory terms." *Id.* (citing *United States v. Mateo-Mendez*, 215 F.3d 1039, 1043 (9th Cir. 2000)). Under these principles, an argument raised for the first time in the

Conclusion of a brief, without any argument, is likewise waived. *See Erwin v. Shinseki*, No. 09-1530, 2011 WL 1563942, at \*6 (Vet. App. Apr. 27, 2011) (refusing to consider an argument raised only in the "Conclusion" section of Erwin's brief).

There is also no basis for the government's request. United has not resisted producing documents or data to the government. United has instead objected, on legal grounds, to undertaking new analysis for the government as part of an interrogatory response to help prepare the government's case for it. And it has also objected that it may not be required to disclose expert analysis or conclusions in response to an interrogatory. If the Court agrees with these arguments, there would be no basis for punishing United for prevailing by then precluding it at trial from introducing relevant and admissible evidence, should it choose to do so.

Finally, unlike situations where a party objects, on the grounds of burden, to producing, in response to a request for production, the only evidence that would permit the requesting party to prove certain facts, and then attempting to capitalize on that refusal at trial, United is merely objecting to undertaking the government's trial preparation for it. United has offered to produce to the government all of the medical records in United's possession that were subject to United chart reviews, and the government can review those medical records to conduct its own expert analysis of whether some or, as it alleges, all of the codes on its list are in fact unsupported. And United has already produced to the government, and has offered to point the government to, all of the data that would enable the government to conduct for itself the matching exercise it wishes to compel United to undertake in response to Interrogatory 14B. United's position does not prevent the government from attempting to meet its burdens of proof in this case, and there is thus no reason whatsoever to preclude United from introducing any evidence of its own at trial.

## IV.    PROPOSED RESOLUTION/CONCLUSION

### A.    United States

The United States respectfully requests that the Court grant the United States'

Motion to Compel a Response to Interrogatory No. 14 and the production of all medical charts associated with any diagnosis codes UnitedHealth contends are supported by medical records, in response to Request for Production No. 147. Alternatively, if UnitedHealth is not compelled to disclose its contentions and produce the medical records it contends support a diagnosis code, the United States requests an Order foreclosing UnitedHealth from later introducing such evidence on the ground that it failed to produce it during fact discovery.

### B. UnitedHealth

The Court should deny the government's Motion to Compel and not require United to respond to Interrogatory 14 or RFP 147, now or in the future.

Dated: April_16, 2021

MICHAEL D. GRANSTON
Deputy Assistant Attorney General, Civil Division
TRACY L. WILKISON
Acting United States Attorney
DAVID M. HARRIS
ABRAHAM C. MELTZER
JOHN E. LEE
JACK D. ROSS
Assistant United States Attorneys

JAMIE A. YAVELBERG
ROBERT McAULIFFE
EDWARD CROOKE
LINDA M. McMAHON
JESSICA E. KRIEG
AMY L. LIKOFF
GREGORY A. MASON
MARTHA N. GLOVER
WENDY ZUPAC
Civil Division, Department of Justice

JAMES P. KENNEDY, JR.
United States Attorney
DAVID CORIELL
Assistant United States Attorney

/S/ Gregory A. Mason

GREGORY A. MASON
Trial Attorney, Department of Justice

Attorneys for the United States of America

Dated:  April 16, 2021

ERIC R. HAVIAN
HARRY LITMAN
JESSICA MOORE
Constantine Cannon LLP

STEVE HASEGAWA
Phillips & Cohen LLP

WILLIAM CHRISTOPHER CARMODY
ARUN SUBRAMANIAN
WILLIAM R.H. MERRILL
CHANLER A. LANGHAM
GENG CHEN
Susman Godfrey LLP


/S/ Henry C. Su

HENRY C. SU
Attorneys for Relator Benjamin Poehling

Dated:  April 16, 2021

DAVID J. SCHINDLER
DANIEL MERON
ABID R. QURESHI
Latham & Watkins LLP

/S/ David J. Schindler

DAVID J. SCHINDLER

Attorneys for Defendants UnitedHealth Group, Inc.; United Healthcare Services, Inc.; United Healthcare, Inc.; UnitedHealthcare Insurance Company; UHIC Holdings, Inc.; Ovations, Inc.; Optum, Inc.; and OptumInsight, Inc.


Attestation

I hereby attest that the other signatories listed, on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

Dated:  April 16, 2021

/S/ Gregory A. Mason

GREGORY A. MASON
Trial Attorney, Department of Justice


47                                    0334

**EXHIBIT D-6**

1  Suzanne H. Segal (Ret.)
2  United States Magistrate Judge
   SIGNATURE RESOLUTION, LLC
3  633 W. 5th Street, Suite 1000
   Los Angeles, CA 90071
4  judgesegal@signatureresolution.com

5                        WESTERN DIVISION

6                 UNITED STATES DISTRICT COURT

7                CENTRAL DISTRICT OF CALIFORNIA

8

9

10 UNITED STATES OF AMERICA ex rel.      Case No. CV 16-8697 FMO (SSx)
   BENJAMIN POEHLING,
11
            Plaintiffs,
12                                       ORDER DENYING WITHOUT PREJUDICE
                                         PLAINTIFF'S MOTION TO COMPEL RE
13 vs.                                   INTERROGATORY NO. 14 AND REQUEST
                                         FOR PRODUCTION NO. 147
14 UNITED HEALTH GROUP, INC., et. al,
15          Defendants.

16

17

18       On April 16, 2021, Plaintiff United States (the "government") filed a motion

19 to compel (the "Motion" or "MTC") seeking an order regarding Defendant United

20 Health Group, Inc. and related entities ("UnitedHealth" or "UHG") to provide a

21 supplemental response to Interrogatory No. 14 ("Interrogatory 14") and Request for

22 Production No. 147 ("RFP 147" or "Request 147").  The parties submitted a Joint

23 Stipulation in connection with the Motion.  Each party also filed a Supplemental

24 Memorandum.   On May 20, 2021, the Special Master held a Zoom hearing on the

25

26

27

28

                                        1

FILED
CLERK, U.S. DISTRICT COURT

MAY 28 2021

CENTRAL DISTRICT OF CALIFORNIA
BY: vdr                    DEPUTY

DocuSign Envelope ID: 61639949-569F-45FD-9865-1B55A3776355

Motion. For the reasons discussed below, the Motion is DENIED without prejudice to renewing the motion at a later stage in the litigation.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The government contends that UnitedHealth has refused to reasonably respond to two discovery requests that address whether UnitedHealth improperly failed to delete diagnosis codes from its Medicare Part C risk adjustment submission. According to the government, UnitedHealth systematically ignored medical record reviews when it indicated that diagnosis codes UnitedHealth previously submitted to CMS were not supported by beneficiaries' medical records.

The government contends that it has identified every diagnosis code that UnitedHealth submitted to CMS to increase its risk adjustment payments and then improperly failed to delete when UnitedHealth's own review found no support for the diagnosis code in the medical records. The government asserts that Interrogatory 14 and Request 147 are intended to discover UnitedHealth's contentions about the very same diagnosis codes. The government seeks to discover whether UnitedHealth contends that any of the diagnosis codes on the government's list were supported by medical records, despite not being found during any of UnitedHealth's reviews of the associated medical records.

2

Interrogatory 14 asked UnitedHealth to, with respect to every diagnosis code on the government's list, (a) identify which code is supported by a medical record and (b) identify every medical record review that UnitedHealth conducted. (MTC at 5-7). Request 147 requests all medical records associated with the diagnosis codes on the government's list. (Id. at 7).

In response to Interrogatory 14, UnitedHealth objected on the grounds that "this Interrogatory is an improper contention interrogatory that impermissibly seeks to shift the burden of proving an essential element of the government's False Claims Act case on to UnitedHealth and seeks expert opinion." (Id. at 8). In response to Request 147, UnitedHealth stated: "Based upon its General and Specific Objections, UnitedHealth does not intend to produce documents responsive to this Request."

At the meet and confer on this issue, UnitedHealth indicated that it would produce the responsive medical records in its possession. This production, however, would require a production of approximately 21 million charts and take 8 months to produce. This proposal did not resolve the discovery dispute.

The government asserts that, as it was required to provide a list of 28 million diagnosis codes to comply with its obligation to identify the diagnosis codes it contends UnitedHealth knew were invalid, UnitedHealth should now explain whether medical records do or do not support these codes. (Id. at 9).

3

DocuSign Envelope ID: 61639D42-569F-49FD-9862-195A3776355

According to UnitedHealth, Interrogatory 14A requires it to identify the over

20 million medical records corresponding to each of the 28 million codes on the

government's list and then to hire experts to review those charts to determine

whether each code on the government's list is or is not supported by the medical

chart. Subpart 14B requests that UnitedHealth "[i]dentify each Medical record

Review(s) of the chart(s) corresponding to that Diagnosis, etc." According to UHG,

this request would also require it to engage in a massive and complex matching

analysis. RFP 147 seeks the documents that relate to the answer required in

Interrogatory 14.

## II. INTERROGATORY 14 REQUIRES EXPERT ANALYSIS TO RESPOND

Although the government argues that Interrogatory 14 is "only seeking facts,"

it would be impossible for anyone other than an expert to provide a reliable answer.

Only an expert -- or someone with specialized knowledge -- could do a fair

comparison of the medical records and the diagnosis codes to determine if the

medical record supported the code. It is also undeniable that the interrogatory would

impose a tremendous burden on the responding party to prepare an answer that does

4

DocuSign Envelope ID: 61629049-5E9F-45FD-9866-1B55A3776355

1 not currently exist. For these reasons, Interrogatory 14 is an improper interrogatory

2

3 at this stage of the proceedings.

4 Contention interrogatories may be improper "[when] they ask the respondent

5 to provide an expert opinion." Amgen Inc. v. Sandoz Inc., 2017 WL 1352052, at *2

6

7 (C.D. Cal. April 13, 2017); Montgomery v. Wal-Mart Stores, Inc., 2015 WL

8 11233384, at *6 (S.D. Cal. July 17, 2015). In addition, a court has discretion to

9

10 delay an answer to a contention interrogatory until designated discovery is complete

11 or at some other time. See Capacchione v. Charlotte-Mecklenburg Sch., 182 F.R.D.

12 486, 489 (W.D.N.C.1998) (stating that "[d]ue to the nature of contention

13

14 interrogatories, they are more appropriately used after a substantial amount of

15 discovery has been conducted - typically, at the end of the discovery period"). In

16 general, courts prefer to defer answers to contention interrogatories that are

17

18 propounded prematurely. See e.g., Everett v. USAir Group., Inc.,165 F.R.D. 1, 3

19 (D.D.C. 1995) (denying without prejudice motion to compel response to contention

20 interrogatory on grounds that interrogatory served too early in discovery process);

21

22 B. Braun Medical, Inc. v Abbott Lab., 155 F.R.D. 525, 527 (E.D. Pa. 1994) ("[T]here

23 is considerable support to defer answering contention interrogatories until the end of

24 the discovery period.").

25

26 In the present action, the request seeks the application of expert knowledge to

27 facts, i.e., the medical records. This interrogatory cannot be answered until after

28

5

expert discovery is completed and only if UnitedHealth intends to assert a defense based upon this information. Indeed, parties generally provide this type of information through expert testimony. See United States ex rel. Desrosiers v. Thaller, 2016 WL 6441548, at \*4-6 (S.D. Fla. Nov. 1, 2016) (whether medical codes submitted for reimbursement were proper was subject of expert testimony); Counts v. Pollock, 2020 WL 5534444, at \*2 (M.D. Fla. August 21, 2020) (providing expert testimony on whether plaintiff's medical bills were properly coded); United States ex rel Armfield v. Gills, 2012 WL 12918274, at \* 2 (M.D. Fla. 2012) (qualifying expert for testimony regarding improperly coded claims). Accordingly, this interrogatory is improper at this stage of the proceedings because it would require expert analysis to respond.

It is also undeniable that preparation of the response to the request would be extremely burdensome and costly. It would require UnitedHealth to pay for and create an analysis for 20 million documents. Ordinarily, a respondent is not required to undertake investigation and analysis to prepare a response to an interrogatory. See Behrazfar v. Unisys Corp., 2009 WL 10673197, at \*4 (C.D. Cal. June 3, 2009) (party need not respond to an interrogatory that would require extensive analysis and cost). While this analysis and cost may be necessary at some point in the litigation, the Special Master concludes that it is premature to order UHG to undertake this analysis now.

6

UnitedHealth has stated that if it discloses during the expert discovery phase that it has retained an expert to testify at trial that the 28 million codes on the government's list are supported by medical records, that information will be produced in a manner that provides the government sufficient time to prepare a rebuttal. (MTC at 42). Nothing more is required during this phase of the litigation. Because Request 14 is a contention interrogatory and requires expert analysis, UnitedHealth is not required to prepare a response at this time.

III.  REQUEST 147 IS DEPENDENT UPON A RESPONSE TO INTERROGATORY 14 AND THEREFORE IS DENIED WITHOUT PREJUDICE

Request 147 seeks: "All Chart(s) corresponding to, associated with, or related to each Beneficiary, from each DOS Year(s) in which that Beneficiary is listed in the United States Response to Defendants' Interrogatory No. 1 (Including the United States' First Supplemental Response served on August 17, 2020, the United States Amended Frist Supplemental Response served on October 13, 2020, the United States' Second Supplemental Response served on October 30, 2020, and any other subsequent responses)." (Mason Decl., Ex. B). The government agreed to limit this

7

request to production of only those medical records UHG contends supports a

diagnosis code on the government's list. (MTC at 7-8).

During the meet and confer process, UnitedHealth offered to produce the

responsive medical records in its possession which would amount to an estimated

21 million charts and take 8 months to collect and produce. This would allow the

government to review the medical records that UnitedHealth reviewed as part of its

chart review program and the government could then determine which of the codes

on its list are or are not supported. (MTC at 17). At the hearing on the MTC,

counsel for the government argued that at a minimum the medical records should be

produced to allow the government to review the medical evidence underlying

UnitedHealth's codes. Production of these records would allow the government to

determine for itself which of the codes on its list are supported or are not supported.

However, in the Motion itself, the government asserted the following: "After

the United States identified its list of all diagnosis codes it contends are at issue, it

served Interrogatory 14 and Request 147 to discover UnitedHealth's contentions

about the very same diagnosis codes. In particular, the United States seeks to

discovery whether UnitedHealth contends that any of the diagnosis codes on the

United States' list were supported by medical records, despite not being found

during any of UnitedHealth's reviews of the associated medical records. The United

States further seeks to discover factual information related to UnitedHealth's

8

medical record reviews." (MTC at 2, ll. 18-24). The United States also noted:

"Request 147, as written, relatedly requests all medical records associated with the

diagnosis codes on the United States' list. (citation omitted). Importantly, as a result

of the meet and confer process . . . the United States agreed to limit its request for

medical records to only those records associated with the diagnosis codes that

UnitedHealth contends were supported (i.e., the medical records UnitedHealth

identifies in response to Part A of Interrogatory 14)." (MTC at 3, ll. 5-11) . . .

"Subsequently, UnitedHealth agreed to produce some (but not all) of the underlying

medical records, but that offer is hollow without identifying which codes

UnitedHealth contends are supported by medical records (i.e., responding to

Interrogatory 14). Simply producing millions of medical records alone does nothing

to illuminate UnitedHealth's contentions." (MTC at 3, ll. 17-21).

    As UHG observed, "RFP 147 is . . . dependent entirely on whether United is

required to Interrogatory 14A; if the Court agrees that United is not required to hire

experts to engage in the coding reviews that responding to Interrogatory 14A would

require, then there would be no medical records responsive to RFP 147 as now

recrafted by the government." (MTC at 16, ll. 2-6). UHG, as part of the meet and

confer efforts, offered to produce to the government every medical record in

United's possession that United reviewed as part of its chart review program, to

allow the government to determine for itself which of the codes on its list are or are

not supported. (MTC at 16, ll. 25-28; 17, ll. 1-2). The government rejected this offer. UHG contends that the government's position regarding Request 147 has "vacillated dramatically over time." (MTC at 17, ll. 12-13). At the hearing on the MTC, the government did take a position that contradicted the government's prior arguments in the MTC, i.e., the government argued that a response to Request 147 <u>would</u> be meaningful even without a response to Interrogatory 14.

The Special Master finds that the inconsistency in the government's arguments undermines their persuasiveness. The Special Master concludes that if the two discovery requests are related and linked as the government originally argued, then the Order should be consistent regarding both requests. Accordingly, the MTC is DENIED without prejudice as it pertains to Request 147. The government may renew Request 147 if the requested documents are relevant to UHG's defenses asserted at a later phase of the action.


IT IS SO ORDERED.


**DATE: May 28, 2021**

DocuSigned by:

*Hon. Suzanne Segal (Ret.)*

2B739185DE71459

**Hon. Suzanne H. Segal (Ret.)**

10

# PROOF OF SERVICE

RE:     **United States ex rel. Poehling v. United Health Group, Inc., et al.**
        **Case ID: KEERX**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and am not a party to the within action. My business address is 633 West 5th Street, Suite 1000  Los Angeles, CA 90071

On June 1 2021 I served the **ORDER DENYING WITHOUT PREJUDICE PLAINTIFF'S MOTION TO COMPEL RE INTERROGATORY NO. 14 AND REQUEST FOR PRODUCTION NO. 147** on the following parties. Placing a true copy to all parties as follows:

Jack D. Ross, Esq.
John E. Lee, Esq.
AUSA - OFFICE OF US ATTORNEY
300 North Los Angeles Street
Los Angeles, CA 90012
jack.ross@usdoj.gov
john.lee2@usdoj.gov

Amy L. Likoff, Esq.
Edward Crooke, Esq.
Gregory A. Mason, Esq.
Jessica Krieg, Esq.
Linda McMahon, Esq.
Martha Glover, Esq.
Robert McAuliffe, Esq.
Zoila E. Hinson, Esq.
US DEPARTMENT OF JUSTICE, LEGAL DIVISION
175 N Street NE
Washington, DC 20002
amy.l.likoff@usdoj.gov
edward.crooke@usdoj.gov
gregory.a.mason@usdoj.gov
jessica.e.krieg@usdoj.gov
linda.mcmahon2@usdoj.gov
martha.n.glover@usdoj.gov
robert.mcauliffe@usdoj.gov
zoila.e.hinson@usdoj.gov

Arun Subramanian, Esq.
Cory Buland, Esq.
Geng Chen, Esq.
SUSMAN GODFREY
1301 Avenue of the Americas
32nd Floor
New York, NY 10019
asubramanian@susmangodfrey.com
cbuland@susmangodfrey.com
gchen@susmangodfrey.com

Meng Xi, Esq.
William R. H. Merrill, Esq.
SUSMAN GODFREY
1000 Louisiana Street
Suite 5100
Houston, TX 77002
mxi@susmangodfrey.com
bmerrill@susmangodfrey.com

Henry C. Su , Esq.
CONSTANTINE CANNON
1001 Pennsylvania Avenue NW
Suite 1300N
Washington, DC 20004
hsu@constantinecannon.com

Stephen S. Hasegawa, Esq.
PHILLIPS & COHEN
100 The Embarcadero
Suite 300
San Francisco, CA 94105
ssh@pcsf.com

David Rowe, Esq.
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
david.rowe@lw.com

Kirstin Scheffler Do, Esq.
LATHAM & WATKINS LLP
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
kirstin.schefflerdo@lw.com

0346

Abid Qureshi, Esq.
Anne Robinson, Esq.
Daniel Meron, Esq.
Morgan Maddoux, Esq.
LATHAM & WATKINS LLP
555 Eleventh Street NW
Suite 1000
Washington, DC 20004
abid.qureshi@lw.com
anne.robinson@lw.com
daniel.meron@lw.com
morgan.maddoux@lw.com

David Schindler, Esq.
LATHAM & WATKINS LLP
355 South Grand Avenue
Suite 100
Los Angeles, CA 90071
david.schindler@lw.com

( ) BY U.S. MAIL: I caused such envelope(s), with postage fully prepaid, to be placed in the U.S. Mail at Los Angeles, California.

( ) BY FACSIMILE: I caused such document to be sent via facsimile to each person.

(X) BY ELECTRONIC MAIL: I caused such document to be sent via electronic mail to each person.

( ) BY PERSONAL SERVICE: I caused such envelope to be delivered by hand to the office of the addressee.

(X) STATE: I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

( ) FEDERAL: I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on June 1, 2021 at Los Angeles, California.

*Alisa Martinez*
Alisa Martinez
Signature Resolution

0347

**EXHIBIT D-7**

1   LATHAM & WATKINS LLP
        David J. Schindler (Bar No. 130490)
2        *david.schindler@lw.com*
    355 South Grand Avenue, Suite 100
3   Los Angeles, CA 90071-1560
    Telephone: +1.213.485.1234
4   Facsimile: +1.213.891.8763

5   LATHAM & WATKINS LLP
        Daniel Meron (appearing *pro hac vice*)
6        *daniel.meron@lw.com*
        Kathryn H. Ruemmler (appearing *pro hac vice*)
7        *kathryn.ruemmler@lw.com*
        Abid R. Qureshi (appearing *pro hac vice*)
8        *abid.qureshi@lw.com*
    555 Eleventh Street NW, Suite 1000
9   Washington, DC 20004-1304
    Telephone: +1.202.637.2200
10  Facsimile: +1.202.637.2201

11  Attorneys for Defendants

12                  **UNITED STATES DISTRICT COURT**

13            **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

14

15  | UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING, | CASE NO. CV 16-08697 FMO (SSx) |
    | --- | --- |
16  |  | **DEFENDANT UHC OF CALIFORNIA'S FIRST INTERROGATORY TO THE GOVERNMENT** |
17  | Plaintiffs, |  |
    | v. |  |
18  |  | Assigned to Hon. Fernando Manzano Olguin |
19  | UNITEDHEALTH GROUP, INC. *et al.*, |  |
20  | Defendants. | DISCOVERY MATTER |
21  |  |  |
22  |  |  |

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

UHC OF CALIFORNIA'S FIRST INTERROGATORY
TO THE GOVERNMENT
2:16-cv-08697-FMO (SSx)
0349

PROPOUNDING PARTY:      Defendant UHC of California

RESPONDING PARTY:       Plaintiff United States Government

SET NO.:                ONE (1)

**TO THE RESPONDING PARTY AND TO ITS ATTORNEYS OF RECORD:**

Please take notice that pursuant to Rule 33 of the Federal Rules of Civil Procedure and Rule 33-1 of the Local Civil Rules of the United States District Court for the Central District of California, Defendant UHC of California, by and through its undersigned attorneys, submits the following First Interrogatory to the Government ("Interrogatory"). UnitedHealth requests that the Government respond separately in writing to the following Interrogatory within thirty (30) days of service. The Definitions and Instructions set forth below shall govern the following Interrogatory, as well as responses to the Interrogatory.

<u>**DEFINITIONS**</u>

As used herein, the following terms and phrases shall have the following meanings:

1.      The applicable definitions and rules of construction set forth in the Federal Rules of Civil Procedure and the local rules are incorporated herein by reference.

2.      "**Beneficiary**" or "**Member**" shall mean an individual enrolled in a Medicare Advantage Plan.

3.      "**CMS HCC**" means an HCC that is used for Medicare Part C.

4.      "**Complaint**" shall mean the United States' Amended Complaint-In-Partial Intervention And Demand For Jury Trial filed by the Government in this case on November 17, 2017, and any forthcoming amended complaints filed by the Government in this case.

5.      "**Diagnosis Code(s)**" shall mean an ICD-9-CM or ICD-10 CM diagnosis code.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

2

UHC OF CALIFORNIA'S FIRST INTERROGATORY
TO THE GOVERNMENT
2:16-cv-08697-FMO (SSx)

0350

6.    "**Date of Service Year(s)**" shall mean the year or years during which a Beneficiary had a medical encounter with a healthcare provider.

7.    "**HCC**" shall mean a hierarchical condition category associated with one or more diagnosis codes (ICD-9-CM or ICD-10-CM codes) that represent the disease component of the beneficiary risk scores that are applied to Medicare Advantage payments.

8.    "**Date of Service**" shall mean the date of a medical encounter or, if the encounter lasted more than 24 hours, the start and end dates for the encounter.

9.    "**Each**" includes the word "every" and "**every**" includes the word "each," "**any**" includes the word "all" and "**all**" includes the word "any," "**and**" includes the word "or" and "**or**" includes the word "and," as necessary to bring within the scope of each Request information that might otherwise be construed to be outside its scope.

10.    "**Government**" shall mean the United States, its agencies, departments, components, agents, representatives, contractors, attorneys, consultants, and all other Persons acting on its behalf, including, but not limited to, any component of the United States Department of Justice, the United States Department of Health and Human Services, the Centers for Medicare & Medicaid Services, and all subdivisions and components thereof.

11.    "**HIC Number**" shall mean a Beneficiary's Health Insurance Claim Number.

12.    "**NPI**" or "**National Provider Identifier**" shall mean the unique 10-digit identification number CMS issues to covered healthcare Providers.

13.    "**Person**" shall mean natural persons, proprietorships, corporations, public corporations, municipal corporations, the federal government and all departments and agencies thereof, state governments, local governments, other governmental agencies, political subdivisions, partnerships, groups, associations or organizations.

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

3

UHC OF CALIFORNIA'S FIRST INTERROGATORY
TO THE GOVERNMENT
2:16-cv-08697-FMO (SSx)

0351

14.     **"Provider"** shall mean any provider of healthcare services including individual providers such as physicians, physicians assistants, laboratories, medical equipment providers, and nurse practitioners; institutional providers such as hospitals and clinics; provider groups such as groups of physicians or associations of physicians with other provider types; and any other type of providers of healthcare services or items. "Provider" includes fee-for-service Providers, providers with Gainshare Arrangements, and Providers with Capitation arrangements. "Provider" also includes any past or present employee, contractor, or agent of any Provider. The term "Provider" shall be given the broadest possible meaning when responding to these Requests.

15.     **"Provider ID"** shall mean the unique identifier(s) used to differentiate the Provider in one or more of UnitedHealth's Risk Adjustment Databases.

16.     **"RxHCC"** means an HCC used for Medicare Part D.

17.     **"Tax ID"** shall mean the nine-digit identification number used by the Internal Revenue Service (IRS) for tax purposes.

18.     **"United"** or **"UnitedHealth"** shall mean all the Defendants listed in Your Complaint.

19.     **"You"** and **"Your"** shall mean the Government and all Persons acting on its behalf.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

4

UHC OF CALIFORNIA'S FIRST INTERROGATORY
TO THE GOVERNMENT
2:16-cv-08697-FMO (SSx)

0352

# **INSTRUCTIONS**

1.     In accordance with the Federal Rules of Civil Procedure, Your obligation to respond to the Interrogatory is continuing. If you receive or discover information after serving a response to the Interrogatory, You should supplement Your responses promptly.

2.     Whenever appropriate, the singular form of a word shall be interpreted as plural, and vice versa. Similarly, the use of the present tense of a verb shall be considered to include within its meaning the future and past tense, and vice versa.

3.     The Interrogatory should be construed so as to include all time periods relevant to the allegations and claims for damages contained in Your Complaint.

4.     Whenever the conjunction "and" is used, it is also to be interpreted disjunctively, and conversely; whenever the disjunctive 'or' is used, it is also to be interpreted conjunctively.

5.     Each Interrogatory is to be construed independently and not in reference to any other Interrogatory for purposes of limiting the scope of the Interrogatory. The answer to an Interrogatory shall not be supplied by referring to the answer to another interrogatory unless the answer to the referenced interrogatory supplies a complete and accurate answer to the Interrogatory being answered.

6.     You are to produce all responsive information that are in Your possession, custody or control, or in the possession, custody, or control of any of Your agents, representatives, and consultants. Without limiting the term "control," responsive information is deemed to be within Your control if You have ownership, possession, or custody or the information, or the right to secure the information from any person. If You do not have responsive information in Your possession, custody, or control, You must state so and answer the Interrogatory in part if You have part of the responsive information.

7.     If a claim of privilege is asserted in objecting to the Interrogatory, or any sub-part thereof, and an answer is not provided on the basis of such assertion,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

5

UHC OF CALIFORNIA'S FIRST INTERROGATORY
TO THE GOVERNMENT
2:16-cv-08697-FMO (SSx)

0353

furnish the following information with respect to the Interrogatory as to which the claim of privilege is asserted: (a) the nature of the privilege (including work product) that is being claimed; and (b) the general topic of the information claimed to be privileged to the extent possible in a manner consistent with the claimed privilege.

8.    Whenever an Interrogatory calls for information with respect to "each" one of a particular type or class of claims, matters, events, persons, or entities, of which there is more than one, You are required to separately list, set forth, or identify for each thereof all of the information requested.

9.    If any meaning of any term in any Interrogatory is unclear to You, without waiver of UnitedHealth's right to seek a full and complete response to the Interrogatory, You shall assume a reasonable meaning, state what the assumed meaning is, and respond to the Interrogatory according to the assumed meaning.

### **INTERROGATORY**

### **INTERROGATORY NO. 1**

Identify for Date of Service Years 2008–2016 the Beneficiary (by name, HIC Number, and date of birth), Date of Service, Diagnosis Code(s), CMS HCC(s) or RxHCC(s), and Provider (by individual name, group name, address, NPI, Tax ID(s), and Provider ID), that corresponds to each and every Diagnosis Code You allege UnitedHealth "knowingly and improperly failed to delete . . . or otherwise return to the Medicare Program [as an] overpayment." United States' Complaint ¶ 342, Dkt. 171.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

6

UHC OF CALIFORNIA'S FIRST INTERROGATORY
TO THE GOVERNMENT
2:16-cv-08697-FMO (SSx)

0354

1   Dated:  January 3, 2020

2                                           LATHAM & WATKINS LLP
                                            DAVID J. SCHINDLER
3                                           DANIEL MERON
                                            KATHRYN H. RUEMMLER
4                                           ABID R. QURESHI

5

6

7   By _____
                                            David J. Schindler
8                                           Attorneys for UnitedHealth
                                            Defendants

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

7

UHC OF CALIFORNIA'S FIRST INTERROGATORY
TO THE GOVERNMENT
2:16-cv-08697-FMO (SSx)

0355

1

# PROOF OF SERVICE

2

I am employed in the County of Los Angeles, State of California.  I

3

am over the age of 18 years and not a party to this action.  My business address is
Latham & Watkins LLP, 355 South Grand Avenue, Suite 100, Los Angeles, CA
90071-1560.

4

5

On **January 3, 2020**, I caused the service of a true copy of the
following document described as:

6

## UHC OF CALIFORNIA'S FIRST INTERROGATORY TO THE GOVERNMENT

7

8

to be served in the following manner:

9

## BY ELECTRONIC MAIL

10

The above-described document was transmitted via electronic mail to
the following party pursuant to written consent under Federal Rule of Civil
Procedure 5(b)(2)(E) on **January 3, 2020**:

11

12

13

## SEE ATTACHED SERVICE LIST

14

I declare that I am employed in the office of a member of the Bar of,

15

or permitted to practice before, this Court at whose direction the service was made
and declare under penalty of perjury under the laws of the State of California that
the foregoing is true and correct.

16

17

Executed on **January 3, 2020**, at Los Angeles, California.

18

19

20

David J. Schindler

21

22

23

24

25

26

27

28

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES, CA

8

UHC OF CALIFORNIA'S FIRST INTERROGATORY
TO THE GOVERNMENT
2:16-cv-08697-FMO (SSx)

0356

## SERVICE LIST

United States District Court
CASE NO. CV 16-08697 FMO (SSx)

| | |
|---|---|
| John E. Lee<br>*john.lee2@usdoj.gov*<br>Assistant United States Attorneys<br>300 N. Los Angeles Street, Room 7516<br>Los Angeles, California 90012<br>Tel: 213.894.3995<br><br>Jack Ross<br>*jack.ross@usdoj.gov*<br>Assistant United States Attorneys<br>300 N. Los Angeles Street, Room 7516<br>Los Angeles, California 90012<br>Tel: 213.894.7395 | Attorneys for the United States of America |
| Jessica Krieg<br>*jessica.e.krieg@usdoj.gov*<br>Paul Perkins<br>*paul.r.perkins@usdoj.gov*<br>Martha N. Glover<br>*martha.n.glover@usdoj.gov*<br>Paul G. Freeborne<br>*paul.g.freeborne2@usdoj.gov*<br>Maria R. Marsh<br>*maria.r.marsh@usdoj.gov*<br>United States Department of Justice<br>P.O. Box 261, Ben Franklin Station<br>Washington, D.C. 20044<br>Tel: 202.307.0486 | Attorneys for the United States of America |
| Edward Crooke<br>*edward.crooke@usdoj.gov*<br>United States Department of Justice<br>Civil Division<br>175 N Street N.E., Room 10-202<br>Washington, D.C. 20002<br>Tel: 202.353.0426<br><br>Zoila E. Hinson<br>*Zoila.e.hinson@usdoj.gov*<br>United States Department of Justice<br>Civil Division, Fraud Section<br>175 N Street N.E., Suite 9-1813<br>Washington, D.C. 20002<br>Tel: 202.353.1286<br><br>Amy Likoff<br>*Amy.L.Likoff@usdoj.gov*<br>United States Department of Justice<br>Civil Division<br>175 N Street N.E., Room 10-1813<br>Washington, D.C. 20002 | Attorneys for the United States of America |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

9

UHC OF CALIFORNIA'S FIRST INTERROGATORY
TO THE GOVERNMENT
2:16-cv-08697-FMO (SSx)

0357

| | |
|---|---|
| Tel: 202.305.3173 | |
| Robert McAuliffe | |
| *Robert.McAuliffe@usdoj.gov* | |
| United States Department of Justice | |
| Civil Division | |
| 175 N Street N.E., Room 9-103 | |
| Washington, D.C. 20002 | |
| Tel: 202.514.6832 | |
| Gregory A. Mason | |
| *gregory.a.mason@usdoj.gov* | |
| United States Department of Justice | |
| Civil Division; Fraud Section | |
| 175 N Street N.E., Room 10-224 | |
| Washington, D.C. 20002 | |
| Tel: 202.514.9472 | |
| Linda M. McMahon | |
| *Linda.mcmahon2@usdoj.gov* | |
| United States Department of Justice | |
| Civil Division | |
| 175 N Street N.E., Room 10-202 | |
| Washington, D.C. 20002 | |
| Tel: 202.307.0448 | |
| Eric R. Havian | Attorneys for Relator Benjamin |
| Mary A. Inman | Poehling |
| Jessica T. Moore | |
| Anne Hayes Hartman | |
| Henry C. Su | |
| Hallie E. Noecker | |
| *UHG-* | |
| *RelatorsCounsel@Lists.SusmanGodfrey.com* | |
| **Constantine Cannon LLP** | |
| 150 California Street, Suite 1600 | |
| San Francisco, CA 94111 | |
| Tel: 415.639.4001 | |
| Timothy P. McCormack | |
| Harry P. Litman | |
| Rosie Dawn Griffin | |
| Max Voldman | |
| *UHG-* | |
| *RelatorsCounsel@Lists.SusmanGodfrey.com* | |
| **Constantine Cannon LLP** | |
| 1001 Pennsylvania Avenue, N.W., Suite 1300 | |
| Washington, D.C. 20004 | |
| Tel: 202.204.3500 | |
| Steve Hasegawa | Attorneys for Relator Benjamin |
| Taeva C. Shefler | Poehling |
| *UHG-* | |
| *RelatorsCounsel@Lists.SusmanGodfrey.com* | |
| **Phillips & Cohen LLP** | |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

10

UHC OF CALIFORNIA'S FIRST INTERROGATORY
TO THE GOVERNMENT
2:16-cv-08697-FMO (SSx)

0358

| | |
|---|---|
| 100 The Embarcadero, Suite 300<br>San Francisco, California 94105<br>Tel: 415.836.9000 | |
| Meng Xi<br>Oleg Elkhunovich<br>Catriona Lavery<br>*UHG-*<br>*RelatorsCounsel@Lists.SusmanGodfrey.com*<br>**Susman Godfrey L.L.P.**<br>1900 Avenue of the Americas, Suite 1400<br>Los Angeles, CA 90067<br>Tel: (310) 789-3100 | Attorneys for Relator Benjamin Poehling |
| Arun S. Subramanian<br>William C. Carmody<br>Geng Chen<br>*UHG-*<br>*RelatorsCounsel@Lists.SusmanGodfrey.com*<br>**Susman Godfrey L.L.P.**<br>1301 Avenue of the Americas, 32nd Fl.<br>New York, NY 100 19-6023<br>Tel: (212) 336-8330 | |
| John P. Lahad<br>Weston L. O'Black<br>William R. H. Merrill<br>*UHG-*<br>*RelatorsCounsel@Lists.SusmanGodfrey.com*<br>**Susman Godfrey L.L.P.**<br>1000 Louisiana Street, 51st Fl.<br>Houston, TX 77002<br>Tel: (713) 654-6666 | |
| Matthew R. Berry<br>*UHG-*<br>*RelatorsCounsel@Lists.SusmanGodfrey.com*<br>**Susman Godfrey L.L.P.**<br>1201 Third Avenue, Suite 3800<br>Seattle, WA 98101<br>Tel: (206) 373-7394 | |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

11

UHC OF CALIFORNIA'S FIRST INTERROGATORY
TO THE GOVERNMENT
2:16-cv-08697-FMO (SSx)

0339

**EXHIBIT D-8**

MICHAEL D. GRANSTON
Deputy Assistant Attorney General, Civil Division
TRACY L. WILKISON
Acting United States Attorney
DAVID M. HARRIS
JOHN E. LEE (CBN 128696)
JACK D. ROSS (CBN 265883)
Assistant United States Attorneys
        300 N. Los Angeles Street, Room 7516
        Los Angeles, California 90012
        Tel: (213) 894-7395; Fax: (213) 894-7819
        Email: jack.ross@usdoj.gov
JAMIE ANN YAVELBERG
EDWARD C. CROOKE
ROBERT McAULIFFE
LINDA M. McMAHON
JESSICA KRIEG
AMY L. LIKOFF
GREGORY A. MASON
MARTHA GLOVER
WENDY ZUPAC
Attorneys, Civil Division, U.S. Department of Justice
        P.O. Box 261, Ben Franklin Station
        Washington, D.C. 20044
        Tel: (202) 307-0486; Fax: (202) 307-3852
        Email: gregory.a.mason@usdoj.gov
JAMES P. KENNEDY, JR.
United States Attorney
DAVID CORIELL
Assistant United States Attorney (Admitted PHV)
        138 Delaware Avenue
        Buffalo, New York 14201
        Tel: (716) 843-5731; Fax: (716) 551-3052
        Email: David.Coriell@usdoj.gov
Attorneys for the United States of America

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING, <br><br> Plaintiffs, <br><br> v. <br><br> UNITEDHEALTH GROUP, INC., *et al.*, <br><br> Defendants. | No. CV 16-08697 FMO <br><br> UNITED STATES' RESPONSES AND OBJECTIONS TO DEFENDANT UHC OF CALIFORNIA'S SECOND SET OF INTERROGATORIES TO THE GOVERNMENT |

0361

1

**PROPOUNDING PARTY:    UHC OF CALIFORNIA, INC.**

2

**RESPONDING PARTY:    UNITED STATES OF AMERICA**

3

**SET NUMBER:    TWO**

4

5

**Preliminary Statement**

6

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and Rule

7

33 of the Local Civil Rules of the United States District Court for the Central District

8

of California, the United States of America ("United States" or "government"),

9

through its undersigned counsel, hereby provides its responses and objections to

10

Defendant UHC of California's ("UnitedHealth" or "Defendant") Second Set of

11

Interrogatories ("Second Set of Interrogatories"), dated February 4, 2021. The

12

responses set forth herein are based on information now known to the United States

13

and its undersigned attorneys, and will be revised, corrected, supplemented, amended,

14

and clarified to the extent required by Rule 26 as discovery proceeds.

15

**General Objections**

16

The following objections apply to each and every separately numbered

17

Interrogatory and are incorporated by reference to the extent applicable into the

18

objection to each Interrogatory.

19

1.    UnitedHealth's Interrogatories are inconsistent with the spirit and letter

20

of the Federal Rules of Civil Procedure ("Federal Rules"), which explain that an

21

interrogatory ought to narrow and sharpen issues for trial. *See* Fed. R. Civ. P. 33

22

Advisory Committee's Note. UnitedHealth's extensive Interrogatories do just the

23

opposite by asking the United States to respond to vague and illogical

24

mischaracterizations of its arguments, and seeking vast amounts of information

25

without the objective to narrow and sharpen issues for trial. For example, the

26

Interrogatories demand that the United States (i) survey all CMS and HHS-OIG

27

Individuals (as defined by UnitedHealth's Second Set of Interrogatories, Definitions

28

4 and 12) to determine if anyone ever held a particular belief between 2008–2017; (ii)

2

reply to convoluted hypotheticals by stating what CMS and HHS-OIG Individuals believe CMS would have done if it had known certain information during the period 2008–2017; and (iii) identify "all evidence and material facts" it relies on for its contentions while discovery in this matter is still ongoing.

2.    The United States objects to the Second Set of Interrogatories to the extent they are vague, ambiguous, overbroad, unduly burdensome, or seek to impose requirements upon the United States beyond those called for or permitted by the Federal Rules, the Local Civil Rules of the United States District Court for the Central District of California ("Local Rules"), or any order of the Court. The United States responds below pursuant to its obligations under the Federal Rules and the Local Rules, namely that the United States has taken and is continuing to undertake reasonable efforts to identify information responsive to the Interrogatories.

3.    The United States objects to the Second Set of Interrogatories to the extent that a response requires disclosure of information protected by an applicable privilege or protection, including, but not limited to, the attorney-client privilege, work product doctrine, deliberative process privilege, law enforcement privilege, common interest privilege, or investigative files privilege, and protections afforded by Fed. R. Civ. P. 26(b), or any other applicable privilege. The United States will not respond in such a way as to disclose such protected information, and inadvertent identification or disclosure of privileged information by the United States shall not be a waiver of any applicable privilege. Under Federal Rule of Evidence 502, Federal Rule of Civil Procedure 26(b)(5)(B), other related sources of law, and the Court's Revised Protective Order Governing Non-Waiver of Privilege and Protected Material, Dkt. 412, the government reserves any and all rights to claw back privileged information it inadvertently discloses in response to the Second Set of Interrogatories.

4.    The United States submits these responses subject to, without intending to waive, but expressly reserving the right to object to other discovery procedures involving or relating to the subject matter of the information in responses to the

3

Second Set of Interrogatories.  The United States reserves the right to object on any ground, at any time, to such other or supplemental requests as the Defendants may propound involving or relating to the subject matter of the Second Set of Interrogatories.

5.    The United States reserves the right to supplement its responses to the Second Set of Interrogatories at any time to the extent provided by the Federal Rules.

6.    The assertion of the same, similar, or additional specific objections to the Second Set of Interrogatories does not and should not be construed to waive or modify any of the United States' general objections.

7.    The United States objects to the Second Set of Interrogatories to the extent they require the United States to draw legal conclusions, comment on the merits of any affirmative defenses, or otherwise seek to impose any requirements beyond those established by the Federal Rules or the Local Rules.

8.    The United States objects to the Second Set of Interrogatories to the extent that they contain multiple subparts numbered as a single Interrogatory.  By responding, the United States in no way waives its right to object that UnitedHealth has exceeded the maximum number of interrogatories permitted under the Federal Rules.

9.    The United States objects to the Second Set of Interrogatories to the extent they purport to require the United States to gather information in the possession or custody of Government components beyond HHS-OIG and CMS on the grounds that they are unduly burdensome and overbroad and that they seek information not relevant to the claims or defenses in this action and disproportionate to the needs of this case.

10.    The United States objects to the Second Set of Interrogatories to the extent they purport to require the United States to gather information in the possession or custody of HHS-OIG where HHS-OIG is not the relevant agency for payment purposes and therefore the Interrogatories are unduly burdensome,

0364

1    overbroad, and seek information not relevant to the claims or defenses in this action

2    and disproportionate to the needs of this case.

3         11.    To the extent the United States produces information or documents in

4    further response to these Interrogatories, it does not admit that the information or

5    documents are true, accurate, authentic, relevant, or admissible in this action.  The

6    United States reserves the right to challenge on evidentiary grounds any information

7    or documents produced in response to these Interrogatories.

8         12.    The fact that the United States has answered any part of all or any

9    particular interrogatory is not intended to and shall not be construed to be a waiver by

10   the United States of all or part of any objection to any interrogatory.

11              **Specific Objections to the Definitions and Instructions**

12        The United States objects to the Definitions and Instructions to the extent they

13   (i) seek to impose burdens on the United States that are different from, are

14   inconsistent with, or exceed those imposed by the Federal Rules and the Local Rules,

15   (ii) are vague or ambiguous, and/or (iii) render the Second Set of Interrogatories

16   overly broad, unduly burdensome, not proportionate to the needs of the case, and not

17   relevant.  The United States further objects to the Second Set of Interrogatories to the

18   extent UnitedHealth has failed to define vague, ambiguous, and confusing terms.

19   **Definition 2:**  The United States objects to the definition of "Believed" (Definition 2)

20   as vague, confusing, ambiguous, and irrelevant to the extent it is used in conjunction

21   with "CMS" or "HHS-OIG."  As entities, CMS and HHS-OIG cannot hold Beliefs.

22   The United States will interpret any Interrogatories involving "Believed" to apply

23   exclusively to individuals.  The United States further objects because the Beliefs of

24   any individual CMS or HHS-OIG employee is irrelevant to any claim or defense in

25   this matter as CMS and HHS-OIG speak through official pronouncements.  The

26   United States also objects to the definition of "Believed" in that "suppose" means

27   something different than "hold something as an opinion" or "think," and this

28   definition encompassing two different meanings therefore renders UnitedHealth's

5

1    Second Set of Interrogatories confusing and self-contradictory. The United States

2    will interpret "Believed" as to hold something as an opinion or to think.

3    **Definitions 3, 10, and 11:** The United States objects to the terms "CMS" (Definition

4    3), "Government" (Definition 10), and "HHS-OIG" (Definition 11) as overbroad and

5    irrelevant to the extent they include current and former contractors or consultants.

6    CMS and HHS-OIG speak through official pronouncements and do not speak through

7    its contractors or consultants, making information provided by contractors and

8    consultants overbroad and irrelevant for the purpose of responding to the Second Set

9    of Interrogatories. The United States objects to the definition of "Government"

10   (Definition 10) to the extent it includes any branch, agency, department, agent,

11   representative, contractor, attorney, consultant, or person acting on its behalf not

12   relevant to this action. This definition is plainly unreasonable, unduly burdensome,

13   and disproportionate to the needs of the case, in that it seeks to require the United

14   States to provide information not currently in the possession, custody, or control of

15   CMS or HHS-OIG. Subject to and without waiving these objections, the United

16   States interprets "Government" to mean CMS and HHS-OIG. To the extent the

17   United States interprets the use of "Government" in a specific Interrogatory as

18   directed at one, but not all, of the above components, the United States will state its

19   interpretation in its response. The United States further objects to the inclusion of

20   "attorneys" in the definitions to the extent that the inclusion of "attorneys" requires

21   the United States to gather information from attorneys within CMS's Office of the

22   General Counsel ("OGC"), the Office of Counsel for the Inspector General

23   ("OCIG"), or the Department of Justice ("DOJ"). The United States is not searching

24   for, collecting, or providing information or materials from any attorney within OGC,

25   OCIG, or DOJ.

26   **Definitions 4 and 12:** The United States objects to the terms "CMS Individual"

27   (Definition 4) and "HHS-OIG Individual" (Definition 12) as irrelevant, unduly

28   burdensome, and beyond the scope of permissible discovery to the extent they

6

1   include all current or former contractors or current or former subcontractors, and

2   therefore demand that the United States obtain information from, or respond on

3   behalf of, persons or entities not reasonably accessible to the United States and over

4   whom the United States has no control.  The United States further objects to the terms

5   "CMS Individual" and "HHS-OIG Individual" as overly broad and unduly

6   burdensome to the extent they include all current employees of each agency, which

7   includes thousands of people who are unlikely to have information relevant to these

8   interrogatories.  The United States objects to the terms "CMS Individual" and "HHS-

9   OIG Individual" as overly broad and unduly burdensome to the extent they include

10  all former employees of each agency, and therefore purport to require the United

11  States to obtain information from, or to respond on behalf of, persons or entities not

12  reasonably accessible to the United States and over whom the United States has no

13  control.  It is plainly unreasonable for the United States to survey each and every

14  current and former employee of CMS and/or HHS-OIG.  The United States further

15  objects to the inclusion of "attorneys" in the definitions to the extent the inclusion of

16  "attorneys" requires the United States to gather information from attorneys within

17  OGC, OCIG, or DOJ.  The United States is not searching for, collecting, or providing

18  information or materials from any attorney within OGC, OCIG, or DOJ.

19  **Definition 17:**  The United States objects to the definition of "Person" (Definition

20  17) to the extent it is defined to mean "the federal government and all departments

21  and agencies thereof, state governments, local governments, [and] other

22  governmental agencies[.]"  This definition is plainly unreasonable, unduly

23  burdensome, and disproportionate to the needs of the case, in that it seeks to require

24  the United States to provide information not currently in the possession, custody, or

25  control of CMS and HHS-OIG.  Furthermore, the United States objects to the extent

26  each definition includes former CMS contractors for whom the United States

27  presently has no reasonable belief they possess or control non-duplicative information

28  relevant to any claim or defense in this case.

**Definition 18:**  The United States objects to the definition of "Proposed Medical Record Review Rule" (Definition 18) to the extent that it is overly broad, vague, and misleading in that the definition cites to provisions of a proposed rule beyond the proposed addition to 42 C.F.R. § 422.310(e).  The United States will interpret "Proposed Medical Record Review Rule" to only include the language at 79 Fed. Reg. 1918, 2000 related to 42 C.F.R. § 422.310(e).

**Definitions 6 and 19:**  The United States objects to the definitions of "Concerning" (Definition 6) and "Relating to" and "regarding" (Definition 19) because the definitions render the Second Set of Interrogatories vague, ambiguous, confusing, overly broad, unduly burdensome, and disproportionate to the needs of the case. Indeed, these terms are defined to seek any piece of information that in some way— no matter how remote, indirect, or tangential—mentions or references matters set forth in the Interrogatory.  The United States responds to the Second Set of Interrogatories by using these terms and the verbs constituting their definitions as limited by the constraining adverb "directly."

**Definition 22**:  The United States objects to the definition of "Time Period" (Definition 22) to the extent it seeks information outside the scope of the Parties' agreement relating to a discovery cut-off date of May 16, 2017, with the exception of discovery relating to CMS's proposed rule *Medicare and Medicaid Programs; Policy and Technical Changes to the Medicare Advantage, Medicare Prescription Drug Benefit, Program of All-Inclusive Care for the Elderly (PACE), Medicaid Fee-for-Service, and Medicaid Managed Care Programs for Years 2020 and 2021* ("Proposed Rule") and underlying FFS Adjuster Study.  *See* August 9, 2019 D. Schindler email to R. McAuliffe.

**Definition 24:**  The United States objects to the definition of "You" and "Your" (Definition 24) as overly broad to the extent these terms are intended to encompass any agency, office, employee, agent, representative, officer, or contractor of either the legislative or judicial branch, and insofar as these terms are defined to include

0368

executive branch agencies and offices not relevant to this action.  This is plainly

unreasonable, unduly burdensome, and disproportionate to the needs of the case, in

that it seeks to require the United States to provide information not currently in the

possession, custody, or control of CMS and HHS-OIG.  Subject to and without

waiving these objections, the United States will interpret this term to mean CMS and

HHS-OIG.  When appropriate, the United States will identify whether it is

interpreting "You" and "Your" as either CMS, HHS-OIG, or both in the context of

each specific Interrogatory.

**Instruction 3:**  The United States objects to Instruction 3 as vague and ambiguous.

For the purposes of responding to these Interrogatories, the United States will

construe the relevant time period as January 1, 2004 through May 16, 2017, in

accordance with the parties' agreed-upon discovery timeframe.  However, with

respect to Interrogatory 6, the United States will construe the relevant time period as

January 1, 2004 to June 30, 2019, in accordance with the parties' agreed-upon

discovery timeframe pertaining to discovery relating to CMS's proposed rule

*Medicare and Medicaid Programs; Policy and Technical Changes to the Medicare*

*Advantage, Medicare Prescription Drug Benefit, Program of All-Inclusive Care for*

*the Elderly (PACE), Medicaid Fee-for-Service, and Medicaid Managed Care*

*Programs for Years 2020 and 2021* ("Proposed Rule") and underlying FFS Adjuster

Study.  *See* August 9, 2019 D. Schindler email to R. McAuliffe.

**Instruction 5:**  The United States objects to Instruction 5 to the extent it seeks to

impose burdens upon the United States beyond those called for or permitted by the

Federal Rules or the Local Rules.

**Instruction 6:**  The United States objects to Instruction 6 to the extent it seeks to

impose burdens upon the United States beyond those called for or permitted by the

Federal Rules or the Local Rules.

**Instruction 7:**  The United States objects to Instruction 7 to the extent it seeks to

impose burdens upon the United States beyond those called for or permitted by the

1    Federal Rules or the Local Rules. The United States will assert any applicable

2    privileges and specify the material to which it applies per Fed. R. Civ. P. 26(b)(5)(A)

3    for all information responsive to an Interrogatory to which the United States has

4    agreed to produce but which is withheld on the basis of a privilege or protection.

5    **Instruction 8:** The United States objects to Instruction 8 to the extent it requires the

6    United States to identify "each" instance of duplicative, redundant, or repetitive

7    information.

8                           <u>**Specific Objections and Responses**</u>

9    **INTERROGATORY NO. 2:** For each Diagnosis Code You identified in response

10   to UHC of California's First Interrogatory, Identify all evidence and material facts

11   upon which You rely, or intend to rely, to support Your contention that these

12   Diagnosis Codes are "not supported by the beneficiaries' medical records," "false,"

13   or "invalid." United States' Am. Compl. ¶¶ 103, 342, Dkt. 171.

14   **Objections:** The United States incorporates by reference each of its General

15   Objections and Specific Objections to the Definitions and Instructions as if stated

16   herein. The United States objects to this Interrogatory as overly broad and unduly

17   burdensome to the extent it improperly requires the United States to lay out "all

18   evidence and material facts" of its case. *See Tubbs v. Sacramento Cty. Jail*, No.

19   CIVS060280LKKGGHP, 2008 WL 863974, at *1 (E.D. Cal. Mar. 28, 2008) ("'Each

20   and every fact' interrogatories pose problems for a responding party and a reviewing

21   court. Parties are not tasked with laying out every jot and tittle of their evidentiary

22   case in response to interrogatories."); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D.N.M.

23   2007) ("Contention interrogatories should not require a party to provide the

24   equivalent of a narrative account of its case, including every evidentiary fact, details

25   of testimony of supporting witnesses, and the contents of supporting documents.");

26   *Aldapa v. Fowler Packing Co. Inc.*, 310 F.R.D. 583, 591 (E.D. Cal. 2015).

27         The United States further objects that the Interrogatory calls for the disclosure

28   of information protected by privilege, insofar as it requests the identification of

                                                    10

                                                                              0370

evidence upon which the United States relies or intends to rely, which is protected by
the attorney work product doctrine.  The United States further objects to this
Interrogatory on the ground that it is premature given that discovery is ongoing and
the material facts and evidence in this case are still being developed through
discovery.  The United States further objects to this Interrogatory on the ground that
it is not required to identify its trial witnesses and exhibits at this stage in the
litigation, and will identify its evidence in accordance with the Federal Rules, and it is
not obligated to, and will not, identify "all evidence" in response to this Interrogatory.
By responding to this Interrogatory, the United States does not represent that it has
identified all material facts related to the topics requested, and reserves the right to
supplement or amend its responses and objections to this Interrogatory if it discovers
new, relevant, and responsive information.  The United States further objects to this
Interrogatory on the ground that it calls for materials protected from disclosure by the
Order Granting Stipulation Regarding Expert Discovery entered by the Court on May
17, 2018, Dkt. 233.  The United States further objects to this Interrogatory to the
extent it seeks the premature disclosure of expert opinion testimony, which is outside
the scope of a proper contention interrogatory.

**Response:**  Subject to and without waiving the foregoing objections, the United
States responds as follows.  Every Diagnosis Code included in the United States'
response to Interrogatory 1 was submitted to UnitedHealth as part of a claim from or
beneficiary encounter with a provider ("Provider Claim or Encounter") and later
submitted by UnitedHealth to CMS for risk adjustment purposes.  The medical
records associated with the Provider Claim or Encounter for every Diagnosis Code
included in the United States' response to Interrogatory 1 were reviewed in
UnitedHealth's process of reviewing medical records and abstracting or identifying
Diagnosis Codes for the purpose of submitting additional Diagnosis Codes to CMS
for risk adjustment payments ("Chart Review" or "Chart Review Program").  For
every Diagnosis Code included in the United States' response to Interrogatory 1,

1   UnitedHealth's Chart Review did not identify that Diagnosis Code as one that was

2   supported by that medical record after review.

3          In its Chart Review Program, UnitedHealth instructed its Chart Review coders

4   to look for all medical conditions purportedly documented in the records, record all

5   Diagnosis Codes identifying those conditions, and report all of those Diagnosis Codes

6   to UnitedHealth.  UnitedHealth coders were trained, qualified, and/or certified to

7   accurately identify Diagnosis Codes supported by the medical record, in accordance

8   with the Ninth or the Tenth Edition of the *International Classification of Diseases*

9   *(ICD) Clinical Modification Guidelines for Coding and Reporting* ("ICD

10  Guidelines").  UnitedHealth relied on its coders' accuracy to submit to CMS

11  Diagnosis Codes that were supported by the medical record but were not previously

12  submitted to UnitedHealth based on a Provider Claim or Encounter.  UnitedHealth

13  attested to the validity of all of these additional submitted Diagnosis Codes based on

14  its Chart Review results.  UnitedHealth's coders were required to meet quality

15  benchmarks of at least 95% for accuracy—defined as completeness in identifying all

16  risk adjusting Diagnosis Codes that were supported by the medical record in

17  accordance with ICD Guidelines—when reviewing and coding a medical record.

18         UnitedHealth conducted additional medical record reviews (through Quality

19  Assurance programs, Recode projects, Claims Verification, etc.) of many of the

20  medical records associated with Diagnosis Codes included in the United States'

21  response to Interrogatory 1.  For example, in UnitedHealth's "Recode Project,"

22  UnitedHealth re-reviewed medical records that had already been through the Chart

23  Review Program.  In the Recode Project, UnitedHealth liberalized its coding

24  standards in order to identify additional Diagnosis Codes that had not been submitted

25  by the provider, nor been found during Chart Review.  None of these additional

26  medical record reviews found support in the beneficiary's medical records for any of

27  the Diagnosis Codes included in the United States' response to Interrogatory 1.

28         The United States will supplement its response to this Interrogatory as

12

0372

1    appropriate.

2    **INTERROGATORY NO. 3:**  For each Diagnosis Code You identified in response

3    to UHC of California's First Interrogatory, state in detail every material fact relating

4    to Your contention that UnitedHealth had Knowledge that these Diagnosis Codes

5    were "not supported by the beneficiaries' medical records," "false," or "invalid,"

6    including but not limited to the specific individuals at UnitedHealth who You contend

7    had such Knowledge. United States' Am. Compl. ¶¶ 103, 342, Dkt. 171.

8    **Objections:**  The United States incorporates by reference each of its General

9    Objections and Specific Objections to the Definitions and Instructions as if stated

10   herein.  The United States objects to this Interrogatory as overly broad and unduly

11   burdensome to the extent it improperly requires the United States to "state in detail

12   every material fact" of its evidentiary case.  *See Tubbs v. Sacramento Cty. Jail*, No.

13   CIVS060280LKKGGHP, 2008 WL 863974, at *1 (E.D. Cal. Mar. 28, 2008) ("'Each

14   and every fact' interrogatories pose problems for a responding party and a reviewing

15   court. Parties are not tasked with laying out every jot and tittle of their evidentiary

16   case in response to interrogatories."); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D.N.M.

17   2007) ("Contention interrogatories should not require a party to provide the

18   equivalent of a narrative account of its case, including every evidentiary fact, details

19   of testimony of supporting witnesses, and the contents of supporting documents.");

20   *Aldapa v. Fowler Packing Co. Inc.*, 310 F.R.D. 583, 591 (E.D. Cal. 2015).

21        The United States further objects to this Interrogatory on the ground that it is

22   premature given that discovery is ongoing and the material facts in this case are still

23   being developed through discovery.  By responding to this Interrogatory, the United

24   States does not represent that it has identified every material fact related to the topics

25   requested, and reserves the right to supplement or amend its responses and objections

26   to this Interrogatory if it discovers new, relevant, and responsive information.  The

27   United States further objects to this Interrogatory on the ground that it calls for

28   materials protected from disclosure by the Order Granting Stipulation Regarding

13

1  Expert Discovery entered by the Court on May 17, 2018, Dkt. 233.  The United

2  States further objects to this Interrogatory to the extent it seeks the premature

3  disclosure of expert opinion testimony, which is outside the scope of a proper

4  contention interrogatory.

5       The United States also objects to this Interrogatory on the ground that it is

6  really two separate interrogatories—one seeking material facts underlying a

7  contention and another seeking the identity of knowledgeable witnesses.  *See Safeco*

8  *of Am. v. Rawstron*, 181 F.R.D. 441, 445 (C.D. Cal. 1998); *see also Ott v. Mortg.*

9  *Inv'rs Corp. of Ohio*, No. 3:14-CV-00645-ST, 2015 WL 691643, at *1 (D. Or. Feb.

10  17, 2015) ("[O]nce a subpart of an interrogatory introduces a line of inquiry that is

11  separate and distinct from the inquiry made by the portion of the interrogatory that

12  precedes it, the subpart must be considered a separate interrogatory no matter how it

13  is designated.").  The Interrogatory requests that the United States: (1) identify "every

14  material fact relating to [the United States'] contention that UnitedHealth had

15  Knowledge that these Diagnosis Codes were 'not supported by the beneficiaries'

16  medical records,' 'false,' or 'invalid,'" and (2) identify "the specific individuals at

17  UnitedHealth who [the United States] contend[s] had such Knowledge."

18  UnitedHealth has therefore issued at least four interrogatories out of the 25

19  interrogatories permitted under the Federal Rules.  By responding to this

20  Interrogatory, the United States in no way waives its right to object if UnitedHealth

21  exceeds the maximum number of permitted interrogatories.

22       The United States objects to this Interrogatory as premature, in that it requires

23  the United States to identify individuals who had Knowledge of relevant facts prior to

24  the completion of fact discovery, and in particular prior to the depositions of

25  UnitedHealth and individual witnesses under Federal Rule of Civil Procedure 30.

26  The United States will supplement its response to this Interrogatory as appropriate.

27  **Response:**  Subject to and without waiving the foregoing objections, the United

28  States hereby incorporates its response to Interrogatory 2 into this response and

14

0374

1    further states that UnitedHealth had Knowledge, as defined by 31 U.S.C. §

2    3729(b)(1)(A), of all of the facts set forth in the United States' response to

3    Interrogatory 2.  In addition, UnitedHealth designed, implemented, and maintained

4    the database systems that contained all of the information necessary to determine that

5    Diagnosis Codes it had previously submitted to CMS were not found by

6    UnitedHealth's coders to have support in the beneficiaries' medical records, and

7    UnitedHealth deliberately ignored or recklessly disregarded the information in its

8    own databases.  UnitedHealth received and maintained data from Provider Claims

9    and Encounters and also maintained the data containing the results of its Chart

10   Review Program.  UnitedHealth had the ability to compare the results of every Chart

11   Review to the diagnosis data UnitedHealth had received from Provider Claims and

12   Encounters and then submitted to CMS for risk adjustment.  UnitedHealth was able

13   to, and frequently did, analyze its Chart Review data to assess whether an HCC was

14   unique as to a specific beneficiary in a specific DOS year.  UnitedHealth had

15   Knowledge that it must act in good faith and exercise due diligence in its submission

16   of Diagnosis Codes to CMS, and that it must, and did, expressly certify that the

17   Diagnosis Codes it submits for risk adjustment payments are accurate and truthful to

18   the best of its Knowledge.  UnitedHealth did not review the results of its Chart

19   Review program in good faith or exercise due diligence in order to obtain and submit

20   true and accurate risk adjustment data to CMS.  Instead, UnitedHealth systematically

21   and deliberately ignored the results of Chart Reviews that showed that Diagnosis

22   Codes received by UnitedHealth from Provider Claims and Encounters and then

23   submitted to CMS were not supported by the beneficiaries' medical records.

24   UnitedHealth knowingly and improperly avoided comparing the Diagnosis Codes

25   from Provider Claims and Encounters submitted by UnitedHealth to CMS for risk

26   adjustment with the results of Chart Review.  UnitedHealth acted with reckless

27   disregard or deliberate ignorance of the truth or falsity of whether the Diagnosis

28   Codes it had submitted to CMS for risk adjustment were supported by the

15

beneficiaries' medical records.

UnitedHealth designed the Chart Review program at issue, and had Knowledge of all relevant facts about the Chart Review program, including that UnitedHealth instructed its Chart Review coders to look for all medical conditions purportedly documented in the medical records, record all Diagnosis Codes identifying those conditions, and report all of those Diagnosis Codes to UnitedHealth. UnitedHealth therefore had Knowledge that every Diagnosis Codes included in the United States' response to Interrogatory 1 was not found to be supported by any review of the medical records. Nor has UnitedHealth contended that any of the Diagnosis Codes included in the United States' response to Interrogatory 1 was in fact supported by a medical record. UnitedHealth had Knowledge that its Claims Verification program and other internal audit programs demonstrated that many Diagnosis Codes UnitedHealth received from Provider Claims and Encounters and submitted to CMS for risk adjustment were not found to have support in a medical record. Furthermore, UnitedHealth had Knowledge that CMS's Risk Adjustment Data Validation audits of select UnitedHealth Medicare Advantage Plans as well as HHS-OIG's Risk Adjustment Data Validation audits of Pacificare of Texas and Pacificare of California demonstrated that many Diagnosis Codes UnitedHealth received from Provider Claims and Encounters and submitted to CMS for risk adjustment were not supported by a medical record. From its own Internal Data Validation ("IDV") Program and Risk Adjustment Coding Compliance Review ("RACCR"), UnitedHealth also had Knowledge of inaccuracies in the Diagnosis Codes it received from Provider Claims and Encounters, which UnitedHealth in turn submitted to CMS for risk adjustment. UnitedHealth recklessly disregarded and deliberately ignored that IDV and RACCR showed that significant percentages of the Diagnosis Codes reported to UnitedHealth from Provider Claims and Encounters were not supported by the beneficiaries' medical records.

Answering now the second and distinct part of this Interrogatory, the United

16

0376

States states that the following UnitedHealth individuals have such Knowledge in that they acted with actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of whether the Diagnosis Codes included in the United States' response to Interrogatory 1 were supported by the beneficiaries' medical records:

- Anita Westrup
- Benjamin Poehling
- Bill Miller
- Brian Lund
- Brian Thompson
- Carol Thompson
- Charlie Tran
- Chris Webb
- Christen Connell
- Cynthia Polich
- Dan Schumacher
- Don James
- Gail Boudreaux
- Jack Larsen
- Janice Redmond
- Jason Bainbridge
- Jay Matushak
- Jeff Dumcum
- Jim Colhour
- Jim Higgins
- John Martinez
- Jon Bird
- Karen Erickson
- Karen Petroff

17

1.  - Karin O'Hara
2.  - Kathleen Baker
3.  - Keith Dobbins
4.  - Kevin Sommerfield
5.  - Kim Halva
6.  - Kyle Anderson
7.  - Larry Renfro
8.  - Lee Valenta
9.  - Marc Beckmann
10. - Marianne Short
11. - Mary Hammond
12. - MaryBeth Meyer
13. - Matt Shors
14. - Melissa Sedor
15. - Mike Jacobson
16. - Natasha Walker
17. - Nick Chiechi
18. - Patty Brennan
19. - Paul Balthazor
20. - Paul Bihm
21. - Randy Meyers
22. - Rebecca Martin
23. - Ronnie Grower
24. - Ryan Maddox
25. - Sanjeev Balsara
26. - Scott Hughes
27. - Scott Theisen
28. - Stephanie Gardner (Will)

0378

- Steve Hemsley
- Steve Nelson
- Thad Johnson
- Thomas MacDougal
- Thomas Paul
- Tim Noel
- Tim Spaeth
- Vinh Troung-son
- William Hnath

The United States will supplement its response to this Interrogatory as appropriate.

**INTERROGATORY NO. 4:**  State in detail every material fact Concerning Your contention that UnitedHealth had Knowledge of "overpayments based on invalid diagnoses," United States' Am. Compl. ¶ 342, Dkt. 171, including but not limited to the specific individuals at UnitedHealth who You contend had such Knowledge.

**Objections:**  The United States incorporates by reference each of its General Objections and Specific Objections to the Definitions and Instructions as if stated herein.  The United States objects to this Interrogatory as overly broad and unduly burdensome to the extent it improperly requires the United States to "state in detail every material fact" of its evidentiary case.  *See Tubbs v. Sacramento Cty. Jail*, No. CIVS060280LKKGGHP, 2008 WL 863974, at *1 (E.D. Cal. Mar. 28, 2008) ("'Each and every fact' interrogatories pose problems for a responding party and a reviewing court. Parties are not tasked with laying out every jot and tittle of their evidentiary case in response to interrogatories."); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D.N.M. 2007) ("Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents."); *Aldapa v. Fowler Packing Co. Inc.*, 310 F.R.D. 583, 591 (E.D. Cal. 2015).

        The United States further objects to this Interrogatory on the ground that it is

premature given that discovery is ongoing and the material facts in this case are still
being developed through discovery.  By responding to this Interrogatory, the United
States does not represent that it has identified every material fact related to the topics
requested, and reserves the right to supplement or amend its responses and objections
to this Interrogatory if it discovers new, relevant, and responsive information. The
United States further objects to this Interrogatory on the ground that it calls for
materials protected from disclosure by the Order Granting Stipulation Regarding
Expert Discovery entered by the Court on May 17, 2018, Dkt. 233.  The United
States further objects to this Interrogatory to the extent it seeks the premature
disclosure of expert opinion testimony, which is outside the scope of a proper
contention interrogatory.

　　　　The United States also objects to this Interrogatory on the ground that it is
really two separate interrogatories—one seeking material facts underlying a
contention and another seeking the identity of knowledgeable witnesses.  *See Safeco
of Am. v. Rawstron*, 181 F.R.D. 441, 445 (C.D. Cal. 1998); *see also Ott v. Mortg.
Inv'rs Corp. of Ohio*, No. 3:14-CV-00645-ST, 2015 WL 691643, at *1 (D. Or. Feb.
17, 2015) ("[O]nce a subpart of an interrogatory introduces a line of inquiry that is
separate and distinct from the inquiry made by the portion of the interrogatory that
precedes it, the subpart must be considered a separate interrogatory no matter how it
is designated."); *McCarthy v. Paine Webber Grp., Inc.*, 168 F.R.D. 448, 450 (D.
Conn. 1996) (observing that contention interrogatories "are distinct from
interrogatories that request identification of witnesses or documents that bear on the
allegations" (citing *In re Convergent Technologies Securities Litig.*, 108 F.R.D. 328,
332-33 (N.D. Cal. 1985)).  The Interrogatory requests that the United States: (1)
identify "every material fact Concerning [the United States'] contention that
UnitedHealth had Knowledge of 'overpayments based on invalid diagnoses,'" and (2)
identify "the specific individuals at UnitedHealth who [the United States] contend[s]
had such Knowledge."  UnitedHealth has therefore issued at least six interrogatories

1  out of the 25 interrogatories permitted under the Federal Rules.  By responding to this

2  Interrogatory, the United States in no way waives its right to object if UnitedHealth

3  exceeds the maximum number of permitted interrogatories.

4        The United States objects to this Interrogatory as premature, in that it requires

5  the United States to identify individuals who had Knowledge of relevant facts prior to

6  the completion of fact discovery, and in particular prior to the depositions of

7  UnitedHealth and individual witnesses under Fed. R. Civ. P. 30.  The United States

8  will supplement its response to this Interrogatory as appropriate.

9  **Response:**  Subject to and without waiving the foregoing objections, the United

10  States hereby incorporates its responses to Interrogatories 2 and 3 into this response

11  and further states that UnitedHealth had Knowledge, as defined by 31 U.S.C. §

12  3729(b)(1)(A), of all of the facts set forth in the United States' response to

13  Interrogatories 2 and 3.  Furthermore, UnitedHealth had Knowledge that the

14  Diagnosis Codes it submitted to CMS for each beneficiary determined the risk

15  adjustment payment CMS made to UnitedHealth for that beneficiary.  UnitedHealth

16  had Knowledge that the risk-adjusting Diagnosis Codes that it submitted for each

17  beneficiary increased the risk adjustment payment CMS made to UnitedHealth for

18  that beneficiary, and that the risk-adjusting Diagnosis Codes that UnitedHealth

19  submitted as deletes or otherwise removed or corrected would cause CMS to reduce

20  the risk adjustment payment it made to UnitedHealth for that beneficiary.

21  UnitedHealth further had Knowledge that CMS's risk adjustment program requires

22  data accuracy and that it is permitted to only submit Diagnosis Codes that are

23  supported by the beneficiaries' medical records, as evidenced by the design and

24  implementation of its Chart Review Program, which reviewed records for additional

25  supported Diagnosis Codes.  UnitedHealth had Knowledge that it was not entitled to

26  receive or retain risk adjustment payments based on Diagnosis Codes that are not

27  supported by a beneficiary's medical record.  UnitedHealth had Knowledge that it

28  must act in good faith and exercise due diligence in its submission of Diagnosis

1   Codes to CMS, and that it must, and did, expressly certify that the Diagnosis Codes it

2   submits for risk adjustment payments are accurate and truthful to the best of its

3   Knowledge.  UnitedHealth had Knowledge that it was required to implement a

4   compliance program, which must include measures that prevent, detect, and correct

5   non-compliance with CMS's program requirements as well as measures that prevent,

6   detect, and correct fraud, waste, and abuse. UnitedHealth had Knowledge that it was

7   required to delete Diagnosis Codes that were not supported by the medical record.

8         The following UnitedHealth individuals have such Knowledge in that they

9   acted with actual knowledge, deliberate ignorance, or reckless disregard of the truth

10  or falsity of whether the UnitedHealth had improperly received or retained

11  overpayments based on the Diagnosis Codes included in the United States' response

12  to Interrogatory 1:

13  - Anita Westrup

14  - Benjamin Poehling

15  - Bill Miller

16  - Brian Lund

17  - Brian Thompson

18  - Carol Thompson

19  - Charlie Tran

20  - Chris Webb

21  - Christen Connell

22  - Cynthia Polich

23  - Dan Schumacher

24  - Don James

25  - Gail Boudreaux

26  - Jack Larsen

27  - Janice Redmond

28  - Jason Bainbridge

0382

1     • Jay Matushak

2     • Jeff Dumcum

3     • Jim Colhour

4     • Jim Higgins

5     • John Martinez

6     • Jon Bird

7     • Karen Erickson

8     • Karen Petroff

9     • Karin O'Hara

10     • Kathleen Baker

11     • Keith Dobbins

12     • Kevin Sommerfield

13     • Kim Halva

14     • Kyle Anderson

15     • Larry Renfro

16     • Lee Valenta

17     • Marc Beckmann

18     • Marianne Short

19     • Mary Hammond

20     • MaryBeth Meyer

21     • Matt Shors

22     • Melissa Sedor

23     • Mike Jacobson

24     • Natasha Walker

25     • Nick Chiechi

26     • Patty Brennan

27     • Paul Balthazor

28     • Paul Bihm

0383

1  • Randy Meyers
2  • Rebecca Martin
3  • Ronnie Grower
4  • Ryan Maddox
5  • Sanjeev Balsara
6  • Scott Hughes
7  • Scott Theisen
8  • Stephanie Gardner (Will)
9  • Steve Hemsley
10 • Steve Nelson
11 • Thad Johnson
12 • Thomas MacDougal
13 • Thomas Paul
14 • Tim Noel
15 • Tim Spaeth
16 • Vinh Troung-son
17 • William Hnath

18  The United States will supplement its response to this Interrogatory as appropriate.

19  **INTERROGATORY NO. 5:**  Separately for each of the years 2008 to 2017,

20  Identify all CMS Individuals and HHS-OIG Individuals who Believed or expressed in

21  writing that CMS would not have paid or continued entering into MA contracts with

22  UnitedHealth if CMS had known that UnitedHealth was not "compar[ing] all chart

23  reviews to the provider reported diagnoses and delet[ing] all of the invalid provider-

24  reported diagnoses that they previously had submitted to the Medicare Program."

25  United States' Am. Compl. ¶ 185, Dkt. 171.

26  **Objections:**  The United States incorporates by reference each of its General

27  Objections and Specific Objections to the Definitions and Instructions as if stated

28  herein.  The United States further objects that this Interrogatory is overly broad,

unduly burdensome, vague, confusing, and ambiguous.  This Interrogatory is overly broad and unduly burdensome because on its face it seeks to require the United States to investigate the communications and beliefs of all of the thousands of current and former CMS employees, current and former HHS-OIG employees, as well as current and former CMS and HHS-OIG contractors, for a period of nearly a decade.  This is plainly unreasonable.  The United States objects that the Interrogatory is disproportionate to the needs of this case because the potential relevance is outweighed by the enormous burden sought by the Interrogatory.  Further, the United States objects that this Interrogatory is irrelevant because Government agencies, including CMS and HHS-OIG, act through official policy and regulations and not the beliefs or impressions of individual government agency employees.  For the purposes of responding to this Interrogatory, the United States has undertaken a reasonable inquiry to identify information responsive to this Interrogatory, but objects to the Interrogatory insofar as it purports to require the United States to identify "every" CMS and HHS-OIG Individual who held a Belief and reiterates its statement that CMS and HHS-OIG only act through official policy and regulations, not through the private Beliefs of its employees.  The United States' Response to this Interrogatory should not be interpreted or construed to represent or otherwise reflect the official position of CMS or HHS-OIG.

The United States objects to the inclusion of current and former HHS-OIG employees and contractors as irrelevant because, as the language of the Interrogatory itself recognizes, it is CMS that makes MA payment and contract decisions, and HHS-OIG does not make Risk Adjustment payment or contracting decisions.  The subjective beliefs and written expressions of HHS-OIG employees and/or contractors about whether "CMS" would have paid or whether "CMS" would have entered into contracts with UnitedHealth is not relevant to any claim or defense in this case.  Therefore, for purposes of responding to this Interrogatory, the United States will not include "HHS-OIG Individuals."

0385

The United States further objects to the Interrogatory in that it asks the United States to search every piece of writing by a given individual, to determine whether they ever "expressed in writing" the topic sought by the Interrogatory. Such an endeavor is overly broad, unduly burdensome, and not proportional to the needs of the case. Moreover, the United States reiterates that any such writings, if they exist, do not reflect the official position of CMS or HHS-OIG. The United States therefore interprets "expressed in writing" to mean official and public pronouncements on behalf of CMS.

The United States objects to this Interrogatory to the extent that it seeks information from after May 16, 2017, the parties' agreed-upon discovery cut-off. For the purposes of responding to this Interrogatory, the United States interprets this Interrogatory as seeking information only up to May 16, 2017. The United States also objects to this Interrogatory as vague, confusing, and ambiguous because it requires CMS individuals to recall whether they held beliefs or made written statements speculating about what "CMS" would or would not have done in the specified years based on information that the agency did not possess in those years.

The United States further objects on the ground that the Interrogatory is vague, confusing, and unduly burdensome because it seeks a separate answer for each year for what an individual "Believed" at the time and to the extent the Interrogatory requires the United States to determine, year by year from 2008–2017, when a given Belief began or ended. For the purpose of responding to this Interrogatory, the United States will interpret "Believed" to mean that the personal belief was held at some point during the relevant time period.

The United States further objects that this Interrogatory is vague, confusing, and ambiguous because the phrase "that CMS would not have paid" is undefined and unclear. Because the Interrogatory places no limitation on the phrase "would not have paid," the United States interprets that phrase to mean that CMS would not have made any payments to UnitedHealth for any plans and any beneficiaries, regardless

26

0386

1   of whether the beneficiaries were the subject of Chart Reviews and regardless of

2   whether the diagnoses submitted by UnitedHealth were supported or unsupported.

3   The United States further objects that this Interrogatory is vague, confusing, and

4   ambiguous because the phrase "would not have . . . continued entering into MA

5   contracts with UnitedHealth" is undefined and unclear.  Because the Interrogatory

6   places no limitation on the phrase "would not have . . . continued entering into MA

7   contracts," the United States interprets that phrase to mean that CMS would have

8   terminated all existing contracts and ceased entering into any new MA contracts with

9   UnitedHealth.

10         The United States objects that this Interrogatory is vague, confusing, and

11  ambiguous because it cites one sentence from one paragraph of the United States'

12  Amended Complaint and incorrectly contorts it into a distorted version of the United

13  States' theory of UnitedHealth's liability under the False Claims Act.  The United

14  States alleges that UnitedHealth failed to delete invalid diagnosis codes that it had

15  Knowledge (as defined by the False Claims Act) were not supported by medical

16  records, and therefore knowingly avoided its obligation to pay CMS.  This

17  Interrogatory is vague, ambiguous, confusing, and irrelevant because it focuses on the

18  design of UnitedHealth's Chart Reviews rather than on UnitedHealth's failure to

19  delete known invalid diagnosis codes.  *See* MTD Order, Dkt. 212 at 21 ("As the

20  Government argues, the issue here is not the one-way Chart Review generally, but the

21  specific invalid diagnosis codes that Defendants submitted and failed to delete despite

22  information available to them.").  The United States objects to this Interrogatory as

23  inaccurate, improper, and misleading to the extent that it implies or suggests that the

24  United States' Amended Complaint alleges that particular CMS Individuals held the

25  belief that CMS should terminate payments to or cease continuing to enter into MA

26  contracts with UnitedHealth when the cited portion of the complaint merely alleges in

27  part that "Defendants should and could have compared the results of *all* Chart

28  Reviews to the provider-reported diagnoses and deleted all of the invalid provider-

27

0387

Case 2:16-cv-08697-FMO-PVC     Document 616-3     Filed 08/06/24     Page 391 of 637
Page ID #:19285

1  reported diagnoses that they previously had submitted to the Medicare Program."

2  Am. Compl. ¶ 185, Dkt. 171.

3      The United States objects to this Interrogatory to the extent that it implies a

4  legal conclusion. Specifically, the United States objects to this Interrogatory as being

5  irrelevant and contrary to law insofar as it implies or suggests that termination of

6  payment or discontinuance of contracts is a requirement of materiality under the False

7  Claims Act. It is not. *See* MTD Order, Dkt. 212, at 20–21 ("[t]he Government has

8  adequately pled facts showing that the Defendants have knowingly avoided

9  obligations to repay CMS by failing to delete invalid diagnosis codes, and that such

10 failure was material"); *see also United States ex rel. Campie v. Gilead Sciences, Inc.*,

11 862 F.3d 890, 906 (9th Cir. 2017). This Interrogatory is vague, confusing, and

12 ambiguous because it mischaracterizes the United States' position regarding

13 materiality under the False Claims Act, which is set forth in its Opposition to the

14 Motion to Dismiss, Dkt 194.

15     The United States further objects to this Interrogatory to the extent that it seeks

16 information protected from disclosure by an applicable privilege or protection.

17 **Response:** Subject to and without waiving the foregoing objections, the United

18 States responds that based on the information available, separately for each year in

19 the period 2008 through 2017, it has not identified any CMS individuals who

20 believed or expressed in writing that CMS would have stopped all payments to

21 UnitedHealth for all beneficiaries (whether or not their charts were reviewed) and all

22 diagnoses (whether those diagnoses were supported and unsupported) or would have

23 terminated all contracts with UnitedHealth and ceased entering into new contracts

24 with UnitedHealth if CMS had known that UnitedHealth was not "compar[ing] all

25 chart reviews to the provider reported diagnoses and delet[ing] all of the invalid

26 provider-reported diagnoses that they previously had submitted to the Medicare

27 Program." The United States further responds that UnitedHealth led CMS to believe

28 that UnitedHealth was not deliberately ignoring the negative results of its Chart

28

0388

Review Program that showed UnitedHealth that diagnoses it had submitted to CMS for payment were invalid. CMS had no actual knowledge of the specific invalid diagnosis codes submitted by UnitedHealth until the United States pursued its investigation of the matter underlying this litigation. In this case, CMS is pursuing the overpayments associated with the invalid diagnoses uncovered in the United States' investigation. The United States will supplement its response to this Interrogatory as appropriate.

**INTERROGATORY NO. 6:** For each CMS Individual or HHS-OIG Individual who participated in or was involved in—including but not limited to drafting, analyzing, revising, commenting on, or reviewing—the Study Underlying CMS's Proposed Rule, provide a description, including the Time Period, of his or her participation or involvement. This Interrogatory should be construed to cover the time period January 1, 2004 to June 30, 2019.

**Objections:** The United States incorporates by reference each of its General Objections and Specific Objections to the Definitions and Instructions as if stated herein. The United States objects to the time period of this Interrogatory to the extent it goes beyond the publication date (November 1, 2018) of the Study Underlying CMS's Proposed Rule as overbroad, unduly burdensome, and irrelevant. Identifying individuals who reviewed the Study Underlying CMS's Proposed Rule after it was published has no bearing on the pre-publication development of the Study. Consistent with its Objections to Definitions 3, 10, and 11, the United States interprets this Interrogatory to exclude attorneys and is not searching for, collecting, or providing information or materials from any attorney within OGC, OCIG, or DOJ.

**Response:** Subject to and without waiving the foregoing objections, the United States responds as follows:

- The following individuals reviewed the Study: Jennifer Lazio (October 2017–November 1, 2018); Jennifer Harlow (July 2018–November 1, 2018); Joanne Davis (January 2018–October 2018); Carolyn Kapustij (May 2018–October

2018).

- The following individuals reviewed and commented on the Study: Delois J. Newkirk (2017–November 1, 2018); Blake Pelzer (September 2018–November 1, 2018); Paul Spitalnic (October 2017–November 1, 2018); Richard Coyle (September 2018); Abby Woodroffe (March 2018); Jesse Levy (March 2018).

- The following individuals conducted analysis for the Study: Michelle Hill (2017—November 1, 2018); Richard Griffith (June 2018 to August 2018).

- The following individuals drafted, analyzed, revised, commented on, and reviewed the Study: Jonathan Smith (January 2017–November 1, 2018), Hans Dutt (January 2017–November 1, 2018).

The United States will supplement its response to this Interrogatory as appropriate.

**INTERROGATORY NO. 7:**   Separately for each of the years 2008 to 2017, Identify all CMS Individuals and HHS-OIG Individuals who Believed or expressed in writing that the existence of unsupported codes in CMS's FFS Medicare data has the capacity to impact Risk Adjustment payments to MA Plans.

**Objections:**  The United States incorporates by reference each of its General Objections and Specific Objections to the Definitions and Instructions as if stated herein.  The United States objects to this Interrogatory as overly broad, unduly burdensome, vague, confusing, and ambiguous.  This Interrogatory is overly broad and unduly burdensome because on its face it seeks to require the United States to investigate the communications and beliefs of all of the thousands of current and former CMS employees, current and former HHS-OIG employees, as well as current and former CMS and HHS-OIG contractors for a period of nearly a decade.  This is plainly unreasonable.  The United States objects that the Interrogatory is disproportionate to the needs of this case because the potential relevance is outweighed by the enormous burden sought by the Interrogatory.  Further, the United States objects that this Interrogatory is irrelevant because Government agencies, including CMS and HHS-OIG, act through official policy and regulations and not the

30

0390

beliefs or impressions of individual government agency employees.  For the purposes
of responding to this Interrogatory, the United States has undertaken a reasonable
inquiry to identify information responsive to this Interrogatory, but objects to the
Interrogatory insofar as it purports to require the United States to identify "every"
CMS and HHS-OIG individual who held a Belief and reiterates its statement that
CMS and HHS-OIG only act through official policy and regulations, not through the
private Beliefs of its employees.  The inclusion of any individuals  in response to this
Interrogatory should not be interpreted or construed to mean that these individuals
represent or otherwise reflect the official position of CMS or HHS-OIG.

      The United States further objects to the Interrogatory in that it asks the United
States to search every piece of writing by a given individual,  to determine whether
they ever "expressed in writing" the topic sought by the Interrogatory.  Such an
endeavor is overly broad, unduly burdensome, and not proportional to the needs of
the case.  Moreover, the United States reiterates that any such writings,  if they exist,
do not reflect the official position of CMS or HHS-OIG.  The United States therefore
interprets "expressed in writing" to mean official and public pronouncements on
behalf of CMS.  The United States objects to this Interrogatory as irrelevant and
overly broad to the extent it seeks information about the beliefs and written
expressions of HHS-OIG employees and/or contractors because HHS-OIG does not
make Risk Adjustment payment decisions for CMS.  Therefore, for purposes of
responding to this Interrogatory, the United States will not include "HHS-OIG
Individuals."

      The United States objects to this Interrogatory to the extent that it seeks
information from after May 16, 2017, the parties' agreed-upon discovery cut-off.  For
the purposes of responding to this Interrogatory, the United States interprets this
Interrogatory as seeking information only up to May 16, 2017.

      The United States further objects on the ground that the Interrogatory is vague,
confusing, and unduly burdensome because it seeks a separate answer for each year

31

1  for what an individual "Believed" at the time and to the extent the Interrogatory

2  requires the United States to determine, year by year from 2008–2017, when a given

3  Belief began or ended.  For the purpose of responding to this Interrogatory, the

4  United States will interpret "Believed" to mean that the belief was held at some point

5  during the relevant time period.

6      The United States further objects that the Interrogatory is vague and ambiguous

7  because the terms "codes," "unsupported," "existence," "has the capacity to," and

8  "impact" are not defined terms.  The United States interprets "codes" to mean any

9  data element relevant to a claim when the claim is submitted to CMS for payment.

10  This includes but is not limited ICD-9 and ICD-10 Diagnosis Codes.  The United

11  States interprets "unsupported" to mean, in the context of Diagnosis Codes, that

12  Diagnosis Codes were not supported by the medical record.  The United States

13  interprets "existence" to mean that something was included in the coding in CMS's

14  FFS Medicare claims data at the time the FFS data was incorporated into the CMS

15  HCC Risk Adjustment Model.  The United States interprets "has the capacity to" to

16  mean that something could potentially, theoretically, or in principle, affect Risk

17  Adjustment payments, regardless of whether it did, in fact, affect Risk Adjustment

18  payments.  The United States interprets the term "impact" to include any potential

19  effect whatsoever on Risk Adjustment payments, regardless of whether the effect was

20  significant or insignificant, and regardless of whether the effect resulted in a higher

21  payment or a lower payment to MA Plans.

22  **Response:**  Subject to and without waiving the foregoing objections, the United

23  States identifies the following individuals who Believed or expressed in writing that

24  any inaccuracies, including but not limited to Diagnosis Codes supported by a

25  medical record that were not submitted to CMS or Diagnosis Codes that were

26  submitted to CMS but were not supported by a medical record, in Medicare Fee-For-

27  Service data that existed within that data when it was used to calibrate the Risk

28  Adjustment model, could potentially, theoretically, or in principle, have some effect

32

on the risk adjustment payments made to MA plans, whether the effect occurred in fact or not, whether the Diagnosis Codes were risk adjusting or not, whether the risk adjusting Diagnosis Code was unique or not (with "unique" meaning that the Diagnosis Code was the only risk adjusting Diagnosis Code mapping to a given HCC within the relevant Part C HCC Risk Adjustment Model for a given beneficiary in a given date of service year), whether the effect on risk adjustment payments was significant or not, whether the effect resulted in increased or decreased payments to MA plans.  Individuals who Believed or expressed this in writing include the following:

- Jonathan Smith
- Cheri Rice
- Monica Reed Asante
- Rebecca Paul
- Ashley Franzel
- Jennifer Lazio
- Paul Spitalnic
- Blake Pelzer
- Carolyn Kapustij
- Jennifer Lazio
- Richard Coyle
- Jennifer Harlow
- Hans Dutt

The United States will supplement its response to this Interrogatory as appropriate.

**INTERROGATORY NO. 8**:  Separately for each of the years 2008 to 2017, Identify all CMS Individuals and HHS-OIG Individuals who drafted, revised, analyzed, or commented on language included in CMS's Announcements regarding Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies indicating that MA organizations are coding "accurately" when they are coding in a

33

manner similar to or reflecting the coding used on the beneficiaries in FFS Medicare to whom MA Plan enrollees are being compared. See, e.g., CMS's April 7, 2008, April 6, 2009, and April 1, 2013 Announcements for Calendar Years (CYs) 2009, 2010, and 2014 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies at 20, 20–21, and 30, respectively.

**Objections:** The United States incorporates by reference each of its General Objections and Specific Objections to the Definitions and Instructions as if stated herein. The United States objects to this Interrogatory as irrelevant to the extent that the language referenced from CMS's Annual Announcements is not relevant to a claim or defense in this case. The United States objects to this Interrogatory as vague, confusing, and ambiguous because it mischaracterizes CMS's responses to comments in the Annual Announcements. The United States further objects to this Interrogatory as confusing, vague, and ambiguous to the extent that the Interrogatory does not specifically state the language subject to the inquiry for each year. Further, the United States objects that the Interrogatory's demand to provide information separately for each of the years 2008–2017 is disproportionate to the needs of this case because the potential relevance is outweighed by the enormous burden placed on the United States by this request. Therefore, the United States will not provide the requested information separately for each year.

The United States objects to this Interrogatory to the extent that it seeks information from after May 16, 2017, the parties' agreed-upon discovery cut-off. For the purposes of responding to this Interrogatory, the United States interprets this Interrogatory as seeking information only up to May 16, 2017.

The United States further objects to this Interrogatory to the extent that it seeks information protected from disclosure by an applicable privilege or protection. Consistent with its Objections to Definitions 3, 10, and 11, the United States interprets this Interrogatory to exclude attorneys and is not searching for, collecting, or providing information or materials from any attorney within OGC, OCIG, or DOJ.

34

**Response:** Subject to and without waiving the foregoing objections, the United States responds that after a reasonable inquiry, it has identified the following individuals as responsive to the Interrogatory:

- Anne Calinger
- Ilina Chaudhuri
- Julie Gover
- Jennifer Harlow
- Anne Hornsby
- Joanne Kong
- Thomas Kornfield
- Rebecca Paul
- Monica Reed-Asante
- Cheri Rice
- Kay Schneider
- Julie Uebersax

The United States will supplement its response to this Interrogatory as appropriate.

**INTERROGATORY NO. 9:** Identify all CMS Individuals and HHS-OIG Individuals who participated in or were involved—including but not limited to drafting, developing, analyzing, revising, commenting on, reviewing, or issuing—CMS's Proposed Medical Record Review Rule and the decision not to finalize the Proposed Medical Record Review Rule articulated in the May 23, 2014 Final Rule.

**Objections:** The United States incorporates by reference each of its General Objections and Specific Objections to Definitions set forth above. The United States further objects that this Interrogatory is overly broad, unduly burdensome, vague, confusing and ambiguous.

The United States also objects to this Interrogatory to the extent that it contains multiple discrete subparts that count as separate Interrogatories. *See Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 445 (C.D. Cal. 1998); *see also Ott v. Mortg. Inv'rs Corp.*

35

0395

*of Ohio*, No. 3:14-CV-00645-ST, 2015 WL 691643, at *1 (D. Or. Feb. 17, 2015)

("[O]nce a subpart of an interrogatory introduces a line of inquiry that is separate and distinct from the inquiry made by the portion of the interrogatory that precedes it, the subpart must be considered a separate interrogatory no matter how it is designated."). The Interrogatory requests that the United States: (1) identify "all CMS Individuals and HHS-OIG Individuals who participated in or were involved—including but not limited to drafting, developing, analyzing, revising, commenting on, reviewing, or issuing—CMS's Proposed Medical Record Review Rule" and (2) identify all CMS Individuals and HHS-OIG involved in "the decision not to finalize the Proposed Medical Record Review Rule articulated in the May 23, 2014 Final Rule." UnitedHealth has therefore issued at least 12 interrogatories out of the 25 interrogatories permitted under the Federal Rules. By responding to this Interrogatory, the United States in no way waives its right to object if UnitedHealth exceeds the maximum number of permitted interrogatories.

The United States objects that this Interrogatory is vague and ambiguous because the terms "participated in," "involved," "reviewing," and "issuing" are not defined terms. The United States will interpret each of these terms to have their ordinary meaning. The United States interprets "participated in" and "involved" to mean actively take part in something. The United States interprets "reviewing" to mean examine something formally with the possibility or intention of instituting change, if necessary. The United States interprets "issuing" to mean publishing in the Federal Register official and public pronouncements on behalf of CMS. Based on these objections, the United States will not identify any individuals who only received the language of the proposed rule or individuals who were only involved in the CMS clearance process of the entire rule to the extent those individuals are not otherwise responsive to the Request as defined above.

The United States further objects to this Interrogatory to the extent that it seeks information protected from disclosure by an applicable privilege or protection.

36

0396

Consistent with its Objections to Definitions 3, 10, and 11, the United States interprets this Interrogatory to exclude attorneys and is not searching for, collecting, or providing information or materials from any attorney within OGC, OCIG, or DOJ.

**Response:**  Subject to and without waiving the foregoing objections, the United States responds that after a reasonable inquiry, it has identified the following Individuals as responsive to the Interrogatory:

- Jon Blum
- Maricruz Bonfante
- Shawn Braxton
- Nora Castro
- Sean Cavanaugh
- Ilina Chaudhuri
- Tim Englehardt
- Kellie Simons (Gombeski)
- Julie Gover
- Jennifer Harlow
- Debra Hennessy
- Anne Hornsby
- Amanda Johnson
- Whitney Johnson
- Marie Manteuffel
- Christopher McClintick
- Cheri Rice
- Kay Schneider
- Marilyn Tavenner
- Cynthia Tudor
- Julie Uebersax
- Jim Wickliffe

0397

1    The United States will supplement its response to this Interrogatory as appropriate.

0398

1                                    Respectfully submitted,

2 Dated:  April 21, 2021           MICHAEL D. GRANSTON

3                                    Deputy Assistant Attorney General, Civil Division

4                                    TRACY L. WILKISON
                                   Acting United States Attorney

5                                    DAVID M. HARRIS
                                   ABRAHAM C. MELTZER

6                                    JOHN E. LEE (CBN 128696)
                                   JACK D. ROSS (CBN 265883)
                                   Assistant United States Attorneys

7

8                                    JAMIE ANN YAVELBERG
                                   EDWARD C. CROOKE

9                                    ROBERT McAULIFFE
                                   LINDA M. McMAHON

10                                    JESSICA KRIEG
                                   AMY L. LIKOFF

11                                    MARTHA GLOVER
                                   WENDY ZUPAC

12                                    Civil Division, Department of Justice

13                                    JAMES P. KENNEDY, JR.
                                   United States Attorney

14                                    DAVID CORIELL
                                   Assistant United States Attorney

15

16                                    GREGORY A. MASON

17                                    Attorneys for the United States

18

19

20

21

22

23

24

25

26

27

28

0399

## PROOF OF SERVICE BY ELECTRONIC MAIL

I am over the age of 18 and not a party to the action entitled U.S. *ex rel.* Poehling v. UnitedHealth Group, Inc., CV-16-8697 FMO.  I am employed by the Department of Justice, Civil Division.  My business address is 175 N Street NE, Room 10.224, Washington, D.C. 20002.

On April 21, 2021, I served the foregoing PLAINTIFF UNITED STATES' RESPONSES AND OBJECTIONS TO DEFENDANT UHC OF CALIFORNIA'S SECOND SET OF INTERROGATORIES TO THE GOVERNMENT on each person or entity named below by electronic mail, pursuant to written consent under Federal Rule of Civil Procedure 5(b)(2)(E).

Date of e-mailing:  April 21, 2021.

Place of e-mailing:  Washington, D.C.

Person(s) and/or Entity(s) to whom e-mailed:

See attached page

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 21, 2021, at Washington, D.C.

_____
GREGORY A. MASON

0400

| | |
|---|---|
| David J. Schindler, Esq.<br>david.schindler@lw.com | Eric Havian, Esq.<br>ehavian@constantinecannon.com |
| Daniel Meron, Esq.<br>daniel.meron@lw.com | Jessica Moore, Esq.<br>jmoore@constantinecannon.com |
| Abid, R. Qureshi, Esq.<br>abid.qureshj@lw.com | Henry C. Su, Esq.<br>hsu@constantinecannon.com |
| Anne Robinson, Esq.<br>anne.robinson@lw.com | Anne Hartman, Esq.<br>ahartman@constantinecannon.com |
| Kirstin Scheffler Do, Esq.<br>kirstin.schefflerdo@lw.com | Stephen S. Hasegawa, Esq.<br>shasegawa@phillipsandcohen.com |
| Morgan Maddoux, Esq.<br>Morgan.maddoux@lw.com | Matthew R. Berry, Esq.<br>mberry@susmangodfrey.com |
| David W. Rowe, Esq.<br>david.rowe@lw.com | Arun Subramanian<br>asubramanian@SusmanGodfrey.com |
| | UHG-RelatorsCounsel@Lists.SusmanGodfrey.Com |

**EXHIBIT D-9**

JOSEPH H. HUNT
Assistant Attorney General, Civil Division
NICOLA T. HANNA
United States Attorney
DAVID M. HARRIS
DAVID K. BARRETT
ABRAHAM C. MELTZER
JOHN E. LEE (CBN 128696)
JACK D. ROSS (CBN 265883)
Assistant United States Attorneys
        300 N. Los Angeles Street, Room 7516
        Los Angeles, California 90012
        Tel: (213) 894-7395; Fax: (213) 894-7819
        Email: jack.ross@usdoj.gov
ANDY J. MAO
ROBERT McAULIFFE
EDWARD C. CROOKE
LINDA M. McMAHON
PAUL G. FREEBORNE
JESSICA KRIEG
ZOILA E. HINSON
AMY L. LIKOFF
GREGORY A. MASON
Attorneys, Civil Division, U.S. Department of Justice
        P.O. Box 261, Ben Franklin Station
        Washington, D.C. 20044
        Tel: (202) 305-3173; Fax: (202) 305-7797
        Email: amy.l.likoff@usdoj.gov
JAMES P. KENNEDY, JR.
United States Attorney
KATHLEEN ANN LYNCH
Assistant United States Attorney (Admitted PHV)
        138 Delaware Avenue
        Buffalo, New York 14201
        Tel: (716) 843-5830; Fax: (716) 551-3052
        Email: kathleen.lynch@usdoj.gov
Attorneys for the United States of America

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING,<br><br>Plaintiffs,<br><br>v.<br><br>UNITEDHEALTH GROUP, INC., *et al.*,<br><br>Defendants. | No. CV 16-08697 FMO (SSx)<br><br>UNITED STATES' RESPONSES AND OBJECTIONS TO DEFENDANT UHC OF CALIFORNIA'S REQUESTS FOR ADMISSION TO THE GOVERNMENT (SET NO. TWO) |

0403

**PROPOUNDING PARTY:**    **UHC OF CALIFORNIA, INC.**

**RESPONDING PARTY:**    **UNITED STATES OF AMERICA**

**SET NUMBER:**    **TWO**

## Preliminary Statement

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure ("Federal Rules") and Rule 36 of the Local Civil Rules of the United States District Court for the Central District of California, the United States of America ("United States" or "government"), through its undersigned counsel, provides these responses and objections to Defendant UHC of California's ("UnitedHealth" or "Defendant") Requests for Admission (Set No. Two), dated August 27, 2019 ("Second Requests"). The objections and responses set forth herein are based on information now known to the United States and its undersigned attorneys, and will be revised, corrected, supplemented, amended, and clarified to the extent required by Rule 26 as discovery proceeds.

## General Objections

The following objections apply to each and every separately numbered Request and are incorporated by reference to the extent applicable into the objection to each Request.

1.  The United States objects to the Second Requests to the extent they are vague, ambiguous, overbroad, unduly burdensome, or seek to impose requirements upon the United States beyond those called for or permitted by the Federal Rules of Civil Procedure, the Local Civil Rules of the United States District Court for the Central District of California, or any order of the Court.  The United States responds below pursuant to its obligations under the Federal Rules and the Local Civil Rules, namely that the United States has taken and is continuing to undertake reasonable efforts to identify information responsive to the Requests.

0404

2.  The United States objects to the Second Requests to the extent they seek the disclosure of information concerning the United States' investigation of this matter as well as the United States' investigation in *United States of America ex rel. Swoben v. SCAN Health Plan, et al., CV* 09-5013 (JEMx), 2017 U.S. Dist. LEXIS 174308 (C.D. Cal. Oct. 5, 2017) ("*Swoben*").  This includes, but is not limited to, the United States' investigative efforts, its assessments of facts and allegations, its deliberative processes concerning actions taken regarding this matter and *Swoben*, and other information generated before and after the commencement of both this litigation and *Swoben*.  The United States objects on the grounds that such information is privileged, work product protected, not relevant to claims or defenses, and not proportional to the needs of the case.

3.  The United States objects to logging the following information withheld on the basis of privilege regarding both this and the *Swoben* action: (a) communications between or among attorneys at the United States Department of Justice (DOJ), including, but not limited to, attorneys at DOJ's Civil Division and the United States Attorneys' Offices both during the Government's pre-complaint investigation and after the Government commenced action;  (b) communications between or among attorneys at DOJ and attorneys at the United States Department of Health & Human Services (HHS) both during the Government's pre-complaint investigation and after the Government commenced action; (c) communications between or among attorneys at DOJ and counsel for Relator James Swoben and/or counsel for Relator Benjamin Poehling during the Government's pre-complaint investigation and after the Government commenced action; (d) work product or other privileged documents generated by or sent to or from attorneys for DOJ, HHS, Relator James Swoben and/or Relator Benjamin Poehling and any of agents or contractors for said attorneys both during the Government's pre-complaint investigation and after the Government commenced action.  The United States asserts this objection on the grounds that such effort would impose undue and extraordinary burdens on the United States, seek

3

information not relevant to the claims and defenses in this action, and be disproportionate to the needs of this case.

4.  Pursuant to Rule 36, any admissions contained herein are for purposes of the present action only and shall not be taken as admissions for any other purpose, including for purposes of any other case.

5.  By making the accompanying responses and objections to Defendant's Second Requests, the government does not waive, and hereby expressly reserves, its right to assert any and all objections as to the admissibility of any documents, testimony, or information into evidence in this action, or in any other proceedings, on any and all grounds including, but not limited to, competency, relevancy, materiality, privilege, or admissibility.  Further, the government makes the responses and objections herein without in any way implying that it considers the Second Requests to be relevant or material to the subject matter of this action.

6.  The United States objects to the below Second Requests to the extent that a response to such Request requires disclosure of information protected from disclosure by an applicable privilege or protection, including, but not limited to, the attorney-client privilege, work product doctrine, deliberative process privilege, law enforcement privilege, common interest privilege, or investigative files privilege, and protections afforded by Fed. R. Civ. P. 26(b), or any other applicable privilege. The United States will not respond in such a way as to disclose such protected information, but inadvertent identification or disclosure of privileged information by the United States shall not be a waiver of any applicable privilege. Under Federal Rule of Evidence 502, Federal Rule of Civil Procedure 26(b)(5)(B), other related sources of law, and the Court's order regarding inadvertent disclosure of privileged information [Doc. 198], the government reserves any and all rights to claw back privileged information it inadvertently discloses in response to the Requests.

7.  The United States submits these responses subject to, without intending to waive, but expressly reserving the right to object to other discovery procedures

4

0406

involving or relating to the subject matter of the information in responses to the Second Requests. The United States reserves the right to object on any ground, at any time, to such other or supplemental requests as the Defendants may propound involving or relating to the subject matter of these Requests.

8.  The United States objects to the Second Requests to the extent they are based on inaccurate assumptions or misstatements of fact or misconstructions of law. Nothing herein is intended to concede the accuracy of the assumptions, facts, or law underlying the Second Requests.

9.  The United States reserves the right to supplement its responses to each and every Request at any time, up to and including trial, as provided by the Federal Rules.

10. The assertion of the same, similar, or additional objections to the below Second Requests does not and should not be construed to waive or modify any of the United States' general objections.

11. The United States objects to the Second Requests to the extent they require the United States to draw legal conclusions, comment on the merits of any affirmative defenses, or otherwise seek to impose any requirements beyond those established by the Federal Rules or the Local Rules.

## Specific Objections to the Definitions and Instructions

The United States objects to the Definitions and Instructions to the extent they (i) seek to impose burdens on the United States that are different from, inconsistent with, or exceed those imposed by the Federal Rules of Civil Procedure and the Local Civil Rules, (ii) are vague or ambiguous, and/or (iii) render the Second Requests overly broad, unduly burdensome, not proportionate to the needs of the case, and not relevant. The United States further objects to the Second Requests to the extent they use terms not defined by UnitedHealth.

**Definitions 5, 9, and 14:**  The United States objects to the definition of "Government" (Definition 9) to the extent it includes any branch, agency, department, agent, representative, contractor, attorney, consultant, or person acting on

0407

1    its behalf not relevant to this action.  This definition is plainly unreasonable.  Subject

2    to and without waiving these objections, the United States interprets "Government" to

3    mean CMS for purposes of the Second Requests.  The United States further objects to

4    the term "Person" (Definition 14) to the extent it is defined to mean "the federal

5    government and all departments and agencies thereof, state governments, local

6    governments, other governmental agencies."  The United States objects to the

7    definitions of "CMS" (Definition 5), "Government" (Definition 9), and "Person"

8    (Definition 14) as unduly burdensome and disproportionate to the needs of the case to

9    the extent they require the United States to provide information not currently in the

10   possession, custody, or control of CMS, HHS Office of the Secretary and Immediate

11   Office of the Secretary and HHS-OIG.  Furthermore, the United States objects to the

12   extent each definition includes former CMS contractors for whom the United States

13   presently has no reasonable belief they possess or control non-duplicative information

14   relevant to any claim or defense in this case.

15   **Definitions 10 and 16:**  The United States objects to the definitions of "including,"

16   "relating to," and "regarding" as rendering the Second Requests vague, ambiguous,

17   confusing, overly broad, and unduly burdensome and disproportionate to the needs of

18   the case.  Indeed, these terms as defined to seek any piece of information that in some

19   way – no matter how remote, indirect, or tangential – mentions or references matters

20   set forth in the Request.  The United States responds to these Second Requests by

21   using these terms and the verbs constituting their definitions as limited by the

22   constraining adverb "directly."

23   **Definition 11:**  The United States objects to the definition of "March 2014 Meeting"

24   to the extent that it includes a specific date in March that has not been established by

25   the evidence in this matter.

26   **Definition 12:**  The United States objects to the definition of "Spring 2014 Phone

27   Call" to the extent that it includes specific dates in March and April that have not

28   been established by the evidence in this matter.

6

0408

**Definition 13:**  The United States also objects to the definition of "Medicare Advantage Organization" and "MAO" (Definition 13) to the extent it is inconsistent with the definition provided by 42 U.S.C. § 1395w-28(a)(1).  For the purpose of responding to the Requests, the United States shall use the definition of MA Plans provided by 42 U.S.C. § 1395w-28(b)(1) and the definition of MAO provided by 42 U.S.C. § 1395w-28(a)(1).

**Definition 18:**  The United States objects to the definition of "State" to the extent it seeks to impose burdens on the United States that are different from, inconsistent with, or exceed those imposed by the Federal Rules of Civil Procedure and the Local Civil Rules.

**Definition 22:**  The United States objects to the definition of "you" and "your" to the extent these terms are intend to encompass any agency, office, employee, agent, representative, officer, or contractor of either the legislative or judicial branch, and insofar as these terms are defined to include executive branch agencies and offices not relevant to this action.  This is plainly unreasonable.  Subject to and without waiving these objections, the United States will interpret this term to mean CMS.

**Instruction 3:**  The United States objects to Instruction 3 as vague and construes each request to include the time period from January 1, 2004 through May 16, 2017.

**Instructions 4:**  The United States objects to Instruction 4 to the extent it seeks to impose burdens upon the United States beyond those called for or permitted by the Federal Rules or the Local Rules for the Central District of California.  The United States will respond to unobjectionable Requests or portions of Requests to the best of its present ability.  The United States submits these responses subject to, without intending to waive, but expressly reserving the right to revise, correct, supplement or clarify any of the responses herein at any time up to and including trial.  Said responses are at all times without prejudice subject to such additional or different information that discovery or further investigation may disclose.

**Instruction 5:**  The United States objects to Instruction 5 to the extent it seeks to

0409

impose burdens upon the United States beyond those called for or permitted by the

Federal Rules or the Local Rules for the Central District of California.

**Instruction 6:**  The United States objects to Instruction 6 to the extent it seeks to

impose burdens upon the United States beyond those called for or permitted by the

Federal Rules or the Local Rules for the Central District of California.  The United

States will assert any applicable privileges and specify the material to which it applies

per Fed. R. Civ. P. 25(b)(5)(A) for all information responsive to a request to which

the United States has agreed to produce but which is withheld on the basis of a

privilege or protection.

0410

1

## Specific Objections and Responses to Requests for Admission

2 **REQUEST FOR ADMISSION NO. 18:**    Admit that during the March 2014

3 Meeting, Jonathan Blum met Larry Renfro in person.

4 **Objection:**  The United States incorporates its General Objections and Specific

5 Objections to the Definitions and Instructions as if stated herein, including but not

6 limited to, its specific objections to the definition of "March 2014 Meeting."  The

7 United States objects to this Request to the extent it calls for information that is

8 already in UnitedHealth's possession, custody, or control, or is otherwise available to

9 UnitedHealth and to the extent that UnitedHealth is using this information to

10 mischaracterize or misinterpret the facts.  The United States objects to this Request to

11 the extent it seeks information not relevant to a claim or defense in this case.

12 **Response:**  Subject to and without waiving the foregoing objections, including

13 regarding the specific date implicated, the United States admits this Request.

14 **REQUEST FOR ADMISSION NO. 19:**    Admit that Larry Renfro requested the

15 March 2014 Meeting with Jonathan Blum.

16 **Objection:**  The United States incorporates its General Objections and Specific

17 Objections to the Definitions and Instructions as if stated herein, including but not

18 limited to, its specific objections to the definition of "March 2014 Meeting."  The

19 United States objects to this Request to the extent it calls for information that is

20 already in UnitedHealth's possession, custody, or control, or is otherwise available to

21 UnitedHealth and to the extent that UnitedHealth is using this information to

22 mischaracterize or misinterpret the facts.  The United States objects to this Request to

23 the extent it seeks information not relevant to a claim or defense in this case.

24 **Response:**  Subject to and without waiving the foregoing objections, including

25 regarding the specific date implicated, the United States admits this Request to the

26 extent that Larry Renfro requested a meeting with Jonathan Blum during this general

27 time frame although Mr. Blum did not know the topic of the requested meeting ahead

28 of time.

9

1   **REQUEST FOR ADMISSION NO. 20:**    Admit that the March 2014 Meeting

2   between Jonathan Blum and Larry Renfro took place in Washington, D.C.

3   **Objection:**  The United States incorporates its General Objections and Specific

4   Objections to the Definitions and Instructions as if stated herein, including but not

5   limited to, its specific objections to the definition of "March 2014 Meeting."  The

6   United States objects to this Request to the extent it calls for information that is

7   already in UnitedHealth's possession, custody, or control, or is otherwise available to

8   UnitedHealth and to the extent that UnitedHealth is using this information to

9   mischaracterize or misinterpret the facts.  The United States objects to this Request to

10  the extent it seeks information not relevant to a claim or defense in this case.

11  **Response:**  Subject to and without waiving the foregoing objections, including

12  regarding the specific date implicated, the United States admits this Request.

13  **REQUEST FOR ADMISSION NO. 21:**    Admit that no other Person attended the

14  March 2014 Meeting between  Jonathan Blum and Larry Renfro.

15  **Objection:**  The United States incorporates its General Objections and Specific

16  Objections to the Definitions and Instructions as if stated herein, including but not

17  limited to, its specific objections to the definitions of  "Person" and "March 2014

18  Meeting."  The United States objects to this Request to the extent it calls for

19  information that is already in UnitedHealth's possession, custody, or control, or is

20  otherwise available to UnitedHealth and to the extent that UnitedHealth is using this

21  information to mischaracterize or misinterpret the facts.  The United States objects to

22  this Request to the extent it seeks information not relevant to a claim or defense in

23  this case.

24  **Response:**  Subject to and without waiving the foregoing objections, including

25  regarding the specific date implicated, the United States admits this Request.

26  **REQUEST FOR ADMISSION NO. 22:**    Admit that Jonathan Blum took notes

27  during the March 2014 Meeting with  Larry Renfro.

28  **Objection:**  The United States incorporates its General Objections and Specific

10

0412

1  Objections to the Definitions and Instructions as if stated herein, including but not

2  limited to, its specific objections to the definition of "March 2014 Meeting."  The

3  United States objects to this Request to the extent it calls for information that is

4  already in UnitedHealth's possession, custody, or control, or is otherwise available to

5  UnitedHealth and to the extent that UnitedHealth is using this information to

6  mischaracterize or misinterpret the facts.

7  **Response:**  Subject to and without waiving the foregoing objections, including

8  regarding the specific date implicated, the United States denies this Request.

9  **REQUEST FOR ADMISSION NO. 23:**    Admit that after the March 2014

10  Meeting between Jonathan Blum and Larry  Renfro, Jonathan Blum took notes about

11  or otherwise memorialized the meeting in  writing.

12  **Objection:**  The United States incorporates its General Objections and Specific

13  Objections to the Definitions and Instructions as if stated herein, including but not

14  limited to, its specific objections to the definition of "March 2014 Meeting."  The

15  United States also objects to this Request to the extent that the undefined phrase "or

16  otherwise memorialized" is vague and ambiguous.  For the purposes of this Request,

17  the United States defines "memorialized" as put in writing.

18  **Response:**  Subject to and without waiving the foregoing objections, including

19  regarding the specific date implicated, the United States denies this Request.

20  **REQUEST FOR ADMISSION NO. 24:**    Admit that after the March 2014

21  Meeting between Jonathan Blum and Larry  Renfro, Jonathan Blum had

22  Communications with the Government regarding the  meeting.

23  **Objection:**  The United States incorporates its General Objections and Specific

24  Objections to the Definitions and Instructions as if stated herein, including but not

25  limited to, its specific objections to the definitions of "March 2014 Meeting" and

26  "Government."  The United States objects to this Request to the extent it seeks

27  disclosure of information that is protected from disclosure by an applicable privilege

28  or protection, including the attorney-client privilege, attorney work-product doctrine,

0413

deliberative process privilege, and/or investigative files privilege. For the purposes of this Request, the United States will interpret the definition of "Government" to include only CMS.

**Response:** Subject to and without waiving the foregoing objections, including regarding the specific date implicated, the United States admits this Request.

**REQUEST FOR ADMISSION NO. 25:**    Admit that during the March 2014 Meeting, Jonathan Blum discussed  UnitedHealth's Claims Verification Program with Larry Renfro.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "March 2014 Meeting."  The United States also objects to this Request to the extent that the undefined term "discussed" is vague and ambiguous.  For purposes of this Request, the United States defines "discussed" as a back and forth conversation on a particular topic.  The United States further objects to this Request to extent it is duplicative of Requests for Admission Nos. 29 and 30.  The United States also objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth and to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts.

**Response:**  Subject to and without waiving the foregoing objections, including regarding the specific date implicated, the United States denies this Request.  To the extent it is possible Larry Renfro raised the topic of Claims Verification at this time, Jonathan Blum did not have a sufficient understanding of UnitedHealth's processes to engage in a discussion with Mr. Renfro.

**REQUEST FOR ADMISSION NO. 26:**    Admit that during the March 2014 Meeting, Jonathan Blum discussed the  Proposed Medical Record Review Rule with Larry Renfro.

**Objection:**  The United States incorporates its General Objections and Specific

0414

1   Objections to the Definitions and Instructions as if stated herein, including but not

2   limited to, its specific objections to the definition of "March 2014 Meeting." The

3   United States also objects to this Request to the extent that the undefined term

4   "discussed" is vague and ambiguous. For purposes of this Request, the United States

5   defines "discussed" as a back and forth conversation on a particular topic. The

6   United States also objects to this Request to the extent it calls for information that is

7   already in UnitedHealth's possession, custody, or control, or is otherwise available to

8   UnitedHealth and to the extent that UnitedHealth is using this information to

9   mischaracterize or misinterpret the facts.

10  **Response:** Subject to and without waiving the foregoing objections, including

11  regarding the specific date implicated, the United States admits that Larry Renfro

12  asked Jonathan Blum for clarification regarding the Proposed Medical Record

13  Review Rule during their one-on-one meeting in approximately March 2014. The

14  United States denies the remainder of this Request.

15  **REQUEST FOR ADMISSION NO. 27:**    Admit that during the March 2014

16  Meeting, Larry Renfro asked Jonathan  Blum what new requirements the Proposed

17  Medical Record Review Rule would  impose on MAOs.

18  **Objection:** The United States incorporates its General Objections and Specific

19  Objections to the Definitions and Instructions as if stated herein, including but not

20  limited to, its specific objections to the definition of "March 2014 Meeting" and

21  "MAO." The United States objects to this Request to the extent it calls for

22  information that is already in UnitedHealth's possession, custody, or control, or is

23  otherwise available to UnitedHealth and to the extent that UnitedHealth is using this

24  information to mischaracterize or misinterpret the facts. The United States objects to

25  this Request to the extent it calls for any legal conclusion.

26  **Response:** Subject to and without waiving the foregoing objections, including

27  regarding the specific date implicated, the United States admits that Larry Renfro

28  asked Jonathan Blum for clarification regarding the Proposed Medical Record

13

Review Rule during their one-on-one meeting in approximately March 2014.

**REQUEST FOR ADMISSION NO. 28:**    Admit that during the March 2014 Meeting, Larry Renfro told Jonathan Blum  that the Proposed Medical Record Review Rule would require MAOs to conduct  Two-Way Looks beginning January 1, 2015.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "March 2014 Meeting" and "MAO."  The United States objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth and to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts.  The United States objects to this Request to the extent it calls for any legal conclusion.

**Response:**  Subject to and without waiving the foregoing objections, including regarding the specific date implicated, the United States admits that Larry Renfro asked Jonathan Blum for clarification regarding the Proposed Medical Record Review Rule during their one-on-one meeting in approximately March 2014. However, the United States responds that, after a reasonable inquiry, it lacks sufficient information to admit or deny the remainder of this Request.

**REQUEST FOR ADMISSION NO. 29:**    Admit that during the March 2014 Meeting, Larry Renfro told Jonathan Blum  that UnitedHealth had been conducting a Claims Verification Program.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "March 2014 Meeting."  The United States objects to this Request to extent it is duplicative of Request for Admission Nos. 25 and 30.  The United States also objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or

14

0416

1  control, or is otherwise available to UnitedHealth and to the extent that UnitedHealth

2  is using this information to mischaracterize or misinterpret the facts.

3  **Response:**    Subject to and without waiving the foregoing objections, including

4  regarding the specific date implicated, the United States responds that, after a

5  reasonable inquiry, it lacks sufficient information to admit or deny this Request.  To

6  the extent it is possible Larry Renfro raised the topic of Claims Verification at this

7  time, Jonathan Blum did not have a sufficient understanding of UnitedHealth's

8  processes to engage in a discussion with Mr. Renfro.

9  **REQUEST FOR ADMISSION NO. 30:**    Admit that during the March 2014

10  Meeting, Larry Renfro told Jonathan Blum  that UnitedHealth had been conducting a

11  Claims Verification Program since  approximately 2012.

12  **Objection:**  The United States incorporates its General Objections and Specific

13  Objections to the Definitions and Instructions as if stated herein, including but not

14  limited to, its specific objections to the definition of "March 2014 Meeting."  The

15  United States objects to this Request to extent it is duplicative of Request for

16  Admission Nos. 25 and 29.  The United States also objects to this Request to the

17  extent it calls for information that is already in UnitedHealth's possession, custody, or

18  control, or is otherwise available to UnitedHealth and to the extent that UnitedHealth

19  is using this information to mischaracterize or misinterpret the facts.

20  **Response:**  Subject to and without waiving the foregoing objections, including

21  regarding the specific date implicated, the United States responds that, after a

22  reasonable inquiry, it lacks sufficient information to admit or deny this Request.  To

23  the extent it is possible Larry Renfro raised the topic of Claims Verification at this

24  time, Jonathan Blum did not have a sufficient understanding of UnitedHealth's

25  processes to engage in a discussion with Mr. Renfro.

26  **REQUEST FOR ADMISSION NO. 31:**    Admit that during the March 2014

27  Meeting, Jonathan Blum told Larry Renfro  there was no then-current requirement for

28  MAOs to conduct Two-Way Looks when  conducting reviews of a Member's

15

1    medical records.

2    **Objection:**  The United States incorporates its General Objections and Specific

3    Objections to the Definitions and Instructions as if stated herein, including but not

4    limited to, its specific objections to the definition of "March 2014 Meeting" and

5    "MAO."  The United States also objects to this Request to the extent that the

6    undefined phrase "reviews of a Member's medical records" is vague and ambiguous.

7    The United States interprets this phrase to mean Chart Review for purposes of this

8    request.  The United States objects to this Request to the extent it calls for

9    information that is already in UnitedHealth's possession, custody, or control, or is

10   otherwise available to UnitedHealth and to the extent that UnitedHealth is using this

11   information to mischaracterize or misinterpret the facts.  The United States objects to

12   this Request to the extent it calls for any legal conclusion.

13   **Response:**  Subject to and without waiving the foregoing objections, including

14   regarding the specific date implicated, the United States denies this Request.

15   **REQUEST FOR ADMISSION NO. 32:**    Admit that during the March 2014

16   Meeting, Larry Renfro asked Jonathan  Blum whether UnitedHealth should conduct

17   its Claims Verification Program before  the Proposed Medical Record Review Rule

18   took effect.

19   **Objection:**  The United States incorporates its General Objections and Specific

20   Objections to the Definitions and Instructions as if stated herein, including but not

21   limited to, its specific objections to the definition of "March 2014 Meeting."  The

22   United States objects to this Request to the extent it calls for information that is

23   already in UnitedHealth's possession, custody, or control, or is otherwise available to

24   UnitedHealth and to the extent that UnitedHealth is using this information to

25   mischaracterize or misinterpret the facts.  The United States objects to this Request to

26   the extent it calls for any legal conclusion.

27   **Response:**  Subject to and without waiving the foregoing objections, including

28   regarding the specific date implicated, the United States admits that Larry Renfro

16

0418

asked Jonathan Blum for clarification regarding the Proposed Medical Record Review Rule during their one-on-one meeting in approximately March 2014. To the extent it is possible Larry Renfro raised the topic of Claims Verification at this time, Jonathan Blum did not have a sufficient understanding of UnitedHealth's processes to engage in a discussion with Mr. Renfro.

**REQUEST FOR ADMISSION NO. 33:**    Admit that during the March 2014 Meeting, Larry Renfro asked Jonathan  Blum whether UnitedHealth should conduct Two-Way Looks when conducting  reviews of a Member's medical records before the Proposed Medical Record Review  Rule took effect.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "March 2014 Meeting."  The United States also objects to this Request to the extent that the undefined phrase "reviews of a Member's medical records" is vague and ambiguous.  The United States interprets this phrase to mean Chart Review for purposes of this request.  The United States objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth and to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts.  The United States objects to this Request to the extent it calls for any legal conclusion.

**Response:**  Subject to and without waiving the foregoing objections, including regarding the specific date implicated, the United States admits that Larry Renfro asked Jonathan Blum for clarification regarding the Proposed Medical Record Review Rule during their one-on-one meeting in approximately March 2014.  To the extent it is possible Larry Renfro raised the topic of UnitedHealth's Chart Review, Jonathan Blum did not have a sufficient understanding of UnitedHealth's processes to engage in a discussion with Mr. Renfro.

**REQUEST FOR ADMISSION NO. 34:**    Admit that during the March 2014

17

0419

1    Meeting, Jonathan Blum told Larry Renfro  he would look into Renfro's question

2    about whether UnitedHealth should continue  to conduct Two-Way Looks in its

3    Claims Verification Program before the Proposed  Medical Record Review Rule went

4    into effect.

5    **Objection:**  The United States incorporates its General Objections and Specific

6    Objections to the Definitions and Instructions as if stated herein, including but not

7    limited to, its specific objections to the definition of "March 2014 Meeting."  The

8    United States also objects to this Request to the extent that the undefined phrases

9    "look into" and "continue" are vague and ambiguous.  The United States objects to

10   this Request to the extent it calls for information that is already in UnitedHealth's

11   possession, custody, or control, or is otherwise available to UnitedHealth and to the

12   extent that UnitedHealth is using this information to mischaracterize or misinterpret

13   the facts.  The United States objects to this Request to the extent it calls for any legal

14   conclusion.

15   **Response:**  Subject to and without waiving the foregoing objections, including

16   regarding the specific date implicated, the United States admits that Jonathan Blum

17   agreed to follow-up with individuals from CMS's staff regarding Larry Renfro's

18   request for clarity regarding the Proposed Medical Record Review Rule.  However,

19   the United States denies the remainder of this Request.

20   **REQUEST FOR ADMISSION NO. 35:**     Admit that Jonathan Blum spoke to

21   Larry Renfro via telephone during the  Spring 2014 Phone Call.

22   **Objection:**  The United States incorporates its General Objections and Specific

23   Objections to the Definitions and Instructions as if stated herein, including but not

24   limited to, its specific objections to the definition of "Spring 2014 Phone Call."  The

25   United States objects to this Request to the extent it calls for information that is

26   already in UnitedHealth's possession, custody, or control, or is otherwise available to

27   UnitedHealth and to the extent that UnitedHealth is using this information to

28   mischaracterize or misinterpret the facts.

18

0420

1  **Response:**  Subject to and without waiving the foregoing objections, including

2  regarding the specific date implicated, the United States admits this Request.

3  **REQUEST FOR ADMISSION NO. 36:**    Admit that Jonathan Blum spoke to

4  Larry Renfro during the Spring 2014  Phone Call to discuss UnitedHealth's Claims

5  Verification Program.

6  **Objection:**  The United States incorporates its General Objections and Specific

7  Objections to the Definitions and Instructions as if stated herein, including but not

8  limited to, its specific objections to the definition of "Spring 2014 Phone Call."  The

9  United States also objects to this Request to the extent that the undefined term

10  "discuss" is vague and ambiguous.  For purposes of this Request, the United States

11  defines "discuss" as a back and forth conversation on a particular topic.  The United

12  States objects to this Request to the extent it calls for information that is already in

13  UnitedHealth's possession, custody, or control, or is otherwise available to

14  UnitedHealth and to the extent that UnitedHealth is using this information to

15  mischaracterize or misinterpret the facts.

16  **Response:**  Subject to and without waiving the foregoing objections, including

17  regarding the specific date implicated, the United States admits that Jonathan Blum

18  spoke with Larry Renfro by telephone as a follow-up to their earlier in-person

19  meeting.  However, to the extent it is possible Larry Renfro raised the topic of

20  UnitedHealth's Claims Verification Program, Jonathan Blum did not have a sufficient

21  understanding of UnitedHealth's processes to engage in a discussion with Mr.

22  Renfro.

23  **REQUEST FOR ADMISSION NO. 37:**    Admit that Jonathan Blum spoke to

24  Larry Renfro during the Spring 2014  Phone Call to discuss conducting Two-Way

25  Looks when conducting reviews of a  Member's medical records.

26  **Objection:**  The United States incorporates its General Objections and Specific

27  Objections to the Definitions and Instructions as if stated herein, including but not

28  limited to, its specific objections to the definition of "Spring 2014 Phone Call."  The

0421

1  United States also objects to this Request to the extent that the undefined phrase

2  "reviews of a Member's medical records" is vague and ambiguous.  The United

3  States interprets this phrase to mean Chart Review for purposes of this request.  The

4  United States also objects to this Request to the extent that the undefined term

5  "discuss" is vague and ambiguous.  For purposes of this Request, the United States

6  defines "discuss" as a back and forth conversation on a particular topic.  The United

7  States objects to this Request to the extent it calls for information that is already in

8  UnitedHealth's possession, custody, or control, or is otherwise available to

9  UnitedHealth and to the extent that UnitedHealth is using this information to

10  mischaracterize or misinterpret the facts.  The United States objects to this Request

11  to the extent it calls for any legal conclusion.

12  **Response:**  Subject to and without waiving the foregoing objections, including

13  regarding the specific date implicated, the United States admits that Jonathan Blum

14  spoke with Larry Renfro by telephone as a follow-up to their earlier in-person

15  meeting.  However, the United States denies the remainder of this Request.

16  **REQUEST FOR ADMISSION NO. 38:**     Admit that Jonathan Blum took notes

17  during the Spring 2014 Phone Call.

18  **Objection:**  The United States incorporates its General Objections and Specific

19  Objections to the Definitions and Instructions as if stated herein, including but not

20  limited to, its specific objections to the definition of "Spring 2014 Phone Call."

21  **Response:**  Subject to and without waiving the foregoing objections, including

22  regarding the specific date implicated, the United States denies this Request.

23  **REQUEST FOR ADMISSION NO. 39:**     Admit that after the Spring 2014 Phone

24  Call, Jonathan Blum took notes about  or otherwise memorialized the meeting in

25  writing.

26  **Objection:**  The United States incorporates its General Objections and Specific

27  Objections to the Definitions and Instructions as if stated herein, including but not

28  limited to, its specific objections to the definition of "Spring 2014 Phone Call."  The

20

1  United States also objects to this Request to the extent that the undefined phrases "or

2  otherwise memorialized" and "the meeting" are vague and ambiguous.  For the

3  purposes of this Request, the United States defines "memorialized" as put in writing

4  and "the meeting" as a phone call between Mr. Renfro and Mr. Blum in

5  approximately Spring 2014.

6  **Response:**  Subject to and without waiving the foregoing objections, including

7  regarding the specific date implicated, after a reasonable inquiry, the United States

8  responds that it lacks sufficient information to admit or deny this Request.  To the

9  extent the United States identifies any writing by Mr. Blum regarding the phone call

10  between Mr. Renfro and Mr. Blum in approximately Spring 2014, it will supplement

11  this Response.

12  **REQUEST FOR ADMISSION NO. 40:**    Admit that after the Spring 2014 Phone

13  Call, Jonathan Blum had  Communications with the Government about the Spring

14  2014 Phone Call.

15  **Objection:**  The United States incorporates its General Objections and Specific

16  Objections to the Definitions and Instructions as if stated herein, including but not

17  limited to, its specific objections to the definition of "Spring 2014 Phone Call" and

18  "Government."  The United States objects to this Request to the extent it seeks

19  disclosure of information that is protected from disclosure by an applicable privilege

20  or protection, including the attorney-client privilege, attorney work-product doctrine,

21  deliberative process privilege, and/or investigative files privilege.  For the purposes

22  of this Request, the United States will interpret the definition of "Government" to

23  include only CMS.

24  **Response:**  Subject to and without waiving the foregoing objections, including

25  regarding the specific date implicated, after a reasonable inquiry, the United States

26  responds that it lacks sufficient information to admit or deny this Request.

27  **REQUEST FOR ADMISSION NO. 41:**    Admit that no other Person from the

28  Government participated in the Spring  2014 Phone Call.

0423

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definitions of "Spring 2014 Phone Call," "Government," and "Person."  For the purposes of this Request, the United States will interpret the definition of "Government" to include only CMS.  The United States objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth and to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts.

**Response:**  Subject to and without waiving the foregoing objections, including regarding the specific date implicated, the United States admits this Request.

**REQUEST FOR ADMISSION NO. 42:**    Admit that Jonathan Blum did not Audio Record the Spring 2014 Phone Call.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "Spring 2014 Phone Call."

**Response:**  Subject to and without waiving the foregoing objections, including regarding the specific date implicated, the United States admits this Request.

**REQUEST FOR ADMISSION NO. 43:**    Admit that the Government did not Audio Record the Spring 2014 Phone Call.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definitions of "Spring 2014 Phone Call" and "Government."  The United States further objects to this request because it is unduly burdensome for the United States to determine the actions of all "agencies, departments, components, agents, representatives, contractors, attorneys, consultants, and all other Persons acting on its behalf."

**Response:**  Subject to and without waiving the foregoing objections, including

regarding the specific date implicated, the United States admits that Jonathan Blum did not audio record the phone call, but after a reasonable inquiry, the United States responds that it lacks sufficient information to admit or deny this Request with respect to the entire United States Government.

**REQUEST FOR ADMISSION NO. 44:**    Admit that during the Spring 2014 Phone Call, Jonathan Blum told Larry Renfro that MAOs other than UnitedHealth were asking if MAOs were required to conduct Two-Way Looks before the Proposed Medical Record Review Rule took effect.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definitions of "Spring 2014 Phone Call" and "MAO."  The United States objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth and to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts.  The United States objects to this Request to the extent it calls for any legal conclusion.

**Response:**  Subject to and without waiving the foregoing objections, including regarding the specific date implicated, the United States responds that, after a reasonable inquiry, it lacks sufficient information to admit or deny this Request.

**REQUEST FOR ADMISSION NO. 45:**    Admit that during the Spring 2014 Phone Call, Jonathan Blum told Larry Renfro that the Proposed Medical Record Review Rule was not retroactive.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "Spring 2014 Phone Call."  The United States objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth and to the extent that UnitedHealth is using this information to

23

0425

1  mischaracterize or misinterpret the facts.  The United States objects to this Request to

2  the extent it calls for any legal conclusion.

3  **Response:**  Subject to and without waiving the foregoing objections, including

4  regarding the specific date implicated, the United States denies this Request.

5  Jonathan Blum responded to Larry Renfro's inquiry simply by telling him to read the

6  Proposed Medical Record Rule.

7  **REQUEST FOR ADMISSION NO. 46:**    Admit that Marilyn Tavenner spoke on

8  the phone with Larry Renfro on  April 8, 2014.

9  **Objection:**  The United States incorporates its General Objections and Specific

10  Objections to the Definitions and Instructions as if stated herein.  The United States

11  objects to this Request to the extent it seeks information not relevant to a claim or

12  defense in this case.  The United States objects to this Request to the extent it calls for

13  information that is already in UnitedHealth's possession, custody, or control, or is

14  otherwise available to UnitedHealth as it is duplicative of information sought and

15  obtained by UnitedHealth in the February 28, 2018 deposition of Marilyn Tavenner.

16  The United States additionally objects to the extent that UnitedHealth is using this

17  information to mischaracterize or misinterpret the facts.

18  **Response:**  Subject to and without waiving the foregoing objections, the United

19  States admits that Marilyn Tavenner spoke by telephone with Larry Renfro in the

20  Spring of 2014, but after a reasonable inquiry, responds that it lacks sufficient

21  information to admit or deny whether a telephone call took place on April 8, 2014.

22  **REQUEST FOR ADMISSION NO. 47:**    Admit that Larry Renfro requested the

23  April 8, 2014 call with Marilyn  Tavenner.

24  **Objection:**  The United States incorporates its General Objections and Specific

25  Objections to the Definitions and Instructions as if stated herein.  The United States

26  objects to this Request to the extent it calls for information that is already in

27  UnitedHealth's possession, custody, or control, or is otherwise available to

28  UnitedHealth as it is duplicative of information sought and obtained by UnitedHealth

24

0426

1  in the February 28, 2018 deposition of Marilyn Tavenner.  The United States

2  additionally objects to the extent that UnitedHealth is using this information to

3  mischaracterize or misinterpret the facts.

4  **Response:**  Subject to and without waiving the foregoing objections, the United

5  States admits that Larry Renfro requested a call with Marilyn Tavenner in the Spring

6  of 2014, but after a reasonable inquiry, responds that it lacks sufficient information to

7  admit or deny whether a telephone call took place on April 8, 2014.  Ms. Tavenner's

8  recollection is consistent with her testimony in her February 28, 2018 deposition, "I

9  remember being approached by Larry to discuss a concern he had about the process

10  that involved a review of charts."

11  **REQUEST FOR ADMISSION NO. 48:**     Admit that Marilyn Tavenner spoke on

12  the phone with Larry Renfro on  April 8, 2014 regarding the Proposed Medical

13  Record Review Rule.

14  **Objection:**  The United States incorporates its General Objections and Specific

15  Objections to the Definitions and Instructions as if stated herein.  The United States

16  objects to this Request to the extent it calls for information that is already in

17  UnitedHealth's possession, custody, or control, or is otherwise available to

18  UnitedHealth as it is duplicative of information sought and obtained by UnitedHealth

19  in the February 28, 2018 deposition of Marilyn Tavenner.  The United States

20  additionally objects to the extent that UnitedHealth is using this information to

21  mischaracterize or misinterpret the facts.

22  **Response:**  Subject to and without waiving the foregoing objections, the United

23  States admits that Marilyn Tavenner spoke by telephone with Larry Renfro in the

24  Spring of 2014 regarding the Proposed Medical Record Review Rule, but after a

25  reasonable inquiry, responds that it lacks sufficient information to admit or deny

26  whether a telephone call took place on April 8, 2014.

27  **REQUEST FOR ADMISSION NO. 49:**     Admit that Marilyn Tavenner took notes

28  during her April 8, 2014 phone call  with Larry Renfro.

25

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein.

**Response:**  Subject to and without waiving the foregoing objections, the United States admits that Marilyn Tavenner spoke by telephone with Larry Renfro in the Spring of 2014, but after a reasonable inquiry, responds that it lacks sufficient information to admit or deny whether a telephone call took place on April 8, 2014. Further, after a reasonable inquiry, the United States responds that it lacks sufficient information to admit or deny whether Ms. Tavenner took notes during her phone call with Mr. Renfro, but can state that it was not Ms. Tavenner's practice to take notes during phone calls.  If the United States identifies notes taken by Ms. Tavenner during her call with Mr. Renfro in the Spring of 2014, it will supplement this Response.

**REQUEST FOR ADMISSION NO. 50:**    Admit that after the April 8, 2014 telephone call between Marilyn Tavenner  and Larry Renfro, Marilyn Tavenner took notes about or otherwise memorialized  the meeting in writing.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein.  The United States also objects to this Request to the extent that the undefined phrase "or otherwise memorialized" is vague and ambiguous.  For the purposes of this Request, the United States defines "memorialized" as put in writing.

**Response:**  Subject to and without waiving the foregoing objections, the United States admits that Marilyn Tavenner spoke by telephone with Larry Renfro in the Spring of 2014, but after a reasonable inquiry, responds that it lacks sufficient information to admit or deny whether a telephone call took place on April 8, 2014. Further, after a reasonable inquiry, the United States responds that it lacks sufficient information to admit or deny whether Ms. Tavenner memorialized the call in writing after the call.  To the extent the United States identifies writing by Ms. Tavenner regarding her call with Mr. Renfro in the Spring of 2014, it will supplement this

0428

Response.

**REQUEST FOR ADMISSION NO. 51:**     Admit that after the April 8, 2014 telephone call between Marilyn Tavenner  and Larry Renfro, Marilyn Tavenner had Communications with the Government  about the call.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "Government."  The United States objects to this Request to the extent it seeks disclosure of information that is protected from disclosure by an applicable privilege or protection, including the attorney-client privilege, attorney work-product doctrine, deliberative process privilege, and/or investigative files privilege.  For the purposes of this Request, the United States will interpret the definition of "Government" to include only CMS.

**Response:**  Subject to and without waiving the foregoing objections, the United States admits that Marilyn Tavenner spoke by telephone with Larry Renfro in the Spring of 2014, but after a reasonable inquiry, responds that it lacks sufficient information to admit or deny whether a telephone call took place on April 8, 2014. Further, the United States admits that following this telephone call with Larry Renfro, Ms. Tavenner communicated with CMS regarding the call.

**REQUEST FOR ADMISSION NO. 52:**     Admit that no other Person participated in the April 8, 2014 call between  Marilyn Tavenner and Larry Renfro.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "Person."

**Response:**  Subject to and without waiving the foregoing objections, the United States admits that Marilyn Tavenner spoke by telephone with Larry Renfro in the Spring of 2014, but after a reasonable inquiry, responds that it lacks sufficient information to admit or deny whether a telephone call took place on April 8, 2014 or whether any other person participated in the call.

27

0429

**REQUEST FOR ADMISSION NO. 53:**     Admit that Marilyn Tavenner did not Audio Record the April 8, 2014 call  between Marilyn Tavenner and Larry Renfro.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein.

**Response:**  Subject to and without waiving the foregoing objections, the United States admits that Marilyn Tavenner spoke by telephone with Larry Renfro in the Spring of 2014, but after a reasonable inquiry, responds that it lacks sufficient information to admit or deny whether a telephone call took place on April 8, 2014. Further, the United States admits that Ms. Tavenner was not in the habit of audio recording any of her telephone calls.  To the extent the United States identifies an audio recording made by Ms. Tavenner of her call with Mr. Renfro in Spring 2014, it will supplement this Response.

**REQUEST FOR ADMISSION NO. 54:**     Admit that the Government did not Audio Record the April 8, 2014 call  between Marilyn Tavenner and Larry Renfro.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition "Government."  The United States further objects to this request because it is unduly burdensome for the United States to determine the actions of all "agencies, departments, components, agents, representatives, contractors, attorneys, consultants, and all other Persons acting on its behalf."

**Response:**  Subject to and without waiving the foregoing objections, the United States admits that Marilyn Tavenner spoke by telephone with Larry Renfro in the Spring of 2014, but after a reasonable inquiry, responds that it lacks sufficient information to admit or deny whether a telephone call took place on April 8, 2014. Further, the United States admits that Ms. Tavenner was not in the habit of audio recording any of her telephone calls, but after a reasonable inquiry, responds that it lacks sufficient information to admit or deny this Request with respect to the entire

0430

1    United States Government.

2    **REQUEST FOR ADMISSION NO. 55:**    Admit that Marilyn Tavenner spoke on

3    the phone with Larry Renfro on  April 8, 2014 regarding whether UnitedHealth was

4    obligated at that time to perform  Two-Way Looks.

5    **Objection:**  The United States incorporates its General Objections and Specific

6    Objections to the Definitions and Instructions as if stated herein.  The United States

7    also objects to this Request to the extent that the undefined term "obligated" is vague

8    and ambiguous.  The United States objects to this Request to the extent it calls for

9    information that is already in UnitedHealth's possession, custody, or control, or is

10    otherwise available to UnitedHealth as it is duplicative of information sought and

11    obtained by UnitedHealth in the February 28, 2018 deposition of Marilyn Tavenner.

12    The United States additionally objects to the extent that UnitedHealth is using this

13    information to mischaracterize or misinterpret the facts.  The United States objects to

14    this Request to the extent it calls for any legal conclusion.

15    **Response:**  Subject to and without waiving the foregoing objections, the United

16    States admits that Marilyn Tavenner spoke by telephone with Larry Renfro in the

17    Spring of 2014 regarding the Proposed Medical Record Review Rule, but after a

18    reasonable inquiry, responds that it lacks sufficient information to admit or deny

19    whether a telephone call took place on April 8, 2014.  Further, the United States

20    responds that after a reasonable inquiry, it lacks sufficient information to admit or

21    deny the remainder of this Request.  Ms. Tavenner's recollection is consistent with

22    her testimony in her February 28, 2018 deposition, "That he [Larry Renfro] was

23    asking me about something that was in the proposed rule that related to chart review,

24    and giving me his ideas on what he thought it meant, and I listened to him, and then I

25    referred him to our staff."

26    **REQUEST FOR ADMISSION NO. 56:**    Admit that Jonathan Blum spoke to

27    Marilyn Tavenner prior to April 8, 2014  about Mr. Blum's March 2014 Meeting with

28    Larry Renfro.

0431

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "March 2014 Meeting."

**Response:**  Subject to and without waiving the foregoing objections, including regarding the specific dates implicated, the United States responds that after a reasonable inquiry, it lacks sufficient information to admit or deny this Request.

**REQUEST FOR ADMISSION NO. 57:**     Admit that Jonathan Blum spoke to Marilyn Tavenner prior to April 8, 2014  about Mr. Blum's Spring 2014 Phone Call with Larry Renfro.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "Spring 2014 Phone Call."

**Response:**  Subject to and without waiving the foregoing objections, including regarding the specific dates implicated, the United States responds that after a reasonable inquiry, it lacks sufficient information to admit or deny this Request.

**REQUEST FOR ADMISSION NO. 58:**     Admit that Marilyn Tavenner told Larry Renfro on April 8, 2014 that she  spoke to Jonathan Blum about Blum's Spring 2014 Phone Call with Renfro.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "Spring 2014 Phone Call."  The United States objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth and to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts.

**Response:**  Subject to and without waiving the foregoing objections, including regarding the specific dates implicated, the United States responds that after a reasonable inquiry, it lacks sufficient information to admit or deny this Request.

1   **REQUEST FOR ADMISSION NO. 59:**    Admit that Marilyn Tavenner told Larry

2   Renfro on April 8, 2014 that she  spoke to Jonathan Blum about Blum's Spring 2014

3   Phone Call with Renfro  regarding UnitedHealth's Claims Verification Program.

4   **Objection:**  The United States incorporates its General Objections and Specific

5   Objections to the Definitions and Instructions as if stated herein, including but not

6   limited to, its specific objections to the definition of "Spring 2014 Phone Call."  The

7   United States further objects to this Request to extent it is duplicative of Request for

8   Admission No. 58.  The United States objects to this Request to the extent it calls for

9   information that is already in UnitedHealth's possession, custody, or control, or is

10  otherwise available to UnitedHealth and to the extent that UnitedHealth is using this

11  information to mischaracterize or misinterpret the facts.

12  **Response:**  Subject to and without waiving the foregoing objections, including

13  regarding the specific dates implicated, the United States responds that after a

14  reasonable inquiry, it lacks sufficient information to admit or deny this Request.

15  **REQUEST FOR ADMISSION NO. 60:**    Admit that Larry Renfro asked Marilyn

16  Tavenner on April 8, 2014 if she  agreed with Jonathan Blum that there was no

17  requirement that UnitedHealth perform  Two-Way Looks before the Proposed

18  Medical Record Review Rule went into effect.

19  **Objection:**  The United States incorporates its General Objections and Specific

20  Objections to the Definitions and Instructions as if stated herein.  The United States

21  objects to this Request to the extent that it purports to set forth a statement of

22  Jonathan Blum which has not been established by the evidence in this matter.  The

23  United States objects to this Request to the extent it calls for information that is

24  already in UnitedHealth's possession, custody, or control, or is otherwise available to

25  UnitedHealth as it is duplicative of information sought and obtained by UnitedHealth

26  in the February 28, 2018 deposition of Marilyn Tavenner.  The United States

27  additionally objects to the extent that UnitedHealth is using this information to

28  mischaracterize or misinterpret the facts.  The United States objects to this Request to

31

1    the extent it calls for any legal conclusion.

2    **Response:**  Subject to and without waiving the foregoing objections, the United

3    States admits that Marilyn Tavenner spoke by telephone with Larry Renfro in the

4    Spring of 2014 regarding the Proposed Medical Record Review Rule, but after a

5    reasonable inquiry, responds that it lacks sufficient information to admit or deny

6    whether a telephone call took place on April 8, 2014.  The United States denies the

7    remainder of this Request.  Ms. Tavenner's recollection is consistent with the

8    testimony in her February 28, 2018 deposition, "That he [Larry Renfro] was asking

9    me about something that was in the proposed rule that related to chart review, and

10   giving me his ideas on what he thought it meant, and I listened to him, and then I

11   referred him to our staff."

12   **REQUEST FOR ADMISSION NO. 61:**    Admit that Larry Renfro asked Marilyn

13   Tavenner on April 8, 2014 whether  UnitedHealth had to perform Two-Way Looks

14   prior to the implementation of the  Proposed Medical Record Review Rule.

15   **Objection:**  The United States incorporates its General Objections and Specific

16   Objections to the Definitions and Instructions as if stated herein.  The United States

17   also objects to this Request to the extent that the undefined phrase "prior to the

18   implementation" is vague and ambiguous.  The United States objects to this Request

19   to the extent it calls for information that is already in UnitedHealth's possession,

20   custody, or control, or is otherwise available to UnitedHealth as it is duplicative of

21   information sought and obtained by UnitedHealth in the February 28, 2018 deposition

22   of Marilyn Tavenner.  The United States additionally objects to the extent that

23   UnitedHealth is using this information to mischaracterize or misinterpret the facts.

24   The United States objects to this Request to the extent it calls for any legal

25   conclusion.

26   **Response:**  Subject to and without waiving the foregoing objections, the United

27   States admits that Marilyn Tavenner spoke by telephone with Larry Renfro in the

28   Spring of 2014 regarding the Proposed Medical Record Review Rule, but after a

32

0434

1    reasonable inquiry, responds that it lacks sufficient information to admit or deny

2    whether a telephone call took place on April 8, 2014.  Further, the United States

3    responds that after a reasonable inquiry, it lacks sufficient information to admit or

4    deny the remainder of this Request.  Ms. Tavenner's recollection is consistent with

5    the testimony in her February 28, 2018 deposition, "That he [Larry Renfro] was

6    asking me about something that was in the proposed rule that related to chart review,

7    and giving me his ideas on what he thought it meant, and I listened to him, and then I

8    referred him to our staff."

9    **REQUEST FOR ADMISSION NO. 62:**    Admit that Marilyn Tavenner told Larry

10    Renfro on April 8, 2014 that MAOs  were not required to conduct Two-Way Looks

11    prior to the implementation of the  Proposed Medical Record Review Rule.

12    **Objection:**  The United States incorporates its General Objections and Specific

13    Objections to the Definitions and Instructions as if stated herein, including but not

14    limited to, its specific objections to the definition "MAO."  The United States also

15    objects to this Request to the extent that the undefined phrase "prior to the

16    implementation" is vague and ambiguous.  The United States objects to this Request

17    to the extent it calls for information that is already in UnitedHealth's possession,

18    custody, or control, or is otherwise available to UnitedHealth as it is duplicative of

19    information sought and obtained by UnitedHealth in the February 28, 2018 deposition

20    of Marilyn Tavenner.  The United States additionally objects to the extent that

21    UnitedHealth is using this information to mischaracterize or misinterpret the facts.

22    The United States objects to this Request to the extent it calls for any legal

23    conclusion.

24    **Response:**  Subject to and without waiving the foregoing objections, the United

25    States denies this Request.  Ms. Tavenner's recollection is consistent with the

26    testimony in her February 28, 2018 deposition in response to questioning seeking to

27    illicit the same information.  *See* Tavenner Dep. at 133:8-15 (Q:  At any point did you

28    tell Mr. Renfro that UnitedHealth did not have an obligation to delete diagnosis codes

1   it knew to be unsupported by the medical record?  A:  We did not have that level of

2   detail in the conversation.  In the conversation, he was just talking about he was

3   unclear what to do with the proposed rule sitting there."), 111:2-6 ("Q:  Okay.  Do

4   you recall telling him that two-way looks were not required because this proposed

5   rule was not yet in effect?  A:  No.  I recall sending him to the staff to ask that

6   question."), 116:14- 117: 1 ("Q:  With respect to the conversation you had with Mr.

7   Renfro, if his recollection of that conversation he had with you was that you told him

8   that United was not required to delete – to look for deletions because the proposed

9   rule was not yet in effect, would he be inaccurate?  A:  I told that I could not make

10  that decision, that that decision would be something he would have to discuss with

11  the staff and Medicare Advantage, and I sent him to those people.")

12  **REQUEST FOR ADMISSION NO. 63:**    Admit that Larry Renfro asked Marilyn

13  Tavenner on April 8, 2014 if he should  talk to anyone else at CMS to confirm that

14  MAOs were not required to perform Two  Way Looks prior to the implementation of

15  the Proposed Medical Record Review  Rule.

16  **Objection:**  The United States incorporates its General Objections and Specific

17  Objections to the Definitions and Instructions as if stated herein, including but not

18  limited to, its specific objections to the definitions of "CMS" and "MAO."  The

19  United States also objects to this Request to the extent that the undefined phrase

20  "prior to the implementation" is vague and ambiguous.  The United States objects to

21  this Request to the extent it calls for information that is already in UnitedHealth's

22  possession, custody, or control, or is otherwise available to UnitedHealth as it is

23  duplicative of information sought and obtained by UnitedHealth in the February 28,

24  2018 deposition of Marilyn Tavenner.  The United States additionally objects to the

25  extent that UnitedHealth is using this information to mischaracterize or misinterpret

26  the facts.  The United States objects to this Request to the extent it calls for any legal

27  conclusion.

28  **Response:**  Subject to and without waiving the foregoing objections, including

34

1    regarding the specific date implicated, the United States denies this Request.

2    **REQUEST FOR ADMISSION NO. 64:**    Admit that Marilyn Tavenner told Larry

3    Renfro on April 8, 2014 that Renfro  did not need to talk to anyone else at CMS to

4    confirm that MAOs were not required  to perform Two-Way Looks prior to the

5    implementation of the Proposed Medical  Record Review Rule.

6    **Objection:**  The United States incorporates its General Objections and Specific

7    Objections to the Definitions and Instructions as if stated herein, including but not

8    limited to, its specific objections to the definitions of "CMS" and "MAO."  The

9    United States also objects to this Request to the extent that the undefined phrase

10   "prior to the implementation" is vague and ambiguous.  The United States objects to

11   this Request to the extent it calls for information that is already in UnitedHealth's

12   possession, custody, or control, or is otherwise available to UnitedHealth as it is

13   duplicative of information sought and obtained by UnitedHealth in the February 28,

14   2018 deposition of Marilyn Tavenner.  The United States additionally objects to the

15   extent that UnitedHealth is using this information to mischaracterize or misinterpret

16   the facts.

17   **Response:**  Subject to and without waiving the foregoing objections, the United

18   States denies this Request.

19   **REQUEST FOR ADMISSION NO. 65:**    Admit that Larry Renfro told Marilyn

20   Tavenner on April 8, 2014 that  UnitedHealth was concerned that other MAOs were

21   not performing Two-Way  Looks.

22   **Objection:**  The United States incorporates its General Objections and Specific

23   Objections to the Definitions and Instructions as if stated herein, including but not

24   limited to, its specific objections to the definition of "MAO."  The United States

25   objects to this Request to the extent it calls for information that is already in

26   UnitedHealth's possession, custody, or control, or is otherwise available to

27   UnitedHealth as it is duplicative of information sought and obtained by UnitedHealth

28   in the February 28, 2018 deposition of Marilyn Tavenner.  The United States

35

0437

1    additionally objects to the extent that UnitedHealth is using this information to

2    mischaracterize or misinterpret the facts.

3    **Response:**  Subject to and without waiving the foregoing objections, including

4    regarding the specific date implicated, the United States responds that after a

5    reasonable inquiry, it lacks sufficient information to admit or deny the Request as

6    written.

7    **REQUEST FOR ADMISSION NO. 66:**    Admit that Marilyn Tavenner told Larry

8    Renfro on April 8, 2014 that  UnitedHealth was not required to perform Two-Way

9    Looks for dates of service years  2012, 2013, and 2014.

10   **Objection:**  The United States incorporates its General Objections and Specific

11   Objections to the Definitions and Instructions as if stated herein.  The United States

12   further objects to this Request to extent it is duplicative of Request for Admission No.

13   62.  The United States objects to this Request to the extent it calls for information that

14   is already in UnitedHealth's possession, custody, or control, or is otherwise available

15   to UnitedHealth as it is duplicative of information sought and obtained by

16   UnitedHealth in the February 28, 2018 deposition of Marilyn Tavenner.  The United

17   States additionally objects to the extent that UnitedHealth is using this information to

18   mischaracterize or misinterpret the facts.  The United States objects to this Request to

19   the extent it calls for any legal conclusion.

20   **Response:**  Subject to and without waiving the foregoing objections, the United

21   States denies this Request.

22   **REQUEST FOR ADMISSION NO. 67:**    Admit that Marilyn Tavenner spoke on

23   the phone with Larry Renfro on  April 26, 2014.

24   **Objection:**  The United States incorporates its General Objections and Specific

25   Objections to the Definitions and Instructions as if stated herein.  The United States

26   objects to this Request to the extent it seeks information not relevant to a claim or

27   defense in this case.  The United States objects to this Request to the extent it calls for

28   information that is already in UnitedHealth's possession, custody, or control, or is

36

1  otherwise available to UnitedHealth as it is duplicative of information sought and

2  obtained by UnitedHealth in the February 28, 2018 deposition of Marilyn Tavenner.

3  The United States additionally objects to the extent that UnitedHealth is using this

4  information to mischaracterize or misinterpret the facts.

5  **Response:**  Subject to and without waiving the foregoing objections, the United

6  States admits that Marilyn Tavenner spoke by telephone with Larry Renfro in the

7  Spring of 2014, but after a reasonable inquiry, responds that it lacks sufficient

8  information to admit or deny whether a telephone call took place on April 26, 2014.

9  Ms. Tavenner's recollection is consistent with the testimony in her February 28, 2018

10  deposition: "I remember being approached by Larry to discuss a concern he had

11  about the process that involved a review of charts."  Tavenner Dep. at 110:3-13.

12  **REQUEST FOR ADMISSION NO. 68:**    Admit that Larry Renfro requested the

13  April 26, 2014 call with Marilyn Tavenner.

14  **Objection:**  The United States incorporates its General Objections and Specific

15  Objections to the Definitions and Instructions as if stated herein.  The United States

16  objects to this Request to the extent it calls for information that is already in

17  UnitedHealth's possession, custody, or control, or is otherwise available to

18  UnitedHealth as it is duplicative of information sought and obtained by UnitedHealth

19  in the February 28, 2018 deposition of Marilyn Tavenner.  The United States

20  additionally objects to the extent that UnitedHealth is using this information to

21  mischaracterize or misinterpret the facts.

22  **Response:**  Subject to and without waiving the foregoing objections, the United

23  States admits that Larry Renfro requested a call with Marilyn Tavenner in the Spring

24  of 2014, but after a reasonable inquiry, responds that it lacks sufficient information to

25  admit or deny whether a telephone call took place on April 26, 2014.  Ms. Tavenner's

26  recollection is consistent with the testimony in her February 28, 2018 deposition, "I

27  remember being approached by Larry to discuss a concern he had about the process

28  that involved a review of charts."  Tavenner Dep. at 110:3-13.

0439

**REQUEST FOR ADMISSION NO. 69:**    Admit that no other Person from the Government participated in the April 26, 2014 call between Marilyn Tavenner and Larry Renfro.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definitions of "Person" and "Government."

**Response:**  Subject to and without waiving the foregoing objections, the United States admits that Marilyn Tavenner spoke by telephone with Larry Renfro in the Spring of 2014, but after a reasonable inquiry, responds that it lacks sufficient information to admit or deny whether a telephone call took place on April 26, 2014 or whether any other person participated in the call.

**REQUEST FOR ADMISSION NO. 70:**    Admit that Marilyn Tavenner took notes during her April 26, 2014 call with  Larry Renfro.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein.

**Response:**  Subject to and without waiving the foregoing objections, the United States admits that Marilyn Tavenner spoke by telephone with Larry Renfro in the Spring of 2014, but after a reasonable inquiry, responds that it lacks sufficient information to admit or deny whether a telephone call took place on April 26, 2014. Further, after a reasonable inquiry, the United States responds that it lacks sufficient information to admit or deny whether Ms. Tavenner took notes during her phone call with Mr. Renfro, but can state that it was not Ms. Tavenner's practice to take notes during phone calls.  To the extent the United States identifies notes taken by Ms. Tavenner during the Spring 2014 phone call, it will supplement this Response.

**REQUEST FOR ADMISSION NO. 71:**    Admit that after the April 26, 2014 telephone call between Marilyn Tavenner  and Larry Renfro, Marilyn Tavenner took notes about or otherwise memorialized  the meeting in writing.

**Objection:**  The United States incorporates its General Objections and Specific

38

0440

1   Objections to the Definitions and Instructions as if stated herein.  The United States

2   also objects to this Request to the extent that the undefined phrase "or otherwise

3   memorialized" is vague and ambiguous.  For the purposes of this Request, the United

4   States defines "memorialized" as put in writing.

5   **Response:**  Subject to and without waiving the foregoing objections, the United

6   States admits that Marilyn Tavenner spoke by telephone with Larry Renfro in the

7   Spring of 2014, but after a reasonable inquiry, responds that it lacks sufficient

8   information to admit or deny whether a telephone call took place on April 26, 2014.

9   Further, after a reasonable inquiry, the United States responds that it lacks sufficient

10  information to admit or deny whether Ms. Tavenner memorialized the call in writing

11  after the call.  To the extent the United States identifies writing by Ms. Tavenner

12  regarding her call with Mr. Renfro in the Spring of 2014, it will supplement this

13  Response.

14  **REQUEST FOR ADMISSION NO. 72:**     Admit that after the April 26, 2014

15  telephone call between Marilyn Tavenner  and Larry Renfro, Marilyn Tavenner had

16  Communications with the Government  about the call.

17  **Objection:**  The United States incorporates its General Objections and Specific

18  Objections to the Definitions and Instructions as if stated herein, including but not

19  limited to, its specific objections to the definition of "Government."  The United

20  States objects to this Request to the extent it seeks disclosure of information that is

21  protected from disclosure by an applicable privilege or protection, including the

22  attorney-client privilege, attorney work-product doctrine, deliberative process

23  privilege, and/or investigative files privilege.  For the purposes of this Request, the

24  United States will interpret the definition of "Government" to include only CMS.

25  **Response:**  Subject to and without waiving the foregoing objections, the United

26  States admits that Marilyn Tavenner spoke by telephone with Larry Renfro in the

27  Spring of 2014, but after a reasonable inquiry, responds that it lacks sufficient

28  information to admit or deny whether a telephone call took place on April 26, 2014.

39

1  The United States admits the remainder of this Request.

2  **REQUEST FOR ADMISSION NO. 73:**    Admit that Marilyn Tavenner did not

3  Audio Record the April 26, 2014 call  between Marilyn Tavenner and Larry Renfro.

4  **Objection:**  The United States incorporates its General Objections and Specific

5  Objections to the Definitions and Instructions as if stated herein.

6  **Response:**  Subject to and without waiving the foregoing objections, the United

7  States admits that Marilyn Tavenner spoke by telephone with Larry Renfro in the

8  Spring of 2014, but after a reasonable inquiry, responds that it lacks sufficient

9  information to admit or deny whether a telephone call took place on April 26, 2014.

10  Further, the United States admits that Ms. Tavenner was not in the habit of audio

11  recording any of her telephone calls.  To the extent the United States identifies an

12  audio recording made by Ms. Tavenner of her call with Mr. Renfro in Spring 2014, it

13  will supplement this Response.

14  **REQUEST FOR ADMISSION NO. 74:**    Admit that the Government did not

15  Audio Record the April 26, 2014 call  between Marilyn Tavenner and Larry Renfro.

16  **Objection:**  The United States incorporates its General Objections and Specific

17  Objections to the Definitions and Instructions as if stated herein, including but not

18  limited to, its specific objections to the definition "Government."  The United States

19  further objects to this request because it is unduly burdensome for the United States

20  to determine the actions of all "agencies, departments, components, agents,

21  representatives, contractors, attorneys, consultants, and all other Persons acting on its

22  behalf."

23  **Response:**  Subject to and without waiving the foregoing objections, the United

24  States admits that Marilyn Tavenner spoke by telephone with Larry Renfro in the

25  Spring of 2014, but after a reasonable inquiry, responds that it lacks sufficient

26  information to admit or deny whether a telephone call took place on April 26, 2014.

27  Further, the United States admits that Ms. Tavenner was not in the habit of audio

28  recording any of her telephone calls, but after a reasonable inquiry, responds that it

0442

1  lacks sufficient information to admit or deny this Request with respect to the entire

2  United States Government.

3  **REQUEST FOR ADMISSION NO. 75:**    Admit that Marilyn Tavenner told Larry

4  Renfro on April 26, 2014 to request a meeting with CMS.

5  **Objection:**  The United States incorporates its General Objections and Specific

6  Objections to the Definitions and Instructions as if stated herein, including but not

7  limited to, its specific objections to the definition "CMS."  The United States objects

8  to this Request to the extent it calls for information that is already in UnitedHealth's

9  possession, custody, or control, or is otherwise available to UnitedHealth and to the

10  extent that UnitedHealth is using this information to mischaracterize or misinterpret

11  the facts.

12  **Response:**  Subject to and without waiving the foregoing objections, the United

13  States admits that Marilyn Tavenner spoke by telephone with Larry Renfro in the

14  Spring of 2014, but after a reasonable inquiry, responds that it lacks sufficient

15  information to admit or deny whether a telephone call took place on April 26, 2014.

16  However, the United States admits that Marilyn Tavenner told Larry Renfro to

17  contact Jonathan Blum during a Spring 2014 phone call.

18  **REQUEST FOR ADMISSION NO. 76:**    Admit that Larry Renfro told Marilyn

19  Tavenner on April 26, 2014 that  UnitedHealth wanted to meet with CMS no later

20  than April 30, 2014.

21  **Objection:**  The United States incorporates its General Objections and Specific

22  Objections to the Definitions and Instructions as if stated herein, including but not

23  limited to, its specific objections to the definition "CMS."

24  **Response:**  Subject to and without waiving the foregoing objections, the United

25  States admits that Marilyn Tavenner spoke by telephone with Larry Renfro in the

26  Spring of 2014, but after a reasonable inquiry, responds that it lacks sufficient

27  information to admit or deny whether a telephone call took place on April 26, 2014.

28  Further, after a reasonable inquiry, the United States responds that it lacks sufficient

41

0443

1    information to admit or deny the remainder of this Request.

2    **REQUEST FOR ADMISSION NO. 77:**    Admit that on April 27, 2014, Larry

3    Renfro informed Marilyn Tavenner that  UnitedHealth wanted to schedule a meeting

4    with CMS no later than April 30, 2014.

5    **Objection:**  The United States incorporates its General Objections and Specific

6    Objections to the Definitions and Instructions as if stated herein, including but not

7    limited to, its specific objections to the definition "CMS."  The United States objects

8    to this Request to the extent it calls for information that is already in UnitedHealth's

9    possession, custody, or control, or is otherwise available to UnitedHealth and to the

10   extent that UnitedHealth is using this information to mischaracterize or misinterpret

11   the facts.

12   **Response:**  Subject to and without waiving the foregoing objections, the United

13   States denies this Request as written.  However, the United States admits that on

14   April 27, 2014 Larry Renfro sent Marilyn Tavenner an email bates labeled

15   MARA1296260.  The United States denies that the email bates labeled

16   MARA1296260 specifically requests a meeting, but admits that the email states

17   "Prior to submitting our attestation this Wednesday, we would like to confirm that

18   our understanding is appropriate.  Based on our conversation, I believe the

19   appropriate people for this conversation would be Sean Cavanaugh and Cheri Rice."

20   **REQUEST FOR ADMISSION NO. 78:**    Admit that Marilyn Tavenner received

21   an April 27, 2014 email bates labeled  MARA1296260 from Larry Renfro requesting

22   a meeting with CMS.

23   **Objection:**  The United States incorporates its General Objections and Specific

24   Objections to the Definitions and Instructions as if stated herein, including but not

25   limited to, its specific objections to the definition "CMS."

26   **Response:**  Subject to and without waiving the foregoing objections, the United

27   States admits that Marilyn Tavenner received an email from Larry Renfro, dated

28   April 27, 2014, which is bates labeled MARA1296260.  The United States denies that

0444

the email bates labeled MARA1296260 specifically requests a meeting, but admits that the email states "Prior to submitting our attestation this Wednesday, we would like to confirm that our understanding is appropriate.  Based on our conversation, I believe the appropriate people for this conversation would be Sean Cavanaugh and Cheri Rice."

**REQUEST FOR ADMISSION NO. 79:**    Admit that UnitedHealth met with CMS on April 29, 2014.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition "CMS."  The United States objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth and to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts.

**Response:**  Subject to and without waiving the foregoing objections, the United States admits that UnitedHealth met with certain employees of CMS on April 29, 2014.

**REQUEST FOR ADMISSION NO. 80:**    Admit that CMS prepared a written agenda for the April 29, 2019 meeting  between CMS and UnitedHealth.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition "CMS."  The United States will interpret this request as referencing a meeting on April 29, 2014 not 2019.

**Response:**  Subject to and without waiving the foregoing objections, the United States denies this Request.

**REQUEST FOR ADMISSION NO. 81:**    Admit that CMS was aware that the purpose of the April 29, 2014 meeting  was to discuss the Proposed Medical Record Review Rule.

43

0445

1    **Objection:**  The United States incorporates its General Objections and Specific

2    Objections to the Definitions and Instructions as if stated herein, including but not

3    limited to, its specific objections to the definition "CMS."  The United States objects

4    to this Request to the extent it calls for information that is already in UnitedHealth's

5    possession, custody, or control, or is otherwise available to UnitedHealth and to the

6    extent that UnitedHealth is using this information to mischaracterize or misinterpret

7    the facts.

8    **Response:**  Subject to and without waiving the foregoing objections, the United

9    States admits that the stated purpose of the April 29, 2014 meeting was ostensibly to

10   discuss the Proposed Medical Record Review Rule.

11   **REQUEST FOR ADMISSION NO. 82:**    Admit that some participants in the April

12   29, 2014 meeting participated via  videoconference.

13   **Objection:**  The United States incorporates its General Objections and Specific

14   Objections to the Definitions and Instructions as if stated herein.  The United States

15   objects to this Request to the extent it seeks information not relevant to a claim or

16   defense in this case.  The United States objects to this Request to the extent it calls for

17   information that is already in UnitedHealth's possession, custody, or control, or is

18   otherwise available to UnitedHealth and to the extent that UnitedHealth is using this

19   information to mischaracterize or misinterpret the facts.

20   **Response:**  Subject to and without waiving the foregoing objections, the United

21   States admits this Request.

22   **REQUEST FOR ADMISSION NO. 83:**    Admit that some participants in the April

23   29, 2014 meeting participated via  teleconference.

24   **Objection:**  The United States incorporates its General Objections and Specific

25   Objections to the Definitions and Instructions as if stated herein.  The United States

26   objects to this Request to the extent it seeks information not relevant to a claim or

27   defense in this case.  The United States objects to this Request to the extent it calls for

28   information that is already in UnitedHealth's possession, custody, or control, or is

44

1  otherwise available to UnitedHealth and to the extent that UnitedHealth is using this

2  information to mischaracterize or misinterpret the facts.

3  **Response:**  Subject to and without waiving the foregoing objections, after a

4  reasonable inquiry, the United States responds that it lacks sufficient information to

5  admit or deny this Request.

6  **REQUEST FOR ADMISSION NO. 84:**    Admit that Sean Cavanaugh attended the

7  April 29, 2014 meeting between  UnitedHealth and CMS.

8  **Objection:**  The United States incorporates its General Objections and Specific

9  Objections to the Definitions and Instructions as if stated herein, including but not

10  limited to, its specific objections to the definition of "CMS."  The United States

11  objects to this Request to the extent it calls for information that is already in

12  UnitedHealth's possession, custody, or control, or is otherwise available to

13  UnitedHealth and to the extent that UnitedHealth is using this information to

14  mischaracterize or misinterpret the facts.

15  **Response:**  Subject to and without waiving the foregoing objections, the United

16  States admits this Request.

17  **REQUEST FOR ADMISSION NO. 85:**    Admit that Cheri Rice attended the April

18  29, 2014 meeting between  UnitedHealth and CMS.

19  **Objection:**  The United States incorporates its General Objections and Specific

20  Objections to the Definitions and Instructions as if stated herein, including but not

21  limited to, its specific objections to the definition of "CMS."  The United States

22  objects to this Request to the extent it calls for information that is already in

23  UnitedHealth's possession, custody, or control, or is otherwise available to

24  UnitedHealth and to the extent that UnitedHealth is using this information to

25  mischaracterize or misinterpret the facts.

26  **Response:**  Subject to and without waiving the foregoing objections, the United

27  States admits this Request.

28  **REQUEST FOR ADMISSION NO. 86:**    Admit that Cynthia Tudor attended the

0447

1  April 29, 2014 meeting between  UnitedHealth and CMS.

2  **Objection:**  The United States incorporates its General Objections and Specific

3  Objections to the Definitions and Instructions as if stated herein, including but not

4  limited to, its specific objections to the definition of "CMS."  The United States

5  objects to this Request to the extent it calls for information that is already in

6  UnitedHealth's possession, custody, or control, or is otherwise available to

7  UnitedHealth and to the extent that UnitedHealth is using this information to

8  mischaracterize or misinterpret the facts.

9  **Response:**  Subject to and without waiving the foregoing objections, the United

10  States admits this Request.

11  **REQUEST FOR ADMISSION NO. 87:**     Admit that Dan Farmer attended the

12  April 29, 2014 meeting between  UnitedHealth and CMS.

13  **Objection:**  The United States incorporates its General Objections and Specific

14  Objections to the Definitions and Instructions as if stated herein, including but not

15  limited to, its specific objections to the definition of "CMS."  The United States

16  objects to this Request to the extent it calls for information that is already in

17  UnitedHealth's possession, custody, or control, or is otherwise available to

18  UnitedHealth and to the extent that UnitedHealth is using this information to

19  mischaracterize or misinterpret the facts.

20  **Response:**  Subject to and without waiving the foregoing objections, the United

21  States admits this Request.

22  **REQUEST FOR ADMISSION NO. 88:**     Admit that Julia Gorner attended the

23  April 29, 2014 meeting between  UnitedHealth and CMS.

24  **Objection:**  The United States incorporates its General Objections and Specific

25  Objections to the Definitions and Instructions as if stated herein, including but not

26  limited to, its specific objections to the definition of "CMS."  The United States

27  objects to this Request to the extent it calls for information that is already in

28  UnitedHealth's possession, custody, or control, or is otherwise available to

0448

1  UnitedHealth and to the extent that UnitedHealth is using this information to

2  mischaracterize or misinterpret the facts.

3  **Response:**  Subject to and without waiving the foregoing objections, the United

4  States denies this Request.

5  **REQUEST FOR ADMISSION NO. 89:**    Admit that, other than Sean Cavanaugh,

6  Cheri Rice, Cynthia Tudor, Dan  Farmer, and Julia Gorner, no other person from

7  CMS or the Government attended  the April 29, 2014 meeting.

8  **Objection:**  The United States incorporates its General Objections and Specific

9  Objections to the Definitions and Instructions as if stated herein, including but not

10  limited to, its specific objections to the definitions of "CMS," "Government," and

11  "Person."  The United States objects to this Request to the extent it calls for

12  information that is already in UnitedHealth's possession, custody, or control, or is

13  otherwise available to UnitedHealth and to the extent that UnitedHealth is using this

14  information to mischaracterize or misinterpret the facts.

15  **Response:**  Subject to and without waiving the foregoing objections, the United

16  States denies this Request.

17  **REQUEST FOR ADMISSION NO. 90:**    Admit that Karen Erickson, Thad

18  Johnson, Steve Nelson, and Dan  Schumacher attended the April 29, 2014 meeting

19  between UnitedHealth and CMS.

20  **Objection:**  The United States incorporates its General Objections and Specific

21  Objections to the Definitions and Instructions as if stated herein, including but not

22  limited to, its specific objections to the definition of "CMS."  The United States

23  objects to this Request to the extent it calls for information that is already in

24  UnitedHealth's possession, custody, or control, or is otherwise available to

25  UnitedHealth and to the extent that UnitedHealth is using this information to

26  mischaracterize or misinterpret the facts.

27  **Response:**  Subject to and without waiving the foregoing objections, the United

28  States admits this Request.

0449

1  **REQUEST FOR ADMISSION NO. 91:**    Admit that the Government Audio

2  Recorded the April 29, 2014 meeting.

3  **Objection:**  The United States incorporates its General Objections and Specific

4  Objections to the Definitions and Instructions as if stated herein, including but not

5  limited to, its specific objections to the definition of "Government."  The United

6  States further objects to this request because it is unduly burdensome for the United

7  States to determine the actions of all "agencies, departments, components, agents,

8  representatives, contractors, attorneys, consultants, and all other Persons acting on its

9  behalf."  For the purposes of this Request, the United States will interpret the

10  definition of "Government" to include only CMS.

11  **Response:**  Subject to and without waiving the foregoing objections, the United

12  States denies this Request to the extent that none of the individuals identified in

13  Request for Admission No. 89 Audio Recorded the April 29, 2014 meeting.

14  However, after a reasonable inquiry, the United States responds that it lacks sufficient

15  information to admit or deny this Request with respect to CMS or the entire United

16  States Government.

17  **REQUEST FOR ADMISSION NO. 92:**    Admit that the Government Video

18  Recorded the April 29, 2014 meeting.

19  **Objection:**  The United States incorporates its General Objections and Specific

20  Objections to the Definitions and Instructions as if stated herein, including but not

21  limited to, its specific objections to the definition of "Government."  The United

22  States further objects to this request because it is unduly burdensome for the United

23  States to determine the actions of all "agencies, departments, components, agents,

24  representatives, contractors, attorneys, consultants, and all other Persons acting on its

25  behalf."  For the purposes of this Request, the United States will interpret the

26  definition of "Government" to include only CMS.

27  **Response:**  Subject to and without waiving the foregoing objections, the United

28  States denies this Request to the extent that none of the individuals identified in

48

0450

1  Request for Admission No. 89 Video Recorded the April 29, 2014 meeting.

2  However, after a reasonable inquiry, the United States responds that it lacks sufficient

3  information to admit or deny this Request with respect to CMS or the entire United

4  States Government.

5  **REQUEST FOR ADMISSION NO. 93:**    Admit that the April 29, 2014 meeting

6  lasted less than one hour.

7  **Objection:**  The United States incorporates its General Objections and Specific

8  Objections to the Definitions and Instructions as if stated herein.  The United States

9  objects to this Request to the extent it seeks information not relevant to a claim or

10  defense in this case.  The United States objects to this Request to the extent it calls for

11  information that is already in UnitedHealth's possession, custody, or control, or is

12  otherwise available to UnitedHealth and to the extent that UnitedHealth is using this

13  information to mischaracterize or misinterpret the facts.

14  **Response:**  Subject to and without waiving the foregoing objections, the United

15  States admits this Request.

16  **REQUEST FOR ADMISSION NO. 94:**    Admit that Sean Cavanaugh took notes

17  during the April 29, 2014 meeting  between UnitedHealth and CMS.

18  **Objection:**  The United States incorporates its General Objections and Specific

19  Objections to the Definitions and Instructions as if stated herein, including but not

20  limited to, its specific objections to the definition of "CMS."

21  **Response:**  Subject to and without waiving the foregoing objections, the United

22  States denies this Request.

23  **REQUEST FOR ADMISSION NO. 95:**    Admit that after the April 29, 2014

24  meeting between UnitedHealth and CMS,  Sean Cavanaugh took notes about or

25  otherwise memorialized the meeting in writing.

26  **Objection:**  The United States incorporates its General Objections and Specific

27  Objections to the Definitions and Instructions as if stated herein, including but not

28  limited to, its specific objections to the definition of "CMS."  The United States also

49

objects to this Request to the extent that the undefined phrase "or otherwise memorialized" is vague and ambiguous.  For the purposes of this Request, the United States defines "memorialized" as put in writing.

**Response:**  Subject to and without waiving the foregoing objections, the United States denies this Request.

**REQUEST FOR ADMISSION NO. 96:**    Admit that after the April 29, 2014 meeting between UnitedHealth and CMS,  Sean Cavanaugh had Communications with the Government about the meeting.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definitions of "CMS" and "Government." The United States objects to this Request to the extent it seeks disclosure of information that is protected from disclosure by an applicable privilege or protection, including the attorney-client privilege, attorney work-product doctrine, deliberative process privilege, and/or investigative files privilege.  For the purposes of this Request, the United States will interpret the definition of "Government" to include only CMS.

**Response:**  Subject to and without waiving the foregoing objections, the United States admits this Request.

**REQUEST FOR ADMISSION NO. 97:**    Admit that Cheri Rice took notes during the April 29, 2014 meeting between  UnitedHealth and CMS.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "CMS."

**Response:**  Subject to and without waiving the foregoing objections, the United States denies this Request.

**REQUEST FOR ADMISSION NO. 98:**    Admit that after the April 29, 2014 meeting between UnitedHealth and CMS,  Cheri Rice took notes about or otherwise

50

1    memorialized the meeting in writing.

2    **Objection:**  The United States incorporates its General Objections and Specific

3    Objections to the Definitions and Instructions as if stated herein, including but not

4    limited to, its specific objections to the definition of "CMS."  The United States also

5    objects to this Request to the extent that the undefined phrase "or otherwise

6    memorialized" is vague and ambiguous.  For the purposes of this Request, the United

7    States defines "memorialized" as put in writing.

8    **Response:**  Subject to and without waiving the foregoing objections, the United

9    States admits this Request to the extent Ms. Rice sent Mr. Nelson a follow up email

10   to the April 29, 2014 meeting, MARA1296257.  The United States otherwise denies

11   this Request.

12   **REQUEST FOR ADMISSION NO. 99:**    Admit that after the April 29, 2014

13   meeting between UnitedHealth and CMS,  Cheri Rice had Communications with the

14   Government about the meeting.

15   **Objection:**  The United States incorporates its General Objections and Specific

16   Objections to the Definitions and Instructions as if stated herein, including but not

17   limited to, its specific objections to the definitions of "CMS" and "Government."

18   The United States objects to this Request to the extent it seeks disclosure of

19   information that is protected from disclosure by an applicable privilege or protection,

20   including the attorney-client privilege, attorney work-product doctrine, deliberative

21   process privilege, and/or investigative files privilege.  For the purposes of this

22   Request, the United States will interpret the definition of "Government" to include

23   only CMS.

24   **Response:**  Subject to and without waiving the foregoing objections, the United

25   States admits this Request.

26   **REQUEST FOR ADMISSION NO. 100:**   Admit that Cynthia Tudor took written

27   notes during the April 29, 2014  meeting between UnitedHealth and CMS.

28   **Objection:**  The United States incorporates its General Objections and Specific

0453

1    Objections to the Definitions and Instructions as if stated herein, including but not

2    limited to, its specific objections to the definition of "CMS."

3    **Response:**  Subject to and without waiving the foregoing objections, the United

4    States admits that Cynthia Tudor took informal notes during the April 29, 2014

5    meeting.

6    **REQUEST FOR ADMISSION NO. 101:**   Admit that after the April 29, 2014

7    meeting between UnitedHealth and CMS,  Cynthia Tudor took written notes about or

8    otherwise memorialized the meeting in  writing.

9    **Objection:**  The United States incorporates its General Objections and Specific

10   Objections to the Definitions and Instructions as if stated herein, including but not

11   limited to, its specific objections to the definition of "CMS."  The United States also

12   objects to this Request to the extent that the undefined phrase "or otherwise

13   memorialized" is vague and ambiguous.  For the purposes of this Request, the United

14   States defines "memorialized" as put in writing.

15   **Response:**  Subject to and without waiving the foregoing objections, the United

16   States denies this Request.

17   **REQUEST FOR ADMISSION NO. 102:**   Admit that after the April 29, 2014

18   meeting between UnitedHealth and CMS,  Cynthia Tudor had Communications with

19   the Government about the meeting.

20   **Objection:**  The United States incorporates its General Objections and Specific

21   Objections to the Definitions and Instructions as if stated herein, including but not

22   limited to, its specific objections to the definitions of "CMS" and "Government."

23   The United States objects to this Request to the extent it seeks disclosure of

24   information that is protected from disclosure by an applicable privilege or protection,

25   including the attorney-client privilege, attorney work-product doctrine, deliberative

26   process privilege, and/or investigative files privilege.  For the purposes of this

27   Request, the United States will interpret the definition of "Government" to include

28   only CMS.

0454

1    **Response:**  Subject to and without waiving the foregoing objections, the United

2    States responds that, after a reasonable inquiry, it lacks sufficient information to

3    admit or deny this Request

4    **REQUEST FOR ADMISSION NO. 103:**   Admit that Dan Farmer took written

5    notes during the April 29, 2014 meeting  between UnitedHealth and CMS.

6    **Objection:**  The United States incorporates its General Objections and Specific

7    Objections to the Definitions and Instructions as if stated herein, including but not

8    limited to, its specific objections to the definition of "CMS."

9    **Response:**  Subject to and without waiving the foregoing objections, the United

10   States responds that, after a reasonable inquiry, it lacks sufficient information to

11   admit or deny this Request.  To the extent the United States identifies notes by Mr.

12   Farmer taken during the April 29, 2014 meeting, it will supplement this Response.

13   **REQUEST FOR ADMISSION NO. 104:**   Admit that after the April 29, 2014

14   meeting between UnitedHealth and CMS,  Dan Farmer took written notes about or

15   otherwise memorialized the meeting in  writing.

16   **Objection:**  The United States incorporates its General Objections and Specific

17   Objections to the Definitions and Instructions as if stated herein, including but not

18   limited to, its specific objections to the definition of "CMS."  The United States also

19   objects to this Request to the extent that the undefined phrase "or otherwise

20   memorialized" is vague and ambiguous.  For the purposes of this Request, the United

21   States defines "memorialized" as put in writing.

22   **Response:**  Subject to and without waiving the foregoing objections, the United

23   States responds that, after a reasonable inquiry, it lacks sufficient information to

24   admit or deny this Request.  To the extent the United States identifies a writing made

25   by Mr. Farmer regarding the April 2014 meeting, it will supplement this Response.

26   **REQUEST FOR ADMISSION NO. 105:**   Admit that after the April 29, 2014

27   meeting between UnitedHealth and CMS,  Dan Farmer had Communications with the

28   Government about the meeting.

0455

1   **Objection:**  The United States incorporates its General Objections and Specific

2   Objections to the Definitions and Instructions as if stated herein, including but not

3   limited to, its specific objections to the definitions of "CMS" and "Government."

4   The United States objects to this Request to the extent it seeks disclosure of

5   information that is protected from disclosure by an applicable privilege or protection,

6   including the attorney-client privilege, attorney work-product doctrine, deliberative

7   process privilege, and/or investigative files privilege.  For the purposes of this

8   Request, the United States will interpret the definition of "Government" to include

9   only CMS.

10  **Response:**  Subject to and without waiving the foregoing objections, the United

11  States responds that, after a reasonable inquiry, it lacks sufficient information to

12  admit or deny this Request.

13  **REQUEST FOR ADMISSION NO. 106:**   Admit that Julia Gorner took written

14  notes during the April 29, 2014 meeting  between UnitedHealth and CMS.

15  **Objection:**  The United States incorporates its General Objections and Specific

16  Objections to the Definitions and Instructions as if stated herein, including but not

17  limited to, its specific objections to the definition of "CMS."

18  **Response:**  Subject to and without waiving the foregoing objections, the United

19  States denies this Request.

20  **REQUEST FOR ADMISSION NO. 107:**   Admit that after the April 29, 2014

21  meeting between UnitedHealth and CMS,  Julia Gorner took written notes about or

22  otherwise memorialized the meeting in  writing.

23  **Objection:**  The United States incorporates its General Objections and Specific

24  Objections to the Definitions and Instructions as if stated herein, including but not

25  limited to, its specific objections to the definition of "CMS."  The United States also

26  objects to this Request to the extent that the undefined phrase "or otherwise

27  memorialized" is vague and ambiguous.  For the purposes of this Request, the United

28  States defines "memorialized" as put in writing.

54

0456

Case 2:16-cv-08697-FMO-PVC    Document 616-3    Filed 08/06/24    Page 460 of 637
Page ID #:19354

**Response:**  Subject to and without waiving the foregoing objections, the United States denies this Request.

**REQUEST FOR ADMISSION NO. 108:**   Admit that after the April 29, 2014 meeting between UnitedHealth and CMS,  Julia Gorner had Communications with the Government about the meeting.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definitions of "CMS" and "Government." The United States objects to this Request to the extent it seeks disclosure of information that is protected from disclosure by an applicable privilege or protection, including the attorney-client privilege, attorney work-product doctrine, deliberative process privilege, and/or investigative files privilege.  For the purposes of this Request, the United States will interpret the definition of "Government" to include only CMS.

**Response:**  Subject to and without waiving the foregoing objections, the United States denies this Request.

**REQUEST FOR ADMISSION NO. 109:**   Admit that no one from CMS or from the Government took written notes  during the April 29, 2014 meeting between UnitedHealth and CMS.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "CMS" and "Government."  The United States further objects to this request because it is unduly burdensome for the United States to determine the actions of all "agencies, departments, components, agents, representatives, contractors, attorneys, consultants, and all other Persons acting on its behalf."  For the purposes of this Request, the United States will interpret the definition of "Government" to include only CMS, and will interpret "CMS" to include only those individuals who attended the meeting on April 29,

1  2014.   The United States objects to this Request to extent it is duplicative of Request

2  for Admission Nos. 94, 97, 100, 103 and 106.

3  **Response:**  Subject to and without waiving the foregoing objections, the United

4  States denies this Request to the extent Ms. Tudor took informal notes during the

5  meeting.

6  **REQUEST FOR ADMISSION NO. 110:**   Admit that after the April 29, 2014

7  meeting between UnitedHealth and CMS,  no one from CMS or from the

8  Government took written notes about or otherwise  memorialized the meeting in

9  writing.

10  **Objection:**  The United States incorporates its General Objections and Specific

11  Objections to the Definitions and Instructions as if stated herein, including but not

12  limited to, its specific objections to the definitions of "CMS" and "Government."

13  The United States further objects to this request because it is unduly burdensome for

14  the United States to determine the actions of all "agencies, departments, components,

15  agents, representatives, contractors, attorneys, consultants, and all other Persons

16  acting on its behalf."  For the purposes of this Request, the United States will

17  interpret the definition of "Government" to include only CMS, and will interpret

18  "CMS" to include only those individuals who attended the meeting on April 29,

19  2014.  The United States also objects to this Request to the extent that the undefined

20  phrase "or otherwise memorialized" is vague and ambiguous.  For the purposes of

21  this Request, the United States defines "memorialized" as put in writing. The United

22  States objects to this Request to extent it is duplicative of Request for Admission

23  Nos. 95, 98, 101, 104 and 107.

24  **Response:**  Subject to and without waiving the foregoing objections, the United

25  States denies this Request to the extent Ms. Rice sent Mr. Nelson a follow up email to

26  the April 29, 2014 meeting, MARA1296257.

27  **REQUEST FOR ADMISSION NO. 111:**   Admit that CMS indicated in the April

28  29, 2014 meeting that CMS understood  prior to the meeting that UnitedHealth had

0458

1   asked for the meeting with CMS to  receive clarification regarding whether there was

2   a current requirement for MAOs  to conduct Two-Way Looks when conducting Chart

3   Reviews.

4   **Objection:**  The United States incorporates its General Objections and Specific

5   Objections to the Definitions and Instructions as if stated herein, including but not

6   limited to, its specific objections to the definition "CMS" and "MAO."  For the

7   purposes of this Request, the United States will interpret the definition of "CMS" to

8   include only those individuals who attended the meeting on April 29, 2014.  The

9   United States objects to this Request to the extent it calls for information that is

10  already in UnitedHealth's possession, custody, or control, or is otherwise available to

11  UnitedHealth and to the extent that UnitedHealth is using this information to

12  mischaracterize or misinterpret the facts.

13  **Response:**  Subject to and without waiving the foregoing objections, the United

14  States denies this Request.

15  **REQUEST FOR ADMISSION NO. 112:**   Admit that UnitedHealth told CMS at

16  the April 29, 2019 meeting that  UnitedHealth's understanding was that MAOs were

17  not required to conduct Two-Way Looks when conducting Chart Reviews prior to the

18  Proposed Medical Record  Review Rule taking effect.

19  **Objection:**  The United States incorporates its General Objections and Specific

20  Objections to the Definitions and Instructions as if stated herein, including but not

21  limited to, its specific objections to the definition "CMS" and "MAO."  The United

22  States will interpret this request as referencing a meeting on April 29, 2014 not 2019.

23  For the purposes of this Request, the United States will interpret the definition of

24  "CMS" to include only those individuals who attended the meeting on April 29,

25  2014.  The United States also objects to this Request to the extent that the undefined

26  phrases "Chart Review" is vague and ambiguous.  The United States objects to this

27  Request to the extent it calls for information that is already in UnitedHealth's

28  possession, custody, or control, or is otherwise available to UnitedHealth and to the

57

extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts.  The United States objects to this Request to the extent it calls for any legal conclusion.

**Response:**  Subject to and without waiving the foregoing objections, the United States admits this Request.

**REQUEST FOR ADMISSION NO. 113:**   Admit that Steve Nelson asked CMS in the April 29, 2014 meeting whether  UnitedHealth had to perform Two-Way Looks when conducting Chart Reviews if  the Proposed Medical Record Review Rule was finalized.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition "CMS."  For the purposes of this Request, the United States will interpret the definition of "CMS" to include only those individuals who attended the meeting on April 29, 2014.  The United States also objects to this Request to the extent that the undefined phrases "Chart Review" is vague and ambiguous.  The United States objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth and to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts.  The United States objects to this Request to the extent it calls for any legal conclusion.

**Response:**  Subject to and without waiving the foregoing objections, the United States admits this Request.

**REQUEST FOR ADMISSION NO. 114:**   Admit that Steve Nelson asked CMS in the April 29, 2014 meeting whether  UnitedHealth had an obligation to perform Two-Way Looks when conducting Chart  Reviews prior to the implementation of the Proposed Medical Record Review Rule.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not

58

1   limited to, its specific objections to the definition "CMS."  For the purposes of this

2   Request, the United States will interpret the definition of "CMS" to include only

3   those individuals who attended the meeting on April 29, 2014.  The United States

4   also objects to this Request to the extent that the undefined phrases "Chart Review" is

5   vague and ambiguous.  The United States objects to this Request to the extent it calls

6   for information that is already in UnitedHealth's possession, custody, or control, or is

7   otherwise available to UnitedHealth and to the extent that UnitedHealth is using this

8   information to mischaracterize or misinterpret the facts.  The United States objects to

9   this Request to the extent it calls for any legal conclusion.

10  **Response:**  Subject to and without waiving the foregoing objections, the United

11  States admits this Request.

12  **REQUEST FOR ADMISSION NO. 115:**   Admit that CMS told UnitedHealth in

13  the April 29, 2014 meeting that  UnitedHealth was not required to perform Two-Way

14  Looks when conducting Chart  Reviews prior to the Proposed Medical Record

15  Review Rule taking effect.

16  **Objection:**  The United States incorporates its General Objections and Specific

17  Objections to the Definitions and Instructions as if stated herein, including but not

18  limited to, its specific objections to the definition "CMS."  For the purposes of this

19  Request, the United States will interpret the definition of "CMS" to include only

20  those individuals who attended the meeting on April 29, 2014.  The United States

21  also objects to this Request to the extent that the undefined phrases "Chart Review" is

22  vague and ambiguous.  The United States objects to this Request to the extent it calls

23  for information that is already in UnitedHealth's possession, custody, or control, or is

24  otherwise available to UnitedHealth and to the extent that UnitedHealth is using this

25  information to mischaracterize or misinterpret the facts.  The United States objects to

26  this Request to the extent it calls for any legal conclusion.

27  **Response:**  Subject to and without waiving the foregoing objections, the United

28  States denies this Request.  Further, the United States responds that on May 2, 2014,

0461

1   Cheri Rice sent an email bates labeled MARA2157067 to Steve Nelson stating that

2   "…I would note that regardless of the effective date of the proposed requirement

3   related to medical record reviews, there are other laws that do impose standards,

4   requirements and responsibilities on MA plans in connection with the federal

5   payments they receive from CMS."

6

7                                         Respectfully submitted,

8   Dated:  November 4, 2019              JOSEPH H. HUNT
                                          Assistant Attorney General, Civil Division
9                                         NICOLA T. HANNA
                                          United States Attorney
10                                        DAVID M. HARRIS
                                          DAVID K. BARRETT
11                                        ABRAHAM C. MELTZER
                                          JOHN E. LEE
12                                        Assistant United States Attorneys

13                                        ANDY J. MAO
                                          ROBERT McAULIFFE
14                                        EDWARD C. CROOKE
                                          LINDA M. McMAHON
15                                        PAUL G. FREEBORNE
                                          JESSICA KRIEG
16                                        ZOILA E. HINSON
                                          AMY L. LIKOFF
17                                        GREGORY A. MASON
                                          Civil Division, Department of Justice
18
                                          JAMES P. KENNEDY, JR.
19                                        United States Attorney
                                          KATHLEEN ANN LYNCH
20                                        Assistant United States Attorney

21
                                          /s/ Jack D. Ross
22                                        JACK D. ROSS
                                          Assistant United States Attorney
23                                        Attorneys for the United States of America

24

25

26

27

28

                                          60

<u>PROOF OF SERVICE BY ELECTRONIC MAIL</u>

I am over the age of 18 and not a party to the action entitled <u>U.S. *ex rel.*</u>

<u>Poehling v. UnitedHealth Group, Inc.</u>, CV 16-8697 FMO (SSx).  I am employed the

United States Attorney's Office for the Central District of California.  My business

address is 300 N. Los Angeles Street, Room 7516, Los Angeles, California 90012.

On November 4, 2019, I served the foregoing UNITED STATES'

RESPONSES AND OBJECTIONS TO DEFENDANT UHC OF CALIFORNIA'S

REQUESTS FOR ADMISSION TO THE GOVERNMENT (SET NO. TWO) on

each person or entity named below by electronic mail, pursuant to written consent

under Federal Rule of Civil Procedure 5(b)(2)(E).

Date of e-mailing:  November 4, 2019.

Place of e-mailing:  Los Angeles, California.

Person(s) and/or Entity(s) to whom e-mailed:

    See attached page

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 4, 2019, at Los Angeles, California.

/s/ Jack D. Ross

JACK D. ROSS

0463

| | |
|---|---|
| David J. Schindler, Esq.<br>david.schindler@lw.com | Eric Havian, Esq.<br>ehavian@constantinecannon.com |
| Daniel Meron, Esq.<br>daniel.meron@lw.com | Jessica Moore, Esq.<br>jmoore@constantinecannon.com |
| Abid, R. Qureshi, Esq.<br>abid.qureshj@lw.com | Henry C. Su, Esq.<br>hsu@constantinecannon.com |
| Anne Robinson, Esq.<br>anne.robinson@lw.com | Anne Hartman, Esq.<br>ahartman@constantinecannon.com |
| Kirstin Scheffler Do, Esq.<br>kirstin.schefflerdo@lw.com | Stephen S. Hasegawa, Esq.<br>shasegawa@phillipsandcohen.com |
| Morgan Maddoux, Esq.<br>Morgan.maddoux@lw.com | Matthew R. Berry, Esq.<br>mberry@susmangodfrey.com |
| | Arun Subramanian<br>asubramanian@SusmanGodfrey.com |
| | UHG-<br>RelatorsCounsel@Lists.SusmanGodfrey.com |

0464

**EXHIBIT D-10**

JOSEPH H. HUNT
Assistant Attorney General, Civil Division
NICOLA T. HANNA
United States Attorney
DAVID M. HARRIS
DAVID K. BARRETT
ABRAHAM C. MELTZER
JOHN E. LEE (CBN 128696)
JACK D. ROSS (CBN 265883)
Assistant United States Attorneys
        300 N. Los Angeles Street, Room 7516
        Los Angeles, California 90012
        Tel: (213) 894-3995; Fax: (213) 894-7819
        Email: john.lee2@usdoj.gov
ANDY J. MAO
ROBERT McAULIFFE
EDWARD C. CROOKE
LINDA M. McMAHON
PAUL G. FREEBORNE
JESSICA KRIEG
ZOILA E. HINSON
AMY L. LIKOFF
GREGORY A. MASON
MARTHA GLOVER
Attorneys, Civil Division, U.S. Department of Justice
        P.O. Box 261, Ben Franklin Station
        Washington, D.C. 20044
        Tel: (202) 305-3173; Fax: (202) 307-3852
        Email:  amy.l.likoff@usdoj.gov
JAMES P. KENNEDY, JR.
United States Attorney
KATHLEEN ANN LYNCH
Assistant United States Attorney (Admitted PHV)
        138 Delaware Avenue
        Buffalo, New York 14201
        Tel: (716) 843-5830; Fax: (716) 551-3052
        Email: kathleen.lynch@usdoj.gov
Attorneys for the United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel*. BENJAMIN POEHLING,<br><br>Plaintiffs,<br><br>v.<br><br>UNITEDHEALTH GROUP, INC., *et al*.,<br><br>Defendants. | No. CV 16-08697 MWF (SSx)<br><br>UNITED STATES' RESPONSES AND OBJECTIONS TO DEFENDANT UHC OF CALIFORNIA'S REQUESTS FOR ADMISSION TO THE GOVERNMENT (SET NO. THREE) |

0466

| | |
|---|---|
| **PROPOUNDING PARTY:** | **UHC OF CALIFORNIA, INC.** |
| **RESPONDING PARTY:** | **UNITED STATES OF AMERICA** |
| **SET NUMBER:** | **THREE** |

### Preliminary Statement

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure ("Federal Rules") and Rule 36 of the Local Civil Rules of the United States District Court for the Central District of California, the United States of America ("United States" or "government"), through its undersigned counsel, provides these responses and objections to Defendant UHC of California's ("UnitedHealth" or "Defendant") Requests for Admission (Set No. Three), dated December 13, 2019 ("Third Requests"). The objections and responses set forth herein are based on information now known to the United States and its undersigned attorneys, and will be revised, corrected, supplemented, amended, and clarified to the extent required by Rule 26 as discovery proceeds.

UnitedHealth's 104 Requests for Admission in its Third Requests are in large part duplicative of both each other and the 97 Requests for Admission in UnitedHealth's Second Set of Requests for Admission ("Second Requests"). For example, Request Nos. 165 and 167 are *identical*, and both are duplicative of 163, multiple Requests seek identical information and differ only in minor word changes (e.g. Request Nos. 138 and 139, 140 and 141), and multiple Requests are duplicative of the Second Requests (e.g. Request Nos. 116 and 112). Given the overlap and duplication among the Second and Third Requests and that the Third Request in large part seek information already in UnitedHealth's possession, it is apparent that the Third Request was designed to burden, harass, and annoy the United States rather than seek information to serve any legitimate purpose. Further numerous Requests seek information already in UnitedHealth's possession (e.g. Request Nos. 144 and 145) and again appear to be served only to increase the time and resources the United

2

0467

States must spend in responding to discovery rather than facilitate proof on issues that are central to the litigation and to narrow the dispute between the parties.  *See* Fed. R. Civ. P. 36 Advisory Committee's Note.

### General Objections

The following objections apply to each and every separately numbered Request and are incorporated by reference to the extent applicable into the objection to each Request.

1.  The United States objects to the Third Requests to the extent they are vague, ambiguous, overbroad, unduly burdensome, or seek to impose requirements upon the United States beyond those called for or permitted by the Federal Rules of Civil Procedure, the Local Civil Rules of the United States District Court for the Central District of California, or any order of the Court.  The United States responds below pursuant to its obligations under the Federal Rules and the Local Civil Rules, namely that the United States has taken and is continuing to undertake reasonable efforts to identify information responsive to the Requests.

2.  The United States objects to the Third Requests to the extent they seek the disclosure of information concerning the United States' investigation of this matter as well as the United States' investigation in *United States of America ex rel. Swoben v. SCAN Health Plan, et al., CV* 09-5013 (JEMx) ), 2017 U.S. Dist. LEXIS 174308 (C.D. Cal. Oct. 5, 2017) ("*Swoben*").  This includes, but is not limited to, the United States' investigative efforts, its assessments of facts and allegations, its deliberative processes concerning actions taken regarding this matter and *Swoben*, and other information generated before and after the commencement of both this litigation and *Swoben*.  The United States objects on the grounds that such information is privileged, work product protected, not relevant to claims or defenses, and not proportional to the needs of the case.

3.  The United States objects to logging the following information withheld on the basis of privilege regarding both this and the *Swoben* action: (a) communications

between or among attorneys at the United States Department of Justice (DOJ), including, but not limited to, attorneys at DOJ's Civil Division and the United States Attorneys' Offices both during the Government's pre-complaint investigation and after the Government commenced action; (b) communications between or among attorneys at DOJ and attorneys at the United States Department of Health & Human Services (HHS) both during the Government's pre-complaint investigation and after the Government commenced action; (c) communications between or among attorneys at DOJ and counsel for Relator James Swoben and/or counsel for Relator Benjamin Poehling during the Government's pre-complaint investigation and after the Government commenced action; (d) work product or other privileged documents generated by or sent to or from attorneys for DOJ, HHS, Relator James Swoben and/or Relator Benjamin Poehling and any of agents or contractors for said attorneys both during the Government's pre-complaint investigation and after the Government commenced action.  The United States asserts this objection on the grounds that such effort would impose undue and extraordinary burdens on the United States, seek information not relevant to the claims and defenses in this action, and be disproportionate to the needs of this case.

4.  Pursuant to Rule 36, any admissions contained herein are for purposes of the present action only and shall not be taken as admissions for any other purpose, including for purposes of any other case.

5.  By making the accompanying responses and objections to Defendant's Third Requests, the government does not waive, and hereby expressly reserves, its right to assert any and all objections as to the admissibility of any documents, testimony, or information into evidence in this action, or in any other proceedings, on any and all grounds including, but not limited to, competency, relevancy, materiality, privilege, or admissibility.  Further, the government makes the responses and objections herein without in any way implying that it considers the Third Requests to be relevant or material to the subject matter of this action.

4

0469

6.  The United States objects to the below Third Requests to the extent that a response to such Request requires disclosure of information protected from disclosure by an applicable privilege or protection, including, but not limited to, the attorney-client privilege, work product doctrine, deliberative process privilege, law enforcement privilege, common interest privilege, or investigative files privilege, and protections afforded by Fed. R. Civ. P. 26(b), or any other applicable privilege. The United States will not respond in such a way as to disclose such protected information, but inadvertent identification or disclosure of privileged information by the United States shall not be a waiver of any applicable privilege. Under Federal Rule of Evidence 502, Federal Rule of Civil Procedure 26(b)(5)(B), other related sources of law, and the Court's order regarding inadvertent disclosure of privileged information [Doc. 198], the government reserves any and all rights to claw back privileged information it inadvertently discloses in response to the Requests.

7.  The United States submits these responses subject to, without intending to waive, but expressly reserving the right to object to other discovery procedures involving or relating to the subject matter of the information in responses to the Third Requests.  The United States reserves the right to object on any ground, at any time, to such other or supplemental requests as the Defendants may propound involving or relating to the subject matter of these Requests.

8.  The United States objects to the Third Requests to the extent they are based on inaccurate assumptions or misstatements of fact or misconstructions of law.  Nothing herein is intended to concede the accuracy of the assumptions, facts, or law underlying the Third Requests.

9.  The United States reserves the right to supplement its responses to each and every Request at any time, up to and including trial, as provided by the Federal Rules.

10. The assertion of the same, similar, or additional objections to the below Third Requests does not and should not be construed to waive or modify any of the United States' general objections.

0470

11. The United States objects to the Third Requests to the extent they require the United States to draw legal conclusions, comment on the merits of any affirmative defenses, or otherwise seek to impose any requirements beyond those established by the Federal Rules or the Local Rules.

### Specific Objections to the Definitions and Instructions

The United States objects to the Definitions and Instructions to the extent they (i) seek to impose burdens on the United States that are different from, inconsistent with, or exceed those imposed by the Federal Rules of Civil Procedure and the Local Civil Rules, (ii) are vague or ambiguous, and/or (iii) render the Third Requests overly broad, unduly burdensome, not proportionate to the needs of the case, and not relevant. The United States further objects to the Third Requests to the extent they use terms not defined by UnitedHealth.

**Definition 2**:  The United States objects to the definition of "Actuarial Equivalence" to the extent that it is vague and ambiguous.  Subject to and without waiving these objections, for the purposes of responding to these Requests, the United States interprets "Actuarial Equivalence" as used by Congress in 42 U.S.C. § 1395w-23(a)(1)(C)(i).

**Definition 6:**  The United States objects to the definition of "Beneficiary" or "Member" as overly broad.  Subject to and without waiving this objection, for the purposes of responding to these Requests the United States interprets these terms to mean individuals enrolled in UnitedHealth's Medicare Advantage (MA) Plans under Part C of the Medicare Program, Prescription Drug (PD) Plans under Part D of the Medicare Program, and MAPD Plans under both Parts C and D of the Medicare Program.

**Definitions 10, 21, 28, and 30:**  The United States objects to the definition of "Government" (Definition 21) to the extent it includes any agency, department, component, agent, representative, contractor, attorney, consultant, or person acting on its behalf not relevant to this action.  This definition is plainly unreasonable.  Subject

6

0471

to and without waiving these objections, the United States interprets "Government" to mean CMS for purposes of the Third Requests.  The United States further objects to the term "Person" (Definition 30) to the extent it is defined to mean "…the federal government and all departments and agencies thereof, state governments, local governments, other governmental agencies…."  The United States objects to the definitions of "CMS" (Definition 10), "Government" (Definition 21), "OIG" (Definition 28), and "Person" (Definition 30) as unduly burdensome and disproportionate to the needs of the case to the extent they require the United States to provide information not currently in the possession, custody, or control of CMS and HHS-OIG.  Furthermore, the United States objects to the extent each definition includes former CMS contractors for whom the United States presently has no reasonable belief they possess or control non-duplicative information relevant to any claim or defense in this case.

**Definition 15:**  The United States objects to the definition of "DOJ" as unduly burdensome and disproportionate to the needs of the case to the extent that it includes any agencies components, offices, representatives, contractors, attorneys, consultants, or any person acting on its behalf not relevant to this action.  Definition 15 is plainly unreasonable.

**Definitions 22 and 33:**  The United States objects to the definitions of "including," "relating to," and "regarding" as rendering the Third Requests vague, ambiguous, confusing, overly broad, and unduly burdensome and disproportionate to the needs of the case.  Indeed, these terms as defined seek any piece of information that in some way – no matter how remote, indirect, or tangential – mentions or references matters set forth in the Request.  The United States responds to these Third Requests by using these terms and the verbs constituting their definitions as limited by the constraining adverb "directly."

**Definition 27:**  The United States also objects to the definition of "Medicare Advantage Organization" and "MAO" (Definition 27) to the extent it is inconsistent

7

0472

1   with the definition provided by 42 U.S.C. § 1395w-28(a)(1).  For the purpose of

2   responding to the Requests, the United States shall use the definition of MA Plans

3   provided by 42 U.S.C. § 1395w-28(b)(1) and the definition of MAO provided by 42

4   U.S.C. § 1395w-28(a)(1).

5   **Definition 32:**  The United States objects to the definition of "Provider" as overbroad

6   and unduly burdensome and disproportionate to the needs of the case to the extent it

7   includes entities or individuals that cannot be used to submit diagnoses for risk

8   adjustment payments.

9   **Definition 34**: The United States objects to the definition of "Risk Adjustment" to the

10  extent it is inconsistent with 42 U.S.C. § 1395w-23 and 42 C.F.R. § 422.308(c)(1).

11  **Definition 35:** The United States objects to the definition of "Risk Adjustment

12  Attestation" as overly broad to the extent this term is intended to encompass all

13  attestations required by 42 C.F.R. § 422.504(l).  Subject to and without waiving this

14  objection, the United States will interpret this term to have the meaning set forth in 42

15  C.F.R. § 422.504(l)(2) ("The CEO, CFO, or an individual delegated with the

16  authority to sign on behalf of one of these officers, and who reports directly to such

17  officer, must certify (based on best knowledge, information, and belief) that the data

18  it submits under § 422.310 are accurate, complete, and truthful.").

19  **Definition 36:**  The United States objects to the definition of "State" to the extent it

20  seeks to impose burdens on the United States that are different from, inconsistent

21  with, or exceed those imposed by the Federal Rules of Civil Procedure and the Local

22  Civil Rules.

23  **Definition 40:**  The United States objects to the definition of "you" and "your" to the

24  extent these terms are intend to encompass any agency, office, employee, agent,

25  representative, officer, or contractor of either the legislative or judicial branch, and

26  insofar as these terms are defined to include executive branch agencies and offices

27  not relevant to this action.  This is plainly unreasonable.  Subject to and without

28  waiving these objections, the United States will interpret this term to mean CMS.

0473

**Instruction 3:**  The United States objects to Instruction 3 as vague and construes each request to include the time period from January 1, 2004 through May 16, 2017.

**Instructions 4:**  The United States objects to Instruction 4 to the extent it seeks to impose burdens upon the United States beyond those called for or permitted by the Federal Rules or the Local Rules for the Central District of California.  The United States will respond to unobjectionable Requests or portions of Requests to the best of its present ability.  The United States submits these responses subject to, without intending to waive, but expressly reserving the right to revise, correct, supplement or clarify any of the responses herein at any time up to and including trial.  Said responses are at all times without prejudice subject to such additional or different information that discovery or further investigation may disclose.

**Instruction 5:**  The United States objects to Instruction 5 to the extent it seeks to impose burdens upon the United States beyond those called for or permitted by the Federal Rules or the Local Rules for the Central District of California.

**Instruction 6:**  The United States objects to Instruction 6 to the extent it seeks to impose burdens upon the United States beyond those called for or permitted by the Federal Rules or the Local Rules for the Central District of California.  The United States will assert any applicable privileges and specify the material to which it applies per Fed. R. Civ. P. 25(b)(5)(A) for all information responsive to a request to which the United States has agreed to produce but which is withheld on the basis of a privilege or protection.

0474

**Specific Objections and Responses to Requests for Admission**

**REQUEST FOR ADMISSION NO. 116:**   Admit that UnitedHealth told CMS at the April 29, 2014 Meeting that UnitedHealth's understanding was that MAOs were not required to conduct Two-Way Looks when conducting Chart Reviews prior to the Proposed Medical Record Review Rule taking effect.

**Objection:**   The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definitions of "CMS" and "MAO."  For the purposes of responding to this Request, the United States will interpret the definition of "CMS" to include only those individuals who attended the meeting on April 29, 2014.  The United States objects to this Request as duplicative of Request for Admission No. 112 from the Second Set of Requests.  The United States further objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth and to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts. The United States objects to this Request to the extent it calls for any legal conclusion.

**Response:**   Subject to and without waiving the foregoing objections, the United States admits this Request.

**REQUEST FOR ADMISSION NO. 117:**   Admit that, other than Sean Cavanaugh, Cheri Rice, Cynthia Tudor, Dan Farmer, and Julie Uebersax, no other person from CMS or the Government attended the April 29, 2014 meeting.

**Objection:**   The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definitions of "CMS," "Government," and "Person."  The United States objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth and to the extent that UnitedHealth is using this

10

0475

1  information to mischaracterize or misinterpret the facts.

2  **Response:**  Subject to and without waiving the foregoing objections, the United

3  States admits this Request.

4  **REQUEST FOR ADMISSION NO. 118:**   Admit that, other than Sean Cavanaugh,

5  Cheri Rice, Cynthia Tudor, and Dan Farmer, no other person from CMS or the

6  Government attended the April 29, 2014 meeting.

7  **Objection:**  The United States incorporates its General Objections and Specific

8  Objections to the Definitions and Instructions as if stated herein, including but not

9  limited to, its specific objections to the definitions of "CMS," "Government," and

10  "Person."  The United States objects to this Request to the extent it calls for

11  information that is already in UnitedHealth's possession, custody, or control, or is

12  otherwise available to UnitedHealth and to the extent that UnitedHealth is using this

13  information to mischaracterize or misinterpret the facts.

14  **Response:**  Subject to and without waiving the foregoing objections, the United

15  States denies this Request.

16  **REQUEST FOR ADMISSION NO. 119:**   Admit that Julie Uebersax attended the

17  April 29, 2014 meeting.

18  **Objection:**   The United States incorporates its General Objections and Specific

19  Objections to the Definitions and Instructions as if stated herein.  The United States

20  objects to this Request to the extent it calls for information that is already in

21  UnitedHealth's possession, custody, or control, or is otherwise available to

22  UnitedHealth and to the extent that UnitedHealth is using this information to

23  mischaracterize or misinterpret the facts.

24  **Response:**  Subject to and without waiving the foregoing objections, the United

25  States admits this Request.

26  **REQUEST FOR ADMISSION NO. 120:**   Admit that UnitedHealth told CMS at

27  the April 29, 2014 Meeting that UnitedHealth had suspended its Claims Verification

28  Program.

0476

1  **Objection:**    The United States incorporates its General Objections and Specific

2  Objections to the Definitions and Instructions as if stated herein, including but not

3  limited to, its specific objections to the definition of "CMS." For the purposes of

4  responding to this Request, the United States will interpret the definition of "CMS" to

5  include only those individuals who attended the meeting on April 29, 2014. The

6  United States also objects to this Request to the extent that the undefined term

7  "suspended" is vague and ambiguous. For the purposes of responding to this

8  Request, the United States defines the term "suspended" as stopped or delayed

9  temporarily. The United States objects to this Request to the extent it calls for

10  information that is already in UnitedHealth's possession, custody, or control, or is

11  otherwise available to UnitedHealth and to the extent that UnitedHealth is using this

12  information to mischaracterize or misinterpret the facts. The United States further

13  objects to this Request to the extent it calls for any legal conclusion.

14  **Response:**  Subject to and without waiving the foregoing objections, after a

15  reasonable inquiry, the United States responds that it lacks sufficient information to

16  admit or deny this Request.

17  **REQUEST FOR ADMISSION NO. 121:**  Admit that UnitedHealth told CMS at

18  the April 29, 2014 Meeting that UnitedHealth had suspended its Claims Verification

19  Program based in part on UnitedHealth's discussions with CMS in March and April

20  2014.

21  **Objection:**   The United States incorporates its General Objections and Specific

22  Objections to the Definitions and Instructions as if stated herein, including but not

23  limited to, its specific objections to the definition of "CMS." For the purposes of

24  responding to this Request, the United States will interpret the definition of "CMS" to

25  include only those individuals who attended the meeting on April 29, 2014. The

26  United States also objects to this Request to the extent that the undefined term

27  "suspended" is vague and ambiguous. For the purposes of responding to this

28  Request, the United States defines the term "suspended" as stopped or delayed

0477

temporarily.  The United States objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth and to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts. The United States further objects to this Request to the extent it calls for any legal conclusion.

**Response:**   Subject to and without waiving the foregoing objections, after a reasonable inquiry, the United States responds that it lacks sufficient information to admit or deny this Request.

**REQUEST FOR ADMISSION NO. 122:**   Admit that UnitedHealth told CMS at the April 29, 2014 Meeting that UnitedHealth had suspended its Claims Verification Program based in part on the inherent error rate in Fee-For-Service Medicare data.

**Objection:**    The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "CMS."  For the purposes of responding to this Request, the United States will interpret the definition of "CMS" to include only those individuals who attended the meeting on April 29, 2014.  The United States also objects to this Request to the extent that the undefined term "suspended" is vague and ambiguous.  For the purposes of responding to this Request, the United States defines the term "suspended" as stopped or delayed temporarily.  The United States objects to this Request to the extent the phrase "inherent error rate" is vague and ambiguous as it is undefined and the United States lacks knowledge about what is being requested.  The United States objects to this Request as improper under Federal Rule of Civil Procedure 36 and applicable case law to the extent it is compound in that it asks the United States to admit multiple facts in one Request.  The United States objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth and to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts. The United States further

13

0478

1    objects to this Request to the extent it calls for any legal conclusion.

2    **Response:**  Subject to and without waiving the foregoing objections, after a

3    reasonable inquiry, the United States responds that it lacks sufficient information to

4    admit or deny this Request.

5    **REQUEST FOR ADMISSION NO. 123:**   Admit that UnitedHealth told CMS at

6    the April 29, 2014 Meeting that UnitedHealth had suspended its Claims Verification

7    Program based in part on the Proposed Medical Record Review Rule.

8    **Objection:**  The United States incorporates its General Objections and Specific

9    Objections to the Definitions and Instructions as if stated herein, including but not

10   limited to, its specific objections to the definition of "CMS."  For the purposes of

11   responding to this Request, the United States will interpret the definition of "CMS" to

12   include only those individuals who attended the meeting on April 29, 2014.  The

13   United States also objects to this Request to the extent that the undefined terms and

14   phrases "suspended" is vague and ambiguous.  For the purposes of responding to this

15   Request, the United States defines the term "suspended" as stopped or delayed

16   temporarily.  The United States objects to this Request as improper under Federal

17   Rule of Civil Procedure 36 and applicable case law to the extent it is compound in

18   that it asks the United States to admit multiple facts in one Request.  The United

19   States objects to this Request to the extent it calls for information that is already in

20   UnitedHealth's possession, custody, or control, or is otherwise available to

21   UnitedHealth and to the extent that UnitedHealth is using this information to

22   mischaracterize or misinterpret the facts. The United States further objects to this

23   Request to the extent it calls for any legal conclusion.

24   **Response:**  Subject to and without waiving the foregoing objections, after a reasonable

25   inquiry, the United States responds that it lacks sufficient information to admit or deny

26   this Request.

27   **REQUEST FOR ADMISSION NO. 124:**   Admit that UnitedHealth told CMS at

28   the April 29, 2014 Meeting about its Claims Verification Program.

14

1    **Objection:**  The United States incorporates its General Objections and Specific

2    Objections to the Definitions and Instructions as if stated herein, including but not

3    limited to, its specific objections to the definition of "CMS."  For the purposes of

4    responding to this Request, the United States will interpret the definition of "CMS" to

5    include only those individuals who attended the meeting on April 29, 2014.  The

6    United States also objects to this Request as vague and ambiguous to the extent that it

7    does not specify what UnitedHealth told CMS about its Claims Verification Program.

8    The United States further objects to this Request to the extent it calls for information

9    that is already in UnitedHealth's possession, custody, or control, or is otherwise

10    available to UnitedHealth and to the extent that UnitedHealth is using this

11    information to mischaracterize or misinterpret the facts.

12    **Response:**  Subject to and without waiving the foregoing objections, the United

13    States admits that UnitedHealth brought up the topic of its internal review processes

14    during the April 29, 2014 meeting, but after a reasonable inquiry, it lacks sufficient

15    information to admit or deny the remainder of this Request.

16    **REQUEST FOR ADMISSION NO. 125:**   Admit that UnitedHealth told CMS at

17    the April 29, 2014 Meeting that its Claims Verification Program included a final step,

18    which consisted of a review of Diagnosis Codes by external coding experts.

19    **Objection:**  The United States incorporates its General Objections and Specific

20    Objections to the Definitions and Instructions as if stated herein, including but not

21    limited to, its specific objections to the definition of "CMS."  For the purposes of

22    responding to this Request, the United States will interpret the definition of "CMS" to

23    include only those individuals who attended the meeting on April 29, 2014.  The

24    United States objects to this Request to the extent the phrase "external coding

25    experts" is vague and ambiguous as it is undefined and the United States lacks

26    knowledge about what is being requested.  The United States further objects to this

27    Request to the extent it calls for information that is already in UnitedHealth's

28    possession, custody, or control, or is otherwise available to UnitedHealth and to the

15

0480

1  extent that UnitedHealth is using this information to mischaracterize or misinterpret

2  the facts.

3  **Response:**  Subject to and without waiving the foregoing objections, after a

4  reasonable inquiry, the United States responds that it lacks sufficient information to

5  admit or deny this Request.

6  **REQUEST FOR ADMISSION NO. 126:**   Admit that UnitedHealth told CMS at

7  the April 29, 2014 Meeting about the number of Diagnosis Codes that UnitedHealth

8  had submitted as Deletes to CMS for 2012 Dates of Service prior to the April 29,

9  2014 Meeting.

10  **Objection:**  The United States incorporates its General Objections and Specific

11  Objections to the Definitions and Instructions as if stated herein, including but not

12  limited to, its specific objections to the definition of "CMS."  For the purposes of

13  responding to this Request, the United States will interpret the definition of "CMS" to

14  include only those individuals who attended the meeting on April 29, 2014.  The

15  United States objects to this Request to the extent it calls for information that is

16  already in UnitedHealth's possession, custody, or control, or is otherwise available to

17  UnitedHealth and to the extent that UnitedHealth is using this information to

18  mischaracterize or misinterpret the facts.

19  **Response:**  Subject to and without waiving the foregoing objections, after a

20  reasonable inquiry, the United States responds that it lacks sufficient information to

21  admit or deny this Request.

22  **REQUEST FOR ADMISSION NO. 127:**   Admit that, at the April 29, 2014

23  Meeting, Cheri Rice asked UnitedHealth how many Diagnosis Codes for 2012 Dates

24  of Service had not yet gone through the entire Claims Verification Program process.

25  **Objection:**  The United States incorporates its General Objections and Specific

26  Objections to the Definitions and Instructions as if stated herein.  The United States

27  objects to this Request to the extent it calls for information that is already in

28  UnitedHealth's possession, custody, or control, or is otherwise available to

16

1   UnitedHealth and to the extent that UnitedHealth is using this information to

2   mischaracterize or misinterpret the facts.  The United States further objects to this

3   Request to the extent it is duplicative of Request for Admission No. 136.

4   **Response:**  Subject to and without waiving the foregoing objections, after a

5   reasonable inquiry, the United States responds that it lacks sufficient information to

6   admit or deny this Request.

7   **REQUEST FOR ADMISSION NO. 128:**   Admit that, at the April 29, 2014

8   Meeting, UnitedHealth told CMS that the number of new and unique Diagnosis

9   Codes for 2012 Dates of Service that had previously been submitted for deletion was

10  approximately 13,000.

11  **Objection:**  The United States incorporates its General Objections and Specific

12  Objections to the Definitions and Instructions as if stated herein, including but not

13  limited to, its specific objections to the definition of "CMS."  For the purposes of

14  responding to this Request, the United States will interpret the definition of "CMS" to

15  include only those individuals who attended the meeting on April 29, 2014.  The

16  United States also objects to this Request to the extent that the undefined term

17  "submitted for deletion" is vague and ambiguous.  For the purposes of responding to

18  this Request, the United States defines "submitted for deletion" as making a Delete.

19  The United States objects to this Request to the extent the phrase "new and unique" is

20  vague and ambiguous as it is undefined and the United States lacks knowledge about

21  what is being requested.  The United States objects to this Request to the extent it

22  calls for information that is already in UnitedHealth's possession, custody, or control,

23  or is otherwise available to UnitedHealth and to the extent that UnitedHealth is using

24  this information to mischaracterize or misinterpret the facts.

25  **Response:**  Subject to and without waiving the foregoing objections, the United

26  States admits that informal notes taken by Cynthia Tudor during the April 29, 2014

27  meeting appear to state "claims new deleted 13K from 2012."  However, the United

28  States responds that, after a reasonable inquiry, it lacks sufficient information to

17

0482

1  admit or deny the remainder of this Request.

2  **REQUEST FOR ADMISSION NO. 129:**   Admit that, at the April 29, 2014

3  Meeting, UnitedHealth told CMS that the number of new and unique Diagnosis

4  Codes for 2012 Dates of Service for which the entire Claims Verification Program

5  process had been completed, but which UnitedHealth had not yet submitted as

6  Deletes, was approximately 8,000.

7  **Objection:**  The United States incorporates its General Objections and Specific

8  Objections to the Definitions and Instructions as if stated herein, including but not

9  limited to, its specific objections to the definition "CMS."  For the purposes of this

10  Request, the United States will interpret the definition of "CMS" to include only

11  those individuals who attended the meeting on April 29, 2014.  The United States

12  objects to this Request to the extent the phrase "new and unique" is vague and

13  ambiguous as it is undefined and the United States lacks knowledge about what is

14  being requested.  The United States objects to this Request to the extent it calls for

15  information that is already in UnitedHealth's possession, custody, or control, or is

16  otherwise available to UnitedHealth and to the extent that UnitedHealth is using this

17  information to mischaracterize or misinterpret the facts.

18  **Response:**  Subject to and without waiving the foregoing objections, the United

19  States admits that informal notes taken by Cynthia Tudor during the April 29, 2014

20  meeting appear to state "8k – completed steps – will delete."  However, the United

21  States responds that, after a reasonable inquiry, it lacks sufficient information to

22  admit or deny the remainder of this Request.

23  **REQUEST FOR ADMISSION NO. 130:**   Admit that, at the April 29, 2014

24  Meeting, UnitedHealth told CMS that approximately 8,000 Diagnosis Codes for 2012

25  Dates of Service had not been submitted as Deletes due to UnitedHealth's suspension

26  of its Claims Verification Program.

27  **Objection:**  The United States incorporates its General Objections and Specific

28  Objections to the Definitions and Instructions as if stated herein, including but not

0483

limited to, its specific objections to the definition of "CMS." For the purposes of responding to this Request, the United States will interpret the definition of "CMS" to include only those individuals who attended the meeting on April 29, 2014. The United States also objects to this Request to the extent that the undefined term "submitted as deletes" is vague and ambiguous. For the purposes of responding to this Request, the United States defines "submitted as deletes" as making a Delete. The United States also objects to this Request to the extent that the undefined term "suspension" is vague and ambiguous. For the purposes of responding to this Request, the United States defines the term "suspension" as the act of stopping or delaying something temporarily. The United States objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth and to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts.

**Response:** Subject to and without waiving the foregoing objections, the United States admits that informal notes taken by Cynthia Tudor during the April 29, 2014 meeting appear to state "8k – completed steps – will delete." However, the United States responds that, after a reasonable inquiry, it lacks sufficient information to admit or deny the remainder of this Request.

**REQUEST FOR ADMISSION NO. 131:** Admit that, at the April 29, 2014 Meeting, UnitedHealth told CMS that UnitedHealth estimated that approximately 40,000 Diagnosis Codes might be deleted if UnitedHealth were to complete its Claims Verification Program for 2012 Dates of Service.

**Objection:** The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "CMS." For the purposes of responding to this Request, the United States will interpret the definition of "CMS" to include only those individuals who attended the meeting on April 29, 2014. The United States also objects to this Request to the extent that the undefined terms and

1   phrases "might be deleted" and "complete" are vague and ambiguous and the United

2   States lacks knowledge of what is being requested.  The United States objects to this

3   Request to the extent it calls for information that is already in UnitedHealth's

4   possession, custody, or control, or is otherwise available to UnitedHealth and to the

5   extent that UnitedHealth is using this information to mischaracterize or misinterpret

6   the facts.

7   **Response:**  Subject to and without waiving the foregoing objections, the United

8   States admits that informal notes taken by Cynthia Tudor during the April 29, 2014

9   meeting appear to state "universe in progress 41k – various stages – not finalized."

10   However, the United States responds that, after a reasonable inquiry, it lacks

11   sufficient information to admit or deny the remainder of this Request.

12   **REQUEST FOR ADMISSION NO. 132:**   Admit that, at the April 29, 2014

13   Meeting, UnitedHealth told CMS that the quality assurance process for Chart Review

14   was different from UnitedHealth's Claims Verification Program.

15   **Objection:**  The United States incorporates its General Objections and Specific

16   Objections to the Definitions and Instructions as if stated herein, including but not

17   limited to, its specific objections to the definition of "CMS."  For the purposes of

18   responding to this Request, the United States will interpret the definition of "CMS" to

19   include only those individuals who attended the meeting on April 29, 2014.  The

20   United States also objects to this Request to the extent that the undefined phrase

21   "quality assurance process" is vague and ambiguous and the United States lacks

22   knowledge about what is being requested.  The United States objects to this Request

23   to the extent it calls for information that is already in UnitedHealth's possession,

24   custody, or control, or is otherwise available to UnitedHealth and to the extent that

25   UnitedHealth is using this information to mischaracterize or misinterpret the facts.

26   **Response:**  Subject to and without waiving the foregoing objections, after a

27   reasonable inquiry, the United States responds that it lacks sufficient information to

28   admit or deny this Request.

0485

**REQUEST FOR ADMISSION NO. 133:**   Admit that, at the April 29, 2014 Meeting, UnitedHealth told CMS that UnitedHealth's Claims Verification Program was a review of certain Beneficiaries' Charts to identify whether any Diagnosis Codes previously submitted to CMS required submission as Deletes.

**Objection:**   The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "CMS."   For the purposes of responding to this Request, the United States will interpret the definition of "CMS" to include only those individuals who attended the meeting on April 29, 2014.   The United States further objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth and to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts.   The United States also objects to this Request to the extent it is duplicative of Request for Admission No. 134.

**Response:**   Subject to and without waiving the foregoing objections, after a reasonable inquiry, the United States responds that it lacks sufficient information to admit or deny this Request.

**REQUEST FOR ADMISSION NO. 134:**   Admit that, at the April 29, 2014 Meeting, UnitedHealth told CMS that UnitedHealth's Claims Verification Program was a process to identify whether any Diagnosis Codes previously submitted to CMS required submission as Deletes.

**Objection:**   The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "CMS."   For the purposes of responding to this Request, the United States will interpret the definition of "CMS" to include only those individuals who attended the meeting on April 29, 2014.   The United States also objects to this Request to the extent that the undefined term "submission as Deletes" is vague and ambiguous.   For the purposes of responding to

0486

this Request, the United States defines "submission as Deletes" as making a Delete. The United States objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth and to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts. The United States also objects to this Request to the extent it is duplicative of Request for Admission No. 133.

**Response:** Subject to and without waiving the foregoing objections, after a reasonable inquiry, the United States responds that it lacks sufficient information to admit or deny this Request.

**REQUEST FOR ADMISSION NO. 135:** Admit that, at the April 29, 2014 Meeting, UnitedHealth told CMS that the Chart Review quality assurance process focused on reviewing Diagnosis Codes identified during Chart Review.

**Objection:** The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "CMS." For the purposes of responding to this Request, the United States will interpret the definition of "CMS" to include only those individuals who attended the meeting on April 29, 2014. The United States also objects to this Request to the extent that the undefined phrase "quality assurance process" is vague and ambiguous and the United States lacks knowledge about what is being requested. The United States objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth and to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts.

**Response:** Subject to and without waiving the foregoing objections, after a reasonable inquiry, the United States responds that it lacks sufficient information to admit or deny this Request.

**REQUEST FOR ADMISSION NO. 136:** Admit that, at the April 29, 2014 Meeting, Cheri Rice asked UnitedHealth how many Diagnosis Codes for 2012 Dates

22

0487

1    of Service UnitedHealth had not yet completed review of in its Claims Verification

2    Program.

3    **Objection:**  The United States incorporates its General Objections and Specific

4    Objections to the Definitions and Instructions as if stated herein.  The United States

5    objects to this Request to the extent it calls for information that is already in

6    UnitedHealth's possession, custody, or control, or is otherwise available to

7    UnitedHealth and to the extent that UnitedHealth is using this information to

8    mischaracterize or misinterpret the facts.  The United States further objects to this

9    Request to the extent it is duplicative of Request for Admission No. 127.

10   **Response:**  Subject to and without waiving the foregoing objections, after a

11   reasonable inquiry, the United States responds that it lacks sufficient information to

12   admit or deny this Request.

13   **REQUEST FOR ADMISSION NO. 137:**   Admit that UnitedHealth told CMS at

14   the April 29, 2014 Meeting that UnitedHealth had suspended UnitedHealth's Claims

15   Verification Program pending UnitedHealth's decision regarding whether to no

16   longer continue its Claims Verification Program.

17   **Objection:**  The United States incorporates its General Objections and Specific

18   Objections to the Definitions and Instructions as if stated herein, including but not

19   limited to, its specific objections to the definition of "CMS."  For the purposes of

20   responding to this Request, the United States will interpret the definition of "CMS" to

21   include only those individuals who attended the meeting on April 29, 2014.  The

22   United States also objects to this Request to the extent that the undefined term

23   "suspended" is vague and ambiguous.  For the purposes of responding to this

24   Request, the United States defines the term "suspended" as stopped or delayed

25   temporarily.  The United States objects to this Request as improper under Federal

26   Rule of Civil Procedure 36 and applicable case law to the extent it is compound in

27   that it asks the United States to admit multiple facts in one Request.  The United

28   States objects to this Request to the extent it calls for information that is already in

1    UnitedHealth's possession, custody, or control, or is otherwise available to

2    UnitedHealth and to the extent that UnitedHealth is using this information to

3    mischaracterize or misinterpret the facts. The United States further objects to this

4    Request to the extent it calls for any legal conclusion.

5    **Response:**  Subject to and without waiving the foregoing objections, after a

6    reasonable inquiry, the United States responds that it lacks sufficient information to

7    admit or deny this Request.

8    **REQUEST FOR ADMISSION NO. 138:**   Admit that, at the April 29, 2014

9    Meeting, Cheri Rice told UnitedHealth that MAOs do not have to confirm whether

10   Diagnosis Codes submitted by Providers are supported by a Beneficiaries' Chart.

11   **Objection:**  The United States incorporates its General Objections and Specific

12   Objections to the Definitions and Instructions as if stated herein, including but not

13   limited to, its specific objections to the definition of "MAO."  The United States also

14   objects to this Request to the extent that the undefined term "confirm" is vague and

15   ambiguous.  For the purposes of responding to this request, the United States defines

16   "confirm" as establishing the truth or accuracy of something.  The United States

17   objects to this Request to the extent it calls for information that is already in

18   UnitedHealth's possession, custody, or control, or is otherwise available to

19   UnitedHealth and to the extent that UnitedHealth is using this information to

20   mischaracterize or misinterpret the facts.  The United States further objects to this

21   Request to the extent it calls for any legal conclusion.

22   **Response:**  Subject to and without waiving the foregoing objections, the United

23   States denies this Request.

24   **REQUEST FOR ADMISSION NO. 139:**   Admit that, at the April 29, 2014

25   Meeting, Cheri Rice told UnitedHealth that UnitedHealth does not need to confirm

26   whether Diagnosis Codes submitted by Providers are supported by a Beneficiaries'

27   Chart.

28   **Objection:**  The United States incorporates its General Objections and Specific

24

0489

1  Objections to the Definitions and Instructions as if stated herein. The United States

2  also objects to this Request to the extent that the undefined term "confirm" is vague

3  and ambiguous.  For the purposes of responding to this request, the United States

4  defines "confirm" as establishing the truth or accuracy of something.  The United

5  States objects to this Request to the extent it calls for information that is already in

6  UnitedHealth's possession, custody, or control, or is otherwise available to

7  UnitedHealth and to the extent that UnitedHealth is using this information to

8  mischaracterize or misinterpret the facts.  The United States further objects to this

9  Request to the extent it calls for any legal conclusion.  The United States objects to

10  this Request as duplicative of Request No. 138.

11  **Response:**  Subject to and without waiving the foregoing objections, the United

12  States denies this Request.

13  **REQUEST FOR ADMISSION NO. 140:**   Admit that, at the April 29, 2014

14  Meeting, Sean Cavanaugh told UnitedHealth that if an MAO does not have

15  Knowledge that a Diagnosis Code is not documented in a Beneficiary's Chart, the

16  MAO does not need to submit that Diagnosis Code to CMS as a Delete.

17  **Objection:**  The United States incorporates its General Objections and Specific

18  Objections to the Definitions and Instructions as if stated herein, including but not

19  limited to, its specific objections to the definitions of "CMS" and "MAO."  The

20  United States objects to this Request to the extent it calls for information that is

21  already in UnitedHealth's possession, custody, or control, or is otherwise available to

22  UnitedHealth and to the extent that UnitedHealth is using this information to

23  mischaracterize or misinterpret the facts.  The United States further objects to this

24  Request to the extent it calls for any legal conclusion.

25  **Response:**  Subject to and without waiving the foregoing objections, the United

26  States denies this Request.

27  **REQUEST FOR ADMISSION NO. 141:**   Admit that, at the April 29, 2014

28  Meeting, Sean Cavanaugh told UnitedHealth that if UnitedHealth does not have

0490

Knowledge that Diagnosis Codes are not documented in a Beneficiary's Chart, UnitedHealth would not need to submit those Diagnosis Codes to CMS as Deletes.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definitions of "CMS."  The United States objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth and to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts.  The United States further objects to this Request to the extent it calls for any legal conclusion.  The United States objects to this Request as duplicative of Request No. 140.

**Response:**  Subject to and without waiving the foregoing objections, the United States denies this Request.

**REQUEST FOR ADMISSION NO. 142:**   Admit that, at the April 29, 2014 Meeting, Cheri Rice told UnitedHealth that if an MAO does not have Knowledge that a Diagnosis Code is not documented in a Beneficiary's Chart, then the MAO has not received an Overpayment.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "MAO."  The United States objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth and to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts.  The United States further objects to this Request to the extent it calls for any legal conclusion.

**Response:**  Subject to and without waiving the foregoing objections, the United States denies this Request.

0491

**REQUEST FOR ADMISSION NO. 143:**   Admit that, at the April 29, 2014 Meeting, Cheri Rice told UnitedHealth that if UnitedHealth does not have Knowledge that a Diagnosis Code is not documented in a Beneficiary's Chart, then UnitedHealth has not received an Overpayment.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein.  The United States objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth and to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts.  The United States further objects to this Request to the extent it calls for any legal conclusion.  The United States objects to this Request as duplicative of Request No. 142.

**Response:**  Subject to and without waiving the foregoing objections, the United States denies this Request.

**REQUEST FOR ADMISSION NO. 144:**   Admit that UnitedHealth submitted a Risk Adjustment Attestation to CMS on April 30, 2014.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "CMS."  The United States objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth and to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts.  The United States further objects to this Request to the extent it calls for any legal conclusion.

**Response:**  Subject to and without waiving the foregoing objections, the United States admits this Request.

**REQUEST FOR ADMISSION NO. 145:**   Admit that UnitedHealth submitted its Risk Adjustment Attestation to CMS on April 30, 2014 electronically.

27

0492

1  **Objection:**  The United States incorporates its General Objections and Specific

2  Objections to the Definitions and Instructions as if stated herein, including but not

3  limited to, its specific objections to the definition of "CMS."  The United States

4  objects to this Request to the extent it seeks information not relevant to a claim or

5  defense in this case.  The United States objects to this Request to the extent it calls for

6  information that is already in UnitedHealth's possession, custody, or control, or is

7  otherwise available to UnitedHealth and to the extent that UnitedHealth is using this

8  information to mischaracterize or misinterpret the facts.  The United States further

9  objects to this Request to the extent it calls for any legal conclusion.

10  **Response:**  Subject to and without waiving the foregoing objections, the United

11  States admits this Request.

12  **REQUEST FOR ADMISSION NO. 146:**   Admit that on April 30, 2014,

13  UnitedHealth informed CMS that UnitedHealth would not Delete Diagnosis Codes

14  that had not completed all steps in its Claims Verification Program at the time that

15  UnitedHealth suspended its Claims Verification Program.

16  **Objection:**  The United States incorporates its General Objections and Specific

17  Objections to the Definitions and Instructions as if stated herein, including but not

18  limited to, its specific objections to the definition of "CMS."  The United States also

19  objects to this Request to the extent that the undefined term "suspended" is vague and

20  ambiguous.  For the purposes of responding to this Request, the United States defines

21  the term "suspended" as stopped or delayed temporarily.  The United States objects to

22  this Request to the extent it calls for information that is already in UnitedHealth's

23  possession, custody, or control, or is otherwise available to UnitedHealth and to the

24  extent that UnitedHealth is using this information to mischaracterize or misinterpret

25  the facts.  The United States further objects to this Request to the extent it calls for

26  any legal conclusion.

27  **Response:**  Subject to and without waiving the foregoing objections, the United

28  States admits that Steve Nelson sent an email dated April 30, 2014, MARA1296257,

0493

1  which stated:

2  > We currently have a process through which we review certain medical records

3  > to determine the accuracy of risk adjustment diagnoses and submit appropriate

4  > deletes.  This process already has resulted in the identification of and, in some

5  > instances, the submission of deletes for 2012 dates of service. But based on the

6  > proposed rule, including the preamble, and recent conversations with CMS, we

7  > suspended that process for 2012 dates of service while we consider whether to

8  > make changes. Pursuant to our discussion, however, we will soon submit for

9  > deletion those diagnosis codes that have undergone a complete review and that

10 > we have therefore identified as appropriate deletes. In the near future, we will

11 > determine whether to continue our review process for the diagnosis codes

12 > which were still under review at the time we suspended our process. In the

13 > meantime, we will not delete these codes.

14  The United States denies the remainder of this Request.

15  **REQUEST FOR ADMISSION NO. 147:**   Admit that on June 26, 2015,

16  UnitedHealth notified CMS that UnitedHealth terminated its Claims Verification

17  Program.

18  **Objection:**  The United States incorporates its General Objections and Specific

19  Objections to the Definitions and Instructions as if stated herein, including but not

20  limited to, its specific objections to the definition of "CMS."  The United States also

21  objects to this Request to the extent that the undefined term "terminated" is vague and

22  ambiguous.  For the purposes of responding to this Request, the United States defines

23  the term "terminated" as caused something to end.  The United States objects to this

24  Request to the extent it calls for information that is already in UnitedHealth's

25  possession, custody, or control, or is otherwise available to UnitedHealth and to the

26  extent that UnitedHealth is using this information to mischaracterize or misinterpret

27  the facts.  The United States further objects to this Request to the extent it calls for

28  any legal conclusion.

0494

**Response:**  Subject to and without waiving the foregoing objections, the United States admits that Steve Nelson sent an email dated June 26, 2015 to Cheri Rice, MAPL000787445, which stated:

> As we discussed last year, we previously had a process through which we reviewed certain medical records to determine the accuracy of risk adjustment diagnoses and submitted appropriate deletes.  Based on our conversations with CMS last year, CMS's withdrawal of the proposed rule, and CMS's ongoing consideration of a FFS Adjuster to address diagnoses not supported by a medical record in the context of RADV, we ended this process and informed you of that decision.  That decision remains operative for 2013 dates of service. In particular, we did not use our previous process to determine whether diagnosis codes submitted through claims are unsupported in the medical record.  We do have a quality assurance process that deletes codes initially identified during chart review and that are later determined to be unsupported.

The United States denies the remainder of this Request.

**REQUEST FOR ADMISSION NO. 148:**   Admit that UnitedHealth did not tell CMS that it was conducting Two-Way Looks when it submitted its MA Part C Supporting Documentation for CY2015 Bid in 2014.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "CMS."  The United States objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth and to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts.  The United States further objects to this Request to the extent it calls for any legal conclusion.

**Response:**  Subject to and without waiving the foregoing objections, the United States responds that UnitedHealth's Bid dated June 2, 2014, USBP000674257, stated:

0495

We also adjusted projected risk scores to account for changes in our medical record review processes.  Specifically, based on multiple conversations with CMS and CMS's treatment of medical record review in its recent rulemaking process, the health plan has decided to cease one of its prior processes that identified and deleted certain diagnoses codes through the medical record review process.

Subject to and without waiving the foregoing objections, after a reasonable inquiry, the United States responds that it lacks sufficient information to admit or deny the remainder of this Request.

**REQUEST FOR ADMISSION NO. 149:**   Admit that UnitedHealth told CMS it was not conducting Two-Way Looks when it submitted its MA Part C Supporting Documentation for CY2016 Bid in 2015.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "CMS."  The United States objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth and to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts.  The United States further objects to this Request to the extent it calls for any legal conclusion.

**Response:**  Subject to and without waiving the foregoing objections, after a reasonable inquiry, the United States responds that it lacks sufficient information to admit or deny this Request.

**REQUEST FOR ADMISSION NO. 150:**   Admit that UnitedHealth told CMS it was not conducting Two-Way Looks when it submitted its MA Part C Supporting Documentation for CY2017 Bid in 2016.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not

31

1  limited to, its specific objections to the definition of "CMS." The United States

2  objects to this Request to the extent it calls for information that is already in

3  UnitedHealth's possession, custody, or control, or is otherwise available to

4  UnitedHealth and to the extent that UnitedHealth is using this information to

5  mischaracterize or misinterpret the facts. The United States further objects to this

6  Request to the extent it calls for any legal conclusion.

7  **Response:** Subject to and without waiving the foregoing objections, the United

8  States admits that UnitedHealth's Bid dated August 4, 2016, MAPL002840316,

9  stated:

10      In addition, prior to 2014, the health plan had a process of identifying and

11      deleting certain diagnosis codes through the medical record review process.

12      Based on multiple conversations with CMS in 2014 and CMS's treatment of

13      medical record review in its 2014 rulemaking process, the health plan ceased

14      this process in 2014. As a result, we will not reduce projected risk scores to

15      account for our previous process.

16  The United States denies the remainder of this Request.

17  **REQUEST FOR ADMISSION NO. 151:** Admit that Cheri Rice read Steve

18  Nelson's April 30, 2014 Email.

19  **Objection:** The United States incorporates its General Objections and Specific

20  Objections to the Definitions and Instructions as if stated herein. The United States

21  further objects to this Request as vague, ambiguous, overly broad, and unduly

22  burdensome to the extent that it is not limited to a specific period of time. The United

23  States objects to this Request to the extent that UnitedHealth is using this information

24  to mischaracterize or misinterpret the facts   The United States further objects to this

25  Request to the extent it calls for any legal conclusion. The United States further

26  objects to this Request to the extent it is duplicative of Request for Admission Nos.

27  152 and 153.

28  **Response:** Subject to and without waiving the foregoing objections, the United

1   States admits this Request.

2   **REQUEST FOR ADMISSION NO. 152:**   Admit that Cheri Rice read Steve

3   Nelson's April 30, 2014 Email on or before May 2, 2014.

4   **Objection:**   The United States incorporates its General Objections and Specific

5   Objections to the Definitions and Instructions as if stated herein.  The United States

6   objects to this Request to the extent that UnitedHealth is using this information to

7   mischaracterize or misinterpret the facts.  The United States further objects to this

8   Request to the extent it calls for any legal conclusion.  The United States further

9   objects to this Request to the extent it is duplicative of Request for Admission Nos.

10  151 and 153.

11  **Response:**  Subject to and without waiving the foregoing objections, the United

12  States admits this Request.

13  **REQUEST FOR ADMISSION NO. 153:**   Admit that Cheri Rice read Steve

14  Nelson's April 30, 2014 Email in its entirety on or before May 2, 2014.

15  **Objection:**   The United States incorporates its General Objections and Specific

16  Objections to the Definitions and Instructions as if stated herein.  The United States

17  objects to this Request to the extent that UnitedHealth is using this information to

18  mischaracterize or misinterpret the facts.  The United States further objects to this

19  Request to the extent it calls for any legal conclusion.  The United States further

20  objects to this Request to the extent it is duplicative of Request for Admission Nos.

21  151 and 152.

22  **Response:**  Subject to and without waiving the foregoing objections, the United

23  States admits this Request.

24  **REQUEST FOR ADMISSION NO. 154:**   Admit that Cheri Rice read in Steve

25  Nelson's April 30, 2014 Email that UnitedHealth had suspended its Claims

26  Verification Program.

27  **Objection:**   The United States incorporates its General Objections and Specific

28  Objections to the Definitions and Instructions as if stated herein.  The United States

33

0498

also objects to this Request to the extent that the undefined term "suspended" is vague and ambiguous. For the purposes of responding to this Request, the United States defines the term "suspended" as stopped or delayed temporarily. The United States further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome to the extent that it is not limited to a specific period of time. The United States objects to this Request to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts. The United States objects to this Request as improper under Federal Rule of Civil Procedure 36 and applicable case law to the extent it is compound in that it asks the United States to admit multiple facts in one Request. The United States further objects to this Request to the extent it calls for any legal conclusion.

**Response:** Subject to and without waiving the foregoing objections, the United States admits that Cheri Rice read Steve Nelson's April 30, 2014 email and that the email stated "We currently have a process through which we review certain medical records to determine the accuracy of risk adjustment diagnoses and submit appropriate deletes.  …we suspended that process for 2012 dates of services while we consider whether to make changes." However, the United States denies the remainder of this Request.

**REQUEST FOR ADMISSION NO. 155:**   Admit that Cheri Rice read in Steve Nelson's April 30, 2014 Email that UnitedHealth understood that MAOs were not required to conduct Two-Way Looks.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "MAO." The United States also objects to this Request to the extent that the undefined terms "understood" is vague and ambiguous. For purposes of this Request, the United States defines "understood" as "grasped the meaning of." The United States further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome to the extent that it is not

34

limited to a specific period of time. The United States objects to this Request to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts. The United States objects to this Request as improper under Federal Rule of Civil Procedure 36 and applicable case law to the extent it is compound in that it asks the United States to admit multiple facts in one Request. The United States objects to this Request to the extent it calls for any legal conclusion.

**Response:** Subject to and without waiving the foregoing objections, the United States admits that Cheri Rice read Steve Nelson's April 30, 2014 email and that the email stated "Fifth, as we discussed yesterday, CMS recently issued a proposed rule that would, if finalized, require MA plans to design any medical record reviews to determine the accuracy of risk adjustment diagnoses associated with those records. During our conversation yesterday and other recent conversations, CMS confirmed to us that these requirements do not apply until the effective date of the rule, and that MA plans are thus not currently required to design their medical record reviews to determine the accuracy of risk adjustment diagnoses." The United States denies the remainder of this Request.

**REQUEST FOR ADMISSION NO. 156:** Admit that after Cheri Rice received Steve Nelson's April 30, 2014 Email, Cheri Rice had Communications with one or more individuals at CMS about the April 30, 2014 Email.

**Objection:** The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "CMS." The United States objects to this Request to the extent it seeks disclosure of information that is protected from disclosure by an applicable privilege or protection, including the attorney-client privilege, attorney work-product doctrine, deliberative process privilege, and/or investigative files privilege. The United States further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome to the extent that it is not limited to a specific period of time. The United States objects to this Request to the

35

extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts. The United States objects to this Request as improper under Federal Rule of Civil Procedure 36 and applicable case law to the extent it is compound in that it asks the United States to admit multiple facts in one Request.

**Response:** Subject to and without waiving the foregoing objections, the United States admits this Request.

**REQUEST FOR ADMISSION NO. 157:** Admit that after Cheri Rice received Steve Nelson's April 30, 2014 Email, Cheri Rice had Communications with DOJ about the April 30, 2014 Email.

**Objection:** The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objection to the definition of "DOJ." The United States objects to this Request as an improper abuse of Federal Rule of Civil Procedure 36 because by its own terms it specifically seeks disclosure of information that is protected from disclosure by the attorney-client privilege. The United States further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome to the extent that it is not limited to a specific period of time. The United States objects to this Request to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts. The United States objects to this Request as improper under Federal Rule of Civil Procedure 36 and applicable case law to the extent it is compound in that it asks the United States to admit multiple facts in one Request.

**Response:** Subject to the foregoing objections, the United States does not intend to respond to this Request because responsive information, if any, is protected by the attorney-client privilege.

**REQUEST FOR ADMISSION NO. 158:** Admit that after Cheri Rice received Steve Nelson's April 30, 2014 Email, Cheri Rice had Communications with OIG about the April 30, 2014 Email.

**Objection:** The United States incorporates its General Objections and Specific

0501

Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "OIG." The United States further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome to the extent that it is not limited to a specific period of time. The United States objects to this Request to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts. The United States objects to this Request as improper under Federal Rule of Civil Procedure 36 and applicable case law to the extent it is compound in that it asks the United States to admit multiple facts in one Request.

**Response:** Subject to and without waiving the foregoing objections, the United States denies this Request.

**REQUEST FOR ADMISSION NO. 159:** Admit that Cheri Rice took notes regarding her Communications with one or more individuals at CMS related to Steve Nelson's April 30, 2014 Email, including such notes before, during, and/or after the Communication(s).

**Objection:** The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "CMS." The United States objects to this Request to the extent it seeks disclosure of information that is protected from disclosure by an applicable privilege or protection, including the attorney-client privilege, attorney work-product doctrine, deliberative process privilege, and/or investigative files privilege. The United States further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome to the extent that it is not limited to a specific period of time. The United States objects to this Request to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts.

**Response:** Subject to and without waiving the foregoing objections, the United States denies this Request.

37

0502

**REQUEST FOR ADMISSION NO. 160:**  Admit that Cheri Rice took notes regarding her Communications with DOJ related to Steve Nelson's April 30, 2014 Email, including such notes before, during, and/or after the Communication(s).

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "DOJ."  The United States objects to this Request as an improper abuse of Federal Rule of Civil Procedure 36 because by its own terms it specifically seeks disclosure of information that is protected from disclosure by the attorney-client privilege.  The United States further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome to the extent that it is not limited to a specific period of time.

**Response:**  Subject to the foregoing objections, the United States does not intend to respond to this Request because responsive information, if any, is protected by the attorney-client privilege.

**REQUEST FOR ADMISSION NO. 161:**  Admit that Cheri Rice took notes regarding her Communications with OIG related to Steve Nelson's April 30, 2014 Email, including such notes before, during, and/or after the Communication(s).

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "OIG."  The United States further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome to the extent that it is not limited to a specific period of time.  The United States objects to this Request to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts.

**Response:**  Subject to and without waiving the foregoing objections, the United States denies this Request.

0503

1    **REQUEST FOR ADMISSION NO. 162:**   Admit that Cheri Rice provided some or

2    all of the content of Steve Nelson's April 30, 2014 Email to one or more individuals

3    at CMS.

4    **Objection:**  The United States incorporates its General Objections and Specific

5    Objections to the Definitions and Instructions as if stated herein, including but not

6    limited to, its specific objections to the definition of "CMS."  The United States

7    objects to this Request to the extent it seeks disclosure of information that is protected

8    from disclosure by an applicable privilege or protection, including the attorney-client

9    privilege, attorney work-product doctrine, deliberative process privilege, and/or

10   investigative files privilege.  The United States further objects to this Request as

11   vague, ambiguous, overly broad, and unduly burdensome to the extent that it is not

12   limited to a specific period of time.  The United States objects to this Request to the

13   extent that UnitedHealth is using this information to mischaracterize or misinterpret

14   the facts.  The United States objects to this Request to the extent it calls for any legal

15   conclusion.  The United States objects to this Request to extent it is duplicative of

16   Request for Admission No. 166.

17   **Response:**  Subject to and without waiving the foregoing objections, the United

18   States admits this Request.

19   **REQUEST FOR ADMISSION NO. 163:**   Admit that Cheri Rice provided some or

20   all of the content of Steve Nelson's April 30, 2014 Email to DOJ.

21   **Objection:**  The United States incorporates its General Objections and Specific

22   Objections to the Definitions and Instructions as if stated herein, including but not

23   limited to, its specific objections to the definition of "DOJ."  The United States

24   objects to this Request as an improper abuse of Federal Rule of Civil Procedure 36

25   because by its own terms it specifically seeks disclosure of information that is

26   protected from disclosure by the attorney-client privilege.  The United States further

27   objects to this Request as vague, ambiguous, overly broad, and unduly burdensome to

28   the extent that it is not limited to a specific period of time.  The United States objects

39

to this Request to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts.  The United States objects to this Request to the extent it calls for any legal conclusion.  The United States objects to this Request to extent it is duplicative of Request for Admission Nos. 165 and 167.

**Response:**  Subject to the foregoing objections, the United States does not intend to respond to this Request because responsive information, if any, is protected by the attorney-client privilege.

**REQUEST FOR ADMISSION NO. 164:**   Admit that Cheri Rice provided some or all of the content of Steve Nelson's April 30, 2014 Email to OIG.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "OIG."  The United States further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome to the extent that it is not limited to a specific period of time.  The United States objects to this Request to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts.  The United States objects to this Request to the extent it calls for any legal conclusion.  The United States objects to this Request to extent it is duplicative of Request for Admission No. 168.

**Response:**  Subject to and without waiving the foregoing objections, the United States denies this Request.

**REQUEST FOR ADMISSION NO. 165:**   Admit that Cheri Rice provided Steve Nelson's April 30, 2014 Email to DOJ.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "DOJ."  The United States objects to this Request as an improper abuse of Federal Rule of Civil Procedure 36 because by its own terms it specifically seeks disclosure of information that is protected from disclosure by the attorney-client privilege.  The United States further

40

0505

1  objects to this Request as vague, ambiguous, overly broad, and unduly burdensome to

2  the extent that it is not limited to a specific period of time.  The United States objects

3  to this Request to the extent that UnitedHealth is using this information to

4  mischaracterize or misinterpret the facts.  The United States objects to this Request to

5  the extent it calls for any legal conclusion.  The United States objects to this Request

6  as harassing to extent it is duplicative of Request for Admission No. 163, and

7  identical to Request for Admission No. 167.

8  **Response:**  Subject to the foregoing objections, the United States does not intend to

9  respond to this Request because responsive information, if any, is protected by the

10  attorney-client privilege.

11  **REQUEST FOR ADMISSION NO. 166:**   Admit that Cheri Rice provided Steve

12  Nelson's April 30, 2014 Email to one or more individuals at CMS.

13  **Objection:**  The United States incorporates its General Objections and Specific

14  Objections to the Definitions and Instructions as if stated herein, including but not

15  limited to, its specific objections to the definition of "CMS."  The United States

16  objects to this Request to the extent it seeks disclosure of information that is protected

17  from disclosure by an applicable privilege or protection, including the attorney-client

18  privilege, attorney work-product doctrine, deliberative process privilege, and/or

19  investigative files privilege.  The United States further objects to this Request as

20  vague, ambiguous, overly broad, and unduly burdensome to the extent that it is not

21  limited to a specific period of time.  The United States objects to this Request to the

22  extent that UnitedHealth is using this information to mischaracterize or misinterpret

23  the facts.  The United States objects to this Request to the extent it calls for any legal

24  conclusion.  The United States objects to this Request to extent it is duplicative of

25  Request for Admission No. 162.

26  **Response:**  Subject to and without waiving the foregoing objections, the United

27  States admits this Request.

28  **REQUEST FOR ADMISSION NO. 167:**   Admit that Cheri Rice provided Steve

0506

1   Nelson's April 30, 2014 Email to DOJ.

2   **Objection:**  The United States incorporates its General Objections and Specific

3   Objections to the Definitions and Instructions as if stated herein, including but not

4   limited to, its specific objections to the definition of "DOJ."  The United States

5   objects to this Request as an improper abuse of Federal Rule of Civil Procedure 36

6   because by its own terms it specifically seeks disclosure of information that is

7   protected from disclosure by the attorney-client privilege.  The United States further

8   objects to this Request as vague, ambiguous, overly broad, and unduly burdensome to

9   the extent that it is not limited to a specific period of time. The United States objects

10   to this Request to the extent that UnitedHealth is using this information to

11   mischaracterize or misinterpret the facts.  The United States objects to this Request to

12   the extent it calls for any legal conclusion.   The United States objects to this Request

13   as harassing to extent it is duplicative of Request for Admission No. 163, and

14   identical to Request for Admission No. 165.

15   **Response:**  Subject to the foregoing objections, the United States does not intend to

16   respond to this Request because responsive information, if any, is protected by the

17   attorney-client privilege.

18   **REQUEST FOR ADMISSION NO. 168:**   Admit that Cheri Rice provided Steve

19   Nelson's April 30, 2014 Email to OIG.

20   **Objection:**  The United States incorporates its General Objections and Specific

21   Objections to the Definitions and Instructions as if stated herein, including but not

22   limited to, its specific objections to the definition of "OIG."  The United States

23   further objects to this Request as vague, ambiguous, overly broad, and unduly

24   burdensome to the extent that it is not limited to a specific period of time.  The United

25   States objects to this Request to the extent that UnitedHealth is using this information

26   to mischaracterize or misinterpret the facts.  The United States objects to this Request

27   to the extent it calls for any legal conclusion.  The United States objects to this

28   Request to extent it is duplicative of Request for Admission No. 164.

0507

**Response:**  Subject to and without waiving the foregoing objections, the United

States denies this Request.

**REQUEST FOR ADMISSION NO. 169:**   Admit that Cheri Rice's

Communications with one or more individuals at CMS regarding the April 30, 2014

Email in part related to UnitedHealth's suspension of its Claims Verification

Program.

**Objection:**  The United States incorporates its General Objections and Specific

Objections to the Definitions and Instructions as if stated herein, including but not

limited to, its specific objections to the definition of "CMS."  The United States also

objects to this Request to the extent that the undefined term "suspension" is vague

and ambiguous.  For the purposes of responding to this Request, the United States

defines the term "suspension" as the act of stopping or delaying something

temporarily.  The United States objects to this Request to the extent it seeks

disclosure of information that is protected from disclosure by an applicable privilege

or protection, including the attorney-client privilege, attorney work-product doctrine,

deliberative process privilege, and/or investigative files privilege.  The United States

further objects to this Request as vague, ambiguous, overly broad, and unduly

burdensome to the extent that it is not limited to a specific period of time.  The United

States objects to this Request to the extent that UnitedHealth is using this information

to mischaracterize or misinterpret the facts.  The United States objects to this Request

to the extent it calls for any legal conclusion.  The United States objects to this

Request as improper under Federal Rule of Civil Procedure 36 and applicable case

law to the extent it is compound in that it asks the United States to admit multiple

facts in one Request.

**Response:**  Subject to and without waiving the foregoing objections, the United

States admits that Cheri Rice had Communications with one or more individuals at

CMS regarding the April 30, 2014 Email.  However, after a reasonable inquiry, the

United States responds that it lacks sufficient information to admit or deny the

0508

1    remainder of this Request.

2    **REQUEST FOR ADMISSION NO. 170:**    Admit that Cheri Rice's

3    Communications with DOJ regarding the April 30, 2014 Email in part related to

4    UnitedHealth's suspension of its Claims Verification Program.

5    **Objection:**    The United States incorporates its General Objections and Specific

6    Objections to the Definitions and Instructions as if stated herein, including but not

7    limited to, its specific objections to the definition of "DOJ."  The United States also

8    objects to this Request to the extent that the undefined term "suspension" is vague

9    and ambiguous.  For the purposes of responding to this Request, the United States

10   defines the term "suspension" as the act of stopping or delaying something

11   temporarily.  The United States objects to this Request as an improper abuse of

12   Federal Rule of Civil Procedure 36 because by its own terms it specifically seeks

13   disclosure of information that is protected from disclosure by the attorney-client

14   privilege.  The United States further objects to this Request as vague, ambiguous,

15   overly broad, and unduly burdensome to the extent that it is not limited to a specific

16   period of time.  The United States objects to this Request to the extent that

17   UnitedHealth is using this information to mischaracterize or misinterpret the facts.

18   The United States objects to this Request to the extent it calls for any legal

19   conclusion.  The United States objects to this Request as improper under Federal Rule

20   of Civil Procedure 36 and applicable case law to the extent it is compound in that it

21   asks the United States to admit multiple facts in one Request.

22   **Response:**    Subject to the foregoing objections, the United States does not intend to

23   respond to this Request because responsive information, if any, is protected by the

24   attorney-client privilege.

25   **REQUEST FOR ADMISSION NO. 171:**    Admit that Cheri Rice's

26   Communications with OIG regarding the April 30, 2014 Email in part related to

27   UnitedHealth's suspension of its Claims Verification Program.

28   **Objection:**    The United States incorporates its General Objections and Specific

0509

Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "OIG." The United States also objects to this Request to the extent that the undefined term "suspension" is vague and ambiguous. For the purposes of responding to this Request, the United States defines the term "suspension" as the act of stopping or delaying something temporarily. The United States further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome to the extent that it is not limited to a specific period of time. The United States objects to this Request to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts. The United States objects to this Request to the extent it calls for any legal conclusion. The United States objects to this Request as improper under Federal Rule of Civil Procedure 36 and applicable case law to the extent it is compound in that it asks the United States to admit multiple facts in one Request.

**Response:** Subject to and without waiving the foregoing objections, the United States denies this Request.

**REQUEST FOR ADMISSION NO. 172:** Admit that Cheri Rice's Communications with one or more individuals at CMS regarding the April 30, 2014 Email in part related to UnitedHealth's statement that it understood from CMS that MAOs were not required to conduct Two-Way Looks.

**Objection:** The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definitions of "CMS" and "MAOs." The United States also objects to this Request to the extent that the undefined terms "understood" is vague and ambiguous. For purposes of this Request, the United States defines "understood" as "grasped the meaning of." The United States objects to this Request to the extent it seeks disclosure of information that is protected from disclosure by an applicable privilege or protection, including the attorney-client privilege, attorney work-product doctrine, deliberative process privilege, and/or

45

0510

investigative files privilege.  The United States further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome to the extent that it is not limited to a specific period of time.  The United States objects to this Request to the extent it calls for any legal conclusion.  The United States objects to this Request to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts.  The United States objects to this Request as improper under Federal Rule of Civil Procedure 36 and applicable case law to the extent it is compound in that it asks the United States to admit multiple facts in one Request.

**Response:**  Subject to and without waiving the foregoing objections, the United States admits that Cheri Rice had Communications with one or more individuals at CMS regarding a response to the April 30, 2014 Email.  However, after a reasonable inquiry, the United States responds that it lacks sufficient information to admit or deny the remainder of this Request.

**REQUEST FOR ADMISSION NO. 173:**   Admit that Cheri Rice's Communications with DOJ regarding the April 30, 2014 Email in part related to UnitedHealth's statement that it understood from CMS that MAOs were not required to conduct Two-Way Looks.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definitions of "DOJ," "CMS," and "MAO." The United States also objects to this Request to the extent that the undefined terms "understood" is vague and ambiguous.  For purposes of this Request, the United States defines "understood" as "grasped the meaning of".  .  The United States objects to this Request as an improper abuse of Federal Rule of Civil Procedure 36 because by its own terms it specifically seeks disclosure of information that is protected from disclosure by the attorney-client privilege.  The United States further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome to the extent that it is not limited to a specific period of time.  The United States further objects to

0511

1    this Request to the extent it calls for any legal conclusion.  The United States objects

2    to this Request to the extent that UnitedHealth is using this information to

3    mischaracterize or misinterpret the facts.  The United States objects to this Request as

4    improper under Federal Rule of Civil Procedure 36 and applicable case law to the

5    extent it is compound in that it asks the United States to admit multiple facts in one

6    Request.

7    **Response:**  Subject to the foregoing objections, the United States does not intend to

8    respond to this Request because responsive information, if any, is protected by the

9    attorney-client privilege.

10   **REQUEST FOR ADMISSION NO. 174:**   Admit that Cheri Rice's

11   Communications with OIG regarding the April 30, 2014 Email in part related to

12   UnitedHealth's statement that it understood from CMS that MAOs were not required

13   to conduct Two-Way Looks.

14   **Objection:**   The United States incorporates its General Objections and Specific

15   Objections to the Definitions and Instructions as if stated herein, including but not

16   limited to, its specific objections to the definitions "OIG," "CMS," and "MAO."  The

17   United States also objects to this Request to the extent that the undefined terms

18   "understood" is vague and ambiguous.  For purposes of this Request, the United

19   States defines "understood" as "grasped the meaning of."  The United States further

20   objects to this Request as vague, ambiguous, overly broad, and unduly burdensome to

21   the extent that it is not limited to a specific period of time.  The United States objects

22   to this Request to the extent it calls for any legal conclusion.  The United States

23   objects to this Request to the extent it calls for any legal conclusion.  The United

24   States objects to this Request to the extent that UnitedHealth is using this information

25   to mischaracterize or misinterpret the facts.  The United States objects to this Request

26   as improper under Federal Rule of Civil Procedure 36 and applicable case law to the

27   extent it is compound in that it asks the United States to admit multiple facts in one

28   Request.

0512

**Response:**  Subject to and without waiving the foregoing objections, the United States denies this Request.

**REQUEST FOR ADMISSION NO. 175:**   Admit that Cheri Rice sent the May 2, 2014 Email in response to Steve Nelson's April 30, 2014 Email.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein.  The United States objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth and to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts.  The United States objects to this Request as improper under Federal Rule of Civil Procedure 36 and applicable case law to the extent it is compound in that it asks the United States to admit multiple facts in one Request.

**Response:**  Subject to and without waiving the foregoing objections, the United States admits this Request.

**REQUEST FOR ADMISSION NO. 176:**   Admit that Cheri Rice did not draft the May 2, 2014 Email to Steve Nelson.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein.  The United States also objects to this Request to the extent that the undefined term "draft" is vague and ambiguous.  For the purposes of responding to this Request, the United States defines the term "draft" as to put something in written form.  The United States objects to this Request to the extent it seeks information not relevant to a claim or defense in this case.  The United States objects to this Request to the extent it seeks disclosure of information that is protected from disclosure by an applicable privilege or protection, including the attorney-client privilege, attorney work-product doctrine, deliberative process privilege, and/or investigative files privilege.  The United States objects to this Request to the extent that UnitedHealth is using this information to

48

0513

mischaracterize or misinterpret the facts.  The United States further objects to this Request to extent it is duplicative of Request for Admission No. 177.

**Response:**  Subject to and without waiving the foregoing objections, the United States admits this Request.

**REQUEST FOR ADMISSION NO. 177:**   Admit that Cheri Rice had assistance with drafting the May 2, 2014 Email to Steve Nelson.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein.  The United States also objects to this Request to the extent that the undefined terms "assistance" and "drafting" are vague and ambiguous.  For the purposes of responding to this Request, the United States defines the term "drafting" as putting in writing.  For the purposes of responding to this Request, the United States defines the term "assistance" as the act of helping someone complete a task.  The United States objects to this Request to the extent it seeks information not relevant to a claim or defense in this case.  The United States objects to this Request to the extent it seeks disclosure of information that is protected from disclosure by an applicable privilege or protection, including the attorney-client privilege, attorney work-product doctrine, deliberative process privilege, and/or investigative files privilege.  The United States objects to this Request to the extent it calls for any legal conclusion.  The United States objects to this Request to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts.  The United States further objects to this Request to extent it is duplicative of Request for Admission No. 176.

**Response:**  Subject to and without waiving the foregoing objections, the United States admits this Request.

**REQUEST FOR ADMISSION NO. 178:**   Admit that CMS did not question UnitedHealth's suspension of its Claims Verification Program.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not

1    limited to, its specific objections to the definition of "CMS." The United States also

2    objects to this Request to the extent that the undefined terms "question" and

3    "suspension" are vague and ambiguous. For the purposes of responding to this

4    Request, the United States defines the term "question" as asking about, expressing

5    uncertainty, or subjecting to analysis. For the purposes of responding to this Request,

6    the United States defines the term "suspension" as the act of stopping or delaying

7    something temporarily. The United States objects to this Request to the extent it calls

8    for information that is already in UnitedHealth's possession, custody, or control, or is

9    otherwise available to UnitedHealth and to the extent that UnitedHealth is using this

10   information to mischaracterize or misinterpret the facts. The United States objects to

11   this Request to the extent it calls for any legal conclusion. The United States further

12   objects to this Request as vague, ambiguous, overly broad, and unduly burdensome to

13   the extent that it is not limited to a specific period of time. The United States further

14   objects to this Request to extent it is duplicative of Request for Admission No. 179.

15   **Response:**  Subject to and without waiving the foregoing objections, the United

16   States denies this Request.

17   **REQUEST FOR ADMISSION NO. 179:**   Admit that CMS did not challenge

18   UnitedHealth's suspension of its Claims Verification Program.

19   **Objection:**     The United States incorporates its General Objections and Specific

20   Objections to the Definitions and Instructions as if stated herein, including but not

21   limited to, its specific objections to the definition of "CMS." The United States also

22   objects to this Request to the extent that the undefined terms "challenge" and

23   "suspension" are vague and ambiguous. For the purposes of responding to this

24   Request, the United States defines the term "challenge" as to dispute. For the

25   purposes of responding to this Request, the United States defines the term

26   "suspension" as the act of stopping or delaying something temporarily. The United

27   States objects to this Request to the extent it calls for information that is already in

28   UnitedHealth's possession, custody, or control, or is otherwise available to

50

1   UnitedHealth and to the extent that UnitedHealth is using this information to

2   mischaracterize or misinterpret the facts. The United States objects to this Request to

3   the extent it calls for any legal conclusion.  The United States further objects to this

4   Request as vague, ambiguous, overly broad, and unduly burdensome to the extent

5   that it is not limited to a specific period of time.  The United States further objects to

6   this Request to extent it is duplicative of Request for Admission No. 178.

7   **Response:**  Subject to and without waiving the foregoing objections, the United

8   States denies this Request.

9   **REQUEST FOR ADMISSION NO. 180:**   Admit that Steve Nelson met with Sean

10   Cavanaugh on June 10, 2014.

11   **Objection:**  The United States incorporates its General Objections and Specific

12   Objections to the Definitions and Instructions as if stated herein.  The United States

13   objects to this Request to the extent it seeks information not relevant to a claim or

14   defense in this case.  The United States objects to this Request to the extent it calls for

15   information that is already in UnitedHealth's possession, custody, or control, or is

16   otherwise available to UnitedHealth and to the extent that UnitedHealth is using this

17   information to mischaracterize or misinterpret the facts.

18   **Response:**  Subject to and without waiving the foregoing objections, the United

19   States admits that a June 13, 2014 email bates labeled USBP001366276 reflects that

20   Sean Cavanaugh and Steve Nelson met on June 10, 2014 to discuss topics related to

21   Hep C and Notice to Beneficiaries, but after a reasonable inquiry, the United States

22   lacks sufficient information to admit or deny the remainder of this Request.

23   **REQUEST FOR ADMISSION NO. 181:**   Admit that, other than Steve Nelson and

24   Sean Cavanaugh, no other person attended the June 10, 2014 Meeting.

25   **Objection:**  The United States incorporates its General Objections and Specific

26   Objections to the Definitions and Instructions as if stated herein, including but not

27   limited to, its specific objections to the definition of "Person."  The United States

28   objects to this Request to the extent it seeks information not relevant to a claim or

51

0516

defense in this case.  The United States objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth and to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts.

**Response:**  Subject to and without waiving the foregoing objections, after a reasonable inquiry, the United States responds that it lacks sufficient information to admit or deny this Request.

**REQUEST FOR ADMISSION NO. 182:**  Admit that the June 10, 2014 Meeting took place in Person.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein.  The United States objects to this Request to the extent it seeks information not relevant to a claim or defense in this case.  The United States objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth and to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts.

**Response:**  Subject to and without waiving the foregoing objections, after a reasonable inquiry, the United States responds that it lacks sufficient information to admit or deny this Request.

**REQUEST FOR ADMISSION NO. 183:**  Admit that the June 10, 2014 Meeting took place by videoconference.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein.  The United States objects to this Request to the extent it seeks information not relevant to a claim or defense in this case.  The United States objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth and to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts.

0517

**Response:**  Subject to and without waiving the foregoing objections, after a reasonable inquiry, the United States responds that it lacks sufficient information to admit or deny this Request.

**REQUEST FOR ADMISSION NO. 184:**   Admit that the June 10, 2014 Meeting took place by telephone.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein.  The United States objects to this Request to the extent it seeks information not relevant to a claim or defense in this case.  The United States objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth and to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts.

**Response:**  Subject to and without waiving the foregoing objections, after a reasonable inquiry, the United States responds that it lacks sufficient information to admit or deny this Request.

**REQUEST FOR ADMISSION NO. 185:**   Admit that the Government Audio Recorded the June 10, 2014 Meeting.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "Government."  The United States further objects to this request because it is unduly burdensome for the United States to determine the actions of all "agencies, departments, components, agents, representatives, contractors, attorneys, consultants, and all other Persons acting on its behalf."  The United States objects to this Request to the extent it seeks information not relevant to a claim or defense in this case.

**Response:**  Subject to and without waiving the foregoing objections, the United States denies that Sean Cavanaugh Audio Recorded the June 10, 2014 meeting.  However, after a reasonable inquiry, the United States responds that it lacks sufficient

1    information to admit or deny this Request with respect to CMS or the entire United

2    States Government.

3    **REQUEST FOR ADMISSION NO. 186:**    Admit that the Government Video

4    Recorded the June 10, 2014 Meeting.

5    **Objection:**  The United States incorporates its General Objections and Specific

6    Objections to the Definitions and Instructions as if stated herein, including but not

7    limited to, its specific objections to the definition of "Government."  The United

8    States further objects to this request because it is unduly burdensome for the United

9    States to determine the actions of all "agencies, departments, components, agents,

10   representatives, contractors, attorneys, consultants, and all other Persons acting on its

11   behalf."  The United States objects to this Request to the extent it seeks information

12   not relevant to a claim or defense in this case.

13   **Response:**  Subject to and without waiving the foregoing objections, the United

14   States denies that Sean Cavanaugh Video Recorded the June 10, 2014 meeting.

15   However, after a reasonable inquiry, the United States responds that it lacks sufficient

16   information to admit or deny this Request with respect to CMS or the entire United

17   States Government.

18   **REQUEST FOR ADMISSION NO. 187:**    Admit that Sean Cavanaugh took notes

19   during the June 10, 2014 Meeting.

20   **Objection:**  The United States incorporates its General Objections and Specific

21   Objections to the Definitions and Instructions as if stated herein.  The United States

22   objects to this Request to the extent it seeks information not relevant to a claim or

23   defense in this case.

24   **Response:**  Subject to and without waiving the foregoing objections, the United

25   States denies this Request.

26   **REQUEST FOR ADMISSION NO. 188:**    Admit that after the June 10, 2014

27   Meeting, Sean Cavanaugh took notes about or otherwise memorialized the meeting in

28   writing.

0519

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein.  The United States also objects to this Request to the extent that the undefined phrase "or otherwise memorialized" is vague and ambiguous.  For the purposes of this Request, the United States defines "memorialized" as put in writing.  The United States further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome to the extent that it is not limited to a specific period of time.  The United States objects to this Request to the extent it seeks information not relevant to a claim or defense in this case.

**Response:**  Subject to and without waiving the foregoing objections, the United States admits that Sean Cavanaugh sent an email to Steve Nelson on June 20, 2014 following up on their June 10, 2014 meeting.  The United States denies the remainder of this Request.

**REQUEST FOR ADMISSION NO. 189:**   Admit that after the June 10, 2014 Meeting, Sean Cavanaugh had Communications with one or more individuals at CMS about the meeting.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "CMS."  The United States objects to this Request to the extent it seeks disclosure of information that is protected from disclosure by an applicable privilege or protection, including the attorney-client privilege, attorney work-product doctrine, deliberative process privilege, and/or investigative files privilege.  The United States further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome to the extent that it is not limited to a specific period of time.  The United States objects to this Request to the extent it seeks information not relevant to a claim or defense in this case.

**Response:**  Subject to and without waiving the foregoing objections, the United States admits this Request.

0520

1  **REQUEST FOR ADMISSION NO. 190:**   Admit that after the June 10, 2014
2  Meeting, Sean Cavanaugh had Communications with DOJ about the meeting.
3  **Objection:**  The United States incorporates its General Objections and Specific
4  Objections to the Definitions and Instructions as if stated herein, including but not
5  limited to, its specific objections to the definition of "DOJ."  The United States
6  objects to this Request as an improper abuse of Federal Rule of Civil Procedure 36
7  because by its own terms it specifically seeks disclosure of information that is
8  protected from disclosure by the attorney-client privilege.  The United States further
9  objects to this Request as vague, ambiguous, overly broad, and unduly burdensome to
10 the extent that it is not limited to a specific period of time.  The United States objects
11 to this Request to the extent it seeks information not relevant to a claim or defense in
12 this case.
13 **Response:**  Subject to the foregoing objections, the United States does not intend to
14 respond to this Request because responsive information, if any, is protected by the
15 attorney-client privilege.
16 **REQUEST FOR ADMISSION NO. 191:**   Admit that after the June 10, 2014
17 Meeting, Sean Cavanaugh had Communications with OIG about the meeting.
18 **Objection:**  The United States incorporates its General Objections and Specific
19 Objections to the Definitions and Instructions as if stated herein, including but not
20 limited to, its specific objections to the definition of "OIG."  The United States
21 further objects to this Request as vague, ambiguous, overly broad, and unduly
22 burdensome to the extent that it is not limited to a specific period of time.  The United
23 States objects to this Request to the extent it seeks information not relevant to a claim
24 or defense in this case.
25 **Response:**  Subject to and without waiving the foregoing objections, the United
26 States denies this Request.
27
28

56

0521

**REQUEST FOR ADMISSION NO. 192:**   Admit that during the June 10, 2014 Meeting, Steve Nelson informed Sean Cavanaugh that UnitedHealth discontinued its Claims Verification Program.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein.  The United States objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth and to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts. The United States objects to this Request to the extent it calls for any legal conclusion.

**Response:**  Subject to and without waiving the foregoing objections, after a reasonable inquiry, the United States responds that it lacks sufficient information to admit or deny this Request.

**REQUEST FOR ADMISSION NO. 193:**   Admit that UnitedHealth discontinued UnitedHealth's Claims Verification Program based in part on UnitedHealth's understanding that the Proposed Medical Record Review Rule would not be retroactive.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein.  The United States objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth and to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts.  The United States objects to this Request to the extent it calls for any legal conclusion.  The United States objects to this Request because by its nature it calls for the United States to provide information outside of its possession, custody or control about UnitedHealth's motives, of which UnitedHealth should presumably be aware.

**Response:**  Subject to and without waiving the foregoing objections, the United

57

States responds that it lacks sufficient information to admit or deny this Request because it seeks information regarding UnitedHealth's own beliefs and legal theories.

**REQUEST FOR ADMISSION NO. 194:**   Admit that UnitedHealth told CMS that UnitedHealth had discontinued UnitedHealth's Claims Verification Program based in part on UnitedHealth's understanding that the Proposed Medical Record Review Rule was not effective until it was finalized.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "CMS."  The United States objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth and to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts.  The United States further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome to the extent that it is not limited to a specific period of time.  The United States objects to this Request to the extent it calls for any legal conclusion.  The United States objects to this Request as improper under Federal Rule of Civil Procedure 36 and applicable case law to the extent it is compound in that it asks the United States to admit multiple facts in one Request.

**Response:**  Subject to and without waiving the foregoing objections, the United States admits that Steve Nelson sent an email dated April 30, 2014, MARA1296257, which stated:

> Fifth, as we discussed yesterday, CMS recently issued a proposed rule that would, if finalized, require MA plans to design any medical record reviews to determine the accuracy of risk adjustment diagnoses associated with those records.  During our conversation yesterday and other recent conversations, CMS confirmed to us that these requirements do not apply until the effective date of the rule, and that MA plans are thus not currently required to design

58

0523

1    their medical record reviews to determine the accuracy of risk adjustment

2    diagnoses.  We currently have a process through which we review certain

3    medical records to determine the accuracy of risk adjustment diagnoses and

4    submit appropriate deletes.  This process already has resulted in the

5    identification of and, in some instances, the submission of deletes for 2012

6    dates of service. But based on the proposed rule, including the preamble, and

7    recent conversations with CMS, we suspended that process for 2012 dates of

8    service while we consider whether to make changes. Pursuant to our

9    discussion, however, we will soon submit for deletion those diagnosis codes

10   that have undergone a complete review and that we have therefore identified as

11   appropriate deletes. In the near future, we will determine whether to continue

12   our review process for the diagnosis codes which were still under review at the

13   time we suspended our process. In the meantime, we will not delete these

14   codes.

15   The United States denies the remainder of this Request.

16   **REQUEST FOR ADMISSION NO. 195:**   Admit that CMS did not express to

17   UnitedHealth an issue or concern with UnitedHealth's discontinuation of its Claims

18   Verification Program.

19   **Objection:**  The United States incorporates its General Objections and Specific

20   Objections to the Definitions and Instructions as if stated herein, including but not

21   limited to, its specific objections to the definition of "CMS."  The United States also

22   objects to this Request to the extent that the undefined phrases "issue or concern" is

23   vague and ambiguous.  The United States objects to this Request to the extent it seeks

24   information not relevant to a claim or defense in this case.  The United States objects

25   to this Request to the extent it calls for information that is already in UnitedHealth's

26   possession, custody, or control, or is otherwise available to UnitedHealth and to the

27   extent that UnitedHealth is using this information to mischaracterize or misinterpret

28   the facts. The United States objects to this Request to the extent it calls for any legal

59

conclusion.  The United States further objects to this Request as vague, ambiguous, overly broad, and unduly burdensome to the extent that it is not limited to a specific period of time.  The United States further objects to this Request to extent it is duplicative of Request for Admission Nos. 178, 179, and 196.

**Response:**  Subject to and without waiving the foregoing objections, the United States denies this Request.

**REQUEST FOR ADMISSION NO. 196:**   Admit that at no time prior to the date on which the Government filed its Complaint has CMS expressed to UnitedHealth an issue or concern with UnitedHealth's discontinuation of its Claims Verification Program.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "CMS."  The United States also objects to this Request to the extent that the undefined phrases "issue or concern" is vague and ambiguous.  The United States objects to this Request to the extent it seeks information not relevant to a claim or defense in this case.  The United States objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth and to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts. The United States objects to this Request to the extent it calls for any legal conclusion.  The United States further objects to this Request to extent it is duplicative of Request for Admission No. 178, 179, and 195.

**Response:**  Subject to and without waiving the foregoing objections, the United States denies this Request.

**REQUEST FOR ADMISSION NO. 197:**   Admit that at no time prior to the date on which the Government filed its Complaint has DOJ expressed to UnitedHealth an issue or concern with UnitedHealth's discontinuation of its Claims Verification Program.

0525

1   **Objection:**  The United States incorporates its General Objections and Specific

2   Objections to the Definitions and Instructions as if stated herein, including but not

3   limited to, its specific objections to the definition of "DOJ."  The United States also

4   objects to this Request to the extent that the undefined phrase "issue or concern" is

5   vague and ambiguous.  The United States objects to this Request to the extent it seeks

6   information not relevant to a claim or defense in this case.  The United States objects

7   to this Request to the extent it calls for information that is already in UnitedHealth's

8   possession, custody, or control, or is otherwise available to UnitedHealth and to the

9   extent that UnitedHealth is using this information to mischaracterize or misinterpret

10  the facts. The United States objects to this Request to the extent it calls for any legal

11  conclusion.  The United States objects to this Request to the extent it suggests the

12  DOJ personnel responsible for investigating and litigating this matter do not act on

13  behalf of their agency client.

14  **Response:**  Subject to and without waiving the foregoing objections, the United

15  States denies this Request.

16  **REQUEST FOR ADMISSION NO. 198:**   Admit that at no time prior to the date on

17  which the Government filed its Complaint has OIG expressed to UnitedHealth an

18  issue or concern with UnitedHealth's discontinuation of its Claims Verification

19  Program.

20  **Objection:**  The United States incorporates its General Objections and Specific

21  Objections to the Definitions and Instructions as if stated herein, including but not

22  limited to, its specific objections to the definition of "OIG."  The United States also

23  objects to this Request to the extent that the undefined phrase "issue or concern" is

24  vague and ambiguous.  The United States objects to this Request to the extent it seeks

25  information not relevant to a claim or defense in this case.  The United States objects

26  to this Request to the extent it calls for information that is already in UnitedHealth's

27  possession, custody, or control, or is otherwise available to UnitedHealth and to the

28  extent that UnitedHealth is using this information to mischaracterize or misinterpret

61

1  the facts. The United States objects to this Request to the extent it calls for any legal

2  conclusion.

3  **Response:**  Subject to and without waiving the foregoing objections, the United

4  States denies this Request.

5  **REQUEST FOR ADMISSION NO. 199:**   Admit that on May 23, 2014, CMS

6  issued the May 23, 2014 Final Rule.

7  **Objection:**  The United States incorporates its General Objections and Specific

8  Objections to the Definitions and Instructions as if stated herein, including but not

9  limited to, its specific objections to the definition of "CMS."  The United States

10  objects to this Request to the extent it calls for information that is already in

11  UnitedHealth's possession, custody, or control, or is otherwise available to

12  UnitedHealth and to the extent that UnitedHealth is using this information to

13  mischaracterize or misinterpret the facts.  The United States objects to this Request to

14  the extent it calls for any legal conclusion.

15  **Response:**  Subject to and without waiving the foregoing objections, the United

16  States admits this Request.

17  **REQUEST FOR ADMISSION NO. 200:**   Admit that the May 23, 2014 Final Rule

18  did not require MAOs to engage in Two-Way Looks.

19  **Objection:**  The United States incorporates its General Objections and Specific

20  Objections to the Definitions and Instructions as if stated herein, including but not

21  limited to, its specific objections to the definition of "MAOs."  The United States

22  objects to this Request to the extent it calls for any legal conclusion.  The United

23  States objects to this Request to the extent it calls for information that is already in

24  UnitedHealth's possession, custody, or control, or is otherwise available to

25  UnitedHealth.   The United States objects to this Request to the extent that

26  UnitedHealth is using this information to mischaracterize or misinterpret the facts,

27  particularly in that it mischaracterizes CMS' statements contained in the Response to

28  Public Comments Section of the May 23, 2014 Final Rule: "However, we emphasize

that our decision to not finalize this regulatory proposal does not change CMS'
existing contractual requirement that MA organizations must certify (based on best
knowledge, information, and belief) the accuracy, completeness, and truthfulness of
the risk adjustment data they submit to CMS.  Further, this decision does not change
the long- standing risk adjustment data requirement that a diagnosis submitted to
CMS by an MA organization for payment purposes must be supported by medical
record documentation." 79 Fed. Reg. 29926.  The United States objects to this
Request to the extent it is duplicative of Request for Admission Nos. 201 and 202.

**Response:**  Subject to and without waiving the foregoing objections, the United
States admits that the May 23, 2014 Final Rule did not include language which
specifically required MAOs to conduct Two-Way Looks.  However, the United States
denies the remainder of this Request particularly in the light of the fact that CMS
made very clear in the Final Rule that "our decision to not finalize this regulatory
proposal does not change CMS' existing contractual requirement that MA
organizations must certify (based on best knowledge, information, and belief) the
accuracy, completeness, and truthfulness of the risk adjustment data they submit to
CMS.  Further, this decision does not change the long-standing risk adjustment data
requirement that a diagnosis submitted to CMS by an MA organization for payment
purposes must be supported by medical record documentation." 79 Fed. Reg. 29926.

**REQUEST FOR ADMISSION NO. 201:**   Admit that the May 23, 2014 Final Rule
did not require MAOs to confirm that every Diagnosis Code submitted by a Provider
is documented in a Beneficiary's Chart.

**Objection:**  The United States incorporates its General Objections and Specific
Objections to the Definitions and Instructions as if stated herein, including but not
limited to, its specific objections to the definition of "MAOs."  The United States
objects to this Request to the extent it calls for any legal conclusion.  The United
States objects to this Request to the extent it calls for information that is already in
UnitedHealth's possession, custody, or control, or is otherwise available to

0528

UnitedHealth.  The United States objects to this Request to the extent that
UnitedHealth is using this information to mischaracterize or misinterpret the facts,
particularly in that it mischaracterizes CMS' statements contained in the Response to
Public Comments Section of the May 23, 2014 Final Rule: "However, we emphasize
that our decision to not finalize this regulatory proposal does not change CMS'
existing contractual requirement that MA organizations must certify (based on best
knowledge, information, and belief) the accuracy, completeness, and truthfulness of
the risk adjustment data they submit to CMS.  Further, this decision does not change
the long- standing risk adjustment data requirement that a diagnosis submitted to
CMS by an MA organization for payment purposes must be supported by medical
record documentation."  79 Fed. Reg. 29926.  The United States objects to this
Request to the extent it is duplicative of Request for Admission No. 200 and 202.

**Response:**  Subject to and without waiving the foregoing objections, the United
States admits that the May 23, 2014 Final Rule did not include language which
specifically required MAOs to confirm that every Diagnosis Code submitted by a
Provider is documented in a Beneficiary's Chart.  However, the United States denies
the remainder of this Request particularly in the light of the fact that CMS made very
clear in the Final Rule that "our decision to not finalize this regulatory proposal does
not change CMS' existing contractual requirement that MA organizations must
certify (based on best knowledge, information, and belief) the accuracy,
completeness, and truthfulness of the risk adjustment data they submit to CMS.
Further, this decision does not change the long-standing risk adjustment data
requirement that a diagnosis submitted to CMS by an MA organization for payment
purposes must be supported by medical record documentation."  79 Fed. Reg. 29926.

**REQUEST FOR ADMISSION NO. 202:**   Admit that CMS did not finalize the
portion of the Proposed Medical Record Review Rule that would have required Two-
Way Looks.

**Objection:**  The United States incorporates its General Objections and Specific

0529

1   Objections to the Definitions and Instructions as if stated herein, including but not

2   limited to, its specific objections to the definition of "CMS."  The United States

3   objects to this Request to the extent it calls for any legal conclusion.  The United

4   States objects to this Request to the extent it calls for information that is already in

5   UnitedHealth's possession, custody, or control, or is otherwise available to

6   UnitedHealth.  The United States objects to this Request to the extent that

7   UnitedHealth is using this information to mischaracterize or misinterpret the facts,

8   particularly in that it mischaracterizes CMS' statements contained in the Response to

9   Public Comments Section of the May 23, 2014 Final Rule: "However, we emphasize

10   that our decision to not finalize this regulatory proposal does not change CMS'

11   existing contractual requirement that MA organizations must certify (based on best

12   knowledge, information, and belief) the accuracy, completeness, and truthfulness of

13   the risk adjustment data they submit to CMS.  Further, this decision does not change

14   the long- standing risk adjustment data requirement that a diagnosis submitted to

15   CMS by an MA organization for payment purposes must be supported by medical

16   record documentation."  79 Fed. Reg. 29926.  The United States objects to this

17   Request to the extent it is duplicative of Request for Admission Nos. 200 and 201.

18   **Response:**  Subject to and without waiving the foregoing objections, the United

19   States admits that the May 23, 2014 Final Rule did not include language which

20   specifically required MAOs to conduct Two-Way Looks.  However, the United States

21   denies the remainder of this Request particularly in the light of the fact that CMS

22   made very clear in the Final Rule that "our decision to not finalize this regulatory

23   proposal does not change CMS' existing contractual requirement that MA

24   organizations must certify (based on best knowledge, information, and belief) the

25   accuracy, completeness, and truthfulness of the risk adjustment data they submit to

26   CMS.  Further, this decision does not change the long-standing risk adjustment data

27   requirement that a diagnosis submitted to CMS by an MA organization for payment

28   purposes must be supported by medical record documentation."  79 Fed. Reg. 29926.

0530

1  **REQUEST FOR ADMISSION NO. 203:**   Admit that CMS removed the portion of

2  the Proposed Medical Record Review Rule that would have required Two-Way

3  Looks when it finalized the May 23, 2014 Final Rule in part related to comments

4  CMS received.

5  **Objection:**   The United States incorporates its General Objections and Specific

6  Objections to the Definitions and Instructions as if stated herein, including but not

7  limited to, its specific objections to the definition of "CMS."  The United States

8  objects to this Request to the extent it calls for any legal conclusion.  The United

9  States objects to this Request to the extent it seeks disclosure of information that is

10  protected from disclosure by an applicable privilege or protection, including the

11  attorney-client privilege, attorney work-product doctrine, deliberative process

12  privilege, and/or investigative files privilege.  The United States objects to this

13  Request to the extent it calls for information that is already in UnitedHealth's

14  possession, custody, or control, or is otherwise available to UnitedHealth.  The

15  United States objects to this Request to the extent that UnitedHealth is using this

16  information to mischaracterize or misinterpret the facts, particularly in that it

17  mischaracterizes CMS' statements contained in the Response to Public Comments

18  Section of the May 23, 2014 Final Rule: "However, we emphasize that our decision

19  to not finalize this regulatory proposal does not change CMS' existing contractual

20  requirement that MA organizations must certify (based on best knowledge,

21  information, and belief) the accuracy, completeness, and truthfulness of the risk

22  adjustment data they submit to CMS.  Further, this decision does not change the long-

23  standing risk adjustment data requirement that a diagnosis submitted to CMS by an

24  MA organization for payment purposes must be supported by medical record

25  documentation." 79 Fed. Reg. 29926.   The United States objects to this Request as

26  improper under Federal Rule of Civil Procedure 36 and applicable case law to the

27  extent it is compound in that it asks the United States to admit multiple facts in one

28  Request. The United States objects to this Request to the extent it is duplicative of

1    Request for Admission No. 204.

2    **Response:**   Subject to and without waiving the foregoing objections, the United

3    States admits that CMS reviewed the comments it received regarding the Proposed

4    Medical Record Review Rule prior to finalizing the May 23, 2014 Final Rule.

5    However, the United States denies the remainder of this Request.

6    **REQUEST FOR ADMISSION NO. 204:**   Admit that CMS did not finalize the

7    portion of the Proposed Medical Record Review Rule that would have required Two-

8    Way Looks in part related to comments CMS received.

9    **Objection:**   The United States incorporates its General Objections and Specific

10   Objections to the Definitions and Instructions as if stated herein, including but not

11   limited to, its specific objections to the definition of "CMS."  The United States

12   objects to this Request to the extent it calls for any legal conclusion.  The United

13   States objects to this Request to the extent it seeks disclosure of information that is

14   protected from disclosure by an applicable privilege or protection, including the

15   attorney-client privilege, attorney work-product doctrine, deliberative process

16   privilege, and/or investigative files privilege.  The United States objects to this

17   Request to the extent it calls for information that is already in UnitedHealth's

18   possession, custody, or control, or is otherwise available to UnitedHealth.  The

19   United States objects to this Request to the extent that UnitedHealth is using this

20   information to mischaracterize or misinterpret the facts, particularly in that it

21   mischaracterizes CMS' statements contained in the Response to Public Comments

22   Section of the May 23, 2014 Final Rule: "However, we emphasize that our decision

23   to not finalize this regulatory proposal does not change CMS' existing contractual

24   requirement that MA organizations must certify (based on best knowledge,

25   information, and belief) the accuracy, completeness, and truthfulness of the risk

26   adjustment data they submit to CMS.  Further, this decision does not change the long-

27   standing risk adjustment data requirement that a diagnosis submitted to CMS by an

28   MA organization for payment purposes must be supported by medical record

67

0532

documentation." 79 Fed. Reg. 29926. The United States objects to this Request as improper under Federal Rule of Civil Procedure 36 and applicable case law to the extent it is compound in that it asks the United States to admit multiple facts in one Request. The United States objects to this Request to the extent it is duplicative of Request for Admission No. 203.

**Response:** Subject to and without waiving the foregoing objections, the United States admits that CMS reviewed the comments it received regarding the Proposed Medical Record Review Rule prior to finalizing the May 23, 2014 Final Rule. However, the United States denies the remainder of this Request.

**REQUEST FOR ADMISSION NO. 205:** Admit that CMS removed the portion of the Proposed Medical Record Review Rule that would have required Two-Way Looks from the Final Rule in part related to comments CMS received from entities engaged in business related to the Medicare Advantage Program.

**Objection:** The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "CMS." The United States also objects to this Request to the extent that the undefined phrase "entities engaged in business related to the Medicare Advantage Program" is vague and ambiguous. For purposes of this Request, the United States defines "entities engaged in business related to the Medicare Advantage Program" as MAOs. The United States objects to this Request to the extent it calls for any legal conclusion. The United States objects to this Request to the extent it seeks disclosure of information that is protected from disclosure by an applicable privilege or protection, including the attorney-client privilege, attorney work-product doctrine, deliberative process privilege, and/or investigative files privilege. The United States objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth. The United States objects to this Request to the extent that UnitedHealth is using this information to mischaracterize or

68

misinterpret the facts, particularly in that it mischaracterizes CMS' statements contained in the Response to Public Comments Section of the May 23, 2014 Final Rule: "However, we emphasize that our decision to not finalize this regulatory proposal does not change CMS' existing contractual requirement that MA organizations must certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the risk adjustment data they submit to CMS.  Further, this decision does not change the long- standing risk adjustment data requirement that a diagnosis submitted to CMS by an MA organization for payment purposes must be supported by medical record documentation."  79 Fed. Reg. 29926. The United States objects to this Request as improper under Federal Rule of Civil Procedure 36 and applicable case law to the extent it is compound in that it asks the United States to admit multiple facts in one Request.  The United States objects to this Request to the extent it is duplicative of Request for Admission Nos. 206, 207 and 208.

**Response:**  Subject to and without waiving the foregoing objections, the United States admits that CMS reviewed the comments it received regarding the Proposed Medical Record Review Rule prior to finalizing the May 23, 2014 Final Rule. However, the United States denies the remainder of this Request.

**REQUEST FOR ADMISSION NO. 206:**   Admit that CMS did not finalize the portion of the Proposed Medical Record Review Rule that would have required Two-Way Looks in part related to comments CMS received from entities engaged in business related to the Medicare Advantage Program.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "CMS."  The United States also objects to this Request to the extent that the undefined phrase "entities engaged in business related to the Medicare Advantage Program" is vague and ambiguous. For purposes of this Request, the United States defines "entities engaged in business

0534

related to the Medicare Advantage Program" as MAOs.  The United States objects to this Request to the extent it calls for any legal conclusion.  The United States objects to this Request to the extent it seeks disclosure of information that is protected from disclosure by an applicable privilege or protection, including the attorney-client privilege, attorney work-product doctrine, deliberative process privilege, and/or investigative files privilege.  The United States objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth.  The United States objects to this Request to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts, particularly in that it mischaracterizes CMS' statements contained in the Response to Public Comments Section of the May 23, 2014 Final Rule: "However, we emphasize that our decision to not finalize this regulatory proposal does not change CMS' existing contractual requirement that MA organizations must certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the risk adjustment data they submit to CMS.  Further, this decision does not change the long- standing risk adjustment data requirement that a diagnosis submitted to CMS by an MA organization for payment purposes must be supported by medical record documentation."  79 Fed. Reg. 29926. The United States objects to this Request as improper under Federal Rule of Civil Procedure 36 and applicable case law to the extent it is compound in that it asks the United States to admit multiple facts in one Request. The United States objects to this Request to the extent it is duplicative of Request for Admission Nos. 205, 207 and 208.

**Response:**  Subject to and without waiving the foregoing objections, the United States admits that CMS reviewed the comments it received regarding the Proposed Medical Record Review Rule prior to finalizing the May 23, 2014 Final Rule. However, the United States denies the remainder of this Request.

0535

**REQUEST FOR ADMISSION NO. 207:**   Admit that CMS removed the portion of the Proposed Medical Record Review Rule that would have required Two-Way Looks from the Final Rule in part related to comments CMS received from MAOs.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "CMS."  The United States objects to this Request to the extent it calls for any legal conclusion.  The United States objects to this Request to the extent it seeks disclosure of information that is protected from disclosure by an applicable privilege or protection, including the attorney-client privilege, attorney work-product doctrine, deliberative process privilege, and/or investigative files privilege.  The United States objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth.  The United States objects to this Request to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts, particularly in that it mischaracterizes CMS' statements contained in the Response to Public Comments Section of the May 23, 2014 Final Rule:  "However, we emphasize that our decision to not finalize this regulatory proposal does not change CMS' existing contractual requirement that MA organizations must certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the risk adjustment data they submit to CMS.  Further, this decision does not change the long-standing risk adjustment data requirement that a diagnosis submitted to CMS by an MA organization for payment purposes must be supported by medical record documentation."  79 Fed. Reg. 29926.   The United States objects to this Request as improper under Federal Rule of Civil Procedure 36 and applicable case law to the extent it is compound in that it asks the United States to admit multiple facts in one Request.  The United States objects to this Request to the extent it is duplicative of Request for Admission Nos. 205, 206 and 208.

71

**Response:**  Subject to and without waiving the foregoing objections, the United

States admits that CMS reviewed the comments it received regarding the Proposed

Medical Record Review Rule prior to finalizing the May 23, 2014 Final Rule.

However, the United States denies the remainder of this Request.

**REQUEST FOR ADMISSION NO. 208:**   Admit that CMS did not finalize the

section of the Proposed Medical Record Review Rule that would have required Two-

Way Looks in part related to comments CMS received from MAOs.

**Objection:**  The United States incorporates its General Objections and Specific

Objections to the Definitions and Instructions as if stated herein, including but not

limited to, its specific objections to the definition of "CMS."  The United States

objects to this Request to the extent it seeks disclosure of information that is protected

from disclosure by an applicable privilege or protection, including the attorney-client

privilege, attorney work-product doctrine, deliberative process privilege, and/or

investigative files privilege.  The United States objects to this Request to the extent it

calls for any legal conclusion.  The United States objects to this Request to the extent

it calls for information that is already in UnitedHealth's possession, custody, or

control, or is otherwise available to UnitedHealth.  The United States objects to this

Request to the extent that UnitedHealth is using this information to mischaracterize or

misinterpret the facts, particularly in that it mischaracterizes CMS' statements

contained in the Response to Public Comments Section of the May 23, 2014 Final

Rule:  "However, we emphasize that our decision to not finalize this regulatory

proposal does not change CMS' existing contractual requirement that MA

organizations must certify (based on best knowledge, information, and belief) the

accuracy, completeness, and truthfulness of the risk adjustment data they submit to

CMS.  Further, this decision does not change the long- standing risk adjustment data

requirement that a diagnosis submitted to CMS by an MA organization for payment

purposes must be supported by medical record documentation."  79 Fed. Reg. 29926.

The United States objects to this Request as improper under Federal Rule of Civil

0537

Procedure 36 and applicable case law to the extent it is compound in that it asks the United States to admit multiple facts in one Request. The United States objects to this Request to the extent it is duplicative of Request for Admission Nos. 205, 206 and 207.

**Response:** Subject to and without waiving the foregoing objections, the United States admits that CMS reviewed the comments it received regarding the Proposed Medical Record Review Rule prior to finalizing the May 23, 2014 Final Rule. However, the United States denies the remainder of this Request.

**REQUEST FOR ADMISSION NO. 209:** Admit that CMS removed the portion of the Proposed Medical Record Review Rule that would have required Two-Way Looks from the Final Rule in part related to the breadth of the Proposed Medical Record Review Rule.

**Objection:** The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "CMS." The United States also objects to this Request to the extent that the undefined term "breadth" is vague and ambiguous. For purposes of this Request, the United States defines "breadth" as the fact of including many different things. The United States objects to this Request to the extent it calls for any legal conclusion. The United States objects to this Request to the extent it seeks disclosure of information that is protected from disclosure by an applicable privilege or protection, including the attorney-client privilege, attorney work-product doctrine, deliberative process privilege, and/or investigative files privilege. The United States objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth. The United States objects to this Request to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts, particularly in that it mischaracterizes CMS' statements contained in the Response to Public Comments Section of the May 23, 2014 Final Rule: "However,

73

0538

we emphasize that our decision to not finalize this regulatory proposal does not change CMS' existing contractual requirement that MA organizations must certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the risk adjustment data they submit to CMS.  Further, this decision does not change the long- standing risk adjustment data requirement that a diagnosis submitted to CMS by an MA organization for payment purposes must be supported by medical record documentation." 79 Fed. Reg. 29926.   The United States objects to this Request as improper under Federal Rule of Civil Procedure 36 and applicable case law to the extent it is compound in that it asks the United States to admit multiple facts in one Request.  The United States objects to this Request to the extent it is duplicative of Request for Admission No. 210.

**Response:**  Subject to and without waiving the foregoing objections, the United States denies this Request.

**REQUEST FOR ADMISSION NO. 210:**   Admit that CMS did not finalize the portion of the Proposed Medical Record Review Rule that would have required Two-Way Looks in part related to the breadth of the Proposed Medical Record Review Rule.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definition of "CMS."  The United States also objects to this Request to the extent that the undefined term "breadth" is vague and ambiguous. For purposes of this Request, the United States defines "breadth" as the fact of including many different things.  The United States objects to this Request to the extent it calls for any legal conclusion.  The United States objects to this Request to the extent it seeks disclosure of information that is protected from disclosure by an applicable privilege or protection, including the attorney-client privilege, attorney work-product doctrine, deliberative process privilege, and/or investigative files privilege.  The United States objects to this Request to the extent it calls for

74

information that is already in UnitedHealth's possession, custody, or control, or is
otherwise available to UnitedHealth.  The United States objects to this Request to the
extent that UnitedHealth is using this information to mischaracterize or misinterpret
the facts, particularly in that it mischaracterizes CMS' statements contained in the
Response to Public Comments Section of the May 23, 2014 Final Rule: "However,
we emphasize that our decision to not finalize this regulatory proposal does not
change CMS' existing contractual requirement that MA organizations must certify
(based on best knowledge, information, and belief) the accuracy, completeness, and
truthfulness of the risk adjustment data they submit to CMS.  Further, this decision
does not change the long- standing risk adjustment data requirement that a diagnosis
submitted to CMS by an MA organization for payment purposes must be supported
by medical record documentation." 79 Fed. Reg. 29926.   The United States objects
to this Request as improper under Federal Rule of Civil Procedure 36 and applicable
case law to the extent it is compound in that it asks the United States to admit
multiple facts in one Request.  The United States objects to this Request to the extent
it is duplicative of Request for Admission No. 209.

**Response:**  Subject to and without waiving the foregoing objections, the United
States denies this Request.

**REQUEST FOR ADMISSION NO. 211:**   Admit that CMS removed the portion of
the Proposed Medical Record Review Rule that would have required Two-Way
Looks from the Final Rule in part related to the advisability of implementing the
Proposed Rule as drafted.

**Objection:**  The United States incorporates its General Objections and Specific
Objections to the Definitions and Instructions as if stated herein, including but not
limited to, its specific objections to the definition of "CMS."  The United States also
objects to this Request to the extent that the undefined phrase "advisability of
implementing" is vague and ambiguous and the United States lacks knowledge about
what is requested.  The United States objects to this Request to the extent it calls for

0540

any legal conclusion.  The United States objects to this Request to the extent it seeks disclosure of information that is protected from disclosure by an applicable privilege or protection, including the attorney-client privilege, attorney work-product doctrine, deliberative process privilege, and/or investigative files privilege.  The United States objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth.  The United States objects to this Request to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts, particularly in that it mischaracterizes CMS' statements contained in the Response to Public Comments Section of the May 23, 2014 Final Rule: "However, we emphasize that our decision to not finalize this regulatory proposal does not change CMS' existing contractual requirement that MA organizations must certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the risk adjustment data they submit to CMS.  Further, this decision does not change the long- standing risk adjustment data requirement that a diagnosis submitted to CMS by an MA organization for payment purposes must be supported by medical record documentation."  79 Fed. Reg. 29926.   The United States objects to this Request as improper under Federal Rule of Civil Procedure 36 and applicable case law to the extent it is compound in that it asks the United States to admit multiple facts in one Request.  The United States objects to this Request to the extent it is duplicative of Request for Admission No. 212.

**Response:**  Subject to and without waiving the foregoing objections, the United States denies this Request.

**REQUEST FOR ADMISSION NO. 212:**   Admit that CMS did not finalize the Proposed Medical Record Review Rule that would have required Two-Way Looks in part related to the advisability of implementing the Proposed Rule as drafted.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not

0541

1   limited to, its specific objections to the definitions of "CMS."  The United States also

2   objects to this Request to the extent that the undefined phrase "advisability of

3   implementing" is vague and ambiguous and the United States lacks knowledge about

4   what is requested.  The United States objects to this Request to the extent it calls for

5   any legal conclusion.  The United States objects to this Request to the extent it seeks

6   disclosure of information that is protected from disclosure by an applicable privilege

7   or protection, including the attorney-client privilege, attorney work-product doctrine,

8   deliberative process privilege, and/or investigative files privilege.  The United States

9   objects to this Request to the extent it calls for information that is already in

10   UnitedHealth's possession, custody, or control, or is otherwise available to

11   UnitedHealth.  The United States objects to this Request to the extent that

12   UnitedHealth is using this information to mischaracterize or misinterpret the facts,

13   particularly in that it mischaracterizes CMS' statements contained in the Response to

14   Public Comments Section of the May 23, 2014 Final Rule: "However, we emphasize

15   that our decision to not finalize this regulatory proposal does not change CMS'

16   existing contractual requirement that MA organizations must certify (based on best

17   knowledge, information, and belief) the accuracy, completeness, and truthfulness of

18   the risk adjustment data they submit to CMS.  Further, this decision does not change

19   the long- standing risk adjustment data requirement that a diagnosis submitted to

20   CMS by an MA organization for payment purposes must be supported by medical

21   record documentation."  79 Fed. Reg. 29926.  The United States objects to this

22   Request as improper under Federal Rule of Civil Procedure 36 and applicable case

23   law to the extent it is compound in that it asks the United States to admit multiple

24   facts in one Request.  The United States objects to this Request to the extent it is

25   duplicative of Request for Admission No. 211.

26   **Response:**  Subject to and without waiving the foregoing objections, the United

27   States denies this Request.

28

0542

1  **REQUEST FOR ADMISSION NO. 213:**   Admit that CMS did not finalize the

2  Proposed Medical Record Review Rule that would have required Two-Way Looks in

3  part because CMS thought Two-Way Looks were already required.

4  **Objection:**  The United States incorporates its General Objections and Specific

5  Objections to the Definitions and Instructions as if stated herein, including but not

6  limited to, its specific objections to the definition of "CMS."  The United States

7  objects to this Request to the extent it calls for any legal conclusion.  The United

8  States objects to this Request to the extent it seeks disclosure of information that is

9  protected from disclosure by an applicable privilege or protection, including the

10  attorney-client privilege, attorney work-product doctrine, deliberative process

11  privilege, and/or investigative files privilege.  The United States objects to this

12  Request to the extent it calls for information that is already in UnitedHealth's

13  possession, custody, or control, or is otherwise available to UnitedHealth.  The

14  United States objects to this Request to the extent that UnitedHealth is using this

15  information to mischaracterize or misinterpret the facts, particularly in that it

16  mischaracterizes CMS' statements contained in the Response to Public Comments

17  Section of the May 23, 2014 Final Rule: "However, we emphasize that our decision

18  to not finalize this regulatory proposal does not change CMS' existing contractual

19  requirement that MA organizations must certify (based on best knowledge,

20  information, and belief) the accuracy, completeness, and truthfulness of the risk

21  adjustment data they submit to CMS.  Further, this decision does not change the long-

22  standing risk adjustment data requirement that a diagnosis submitted to CMS by an

23  MA organization for payment purposes must be supported by medical record

24  documentation."  79 Fed. Reg. 29926.  The United States objects to this Request as

25  improper under Federal Rule of Civil Procedure 36 and applicable case law to the

26  extent it is compound in that it asks the United States to admit multiple facts in one

27  Request.   The United States objects to this Request to the extent it is duplicative of

28  Request for Admission No. 214.

0543

**Response:**  Subject to and without waiving the foregoing objections, the United

States denies that CMS identified Two Way Looks as the only manner in which

MAOs could comply with their existing regulatory and contractual obligations.

However, the United States admits that CMS reaffirmed the existing obligations of

MA Organizations in the preamble to the Final Rule: "However, we emphasize that

our decision to not finalize this regulatory proposal does not change CMS' existing

contractual requirement that MA organizations must certify (based on best

knowledge, information, and belief) the accuracy, completeness, and truthfulness of

the risk adjustment data they submit to CMS.  Further, this decision does not change

the long-standing risk adjustment data requirement that a diagnosis submitted to CMS

by an MA organization for payment purposes must be supported by medical record

documentation."  79 Fed. Reg. 29926.

**REQUEST FOR ADMISSION NO. 214:**   Admit that CMS removed the portion of

the Proposed Medical Record Review Rule that would have required Two-Way

Looks from the Final Rule in part because CMS thought Two-Way Looks were

already required.

**Objection:**  The United States incorporates its General Objections and Specific

Objections to the Definitions and Instructions as if stated herein, including but not

limited to, its specific objections to the definition of "CMS."  The United States

objects to this Request to the extent it calls for any legal conclusion.  The United

States objects to this Request to the extent it seeks disclosure of information that is

protected from disclosure by an applicable privilege or protection, including the

attorney-client privilege, attorney work-product doctrine, deliberative process

privilege, and/or investigative files privilege.  The United States objects to this

Request to the extent it calls for information that is already in UnitedHealth's

possession, custody, or control, or is otherwise available to UnitedHealth.  The

United States objects to this Request to the extent that UnitedHealth is using this

information to mischaracterize or misinterpret the facts, particularly in that it

0544

1  mischaracterizes CMS' statements contained in the Response to Public Comments

2  Section of the May 23, 2014 Final Rule: "However, we emphasize that our decision

3  to not finalize this regulatory proposal does not change CMS' existing contractual

4  requirement that MA organizations must certify (based on best knowledge,

5  information, and belief) the accuracy, completeness, and truthfulness of the risk

6  adjustment data they submit to CMS.  Further, this decision does not change the long-

7  standing risk adjustment data requirement that a diagnosis submitted to CMS by an

8  MA organization for payment purposes must be supported by medical record

9  documentation." 79 Fed. Reg. 29926.  The United States objects to this Request as

10  improper under Federal Rule of Civil Procedure 36 and applicable case law to the

11  extent it is compound in that it asks the United States to admit multiple facts in one

12  Request.   The United States objects to this Request to the extent it is duplicative of

13  Request for Admission No. 213.

14  **Response:**  Subject to and without waiving the foregoing objections, the United

15  States denies that CMS identified Two Way Looks as the only manner in which

16  MAOs could comply with their existing regulatory and contractual obligations.

17  However, the United States admits that CMS reaffirmed the existing obligations of

18  MA Organizations in in the preamble to the Final Rule, "However, we emphasize that

19  our decision to not finalize this regulatory proposal does not change CMS' existing

20  contractual requirement that MA organizations must certify (based on best

21  knowledge, information, and belief) the accuracy, completeness, and truthfulness of

22  the risk adjustment data they submit to CMS.  Further, this decision does not change

23  the long-standing risk adjustment data requirement that a diagnosis submitted to CMS

24  by an MA organization for payment purposes must be supported by medical record

25  documentation." 79 Fed. Reg. 29926.

26  **REQUEST FOR ADMISSION NO. 215:**   Admit that CMS did not finalize the

27  Proposed Medical Record Review Rule that would have required Two-Way Looks in

28  part because CMS thought Two-Way Looks were burdensome for MAOs.

0545

**Objection:**  The United States incorporates its General Objections and Specific

Objections to the Definitions and Instructions as if stated herein, including but not

limited to, its specific objections to the definitions of "CMS" and "MAO."  The

United States also objects to this Request to the extent that the undefined term

"burdensome" is vague and ambiguous.  For purposes of this Request, the United

States defines "burdensome" as difficult to carry out.  The United States objects to

this Request to the extent it calls for any legal conclusion.  The United States objects

to this Request to the extent it seeks disclosure of information that is protected from

disclosure by an applicable privilege or protection, including the attorney-client

privilege, attorney work-product doctrine, deliberative process privilege, and/or

investigative files privilege.  The United States objects to this Request to the extent it

calls for information that is already in UnitedHealth's possession, custody, or control,

or is otherwise available to UnitedHealth.  The United States objects to this Request

to the extent that UnitedHealth is using this information to mischaracterize or

misinterpret the facts, particularly in that it mischaracterizes CMS' statements

contained in the Response to Public Comments Section of the May 23, 2014 Final

Rule:  "However, we emphasize that our decision to not finalize this regulatory

proposal does not change CMS' existing contractual requirement that MA

organizations must certify (based on best knowledge, information, and belief) the

accuracy, completeness, and truthfulness of the risk adjustment data they submit to

CMS.  Further, this decision does not change the long- standing risk adjustment data

requirement that a diagnosis submitted to CMS by an MA organization for payment

purposes must be supported by medical record documentation."  79 Fed. Reg. 29926.

The United States objects to this Request as improper under Federal Rule of Civil

Procedure 36 and applicable case law to the extent it is compound in that it asks the

United States to admit multiple facts in one Request.   The United States objects to

this Request to the extent it is duplicative of Request for Admission No. 216.

**Response:**  Subject to and without waiving the foregoing objections, the United

0546

1    States denies this Request.

2    **REQUEST FOR ADMISSION NO. 216:**    Admit that CMS removed the portion of

3    the Proposed Medical Record Review Rule that would have required Two-Way

4    Looks from the Final Rule in part because CMS thought Two-Way Looks were

5    burdensome for MAOs.

6    **Objection:**    The United States incorporates its General Objections and Specific

7    Objections to the Definitions and Instructions as if stated herein, including but not

8    limited to, its specific objections to the definitions of "CMS" and "MAO."  The

9    United States also objects to this Request to the extent that the undefined term

10    "burdensome" is vague and ambiguous.  For purposes of this Request, the United

11    States defines "burdensome" as difficult to carry out.  The United States objects to

12    this Request to the extent it calls for any legal conclusion.  The United States objects

13    to this Request to the extent it seeks disclosure of information that is protected from

14    disclosure by an applicable privilege or protection, including the attorney-client

15    privilege, attorney work-product doctrine, deliberative process privilege, and/or

16    investigative files privilege.  The United States objects to this Request to the extent it

17    calls for information that is already in UnitedHealth's possession, custody, or control,

18    or is otherwise available to UnitedHealth.  The United States objects to this Request

19    to the extent that UnitedHealth is using this information to mischaracterize or

20    misinterpret the facts, particularly in that it mischaracterizes CMS' statements

21    contained in the Response to Public Comments Section of the May 23, 2014 Final

22    Rule: "However, we emphasize that our decision to not finalize this regulatory

23    proposal does not change CMS' existing contractual requirement that MA

24    organizations must certify (based on best knowledge, information, and belief) the

25    accuracy, completeness, and truthfulness of the risk adjustment data they submit to

26    CMS.  Further, this decision does not change the long- standing risk adjustment data

27    requirement that a diagnosis submitted to CMS by an MA organization for payment

28    purposes must be supported by medical record documentation."  79 Fed. Reg. 29926.

0547

1   The United States objects to this Request as improper under Federal Rule of Civil

2   Procedure 36 and applicable case law to the extent it is compound in that it asks the

3   United States to admit multiple facts in one Request.  The United States objects to

4   this Request to the extent it is duplicative of Request for Admission No. 215.

5   **Response:**  Subject to and without waiving the foregoing objections, the United

6   States denies this Request.

7   **REQUEST FOR ADMISSION NO. 217:**   Admit that CMS did not finalize the

8   Proposed Medical Record Review Rule that would have required Two-Way Looks in

9   part because of the FFS Adjuster.

10  **Objection:**  The United States incorporates its General Objections and Specific

11  Objections to the Definitions and Instructions as if stated herein, including but not

12  limited to, its specific objections to the definition of "CMS."  The United States

13  objects to this Request to the extent it calls for any legal conclusion.  The United

14  States objects to this Request to the extent it seeks disclosure of information that is

15  protected from disclosure by an applicable privilege or protection, including the

16  attorney-client privilege, attorney work-product doctrine, deliberative process

17  privilege, and/or investigative files privilege.  The United States objects to this

18  Request to the extent it calls for information that is already in UnitedHealth's

19  possession, custody, or control, or is otherwise available to UnitedHealth.  The

20  United States objects to this Request to the extent that UnitedHealth is using this

21  information to mischaracterize or misinterpret the facts, particularly in that it

22  mischaracterizes CMS' statements contained in the Response to Public Comments

23  Section of the May 23, 2014 Final Rule: "However, we emphasize that our decision

24  to not finalize this regulatory proposal does not change CMS' existing contractual

25  requirement that MA organizations must certify (based on best knowledge,

26  information, and belief) the accuracy, completeness, and truthfulness of the risk

27  adjustment data they submit to CMS.  Further, this decision does not change the long-

28  standing risk adjustment data requirement that a diagnosis submitted to CMS by an

0548

1  MA organization for payment purposes must be supported by medical record

2  documentation."  79 Fed. Reg. 29926.  The United States objects to this Request as

3  improper under Federal Rule of Civil Procedure 36 and applicable case law to the

4  extent it is compound in that it asks the United States to admit multiple facts in one

5  Request.   The United States objects to this Request to the extent it is duplicative of

6  Request for Admission No. 218.

7  **Response:**  Subject to and without waiving the foregoing objections, the United

8  States denies this Request.

9  **REQUEST FOR ADMISSION NO. 218:**   Admit that CMS removed the portion of

10  the Proposed Medical Record Review Rule that would have required Two-Way

11  Looks from the Final Rule in part because of the FFS Adjuster.

12  **Objection:**  The United States incorporates its General Objections and Specific

13  Objections to the Definitions and Instructions as if stated herein, including but not

14  limited to, its specific objections to the definition of "CMS."  The United States

15  objects to this Request to the extent it calls for any legal conclusion.  The United

16  States objects to this Request to the extent it seeks disclosure of information that is

17  protected from disclosure by an applicable privilege or protection, including the

18  attorney-client privilege, attorney work-product doctrine, deliberative process

19  privilege, and/or investigative files privilege.  The United States objects to this

20  Request to the extent it calls for information that is already in UnitedHealth's

21  possession, custody, or control, or is otherwise available UnitedHealth.  The United

22  States objects to this Request to the extent that UnitedHealth is using this information

23  to mischaracterize or misinterpret the facts, particularly in that it mischaracterizes

24  CMS' statements contained in the Response to Public Comments Section of the May

25  23, 2014 Final Rule: "However, we emphasize that our decision to not finalize this

26  regulatory proposal does not change CMS' existing contractual requirement that MA

27  organizations must certify (based on best knowledge, information, and belief) the

28  accuracy, completeness, and truthfulness of the risk adjustment data they submit to

84

0549

CMS.  Further, this decision does not change the long- standing risk adjustment data requirement that a diagnosis submitted to CMS by an MA organization for payment purposes must be supported by medical record documentation."  79 Fed. Reg. 29926. The United States objects to this Request as improper under Federal Rule of Civil Procedure 36 and applicable case law to the extent it is compound in that it asks the United States to admit multiple facts in one Request.  The United States objects to this Request to the extent it is duplicative of Request for Admission No. 217.

**Response:**  Subject to and without waiving the foregoing objections, the United States denies this Request.

**REQUEST FOR ADMISSION NO. 219:**   Admit that CMS did not finalize the Proposed Medical Record Review Rule that would have required Two-Way Looks in part because of Actuarial Equivalence.

**Objection:**  The United States incorporates its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, including but not limited to, its specific objections to the definitions of "CMS" and "Actuarial Equivalence."  The United States objects to this Request to the extent it calls for any legal conclusion.  The United States objects to this Request to the extent it seeks disclosure of information that is protected from disclosure by an applicable privilege or protection, including the attorney-client privilege, attorney work-product doctrine, deliberative process privilege, and/or investigative files privilege.  The United States objects to this Request to the extent it calls for information that is already in UnitedHealth's possession, custody, or control, or is otherwise available to UnitedHealth.  The United States objects to this Request to the extent that UnitedHealth is using this information to mischaracterize or misinterpret the facts, particularly in that it mischaracterizes CMS' statements contained in the Response to Public Comments Section of the May 23, 2014 Final Rule: "However, we emphasize that our decision to not finalize this regulatory proposal does not change CMS' existing contractual requirement that MA organizations must certify (based on best

85

0550

1  knowledge, information, and belief) the accuracy, completeness, and truthfulness of

2  the risk adjustment data they submit to CMS.  Further, this decision does not change

3  the long- standing risk adjustment data requirement that a diagnosis submitted to

4  CMS by an MA organization for payment purposes must be supported by medical

5  record documentation."  79 Fed. Reg. 29926.  The United States objects to this

6  Request as improper under Federal Rule of Civil Procedure 36 and applicable case

7  law to the extent it is compound in that it asks the United States to admit multiple

8  facts in one Request.  The United States objects to this Request to the extent it is

9  duplicative of Request for Admission No. 220.

10  **Response:**  Subject to and without waiving the foregoing objections, the United

11  States denies this Request.

12  **REQUEST FOR ADMISSION NO. 220:**   Admit that CMS removed the portion of

13  the Proposed Medical Record Review Rule that would have required Two-Way

14  Looks from the Final Rule in part because of Actuarial Equivalence.

15  **Objection:**  The United States incorporates its General Objections and Specific

16  Objections to the Definitions and Instructions as if stated herein, including but not

17  limited to, its specific objections to the definitions of "CMS" and "Actuarial

18  Equivalence."  The United States objects to this Request to the extent it calls for any

19  legal conclusion.  The United States objects to this Request to the extent it seeks

20  disclosure of information that is protected from disclosure by an applicable privilege

21  or protection, including the attorney-client privilege, attorney work-product doctrine,

22  deliberative process privilege, and/or investigative files privilege.  The United States

23  objects to this Request to the extent it calls for information that is already in

24  UnitedHealth's possession, custody, or control, or is otherwise available to

25  UnitedHealth.  The United States objects to this Request to the extent that

26  UnitedHealth is using this information to mischaracterize or misinterpret the facts,

27  particularly in that it mischaracterizes CMS' statements contained in the Response to

28  Public Comments Section of the May 23, 2014 Final Rule: "However, we emphasize

86

1   that our decision to not finalize this regulatory proposal does not change CMS'

2   existing contractual requirement that MA organizations must certify (based on best

3   knowledge, information, and belief) the accuracy, completeness, and truthfulness of

4   the risk adjustment data they submit to CMS.  Further, this decision does not change

5   the long- standing risk adjustment data requirement that a diagnosis submitted to

6   CMS by an MA organization for payment purposes must be supported by medical

7   record documentation."  79 Fed. Reg. 29926.  The United States objects to this

8   Request as improper under Federal Rule of Civil Procedure 36 and applicable case

9   law to the extent it is compound in that it asks the United States to admit multiple

10  facts in one Request.  The United States objects to this Request to the extent it is

11  duplicative of Request for Admission No. 219.

12  **Response:**  Subject to and without waiving the foregoing objections, the United

13  States denies this Request.

14

15

16                            Respectfully submitted,

17

18

19

20

21

22

23

24

25

26

27

28

1    Dated:  February 12, 2020              JOSEPH H. HUNT
                                           Assistant Attorney General, Civil Division
2                                          NICOLA T. HANNA
                                           United States Attorney
3                                          DAVID M. HARRIS
                                           Chief, Civil Division
4                                          DAVID K. BARRETT
                                           Chief, Civil Fraud Section
5                                          ABRAHAM C. MELTZER
                                           Deputy Chief, Civil Fraud Section
6                                          Assistant United States Attorneys
                                           JOHN LEE
7                                          JACK ROSS
                                           Assistant United States Attorneys
8

9                                          ANDY J. MAO
                                           ROBERT McAULIFFE
10                                         EDWARD C. CROOKE
                                           LINDA M. McMAHON
11                                         PAUL G. FREEBORNE
                                           JESSICA KRIEG
12                                         ZOILA E. HINSON
                                           AMY L. LIKOFF
13                                         GREGORY A. MASON
                                           MARTHA GLOVER
14                                         Civil Division, Department of Justice

15                                         JAMES P. KENNEDY, JR.
                                           United States Attorney
16                                         KATHLEEN ANN LYNCH
                                           Assistant United States Attorney
17

18                                         _____
                                           AMY L. LIKOFF
19                                         Attorneys, Civil Division
                                           United States Department of Justice
20

21

22

23

24

25

26

27

28

                                    88

                                                                         0553

## PROOF OF SERVICE BY ELECTRONIC MAIL

I am over the age of 18 and not a party to the action entitled U.S. *ex rel*. Poehling v. UnitedHealth Group, Inc., Claims Verification 16-8697 MWF (SSx).  I am employed by the Department of Justice, Civil Division.  My business address is 175 N Street NE, Room 10.1813, Washington, D.C. 20002.

On February 12, 2020, I served the foregoing UNITED STATES' RESPONSES AND OBJECTIONS TO DEFENDANT UHC OF CALIFORNIA'S REQUESTS FOR ADMISSION TO THE GOVERNMENT (SET NO. THREE) on each person or entity named below by electronic mail, pursuant to written consent under Federal Rule of Civil Procedure 5(b)(2)(E).

Date of e-mailing:  February 12, 2020.

Place of e-mailing:  Washington, D.C.

Person(s) and/or Entity(s) to whom e-mailed:

See attached page

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 12, 2020, at Washington, D.C.


_____
AMY L. LIKOFF

89

0554

| David J. Schindler, Esq.<br>david.schindler@lw.com | Eric Havian, Esq.<br>ehavian@constantinecannon.com |
|---|---|
| Daniel Meron, Esq.<br>daniel.meron@lw.com | Jessica Moore, Esq.<br>jmoore@constantinecannon.com |
| Abid, R. Qureshi, Esq.<br>abid.qureshj@lw.com | Henry C. Su, Esq.<br>hsu@constantinecannon.com |
| Anne Robinson, Esq.<br>anne.robinson@lw.com | Anne Hartman, Esq.<br>ahartman@constantinecannon.com |
| Kirstin Scheffler Do, Esq.<br>kirstin.schefflerdo@lw.com | Stephen S. Hasegawa, Esq.<br>shasegawa@phillipsandcohen.com |
| Morgan Maddoux, Esq.<br>Morgan.maddoux@lw.com | Matthew R. Berry, Esq.<br>mberry@susmangodfrey.com |
| | Arun Subramanian<br>asubramanian@SusmanGodfrey.com |
| | UHG-RelatorsCounsel@Lists.SusmanGodfrey.com |

0555

**EXHIBIT D-11A**

JOSEPH H. HUNT
Assistant Attorney General, Civil Division
NICOLA T. HANNA
United States Attorney
DAVID K. BARRETT
DAVID M. HARRIS
JOHN E. LEE (CBN 128696)
JACK D. ROSS (CBN 265883)
Assistant United States Attorneys
    300 N. Los Angeles Street, Room 7516
    Los Angeles, California 90012
    Tel: (213) 894-3995; Fax: (213) 894-7819
    Email: jack.ross@usdoj.gov
ANDY J. MAO
EDWARD C. CROOKE
ROBERT McAULIFFE
LINDA M. McMAHON
PAUL G. FREEBORNE
MARTHA GLOVER
JESSICA KRIEG
ZOILA E. HINSON
AMY L. LIKOFF
GREGORY A. MASON
Attorneys, Civil Division, U.S. Department of Justice
    P.O. Box 261, Ben Franklin Station
    Washington, D.C. 20044
    Tel: (202) 307-0486; Fax: (202) 307-3852
    Email:  gregory.a.mason@usdoj.gov
JAMES P. KENNEDY, JR.
United States Attorney
KATHLEEN ANN LYNCH
Assistant United States Attorney (Admitted PHV)
    138 Delaware Avenue
    Buffalo, New York 14201
    Tel: (716) 843-5830; Fax: (716) 551-3052
    Email: kathleen.lynch@usdoj.gov
Attorneys for the United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING,<br><br>Plaintiffs,<br><br>v.<br><br>UNITEDHEALTH GROUP, INC., *et al.*,<br><br>Defendants. | No. CV 16-08697 FMO (SSx)<br><br>UNITED STATES' RESPONSES AND OBJECTIONS TO DEFENDANT UHC OF CALIFORNIA'S FIRST SET OF INTERROGATORIES TO THE GOVERNMENT |

| | |
|---|---|
| **PROPOUNDING PARTY:** | **UHC OF CALIFORNIA, INC.** |
| **RESPONDING PARTY:** | **UNITED STATES OF AMERICA** |
| **SET NUMBER:** | **ONE** |

## Preliminary Statement

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure ("Federal Rules") and Rule 33 of the Local Civil Rules of the United States District Court for the Central District of California, the United States of America ("United States" or "government"), through its undersigned counsel, provides these responses and objections to Defendant UHC of California's ("UnitedHealth" or "Defendant") First Set of Interrogatories, dated January 3, 2020. The objections and responses set forth herein are based on information now known to the United States and its undersigned attorneys, and will be revised, corrected, supplemented, amended, and clarified to the extent required by Rule 26 as discovery proceeds.

## General Objections

The following objections apply to each and every separately numbered Interrogatory and are incorporated by reference to the extent applicable into the objection to each Interrogatory.

1. The United States objects to the First Set of Interrogatories to the extent it is vague, ambiguous, overbroad, unduly burdensome, or seeks to impose requirements upon the United States beyond those called for or permitted by the Federal Rules of Civil Procedure, the Local Civil Rules of the United States District Court for the Central District of California, or any order of the Court. The United States responds below pursuant to its obligations under the Federal Rules and the Local Civil Rules, namely that the United States has taken and is continuing to undertake reasonable efforts to identify information responsive to the Interrogatories.

2. The United States objects to the First Set of Interrogatories to the extent they seek the disclosure of information concerning the United States' investigation of this

0558

matter as well as the United States' investigation in *United States of America ex rel. Swoben v. SCAN Health Plan, et al., CV* 09-5013 JFW (JEMx), 2017 U.S. Dist. LEXIS 174308 (C.D. Cal. Oct. 5, 2017) ("*Swoben*").  This includes, but is not limited to, the United States' investigative efforts, its assessments of facts and allegations, its deliberative processes concerning actions taken regarding this matter and *Swoben*, and other information generated before and after the commencement of both this litigation and *Swoben*.  The United States objects on the grounds that such information is privileged, work-product protected, not relevant to claims or defenses, and not proportional to the needs of the case.

3.  The United States objects to the below First Set of Interrogatories to the extent that a response requires disclosure of information protected from disclosure by an applicable privilege or protection, including, but not limited to, the attorney-client privilege, work product doctrine, deliberative process privilege, law enforcement privilege, common interest privilege, or investigative files privilege, and protections afforded by Fed. R. Civ. P. 26(b), or any other applicable privilege. The United States will not respond in such a way as to disclose such protected information, but inadvertent identification or disclosure of privileged information by the United States shall not be a waiver of any applicable privilege. Under Federal Rule of Evidence 502, Federal Rule of Civil Procedure 26(b)(5)(B), other related sources of law, and the Court's order regarding inadvertent disclosure of privileged information [Doc. 198], the government reserves any and all rights to claw back privileged information it inadvertently discloses in response to the First Set of Interrogatories.

4.  The United States submits these responses subject to, without intending to waive, but expressly reserving the right to object to other discovery procedures involving or relating to the subject matter of the information in responses to the First Set of Interrogatories. The United States reserves the right to object on any ground, at any time, to such other or supplemental requests as the Defendants may propound involving or relating to the subject matter of the First Set of Interrogatories.

3

0559

5.  The United States reserves the right to supplement its responses to the First Set of Interrogatories at any time, up to and including trial, as provided by the Federal Rules.

6.  The assertion of the same, similar, or additional specific objections to the First Set of Interrogatories does not and should not be construed to waive or modify any of the United States' general objections.

7.  The United States objects to the First Set of Interrogatories to the extent they require the United States to draw legal conclusions, comment on the merits of any affirmative defenses, or otherwise seek to impose any requirements beyond those established by the Federal Rules or the Local Rules.

8.  The United States objects to the First Set of Interrogatories to the extent that any it contains multiple subparts numbered as a single Interrogatory.  By responding, the United States in no way waives its right to object that UnitedHealth has exceeded the maximum number of interrogatories permitted under the Federal Rules of Civil Procedure.

**Specific Objections to the Definitions and Instructions**

The United States objects to the Definitions and Instructions to the extent they (i) seek to impose burdens on the United States that are different from, inconsistent with, or exceed those imposed by the Federal Rules of Civil Procedure and the Local Civil Rules, (ii) are vague or ambiguous, and/or (iii) render the First Set of Interrogatories overly broad, unduly burdensome, not proportionate to the needs of the case, and not relevant. The United States further objects to the First Set of Interrogatories to the extent they use terms not defined by UnitedHealth.

**Definition 10:**  The United States objects to the definition of "Government" (Definition 10) to the extent it includes any branch, agency, department, agent, representative, contractor, attorney, consultant, or person acting on its behalf not relevant to this action.  This definition is plainly unreasonable, unduly burdensome, and disproportionate to the needs of the case, in that it seeks to require the United

States to provide information not currently in the possession, custody, or control of CMS, HHS Office of the Secretary and Immediate Office of the Secretary and HHS-OIG.  Subject to and without waiving these objections, the United States interprets "Government" to mean CMS, HHS Office of the Secretary and Immediate Office of the Secretary, and HHS-OIG.  To the extent the United States interprets the use of "Government" in a specific Interrogatory as directed at one, but not all, of the above components, the United States will state its interpretation in its response.

**Definition 13:**  The United States objects to the term "Person" (Definition 13) to the extent it is defined to mean "the federal government and all departments and agencies thereof, state governments, local governments, [and] other governmental agencies[.]" This definition is plainly unreasonable, unduly burdensome, and disproportionate to the needs of the case, in that it seeks to require the United States to provide information not currently in the possession, custody, or control of CMS, HHS Office of the Secretary and Immediate Office of the Secretary and HHS-OIG.  Furthermore, the United States objects to the extent each definition includes former CMS contractors for whom the United States presently has no reasonable belief they possess or control non-duplicative information relevant to any claim or defense in this case.

**Definition 19:**  The United States objects to the definition of "You" and "Your" to the extent these terms are intended to encompass any agency, office, employee, agent, representative, officer, or contractor of either the legislative or judicial branch, and insofar as these terms are defined to include executive branch agencies and offices not relevant to this action.  This is plainly unreasonable, unduly burdensome, and disproportionate to the needs of the case, in that it seeks to require the United States to provide information not currently in the possession, custody, or control of CMS, HHS Office of the Secretary and Immediate Office of the Secretary and HHS-OIG.  Subject to and without waiving these objections, the United States will interpret this term to mean the Department of Justice, CMS, HHS Office of the Secretary and

0561

1   Immediate Office of the Secretary, and HHS-OIG.

2   **Instruction 3:**  The United States objects to Instruction 3 as vague and ambiguous.

3   The United States construes the Interrogatory to encompass the time period from

4   Date of Service Years 2008-2016.

5   **Instruction 5:**  The United States objects to Instruction 5 to the extent it seeks to

6   impose burdens upon the United States beyond those called for or permitted by the

7   Federal Rules or the Local Rules for the Central District of California.

8   **Instruction 6:**  The United States objects to Instruction 6 to the extent it seeks to

9   impose burdens upon the United States beyond those called for or permitted by the

10  Federal Rules or the Local Rules for the Central District of California.

11  **Instruction 7:**  The United States objects to Instruction 7 to the extent it seeks to

12  impose burdens upon the United States beyond those called for or permitted by the

13  Federal Rules or the Local Rules for the Central District of California.  The United

14  States will assert any applicable privileges and specify the material to which it applies

15  per Fed. R. Civ. P. 25(b)(5)(A) for all information responsive to a request to which

16  the United States has agreed to produce but which is withheld on the basis of a

17  privilege or protection.

18  <div align="center">**Specific Objections and Responses**</div>

19  **INTERROGATORY NO. 1:**  Identify for Date of Service Years 2008–2016

20  the Beneficiary (by name, HIC Number, and date of birth), Date of Service,

21  Diagnosis Code(s), CMS HCC(s) or RxHCC(s), and Provider (by individual

22  name, group name, address, NPI, Tax ID(s), and Provider ID), that corresponds

23  to each and every Diagnosis Code You allege UnitedHealth "knowingly and

24  improperly failed to delete . . . or otherwise return to the Medicare Program [as

25  an] overpayment." United States' Complaint ¶ 342, Dkt. 171.

26  **Objection:**  The United States incorporates its General Objections and Specific

27  Objections to the Definitions and Instructions as if stated herein.  The United States

28  further objects to this Interrogatory on the grounds that it is oppressive and unduly

<div align="center">6</div>

burdensome in that it seeks information that is more readily available to or in the

possession, custody, or control of the UnitedHealth defendants concerning their own

Beneficiaries and Diagnoses Codes reported on behalf of their own Beneficiaries.

The United States further objects to this Interrogatory in that it prematurely seeks the

disclosure of expert analysis and opinion. The United States will provide its expert

analyses and opinions in accordance with the expert discovery schedule set forth in

this case. The United States further objects to this Interrogatory in that, with fact

discovery still ongoing, the United States has not yet identified "each and every

Diagnosis Code" that the United States alleges that UnitedHealth knowingly and

improperly failed to delete and that the interrogatory therefore prematurely seeks the

United States' contentions about "each and every Diagnosis Code." Further,

UnitedHealth has inhibited the United States' ability to identify "each and every

Diagnosis Code" by improperly refusing to produce – for more than a year and a half

– complete chart review data for the relevant time period. Indeed, UnitedHealth only

recently produced chart review data for Date of Service Years 2015 and 2016 on or

about December 6, 2019. The United States further objects to the extent that the

Interrogatory asks for information that the United States does not have or cannot

determine because of the manner in which UnitedHealth recorded and maintained

data. The United States further objects to the extent that UnitedHealth's use of an

ellipsis is misleading and confusing and renders the quotation nonsensical.

**Response:** Subject to and without waiving the foregoing objections, the United

States responds that although fact discovery is ongoing, and expert disclosures are not

due until December 18, 2020, and that the United States reserves the right to

supplement and/or amend this answer in full or in part as it learns new information

and as expert analysis progresses, the United States alleges that UnitedHealth

Defendants "knowingly and improperly failed to delete in the RAPS system the

invalid diagnoses that had been submitted to the Medicare Program for risk

adjustment payments which were made by the Medicare Program to them or

1  knowingly and improperly failed to otherwise return to the Medicare Program the

2  overpayments based on the invalid diagnoses" for each and every Diagnosis Code

3  that was known (as that term is defined by the False Claims Act) to be unsupported

4  by medical records and that affected the amount of payment received by

5  UnitedHealth from the Medicare Program.  The information UnitedHealth seeks is

6  readily available to or in its possession, custody, or control, and can be derived from

7  documents that UnitedHealth has produced including, but not limited to:

8  MARA1795523; MARA1795803; MARA768242; MARA2100494-495;

9  MARA2100496-MARA2100500; MARA2100501-502; MARA2117122;

10  MARA2117127-128; MARA2117129-137; MARA2117312-539; MARA2152913-

11  MARA2152925; MARAR2152926; MARA2152922; MARA2152927-

12  MARA2152934; MARA2156616- 618;  MARA2156619-6787; MARA2157305-

13  MARA2157320; MARA2157332 - MARA2157345; MARA2157351-

14  MARA2160459; MARA2160460-MARA2160489; MARA2160490 –

15  MARA2160498; MARA2160502 - MARA2160535; MARA2160687-

16  MARA2160695; MARA2160704-MARA2160725; MARA2160726 -

17  MARA2160729; MARA2160732-MARA2160735; MARA2160730 -

18  MARA2160731; MARA2160736-MARA2160737; MARA2180340-

19  MARA2180341; MARA2180342- MARA2180343; MAPL000724235-

20  MAPL000724836; MAPL001370197-MAPL001370236; MAPL001570602 -

21  MAPL001570606; MAPL002077000 - MAPL002079216; MAPL003292331-

22  MAPL003292498; MAPL003667028-MAPL003667128; MAPL003958939-

23  MAPL003959010; MAPL005462834- MAPL005462902; and MAPL006427492-

24  MAPL006427602.

25        Further, the United States refers to MARA1298042, MARA2092181,

26  MARA2157036, MARA2160501, and MARA2117116, incorporates as if fully set

27  forth herein and identifies all Diagnosis Codes contained therein that affected the

28  amount of payment received by UnitedHealth from the Medicare Program.

0564

1  At this time and based upon the incomplete information and subject to the right to

2  supplement and/or amend this answer in full or in part, the United States additionally

3  identifies and incorporates into its answer the attached chart of representative

4  examples of Diagnosis Codes that UnitedHealth "knowingly and improperly failed to

5  delete in the RAPS system" or "knowingly and improperly failed to otherwise return

6  to the Medicare Program the overpayments based on" such diagnoses.  The provider

7  information in the attached chart has been reproduced as it appears in the data that

8  UnitedHealth produced in this case, including missing fields, dummy values, and

9  placeholders, and we have preserved the convention of using "~" to indicate a

10 database null.  Further, although the Interrogatory asked for the Provider ID, there is

11 no field designated Provider_ID and we have responded with the Provider_Nbr.  For

12 COSMOS Providers, we have included two sets of provider information: the provider

13 information that results from a direct lookup in the Provider table (2A), and the

14 provider information that results from a lookup in the SAS_All_Providers table you

15 provided to us, linking the LOB_Cd associated with the encounter's LOB_Key to the

16 Site_Cd field. For non-COSMOS Providers, the second set of columns has been left

17 blank.

18      The United States will supplement its response to this Interrogatory as

19 appropriate and subject to the expert discovery schedule set forth in this case.

20

21

22

23

24

25

26

27

28

0565

1

2    Dated:  February 3, 2020

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General, Civil Division
NICOLA T. HANNA
United States Attorney
DAVID M. HARRIS
DAVID K. BARRETT
ABRAHAM C. MELTZER
JOHN E. LEE (CBN 128696)
JACK D. ROSS (CBN 265883)
Assistant United States Attorneys

ANDY J. MAO
EDWARD C. CROOKE
ROBERT McAULIFFE
LINDA M. McMAHON
PAUL G. FREEBORNE
MARTHA GLOVER
JESSICA KRIEG
ZOILA E. HINSON
AMY L. LIKOFF
GREGORY A. MASON
Civil Division, Department of Justice

JAMES P. KENNEDY, JR.
United States Attorney
KATHLEEN ANN LYNCH
Assistant United States Attorney

_____

GREGORY A. MASON
Attorneys for the United States

10

0566

<div align="center">PROOF OF SERVICE BY ELECTRONIC MAIL</div>

I am over the age of 18 and not a party to the action entitled U.S. *ex rel*.

Poehling v. UnitedHealth Group, Inc., CV-16-8697 MWF (SSx). I am employed by

the Department of Justice, Civil Division. My business address is 175 N Street NE,

Room 10.224, Washington, D.C. 20002.

On February 3, 2020, I served the foregoing PLAINTIFF UNITED STATES'

RESPONSES AND OBJECTIONS TO DEFENDANT UHC OF CALIFORNIA'S

FIRST SET OF INTERROGATORIES TO THE GOVERNMENT on each person or

entity named below by electronic mail, pursuant to written consent under Federal

Rule of Civil Procedure 5(b)(2)(E).

Date of e-mailing: February 3, 2020.

Place of e-mailing: Washington, D.C.

Person(s) and/or Entity(s) to whom e-mailed:

See attached page

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 3, 2020, at Washington, D.C.

_____
GREGORY A. MASON

0567

| David J. Schindler, Esq.<br>david.schindler@lw.com | Eric Havian, Esq.<br>ehavian@constantinecannon.com |
|---|---|
| Daniel Meron, Esq.<br>daniel.meron@lw.com | Jessica Moore, Esq.<br>jmoore@constantinecannon.com |
| Abid, R. Qureshi, Esq.<br>abid.qureshj@lw.com | Henry C. Su, Esq.<br>hsu@constantinecannon.com |
| Anne Robinson, Esq.<br>anne.robinson@lw.com | Anne Hartman, Esq.<br>ahartman@constantinecannon.com |
| Kirstin Scheffler Do, Esq.<br>kirstin.schefflerdo@lw.com | Stephen S. Hasegawa, Esq.<br>shasegawa@phillipsandcohen.com |
| Morgan Maddoux, Esq.<br>Morgan.maddoux@lw.com | Matthew R. Berry, Esq.<br>mberry@susmangodfrey.com |
| David W. Rowe, Esq.<br>david.rowe@lw.com | Arun Subramanian<br>asubramanian@SusmanGodfrey.com |
| | UHG-RelatorsCounsel@Lists.SusmanGodfrey.Com |

12

United States ex rel. Poehling v. UnitedHealth Group, Inc., No. 16-08697 FMO (SSx)
CONFIDENTIAL: Contains PHI and PII

| HICN | Last Name | First Name | DOB | Dx | HCC | RxHCC | HCC V22 | DOS - From | DOS - Thru | Provider # | Provider Name | Address | NPI | Tax ID | Provider Name | Address | NPI | Tax ID |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 29369370A | DAILEY | WALTER | 7/21/1930 | 20401 | 7 | | 11 | 12/21/2010 | 12/21/2010 | 0001002129 2 | ~ | | | | 0000000000 | GONZALEZ, M.D., EVANGELIO TRENTON | 690 DALLAS HWY STE 303, VILLA RICA, GA, 30180 | 1598739609 | 582453300 |
| 29369370A | DAILEY | WALTER | 7/21/1930 | 436 | 96 | | 97 | 12/21/2010 | 12/21/2010 | 0001021292 | ~ | | | | 0000000000 | GONZALEZ, M.D., EVANGELIO TRENTON | 690 DALLAS HWY STE 303, VILLA RICA, GA, 30180 | 1598739609 | 582453300 |
| 462424512D | DUNCAN | LERA | 12/8/1933 | 28800 | 45 | | | 1/15/2010 | 1/15/2010 | 0153180318 | CHOWDHARY, SULTAN A | 4201 MEDICAL CENTER DR #180, MCKINNEY, TX, 75069 | 1033114459 | 751312419 | | | | |
| 245862242A | MOBLEY | BARBARA | 2/1/1953 | 28800 | 45 | | | 7/20/2010 | 7/20/2010 | 0004000317S | KIM, M.D., JUNG MIN | 1044 BELMONT AVE, YOUNGSTOWN, OH, 44504 | ~ | | 0340505560 | CHAI, M.D., SEUNGJEAN | 411 BILLINGSLEY RD STE 103, CHARLOTTE, NC, 28211 | ~ | 561886140 |
| 245862242A | MOBLEY | BARBARA | 2/1/1953 | 2839 | 44 | | 50 | 7/20/2010 | 7/20/2010 | 0004000317S | KIM, M.D., JUNG MIN | 1044 BELMONT AVE, YOUNGSTOWN, OH, 44504 | ~ | | 0340505560 | CHAI, M.D., SEUNGJEAN | 411 BILLINGSLEY RD STE 103, CHARLOTTE, NC, 28211 | ~ | 561886140 |
| 255488111A | FLUELLEN | CHARLIE | 8/23/1929 | 28809 | 45 | | | 8/25/2010 | 8/25/2010 | 0004006970 | PEACOCK, M.D., MICHAEL TODD | 911 PLAZA AVE STE C, EASTMAN, GA, 31023 | 1487636742 | 582375713 | PEACOCK, M.D., MICHAEL TODD | 911 PLAZA AVE STE C, EASTMAN, GA, 31023 | 1487636742 | 582375713 |
| 255488111A | FLUELLEN | CHARLIE | 8/23/1929 | 4139 | 83 | | 89 | 11/17/2010 | 11/17/2010 | 0004069470 | PEACOCK, M.D., MICHAEL TODD | 911 PLAZA AVE STE C, EASTMAN, GA, 31023 | 1487636742 | 582375713 | PEACOCK, M.D., MICHAEL TODD | 911 PLAZA AVE STE C, EASTMAN, GA, 31023 | 1487636742 | 582375713 |
| 255488111A | FLUELLEN | CHARLIE | 8/23/1929 | 4414 | 105 | | | 7/22/2010 | 7/22/2010 | 0004006970 | PEACOCK, M.D., MICHAEL TODD | 911 PLAZA AVE STE C, EASTMAN, GA, 31023 | 1487636742 | 582375713 | PEACOCK, M.D., MICHAEL TODD | 911 PLAZA AVE STE C, EASTMAN, GA, 31023 | 1487636742 | 582375713 |
| 513803046A | GROSS | DOROTHY | 4/4/1954 | 2841 | 44 | | 50 | 1/25/2010 | 1/25/2010 | 0036000101 | SHAH, M.D., AMIT I. | 4420 SUN N LAKE BLVD, SEBRING, FL, 33872 | 1407850449 | 0650826332 | MATTAR, M.D., BASSAM I. | 818 N EMPORIA ST STE 403, WICHITA, KS, 67214 | 1053372649 | 481181579 |
| 513803046A | GROSS | DOROTHY | 4/4/1954 | 28803 | 45 | | | 1/25/2010 | 1/25/2010 | 0036000101 | SHAH, M.D., AMIT I. | 4420 SUN N LAKE BLVD, SEBRING, FL, 33872 | 1407850449 | 0650826332 | MATTAR, M.D., BASSAM I. | 818 N EMPORIA ST STE 403, WICHITA, KS, 67214 | 1053372649 | 481181579 |
| 256580343A | TIGNER | HERMAN | 5/1/1941 | 20500 | 7 | | | 10/21/2010 | 10/21/2010 | 0033000635 | FREITAG, M.D., ANNA | 1351 WASHINGTON BLVD, STAMFORD, CT, 06902 | 1235113507 | 047629908 | WELCH, M.D., NORMAN SPENCER | 77 COLLIER RD NW STE 2080, ATLANTA, GA, 30309 | ~ | 581578080 |
| 256580343A | TIGNER | HERMAN | 5/1/1941 | 25040 | 15 | | 14 | 4/22/2010 | 4/22/2010 | 0033000635 | FREITAG, M.D., ANNA | 1351 WASHINGTON BLVD, STAMFORD, CT, 06902 | 1235113507 | 047629908 | WELCH, M.D., NORMAN SPENCER | 77 COLLIER RD NW STE 2080, ATLANTA, GA, 30309 | ~ | 581578080 |
| 257588470A | CALLAWAY | WILLIAM | 3/6/1940 | 20500 | 7 | | | 10/4/2010 | 10/4/2010 | 0048000769 | ~ | | | | 0582473891 | JOSEPH, M.D., CARMEL | 3630 J DEWEY GRAY CR, AUGUSTA, GA, 30909 | 1245286681 | 320344413 |
| 257588470A | CALLAWAY | WILLIAM | 3/6/1940 | 4168 | 80 | | 86 | 10/4/2010 | 10/4/2010 | 0048000769 | ~ | | | | 0582473891 | JOSEPH, M.D., CARMEL | 3630 J DEWEY GRAY CR, AUGUSTA, GA, 30909 | 1245286681 | 320344413 |
| 341200050A | BRUHA | AUGUST | 9/6/1928 | 2841 | 44 | | 50 | 3/1/2010 | 3/1/2010 | 0036000792 1 | CELANO, M.D., PAUL C. | 6569 N CHARLES ST STE 205, BALTIMORE, MD, 21204 | ~ | 526049658 | CELANO, M.D., PAUL C. | 6569 N CHARLES ST STE 205, BALTIMORE, MD, 21204 | ~ | 526049658 |
| 341200050A | BRUHA | AUGUST | 9/6/1928 | 2841 | 44 | | 50 | 11/15/2010 | 11/15/2010 | 0036000792 1 | CELANO, M.D., PAUL C. | 6569 N CHARLES ST STE 205, BALTIMORE, MD, 21204 | ~ | 526049658 | CELANO, M.D., PAUL C. | 6569 N CHARLES ST STE 205, BALTIMORE, MD, 21204 | ~ | 526049658 |
| 497205501A | PLOUDER | JACK | 3/23/1927 | 25072 | 15 | | 14 | 2/24/2011 | 2/24/2011 | 0004000227 | ECKSTEIN, M.D., MICHAEL B. | 3909 ORANGE PL STE 2400, BEACHWOOD, OH, 44122 | 1134265614 | 0341768928 | NAUMOVICH, M.D., ANNA D. | 5205 S GRAND BLVD, SAINT LOUIS, MO, 63111 | 1669542668 | 431483961 |
| 497205501A | PLOUDER | JACK | 3/23/1927 | 25072 | 15 | | 14 | 7/5/2011 | 7/5/2011 | 0004000227 | ECKSTEIN, M.D., MICHAEL B. | 3909 ORANGE PL STE 2400, BEACHWOOD, OH, 44122 | 1134265614 | 0341768928 | NAUMOVICH, M.D., ANNA D. | 5205 S GRAND BLVD, SAINT LOUIS, MO, 63111 | 1669542668 | 431483961 |
| 497205501A | PLOUDER | JACK | 3/23/1927 | 7854 | 104 | | | 7/5/2011 | 7/5/2011 | 0004000227 | ECKSTEIN, M.D., MICHAEL B. | 3909 ORANGE PL STE 2400, BEACHWOOD, OH, 44122 | 1134265614 | 0341768928 | NAUMOVICH, M.D., ANNA D. | 5205 S GRAND BLVD, SAINT LOUIS, MO, 63111 | 1669542668 | 431483961 |
| 497205501A | PLOUDER | JACK | 3/23/1927 | 4439 | 4439 | 105 | 101 | 7/5/2011 | 7/5/2011 | 0004000227 | ECKSTEIN, M.D., MICHAEL B. | 3909 ORANGE PL STE 2400, BEACHWOOD, OH, 44122 | 1134265614 | 0341768928 | NAUMOVICH, M.D., ANNA D. | 5205 S GRAND BLVD, SAINT LOUIS, MO, 63111 | 1669542668 | 431483961 |
| 497205501A | PLOUDER | JACK | 3/23/1927 | 5852 | 131 | | 125 | 7/5/2011 | 7/5/2011 | 0004000227 | ECKSTEIN, M.D., MICHAEL B. | 3909 ORANGE PL STE 2400, BEACHWOOD, OH, 44122 | 1134265614 | 0341768928 | NAUMOVICH, M.D., ANNA D. | 5205 S GRAND BLVD, SAINT LOUIS, MO, 63111 | 1669542668 | 431483961 |
| 439270707A | KELLY | JEROME | 2/21/1963 | 73340 | 37 | | 38 | 5/9/2011 | 5/20/2011 | 0004000065 | FERRI, M.D., FRED | 1539 ATWOOD AVE STE 101, JOHNSTON, RI, 02919 | 1013903400 | 0050483739 | LEE, M.D., CHOK KEUNG | 1200 BINZ STE 875, HOUSTON, TX, 77004 | 1568416212 | 760106340 |
| 439270707A | KELLY | JEROME | 2/21/1963 | 73342 | 37 | | 38 | 2/23/2011 | 2/23/2011 | 0001002078 | ~ | | | | 0391195501 | UZOAGA, M.D., ENYIBUAKU RITA | 9119 S GESSNER DR STE 305, HOUSTON, TX, 77074 | 1245246925 | 202374197 |
| 439270707A | KELLY | JEROME | 2/21/1963 | 07054 | 27 | | 25 | 7/1/2011 | 7/1/2011 | 0004000065 | FERRI, M.D., FRED | 1539 ATWOOD AVE STE 101, JOHNSTON, RI, 02919 | 1013903400 | 0050483739 | LEE, M.D., CHOK KEUNG | 1200 BINZ STE 875, HOUSTON, TX, 77004 | 1568416212 | 760106340 |
| 439270707A | KELLY | JEROME | 2/21/1963 | 28800 | 45 | | | 5/9/2011 | 5/20/2011 | 0004000065 | FERRI, M.D., FRED | 1539 ATWOOD AVE STE 101, JOHNSTON, RI, 02919 | 1013903400 | 0050483739 | LEE, M.D., CHOK KEUNG | 1200 BINZ STE 875, HOUSTON, TX, 77004 | 1568416212 | 760106340 |
| 439270707A | KELLY | JEROME | 2/21/1963 | 496 | 108 | | 104 | 6/30/2011 | 6/30/2011 | 0004000065 | FERRI, M.D., FRED | 1539 ATWOOD AVE STE 101, JOHNSTON, RI, 02919 | 1013903400 | 0050483739 | LEE, M.D., CHOK KEUNG | 1200 BINZ STE 875, HOUSTON, TX, 77004 | 1568416212 | 760106340 |
| 439270707A | KELLY | JEROME | 2/21/1963 | 4011 | 88 | | | 5/9/2011 | 5/20/2011 | 0004000065 | FERRI, M.D., FRED | 1539 ATWOOD AVE STE 101, JOHNSTON, RI, 02919 | 1013903400 | 0050483739 | LEE, M.D., CHOK KEUNG | 1200 BINZ STE 875, HOUSTON, TX, 77004 | 1568416212 | 760106340 |
| 439270707A | KELLY | JEROME | 2/21/1963 | 4019 | 88 | | | 2/23/2011 | 2/23/2011 | 0001002078 | ~ | | | | 0391195501 | UZOAGA, M.D., ENYIBUAKU RITA | 9119 S GESSNER DR STE 305, HOUSTON, TX, 77074 | 1245246925 | 202374197 |
| 448243317D | CHEATHAM | CLEMMIE | 4/15/1930 | 20500 | 7 | | | 9/17/2011 | 9/18/2011 | 0004000367 | TAN, M.D., AILEEN S. | 4448 W LOOMIS RD STE 204, MILWAUKEE, WI, 53220 | 1720166234 | 0391696443 | EZENWABACHILI, M.D., OBAJULU C. | 8300 BISSONNET ST STE 180, HOUSTON, TX, 77074 | 1518945674 | 760696321 |
| 495269943D | LAMPERT | JEAN | 1/12/1935 | 73313 | 157 | | 45 | 11/17/2011 | 11/17/2011 | 0004000227 | ECKSTEIN, M.D., MICHAEL B. | 3909 ORANGE PL STE 2400, BEACHWOOD, OH, 44122 | 1134265614 | 0341768928 | NAUMOVICH, M.D., ANNA D. | 5205 S GRAND BLVD, SAINT LOUIS, MO, 63111 | 1669542668 | 431483961 |
| 354467044A | RAMSAK | EDWARD | 7/10/1952 | 2841 | 44 | | 50 | 2/15/2011 | 2/15/2011 | 0195460699 | PLUNKETT, LARRY | 6311 E 14TH AVE, DENVER, CO, 80220 | 0000000427 | 841319830 | | | | |
| 555187641D | MADRONAL | BELLA | 3/16/1931 | 4139 | 83 | | 89 | 6/2/2011 | 6/2/2011 | 0333000973 | STEPHEN BLOOMFIELD | 5250 NEIL RD STE 207, RENO, NV, 89502 | 1518053743 | 263427764 | | | | |
| 464889872A | HUBBARD | BETTY | 5/21/1948 | 436 | 96 | | 97 | 9/11/2012 | 9/11/2012 | 0004012076 | M.D., ANIL GEORGE | 2100 STANTONSBURG RD, GREENVILLE, NC, 27834 | 1154307684 | 0566000403 | AIIM, M.D., ALICE A. | 2101 CRAWFORD STE 210, HOUSTON, TX, 77002 | ~ | 412175620 |
| 464889872A | HUBBARD | BETTY | 5/21/1948 | 27700 | 107 | | 103 | 2/7/2012 | 2/7/2012 | 0004012076 | M.D., ANIL GEORGE | 2100 STANTONSBURG RD, GREENVILLE, NC, 27834 | 1154307684 | 0566000403 | AIIM, M.D., ALICE A. | 2101 CRAWFORD STE 210, HOUSTON, TX, 77002 | ~ | 412175620 |
| 132509123A | PENELLO JR | ARTHUR | 6/11/1958 | 28260 | 44 | | 50 | 8/9/2012 | 8/9/2012 | 0005008510 | SHUMATE JR, M.D., JACK B. | 100 DOCTORS DR STE B, PANAMA CITY, FL, 32405 | 1558366955 | 593562065 | SHUMATE JR, M.D., JACK B. | 100 DOCTORS DR STE B, PANAMA CITY, FL, 32405 | 1558366955 | 593562065 |
| 387849861A | DEQUAINE | MARK | 11/1/1965 | 2849 | 44 | | 50 | 6/1/2012 | 6/1/2012 | 0004007538 | CARSON, M.D., JOHN TURNER | 9686 CINCINNATI-COLUMBUS RD, WEST CHESTER, OH, 45241 | 1053409151 | 0295448596 | LACEY, M.D., JAMES V. | 101 SCHOOL CREEK TRL, LUXEMBURG, WI, 54217 | 1770571325 | 390817529 |
| 314340607A | GILLESPIE | ERNEST | 7/28/1936 | 1980 | 7 | | 11 | 2/20/2012 | 2/20/2012 | 0001003240 | TAYLOR, M.D., MARSHA A. | 5349 N 22ND ST STE 1, OZARK, MO, 65721 | ~ | 452926643 | TAYLOR, M.D., MARSHA A. | 5349 N 22ND ST STE 1, OZARK, MO, 65721 | ~ | 452926643 |
| 314340607A | GILLESPIE | ERNEST | 7/28/1936 | 1889 | 10 | | | 2/20/2012 | 2/20/2012 | 0001003240 | TAYLOR, M.D., MARSHA A. | 5349 N 22ND ST STE 1, OZARK, MO, 65721 | ~ | 452926643 | TAYLOR, M.D., MARSHA A. | 5349 N 22ND ST STE 1, OZARK, MO, 65721 | ~ | 452926643 |
| 507365409A | STIKA | DOROTHY | 9/22/1937 | 1963 | 7 | | 11 | 1/24/2012 | 1/24/2012 | 0036000635 | HEWITT, M.D., MAUREEN | 440 E MARSHALL ST STE 201, WEST CHESTER, PA, 19380 | 1447312368 | 0232943766 | SOORI, M.D., GAMINI S. | 8303 DODGE ST STE 250, OMAHA, NE, 68114 | 1891775789 | 470754790 |
| 507365409A | STIKA | DOROTHY | 9/22/1937 | 1745 | 10 | | 10 | 1/24/2012 | 1/24/2012 | 0036000635 | HEWITT, M.D., MAUREEN | 440 E MARSHALL ST STE 201, WEST CHESTER, PA, 19380 | 1447312368 | 0232943766 | SOORI, M.D., GAMINI S. | 8303 DODGE ST STE 250, OMAHA, NE, 68114 | 1891775789 | 470754790 |
| 256584739B | BLEDSOE | VIVIAN | 1/11/1941 | 20401 | 7 | | 11 | 10/22/2012 | 10/22/2012 | 0001021635 | LOCKETTE, M.D., PATRINA L. | 110 NORMAN DORMINY DR STE A, FITZGERALD, GA, 31750 | ~ | 263792403 | LOCKETTE, M.D., PATRINA L. | 110 NORMAN DORMINY DR STE A, FITZGERALD, GA, 31750 | ~ | 263792403 |
| 256584739B | BLEDSOE | VIVIAN | 1/11/1941 | 4280 | 80 | | 87 | 10/15/2012 | 10/15/2012 | 0001021635 | LOCKETTE, M.D., PATRINA L. | 110 NORMAN DORMINY DR STE A, FITZGERALD, GA, 31750 | ~ | 263792403 | LOCKETTE, M.D., PATRINA L. | 110 NORMAN DORMINY DR STE A, FITZGERALD, GA, 31750 | ~ | 263792403 |
| 256584739B | BLEDSOE | VIVIAN | 1/11/1941 | 2449 | 20 | | | 10/22/2012 | 10/22/2012 | 0001021635 | LOCKETTE, M.D., PATRINA L. | 110 NORMAN DORMINY DR STE A, FITZGERALD, GA, 31750 | ~ | 263792403 | LOCKETTE, M.D., PATRINA L. | 110 NORMAN DORMINY DR STE A, FITZGERALD, GA, 31750 | ~ | 263792403 |
| 256584739B | BLEDSOE | VIVIAN | 1/11/1941 | 2449 | 20 | | | 9/4/2012 | 9/4/2012 | 0001008528 | LIM, M.D., ASTOR T. | 3226 HAMPTON AVE STE E, BRUNSWICK, GA, 31520 | 1891714887 | 582502023 | LIM, M.D., ASTOR T. | 3226 HAMPTON AVE STE E, BRUNSWICK, GA, 31520 | 1891714887 | 582502023 |
| 420301170A | PARKER | HUNTER | 12/7/1929 | 1975 | 7 | | 10 | 1/25/2012 | 1/25/2012 | 0004000522 | MCRAE, M.D., MALLORY | 1518 MILLILI AVE, BAINBRIDGE, GA, 39819 | 1700890274 | 0200427161 | MCRAE, M.D., MALLORY | 1518 MILLILI AVE, BAINBRIDGE, GA, 39819 | 1700890274 | 200427161 |
| 450503376A | GABY | CHARLES | 9/24/1935 | 1962 | 7 | | | 9/10/2013 | 9/10/2013 | 0158190159 | DOYAL, JESSE D | 1106 N GALLOWAY AVE, MESQUITE, TX, 75149 | 0000000001629 | 752128773 | | | | |
| 170561650A | RODRIGUEZ | REYNALDO | 4/7/1968 | 20501 | 7 | | 8 | 3/11/2013 | 3/11/2013 | 0000462150 | MATILDE SOTOMAYOR | | 1932203544 | 453012323 | | | | |
| 487465130A | HINRICHS | PAUL | 2/2/1943 | 1981 | 7 | | 11 | 8/13/2013 | 8/13/2013 | 0301000471 | RINGHOFER, M.D., BRIAN R. | 621 S NEW BALLAS RD STE 3015B, SAINT LOUIS, MO, 63141 | 1538380076 | 431556947 | RINGHOFER, M.D., BRIAN R. | 621 S NEW BALLAS RD STE 3015B, SAINT LOUIS, MO, 63141 | 1538380076 | 431556947 |
| 127328953A | FULLER | JOHN | 8/20/1942 | 1970 | 7 | | 10 | 4/24/2013 | 4/24/2013 | 0360000654 | ~ | | | | 0000000000 | IGNACZAK, M.D., STEPHEN M. | 6 AMBULANCE DR, CLIFTON SPRINGS, NY, 14432 | 1962452136 | 030441307 |
| 127328953A | FULLER | JOHN | 8/20/1942 | 1970 | 7 | | 10 | 8/13/2013 | 8/13/2013 | 0360000654 | ~ | | | | 0000000000 | IGNACZAK, M.D., STEPHEN M. | 6 AMBULANCE DR, CLIFTON SPRINGS, NY, 14432 | 1962452136 | 030441307 |
| 127328953A | FULLER | JOHN | 8/20/1942 | 44102 | 104 | | 107 | 8/13/2013 | 8/13/2013 | 0360000654 | ~ | | | | 0000000000 | IGNACZAK, M.D., STEPHEN M. | 6 AMBULANCE DR, CLIFTON SPRINGS, NY, 14432 | 1962452136 | 030441307 |
| 127328953A | FULLER | JOHN | 8/20/1942 | 44102 | 104 | | 107 | 4/24/2013 | 4/24/2013 | 0360000654 | ~ | | | | 0000000000 | IGNACZAK, M.D., STEPHEN M. | 6 AMBULANCE DR, CLIFTON SPRINGS, NY, 14432 | 1962452136 | 030441307 |

0569

**<u>VERIFICATION</u>**

I, Amanda Johnson, declare that I am the Director of the Division of Encounter

Data and Risk Adjustment Operations, and I am authorized to make this Verification

on behalf of the United States.  I have read the UNITED STATES' RESPONSES

AND OBJECTIONS TO DEFENDANT UHC OF CALIFORNIA'S FIRST SET OF

INTERROGATORIES TO THE GOVERNMENT dated February 3, 2020, and I

personally know or have been informed of the contents thereof.  The facts stated in

the aforementioned responses are not all within my personal knowledge, but have

been assembled by authorized employees and/or consultants of the United States, and

I am informed by said employees and/or consultants that the facts stated therein are

true at this time.

I declare under penalty of perjury under the laws of the United States that the

foregoing is true and correct.

Executed on May _12, 2020 at 7:05 am_.


_____
Amanda Johnson
Director, Division of Encounter Data and Risk
Adjustment Operations
Centers for Medicare & Medicaid Services, Medicare
Plan and Payment Group

**EXHIBIT D-11B**

ETHAN P. DAVIS
Acting Assistant Attorney General, Civil Division
NICOLA T. HANNA
United States Attorney
DAVID K. BARRETT
DAVID M. HARRIS
JOHN E. LEE (CBN 128696)
JACK D. ROSS (CBN 265883)
Assistant United States Attorneys
        300 N. Los Angeles Street, Room 7516
        Los Angeles, California 90012
        Tel: (213) 894-7395; Fax: (213) 894-7819
        Email: jack.ross@usdoj.gov
JAMIE ANN YAVELBERG
EDWARD C. CROOKE
ROBERT McAULIFFE
LINDA M. McMAHON
MARTHA GLOVER
JESSICA KRIEG
ZOILA E. HINSON
AMY L. LIKOFF
GREGORY A. MASON
Attorneys, Civil Division, U.S. Department of Justice
        P.O. Box 261, Ben Franklin Station
        Washington, D.C. 20044
        Tel: (202) 307-0486; Fax: (202) 307-3852
        Email:  gregory.a.mason@usdoj.gov
JAMES P. KENNEDY, JR.
United States Attorney
KATHLEEN ANN LYNCH
Assistant United States Attorney (Admitted PHV)
        138 Delaware Avenue
        Buffalo, New York 14201
        Tel: (716) 843-5830; Fax: (716) 551-3052
        Email: kathleen.lynch@usdoj.gov
Attorneys for the United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel*. BENJAMIN POEHLING,<br><br>Plaintiffs,<br><br>v.<br><br>UNITEDHEALTH GROUP, INC., *et al*.,<br><br>Defendants. | No. CV 16-08697 FMO<br><br>UNITED STATES' FIRST SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT UHC OF CALIFORNIA'S FIRST SET OF INTERROGATORIES TO THE GOVERNMENT |

| | |
|---|---|
| **PROPOUNDING PARTY:** | **UHC OF CALIFORNIA, INC.** |
| **RESPONDING PARTY:** | **UNITED STATES OF AMERICA** |
| **SET NUMBER:** | **ONE** |

### Preliminary Statement

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure ("Federal Rules") and Rule 33 of the Local Civil Rules of the United States District Court for the Central District of California, the United States of America ("United States" or "government"), through its undersigned counsel, hereby provides its first supplemental responses and objections to Defendant UHC of California's ("UnitedHealth" or "Defendant") First Set of Interrogatories, dated January 3, 2020. The objections and responses set forth herein are based on information now known to the United States and its undersigned attorneys, and will be revised, corrected, supplemented, amended, and clarified to the extent required by Rule 26 as discovery proceeds.

### General Objections and Specific Objections to Definitions and Instructions

The United States incorporates by reference its General Objections and Specific Objections to Definitions and Instructions that are set forth in the United States' Responses and Objections to Defendant UHC of California's First Set of Interrogatories, dated February 3, 2020.

### Specific Objections and Responses

**INTERROGATORY NO. 1:**   Identify for Date of Service Years 2008–2016 the Beneficiary (by name, HIC Number, and date of birth), Date of Service, Diagnosis Code(s), CMS HCC(s) or RxHCC(s), and Provider (by individual name, group name, address, NPI, Tax ID(s), and Provider ID), that corresponds to each and every Diagnosis Code You allege UnitedHealth "knowingly and improperly failed to delete . . . or otherwise return to the Medicare Program [as an] overpayment." United States' Complaint ¶ 342, Dkt. 171.

2

**Response to Interrogatory No. 1:**  The United States incorporates by reference each of its General Objections and Specific Objections to the Definitions and Instructions as if stated herein, and further incorporates by reference its specific objections to this Interrogatory as set forth in United States' Responses and Objections to Defendant UHC of California's First Set of Interrogatories, dated February 3, 2020.

Subject to and without waiving these objections, the United States also incorporates its response to this Interrogatory as set forth in United States' Responses and Objections to Defendant UHC of California's First Set of Interrogatories, dated February 3, 2020, and further responds as follows.  Although fact discovery is ongoing, expert disclosures are not due until June 18, 2021, and the United States reserves the right to supplement and/or amend this answer in full or in part as it learns new information and as expert analysis progresses, the United States alleges that UnitedHealth Defendants "knowingly and improperly failed to delete . . . the invalid diagnoses that had been submitted to the Medicare Program for risk adjustment payments which were made by the Medicare Program to them or knowingly and improperly failed to otherwise return to the Medicare Program the overpayments based on the invalid diagnoses" for each and every Diagnosis Code that was known (as that term is defined by the False Claims Act) to be unsupported by medical records and that affected the amount of payment received by UnitedHealth from the Medicare Program.

At this time and subject to the United States' right to supplement and/or amend this answer in full or in part, the United States additionally identifies and incorporates into its answer the attached charts of Diagnosis Codes that UnitedHealth "knowingly and improperly failed to delete" or "knowingly and improperly failed to otherwise return to the Medicare Program the overpayments based on" such diagnoses for date of service years (DOS) 2010-2013.  The provider information in the attached charts has been reproduced as it appears in the data that UnitedHealth produced in this case, including missing fields, dummy values, and placeholders, and has preserved the

3

0574

1  convention of using "~" to indicate a database null.  Further, although the

2  Interrogatory asked for the Provider ID, there is no field designated Provider_ID and

3  the United States has responded with the Provider_Nbr.  For COSMOS Providers, the

4  United States have included two sets of provider information: the provider

5  information that results from a direct lookup in the Provider table (2A), and the

6  provider information that results from a lookup in the SAS_All_Providers table

7  UnitedHealth provided to the United States, linking the LOB_Cd associated with the

8  encounter's LOB_Key to the Site_Cd field. For non-COSMOS Providers, the second

9  set of columns has been left blank.

10         The United States will supplement its response to this Interrogatory as

11  appropriate.

4

1                                           Respectfully submitted,

2    Dated:  August 17, 2020         ETHAN P. DAVIS
Acting Assistant Attorney General, Civil Division

3                                           NICOLA T. HANNA
United States Attorney

4                                           DAVID M. HARRIS
DAVID K. BARRETT

5                                           ABRAHAM C. MELTZER
JOHN E. LEE (CBN 128696)

6                                           JACK D. ROSS (CBN 265883)
Assistant United States Attorneys

7

8                                           JAMIE ANN YAVELBERG
EDWARD C. CROOKE

9                                           ROBERT McAULIFFE
LINDA M. McMAHON

10                                         PAUL G. FREEBORNE
MARTHA GLOVER

11                                         JESSICA KRIEG
ZOILA E. HINSON

12                                         AMY L. LIKOFF
GREGORY A. MASON

13                                         Civil Division, Department of Justice

14                                         JAMES P. KENNEDY, JR.
United States Attorney

15                                         KATHLEEN ANN LYNCH
Assistant United States Attorney

16

17

18                                         GREGORY A. MASON
Attorneys for the United States

19

20

21

22

23

24

25

26

27

28

<u>PROOF OF SERVICE BY ELECTRONIC MAIL</u>

I am over the age of 18 and not a party to the action entitled U.S. *ex rel.* Poehling v. UnitedHealth Group, Inc., CV-16-8697 FMO. I am employed by the Department of Justice, Civil Division. My business address is 175 N Street NE, Room 10.224, Washington, D.C. 20002.

On August 17, 2020, I served the foregoing PLAINTIFF UNITED STATES' FIRST SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT UHC OF CALIFORNIA'S FIRST SET OF INTERROGATORIES TO THE GOVERNMENT on each person or entity named below by electronic mail, pursuant to written consent under Federal Rule of Civil Procedure 5(b)(2)(E).

Date of e-mailing: August 17, 2020.

Place of e-mailing: Washington, D.C.

Person(s) and/or Entity(s) to whom e-mailed:

See attached page

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 17, 2020, at Washington, D.C.


_____

GREGORY A. MASON

0577

| David J. Schindler, Esq. <br> david.schindler@lw.com | Eric Havian, Esq. <br> ehavian@constantinecannon.com |
| --- | --- |
| Daniel Meron, Esq. <br> daniel.meron@lw.com | Jessica Moore, Esq. <br> jmoore@constantinecannon.com |
| Abid, R. Qureshi, Esq. <br> abid.qureshj@lw.com | Henry C. Su, Esq. <br> hsu@constantinecannon.com |
| Anne Robinson, Esq. <br> anne.robinson@lw.com | Anne Hartman, Esq. <br> ahartman@constantinecannon.com |
| Kirstin Scheffler Do, Esq. <br> kirstin.schefflerdo@lw.com | Stephen S. Hasegawa, Esq. <br> shasegawa@phillipsandcohen.com |
| Morgan Maddoux, Esq. <br> Morgan.maddoux@lw.com | Matthew R. Berry, Esq. <br> mberry@susmangodfrey.com |
| David W. Rowe, Esq. <br> david.rowe@lw.com | Arun Subramanian <br> asubramanian@SusmanGodfrey.com |
| | UHG-RelatorsCounsel@Lists.SusmanGodfrey.Com |

0578

**EXHIBIT D-12**

MICHAEL D. GRANSTON
Deputy Assistant Attorney General, Civil Division
TRACY L. WILKISON
United States Attorney
DAVID M. HARRIS
ROSS M. CUFF
JOHN E. LEE (CBN 128696)
JACK D. ROSS (CBN 265883)
Assistant United States Attorneys
300 N. Los Angeles Street, Room 7516
Los Angeles, California 90012
Tel: (213) 894-3995; Fax: (213) 894-7819
Email: john.lee2@usdoj.gov
JAMIE ANN YAVELBERG
ROBERT McAULIFFE
EDWARD CROOKE
LINDA McMAHON
JESSICA E. KRIEG
AMY L. LIKOFF
GREGORY A. MASON
MARTHA N. GLOVER
WENDY ZUPAC
Attorneys, Civil Division, U.S. Department of Justice
P.O. Box 261, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-0486; Fax: (202) 307-3852
Email:  robert.mcauliffe@usdoj.gov
TRINI E. ROSS
United States Attorney
DAVID CORIELL
Assistant United States Attorney
138 Delaware Avenue
Buffalo, New York 14201
Tel: (716) 843-5830; Fax: (716) 551-3052
Email:  david.coriell@usdoj.gov
Attorneys for the United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel*. BENJAMIN POEHLING,<br><br>Plaintiffs,<br><br>v.<br><br>UNITEDHEALTH GROUP, INC., *et al*.,<br><br>Defendants. | No. CV 16-08697 FMO<br><br>UNITED STATES' RESPONSES AND OBJECTIONS TO DEFENDANT UHC OF CALIFORNIA'S SECOND SET OF INTERROGATORIES TO THE GOVERNMENT |

| | |
|---|---|
| **PROPOUNDING PARTY:** | **UHC OF CALIFORNIA, INC.** |
| **RESPONDING PARTY:** | **UNITED STATES OF AMERICA** |
| **SET NUMBER:** | **THREE** |

### Preliminary Statement

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure ("Federal Rules") and Rule 33 of the Local Civil Rules of the United States District Court for the Central District of California, the United States of America ("United States" or "government"), through its undersigned counsel, hereby provides its responses and objections to Defendant UHC of California's ("Defendant") Third Set of Interrogatories, dated May 24, 2022.  The objections and responses set forth herein are based on information now known to the United States and its undersigned attorneys, and will be revised, corrected, supplemented, amended, and clarified to the extent required by Rule 26 as discovery proceeds.

### General Objections and Specific Objections to Definitions and Instructions

The following objections apply to each and every separately numbered Interrogatory and are incorporated by reference to the extent applicable into the objection to each Interrogatory.

1.      UnitedHealth's Interrogatories are inconsistent with the spirit and letter of the Federal Rules of Civil Procedure ("Federal Rules"), which explain that an interrogatory ought to narrow and sharpen issues for trial.  *See* Fed. R. Civ. P. 33 Advisory Committee's Note.  UnitedHealth's extensive Interrogatories do just the opposite by asking the United States to respond to vague and illogical mischaracterizations of its arguments, and seeking vast amounts of information without the objective to narrow and sharpen issues for trial.  For example, the Interrogatories demand that the United States survey all "CMS and HHS-OIG Individuals" (as defined by UnitedHealth's Third Set of Interrogatories, Definitions 8 and 22) to determine if anyone ever held a particular belief between 2008–2017.

2.      The United States objects to the Third Set of Interrogatories to the extent they are vague, ambiguous, overbroad, unduly burdensome, or seek to impose requirements upon the United States beyond those called for or permitted by the Federal Rules, the Local Civil Rules of the United States District Court for the Central District of California ("Local Rules"), or any order of the Court.  The United States responds below pursuant to its obligations under the Federal Rules and the Local Rules, namely that the United States has taken and is continuing to undertake reasonable efforts to identify information responsive to the Interrogatories.

3.      The United States objects to the Third Set of Interrogatories to the extent that a response requires disclosure of information protected by an applicable privilege or protection, including, but not limited to, the attorney-client privilege, work product doctrine, deliberative process privilege, law enforcement privilege, common interest privilege, or investigative files privilege, and protections afforded by Fed. R. Civ. P. 26(b), or any other applicable privilege.  The United States will not respond in such a way as to disclose such protected information, and inadvertent identification or disclosure of privileged information by the United States shall not be a waiver of any applicable privilege.  Under Federal Rule of Evidence 502, Federal Rule of Civil Procedure 26(b)(5)(B), other related sources of law, and the Court's Revised Protective Order Governing Non-Waiver of Privilege and Protected Material, Dkt. 412, the government reserves any and all rights to claw back privileged information it inadvertently discloses in response to the Third Set of Interrogatories.

4.      The United States submits these responses subject to, without intending to waive, but expressly reserving the right to object to other discovery procedures involving or relating to the subject matter of the information in responses to the Third Set of Interrogatories.  The United States reserves the right to object on any ground, at any time, to such other or supplemental requests as the Defendants may propound involving or relating to the subject matter of the Third Set of Interrogatories.

3

0582

5. The United States reserves the right to supplement its responses to the Third Set of Interrogatories at any time to the extent provided by the Federal Rules.

6. The assertion of the same, similar, or additional specific objections to the Third Set of Interrogatories does not and should not be construed to waive or modify any of the United States' general objections.

7. The United States objects to the Third Set of Interrogatories to the extent they require the United States to draw legal conclusions, comment on the merits of any affirmative defenses, or otherwise seek to impose any requirements beyond those established by the Federal Rules or the Local Rules.

8. The United States objects to the Third Set of Interrogatories to the extent that they contain multiple subparts numbered as a single Interrogatory. By responding, the United States in no way waives its right to object that UnitedHealth has exceeded the maximum number of interrogatories permitted under the Federal Rules.

9. The United States objects to the Third Set of Interrogatories to the extent they purport to require the United States to gather information in the possession or custody of Government components beyond HHS-OIG and CMS on the grounds that they are unduly burdensome and overbroad and that they seek information not relevant to the claims or defenses in this action and disproportionate to the needs of this case.

10. The United States objects to the Third Set of Interrogatories to the extent they purport to require the United States to gather information in the possession or custody of HHS-OIG where HHS-OIG is not the relevant agency for payment purposes and therefore the Interrogatories are unduly burdensome, overbroad, and seek information not relevant to the claims or defenses in this action and disproportionate to the needs of this case.

11. To the extent the United States produces information or documents in further response to these Interrogatories, it does not admit that the information or

4

documents are true, accurate, authentic, relevant, or admissible in this action.  The United States reserves the right to challenge on evidentiary grounds any information or documents produced in response to these Interrogatories.

12.    The fact that the United States has answered any part of all or any particular interrogatory is not intended to and shall not be construed to be a waiver by the United States of all or part of any objection to any interrogatory.

### Specific Objections to the Definitions and Instructions

The United States objects to the Definitions and Instructions to the extent they (i) seek to impose burdens on the United States that are different from, are inconsistent with, or exceed those imposed by the Federal Rules and the Local Rules, (ii) are vague or ambiguous, and/or (iii) render the Third Set of Interrogatories overly broad, unduly burdensome, not proportionate to the needs of the case, and not relevant.  The United States further objects to the Third Set of Interrogatories to the extent UnitedHealth has failed to define vague, ambiguous, and confusing terms.

**Objections to Definition 1:**    The United States objects to the definition of "Believed" (Definition 1) in that "suppose" means something different than "hold something as an opinion" or "think," and this definition encompassing two different meanings therefore renders UnitedHealth's Third Set of Interrogatories confusing and self-contradictory.  The United States will interpret "Believed" as to hold something as an opinion or to think.

**Objections to Definition 5:**    The United States objects to the definition of "Chart Review" (Definition 5) as inconsistent with UnitedHealth's chart review processes at issue in this litigation.  The United States interprets "Chart Review" to mean UnitedHealth's actual chart review process, in which certified coders were instructed to identify every risk-adjusting diagnosis code that had sufficient documentation support in a Chart.

**Objections to Definitions 6, 20, and 21:**    The United States objects to the terms "CMS" (Definition 6), "Government" (Definition 20), and "HHS-OIG" (Definition

5

0584

21) as overbroad and irrelevant to the extent they include current and former
contractors or consultants.  CMS and HHS-OIG speak through official
pronouncements and do not speak through its contractors or consultants, making
information provided by contractors and consultants overbroad and irrelevant for the
purpose of responding to the Third Set of Interrogatories.  The United States objects
to the definition of "Government" (Definition 20) to the extent it includes any branch,
agency, department, agent, representative, contractor, attorney, consultant, or person
acting on its behalf not relevant to this action.  This definition is plainly unreasonable,
unduly burdensome, and disproportionate to the needs of the case, in that it seeks to
require the United States to provide information not currently in the possession,
custody, or control of CMS or HHS-OIG.  Subject to and without waiving these
objections, the United States interprets "Government" to mean CMS and HHS-OIG.
To the extent the United States interprets the use of "Government" in a specific
Interrogatory as directed only HHS-OIG or CMS (and not both), the United States
will state its interpretation in its response.  The United States further objects to the
inclusion of "attorneys" in the definitions to the extent that the inclusion of
"attorneys" requires the United States to gather information from attorneys within
CMS's Office of the General Counsel ("OGC"), the Office of Counsel for the
Inspector General ("OCIG"), or the Department of Justice ("DOJ").  The United
States is not searching for, collecting, or providing information or materials from any
attorney within OGC, OCIG, or DOJ.

**Objections to Definitions 7:**     The United States objects to the definition of "CMS-
HCC Risk Adjustment Model" (Definition 7) as overly broad to the extent it includes
iterations of the CMS-HCC Risk Adjustment Model (V12, V21, or V22) that were
not used to calculate risk scores that were used determine payments to UnitedHealth.
The United States interprets this definition to include only iterations of the CMS-
HCC Risk Adjustment Model that were used to calculate risk scores that were used
determine payments to UnitedHealth.  The United States further objects to this

0585

definition as overly broad to the extent it includes a timeframe that it is more expansive that the timeframe for the damages sought in this matter.  The United States will interpret this definition to apply to iterations of the CMS-HCC Risk Adjustment Model in use for 2008-2016 Date of Service Years/2009-2017 Contract Years.

**Objections to Definitions 8 and 22:**  The United States objects to the terms "CMS Individual" (Definition 8) and "HHS-OIG Individual" (Definition 22) as irrelevant, unduly burdensome, and beyond the scope of permissible discovery to the extent they include all current or former contractors or current or former subcontractors, and therefore demand that the United States obtain information from, or respond on behalf of, persons or entities not reasonably accessible to the United States and over whom the United States has no control.  The United States further objects to the terms "CMS Individual" and "HHS-OIG Individual" as overly broad and unduly burdensome to the extent they include all current employees of each agency, which includes thousands of people who are unlikely to have information relevant to these interrogatories.  The United States objects to the terms "CMS Individual" and "HHS-OIG Individual" as overly broad and unduly burdensome to the extent they include all former employees of each agency, and therefore purport to require the United States to obtain information from, or to respond on behalf of, persons or entities not reasonably accessible to the United States and over whom the United States has no control.  It is plainly unreasonable for the United States to survey each and every current and former employee of CMS and/or HHS-OIG.  The United States further objects to the inclusion of "Person" in the definitions to the extent the inclusion of "Person" includes attorneys and requires the United States to gather information from attorneys within OGC, OCIG, or DOJ.  The United States is not searching for, collecting, or providing information or materials from any attorney within OGC, OCIG, or DOJ.

**Objections to Definition 9:**    The United States objects to the definition of "CMS

7

0586

Contractor" as irrelevant, unduly burdensome, and beyond the scope of permissible discovery to the extent it includes all former contractors or former subcontractors, and therefore demands that the United States obtain information from, or respond on behalf of, persons or entities not reasonably accessible to the United States and over whom the United States has no control. The United States will not include former contractors or subcontractors in the definition of "CMS Contractor."

**Objections to Definitions 11 and 36:**  The United States objects to the definitions of "Concerning" (Definition 11) and "Relating to" and "regarding" (Definition 36) because the definitions render the Third Set of Interrogatories vague, ambiguous, confusing, overly broad, unduly burdensome, and disproportionate to the needs of the case. Indeed, these terms are defined to seek any piece of information that in some way—no matter how remote, indirect, or tangential—mentions or references matters set forth in the Interrogatory. The United States responds to the Third Set of Interrogatories by using these terms and the verbs constituting their definitions as limited by the constraining adverb "directly."

**Objections to Definition 12:**    The United States objects to the term "Corrected" (Definition 12) as vague because it is unclear where the referenced "remov[als]" and "changes" of Diagnosis Codes are made. The United States will interpret this to mean removals or change within the CMS databases from which data used to calibrate the CMS-HCC Risk Adjustment Model are pulled.

**Objections to Definition 32:**    The United States objects to the definition of "Person" (Definition 32) to the extent it is defined to mean "the federal government and all departments and agencies thereof, state governments, local governments, [and] other governmental agencies[.]" This definition is plainly unreasonable, unduly burdensome, and disproportionate to the needs of the case, in that it seeks to require the United States to provide information not currently in the possession, custody, or control of CMS and HHS-OIG. Furthermore, the United States objects to the extent each definition includes former CMS contractors for whom the United States

0587

1    presently has no reasonable belief they possess or control non-duplicative information

2    relevant to any claim or defense in this case.

3    **Objections to Definition 33:**    The United States objects to the definition of

4    "Poehling Matter" as overly broad to the extent it includes *United States ex rel.*

5    *Swoben v. Secure Horizons*, CV-609-5013-JFW (JEM) ("Swoben"), which is a

6    separate litigation in which the Court declined to consolidate with this litigation, *see*

7    Statement of Decision Denying the United State of America's Motion to Consolidate,

8    *United States ex rel. Swoben v. Secure Horizons*, CV-609-5013-JFW (JEM), Dkt.

9    295.  The United State will not include the *Swoben* matter in this definition.

10   **Objections to Definition 42:**    The United States objects to the definition of "You"

11   and "Your" to the extent these terms are intend to encompass any agency, office,

12   employee, agent, representative, officer, or contractor of either the legislative or

13   judicial branch, and insofar as these terms are defined to include executive branch

14   agencies and offices not relevant to this action.  This is plainly unreasonable.  Subject

15   to and without waiving these objections, the United States will interpret this term to

16   mean CMS and HHS-OIG.  To the extent the United States interprets a specific

17   request as directed at only HHS-OIG or CMS (and not both), the United States will

18   state its interpretation in its response.

19                              **Objections to Instructions**

20   **Objections to Instruction 3:**    The United States objects to Instruction 3 as vague

21   and ambiguous.  For the purposes of responding to these Interrogatories, the United

22   States will construe the relevant time period as January 1, 2004 through May 16,

23   2017, in accordance with the parties' agreed-upon discovery timeframe.  However,

24   with respect to Interrogatory 10, the United States will construe the relevant time

25   period as January 1, 2004 to June 30, 2019, in accordance with the parties' agreed-

26   upon discovery timeframe pertaining to discovery relating to CMS's proposed rule

27   *Medicare and Medicaid Programs; Policy and Technical Changes to the Medicare*

28   *Advantage, Medicare Prescription Drug Benefit, Program of All-Inclusive Care for*

*the Elderly (PACE), Medicaid Fee-for-Service, and Medicaid Managed Care Programs for Years 2020 and 2021* ("Proposed Rule") and underlying FFS Adjuster Study. *See* August 9, 2019 D. Schindler email to R. McAuliffe.

**Objections to Instruction 5:**  The United States objects to Instruction 5 to the extent it seeks to impose burdens upon the United States beyond those called for or permitted by the Federal Rules or the Local Rules.

**Objections to Instruction 6:**  The United States objects to Instruction 6 to the extent it seeks to impose burdens upon the United States beyond those called for or permitted by the Federal Rules or the Local Rules.

**Objections to Instruction 7:**  The United States objects to Instruction 7 to the extent it seeks to impose burdens upon the United States beyond those called for or permitted by the Federal Rules or the Local Rules.  The United States will assert any applicable privileges and specify the material to which it applies per Fed. R. Civ. P. 26(b)(5)(A) for all information responsive to an Interrogatory to which the United States has agreed to produce but which is withheld on the basis of a privilege or protection.

**Objections to Instruction 8:**  The United States objects to Instruction 8 to the extent it requires the United States to identify "each" instance of duplicative, redundant, or repetitive information.

## Specific Objections and Responses

**INTERROGATORY NO. 10**  Explain in detail the bases upon which You contend that the Study Underlying CMS's Proposed Rule is relevant to any claim, defense, contention, or issue in this litigation.

**Objections:**

> The United States incorporates by reference each of its General Objections and Specific Objections to the Definitions and Instructions as if stated herein.  The United States objects to the phrase "explain in detail" as vague and ambiguous, and will interpret the phrase to mean "explain."  The United States objects to the phrase "any

claim, defense, contention, or issue in this litigation" as vague and ambiguous, and objects to the phrase insofar as it purports to include "contentions" or "issues" that are not part of any claim or defense. The United States will interpret this phrase to be "any claim or defense in this litigation." The United States objects to this Interrogatory insofar as it purports to require the United States to explain the relevance of facts to UnitedHealth's claims or defenses. The United States further objects to this Interrogatory in that it requests that the United States explain how the Study Underlying CMS's Proposed Rule is relevant to UnitedHealth's defenses or contentions. Because UnitedHealth has not given the United States sufficient information to understand what its defenses and contentions are, the United States is unable to explain how the Study Underlying CMS's Proposed Rule is relevant to them, and reserves the right to rely on the Study Underlying CMS's Proposed Rule in any way as it learns additional information about UnitedHealth's defenses and contentions in this case. The United States objects to this Interrogatory to the extent it misstates the United States' contentions in this matter.

**Response to Interrogatory No. 10:** Subject to and without waiving the foregoing objections, the United States hereby states that it does not contend that the Study Underlying CMS's Proposed Rule is relevant to the claims in this matter. It is the United States' position that the FFS Adjuster is not relevant to its claims in this case, and therefore no FFS Adjuster study (including the Study Underlying CMS's Proposed Rule or any study that UnitedHealth might conduct) is relevant to the United States' claims in this case. However, if UnitedHealth contends that error rates in FFS data are relevant to its defenses, the United States reserves the right to cite the Study Underlying CMS's Proposed Rule.

**<u>INTERROGATORY NO. 11:</u>** Identify all CMS Individuals and HHS-OIG Individuals who You contend Believed or expressed in writing that the existence of unsupported Diagnoses in CMS's FFS Medicare data reduces the average value of the Relative Factors. This Interrogatory should be construed to cover the time period

January 1, 2004 to June 30, 2019.

**Objections:**

The United States incorporates by reference each of its General Objections and Specific Objections to the Definitions and Instructions as if stated herein. The United States objects to this Interrogatory to the extent it requests information beyond May 16, 2017. The parties' agreed-upon discovery timeframe only extends to June 30, 2019 for discovery relating to CMS's Proposed Rule and underlying FFS Adjuster Study. *See* August 9, 2019 D. Schindler email to R. McAuliffe. Further, the United States objects to this Interrogatory to the extent that it is irrelevant because Government agencies, including CMS and HHS-OIG, act through official policy and regulations and not the beliefs or impressions of individual employees or contractors. The United States objects to this Interrogatory to the extent it misstates the United States' contentions in this matter. The United States does not contend that CMS Individuals and HHS-OIG Individuals Believed or expressed in writing that the existence of unsupported Diagnoses in CMS's FFS Medicare data reduces the average value of the Relative Factors. The United States objects to this Interrogatory as vague as to the meaning of "reduces the average value of the Relative Factors." It is unclear if the Request is asking whether the average value of *every* Relative Factor is reduced or if, on average, the value of the group of Relative Factors is reduced (*i.e.*, some could go up and some could down in value but, on average, the value of the group of Relative Factors is reduced). The United States interprets this Request as seeking information regarding whether the average value of every Relative Factor is reduced.

**Response to Interrogatory No. 11:** Subject to and without waiving the foregoing objections, the United States hereby states that it does not contend that any CMS and HHS-OIG Individual Believed or expressed in writing that the existence of unsupported Diagnoses in CMS's FFS Medicare data reduces the average value of the Relative Factors. Rather, it is the United States' position that UnitedHealth

contracted with CMS on an annual basis to receive payments under the CMS- HCC
Risk Adjustment Model in place at the time of the contract and did, in fact, receive
payments under those contracts from CMS that were calculated under the existing
CMS-HCC Risk Adjustment Model, making the existence of unsupported Diagnoses
in CMS's FFS Medicare data and any potential impact that they may have on
Relative Factors wholly irrelevant to this matter.

**INTERROGATORY NO. 12:** State in detail every material fact upon which You
base Your contention that MA Organizations "were obligated to 'look both ways'" or
to otherwise design their Chart Review program to also validate Diagnoses reported
by Providers that the MA Organizations submitted to CMS. United States' Am.
Compl. ¶ 122, Dkt. 171.

**Objections:**

The United States incorporates by reference each of its General Objections and
Specific Objections to the Definitions and Instructions as if stated herein.  The United
States further objects to this Interrogatory to the extent that it seeks information
protected from disclosure by an applicable privilege or protection.  The United States
objects to this Interrogatory as overly broad and unduly burdensome to the extent it
improperly requires the United States to "state in detail every material fact" of its
evidentiary case. *See Tubbs v. Sacramento Cty. Jail*, No. CIVS060280LKKGGHP,
2008 WL 863974, at *1 (E.D. Cal. Mar. 28, 2008) ("'Each and every fact'
interrogatories pose problems for a responding party and a reviewing court. Parties
are not tasked with laying out every jot and tittle of their evidentiary case in response
to interrogatories."); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D.N.M. 2007)
("Contention interrogatories should not require a party to provide the equivalent of a
narrative account of its case, including every evidentiary fact, details of testimony of
supporting witnesses, and the contents of supporting documents."); *Aldapa v. Fowler
Packing Co. Inc.*, 310 F.R.D. 583, 591 (E.D. Cal. 2015).  The United States objects
that this Interrogatory is vague, confusing, and ambiguous because it distorts the

meaning of the United States' contention and theory of UnitedHealth's liability under the False Claims Act by citing an incomplete fragment of a sentence from one paragraph of the United States' Amended Complaint.  This Interrogatory is vague, ambiguous, confusing, and irrelevant to the extent it focuses on the design of an MAO's chart review program rather than on UnitedHealth's Chart Review program and UnitedHealth's failure to delete known invalid diagnosis codes. *See* MTD Order, Dkt. 212 at 21 ("As the Government argues, the issue here is not the one-way Chart Review generally, but the specific invalid diagnosis codes that Defendants submitted and failed to delete despite information available to them.").  This Interrogatory misstates the United States' contention.

**Response to Interrogatory No. 12:**  Subject to and without waiving the foregoing objections, the United States does not contend in Paragraph 122 of its Complaint that MA Organizations, as defined in this set of Interrogatories, were generally obligated to "look both ways" or to otherwise design their Chart Review program to also validate Diagnoses reported by Providers that the MA Organizations submitted to CMS.  Rather, as is clear in Paragraph 122, when read in its entirety, the United States contends that UnitedHealth *did* design, and implemented, its Chart Review program to identify all codes supported by Charts, but chose to submit to CMS new diagnosis codes identified by its Chart Review program that would lead to additional payments from CMS while failing to delete or otherwise retract diagnosis codes previously submitted by UnitedHealth to CMS that its Chart Review program revealed were not supported by medical record documentation.  In addition to the United States' factual allegations made in its Amended Complaint, the United States further sets forth the following material facts that relate to its contention but do not recite every "jot and tittle" of the United States' evidentiary case:

- Before submitting Diagnoses to CMS for payment, UnitedHealth signed Electronic Data Interchange agreements on behalf of each of its MA Organizations, agreeing that "it will be responsible for all Medicare risk

14

adjustment data submitted to CMS by itself, its employees, or its agents[;]"
"Based on best knowledge, information, and belief, that it will submit risk
adjustment data that are accurate, complete, and truthful[;]" and "That it will
research and correct risk adjustment data discrepancies."

- Since at least 2008, UnitedHealth has entered into annual contracts with CMS
  where it agreed to "operate one or more coordinated care plans . . . in
  compliance with the requirements of this contract and applicable Federal
  statutes, regulations, and policies (e.g., policies as described in the Call Letter,
  Medicare Managed Care Manual, etc.)."

- After entering into these contracts, UnitedHealth submitted Diagnoses to CMS.

- Some of these Diagnoses originated from Providers, who submitted Diagnoses
  to UnitedHealth as part of a claim or beneficiary encounter ("Provider Claim or
  Encounter"). Those Diagnoses were later submitted by UnitedHealth to CMS
  for risk adjustment purposes.

- Some of the Diagnoses UnitedHealth submitted to CMS originated from its
  Chart Review program. In its Chart Review program, UnitedHealth reviewed
  medical records and abstracted or identified Diagnosis Codes for the purpose
  of submitting additional Diagnosis Codes to CMS for risk adjustment
  payments.  In its Chart Review Program, UnitedHealth instructed its Chart
  Review coders to look for all medical conditions purportedly documented in
  the records, record all Diagnosis Codes identifying those conditions, and report
  all of those Diagnosis Codes to UnitedHealth.

- UnitedHealth coders were trained, qualified, and/or certified to accurately
  identify Diagnosis Codes supported by the medical record, in accordance with
  the Ninth or the Tenth Edition of the International Classification of Diseases
  (ICD) Clinical Modification Guidelines for Coding and Reporting ("ICD
  Guidelines"). UnitedHealth relied on its coders' accuracy to submit to CMS
  Diagnosis Codes that were supported by the medical record but were not

15

previously submitted to UnitedHealth based on a Provider Claim or Encounter and thus not previously submitted by UnitedHealth to CMS. UnitedHealth's coders were required to meet quality and accuracy benchmarks—defined as completeness in identifying all risk adjusting Diagnosis Codes that were supported by the medical record in accordance with ICD Guidelines—when reviewing and coding a medical record.

- UnitedHealth conducted additional medical record reviews, including through quality assurance programs, recode projects, and claims verification of many of the medical records that were included in its Chart Review Program.

- Many of the Diagnoses submitted by Providers to UnitedHealth (and, ultimately, by UnitedHealth to CMS) were not identified in UnitedHealth's Chart Review Program or other medical record reviews, even though the Chart associated with the Diagnoses was reviewed in UnitedHealth's Chart Review Program and also, in some instances, in the other medical record reviews Programs. UnitedHealth did not delete or otherwise retract these unsupported codes.

- Since at least 2004, employees of UnitedHealth attended trainings conducted by CMS and/or CMS contractors, participated in CMS user group calls, and engaged in email, in person, or telephonic communications with CMS employees or contractors and were consistently told that Diagnoses must be supported by Charts and if a Diagnoses that impacts a beneficiary risk score is not supported by a Chart, the Diagnoses must be deleted or otherwise retracted from CMS data systems.

- Since at least 2004, employees of UnitedHealth have also reviewed and relied on written CMS guidance, including Chapter 7 of the Medicare Managed Care Manual, CMS training materials, HPMS memoranda, and CMS Participant Guides, which say that Diagnoses must be supported by Charts and Diagnoses that are not supported by Charts must be deleted or otherwise retracted from

16

0595

the CMS data systems.

- Each year since at least 2010, employees of UnitedHealth signed annual attestations relating to Diagnoses submitted to CMS for, at least, 2008 Dates of Service through 2016 Dates of Service.  Through these attestations, UnitedHealth requested "payment under the contract."  Specifically, UnitedHealth  "acknowledge[d] that the information described below directly affects the calculation of CMS payments to the MA Organization or additional benefit obligations of the MA Organization and that misrepresentation to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution" and further certifying "[b]ased on best knowledge, information, and belief . . . , all information submitted to CMS in this report is accurate, complete, and truthful."

- UnitedHealth, in fact, received payments from CMS pursuant to its contract with CMS based on the Diagnoses it submitted to CMS.

- UnitedHealth had knowledge, as defined by 31 U.S.C. § 3729(b)(1)(A), that Diagnoses it received from Providers and submitted to CMS were not supported by Chart documentation, as determined by its Chart Review Program and, in some instances, other medical record reviews, but it failed to delete those Diagnoses and thereby retained payments from CMS to which it was not entitled.

**INTERROGATORY NO. 13**  Separately for each of the years 2008 to 2017, Identify all CMS Individuals and HHS-OIG Individuals who You contend Believed or expressed in writing that MA Organizations were required to design their Chart Review program to also validate Diagnoses reported by Providers that the MA Organizations submitted to CMS.

**Objections:**

The United States incorporates by reference each of its General Objections and Specific Objections to the Definitions and Instructions as if stated herein.  The United

17

0596

States further objects on the ground that the Interrogatory is vague, confusing, and unduly burdensome because it seeks a separate answer for each year for what an individual "Believed" at the time and to the extent the Interrogatory requires the United States to determine, year by year from 2008–2017, when a given Belief began or ended. Further, the United States objects to this Interrogatory to the extent that it is irrelevant because Government agencies, including CMS and HHS-OIG, act through official policy and regulations and not the beliefs or impressions of individual employees or contractors. The United States objects to this Interrogatory to the extent it misstates the United States' contentions in this matter. The Interrogatory states that the United States contends that MA Organizations were required to *design* their Chart Review program to also validate Diagnoses reported by Providers that the MA Organizations submitted to CMS. The United States makes no such contention. The United States does not contend that UnitedHealth had to design its Chart Review program in any particular way—rather, the United States contends that UnitedHealth *did* design its Chart Review program to identify all supported codes, but chose to submit new diagnosis codes identified by its Chart Review program that would lead to additional payments from CMS while failing to delete diagnosis codes submitted by Providers that its Chart Review program revealed were not supported by medical record documentation. Thus, the beliefs or written statements by CMS employees about *whether* MA Organizations have to design their Chart Review programs to also validate Diagnoses reported by Providers that the MA Organizations submitted to CMS are irrelevant and any exercise to ascertain those beliefs or otherwise identify applicable writings would be meaningless and will not narrow and sharpen issues for trial. *See* Fed. R. Civ. P. 33 Advisory Committee's Note.

**Response to Interrogatory No. 13:** Subject to and without waiving the foregoing objections, the United States does not contend that any CMS and HHS-OIG Individual Believed or expressed in writing that MA Organizations were required to

1  design their Chart Review program in any particular way.  However, the United

2  States does contend that the obligations of MA Organizations include, among other

3  things, that if an MA Organization identifies Diagnoses reported by Providers that the

4  MA Organization submitted to CMS that are not supported by medical record

5  documentation, the MA Organization must delete or otherwise retract those

6  unsupported diagnosis codes from CMS data systems.

7  **INTERROGATORY NO. 15**  Describe in detail how You implemented each of

8  Your policies, processes, and procedures Relating to Your retention, preservation, or

9  destruction of Documents and Electronically Stored Information.

10  **Objections:**

11       The United States incorporates by reference each of its General Objections and

12  Specific Objections to the Definitions and Instructions as if stated herein.  The United

13  States objects to this Interrogatory as vague because it is unclear what information is

14  sought.  The United States interprets this Interrogatory to request information about

15  the general policies set up to establish the principles, responsibilities, and

16  requirements for managing CMS and HHS-OIG records.  Further, the United States

17  does not interpret this Interrogatory to request information about the litigation hold in

18  place in the Poehling Matter because, if UnitedHealth were requesting information

19  about the litigation hold in the Poehling Matter, it would have done so, as it did in

20  Interrogatory 14.  The United States further objects to this Interrogatory to the extent

21  that it seeks information protected from disclosure by an applicable privilege or

22  protection.  The United States interprets this Interrogatory to exclude attorneys and is

23  not searching for, collecting, or providing information or materials from any attorney

24  within OGC, OCIG, or DOJ.  The United States further objects to this Interrogatory

25  to the extent that the information sought is publicly available, and the burden of

26  deriving the answer to this Interrogatory is substantially the same for both parties.

27  The United States further objects to this Interrogatory to the extent that the

28  information sought is contained in documents already produced in this matter, and the

19

burden of deriving the answer to this Interrogatory is substantially the same for both parties.

**Response to Interrogatory No. 15:**  Subject to and without waiving the foregoing objections, the United States hereby responds that the information sought by this Interrogatory can be derived from the following publicly-available sources and documents already produced in this matter, including the following policy and training documents:

- HHS Policy for Records Management, last reviewed on May 2020, *available at* https://www.hhs.gov/web/governance/digital-strategy/it-policy-archive/hhs-ocio-policy-for-records-management.html;
- HHS Policy for Litigation Holds, dated November 29, 2016 (USBP009834298);
- HHS Policy for Records Management, dated November 25, 2015 (USBP000105908);
- HHS Policy for Records Management of Emails, dated May 15, 2008 (USBP000105921);
- HHS Records Management Procedures Manual, dated December 5, 2008 (USBP000105935);
- HHS Records Management Council (RMC) Charter, dated August 21, 2007 (USBP000105930);
- General Records Management Training (USBP000490288);
- Office of Personnel Management Operating Manual, The Guide to Personnel Recordkeeping (USBP000490327);
- CMS Litigation Support Meeting Powerpoint, dated November 14, 2019 (USBP009834319);
- Procedures for Implementing Litigations Holds/Document Preservation in Civil Litigation, Office of Strategic Operations and Regulatory Affairs, Centers for Medicare & Medicaid Services, Last Updated – March 2013

20

0599

(USBP009834304);

- OCIG ACRB Records Retention Guidance, dated March 17, 2020
  (USBP009834292);

- OCIG Record Destruction Guidelines (USBP009834288).

The United States further responds that the information sought by this Interrogatory can be derived from the following records schedules and related documents already produced in this matter:

- Introduction to the General Records Schedules (USBP000490439);

- General Records Schedule 2.5:  Employee Separation Records
  (USBP000490244) and Crosswalk (USBP000490271);

- General Records Schedule 2.6:  Employee Training Records
  (USBP000490247); Crosswalk (USBP000490272); and Frequently Asked
  Questions (USBP000490273);

- General Records Schedule 2.8:  Employee Ethics Records
  (USBP000490249);

- General Records Schedule 3.1:  General Technology Management Records
  (USBP000490255); Crosswalk (USBP000490279); and Frequently Asked
  Questions (USBP000490280);

- General Records Schedule 5.4:  Facility, Equipment, Vehicle, Property,
  and Supply Records (USBP000490264);

- General Records Schedule 5.5:  Mail, Printing, and Telecommunication
  Service Management Records (USBP000490285);

- General Records Schedule Disposition Spreadsheet (USBP000490310);

- Office of the Inspector General Office of Audit Services Files Plan Rollup
  (USBP000490311).

**INTERROGATORY NO. 16**  Identify all Persons, including but not limited to CMS Individuals and HHS-OIG Individuals, with responsibility for or involvement in overseeing the implementation of policies Relating to Your retention, preservation, or

0600

1    destruction of Documents and Electronically Stored Information.

2    **Objections:**

3        The United States incorporates by reference each of its General Objections and

4    Specific Objections to the Definitions and Instructions as if stated herein.  The United

5    States objects to this Interrogatory as vague and overly broad because it is unclear

6    what is meant by "policies."  The United States will interpret "policies" to mean the

7    policies that are publicly available at:  https://www.hhs.gov/web/governance/digital-

8    strategy/it-policy-archive/hhs-ocio-policy-for-records-management.html.  Further, the

9    United States does not interpret this Interrogatory to request information about the

10    litigation hold in place in the Poehling Matter because, if UnitedHealth were

11    requesting information about the litigation hold in the Poehling Matter, it would have

12    done so, as it did in Interrogatory 14.  The United States further objects to this

13    Interrogatory as vague because it is unclear what constitutes "responsibility for or

14    Involvement in overseeing the implementation" and could, conceivably, extend to

15    each of the thousands of CMS and HHS-OIG employees as well as other individuals

16    tasked with maintaining or preserving records within the Executive Branch of the

17    United States government.  The United States will interpret this Interrogatory to

18    pertain to the individuals with roles and responsibilities for implementing HHS

19    Policy for Records Management ("Records Management Policy"), last reviewed on

20    May 20 and available at https://www.hhs.gov/web/governance/digital-strategy/it-

21    policy-archive/hhs-ocio-policy-for-records-management.html.  The United States

22    further objects to this Interrogatory to the extent that it seeks information protected

23    from disclosure by an applicable privilege or protection.  The United States interprets

24    this Interrogatory to exclude attorneys and is not searching for, collecting, or

25    providing information or materials from any attorney within OGC, OCIG, or DOJ.

26    **Response to Interrogatory No. 16:**  Subject to and without waiving the foregoing

27    objections, the United States hereby states that Section 7 of the Records Management

28    Policy sets forth the roles and responsibilities of the HHS Secretary; the HHS

Secretary for Administration; the HHS Chief Information Office; the Agency Records Management Officer; the Operating Divisions ("OpDiv") Chief Information Officers; the HHS Chief Information Security Officer; the OpDiv Chief Information Security Officers; the OpDiv Records Management Officers; the OpDiv and Staff Divisions ("StaffDiv") Records Managers and Records Liaisons; the OpDiv and StaffDiv Records Custodians; Managers and Supervisors; Contracting Officers and Contracting Officer Representatives; HHS Employees, Contractors, Interns, and Fellows; the Freedom of Information Act Official; the Office of the General Counsel; the Office of the Inspector General; and IT Infrastructure and Operations and System Managers with respect to records management.

**INTERROGATORY NO. 17**  Identify for Date of Service Years 2004–2016, the Number of Diagnoses Codes submitted in FFS Medicare that were audited in each Date of Service Year through Medical Record Reviews by Medical Record Review Contractors prior to calibrating or recalibrating the CMS-HCC Risk Adjustment Model using Diagnoses Codes from that same Date of Service Year.

**Objections:**

The United States incorporates by reference each of its General Objections and Specific Objections to the Definitions and Instructions as if stated herein.  The United States objects to this Interrogatory to the extent it calls for the United States to prepare documents and/or perform data analysis that does not already exist.  The United States objects to this Interrogatory as irrelevant because, during each year of the relevant time period, UnitedHealth's MA Organizations entered into contracts with CMS and agreed to receive payments based on the CMS-HCC Risk Adjustment Model in place at the time.  This is a case brought under the False Claims Act and it does not involve any potential challenges by UnitedHealth to the CMS-HCC Risk Adjustment Model payment system.  Thus, any post-hoc analysis of the data used to calibrate the model used for any such payments is irrelevant to the claims and defenses in this matter and any substantive analysis by the United States in response

0602

1  to this Interrogatory is not proportional to the needs of the case.  The United States

2  objects to this Interrogatory as overly broad and not proportional to the needs of this

3  case to the extent that it seeks information relating to audits conducted for DOS years

4  irrelevant to the years for which damages are sought in this matter.

5  **Response to Interrogatory No. 17:**  Subject to and without waiving the foregoing

6  objections, the United States hereby states that CMS regularly conducts audits of

7  claims submitted under Part A and Part B of the Medicare Program, some of which

8  included audits of diagnosis codes submitted with the claims data.  To the extent

9  corrections were made to the claims, diagnosis codes, or costs and those changes

10  were applied in relevant databases in advance of the data pull for the data used in the

11  calibration or recalibration of the CMS-HCC Risk Adjustment Model, those

12  corrections were reflected in the data used in the calibration or recalibration of the

13  CMS-HCC Risk Adjustment Model.  The United States has already produced

14  business records related to the Medical Record Reviews by Medical Record Review

15  Contractors of FFS Medicare, to the extent they existed, after a reasonable search

16  from which information responsive to this Interrogatory may be determined or

17  ascertained.  The burden of determining or ascertaining the answer is substantially the

18  same for the United States as it is for UnitedHealth.  The United States further states

19  that, after a reasonable inquiry, it has determined that CMS has not undertaken this

20  analysis, does not know the exact number of Diagnosis Codes responsive to this

21  Interrogatory, and, even using the data and business records CMS does possess

22  related to the Medical Record Reviews by Medical Record Review Contractors of

23  FFS Medicare (which were collected and produced to UnitedHealth), the United

24  States does not believe that it is possible to answer this Interrogatory.

25  **INTERROGATORY NO. 18**  Identify for Date of Service Years 2004–2016, the

26  Number of Diagnoses Codes submitted in FFS Medicare that were Corrected in each

27  Date of Service Year through Medical Record Reviews by Medical Record Review

28  Contractors prior to calibrating or recalibrating the CMS-HCC Risk Adjustment

24

0603

1   Model using Diagnoses Codes from that same Date of Service Year.

2   **Objections:**

3       The United States incorporates by reference each of its General Objections and

4   Specific Objections to the Definitions and Instructions as if stated herein.  The United

5   States objects to this Interrogatory to the extent it calls for the United States to

6   prepare documents and/or perform data analysis that does not already exist.  The

7   United States objects to this Interrogatory as irrelevant because, during each year of

8   the relevant time period, UnitedHealth's MA Organizations entered into contracts

9   with CMS and agreed to receive payments based on the CMS-HCC Risk Adjustment

10  Model in place at the time.  This is a case brought under the False Claims Act and it

11  does not involve any potential challenges by UnitedHealth to the CMS-HCC Risk

12  Adjustment Model payment system.  Thus, any post-hoc analysis of the data used to

13  calibrate the model used for any such payments is irrelevant to the claims and

14  defenses in this matter and any substantive analysis by the United States in response

15  to this Interrogatory is not proportional to the needs of the case.  The United States

16  objects to this Interrogatory as overly broad and not proportional to the needs of this

17  case to the extent that it seeks information relating to audits conducted for DOS years

18  irrelevant to the years for which damages are sought in this matter.

19  **Response to Interrogatory No. 18:**  Subject to and without waiving the foregoing

20  objections, the United States hereby states that CMS regularly conducts audits of

21  claims submitted under Part A and Part B of the Medicare Program, some of which

22  included audits of diagnosis codes submitted with the claims data.  To the extent

23  corrections were made to the claims, diagnosis codes, or costs and those changes

24  were applied in relevant databases in advance of the data pull for the data used in the

25  calibration or recalibration of the CMS-HCC Risk Adjustment Model, those

26  corrections were reflected in the data used in the calibration or recalibration of the

27  CMS-HCC Risk Adjustment Model.  The United States has already produced

28  business records related to the Medical Record Reviews by Medical Record Review

0604

1  Contractors of FFS Medicare, to the extent they existed, after a reasonable search

2  from which information responsive to this Interrogatory may be determined or

3  ascertained.  The burden of determining or ascertaining the answer is substantially the

4  same for the United States as it is for UnitedHealth.  The United States further states

5  that, after a reasonable inquiry, it has determined that CMS has not undertaken this

6  analysis, does not know the exact number of Diagnosis Codes responsive to this

7  Interrogatory, and, even using the data and business records CMS does possess

8  related to the Medical Record Reviews by Medical Record Review Contractors of

9  FFS Medicare (which were collected and produced to UnitedHealth), the United

10 States does not believe that it is possible to answer this Interrogatory.

11

12                              Respectfully submitted,

13  Dated:  June 23, 2022          MICHAEL D. GRANSTON
                                    Deputy Assistant Attorney General, Civil Division
14                                  TRACY L. WILKISON
                                    United States Attorney
15                                  DAVID M. HARRIS
                                    ROSS M. CUFF
16                                  JOHN E. LEE
                                    JACK D. ROSS
17                                  Assistant United States Attorneys

18                                  JAMIE ANN YAVELBERG
                                    ROBERT McAULIFFE
19                                  EDWARD CROOKE
                                    LINDA McMAHON
20                                  JESSICA E. KRIEG
                                    AMY L. LIKOFF
21                                  GREGORY A. MASON
                                    WENDY ZUPAC
22                                  Civil Division, Department of Justice

23                                  TRINI E. ROSS
                                    United States Attorney
24                                  DAVID CORIELL
                                    Assistant United States Attorney
25

26                                  *Martha Glover*

27                                  MARTHA N. GLOVER
                                    Trial Attorney, United States Department of Justice
28                                  Attorneys for the United States of America

                                    26

                                                                    0605

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

0606

PROOF OF SERVICE BY ELECTRONIC MAIL

1.      I am over the age of 18 and not a party to the action entitled U.S. *ex rel.* Poehling v. UnitedHealth Group, Inc., CV 16-8697 FMO (SSx). I am employed by the Department of Justice, Civil Division, Commercial Litigation Branch, Fraud Section. My business address is 175 N St. NE, Washington, District of Columbia 20002.

2.      On June 23, 2022, I served the foregoing PLAINTIFF UNITED STATES' SIXTH SET OF INTERROGATORIES TO DEFENDANTS on each person or entity named below by electronic mail, pursuant to written consent under Federal Rule of Civil Procedure 5(b)(2)(E).

        Date of e-mailing: June 23, 2022.

        Place of e-mailing: Washington, District of Columbia.

        Person(s) and/or Entity(s) to whom e-mailed:  See attached page

3.      I declare under penalty of perjury that the foregoing is true and correct. Executed on June 23, 2022, at Washington, District of Columbia.

_____
Martha N. Glover

0607

| | | |
|---|---|---|
| 1 | David J. Schindler, Esq. | Eric Havian, Esq. |
| 2 | david.schindler@lw.com | ehavian@constantinecannon.com |
| | Daniel Meron, Esq. | Anne Hartman, Esq. |
| 3 | daniel.meron@lw.com | ahartman@constantinecannon.com |
| 4 | Abid, R. Qureshi, Esq. | Stephen S. Hasegawa, Esq. |
| | abid.qureshj@lw.com | shasegawa@phillipsandcohen.com |
| 5 | Manny Abascal, Esq. | Arun Subramanian, Esq. |
| 6 | Manny.Abascal@lw.com | asubramanian@SusmanGodfrey.com |
| | Kirstin Scheffler Do, Esq. | Geng Chen, Esq. |
| 7 | kirstin.schefflerdo@lw.com | GChen@susmangodfrey.com |
| 8 | Morgan Maddoux, Esq. | Chanler Langham, Esq. |
| | Morgan.maddoux@lw.com | clangham@SusmanGodfrey.com |
| 9 | Samantha Koppel | |
| 10 | Samantha.Koppel@lw.com | |
| | Morgan Maddoux | |
| 11 | Morgan.Maddoux@lw.com | |
| 12 | David Rowe | |
| | David.Rowe@lw.com | |
| 13 | Heather Blakeman | |
| 14 | Heather.Blakeman@lw.com | |
| | UHG-RelatorsCounsel@Lists.SusmanGodfrey.com | |
| 15 | poehling@bartlitbeck.com | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

0608

**EXHIBIT D-13 INTENTIONALLY BLANK**

**EXHIBIT D-14**

En

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

## Centers for Medicare & Medicaid Services

**42 CFR Parts 411, 412, 413, 422, and 489**

**[CMS–1390–F; CMS–1531–IFC1; CMS–1531–IFC2; CMS–1385–F4]**

**RIN 0938–AP15; RIN 0938–AO35; RIN 0938–AO65**

**Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2009 Rates; Payments for Graduate Medical Education in Certain Emergency Situations; Changes to Disclosure of Physician Ownership in Hospitals and Physician Self-Referral Rules; Updates to the Long-Term Care Prospective Payment System; Updates to Certain IPPS-Excluded Hospitals; and Collection of Information Regarding Financial Relationships Between Hospitals**

**AGENCY:** Centers for Medicare and Medicaid Services (CMS), HHS.

**ACTION:** Final rules.

**SUMMARY:** We are revising the Medicare hospital inpatient prospective payment systems (IPPS) for operating and capital-related costs to implement changes arising from our continuing experience with these systems, and to implement certain provisions made by the Deficit Reduction Act of 2005, the Medicare Improvements and Extension Act, Division B, Title I of the Tax Relief and Health Care Act of 2006, the TMA, Abstinence Education, and QI Programs Extension Act of 2007, and the Medicare Improvements for Patients and Providers Act of 2008. In addition, in the Addendum to this final rule, we describe the changes to the amounts and factors used to determine the rates for Medicare hospital inpatient services for operating costs and capital-related costs. These changes are generally applicable to discharges occurring on or after October 1, 2008. We also are setting forth the update to the rate-of-increase limits for certain hospitals and hospital units excluded from the IPPS that are paid on a reasonable cost basis subject to these limits. The updated rate-of-increase limits are effective for cost reporting periods beginning on or after October 1, 2008.

In addition to the changes for hospitals paid under the IPPS, this document contains revisions to the patient classifications and relative weights used under the long-term care

hospital prospective payment system (LTCH PPS). This document also contains policy changes relating to the requirements for furnishing hospital emergency services under the Emergency Medical Treatment and Labor Act of 1986 (EMTALA).

In this document, we are responding to public comments and finalizing the policies contained in two interim final rules relating to payments for Medicare graduate medical education to affiliated teaching hospitals in certain emergency situations.

We are revising the regulatory requirements relating to disclosure to patients of physician ownership or investment interests in hospitals and responding to public comments on a collection of information regarding financial relationships between hospitals and physicians. In addition, we are responding to public comments on proposals made in two separate rulemakings related to policies on physician self-referrals and finalizing these policies.

**DATES:** *Effective Dates:* This final rule is effective on October 1, 2008, with the following exceptions: Amendments to §§ 412.230, 412.232, and 412.234 are effective on September 2, 2008. Amendments to §§ 411.357(a)(5)(ii), (b)(4)(ii), (1)(3)(i) and (ii), and (p)(1)(i)(A) and (B) and the definition of entity in § 411.351 are effective on October 1, 2009.

*Applicability Dates:* The provisions of § 412.78 relating to payments to SCHs are applicable for cost reporting periods beginning on or after January 1, 2009. Our process for allowing certain hospitals to opt out of decisions made on behalf of hospitals (as discussed in section III.I.7. of this preamble) are applicable on August 19, 2008.

**FOR FURTHER INFORMATION CONTACT:** Gay Burton, (410) 786–4487, Operating Prospective Payment, MS–DRGs, Wage Index, New Medical Service and Technology Add-On Payments, Hospital Geographic Reclassifications, and Postacute Care Transfer Issues.

Tzvi Hefter, (410) 786–4487, Capital Prospective Payment, Excluded Hospitals, Direct and Indirect Graduate Medical Education, MS–LTC–DRGs, EMTALA, Hospital Emergency Services, and Hospital-within-Hospital Issues.

Siddhartha Mazumdar, (410) 786–6673, Rural Community Hospital Demonstration Program Issues.

Sheila Blackstock, (410) 786–3502, Quality Data for Annual Payment Update Issues.

Thomas Valuck, (410) 786–7479, Hospital Value-Based Purchasing and Readmissions to Hospital Issues.

Rebecca Paul, (410) 786–0852, Collection of Managed Care Encounter Data Issues.

Jacqueline Proctor, (410) 786–8852, Disclosure of Physician Ownership in Hospitals and Financial Relationships between Hospitals and Physicians Issues.

Lisa Ohrin, (410) 786–4565, and Don Romano, (410) 786–1401, Physician Self-Referral Issues.

**SUPPLEMENTARY INFORMATION:**

**Electronic Access**

This **Federal Register** document is also available from the **Federal Register** online database through *GPO Access*, a service of the U.S. Government Printing Office. Free public access is available on a Wide Area Information Server (WAIS) through the Internet and via asynchronous dial-in. Internet users can access the database by using the World Wide Web, (the Superintendent of Documents' home page address is *http://www.gpoaccess.gov/*), by using local WAIS client software, or by telnet to *swais.access.gpo.gov*, then login as guest (no password required). Dial-in users should use communications software and modem to call (202) 512–1661; type swais, then login as guest (no password required).

**Acronyms**

AARP American Association of Retired Persons
AAHKS American Association of Hip and Knee Surgeons
AAMC Association of American Medical Colleges
ACGME Accreditation Council for Graduate Medical Education
AF Artrial fibrillation
AHA American Hospital Association
AICD Automatic implantable cardioverter defibrillator
AHIMA American Health Information Management Association
AHIC American Health Information Community
AHRQ Agency for Healthcare Research and Quality
AMA American Medical Association
AMGA American Medical Group Association
AMI Acute myocardial infarction
AOA American Osteopathic Association
APR DRG All Patient Refined Diagnosis Related Group System
ASU Ambulatory surgical center
ASITN American Society of Interventional and Therapeutic Neuroradiology
BBA Balanced Budget Act of 1997, Public Law 105–33
BBRA Medicare, Medicaid, and SCHIP [State Children's Health Insurance Program] Balanced Budget Refinement Act of 1999, Public Law 106–113
BIPA Medicare, Medicaid, and SCHIP [State Children's Health Insurance Program] Benefits Improvement and Protection Act of 2000, Public Law 106–554

Congress stipulated that hospitals paid based on the standardized amount should not receive additional payments based on the effect of documentation and coding changes that do not reflect real changes in case-mix. Similarly, we believe that hospitals paid based on the hospital-specific rate should not have the potential to realize increased payments due to documentation and coding improvements that do not reflect real increases in patients' severity of illness. While we continue to believe that section 1886(d)(3)(A)(vi) of the Act does not provide explicit authority for application of the documentation and coding adjustment to the hospital-specific rates, we believe that we have the authority to apply the documentation and coding adjustment to the hospital-specific rates using our special exceptions and adjustment authority under section 1886(d)(5)(I)(i) of the Act. The special exceptions and adjustment authority authorizes us to provide "for such other exceptions and adjustments to [IPPS] payment amounts * * * as the Secretary deems appropriate." In light of this authority, for the FY 2010 rulemaking, we plan to examine our FY 2008 claims data for hospitals paid based on the hospital-specific rate. In the FY 2009 IPPS proposed rule, we stated that if we find evidence of significant increases in case-mix for patients treated in these hospitals, we would consider proposing application of the documentation and coding adjustments to the FY 2010 hospital-specific rates under our authority in section 1886(d)(5)(I)(i) of the Act. As noted previously, the documentation and coding adjustments established in the FY 2008 IPPS final rule with comment period are cumulative. For example, the −0.9 percent documentation and coding adjustment to the national standardized amount in FY 2009 is in addition to the −0.6 percent adjustment made in FY 2008, yielding a combined effect of −1.5 percent in FY 2009. Given the cumulative nature of the documentation and coding adjustments, if we were to propose to apply the documentation and coding adjustment to the FY 2010 hospital-specific rates, it may involve applying the FY 2008 and FY 2009 documentation and coding adjustments (−1.5 percent combined) plus the FY 2010 documentation and coding adjustment, discussed in the FY 2008 IPPS final rule with comment period, to the FY 2010 hospital-specific rates.

*Comment:* A number of commenters opposed application of the documentation and coding adjustment to the hospital-specific rates. MedPAC

supported application of a documentation and coding adjustment to the prospective payment rates and the hospital-specific rates for all IPPS hospitals that are paid based on their reported case-mix. Another commenter supported application of a documentation and coding adjustment to the hospital-specific rates if analysis of FY 2008 claims data supports a positive adjustment and recommended a transition be considered if the data support a negative adjustment.

*Response:* We appreciate the comments received. We did not propose to apply the documentation and coding adjustment to the hospital-specific rates for FY 2009. Instead, as we indicated in the proposed rule and reiterated above, we intend to consider whether such a proposal is warranted for FY 2010. To gather information to evaluate these considerations, we plan to perform analyses on FY 2008 claims data to examine whether there has been a significant increase in case-mix for hospitals paid based on the hospital-specific rate. If we find that application of the documentation and coding adjustment to the hospital-specific rates for FY 2010 is warranted, we would include a proposal in the FY 2010 IPPS proposed rule, which would be open for public comment at that time.

3. Application of the Documentation and Coding Adjustment to the Puerto Rico-Specific Standardized Amount

Puerto Rico hospitals are paid based on 75 percent of the national standardized amount and 25 percent of the Puerto Rico-specific standardized amount. As noted previously, the documentation and coding adjustment we adopted in the FY 2008 IPPS final rule with comment period relied upon our authority under section 1886(d)(3)(A)(vi) of the Act, which provides the authority to adjust "the standardized amounts computed under this paragraph" to eliminate the effect of changes in coding or classification that do not reflect real changes in case-mix. Section 1886(d)(3)(A)(vi) of the Act applies to the national standardized amounts computed under section 1886(d)(3) of the Act, but does not apply to the Puerto Rico-specific standardized amount computed under section 1886(d)(9)(C) of the Act. In calculating the FY 2008 payment rates, we made an inadvertent error and applied the FY 2008 −0.6 percent documentation and coding adjustment to the Puerto Rico-specific standardized amount, relying on our authority under section 1886(d)(3)(A)(vi) of the Act. However, section 1886(d)(3)(A)(vi) of the Act authorizes application of a

documentation and coding adjustment to the national standardized amount and does not apply to the Puerto Rico-specific standardized amount. In this final rule, we are correcting this inadvertent error by removing the −0.6 percent documentation and coding adjustment from the FY 2008 Puerto Rico-specific rates. The revised FY 2008 Puerto Rico-specific operating standardized amounts are: $1,471.10 for the labor share and $901.64 for the nonlabor share for a hospital with a wage index greater than 1 and $1,392.80 for the labor share and $979.94 for the non-labor share for a hospital with a wage index less than or equal to 1. The revised FY 2008 Puerto Rico capital payment rate is $202.89 (as discussed in section III.A.6.b. of the Addendum to this final rule). These revised rates are effective October 1, 2007, for FY 2008.

While section 1886(d)(3)(A)(vi) of the Act is not applicable to the Puerto Rico-specific standardized amount, we believe that we have the authority to apply the documentation and coding adjustment to the Puerto Rico-specific standardized amount using our special exceptions and adjustment authority under section 1886(d)(5)(I)(i) of the Act. Similar to SCHs and MDHs that are paid based on the hospital-specific rate, discussed in section II.D.2. of this preamble, we believe that Puerto Rico hospitals that are paid based on the Puerto Rico-specific standardized amount should not have the potential to realize increased payments due to documentation and coding improvements that do not reflect real increases in patients' severity of illness. Consistent with the approach described for SCHs and MDHs in section II.D.2. of the preamble of this final rule, for the FY 2010 rulemaking, we plan to examine our FY 2008 claims data for hospitals in Puerto Rico. As we indicated in the FY 2009 proposed rule, if we find evidence of significant increases in case-mix for patients treated in these hospitals, we would consider proposing application of the documentation and coding adjustments to the FY 2010 Puerto Rico-specific standardized amount under our authority in section 1886(d)(5)(I)(i) of the Act. As noted previously, the documentation and coding adjustments established in the FY 2008 IPPS final rule with comment period are cumulative. Given the cumulative nature of the documentation and coding adjustments, if we were to propose to apply the documentation and coding adjustment to the FY 2010 Puerto Rico-specific standardized amount, it may involve applying the FY 2008 and FY

2009 documentation and coding adjustments (−1.5 percent combined) plus the FY 2010 documentation and coding adjustment, discussed in the FY 2008 IPPS final rule with comment period, to the FY 2010 Puerto Rico-specific standardized amount.

*Comment:* Some commenters opposed application of the documentation and coding adjustment to the Puerto Rico-specific standardized amount. MedPAC supported application of a documentation and coding adjustment to the prospective payment rates and the hospital-specific rates for all IPPS hospitals that are paid based on their reported case-mix.

*Response:* We appreciate the comments. We did not propose to apply the documentation and coding adjustment to the Puerto Rico-specific standardized amount for FY 2009. Instead, as we indicated in the proposed rule, we intend to consider whether such a proposal is warranted for FY 2010. To gather information to evaluate these considerations, we plan to perform analyses on FY 2008 claims data to examine whether there has been a significant increase in case-mix for hospitals in Puerto Rico. If we find that application of the documentation and coding adjustment to the Puerto Rico-specific standardized amount for FY 2010 is warranted, we would include a proposal in the FY 2010 proposed rule, which would be open for public comment at that time.

4. Potential Additional Payment Adjustments in FYs 2010 Through 2012

Section 7 of Public Law 110–90 also provides for payment adjustments in FYs 2010 through 2012 based upon a retrospective evaluation of claims data from the implementation of the MS–DRG system. If, based on this retrospective evaluation, the Secretary finds that in FY 2008 and FY 2009, the actual amount of change in case-mix that does not reflect real change in underlying patient severity differs from the statutorily mandated documentation and coding adjustments implemented in those years, the law requires the Secretary to adjust payments for discharges occurring in FYs 2010 through 2012 to offset the estimated amount of increase or decrease in aggregate payments that occurred in FY 2008 and FY 2009 as a result of that difference, in addition to making an appropriate adjustment to the standardized amount under section 1006(d)(3)(A)(vi) of the Act.

In order to implement these requirements of section 7 of Public Law 110–90, we are planning a thorough retrospective evaluation of our claims

data. Results of this evaluation would be used by our actuaries to determine any necessary payment adjustments in FYs 2010 through 2012 to ensure the budget neutrality of the MS–DRG implementation for FY 2008 and FY 2009, as required by law. In the FY 2009 IPPS proposed rule, we described our preliminary analysis plans to provide the opportunity for public input.

In the proposed rule, we indicated that we intend to measure and corroborate the extent of the overall national average changes in case-mix for FY 2008 and FY 2009. We expect part of this overall national average change would be attributable to underlying changes in actual patient severity and part would be attributable to documentation and coding improvements under the MS–DRG system. In order to separate the two effects, we plan to isolate the effect of shifts in cases among base DRGs from the effect of shifts in the types of cases within base DRGs. The shifts among base DRGs are the result of changes in principal diagnoses while the shifts within base DRGs are the result of changes in secondary diagnoses. Because we expect most of the documentation and coding improvements under the MS–DRG system will occur in the secondary diagnoses, we believe that the shifts among base DRGs are less likely to be the result of the MS–DRG system and the shifts within base DRGs are more likely to be the result of the MS–DRG system. We also anticipate evaluating data to identify the specific MS–DRGs and diagnoses that contributed significantly to the improved documentation and coding payment effect and to quantify their impact. This step would entail analysis of the secondary diagnoses driving the shifts in severity within specific base DRGs.

In the proposed rule, we also stated that, while we believe that the data analysis plan described previously will produce an appropriate estimate of the extent of case-mix changes resulting from documentation and coding improvements, we may also decide, if feasible, to use historical data from our Hospital Payment Monitoring Program (HPMP) to corroborate the within-base DRG shift analysis. The HPMP is supported by the Medicare Clinical Data Abstraction Center (CDAC). From 1998 to 2007, the CDAC obtained medical records for a sample of discharges as part of our hospital monitoring activities. These data were collected on a random sample of between 30,000 to 50,000 hospital discharges per year. The historical CDAC data could be used to develop an upper bound estimate of the

trend in real case-mix growth (that is, real change in underlying patient severity) prior to implementation of the MS–DRGs.

In the FY 2009 IPPS proposed rule, we solicited public comments on the analysis plans described above, as well as suggestions on other possible approaches for conducting a retrospective analysis to identify the amount of case-mix changes that occurred in FY 2008 and FY 2009 that did not reflect real increases in patients' severity of illness.

*Comment:* A few commenters, including MedPAC, expressed support for the analytic approach described in the proposed rule. A number of other commenters expressed concerns about certain aspects of the approach and/or suggested alternate analyses or study designs. In addition, one commenter recommended that any determination or retrospective evaluation by the actuaries of the impact of the MS–DRGs on case-mix is open to public scrutiny prior to the implementation of final payment adjustments for FY 2010 through 2012.

*Response:* We thank the commenters for their response. We will take all of the comments into consideration as we continue development of our analysis plans. Our analysis, findings, and any resulting proposals to adjust payments for discharges occurring in FYs 2010 through 2012 to offset the estimated amount of increase or decrease in aggregate payments that occurred in FY 2008 and FY 2009 will be discussed in future years' proposed rules, which will be open for public comment.

*Comment:* One commenter expressed concern about the impact that an adjustment to the FY 2010 through FY 2012 payment rates could have on small rural hospitals. The commenter stated that if CMS finds that there was an increase in aggregate payments in FY 2008 or FY 2009 that requires an offsetting adjustment to the FY 2010 through FY 2012 payment rates, CMS should consider a transition period before fully implementing such ad adjustment.

*Response:* If our analysis suggests that an adjustment to the FY 2010 through FY 2012 payment rates is necessary, a proposal would be made in a future proposed rule and the public would have an opportunity to comment on the proposal at that time.

*E. Refinement of the MS–DRG Relative Weight Calculation*

1. Background

In the FY 2008 IPPS final rule with comment period (72 FR 47188), we

continued to implement significant revisions to Medicare's inpatient hospital rates by basing relative weights on hospitals' estimated costs rather than on charges. We continued our 3-year transition from charge-based relative weights to cost-based relative weights. Beginning in FY 2007, we implemented relative weights based on cost report data instead of based on charge information. We had initially proposed to develop cost-based relative weights using the hospital-specific relative value cost center (HSRVcc) methodology as recommended by MedPAC. However, after considering concerns raised in the public comments, we modified MedPAC's methodology to exclude the hospital-specific relative weight feature. Instead, we developed national CCRs based on distinct hospital departments and engaged a contractor to evaluate the HSRVcc methodology for future consideration. To mitigate payment instability due to the adoption of cost-based relative weights, we decided to transition cost-based weights over 3 years by blending them with charge-based weights beginning in FY 2007. In FY 2008, we continued our transition by blending the relative weights with one-third charge-based weights and two-thirds cost-based weights.

Also, in FY 2008, we adopted severity-based MS–DRGs, which increased the number of DRGs from 538 to 745. Many commenters raised concerns as to how the transition from charge-based weights to cost-based weights would continue with the introduction of new MS–DRGs. We decided to implement a 2-year transition for the MS–DRGs to coincide with the remainder of the transition to cost-based relative weights. In FY 2008, 50 percent of the relative weight for each DRG was based on the CMS DRG relative weight and 50 percent was based on the MS–DRG relative weight. We refer readers to the FY 2007 IPPS final rule (71 FR 47882) for more detail on our final policy for calculating the cost-based DRG relative weights and to the FY 2008 IPPS final rule with comment period (72 FR 47199) for information on how we blended relative weights based on the CMS DRGs and MS–DRGs.

As we transitioned to cost-based relative weights, some commenters raised concerns about potential bias in the weights due to "charge compression," which is the practice of applying a higher percentage charge markup over costs to lower cost items and services, and a lower percentage charge markup over costs to higher cost items and services. As a result, the cost-based weights would undervalue high

cost items and overvalue low cost items if a single CCR is applied to items of widely varying costs in the same cost center. To address this concern, in August 2006 we awarded a contract to RTI to study the effects of charge compression in calculating the relative weights and to consider methods to reduce the variation in the CCRs across services within cost centers. RTI issued an interim draft report in March 2007 which was posted on the CMS Web site with its findings on charge compression. In that report, RTI found that a number of factors contribute to charge compression and affect the accuracy of the relative weights. RTI found inconsistent matching of charges in the Medicare cost report and their corresponding charges in the MedPAR claims for certain cost centers. In addition, there was inconsistent reporting of costs and charges among hospitals. For example, some hospitals would report costs and charges for devices and medical supplies in the Medical Supplies Charged to Patients cost center, while other hospitals would report those costs and charges in their related ancillary departments such as Operating Room or Radiology. RTI also found evidence that certain revenue codes within the same cost center had significantly different markup rates. For example, within the Medicare Supplies Charged to Patients cost center, revenue codes for devices, implantables, and prosthetics had different markup rates than the other medical supplies in that cost center. RTI's findings demonstrated that charge compression exists in several CCRs, most notably in the Medical Supplies and Equipment CCR.

RTI offered short-term, medium-term, and long-term recommendations to mitigate the effects of charge compression. RTI's short-term recommendations included expanding the distinct hospital CCRs to 19 by disaggregating the "Emergency Room" and "Blood and Blood Products" from the Other Services cost center and by estimating regression-based CCRs to disaggregate Medical Supplies, Drugs, and Radiology cost centers. RTI recommended, for the medium-term, to expand the MedPAR file to include separate fields that disaggregate several existing charge departments. In addition, RTI recommended improving hospital cost reporting instructions so that hospitals can properly report costs in the appropriate cost centers. RTI's long-term recommendations included adding new cost centers to the Medicare cost report, such as adding a "Devices, Implants and Prosthetics" line under "Medical Supplies Charged to Patients"

and a "CT Scanning and MRI" subscripted line under "Radiology-Diagnostics".

Among RTI's short-term recommendations, for FY 2008, we expanded the number of distinct hospital department CCRs from 13 to 15 by disaggregating "Emergency Room" and "Blood and Blood Products" from the Other Services cost center as these lines already exist on the hospital cost report. Furthermore, in an effort to improve consistency between costs and their corresponding charges in the MedPAR file, we moved the costs for cases involving electroencephalography (EEG) from the Cardiology cost center to the Laboratory cost center group which corresponds with the EEG MedPAR claims categorized under the Laboratory charges. We also agreed with RTI's recommendations to revise the Medicare cost report and the MedPAR file as a long-term solution for charge compression. We stated that, in the upcoming year, we would consider additional lines to the cost report and additional revenue codes for the MedPAR file.

Despite receiving public comments in support of the regression-based CCRs as a means to immediately resolve the problem of charge compression, particularly within the Medical Supplies and Equipment CCR, we did not adopt RTI's short-term recommendation to create four additional regression-based CCRs for several reasons. We were concerned that RTI's analysis was limited to charges on hospital inpatient claims, while typically hospital cost report CCRs combine both inpatient and outpatient services. Further, because both the IPPS and OPPS rely on cost-based weights, we preferred to introduce any methodological adjustments to both payment systems at the same time. We have since expanded RTI's analysis of charge compression to incorporate outpatient services. RTI has been evaluating the cost estimation process for the OPPS cost-based weights, including a reassessment of the regression-based CCR models using both outpatient and inpatient charge data. Because the RTI report was not available until after the conclusion of our proposed rule development process, we were unable to include a summary of the report in the FY 2009 IPPS proposed rule. The IPPS-related chapters of RTI's interim report were posted on the CMS Web site on April 22, 2008, for a 60-day comment period, and we welcomed comments on the report. In this final rule, we are providing a summary of RTI's findings and the public comments

we received in section II.E.2. of the preamble of this final rule.

2. Summary of RTI's Report on Charge Compression

As stated earlier, subsequent to the release of the FY 2009 IPPS proposed rule, we posted on April 22, 2008, an interim report discussing RTI's research findings for the IPPS MS–DRG relative weights to be available during the public comment period on the FY 2009 IPPS proposed rule. This report can be found on RTI's Web site at: *http://www.rti.org/reports/cms/HHSM-500-2005-0029I/PDF/Refining_Cost_to_Charge_Ratios_200804.pdf*. The IPPS-specific chapters, which were separately displayed in the April 2008 interim report, as well as the more recent OPPS chapters, are included in the July 2008 RTI final report entitled, "Refining Cost-to-Charge Ratios for Calculating APC and DRG Relative Payment Weights," that became available at the time of the development of this final rule. The RTI final report can be found on RTI's Web site at: *http://www.rti.org/reports/cms/HHSM-500-2005-0029I/PDF/Refining_Cost_to_Charge_Ratios_200807_Final.pdf*.

RTI's final report distinguished between two types of research findings and recommendations: Those pertaining to the accounting or cost report data and those related to statistical regression analysis. Because the OPPS uses a hospital-specific CCR methodology, employs detailed cost report data, and estimates costs at the claim level, CMS asked RTI to closely evaluate the accounting component of the OPPS cost-based weight methodology. In reviewing the cost report data for nonstandard cost centers used in the crosswalk, RTI discovered some problems concerning the classification of nonstandard cost centers that impact both the IPPS and the OPPS. RTI reclassified nonstandard cost centers by reading providers' cost center labels. Standard cost centers are preprinted in the CMS-approved cost report software, while nonstandard cost centers are identified and updated periodically through analysis of frequently used labels. Under the IPPS, the line reassignments only slightly impact the 15 national aggregate CCRs used in the relative weight calculation. However, improved cost report data for CT Scanning, MRI, Nuclear Medicine, Therapeutic Radiology, and Cardiac Catheterization through line reassignments allowed for the reduction in aggregation bias by expanding the number of national CCRs available to separately capture these and other services. Importantly, RTI found that,

under the IPPS and the OPPS, this improvement to the cost reporting data reduces some of the sources of aggregation bias without having to use regression-based adjustments.

In general, with respect to the regression-based adjustments, RTI confirmed the findings of its March 2007 report that regression models are a valid approach for diagnosing potential aggregation bias within selected services for the IPPS and found that regression models are equally valid for setting payments under the OPPS. RTI also suggested that regression-based CCRs could provide a short-term correction until accounting data could be refined to support more accurate CCR estimates under both the IPPS and the OPPS. RTI again found aggregation bias in devices, drugs, and radiology and, using combined outpatient and inpatient claims, expanded the number of recommended regression-adjusted CCRs to create seven regression-adjusted CCRs for Devices, IV Solutions, Cardiac Catheterization, CT Scanning, MRI, Therapeutic Radiology, and Nuclear Medicine.

In almost all cases, RTI observed that potential distortions from aggregation bias and incorrect cost reporting in the OPPS relative weights were proportionally much greater than for MS–DRGs for both accounting-based and statistical adjustments because OPPS groups are small and generally price a single service. HCRIS line reassignments by themselves had little effect on most inpatient weights. However, just as the overall impacts on MS–DRGs were more moderate because MS–DRGs experienced offsetting effects in cost estimation among numerous revenue codes in an episode, a given hospital outpatient visit might include more than one service, leading to offsetting effects in cost estimation for services provided in the outpatient episode as a whole.

Notwithstanding likely offsetting effects at the provider-level, RTI asserted that, while some averaging is appropriate for a prospective payment system, extreme distortions in payments for individual services bias perceptions of service profitability and may lead hospitals to inappropriately set their charge structure. RTI noted that this may not be true for "core" hospital services, such as oncology, but has a greater impact in evolving areas with greater potential for provider-induced demand, such as specialized imaging services. RTI also noted that cost-based weights are only one component of a final prospective payment rate. There are other rate adjustments (wage index, IME, and DSH) to payments derived

from the revised cost-based weights and the cumulative effect of these components may not improve the ability of final payment to reflect resource cost. With regard to APCs and MS–DRGs that contain substantial device costs, RTI cautioned that other prospective payment system adjustments (wage index, IME, and DSH) largely offset the effects of charge compression among hospitals that receive these adjustments. RTI endorsed short-term regression-based adjustments, but also concluded that more refined and accurate accounting data are the preferred long-term solution to mitigate charge compression and related bias in hospital cost-based weights.

As a result of this research, RTI made 11 recommendations. The first set of recommendations is more applicable to the OPPS because it uses more granular HCRIS data and concentrates on short-term accounting changes to current cost report data. This set includes a recommendation that CMS immediately implement a review of HCRIS cost center assignments based on text searches of providers' line descriptions and reassign lines appropriately. The second set addresses short-term regression-based and other statistical adjustments. The third set focuses on clarifying existing cost report instructions to instruct providers to use all applicable standard cost centers, adding new standard cost centers (for Devices, CT Scans, MRIs, Cardiac Catheterization, and Infusion Drugs), and creating new charge category summaries in the MedPAR to match the new cost centers on the cost report. Specifically, the new MedPAR groups would be for Intermediate Care (revenue codes 0206 and 0214), Devices (revenue codes 0274, 0275, 0276 and 0278), IV Solutions (revenue code 0258), CT Scanning (revenue codes 035x), Nuclear Medicine (revenue codes 034x, possibly combined with 0404), and Therapeutic Radiology (revenue codes 033x). RTI also recommends educating hospitals through industry-led educational initiatives directed at methods for capital cost finding, specifically encouraging providers to use direct assignment of equipment depreciation and lease costs wherever possible, or at least to allocate moveable equipment depreciation based on the dollar value of assigned depreciation costs. Lastly, although not directly the focus of its study, RTI mentions the problem of nursing cost compression in the relative weights, and notes that cost compression within inpatient nursing services is a significant source of distortion in the various IPPS' relative

weights, possibly more so than any of the factors studied by RTI. RTI suggests that it may be best for hospitals to agree to expand charge coding conventions for inpatient nursing, which would foster increased use of patient-specific nursing incremental charge codes in addition to baseline unit-specific per-diem charges.

*Comment:* One commenter agreed with the enhancements made by RTI (in the portion of the RTI report that was made available to the public in the April 2008 report) to the model for disaggregating CCRs in the Medical Supplies cost center, but was "disappointed" that CMS did not post the complete report, including the impact of charge "decompression" on the APC weights under the OPPS, and urged CMS to release the full report as soon as possible to allow a comprehensive review of the findings applicable to both the IPPS and the OPPS.

*Response:* Because the final RTI report was not scheduled to be completed before July 2008, we were unable to make the complete report, including sections focusing on the OPPS, available to the public in April 2008. Because we wanted to give the public the benefit of a 60-day comment period on the IPPS sections of the RTI report that would generally coincide with the 60-day comment period on the FY 2009 IPPS proposed rule, we chose to make available in April 2008 those sections of the RTI report that specifically dealt with the IPPS MS–DRG relative weights. We note that on July 3, 2008, we included on the CMS Web site the link to the complete RTI report: *http://www.rti.org/reports/cms/ HHSM-500-2005-00291/PDF/ Refining_Cost_to_ Charge_Ratios_200807_Final.pdf.*

*Comment:* One commenter recommended that, for purposes of calculating the relative weights for FY 2009, CMS adopt RTI's recommendation to reassign cost center lines based on the provider's entered text description to correct errors in the assignment of costs and charges by hospitals in nonstandard cost centers on the cost report. The commenter also suggested that CMS adopt RTI's recommendation that, in the MedPAR file, intermediate care charges should be reclassified from the Intensive Care Unit cost center to the Routine cost center to correct a mismatch between where the intermediate care charges are assigned on the cost report (that is, in the Routine cost center) and where the charges are grouped in MedPAR (that is, with intensive care unit charges).

*Response:* The commenter's recommendations are important and are consistent with existing Medicare

policy. Currently, the MedPAR file incorrectly groups intermediate care charges with intensive care unit charges; intermediate care charges and costs are, in fact, to be included in the General Routine (that is, Adults and Pediatrics) cost center on the cost report, in accordance with section 2202.7.II.B. of the PRM–1. However, in its July 2008 report, RTI found that HCRIS line reassignments by themselves had little effect on most inpatient weights (page 8). The impact of adopting these recommendations would likely be more pronounced if we were adopting regression-based CCRs for purposes of calculating the relative weights for FY 2009. However, because we are not using regression-based CCRs for FY 2009, we do not believe it is necessary to adopt the commenter's recommendations for the MS–DRG relative weights at this time, but will consider them for future rulemaking.

*Comment:* One commenter commended CMS for proposing to break out the existing line on the cost report for Medical Supplies Charged to Patients into two lines, one for costly devices and implants and the other for low-cost supplies, and for undertaking a comprehensive review of the cost report. However, the commenter observed that RTI's 2008 report demonstrates that additional lines are also needed to further break out drugs, radiology (CT scans and MRI scans) and cardiac catheterization because hospitals apply varying markups within these cost centers as well.

*Response:* We acknowledge, as RTI has found, that charge compression occurs in several cost centers that exist on the Medicare cost report. However, as we stated in the proposed rule, we proposed to focus on the CCR for Medical Supplies and Equipment because RTI found that the largest impact on the MS–DRG relative weights could result from correcting charge compression for devices and implants.

We note that in the CY 2009 OPPS/ ASC proposed rule (73 FR 41490), we are proposing to break the single standard Drugs Charged to Patient cost center, Line 56, into two standard cost centers, Drugs with High Overhead Cost Charged to Patients and Drugs with Low Overhead Cost Charged to Patients, to reduce the reallocation of pharmacy overhead from expensive to inexpensive drugs and biologicals. We use the term "pharmacy overhead" here to refer to overhead and related expenses such as pharmacy services and handling costs. This proposal is consistent with RTI's recommendation for creating a new cost center with a CCR that would be used to adjust

charges to costs for drugs requiring detail coding. In the CY 2009 OPPS/ ASC proposed rule, we note that comments on the proposed changes to the cost report for drugs should address any impact on both the inpatient and outpatient payment systems because both systems rely upon the Medicare hospital cost report for cost estimation. Furthermore, in that proposed rule, we specifically invited public comment on the appropriateness of creating standard cost centers for Computed Tomography (CT) Scanning, Magnetic Resonance Imaging (MRI), and Cardiac Catheterization, rather than continuing the established nonstandard cost centers for these services (73 FR 41431).

### 3. Summary of RAND's Study of Alternative Relative Weight Methodologies

A second reason that we did not implement regression-based CCRs at the time of the FY 2008 IPPS final rule with comment period was our inability to investigate how regression-based CCRs would interact with the implementation of MS–DRGs. In the FY 2008 final rule with comment period (72 FR 47197), we stated that we engaged RAND as the contractor to evaluate the HSRV methodology in conjunction with regression-based CCRs and we would consider their analysis as we prepared for the FY 2009 IPPS rulemaking process. We stated that we would analyze how the relative weights would change if we were to adopt regression-based CCRs and an HSRV methodology using fully-phased in MS–DRGs. We stated that we would consider the results of the second phase of the RAND study as we prepared for the FY 2009 IPPS rulemaking process. We had intended to include a detailed discussion of RAND's study in the FY 2009 IPPS proposed rule. However, due to some delays in releasing identifiable data to the contractor under revised data security rules, the report on this second stage of RAND's analysis was not completed in time for the development of the proposed rule. Therefore, we continued to have the same concerns with respect to uncertainty about how regression-based CCRs would interact with the MS–DRGs or an HSRV methodology, and we did not propose to adopt the regression-based CCRs or an HSRV methodology in the FY 2009 IPPS proposed rule. Nevertheless, we welcomed public comments on our proposals not to adopt regression-based CCRs or an HSRV methodology at that time or in the future. The RAND report on regression-based CCRs and the HSRV methodology was finalized at the conclusion of our proposed rule

**EXHIBIT D-15**

Case 2:16-cv-08697-FMO-PVC    Document 616-3    Filed 08/06/24    Page 621 of 637
Page ID #:19515
Medicare Program; Policy and Technical Changes to the Medicare ... 75 FR 19678-01

75 FR 19678-01, 2010 WL 1483422(F.R.)

RULES and REGULATIONS

DEPARTMENT OF HEALTH AND HUMAN SERVICES

Centers for Medicare & Medicaid Services

42 CFR Parts 417, 422, 423, and 480

[CMS-4085-F]

RIN 0938-AP77

Medicare Program; Policy and Technical Changes to the Medicare
Advantage and the Medicare Prescription Drug Benefit Programs

Thursday, April 15, 2010

AGENCY: Centers for Medicare & Medicaid Services (CMS), HHS.

**\*19678**  ACTION: Final rule.

SUMMARY: This final rule makes revisions to the regulations governing the Medicare Advantage (MA) program (Part C) and prescription drug benefit program (Part D) based on our continued experience in the administration of the Part C and D programs. The revisions strengthen various program participation and exit requirements; strengthen beneficiary protections; ensure that plan offerings to beneficiaries include meaningful differences; improve plan payment rules and processes; improve data collection for oversight and quality assessment, implement new policies and clarify existing program policy.

DATES: Effective Date: These regulations are effective on June 7, 2010. However, we note that because health and drug plans under the Part C and D programs operate under contracts with CMS that are applicable on a calendar year basis, the provisions will not be applicable prior to contract year January 1, 2011, except where otherwise noted.

FOR FURTHER INFORMATION CONTACT:

Alissa Deboy, (410) 786-6041, General information and Part D issues.

Sabrina Ahmed, (410) 786-7499, Part C issues.

Terry Lied, (410) 786-8973, Collection of information requirements and regulatory impact analysis issues.

Kristy Nishimoto, (410) 786-8517, Part C and D enrollment and appeals issues.

Jennifer Smith, (410) 786-2987, Part C and D compliance and sanction issues.

Frank Szeflinski, (303) 844-7119, Part C payment issues.

SUPPLEMENTARY INFORMATION:

**Table of Contents**

I. Background

A. Overview of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003

B. History and Overview

II. Provisions of the Proposed Rule and Analysis and Responses to Public Comments

A. Changes to Strengthen Our Ability To Distinguish for Approval Stronger Applicants for Part C and D Program Participation and To Remove Consistently Poor Performers

1. Require Notice of Intent to Apply Under Part C and D Within the Application Requirements (§ 422.501 and § 423.502)

2. Application Requirements (§ 422.501(c) and § 423.502(c)) and Evaluation and Determination Procedures for Determining Whether Applicants are Qualified for a Contract Under Parts C and D (§ 422.502 and § 423.503)

3. Deny Contract Qualification Applications Based on Past Contract Performance (§ 423.750 and § 422.750)

4. Use of Data to Evaluate Continued Ability to Act as a Qualified Sponsoring Organization Under Parts C and D (§ 422.504, and § 423.505)

5. Compliance Programs Under Part C and D (§ 422.503(b)(4)(vi) and § 423.504(b)(4)(vi))

6. Network Adequacy of Coordinated Care and Network-Based Private Fee-for-Service Plans Under Part C (§ 422.112)

7. Deemable Program Requirements Under Parts C and D (§ 422.156(b) (7), § 422.156 (f), § 423.165(b), and § 423.165(f))

8. Modify the Corrective Action Plan (CAP) Process as it Relates to Procedures for Termination and Nonrenewal of a Part C or D Contract By CMS (§ 422.506(b)(3), § 422.510(c)(1), § 423.507(b)(3), and § 423.509(c)(1))

9. Procedures for Imposing Intermediate Sanctions and Civil Money Penalties Under Part C and D (§ 422.756 and 423.756)

10. Termination of Contracts Under Parts C and D (§ 422.510(a) and § 423.509(a))

11. Request for Hearing Under Parts C and D (§ 422.662 and § 423.651)

12. Burden of Proof, Standard of Proof, Standard of Review and Conduct of Hearing (§ 422.660, § 423.650, § 422.676, and § 423.658)

13. Expedited Contract Terminations Procedures (§ 422.510, § 423.509, § 422.664, § 423.652, § 422.644, and § 423.642) Under Parts C and D

14. Time and Place of Hearing Under Parts C and D (§ 422.670 and § 423.655)

15. Discovery Under Parts C and D (§ 422.682 and § 423.661)

16. Review by the Administrator Under Parts C and D (§ 422.692(a) and § 423.666(a))

17. Reopening of an Initial Contract Determination or Decision of a Hearing Officer or the Administrator Under Parts C and D (§ 422.696 and § 423.668)

18. Prohibition of MA and Part D Applications for 2 Years after a Mutual Termination (§ 422.503(b)(6) and § 423.504(b)(5))

B. Changes to Strengthen Beneficiary Protections

1. Broker and Agent Requirements Under Parts C and D

2. Beneficiary Communications Materials Under Parts C and D (§ 422.2260, § 423.2262, § 423.2260, and § 423.2262)

3. Required Use of Standardized Model Materials Under Parts C and D (§ 422.2262 and § 423.2262)

4. Involuntary Disenrollment for Failure to Pay Plan Premiums Under Parts C and D (§ 422.74 and § 423.44)

Case 2:16-cv-08697-FMO-PVC    Document 616-3    Filed 08/06/24    Page 623 of 637
Page ID #:19517
Medicare Program; Policy and Technical Changes to the Medicare..., 75 FR 19678-01

Another commenter argued that CMS should not state that the transition period will be "as determined by CMS," but rather specify how the transition period will be measured. The same commenter wrote that if CMS does finalize the proposed requirement, we should not apply it to any acquisition prior to issuance of the rule, as the organization would have already taken action based on transition-related guidance in the 2008 and 2009 call letters.

Response: As stated in the preamble to the proposed rule, based on our experience, we believe that our proposed timeline for transitions provides ample time for organizations and sponsors to ensure that benefit packages are sufficiently different and to notify enrollees of any changes. Because the transition period actually applies for  **\*19740**  the two contract years following the year of the acquisition or merger, that is, if a merger takes place in 2010, the MAO or sponsor would have until 2013 to offer meaningfully different plans, we believe this period is disruptive neither to plans nor to beneficiaries, and thus disagree with the commenter who asserted that a 3-year transition was needed to allow MA organizations and Part D plan sponsors to adapt their benefit structures and communicate to beneficiaries about the changes being made.

We clarify that only organizations or sponsors that merge or are acquired after the effective date of this final rule will be subject to the requirement at § 422.256(b)(4)(ii) and § 423.272(b)(3)(ii) that their offerings are meaningfully different after a 2-year transition period. In the case of plans offered by organizations or sponsors that merge or acquire other plans prior to the effective date of this regulation, the previously articulated 3-year transition period would apply.

### 3. Non-Renewing Low-Enrollment Plans (§ 422.506(b)(1)(iv), § 423.507(b)(1)(iii))

As part of our process to streamline and simplify the plan selection process for beneficiaries, and ensure that beneficiaries are only offered plans with long-term viability, we proposed in § 422.506(b)(1)(iv) and § 423.507(b)(1)(iii) to include, as a specific ground for non-renewal of a contract, a finding that a Part C or Part D plan has failed to attract a significant number of enrollees over a sustained period of time. We justified this requirement on the grounds that, as a general matter, continuing such a low enrollment plan was not consistent with effective and efficient administration of the Medicare program for purposes of section 1857(c)(2)(B) of the Act (incorporated for Part D under section 1860D-12(b)(3)(B) of the Act), which provides authority to terminate a contract under such circumstances. In the preamble to the proposed rule, we acknowledged that there may be instances in which low enrollment over a sustained period of time is a function of the type of beneficiaries served, geographic location, or other circumstances, and that we would consider continuing to renew a low enrollment plan in such situations including, but not limited to, chronic care SNPs offering health care services especially tailored to this category of beneficiaries and not available elsewhere or employer group health plans offering benefits augmenting those of an MA plan to employees of a small business. We further stated that, if a case could be made that low enrollment is justified, and the absence of such a plan would significantly limit beneficiary health care options in a service area, consistent with effective and efficient administration of the Part C or Part D program, we would not non-renew that plan. Similarly, we also stated that the threshold for low enrollment could fluctuate, although we noted that we used a threshold of 100 enrollees for purposes of reducing the number of low enrollment plans for contract year 2010. Therefore, we did not propose to revise our regulations to specify a specific threshold. We solicited comments on this approach and whether we had provided sufficient clarity on how we would determine whether a low-enrollment plan would be non-renewed.

Comment: Several commenters supported the proposal to non-renew low enrollment plans, but recommended that the threshold and guidelines we would use to apply this requirement (including such factors as the number of plans in a market, plan enrollment, and the number of years of operation with low enrollment numbers) be clear and transparent, and that they be made available publicly early in the year preceding the contract year to which they will apply. One commenter wrote that CMS should convene a working group prior to enacting our proposed policy to non-renew low enrollment plans. Another commenter wrote that CMS should consider low enrollment to be in the 250 to 500 enrollee range rather than 100 enrollees (the number used in our efforts to reduce low-enrollment plans for contract year 2010, as detailed in the preamble to our proposed rule). Another recommended a low enrollment threshold of 1000 enrollees because it believes that plans serving fewer than 1000 people in a service area would be unable to offer negotiated savings, quality managed care, or popular plan features. A commenter asked CMS to clarify what is meant by "a small number of enrollees over a period of time."

Response: We agree that guidelines concerning minimum enrollment thresholds and criteria should be published annually and as early as possible in the year preceding the contract year to which they will apply. While we disagree that we should specify thresholds in regulations, we intend to provide opportunities for the public to review and comment on our proposed thresholds and criteria for assessing low enrollment for the following contract year (for example, through our annual call letter). We recognize that we must be flexible in assessing minimum enrollment to ensure that plans with legitimate reasons for low enrollments, such as lack of other health care plan options, specialized plan offering (such as, a chronic care SNP), or recent establishment of the plan, may continue to operate and that beneficiaries who might not otherwise have access to health care options offered by a low-enrollment plan will continue to have such access. Because we intend to provide for public input annually on our implementation guidance and will consider the suggestions for specific threshold amounts submitted by the commenters in that context, we do not believe the suggested "workgroup" to be necessary. With respect to the question of what constitutes "a small number of enrollees" over a period of time, the process described above may also be used to determine the number of enrollees that would trigger application of this regulation, as well as the period of time for which the small number would have to be sustained.

Comment: Another commenter recommended that CMS make clear that the length of time a plan has had low enrollment will be a primary factor in determining whether a plan is non-renewed, and that we should modify our regulations language to explicitly provide for "waivers" of the proposed requirement at § 422.506(b)(1)(iv) (§ 423.507(b)(1)(iii) for Part D plans) when special circumstances such as the type of beneficiaries served, geographic location, and absence of the plan would significantly limit beneficiary health care options in a service area.

Response: The length of time in which a plan has had low enrollment is only one of the factors that we will consider in determining whether it is consistent with effective and efficient administration of the Part C or Part D benefit. We will also consider the type of benefits being offered under the plan and the nature of the enrollment in the plan. As stated above, we recognize that we must be flexible in applying any minimum enrollment requirement to ensure that plans with legitimate reasons for low enrollments, such as lack of other health care plan options, specialized plan offering or recent establishment of the plan, may continue to operate. This flexibility will ensure that beneficiaries who might not otherwise have access to health care options offered by a low-enrollment plan will continue to have such access. Because we intend to apply this requirement in a flexible manner that considers the particular circumstances of each low enrollment plan, we do not **\*19741** believe it is necessary to modify the proposed regulations at § 422.506(b)(1)(iv) and § 423.507(b)(1)(iii) to provide explicitly for "waivers" of this requirement.

Comment: A commenter recommended that non-renewed plans be permitted to passively enroll affected enrollees into another plan offered by the MA organization or Part D sponsor.

Response: With respect to the recommendation to provide for passive enrollment of beneficiaries in a non-renewed plan into another plan offered by that organization, we believe this is appropriate only in limited circumstances when a compelling case can be made that such passive enrollment is in beneficiaries' best interests. In making such determinations, we take into consideration criteria such as benefits, cost sharing, the provider network, and premiums to ensure a comparable plan offering. In all other cases, we believe it is most appropriate to leave enrollment decisions to beneficiaries, who will have an opportunity during the annual coordinated election period to select another MA plan or Part D plan offered by the MA organization or Part D sponsor offering the plan being terminated. If a plan is terminated or nonrenewed, the affected organization or sponsor must follow all beneficiary and CMS advance notification requirements as specified in §§ 422.506, 422.508, 422.510, and 422.512 (MA program regulations), §§ 423.507, 423.508, 423.509, and 423.510 (Part D program regulations) and related guidance for both programs. In addition, passive enrollment initiated by an organization or sponsor in the absence of CMS approval is not among the transactions permitted by us in our annual renewal/non-renewal guidance. Because of these requirements and policies, an MA organization or Part D sponsor wishing to enroll members from the terminating or non-renewing plan into another of their plans could not do this without prior CMS review and consent. If we were to determine that such a transaction was in beneficiaries' best interests, we would, as is our practice, facilitate and closely monitor the process. We note as well

Case 2:16-cv-08697-FMO-PVC    Document 616-3    Filed 08/06/24    Page 625 of 637
Page ID #:19519
Medicare Program; Policy and Technical Changes to the Medicare... 75 FR 19678-01

that beneficiaries in terminated or non-renewed plans have guaranteed issue Medigap rights, access to information about other available health care options, and other information that will assist them in finding plans most suited to their needs.

Comment: Several commenters supported our proposal but asked that we make exceptions for SNPs. One commenter requesting the SNP exception wrote that "status as a SNP should be prima facie evidence that low enrollment is justified." A few of these commenters specifically requested that such exceptions be codified in the final regulations text. One commenter requested an exception be made for employer group plans. One commenter requested an exception for MA-only plans, stating that enrollees who get their prescription drugs through some means other an MA-PD should still have the option of remaining in an MA-only plan, and another commenter requested that "national" plans be exempted from these requirements.

Response: While we will consider exceptions on a case-by-case basis to any low-enrollment thresholds we establish, we do not believe it is necessary to exempt any specific plan type a priority. As we stated in the preamble to the proposed rule, there may be reasons for exceptions based on plan type, geography, or special health conditions of enrollees served that warrant a waiver of the requirements. However, a specific plan type, for example, a SNP or employer group plan, will not automatically be exempt from the minimum enrollment standard for renewal due to plan type alone. While sustained low enrollment may well be justified in the case of certain SNPs serving individuals with a relatively rare condition, a SNP serving an individual with a more common disease such as diabetes, or serving dual eligibles, should be able to attract enrollees. Similarly, we do not believe there is justification for exempting MA-only plans or "national" plans from the requirements unless there are other reasons to exempt them (for example, lack of other health care plan options, the specialized nature of the plan, or the recent establishment of the plan).

## 4. Medicare Options Compare and Medicare Prescription Drug Plan Finder

In the proposed rule we asked for comments on ways to improve the web tools, Medicare Options Compare (MOC), and the Medicare Prescription Drug Plan Finder (MDPF). We summarize and respond to these comments below.

Comment: One commenter requested that CMS add a function to limit the information that can be seen in the MOC so that users of the tool can focus on information they need most.

Response: The 2011 contract year update will include functions that expand and collapse which will help users of the MOC better focus on specific information.

Comment: Another commenter asked that the MOC contain direct links to the plan(s) discussed, not just the organization's Web site as is now often the case.

Response: We are not making the suggested change at this time as we believe that MOC already includes sufficient information to contact plans.

Comment: Another commenter requested that the tool clearly indicate what is meant by an "enhanced plan," even if this is just a general description in the tool of the typical features of an enhanced plan.

Response: We do not believe that revisions are necessary as information on enhanced plans is currently available in the glossary and at http://www.medicare.gov/medicarereform/howtoread.asp.

Comment: A commenter requested that CMS add back the search function in MPDPF notifying the user of the number of drugs covered by a particular plan. The same commenter requested that information be included about when a plan last updated its drug pricing information and that the tool includes information about coverage of drugs traditionally covered under Part B, for example, infused and injectable drugs for MA-PD plans.

WESTLAW    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:16-cv-08697-FMO-PVC    Document 616-3    Filed 08/06/24    Page 626 of 637
Page ID #:19520
Medicare Program; Policy and Technical Changes to the Medicare... 75 FR 19678-01

Response: Currently the drugs an individual beneficiary takes may be entered and displayed to determine coverage, but the MPDPF does not permit display a list of all the drugs a plan covers as this would take a very long time for the tool to display. CMS reviews drug pricing on a regular basis and the data is updated monthly to reflect any changes. We believe the compare function best permits users to tailor their searches for the specific drugs in the specific forms that they need.

Comment: Another commenter wrote that the MOC is relatively thorough but inconsistent in that some plans in the tool do not include information about health care costs and that saved searches often yield different results when retrieved later. The commenter recommended that the tool be refined to allow the user to move easily back and forth between information for MA and Part D plans, that the conditions required for enrollment in a chronic care SNP be specified, and that the function concerning costs for tiers of drugs is "incredibly unfriendly and confusing."

Response: We are considering how best to streamline and make the use of these comparative functions easier.

*19742 *D. Changes To Improve Payment Rules and Processes*

This section addresses three payment issues under Part C. These provisions are outlined in Table 4.

### Table 4^Improving Payment Rules and Processes

| Provision | Part 417/422 Subpart | Part 417/422 Section | Part 423 Subpart | Part 423 Section |
|---|---|---|---|---|
| Risk Adjustment Data Validation | Subpart F | § 422.2 | N/A | N/A. |
| Dispute and Appeals Process | Subpart G | § 422.311 | | |
| Payments to Medicare Advantage Organizations-Actuarial Valuation | Subpart F | § 422.254 | N/A | N/A. |
| Determination of Acceptable Administrative Costs by HMO/CMP Cost Contract and Health Care Prepayment Plans (HCPPs) | Subpart O | § 417.564 | N/A | N/A. |
| Calculation of the Minimum Percentage Increase under Part C | Subpart G | § 422.306 | N/A | N/A. |

## 1. Definitions Related to Risk Adjustment Data Validation Appeals (§ 422.2) and Addition of Medicare Advantage Organization Risk Adjustment Data Validation^Dispute and Appeal Procedures (§ 422.311)

In the October 22, 2009 proposed rule, we proposed regulations establishing an appeals process to be used by MA organizations to appeal the error calculation resulting from Risk Adjustment Data Validation (RADV) audits. As explained in the preamble of that proposed rule, under RADV audits and medical records are reviewed to determine whether they support diagnosis codes (known as Hierarchical Condition Codes, or HCCs) submitted to us under the MA risk adjustment methodology. Under this methodology, certain diagnosis codes are considered to signify higher costs for the enrollee, and therefore, we pay a higher amount to the MA organization for an enrollee to reflect these higher costs. If, in fact, a diagnosis code was not justified by the enrollee's medical condition, the higher payment amount associated with that diagnosis code would have been an overpayment. Under the RADV audit process we plan to recover the overpayments identified during the RADV audit. The appeals process we proposed in the October 22, 2009 proposed rule was intended to provide a mechanism for MA organizations to appeal the error calculation associated with the overpayments identified under RADV audits. We invited and received a large number of comments from health plans, managed care industry trade associations, and other interested parties regarding not only the proposed appeals process, but on the RADV audit process and underlying MA payment policy producing the overpayment

Case 2:16-cv-08697-FMO-PVC    Document 616-3    Filed 08/06/24    Page 627 of 637
Page ID #:19521
Medicare Program; Policy and Technical Changes to the Medicare...    75 FR 19678-01

findings and our definitions proposed at § 422.2. Since neither the statute nor existing MA program regulations currently specify a process for appealing overpayments resulting from RADV audits, the appeals process we proposed was based on our authority to establish MA program standards by regulation at section 1856(b)(1) of the Act. Specifically, we proposed adding a new § 422.311 to part 422, subpart G, to specify RADV dispute and appeal rights for MA organizations. We proposed regulatory provisions allowing MA organizations that undergo RADV audit(s) to^(1) submit physician and other practitioner signed attestations relating to physician and other outpatient medical records that had a missing signature, or credentials that resulted in a payment error finding; (2) dispute certain other types of medical record review-related findings through the use of a documentation dispute process; and (3) appeal our RADV payment error calculation. By availing themselves of these RADV dispute and appeal processes, we noted that MA organizations would be able to reduce their RADV payment error and thereby, reduce their overall estimated MA payment error. Therefore, we proposed the following provisions under part 422:

• To revise § 422.2 to add definitions of six terms that pertain to RADV activities, and thus to our proposals for implementing a RADV dispute and appeal processes.

• A new § 422.311 describing procedures that we would implement to afford MA organizations facing a potential overpayment determination resulting from RADV audits the opportunity to have certain potential RADV payment errors addressed in advance of RADV-audit-related payment error determinations, and to have other types of confirmed payment errors overturned. At § 422.311(a) and (b), we summarized the RADV audit procedures. Beginning with § 422.311(c), we proposed implementing a three-pronged RADV dispute and appeal procedure that MA organizations could employ to reduce their RADV payment error rate, including^

• Physician/practitioner attestation(s);

• Documentation dispute; and

• RADV payment error calculation appeal.

We noted that analysis of data originating from medical records submitted by MA organizations that have undergone RADV audit indicates that a substantial percentage of medical record-related payment error determinations are due to missing signatures or credentials on medical records. Medicare program rules dictate the necessity of physician signatures on medical records, and MA risk adjustment requirements dictate that risk adjustment diagnosis data be accepted only for health services that were provided by certain physician specialties. Therefore, RADV audit procedures require that, in addition to finding diagnosis information that would support the HCCs submitted by the MA organization for risk adjustment purposes, physician signatures, and appropriate credentials must be present on medical records. Medical records with missing signatures or credentials are scored as errors under RADV audit procedures. We estimated that if given the opportunity to do so, many physicians and other practitioners that provided the diagnosis information on RADV-reviewed medical records would in fact attest that they documented the information in these medical records, even though signatures and credentials were missing from those records. Moreover, the presence of a signature or credential attestation to accompany these medical records would in our opinion, provide justification for preventing both contract-level and national-level RADV payment errors  **19743**  that would otherwise originate from medical record signature, or credential-related discrepancies.

Therefore, in proposed § 422.311(c)(1), we proposed to implement a process that would allow MA organizations to voluntarily submit CMS attestations (that is, attestations developed and pre-populated by CMS). These attestations would be signed by physicians/practitioners who would attest responsibility for providing and documenting the health services in the physician and outpatient medical record(s) that were submitted for RADV audit. We specified at proposed § 422.311(c)(1)(ii) and (iii) that MA organizations would be eligible to use attestations to address signature or credential-related discrepancies only from physician or outpatient medical records; attestations would not be allowed to address signature or credential-related discrepancies found on inpatient medical records. The proposed use of an attestation would not in any way supplant the medical record, nor would

Case 2:16-cv-08697-FMO-PVC    Document 616-3    Filed 08/06/24    Page 628 of 637
Page ID #:19522
Medicare Program; Policy and Technical Changes to the Medicare... 75 FR 19678-01

it permit attesting physicians/practitioners to alter the existing medical record. Attestations would not be acceptable to address any issues outside of the RADV-audit process.

At proposed § 422.311(c)(1)(C)(iv), we indicated that we would prospectively notify MA organizations that if the "one best" medical record used to validate an audited HCC were missing a physician/practitioner signature or credential, the MA organization would be permitted to submit a CMS-RADV attestation along with the medical record, to fulfill the requirement that medical records contain physician/practitioner signatures and credentials.

We described the proposed process that we would jointly undertake to review attestations submitted for our review at proposed § 422.311(c)(1)(iv) and (v), noting the following:

• Only CMS-generated attestations that meet certain requirements described at § 422.311(c)(1) and (d) would be eligible for consideration. Failure to meet these requirements would result in us not reviewing or accepting submitted attestations.

• CMS attestations that have been altered or amended (for example, striking out prepopulated words and replacing them with hand-written replacement words) without instruction or written concurrence from us would not be accepted.

• Attestations would need to accompany the medical record at the same time that the medical record was submitted to us for RADV audit. MA organizations would not be permitted to submit attestations before or after submission of their RADV medical records.

• Attestations would need to originate from the physician/practitioner whose medical record accompanies and corresponds to the attestation. We would not accept attestations or medical records from any party other than the MA organization.

• Organizations would not be permitted to submit attestations during the documentation dispute or RADV reconsideration processes described at § 422.311(c)(2) and § 422.311(c)(3).

At proposed § 422.311(c)(1)(iv), we described the process that we would undertake to review attestations and notify appellant MA organizations of the results of these attestation reviews. Our attestation review determinations would be final and binding upon both parties and would not be eligible for further appeal.

We further proposed affording MA organizations the option of disputing other nonsignature or credential-types of RADV-related medical record diagnosis coding discrepancies via a proposed documentation dispute process that we described in new paragraph § 422.311(c)(2). Under our proposal, in order to be eligible for documentation dispute, MA organizations would need to submit their "one best" medical record in accordance with RADV medical record submission deadlines established by us during the RADV medical record request process.

At proposed § 422.311(c)(2)(a), we specified the types of RADV-related errors that would be eligible for the proposed documentation dispute process. The documentation dispute process would apply only to the errors that arise out of operational processing of medical records selected for RADV audits and submitted to us by established deadlines. In this context, errors that arise from operational processing mean errors that arise from the collection and processing of medical records for a RADV audit.

At § 422.311(c)(2)(ii), we proposed limitations that we would impose upon the documentation dispute process; namely that MA organizations would not be permitted to dispute any medical record coding discrepancies, nor would MA organizations be permitted to submit altogether new medical records in place of previously submitted medical records. Payment errors that resulted from missing medical records would not be eligible for documentation dispute. At proposed § 422.311(c)(2)(iii) and (iv), we indicated that we would prospectively notify MA organizations of RADV payment errors that would be eligible for documentation dispute, describe the documentation dispute process that we would undertake, along with the process that we would undertake to notify MA organizations of the results of documentation dispute reviews. As described at proposed §

422.311(c)(2)(v), our documentation dispute review determination would be final and binding upon both parties and would not otherwise be eligible for further administrative appeal.

Proposed § 422.311(c)(3) would establish an appeals process under which RADV payment error calculations would be subject to appeal. Unlike our proposed attestation process described at § 422.311(c)(1), and proposed documentation dispute process describe at § 422.311(c)(2), which would afford MA organizations the opportunity to dispute aspects of our medical record review process, the proposed RADV payment error calculation appeal process was specifically designed to afford MA organizations the opportunity to appeal our contract-level RADV payment error calculation. Under the proposed RADV payment error calculation appeal process, we proposed establishing a three-level appeal process whereby MA organizations may^

• Seek reconsideration;

• Appeal the reconsideration decision to an independent CMS Hearing Officer; and

• Appeal the decision of the independent CMS Hearing Officer to the CMS Administrator.

Given the complexity of RADV audits in general, and the calculation of RADV-related error rates in particular, we stated our belief that it was prudent to afford appellant MA organizations multiple-layers of RADV-related payment error appeal.

At proposed § 422.311(c)(3)(ii), we also specified that MA organizations would not, under the proposed RADV payment error calculation appeal process, be permitted to appeal medical record review errors, nor would MA organizations be permitted to seek formal appeal of physician or practitioner signature or credential-related review errors. We believed that medical record review-related issues would be addressed as a result of the rigorous medical record review process, and the attestation and documentation dispute processes described earlier in the proposed regulation. In accordance with our proposed regulation at § 422.311(c)(3)(i), the RADV payment error calculation appeals process would only apply to errors identified in the RADV payment error calculation. MA organizations would not be permitted to **\*19744** utilize the payment error calculation appeal process as a method for submitting any medical records for consideration in the calculation of the payment error. In order to be eligible for RADV payment error calculation appeal, MA organizations would need to adhere to established RADV audit requirements, including the submission of medical records in the manner and by the deadlines specified by CMS.

Furthermore, we noted that MA organizations would not be permitted to appeal our RADV payment error calculation methodology. Our justification for excluding methodological appeals was two-fold. First, we said the methodology that we planned to employ to calculate RADV payment errors was methodologically sound and academically defensible. We stated that we intended to ensure that all MA organizations understand the RADV payment error calculation methodology by providing annual notice to all MA organizations of the methodology that will be employed for calculating Part C payment errors. MA organizations that object to CMS' RADV payment error calculation methodology would be given an opportunity to provide comment to us under ours annual notice of RADV audit methodology. Second, in addition to providing an annual notice of RADV audit methodology, we stated that we would provide an expanded explanation of methodology as part of each RDV audit report that we send to MA organizations that undergo RADV audit. Included in this expanded explanation of methodology would be RADV payment error calculation factors unique to each audited MA organization that would enable the MA organization to independently calculate its own RADV payment error.

At proposed § 422.311(c)(3)(iii) and (v), we specified that MA organizations would be notified of their RADV payment error calculation appeal rights at the time we issue a RADV audit report to that organization. MA organizations would have 30 calendar days from the date of this notice to submit a written request for reconsideration of its RADV payment error calculation. A request for reconsideration would need to specify the issues with which the MA organization disagrees, the reasons for the disagreements and explain why the organization believes the issues are eligible for reconsideration. The request for reconsideration would need to include additional documentary evidence that the MA organization considers material to the reconsideration, though

MA organizations would be prohibited from submitting medical record-related evidence such as new or previously submitted medical records or physician or practitioner attestations and from appealing any issues pertaining to the methodology applied in any part of the RADV audit. At proposed § 422.311(c)(3)(iv), we further specified that the MA organization would bear the burden of proof to demonstrate that our RADV payment error calculation was clearly incorrect.

We described our proposal regarding the conduct of a RADV payment error calculation reconsideration, the decision of the reconsideration official and the effect of the CMS reconsideration decision official at proposed § 422.311(c)(3)(e) and (f).

At proposed § 422.311(c)(3)(v) and (vi), we described the first level of RADV payment error calculation appeal, the request for reconsideration of our RADV payment error calculation. Under this process a CMS official or our contractor not otherwise involved in error-rate calculation activity would review our RADV payment error calculation and any written evidence submitted by the MA organization that pertains to CMS' RADV payment error calculation, recalculate the payment error utilizing our RADV payment error calculation methodology (as specified in our standard operating procedures), and render a determination whether the RADV payment error calculation was accurate. This CMS official or CMS contractor not otherwise involved in RADV error-rate calculation activity would recalculate and arrive at an independent RADV payment error. Whether the official or contractor agreed with our payment error calculation, or overturned the calculation and established a new RADV payment error, this party's RADV payment error calculation determination would be issued to a CMS reconsideration official. The CMS reconsideration official would review their analysis and make a determination whether to accept or reject the findings of the CMS official or CMS contractor that recalculated the RADV payment error. In instances when the CMS official or contractor recommended overturning CMS' RADV payment error calculation and the reviewing CMS reconsideration official agreed with the newly calculated RADV payment error, we would issue a reconsideration decision which informed the appealing MA organization in writing of its reconsideration decision, in effect, notifying the MA organization of its new RADV payment error. If the reconsideration official upheld the decision of the CMS official or contractor to sustain our initial RADV payment error calculation, the reconsideration official similarly would notify the appellant MA organization of its determination. In either instance, the decision of the reconsideration official would be final and binding, unless a request for hearing was filed by CMS or the appellant MA organization.

At proposed § 422.311(c)(4), we clarified that if CMS or an MA organization were dissatisfied with the decision of the CMS reconsideration official described at § 422.311(c)(3), CMS or the MA organization would be permitted to request a second-level RADV payment error calculation appeal, which is a hearing on the RADV payment error calculation determination. CMS or MA organization choosing to pursue a hearing would be required to file a request for hearing within 30 calendar days of the date the MA organization received the written RADV payment error calculation reconsideration decision, as described at proposed § 422.311(c)(3)(vi).

We noted that CMS or MA organizations requesting a hearing would need to do so in writing, including a copy of the CMS reconsideration official's decision to either uphold or overturn the initial RADV payment error calculation, and specify the findings or issues in that reconsideration decision that they disagreed with and why they disagreed with them. The hearing would be conducted by the CMS Office of Hearings and presided over by a CMS Hearing Officer who neither receives testimony nor accepts any new evidence that was not presented with the request for reconsideration of the RADV payment error calculation. The hearing would be held on the record, unless the parties requested, subject to the Hearing Officer's discretion, a live or telephonic hearing. The Hearing Officer would also be permitted to schedule a live or telephonic hearing upon their own motion. The CMS Hearing Officer would be limited to a review of the record that was used for the initial RADV payment error calculation and the reconsidered RADV payment error calculation.

Additionally, we noted that the Hearing Officer would have full power to make rules and establish procedures, consistent with the law, regulations, and CMS rulings. These powers would include the authority to take appropriate action in response to failure of an organization to comply with such procedures.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

At proposed § 422.311(c)(4)(iv), we also indicated that the CMS Hearing Officer would review and decide **\*19745** whether the reconsideration official's decision was correct and to notify CMS and the MA organization in writing of his/her decision, explaining the basis for the decision, which would be final and binding, unless the decision was reversed or modified by the CMS Administrator in accordance with § 422.311(c)(5).

We explained that the third level of RADV payment error calculation appeal that MA organizations can request would be discretionary review by the CMS Administrator. We described this proposed process at § 422.311(c)(5). At this level of appeal, CMS or the MA organization would be permitted to appeal the decision of the CMS Hearing Officer by requesting that the CMS Administrator review the CMS Hearing Officer's determination. Parties requesting CMS Administrator review would have to request the review within 30 calendar days of receipt of the CMS Hearing Officer's determination. If the Administrator agreed to review the case, the Administrator would review the Hearing Officer's decision as well as any other information included in the record of the Hearing Officer's decision and would determine whether to uphold, reverse, or modify the CMS Hearing Officer's decision. The Administrator's determination would be final and binding.

We also noted that, based on our experience with appeals of MA and Medicare Part D program contract determinations, we have determined that it would be necessary for us to establish a "compliance date" to use as a reference point in issuing a ruling regarding RADV audit findings. Therefore, we proposed at § 422.311(b)(2), to require that the compliance date for meeting Federal regulations requiring MA organizations to submit medical records for the validation of risk adjustment data (§ 422.310(e)) also be the due date when MA organizations (or their contractor(s)) selected for RADV audit would need to submit medical records to us. We stated we would inform an MA organization in writing regarding selection for RADV audit, including the due date for submission of medical records.

We invited and received a large number of comments from health plans, managed care industry trade associations, and other interested parties regarding not only the proposed appeals process described in proposed § 422.311^but also the RADV audit process and underlying Medicare Advantage payment policy. These comments have resulted in changes to our above-described proposals as discussed below.

While many comments that we received relate to the underlying RADV audit process and risk adjustment methodology and may not directly address the RADV appeals process specifically, we are responding to these comments, because they appear to be relevant to the RADV appeals process that we had proposed in our Notice of Proposed Rulemaking. Certain comments were outside the scope of our proposed rule and we have not included responses to those comments.

Comment: A comment alleged that it was premature for CMS to propose rules related to the RADV appeals process because the commenter stated that the Administrative Procedure Act (APA) required that the underlying RADV audit process giving rise to the overpayments that would be appealed under our proposed regulations be subjected to notice and comment rulemaking.

Response: We disagree and believe that the RADV audit process does not establish any substantive rules within the meaning of the APA or section 1871 of the Act, but rather is a means for ensuring that payments made to MA organizations comply with substantive rules governing MA payments that are set forth in the statute, and in regulations that have been subjected to notice and comment procedures. Regulations specifying that payment amounts are subject to audit (for example, § 422.504(d)(1)(i) have been subjected to notice and comment procedures, and provide ample notice of the fact that we have the right (and, indeed, the duty) to ensure that MA payment amounts are accurate. See also, § 422.310(e), which states that MA organizations and their providers and practitioners will be required to submit a sample of medical records for the validation of risk adjustment data, as required by CMS, and that there may be penalties for submission of inaccurate data.

Indeed, we would point out that throughout the Medicare program, and government programs generally, audit policies and procedures intended to ensure or verify payment accuracy assist in the enforcement of rules, and are not themselves substantive rules subject to APA notice and comment procedures. Therefore, to the extent we are providing a RADV appeals process, we are

Case 2:16-cv-08697-FMO-PVC    Document 616-3    Filed 08/06/24    Page 632 of 637
Page ID #:19526
Medicare Program; Policy and Technical Changes to the Medicare..., 75 FR 19678-01

providing an opportunity that does not currently exist for MA organizations to appeal audit findings that they would otherwise not have been permitted to question.

Comment: Some commenters stated that CMS did not follow proper procedures and stated that procedures set forth in our proposed regulations, such as our "one best medical record" and other documentation requirements, established a substantive legal standard governing the payment to MA organizations, and therefore, they had to be included in the annual notice of changes to payment methods required under section 1853(b)(2) of the Act, which requires that MA organizations be afforded an opportunity to comment on changes in the methodology for determining MA payments.

Response: We disagree. The requirement in section 1853(b)(2) of the Act to provide an advance notice of methodological changes to MA organizations of proposed changes to the methodology and assumptions used to compute annual MA capitation rates pertains to the methodology for determining the proper amount of payment. All substantive changes to the risk adjustment methodology at issue in the RADV audit process have been described in the annual advance notice. The RADV audit process and appeals procedures proposed in the October 22, 2009 proposed rule do not make any substantive changes in the methodology for determining MA payment amounts. Rather, they are designed to ensure that this payment methodology has been applied correctly, and the MA organization has received the amount to which it was entitled under this methodology. The risk adjustment methodology provides that a specific amount is paid if an enrollee has a particular condition. The RADV audits and appeals process are designed to ensure that the enrollee in fact has that condition, and that the MA organization is thus entitled to the amount that has been paid for that condition. The fact that audits might determine that an MA organization was not, in fact, paid correctly, is not a change in methodology or assumptions related to how the payment amount is to be determined and therefore is not subject to the advance notice requirements under section 1853(b)(2) of the Act. Nonetheless, in our October 22, 2009 proposed rule, we proposed to provide notice of RADV audit methodology to the public, as well as a summary of RADV methodology issues for each audited MA organization at the time we issue our audit finding pursuant to an actual RADV audit. We offered to provide details of our RADV audit methodology in an attempt to provide additional transparency related to the process. We anticipate providing additional notice of RADV audit methodology to the public by publishing the methodology in some **\*19746** type of Medicare program document^most likely in a Medicare manual later this year (2010).

Comment: A commenter stated that CMS was not complying with requirements in section 1871(a)(2) of the Act, which states that "No rule, requirement, or other statement of policy (other than a national coverage determination) that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, * * * shall take effect unless it is promulgated by the Secretary by regulation* * *"

Response: As discussed previously, the RADV audit process, and the appeals procedures addressed in this rulemaking, do not "establish" or "change" any "substantive legal standard governing * * * payment." To the contrary, they are designed to ensure that the substantive legal standards for payment set forth in the statute and regulations are correctly applied. The substantive rules governing the amount of payment to which the MA organization is entitled are unchanged as governed by statute and implementing regulations.

Comment: A commenter urged that CMS suspend RADV audits until such time as CMS subjects the rules to notice and comment rulemaking.

Response: As discussed previously, we do not believe subjecting the RADV audit process to rulemaking is required or appropriate, there would be no basis for suspending the audit process.

Comment: One commenter noted that when the risk adjustment system was initially established, the Secretary was required to submit a report to Congress in accordance with section 1853(a)(3)(A) of the Act that documented the proposed method of risk adjustment of MA payment rates, and that included an evaluation of the method by an outside, independent actuary of the actuarial soundness of the proposal. The commenter believed that such an evaluation was required in the case of the RADV audit process.

Case 2:16-cv-08697-FMO-PVC    Document 616-3    Filed 08/06/24    Page 633 of 637
Page ID #:19527
Medicare Program; Policy and Technical Changes to the Medicare... 75 FR 19678-01

Response: We disagree that RADV audits impact the risk adjustment system in any manner. As indicated earlier, RADV audits are solely to verify that the risk adjustment methodology is being correctly applied.

We also received a large number of comments from MA organizations, managed care trade associations and a law firm regarding RADV methodological-related issues. While some comments were not relevant to the rules that CMS proposed regarding the RADV appeals process, there were a number of comments that we believe should be addressed, and as such, we do so as follows.

Comment: Many commenters recommended that CMS independently test and validate its RADV methodology before CMS implements it. The commenters indicated that CMS failed to provide any record of submitting its methodologies to an academic review and that if CMS has done so, we should have included such studies with the proposed rule so that interested parties could review and comment on any of these academic studies. The commenters recommended that CMS provide a process that permits thorough review and comment by plans of RADV audit methodology issues before undertaking further RADV audits. Several commenters further recommended that all methodological issues pertaining to RADV audits be appealable.

Response: Previously in this preamble we indicate that the process of independently reviewing medical records to validate risk adjustment data submitted by MA organizations for payment purposes has been established and operational for more than 10 years. Over the course of this timeframe, we have been advised on the RADV process by statisticians, senior analysts, expert medical record coders, physicians, managed care professionals, and other health care providers. From a medical record coding perspective, we have secured expert direction from Peer Review Organizations (PROs) (in the past) and Quality Improvement Organizations (QIOs) (currently) by incorporating them into the RADV team. From an analytic design and implementation perspective, we have in the past and continue to employ senior level expert analysts from different academic fields as independent contributors to the RADV operations team to review and validate the accuracy of the findings across the RADV process, including peer review of statistical sampling and payment error calculation methodologies. The independent expert analysis and review is similar to that conducted in an academic setting in that the participating parties are credentialed in a specific field of study, such as statistics, and possess substantial years of expertise conducting similar processes and analyses. The independent methodology review processes also involve the use of internal controls, and tests for consistency and accuracy. RADV procedures are subject to the evaluation requirements of the CMS Annual Financial Audit.

In addition, the RADV methodology that we employ in the process of reporting a component of the national Part C payment error is similar to the methodological approach that we employ in conducting contract-specific RADV audits and error calculations. This methodology has been reviewed and approved by officials at the HHS.

This notwithstanding, in considering the commenters' questions, where necessary, we will incorporate additional independent third party review for purposes of validating RADV error-calculation methodology. As indicated in our proposed rule and cited elsewhere in the preamble to this final rule, we intend to publish its RADV methodology in some type of public document-most likely, a Medicare Manual, so that the public can review and provide comment as it deems necessary. Finally, to ensure that audited organizations understand how their RADV error rate was calculated, as indicated in our proposed rule, we further intend to describe our RADV methodology in each audited organization's RADV audit report.

Given these efforts to ensure that the RADV process is transparent to audited MA organizations and the public, and that the methodology used under that process is reasonable, consistent, and accurate, we do not believe any further action is required.

Comment: Several commenters argued that CMS should include Medicare plan enrollees for whom no diagnosis code was submitted under the risk adjustment methodology as part of its RADV error testing samples. These commenters also recommended that CMS include "under-coding" findings in the audit error estimates in order to more accurately account for members' health status.

Response: Our RADV audit policy does account for both underpayments and overpayments. The RADV process addresses under-coding through the application of rules for crediting a sampled enrollee with additional HCCs that are identified incidentally, during medical record review. We emphasize that these "additional" diagnoses were not originally submitted for payment for enrollees selected in the sample, and yet we provide audited organizations credit through our RADV medical record review process.

However, we have not and do not expect to sample enrollees for whom no HCCs were submitted. This is because the RADV is an audit process that is intended to validate the HCCs that were submitted by MA organizations in order to determine whether the additional payment amounts associated with these  **\*19747**  diagnosis codes were properly made. Under our separate Risk Adjustment Data Submission Process, the data submission period for any given payment year is lengthy and extends beyond the actual payment year, providing a substantial amount of time for organizations to submit and/or correct enrollee HCC risk adjustment data for any given payment year^to reflect of enrollee health status. This is sufficient time for plans to submit data on all their enrollees, including those with no HCCs. The RADV audit process is not intended to serve as a de facto mechanism for extending the HCC data submission deadlines under which MA organizations operate.

We received a number of comments from MA organizations and a law firm regarding the financial impact of RADV audits. While these comments did not pertain directly to our proposed RADV appeals procedures, some comments nevertheless indirectly impact the RADV appeals rules. Therefore, we respond to several of these comments here.

Comment: Several commenters suggested that CMS's proposed methodology to calculate and apply error rates and payment adjustments across contract years after payments were made undermines the actuarially-based risk assumptions inherent in Plans' bid submissions.

Response: Regarding the assertion that RADV audits undermine the Part C bidding process, beginning with the introduction of the HCC risk adjustment model for CY 2004, we have published clear guidelines to be followed by MA organizations in the collection and support of diagnosis codes underlying risk scores for plan enrollees. In their preparation of a MA bid, certifying actuaries are expected to ensure that the underlying data are reasonable and appropriate for the circumstance, including the base year risk scores. If the ultimate risk scores for a plan's population are lower than initially forecast by the certifying actuary, then the plan is likely to experience lower than expected margin. Conversely, if the ultimate risk scores for a plan's population are higher than initially forecast by the certifying actuary, then the plan is likely to experience greater than expected margin. These results illustrate the nature of health plan capitation and the risk borne by MA organizations.

Comment: Commenters stated that the establishment of an audit methodology that involves retrospective contract-level payment adjustments creates the potential for unpredictable retroactive liability that MA organizations could not have considered in developing bids for affected prior years. Commenters suggested that CMS' sampling methodology undercuts the mandate in section 1854(b)(6)(B)(iv) of the Act that MA organizations' rates reflect the revenue needs of the organization. The commenters assert that MA organizations did not develop bid submissions for calendar years 2006 through 2009 with an expectation that CMS would implement contract-wide payment adjustments based on provider documentation issues outside of the MA organizations' control. As a result, if payments effectively are reduced retroactively as the result of RADV audits, the bid submissions (and resulting payments) arguably would not adequately reflect Plans' risks, and MA organizations may be forced to dip into their reserves to repay dollars that were not anticipated to be at risk.

Response: We disagree. If plan bids are developed based on faulty data, such as inappropriate claim costs or risk score data, there is a greater likelihood of error in the bid projection. There are many factors that influence the accuracy of bid projection, and data quality is just one such factor. There is no legal authority to change a bid amount after it has been accepted regardless if additional information suggests that the bid is too high or too low.

In general, it is our belief that health plans are confusing actuarial equivalence in payment amount^ which demographic adjustments, risk adjustment methodology, and coding intensity adjustment are all designed to achieve^ with differences in

the way costs are documented. Because MA organizations are paid on a capitation basis, costs are not covered for a specific service provided. Rather, they are based on the actuarial value of such costs. The risk adjustment methodology uses diagnosis codes as a proxy for higher costs associated with a particular diagnosis. Because, under original Medicare, costs of specific services received are reimbursed, the diagnoses leading to such costs being incurred have a different relevance under original Medicare than they do under the Medicare Part C payment system. The risk adjustment methodology and RADV audit process that we employ to ensure accuracy under Medicare Part C actually further actuarial equivalence, rather than conflicting with it. The differences between MA and original Medicare are simply attributable to differences in how payment is made. It is these differences that necessitate the actuarial equivalence standard in the first place.

Comment: Several commenters questioned whether CMS's RADV medical record review coders have the qualifications and experience necessary to code RADV-related medical records. Commenters specifically questioned whether RADV coders were equipped to code accurately in situations in which clinical training may be required in order to recognize all extractable ICD-9 codes. They inquired into the certification and coding experience qualifications for the RADV coders.

Response: The coders that CMS uses to review RADV medical records are fully qualified to code RADV-related medical records. All coders are professionally certified for example, Certified Professional Coder (CPC), Certified Coding Specialist (CCS), Registered Health Information Administrator, (RHIA) and Registered Health Information Technician (RHIT), and must have prior experience coding medical records. Coders have access to physician consultation as needed. Coders also have access to our Independent Coding Consultant^a coding expert with more than 10 years of professional coding experience, which we require to be RHIA, coding certified and to have at least 5 years of experience in RADV-specific coding.

Comment: Several commenters objected to what they contend is a burden that RADV audits impose upon the physicians and physician practices who must produce medical records necessary to conduct audits. These commenters recommended that CMS take into account the potential impacts of more aggressive program integrity efforts on the medical practices that provide care to MA plan enrollees. Outside of the proposed rule, we have also received letters arguing that the burden associated with RADV audits is not limited to the CMS' audits but also extends to internal audit activity undertaken by Medicare health plans that mimics the RADV audits that we undertake for Medicare payment validation. These commenters raised concerns that Medicare health plans were misrepresenting their internal audit activity as official CMS RADV audits.

Response: Section 422.310(e) requires that providers who voluntarily enter into contracts with MA organizations submit data to CMS contractors/IVCs for RADV audits. In an effort to minimize the burden associated with this activity, we have developed best practices that we encourage health plans to employ in their efforts to gather medical records from providers and hospitals. To the extent MA organizations employ these practices, it is our belief that the impact of RADV audits on providers can be minimized.

 *19748  We also understand the increasing need for providers to be able to distinguish when they are being asked for medical records in association with an MA plan's own audit or in accordance with an official Medicare program RADV audit which is subject to legislative requirements. Therefore, we issue letters on our letterhead that MA organizations must use when requesting medical records from providers when the request is specifically related to an official CMS RADV audit. Providers may rely upon these letters as an indicator that a given medical record request is for CMS' RADV, and providers may request this authorizing letter before responding to requests by the MA plan.

We received a large number of comments from MA organizations, managed care trade associations and a law firm regarding the "one best medical record" policy that CMS proposed to apply to the RADV program. By way of explanation, the "one best medical record" policy specifies that for any one sampled beneficiary^with any one HCC^the MA organization is allowed to select and submit supporting medical record documentation of a face-to-face encounter for a physician or outpatient visit (one date of service) or an inpatient stay (range of dates from admit to discharge). The face-to-face encounter would have needed to occur at some point during the data collection year (from January 1st to December 31[FNst]).

Case 2:16-cv-08697-FMO-PVC    Document 616-3    Filed 08/06/24    Page 636 of 637
Page ID #:19530
Medicare Program; Policy and Technical Changes to the Medicare ... 75 FR 19678-01

Comment: Commenters contended that the one best medical record policy forces plans to omit relevant data that could be supported through documentation that CMS does not permit^such as prescription drug data and lab results.

Response: The RADV risk adjustment model is based upon FFS claims data from specific risk adjustment provider types, and not alternative data sources, such as, prescription drug data or lab results. Therefore, the RADV audit process is based upon supporting medical record documentation from provider data sources that are used to calibrate the model. As for the one best medical record policy, while MA organizations that voluntarily submit HCCs for Medicare payment are prospectively paid based on these unaudited and unvalidated HCCs submissions, we, upon the recommendation of MA organizations, agreed to allow any one medical record from across an entire data collection period to validate an HCC incorporated into the payment to the MA organization.

Comment: Some commenters contend that if CMS is going to rely on the one best medical record policy to the exclusion of other sources of information that might confirm an HCC, the RADV appeals process should allow for HCC medical record review findings to be appealed.

Response: To address these comments as described in § 422.311(c)(2) of this final rule, we have revised the process so that MA organizations may appeal medical record review determinations in accordance with the procedures specified in § 422.311(c)(2).

Comment: A number of commenters argued that the one best medical record policy is flawed in that it provides an insufficient basis for confirming an HCC for members with chronic diseases when a collection of several records, perhaps from various providers, considered in the aggregate might better verify a patient's condition.

Response: We disagree. In the case of a chronic disease such as congestive heart failure, all that is required is medical record documentation from one visit to a physician or a hospital, over the course of the data collection year, to validate the audited HCC.

Comment: We received several comments comparing the RADV audit and appeals process to varying program attributes of the Medicare FFS program. For example, some commenters argued that CMS' one best medical record rule conflicts with Medicare FFS standards since there is no one best medical record rule applied to Medicare payment error-rate testing for FFS providers.

Response: Payment error-testing under original Medicare is different than payment error testing under Medicare Part C. Under original Medicare, much of what comprises the error testing regimen is aimed at validating that a particular level of service was provided and therefore justifies a given level of Medicare payment. Under RADV, the payment error testing focuses on validating HCCs by examining medical records to determine whether they contain supporting diagnostic codes. This error testing is aimed at validating that a particular Medicare beneficiary indeed has the medical condition for which the MA organization has been paid for, and not whether a particular level of service (for example, level 1 office visit vs. level 2 office visits) was provided. Moreover, there is no evidence to support the notion that the Congress, in establishing the Part C payment process, ever intended the Part C payment process to mimic payment processes under Original Medicare. Indeed, they are fundamentally different.

Moreover, we believe that the one best medical record policy and the operational process associated with it are far less restrictive than Medicare FFS. MA organizations are not limited to the specified date(s) of service they reported to us with regard to selecting a medical record as supporting documentation for a specific HCC. We continue to believe that the one best medical record policy is appropriate for the Medicare Part C risk adjusted payment system which is distinct from a FFS payment system where payment is determined on a claim-by-claim basis. Under Part C, we only require that plans send one HCC for payment for an entire year; it therefore logically follows that we would only require one medical record to validate this HCC.

Comment: Some commenters stated that the one best medical record rule was inconsistent with the mandate that MA payment adjustments be actuarially equivalent to the FFS sector.

Response: It is our belief that health plans are confusing actuarial equivalence in payment amount^ which demographic adjustments, risk adjustment methodology, and coding intensity adjustment are all designed to achieve^with differences in the way costs are documented. Because MA organizations are paid on a capitation basis, costs are not covered for a specific service provided. Rather, they are based on the actuarial value of such costs. The risk adjustment methodology uses diagnosis codes as a proxy for higher costs associated with a particular diagnosis. Because, under original Medicare, costs of specific services received are reimbursed, the diagnosis leading to such costs being incurred has a different relevance under original Medicare than they do under the Medicare Part C payment system. The risk adjustment methodology and RADV audit process that we employs to ensure accuracy under Medicare Part C we believe furthers actuarial equivalence, rather than conflicts with it. The differences between MA and original Medicare are simply attributable to differences in how payment is made. It is these differences that necessitate the actuarial equivalence standard in the first place.

Comment: A commenter noted that in Medicare Part A and B appeal contexts, supplemental information and testimony are considered, and given such weight as the fact finder determines is appropriate.

Response: Under our proposed appeals procedures that affords MA organizations the ability to appeal the Part C error calculation specifiedat § 422.311(c)(3), the CMS Hearing Officer **19749** has the discretion to conduct the hearing in alternative ways beyond conducting the hearing on the record. For example, the Hearing Officer can choose to conduct the hearing by way of teleconference or in person. The CMS Hearing Officer also has the discretion to request supplemental information or to accept testimony, as he or she deems necessary. Also, under the medical record review appeal processes that we specify at § 422.311(c)(2), we afford MA organizations the ability to submit supplemental information^the attestation reviewed by the IVC^ to validate the same HCC that the Initial Validation Contractor (IVC) initially determined to be in error.

Comment: Several commenters, focusing on the relationship between MA organizations and their providers, noted that errors in documentation are ultimately attributable to providers, not MA organizations. These commenters argued that, due to the nature of the MA program, while CMS makes a capitated payment to organizations that have relationships with providers, these providers may not have an incentive to document the HCCs which affect payment to the MA organization. The commenters also stated that contract-level payment adjustments penalize MA organizations, while it is providers who are responsible for maintaining adequate records. A commenter also suggested that we accept "other data" to supplement, or substitute, a medical record.

Response: Section 422.504(i)(1) clarifies for MA organizations that they are ultimately responsible for the risk adjustment information submitted to CMS. This section of the regulations states, "Notwithstanding any relationship(s) that the MA organization may have with first tier, downstream, and related entities, the MA organization maintains ultimate responsibility for adhering to and otherwise fully complying with all terms and conditions of its contract with CMS." MA organizations are further directed in § 422.504(i)(2) that all their "first tier, downstream, and related entities are required to agree that HHS, the Comptroller General, or their designees have the right to audit, evaluate, and inspect * * * medical records." Therefore, while we acknowledge the comments, we maintain that it is the responsibility of MA organizations to ensure that they submit accurate risk adjustment information, and that the providers with whom they contract are aware that we have authority to audit medical records to verify this information.

We do not require MA organizations to submit HCCs for beneficiaries; MA organizations choose whether or not to do so. For risk adjustment diagnoses that are submitted, it is the responsibility of the MA organization to obtain appropriate documentation. If MA organizations are not confident in the information they obtain from their providers, they may wish to initiate education efforts, or include provisions in their contracts that ensure providers appropriately document diagnoses and provide medical record documentation to the plan upon request.

In regards to supplemental information, we have determined, and MA plans have been informed multiple times, that the appropriate format for obtaining risk adjustment information is a medical record. For validation purposes, plans are asked to submit the one best medical record documenting the HCC. We carefully determined the one best medical record policy, after