LATHAM & WATKINS LLP
  David J. Schindler (Bar No. 130490)
   *david.schindler@lw.com*
  Manuel A. Abascal (Bar No. 171301)
   *manny.abascal@lw.com*
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone: +1.213.485.1234;
Facsimile: +1.213.891.8763

*Attorneys for United Defendants*

MICHAEL D. GRANSTON
Deputy Assistant Attorney General, Civil Division
E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
ROSS M. CUFF
JACK D. ROSS (CBN 265883)
HUNTER B. THOMSON (CBN 330533)
Assistant United States Attorneys
300 N. Los Angeles Street, Room 7516
Los Angeles, California 90012
Tel: (213) 894-6379; Fax: (213) 894-7819
Email: *hunter.thomson@usdoj.gov*

*Attorneys for the United States of America*

[Additional Counsel Listed on Next Page]

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BENJAMIN POEHLING, <br><br> Plaintiff, <br><br> v. <br><br> UNITEDHEALTH GROUP, INC. *et al.*, <br><br> Defendants. | CASE NO. 2:16-cv-08697-FMO-PVCx <br><br> **JOINT EVIDENTIARY APPENDIX** <br><br> **VOLUME 3 OF 14** <br> **EXHIBITS D-16 THROUGH D-25** <br> **PAGES 0635 THROUGH 0707** <br><br> Hon. Fernando M. Olguin <br><br> Hearing Date: September 5, 2024 <br> Hearing Time: 10:00 a.m. <br> Courtroom: 6D |

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

1  LATHAM & WATKINS LLP
       Daniel Meron (appearing *pro hac vice*)
2        daniel.meron@lw.com
       Abid R. Qureshi (appearing *pro hac vice*)
3        abid.qureshi@lw.com
   555 Eleventh Street, NW, Suite 1000
4  Washington, DC 20004-1304
   Telephone: +1.202.637.2200
5  Facsimile: +1.202.637.2201

6  BARTLIT BECK LLP
       Philip S. Beck (appearing *pro hac vice*)
7        philip.beck@bartlitbeck.com
       Sean W. Gallagher (appearing *pro hac vice*)
8        sean.gallagher@bartlitbeck.com
       Cindy L. Sobel (appearing *pro hac vice*)
9        cindy.sobel@bartlitbeck.com
       Nicolas Martinez (appearing *pro hac vice*)
10       nicolas.martinez@bartlitbeck.com
       Benjamin R. Montague (appearing *pro hac vice*)
11       benjamin.montague@bartlitbeck.com
   54 W. Hubbard Street, Suite 300
12 Chicago, Illinois 60654-8174
   Telephone: +1.312.494.4400
13 Facsimile: +1.312.494.4440

14 BARTLIT BECK LLP
       Andrew C. Baak (appearing *pro hac vice*)
15       andrew.baak@bartlitbeck.com
       Jameson R. Jones (appearing *pro hac vice*)
16       jameson.jones@bartlitbeck.com
   1801 Wewatta Street, Suite 1200
17 Denver, Colorado 80202-6318
   Telephone: +1.303.592.3100
18 Facsimile: +1.303.592.3140

19 *Attorneys for United Defendants*

20
   JAMIE ANN YAVELBERG
21 ROBERT McAULIFFE
   EDWARD CROOKE
22 LINDA McMAHON
   JESSICA E. KRIEG
23 AMY L. LIKOFF
   GREGORY A. MASON
24 MARTHA N. GLOVER
   WENDY ZUPAC
25 Attorneys, Civil Division, U.S. Department of Justice
           P.O. Box 261, Ben Franklin Station
26         Washington, D.C. 20044
           Tel: (202) 307-0486; Fax: (202) 307-3852
27         Email:  robert.mcauliffe@usdoj.gov
   TRINI E. ROSS
28 United States Attorney

DAVID CORIELL
Assistant United States Attorney
138 Delaware Avenue
Buffalo, New York 14201
Tel: (716) 843-5830; Fax: (716) 551-3052
Email: david.coriell@usdoj.gov

*Attorneys for the United States of America*

**EXHIBIT D-16**

**1918**    Federal Register / Vol. 79, No. 7 / Friday, January 10, 2014 / Proposed Rules

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Centers for Medicare & Medicaid Services

**42 CFR Parts 409, 417, 422, 423, and 424**

[CMS–4159–P]

RIN 0938–AR37

### Medicare Program; Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs

**AGENCY:** Centers for Medicare & Medicaid Services (CMS), HHS.

**ACTION:** Proposed rule.

**SUMMARY:** The proposed rule would revise the Medicare Advantage (MA) program (Part C) regulations and prescription drug benefit program (Part D) regulations to implement statutory requirements; strengthen beneficiary protections; exclude plans that perform poorly; improve program efficiencies; and clarify program requirements. The proposed rule also includes several provisions designed to improve payment accuracy.

**DATES:** To be assured consideration, comments must be received at one of the addresses provided below, no later than 5 p.m. on March 7, 2014.

**ADDRESSES:** In commenting, please refer to file code CMS–4159–P. Because of staff and resource limitations, we cannot accept comments by facsimile (FAX) transmission.

You may submit comments in one of four ways (please choose only one of the ways listed):

1. *Electronically.* You may submit electronic comments on this regulation to *http://www.regulations.gov.* Follow the "Submit a comment" instructions.

2. *By regular mail.* You may mail written comments to the following address ONLY: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–4159–P, P.O. Box 8013, Baltimore, MD 21244–8013.

Please allow sufficient time for mailed comments to be received before the close of the comment period.

3. *By express or overnight mail.* You may send written comments to the following address ONLY: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–4159–P, Mail Stop C4–26–05, 7500 Security Boulevard, Baltimore, MD 21244–1850.

4. *By hand or courier.* Alternatively, you may deliver (by hand or courier)

your written comments ONLY to the following addresses prior to the close of the comment period: a. For delivery in Washington, DC—Centers for Medicare & Medicaid Services, Department of Health and Human Services, Room 445–G, Hubert H. Humphrey Building, 200 Independence Avenue SW., Washington, DC 20201.

(Because access to the interior of the Hubert H. Humphrey Building is not readily available to persons without federal government identification, commenters are encouraged to leave their comments in the CMS drop slots located in the main lobby of the building. A stamp-in clock is available for persons wishing to retain a proof of filing by stamping in and retaining an extra copy of the comments being filed.) b. For delivery in Baltimore, MD— Centers for Medicare & Medicaid Services, Department of Health and Human Services, 7500 Security Boulevard, Baltimore, MD 21244–1850.

If you intend to deliver your comments to the Baltimore address, call telephone number (410) 786–9994 in advance to schedule your arrival with one of our staff members.

Comments erroneously mailed to the addresses indicated as appropriate for hand or courier delivery may be delayed and received after the comment period.

For information on viewing public comments, see the beginning of the **SUPPLEMENTARY INFORMATION** section.

**FOR FURTHER INFORMATION CONTACT:** Christopher McClintick, (410) 786–4682, Part C issues. Marie Manteuffel, (410) 786–3447, Part D issues. Kristy Nishimoto, (206) 615–2367, Part C and D enrollment and appeals issues. Whitney Johnson, (410) 786–0490, Part C and D payment issues. Clarisse Owens, (410) 786–0880, Part C and D compliance issues. Frank Whelan, (410) 786–1302, Part D improper prescribing issues.

**SUPPLEMENTARY INFORMATION:** *Inspection of Public Comments:* All comments received before the close of the comment period are available for viewing by the public, including any personally identifiable or confidential business information that is included in a comment. We post all comments received before the close of the comment period on the following Web site as soon as possible after they have been received: *http://www.regulations.gov.* Follow the search instructions on that Web site to view public comments.

Comments received timely will also be available for public inspection as they are received, generally beginning approximately 3 weeks after publication

of a document, at the headquarters of the Centers for Medicare & Medicaid Services, 7500 Security Boulevard, Baltimore, Maryland 21244, Monday through Friday of each week from 8:30 a.m. to 4 p.m. To schedule an appointment to view public comments, phone 1–800–743–3951.

## Table of Contents

I. Executive Summary
  A. Purpose
  B. Summary of the Major Provisions
  1. Eligibility of Enrollment for Individuals Not Lawfully Present in the United States
  2. Modifying the Agent/Broker Requirements, Specifically Agent/Broker Compensation
  3. Drug Categories or Classes of Clinical Concern
  4. Improving Payment Accuracy
  5. Risk Adjustment Data Requirements (§ 422.310)
  C. Summary of Costs and Benefits
II. Background
III. Provisions of the Proposed Regulations
  A. Clarifying Various Program Participation Requirements
  1. Closing Cost Contract Plans to New Enrollment (§ 422.2 and § 422.503)
  2. Two-Year Limitation on Submitting a New Bid in an Area Where an MA has been Required To Terminate a Low-Enrollment MA Plan (§ 422.504(a)(19))
  3. Authority To Impose Intermediate Sanctions and Civil Money Penalties (§ 422.752, § 423.752, § 422.760 and § 423.760)
  4. Contract Termination Notification Requirements and Contract Termination Basis (§ 422.510 and § 423.509)
  5. Reducing the Burden of the Compliance Program Training Requirements (§ 422.503(b)(4)(vi)(C) and § 423.504(b)(4)(vi)(C))
  6. Changes To Audit and Inspection Authority (§ 422.503(d)(2) and § 423.504(d)(2))
  7. Procedures for Imposing Intermediate Sanctions and Civil Money Penalties Under Parts C and D (§ 422.756 and § 423.756)
  8. Timely Access to Mail Order Services (§ 423.120)
  9. Collections of Premiums and Cost Sharing (§ 423.294)
  10. Enrollment Eligibility for Individuals Not Lawfully Present in the United States (§§ 417.2, 417.420, 417.422, 417.460, 422.1, 422.50, 422.74, 423.1, 423.30, and 423.44)
  a. Basic Enrollment Requirements
  b. Medicare Eligibility and Lawful Presence
  c. Alignment of MA, PDP, and Cost Plan Eligibility With FFS Payment Exclusion Policy
  11. Part D Notice of Changes (§ 423.128(g))
  12. Separating the Annual Notice of Change (ANOC) From the Evidence of Coverage (EOC) (§ 423.111(a)(3) and § 423.128(a)(3))

at § 423.360, we do not believe that it is necessary to reopen a payment reconciliation after that 5-year period, nor do we believe it is necessary to reopen a reconsidered payment determination. Therefore, we propose to amend § 423.346 (a) such that CMS will only reopen the initial payment determination and will not reopen a reconsidered payment determination.

As stated in our final rule entitled, "Medicare Program; Medicare Prescription Drug Benefit" published in the **Federal Register** on January 28, 2005 (70 FR 4194), CMS can initiate a reopening on its own or an organization could request a reopening, but such reopenings are at CMS' discretion. In determining whether to reopen, we will consider a number of issues, including, but not limited to, whether the contract has terminated and received a final settlement. We will not approve a request to reopen for a contract that has terminated and received a final settlement. In addition, when we perform a reopening on its own initiative, contracts that have been terminated and settled will not be included in the reopening.

b. Coverage Gap Discount Reconciliation Reopening

Under § 423.2320(b), CMS performs a Coverage Gap Discount Reconciliation in which CMS reconciles interim payments with invoiced manufacturer discount amounts made available to each Part D plan's enrollee under the Discount Program. Since the interim coverage gap payments are estimates (76 FR 63017, 63027 (October 11, 2011)), a cost-based reconciliation is performed to ensure that Part D sponsors are paid dollar for dollar for all manufacturer discount amounts as reported on invoiced PDE data submitted for Part D payment reconciliation. Manufacturer discount amounts reported on PDE records submitted after the PDE submission deadline for reconciliation continue to be invoiced to manufacturers within a maximum of 3 years of the date of dispensing, and manufacturers remit payments for invoiced coverage gap discount amounts to Part D sponsors.

We propose to establish a reopening provision for the Coverage Gap Discount Reconciliation for the same reasons and under the same authority that we established a reopening provision for the Part D payment reconciliation process described in our final rule, "Medicare Program; Medicare Prescription Drug Benefit" published on January 28, 2005 (70 FR 4194, 4316). In a Health Plan Management System (HPMS) memorandum dated April 30,

2010, we stated that the final reconciled discount program payments are subject to the reopening provision in § 423.346. We anticipate rarely needing to reopen the Coverage Gap Discount Reconciliation as a result of the invoicing process that continues to occur after the reconciliation process. However, we want to leave open the option to reopen if unforeseen events result in underpayments or overpayments to Part D sponsors. Therefore, we propose to amend § 423.346 to accommodate reopening a Coverage Gap Discount Reconciliation.

Based on the preceding, we propose to revise § 423.346 by removing the phrase "or reconsidered" from paragraph (a), amending paragraph (a) to account for the proposed timing of the Part D reopening, removing paragraphs (a)(1) through (3) and (b)(1) through (3); adding a new paragraph (b) to accommodate a Coverage Gap Discount Reconciliation reopening; and revising paragraph (c) to eliminate the reference to "good cause."

4. Payment Appeals (§ 423.350)

Pursuant to § 423.2320 (b), we perform a Coverage Gap Discount Reconciliation in which we reconcile interim payments with invoiced manufacturer discount amounts made available to each Part D plan's enrollee under the Discount Program. Current regulations do not describe the appeals process for a Coverage Gap Discount Reconciliation. We propose to establish an appeals provision for the Coverage Gap Discount Reconciliation for the same reasons and under the same authority that was used to establish the Part D payment reconciliation appeals process described in our final rule, "Medicare Program; Medicare Prescription Drug Benefit" published on January 28, 2005 (70 FR 4194, 4317). In an HPMS memorandum dated April 30, 2010, CMS stated that the final reconciled discount program payments are subject the appeals provisions in § 423.350, and we now propose to revise § 423.350 to accommodate a Coverage Gap Discount Reconciliation appeals process.

Consistent with the Part D payment appeals process currently described at § 423.350, the proposed changes establish an appeals process whereby the final reconciliation of the interim Coverage Gap Discount Program payments may be subject to appeal. As stated in our final rule describing the Part D payment appeals process (70 FR 4317 (January 28, 2005)), the Part D payment appeals process only applies to perceived errors in the application of the payment methodology and the

payment information submitted by the Part D sponsor cannot be appealed through this process. In the January 28, 2005 final rule (70 FR 4317), Part D plans are expected to submit payment information correctly and within the established timelines. We codified at § 423.350(a)(2) that payment information submitted to CMS under § 423.322 and reconciled under § 423.343 is final and may not be appealed nor may the appeals process be used to submit new information after the submission of information necessary to determine retroactive adjustments and reconciliations. We propose to amend § 423.350(a)(2) to include information that is submitted and reconciled under § 423.2320(b) is final and may not be appealed nor may the appeals process be used to submit new information after the submission of information necessary to determine retroactive adjustments and reconciliations.

Also consistent with the Part D payment appeals process, we propose that the request for a reconsideration of the Coverage Gap Discount Reconciliation must be filed within 15 days from the date of the final payment, which is the date of the final reconciled payment made under § 423.2320 (b). Therefore, we propose to amend § 423.350(b)(1) by adding a new paragraph (iv) to define the timeframe for filing a reconsideration of the Coverage Gap Discount Reconciliation.

Based on the preceding, we propose to revise § 423.350 by adding a new paragraph (a)(1)(v) to allow for an appeal of a reconciled coverage gap payment under § 423.2320 (b), by revising paragraph (a)(2) to indicate that the payment information submitted to CMS and reconciled under § 423.2320(b) is final and may not be appealed, and by adding a new paragraph (b)(1)(iv) to define the timeframe for appealing the final reconciled payment under § 423.2320(b).

5. Payment Processes for Part D Sponsors (§ 423.2320)

In our final rule entitled, "Medicare Program; Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs for Contract Year 2013 and Other Changes" (77 FR 22071, 22086; April 12, 2012), CMS described the payment process for Part D sponsors under the Coverage Gap Discount Program. Under § 423.2320(a), CMS provides monthly interim Coverage Gap Discount Program payments as necessary for Part D sponsors to advance coverage gap discounts to beneficiaries. Part D

**2000** **Federal Register** / Vol. 79, No. 7 / Friday, January 10, 2014 / Proposed Rules

sponsors report the gap discount amounts to CMS, and through a contractor, CMS invoices the manufacturers on a quarterly basis for the applicable discount amounts. The manufacturers repay each Part D sponsor directly for the invoiced amounts under the Medicare Coverage Gap Discount Program Agreement (Agreement) described at § 423.2315. Under § 423.2320(b), CMS reconciles the interim payments with amounts invoiced to manufacturers.

In the event that a manufacturer fails to the provide the applicable discounts in accordance with the Agreement, we must impose civil money penalties (CMPs) equal to the sum of the applicable discount the manufacturer would have paid under the Agreement and 25 percent of that amount. The CMP that is equal to the sum of the applicable discount the manufacturer would have paid under the agreement is used to pay the applicable discount that the manufacturer had failed to provide.

In our final rule describing the payment process for Part D sponsors under the Coverage Gap Discount Program, we did not contemplate a payment process in the event that a manufacturer becomes bankrupt and does not pay the Part D sponsors for quarterly invoiced amounts under the Agreement. Even though we will impose a CMP on a bankrupt manufacturer in an effort to collect the unpaid invoiced amounts, the bankruptcy settlements will likely result in the CMP being modified or reduced. In order to ensure that the Part D sponsors have the funds available to advance the gap discounts at the point-of-sale, as required under section 1860D–14A(c)(1)(A)(ii) of the Act, we now propose to amend § 423.2320 such that we will assume financial liability for the applicable discount by covering the costs of the quarterly invoices that go unpaid by a bankrupt manufacturer at the time of the Coverage Gap Discount Reconciliation described at § 423.2320(b). We would then file a proof of claim with the bankruptcy court to recover those costs from the bankrupt manufacturer.

The proposed policy that CMS assume financial liability for the applicable discounts in the event of a manufacturer bankruptcy is consistent with CMS' payment processes for Part D sponsors under the Medicare Coverage Gap Discount Program. Under § 423.2320 (a), CMS provides interim payments to ensure that Part D sponsors have the funds available to advance the coverage gap discount to beneficiaries at point of sale. Under § 423.2320 (b), CMS reconciles the interim payments with the invoiced manufacturer discount

amounts in order make the PDP sponsor whole for the gap discount amount provided to the beneficiaries at point of sale. (For more information on these provisions, see October 11, 2011 final rule (76 FR 63017, 63027).) In order to remain consistent with the intent of the Coverage Gap Discount Reconciliation to make the Part D sponsor whole for the gap discounts amounts advanced at point of sale, CMS must provide payments to the Part D sponsor to cover the cost of the applicable discount in the event that the manufacturer cannot pay the quarterly invoices due to a bankruptcy. We propose to cover the costs of unpaid quarterly invoices only in the event that a manufacturer becomes bankrupt. We would not cover the cost of unpaid quarterly invoices for any other reasons because, in the event that a manufacturer fails to pay the quarterly invoices, we will impose CMPs that will cover the cost of the unpaid invoices. In the event that a manufacturer becomes bankrupt, we are concerned that the court will either modify or reduce the amount of the CMP, making the CMP process ineffective for covering the cost of the invoices and leaving the Part D sponsor in the position of having to cover the costs of the gap discount.

We propose to implement this policy by adjusting the Coverage Gap Discount Reconciliation to account for quarterly invoices that go unpaid as a result of a manufacturer becoming bankrupt. This adjustment will only occur for manufacturer discount amounts as they are reported on PDEs submitted by the submission deadline for the Part D reconciliation.

Based on the preceding, we propose to add a new paragraph (c) to § 423.2320 to describe a process for accounting for quarterly invoiced amounts that go unpaid by a bankrupt manufacturer.

### 6. Risk Adjustment Data Requirements (§ 422.310)

We propose to strengthen existing regulations related to the accuracy of risk adjustment data by amending § 422.310 on risk adjustment data validation. First, we propose to renumber existing paragraph § 422.310(e) as paragraph (e)(2) and add new paragraph (e)(1), which would require that any medical record reviews conducted by an MA organization must be designed to determine the accuracy of diagnoses submitted under § 422.308(c)(1) and § 422.310(g)(2). (Paragraph § 422.308(c)(1) addresses adjustments to payments for health status, and paragraph § 422.310(g)(2) addresses deadlines for risk adjustment data submission, including the final risk

adjustment data submission deadline prior to CMS' calculation of the final risk factors for a payment year.) Under our proposal, medical record reviews conducted by an MA organization cannot be designed only to identify diagnoses that would trigger additional payments by CMS to the MA organization; and medical record review methodologies must be designed to identify errors in diagnoses submitted to CMS as risk adjustment data, regardless of whether the data errors would result in positive or negative payment adjustments. This proposed amendment furthers our goals of improving payment accuracy and reducing payment errors.

We also propose to amend § 422.310(g) regarding deadlines for submission of risk adjustment data. Our current procedures generally permit submission of risk adjustment data after the final risk adjustment submission deadline only to correct overpayments. We propose to revise the regulation to explicitly permit late submissions only to correct overpayments but not to submit diagnoses for additional payment.

Finally, we propose to align this regulation with proposed § 422.326 by making two additional changes in paragraph (g). First, we propose the deletion of the January 31 deadline in subparagraph (2) and replacing it with the statement that CMS will announce the deadline by which final risk adjustment data must be submitted to CMS or its contractor. This means that the risk adjustment data submission deadline would also function as the Part C applicable reconciliation date for purposes of proposed § 422.326 on overpayment rules, as discussed in section II.B.1.b. of this proposed rule. Second, we propose to add subparagraph (3) to § 422.310(g). Proposed paragraph (3) cites § 422.326 as the source of rules for submission of corrected risk adjustment data after the final risk adjustment data submission deadline, that is, after applicable reconciliation as defined at § 422.326(a).

### 7. RADV Appeals

#### a. Background

We published Risk Adjustment Data Validation (RADV) appeals regulations in the April 15, 2010 **Federal Register**. These rules were proposed and finalized under CMS's authority to establish Medicare Advantage (MA) program standards by regulation at section 1856(b)(1) of the Act and are found at § 422.311 et seq.

As explained in the preamble of that final rule, Subpart G of the MA regulations at part 422 describes how

payment is made to MA organizations. These payment principles are based on sections 1853, 1854, and 1858 of the Act. Subpart G also sets forth the requirements for making payments to MA organizations offering local and regional MA plans, including calculation of MA capitation rates. Section 1853(a)(3) of the Act requires that we risk adjust our payments to MA organizations. Risk adjustment strengthens the Medicare program by ensuring that accurate payments are made to MA organizations based on the health status plus demographic characteristics of their enrolled beneficiaries and ensures that MA organizations are paid appropriately for their plan enrollees (that is, less for healthier enrollees expected to incur lower health care costs and more for less healthy enrollees expected to incur higher health care costs). Accurate payments to MA organizations also help ensure that providers are paid appropriately for the services they provide to MA beneficiaries. In general, the current risk adjustment methodology relies on enrollee diagnoses, as specified by the International Classification of Disease, currently the Ninth Revision Clinical Modification guidelines (ICD–9–CM) to prospectively adjust capitation payments for a given enrollee based on the health status of the enrollee. Diagnosis codes determine the risk scores, which in turn determine the risk adjusted reimbursement. As a result, physicians and providers must focus attention on complete and accurate diagnosis reporting according to the official ICD–9–CM coding guidelines (that is, coding diagnoses accurately and to the highest level of specificity).

MA enrollee Hierarchical Condition Categories (HCCs) are assigned based on risk adjustment diagnoses from FFS claims and from risk adjustment data submitted to us by MA organizations via the Risk Adjustment Payment System (RAPS). The CMS–HCCs contribute to an enrollee's risk score, which is used to adjust a base payment rate. Essentially, the higher the risk score for an enrollee, the higher the expected health care cost for the enrollee. The HCC data that MA organizations submit to CMS via the RAPS system is self-reported by the MA organization and does not go through a validation review before being incorporated into a given beneficiary's risk-profile. Since there is an incentive for MA organizations to potentially over-report diagnoses so that they can increase their payment, the Agency audits plan-submitted diagnosis data a few years later to ensure they are

supported by medical record documentation.

Verifiable medical record documentation is the key to accurate payment and successful data validation. We annually select contracts for RADV audits. RADV audits are intended to confirm the presence of risk adjustment conditions (that is, diagnoses that map to HCCs) as reported by MA organizations for their enrollees and confirmed via medical record documentation. RADV audits occur after the final risk adjustment data submission deadline for the MA contract year. We validate the HCC data submitted by MA organizations by reviewing hospital inpatient, hospital outpatient, and physician/practitioner provider medical records. The focus of this medical record review activity is on diagnoses related to the enrollee's HCC profile. Risk adjustment discrepancies are identified when the enrollee's HCCs used for payment (based upon MA organization-submitted data) differ from the HCCs assigned based on the medical record, under the RADV audit process. Risk adjustment discrepancies can be aggregated to determine an overall level payment error. In turn, payment error for a sample of contract enrollees can be extrapolated to calculate a contract-level payment error estimate.

Since finalizing these rules in 2010, we have conducted additional RADV audits and believe that some of the appeals provisions finalized in the 2010 RADV Appeals final rule should now be modified to prevent confusion, and to strengthen the RADV appeals process. We therefore, propose revisions to the RADV appeals regulations finalized in the April 15, 2010 **Federal Register**. These proposed revisions clarify program requirements and simplify the RADV appeals process. These proposed RADV provisions will apply to any RADV determinations issued on or after the effective date of this regulation.

**b. RADV Definitions**

We propose to amend the RADV definitions at § 422.2 as follows:
- Removing the following definitions:
  ++ "Initial Validation Contractor (IVC)" means the first level of medical record review under the RADV audit process.
  ++ "RADV payment error calculation appeal process" means an administrative process that enables MA organizations that have undergone RADV audit to appeal the CMS calculation of an MA organization's RADV payment error.
  ++ "The one best medical record for the purposes of Medicare Advantage Risk Adjustment

Validation (RADV)" means the clinical documentation for a single encounter for care (that is, a physician office visit, an inpatient hospital stay, or an outpatient hospital visit) that occurred for one patient during the data collection period. The single encounter for care must be based on a face-to-face encounter with a provider deemed acceptable for risk adjustment and documentation of this encounter must be reflected in the medical record.
- Adding the following definition:
  ++ "RADV appeal process" means an administrative process that enables MA organizations that have undergone RADV audit to appeal the Secretary's medical record review determinations and the Secretary's calculation of an MA organization's RADV payment error.
- Revising the following definitions:
  ++ Risk adjustment data validation (RADV) audit means a payment audit of a Medicare Advantage (MA) organization administered by CMS or the Secretary that ensures the integrity and accuracy of risk adjustment payment data.
  ++ "Attestation process" means a CMS-developed RADV process that enables MA organizations undergoing RADV audit to submit CMS-generated attestations for eligible medical records with missing or illegible signatures or credentials. The purpose of the CMS-generated attestations is to cure signature and credential issues for eligible medical records. CMS-generated attestations do not provide an opportunity for a provider or supplier to replace a medical record or for a provider or supplier to attest that a beneficiary has the medical condition.

**c. Publication of RADV Methodology**

In the October 22, 2009 Notice of Proposed Rule Making (NPRM), and as reinforced in the April 15, 2010 Final Regulation, CMS indicated that we would, "publish its RADV methodology in some type of public document—most likely, a Medicare Manual, so that the public can review and provide comment as it deems necessary". We also indicated that we would provide an annual notice of RADV audit methodology. Our last RADV-related notice of methodology was published in February, 2012. We will continue to publish a notice of the methodology employed, but will do so only if there is a change in the RADV methodology that would require publication. We note that these notices of RADV audit

methodology updated information provided on RADV audit methodology provided in the October 22, 2009 proposed rule and April 15, 2010 final rule.

In addition, we provided in the October 22, 2009 proposed rule preamble that we would provide an expanded explanation of methodology and payment error calculation factors as a part of each audit report of findings that we send to MA organizations that undergo RADV audit. Such explanation and factors have been and will continue to be part of the RADV audit report(s) that CMS provides health plans that have undergone RADV audits.

d. Proposal To Update RADV Appeals Terminology (§ 422.311)

Current RADV regulations utilize the following terms for the CMS-issued RADV audit report: Audit report post medical record review; RADV audit report; IVC-level RADV audit report; and RADV audit report of finding. This use of multiple terms to refer to what is the same audit report (the RADV audit report that CMS issues following conclusion of the medical record review portion of the audit) is potentially confusing. Therefore, we propose amending the RADV regulations throughout to adopt one common term to refer to RADV audit reports: "RADV Audit Report". By standardizing terminology throughout the RADV regulations, the proposed amendment provides clarity which may lead to increased efficiency. We welcome comment on this proposal.

As mentioned earlier in the description of RADV-related definitions that have changed, we have revised certain RADV-related definitions to accommodate changes to both the RADV audit process and the RADV appeals process. One definition that we have removed from the RADV regulations is Initial Validation Contractor, or IVC. The RADV medical record review process no longer utilizes "initial" and "secondary" validation contractors to conduct medical record review under RADV. Instead we now utilize medical record reviewers to code medical records undergoing RADV review. These reviewers may be employed by the same or different medical record review contractors. Therefore, the term "IVC" is no longer relevant to the RADV audit process. We therefore propose to remove this term from the RADV regulations at the following citations: § 422.311(c)(2)(i)(B) through (D); § 422.311(c)(2)(ii)(B), § 422.311(c)(2)(iii)(A), § 422.111(c)(2)(v), (vi), § 422.311(c)(3)(ii)(A), and

§ 422.311(c)(3)(iii)(A) and (B). We invite comment on this proposal.

e. Proposal To Simplify the RADV Appeals Process

Currently, there are two types of RADV-related appeals processes described in Federal regulations at § 422.311 et seq.: Medical record review-determination appeals and RADV payment error calculation appeals. RADV medical record review-determination appeal requirements and procedures are discussed at § 422.311(b)(3) and § 422.311(c)(2). Medical record review determination appeal is a two-stage administrative appeal process: The first step is a hearing by a hearing officer, followed by a CMS Administrator-level review. This appeal procedure provides MA organizations with an opportunity to appeal RADV medical record review determinations that are made by coders reviewing the medical record documentation submitted by MA organizations undergoing RADV audit. The second type of RADV appeal, payment error calculation appeal, is discussed at § 422.311(c)(3). Payment error calculation appeal is a three-pronged appeal process: Reconsideration, followed by a hearing officer review, followed by CMS Administrator-level review. This appeal process was specifically designed to afford MA organizations the opportunity to appeal CMS's contract-level RADV payment error calculation.

We propose that the administrative appeals language described at § 422.311(b)(3) and § 422.311(c)(2) for RADV medical record review determination appeals and § 422.311(c)(3) for RADV payment error calculation appeals be replaced with new regulatory language proposed at § 422.311(c)(1) et seq., that combines the two existing RADV appeal policies and procedures into one set of requirements and one process. We propose to combine the two RADV appeals processes into one combined RADV appeals process that is comprised of three administrative steps: Reconsideration, hearing officer review, and CMS Administrator-level review. A three-step administrative appeals process comprising reconsideration, hearing officer review, and Administrator-levels of review is a common administrative appeals model used elsewhere within the Medicare managed care program, such as in appealing contract award determinations and intermediate sanctions. The combined RADV appeal process that we are proposing at new § 422.311(c)(1) et seq., also has the

benefit of simplifying what is today a complex two-track appeal process into one process. While both CMS and the MA industry will benefit from simplifying this process, MA organizations also obtain an additional level of review under the combined approach since MA organizations will be afforded a reconsideration appeal step for medical record review determinations that is today—not part of the existing RADV appeal process. Shortening the existing two-track appeal process should also reduce the resources and level of effort needed from both MA organizations and CMS in participating in a RADV appeal proceeding. Under this proposal, MA organizations can simply request to appeal their RADV audit findings one time and specify whether they want to appeal either their medical record review determination(s), payment error calculation, or both. The specific details regarding this proposed process follow. We propose these changes based upon our experience with RADV appeals and because we hope to reduce the burden associated with undertaking RADV appeals on both MA organizations and CMS. The details of this proposed policy and procedure follows.

(1) Issues Eligible for RADV Appeal

Current regulations at § 422.311(c)(2) et seq., and § 422.311(c)(3) et seq., specify RADV-related medical record review and payment error calculation documents and issues eligible for the medical record review determination and payment error calculation appeal processes. We propose to amend the policies and procedures around issues eligible for RADV appeals at § 422.311(c)(2) and § 422.311(c)(3) by combining proposed policies and procedures for the existing two-pronged appeal approach into one set of policies and procedures for RADV appeals at the new § part 422.311(c)(2)(iv). At § 422.311(c)(2)(i), we propose that as a general rule, MA organizations may appeal RADV medical record review determinations and RADV payment error calculation, though in order to be eligible to pursue these appeals, we specify at proposed § 422.311(c)(2)(i)(A) and (B) that MA organizations must adhere to established RADV audit procedures and requirements and adhere to RADV appeals procedures and requirements. At § 422.311(c)(2)(ii) we propose that failure to follow RADV audit procedures and requirements and RADV appeals procedures and requirements will render the MA organization's request for RADV appeal invalid. Furthermore, at proposed § 422.311(c)(2)(iii) we stipulate that the

**EXHIBIT D-17**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Centers for Medicare & Medicaid Services

**42 CFR Parts 417, 422, 423, and 424**

**[CMS–4159–F]**

**RIN 0938–AR37**

### Medicare Program; Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs

**AGENCY:** Centers for Medicare & Medicaid Services (CMS), HHS.

**ACTION:** Final rule.

**SUMMARY:** The final rule will revise the Medicare Advantage (MA) program (Part C) regulations and prescription drug benefit program (Part D) regulations to implement statutory requirements; improve program efficiencies; and clarify program requirements. The final rule also includes several provisions designed to improve payment accuracy.

**DATES:** *Effective Dates:* These regulations are effective on July 22, 2014 except for the amendment in instruction 27 to § 423.100, the amendment in instruction 30 to § 423.501, and the amendment in instruction 34 to § 423.505, which are effective on January 1, 2016.

*Applicability Dates:* In the **SUPPLEMENTARY INFORMATION** section of this final rule, we provide a table (Table 1) which lists key changes in this final rule that have an applicability date other than the effective date of this final rule.

**FOR FURTHER INFORMATION CONTACT:**

Christopher McClintock, (410) 786–4682, Part C issues.

Marie Manteuffel, (410) 786–3447, Part D issues.

Kristy Nishimoto, (206) 615–2367, Part C and D enrollment and appeals issues.

Whitney Johnson, (410) 786–0490, Part C and D payment issues.

Joscelyn Lissone, (410) 786–5116, Part C and D compliance issues.

Frank Whelan, (410) 786 1302, Part D improper prescribing issues.

**SUPPLEMENTARY INFORMATION:** Table 1 lists key changes that have an applicability date other than 60 days after the date of publication of this final rule. The applicability dates are discussed in the preamble for each of these items.

### TABLE 1—APPLICABILITY DATE OF KEY PROVISIONS OTHER THAN 60 DAYS AFTER THE DATE OF PUBLICATION OF THE FINAL RULE

| Preamble section | Section title | Applicability date |
|---|---|---|
| III.A.4 | Reducing the Burden of the Compliance Program Training Requirements (§§ 422.503(b)(4)(vi)(C) and § 423.504(b)(4)(vi)(C)). | 01/01/2016 |
| III.A.7 | Agent/Broker Compensation Requirements (§§ 422.2274 and 423.2274) | 01/01/2015 |
| III.A.20 | Enrollment Requirements for the Prescribers of Part D Covered Drugs (§ 423.120(c)(6)) | 06/01/2015 |
| III.A.24 | Eligibility of Enrollment for Incarcerated Individuals (§§ 417.1, 417.460(b)(2)(i), 417.460(f)(1)(i)(A) through (C), 422.74(d)(4)(i)(A), 422.74(d)(4)(v), 423.44(d)(5)(iii) and (iv)). | 01/01/2015 |

## Table of Contents

I. Executive Summary
  A. Purpose
  B. Summary of the Major Provisions
  1. Modifying the Agent/Broker Requirements, Specifically Agent/Broker Compensation
  2. Drug Categories or Classes of Clinical Concern
  3. Improving Payment Accuracy—Implementing Overpayment Provisions of Section 1128J (d) of the Social Security Act (§§ 422.326 and 423.360).
  4. Risk Adjustment Data Requirements (§ 422.310)
  C. Summary of Costs and Benefits
II. Background
  A. General Overview and Regulatory History
  B. Issuance of a Notice of Proposed Rulemaking
  C. Public Comments Received in Response to the CY 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs Proposed Rule
  D. Provisions Not Finalized in This Final Rule
III. Provisions of the Proposed Regulations
  A. Clarifying Various Program Participation Requirements
  1. Closing Cost Contract Plans to New Enrollment (§§ 422.2 and 22.503)
  2. Authority to Impose Intermediate Sanctions and Civil Money Penalties (§§ 422.752, 423.752, 422.760 and 423.760)
  3. Contract Termination Notification Requirements and Contract Termination Basis (§§ 422.510 and 423.509)
  4. Reducing the Burden of the Compliance Program Training Requirements (§§ 422.503(b)(4)(vi)(C) and 423.504(b)(4)(vi)(C))
  5. Procedures for Imposing Intermediate Sanctions and Civil Money Penalties Under Parts C and D (§§ 422.756 and 423.756)
  6. Timely Access to Mail Order Services (§ 423.120)
  7. Agent/Broker Requirements, Particularly Compensation (§§ 422.2274 and 423.2274)
  8. Drug Categories or Classes of Clinical Concern (§ 423.120(b)(2)(v))
  9. Medication Therapy Management Program (MTMP) under Part D (§ 423.153(d))
  a. Multiple Chronic Diseases
  b. Multiple Part D Drugs
  c. Annual Cost Threshold
  10. Requirement for Applicants or their Contracted First Tier, Downstream, or Related Entities to Have Experience in the Part D Program Providing Key Part D Functions (§ 423.504(b))
  11. Requirement for Applicants for Stand Alone Part D Plan Sponsor Contracts to Be Actively Engaged in the Business of the Administration of Health Insurance Benefits (§ 423.504(b)(9))
  12. Limit Parent Organizations to One Prescription Drug Plan (PDP) Sponsor Contract Per PDP Region (§ 423.503)
  13. Limit Stand-Alone Prescription Drug Plan Sponsors to Offering No More Than Two Plans Per PDP Region (§ 423.265)
  14. Applicable Cost-Sharing for Transition Supplies: Transition Process Under Part D (§ 423.120(b)(3))
  15. Interpreting the Non Interference Provision (§ 423.10)
  16. Pharmacy Price Concessions in Negotiated Prices (§ 423.100)
  17. Preferred Cost Sharing (§§ 423.100 and 423.120)
  18. Prescription Drug Pricing Standards and Maximum Allowable Cost (§ 423.505(b)(21))
  19. Any Willing Pharmacy Standard Terms & Conditions (§ 423.120(a)(8))
  20. Enrollment Requirements for Prescribers of Part D Covered Drugs (§ 423.120(c)(5) and (6))
  21. Improper Prescribing Practices (§§ 424.530 and 424.535)
  a. Background and Program Integrity Concerns
  b. Drug Enforcement Administration (DEA) Certification of Registration
  c. Patterns or Practices of Prescribing
  22. Broadening the Release of Part D Data (§ 423.505)
  23. Establish Authority to Directly Request Information From First Tier, Downstream, and Related Entities (§§ 422.504(i)(2)(i) and 423.505(i)(2)(i))

24. Eligibility of Enrollment for Incarcerated Individuals (§§ 417.1, 417.422, 417.460, 422.74, and 423.44)
a. Changes in Definition of Service Area for Cost Plans (§§ 417.1 and 417.422(b))
b. Involuntary Disenrollment for Incarcerated Individuals Enrolled in MA, PDP and cost plans (§§ 417.460, 422.74, and 423.44)
25. Rewards and Incentives Program Regulations for Part C Enrollees (§ 422.134)
B. Improving Payment Accuracy
1. Implementing Overpayment Provisions of Section 1128J(d) of the Social Security Act (§§ 422.326 and 423.360)
a. Terminology (§§ 422.326(a) and 423.360(a))
b. General Rules for Overpayments (§ 422.326(b) through (c); § 423.360(b) through (c))
c. Look-back Period for Reporting and Returning Overpayments
2. Risk Adjustment Data Requirements (§ 422.310)
3. RADV Appeals
a. Background
b. RADV Definitions
c. Publication of RADV Methodology
d. Proposal to Update RADV Appeals Terminology (§ 422.311)
e. Proposal to Simplify the RADV Appeals Process
(1) Issues Eligible for RADV Appeal
(2) Issues Not Eligible for RADV Appeals
(3) Manner and Timing of a Request for RADV Appeal
(4) Reconsideration Stage
(5) Hearing Stage
(6) CMS Administrator Review Stage
f. Proposal to Expand Scope of RADV Audits
g. Proposal to Clarify the RADV Medical Record Review Determination Appeal Burden of Proof Standard
h. Proposal to Change RADV Audit Compliance Date
4. Recovery Audit Contractor (RAC) Determination Appeals (Proposed Part 422 Subpart Z and Part 423 Subpart Z)
a. Background
b. Proposed RAC Appeals Process
(1) Reconsiderations (§§ 422.2605 and 423.2605)
(2) Hearing Official Determinations (§§ 422.2610 and 423.2610)
(3) Administrator Review (§§ 422.2615 and 423.2615)
C. Implementing Other Technical Changes
1. Definition of a Part D Drug (§ 423.100)
a. Combination Products
b. Barbiturates and Benzodiazepines
c. Medical Foods
2. Special Part D Access Rules During Disasters or Emergencies (§ 423.120)
3. Termination of a Contract Under Parts C and D (§§ 422.510 and 423.509)
a. Cross-reference Change (§ 423.509(d))
b. Terminology Change (§§ 422.510 and 423.509)
c. Technical Change to Align Paragraph Headings (§ 422.510(b)(2))
d. Terminology Change (§ 423.509(b)(2)(C)(ii))
4. Technical Changes Regarding Intermediate Sanctions and Civil Money Penalties (§§ 422.756 and 423.756)

a. Technical Changes to Intermediate Sanctions Notice Receipt Provisions (§§ 422.756(a)(2) and 423.756(a)(2))
b. Cross-reference Changes (§§ 422.756(b)(4) and 423.756(b)(4))
c. Technical Changes (§§ 422.756(d) and 423.756(d))
d. Technical Changes to Align the Civil Money Penalty Provision with the Authorizing Statute (§§ 422.760(a)(3) and 423.760(a)(3))
e. Technical Changes to Align the Civil Money Penalty Notice Receipt Provisions (§§ 422.1020(a)(2), 423.1020(a)(2), 422.1016(b)(1), and 423.1016(b)(1))
IV. Collection of Information Requirements
A. ICRs Related to Improper Prescribing Practices and Patterns (§ 424.535(a)(13) and (14))
B. ICRs Related to Applicants or their Contracted First Tier, Downstream, or Related Entities to Have Experience in the Part D Program Providing Key Part D Functions (§ 423.504(b)(8)(i) through (iii))
C. ICRs Related to Eligibility of Enrollment for Incarcerated Individuals (§§ 417.460, 422.74, and 423.44)
D. ICRs Related to Rewards and Incentives Program Regulations for Part C Enrollees (§ 422.134)
E. ICR Related to Recovery Audit Contractor Determinations (Part 422, Subpart Z and Part 423, Subpart Z)
V. Regulatory Impact Analysis
A. Statement of Need
B. Overall Impact
C. Anticipated Effects
1. Effects of Closing Cost Contract Plans to New Enrollment
2. Effects of the Authority to Impose Intermediate Sanctions and Civil Money Penalties
3. Effects of Contract Termination Notification Requirements and Contract Termination Basis
4. Effects of Reducing the Burden of the Compliance Program Training Requirements
5. Effects of the Procedures for Imposing Intermediate Sanctions and Civil Money Penalties under Parts C and D
6. Effects of Timely Access to Mail Order Services
7. Effects of the Modification of the Agent/Broker Compensation Requirements
8. Effects of Drug Categories or Classes of Clinical Concern
9. Effects of the Medication Therapy Management Program (MTMP) under Part D
10. Effects of the Requirement for Applicants or their Contracted First Tier, Downstream, or Related Entities to Have Experience in the Part D Program Providing Key Part D Functions
11. Effects of Requirement for Applicants for Stand Alone Part D Plan Sponsor Contracts to Be Actively Engaged in the Business of the Administration of Health Insurance Benefits
12. Effects of Limit Parent Organizations to One Prescription Drug Plan (PDP) Sponsor Contract per PDP Region
13. Effects of Limit Stand-Alone Prescription Drug Plan Sponsors to

Offering No More Than Two Plans per PDP Region
14. Effects of Applicable Cost-Sharing for Transition Supplies: Transition Process Under Part D
15. Effects of Interpreting the Non-Interference Provision
16. Effects of Pharmacy Price Concessions in Negotiated Prices
17. Effects of Preferred Cost Sharing
18. Effects of Maximum Allowable Cost Pricing Standard
19. Effects of Any Willing Pharmacy Standard Terms & Conditions
20. Effects of Enrollment Requirements for Prescribers of Part D Covered Drugs
21. Effects of Improper Prescribing Practices and Patterns
22. Effects of Broadening the Release of Part D Data
23. Effects of Establish Authority to Directly Request Information From First Tier, Downstream, and Related Entities
24. Effects of Eligibility of Enrollment for Incarcerated Individuals
25. Effects of Rewards and Incentives Program Regulations for Part C Enrollees
26. Effects of Improving Payment Accuracy: Reporting Overpayments, RADV Appeals, and LIS Cost Sharing
27. Effects of Part C and Part D RAC Determination Appeals
28. Effects of the Technical Changes to the Definition of a Part D Drug
29. Effects of the Special Part D Access Rules During Disasters
30. Effects of Termination of a Contract under Parts C and D
31. Effects of Technical Changes Regarding Intermediate Sanctions and Civil Money Penalties
D. Expected Benefits
1. Drug Categories or Classes of Clinical Concern
2. Medication Therapy Management Program under Part D
E. Alternatives Considered
1. Modifying the Agent/Broker Compensation Requirements
2. Any Willing Pharmacy Standard Terms and Conditions
3. Pharmacy Price Concessions in Negotiated Prices
4. Special Part D Access Rules During Disasters or Emergencies
5. Drug Categories or Classes of Clinical Concern
6. Medication Therapy Management Program (MTM) Under Part D
7. Requirement for Applicants or their Contracted First Tier, Downstream, or Related Entities to have Experience in the Part D Program Providing Key Part D Functions
F. Accounting Statement and Table
G. Conclusion

Regulations Text

Acronyms

ADS   Automatic Dispensing System
AEP   Annual Enrollment Period
AHFS   American Hospital Formulary Service
AHFS–DI   American Hospital Formulary Service–Drug Information
AHRQ   Agency for Health Care Research and Quality

ALJ  Administrative Law Judge
ANOC  Annual Notice of Change
AO  Accrediting Organization
AOR  Appointment of Representative
BBA  Balanced Budget Act of 1997 (Pub. L. 105–33)
BBRA  [Medicare, Medicaid and State Child Health Insurance Program] Balanced Budget Refinement Act of 1999 (Pub. L. 106–113)
BIPA  [Medicare, Medicaid, and SCHIP] Benefits Improvement Protection Act of 2000 (Pub. L. 106–554)
BLA  Biologics License Application
CAHPS  Consumer Assessment Health Providers Survey
CAP  Corrective Action Plan
CCIP  Chronic Care Improvement Program
CC/MCC  Complication/Comorbidity and Major Complication/Comorbidity
CCS  Certified Coding Specialist
CDC  Centers for Disease Control
CHIP  Children's Health Insurance Programs
CMP  Civil Money Penalty
CMR  Comprehensive Medical Review
CMS  Centers for Medicare & Medicaid Services
CMS–HCC  CMS Hierarchal Condition Category
CTM  Complaints Tracking Module
COB  Coordination of Benefits
CORF  Comprehensive Outpatient Rehabilitation Facility
CPC  Certified Professional Coder
CY  Calendar year
DAB  Departmental Appeals Board
DEA  Drug Enforcement Administration
DIR  Direct and Indirect Remuneration
DME  Durable Medical Equipment
DMEPOS  Durable Medical Equipment, Prosthetic, Orthotics, and Supplies
D–SNPs  Dual Eligible SNPs
DOL  U.S. Department of Labor
DUA  Data Use Agreement
DUM  Drug Utilization Management
EAJR  Expedited Access to Judicial Review
EGWP  Employer Group/Union-Sponsored Waiver Plan
EOB  Explanation of Benefits
EOC  Evidence of Coverage
ESRD  End-Stage Renal Disease
FACA  Federal Advisory Committee Act
FDA  Food and Drug Administration
FEHBP  Federal Employees Health Benefits Plan
FFS  Fee-For-Service
FIDE  Fully-integrated Dual Eligible
FIDE SNPs  Fully-integrated Dual Eligible Special Needs Plans
FMV  Fair Market Value
FY  Fiscal year
GAO  Government Accountability Office
HAC  Hospital-Acquired Conditions
HCPP  Health Care Prepayment Plans
HEDIS  HealthCare Effectiveness Data and Information Set
HHS  [U.S. Department of] Health and Human Services
HIPAA  Health Insurance Portability and Accountability Act of 1996 (Pub. L. 104–191)
HMO  Health Maintenance Organization
HOS  Health Outcome Survey
HPMS  Health Plan Management System
ICL  Initial Coverage Limit
ICR  Information Collection Requirement

ID  Identification
IVC  Initial Validation Contractor
LCD  Local Coverage Determination
LEP  Late Enrollment Penalty
LIS  Low Income Subsidy
LPPO  Local Preferred Provider Organization
LTC  Long Term Care
MA  Medicare Advantage
MAAA  Member of the American Academy of Actuaries
MA–PD  Medicare Advantage–Prescription Drug Plan
MIPPA  Medicare Improvements for Patients and Providers Act of 2008 (Pub. L. 110–275)
MOC  Medicare Options Compare
MOOP  Maximum Out-of-Pocket
MPDPF  Medicare Prescription Drug Plan Finder
MMA  Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (Pub. L. 108–173)
MS–DRG  Medicare Severity Diagnosis Related Group
MSA  Metropolitan Statistical Area
MSAs  Medical Savings Accounts
MSP  Medicare Secondary Payer
MTM  Medication Therapy Management
MTMP  Medication Therapy Management Program
NAIC  National Association of Insurance Commissioners
NCD  National Coverage Determination
NCPDP  National Council for Prescription Drug Programs
NCQA  National Committee for Quality Assurance
NDA  New Drug Application
NDC  National Drug Code
NGC  National Guideline Clearinghouse
NIH  National Institutes of Health
NOMNC  Notice of Medicare Non-Coverage
NPI  National Provider Identifier
NWS  National Weather Service
OIG  Office of Inspector General
OMB  Office of Management and Budget
OPM  Office of Personnel Management
OTC  Over the Counter
Part C  Medicare Advantage
Part D  Medicare Prescription Drug Benefit Program
PBM  Pharmacy Benefit Manager
PDE  Prescription Drug Event
PDP  Prescription Drug Plan
PFFS  Private Fee For Service Plan
POA  Present on Admission (Indicator)
POS  Point-of-Sale
PPO  Preferred Provider Organization
PPS  Prospective Payment System
P&T  Pharmacy & Therapeutics
QIC  Qualified Independent Contractor
QIO  Quality Improvement Organization
QRS  Quality Review Study
PACE  Programs of All Inclusive Care for the Elderly
RADV  Risk Adjustment Data Validation
RAPS  Risk Adjustment Payment System
RPPO  Regional Preferred Provider Organization
SCORM  Sharable Content Object Reference Model
SEP  Special Election Period
SHIP  State Health Insurance Assistance Programs
SNF  Skilled Nursing Facility

SNP  Special Needs Plan
SPAP  State Pharmaceutical Assistance Programs
SSA  Social Security Administration
SSI  Supplemental Security Income
T&C  Terms and Conditions
TPA  Third Party Administrator
TrOOP  True Out-Of-Pocket
U&C  Usual and Customary
UPIN  Uniform Provider Identification Number
USP  U.S. Pharmacopoeia

## I. Executive Summary

### A. Purpose

The purpose of this final rule is to make revisions to the Medicare Advantage (MA) program (Part C) and Prescription Drug Benefit Program (Part D) regulations based on our continued experience in the administration of the Part C and Part D programs and to implement certain provisions of the Affordable Care Act. This final rule is necessary to—(1) clarify various program participation requirements; (2) improve payment accuracy; and (3) make other clarifications and technical changes.

### B. Summary of the Major Provisions

1. Modifying the Agent/Broker Requirements, Specifically Agent/Broker Compensation

The former regulatory compensation structure was comprised of a 6-year cycle that ended December 31, 2013. Under that structure, MA organizations and Part D sponsors provided an initial compensation payment to independent agents for new enrollees (Year 1), and paid a renewal rate (equal to 50 percent of the initial year compensation) for Years 2 through 6. MA organizations and Part D sponsors had the option to pay the 50 percent renewal rate for CY2014 (year 1). This compensation structure proved to be complicated to implement and monitor, and also created an incentive for agents to move beneficiaries as long as the fair market value (FMV) continued to increase each year. To resolve these issues, we proposed to revise the compensation structure. Under our proposal, MA organizations and Part D sponsors would continue to have the discretion to decide, on an annual basis, whether or not to use independent agents. Also, for new enrollments, MA organizations and Part D sponsors could determine what their initial rate would be, up to the CMS designated FMV amount. For renewals in Year 2 and subsequent years, with no end date, the MA organization or Part D sponsor could pay up to 35 percent of the current FMV amount for that year. We believed that revising the existing compensation

structure to allow MA organizations or Part D sponsors to pay up to 35 percent of the FMV for year 2 and subsequent years was appropriate based on a couple of factors. First, we believed that a 2 tiered payment system (that is, initial and renewal) would be significantly less complicated than a 3-tiered system (that is, initial, 50 percent renewal for years 2 through 6, and 25 percent residual for years 7 and subsequent years), and would reduce administrative burden and confusion for plan sponsors. Second, our analysis determined that 35 percent was the renewal compensation level at which the present value of overall payments under a 2-tiered system would be relatively equal to the present value of overall payments under a 3-tiered system (taking into account the estimated life expectancy for several beneficiary age cohorts). In addition to revising the agent and broker compensation structures, we proposed to amend the training and testing requirements as well as setting limits on referral fees ($100) for agents and brokers.

We received more than 140 comments from agents, health plans, and trade associations opposing the 35 percent renewal rate, and instead suggesting that CMS maintain the 50 percent renewal rate. A number of commenters expressed concerns that the proposed reduction in compensation would represent a significant decrease from the current compensation limit, and a rate set at 50 percent of FMV would be in line with industry standard. They noted that the higher compensation amount would be particularly important for stand-alone prescription drug plans, as 35 percent would be insufficient to cover an agent's costs associated with the renewal transaction and could discourage agents from assisting in the annual evaluation of a Medicare beneficiary's options. Commenters also stated that, compared to current practice, the proposed 35 percent renewal rate is a reduction since a number of MA plans began offering a renewal rate of 50 percent for 10 years or more at the end of the 6-year cycle (2013). The majority of commenters also stated that agents play an important role in educating beneficiaries about Medicare and the proposed reduction in the renewal rate could reduce the level and quality of services provided to beneficiaries, thereby resulting in less information sharing and poorer plan choices by beneficiaries. Many commenters also stated that agents spend a significant amount of time in training, preparing, and educating beneficiaries and that the compensation

is already low relative to the hours spent. Some commenters also expressed concern that the lower compensation rate would discourage new agents from entering the MA market. Many agents stated they would have to stop selling MA products and instead sell other more profitable products. No plans strongly supported the 35 percent renewal rate. Therefore, we are modifying the compensation renewal rate from up to 35 percent to up to 50 percent. These changes will be applicable for enrollments effective January 2015. Because the proposed rate is similar to previous regulatory requirements, present CMS guidance, and industry practice, we believe this implementation timeframe is reasonable and appropriate. We are not finalizing the proposed changes to agent and broker training and testing at this time. We are finalizing limits on referral fees for agents as proposed.

### 2. Drug Categories or Classes of Clinical Concern

We are not finalizing any new criteria and will maintain the existing six protected classes.

### 3. Improving Payment Accuracy— Implementing Overpayment Provisions of Section 1128J(d) of the Social Security Act (§§ 422.326 and 423.360)

These proposed regulatory provisions codify the Affordable Care Act requirement establishing section 1128J(d) of the Act that MA organizations and Part D sponsors report and return identified Medicare overpayments.

We proposed to adopt the statutory definition of overpayment for both Part C and Part D, which means any funds that an MA organization or Part D sponsor has received or retained under Title XVIII of the Act to which the MA organization or Part D sponsor, after applicable reconciliation, is not entitled under such title. To reflect the unique structure of Part C and Part D payments to plan sponsors, we also propose to define two terms included in the statutory definition of overpayments: "funds" and "applicable reconciliation." We proposed to define funds as payments an MA organization or Part D sponsor has received that are based on data that these organizations submitted to CMS for payment purposes. For Part C we proposed that applicable reconciliation occurs on the annual final risk adjustment data submission deadline. For Part D, we proposed that applicable reconciliation occurs on the date that is the later of either the annual deadline for submitting prescription drug event

(PDE) data for the annual Part D payment reconciliations referred to in § 423.343(c) and (d) or the annual deadline for submitting DIR data.

In addition, we proposed to state in regulation that an MA organization or Part D sponsor has identified an overpayment if it has actual knowledge of the existence of the overpayment or acts in reckless disregard or deliberate ignorance of the existence of the overpayment. An MA organization or Part D sponsor must report and return any identified overpayment it received no later than 60 days after the date on which it identified it received an overpayment. The MA organization or Part D sponsor must notify CMS, using a notification process determined by CMS, of the amount and reason for the overpayment. Finally, we proposed a look-back period with an exception for overpayments resulting from fraud, whereby MA organizations and Part D sponsors would be held accountable for reporting overpayments within the 6 most recent completed payment years for which the applicable reconciliation has been completed.

We received approximately 30 comments from organizations and individuals. Generally, commenters supported establishing separate applicable reconciliation dates for Part C and Part D. Many commenters questioned when the 60-day period for reporting and returning begins, and what activities constitute reporting and returning an overpayment to CMS, including questions about estimating an amount of overpayment. A number of commenters also requested to clarify the standards for "identifying" an overpayment, including questions about the meaning of reasonable diligence. Finally, a few commenters recommended that we impose the same limitation on the look-back period for all overpayments, even those relating to fraud.

We are finalizing the provisions at §§ 422.326 and 423.360, with the following modifications. First, we add at the end of paragraph § 422.326(d) the phrase "unless otherwise directed by CMS for the purpose of § 422.311." Also, to increase clarity we revise §§ 422.326(c) and 133.360(u) regarding identified overpayments. Finally, we strike the following sentence in the proposed paragraphs on the 6-year look-back period: "Overpayments resulting from fraud are not subject to this limitation of the lookback period."

### 4. Risk Adjustment Data Requirements

We proposed several amendments to § 422.310 to strengthen existing regulations related to the accuracy of

risk adjustment data, including: (1) A requirement that medical record reviews, if used, be designed to determine the accuracy of diagnoses submitted under §§ 422.308(c)(1) and 422.310(g)(2); (2) a revision in the deadlines for submission of risk adjustment data; and (3) a limitation on the type and purpose of late data submissions. We also proposed a restructuring of subparagraph (g)(2) as

part of the revisions. We received approximately 25 comments from organizations and individuals regarding these proposals; many of the comments were concerned and critical of the proposals, highlighting vagueness and the potential for operational instability. For reasons discussed in more detail below in section III.B.2 of the preamble, we are not finalizing the proposed amendment regarding the scope of

medical reviews and we are not finalizing at this time the proposal to change the date for final risk adjustment data submission. We are finalizing as proposed the restructuring of §§ 422.310(g)(2) and the 422.310(g)(2)(ii) provision to prohibit submission of diagnoses for additional payment after the final risk adjustment data submission deadline.

*C. Summary of Costs and Benefits*

### TABLE 2—SUMMARY OF COSTS AND BENEFITS

| Provision description | Total costs | Transfers |
|---|---|---|
| Modifying the agent/broker requirements, specifically agent/broker compensation. | N/A | N/A |
| Improving Payment Accuracy | N/A | N/A |
| Eligibility of Enrollment for Incarcerated Individuals. | | We estimate that this change could save the MA program up to $27 million in 2015, increasing to $103 million in 2024 (total of $650 million over this period), and could save the Part D program (includes the Part D portion of MA PD plans) up to $46 million in 2015, increasing to $153 million in 2024 (total of $965 million over this period). |

## II. Background

### A. General Overview and Regulatory History

The Balanced Budget Act of 1997 (BBA) (Pub. L. 105–33) created a new "Part C" in the Medicare statute (sections 1851 through 1859 of the Social Security Act (the Act)) which established what is now known as the Medicare Advantage (MA) program. The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA) (Pub. L. 108–173), enacted on December 8, 2003, added a new "Part D" to the Medicare statute (sections 1860D–1 through 42 of the Act) entitled the Medicare Prescription Drug Benefit Program (PDP), and made significant changes to the existing Part C program, which it named the Medicare Advantage (MA) Program. The MMA directed that important aspects of the Part D program be similar to, and coordinated with, regulations for the MA program. Generally, the provisions enacted in the MMA took effect January 1, 2006. The final rules implementing the MMA for the MA and Part D prescription drug programs appeared in the **Federal Register** on January 28, 2005 (70 FR 4588 through 4741 and 70 FR 4194 through 4585, respectively).

Since the inception of both Parts C and D, we have periodically revised our regulations either to implement statutory directives or to incorporate knowledge obtained through experience with both programs. For instance, in the September 18, 2008 and January 12, 2009 **Federal Register** (73 FR 54226 and 74 FR 1494, respectively), we issued Part C and D regulations to implement

provisions in the Medicare Improvement for Patients and Providers Act (MIPPA) (Pub. L. 110–275). We promulgated a separate interim final rule in January 16, 2009 (74 FR 2881) to address MIPPA provisions related to Part D plan formularies. In the final rule that appeared in the April 15, 2010 **Federal Register** (75 FR 19678), we made changes to the Part C and D regulations which strengthened various program participation and exit requirements; strengthened beneficiary protections; ensured that plan offerings to beneficiaries included meaningful differences; improved plan payment rules and processes; improved data collection for oversight and quality assessment; implemented new policies; and clarified existing program policy.

In a final rule that appeared in the April 15, 2011 **Federal Register** (76 FR 21432), we continued our process of implementing improvements in policy consistent with those included in the April 2010 final rule, and also implemented changes to the Part C and Part D programs made by recent legislative changes. The Patient Protection and Affordable Care Act (Pub. L. 111–148) was enacted on March 23, 2010, as passed by the Senate on December 24, 2009, and the House on March 21, 2010. The Health Care and Education Reconciliation Act (Pub. L. 111–152), which was enacted on March 30, 2010, modified a number of Medicare provisions in Pub. L. 111–148 and added several new provisions. The Patient Protection and Affordable Care Act (Pub. L. 111–148) and the Health Care and Education Reconciliation Act (Pub. L. 111–152) are collectively

referred to as the Affordable Care Act. The Affordable Care Act included significant reforms to both the private health insurance industry and the Medicare and Medicaid programs. Provisions in the Affordable Care Act concerning the Part C and D programs largely focused on beneficiary protections, MA payments, and simplification of MA and Part D program processes. These provisions affected implementation of our policies regarding beneficiary cost-sharing, assessing bids for meaningful differences, and ensuring that cost-sharing structures in a plan are transparent to beneficiaries and not excessive. In the April 2011 final rule, we revised regulations on a variety of issues based on the Affordable Care Act and our experience in administering the MA and Part D programs. The rule covered areas such as marketing, including agent/broker training; payments to MA organizations based on quality ratings; standards for determining if organizations are fiscally sound; low income subsidy policy under the Part D program; payment rules for non-contract health care providers; extending current network adequacy standards to Medicare medical savings account (MSA) plans that employ a network of providers; establishing limits on out-of-pocket expenses for MA enrollees; and several revisions to the special needs plan requirements, including changes concerning SNP approvals.

In a final rule that appeared in the April 12, 2012 **Federal Register** (77 FR 22072 through 22175), we made several changes to the Part C and Part D

programs required by statute, including the Affordable Care Act, as well as made improvements to both programs through modifications reflecting experience we have obtained administering the Part C and Part D programs. Key provisions of that final rule implemented changes closing the Part D coverage gap, or "donut hole," for Medicare beneficiaries who do not already receive low-income subsidies from us by establishing the Medicare Coverage Gap Discount Program. We also included provisions providing new benefit flexibility for fully-integrated dual eligible special needs plans, clarifying coverage of durable medical equipment, and combatting possible fraudulent activity by requiring Part D sponsors to include an active and valid prescriber National Provider Identifier on prescription drug event records.

*B. Issuance of a Notice of Proposed Rulemaking*

In the proposed rule titled "Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs," which appeared in the January 10, 2014 **Federal Register** (79 FR 1918), we proposed to revise the Medicare Advantage (MA) program (Part C) regulations and prescription drug benefit program (Part D) regulations to implement statutory requirements; strengthen beneficiary protections; exclude plans that perform poorly; improve program efficiencies; and clarify program requirements. The proposed rule also included several provisions designed to improve payment accuracy.

*C. Public Comments Received in Response to the CY 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs Proposed Rule*

We received approximately 7,600 timely pieces of correspondence containing multiple comments on the CY 2014 proposed rule. While we are finalizing several of the provisions from the proposed rule, there are a number of provisions from the proposed rule (for example, enrollment eligibility criteria for individuals not lawfully present in the United States) that we intend to address later and a few which we do not intend to finalize. We also note that some of the public comments were outside of the scope of the proposed rule. These out-of-scope public comments are not addressed in this final rule. Summaries of the public comments that are within the scope of the proposed rule and our responses to those public comments are set forth in the various sections of this final rule under the appropriate heading. However, we note that in this final rule we are not addressing comments received with respect to the provisions of the proposed rule that we are not finalizing at this time. Rather, we will address them at a later time, in a subsequent rulemaking document, as appropriate.

*D. Provisions Not Finalized in This Final Rule*

As noted previously, some of the provisions of the proposed rule will be addressed later and, therefore, are not being finalized in this rule. Table 3 lists the provisions that were proposed but are not addressed at this time. We note that several provisions that were proposed are not being finalized in this rule and are effectively being withdrawn; those provisions are not listed in Table 3.

TABLE 3—PROVISIONS NOT FINALIZED AT THIS TIME

| Proposed rule section | Topic |
|---|---|
| **Clarifying Various Program Participation Requirements** | |
| III.A.2 ........... | Two-year Limitation on Submitting a New Bid in an Area Where an MA has been Required to Terminate a Low-enrollment MA Plan (§ 422.504(a)(19)). |
| III.A.6 ........... | Changes to Audit and Inspection Authority (§ 422.503(d)(2) and § 423.504(d)(2)). |
| III.A.9 ........... | Collections of Premiums and Cost Sharing (§ 423.294). |
| III.A.10 ......... | Enrollment Eligibility for Individuals Not Lawfully Present in the United States (§§ 417.2, 417.420, 417.422, 417.460, 422.1, 422.50, 422.74, 423.1, 423.30, and 423.44). |
| III.A.11 ......... | Part D Notice of Changes (§ 423.128(g)). |
| III.A.12 ......... | Separating the Annual Notice of Change (ANOC) from the Evidence of Coverage (EOC) (§ 422.111(a)(3) and § 423.128(a)(3)). |
| III.A.14 ......... | Exceptions to Drug Categories or Classes of Clinical Concern (§ 423.120(b)(2)(vi)). |
| III.A.15 ......... | Medication Therapy Management Program (MTMP) under Part D (§ 423.153(d)(1)(v)(A))—outreach strategies. |
| III.A.16 ......... | Business Continuity for MA Organizations and PDP Sponsors (§ 422.504(o) and § 423.505(p)). |
| III.A.21 ......... | Efficient Dispensing in Long Term Care Facilities and Other Changes (§ 423.154). |
| III.A.23 ......... | Medicare Coverage Gap Discount Program and Employer Group Waiver Plans (§ 423.2325). |
| III.A.26 ......... | Payments to PDP Plan Sponsors For Qualified Prescription Drug Coverage (§ 423.308) and Payments to Sponsors of Retiree Prescription Drug Plans (§ 423.882). |
| III.A.32 ......... | Transfer of TrOOP Between PDP Sponsors Due to Enrollment Changes during the Coverage Year (§ 423.464). |
| III.A.37 ......... | Expand Quality Improvement Program Regulations (§ 422.152). |
| III.A.38 ......... | Authorization of Expansion of Automatic or Passive Enrollment Non-Renewing Dual Eligible SNPs (D-SNPs) to another D-SNP to Support Alignment Procedures (§ 422.60). |
| **Improving Payment Accuracy** | |
| III.B.2 ........... | Determination of Payments (§ 423.329). |
| III.B.3 ........... | Reopening (§ 423.346). |
| III.B.4 ........... | Payment Appeals (§ 423.350). |
| III.B.5 ........... | Payment Processes for Part D Sponsors (§ 423.2320). |
| III.B.6 ........... | Risk adjustment data requirements—proposal regarding annual deadline for MAO submission of final risk adjustment data (§ 422.310(g)(2)(ii)). |
| **Strengthening Beneficiary Protections** | |
| III.C.1 ........... | Providing High Quality Health Care (§ 422.504(a)(3) and § 423.505(b)(27)). |
| III.C.2 ........... | MA-PD Coordination Requirements for Drugs Covered Under Parts A, B, and D (§ 422.112). |

**29850**    Federal Register / Vol. 79, No. 100 / Friday, May 23, 2014 / Rules and Regulations

TABLE 3—PROVISIONS NOT FINALIZED AT THIS TIME—Continued

| Proposed rule section | Topic |
|---|---|
| III.C.3 .......... | Good Cause Processes (§ 417.460, § 422.74 and § 423.44). |
| III.C.4 .......... | Definition of Organization Determination (§ 422.566). |
| III.C.5 .......... | MA Organizations May Extend Adjudication Timeframes for Organization Determinations and Reconsiderations (§ 422.568, § 422.572, § 422.590, § 422.618, and § 422.619). |

**Strengthening Our Ability to Distinguish Stronger Applicants for Part C and D Program Participation and to Remove Consistently Poor Performers**

| | |
|---|---|
| III.D.1 .......... | Two-Year Prohibition When Organizations Terminate Their Contracts (§§ 422.502, 422.503, 422.506, 422.508, and 422.512). |
| III.D.2 .......... | Withdrawal of Stand-Alone Prescription Drug Plan Bid Prior to Contract Execution (§ 423.503). |
| III.D.3 .......... | Essential Operations Test Requirement for Part D (§§ 423.503(a) and (c), 423.504(b)(10), 423.505(b)(28), and 423.509). |
| III.D.4. .......... | Termination of the Contracts of Medicare Advantage Organizations Offering PDP for Failure for 3 Consecutive Years to Achieve 3 Stars on Both Part C and Part D Summary Star Ratings in the Same Contract Year (§ 422.510). |

**Implementing Other Technical Changes**

| | |
|---|---|
| III.E.1 .......... | Requirements for Urgently Needed Services (§ 422.113). |
| III.E.2 .......... | Skilled Nursing Facility Stays (§§ 422.101 and 422.102). |
| III.E.3 .......... | Agent and Broker Training and Testing Requirements (§§ 422.2274 and 423.2274). |
| III.E.4 .......... | Deemed Approval of Marketing Materials (§ 422.2266 and § 423.2266). |
| III.E.5 .......... | Cross-Reference Change in the Part C Disclosure Requirements (§ 422.111). |
| III.E.6 .......... | Managing Disclosure and Recusal in P&T Conflicts of Interest: (Formulary) Development and Revision by a Pharmacy and Therapeutics Committee under PDP (§ 423.120(b)(1)). |
| III.E.8 .......... | Thirty-Six-Month Coordination of Benefits (COB) Limit (§ 423.466(b)). |
| III.E.9 .......... | Application and Calculation of Daily Cost-Sharing Rates (§ 423.153). |
| III.E.10 ....... | Technical Change to Align Regulatory Requirements for Delivery of the Standardized Pharmacy Notice (§ 423.562). |
| III.E.12 ....... | MA Organization Responsibilities in Disasters and Emergencies (§ 422.100). |
| III.E.14 ....... | Technical Changes to Align Part C and Part D Contract Determination Appeal Provisions (§§ 422.641 and 422.644). |
| III.E.15 ....... | Technical Changes to Align Parts C and D Appeal Provisions (§§ 422.660 and 423.650). |
| III.E.17 ....... | Technical Change to the Restrictions on use of Information under Part D (§ 423.322). |

**III. Provisions of the Proposed Regulations and Analysis of and Responses to Public Comments**

*A. Clarifying Various Program Participation Requirements*

1. Closing Cost Contract Plans to New Enrollment (§ 422.503(b)(4))

To ensure that our original intent is realized and to eliminate the potential for organizations to move enrollees from one of their plans to another based on financial or some other interest, we proposed to revise paragraph § 422.503(b)(4)(vi)(G)(5) so that an "entity seeking to contract as an MA organization must [n]ot accept, or share, a corporate parent organization with an entity that accepts, new enrollees under a section 1876 reasonable cost contract in any area in which it seeks to offer an MA plan."

In making the proposed revision to paragraph § 422.503(b), we also proposed to add the definition of "parent organization" to § 422.2 of the MA program definitions, specifying that, "Parent organization means a legal entity that owns one or more other subsidiary legal entities." Although the MA program regulations do not currently define the term "parent organization," our proposed definition is consistent with the way the term is

currently used in the context of the MA program, for example, when assessing an organization's business structure. We requested comments on whether a parent organization with less than a 100 percent interest in a subsidiary legal entity should trigger the prohibition we proposed with the amendment at § 422.503(b)(4).

During the public notice and comment process, a handful of commenters provided their input on our proposal. Some of the respondents included multiple comments. The comments and our responses follow.

*Comment:* A commenter supported the proposal, stating that it would prevent possible shifting of sicker enrollees to cost plans and should result in Medicare savings.

*Response:* We thank the commenter for the support.

*Comment:* A commenter stated that there is no evidence of complaints about the current situation and thus no change in current policy is necessary.

*Response:* The intention of our initial rule was to ensure that situations not arise in which an entity was able to move an enrollee from one of its plans to another plan in the same area based on financial or other reasons that may not be in the enrollee's best interest. The current regulations limit this possibility to some extent, but, without the

proposed changes, would leave open the possibility that legal entities controlled by a shared parent organization could move enrollees from one plan to another, based on something other than the enrollee's best interest.

*Comment:* A commenter stated that risk-adjusted payments for MA plans eliminate any incentive for an entity to move sicker enrollees from an MA plan to a cost plan.

*Response:* While risk adjusted payments do help to account for costs associated with sicker enrollees, it may still be advantageous for an organization to move an enrollee from an MA plan to a cost plan. Even with risk adjustment, there are other reasons an organization might want to move enrollees from one plan to another to include enrollment and other interests based on the organization's business model.

*Comment:* A commenter stated that, because cost plan cost-sharing and premiums must be equal to the actuarial value of Medicare fee-for-service cost-sharing, cost plan enrollees with high health care needs would have higher relative costs resulting in higher premiums for the cost plan, thus removing any incentive for moving sicker enrollees from an entity's MA plan to the cost plan.

overpayment pending completion of the reopening.

*Response:* For both the Part C and Part D programs, the provisions regarding reporting and returning identified overpayments become effective the day after the date of applicable reconciliation. As we have stated, MA organizations and Part D sponsors are deemed to have returned the overpayment when they have submitted corrected data that is the source of the overpayment. We will recover the overpayment amount through routine processing. For Part D, that means that if an overpayment is discovered after the initial reconciliation but prior to the reopening described at § 423.346, a Part D sponsor may request a reopening and submit the corrected data to fulfill its obligation to return the overpayment. The overpayment will be reconciled through the routine reopening process.

*Comment:* A commenter stated that the onus on plans for the calculation of an overpayment amount creates a risk that CMS may be overpaid/underpaid in the monies returned.

*Response:* As explained in proposed rule (79 FR 1997), we will recover overpayments through the correction of erroneous data and established payment adjustment processes. Therefore, we believe that the risk the commenter mentions does not exist because CMS' systems will calculate the exact amount to be recovered.

*Comment:* A few commenters objected to the fact that the proposed rule does not address situations in which a sponsor has overpaid CMS, and requested that this regulation also set forth rules by which CMS handles an organization's overpayments to CMS.

*Response:* This final rule is intended to implement section 1128J(d) of the Act, which pertains only to overpayments the government made to contracting MA organizations and Part D sponsors.

*Comment:* A commenter requested that MA organizations and Part D sponsors be able to submit auditable estimates of an overpayment in lieu of determining which data is in error and submitting corrected data, given the fact that the administrative costs of determining a specific set of data deletes is significant relative to the size of the issue. The commenter recommended that CMS permit plans to proactively suggest the use of such tools to resolve potential overpayments.

*Response:* The use of auditable estimates is intended only for a limited set of circumstances. This may occur, for example, when the Part D reopening occurs prior to the end of the look-back period or if an MA organization or Part

D sponsor had a thoroughly-documented catastrophic loss of stored data. Information about the nature of such a request would be detailed in forthcoming operational guidance. Therefore, we will not allow, on a routine basis, submission of auditable estimates in lieu of submission of corrected data. By recovering overpayments based on the corrected payment data, we will be more likely to ensure that the most accurate overpayment amounts are returned to the Medicare Trust Fund.

*Comment:* A commenter expressed concern that this final rule could impose a boundless duty to troll medical records in search of unknown vulnerabilities, and requested that CMS make clear that Part C and Part D plans are not obliged to proactively search for an overpayment without reason to believe that a specific overpayment exists.

*Response:* The focus of this final rule is on ensuring that MA and Part D organizations return an overpayment when it is identified. For many years organizations have been obliged to submit accurate, complete, and truthful payment-related data, as described at §§ 422.504(l) and 423.505(k). Further, CMS has required for many years that diagnoses that MA organizations submit for payment be supported by medical record documentation. Thus, we have always expected that MA organization or Part D sponsor implement, during the routine course of business, appropriate payment evaluation procedures in order to meet the requirement of certifying the data they submit to CMS for purposes of payment. Therefore, we do not believe that §§ 422.326 and 423.360 represent such a new requirement.

*Comment:* A commenter requested that CMS confirm that the data submission requirement under this section is based on enrollment data and risk adjustment scores, and thus does not apply to direct overpayments from providers.

*Response:* Once an overpayment is identified, the MA or Part D organization is responsible for correcting the data that caused the overpayment. This is data that is routinely submitted to CMS for payment purposes, such as, risk adjustment data.

*Comment:* A commenter requested that CMS clarify if changes in a beneficiary's low income subsidy (LIS) status could result in an overpayment under this provision.

*Response:* As we stated in the proposed rule, we believe that MA organizations and Part D sponsors cannot be held accountable for the accuracy of the data controlled and

submitted to CMS by other entities. (We emphasize here that the term "other entities" used to discuss these overpayment provisions does not include the following parties referenced in §§ 422.504(i) and 423.505(i): first tier, downstream, and related entities, contractors, or subcontractors to the MA organization or Part D sponsor.) It is the Social Security Administration and the states that notify CMS of individuals whom they have determined to be eligible for the Part D LIS. We in turn provide the subsidy information, including effective date and level of subsidy, to the Part D plan in which the beneficiary enrolls. Although, we will not consider an overpayment to have occurred strictly due to changes in a beneficiary's LIS status, Part D sponsors are required to adjust prescription drug event (PDE) data to accurately reflect the beneficiary's LIS status.

*Comment:* A commenter supported our proposal for when overpayments have been identified.

*Response:* We appreciate the commenter's support for our proposal.

*Comment:* A few commenters requested that CMS provide more clarity or an example of what is meant by "acts in reckless disregard or deliberate ignorance."

*Response:* We are revising our definition of an identified overpayment to state that an MA organization or Part D sponsor has identified an overpayment when it has determined, or should have determined through the exercise of reasonable diligence, that the MA organization or Part D sponsor has received an overpayment.

As to the circumstances that give rise to a duty to exercise reasonable diligence, we are not able to anticipate all factual scenarios in this rulemaking. MA organizations and Part D sponsors are responsible for ensuring that payment data they submit to CMS are accurate, truthful, and complete (based on best knowledge, information, and belief), and are expected to have effective and appropriate payment evaluation procedures and effective compliance programs as a way to avoid receiving or retaining overpayments. Thus, at a minimum, reasonable diligence would include proactive compliance activities conducted in good faith by qualified individuals to monitor for the receipt of overpayments. However, conducting proactive compliance activities does not mean that the person has satisfied the reasonable diligence standard in all circumstances. In certain circumstances, for example, reasonable diligence might require an investigation conducted in good faith and in a timely manner by

qualified individuals in response to credible information of a potential overpayment.

We note that in discussing the standard term "reasonable diligence" in the preamble, we are interpreting the obligation to "report and return the overpayment" which is contained in section 1128J(d) of the Social Security Act. We are not seeking to interpret the terms "knowing" and "knowingly", which are defined in the Civil False Claims Act and have been interpreted by a body of False Claims Act case law.

*Comment:* Some commenters thought that we had an overly broad interpretation of the statute and that there was no statutory basis for CMS to interpret the term "identified" in section 6402 of the Affordable Care Act to include "reckless disregard or deliberate ignorance of the existence of the overpayment." A commenter stated that the term "knowing" is not actually used in the overpayment standard set forth in section 6402(d) of the Affordable Care Act, so the mere existence of an errant reference to the False Claims Act definition of "knowing" does not give CMS sufficient basis to apply the expansive False Claims Act knowledge standard to the definition of "identified" under section 6402. This commenter noted that in an earlier version of the Affordable Care Act, H.R. 3962, used the False Claims Act knowledge standard in the section on reporting and returning of overpayments. The commenter also stated that the final version of the Affordable Care Act enacted by the Congress used the term "identified," and not the word "knowledge." This commenter believed that the Congress's explicit rejection of the False Claims Act knowledge standard, and use of the term "identified" in the final legislative language weighs against incorporating the False Claims Act knowledge standard into the regulatory provision.

*Response:* We disagree with the commenters' arguments. While we acknowledge that the terms "knowing" and "knowingly" are defined but not otherwise used in section 1128J(d), we believe that the Congress intended for section 1128J(d) to apply broadly. If the requirement to report and return overpayments applied only to situations where the MA organization or Part D sponsor has actual knowledge of the existence of an overpayment, then these entities could easily avoid returning improperly received payments and the purpose of the section would be defeated. Thus, we decline to read a narrow actual knowledge limitation into the law as suggested by commenters.

*Comment:* Several commenters recommended that CMS remove the language relating to "reasonable diligence" from the proposed regulation. These commenters believed that an identified overpayment should be limited to actual knowledge of an overpayment.

*Response:* For the reasons discussed previously, we decline to read a narrow actual knowledge limitation into the law as suggested by commenters.

*Comment:* A few commenters were concerned that by adding a reasonable diligence requirement, CMS appears to be suggesting that a much lower level of sponsor behavior—a failure to act reasonably—could trigger potential False Claims Act liability. One commenter stated that the phrase "reasonable diligence" is not a recognized or defined standard and is overly vague as to the obligations of plans to follow through on information received regarding a potential overpayment. The commenters have serious concerns about the implication of such a standard.

*Response:* We understand the commenters' concerns. However, we do not believe that it is inappropriate to expect that MA organizations and Part D sponsors act reasonably. We note that it is the statute that establishes liability under the False Claims Act for failure to report and return identified overpayments, pursuant to section 1128J(d)(3).

c. Look-Back Period for Reporting and Returning Overpayments

We proposed at §§ 422.326(e) and 423.360(e) to codify a look-back period for MA organizations and Part D sponsors. MA organizations and Part D sponsors would be required to report and return any overpayment that they identify within the 6 most recent completed payment years. The statute of limitations related to the False Claims Act is 6 years from the date of the violation or 3 years from the date the relevant government official learns of the situation, but in no case more than 10 years from the date of the violation. CMS proposed 6 years as the look-back period because we believe this best balances government's interest in having overpayments returned with entities' interest in finality. Six years also is consistent with the CMP provisions, and maintenance of records requirements under the contracts. We also proposed that overpayments resulting from fraud would not be subject to this limitation of a look-back period.

We received the following comments on the look-back period, and our responses follow.

*Comment:* We received a few comments recommending that we shorten the 6-year look-back period. A commenter noted that permitting greater finality in overpayment reporting and recovery will decrease administrative costs and free up resources to focus on benefits. This commenter also stated that an organization would have to retain a significant amount of documentation to fully support and justify payments, more than what they would retain under CMS's 10-year record retention requirement. Several commenters recommended that the look-back period be 3 years to align with the RAC look-back period. A commenter noted that the 3-year period would also be consistent with the federal government's treatment of government contractors that are subject to the Federal Acquisition Regulation. A couple of commenters recommended that we implement a 4-year look-back period to align with the 4-year period that Medicare Administrative Contractors can reopen Medicare fee-for-service payment determinations.

*Response:* We disagree with the commenters' recommendations to shorten the look-back period. We note that section 1128J(d) of the Act has no time limit to the obligation to report and return overpayments received by a provider or supplier. However, as we stated in the preamble to our proposed rule and again in this preamble to our final rule, we proposed 6 years as the look-back period because we believe this best balances government's interest in having overpayments returned with entities' interest in finality. Six years is consistent with the CMP provisions, and maintenance of records requirements under the contracts. It is also consistent with the False Claims Act in that the statute of limitations related to the False Claims Act is 6 years from the date of the violation or 3 years from the date the relevant government official learns of the situation, but in no case more than 10 years from the date of the violation. We believe that our final rule does not create additional recordkeeping burden or cost. Under § 422.504(d) and § 423.505(d), MA organizations and Part D sponsors are required to maintain for 10 years books, records, documents, and other evidence of accounting procedures and practices related to costs, financial statements, cash flow, etc.

*Comment:* A commenter requested that CMS clarify the parameters of the 6-year look-back provision.

*Response:* As we stated in the preamble to the proposed rule and this

final rule and again in §§ 422.326(e) and 423.360(e), MA organizations and Part D sponsors are required to report and return any overpayment that they identify within the 6 most recent completed payment years. That would mean, for example, after the initial reconciliation that takes place for Part D payments (that is, the determination on the final amount of direct subsidy described in § 423.329(a)(1), final reinsurance payments described in § 423.329(c), the final amount of the low income subsidy described in § 423.329(d), or final risk corridor payments as described in § 423.336) for contract year 2015 (which will take place at the end of 2016), Part D sponsors are obligated to report and return overpayments under § 423.360 for contract years 2010 through 2015.

*Comment:* A few commenters recommended that CMS impose the same limitation on the look-back period for all overpayments, even those relating to fraud. A commenter noted that under the statutory scheme set forth in section 6402 of the Affordable Care Act, the existence of an overpayment does not depend on, or otherwise reflect, the existence of fraud. Commenters also requested clarification from CMS whether MA organizations and Part D sponsors that become aware of an overpayment prior to the look-back period have an obligation to investigate and determine whether that overpayment resulted from fraud. These commenters were concerned that MA organizations and Part D sponsors would have to investigate potential overpayments indefinitely, no matter how far in the past they may have occurred, because these organizations would have to determine whether there was any fraud in connection with the potential overpayment in order to determine whether a reporting obligation exists.

*Response:* Upon further review, we agree with the commenters' suggestion that CMS impose the same limitation on the look-back period for all overpayments. Six years is consistent with the more commonly applicable FCA statute of limitations as well as the statute of limitations under section 1128A of the Act. Therefore, we have elected to establish a 6-year look-back period regardless of the nature of the overpayment, and we have amended the regulation text at §§ 422.326(e) and 423.360(e) accordingly. We note that the government may have other avenues for pursuing the return of overpayments due to false and fraudulent claims outside of these provisions.

Finally, we note that an MA organization's and Part D sponsor's obligation to investigate and identify false and fraudulent claims is outside the scope of this final rule.

After consideration of the public comments received on the overpayment provisions, we are finalizing as proposed the following provisions: §§ 422.1, 422.300, 422.504(l), 423.1, and 423.505(k). We are finalizing the provisions at § 422.326, with the following modifications. First, we add at the end of paragraph (d) the phrase "unless otherwise directed by CMS for the purpose of § 422.311." Second, we strike the following sentence in the proposed paragraph on the six-year look-back period: "Overpayments resulting from fraud are not subject to this limitation of the lookback period." To increase clarity we also revise paragraph (c) regarding identified overpayments. We also are making a technical correction by redesignating proposed paragraph (d)(3) on enforcement as paragraph (e), and redesignating proposed paragraph (e) on the six-year look-back period as paragraph (f), and revising new paragraph (e) on enforcement to say "Any overpayment retained by an MA organization is an obligation under 31 U.S.C. 3729(b)(3) if not reported and returned in accordance with paragraph (d) above."

Finally, we are finalizing the provisions at § 423.360 with the following modifications. We strike the following sentence in the proposed paragraph on the six-year look-back period: "Overpayments resulting from fraud are not subject to this limitation of the lookback period." To increase clarity we also revise paragraph (c) regarding identified overpayments. We also are making a technical correction by redesignating proposed paragraph (d)(3) on enforcement as paragraph (e), and redesignating proposed paragraph (e) on the six-year look-back period as paragraph (f), and revising new paragraph (e) on enforcement to say "Any overpayment retained by a Part D sponsor is an obligation under 31 U.S.C. 3729(b)(3) if not reported and returned in accordance with paragraph (d)."

**2. Risk Adjustment Data Requirements (§ 422.310)**

We proposed several amendments to § 422.310 to strengthen existing regulations related to the accuracy of risk adjustment data. We proposed to renumber existing paragraph § 422.310(e) as paragraph (e)(2) and add new paragraph (e)(1), which would require that any medical record reviews conducted by an MA organization must be designed to determine the accuracy of diagnoses submitted under

§§ 422.308(c)(1) and 422.310(g)(2). Under our proposal, medical record reviews conducted by an MA organization could not be designed *only* to identify diagnoses that would trigger additional payments by CMS to the MA organization; medical record review methodologies would have to be designed to identify errors in diagnoses submitted to CMS as risk adjustment data, regardless of whether the data errors would result in positive or negative payment adjustments.

We also proposed to amend § 422.310(g) regarding deadlines for submission of risk adjustment data; our proposal was to restructure and revise subparagraph (g)(2) and add subparagraph (g)(3). Our current procedures generally permit submission of risk adjustment data after the final risk adjustment submission deadline only to correct overpayments. Thus, we proposed, at § 422.310(g)(2)(ii) to explicitly permit late submissions only to correct overpayments but not to submit diagnoses for additional payment so that the regulation text would be consistent with our procedures.

Finally, we proposed to make two additional changes in paragraph (g). First, we proposed the deletion of the January 31 deadline in paragraph (2) and replacing it with the statement that CMS will announce the deadline by which final risk adjustment data must be submitted to CMS or its contractor. We noted that the risk adjustment data submission deadline would also function as the Part C applicable reconciliation date for purposes of proposed § 422.326 on overpayment rules, also discussed in this final rule. Second, we proposed adding paragraph (3) to § 422.310(g). Proposed paragraph (3) cites § 422.326 as the source of rules for submission of corrected risk adjustment data after the final risk adjustment data submission deadline, that is, after applicable reconciliation as defined at § 422.326(a).

In response to the January 10, 2014 proposed rule, we received approximately 25 pieces of correspondence from organizations and individuals regarding these proposals. We received the following public comments and our responses follow.

*Comment:* Many commenters expressed concern about the vagueness and overly broad statement of CMS' proposal to amend § 422.310(e) to require that medical record reviews conducted by MA organizations be designed to determine the accuracy of diagnoses they submitted to CMS. Some commenters thought this implied a requirement to verify every diagnosis

submitted by every provider, while others thought this implied a restriction on the ability of plans to identify what medical records to review. Other commenters believed the proposed amendment limited plans' ability to review medical records for operational purposes other than risk-adjusted payment, such as focusing on only a portion of a medical record for a subset of beneficiaries in order to enhance HEDIS scores, conduct contract compliance reviews, and validate claims processing and billing.

Finally, a few commenters argued that CMS should offset the payment impact of diagnoses an MA organization submitted to CMS that were later found through medical record reviews to not be supported by medical record documentation by adjusting the amount of CMS' overpayment to the MA organization for the level of error in equivalent diagnoses in FFS claims data. Specifically, the commenters argued that CMS should give MA organizations a credit for erroneous diagnoses they submitted from their providers' claims up to the rate identified by CMS as the applicable FFS Adjuster in the RADV program. The commenters also argued that there is no reason to require that both MA and FFS diagnosis data be scrutinized for error rates when determining retroactive payment adjustments, while not engaging in a similar adjustment process when paying plans prospectively.

*Response:* We thank the commenters for their input. We are not finalizing the proposed amendment to § 410.322(e).

However, we emphasize that our decision to not finalize this regulatory proposal does not change CMS' existing contractual requirement that MA organizations must certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the risk adjustment data they submit to CMS. Further, this decision does not change the long-standing risk adjustment data requirement that a diagnosis submitted to CMS by an MA organization for payment purposes must be supported by medical record documentation.

*Comment:* A few commenters supported CMS' proposal to remove the current date of January 31 as the annual final risk adjustment data submission deadline and replace it with the provision that CMS will announce the deadline annually, with the proviso that CMS' timing of this annual deadline always allows organizations sufficient opportunity to make final data submissions. Several other commenters stated their concern about this proposed change in deadline, including a concern

that CMS might announce a deadline earlier than January 31 in some years. These commenters requested that CMS clarify that the annual deadline would never be before January 31, and a few commenters suggested that the regulation state that the deadline is January 31 but may be extended. Finally, a few commenters requested that CMS not change the January 31 date to a floating date, in order to allow operational stability.

*Response:* We are not finalizing this proposal at this time.

*Comment:* Many commenters disagreed with CMS' proposal under § 410.322(g)(2) that, after the final risk adjustment data submission deadline, CMS would permit submission of data to correct overpayments but not permit late submission of diagnosis data that would result in additional payment, asserting that this asymmetrical approach does not promote CMS' stated goal of improving payment accuracy. The commenters maintained that an MA organization should be allowed to submit additional diagnoses after the final risk adjustment data submission deadline to correct not only an overpayment to the MA organization, but also an underpayment. A commenter recommended that, after the final deadline, MA organizations should be able to submit paired deletions-additions of diagnoses as long as the result is not an increased payment to the organization but a smaller reduction in payment than would otherwise occur if only the deletion were submitted; for example, an MA organization may want to delete the diagnosis code for diabetes with acute complications and replace it with the code for diabetes without complications so that it loses only some of the payment. Finally, a commenter requested that CMS allow exceptions to the general rule that no new diagnoses may be submitted after the final risk adjustment data submission deadline for special circumstances such as system failures, file formatting issues, and other technical problems.

*Response:* For a given payment year (which is a calendar year), CMS applies diagnoses from the previous year (the data collection year) to calculate beneficiary risk scores used to risk-adjust payments to MA organizations in the payment year. MA organizations must finalize any corrections and new submissions of diagnosis data for a data collection year by January 31 of the year after the payment year. That is, we allow 13 months after the end of the diagnosis year for MA organizations to identify errors in data they have submitted (that is, deleting diagnoses from CMS' systems) and to identify and

submit additional diagnoses that were not submitted during the diagnosis year. We believe that is a very reasonable period of time to finalize risk adjustment data for a diagnosis year.

These risk adjustment processes have been in place for many years, and we believe it is the responsibility of MA organizations to have internal audit processes in place allowing them to finalize their risk adjustment data for a payment year by the conclusion of this 13-month period. Therefore, we are finalizing, as proposed, the provision codified at § 422.310(g)(2)(ii) that, after the final deadline, an MA organization may submit risk adjustment data to correct overpayments but not to add payments.

*Comment:* A commenter supported CMS' proposal to limit post-deadline modifications to deletions of incorrect diagnoses but requested that CMS offer one additional opportunity to eliminate unsupported diagnosis codes in advance of a RADV audit.

*Response:* When we are preparing to initiate a RADV audit cycle, all MA organizations are notified that they should eliminate unsupported diagnoses from CMS' systems by a date specified in the notice. Subsequently, we inform the contracts that have been selected for RADV.

In summary, after consideration of the public comments received, we are not finalizing the proposed amendment to § 410.322(e). Also, we are not finalizing at this time our proposal at § 422.310(g)(2)(ii) to remove the current date of January 31 as the annual final risk adjustment data submission deadline and replace it with the provision that CMS will announce the deadline annually. We are finalizing as proposed the restructuring of §§ 422.310(g)(2) and the 422.310(g)(2)(ii) provision to prohibit submission of diagnoses for additional payment after the final risk adjustment data submission deadline. We did not receive any comments on subparagraph (g)(3) and are finalizing it as proposed.

### 3. RADV Appeals

#### a. Background

We published final Risk Adjustment Data Validation (RADV) appeals regulations in the April 15 2010 **Federal Register** (75 FR 19677). These rules were proposed and finalized under our authority to establish Medicare Advantage (MA) program standards at section 1856(b)(1) of the Act and are found at § 422.311 et seq. Since finalizing these rules in 2010, we conducted additional RADV audits and determined that some of the appeals

provisions finalized in the 2010 RADV Appeals final rule should be modified to strengthen and streamline the RADV appeals process and to prevent confusion. Therefore, we proposed revisions to the RADV appeals regulations on January 10, 2014. These proposed RADV provisions will apply to any RADV determinations issued on or after the effective date of this regulation.

We proposed changing certain RADV definitions at § 422.2. Specifically, we proposed removing the definition Initial Validation Contractor (IVC); removing the definition of RADV payment error calculation appeal process; and removing the definition for "One Best Medical Record for the purposes of Medicare Advantage Risk Adjustment Data Validation (RADV)". In addition, we proposed adding one new definition by specifically defining the RADV appeals process. We also proposed revising the definitions of "Risk Adjustment Data Validation (RADV)" and "attestation process" within the RADV appeals context. Furthermore, we proposed amending RADV definitions at § 422.2 to specify that the Secretary, along with CMS, could conduct RADV audits.

At § 422.311, we proposed to update select RADV appeals terminology. We proposed amending the RADV regulations by adopting one common term to refer to RADV audit reports: "RADV Audit Report". As mentioned earlier, we proposed removing from the RADV regulations the term—"Initial Validation Contractor, or IVC," since RADV medical record review process no longer utilizes "initial" and "secondary" validation contractors to conduct medical record review under RADV. Instead, we now utilize medical record reviewers to code medical records who may be employed by the same or different medical record review contractors.

At § 422.311(c)(1), we proposed to simplify the RADV appeals process by combining the two existing RADV appeal procedures—one for medical record review and one for payment error calculation—into one set of requirements and one process comprised of three administrative steps: Reconsideration, hearing officer review, and CMS Administrator-level review. Combining these existing RADV medical record review determination and payment error calculation appeals policies and processes improves the overall appeals process by simplifying the overall RADV appeals process and reducing burden on all parties involved in the RADV appeals process. We also believed that doing so improves overall

RADV appeals procedures by providing clarity that leads to greater efficiencies in adjudicating RADV appeals. Within this overall framework, we also proposed defining issues that would be eligible for RADV appeal at § 422.311(c)(2) and issues that would not be eligible for RADV appeals under this combined-appeal process at § 422.311(c)(3). We further proposed defining the manner and timing of a request for RADV appeal at § 422.311(c)(2)(iii), a reconsideration process at § 422.311(c)(6), a hearing process at § 422.311(c)(7)(iv), and an Administrator-level review at § 422.311(c)(8).

At § 422.311(a), we proposed that the Secretary, along with CMS, be permitted to conduct RADV audits beginning with the effective date of this regulation. Because of the absence of a clearly-defined burden of proof standard for RADV medical record review determination appeals, at § 422.311(c)(4) we proposed adoption of a burden of proof standard for all RADV determinations—be they payment error calculation or RADV medical record review determinations—whereby the burden would be on MA organizations to prove, based on a preponderance of the evidence, that CMS's determination(s) was (were) erroneous. At § 422.311(b)(2) we proposed changing the compliance date for meeting RADV audit requirements for the validation of risk adjustment data to the due date when MA organizations selected for RADV audit must submit medical records to the Secretary—and not only CMS.

We received comments from health plans, managed care industry trade associations, providers, provider trade associations and other interested parties. These comments have resulted in changes to the previously described proposals, as discussed later in this section. Some of the comments we received did not apply to the proposed RADV appeals processes. However, because some of these comments apply to underlying RADV audit process, we are responding to certain comments because they appear to be relevant to the RADV appeals process. Other comments were clearly outside the scope of our proposed rule, so we have not included responses to those comments.

b. RADV Definitions

We proposed to amend the RADV definitions at § 422.2 as follows:
• Removing the following definitions:
++ "Initial Validation Contractor (IVC)" means the first level of medical record review under the RADV audit process.

++ "RADV payment error calculation appeal process" means an administrative process that enables MA organizations that have undergone RADV audit to appeal the CMS calculation of an MA organization's RADV payment error.

++ "The one best medical record for the purposes of Medicare Advantage Risk Adjustment Validation (RADV)" means the clinical documentation for a single encounter for care (that is, a physician office visit, an inpatient hospital stay, or an outpatient hospital visit) that occurred for one patient during the data collection period. The single encounter for care must be based on a face-to-face encounter with a provider deemed acceptable for risk adjustment and documentation of this encounter must be reflected in the medical record.

• Adding the following definition:
++ "RADV appeal process" means an administrative process that enables MA organizations that have undergone RADV audit to appeal the Secretary's medical record review determinations and the Secretary's calculation of an MA organization's RADV payment error.

• Revising the following definitions:
++ Risk adjustment data validation (RADV) audit means a payment audit of a Medicare Advantage (MA) organization administered by CMS or the Secretary that ensures the integrity and accuracy of risk adjustment payment data.

++ "Attestation process" means a CMS-developed RADV process that enables MA organizations undergoing RADV audit to submit CMS-generated attestations for eligible medical records with missing or illegible signatures or credentials. The purpose of the CMS-generated attestations is to cure signature and credential issues for eligible medical records. CMS-generated attestations do not provide an opportunity for a provider or supplier to replace a medical record or for a provider or supplier to attest that a beneficiary has the medical condition.

We received no comments specifically recommending modifications to the proposed definitions as stated, though we did receive comments regarding the policy behind some of these definition changes. The policy comments will be addressed later in this rule, though we are finalizing the specific definitions without modification.

c. Publication of RADV Methodology

In the October 22, 2009 proposed rule, and as reinforced in the April 15, 2010 final rule, we indicated that we would, "publish its RADV methodology in some type of public document—most

likely, a Medicare Manual, so that the public can review and provide comment as it deems necessary". We also indicated that we would provide an annual notice of RADV audit methodology. Our last RADV-related notice of methodology was published in February 2012. We will continue to publish a notice of the methodology employed, but will do so only if there is a change in the RADV methodology that would require publication. We note that these notices of RADV audit methodology updated information provided on RADV audit methodology provided in the October 22, 2009 proposed rule and April 15, 2010 final rule.

In addition, we provided in the October 22, 2009 proposed rule preamble that we would provide an expanded explanation of methodology and payment error calculation factors as a part of each audit report of findings that we send to MA organizations that undergo RADV audit. Such explanation and factors have been and will continue to be part of the RADV audit report(s) that CMS provides health plans that have undergone RADV audits.

d. Proposal To Update RADV Appeals Terminology (§ 422.311)

Current RADV regulations utilize the following terms for the CMS-issued RADV audit report: Audit report post medical record review; RADV audit report; IVC-level RADV audit report; and RADV audit report of finding. This use of multiple terms to refer to what is the same audit report (the RADV audit report that CMS issues following conclusion of the medical record review portion of the audit) is potentially confusing. Therefore, we proposed amending the RADV regulations throughout to adopt one common term to refer to RADV audit reports: "RADV Audit Report". By standardizing terminology throughout the RADV regulations, the proposed amendment provides clarity which may lead to increased efficiency.

As mentioned earlier in the description of RADV-related definitions that have changed, we have revised certain RADV-related definitions to accommodate changes to both the RADV audit process and the RADV appeals process. One definition that we have removed from the RADV regulations is Initial Validation Contractor, or IVC. The RADV medical record review process no longer utilizes "initial" and "secondary" validation contractors to conduct medical record review under RADV. Instead we now utilize medical record reviewers to code medical records undergoing RADV review.

These reviewers may be employed by the same or different medical record review contractors. Therefore, the term "IVC" is no longer relevant to the RADV audit process. As a result, we proposed to remove this term from the RADV regulations at the following citations: § 422.311(c)(2)(i)(B) through (D); § 422.311(c)(2)(ii)(B), § 422.311(c)(2)(iii)(A), § 422.111(c)(2)(v), (vi), § 422.311(c)(3)(ii)(A), and § 422.311(c)(3)(iii)(A) and (B). We invited comment on this proposal.

*Comment:* A commenter requested that CMS verify that the medical record review error determination standard, which presently requires multiple review determinations by independent coders to confirm a CMS–HCC coding error, remains in effect and is not altered by this proposed rule.

*Response:* While we did not propose RADV coding changes, we believe the question merits a response. We believe that our proposal to remove the definition of "Initial Validation Contractor" (IVC) may have led some to believe that we were abandoning RADV audit processes that require multiple levels of independent medical record review (coding) before we will confirm a CMS–HCC coding error. This standard has not changed, notwithstanding the removal of the term IVC from the RADV appeals rules. We continue to utilize medical record reviewers to code medical records undergoing RADV review, though these reviewers may now be employed by the same or different medical record review contractors. The principle of independent review and multiple confirmations of an identified CMS–HCC remain in effect.

e. Proposal To Simplify the RADV Appeals Process

Currently, there are two types of RADV-related appeals processes described in our regulations at § 422.311: Medical record review-determination appeals and RADV payment error calculation appeals. RADV medical record review-determination appeal requirements and procedures are discussed at § 422.311(b)(3) and § 422.311(c)(2). Medical record review determination appeal is a two-stage administrative appeal process—the first step is a hearing by a hearing officer, followed by a CMS Administrator—level review. This appeal procedure provides MA organizations with an opportunity to appeal RADV medical record review determinations that are made by coders reviewing the medical record documentation submitted by MA

organizations undergoing RADV audit. The second type of RADV appeal, payment error calculation appeal, is discussed at § 422.311(c)(3). Payment error calculation appeal is a three-pronged appeal process: reconsideration, followed by a hearing officer review, followed by CMS Administrator—level review. This appeal process was specifically designed to afford MA organizations the opportunity to appeal CMS's contract-level RADV payment error calculation.

We proposed that the administrative appeals language described at § 422.311(b)(3) and § 422.311(c)(2) for RADV medical record review determination appeals and § 422.311(c)(3) for RADV payment error calculation appeals be replaced with new regulatory language proposed § 422.311(c)(1), that combines the two existing RADV appeal policies and procedures into one set of requirements and one process. We proposed to combine the two RADV appeals processes into one combined RADV appeals process that is comprised of three administrative steps: Reconsideration, hearing officer review, and CMS Administrator-level review. A three-step administrative appeals process comprising reconsideration, hearing officer review, and Administrator-levels of review is a common administrative appeals model used elsewhere within the Medicare managed care program, such as in appealing contract award determinations and intermediate sanctions. The combined RADV appeal process that we proposed at new § 422.311(c)(1), also has the benefit of simplifying what is today a complex two-track appeal process into one process. While both CMS and the MA industry will benefit from simplifying this process, MA organizations also obtain an additional level of review under the combined approach since MA organizations will be afforded a reconsideration appeal step for medical record review determinations that is today—not part of the existing RADV appeal process. Shortening the existing two-track appeal process should also reduce the resources and level of effort needed from both MA organizations and CMS in participating in a RADV appeal proceeding. Under this proposal, MA organizations can simply request to appeal their RADV audit findings one time and specify whether they want to appeal either their medical record review determination(s), payment error calculation, or both. The specific details regarding this proposed process follow. We proposed these changes based upon

our experience with RADV appeals and because we hope to reduce the burden associated with undertaking RADV appeals on both MA organizations and CMS. The details of the proposed policy and procedure follow.

**(1) Issues Eligible for RADV Appeal**

Current regulations at §§ 422.311(c)(2) et seq., and 422.311(c)(3) et seq., specify RADV-related medical record review and payment error calculation documents and issues eligible for the medical record review determination and payment error calculation appeal processes. We proposed to amend the policies and procedures around issues eligible for RADV appeals at § 422.311(c)(2) and § 422.311(c)(3) by combining proposed policies and procedures for the existing two-pronged appeal approach into one set of policies and procedures for RADV appeals at the new § part 422.311(c)(2)(iv). At § 422.311(c)(2)(i), we proposed that as a general rule, MA organizations may appeal RADV medical record review determinations and RADV payment error calculation, though in order to be eligible to pursue these appeals, we specify at proposed § 422.311(c)(2)(i)(A) and (B) that MA organizations must adhere to established RADV audit procedures and requirements and adhere to RADV appeals procedures and requirements. At § 422.311(c)(2)(ii) we proposed that failure to follow RADV audit procedures and requirements and RADV appeals procedures and requirements will render the MA organization's request for RADV appeal invalid. Furthermore, at proposed § 422.311(c)(2)(iii) we stipulate that the MA organization's written request for medical record review determination appeal must specify the audited HCC(s) that have been identified pursuant to RADV audit as being in error, and further specify that MA organizations must provide a justification in support of the audited HCC(s) that the MA organization elects to appeal. At § 422.311(c)(2)(i)(iv) we proposed that for each audited HCC, MA organizations may appeal one medical record that has undergone RADV medical record review and that if an attestation was submitted to cure a signature or credential issue, that attestation may likewise be included in the HCC appeal. For example, if an MA organization submitted a medical record that did not contain a signature and/or credential—and the MA organization submitted an attestation to cure the error that CMS subsequently failed to accept—the MA organization could choose to appeal CMS's determination to not accept the submitted attestation. We reiterate that

the purpose of CMS-generated attestations is to cure signature and credential errors associated with an eligible submitted medical record and not to provide an opportunity for a provider or supplier to attest that a beneficiary has a certain medical condition. Evidence for the existence of the medical condition is found in a medical record.

We proposed to modify our language at § 422.311(c)(2)(i)(v) to clarify existing RADV appeals provisions which stipulate that MA organizations must adhere to the "one best medical record" policy. Under changes to the RADV audit methodology announced by CMS in February 2012, we now allow MA organizations to submit more than one medical record (that is, more than the "one best medical record") during the RADV audit process to validate an audited CMS–HCC. However, for purposes of appealing a CMS medical record review determination, we will not permit organizations to appeal multiple medical records but will instead—require that MA organizations identify a record from amongst those records submitted, and to submit that record for appeal. For each audited HCC, MA organizations may appeal only one medical record that has undergone RADV review. This policy was published in the February 2012 White Paper and is not included in this final rule.

At § 422.311(c)(2)(vi) we proposed that a written request for RADV payment error calculation appeal must clearly specify the MA organization's own RADV payment error calculation and must also specify where the payment error calculation was erroneous.

**(2) Issues Not Eligible for RADV Appeals**

At § 422.311(c)(3) we proposed documents and issues that are ineligible for RADV appeals. Consistent with the overall approach of combining into one RADV appeals process what was heretofore two separate RADV appeals processes—by way of this new proposed section, we propose to amend existing regulations at § 422.311(c)(3). At new § 422.311(c)(3), we proposed that MA organizations' request for appeal may not include HCCs, medical records or other documents beyond the audited HCC, selected medical record and any accompanying attestation that the MA organization chooses to appeal. We specify at § 422.311(c)(3)(ii) that the MA organizations may not appeal CMS's medical record review determination methodology or CMS's payment error calculation methodology. This is a

clarification to existing RADV regulations at § 422.311(c)(3)(D) which specifies that MA organizations may not appeal CMS's payment error calculation methodology. At § 422.311(c)(3)(iii) we specify that MA organizations may not appeal RADV medical record review-related errors when appealing RADV error-calculation issues since medical record review determination issues must be resolved before we can calculate RADV payment errors. And at § 422.311(c)(3)(iv) we specify that RADV errors that result from an MA organization's failure to submit a medical record are not eligible for appeal.

**(3) Manner and Timing of a Request for RADV Appeal**

We proposed to replace existing RADV regulations at § 422.311(c)(2)(iii) et seq., and § 422.311(c)(3)(iii) et seq., regarding the manner and timing of a request for RADV appeals. Again, at § 422.311(c)(5), we proposed to combine the formerly two separate sets of requirements and procedures into one RADV appeals process addressing the request for RADV appeal. At § 422.311(c)(5)(i) we proposed that at the time the Secretary issues her RADV audit report, the Secretary notifies audited MA organizations that they may appeal RADV HCC errors that are eligible for medical record review determination appeal and may appeal the Secretary's RADV payment error calculation. At § 422.311(c)(5)(ii) we specify that MA organizations have 30 days from the date of CMS's issuance of the RADV audit report to file a written request with CMS for RADV appeal. This request for RADV appeal must specify whether the MA organization requests medical record review determination appeal, whether the MA organization requests RADV payment error calculation appeal, or whether the MA organization requests both medical record review determination appeal and RADV payment error calculation appeal—and in each instance—the issues with which the MA organization disagrees, and the reasons for the disagreements. See proposed regulations at § 422.311(c)(6).

In proposed § 422.311(c)(5)(ii), we specify that while MA organizations may now elect to appeal either medical record review determination, payment error calculation, or both—they must notify CMS which issues they will appeal at the same time. This new provision replaces existing RADV appeals requirements regarding notification at § 422.311(c)(2)(iii) and § 422.311(c)(3)(iii)(C).

**EXHIBIT D-18**



TABLE 1 TO PARAGRAPH (a)(1)—Continued

| Commodity | | | | | | Parts per million |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |
| Coffee, green beans | | | | | | 0.03 |
| * | * | * | * | * | * | * |
| Fennel, Florence, fresh leaves and stalk | | | | | | 20 |
| * | * | * | * | * | * | * |
| Kohlrabi | | | | | | 4 |
| Leaf petiole vegetable subgroup 22B | | | | | | 20 |
| Leafy greens subgroup 4–16A | | | | | | 40 |
| * | * | * | * | * | * | * |
| Papaya | | | | | | 1.5 |
| * | * | * | * | * | * | * |
| Peppermint, dried leaves | | | | | | 0.8 |
| Peppermint, fresh leaves | | | | | | 0.6 |
| * | * | * | * | * | * | * |
| Spearmint, dried leaves | | | | | | 0.8 |
| Spearmint, fresh leaves | | | | | | 0.6 |
| Spice group 26 | | | | | | 70 |
| * | * | * | * | * | * | * |
| Vegetable, *Brassica*, head and stem, group 5–16 | | | | | | 4 |
| * | * | * | * | * | * | * |
| Vegetable, legume, bean, edible podded, subgroup 6–22A | | | | | | 4 |
| Vegetable, legume, bean, succulent shelled, subgroup 6–22C | | | | | | 0.2 |
| Vegetable, legume, pea, edible podded, subgroup 6–22B | | | | | | 4 |
| Vegetable, legume, pea, succulent shelled, subgroup 6–22D | | | | | | 0.2 |
| Vegetable, legume, pulse, bean, dried shelled, except soybean, subgroup 6–22E | | | | | | 0.7 |
| * | * | * | * | * | * | * |

[1] There are no U.S. registrations.

*    *    *    *    *

[FR Doc. 2023–02109 Filed 1–31–23; 8:45 am]

**BILLING CODE 6560–50–P**

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Centers for Medicare & Medicaid Services**

**42 CFR Part 422**

**[CMS–4185–F2]**

**RIN 0938–AT59**

**Medicare and Medicaid Programs; Policy and Technical Changes to the Medicare Advantage, Medicare Prescription Drug Benefit, Program of All-Inclusive Care for the Elderly (PACE), Medicaid Fee-For-Service, and Medicaid Managed Care Programs for Years 2020 and 2021**

**AGENCY:** Centers for Medicare & Medicaid Services (CMS), HHS.

**ACTION:** Final rule.

**SUMMARY:** This final rule announces certain policies to improve program integrity and payment accuracy in the Medicare Advantage (MA) program. The purpose of this final rule is to outline our audit methodology and related policies for the contract-level MA Risk Adjustment Data Validation (RADV) program. Specifically, this final rule codifies in regulation that, as part of the RADV audit methodology, CMS will extrapolate RADV audit findings beginning with payment year (PY) 2018 and will not extrapolate RADV audit findings for PYs 2011 through 2017. We are also finalizing a policy whereby CMS will not apply an adjustment factor (known as a Fee-For-Service (FFS) Adjuster) in RADV audits. We are also codifying in regulation the requirement that MA organizations (MAOs) remit improper payments identified during RADV audits in a manner specified by CMS.

**DATES:** This final rule is effective on April 3, 2023.

**FOR FURTHER INFORMATION CONTACT:** Joseph Strazzire, 410–786–2775 or David Gardner, 410–786–7791.

**SUPPLEMENTARY INFORMATION:**

**I. Executive Summary**

Contract-level Risk Adjustment Data Validation (RADV) audits are our main corrective action for overpayments made to Medicare Advantage organizations (MAOs) when there is a lack of documentation in the medical record to support the diagnoses reported for risk adjustment. The purpose of this final rule is to outline our audit methodology and related policies for the contract-level RADV program. Specifically, this final rule codifies in regulation our approach to the use of extrapolation, our decision to not apply an FFS Adjuster in RADV audits, and the payment years in which these policies will apply.

We are finalizing that, as part of the RADV audit methodology, CMS will extrapolate RADV audit findings. We are not adopting any specific sampling or extrapolated audit methodology, but will rely on any statistically valid method for sampling and extrapolation that is determined to be well-suited to a particular audit. Rather than applying extrapolation beginning for payment year (PY) 2011 audits as we proposed,

we are finalizing a policy whereby we will not extrapolate RADV audit findings for PYs 2011 through 2017 and will begin extrapolation with the PY 2018 RADV audit. As a result, CMS will only collect the non-extrapolated overpayments identified in the CMS RADV audits and Department of Health and Human Services Office of Inspector General (HHS–OIG) audits between PY 2011 and PY 2017, and will begin collection of extrapolated overpayment findings for any CMS and OIG audits conducted in PY 2018 and any subsequent payment year. We believe that this is an appropriate policy because it recognizes our fiduciary duty to protect taxpayer dollars from overpayments, and preserves our ability to collect on potentially significant amounts of overpayments made to plans beginning in PY 2018 using an extrapolation methodology. This final rule will also allow CMS to focus on conducting future RADV audits as soon as practicable after an MAO payment year concludes, which was the topic of significant public comment to the proposed rule. Lastly, we have determined that it is in the best interest of all parties to ensure that the contract-level RADV appeals process, which is also outlined in regulation, is able to successfully process all RADV appeals. By not using an extrapolation methodology prior to PY 2018, we expect to better control the total number of active appeals that are submitted in the first few years following finalization of this rule, which will alleviate burden on MAOs and CMS.

We are also finalizing a policy whereby CMS will not apply an FFS Adjuster in RADV audits because we have determined that an FFS Adjuster is not appropriate. As described at great length in this final rule, we have decided not to apply an FFS Adjuster in RADV audits because: (1) we believe, consistent with the D.C. Circuit's decision in *UnitedHealthcare Insurance Co.* v. *Becerra*, 16 F.4th 867 (D.C. Cir. August 13, 2021, reissued November 1, 2021), *cert. denied*, 142 S. Ct. 2851 (U.S. June 21, 2022) (No. 21–1140)), that the actuarial equivalence provision of the statute applies only to how CMS risk adjusts the payments it makes to MAOs and not to the obligation of MAOs to return improper payments (for example, payments for unsupported diagnosis codes); and (2) it would not be reasonable to read the Social Security Act (the Act) as requiring a reduction in payments to MAOs by a statutorily-set minimum adjustment in the coding pattern adjustment, while at the same

time prohibiting CMS from enforcing longstanding documentation requirements by requiring an offset to the recovery amounts calculated for CMS audits.

We are also codifying in regulation the requirement that MAOs remit improper payments identified during RADV audits in a manner specified by CMS. After the effective date of this final regulation, on a rolling basis (over a period of months, which will be communicated to MAOs by CMS), we will begin issuing the enrollee-level audit findings from the CMS RADV audits that have been completed, as well as recovering the enrollee-level improper payments identified in HHS– OIG audits.

Nothing in this rule changes the longstanding principle that a diagnosis code that is not documented in a patient's medical record is not a valid basis for CMS risk adjustment payments to an MAO. *UnitedHealthcare Ins. Co.* v. *Becerra*, 16 F.4th 867, 869 (D.C. Cir. 2021) ("Neither Congress nor CMS has ever treated an unsupported diagnosis for a beneficiary as valid grounds for payment to a Medicare Advantage insurer."). Nor does this rule change the longstanding obligation of an insurer to refund payments to CMS if it learns through any means that a diagnosis lacks support in the beneficiary's medical record. *Id.*

## II. Background

### A. General Overview of Risk Adjustment Payments in the MA Program

The Balanced Budget Act of 1997 (BBA), Public Law (Pub. L.) 105–33, established a new Part C of the Medicare program, known then as the Medicare+Choice (M+C) program, which became effective in January 1999. As part of the M+C program, the BBA authorized CMS to contract with public or private organizations to offer a variety of health plan options for Medicare beneficiaries. These health plans provide all Medicare Part A and Part B (also known as "Original Medicare," or "Medicare FFS") benefits, and most offer additional benefits beyond those covered under the Medicare FFS program. The M+C program in Part C of Medicare was renamed the Medicare Advantage (MA) program under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA) (Pub. L. 108–173), enacted in December 2003. The MMA updated and improved the choice of plans for beneficiaries under Part C and changed the way benefits are established and payments are made. As of August 2022, over 29 million individuals receive their

Medicare benefits through MA, which represents nearly half of the total Medicare beneficiary population.[1]

Section 1853(a)(1)(C) of the Act requires that CMS risk-adjust payments made to MAOs. Risk adjustment strengthens the MA program by ensuring that accurate payments are made to MAOs based on the health status and demographic characteristics of their enrolled beneficiaries, and that MAOs are paid appropriately for their plan enrollees (that is, less for healthier enrollees who are expected to incur lower health care costs, and more for less healthy enrollees who are expected to incur higher health care costs). Making accurate payments to MAOs also ensures we are safeguarding Federal taxpayer dollars.

The current risk adjustment model employed to adjust MAO payments is known as the CMS Hierarchical Condition Category (CMS-HCC) model. This model functions by categorizing International Classification of Disease, Clinical Modification (ICD–CM)[2] diagnosis codes into disease groups called Hierarchical Condition Categories, or HCCs. Each HCC includes diagnosis codes that are related clinically and have similar cost implications. There are approximately 9,875 diagnoses mapped to 86 HCCs in the CMS-HCC Risk Adjustment Model for 2022.[3] MA enrollee HCCs are assigned based on data submitted to CMS by MAOs. The HCCs contribute to an enrollee's risk score, which is used to adjust a base payment rate. Essentially, the higher the risk score for an enrollee, the higher the expected health care cost for the enrollee and the greater payment that is received by the MAO.

The CMS–HCC model was first used for payment in 2004 and has been recalibrated numerous times since then. When CMS recalibrates the CMS-HCC risk adjustment model, it uses data from Medicare FFS claims, using diagnoses in one year to predict the following year's expenditures. Claims data from beneficiaries enrolled in the Medicare FFS program are used to calibrate the CMS–HCC model, which produces a set of coefficients (also known as risk

---

[1] CMS, *CMS Fast Facts, August 2022 Edition,* pg.1. *https://data.cms.gov/sites/default/files/2022-08/4f0176a6-d634-47c1-8447-b074f014079a/ CMSFastFactsAug2022.pdf.*

[2] The ICD–CM is a modification of the ICD, authorized by the World Health Organization, used as a source for diagnosis codes in the United States. The ICD–CM has been adopted by the Secretary as the standard medical data code set. *See* 45 CFR 162.1002.

[3] Source: *2022 Midyear Final ICD-10 Mappings* at *https://www.cms.gov/files/zip/2022-midyear-final-icd-10-mappings.zip.*

factors) that represent the marginal (additional) cost of each medical condition and demographic factor reported for a given beneficiary. (For additional information, see the Medicare Managed Care Manual, Ch. 7, section 70.1.[4]) Each beneficiary's risk coefficients are added together to form a risk score for that beneficiary that is used to adjust the insurer's base payment rate for that beneficiary.

The diagnosis data that MAOs submit to CMS do not undergo a validation review by CMS before being relied on by CMS to calculate each enrollee's risk score and make payments. Because there is an incentive for MAOs to potentially over-code diagnoses to increase their payments, that is, to code diagnoses not properly substantiated by medical record documentation, CMS conducts post-payment audits of MAO-submitted diagnosis data from a selection of MAOs for specific payment years to ensure that the diagnoses they submitted are supported by their enrollees' medical records. These audits are called contract-level Risk Adjustment Data Validation (RADV) program audits. While RADV audits are intended to identify improper risk adjustment payments, they are not specifically designed to detect fraud,[5] nor are they intended to identify all improper diagnosis submissions made by MAOs for risk adjustment payment.[6]

### B. Purpose and Description of Contract-Level RADV Audits

The improper payment measurements conducted each year by CMS that are included in the HHS Agency Financial Report, as well as audits conducted by the HHS–OIG, have demonstrated that the MA program is at high risk of improper payments. In fiscal year (FY) 2021 (based on calendar year 2019 payments), we calculated that CMS made over $15 billion in Part C overpayments, a figure representing nearly 7 percent of total Part C payments.[7] The HHS–OIG has also released several reports over the past few years that demonstrate a high risk of improper payments in the MA program,[8] and for several years has identified the MA program as one of the top management and performance challenges facing HHS due to the high amount of improper payments.[9] The Medicare program, including MA, has also been identified by the Government Accountability Office (GAO) as a high-risk program due to the risk of substantial improper payments.[10]

RADV audits are our main corrective action for overpayments made to MAOs when there is a lack of documentation in the medical record to support the diagnoses reported for risk adjustment. We select MAOs for RADV audits using a risk-based approach that focuses on HCCs that are more likely to be in error as identified by prior RADV audits, Part C Improper Payment Measurements, and OIG findings, and other vulnerability analyses. RADV audits occur after the final risk adjustment data submission deadline for the MA contract year and after CMS recalculates the risk factors for affected individuals to determine if payment adjustments are necessary, as described at 42 CFR 422.310(g).[11] RADV audits are intended to confirm the presence of risk adjustment conditions (that is, diagnoses that map to HCCs) as reported by MAOs in medical record documentation. RADV audits confirm the presence of the diagnoses related to the enrollee's HCC profile through the review of certain categories of medical records submitted by the MAOs for the purpose of a RADV audit; specifically, inpatient hospital, hospital outpatient facility, and physician/practitioner (excluding suppliers of durable medical equipment, prosthetics, orthotics, and supplies) medical records. Risk adjustment discrepancies are identified when an enrollee's HCCs used for payment, which are based on MAO self-reported data, differ from the HCCs assigned based on the medical record review performed by CMS through the RADV audit process. Risk adjustment discrepancies can be aggregated to determine an overall level of payment error. In turn, payment error for a sample of contract enrollees can be used to calculate a total payment error estimate, for the larger universe of enrollees within an MAO contract from which a sample is drawn, within specified confidence intervals using statistical extrapolation.

### C. History of the Contract-Level RADV Program

RADV audits have existed in various forms and approaches for over 20 years. RADV audits began for payment year (PY) 1999, when the amount of payment made to MAOs on a risk-adjusted basis was small (10 percent). During the audit period from PY 1999 until PY 2003, our RADV activity had an educational focus and was primarily intended to provide information that could be used by MAOs to improve the accuracy of the risk adjustment data submitted to CMS for payment. Payment adjustments (recoveries) were limited to enrollee-level adjustments for those enrollees sampled in the audits and were not extrapolated to the overall error of the

[4] https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/mc86c07.pdf.

[5] For example, the Department of Justice is responsible for pursing potential violations of the False Claims Act, which includes certain elements of knowledge.

[6] CMS contract-level RADV audits focus on specific MAO contracts to determine and recoup improper payments. The HHS–OIG also undertakes audits of MAOs, similar to RADV audits, as part of its oversight functions. CMS can collect the improper payments identified during those HHS–OIG audits, including the extrapolated amounts calculated by the OIG. CMS also oversees the Part C Improper Payment Measurement, previously referred to as "national RADV," to determine a program-wide improper payment rate as required by the Payment Integrity Information Act of 2019 (Pub. L. 116–117). In addition to risk adjustment oversight conducted by CMS, HHS also oversees HHS–RADV, which was created by the Affordable Care Act to strengthen the integrity of the Affordable Care Act Marketplace by validating the accuracy of data submitted by issuers that is used to calculate the amount of funds transferred to insurers based on the actuarial risk of the individuals they enroll. Neither the Part C Improper Payment Measurement nor the HHS–RADV programs are subject to the provisions of this final rule.

[7] HHS, FY 2021 HHS Agency Financial Report, pg. 211, https://www.hhs.gov/sites/default/files/fy-2021-hhs-agency-financial-report.pdf. CMS made over $23 billion in total Part C improper payments. The improper payment measurement for the MA program in FY 2021 included both overpayments ($15 billion) and underpayments ($8 billion).

[8] For example, see reports: Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Anthem Community Insurance Company, Inc. For example, see reports: Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Anthem Community Insurance Company, Inc. (Contract H3655) Submitted to CMS, May 21, 2021, https://oig.hhs.gov/oas/reports/region7/71901187.asp; Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Blue Cross Blue Shield of Michigan (Contract H9572) Submitted to CMS, February 24, 2021, https://oig.hhs.gov/oas/reports/region2/21801028.asp; Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Highmark Senior Health Company (Contact H3916) Submitted to CMS, September 29, 2022, https://oig.hhs.gov/oas/reports/region3/31900001.asp; Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Carlton Health Plan, Inc., (Contract H6461) Submitted to CMS, July 18, 2022, https://oig.hhs.gov/oas/reports/region2/22001009.asp; Medicare Advantage Compliance Audit of Diagnosis Codes That SCAN Health Plan (Contract H5425) Submitted to CMS, February 3, 2022, https://oig.hhs.gov/oas/reports/region7/71701169.asp; Medicare Advantage Compliance Audit of Diagnosis Codes That Humana, Inc., (Contract H1036) Submitted to CMS, April 19, 2021, https://oig.hhs.gov/oas/reports/region7/71601165.asp.

[9] For example, see OIG, 2021 Top Management and Performance Challenges Facing HHS, pg. 13, https://oig.hhs.gov/reports-and-publications/top-challenges/2021/2021-tmc.pdf.

[10] GAO, Medicare Program & Improper Payments, https://www.gao.gov/highrisk/medicare-program-improper-payments.

[11] See the May 23, 2014 final rule titled "Medicare Program; Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs Final Rule" (79 FR 29843, at 29926) for a more detailed discussion of the timing and execution of the RADV audit and appeals process.

contract. As a result, for the few MA plans we audited, payment recovery amounts were small.

Risk adjustment payments using the CMS–HCC risk adjustment model began for the first time in PY 2004. Because of various risk adjustment payment methodology changes required in the BBA and the Benefits Improvement and Protection Act of 2000 (BIPA) (Pub. L. 106–554), we provided a payment "phase-in" under the new risk adjustment methodologies from 2000 to 2007, when MAOs' payments were 100 percent risk-adjusted under the current methodology.[12] Under the new methodology that began in PY 2004, MAOs were required to submit diagnoses from multiple sites of care, which increased the administrative data burden on MAOs. Because of this burden and the associated phase-in of the new methodology, CMS considered PYs 2004 through 2006 as pilot years for the purpose of the RADV program and did not seek to recover improper payments for those payment years based on the audit results.

Improper payment recovery resumed for PY 2007, when we conducted two sets of RADV audits: (1) Pilot 2007, which involved 5 MA contracts; and (2) Targeted 2007, which involved 32 MA contracts. CMS began with the Pilot 2007 audit to test the methodology and make any needed changes before conducting the Targeted 2007 audit. CMS selected MA contracts after measuring the weighted average change in disease scores (risk scores) over the preceding 3-year period and grouping MAO contracts as high, medium, or low relative to other MA contracts that were eligible for a RADV audit. Through these two sets of audits, we recouped $13.7 million. Payment adjustments were again limited to enrollee-level adjustments for those enrollees sampled in the audits and not extrapolated to the overall contract error. After CMS' findings were reported to each MAO, any MAO that disagreed with CMS' determinations could challenge them through an administrative dispute and appeals process that was established by regulation (75 FR 19678). This dispute and appeals process, as subsequently amended (75 FR 32858 and 79 FR 29844), remains in effect and allows for the appeal of the medical record review determination and/or the payment error calculation through a three-level administrative review process, as

outlined in 42 CFR 422.311. To date, CMS has not recovered based on RADV audit findings for audit years after PY 2007, as described more fully in this section of this rule.

### 1. Development of an Audit Methodology (PYs 2007 Through 2010)

After the RADV audits were conducted for PY 2007, CMS paused RADV audits for PYs 2008, 2009, and 2010. CMS used those years to continue refining the methodology for the RADV audits, including the consideration of statistical methods to calculate extrapolated improper payments based on the individual errors identified. The use of extrapolation would enable us to make contract-level payment adjustments rather than simply adjusting payments for specific enrollees from an audit sample, as we had done previously.

On December 20, 2010, we published an informal proposal on the CMS website that outlined our intended RADV methodology for: (1) selecting a statistically valid sample of enrollees from each audited MA contract; and (2) calculating a contract-level payment adjustment by extrapolating the results of that sample. We invited public comment on this proposed methodology.

### 2. Informal Proposal Comments and the FFS Adjuster

In response to the December 2010 informal proposal, some MAOs suggested that CMS cannot lawfully enforce the requirement of medical record documentation for diagnosis codes while making payments at the published rates. These MAOs argued that there is a difference in auditing standards between Medicare FFS and MA diagnosis data because, in contrast to the MAO-submitted diagnoses data, Medicare FFS data is "unaudited" by CMS. This difference purportedly exists because most FFS payments are made on the basis of the item or service provided and not the beneficiary's diagnosis or diagnoses. For example, an office visit is paid based on whether the evaluation and management service billed met Medicare coverage and payment rules, not based on what diagnoses are listed on the claim or in the medical record. As a result, they argued, the Medicare FFS data used to calculate MAO payments will understate the cost of treating various conditions and, because erroneous diagnoses in the FFS claims data are used to calibrate the MA payment model, CMS must either adjust payment rates (by raising them) or adjust documentation standards (by loosening

them) to resolve the alleged incompatibility between the payment rates and documentation standards. This proposed adjustment to the MAO payment rates and/or documentation standard is referred to as an "FFS Adjuster."

To understand the MAOs' argument about why an FFS Adjuster is needed, some background is important. These MAOs ground their arguments in section 1853(a)(1)(C)(i) of the Act, which requires the Secretary to adjust payments to MAOs for demographic and health-related risk factors so as to ensure "actuarial equivalence." As described previously, the Act requires that we calculate risk-adjusted payments to MAOs to ensure that MAOs are paid appropriately based on the enrollees' health status and demographic characteristics. The current risk adjustment model does this by calculating plan enrollees' risk scores and, in turn, using them to adjust the MAOs' base payment rates, which are the rates for the average beneficiary.

This system of risk adjustment rests on two important principles. First, MAOs' payments are calculated using the CMS–HCC risk adjustment model, which is published each time it is updated (see section 1853(b) of the Act).[13] Second, an MAO may only report a diagnosis when that diagnosis is properly supported by the beneficiary's medical records. As we noted in our April 15, 2022 Health Plan Management System (HPMS) memorandum, *Reminder of Existing Obligation to Submit Accurate Risk Adjustment Data*, MAOs must submit data that conforms to all relevant national standards, including the International Classification of Diseases, Tenth Revision, Clinical Modification (ICD–10–CM) Guidelines for Coding and Reporting requirement that diagnoses be documented in patients' medical records. (*See* 42 CFR 422.310(d)(1); 45 CFR 162.1002(c)(2) and (c)(3).) The diagnosis codes and other risk adjustment information that MAOs submit directly affect the calculation of CMS payments to the MAO. A diagnosis code that is not documented in a patient's medical record is not a valid basis for CMS risk adjustment payments to an MAO. *UnitedHealthcare Ins. Co.* v. *Becerra*, 16 F.4th 867, 869, 877 (D.C. Cir. 2021). Medical records properly support a reported diagnosis when they comply with all CMS data and documentation requirements, which are described in current agency policy

---

[12] CMS, *Advance Notice of Methodological Changes for Calendar Year (CY) 2004 Medicare+Choice (M+C) Payment Rates*, 4–5 (March 28, 2003), https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/Advance2004.pdf.

[13] https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Announcements-and-Documents.

documents, including the Medicare Managed Care Manual.[14] In their annual contracts with CMS, MAOs agree to operate in accordance with applicable Federal statutes, regulations, and policies, including policies described in the Medicare Managed Care Manual. MAOs are also required to submit a sample of medical records for the validation of this risk adjustment data, as required by CMS (see 42 CFR 422.310(e)).

3. The 2012 Methodology

The feedback received from industry in response to the informal proposal in 2010 was considered by CMS, and on February 24, 2012, we issued on our website [15] what we described as a final methodology for RADV contract-level payment error calculation, to begin with PY 2011 RADV audits (referred to herein as the ''2012 methodology''). That methodology described sampling techniques and a statistical calculation to extrapolate from the sample selected, as well as the use of an FFS Adjuster.[16] (Although the use of an FFS Adjuster beginning with PY 2011 RADV audits was included in the 2012 methodology, CMS has not issued final RADV audit results for PY 2011 audits or any subsequent year, and therefore, an FFS Adjuster has not been applied to any RADV audits issued by CMS to date.)

*Sampling Technique:* Under the 2012 methodology, up to 201 enrollees from each audited MA contract would be selected according to certain criteria. These criteria included, but were not limited to, the enrollee's: (1) continuous enrollment in the MA contract for the entire data collection year and January of the payment year; (2) lack of end-stage renal disease (ESRD) or hospice status for the entire data collection year and January of the payment year; (3) enrollment in Medicare Part B coverage for the entire data collection year; and (4) assignment of at least one CMS–HCC based on diagnoses submitted by the MAO for risk-adjustment payment. The RADV-eligible enrollees would then be ranked by risk score and divided into three equal strata (low risk score, average risk score, and high risk score), with an equal number of enrollees randomly selected from each stratum

(for example, 67 enrollees per stratum in the case of an audit of 201 enrollees).

*Payment Error Calculation:* After medical records were reviewed, payment errors would be calculated for each selected enrollee based on the number of months the person was enrolled in the selected MA contract (and also was not in ESRD or hospice status) during the payment year. A payment error amount for each stratum would be calculated, which could include both RADV-identified overpayments and underpayments, and an overall payment error estimate for the audited contract would be derived, along with a 99 percent confidence interval around the payment error estimate.

*FFS Adjuster:* As part of the 2012 methodology, we also stated that we would apply an FFS Adjuster before finalizing audit recovery. The 2012 methodology stated that the actual value of the FFS Adjuster would be calculated by CMS based on a RADV-like review of records submitted to support FFS claims data.

CMS subsequently conducted an extensive study regarding the impact of such errors in Medicare FFS claims data for the purpose of determining the appropriate value of an FFS Adjuster. This study found that, in fact, errors in Medicare FFS claims data did not have any systematic effect on the risk scores calculated by the CMS–HCC risk adjustment model and, therefore, did not have any systematic effect on the payments made to MAOs. On October 26, 2018, we published an Executive Summary and Technical Appendix of our FFS Adjuster study findings on the CMS website, which are available at *https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-Risk-Adjustment-Data-Validation-Program/Resources.html.* Additional information on this study can also be found in the November 2018 proposed rule.

4. The 2018 RADV Proposed Rule

In the 2018 proposed rule, to enhance transparency and provide ample notice to MAOs, we proposed to codify in regulation our methodological approach to RADV audits that would apply to all of the payment year audits that have not yet been finalized. These methodologies would apply to PY 2011 and subsequent years and include our proposals to use extrapolation and not apply an FFS Adjuster to our RADV audit findings.

5. Subsequent **Federal Register** Notices (2018, 2019, 2021, and 2022)

Since publication of the 2018 proposed rule, we have published

several related notices to further enhance transparency and encourage robust public comment:

• On December 27, 2018, we announced in the **Federal Register** (83 FR 66661) an extension of the comment period for the proposed RADV provisions until April 30, 2019, as well as a plan to release data underlying the October 26, 2018, FFS Adjuster Study.[17]

• On March 6, 2019, we issued a notice in the **Federal Register** (84 FR 8069) announcing the release of additional data underlying the FFS Adjuster Study, both on the CMS website and to those organizations who established data use agreements (DUAs) with the CMS Office of Enterprise Data Analytics (OEDA).[18]

• On April 25, 2019, we posted updates to existing documentation related to the study data, as well as additional data on the CMS website.[19]

• On April 30, 2019, we issued a notice in the **Federal Register** (84 FR 18215) granting an additional extension of the comment period for the proposed RADV provisions until August 28, 2019. We also announced that we would be releasing additional data underlying the FFS Adjuster Study, including data containing Protected Health Information (PHI), to all parties who entered an applicable DUA with CMS and paid the required fee.[20]

• On June 26, 2019, we issued a notice in the **Federal Register** (84 FR 30983)[21] that we replicated the FFS Adjuster Study and published a summary of that replication as an addendum to the study on the CMS website.[22] The purpose of this replication was to allow us to test our initial results and release a more complete set of underlying data. (Certain intermediate data elements, not saved as part of the implementation of the initial study, were preserved and published in the addendum.) The

---

[14] *https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/internet-Only-Manuals-IOMs-Items/CMS019326.*

[15] CMS, *Notice of Final Payment Error Calculation Methodology for Part C Medicare Advantage Risk Adjustment Data Validation Contract-Level Audits, https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/recovery-audit-program-parts-c-and-d/Other-Content-Types/RADV-Docs/RADV-Methodology.pdf.*

[16] *Id.* at 4–5.

[17] *https://www.federalregister.gov/documents/2018/12/27/2018-28070/medicare-and-medicaid-programs-risk-adjustment-data-validation.*

[18] *https://www.federalregister.gov/documents/2019/03/06/2019-04052/medicare-program-release-of-data-underlying-risk-adjustment-data-validation-provisions.*

[19] *https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-Risk-Adjustment-Data-Validation-Program/Other-Content-Types/RADV-Docs/NPRM-4185-Provisional-Data-Release-CPI-FFSA-Coefficients.xlsx.*

[20] *https://www.cms.gov/research-statistics-data-and-systems/files-for-order/limiteddatasets/.*

[21] *https://www.federalregister.gov/documents/2019/06/26/2019-13691/medicare-and-medicaid-programs-risk-adjustment-data-validation.*

[22] *https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-Risk-Adjustment-Data-Validation-Program/Resources.html.*

results of the replication were broadly consistent with the initial implementation of the study. In addition, the addendum contained further discussion of the study's assumptions and methodology. We also released the programming language used to implement the replication of the study, and a description of the technical requirements for use of that programming language.

• In the October 21, 2021 **Federal Register** (86 FR 58245), we issued a notice that provided a 1-year extension of the timeline for publication of the final rule.[23]

As part of this extension, we explained our determination that we were unable to meet the 3-year timeline for publication.[24] Based on extensive public comments received on the 2018 proposed rule and subsequent FFS Adjuster study and related data, along with delays resulting from the agency's focus on the COVID–19 public health emergency, we determined that additional time was needed to address the complex policy and operational issues that were raised. As such, we

extended the timeline to publish the final rule from November 1, 2021 to November 1, 2022.

• In the November 1, 2022 **Federal Register** (87 FR 65723), we issued a notice that provided a 3-month extension of the timeline for publication of the final rule.[25] We explained that we were unable to meet the November 1, 2022, timeline for publication of the previously referenced RADV-audit related provisions. We explained that we continued to have ongoing delays resulting from the agency's focus on the COVID–19 public health emergency, and we determined that additional time continued to be needed to address the complex policy and operational issues that were raised. As such, we extended the timeline to publish the final rule from November 1, 2022, to February 1, 2023.

We received approximately 154 timely pieces of correspondence in response to the 2018 proposed rule and the subsequent notices and data releases. Summaries of the public comments that respond to the RADV provisions, and our responses to those public comments, are set forth in the discussion that follows. Additional public comments outside of the scope of the RADV proposed provisions were not considered and are not addressed in this final rule.

## III. Provisions of the RADV Final Rule

### A. Extrapolation of RADV Audit Findings

#### 1. Use of Extrapolation in the Medicare Program

Extrapolation, or the act of estimating a value (such an overpayment amount for a Medicare provider) based on a statistically valid sample of units (such as Medicare claims), has historically been a standard part of auditing practice at CMS. There is significant guidance, including case law and best practices from HHS and other Federal agencies, stating that extrapolation may be utilized as a valid part of calculating improper payments. In particular, courts have held that sampling and extrapolation are a valid method of calculating improper Medicare payments, so long as statistically valid methods are used. *See United States* v. *Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 18 n.19 (1st Cir. 2005) (noting that "sampling of similar claims and extrapolation from the sample is a recognized method of proof" for the

United States in an affirmative case seeking recovery under a common-law theory). *See also Ratanasen* v. *California Dep't of Health Servs.*, 11 F.3d 1467, 1469–71 (9th Cir. 1993) (collecting cases in which sampling and extrapolation have been approved in the Medicaid context, and "join[ing] other circuits in approving the use of sampling and extrapolation as part of audits in connection with Medicare and other similar programs"); *Chaves Cnty. Home Health Serv.* v. *Sullivan*, 931 F.2d 914, 917–23 (D.C. Cir. 1991). The authority to use sampling and extrapolation in Medicare audits is grounded in our statutory and regulatory authority to audit providers and recoup improper payments. *See Chaves*, 931 F.2d at 919 (interpreting the Medicare statute to allow for a "sample adjudication procedure" followed by extrapolation from that sample, which "is reasonable given the logistical imperatives recognized by courts in other comparable circumstances").

Sampling and extrapolation have been used to calculate improper payments in Medicare FFS (Part A and Part B) for decades. CMS formally approved of this technique in 1986 (HCFA Ruling 86–1), but Medicare Administrative Contractors (MACs), which are responsible for determining medical necessity and paying Medicare FFS claims, have been using it "at least since 1972." *Chaves*, 931 F.2d at 921; *see id.* at 913 (explaining that "sample adjudication has been used in previous instances involving post-payment review of 'coverage determinations' under Part A," and that HCFA Ruling 86–1 "simply reiterated [the agency's] belief that it had the latitude to employ sample audits on post-payment review to efficiently recoup overpayments for non-covered services"). In 1991, the United States Court of Appeals for the District of Columbia Circuit, in *Chaves*, upheld the use of this audit methodology against arguments that the Medicare statute required individualized review of claims submitted by providers (*Id.* at 922).

The MMA imposed limits on the use of sampling and extrapolation in Medicare payment decisions in the context of Part A and Part B, when a settlement to resolve improper payments is not reached. Since 2003, Medicare Part A and Part B extrapolation under section 1893(f)(3) of the Act has been limited to instances in which the Secretary determines either that "there is a sustained or high level of payment error" or that "documented educational intervention has failed to correct the payment error." No similar limitation applies to the MA program.

---

[23] *https://www.federalregister.gov/documents/2021/10/21/2021-22908/medicare-and-medicaid-programs-policy-and-technical-changes-to-the-medicare-advantage-medicare.*

[24] Section 1871(a)(3)(A) of the Act requires the Secretary to "establish and publish a regular timeline for the publication of final regulations based on the previous publication of a proposed regulation or an interim final regulation." Section 1871(a)(3)(B) of the Act provides that "[s]uch timeline . . . shall not be longer than 3 years except under exceptional circumstances." The Secretary therefore may not "establish" a "regular timeline" for the finalization of a proposal or interim final rule that exceeds three years, absent exceptional circumstances. Section 1871(a)(3)(B) of the Act authorizes the Secretary to "vary such timeline"— that is, to alter the "regular timeline" initially "establish[ed] for finalization—by publishing a timely notice in the **Federal Register** with "a brief explanation of the justification for such variation." As we have said, "[t]he Secretary may extend the initial targeted publication date of the final regulation, if the Secretary provides public notice including a brief explanation of the justification for the variation no later than the regulation's previously established proposed publication date." 69 FR 78443.

Under the plain text of the Act, *no* "exceptional circumstances" are required for the Secretary to extend the initial targeted publication date of the final regulation, but only "a brief explanation of the justification" for doing so. The Secretary has often extended such timelines without any reference to "exceptional circumstances." (See 86 FR 50263; 85 FR 55385; 85 FR 52940; 85 FR 7; 79 FR 62356; 74 FR 8867; 72 FR 16794; 72 FR 13710.) But the Secretary has also said that the Act "permits an extension of a published timeline under exceptional circumstances," 69 FR 78442, and has invoked "exceptional circumstances" in extending such timelines, including in the notices published in this rulemaking. For the reasons explained in this note, the Act has never required exceptional circumstances for such extensions—though exceptional circumstances have often been present, as they were here, when such timelines have been extended.

[25] *https://www.federalregister.gov/documents/2022/11/01/2022-23563/medicare-and-medicaid-programs-policy-and-technical-changes-to-the-medicare-advantage-medicare.*

As previously discussed, sampling and extrapolation is a generally accepted audit technique in the Medicare context, and the Act does not apply any limits to the use of extrapolation in the MA program. Therefore, we believe that CMS has the authority to implement this audit methodology in RADV audits for any case in which a RADV audit identifies improper risk-adjusted payments. We also believe that this is a reasonable approach to our RADV audits, given the sustained and high level of risk adjustment payment error, as previously described.

2. Summary of Proposed Rule

In the 2018 proposed rule, CMS proposed to extrapolate contract-level RADV audit findings using statistically valid random sampling techniques. CMS proposed to extrapolate findings in PY 2011 and all subsequent payment years, but specifically sought comment on how to treat the audits for PYs 2011, 2012, and 2013. In the proposed rule, we explained that we had conducted RADV audits for PYs 2011–2013 according to the sampling and extrapolation methodology described in the 2012 methodology but that these audits were not yet finalized because we had not yet issued the audit findings to the MAOs.[26] For PYs 2011 through 2013, we estimated that audited MA contracts received $650 million in improper payments.

In the 2018 proposed rule, we stated that, given the amount of improper payments identified under the MA program, interest in determining an accurate recovery amount for each audited MA plan, and importance of protecting the overall integrity of the program, we believed that it was in the public interest for CMS to apply the RADV payment error methodology(ies) adopted through this rulemaking to PY 2011 and all subsequent years. We stated that CMS would be acting in compliance with the improper payment obligations under the Act (most recently updated as part of the Payment Integrity Information Act of 2019 (PIIA)), as well as our fiduciary responsibility to recover funds due to the Medicare Trust Funds. We also noted that our February 2012 publication put MAOs on notice that CMS expected to calculate a contract-level payment error for PY 2011 and subsequent payments years by extrapolating from its review of a statistically valid sample of enrollees, and that MAOs have never been entitled to receive or retain payments associated

with HCCs that cannot be validated by medical records.

We also proposed that MAOs would be required to remit extrapolated recovery amounts from RADV audit findings through CMS' payment system, the Medicare Advantage and Prescription Drug system (MARx), as offsets to MA plans' monthly capitation payments. In the event that the recovery amount exceeds the payment in one month, we proposed that the recovery would be spread across adjustments for multiple months until the full amount is recovered. We also proposed that CMS might likewise require MAOs to remit such recovery amounts based upon audit findings by the HHS–OIG.

We explained in the 2018 proposed rule that CMS is not required to set forth the methodology for calculating an extrapolated payment error through regulatory provisions. However, we explained that, in the interest of transparency, we were choosing to inform MAOs about our plans to use various sampling and extrapolation methodologies in RADV audits, as CMS deems appropriate, through rulemaking.

In addition to codifying in regulation our existing authority to use extrapolation techniques in the RADV context, we also used the 2018 proposed rule as a means to gather public feedback on sampling methodologies that could be employed for purposes of extrapolation. We explained that, in addition to the contract-level approach described in the 2012 RADV Methodology, we have identified other potential methodologies for sampling and extrapolation that are based on a particular sub-cohort or sub-cohorts in a given payment year. For example, a sub-cohort could be the enrollees for whom a particular HCC or one of a related set of HCCs (such as the three diabetes HCCs) was reported.

TABLE 1—DIABETES HCCS

| HCC category description | HCC |
|---|---|
| Diabetes with acute complications ... | 17 |
| Diabetes with chronic complications | 18 |
| Diabetes without complication .......... | 19 |

After choosing an MA contract and a sub-cohort or sub-cohorts to audit, we would select a statistically significant sample of enrollees in the sub-cohort or sub-cohorts. After reviewing these enrollees' medical records that are submitted by the MAO, we would use statistical extrapolation to calculate and recoup the improper payments made to the audited MA contract for all enrollees in the sub-cohort or sub-cohorts in that payment year.

We noted in the 2018 proposed rule that using a sub-cohort methodology, such as one focused on enrollees with high-risk HCCs, could allow us to use a much smaller sample size to calculate a statistically valid extrapolated improper payment amount. This is possible because, when selecting a sample from a smaller population (that is, a sub-cohort of enrollees), one can still achieve an acceptable level of statistical confidence with that smaller sample size. This sub-cohort-based audit methodology would also allow us to spread our audit resources across a wider range of MA contracts and focus on cohorts of enrollees that raise programmatic concerns, while also reducing operational burden on both CMS and the MAOs due to the reduced sample size needed to calculate improper payments.

In the 2018 proposed rule, we invited comment on both the contract-level audit methodology published in February 2012 and our proposal for an extrapolated audit methodology based on sub-cohorts of enrollees. We also sought comment on whether there are particular situations in which one methodology may be preferable to the other. We emphasized that neither proposed methodology was meant to displace our longstanding authority to audit the medical records of particular enrollees who we believe may be associated with improper payments or to use any statistically valid audit methodology. We also stated that, if we finalize one or more sampling and extrapolation methodologies through this rulemaking, we would announce any future changes to that methodology (or those methodologies) through the Health Plan Management System (HPMS).

In addition, we stated that we may begin to conduct RADV audits for PYs 2014 and 2015 before finalizing the policies in the proposed rule, pursuant to our longstanding authority to review the medical records of any MA enrollee and recoup improper payments identified. We also sought comment on whether the use of sampling and extrapolation for certain payment years would require the exercise of our statutory authority to engage in retroactive rulemaking, as set out in section 1871(e)(1)(A) of the Act, which authorizes retroactive application of rules where "failure to apply the change would be contrary to the public interest."

We also discussed proposed changes to our current RADV dispute and appeals regulations in 42 CFR 422.311 to conform with the finalized RADV provisions. Specifically, consistent with

our other proposed policies, we proposed to amend § 422.311 by adding language to clarify that recovery of improper payments from MAOs will be conducted according to the Secretary's payment error extrapolation and recovery methodologies, and that CMS will apply extrapolation to RADV audits beginning with PY 2011. We also requested comment on whether to explicitly expand the MAOs' RADV appeal rights, such as by permitting appeal of the RADV payment error calculation methodology used in a RADV audit, similar to practices in Medicare FFS. A summary of the comments received and our responses follow.

3. Summary of Public Comments

*Comment:* Several commenters supported CMS' proposal to use extrapolation in RADV audits, as well as our proposal to begin extrapolation for PY 2011 audits. Commenters indicated that this is the most effective way to address improper payments in MA.

*Response:* We thank commenters for their support. While we plan to finalize our proposal to apply extrapolation to RADV audits, we are making a change to the years in which to apply extrapolation to achieve what we believe is an appropriate final policy that still takes into consideration our obligation to address potentially significant improper payments in the MA program. Extrapolation will now begin with the PY 2018 RADV audits rather than PY 2011, as proposed. This change, as further described in this section of this rule, is being made due to our fiduciary duty to protect taxpayer dollars from overpayments, certain operational considerations, and public comments on the timeliness of RADV audits.

*Comment:* Several commenters opposed the use of extrapolation in RADV audits. Some commenters questioned whether we had the statutory authority to use sampling and extrapolation in RADV audits. These commenters suggested that, because section 1893(f)(3) of the Act grants CMS the authority to use sampling and extrapolation in certain circumstances when conducting audits in Medicare Part A and Part B, CMS cannot use those techniques in Part C audits without an equivalent grant of statutory authority.

Several commenters challenged the statistical and methodological validity of both the contract-level sampling and extrapolation techniques described in the 2012 methodology, as well as an approach based on sub-cohorts of enrollees. A commenter stated that it is more difficult for plans to determine

results from extrapolation in MA than in Medicare FFS because RADV audits can include the review of multiple medical records to validate one diagnosis from various providers with "disparate methods of documentation."

Some comments focused on the application of extrapolation beginning in PY 2011. Several commenters asserted that increased liabilities of MAOs from retroactive application of an extrapolated payment error recovery would deter future participation by MAOs in the MA program and reduce benefits to beneficiaries. Several commenters expressed concern that extrapolation for past payment years will destabilize physician care. Specifically, the concern is that providers participating in risk-sharing contracts with MAOs that have not yet completed a final settlement may be at risk for losses. The same commenters believe that recovering improper payments when the audit methodology has been revised several times is inequitable to the MAOs.

*Response:* We appreciate these comments and considered them when finalizing the timing and content of these extrapolation policies. As discussed previously, CMS has the authority to use sampling and extrapolation in its RADV audits. Federal courts have held that sampling and extrapolation are a valid method of calculating improper Medicare payments, so long as statistically valid methods are used. The MMA added section 1893(f)(3) of the Act, which specifically applies to Medicare Part A and Part B and limits the use of extrapolation to determine overpayment amounts for recoupment under certain circumstances. This provision did not confer new authority to use extrapolation, but limited our preexisting audit authority in Medicare Part A and Part B. No similar limitation has been applied to audits in Medicare Part C. However, CMS will continue to focus its RADV efforts on MAOs identified as being at higher risk of improper payments.

In the implementation of this authority to use sampling and extrapolation in RADV, CMS will employ statistical methods to determine statistically valid sample sizes, accurately identify payment error, and extrapolate to the universe of enrollees from which the sample is selected. These statistically valid methods may include applying one or more RADV audit methodologies for any given RADV audit. In addition, while CMS views extrapolation as a statistically valid methodology for RADV audits, the agency may, at times, use its discretion

to not utilize extrapolation in a particular instance. For example, there may be unforeseen circumstances in which the statistical validity of the sample is disturbed (such as the need to exclude a large number of cases from the sample due to the loss of medical records in a natural disaster) and extrapolation is no longer possible, despite the initial intent to do so. There may be other limited instances in which CMS seeks to collect overpayments associated only with enrollees in a given sample, or wishes to perform only a probe sample of RADV reviews without the use of a statistically valid sample and yet will seek to recover any identified, non-extrapolated overpayments. The OIG may also independently decide not to extrapolate for reasons outside the control of CMS, and CMS will still recover those overpayments in accordance with the provisions in this final rule. To account for this, we are finalizing § 422.311(a)(2) to read "CMS *may* [emphasis added] apply extrapolation to audits for payment year 2018 and subsequent payment years," rather than "CMS will apply extrapolation . . . ." as proposed. This language is not intended to signal that it would be a frequent occurrence to not extrapolate in PY 2018 and future audits; rather, extrapolation is expected to be the standard practice for RADV audits beginning in PY 2018.

As previously stated, we believe that it is in the best interest of the Federal Government and our efforts to protect taxpayer dollars to extrapolate in our RADV audits, given the substantial amount of improper payments in MA and the fact that RADV is CMS' main corrective action used to address the submission of inaccurate diagnosis data. However, we also have decided not to extrapolate for PY 2011 through 2017 audits, as originally proposed, due to certain operational considerations and public comments on the timeliness of RADV audits. The reasoning for this decision is discussed in greater detail later in this final rule.

In addition, we do not agree with the comment that RADV audits include the review of multiple medical records with "disparate methods of documentation." We reemphasize that the policies we are finalizing in this rule do not impose new documentation requirements on providers. The core component of a RADV audit is ensuring that all diagnoses reported to CMS are properly supported by medical record documentation. CMS' existing regulatory documentation standards, 42 CFR 422.310(d)(1); 45 CFR 162.1002(c)(2) and (c)(3), including the RADV-specific authority to validate risk

adjustment data through the review of a sample of medical records at § 422.310(e), remain unchanged under this final rule and are described in current agency policy documents, including the Medicare Managed Care Manual (with which MAOs agree, in their MA contracts, to comply). MAOs are also already required to ensure that contracted providers meet MA documentation requirements.

We respectfully disagree with commenters' assertions that liabilities will increase. We are not imposing additional liabilities, penalties or retroactive application of new requirements or policy. We only seek to recover improper payments received by MAOs for HCCs that are not substantiated by enrollees' medical records. We continue to rely on existing program methods to establish auditing practices that encourage proper payment recovery consistent with established audit practices. We recognize that MAOs enter into agreements with providers, including those with a risk-sharing component, and we encourage all parties to those agreements to take steps to mitigate the submission of diagnosis codes that are not properly supported in the medical record.

We emphasize that nothing in this rule changes the longstanding principle that a diagnosis code that is not documented in a patient's medical record is not a valid basis for CMS risk adjustment payments to an MAO. Nor does this rule change the longstanding obligation of an insurer to refund payments to CMS if it learns that a diagnosis lacks support in the beneficiary's medical record.

*Comment:* Many comments were received on the proposed extrapolation methodologies, mainly focused on our proposed sub-cohort approach. Some commenters requested clarity on the sub-cohort methodology, while others expressed support for this methodology with various suggestions to improve it. Commenters questioned whether the proposed sub-cohort methodology will replace the existing contract-level methodology, which utilizes a general, non-targeted sampling methodology, and how CMS will determine which HCC groups will be used in the identification of sub-cohorts. A commenter requested that CMS confirm whether RADV will consist of a single audit methodology or whether MAOs will be subject to multiple audit methodologies.

Some commenters believe that applying a sub-cohort extrapolation methodology of enrollees would produce inaccurate results in RADV

audits because of differences between plans with regard to size and risk characteristics. For example, several commenters argued that plans with a higher than average risk score are at increased risk for RADV audit because high-risk enrollees are more likely to have more HCCs. Other commenters believe that a small sample size, which CMS sees as a benefit of a sub-cohort methodology, will result in inaccuracies. Others commented that an extrapolation methodology based on sub-cohorts of enrollees would violate the statutory mandate of "actuarial equivalence" between payments made under MA and Medicare FFS because it would generate recoveries based on random outcomes without regard to specific characteristics of MA plans' diagnostic mix, enrollment size, and risk scores. A commenter requested that, if CMS adopts a sub-cohort extrapolation methodology, it uses a pilot period first before implementing the program on a large scale and extrapolating results.

Other comments spoke to extrapolation methods more generally, including the appropriate confidence interval, potential for plans of certain sizes to be unduly chosen for RADV audits, and perceived inability to assess potential liability for RADV audits already performed if CMS abandons the extrapolation methodology set forth in the 2012 methodology.

Other comments on our proposed extrapolation methodologies were focused on the impact of underpayments. A commenter objected to the RADV audit sampling methodology, arguing that it results in a purported payment recovery bias against MAOs. The commenter believes the results of the RADV audit sample are "asymmetric," that incorrectly representing the improper payment rate. More specifically, the commenter asserted that "[t]hough there is no upper limit for how high the payment recovery amount can be, there is no balancing negative recovery amount." In other words, the commenter objected that MAOs cannot receive a payment from CMS based on a RADV audit if, overall, the risk scores should have been higher because, for instance, there were more supported diagnoses that had not been submitted (that is more under-coding) than unsupported diagnoses that had been submitted (that is over-coding). Other commenters shared these concerns, as well as voiced concern that RADV audit samples do not account for the reported bias that exists for enrollees who have no diagnosis codes submitted during the year but have existing documentation to support a diagnosis

that could have been submitted. The same commenters perceive the audit methodology as being random and indiscriminate, believing that the results will incorrectly estimate the risk profile of enrollees.

A commenter requested information related to the sampling methodology used to select enrollees for the PY 2014 RADV audit. Specifically, the commenter requested details on the development of the regression model used to predict payment error and on the sampling criteria from which the RADV audit currently extrapolates. This commenter also contended that the PY 2014 methodology appears to maximize the probability of selecting individuals with coding errors.

*Response:* As previously explained, extrapolation is an established auditing practice and remains a valid method for addressing audit recoveries. In this final rule, we are clarifying the scope of our authority to strengthen the integrity of the MA program by identifying improper payments. Our initiatives are designed to ensure fair and accurate recovery efforts by focusing on the areas at highest risk of improper payments. We will use statistically valid methodologies to extrapolate improper payment findings to the universe of enrollees from which a sample is selected. These statistically valid methodologies may include applying one or more RADV audit methodologies for any given RADV audit. As previously discussed, we may also determine that extrapolation will not be applied in certain limited instances. We emphasize that, in this final rule, we are not adopting either the contract-level sampling and extrapolation technique described in the 2012 methodology or a specific extrapolated audit methodology based on sub-cohorts of enrollees. Instead, for future RADV audits, CMS will rely on any statistically valid method for sampling and extrapolation that it determines to be well-suited to a particular audit. We described the sub-cohort methodology in the 2018 proposed rule to provide the industry with transparency on potential audit methodologies. In addition, while not required, CMS will continue to disclose our extrapolation methodology to MAOs through HPMS memos or other appropriate means, providing MAOs with the information sufficient to understand the means by which CMS extrapolated the improper payment determination.

Any sampling and extrapolation methodologies adopted by CMS for RADV audits will be focused on MAO contracts and enrollees' HCCs that, through statistical modeling and/or data

**6652**    **Federal Register** / Vol. 88, No. 21 / Wednesday, February 1, 2023 / Rules and Regulations

analytics, are identified as being at highest risk for improper payments. This is an appropriate approach to any Federal MA audit that seeks to recoup taxpayer dollars that have been inappropriately paid to MAOs for diagnoses that are not supported in the medical record. This approach was also recommended by the GAO in a 2016 report titled "Fundamental Improvements Needed in CMS's Effort to Recover Substantial Amounts of Improper Payments." [27] The GAO recommended that CMS "modify [its] selection of contracts for contract-level RADV audits to focus on those contracts most likely to have high rates of improper payments by taking actions such as the following: selecting more contracts with the highest coding intensity scores; excluding contracts with low coding intensity scores; selecting contracts with high rates of unsupported diagnoses in prior contract-level RADV audits; if a contract with a high rate of unsupported diagnoses is no longer in operation, selecting a contract under the same MAO that includes the service area of the prior contract; and selecting some contracts with high enrollment that also have either high rates of unsupported diagnoses in prior contract-level RADV audits or high coding intensity scores." [28]

We also note that the purpose of RADV audits is to validate that diagnoses submitted by MAOs for risk-adjusted payment are properly supported by medical record documentation. *See* 42 CRF 422.310(e). RADV audits are the main corrective action used to address the submission of inaccurate diagnosis data. Occasionally, upon review of these medical records, CMS will uncover "additional" diagnoses supported by the medical records that were not submitted for payment by MAOs during the data collection period for enrollees selected in the sample. Under current contract-level RADV policy, when CMS uncovers these additional diagnoses that map to CMS–HCCs during medical record review of audited CMS–HCC(s), these newly-discovered diagnosis codes are used to recalculate risk scores in certain circumstances, which may result in an updated (reduced) improper payment calculation.

MAOs are required by CMS regulations (§§ 422.503 and 422.504) and MAO contracts to establish compliance programs and processes to ensure accurate diagnosis coding and

the submission of accurate diagnosis data. These processes should enable MAOs to identify not only instances where diagnoses submitted for risk-adjustment payment are not supported by the medical record, but also diagnoses that may not have been submitted to CMS. MAOs can submit additional diagnoses for risk-adjusted payment up until the final risk adjustment data submission deadlines described at § 422.310(g)(2)(ii). As with overpayment recoveries under the Affordable Care Act and CMS's Overpayment Rule, the purpose of RADV audits is not to reopen submission deadlines and for CMS to make additional payments. [29] RADV audits identify overpayments after the final risk adjustment data submission deadline.

*Comment:* Some comments were focused on the scope and number of plans selected for RADV audit. A commenter objected to an increase in the number of plans selected for the RADV audits. Another commenter requested an explanation of how sample sizes will be determined for Program of All-Inclusive Care for the Elderly (PACE) organizations, most of which have fewer than 500 enrollees.

*Response:* As previously described, any extrapolation methodology adopted by CMS for RADV audits will be focused on MAO contracts that, through statistical modeling and/or data analytics, are identified as being at highest risk for improper payments. Examples of MAO contracts that may be deemed higher risk for the purposes of RADV audit selection are discussed later in this section. This is also the best approach to ensure that MAOs that do not show indications of being at high risk of improper payments are not exposed to audit burden to the exclusion of higher-risk plans. In addition, as noted previously, such an approach was recommended by the GAO in its April 2016 report. [30] CMS does not currently subject PACE organizations to RADV audits and CMS' selection methodology for each year will

describe any adjustments made for PACE or other low enrollment contracts.

*Comment:* Several commenters noted that implementing these proposed policies would lead to more audit burden for providers because of an increase in documentation standards for treating providers. For example, commenters believe that this is a "more stringent audit expectation" that will increase administrative burden at a time in which there is already a physician shortage, thereby impacting patients. Another commenter contended that our extrapolation methodology should reflect that certain HCCs are more difficult to substantiate in medical record documentation than others.

*Response:* RADV audits will not impose new documentation requirements on health care providers and, therefore, we believe there will be no additional audit impact on providers that contract with MAOs to provide services to MA plan enrollees. As previously stated, nothing in this rule changes the longstanding principle that a diagnosis code that is not documented in a patient's medical record is not a valid basis for CMS risk adjustment payments to an MAO. In addition, there is a longstanding requirement under § 422.310(e), in place since the beginning of the MA program, that "[MAOs] and their providers and practitioners will be required to submit a sample of medical records for the validation of risk adjustment data, as required by CMS," which is unaffected by this final rule. This requirement is consistent with longstanding requirements applicable to Medicare Part A and Part B providers that furnish sufficient information to support payment. 42 U.S.C. 1395(g) (Effective July 7, 2004) ("[No]. . . . payments shall be made to any provider unless it has furnished such information as the Secretary may request in order to determine the amounts due such provider . . ."); *Clinic Res. Mgmt.* v. *Burwell,* 2015 WL 3932657, at *2 (S.D. Tex. June 26, 2015) ("The provider is responsible for maintaining and submitting adequate information to substantiate medical necessity and entitlement to payment."). [31]

[27] GAO, at 26, *https://www.gao.gov/assets/gao-16-76.pdf* (April 2016).
[28] *Id.*

[29] Section 6402 of the Affordable Care Act (Pub. L. 11–148) established section 1128J(d) of the Act. Under the Part C and D Overpayment Rule (79 FR 29844), which implemented section 6402 of the Affordable Care Act, MAOs are required to correct overpayments by self-reporting and returning payments associated with MAO diagnosis codes not supported by medical record documentation. Although MAOs are required to correct identified overpayments after the final risk adjustment data submission deadline in order for CMS to conduct reruns and recover the overpayments, MAOs are not permitted to submit additional diagnoses for payment after the submission deadline.
[30] GAO, at 26, *https://www.gao.gov/assets/gao-16-76.pdf* (April 2016).

[31] Under section 1853(a)(3) of the Act, the Secretary must require MAOs to submit data regarding inpatient hospital services and other services, as well as other information as the Secretary deems necessary to calculate MA risk adjustment payments. This authority has been implemented at § 422.310, which requires MAOs to submit "data necessary to characterize the context and purposes of each item and service provided to a Medicare enrollee by a provider, supplier, physician, or other practitioner." § 422.310(b). MAOs must submit data that conforms to CMS' requirements for data equivalent to Medicare FFS

*Comment:* A commenter contested CMS' proposal to recover contract-level payment adjustments through a lump-sum reduction in the plans' monthly payments through MARx. The commenter noted that, for example, CMS currently makes retroactive, beneficiary-specific adjustments related to miscellaneous corrections to beneficiaries' status (such as eligibility, State and county of residence, date of death, etc.) outside of the RADV process. The commenter requested that CMS seek only beneficiary-level recoveries through RADV audits so as not to overlap with these non-RADV recoveries.

*Response:* While we appreciate the commenter's consideration of the other areas in which CMS may make adjustments to MA payments, we do not believe that current and proposed RADV efforts overlap with non-RADV adjustments. RADV audits only validate diagnoses associated with a beneficiary's medical record documentation, not a beneficiary's demographic characteristics. If an HCC cannot be validated with medical records, MAOs are not entitled to the risk-adjustment payment associated with that HCC.

*Comment:* Several commenters opposed the application of our extrapolation methodology to past payment years claiming that, pursuant to section 1853(b)(2) of the Act, this would be considered a retroactive application of policy and CMS must disclose our RADV audit methodology changes prior to any payment year RADV audit. Some commenters also asserted that the application of this rule to past payment years would alter the actuarial soundness of payments previously received by MA contracts, as existing contracts relied on the RADV audit methodology we announced in the 2012 RADV Methodology. Other commenters also characterized this approach as contrary to the Supreme Court's holding in *Azar* v. *Allina Health Servs.*, 139 S. Ct. 1804, 204 L. Ed. 2d 139 (2019), which emphasized that a substantive legal standard must go through a notice-and-comment process.

*Response:* First, as a fundamental concept, this policy does not impose any new requirements on MAOs that

could be construed as retroactive. The 2012 RADV Methodology did not create a different "documentation standard" for MA plans than the standard that applies to traditional Medicare providers, nor did we state that an FFS Adjuster should set a permissible rate for the submission of erroneous codes. There is only one documentation standard for diagnosis coding, as discussed previously: proper medical record documentation is required for any reported diagnosis code to be valid. That is the consistent policy throughout the Medicare program (see previous discussion).

The RADV auditing methodology has not fundamentally changed the longstanding requirement that a diagnosis submitted to CMS by an MAO for payment must be properly supported by medical record documentation. See *UnitedHealthcare Ins. Co.* v. *Becerra,* 16 F.4th 867, 869, 877 (D.C. Cir. August 13, 2021, reissued November 1, 2021), *cert. denied,* 142 S. Ct. 2851 (U.S. June 21, 2022) (No. 21–1140). Rather, it only enforces the well-established regulatory requirement that MA diagnoses be validated under that longstanding documentation standard. (For additional information, see § 422.310(e); 83 FR 55037 (and authorities cited therein).)

We also noted in the 2018 proposed rule that we may begin to conduct RADV audits for additional payment years (specifically, 2014 and 2015) before this proposal is finalized, pursuant to our longstanding authority to review the medical records of any MA enrollee and recoup any improper payments identified.

Even if this methodology was determined to be a retroactive application of policy, a position with which we do not agree, it is still necessary to comply with statutory requirements and is in the public interest for CMS to apply extrapolation to past payment years, and, therefore, is authorized under the Act. CMS has the authority, in accordance with section 1871(e)(1)(A) of the Act, to apply retroactive changes in regulations, manual instructions, interpretative rules, statements of policy, or guidelines of general applicability to items and services furnished before the effective date of the change, if the Secretary determines that "such retroactive application is necessary to comply with statutory requirements or failure to apply the change would be contrary to the public interest." We believe that recovering extrapolated improper amounts is necessary to comply with statutory requirements and advances the public interest by protecting the overall integrity of the MA program. We have

a statutory mandate under the PIIA to reduce improper payments and a fiduciary responsibility to recover funds due and owed to the Medicare Trust Funds.

As previously discussed, HHS and the GAO have identified a significant volume of improper payments in the MA program,[32] and RADV audits are the main way CMS ensures payment accuracy to MAOs. As further discussed in the Regulatory Impact Analysis section of this final rule, CMS estimates extrapolated improper payment recoveries of approximately $479 million per audit year beginning with the PY 2018 audit. We also believe that there will be an additional sentinel effect of RADV audits on the improper payment rate as MAOs improve their processes to report only those diagnoses that meet CMS requirements for risk adjustment payment.

In addition, as discussed previously, RADV audits will not impose new documentation requirements on health care providers. The core component of a RADV audit is ensuring that all diagnoses are properly supported by medical records. We only seek to recover improper payments received by MAOs for HCCs that are not substantiated by enrollees' medical records. MAOs have never been entitled to receive or retain payments associated with HCCs that cannot be validated by medical records. Therefore, applying the rule under the public interest exception in section 1871(e)(1)(A) of the Act would not upset any settled or reasonable reliance interests. This all serves the public interest by reducing the improper allocation of taxpayer dollars that can otherwise be used for other purposes within the Federal Government, including solvency of the Medicare Trust Funds. Thus, applying the rule retroactively is necessary to comply with statutory requirements and in the public interest within the meaning of section 1871(e)(1)(A) of the Act.

*Comment:* Several comments provided input on the potential promulgation of rules permitting administrative appeals of RADV audit methodology. A commenter opined that such procedures were unnecessary because stakeholders had an opportunity to participate in the development of our methodology through the notice-and-comment

---

data, when appropriate, and to all relevant national standards. The International Classification of Diseases, Tenth Revision, Clinical Modification (ICD–10–CM) Guidelines for Coding and Reporting is the existing national standard. [*See* § 422.310(d)(1); 45 CFR 162.1002(c)(2) and (c)(3)]. This is consistent with obligations imposed on hospitals and providers in Medicare Parts A and B, who are required to furnish proper documentation and comply with the ICD Guidelines. See, for example, 42 U.S.C. 1395g and 1395n.

[32] For example, the FY 2021 HHS Agency Financial Report, pg. 211, *https://www.hhs.gov/sites/default/files/fy-2021-hhs-agency-financial-report.pdf,* states that Part C Improper Payment Measurement (IPM) estimated approximately $15 billion in overpayments for calendar year 2019 risk-adjusted payments to MAOs.

**EXHIBIT D-19 INTENTIONALLY BLANK**

**EXHIBIT D-20 INTENTIONALLY BLANK**

**EXHIBIT D-21**

Message
_____

**From:**     Nelson, Steve H [steve_nelson@uhc.com]
**Sent:**     6/26/2015 11:41:30 AM
**To:**       cheri.rice@cms.hhs.gov
**Subject:**  2013 CMS RAF Attestation


Cheri,

Similar to last year, we are reaching out to you, to reiterate our approach to the electronic annual risk adjustment certifications. As you know, annual risk adjustment data certifications before 2014 were submitted on paper, enabling companies to add notes explaining their understanding of these certifications (including any remediation efforts).  As we discussed with you last year, because the certifications are now electronic, companies are unable to include explanatory notes.  As such, we informed you in writing our understanding of these certifications.

Because the certifications remain electronic with no ability to add explanatory notes, we feel it would again be helpful, and appropriate, to capture our discussion and understanding regarding the certifications.

- As with our past certifications, the 2013 certifications are based on facts reasonably available or made available to us as of the date of the certifications.  As we receive additional information, we may be required to modify the data to which the certifications relate

- The certifications use the phrase best knowledge, information, and belief,which is based on our ordinary business practices.

- The certifications only cover risk adjustment data for 2013 dates of service that were submitted to CMS and not subsequently deleted prior to the date of the certifications.

- As we have mentioned to you previously, we are engaged in an ongoing review of our risk adjustment processes and submission system.  This review has identified areas for improvement and, as a result, we will be deleting all risk adjustment data for 2013 dates of service that we ultimately determine should be deleted consistent with this email.

- CMS issued a proposed rule last year that would have required MA plans to design any medical record reviews to determine the accuracy of risk adjustment diagnoses associated with those records.  In May 2014, CMS withdrew the proposed rule.  During our conversations last year before the proposed rule was withdrawn, CMS confirmed to us that the proposed requirements would not apply until the effective date of the rule, and that MA plans were thus not required to design their medical record reviews to determine the accuracy of risk adjustment diagnoses. As we discussed last year, we previously had a process through which we reviewed certain medical records to determine the accuracy of risk adjustment diagnoses and submitted appropriate deletes.  Based on our conversations with CMS last year, CMSs withdrawal of the proposed rule, and CMS s ongoing consideration of a FFS Adjuster to address diagnoses not supported by a medical record in the context of RADV, we ended this process and informed you of that decision.  That decision remains operative for 2013 dates of service.  In particular, we did not use our previous process to determine whether diagnosis codes submitted through claims are unsupported in the medical record.  We do have a quality assurance process that deletes codes initially identified during chart review and that are later determined to be unsupported.

The certifications we submit this year are made subject to these clarifications.  Please let me know if you have any questions.  As always, we appreciate your time and attention on this matter.

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

Steve Nelson

Chief Executive Officer

UnitedHealthcare Medicare & Retirement

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

0672
MARA2152279

**EXHIBIT D-22**

*Privileged and Confidential*
*Attorney Work Product*
*Attorney/Client Communication*
*April 29, 2014*

## CMS MEETING NOTES

Meeting Date
- April 29, 2014
- Approximate start time was 12:45 eastern time

Attendees
- CMS:  Sean Cavanaugh, Cynthia Tudor, Cheri Rice, Dan [Farmer], Julie Grover
- UnitedHealth Group (UHG):  Dan Schumacher, Steve Nelson, Karen Erickson, Thad Johnson

Location
- UHG attendees:  HHS offices in Washington DC
- CMS attendees:  CMS offices in Baltimore, MD

Topic
- Medical records review requirements; Notice of Proposed Rulemaking (NPR or "proposed rule") issued in January 2014; 2012 annual risk adjustment data certification

Meeting Summary
- CMS and UHG representatives began the meeting by introducing themselves.  UHG representatives explained the reason for requesting the meeting and asked whether the CMS attendees had seen the email to Marilyn Tavenner sent by Larry Renfro on April 27 requesting the meeting (see exhibit A hereto).  CMS attendees acknowledged that they had read the email and inquired as to UHG's specific ask.
- UHG representatives explained their  understanding that CMS' proposed rule relates to future periods and wanted to confirm any potential impact to 2012 dates of service in light of the annual risk adjustment data certification for 2012 dates of service due on April 30.
- CMS had a number of clarifying questions relating to UHG's current processes as they relate to medical records review
- UHG representatives provided a general overview of UHG's claim verification process and explained that UHC had already submitted a number of deletes for 2012 dates of services as a result of that process.  (Later in the meeting, UHG representatives informed CMS that the number of new and unique diagnosis code deletes already submitted was approximately 13,000.)  UHG representatives also indicated that, in light of the proposed rule and other discussions with CMS, UHC had suspended its claims verification process pending a decision by the Company of whether it was appropriate to submit additional deletes to CMS that have been identified through the Company's claims verification process; and also whether the Company should continue with, make changes to, or stop, its current process to identify any additional potential deletes relating to 2012 dates of service.
- Cheri Rice of CMS indicated that until the proposed rule relating to medical records review was finalized, MA plans do not have any proactive responsibility to confirm whether diagnoses submitted by physicians are correct.  She also said, however, that if a plan has knowledge that specific codes submitted through medical claims are not supported by medical charts appropriate deletes should be submitted.  She summarized this by saying that if a plan has knowledge of an overpayment it should submit appropriate deletes.

- There was then a more detailed discussion of UHG's claim verification process, including the last step of the process being a review by an external expert. Cheri Rice asked for a quantification of the number of codes at various steps in the process. UHG's representatives informed CMS of the number of new and unique codes that had previously been submitted for deletion for 2012 dates of services (approximately 13,000); the number of new and unique codes for which all steps of the claims verification process had been completed, including external review, but which had not been submitted as deletes due to the Company suspending its claims verification process in light of (1) CMS' proposed rule, (2) prior conversations with CMS and (3) the inherent FFS error rate (approximately 8,000); and the number of codes that the Company estimated might be deleted if the Company were to continue its claims verification process to conclusion, including external review, for all codes that were still under review in the claims verification process (i.e., codes for which the claims verification process had not been completed) (approximately 40,000). Cheri Rice requested clarification of the last group and was informed that these codes were at various stages of the process including not having been through external review.

- Cheri Rice then asked some follow-up questions on the general state of the submission of deletes relating to 2012 dates of service based on a call other CMS employees had with OptumInsight the week of April 21, and whether our inquiry was related to the deletes discussed on that call. UHG representatives explained that the prior call related to a number of other deletes that were still in the process of being completed, including finalization of the Q/A process relating to chart review and completion of the Company's process for obtaining attestations for medical charts that may not have included signatures. UHG further explained in response to CMS questions that the Q/A process for chart review was separate from the claims verification process and was a quality control procedure for codes added as a part of chart review. As part of this discussion, CMS representatives reiterated that, under CMS regulations, MA plans were not required to design their chart review programs for overall accuracy until the proposed rule is finalized. Sean Cavanaugh stated that, under current rules, if UHG doesn't know codes are inaccurate the Company would not have to delete them. He went on to state that if UHC does not know until the end of its claims verification process that a code is incorrect then there is no requirement to delete the code until the effective date of CMS' final rule. Cheri Rice added that there is a false claims act requirement that plans not knowingly keep overpayments so if you do not know that there is an overpayment you do not need to delete a code.

- UHC representatives then informed CMS that, due to the new electronic certification methodology and the resultant inability to footnote the certification as UHG had done previously, UHG would be submitting a letter from Steve Nelson explaining UHG's understandings regarding the certification. CMS representatives indicated they were working with other plans on similar concerns.

- UHG inquired whether CMS could provide any guidance into assumptions the Company should make about chart review requirements in preparing its bids for 2015. After conferring among themselves, CMS representatives acknowledged the issues created by the proposed rule, but stated they could not provide any guidance into assumptions UHG should make in preparing its 2015 bids.

- UHG representatives thanked CMS attendees for their time and the meeting concluded.

CONFIDENTIAL AND PROPRIETARY
FOIA EXEMPT

MARA2157040

**EXHIBIT D-23**

**Paul, Rebecca (CMS/CM)**

| | |
|---|---|
| **From:** | Rice, Cheri M. (CMS/CM) |
| **Sent:** | Tuesday, June 7, 2016 11:22 AM |
| **To:** | Kreisel, Johanna (OS/OGC) |
| **Cc:** | Paul, Rebecca (CMS/CM); Harlow, Jennifer A. (CMS/CM); Reed-Asante, Monica (CMS/CM); Chaudhuri, Ilina (CMS/CM); Simons, Kellie M. (CMS/CM); Tudor, Cynthia G. (CMS/CM) |
| **Subject:** | FW: 2014 CMS RAF Attestation |

> # Redacted

**From:** Nelson, Steve H [mailto:steve_nelson@uhc.com]
**Sent:** Tuesday, June 7, 2016 10:21 AM
**To:** Rice, Cheri M. (CMS/CM) <Cheri.Rice@cms.hhs.gov>
**Subject:** 2014 CMS RAF Attestation

Cheri,

As we have done the past several years, we are reaching out to you, to reiterate our approach to the electronic annual risk adjustment certifications. As you know, annual risk adjustment data certifications before 2014 were submitted on paper, enabling companies to add notes explaining their understanding of these certifications (including any remediation efforts). As we discussed with you in the past, because the certifications are now electronic, companies are unable to include explanatory notes. As such, we informed you in writing regarding our understanding of these certifications.

Because the certifications remain electronic with no ability to add explanatory notes, we feel it would again be helpful, and appropriate, to capture our prior discussion and understanding regarding the certifications.

- As with our past certifications, the 2014 certifications are based on facts reasonably available or made available to us as of the date of the certifications. As we receive additional information, we may be required to modify the data to which the certifications relate
- The certifications use the phrase "best knowledge, information, and belief," which is based on our ordinary business practices.
- The certifications only cover risk adjustment data for 2014 dates of service that were submitted to CMS and not subsequently deleted prior to the date of the certifications.
- As we have mentioned to you previously, we are continuously engaged in the ongoing review of our risk adjustment processes and submission system. This review has identified areas for improvement and, as a result, we will be deleting all risk adjustment data for 2014 dates of service that we ultimately determine should be deleted consistent with this email.
- CMS issued a proposed rule two years ago that would have required MA plans to design any medical record reviews to determine the accuracy of risk adjustment diagnoses associated with those records. In May 2014, CMS withdrew the proposed rule. During our conversations before the proposed rule was withdrawn, CMS confirmed to us that the proposed requirements would not apply until the effective date of the rule, and that MA plans were thus not required to design their medical record reviews to

1

USBP000498420

determine the accuracy of risk adjustment diagnoses. As we discussed at that time, we previously had a process through which we reviewed certain medical records to determine the accuracy of risk adjustment diagnoses and submitted appropriate deletes.  Based on our conversations with CMS two years ago, CMS's withdrawal of the proposed rule, and CMS's announced plans to use a FFS Adjuster to address diagnoses not supported by a medical record in the context of RADV, we ended this process and informed you of that decision at the time.  That decision remains operative for 2014 dates of service.  In particular, we did not use our previous process to determine whether diagnosis codes submitted through claims are unsupported in the medical record.  We do have a quality assurance process that deletes codes initially identified during chart review and that are later determined to be unsupported.

The certifications we submit this year are made subject to these clarifications.  Please let me know if you have any questions.  As always, we appreciate your time and attention on this matter.

Steve Nelson
Chief Executive Officer
UnitedHealthcare Medicare & Retirement

This e-mail, including attachments, may include confidential and/or proprietary information, and may be used only by the person or entity to which it is addressed. If the reader of this e-mail is not the intended recipient or his or her authorized agent, the reader is hereby notified that any dissemination, distribution or copying of this e-mail is prohibited. If you have received this e-mail in error, please notify the sender by replying to this message and delete this e-mail immediately.

0678

USBP000498421

**EXHIBIT D-24**

## 29 TUESDAY
APRIL, 2014 • 119th Day, 246 Days Left • 18th Week

**APPOINTMENTS & SCHEDULED EVENTS**

Steve
Nelson
Don Shoemaker
~~Fred~~ CFO —
UHC & Medica
Fred Jersen
legal
Unilee

2012 — client
reviews "sloppy"
to sign attestation

**TO BE DONE TODAY (ACTION LIST)**

Obligation to ~~not~~
stop review or
tell us about
whatever they find.
"Addities" — eventually
accuracy
stop ~~un~~ unds.

**DIARY AND WORK RECORD**

8  No preventive
9  to confirm
10  accuracy of dx

12  Claims ver
   deleted 13k
   from 2012
8k — completed
steps will
delete
Unreviewed in process
41k
reviews
steps
not deleted

**EXPENSE & REIMBURSEMENT RECORD**

Impr



0680

USBP000548071

**EXHIBIT D-25**

**FILED UNDER SEAL IN ITS ENTIRETY**