1   LATHAM & WATKINS LLP
        David J. Schindler (Bar No. 130490)
2        *david.schindler@lw.com*
        Manuel A. Abascal (Bar No. 171301)
3        *manny.abascal@lw.com*
    355 South Grand Avenue, Suite 100
4   Los Angeles, California 90071-1560
    Telephone: +1.213.485.1234;
5   Facsimile: +1.213.891.8763

6   *Attorneys for United Defendants*

7   MICHAEL D. GRANSTON
    Deputy Assistant Attorney General, Civil Division
8   E. MARTIN ESTRADA
    United States Attorney
9   DAVID M. HARRIS
    ROSS M. CUFF
10  JACK D. ROSS (CBN 265883)
    HUNTER B. THOMSON (CBN 330533)
11  Assistant United States Attorneys
    300 N. Los Angeles Street, Room 7516
12  Los Angeles, California 90012
    Tel: (213) 894-6379; Fax: (213) 894-7819
13  Email: *hunter.thomson@usdoj.gov*

14  *Attorneys for the United States of America*

15  [Additional Counsel Listed on Next Page]

16              **UNITED STATES DISTRICT COURT**
17              **CENTRAL DISTRICT OF CALIFORNIA**

18  UNITED STATES OF AMERICA *ex rel.*        CASE NO. 2:16-cv-08697-FMO-PVCx
    BENJAMIN POEHLING,
19                                            **JOINT EVIDENTIARY APPENDIX**
                Plaintiff,
20                                            **VOLUME 5 OF 14**
        v.                                    **EXHIBITS D-35 THROUGH D-44**
21                                            **PAGES 0758 THROUGH 1019**
    UNITEDHEALTH GROUP, INC. *et al.*,
22                                            Hon. Fernando M. Olguin
                Defendants.
23
24                                            Hearing Date:  September 5, 2024
25                                            Hearing Time:  10:00 a.m.
26                                             Courtroom:  6D
27
28

LATHAM & WATKINS LLP
    Daniel Meron (appearing *pro hac vice*)
      *daniel.meron@lw.com*
    Abid R. Qureshi (appearing *pro hac vice*)
      *abid.qureshi@lw.com*
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
Telephone: +1.202.637.2200
Facsimile: +1.202.637.2201

BARTLIT BECK LLP
    Philip S. Beck (appearing *pro hac vice*)
      *philip.beck@bartlitbeck.com*
    Sean W. Gallagher (appearing *pro hac vice*)
      *sean.gallagher@bartlitbeck.com*
    Cindy L. Sobel (appearing *pro hac vice*)
      *cindy.sobel@bartlitbeck.com*
    Nicolas Martinez (appearing *pro hac vice*)
      *nicolas.martinez@bartlitbeck.com*
    Benjamin R. Montague (appearing *pro hac vice*)
      *benjamin.montague@bartlitbeck.com*
54 W. Hubbard Street, Suite 300
Chicago, Illinois 60654-8174
Telephone: +1.312.494.4400
Facsimile: +1.312.494.4440

BARTLIT BECK LLP
    Andrew C. Baak (appearing *pro hac vice*)
      *andrew.baak@bartlitbeck.com*
    Jameson R. Jones (appearing *pro hac vice*)
      *jameson.jones@bartlitbeck.com*
1801 Wewatta Street, Suite 1200
Denver, Colorado 80202-6318
Telephone: +1.303.592.3100
Facsimile: +1.303.592.3140

*Attorneys for United Defendants*


JAMIE ANN YAVELBERG
ROBERT McAULIFFE
EDWARD CROOKE
LINDA McMAHON
JESSICA E. KRIEG
AMY L. LIKOFF
GREGORY A. MASON
MARTHA N. GLOVER
WENDY ZUPAC
Attorneys, Civil Division, U.S. Department of Justice
      P.O. Box 261, Ben Franklin Station
      Washington, D.C. 20044
      Tel: (202) 307-0486; Fax: (202) 307-3852
      Email: robert.mcauliffe@usdoj.gov
TRINI E. ROSS
United States Attorney

DAVID CORIELL
Assistant United States Attorney
    138 Delaware Avenue
    Buffalo, New York 14201
    Tel: (716) 843-5830; Fax: (716) 551-3052
    Email:  david.coriell@usdoj.gov

*Attorneys for the United States of America*

**EXHIBIT D-35**

Message

| | |
|---|---|
| **From:** | Bonfante, Maricruz (CMS/CM) [/O=HHS EES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MARICRUZ.BOFANTE.CMS] |
| **Sent:** | 9/27/2013 5:29:02 PM |
| **To:** | Harlow, Jennifer A. (CMS/CM) [/O=HHS EES/OU=First Administrative Group/cn=Recipients/cn=jennifer.harlow.cms20728073]; Chaudhuri, Ilina (CMS/CM) [/O=HHS EES/OU=First Administrative Group/cn=Recipients/cn=Ilina.Chaudhuri.CMS]; Scott, John A. (CMS/CM) [/O=HHS EES/OU=First Administrative Group/cn=Recipients/cn=john.scott.cms63365671] |
| **CC:** | Johnson, Whitney S. (CMS/CM) [/O=HHS EES/OU=First Administrative Group/cn=Recipients/cn=whitney.may.cms61855760]; Smith, Jonathan (CMS/CM) [/O=HHS EES/OU=First Administrative Group/cn=Recipients/cn=Jonathan.Smith3.CMS]; Pulley, Tobi A. (CMS/CM) [/O=HHS EES/OU=First Administrative Group/cn=Recipients/cn=Tobi.Pulley.CMS]; Johnson, Amanda S. (CMS/CPC) [/O=HHS EES/OU=First Administrative Group/cn=Recipients/cn=amanda.ryan.cms69944978]; Paul, Rebecca (CMS/CM) [/O=HHS EES/OU=First Administrative Group/cn=Recipients/cn=rebecca.paul.cms55708697]; Franzel, Ashley S. (CMS/CM) [/O=HHS EES/OU=First Administrative Group/cn=Recipients/cn=ashley.franzel.cms02591694]; Gover, Julie (CMS/CM) [/O=HHS EES/OU=First Administrative Group/cn=Recipients/cn=Julie.Gover2.CMS]; Hornsby, Anne M. (CMS/CM) [/O=HHS EES/OU=First Administrative Group/cn=Recipients/cn=anne.hornsby.cms49724712] |
| **Subject:** | RE: OMB Responses (Overpayment and Part D techncial changes in CMS-4159-P) - For your review - due by noon tomorrow |

Jennifer:

Yes and No.  I pulled some cases which use the phrase "reasonable diligence", but only one seemed to provide a standard for it.  The cases were primarily ERISA and RICO cases.

A more commonly used term of art would be "due diligence" or "reasonable care".   Anne and I started trying to piece something together, but I would have to agree that if we want to stay consistent with the CPI reg – we should hold on trying to create a standard on our end – especially if we want to lessen plan burden and also not create an affirmative obligation to "identify".

Maricruz J. Bonfante
Center for Medicare (CM)
Medicare Plan Payment Group (MPPG)
410.786.5086 | 410.786.6730

**From:** Harlow, Jennifer A. (CMS/CM)
**Sent:** Friday, September 27, 2013 1:23 PM
**To:** Chaudhuri, Ilina (CMS/CM); Scott, John A. (CMS/CM)
**Cc:** Johnson, Whitney S. (CMS/CM); Smith, Jonathan (CMS/CM); Pulley, Tobi A. (CMS/CM); Johnson, Amanda S. (CMS/CPC); Paul, Rebecca (CMS/CM); Franzel, Ashley S. (CMS/CM); Gover, Julie (CMS/CM); Bonfante, Maricruz (CMS/CM); Hornsby, Anne M. (CMS/CM)
**Subject:** RE: OMB Responses (Overpayment and Part D techncial changes in CMS-4159-P) - For your review - due by noon tomorrow

Is "reasonable diligence" a term of art that is commonly used in legal forums?

> # Redacted

**From:** Chaudhuri, Ilina (CMS/CM)
**Sent:** Friday, September 27, 2013 12:05 PM
**To:** Scott, John A. (CMS/CM)
**Cc:** Johnson, Whitney S. (CMS/CM); Smith, Jonathan (CMS/CM); Pulley, Tobi A. (CMS/CM); Johnson, Amanda S. (CMS/CPC); Paul, Rebecca (CMS/CM); Franzel, Ashley S. (CMS/CM); Gover, Julie (CMS/CM); Bonfante, Maricruz (CMS/CM); Hornsby, Anne M. (CMS/CM); Harlow, Jennifer A. (CMS/CM)

0759

USBP066819447

**Subject:** Re: OMB Responses (Overpayment and Part D techncial changes in CMS-4159-P) - For your review - due by noon tomorrow

I like that - deliberately choosing not to define the term, consistent with CPI.

On Sep 27, 2013, at 11:41 AM, "Scott, John A. (CMS/CM)" <John.Scott@cms.hhs.gov> wrote:

> Got it.  Maybe that's all we need to say then:
> We are developing these overpayment regulations in a manner consistent with the overpayment regulations developed by CPI, including CPI's use of "due diligence."  Because CPI did not define due diligence in its regulations, we deliberately chose not to define it in our proposed regulations either.

# Redacted

Just a thought.

**From:** Johnson, Whitney S. (CMS/CM)
**Sent:** Friday, September 27, 2013 10:04 AM
**To:** Scott, John A. (CMS/CM); Smith, Jonathan (CMS/CM); Pulley, Tobi A. (CMS/CM); Johnson, Amanda S. (CMS/CPC); Paul, Rebecca (CMS/CM); Chaudhuri, Ilina (CMS/CM); Franzel, Ashley S. (CMS/CM)
**Cc:** Gover, Julie (CMS/CM); Bonfante, Maricruz (CMS/CM); Hornsby, Anne M. (CMS/CM); Harlow, Jennifer A. (CMS/CM)
**Subject:** Re: OMB Responses (Overpayment and Part D techncial changes in CMS-4159-P) - For your review - due by noon tomorrow

# Redacted

final (I checked with them). We took this term from CPI and need to be consistent as possible. OMB is asking this question.

**From:** Scott, John A. (CMS/CM)
**Sent:** Friday, September 27, 2013 09:38 AM
**To:** Johnson, Whitney S. (CMS/CM); Smith, Jonathan (CMS/CM); Pulley, Tobi A. (CMS/CM); Johnson, Amanda S. (CMS/CPC); Paul, Rebecca (CMS/CM); Chaudhuri, Ilina (CMS/CM); Franzel, Ashley S. (CMS/CM)
**Cc:** Gover, Julie (CMS/CM); Bonfante, Maricruz (CMS/CM); Hornsby, Anne M. (CMS/CM); Harlow, Jennifer A. (CMS/CM)
**Subject:** RE: OMB Responses (Overpayment and Part D techncial changes in CMS-4159-P) - For your review - due by noon tomorrow

I don't think our response answers the question about defining reasonable diligence.  We say a plan must use reasonable diligence to determine whether an overpayment exists, but we aren't saying what

# Redacted

exercise reasonable diligence to do that is up them.  In other words, reasonable diligence in this context may be the amount of diligence the plan deems reasonable to identify an overpayment.

# Redacted

0760

USBP066819448

**From:** Johnson, Whitney S. (CMS/CM)
**Sent:** Thursday, September 26, 2013 2:05 PM
**To:** Smith, Jonathan (CMS/CM); Pulley, Tobi A. (CMS/CM); Scott, John A. (CMS/CM); Johnson, Amanda S. (CMS/CPC); Paul, Rebecca (CMS/CM); Chaudhuri, Ilina (CMS/CM); Franzel, Ashley S. (CMS/CM)
**Cc:** Gover, Julie (CMS/CM); Bonfante, Maricruz (CMS/CM); Hornsby, Anne M. (CMS/CM); Harlow, Jennifer A. (CMS/CM)
**Subject:** OMB Responses (Overpayment and Part D techncial changes in CMS-4159-P) - For your review - due by noon tomorrow

Hello,

Below are draft responses to OMB questions we have received (so far...). Please send me any major edits/comments by noon tomorrow. Thanks!

Whitney

---

# Redacted

---

Any person who 'knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government' may be found liable under the False Claims Act. (See 31 U.S.C. 3729 et seq.). Additionally, any person who knows of an overpayment [as defined in section 1128J(d)(4) of the Act] and does not report and return the overpayment in accordance with such section' may be found liable under the Civil Monetary Penalties Law (section 1128A(a)(10) of the Act) and accordingly could be excluded from participation in Federal health care programs.

**A102: Reasonable Diligence: Is this defined somewhere?**

As indicated in preamble, it is to determine whether an overpayment exists. Without such a proposal, some providers and suppliers might avoid performing activities to determine whether an overpayment exists.

**A103: "CMS will recover the returned overpayment through routine processing according to the systems schedule established in the annual operations budget": Please provide more information on the timing of these processes.**

For Parts C and D, some reconciliations are routine and some are at CMS discretion.  For Part C, final reconciliations occur each year around August (risk adjustment).  For Part D, final reconciliations occur around October for the previous payment year. Reopening of the reconciliation for a payment year generally occurs several years later and for Part D we are proposing once within five years after the initial final reconciliation. Running reconciliation is resource-intensive.

**A104: "However, in light of the overpayment provision......we do not believe that it is necessary to reopen a payment reconciliation after that five year period, nor do we believe it is necessary to reopen a reconsidered payment determination": Please confirm that even in the case of fraud reopening a payment reconciliation is still subject to the 5 year limitation.**

That is correct.  Even in the case of fraud, the reopening payment reconciliation is still subject to the 5 year limitation.  If an overpayment (even an overpayment resulting from fraud) is discovered after a payment year has closed, the overpayment will be reported and returned to CMS via the overpayment process described at proposed § 423.360.

**A105: "we now propose to amend 423.2320 such that.....CMS will then attempt to recover those costs from the bankrupt manufacturer by filing a proof of claim with the bankruptcy court": Are there estimated costs with this policy?**

CONFIDENTIAL

Given our experience, we do not anticipate many manufacturers failing to pay quarterly invoices as a result of bankruptcy. The more typical scenario we see is that a manufacturer, or its assets, becomes acquired by another company prior to the manufacturer declaring bankruptcy. Since 2011, only one manufacturer has declared bankruptcy, and it is too early to determine whether or not there could be costs, or the extent of those costs, based on that case.

**A016: "In the event that a manufacturer becomes bankrupt, CMS is concerned that the court will either discharge or reduce the amount of the CMP….": In absence of CMS covering these costs, would these losses show up in reconciliation?**

CMS reconciles based on the amounts invoiced to the manufacturers, not the amounts actually paid by the manufacturers. Therefore, if a manufacturer fails to pay a quarterly invoice, that unpaid invoiced amount will not be reflected in reconciliation.

**A107: "Medical record review methodologies must be designed to identify errors in diagnoses submitted to CMS as risk adjustment data, regardless of whether the data errors would result in positive or negative payment adjustments": How will this be enforced?**

We expect that RADV audits will help in evaluating whether a MA organization is effectively fulfilling this requirement.

0762

**EXHIBIT D-36**



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**TABLE OF CONTENTS**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... I-1

MODULE 1 – RISK ADJUSTMENT METHODOLOGY ............................................... 1-1
1.1        Risk Adjustment History................................................................. 1-1
1.2        Calculating Payments.................................................................... 1-4
1.2.1      Payments for 2004 to 2005 ......................................................... 1-4
1.2.2      MA Capitation Rates for 2006 through 2008................................ 1-5
1.2.3      Risk Ratebook.............................................................................. 1-5
1.2.3.1    Adjustment for Budget Neutrality.................................................. 1-7
1.2.3.2    Change in the Budget Neutrality Calculation to Account for Different Payment
           Methodologies for Local MA Plans Versus Regional MA Plans ........... 1-7
1.2.3.3    Phase Out of Budget Neutrality..................................................... 1-7
1.2.4      Payment Blends ........................................................................... 1-8
1.2.5      Fee-for-Service Normalization Adjustment .................................. 1-9
1.2.6      Payments for 2006 and Beyond .................................................. 1-10
1.2.6.1    Bidding Background...................................................................... 1-10
1.2.7      Intra-Service Area Rate (ISAR) Adjusted County Payments Rates .... 1-10
1.2.8      Plan Payments ............................................................................ 1-11
1.3        Risk Adjustment Payment Models for Payment.......................... 1-12
1.3.1      Components of the Risk Score in the CMS-HCC Model .............. 1-14
1.3.1.1    Demographic Factors................................................................... 1-14
1.3.1.2    Disease Groups/HCCs ................................................................. 1-15
1.3.1.3    Disease Hierarchies .................................................................... 1-15
1.3.1.4    Disease Interactions .................................................................... 1-16
1.3.1.5    Disabled/Disease Interactions..................................................... 1-16
1.3.2      New Enrollee Factors .................................................................. 1-17
1.3.3      Community and Long-Term Institutional Model Distinctions......... 1-18
1.3.4      Frailty Adjuster............................................................................ 1-20
1.3.4.1    Why is There a Frailty Adjuster? ................................................. 1-21
1.3.4.2    Which Organizations Are Currently Being Paid Under Frailty Adjustment? ...... 1-21
1.3.4.3    How Does the Frailty Adjuster Work Under the CMS-HCC Model?.... 1-21
1.3.4.4    Frailty Model Development............................................................ 1-21
1.3.4.5    Frailty Payment Implementation .................................................. 1-23
1.3.4.6    ADL Information Collection and Frailty Adjuster Development ....... 1-24
1.3.4.7    Calculating the Frailty Score for Payment.................................... 1-24
1.3.5      Payment Methodology for ESRD Enrollees .................................. 1-25
1.3.5.1    Risk Adjustment Model for Dialysis Patients ............................... 1-26
1.3.5.2    Transplant Model ......................................................................... 1-27
1.3.5.3    Functioning Graft Model............................................................... 1-27
1.3.5.4    Model Comparison of Coefficients ............................................... 1-27
1.3.5.5    New Enrollee Factor ..................................................................... 1-27
1.3.5.6    Reporting of ESRD Status............................................................ 1-28
1.3.6      Medicare Part D ........................................................................... 1-28
1.3.6.1    Part D Risk Adjustment Model ..................................................... 1-28
1.3.6.2    Low Income and Long Term Institutionalization Multipliers........... 1-30



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**TABLE OF CONTENTS**

1.4     Parts C and D Final Submission of Risk Adjustment Data (Reconciliation) ...................... 1-32
1.4.1   Parts C and D Risk Adjustment Schedule & Elimination of the Payment Lag................... 1-32
1.5     Updating Diagnosis Codes in the Parts C and D Risk Adjustment Models ........................ 1-33

**MODULE 2– RISK ADJUSTMENT SUBMISSION PROCESS OVERVIEW**.................................... 2-1
2.1     Common Risk Adjustment Terms ................................................................................. 2-1
2.2     Risk Adjustment Process Overview.............................................................................. 2-2
2.2.1   Risk Adjustment Data Requirements ........................................................................... 2-2
2.2.2   Risk Adjustment Data Collection ................................................................................ 2-2
2.2.3   Risk Adjustment Data Submission .............................................................................. 2-3
2.2.4   Risk Adjustment Dataflow ......................................................................................... 2-4
2.2.5   Important Information About Risk Adjustment Processing.............................................. 2-5
2.3     Submission Schedule ................................................................................................ 2-6
2.4     Training and Support ................................................................................................ 2-7

**MODULE 3 – DATA COLLECTION**............................................................................................ 3-1
3.1     Required Risk Adjustment Data Elements .................................................................... 3-1
3.1.1   HIC Number ............................................................................................................ 3-1
3.1.2   ICD-9-CM Diagnosis Code ........................................................................................ 3-2
3.1.3   Service From and Through Dates................................................................................ 3-2
3.1.4   Provider Type .......................................................................................................... 3-2
3.2     Data Sources .......................................................................................................... 3-3
3.2.1   Hospital Inpatient..................................................................................................... 3-3
3.2.2   Hospital Outpatient................................................................................................... 3-3
3.2.2.1 Determining Whether Facilities Are Acceptable for Risk Adjustment ................................ 3-4
3.2.2.2 National Provider Identifier........................................................................................ 3-5
3.2.3   Physician Data ........................................................................................................ 3-9
3.2.4   Alternative Data Sources........................................................................................... 3-11
3.2.5   Excluded Providers .................................................................................................. 3-11
3.3     Data Collection Formats and Considerations................................................................. 3-11
3.3.1   Data Collection Formats ........................................................................................... 3-11
3.3.2   Collection Format Features........................................................................................ 3-12
3.3.3   Collecting Data from Physicians Using a Superbill ........................................................ 3-12
3.3.4   Factors Affecting Data Collection Method.................................................................... 3-16
3.3.4.1 Contractual Relationships and Implications for Data Collection ....................................... 3-16
3.4     Health Information Portability and Accountability Act (HIPAA) ....................................... 3-17
3.5     Provider Communication and Risk Adjustment.............................................................. 3-17
3.5.1   Key Messages ......................................................................................................... 3-17
3.5.2   Characteristics of Effective Communication ................................................................. 3-18
3.5.3   Communication Methods........................................................................................... 3-19

**MODULE 4 – DATA SUBMISSION**............................................................................................ 4-1
4.1     Submission Process Requirements .............................................................................. 4-1
4.2     Connectivity Options................................................................................................ 4-2
4.3     Relevant Diagnosis.................................................................................................. 4-2
4.4     Submission Formats ................................................................................................ 4-3
4.5     Submission File Layout Logic..................................................................................... 4-3
4.6     Diagnosis Cluster .................................................................................................... 4-5

0765



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

### TABLE OF CONTENTS

4.7      Provider Type ............................................................................................. 4-5
4.8      From and Through Dates............................................................................. 4-5
4.9      Diagnosis Code .......................................................................................... 4-6
4.10     RAPS Format.............................................................................................. 4-6
4.11     Filtering Risk Adjustment Data.................................................................... 4-11
4.12     Modifying Risk Adjustment Data ................................................................. 4-11
4.13     Deleting Diagnosis Clusters ....................................................................... 4-12
4.14     Reasons to Delete a Diagnosis Cluster....................................................... 4-12
4.15     Steps for Deleting a Diagnosis Cluster........................................................ 4-12
4.16     MA Organization Responsibilities Regarding Deletions................................ 4-13
4.17     Direct Data Entry....................................................................................... 4-13

**MODULE 5 – EDITS**............................................................................................ 5-1
5.1      Data Flow.................................................................................................. 5-1
5.1.1    FERAS System........................................................................................... 5-2
5.1.2    FERAS Error Code Logic ............................................................................ 5-3
5.1.3    FERAS Error Code Ranges ......................................................................... 5-3
5.1.4    RAPS Edits................................................................................................ 5-6
5.1.5    RAPS Editing Rules .................................................................................... 5-7
5.2      Resolving Error Codes................................................................................ 5-11
5.2.1    Resolution Steps........................................................................................ 5-11
5.2.2    Informational Error Messages ..................................................................... 5-13
5.2.3    Duplicate Diagnosis Cluster Error and 5 Percent Benchmark......................... 5-13
5.2.4    Common Errors .......................................................................................... 5-15
5.2.4.1  File Name Duplicates Another File Accepted Within Last 12 Months............... 5-15
5.2.4.2  Delete Error, Diagnosis Cluster Previously Deleted ...................................... 5-16
5.2.4.3  Diagnosis Cluster Not Successfully Deleted. Another Diagnosis Cluster With the
         Same Attributes Was Already Deleted From the RAPS Database On This Date ... 5-17
5.2.4.4  Service From Date Is Not Within MA Organization Enrollment......................... 5-17
5.2.4.5  Beneficiary Is Not Enrolled In Plan On or After Service From Date ................. 5-19

**MODULE 6 – DIAGNOSIS CODES & RISK ADJUSTMENT** ......................................... 6-1
6.1      Introduction............................................................................................... 6-1
6.1.1    Benefit to the MA Organization and Physician .............................................. 6-2
6.2      Structure and Terminology of ICD-9-CM ...................................................... 6-2
6.2.1    Special Notes and Abbreviations................................................................. 6-3
6.2.2    Supplemental Classifications and Tables ...................................................... 6-3
6.3      ICD-9-CM Updates..................................................................................... 6-4
6.3.1    Diagnosis Codes Phase-in Schedule............................................................ 6-4
6.3.2    International Classification of Diseases 10th Revision, Clinical Modification (ICD-10-CM)..... 6-5
6.4      Coding Guidelines Impacting the CMS-HCC Model ....................................... 6-5
6.4.1    Co-Existing and Related Conditions ............................................................ 6-5
6.4.1.1  Combination Codes..................................................................................... 6-6
6.4.2    Unconfirmed Diagnoses .............................................................................. 6-7
6.4.3    Clinical Specificity in Documentation ........................................................... 6-8
6.4.4    Coding to the Highest Specificity-Fourth and Fifth Digits ............................... 6-9
6.4.5    V Codes..................................................................................................... 6-10
6.4.6    E Codes..................................................................................................... 6-10

0766



| | | |
|---|---|---|
| 6.5 | Supporting Documentation Summary | 6-10 |
| 6.6 | Provider and Staff Training | 6-11 |
| | | |
| **MODULE 7 – RISK ADJUSTMENT DATA VALIDATION** | | **7-1** |
| 7.1 | Risk Adjustment Data Validation | 7-1 |
| 7.1.1 | Purpose of Risk Adjustment Data Validation | 7-1 |
| 7.1.2 | Objectives of Risk Adjustment Data Validation | 7-2 |
| 7.1.3 | Good Documentation = Accurate Payment | 7-2 |
| 7.1.4 | Guidelines for Risk Adjustment Data Validation | 7-2 |
| 7.1.5 | Medical Record Documentation | 7-3 |
| 7.1.6 | Overview of Risk Adjustment Data Validation | 7-3 |
| 7.1.7 | Risk Adjustment Discrepancies | 7-4 |
| 7.1.8 | Data Validation Activities (Current and Future) | 7-4 |
| 7.1.9 | Risk Adjustment Data Validation Process | 7-4 |
| 7.2 | Components of the Risk Adjustment Data Validation Process | 7-7 |
| 7.2.1 | Contract Selection | 7-7 |
| 7.2.2 | Medical Record Request Process | 7-7 |
| 7.2.2.1 | Medical Record Request – Initial Contact Letter | 7-8 |
| 7.2.2.2 | Medical Record Request – Beneficiary List | 7-8 |
| 7.2.2.3 | Medical Record Request – Comprehensive Instructions and Coversheets | 7-9 |
| 7.2.3 | Medical Record Submission | 7-10 |
| 7.2.3.1 | Medical Record Submission - Coversheets | 7-10 |
| 7.2.4 | Medical Record Receipt by the IVC and Reimbursement | 7-12 |
| 7.2.4.1 | Medical Record Documentation | 7-12 |
| 7.2.4.2 | General Guidelines for Hospital Inpatient Medical Record Documentation | 7-13 |
| 7.2.4.3 | General Guidelines for Hospital Outpatient and Physician Medical Record Documentation | 7-13 |
| 7.2.4.4 | Unacceptable Medical Record Documentation | 7-14 |
| 7.2.4.5 | Physician Signatures, Physician Credentials, and Dates of Service | 7-15 |
| 7.2.4.6 | Additional Guidance | 7-17 |
| 7.2.5 | Medical Record Review | 7-19 |
| 7.2.5.1 | Risk Adjustment Discrepancies | 7-19 |
| 7.2.6 | Risk Adjustment Data Validation Findings | 7-20 |
| 7.2.7 | Payment Adjustment | 7-20 |
| 7.2.8 | Appeals | 7-21 |
| 7.2.9 | Correct Payment | 7-21 |
| 7.3 | Recommendations & Lessons Learned to Date | 7-22 |
| 7.4 | Technical Assistance | 7-23 |
| 7.5 | CMS Data Validation Team Contacts | 7-23 |
| 7.6 | Next Steps | 7-23 |
| | | |
| **MODULE 8 – REPORTS** | | **8-1** |
| 8.1 | Accessing Risk Adjustment Processing Reports | 8-1 |
| 8.2 | Printing Reports | 8-2 |
| 8.3 | Report Overview | 8-2 |
| 8.4 | FERAS Response Report | 8-4 |
| 8.5 | RAPS Processing Reports | 8-5 |
| 8.5.1 | RAPS Return File | 8-6 |
| 8.5.2 | RAPS Transaction Error Report | 8-7 |



| | | |
|---|---|---|
| 8.5.3 | RAPS Transaction Summary Report | 8-10 |
| 8.5.3.1 | Relationships Between Values in Report | 8-12 |
| 8.5.4 | RAPS Duplicate Diagnosis Cluster Report | 8-13 |
| 8.6 | RAPS Management Reports | 8-15 |
| 8.6.1 | RAPS Monthly Plan Activity Report | 8-15 |
| 8.6.2 | RAPS Cumulative Plan Activity Report | 8-23 |
| 8.6.3 | Correcting Rejected Data | 8-29 |
| 8.6.4 | RAPS Error Frequency Reports | 8-29 |
| 8.7 | Analysis of Reports | 8-33 |
| 8.7.1 | Collecting Sufficient Accurate Data | 8-33 |
| 8.7.2 | External Issues Affecting Data Collection | 8-34 |
| 8.7.3 | Internal Processes Supporting Data Submissions | 8-35 |
| 8.8 | Report Naming Conventions | 8-35 |
| 8.9 | Plan Monitoring Process | 8-36 |
| | | |
| **MODULE 9 – VERIFYING RISK SCORES** | | **9-1** |
| 9.1 | Calculating Risk Scores | 9-1 |
| 9.2 | Risk Score Verification Tools | 9-4 |
| 9.2.1 | RAPS Return File/RAPS Transaction Error Report | 9-5 |
| 9.2.2 | RAPS Management Reports | 9-7 |
| 9.2.3 | CMS-HCC Risk Adjustment Model Software | 9-9 |
| 9.2.4 | Monthly Membership Reports (MMR) | 9-10 |
| 9.2.4.1 | Monthly Membership Summary Reports | 9-11 |
| 9.2.4.2 | Monthly Membership Detail Reports | 9-11 |
| 9.2.4.2.1 | Non-Drug Monthly Membership Report | 9-11 |
| 9.2.4.2.2 | Drug Monthly Membership Report | 9-11 |
| 9.2.5 | Risk Adjustment Model Output Reports (MOR) | 9-19 |
| 9.2.5.1 | Part C Risk Adjustment MOR | 9-19 |
| 9.2.5.2 | RAS RxHCC MOR | 9-20 |

0768



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**TABLE OF CONTENTS**

## LIST OF TABLES

Table A    Training Tools ...................................................................................................... I-2
Table B    Organization Description ....................................................................................... I-3
Table C    Risk Adjustment Process Points of Contact............................................................ I-4
Table 1A   Risk Adjustment Model Implementation for Payment ..................................... 1-7
Table 1B   Phase-Out Schedule for Budget Neutral Risk Adjustment Payments .................. 1-9
Table 1C   Risk Adjustment Implementation Schedule for MA Organizations and for MA-PDs and PDPs for Drug Benefit.......................................................................................... 1-8
Table 1D   Payment Blend Schedule for Specialty Organizations ...................................... 1-8
Table 1E   Dialysis and Transplant Risk Score Normalization Phase-in Schedule ................ 1-9
Table 1F   Characteristics of the Risk Adjustment Models................................................. 1-13
Table 1G   Which Risk Adjustment Factors Apply to Payment .......................................... 1-18
Table 1H   Community Versus Long-Term Institutionalized Populations ........................... 1-19
Table 1I    Distribution of Long-Term Institutionalized Beneficiaries Across Organizations Types – 2005 .................................................................................................... 1-20
Table 1J   Plans Receiving Frailty Adjustment.................................................................. 1-21
Table 1K   Current and Revised Frailty Factors................................................................. 1-22
Table 1L   Frailty Payment Implementation Schedule for PACE and Dual Demonstration Organizations.................................................................................................... 1-23
Table 1M   Range of Frailty Score by Type of Organization ............................................. 1-24
Table 1N   New ESRD Dialysis and Transplant Payment Transition ................................. 1-26
Table 1O   Definition of the Low Income Multipliers for Part D Benefit............................ 1-30
Table 2A   Risk Adjustment Common Terms ................................................................... 2-1
Table 2B   Submission Timetable...................................................................................... 2-6
Table 2C   Training and Support....................................................................................... 2-7
Table 3A   Structure of HIC Numbers .............................................................................. 3-2
Table 3B   Hospital Inpatient............................................................................................ 3-3
Table 3C   Hospital Outpatient.......................................................................................... 3-4
Table 3D   Determining Covered Hospital Entity Provider Numbers ................................. 3-5
Table 3E   Provider Number State Assignments ................................................................ 3-6
Table 3F   Hospital Inpatient Covered Entities ................................................................. 3-7
Table 3G   Hospital Outpatient Covered Entities ............................................................... 3-7
Table 3H   Acceptable Physician Specialties ................................................................... 3-10
Table 3I    Data Collection Formats ................................................................................ 3-11
Table 3J   Collection Format Features.............................................................................. 3-12
Table 3K   Contractual Payment Relationships ................................................................ 3-16
Table 4A   Connectivity Options...................................................................................... 4-2
Table 4B   Provider Types ................................................................................................ 4-5
Table 4C   From and Through Dates ................................................................................. 4-6
Table 4D   RAPS File Layout............................................................................................ 4-7
Table 5A   FERAS Error Code Logic ............................................................................... 5-3
Table 5B   Error Code Ranges .......................................................................................... 5-4
Table 5C   FERAS Error Codes ........................................................................................ 5-5
Table 5D   Explanation of Error and Consequences........................................................... 5-9
Table 5E   RAPS Error Codes........................................................................................... 5-9
Table 5F   Informational Edits ........................................................................................ 5-10
Table 5G   Duplicate Diagnosis Cluster Edit .................................................................. 5-11

0769



Table 5H    Informational Message Codes.................................................................... 5-13
Table 5I     502 Benchmark Comparison Examples ......................................................... 5-14
Table 5J     Tips for Ensuring Compliance with the 5 Percent Benchmark for Duplicate Diagnosis
             Cluster Error Guidance............................................................................ 5-14
Table 6A    Benefits to MA Organizations and Physicians.................................................. 6-2
Table 6B    Risk Adjustment Phase In Schedule for New List of Diagnosis Codes................................ 6-5
Table 6C    Documentation Considerations .................................................................. 6-11
Table 6D    Documentation and Coding Resources ........................................................... 6-12
Table 7A    Beneficiary List....................................................................................... 7-9
Table 7B    Types of Acceptable Physician Signatures and Credentials............................................ 7-16
Table 7C    Types of Unacceptable Physician Signatures and Credentials......................................... 7-16
Table 7D    CMS Staff ................................................................................................. 7-23
Table 8A    Reports Overview ........................................................................................ 8-3
Table 8B    RAPS Record Layout ..................................................................................... 8-6
Table 8C    Steps In RAPS Edit Process ............................................................................. 8-9
Table 8D    Report Naming Conventions ............................................................................ 8-36
Table 9A    Risk Score Calculation Steps........................................................................... 9-3
Table 9B    Risk Score Verification Tools........................................................................... 9-5
Table 9C    Software-Provided Files.................................................................................. 9-10
Table 9D    User Supplied Files ...................................................................................... 9-10
Table 9E    Summary of the MMR Detail Record Layout Field Ranges.............................................. 9-11
Table 9F    Monthly Membership Report (MMR) (Drug and Non-Drug Fields) ................................... 9-12
Table 9G    Part C Risk Adjustment MOR Field Summary ....................................................... 9-20
Table 9H    RxHCC MOR Field Summary ........................................................................... 9-20
Table 9I     Part C Risk Adjustment Model Output Data File.......................................................... 9-21
Table 9J     RAS Rx HCC MOR Record Format............................................................................ 9-31

0770



# LIST OF FIGURES

Figure 1A    Calculation of Risk Adjusted Payment for Plans ............................................................ 1-12
Figure 1B    Frailty Adjustment Calculation .................................................................................. 1-25
Figure 1C    Calculation of Part D Direct Subsidy ......................................................................... 1-31
Figure 2A    Risk Adjustment Dataflow ....................................................................................... 2-4
Figure 3A    WPC-EDE.COM........................................................................................................ 3-8
Figure 3B    American Hospital Directory ..................................................................................... 3-9
Figure 3C    Sample Fee-for-Service Superbill............................................................................... 3-14
Figure 3D    Sample Risk Adjustment Superbill ............................................................................ 3-15
Figure 3E    Communication Methods .......................................................................................... 3-20
Figure 4A    RAPS File Structure Summary .................................................................................. 4-4
Figure 4B    DDE 1 ................................................................................................................... 4-14
Figure 4C    DDE 2 ................................................................................................................... 4-14
Figure 4D    DDE 3 ................................................................................................................... 4-15
Figure 4E    DDE 4 ................................................................................................................... 4-15
Figure 4F    DDE 5 ................................................................................................................... 4-16
Figure 4G    DDE 6 ................................................................................................................... 4-16
Figure 5A    Data Flow............................................................................................................... 5-2
Figure 5B    Flow of Data for Eligibility Checks ............................................................................ 5-8
Figure 5C    Resolution Steps ..................................................................................................... 5-11
Figure 7A    Data Validation Process........................................................................................... 7-6
Figure 7B    Appeals Process Timeline ........................................................................................ 7-21
Figure 8A    Rejected FERAS Response Report ............................................................................. 8-4
Figure 8B    FERAS Response Report........................................................................................... 8-5
Figure 8C    RAPS Return File .................................................................................................... 8-7
Figure 8D    RAPS Transaction Error Report ................................................................................ 8-8
Figure 8E    RAPS Transaction Error Report ................................................................................ 8-10
Figure 8F    RAPS Transaction Summary Report........................................................................... 8-11
Figure 8G    Transaction Summary Report ................................................................................... 8-13
Figure 8H    Duplicate Diagnosis Cluster Report........................................................................... 8-14
Figure 8I    Analysis of Management Reports .............................................................................. 8-15
Figure 8J    RAPS Monthly Plan Activity Report Layout ................................................................ 8-16
Figure 8K    RAPS Monthly Plan Activity Report ........................................................................... 8-19
Figure 8L    RAPS Cumulative Plan Activity Report Layout............................................................. 8-23
Figure 8M    RAPS Cumulative Plan Activity Report....................................................................... 8-26
Figure 8N    RAPS Monthly Error Frequency Report Layout............................................................. 8-30
Figure 8O    RAPS Monthly Error Frequency Report....................................................................... 8-32
Figure 8P    Analysis of Cumulative Plan Activity Report................................................................ 8-34
Figure 9A    Risk Score Calculation Process................................................................................. 9-2
Figure 9B    RAPS Return File .................................................................................................... 9-6
Figure 9C    Internal Diagnosis Cluster Database........................................................................... 9-6
Figure 9D    Internal Diagnosis Cluster Database........................................................................... 9-7
Figure 9E    RAPS Cumulative Plan Activity Report........................................................................ 9-8
Figure 9F    MMR Report Format – Non-Drug............................................................................... 9-17
Figure 9G    MMR Report Format – Drug...................................................................................... 9-18
Figure 9H    Part C MOR Report Format....................................................................................... 9-47
Figure 9I    RAS RxHCC MOR Report Format ............................................................................... 9-48



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**INTRODUCTION**

## INTRODUCTION

### Purpose (Slide 2)

The purpose of this training is to provide participants who are new to risk adjustment the support necessary to understand risk adjustment. This information will enable new participants to collect and submit risk adjustment data in accordance with Centers for Medicare & Medicaid Services (CMS) requirements.

### About This Training

This training is organized into nine modules:

| ICON KEY | |
|---|---|
| Example | ⊠ |
| Reminder | 🔍 |
| Resource | 📖 |

1. **Risk Adjustment Methodology**
   *Provides an understanding of CMS' Risk Adjustment models and payment methodologies.*

2. **Risk Adjustment Process Overview**
   *Identifies the systems and timeline for the risk adjustment data collection, submission, editing, and reporting processes.*

3. **Data Collection**
   *Describes the acceptable sources of risk adjustment data and data collection formats.*

4. **Data Submission**
   *Describes the acceptable formats for submitting risk adjustment data.*

5. **Edits**
   *Identifies data integrity logic and error codes, error resolution, and suggestions for avoiding errors.*

6. **Diagnosis Codes & Risk Adjustment**
   *Provides important medical record documentation and coding guidelines related to risk adjustment.*

7. **Data Validation**
   *Identifies the data validation approach under the CMS' Risk Adjustment models, including responding to CMS medical record requests.*

8. **Reports**
   *Describes risk adjustment reports, and defines their uses in monitoring data collection and submission processes.*

9. **Verifying Risk Scores**
   *Describes the process for calculating the risk score and its impact on risk adjusted payment.*

0772



This participant guide is designed as the foundation of the training program. The presentation slides complement the participant guide and both will be used extensively throughout this training. The participant binder includes the participant guide, presentation slides, a resource guide, and job aids. Collectively, these tools enhance the learning experience. Sections of the binder are described in Table A.

**TABLE A – TRAINING TOOLS**

| SECTION | DESCRIPTION |
|---------|-------------|
| **Participant Guide** | • Detailed description of relevant risk adjustment information <br>• Case studies <br>• Exercises <br>• Answer keys |
| **Slides** | • Organized by module <br>• Printed two slides per page |
| **Resource Guide** | • List of common acronyms <br>• Risk adjustment instructions <br>• Contact information <br>• Other source documents |

## Future Use of This Participant Guide

The participant guide, slides, and resource guide are designed for use when participants return to their organizations. Additional copies of the training materials are available at www.cssoperations.com. CMS revises training materials, when required. An appropriate label will appear in the footer of the replacement pages affected by the revisions. Organizations are encouraged to register at www.cssoperations.com to receive notification for these revisions.

## Audience

This training program is designed for individuals new to the risk adjustment process. The primary audiences for this training are:

- Staff of new Medicare Advantage (MA) and Medicare Advantage – Prescription Drug (MA-PD) organizations, Regional and Employer Group Health plans, demonstration projects, Program of All-Inclusive Care for the Elderly (PACE) organizations, and specialty plans.
- Existing staff unable to attend previous training sessions.
- New staff at the existing organizations mentioned above.
- Third party submitters contracted to submit data on behalf of MA Risk Adjustment organizations.

The organizations listed in Table B will be used throughout this training.



## TABLE B – ORGANIZATION DESCRIPTION

| NAME | DESCRIPTIONS |
|---|---|
| **MA Organizations** | Organizations, including Health Maintenance Organizations with or without Prescription Drug Programs, Employer Group Health and Medical Savings Account organizations, private fee-for-service organizations, preferred provider organizations, and provider sponsored organizations that receive capitated payments to provide comprehensive medical services to Medicare beneficiaries. |
| **PACE** | Program of All-Inclusive Care for the Elderly (PACE) that serves a community of frail and elderly individuals who are eligible for nursing home placement based on State Medicaid criteria. |
| **MSHO/ MnDHO** | Minnesota Senior Health Options (MSHO) and Minnesota Disability Health Options (MnDHO) are managed care products in a ten-county area in Minnesota, including the Twin Cities. They integrate Medicare and Medicaid financing of acute and long-term care service delivery for dually eligible and Medicaid eligible physically disabled adults and elderly. MnDHO is approved for Carver, Scott, Washington, Hennepin, Ramsey, Dakota, and Anoka counties. |
| **S/HMO** | Social Health Maintenance Organizations (SHMO) offer seniors an expanded care benefits package that may include prescription drugs and community-based services, which enables them to maintain independence and avoid nursing home placement. |
| **WPP** | Wisconsin Partnership Program (WPP) is a comprehensive program for Medicaid and Medicare beneficiaries who are elderly or disabled and meet the State's nursing home criteria. WPP integrates health and long-term support services, and includes home and community-based waiver services (HCBS), physician services, and all other medical care. |
| **SCO** | The MassHealth Senior Care Option (SCO) is a dual eligible demonstration that CMS and the Division of Medical Assistance for the Commonwealth of Massachusetts developed. The contractors provide care through managed care organizations to beneficiaries who enroll voluntarily. SCOs serve community-well, community-frail and institutionalized beneficiaries age 65 and older. SCOs are required to contract with State Aging Services Access Point providers as part of the SCO care management team, which deliver home and community-based services as part of an integrated model of care. |
| **Capitated Demonstration Projects** | Capitated demonstration projects use alternative capitated financing to allow the provider to offer comprehensive medical service. |

0774



## Learning Objectives (Slide 5)

At the completion of this training, participants will be able to:

- Identify Risk Adjustment and payment methodologies.
- Describe the requirements for data collection.
- Determine the process for submitting data to CMS.
- Interpret the editing rules and steps in the error resolution process.
- Name and interpret the reports available for risk adjustment monitoring.
- Demonstrate how to verify risk scores.

The roles and contact information for important resources are provided in Table C.

### TABLE C – RISK ADJUSTMENT PROCESS POINTS OF CONTACT

| ORGANIZATION | ROLE | CONTACT INFORMATION |
|---|---|---|
| **CMS Center for Beneficiary Choices** | Develops and implements the risk adjustment payment methodology for the MMA program. Monitors plans to improve the quality of data. | Sean Creighton<br>sean.creighton@cms.hhs.gov<br>Henri Thomas<br>henry.thomas@cms.hhs.gov<br>Louis Johnson<br>Louis.johnson@cms.hhs.gov<br>Lateefah Hughes<br>Lateefah.hughes@cms.hhs.gov |
| **CMS Regional Offices** | Provide assistance to Risk Adjustment organizations and beneficiaries regarding various issues related to the Medicare program. | Contact your plan manager. |
| **Palmetto Government Benefits Administration (Palmetto GBA)** | Manages the Front-End Risk Adjustment System (FERAS) and the Customer Service and Support Center (CSSC). | www.csscoperations.com |
| **Leading Through Change, Inc. (LTC, Inc.)** | Training Contractor responsible for risk adjustment training initiatives, including regional training programs and User Group meetings. | RARegistration@medicaretraining.net |

0775



## MODULE 1 – RISK ADJUSTMENT METHODOLOGY

### Purpose (Slide 2)

To provide information on risk adjusted data submission and payment under the risk payment models. The goal of risk adjustment is to pay applicable Parts C and D organizations accurately and fairly by adjusting payment for enrollees based on demographics and health status. Changes to risk adjustment under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA) are also provided in this module.

### Learning Objectives (Slide 3)

At the completion of this module, participants will be able to:

- Define the purpose of risk adjustment.
- Identify the components of risk adjusted payments.
- Describe the Part C community model.
- Describe how to calculate the frailty adjuster.
- Describe Part C Community and Long-term institutional models.
- Describe how to calculate a risk factor.
- Recognize the components of the Part C End-Stage Renal Disease (ESRD) model.
- Describe the Part D Prescription Drug Risk Adjustment model.
- Identify the new enrollee factors.



### 1.1   Risk Adjustment History  (Slides 4-9)

The following is a list of key dates that have occurred during the process of implementing a risk adjustment payment methodology.

- Balanced Budget Act of 1997 (BBA) (42 CFR 422).
  - Created the Medicare+Choice (M+C) program.
  - Mandated risk adjustment payment methodology to increase payment accuracy.
  - Mandated the implementation of a frailty adjuster for the Program for All-Inclusive Care for the Elderly (PACE) organizations.

- August 1998
  - Hospital inpatient encounter data collection began.



- January 2000 – Principal Inpatient Diagnostic Cost Group (PIP-DCG) Payment Model implemented.
  - Gradual phase-in of risk adjustment based on principal inpatient diagnosis and demographic factors (age, sex, Medicaid status, original reason for Medicare entitlement).
  - Implemented at 10 percent PIP-DCG and 90 percent demographic.
  - The PIP-DCG model is based on hospital inpatient diagnoses only.

- Benefits Improvement and Protection Act of 2000 (BIPA) (December).
  - Established the current implementation schedule to achieve 100 percent risk adjusted payment in 2007.
  - Mandated the incorporation of ambulatory data.

- May 2001 – Secretary of the Department of Health and Human Services suspended collection of ambulatory data to seek burden reduction for M+C organizations.

- January 2002 – CMS announced new risk adjustment data processing system—RAPS (Risk Adjustment Processing System).

- March 2002 – Draft CMS-HCC Payment Model selected.
  - New risk adjustment model needed to accommodate other types of data (hospital outpatient and physician)
  - Included approximately 70 condition groups with reduced number of diagnostic codes.
  - Proposed for implementation in calendar year 2004.

- February 3, 2003 – CMS presented a draft CMS-HCC model discussed at national public meeting and addressed the elimination of the data lag for payment.

- March 28, 2003 – Advanced Notice of Methodological Changes (i.e., 45-Day notice) published the proposed CMS-HCC model, ESRD model, frailty adjuster, and elimination of the data lag.

- May 12, 2003 – Published final M+C rates for 2004 payment.
  - Announced final CMS-HCC model, including the institutional and community models.
  - Provided risk adjustment new enrollee factors.
  - Delayed implementation of ESRD model for M+C until 2005.
  - Described process for elimination of the data lag.

📖 See 2004 45-Day Notice at
http://www.cms.hhs.gov/MedicareAdvtgSpecRateStats/Downloads/Advance2004.pdf and May 12, 2003 Announcement of Rates for 2004 at:
http://www.cms.hhs.gov/MedicareAdvtgSpecRateStats/Downloads/Announcement2004.pdf

- December 8, 2003 – Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA) Enacted (P.L. 108-173).
  - Created MA program to replace M+C program.
  - Retained many M+C provisions.
  - Created Medicare drug benefit to begin in 2006.
  - Established bidding methodology for MA organizations and drug plans in 2006.

0777



- January 16, 2004-New ratebook for 2004 published.
  - Revised ratebook took into account changes from MMA—adding 4th prong to the "highest of" methodology for 2004 and modifying the minimum percentage increase rate for 2004 and
  - beyond.

📖 See January 16, 2004 cover letter regarding revised MA rates at:
http://www.cms.hhs.gov/MedicareAdvtgSpecRateStats/Downloads/Announcement2004b.pdf

- March 26, 2004-Advanced Notice of Methodological Changes for 2005 (i.e., 45-Day notice) published.
  - Proposed revised MA payment methodology—based on MMA, ratebook transitions to "highest of 2."
  - Proposes ESRD model for implementation in 2005.

📖 See 2005 45-Day Notice for additional details at:
http://www.cms.hhs.gov/MedicareAdvtgSpecRateStats/Downloads/Advance2005.pdf

- May 2004-Announcement of draft diagnoses collected for drug risk adjustment model for payment beginning in 2006 and additional codes for CMS-HCC risk adjustment models.

- May 10, 2004-Announcement of rates for 2005.
  - Announced MA county capitation rates.
  - Announced final ESRD CMS-HCC risk adjustment model.

- February 18, 2005-Advanced Notice of Methodological Changes for 2006 (i.e., 45-Day notice) published.
  - Proposed changes in the MA capitation rate methodology and risk adjustment methodology under Part C.
  - Proposed the health status risk adjustment methodology for Part D [Draft Prescription Drug (RxHCC) Model].
  - Proposed payment methodologies for the direct, low income, and reinsurance subsidies, and risk sharing.

📖 See 2006 45-Day Notice for additional details at:
http://www.cms.hhs.gov/MedicareAdvtgSpecRateStats/Downloads/Advance2006.pdf

📖 April 4, 2005-Announcement of rates for 2006.
  - Announced final Part D risk adjustment model.
  - Rolled back proposed changes to MA risk adjustment model outlined in February 18, 2005 Advance Notice.
  - April 8, 2005-Updated regional rates.
  - April 13, 2005-Updated ratebook.

📖 See Final 2006 Notice for additional details at:
http://www.cms.hhs.gov/MedicareAdvtgSpecRateStats/Downloads/Announcement2006.pdf

April 7, 2005- Risk Adjustment models and ICD-9/HCC crosswalks posted at
http://www.cms.hhs.gov/MedicareAdvtgSpecRateStats/06_Risk_adjustment.asp

0778



📖  April 3, 2006-Announcement of 2007 Payments posted at
http://www.cms.hhs.gov/MedicareAdvtgSpecRateStats/Downloads/Announcement2007.pdf.

  −  Announced recalibrated version of the CMS-HCC model for 2007

  −  Announced updated normalization factor for CMS-HCC models

📖  April 2, 2007—Announcement of 2008 Payments posted at
http://www.cms.hhs.gov/MedicareAdvtgSpecRateStats/Downloads/Announcement2008.pdf.

  −  Announced recalibrated versions of ESRD models for 2008

  −  Announced normalization factor for Part D risk adjustment model

  −  Announced updated normalization factor for Part C CMS-HCC and functioning graft models

  −  Announced normalization factor for ESRD dialysis and transplant models

  −  Announced recalibrated frailty model

  −  Announced new frailty payment implementation for PACE and certain demonstration
     organizations

## 1.2  Calculating Payments

### 1.2.1 Payments for 2004 and 2005

Traditionally, payments to MA organizations were based solely on demographic information. Risk
adjustment provides more accurate payments for MA organizations. Payments are higher for less healthy
enrollees and lower for more healthy enrollees.  For 2004 and 2005, MA risk payment calculations
involved two steps:
1.  Derive the county risk rate, and
2.  Multiply by the individual risk factor.

CMS derived county risk rates for Part A and Part B by multiplying the unadjusted Part A and Part B
county rates (used for demographic payments) by a rescaling factor, based on the CMS-HCC risk factor of
the FFS enrollees in that county. This county risk rate was then multiplied by the individual's CMS-HCC
risk factor to determine the appropriate payment amount. The MA organization demographic and CMS-
HCC payment rates for 2004 through 2007 and beyond are as follows:
•  For 2004, MA organizations were paid using 70 percent of the demographic payments and 30 percent
   of the CMS-HCC payments.
•  For 2005, MA organizations were paid using 50 percent of the demographic payments and 50 percent
   of the CMS-HCC payments.
•  For 2006, MA organizations were paid using 25 percent of the demographic payments and 75 percent
   of the CMS-HCC payment.
•  For 2007 and beyond, MA organizations are paid using 100 percent of the CMS-HCC payment.

Prior to the passage of the MMA, the 2004 MA (then M+C) rates for each county were defined as the
maximum of three possible categories: the blended capitation rate, minimum "floor" amount, or minimum
two percent increase rate. With the enactment of the MMA in December 2003, the original 2004 payment
methodology changed and required CMS to issue revised capitation rates for CY 2004.

0779



**2007 Risk Adjustment Data Training**
**For Medicare Advantage Organizations**
**Participant Guide**

**RISK ADJUSTMENT METHODOLOGY**

The MMA mandated that a fourth rate type, 100 percent of projected fee-for-service Medicare costs (with adjustments to exclude direct medical education and include a VA/DOD adjustment) be added to the payment methodology. With the addition of this 4th prong to the MA payment methodology, the formula reconnects the link between managed care payment rates and fee-for-service spending at the county level. For 2004 only (a transition year under the MMA rate-setting rules), the county capitation rate was this highest of four rates: blended rate, floor amount, minimum increase rate, and FFS rate.

In addition, from 2004 onward, the MMA modifies the methodology for calculating the minimum percentage increase. The previous year's rate is increased by the larger of:

- 2 percent

or

- the Medicare growth percentage, - with no adjustments to this growth trend for over/under projections for years before 2004.

For 2005 and subsequent years , the MA capitation rate for a county is the minimum percentage increase rate, except for years when CMS re-tabulates ("rebases") the FFS rates. In rebasing years, the county capitation rate is the higher of the minimum percentage increase rate or the FFS rate.

### 1.2.2  MA Capitation Rates for 2006 through 2008

CY 2006 was the first year that MAOs were paid based on the MMA bid-based methodology. Thus, the capitation rates are no longer the same as payment rates. Capitation rates are used to establish benchmarks, and payment rates are plan-specific per capita monthly bids (adjusted).

For 2006, the final estimate of the increase in the National Per Capita Medicare Advantage Growth Percentage for aged beneficiaries was 4.8 percent, which is greater than 2 percent. Therefore, 4.8 percent was used as the minimum update percentage in calculating the 2006 rates. For 2006, all capitation rates are the 2005 rate increased by 4.8 percent. Per the MMA, CMS is not required to rebase the county fee-for-service rate every year and did not do so for 2006. In addition, for 2006, MA organizations were paid using 25 percent of the demographic payments and 75 percent of the CMS-HCC risk payments.

For 2007, the final estimate of the National Per Capita Medicare Advantage Growth Percentage was 7.1 percent. Because fee-for-service rates were rebased (to reflect more recent county growth trends in fee-for-service expenditures), counties where the FFS rate is greater than the minimum percentage increase rate received the FFS rate. For 2007, 6 percent of the counties received the FFS rates. For 2007 and beyond, payments to MA organizations will be at 100 percent of the CMS-HCC risk rate.

For 2008, the final estimate of the National Per Capita MA Growth Percentage is 5.7%. This final estimate includes 4.3 percent for the 2008 underlying trend change and 1.3 percent due to corrections to prior years' estimates, as required by law. CMS did not re-tabulate the FFS rates for 2008, so all MA capitation rate are minimum percentage increase rates.

### 1.2.3    Risk Ratebook

For payments years through 2006, a rescaling factor has been used to convert the demographic capitation rates to the risk adjusted capitation rates for each county. This is referred to a restandardizing

0780



the ratebook. The rescaling factor is defined as the county rate properly standardized to the new risk adjustment factors divided by the demographic county rate. In addition to restandardizing the ratebook, a budget neutrality factor is applied to make risk adjustment budget neutral. (see below for more information)

Section 5301 of the Deficit Reduction Act (DRA) changes the way CMS develops its capitation rates, beginning in 2007. The DRA established a single risk ratebook for monthly capitation rates, because the statutory transition for MA plans from payment based on the demographic rates and demographic adjustment factors to payment based on risk adjustment rates and risk adjustment factors were completed in 2006. Effective 2007, MA capitation rates are risk rates. Capitation risk rates are used to determine the plan benchmarks for virtually all MA plans and MAOs set their bids in relation to their benchmarks.

The DRA defines the risk rates as the base ratebook, so CMS will now publish two sets of rates – risk and demographic rates. CMS will continue to publish the demographic rates because they are used in budget neutrality (BN) factor calculations. Also, the demographic rates will be used in 2007 to determine payments to certain demonstrations and PACE organizations, which lag one year in the transition blend so that 25 percent of their payments will be based on demographic rates.

In addition, the FFS normalization factor, which was applied in the rate book prior to 2007, is instead applied to the risk scores starting in 2007. The result of these two approaches is mathematically the same.

Table 1A shows the risk adjustment models and updates implemented for payments beginning with 2004. Note that all models are implemented with their associated new enrollee models.

**TABLE 1A – RISK ADJUSTMENT MODEL IMPLEMENTATION FOR PAYMENT (Slides 12 & 37)**

| PAYMENT YEAR | RISK ADJUSTMENT MODEL IMPLEMENTED FOR PAYMENT | CALIBRATION YEARS | NORMALIZATION FACTOR |
|---|---|---|---|
| 2004-2006 | CMS-HCC Community & Institutional | 1999-2000 | 1.05 |
| 2005-2007 | ESRD Functioning Graft | 1999-2000 | 1.05 |
| | ESRD Dialysis and Transplant | 1999-2000 | N/A |
| 2006-current | RxHCC | 2002-2006 | N/A |
| 2007-current | Recalibrated CMS-HCC Community & Institutional | 2002-2003 | 1.029 |
| 2008 | Recalibrated ESRD Functioning Graft | 2002-2003 | 1.04 |
| | Recalibrated ESRD Dialysis and Transplant | 2002-2003 | 1.010 |
| | Recalibrated CMS-HCC Community and Institutional | 2002-2003 | 1.04* |
| | RxHCC | 2002-2006 | 1.065** |

*The 2008 normalization factor for the CMS-HCC community and institutional models was updated from 2007 to include one additional year of FFS data. Note that the 2007 recalibrated model did not change for 2008 payments.
**The 2008 normalization factor for the RxHCC model will be first implemented in 2008. Note that the 2006 model did not change for 2008 payments.

### 1.2.3.1    Adjustment for Budget Neutrality

While risk adjustment (without the implementation of budget neutrality) would reduce aggregate payments to the MA program, budget neutrality redistributes these payments as a constant percentage to organizations affected by risk adjustment (including MA organizations, PACE, and certain demonstrations). In other words, under budget neutrality, savings that would have accrued to the Medicare Trust Fund due to the application of risk adjustment are instead redistributed among MA organizations. The budget neutrality factor is calculated as the difference between payments under 100 percent of the risk adjustment method (i.e., under the CMS-HCC model) versus payment under 100 percent of the demographic only method.

The following sections discuss recent changes in the application of budget neutrality policy.

### 1.2.3.2    Change in the Budget Neutrality Calculation to Account for Different Payment Methodologies for Local MA Plans Versus Regional MA Plans

Because of the difference in payment methods for local MA plans versus regional MA plans beginning in 2006, CMS will modify the budget neutrality calculation. Budget neutrality is calculated as the difference between aggregate MA payments at the local MA benchmark rate that would have been made using the demographic method for 100 percent of payments and the aggregate payments that would be made using 100 percent of risk adjusted payments. Budget neutrality will be applied to both local and regional MA plans. For regional plans, this means that the budget neutrality factor will be applied to the statutory component of the benchmark.

### 1.2.3.3    Phase Out of Budget Neutrality

The DRA mandates the phase-out schedule for the BN factor from 2007 through 2010. The phase out schedule is shown in Table 1B. Under the budget neutrality methodology, in 2006, 100 percent of the difference between payment under the demographic method and payment under risk adjustment was added back to the risk payment rates via a rescaling factor. However, due to the payment blend for 2006 this will result in 75 percent of the budget neutrality amount being added back to the blended benchmark. For 2007, 55 percent of the BN factor was applied to every risk rate. The percentage applied will decrease each year until 2011, when it is 0 percent (see Table 1B).

**TABLE 1B – PHASE-OUT SCHEDULE FOR BUDGET NEUTRAL RISK ADJUSTMENT PAYMENTS**

| YEAR | BUDGET NEUTRALITY PERCENTAGE |
|------|------------------------------|
| 2006 | 100% [1] |
| 2007 | 55% |
| 2008 | 40% |
| 2009 | 25% |
| 2010 | 5% |
| 2011 | 0% |

[1] 100 percent of the difference between payment under the demographic method and the payment under the risk adjusted method will be added to the risk adjusted payment rates. However, due to the payment blend for 2006 of 25 percent demographic and 75 percent risk adjustment the net effect is a 75 budget neutrality adjustment.



### 1.2.4  Payment Blends

The schedule for implementing risk adjusted payments based on the CMS-HCC model and the blended transitional approach is shown below. In 2004, the CMS-HCC model was implemented at a 30 percent risk adjusted payment, with the remaining 70 percent represented by the demographic payment. The portion of risk adjusted payment will increase to 50 percent in 2005, to 75 percent in 2006, and finally to 100 percent in 2007. There was not blended payment transition for the Part C ESRD and Part D models. Payments under these models were implemented at 100 percent risk adjustment from the beginning. The CMS-HCC implementation schedule is shown in Table 1C. The Part C blended payment transition schedule for PACE and certain demonstration organizations is on a one year lag from the payment transition for MA organizations. Table 1D shows that CMS-HCC implementation schedule for specialty organizations.

**TABLE 1C – RISK ADJUSTMENT IMPLEMENTATION SCHEDULE FOR MA ORGANIZATIONS
AND FOR MA-PDS AND PDPS FOR DRUG BENEFIT**

| PAYMENT YEAR | CMS-HCC MODEL -COMMUNITY -INSTITUTIONAL | ESRD CMS-HCC MODEL | DRUG BENEFIT MODEL |
|---|---|---|---|
| 2004 | 70% Demographic 30% CMS-HCC Model | N/A | N/A |
| 2005 | 50% Demographic 50% CMS-HCC Model | 100% | N/A |
| 2006 | 25% Demographic 75% CMS-HCC Model | 100% | 100% |
| 2007 | 100% CMS-HCC Model | 100% | 100% |

**TABLE 1D – PAYMENT BLEND SCHEDULE FOR SPECIALTY ORGANIZATIONS**

| TYPE OF HEALTH PLAN | PART C TRANSITION BLEND* | | | | |
|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2007 | 2008 |
| PACE | 90/10% | 70/30% | 50/50% | 25/75% | 100% |
| WPP | 90/10% | 70/30% | 50/50% | 25/75% | 100% |
| MSHO and MnDHO | 90/10% | 70/30% | 50/50% | 25/75% | 100% |
| S/HMOs | 90/10% | 70/30% | 50/50% | 25/75% | 100% |
| SCO | 90/10% | 70/30% | 50/50% | 25/75% | 100% |

*Represents percentage of original demographic payment methodology (specific to each plan type) versus CMS-HCC risk adjusted portion of payment. ESRD and Part D risk adjustment were implemented at 100 percent risk.

0783



## 1.2.5  Fee-for-Service Normalization Adjustment (Slide 37)

The purpose of the fee-for-service normalization adjustment is so that CMS payments are based on a population with an average risk score of 1.0. Because average predicted FFS expenditures increase after the model calibration year due to coding and population changes, CMS applies a normalization factor to adjust beneficiaries' risk scores so that the average risk score is 1.0 in subsequent years. Through 2006, CMS adjusted the restandardized ratebook to the appropriate denominator for the payment year. The denominator represented the national average predicted fee-for-service expenditures per beneficiary in that year. Every year there are shifts in the Medicare population. Specifically, fee-for-service coding across all sites of service, coding has not yet stabilized as much as inpatient hospital coding. Therefore, it has been necessary to apply a fee-for-service normalization factor to adjust for changes in coding patterns.

The DRA required CMS to apply the fee-for-service normalization factor to the risk scores. For 2007 the Part C normalization factor for the recalibrated CMS-HCC model is 1.029, and 1.05 for the ESRD functioning graft models. The functioning graft normalization factor remained unchanged from the previous year since the ESRD models were not recalibrated for 2007. There was no normalization factor applied to the dialysis and transplant risk scores for 2007. For 2008, the normalization factor is 1.04 for the CMS-HCC and ESRD functioning graft risk scores. The Part D normalization factor is 1.065.

CMS will implement a four-year normalization phase-in of the Part C - ESRD dialysis and transplant risk scores. For 2008 (Y1) through 2011 (Y4), CMS will calculate a yearly normalization factor. The calculated normalization factor for each year will be adjusted using the specified phase-in percentage for that year. The risk scores will then be divided by the resulting adjusted normalization factor for that year. For example, in 2008 (Y1), dialysis and transplant risk scores will be divided by 25% of the calculated 2008 normalization factor. The normalization factor calculated for 2008 is .039 (or 3.9%). This factor will be multiplied by 25% to get the adjusted normalization factor. Therefore, the ESRD dialysis and transplant risk score normalization formula is [risk score/(1+(the adjusted factor))], which is 1.010 (i.e., 1+(.039 *25%)) (See Table 1E).

Beneficiary risk scores are divided by a normalization factor. The fee-for-service normalized risk scores will appear on the MMRs. If plans calculate their own raw risk scores using the CMS-provided software, they will need to divide these raw risk scores by the respective normalization factors to obtain the risk scores used for payment.

**TABLE 1E – DIALYSIS AND TRANSPLANT RISK SCORE NORMALIZATION
PHASE-IN SCHEDULE**

| YEAR | ADJUSTED NORMALIZATION FACTOR PHASE-IN PERCENTAGE |
|---|---|
| 2008 (Y1) | 1+ (.039*25%) |
| 2009 (Y2) | 1+ (Calculated Normalization Factor * 50%) |
| 2010 (Y3) | 1+ (Calculated Normalization Factor * 75%) |
| 2011 (Y4) (forward) | 1+ (Calculated Normalization Factor * 100%) |

📖  For a complete explanation of the derivation of the demographic and risk adjusted ratebook, see the following: http://www.cms.hhs.gov/manuals/Downloads/mc86c07.pdf

0784



## 1.2.6  Payments for 2006 and Beyond

### 1.2.6.1  Bidding Background

Beginning in 2006, CMS' payments for plan enrollees are based on the plan bid relative to the plan benchmark. An MA organization's combined bid for its service area, for both local and regional organizations (or service area segment, in the case of a local organization), will have three parts:

- An amount for the provision of Medicare Parts A and B medical benefits. (This is the standardized A/B bid, and does not include beneficiary cost-sharing.)

- An amount for basic coverage of Medicare prescription drug benefits (if any).

- An amount for the provision of supplemental medical and prescription drug benefits (if any).

Benchmarks. For both local and regional MA plans, the plan A/B benchmark, when compared against the plan A/B bid, determines whether a plan will have savings and rebates to offer additional benefits, or whether the MA organization will have to charge a basic premium for the plan's coverage of Part A and B benefits.

For local plans, the plan A/B benchmark is determined according to formulas established in the MMA. For a single-county plan (or segment), the plan A/B benchmark is the capitation rate for that county, adjusted to reflect the plan's projected risk profile to allow comparison to the plan A/B bid.

For local plans serving more than one county, the plan A/B benchmark is the enrollment-weighted average of all the county capitation rates in the plan's service area (or segment), adjusted by the projected risk profile of the plan. (In determining the enrollment-weighted average, the weights are based on the plan's projected enrollment in each county of its service area.)

The standardized benchmark for each MA region is a blend of two components: a statutory component consisting of the weighted average of the county capitation rates across the region; and, a competitive component consisting of the weighted average of all of the standardized A/B bids for regional plans in the region. The weighting for the statutory component is based on MA eligible individuals in the region. "MA eligibles" refers to all Medicare beneficiaries in the FFS and MA programs. The weighting for the competitive component (which includes each regional plan's bid) is based on the projected enrollment of the regional plans competing in the region. The blend of the two components will reflect the market share of traditional Medicare (for the statutory component) and the market share of all MA organizations (for the competitive component) in the Medicare population nationally.

## 1.2.7  Intra-Service Area Rate (ISAR) Adjusted County Payment Rates

In 2006 and beyond, payments to MA organizations must be adjusted to account for variations in MA local payment rates among the different MA local areas included in the MA plan's service area. For each MA plan, CMS will apply an ISAR adjustment based on the variation among MA capitation rates in the counties of a MA plan's service area. The ISAR is used to convert the plan's service-area bid into plan-specific county rates.



The ISAR factor is calculated as the ratio of a county rate to the weighted average of all county rates for the service area, using plan projected county enrollment as the weights. For example, a plan with a service area of three counties (X, Y, and Z) could have ISAR factors of 0.98 for county X, 1.12 for county Y, and 0.9 for county Z. The weighted average of all the plan's county ISAR factors for that plan's service area must equal 1.0. Thus, for each county in the plan's service area, there will be a plan-specific county rate derived from the bid and the ISAR factor.

### 1.2.8 Plan Payments

Plan payments Part C benefits are based on the relationship of the plan's bid with the plan benchmark.

(a) If the plan bid is less than the plan benchmark, monthly payment from CMS for an enrollee is:

> ISAR-adjusted county rate × enrollee risk factor + rebate

(b) If the plan bid is equal to the plan benchmark, monthly payment from CMS for an enrollee is:

> ISAR-adjusted county rate × enrollee risk factor

> There is no rebate and no basic beneficiary premium.

(c) If the plan bid is greater than the plan benchmark, monthly payment from CMS for an individual is:

> ISAR-adjusted county rate × enrollee risk factor + government premium adjustment.

> There is no rebate and the enrollee pays a basic premium. The combined payment from CMS and the enrollee will on average equal the organization's bid (based on enrollment assumed in the bid submission).

For enrollees who are out of the service area, the base payment will be the 1.0 bid (with individual-level risk adjustment for demographic and health status factors). (Note that for plans with bids above benchmarks, the base payment for out-of-area enrollees is the benchmark because the beneficiary premium is subtracted from CMS' payment.) The rebate amount is not geographically or otherwise adjusted. It is a fixed amount determined through comparison of the plan A/B bid to the plan A/B benchmark based on the plan's projected enrollment.

### ⊠ Example: Plan with a Rebate

- Mr. Jones' plan:
  - Standardized ("1.0") A/B bid = $600
  - Rebate = $54
  - His plan's county ISAR factor = .98
  - His risk factor = 1.2
- ISAR–adjusted payment rate for Mr. Jones' county for his plan: ($600 X .98) = $588
- Monthly Part C payment for Mr. Jones for his plan:
  - ($588 X 1.2) + 54 = $759.60



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT METHODOLOGY**

Figure 1A illustrates the calculation of Risk Adjusted Payment for Plans.

**Figure 1A – Calculation of Risk Adjusted Payment for Plans**

| Plan-specific County Rate (1.0 Bid X ISAR factor) | X | Risk Factor for Enrollee | − | MA Monthly Basic Beneficiary Premium (if any) |

| + | Rebate (if any) [Total rebate minus $ applied to Part B and Part D basic premium reduction (if any)] | = | Total Medicare Payment for A/B Benefits for Enrollee |

## 1.3   Risk Adjustment Payment Models for Payment (Slide 13)

In 2003, after public comment, the CMS-HCC model was finalized as the risk adjustment payment model. The goal was to select a clinically sound risk adjustment model that improved payment accuracy while minimizing the administrative burden on MA organizations.

The model is a revision of the Hierarchical Condition Category model, originally developed by Health Economics Research, Inc. The CMS-HCC model functions by categorizing *International Classification of Diseases, 9th Edition, Clinical Modification* (ICD-9-CM) codes into separate groups of clinically related codes, (e.g., diabetes, cancer, ischemic heart disease, infections, etc.) that have similar cost implications.

In order to improve payment further, CMS has developed separate models for different populations who have different cost patterns than the general Medicare population. There are four CMS-HCC models used to calculate risk scores for MA plans: a community model, a long-term institutional model, an ESRD model, and a new enrollee model. The new enrollee model is different than the other models in that it is not disease based.

CMS implemented the Prescription Drug (Rx-HCC) model in 2006 for payment under Part D. The RxHCC model is also a disease based model similar to the CMS-HCC model. However, it varies in that there is a base model and there are separate multipliers for the long term institutionalized (LTI) and low income

0787



beneficiaries which are applied to payment outside the model. The RxHCC model is described in detail towards the end of this module.

CMS has updated all of its Part C models and the frailty adjustment model, which is used for Non-ESRD $\geq$55 community residents. The result of the model recalibrations also yields updated normalization factors. Application of the normalization factors is described later in this module.

In 2007, CMS implemented updated versions of the CMS-HCC community and institutional risk adjustment models. Fee-for-service (FFS) claims data for the years 2002 and 2003 were used in the recalibrated model. Diagnosis data for 2002 predict 2003 expenditures. As these data are more current than the 1999 and 2000 data used for the original CMS-HCC model, the updated models reflect newer treatment and coding patterns in Medicare FFS.

For 2008, CMS recalibrated the original Part C ESRD models, and refined the frailty adjustment factors that are applied to the Part C community model risk scores. Similar to the community and institutional recalibration efforts, the ESRD models were recalibrated using 2002 and 2003 FFS claims data for ESRD enrollees. The frailty factors are used to calculate frailty scores applied to the payments to PACE organizations and certain demonstration plans. For PACE plans, CMS will transition from using the frailty factors used in 2007 to the revised frailty factors over five years. CMS will apply the current frailty adjustment factors to MA demonstration organization's payments on a phased-out schedule (described in the frailty section).

CMS' suite of payment models share common conceptual framework in general; however, the purpose for each is distinct to the expenditure patterns for specific Medicare populations.

Table 1F describes the characteristics of the Part C (CMS-HCC) and Part D (RxHCC) models.

### TABLE 1F – CHARACTERISTICS OF THE RISK ADJUSTMENT MODELS

| CHARACTERISTIC | DESCRIPTION |
|---|---|
| **SIMILAR MODEL CHARACTERISTICS (PART C AND PART D)** | |
| **Selected Significant Disease (SSD) Model** | • Serious manifestations of a condition are considered rather than all levels of severity of a condition.<br>• Models are additive.<br>• Include most body systems and conditions. |
| **Prospective Model** | • Uses diagnostic information from a base year to predict total costs for the following year. |
| **Site Neutral** | • Models do not distinguish payment based on a site of care. |
| **Diagnostic Sources** | • Models recognize diagnoses from hospital inpatient, hospital outpatient, and physician settings. |
| **Multiple Chronic Diseases Considered** | • Risk adjusted payment is based on assignment of diagnoses to disease groups, also known as HCCs.<br>• Model is most heavily influenced by Medicare costs associated with chronic diseases. |
| **Disease Interactions and Hierarchies Included** | • Interactions allow for additive factors based on chronic conditions and disabled status to increase payment accuracy.<br>• Hierarchies allow for payment based on the most serious conditions when less serious conditions also exist. |
| **Demographic Variables** | • Models include four demographic factors: age, sex, disabled status, and original reason for entitlement.<br>• These factors are typically measured as of the data collection period. |



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT METHODOLOGY**

### TABLE 1F – CHARACTERISTICS OF THE RISK ADJUSTMENT MODELS (CONTINUED)

| CHARACTERISTIC | DESCRIPTION |
|---|---|
| **PART C SPECIFIC CHARACTERISTICS** ||
| **Frailty Adjuster** | • Frailty add-on is used for PACE and certain demonstration plans with a frail elderly population in the community. |
| **Medicaid Eligibility** | • Medicaid status for full risk enrollees is prospective and always determined based on the data collection period.<br>• Medicaid status for new enrollees is concurrent and based on Medicaid status during the payment year (during final payment). |
| **Community-Based and Long-Term Institutionalized Enrollees Distinguished** | • Long-term institutionalized is defined as enrollees with 90 days or greater of residence in a nursing home.<br>• Institutional model is not based on institutional factor demographic-only model.<br>• Separate models account for higher treatment costs of similarly-ill community residents.<br>• Community and institutional models both include 70 disease groups. |
| **ESRD CMS-HCC Model** | • Model addresses disparate treatment costs structures related to ESRD enrollee status.<br>• The model includes specific payments for individuals with dialysis, transplant, and functioning graft.<br>• The ESRD model includes 67 disease groups. |
| **PART D SPECIFIC CHARACTERISTICS** ||
| **LTI Multiplier** | • Long term institutional (LTI) factor – gets assigned to the risk scores of beneficiaries with 90 days of residence or greater in a nursing home.<br>• LTI status is determined based on the data collection period. |
| **LIS Multiplier** | • Two low income status (LIS) factors (full subsidy, and partial subsidy) – one or the other gets assigned to the risk score for enrollees based on their Part D determined LIS status.<br>• LIS status is determined during the payment year. |

## 1.3.1  Components of the Risk Score in the CMS-HCC Model

CMS uses diagnoses from Medicare fee-for-service and/or from RAPS for determining the HCCs for each enrollee. Medicare fee-for-service data are utilized for risk adjusted payment when an enrollee joins an MA organization (or PACE/demonstration) after opting out of traditional Medicare fee-for-service coverage. That is, if an enrollee new to an MA organization enrolls in January of a calendar year, then CMS will use up to 12-months of prior fee-for-service data within the data collection period (both Part A and Part B) to obtain diagnostic data. Where data for a person have been submitted via RAPS, those data are also used in calculating the risk score for a person.

The risk score used in calculating payments under the CMS-HCC model includes demographics as part of the risk model as well as different disease groups or HCCs. The model allows for the recognition of coexisting diseases when calculating payment by recognizing multiple chronic conditions listed for the beneficiary. Interactions (i.e., combinations) are used to account for expected costs that are higher because, for example, multiple coexisting diseases cause additional complications. Hierarchies are imposed to provide payments only for the most severe manifestation of a certain disease.

## 1.3.1.1   Demographic Factors (Slide 15)

The risk score uses five demographic factors in calculating the risk score under the CMS-HCC model, including age, sex, Medicaid status, disability, and original reason for Medicare entitlement (i.e., disability).

0789



***Age and Sex*:**  Based upon the enrollee's age and sex, risk adjusted demographic factors are assigned for the calculation of the enrollee's risk factor.

Under the CMS-HCC model, CMS bases payments for the entire payment year upon the age an enrollee attains as of February 1st of each year with one exception, when an enrollee ages in to Medicare. (i.e., Beneficiaries are treated as age 65 for risk adjustment purposes when they attained 65 years of age in the payment year and the reason for entitlement is age.)

***Disabled Status*:**  The disabled factors for enrollees under 65 years old are labeled as "disabled" and those over 65 years old are labeled as "aged." Under the CMS-HCC model, additional payments are made for Medicaid eligible disabled individuals.

***Original Reason for Medicare Entitlement (OREC)*:**  The factors labeled "originally disabled" apply to enrollees that are 65 years old or over who were originally entitled for Medicare due to disability. Under the CMS-HCC model, additional payments are made for OREC individuals with Medicaid based on age and sex,

***Medicaid Status*:**  The Medicaid factor applies to enrollees who are entitled to Medicaid under Title XIX of the Social Security Act. A Medicaid factor is applied based on the "aged", "disabled", or "originally disabled" status of the Medicaid enrollee.

### 1.3.1.2    Disease Groups/HCCs (Slide 16)

Disease groups contain major diseases and are broadly organized into body systems. For risk adjustment purposes, CMS refers to disease groups as HCCs. The HCC assigned to a disease is determined by the ICD-9-CM diagnosis codes submitted during a data collection period. Only selected diagnosis codes are included in the CMS-HCC model. There are 70 distinct disease groups for payment for community and long-term institutionalized residents. The ESRD model has approximately 67 disease groups, depending on the subpart of the model.

    **Example 1**

| DISEASE GROUP/HCC | DESCRIPTION |
|---|---|
| HCC92 | Specified Heart Arrhythmia |
| HCC158 | Hip Fracture/Dislocation |

### 1.3.1.3    Disease Hierarchies (Slide 17)

Finally, the CMS-HCC model incorporates disease hierarchies. These hierarchies are used to provide payments for only the most severe manifestation of a disease, even when diagnoses for less severe manifestations of a disease are also present in the beneficiary during the data collection year. For example, an individual with diabetes that progresses over a year from having no complications (HCC19) to having acute complications (HCC17) would trigger the payments for HCC17 but not for HCC19. (Note that payments for HCC17 are higher than for HCC19.)

0790



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT METHODOLOGY**

 **Example 4**

Cancer

| CMS-HCC DISEASE HIERARCHIES | | | |
|---|---|---|---|
| **If the Disease Group is Listed in This Column...** | | **...Then Drop the Associated Disease Group(s) Listed in This Column** | |
| **HCC** | **Disease Group Label** | **HCC** | **Disease Group Label** |
| 9 | Lymphatic, head & neck, brain & other major cancers | 10 | Breast, prostate, colorectal & other cancers & tumors |

### 1.3.1.4 Disease Interactions

Certain combinations of coexisting diagnoses for an individual can increase their medical costs. The CMS-HCC model recognizes these higher costs through incorporating payments for disease interactions.

There are six disease interactions in the community model and five in the institutional model. Examples of the disease interactions include a two-way combination of diabetes mellitus (DM) and congestive heart failure (CHF) or a three-way combination of chronic obstructive pulmonary disease (COPD), cerebrovascular disease (CVD), and coronary artery disease (CAD).

In calculating this part of the risk score for an individual, the individual score for each HCC is added and then the disease interaction score is added. In the example below, the risk adjusted payment would include an additional factor when an enrollee has both diabetes mellitus and congestive heart failure.

 **Example 2**

Two-disease Interaction for Community-Based Enrollee
      Factor 1:  Diabetes Mellitus (DM), HCC15 = 0.608
      Factor 2:  Congestive Heart Failure (CHF), HCC80 = 0.395
      Factor 3:  Interaction:  DM*CHF = 0.204

      Risk Score = (demographics) + 0.608 + 0.395 + 0.204

In this case, the enrollee receives an additional interaction instead of only two factors for HCC15 and HCC80.

### 1.3.1.5 Disabled/Disease Interactions

Another type of interaction accounted for in the CMS-HCC model involves certain diseases and the disabled status for an enrollee. There are five disabled/disease interactions in the community model and four in the institutional model.

Below is an example of an individual who is disabled and has been diagnosed with rheumatoid arthritis and an opportunistic infection.

0791



2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide

**RISK ADJUSTMENT METHODOLOGY**

 **Example 3**

Disabled/Disease Interaction for Community-Based Enrollee
    Factor 1: Rheumatoid Arthritis, HCC38 = 0.363
    Factor 2: Opportunistic Infection, HCC5 = 0.410
    Factor 2: Disabled * Opportunistic Infection = 0.941

    Risk Score = (demographics) + 0.363 + 0.410 + 0.941

## 1.3.2 New Enrollee Factors

For purposes of risk adjustment, new enrollees are defined as newly eligible disabled or age-in beneficiaries (including "ever-disabled" age-in beneficiaries) with less than 12 months of Medicare Part B entitlement during the data collection year. Note that payments based on Medicaid eligibility will be made retroactively for all new enrollees, once enrollment can be established and verified.

As indicated in Table 1G, beneficiaries with 12 or more months of Medicare Part B enrollment during the data collection period (previous calendar year) are considered full risk enrollees. The new enrollee factors do not apply.

Beneficiaries with less than 12 months of entitlement to benefits under Part A and less than 12 months of Part B enrollment during the data collection period will be treated as new enrollees.

Previously, beneficiaries with 12 or more months of entitlement to benefits under Part A and less than 12 months of Part B enrollment during the data collection period (referred to as "Part A-only" enrollees) are considered new enrollees for the purpose of risk adjusted payments. Because of concerns expressed by some demonstrations that "Part A only" enrollees are always considered to be new enrollees, CMS has created an option for determining payments for this category of enrollees. Effective for 2006 payments, organizations may elect to have CMS determine payments for all "Part A-only" enrollees using either new enrollee factors or full risk adjustment factors. The organization's decision will be applied to **all** "Part A-only" enrollees in the plan. Plans may not elect to move some eligible "Part A-only" enrollees into risk adjustment, while retaining others as new enrollees.

This option elected by the organization will remain turned "on" until CMS is notified otherwise prior to August 31st of any successive year. CMS will apply this option during reconciliation for a payment year only (that is, it will not be applied prospectively). Plans interested in this option must contact: Henry Thomas at Henry.Thomas@cms.hhs.gov by 8/31/2007 to elect this option.

0792



2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide

**RISK ADJUSTMENT METHODOLOGY**

### TABLE 1G – WHICH RISK ADJUSTMENT FACTORS APPLY TO PAYMENT*

| Time Period Beneficiary Has Been Enrolled in Part B Medicare** | Time Period Beneficiary Has Been Entitled to Benefits under Part A Medicare** | |
|---|---|---|
| | 0 - 11 months | ≥ 12 months |
| 0 – 11 months | new enrollee factors | Plan's option: new enrollee or full risk adjustment factors |
| ≥ 12 months | full risk adjustment factors | full risk adjustment factors |

*Applies to Part C and D payments for MA plans, demonstrations, and PACE organizations. Note that MA enrollees must be entitled to benefits under Part A and enrolled in Part B.
** During data collection period (previous calendar year).

During the payment year, a new enrollee factor will also be assigned to any beneficiary whose risk score is not available. In this case, the beneficiary's correct risk score will be determined during the next reconciliation.

📖   The new enrollee factors for Part C are available at:
http://www.cms.hhs.gov/MedicareAdvtgSpecRateStats/Downloads/Announcement2008.pdf

### 1.3.3  Community and Long-Term Institutional Model Distinctions

The CMS risk adjustment approach for Part C uses separate models for non-ESRD community and long-term institutional residents. Separate models were necessary because there are significant cost differences between the traditional community-based MA beneficiary population and the long-term institutionalized beneficiary population with the same disease profile. An adjustment for place of residence improves the payment accuracy of risk adjustment.

A long-term institutionalized MA enrollee is defined as someone who resides in an institution for more than 90 days as identified using the Minimum Data Set (MDS). The costs of the short term institutionalized (less than 90 days) are recognized in the community model.

Table 1H lists the considerations for community and long-term institutionalized populations.

0793



Table 1I reflects the distribution of Medicare beneficiaries in the January 2005 cohort institutionalized longer than 90 days as of April 2004.

**TABLE 1I – DISTRIBUTION OF LONG-TERM INSTITUTIONALIZED BENEFICIARIES
ACROSS ORGANIZATION TYPES - 2005**

| Organization Type | Total Number Beneficiaries | Number Beneficiaries Institutional | Percent of Beneficiaries Institutional | Number of Plans | Number Of Plans >5% of Beneficiaries Institutional |
|---|---|---|---|---|---|
| 1876 Cost | 337,869 | 5,435 | 1.61% | 32 | 3 |
| Dual Eligible and Other Demonstrations | 7,427 | 2,387 | 32.14% | 12 | 5 |
| HCPP | 97,210 | 2,512 | 2.58% | 15 | 0 |
| PACE | 10,150 | 531 | 5.23% | 32 | 19 |
| Medicare Advantage | 4,848,817 | 50,158 | 1.03% | 199 | 12 |
| S/HMO | 133,763 | 840 | 0.63% | 4 | 0 |
| **Total** | **5,435,236** | **61,863** | **1.14%** | **294** | **39** |

**Key**
Dual Eligible and Other Demonstrations: include Wisconsin Partnership Program (WPP), Minnesota Senior Care Options (MSHO) and Disability Health Options (MnDHO), Massachusetts Senior Options (SCO)
S/HMO: Social Health Maintenance Organizations

### 1.3.4  Frailty Adjuster (Slides 19-20)

The frailty adjuster is included as part of risk adjusted payments for A and B services to PACE and certain demonstration organizations. The purpose of the frailty adjuster is to predict Medicare expenditures that are unexplained by the risk adjustment methodology alone. The CMS-HCC model uses diagnoses to adjust the payments to MA organizations. This model was calibrated based on the general Medicare population that has an average level of functional impairment. The frailty model further adjusts payment based on whether an organization's enrollees are more or less frail than the average.

Under frailty adjustment, the relative frailty of an organization is measured in terms of the number of functional limitations as represented by the Activities of Daily Living (ADL) scale. There are six ADLs:  1) bathing and showering; 2) dressing; 3) eating; 4) getting in or out of bed or chairs; 5) walking; and 6) using the toilet. A sample of individuals in each organization is surveyed to determine the relative frailty of the organization. Frailty adjustment lowers risk scores for individuals with 0 ADLs and increases risk scores for all of the categories of ADLs.

0795



### 1.3.4.1   Why is There a Frailty Adjuster?

- The Balanced Budget Act of 1997 (BBA) mandated that Medicare capitated payments to PACE organizations be based on MA payment rates, adjusted to account for the comparative frailty of PACE enrollees.

- The CMS-HCC model does not explain all of the variation in expenditures for the frail, community-based population. The frailty adjuster is used to project the Medicare expenditures of community populations age 55 and over that are unexplained by risk adjustment.

### 1.3.4.2   Which Organizations Are Currently Being Paid Under Frailty Adjustment?

Table 1J lists the types of health plans being paid under frailty adjustment.

**TABLE 1J – PLANS RECEIVING FRAILTY ADJUSTMENT**

| TYPE OF HEALTH PLAN | FRAILTY ADJUSTER IS PART OF RISK ADJUSTED PAYMENT |
|---|---|
| MA | NO |
| PACE | YES |
| Wisconsin Partnership Program (WPP) | YES |
| Minnesota Senior Care Options (MSHO) and Disability Health Options (MnDHO) | YES |
| Social Health Maintenance Organizations (S/HMOs) | YES |
| Massachusetts Senior Options (SCO) | YES |

### 1.3.4.3   How Does the Frailty Adjuster Work Under the CMS-HCC Model?

The frailty adjustment factors were designed to explain (or predict) the Medicare expenditures that are unexplained by risk adjustment for groups with similar functional impairments. Therefore, frailty adjustment was designed to be applied in conjunction with the CMS-HCC model. Since the CMS-HCC model adequately predicts the Medicare expenditures of the long-term institutionalized and the under-55 disabled population, frailty adjustment is only applied to non-ESRD community residents who are 55 and over.

CMS calculates an organization-level frailty score based on the difficulties in activities of daily living (ADLs) that are reported by enrollees. The organization-level frailty score is then added to the risk score for each 55 and over community resident.

### 1.3.4.4   Frailty Model Development (Slide 22)

The current frailty factors were calibrated using ADL limitation information from the Medicare Current Beneficiary Survey (MCBS) -- which is a face-to-face survey. Annual frailty factors were calculated using the Health Outcomes Survey – Modified (HOS-M) -- which is an anonymous mail-in survey with telephone follow-up.

0796



For 2008 payments, CMS has changed its source for calibrating the frailty model from the MCBS to the FFS CAHPS data. The change has the advantage of using two surveys with similar methodologies for calibrating the model and for calculating annual frailty scores -- both the HOS-M and FFS CAHPS collect ADL information via mail surveys with telephone follow-up. CMS added questions regarding ADLs to the FFS CAHPS surveys collected between March 2003 and February 2004, used claims data for the beneficiaries in the sample, and recalibrated the frailty factors with these data.

The revised frailty factors are also generally lower because:
1. Through mail versus face-to-face survey, beneficiaries more accurately report the their functional impairments. Researchers have recognized that written surveys capture more accurate accounts of personal reporting than surveys that are conducted face-to-face. The changes in reporting of ADL limitations resulted in more accurate accounting of the residual expenditures from the CMS-HCC model; and

2. The decrease in home health payments mandated by BBA—as frailty is highly correlated with home health expenditures in a community setting. CMS will continue to use the current frailty methodology to transition frailty payment for PACE organizations and phase-out frailty payments for certain demonstration organization. This implementation schedule is provided in Section 1.3.4.5.

The CAHPS frailty calibration sample is much larger than the MCBS sample. These data have helped to better determine the relationship between frailty and costs given Medicaid and non-Medicaid status in the general Medicare population. For this reason, CMS is able to reliably estimate separate frailty factors for Medicaid and non-Medicaid frail Medicare beneficiaries—because the Medicaid and non-Medicaid frail populations show differences in the relationships between unexplained expenditures (in the CMS-HCC model) and functional impairments. Table 1K provides the Current and Revised Frailty Factors by ADL distribution.

CMS has considered the impact of applying a program wide frailty adjuster and the effect of this on the current bidding methodology. CMS decided that the frailty adjuster will not be applied across all MA organizations. Methodologically, a program-wide adjustment does not improve payment accuracy for two reasons:
1. The HOS data used currently to determine frailty scores for payment is sampled only at the contract level, and therefore, does not allow for accurate calculation of frailty scores at the plan benefit package (PBP) level--thus, contract level frailty scores would lead to inconsistent payments across plans and beneficiaries; and

2. MA organizations would need to project frailty scores in their bids. Due to the changing nature of the marketplace and the different enrollment profiles of plans from year to year, this creates a risk that the level of frailty assumed by a plan in its bid would not reflect its actual score in the payment year.

### TABLE 1K – CURRENT AND REVISED FRAILTY FACTORS

| ADL  LIMITATIONS | CURRENT FACTOR | REVISED MODEL FACTORS | |
|---|---|---|---|
| | | **NON-MEDICAID** | **MEDICAID** |
| 0 | -0.141 | -.089 | -.183 |
| 1-2 | +0.171 | +0.110 | +0.024 |
| 3-4 | +0.344 | +0.200 | +0.132 |
| 5-6 | +1.088 | +0.377 | +0.188 |

0797



**2007 Risk Adjustment Data Training**
**For Medicare Advantage Organizations**
**Participant Guide**

**RISK ADJUSTMENT METHODOLOGY**

### 1.3.4.5    Frailty Payment Implementation

In 2008, CMS will begin transitioning PACE organization payments to 100 percent of the revised frailty factors over a 5-year period through 2012. In each year, the monthly PACE organizations payment would be based on the A/B risk score plus the established frailty transition amount. CMS will also begin a four year phase-out of frailty payments using the current methodology through 2011 for the dual demonstration organizations-- Social Health Maintenance Organizations (S/HMOs), Minnesota Senior Health Options (MSHO)/Minnesota Disability Health Options (MnDHO), Wisconsin Partnership Program (WPP), and Massachusetts Senior Care Options (SCO). Table 1L shows the frailty payment implementation schedule for PACE and demonstration organizations. The percentage (%) represents the percent of the contract-level frailty factor (current and/or revised) that will be added to the monthly A/B risk scores for payment.

**TABLE 1L – FRAILTY PAYMENT IMPLEMENTATION SCHEDULE FOR PACE AND DUAL DEMONSTRATION ORGANIZATIONS**

| TYPE OF CONTRACT | 2008 FRAILTY PAYMENT SCHEDULE | 2009 FRAILTY PAYMENT SCHEDULE | 2010 FRAILTY PAYMENT SCHEDULE | 2011 FRAILTY PAYMENT SCHEDULE | 2012 FRAILTY PAYMENT SCHEDULE |
|---|---|---|---|---|---|
| % current frailty factor   /   % revised frailty factor | | | | | |
| PACE | 90 / 10 | 70 / 30 | 50 / 50 | 25 / 75 | 0 / 100 |
| Wisconsin Partnership Program (WPP) | 75 / 0 | 50 / 0 | 25 / 0 | 0 / 0 | |
| Minnesota Senior Care Options (MSHO) and Disability Health Options (MnDHO) | 75 / 0 | 50 / 0 | 25 / 0 | 0 / 0 | |
| Social Health Maintenance Organizations (S/HMOs) | 75 / 0 | 50 / 0 | 25 / 0 | 0 / 0 | |
| Massachusetts Senior Options (SCO) | 75 / 0 | 50 / 0 | 25 / 0 | 0 / 0 | |

The range of frailty scores varies considerably among the organizations to which frailty adjustment applies (i.e., "frailty" plans). Table 1M shows a range of frailty scores by type of organizations for the current frailty methodology conducted using the MCBS and the new frailty calibration methodology using the FFS CAHPS data.

0798



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT METHODOLOGY**

**TABLE 1M – RANGE OF FRAILTY SCORE BY TYPE OF ORGANIZATION**

| ORGANIZATION TYPE | CURRENT MODEL FRAILTY SCORE (MCBS DATA) | RECALIBRATED—MEDICAID/ NON-MEDICAID FRAILTY SCORE (FFS CAHPS DATA) |
|---|---|---|
| PACE | 0.375 – 0.791 | 0.064-0.226 |
| S/HMOs | 0.057 – 0.122 | 0.008-0.039 |
| WPP | 0.371 – 0.574 | 0.091-0.162 |
| MnDo | 0.583 | 0.143 |
| MSHO | 0.176 – 0.263 | -0.017-0.009 |
| SCO | 0.166 – 0.414 | -0.033-0.053 |

### 1.3.4.6    ADL Information Collection and Frailty Adjuster Development

CMS will continue to calculate annual contract-level frailty scores using results from the HOS-M survey. The revised frailty adjuster that will be used for PACE organization payments will include eight factors (instead of four factors under the current model): Medicaid eligible ADL limitations 0, 1-2, 3-4, and 5-6; and Non-Medicaid ADL limitations 0, 1-2, 3-4, and 5-6. The weighted factors will be summed to get the contract-level frailty score for payment. Demonstration organizations stated in Section 1.3.4.4 will continue to receive frailty payments based on the single frailty factor that is calculated using the current methodology (i.e., MCBS).

### 1.3.4.7    Calculating the Frailty Score for Payment

The organization-level frailty score is calculated as the weighted average frailty factor across all 55 and over community survey respondents for that organization.

The first step is to determine the number of ADLs with which each respondent has difficulty or is unable to do. Then the number of respondents in each ADL category (0 ADLs, 1 to 2 ADLs, 3 to 4 ADLs and 5 to 6 ADLs) is counted. These counts are multiplied by the corresponding frailty factor for each ADL category. The resulting products are then summed for each organization. This sum is divided by the number of 55 and over community respondents, yielding a weighted average factor (or frailty score) for each organization. The same frailty score is used for all 55 and over respondents and non-respondents of a plan who reside in the community.

This frailty score is added to the risk score of each 55 and over community enrollee in the organization (including new enrollees), resulting in a risk+frailty score for each individual. Payments to these plans are the product of this combined score and the risk adjusted county rate. Figure 1B illustrates this calculation and includes the ADL-based frailty factors.

0799



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT METHODOLOGY**

**Figure 1B – Frailty Adjustment Calculation**



**Note:** For new PACE organizations not yet participating in the survey, their frailty score is the weighted average factor across all community respondents of all PACE organizations.

## 1.3.5  Payment Methodology for ESRD Enrollees (Slides 25-27)

In order to further improve payment accuracy, CMS implemented the ESRD risk adjustment model. Effective January 2005, MA enrollees with ESRD were incorporated into diagnosis-based risk adjustment using a different version of the CMS-HCC model. This ESRD models were re-estimated for payments beginning in 2007 and ESRD risk score normalization of dialysis and transplant risk scores will be implemented in 2008. Section 605 of BIPA required CMS to adjust its approach to computing ESRD payment rates to reflect the method used in the ESRD S/HMO demonstration then in place. The three parts of the ESRD CMS-HCC model are:

**Dialysis Status–**A risk adjustment model that is calibrated for people on dialysis, so the payment weights are unique to these beneficiaries. The State ratebook used for dialysis payments was rebased with more recent data.

**Transplant Status–**Kidney or Kidney/Pancreas – CMS calculates the payment amount by calculating the cost of services during the month of the transplant and for the two succeeding months. CMS makes different payments for those who have a kidney transplant and for those who have a pancreas transplant simultaneous with the kidney transplant. However, because the initial data system used for payment will not be able to distinguish individuals with a double transplant in a timely manner, all transplants will initially be paid at the kidney transplant rate. The rarer double transplant will be taken into account in

0800



reconciliation. CMS also differentiates payments for months close to the transplant period from those further out.

**Functioning Graft Status–**A modified version of the CMS-HCC model for people who have functioning kidney grafts, i.e., that they have received a kidney transplant or kidney/pancreas transplant at least three months ago and did not return to dialysis status since the transplant. The model has an additional term to recognize the extra costs of immunosuppressive drugs and higher intensity of care for this group.

CMS developed this three-part model in response to the findings on expenditure patterns for ESRD beneficiaries. Dialysis patients have high ongoing costs, while transplant patients incur a very high one-time cost. Functioning graft patients are much more similar to the general population than they are to dialysis patients except for the cost of immunosuppressive drugs. Using the same payment weights for all three groups would lead to over- or underpayments to MA organizations.

CMS updated the state ratebook used to make payments for enrollees in dialysis and transplant status. CMS will phase-in the revised State rates by blending payments based on the current ratebook and the ratebook using the dialysis-only trend. Over a 4-year period, CMS will apply the payment blend according to the schedule described below in Table 1N.

**TABLE 1N – NEW ESRD DIALYSIS AND TRANSPLANT PAYMENT TRANSITION**

| YEAR | CURRENT RATEBOOK PERCENTAGE | REVISED RATEBOOK PERCENTAGE |
|------|------------------------------|------------------------------|
| 2008 | 75% | 25% |
| 2009 | 50% | 50% |
| 2010 | 25% | 75% |
| 2011 | 0 | 100% |

### 1.3.5.1    Risk Adjustment Model for Dialysis Patients

The dialysis model has the same HCC categories used for the CMS-HCC model. The exception is that the HCCs representing dialysis status and kidney failure are excluded (HCC130 to HCC131). This means that the ESRD model has only 68 HCC categories. The model is calibrated only on dialysis patients, so the disease weights used for payment recognize disease and expenditure patterns are unique to this population.

The data used for calibrating the ESRD models were 2002 (diagnostic) and 2003 (program payment) data on fee-for-service ESRD beneficiaries. For example, expenditures for a fee-for-service beneficiary on dialysis from January through August 2003 who received a transplant in September 2003 are included in the dialysis group for eight months, but then are excluded. From September through November 2003, this beneficiary's costs are included in the transplant data to determine estimated average transplant costs. As of December 2003, this beneficiary is included in the functioning graft model.



### 1.3.5.2  Transplant Model

To accommodate the high one-time cost of a transplant, CMS will make payments over three months to cover the costs for this transplant and payments for the immediate subsequent services. CMS calibrated the payments by using fee-for-service hospital stay payments for the transplant, and physician and other services rendered for the hospital stay and the two months after discharge. The national average was converted to a relative factor by dividing by the national average payment for dialysis patients. For example, the factor for month 1 is calculated as: $32,558 (average transplant costs in month 1) divided by $5,039 (mean monthly dialysis costs, i.e., $60,471/12). The relative factors for transplant reflect the costs in each month; therefore, the 1st month has a substantially higher factor (6.45) than months 2 and 3 (1.01). The transplant factor is applied to the dialysis state ratebook to provide a transplant payment. Payment will be made in practice by determining the month of transplant and paying the amount over the three-month period starting with the transplant month.

### 1.3.5.3  Functioning Graft Model

The model for functioning graft enrollees is based on the model for the general population, except that HCCs for kidney transplant status, dialysis status, and renal failure are excluded. For their members with functioning grafts, as for dialysis members, MA organizations will be paid in 2008 based on the diseases reported from all risk adjustment sources in the prior year. However, functioning graft status is recognized in the payment year. In the adapted general population model, almost all of the HCC disease coefficients have been held to their general population values. A few HCCs have been removed and extra terms have been added specific to being in functioning graft status.

The values for the add-on terms have been estimated with data specific to this population and recognize the Medicare coverage of immunosuppressive drugs and the added intensity of services required by this population. They are identified as "graft factors" in the functioning graft model. The graft factors include two sets of coefficients. One set is used between the fourth and the end of the ninth month after a transplant and the second set is used for tenth month and all months thereafter. The functioning graft payment automatically begins the month after the third transplant payment unless the ESRD Network reports that the member has returned to dialysis or had to have another transplant. Anytime a functioning graft patient returns to dialysis, payment is made using the dialysis model.

### 1.3.5.4  Model Comparison of Coefficients (Slide 28)

The ESRD dialysis model has a higher base factor (age/sex) and lower factors associated with diagnoses than does the CMS-HCC model. This is because Medicare costs for ESRD beneficiaries are much higher than they are for the average Medicare beneficiary, but they are relatively uniform. This means that the Medicare costs for ESRD beneficiaries do not vary as much as the Medicare costs for Medicare beneficiaries in general. Hence, diseases do not explain as much of the cost variation among ESRD beneficiaries and therefore, these costs are retained in the age/sex coefficient in the ESRD dialysis model.

### 1.3.5.5  New Enrollee Factor

The dialysis and functioning graft models have new enrollee factors for enrollees whose risk scores are not available. New enrollees with transplants receive the normal transplant model factors.

0802



### 1.3.5.6    Reporting of ESRD Status

In implementing the new ESRD risk adjustment method, CMS will utilize the existing systems for identification of enrollees receiving dialysis services. Currently, MA enrollees are assigned ESRD status as a result of a physician certifying their ESRD status on CMS Form 2728, the End-Stage Renal Disease Medical Evidence Report. The ESRD facility sends Form 2728 to the Renal Network, which then transmits the status to CMS systems where various databases are updated to record the ESRD status. Payments for dialysis are triggered by this system.

### 1.3.6  Medicare Part D

**Medicare Part D Drug Benefit.** In Title I, in addition to the creation of the MA program in Title II of the MMA, Congress added a voluntary prescription drug benefit to Medicare (known as Part D) to be made available for all Medicare beneficiaries through either the MA program or the prescription drug plans. To that end, MA organizations will be required to provide at least one MA plan that provides a "required drug coverage" in each of its service areas. MA plans that offer drug coverage are called MA prescription drug plans (MA-PDs). Beneficiaries receiving health care benefits through fee-for-service Medicare will have the option of accessing prescription drug coverage through sponsors of prescription drug plans (PDPs). Unlike PDPs which can offer supplemental drug coverage only when they offer a standard package in an area, MA-PDs can offer plans with supplemental coverage that qualify as "required prescription drug coverage." Similar to the MA program, CMS established regions (34) through which PDP sponsors will offer Part D drug coverage. To the extent practicable, CMS designed the PDP regions to overlap with the MA regions. Payments to PDP plans for eligible low-income Medicare beneficiaries will be subsidized at different levels depending upon the income and asset of the enrollee.

The MMA requires organizations intending to offer MA plans with original Medicare Parts A and B benefits and/or Part D benefits to submit bids in early June of each year for their basic, supplemental and/or Part D benefit packages. Each bid must reflect a plan's actual revenue requirements to provide the benefits offered in the proposed benefit packages. Benchmarks will be created for local and/or regional plans for bid-benchmark comparisons. Monthly capitated payments will be made based on each plan's bid risk adjusted for health status minus the beneficiary premium amount. The MMA mandates MA organizations and PDPs to provide basic prescription drug coverage as one of their benefit plans.

### 1.3.6.1    Part D Risk Adjustment Model (Slides 29-30)

The Part D model is similar to the CMS-HCC risk adjustment model. The model includes 113 coefficients: 84 disease groups, 24 age-sex adjustments, 3 interactions between age and disease, and 2 sex-age-originally disabled status interactions. The model was developed assuming an unlimited drug benefit, and was then adjusted for the plan's liability under the Medicare standard Part D benefit.

CMS announced the final Part D risk adjustment on April 4, 2005. The model is published at:
http://www.cms.hhs.gov/MedicareAdvtgSpecRateStats/06_Risk_adjustment.asp

The Part D risk adjustment model shares most of the characteristics of the CMS-HCC model. That is, the model is: prospective, additive, hierarchical, and contains demographic new enrollee model.

0803



The key differences are:

- The Part D model is designed to predict plan liability for prescription drugs under the Medicare drug benefit rather than Medicare Part A/B costs.

- Different diseases predict drug costs than Part A/B costs.

- Incremental costs of low-income (LI) and long term institutional (LTI) beneficiaries are multipliers to the base RxHCC model score.

As in the CMS-HCC model, some of the disease groups fall into hierarchies. Drug regimens may intensify and more drugs added in cases where a disease has a higher severity. In such an instance, the highest cost category of the related diseases is triggered and the lower cost category does not increase the Part D risk score.

Like the CMS-HCC model, the Part D model uses the presence of particular demographic characteristics and diagnoses to predict costs in the following year for an individual. The model clusters a set of ICD-9-CM diagnoses within groups that are similar clinically and in terms of their expected costs. The groupings used to predict drug spending are variants of the groups used to predict Part A and B spending, and the data sources for diagnoses are the same as those used in Part C. Disease groups and draft coefficients for the Part D risk adjustment can be found on the CMS web site at:
http://www.cms.hhs.gov/MedicareAdvtgSpecRateStats/06_Risk_adjustment.asp

In development of the model, drug spending in dollars is used as the dependent variable of a regression model that estimates the marginal or incremental spending related to each of the explanatory variables (demographics and conditions) in the model. The model is ultimately expressed not in dollars, but as relative factors. The incremental dollars associated with each variable in the model are divided by the mean predicted dollars to produce a "relative costliness" or risk factor. Summing the risk factors for an individual yields a total risk adjustment factor that, when multiplied by a base rate, yields an individualized capitation rate.

Recent research has found that the variation in drug expenditures that can be explained is primarily driven by chronic conditions persisting from year to year. The research suggests many of the diagnoses used by CMS for the CMS-HCC model could be used in the Part D risk adjustment model in addition to new diagnosis codes collected. For example, the findings indicated that certain chronic conditions such as congestive heart failure and schizophrenia (CMS-HCC model diagnoses) are good predictors of drug expenditures. However, this research also shows that hypertension and glaucoma, not currently in the model, are also key predictors of drug expenditures. Hence, such findings lead to the conclusion that additional diagnoses, beyond those in the current CMS-HCC model, need to be collected to properly develop a drug risk adjustment model. It is equally true that some conditions currently included in the CMS-HCC model are predictive of Medicare Part A and B medical costs, but not predictive of Part D costs. As such, these diseases could decrease drug expenditures.

Using a similar methodology to that used for the development of the CMS-HCC risk adjustment model, CMS created a list of diagnoses for the drug risk adjuster and, in April 2005, announced the final list of conditions for inclusion in the drug risk adjustment model. Some of the diagnoses overlap with the current CMS-HCC model and others do not. In particular, there are 1,540 ICD-9 codes unique to the CMS-HCC model, 1,940 ICD-9 codes unique to the Part D risk adjustment model, and 1,622 ICD-9 codes

**2007 Risk Adjustment Data Training**
**For Medicare Advantage Organizations**
**Participant Guide**

**RISK ADJUSTMENT METHODOLOGY**

included in both models. Collection of the diagnoses for the CMS drug risk adjustment model from current MA organizations began in July 2004 and will begin payment in January 2006.

Beneficiaries with less than 12 months of Part B enrollment prior to the payment year and who do not have a complete diagnostic record in the Medicare files will be classified as new enrollees. These individuals will receive the new enrollee factor for the RxHCC model.

### 1.3.6.2 Low Income and Long Term Institutionalization Multipliers (Slides 31-32)

Base Part D risk factors are incremented by either a LI or a LTI multiplier to account for the additional costs of beneficiaries in these categories. See Table 1O for the definition of LI multipliers for the Part D benefit.

**TABLE 1O – DEFINITION OF THE LOW INCOME MULTIPLIERS FOR PART D BENEFIT**

|  | **GROUP 1** | **GROUP 1** | **GROUP 2** | **GROUP 2** |
|---|---|---|---|---|
| Income test | Medicaid Dual <100% FPL | <135% FPL | <135% FPL | 135-150% FPL |
| Asset test | <2× SSI | <3× SSI | >3× SSI & <$10,000 single $20,000 couple | <$10,000 single $20,000 couple |
| Deductible | $0 | $0 | $50 | $50 |
| Copay for generic drugs up to catastrophic threshold | $1 | $2 | — | — |
| Copay for brand-name drugs up to catastrophic threshold | $3 | $5 | — | — |
| Coinsurance up to catastrophic threshold | — | — | 15% | 15% |
| Coinsurance above catastrophic threshold | 0% | 0% | 0% | 0% |
| Copay for generic drugs above catastrophic threshold | $0 | $0 | $2 | $2 |
| Copay for brand-name drugs above catastrophic threshold | $0 | $0 | $5 | $5 |
| Premium subsidy | 100% | 100% | 100% | Sliding scale |

The LI multiplier is estimated to be 1.08 for Group 1 LI individuals (as defined above) and 1.05 for Group 2 individuals (as defined above). This multiplier is defined on a concurrent basis. (For example, if an individual were not defined as LI for January 2007 but was determined to be a Group 1 beneficiary for February 2007, the plan would receive the LI multiplier for February (and beyond) but not for January.)

An enhancement was also computed for the predicted spending by persons institutionalized in nursing facilities for more than 90 days. Spending for this group is expected to be higher because prices for the specific packages of drugs they receive are somewhat higher than the same drugs in the community.

0805



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT METHODOLOGY**

(An analysis of drug data done by IMS Health shows that the price differences in the claims were small, particularly for brand name drugs that dominate the spending.) There are also effects related to compliance in acquiring and taking drugs in the institutional environment. On the other side, often patients take fewer drugs because of more careful monitoring of interactions.

An analysis was done for the spending by the institutionalized by first using the base model to predict for this population and then comparing the actual spending and liability to the predicted. For the case of spending, there was a significant positive effect for the aged and the disabled who are in institutions. The effect for the disabled is greater than for the aged. It was also observed that average spending for both groups was in the 100 percent coinsurance range. The disabled mean was quite close to the catastrophic limit. The implications of additional demand being, to a large extent, in the range in which plans do not have incremental liability means that the effect on plan liability is much smaller than the effect on spending. The final payment adjustments for the institutionalized are smaller for the aged than for the disabled and smaller perhaps than some people expect because the final measure is plan liability rather than spending.

Figure 1C illustrates the calculation of the Part D Direct Subsidy.

**Figure 1C – Calculation of Part D Direct Subsidy**



0806



## 1.4    Parts C and D Final Submission of Risk Adjustment Data (Reconciliation)

Reconciliation is used to complete the implementation of payments, with CMS calculating final risk adjustment factors and beneficiary status based on complete data. CMS continues to allow a period (approximately 13 months after the data collection year) for submitting final RAPS data for the appropriate data collection period. Data not received or submitted by the initial submission deadline for a data collection period can be submitted by the final submission deadline (reconciliation). In addition to incorporating new RAPS and fee-for-service diagnoses, reconciliation takes into account necessary adjustments to institutional status and demographic data for enrollees.

**Note:** CMS reconciles risk-adjusted payments for a calendar year only one time. When submitting risk adjustment data for reconciliation, plans may submit as well as correct data that was previously submitted.

### 1.4.1    Parts C and D Risk Adjustment Schedule & Elimination of the Payment Lag

Risk adjusted payments were originally implemented with a 6-month payment lag from the end of the collection period to the start of revised payments, based on the data collected.

⊠    **Example: 6**

Data Collection Period: July 1, 2006 through June 30, 2007
Data Collection End Date: June 30, 2007
CY2007:  First payment made based on this collection period = January 1, 2008
As you can see, payments began 6 months after the end of the data collection period.

**Note:** The purpose of eliminating the lag between the end of the data collection period and the payment based on that year's data is to use the most recent data for more accurate payment.

Data Collection Period: January 1, 2007 through December 31, 2007
Data Collection End Date: December 31, 2007
CY2007:  Updated payment made based on the non-lagged data collection period = July, 2008

- CMS calculates a preliminary risk factor based on lagged data. For 2008, it will be based on data from July 2006 through June 2007. Payments from January 2008 through June 2008 will be based on this factor.

- In July 2008 CMS will use a risk factor based on non-lagged data (i.e., from calendar year 2007) for calculating payments. That factor will be used for the remainder of the year.

- By eliminating the lag, the collection period will change from July 1 through June 30 to January 1 through December 31 (or a calendar year).

0807



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT METHODOLOGY**

## 1.5    Updating Diagnosis Codes in the Parts C and D Risk Adjustment Models

CMS updates the risk adjustment models to reflect the annual updates to the ICD-9 diagnostic code set. After clinical review, new ICD-9 diagnosis codes are added to the appropriate diagnostic categories and included in the CMS-HCC model. A comprehensive listing of the ICD-9 codes that MA organizations are required to submit for all risk adjustment models can be found at http://www.cms.hhs.gov/MedicareAdvtgSpecRateStats/06_Risk_adjustment.asp#TopOfPage. This list will be updated annually to take into account new codes that are required for risk adjustment.

0808



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT SUBMISSION PROCESS OVERVIEW**

## MODULE 2 – RISK ADJUSTMENT SUBMISSION PROCESS OVERVIEW

### Purpose

The success of Medicare Advantage (MA) risk adjustment is dependent upon organizations understanding the process of collecting and submitting accurate risk adjustment data. The purpose of this module is to provide participants with important terms, key resources, and schedule information that will provide the foundation for this training.

### Learning Objectives

At the completion of this module, participants will be able to:

- Define common risk adjustment terminology.
- Demonstrate knowledge in interpreting key components of the risk adjustment process.
- Interpret the risk adjustment schedule.
- Identify the Centers for Medicare & Medicaid Services (CMS) outreach efforts available to organizations.



### 2.1    Common Risk Adjustment Terms (Slide 6)

Table 2A provides descriptions of common risk adjustment terminology.

**TABLE 2A – RISK ADJUSTMENT COMMON TERMS**

| TERM | DESCRIPTION |
|---|---|
| **FERAS** | Risk adjustment submitters send data to Palmetto through the **Front-End Risk Adjustment System**. |
| **RAPS** | Risk adjustment data are processed by the **Risk Adjustment Processing System.** |
| **RAS** | The **Risk Adjustment System** calculates the risk score. |
| **MARx** | The **Medicare Advantage Prescription Drug System** calculates the risk payment. |
| **Common UI** | The **Common UI** maintains Medicare beneficiary eligibility data. |
| **HPMS** | The **Health Plan Management System** is a CMS MA information system that contains health plan-level data. |
| **Relevant Diagnosis** | ICD-9-CM diagnosis code in the CMS-Hierarchical Condition Category (HCC) model. |

0809



## 2.2    Risk Adjustment Process Overview

Hospital inpatient, hospital outpatient, and physician risk adjustment data must be submitted at least quarterly. Risk adjustment data are processed through RAPS.

### 2.2.1  Risk Adjustment Data Requirements (Slide 7)

- The data required under the risk adjustment process include:

  - Health Insurance Claim (HIC) number.
  - Diagnosis code.
  - Service from date.
  - Service through date.
  - Provider type (hospital inpatient, hospital outpatient, physician).

- MA organizations must submit data at least quarterly to CMS.

- Each quarterly submission should represent approximately one-fourth of the data that the MA organization will submit during a data collection year. MA organizations will be monitored to ensure compliance.

- All beneficiary ICD-9-CM diagnosis codes relevant for the CMS-HCC risk adjustment model must be reported at least once per enrollee in the data collection period.

### 2.2.2  Risk Adjustment Data Collection (Slide 8)

- MA organizations may choose to collect data from providers in a variety of formats:

  - Standard fee-for-service claim or encounter formats
    - Uniform Billing Form (UB-04)
    - HCFA 1500
    - National Standard Format (NSF) v3.01
    - American National Standards Institute (ANSI) X12 837 v30.51 or v40.10. Health Insurance Portability and Accountability Act (HIPAA) mandated transactions must use v40.10.

  - Superbill

  - RAPS format
    - HIC number
    - Provider type
    - Diagnosis code
    - Service from date
    - Service through date

0810



**2007 Risk Adjustment Data Training**
**For Medicare Advantage Organizations**
**Participant Guide**

**RISK ADJUSTMENT SUBMISSION PROCESS OVERVIEW**

### 2.2.3  Risk Adjustment Data Submission (Slide 9)

- MA organizations must submit data to CMS through FERAS (Palmetto GBA) utilizing the following formats:

    - RAPS format (all types of data)
    - Direct Data Entry Screen (all types of data)

Figure 2A illustrates the risk adjustment dataflow.

0811

**2007 Risk Adjustment Data Training**
**For Medicare Advantage Organizations**
**Participant Guide**

### RISK ADJUSTMENT SUBMISSION PROCESS OVERVIEW

## 2.2.4  Risk Adjustment Dataflow (Slide 10)

- Hospital/physician submits data to MA organization via:
  - Full or abbreviated UB-04, HCFA 1500, NSF v3.01, ANSI x837 v30.51 or v40.10, Superbill or RAPS format.

- The MA organization submits these data at least quarterly to Palmetto GBA.

- The MA organization submits the data via Direct Data Entry or in the RAPS format.

- The data are sent to FERAS for processing where the file-level data, batch-level data, and first and last detail records are checked.

- If any data are rejected, then data are reported on the FERAS Response Report.

- After passing the FERAS checks, the file is submitted to RAPS where detail editing is performed.

- The RAPS Return File is returned daily and shows all records approved and where errors occurred.

- The RAPS Transaction Error Report displays records on which errors occurred.

- The RAPS Transaction Summary Report is sent to the MA organization daily and identifies data that have been finalized in RAPS database.

- The Duplicate Diagnosis Cluster Report identifies diagnosis clusters submitted with information that duplicates a stored cluster.

- The RAPS Monthly Plan Activity Report and Cumulative Plan Activity Report provides a summary of all diagnoses stored for a given time period.

- Distributed monthly and quarterly, the Error Frequency Report provides an overview of all errors associated with files submitted in test and production.

- RAPS database stores all finalized diagnosis clusters.

- RAS calculates the Risk Adjuster Factors by executing the CMS-HCC model.

- MARx is used in the calculation of payments and determination of plan payments. MARx replaced Medicare Managed Care System (MMCS) on November 15, 2005.

**Figure 2A – Risk Adjustment Dataflow**





\* These reports/ files are returned to the MA organization

0812



### 2.2.5  Important Information About Risk Adjustment Processing

- MA organizations transmit data to FERAS at Palmetto GBA.

- FERAS performs format and face validity checks on the file- and batch- level as well as formatting verification on the first and last detail record (CCC) in the file.

- If the data fail the front-end checks, the complete file is rejected at the front end.

- The FERAS Response Report identifies whether the file is accepted or rejected up front.

- Once the file has passed front-end checks, it moves to RAPS. All validity edits on detail-level data are performed in this system.

- Processing time from beginning to end should take approximately 1 to 2 days.

- After the file has processed through RAPS, the MA organization will receive a RAPS Return File and RAPS Transaction Error Report identifying any errors.

- All ICD-9-CM diagnoses that pass validity edits are stored in the RAPS database.

- The MA organization will also receive a RAPS Transaction Summary Report reflecting all finalized data sent to the RAPS database along with all rejected data.

- The MA organization also receives two monthly risk adjustment management reports: 1) the RAPS Monthly Plan Activity Report and 2) the RAPS Cumulative Plan Activity Report.

- All data are converted to the RAPS format and returned in the RAPS Return File.

- Interim hospital inpatient bills (112, 113, and 114 bill types) must not be submitted. If a MA organization receives interim bills, the organization should submit the hospital inpatient diagnoses on receipt of the final bill (114). This means the appropriate *discharge* diagnoses will be submitted for risk adjustment, rather than the *admitting* diagnoses.

0813



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT SUBMISSION PROCESS OVERVIEW**

## 2.3    Submission Schedule (Slide 11)

The elimination of the payment lag changes the submission schedule. This requires MA organizations to meet three submission deadlines—the first Friday in September, the first Friday in March of each year, and a reconciliation (final submission) deadline of January 31. The schedule is illustrated in Table 2B.

**TABLE 2B – SUBMISSION TIMETABLE**

| CY | DATES OF SERVICE | INITIAL SUBMISSION DEADLINE | FIRST PAYMENT DATE | FINAL SUBMISSION DEADLINE |
|----|------------------|------------------------------|--------------------|---------------------------|
| 2007 | July 1, 2005 through June 30, 2006 | September 1, 2006 | January 1, 2007 | NA |
| 2007 | January 1, 2006 through December 31, 2006 | March 2, 2007 | July 1, 2007 | January 31, 2008 |
| 2008 | July 1, 2006 through June 30, 2007 | September 7, 2007 | January 1, 2008 | NA |
| 2008 | January 1, 2007 through December 31, 2007 | March 7, 2008 | July 1, 2008 | January 31, 2009 |
| 2009 | July 1, 2007 through June 30, 2008 | September 5, 2008 | January 1, 2009 | NA |
| 2009 | January 1, 2008 through December 31, 2008 | March 6, 2009 | July 1, 2009 | January 31, 2010 |

0814



**2007 Risk Adjustment Data Training**
**For Medicare Advantage Organizations**
**Participant Guide**

**RISK ADJUSTMENT SUBMISSION PROCESS OVERVIEW**

## 2.4    Training and Support (Slide 12)

To ensure that participating organizations have the necessary tools and information to be successful with the risk adjustment process, CMS has planned the following outreach efforts, as described in Table 2C.

**TABLE 2C – TRAINING AND SUPPORT**

| INITIATIVE | DESCRIPTION |
|---|---|
| **Customer Service & Support Center (CSSC)** | This toll free help line (1-877-534-2772) is available Monday – Friday, 9:00 a.m. to 7:00 p.m. Eastern Time (ET) (with the exception of corporate observed holidays) to provide assistance.<br><br>The support center provides ongoing assistance.<br><br>The FERAS system is available to submit risk adjustment data 24 hours a day, 7 days a week regardless of holidays. The only exception is from 5:00 PM EST - 10:00 PM EST on Sunday when systems and equipment undergo routine maintenance. |
| **www.csscoperations.com** | The CSSC website, www.csscoperations.com is the gateway to RAPS. Visitors to the site can access information about RAPS/FERAS, including opportunities to register for service, enroll to submit risk adjustment data, and obtain comprehensive information about data entry and report layouts. In addition, the site provides valuable links to CMS instructions and other official resources. Monthly User Group and other training information are regularly posted. Finally, the site provides up-to-date system status alerts and answers to frequently asked questions (FAQs) about risk adjustment.<br><br>To register for email updates, go to www.csscoperations.com, click on Risk Adjustment Processing System (RAPS), and then click on "Register for Medicare Advantage". Afterwards, click on "new registrations only" and complete the registration form. |
| **User Groups** | Conducted once each month from 1:30 – 2:30 p.m. ET. The purpose of the User Group meeting is to share information among participants, distribute new information, and identify issues for future resolution. Meeting notes and Q&As are provided.<br><br>To register online for User Groups, go to www.medicaretraining.net. |
| **Onsite Consultation** | On-site consultation visits provide MA organizations with the opportunity to gain valuable information about risk adjustment data submission and data validation processes. These consultations generally occur between April and May. Each visit includes a review of the MA organization's system. |
| **Monthly and Regional Training Program** | The program provides practical training for new and current users. |
| **www.medicaretraining.net** | The website, www.medicaretraining.net is the website for risk adjustment training and User Group information. The website includes information about trainings and user groups, training dates, locations, online registration, and training FAQs. |

0815



## MODULE 3 – DATA COLLECTION

### Purpose (Slide 2)

For the purpose of risk adjustment, Medicare Advantage (MA) organizations must collect data from hospital inpatient facilities, hospital outpatient facilities, and physicians. The collection of data from the appropriate risk adjustment sources and formats is critical for accurate risk adjusted payment. This module is designed to offer participants an opportunity to apply data collection principles in accordance with Centers for Medicare & Medicaid Services (CMS) requirements.

### Learning Objectives (Slide 3)

At the completion of this module, participants will be able to:

- Identify the data elements required for risk adjustment.
- List the three sources of risk adjustment data.
- Describe the data collection formats.
- Discuss factors to consider when determining the method for collection of diagnostic data.
- Apply Health Insurance Portability and Accountability Act (HIPAA) transaction standards for purposes of risk adjustment data collection.



### 3.1    Required Risk Adjustment Data Elements (Slide 5)

MA organizations must collect certain data elements from the sources (providers/physicians) of risk adjustment data described in this module. The minimum data elements that must be collected are:

- Health Insurance Claim (HIC) Number
- ICD-9-CM Diagnosis Codes
- Service From Date
- Service Through Date
- Provider Type

### 3.1.1  HIC Number (Slides 6-7)

A HIC number is a Medicare beneficiary's identification number. Both CMS and the Railroad Retirement Board (RRB) issue Medicare HIC numbers. The format of a HIC number issued by CMS is a Social Security number followed by an alpha or alphanumeric Beneficiary Identification Code (BIC). RRB numbers issued before 1964 are 6-digit numbers preceded by an alpha prefix. After 1964, the RRB began using Social Security numbers as Medicare beneficiary identification numbers preceded by an alpha prefix. Table 3A shows the characteristics for each HIC type.



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**DATA COLLECTION**

## TABLE 3A – STRUCTURE OF HIC NUMBERS

| HIC TYPE | CHARACTERISTICS |
|----------|-----------------|
| CMS | • 9-Digit Social Security number<br>• alpha suffix<br>  - "A" beneficiary<br>  - "B" spouse<br>  - "C" children<br>  - "D" divorced spouse, widow, widower<br>• alpha-numeric suffix<br>  - indicates number of children (e.g., "C1" first child) |
| RRB pre-1964 | • alpha prefix<br>• 6-digit random numbers |
| RRB post-1964 | • alpha prefix<br>• 9-digit Social Security number |

**Note:** MA organizations are not required to collect HIC numbers from physicians and providers, but must identify beneficiaries using the HIC number when submitting data to CMS.

### 3.1.2  ICD-9-CM Diagnosis Code (Slide 8)

International Classification of Diseases-9[th] Edition-Clinical Modification (ICD-9-CM) codes are 3- to 5-digit codes used to describe the clinical reason for a patient's treatment. ICD-9-CM codes do not describe the service performed, just the patient's medical condition. Diagnosis codes drive the risk scores, which drive the risk adjusted reimbursement from CMS to MA organizations.

### 3.1.3  Service From and Through Dates (Slide 9)

The dates of service define when a beneficiary received medical treatment from a physician or medical facility. For outpatient and physician services, the From Date and Through Date may be identical. For inpatient services, these dates are different from each other, and reflect the dates of admission to and discharge from a facility.

 Date span is the number of days between the From Date and Through Date for a reported diagnosis. For risk adjustment, the date span is important to determine if the reported diagnosis cluster falls within the data reporting period.

### 3.1.4  Provider Type (Slide 10)

For the purpose of risk adjustment, MA organizations must collect data from the following provider types:

- Hospital inpatient facilities
- Hospital outpatient facilities
- Physicians

These are the three principal sources of data. MA organizations are responsible for determining provider type based on the source of the data.

0817



## 3.2    Data Sources

MA organizations are responsible for ensuring that the data they collect comes from acceptable sources. These sources are hospital inpatient facilities, hospital outpatient facilities, and physicians.

### 3.2.1  Hospital Inpatient (Slide 11)

A hospital inpatient service is one provided by a hospital during which a patient is admitted to the facility for at least one overnight stay.

Inpatient hospital data should be differentiated based on whether it is received from within or outside of the MA organization's provider network. Effective May 1, 2007, a network hospital should have a National Provider Identifier (NPI) number as a hospital inpatient facility. Table 3B identifies covered and non-covered facilities with regard to risk adjustment data collection.

**TABLE 3B – HOSPITAL INPATIENT**

| PROVIDER TYPE | COVERED FACILITIES | NON-COVERED FACILITIES* |
|---|---|---|
| **Hospital Inpatient** | • Short-term (general and specialty) Hospitals<br>• Religious Non-Medical Health Care Institutions (formerly Christian Science Sanatoria)<br>• Long-term Hospitals<br>• Rehabilitation Hospitals<br>• Children's Hospitals<br>• Psychiatric Hospitals<br>• Medical Assistance Facilities/ Critical Access Hospitals | • Skilled Nursing Facilities (SNFs)<br>• Hospital Inpatient Swing Bed Components<br>• Intermediate Care Facilities<br>• Respite Care<br>• Hospice |

* These are examples of non-covered facilities and not a comprehensive list.



When submitting hospital inpatient data, MA organizations must make a distinction between the principal diagnosis and other diagnoses. The details of submitting data will be covered in the Data Submission module.

### 3.2.2  Hospital Outpatient (Slide 12)

Hospital outpatient services are therapeutic and rehabilitative services provided for sick or injured persons who do not require inpatient hospitalization or institutionalization.

Data must be collected from hospital outpatient departments. As with hospital inpatient facilities, the MA organization must determine which facility is Medicare certified, network, or non-network. Table 3C identifies covered and non-covered hospital outpatient facilities.

0818



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**DATA COLLECTION**

### TABLE 3C – HOSPITAL OUTPATIENT

| PROVIDER TYPE | COVERED FACILITIES | NON-COVERED FACILITIES* |
|---|---|---|
| **Hospital Outpatient** | • Short-term (general and specialty) Hospitals<br>• Medical Assistance Facilities/ Critical Access Hospitals<br>• Community Mental Health Centers 1**<br>• Federally Qualified Health Centers 2/ Religious Non-Medical Health Care Institutions (formerly Christian Science Sanatoria) **<br>• Long-term Hospitals<br>• Rehabilitation Hospitals<br>• Children's Hospitals<br>• Psychiatric Hospitals<br>• Rural Health Clinic (Free-standing and Provider-Based) 3** | • Free-standing Ambulatory Surgical Centers (ASCs)<br>• Home Health Care<br>• Free-standing Renal Dialysis Facilities |
| | **NON-COVERED SERVICES** | |
| | • Laboratory Services<br>• Ambulance<br>• Durable Medical Equipment<br>• Prosthetics | • Orthotics<br>• Supplies<br>• Radiology Services |

\*   These are examples of non-covered facilities and are not to be considered a comprehensive list.
\*\*  Facilities use a composite bill that covers both the physician and the facility component of the services, and services rendered in these facilities do not result in an independent physician claim.
1.  Community Mental Health Centers (CMHCs) provide outpatient services, including specialized outpatient services for children, the elderly, individuals who are chronically ill, and residents of the CMHC's mental health services area who have been discharged from inpatient treatment at an inpatient facility.
2.  Federally Qualified Health Centers (FQHCs) are facilities located in a medically underserved area that provide Medicare beneficiaries with preventive primary medical care under the general direction of a physician.
3.  Rural Health Clinics (RHCs) are Medicare certified facilities that are located in a rural, medically underserved area that provide ambulatory primary medical care under the general direction of a physician.

### 3.2.2.1    Determining Whether Facilities Are Acceptable for Risk Adjustment (Slide 13)

MA organizations are responsible for ensuring data collected and submitted are acceptable for the risk adjustment process. In the past, the provider number has been used to assist in this. However, CMS is in the process of implementing a new provider identifier, the National Provider Identification (NPI) number. As will be discussed below, the CMS will continue to allow the use of the legacy provider number along with the new NPI for a transition time. However, the NPI does not have intelligence, so a new code called the "taxonomy code" was developed to help identify types of providers. Both the legacy provider number and the taxonomy code can be used in determining the appropriateness of the covered hospital entities for the purposes of risk adjustment data collection. Table 3D illustrates the steps MA organizations may use to identify the provider numbers or taxonomy codes for facilities.

0819



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**DATA COLLECTION**

### TABLE 3D – DETERMINING COVERED HOSPITAL ENTITY PROVIDER NUMBERS

| SITUATION | ISSUE | ACTION |
|---|---|---|
| **Situation 1** | The provider number or taxonomy code is identified. | Determine if the number is in an acceptable range for risk adjustment. If in the acceptable range, submit the data. |
| **Situation 2** | An in-network provider submitted a claim but did not include the provider number or taxonomy code. | Obtain the provider number or taxonomy code and determine if the number is in an acceptable range for risk adjustment. If in the acceptable range, submit the data. |
| | | NOTE: All network providers are required to have certified Medicare provider numbers or taxonomy codes; therefore, do not submit risk adjustment data for this provider until these numbers are obtained. |
| **Situation 3** | An out-of-network provider submits a claim without a provider number. | Try to obtain a provider number or taxonomy code, if possible. If not available, check the list of Veterans Administration and Department of Defense (VA/DoD) listings published on csscoperations.com. If the provider is listed there, submit the data. |
| | | If the provider is not on the VA/DoD list, the organization may need to contact CMS to determine if the provider is acceptable for risk adjustment. |
| | | **NOTE:** All network providers are required to have certified Medicare provider numbers or taxonomy codes; therefore, do not submit risk adjustment data for this provider until these numbers are obtained. |

### 3.2.2.2   National Provider Identifier

CMS has recently issued contingency guidance for National Provider Identifier implementation. This contingency guidance provides that, for a period of 12 months after the NPI Rule compliance date of May 23, 2007, CMS will not impose civil money penalties on covered entities that deploy contingency plans, including (in order to ensure the smooth flow of payments) continuing to use and accept legacy identifiers on HIPAA transactions, if they have made reasonable and diligent efforts to become compliant and, in the case of health plans (that are not small health plans), in order to facilitate the compliance of their trading partners.

MA organizations should verify that diagnoses are collected from Medicare certified hospitals/facilities and that data from all Medicare certified network hospital/facilities include the associated Medicare provider identifiers (NPI and taxonomy code; and in the interim the legacy provider number). They should also verify that the Medicare certified hospitals/facilities providing the data are from acceptable facilities and

0820



services. As stated above, plans may use either the legacy Medicare provider numbers or the taxonomy code to determine if facilities and services are acceptable for risk adjustment.

MA organizations may wish to create a system for checking if the data are from acceptable facilities and for acceptable services. They may check the legacy provider number against the provider number ranges or check the taxonomy code against the taxonomy code ranges, both of which identify what type of service has been rendered.

If using the provider number, please note that it has six characters. The first two characters are numerals and represent the state/territory as illustrated in Table 3E.

#### TABLE 3E – PROVIDER NUMBER STATE ASSIGNMENTS

| STATE | CODE | STATE | CODE | STATE | CODE |
|---|---|---|---|---|---|
| Alabama | 01 | Kentucky | 18 | Oklahoma | 37 |
| Alaska | 02 | Louisiana | 19 | Oregon | 38 |
| American Samoa | 64 | Maine | 20 | Palau | N/A |
| Arizona | 03 | Maryland | 21 | Pennsylvania | 39 |
| Arkansas | 04 | Massachusetts | 22 | Puerto Rico | 40 |
| California | 05 | Michigan | 23 | Rhode Island | 41 |
| Colorado | 06 | Minnesota | 24 | South Carolina | 42 |
| Connecticut | 07 | Mississippi | 25 | South Dakota | 43 |
| Delaware | 08 | Missouri | 26 | Tennessee | 44 |
| District of Columbia | 09 | Montana | 27 | Texas | 45 |
| Florida | 10 | Nebraska | 28 | Utah | 46 |
| Georgia | 11 | Nevada | 29 | Vermont | 47 |
| Guam | 65 | New Hampshire | 30 | Virgin Islands | 48 |
| Hawaii | 12 | New Jersey | 31 | Virginia | 49 |
| Idaho | 13 | New Mexico | 32 | Washington | 50 |
| Illinois | 14 | New York | 33 | West Virginia | 51 |
| Indiana | 15 | North Carolina | 34 | Wisconsin | 52 |
| Iowa | 16 | North Dakota | 35 | Wyoming | 53 |
| Kansas | 17 | Ohio | 36 | | |

   States and territories are included in the list of Medicare provider numbers.

The third character may be a numeral or a letter. Provider numbers with a **U, W, Y, Z, 5** or **6** in the third character indicate that the service was provided in a swing bed component of a hospital or a skilled nursing facility, which, are not covered entities. The last three characters are numerals unique to the facility.

If using the taxonomy code, the bill type will be needed to identify if the service was provided in non-covered entity such as a swing bed component of a hospital or a skilled nursing facility.

0821



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**DATA COLLECTION**

As an additional check, refer to Tables 3F and 3G, which provide the only acceptable ranges for hospital facilities. The tables reflect the range of provider numbers for risk adjustment covered hospital entities. Risk Adjustment data are not acceptable when received from facilities with numbers outside the ranges.

 Skilled nursing facilities, home health care and hospital inpatient swing bed components are not covered entities for risk adjustment data.

**TABLE 3F – HOSPITAL INPATIENT COVERED ENTITIES**

| TYPE OF HOSPITAL INPATIENT FACILITY | PROVIDER NUMBER RANGE | TAXONOMY CODE/TYPE OF BILL(TOB) |
|---|---|---|
| Short-term (General and Specialty) Hospital | XX0001-XX0899<br>XXS001-XXS899<br>XXT001-XXT899 | 282N00000X<br>273R00000X<br>273Y00000X |
| Medical Assistance Facilities/Critical Access Hospitals | XX1225-XX1399 | 282NC0060X |
| Religious Non-Medical Health Care Institutions | XX1990-XX1999 | TOB 4XX |
| Long-term Hospitals | XX2000-XX2299 | 282E00000X |
| Rehabilitation Hospitals | XX3025-XX3099 | 283X00000X |
| Children's Hospitals | XX3300-XX3399 | 282NC2000X |
| Psychiatric Hospitals | XX4000-XX4499 | 283Q00000X |

**TABLE 3G – HOSPITAL OUTPATIENT COVERED ENTITIES**

| TYPE OF HOSPITAL OUTPATIENT FACILITY | PROVIDER NUMBER RANGE | TAXONOMY CODE/TYPE OF BILL (TOB) |
|---|---|---|
| Short-term (General and Specialty) Hospital | XX0001-XX0899<br>XXS001-XXS899<br>XXT001-XXT899 | 282N00000X<br>273R00000X<br>273Y00000X |
| Medical Assistance Facilities/Critical Access Hospitals | XX1225-XX1399 | 282NC0060X |
| Community Mental Health Centers | XX1400-XX1499<br>XX4600-XX4799<br>XX4900-XX4999 | TOB 76X |
| Federally Qualified Health Centers/Religious Non-Medical Health Care Institutions | XX1800-XX1999 | TOB 73X for FQHC<br>TOB 4XX for RNHCI |
| Long-term Hospitals | XX2000-XX2299 | 282E00000X |
| Rehabilitation Hospitals | XX3025-XX3099 | 283X00000X |
| Children's Hospitals | XX3300-XX3399 | 282NC2000X |
| Rural Health Clinics, Freestanding and Provider-Based | XX3400-XX3499<br>XX3800-XX3999<br>XX8500-XX8999 | TOB 71X |
| Psychiatric Hospitals | XX4000-XX4499 | 283Q00000X |

0822



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**DATA COLLECTION**

The implementation of the NPI did not change the valid Hospital Inpatient and Outpatient facilities for submission of risk adjustment data nor eliminate the process for receiving and verifying information from Medicare health care providers that are in network. Institutional providers that currently bill Medicare using more than one legacy identifier in order to identify subparts of their facility are required to submit a taxonomy code on all of the claims they submit to Medicare.

The following web site serves as a reference to types of facilities and taxonomy codes.

http://www.wpc-edi.com/codes/taxonomy

Figure 3A is a screen shot of the wpc-edi.com website which serves as a reference tool to determine types of facilities and taxonomy codes.

**Figure 3A – WPC-EDE.COM**



The following website serves as a reference for hospital provider numbers:

http://www.ahd.com/freesearch.php3

Figure 3B is a screenshot of the search page on the American Hospital Directory website. This web-based search database allows MA organizations the opportunity to access Medicare provider number by entering key words, city, state, zip code, or area code. When using the search tool, users need to be aware of the following:

- The most effective search option is to select the state where the provider is located.
- When entering the hospital name, users should be aware that the official name of the hospital may be different then what is included in the database.
- Avoid entering abbreviations.

0823



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**DATA COLLECTION**

**Figure 3B – American Hospital Directory**



📖    See Resource Guide for more information about Medicare provider numbers.

### 3.2.3  Physician Data (Slide 14)

The collection of physician data relevant for risk adjustment is associated with the physician's specialty. That is, all ICD-9-CM diagnoses that are in the risk adjustment model and rendered as a result of a physician visit must be collected by the MA organization. This includes data collected from non-network as well as network physicians.

Only those physician specialties and other clinical specialists identified in Table 3H are acceptable for risk adjustment.

0824



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**DATA COLLECTION**

## TABLE 3H – ACCEPTABLE PHYSICIAN SPECIALTIES

| CODE | SPECIALTY | CODE | SPECIALTY | CODE | SPECIALTY |
|------|-----------|------|-----------|------|-----------|
| 01 | General Practice | 29 | Pulmonary Disease | 70* | Multispecialty Clinic or Group Practice |
| 02 | General Surgery | 33* | Thoracic Surgery | 72* | Pain Management |
| 03 | Allergy/Immunology | 34 | Urology | 76* | Peripheral Vascular Disease |
| 04 | Otolaryngology | 35 | Chiropractic | 77 | Vascular Surgery |
| 05 | Anesthesiology | 36 | Nuclear Medicine | 78 | Cardiac Surgery |
| 06 | Cardiology | 37 | Pediatric Medicine | 79 | Addiction Medicine |
| 07 | Dermatology | 38 | Geriatric Medicine | 80 | Licensed Clinical Social Worker |
| 08 | Family Practice | 39 | Nephrology | 81 | Critical Care (Intensivists) |
| 10* | Gastroenterology | 40 | Hand Surgery | 82 | Hematology |
| 11 | Internal Medicine | 41 | Optometry (specifically means optometrist) | 83 | Hematology/Oncology |
| 12 | Osteopathic Manipulative Therapy | 42 | Certified Nurse Midwife | 84 | Preventive Medicine |
| 13 | Neurology | 43 | Certified Registered Nurse Anesthetist | 85 | Maxillofacial Surgery |
| 14 | Neurosurgery | 44 | Infectious Disease | 86 | Neuropsychiatry |
| 16* | Obstetrics/Gynecology | 46* | Endocrinology | 89* | Certified Clinical Nurse Specialist |
| 18* | Ophthalmology | 48* | Podiatry | 90 | Medical Oncology |
| 19 | Oral Surgery (Dentists only) | 50* | Nurse Practitioner | 91 | Surgical Oncology |
| 20 | Orthopedic Surgery | 62* | Psychologist | 92 | Radiation Oncology |
| 22* | Pathology | 64* | Audiologist | 93 | Emergency Medicine |
| 24* | Plastic and Reconstructive Surgery | 65 | Physical Therapist | 94 | Interventional Radiology |
| 25 | Physical Medicine and Rehabilitation | 66 | Rheumatology | 97* | Physician Assistant |
| 26 | Psychiatry | 67 | Occupational Therapist | 98 | Gynecologist/Oncologist |
| 28* | Colorectal Surgery | 68 | Clinical Psychologist | 99 | Unknown Physician Specialty |

* Indicates that a number has been skipped.

 Qualified physician data for risk adjustment requires a face-to-face visit with the exception of pathology services (professional component only).

0825



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**DATA COLLECTION**

### 3.2.4  Alternative Data Sources

Alternative data sources (ADS) include diagnostic data from sources other than hospital inpatient, hospital outpatient, and physician services. MA organizations may use ADS as a *check* to ensure that all required diagnoses have been submitted to CMS for risk adjustment purposes, such as pharmacy records and information provided to national or state cancer registries. The MA organization may not, however, use ADS as substitutes for diagnoses from a hospital/physician. As in all diagnoses submitted, there must be medical record documentation to support the diagnosis as having been documented as a result of a hospital inpatient stay, a hospital outpatient visit, or a physician visit during the data collection period.

For example, a prescription for an ACE inhibitor, alone, is not considered sufficient for the sole data source of "clinical evidence" of congestive heart failure (CHF); instead, the medical record needs to document an appropriate clinician's diagnosis of CHF during the data collection period (e.g., where an "appropriate clinician" is a physician/nurse practitioner/physician assistant). A laboratory test showing one reading of high blood sugar is not considered sufficient "clinical evidence" of diabetes–the medical record needs to document a clinician's diagnosis of diabetes during the data collection period.

### 3.2.5  Excluded Providers

Medicare will not pay for items or services rendered to beneficiaries and recipients by an excluded provider or by entities owned or managed by an excluded provider. Providers are excluded for the following reasons: a program related crime, patient abuse or neglect, health care fraud in any health care program, and convictions relating to controlled substances.

📖    The HHS monthly exclusion notification can be found at http://oig.hhs.gov/fraud/exclusions.html.

### 3.3    Data Collection Formats and Considerations

There are several formats that MA organizations can accept when collecting data from medical providers. Table 3I lists the formats by provider type.

### 3.3.1  Data Collection Formats (Slide 16)

For facility services, the standard billing format is UB-04 (Uniform Billing Form –2004 version). The HCFA 1500 form is the standard format for physician services.

**TABLE 3I – DATA COLLECTION FORMATS**

| HOSPITAL INPATIENT/HOSPITAL OUTPATIENT | • UB-04<br>• ANSI X12 837 4010<br>• RAPS Format |
|---|---|
| PHYSICIAN | • HCFA 1500<br>• NSF 3.01<br>• ANSI X12 837 4010<br>• RAPS Format<br>• Superbill |

0826



### 3.3.2  Collection Format Features

MA organizations need to carefully consider decisions regarding data collection tools, as they may impact the volume and accuracy of data received from physicians and providers. When examining the data collection options, the organization's management should consider the features of each of the approved data collection tools. Table 3J describes key features of each data collection tools.

**TABLE 3J – COLLECTION FORMAT FEATURES**

| FORMAT | FEATURE | | | | | |
|---|---|---|---|---|---|---|
| | **PHYSICIAN SERVICES** | **HOSPITAL INPATIENT/ OUTPATIENT SERVICES** | **MINIMUM DATA SET** | **FULL CLAIMS DATA** | **PAPER FORMAT** | **ELECTRONIC** |
| HCFA 1500* | ● | | | ● | ● | |
| UB-04* | | ● | | ● | ● | |
| NSF* | ● | | | ● | ● | ● |
| ANSI X12 837 | ● | ● | | ● | | ● |
| Superbill | ● | | ● | | ● | |
| RAPS Format | ● | ● | ● | | | ● |

*These data collection formats are not HIPAA compliant transactions. However, if your plan is HIPAA compliant and your trading partners are not HIPAA compliant, CMS is allowing receipt of non-HIPAA formats until such time as your trading partners are prepared to submit the HIPAA transaction sets.

The data collection options provided by CMS offer the MA organization the ability to determine which format works best for each of the plan's providers. A variety of collection formats may be used for different providers. If an organization plans to use multiple collection formats, consideration should be given to the complexity and costs associated with supporting these formats (e.g., systems, processes, staffing, etc.).

### 3.3.3  Collecting Data from Physicians Using a Superbill

The superbill is a data collection option for risk adjustment. The superbill is a common physician office claim form that lists standard ICD-9-CM codes, CPT (Current Procedural Terminology) codes, and beneficiary information. Typically, physicians use the superbill to record clinical information with the appropriate codes to aid in preparing claims or encounter data for submission. MA organizations may develop superbills for use by their capitated physicians for capturing diagnostic information for risk adjustment.

0827



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**DATA COLLECTION**

 If the MA organization currently utilizes a superbill that works well for its data collection needs, then it is not necessary to create a new format for risk adjustment data collection. Additionally, if a physician group has a superbill that will capture all relevant risk adjustment diagnoses, it is not necessary for the MA organization to replace that superbill with one that is specific to risk adjustment requirements.

 **Examples**

**Examples of Superbills**

Two examples of superbills are provided in Figures 3C and 3D. The first example is a typical fee-for-service superbill for an internist. This superbill contains both ICD-9-CM diagnosis codes and CPT procedure codes. For illustrative purposes, the relevant risk adjustment diagnoses have been bolded.

The second example illustrates what the same superbill might look like if used specifically for collection of risk adjustment data. The ICD-9-CM code list provided by CMS is used to develop the list of common internist ICD-9-CM diagnoses codes on the superbill. These are codes that are relevant diagnoses for the risk adjustment model, related conditions that are not specific to risk adjustment, as well as other common internists' diagnoses. A space was left for the internist to enter diagnoses that are not on the list. Note that there are no CPT procedure codes on the superbill because they are not required for risk adjustment.

0828



**2007 Risk Adjustment Data Training**
**For Medicare Advantage Organizations**
**Participant Guide**

**DATA COLLECTION**

## FIGURE 3C – SAMPLE FEE-FOR-SERVICE SUPERBILL

| JOHN E. DOE, M.D. | PATIENT NAME | | INSURANCE | | | |
|---|---|---|---|---|---|---|
| **Internal Medicine** Board Certified | OFFICE PATIENT NUMBER 847 | ADMIT DATE | DIAGNOSIS | | | |
| 123 Main Street Anytown, UL 99999 Office (555) 555-5555 Billing (555) 555-5550 TAX I.D. #12345678 | DR# ACCIDENT TYPE ☐ Work Comp ☐ Auto ☐ Other | DATE OF ACCIDENT ___/___/___ | 1) | 2) | 3) | 4) |

**OFFICE SERVICE**

| | New | Mod | Fee | DX | Est. | Mod | Fee | DX |
|---|---|---|---|---|---|---|---|---|
| Level 1 | 99201 | | 48 | | 99211 | | 27 | |
| Level 2 | 99202 | | 82 | | 99212 | | 48 | |
| Level 3 | 99203 | | 121 | | 99213 | | 67 | |
| Level 4 | 99204 | | 176 | | 99214 | | 105 | |
| Level 5 | 99205 | | 222 | | 99215 | | 155 | |

**PHYSICALS**

| | New | Mod | Fee | DX | Est. | Mod | Fee | DX |
|---|---|---|---|---|---|---|---|---|
| 2-17yrs | 99354 | | 168 | | 99394 | | 133 | |
| 18-39yrs | 99385 | | 182 | | 99385 | | 140 | |
| 40-64yrs | 99386 | | 189 | | 99396 | | 147 | |
| >65yrs | 99387 | | 203 | | 99397 | | 154 | |

**INITIAL HOSPITAL CARE**

| Level 1 | 99221 | 95 |
| Level 2 | 99222 | 156 |
| Level 3 | 99223 | 213 |

**DAILY HOSPITAL CARE**

| Level 1 | | 98231 | |
| Level 2 | From ___ To ___ @ $55 | 99232 | |
| Level 3 | From ___ To ___ @ $87 | 992 | |
| | From ___ o ___ @$145 | | |
| Discharge | 98238 | 92 |
| Discharge-over 30 | 99239 | 1 2 |

**G HOME CARE**

| | 99502 | 13 |
| Partial Detailed | 99303 | 6 |
| Partial Comprehe ve | 99311 | |
| Follow Up Level 1 | 99312 | 71 |
| Follow Up Level 2 | 99313 | 99 |
| Follow Up Level 3 | 99315 | |
| Discharge-30 minutes or less | 99316 | |
| Discharge-over 30 minutes | | |

**PROCEDURES**

| Venipuncture | 38415 | 17 |
| Ear Irrigation | 69210 | 44 |
| ECG With Interpretation & Report | 93000 | 39 |
| ECG Only | 93005 | 25 |
| ID Abcess | 10060 | 119 |
| ID | 86580 | 12 |
| Stool WBC | 82270 | 6 |
| Analysis with Micro | 81000 | 9 |
| Analysis without Micro | 81002 | 7 |

**IMMUNIZATIONS & INJECTIONS**

| B-12 | J3420 | 3 |
| Hepatitis A, Adult | 90632 | 70 |
| Hepatitis B, Adult | 90746 | 70 |
| Hepatitis B, adolescent | 90744 | 60 |
| Influenza-Whole | 90550 | 15 |
| MMR | 90707 | 57 |
| Pneumovax | 90732 | 40 |
| Tetanus | 90703 | 26 |
| Other _____ | | |
| Other _____ | | |

---

☐ MCR PAP SMEAR
| 992 | -25 | E&M |
| Q0091 | Pap | $50 |
| G0101 | P&B Exam $60 | |
| V15.80 | High Risk Dx | |
| V76.2 | Routine Dx | |

☐ FLU SHOT
| 90659 | Flu Shot | |
| 90471 | Admin | |
| V04.8 | Flu Vaccine Dx | |

☐ MCR FLU SHOT
| 90859 | Flu Shot | |
| G0008 | Admin | |
| V04.8 | Flu Vaccine Dx | |

☐ PNEUMOVAX
| 80732 | Shot | |
| 90471 | Admin | |
| V03.82 | Vaccine Dx | |

☐ MCR PNEUMOVAX
| 90732 | Shot | |
| G0008 | Admin | |
| V0 | Vacc | x |

☐ EPATITI
| 9074 | lt Shc |
| 9074 | ld Sho |
| 90 | n |
| V0 | ne Dx |

☐ HEPATITIS A
| 90632 | Shot | |
| 90471 | Admin | |
| V08.3 | Vaccine Dx | |

☐ TETANUS
| 90707 | Shot | |
| 90471 | Admin | |
| 906.5 | Vaccine Dx | |

☐ B-12 INJECTION
| J3420 | Shot | |
| 80782 | Admin | |
| 266.2 | B-12 Dx | |

**Next Visit**

Total: $ _____
Amt Pd $ _____
11    ☐ Check # _____
43    ☐ Co-Pay Not Collected

Physician Signature    Date

---

DIAGNOSIS CODES: ICD-9-CM

_789.00 Abdominal Pain, NEC
_796.4 Abnor Unexpl Tst
_762.3 Adema
**_427.31 A. Fib.**
_285.9 Anemia NOS
**_413.9 Angina**
_V58.61 Anticoag Med
_300.00 Anxiety
_427.9 Arythmia NOS
_719.40 Arthralgia
_716.00 Arthritis Acu Chron
**_714.0 Arthritis, Rheum**
_429.2 ASCVD
_493.90 Asthma
_724.2 Back Pain
_578.1 Blood in Stool
_726.91 Bone Spur
**_174.9 Breast CA, Female**
_611.72 Breast Lump
_490 Bronchitis
_727.3 Bursitis
_682.9 Cellulitis, NOS
_767.99 Chg/Bowel/Habits
_780.9 Chg
_786.50 Chest Pain
**_428.0 CHF**
_574.20 Cholelithiasis, NOS
_153.9 Colon CA
_564.0 Constipation
**_496 COPD**
**_436 CVA**
_799.4 Decondition
_276.5 Dehydration
_294.8 Dementia
_311 Depre sion
_692.9 Der atitis
**_250.92 abetes** e
ab Mis
**_250.62 Diab Neuropathy**
**_250.00 Diabetes, NIDDM**
**_250.50 Diabs, Retinopathy**
**_250.00 Diabetes, Type II**
**_250.32 Diabetic Coma**
_787.91 Diarrhea
_562.11 Diverticulitis
_780.4 Dizziness/Vertigo
**_453.8 DVT**
_787.2 Dysphagia
_780.7 Fatigue
_610.1 Fibrocystic Breast Dis
_729.1 Fibromyalgia
_558.9 Gastroenteritis
_530.81 GERD
_578.9 GI Bleeding
_240.9 Goiter
_274.9 Gout
_242.0 Graves Disease
_245.2 Hashimotos
_307.81 Headache, Tension
_784.0 Headache
_V70.0 Health Maint
_V43.2 Heart Valve Repl
_455.6 Hemorrhoids
_573.3 Hepatitis, NOS
_070.1 Hepatitis A
_070.30 Hepatitis B
_070.61 Hepatitis C, Acute
**_070.54 Hepatitis, C, Chron**
_V05.3 Hepatitis Viral, Vac

_704.1 Hirsutism
_276.7 Hyperka
_272.4 Hyper
_276.0 Hyper
_252.0 Hyperparathyroid
_401.9 Hypertension
_242.90 Hyperthyroid
_276.8 Hypokalemia
_276.1 Hyponatremia
_244.9 Hypothyroid
_788.30 Incon Urinary
_487.1 Influenza
_V04.8 Influenza Vac
_780.52 Insomnia
_564.1 Irrit Bowel Syn
_386.30 Labyrinthitis
**_710.0 Lupus**
**_263.9 Malnutrition**
_995.2 Med Side Effect
**_410.9 MI, Acu, Unspec**
_412 MI, Old 8+ wks
_424.0 Vive Pro
_728.85 Muscle Spasm
_355.9 Neuropathy
_278.00 Obesity
_110.0 Onychomycosis
_733.00 Osteopotasin
_388.70 Otalgia
_362.9 Otitis Media
_V15.89 Pap High Risk
_V76.2 Pap Rout MCR
_625.9 Pelvic Pain, Fem
_281.0 Perrouout Anem
_462. Pharyngitis
_486 Pneumonia
_V03.82 Pneumonia Vac
_627.2 Post Meno Synd
_V72.84 Preop Exam
**_185 Prostate Cancer**
_600.0 Prostate Hyper
_601.9 Prostatis
_896.1 Psoriasis
**_415.19 Pulmon Embol**
_569.3 Rectal Bleeding
_592.9 Renal Lithisis
_477.9 Rhinitis, Allergic
_473.9 Sinusitis
_709.9 Skin Lesion
_305.10 Smoker
_848.9 Strain/Spasm, NOS
_780.2 Syncope/Collapse
_079.89 System Vrt Infect
_451.9 Thrombophlebitia
**_193 Thyroid CA**
_241.0 Thyroid Nodule
_245 Thyroiditis
_533.9 Ulcer, Peptic
**_411.1 Unstable Angina**
_465.9 URI
_599.0 UTI
_616.10 Vaginitis
_286.2 Vit B-12 Deficiency
_380.4 Wax in Ears
_783.2 Weight Loss
_V72.3 Well Woman

---

NOT INTENDED FOR REPRODUCTION

SAMPLE

3-14



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**DATA COLLECTION**

## FIGURE 3D – SAMPLE RISK ADJUSTMENT SUPERBILL

| JOHN E. DOE, M.D.<br>*Internal Medicine*<br>*Board Certified* | PATIENT NAME | | INSURANCE |
|---|---|---|---|

123 Main Street
Anytown, UL 99999
Office (555) 555-5555
Billing (555) 555-5550
TAX I.D. #12345678

DR#    ACCIDENT TYPE
☐ Work Comp
☐ Auto
☐ Other

DATE OF ACCIDENT
____/____/____

DIAGNOSIS CODES: ICD-9-CM

| | |
|---|---|
| 427.3 | A. Fib/flutter |
| 427.9 | Arrythmia |
| 285.9 | Anemia,NOS |
| 284 | Aplastic Anemia |
| 413 | Angina |
| 300.00 | Anxiety |
| 716.90 | Arthritis, NOS |
| 714 | Arthritis, Rheumatoid |
| 427.9 | Arrythmia,NOS |
| 429.2 | ASCVD |
| 493.90 | Asthma |
| 493.2 | Asthma COP |
| 174 | ast C male |
| 511.72 | ast p |
| 490 | nchitis, NOS |
| 466.0 | nchitis, acute |
| 491 | nchitis, chroni |
| 382.9 | nitis, NOS |
| 786.50 | Chest pain |
| 428 | CHF |
| 574.20 | Cholelithiasis, NOS |
| 153 | Colon CA |
| 496 | COPD |
| 436 | CVA |
| 276.5 | Dehydration |
| 294.8 | Dementia |
| 311 | Depression |
| 296 | Depression, major |
| 692.9 | Dermatitis |
| 250 | Diabetes |
| 250.9 | Diabetes, Brittle |
| 250.3 | Diabetic Coma |
| 250.1 | Diabetic Keto |
| 250.4 | Diabetic Nephrosis |
| 250.6 | Diabetic Neuropathy |
| 250.0 | Diabetes,NIDDM |
| 250.7 | Diabetic PVD |
| 250.5 | Diabetic Retinopathy |
| 562.11 | Diverticulitis |
| 453.8 | DVT |
| 610.1 | Fibrocystic Breast |
| 729.1 | Fibromyalagia |
| 558.9 | Gastroenteritis |
| 530.81 | GERD |
| 578.9 | GI Bleeding |
| 240.9 | Goiter |
| 274.9 | Gout |
| 242.0 | Graves' Disease |

| | |
|---|---|
| 573.3 | Hepatitis,NOS |
| 070.1 | Hepatitis A |
| 070.30 | Hepatitis B |
| 070.51 | Hepatitis C, Acute |
| 070.54 | Hepatitis C, Chronic |
| 401.9 | Hypertension |
| 242.90 | Hyperthyroidism |
| 276.8 | Hypokalemia |
| 276.0 | Hyponatremia |
| 244.9 | Hypothyroidism |
| 487.1 | Influenza |
| 564.1 | Irrit. Bowel Syn |
| 36.30 | Labyrinthitis |
| 710 | Lupus |
| 263 | Malnutrition |
| 995.2 | Medicine Side Effect |
| 410 | MI |
| 424.0 | Mitral Valve |
| 5.9 | Neuropathy |
| 110.0 | Onychomycosis |
| 715.90 | Osteoarthritis |
| 733.00 | Osteoporosis |
| 427.0 | PAT |
| 427.1 | PVT |
| 427.2 | Parox Tachycardia |
| 462 | Pharyngitis |
| 486 | Pneumonia |
| 48 | Pneumonia, specified |
| 185 | Prostate Cancer |
| 600.00 | Prostate Hypertrophy |
| 415.19 | Pulmonary Embolism |
| 592.0 | Renal Lithiasis |
| 477.9 | Rhinitis, Allergic |
| 473.9 | Sinusitis |
| 079.89 | Systemic Viral Infec |
| 451.9 | Thrombophlebitis |
| 193 | Thyroid Cancer |
| 241.0 | Thyroid Nodule |
| 245.9 | Thyroiditis |
| 533.9 | Ulcer, Peptic |
| 53._. | Ulcer, perforated |
| 411 | Unstable Angina |
| 465.9 | URI |
| 599.0 | UTI |

Other:

Next Visit

Total: $ _____
Amt Pd $ _____

12  ☐ Check # _____
44  ☐ Co-Pay Not Collected

Physician Signature    Date

NOT INTENDED FOR
REPRODUCTION

SAMPLE

3-15

0830



### 3.3.4  Factors Affecting Data Collection Method (Slide 17)

The risk adjustment model requires that MA organizations collect a subset of data from their providers/physicians. While CMS requires that only the minimum data are collected for risk adjustment, MA organizations should also consider their business needs.

- The organization may decide to collect full claims data for a variety of reasons:

    - The organization has fee-for-service contracts and pays providers and physicians based on the specific service provided to patients.

    - The organization is earning or maintaining National Committee for Quality Assurance (NCQA) accreditation and is therefore required to collect Health Employers Data Information Set (HEDIS) data used to evaluate the plan's performance in areas of customer service, access to care, and claims processing.

    - The organization has established an internal process for credentialing purposes that requires evidence of compliance with regulatory and other standards of practice such as Joint Commission on Accreditation of Health Care Organizations (JCAHO) or American College of Surgeons. The JCAHO certification requires extensive onsite review to evaluate the health organization's performance in areas that impact healthcare.

- The organization may decide to collect the minimum data set for a variety of reasons:

    - The organization has capitated payment arrangement with physicians and providers, and pays a fixed amount for services provided.

    - The organization's physicians are paid employees of the managed care plan.

### 3.3.4.1   Contractual Relationships and Implications for Data Collection (Slide 18)

There are several types of contractual payment relationships that MA organizations have with network physicians. These relationships include: fee-for-service, capitated, staff model, and mixed services. These contractual relationships affect how MA organizations collect data from physicians. Table 3K describes the contractual payment relationships.

#### TABLE 3K – CONTRACTUAL PAYMENT RELATIONSHIPS

| | |
|---|---|
| **FEE-FOR-SERVICE** | In a fee-for-service contract, the physician is paid based on the specific services provided to each patient. |
| **CAPITATED** | The physician is paid a fixed amount per patient per month, regardless of the types of services provided. |
| **STAFF MODEL** | Physicians are paid employees of the managed care plan. Physicians generally provide services in a clinic setting. |
| **MIXED SERVICES MODEL** | In a mixed services model environment, managed care organizations use a combination of contractual arrangements. |

0831



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**DATA COLLECTION**

## 3.4    Health Information Portability and Accountability Act (HIPAA) (Slide 19)

Effective October 16, 2003, when HIPAA transaction standards became mandatory, all *electronic* claims/encounters sent from providers/physicians to MA organizations (health plans) constitute a HIPAA-covered transaction. Any MA organization that receives an electronic claim/encounter from a provider/physician must use the ANSI X12 837 v.40.10 format. This means that after the MA organization receives electronic data in HIPAA format, it cannot request that the physician resubmit the identical information (same patient, same diagnosis) in a different format (e.g., HCFA 1500) for purposes of risk adjustment data collection.

However, if needing to clarify original information or to obtain additional information, MA organizations may use an abbreviated data collection instrument for the sole purpose of collecting supplemental diagnostic information.

UB-92 and NSF are the old data collection formats and are not HIPAA compliant transactions. However, if your plan is HIPAA compliant and your trading partners are not HIPAA compliant, CMS is allowing receipt of the non-HIPAA formats until such time as your trading partners are prepared to submit the HIPAA transaction sets. This allowance is not an extension of the mandatory date of HIPAA (October 2003), and all organizations must be able to accept the HIPAA transactions. This extension simply allows plans to continue electronic commerce while their trading partners work toward compliance.

 **If** the transaction is from a provider to an MA organization (i.e., data collection) **and** the transaction is a claim or an encounter, **then** data must be used for risk adjustment **and** the same data cannot be requested in a different format from the provider.

## 3.5    Provider Communication and Risk Adjustment

Communicating risk adjustment requirements to physicians and providers can help to improve the quality and quantity of the data submitted by MA organizations. It can also help physicians and providers understand the importance of accurate coding and medical record documentation, and their role in data validation. This section describes key messages to include in provider communications, characteristics of effective communication with physicians and providers, and communication methods to consider when sending messages about risk adjustment.

### 3.5.1  Key Messages

Physicians and providers receive many messages from MA and other managed care organizations. It is easy for a message about risk adjustment to get lost in the stream of communications sent to physicians and providers. To help ensure that messages about risk adjustment get the attention of the provider community, it is important that organizations routinely include basic information about risk adjustment in a variety of provider communications. The key messages to reinforce are:

- **What is the purpose of risk adjustment?**
  Risk adjustment strengthens the Medicare program by ensuring that accurate payments are made to MA organizations based on the health status of their enrolled beneficiaries. Accurate payments to MA organizations help ensure that providers are paid appropriately for the services they provide to MA beneficiaries. Finally, risk adjustment provides MA organizations with incentives to enroll and treat less healthy individuals.

0832



- **Why is risk adjustment important to physicians and providers?**
  The risk adjustment model relies on the ICD-9-CM diagnosis codes to prospectively reimburse MA organizations based on the health status of their enrolled beneficiaries. Physicians and providers must focus attention on complete and accurate diagnosis reporting according to the official ICD-9-CM coding guidelines.

- **What are the responsibilities of physicians and providers?**
  Physicians must report the ICD-9-CM diagnosis codes to the highest level of specificity and report these codes accurately. This requires accurate and complete medical record documentation. They are required to alert the MA organization of any erroneous data submitted and to follow the MA organization's procedures for correcting erroneous data. Finally, they must report claims and encounter information in a timely manner, generally within 30 days of the date of service (or discharge for hospital inpatient facilities).

 Organizations may also want to include information about the correct data collection formats available to them, as well as any information revealed through analysis of data collection trends uncovered through monitoring of the risk adjustment process.

### 3.5.2 Characteristics of Effective Communication

Physicians and providers tend to respond more positively to communications from MA organizations when the messages are considered reliable, accurate, timely, and helps them make their organization or practice more efficient. For this reason, it may be helpful to consider the following characteristics when developing provider communications:

- **Authoritative**
  Make the "look and feel" of provider communications conservative, official, and factual. Be certain all information is accurate. Grammar, spelling, and punctuation must be perfect, or the errors will undercut the reader's level of confidence in the message.

- **Current**
  Ensure that risk adjustment information is the most recent available. Update provider handbooks, websites, job aids, and training materials routinely so all information is current. Physicians and providers will not spend time reading information they know is outdated.

- **Timely**
  Provide information to providers when they need to know it. For example, if MA organizations need physicians and providers to send their diagnostic data via a specific format by a certain date, send that message to them with enough lead-time to allow them to prepare for and meet the deadline for the change.

- **Consistent**
  Send consistent messages about risk adjustment. MA organizations can contact the Customer Service and Support Center (CSSC) anytime to confirm that information they are about to send out to providers is correct. Physicians and providers appreciate receiving the right information the first time and every time.

0833



- **Practical, relevant and well organized**
  Delete "background noise" from your physician and provider messages. That is, identify the primary message you want to send and provide the key information necessary to make the point. That is, focus the message. Identify any specific actions that are required in clear, easy-to-read language.

- **Accessible**
  Create materials for physicians and providers that are easy to access. Information that physicians and providers can locate quickly helps to ensure compliance with risk adjustment requirements, whether that information is available on the Internet, or in a paper document.

### 3.5.3 Communication Methods

Many MA organizations indicate that communicating to physicians and providers through a single medium, like a newsletter, is not effective. A multimodal approach is more successful at reaching the provider community because it reaches a broader audience and reinforces the message in a number of different formats.

When deciding the methods to communicate with physicians and providers, consider the following steps:

- **Identify the methods that tend to work best for the organization.** Many MA organizations indicate that the organization's provider Web page and newsletters reach audiences, but small and large group training sessions are most successful for causing a change in action.

- **Determine the goal of the message.** If the message's intent is to raise awareness about a topic, then broad-based communication methods may be appropriate. However, if the message is intended to change the way physicians and providers do something, then group meetings, followed up by emails, and provider handbook and contract updates may be excellent options.

- **Consider the physician's and provider's response.** If the message is likely to provoke a negative reaction from the provider community, then meetings with them can be helpful in addressing and clarifying issues, and discussing possible solutions to problems.

There are a number of methods MA organizations may use to communicate risk adjustment messages to the provider community. These are illustrated in Figure 3E. Understand that, once your organization establishes a communication channel, physicians and providers will rely on that channel to receive information. Any new channels MA organizations use may not be as effective as established ones.



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**DATA COLLECTION**

**Figure 3E – Communication Methods**



0835



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**DATA SUBMISSION**

## MODULE 4 – DATA SUBMISSION

### Purpose (Slide 2)

Medicare Advantage (MA) organizations must submit accurate diagnostic data when submitting risk adjustment data. This module describes the file layout for risk adjustment process submissions.

### Learning Objectives (Slides 3-4)

At the completion of this module, participants will be able to:

- Understand the submission process requirements, connectivity options, and Risk Adjustment Processing System (RAPS) file layout.
- Identify the data elements required to submit risk adjustment data.
- Locate and describe the diagnosis clusters in the RAPS format.
- Understand the Direct Data Entry (DDE) process.
- Describe the filtering process.
- Describe the diagnoses deletion process.



### 4.1    Submission Process Requirements (Slide 6)

New MA organizations must complete an Electronic Data Interchange (EDI) Agreement with the Centers for Medicare & Medicaid Services (CMS) and submit that Agreement to the Customer Service and Support Center (CSSC) prior to submitting risk adjustment data. The EDI Agreement is a contract between the MA organization and CMS attesting to the accuracy of the data submitted. An officer (e.g., CEO) that represents the MA organization must sign this document.  New Plans must submit the EDI Agreement within 1 month of the HPMS effective date.

MA organizations must make special arrangements to use a third party submitter. If the submitter is an entity other than an MA organization, the submitter must complete the Submitter ID Application Form, and the MA organization must complete the EDI Agreement. MA organizations must complete, sign, and return the EDI Agreement for each plan number submitting data. CMS holds the MA organization accountable for the content of submissions regardless of who submits the data.

New MA organizations must submit test data within 3 months of the HPMS effective date and a production file must be submitted within 4 months of the effective date.

If a new contract number is required, the MA organization must submit a new EDI agreement.  If the submitter's system successfully submitted test data previously, CMS does not require additional testing.

0836



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**DATA SUBMISSION**


MA organizations must submit during each calendar quarter, at a minimum, approximately one-fourth of their total risk adjustment data submission for the collection period. More frequent submissions are recommended and benefit MA organizations, in identifying data collection and submission issues early.

## 4.2    Connectivity Options (Slide 7)

Connectivity refers to the electronic connection between the MA organization and CMS. MA organizations use the electronic connection to submit risk adjustment to CMS and receive information in return. Table 4A describes the three connectivity options.

**TABLE 4A – CONNECTIVITY OPTIONS**

| Connect:Direct | Formerly Network Data Mover (NDM). Mainframe-to-mainframe connection. Next day receipt of FERAS response. |
|---|---|
| FTP File Transfer Protocol | Modem-to-modem (dial-up) or lease line connection. Requires password and phone line. Same day receipt of FERAS response. |
| Gentran | Two connectivity options: -Secure File Transfer Protocol (SFTP); standards based protocol via a vender. -Secure Hyper Text Transfer Protocol (HTTPS), secure web interface. |

Small plans with less then or equal to 100, 000 members may submit data using the Gentran Mailbox. For technical support questions regarding Gentran mailbox, users may contact the Customer Support for Medicare Modernization (CSMM) by calling (800) 927-8069, emailing mmahelp@cms.hhs.gov, or viewing the website at http://www.cms.hhs.gov/mmahelp.

## 4.3    Relevant Diagnosis (Slide 8)

MA organizations must submit each relevant diagnosis at least once during a reporting period for each enrolled beneficiary.


For payments beginning on January 1, 2008, the initial submission deadline is September 7, 2007 for the reporting period July 1, 2006 through June 30, 2007. For payments beginning on July 1, 2008, March 7, 2008 is the initial submission deadline for reporting data with dates of service January 1, 2007 through December 31, 2007. **Refer to the Risk Adjustment Process Overview module, Table 2B.**

A relevant (model) diagnosis must meet the following criteria:

- The diagnosis is included in the CMS-Hierarchical Condition Category (CMS-HCC), Prescription Drug (RxHCC) or End Stage Renal Disease (ESRD) risk adjustment models.
- The diagnosis must be received from one of the three provider types (hospital inpatient, hospital outpatient, and physician) covered by the risk adjustment requirements.

0837



**2007 Risk Adjustment Data Training**
**For Medicare Advantage Organizations**
**Participant Guide**

**DATA SUBMISSION**

---

- The diagnosis must be collected according to the risk adjustment data collection instructions.

MA organizations may elect to submit a diagnosis more than once during a data collection period for any given beneficiary, as long as that recorded diagnosis was from a face-to-face visit with one of the three provider types covered under risk adjustment. MA organizations may submit any diagnoses received from the three covered provider types, including diagnoses that are not in the CMS-HCC risk adjustment model. Diagnoses that are in the model but that were not collected from one of the three provider types cannot be submitted as risk adjustment data.

## 4.4    Submission Formats (Slide 9)

Effective October 1, 2007, MA organizations must submit data electronically using one of two formats:

- RAPS format (all provider types)
- DDE screen (all provider types)

## 4.5    Submission File Layout Logic (Slide 10)

Submissions are organized into three levels of data:

- File-level information—identifies the submitter
- Batch-level information—identifies the MA organization
- Detail-level information—identifies the beneficiary

Figure 4A illustrates a summary of the RAPS file structure.

---

0838



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**DATA SUBMISSION**

**Figure 4A – RAPS File Structure Summary**



**RT AAA – FILE HEADER (Submitter Info)**
Always the first record on the file, and must be followed by Record Type (RT) BBB.
- Record ID
- Submitter ID
- File ID
- Transaction Date
- Production/Test Indicator
- Filler

    **RT BBB – BATCH HEADER (MA Organization Info)**
    Must follow RT AAA or RT YYY and must be followed by RT CCC.
    - Record ID
    - Sequence Number
    - Plan Number
    - Filler

        **RT CCC – DETAIL RECORD (Beneficiary Info)**
        Must follow RT BBB or RT CCC and may be followed by another RT CCC.
        - Record ID
        - Sequence Number
        - Sequence Number Error
        - Patient Control Number (optional)
        - HIC Number
        - HIC Error Code
        - Patient Date of Birth (optional)
        - Date of Birth Error Code
        - Diagnosis Cluster (10 Occurrences)
            ▸ Provider Type
            ▸ From Date
            ▸ Through Date
            ▸ Delete Indicator
            ▸ Diagnosis Code
            ▸ Diagnosis Code – Filler
            ▸ Diagnosis Cluster – Error 1
            ▸ Diagnosis Cluster – Error 2
        - Corrected HIC Number
        - Filler

    **RT YYY – BATCH TRAILER**
    Must follow RT CCC and may be followed by another RT BBB or RT ZZZ.
    - Record ID
    - Sequence Number
    - Plan Number
    - CCC Record Total
    - Filler

**RT ZZZ – FILE TRAILER**
Must follow RT YYY, and must be the last record on the file.
- Record ID
- Submitter ID
- File ID
- BBB Record Total
- Filler

*DETAIL LEVEL*    *BATCH LEVEL*    *FILE LEVEL*

0839



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**DATA SUBMISSION**

## 4.6   Diagnosis Cluster

The diagnosis cluster contains the core information used to calculate a risk adjustment factor. The following components are included in the cluster:

* Provider Type
* From Date
* Through Date
* Diagnosis Code

A maximum of 10 diagnosis clusters are allowed per CCC record. Each cluster must include the items identified above. If any of these attributes are submitted more than once for the same HIC number, a duplicate diagnosis cluster error will occur.

## 4.7   Provider Type

MA organizations must submit risk adjustment data for hospital inpatient, hospital outpatient, and physician services. MA organizations may submit all provider types in the same CCC record. The provider type must be coded accurately. There is one provider type per diagnosis cluster. Table 4B shows the provider types and their codes.

Type of Bill (TOB), which is coded on the UB-04 during the collection of hospital data, may be used to assist in translating the correct provider type. Table 4B also shows the TOB and provider type correlation.

**TABLE 4B – PROVIDER TYPES**

| PROVIDER TYPE | CODE | TYPE OF BILL |
|---|---|---|
| Principal Hospital Inpatient (principal diagnosis) | 01 | 111 or 11Z |
| Hospital Inpatient Other (other diagnosis) | 02 | 111 or 11Z |
| Hospital Outpatient | 10 | 131, 13Z, 141 or 14Z |
| Physician | 20 | N/A |

   Interim bills (112, 113, & 114 bill types) are not accepted. If an MA organization receives interim bills, do not submit the hospital inpatient diagnoses until the receipt of the final interim bill (114).

## 4.8   From and Through Dates

* CCYYMMDD is the correct submission format for the "From and Through" dates of service.
* The "Through Date" defines the data used in the data collection year for risk adjustment purposes.

⊠   June 30, 2006 is submitted as 20060630.

Table 4C shows the "From" and "Through Dates" for each provider type.

0840



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**DATA SUBMISSION**

### TABLE 4C – FROM AND THROUGH DATES

| PROVIDER TYPE | FROM DATE | THROUGH DATE |
|---|---|---|
| Hospital Inpatient | Admission Date | Must have a through date and must be the discharge date |
| Hospital Outpatient | Exact date of patient visit or the first date service began for a series of services | Exact date of patient visit or the last date of service for a series of services |
| Physician | | |



When a submitter submits a "From Date" that does not include a "Through Date" for physician or hospital outpatient services, RAPS automatically copies the "From Date" into the "Through Date" field.

### 4.9   Diagnosis Code

- Each relevant (model) diagnosis code must be submitted at least once during a reporting period.
- The decimal is implied in the format.

### 4.10   RAPS Format

Table 4D describes each field of the RAPS file layout.

- The shaded fields in the table represent where the RAPS Return File provides new information after data processes through RAPS.
- There are two diagnosis cluster error fields because MA organizations can receive up to two errors on any diagnosis cluster.

0841



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**DATA SUBMISSION**

### TABLE 4D – RAPS FILE LAYOUT

| RAPS RECORD AAA – FILE HEADER | | | | |
|---|---|---|---|---|
| **FIELD NO** | **POSITION** | **SUBMISSION STATUS** | **FIELD NAME** | **EXPLANATION** |
| 1 | 1-3 | Required | Record ID | File-level information that identifies the submitter. This field should always be populated with "AAA." |
| 2 | 4-9 | Required | Submitter ID | Identifies the submitter and should be populated with the six-digit alphanumeric SH# assigned by CSSC. |
| 3 | 10-19 | Required | File ID | 10-digit alphanumeric character identifying the specific file submitted. This file name may not be repeated within a 12-month period. |
| 4 | 20-27 | Required | Transaction Date | Specifies the date that the file was submitted to Palmetto and formatted as CCYYMMDD. |
| 5 | 28-31 | Required | Production Test Indicator | Must be populated with "PROD" or "TEST." Submission test data proceeds through the entire process. |
| 6 | 32-512 | Spaces | Filler | Must be populated with 481 spaces. The "Filler" field allows for additional fields in the future. |

| RAPS RECORD BBB – BATCH HEADER | | | | |
|---|---|---|---|---|
| **FIELD NO** | **POSITION** | **SUBMISSION STATUS** | **FIELD NAME** | **EXPLANATION** |
| 1 | 1-3 | Required | Record ID | Batch-level information that identifies the MA organization is populated with "BBB." |
| 2 | 4-10 | Required | Sequence Number | This field identifies the batch submitted. The first batch in a file must begin with 0000001. All successive batch sequence numbers in the file must be incremented by one. This is a numeric field. |
| 3 | 11-15 | Required | Plan Number | Identifies the MA organization and should be populated with the five-digit alphanumeric contract assigned by CMS. (H#, R#, etc.) |
| 4 | 16-512 | Spaces | Filler | Must be populated with 497 spaces. The "Filler" field allows for additional fields in the future. |

0842

**TABLE 4D – RAPS FILE LAYOUT (CONTINUED)**

| RAPS RECORD CCC – DETAIL LEVEL | | | | |
|---|---|---|---|---|
| **FIELD NO** | **POSITION** | **SUBMISSION STATUS** | **FIELD NAME** | **EXPLANATION** |
| 1 | 1-3 | Required | Record ID | Detail-level information that identifies the beneficiary information. This field should always be populated with "CCC." |
| 2 | 4-10 | Required | Sequence Number | This field identifies the detail record submitted. The first detail record in a batch must begin with 0000001. All successive detail sequence numbers in the batch must be incremented by one. This is a numeric field. Limited to 1,000,000 per day. |
| 3 | 11-13 | RAPS RETURN | Sequence Number Error Code | This field must be submitted with spaces. Upon return, this field is populated with an error code if RAPS finds an error in the sequence number, or will remain blank if no errors were detected in the sequence number. |
| 4 | 14-53 | Optional | Patient Control Number | This optional field may be used by the MA organization to identify the claim submitted. The field allows up to 40 alphanumeric characters. |
| 5 | 54-78 | Required | HIC | The Health Insurance Claim number for the beneficiary. This is a 25-digit alphanumeric field. Enter spaces, not zeros, in unused spaces. |
| 6 | 79-81 | RAPS RETURN | HIC Error Code | This should be submitted with spaces. Upon return, this field is populated with an error code if RAPS finds an error in the HIC number, or remains blank if no errors were detected in the HIC number. |
| 7 | 82-89 | Optional | Patient DOB | This optional field may be populated with the patient's date of birth and is used to verify that the correct beneficiary identification was submitted. If the field is populated, it must be formatted as CCYYMMDD, and CMS edits this field against the information on file at the MBD. If no DOB is submitted, fill with spaces. |
| 8 | 90-92 | RAPS RETURN | DOB Error Code | This field must be submitted with spaces. Upon return, this field is populated with an error code if RAPS finds an error with DOB, or remains blank if no errors were detected in the DOB. |



## TABLE 4D – RAPS FILE LAYOUT (CONTINUED)

| **RAPS RECORD CCC – DETAIL LEVEL (CONTINUED)** |
|---|---|---|---|---|
| **FIELD NO** | **POSITION** | **SUBMISSION STATUS** | **FIELD NAME** | **EXPLANATION** |
| 9 | 93-412 | DIAGNOSIS-CLUSTER (10 occurrences) |  | The following 8 fields (9.0-9.7) may be repeated 10 times in the same "CCC" record with one diagnosis per cluster. Each diagnosis cluster must contain 32 characters or spaces. Plans must not skip clusters when submitting active diagnosis codes. If there are less than 10 diagnosis clusters the remaining clusters are space filled. If there are more than 10 diagnoses, a new "CCC" record must be established. |
| 9.0 |  | Required | Provider Type | This 2-digit alphanumeric field identifies the site of service provided (01,02,10,20). |
| 9.1 |  | Required | From Date | For hospital inpatient this describes the admission date. For physician and hospital outpatient this describes the date of service. Must be formatted as CCYYMMDD. |
| 9.2 |  | Required | Through Date | For hospital inpatient this describes the discharge date. For physician and hospital outpatient this may be left blank and the system will fill with the "From Date." Must be formatted as CCYYMMDD. |
| 9.3 |  | Conditional | Delete Indicator | This field allows the MA organization to delete a diagnosis, for correction purposes, that has been stored in the RAPS database. Enter a "D" or space. |
| 9.4 |  | Required | Diagnosis Code | This field is populated with the three-to-five-digit ICD-9-CM diagnosis code. The decimal is implied and should not be included (e.g., 42732). |
| 9.5 |  | SPACE | Diagnosis Code Filler | This field is designed to allow space for future ICD-10-CM codes and any other growth in the diagnosis cluster. This field must be populated with spaces. |
| 9.6 |  | RAPS RETURN | Diagnosis Cluster Error 1 | This field must be submitted with spaces. Upon return, this field is populated with one error code if RAPS finds an error in the diagnosis cluster, or remains blank if no errors were detected in the diagnosis cluster. |
| 9.7 |  | RAPS RETURN | Diagnosis Cluster Error 2 | This field must be submitted with spaces. Upon return, this field is populated with one error code if RAPS finds an error in the diagnosis cluster, or remains blank if no errors were detected in the diagnosis cluster. |
| 19 | 413-437 | RAPS RETURN | Corrected HIC number | This field must be submitted with spaces. If the MA organization has submitted an outdated HIC, upon return, this field is populated with the most current HIC number and the "HIC Error" field contains an information error code. |
| 20 | 438-512 | Spaces | Filler | Must be populated with 75 spaces. The "Filler" field allows for additional fields in the future. |

0844



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**DATA SUBMISSION**

## TABLE 4D – RAPS FILE LAYOUT (CONTINUED)

| RAPS RECORD YYY – BATCH TRAILER | | | | |
|---|---|---|---|---|
| **FIELD NO** | **POSITION** | **SUBMISSION STATUS** | **FIELD NAME** | **EXPLANATION** |
| 1 | 1-3 | Required | Record ID | Batch trailer information should be populated with "YYY." |
| 2 | 4-10 | Required | Sequence Number | A 7-digit numeric character identifying the batch submitted. Must match the "BBB" record. |
| 3 | 11-15 | Required | "H" Number | "H" number assigned by CMS to identify the MA organization. Must match the "H" number in the corresponding "BBB" record (i.e., the "BBB" record with the same sequence number). |
| 4 | 16-22 | Required | CCC Record Total | This field should total the number of CCC records in the batch. This field is numeric and should be filled with leading zeroes (e.g., 0000001). Limited to 1,000,000 per day. |
| 5 | 23-512 | Spaces | Filler | Must be populated with 490 spaces. The "Filler" field allows for additional fields in the future. |

| RAPS RECORD ZZZ – FILE TRAILER | | | | |
|---|---|---|---|---|
| **FIELD NO** | **POSITION** | **SUBMISSION STATUS** | **FIELD NAME** | **EXPLANATION** |
| 1 | 1-3 | Required | Record ID | File Trailer Information should be populated with "ZZZ." |
| 2 | 4-9 | Required | Submitter ID | Identifies the submitter and must match the 6-digit alphanumeric SH# in the AAA records. |
| 3 | 10-19 | Required | File ID | 10-digit alphanumeric character identifying the specific file submitted. Must match the File ID in the "AAA" record. |
| 4 | 20-26 | Required | BBB Record Total | This field should total the number of batches in the file. This field is numeric and should be filled with leading zeros (e.g., 0000001). |
| 5 | 27-512 | Required | Filler | Must be populated with 486 spaces. The "Filler" field allows for additional fields in the future. |

0845



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**DATA SUBMISSION**

## 4.11   Filtering Risk Adjustment Data (Slides 13-14)

MA organizations are required to filter risk adjustment data to ensure that they submit data from only appropriate data sources (e.g., hospital inpatient, hospital outpatient, and physician provider types). A filtering process is used to identify the correct provider types in claims and encounter data. CMS further recommends the following filtering guidelines:

- Hospital inpatient data require admission and discharge dates of service from appropriate facilities. **Refer to the Data Collection module** for examples of covered facilities.
- Physician data require face-to-face visits with a professional listed on the CMS specialty list. **Refer to the Data Collection module** for the list of acceptable physician data sources.
- Hospital outpatient data require the most demanding or accurate filtering. Data requirements include diagnoses from appropriate facilities and covered services contained on the CMS covered outpatient listings. **Refer to the Data Collection module** for examples of covered facilities and non-covered services/facilities.

The following over-filtering and under-filtering examples may be useful:

   a)  Hospital Inpatient:
- Over-filtering - Failing to submit data from specialized facilities (e.g., Rehabilitation and Psychiatric Hospitals).
- Under-filtering - Submitting data from interim bills or from non-covered institutional stays (e.g., nursing facility data).

   b)  Hospital Outpatient:
- Over-filtering - Failing to submit data from specialized facilities, particularly those that do not appear on the inpatient provider list (e.g., Rural Health Clinics, Federally Qualified Health Centers) excluding bills with both covered and non-covered procedure codes.
- Under-filtering - Submitting data from non-covered facilities or submitting non-covered services from covered facilities (e.g., laboratory only or radiology only claims).

   c)  Physicians:
- Over-filtering - Failing to capture data from non-physician practitioners that appear on the physician specialty list (e.g., nurse practitioners, physician assistants, etc.).
- Under-filtering - Submitting all paid claims from the claims database, including laboratory, Durable Medical Equipment (DME), ambulance, etc.



For those plans that use CPT codes to screen diagnosis codes submitted to CMS, please note that the CPT range for radiology is 7000 through 79999. The following CPT codes indicate diagnostic radiology and diagnoses on claims and should not be submitted to CMS in risk adjustment data: 70010 through 76999 and 78000 through 78999.

## 4.12   Modifying Risk Adjustment Data (Slide 15)

RAPS allows for the correction of risk adjustment data submitted to CMS. This correction process is based on the concept that the incorrect cluster must be deleted from the system before the correct cluster information is added. For this reason, data correction is at least a two-step process.

0846



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**DATA SUBMISSION**

## 4.13   Deleting Diagnosis Clusters (Slide 16)

Each diagnosis cluster ("Diagnosis Code," "From Date," "Through Date," and "Provider Type") is stored separately as a unique cluster associated with a beneficiary's HIC number. If a diagnosis was submitted in error and needs to be corrected, the original diagnosis cluster must be resubmitted with a delete indicator in the appropriate field. **Delete transactions may only be submitted using the RAPS format or the DDE function.** When a delete record is received, CMS maintains the original diagnosis cluster on file and adds a delete indicator to it and the date of the deletion.

## 4.14   Reasons to Delete a Diagnosis Cluster (Slide 17)

There are three reasons MA organizations may delete a diagnosis cluster:

- Diagnosis cluster submitted erroneously (e.g., data from an interim bill was submitted for hospital inpatient).
- Incorrect HIC number used for submission of a beneficiary's diagnostic information.
- An error in a diagnosis cluster field (i.e., "Provider Type," "Dates of Service," "Diagnosis Code").

MA organizations submit deletions within a file, batch, or record containing previously submitted risk adjustment data.

## 4.15   Steps for Deleting a Diagnosis Cluster (Slides 18-20)

 Before deleting an error, verify that the diagnosis cluster appears on the RAPS Return File. Only diagnosis clusters accepted by RAPS and stored in the RAPS database may be deleted.

There are two methods for deleting diagnosis clusters:

**Method 1 for Deleting Clusters**
1. Submit RAPS format using normal submission process with appropriate HIC number included.
2. Enter information in the diagnosis cluster fields (9.0, 9.1, 9.2, 9.4, 9.5) exactly as it appeared in the original submission.
3. In field 9.3 enter a "D" for delete.
4. Enter the appropriate information in all other records to ensure the submission file is complete.
5. Transmit the file to FERAS. (See www.csscoperations.com for details.)

**Method 2 for Deleting Clusters**
1. Create a file using the DDE screens available through FERAS at Palmetto (detailed information about the DDE process is located in Section 4.20).
2. Enter information exactly as it appeared in the original submission.
3. In the DDE "CCC" record screen, hit the down arrow key and select "D."
4. Proceed with entering all appropriate information.
5. Upload the file created in DDE to FERAS at Palmetto.

0847



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**DATA SUBMISSION**

## 4.16    MA Organization Responsibilities Regarding Deletions (Slide 21)

- MA organizations must submit delete records when an erroneous diagnosis cluster has been accepted by RAPS and stored in the RAPS database.

- If a diagnosis cluster is deleted for the purpose of correcting data, the MA organization is responsible for submitting the correct diagnosis cluster. Conversely, if the MA organization submits corrected data, the MA organization must submit the appropriate deletion record. That is, if the correct diagnosis cluster is submitted, the erroneous diagnosis cluster cannot be ignored.

- If a correction applies to the same beneficiary as the deletion, the correction may be included in the same "CCC" record as the deletion. (Do not exceed 10 diagnosis clusters per "CCC" record.)

- If only one of several clusters within the CCC record requires modification, do not resubmit all other associated clusters.  If clusters are resubmitted exactly the same without the delete indicator, the plans will generate a duplicate cluster error.

- If the corrected diagnosis cluster belongs to a different beneficiary than the deleted diagnosis cluster, the correct diagnosis cluster may be submitted in the same file as the deletion.

    MA organizations should not delete a diagnosis code or record repeatedly on the same day and on the same record. MA organizations should implement a process to ensure that only one instance of a specific diagnosis cluster (either add or delete) is submitted on a given day.

## 4.17    Direct Data Entry (Slide 22)

MA organizations have the option of manually entering diagnostic information via the DDE application offered by Palmetto. DDE instructions are illustrated in the screen shots below. DDE is available in FERAS at Palmetto via the Medicare Data Communications Network (MDCN).

- DDE entries allow for deletion of records for corrections even if another submission format was used.
- The DDE screens, as shown in Figures 4B through 4G, automatically prevent the placement of incorrect data characters (e.g., alpha characters will not be accepted in the "From" or "Through Date" fields).
- After the user has entered all relevant data, the user will click on the "Create File" button in FERAS. This will create a file on the user's local PC.
- After the file is created on the local PC, the user must upload the file to FERAS in order to complete the process.
- Files created in DDE and uploaded to FERAS will receive a FERAS Response Report, which may be downloaded from the MA organization's electronic mailbox.

0848



**Figure 4B – DDE 1**

Front End Risk Adjustment System (FERAS) - Netscape
http://a70tmcoedfs/servlet/Transfers?method=Login
Welcome to the
Front End Risk Adjustment System
(FERAS)
Home
What's New
CMS Publications
File Submissions
Reason Codes
Documents
FAQs
Help
Contact Information
Search
Site Map
Risk Adjustment Submission - Login
Please Log Into The System
User Name:
Password:
Login
Reset
Document: Done

**LOGIN PAGE – Submitters are assigned a User Name and Password to access the DDE application.**

**Figure 4C – DDE 2**

Front End Risk Adjustment System (FERAS) - Netscape
http://a70tmcoedfs/servlet/Builder?method=Create+File
Welcome to the
Front End Risk Adjustment System
(FERAS)
Home
What's New
CMS Publications
File Submissions
Reason Codes
Documents
FAQs
Help
Contact Information
Search
Site Map
Risk Adjustment Submission - Welcome
I am not SH9999 Help
Welcome to the Risk Adjustment Create File Page.
The next few pages will walk you through the data entry, downloading and uploading of your file. Each session consists of building one file from creation to submission.
You will be stepped through the following process:
1. AAA Page - enter data for the AAA record.
2. BBB Page - enter data for the BBB record(s).
3. CCC Page - enter data for the CCC record(s).
4. Edit/Review/View/Build Page - edit, review, view and perform the final build of your file.
5. Download/Upload Page - download your file to your computer and upload your file to the FERAS.
Click the Help button at the top of each page to access the help section.
Click the Start button to begin building your file, or the Cancel button to go back to the main menu.
Document: Done
11:16 AM

**WELCOME PAGE – Submitters are provided instructions on the use of the DDE.**

**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**DATA SUBMISSION**

**Figure 4D – DDE 3**



The file-level information is entered and must begin with RT AAA.

**Figure 4E – DDE 4**



The batch-level information is entered and must begin with RT BBB.

0850



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**DATA SUBMISSION**

**Figure 4F – DDE 5**



The CCC Record allows up to 10 diagnostic clusters.

**Figure 4G – DDE 6**



The file has been uploaded to FERAS.

0851



# MODULE 5 – EDITS

## Purpose (Slide 2)

The risk adjustment process includes an editing stage to ensure the accuracy of the data prior to storing the data for risk adjustment calculation. When Medicare Advantage (MA) organizations understand common errors and steps to prevent such errors, the efficiency of the risk adjustment process is increased. This module introduces participants to the Front-End Risk Adjustment System (FERAS) and the Centers for Medicare & Medicaid Services (CMS) Risk Adjustment Processing System (RAPS) data logic and editing processes. It provides information to assist MA organizations in minimizing data errors and taking appropriate steps in correcting errors that occur.

## Learning Objectives (Slide 3)

At the completion of this module, participants will be able to:

- Interpret the FERAS and the RAPS data integrity logic and error codes.
- Describe the FERAS and RAPS editing processes.
- Recognize common FERAS and RAPS errors and determine action required to avoid or correct them.

| **ICON KEY** | |
|---|---|
| Example | |
| Reminder | |
| Resource | |

## 5.1 Data Flow (Slide 4)

After MA organizations submit data to Palmetto, FERAS performs format and integrity checks on the file and batch levels, as well as on the first and last detail (CCC) record. After the data pass the checks, they are sent to RAPS for complete editing of all detail records before they are stored in the RAPS database.

Files submitted in Test and Production are processed through FERAS and RAPS, and all edits are performed. Test files, however, are not stored in the RAPS database. The flow of data for edit processing is illustrated in Figure 5A.

2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide

**EDITS**

Figure 5A – Data Flow



### 5.1.1 FERAS System (Slide 5)

MA organizations submit data to FERAS, which performs the format and integrity checks.

- FERAS performs format and integrity checks on file- and batch-level data.
- FERAS checks the first and last detail records in each batch.
- FERAS accepts or rejects the entire file.
- FERAS ensures that all accepted transactions contain the following correct data:
  - AAA and ZZZ record.
  - At least one BBB record for each YYY record.
  - Following each BBB record, at least one CCC record with at least one diagnosis cluster populated.
  - Valid submitter ID and plan numbers.
  - Valid record and file totals.
  - The first and last CCC record will be edited to ensure that the submitted data are in the correct location on the record (i.e., spaces are where they should be located).
  - Record Type CCC must be present in the first field.
  - The first sequence number must equal 0000001.
  - The last sequence number must equal the total CCC record count in the YYY record.
  - The "HIC (Health Insurance Claim) Error Code" and "Diagnosis Code – Filler" fields contain spaces. Do not fill fields with zeros.

If all checks pass, the transaction processing continues in RAPS. If any of the data fail, the complete file is rejected.

0853



 **Example: 1**

**Scenario**: The MA organization submitted a file and entered "AA1" in record type AAA, field 1.

**Results:** FERAS will reject the entire file with error message 100. The field must always be populated with "AAA".

Generally, FERAS errors occur during the initial establishment of the system and risk adjustment process in MA organizations. After data are processed, automated formats are programmed, and FERAS errors occur less frequently.

### 5.1.2 FERAS Error Code Logic (Slide 7)

When a FERAS check fails, an associated error code is created. Table 5A describes the error code logic. If any errors occur in FERAS, the complete file is rejected and returned to the submitter after all checks are completed.

**TABLE 5A – FERAS ERROR CODE LOGIC**

| SERIES | EXPLANATION |
|--------|-------------|
| 100 | File-level errors on the AAA or ZZZ records. |
| 200 | Batch-level errors on the BBB or YYY records. |
| 300-400 | Check performed on first and last CCC records. |

- The 100- and 200- series error codes are assigned based on the level of checks that are performed, as well as the location of the edit.
- The entire file is returned to the submitter.

### 5.1.3 FERAS Error Code Ranges (Slide 8)

Error code ranges are explained in Table 5B.

0854



## TABLE 5B - ERROR CODE RANGES

| SERIES | EXPLANATION |
|--------|-------------|
| **100** | Indicates that the system could not determine the record type; all editing stopped at that point. |
| **101-109** | Indicates a failure of a face-validity edit on the AAA record (file-level header). The last digit indicates the specific field in which the error was found. For example, the 101-error code refers to an error found in field 1 on the AAA record. |
| **111-125** | Indicates a failure of a cross-reference edit between a field on the AAA (file-level header) record and a look-up table, a field on another record, or a value calculated from another record. The last digit will indicate the specific AAA field against which the cross-check was performed. For example, the 112-error code indicates that the submitter ID in field 2 did not appear on a look-up table of valid submitter IDs. |
| **151-159** | Indicates a failure of a face-validity edit on the ZZZ record (file-level trailer). The last digit indicates the specific field in which the error was found. For example, the 151-error code refers to an error found in field 1 on the ZZZ record. |
| **161-175** | Indicates a failure of a cross-reference edit between a field on the ZZZ (file-level trailer) record and a look-up table, a field on another record, or a value calculated from another record. The last digit will indicate the specific ZZZ field against which the cross-check was performed. For example, the 162-error code indicates that the submitter ID, field 2 in ZZZ record, does not match the submitter ID on the AAA record. |
| **201-209** | Indicates a failure of a face-validity edit on the BBB (batch-level header) record. The last digit indicates the specific field in which the error was found. For example, the 201-error code refers to an error found in field 1 on the BBB record. |
| **211-225** | Indicates a failure of a cross-reference edit between a field on the BBB (batch-level header) record and a look-up table, a field on another record, or a value calculated from another record. The last digit will indicate the specific BBB field against which the cross-check was performed. For example, the 213-error code indicates that the submitter ID, field 3 in BBB record, is not authorized to submit for the plan ID. |
| **251-259** | Indicates a failure of a face-validity edit on the YYY (batch-level trailer) record. The last digit indicates the specific field in which the error was found. For example, the 251-error code refers to an error found in field 1 in the YYY record. |
| **261- 275** | Indicates a failure of a cross-reference edit between a field on the YYY (batch-level header) record and a look-up table, a field on another record, or a value calculated from another record. The last digit will indicate the specific YYY field against which the cross-check was performed. For example, the 262-error code indicates that the sequence number in the YYY record field 2 does not match the sequence number in field 2. |
| **301-489** | Indicates a format problem with the first or last CCC record. The problem is either with the face validity of the data in specific fields or the presence of data in fields that are required to be blank. In either circumstance, the basic CCC record format is assumed to be in error and the entire file is rejected. |

0855



**Note**: FERAS checks the validity and format of an individual field before performing checks between fields. For example, the system first checks that there is a valid submitter ID on the AAA record before it checks that the submitter ID reported in the YYY record is identical. FERAS file-level, batch-level, and detail-level error codes are described in Table 5C.

### TABLE 5C – FERAS ERROR CODES

#### FILE-LEVEL ERROR CODES

| ERROR CODE | RECORD ID | ERROR DESCRIPTION |
|---|---|---|
| 100 | AAA | INVALID RECORD TYPE |
| 101 | AAA | AAA RECORD MISSING FROM TRANSACTION |
| 102 | AAA | MISSING / INVALID SUBMITTER-ID ON AAA RECORD |
| 103 | AAA | MISSING FILE-ID ON AAA RECORD |
| 104 | AAA | MISSING / INVALID TRANSACTION DATE ON AAA RECORD |
| 105 | AAA | MISSING / INVALID PROD-TEST-INDICATOR ON AAA RECORD |
| 112 | AAA | SUBMITTER ID NOT ON FILE |
| 113 | AAA | FILE NAME DUPLICATES ANOTHER FILE ACCEPTED WITHIN LAST 12 MONTHS |
| 114 | AAA | TRANSACTION DATE IS GREATER THAN CURRENT DATE |
| 151 | ZZZ | ZZZ RECORD MISSING FROM TRANSACTION |
| 152 | ZZZ | MISSING / INVALID SUBMITTER-ID ON ZZZ RECORD |
| 153 | ZZZ | MISSING / INVALID FILE-ID ON ZZZ RECORD |
| 154 | ZZZ | MISSING / INVALID BBB-RECORD-TOTAL |
| 162 | ZZZ | ZZZ SUBMITTER-ID DOES NOT MATCH SUBMITTER-ID ON AAA RECORD |
| 163 | ZZZ | FILE ID DOES NOT MATCH FILE ID ON AAA RECORD |
| 164 | ZZZ | ZZZ VALUE IS NOT EQUAL TO THE NUMBER OF BBB RECORDS |

#### BATCH-LEVEL ERROR CODES

| ERROR CODE | RECORD ID | ERROR DESCRIPTION |
|---|---|---|
| 201 | BBB | BBB RECORD MISSING FROM TRANSACTION |
| 202 | BBB | MISSING / INVALID SEQUENCE NUMBER ON BBB RECORD |
| 203 | BBB | MISSING / INVALID PLAN NUMBER ON BBB RECORD |
| 212 | BBB | SEQUENCE NUMBER ON BBB RECORD IS OUT OF SEQUENCE |
| 213 | BBB | SUBMITTER ID NOT AUTHORIZED TO SUBMIT FOR THIS PLAN ID |
| 251 | YYY | YYY RECORD MISSING FROM TRANSACTION |
| 252 | YYY | MISSING / INVALID SEQUENCE NUMBER ON YYY RECORD |
| 253 | YYY | MISSING / INVALID PLAN NUMBER ON YYY RECORD |
| 254 | YYY | MISSING / INVALID CCC-RECORD-TOTAL |
| 262 | YYY | LAST YYY SEQUENCE NUMBER IS NOT EQUAL TO NUMBER OF YYY RECORDS |
| 263 | YYY | PLAN NUMBER DOES NOT MATCH PLAN NUMBER IN BBB RECORD |
| 264 | YYY | YYY VALUE IS NOT EQUAL TO THE NUMBER OF CCC RECORDS |
| 272 | YYY | SEQUENCE NUMBER ON YYY RECORD IS OUT OF SEQUENCE |

0856



## TABLE 5C – FERAS ERROR CODES (CONTINUED)

### DETAIL-LEVEL ERROR CODES

| ERROR CODE | RECORD ID | ERROR DESCRIPTION |
|---|---|---|
| 301 | CCC | CCC RECORD MISSING FROM TRANSACTION |
| 302 | CCC | MISSING / INVALID SEQ-NO ON CCC RECORD |
| 303 | CCC | SEQUENCE-ERROR-CODE FILLER NOT EQUAL TO SPACES |
| 304 | CCC | HIC-ERROR-CODE FILLER NOT EQUAL TO SPACES |
| 305 | CCC | DOB-ERROR-CODE FILLER NOT EQUAL TO SPACES |
| 306 | CCC | DIAGNOSIS CODE-FILLER NOT EQUAL TO SPACES |
| 307 | CCC | DIAGNOSIS-CLUSTER-ERROR-1 NOT EQUAL TO SPACES |
| 308 | CCC | DIAGNOSIS-CLUSTER-ERROR-2 NOT EQUAL TO SPACES |
| 309 | CCC | SEQUENCE-NUMBER ON CCC RECORD IS OUT OF SEQUENCE |
| 310 | CCC | MISSING / INVALID HIC-NO ON CCC RECORD |
| 311 | CCC | AT LEAST ONE DIAGNOSIS CLUSTER REQUIRED ON TRANSACTION |
| 313 | CCC | DELETE-INDICATOR MUST BE BLANK OR EQUAL TO "D" |
| 314 | CCC | INVALID DIAGNOSIS CODE FORMAT ON CCC RECORD |
| 315 | CCC | CORRECTED HIC NOT EQUAL TO SPACES |
| 350 | CCC | INVALID PATIENT-DOB ON CCC RECORD |
| 400 | CCC | MISSING / INVALID PROVIDER-TYPE ON CCC RECORD |
| 401 | CCC | INVALID FROM-DATE ON CCC RECORD |
| 402 | CCC | INVALID THRU-DATE ON CCC RECORD |

  **Example: 2**

> **Scenario**: The MA organization submitted a file with a 2.0 in the "Diagnosis Code – Filler"
> field on the first CCC record.
>
> **Results:** FERAS would reject the complete file due to data being placed in the "Diagnosis
> Code – Filler" field of the diagnosis cluster; it must be populated with spaces. FERAS would
> identify this error, since it occurred in the first CCC record.

> FERAS errors rarely occur after MA organizations program file layouts and adequately test the
> formats before submission to CMS.

### 5.1.4  RAPS Edits (Slide 10)

After data pass the FERAS checks, the file is sent via Connect: Direct to the CMS data center for RAPS
processing.

- As a precautionary measure, RAPS performs balancing checks to ensure that the complete file was
received from Palmetto prior to editing data.



- The RAPS system performs editing on the CCC transactions.

- The data elements edited include HIC Number, Provider Type, Diagnosis Code, From Date, and Through Date.

- If Date of Birth is submitted, RAPS performs an edit on that field.

### 5.1.5  RAPS Editing Rules

The RAPS editing process takes place in four logical stages.

#### Stage 1- Field Validity and Integrity Edits (Slide 11)

RAPS performs format and integrity checks on all CCC-level fields as a first level of editing. If there are data in the "HIC Error Code" or "Diagnosis Code - Filler" fields, the entire detail record is rejected with no further editing performed. If a record fails this stage of editing, it is assumed that the data are corrupt.

The dates also are checked at this stage. If the dates within a diagnosis cluster are not valid dates, then RAPS stops the editing process for that diagnosis cluster because all other data edits within a diagnosis cluster depend upon the validity of the dates.

#### Stage 2 - Field-to-Field Edits (Slide 12)

After RAPS checks format and integrity of the fields, the field-to-field editing takes place.

- RAPS ensures that the from date is equal or prior to the through date.

- RAPS also checks all diagnosis clusters for hospital outpatient and physician provider types to ensure compliance with the 31-day span rule.

- RAPS checks all data to make certain that MA organizations submit the reconciliation data properly. See Submission Timetable in Module 2 (Risk Adjustment Process Overview) for dates of service included in each data submission period.

#### Stage 3 - Eligibility Edits (Slides 13)

The next stage of editing cross-checks the appropriate fields against the common tables in MBD and MARx. MA organizations may access MBD through the common user interface, Medicare Advantage & Part D Inquiry System. For risk adjustment purposes, these common tables are the authoritative source of beneficiary information, and supports managed care enrollments to MA organizations.

In this editing stage, the HIC number, date of birth, and Medicare entitlement are checked. For example, in Stage 1 editing, the system ensured that a valid HIC number was present in field 5 of the CCC record. In Stage 3 editing, the system makes certain that the HIC number exists on the common tables.



Figure 5B illustrates the flow of data between MARx and MBD and RAPS.

**Figure 5B —Flow of Data for Eligibility Checks**



The HIC number is a common way to begin researching data in the common tables.

*   The common tables store historical data on file, so if a beneficiary's HIC number changed, the common tables will cross-reference the old and new numbers.
*   Railroad Retirement Board (RRB) beneficiary numbers are cross-referenced automatically. This allows users to research demographic and eligibility information for beneficiaries with RRB and HIC numbers.

## Stage 4 – Diagnosis Code Edits (Slide 14)

After RAPS edits the integrity of the individual fields and validates the HIC number and eligibility, it edits the diagnosis code against the Diagnosis Lookup Table in RAPS. In this stage, the system first ensures that each diagnosis code is valid. Then the system checks each diagnosis code against service dates and gender. If any of these edits fail, the diagnosis cluster is not stored in the RAPS database. The edits at this stage also include an edit to check if the diagnosis code is in the risk adjustment model. If the diagnosis code is not in the model, an information error is returned. The diagnosis cluster is stored if an information-only error is returned, and no further action by the MA organization is required.

Explanations of error codes and their consequences, RAPS error codes, informational edits, and duplicate diagnosis cluster edit are presented in Tables 5D, 5E, 5F, and 5G, respectively.



### TABLE 5D – EXPLANATION OF ERROR AND CONSEQUENCES

| SERIES | EXPLANATION OF ERROR AND CONSEQUENCES |
|--------|----------------------------------------|
| 300-349 | Record-level error. The record was bypassed and all editing was discontinued. No diagnosis clusters from this record were stored. |
| 350-399 | Record-level error. All possible edits were performed, but no diagnosis clusters from this record were stored. |
| 400-489 | Diagnosis cluster error. All possible diagnosis edits were performed, but the diagnosis cluster is not stored. |
| 490-499 | Diagnosis delete error; diagnosis was not deleted. |
| 500-599 | Informational message, all edits were performed; diagnosis cluster was stored unless some other error is noted. |

### TABLE 5E – RAPS ERROR CODES

| ERROR CODE | RECORD ID | ERROR DESCRIPTION |
|------------|-----------|-------------------|
| 301 | CCC | CCC RECORD MISSING FROM TRANSACTION |
| 302 | CCC | MISSING / INVALID SEQUENCE-NUMBER ON CCC RECORD |
| 303 | CCC | SEQUENCE-ERROR-CODE FILLER NOT EQUAL TO SPACES |
| 304 | CCC | HIC-ERROR-CODE FILLER NOT EQUAL TO SPACES |
| 305 | CCC | DOB-ERROR-CODE FILLER NOT EQUAL TO SPACES |
| 306 | CCC | DIAGNOSIS CODE FILLER NOT EQUAL TO SPACES |
| 307 | CCC | DIAGNOSIS-CLUSTER-ERROR-1 NOT EQUAL TO SPACES |
| 308 | CCC | DIAGNOSIS-CLUSTER-ERROR-2 NOT EQUAL TO SPACES |
| 309 | CCC | SEQUENCE-NUMBER ON CCC RECORD IS OUT OF SEQUENCE |
| 310 | CCC | MISSING / INVALID HIC-NUMBER ON CCC RECORD |
| 311 | CCC | AT LEAST ONE DIAGNOSIS CLUSTER REQUIRED ON TRANSACTION |
| 313 | CCC | DELETE-INDICATOR MUST EQUAL SPACE OR "D" FOR DELETE |
| 314 | CCC | INVALID DIAGNOSIS CODE FORMAT ON CCC RECORD |
| 315 | CCC | CORRECTED HIC NOT EQUAL TO SPACES |
| 350 | CCC | INVALID PATIENT-DOB ON CCC RECORD |
| 353 | CCC | HIC NUMBER DOES NOT EXIST ON MBD |
| 354 | CCC | PATIENT DOB DOES NOT MATCH WITH MBD DOB |

0860



### TABLE 5E – RAPS ERROR CODES (CONTINUED)

| ERROR CODE | RECORD ID | ERROR DESCRIPTION |
|---|---|---|
| 400 | CCC | MISSING / INVALID PROVIDER-TYPE CODE ON CCC RECORD |
| 401 | CCC | INVALID SERVICE FROM-DATE ON CCC RECORD |
| 402 | CCC | INVALID SERVICE THROUGH-DATE ON CCC RECORD |
| 403 | CCC | SERVICE THROUGH-DATE MUST BE GREATER THAN 12/31/2004 |
| 404 | CCC | SERVICE FROM-DATE MUST BE LESS THAN OR EQUAL TO THROUGH-DATE |
| 405 | CCC | DOB IS GREATER THAN SERVICE FROM-DATE |
| 406 | CCC | SERVICE FROM-DATE IS NOT WITHIN MEDICARE ENTITLEMENT PERIOD |
| 407 | CCC | SERVICE THROUGH-DATE IS NOT WITHIN MEDICARE ENTITLEMENT PERIOD |
| 408 | CCC | SERVICE FROM-DATE IS NOT WITHIN MA ORG ENROLLMENT PERIOD |
| 409 | CCC | SERVICE THROUGH-DATE IS NOT WITHIN MA ORG ENROLLMENT PERIOD |
| 410 | CCC | BENEFICIARY IS NOT ENROLLED IN PLAN ON OR AFTER SERVICE FROM-DATE |
| 411 | CCC | SERVICE THROUGH-DATE IS GREATER THAN DATE OF DEATH |
| 412 | CCC | SERVICE FROM-DATE GREATER THAN TRANSACTION DATE |
| 413 | CCC | SERVICE THROUGH-DATE GREATER THAN TRANSACTION DATE |
| 450 | CCC | DIAGNOSIS DOES NOT EXIST FOR THIS SERVICE THROUGH-DATE |
| 451 | CCC | SERVICE THROUGH-DATE IS GREATER THAN DIAGNOSIS END DATE |
| 453 | CCC | DIAGNOSIS CODE IS NOT APPROPRIATE FOR PATIENT SEX |
| 454 | CCC | DIAGNOSIS IS VALID, BUT IS NOT SUFFICIENTLY SPECIFIC FOR RISK ADJUSTMENT GROUPING |
| 455 | CCC | DIAGNOSIS CLUSTER NOT EDITED DUE TO RECORD FORMAT ERROR |
| 460 | CCC | SERVICE FROM- AND THROUGH-DATE SPAN IS GREATER THAN 31 DAYS |
| 490 | CCC | COULD NOT DELETE, DIAGNOSIS CLUSTER NOT IN RAPS DATABASE BENEFICIARY RECORD |
| 491 | CCC | DELETE ERROR, DIAGNOSIS CLUSTER PREVIOUSLY DELETED |
| 492 | CCC | DELETE ERROR, DIAGNOSIS CLUSTER WAS NOT DELETED. A DIAGNOSIS CLUSTER WITH THE SAME ATTRIBUTES WAS ALREADY DELETED FROM THE RAPS DATABASE ON THIS DATE |

### TABLE 5F – INFORMATIONAL EDITS

| ERROR CODE | RECORD ID | ERROR DESCRIPTION |
|---|---|---|
| 500 | CCC | BENEFICIARY HIC NUMBER HAS CHANGED ACCORDING TO CMS RECORDS; USE CORRECT HIC NUMBER FOR FUTURE SUBMISSIONS |
| 501 | CCC | VALID DIAGNOSIS BUT NOT A RELEVANT DIAGNOSIS FOR RISK ADJUSTMENT DURING THIS SERVICE PERIOD |

0861



**TABLE 5G – DUPLICATE DIAGNOSIS CLUSTER EDIT**

| ERROR CODE | RECORD ID | ERROR DESCRIPTION |
|---|---|---|
| 502 | CCC | DIAGNOSIS CLUSTER WAS ACCEPTED BUT NOT STORED. A DIAGNOSIS CLUSTER WITH THE SAME ATTRIBUTES IS ALREADY STORED IN THE RAPS DATABASE |

⊠  **Example: 3**

**Scenario**: The Low Rest Insurance Company submitted a risk adjustment transaction for Susan Doe who was admitted into the hospital. The principal diagnosis submitted was 601.0 for acute prostatitis.

**Results:** The error code 453 would occur. The system checked that the diagnosis field was complete. Next, the system verified that the HIC number was entered. RAPS then verified that the HIC number was on the common tables and the beneficiary was eligible. The diagnosis was determined to be a valid diagnosis. However, the diagnosis was not valid for the sex. This diagnosis cluster was rejected and not stored in the RAPS database.

## 5.2    Resolving Error Codes

CMS began accepting risk adjustment data in FERAS and processing data through RAPS in October 2002. While the error rate is less than one percent, there are several errors that represent the majority of the common errors seen.

### 5.2.1 Resolution Steps (Slide 17)

It is the MA organization's responsibility to resolve errors that CMS identifies. Described below in Figure 5C are the basic steps required to resolve errors. If inaccurate data are the cause of the error, the organization must submit a new record with corrected information to resolve the error.

**Figure 5C – Resolution Steps**

Determine the error level of the code to identify the nature of the problem.

See Tables 6A and 6D – Explanation of Error and Consequences.

→ Look up the error code and read the associated message.

See FERAS and RAPS Error Code Job Aids.

→ Based on error message, determine the next step.

→ Take steps to resolve the error.

0862



 System problems may occur when MA organizations submit and delete the same diagnosis cluster several times on the same day. The error code 492 will occur if the organization tries to delete the same cluster more than once.

 **Example: 4**

> **Scenario**: John Smart at BaseCare Health Plan deleted a diagnosis cluster. Later the same day, he mistakenly added the same cluster using Direct Data Entry (DDE). Realizing his mistake, John immediately attempted to delete this cluster using DDE.
>
> **Results:** The error code 492 occurs, indicating that (1) the diagnosis cluster was not successfully deleted and (2) that the cluster is already stored as a delete and another delete is not necessary.

Effective January 3, 2006, new error code 455 was added to the RAPS Error Codes list. The message reads "Diagnosis cluster not edited due to record format error. " The diagnosis cluster is not stored. A plan will receive this error if the plan leaves a cluster blank within a CCC record, and then populates the next cluster. Error code 455 clusters may occur with, or after, the first blank diagnosis cluster. Blank clusters will not receive a 455 error.

When a submitter receives a 455-error code, "Diagnosis Cluster Not Edited Due to Record Format Error", the following steps should be taken:

- Since this is a 400-level error code message, the submitter will refer to the diagnosis cluster.

- The error code series 400-489 indicates that all possible diagnosis edits were performed but the diagnosis cluster is not stored.

- The submitter should ensure that the CCC record contains valid clusters, left justified in the record, followed by blank clusters.

- Resubmit following correction.

**Note**: A 455 error will not occur with error codes 302 through 315. These error codes indicate the CCC record is not valid.

 **Example: 5**

> **Scenario:** Horizon Valley Health Plan submitted eight diagnosis clusters. However, the fifth diagnosis cluster was a blank cluster.
>
> **Results:** Error code 455 occurs. All of the diagnosis clusters following the blank cluster received the error code 455. All possible diagnosis edits were performed, but the diagnosis clusters were not stored.

0863



## 5.2.2  Informational Error Messages

RAPS generates informational messages that do not stop processing of data, i.e., no immediate action is necessary. However, these messages, illustrated in Table 5H, provide MA organizations with information to improve future submissions.

### TABLE 5H – INFORMATIONAL MESSAGE CODES

| ERROR CODE | RECORD ID | ERROR DESCRIPTION | PROCESS IMPROVEMENT |
|---|---|---|---|
| 500 | CCC | BENEFICIARY HIC NUMBER HAS CHANGED ACCORDING TO CMS RECORDS; USE CORRECT HIC NUMBER FOR FUTURE SUBMISSIONS. | USE UPDATED HIC NUMBER ON ALL FUTURE SUBMISSIONS FOR THIS BENEFICIARY. |
| 501 | CCC | VALID DIAGNOSIS BUT NOT A RELEVANT DIAGNOSIS FOR RISK ADJUSTMENT DURING THIS SERVICE PERIOD. | DETERMINE IF FILTERING SHOULD BE INCORPORATED INTO SUBMISSION PROCESS TO REDUCE NUMBER OF 501 MESSAGES. |

## 5.2.3  Duplicate Diagnosis Cluster Error and 5 Percent Benchmark

CMS has put a 5 percent benchmark requirement in place for 502 errors, "Diagnosis cluster was accepted but not stored. A diagnosis cluster with the same attributes is already stored in the RAPS database," CMS monitors plans with error rates that exceed the benchmark. CMS defines a duplicate submission as a diagnosis cluster with the same attributes (provider type, from date, through date, diagnosis code, and HIC number) that are already stored in the RAPS database.

Each duplicate cluster that receives a 502-error code counts toward the 5 percent benchmark. For example, if a record included 10 diagnosis clusters and each one was a duplicate of another cluster, there would be 10 502-error codes and all 10 would count towards the 5 percent benchmark.

CMS will look at the overall metrics per file, as this is the easiest way to measure the benchmark. CMS will look at files on a weekly basis to determine volume and the number of duplicates the plan receives to determine if a compliance letter needs to be sent.

If the submitter is a third party and the file contains records for multiple plans, the review will occur at the plan level within the file. Table 5I provides examples of how CMS reviews plan submissions against the benchmark.



## TABLE 5I – 502 BENCHMARK COMPARISON EXAMPLES

| EXAMPLE NUMBER | EXAMPLE DESCRIPTION |
|---|---|
| 1 | If a plan submitted one file in a given week with two records and they were duplicates, the plan would have a 100% duplicate rate, but with only two records. |
| 2 | Afterwards, the plan submitted additional files that had 10,000 records and a 2% duplicate rate. In this case, CMS would not send this plan a compliance letter. |
| 3 | If, on the other hand, a plan submitted a file with 2 million records and 1 million of them were duplicates, CMS would send a compliance letter. |

Submitters should consider establishing an automated system or a process that checks previously submitted files for accepted diagnosis clusters in order to minimize or eliminate the resubmission of duplicate diagnosis clusters.

While this is an informational error and does not require action in terms of correcting an error, it is critical that plans self-monitor their submissions so that they do not exceed the 5 percent benchmark requirement on 502 errors. Table 5J provides tips to ensure plans are compliant with the guidance on the 5 percent benchmark for duplicate diagnosis cluster errors.

## TABLE 5J – TIPS FOR ENSURING COMPLIANCE WITH THE 5 PERCENT BENCHMARK FOR DUPLICATE DIAGNOSIS CLUSTER ERROR GUIDANCE

| TIP | DESCRIPTION |
|---|---|
| **Tip 1: Identify a Duplicate Diagnosis Cluster** | CMS defines a Duplicate Diagnosis Cluster as one that shares all of the same attributes (HIC Number, Provider Type, From and Through Dates and Diagnosis) as one previously submitted and stored in the RAPS database. |
| **Tip 2: Review Your Reports** | Review your current and previous RAPS Return Files to determine which clusters were stored. If the cluster was stored, do not resubmit. |
| **Tip 3: Understand Error Resolution** | If you are resolving an error, you do not necessarily need to resubmit all clusters included in the record. If you are resolving a 300-level error, this indicates that none of the diagnosis clusters were stored because there was a record level error. If this is the case, you will need to resubmit all clusters associated with the record. This would not create a duplicate diagnosis because none of the records were previously stored. If you are resolving a 400-level error, this indicates that a specific diagnosis cluster was not stored. You should only resubmit the specific cluster that resulted in the 400-level error message. *Do not* resubmit all clusters within the record. If there were ten clusters within the record, but you received a 400-level error message on only two of the clusters, you should only resubmit the two clusters where the error occurred. |
| **Tip 4: Understanding Modifying Data** | In the case of self-identified errors, those not reported as an error on the RAPS reports, you should be careful to only resubmit the diagnosis clusters that require a modification. If you submit a record with eight clusters, but the following week you realize that the date of service was incorrect in one of the clusters, you would submit that specific cluster with a "D" in the delete indicator field, and submit a new cluster with the correct date. Resubmitting all of the remaining seven clusters would create seven duplicates. |

0865

Use the tips above to assist your plan in reducing or eliminating the submission of duplicate diagnosis clusters to avoid implications that may result in suspension of data submission privileges and ultimately impact your payments.

 **Example: 6**

**Scenario:** Blue Health Plan submitted a CCC record with five diagnosis clusters in which the third diagnosis cluster has an invalid HIC number. Blue Health Plan also submitted a CCC record with seven diagnosis clusters in which the sixth diagnosis cluster received an error indicating the diagnosis was not appropriate for the patient sex.

**Results:**

The CCC record with the five diagnosis clusters received a record level error, error code 310 on the third cluster. This means that the diagnosis clusters were not stored for this CCC record and all the diagnosis clusters in this record should be resubmitted.

The CCC record with the seven diagnosis clusters received a cluster level error, error code 453 on the sixth cluster. The only cluster not accepted and stored from this CCC record is the sixth cluster. Therefore, the only cluster that should be resubmitted by Blue Health Plan is the sixth cluster, the one that received the error. Resubmitting the other diagnosis clusters that were accepted and stored would result in the Blue Health Plan receiving error code 502 for submitting duplicate diagnosis clusters. This would count against the plan's 5% benchmark.

### 5.2.4 Common Errors (Slide 22)

In an effort to prevent common errors, the next section describes the errors and steps that MA organizations may take to minimize their occurrence.

#### 5.2.4.1 File Name Duplicates Another File Accepted Within Last 12 Months

To identify the unique file that has been accepted, CMS requires that all files include a 10-digit alpha-numeric file ID. This file ID is required when submitting test or production data. Once a file ID has been submitted and accepted in test or production, the same file ID may not be submitted on any other files within 12 months.

In addition, if a file ID was accepted in encounter data processing prior to October 2003, the file ID should not be used for Risk Adjustment processing within 12 months. FERAS performs an edit of the entire 10-digit file number, therefore submitters should make certain that those digits are unique.



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**EDITS**

 **Example: 7**

SenCare Health Plan submitted an encounter data hospital inpatient production file in August 2002 and an encounter data physician test file in August 2002. The plan cannot submit both files with the same file ID within 12 consecutive months (between August 2002 and August 2003).

## Prevention

Submitters should consider establishing an automated system to assign a file sequence number during the establishment of the data file.

## Correction

When a submitter receives a 113-error code, "File name duplicates another file accepted within the last 12 months", the following steps should be taken:

- Since this is a 100-level error code message, the submitter will refer to the AAA record.
- The error code 11**3**, describes the field within the AAA record that must be corrected.
- The submitter must enter a valid 10-digit file ID in AAA 3.
- The file must be resubmitted following correction.

 Since this file was rejected by FERAS, it will not be processed in RAPS until the data are corrected.

### 5.2.4.2    Delete Error, Diagnosis Cluster Previously Deleted

When a plan submits a delete and RAPS accepts it, the cluster is not physically deleted from the RAPS database. The RAPS database stores a "D" in the delete indicator and enters a delete date to indicate when the diagnosis was deleted. If a plan tries to delete the exact same diagnosis cluster at a later time, the system will generate a 491-error code, informing the plan that the cluster was already deleted.

## Prevention

This issue normally occurs when plans delete all clusters from a previously submitted file, and the original file included duplicate diagnosis clusters. One way to prevent the errors is to check for duplicate diagnosis clusters prior to submitting the file with the deletes on it.

## Correction

There is no corrective action necessary because the 491-error code indicates that the cluster has already been deleted.

0867



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**EDITS**

### 5.2.4.3 Diagnosis Cluster Not Successfully Deleted. Another Diagnosis Cluster With the Same Attributes Was Already Deleted From the RAPS Database On This Date

When plans submit delete records, the "D" indicator and the delete date become part of the unique database key for the diagnosis cluster. Diagnosis clusters must have one unique attribute in the database key in order to be stored. The 492-error code occurs when a plan deletes, adds, and then attempts to delete the exact same cluster during a single processing day. The delete will successfully process, as will the following add transaction. The add transaction will create a new record for this diagnosis cluster. The second delete cannot process, since accepting the second delete will cause the creation of a duplicate record in the RAPS database. This error is different from the 491 in that the last record on file will be the add record; that is, the diagnosis cluster has not been successfully deleted.

#### Prevention

Again, this error normally occurs when plans submit large files of correction records. Plans should check when deleting records that they are not adding the exact same cluster in the same file, or on different files on the same day. If a plan detects multiple submissions of the same diagnosis cluster, the plan should determine the final status of the cluster, deleted or active, and take appropriate action.

#### Correction

When a submitter receives a 492-error code, "Diagnosis Cluster Not Successfully Deleted", the following steps should be taken:

• Since this is a 400-level error code message, the submitter will refer to the CCC record.

• The error code series 490-499 indicates that it is a deletion problem.

• The submitter must determine if the diagnosis cluster should be deleted or active as a final action.

• If the cluster should be active, no further action is required.

• If the diagnosis is supposed to be deleted, the plan must submit one delete record. Since any future submissions will have a different delete date than any other clusters on file, a single delete record will successfully process.

### 5.2.4.4 Service From Date Is Not Within MA Organization Enrollment

MA organizations can reduce the numbers of errors that are returned due to invalid eligibility by accessing the common user interface to determine eligibility and other demographic information stored on the common tables. Implementing the following procedures can reduce time spent on resolving errors.

• Develop a monthly validation protocol verifying eligibility of MA organization enrollees.
• Program internal information systems that cross check the common tables before submitting data to FERAS.



The Beneficiary Eligibility and Beneficiary Detail screens in the common user interface provide information that supports the MA risk adjustment requirements. The information includes:

- Date of birth.
- HIC Number.
- Medicare effective date.
- Medicare termination date.

**Note:** MA organizations can manually research each beneficiary online or electronically research beneficiaries in batches using the Batch Eligibility Query Request File.

The beneficiary receiving services under the MA program must be enrolled in Medicare during the service period. The dates of service reported in the diagnosis clusters must be within the enrollment dates that are posted on the common tables. RAPS cross-references the common tables to verify that the beneficiary was covered during the identified from and through dates of service. Prior to March 2003, MA organizations received the 408- and 409-error codes to reflect data inconsistencies between various CMS systems.

 The 408-error code occurs with all data. The 409-error code occurs only with hospital outpatient and physician data.

### Prevention

Submitters should check the from and through dates of service against internal enrollment records. Remember that for hospital outpatient and physician data, both the from and through dates must be within MA enrollment periods. For hospital inpatient data, only the from dates must be within MA enrollment periods. Performing these pre-edits will minimize the number of errors received regarding enrollment information.

### Correction

When a submitter receives a 408-error code "Service from date is not within MA organization enrollment period", or a 409-error code "Service through date is not within MA organization enrollment period", the following steps should be taken:

- Since this is a 400-level error code message, the submitter will refer to the diagnosis cluster.

- The submitter must ensure that the correct service from date was entered in CCC 9.1.

- The submitter must ensure that the correct service through date was entered in CCC 9.2.

- The submitter should check these dates against the plan enrollment dates in the common tables.

- If the submitter determines that there are discrepancies in the data in CMS systems, contact CSSC.

- If the CSSC determines that the common tables require updated plan enrollment data, resubmit the data after CSSC corrects the data.

0869



 Since this is not a format or integrity edit, this error will not be detected in FERAS; therefore, DDE users may encounter this error. When this is detected in RAPS, the problem must be corrected in order to store any diagnosis clusters associated with this record.

## 5.2.4.5    Beneficiary Is Not Enrolled In Plan On or After Service From Date

Beneficiaries must be enrolled in the plan on or after the date of the service provided.

### Prevention

Using information from the monthly membership report and internal enrollment files, submitters should be knowledgeable regarding the enrollment and eligibility of their beneficiaries. Establishing a systematic beneficiary enrollment tracking system will reduce the number of errors associated with this edit.

 The 408- and 409-error code messages indicate that the service occurred while the beneficiary was not participating in *any* MA program. The 410-error code message indicates that the service occurred while the beneficiary was not enrolled in *your* organization.

### Correction

When a submitter receives a 410-error code "Beneficiary is not enrolled in plan on or after service from date", the following steps should be taken:

- Since this is a 400-level error code message, the submitter will refer to the diagnosis cluster.

- The submitter must ensure that the correct service from date was entered in CCC 9.1.

- The submitter should check the service from date against the plan enrollment dates to confirm that the beneficiary was enrolled in this plan on or after the from date.

- If the submitter determines that there are discrepancies in the data in CMS systems, contact CSSC.

- If CSSC determines that the common tables require updated plan enrollment data, resubmit after CSSC corrects the data.

 Since this is not a format or integrity edit, this error will not be detected in FERAS; therefore, DDE users may encounter this error. When this is detected in RAPS, the problem must be corrected in order to store any diagnosis clusters associated with this record.



## MODULE 6 – DIAGNOSIS CODES & RISK ADJUSTMENT

### Purpose

It is neither the intention of this module nor the purpose of this training to provide diagnostic coding training. However, this module does provide Risk Adjustment organizations with an introduction to diagnosis coding and stresses the importance of accurate diagnosis documentation and coding for risk adjustment. The module first explains the structure and layout of the official Centers for Medicare & Medicaid Services (CMS) diagnosis coding set-- the International Classification of Diseases, 9th Revision, Clinical Modification (ICD-9-CM). The module also discusses the diagnosis coding guidelines that apply to the ICD-9-CM, and how following these guidelines ensures accurate risk adjustment. The module demonstrates how verification of compliance with coding guidelines depends upon accurate documentation in the medical record. Finally, the module provides information to assist MA organizations in communicating with their physicians regarding proper documentation and diagnosis coding.

### Learning Objectives

At the completion of this module, participants will be able to:

- Identify the background, key terms, and organization of ICD-9-CM.
- Describe the coding update process, recent and proposed changes impacting risk adjustment, and the status of ICD-10-CM.
- Apply official coding guidelines to common Medicare diagnoses and understand the impact on associated Hierarchical Condition Category (HCC) assignment.
- Define and identify V codes and E codes in the HCC model.
- Describe the importance of ICD-9-CM and medical record documentation to risk adjustment.
- Identify resources available for additional training and policy formation regarding documentation and coding.



| ICON KEY | |
|---|---|
| Example | ⊠ |
| Reminder | 🔍 |
| Resource | 📖 |

### 6.1    Introduction

Medicare uses ICD-9-CM as the official diagnosis code set for all lines of business including determination of risk adjustment factors. MA organizations must:

- Implement procedures to ensure that diagnoses are coming from physician, hospital inpatient, or hospital outpatient provider types.

- Submit all relevant ICD-9-CM diagnosis codes for each beneficiary.

- Submit unique diagnoses at least once during the risk adjustment data reporting period.

0871



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**DIAGNOSIS CODES & RISK ADJUSTMENT**

The source medical record documentation that supports each coded diagnosis must be obtainable and demonstrate adherence to official coding guidelines.

 Relevant diagnoses are defined as those diagnoses collected from one of the three provider types that are used in the Risk Adjustment models (i.e., CMS-HCC, ESRD and RxHCC models).

This module emphasizes physician documentation and reporting of diagnosis codes. Historically, physician reimbursement in fee-for-service is primarily based on procedures or services rather than diagnoses, and physicians are very familiar with documentation guidelines for procedures and services. Physicians generally are not as familiar with diagnosis codes and their associated documentation guidelines as they are with procedure coding rules. The Risk Adjustment models depend upon accurate diagnosis coding, which means that physicians must fully understand and comply with documentation and coding guidelines for reporting diagnoses.

### 6.1.1  Benefit to the MA Organization and Physician

Benefits to the MA organization and physician are illustrated in Table 6A.

**TABLE 6A – BENEFITS TO MA ORGANIZATIONS AND PHYSICIANS**

| A basic understanding of ICD-9-CM process and guidelines assists MA organizations in: |
|---|
| • Interpreting and designing management reports. |
| • Determining possible causes of ICD-9-CM errors. |
| • Communicating diagnosis-related collection issues to the provider staff. |
| Developing and maintaining information systems that meet the clinical data collection needs of the organization. |
| • Understanding clinical issues important to beneficiaries. |
| • Planning for future MA organization services. |
| **Medical record documentation and coding impact several issues important to the physician and MA organization including:** |
| • Accurate reimbursement. |
|    – ICD-9-CM codes are the basis of the Risk Adjustment models. |
|    – Accurate diagnosis codes are a result of clear, consistent, and complete documentation. |
|    – CMS may verify the accuracy of the diagnoses submitted relative to the medical record documentation. |
| • Communication among all members of the health care team. |
| • Evaluation of the care provided. |
| • Research and education. |
| • Practice patterns. |

### 6.2  Structure and Terminology of ICD-9-CM

ICD-9-CM diagnosis codes are 3- to 5-digit codes used to describe the clinical reason for a patient's treatment. They do not describe the service performed, just the patient's medical condition. For any classification system to be reliable, the application of the codes must be consistent across users.

0872



Therefore, CMS, the American Hospital Association (AHA), the American Health Information Management Association (AHIMA), and the National Center for Health Statistics (NCHS) together have developed official coding guidelines. These guidelines are available on:
www.cdc.gov/nchs/data/icd9/icdguide.pdf. The diagnosis portion of ICD-9-CM consists of two volumes: the Disease Tabular and the Disease Index.

- **The Disease Tabular (Numeric)** is also known as Volume I of ICD-9-CM. It is a numeric listing of codes organized primarily by body system. The Disease Tabular provides much more detail than the Alphabetic Index on conditions included and excluded in the code selected. Another code in the same category may represent the diagnostic description better than the one indicated in the Disease Index.

- **The Disease Index (Alphabetic)** is also known as Volume II of ICD-9-CM. It is an index of all diseases and injuries categorized in ICD-9-CM. When a code is listed after the description, it means the reader should look up that code in the Disease Tabular section to determine if that is the most specific code to describe the diagnosis. The index is organized by main terms and subterms that further describes or specifies the main term. In general, the main term is the condition, disease, symptom, or eponym (i.e., disease named after a person), not the organ or body system involved.

### 6.2.1  Special Notes and Abbreviations

Throughout ICD-9-CM, there are notes and cross references to assist the coder in arriving at the most accurate code according to official coding guidelines. Examples include:

*Excludes* notes: Informs the coder which diagnosis codes are not included in the code selected.

*Use Additional Code* note:  Informs the coder that more than one code is needed to fully describe the condition and gives examples of common associated conditions.

*Not otherwise specified (NOS):*  Basically means "unspecified." The documentation does not provide additional information to assign a more specific code in the particular category. In many (but not all) code categories, the fourth digit "9" signifies an unspecified code.

*Not elsewhere classified (NEC)* also is present in ICD-9-CM. It is used when the medical record documents a condition to a level of specificity not identified by a specific ICD-9-CM code. In some cases the fifth digit "8" represents an NEC code.

### 6.2.2  Supplemental Classifications and Tables

Included in Volumes I and II are supplemental classifications and special tables that provide additional guidance in determining the most accurate code.

- **V codes** are a section of ICD-9-CM diagnosis codes that represent factors that influence health status or describe contact with health services. They are used to describe those circumstances or reasons for encounter other than for disease or injury. Selected V codes are included in the Risk Adjustment models and are described later in this module.



- **E codes** are a supplemental classification included in ICD-9-CM and are used for reporting external causes of injuries and poisonings. The Risk Adjustment models include codes E950-E959, describing suicide or self-inflicted injuries.

- **Neoplasm Table** located in the Alphabetic Index (see *Neoplasm*) lists all cancer codes by site and nature of the disease (e.g. malignant primary or secondary, benign, or unspecified behavior).

- **Table of Drugs and Chemicals** is located at the end of the Alphabetic Index. It lists drug classifications; as well as specific names of drugs; identifies the code for poisoning by that drug; and the associated E code to specify if the poisoning was accidental, an adverse effect (therapeutic use), suicide attempt, assault, or undetermined.

## 6.3    ICD-9-CM Updates

To assist users of ICD-9-CM in interpreting and clarifying the guidelines, as well as publishing updated codes and applications, the AHA Central Office on ICD-9-CM publishes quarterly official code advice in *Coding Clinic for ICD-9-CM*. The *Coding Clinic for ICD-9-CM* is the approved resource to update and clarify the use of ICD-9-CM. The small volumes (typically about 20 pages) include clarifications of previous advice and guidelines, or new information on a specific diagnosis coding practice by means of articles and a question and answer section.

> The ICD-9-CM diagnosis code listing is updated on October 1 and April 1 (beginning April 2005). The ICD-9-CM Coordination and Maintenance Committee holds a public forum for requested updates and publishes a transcript of their recommendations on the CMS website and in the *Federal Register*. Revisions discussed at the April and December meetings generally become effective in October the following year. A complete listing and description of annual updates are available in *Coding Clinic for ICD-9-CM* during the fourth quarter of each year. More information on the process for updating ICD-9 codes may be found at
> http://www.cms.hhs.gov/ICD9ProviderDiagnosticCodes/01_overview.asp.



**Note:** There were no new ICD-9 codes implemented in April 2006. The next update to ICD-9-CM will be in October 2006. The annual ICD-9-CM diagnosis codes update may result in updates to the list of diagnosis codes used in the Risk Adjustment models. CMS posts a list of new codes in the CMS-HCC model annually, prior to the codes taking effect on October 1 and April 1.

The ICD-9-CM coding guidelines are not updated as frequently as the list of diagnosis codes. The most recent official guideline revision is published in *Coding Clinic for ICD-9-CM*, December 2005.

## 6.3.1  Diagnosis Codes Phase-in Schedule

As described in Table 6B below, starting with 2008 payment, the list of acceptable ICD-9-CM codes for the CMS-HCC, ESRD and RxHCC risk adjustment models for risk adjustment for any given payment year will comprise the list of published NCHS/CMS codes that are valid for the payment year.

0874



**TABLE 6B – RISK ADJUSTMENT PHASE IN SCHEDULE FOR NEW LISTS OF DIAGNOSIS CODES**

| Year of Payment | Date Collection Period | Description/Source of Codes |
|---|---|---|
| 2007 | 1/06 – 12/06 | The list of codes is published on our website at: http:\www.cms.hhs.gov/MedicareAdvtgSpecRateStats/06_Risk_adjustment. asp#TopOfPage, which lists acceptable codes by years. |
| 2008 | 1/07 – 12/07 | The list of codes is published on our website at: http:\www.cms.hhs.gov/MedicareAdvtgSpecRateStats/06_Risk_adjustment. asp#TopOfPage |
| 2009 | 1/08 – 12/08 | Valid diagnoses in Fiscal Years 2007, 2008 |
| 2010 | 1/09 – 12/09 | Valid diagnoses in Fiscal Years 2008, 2009 |
| 2011 | 1/10 – 12/10 | Valid diagnoses in Fiscal Years 2009, 2010 |

### 6.3.2 International Classification of Diseases 10th Revision, Clinical Modification (ICD-10-CM)

ICD-10-CM is the clinical modification of ICD-10, which was adopted by the World Health Organization in July 2000. In 1994, the NCHS began a comprehensive evaluation of ICD-10-CM to determine if it is a significant improvement over ICD-9-CM and should be implemented in the United States. The new system was tested and results were favorable. In November 2003, the National Committee on Vital and Health Statistics recommended that the Secretary of the Department of Health and Human Services (HHS) approve ICD-10-CM for all lines of business. The Secretary of HHS is currently studying this recommendation. To implement this new coding system as part of the Health Insurance Portability and Accountability Act (HIPAA), the Secretary will publish a notice of proposed rule-making, and request public comment on the new policy.

### 6.4 Coding Guidelines Impacting the CMS-HCC Model

Standard ICD-9-CM coding practices support the CMS-HCC model. In all cases, the documentation must support the code selected and substantiate that the proper coding guidelines were followed. Data validation ensures that both are appropriate. Upcoding or changing diagnoses to obtain higher reimbursement without supporting source documents is fraudulent. However, thoroughly reviewing documentation and coding practices through internal auditing procedures ensure that data have been reported correctly and that appropriate reimbursement is received. This benefits both the MA organization and physician/provider. Several guidelines that impact physician documentation and reporting of diagnosis data are listed in the following sections.

### 6.4.1 Co-Existing and Related Conditions

The instructions for risk adjustment implementation refer to the official coding guidelines for ICD-9-CM, published at www.cdc.gov/nchs/icd9.htm and in the *Coding Clinic*. Physicians should "code all documented conditions that co-exist at the time of the encounter/visit, and require or affect patient care treatment or management. Do not code conditions that were previously treated and no longer exist. However, history codes (V10-V19 not in HCC model) may be used as secondary codes if the historical condition or family history has an impact on current care or influences treatment."

0875



Co-existing conditions include chronic, ongoing conditions such as diabetes (250.XX, HCCs 15-19), congestive heart failure (428.0, HCC 80), atrial fibrillation (427.31, HCC 92), chronic obstructive and pulmonary disease (496, HCC 108). These diseases are generally managed by ongoing medication and have the potential for acute exacerbations if not treated properly, particularly if the patient is experiencing other acute conditions. It is likely that these diagnoses would be part of a general overview of the patient's health when treating co-existing conditions for all but the most minor of medical encounters.

Co-existing conditions also include ongoing conditions such as multiple sclerosis (340, HCC 72), hemiplegia (342.9X, HCC 100), rheumatoid arthritis (714.0, HCC 38) and Parkinson's disease (332.0, HCC 73). Although they may not impact every minor healthcare episode, it is likely that patients having these conditions would have their general health status evaluated within a data reporting period, and these diagnoses would be documented and reportable at that time.

 MA organizations must submit each relevant diagnosis at least once during a risk adjustment reporting period. Therefore, these co-existing conditions should be documented by one of the allowable provider types at least once within the data reporting period.

Another type of co-existing conditions is symptoms. Symptoms that are integral to an underlying condition should not be coded.

 **Example: 1**

Initial myocardial infarction (410.91, HCC 81) is a specific condition that, when coded, would eliminate the need to code symptoms of that condition. For example, unstable angina (411.1, HCC 82) or angina pectoris (413.9, HCC 83) are symptoms of initial myocardial infarction and various other cardiovascular conditions and would not typically be coded in addition to the underlying problem.

### 6.4.1.1  Combination Codes

Often ICD-9-CM combines two or more conditions into one code when both conditions occur together or when one is a manifestation of the other. When a combination code fully describes the encounter, the combination code is reported, not the separate component codes. However, when ICD-9-CM instructions include "Code also" notes, follow the directions to fully describe the encounter.

 **Example: 2**

Hypertension (401.9) is not in the risk adjustment model; however it may be associated with other conditions resulting in combination codes that are in the model. The documentation must specifically and directly connect the conditions using terms such as "due to" or "associated with" hypertension. The mere listing of the diseases in the same paragraph or diagnosis list does not assume the connection. For example "congestive heart failure *due to* hypertension" is coded 402.91 (hypertensive heart disease with CHF, HCC 80). Other examples include hypertensive renal disease with renal failure (403.91, HCC 131) and hypertensive heart and renal disease with heart failure and renal failure (404.93, HCC 131 & 80).

0876



**Code also combinations**
Some codes have suggestions of related codes that might further explain the exact nature of the condition. While these codes are not required to be present, in many cases a second code is appropriate and should be utilized.

 **Example: 3**

Some diabetes codes carry "Code also" instructions that impact directly on the Risk Adjustment models.

• If a patient has diabetic retinopathy (250.50, HCC 18), the tabular section requires a code for also the manifestation (if known). The ICD-9-CM offers several different manifestations, such as blindness (369.00-369.9, not in the CMS-HCC model) or proliferative diabetic retinopathy (362.02, HCC 119). Here, coding the correct manifestation is essential to correct HCC assignment.

• Diabetic ulcers are one of the conditions covered under diabetes with other specified manifestations (250.80, HCC 16). If ulcers are the specific manifestation, the guidelines say to code also the site of the ulcer, such as lower extremity (707.10, HCC 149). If the specific manifestation is diabetic bone changes (731.8), that code is not in the CMS-HCC model, but should be coded as instructed in the tabular section. Again, coding the correct specific manifestation ensures appropriate HCC assignment.

## 6.4.2 Unconfirmed Diagnoses

Physicians and hospital outpatient departments shall not code diagnoses documented as "probable," "suspected," "questionable," "rule out," or "working." Rather, the condition(s) shall be coded to the highest degree of certainty known for that encounter/visit, such as symptoms, signs, abnormal test results, or other reason for the visit. CMS recognizes that this is an area where the physician-reported diagnosis and hospital inpatient diagnosis for the same encounter may disagree, particularly since hospital inpatient rules allow for coding of suspected conditions as if they were confirmed.

It also is understood that the physician record is not a static document. Positive test results and notations regarding contact with the patient for a revised plan of treatment often are added to the record several days after the patient encounter. When these addenda are made, corrections or additions to the diagnoses reported to MA organizations may be recommended, particularly if the HCC assignment is impacted.

 **Example: 4**

A physician removes a mole during an office visit and sends the specimen for pathology. The diagnoses documented are "suspicious skin lesion" (709.9, not in model) and "rule out melanoma." At this point, the diagnosis 709.9 may be submitted, but the diagnosis of melanoma may not. The pathology report is returned several days later and confirms malignant melanoma (172.9, HCC 10). The physician reviews the findings, initials the report, and documents in the record the results and notification to the patient. Since the removal of the mole was done during the office visit, the new code (172.9, melanoma) should be submitted with that date of service.

0877



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**DIAGNOSIS CODES & RISK ADJUSTMENT**

## 6.4.3  Clinical Specificity in Documentation

Clinical specificity involves having a diagnosis fully documented in the source medical record instead of routinely defaulting to a general term for the diagnosis. It is important to understand medical terminology in order to identify terms in the medical record that may be a more specific description of a general term. Communication with the physician is key to improving documentation skills that allow for more specific coding. The following examples are guidelines and specific conditions selected from various chapters of ICD-9-CM (e.g., Circulatory, Respiratory, Neoplasm, etc.) that are representative of documentation and coding decisions that impact HCCs.

The first three examples involve situations in which a physician may use the most common code for all forms of a disease and conditions. Remember, this practice has had no impact in the past on physician reimbursement. With the Risk Adjustment models, physicians must be careful to code the correct forms and manifestations of diseases and conditions.

 **Example: 5**

Anemia (285.9) is the most commonly coded form of anemia in physician offices. However, there are many types of anemia. Some are in the models and some are not. If the term "neutropenia" is used to describe the anemia, it must be coded to the more specific diagnosis code 288.0 (agranulocytosis), which groups to HCC 45. "Refractory" anemia is coded 238.7 (HCC 44). It is important that physicians code these types of anemia accurately.

 **Example: 6**

Pneumonia (486) unspecified is not in the model. If the organism responsible for the pneumonia (HCC 111-112) is known or if the physician documents that the patient aspirated prior to developing pneumonia (507.0 HCC 111), the more specific code should be reported.

**Example: 7**

**Mental disorders in the HCC models require particular attention to specific wording in documentation and coding**. Episodic mood disorders (296.XX, HCC 55) are mental diseases that include mood disturbances such as major depression (296.2X-296.3X). Physicians are encouraged to carefully document the characteristics of the mood disturbance (e.g., mania, depression, single episode, recurrent episode, circular) and use specific mental disorder terminology in the final diagnosis. The coder is cautioned to exactly code only the narrative provided by the physician in the final diagnosis and not make any further assumptions based on the patient work-up. For example, in coding depression, careful use of the ICD-9-CM index directs the coder to the correct type documented. If the physician does not document specific descriptor terms such as "major" or "recurrent", then code 311 (depression, not otherwise specified, not in the model) is used.

**Use of "history of."** In ICD-9-CM, "history of" means the patient no longer has the condition and the diagnosis often indexes to a V code not in the HCC models. A physician can make errors in one of two ways with respect to these codes. One error is to code a past condition as active. The opposite error is to code as "history of" a condition when that condition is still active. Both of these errors can impact risk adjustment.

0878



  **Example: 8**

The diagnosis statement "history of hip fracture" is not coded as a current hip fracture (820.8, HCC 158), but with a V code for orthopedic aftercare (V54.XX) or history of injury (V15.5), if appropriate. Neither "history of" code is in the HCC models. If a patient has a current acute condition, then the "history of" wording should not be used to describe the recent occurrence.

  **Example: 9**

The physician may actually intend to communicate that a condition is ongoing, but note the "history of" a condition. An example of this is "history of Hepatitis C" (V12.09 personal history of other infectious disease). Hepatitis C generally presents as a chronic condition (070.54, HCC 27) that is rarely fully eradicated. While assigning V12.09 is not necessarily an example of incorrect coding, it may indicate that the physician office is not coding correctly. Again, communication and clear documentation are essential to make the appropriate determination.

**Correct use of associated terms**. Some conditions are described by more than one term depending on the clinical presentation and medical terminology practices of the physician. Coders must be careful not to assign a diagnosis to conditions that are not specified by the physician and cannot be validated by the medical record.

  **Example: 10**

**Cancer coding requires detailed specificity**. Several different HCCs exist for cancer, and assigning the appropriate HCC requires closely following the cancer coding guidelines. The HCC varies depending on whether the cancer is a primary site or a secondary site. Coding guidelines state that if the malignant status is not specified, then code to the primary site, except for the following: bone, brain, diaphragm, heart, liver, lymph nodes, mediastinum, meninges, peritoneum, pleura, retro peritoneum, and spinal cord. Applying this rule assures that the correct HCC for secondary malignant neoplasm is assigned rather than an HCC for primary malignant neoplasms. [For example, bone cancer (primary) (170.9, HCC 9) vs. bone cancer (secondary) (198.5, HCC 7). Since the cancer is not specified as primary or secondary, and bone is one of the sites listed above, the correct HCC is 7.]


Cancer codes are part of a multi-category HCC hierarchy. It is not unusual for a patient to have more than one type of cancer. However, only the most severe and costly form of cancer is recognized in the HCC models. Even if the type of cancer included in HCC 7 is of a different site or origin than any other cancer the patient has and is included in HCCs 8, 9, and 10, the HCC models drop it.

  Complete Neoplasm guidelines are included in the Resource Guide.

### 6.4.4  Coding to the Highest Specificity-Fourth and Fifth Digits

ICD-9-CM codes have three, four, or five digits. Diagnoses should be reported to the highest level of code available for that category. In selected cases, the fifth digit may impact whether the code is in the models, but at a different HCC level, which may impact reimbursement.

0879



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**DIAGNOSIS CODES & RISK ADJUSTMENT**

---

   **Example: 11**

Myocardial infarction (MI) (heart attack, 410.XX) is unspecified or subsequent episode fifth digits 0 and 2 are in HCC 82. All initial care for a new MI (from physician office to emergency room to hospital) should have the fifth digit of "1" and group to HCC 81.

   **Example: 12**

Diabetes (250.XX) codes group into HCCs 15, 16, 17, 18, or 19 depending on the fourth digit applied. The fourth digit designates manifestations or complications of diabetes such as neurological conditions, eye disorders, or diabetic ulcers.

   At a minimum, the submitted ICD-9-CM codes must be sufficiently specific to allow appropriate grouping of the diagnoses in the risk adjustment model. CMS encourages MA organizations to use the full level of specificity in submitting data to provide the most accurate coding and grouping of codes in the model.

### 6.4.5  V Codes

Health status situations that should be described by V codes are common in physician documentation. Those that impact risk adjustment include HIV status, transplant status, artificial opening status or maintenance, dialysis status or encounter, and amputation status. These V codes are used in several HCCs.

### 6.4.6  E Codes

The HCC models include codes E950-E959 describing suicide or self inflicted injuries (HCC 55, Major Depressive Disorders). The injury or poisoning diagnosis codes that would be reported with these E codes are not included as relevant diagnoses. Therefore, it is important that the physician documents and codes the appropriate external cause of all self-inflicted injuries and poisonings so the MA organization can report them as relevant diagnoses.

📖   The complete list of V codes and E codes in the model is provided in the Resource Guide.

### 6.5    Supporting Documentation Summary

Accurate coding begins with complete documentation. Characteristics of effective documentation include quality documentation as a team effort that may require some intervention by the MA organization. Table 6C lists documentation considerations.

---

0880



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**DIAGNOSIS CODES & RISK ADJUSTMENT**

## TABLE 6C – DOCUMENTATION CONSIDERATIONS

| Documentation Guidelines |
|---|
| • Reported diagnoses must be supported with medical record documentation.<br>• Medical records and codes are subject to CMS validation.<br>• Characteristics of acceptable documentation include:<br>  – Clear.<br>  – Concise.<br>  – Consistent.<br>  – Complete.<br>  – Legible. |
| **Physician Documentation and Communication Tips** |
| • Document and report co-existing diagnoses.<br>• Communicate issues regarding inadequate documentation.<br>• Adhere to proper methods for appending (late entries) or correcting inaccurate data entries.<br>  – Lab/Radiology results.<br>  – Strike through, initial, and date. Do not obliterate.<br>• Use only standard abbreviations.<br>• Identify patient and date on each page of the record. |
| **SOAP Notes** |
| • SOAP note format assists both the physician and record reviewer/coder in identifying key documentation elements. SOAP stands for:<br>  – **S**ubjective:  How the patients describe their problem or illness.<br>  – **O**bjective:  Data obtained from examinations, lab results, vital signs, etc.<br>  – **A**ssessment:  Listing of the patient's current condition and status of all chronic conditions. How the objective data relate to the patient's acute problem.<br>  – **P**lan:  Next steps in diagnosing problem further, prescriptions, consultation referrals, patient education, and recommended time to return for followup. |

## 6.6    Provider and Staff Training

Remaining current on medical record documentation and coding guidelines is important to ensure accurate risk adjustment payment. Table 6D provides examples of resources available for medical record documentation and coding guidelines.

0881



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**DIAGNOSIS CODES & RISK ADJUSTMENT**

### TABLE 6D – DOCUMENATION AND CODING RESOURCES

| TRAINING SOURCES | DESCRIPTION |
|---|---|
| **Official Coding Guidelines on CDC Website** Available at www.cdc.gov/nchs/icd9.htm | The Official ICD-9-CM Coding Guidelines are available as an Adobe .pdf file, or as a CD-ROM. The CDC site has the .pdf file for download, as well as information to order the CD-ROM from the Government Printing Office. |
| *Coding Clinic for ICD-9-CM* Available through AHA. | Published quarterly by the AHA. It is the official publication for ICD-9-CM coding guidelines and advice as designated by the AHA, AHIMA, CMS, and the NCHS. |
| **American Health Information Management Association (AHIMA)** www.ahima.org | AHIMA is a professional association for health information management professionals. Members make information accessible to healthcare providers and work in the healthcare industry and in the public sector by managing, analyzing, and using data that are critical to patient care. The AHIMA Catalog online offers tools for coders such as audio seminars, books, and continuing education courses. |
| **American Academy of Professional Coders (AAPC)** www.aapc.com | AAPC provides education and certification for professional medical coders. Certifications focus on physician practice (CPC) and hospital outpatient facility (CPC-H) coding. Students learn Current Procedural Terminology (CPT) Codes, diagnosis codes (ICD-9-CM), and Healthcare Common Procedure Coding System (HCPCS) while focusing on HIPAA, Office of Inspector General (OIG), and Medicare compliance. |
| **American Medical Association (AMA)** www.ama-assn.org | AMA is an advocate of physician and patient rights. Coders may access the AMA Press Online Catalog to find current resources on medical record documentation and the medical record review process. |
| **American Hospital Association (AHA)** www.aha.org | AHA is a national organization that serves and represents hospitals, healthcare networks, and their patients. The AHA Online Store offers coders online reference materials including ICD-9-CM, HCPCS, and testing and certification for HIPAA. |
| **Local Colleges** Check local community and 4-year colleges for courses. | These provide online courses in clinical coding and guidelines. |

0882



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT DATA VALIDATION**

## MODULE 7 – RISK ADJUSTMENT DATA VALIDATION

### Purpose (Slide 2)

To provide participants with an understanding of the risk adjustment data validation process.

### Objectives (Slide 3)

- Identify
  - The purpose and goals of risk adjustment data validation
  - The stages of risk adjustment data validation
  - Risk adjustment data discrepancies
- Understand
  - The components of a medical record request
  - Requirements for acceptable medical record documentation
  - Payment adjustments and appeals
- Provide
  - Recommendations and lessons learned.

| ICON KEY | |
|---|---|
| Example | ⊠ |
| Reminder | 🔍 |
| Resource | 📖 |

### 7.1 Risk Adjustment Data Validation

### 7.1.1 Purpose of Risk Adjustment Data Validation (Slide 4)

Data validation occurs after risk adjustment data are collected and submitted, and payments are made to the Medicare Advantage (MA) organizations. CMS uses medical record review to validate the accuracy of risk adjustment diagnoses submitted by MA organizations for payment. Future data validation activities may include other data monitoring activities.

> ***Risk adjustment data validation is the process of verifying that diagnosis codes submitted for payment by the MA organization are supported by medical record documentation for an enrollee.***

> **Purpose: To ensure risk adjusted payment integrity and accuracy**



### 7.1.2  Objectives of Risk Adjustment Data Validation (Slide 5)

The primary objectives of risk adjustment data validation are to:

- Identify:
    - Confirmed risk adjustment discrepancies
    - Contracts in need of technical assistance to improve the quality of risk adjustment data

- Measure:
    - Accuracy of risk adjustment data
    - Impact of discrepancies on payment

- Improve/Inform:
    - Quality of risk adjustment data
    - The CMS-Hierarchical Condition Category (HCC) model.

### 7.1.3  Good Documentation = Accurate Payment (Slide 6)

Good documentation begins at the time of the patient's face-to-face encounter with the physician.  The physician documents the clinical findings in the medical record.  The medical record is used to determine ICD-9-CM codes. The pertinent information from the patient encounter is submitted to the MA organization for payment.

### 7.1.4  Guidelines for Risk Adjustment Data Validation (Slide 7)

The guidelines for risk adjustment data validation reflect the purpose and goals described above. Beginning with the CY2004 payments, validation activities incorporated the review of hospital inpatient, hospital outpatient, and physician medical records. This process reflects the implementation of the CMS-HCC model that began with CY2004 payment. Beginning with CY2006 payments, validation activities incorporated RxHCC data. This process reflects the implementation of the CMS RxHCC model that began with CY2006 payment.

> **Guiding Principle:**  The risk adjustment diagnosis must be based on clinical medical record documentation from a face-to-face encounter, coded according to the *ICD-9-CM Guidelines for Coding and Reporting*; assigned based on dates of service within the data collection period, and submitted to the MA organization from an appropriate risk adjustment provider type and an appropriate risk adjustment physician data source.

In addition to the Guiding Principle, risk adjustment data validation guidelines include the following:

- The medical record documentation must support an assigned HCC.

- Beneficiary HCCs and risk adjustment records are selected based on risk adjustment diagnoses (ICD-9 codes), provider type, and the Health Insurance Claim (HIC) number that are submitted to the Risk Adjustment Processing System (RAPS).

0884



Header on the right.

**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT DATA VALIDATION**

- Given the flexibility of the Guiding Principle, contracts must select **"one best medical record"** to support each beneficiary HCC identified for validation. This means the contract decides whether to submit a hospital inpatient, hospital outpatient, or physician medical record when more than one option is available.

- Since CMS does not collect provider identifiers for risk adjustment, MA organizations must be able to track and locate supporting medical record documentation.

- Once a MA organization selects the "one best medical record," the organization must identify the date of service to be reviewed to facilitate the medical record review process. The coders that are hired to review the medical records on behalf of CMS will not search beyond the date of service identified by the MA organization for the review.

- Payment adjustments are based on confirmed risk adjustment discrepancies.

- An appeals process is in place to address disagreement with a confirmed risk adjustment discrepancy.

### 7.1.5  Medical Record Documentation (Slide 8)

As stated in the *1997 Documentation Guidelines for Evaluation and Management Services*, "Medical record documentation is required to record pertinent facts, findings, and observations about an individual's health history, including past and present illnesses, examinations, tests, treatments, and outcomes."

### 7.1.6  Overview of Risk Adjustment Data Validation (Slides 9-10)

Risk adjustment data validation is the process of verifying that diagnosis codes submitted by the MA organization for payment are supported by medical record documentation for an enrollee.  It involves the review of hospital inpatient, hospital outpatient, and physician medical records. Since contracts must select the "one best medical record" to validate the HCC from hospital inpatient, hospital outpatient, and physician medical records, the approach is flexible. Additionally, the data validation approach is based on the CMS risk adjustment models:

- CMS-HCC—CY 2004 and beyond for Part C
- CMS RxHCC—CY 2006 and beyond for Part D.

Hereafter for purposes of this module only, the term "HCC" refers to both CMS-HCCs and RxHCCs.

CMS contracts with two independent review contractors to conduct medical record reviews. The initial validation contractor (IVC) conducts facilitates the process and conducts the initial review of medical records  The second validation contractor (SVC) receives the discrepant medical records from the IVC, confirms risk adjustment discrepancies that are identified by the IVC, and implements the appeals process. Both IVC and SVC use certified coders to abstract diagnosis codes and validation provider type, physician data source, and date(s) of service.

0885



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT DATA VALIDATION**

## 7.1.7  Risk Adjustment Discrepancies (Slide 11)

Risk adjustment discrepancies are identified when the HCC assigned based on risk adjustment data submitted by the MA organization differs from the HCC assigned after validation. Risk adjustment discrepancies affect the beneficiary risk score because of the change in HCC.

## 7.1.8  Data Validation Activities  (Current and Future) (Slide 12)

CMS has several data validation activities on which it is or will be working.  They are as follows:

- CY 2004
    - July 12, 2007: Disseminated plan-specific findings to MA organizations in the targeted sample.
    - August 29, 2007: Conducted teleconference to communicate the CY 2004 pre-reconciled medical record review national results.
    - Mid-October 2007: Anticipate mailing pre-reconciled findings to MA organizations with enrollees selected for the national sample.
- CY 2005
    - Quality checking the IVC and SVC results.
    - Anticipate releasing findings in the late fall.
- CY 2006
    - Selected contracts notified in May 2007.
- CY 2007
    - CMS to sample after final data submission deadline (January 31, 2008).

## 7.1.9  Risk Adjustment Data Validation Process (Slide 13)

Risk adjustment data validation occurs every year. Figure 7A illustrates the overall data validation process. This process involves the coordination of multiple entities such as CMS, MA organizations, and CMS contractors. The data validation process begins with selecting MA organizations, then beneficiaries and their respective HCCs. This occurs after the risk adjustment data submission deadline for calendar year payment. The stages of the risk adjustment data validation process are briefly described below:

**STAGE 1**    **Contract Selection:** CMS designs a sampling plan to select MA organizations for risk adjustment data validation. Once the MA organizations are selected, individual beneficiaries and their HCCs are selected on the basis of the sample framework. The sample is based on payment year risk adjustment data. Every MA organization has a chance of being selected for validation.

**STAGE 2**    **Medical Record Request Process:**  Stage 2 is defined by three distinct segments: 1) medical record request; 2) medical record submission (contract response); and 3) medical record receipt. After the sample has been drawn, medical records are requested from the selected MA organizations. All correspondence with MA organizations related to Stage 1 is facilitated by the IVC.

**STAGE 3**    **Medical Record Review:** After medical records are received by the IVC, certified ICD-9 coders review the medical records to validate the selected beneficiary HCC(s). During this stage, data discrepancies are identified. Data discrepancies occur when beneficiary medical record documentation does not match the risk adjustment data submitted for payment. A data discrepancy that results in an HCC assignment change is known as a risk adjustment

0886



**2007 Risk Adjustment Data Training**
**For Medicare Advantage Organizations**
**Participant Guide**

**RISK ADJUSTMENT DATA VALIDATION**

discrepancy. All identified risk adjustment discrepancies undergo a second, independent medical record review to confirm the discrepancy. The second medical record review is conducted by the SVC. This activity is transparent to MA organizations. There is no correspondence between the SVC and contracts during this stage.

☞ **STAGE 4**    **Contract-Level Findings:** At this point in the data validation process, CMS communicates contract-level findings from Stage 3 to the selected MA organizations. Data discrepancies determined by medical record review are described. Additional feedback such as national and contract-level response rates and discrepancy rates are provided. Contract patterns, systemic problems, and contracts in need of additional technical assistance may also be identified during this stage.

☞ **STAGE 5**    **Payment Adjustment:** The CMS CBC Director makes all decisions with regard to payment adjustment based on validation findings. A payment adjustment is based on a confirmed risk adjustment discrepancy. If the CMS CBC Director decides to make the adjustment, then the change in the risk adjustment payment is applied. Payment adjustments are typically reflected in the Monthly Membership Report (MMR).

☞ **STAGE 6**    **Appeals:** After payment adjustments are made, MA organizations have the option of appealing the change. In the event that a contract chooses to appeal, then the organization has 60 days from the date of the payment adjustment to respond. This process is fully described in the *Appeals* section of this module.

☞ **STAGE 7**    **Correct Payment:** The conclusion of the appeals process determines the correct risk adjusted payment for an MA organization. The original payment adjustment decision may stand (unchanged) or be reversed. All appeal decisions are final.

0887



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT DATA VALIDATION**

**Figure 7A – Data Validation Process**



\*Payment adjustment
decisions are made by
the CMS CBC Director.

0888



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT DATA VALIDATION**

## 7.2    Components of the Risk Adjustment Data Validation Process

The key components of the data validation process include: 1) sampling; 2) the medical record request process and the receipt of medical record documentation by the IVC; and 3) the medical record review.

### 7.2.1  Contract Selection    STAGE 1  (Slide 14)

#### Sampling

Sampling for data validation is conducted on an annual basis. Sampling involves the selection of contracts, beneficiaries, and the beneficiary HCC(s). The sample is drawn from risk adjustment data submitted for the payment year (data collection period, January 1 through December 31). The sampling approach includes both random and targeted components. Some contracts may be selected randomly, while others may be targeted.

Under the CMS-HCC model, CMS expects to select a national sample for each payment year. The purpose of the national sample is to derive national net payment error and risk adjustment discrepancy estimates for the payment year. In addition to the national random sample, some targeted sampling will be employed. The targeting criteria may include:

- Patterns in the risk adjustment data that are suggestive of potential problems.
    - A contract may be targeted for data validation because the risk adjustment data for that contract showed a disproportionately high number of HCCs.

- Past performance from previous data validation years.
    - A contract may be selected for medical record review as a result of a high error rates from prior validation activities.

In addition, CMS may sample based on random selection of specific contract types(s). The medical records reviewed for a beneficiary could reflect either the entire HCC profile (all HCCs) or a subset of one or more HCCs. Every MA organization has equal opportunity of being selected.

### 7.2.2  Medical Record Request Process    STAGE 2  (Slides 15)

During Stage 2 CMS works with the IVC to implement the process for requesting and receiving medical records from MA organizations. Stage 2 is defined by three distinct segments: 1) medical record request; 2) medical record submission (contract response); and 3) medical record receipt.

0889



### 7.2.2.1    Medical Record Request - Initial Contact Letter (Slide 16)

On behalf of CMS, the IVC sends an initial contact letter to the Medicare compliance officer for each MA organization selected for validation. The purpose of the initial contact letter is to: 1) inform the compliance officer that the organization was selected for data validation; and 2) request a primary point of contact (either the compliance officer or a designee) to be responsible for facilitating the medical record request process for the organization.

### 7.2.2.2    Medical Record Request - Beneficiary List (Slide 16)

A list of contract-specific selected beneficiaries for each selected MA organization is sent to the confirmed primary contact person for the MA organization. The beneficiary list is generated based on risk adjustment data submitted for the enrollee sample. The list may be provided to MA organizations either in advance of or in conjunction with the medical record request instructions package. The purpose of the list is to provide MA organizations with ample opportunity to easily identify the selected enrollees in their systems, and establish contact with the specific provider(s) of services for those enrollees. As previously mentioned, CMS does not require or store provider identification numbers as part of risk adjustment data. Therefore, the MA organization must use data systems that can:

- Track and locate the requested medical records.
- Link a specific diagnosis to a specific provider.

The beneficiary list is provided in an electronic spreadsheet format, which displays:

- MA organization's name,
- Current Contract ID (H-number), and
- Previous Contract ID (H-number)—this information is furnished if the contract ID used during the data collection period differs from the current contract ID.

For each selected enrollee the following information is included in the beneficiary list:

- Coversheet ID number (A masked ID tracking number that can be found on the bottom left of each HCC coversheet)
- Enrollee Last Name
- Enrollee First Name
- Enrollee Date of Birth
- Enrollee HIC Number
- Validation HCC
- ICD-9-CM code(s) related to the validation HCC—you must submit a medical record to support the enrollee HCC.

Note that the beneficiary list will contain a line for each enrollee's unique HCC. This means that if an enrollee has multiple different HCCs, each line for the enrollee will comprise a unique HCC and all associated risk adjustment diagnoses that were submitted by your organization for that HCC. Therefore, a complete enrollee HCC profile could comprise multiple lines on the beneficiary list. Table 7A displays a sample beneficiary list. The information shown on the line with each beneficiary HCC reflects all ICD-9 codes submitted by the MA organizations for that HCC.



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT DATA VALIDATION**

    **Example 1**

For beneficiary Joe K. Smith - HCCs 38, 80 and 16 will be validated. For HCC 38, the MA organization may
rely on one of the five ICD-9 codes associated with that HCC to identify the date of service and provider,
and **"one best medical record"** for review. The organization could also opt to identify a provider that
rendered a diagnosis that is not on the list, but will map to HCC 38. Contracts should take advantage of
whichever approach yields the most efficient results.

**TABLE 7A – BENEFICIARY LIST**

| MA Organization Name – Health Plan for People with Medicare | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Current Contract ID: H1111 Previous Contract ID: H0000 | | | | | | | | | | | |
| Coversheet ID # | LAST NAME | FIRST NAME | MI | DOB | HIC | HCC | ICD-9 CODE | ICD-9 CODE | ICD-9 CODE | ICD-9 CODE | ICD-9 CODE |
| H1111-10005-HCC38 | Smith | Joe | K | 09/02/1925 | 183838279A | HCC 38 | 7101 | 446 | 4460 | 4465 | 71430 |
| H1111-10005-HCC80 | | | | | | HCC 80 | 40201 | 40491 | 416 | | |
| H1111-10005-HCC16 | | | | | | HCC 16 | 2506 | 25062 | 2508 | 25080 | |
| H1111-10006-HCC16 | Johnson | James | | 8/16/1937 | 987699890A | HCC 16 | 2506 | 2508 | | | |
| H1111-10007-HCC2 | Mumford | Anne | A | 03/15/1933 | 986023456A | HCC 2 | 0382 | 0389 | | | |
| H1111-10007-HCC79 | | | | | | HCC 79 | 42741 | 51883 | | | |

## 7.2.2.3    Medical Record Request - Comprehensive Instructions and Coversheets (Slide 16)

A comprehensive instructions package is sent to MA organizations to facilitate the request for submitting
medical records. This package will at a minimum include the following:
- Detailed instructions for requesting records from providers and submitting to the IVC;
- Guidance and best practices to further assist organizations with the request process;
- A list of the beneficiaries (as previously described) and their HCCs;
- CMS letters addressed to providers describing the overall risk adjustment data validation approach;
- HIPAA fact sheet to discuss HIPAA privacy;
- CMS sample request letters to providers; and
- Coversheets for each enrollee HCC.

The organizations must request records from hospital inpatient, hospital outpatient, or physician
providers. When requesting medical records from your providers, be sure to attach the HIPAA fact sheet
and include your MA organization contact information. This will facilitate the provider's contacting you in
the event the provider has questions with regard to the medical record request.



**When requesting medical records from providers, the organization must make every effort to limit disclosure of beneficiary health information to the minimum necessary as it pertains to the specific diagnosis (es) as rendered by the provider. This means that if the organization finds a date of service for which one provider rendered a diagnosis then the organization should only request from that provider medical record documentation for the respective diagnosis.**

### 7.2.3  Medical Record Submission (Slide 17)

MA organizations must submit medical records and all corresponding coversheets for each enrollee HCC to the IVC. In responding to the medical record request, MA organizations must select the "one best medical record" to support the enrollee HCC.

### 7.2.3.1    Medical Record Submission and Coversheets (Slide 17)

Under the CMS-HCC model, beneficiaries could have more than one HCC. Therefore, one coversheet will be generated and provided for every HCC being validated for each selected beneficiary. Each coversheet shows every risk adjustment diagnosis that was submitted to RAPS and generated the same HCC. Attachment A provides a sample beneficiary HCC coversheet with directions for completion.

**Note that if one enrollee has two different HCCs, the contract will receive two separate HCC coversheets for that enrollee. In addition, one medical record could be used to support multiple HCCs. If you identify a medical record that supports more than one HCC selected for validation, then complete each HCC coversheet, and attach them to that the one medical record.**

The coversheet is where the concept of the "one best medical record" is applied. The coversheet will at a minimum provide enrollee demographic information, stored risk adjustment data (HCC and ICD-9 codes). The MA organization must select and submit the best medical record and indicate on the coversheet the provider type and date(s) of service to be reviewed for the HCC. The date(s) of service could include a range of consecutive dates if the record is from a hospital inpatient provider or one date if the record is from a hospital outpatient or physician provider.



All coversheets must be returned regardless of whether a medical record is submitted to support the HCC. MA organizations must complete the coversheets to identify the information being submitted. Complete medical record coversheets are essential to timely medical record review.



If an MA organization is unable to submit the required medical record(s) to support the enrollee HCC(s), it must complete the coversheet as per the instructions package prior to submitting the coversheet to the IVC. This will inform the IVC that no medical record could be obtained to support the HCC.

CMS reimburses MA organizations for each medical record submitted per beneficiary HCC; however, only one medical record per beneficiary HCC will be accepted for reimbursement. If one record supports more than one beneficiary HCC, then the contract will receive reimbursement for one record. Reimbursement checks are sent by the IVC after completion of data validation activities.



**Guidance for Submitting Medical Records to the IVC**

1. Do not submit medical records for date(s) of service that occurred outside of the data collection period.

2. If you select an inpatient discharge to substantiate the HCC(s), submit the entire inpatient medical record. Do not just submit parts of the record that may state the diagnosis as inpatient coding guidelines may differ from those for outpatient settings depending on the diagnosis.

3. Several organizations choose to submit medical record documentation that reflects only the physician face-to-face portion of an inpatient record when the entire inpatient record is not available. When this is the case complete the coversheet to reflect a "physician" provider type and the date of service in the medical record for which the physician visit occurred during the inpatient stay. Only submit the medical record page(s) for the selected physician face-to-face.

    If the entire inpatient medical record is available, the contract should opt to submit the entire record and complete the coversheet as appropriate to reflect the date range for the stay. It is likely that this approach would not limit the amount of diagnoses to be abstracted for the stay.

4. In order to prevent medical record information from inadvertently being attached to the wrong coversheet(s), be sure that all coversheets are stapled to the record whenever possible. We understand that this may be difficult to do with large inpatient medical records. If necessary, consider the use of rubber bands to attach coversheets with the records. Do not submit loose documentation or documentation with only paper clips.

5. If you are submitting for multiple organizations (i.e., those with different "H" numbers), separate the records for the different organizations.

6. Unless instructed by the IVC, submit only one coversheet per enrollee HCC. Only one coversheet–the first—will be accepted. If you are unsure whether a record substantiates an HCC, you must determine whether to submit it or wait for another record.

7. Do not clip together medical records for multiple different enrollees.

8. When in doubt about the clinical documentation in a medical record and you have no viable substitute, send the medical record even if you do not believe the record supports the HCC. We may find that the record does support the HCC and/or could contain clinical information that result in risk adjustment ICD-9 codes that were not previously submitted CMS.

9. **SUBMIT ALL MEDICAL RECORDS AND COVERSHEETS BY THE OFFICIAL DEADLINE.** In the event that you are unable to submit a medical record(s), you must complete as per the instructions package and return the coversheets to the IVC.



**2007 Risk Adjustment Data Training
For Medicare Advantage Organizations
Participant Guide**

**RISK ADJUSTMENT DATA VALIDATION**

## 7.2.4  Medical Record Receipt by the IVC and Reimbursement (Slide 18)

Once medical records are selected by the MA organization, the organization must submit them to the IVC for data validation. Upon receipt, the IVC will log medical records into a chart-tracking database on the basis of the barcode on each medical record coversheet. This method identifies the date the medical record was received for a given HCC. To protect patient confidentiality, all records are stored in a secure, designated area accessible only to those having direct responsibility for risk adjustment data validation activities.

When the coversheet and medical record are received by the IVC, the following intake process is initiated:

- Administrative check—confirms beneficiary demographic information, including name, HIC number, and service date within or outside of the collection period.

- Clinical check—determines whether the:
  - Record is from an appropriate provider type.
  - Pertinent components needed for coding are included in the record.
  - Record is dated and signed.

Based on the administrative and clinical checks, the IVC may elect to contact (telephone call or email message) the MA organization to request clarification or additional information. This step is provided as a service to the organization and normally is performed only if the records are received in a timely manner.

After intake, the medical record (with coversheet) is assigned to a category. The possible categories include:

- Identified as "okay" for review;
- Problem; or
- Missing medical record.

> Throughout the data validation process, CMS and its contractors will make a reasonable effort to alert MA organizations of medical record documentation issues and allow contracts the opportunity to correct problems.

## 7.2.4.1  Medical Record Documentation  ▐ STAGE 3  (Slide 19)

Proper medical record documentation is the key to accurate  payment and successful data validation. The accurate assignment of ICD-9-CM diagnosis codes is based on thorough medical record documentation. Therefore, risk adjusted payment accuracy also relies on medical record documentation. Remember, a beneficiary HCC is assigned based on a diagnosis cluster that has been submitted to RAPS.

Below are some general guidelines for medical record documentation, based on the sources of the documentation.

0894



### 7.2.4.2    General Guidelines for Hospital Inpatient Medical Record Documentation (Slide 20)

Hospital inpatient medical records are generally considered to be the most reliable source of diagnostic coding because hospitals employ certified professional coders.

#### Coding

According to the *ICD-9-CM Official Guidelines for Coding and Reporting,* for hospital inpatient stays a medical record reviewer should code the principal diagnosis and:

> ...all conditions that coexist at the time of admission, that develop subsequently, or that affect the treatment received and/or length of stay. Diagnoses that relate to an earlier episode which have no bearing on the current hospital stay are to be excluded.

The required medical record documentation should include, but is not limited to, the following:

- Face sheet
- History and physical exam
- Physician orders
- Progress notes
- Operative and pathology reports
- Consultation reports
- Diagnostic (radiology, cardiology, etc.) testing reports
- Discharge summary.

### 7.2.4.3    General Guidelines for Hospital Outpatient and Physician Medical Record Documentation (Slide 20)

Hospital outpatient and physician office medical records should include, but are not limited to, the following:

- Face sheet
- History and physical exam
- Physician orders
- Progress notes
- Diagnostic reports (to support documentation)
- Consultation reports


Submit all relevant medical record components needed to validate the date of service, beneficiary, the HCC, and ICD-9 code selected. When you submit medical record documentation to support only the physician face-to-face that occurred during an inpatient stay, the same medical components are needed; however, the medical record documentation will be reviewed in accordance with *Diagnostic Coding and Reporting Guidelines for Outpatient Services.*

0895



Only services

**EXHIBIT D-37 INTENTIONALLY BLANK**

**EXHIBIT D-38**

# DEPARTMENT OF JUSTICE
# JOURNAL OF FEDERAL LAW AND PRACTICE



| Volume 71 | December 2023 | Number 4 |
|---|---|---|

### Acting Director
Norman Wong

### Editor-in-Chief
Christian A. Fisanick

### Managing Editor
Kari Risher

## University of South Carolina Law Clerks

| Chandler Hines | LauraKate Roland |
|---|---|
| Jay Slappy | Kara Wagstaff |

United States Department
of Justice

Executive Office for United
States Attorneys

Washington, D.C. 20530

The Department of Justice Journal
of Federal Law and Practice is
published pursuant to
28 C.F.R. § 0.22(c).

The Department of Justice Journal of
Federal Law and Practice is published
by the Executive Office for United States
Attorneys

Office of Legal Education

1620 Pendleton Street
Columbia, SC 29201

Cite as:

71 DOJ J. FED. L. & PRAC., no. 4, 2023.

Internet Address:

https://www.justice.gov/usao/resources/
journal-of-federal-law-and-practice

*The opinions and views contained herein are those of the authors and do not necessarily reflect the views of the Department of Justice. Further, they should not be considered as an endorsement by EOUSA of any policy, program, or service.*

If, however, the prosecutor believes that the court could potentially exclude or limit the RA's testimony because it borders on expert testimony, the prosecutor should alternatively notice the witness as a potential expert witness and follow the requirements of Rule 702 of the Federal Rules of Evidence. It is important for prosecutors to determine how judges in their district have typically treated RA summary testimony. In some districts, judges treat the RAs as summary expert witness and expect prosecutors to comply with the requirements for experts under Rule 702.

## 5. Employees of the defendant's business

If the defendant prepared her fraudulent tax returns through a business that had employees, those employees can also be valuable witnesses at trial. Employees who did not participate in preparing false tax returns could testify about the general operations of the business and how legitimate tax returns were prepared, including how tax information was obtained from clients and incorporated into tax returns. They could also testify about any training and instructions the defendant gave them about how to prepare tax returns. Employees who had a role in the preparation of false tax returns could also testify about any instructions the defendant gave them about falsifying items on those tax returns.

## 6. IRS Special Agent

Although calling the case agent to testify is often discouraged, as it potentially puts the entire investigation on trial and certainly makes discovery disclosure obligations more burdensome, there are certain occasions when you would want to call the IRS Special Agent who investigated the case to testify. For example, in circumstances where the Special Agent has interviewed the defendant, who has made certain favorable admissions that the prosecutor believes should be introduced at trial. If there is a second Special Agent at the interview, it would be preferable to call the non-case agent to testify instead, so long as they are able to testify concerning those statements made by the defendant.

## C. Rule 404(b) evidence

In almost every fraudulent return preparer prosecution, there will be evidence of false tax returns prepared by the defendant that cannot be

---

excluded from sequestration. Fed. R. Evid. 615. When a witness's testimony relates only to a summary of evidence, even the rationale for the sequestration of the witness is absent. *See* United States v. Charles, 456 F.3d 249, 258 (1st Cir. 2006); *see also* United States v. Strauss, 473 F.2d 1262, 1263 (3d Cir. 1973) (purpose of excluding witnesses is "to prevent the shaping of testimony by witnesses to match that given by other witnesses") (internal citations omitted).

0900

included in the indictment because they fall outside of the statute of limitations. The prosecutor should consider whether to offer this as "other act" evidence under Rule 404(b) of the Federal Rules of Evidence.

Rule 404(b) provides that while "evidence of any crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," evidence of any crime, wrong, or act "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." [30]

In fraudulent return preparer prosecutions, the evidence of other, similarly false tax returns prepared by the defendant is typically offered to prove the defendant's intent. In a case charged under 26 U.S.C. § 7206(1) or 7206(2) the government must prove that the defendant acted willfully, that is, that the defendant intentionally violated a known legal duty. [31] Willfulness is rarely proved directly in any case, much less a tax case, but often is proved by circumstantial evidence of a defendant's conduct. [32] Evidence of other, similarly false tax returns prepared by the defendant is highly probative of the defendant's intent.

The prosecutor should be cautious, however, in how much evidence to attempt to admit through Rule 404(b). While there is no bright line rule, it is prudent to make sure that the uncharged conduct is proportionate to the charged conduct. Otherwise, an objection under Rule 403 of the Federal Rules of Evidence of unfair prejudice may be sustained. [33]

## D. Common defenses

While, on occasion, a defendant will claim not to have prepared the false tax returns at issue in a fraudulent return preparer trial, a more typical defense is that the defendant did not act willfully because she did not know what she was doing was wrong. This commonly takes one of

---

[30] Fed. R. Evid. 404(b).

[31] Willfulness has the same meaning in fraudulent return preparer cases as it has for other criminal tax violations: "the word 'willfully' in these statutes generally connotes a voluntary, intentional violation of a known legal duty." United States v. Bishop, 412 U.S. 346, 360 (1973); *see also* Cheek v. United States, 498 U.S. 192, 200 (1991); United States v. Ervasti, 201 F.3d 1029, 1041 (8th Cir. 2000).

[32] *See generally* Huddleston v. United States, 485 U.S. 681, 685 (1988) ("Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct.").

[33] Under Rule 403, a court may find that the probative value of an excessive number of uncharged returns is not "substantially outweighed by the danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

two forms: (1) the defendant did not know she reported false information
on the tax returns ("blame the clients"); or (2) the defendant did not
know she reported items incorrectly on the tax returns ("blame the tax
law"). If the prosecutor has properly prepared the case, neither of these
defenses is likely to be successful.

A "blame the clients" defense gains little traction where client-witne-
sses testify unequivocally that they did not provide the false information
to the defendant, and where the tax returns of multiple client witnesses
all contain the same, or similar falsities. This testimony is even stronger
when it is corroborated by prior or subsequent tax returns of the client
witnesses that were not prepared by the defendant, and that did not
include similar falsities. This evidence supports the argument that the
false items on the tax returns had to have come from the defendant.

A "blame the law" defense can be trickier to rebut. Often, an appeal to
the jurors' common sense is the best approach. A defendant's scheme may
be so egregious (for example, reporting wholly fake Schedule C businesses
for clients) that an argument that the defendant did not know it was
wrong lacks all credibility.

To support either defense, a defendant may seek to admit evidence of
uncharged, non-fraudulent tax returns to support a willfulness defense. As
a general rule, evidence of non-criminal conduct is irrelevant, and the fact
that a defendant prepared other, accurate tax returns has no bearing on
whether the tax returns charged in the indictment are false.[34] Accordingly,
if applicable, the prosecutor should consider moving *in limine* to exclude
any such evidence before trial.

## E. Jury instructions

In addition to any applicable Circuit pattern jury instructions, the
prosecutor can find model jury instructions for fraudulent return preparer
cases in the Tax Division's Criminal Tax Manual. Several instructions
warrant particular consideration. First, a unanimity instruction can be
important in a fraudulent return preparer case. That is, where a particular
count in the indictment alleges that a tax return is false in more than one
way, the prosecutor should consider an instruction that the jury need not
find that *all* items alleged as false in the count are false, but the jury
must unanimously agree on what item alleged as false is false.[35]

---

[34] *See, e.g.*, United States v. Daulton, 266 F.App'x. 381, 386 (6th Cir. 2008)
("[e]vidence of noncriminal conduct to negate the inference of criminal con-
duct is generally irrelevant"); United States v. Ellisor, 522 F.3d 1255, 1270
(11th Cir. 2008) (evidence of good conduct is not admissible to negate criminal intent);
United States v. Scarpa, 897 F.2d 63, 70 (2d Cir. 1990).

[35] *See, e.g.*, United States v. Helmsley, 941 F.2d 71, 93 (2d Cir. 1991).

Second, given that in some fraudulent return preparation cases the defendant's clients were knowing and willing participants in the fraud, an instruction that the culpability of the client is irrelevant to the culpability of the preparer should be used. The defense is likely to attempt to blame the clients for the falsities on their tax returns, but it is not a defense that the client also knew that the return was false.

# IV. Sentencing

The defendant has been convicted at trial, and it is now time for sentencing. There are several issues the prosecutor should be prepared to address at sentencing.

## A. Tax loss

### 1. Two-level enhancement for return preparers

First, the prosecutor should always argue that a two-level increase in the defendant's offense level is appropriate because the defendant "was in the business of preparing or assisting in the preparation of tax returns."[36]

### 2. Aggravating Role Enhancement

Second, the prosecutor should consider whether the facts of the return preparer case merit an aggravating role enhancement. Aggravating role enhancements apply if the defendant was an organizer, leader, manager, or supervisor in the criminal activity and range from a two-level increase to a four-level increase.[37] The enhancement may be appropriate in cases where the return preparer's employees were knowingly filing false returns. It may also be appropriate if the false return scheme involved other participants responsible for creating false documents to support the fraudulently filed tax returns.

### 3. Relevant conduct

Third, the prosecutor should seek to include as many uncharged, but false, tax returns in the applicable tax loss calculations as possible.

In determining the base offense level for sentencing, a court must include all relevant conduct.[38] The U.S. Sentencing Guidelines specify that relevant conduct includes "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction," but only for "offenses of a character for which § 3D1.2(d)

---

[36] U.S.S.G. § 2T1.4(b)(1)(B).
[37] U.S.S.G. § 3B1.1.
[38] U.S.S.G. § 1B1.3(a).

would require grouping of multiple counts"—which includes tax offenses sentenced under Part T of Chapter Two of the Guidelines.[39] The commentary to section 2T1.1 further explains that "all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated."[40] Thus, other fraudulently prepared tax returns, because they are part of the same course of conduct or common scheme or plan as the offense of conviction, should be accounted for as relevant conduct in calculating tax loss.[41]

Relevant conduct is important in fraudulent return preparer prosecutions because the counts charged in the indictment rarely capture the full extent of the defendant's crimes. Thus, the prosecutor should argue that the proper tax loss includes all other known false tax returns prepared by the defendant. Any tax returns that can be shown, by a preponderance of the evidence, to be false should be treated as relevant conduct, including other false tax returns prepared for the clients who testified at trial and false returns prepared on behalf of clients whose returns were not included in the indictment. It is proper to include tax returns that were confirmed to be false during IRS interviews with taxpayers, even if there was no opportunity for the defendant to cross-examine the taxpayers.[42] The relevant conduct can include tax loss from years barred by the statute of limitations, and it can also include acquitted conduct.[43]

Given that much of this type of evidence is unlikely to have been admitted at trial, it will need to be introduced at sentencing. Typically, an IRS RA can testify about these additional tax loss figures and the methodology used to calculate them.

## 4. Extrapolation

Relevant conduct can also be established through an extrapolation method. "To extrapolate means 'to estimate the values of . . . a function or series . . . outside a range in which some of its values are known, on

---

[39] *Id.*; U.S.S.G. § 3D1.2(d) (providing that "[o]ffenses covered by" (inter alia) "§§2T1.1, 2T1.4, 2T1.6, 2T1.7, 2T1.9, 2T2.1, [and] 2T3.1" "are to be grouped under this subsection").

[40] U.S.S.G. § 2T1.1, n.2.

[41] *See, e.g.*, United States v. Hendrickson, 822 F.3d 812, 829–30 (6th Cir. 2016) (court properly included tax loss from fraudulent refunds in failure to file case).

[42] United States v. Goosby, 523 F.3d 632, 639 (6th Cir. 2008).

[43] *See, e.g.*, United States v. Ziskind, 491 F.3d 10, 16–17 (1st Cir. 2007); United States v. Watts, 519 U.S. 148, 157 (1997) (per curiam) (guidelines range may rest on uncharged conduct or conduct underlying acquitted charges, if court finds conduct proven by a preponderance of evidence).

0904

the assumption that the trends followed inside the range continue outside it.'"[44] In a fraudulent return preparer case, that means taking a random sample of tax returns that are "representative of the larger group of" returns, calculating the tax loss within that sample, and then using that figure to estimate the total tax loss.[45]

For an extrapolation to be unbiased, the sample returns must be randomly chosen.[46] The sample returns must be chosen from the entire universe of the defendant's returns, not those already flagged by the IRS as suspicious. A sample used for extrapolation must also consist of enough returns to allow the estimate of the total tax loss to be made with reasonable confidence—typically, that means the sample must be at least thirty returns.[47] Practically speaking, a successful extrapolation may require a lot of legwork, especially on behalf of the case agent, who will need to interview taxpayers or obtain other evidence (such as IRS audit files) that establish which of the sample returns are false. Extrapolation can be time-consuming and complicated. A prosecutor who would like to undertake it should consult with the Tax Division to obtain guidance and assistance.

## B. Restitution

Restitution is an important component of sentencing in criminal tax cases. Restitution is limited to the actual loss caused by the counts of conviction, unless the defendant agrees to pay a higher restitution amount.[48] As a result, the restitution calculations will often differ from the total tax loss calculations. As previously discussed, restitution can only be ordered as a separate part of the defendant's sentence if the defendant agrees to pay restitution in a plea agreement. When negotiating a plea agreement, the Tax Division directs prosecutors to include the sample restitution language in the Criminal Tax Manual. If there isn't a plea agreement, or the plea agreement does not include an agreement to restitution, then the court may only order restitution as a condition of supervised release or probation.[49] It is important that prosecutors alert the court to the appropriate manner of ordering restitution to ensure a clean record.

---

[44] United States v. Mehta, 594 F.3d 277, 283 (4th Cir. 2010) (internal citation omitted).

[45] *Id.*

[46] *See* United States v. Jenkins, 786 F.App'x 852, 860 (11th Cir. 2019).

[47] *See* United States v. Johnson, 185 F.3d 765, 769 (7th Cir. 1999).

[48] U.S. DEP'T OF JUST., CRIMINAL TAX MANUAL, 44.03[1].

[49] U.S. DEP'T OF JUST., CRIMINAL TAX MANUAL, 44.00; CTM 44.10[1].

**EXHIBIT D-39**

February 22, 2008

**NOTE TO: Medicare Advantage Organizations, Prescription Drug Plan Sponsors, and Other Interested Parties**

**SUBJECT: Advance Notice of Methodological Changes for Calendar Year (CY) 2009 for Medicare Advantage (MA) Capitation Rates and Part D Payment Policies**

In accordance with Section 1853(b)(2) of the Social Security Act (the Act), we are notifying you of proposed changes in the MA capitation rate methodology and risk adjustment methodology applied under Part C of the Act for CY 2009. Preliminary estimates of the national per capita MA growth percentage and other MA payment methodology changes for CY 2009 are also discussed. For 2009, CMS will announce the MA capitation rates on the first Monday in April 2008, in accordance with the timetable established in the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA). This Advance Notice is published 45 days before that date.

Attachment I shows the preliminary estimates of the national per capita MA growth percentage component of the minimum percentage increase, which is a key factor is determining the MA capitation rates. Attachment II sets forth the changes in payment methodology for CY 2009 for original Medicare benefits. Attachment III set forth the changes in payment methodology for CY 2009 for Part D benefits. Attachment IV presents the preliminary CMS-HCC risk adjustment factors, and Attachment V presents the annual adjustments for 2009 to the Medicare Part D benefit parameters for the defined standard benefit.

Any changes to employer/union-only group waiver plan payment for 2009 will be issued in future guidance.

Comments or questions may be submitted electronically to the following address: AdvanceNotice2009@cms.hhs.gov. Comments or questions also may be mailed to:

Anne Hornsby
Centers for Medicare & Medicaid Services
7500 Security Boulevard
S3-16-16
Baltimore, Maryland 21244

2

In order to receive consideration prior to the April 7, 2008 release of the Announcement of Calendar Year (CY) 2009 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies, comments must be received by 6:00 PM EST on Friday, March 7, 2008.

/ s /
Abby L. Block
Director
Center for Beneficiary Choices

/ s /
Paul Spitalnic, A.S.A., M.A.A.A.
Director
Parts C & D Actuarial Group
Office of the Actuary


Attachments

**2009 ADVANCE NOTICE**
**TABLE OF CONTENTS**

Attachment I.  Preliminary Estimate of the National Per Capita Growth Percentage for
 Calendar Year 2009 ...................................................................................................5

Attachment II.  Changes in the Payment Methodology for Original Medicare Benefits for
 CY 2009 ......................................................................................................................6

Section A.  Recalibration of CMS-HCC Model .................................................................6

Section B.  Frailty Adjustment..........................................................................................7

 B1.  Frailty Adjustment Factors ................................................................................ 7

 B2.  Frailty Adjustment Transition for PACE organizations.................................... 7

 B3.  Frailty Adjustment Transition for Certain Demonstrations ............................. 7

Section C.  Normalization Factors ....................................................................................8

 C1.  Normalization Factor for the CMS-HCC Model................................................ 8

 C2.  Normalization Factor for the ESRD Dialysis Model ........................................ 8

 C3.  Normalization Factor for the RxHCC Model..................................................... 9

 C4.  Normalization Factor for Functioning Graft Enrollees' Risk Scores................. 9

Section D.  Budget Neutrality............................................................................................9

Section E.  Adjustment for MA Coding Intensity.............................................................10

 Background .............................................................................................................. 10

 Study Results .......................................................................................................... 10

 Calculation and Application of a Coding Intensity Measure........................................ 13

Section F.  Medicare as Secondary Payer (MSP) Adjustment Factor for Aged & Disabled
 Enrollees ...................................................................................................................14

Section G.  ESRD Bidding and Payment .........................................................................15

 G1.  ESRD Bidding Policy ...................................................................................... 15

 G2.  Transition to New ESRD Payment .................................................................. 15

 G3.  ESRD Functioning Graft Payments ................................................................. 16

Section H.  Regional Plan Stabilization Fund..................................................................16

Section I.  Continuation of Clinical Trial Policy ..............................................................16

Section J.  Adjustment to FFS Capitation Rates for VA-DOD Costs....................................16

Section K.  Operational Policies ......................................................................................17

 K1.  Reporting of Medicaid Status for Part C Payment.............................................. 17

 K2.  Standard Set of ICD-9 Diagnosis Codes for Risk Adjustment ................................ 18

Attachment III.  Changes in the Payment Methodology for Medicare Part D for CY 2009 ........20

Section A.  Benefit Design................................................................................................20

 A1.  Medicare Part D Benefit Parameters: Annual Adjustments for Defined Standard
 Benefit in 2009.................................................................................................. 20

    A2.  Reporting Drug Costs When Contracting with a Pharmacy Benefit Manager (PBM) ............................................................................................................... 23

Section B.  Bidding ................................................................................................................. 23

    B1.  Calculation of the National Average Monthly Bid Amount ...................................... 23

    B2.  Calculation of the Low-Income Benchmark Premium Amount ............................... 24

    B3.  Coordination of Benefits (COB) User Fees .............................................................. 25

    B4.  Budget Neutrality Offsets for Reinsurance Payment Demonstration Plans in 2009. 25

Section C.  Risk Adjustment ................................................................................................... 26

    C1.  Normalization Factor for the RxHCC Model ............................................................ 26

    C2.  Standard Set of ICD-9 Diagnosis Codes for Risk Adjustment ................................. 26

Section D.  Payment Reconciliation ....................................................................................... 26

Attachment IV.  Preliminary CMS-HCC Risk Adjustment Factors ......................................... 27

    Exhibit IV-1.  Preliminary 2009 Community and Institutional Factors for the CMS-HCC Model .................................................................................................................... 27

    Exhibit IV-2.  Preliminary Disease Hierarchies for the CMS-HCC Model ........................... 31

    Exhibit IV-3.   Preliminary 2009 CMS-HCC Model for New Enrollees ................................ 32

Attachment V.  Medicare Part D Benefit Parameters for the Defined Standard Benefit: Annual Adjustments for 2009 ............................................................................................ 33

    I. Annual Percentage Increase in Average Expenditures for Part D Drugs Per Eligible Beneficiary ................................................................................................................. 33

    II. Annual Percentage Increase in Consumer Price Index, All Urban Consumers (all items, U.S. city average) ........................................................................................... 34

    III. Calculation Methodology ............................................................................................. 34

    Annual Percentage Increase .......................................................................................... 34

    Annual Percentage Increase in Consumer Price Index, All Urban Consumers (all items, U.S. city average) ............................................................................................ 35

    IV. Part D Payment Demonstration Adjustment ................................................................ 36

    V. Retiree Drug Subsidy Amounts .................................................................................... 36

5

## Attachment I.  Preliminary Estimate of the National Per Capita Growth Percentage for Calendar Year 2009

Section 1853(c)(1) of the Social Security Act (the Act) provides that, for years when CMS is "rebasing" the amount representing the actuarial value of 100 percent of costs under original fee-for-service (FFS) Medicare, MA capitation rates will be based on the greater of 100 percent of FFS costs or an increase which is the greater of two percent or the national per capita MA growth percentage, with no adjustment to this percentage for over- or under-estimates for years before 2004. CMS is rebasing the FFS rates for 2009.  See section J, Attachment II for a discussion of the proposed methodology for adjusting the FFS rates to reflect DOD and VA costs, per Section 1853(c)(1)(D)(iii) of the Act.

The current estimate of the change in the national per capita MA growth percentage for aged and disabled enrollees combined in CY 2009 is 4.8 percent. This estimate reflects an underlying trend change for CY 2009 in per capita costs of 3.4 percent and adjustments to the estimates for CY 2008, CY 2007, CY 2006, CY 2005, and CY 2004 aged and disabled MA growth percentages of 2.4 percent, –0.9 percent, 0.1 percent, –0.3 percent, and 0.2 percent, respectively. Our new estimates for these years are lower than the estimates actually used in calculating the CY 2008 capitation rate book for CYs 2005 and 2007 and higher for CYs 2004, 2006, and 2008 than was published April 2, 2007, and are required by Section 1853(c)(6)(C) of the Act.

The following table summarizes the estimates for the change in the national per capita MA growth percentage.

### Table I-1.  National Per Capita MA Growth Percentage

|  | Aged | Disabled | ESRD | Aged+Disabled |
|---|---|---|---|---|
| 2009 Trend Change | 3.4% | 3.4% | 1.6% | 3.4% |
| Revision to CY 2008 Estimate | 1.8% | 5.7% | 2.9% | 2.4% |
| Revision to CY 2007 Estimate | –1.1% | 0.2% | –3.2% | –0.9% |
| Revision to CY 2006 Estimate | 0.3% | –1.3% | –5.1% | 0.1% |
| Revision to CY 2005 Estimate | –0.2% | –1.2% | –1.8% | –0.3% |
| Revision to CY 2004 Estimate | 0.2% | 0.2% | –0.2% | 0.2% |
| Total Change | 4.5% | 7.0% | –5.9% | 4.8% |

Notes: (1) The total percentage change is multiplicative, not additive and may not exactly
match due to rounding.

(2) Starting in 2008, the trend change for ESRD reflects an estimate of the trend for
dialysis-only beneficiaries.

These estimates are preliminary and could change before the final rates are announced on April 7, 2008 in the Announcement of Calendar Year (CY) 2009 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies.  Further details on the derivation of the national per capita MA growth percentage will also be presented in the Announcement.

6

## Attachment II.   Changes in the Payment Methodology for Original Medicare Benefits for CY 2009

### Section A.  Recalibration of CMS-HCC Model

In 2009, CMS will implement an updated version of the aged-disabled CMS-HCC risk adjustment model, including community, institutional, and new enrollee segments of the model. Fee-for-service (FFS) claims data for the years 2004 and 2005 are used in the recalibration of the model. Disease groupings are the same as in past models; however, the factors are different.

When CMS recalibrates the CMS-HCC risk adjustment model with more recent data, an updated coefficient is calculated for each diagnosis group and demographic characteristic in the model (e.g., age, sex), which represents the marginal (additional) cost of that diagnosis group or demographic characteristic in predicting FFS per capita costs. These coefficients are then converted to relative cost factors by dividing each by the per capita cost predicted for a specific year. For the CY 2009 recalibration, CMS used predicted per capita costs for 2007. The relative factors are used to calculate risk scores for individual beneficiaries, which will average 1.0 in the denominator year.

The current CMS-HCC model is calibrated on 2002 and 2003 data, and recalibrating the model on more current data results in more appropriate relative weights for each HCC because they reflect more recent coding and expenditure patterns in FFS Medicare. In addition, recalibrating with more recent data adjusts the model for increases in predicted FFS expenditures between calibration years. Recalibration of the CMS-HCC model can result in changes in relative risk scores for individual beneficiaries and for average plan risk scores, depending on individual beneficiaries' combinations of diagnoses.

One change that was made to the model was to remove the constraints on two HCCs: Metastatic Cancer (HCC 7) and Severe Cancers (HCC 8). In the version of the model currently in use, the coefficients of HCC 7 (Metastatic Cancer) and HCC 8 (Severe Cancers) were constrained to be equal. In the past, these HCCs were constrained because there were concerns regarding the completeness of the coding for Metastatic Cancer, specifically that secondary (metastatic) cancers were sometimes incorrectly coded as primary cancers.

With the constraint removed, the estimated incremental cost of Metastatic Cancer (HCC 7) is now higher than that for Severe Cancers (HCC 8). CMS determined that there was significant clinical and expected treatment cost difference between metastatic and localized cancer (e.g., chemotherapy for metastatic cancer). Although current coding may be imperfect, there are specific diagnostic tests and indications for metastatic versus localized cancers, and allowing a payment differential will provide incentives for accurate coding. More importantly, a higher incremental payment for beneficiaries with metastatic cancer will provide for more accurate payment to Medicare Advantage plans that enroll such beneficiaries.

In Attachment IV of this Notice, we provide the relative cost factors for each HCC for each segment of the aged-disabled model.

## Section B.  Frailty Adjustment

**B1.  Frailty Adjustment Factors**
CMS has recalibrated the frailty factors for CY 2009.  The purpose of frailty adjustment is to predict the Medicare expenditures of community populations with functional impairments that are unexplained by the CMS-HCC risk adjustment model. Whenever CMS recalibrates the CMS-HCC risk adjustment model, the amount of unexplained Medicare expenditures can change. Thus, it is necessary to simultaneously recalibrate the frailty factors.  Table II-1 presents the preliminary recalibrated frailty factors for CY 2009.

**Table II-1.  Preliminary Recalibrated Frailty Factors for CY 2009**

| ADL | 2008 Factors (Non-Medicaid) | 2009 Recalibrated Factors (Non-Medicaid) | 2008 Factors (Medicaid) | 2009 Recalibrated Factors (Medicaid) |
|---|---|---|---|---|
| 0 | −0.089 | −0.093 | −0.183 | −0.180 |
| 1-2 | +0.110 | +0.112 | +0.024 | +0.035 |
| 3-4 | +0.200 | +0.201 | +0.132 | +0.155 |
| 5-6 | +0.377 | +0.381 | +0.188 | +0.200 |

CMS is not proposing to change the way we calculate the contract-level frailty score; we will use the results from each contract's 2008 HOS survey to calculate each contract-level frailty score for CY 2009.

**B2.  Frailty Adjustment Transition for PACE organizations**
Frailty adjustment factors will be applied to payment to PACE organizations using the transition schedule published in the 2008 Announcement (published April 2, 2007).  PACE frailty scores for payment year 2009 will be calculated at a blend of 70% of the frailty factors in use prior to 2008 and 30% of the recalibrated frailty factors implemented in 2009.  The full transition schedule is as follows:

- In 2008 (year 1):  90% of the pre-2008 frailty factors and 10% of the 2008 frailty factors.
- In 2009 (year 2):  70% of the pre-2008 frailty factors and 30% of the 2009 frailty factors.
- In 2010 (year 3):  50% of the pre-2008 frailty factors and 50% of the most recently calibrated frailty factors.
- In 2011 (year 4): 25% of the pre-2008 frailty factors and 75% of the most recently calibrated frailty factors.
- In 2012 (year 5): 100% of the most recently calibrated frailty factors.

**B3.  Frailty Adjustment Transition for Certain Demonstrations**
Frailty adjustment factors will be applied to payment to the following MA plan types using the phase-out schedule published in the 2008 Announcement (published April 2, 2007):  Social Health Maintenance Organizations (S/HMOs), Minnesota Senior Health Options (MSHO)/ Minnesota Disability Health Options (MnDHO), Wisconsin Partnership Program (WPP) and Massachusetts Senior Care Options (SCO) plans.

The full phase out schedule is as follows:
- In 2008 (year 1): 75% of the pre-2008 frailty factors
- In 2009 (year 2) 50% of the pre-2008 frailty factors
- In 2010 (year 3) 25% of the pre-2008 frailty factors
- In 2011, 0% of the pre-2008 frailty factors

## Section C.  Normalization Factors

When we calibrate a risk adjustment model and normalize the risk scores to 1.0, we produce a fixed set of dollar expenditures and coefficients appropriate to the population and data for that calibration year.  When the model with fixed coefficients is used to predict expenditures for other years, predictions for prior years are lower and predictions for succeeding years are higher than for the calibration year.  Because average predicted fee-for-service (FFS) expenditures increase after the model calibration year due to coding and population changes, CMS applies a normalization factor to adjust beneficiaries' risk scores so that the average risk score is 1.0 in subsequent years.

The normalization factor is derived by first using the model to predict risk scores for the FFS population over a number of years.  Next, we trend the risk scores to determine the annual percent change in the risk score.  This amount is then compounded by the number of years between the model denominator year and the payment year to produce the normalization factor.

Starting in 2009, CMS will use a standard of five years of data in the normalization trend.  Each year, CMS will drop the earliest year and add a new year of risk scores to the trend data to create the five-year dataset.  By using a standard number of years, CMS intends to calculate risk score trends based on recent trends in coding, while maintaining stability in the year-to-year trends used.  For the CY 2009 recalibration, trends calculated for the aged-disabled CMS-HCC, ESRD Dialysis, and the RxHCC models are developed on risk scores calculated for 2003-2007.

Below are the preliminary normalization factors for each model.  The final normalization factors will be included in the April 7, 2008 Announcement.

### C1.  Normalization Factor for the CMS-HCC Model
The preliminary 2009 normalization factor for the aged-disabled model is 1.030. The 2009 factor will adjust for two years of FFS risk score growth, i.e., from the denominator year of 2007 to the payment year of 2009. This 2009 normalization factor of 1.030 is lower than the 2008 factor of 1.04 because the 2008 factor adjusted for three years of FFS risk score growth (2005-2008).

### C2.  Normalization Factor for the ESRD Dialysis Model
The preliminary 2009 normalization factor for the ESRD dialysis model is 1.019.  The 2009 factor will adjust for six years of risk score growth, i.e., from the denominator year of 2003 to the payment year of 2009, and will be applied at a phased-in percentage of 50%.  (As discussed in last year's Advance Notice, the ESRD Dialysis normalization factor is being applied on the same transition schedule as is the transition of the ESRD State ratebook; see Section G2.)

9

## C3. Normalization Factor for the RxHCC Model

The preliminary 2009 normalization factor for the RxHCC model is 1.085. This normalization factor reflects a trend calculated on five years of risk score data (2003-2007). We calculated the RxHCC normalization factor by taking the actual 2007 average Part D risk score for all potential Part D plan enrollees and the annual trend applied for the two years between the calculation of actual average Part D risk score and the payment year (2007-2009).

## C4. Normalization Factor for Functioning Graft Enrollees' Risk Scores

CMS applies the normalization factor for the aged-disabled CMS-HCC model to Functioning Graft enrollees' risk scores because all but one of the coefficients for the Functioning Graft model are constrained to equal the coefficients of the CMS-HCC model, and because CMS pays for Functioning Graft enrollees using the county ratebook. However, because CMS recalibrates the functioning graft coefficients along with the dialysis model, the functioning graft coefficients still have a denominator of 2005 (instead of the 2007 denominator that the CMS-HCC community and institutional coefficients will have in 2009). For that reason, CMS will add an additional year to the 2008 CMS-HCC normalization factor; the preliminary 2009 normalization factor to be applied to the 2009 risk scores of enrollees in functioning graft status is 1.058.

## Section D. Budget Neutrality

From 2003 through 2006, CMS implemented risk adjusted payments in a budget neutral manner by applying to the risk rates 100 percent of the Budget Neutrality (BN) factor, which is calculated as the estimated difference between payments to MA organizations at 100 percent of the demographic rates and payments at 100 percent of the risk rates. As previously announced by CMS on February 17, 2006 in the Advance Notice for 2007, and as summarized below, the phase-out of budget-neutral risk adjusted payments began in 2007 and will be completed by 2011, when plans will receive no budget neutrality payment adjustment. For 2009, 25 percent of the BN factor will be applied to the risk rates.

Since CMS cannot calculate the BN factor until the final capitation rates are determined, the factor will be announced in the April 7, 2008 Rate Announcement.

Phase-out Schedule for Budget Neutral Risk Adjusted Payments:

The percentage of the budget neutrality factor that is applied to the risk rates is:
- 2007: 55%
- 2008: 40%
- 2009: 25%
- 2010:  5%
- 2011:  0%

## Section E.  Adjustment for MA Coding Intensity

### Background
As promulgated by the Deficit Reduction Act (DRA), Section 1853(k)(2)(B)(iv)(III) requires CMS to reflect in its risk adjustment for Part C payment "differences in coding patterns between Medicare Advantage plans and providers under part A and B to the extent that the Secretary has identified such differences."  The DRA further instructs that results of the analysis will be "incorporated into the risk scores only for 2008, 2009, and 2010."  In order to comply with this section of the DRA, CMS has studied the changes in MA and FFS risk scores, the differences between those changes, and the coding patterns behind these changes.

From our research for the 2008 payment year, CMS found that MA risk scores increased approximately twice as much as FFS risk scores did for our study population between 2004 and 2006.  There are a number of key reasons why risk scores in the MA and FFS sectors may rise at different rates.  The composition of enrollment in each sector can have an effect on the change in the average risk score.  Initially, some MA plans may have had difficulty gathering and reporting diagnosis codes as completely as FFS, so part of the differential risk score growth could be due to "catching up" to FFS.  MA plans may be finding and diagnosing disease at a higher rate than FFS providers.  Or, it is possible that beneficiaries enrolled in MA plans may be getting sicker faster than beneficiaries in FFS.

Our preliminary research on coding patterns, which was conducted prior to the release of the 2008 Rate Announcement, was unable to clarify enough about the coding pattern differences that result in MA and FFS risk score differences.  Therefore, we did not make an adjustment for coding patterns differences in payment year 2008.  We stated that we would continue to study this issue, with particular focus on the plans that have experienced significant increases in risk scores, in an effort to determine what the appropriate adjustment might be for 2009 and 2010.

CMS has continued its analysis of the coding patterns that result in differences in the MA and FFS risk scores.  The findings below are based on diagnoses reported for payment years 2004-2006.  CMS will update these figures by adding the (currently unavailable) 2007 risk scores to the analysis, prior to the publication of the Announcement on April 7, 2008.

### Study Results
*Composition effects*:  In order to analyze the gross difference between the change in FFS and MA risk scores, we examined the change in risk scores for three categories of enrollees:  stayers, leavers, and joiners.  **Stayers** were those enrollees who remained in the same sector (either FFS or MA) over the study period, **leavers** were those who left either the MA or FFS sector, either to go to the other sector or who died, and **joiners** where those who came into FFS or MA, either from the other sector or who were newly eligible to Medicare.  We found that indeed some of the difference in the change in risk scores between MA and FFS was due to composition effects.  Specifically, we found that:

- A significant portion of the beneficiaries who join MA are beneficiaries who are switching from FFS.  In FFS, the vast majority of beneficiaries who join are newly-eligible to Medicare.  The risk scores of beneficiaries who are newly eligible to Medicare

0916

tend to be very low and these low risk scores depress FFS risk score growth relative to MA.

- Of the leavers, decedents (who have high risk scores) are a slightly larger fraction of FFS beneficiaries than of MA enrollees and, thus, the exit of high-risk score decedents restrains the year-to-year growth of average FFS risk scores by slightly more than it does MA scores.

Because most new enrollees in FFS are newly-eligible to Medicare and FFS is losing higher risk beneficiaries, overall average MA risk scores are pushed up at a faster rate than risk scores in FFS. Over the two-year period, approximately 50% of the difference between the MA and FFS sectors in the growth of risk scores is due to enrollment patterns and approximately 50% is due to the more rapid growth in risk scores for beneficiaries who stay in the same sector in consecutive years.

*Focus on "stayers:"* Focusing on the stayers allows us to examine differences in risk score changes that are not due to the changing composition of the enrolled population. In our analyses of the impact of coding patterns on stayers' risk scores, we did the following:

- We focused on two cohorts of stayers: those who were stayers in 2004-2005, and those who were stayers in 2005-2006. We weren't able to add the 2006-2007 cohort to the analysis prior to the release of the Advance Notice, but will do so before the release of the Announcement in April 2008.
- For each cohort, we defined MA stayers as those enrollees who were in the same contract in the July of each cohort year, as well as in each data collection year. For example, for the 2004-2005 stayer cohort, we include enrollees who were in the same contract in July 2004 and July 2005, and in all of 2003 and 2004. This criterion resulted in the exclusion of enrollees who would have been new enrollees in the data collection years, as well as those enrollees who switched contracts.
- We found that the overall risk scores of MA stayers increased by 0.032 more than those of FFS stayers over the two-year study period. As discussed below, we then broke down the change in aggregate risk scores into the changes in the disease component of the CMS-HCC risk score (the "disease score") versus the demographic component.

*Focus on the disease score of stayers*: The disease score is the HCC component of the risk score that plans (and FFS providers) affect by their reporting of diagnosis codes. Among stayers, we found that MA disease scores increased more quickly than FFS disease scores and that change in the disease component of the risk score accounted for approximately 90% of the difference in the change in MA versus FFS risk scores.

We found that, on average, disease scores for stayers in MA plans increased 20% faster than stayers in FFS over the two years in the study period. Specifically, FFS disease scores for stayers increased by 0.145 over the two-year period between 2004 and 2006, while the average disease score among beneficiaries who remained enrolled in a single MA contract for at least two data collection years increased by 0.174 over the same time period for a two-year difference of 0.029.

*Dynamics behind changes in disease scores*: CMS also analyzed the reasons why the change in MA and FFS disease scores differed among stayers. A significant portion of the difference in

disease score changes is attributable to the reporting of 26 HCCs (of the 70 HCCs in the model) that fall into one of seven hierarchies: diabetes (5 HCCs), cardiovascular disease (4 HCCs), coronary artery disease (3 HCCs), cancer (4 HCCs), quadriplegia and other central nervous system disease (4 HCCs), liver disease (3 HCCs), and dialysis/renal disease (3 HCCs). Approximately one-third of the difference in disease score change is due to increases in severity within these hierarchies, particularly within the diabetes hierarchy. The remaining difference results primarily from greater retention of reported diagnosis codes within certain hierarchies from one year to the next, especially the coronary artery disease, liver, diabetes, and renal hierarchies.

*Variation among contracts*: CMS research has also revealed a large amount of variation among MA contracts in the disease score change among stayers, and in the dynamics behind contracts' changing disease scores. As described above, on average, disease scores for MA stayers increased by 0.174 over the 2004-2006 study period, or 0.029 greater than the average increase of 0.145 for FFS stayers. We found that approximately 40% of the contracts in our study – those operating continuously during the 2004, 2005, and 2006 payment years – had changes in stayer disease scores that were less than the changes in FFS stayers' disease scores. Looking at enrollees, we found that 25% of the MA stayers in our analysis were enrolled in contracts where the difference between the two-year increase in stayers' disease scores and the FFS increase was at least twice the industry average.

*Catch-up to FFS levels of coding*: Although CMS cannot definitely determine whether "catch up" to FFS coding occurred or not, CMS recognizes that plans may have experienced some catch up, particularly during initial years of operation. In order to take any such catch up into account in our adjustment, we are proposing to:
- Adjust for MA coding only in 2009 and later (not adjust for previous year's coding patterns differences).
- Make an adjustment for contracts that have existed since at least 2005.
- Adjust risk scores for enrollees in contracts that have significant coding pattern differences from FFS.
- We are proposing to weight the impact of coding differences on disease scores in more recent years (when plans would have caught up to FFS) differently than coding patterns differences in earlier years.

*More complete coding*: We do not assume that the coding pattern differences that we found in our study are the result of improper coding. As discussed above, CMS understands that MA plans have made efforts to identify enrollees' conditions and may be coding more completely than FFS. However, because MA coding patterns differ from FFS coding patterns, the normalization factor (which is calculated based on FFS coding) does not currently adjust for these different coding patterns.

*Impact of health status on risk score changes*: As noted above, it is possible that beneficiaries enrolled in MA plans may be getting sicker faster than beneficiaries in FFS and this could be driving faster risk score growth for MA enrollees. Given the care coordination and disease management activities of MA plans, however, we do not find it reasonable to assume that MA stayers' underlying health status is getting worse at a faster rate than stayers in FFS. CMS analysis has found that MA mortality rates during the study period do not explain rising risk

13

scores; when applying expected mortality rates to the MA population, risk scores are expected to decrease, not increase. (In our analysis, we adjusted mortality rates for age, sex, county, Medicaid status, and institutional status.)

**Calculation and Application of a Coding Intensity Measure**
While our research supports the finding that MA plans have coding patterns that differ from FFS, we only have a few years to observe the differences in MA and FFS coding patterns. Therefore, for 2009 we propose to apply an MA coding adjustment factor as follows:

- Apply an adjustment to the risk scores of enrollees in those contracts for which the difference between the change in stayers' disease scores and the change in the FFS stayers' disease scores is two or more times the industry average; this threshold is approximately the same as a threshold at the plans enrolling the 25% of MA stayers with the largest change in disease score. We considered a few other options for applying an adjustment:
  - We considered applying an adjustment to those contracts above two standard deviations above the mean difference in disease score change, but the variation among plans is so great that such a threshold would eliminate most contracts.
  - We considered applying an adjustment on a contract-by-contract basis, but decided instead to apply a relatively high threshold in order to focus on the contracts that have experienced the largest changes in their stayers' disease scores, relative to FFS stayers' disease scores.
  CMS is requesting comments on the criteria for determining the threshold used to determine those contracts' payment to which we would apply an adjustment factor.

- Exclude those contracts that were not in existence until after 2005 (came into existence in 2006 or later). Contracts that existed in 2005 and earlier have at least two years of experience reporting to CMS stayers' diagnosis codes that have been used to calculate risk scores.

- Exclude contracts with under an average of 1,000 enrollees during 2005-2006. CMS considers these contracts too small to provide enough data to make reliable estimates of their coding patterns.

CMS proposes to calculate the 2009 MA coding adjustment as follows:

1. *Calculate the average annual difference between the increase in MA and FFS stayers' disease scores.* The average annual change in stayers' disease scores for a contract is calculated as the change in average disease score, averaged over as many cohorts of stayers that a contract has, e.g., CMS would calculate the annual average change in disease score for contracts that have been in existence since 2003 or earlier as the average of the change in disease score for the 2004-2005, 2005-2006, and the 2006-2007 stayer cohorts. We would then subtract the FFS annual average change in stayers' disease score to obtain the differential increase in stayers' disease scores. Changes in disease scores would be adjusted for age and survivor status.

2. *Calculate this average annual difference in the change in stayers' disease scores within that group of contracts that would fall above the threshold for applying the adjustment.* For example, we would calculate the annual average difference between MA and FFS stayers' disease score increase based only on MA data from those contracts where the difference between the change in stayers' disease scores and the change in FFS stayers' disease scores was two or more times the industry average. We would calculate the average disease score change for the set of contracts by weighting each contract's disease score change by the number of beneficiaries in each contract. We would then subtract the FFS disease score change from this weighted average. Based on the two years of data that were included in our analysis to date, the difference in the change in stayers' disease score for the contracts in this group and the FFS average is 0.050.

3. *Adjust the annual average difference in disease score change for the average percent of MA plan enrollees in the payment year who were enrolled in the same plan in the data collection year.* CMS currently estimates that this percentage of enrollees is approximately 75%, but will finalize the percentage after we add 2007 risk score data to our analysis. Based on our current estimate of 75% for the proportion of MA enrollees who are stayers, the adjustment for the contracts with the top 25% of MA enrollees with the largest difference between their change in disease score and the FFS change in disease score would be 0.0375. CMS (1) will update this calculation with 2007 data, (2) proposes to convert the adjustment amount into a percent change to risk scores in the Announcement, and (3) will consider whether to apply a straight average across the year-to-year differences, or whether to give more weight the disease score change differences in the most recent years. CMS requests comment on how we calculate the adjustment factor.

The average change in MA stayers' disease score, the change in MA stayers' disease scores for the top group of contracts, the FFS average change in disease score, the difference between MA and FFS, and the proportion of stayers we project to be enrolled in MA contracts in 2009, along with other calculations, will be updated in the Announcement.

## Section F. Medicare as Secondary Payer (MSP) Adjustment Factor for Aged & Disabled Enrollees

MA capitation rates are calculated as if Medicare were always the primary payer; adjustments to the rates for situations in which Medicare is secondary are made as part of actual payment. The MSP adjuster applied to aged and disabled beneficiaries is calculated as the ratio of the actual Medicare spending for all MSP months for all MSP beneficiaries to the predicted Medicare spending for all MSP months for all MSP beneficiaries. Actual spending was calculated using the 2005 claims from the same analytic files used to recalibrate the CMS-HCC model. The predicted amount was calculated using the newly recalibrated CMS-HCC model. MSP status, which was determined using the working aged/working disabled status data in 2005, was used both for determining whom to exclude from the recalibration and for determining which beneficiaries to include in the MSP adjuster calculation.

CMS has recalculated the MSP adjuster for working aged and working disabled beneficiaries. The current adjuster of 0.215 will be revised to 0.174 in the 2009 payment year. There are two reasons for the change in the adjuster. First, CMS has refined the methodology used to calculate the adjuster. Previously, we prorated each beneficiary's MSP months using their total Medicare-paid costs during all months when beneficiary was enrolled. The new methodology includes costs only from those months in which beneficiaries have MSP status. Second, the average number of actual dollars calculated in the MSP months has decreased.

We are not proposing to change the formula for calculating the contract-level working aged/working disabled factor that is applied to each contract's total monthly payment for non-hospice/non-ESRD enrollees. We would simply change the value of the adjuster in that formula from 0.215 to 0.174.

## Section G.  ESRD Bidding and Payment

Pursuant to Section 1853(a)(1)(H) of the Act,  CMS has the authority to determine whether to apply the competitive bidding methodology to ESRD enrollees, and must establish "separate rates of payment" with respect to ESRD beneficiaries.

### G1. ESRD Bidding Policy
For 2009, CMS will continue the policy of excluding costs for ESRD enrollees in the plan A/B bid. The MA Bidding Instructions for CY 2009 will provide guidance on the option of adjusting A/B mandatory supplemental premiums to reflect the costs or savings for ESRD enrollees in the basic and supplemental benefits.

### G2. Transition to New ESRD Payment
As announced in last year's Advance Notice, CMS continues the phase-in of the revised State capitation rates used to determine payments for enrollees in dialysis and transplant status. For payment year 2009, CMS will pay for ESRD dialysis and transplant enrollees using a blend of 50% of the old State ratebook (in use through 2007) and 50% of the revised State ratebook (implemented in 2008). The revised ESRD State ratebook reflects the dialysis-only trend. During the transition period, we will continue to trend forward the old and the revised State rates using the same dialysis-only growth trend. CMS is not rebasing the ESRD Dialysis State rates for 2009.

The full transition schedule is as follows. CMS payments for ESRD dialysis and transplant beneficiaries enrolled in MA plans will be:

- In 2008 (year 1): a blend of 75% old ratebook-based payments and 25% revised ratebook-based payments.
- In 2009 (year 2): a blend of 50% old ratebook-based payment and 50% revised ratebook-based payments.
- In 2010 (year 3): a blend of 25% old ratebook-based payments and 75% revised ratebook-based payments.
- In 2011:  100% of the revised ratebook.

In States where the revised dialysis rates are higher than the pre-2008 State rates, we will apply the revised ESRD State rates.

### G3.  ESRD Functioning Graft Payments

CMS pays for Functioning Graft enrollees with risk scores calculated using the aged-disabled CMS-HCC model coefficients, with the exception of the coefficient for HCC174 (Major Organ Transplant), which is not constrained, and the Graft factors, which are additive to the functioning graft risk scores. However, because CMS recalibrates the functioning graft coefficients along with the dialysis model, for 2009 CMS will continue to use the functioning graft coefficients published in the April 7, 2007 Advance Notice for 2008, when the ESRD dialysis model was last recalibrated. See Section C4 for a discussion of the normalization factors to be used with the functioning graft risk scores.

### Section H.   Regional Plan Stabilization Fund

Section 221 of the MMA added Section 1858(e) to the Act to create a new MA Regional Plan Stabilization Fund. The purpose of the fund is to provide financial incentives to MA organizations to offer MA regional PPO plans in each MA region, and to retain MA regional PPO plans in regions with relatively low MA market penetration.

Section 101 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 – enacted December 18, 2007 – delayed Stabilization Fund payments until January 1, 2013.

### Section I.  Continuation of Clinical Trial Policy

In 2009, we will continue the policy of paying on a fee-for-service basis for clinical trial items and services provided to MA plan members that are covered under the relevant National Coverage Determinations on clinical trials.

### Section J.   Adjustment to FFS Capitation Rates for VA-DOD Costs

Per Section 1853(c)(1)(D)(iii) of the Act, CMS proposes to adjust to the extent appropriate the 2009 FFS rates to reflect CMS' "estimate, on a per capita basis, of the amount of additional payments that would have been made in the area involved under this title if individuals entitled to benefits under this title had not received services from facilities of the Department of Defense or the Department of Veterans Affairs."

The Office of the Actuary (OACT) proposes to compare the risk-adjusted Medicare reimbursements of dual-eligible individuals — those entitled to benefits under this title and entitled to benefits from the Department of Defense (e.g., DoD TRICARE for Life, DoD US Family Health Plan) or the Department of Veterans Affairs (VA) — with individuals entitled only under this title. In cases where groupings of dual-eligible individuals (who would possibly have services provided in VA or DoD facilities not reimbursed by Medicare) have risk-adjusted Medicare reimbursements significantly different from other Medicare-eligible individuals, we propose to adjust the MA FFS rates by excluding these individuals from the calculation. This

17

exclusion implicitly assumes that these individuals, if they had received all their services from Medicare-covered providers, would have the same risk-adjusted Medicare reimbursements as the remaining individuals.

MA FFS rates could be higher or lower under this adjustment. This is because the MA FFS rates are risk-adjusted rates. We note that under the current payment methodology we are missing two pieces of information on beneficiaries receiving health services through the VA or DoD:

1.  The amounts Medicare would have reimbursed if these individuals had received their services from Medicare-covered providers rather than from VA/DoD providers.

2.  Diagnostic information identified in VA/DoD-provided services but not identified in Medicare-covered services. Lack of diagnostic information could potentially understate individuals' risk scores.

Since the MA FFS rates are calculated using risk-adjusted reimbursements, there could be cases where the risk scores are understated to a greater extent than reimbursements leading to a reduction in the MA FFS rates in some counties.

In light of the foregoing, further information and analysis is required before making a final decision on the appropriateness of adjustments.

## Section K.  Operational Policies

### K1.  Reporting of Medicaid Status for Part C Payment

In CY 2009, CMS will complete the transition to using the MMA Medicare/Medicaid Dual Eligible monthly submission file (MMA State files) as the main source of Medicaid status for Part C plan payments. At the same time, CMS will end the use of the Third Party files as a source of Medicaid status. CMS anticipates that this change in Medicaid status source will improve – and increase – the identification of dual-eligible MA enrollees. As discussed in the 2008 Announcement (published April 2, 2007), CMS has found that the MMA State files identify approximately one million more dual eligibles than both the Third Party files and plan-reported data. (Please note that the changes discussed here only affect how we assign Medicaid status for Part C risk adjustment purposes, and that we are not changing how we identify deemed individuals for purposes of Part D payment.)

Plan Reporting. For any Medicaid period open on or after January 1, 2008, organizations may no longer submit batch "01" transactions to CMS. Instead, to request changes to Medicaid status, organizations must submit retroactive "01" transactions to IntegriGuard, as indicated in Table II-2.

**Table II-2. Data sources for the assignment of Medicaid status**

| | Payment year 2007 | Payment year 2008 | Payment year 2009 |
|---|---|---|---|
| **New enrollees** | 1. Third Party Buy-In file<br>2. Plan-reported Medicaid<br> • Batch "01"<br>  transactions<br> • Retroactive "01s"<br>  through IntegriGuard | 1. MMA State files<br>2. Plan-reported<br> • Retroactive "01s"<br>  through IntegriGuard | 1. MMA State files<br>2. Plan-reported<br> • Retroactive<br>  "01s" through<br>  IntegriGuard |
| **Full risk enrollees** | | 1. MMA State files<br>2. Third Party Buy-In file<br>3. Plan-reported Medicaid<br> • Batch "01"<br>  transactions<br> • Retroactive "01s"<br>  through IntegriGuard | |

*Notes*: <u>Full risk enrollees</u>. CMS considers full risk Medicare beneficiaries as dually-eligible if they were eligible for title XIX during any month in the year prior to the payment year. Full risk Medicare beneficiaries have 12 months of Part B in the year prior to the payment year.

<u>New enrollees</u>. CMS assigns Medicaid status for new enrollees on a concurrent basis, i.e., if a newly-enrolled Medicare beneficiary is eligible for title XIX during any month during the payment year, they are considered Medicaid for that year.

## K2. Standard Set of ICD-9 Diagnosis Codes for Risk Adjustment

As discussed in the 2008 Announcement (released April 2, 2007), CMS is implementing the use of a standard set of valid codes to determine which plan-submitted diagnosis codes are acceptable for use in CMS's Risk Adjustment Processing System (RAPS). The goal is for RAPS to accept and store only those diagnoses codes that are valid. RAPS has historically accepted and stored old ICD-9 codes that had been superseded by more recent National Center for Health Statistics (NCHS) codes, i.e., invalid codes, without sending error messages to the plans. Having a standard set of valid codes for each year will make it more efficient for CMS and plans to manage risk adjustment processing, editing, and error reporting.

Starting with payment year 2009, RAPS will only accept valid ICD-9-CM codes for two fiscal years -- the fiscal year that begins prior to the payment year and the fiscal year that begins during the payment year -- for the CMS-HCC, ESRD, and RxHCC risk adjustment models. For example, for diagnoses codes to be used in 2009 final payment, i.e., for diagnoses from service dates between January 1, 2008 and December 31, 2008, RAPS will only accept codes that are valid for Fiscal Year 2008 and Fiscal Year 2009. (Please note that for the initial risk score run for payment year 2009, CMS will use valid diagnosis codes from FY 2007 and FY 2008 -- services dates between July 1, 2007 and June 30, 2008.)

Refer to Table II-3 for the implementation schedule of the new rules regarding the acceptance of diagnosis codes. <u>Please note that Table II-3 of this Notice supersedes the table published in the April 2, 2007 Rate Announcement for 2008.</u>

CMS is in the process of updating the "future diagnoses file" to eliminate invalid codes from that list. However, whether submitting diagnosis codes from the list of current model diagnoses or the list of future diagnoses, plans should resubmit an updated valid diagnosis code whenever they receive a RAPS error code specifying that a submitted diagnosis code is invalid. Both lists of current diagnosis codes and future diagnosis codes can be found in a zipped file on the CMS Web site at

19

http://www.cms.hhs.gov/MedicareAdvtgSpecRateStats/06_Risk_adjustment.asp#TopOfPage.
Please refer to the HPMS memo released November 26, 2007 for a discussion of this policy and
of the related RAPS error codes.

Table II-3. Acceptable diagnoses codes

| Year of Payment | Date of Service | Source of codes |
|---|---|---|
| 2007 | 1/06 – 12/06 | The list of codes published on our website at http://www.cms.hhs.gov/MedicareAdvtgSpecRateStats/06_Risk_adjustment.asp#TopOfPage (which lists acceptable codes by year) |
| 2008 | 1/07 – 12/07 | The list of codes published on our website at http://www.cms.hhs.gov/MedicareAdvtgSpecRateStats/06_Risk_adjustment.asp#TopOfPage (which lists acceptable codes by year) |
| 2009 | 1/08 – 12/08 | Valid diagnoses in Fiscal Years  2008, 2009 |
| 2010 | 1/09 – 12/09 | Valid diagnoses in Fiscal Years  2009, 2010 |
| 2011 | 1/10 – 12/10 | Valid diagnoses in Fiscal Years  2010, 2011 |

20

## Attachment III.  Changes in the Payment Methodology for Medicare Part D for CY 2009

### Section A.  Benefit Design

### A1.  Medicare Part D Benefit Parameters: Annual Adjustments for Defined Standard Benefit in 2009

In accordance with section 1860D-2(b) of the Social Security Act (the Act), CMS must update the statutory parameters for the defined standard Part D prescription drug benefit each year. These parameters include the annual deductible, initial coverage limit, annual out-of-pocket threshold, and minimum copayments for costs above the annual out-of-pocket threshold. As required by statute, the parameters for the defined standard benefit are indexed to the percentage increase in average per capita total Part D drug expenses for Medicare beneficiaries. Accordingly, the actuarial value of the drug benefit increases along with any increase in Part D drug expenses, and the defined standard Part D benefit continues to cover a constant share of Part D drug expenses from year to year. The Part D benefit parameters are updated using two indexing methods specified by statute: (i) the annual percentage increase in average expenditures for Part D drugs per eligible beneficiary or the "annual percentage increase", and (ii) the annual percentage increase in the Consumer Price Index (CPI) (all items, U.S. city average).

As required by statute, the first indexing method, the "annual percentage increase," is used to update the following Part D benefit parameters:

(i)     the deductible, initial coverage limit, and out-of-pocket threshold for the defined standard benefit;

(ii)    minimum copayments for costs above the annual out-of-pocket threshold;

(iii)   maximum copayments below the out-of-pocket threshold for certain low-income full subsidy eligible enrollees;

(iv)    the deductible for partial low-income subsidy (LIS) eligible enrollees; and

(v)     maximum copayments above the out-of-pocket threshold for partial LIS eligible enrollees.

The benefit parameters listed above will be increased by 7.54% for 2009 as summarized by Table III-1 below. This increase reflects the 2008 annual percentage trend of 5.97% as well as a multiplicative update of 1.48% for prior year revisions. Please see Attachment V for additional information on the calculation of the annual percentage increase.

Per 42 CFR 423.886(b)(3), the cost threshold and cost limit for qualified retiree prescription drug plans are updated after 2006 in the same manner as the deductible and out-of-pocket threshold for the defined standard benefit. Thus, the "annual percentage increase" will be used to update these parameters as well. The cost threshold and cost limit for qualified retiree prescription drug plans will be increased by 7.54% from their 2008 values.

The statute requires CMS to use the second indexing method, the annual percentage increase in the CPI, to update the maximum copayments below the out-of-pocket threshold for full benefit dual eligible enrollees with incomes that do not exceed 100% of the Federal poverty line. These maximum copayments will be increased by 3.18% for 2009 as summarized in Table III-1 below.

21

This increase reflects the 2008 annual percentage trend in CPI of 2.60%, as well as a
multiplicative update of 0.57% for prior year revisions.  Please see Attachment V for additional
information on the calculation of the annual percentage increase in the CPI.

**Table III-1. Updated Part D Benefit Parameters for Defined Standard Benefit,
Low-Income Subsidy, and Retiree Drug Subsidy**

| Annual Percentage Increases | | | |
|---|---|---|---|
| | Annual percentage trend for 2008 | Prior year revisions | Annual percentage increase for 2008 |
| Applied to all parameters but (1) | 5.97% | 1.48% | 7.54% |
| CPI (all items, U.S. city average): Applied to (1) | 2.60% | 0.57% | 3.18% |
| **Part D Benefit Parameters** | | **2008** | **2009** |
| Standard Benefit Design Parameters | | | |
| Deductible | | $275 | $295 |
| Initial Coverage Limit | | $2,510 | $2,700 |
| Out-of-Pocket Threshold | | $4,050 | $4,350 |
| Total Covered Part D Drug Spend at OOP Threshold (2) | | $5,726.25 | $6,153.75 |
| Minimum Cost-sharing in Catastrophic Coverage Portion of Benefit | | | |
| Generic/Preferred Multi-Source Drug | | $2.25 | $2.40 |
| Other | | $5.60 | $6.00 |
| Part D Full Benefit Dual Eligible Parameters | | | |
| Copayments for Institutionalized Beneficiaries | | $0.00 | $0.00 |
| Maximum Copayments for Non-Institutionalized Beneficiaries | | | |
| Up to or at 100% FPL | | | |
| Up to Out-of-Pocket Threshold (1) | | | |
| Generic/Preferred Multi-Source Drug (3) | | $1.05 | $1.10 |
| Other (3) | | $3.10 | $3.20 |
| Above Out-of-Pocket Threshold | | $0.00 | $0.00 |
| Over 100% FPL | | | |
| Up to Out-of-Pocket Threshold | | | |
| Generic/Preferred Multi-Source Drug | | $2.25 | $2.40 |
| Other | | $5.60 | $6.00 |
| Above Out-of Pocket Threshold | | $0.00 | $0.00 |
| Part D Non-Full Benefit Dual Eligible Full Subsidy Parameters | | | |
| Resources ≤ $6,290 (individuals) or ≤ $9,440 (couples) (4) | | | |
| Maximum Copayments up to Out-of-Pocket Threshold | | | |
| Generic/Preferred Multi-Source Drug | | $2.25 | $2.40 |
| Other | | $5.60 | $6.00 |
| Maximum Copayments above Out-of-Pocket Threshold | | $0.00 | $0.00 |
| Resources bet $6,290-$10,490 (ind) or $9,440-$20,970 (couples) (4) | | | |
| Deductible (3) | | $56.00 | $60.00 |
| Coinsurance up to Out-of-Pocket Threshold | | 15% | 15% |
| Maximum Copayments above Out-of-Pocket Threshold | | | |
| Generic/Preferred Multi-Source Drug | | $2.25 | $2.40 |
| Other | | $5.60 | $6.00 |
| Part D Non-Full Benefit Dual Eligible Partial Subsidy Parameters | | | |
| Deductible (3) | | $56.00 | $60.00 |
| Coinsurance up to Out-of-Pocket Threshold | | 15% | 15% |
| Maximum Copayments above Out-of-Pocket Threshold | | | |
| Generic/Preferred Multi-Source Drug | | $2.25 | $2.40 |
| Other | | $5.60 | $6.00 |
| Retiree Drug Subsidy Amounts | | | |
| Cost Threshold | | $275 | $295 |
| Cost Limit | | $5,600 | $6,000 |

(1) CPI adjustment applies to copayments for non-institutionalized beneficiaries up to or at 100% FPL.

(2) Amount of total drug spending required to attain out-of-pocket threshold in the defined standard benefit if beneficiary does not have prescription drug coverage through a group health plan, insurance, government-funded health program or similar third party arrangement.

(3) The increases to the LIS deductible, generic/preferred multi-source drugs and other drugs copayments are applied to the unrounded 2008 values of $55.91, $1.04, and $3.13 respectively.

(4) The actual amount of resources allowable will be updated for contract year 2009.

Office of the Actuary
Centers for Medicare and Medicaid Services
February 22, 2007

23

**A2. Reporting Drug Costs When Contracting with a Pharmacy Benefit Manager (PBM)**
In the 2008 Part D Payment Notification issued on April 2, 2007, we stated our intent to issue a
Notice of Proposed Rulemaking proposing that the pass through amount (the amount received by
the pharmacy or other dispensing provider) be the only acceptable price for determining
beneficiary cost-sharing and reporting drug costs to CMS in 2009 and beyond. This Notice of
Proposed Rulemaking was released in the Federal Register on May 25, 2007. CMS has reviewed
the comments received and expects to issue the final rule in Spring 2008. This will allow
sufficient time for Part D sponsors to prepare their 2009 Part D bids in accordance with the
policies established in the final rule.

## Section B. Bidding

### B1. Calculation of the National Average Monthly Bid Amount
CMS will complete the transition to an enrollment-weighted average for the calculation of the
national average monthly bid amount in 2009. Section 1860D-13(a)(4)(B) of the Act directs
CMS to calculate the national average monthly bid amount each year as a weighted average of
the standardized bid amounts for each prescription drug plan (PDP) and Medicare Advantage
Prescription Drug Plan (MA-PD) described in section 1851(a)(2)(A)(i) of the Act starting in
2007. When calculating the national average monthly bid amount for contract year 2006, CMS
assigned equal weighting to PDP sponsors, under section 1860D-13(a)(4)(B)(ii), because CMS
did not have prior enrollment for these Part D plans. MA-PD plans were assigned a weight
based on their prior MA enrollments and new MA-PD plans were assigned zero weight.

In 2007, CMS implemented the Medicare Part D demonstration entitled, "Medicare
Demonstration to Limit Annual Changes in Part D Premiums Due to Beneficiary Choice of Low-
Cost Plans," and began a transition from the 2006 method of calculating the national average
monthly bid amount to the weighted average method based on actual plan enrollments. Under
this demonstration, the national average monthly bid amounts for contract years 2007 and 2008
were calculated as a composite of (i) a weighted average calculated using the 2006 weighting
methodology and (ii) a weighted average calculated based on actual plan enrollments. In 2007,
80% of the national average monthly bid amount was based on the 2006 averaging methodology
and 20% was based on the enrollment-weighted average. In 2008, 40% of the national average
monthly bid amount is based on the 2006 averaging methodology and 60% is based on the
enrollment-weighted average. Please find the weighting methodologies for contract years 2006-
2009 below.

**Table III-2. Weighting Blends for the National Average Monthly Bid Amount**

| Contract Year | 2006 Weighting | Enrollment Weighting |
|---------------|----------------|----------------------|
| 2006 | 100% | 0% |
| 2007 | 80% | 20% |
| 2008 | 40% | 60% |
| 2009 | 0% | 100% |

CMS will complete the transition to the weighted average method based on actual plan
enrollments in 2009. Thus for contract year 2009, 100% of the national average monthly bid
amount will be based on the enrollment-weighted average. The "Medicare Demonstration to

Limit Annual Changes in Part D Premiums Due to Beneficiary Choice of Low-Cost Plans" will not be extended for contract year 2009. The 2009 national average monthly bid amount and the reference month for the plan enrollment used to determine the enrollment-weighted average will be provided in future guidance after the June bid submission deadline.

## B2. Calculation of the Low-Income Benchmark Premium Amount

The Medicare Prescription Drug Improvement, and Modernization Act of 2003 (MMA) directs CMS to use a weighted average to calculate the regional low-income benchmark premium amount used in the determination of the low-income premium subsidy amount. In determining the 2006 low-income benchmark premium amounts, PDPs were weighted equally, MA-PD plans were assigned a weight based on prior enrollment as of March 31, 2005, and new MA-PD plans were assigned a zero weight. In 2007, under the "Medicare Demonstration to Transition Enrollment of Low Income Subsidy Beneficiaries," CMS calculated the regional low-income benchmark premium amounts using the same weighting methodology applied in 2006, i.e., all PDP bids were weighted equally, and MA-PD bids received weights based on plan enrollments in the reference month (June 2006).

For contract year 2008, CMS implemented a transition to the statutorily required weighting such that the regional low-income benchmark premiums would experience a smaller decrease. CMS calculated the 2008 regional benchmarks using a composite of the 2006 weighting approach (simple average) and the statutory weighting formula (weighted average).

- The first component, the simple average, was the same as the 2006 weighting methodology for the regional low-income benchmark premium amount. The PDP organization premium amounts for basic prescription drug coverage in each region would be weighted equally and the MA-PD plan premiums, after the application of Part A/B rebates, would be weighted based upon prior enrollment.
- The second component was a weighted average of the premium amounts for each PDP and MA-PD with a weighting based on each plan's prior enrollment as a percentage of all beneficiaries enrolled in those plans.

In 2008, 50% of the regional low-income benchmark amount was based on the first component, the simple average, and 50% was based on the second component, the enrollment weighted average.

CMS proposes to calculate the 2009 regional benchmarks using a composite of the 2006 weighting approach (simple average) and the statutory weighting formula (weighted average) again. However, in 2009, 25% of the regional low-income benchmark amount will be based on the first component, the simple average, and 75% will be based on the second component, the enrollment weighted average. This proposal would continue the transition to the statutorily required weighting that was started in 2008, such that the regional low-income benchmark premiums would experience a smooth glide path to the statutory weighting approach.

Under the demonstration in 2007 and 2008, CMS also implemented a policy whereby Part D plans were required to charge full-subsidy eligible beneficiaries a monthly beneficiary premium equal to the low-income premium subsidy amount, if the plan's premium exceeded the low-

income premium subsidy amount by a certain "de minimis" amount. We do not propose to extend the "de minimis" component of this demonstration to 2009. On January 8, 2008, CMS published a proposed rule titled "Option for Prescription Drug Plans to Lower Their Premiums for Low-Income Subsidy Beneficiaries." It is our intent that the policy in the final version of this rule will replace the current "de minimis" policy.

## B3. Coordination of Benefits (COB) User Fees

CMS is authorized to impose user fees on Part D sponsors for the transmittal of information necessary for benefit coordination between sponsors and other entities providing prescription drug coverage. CMS may review and update this user fee annually to reflect the costs associated with COB activities. For contract year 2008, the Part D COB user fee was $1.36 per enrollee per year. Upon review of the anticipated costs of COB activities in 2009, the Part D COB user fee will increase to $2.52 per enrollee per year for contract year 2009. This COB user fee will be collected at a rate of $0.28 per enrollee per month from January to September (for an annual rate of $0.21 per enrollee per month) for a total user fee of $2.52 per enrollee per year. Part D sponsors should account for this COB user fee when developing their 2009 bids.

## B4. Budget Neutrality Offsets for Reinsurance Payment Demonstration Plans in 2009

The budget neutrality offsets applied to the capitated reinsurance payments for flexible capitated, fixed capitated, and Medicare Advantage rebate option plans will remain at $10.00 per member per year for contract year 2009. The Part D Reinsurance Payment Demonstration is a budget neutral alternative payment approach that provides an incentive for Part D sponsors to offer supplemental drug coverage to Medicare beneficiaries. Under this demonstration, Medicare pays participating Part D plans a capitated reinsurance payment that is actuarially equivalent to the federal reinsurance payments that they would otherwise receive when a beneficiary reaches the catastrophic phase of the Part D benefit ($4,050 in True Out-of-pocket costs for 2008).

This demonstration must be budget neutral as stated in the Instructions for Part D Payment Demonstration released on May 10, 2005 such that the expected Medicare costs under the demonstration are no more than the expected costs to the Medicare program in the absence of the demonstration. In order to ensure budget neutrality, the capitated reinsurance payments for all plans offered under the Part D Reinsurance Payment Demonstration were offset by $10.00 per member per year in 2008.

As stated in the Federal Register Notice published on February 25, 2005 (70 FR 9360), in order to ensure budget neutrality for this payment demonstration, CMS may increase these offsets each year in order to reflect an increase in the expected costs of the demonstration. The capitated reinsurance payments for 2009 must continue to be offset by $10.00 per member per year to ensure that the Part D Reinsurance Payment Demonstration remains budget neutral. When developing the 2009 bids for flexible capitated, fixed capitated, and Medicare Advantage rebate option plans, Part D sponsors should reflect this offset amount in the direct administrative expense line item of the Bid Pricing Tool (BPT).

26

## Section C.  Risk Adjustment

### C1.  Normalization Factor for the RxHCC Model
Please see Section C, item C3 in Attachment II, Changes in the Payment Methodology for
Original Medicare Benefits for CY 2009.

### C2.  Standard Set of ICD-9 Diagnosis Codes for Risk Adjustment
Please See Section K, item K2 in Attachment II, Changes in the Payment Methodology for
Original Medicare Benefits for CY 2009.

## Section D.  Payment Reconciliation

Pursuant to section 1860D-15(e) of the Act and the regulations at 42 CFR 423.336, the risk
percentages and payment adjustments for Part D risk sharing are unchanged from contract year
2008.  The risk percentages for the first and second thresholds remain at 5% and 10% of the
target amount respectively for 2009.  The payment adjustments for the first and second corridors
are 50% and 80% respectively.  Please see Figure 1 below which illustrates the risk corridors for
2008-2011.

### Figure 1. Part D Risk Corridors for 2008-2011



27

## Attachment IV.  Preliminary CMS-HCC Risk Adjustment Factors

### Exhibit IV-1.  Preliminary 2009 Community and Institutional Factors for the CMS-HCC Model

| Variable | Disease Group | Community Factors | Institutional Factors |
|---|---|---|---|
| **Female** | | | |
| 0-34 Years | | 0.187 | 1.026 |
| 35-44 Years | | 0.206 | 0.884 |
| 45-54 Years | | 0.275 | 0.888 |
| 55-59 Years | | 0.333 | 0.943 |
| 60-64 Years | | 0.411 | 0.943 |
| 65-69 Years | | 0.299 | 0.971 |
| 70-74 Years | | 0.368 | 0.931 |
| 75-79 Years | | 0.457 | 0.835 |
| 80-84 Years | | 0.544 | 0.775 |
| 85-89 Years | | 0.637 | 0.704 |
| 90-94 Years | | 0.761 | 0.614 |
| 95 Years or Over | | 0.771 | 0.457 |
| **Male** | | | |
| 0-34 Years | | 0.120 | 1.030 |
| 35-44 Years | | 0.164 | 0.871 |
| 45-54 Years | | 0.217 | 0.871 |
| 55-59 Years | | 0.249 | 0.978 |
| 60-64 Years | | 0.389 | 1.015 |
| 65-69 Years | | 0.328 | 1.221 |
| 70-74 Years | | 0.413 | 1.154 |
| 75-79 Years | | 0.517 | 1.143 |
| 80-84 Years | | 0.597 | 1.087 |
| 85-89 Years | | 0.692 | 1.001 |
| 90-94 Years | | 0.834 | 0.932 |
| 95 Years or Over | | 0.980 | 0.743 |
| **Medicaid and Originally Disabled Interactions with Age and Sex** | | | |
| Medicaid_Female_Aged | | 0.179 | 0.091 |
| Medicaid_Female_Disabled | | 0.131 | 0.091 |
| Medicaid_Male_Aged | | 0.166 | 0.091 |
| Medicaid_Male_Disabled | | 0.077 | 0.091 |
| Originally Disabled_Female | | 0.204 | 0.023 |
| Originally Disabled_Male | | 0.168 | 0.023 |
| **Disease Coefficients** | **Description Label** | | |
| HCC1 | HIV/AIDS | 0.945 | 0.967 |
| HCC2 | Septicemia/Shock | 0.759 | 0.764 |
| HCC5 | Opportunistic Infections | 0.300 | 0.288 |
| HCC7 | Metastatic Cancer and Acute Leukemia | 2.276 | 0.824 |
| HCC8 | Lung, Upper Digestive Tract, and Other Severe Cancers | 1.053 | 0.470 |

28

| Variable | Disease Group | Community Factors | Institutional Factors |
|---|---|---|---|
| HCC9 | Lymphatic, Head and Neck, Brain, and Other Major Cancers | 0.794 | 0.368 |
| HCC10 | Breast, Prostate, Colorectal and Other Cancers and Tumors | 0.208 | 0.182 |
| HCC15 | Diabetes with Renal or Peripheral Circulatory Manifestation[1] | 0.508 | 0.459 |
| HCC16 | Diabetes with Neurologic or Other Specified Manifestation[1] | 0.408 | 0.459 |
| HCC17 | Diabetes with Acute Complications[1] | 0.339 | 0.459 |
| HCC18 | Diabetes with Ophthalmologic or Unspecified Manifestation[1] | 0.259 | 0.459 |
| HCC19 | Diabetes without Complication[1] | 0.162 | 0.248 |
| HCC21 | Protein-Calorie Malnutrition | 0.856 | 0.374 |
| HCC25 | End-Stage Liver Disease | 0.978 | 0.654 |
| HCC26 | Cirrhosis of Liver | 0.406 | 0.384 |
| HCC27 | Chronic Hepatitis | 0.406 | 0.384 |
| HCC31 | Intestinal Obstruction/Perforation | 0.311 | 0.345 |
| HCC32 | Pancreatic Disease | 0.403 | 0.309 |
| HCC33 | Inflammatory Bowel Disease | 0.241 | 0.205 |
| HCC37 | Bone/Joint/Muscle Infections/Necrosis | 0.535 | 0.497 |
| HCC38 | Rheumatoid Arthritis and Inflammatory Connective Tissue Disease | 0.346 | 0.215 |
| HCC44 | Severe Hematological Disorders | 1.015 | 0.493 |
| HCC45 | Disorders of Immunity | 0.912 | 0.427 |
| HCC51 | Drug/Alcohol Psychosis[3] | 0.274 | 0.000 |
| HCC52 | Drug/Alcohol Dependence[3] | 0.274 | 0.000 |
| HCC54 | Schizophrenia | 0.524 | 0.351 |
| HCC55 | Major Depressive, Bipolar, and Paranoid Disorders | 0.353 | 0.293 |
| HCC67 | Quadriplegia, Other Extensive Paralysis | 1.011 | 0.434 |
| HCC68 | Paraplegia | 0.993 | 0.434 |
| HCC69 | Spinal Cord Disorders/Injuries | 0.558 | 0.225 |
| HCC70 | Muscular Dystrophy[3] | 0.395 | 0.000 |
| HCC71 | Polyneuropathy | 0.327 | 0.225 |
| HCC72 | Multiple Sclerosis | 0.599 | 0.145 |
| HCC73 | Parkinson's and Huntington's Diseases | 0.592 | 0.092 |
| HCC74 | Seizure Disorders and Convulsions | 0.267 | 0.177 |
| HCC75 | Coma, Brain Compression/Anoxic Damage[3] | 0.415 | 0.000 |
| HCC77 | Respirator Dependence/Tracheostomy Status | 1.867 | 1.559 |
| HCC78 | Respiratory Arrest | 1.082 | 1.235 |
| HCC79 | Cardio-Respiratory Failure and Shock | 0.578 | 0.445 |
| HCC80 | Congestive Heart Failure | 0.410 | 0.228 |
| HCC81 | Acute Myocardial Infarction | 0.359 | 0.424 |
| HCC82 | Unstable Angina and Other Acute Ischemic Heart Disease | 0.284 | 0.424 |
| HCC83 | Angina Pectoris/Old Myocardial Infarction | 0.244 | 0.290 |
| HCC92 | Specified Heart Arrhythmias | 0.293 | 0.207 |
| HCC95 | Cerebral Hemorrhage | 0.324 | 0.179 |
| HCC96 | Ischemic or Unspecified Stroke | 0.265 | 0.179 |
| HCC100 | Hemiplegia/Hemiparesis | 0.437 | 0.039 |
| HCC101 | Cerebral Palsy and Other Paralytic Syndromes[3] | 0.180 | 0.000 |
| HCC104 | Vascular Disease with Complications | 0.610 | 0.482 |
| HCC105 | Vascular Disease | 0.316 | 0.165 |

| Variable | Disease Group | Community Factors | Institutional Factors |
|---|---|---|---|
| HCC107 | Cystic Fibrosis | 0.399 | 0.631 |
| HCC108 | Chronic Obstructive Pulmonary Disease | 0.399 | 0.359 |
| HCC111 | Aspiration and Specified Bacterial Pneumonias | 0.703 | 0.573 |
| HCC112 | Pneumococcal Pneumonia, Emphysema, Lung Abscess | 0.249 | 0.181 |
| HCC119 | Proliferative Diabetic Retinopathy and Vitreous Hemorrhage | 0.252 | 0.497 |
| HCC130 | Dialysis Status | 1.349 | 1.718 |
| HCC131 | Renal Failure | 0.368 | 0.388 |
| HCC132 | Nephritis | 0.125 | 0.253 |
| HCC148 | Decubitus Ulcer of Skin | 1.153 | 0.485 |
| HCC149 | Chronic Ulcer of Skin, Except Decubitus | 0.449 | 0.241 |
| HCC150 | Extensive Third-Degree Burns[3] | 1.416 | 0.000 |
| HCC154 | Severe Head Injury[3] | 0.415 | 0.000 |
| HCC155 | Major Head Injury[3] | 0.106 | 0.000 |
| HCC157 | Vertebral Fractures without Spinal Cord Injury | 0.443 | 0.161 |
| HCC158 | Hip Fracture/Dislocation[3] | 0.429 | 0.000 |
| HCC161 | Traumatic Amputation | 0.678 | 0.260 |
| HCC164 | Major Complications of Medical Care and Trauma | 0.296 | 0.309 |
| HCC174 | Major Organ Transplant Status | 0.705 | 0.920 |
| HCC176 | Artificial Openings for Feeding or Elimination | 0.662 | 0.841 |
| HCC177 | Amputation Status, Lower Limb / Amputation Complications | 0.678 | 0.260 |
| **Disabled/Disease Interactions** | | | |
| D_HCC5 | Disabled_Opportunistic Infections | 0.623 | 1.016 |
| D_HCC44 | Disabled_Severe Hematological Disorders | 1.036 | 0.362 |
| D_HCC51 | Disabled_Drug/Alcohol Psychosis | 0.729 | 0.299 |
| D_HCC52 | Disabled_Drug/Alcohol Dependence | 0.310 | 0.299 |
| D_HCC107 | Disabled_Cystic Fibrosis[3] | 1.097 | - |
| **Disease Interactions** | | | |
| INT1 | DM_CHF[2] | 0.154 | 0.125 |
| INT2 | DM_CVD | 0.102 | 0.028 |
| INT3 | CHF_COPD | 0.219 | 0.194 |
| INT4 | COPD_CVD_CAD | 0.173 | 0.071 |
| INT5 | RF_CHF[2,3] | 0.231 | - |
| INT6 | RF_CHF_DM[2] | 0.477 | 0.358 |

**NOTES:**

[1] Includes Type I or Type II Diabetes Mellitus.

[2] Beneficiaries with the three-way interaction RF*CHF*DM are excluded from the two-way interactions DM*CHF and RF*CHF. Thus, the three-way interaction term RF*CHF*DM is not additive to the two-way interaction terms DM*CHF and RF*CHF. Rather, it is hierarchical to, and excludes these interaction terms. A beneficiary with all three conditions is not "credited" with the two-way interactions. All other interaction terms are additive.

[3] HCC or disease interaction excluded from institutional model because estimated coefficient less than 0 or t-statistic less than 1.0.

The 2007 denominator of $7,463.14 used to calculate both the community and institutional factors is the national predicted average annual cost under the model.

DM is diabetes mellitus (HCCs 15-19).
CHF is congestive heart failure (HCC 80).

30

COPD is chronic obstructive pulmonary disease (HCC 108).
CVD is cerebrovascular disease (HCCs 95, 96, 100, and 101).
CAD is coronary artery disease (HCCs 81-83).
RF is renal failure (HCC 131).

SOURCE:  RTI International analysis of 2004/2005 Medicare 5% sample.
SOURCE:  RTI International analysis of 2004/2005 Medicare 100% institutional sample.

## Exhibit IV-2.  Preliminary Disease Hierarchies for the CMS-HCC Model

| Hierarchical Condition Category (HCC) | If the Disease Group is Listed in This Column... | ...Then Drop the Associated Disease Group(s) Listed in This Column |
|---|---|---|
| | **Disease Group Label** | |
| 5 | Opportunistic Infections | 112 |
| 7 | Metastatic Cancer and Acute Leukemia | 8, 9, 10 |
| 8 | Lung, Upper Digestive Tract, and Other Severe Cancers | 9, 10 |
| 9 | Lymphatic, Head and Neck, Brain and Other Major Cancers | 10 |
| 15 | Diabetes with Renal Manifestations or Peripheral Circulatory Manifestation | 16, 17, 18, 19 |
| 16 | Diabetes with Neurologic or Other Specified Manifestation | 17, 18, 19 |
| 17 | Diabetes with Acute Complications | 18, 19 |
| 18 | Diabetes with Ophthalmologic or Unspecified Manifestations | 19 |
| 25 | End-Stage Liver Disease | 26, 27 |
| 26 | Cirrhosis of Liver | 27 |
| 51 | Drug/Alcohol Psychosis | 52 |
| 54 | Schizophrenia | 55 |
| 67 | Quadriplegia/Other Extensive Paralysis | 68, 69, 100, 101, 157 |
| 68 | Paraplegia | 69, 100, 101, 157 |
| 69 | Spinal Cord Disorders/Injuries | 157 |
| 77 | Respirator Dependence/ Tracheostomy Status | 78, 79 |
| 78 | Respiratory Arrest | 79 |
| 81 | Acute Myocardial Infarction | 82, 83 |
| 82 | Unstable Angina and Other Acute Ischemic Heart Disease | 83 |
| 95 | Cerebral Hemorrhage | 96 |
| 100 | Hemiplegia/Hemiparesis | 101 |
| 104 | Vascular Disease with Complications | 105, 149 |
| 107 | Cystic Fibrosis | 108 |
| 111 | Aspiration and Specified Bacterial Pneumonias | 112 |
| 130 | Dialysis Status | 131, 132 |
| 131 | Renal Failure | 132 |
| 148 | Decubitus Ulcer of Skin | 149 |
| 154 | Severe Head Injury | 75, 155 |
| 161 | Traumatic Amputation | 177 |

**How Payments are Made with a Disease Hierarchy -- EXAMPLE:** If a beneficiary triggers HCCs 148 (Decubitus Ulcer of the Skin) and 149 (Chronic Ulcer of Skin, Except Decubitus), then HCC 149 will be dropped. In other words, payment will always be associated with the HCC in column 1 if a HCC in column 3 also occurs during the same collection period. Therefore, the MA organization's payment will be based on HCC 148 rather than HCC 149.

32

**Exhibit IV-3.  Preliminary 2009 CMS-HCC Model for New Enrollees**

|  | Non-Medicaid & Non-Originally Disabled | Medicaid & Non-Originally Disabled | Non-Medicaid & Originally Disabled | Medicaid & Originally Disabled |
|---|---|---|---|---|
| **Female** | | | | |
| 0-34 Years | 0.496 | 0.807 | 0.000 | 0.000 |
| 35-44 Years | 0.652 | 0.963 | 0.000 | 0.000 |
| 45-54 Years | 0.841 | 1.152 | 0.000 | 0.000 |
| 55-59 Years | 0.969 | 1.280 | 0.000 | 0.000 |
| 60-64 Years | 1.094 | 1.404 | 0.000 | 0.000 |
| 65 Years | 0.497 | 0.958 | 1.096 | 1.557 |
| 66 Years | 0.554 | 0.987 | 1.153 | 1.587 |
| 67 Years | 0.595 | 1.028 | 1.194 | 1.628 |
| 68 Years | 0.619 | 1.052 | 1.218 | 1.651 |
| 69 Years | 0.652 | 1.085 | 1.251 | 1.684 |
| 70-74 Years | 0.759 | 1.208 | 1.320 | 1.769 |
| 75-79 Years | 0.955 | 1.357 | 1.430 | 1.832 |
| 80-84 Years | 1.118 | 1.520 | 1.593 | 1.995 |
| 85-89 Years | 1.255 | 1.657 | 1.730 | 2.132 |
| 90-94 Years | 1.358 | 1.760 | 1.834 | 2.236 |
| 95 Years or Over | 1.232 | 1.634 | 1.707 | 2.109 |
| **Male** | | | | |
| 0-34 Years | 0.344 | 0.675 | 0.000 | 0.000 |
| 35-44 Years | 0.583 | 0.914 | 0.000 | 0.000 |
| 45-54 Years | 0.729 | 1.060 | 0.000 | 0.000 |
| 55-59 Years | 0.827 | 1.158 | 0.000 | 0.000 |
| 60-64 Years | 1.033 | 1.365 | 0.000 | 0.000 |
| 65 Years | 0.550 | 1.022 | 1.116 | 1.587 |
| 66 Years | 0.586 | 1.058 | 1.117 | 1.589 |
| 67 Years | 0.664 | 1.136 | 1.195 | 1.667 |
| 68 Years | 0.664 | 1.136 | 1.195 | 1.667 |
| 69 Years | 0.723 | 1.195 | 1.254 | 1.726 |
| 70-74 Years | 0.855 | 1.322 | 1.392 | 1.859 |
| 75-79 Years | 1.113 | 1.484 | 1.521 | 1.893 |
| 80-84 Years | 1.299 | 1.670 | 1.707 | 2.078 |
| 85-89 Years | 1.468 | 1.839 | 1.876 | 2.247 |
| 90-94 Years | 1.630 | 2.001 | 2.038 | 2.409 |
| 95 Years or Over | 1.638 | 2.009 | 2.046 | 2.417 |

**NOTES:**

The 2007 denominator of $7,463.14 used to calculate the new enrollee factors is the national predicted average annual cost under the model.

Three sets of interaction coefficients were constrained to be equal (Male, Age 67 & Male, Age 68; Medicaid, Male, Age 65 & Medicaid, Male, Ages 66 to 69; Originally Disabled, Female, Age 65 & Originally Disabled, Female, Ages 66 to 69).  These constraints are necessary so that predicted expenditures, and risk scores for all demographic groups, vary in a reasonable way, as shown in the table of mutually exclusive demographic groups.

SOURCE:  RTI International analysis of 2004/2005 Medicare 5% sample.

**Attachment V.  Medicare Part D Benefit Parameters for the Defined Standard Benefit: Annual Adjustments for 2009**

The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA) directs CMS to update the statutory parameters for the defined standard Part D drug benefit each year. These parameters include the standard deductible, initial coverage limit, and catastrophic coverage threshold, and minimum copayments for costs above the annual out-of-pocket threshold.  In addition, CMS is statutorily required to update the parameters for the low income subsidy benefit and the cost threshold and cost limit for qualified retiree prescription drug plans eligible for the Retiree Drug Subsidy.  Included in this notice are (i) the methodologies for updating these parameters, (ii) the updated parameter amounts for the Part D defined standard benefit and low-income subsidy benefit for 2009, and (iii) the updated cost threshold and cost limit for qualified retiree prescription drug plans.

As required by statute, the parameters for the defined standard benefit formula are indexed to the percentage increase in average per capita total Part D drug expenses for Medicare beneficiaries. Accordingly, the actuarial value of the drug benefit increases along with any increase in drug expenses, and the defined standard Part D benefit continues to cover a constant share of drug expenses from year to year.

All of the Part D benefit parameters are updated using one of two indexing methods specified by statute: (i) the annual percentage increase in average expenditures for Part D drugs per eligible beneficiary, and (ii) the annual percentage increase in the Consumer Price Index (CPI) (all items, U.S. city average).

## I. Annual Percentage Increase in Average Expenditures for Part D Drugs Per Eligible Beneficiary

Section 1860D-2(b)(6) of the Social Security Act defines the "annual percentage increase" as "the annual percentage increase in average per capita aggregate expenditures for covered Part D drugs in the United States for Part D eligible individuals, as determined by the Secretary for the 12-month period ending in July of the previous year using such methods as the Secretary shall specify."  The following parameters are updated using the "annual percentage increase":

**Deductible:**  From $275 in 2008 and rounded to the nearest multiple of $5.

**Initial Coverage Limit:**  From $2,510 in 2008 and rounded to the nearest multiple of $10.

**Out-of-Pocket Threshold:**  From $4,050 in 2008 and rounded to the nearest multiple of $50.

**Minimum Cost-Sharing in the Catastrophic Coverage Portion of the Benefit:**  From $2.25 per generic or preferred drug that is a multi-source drug, and $5.60 for all other drugs in 2008, and rounded to the nearest multiple of $0.05.

**Maximum Copayments below the Out-of-Pocket Threshold for certain Low Income Full Subsidy Eligible Enrollees:** From $2.25 per generic or preferred drug that is a multi-source drug, and $5.60 for all other drugs in 2008, and rounded to the nearest multiple of $0.05.

**Deductible for Low Income (Partial) Subsidy Eligible Enrollees:** From $56[1] in 2008 and rounded to the nearest $1.

**Maximum Copayments above the Out-of-Pocket Threshold for Low Income (Partial) Subsidy Eligible Enrollees:** From $2.25 per generic or preferred drug that is a multi-source drug, and $5.60 for all other drugs in 2008, and rounded to the nearest multiple of $0.05.

## II. Annual Percentage Increase in Consumer Price Index, All Urban Consumers (all items, U.S. city average)

Section 1860D-14(a)(4) of the Social Security Act specifies that the annual percentage increase in the CPI, All Urban Consumers (all items, U.S. city average) as of September of the previous year is used to update the maximum copayments below the out-of-pocket threshold for full benefit dual eligible enrollees with incomes that do not exceed 100% of the Federal poverty line. These copayments are increased from $1.05 per generic or preferred drug that is a multi-source drug, and $3.10 for all other drugs in 2008[2], and rounded to the nearest multiple of $0.05 and $0.10, respectively.

## III. Calculation Methodology

### Annual Percentage Increase

For the 2007 and 2008 contract years, the annual percentage increases, as defined in section 1860D-2(b)(6) of the Social Security Act, were based on the National Health Expenditure (NHE) prescription drug per capita estimates because sufficient Part D program data was not available. For the 2009 contract year benefit parameters, Part D program data is used to calculate the annual percentage trend as follows:

$$\frac{August\ 2007 - July\ 2008}{August\ 2006 - July\ 2007} = \frac{\$2,659.37}{\$2,509.48} = 1.0597$$

In the formula, the average per capita cost for August 2006 – July 2007 ($2,509.48) is calculated from actual Part D prescription drug event (PDE) data and the average per capita cost for August 2007 – July 2008 ($2,659.37) is calculated based on actual Part D PDE data incurred from August – December, 2007 and projected through July, 2008.

---

[1] Consistent with the statutory requirements of 1860D-14(a)(4)(B) of the Social Security Act, the update for the deductible for low income (partial) subsidy eligible enrollees is applied to the unrounded 2008 value of $55.91.

[2] Consistent with the statutory requirements of 1860D-14(a)(4)(A) of the Social Security Act, the copayments are increased from the unrounded 2008 values of $1.04 per generic or preferred drug that is a multi-source drug, and $3.13 for all other drugs.

The 2009 benefit parameters reflect the 2008 annual percentage trend as well as a revision to the prior estimates for the 2006 and 2007 annual percentage increases. Based on the updated NHE prescription drug per capita costs, the 2007 and 2008 increases are now estimated to be 6.45% and 6.59%, respectively. Accordingly, the 2009 benefit parameters reflect a multiplicative update of 1.47% (1.0645/1.0529 * 1.0659/1.0619 – 1) for prior year revisions. In summary, the 2008 parameters outlined in section I are updated by 7.54% for 2009 as summarized by Table V-1.

**Table V-1. Annual Percentage Increase**

| Annual percentage trend for July 2008 | 5.97% |
|---|---|
| Prior year revisions | 1.48% |
| Annual percentage increase for 2008 | 7.54% |

Note: Percentages are multiplicative, not additive.
Values are carried to additional decimal places and may not agree
to the rounded values presented above.

**Annual Percentage Increase in Consumer Price Index, All Urban Consumers (all items, U.S. city average)**

The annual percentage increase in the CPI as of September of the previous year referenced in section 1860D-14(a)(4)(A)(ii) is interpreted to mean that, for contract year 2009, the September 2008 CPI should be used in the calculation of the index. To ensure that plan sponsors and CMS have sufficient time to incorporate the cost-sharing requirements into benefit, marketing material and systems development, the methodology to calculate this update includes an estimate of the September 2008 CPI based on the projected amount included in the President's FY2009 Budget. The September 2007 value is from the Bureau of Labor Statistics. The annual percentage trend in CPI for contract year 2009 is calculated as follows:

$$\frac{\text{Projected September 2008 CPI}}{\text{Actual September 2007 CPI}} \quad or \quad \frac{213.9}{208.5} = 1.026$$

(Source: President's FY2009 Budget and Bureau of Labor Statistics, Department of Labor)

The 2009 benefit parameters reflect the 2008 annual percentage trend in the CPI, as well as a revision to the prior estimate for the 2007 annual percentage increase. The 2008 parameter update reflected an annual percentage trend in CPI of 2.17%. Based on the actual reported CPI for September 2007, the September 2007 CPI increase is now estimated to be 2.76%. Thus, the 2009 update reflects a multiplicative 0.57% (1.0276/1.0217 – 1) correction for prior year revisions. In summary, the cost sharing items outlined in section II are updated by 3.18% for 2009 as summarized by Table V-2.

**Table V-2. Cumulative Annual Percentage Increase in CPI**

| | |
|---|---|
| Annual percentage trend for September 2008 | 2.60% |
| Prior year revisions | 0.57% |
| Annual percentage increase for 2008 | 3.18% |

Note: Percentages are multiplicative, not additive.
Values are carried to additional decimal places and may not agree
to the rounded values presented above.


## IV.  Part D Payment Demonstration Adjustment

The fixed capitated option of the Part D Payment Demonstration includes a catastrophic benefit that begins at the total drug expense corresponding to the out-of-pocket threshold in the Defined Standard Benefit.  For 2009, this amount is increased from $5,726.50 in 2008 to $6,153.75. Specifically, this is the minimum amount of total covered Part D drug expenditures that will have occurred when the beneficiary reaches the out-of-pocket threshold of $4,350 in 2009 in the defined standard benefit.  This expense level is determined arithmetically as a function of the 2009 out-of-pocket threshold (as opposed to being indexed directly).


## V.  Retiree Drug Subsidy Amounts

As outlined in §423.886(b)(3) of the regulations implementing the Part D benefit, the cost threshold and cost limit for qualified retiree prescription drug plans that end in years after 2006 are adjusted in the same manner as the annual Part D deductible and out-of-pocket threshold are adjusted under §423.104(d)(1)(ii) and (d)(5)(iii)(B), respectively.  Specifically, they are adjusted by the "annual percentage increase" as defined previously in this document and the cost threshold is rounded the nearest multiple of $5 and the cost limit is rounded to the nearest multiple of $50. The cost threshold and cost limit are defined as $265 and $5,350, respectively, for plans that end in 2007, and, as $275 and $5,600, respectively, for plans that end in 2008.  For 2009, the cost threshold is increased to $295, and the cost limit is increased to $6,000.

**EXHIBIT D-40**

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

CARRIER

| PICA | | PICA |

1. MEDICARE  MEDICAID  TRICARE  CHAMPVA  GROUP HEALTH PLAN  FECA BLK LUNG  OTHER   1a. INSURED'S I.D. NUMBER (For Program in Item 1)

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)   3. PATIENT'S BIRTH DATE MM DD YY SEX M F   4. INSURED'S NAME (Last Name, First Name, Middle Initial)

5. PATIENT'S ADDRESS (No., Street)   6. PATIENT RELATIONSHIP TO INSURED Self Spouse Child Other   7. INSURED'S ADDRESS (No., Street)

CITY  STATE   8. RESERVED FOR NUCC USE   CITY

ZIP CODE  TELEPHONE (Include Area Code)

9. OTHER INSURED'S NAME   10. IS PATIENT'S CONDITION RELATED TO:   11. INSURED'S POLICY GROUP OR FECA NUMBER

a. OTHER INSURED'S POLICY OR GROUP NUMBER   a. EMPLOYMENT? (Current or Previous) YES NO

b. RESERVED FOR NUCC USE   b. AUTO ACCIDENT? YES

c. RESERVED FOR NUCC USE   c. OTHER ACCIDENT?

d. INSURANCE PLAN NAME OR PROGRAM NAME   10d.   d. IS THERE ANOTHER HEALTH BENEFIT PLAN? YES NO If yes, complete items 9, 9a, and 9d.

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE   SIGNED
13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE   SIGNED

14. DATE OF CURRENT ILLNESS... PREGNANCY (LMP)   16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION FROM TO
17. NAME OF REFERRING PROVIDER   18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES FROM TO
19. ADDITIONAL CLAIM INFORMATION   20. OUTSIDE LAB? YES NO $ CHARGES
NATURE OF ILLNESS... ICD Ind.   22. RESUBMISSION CODE ORIGINAL REF. NO.
23. PRIOR AUTHORIZATION NUMBER

SAMPLE

24. A. DATE(S) OF SERVICE  B. PLACE OF SERVICE  C. EMG  D. PROCEDURES, SERVICES, OR SUPPLIES CPT/HCPCS MODIFIER  E. DIAGNOSIS POINTER  F. $ CHARGES  G. DAYS OR UNITS  H. EPSDT Family Plan  I. ID. QUAL.  J. RENDERING PROVIDER ID. #
(rows 1-6 with NPI)

25. FEDERAL TAX I.D. NUMBER SSN EIN  26. PATIENT'S ACCOUNT NO.  27. ACCEPT ASSIGNMENT? YES NO  28. TOTAL CHARGE $  29. AMOUNT PAID $  30. Rsvd for NUCC Use
31. SIGNATURE OF PHYSICIAN OR SUPPLIER  SIGNED DATE  32. SERVICE FACILITY LOCATION INFORMATION  33. BILLING PROVIDER INFO & PH #

NUCC Instruction Manual available at: www.nucc.org   PLEASE PRINT OR TYPE   APPROVED OMB-0938-1197 FORM 1500 (02/12)

0944

BECAUSE THIS FORM IS USED BY VARIOUS GOVERNMENT AND PRIVATE HEALTH PROGRAMS, SEE SEPARATE INSTRUCTIONS ISSUED BY APPLICABLE PROGRAMS.

NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

## REFERS TO GOVERNMENT PROGRAMS ONLY

MEDICARE AND TRICARE PAYMENTS: A patient's signature requests that payment be made and authorizes release of any information necessary to process the claim and certifies that the information provided in Blocks 1 through 12 is true, accurate and complete. In the case of a Medicare claim, the patient's signature authorizes any entity to release to Medicare medical and nonmedical information and whether the person has employer group health insurance, liability, no-fault, worker's compensation or other insurance which is responsible to pay for the services for which the Medicare claim is made. See 42 CFR 411.24(a). If Item 9 is completed, the patient's signature authorizes release of the information to the health plan or agency shown. In Medicare assigned or TRICARE participation cases, the physician agrees to accept the charge determination of the Medicare carrier or TRICARE fiscal intermediary as the full charge and the patient is responsible only for the deductible, coinsurance and non-covered services. Coinsurance and the deductible are based upon the charge determination of the Medicare carrier or TRICARE fiscal intermediary if this is less than the charge submitted. TRICARE is not a health insurance program but makes payment for health benefits provided through certain affiliations with the Uniformed Services. Information on the patient's sponsor should be provided in those items captioned in "Insured", i.e., Items 1a, 4, 6, 7, 9, and 11.

## BLACK LUNG AND FECA CLAIMS

The provider agrees to accept the amount paid by the Government as payment in full. See Black Lung and FECA instructions regarding required procedure and diagnosis coding systems.

## SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, TRICARE, FECA AND BLACK LUNG)

In submitting this claim for payment from Federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each service rendered incident to my professional service, the identity (legal name and NPI, license #, or SSN) of the primary individual rendering each service is reported in the designated section.For services to be considered "incident to" a physician's professional services, 1) they must be rendered under the physician's direct supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician's service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of non-physicians must be included on the physician's bills.

For TRICARE claims, I further certify that I (or any employee) who rendered services am not an active duty member of the Uniformed Services or a civilian employee of the United States Government or a contract employee of the United States Government, either civilian or military (refer to 5 USC 5536). For Black-Lung claims, I further certify that the services performed were for a Black-Lung related disorder.

No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32).

NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

## NOTICE TO PATIENT ABOUT THE COLLECTION AND USE OF MEDICARE, TRICARE, FECA, AND BLACK LUNG INFORMATION (PRIVACY ACT STATEMENT)

We are authorized by CMS, TRICARE and OWCP to ask you for information needed in the administration of the Medicare, TRICARE, FECA, and Black Lung programs. Authority to collect information is in section 205(a), 1862, 1872 and 1874 of the Social Security Act as amended, 42 CFR 411.24(a) and 424.5(a) (6), and 44 USC 3101;41 CFR 101 et seq and 10 USC 1079 and 1086; 5 USC 8101 et seq; and 30 USC 901 et seq; 38 USC 613; E.O. 9397.

The information we obtain to complete claims under these programs is used to identify you and to determine your eligibility. It is also used to decide if the services and supplies you received are covered by these programs and to insure that proper payment is made.

The information may also be given to other providers of services, carriers, intermediaries, medical review boards, health plans, and other organizations or Federal agencies, for the effective administration of Federal provisions that require other third parties payers to pay primary to Federal program, and as otherwise necessary to administer these programs. For example, it may be necessary to disclose information about the benefits you have used to a hospital or doctor. Additional disclosures are made through routine uses for information contained in systems of records.

FOR MEDICARE CLAIMS: See the notice modifying system No. 09-70-0501, titled, 'Carrier Medicare Claims Record,' published in the Federal Register, Vol. 55 No. 177, page 37549, Wed. Sept. 12, 1990, or as updated and republished.

FOR OWCP CLAIMS: Department of Labor, Privacy Act of 1974, 'Republication of Notice of Systems of Records,' Federal Register Vol. 55 No. 40, Wed Feb. 28, 1990, See ESA-5, ESA-6, ESA-12, ESA-13, ESA-30, or as updated and republished.

FOR TRICARE CLAIMS: PRINCIPLE PURPOSE(S): To evaluate eligibility for medical care provided by civilian sources and to issue payment upon establishment of eligibility and determination that the services/supplies received are authorized by law.

ROUTINE USE(S): Information from claims and related documents may be given to the Dept. of Veterans Affairs, the Dept. of Health and Human Services and/or the Dept. of Transportation consistent with their statutory administrative responsibilities under TRICARE/CHAMPVA; to the Dept. of Justice for representation of the Secretary of Defense in civil actions; to the Internal Revenue Service, private collection agencies, and consumer reporting agencies in connection with recoupment claims; and to Congressional Offices in response to inquiries made at the request of the person to whom a record pertains. Appropriate disclosures may be made to other federal, state, local, foreign government agencies, private business entities, and individual providers of care, on matters relating to entitlement, claims adjudication, fraud, program abuse, utilization review, quality assurance, peer review, program integrity, third-party liability, coordination of benefits, and civil and criminal litigation related to the operation of TRICARE.

DISCLOSURES: Voluntary; however, failure to provide information will result in delay in payment or may result in denial of claim. With the one exception discussed below, there are no penalties under these programs for refusing to supply information. However, failure to furnish information regarding the medical services rendered or the amount charged would prevent payment of claims under these programs. Failure to furnish any other information, such as name or claim number, would delay payment of the claim. Failure to provide medical information under FECA could be deemed an obstruction.

It is mandatory that you tell us if you know that another party is responsible for paying for your treatment. Section 1128B of the Social Security Act and 31 USC 3801-3812 provide penalties for withholding this information.

You should be aware that P.L. 100-503, the "Computer Matching and Privacy Protection Act of 1988", permits the government to verify information by way of computer matches.

## MEDICAID PAYMENTS (PROVIDER CERTIFICATION)

I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency or Dept. of Health and Human Services may request.

I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program, with the exception of authorized deductible, coinsurance, co-payment or similar cost-sharing charge.

SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-1197. The time required to complete this information collection is estimated to average 10 minutes per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850. This address is for comments and/or suggestions only. DO NOT MAIL COMPLETED CLAIM FORMS TO THIS ADDRESS.

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

**CARRIER**

☐☐ PICA

PICA ☐☐

| 1. MEDICARE (Medicare#) | MEDICAID (Medicaid#) | TRICARE (ID#/DoD#) | CHAMPVA (Member ID#) | GROUP HEALTH PLAN (ID#) | FECA BLK LUNG (ID#) | OTHER (ID#) | 1a. INSURED'S I.D. NUMBER (For Program in Item 1) |

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)

3. PATIENT'S BIRTH DATE MM DD YY    SEX M ☐ F ☐

4. INSURED'S NAME (Last Name, First Name, Middle Initial)

5. PATIENT'S ADDRESS (No., Street)

6. PATIENT RELATIONSHIP TO INSURED    Self ☐ Spouse ☐ Child ☐ Other ☐

7. INSURED'S ADDRESS (No., Street)

CITY    STATE

8. RESERVED FOR NUCC USE

CITY

ZIP CODE    TELEPHONE (Include Area Code) ( )

ZIP CODE    TELEP___ ___a Code) ( )

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

11. I___ ___OLICY GROUP OR FECA NU___

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (Current or Previous)    YES ☐ NO ☐

INSURE___ ___ BIRTH M___ ___ YY    F ☐

b. RESERVED FOR NUCC USE

b. AUTO ACCIDENT?    YES ☐    ___ (Sta___

___ER CLA___ ___

c. RESERVED FOR NUCC USE

c. OTHER ACC___ ___?    YES ☐

___SURANCE PLAN___ ___ROGRAM NAME

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. ___ ___signated L___

d. IS THERE ANOTHER HEALTH BENEFIT PLAN?    YES ☐ NO ☐    *If yes,* complete items 9, 9a, and 9d.

**READ BACK OF FORM BEFORE CO___ ___ & SIGNI___**

12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE ___se of ___al ___formation n___ to process this claim. I also request payment of governme___ ___lf or ___rty ___ ___ assignm___ below.

SIGNED

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED

14. DATE OF CURRENT ILLNESS ___ PREGNANCY (LM___ ___HER ___    DD YY

15. ___ ___    DD YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION MM DD YY    MM DD YY    FROM    TO

17. NAME OF REFERRING PRO___ ___CE    17b.

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES MM DD YY    MM DD YY    FROM    TO

19. ADD___ ___L CLAIM INFORMA___ ___signate___

20. OUTSIDE LAB?    YES ☐ NO ☐    $ CHARGES

___AGNOS___ ___ OR NATURE OF IL___ ___ Relate___ ___ to service line below (24E)    ICD Ind. ___

A. ___    B. ___    C. ___    D. ___
E. ___    F. ___    G. ___    H. ___
I. ___    J. ___    K. ___    L. ___

22. RESUBMISSION CODE ___    ORIGINAL REF. NO. ___

23. PRIOR AUTHORIZATION NUMBER ___

| 24. A. DATE(S) ___ ___E | | B. PLACE OF | C. | D. PROCEDURES, SERVICES, OR SUPPLIES | | E. | F. | G. DAYS OR | H. EPSDT | I. | J. |
| F___ To | | SERVICE | EMG | (Explain Unusual Circumstances) | | DIAGNOSIS | | DAYS OR | Family | ID. | RENDERING |
| MM DD YY DD YY | | | | CPT/HCPCS    MODIFIER | | POINTER | $ CHARGES | UNITS | Plan | QUAL. | PROVIDER ID. # |
| 1 | | | | | | | | | | NPI | |
| 2 | | | | | | | | | | NPI | |
| 3 | | | | | | | | | | NPI | |
| 4 | | | | | | | | | | NPI | |
| 5 | | | | | | | | | | NPI | |
| 6 | | | | | | | | | | NPI | |

25. FEDERAL TAX I.D. NUMBER    SSN EIN ☐☐

26. PATIENT'S ACCOUNT NO.

27. ACCEPT ASSIGNMENT? *For govt. claims, see back)*    YES ☐ NO ☐

28. TOTAL CHARGE $

29. AMOUNT PAID $

30. Rsvd for NUCC Use

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)

SIGNED    DATE

32. SERVICE FACILITY LOCATION INFORMATION

a. ___    b. ___

33. BILLING PROVIDER INFO & PH # ( )

a. ___    b. ___

NUCC Instruction Manual available at: www.nucc.org    *PLEASE PRINT OR TYPE*    APPROVED OMB-0938-1197 FORM 1500 (02-12)

**PATIENT AND INSURED INFORMATION**

**PHYSICIAN OR SUPPLIER INFORMATION**

0946

**HEALTH INSURANCE CLAIM FORM**

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

CARRIER

PATIENT AND INSURED INFORMATION

PHYSICIAN OR SUPPLIER INFORMATION

| PICA | | | | | | PICA |
|---|---|---|---|---|---|---|

1. MEDICARE / MEDICAID / TRICARE / CHAMPVA / GROUP HEALTH PLAN / FECA BLK LUNG / OTHER    1a. INSURED'S I.D. NUMBER (For Program in Item 1)

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)    3. PATIENT'S BIRTH DATE / SEX    4. INSURED'S NAME (Last Name, First Name, Middle Initial)

5. PATIENT'S ADDRESS (No., Street)    6. PATIENT RELATIONSHIP TO INSURED    7. INSURED'S ADDRESS (No., Street)

8. RESERVED FOR NUCC USE

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)    10. IS PATIENT'S CONDITION RELATED TO:    11. INSURED'S POLICY GROUP OR FECA NUMBER

a. OTHER INSURED'S POLICY OR GROUP NUMBER    a. EMPLOYMENT? (Current or Previous)    a. INSURED'S DATE OF BIRTH / SEX

b. RESERVED FOR NUCC USE    b. AUTO ACCIDENT?    PLACE (State)    b. OTHER CLAIM ID (Designated by NUCC)

c. RESERVED FOR NUCC USE    c. OTHER ACCIDENT?    c. INSURANCE PLAN NAME OR PROGRAM NAME

d. INSURANCE PLAN NAME OR PROGRAM NAME    10d. CLAIM CODES (Designated by NUCC)    d. IS THERE ANOTHER HEALTH BENEFIT PLAN?    If yes, complete items 9, 9a and 9d.

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.

12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.    SIGNED

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.    SIGNED

14. DATE OF CURRENT ILLNESS, INJURY or PREGNANCY (LMP)    QUAL.    15. OTHER DATE    QUAL.    16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION    FROM    TO

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE    17b. NPI    18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES    FROM    TO

19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)    20. OUTSIDE LAB?    $ CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY Relate A-L to service line below (24E)    ICD Ind.    22. RESUBMISSION CODE / ORIGINAL REF. NO.
A.    B.    C.    D.    23. PRIOR AUTHORIZATION NUMBER
E.    F.    G.    H.
I.    J.    K.    L.

| 24. A. DATE(S) OF SERVICE | | | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS  MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID. QUAL | RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|
| From MM DD YY | To MM DD YY | | | | | | | | | | |
| 1 | XX XX XXXX | XX XX XXXX | XX | X | XXXXX   XX XX XX | XX | XXXXXXXXX | XXX | XX | NPI | XXXXXXXXXX |
| 2 | XX XX XXXX | XX XX XXXX | XX | X | XXXXX   XX XX XX | XX | XXXXXXXXX | XXX | XX | NPI | XXXXXXXXXX |
| 3 | XX XX XXXX | XX XX XXXX | XX | X | XXXXX   XX XX XX | XX | XXXXXXXXX | XXX | XX | NPI | XXXXXXXXXX |
| 4 | XX XX XXXX | XX XX XXXX | XX | X | XXXXX   XX XX XX | XX | XXXXXXXXX | XXX | XX | NPI | XXXXXXXXXX |
| 5 | XX XX XXXX | XX XX XXXX | XX | X | XXXXX   XX XX XX | XX | XXXXXXXXX | XXX | XX | NPI | XXXXXXXXXX |
| 6 | XX XX XXXX | XX XX XXXX | XX | X | XXXXX   XX XX XX | XX | XXXXXXXXX | XXX | XX | NPI | XXXXXXXXXX |

25. FEDERAL TAX I.D. NUMBER    SSN EIN    26. PATIENT'S ACCOUNT NO.    27. ACCEPT ASSIGNMENT? (For govt. claims, see back)    28. TOTAL CHARGE    29. AMOUNT PAID    30. Rsvd for NUCC Use

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)    SIGNED    DATE    32. SERVICE FACILITY LOCATION INFORMATION    33. BILLING PROVIDER INFO & PH #

NUCC Instruction Manual available at: www.nucc.org    *PLEASE PRINT OR TYPE*    APPROVED OMB-0938-1197 FORM 1500 (02-12)

0947

**EXHIBIT D-41**

February 24, 2012

## Notice of Final Payment Error Calculation Methodology for
## Part C Medicare Advantage Risk Adjustment Data Validation Contract-Level Audits

### Introduction

On December 21, 2010 the Centers for Medicare and Medicaid Services (CMS) posted on its website the "Medicare Advantage Risk Adjustment Data Validation (RADV) Notice of Payment Error Calculation Methodology for Part C Organizations Selected for RADV Audit – Request for Comment". CMS invited public comment on the proposed methodology, with such comments to be submitted in writing by Friday, January 21, 2011.

CMS carefully reviewed the more than 500 comments received on the draft methodology. This Notice responds to the analytic concerns raised relating to extrapolation and payment recovery and presents the final methodology for the RADV payment error calculation.

Following the background section, this Notice provides a general walkthrough of the RADV payment error calculation methodology in two sections: (A) sampling; and (B) payment error calculation.

This methodology will be applied to the next round of RADV contract-level audits, which will be conducted on payment year 2011. Payment year 2011 is the first year for which payment recovery based on extrapolated estimates will be conducted for Medicare Advantage (MA). Note that sampling for RADV audits will occur after the close of final reconciliation for the payment year being audited.

CMS' RADV audit initiative is the Agency's primary strategy to address the national payment error rate for the MA program, which is currently estimated to be 11 percent for FY 2011. In addition to recovery of overpayments through RADV audits, CMS also expects that these contract-level audits will have a sentinel effect on the quality of risk adjustment data submitted for payment by MA organizations.

### Background

Section 1853(a)(3) of the Social Security Act requires that CMS risk adjust payments to Medicare Advantage (MA) organizations. In general, the current risk adjustment methodology relies on enrollee diagnoses, as specified by the International Classification of Disease, Ninth Revision Clinical Modification guidelines (ICD-9-CM), to prospectively adjust capitation payments for a given enrollee based on the health status of the enrollee. Diagnosis codes submitted by MA organizations are used to determine beneficiary risk scores, which in turn determine the risk-adjusted reimbursement.

RADV audits determine whether the diagnosis codes submitted by MA organizations can be validated by supporting medical record documentation. This medical record documentation must meet certain criteria and standards specified in RADV materials that CMS provides to audited contracts. Diagnoses that cannot be validated contribute to a payment error rate. This document describes the sampling

methodology that CMS will use for RADV audits and the methodology for calculating the payment error for each audited Medicare Advantage contract.

## A. Sampling

To conduct these audits, CMS selects a set of MA contracts for each RADV audit cycle. Enrollees are sampled from each selected MA contract for the purpose of estimating payment error related to risk adjustment.

### Sampling Frame

First, CMS identifies all beneficiaries under each MA contract who are "RADV-eligible" because they meet the following criteria:

1. Enrolled in an MA contract (H-number, E-number, or R-number) in January of the payment year— based on CMS' monthly member enrollment files;
2. Continuously enrolled in the same MA contract (as identified in step (1) above) from January of the data collection year through January of the payment year;
3. Non-End Stage Renal Disease (non-ESRD) status from January of the data collection year through January of the payment year;
4. Non-hospice status from January of the data collection year through January of the payment year;
5. Enrolled in Medicare Part B coverage for all 12 months during the data collection year (i.e., defined as full risk enrollees for risk adjusted payment); and
6. Had at least one risk adjustment diagnosis (ICD-9-CM code) submitted during the data collection year that led to at least one CMS-Hierarchical Condition Category (HCC) assignment for the payment year.

### Sample Size and Strata

Next, CMS selects a sample of beneficiaries from each contract's cohort of RADV-eligible enrollees. Enrollee-based stratification will be used in the process of sampling enrollees. In order to derive the strata, the RADV-eligible enrollees in each contract will be ranked from lowest to highest based on their community risk score. The enrollees will then be divided into three equal groups based on the total number of eligible enrollees, where the first group will include the third of enrollees with the highest risk scores and the third group will include the third of enrollees with the lowest risk scores. The remaining enrollees will be in the middle stratum.

CMS will select up to 201 enrollees for medical record review from each contract selected for a contractlevel audit. For smaller contracts, i.e., those with fewer than 1,000 RADV-eligible enrollees, CMS will individually adjust their sample sizes by using the finite population correction factor. The sample sizes for these smaller contracts will be 201 or fewer enrollees.

0950

To achieve a sample size of 201 enrollees per contract, sixty-seven (67) enrollees will be randomly sampled from each group or stratum. The corresponding stratum-based enrollee weights will be computed as the number of RADV-eligible enrollees in the population grouping (or stratum) divided by the number of enrollees selected from that grouping for the sample, i.e., $N_h/n_h$, where $h$ represents the corresponding stratum.

For example, if a contract has 3,000 RADV-eligible enrollees, the enrollees would be ranked by risk score, then divided into three equal groups of 1,000 enrollees each (to represent high, medium, and low strata). An equal number of enrollees will be randomly selected from each group. The weight for each sampled enrollee will equal 14.925 (i.e., 1,000/67).

For small contracts with fewer than 1,000 RADV-eligible enrollees, the same enrollee-based stratification process will be applied; however, a proportionally smaller number of enrollees will be randomly sampled from each group or stratum.

The enrollee sampling weights will be used as multipliers to scale-up (or extrapolate) the sample payment error findings to the population it represents.

Once enrollees have been selected, the MA contract will be required to submit medical records to support all CMS-HCCs represented in the sampled beneficiaries' risk scores for the payment year.

Effective with the CY 2011 RADV audit, CMS will allow audited MA contracts to submit multiple medical records for each CMS-HCC being validated. All diagnoses will be abstracted from the first medical record that validates the CMS-HCC under review. The one best medical record policy will continue to apply to the RADV audit dispute and appeal processes outlined in 42 CFR §422.311. CMS will provide more detailed information in the RADV audit procedures that will be distributed to audited MA contracts.

## B. Payment Error Calculation

*Enrollee-level Payment Error Calculation*

CMS will calculate each contract's payment error based on the validation results. For each sampled enrollee, the RADV-corrected risk score and corrected payment will be calculated based on the CMSHCCs that are supported by RADV medical record review findings for the enrollee. Enrollee-level payment errors will be defined as the difference between the original payment and the RADV-corrected payment (per member per month). The payment error for each enrollee will be either positive (representing a net overpayment), or negative (representing a net underpayment). An annual payment error amount will be calculated for each sampled enrollee based on the number of months the person was enrolled in the selected MA contract (and was not in ESRD or hospice status) during the payment year.

0951

*Payment Error Extrapolation Calculation*

To derive the payment error estimate for each MA contract, the annual payment error for each sampled enrollee will be multiplied by the enrollee's sampling weight (computed for each stratum [h] during the sampling phase as $N_h/n_h$, where N represents the number of enrollees in the RADV-eligible population and n is the number of enrollees sampled). The weighted enrollee annual payment error will be summed across all enrollees in the sample to determine an estimated payment error for the MA contract (the "point estimate"). A 99 percent confidence interval (CI) will then be calculated for the estimated payment error for each audited MA contract.

The following formulas illustrate computation of a 99 percent CI around the payment error estimate for one contract, assuming a sample size of 201, with 67 enrollees selected from each of three strata groupings.

The lower bound of the 99 percent CI is computed as the estimated payment error for the contract (PE) minus (2.575 multiplied by the standard error), or (PE – (2.575 * SE)). The standard error (SE) can be calculated as follows:

1. Derive the variance, $v_h$, (standard deviation squared) of the unweighted enrollee payment errors across the sample enrollees within each of the three strata (h).

2. Calculate the variance of the estimated total ( $V_T$ ) payment error, where N represents the number of enrollees in the RADV-eligible population of the $h^{th}$ (1st, 2nd, 3rd) stratum:

$$V_T = \sum_{h=1}^{3} \frac{N_h^2}{67} \cdot v_h$$

3. The standard error is $SE_T = \sqrt{V_T}$

Payment Recovery Amount and the Fee-For-Service Adjuster

If the CI for the point estimate includes zero or is below zero, the contract will have the payment recovery amount constrained to zero.

If the CI for the point estimate is above zero, the payment recovery amount for the contract will be determined as follows. First, a preliminary payment recovery amount will be set at the lower bound of the 99 percent CI for the contract's point estimate. Second, to determine the final payment recovery amount, CMS will apply a Fee-for-Service Adjuster (FFS Adjuster) amount as an offset to the preliminary recovery amount. If the FFS Adjuster amount is greater than the preliminary recovery amount, the final recovery amount is equal to zero.

The FFS adjuster accounts for the fact that the documentation standard used in RADV audits to determine a contract's payment error (medical records) is different from the documentation standard

4

used to develop the Part C risk-adjustment model (FFS claims). The actual amount of the adjuster will be calculated by CMS based on a RADV-like review of records submitted to support FFS claims data.

0953

**EXHIBIT D-42**

# Risk Adjustment of Medicare Capitation Payments Using the CMS-HCC Model

Gregory C. Pope, M.S., John Kautter, Ph.D., Randall P. Ellis, Ph.D., Arlene S. Ash, Ph.D.,
John Z. Ayanian, M.D., M.P.P., Lisa I. Iezzoni, M.D., M.Sc., Melvin J. Ingber, Ph.D., Jesse M. Levy, Ph.D.,
and John Robst, Ph.D.

*This article describes the CMS hierarchical condition categories (HCC) model implemented in 2004 to adjust Medicare capitation payments to private health care plans for the health expenditure risk of their enrollees. We explain the model's principles, elements, organization, calibration, and performance. Modifications to reduce plan data reporting burden and adaptations for disabled, institutionalized, newly enrolled, and secondary-payer subpopulations are discussed.*

## INTRODUCTION

Medicare is one of the world's largest health insurance programs, with annual expenditures exceeding $200 billion. It provides health insurance to nearly 40 million beneficiaries entitled by elderly age, disability, or ESRD. Approximately 11 percent of Medicare beneficiaries are enrolled in private managed care health care plans, with the rest in the traditional FFS program. The 1997 BBA modified the Medicare managed care (MMC) and other capitated programs, collectively called M+C.[1] Medicare pays private plans participating in M+C a monthly capitation rate to provide health care services to enrolled beneficiaries.

Historically, capitation payments to MMC plans were linked to FFS expenditures by geographic area, with payments set at 95 percent of an enrollee's county's adjusted average per capita cost (AAPCC). The AAPCC actuarial rate cells were defined by: age, sex, Medicaid enrollment (indicating poverty), institutional status (for nursing home residents), and working aged status (for beneficiaries with employer-based insurance where Medicare is a secondary payer). Separate county factors were calculated for the aged and non-aged disabled (under 65 years), and at the State-level only (due to small numbers), for ESRD-entitled beneficiaries.

The AAPCC payment methodology explains only about 1-percent of the variation in expenditures for Medicare beneficiaries, and does not pay more for sicker people. Thus, research showed that the managed care program was increasing total Medicare Program expenditures, because its enrollees were healthier than FFS enrollees, and the AAPCC did not account for this favorable selection (Brown et al., 1993; Riley et al., 1996; Mello et al.,

Gregory C. Pope and John Kautter are with RTI International. Randall P. Ellis and Arlene S. Ash are with Boston University. John Z. Ayanian is with Harvard Medical School and Brigham and Women's Hospital. Lisa I. Iezzoni is with Harvard Medical School and Beth Israel Deaconess Medical Center. Melvin J. Ingber, Jesse M. Levy, and John Robst are with the Centers for Medicare & Medicaid Services (CMS). The research in this article was funded by CMS to RTI International under Contract Numbers 500-95-048 and 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. The views expressed in this article are those of the authors and do not necessarily reflect the views of RTI International, Boston University, Harvard Medical School, Brigham and Women's Hospital, Beth Israel Deaconess Medical Center, or CMS.

[1] The Medicare Prescription Drug, Improvement and Modernization Act of 2003 (MMA) renames the M+C program Medicare Advantage. However, since this renaming does not officially take place until 2006, we continue to use M+C.

0955

2003). Also, more money was not directed to plans enrolling sicker beneficiaries, or to plans specializing in treating high-cost populations, such as beneficiaries with particular chronic diseases or high levels of functional impairment.

The M+C program fundamentally changed the MMC payment method, including a mandate for health-based Medicare capitation payments by 2000. To support this mandate, the BBA required managed care organizations (MCOs) to report inpatient encounter data (i.e., records for each inpatient admission of a plan's enrollees noting, among other things, the beneficiaries' diagnoses) beginning in 1998. In 2000 CMS, which administers the Medicare Program, implemented the PIP-DCG model as a health-based payment adjuster (Pope et al., 2000a). This model estimates beneficiary health status (expected cost next year) from AAPCC-like demographics and the worst principal inpatient diagnosis (principal reason for inpatient stay) associated with any hospital admission. PIP-DCG-based payments were introduced gradually, with only 10 percent of total Medicare capitation payments adjusted by PIP-DCG factors in 2000. The other 90 percent of payments were still adjusted using a purely demographic (AAPCC-like) model.

The PIP-DCG model was intended as a transition, a feasible way to implement risk adjustment based on the readily available, already audited inpatient diagnostic data. Relying on inpatient diagnoses is the PIP-DCG model's major shortcoming, since only illnesses that result in hospital admissions are counted; MCOs that reduce admis-sions (e.g., through good ambulatory care) can end up with apparently healthier patients and lower payments. Congress's BIPA (2000) addressed the PIP-DCG limitations by requiring the use of ambulatory diagnoses in Medicare risk-

adjustment, to be phased in from 2004 to 2007 at 30, 50, 75, and 100 percent of total payments. CMS began collecting encounter data from MCOs for the physician office and hospital outpatient settings (i.e., records of each enrollee visit to these providers with dates, procedures performed, diagnoses, etc.) in October 2000 and April 2001, respectively. However, following complaints from MCOs about the burden of reporting encounter data, CMS suspended data collection in May 2001, ultimately adopting a drastically streamlined data reporting strategy (discussed later).

CMS evaluated several risk-adjustment models that use both ambulatory and inpatient diagnoses, including ACGs (Weiner et al., 1996), the chronic disease and disability payment system (CDPS) (Kronick et al., 2000), clinical risk groups (CRGs) (Hughes et al., 2004), the clinically detailed risk information system for cost (CD-RISC) (Kapur et al., 2003), and DCG/HCCs (Pope et al, 2000b). CMS chose the DCG/HCC model for Medicare risk-adjustment, largely on the basis of transparency, ease of modification, and good clinical coherence. The DCG/HCC model, part of the same DCG family of models as the PIP-DCG, was developed with CMS funding by researchers at RTI International[2] and Boston University, with clinical input from physicians at Harvard Medical School.[3]

Prior to implementing Medicare risk-adjustment in 2004, the DCG/HCC model developers and CMS staff adapted the original model for consistency with CMS' simplified data collection, and for customized fit for Medicare subpopulations. The resulting CMS-HCC model reflects these

[2] The early development of the DCG/HCC model was done by Health Economics Research, Inc. while under contract to CMS. However, RTI International acquired Health Economics Research, Inc. in 2002.

[3] The original version of the DCG/HCC model is described in Ellis et al. (1996). The DCG/HCC model has been refined as described in Pope et al., 1998 and 2000b.

Medicare-specific adaptations of the DCG/HCC model and provides a comprehensive framework for Medicare risk-adjustment.

This article describes the DCG/HCC and CMS-HCC models. The next section describes the DCG/HCC model, including the principles and elements of its diagnostic classification system and how its performance compares to earlier models. We then describe the modifications to accommodate the simplified data that lead to the CMS-HCC model. The final section describes the CMS-HCC model adaptations for subpopulations.

## DCG/HCC MODEL PRINCIPLES

### Diagnostic Classification System

The following ten principles guided the creation of the diagnostic classification system.

*Principle 1*—Diagnostic categories should be clinically meaningful. Each diagnostic category is a set of ICD-9-CM codes (Centers for Disease Control and Prevention, 2004). These codes should all relate to a reasonably well-specified disease or medical condition that defines the category. Conditions must be sufficiently clinically specific to minimize opportunities for gaming or discretionary coding. Clinical meaningfulness improves the face validity of the classification system to clinicians, its interpretability, and its utility for disease management and quality monitoring.

*Principle 2*—Diagnostic categories should predict medical expenditures. Diagnoses in the same HCC should be reasonably homogeneous with respect to their effect on both current (this year's) and future (next year's) costs. (In this article we present prospective models predicting future costs.)

*Principle 3*—Diagnostic categories that will affect payments should have adequate sample sizes to permit accurate and stable estimates of expenditures. Diagnostic categories used in establishing payments should have adequate sample sizes in available data sets. Given the extreme skewness of medical expenditure data, the data cannot reliably determine the expected cost of extremely rare diagnostic categories.

*Principle 4*—In creating an individual's clinical profile, hierarchies should be used to characterize the person's illness level within each disease process, while the effects of unrelated disease processes accumulate. Because each new medical problem adds to an individual's total disease burden, unrelated disease processes should increase predicted costs of care. However, the most severe manifestation of a given disease process principally defines its impact on costs. Therefore, related conditions should be treated hierarchically, with more severe manifestations of a condition dominating (and zeroing out the effect of) less serious ones.

*Principle 5*—The diagnostic classification should encourage specific coding. Vague diagnostic codes should be grouped with less severe and lower-paying diagnostic categories to provide incentives for more specific diagnostic coding.

*Principle 6*—The diagnostic classification should not reward coding proliferation. The classification should not measure greater disease burden simply because more ICD-9-CM codes are present. Hence, neither the number of times that a particular code appears, nor the presence of additional, closely related codes that indicate the same condition should increase predicted costs.

*Principle 7*—Providers should not be penalized for recording additional diagnoses (monotonicity). This principle has

two consequences for modeling: (1) no condition category should carry a negative payment weight, and (2) a condition that is higher-ranked in a disease hierarchy (causing lower-rank diagnoses to be ignored) should have at least as large a payment weight as lower-ranked conditions in the same hierarchy.

*Principle 8*—The classification system should be internally consistent (transitive). If diagnostic category A is higher-ranked than category B in a disease hierarchy, and category B is higher-ranked than category C, then category A should be higher-ranked than category C. Transitivity improves the internal consistency of the classification system, and ensures that the assignment of diagnostic categories is independent of the order in which hierarchical exclusion rules are applied.

*Principle 9*—The diagnostic classification should assign all ICD-9-CM codes (exhaustive classification). Since each diagnostic code potentially contains relevant clinical information, the classification should categorize all ICD-9-CM codes.

*Principle 10*—Discretionary diagnostic categories should be excluded from payment models. Diagnoses that are particularly subject to intentional or unintentional discretionary coding variation or inappropriate coding by health plans/providers, or that are not clinically or empirically credible as cost predictors, should not increase cost predictions. Excluding these diagnoses reduces the sensitivity of the model to coding variation, coding proliferation, gaming, and upcoding.

In designing the diagnostic classification, principles 7 (monotonicity), 8 (transitivity), and 9 (exhaustive classification) were followed absolutely. For example, if the expenditure weights for our models did not originally satisfy monotonicity, we imposed constraints to create models that did. Judgment was used to make tradeoffs

among other principles. For example, clinical meaningfulness (principle 1) is often best served by creating a very large number of detailed clinical groupings. But a large number of groupings conflicts with adequate sample sizes for each category (principle 3). Another tradeoff is encouraging specific coding (principle 5) versus predictive power (principle 2). In current coding practice, non-specific codes are common. If these codes are excluded from the classification system, substantial predictive power is sacrificed. Similarly, excluding discretionary codes (principle 10) can also lower predictive power (principle 2). We approached the inherent tradeoffs involved in designing a classification system using empirical evidence on frequencies and predictive power, clinical judgment on relatedness, specificity, and severity of diagnoses, and the judgment of the authors on incentives and likely provider responses to the classification system. The DCG/HCC models balance these competing goals to achieve a feasible health-based payment system.

## Elements and Organization

As shown in Figure 1, the HCC diagnostic classification system first classifies each of over 15,000 ICD-9-CM codes into 804 diagnostic groups, or DxGroups. Each ICD-9-CM code maps to exactly one DxGroup, which represents a well-specified medical condition, such as DxGroup 28.01 Acute Liver Disease. DxGroups are further aggregated into 189 Condition Categories, or CCs.[4] CCs describe a broader set of similar diseases, generally organized into body systems, somewhat like ICD-9-CM major diagnostic categories.

---

[4] Most CCs are assigned entirely with ICD-9-CM codes. But CCs 185-189 are assigned by beneficiary utilization of selected types of DME, such as wheelchairs. CC 173, Major Organ Transplant, is defined by procedure codes only. CC 129, ESRD is defined by Medicare entitlement status. None of these CCs are included in the CMS-HCC model.

0958

**Figure 1**

**Hierarchical Condition Categories Aggregations of ICD-9-CM Codes**



NOTE: ICD-9-CM is *International Classification of Diseases, Ninth Revision, Clinical Modification.*
SOURCE: (Pope et al., 2000b.)

Although they are not as homogeneous as DxGroups, CCs are both clinically- and cost-similar. An example is CC 28 Acute Liver Failure/Disease that includes DxGroups 28.01 and 28.02 Viral Hepatitis, Acute or Unspecified, with Hepatic Coma.

Hierarchies are imposed among related CCs, so that a person is only coded for the most severe manifestation among related diseases. For example (Figure 2), ICD-9-CM Ischemic Heart Disease codes are organized in the Coronary Artery Disease hierarchy, consisting of 4 CCs arranged in descending order of clinical severity and cost, from CC 81 Acute Myocardial Infarction to CC 84 Coronary Athlerosclerosis/Other Chronic Ischemic Heart Disease. A person with an ICD-9-CM code in CC 81 is excluded from being coded in CCs 82, 83, or 84 even if codes that group into those categories were also present. Similarly, a person with ICD-9-CM codes that group into both CC 82 Unstable Angina and Other Acute Ischemic Heart Disease, and CC 83 Angina Pectoris/Old Myocardial Infarction is coded for CC 82, but not CC 83. After imposing hierarchies, CCs become Hierarchical Condition Categories, or HCCs.[5]

Although HCCs reflect hierarchies among related disease categories, for unrelated diseases, HCCs accumulate. For example, a male with heart disease, stroke, and cancer has (at least) three separate HCCs coded, and his predicted cost will reflect increments for all three problems. The HCC model is more than simply additive because some disease combinations interact. For example, the presence of both Diabetes and Congestive Heart Failure (CHF) could increase predicted cost by more (or less) than the sum of the separate increments for people who have diabetes or CHF alone.

We tested 35 two- and three-way interactions among six common and high-cost chronic diseases defined by HCCs or

---

[5] The full list of hierarchies used in the CMS-HCC model is available on request from the authors.

0959

**Figure 2**

**Hierarchical Condition Categories Coronary Artery Disease Hierarchy**



SOURCE: (Pope et al., 2000b.)

groups of HCCs: diabetes, cerebrovascular disease, vascular disease, or chronic obstructive pulmonary disease (COPD), CHF, and coronary artery disease (Pope et al., 2000b), as well as three interactions of several of these conditions with renal failure.[6] Simple additivity yields most of the explanatory power, in the sense that adding all 38 interactions barely increased the base DCG/HCC model's $R^2$ (from 11.10 to 11.13 percent). However, six interactions were substantial in magnitude, statistically significant, and clinically plausible. Hence, to improve clinical face validity and predictive accuracy for important subgroups of beneficiaries, we include them in the DCG/HCC model. For example, the simultaneous presence of CHF and COPD leads to higher expected costs than would be calculated by adding the separate increments for CHF and COPD alone.

Because a single beneficiary may be coded for none, one, or more than one DxGroup or HCC, the DCG/HCC model can individually price tens of thousands of distinct clinical profiles using fewer than 200 parameters. The model's structure thus provides, and predicts from, a detailed comprehensive clinical profile for each individual.

HCCs are assigned using hospital and physician diagnoses from any of five sources: (1) principal hospital inpatient; (2) secondary hospital inpatient; (3) hospital outpatient; (4) physician; and (5) clinically-trained non-physician (e.g., psychologist, podiatrist). The DCG/HCC model does not distinguish among sources; in particular, it places no premium on diagnoses from inpatient care. Using Medicare 5-percent sample FFS data, we investigated adding diagnoses from other sources (Pope et al., 2000b). Adding diagnoses from home health providers raised the explanatory power of the base model from

---

[6] In later work unpublished work, we also examined all two-way interactions of cancer with the other six diagnoses, but did not find any significant effects.

11.15 to 11.65 percent. Further adding diagnoses from DME suppliers raised the explanatory power from 11.65 to 11.85 percent. All other sources of diagnoses either add no predictive power (SNF, ASC, or hospice) or detract from predictive power (clinical laboratory and radiology/imaging clinics). Diagnoses assigned by home health and DME providers are likely to be less reliable than those assigned by physicians or other providers with greater clinical training. Diagnoses from laboratory and imaging tests are also problematic given the significant proportion of rule-out diagnoses. In implementing the CMS-HCC model, potential gains in predictive power from using additional sources were balanced against the costs of collecting and auditing these data; the decision was to only ask MCOs to collect diagnoses from the five baseline sources previously listed.

Consistent with principle 10, we excluded discretionary diagnostic categories (HCCs) from the preliminary prospective payment model. We excluded diagnoses that were vague/non-specific (e.g., symptoms), discretionary in medical treatment or coding (e.g., osteoarthritis), not medically significant (e.g., muscle strain), or transitory or definitively treated (e.g., appendicitis). We also excluded HCCs that did not (empirically) add to costs, and finally, the five HCCs that were defined by the presence of procedures or use of DME, because, as much as possible, we wanted payments to follow what medical problems were present as opposed to what services were offered.[7] Altogether, we excluded 88 of the 189 HCCs, leaving 101 HCCs in the preliminary prospective payment model. As discussed further, additional HCCs were excluded from the final, 70-category CMS-HCC model.

The DCG/HCC model also relies on demographics. Demographic adjusters included in the model are 24 mutually exclusive age/sex cells (e.g., female, age 65-69), an indicator for at least 1-month of Medicaid enrollment in the base year (a poverty indicator), and an indicator of originally disabled status. The age cells distinguish beneficiaries currently entitled to Medicare by age (65 or over) versus disability (under 65); a separate, explicit aged versus disabled entitlement status indicator would be redundant. The originally disabled indicator distinguishes beneficiaries who are currently age 65 or over, but were first entitled to Medicare before age 65 by disability. The age/sex, Medicaid, and originally disabled categories add to each other and to the HCC diagnostic categories.[8] The demographic variables are the same as have been used in the PIP-DCG model, and are discussed at greater length elsewhere (Pope et al., 2000a).

Figure 3 displays a hypothetical clinical vignette of a female age 79, eligible for Medicaid and diagnosed with acute myocardial infarction (AMI), angina pectoris, COPD, renal failure, chest pain, and an ankle sprain. Note that although this female receives CCs for both AMI and angina, she receives no HCC for angina because AMI is a more severe manifestation of coronary artery disease. Also note that while payment includes additive increments for females age 75-79 (demographic categories not shown in Figure 3), Medicaid, AMI, COPD, and renal failure, the HCCs for major symptoms and other injuries are excluded from the payment calculation. Chest pain is a symptom associated with a variety of medical conditions ranging from minor to serious, and sprains are transitory, with minimal implications for next year's cost.

[7] The DME HCCs were developed to predict costs associated with functional impairment not captured by diagnoses. Although they did improve prediction for the functionally impaired, substantial under-prediction remained (Pope et al., 2000b; Kautter and Pope, 2001).

[8] We did not systematically investigate interactions of age and sex with HCCs (diagnoses). This is a subject for future research.

**Figure 3**

**Clinical Vignette for Hierarchical Condition Categories Classification 79 Year Old Female with AMI, Angina Pectoris, COPD, and Renal Failure**



NOTES: AMI is acute myocardial infarction. COPD is chronic obstructive pulmonary disease.
SOURCE: (Pope et al., 2000b.)

## PERFORMANCE OF DCG/HCC AND PIP-DCG MODELS

The predictive accuracy of risk-adjustment models is typically judged by the $R^2$ statistic (percentage of variation explained) to measure predictive accuracy for individuals and predictive ratios (ratios of mean predicted to mean actual expenditures for subgroups of beneficiaries) to measure predictive accuracy for groups. The $R^2$ of age/sex, PIP-DCG, and DCG/HCC models as measured on 1996-1997 Medicare's 5-

percent sample FFS data are: age/sex, 1.0 percent; PIP-DCG, 6.2 percent; and DCG/HCC, 11.2 percent.

Adding PIP-DCG to demographic predictors (age/sex) increases predictive power sixfold. Adding secondary inpatient and ambulatory diagnoses (hospital outpatient and physician), and arraying them in a multi-condition cumulative model (DCG/HCC) nearly doubles the power again. Besides the $R^2$, another interesting summary statistic is the percentage of payments based on demographic variables: 100

**Table 1**

**Predictive Ratios[1] for Alternative Risk-Adjustment Models**

| Category | | Model | |
|---|---|---|---|
| **Quintiles of Expenditures** | Age/Sex | PIP-DCG | DCG/HCC |
| First (Lowest) | 2.66 | 2.09 | 1.23 |
| Second | 1.93 | 1.54 | 1.23 |
| Third | 1.37 | 1.10 | 1.14 |
| Fourth | 0.95 | 0.84 | 1.02 |
| Fifth (Highest) | 0.44 | 0.75 | 0.86 |
| Top 5 Percent | 0.28 | 0.61 | 0.77 |
| Top 1 Percent | 0.17 | 0.47 | 0.69 |
| **Hospitalizations** | | | |
| None | 1.33 | 1.07 | 1.03 |
| 1 | 0.63 | 1.02 | 1.02 |
| 2 | 0.44 | 0.91 | 0.98 |
| 3 or More | 0.26 | 0.69 | 0.82 |
| **Diagnoses[2]** | | | |
| Heart Failure | 0.47 | 0.74 | 0.97 |
| Heart Attack | 0.45 | 0.78 | 0.98 |
| COPD | 0.59 | 0.79 | 0.99 |
| Hip Fracture | 0.56 | 0.83 | 0.99 |
| Depression | 0.54 | 0.77 | 0.92 |
| Colorectal Cancer | 0.60 | 0.78 | 0.98 |
| Cerebral Hemorrhage | 0.44 | 0.73 | 1.04 |

[1] Mean predicted cost divided by mean actual cost.

[2] From either inpatient or ambulatory setting.

NOTES: Expenditures, hospitalizations, and diagnoses are measured in the base year. COPD is chronic obstructive pulmonary disease.

SOURCE: (Pope et al., 2000b.)

percent in a demographic model, 81 percent in the PIP-DCG model, but only 43 percent in the DCG/HCC model (Pope et al., 2001). With over one-half of payments determined by diagnoses, the DCG/HCC model moves decisively away from the AAPCC demographic-based payment system.

Table 1 shows predictive ratios for selected groups of Medicare beneficiaries. Ratios close to 1.0 indicate accurate prediction of costs; less than 1.0, under prediction; and, more than 1.0, over prediction. The PIP-DCG model improves substantially on age/sex, and in almost all cases, the DCG/HCC model improves significantly on the PIP-DCG model. This is true even for hospitalizations, where the PIP-DCG model distinguishes between those hospitalized or not, while the DCG/HCC model makes no distinction by source of diagnosis.[9] Despite the DCG/HCC model's

[9] The DCG/HCC model captures multiple conditions that might be diagnosed in multiple inpatient stays, whereas the PIP-DCG model captures only the single principal inpatient diagnosis most predictive of future costs if multiple inpatient stays occur.

impressive gains over the age/sex and PIP-DCG models, it still under-predicts for the most expensive and most often hospitalized beneficiaries.

## CMS-HCC MODEL

This section describes how the DCG/HCC model was modified before implementation as the M+C risk adjuster for capitation payments in 2004. We will refer to the modified model as CMS-HCC.

### DCG/HCC Model Modification to Simplify Data Collection

When several MCOs withdrew from the M+C program around the year 2000, CMS sought to improve plan retention. Since some MCOs had complained of the burden of collecting encounter data for risk-adjustment, CMS sought to develop risk adjustment models that predict well and rely on ambulatory data, but with reduced data col-



**Figure 4**

**Model Explanatory Power as a Function of Number of Hierarchical Condition Categories (HCC)**

NOTES: All models, including the one with zero HCCs, include 24 age/sex cells, and Medicaid and originally disabled status. Results based on stepwise regression analysis.

SOURCE: (Pope et al., 2001.)

lection requirements. One measure of the data collection burden imposed by a model is its number of diagnostic categories.[10]

We investigated the relationship between number of diagnostic categories used in the DCG/HCC model and its predictive power (Pope et al., 2001). Figure 4 plots the relationship between number of diagnostic categories and model explanatory power measured by $R^2$. Diagnostic categories (HCCs) were entered into the model in descending order of their incremental explanatory power using stepwise regression. The base model (with zero HCCs) includes 26 demographic variables, the 24 age/sex cells, and Medicaid and originally disabled status. Its $R^2$ is 1.69 percent.

The incremental contribution to predictive power declines rapidly with the number of diagnostic categories added to the model. The first diagnostic category entered by the stepwise regression is CHF, which more than doubles the demographic model $R^2$ to 4.11 percent. The second condition category entered is COPD, raising the $R^2$ to 4.94 percent. This is an incremental gain of 0.83 percentage points, substantial, but much less then the increment of 2.42 percentage points due to CHF. With 5 HCCs included, 61 percent of the maximum explanatory power of the full (101 HCC) model is attained; with 10 HCCs, 74 percent of the maximum is achieved; with 20, 85 percent, and with 30, 90 percent. The incremental $R^2$ from adding a diagnostic category is 0.48 percentage points at 5 HCCs; 0.26 percentage points at 10 HCCs; 0.08 percentage points at 20 HCCs; and 0.05 percentage points at 30 HCCs.

[10] The relationship between number of diagnostic categories and data collection burden is controversial. Some MCOs seemed to feel that it would be less burdensome to report all diagnoses, which CMS allows.

This analysis shows that a parsimonious risk-adjustment model with a substantially reduced number of diagnostic categories is almost as predictive as a full model. But parsimony has a cost. In limiting the number of conditions that affect payment, many serious, high-cost diagnoses—especially rare ones—will be ignored. MCOs enrolling beneficiaries with excluded diagnoses will be disadvantaged, and beneficiaries with such conditions may not be well served by MCOs.

CMS considered these results, and consulted with clinicians, on the tradeoff between number of diagnostic categories and predictive power, and also other criteria for diagnostic categories to include in risk adjustment, such as well-defined diagnostic criteria and clinical coherence and homogeneity. It was important that the HCC hierarchies not be disrupted by deletion of higher-ranked HCCs while lower-ranked HCCs were retained. After this process, CMS selected 70 HCCs to include in the CMS-HCC model. The choices reflect a balance among the competing considerations of reducing data collection burden, maximizing predictive power, including rare, high-cost conditions, and selecting only well-defined and clinically coherent conditions. Generally, the higher-cost, more severe conditions at the top of the HCC disease hierarchies were retained, while some lower-cost, more frequent and more discretionary conditions at the bottom of the hierarchies were pruned. For example, in the coronary artery disease hierarchy, AMI (heart attack), other acute IHD (e.g., unstable angina), and angina pectoris/old myocardial infarction were retained, but chronic IHD (e.g., coronary atherosclerosis) was excluded.

After the CMS-HCC model was finalized, a list of approximately 3,000 of the more than 15,000 ICD-9-CM diagnosis codes was identified that are sufficient to define the model's 70 HCCs. In addition, because the CMS-HCC model does not give extra credit for multiple reports of the same diagnosis, MCOs need only report a single encounter during the relevant year of data collection that establishes the diagnosis. The information required for the single encounter is: (1) beneficiary identification number, (2) date (to establish that the diagnosis was made during the relevant reporting period), (3) setting (to establish that the diagnosis was made in one of the allowed hospital or physician settings), and (4) ICD-9-CM diagnosis code. In short, MCOs are required to report only the minimum.

Concern about the quality of diagnostic reporting is the greatest in physician offices, where diagnoses have not heretofore affected payment, and recording of diagnoses is less rigorously practiced than in hospitals. The auditing standard that CMS has promulgated for reporting of physician office diagnoses is that a physician has established the diagnosis in the medical record, and that medical coders have recorded it in accordance with ICD-9-CM rules. CMS will conduct coding audits, but not clinical audits. That is, CMS will require MCOs to demonstrate that a diagnosis is present in the medical record on the specified date and has been coded according to ICD-9-CM. CMS will not require clinical verification of these diagnoses, such as diagnostic test results.

## CMS-HCC Model Calibration

We calibrated the CMS-HCC model to 1999-2000 Medicare 5-percent sample FFS data for beneficiaries entitled by age or disability (beneficiaries entitled by ESRD were excluded). The model is prospective, meaning that diagnoses collected in a base year (1999) are used to predict expenditures in the following year (2000). An

important operational change from the PIP-DCG model is that the data lag will be eliminated, making the application of the model consistent with its calibration. With the PIP-DCG model, the data collection period for a payment year ended 6 months before the start of the year, i.e., on June 30 of the previous year, so that final capitation rates could be published by January 1 of the payment year. With the CMS-HCC model, provisional rates will be established by January 1 based on 6-month lagged data, and final rates will be available by June 30 of the payment year based on the previous calendar year's diagnoses. A reconciliation process will adjust the first 6 months of payments to the final rates, if necessary.

A standard set of sample restrictions was employed to ensure a population of beneficiaries with complete 12-month base year diagnostic profiles and complete payment year Medicare expenditures from the FFS claims for aged and disabled beneficiaries (Pope et al., 2000b). Decedents are included in the payment year for their eligible period. Complete FFS claims are not available for months of M+C enrollment or when Medicare is a secondary payer, and M+C plans are not responsible for hospice care, so these months were excluded from our sample. The final sample size is 1,337,887 beneficiaries.

We summed all Medicare payments for a beneficiary for months in 2000 satisfying our sample restrictions, excluding (1) deductibles and copayments paid by the beneficiary; (2) hospice payments; and (3) indirect medical education payments. Hospice and indirect medical education payments are excluded because they were not included in M+C capitation rates, but were paid directly to hospices and teaching hospitals utilized by M+C enrollees. Payments were annualized by dividing them by the fraction of months in 2000 that satisfy our sample restrictions; all analyses are weighted by this eligibility fraction. In general, annualization and weighting ensures that monthly payments are correctly estimated for all beneficiaries, including those who died (Ellis et al., 1996).[11]

The model was calibrated using weighted least squares multiple regression. The CMS-HCC regression model estimated for the combined aged and disabled Medicare population is shown in Table 2.

The elements of the model are:
- Age/sex cells (24).
- Medicaid interacted with sex and age/disabled entitlement status.
- Originally disabled status interacted with sex.
- HCC diagnostic categories (70).
- Interactions of diagnostic categories with entitlement by disability (5).
- Disease interactions (6).

The $R^2$ for this model is 9.8 percent. Several coefficients are constrained because the unconstrained coefficients violate the principle that higher-ranked conditions in a hierarchy should have higher predicted costs, or for other reasons.[12]

As an example of expenditure prediction, consider our hypothetical scenario in Figure 3 of a female age 79 eligible for Medicaid diagnosed with AMI, angina pectoris, COPD, renal failure, chest pain, and an ankle sprain. The female receives the following incremental cost predictions: female, 75 to 79, $2,562; aged, female, Medicaid, $616; AMI (HCC 81), $1,885; angina pectoris, $0; COPD (HCC 108), $1,936; renal failure (HCC 131), $2,908;

[11] In our calibration, we did not make any geographic adjustments to Medicare payments. In past work, we have found that deflating payments by a geographic input price index had little effect on estimated risk-adjustment model parameters.

[12] Clinical consultants to CMS suggested that metastatic cancer is not consistently correctly coded, so HCCs 7 and 8 were constrained to have equal coefficients. HCCs 81 and 82 were constrained to have equal coefficients because the ICD-9-CM diagnostic detail CMS collects from health plans is not sufficient to distinguish them.

0966

**Table 2**

**Centers for Medicare & Medicaid Services-Hierarchical Condition Categories (CMS-HCC)
Combined, Community, and Institutional Models**

|  | Models | | | | | |
|---|---|---|---|---|---|---|
|  | Combined | | Community | | Institutional | |
| Number of Observations | 1,337,887 | | 1,291,308 | | 65,593 | |
| $R^2$ | 0.0977 | | 0.0976 | | 0.0596 | |
| Adjusted $R^2$ | 0.0977 | | 0.0976 | | 0.0589 | |
| Dependent Variable Mean | 5,352 | | 5,213 | | 8,937 | |
| Root Mean Square Error | 13,407 | | 13,337 | | 15,954 | |
| Model Parameters | 105 | | 105 | | 50 | |
| **Variable** | Parameter Estimate | t-ratio | Parameter Estimate | t-ratio | Parameter Estimate | t-ratio |
| **Female** | | | | | | |
| 0-34 Years | 678 | 3.81 | 598 | 3.36 | 5,457 | 11.72 |
| 35-44 Years | 1,110 | 8.82 | 1,012 | 8.03 | 5,457 | 11.72 |
| 45-54 Years | 1,177 | 11.20 | 1,096 | 10.40 | 5,457 | 11.72 |
| 55-59 Years | 1,463 | 11.87 | 1,360 | 11.00 | 5,457 | 11.72 |
| 60-64 Years | 1,996 | 17.26 | 1,924 | 16.56 | 5,457 | 11.72 |
| 65-69 Years | 1,648 | 42.11 | 1,572 | 40.15 | 5,970 | 11.73 |
| 70-74 Years | 2,061 | 60.25 | 1,970 | 57.42 | 6,049 | 17.09 |
| 75-79 Years | 2,562 | 71.59 | 2,475 | 68.56 | 5,089 | 19.63 |
| 80-84 Years | 2,998 | 71.39 | 2,936 | 68.34 | 4,813 | 22.51 |
| 85-89 Years | 3,360 | 63.45 | 3,408 | 61.01 | 4,515 | 23.28 |
| 90-94 Years | 3,683 | 46.81 | 4,077 | 46.25 | 4,048 | 19.08 |
| 95 Years or Over | 3,128 | 23.27 | 4,130 | 25.32 | 2,980 | 10.34 |
| **Male** | | | | | | |
| 0-34 Years | 405 | 2.72 | 346 | 2.32 | 5,664 | 13.77 |
| 35-44 Years | 701 | 6.63 | 617 | 5.81 | 5,664 | 13.77 |
| 45-54 Years | 1,059 | 12.15 | 973 | 11.14 | 5,664 | 13.77 |
| 55-59 Years | 1,460 | 13.42 | 1,386 | 12.68 | 5,664 | 13.77 |
| 60-64 Years | 1,824 | 17.90 | 1,755 | 17.13 | 5,664 | 13.77 |
| 65-69 Years | 1,827 | 41.47 | 1,774 | 40.28 | 7,435 | 13.24 |
| 70-74 Years | 2,380 | 59.66 | 2,323 | 58.17 | 6,350 | 14.34 |
| 75-79 Years | 3,031 | 69.04 | 2,960 | 67.13 | 6,210 | 16.45 |
| 80-84 Years | 3,454 | 62.03 | 3,372 | 59.83 | 6,201 | 17.67 |
| 85-89 Years | 4,129 | 52.24 | 4,050 | 49.80 | 6,366 | 17.40 |
| 90-94 Years | 4,505 | 32.20 | 4,620 | 31.08 | 5,378 | 11.29 |
| 95 Years or Over | 4,753 | 15.83 | 5,307 | 15.89 | 4,287 | 5.34 |
| **Medicaid and Originally Disabled Interactions with Age and Sex** | | | | | | |
| Medicaid-Female-Disabled | 1,141 | 11.31 | 1,133 | 11.18 | — | — |
| Medicaid-Female-Aged | 616 | 12.91 | 940 | 18.18 | — | — |
| Medicaid-Male-Disabled | 632 | 6.80 | 592 | 6.31 | — | — |
| Medicaid-Male-Aged | 788 | 10.33 | 944 | 11.62 | — | — |
| Originally Disabled-Female | 1,231 | 17.34 | 1,213 | 16.44 | — | — |
| Originally Disabled-Male | 809 | 11.66 | 757 | 10.73 | — | — |
| **Disease Coefficients Label** | | | | | | |
| HCC1 | HIV/AIDS | 3,587 | 13.16 | 3,514 | 12.88 | 6,893 | 5.42 | C1 |
| HCC2 | Septicemia/Shock | 4,365 | 34.74 | 4,563 | 32.92 | 4,854 | 13.89 |
| HCC5 | Opportunistic Infections | 3,643 | 10.43 | 3,346 | 9.29 | 6,893 | 5.42 | C1 |
| HCC7 | Metastatic Cancer and Acute Leukemia | 7,438 | 81.16 | 7,510 | 81.00 | 2,771 | 4.54 |
| HCC8 | Lung, Upper Digestive Tract, and Other Severe Cancers | 7,438 | 81.16 | 7,510 | 81.00 | 2,771 | 4.54 |
| HCC9 | Lymphatic, Head and Neck, Brain, and Other Major Cancers | 3,540 | 35.91 | 3,539 | 35.51 | 2,319 | 3.50 |
| HCC10 | Breast, Prostate, Colorectal and Other Cancers and Tumors | 1,209 | 26.35 | 1,194 | 25.79 | 1,330 | 4.01 |

Refer to NOTES at end of table.

## Table 2—Continued

### Centers for Medicare & Medicaid Services-Hierarchical Condition Categories (CMS-HCC) Combined, Community, and Institutional Models

| | | Models | | | | | |
|---|---|---|---|---|---|---|---|
| | | Combined | | Community | | Institutional | |
| Variable | | Parameter Estimate | t-ratio | Parameter Estimate | t-ratio | Parameter Estimate | t-ratio |
| **Disease Coefficients Label** | | | | | | | |
| HCC15 | Diabetes with Renal or Peripheral Circulatory Manifestation | 3,827 | 37.71 | 3,921 | 36.90 | 3,137 | 10.49 |
| HCC16 | Diabetes with Neurologic or Other Specified Manifestation | 2,931 | 30.09 | 2,833 | 28.43 | 3,137 | 10.49 |
| HCC17 | Diabetes with Acute Complications | 2,056 | 7.84 | 2,008 | 7.41 | 3,137 | 10.49 |
| HCC18 | Diabetes with Ophthalmologic or Unspecified Manifestation | 1,839 | 18.35 | 1,760 | 17.32 | 3,137 | 10.49 |
| HCC19 | Diabetes without Complication | 1,055 | 26.10 | 1,024 | 25.02 | 1,308 | 5.32 |
| HCC21 | Protein-Calorie Malnutrition | 3,818 | 27.52 | 4,727 | 29.77 | 2,193 | 6.49 |
| HCC25 | End-Stage Liver Disease | 4,496 | 14.91 | 4,616 | 14.92 | 1,375 | 5.09 |
| HCC26 | Cirrhosis of Liver | 2,727 | 11.93 | 2,645 | 11.37 | 1,375 | 5.09 |
| HCC27 | Chronic Hepatitis | 1,839 | 6.73 | 1,841 | 6.71 | 1,375 | 5.09 |
| HCC31 | Intestinal Obstruction/Perforation | 1,997 | 21.69 | 2,094 | 21.62 | 1,375 | 5.09 |
| HCC32 | Pancreatic Disease | 2,336 | 17.30 | 2,281 | 16.61 | 1,375 | 5.09 |
| HCC33 | Inflammatory Bowel Disease | 1,574 | 10.25 | 1,575 | 10.16 | 1,375 | 5.09 |
| HCC37 | Bone/Joint/Muscle Infections/Necrosis | 2,629 | 19.68 | 2,546 | 18.41 | 2,539 | 4.42 |
| HCC38 | Rheumatoid Arthritis and Inflammatory Connective Tissue Disease | 1,683 | 27.72 | 1,653 | 26.93 | 1,463 | 3.61 |
| HCC44 | Severe Hematological Disorders | 5,055 | 30.80 | 5,188 | 30.69 | 2,299 | 4.08 |
| HCC45 | Disorders of Immunity | 4,224 | 26.77 | 4,260 | 26.64 | 2,299 | 4.08 |
| HCC51 | Drug/Alcohol Psychosis | 1,571 | 6.57 | 1,810 | 6.99 | 1,131 | 6.06 |
| HCC52 | Drug/Alcohol Dependence | 1,477 | 6.15 | 1,361 | 5.44 | 1,131 | 6.06 |
| HCC54 | Schizophrenia | 2,592 | 26.75 | 2,786 | 27.04 | 1,131 | 6.06 |
| HCC55 | Major Depressive, Bipolar, and Paranoid Disorders | 2,024 | 30.00 | 2,209 | 30.85 | 1,131 | 6.06 |
| HCC67 | Quadriplegia, Other Extensive Paralysis | 5,665 | 27.45 | 6,059 | 27.20 | 504 | 3.94 |
| HCC68 | Paraplegia | 5,665 | 27.45 | 6,059 | 27.20 | 504 | 3.94 |
| HCC69 | Spinal Cord Disorders/Injuries | 2,484 | 17.77 | 2,526 | 17.45 | 504 | 3.94 |
| HCC70 | Muscular Dystrophy | 2,239 | 3.82 | 1,981 | 3.27 | 504 | 3.94 |
| HCC71 | Polyneuropathy | 1,480 | 19.74 | 1,377 | 18.06 | 504 | 3.94 |
| HCC72 | Multiple Sclerosis | 2,329 | 11.44 | 2,654 | 12.19 | 504 | 3.94 |
| HCC73 | Parkinson's and Huntington's Diseases | 1,954 | 19.69 | 2,436 | 22.04 | 504 | 3.94 |
| HCC74 | Seizure Disorders and Convulsions | 1,334 | 17.25 | 1,381 | 16.68 | 504 | 3.94 |
| HCC75 | Coma, Brain Compression/Anoxic Damage | 2,396 | 7.88 C1 | 2,912 | 8.62 C1 | 504 | 3.94 C2 |
| HCC77 | Respirator Dependence/Tracheostomy Status | 10,417 | 29.54 | 10,783 | 28.46 | 7,259 | 8.19 |
| HCC78 | Respiratory Arrest | 7,543 | 20.23 | 7,327 | 18.79 | 7,259 | 8.19 |
| HCC79 | Cardio-Respiratory Failure and Shock | 3,451 | 42.70 | 3,550 | 42.39 | 1,481 | 4.31 |
| HCC80 | Congestive Heart Failure | 2,055 | 38.48 | 2,141 | 38.54 | 903 | 4.16 |
| HCC81 | Acute Myocardial Infarction | 1,885 | 31.23 | 1,785 | 29.13 | 1,476 | 5.75 |
| HCC82 | Unstable Angina and Other Acute Ischemic Heart Disease | 1,885 | 31.23 | 1,785 | 29.13 | 1,476 | 5.75 |
| HCC83 | Angina Pectoris/Old Myocardial Infarction | 1,246 | 22.82 | 1,205 | 21.76 | 1,476 | 5.75 |

Refer to NOTES at end of table.

0968

**Table 2—Continued**

**Centers for Medicare & Medicaid Services-Hierarchical Condition Categories (CMS-HCC)
Combined, Community, and Institutional Models**

| Variable | Label | Combined Parameter Estimate | Combined t-ratio | | Community Parameter Estimate | Community t-ratio | | Institutional Parameter Estimate | Institutional t-ratio | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Disease Coefficients** | | | | | | | | | | |
| HCC92 | Specified Heart Arrhythmias | 1,362 | 31.73 | | 1,363 | 30.95 | | 961 | 4.62 | |
| HCC95 | Cerebral Hemorrhage | 1,901 | 10.05 | | 2,011 | 9.88 | | 774 | 4.01 | |
| HCC96 | Ischemic or Unspecified Stroke | 1,498 | 20.90 | | 1,569 | 20.34 | | 774 | 4.01 | |
| HCC100 | Hemiplegia/Hemiparesis | 1,678 | 13.96 | | 2,241 | 16.61 | | 504 | 3.94 | |
| HCC101 | Cerebral Palsy and Other Paralytic Syndromes | 767 | 3.34 | | 840 | 3.42 | | 504 | 3.94 | C2 |
| HCC104 | Vascular Disease with Complications | 3,432 | 36.22 | | 3,473 | 35.49 | | 2,612 | 6.30 | |
| HCC105 | Vascular Disease | 1,662 | 39.94 | | 1,832 | 41.72 | | 583 | 3.72 | |
| HCC107 | Cystic Fibrosis | 1,936 | 45.73 | | 1,929 | 44.87 | | 1,180 | 4.69 | |
| HCC108 | Chronic Obstructive Pulmonary Disease | 1,936 | 45.73 | | 1,929 | 44.87 | | 1,180 | 4.69 | |
| HCC111 | Aspiration and Specified Bacterial Pneumonias | 3,010 | 20.47 | | 3,556 | 21.53 | | 2,377 | 6.82 | |
| HCC112 | Pneumococcal Pneumonia, Empyema, Lung Abscess | 1,151 | 6.55 | | 1,034 | 5.68 | | 2,377 | 6.82 | |
| HCC119 | Proliferative Diabetic Retinopathy and Vitreous Hemorrhage | 1,975 | 13.36 | | 1,791 | 11.96 | | 5,102 | 5.46 | |
| HCC130 | Dialysis Status | 15,926 | 26.97 | | 15,778 | 25.96 | | 15,959 | 5.82 | |
| HCC131 | Renal Failure | 2,908 | 23.20 | | 2,954 | 22.73 | | 2,152 | 6.26 | |
| HCC132 | Nephritis | 1,541 | 6.95 | | 1,401 | 6.23 | | 2,152 | 6.26 | |
| HCC148 | Decubitus Ulcer of Skin | 3,888 | 32.32 | | 5,285 | 37.28 | | 1,628 | 5.98 | |
| HCC149 | Chronic Ulcer of Skin, Except Decubitus | 2,381 | 26.76 | | 2,485 | 26.65 | | 1,346 | 3.98 | |
| HCC150 | Extensive Third-Degree Burns | 4,427 | 2.36 | | 4,935 | 2.54 | | 1,274 | 3.37 | |
| HCC154 | Severe Head Injury | 2,396 | 7.88 | C1 | 2,912 | 8.62 | C1 | 1,274 | 3.37 | |
| HCC155 | Major Head Injury | 1,211 | 8.43 | | 1,239 | 8.08 | | 1,274 | 3.37 | C3 |
| HCC157 | Vertebral Fractures w/o Spinal Cord Injury | 2,462 | 20.64 | | 2,514 | 20.23 | | 504 | 3.94 | C2 |
| HCC158 | Hip Fracture/Dislocation | 1,301 | 13.37 | | 2,010 | 18.51 | | 0 | — | |
| HCC161 | Traumatic Amputation | 3,965 | 17.86 | C2 | 4,322 | 17.92 | C2 | 1,274 | 3.37 | C3 |
| HCC164 | Major Complications of Medical Care and Trauma | 1,438 | 18.25 | | 1,346 | 16.60 | | 1,347 | 3.66 | |
| HCC174 | Major Organ Transplant Status | 3,790 | 8.55 | | 3,702 | 8.37 | | 4,523 | 11.13 | |
| HCC176 | Artificial Openings for Feeding or Elimination | 3,810 | 23.84 | | 4,054 | 22.39 | | 4,523 | 11.13 | |
| HCC177 | Amputation Status, Lower Limb/Amputation Complications | 3,965 | 17.86 | C2 | 4,322 | 17.92 | C2 | 1,274 | 3.37 | C3 |
| **Disabled/Disease Interactions** | | | | | | | | | | |
| D-HCC5 | Disabled Opportunistic Infections | 3,965 | 5.49 | | 4,047 | 5.52 | | — | — | |
| D-HCC44 | Disabled Severe Hematological Disorders | 4,649 | 9.98 | | 4,580 | 9.72 | | — | — | |
| D-HCC51 | Disabled Drug/Alcohol Psychosis | 2,830 | 7.12 | | 2,608 | 6.32 | | — | — | |
| D-HCC52 | Disabled Drug/Alcohol Dependence | 2,160 | 6.90 | | 2,122 | 6.61 | | — | — | |
| D-HCC107 | Disabled Cystic Fibrosis | 9,691 | 6.70 | | 9,547 | 6.63 | | — | — | |

Refer to NOTES at end of table.

0969

**Table 2—Continued**

**Centers for Medicare & Medicaid Services-Hierarchical Condition Categories (CMS-HCC)
Combined, Community, and Institutional Models**

| | | Models | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Combined | | Community | | Institutional | |
| Variable | | Parameter Estimate | t-ratio | Parameter Estimate | t-ratio | Parameter Estimate | t-ratio |
| **Disease Interactions** | | | | | | | |
| INT1 | DM-CHF1 | 1,265 | 14.62 | 1,296 | 14.46 | 1,064 | 2.91 |
| INT2 | DM-CVD | 490 | 4.05 | 639 | 4.89 | — | — |
| INT3 | CHF-COPD | 1,261 | 14.82 | 1,238 | 14.06 | 1,906 | 4.95 |
| INT4 | COPD-CVD-CAD | 316 | 1.49 | 406 | 1.82 | — | — |
| INT5 | RF-CHF1 | 857 | 3.94 | 1,202 | 5.24 | — | — |
| INT6 | RF-CHF-DM1 | 4,185 | 18.48 | 4,433 | 18.71 | — | — |

NOTES: Beneficiaries with the three-way interaction RF-CHF-DM are excluded from the two-way interactions DM-CHF and RF-CHF. DM is diabetes mellitus (HCCs 15-19). CHF is congestive heart failure (HCC 80). COPD is chronic obstructive pulmonary disease (HCC 108). CVD is cerebrovascular disease (HCCs 95-96, 100-101). CAD is coronary artery disease (HCCs 81-83). RF is renal failure (HCC 131). "|" means coefficients of HCCs are constrained to be equal. C1, C2, and C3 denote non-contiguous constraints.

SOURCE: Pope, G.C. and Kautter, J., RTI International, Ellis, R.P. and Ash, A.S., Boston University, Ayanian, J.Z., Harvard Medical School and Brigham and Women's Hospital, Iezzoni, L.I., Harvard Medical School and Beth Israel Deaconess Medical Center, Ingber, M.J., Levy, J.M., and Robst, J., Centers for Medicare & Medicaid Services, Analysis of 1999-2000 Medicare 5% Standard Analytic File (SAF).

chest pain, $0; and ankle sprain, $0[13] (Table 2). Her total cost prediction is the sum of these increments, or $9,907.

Calibration of DCG/HCC models on several years of data reveals increasingly thorough diagnostic coding. For example, if 1999 diagnoses are used to predict expenditures with a model calibrated on 1996/1997 data, mean expenditures will be over predicted. If more complete coding over time is not accounted for, MCOs will be overpaid by the use of current diagnoses with a model calibrated on historical data. CMS makes a slight downward adjustment in HCC-predicted expenditures to account for this.

## CMS-HCC Models for Subpopulations

Medicare beneficiaries differ along characteristics that are important for risk adjustment. First, they may be entitled to Medicare in one of three ways: age, disability, or ESRD. Second, some beneficiaries reside in institutions rather than in the community. Third, some enrollees are new to

Medicare and do not have complete diagnostic data. Fourth, Medicare is a secondary payer for some beneficiaries. To account for the different cost and diagnostic patterns of these disparate subgroups of beneficiaries, the CMS-HCC model was adapted for Medicare subpopulations. This section describes models for subpopulations.[14]

## Beneficiaries Entitled by Disability

Approximately 12 percent of Medicare beneficiaries are entitled to Medicare because they are under age 65 and have a medical condition that prevents them from working (the disabled). Models calibrated on the full Medicare population (excluding ESRD eligibles), mostly reflect cost patterns among the elderly, the other 88 percent of the population. The implications of some diagnoses might differ between the elderly and disabled. For example, a diagnosis that is disabling may be more severe, and the cost of treating a disease may vary by age. We considered allowing differences in incremental expenditure weights for some diagnoses (HCCs) for the disabled (Pope et al., 1998; 2000b).

[13] The female receives no incremental cost prediction for angina pectoris because AMI is higher-ranked in the coronary artery disease hierarchy and excludes angina. No incremental prediction is made for chest pain and ankle sprain because these diagnoses are not included in the CMS-HCC model.

[14] Risk-adjustment models for ESRD-entitled and functionally-limited beneficiaries are not described in this article.

Using Medicare's 5-percent sample FFS data (1996-1997), we estimated the DCG/HCC model separately on aged and disabled subsamples. We evaluated differences in age versus disabled parameter estimates according to their statistical significance, magnitude, clinical plausibility, and frequency of occurrence in the disabled population (Pope et al., 2000b). Based on these considerations, we chose nine diagnostic categories to receive incremental payments when they occur among disabled beneficiaries. Five of these categories remained significantly different for the disabled when the CMS-HCC model was re-estimated on 1999-2000 data: opportunistic infections, severe hematological disorders (e.g., hemophilia, sickle cell anemia), drug/alcohol psychosis, drug/alcohol dependence, and cystic fibrosis. Incremental annual payments for these conditions among the disabled (in addition to base payments for the elderly) are substantial, ranging from $2,160 to $9,691.

Other than for these five conditions, disease risk-adjustment weights are the same for the aged and disabled populations. The CMS-HCC model is estimated on a combined sample of aged and disabled beneficiaries, with disabled interactions for these five diagnostic categories. The combined aged/disabled model is shown in Table 2.

## Community and Institutional Residents

Using the newly available Medicare MDS, we identified long–term nursing home residents in the current (i.e., payment) year. Long-term nursing home residence was defined as continuously residing in a nursing home for at least 90 days, as indicated by a 90-day clinical assessment reported by the nursing facility through the MDS. In our prospective risk-adjustment modeling sample of 1,337,887

beneficiaries, 65,593 beneficiaries, or 5 percent, had at least 1 month of long-term nursing facility residence in 2000.[15]

Table 3 compares sample sizes and mean expenditures by demographic categories for community and institutional residents, and shows predictive ratios from the CMS-HCC model calibrated on the combined community/institutional sample (Table 2). Nearly one-half (49 percent) of long-term nursing facility residents are age 85 or over. Facility residents are only 2 percent of the combined community plus institutional population for females age 70 to 74, but fully 37 percent of the combined population for females age 95 or over.

Overall, institutional residents are 71 percent more expensive than community residents, $8,937 in mean annualized expenditures compared to $5,213. The age profiles of expenditures are quite different. Among community residents, mean expenditures rise steadily with age in the under 65 disabled population and then again in the elderly population, except for a slight decline for the oldest females. In contrast, among the institutionalized, mean expenditures are fairly constant across all ages until they decline significantly among the oldest old. For all age/sex cells except the oldest old, mean expenditures for the institutionalized are substantially higher than for community-dwelling beneficiaries.

However, although not shown in Table 3, among beneficiaries diagnosed with particular HCCs, mean expenditures for the institutionalized are often similar to those of community residents. For example, among all beneficiaries with CHF (HCC 80), expenditures for the institutionalized are $11,719, which is $255 less than for community residents. More generally, when classifying people by the presence of

---

[15] Beneficiaries with both community and long-term institutional months in the same year are included in both samples, weighted by the fraction of their total months alive in the year in each status.

**Table 3**

**Descriptive Statistics for Community and Institutionalized Residents**

| Variable | Community | | | Institutional | | |
|---|---|---|---|---|---|---|
| | Observations | Mean Annualized Expenditures | Predictive Ratio[1] | Observations | Mean Annualized Expenditures | Predictive Ratio[1] |
| Overall | 1,291,308 | 5,213 | 0.99 | 65,593 | 8,937 | 1.12 |
| **Demographics** | | | | | | |
| **Female** | | | | | | |
| 0-34 Years | 7,007 | 3,623 | 1.00 | 49 | 9,251 | 0.99 |
| 35-44 Years | 15,566 | 4,332 | 1.00 | 199 | 9,395 | 0.94 |
| 45-54 Years | 22,077 | 4,692 | 1.00 | 473 | 8,869 | 1.07 |
| 55-59 Years | 14,023 | 5,254 | 1.00 | 343 | 10,168 | 0.91 |
| 60-64 Years | 15,793 | 5,993 | 1.00 | 501 | 9,906 | 1.04 |
| 65-69 Years | 129,970 | 3,714 | 1.00 | 1,380 | 10,961 | 0.99 |
| 70-74 Years | 171,775 | 4,372 | 1.00 | 3,098 | 10,901 | 0.97 |
| 75-79 Years | 157,586 | 5,260 | 1.00 | 6,260 | 9,458 | 1.08 |
| 80-84 Years | 111,303 | 6,101 | 0.99 | 9,801 | 8,797 | 1.13 |
| 85-89 Years | 66,301 | 6,882 | 0.97 | 12,294 | 8,054 | 1.19 |
| 90-94 Years | 26,852 | 7,606 | 0.92 | 9,535 | 7,146 | 1.29 |
| 95 Years or Over | 8,074 | 7,338 | 0.83 | 4,729 | 5,734 | 1.42 |
| **Male** | | | | | | |
| 0-34 Years | 10,272 | 2,868 | 1.00 | 106 | 10,622 | 0.95 |
| 35-44 Years | 22,913 | 3,666 | 1.00 | 384 | 9,596 | 0.92 |
| 45-54 Years | 29,377 | 3,968 | 1.00 | 606 | 10,186 | 0.91 |
| 55-59 Years | 16,391 | 4,651 | 1.00 | 438 | 10,340 | 0.96 |
| 60-64 Years | 18,581 | 5,214 | 1.00 | 588 | 10,486 | 1.00 |
| 65-69 Years | 105,856 | 4,018 | 1.00 | 1,132 | 12,432 | 0.88 |
| 70-74 Years | 128,874 | 5,014 | 1.00 | 1,921 | 11,501 | 0.99 |
| 75-79 Years | 106,402 | 6,207 | 1.00 | 2,842 | 11,411 | 1.04 |
| 80-84 Years | 64,263 | 7,083 | 1.00 | 3,404 | 11,049 | 1.06 |
| 85-89 Years | 30,765 | 8,144 | 0.99 | 3,116 | 10,754 | 1.08 |
| 90-94 Years | 9,343 | 8,731 | 0.97 | 1,783 | 9,489 | 1.20 |
| 95 Years or Over | 1,944 | 9,062 | 0.92 | 611 | 8,096 | 1.37 |
| Medicaid | 196,604 | 6,523 | 0.97 | 33,074 | 8,895 | 1.17 |
| Originally-Disabled | 81,894 | 7,614 | 0.99 | 7,415 | 10,606 | 1.11 |

[1] Ratio of mean expenditures predicted by the Centers for Medicare & Medicaid Services – Hierarchical Condition Categories (CMS-HCC) model for combined community/institutional samples to mean actual expenditures.

SOURCE: Pope, G.C. and Kautter, J., RTI International, Ellis, R.P. and Ash, A.S., Boston University, Ayanian, J.Z., Harvard Medical School and Brigham and Women's Hospital, Iezzoni, L.I., Harvard Medical School and Beth Israel Deaconess Medical Center, Ingber, M.J., Levy, J.M., and Robst, J., Centers for Medicare & Medicaid Services, Analysis of 1999-2000 Medicare 5% Standard Analytic File (SAF).

a single diagnosis, expenditures for the institutionalized may be higher, lower, or about the same.

Thus, the main reason that people in facilities cost more is that they have more medical problems, a distinction that is fully accounted for by the HCCs. In fact, the predictive ratios from the combined CMS-HCC model for community and institutional beneficiaries are, respectively, 0.99 and 1.12 (Table 3). This means that the combined model, on average, under predicts expenditures for community residents by 1 percent, and over predicts expenditures for

long–term nursing home residents by 12 percent. Lower expenditures among facility residents adjusting for disease burden could result from substituting non-Medicare for Medicare-reimbursed services; since most nursing home service are not reimbursed by Medicare. Also, greater monitoring of nursing home than community residents may identify and prevent problems leading to hospitalization. The under-prediction for community residents and over-prediction for facility residents is most severe for the oldest age groups, most likely due to decisions to limit

aggressive care for very old residents in nursing homes. The over-prediction of the costs of the institutionalized, together with their different cost patterns by age and diagnosis, led us to consider differentiating the CMS-HCC model for community and institutional populations.

Within a multiple regression model estimation framework, we investigated alternative approaches to allowing differences in the model between community and institutional residents, ultimately choosing to estimate separate models. This properly calibrates the prediction of each group's costs, while allowing all demographic and disease coefficients to differ between community and institutional populations.

In addition to the combined model, Table 2 shows the CMS–HCC community and institutional models. Not surprisingly, the community model $R^2$ and most of the demographic and disease coefficients are very similar to the combined model, because community residents comprise 95 percent of the combined sample. A few coefficients show greater differences. The community coefficients for the oldest age cells are significantly larger than the combined model coefficients because the lower-cost very old institutionalized have been removed from these cells. The community coefficients for the aged enrolled in Medicaid are also significantly higher, as are several HCC coefficients.

The institutional model $R^2$ is considerably lower than the community model. But some of the community model's predictive power comes from distinguishing beneficiaries who are healthy (no diagnoses) versus sick (with diagnoses), while the institutional model is explaining cost variations among a population comprised entirely of impaired individuals. Diagnoses help explain why someone might be institutionalized (i.e., distinguish healthy from sick), but are not as powerful in explaining

expenditure differences among the institutionalized. Disease (HCC) coefficients tend to be smaller in the institutional model than in the community model (Table 2). Diagnoses are less predictive of incremental costs among the more uniformly expensive institutional population than they are among the community population.

We constrained certain groups of demographic and diagnostic coefficients in the institutional model to be equal (Table 2), because the small available sample of institutionalized beneficiaries resulted in their low prevalence in some diagnostic categories (HCCs) and made it difficult to obtain stable estimates of each separate parameter. For the same reason, we included no disabled interaction terms, and only two of the disease interaction terms in the institutional model. Also, HCC 158 Hip Fracture/Dislocation was excluded because its coefficient was negative.

The age/sex coefficients for the institutionalized are much higher than for community residents except for the oldest ages. This implies that institutionalized beneficiaries are predicted to be expensive regardless of their diagnostic profile (e.g., even lacking any of the diagnoses included in the CMS-HCC model), whereas community residents are predicted to be expensive only if diagnosed with at least one of the serious diseases included in the CMS-HCC model. This makes sense since institutionalization itself is a marker of poor health, aside from diagnostic profile, but the institutionalized age/sex coefficients decline for the oldest ages, and fall below the community coefficients. Medical treatment may be less aggressive for old, frail beneficiaries who are institutionalized.

Among the institutional population, the coefficient for Medicaid was negative and the coefficients for originally disabled was statistically insignificant. These variables

were excluded from the institutional model. Beneficiaries often qualify for Medicaid after spending down their personal assets to pay for a lengthy nursing home stay. Thus, Medicaid may be a proxy for beneficiaries in the later portion of their stays, when they are less expensive than in the earlier, post-acute phase of their nursing home tenure.

## New Medicare Enrollees

The CMS–HCC model requires a complete 12-month base year diagnostic profile to predict the next year's expenditures. Beneficiaries without 12 months base year Medicare enrollment, but at least 1 month of prediction year enrollment, are defined as new enrollees. About two–thirds of new enrollees are age 65.[16] New enrollees may be under age 65 if they become eligible for Medicare by disability; they may be over age 65 if they delay Medicare enrollment or are not originally enrolled in both Parts A and B.[17] We developed a demographic model to predict expenditures for new enrollees who lack the data needed to apply the CMS-HCC model.

Table 4 presents frequencies and mean annualized expenditures from the 5-percent FFS sample data for new enrollees and continuing enrollees. Continuing enrollees are defined as beneficiaries having 12 months of Parts A and B Medicare enrollment in the base year and at least 1 month in the prediction year. For female and male new enrollees age 65, mean annualized expenditures are $2,729 and $2,900, respectively, less than one-half of costs of continuing enrollees ($6,952 for female and $6,055 for male). For almost all new enrollees age 65, the original reason for Medicare entitlement is age.[18] In contrast, continuing enrollees age 65 were originally entitled to Medicare by disability, and hence are much more expensive. For other ages, mean expenditures of new and continuing enrollees are much more similar. To achieve sufficient sample sizes in all age ranges to calibrate the new enrollees model, we merged the new and continuing enrollees samples, which resulted in a sample size of 1,495,225 with mean expenditures of $5,184. For age 65, actual new enrollees dominate the combined sample, and the cost weight reflects their (low) relative costs. Continuing enrollees age 65 are included in the sample to calibrate the originally disabled coefficient for age 65. For other than age 65, the sample is dominated by continuing enrollees, but their costs appear to proxy actual new enrollee costs reasonably well for younger or older ages.

## Beneficiaries for Whom Medicare is a Secondary Payer

Working aged beneficiaries are Medicare beneficiaries, age 65 or over, with private group health insurance coverage from their or their spouse's employer. By law, Medicare is a secondary payer for these beneficiaries. The primary private health plan must pay for medical expenses to the extent of its defined benefits. Only if Medicare covers services not covered by the private plan, or has more generous coverage (e.g., lower deductibles or copayments) for Medicare-covered services, is Medicare responsible for payment, and then only to the extent of the difference in

---

[16] To simplify the new enrollees model, we recoded new enrollees age 64 on February 1 with an original reason for Medicare entitlement of aged to age 65. Thus, the age 65 cell in the new enrollees model combines new enrollees ages 64 and 65 on February 1 of the prediction year whose original reason for entitlement is aged.

[17] For example, a beneficiary might be entitled to Part A (hospital insurance) by age at age 65 or over, but might not pay Part B (physician insurance) premium until an older age.

[18] Some age 65 new enrollees might have originally been entitled to Medicare by disability when under age 65, but then have rejoined the work force and lost their Medicare eligibility, only to re-enroll at age 65.

**Table 4**

**Descriptive Statistics for New and Continuing Medicare Enrollees[1]**

| Age/Sex Category | New Enrollees[2] | | Continuing Enrollees[3] | |
|---|---|---|---|---|
| | Observations | Mean Annualized Expenditures | Observations | Mean Annualized Expenditures |
| **Female** | | | | |
| 0-34 Years | 2,540 | 3,532 | 7,037 | 3,653 |
| 35-44 Years | 3,685 | 4,341 | 15,717 | 4,385 |
| 45-54 Years | 5,891 | 4,814 | 22,431 | 4,767 |
| 55-59 Years | 4,029 | 4,903 | 14,277 | 5,354 |
| 60-64 Years | 3,310 | 5,705 | 16,159 | 6,094 |
| 65 Years | 58,946 | 2,729 | 3,336 | 6,952 |
| 66 Years | 1,448 | 3,319 | 29,534 | 3,401 |
| 67 Years | 845 | 3,349 | 31,560 | 3,684 |
| 68 Years | 531 | 3,116 | 32,578 | 3,740 |
| 69 Years | 504 | 3,608 | 33,893 | 3,905 |
| 70-74 Years | 1,311 | 4,672 | 173,829 | 4,461 |
| 75-79 Years | 471 | 5,063 | 161,843 | 5,387 |
| 80-84 Years | 200 | 6,043 | 118,144 | 6,276 |
| 85-89 Years | 95 | 8,111 | 75,186 | 7,035 |
| 90-94 Years | 46 | 5,931 | 34,135 | 7,500 |
| 95 Years or Over | 15 | 6,457 | 11,886 | 6,795 |
| **Male** | | | | |
| 0-34 Years | 3,434 | 3,089 | 10,342 | 2,934 |
| 35-44 Years | 4,281 | 3,690 | 23,172 | 3,746 |
| 45-54 Years | 5,820 | 4,099 | 29,814 | 4,074 |
| 55-59 Years | 4,120 | 4,603 | 16,677 | 4,772 |
| 60-64 Years | 4,196 | 4,775 | 18,986 | 5,346 |
| 65 Years | 46,262 | 2,900 | 3,940 | 6,055 |
| 66 Years | 1,546 | 3,205 | 24,472 | 3,644 |
| 67 Years | 872 | 2,976 | 25,279 | 3,933 |
| 68 Years | 570 | 3,501 | 25,915 | 4,145 |
| 69 Years | 490 | 3,638 | 27,009 | 4,295 |
| 70-74 Years | 1,223 | 5,700 | 130,148 | 5,087 |
| 75-79 Years | 429 | 6,476 | 108,214 | 6,307 |
| 80-84 Years | 144 | 5,916 | 66,505 | 7,231 |
| 85-89 Years | 63 | 8,028 | 32,848 | 8,326 |
| 90-94 Years | 19 | 13,027 | 10,601 | 8,827 |
| 95 Years or Over | 2 | 3,221 | 2,420 | 8,867 |

[1] Aged and disabled beneficiaries. Excludes working aged and ESRD beneficiaries.

[2] Enrollees with less than 12 months of base year eligibility.

[3] Enrollees with 12 months of base year eligibility.

SOURCE: Pope, G.C. and Kautter, J., RTI International, Ellis, R.P. and Ash, A.S., Boston University, Ayanian, J.Z., Harvard Medical School and Brigham and Women's Hospital, Iezzoni, L.I., Harvard Medical School and Beth Israel Deaconess Medical Center, Ingber, M.J., Levy, J.M., and Robst, J., Centers for Medicare & Medicaid Services, Analysis of 1999-2000 Medicare 5% Standard Analytic File (SAF).

coverage. Medicare expenditures for working aged beneficiaries are lower for this reason, as well as because working may be a proxy for better health.[19] Estimation of a separate model for the working aged is not feasible with the sample sizes available from the Medicare's 5-percent FFS sample. A simple adjustment to CMS–HCC model predictions is a multiplier that scales cost predictions to be lower for these beneficiaries.

We defined the working aged as beneficiaries otherwise satisfying the requirements of our 1999-2000 aged/disabled prospective modeling sample who had at least 1 month of working aged status in the prediction year (2000). There are 19,057 beneficiaries in our working aged sample, or about 1.4 percent as many individuals as in our aged/disabled sample. The mean annualized expenditures of the working aged are $966, less than one-fifth as much as for the aged/disabled community sample ($5,213). The CMS–HCC community

[19] Throughout this section, we use the terms working and working aged to include both those who are actually working, and the spouses of those who are working.

model over-predicts mean working aged expenditures by a factor of 3.66. Essentially, we define the working aged multiplier as the ratio of mean actual to mean predicted expenditures for the working aged sample, where expenditures are predicted by the CMS-HCC community model. With an adjustment for beneficiaries who have a mixture of working aged and non-working-aged months in the payment year, the working aged multiplier is 0.215.

## CONCLUSIONS

CMS' adaptation of the DCG/HCC model makes substantially more accurate predictions of medical costs for M+C enrollees than has previously been possible. Its use is intended to redirect money away from MCOs that cherry-pick the healthy, while providing the MCOs that care for the sickest patients the resources to do so. The ultimate purpose of the CMS-HCC payment model is to promote fair payments to MCOs that reward efficiency and encourage excellent care for the chronically ill. The CMS-HCC model will continue to evolve. Additional diagnoses may be needed to predict drug expenditures incurred under the drug benefit enacted by MMA (2003). The model may need to be recalibrated to reflect new treatment patterns and disease prevalence. Diagnosis-based risk adjustment may need to be coordinated with disease management programs and incentives for quality of care.

The model has evolved over two decades of research,[20] with careful attention to clinical credibility, real-world incentives and feasibility tradeoffs. Continuous feedback between government technical staff and policymakers at CMS on the one hand, and research organization and academic researchers on the other, has shaped the CMS-HCC model. Much of the recent research reported in this article has related to adapting the model for Medicare subpopulations. The use of a single modeling framework—the CMS-HCC model—provides unity and organization to the subgroup models with the unique features specific to certain types of beneficiaries. Comprehensive risk adjustment, based on ambulatory as well as inpatient diagnoses, is just beginning to be implemented. Thus, it is too early to tell whether it will achieve its goals. As risk adjustment continues to be incorporated in Medicare payments to MCOs, it will be important to evaluate its impact on these organizations and the beneficiaries they serve, especially organizations that care for the chronically ill and their enrollees. This will tell us a great deal about the feasibility and consequences of matching health care resources to needs.

## ACKNOWLEDGMENT

The authors would like to thank Helen Margulis for her exceptional computer programming assistance.

## REFERENCES

Ash, A.S., Porell, F., Gruenberg, L., et al.: Adjusting Medicare Capitation Payments Using Prior Hospitalization. *Health Care Financing Review* 10(4):17-29, Summer 1989.

Brown, R.S., Clement, D.G., Hill, J.W., et al.: Do Health Maintenance Organizations Work for Medicare? *Health Care Financing Review* 15(1):7-23, Fall 1993.

Centers for Disease Control and Prevention: *International Classification of Diseases, Ninth Revision, Clinical Modification (IC+CD-9-CM)*. Internet address: http://www.cdc.gov/nchs/about/otheract/icd9/abticd9.ht. (Accessed 2004.)

Ellis, R.P., Pope, G.C., Iezzoni, L.I., et al.: Diagnosis-Based Risk Adjustment for Medicare Capitation Payments. *Health Care Financing Review* 17(3):101-128, Spring 1996.

---

[20] The DCG line of risk-adjustment research dates back to the report by Ash et al. (1989), based on research begun in 1984.

Ellis, R.P., Pope, G.C., Iezzoni, L.I., et al.: Diagnostic Cost Group (DCG) and Hierarchical Coexisting Conditions (HCC) Models for Medicare Risk Adjustment. Final Report to the Health Care Financing Administration under Contract Number 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, Delivery Order Number 6. Health Economics Research, Inc. Waltham, MA. April, 1996.

Ellis, R.P., Ash, A.S.: Refinements to the Diagnostic Cost Group Model. *Inquiry* 32(4):1-12, Winter 1995.

Hughes, J.S., Averill, R.F., Eisenhandler, J., et al.: Clinical Risk Groups (CRGs): A Classification System for Risk-Adjusted Capitation-Based Payment and Health Care Management. *Medical Care* 42(1):81-90, January 2004.

Kapur, K., Tseng, C.W., Rastegar, A., et al.: Medicare Calibration of the Clinically Detailed Risk Information System for Cost. *Health Care Financing Review* 25(1):37-54, Fall 2003.

Kautter, J., and Pope, G.C.: Predictive Accuracy of Diagnostic Cost Group (DCG) Risk Adjustment Models. Final Report to the Centers for Medicare & Medicaid Services under Contract Number 500-95-048. Health Economics Research, Inc. Waltham, MA. August 2001.

Kronick, R., Gilmer, T., Dreyfus, T., et al.: Improving Health-Based Payment for Medicaid Beneficiaries: Chronic Illness and Disability Payment System. *Health Care Financing Review* 21(3):29-64, Spring 2000.

Mello, M.M., Stearns, S.C., Norton, E.C., et al.: Understanding Biased Selection in Medicare HMOs. *Health Services Research* 38(3):961-992, June 2003.

Pope, G.C., Kautter, J., Ash, A.S., et al.: Parsimonious Risk Adjustment Models for Medicare. Final Report to the Centers for Medicare & Medicaid Services under Contract Number 500-95-048. Health Economics Research, Inc. Waltham, MA. December, 2001.

Pope, G.C., Ellis, R.P., Ash, A.S., et al.: Principal Inpatient Diagnostic Cost Group Model for Medicare Risk Adjustment. *Health Care Financing Review* 21(3):93-118, Spring 2000a.

Pope, G.C., Ellis, R.P., Ash, A.S., et al.: Diagnostic Cost Group Hierarchical Condition Category Models for Medicare Risk Adjustment. Final Report to the Health Care Financing Administration under Contract Number 500-95-048. Health Economics Research, Inc. Waltham, MA. December, 2000b.

Pope, G.C., Liu, C.F., Ellis, R.P., et al.: Principal Inpatient Diagnostic Cost Group Models for Medicare Risk Adjustment. Final Report to the Health Care Financing Administration under Contract Number 500-95-048. Health Economics Research, Inc. Waltham, MA. February 1999.

Pope, G.C., Adamache, K.A., Walsh, E.G., and et al.: Evaluating Alternative Risk Adjusters for Medicare. *Health Care Financing Review* 20(2):109-129, Winter 1998.

Pope, G.C., Ellis, R.P., Liu, C.F., et al.: Revised Diagnostic Cost Group (DCG)/Hierarchical Coexisting Conditions (HCC) Models for Medicare Risk Adjustment. Final Report to the Health Care Financing Administration under Contract Number 500-95-048. Health Economics Research, Inc. Waltham, MA. February 1998.

Riley, G., Tudor, C., Chiang, Y., et al.: Health Status of Medicare Enrollees in HMOs and Fee-for-Service in 1994. *Health Care Financing Review* 17(4):65-76, Summer 1996.

Weiner, J.P., Dobson, A., Maxwell, S.L., et al.: Risk-Adjusted Medicare Capitation Rates Using Ambulatory and Inpatient Diagnoses. *Health Care Financing Review* 17(3):77-100, Spring 1996.

Reprint Requests: Gregory C. Pope, RTI International, 411 Waverly Oaks Road, Suite 330, Waltham, MA 02452. E-mail address: gpope@rti.org

**EXHIBIT D-43**

© Health Research and Educational Trust
DOI: 10.1111/j.1475-6773.2005.00444.x

# Measuring Diagnoses: ICD Code Accuracy

*Kimberly J. O'Malley, Karon F. Cook, Matt D. Price, Kimberly Raiford Wildes, John F. Hurdle, and Carol M. Ashton*

**Objective.** To examine potential sources of errors at each step of the described inpatient International Classification of Diseases (ICD) coding process.

**Data Sources/Study Setting.** The use of disease codes from the ICD has expanded from classifying morbidity and mortality information for statistical purposes to diverse sets of applications in research, health care policy, and health care finance. By describing a brief history of ICD coding, detailing the process for assigning codes, identifying where errors can be introduced into the process, and reviewing methods for examining code accuracy, we help code users more systematically evaluate code accuracy for their particular applications.

**Study Design/Methods.** We summarize the inpatient ICD diagnostic coding process from patient admission to diagnostic code assignment. We examine potential sources of errors at each step and offer code users a tool for systematically evaluating code accuracy.

**Principle Findings.** Main error sources along the "patient trajectory" include amount and quality of information at admission, communication among patients and providers, the clinician's knowledge and experience with the illness, and the clinician's attention to detail. Main error sources along the "paper trail" include variance in the electronic and written records, coder training and experience, facility quality-control efforts, and unintentional and intentional coder errors, such as misspecification, unbundling, and upcoding.

**Conclusions.** By clearly specifying the code assignment process and heightening their awareness of potential error sources, code users can better evaluate the applicability and limitations of codes for their particular situations. ICD codes can then be used in the most appropriate ways.

**Key Words.** ICD codes, accuracy, error sources

Nosology (the systematic classification of diseases) has always fascinated the sick and their would-be healers. Western societies developed an interest in nosology in the seventeenth and eighteenth centuries when they began to track the causes of sickness and death among their citizens. In the twentieth

0979

century, when medical insurance programs made payers other than patients responsible for medical care, nosology became a matter of great interest to those public and private payers. The most commonly used nosologies include International Classification of Diseases (ICD), the American Medical Association's Current Procedural Terminology, 4th Edition (CPT-4); the Health Care Financing Administration (HCFA, now known as the Centers for Medicare and Medicaid Services) Health Care Common Procedural Coding System (HCPCS); the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, 4th Revision (DSM-IV); Europe's Classification of Surgical Operations and Procedures, 4th Revision (OPCS-4); and the Agency for Healthcare Research and Quality's Clinical Classification Software (CCS).

This paper focuses on the International Classification of Diseases, now in its ninth and soon to be tenth iteration; the most widely used classification of diseases. Beginning in 1900 with the ICD-1 version, this nosology has evolved from 179 to over 120,000 total codes in ICD-10-CM (ICD-10 2003; ICD-10-CM 2003). The use of codes has expanded from classifying morbidity and mortality information for statistical purposes to diverse sets of applications, including reimbursement, administration, epidemiology, and health services research. Since October 1 1983, when Medicare's Prospective Payment System (PPS) was enacted, diagnosis-related groups (DRGs) based on ICD codes emerged as the basis for hospital reimbursement for acute-care stays of Medicare beneficiaries (U.S. Congress 1985). Today the use of ICD coding for reimbursement is a vital part of health care operations. Health care facilities use ICD codes for workload and length-of-stay tracking as well as to assess quality of care. The Veterans Health Administration uses ICD codes to set capitation rates and allocate resources to medical centers caring for its 6 million beneficiaries. Medical research uses ICD codes for many purposes. By grouping patients according to their diagnoses, clinical epidemiologists use ICD codes to study patterns of disease, patterns of care, and outcomes

Address correspondence to Kimberly J. O'Malley, Ph.D., Pearson Educational Measurement, 2201 Donley Drive, Suite 195, Austin, TX 78758. Karon F. Cook, Ph.D., Associate Director for Research, is with the Parkinson's Disease Research, Education and Clinical Center, Michael E. DeBakey VA Medical Center, Houston, TX. Matt D. Price, M.S., R.H.I.A., Kimberly Raiford Wildes, Dr.P.H., M.A., and Carol M. Ashton, M.D., M.P.H., are with the Houston Center for Quality of Care and Utilization Studies, Houston VA Medical Center, Baylor College of Medicine, Department of Medicine, Section of Health Services Research, Michael E. DeBakey VA Medical Center, Houston, TX. John F. Hurdle, M.D., Ph.D., is with the VA Salt Lake City Health Care System, Salt Lake City, UT.

of disease. Health services researchers use the codes to study risk-adjusted, cross-sectional, and temporal variations in access to care, quality of care, costs of care, and effectiveness of care. Medical and health services researchers commonly use ICD codes as inclusion and exclusion criteria to define sampling frames, to document the comorbidities of patients, report the incidence of complications, track utilization rates, and determine the case fatality and morbidity rates (see Calle et al. 2003 for a recent example) (Steinman, Landefeld, and Gonzales 2000; Calle et al. 2003; Charbonneau et al. 2003; Jackson et al. 2003; Martin et al. 2003; Studdert and Gresenz 2003). The widespread and diverse use of ICD codes demonstrates the central role nosology plays in health care.

Increased attention to code accuracy has occurred both as a result of the application of ICD codes for purposes other than those for which the classifications were originally designed as well as because of the widespread use for making important funding, clinical, and research decisions. Code accuracy, defined as the extent to which the ICD nosologic code reflects the underlying patient's disease, directly impacts the quality of decisions that are based on codes, and therefore code accuracy is of great importance to code users. Accuracy is a complicated issue, however, as it influences each code application differently. Using the codes for reporting case fatality rates in persons hospitalized for influenza, for example, might require a different level of accuracy than using codes as the basis for reimbursing hospitals for providing expensive surgical services to insured persons. Therefore, users of disease classifications, just as users of any measure, must consider the accuracy of the classifications within their unique situations. An appreciation of the measurement context in which disease classifications take place will improve the accuracy of those classifications and will strengthen research and health care decisions based on those classifications.

Researchers studying errors in the code assignment process have reported a wide range of errors. Studies in the 1970s found substantial errors in diagnostic and procedure coding. These error rates ranged from 20 to 80 percent (Institute of Medicine 1977; Corn 1981; Doremus and Michenzi 1983; Johnson and Appel 1984; Hsia et al. 1988). Studies in the 1980s reported slightly increased accuracy with average error rates around 20 percent, and most below 50 percent (Lloyd and Rissing 1985; Fischer et al. 1992; Jolis et al. 1993). Studies in the 1990s found rates similar to those of the 1980 studies, with error rates ranging from 0 to 70 percent (Benesch et al. 1997; Faciszewski, Broste, and Fardon 1997; Goldstein 1998). The inconsistency in the error rates and wide range of reported amounts of error is due largely to

Case 2:16-cv-08697-FMO-PVC   Document 616-6   Filed 08/06/24   Page 228 of 265
Page ID #:19836

differences across study methods (i.e., different data sets, versions of the ICD classifications, conditions studied, number of digits compared, codes examined, etc.) (Bossuyt et al. 2004). However, variation in error rates is also influenced by the many different sources of errors that influence code accuracy (Green and Wintfeld 1993). By clearly specifying the code process and the types of errors and coding inconsistencies that occur in each study, researchers can begin to understand which errors are most common and most important in their situation. They can then institute steps for reducing those errors.

If we think of the assignment of ICD codes as a common measurement process, then the person's true disease and the assigned ICD code represent true and observed variables, respectively. One approach to evaluating ICD code accuracy is to examine sources of errors that lead to the assignment of a diagnostic code that is not a fair representation of the patient's actual condition. Errors that differentiate the ICD code from the true disease include both random and systematic measurement errors. By understanding these sources of error, users can evaluate the limitations of the classifications and make better decisions based on them. In this manuscript, we (1) present the history of ICD code use, (2) summarize the general inpatient ICD coding process (from patient admission to the assignment of diagnostic codes), (3) identify potential sources of errors in the process, and (4) critique methods for assessing these errors.

## BACKGROUND

### *History of ICD Codes*

In 1893, the French physician Jacques Bertillon introduced the Bertillon Classification of Causes of Death. This first edition, had 179 causes of death. It was recommended that this classification system, subsequently known as the International Classification of Causes of Death (ICD), be revised every 10 years. With each revision, the numbers of codes increased, as did the appeal of using them for other purposes.

The World Health Organization (WHO) published the ninth revision of ICD in 1978. The ICD-9 is used to code mortality data from death certificates. To make the ICD more useful for American hospitals, the U.S. Public Health Service modified ICD-9 and called it the International Classification of Diseases, Ninth Revision, Clinical Modification (ICD-9-CM). In the Clinical Modification (CM) of ICD-9, codes were intended to be more precise than those needed only for statistical groupings and trend analysis (The International Classification of Diseases, 9th Revision, Clinical Modification [ICD-9-CM], Sixth Edition 2002).

The modified version expanded to three volumes, and a fifth-digit subclassification was introduced. The fifth digit adds increased specificity and is required when available. When identifying burns with codes 941 through 954, for example, a fourth digit indicates the depth of the burn and a fifth digit specifies the exact location. ICD-9-CM is used in the United States to code and classify diagnoses and procedures from inpatient and outpatient records, as well as inpatient procedures. The ninth revision contains over 12,000 diagnostic and 3,500 procedure codes.

The development of a tenth revision, International Statistical Classification of Diseases and Related Health Problems (ICD-10), introduces alphanumeric codes and greater specificity than ICD-9, and includes over 21,800 total codes (ICD-10 2003). In January 1999, the United States began using ICD-10 to code and classify mortality data from death certificates; however, at the time of this writing, the clinical modification version (ICD-10-CM), was still under development by the National Center for Health Statistics (NCHS) and has not been released.

### The Process for Assigning ICD Codes

In this paper, we focus on codes assigned during hospital stays, and whereas basic coding procedures are similar across ambulatory settings, the reader is cautioned that some errors may be setting-specific. The basic process for assigning ICD codes for inpatient stays, presented in Figure 1, can be conceptualized as the dynamic interplay between the patient as he or she progresses through the health care system (called the "patient trajectory") and the creation of the medical record (called the "paper trail"). The basic process shown in Figure 1 is typical, even though details of any given step at any given facility may vary. The left side of Figure 1 portrays the patient trajectory through the system, from admission to discharge. The right side of Figure 1 represents the paper trail, or medical record creation, from the recording of the admitting diagnosis to the assignment of the ICD codes after discharge.

The patient trajectory starts when the patient arrives at the hospital, at which time some type of precertification (insurance) based on the admitting diagnosis is performed by the admission clerk (at least for insured patients). After admission, based on the physician's admitting diagnosis and the information generated by the initial workup, the patient undergoes diagnostic tests and procedures and/or other treatment, as ordered by the medical staff. The patient and medical staff members continue to meet throughout the hospital stay to exchange information, and additional tests, procedures, and/or

0983

*Measuring Diagnoses*    1625



Figure 1:   Overview of the Inpatient Coding Process.

treatments may be ordered. Test and procedure results are added to the
medical record. The results from the tests and procedures often result in

changes in the admitting diagnosis. Furthermore, complications arising from care may also add to the list of diagnoses. The staff documents the hospital stay using either handwritten or electronic reporting. Upon discharge, the physician completes a narrative discharge summary that includes a list of primary and secondary diagnoses (word labels) and describes follow-up plans.

Upon discharge, the patient's medical record and all associated documentation are transferred to the medical record or health information management department. Concurrently, technicians check to ensure that all medical record information is accurate and complete (including the face sheet, history and physical, operative reports, radiology reports, physician's orders, progress and nursing notes, consultations, discharge summary, etc.). Coders then begin the process of classifying documentation, including diagnoses and procedures, using rigid ICD coding guidelines and conventions. Some facilities outsource medical transcription and coding.

After reviewing all pertinent medical record information, medical coders assign a code for the principal diagnosis, defined by the Uniform Hospital Discharge Data Set (UHDDS) as "that condition established after study to be chiefly responsible for occasioning the admission of the patient to the hospital care" (Uniform Hospital Discharge Data Set 1985). The principal diagnosis assignment is made based on written documentation from the providers. Coders also assign a code for the principal procedure, or one performed for definitive treatment or that was necessary for treating a complication. They assign additional diagnostic codes (the code count being determined by the facility) for diagnoses that require clinical evaluation, therapeutic interventions, diagnostic procedures, extended lengths of stay (for inpatient stays), or increased nursing care and/or monitoring. Additional procedures are coded as well. The VA, for example, allows up to 10 diagnoses and five procedure codes per inpatient day (Department of Veterans Affairs 2002). Coders may also assign V-codes (codes describing conditions that coexist during a patient's stay that influence the stay, such as history of cancer or lack of housing), E-codes (supplementary classification of factors influencing the patient's health status and contact with health services), and M-Codes (supplementary classification of the morphology of neoplasms).

After the code assignments and the sequencing of the codes have been determined, a computerized software program, called a grouper, is often used to classify or group the codes for reimbursement purposes. When the coding process is complete, the codes are transmitted to the billing department for reimbursement purposes.

## EXAMINING CODING ERRORS

### Sources of Errors

Many sources of error are interposed between a person's disease (as it is in truth) and the word label (the diagnosis) applied to it by a clinician, and between the diagnosis and the nosologic code applied to it by a medical coder. A summary of these errors, organized according to the patient trajectory and the paper trail depicted in Figure 1.

### Errors Along the Patient Trajectory

A "diagnosis" is a word label applied to the disordered anatomy and physiology (the disease) presumed to be causing a person's constellation of symptoms and signs. Several sources of error influence the diagnostic process from patient admission to discharge. "Diagnosis, is in the end, an expression of probability" (author of quotation is unknown). Hardly any diagnosis—even one made at autopsy—is certain (Ornelas-Aguirre et al. 2003; Silfvast et al. 2003). The certainty, or accuracy, of a diagnosis depends upon multiple factors such as the participants (e.g., patient, clinician, medical staff), disease type, current state of medical knowledge and technology, context within which the diagnosis is made, and translation of coding changes into practice.

The first potential sources of error along the trajectory in Figure 1 relate to communication. The quality and quantity of communication between the patient and his or her admitting clerk and treating clinicians are critical determinants of the accuracy of the admitting diagnosis. If the patient describes only a subset of symptoms or withholds important information, for example, the accuracy of the diagnosis may be compromised, leading the clinician down the wrong line of diagnostic reasoning. Clinicians can be poor communicators as well. The clinician may fail to ask the right questions, may not fully elicit the patient's history, or may misunderstand the patient, resulting in another source of error in the process.

When the clinician orders diagnostic tests and procedures, potential sources of error that may be introduced include the clinician's knowledge about the best diagnostic tests and procedures, the availability of these tests and procedures, and the clinician's ability to interpret the results. Diagnostic accuracy depends upon the state of scientific understanding regarding various presentations and etiologies of the disease. Further, the utility (sensitivity, specificity, and predictive value) of the tests and procedures available to the clinician impacts the certainty of the diagnosis. A disease for which tests have high sensitivity and specificity will result in higher diagnostic accuracy

compared with a disease with vague manifestations and poor diagnostic tests. The accuracy of cancer diagnoses, for example, is typically higher than of schizophrenia diagnoses, in part because tumor histopathology and serum markers are less ambiguous than the behavioral diagnostic criteria for schizophrenia. Errors also occur when the physician records the diagnosis. Variance in the clinician's description of the diagnosis—often 5–10 synonyms exist for the same clinical entity—and clarity in the recording of the diagnosis, especially if handwritten, also introduce error into the coding process. Clinicians are notorious for undecipherable handwriting.

Consider how errors in the patient trajectory may influence the diagnosis of a patient with a stroke (a disruption of blood supply to the brain). The warning symptom for stroke, a transient ischemic attack (TIA), is a set of transitory neurological symptoms (in medical parlance, symptoms are subjective and not directly observable by others) and/or signs (signs are observable by others) thought to result from a temporary interference with arterial circulation to a discrete part of the brain. Some TIAs are over in seconds; by definition, all TIAs resolve within 24 hours or they are given a different label ( Johnston et al. 2003). The signs and symptoms of TIA are nonspecific; that is, they can result from several other conditions besides a temporary interruption of blood flow to a part of the brain. Because the symptoms are nonspecific, the patient at admission might choose to share only a few (e.g., the patient reports headache but not dizziness), or the patient might not notice the more subtle symptoms (e.g., subtle visual field disturbances) and therefore not share them with the clinician. During the patient–clinician interaction, the clinician might make a decision based only on the symptoms reported by the patient and only on the most obvious signs. Furthermore, no blood or imaging test at present can confirm or disconfirm the occurrence of a TIA. Therefore, the diagnosis of TIA rests on a clinician's acumen, and acumen depends on training, experience, attention, thoroughness, and the ability to elicit information from the patient and/or available informants. Consequently, the interrater reliability of the diagnosis of TIA is very low, such as $\kappa$ values just over 0.40 and overall agreement of 57 percent (Dewey et al. 1999; Goldstein et al. 2001; Wilson et al. 2002). Further, new diagnostic criteria for TIA have recently been proposed (Albers et al. 2002). If adopted, these criteria will compound the difficulty in monitoring the incidence and prevalence of TIAs over time.

As criteria for the diagnosis of diseases are constantly in flux because of the evolving nature of medical knowledge, new types of errors (or coding inconsistencies) are introduced into the process, and other errors may decrease as diagnostic accuracy increases. New errors may evolve from

clinicians' delay in learning about medical advances or new diagnostic tools. This is especially true for conditions for which no laboratory or imaging tests are available. A case in point is mental illness, the diagnosis of which is based on the DSM published by the American Psychiatric Association, now in its fourth major iteration (American Psychiatric Association 1994). Consider, for example, how "homosexuality" as a diagnosis evolved from being a nondiagnosis to a mental illness diagnosis to a "life style."

Even when laboratory or imaging tests are available for confirming or ruling out a diagnosis, medical technology evolves and the tests improve. For example, the diagnosis of acute stroke no longer requires a spinal tap and direct arteriography of cerebral vessels; the diagnosis can now be made noninvasively with a magnetic resonance imaging study of the brain (Provenzale et al. 2003).

### Errors Along the Paper Trail

The first three error sources, those of communication and those related to tests and procedures the patient undergoes, that are listed in Figure 1 affecting the paper trail were described in the previous section. Another potential set of errors can be found in the record itself. Clinicians do not generally assign codes; coders assign them based on the labels recorded by clinicians in charts or on death certificates. Errors in this phase have been reported to range from 17.1 to 76.9 percent (Hsia et al. 1988). The variability in the error rates is best understood by considering the measurement contexts in which the code assignments take place.

One potential set of errors can be found in the record itself. In Figure 1, these are the fourth set of errors listed. In their written or electronically entered record, clinicians often use synonyms and abbreviations to describe the same condition. For example, synonyms for "stroke" include cerebrovascular accident, cerebral occlusion, cerebral infarction, and apoplexy, among others. The variance in terms is problematic, as each diagnostic code should represent one and only one disease entity. From the clinician's recorded diagnosis label, the coder must select the ICD code that best seems to match the clinician's terminology. The use of synonyms leads to imprecision. For example, a patient who had a stroke can be described by one doctor as having had an intracerebral hemorrhage (Code 431) and by another doctor as having had a cerebrovascular accident (Code 436) and both doctors would be technically correct. Errors can also occur because of physicians' and other staff's omissions in the medical record. In 1985, a study of 1,829 medical records in the Veterans Administration indicated that over 40 percent of physician errors

were attributed to omissions (Lloyd and Rissing 1985). Another source of recorder error is in the transcription of the medical record. Transcription can be defined as the process of converting medical record information from voice (dictation) to hardcopy report or electronic format. Transcription or scanning errors are additional threats to code accuracy. The extent to which the chart information is complete influences the accuracy of the codes as well. Concurrent coding, coding that is performed before patient discharge, is implemented in some facilities in order to expedite the coding and billing processes. With the considerable pressure on hospitals to discharge patients these days (at least, in the U.S.), coders may have incomplete clinical information when they receive the chart. As a result, coders are required to assign codes with varying amounts of information, which impacts code accuracy.

Many potential errors originate with the coder. The fact that coders must pour through sometimes voluminous records to extract diagnoses can lead to several types of errors. One study examining coding variation found that when 11 experienced, active medical coders reviewed 471 medical records and were told they would be reevaluated, all of the coders differed in one or more data fields for more than half of the records (Lloyd and Rissing 1985). The adequacy of training the coder receives influences her or his ability to synthesize large amounts of information and assign precise codes. The American Health Information Management Association (AHIMA), the governing body for health information professionals, designates two types of certification: a 2-year certification (Registered Health Information Technician, previously Accredited Record Technician) and a 4-year certification (Registered Health Information Administrator, previously Registered Record Administrator). The existence of two levels of certification, based on length of academic programs and course content, may contribute to coding inconsistencies. In addition to these two professional credentials, AHIMA also offers multiple coder certification opportunities and credentials. Continuing education of coders, or lack thereof, also influences coding accuracy, as the codes and coding rules expand and change annually. For example, on October 1 2003, a new ICD-9 procedure code (00.15) was created to identify patients who receive high dose interleukin-2 treatment. As another example, a comparison of ICD-9-CM with ICD-10-CM indicates that the number of categories doubled from 4,000 to 8,000 and the number of death causes increased from 72 to 113 (Colorado Department of Public Health and Environment 2001). Changes in codes include reclassification of codes, such as moving of hemorrhage from the "circulatory" chapter to the "signs and symptoms" chapter, and changing of the four-digit numeric codes of ICD-9 to the four-digit alphanumeric codes of

ICD-10. Diabetes mellitus, for example, was coded 250 in ICD-9 and is coded E10-E14 in ICD-10 (ICD-10 2003). Without continuing education on code changes and additions, hospitals can lose reimbursement funds and researchers can lose data accuracy.

The coders' experience, attention, and persistence also affect the accuracy of coding. These errors are the fifth and sixth errors shown in Figure1. When a patient is admitted with renal failure and hypertension, a novice coder may code each condition separately, whereas an experienced coder will look to see if there is a connection between the two conditions, and if so, will use the specific combination code. If coders are unsure of a diagnosis or which diagnosis constitutes the principal diagnosis, they are expected to contact the physician or gather the necessary information to record the correct diagnosis. If coders fail to recognize when they need additional information or if they are not persistent in collecting it, additional error is imposed into the coding system.

At the phase of the paper trail in which diagnostic labels are translated into ICD codes, some specific types of coder-level errors can be identified. These errors, the next to last set in Figure 1, include creep, upcoding, and unbundling, to name a few. Creep includes diagnostic assignments that deviate from the governing rules of coding. Creep errors have also been labeled as misspecification, miscoding, and resequencing errors (Hsia et al. 1988).

Misspecification occurs when the primary diagnosis or order for tests and procedures is misaligned with the evidence found in the medical record. Miscoding includes assignment of generic codes when information exists for assigning more specific codes, assignment of incorrect codes according to the governing rules, or assignment of codes without the physician attesting to their accuracy (Hsia et al. 1988). An example of miscoding for an ischemic stroke might involve using the more generic ICD-9 code of 436 (acute but ill-defined cerebrovascular disease) in place of the more specific ICD-9 codes of 433 (occlusion and stenosis of precerebral arteries) or 434 (occlusion of cerebral arteries) (Goldstein 1998).

Resequencing codes, or changing the order of them, comprises another potential error source. Take as an example the patient who had respiratory failure as a manifestation of congestive heart failure. The congestive heart failure should be the principal diagnosis and the respiratory failure the secondary diagnosis. Resequencing errors occur when these diagnoses are reversed (Osborn 1999). Most sequencing errors are not deliberate. Sequencing errors may comprise the commonest kind of errors in hospital discharge abstracts (Lloyd and Rissing 1985).

Upcoding, assigning codes of higher reimbursement value over codes with lesser reimbursement value, is an additional source of error at the coder level. For example, upcoding a urinary tract infection to the more serious condition of septicemia results in an increase of over $2,000 in reimbursement. Because upcoding misrepresents the true condition of the patient, it constitutes falsification of medical records and can often be detected by comparing the medical record to the codes listed in the discharge abstract. When coders assign codes for all the separate parts of a diagnosis instead of assigning a code for the overall diagnosis, the practice is called unbundling. Whether done in error or intentionally for gain, unbundling constitutes coding error. Although we label these errors as coder-level errors, systematic coding variation may be apparent at the hospital-level, as shown by some evidence from at least one study (Romano et al. 2002).

The final potential error listed in Figure 1 occurs when the physician attests to the accuracy of the coding information. As physicians treat many patients simultaneously and support heavy workloads, the time and attention physicians dedicate to checking the accuracy of the codes varies tremendously. Errors at the point of attestation include reviewing too quickly or not reviewing the face sheet and supporting documents, poor recall of the details of the patient's conditions, and incorrect recording on the attestation sheet.

### Ways to Measure Code Accuracy

Five statistics are commonly used to summarize the amount of error in ICD coding: sensitivity, specificity, positive predictive value, negative predictive value, and $\kappa$ coefficient. These statistics are simple to compute; that is, it is easy to come up with the "right answer." It is more challenging to state precisely what questions are answered by each of these statistics. In the current context, it is helpful to remember that the reliability of ICD coding is with respect to some other method of obtaining a diagnostic label. Sensitivity and specificity are statistics often used when some "gold standard" is available. As discussed above, however, there is no gold standard for diagnostic labeling.

A researcher whose question is, "How accurate are the diagnoses?" might compare the diagnostic labels assigned by two or more experts (e.g., physicians) evaluating the same sample of patients. A good choice of statistic for this research design might be the $\kappa$ coefficient. This statistic quantifies beyond-chance agreement among experts; therefore, it would be an appropriate estimator of the reliability of diagnoses made by experts. However, if the research question is, "In medical chart reviews, how well do medical

coders' ICD code assignments match those of physicians?" then a true gold standard exists. In such a case, the researcher might prefer to calculate specificity, sensitivity, and predictive values using the physicians' reviews as the gold standard. What must be kept clearly in mind, however, is that the values of the statistics obtained in this scenario express nothing about the reliability of medical diagnosis. They estimate, in the context of medical chart review, the corroboration between physician and medical coders' ICD classifications.

## Discussion

The process of assigning ICD codes is complicated. The many steps and participants in the process introduce numerous opportunities for error. By describing a brief history of ICD coding, detailing the process for assigning codes, identifying places where errors can be introduced into the process, and reviewing methods for examining code accuracy, we hope to demystify the ICD code assignment process and help code users more systematically evaluate code accuracy for their particular applications. Consideration of code accuracy within the specific context of code use ultimately will improve measurement accuracy and, subsequently, health care decisions based on that measurement.

Although this paper focused on errors influencing code accuracy, the goal was not to disparage ICD codes in general. ICD codes have proven incredibly helpful for research, reimbursement, policymaking, etc. In fact, without ICD codes, health care research, policy, and practice could not have advanced as far as they have. However, code use and decision making on the bases of codes is improved when code accuracy is well understood and taken into account. By heightening their awareness of potential error sources, users can better evaluate the applicability and limitations of codes in their own context, and thus use ICD codes in optimal ways.

One way to heighten code users' awareness of potential error sources is to create a tool for their use when evaluating ICD codes. Based on our evaluation of the code assignment process, we created Figure 1, which summarizes the basic inpatient process for code assignment. This flowchart is designed to focus code users' attention on key aspects of the code assignment process and facilitate their critique of codes. By identifying potential code errors, users may be able to specify bias that might influence data accuracy. Instead of weakening a study, the recognition of potential sources of code bias will strengthen researchers' interpretations of data analyses using the codes.

A few practical recommendations can be made for code users. First, codes are likely to be most accurate under the following conditions: the disease has a clear definition with observable signs and symptoms, highly qualified physicians document information on the patient, experienced coders with full access to information assign the codes, and the codes are not new. Furthermore, codes are more likely to be accurate in calculating disease prevalence than in calculating disease incidence, as incidence requires identification of new cases, or cases without previous documentation. When the accuracy of a specified code is high, it would be appropriate to identify individuals for inclusion in patient registries or intervention studies. Codes considered less accurate are better suited for screening for potential study participants and for identifying pools of recruits. As code accuracy decreases, or becomes more questionable, researchers will want to use codes in combination with other measures. For example, codes from one occasion could be combined with test results or with codes from other occasions to improve the accuracy of disease classification. Suppose researchers wish to identify patients with stroke for an expensive intervention study. Given that past studies have found that using ICD-9 diagnostic codes of 433 through 436 from administrative databases are not very accurate for diagnosing stroke (Leibson et al. 1994; Benesch et al. 1997), researchers may decide to use codes 433 through 436 as an initial screener for including patients in the study. Then, to increase the accuracy of the diagnosis, researchers may wish to review these patients' hospitalization charts and outpatient records. Researchers can make study inclusion decisions based on the combination of ICD codes and clinical evidence, such as prior history of cerebral ischemic events, cerebrovascular risk factors, related procedures (carotid endarterectomy or angiography), and functional abilities. Although collecting the clinical evidence will take additional time and resources, it will improve the accuracy of the diagnoses and will likely lead to more appropriate study results.

Because the use of ICD codes is commonplace, and studies on code accuracy can be found in a wide variety of disease- and discipline-specific journals, code users need easy access to a resource for reviewing code accuracy studies. To meet this need, the Measurement Excellence and Training Resource Information Center (METRIC), a VA initiative for improving measurement in health care, has created a repository of abstracts from code accuracy studies. The repository is located at http://www.measurementexperts. org/icd9ab.htm. The METRIC started the repository, but recognizes many important study references are missing. METRIC encourages code users to visit the site, review the repository, and recommend other studies and

0993

documents that can be added. With input from the many types of code users, this resource can become a valuable tool for evaluating ICD code accuracy. METRIC envisions this as a dynamic resource that will facilitate ICD code users' ability to access code accuracy information in an efficient and timely manner.

Although many studies have examined ICD code accuracy, knowledge in several areas is underdeveloped. Two important areas are the reliability of physician diagnoses and the factors that influence that reliability. Many ICD code accuracy studies consider the physician diagnosis as recorded in the medical record as the gold standard for measuring diagnoses (Lloyd and Rissing 1985; Hsia et al. 1988; Fischer et al. 1992). In at least one study, researchers demonstrated that the medical record cannot be considered a gold standard, as measured against standardized patients, for example Peabody et al. (2000).

Little consideration is given to the process leading to the physician's diagnosis. Certainly the quality of the gold standard varies based on disease factors (type, knowledge, and progression) and physician factors (experience with the disease and knowledge of diagnostic tools for the disease). Further research examining which factors influence the quality of the physician's diagnosis and the extent to which these factors affect the gold standard is greatly needed.

As researchers, policy makers, insurers, and others strive to impose some organization on the complicated health care field, disease and procedure classification systems will receive increased attention. Although no system of classification will ever be perfect, our ability to improve taxonomies rests in our dedication to understanding the code assignment process and to sharing information about its strengths and weaknesses.

## ACKNOWLEDGMENTS

The authors would like to acknowledge and thank University of Kansas Medical Center staff members Richard Sahlfeld, RHIA, director and corporate privacy officer; Theresa Jackson, RHIA, assistant director; and Vicky Koehly, RHIT, coding supervisor, medical record department, for their input during our interviews and for their time spent in reviewing our manuscript. The authors would also like to thank Sandra Johnston, MA, RHIA, clinical coordinator, health information management department, School of Allied Health, University of Kansas, Kansas City, Kansas, for her contributions to the

manuscript. The expertise of these professionals in health information management and the coding process was invaluable.

Funding for the development of this manuscript came from the Department of Veterans Affairs, Veterans Health Administration, Health Services Research and Development Service, Measurement Excellence and Training Resource Information Center (METRIC; RES 02-235).

This material is the result of work supported with resources and the use of facilities at the Houston Center for Quality of Care & Utilization Studies, Houston Veterans Affairs Medical Center.

The views expressed in this article are those of the authors and do not necessarily represent the views of the Department of Veterans Affairs or Baylor College of Medicine.

# REFERENCES

Albers, G. W., L. R. Caplan, J. D. Easton, P. B. Fayad, J. P. Mohr, J. L. Saver, and D. G. Sherman, TIA Working Group. 2002. "Transient Ischemic Attack—Proposal for a New Definition." *New England Journal of Medicine* 347 (21): 1713–6.

American Psychiatric Association. 1994. *Diagnostic and Statistical Manual of Mental Disorders*, 4th edition. Washington, DC: American Psychiatric Association.

Benesch, C., D. M. Witter Jr., A. L. Wilder, P. W. Duncan, G. P. Samsa, and D. B. Matchar. 1997. "Inaccuracy of the International Classification of Diseases (ICD-9-CM) in Identifying the Diagnosis of Ischemic Cerebrovascular Disease." *Neurology* 49: 660–4.

Bossuyt, P. M., J. B. Reitsma, D. E. Bruns, C. A. Gatsonis, P. P. Glasziou, L. M. Irwig, J. G. Lijmer, D. Moher, and D. Rennie, H. C. de Vet, and the STARD Group. 2004. "Towards Complete and Accurate Reporting of Studies of Diagnostic Accuracy: The STARD Initiative." *Family Practice* 21: 4–10.

Calle, E. E., C. Rodriguez, K. Walker-Thurmond, and M. J. Thun. 2003. "Overweight, Obesity, and Mortality from Cancer in a Prospectively Studied Cohort of U.S. Adults." *New England Journal of Medicine* 348 (17): 1625–38.

Charbonneau, A., A. K. Rosen, A. S. Ash, R. R. Owen, B. Kader, A. Spiro, C. Hankin, L. R. Herz, M. J. V. Pugh, L. Kazis, D. R. Miller, and D. R. Berlowitz. 2003. "Measuring the Quality of Depression in a Large Integrated Health System." *Medical Care* 41: 669–80.

Colorado Department of Public Health and Environment. 2001. "New International Classification of Diseases (ICD-10): The History and Impact." Brief Health Statistics Section, March 2001, No. 41. Available at http://www.cdphe.state.co.us/hs/Briefs/icd10brief.pdf

Corn, R. F. 1981. "The Sensitivity of Prospective Hospital Reimbursement to Errors in Patient Data." *Inquiry* 18: 351–60.

Department of Veterans Affairs. 2002. *Handbook for Coding Guidelines, Version 2.0.* Health Information Management. Available at http://www.virec.research.med.-va.gov/References/VHACodingHandbook/CodingGuidelines.htm

Dewey, H. M., G. A. Donnan, E. J. Freeman, C. M. Sharples, R. A. Macdonell, J. J. McNeil, and A. G. Thrift. 1999. "Interrater Reliability of the National Institutes of Health Stroke Scale: Rating by Neurologists and Nurses in a Community-Based Stroke Incidence Study." *Cerebrovascular Disease* 9 (6): 323–7.

Doremus, H. D., and E. M. Michenzi. 1983. "Data Quality: An Illustration of Its Potential Impact upon Diagnosis-Related Group's Case Mix Index and Reimbursement." *Medical Care* 21: 1001–11.

Faciszewski, T., S. K. Broste, and D. Fardon. 1997. "Quality of Data Regarding Diagnoses of Spinal Disorders in Administrative Databases. A Multicenter Study." *Journal of Bone Joint Surgery America* 79: 1481–8.

Fischer, E. D., F. S. Whaley, W. M. Krushat, D. J. Malenka, C. Fleming, J. A. Baron, and D. C. Hsia. 1992. "The Accuracy of Medicare's Hospital Claims Data: Progress Has Been Made, but Problems Remain." *American Journal of Public Health* 82: 243–8.

Goldstein, L. B. 1998. "Accuracy of ICD-9-CM Coding for the Identification of Patients with Acute Ischemic Stroke: Effect of Modifier Codes." *Stroke* 29 (8): 1602–4.

Goldstein, L. B., M. R. Jones, D. B. Matchar, L. J. Edwards, J. Hoff, V. Chilukuri, S. B. Armstrong, and R. D. Horner. 2001. "Improving the Reliability of Stroke Subgroup Classification Using the Trial of ORG 10172 in Acute Stroke Treatment (TOAST) Criteria." *Stroke* 32 (5): 1091–8.

Green, J., and N. Wintfeld. 1993. "How Accurate Are Hospital Discharge Data for Evaluating Effectiveness of Care?" *Medical Care* 31: 719–31.

Hsia, D. C., W. M. Krushat, A. B. Fagan, J. A. Tebbutt, and R. P. Kusserow. 1988. "Accuracy of Diagnostic Coding for Medicare Patients under the Prospective-Payment System." *New England Journal of Medicine* 318 (6): 352–25.

Institute of Medicine. 1977. *Reliability of Hospital Discharge Records.* Washington, DC: National Academy of Sciences.

International Classification of Diseases, 10th Revision (ICD-10). 2003. Department of Health and Human Services. Centers for Disease, Control and Prevention. National Center for Health Statistics. Available at http://www.cdc.gov/nchs/data/dvs/icd10fct.pdf

International Classification of Diseases, 9th Revision, Clinical Modification (ICD-9-CM), Sixth Edition. 2002. Department of Health and Human Services. Centers for Disease Control and Prevention. National Center for Health Statistics. Available at ftp://ftp.cdc.gov/pub/Health_Statistics/NCHS/Publications/ICD9-CM/2002/

International Classification of Diseases, 10th Revision, Clinical Modification (ICD-10-CM). 2003. National Center for Health Statistics. Pre-release Draft, June 2003. Centers for Disease Control and Prevention. Available at http://www.cdc.gov/nchs/about/otheract/icd9/icd10cm.htm

Jackson, L. A., K. M. Neuzil, O. Yu, W. E. Barlow, A. L. Adams, C. A. Hanson, L. D. Mahoney, D. K. Shay, and W. W. Thompson. 2003. "Effetiveness of

Pneumococcal Polysaccharide Vaccine in Older Adults." *New England Journal of Medicine* 348 (18): 1747–55.

Johnson, A. N., and G. L. Appel. 1984. "DRGs and Hospital Case Records: Implications for Medicare Casemix Accuracy." *Inquiry* 21: 128–34.

Johnston, S. C., P. B. Fayad, P. B. Gorelick, D. F. Hanley, P. Shwayder, D. Van Husen, and T. Weiskopf. 2003. "Prevalence and Knowledge of Transient Ischemic Attack among US Adults." *Neurology* 60 (9): 1429–34.

Jolis, J. G., M. Ancukiewics, E. R. DeLong, D. B. Pryor, L. H. Muhlbaier, and D. B. Mark. "Discordance of Databases Designed for Claims Payment versus Clinical Information Systems." *Annals of Internal Medicine* 119: 844–50.

Leibson, C. L., J. M. Naessens, R. D. Brown, and J. P. Whisnant. 1994. "Accuracy of Hospital Discharge Abstracts for Identifying Stroke." *Stroke* 25: 2348–55.

Lloyd, S. S., and J. P. Rissing. 1985. "Physician and Coding Errors in Patient Records." *Journal of the American Medical Association* 254 (10): 1330–6.

Martin, G. S., D. M. Mannino, S. Eaton, and M. Moss. 2003. "The Epidemiology of Sepsis in the United States from 1979 through 2000." *New England Journal of Medicine* 348 (16): 1546–54.

Ornelas-Aguirre, J. M., G. Vazquez-Camacho, L. Gonzalez-Lopez, A. Garcia-Gonzalez, and J. I. Gamez-Nava. 2003. "Concordance between Premortem and Postmortem Diagnosis in the Autopsy: Results of a 10-Year Study in a Tertiary Care Center." *Annals of Diagnostic Pathology* 7 (4): 223–30.

Osborn, C. E. 1999. "Benchmarking with National ICD-9-CM Coded Data." *Journal of the American Health Information Management Association* 70 (3): 59–69.

Peabody, J. W., J. Luck, P. Glassman, T. R. Dresselhaus, and M. Lee. 2000. "Comparison of Vignettes, Standardized Patients, and Chart Abstraction: A Prospective Validation Study of 3 Methods for Measuring Quality." *Journal of the American Medical Association* 283: 1715–22.

Provenzale, J. M., R. Jahan, T. P. Naidich, and A. J. Fox. 2003. "Assessment of the Patient with Hyperacute Stroke: Imaging and Therapy." *Radiology* 229 (2): 347–59.

Romano, P. S., B. K. Chan, M. E. Schembri, and J. A. Rainwater. 2002. "Can Administrative Data Be Used to Compare Postoperative Complication Rates across Hospitals?" *Medical Care* 40: 847–50.

Silfvast, T., O. Takkunen, E. Kolho, L. C. Andersson, and P. Rosenberg. 2003. "Characteristics of Discrepancies between Clinical and Autopsy Diagnoses in the Intensive Care Unit: A 5-Year Review." *Intensive Care Medicine* 29 (2): 321–4.

Steinman, M. A., C. S. Landefeld, and R. Gonzales. 2003. "Predictors of Broad-Spectrum Antibiotic Prescribing for Acute Respiratory Tract Infections in Adult Primary Care." *Journal of the American Medical Association* 289 (6): 719–25.

Studdert, D. M., and C. R. Gresenz. 2003. "Enrollee Appeals of Preservice Coverage Denials at 2 Health Maintenance Organizations." *Journal of the American Medical Association* 289 (7): 864–70.

U.S. Congress. 1985. *Office of Technology Assessment, "Medicare's Prospective Payment System: Strategies for Evaluating Cost, Quality, and Medical Technology," OTA-H-262.* Washington, DC: U.S. Government Printing Office.

Uniform Hospital Discharge Data Set (UHDDS). 1992. "Definition of Principal and Other [Secondary] Diagnoses." 50 Federal Register 31039; adopted 1986, revised 1992.

Wilson, J. T., A. Hareendran, M. Grant, T. Baird, U. G. Schulz, K. W. Muir, and I. Bone. 2002. "Improving the Assessment of Outcomes in Stroke: Use of a Structured Interview to Assign Grades on the Modified Rankin Scale." *Stroke* 33 (9): 2243–6.

**EXHIBIT D-44**

C H A P T E R 4

Issues for risk adjustment
in Medicare Advantage



CHAPTER 4

# Issues for risk adjustment in Medicare Advantage

## Chapter summary

Health plans that participate in the Medicare Advantage (MA) program
receive monthly capitated payments for each Medicare enrollee. Each
capitated payment is the product of two general parts: a base rate, which
reflects the payment if an MA enrollee has the health status of the national
average beneficiary, and a risk score, which indicates how costly the enrollee
is expected to be relative to the national average beneficiary. The purpose
of the risk scores is to adjust MA payments so that they accurately reflect
how much each MA enrollee would be expected to cost. In this chapter, we
examine the performance of the risk-adjustment system in the MA program
and offer alternatives for improving it.

### Improving payment accuracy of the CMS–hierarchical condition category model

Currently, CMS uses the CMS–hierarchical condition category (CMS–
HCC) model to risk adjust each MA payment. This model uses enrollees'
demographics and medical conditions collected into 70 HCCs to predict their
costliness. It has been shown to be a much better predictor of a beneficiary's
costliness than the demographic-based model that preceded it. Analysis of
the CMS–HCC model and the demographic model indicates that the CMS–
HCC model explains about 11 percent of the variation in costliness among
individual beneficiaries, whereas the demographic model explains only about
1 percent (Pope et al. 2004).

### In this chapter

- Evidence that MA enrollees
  tend to be lower cost than
  FFS beneficiaries

- Improving predictive accuracy
  of the CMS–HCC model

- Issues related to financial
  neutrality between FFS
  Medicare and the MA
  program

The demographic model did not include factors that are important for predicting beneficiaries' costliness—such as conditions. Consequently, it systematically overpredicted costs for healthy beneficiaries and systematically underpredicted costs for beneficiaries in poor health. Because the CMS–HCC model includes beneficiaries' conditions as well as their demographic information, it explains more of the variation in beneficiaries' costliness and predicts costs more accurately than the demographic model. However, systematic overpredictions and underpredictions may remain under the CMS–HCC model. For example, for all beneficiaries who have the same condition, the CMS–HCC model adjusts MA payments by the same proportion. But the severity of a condition varies across beneficiaries, and those with greater severity tend to be more costly. In addition, research suggests that a minimum of 20 percent to 25 percent of the variation in beneficiaries' costliness may be predictable, so the CMS–HCC may leave half or more of the predictable variation unexplained (Newhouse et al. 1997). Therefore, for a given condition it is possible that plans can be financially advantaged or disadvantaged based on the risk profile (overall health status) of their enrollees.

To the extent that systematic prediction errors occur under the CMS–HCC model, we explored several policy options for reducing these errors:

- Add measures of income and indicators for race to the model. If beneficiaries in certain income categories or racial groups tend to have greater severity for given conditions, these additional variables could reduce prediction errors.
- Include measures for the number of conditions in the model. The cost of treating a certain condition may increase as more comorbidities are present.
- Use two years of beneficiaries' diagnoses to determine their condition categories. CMS currently uses one year of beneficiaries' diagnoses to determine their conditions, but we have found that providers often do not consistently code conditions on claims from year to year. Using two years of diagnosis data (when available) would help to fully identify beneficiaries' conditions.

Our analysis indicates that including beneficiaries' race and measures of income would not improve predictive accuracy. However, including the number of conditions would improve predictive accuracy for beneficiaries who have many conditions. Using two years of diagnoses to identify beneficiaries' conditions also would improve predictive accuracy for beneficiaries who have many conditions but to a lesser extent than adding the number of conditions. In addition, using two years of diagnoses would reduce year-to-year fluctuations in beneficiaries' risk scores, which would result in more stable revenue streams for MA plans.

Because adding the number of conditions and using two years of diagnosis data both have beneficial effects, but in different ways, we also examined the effects of adding both features to the CMS–HCC model. It resulted in more accurate predictions for high-risk beneficiaries and smaller year-to-year fluctuations in beneficiaries' risk scores.

## Other issues for MA risk adjustment

On several occasions, the Commission has taken a position that payments for MA enrollees should equal what they would be expected to cost in FFS Medicare (financial neutrality) (Medicare Payment Advisory Commission 2001, Medicare Payment Advisory Commission 2002, Medicare Payment Advisory Commission 2004, Medicare Payment Advisory Commission 2005). An underlying rationale for this policy is that it encourages beneficiaries to enroll in whichever sector (MA or FFS) is more efficient in their local health care market. Two recently published papers have implications for the interaction between risk adjustment and financial neutrality. One paper shows that in FFS Medicare, regions that have high per capita service use also have high average risk scores, and areas that have low per capita service use have low average risk scores (Song et al. 2010). At least some of the regional difference in risk scores is due to differences in service use that do not reflect differences in health status; that is, risk scores are high in some regions simply because beneficiaries get more health care, not because they are sicker. If these same regional differences in service use and risk scores occur in the MA program, they drive MA payments higher in high-use regions. Adjustments could be made to eliminate these differences.

A second paper shows there are differences between FFS Medicare and a large MA plan in the relative costliness of treating conditions (Newhouse et al. 2011). If these cost differences between FFS Medicare and MA plans are widespread, risk adjustment underpredicts MA costs for some conditions and overpredicts MA costs for other conditions. An issue to consider is whether it is more appropriate for CMS to estimate the CMS–HCC model by using cost and diagnosis data from MA enrollees rather than FFS beneficiaries.

Both papers have implications for equity in the MA program: Adjusting MA risk scores to reduce the effects of regional differences in risk scores would reduce regional variations in MA payments, and using data from MA enrollees to estimate the CMS–HCC model would reduce incentives for plans to attract beneficiaries who have some conditions and avoid beneficiaries who have other conditions. However, both issues are inconsistent with the concept of financial neutrality between MA and FFS Medicare. These issues will have to be discussed in the future.

1004

A final issue regarding risk adjustment is that analyses by CMS and the Government Accountability Office (GAO) both indicate that risk scores have increased at a faster rate in the MA program than in FFS Medicare (Centers for Medicare & Medicaid Services 2009, Government Accountability Office 2012). The higher growth rate in MA has resulted in MA enrollees having higher risk scores than they would have in FFS Medicare. In an effort to bring MA risk scores in line with those in FFS Medicare, CMS has made adjustments to MA risk scores, but GAO believes that larger adjustments should be made. ■

Health plans that participate in the Medicare Advantage (MA) program receive monthly capitated payments for each Medicare enrollee. Each capitated payment is the product of two general parts: a base rate, which reflects the payment if an MA enrollee has the health status of the national average Medicare beneficiary, and a risk score, which indicates how costly the enrollee is expected to be relative to the national average beneficiary.

Over the years, CMS has employed various methods for determining MA enrollees' risk scores. Currently, CMS uses the CMS–hierarchical condition category (CMS–HCC) risk-adjustment model, which uses enrollees' demographics and condition categories (such as diabetes and stroke) to predict their costliness. The demographic variables include age, sex, Medicaid status, institutional status, eligibility based on being disabled, and eligibility based on age but originally eligible because of disability.

All demographic variables are from the year for which beneficiaries' costs are to be predicted (the prediction year). The condition categories are based on diagnoses recorded on physician, hospital outpatient, and hospital inpatient claims in the year before beneficiaries' costs are to be predicted (the base year). This makes the CMS–HCC a prospective model, as opposed to a concurrent model, which would use conditions from the prediction year. It is logical to use a prospective model in the MA program because the express purpose of MA plans is to provide care to manage their enrollees' conditions. If concurrent risk adjustment were used, MA plans would be reimbursed as their enrollees' conditions occur, rather than being paid to manage existing chronic conditions.

An underlying feature of a prospective risk-adjustment model for beneficiaries with a given set of conditions is that it underpredicts costs for some beneficiaries, overpredicts for others, but predicts accurately on average. However, when prediction inaccuracies occur systematically with identifiable beneficiary characteristics, plans can benefit if their enrollees have characteristics predictive of lower-than-average costs (favorable selection) or be disadvantaged if their enrollees have characteristics predictive of higher-than-average costs (adverse selection). An ideal risk-adjustment system would eliminate all opportunities for favorable selection, but a risk adjuster can be less than ideal and still be effective if it makes efforts by plans to identify favorable risks prohibitively costly.

To the extent that favorable selection occurs in the MA program, it could be caused by the behavior of plans

or beneficiaries. Plans can attract favorable risks by structuring benefits that are attractive to relatively healthy beneficiaries or by marketing their products so that they attract healthy enrollees. Alternatively, relatively healthy beneficiaries may find the structure of managed care plans more attractive than do beneficiaries in poor health.

Selection problems can be reduced by improving risk adjustment to reduce the extent of systematic prediction errors. An alternative method for reducing selection problems is partial capitation, which would pay plans partly on the basis of capitated rates and partly on the actual costs of providing care. This would reduce the likelihood of plans experiencing large losses from very sick enrollees or large profits from healthy enrollees. However, it is not clear what fraction of the payments should be capitated and what fraction should be based on costs.

For each MA enrollee, CMS obtains from the enrollee's plan the condition codes from encounters with physicians, hospital outpatient departments, and hospital inpatient departments. CMS maps the condition codes into hierarchical condition categories (HCCs), which define broad condition categories, such as diabetes and congestive heart failure. All condition codes fall into one of the 189 CMS-defined HCCs. However, CMS uses only 70 HCCs in the CMS–HCC model, so many conditions have no effect on beneficiaries' risk scores.[1] Some conditions, such as diabetes and cancer, are actually represented by groups of several HCCs, which differ according to severity. CMS has determined that a beneficiary cannot have more than one HCC indicated in each of these condition groups. If CMS finds that a beneficiary has conditions that map into more than one HCC within a condition group, only the highest cost HCC is used in predicting the beneficiary's costliness. For example, the CMS–HCC model has five diabetes HCCs. If CMS finds that a beneficiary has condition codes that fit the HCC "diabetes with acute complications" and the HCC "diabetes without complications," CMS drops the HCC "diabetes without complications."

CMS calibrates the additional costliness associated with each demographic variable and each HCC in the model using cost, demographic, and diagnosis data from beneficiaries in fee-for-service (FFS) Medicare, but CMS has begun collecting data on MA beneficiaries and intends to use those data to calibrate the CMS–HCC model.[2] CMS applies linear regression methods to obtain coefficients on each variable in the model. If a beneficiary has a particular

variable represented in the CMS–HCC model, the coefficient on that variable indicates its marginal cost.

A model that CMS used before the CMS–HCC model included only beneficiaries' demographic data (demographic model). The demographic model does not include important observable characteristics of beneficiaries that affect their costliness, such as medical conditions. Consequently, the demographic model explains a small fraction of the variation in beneficiaries' Medicare costliness (about 1 percent) and, within a given demographic category, systematically overpredicts costs for relatively healthy beneficiaries and underpredicts costs for the sickest beneficiaries, leaving the potential for selection problems.

The CMS–HCC model has been shown to be a much better predictor of a beneficiary's costliness. For example, it explains about 11 percent of the variation in beneficiaries' costliness. Therefore, the CMS–HCC model likely mitigates selection problems in the MA program.

However, the CMS–HCC model has shortcomings such that it may not have fully eliminated systematic prediction inaccuracies:

* Research on variation in individual-level health care spending suggests that at least 20 percent to 25 percent of the variation in spending can be predicted, with the remaining being random and, hence, unpredictable (Newhouse et al. 1997). Because the CMS–HCC model explains about 11 percent of the variation in spending, it may leave half or more of the predictable variation unexplained.

* For all enrollees with a given health condition, the CMS–HCC model adjusts MA capitated payments by the same rate. For example, the CMS–HCC model increases capitated payments for all MA enrollees with acute myocardial infarction by 35.9 percent above the base rate. However, within condition categories, some beneficiaries are healthier and less costly than others, while some are sicker and more costly.

Because of these shortcomings of the CMS–HCC model, there is a potential for MA plans to benefit financially if they have a relatively healthy beneficiary profile or to be disadvantaged if they have a sicker beneficiary profile. This is especially relevant to plans that specialize in managing the care for the sickest beneficiaries, such as special needs plans (SNPs) and plans in the Program of All-Inclusive Care for the Elderly (PACE), because

payments may not be adequately adjusted to effectively provide care.

We have done an analysis that suggests that MA enrollees are healthier and less costly than their FFS counterparts, meaning that favorable selection may be occurring in the MA program. In this chapter, we discuss this analysis as well as options for modifying the CMS–HCC model to mitigate systematic prediction errors.

This chapter discusses two other issues concerning risk adjustment in the MA program:

* Research indicates that geographic differences in per capita service use in FFS Medicare lead to geographic differences in risk scores that do not reflect differences in health status among FFS beneficiaries (Song et al. 2010). If regional differences in service use also lead to regional differences in risk scores in the MA program, then plans in regions where service use is high have higher risk scores, which drive capitated payments in those regions above the level in lower use regions.

* The coefficients on the conditions in the CMS–HCC model indicate the relative costliness of treating those conditions in FFS Medicare. However, the CMS–HCC model is used to risk-adjust payments in the MA program, where the relative costs of treating conditions may differ from costs in FFS Medicare (Newhouse et al. 2011). This raises questions of whether it is more appropriate to continue to calibrate the CMS–HCC model using data on FFS beneficiaries, or to switch to data on MA enrollees.

## Evidence that MA enrollees tend to be lower cost than FFS beneficiaries

Recently, there has been renewed interest in examining the extent to which favorable selection occurs in the MA program. One study found a substantial amount of favorable selection (Brown et al. 2011). Another study used cost data from a large MA plan and found little correlation between how costly a condition is to treat in FFS Medicare and the extent to which beneficiaries with that condition are profitable to that plan (Newhouse et al. 2011). This gives the plan little incentive to try to select against the sickest, highest cost beneficiaries.

Within a given HCC, the severity of the condition and hence the cost of treating it can vary. For example, we examined FFS beneficiaries who were grouped into

the HCC for congestive heart failure (CHF) in 2008 and had no other HCCs. In 2008, the beneficiary at the 95th percentile of costliness had more than $37,000 in Medicare spending, while the beneficiary at the 5th percentile had $115 in Medicare spending. Despite these large cost differences for beneficiaries who have the same condition, the CMS–HCC model adjusts the payment rate for each beneficiary who has CHF by the same proportion (41 percent). Therefore, it is possible that, for beneficiaries in a given HCC, some will be profitable to MA plans because they are low-severity cases while others will not be profitable because they are high-severity cases.

If beneficiaries who have the same condition are randomly selected into MA plans in sufficiently large numbers, those who are profitable will be offset by those who are unprofitable, resulting in no financial gain or loss for the plan. However, if the selection of these beneficiaries is not random, it is possible that those who enroll in MA plans are on average profitable. This could occur either through the actions of plans—perhaps through benefits that are attractive to healthier beneficiaries or marketing techniques that target those beneficiaries—or because relatively healthy beneficiaries find the structure of MA plans more attractive than do sicker beneficiaries.

We conducted a study using two measures that may suggest, but not confirm, whether MA enrollees are, on average, lower risk than FFS beneficiaries. We divided the beneficiaries who were in FFS Medicare in 2007 into two groups: those who stayed in FFS Medicare in 2008 (stayers) and those who enrolled in MA plans in 2008 (joiners). For each group, we calculated the mean FFS costliness in 2007 in each HCC and used beneficiaries' risk scores to adjust for differences in health status. We reasoned that, for each HCC, if the risk-adjusted mean cost of the joiners was below that of the stayers, it indicates that lower cost beneficiaries are more likely to enroll in the MA program. We also identified the beneficiaries who were in FFS Medicare in 2008 and divided them into two groups: those who were in FFS Medicare throughout 2007 and those who left an MA plan in 2007. For both groups, we calculated the mean FFS costliness in 2008 of the beneficiaries who had conditions in each HCC and used beneficiaries' risk scores to adjust for differences in health status. We reasoned that, for each HCC, if the risk-adjusted mean cost of the beneficiaries who left an MA plan in 2007 was above that of beneficiaries who were in FFS Medicare throughout 2007 and 2008, it indicates that beneficiaries who stay in MA plans tend to be lower cost than those who leave MA for FFS Medicare.

Our results from both analyses suggest that MA enrollees are, on average, lower cost than FFS beneficiaries. In the first analysis, for 68 of the 70 HCCs, beneficiaries who joined an MA plan in 2008 had lower FFS costs in 2007 than the beneficiaries who stayed in FFS Medicare in 2008. On average, the joiners had costs that were 15 percent lower than the stayers. In the second analysis, beneficiaries who left an MA plan in 2007 had FFS costs in 2008 that averaged 16 percent higher than beneficiaries who were in FFS Medicare throughout 2007. Moreover, for 69 of the 70 HCCs, beneficiaries who disenrolled from MA in 2007 had higher average costs in 2008 than those who were in FFS Medicare throughout 2007.

Although these results suggest that MA enrollees are lower cost than FFS beneficiaries, we emphasize that they are not conclusive. It is possible that beneficiaries with relatively low costs are more likely to enroll in an MA plan but that their costs increase after enrollment. Possible reasons this may occur include that their costs regress to the mean over time, they lacked supplemental coverage while in FFS Medicare, or they have low incomes and the more comprehensive coverage that often occurs in MA plans encourages them to increase their service use.

## Improving predictive accuracy of the CMS–HCC model

We have evaluated three alternatives for improving the predictive accuracy of the CMS–HCC model so that systematic prediction errors are reduced. All three options involve using more data than are currently used in the CMS–HCC model:

- Add socioeconomic variables such as race/ethnicity and income to the model. This model includes all variables in the current CMS–HCC model plus race/ethnicity indicators (African American, Hispanic, White, other race) and income level, which we approximated by the per capita income in the beneficiary's county of residence.

- Add indicators for the number of conditions beneficiaries have. This model includes all variables in the current CMS–HCC model plus indicators of whether beneficiaries have zero, one, two, three, four, or five or more HCCs.[3]

- Use two years of diagnosis data (when available) to determine each beneficiary's HCCs rather than one

| TABLE 4–1 | Adding indicators of race and measure of income has little effect on predictive accuracy of CMS–HCC model | |
|---|---|---|
| | **Predictive ratio** | |
| **Category** | **Standard model** | **Race/income model** |
| Specific conditions | | |
| Diabetes | 1.00 | 1.00 |
| COPD | 1.01 | 1.01 |
| CHF | 0.99 | 0.99 |
| Cancer | 0.99 | 0.99 |
| Mental illness | 1.00 | 1.00 |
| Schizophrenia | 1.00 | 1.00 |
| AMI | 1.03 | 1.02 |
| Unspecified stroke | 1.01 | 1.00 |
| All strokes | 1.01 | 1.00 |
| Number of conditions | | |
| 0 | 0.94 | 0.94 |
| 1 | 1.02 | 1.02 |
| 2 | 1.03 | 1.03 |
| 3 | 1.03 | 1.02 |
| 4 | 1.02 | 1.02 |
| 5 or more | 0.98 | 0.98 |
| 8 or more | 0.95 | 0.94 |

Note:    CMS–HCC (CMS–hierarchical condition category), COPD (chronic obstructive pulmonary disease), CHF (congestive heart failure), AMI (acute myocardial infarction). We determined the number of conditions by counting the number of HCCs a beneficiary maps into. Both models use one year of diagnosis data to determine beneficiaries' conditions.

Source:    MedPAC analysis of 5 percent standard analytic claims files and 5 percent Medicare denominator file.

year of diagnosis data, which CMS currently uses. Obviously, two years of diagnosis data would not be available for beneficiaries in their first or second year of Medicare eligibility. For those in the first year of Medicare eligibility, the demographic model that CMS currently uses for new enrollees is a viable option. For those in the second year of eligibility, we could use the current version of the CMS–HCC model.

## Adding socioeconomic variables does not improve predictive accuracy of CMS–HCC model

We calibrated a model that has all the variables of the current version of the CMS–HCC model, which has 70 HCCs (standard model). We also calibrated a version that has the same variables as the standard model plus race/

ethnicity indicators (African American, Hispanic, White, and other race) and income level, which we approximated by the per capita income in the beneficiary's county of residence (race/income model). For a description of the method we used to calibrate the models presented in this chapter, see the text box (pp. 106–107).

We evaluated the predictive accuracy of the standard and race/income versions using two measures:

- $R^2$, a statistical measure of how much of the variation in costliness among individuals is explained by the model: The closer the $R^2$ is to 1.0, the more of the variation the model has explained.

- Predictive ratio: For a group of beneficiaries, it is the total costliness predicted by the model divided by the total actual costliness of the group. The closer the predictive ratio is to 1.0, the better the model has predicted the actual costs. Predictive ratios less than 1.0 indicate the predicted costs are below the actual costs (underprediction); predictive ratios greater than 1.0 indicate the predicted costs are above actual costs (overprediction).

The $R^2$ gives a general sense of how well a model accounts for variations in costs across individuals. However, strategies to attract favorable risks are typically based on characteristics such as conditions that define groups of beneficiaries, not on specific individuals. Therefore, many analysts prefer to use predictive ratios to evaluate the predictive accuracy of risk-adjustment models (Frogner et al. 2011, Pope et al. 2004, Pope et al. 2011). For beneficiaries with a given attribute, the predictive ratio indicates (on average) the extent to which a model overpredicts or underpredicts the costliness of the beneficiaries with the attribute and by how much.

The addition of race and income variables to the standard model did very little to enhance its predictive accuracy. Using the standard CMS–HCC model, we obtained an $R^2$ of 0.1100. Adding race and income variables had no effect on the $R^2$.

We also used predictive ratios to examine how accurately these two models predict beneficiaries' costliness for nine condition categories. For most of these conditions, both models predict beneficiaries' costliness quite well, but they overpredict costs to some degree for acute myocardial infarction (AMI). Within each of these conditions—as well as all conditions represented in the CMS–HCC model— some beneficiaries are relatively healthy and have no other

conditions, while other beneficiaries are much sicker and have many other conditions. We analyzed categories of beneficiaries identified by number of conditions: zero, one, two, three, four, five or more, and eight or more. We found that both models underpredict costliness to some degree for beneficiaries who have five or more conditions and by a larger degree for those who have no conditions or eight or more conditions. Also, both models overpredict costliness to some degree for categories defined by one condition, two conditions, three conditions, and four conditions (Table 4-1).

These prediction errors can be seen when we parse the beneficiaries who have diabetes by how many other conditions they have. For diabetics who have one other condition (and would be in the two conditions group in Table 4-1), the predictive ratio is 1.03; for diabetics who have at least seven other conditions (and would be in the eight or more conditions group in Table 4-1), the predictive ratio is 0.93. However, these deviations from 1.0 are a concern only if there is systematic selection into MA plans of the beneficiaries who are in categories for which the predictive ratio is above 1.0.

The important points to take away from Table 4-1 are:

- The CMS–HCC model accurately predicts costs, on average, for most conditions that are represented in the model.

- However, among beneficiaries who have the same condition, some are relatively healthy and have no other conditions or only a few other conditions, while others are sicker and have many other conditions. For those who have only a few conditions, the CMS–HCC model slightly overpredicts costs, and for those who have many conditions, the model underpredicts costs, and the underprediction increases as the number of conditions increases. Consequently, SNPs and plans in PACE, which focus on the sickest beneficiaries, may be at a disadvantage, while plans that are able to attract the healthiest beneficiaries with a given condition may benefit.

- Adding race and income to the CMS–HCC model does little to improve the model's predictive accuracy.

## Including number of conditions improves predictive accuracy

We used 2007 diagnosis data and 2008 demographic and program cost data to calibrate two versions of the CMS–

HCC model. One is the standard model that CMS uses in the MA program and is the same standard model in Table 4-1. The other is the conditions model, which adds to the standard model six indicators for how many conditions each beneficiary has, as determined by the beneficiary's diagnoses: zero, one, two, three, four, and five or more conditions. We define number of conditions as the number of HCCs that each beneficiary's conditions map into.

This standard model has an $R^2$ of 0.1100, indicating that it explains 11 percent of the variation in beneficiaries' Medicare costs. When we add the six measures indicating the number of conditions, the improvement in the $R^2$ is nearly imperceptible, 0.1105.

We also calculated predictive ratios for nine condition categories using both the standard and conditions models. For all nine conditions, the predictive ratios show little or no change between the two models. For most conditions, both predict reasonably well, with the exception being AMI, where there is some degree of overprediction under both models. As we saw in Table 4-1, the standard model underpredicts for beneficiaries who have zero conditions, five or more conditions, and eight or more conditions and overpredicts for one, two, three, and four conditions. In contrast, the conditions model predicts quite accurately for each of those groups (Table 4-2, p. 104). Because the conditions model predicts accurately for the sickest beneficiaries (those who have many conditions), it may be beneficial for SNPs and PACE plans.

## Using two years of diagnosis data stabilizes risk scores and improves predictive accuracy

Previous research indicates that in FFS Medicare, a beneficiary who has a chronic condition indicated on a claim in one year often will not have that condition appear on a claim in the following year (Frogner et al. 2011, Medicare Payment Advisory Commission 1998). If this inconsistent coding of beneficiaries' chronic conditions also occurs among MA plans, beneficiaries' risk scores will often have large year-to-year changes.

We evaluated the extent to which beneficiaries who were coded for the HCCs for kidney failure, stroke, quadriplegia or paraplegia, diabetes, CHF, and chronic obstructive pulmonary disease in 2007 also were coded for those HCCs in 2008. We did this for both FFS enrollees and MA enrollees.

Our results indicate that coding for all of these conditions was not consistent from year to year. The same was true for beneficiaries in both FFS Medicare and MA plans

**TABLE 4-2**

**Adding number of conditions to CMS–HCC model improves predictive accuracy for beneficiaries who have many conditions**

| | Predictive ratio | |
|---|---|---|
| **Category** | **Standard model** | **Conditions model** |
| Specific conditions | | |
| Diabetes | 1.00 | 1.00 |
| COPD | 1.01 | 1.01 |
| CHF | 0.99 | 0.99 |
| Cancer | 0.99 | 0.99 |
| Mental illness | 1.00 | 1.00 |
| Schizophrenia | 1.00 | 1.00 |
| AMI | 1.03 | 1.03 |
| Unspecified stroke | 1.01 | 1.01 |
| All strokes | 1.01 | 1.00 |
| Number of conditions | | |
| 0 | 0.94 | 1.00 |
| 1 | 1.02 | 1.00 |
| 2 | 1.03 | 1.00 |
| 3 | 1.03 | 1.00 |
| 4 | 1.02 | 1.00 |
| 5 or more | 0.98 | 0.99 |
| 8 or more | 0.95 | 0.95 |

Note: CMS–HCC (CMS–hierarchical condition category), COPD (chronic obstructive pulmonary disease), CHF (congestive heart failure), AMI (acute myocardial infarction). We determined the number of conditions by counting the number of HCCs a beneficiary maps into. Both models use one year of diagnosis data to determine beneficiaries' conditions.

Source: MedPAC analysis of 5 percent standard analytic claims files and 5 percent Medicare denominator file.

(Table 4-3). This lack of consistent coding over time presents two problems for risk adjustment. First, in a given year, many FFS beneficiaries who have a condition will not have that condition appear on a claim. Because CMS uses conditions recorded on claims for FFS beneficiaries to calibrate the CMS–HCC model, the model may not accurately reflect the true additional cost of a particular condition. Second, inconsistent coding of conditions in MA results in greater year-to-year fluctuations in enrollees' risk scores, which leads to less stable payments and revenue streams to MA plans.

These problems related to inconsistent coding of conditions would be mitigated if CMS used two years of beneficiaries' diagnosis data rather than one year to calibrate the CMS–HCC model and determine

beneficiaries' risk scores. The Commission has recommended this position in the past (Medicare Payment Advisory Commission 2000).

We calibrated a version of the CMS–HCC model that is the same as the standard model, but we used two years of diagnosis data to assign beneficiaries to HCCs (two-year model). We found that this model produces risk scores that are more consistent over time than does the standard CMS–HCC model. For example, we found that the correlation coefficient between the 2008 and 2009 risk scores for more than 1 million beneficiaries was 0.62 using the standard model and 0.80 using the two-year model, where the correlation coefficient indicates how strongly one variable is correlated with another. The closer a correlation coefficient is to 1.0, the more closely two variables are correlated.

We also found that for specific conditions, there is little difference in predictive accuracy between the standard model and the two-year model, except for mental illness. However, the two-year model predicts more accurately for beneficiaries who have five or more conditions and for those who have eight or more conditions (Table 4-4). As we mentioned earlier, this means that for most conditions, both models pay accurately, on average, except for AMI, where there is some degree of overprediction of costs. However, for those who have five or more conditions and those who have eight or more conditions, the two-year model underpredicts by a lesser amount than does the

**TABLE 4-3**

**Beneficiaries who had chronic condition on claim in 2007 often did not have same condition on claim in 2008**

| | Of those with condition coded in 2007, percent who did not have it coded again in 2008 | |
|---|---|---|
| **Condition category** | **FFS Medicare** | **MA program** |
| Diabetes | 12.9% | 10.9% |
| COPD | 33.8 | 29.9 |
| CHF | 37.9 | 34.4 |
| Kidney failure | 35.4 | 28.9 |
| Stroke | 56.7 | 59.0 |
| Quadriplegia/paraplegia | 58.7 | 62.3 |

Note: FFS (fee-for-service), MA (Medicare Advantage), COPD (chronic obstructive pulmonary disease), CHF (congestive heart failure).

Source: MedPAC analysis of 2007 and 2008 risk score files from Acumen, LLC, and 2006 and 2007 Medicare denominator files from Acumen, LLC.

| TABLE 4-4 | Using two years of diagnoses in CMS–HCC model improves predictive accuracy for beneficiaries who have many conditions | |
|---|---|---|
| | **Predictive ratio** | |
| **Category** | **Standard model** | **Two-year model** |
| Specific conditions | | |
| Diabetes | 1.00 | 1.00 |
| COPD | 1.01 | 1.01 |
| CHF | 0.99 | 1.00 |
| Cancer | 0.99 | 0.99 |
| Mental illness | 1.00 | 0.96 |
| Schizophrenia | 1.00 | 1.00 |
| AMI | 1.03 | 1.02 |
| Unspecified stroke | 1.01 | 1.01 |
| All strokes | 1.01 | 1.01 |
| Number of conditions | | |
| 0 | 0.94 | 0.92 |
| 1 | 1.02 | 1.00 |
| 2 | 1.03 | 1.02 |
| 3 | 1.03 | 1.03 |
| 4 | 1.02 | 1.03 |
| 5 or more | 0.98 | 1.00 |
| 8 or more | 0.95 | 0.97 |

Note: CMS–HCC (CMS–hierarchical condition category), COPD (chronic obstructive pulmonary disease), CHF (congestive heart failure), AMI (acute myocardial infarction). We determined the number of conditions by counting the number of HCCs a beneficiary maps into. The standard model uses one year of diagnosis data to determine beneficiaries' conditions, the two-year model uses two years of diagnosis data.

Source: MedPAC analysis of 5 percent standard analytic claims files and 5 percent Medicare denominator file.

standard model. In summary, the two-year model offers the advantages of smaller year-to-year fluctuations in risk scores and more accurate payments for the sickest beneficiaries.

### Including number of conditions and using two years of diagnosis data have the benefits of both

We also analyzed the effects of a version of the CMS–HCC model that includes indicators for number of conditions and uses two years of diagnosis data to determine beneficiaries' HCCs (combined model). The combined model has the benefits of both the conditions model and the two-year model: It improves the predictive accuracy for beneficiaries who have many conditions and it reduces year-to-year fluctuations in beneficiaries'

risk scores (Table 4-5). However, the combined model underpredicts costliness for mental illness, which also occurs under the two-year model.

### Issues related to financial neutrality between FFS Medicare and the MA program

CMS estimates the CMS–HCC model using cost, demographic, and diagnosis data from FFS beneficiaries. Therefore, the coefficients for each HCC indicate the relative costliness of treating those conditions in FFS Medicare. On several occasions, the Commission has

| TABLE 4-5 | Adding measures for number of conditions and using two years of diagnoses in CMS–HCC model improves predictive accuracy for beneficiaries who have many conditions | |
|---|---|---|
| | **Predictive ratio** | |
| **Category** | **Standard model** | **Combined model** |
| Specific conditions | | |
| Diabetes | 1.00 | 1.00 |
| COPD | 1.01 | 1.01 |
| CHF | 0.99 | 1.00 |
| Cancer | 0.99 | 0.99 |
| Mental illness | 1.00 | 0.95 |
| Schizophrenia | 1.00 | 1.00 |
| AMI | 1.03 | 1.02 |
| Unspecified stroke | 1.01 | 1.01 |
| All strokes | 1.01 | 1.01 |
| Number of conditions | | |
| 0 | 0.94 | 1.01 |
| 1 | 1.02 | 1.00 |
| 2 | 1.03 | 1.00 |
| 3 | 1.03 | 1.01 |
| 4 | 1.02 | 0.99 |
| 5 or more | 0.98 | 0.99 |
| 8 or more | 0.95 | 0.97 |

Note: CMS–HCC (CMS–hierarchical condition category), COPD (chronic obstructive pulmonary disease), CHF (congestive heart failure), AMI (acute myocardial infarction). We determined the number of conditions by counting the number of HCCs a beneficiary maps into. The standard model uses one year of diagnosis data to determine beneficiaries' conditions, the combined model uses two years of diagnosis data.

Source: MedPAC analysis of 5 percent standard analytic claims files and 5 percent Medicare denominator file

## Methods used in regression analysis

For this chapter, we estimated several versions of the CMS–hierarchical condition category (CMS–HCC) risk-adjustment model. We used the same general method to produce all of the regression-based results presented. The only differences between regressions are the explanatory variables. The results in all our regressions are based on a 5 percent sample of fee-for-service (FFS) beneficiaries.

In each regression, we used data from 2007 and 2008. The 2007 data are the HCCs based on diagnoses from hospital inpatient, hospital outpatient, and physician claims that we used to determine each beneficiary's condition categories for 2008, which are defined by 70 HCCs in the CMS–HCC model. Examples of conditions defined by the HCCs include diabetes with various degrees of severity, congestive heart failure (CHF), and chronic obstructive pulmonary disease (COPD). The 2008 data include the following for each beneficiary: total costliness to the Medicare program, age, sex, Medicaid status, whether institutionalized for three consecutive months, and whether eligible for Medicare on the basis of age but originally eligible because of disability.

To be included in the analysis, beneficiaries had to meet the following requirements: in both Part A and Part B of Medicare throughout 2007, in both Part A and Part B throughout their Medicare eligibility in 2008, no

Medicare Advantage enrollment at any time in 2007 or 2008, no hospice care in 2008, not classified as having end-stage renal disease in 2008, lived within the United States for all of 2007 and 2008, no Medicare as a secondary payer in 2007 or 2008, and not long-term institutionalized in 2008. In addition, the results in Tables 4-4 and 4-5 include analyses of versions of the CMS–HCC model that use two years of diagnosis data to determine each beneficiary's HCCs. For this regression, we used diagnoses from 2006 and 2007 claims; when we used data from 2007 to exclude beneficiaries in the other regressions, we used data from 2006 and 2007 to exclude beneficiaries in the two-year regression.

In each regression, the dependent variable was each beneficiary's 2008 costliness to FFS Medicare that we annualized if the beneficiary was in FFS Medicare for only a fraction of 2008. That is, we divided each beneficiary's 2008 costliness to FFS Medicare by the fraction of the year the beneficiary was in FFS Medicare in 2008. Each regression included the following explanatory variables:

- 70 HCCs;

- 24 categories indicating age and sex;

- 4 variables indicating Medicaid status;

*(continued next page)*

stated that payments to MA plans should be equal to what MA enrollees would cost in FFS Medicare (financial neutrality) (Medicare Payment Advisory Commission 2001, Medicare Payment Advisory Commission 2002, Medicare Payment Advisory Commission 2004, Medicare Payment Advisory Commission 2005). The current method of using cost and diagnosis data from FFS Medicare to estimate the CMS–HCC model is consistent with the goal of financial neutrality.[4]

In light of two recently published papers, more discussion about financial neutrality between FFS Medicare and the MA program may be appropriate. One study found that large regional differences in service use among FFS

beneficiaries lead to large regional differences in risk scores (Song et al. 2010). This study indicates that these regional differences in risk scores are due, at least in part, simply to differences in service use rather than differences in health status. It is not known if these regional differences in risk scores also occur in the MA program. If they do, higher risk scores in high-use regions will drive up MA payments not because MA enrollees are less healthy but simply because service use is higher.

A second study found that the relative cost of treating specific conditions differs widely between a large MA plan and FFS Medicare. For some conditions, the relative cost is

## Methods used in regression analysis (continued)

- 2 variables indicating beneficiaries who are eligible because of age but were originally eligible because of disability;

- 5 categories indicating that beneficiaries are disabled and have 1 of 5 conditions: opportunistic infections, severe hematologic disorders, drug or alcohol psychosis, drug or alcohol dependence, and cystic fibrosis; and

- 6 disease interaction terms: diabetes and CHF, diabetes and cardiovascular disease, CHF and COPD, CHF with COPD and coronary artery disease, renal failure (RF) and CHF, and RF with CHF and diabetes.

These are the same dependent and explanatory variables that CMS includes in the version of the CMS–HCC model it currently uses.

We ran six weighted regressions to produce the results in Tables 4-1, 4-2, 4-4, and 4-5, where the weight is the fraction of the year each beneficiary was in FFS Medicare in 2008, which is the same fraction we used to annualize each beneficiary's costs. For Table 4-1, we ran a standard version of the CMS–HCC model, which includes all the variables listed above, and we ran a race/income version that includes the same variables plus indicators for each beneficiary's race (African American, Hispanic, White, or other) and income,

which we approximated by the per capita income in each beneficiary's county of residence.

For Tables 4-2, 4-4, and 4-5, we ran the following regressions:

- a conditions version, which includes all the variables in the standard version plus indicators of whether each beneficiary has zero, one, two, three, four, or five or more HCCs (Table 4-2);

- a two-year version, which includes all the variables in the standard version, but HCCs for each beneficiary are based on two years of diagnosis data rather than the single year used in the standard version (Table 4-4); and

- a version that combines the conditions version and the two-year version and includes all the variables in the standard version, whether each beneficiary has zero, one, two, three, four, or five or more HCCs, and HCCs that are based on two years of diagnosis data (Table 4-5).

We developed the analytic samples for each of these regressions from 5 percent samples of all FFS beneficiaries in 2008. It resulted in analytic samples of about 1.2 million beneficiaries for the standard and conditions versions and about 1.1 million beneficiaries for the two-year version and the version that combines the conditions and two-year versions. ∎

---

lower in the MA plan; for other conditions, the relative cost in the MA plan is higher (Newhouse et al. 2011).

## Should MA risk scores be adjusted for regional differences in service use?

Risk adjustment affects payments to MA plans through two mechanisms. First, county-level benchmarks depend directly on each county's per capita FFS spending, divided by the county's average CMS–HCC risk score among FFS beneficiaries. Second, CMS uses the risk scores to adjust MA payments for each enrollee.

CMS–HCC risk scores depend heavily on beneficiaries' conditions that providers have coded on claims. Research

indicates that among FFS beneficiaries, per capita service use is higher in some areas of the country than in others. Moreover, average risk scores among FFS beneficiaries are highest in regions where service use is highest and lowest in regions where service use is lowest (Song et al. 2010).

This correlation between regional differences in service use and regional differences in risk scores could occur for two reasons. First, it could occur because those in the high-use regions are sicker. In this case, the relatively high risk scores in the high-use regions accurately reflect regional differences in health status. Second, it could occur because beneficiaries in high-use areas simply use more

medical care without being sicker than beneficiaries in lower use areas. In this case, the relatively high risk scores in high-use areas do not reflect regional differences in health status. Research indicates that at least part of the regional differences in risk scores is due to beneficiaries in high-use regions using more medical care without actually being sicker. That is, beneficiaries in high-use areas would have lower risk scores if they lived in regions where service use was lower (Song et al. 2010).

To the extent that regional differences in service use cause differences in risk scores, there may be little effect on the county-level benchmarks. For example, if a county has a high level of service use, it is likely to be reflected in both high per capita FFS spending and a high average risk score among FFS beneficiaries. The high FFS spending and high average risk score should largely offset each other, so the county benchmark should be unaffected.

Regional differences in service use are more likely to have an effect on MA payments through the risk scores of MA enrollees. In regions with relatively high service use among MA enrollees, it is possible that providers' coding of conditions is more intensive than in other regions, leading to higher risk scores and MA payments in those regions. However, it is not clear whether the regional differences in service use and risk scores that occur in the FFS program also occur in the MA program because data are not available to make that determination. But, CMS has begun collecting beneficiary-level cost and diagnosis data from MA plans; after it has collected multiple years of these data, it may be possible to replicate the analysis by Song and colleagues for the MA population.

## Addressing regional differences in risk scores due to differences in service use

The study by Song and colleagues (2010) divided the country into regions and determined per capita service use in FFS Medicare in each region. The regions were sorted into quintiles of per capita service use. The authors found that regional differences in service use led to regional differences in how intensively conditions are coded on claims, which resulted in average risk scores in the highest quintile of service use that were 15 percent higher than they would have been had the beneficiaries lived in a region in the lowest quintile.

If there are similar regional differences in the MA program, adjustments could be made to MA risk scores. Using the results from Song and colleagues as a hypothetical example, these adjustments could work as

follows. Regions that are in the middle (third) quintile of service use could be used as the baseline. MA enrollees residing in a region that is in the third quintile would have no adjustment to their risk scores. Relative to the third quintile, Song and colleagues found that regional differences in service use result in risk scores that are 5.2 percent lower in the first quintile, 1.7 percent lower in the second quintile, 5.7 percent higher in the fourth quintile, and 8.8 percent higher in the fifth quintile. MA risk scores in these four regions could be adjusted by these percentages to account for differences in coding.

Adjusting risk scores for MA enrollees for the effects of regional differences in service use should be considered alongside the Commission's previously stated position on financial neutrality between the MA and FFS programs. On the one hand, making regional adjustments to MA risk scores is somewhat inconsistent with financial neutrality because one sector (FFS or MA) would have a financial advantage over another sector for treating the same patient or condition. On the other hand, to the extent that regional differences in service use that are independent of beneficiaries' health status result in regional differences in risk scores among MA enrollees, plans in high-use regions would have higher payments than plans in lower use regions simply because of regional differences in use rates. It may be appropriate to discuss the merits of each alternative.

## Should CMS use FFS or MA data to estimate the CMS–HCC model?

If the large differences found by Newhouse and colleagues between the cost of treating conditions in a large MA plan and FFS Medicare also occur in most or all other MA plans, the CMS–HCC model underpredicts the costs in MA plans for some conditions and overpredicts the costs in MA plans for other conditions. Obviously, it is financially beneficial for plans to have beneficiaries who have conditions for which costs are overpredicted and avoid beneficiaries who have conditions for which costs are underpredicted.

In light of the Commission's stance on financial neutrality and the findings from Newhouse and colleagues, it may be appropriate to have a discussion about whether CMS should continue using data from FFS beneficiaries to calibrate the CMS–HCC model or switch to using data from MA enrollees. An argument for continued use of FFS data is that it is consistent with a policy of financial neutrality, and financial neutrality encourages care to be provided in the sector where it can be provided more

efficiently (MA or FFS). Under financial neutrality, when plans are able to provide care at a lower cost than FFS Medicare, they may be able to offer enhanced benefits that are more attractive to beneficiaries than FFS Medicare. Alternatively, if plans cannot provide care at a lower cost than FFS Medicare, they may not be able to offer benefits that are competitive with FFS Medicare. An argument for use of MA data is that costs incurred by MA plans may differ from costs for FFS Medicare—perhaps because of different risk profiles between sectors or because of different models of care. To the extent these cost deviations occur between sectors, MA payments that reflect the cost of efficient providers require risk adjustment calibrated on data from MA enrollees.

### Differences in coding between FFS Medicare and the MA program

MA plans have an incentive for providers to code their enrollees' conditions as completely as possible because MA risk scores and payments strongly depend on each enrollee's conditions. The incentive to code conditions is present but not as strong in FFS Medicare because FFS payments often depend on the services provided rather than beneficiaries' conditions.

This discrepancy in incentives between the MA program and FFS Medicare may be reflected in analyses by CMS and the Government Accountability Office (GAO), which found differences in diagnostic coding intensity between the two sectors (Centers for Medicare & Medicaid Services 2009, Government Accountability Office 2012). In response to its finding, CMS has reduced risk scores of MA enrollees by 3.4 percent in 2010, 2011, and 2012. However, GAO asserts that CMS has underestimated the magnitude of the greater coding intensity in the MA program by at least 1.4 percentage points and by as much as 3.7 percentage points. Statutory adjustments in the Patient Protection and Affordable Care Act of 2010 (PPACA) are consistent with the findings of the GAO. Starting in 2014, PPACA requires CMS to reduce MA enrollees' risk scores by an amount greater than 3.4 percent in each year, unless CMS begins using diagnosis and cost data from MA enrollees to estimate the CMS–HCC model. ■

# Endnotes

1   CMS arrived at which HCCs to retain and how many to retain by balancing several competing considerations, including data collection burden, predictive power, whether to retain rare high-cost conditions, and retaining only well-defined, clinically coherent conditions (Pope et al. 2004).

2   It is not clear when CMS intends to begin using the data from MA enrollees to estimate the CMS–HCC model.

3   When we estimated the model using regression analysis, we used zero conditions as the basis of comparison, so we excluded that variable from the regression.

4   Financial neutrality can be obtained only if coding of conditions is the same in FFS Medicare and the MA program. Research by CMS and the Government Accountability Office (GAO) indicates that differences in coding exist between these two sectors (Centers for Medicare & Medicaid Services 2009, Government Accountability Office 2012). CMS has made adjustments to account for these differences, but GAO believes the adjustments are too small.

# References

Brown, J., M. Duggan, I. Kuziemko, et al. 2011. *How does risk selection respond to risk adjustment? Evidence from the Medicare Advantage program.* NBER working paper 16977. Cambridge, MA: National Bureau of Economic Research.

Centers for Medicare & Medicaid Services, Department of Health and Human Services. 2009. Announcement of calendar year (CY) 2010 Medicare Advantage capitation rates and Medicare Advantage and Part D payment policies. Note from Jonathan D. Blum, acting director, Center for Drug and Health Plan Choice, and Paul Spitalnic, director, Parts C & D Actuarial Group, Office of the Actuary, to Medicare Advantage organizations, prescription drug plan sponsors, and other interested parties. April 6.

Frogner, B. K., G. F. Anderson, R. A. Cohen, et al. 2011. Incorporating new research into Medicare risk adjustment. *Medical Care* 49, no. 3 (March): 295–300.

Government Accountability Office. 2012. *Medicare Advantage: CMS should improve the accuracy of risk score adjustments for diagnostic coding practices.* Government Accountability Office report GAO–12–51. Washington, DC: GAO.

Medicare Payment Advisory Commission. 1998. *Report to the Congress: Medicare payment policy, volume II.* Washington, DC: MedPAC.

Medicare Payment Advisory Commission. 2000. *Report to the Congress: Improving risk adjustment in Medicare.* Washington, DC: MedPAC.

Medicare Payment Advisory Commission. 2001. *Report to the Congress: Medicare payment policy.* Washington, DC: MedPAC.

Medicare Payment Advisory Commission. 2002. *Report to the Congress: Medicare payment policy.* Washington, DC: MedPAC.

Medicare Payment Advisory Commission. 2004. *Report to the Congress: Medicare payment policy.* Washington, DC: MedPAC.

Medicare Payment Advisory Commission. 2005. *Report to the Congress: Issues in a modernized Medicare program.* Washington, DC: MedPAC.

Newhouse, J. P., M. B. Buntin, and J. D. Chapman. 1997. Risk adjustment and Medicare: Taking a closer look. *Health Affairs* 16, no. 5 (September–October): 26–43.

Newhouse, J. P., J. Huang, R. J. Brand, et al. 2011. The structure of risk adjustment for private plans in Medicare. *American Journal of Managed Care* 17, no. 6 (June): e231–240.

Pope, G. C., J. Kautter, R. P. Ellis, et al. 2004. Risk adjustment of Medicare capitation payments using the CMS–HCC model. *Health Care Financing Review* 25, no. 4 (Summer): 119–141.

Pope, G. C., J. Kautter, M. J. Ingber, et al. 2011. *Evaluation of the CMS-HCC risk adjustment model.* Report prepared by RTI International for the Centers for Medicare & Medicaid Services. Baltimore, MD: CMS.

Song, Y., J. Skinner, J. Bynum, et al. 2010. Regional variations in diagnostic practices. *New England Journal of Medicine* 363, no. 1 (July 1): 45–53.