1   LATHAM & WATKINS LLP
        David J. Schindler (Bar No. 130490)
2          david.schindler@lw.com
        Manuel A. Abascal (Bar No. 171301)
3          manny.abascal@lw.com
    355 South Grand Avenue, Suite 100
4   Los Angeles, California 90071-1560
    Telephone: +1.213.485.1234;
5   Facsimile: +1.213.891.8763

6   *Attorneys for United Defendants*

7   MICHAEL D. GRANSTON
    Deputy Assistant Attorney General, Civil Division
8   E. MARTIN ESTRADA
    United States Attorney
9   DAVID M. HARRIS
    ROSS M. CUFF
10  JACK D. ROSS (CBN 265883)
    HUNTER B. THOMSON (CBN 330533)
11  Assistant United States Attorneys
    300 N. Los Angeles Street, Room 7516
12  Los Angeles, California 90012
    Tel: (213) 894-6379; Fax: (213) 894-7819
13  Email: *hunter.thomson@usdoj.gov*

14  *Attorneys for the United States of America*

15  [Additional Counsel Listed on Next Page]

16                    **UNITED STATES DISTRICT COURT**
17                    **CENTRAL DISTRICT OF CALIFORNIA**

18   UNITED STATES OF AMERICA *ex rel.*          CASE NO. 2:16-cv-08697-FMO-PVCx
     BENJAMIN POEHLING,
19                                               **JOINT EVIDENTIARY APPENDIX**
                      Plaintiff,
20                                               **VOLUME 6 OF 14**
21        v.                                     **EXHIBITS D-45 THROUGH D-48**
                                                 **PAGES 1020 THROUGH 1219**
     UNITEDHEALTH GROUP, INC. *et al.*,
22
                      Defendants.               Hon. Fernando M. Olguin
23
24                                              Hearing Date:  September 5, 2024
25                                              Hearing Time:  10:00 a.m.
26                                               Courtroom:  6D
27
28

LATHAM & WATKINS LLP
   Daniel Meron (appearing *pro hac vice*)
    *daniel.meron@lw.com*
   Abid R. Qureshi (appearing *pro hac vice*)
    *abid.qureshi@lw.com*
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
Telephone: +1.202.637.2200
Facsimile: +1.202.637.2201

BARTLIT BECK LLP
   Philip S. Beck (appearing *pro hac vice*)
    *philip.beck@bartlitbeck.com*
   Sean W. Gallagher (appearing *pro hac vice*)
    *sean.gallagher@bartlitbeck.com*
   Cindy L. Sobel (appearing *pro hac vice*)
    *cindy.sobel@bartlitbeck.com*
   Nicolas Martinez (appearing *pro hac vice*)
    *nicolas.martinez@bartlitbeck.com*
   Benjamin R. Montague (appearing *pro hac vice*)
    *benjamin.montague@bartlitbeck.com*
54 W. Hubbard Street, Suite 300
Chicago, Illinois 60654-8174
Telephone: +1.312.494.4400
Facsimile: +1.312.494.4440

BARTLIT BECK LLP
   Andrew C. Baak (appearing *pro hac vice*)
    *andrew.baak@bartlitbeck.com*
   Jameson R. Jones (appearing *pro hac vice*)
    *jameson.jones@bartlitbeck.com*
1801 Wewatta Street, Suite 1200
Denver, Colorado 80202-6318
Telephone: +1.303.592.3100
Facsimile: +1.303.592.3140

*Attorneys for United Defendants*

JAMIE ANN YAVELBERG
ROBERT McAULIFFE
EDWARD CROOKE
LINDA McMAHON
JESSICA E. KRIEG
AMY L. LIKOFF
GREGORY A. MASON
MARTHA N. GLOVER
WENDY ZUPAC
Attorneys, Civil Division, U.S. Department of Justice
    P.O. Box 261, Ben Franklin Station
    Washington, D.C. 20044
    Tel: (202) 307-0486; Fax: (202) 307-3852
    Email:  robert.mcauliffe@usdoj.gov
TRINI E. ROSS
United States Attorney

DAVID CORIELL
Assistant United States Attorney
        138 Delaware Avenue
        Buffalo, New York 14201
        Tel: (716) 843-5830; Fax: (716) 551-3052
        Email:  david.coriell@usdoj.gov

*Attorneys for the United States of America*

**EXHIBIT D-45**

# TOOLKIT

## To Help Decrease Improper Payments in Medicare Advantage Through the Identification of High-Risk Diagnosis Codes

December 2023 | A-07-23-01213

**Amy Frontz**

Deputy Inspector General
for Audit Services

U.S. Department of Health and Human Services
Office of Inspector General



1021

# Toolkit To Help Decrease Improper Payments in Medicare Advantage Through the Identification of High-Risk Diagnosis Codes

## What Is the Toolkit?

This toolkit offers Medicare Advantage (MA) organizations information that will enable them to replicate Office of Inspector General's (OIG's) techniques to identify and evaluate high-risk diagnosis codes to ensure proper payments and provide better care for enrollees.

The Centers for Medicare & Medicaid Services (CMS) makes monthly payments to MA organizations for each of their enrollees. These payments are based, in part, on the diagnoses that their enrollees receive from their providers. Using a system of risk adjustment, CMS pays MA organizations more for providing benefits to enrollees with diagnoses associated with more intensive use of health care resources relative to healthier enrollees, who would be expected to require fewer health care resources. Accordingly, CMS relies on MA organizations not only to collect diagnosis codes from their providers and submit the associated codes to CMS, but also to implement an effective compliance program to monitor the accuracy of these diagnosis codes. In this respect, MA organizations generally review medical records in order to detect and correct inaccurate diagnosis codes.

> This toolkit is meant to be a practical, hands-on device that will help MA organizations improve the accuracy of their submitted diagnoses that are at high risk for being miscoded.

We have identified certain diagnosis codes which, when paired with other circumstances, are at a high risk for being miscoded. This toolkit provides additional information about the circumstances under which these diagnosis codes could be miscoded and the actual programming codes that we used in our audits to identify them.

## Why Did OIG Create This Toolkit?

We have performed several audits for which our objectives were to determine whether MA organizations submitted certain diagnosis codes—ones that when coupled with other data indicated that the codes were at high risk for being miscoded—to CMS for use in CMS's risk adjustment program in accordance with Federal requirements. Thus far, we have found that overall, approximately 70 percent of those diagnosis codes were not supported in the associated medical records. Moreover, some diagnosis codes were consistently not supported over 90 percent of the time. Although the audited MA organizations usually disagreed with our reports' recommendations and with various aspects of our audit methodologies, those MA organizations generally did not disagree with our determinations regarding these diagnosis codes, and some expressed a genuine interest in submitting corrections to CMS. Other MA organizations—including ones that we have not audited—have asked us to share with them how we decided which diagnosis codes were at high risk for being miscoded.

The purpose of this toolkit is to provide information as to the steps that we followed as well as the data supporting the process that we followed. Our hope is that the users of this toolkit will, at a minimum, use the information to detect and correct inaccurate diagnosis codes in their own systems. To a greater extent, we hope that MA organizations use this toolkit as a starting point to identify other diagnosis codes that are at high risk for being miscoded and take appropriate measures to prevent, detect, and correct such errors. Thus, our goals are to ensure that CMS makes accurate payments to the MA organizations and that the enrollees receive the correct level of care.

## What Does This Toolkit Include?

We have compiled the high-risk groups identified in our audits for incorrect diagnosis codes that were consistently submitted to CMS.[1] We have also included explanations that demonstrate why these specific diagnosis codes, when coupled with other data (including procedure codes and prescription drug events (PDEs)), are at high risk for being miscoded. This toolkit contains the Structured Query Language (SQL)—a programming language used in many software programs—that we used in our audits to query CMS's systems. To provide further information as to what we analyzed, we have included all of the codes used in our programming language. The SQL language and codes included in this toolkit relate to the 2019 payment year.[2]

This toolkit enables an MA organization to adapt our actual programming codes in order to query its internal data systems so that it can more accurately identify the enrollees in the various high-risk groups.

To place our work in context, the figure below summarizes the errors that our audits identified for each of high-risk groups included in this toolkit.

#### Figure: Errors in High-Risk Groups as of November 2023

| High-Risk Group | Total | Errors | Error % |
|---|---|---|---|
| Acute stroke | 945 | 908 | 96% |
| Acute heart attack | 791 | 751 | 95% |
| Embolism | 754 | 593 | 79% |
| Lung cancer | 391 | 345 | 88% |
| Breast cancer | 390 | 373 | 96% |
| Colon cancer | 390 | 368 | 94% |
| Prostate cancer | 360 | 322 | 89% |
| Potentially mis-keyed diagnosis codes | 522 | 421 | 81% |
| **Totals** | **4,543** | **4,081** | **90%** |

---

[1] Not every high-risk group that we audited had incorrect diagnosis codes that were consistently submitted to CMS. This toolkit includes only those high-risk groups that had high error rates.

[2] Our various audits have spanned the 2013 through 2019 payment years. See our discussion on the next page for an explanation of "payment years."

*Toolkit To Help Decrease Improper Payments in Medicare Advantage*

Detailed information on our audits of the MA program, as well as related information on the high-risk diagnoses codes discussed in this toolkit, can be found at Managed Care | HHS-OIG

# Background

## Medicare Advantage Program—Risk-Adjusted Payments

Under the MA program, CMS makes advance payments each month to MA organizations. Federal requirements mandate that these payments be based on the anticipated cost of providing Medicare benefits to a given enrollee and, in doing so, also account for variations in the demographic characteristics and health status of each enrollee.[3]

CMS uses two principal components to calculate the risk-adjusted payment that it will make to an MA organization for an enrollee: a base rate that CMS sets using bid amounts received from the MA organization and the risk score for that enrollee. These are described as follows:

- **Base rate:** Before the start of each year, each MA organization submits bids to CMS that reflect the MA organization's estimate of the monthly revenue required to cover an enrollee with an average risk profile.[4] CMS compares each bid to a specific benchmark amount for each geographic area to determine the base rate that an MA organization is paid for each of its enrollees.

- **Risk score:** A risk score is a relative measure that reflects the additional or reduced costs that each enrollee is expected to incur compared with the costs incurred by enrollees on average. CMS calculates risk scores based on an enrollee's health status (discussed below) and demographic characteristics (such as the enrollee's age and gender). This process results in an individualized risk score for each enrollee, which CMS calculates annually.

To determine an enrollee's health status for purposes of calculating the risk score, CMS uses diagnoses that the enrollee receives from acceptable provider types, including certain physicians and hospitals.[5] MA organizations collect the diagnosis codes from providers based on information documented in the medical records and submit these codes to CMS. CMS then maps certain diagnosis codes, on the basis of similar clinical characteristics and severity and cost implications, into Hierarchical Condition Categories (HCCs). Each HCC has a factor (which is a numerical value) assigned to it for use in each enrollee's risk score.

The risk adjustment program is prospective. Specifically, CMS uses the diagnosis codes that the enrollee received for one year (known as the service year) to determine HCCs and calculate risk scores for the following calendar year (known as the payment year). Thus, an enrollee's risk score does not change for the year in which a diagnosis is made. Instead, the risk score changes for the entirety of the year after the diagnosis has been made. Further, the risk score calculation is an additive process: As HCC factors (and, when applicable, disease interaction factors) accumulate, an enrollee's risk score increases, and the monthly risk-adjusted payment to the MA organization also increases. In this way, the risk adjustment program compensates MA

---

[3] The Social Security Act (the Act) §§ 1853(a)(1)(C) and (a)(3); 42 CFR § 422.308(c).

[4] The Act § 1854(a)(6); 42 CFR § 422.254 *et seq.*

[5] The providers code diagnoses using the International Classification of Diseases (ICD), Clinical Modification (CM), *Official Guidelines for Coding and Reporting* (ICD Coding Guidelines). The ICD is a coding system that is used by physicians and other health care providers to classify and code all diagnoses, symptoms, and procedures.

organizations for the additional risk of providing coverage to enrollees expected to require more health care resources.

CMS multiplies the risk scores by the base rates to calculate the total monthly Medicare payment that an MA organization receives for each enrollee. Thus, if the factors used to determine an enrollee's risk score are incorrect, CMS will make an improper payment to an MA organization. Specifically, if diagnosis codes are incorrect, the HCCs are unvalidated, which causes overstated enrollee risk scores and overpayments from CMS.

# Identifying High-Risk Groups of Diagnoses

For each of our audits, we used data mining techniques and discussed certain circumstances with medical professionals in order to identify diagnoses that were at higher risk for being miscoded.

## Data Mining Techniques

After an enrollee receives a medical service, the provider of that service generates a claim for payment to the MA organization. Although MA organizations make their own payment arrangements with providers for these services, CMS requires MA organizations to submit copies of all claims to CMS. These claims include services that can be used for risk adjustment purposes (physician, outpatient, and inpatient) as well as claims whose services are not used for risk adjustment purposes (such as home health services, skilled nursing facility services, durable medical equipment, laboratory services, and x-rays, among other services).

We have developed computerized programs to access and analyze these claims data. For example, we identify the services that contain the risk-adjusted diagnoses and how often those diagnoses were submitted throughout the service year. In this regard, we analyze the data to see which diagnoses were submitted to CMS and when. We combine our knowledge of the MA program along with what we glean from our discussions with medical professionals to identify which diagnosis codes to review.

## Discussions With Medical Professionals

For our audits, we have discussed various circumstances with medical professionals to ensure that we analyzed the data correctly. For example, CMS has identified 21 diagnosis codes that map to the HCC for Acute Myocardial Infarction. Our discussions with medical professionals revealed that 17 of those 21 diagnosis codes were at higher risk for being miscoded if: (1) they occurred through a face-to-face encounter with a physician, but (2) that same diagnosis did not occur on an inpatient claim within 6 months (before or after) that encounter. For instances of this nature, the medical professionals also explained to us what was likely supported in the medical records and what should have been submitted to CMS. Continuing the example, the medical professionals told us that the medical records likely supported an old myocardial infarction diagnosis (which does not map to an HCC) instead of an acute myocardial infarction diagnosis.

For this toolkit we have compiled the high-risk groups identified in our audits for incorrect diagnosis codes that were consistently submitted to CMS. We have also included explanations that demonstrate why these specific diagnosis codes, when coupled with other data (including procedure codes and PDEs), are at high risk for being miscoded. This toolkit contains the SQL, which is a programming language used in many software programs, that we used in our audits to query CMS's systems. To provide further information as to what we analyzed, we have included all of the codes used in our programming language.

Our goal is to enable an MA organization to adapt our actual programming codes in order to query its internal data systems, so that it can more accurately identify the enrollees in the various high-risk groups.

# Data Analytics for High-Risk Groups

We have compiled data on the high-risk groups identified in our audits for incorrect diagnosis codes that were consistently submitted to CMS. For each of these high-risk groups, we are providing the following information:

- We have included explanations that demonstrate why these specific diagnosis codes, when coupled with other data (including procedure codes and PDEs), are at high risk for being miscoded. For example, one high-risk group included individuals who received one lung cancer diagnosis during a service year, but the encounters and the relevant PDE data did not indicate that the individuals received certain types of care and medication.

- Based on discussions with medical professionals, we have also provided in each case the diagnosis code that typically should have been submitted to CMS instead of the incorrect diagnosis code that actually was submitted. Continuing with the lung cancer diagnosis example, a history of lung cancer diagnosis is generally what was supported in the medical records.

- As a further extension of the narrative description, we have identified all the various codes and the names of the codes that we analyzed. For the example of the lung cancer high-risk group, we are providing a list of the codes and names for:

  o the lung cancer diagnoses,

  o the surgical therapy procedures,

  o the radiation treatment procedures, and

  o the chemotherapy drug treatment procedures.

- Finally, we have included the SQL—that programming language mentioned earlier—that we used in our audits to query CMS's systems. Our goal is to enable an MA organization to adapt our SQL codes in order to query its internal data systems, so that it can also identify the enrollees in the various high-risk groups.

# 1. Acute Stroke High-Risk Group

For the acute stroke high-risk group, we focused on enrollees who received one acute stroke diagnosis (that mapped to the HCC for Ischemic or Unspecified Stroke (HCC 100)) on one physician claim during the service year but did not have an acute stroke diagnosis on a corresponding inpatient or outpatient hospital claim (Table 1.1). In these instances, a diagnosis of history of stroke (which does not map to an HCC) typically should have been used.

## Codes Used in Our Analysis

Table 1.1 includes the 94 acute stroke diagnosis codes used in our analysis:

**Table 1.1: Acute Stroke Diagnosis Codes**

| Diagnosis Code | Description |
|---|---|
| I6300 | Cerebral Infarction (CI) due to thrombosis of unspecified precerebral artery |
| I63011 | CI due to thrombosis of right vertebral artery |
| I63012 | CI due to thrombosis of left vertebral artery |
| I63013 | CI due to thrombosis of bilateral vertebral arteries |
| I63019 | CI due to thrombosis of unspecified vertebral artery |
| I6302 | CI due to thrombosis of basilar artery |
| I63031 | CI due to thrombosis of right carotid artery |
| I63032 | CI due to thrombosis of left carotid artery |
| I63033 | CI due to thrombosis of bilateral carotid arteries |
| I63039 | CI due to thrombosis of unspecified carotid artery |
| I6309 | CI due to thrombosis of other precerebral artery |
| I6310 | CI due to embolism of unspecified precerebral artery |
| I63111 | CI due to embolism of right vertebral artery |
| I63112 | CI due to embolism of left vertebral artery |
| I63113 | CI due to embolism of bilateral vertebral arteries |
| I63119 | CI due to embolism of unspecified vertebral artery |
| I6312 | CI due to embolism of basilar artery |
| I63131 | CI due to embolism of right carotid artery |
| I63132 | CI due to embolism of left carotid artery |
| I63133 | CI due to embolism of bilateral carotid arteries |
| I63139 | CI due to embolism of unspecified carotid artery |
| I6319 | CI due to embolism of other precerebral artery |
| I6320 | CI due to unspecified occlusion or stenosis of unspecified precerebral arteries |
| I63211 | CI due to unspecified occlusion or stenosis of right vertebral arteries |

| Diagnosis Code | Description |
|---|---|
| I63212 | CI due to unspecified occlusion or stenosis of left vertebral arteries |
| I63213 | CI due to unspecified occlusion or stenosis of bilateral vertebral arteries |
| I63219 | CI due to unspecified occlusion or stenosis of unspecified vertebral arteries |
| I6322 | CI due to unspecified occlusion or stenosis of basilar arteries |
| I63231 | CI due to unspecified occlusion or stenosis of right carotid arteries |
| I63232 | CI due to unspecified occlusion or stenosis of left carotid arteries |
| I63233 | CI due to unspecified occlusion or stenosis of bilateral carotid arteries |
| I63239 | CI due to unspecified occlusion or stenosis of unspecified carotid arteries |
| I6329 | CI due to unspecified occlusion or stenosis of other precerebral arteries |
| I6330 | CI due to thrombosis of unspecified cerebral artery |
| I63311 | CI due to thrombosis of right middle cerebral artery |
| I63312 | CI due to thrombosis of left middle cerebral artery |
| I63313 | CI due to thrombosis of bilateral middle cerebral arteries |
| I63319 | CI due to thrombosis of unspecified middle cerebral artery |
| I63321 | CI due to thrombosis of right anterior cerebral artery |
| I63322 | CI due to thrombosis of left anterior cerebral artery |
| I63323 | CI due to thrombosis of bilateral anterior arteries |
| I63329 | CI due to thrombosis of unspecified anterior cerebral artery |
| I63331 | CI due to thrombosis of right posterior cerebral artery |
| I63332 | CI due to thrombosis of left posterior cerebral artery |
| I63333 | CI to thrombosis of bilateral posterior arteries |
| I63339 | CI due to thrombosis of unspecified posterior cerebral artery |
| I63341 | CI due to thrombosis of right cerebellar artery |
| I63342 | CI due to thrombosis of left cerebellar artery |
| I63343 | CI to thrombosis of bilateral cerebellar arteries |
| I63349 | CI due to thrombosis of unspecified cerebellar artery |
| I6339 | CI due to thrombosis of other cerebral artery |
| I6340 | CI due to embolism of unspecified cerebral artery |
| I63411 | CI due to embolism of right middle cerebral artery |
| I63412 | CI due to embolism of left middle cerebral artery |
| I63413 | CI due to embolism of bilateral middle cerebral arteries |
| I63419 | CI due to embolism of unspecified middle cerebral artery |
| I63421 | CI due to embolism of right anterior cerebral artery |
| I63422 | CI due to embolism of left anterior cerebral artery |
| I63423 | CI due to embolism of bilateral anterior cerebral arteries |

| Diagnosis Code | Description |
|---|---|
| I63429 | CI due to embolism of unspecified anterior cerebral artery |
| I63431 | CI due to embolism of right posterior cerebral artery |
| I63432 | CI due to embolism of left posterior cerebral artery |
| I63433 | CI due to embolism of bilateral posterior cerebral arteries |
| I63439 | CI due to embolism of unspecified posterior cerebral artery |
| I63441 | CI due to embolism of right cerebellar artery |
| I63442 | CI due to embolism of left cerebellar artery |
| I63443 | CI due to embolism of bilateral cerebellar arteries |
| I63449 | CI due to embolism of unspecified cerebellar artery |
| I6349 | CI due to embolism of other cerebral artery |
| I6350 | CI due to unspecified occlusion or stenosis of unspecified cerebral artery |
| I63511 | CI due to unspecified occlusion or stenosis of right middle cerebral artery |
| I63512 | CI due to unspecified occlusion or stenosis of left middle cerebral artery |
| I63513 | CI due to unspecified occlusion or stenosis of bilateral middle arteries |
| I63519 | CI due to unspecified occlusion or stenosis of unspecified middle cerebral artery |
| I63521 | CI due to unspecified occlusion or stenosis of right anterior cerebral artery |
| I63522 | CI due to unspecified occlusion or stenosis of left anterior cerebral artery |
| I63523 | CI due to unspecified occlusion or stenosis of bilateral anterior arteries |
| I63529 | CI due to unspecified occlusion or stenosis of unspecified anterior cerebral artery |
| I63531 | CI due to unspecified occlusion or stenosis of right posterior cerebral artery |
| I63532 | CI due to unspecified occlusion or stenosis of left posterior cerebral artery |
| I63533 | CI due to unspecified occlusion or stenosis of bilateral posterior arteries |
| I63539 | CI due to unspecified occlusion or stenosis of unspecified posterior cerebral artery |
| I63541 | CI due to unspecified occlusion or stenosis of right cerebellar artery |
| I63542 | CI due to unspecified occlusion or stenosis of left cerebellar artery |
| I63543 | CI due to unspecified occlusion or stenosis of bilateral cerebellar arteries |
| I63549 | CI due to unspecified occlusion or stenosis of unspecified cerebellar artery |
| I6359 | CI due to unspecified occlusion or stenosis of other cerebral artery |
| I638 | Other CI |
| I639 | CI, unspecified |
| I97810 | Intraoperative cerebrovascular infarction during cardiac surgery |
| I97811 | Intraoperative cerebrovascular infarction during other surgery |
| I97820 | Postprocedural cerebrovascular infarction during cardiac surgery |
| I97821 | Postprocedural cerebrovascular infarction during other surgery |
| I636 | CI due to cerebral venous thrombosis, nonpyogenic |

*Toolkit To Help Decrease Improper Payments in Medicare Advantage*

Table 1.2 includes two additional diagnosis codes that mapped to the HCC for Ischemic or Unspecified Stroke (HCC 100)); however, we did not consider these codes to be at a high risk for being miscoded. Therefore, enrollees who received either of these diagnoses were excluded from our analysis:

**Table 1.2: Excluded Diagnosis Codes for the Acute Stroke High-Risk Group**

| Diagnosis Code | Description |
|---|---|
| I6381 | Other cerebral infarction due to occlusion or stenosis of small artery |
| I6389 | Other cerebral infarction |

## SQL Programming Language

Table 1.3 details the SQL programming language used to query CMS's systems in order to identify the acute stroke high-risk diagnosis codes.

**Table 1.3: SQL Programming Language for Acute Stroke High-Risk Group**

**Step 1**

We identified enrollees who received an acute stroke diagnosis (Table 1.1) in a physician setting without a corresponding inpatient or outpatient claim.

```
SELECT raps.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
,COUNT(raps.BENE_SK) AS BENE_LINES /*Counts the number of acute stroke diagnosis codes in an office (physician)
setting.  Limited to one instance in Step #2*/
FROM CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_BENE_RAPS_MAO_DGNS raps /*CMS RAPS data*/

WHERE raps.DGNS_CD /*RAPS diagnosis code field used to match to Acute Stroke Diagnosis Codes Table*/
IN (
SELECT DX_CD /*Represents the diagnosis code field in the Acute Stroke Diagnosis Codes Table*/
FROM CMS_ADM_OIG_OAS_PRD.ACTIVE_STROKE_DX_CODES) /*Acute Stroke Diagnosis Codes Table*/

AND BENE_RAPS_SRVC_THRU_DT BETWEEN '2018-01-01' AND '2018-12-31' /*Specified timeframe*/
AND BENE_RAPS_PRVDR_TYPE_CD = '20' /*RAPS Provider Type Code "20" represents "physician" claims*/
AND BENE_RAPS_DGNS_DLT_SW = '~' /*"~" indicates the RAPS diagnosis code is not deleted*/

/*Subquery to identify and exclude enrollees with an acute stoke diagnosis code in an inpatient or outpatient setting*/

AND raps.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
NOT IN
SELECT DISTINCT raps.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
FROM CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_BENE_RAPS_MAO_DGNS raps  *CMS RAPS data*/

WHERE raps.DGNS_CD /*RAPS diagnosis field used to match to Acute Stroke Diagnosis Codes Table*/
IN (
SELECT DX_CD /*Represents the diagnosis code field in the Acute Stroke Diagnosis Codes Table*/
FROM CMS_ADM_OIG_OAS_PRD. ACTIVE_STROKE_DX_CODES) /*Acute Stroke Diagnosis Codes Table*/
```

```
AND BENE_RAPS_SRVC_THRU_DT BETWEEN '2018-01-01' AND '2018-12-31' /*Specified timeframe*/
AND BENE_RAPS_DGNS_DLT_SW = '~' /*"~" indicates the RAPS diagnosis code is not deleted*/
AND  BENE_RAPS_PRVDR_TYPE_CD IN ('01', '02','10') /*RAPS Provider Type Code "01" and "02" represent "inpatient"
claims and provider type code "10" represents "outpatient" claims*/

GROUP BY raps.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
```

### Step 2

Using the output from Step 1, we then limited our results to those enrollees who had only one instance of an acute stroke diagnosis during the time period of interest and those enrollees whose risk scores were confirmed in CMS's Risk Adjustment System (RAS) as including HCC 100.

```
SELECT raps.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
FROM CMS_ADM_OIG_OAS_PRD.ACUTE_STROKE_ENROLLEES_STEP_1 raps /*Output from Step #1*/
WHERE raps.BENE_LINES < 2 /*Criteria to limit enrollees to those with a single instance of an acute stroke diagnosis code
in an office (physician) setting*/
AND raps.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
 IN (

SELECT ras.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
FROM CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_BENE_RISK_PTC_I_SCRE ras /*CMS RAS data*/

WHERE BENE_PTC_HCC_100_SW ='1' /*Confirms HCC 100 was utilized in the payment risk score*/
AND BENE_FINL_RISK_IND = 'F' /*"F" represents the final RAS record*/
AND BENE_PTC_SCRE_MODEL_SBTYP_CD = 'I02' /*Used subtype code "I02" since all enrollees have this subtype record,
not required for identifying enrollees for review, helps with computing efficiency*/
AND BENE_RISK_SQNC_NUM = '1' /*Used the RAS risk sequence "1" since it represents the RAPS based RAS record*/
AND (CLNDR_CY_NUM = 2019)) /*Specifies the payment year for the HCC confirmation*/
```

## Downloadable Information

All of the codes used in this analysis along with the SQL programming language can be found at
https://oig.hhs.gov/oas/toolkit/Acute-Stroke-High-Risk-Group.pdf.

# 2. Acute Myocardial Infarction High-Risk Group

For the acute myocardial infarction high-risk group, we focused on enrollees who received one diagnosis (that mapped to the HCC for Acute Myocardial Infarction (HCC 86)) on only one physician or outpatient claim during the service year but did not have an acute myocardial infarction diagnosis on a corresponding inpatient hospital claim (either within 60 days before or 60 days after the physician or outpatient claim) (Table 2.1). In these instances, a diagnosis indicating a history of myocardial infarction (which does not map to an HCC) typically should have been used.

## Codes Used in Our Analysis

Table 2.1 includes the 17 acute myocardial diagnosis codes used in our analysis:

**Table 2.1: Acute Myocardial Infarction Diagnosis Codes[6]**

| Diagnosis Code | Description |
|---|---|
| I2109 | ST elevation myocardial infarction (STEMI) involving other coronary artery of anterior wall |
| I2111 | STEMI involving right coronary artery |
| I2119 | STEMI involving other coronary artery of inferior wall |
| I2129 | STEMI involving other sites |
| I213 | STEMI of unspecified site |
| I214 | Non-ST elevation myocardial infarction (NSTEMI) |
| I2101 | STEMI involving left main coronary artery |
| I2102 | STEMI involving left anterior descending coronary artery |
| I2121 | STEMI involving left circumflex coronary artery |
| I219 | Acute myocardial infarction, unspecified |
| I220 | Subsequent STEMI of anterior wall |
| I221 | Subsequent STEMI of inferior wall |
| I222 | Subsequent NSTEMI |
| I228 | Subsequent STEMI of other sites |
| I229 | Subsequent STEMI of unspecified site |
| I21A1 | Myocardial infarction type 2 |
| I21A9 | Other myocardial infarction type |

Table 2.2 on the following page includes 4 additional diagnosis codes that mapped to the HCC for Acute Myocardial Infarction (HCC 86) and all 20 diagnosis codes that mapped to the HCC for Unstable Angina and

---

[6] The term "ST," used in many descriptions in this table, refers to the flat section of an echocardiogram (ECG). When an individual has the most severe type of heart attack, this segment will no longer be flat on the ECG but will appear abnormally elevated.

*Toolkit To Help Decrease Improper Payments in Medicare Advantage*

Other Acute Ischemic Heart Disease (HCC 87). We did not consider these codes to be at a high risk for being miscoded and therefore, enrollees who received any one of these diagnoses were excluded from our analysis:

**Table 2.2: Excluded Diagnosis Codes for the Acute Myocardial Infarction High-Risk Group**

| Diagnosis Code | Description |
|---|---|
| I200 | Unstable angina |
| I230 | Hemopericardium as current complication following acute myocardial infarction |
| I231 | Atrial septal defect as current complication following acute myocardial infarction |
| I232 | Ventricular septal defect as current complication following acute myocardial infarction |
| I233 | Rupture of cardiac wall without hemopericardium as current complication following acute myocardial infarction |
| I234 | Rupture of chordae tendineae as current complication following acute myocardial infarction |
| I235 | Rupture of papillary muscle as current complication following acute myocardial infarction |
| I236 | Thrombosis of atrium, auricular appendage, and ventricle as current complications following acute myocardial infarction |
| I237 | Postinfarction angina |
| I238 | Other current complications following acute myocardial infarction |
| I240 | Acute coronary thrombosis not resulting in myocardial infarction |
| I241 | Dressler's syndrome |
| I248 | Other forms of acute ischemic heart disease |
| I249 | Acute ischemic heart disease, unspecified |
| I25110 | Atherosclerotic heart disease of native coronary artery with unstable angina pectoris |
| I25700 | Atherosclerosis of coronary artery bypass graft(s), unspecified, with unstable angina pectoris |
| I25710 | Atherosclerosis of autologous vein coronary artery bypass graft(s) with unstable angina pectoris |
| I25720 | Atherosclerosis of autologous artery coronary artery bypass graft(s) with unstable angina pectoris |
| I25730 | Atherosclerosis of nonautologous biological coronary artery bypass graft(s) with unstable angina pectoris |
| I25750 | Atherosclerosis of native coronary artery of transplanted heart with unstable angina |
| I25760 | Atherosclerosis of bypass graft of coronary artery of transplanted heart with unstable angina |
| I25790 | Atherosclerosis of other coronary artery bypass graft(s) with unstable angina pectoris |
| I511 | Rupture of chordae tendineae, not elsewhere classified |
| I512 | Rupture of papillary muscle, not elsewhere classified |

## SQL Programming Language

Table 2.3 details the SQL programming language used to query CMS's systems in order to identify the acute myocardial infarction high-risk diagnosis codes.

**Table 2.3: SQL Programming Language for Acute Myocardial Infarction High-Risk Group**

**Step 1**

We identified enrollees who received an acute myocardial infarction diagnosis (Table 2.1) in a physician or outpatient setting without a corresponding inpatient claim.

SELECT raps.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
,COUNT(raps.DGNS_CD) AS BENE_LINES /*Counts the number of acute myocardial infarction diagnosis codes in an office (physician) or outpatient setting. Limited to one instance in Step #2*/
FROM CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_BENE_RAPS_MAO_DGNS raps /*CMS RAPS data*/

WHERE raps.DGNS_CD /*RAPS diagnosis code field used to match to Acute Myocardial Infarction Diagnosis Codes Table*/
IN ( 'I2109', 'I2111', 'I2119', 'I2129', 'I213', 'I214','I2101', 'I2102', 'I2121', 'I219', 'I220','I221','I222', 'I228', 'I229', 'I21A1', 'I21A9') /* Acute Myocardial Infarction Diagnosis Codes Table*/

AND BENE_RAPS_SRVC_THRU_DT BETWEEN '2018-01-01' AND '2018-12-31'/*Specified timeframe*/
AND BENE_RAPS_DGNS_DLT_SW = '~' /*"~" indicates the RAPS diagnosis code is not deleted*/
AND (BENE_RAPS_PRVDR_TYPE_CD = '20'/*RAPS Provider Type Code "20" represents "physician" claims*/
OR BENE_RAPS_PRVDR_TYPE_CD = '10') /*RAPS Provider Type Code "10" represents "outpatient" claims*/

/* Subquery to identify and exclude all enrollees with an acute myocardial infarction diagnosis in an inpatient setting*/

AND raps.BENE_SK/*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/ NOT IN
SELECT DISTINCT raps.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
FROM CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_BENE_RAPS_MAO_DGNS raps /*CMS RAPS data*/

WHERE raps.DGNS_CD /*RAPS diagnosis code field used to match to Acute Myocardial Infarction Diagnosis Codes Table*/
IN ('I2109', 'I2111', 'I2119', 'I2129', 'I213', 'I214','I2101', 'I2102', 'I2121', 'I219', 'I220','I221','I222', 'I228', 'I229', 'I21A1', 'I21A9') /* Acute Myocardial Infarction Diagnosis Codes Table*/

AND BENE_RAPS_SRVC_THRU_DT BETWEEN '2018-01-01' AND '2018-12-31'/*Specified timeframe*/
AND (BENE_RAPS_PRVDR_TYPE_CD = '01'
OR BENE_RAPS_PRVDR_TYPE_CD = '02'/*RAPS Provider Type Code "01" and "02" represent "inpatient" claims*/)
AND BENE_RAPS_DGNS_DLT_SW = '~' /*"~" indicates the RAPS diagnosis code is not deleted*/

GROUP BY raps.BENE_SK; /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/

**Step 2**

Using the output from Step 1, we then limited our results to those enrollees who had only one instance of an acute myocardial infarction diagnosis during the time period of interest and those enrollees whose risk scores were confirmed in CMS's Risk Adjustment System (RAS) as including HCC 86.

SELECT raps.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
FROM CMS_ADM_OIG_OAS_PRD. MYOCARDIAL_INFARCTION_STEP_1 raps /*Output from Step #1*/
WHERE raps.BENE_LINES < 2 /*Criteria to limit enrollees to those with a single instance of an acute myocardial infarction diagnosis code in an office (physician) or outpatient setting*/

AND raps.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
IN (

SELECT ras.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
FROM CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_BENE_RISK_PTC_I_SCRE ras /*CMS RAS data*/

WHERE (BENE_PTC_HCC_86_SW ='1' /*Confirms HCC 86 was utilized in the payment risk score*/
OR BENE_PTC_HCC_87_SW ='1') /*Confirms HCC 87 was utilized in the payment risk score*/
AND BENE_FINL_RISK_IND = 'F' /*"F" represents the final RAS record*/
AND BENE_PTC_SCRE_MODEL_SBTYP_CD = 'I02' /*Used subtype code "I02" since all enrollees have this subtype record, not required for identifying enrollees for review, helps with computing efficiency*/
AND BENE_RISK_SQNC_NUM = '1'/*Used the RAS risk sequence "1" since it represents the RAPS based RAS record*/
AND (CLNDR_CY_NUM =2019)) /*Specifies the payment year for the HCC confirmation*/

### Step 3

Using the output from Step 2, we identified and removed the enrollees who had received one or more diagnoses that also mapped to HCC 86 or 87 that we did not consider to be at a high risk for being miscoded (Table 2.2).

SELECT DISTINCT fdr.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
FROM CMS_ADM_OIG_OAS_PRD. MYOCARDIAL_INFARCTION_STEP_2 fdr /*Output from Step #2*/

/*Subquery to identify and remove all enrollees that received diagnosis which maps to HCC 86 or 87 that we did not consider to be at a high risk for being miscoded */

WHERE fdr.BENE_SK NOT IN

SELECT DISTINCT raps.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
FROM CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_BENE_RAPS_MAO_DGNS raps /*CMS RAPS data*/

WHERE raps.DGNS_CD /*RAPS diagnosis code field used to match to the Excluded Diagnosis Codes for the Acute Myocardial Infarction High-Risk Group Table*/ IN ('I200', 'I230', 'I231', 'I232', 'I233', 'I234','I235', 'I236', 'I237', 'I238', 'I240', 'I241', 'I248','I249', 'I25110', 'I25700', 'I25710', 'I25720', 'I25730','I25750', 'I25760', 'I25790', 'I511', 'I512') /* Excluded Diagnosis Codes for the Acute Myocardial Infarction High-Risk Group Table*/

AND BENE_RAPS_SRVC_THRU_DT BETWEEN '2018-01-01' AND '2018-12-31' /*Specified timeframe*/
AND BENE_RAPS_DGNS_DLT_SW = '~' ) /*"~" indicates the RAPS diagnosis code is not deleted*/

### Step 4

Using the output from Step 3, we identified the Risk Adjustment Processing System (RAPS) record that included the acute myocardial infarction diagnosis.  We then created a 60-day before-and-after date window using the RAPS "service thru date" field, which identified inpatient stays that occurred in the prior or preceding service year.

SELECT raps.*, /*selects the detail RAPS record from the CMS RAPS table*/
ADD_MONTHS (BENE_RAPS_SRVC_THRU_DT,2) AS IP_60_DAYS_FROM_DT, /*Creates a date 60 days after the RAPS Thru Date*/
ADD_MONTHS(BENE_RAPS_SRVC_THRU_DT,-2) AS IP_60_DAYS_BEFORE_DT, /*Creates a date 60 days before the RAPS Thru Date*/
SUM (1) over (rows unbounded preceding) AS AATS_CLM_ID /*Create a unique RAPS record id*/
FROM CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_BENE_RAPS_MAO_DGNS raps /*CMS RAPS data*/

JOIN CMS_ADM_OIG_OAS_PRD. MYOCARDIAL_INFARCTION_STEP_3 fdr /*Output Enrollee List from Step #3*/
ON fdr.BENE_SK = raps.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/

WHERE raps.DGNS_CD /*RAPS diagnosis code field used to match to Acute Myocardial Infarction Diagnosis Codes Table*/
IN ('I2109', 'I2111', 'I2119', 'I2129', 'I213', 'I214','I2101', 'I2102', 'I2121', 'I219', 'I220', 'I221','I222', 'I228', 'I229', 'I21A1', 'I21A9') /*Acute Myocardial Infarction Diagnosis Codes Table */

AND BENE_RAPS_SRVC_THRU_DT BETWEEN '2018-01-01' AND '2018-12-31'/*Specified timeframe*/

AND BENE_RAPS_DGNS_DLT_SW = '~' /*'~' indicates the RAPS diagnosis code is not deleted*/

AND (BENE_RAPS_PRVDR_TYPE_CD = '10' /*RAPS Provider Type Code "10" represents "outpatient" claims*/
OR BENE_RAPS_PRVDR_TYPE_CD = '20') /*RAPS Provider Type Code "20" represents "physician" claims*/

**Step 5**

Using the output from Step 4, we identified and removed the enrollees for whom a physician or outpatient acute myocardial infarction diagnosis had occurred within the 60-day timeframe of an inpatient stay with an acute myocardial infarction diagnosis.

SELECT fdr.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
FROM CMS_ADM_OIG_OAS_PRD. MYOCARDIAL_INFARCTION_STEP_4 fdr

/*Subquery to identify and remove all enrollees from the step #4 list that received an acute myocardial infarction diagnosis from an inpatient stay within the 60-day calcualted timeframe*/

WHERE fdr.BENE_SK NOT IN (

SELECT DISTINCT raps.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
FROM CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_BENE_RAPS_MAO_DGNS raps /*CMS RAPS data*/

JOIN CMS_ADM_OIG_OAS_PRD. MYOCARDIAL_INFARCTION_STEP_4 fdr /*Output Enrollee List from Step #4*/
ON raps.BENE_SK = fdr.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/

WHERE (raps.BENE_RAPS_SRVC_THRU_DT BETWEEN fdr.IP_60_DAYS_BEFORE_DT
AND fdr.IP_60_DAYS_FROM_DT) /*Specified calculated 60 day timeframe*/

AND raps.BENE_RAPS_DGNS_DLT_SW = '~' /*'~' indicates the RAPS diagnosis code is not deleted*/
AND (raps.BENE_RAPS_PRVDR_TYPE_CD = '01'
OR raps.BENE_RAPS_PRVDR_TYPE_CD = '02') /*RAPS Provider Type Code "01" and "02" represent "inpatient"*/

AND raps.DGNS_CD /*RAPS diagnosis code field used to match to Acute Myocardial Infarction Diagnosis Codes Table*/ IN
('I2109', 'I2111', 'I2119', 'I2129', 'I213', 'I214','I2101', 'I2102', 'I2121', 'I219', 'I220', 'I221','I222', 'I228', 'I229', 'I21A1', 'I21A9')); /* Acute Myocardial Infarction Diagnosis Codes Table*/

# Downloadable Information

- All of the codes used in this analysis along with the SQL programming language can be found at https://oig.hhs.gov/oas/toolkit/Acute-Myocardial-Infarction-High-Risk-Group.pdf.

# 3. Embolism High-Risk Group

For the embolism high-risk group, we focused on enrollees who received one diagnosis that mapped to either the HCC for Vascular Disease or to the HCC for Vascular Disease With Complications (Embolism HCCs) (HCCs 107 & 108) during the service year but did not have an anticoagulant medication dispensed on their behalf (Table 3.1). An anticoagulant medication is typically used to treat an embolism. In these instances, a diagnosis of history of embolism (an indication that the provider is evaluating a prior acute embolism diagnosis, which does not map to an HCC) typically should have been used.

## Codes Used in Our Analysis

Table 3.1 includes the 63 embolism diagnosis codes used in our analysis:

**Table 3.1: Embolism Diagnosis Codes**

| Diagnosis Code | Description |
|---|---|
| I2692 | Saddle embolus of pulmonary artery without acute cor pulmonale |
| I2699 | Other pulmonary embolism without acute cor pulmonale |
| I82290 | Acute embolism and thrombosis of other thoracic veins |
| I82409 | Acute embolism and thrombosis of unspecified deep veins of unspecified lower extremity |
| I82419 | Acute embolism and thrombosis of unspecified femoral vein |
| I82429 | Acute embolism and thrombosis of unspecified iliac vein |
| I82439 | Acute embolism and thrombosis of unspecified popliteal vein |
| I82449 | Acute embolism and thrombosis of unspecified tibial vein |
| I82499 | Acute embolism and thrombosis of other specified deep vein of unspecified lower extremity |
| I824Y9 | Acute embolism and thrombosis of unspecified deep veins of unspecified proximal lower extremity |
| I824Z9 | Acute embolism and thrombosis of unspecified deep veins of unspecified distal lower extremity |
| I82629 | Acute embolism and thrombosis of deep veins of unspecified upper extremity |
| I82A19 | Acute embolism and thrombosis of unspecified axillary vein |
| I82B19 | Acute embolism and thrombosis of unspecified subclavian vein |
| I82C19 | Acute embolism and thrombosis of unspecified internal jugular vein |
| I2601 | Septic pulmonary embolism with acute cor pulmonale |
| I2602 | Saddle embolus of pulmonary artery with acute cor pulmonale |
| I2609 | Other pulmonary embolism with acute cor pulmonale |
| I82401 | Acute embolism and thrombosis of unspecified deep veins of right lower extremity |
| I82402 | Acute embolism and thrombosis of unspecified deep veins of left lower extremity |
| I82403 | Acute embolism and thrombosis of unspecified deep veins of lower extremity, bilateral |
| I824Y1 | Acute embolism and thrombosis of unspecified deep veins of right proximal lower extremity |
| I824Y2 | Acute embolism and thrombosis of unspecified deep veins of left proximal lower extremity |
| I824Y3 | Acute embolism and thrombosis of unspecified deep veins of proximal lower extremity, bilateral |
| I824Z1 | Acute embolism and thrombosis of unspecified deep veins of right distal lower extremity |
| I824Z2 | Acute embolism and thrombosis of unspecified deep veins of left distal lower extremity |
| I824Z3 | Acute embolism and thrombosis of unspecified deep veins of distal lower extremity, bilateral |

| Diagnosis Code | Description |
|---|---|
| I82411 | Acute embolism and thrombosis of right femoral vein |
| I82412 | Acute embolism and thrombosis of left femoral vein |
| I82413 | Acute embolism and thrombosis of femoral vein, bilateral |
| I82421 | Acute embolism and thrombosis of right iliac vein |
| I82422 | Acute embolism and thrombosis of left iliac vein |
| I82423 | Acute embolism and thrombosis of iliac vein, bilateral |
| I82431 | Acute embolism and thrombosis of right popliteal vein |
| I82432 | Acute embolism and thrombosis of left popliteal vein |
| I82433 | Acute embolism and thrombosis of popliteal vein, bilateral |
| I82441 | Acute embolism and thrombosis of right tibial vein |
| I82442 | Acute embolism and thrombosis of left tibial vein |
| I82443 | Acute embolism and thrombosis of tibial vein, bilateral |
| I82491 | Acute embolism and thrombosis of other specified deep vein of right lower extremity |
| I82492 | Acute embolism and thrombosis of other specified deep vein of left lower extremity |
| I82493 | Acute embolism and thrombosis of other specified deep vein of lower extremity, bilateral |
| I82621 | Acute embolism and thrombosis of deep veins of right upper extremity |
| I82622 | Acute embolism and thrombosis of deep veins of left upper extremity |
| I82623 | Acute embolism and thrombosis of deep veins of upper extremity, bilateral |
| I82A11 | Acute embolism and thrombosis of right axillary vein |
| I82A12 | Acute embolism and thrombosis of left axillary vein |
| I82A13 | Acute embolism and thrombosis of axillary vein, bilateral |
| I82B11 | Acute embolism and thrombosis of right subclavian vein |
| I82B12 | Acute embolism and thrombosis of left subclavian vein |
| I82B13 | Acute embolism and thrombosis of subclavian vein, bilateral |
| I82C11 | Acute embolism and thrombosis of right internal jugular vein |
| I82C12 | Acute embolism and thrombosis of left internal jugular vein |
| I82C13 | Acute embolism and thrombosis of internal jugular vein, bilateral |
| I7410 | Embolism and thrombosis of unspecified parts of aorta |
| I7411 | Embolism and thrombosis of thoracic aorta |
| I7419 | Embolism and thrombosis of other parts of aorta |
| I742 | Embolism and thrombosis of arteries of the upper extremities |
| I743 | Embolism and thrombosis of arteries of the lower extremities |
| I744 | Embolism and thrombosis of arteries of extremities, unspecified |
| I745 | Embolism and thrombosis of iliac artery |
| I748 | Embolism and thrombosis of other arteries |
| I749 | Embolism and thrombosis of unspecified artery |

There were 365 additional diagnosis codes that mapped to the Embolism HCCs; however, we did not consider these codes to be at a high risk for being miscoded. Therefore, enrollees who received any one of these diagnoses were excluded from our analysis. The table of 365 diagnosis codes can be downloaded at the link included in the Downloadable Information subsection found later in this section.

*Toolkit To Help Decrease Improper Payments in Medicare Advantage*

There were 812 National Drug Codes (NDCs) pulled from the PDE data used in our analysis. We removed enrollees in Step 3 of the SQL Programming Language who received one or more the drugs associated with these NDCs. The table of 812 NDCs can be downloaded at the link included in the Downloadable Information subsection found later in this section.

## SQL Programming Language

Table 3.2 details the SQL programming language used to query CMS's systems in order to identify the embolism high-risk diagnosis codes.

**Table 3.2: SQL Programming Language for Embolism High-Risk Group**

**Step 1**

We identified enrollees who received an embolism diagnosis (Table 3.1). Additionally, we removed any enrollees who received one or more diagnoses that also mapped to HCC 107 or 108 that we did not consider to be at a high risk for being miscoded.

```
SELECT  raps.BENE_SK, /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
COUNT(raps.DGNS_CD) AS BENE_LINES /*Counts the number of embolism diagnosis codes. Limited to one instance in Step
#2*/

FROM CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_BENE_RAPS_MAO_DGNS raps /*CMS RAPS data*/

WHERE raps.DGNS_CD /*RAPS diagnosis code field used to match to Embolism Diagnosis Codes Table*/ IN ('I2692', 'I2699',
'I82290', 'I82409', 'I82419', 'I82429', 'I82439', 'I82449', 'I82499', 'I824Y9', 'I824Z9', 'I82629', 'I82A19', 'I82B19', 'I82C19',
'I2601', 'I2602', 'I2609', 'I82401', 'I82402', 'I82403', 'I824Y1', 'I824Y2', 'I824Y3', 'I824Z1', 'I824Z2', 'I824Z3', 'I82411', 'I82412',
'I82413', 'I82421', 'I82422', 'I82423', 'I82431', 'I82432', 'I82433', 'I82441', 'I82442', 'I82443', 'I82491', 'I82492', 'I82493',
'I82621', 'I82622', 'I82623', 'I82A11', 'I82A12', 'I82A13', 'I82B11', 'I82B12', 'I82B13', 'I82C11', 'I82C12', 'I82C13', 'I7410',
'I7411', 'I7419', 'I742', 'I743', 'I744', 'I745', 'I748', 'I749') /*Embolism Diagnosis Codes Table*/

AND BENE_RAPS_SRVC_THRU_DT BETWEEN '2018-01-01' AND '2018-12-31' /*Specified timeframe*/
AND BENE_RAPS_DGNS_DLT_SW = '~' /*"~" indicates the RAPS diagnosis code is not deleted*/

/*Subquery to identify and remove all enrollees that received a diagnosis that maps to HCC 107 or 108 that we did not
consider to be a high risk for being miscoded*/

AND raps.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/ NOT IN (

SELECT  DISTINCT raps.BENE_SK  /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
FROM CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_BENE_RAPS_MAO_DGNS raps /*CMS RAPS data*/

WHERE  DGNS_CD /*RAPS diagnosis code field used to match to Embolism Diagnosis Codes Table*/ IN (
SELECT dx.DX_CD /*Represents the diagnosis code field in the Embolism Diagnosis Codes Table*/
FROM CMS_ADM_OIG_OAS_PRD.ACTIVE_PULMONARY_EMBOLISM_EXCLUDED_DX dx) /*Excluded Diagnosis Codes for the
Embolism High-Risk Group Table*/

AND BENE_RAPS_SRVC_THRU_DT BETWEEN '2018-01-01' AND '2018-12-31' /*Specified timeframe*/
AND BENE_RAPS_DGNS_DLT_SW = '~' /*"~" indicates the RAPS diagnosis code is not deleted*/
)
GROUP  BY raps.BENE_SK; /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
```

**Step 2**

Using the output from Step 1, we then limited our results to those enrollees who had only one instance of an embolism diagnosis during the time period of interest and those enrollees whose risk scores were confirmed in CMS's RAS as including HCC 107 or 108.

```
SELECT   raps.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
FROM     CMS_ADM_OIG_OAS_PRD.ACTIVE_PULMONARY_EMBOLISM_STEP_1 raps /*Output from Step #1*/
WHERE    raps.BENE_LINES < 2 /*Criteria to limit enrollees to those with a single instance of an embolism diagnosis code*/

AND raps.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
 IN ( /*The following sub query identifies all enrollees from the Step #1 with HCC 107 or 108*/

SELECT   ras.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
FROM     CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_BENE_RISK_PTC_I_SCRE ras /*CMS RAS data*/

WHERE  (BENE_PTC_HCC_107_SW ='1' /*Confirms HCC 107 was utilized in the payment risk score*/
OR BENE_PTC_HCC_108_SW ='1') /*Confirms HCC 108 was utilized in the payment risk score*/
AND BENE_FINL_RISK_IND = 'F' /*"F" represents the final RAS record*/
AND BENE_PTC_SCRE_MODEL_SBTYP_CD = 'I02' /*Used subtype code "I02" since all enrollees have this subtype record, not
required for identifying enrollees for review, helps with computing efficiency*/
AND BENE_RISK_SQNC_NUM = '1'/*Used the RAS risk sequence "1" since it represents the RAPS based RAS record*/
AND (CLNDR_CY_NUM =2019)) ; /*Specifies the payment year for the HCC confirmation*/
```

**Step 3**

Using the output from Step 2, we identified enrollees who (according to their associated medical records) did not receive any of the embolism drugs (anticoagulant medication) during the time period of interest.

```
select DISTINCT fdr.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
FROM CMS_ADM_OIG_OAS_PRD. ACTIVE_PULMONARY_EMBOLISM_STEP_2 fdr /*Output from Step #2*/

WHERE fdr.BENE_SK NOT IN (/*The following sub query identifies all enrollees with a drug claim for one or more of the
NDC's provided*/

SELECT DISTINCT fdr.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
FROM CMS_ADM_OIG_OAS_PRD. ACTIVE_PULMONARY_EMBOLISM_STEP_2 fdr /*Output from Step #2*/

INNER JOIN  CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_CLM hdr /*CMS Medicare Claim table data*/
ON fdr.BENE_SK = hdr.BENE_SK /*Joins enrollees from the step #2 results to the CMS Part D perscription drug claims*/

INNER JOIN CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_CLM_LINE lin /*CMS Medicare Claim Line data*/
ON hdr.GEO_BENE_SK = lin.GEO_BENE_SK
AND hdr.CLM_DT_SGNTR_SK = lin.CLM_DT_SGNTR_SK
AND hdr.CLM_TYPE_CD = lin.CLM_TYPE_CD
AND hdr.CLM_NUM_SK = lin.CLM_NUM_SK
AND hdr.CLM_FROM_DT = lin.CLM_FROM_DT /*Joins CMS Medicare Claims to the claim line table (Part D perscription drug
claims to the individual claim lines)*/

INNER JOIN CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_CLM_LINE_RX rx /*CMS Medicare Claim Line RX table data*/
ON lin.GEO_BENE_SK = rx.GEO_BENE_SK
AND lin.CLM_DT_SGNTR_SK = rx.CLM_DT_SGNTR_SK
AND lin.CLM_TYPE_CD = rx.CLM_TYPE_CD
AND lin.CLM_NUM_SK = rx.CLM_NUM_SK
AND lin.CLM_LINE_NUM = rx.CLM_LINE_NUM /*Joins CMS Part D perscription drug claim lines to the individual Part D
speceific claim lines*/
```

```
INNER JOIN CMS_ADM_OIG_OAS_PRD.ACTIVE_PULMONARY_EMBOLISM_PDE_NDC_LIST ndc /*NDCs for Embolism High-
Risk Group Table */
ON lin.CLM_LINE_NDC_CD = ndc.NDC_CD /*Joins CMS Part D perscription drug claim line NDC code to the NDCs for
Embolism High-Risk Group Table*/

WHERE hdr.CLM_TYPE_CD IN (1,2,4) /*Represents Non-Deleted Part D Drug Claim types*/

AND hdr.clm_thru_dt BETWEEN '2018-01-01' AND '2018-12-31' /*Specified timeframe*/

AND hdr.clm_finl_actn_ind = 'Y' /*Indicates only Final Action Claims*/
AND rx.CLM_LINE_INGRDNT_CST_AMT >0  /*Identifies non-zero pay claims*/
AND rx.CLM_DRUG_CVRG_STUS_CD='C') ; /*Identifies only covered drug claims*/
```

## Downloadable Information

- All of the codes used in this analysis along with the SQL programming language can be found at https://oig.hhs.gov/oas/toolkit/Embolism-High-Risk-Group.pdf.

# 4. Lung Cancer High-Risk Group

For the lung cancer high-risk group, we focused on enrollees who received one lung cancer diagnosis (that mapped to the HCC for Lung and Other Severe Cancers (HCC 9)) during the service year but did not have surgical therapy, radiation treatments, or chemotherapy drug treatments administered within a 6-month period either before or after the diagnosis (Table 4.1). In these instances, a diagnosis of history of lung cancer (which does not map to an HCC) typically should have been used.

## Codes Used in Our Analysis

Table 4.1 includes the 17 lung cancer diagnosis codes used in our analysis:

**Table 4.1: Lung Cancer Diagnosis Codes**

| Diagnosis Code | Description |
|---|---|
| C33 | Malignant neoplasm of trachea |
| C3400 | Malignant neoplasm of unspecified main bronchus |
| C3401 | Malignant neoplasm of right main bronchus |
| C3402 | Malignant neoplasm of left main bronchus |
| C3410 | Malignant neoplasm of upper lobe, unspecified bronchus or lung |
| C3411 | Malignant neoplasm of upper lobe, right bronchus or lung |
| C3412 | Malignant neoplasm of upper lobe, left bronchus or lung |
| C342 | Malignant neoplasm of middle lobe, bronchus or lung |
| C3430 | Malignant neoplasm of lower lobe, unspecified bronchus or lung |
| C3431 | Malignant neoplasm of lower lobe, right bronchus or lung |
| C3432 | Malignant neoplasm of lower lobe, left bronchus or lung |
| C3480 | Malignant neoplasm of overlapping sites of unspecified bronchus and lung |
| C3481 | Malignant neoplasm of overlapping sites of right bronchus and lung |
| C3482 | Malignant neoplasm of overlapping sites of left bronchus and lung |
| C3490 | Malignant neoplasm of unspecified part of unspecified bronchus or lung |
| C3491 | Malignant neoplasm of unspecified part of right bronchus or lung |
| C3492 | Malignant neoplasm of unspecified part of left bronchus or lung |

There were 93 additional diagnosis codes that mapped to the Lung and Other Severe Cancers HCCs; however, we did not consider these codes to be at a high risk for being miscoded. Therefore, enrollees who received any one of these diagnoses were excluded from our analysis. The table of 93 diagnosis codes can be downloaded at the link included in the Downloadable Information subsection found later in this section.

We used various Current Procedural Terminology (CPT) codes to further refine our analysis.[7]  We identified and removed enrollees who received at least one of the following:

1. Table 4.2 includes 19 chemotherapy drug treatment CPT codes that we identified as common procedure codes associated with an enrollee who received a chemotherapy drug treatment for an active cancer diagnosis.

### Table 4.2: Chemotherapy Drug Treatment CPT Codes

| CPT Code | Description |
|---|---|
| 96420 | Injection of chemotherapy using push technique into an artery |
| 96402 | Hormonal anti-neoplastic chemotherapy administration beneath the skin or into muscle |
| 96405 | Administration of chemotherapy into growth, 1 – 7 |
| 96406 | Chemotherapy into a lesion, more than 7 lesions |
| 96409 | Infusion of chemotherapy into a vein using push technique |
| 96411 | Infusion of different chemotherapy drug or substance into a vein |
| 96413 | Infusion of chemotherapy into a vein up to 1 hour |
| 96415 | Infusion of chemotherapy into a vein |
| 96401 | Administration of non-hormonal anti-neoplastic chemotherapy under skin or into muscle |
| 96417 | Infusion of different chemotherapy drug or substance into a vein up to 1 hour |
| 96549 | Other chemotherapy procedure |
| 96422 | Infusion of chemotherapy into an artery up to 1 hour |
| 96423 | Infusion of chemotherapy into artery |
| 96425 | Prolonged chemotherapy infusion into artery by portable or implanted pump, more than 8 hours |
| 96440 | Chemotherapy administration into chest cavity requiring insertion of catheter |
| 96446 | Administration of chemotherapy into abdominal cavity |
| 96450 | Chemotherapy administration into spinal canal requiring spinal tap |
| 96542 | Injection of chemotherapy via reservoir under skin |
| 96416 | Prolonged chemotherapy infusion into a vein by portable or implanted pump more than 8 hours |

2. Table 4.3 includes 22 radiation treatment CPT codes that we identified as common procedure codes associated with an enrollee who received radiation treatment for an active cancer diagnosis.

### Table 4.3: Radiation Treatment CPT Codes

| CPT Code | Description |
|---|---|
| 77762 | Application of organ cavity radiation source, intermediate |
| 77402 | Delivery of simple radiation treatment |
| 77407 | Delivery of intermediate radiation treatment |
| 77412 | Radiation treatment delivery, complex |

---

[7] The five character codes and descriptions included in this document are obtained from Current Procedural Terminology (CPT®), copyright 2023 by the American Medical Association (AMA).  CPT is developed by the AMA as a listing of descriptive terms and five character identifying codes and modifiers for reporting medical services and procedures.  Any use of CPT outside of this document should refer to the most current version of the Current Procedural Terminology available from AMA.  Applicable FARS/DFARS apply.

| CPT Code | Description |
|---|---|
| 77417 | Therapeutic radiology port films |
| 77423 | Radiation treatment delivery, high energy |
| 77424 | Intraoperative single X-ray radiation treatment session |
| 77425 | Intraoperative electrons radiation treatment single session |
| 77427 | Radiation treatment management, 5 treatments |
| 77401 | Radiation treatment delivery, superficial |
| 77761 | Simple body cavity radiation source application |
| 77799 | Other administration of radiation therapy |
| 77763 | Complex body cavity radiation source application |
| 77767 | High dose brachytherapy through skin surface, 1 channel or up to 2.0 cm |
| 77768 | High dose brachytherapy through skin surface, 2 channels or more than 2.0 cm |
| 77770 | High dose radiation therapy, 1 channel |
| 77771 | High dose brachytherapy , 2 – 12 channels |
| 77772 | High dose brachytherapy, more than 12 channels |
| 77778 | Complex application of radiation source |
| 77789 | Surface application of radiation |
| 77790 | Supervision, handling, loading of radiation |
| 77750 | Infusion or instillation of radioelement solution |

3.  Table 4.4 includes 12 surgical therapy CPT codes that we identified as common procedure codes associated with an enrollee who received surgical therapy for an active lung cancer diagnosis.

### Table 4.4: Lung Cancer Surgical CPT Codes

| CPT Code | Description |
|---|---|
| 32501 | Repair of lung airway and removal of segment of lung |
| 32491 | Removal of a lung segment to reduce lung volume |
| 32488 | Removal of remaining lung after prior lung surgery |
| 32486 | Removal portion of lung tissue and segment of lung airway |
| 32484 | Removal of a segment of lung tissue |
| 32482 | Removal of two lobes of lung |
| 32480 | Removal of lobe of lung |
| 32445 | Removal of lung and chest cavity lining |
| 32442 | Removal of lung and portion of windpipe cartilage |
| 32440 | Removal of lung |
| 32405 | Needle biopsy of lung or chest tissue, accessed through the skin |
| 32400 | Needle biopsy of lining of lung, accessed through the skin |

## SQL Programming Language

Table 4.5 details the SQL programming language used to query CMS's systems in order to identify the lung cancer high-risk diagnosis codes.

---

### Table 4.5: SQL Programming Language for Lung Cancer High-Risk Group

**Step 1**

We identified enrollees who received a lung cancer diagnosis (Table 4.1). Additionally, we removed any enrollees who received one or more diagnoses that also mapped to HCC 9 that we did not consider to be at high risk for being miscoded.

```
SELECT raps.BENE_SK, /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
 COUNT(raps.DGNS_CD) AS BENE_LINES /*Counts the number of lung cancer diagnosis codes. Limited to one instance in
Step #2*/
FROM CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_BENE_RAPS_MAO_DGNS raps /*CMS RAPS data*/
WHERE raps.DGNS_CD /*RAPS diagnosis code field used to match to Lung Cancer Diagnosis Codes Table*/ IN ( 'C33',
'C3400', 'C3401', 'C3402', 'C3410','C3411', 'C3412', 'C342', 'C3430', 'C3431', 'C3432', 'C3480', 'C3481', 'C3482', 'C3490',
'C3491', 'C3492') /*Lung Cancer Diagnosis Codes Table*/

AND BENE_RAPS_SRVC_THRU_DT BETWEEN '2018-01-01' AND '2018-12-31' /*Specified timeframe*/
AND BENE_RAPS_DGNS_DLT_SW = '~' /*"~" indicates the RAPS diagnosis code is not deleted*/

/*Subquery to identify and remove all enrollees that received a diagnosis that maps to HCC 9 that we did not consider to be
at a high risk for being miscoded*/

AND  raps.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/ NOT IN (
SELECT DISTINCT raps.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
FROM CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_BENE_RAPS_MAO_DGNS raps /*CMS RAPS data*/

WHERE  raps.DGNS_CD /*RAPS diagnosis code field used to match to Excluded Diagnosis Codes for the Lung Cancer High-
Risk Group Table*/  IN (
SELECT DX_CD

FROM CMS_ADM_OIG_OAS_PRD.LUNG_CANCER_EXCLUDED_DX) /* Excluded Diagnosis Codes for the Lung Cancer High-
Risk Group Table*/

AND BENE_RAPS_SRVC_THRU_DT BETWEEN '2018-01-01' AND '2018-12-31' /*Specified timeframe*/
AND BENE_RAPS_DGNS_DLT_SW = '~' /*"~" indicates the RAPS diagnosis code is not deleted*)
GROUP BY raps.BENE_SK; /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
```

**Step 2**

Using the output from Step 1, we then limited our results to those enrollees who had only one instance of a lung cancer diagnosis during the time period of interest and those enrollees whose risk scores were confirmed in CMS's RAS as including HCC 9.

```
SELECT raps.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
FROM CMS_ADM_OIG_OAS_PRD.LUNG_CANCER_STEP_1 raps /*Output from Step #1*/
WHERE raps.BENE_LINES < 2 /*Criteria to limit enrollees to those with a single instance of a lung cancer diagnosis code*/

AND raps.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
IN (
```

---

*Toolkit To Help Decrease Improper Payments in Medicare Advantage*

```
/*Subquery to identify all enrollees from Step #1 with HCC 9 */

SELECT  ras.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
FROM    CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_BENE_RISK_PTC_I_SCRE ras /*CMS RAS data*/

WHERE  (BENE_PTC_HCC_9_SW ='1' /*Confirms HCC 9 was utilized in the payment risk score*/
AND BENE_FINL_RISK_IND = 'F' /*"F" represents the final RAS record*/
AND BENE_PTC_SCRE_MODEL_SBTYP_CD = 'I02'  /*Used subtype code "I02" since all enrollees have this subtype record, not
required for identifying enrollees for review, helps with computing efficiency*/
AND BENE_RISK_SQNC_NUM = '1'/*Used the RAS risk sequence "1" since it represents the RAPS based RAS record*/
AND (CLNDR_CY_NUM =2019)) ; /*Specifies the payment year for the HCC confirmation*/
```

**Step 3**

Using the output from Step 2, we identified the RAPS record that included the targeted lung cancer diagnosis so
that we could do an encounter claim search spanning the 6-months-before-and-after date window using the
targeted diagnosis RAPS "service thru date" field in the following step.

```
SELECT  raps.BENE_SK, /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
        raps.BENE_RAPS_SRVC_THRU_DT,
        raps.DGNS_CD
FROM CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_BENE_RAPS_MAO_DGNS raps /*CMS RAPS data*/

JOIN CMS_ADM_OIG_OAS_PRD. LUNG_CANCER_STEP_2 fdr /*Output from Step #2*/
ON RAPS.BENE_SK = fdr.BENE_SK /*Join on CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/

WHERE DGNS_CD IN ( 'C33', 'C3400', 'C3401', 'C3402', 'C3410',  'C3411', 'C3412', 'C342', 'C3430',
'C3431', 'C3432', 'C3480', 'C3481', 'C3482', 'C3490', 'C3491', 'C3492') /*Lung Cancer Diagnosis Codes Table*/

AND BENE_RAPS_SRVC_THRU_DT BETWEEN '2018-01-01' AND '2018-12-31' /*Specified timeframe*/
AND BENE_RAPS_DGNS_DLT_SW = '~' /*"~" indicates the RAPS diagnosis code is not deleted*/
```

**Step 4**

Using the output from Step 3, we identified and removed the enrollees for whom there was a Part C encounter
claim with one of the corresponding procedure codes related to a lung cancer treatment rendered within
6 months of submission of the targeted lung cancer diagnosis.

```
SELECT distinct fdr.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
FROM CMS_ADM_OIG_OAS_PRD. LUNG_CANCER_STEP_3 fdr /*Output from Step #3*/

/*Subquery to identify all enrollees to remove from the step #3 output who had a Part C encounter claim that contains a
lung cancer treatment procedure code. /

WHERE  fdr.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/ NOT IN (

SELECT fdr.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
FROM CMS_ADM_OIG_OAS_PRD. LUNG_CANCER_STEP_3 fdr  /*Output from Step #3*/

JOIN CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_CLM hdr
ON hdr.BENE_SK = fdr.BENE_SK /*Join enrollees from the step #3 results to the CMS Medicare Part C encounter claims*/

JOIN CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_CLM_LINE lin
ON hdr.GEO_BENE_SK = lin.GEO_BENE_SK
AND hdr.CLM_DT_SGNTR_SK = lin.CLM_DT_SGNTR_SK
AND hdr.CLM_TYPE_CD = lin.CLM_TYPE_CD
AND hdr.CLM_NUM_SK = lin.CLM_NUM_SK
```

*Toolkit To Help Decrease Improper Payments in Medicare Advantage*

**AND** hdr.CLM_FROM_DT = lin.CLM_FROM_DT */*Joins CMS Medicare Part C encounter claim to the claim line table with the individual claim lines)*/*

**WHERE** lin.CLM_LINE_THRU_DT **BETWEEN** fnd.BENE_RAPS_SRVC_THRU_DT-183
**AND** fnd.BENE_RAPS_SRVC_THRU_DT+183 */* Identifies enrollees with encounter submissions occurring 6 months before and 6 months after which include a lung cancer treatment procedure code */*

**AND** lin.CLM_LINE_HCPCS_CD **IN** ('32400', '32405','32440', '32442', '32445', '32480', '32482', '32484', '32486', '32488', '32491','32501', */*Lung Cancer Surgical CPT Codes*/*

'96401', '96402', '96405', '96406', '96409', '96411', '96413', '96415', '96416', '96417', '96420', '96422', '96423', '96425', '96440', '96446', '96450', '96542', '96549', */*Chemotherapy Drug Treatment CPT Codes*/*

'77401', '77402', '77407''77412', '77417''77423', '77424', '77425', '77427', '77750', '77761', '77762', '77763', '77767', '77768', '77770', '77771', '77772'', 77778', '77789', '77790', '77799') */*Radiation Treatment CPT Codes */*

**AND** hdr.CLM_TYPE_CD > 3900 */*Identifies the encounter claim type codes*/*
**AND** hdr.CLM_FINL_ACTN_IND = 'Y'); */*Indicates a final action encounter claim*/*

## Downloadable Information

- All of the codes used in this analysis along with the SQL programming language can be found at https://oig.hhs.gov/oas/toolkit/Lung-Cancer-High-Risk-Group.pdf.

# 5. Breast Cancer High-Risk Group

For the breast cancer high-risk group, we focused on enrollees who received one breast cancer diagnosis (that mapped to the HCC for Breast, Prostate, and Other Cancers and Tumors (HCC 12)) during the service year but did not have surgical therapy, radiation treatments, or chemotherapy drug treatments administered within a 6-month period before or after the diagnosis (Table 5.1). In these instances, a diagnosis of history of breast cancer (which does not map to an HCC) typically should have been used.

## Codes Used in Our Analysis

Table 5.1 includes the 54 breast cancer diagnosis codes used in our analysis:

**Table 5.1: Breast Cancer Diagnosis Codes**

| Diagnosis Code | Description |
|---|---|
| C50011 | Malignant neoplasm of nipple and areola, right female breast |
| C50012 | Malignant neoplasm of nipple and areola, left female breast |
| C50019 | Malignant neoplasm of nipple and areola, unspecified female breast |
| C50021 | Malignant neoplasm of nipple and areola, right male breast |
| C50022 | Malignant neoplasm of nipple and areola, left male breast |
| C50029 | Malignant neoplasm of nipple and areola, unspecified male breast |
| C50111 | Malignant neoplasm of central portion of right female breast |
| C50112 | Malignant neoplasm of central portion of left female breast |
| C50119 | Malignant neoplasm of central portion of unspecified female breast |
| C50121 | Malignant neoplasm of central portion of right male breast |
| C50122 | Malignant neoplasm of central portion of left male breast |
| C50129 | Malignant neoplasm of central portion of unspecified male breast |
| C50211 | Malignant neoplasm of upper-inner quadrant of right female breast |
| C50212 | Malignant neoplasm of upper-inner quadrant of left female breast |
| C50219 | Malignant neoplasm of upper-inner quadrant of unspecified female breast |
| C50221 | Malignant neoplasm of upper-inner quadrant of right male breast |
| C50222 | Malignant neoplasm of upper-inner quadrant of left male breast |
| C50229 | Malignant neoplasm of upper-inner quadrant of unspecified male breast |
| C50311 | Malignant neoplasm of lower-inner quadrant of right female breast |
| C50312 | Malignant neoplasm of lower-inner quadrant of left female breast |
| C50319 | Malignant neoplasm of lower-inner quadrant of unspecified female breast |
| C50321 | Malignant neoplasm of lower-inner quadrant of right male breast |
| C50322 | Malignant neoplasm of lower-inner quadrant of left male breast |
| C50329 | Malignant neoplasm of lower-inner quadrant of unspecified male breast |
| C50411 | Malignant neoplasm of upper-outer quadrant of right female breast |
| C50412 | Malignant neoplasm of upper-outer quadrant of left female breast |
| C50419 | Malignant neoplasm of upper-outer quadrant of unspecified female breast |
| C50421 | Malignant neoplasm of upper-outer quadrant of right male breast |
| C50422 | Malignant neoplasm of upper-outer quadrant of left male breast |

| Diagnosis Code | Description |
|---|---|
| C50429 | Malignant neoplasm of upper-outer quadrant of unspecified male breast |
| C50511 | Malignant neoplasm of lower-outer quadrant of right female breast |
| C50512 | Malignant neoplasm of lower-outer quadrant of left female breast |
| C50519 | Malignant neoplasm of lower-outer quadrant of unspecified female breast |
| C50521 | Malignant neoplasm of lower-outer quadrant of right male breast |
| C50522 | Malignant neoplasm of lower-outer quadrant of left male breast |
| C50529 | Malignant neoplasm of lower-outer quadrant of unspecified male breast |
| C50611 | Malignant neoplasm of axillary tail of right female breast |
| C50612 | Malignant neoplasm of axillary tail of left female breast |
| C50619 | Malignant neoplasm of axillary tail of unspecified female breast |
| C50621 | Malignant neoplasm of axillary tail of right male breast |
| C50622 | Malignant neoplasm of axillary tail of left male breast |
| C50629 | Malignant neoplasm of axillary tail of unspecified male breast |
| C50811 | Malignant neoplasm of overlapping sites of right female breast |
| C50812 | Malignant neoplasm of overlapping sites of left female breast |
| C50819 | Malignant neoplasm of overlapping sites of unspecified female breast |
| C50821 | Malignant neoplasm of overlapping sites of right male breast |
| C50822 | Malignant neoplasm of overlapping sites of left male breast |
| C50829 | Malignant neoplasm of overlapping sites of unspecified male breast |
| C50911 | Malignant neoplasm of unspecified site of right female breast |
| C50912 | Malignant neoplasm of unspecified site of left female breast |
| C50919 | Malignant neoplasm of unspecified site of unspecified female breast |
| C50921 | Malignant neoplasm of unspecified site of right male breast |
| C50922 | Malignant neoplasm of unspecified site of left male breast |
| C50929 | Malignant neoplasm of unspecified site of unspecified male breast |

There were 217 additional diagnosis codes that mapped to the HCC for Breast, Prostate, and Other Cancers and Tumors; however, we did not consider these codes to be at a high risk for being miscoded. Therefore, enrollees who received any one of these diagnoses were excluded from our analysis. The table of 217 diagnosis codes can be downloaded at the link included in the Downloadable Information subsection found later in this section.

We used various CPT codes to further refine our analysis. We identified and removed enrollees who received at least one of the following:

1. 19 chemotherapy drug treatment CPT codes that we identified as common procedure codes associated with an enrollee who received a chemotherapy drug treatment for an active cancer diagnosis (Table 4.2 in the preceding section).

2. 22 radiation treatment CPT codes that we identified as common procedure codes associated with an enrollee who received radiation treatment for an active cancer diagnosis (Table 4.3 in the preceding section).

3. Table 5.2 includes seven surgical therapy CPT codes (footnote 7) that we identified as common procedure codes associated with an enrollee who received surgical therapy for an active breast cancer diagnosis.

**Table 5.2: Breast Cancer Surgical CPT Codes**

| CPT Code | Description |
|----------|-------------|
| 19301 | Partial removal of breast |
| 19302 | Partial removal of breast and underarm lymph nodes |
| 19303 | Total removal of breast |
| 19304 | Removal of tumor and breast tissue, accessed beneath the skin |
| 19305 | Removal of breast, lymph nodes, and muscle |
| 19306 | Extensive removal of breast, chest muscle, underarm lymph nodes, and breast lymph nodes |
| 19307 | Removal of breast and underarm lymph nodes |

There were 181 NDCs pulled from the PDE data used in our analysis. We removed enrollees who received one or more of these NDCs on a drug claim. The table of 181 NDCs can be downloaded at the link included in the Downloadable Information subsection found later in this section.

## SQL Programming Language

Table 5.3 details the SQL programming language used to query CMS's systems in order to identify the breast cancer high-risk diagnosis codes.

**Table 5.3: SQL Programming Language for Breast Cancer High-Risk Group**

**Step 1**

We identified enrollees who received a breast cancer diagnosis (Table 5.1). Additionally, we removed any enrollees who received one or more diagnoses that also mapped to HCC 12 that we did consider to be at a high risk for being miscoded.

**SELECT** raps.BENE_SK, /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
COUNT(raps.DGNS_CD **AS** BENE_LINES /*Counts the number of breast cancer diagnosis codes. Limited to one instance in Step #2*/
**FROM** CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_BENE_RAPS_MAO_DGNS raps /*CMS RAPS data*/

**WHERE** DGNS_CD /* RAPS diagnosis cod field used to match to the Breast Cancer Diagnosis Codes Table*/ **IN** ('C50011', 'C50012', 'C50019', 'C50021', 'C50022', 'C50029', 'C50111', 'C50112', 'C50119', 'C50121', 'C50122', 'C50129', 'C50211', 'C50212', 'C50219', 'C50221', 'C50222', 'C50229', C50311', 'C50312', 'C50319', 'C50321', 'C50322', 'C50329', 'C50411', 'C50412', 'C50419', 'C50421', 'C50422', 'C50429', 'C50511', 'C50512', 'C50519', 'C50521', 'C50522', 'C50529', 'C50611', 'C50612', 'C50619', 'C50621', 'C50622', 'C50629', 'C50811', 'C50812', 'C50819', 'C50821', 'C50822', 'C50829', 'C50911', 'C50912', 'C50919', 'C50921', 'C50922', 'C50929') /*Breast Cancer Diagnosis Codes Table*/

**AND** BENE_RAPS_SRVC_THRU_DT **BETWEEN** '2018-01-01' **AND** '2018-12-31' /*Specified timeframe*/
**AND** BENE_RAPS_DGNS_DLT_SW = '~' /*"~" indicates the RAPS diagnosis code is not deleted*/

/*Subquery to identify and remove all enrollees that received a diagnosis that maps to HCC 12 that we did consider to be at a high risk for being miscoded*/

**AND** raps.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/ **NOT IN** (

```
SELECT DISTINCT raps.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
FROM CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_BENE_RAPS_MAO_DGNS raps /*CMS RAPS data*/

WHERE raps.DGNS_CD /*RAPS diagnosis code field used to match to Excluded Diagnosis Codes for the Breast Cancer High-
Risk Group Table*/ IN(
SELECT DX_CD

FROM CMS_ADM_OIG_OAS_PRD.BREAST_CANCER_EXCLUDED_DX) /* Excluded Diagnosis Codes for the Breast Cancer
High-Risk Group Table*/

AND BENE_RAPS_SRVC_THRU_DT BETWEEN '2018-01-01' AND '2018-12-31' /*Specified timeframe*/
AND BENE_RAPS_DGNS_DLT_SW = '~' /*'~' indicates the RAPS diagnosis code is not deleted*
)
GROUP BY raps.BENE_SK; /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
```

### Step 2

Using the output from Step 1, we then limited our results to those enrollees who had only one instance of a breast cancer diagnosis during the time period of interest and those enrollees whose risk scores were confirmed in CMS's RAS as including HCC 12.

```
SELECT raps.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
FROM CMS_ADM_OIG_OAS_PRD.BREAST_CANCER_STEP_1 raps /*Output from Step #1*/

WHERE raps.BENE_LINES < 2 /*Criteria to limit enrollees to those with a single instance of a breast cancer diagnosis code*/

AND raps.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
IN (

/*Subquery to identify all enrollees from Step #1 with HCC 12 */

SELECT ras.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
FROM CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_BENE_RISK_PTC_I_SCRE ras /*CMS RAS data*/

WHERE (BENE_PTC_HCC_12_SW ='1' /*Confirms HCC 12 was utilized in the payment risk score*/
AND BENE_FINL_RISK_IND = 'F' /*"F" represents the final RAS record*/
AND BENE_PTC_SCRE_MODEL_SBTYP_CD = 'I02' /*Used subtype code "I02" since all enrollees have this subtype record, not
required for identifying enrollees for review, helps with computing efficiency*/
AND BENE_RISK_SQNC_NUM = '1'/*Used the RAS risk sequence "1" since it represents the RAPS based RAS record*/
AND (CLNDR_CY_NUM =2019)) ; /*Specifies the payment year for the HCC confirmation*/
```

### Step 3

Using the output from Step 2, we identified the RAPS record that included the targeted breast cancer diagnosis so that we could do an encounter claim search spanning the 6-months-before-and-after date window using the targeted diagnosis RAPS "service thru date" field in the following step.

```
SELECT raps.BENE_SK, /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
       raps.BENE_RAPS_SRVC_THRU_DT,
       raps.DGNS_CD
FROM CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_BENE_RAPS_MAO_DGNS raps /*CMS RAPS data*/

JOIN CMS_ADM_OIG_OAS_PRD. BREAST_CANCER_STEP_2 fdr /*Output from Step #2*/
ON RAPS.BENE_SK = fdr.BENE_SK /* Join on CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
```

WHERE raps.DGNS_CD IN ( 'C50011', 'C50012', 'C50019', 'C50021', 'C50022', 'C50029', 'C50111', 'C50112', 'C50119',
  'C50121', 'C50122', 'C50129', 'C50211', 'C50212', 'C50219', 'C50221', 'C50222', 'C50229', 'C50311', 'C50312', 'C50319',
  'C50321', 'C50322', 'C50329', 'C50411', 'C50412', 'C50419', 'C50421', 'C50422', 'C50429', 'C50511', 'C50512', 'C50519',
  'C50521', 'C50522', 'C50529', 'C50611', 'C50612', 'C50619', 'C50621', 'C50622', 'C50629', 'C50811', 'C50812', 'C50819',
  'C50821', 'C50822', 'C50829', 'C50911', 'C50912', 'C50919', 'C50921', 'C50922', 'C50929')/* Breast Cancer Diagnosis Codes
  Table*/

 AND BENE_RAPS_SRVC_THRU_DT BETWEEN '2018-01-01' AND '2018-12-31' /*Specified timeframe*/
 AND BENE_RAPS_DGNS_DLT_SW = '~' /*"~" indicates the RAPS diagnosis code is not deleted*/

**Step 4**

Using the output from Step 3, we identified and removed the enrollees for whom there was a Part C encounter
claim with one of the corresponding procedure codes related to a breast cancer treatment rendered within 6
months of submission of the targeted breast cancer diagnosis.

SELECT distinct fdr.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
FROM CMS_ADM_OIG_OAS_PRD. BREAST_CANCER_STEP_3 fdr /*Output from Step #3*/

/*Subquery to identify all enrollees to remove from the step #3 output who had a Part C encounter claim that contains a
breast cancer treatment procedure code. /

WHERE  fdr.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/ NOT IN(

SELECT fdr.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
FROM CMS_ADM_OIG_OAS_PRD. BREAST_CANCER_STEP_3 fdr  /*Output from Step #3*/

JOIN CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_CLM hdr
ON hdr.BENE_SK = fdr.BENE_SK /*Join enrollees from the step #3 results to the CMS Medicare Part C encounter claims*/

JOIN CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_CLM_LINE lin
ON hdr.GEO_BENE_SK = lin.GEO_BENE_SK
AND hdr.CLM_DT_SGNTR_SK = lin.CLM_DT_SGNTR_SK
AND hdr.CLM_TYPE_CD = lin.CLM_TYPE_CD
AND hdr.CLM_NUM_SK = lin.CLM_NUM_SK
AND hdr.CLM_FROM_DT = lin.CLM_FROM_DT /*Joins CMS Medicare Part C encounter claim to the claim line table with the
individual claim lines)*/

WHERE lin.CLM_LINE_THRU_DT BETWEEN fnd.BENE_RAPS_SRVC_THRU_DT-183
AND fnd.BENE_RAPS_SRVC_THRU_DT+183 /* Identifies enrollees with encounter submissions occurring 6 months before
and 6 months after which include a breast cancer treatment procedure code */

AND lin.CLM_LINE_HCPCS_CD IN ( /*Identifies all HCPCS/CPT Codes associated with encounter claim*/

'19301', '19302', '19303', '19304', '19305', '19306', '19307', /*Breast Cancer Surgical CPT Codes*/

'96401', '96402', '96405', '96406', '96409', '96411', '96413', '96415', '96416', '96417', '96420', '96422', '96423', '96425',
'96440', '96446', '96450', '96542', '96549', /*Chemotherapy Drug Treatment CPT Codes*/

'77401', '77402', '77407''77412', '77417''77423', '77424', '77425', '77427', '77750', '77761', '77762', '77763', '77767',
'77768', '77770', '77771', '77772', '77778', '77789', '77790', '77799') /*Radiation Treatment CPT Codes */

AND hdr.CLM_TYPE_CD > 3900 /*Identifies the encounter claim type codes*/
AND hdr.CLM_FINL_ACTN_IND = 'Y'); /*Indicates a final action encounter claim*/

---

*Toolkit To Help Decrease Improper Payments in Medicare Advantage*

**Step 5**

Using the output from Step 4, we identified and removed the enrollees who had received a drug claim for any of the NDCs provided within 6 months (before or after) of the targeted breast cancer diagnosis.

```
select DISTINCT fdr.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
FROM CMS_ADM_OIG_OAS_PRD. BREAST_CANCER_STEP_4 fdr /*Output from Step #4*/

WHERE fdr.BENE_SK NOT IN (

/*Subquery to identify all enrollees with a drug claim for one or more of the NDC's provided*/

SELECT DISTINCT fdr.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
FROM CMS_ADM_OIG_OAS_PRD. BREAST_CANCER_STEP_4 fdr /*Output from Step #4*/

INNER JOIN  CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_CLM hdr /*CMS Medicare Claim table data*/
ON fdr.BENE_SK = hdr.BENE_SK /*Joins enrollees from the step #4 results to the CMS Part D perscription drug claims*/

INNER JOIN CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_CLM_LINE lin /*CMS Medicare Claim Line data*/
ON hdr.GEO_BENE_SK = lin.GEO_BENE_SK
AND hdr.CLM_DT_SGNTR_SK = lin.CLM_DT_SGNTR_SK
AND hdr.CLM_TYPE_CD = lin.CLM_TYPE_CD
AND hdr.CLM_NUM_SK = lin.CLM_NUM_SK
AND hdr.CLM_FROM_DT = lin.CLM_FROM_DT /*Joins CMS Medicare Claims to the claim line table (Part D perscription drug
claims to the individual claim lines)*/

INNER JOIN CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_CLM_LINE_RX rx /*CMS Medicare Claim Line RX table data*/
ON  lin.GEO_BENE_SK = rx.GEO_BENE_SK
AND lin.CLM_DT_SGNTR_SK = rx.CLM_DT_SGNTR_SK
AND lin.CLM_TYPE_CD = rx.CLM_TYPE_CD
AND lin.CLM_NUM_SK = rx.CLM_NUM_SK
AND lin.CLM_LINE_NUM = rx.CLM_LINE_NUM  /*Joins CMS Part D perscription drug claim lines to the individual Part D
speceific claim lines*/

INNER JOIN CMS_ADM_OIG_OAS_PRD.BREAST_CANCER_PDE_NDC_LIST ndc  /*NDCs for Breast Cancer High-Risk Group
Table*/
ON lin.CLM_LINE_NDC_CD = ndc.NDC_CD /*Joins CMS Part D perscription drug claim line NDC code to the NDCs for Breast
Cancer High-Risk Group Table*/

WHERE hdr.CLM_TYPE_CD IN (1,2,4) /*Represents Non-Deleted Part D Drug Claim types*/

AND hdr.CLM_THRU_DT BETWEEN fdr.BENE_RAPS_SRVC_THRU_DT-183 AND fdr.BENE_RAPS_SRVC_THRU_DT+183
/*Specified six month before and after timeframe*/

AND hdr.clm_finl_actn_ind = 'Y' /*Indicates only Final Action Claims*/
AND rx.CLM_LINE_INGRDNT_CST_AMT >0  /*Identifies non-zero pay claims*/
AND rx.CLM_DRUG_CVRG_STUS_CD='C') ; /*Identifies only covered drug claims*/
```

## Downloadable Information

- All of the codes used in this analysis along with the SQL programming language can be found at
  https://oig.hhs.gov/oas/toolkit/Breast-Cancer-High-Risk-Group.pdf.

*Toolkit To Help Decrease Improper Payments in Medicare Advantage*

# 6. Colon Cancer High-Risk Group

For the colon cancer high-risk group, we focused on enrollees who received one colon cancer diagnosis (that mapped to the HCC for Colorectal, Bladder, and Other Cancers (HCC 11)) during the service year but did not have surgical therapy, radiation treatments, or chemotherapy drug treatments administered within a 6-month period before or after the diagnosis (Table 6.1). In these instances, a diagnosis of history of colon cancer (which does not map to an HCC) typically should have been used.

## Codes Used in Our Analysis

Table 6.1 includes the 10 colon cancer diagnosis codes used in our analysis:

**Table 6.1: Colon Cancer Diagnosis Codes**

| Diagnosis Code | Description |
|---|---|
| C180 | Malignant neoplasm of cecum |
| C181 | Malignant neoplasm of appendix |
| C182 | Malignant neoplasm of ascending colon |
| C183 | Malignant neoplasm of hepatic flexure |
| C184 | Malignant neoplasm of transverse colon |
| C185 | Malignant neoplasm of splenic flexure |
| C186 | Malignant neoplasm of descending colon |
| C187 | Malignant neoplasm of sigmoid colon |
| C188 | Malignant neoplasm of overlapping sites of colon |
| C189 | Malignant neoplasm of colon, unspecified |

There were 123 additional diagnosis codes that mapped to the HCC for Colorectal, Bladder, and Other Cancers; however, we did not consider these codes to be at a high risk for being miscoded. Therefore, enrollees who received any one of these diagnoses were excluded from our analysis. The table of 123 diagnosis codes can be downloaded at the link included in the Downloadable Information subsection found later in this section.

We used various CPT codes to further refine our analysis. We identified and removed enrollees who received at least one of the following:

1. 19 chemotherapy drug treatment CPT codes that we identified as common procedure codes associated with an enrollee who received a chemotherapy drug treatment for an active cancer diagnosis (Table 4.2 in a preceding section).

2. 22 radiation treatment CPT codes that we identified as common procedure codes associated with an enrollee who received radiation treatment for an active cancer diagnosis (Table 4.3 in a preceding section).

3. Table 6.2 includes 31 surgical therapy CPT codes (footnote 7) that we identified as common procedure codes associated with an enrollee who received surgical therapy for an active colon cancer diagnosis.

### Table 6.2: Colon Cancer Surgical CPT Codes

| CPT Code | Description |
|---|---|
| 44187 | Creation of small bowel opening using an endoscope, non-tube |
| 44140 | Partial removal of large bowel |
| 44141 | Partial removal of large bowel with creation of opening to the skin |
| 44143 | Partial removal of large bowel with creation of opening |
| 44144 | Partial removal of large bowel with creation of small or large bowel opening |
| 44145 | Partial removal of large bowel and reattachment to rectum |
| 44146 | Partial removal of large bowel and reattachment to rectum and creation of large bowel opening |
| 44147 | Partial removal of large bowel, abdominal and transanal approach |
| 44150 | Removal of large bowel with attachment of small bowel to rectum or creation of small bowel opening |
| 44151 | Removal of large bowel with creation of small bowel opening |
| 44155 | Removal of large bowel and rectum and creation of opening from end of small bowel to skin through abdomen |
| 44156 | Removal of large bowel and rectum with creation of small bowel opening |
| 44157 | Removal of large bowel and rectum with attachment of small bowel to anus |
| 44158 | Removal of large bowel and rectum with attachment of small bowel to anus and creation of small bowel reservoir |
| 44139 | Release of large bowel from spleen and abdominal wall |
| 44206 | Partial removal of large bowel with creation of opening using an endoscope |
| 44227 | Closure of large or small bowel opening using an endoscope |
| 44213 | Partial release of large bowel and partial removal of large bowel using an endoscope |
| 44212 | Removal of large bowel and rectum with creation of small bowel opening using an endoscope |
| 44211 | Removal of large bowel and rectum with attachment of small bowel to anus and creation of small bowel opening using an endoscope |
| 44210 | Removal of large bowel with attachment of small bowel to rectum or creation of small bowel opening using an endoscope |
| 44160 | Partial removal of small and large bowel with attachment of small and large bowel |
| 44207 | Partial removal of large bowel and reattachment to rectum using an endoscope |
| 44186 | Creation of small bowel opening using an endoscope |
| 44205 | Partial removal of small and large bowel with attachment of small and large bowel using an endoscope |
| 44204 | Partial removal of large bowel using an endoscope |
| 44203 | Partial removal of small bowel using an endoscope, each additional resection and connection |
| 44202 | Partial removal and reconnection of small bowel using an endoscope |
| 44188 | Creation of large bowel opening using an endoscope |
| 44238 | Bowel procedure using an endoscope |
| 44208 | Partial removal of large bowel and reattachment to rectum and creation of opening from large bowel to skin using an endoscope |

# SQL Programming Language

Table 6.3 details the SQL programming language used to query CMS's systems in order to identify the colon cancer high-risk diagnosis codes.

**Table 6.3: SQL Programming Language for Colon Cancer High-Risk Group**

**Step 1**

We identified enrollees who received a colon cancer diagnosis (Table 6.1). Additionally, we removed any enrollees who received one or more diagnoses that also mapped to HCC 11 that we did not consider to be at a high risk for being miscoded.

```
SELECT raps.BENE_SK, /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
 COUNT(raps.DGNS_CD) AS BENE_LINES /*Counts the number of colon cancer diagnosis codes.  Limited to one instance in
Step #2*/
FROM CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_BENE_RAPS_MAO_DGNS raps /*CMS RAPS data*/

WHERE raps.DGNS_CD /*RAPS diagnosis code field used to match to Colon Cancer Diagnosis Codes Table*/ IN ( 'C180',
'C181', 'C182', 'C183', 'C184', 'C185', 'C186', 'C187', 'C188', 'C189') /*Colon Cancer Diagnosis Codes Table*/

AND BENE_RAPS_SRVC_THRU_DT BETWEEN '2018-01-01' AND '2018-12-31' /*Specified timeframe*/
AND BENE_RAPS_DGNS_DLT_SW = '~' /*"~" indicates the RAPS diagnosis code is not deleted*/

/*Subquery to identify and remove all enrollees that received a diagnosis that maps to HCC 11 that we did not consider to be
at a high risk for being miscoded*/

AND  raps.BENE_SK  /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/ NOT IN (

SELECT DISTINCT raps.BENE_SK  /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
FROM  CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_BENE_RAPS_MAO_DGNS raps /*CMS RAPS data*/

WHERE  raps.DGNS_CD /*RAPS diagnosis code field used to match to Excluded Diagnosis Codes for the Colon Cancer High-
Risk Group Table*/ IN (

SELECT DX_CD
FROM CMS_ADM_OIG_OAS_PRD.COLON_CANCER_EXCLUDED_DX) /*Excluded Diagnosis Codes for the Colon Cancer High-
Risk GroupTable*/

AND BENE_RAPS_SRVC_THRU_DT BETWEEN '2018-01-01' AND '2018-12-31' /*Specified timeframe*/
AND BENE_RAPS_DGNS_DLT_SW = '~' /*"~" indicates the RAPS diagnosis code is not deleted*
)
GROUP BY raps.BENE_SK; /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
```

**Step 2**

Using the output from Step 1, we then limited our results to those enrollees who had only one instance of a colon cancer diagnosis during the time period of interest and those enrollees whose risk scores were confirmed in CMS's RAS as including HCC 11.

```
SELECT raps.BENE_SK  /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
FROM CMS_ADM_OIG_OAS_PRD.COLON_CANCER_STEP_1 raps /*Output from Step #1*/

WHERE raps.BENE_LINES < 2 /*Criteria to limit enrollees to those with a single instance of a colon cancer diagnosis code*/

AND raps.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
```

**IN (**

*/\*Subquery to identify all enrollees from the Step #1 with HCC 11 \*/*

**SELECT** ras.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier\*/*
**FROM**   CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_BENE_RISK_PTC_I_SCRE ras /*CMS RAS data\*/*

**WHERE**  (BENE_PTC_HCC_11_SW ='1' /*Confirms HCC 11 was utilized in the payment risk score\*/*
**AND** BENE_FINL_RISK_IND = 'F' /*"F" represents the final RAS record\*/*
**AND** BENE_PTC_SCRE_MODEL_SBTYP_CD = 'I02' /*Used subtype code "I02" since all enrollees have this subtype record, not required for identifying enrollees for review, helps with computing efficiency\*/*
**AND** BENE_RISK_SQNC_NUM = '1'/*Used the RAS risk sequence "1" since it represents the RAPS based RAS record\*/*
**AND** (CLNDR_CY_NUM =2019)) ; /*Specifies the payment year for the HCC confirmation\*/*

### Step 3

Using the output from Step 2, we identified the RAPS record that included the targeted colon cancer diagnosis so that we could do an encounter claim search spanning the 6-months-before-and-after date window using the targeted diagnosis RAPS "service thru date" field in the following step.

**SELECT**  raps.BENE_SK, /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier\*/*
            raps.BENE_RAPS_SRVC_THRU_DT,
            raps.DGNS_CD
**FROM**    CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_BENE_RAPS_MAO_DGNS raps /*CMS RAPS data\*/*

**JOIN** CMS_ADM_OIG_OAS_PRD. COLON_CANCER_STEP_2 fdr /*Output from Step #2\*/*
**ON** RAPS.BENE_SK = fdr.BENE_SK /* Join on CMS enrollee unique identifier, replace with HIC, MBI or plan identifier\*/*

**WHERE** DGNS_CD **IN** ('C180', 'C181', 'C182', 'C183', 'C184', 'C185', 'C186', 'C187', 'C188', 'C189') /* Colon Cancer Diagnosis Codes Table\*/*

**AND**     BENE_RAPS_SRVC_THRU_DT **BETWEEN** '2018-01-01' **AND** '2018-12-31' /*Specified timeframe\*/*
**AND**     BENE_RAPS_DGNS_DLT_SW = '~' ; /*"~" indicates the RAPS diagnosis code is not deleted\*/*

### Step 4

Using the output from Step 3, we identified and removed the enrollees for whom there was a Part C encounter claim with one of the corresponding procedure codes related to a colon cancer treatment rendered within 6 months of submission of the targeted colon cancer diagnosis.

**SELECT distinct** fdr.BENE_SK
**FROM** CMS_ADM_OIG_OAS_PRD. COLON_CANCER_STEP_3 fdr /*Output from Step #3\*/*

*/\*Subquery to identify all enrollees to remove from the step #3 output who had a Part C encounter claim that contains a colon cancer treatment procedure code. /*

**WHERE**  fdr.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier\*/* **NOT IN (**

**SELECT** fdr.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier\*/*
**FROM** CMS_ADM_OIG_OAS_PRD. COLON_CANCER_STEP_3 fdr /*Output from Step #3\*/*

**JOIN** CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_CLM hdr
**ON** hdr.BENE_SK = fdr.BENE_SK /*Join enrollees from the step #3 results to the CMS Medicare Part C encounter claims\*/*

**JOIN** CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_CLM_LINE lin
**ON** hdr.GEO_BENE_SK = lin.GEO_BENE_SK
**AND** hdr.CLM_DT_SGNTR_SK = lin.CLM_DT_SGNTR_SK

*Toolkit To Help Decrease Improper Payments in Medicare Advantage*

```
AND hdr.CLM_TYPE_CD = lin.CLM_TYPE_CD
AND hdr.CLM_NUM_SK = lin.CLM_NUM_SK
AND hdr.CLM_FROM_DT = lin.CLM_FROM_DT /*Joins CMS Medicare Part C encounter claim to the claim line table with the
individual claim lines)*/

WHERE lin.CLM_LINE_THRU_DT BETWEEN fnd.BENE_RAPS_SRVC_THRU_DT-183
AND fnd.BENE_RAPS_SRVC_THRU_DT+183 /* Identifies enrollees with encounter submissions occurring 6 months before
and 6 months after which include a colon cancer treatment procedure code */

AND lin.CLM_LINE_HCPCS_CD IN ('44139', '44140', '44141', '44143', '44144', '44145', '44146', '44147', '44150', '44151',
'44155', '44156', '44157', '44158', '44160', '44186', '44187','44188', '44202', '44203', '44204', '44205', '44206', '44207',
'44208', '44210', '44211', '44212', '44213', '44227' ,'44238' /*Colon Cancer Surgical CPT Codes*/

'96401', '96402', '96405', '96406', '96409', '96411', '96413', '96415', '96416', '96417', '96420', '96422', '96423', '96425',
'96440', '96446', '96450', '96542', '96549', /*Chemotherapy Drug Treatment CPT Codes*/

'77401', '77402', '77407', '77412', '77417', '77423', '77424', '77425', '77427', '77750', '77761', '77762', '77763', '77767',
'77768', '77770', '77771', '77772', '77778', '77789', '77790', '77799') /*Radiation Treatment CPT Codes */

AND hdr.CLM_TYPE_CD > 3900 /*Identifies the encounter claim type codes*/
AND hdr.CLM_FINL_ACTN_IND = 'Y'); /*Indicates a final action encounter claim*/
```

## Downloadable Information

- All of the codes used in this analysis along with the SQL programming language can be found at
  https://oig.hhs.gov/oas/toolkit/Colon-Cancer-High-Risk-Group.pdf.

# 7. Prostate Cancer High-Risk Group

For the prostate cancer high-risk group, we focused on enrollees who were 74 years old or younger and received one prostate cancer diagnosis (that mapped to the HCC for Breast, Prostate, and Other Cancers and Tumors HCC 12)) during the service year but did not have surgical therapy, radiation treatments, or chemotherapy drug treatments administered within a 6-month period before or after the diagnosis (Table 7.1). In these instances, a diagnosis of history of prostate cancer (which does not map to an HCC) typically should have been used.

## Codes Used in Our Analysis

Table 7.1 includes the single prostate cancer diagnosis code used in our analysis:

**Table 7.1: Prostate Cancer Diagnosis Code**

| Diagnosis Code | Description |
|---|---|
| **C61** | Malignant neoplasm of prostate |

There were 270 additional diagnosis codes that mapped to the HCC for Breast, Prostate, and Other Cancers and Tumors; however, we did not consider these codes to be at a high risk for being miscoded. Therefore, enrollees who received any one of these diagnoses were excluded from our analysis. The table of 270 diagnosis codes can be downloaded at the link included in the Downloadable Information subsection found later in this section.

We used various CPT codes to further refine our analysis. We identified and removed enrollees who received at least one of the following:

1. 19 chemotherapy drug treatment CPT codes that we identified as common procedure codes associated with an enrollee who received a chemotherapy drug treatment for an active cancer diagnosis (Table 4.2 in a preceding section).

2. 22 radiation treatment CPT codes that we identified as common procedure codes associated with an enrollee who received radiation treatment for an active cancer diagnosis (Table 4.3 in a preceding section).

3. Table 7.2 on the following page includes 10 surgical therapy CPT codes (footnote 7) that we identified as common procedure codes associated with an enrollee who received surgical therapy for an active prostate cancer diagnosis.

**Table 7.2: Prostate Cancer Surgical CPT Codes**

| CPT Code | Description |
|---|---|
| 55866 | Surgical removal of prostate and surrounding lymph nodes using an endoscope |
| 55845 | Removal of prostate gland and surrounding lymph nodes on both sides of the pelvis through abdominal incision |
| 55842 | Removal of prostate gland and lymph node biopsy through abdominal incision |
| 55840 | Removal of prostate gland |
| 55831 | Partial removal of the prostate gland |
| 55821 | Partial removal of prostate (suprapubic) |
| 55815 | Removal of prostate gland through incision between scrotum and anus and removal of surrounding lymph nodes on both sides of the pelvis |
| 55812 | Removal of prostate gland with lymph node biopsy through incision between scrotum and anus |
| 55810 | Removal of prostate gland, glands for sperm movement, and sperm duct |
| 55801 | Partial removal of prostate gland through incision between scrotum and anus |

There were 119 NDCs pulled from the PDE data used in our analysis. We removed enrollees who received one or more of these NDCs on a drug claim. The table of 119 NDCs can be downloaded at the link included in the Downloadable Information subsection found later in this section.

## SQL Programming Language

Table 7.3 details the SQL programming language used to query CMS's systems in order to identify the prostate cancer high-risk diagnosis codes.

**Table 7.3: SQL Programming Language for Prostate Cancer High-Risk Group**

**Step 1**

We identified enrollees who received a prostate cancer diagnosis (Table 7.1). Additionally, we removed any enrollees who received one or more diagnoses that also mapped to HCC 12 that we did not consider to be at a high risk for being miscoded.

SELECT  raps.BENE_SK, /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
 COUNT(raps.DGNS_CD AS BENE_LINES /*Counts the number of prostate cancer diagnosis codes. Limited to one instance in Step #2*/

FROM CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_BENE_RAPS_MAO_DGNS raps /*CMS RAPS data*/

WHERE DGNS_CD /* RAPS diagnosis cod field used to match to Prostate Cancer Diagnosis Codes Table*/ IN (
'C61') /*Prostate Cancer Diagnosis Codes Table*/

AND BENE_RAPS_SRVC_THRU_DT BETWEEN '2018-01-01' AND '2018-12-31' /*Specified timeframe*/
AND BENE_RAPS_DGNS_DLT_SW = '~' /*"~" indicates the RAPS diagnosis code is not deleted*/

/*Subquery to identify and remove all enrollees that received a diagnosis that maps to HCC 12 that we did not consider to be at a high risk for being miscoded*/

AND  raps.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/ NOT IN (

*Toolkit To Help Decrease Improper Payments in Medicare Advantage*

```
SELECT DISTINCT raps.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
FROM CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_BENE_RAPS_MAO_DGNS raps /*CMS RAPS data*/

WHERE raps.DGNS_CD /*RAPS diagnosis code field used to match to Excluded Diagnosis Codes for the Prostate Cancer
High-Risk Group Table*/ IN (
SELECT DX_CD

FROM CMS_ADM_OIG_OAS_PRD.PROSTATE_CANCER_EXCLUDED_DX) /* Excluded Diagnosis Codes for the Prostate Cancer
High-Risk Group Table*/

AND BENE_RAPS_SRVC_THRU_DT BETWEEN '2018-01-01' AND '2018-12-31' /*Specified timeframe*/
AND BENE_RAPS_DGNS_DLT_SW = '~' /*'~' indicates the RAPS diagnosis code is not deleted*
)
GROUP BY raps.BENE_SK; /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
```

## Step 2

Using the output from Step 1, we then limited our results to those enrollees who had only one instance of a prostate cancer diagnosis during the time period of interest and those enrollees whose risk scores were confirmed in CMS's RAS as including HCC 12.

```
SELECT raps.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
FROM CMS_ADM_OIG_OAS_PRD.PROSTATE_CANCER_STEP_1 raps /*Output from Step #1*/

WHERE raps.BENE_LINES < 2 /*Criteria to limit enrollees to those with a single instance of a prostate cancer diagnosis
code*/

AND raps.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
IN (

/*Subquery to identify all enrollees from Step #1 with HCC 12 */

SELECT ras.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
FROM CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_BENE_RISK_PTC_I_SCRE ras /*CMS RAS data*/

WHERE (BENE_PTC_HCC_12_SW ='1' /*Confirms HCC 12 was utilized in the payment risk score*/
AND BENE_FINL_RISK_IND = 'F' /*"F" represents the final RAS record*/
AND BENE_PTC_SCRE_MODEL_SBTYP_CD = 'I02' /*Used subtype code "I02" since all enrollees have this subtype record, not
required for identifying enrollees for review, helps with computing efficiency*/
AND BENE_RISK_SQNC_NUM = '1'/*Used the RAS risk sequence "1" since it represents the RAPS based RAS record*/
AND (CLNDR_CY_NUM =2019)) /*Specifies the payment year for the HCC confirmation*/
AND BENE_PTC_SCRE_AGE_BRKT_NUM IN ('7074', '6569', '6064', '5559', '4554', '3544')) /*Specifies men
under the age of 74*/
```

## Step 3

Using the output from Step 2, we identified the RAPS record that included the targeted prostate cancer diagnosis so that we could do an encounter claim search spanning the 6-months-before-and-after date window using the targeted diagnosis RAPS "service thru date" field in the following step.

```
SELECT raps.BENE_SK, /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
       raps.BENE_RAPS_SRVC_THRU_DT,
       raps.DGNS_CD
FROM CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_BENE_RAPS_MAO_DGNS raps /*CMS RAPS data*/

JOIN CMS_ADM_OIG_OAS_PRD. PROSTATE_CANCER_STEP_2 fdr /*Output from Step #2*/
ON RAPS.BENE_SK = fdr.BENE_SK /* Join on CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
```

```
WHERE raps.DGNS_CD IN
('C61') /* Prostate Cancer Diagnosis Codes Table*/

AND BENE_RAPS_SRVC_THRU_DT BETWEEN '2018-01-01' AND '2018-12-31' /*Specified timeframe*/
AND BENE_RAPS_DGNS_DLT_SW = '~' /*'~' indicates the RAPS diagnosis code is not deleted*/
```

**Step 4**

Using the output from Step 3, we identified and removed the enrollees for whom there was a Part C encounter claim with one of the corresponding procedure codes related to a prostate cancer treatment rendered within 6 months of submission of the targeted prostate cancer diagnosis.

```
SELECT distinct fdr.BENE_SK
FROM CMS_ADM_OIG_OAS_PRD. PROSTATE_CANCER_STEP_3 fdr /*Output from Step #3*/

/*Subquery to identify all enrollees to remove from the step #3 output who had a Part C encounter claim that contains a
prostate cancer treatment procedure code. /

WHERE fdr.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/ NOT IN (

SELECT fdr.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
FROM CMS_ADM_OIG_OAS_PRD. PROSTATE_CANCER_STEP_3 fdr /*Output from Step #3*/

JOIN CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_CLM hdr
ON hdr.BENE_SK = fdr.BENE_SK /*Join enrollees from the step #3 results to the CMS Medicare Part C encounter claims*/

JOIN CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_CLM_LINE lin
ON hdr.GEO_BENE_SK = lin.GEO_BENE_SK
AND hdr.CLM_DT_SGNTR_SK = lin.CLM_DT_SGNTR_SK
AND hdr.CLM_TYPE_CD = lin.CLM_TYPE_CD
AND hdr.CLM_NUM_SK = lin.CLM_NUM_SK
AND hdr.CLM_FROM_DT = lin.CLM_FROM_DT /*Joins CMS Medicare Part C encounter claim to the claim line table with the
individual claim lines)*/

WHERE lin.CLM_LINE_THRU_DT BETWEEN fnd.BENE_RAPS_SRVC_THRU_DT-183
AND fnd.BENE_RAPS_SRVC_THRU_DT+183 /* Identifies enrollees with encounter submissions occurring 6 months before
and 6 months after which include a prostate cancer treatment procedure code */

AND lin.CLM_LINE_HCPCS_CD IN ( /*Identifies all HCPCS/CPT Codes associated with encounter claim*/

'55801', '55810', '55812', '55815', '55821', '55831', '55840', '55842', '55845', '55866' /*Prostate Cancer Surgical CPT Codes*/

'96401', '96402', '96405', '96406', '96409', '96411', '96413', '96415', '96416', '96417', '96420', '96422', '96423', '96425',
'96440', '96446', '96450', '96542', '96549', /*Chemotherapy Drug Treatment CPT Codes*/

'77401', '77402', '77407', '77412', '77417', '77423', '77424', '77425', '77427', '77750', '77761', '77762', '77763', '77767',
'77768', '77770', '77771', '77772', '77778', '77789', '77790', '77799') /*Radiation Treatment CPT Codes */

AND hdr.CLM_TYPE_CD > 3900 /*Identifies the encounter claim type codes*/
AND hdr.CLM_FINL_ACTN_IND = 'Y'); /*Indicates a final action encounter claim*/
```

**Step 5**

Using the output from Step 4 we identified and removed the enrollees who had received a drug claim for any of the NDCs provided within 6 months (before and after) of the targeted prostate cancer diagnosis.

```sql
select DISTINCT fdr.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
FROM CMS_ADM_OIG_OAS_PRD. PROSTATE_CANCER_STEP_4 fdr /*Output from Step #4*/

WHERE fdr.BENE_SK NOT IN ( /*The following sub query identifies all enrollees with a drug claim for one or more of the
NDC's provided*/

SELECT DISTINCT fdr.BENE_SK /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
FROM CMS_ADM_OIG_OAS_PRD. PROSTATE_CANCER_STEP_4 fdr /*Output from Step #4*/

INNER JOIN CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_CLM hdr /*CMS Medicare Claim table data*/
ON fdr.BENE_SK = hdr.BENE_SK /*Joins enrollees from the step #4 results to the CMS Part D perscription drug claims*/

INNER JOIN CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_CLM_LINE lin /*CMS Medicare Claim Line data*/
ON hdr.GEO_BENE_SK = lin.GEO_BENE_SK
AND hdr.CLM_DT_SGNTR_SK = lin.CLM_DT_SGNTR_SK
AND hdr.CLM_TYPE_CD = lin.CLM_TYPE_CD
AND hdr.CLM_NUM_SK = lin.CLM_NUM_SK
AND hdr.CLM_FROM_DT = lin.CLM_FROM_DT /*Joins CMS Medicare Claims to the claim line table (Part D perscription drug
claims to the individual claim lines)*/

INNER JOIN CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_CLM_LINE_RX rx /*CMS Medicare Claim Line RX table data*/
ON lin.GEO_BENE_SK = rx.GEO_BENE_SK
AND lin.CLM_DT_SGNTR_SK = rx.CLM_DT_SGNTR_SK
AND lin.CLM_TYPE_CD = rx.CLM_TYPE_CD
AND lin.CLM_NUM_SK = rx.CLM_NUM_SK
AND lin.CLM_LINE_NUM = rx.CLM_LINE_NUM /*Joins CMS Part D perscription drug claim lines to the individual Part D
speceific claim lines*/

INNER JOIN CMS_ADM_OIG_OAS_PRD.PROSTATE_CANCER_PDE_NDC_LIST ndc /*NDCs for Prostate Cancer High-Risk
Group Table*/
ON lin.CLM_LINE_NDC_CD = ndc.NDC_CD /*Joins CMS Part D perscription drug claim line NDC code to the NDCs for Prostate
Cancer High-Risk Group Table*/

WHERE hdr.CLM_TYPE_CD IN (1,2,4) /*Represents Non-Deleted Part D Drug Claim types*/

AND hdr.CLM_THRU_DT BETWEEN fdr.BENE_RAPS_SRVC_THRU_DT-183 AND fdr.BENE_RAPS_SRVC_THRU_DT+183
/*Specified six month before or after timeframe*/

AND hdr.clm_finl_actn_ind = 'Y' /*Indicates only Final Action Claims*/
AND rx.CLM_LINE_INGRDNT_CST_AMT >0 /*Identifies non-zero pay claims*/
AND rx.CLM_DRUG_CVRG_STUS_CD='C') ; /*Identifies only covered drug claims*/
```

## Downloadable Information

- All of the codes used in this analysis along with the SQL programming language can be found at
  https://oig.hhs.gov/oas/toolkit/Prostate-Cancer-High-Risk-Group.pdf.

# 8. Potentially Mis-Keyed Diagnosis Codes High-Risk Group

For the high-risk group involving potentially mis-keyed diagnosis codes, we focused on enrollees who received multiple diagnoses for a condition but received only one—potentially mis-keyed—diagnosis for an unrelated condition (which mapped to a possibly unvalidated HCC). For example, ICD-10 diagnosis code I720 (which maps to the HCC for Vascular Disease) could be transposed as diagnosis code I270 (which maps to the HCC for Congestive Heart Failure and in this example would be unvalidated). Using an analytical tool that we developed, we identified 3,780 scenarios in which diagnosis codes could have been mis-keyed because numbers were transposed or because other data-entry errors occurred that could have resulted in the assignment of an unvalidated HCC.

## Codes Used in Our Analysis

The table of 3,780 potentially mis-keyed diagnosis code pairs can be downloaded at the link included in the Downloadable Information subsection found later in this section.

## SQL Programming Language

Table 8.1 details the SQL programming language used to query CMS's systems in order to identify the potentially mis-keyed diagnosis codes.

**Table 8.1: SQL Programming Language for Potentially Mis-Keyed Diagnosis Codes High-Risk Group**

**Step 1**

We Identified non-deleted RAPS records for all enrollees with a diagnosis code listed in the payment year 2019 RAPS Version 22 (V22) HCC mapping file published by CMS.

```
SELECT  raps.BENE_SK, /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
raps.BENE_RAPS_SRVC_FROM_DT,
raps.BENE_RAPS_SRVC_THRU_DT, /*RAPS Diagnosis Code Service Dates*/
raps.CNTRCT_NUM, /*RAPS Submitter Contract Number*/
raps.BENE_RAPS_SRVC_THRU_DT(FORMAT 'YYYY')(CHAR(4)) AS THRU_YEAR, /*Capture RAPS Service Thru Year*/
raps.DGNS_CD, /*RAPS diagnosis code field used to match to CMS Diagnosis Code Mapping Table*/
dx.V22 /*HCC from the CMS Diagnosis Code Mapping Table*/
FROM CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_BENE_RAPS_MAO_DGNS raps /*CMS RAPS data*/

JOIN CMS_ADM_OIG_OAS_PRD.RSK_ADJ_DX_PY19_RAPS_OP_PHYSN_HCC_MAPPING dx
on raps.DGNS_CD = dx.DX_CD /*CMS Diagnosis Code Mapping Table*/

WHERE raps.BENE_RAPS_SRVC_THRU_DT BETWEEN '2018-01-01' AND '2018-12-31'  /*Specified timeframe*/
AND raps.BENE_RAPS_DGNS_DLT_SW = '~'; /*"~" indicates the RAPS diagnosis code is not deleted*/
```

**Step 2**

Using the output from Step 1, we created a distinct list of potentially incorrect diagnosis codes by matching the diagnosis codes from Step 1 to the Office of Inspector General (OIG) Mis-Keyed Diagnosis Codes Table.

```
SELECT raps.BENE_SK, /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
raps.CNTRCT_NUM, /*RAPS Submitter Contract Number*/
raps.DGNS_CD, /*RAPS diagnosis code used to match to OIG Mis-Keyed Diagnosis Codes Table*/
        fnd.FLIPPED_HCC_VAL, /*Potential Incorrect Diagnosis Code Value from OIG Mis-Keyed Diagnosis Codes Table*/
```

COUNT (DGNS_CD) as CNT_FLIPPED_DX /*Count of occurrence of potentially incorrect diagnosis submissions from the OIG Mis-keyed Diagnosis Codes Table*/

FROM CMS_ADM_OIG_OAS_PRD. FLIPPED_DGNS_STEP_1 raps /*Output from Step #1*/

JOIN CMS_ADM_OIG_OAS_PRD.DASH_PY19_FD_FLIPPED_DX_CD fnd
ON fnd.FLIPPED_DIAG = raps.DGNS_CD /*The OIG Mis-Keyed Diagnosis Codes Table contains potential incorrect mis-keyed diagnosis codes and the HCC Value; and the coorsponding correct diagnosis and HCC value*/

WHERE raps.BENE_RAPS_SRVC_THRU_DT BETWEEN '2018-01-01' AND '2018-12-31' /*Specified timeframe*/
AND raps.BENE_RAPS_DGNS_DLT_SW = '~'; /*"~" indicates the RAPS diagnosis code is not deleted*/

GROUP BY BENE_SK,CNTRCT_NUM, DGNS_CD, FLIPPED_HCC_VAL; /*Group records to create distinct list of potentially mis-keyed diagnosis codes*/

## Step 3

Using the output from Step 2, we identified all enrollees with only one instance of the possible mis-keyed diagnosis code.

SELECT fnd.* /* Pull the entire record from Step #2*/
FROM CMS_ADM_OIG_OAS_PRD. FLIPPED_DGNS_STEP_2 fnd /*Output from Step #1*/

WHERE CNT_FLIPPED_DX = 1; /*Limits the results to a single instance of a potenially incorrect diagnosis*/

## Step 4

Using the output from Step 1, we grouped all the RAPS records that mapped to an HCC by enrollee, contract number, and HCC.  We also counted the number of diagnosis codes that mapped to an HCC.

SELECT BENE_SK, /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
CNTRCT_NUM, /*RAPS Submitter Contract Number*/
V22, /*HCC from the CMS Diagnosis Code Mapping Table*/
COUNT (V22) AS CNT_BENE_HCC /*Represent diagnosis submission count by HCC*/
FROM CMS_ADM_OIG_OAS_PRD. FLIPPED_DGNS_STEP_1 /*Output from Step #1*/

GROUP BY BENE_SK, CNTRCT_NUM, V22; /*Group RAPS records to create distinct list enrollee HCC with a diagnosis submission count*/

## Step 5

Using the output from Step 4, we identified enrollees with only one instance of a diagnosis code that mapped to an HCC.

SELECT fnd .* /* Pull the entire record from Step #4*/
FROM CMS_ADM_OIG_OAS_PRD. FLIPPED_DGNS_STEP_1 fnd /*Output from Step #4*/
WHERE CNT_BENE_HCC = 1; /*Limits the results to a single instance of a potenially incorrect diagnosis*/

## Step 6

Using the outputs from Step 3 and Step 4, we joined the two tables on the enrollee identification number and HCC to identify potentially incorrect diagnosis codes that were used to support the HCC.

SELECT t2.BENE_SK, /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
t2.CNTRCT_NUM, /*RAPS Submitter Contract Number*/
t1.DGNS_CD, /*RAPS potentially incorrect diagnosis*/
t2.V22 /*RAPS potentially incorrect diagnosis HCC (V22)*/
FROM CMS_ADM_OIG_OAS_PRD. FLIPPED_DGNS_STEP_3 t1 /*Output from Step #3*/

```
JOIN CMS_ADM_OIG_OAS_PRD. FLIPPED_DGNS_STEP_5 t2 /*Output from Step #5*/
ON t1.BENE_SK = t2.BENE_SK /*Join on enrollee identifier*/
and t1.FLIPPED_HCC_VAL = t2.V22 ; /*Join on mis-keyed diagnosis HCC and single diagnosis HCC*/
```

### Step 7

Using all RAPS data, we prepared an enrollee summary by grouping the information by the enrollee, contract number, diagnosis code, and the count of diagnosis code submissions.

```
SELECT raps.BENE_SK, /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
raps.CNTRCT_NUM, /*RAPS Submitter Contract Number*/
raps.DGNS_CD, /*RAPS potentially incorrect diagnosis*/
COUNT(raps.DGNS_CD) AS BENE_DX_CNT /*Represent diagnosis submission count by enrollee*/
FROM CMS_VDM_VIEW_MDCR_PRD.V2_MDCR_BENE_RAPS_MAO_DGNS raps /*CMS RAPS data*/

WHERE raps.BENE_RAPS_SRVC_THRU_DT BETWEEN '2018-01-01' AND '2018-12-31'  /*Specified timeframe*/
AND raps.BENE_RAPS_DGNS_DLT_SW = '~'; /*'~' indicates the RAPS diagnosis code is not deleted*/

GROUP BY raps.BENE_SK, raps.CNTRCT_NUM, raps.DGNS_CD ; /*Group RAPS records to create distinct list of enrollees by
contract and diagnosis*/
```

### Step 8

Using the output from Step 7, we identified enrollees with more than one instance of a diagnosis code submission.

```
SELECT  BENE_SK, /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
CNTRCT_NUM, /*RAPS Submitter Contract Number*/
DGNS_CD, /*RAPS potentially incorrect diagnosis*/
BENE_DX_CNT /*Represent diagnosis submission count by enrollee*/
FROM CMS_ADM_OIG_OAS_PRD.FLIPPED_DGNS_STEP_7 /*Output from Step #5*/
WHERE BENE_DX_CNT > 1 ; /*Diagnosis submission count greater than one*/
```

### Step 9

Using the outputs from Step 6 and Step 8 and the OIG Mis-Keyed Diagnosis Codes Table, we identified enrollees with multiple instances of what appeared to be the correct diagnosis and HCC and a single instance of what appeared to be the potentially incorrect diagnosis or HCC.

```
SELECT t6.BENE_SK, /*CMS enrollee unique identifier, replace with HIC, MBI or plan identifier*/
t6.CNTRCT_NUM, /*RAPS Submitter Contract Number*/
fnd.DIAG_CORRECT, /*Mis-Keyed Diagnosis Codes Table correct diagnosis match to step #8 output*/
fnd.HCC_CORRECT_DX_VAL, /* Mis-Keyed Diagnosis Codes Table correct diagnosis HCC value*/
t8.BENE_DX_CNT, /*Count of correct diagnosis from Step 8 output*/
fnd.FLIPPED_DIAG, /* Mis-Keyed Diagnosis Codes Table incorrect diagnosis match to step #6 output*/
fnd.FLIPPED_HCC_VAL, /* Mis-Keyed Diagnosis Codes Table incorrect diagnosis HCC value*/
'2019' AS PMT_YR /*Identifies payment year*/
FROM CMS_ADM_OIG_OAS_PRD. FLIPPED_DGNS_STEP_6 t6 /*Output from Step #6, contains enrollee list of potentially
incorrect diagnosis*/

JOIN CMS_ADM_OIG_OAS_PRD.DASH_PY18_FD_FLIPPED_DX_CD fnd /*OIG Mis-Keyed Diagnosis Codes Table*/
ON (t6.V22 = fnd.FLIPPED_HCC_VAL /*OIG Mis-Keyed Diagnosis Codes Table potentially incorrect diagnosis HCC */
AND t6.DGNS_CD = fnd.FLIPPED_DIAG) /*OIG Mis-Keyed Diagnosis Codes Table potentially incorrect diagnosis*/

JOIN CMS_ADM_OIG_OAS_PRD. FLIPPED_DGNS_STEP_8 t8 /*Output from Step 8, contains enrollee list of what appears to
be the correct diagnosis*/
ON ( t6.BENE_SK = t8.BENE_SK
AND fnd.DIAG_CORRECT = t8.DGNS_CD)
```

## Downloadable Information

- All of the codes used in this analysis along with the SQL programming language can be found at https://oig.hhs.gov/oas/toolkit/Potentially-Mis-Keyed-Diagnosis-Codes-High-Risk-Group.pdf.

## Notice

*Note that OIG is providing this toolkit, including the associated SQL programming code, to assist users in analyzing large datasets of MA claims data to identify individuals who received diagnosis codes that are at a high risk of being miscoded. This toolkit was prepared as a technical resource and is not intended to, and does not, create any rights, privileges, or benefits, substantive or procedural, enforceable by a party against the United States; its agencies or instrumentalities; its officers or employees; or any other person. The toolkit is provided in "as-is" condition, and OIG and its employees, agents, and staff disclaim any express or implied representation, warranty, or guarantee, including, but not limited to, the implied warranties of merchantability and fitness for a particular purpose. In particular, no representation is made that the information included in the toolkit, or any data the toolkit produces, is error free. The toolkit is not intended to be used to determine compliance with any laws, regulations, or other guidance. In no event shall OIG or its employees, agents, or staff be liable for any claim, damages, or liability, whether in an action of contract, tort or otherwise, and including direct, indirect, incidental, special, exemplary, or consequential damages, however caused, and on any theory of liability, arising in any way out of the use of this toolkit or its associated code, even if advised of the possibility of such damage. Compatibility of the toolkit with any user systems is not guaranteed, and any manipulation or alteration of the code is to the sole responsibility of the user.*

**EXHIBIT D-46**

# Department of Health and Human Services

## OFFICE OF
## INSPECTOR GENERAL

# MEDICARE ADVANTAGE COMPLIANCE AUDIT OF SPECIFIC DIAGNOSIS CODES THAT CIGNA-HEALTHSPRING LIFE & HEALTH INSURANCE COMPANY, INC. (CONTRACT H4513) SUBMITTED TO CMS

*Inquiries about this report may be addressed to the Office of Public Affairs at*
*Public.Affairs@oig.hhs.gov.*



Amy J. Frontz
Deputy Inspector General
for Audit Services

March 2023
A-07-19-01192

1070

# *Office of Inspector General*

https://oig.hhs.gov/

The mission of the Office of Inspector General (OIG), as mandated by Public Law 95-452, as amended, is to protect the integrity of the Department of Health and Human Services (HHS) programs, as well as the health and welfare of beneficiaries served by those programs. This statutory mission is carried out through a nationwide network of audits, investigations, and inspections conducted by the following operating components:

## *Office of Audit Services*

The Office of Audit Services (OAS) provides auditing services for HHS, either by conducting audits with its own audit resources or by overseeing audit work done by others. Audits examine the performance of HHS programs and/or its grantees and contractors in carrying out their respective responsibilities and are intended to provide independent assessments of HHS programs and operations. These audits help reduce waste, abuse, and mismanagement and promote economy and efficiency throughout HHS.

## *Office of Evaluation and Inspections*

The Office of Evaluation and Inspections (OEI) conducts national evaluations to provide HHS, Congress, and the public with timely, useful, and reliable information on significant issues. These evaluations focus on preventing fraud, waste, or abuse and promoting economy, efficiency, and effectiveness of departmental programs. To promote impact, OEI reports also present practical recommendations for improving program operations.

## *Office of Investigations*

The Office of Investigations (OI) conducts criminal, civil, and administrative investigations of fraud and misconduct related to HHS programs, operations, and beneficiaries. With investigators working in all 50 States and the District of Columbia, OI utilizes its resources by actively coordinating with the Department of Justice and other Federal, State, and local law enforcement authorities. The investigative efforts of OI often lead to criminal convictions, administrative sanctions, and/or civil monetary penalties.

## *Office of Counsel to the Inspector General*

The Office of Counsel to the Inspector General (OCIG) provides general legal services to OIG, rendering advice and opinions on HHS programs and operations and providing all legal support for OIG's internal operations. OCIG represents OIG in all civil and administrative fraud and abuse cases involving HHS programs, including False Claims Act, program exclusion, and civil monetary penalty cases. In connection with these cases, OCIG also negotiates and monitors corporate integrity agreements. OCIG renders advisory opinions, issues compliance program guidance, publishes fraud alerts, and provides other guidance to the health care industry concerning the anti-kickback statute and other OIG enforcement authorities.

# *Notices*

## THIS REPORT IS AVAILABLE TO THE PUBLIC
at https://oig.hhs.gov

Section 8M of the Inspector General Act, 5 U.S.C. App., requires
that OIG post its publicly available reports on the OIG website.

## OFFICE OF AUDIT SERVICES FINDINGS AND OPINIONS

The designation of financial or management practices as
questionable, a recommendation for the disallowance of costs
incurred or claimed, and any other conclusions and
recommendations in this report represent the findings and
opinions of OAS. Authorized officials of the HHS operating
divisions will make final determination on these matters.

**Report in Brief**

Date: March 2023
Report No. A-07-19-01192

U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES
**OFFICE OF INSPECTOR GENERAL**

## Why OIG Did This Audit

Under the Medicare Advantage (MA) program, the Centers for Medicare & Medicaid Services (CMS) makes monthly payments to MA organizations according to a system of risk adjustment that depends on the health status of each enrollee. Accordingly, MA organizations are paid more for providing benefits to enrollees with diagnoses associated with more intensive use of health care resources than to healthier enrollees, who would be expected to require fewer health care resources.

To determine the health status of enrollees, CMS relies on MA organizations to collect diagnosis codes from their providers and submit these codes to CMS. Some diagnoses are at higher risk for being miscoded, which may result in overpayments from CMS.

For this audit, we reviewed one MA organization, Cigna-HealthSpring Life & Health Insurance Company, Inc. (Cigna), and focused on nine groups of high-risk diagnosis codes. Our objective was to determine whether selected diagnosis codes that Cigna submitted to CMS for use in CMS's risk adjustment program complied with Federal requirements.

## How OIG Did This Audit

We sampled 300 unique enrollee-years with the high-risk diagnosis codes for which Cigna received higher payments for 2016 through 2017. We limited our review to the portions of the payments that were associated with these high-risk diagnosis codes, which totaled $720,395.

# Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (Contract H4513) Submitted to CMS

## What OIG Found

With respect to the nine high-risk groups covered by our audit, most of the selected diagnosis codes that Cigna submitted to CMS for use in CMS's risk adjustment program did not comply with Federal requirements. Specifically, for 200 of the 300 sampled enrollee-years, the medical records that Cigna provided did not support the diagnosis codes and resulted in $468,372 in overpayments. As demonstrated by the errors found in our sample, Cigna's policies and procedures to prevent, detect, and correct noncompliance with CMS's program requirements could be improved. On the basis of our sample results, we estimated that Cigna received at least $6.24 million in overpayments for 2016 and 2017.

## What OIG Recommends and Cigna Comments

We recommend that Cigna: (1) refund to the Federal Government the $468,372 of overpayments; (2) identify, for the high-risk diagnoses included in this report, similar instances of noncompliance that occurred before or after our audit period and refund any resulting overpayments to the Federal Government; and (3) continue its examination of its existing compliance procedures to identify areas where improvements can be made to ensure that diagnosis codes that are at high risk for being miscoded comply with Federal requirements and take the necessary steps to enhance those procedures.

Cigna did not concur with our recommendations and did not concur with our findings for 6 sampled enrollee-years which, according to Cigna, were supported by the medical records. Cigna did not directly agree or disagree with our findings for the remaining enrollee-years. Cigna did not agree with our audit methodology, use of extrapolation, and standards for data accuracy, coding, and documentation requirements.

After reviewing Cigna's comments and the additional information that Cigna provided, we revised the number of enrollee-years in error from 201 to 200 for this final report. After we had issued our draft report, CMS updated regulations for audits in its risk adjustment program to specify that extrapolated overpayments could only be recouped beginning with payment year 2018. Because our audit period covered payment years 2016 and 2017, we revised our first recommendation to specify a refund of only the overpayments for the sampled enrollee-years. We made no changes to our other recommendations. We followed a reasonable audit methodology and correctly applied applicable Federal requirements underlying the MA program.

The full report can be found at https://oig.hhs.gov/oas/reports/region7/71901192.asp.

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

    Why We Did This Audit ........................................................................................ 1

    Objective ............................................................................................................... 1

    Background ............................................................................................................ 2
        Medicare Advantage Program ........................................................... 2
        Risk Adjustment Program .................................................................. 2
        High-Risk Groups of Diagnoses ......................................................... 4
        Cigna-HealthSpring Life & Health Insurance Company, Inc. ............... 6

    How We Conducted This Audit .......................................................................... 6

FINDINGS ..................................................................................................................... 7

    Federal Requirements ......................................................................................... 8

    Most of the Selected High-Risk Diagnosis Codes That Cigna-HealthSpring Life & Health
      Insurance Company Submitted to CMS Did Not Comply With Federal Requirements ... 9
        Incorrectly Submitted Diagnosis Codes for Acute Stroke ..................... 10
        Incorrectly Submitted Diagnosis Codes for Acute Heart Attack ........... 10
        Incorrectly Submitted Diagnosis Codes for Major Depressive Disorder ............. 12
        Incorrectly Submitted Diagnosis Codes for Embolism .......................... 12
        Incorrectly Submitted Diagnosis Codes for Vascular Claudication ........ 13
        Incorrectly Submitted Diagnosis Codes for Lung Cancer ...................... 13
        Incorrectly Submitted Diagnosis Codes for Breast Cancer .................... 14
        Incorrectly Submitted Diagnosis Codes for Colon Cancer ..................... 15
        Incorrectly Submitted Diagnosis Codes for Prostate Cancer ................. 16
        Summary of Incorrectly Submitted Diagnosis Codes ............................ 16

    The Policies and Procedures That Cigna-HealthSpring Life & Health Insurance
      Company Had To Prevent, Detect, and Correct Noncompliance With Federal
      Requirements Could Be Improved ................................................................... 17

    Cigna-HealthSpring Life & Health Insurance Company Received Overpayments ........... 17

RECOMMENDATIONS .................................................................................................. 18

CIGNA-HEALTHSPRING LIFE & HEALTH INSURANCE COMPANY COMMENTS AND
    OFFICE OF INSPECTOR GENERAL RESPONSE ............................................................. 18

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health
Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*

1074

Cigna-HealthSpring Life & Health Insurance Company Did Not Concur With the Office
of Inspector General's Recommendation That It Refund Overpayments .................... 19
    Cigna-HealthSpring Life & Health Insurance Company Did Not Agree With
    the Office of Inspector General's Findings for 6 Sampled Enrollee-Years......... 19
    Cigna-HealthSpring Life & Health Insurance Company Stated That the
    Office of Inspector General's Audits Were Focused Only on Identifying
    Overpayments ................................................................................................... 20
    Cigna-HealthSpring Life & Health Insurance Company Stated That the
    Office of Inspector General Did Not Follow CMS's Established Risk
    Adjustment Data Validation Methodology ........................................................ 21
    Cigna-HealthSpring Life & Health Insurance Company Stated That the
    Office of Inspector General's Audits Were Inconsistent With CMS
    Standards for Data Accuracy .............................................................................. 22
    Cigna-HealthSpring Life & Health Insurance Company Did Not Agree With
    the Office of Inspector General's Use of Extrapolation ..................................... 24

Cigna-HealthSpring Life & Health Insurance Company Did Not Agree With the
Office of Inspector General's Medical Record Coding Review Process ........................ 26
    Cigna-HealthSpring Life & Health Insurance Company Did Not Agree With the
    Office of Inspector General's Use of Medicare Administrative Contractors ..... 26
    Cigna-HealthSpring Life & Health Insurance Company Stated That Coding
    and Documentation Standards Used During the Audit Were Not
    Validly Established ............................................................................................. 27
    Cigna-HealthSpring Life & Health Insurance Company Stated That the
    Office of Inspector General Did Not Provide Any Information Regarding the
    Independent Medical Review Contractor and the Coding Standards Used
    for This Audit .................................................................................................... 28
    Cigna-HealthSpring Life & Health Insurance Company Stated That the Office
    of Inspector General Used an Arbitrary Date Range That Prohibited Cigna
    From Submitting Documentation That Would Substantiate a Diagnosis.......... 30
    Cigna-HealthSpring Life & Health Insurance Company Stated That the Office
    of Inspector General Used Problematic Standards To Determine the
    Validity of Diagnoses ......................................................................................... 31

Cigna-HealthSpring Life & Health Insurance Company Did Not Concur With the
Office of Inspector General's Recommendation To Perform Additional Reviews
Before or After the Audit Period .................................................................................. 33
    Cigna-HealthSpring Life & Health Insurance Company Comments..................... 33
    Office of Inspector General Response ................................................................ 33

Cigna-HealthSpring Life & Health Insurance Company Did Not Concur With the
Office of Inspector General's Recommendation That It Enhance Its Existing
Compliance Procedures ............................................................................................... 34
    Cigna-HealthSpring Life & Health Insurance Company Comments..................... 34

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health
Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*

1075

     Office of Inspector General Response ................................................................. 34

APPENDICES

     A: Audit Scope and Methodology ..................................................................... 36

     B: Related Office of Inspector General Reports............................................... 40

     C: Statistical Sampling Methodology .............................................................. 42

     D: Sample Results and Estimates..................................................................... 45

     E: Federal Regulations Regarding Compliance Programs That
       Medicare Advantage Organizations Must Follow ......................................... 46

     F: Cigna-HealthSpring Life & Health Insurance Company Comments.............................. 48

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*

1076

## INTRODUCTION

### WHY WE DID THIS AUDIT

Under the Medicare Advantage (MA) program, the Centers for Medicare & Medicaid Services (CMS) makes monthly payments to MA organizations based in part on the characteristics of the enrollees being covered. Using a system of risk adjustment, CMS pays MA organizations the anticipated cost of providing Medicare benefits to a given enrollee, depending on such risk factors as the age, gender, and health status of that individual. Accordingly, MA organizations are paid more for providing benefits to enrollees with diagnoses associated with more intensive use of health care resources relative to healthier enrollees, who would be expected to require fewer health care resources. To determine the health status of enrollees, CMS relies on MA organizations to collect diagnosis codes from their providers and submit these codes to CMS.[1] We are auditing MA organizations because some diagnoses are at higher risk for being miscoded, which may result in overpayments from CMS.

This audit is part of a series of audits in which we are reviewing the accuracy of diagnosis codes that MA organizations submitted to CMS.[2] Using data mining techniques and considering discussions with medical professionals, we identified diagnoses that were at higher risk for being miscoded and consolidated those diagnoses into specific groups. (For example, we consolidated 29 major depressive disorder diagnoses into 1 group.) This audit covered Cigna-HealthSpring Life & Health Insurance Company, Inc. (Cigna), for contract number H4513 and focused on nine groups of high-risk diagnosis codes for payment years 2016 and 2017.[3]

### OBJECTIVE

Our objective was to determine whether selected diagnosis codes that Cigna submitted to CMS for use in CMS's risk adjustment program complied with Federal requirements.

---

[1] The providers code diagnoses using the International Classification of Diseases (ICD), Clinical Modification (CM), *Official Guidelines for Coding and Reporting* (ICD Coding Guidelines). The ICD is a coding system that is used by physicians and other health care providers to classify and code all diagnoses, symptoms, and procedures. Effective October 1, 2015, CMS transitioned from the ninth revision of the ICD Coding Guidelines (ICD-9-CM) to the tenth revision (ICD-10-CM). Each revision includes different diagnosis code sets.

[2] See Appendix B for a list of related Office of Inspector General reports.

[3] All subsequent references to "Cigna" in this report refer solely to contract number H4513.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*   1

**1077**

**BACKGROUND**

**Medicare Advantage Program**

The MA program offers beneficiaries managed care options by allowing them to enroll in private health care plans rather than having their care covered through Medicare's traditional fee-for-service program.[4]  Beneficiaries who enroll in these plans are known as enrollees.  To provide benefits to enrollees, CMS contracts with MA organizations, which in turn contract with providers (including hospitals) and physicians.

Under the MA program, CMS makes advance payments each month to MA organizations for the expected costs of providing health care coverage to enrollees.  These payments are not adjusted to reflect the actual costs that the organizations incurred for providing benefits and services.  Thus, MA organizations will either realize profits if their actual costs of providing coverage are less than the CMS payments or incur losses if their costs exceed the CMS payments.

For 2020, CMS paid MA organizations $317.1 billion, which represented 34 percent of all Medicare payments for that year.

**Risk Adjustment Program**

Federal requirements mandate that payments to MA organizations be based on the anticipated cost of providing Medicare benefits to a given enrollee and, in doing so, also account for variations in the demographic characteristics and health status of each enrollee.[5]

CMS uses two principal components to calculate the risk-adjusted payment that it will make to an MA organization for an enrollee: a base rate that CMS sets using bid amounts received from the MA organization and the risk score for that enrollee.  These are described as follows:

- *Base rate*: Before the start of each year, each MA organization submits bids to CMS that reflect the MA organization's estimate of the monthly revenue required to cover an enrollee with an average risk profile.[6]  CMS compares each bid to a specific benchmark amount for each geographic area to determine the base rate that an MA organization is paid for each of its enrollees.[7]

---

[4] The Balanced Budget Act of 1997, P.L. No. 105-33, as modified by section 201 of the Medicare Prescription Drug, Improvement, and Modernization Act, P.L. No. 108-173, established the MA program.

[5] The Social Security Act (the Act) §§ 1853(a)(1)(C) and (a)(3); 42 CFR § 422.308(c).

[6] The Act § 1854(a)(6); 42 CFR § 422.254 *et seq*.

[7] CMS's bid-benchmark comparison also determines whether the MA organization must offer supplemental benefits or must charge a basic beneficiary premium for the benefits.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*    2

1078

- *Risk score*: A risk score is a relative measure that reflects the additional or reduced costs that each enrollee is expected to incur compared with the costs incurred by enrollees on average. CMS calculates risk scores based on an enrollee's health status (discussed below) and demographic characteristics (such as the enrollee's age and gender). This process results in an individualized risk score for each enrollee, which CMS calculates annually.

To determine an enrollee's health status for purposes of calculating the risk score, CMS uses diagnoses that the enrollee receives from acceptable data sources, including certain physicians and hospitals. MA organizations collect the diagnosis codes from providers based on information documented in the medical records and submit these codes to CMS. CMS then maps certain diagnosis codes, on the basis of similar clinical characteristics and severity and cost implications, into Hierarchical Condition Categories (HCCs).[8] Each HCC has a factor (which is a numerical value) assigned to it for use in each enrollee's risk score.

As a part of the risk adjustment program, CMS consolidates certain HCCs into related-disease groups. Within each of these groups, CMS assigns an HCC for only the most severe manifestation of a disease in a related-disease group. Thus, if MA organizations submit diagnosis codes for an enrollee that map to more than one of the HCCs in a related-disease group, only the most severe HCC will be used in determining the enrollee's risk score.

For enrollees who have certain combinations of HCCs, CMS assigns a separate factor that further increases the risk score. CMS refers to these combinations as disease interactions. For example, if MA organizations submit diagnosis codes for an enrollee that map to the HCCs for lung cancer and immune disorders, CMS assigns a separate factor for this disease interaction. By doing so, CMS increases the enrollee's risk score for each of the two HCC factors and by an additional factor for the disease interaction.

The risk adjustment program is prospective. Specifically, CMS uses the diagnosis codes that the enrollee received for one year (known as the service year) to determine HCCs and calculate risk scores for the following calendar year (known as the payment year). Thus, an enrollee's risk score does not change for the year in which a diagnosis is made. Instead, the risk score changes for the entirety of the year after the diagnosis has been made. Further, the risk score calculation is an additive process: As HCC factors (and, when applicable, disease interaction factors) accumulate, an enrollee's risk score increases, and the monthly risk-adjusted payment to the MA organization also increases. In this way, the risk adjustment program compensates MA organizations for the additional risk of providing coverage to enrollees expected to require more health care resources.

CMS multiplies the risk scores by the base rates to calculate the total monthly Medicare payment that an MA organization receives for each enrollee before applying the budget

---

[8] During our audit period CMS calculated risk scores based on the Version 22 CMS-HCC model.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*    *3*

sequestration reduction.[9] Thus, if the factors used to determine an enrollee's risk score are incorrect, CMS will make an improper payment to an MA organization. Specifically, if medical records do not support the diagnosis codes that an MA organization submitted to CMS, the HCCs are unvalidated, which causes overstated enrollee risk scores and overpayments from CMS.[10] Conversely, if medical records support the diagnosis codes that an MA organization did not submit to CMS, validated HCCs may not have been included in enrollees' risk scores, which may cause those risk scores to be understated and may result in underpayments.

**High-Risk Groups of Diagnoses**

Using data mining techniques and discussions with medical professionals, we identified diagnoses that were at higher risk for being miscoded and consolidated those diagnoses into specific groups. For this audit, we focused on nine high-risk groups:

- *Acute stroke*: An enrollee received one acute stroke diagnosis (that mapped to the HCC for Ischemic or Unspecified Stroke) on one physician claim during the service year but did not have that diagnosis on a corresponding inpatient or outpatient hospital claim. In these instances, a diagnosis of history of stroke (which does not map to an HCC) typically should have been used.

- *Acute heart attack*: An enrollee received one diagnosis that mapped to either the HCC for Acute Myocardial Infarction or to the HCC for Unstable Angina and Other Acute Ischemic Heart Disease (Acute Heart Attack HCCs) on only one physician or outpatient claim during the service year but did not have that diagnosis on a corresponding inpatient hospital claim (either within 60 days before or 60 days after the physician or outpatient claim). In these instances, a diagnosis for a less severe manifestation of a disease in the related-disease group typically should have been used.

- *Major depressive disorder*: An enrollee received one major depressive disorder diagnosis (that mapped to the HCC for Major Depressive, Bipolar, and Paranoid Disorders) during the service year but did not have an antidepressant medication dispensed on his or her behalf. In these instances, a major depressive disorder diagnosis may not be supported in the medical records.

---

[9] Budget sequestration refers to automatic spending cuts that occurred through the withdrawal of funding for certain Federal programs, including the MA program, as provided in the Budget Control Act of 2011 (BCA) (P.L. No. 112-25 (Aug. 2, 2011)). Under the BCA, the sequestration of mandatory spending began in April 2013.

[10] 42 CFR § 422.310(e) requires MA organizations (when undergoing an audit conducted by the Secretary) to submit "medical records for the validation of risk adjustment data." For purposes of this report, we use the terms "supported" or "unsupported" to denote whether or not the reviewed diagnoses were evidenced in the medical records. If our audit determines that the diagnoses are supported or unsupported, we accordingly use the terms "validated" or "unvalidated" with respect to the associated HCC.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*    4

1080

- *Embolism*: An enrollee received one diagnosis that mapped to either the HCC for Vascular Disease or to the HCC for Vascular Disease With Complications (Embolism HCCs) during the service year but did not have an anticoagulant medication dispensed on his or her behalf. An anticoagulant medication is typically used to treat an embolism. In these instances, a diagnosis of history of embolism (an indication that the provider is evaluating a prior acute embolism diagnosis, which does not map to an HCC) typically should have been used.

- *Vascular claudication*: An enrollee received one diagnosis related to vascular claudication (that mapped to the HCC for Vascular Disease) during the service year, but had not received one of these diagnoses during the 2 preceding years and had medication dispensed on his or her behalf that is frequently dispensed for a diagnosis of neurogenic claudication.[11] In these instances, the diagnosis related to vascular claudication may not be supported in the medical records.

- *Lung cancer*: An enrollee received one lung cancer diagnosis (that mapped to the HCC for Lung and Other Severe Cancers) during the service year but did not have surgical therapy, radiation treatments, or chemotherapy drug treatments administered within a 6-month period either before or after the diagnosis. In these instances, a diagnosis of history of lung cancer (which does not map to an HCC) typically should have been used.

- *Breast cancer*: An enrollee received one breast cancer diagnosis (that mapped to the HCC for Breast, Prostate, and Other Cancers and Tumors) during the service year but did not have surgical therapy, radiation treatments, or chemotherapy drug treatments administered within a 6-month period before or after the diagnosis. In these instances, a diagnosis of history of breast cancer (which does not map to an HCC) typically should have been used.

- *Colon cancer*: An enrollee received one colon cancer diagnosis (that mapped to the HCC for Colorectal, Bladder, and Other Cancers) during the service year but did not have surgical therapy, radiation treatments, or chemotherapy drug treatments administered within a 6-month period before or after the diagnosis. In these instances, a diagnosis of history of colon cancer (which does not map to an HCC) typically should have been used.

- *Prostate cancer:* An enrollee 74 years old or younger received one prostate cancer diagnosis (that mapped to the HCC for Breast, Prostate, and Other Cancers and Tumors) during the service year but did not have surgical therapy, radiation treatments, or chemotherapy drug treatments administered within a 6-month period before or after

---

[11] Vascular claudication and neurogenic claudication are different diagnoses. Vascular claudication is a condition that can result in leg pain while walking and is caused by insufficient blood flow. Neurogenic claudication is a condition that can also result in leg pain but is caused by damage to the neurological system, namely the spinal cord and nerves.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*    5

1081

the diagnosis. In these instances, a diagnosis of history of prostate cancer (which does not map to an HCC) typically should have been used.

In this report, we refer to the diagnosis codes associated with these groups as "high-risk diagnosis codes."

**Cigna-HealthSpring Life & Health Insurance Company, Inc.**

Cigna is an MA organization based in Nashville, Tennessee. As of December 2017, Cigna provided coverage under contract number H4513 to 82,539 enrollees. For the 2016 and 2017 payment years (audit period), CMS paid Cigna approximately $2.1 billion to provide coverage to its enrollees.[12, 13]

**HOW WE CONDUCTED THIS AUDIT**

Our audit included enrollees on whose behalf providers documented diagnosis codes that mapped to one of the nine high-risk groups during the 2015 and 2016 service years, for which Cigna received increased risk-adjusted payments for payment years 2016 and 2017, respectively. Because enrollees could be classified into more than one high-risk group or could have high-risk diagnosis codes documented in more than 1 year, we classified these individuals according to the condition and the payment year, which we refer to as "enrollee-years."

We identified 8,667 unique enrollee-years and limited our review to the portions of the payments that were associated with these high-risk diagnosis codes ($19,537,407). We selected for audit a stratified sample of 300 enrollee-years as shown in Table 1 on the following page.

---

[12] The 2016 and 2017 payment year data were the most recent data available at the start of the audit.

[13] All of the payment amounts that CMS made to Cigna and the overpayment amounts that we identified in this report reflect the budget sequestration reduction.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*    *6*

1082

**Table 1: Sampled Enrollee-Years**

| High-Risk Group | Number of Sampled Enrollee-Years |
|---|---|
| 1. Acute stroke | 30 |
| 2. Acute heart attack | 30 |
| 3. Major depressive disorder | 60 |
| 4. Embolism | 30 |
| 5. Vascular claudication | 30 |
| 6. Lung cancer | 30 |
| 7. Breast cancer | 30 |
| 8. Colon cancer | 30 |
| 9. Prostate cancer | 30 |
| **Total for All High-Risk Groups** | **300** |

Cigna provided medical records as support for the selected diagnosis codes associated with 288 of the 300 sampled enrollee-years.[14] We used an independent medical review contractor to review the medical records to determine whether the HCCs associated with the sampled enrollee-years were validated. If the contractor identified a diagnosis code that should have been submitted to CMS instead of the selected diagnosis code, we included the financial impact of the resulting HCC (if any) in our calculation of overpayments.

We conducted this performance audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

Appendix A contains the details of our audit scope and methodology, Appendix C contains our statistical sampling methodology, Appendix D contains our sample results and estimates, and Appendix E contains the Federal regulations.

**FINDINGS**

With respect to the nine high-risk groups covered by our audit, most of the selected diagnosis codes that Cigna submitted to CMS for use in CMS's risk adjustment program did not comply with Federal requirements. For 100 of the 300 sampled enrollee-years, the medical records

---

[14] Cigna could not locate medical records for the remaining 12 sampled enrollee-years.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*    7

validated the reviewed HCCs.[15]  For the remaining 200 enrollee-years, however, either the medical records that Cigna provided did not support the diagnosis codes or Cigna could not locate the medical records to support the diagnosis codes and the associated HCCs were therefore not validated.  As a result, Cigna received $468,372 in overpayments.

As demonstrated by the errors found in our sample, Cigna's policies and procedures to prevent, detect, and correct noncompliance with CMS's program requirements, as mandated by Federal regulations, could be improved.  On the basis of our sample results, we estimated that Cigna received at least $6.24 million in overpayments for 2016 and 2017.[16]

## FEDERAL REQUIREMENTS

Payments to MA organizations are adjusted for risk factors, including the health status of each enrollee (the Social Security Act § 1853(a)).  CMS applies a risk factor based on data obtained from the MA organizations (42 CFR § 422.308).

Federal regulations state that MA organizations must follow CMS's instructions and submit to CMS the data necessary to characterize the context and purposes of each service provided to a Medicare enrollee by a provider, supplier, physician, or other practitioner (42 CFR § 422.310(b)).  MA organizations must obtain risk adjustment data required by CMS from the provider, supplier, physician, or other practitioner that furnished the item or service (42 CFR § 422.310(d)(3)).

Federal regulations also state that MA organizations are responsible for the accuracy, completeness, and truthfulness of the data submitted to CMS for payment purposes and that such data must conform to all relevant national standards (42 CFR §§ 422.504(l) and 422.310(d)(1)).  In addition, MA organizations must contract with CMS and agree to follow CMS's instructions, including the *Medicare Managed Care Manual* (the Manual) (42 CFR § 422.504(a)).

CMS has provided instructions to MA organizations regarding the submission of data for risk scoring purposes (the Manual, chap. 7 (last rev. Sept. 19, 2014)).  Specifically, CMS requires all submitted diagnosis codes to be documented in the medical record and to be documented as a result of a face-to-face encounter (the Manual, chap. 7, § 40).  The diagnosis must be coded

---

[15] For 1 of the 100 enrollee-years, Cigna informed us that it could not locate the associated medical record because the record had been destroyed in a natural disaster.  CMS provides guidance for medical records that are unavailable because of "extraordinary circumstances" (*Contract-Level Risk Adjustment Data Validation CMS Submission Instructions*).  Based on our assessment of the information provided by Cigna, we determined that an extraordinary circumstance prevented Cigna from locating the medical record for this enrollee-year, and we treated the sample item as a non-error.

[16] Specifically, we estimated that Cigna received at least $6,247,399 of overpayments.  To be conservative, we estimate overpayments at the lower limit of a two-sided 90-percent confidence interval.  Lower limits calculated in this manner are designed to be less than the actual overpayment total 95 percent of the time.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*          *8*

according to the International Classification of Diseases (ICD), Clinical Modification, *Official Guidelines for Coding and Reporting* (42 CFR § 422.310(d)(1) and 45 CFR §§ 162.1002(b)(1) and (c)(2)-(3)). Further, MA organizations must implement procedures to ensure that diagnoses come only from acceptable data sources, which include hospital inpatient facilities, hospital outpatient facilities, and physicians (the Manual, chap. 7, § 40).

Federal regulations state that MA organizations must monitor the data that they receive from providers and submit to CMS. Federal regulations also state that MA organizations must "adopt and implement an effective compliance program, which must include measures that prevent, detect, and correct non-compliance with CMS' program requirements . . . ." Further, MA organizations must establish and implement an effective system for routine monitoring and identification of compliance risks (42 CFR § 422.503(b)(4)(vi)).

## MOST OF THE SELECTED HIGH-RISK DIAGNOSIS CODES THAT CIGNA-HEALTHSPRING LIFE & HEALTH INSURANCE COMPANY SUBMITTED TO CMS DID NOT COMPLY WITH FEDERAL REQUIREMENTS

Most of the selected high-risk diagnosis codes that Cigna submitted to CMS for use in CMS's risk adjustment program did not comply with Federal requirements. Specifically, as shown in the figure below, the medical records for 200 of the 300 sampled enrollee-years did not support the diagnosis codes. In these instances, Cigna should not have submitted the diagnosis codes to CMS and received the resulting overpayments.

**Figure: Analysis of High-Risk Groups**



*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)* *9*

**Incorrectly Submitted Diagnosis Codes for Acute Stroke**

Cigna incorrectly submitted diagnosis codes for acute stroke for 29 of 30 sampled enrollee-years.  Specifically:

- For 23 enrollee-years, the medical records indicated in each case that the individual had previously had a stroke, but the records did not justify an acute stroke diagnosis at the time of the physician's service.

  For example, for 1 enrollee-year, the independent medical review contractor stated that "there is no evidence of an acute stroke or any related condition that would result in an assignment of the submitted HCC or a related HCC.  There is mention of a history of a stroke [diagnosis] but no description of residuals or sequelae that should be coded."[17] The history of stroke diagnosis code does not map to an HCC.

- For the remaining 6 enrollee-years, the medical records in each case did not support an acute stroke diagnosis.[18]

  For example, for 1 enrollee-year, the independent medical review contractor stated that "there is no evidence of an acute stroke or any related condition that would result in an assignment of the submitted HCC [for Ischemic or Unspecified Stroke] or a related HCC. Although [there] is mention of a cerebral infarction [diagnosis] in the current assessment there is no indication that this condition is active."[19]

As a result of these errors, the HCC for Ischemic or Unspecified Stroke was not validated, and Cigna received $62,466 in overpayments for these 29 sampled enrollee-years.

**Incorrectly Submitted Diagnosis Codes for Acute Heart Attack**

Cigna incorrectly submitted diagnosis codes for acute heart attack for 29 of 30 sampled enrollee-years.  Specifically:

- For 13 enrollee-years, the medical records indicated in each case that the individual had an old myocardial infarction diagnosis, but the records did not justify one of the

---

[17] Residuals or sequelae are the late effects of an injury that can occur only after the acute phase of the injury or illness has passed.

[18] For 1 of these enrollee-years, the medical record that Cigna provided to support the reviewed HCC was a magnetic resonance imaging (MRI) report.  This record was not from an acceptable data source (a face-to-face encounter with a provider, physician, or other practitioner) (42 CFR § 422.310(d)(3)); the Manual, chap. 7, §§ 40 and 120.1).

[19] A cerebral infarction, or stroke, is defined as a brain lesion in which a cluster of brain cells dies due to lack of blood.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*    *10*

1086

diagnoses that mapped to an Acute Heart Attack HCC at the time of the physician's service.[20]

For example, for 1 enrollee-year, the independent medical review contractor stated that "there is no documentation of any condition that will result in the assignment of [the] HCC [for Acute Myocardial Infarction]. There is documentation of a past medical history of myocardial infarction [diagnosis] that does not result in an HCC."

- For 9 enrollee-years, the medical records in each case did not support the submitted diagnosis that mapped to an Acute Heart Attack HCC. However, for each of these enrollee-years, we identified support for another diagnosis that mapped to the HCC for Angina Pectoris, which is a less severe manifestation of the related-disease group.[21]

  For example, for 1 enrollee-year, the independent medical review contractor stated that "there is no documentation of any condition that will result in the assignment of [the] HCC [for Unstable Angina and Other Acute Ischemic Heart Disease]. There is documentation of [an] angina pectoris [diagnosis] that results in [the] HCC [for Angina Pectoris] . . . ."

- For 6 enrollee-years, the medical records in each case did not support a diagnosis that mapped to an Acute Heart Attack HCC.

  For example, for 1 enrollee-year, the independent medical review contractor stated that "there is no documentation of any condition that will result in the assignment of [the] HCC [for Acute Myocardial Infarction]. The discharge final diagnosis stated that the patient was ruled out for an acute myocardial infarction."

- For the remaining 1 enrollee-year, Cigna could not locate any medical records to support a diagnosis that mapped to an Acute Heart Attack HCC; therefore, an Acute Heart Attack HCC was not validated.

As a result of these errors, the Acute Heart Attack HCCs were not validated, and Cigna received $41,309 in overpayments for these 29 sampled enrollee-years.

---

[20] An "old myocardial infarction" is a distinct diagnosis that represents a myocardial infarction that occurred more than 4 weeks previously, has no current symptoms directly associated with that myocardial infarction, and requires no current care.

[21] Angina pectoris is defined as a disease marked by brief sudden attacks of chest pain or discomfort caused by deficient oxygenation of the heart muscles, usually due to impaired blood flow to the heart.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*    *11*

1087

**Incorrectly Submitted Diagnosis Codes for Major Depressive Disorder**

Cigna incorrectly submitted diagnosis codes for major depressive disorder for 3 of 60 sampled enrollee-years. Specifically:

- For 2 enrollee-years, the medical records in each case did not support a major depressive disorder diagnosis.

  For example, for 1 enrollee-year, the independent medical review contractor stated that "there is no documentation of any condition that will result in the assignment of [the] HCC [for Major Depressive, Bipolar, and Paranoid Disorders]."

- For the remaining 1 enrollee-year, Cigna could not locate any medical records to support the major depressive disorder diagnosis; therefore, the HCC for Major Depressive, Bipolar, and Paranoid Disorders was not validated.

As a result of these errors, the HCC for Major Depressive, Bipolar, and Paranoid Disorders was not validated, and Cigna received $7,247 in overpayments for these 3 sampled enrollee-years.

**Incorrectly Submitted Diagnosis Codes for Embolism**

Cigna incorrectly submitted diagnosis codes for embolism for 22 of 30 sampled enrollee-years. Specifically:

- For 13 enrollee-years, the medical records in each case did not support a diagnosis that mapped to an Embolism HCC.

  For example, for 1 enrollee-year, the independent medical review contractor stated that "there is no documentation of any condition that will result in the assignment of [the] HCC [for Vascular Disease]. Per . . . ultrasound test results, there was no evidence of deep vein thrombosis."[22]

- For 8 enrollee-years, the medical records indicated in each case that the individual had previously had an embolism, but the records did not justify a diagnosis that mapped to an Embolism HCC at the time of the physician's service.

  For example, for 1 enrollee-year, the independent medical review contractor stated that "there is no documentation of any condition that will result in the assignment of [the] HCC [for Vascular Disease]. There is documentation of a past medical history of deep vein thrombosis [diagnosis] that does not result in an HCC."

---

[22] Deep vein thrombosis is defined as a blood clot that forms in one or more of the deep veins in the body, usually in the legs.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*                    *12*

**1088**

- For the remaining 1 enrollee-year, Cigna could not locate any medical records to support a diagnosis that mapped to an Embolism HCC; therefore, an Embolism HCC was not validated.

As a result of these errors, the Embolism HCCs were not validated, and Cigna received $51,125 in overpayments for these 22 sampled enrollee-years.

**Incorrectly Submitted Diagnosis Codes for Vascular Claudication**

Cigna incorrectly submitted diagnosis codes for vascular claudication for 7 of 30 sampled enrollee-years. Specifically:

- For 6 enrollee-years, the medical records in each case did not support a vascular claudication diagnosis.

  For example, for 1 enrollee-year, the independent medical review contractor stated that "there is no documentation of any condition that will result in the assignment of [the] HCC [for Vascular Disease]."

- For the remaining 1 enrollee-year, Cigna could not locate any medical records to support the vascular claudication diagnosis; therefore, the HCC for Vascular Disease was not validated.

As a result of these errors, the HCC for Vascular Disease was not validated, and Cigna received $12,872 in overpayments for these 7 sampled enrollee-years.

**Incorrectly Submitted Diagnosis Codes for Lung Cancer**

Cigna incorrectly submitted diagnosis codes for lung cancer for 28 of 30 sampled enrollee-years. Specifically:

- For 14 enrollee-years, the medical records indicated in each case that the individual had previously had lung cancer, but the records did not justify a lung cancer diagnosis at the time of the physician's service.

  For example, for 1 enrollee-year, the independent medical review contractor stated that "there is no documentation of any condition that will result in the assignment of [the] HCC for [Lung and Other Severe Cancers]. There is documentation of a past medical history of lung cancer [diagnosis] that does not result in an HCC."

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*    *13*

1089

- For 10 enrollee-years, the medical records in each case did not support a lung cancer diagnosis.[23]

  For example, for 1 enrollee-year, the independent medical review contractor stated that "there is no documentation of any condition that will result in the assignment of [the] HCC [for Lung and Other Severe Cancers]. There was not enough documentation to support that the lung cancer was an active condition on this date of service."

- For 2 enrollee-years, the medical records in each case did not support a lung cancer diagnosis. However, for each of these enrollee-years, we identified support for another diagnosis that mapped to an HCC for a less severe manifestation of the related-disease group. Accordingly, Cigna should not have received an increased payment for the submitted lung cancer diagnosis, but it should have received a lesser increased payment for the other diagnosis identified.

- For each of the remaining 2 enrollee-years, Cigna could not locate any medical records to support the lung cancer diagnosis; therefore, the HCC for Lung and Other Severe Cancers was not validated.

As a result of these errors, the HCC for Lung and Other Severe Cancers was not validated, and Cigna received $169,930 in overpayments for these 28 sampled enrollee-years.

**Incorrectly Submitted Diagnosis Codes for Breast Cancer**

Cigna incorrectly submitted diagnosis codes for breast cancer for 28 of 30 sampled enrollee-years. Specifically:

- For 20 enrollee-years, the medical records indicated in each case that the individual had previously had breast cancer, but the records did not justify a breast cancer diagnosis at the time of the physician's service.

  For example, for 1 enrollee-year, the independent medical review contractor stated that "there is no documentation of any condition that will result in the assignment of [the] HCC [for Breast, Prostate, and Other Cancers and Tumors]. There is documentation of a past medical history of breast cancer [diagnosis] that does not result in an HCC."

---

[23] For 1 of these enrollee-years, the medical record that Cigna provided to support the reviewed HCC contained only laboratory test results. This record was not from an acceptable data source (a face-to-face encounter with a provider, physician, or other practitioner) (42 CFR § 422.310(d)(3)); the Manual, chap. 7, §§ 40 and 120.1).

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*    *14*

1090

- For 7 enrollee years, the medical records in each case did not support a breast cancer diagnosis.[24]

  For example, for 1 enrollee-year, the independent medical review contractor stated that "there is no documentation of any condition that will result in the assignment of [the] HCC [for Breast, Prostate, and Other Cancers and Tumors] . . . . There was not enough documentation to support that the breast cancer was an active condition on this date of service."

- For the remaining 1 enrollee-year, Cigna could not locate any medical records to support the breast cancer diagnosis; therefore, the HCC for Breast, Prostate, and Other Cancers and Tumors was not validated.

As a result of these errors, the HCC for Breast, Prostate, and Other Cancers and Tumors was not validated, and Cigna received $31,104 in overpayments for these 28 sampled enrollee-years.

**Incorrectly Submitted Diagnosis Codes for Colon Cancer**

Cigna incorrectly submitted diagnosis codes for colon cancer for 28 of 30 sampled enrollee-years. Specifically:

- For 18 enrollee-years, the medical records indicated in each case that the individual had previously had colon cancer, but the records did not justify a colon cancer diagnosis at the time of the physician's service.

  For example, for 1 enrollee-year, the independent medical review contractor stated that "there is no documentation of a diagnosis that results in [the] HCC [for Colorectal, Bladder, and Other Cancers]. There is documentation of a past medical history of colon cancer [diagnosis] that does not result in an HCC."

- For 5 enrollee-years, the medical records in each case did not support a colon cancer diagnosis.

  For example, for 1 enrollee-year, the independent medical review contractor stated that "there is no documentation of any condition that will result in the assignment of [the] HCC [for Colorectal, Bladder, and Other Cancers]. The medical documentation does not indicate an active diagnosis of colon cancer."

- For 3 enrollee-years, the medical records in each case did not support a colon cancer diagnosis. However, for each of these enrollee-years, we identified support for another

---

[24] For 1 of these enrollee-years, the medical record that Cigna provided to support the reviewed HCC was a radiology order requisition. This record was not from an acceptable data source (a face-to-face encounter with a provider, physician, or other practitioner) (42 CFR § 422.310(d)(3)); the Manual, chap. 7, §§ 40 and 120.1).

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*    *15*

1091

diagnosis that mapped to an HCC for a less severe manifestation of the related-disease group. Accordingly, in each case Cigna should not have received an increased payment for the submitted colon cancer diagnosis, but it should have received a lesser increased payment for the other diagnosis identified.

- For each of the remaining 2 enrollee-years, Cigna could not locate any medical records to support the colon cancer diagnosis; therefore, the HCC for Colorectal, Bladder, and Other Cancers was not validated.

As a result of these errors, the HCC for Colorectal, Bladder, and Other Cancers was not validated, and Cigna received $56,923 in overpayments for these 28 sampled enrollee-years.

**Incorrectly Submitted Diagnosis Codes for Prostate Cancer**

Cigna incorrectly submitted diagnosis codes for prostate cancer for 26 of 30 sampled enrollee-years. Specifically:

- For 23 enrollee-years, the medical records indicated in each case that the individual had previously had prostate cancer, but the records did not justify a prostate cancer diagnosis at the time of the physician's service.

  For example, for 1 enrollee-year, the independent medical review contractor stated that "there is no documentation of any condition that will result in the assignment of [the] HCC [for Breast, Prostate, and Other Cancers and Tumors] . . . History of prostate cancer [diagnosis] should have been assigned . . . and does not result in an HCC."

- For each of 2 enrollee-years, Cigna could not locate any medical records to support the prostate cancer diagnosis; therefore, the HCC for Breast, Prostate, and Other Cancers and Tumors was not validated.

- For the remaining 1 enrollee-year, the medical records did not support a prostate cancer diagnosis. Specifically, the independent medical review contractor stated that "there is no documentation of any condition that will result in the assignment of [the] HCC [for Breast, Prostate, and Other Cancers and Tumors]. There was not enough documentation to support that the prostate cancer was an active condition on this date of service."

As a result of these errors, the HCC for Breast, Prostate, and Other Cancers and Tumors was not validated, and Cigna received $35,396 in overpayments for these 26 sampled enrollee-years.

**Summary of Incorrectly Submitted Diagnosis Codes**

In summary and with respect to the nine high-risk groups covered by our audit, Cigna received $468,372 in overpayments for the 200 sampled enrollee-years.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*                    *16*

**THE POLICIES AND PROCEDURES THAT CIGNA-HEALTHSPRING LIFE & HEALTH INSURANCE COMPANY HAD TO PREVENT, DETECT, AND CORRECT NONCOMPLIANCE WITH FEDERAL REQUIREMENTS COULD BE IMPROVED**

As demonstrated by the errors found in our sample, the policies and procedures that Cigna had to prevent, detect, and correct noncompliance with CMS's program requirements, as mandated by Federal regulations at 42 CFR § 422.503(b)(4)(vi), could be improved.

During our audit period, Cigna had compliance procedures in place that were designed to prevent providers from submitting incorrect diagnosis codes. These procedures included a variety of provider-specific outreach efforts to help educate its providers on medical record documentation, including accurately differentiating between: (1) conditions that were manifesting as acute and (2) conditions that were not currently active but had been historically present, such as stroke, myocardial infarction, and cancer. In addition, Cigna routinely educated its coders on best coding practices and acceptable medical documentation guidelines, and coders were expected to identify codes with at least 95-percent accuracy.

Cigna also had compliance procedures in place that were designed to determine whether the diagnosis codes that it submitted to CMS to calculate risk-adjusted payments were correct. These procedures included the use of internal data quality reviews that selected diagnosis codes from specific claims and compared them to the diagnoses that were documented on the associated medical records. Cigna had several criteria governing its selection of these diagnosis codes, including: (1) the frequency of usage by specific physicians and (2) the presence of diagnosis codes that met certain conditions (such as diagnosis codes for acute conditions that could be inaccurate when coded in an outpatient setting). Cigna's procedures also included guidance on how its reviewers should address the coding of certain conditions, including acute stroke, myocardial infarction, cancer, and the use of "history of" diagnosis codes. If the reviewers detected a compliance problem, Cigna's policies and procedures provided guidance on how to communicate the correction of the problem to CMS.

Although Cigna had policies and procedures that addressed some incorrect high-risk diagnosis codes, Cigna did not identify these diagnosis codes as problematic unless they appeared on a specific claim that was selected for review. For this reason, we concluded that Cigna's policies and procedures to prevent, detect, and correct miscoded high-risk diagnoses during our audit period could be improved.

**CIGNA-HEALTHSPRING LIFE & HEALTH INSURANCE COMPANY RECEIVED OVERPAYMENTS**

As a result of the errors we identified, the HCCs for these high-risk diagnosis codes were not validated. On the basis of our sample results, we estimated that Cigna received at least $6,247,399 in overpayments for 2016 and 2017. (See Appendix D for sample results and estimates).

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*          *17*

1093

Because of Federal regulations that limit the use of extrapolation in Risk Adjustment Data Validation (RADV) audits for recovery purposes, we are reporting the estimated overpayment amount but are recommending a refund of only the $468,372 in overpayments that Cigna received for the 200 sampled enrollee-years.[25]

## RECOMMENDATIONS

We recommend that Cigna-HealthSpring Life & Health Insurance Company, Inc.:

- refund to the Federal Government the $468,372 of overpayments;

- identify, for the high-risk diagnoses included in this report, similar instances of noncompliance that occurred before or after our audit period and refund any resulting overpayments to the Federal Government; and

- continue its examination of its existing compliance procedures to identify areas where improvements can be made to ensure that diagnosis codes that are at high risk for being miscoded comply with Federal requirements (when submitted to CMS for use in CMS's risk adjustment program) and take the necessary steps to enhance those procedures.

## CIGNA-HEALTHSPRING LIFE & HEALTH INSURANCE COMPANY COMMENTS AND OFFICE OF INSPECTOR GENERAL RESPONSE

In written comments on our draft report, Cigna did not concur with some of our findings and did not concur with any of our recommendations. More specifically, Cigna did not concur with our findings for 6 of the 201 enrollee-years in error identified in our draft report. For these 6 enrollee-years, Cigna provided explanations as to why it believed that the medical records that it previously gave us validated the reviewed HCCs. Cigna did not directly agree or disagree with our findings for the HCCs under audit for each of the remaining 195 enrollee-years.[26] With respect to the estimated overpayments, Cigna stated that our audit was "skewed toward identifying 'overpayments'" and that the basic premise of our audit was inconsistent with Federal requirements.

We reviewed the entirety of Cigna's comments and the additional information that it provided and, accordingly, reduced the number of enrollee-years in error from 201 to 200 and adjusted our calculation of overpayments for this final report. After we issued our draft report, CMS updated its regulations for RADV audits to specify that extrapolated overpayments could only

---

[25] After we had issued our draft report, CMS updated Federal regulations that limit the use of extrapolation in RADV audits to payment years 2018 and forward (88 Fed. Reg. 6643 (Feb. 1, 2023)). RADV audits are conducted to verify that diagnoses submitted by MA organizations for risk-adjusted payment are supported by medical record documentation.

[26] For 19 of the 195 enrollee-years, Cigna provided additional information that was outside the scope of our audit; accordingly, this information did not impact our audit results.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*   *18*

1094

be recouped beginning with payment year 2018 (footnote 25). Because our audit period covered payment years 2016 and 2017, we revised the amount in our first recommendation to reflect only the overpayments for the 200 sampled enrollee-years. We maintain that our second and third recommendations remain valid.

A summary of Cigna's comments and our responses follows. Cigna's comments appear as Appendix F. We excluded attachments (which Cigna identified as Exhibit A and Exhibit B in its comments) because they contained personally identifiable information. We are separately providing Cigna's comments and attachments in their entirety to CMS.

## CIGNA-HEALTHSPRING LIFE & HEALTH INSURANCE COMPANY DID NOT CONCUR WITH THE OFFICE OF INSPECTOR GENERAL'S RECOMMENDATION THAT IT REFUND OVERPAYMENTS

### Cigna-HealthSpring Life & Health Insurance Company Did Not Agree With the Office of Inspector General's Findings for 6 Sampled Enrollee-Years

*Cigna-HealthSpring Life & Health Insurance Company Comments*

Cigna did not concur with our findings for 6 of the sampled enrollee-years (as shown in Table 2) and provided explanations as to why it believed that the medical records that it previously gave us validated the reviewed HCCs.

### Table 2: Summary of Enrollee-Years for Which Cigna-HealthSpring Life & Health Insurance Company Disagreed With Our Findings

| High-Risk Group | Number of Sampled Enrollee-Years |
|---|---|
| Prostate cancer | 4 |
| Vascular claudication | 1 |
| Lung cancer | 1 |
| **Total** | **6** |

*Office of Inspector General Response*

For 1 of the 6 enrollee-years that Cigna specifically disputed, our independent medical review contractor reversed its original decision after reviewing the explanation that Cigna submitted, and determined that the HCC was validated.

Specifically, for the 1 enrollee-year from the vascular claudication high-risk group, Cigna cited the medical record's reference to a physical exam that noted "dorsalis pedis pulses . . . a follow up lower extremity arterial doppler was performed 3 weeks later . . . confirming a diagnosis of

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*   *19*

1095

[peripheral vascular disease] PVD."[27]  After reviewing Cigna's explanation for this enrollee-year, our independent medical review contractor reversed its original decision.  In so doing, the contractor stated: "[t]here is documentation of [a] lower extremity claudication [diagnosis] that results in [the] HCC [for Vascular Disease]."

Accordingly, we reduced the number of enrollee-years in error from 201 (in our draft report) to 200 for this final report.  We also revised our findings and reduced the associated monetary recommendation.  Our independent medical review contractor confirmed that Cigna's written comments and additional explanations had no impact on the decisions that the contractor made for other sampled enrollee-years and stated that there were no "systemic issues identified" in its reviews.

For the remaining 5 enrollee-years for which Cigna disagreed with the results of our independent medical review contractor's coding review, our contractor reaffirmed that the HCCs were not validated and thus upheld its original decision.  For example, for 1 enrollee-year from the prostate cancer high-risk group, the contractor stated that "[t]he medical record for the date of service . . . indicates a past history of prostate cancer that was under surveillance." Further, the contractor stated that "[t]here is no medical record evidence to support the diagnosis of prostate cancer, including no documentation of PSA [prostate-specific antigen] [test], monitoring or treatment."[28]

**Cigna-HealthSpring Life & Health Insurance Company Stated That the Office of Inspector General's Audits Were Focused Only on Identifying Overpayments**

*Cigna-HealthSpring Life & Health Insurance Company Comments*

Cigna stated that our "audit methodology was so targeted that it could not equally identify overpayments and underpayments."  Furthermore, Cigna stated that our audit targeted "specific diagnosis categories that OIG [Office of Inspector General] hypothesized . . . [are] likely to have resulted in an 'overpayment.'"  Cigna also stated that we did not allow it "to demonstrate support for and receive credit for diagnosis codes that had not previously been submitted to CMS for the audited [enrollees] that were unrelated to the target diagnosis codes."  Furthermore, according to Cigna, "OIG only focused on samples that it viewed to be high-risk diagnoses so that it could only identify a potential overpayment."  Cigna added that this "biased targeting resulted in findings that do not ensure accuracy because the audit was

---

[27] The dorsalis pedis artery is the main source of blood supply to the foot.  A lower extremity arterial doppler is an ultrasound test used to check the blood flow of the arteries and veins in the lower extremities (leg, ankle and foot). PVD is a systemic disorder that involves the narrowing of peripheral blood vessels (i.e., vessels situated away from the heart or the brain).  Both PVD and vascular claudication map to the HCC for Vascular Disease.

[28] The PSA blood test measures the amount of PSA in the blood and is used primarily to screen for prostate cancer.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*                                                                 *20*

not designed to look at payment accuracy, which would include both overpayments and underpayments."

For these reasons, Cigna stated that it was concerned "that the proposed overpayment figure used by OIG cannot be an adequate basis" for the audit results in this report.

*Office of Inspector General Response*

Our objective was to determine whether selected high-risk diagnosis codes that Cigna submitted to CMS for use in CMS's risk adjustment program complied with Federal requirements. We identified diagnoses that were at higher risk for being miscoded and consolidated those diagnoses into nine specific high-risk groups. This process involved a carefully designed audit methodology (see Appendix A) rather than "hypothesized" categories of diagnoses. Our objective did not extend to diagnosis codes not previously submitted by Cigna or to HCCs that were beyond the scope of our audit. A valid calculation of overpayments, given the objective of our audit, does not need to take into consideration all potential HCCs or underpayments within the audit period. Although for this final report we reduced the amount in our first recommendation (as discussed above), we based our calculation of overpayments on the results of the independent medical review contractor's review; this calculation addressed only the accuracy of the portion of payments related to the reviewed HCCs and does not extend to HCCs that were beyond the scope of this audit.

**Cigna-HealthSpring Life & Health Insurance Company Stated That the Office of Inspector General Did Not Follow CMS's Established Risk Adjustment Data Validation Methodology**

*Cigna-HealthSpring Life & Health Insurance Company Comments*

Cigna stated that our audit methodology did not account for a payment principal known as "actuarial equivalence," because we did not apply an adjustment called a Fee-for-Service (FFS) Adjuster. The FFS Adjuster, according to Cigna, "incorporate[s] the FFS error rate into [CMS's] methodology for calculating recovery amounts for unsupported HCCs identified during its RADV audits." Cigna noted that, to address the FFS error rate, CMS published a notice in 2012 that notified MA organizations that it planned to calculate and apply an FFS Adjuster to payment recoveries in RADV audits to adjust for diagnosis coding errors in claims data from traditional Medicare.[29] Cigna also cited recent Federal court cases that have dealt with the principle of actuarial equivalence and mentioned that a CMS final rule on this issue (that CMS proposed in 2018) is still pending. In addition, Cigna stated that because we did not apply an FFS Adjuster, we "violate[d]" requirements for notice-and-comment Federal rulemaking and departed from how we addressed the FFS adjuster in a previous report.[30]

---

[29] Cigna's comment in this respect cited to CMS's *Notice of Final Payment Error Calculation Methodology for Part C Medicare Advantage Risk Adjustment Data Validation for Contract-Level Audits* (Feb. 24, 2012), pages 3-4.

[30] The previous report to which Cigna referred was *Risk Adjustment Data Validation of Payments Made to PacifiCare of California for Calendar Year 2007 (Contract Number H0543)* (A-09-09-00045; Nov. 2012).

Cigna added that "[the] actuarial equivalence requirement extends to OIG's estimation and extrapolation of a potential 'overpayment' amount in this audit," and that because we did not apply an FFS Adjuster, "it is not possible for OIG to determine whether Cigna received an overpayment."

*Office of Inspector General Response*

Our audit methodology correctly applied CMS requirements to properly identify the overpayment amount associated with the unvalidated HCCs for each sample item. Specifically, we used the results of the independent medical review contractor's review to determine which HCCs were not validated and, in some instances, to identify HCCs that should have been used but were not used in the associated enrollees' risk score calculations. We followed CMS's risk adjustment program requirements to determine the payment that CMS should have made for each enrollee and to estimate overpayments. With respect to Cigna's comment regarding actuarial equivalence in our overpayment calculations, we note that after we issued our draft report, CMS stated that it "will not apply an adjustment factor (known as an FFS Adjuster) in RADV audits."[31] In the context of CMS's requirements and updated guidance, we recognize that CMS—not OIG—was responsible in 2012 and is responsible now for making operational and program payment determinations for the MA program.

**Cigna-HealthSpring Life & Health Insurance Company Stated That the Office of Inspector General's Audits Were Inconsistent With CMS Standards for Data Accuracy**

*Cigna-HealthSpring Life & Health Insurance Company Comments*

Cigna stated that we "designed and conducted an audit that was inconsistent with RADV regulations and CMS standards for data accuracy." According to Cigna, "[t]he perfection standard posited by [our report] reflects either a misunderstanding of CMS regulations or a rejection of the data standards set by CMS." Specifically:

- Cigna stated that we misunderstood Federal regulations at 42 CFR § 422.504(l), "in taking the position that MA organizations 'are responsible for the accuracy, completeness, and truthfulness of the data submitted to CMS.'" Cigna added that this regulation also states that when submitting data to CMS, an MA organization attests to the accuracy of those data according to its "best knowledge, information and belief." In this context, Cigna said that CMS has stated that there is no requirement that MA organizations need to verify every diagnosis submitted by providers. Cigna also referred to a CMS comment that MA organizations "cannot reasonably be expected to know that every piece of data is correct."[32]

---

[31] 88 Fed. Reg. 6643 (Feb. 1, 2023).

[32] For this comment, Cigna cited 65 Fed. Reg. 40170, 40268 (Jun. 29, 2000).

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*    *22*

1098

- Additionally, Cigna commented that the "perfection standard reflected in [our report] also is inconsistent with the realities and limitations of attempting to perform a risk adjustment function." Cigna elaborated on this position in several ways:

  o Cigna referred to the "inherently subjective" nature of diagnosis coding and stated that we did not take into account that "[a]lthough [Cigna] make[s] coding and documentation training available to . . . providers, [Cigna] ultimately cannot control their submissions." Cigna also said that CMS generally "allows providers to use their best professional judgment."

  o Cigna also alluded to various difficulties in obtaining medical records from providers. Cigna said that the 5 to 6 years between the encounters at issue and the audit, as well as the onset of COVID-19 during the audit and resulting staff shortages, made it difficult to obtain the necessary records from providers. Moreover, according to Cigna, this 5-to-6-year "gap creates a significant data validation issue for Cigna," because of providers that are no longer in its network and various recordkeeping challenges.

  o Furthermore, Cigna stated that the "consolidation of hospital systems and large provider groups and the increasing number of providers who are publicly traded or private investor-backed has led to some large groups and health systems refusing to respond to records requests [from MA organizations] in a timely fashion, if at all."

*Office of Inspector General Response*

We disagree with Cigna's statement that we misunderstood regulations or rejected the data standards set by CMS. Specifically, we do not agree with Cigna's interpretation of the Federal requirements at 42 CFR § 422.504(l). We recognize that CMS applies a "best knowledge, information and belief" standard when MA organizations certify the great volume of data that they submit to CMS for use in the risk adjustment program.[33] We recognize as well that, as Cigna said, there is no CMS requirement that MA organizations verify every diagnosis submitted by providers. We also acknowledge that Cigna cannot "reasonably be expected to know that every piece of data is correct."

However, our audit revealed a significant error rate (200 of 300 enrollee-years) with unsupported diagnosis codes (see Appendix D)) for the high-risk areas we audited. Federal regulations require MA organizations to implement procedures for "promptly responding to compliance issues as they are raised" and to "[correct] such problems promptly and thoroughly to reduce the potential for recurrence" (42 CFR § 422.503(b)(4)(vi)(G) (see Appendix E)). Accordingly, we believe that Cigna is responsible for addressing the issues that resulted in that significant error rate. Correcting these issues will also assist Cigna in attaining better assurance

---

[33] 79 Fed. Reg. 29844, 29926 (May 23, 2014).

with regard to the "accuracy, completeness and truthfulness" of the risk adjustment data that it submits in the future.

With respect to Cigna's comment about the "inherently subjective" coding process, we designed our audit methodology (see Appendix A) to be as objective as possible—that is, to minimize the effects of any potential coding subjectivities on our overpayment calculations. Our independent medical review contractor followed a specific process when reviewing the medical records that Cigna gave to us, to determine whether the diagnosis codes that Cigna submitted to CMS for risk-adjustment purposes were supported. If the first reviewer (a senior coder) found that a diagnosis was not supported on the medical records, then a second senior coder (and sometimes a third reviewer, a physician) performed a separate review of the same medical records. Two reviewers needed to agree that the diagnosis was unsupported for it to be counted as an error and be included in our overpayment calculations.

Moreover, CMS's RADV Submission Instructions, issued to MA organizations, recognizes that "there may be extraordinary circumstances that prevent an MA Organization . . . from submitting medical records for the audited enrollee(s) and CMS-HCC(s) in accordance with . . . audit requirements."[34] However, CMS also notes in these instructions that "extraordinary circumstances do not typically include ordinary issues encountered during the process of requesting medical records and attestations from providers." These ordinary issues include, but are not limited to, (1) difficulty in communicating with the provider, (2) provider difficulty in locating the record, and (3) delay caused by health information management system issues, including issues with third-party companies or vendors.

During our audit work, we worked with Cigna officials to extend (by several months) the medical record collection timeframe to account for the collection difficulties associated with the COVID-19 pandemic. Furthermore, Cigna did not convey to us during the audit that it was confronting any other extraordinary circumstances that prevented it from obtaining and providing to us medical records that would have supported the diagnosis codes submitted to CMS and validated the HCCs under review.

**Cigna-HealthSpring Life & Health Insurance Company Did Not Agree With the Office of Inspector General's Use of Extrapolation**

*Cigna-HealthSpring Life & Health Insurance Company Comments*

Cigna disagreed with our use of extrapolation to calculate overpayments for the following reasons:

- Cigna did not agree with the fact that we used the lower limit of a two-sided 90-percent confidence interval to calculate the extrapolated repayment amount. Cigna noted that

---

[34] *Contract-Level Risk Adjustment Data Validation CMS Submission Instructions*, Sep. 7, 2016.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*    24

CMS follows the "statistically valid and more robust practice" of using the lower limit of a 95-percent or 99-percent confidence interval for its RADV audits.

- Cigna also stated that it "do[es] not believe that extrapolation has been authorized by Congress. . . . Part C of the Medicare statute does not authorize extrapolated recoveries and, in the absence of explicit Congressional authorization, we believe extrapolation is not available." In addition, Cigna stated that "[e]ven if extrapolation were permitted, the methodology used would have to adhere to the final methodology established by CMS."

*Office of Inspector General Response*

As stated above, for this final report our recommendation to refund overpayments is limited to the overpayments associated with the 200 sampled enrollee-years, rather than to an estimate (footnote 25). However, we believe that the results of our sampling, as well as our estimate of overpayments (Appendix D), provide a reasonable basis for our findings and conclusions—and support our recommendation that Cigna continue to examine its existing compliance procedures to identify areas where improvements can be made.

OIG is an independent oversight agency; therefore, our estimation methodology does not need to mirror CMS's estimation methodology. Our policy recommends recovery at the lower limit of a two-sided 90-percent confidence interval. We believe that the lower limit of a two-sided 90-percent confidence interval provides a reasonably conservative estimate of the total amount overpaid to Cigna for the enrollee-years and time period covered in our sampling frame. This approach, which is routinely used by HHS for recovery calculations,[35] results in a lower limit (the estimated overpayment amount) that is designed to be less than the actual overpayment total 95 percent of the time.

With respect to Cigna's comments that we are not authorized to extrapolate, we note that neither Federal statute nor any other authority limits our ability to recommend a recovery to CMS based on extrapolation. Extrapolation has long been recognized as a permissible method of calculating overpayments in Medicare. Further, Federal courts have consistently upheld statistical sampling and extrapolation as a valid means to determine overpayment amounts in

---

[35] For example, HHS has used the two-sided 90-percent confidence interval when calculating recoveries in both the Administration for Child and Families and Medicaid programs. See e.g., *New York State Department of Social Services*, HHS Departmental Appeals Board (DAB) No. 1358, 13 (1992); *Arizona Health Care Cost Containment System*, DAB No. 2981, 4-5 (2019). In addition, HHS contractors rely on the one-sided 90-percent confidence interval, which is less conservative than the two-sided interval, for recoveries arising from Medicare FFS overpayments. See e.g., *Maxmed Healthcare, Inc. v. Burwell*, 152 F. Supp. 3d 619, 634–37 (W.D. Tex. 2016), *aff'd*, 860 F.3d 335 (5th Cir. 2017); *Anghel v. Sebelius*, 912 F. Supp. 2d 4, 17-18 (E.D.N.Y. 2012).

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)* 25

1101

Medicare and Medicaid.[36]  The legal standard for use of sampling and extrapolation is that it must be based on a statistically valid methodology, not the most precise methodology.[37]  We properly executed our statistical sampling methodology in that we defined our sampling frame and sample unit, randomly selected our sample, applied relevant criteria in evaluating the sample, and used statistical sampling software (i.e., RAT-STATS) to apply the correct formulas for the extrapolation.  Thus, we did not revise the amount in our first recommendation based on Cigna's comments; rather, we revised the amount in response to the updated regulations that CMS published after we issued our draft report.

**CIGNA-HEALTHSPRING LIFE & HEALTH INSURANCE COMPANY DID NOT AGREE WITH THE OFFICE OF INSPECTOR GENERAL'S MEDICAL RECORD CODING REVIEW PROCESS**

**Cigna-HealthSpring Life & Health Insurance Company Did Not Agree With the Office of Inspector General's Use of Medicare Administrative Contractors**

*Cigna-HealthSpring Life & Health Insurance Company Comments*

Cigna disagreed with our use of a Medicare Administrative Contractor (MAC) to identify HCCs that were at a high risk for noncompliance.  Cigna stated that our "sampling methodology was arbitrary and relied on a source [a MAC] that lacks sufficient MA experience," and added that furthermore, "[n]o MAC is assigned to evaluate the MA risk adjustment system."  Cigna stated that we did not: explain why a MAC was consulted, disclose the MAC that was consulted, or indicate the qualifications and level of expertise of the MAC medical professionals whom we consulted.  Cigna described these considerations as indicative of a "lack of transparency" that prevented it from being able to evaluate the standards to which it and its contracted providers were being held.

*Office of Inspector General Response*

Cigna's assertions regarding our use of a MAC are not accurate.  In order to accomplish our objective, we used a reasonable approach to identify diagnoses that were at higher risk for being miscoded.  The MAC medical professionals whom we consulted advised us only on information that we had previously gathered from other sources, including information on some of the high-risk groups identified in this report.  We did not ask the MAC professionals to

---

[36] See *Yorktown Med. Lab., Inc. v. Perales*, 948 F.2d 84 (2d Cir. 1991); *Illinois Physicians Union v. Miller*, 675 F.2d 151 (7th Cir. 1982); *Momentum EMS, Inc. v. Sebelius*, 2013 U.S. Dist. LEXIS 183591 at *26-28 (S.D. Tex. 2013), *adopted by* 2014 U.S. Dist. LEXIS 4474 (S.D. Tex. 2014); *Anghel v. Sebelius*, 912 F. Supp. 2d 4 (E.D.N.Y. 2012); *Miniet v. Sebelius*, 2012 U.S. Dist. LEXIS 99517 at *17 (S.D. Fla. 2012); *Bend v. Sebelius*, 2010 U.S. Dist. LEXIS 127673 (C.D. Cal. 2010).

[37] See *John Balko & Assoc. v. Sebelius*, 2012 U.S. Dist. LEXIS 183052 at *34-35 (W.D. Pa. 2012), *aff'd* 555 F. App'x 188 (3d Cir. 2014); *Maxmed Healthcare, Inc. v. Burwell*, 152 F. Supp. 3d 619, 634–37 (W.D. Tex. 2016), *aff'd*, 860 F.3d 335 (5th Cir. 2017); *Anghel v. Sebelius*, 912 F. Supp. 2d 4, 18 (E.D.N.Y. 2012); *Miniet v. Sebelius*, 2012 U.S. Dist. LEXIS 99517 at *17 (S.D. Fla. 2012); *Transyd Enters., LLC v. Sebelius*, 2012 U.S. Dist. LEXIS 42491 at *13 (S.D. Tex. 2012).

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*          *26*

1102

provide opinions related to the MA risk adjustment process or to perform a coding review for the sampled enrollee-years; rather we relied only on our independent medical review contractor to perform the coding reviews. Thus, we do not believe that identifying the MAC would provide additional information that is relevant to our findings and recommendations.

### Cigna-HealthSpring Life & Health Insurance Company Stated That Coding and Documentation Standards Used During the Audit Were Not Validly Established

*Cigna-HealthSpring Life & Health Insurance Company Comments*

Cigna stated that the "coding and documentation standards" applied during our audit were not validly established through the notice-and-comment rulemaking process that is required by the Administrative Procedure Act[38] and more broadly by Medicare statute.[39] Cigna argued that "[t]he Supreme Court has explained that this [notice and comment] obligation is broad and is likely to invalidate many policies found only in the Medicare manuals." In addition, Cigna stated that "[a]s applied to this audit, the coding and documentation standards are offered as the difference between valid risk adjustment payments and alleged overpayments. The audit uses sub-regulatory standards" (i.e., policies found only in Medicare manuals) to determine whether any overpayments occurred. For these reasons, Cigna stated that our "potential reliance on these standards is improper."

*Office of Inspector General Response*

We disagree with Cigna's assertion that our reliance on the Manual to differentiate between a valid risk adjustment payment and an overpayment was improper. We designed our audit to comply with Federal requirements. Specifically, our audit methodology required that our independent medical review contractor review medical records to determine whether the diagnosis codes that Cigna submitted to CMS for risk-adjustment purposes were supported. With regard to Cigna's comment about *Azar v. Allina Health Services*, our reliance on the Manual does not constitute the creation of new payment rules. Rather, we have designed our audit to determine whether Cigna complied with Federal requirements.

Moreover, the Manual is legally binding on an MA organization, a fact that is based not only on regulation, but also on the organization's contract with CMS. Federal regulations state that MA organizations are responsible for the accuracy, completeness, and truthfulness of the data submitted to CMS for payment purposes and that such data must conform to all relevant national standards.[40] In addition, MA organizations that contract with CMS must agree to

---

[38] 5 U.S.C. § 553.

[39] 42 U.S.C. § 1395hh(a)(2) as acknowledged *in Azar v. Allina Health Services*, 139 S.Ct. 1804 (2019).

[40] 42 CFR §§ 422.504(l) and 422.310(d)(1).

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*    27

1103

follow CMS's instructions, including the provisions of the Manual.[41]  Cigna has agreed to operate in compliance with the Manual under the terms of its contract with CMS and is bound by the requirements of that contract, including any applicable provisions of the Manual.

**Cigna-HealthSpring Life & Health Insurance Company Stated That the Office of Inspector General Did Not Provide Any Information Regarding the Independent Medical Review Contractor and the Coding Standards Used for This Audit**

*Cigna-HealthSpring Life & Health Insurance Company Comments*

Cigna stated that it had concerns regarding our independent medical review contractor's review and that the review methodology was "[n]eedlessly [o]paque."  With regard to these concerns, Cigna made several related points:

- Cigna stated that we should identify our independent medical review contractor so that Cigna can assess: (1) whether there is a conflict of interest, (2) the contractor's credentials, coding policies, procedures, and training, (3) consistency between this audit and prior work, and (4) the results of each level of medical review as well as any inter-rater reliability (IRR) reviews.[42]

- Cigna stated that we did not provide the coding or documentation standards used by the independent medical review contractor. In this context, Cigna referred to "inconsistencies and variations" in the ICD-9-CM and ICD-10-CM coding guidelines (footnote 1) and added that we should identify the specific coding and documentation standards used to evaluate the high-risk groups of diagnoses.

- Cigna cited our report's discussion of multiple levels of reviews performed by our independent medical review contractor, and stated that Cigna received only the final medical review determinations.  Cigna added that "the subjective nature of coding determinations" made it important for Cigna to be able to evaluate the results of each level of review.

- In addition, Cigna stated that it believed "that OIG's contractor went beyond assessing coding and questioned the clinical validity of providers' diagnostic statements . . . [because] the audit methodology indicate[d] that a physician was required to serve as a tie-breaker when at least one coder already determined a code to be supported."

---

[41] 42 CFR § 422.504(a).

[42] IRR reviews verify the accuracy of medical record decisions and identify the consistency of decisions between two reviewers.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*    *28*

*Office of Inspector General Response*

We do not agree with Cigna's comments that we should provide additional information about the independent medical review contractor and results of each level of the contractor's reviews. Specifically:

- It is not our practice to name our independent medical review contractor. However, our audit process includes measures to ensure that there are no conflicts of interest among the parties involved in the audit. The name of the independent medical review contractor would not provide information about the contractor's qualifications beyond what we state in this audit report. Furthermore, during the course of our audit, we informed Cigna that our medical reviews were performed by professional coders credentialed by the American Health Information Management Association (AHIMA) and the American Academy of Professional Coders (AAPC).[43] These coders were experienced in coding ICD-9-CM and ICD-10-CM diagnosis codes for hospital inpatient, outpatient, and physician medical records.

  The independent medical review contractor's quality review process included IRR reviews along with additional supervisory review of case determinations. The quality review process identified and made corrections, if needed. We do not believe that providing the results of those internal IRR reviews would provide additional information, as the results of the quality review process are reflected in the coding determinations that serve as the bases for our findings.

- Our independent medical review contractor used the following coding and documentation standards: (1) the CMS-published Contract-Level Risk Adjustment Data Validation Medical Record Reviewer Guidance,[44] (2) 2011 ICD-9-CM Official Guidelines for Coding and Reporting,[45] (3) 2015 ICD-10-CM Official Guidelines for Coding and

---

[43] Our independent medical review contractor used senior coders all of whom possessed one or more of the following qualifications and certifications: Registered Health Information Technician (RHIT), Certified Coding Specialist (CCS), Certified Coding Specialist – Physician-Based (CCS-P), Certified Professional Coder (CPC), CPC – Instructor, and Certified Risk Adjustment Coder (CRC). RHITs have completed a 2-year degree program and have passed an AHIMA certification exam. AHIMA also credentials individuals with CCS and CCS-P certifications and the AAPC credentials both CPCs and CRCs. This information also appears in a footnote in Appendix A of both our draft and final reports.

[44] CMS, *Contract-Level Risk Adjustment Data Validation Medical Record Reviewer Guidance As of 9/27/2017*. Available online at https://www.cms.gov/research-statistics-data-and-systems/monitoring-programs/medicare-risk-adjustment-data-validation-program/other-content-types/radv-docs/coders-guidance.pdf. Accessed on Nov. 18, 2022.

[45] *ICD-9-CM Official Guidelines for Coding and Reporting Effective October 1, 2011*. Available online at https://www.cdc.gov/nchs/data/icd/icd9cm_guidelines_2011.pdf. Accessed on Nov. 18, 2022.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*    29

Reporting,[46] (4) the American Hospital Association (AHA), Coding Clinic for ICD-9-CM, and (5) the AHA Coding Clinic for ICD-10-CM and ICD-10-PCS.[47] We provided Cigna information regarding the coding guidelines and guidance during the course of our audit.

- As explained in our audit methodology (Appendix A), the coding review followed a specific process to determine whether there was support for a diagnosis code and the associated HCC. At the conclusion of this process, we used only the final coding review determination for each sampled enrollee-year to calculate overpayments or underpayments (if any). We provided Cigna the final coding review determinations for each sampled enrollee-year.

- The independent medical review contractor used both skilled coders and physicians (when necessary) to review medical record documentation in accordance with the relevant CMS guidance,[48] which states, "**reviewers** should evaluate all listed conditions for consistency within the full provider documentation" (emphasis added). The coders and physicians did not make clinical judgments, but rather applied coding rules to accurately assign applicable ICD codes that translated to HCCs. Physician input was not an assessment of clinical support; rather, it constituted an assessment of documented evidence in support of the assignment of diagnosis codes. We believe that the use of a physician to serve as the final decision maker (i.e., tiebreaker), was a reasonable method for determining whether the medical records adequately supported the reported diagnosis codes.

**Cigna-HealthSpring Life & Health Insurance Company Stated That the Office of Inspector General Used an Arbitrary Date Range That Prohibited Cigna From Submitting Documentation That Would Substantiate a Diagnosis**

Cigna stated that our "narrowly defined documentation requirements conflicted" with our sampling methodology. Specifically, Cigna stated that we developed "parameters for when a diagnosis would be considered a high risk of noncompliance" but prohibited Cigna from submitting documentation from the same time periods as were contained within those parameters. Cigna also stated that because of this conflict, "records that would substantiate a diagnosis were not accept[ed] if outside of the narrow time frame of the audit." Cigna offered

---

[46] *ICD-10-CM Official Guidelines for Coding and Reporting FY 2015.* Available online at https://www.cdc.gov /nchs/data/icd/10cmguidelines-2015-updated-9-26-14.pdf. Accessed on Nov. 18, 2022.

[47] The "PCS" acronym in the ICD-10-PCS refers to the Procedure Coding System, which is a medical classification coding system that tracks various health interventions taken by medical professionals. See also footnote 1.

[48] CMS, Contract-Level Risk Adjustment Data Validation, Medical Record Reviewer Guidance, for reviews 3/20/2019. Available online at https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-Risk-Adjustment-Data-Validation-Program/Other-Content-Types/RADV-Docs/Medical-Record-Reviewer-Guidance.pdf. Accessed on Nov. 18, 2022.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*          *30*

examples of cases in which enrollees received diagnoses near the end of one calendar year and treatments or prescriptions the following calendar year. Cigna argued that "[t]his disregard of documentation and support for a diagnosis code based on an arbitrary date range . . . ignores the fact that for MA [enrollees] and their plan providers, the end of a calendar year does not change how providers deliver care."

*Office of Inspector General Response*

Cigna incorrectly linked the methodology we used to develop the sampling frame with CMS's medical record documentation requirements. As explained in Appendix C, our sampling methodology identified specific diagnoses that occurred only once during the service year along with other information that we took into consideration. Although the dates associated with this other information may have spanned consecutive calendar years, they helped us determine whether the identified diagnoses were at high risk for being miscoded. Thus, our sampling methodology has no correlation to CMS's medical record documentation requirements.

With respect to the medical record documentation, CMS uses the diagnosis codes that the enrollee received for one calendar year (known as the service year) to determine HCCs and calculate risk scores for the following calendar year (known as the payment year). Accordingly, the medical record documentation that we considered for each enrollee-year involved only the service year associated with the scope of the audit (service years 2015 and 2016).

**Cigna-HealthSpring Life & Health Insurance Company Stated That the Office of Inspector General Used Problematic Standards To Determine the Validity of Diagnoses**

*Cigna-HealthSpring Life & Health Insurance Company Comments*

Cigna stated that OIG used "problematic and arbitrary" standards "to supplant its medical knowledge years later for that of . . . treating providers." Cigna added that it knows of "no CMS guidance suggesting that the health status of [an enrollee] . . . is disproved solely by whether a provider prescribes a certain course of treatment or whether [an enrollee] elects to follow through with such treatment." As an example, Cigna cited a sampled enrollee-year in which the individual had been diagnosed with prostate cancer and who had elected to undergo "watchful waiting with monitoring of his PSA levels."[49] Cigna stated that "[i]dentifying such a diagnosis as unsupported was clinically inaccurate . . . and this finding results in OIG and its MAC consultant supplanting the member's personal choices with their own."

In addition, Cigna stated that we "ignored information regarding [enrollees] seeking care outside of the Medicare program." For example, Cigna cited a sampled enrollee-year in which the individual "was diagnosed with and treated for prostate cancer in 2006, and continued to

---

[49] "Watchful waiting" involves closely watching a patient's condition but not giving treatment unless symptoms appear or change.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*          *31*

be prescribed Lupron for his prostate cancer in 2016."[50]  In addition, the enrollee was obtaining
followup care through the Department of Veterans Affairs (VA).  Because this individual filled
the prescription using a means other than the Cigna MA plan and "was obtaining oncology
follow-up care through the VA, OIG invalidated the diagnosis."

*Office of Inspector General Response*

We disagree with Cigna's characterizations of the standards used during the medical review
process.  We used a reasonable approach to identify diagnoses that were at higher risk for
being miscoded.  This approach involved, among other things, discussions with medical
professionals regarding the treatment of certain conditions; and used that information to
identify enrollee-years with high-risk diagnosis codes.  This sampling methodology has no
correlation to the CMS medical record documentation requirements that our independent
medical review contractor used to determine whether or not the diagnoses were supported.

For this audit, our objective was to determine whether selected high-risk diagnosis codes that
Cigna submitted to CMS for use in CMS's risk adjustment program complied with Federal
requirements.  For each of the sampled enrollee-years, we asked Cigna to provide up to five
medical records of its choosing to support the reviewed HCC.  We asked our independent
medical review contractor to review all the medical records that Cigna provided to determine
whether the information documented in the medical records supported any diagnoses that
mapped to the reviewed HCC.  During its review, the independent medical review contractor
did not make clinical judgments, but rather used applicable coding and documentation
standards to accurately assign the appropriate diagnosis codes that translate to HCCs.

With respect to Cigna's example of the individual who had been diagnosed and treated for
prostate cancer through the VA, the associated enrollee-year is one for which we reviewed the
additional explanations provided by Cigna for this final report.  Specifically, our independent
medical review contractor reviewed the additional information that Cigna provided and
determined that there was no documentation that the individual was being actively treated for
prostate cancer, stating that "the patient had a radical prostatectomy in the past.  There is no
evidence of active cancer."[51]

More generally, our audit does not supplant provider decision making or enrollee choice.  We
acknowledge that providers have choices in prescribing courses of treatment, and that
enrollees also have choices regarding treatment, some of which are outside of the Medicare
program.  Nevertheless, Medicare requirements are clear that in order for a diagnosis code that
has been submitted to CMS to be appropriately included in the calculation of the risk score, the
diagnosis needs to be documented in, and supported by, an acceptable medical record.

---

[50] Lupron is a type of hormone therapy that doctors typically use in combination with other treatments to treat
people with prostate cancer.

[51] In a radical prostatectomy operation, the surgeon removes the entire prostate gland as well as some of the
tissue around it.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health
Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*                    *32*

1108

**CIGNA-HEALTHSPRING LIFE & HEALTH INSURANCE COMPANY DID NOT CONCUR WITH THE OFFICE OF INSPECTOR GENERAL'S RECOMMENDATION TO PERFORM ADDITIONAL REVIEWS BEFORE OR AFTER THE AUDIT PERIOD**

**Cigna-HealthSpring Life & Health Insurance Company Comments**

Cigna did not concur with our second recommendation—that it perform additional reviews to determine whether similar instances of high-risk diagnoses occurred before or after the audit period. According to Cigna, "MA regulations do not require the sort of audits that OIG recommends and do not require data perfection." Cigna also stated that this recommendation holds MA organizations to standards that are "unknown, vague, and nonexistent." Further, Cigna stated that if it "undertook an audit similar to OIG's, it could not result in 'risk adjustment payment integrity and accuracy'" because "a payment audit designed to target errors without considering and recognizing diagnoses that are supported but not previously submitted, does not ensure payment accuracy and is improper."

**Office of Inspector General Response**

We do not agree with Cigna's interpretation of the Federal requirements. Contrary to Cigna's assertions, we maintain that our recommendation that Cigna review whether similar instances of high-risk diagnoses occurred before or after our audit period remains valid and conforms to the requirements specified in Federal regulations (42 CFR § 422.503(b)(4)(vi) (Appendix E)).

These Federal regulations state that MA organizations must "implement an effective compliance program, which must include measures that prevent, detect, and correct non-compliance with CMS' program requirements." Further, these regulations specify that Cigna's compliance plan "must, at a minimum, include [certain] core requirements," which include "an effective system for routine monitoring and identification of compliance risks . . . [including] internal monitoring and audits and, as appropriate, external audits to evaluate . . . compliance with CMS requirements and the overall effectiveness of the compliance program." These regulations also require MA organizations to implement procedures and a system for investigating "potential compliance problems as identified in the course of self-evaluations and audits, correcting such problems promptly and thoroughly to reduce the potential for recurrence." Thus, CMS has, through the issuance of these Federal regulations, assigned the responsibility for dealing with potential compliance issues to the MA organizations.

With respect to Cigna's comments stating that audits like ours do not result in payment accuracy, we note that our findings are not indicative of the overall accuracy of diagnosis codes that Cigna submitted to CMS. We limited our audit and recommendations to certain diagnosis codes that we determined to be at high risk for being miscoded. We believe that the error rate identified in our audit (200 of 300 enrollee-years (see Appendix D)) demonstrates that Cigna has compliance issues that need to be addressed. These issues may extend to periods of time beyond our scope. Accordingly, we maintain the validity of our recommendation that Cigna

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*    *33*

1109

identify, for the high-risk diagnoses included in this report, similar instances of noncompliance that occurred before or after our audit period.

**CIGNA-HEALTHSPRING LIFE & HEALTH INSURANCE COMPANY DID NOT CONCUR WITH THE OFFICE OF INSPECTOR GENERAL'S RECOMMENDATION THAT IT ENHANCE ITS EXISTING COMPLIANCE PROCEDURES**

**Cigna-HealthSpring Life & Health Insurance Company Comments**

Cigna did not concur with our third recommendation—that it continue to examine its existing compliance procedures for diagnoses that are at high risk for being miscoded and enhance those procedures as necessary. Specifically, Cigna stated that it "has a strong and effective compliance program that is designed to comply with all relevant legal and regulatory requirements," and that it had made numerous changes to its compliance program since 2015 and 2016. In addition, Cigna said that it has "put forth significant effort to educate providers regarding the appropriate use of some of the specific codes targeted by OIG in this audit." Further, Cigna noted that in 2021, it underwent a CMS program audit that had no findings related to Cigna's compliance program. Cigna also cited a recent OIG contract-level RADV audit (of another contract) that described Cigna's policies and procedures as generally effective.[52]

Cigna also stated that we made "potentially misleading statements" with regard to the Federal regulations that MA organizations are required to follow regarding compliance programs. Cigna said that it believed that we have "expanded [CMS's] MA compliance program requirements" because we did not take into consideration that CMS gives MA organizations "broad discretion to design their own compliance and risk adjustment data accuracy programs," and that MA organizations "are not held to a standard of guaranteeing the accuracy of the risk adjustment data that [are] submitted."

Finally, Cigna stated that "[t]he fact that OIG identified supposedly unsupported diagnoses . . . does not indicate that Cigna's compliance program is ineffective, particularly when measured by MA program guidance."

**Office of Inspector General Response**

Cigna's response implied that we opined on the effectiveness of its entire compliance program. That was not our intention or our focus for this audit. Rather, we limited our audit to selected diagnoses that we determined to be at high risk for being miscoded. Our audit revealed a significant error rate for some of these high-risk groups. Although a prior CMS program audit did not result in any findings, and although the OIG contract-level RADV audit— which had a different objective than this audit—found Cigna's policies and procedures to be

---

[52] *Medicare Advantage Compliance Audit of Diagnosis Codes That Cigna HealthSpring of Florida, Inc. (Contract H5410) Submitted to CMS.* Available online at https://oig.hhs.gov/oas/reports/region3/31800002.pdf. Accessed on Nov. 18, 2022. See also Appendix B of this report.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*                    *34*

generally effective, we continue to believe that Cigna should enhance its compliance procedures with respect to these high-risk groups of diagnoses.

Moreover, although we acknowledge that CMS gives discretion to MA organizations when designing a compliance plan, Federal regulations also require MA organizations to implement procedures for "promptly responding to compliance issues as they are raised" and to "[correct] such problems promptly and thoroughly to reduce the potential for recurrence" (42 CFR § 422.503(b)(4)(vi)(G). The continued improvement of Cigna's existing procedures and internal data quality reviews (based on the results of this audit) will assist Cigna in attaining better assurance with regard to the "accuracy, completeness and truthfulness" of the risk adjustment data that it submits in the future.  Accordingly, we maintain that our third recommendation is valid.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*   *35*

1111

**APPENDIX A: AUDIT SCOPE AND METHODOLOGY**

**SCOPE**

CMS paid Cigna $2,140,237,283 to provide coverage to its enrollees for 2016 and 2017. We identified a sampling frame of 8,667 unique enrollee-years on whose behalf providers documented high-risk diagnosis codes during the 2015 and 2016 service years. Cigna received $134,347,953 in payments from CMS for these enrollee-years for 2016 and 2017. We selected for audit 300 enrollee-years with payments totaling $4,939,748.

The 300 enrollee-years included 30 acute stroke diagnoses, 30 acute heart attack diagnoses, 60 major depressive disorder diagnoses, 30 embolism diagnoses, 30 vascular claudication diagnoses, 30 lung cancer diagnoses, 30 breast cancer diagnoses, 30 colon cancer diagnoses, and 30 prostate cancer diagnoses. We limited our review to the portions of the payments that were associated with these high-risk diagnosis codes, which totaled $720,395 for our sample.

Our audit objective did not require an understanding or assessment of Cigna's complete internal control structure, and we limited our review of internal controls to those directly related to our objective.

We performed audit work from August 2019 through April 2022.

**METHODOLOGY**

To accomplish our objective, we performed the following steps:

- We reviewed applicable Federal laws, regulations, and guidance.

- We discussed with CMS program officials the Federal requirements that MA organizations should follow when submitting diagnosis codes to CMS.

- We identified, through data mining and discussions with medical professionals at a MAC, diagnosis codes and HCCs that were at high risk for noncompliance. We also identified the diagnosis codes that potentially should have been used for cases in which the high-risk diagnoses were miscoded.

- We consolidated the high-risk diagnosis codes into specific groups, which included:

  o  74 diagnosis codes for acute stroke,
  o  38 diagnosis codes for acute heart attack,
  o  29 diagnosis codes for major depressive disorder,
  o  85 diagnosis codes for embolism,
  o  4 diagnosis codes for vascular claudication,
  o  24 diagnosis codes for lung cancer,

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*    *36*

1112

- o 65 diagnosis codes for breast cancer
- o 20 diagnosis codes for colon cancer, and
- o 2 diagnosis codes for prostate cancer.

- We used CMS's systems to identify the enrollee-years on whose behalf providers documented the high-risk diagnosis codes.  Specifically, we used extracts from CMS's:

  - o Risk Adjustment Processing System (RAPS)[53] to identify enrollees who received high-risk diagnosis codes from a physician during the service years,

  - o Risk Adjustment System (RAS)[54] to identify enrollees who received an HCC for the high-risk diagnosis codes,

  - o Medicare Advantage Prescription Drug System (MARx)[55] to identify enrollees for whom CMS made monthly Medicare payments to Cigna, before applying the budget sequestration reduction, for the relevant portions of the service and payment years (Appendix C),

  - o Encounter Data System (EDS)[56] to identify enrollees who received specific procedures, and

  - o Prescription Drug Event (PDE) file[57] to identify enrollees who had Medicare claims with certain medications dispensed on their behalf.

- We interviewed Cigna officials to gain an understanding of: (1) the policies and procedures that Cigna followed to submit diagnosis codes to CMS for use in the risk adjustment program and (2) Cigna's monitoring of those diagnosis codes to identify and detect noncompliance with Federal requirements.

- We selected for audit a stratified random sample of 300 enrollee-years (Appendix C).

---

[53] MA organizations use the RAPS to submit diagnosis codes to CMS.

[54] The RAS identifies the HCCs that CMS factors into each enrollee's risk score calculation.

[55] The MARx identifies the payments made to MA organizations.

[56] The EDS contains information on each item (including procedures) and service provided to enrollees.

[57] The PDE file contains claims with prescription drugs that have been dispensed to enrollees through the Medicare Part D (prescription drug coverage) program.

- We used an independent medical review contractor to perform a coding review for the 300 enrollee-years to determine whether the high-risk diagnosis codes submitted to CMS complied with Federal requirements.[58]

- The independent medical review contractor's coding review followed a specific process to determine whether there was support for a diagnosis code and the associated HCC:

    o If the first senior coder found support for the diagnosis code on the medical record, the HCC was considered validated.

    o If the first senior coder did not find support on the medical record, a second senior coder performed a separate review of the same medical record:

        ▪ If the second senior coder also did not find support, the HCC was considered to be not validated.

        ▪ If the second senior coder found support, then a physician independently reviewed the medical record to make the final determination.

    o If either the first or second senior coder asked a physician for assistance, the physician's decision became the final determination.

- We used the results of the independent medical review contractor to calculate overpayments or underpayments (if any) for each enrollee-year.  Specifically, we calculated:

    o a revised risk score in accordance with CMS's risk adjustment program and

    o the payment that CMS should have made for each enrollee-year.

- We estimated the total overpayment made to Cigna during the audit period.

---

[58] Our independent medical review contractor used senior coders all of whom possessed one or more of the following qualifications and certifications: Registered Health Information Technician (RHIT), Certified Coding Specialist (CCS), Certified Coding Specialist – Physician-Based (CCS-P), Certified Professional Coder (CPC), CPC – Instructor, and Certified Risk Adjustment Coder (CRC).  RHITs have completed a 2-year degree program and have passed an AHIMA certification exam.  AHIMA also credentials individuals with CCS and CCS-P certifications and the AAPC credentials both CPCs and CRCs.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*          *38*

1114

- We limited the total overpayment that we recommended for recovery to the sampled enrollee-years.[59]

- We discussed the results of our audit with Cigna officials on February 28, 2022.

We conducted this performance audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

---

[59] Federal regulations at 42 CFR § 422.311 state: "the Secretary annually conducts RADV audits to ensure risk-adjusted payment integrity and accuracy." Recovery of improper payments from MA organizations will be conducted in accordance with the Secretary's payment error extrapolation and recovery methodologies. CMS may apply extrapolation to audits for payment year 2018 and subsequent payment years. 88 Fed. Reg. 6643, 6655 (Feb. 1, 2023).

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*    *39*

1115

**APPENDIX B: RELATED OFFICE OF INSPECTOR GENERAL REPORTS**

| Report Title | Report Number | Date Issued |
|---|---|---|
| Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring of Tennessee, Inc. (Contract H4454) Submitted to CMS | A-07-19-01193 | 12/22/2022 |
| Medicare Advantage Compliance Audit of Specific Diagnosis Codes That BCBS of Rhode Island (Contract H4152) Submitted to CMS | A-01-20-00500 | 11/16/2022 |
| Medicare Advantage Compliance Audit of Specific Diagnosis Codes That California Physicians' Service, Inc. (Contract H0504) Submitted to CMS | A-09-19-03001 | 11/10/2022 |
| Medicare Advantage Compliance Audit of Specific Diagnosis Codes That HumanaChoice (Contract R5826) Submitted to CMS | A-05-19-00039 | 9/30/2022 |
| Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Highmark Senior Health Company (H3916) Submitted to CMS | A-03-19-00001 | 9/29/2022 |
| Medicare Advantage Compliance Audit of Specific Diagnosis Codes That BlueCross BlueShield of Tennessee, Inc. (Contract H7917) Submitted to CMS | A-07-19-01195 | 9/29/2022 |
| Medicare Advantage Compliance Audit of Diagnosis Codes That Inter Valley Health Plan, Inc. (Contract H0545), Submitted to CMS | A-05-18-00020 | 9/26/2022 |
| Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Regence BlueCross BlueShield of Oregon (Contract H3817) Submitted to CMS | A-09-20-03009 | 9/13/2022 |
| Medicare Advantage Compliance Audit of Specific Diagnosis Codes That WellCare of Florida, Inc., (Contract H1032) Submitted to CMS | A-04-19-07084 | 8/29/2022 |
| Medicare Advantage Compliance Audit of Diagnosis Codes That Cigna HealthSpring of Florida, Inc. (Contract H5410) Submitted to CMS | A-03-18-00002 | 8/19/2022 |
| Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cariten Health Plan, Inc., (Contract H4461) Submitted to CMS | A-02-20-01009 | 7/18/2022 |
| Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Peoples Health (Contract H1961) Submitted to CMS | A-06-18-05002 | 5/25/2022 |
| Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Tufts Health Plan (Contract H2256) Submitted to CMS | A-01-19-00500 | 2/14/2022 |

| Report Title | Report Number | Date Issued |
|---|---|---|
| *Medicare Advantage Compliance Audit of Diagnosis Codes That SCAN Health Plan (Contract H5425) Submitted to CMS* | A-07-17-01169 | 2/3/2022 |
| *Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (Contract H3359) Submitted to CMS* | A-02-18-01029 | 1/5/2022 |
| *Medicare Advantage Compliance Audit of Specific Diagnosis Codes That UPMC Health Plan, Inc. (Contract H3907) Submitted to CMS* | A-07-19-01188 | 11/5/2021 |
| *Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Coventry Health Care of Missouri, Inc. (Contract H2663) Submitted to CMS* | A-07-17-01173 | 10/28/2021 |
| *Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Anthem Community Insurance Company, Inc. (Contract H3655) Submitted to CMS* | A-07-19-01187 | 5/21/2021 |
| *Medicare Advantage Compliance Audit of Diagnosis Codes That Humana, Inc., (Contract H1036) Submitted to CMS* | A-07-16-01165 | 4/19/2021 |
| *Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Blue Cross Blue Shield of Michigan (Contract H9572) Submitted to CMS* | A-02-18-01028 | 2/24/2021 |
| *Some Diagnosis Codes That Essence Healthcare, Inc., Submitted to CMS Did Not Comply With Federal Requirements* | A-07-17-01170 | 4/30/2019 |

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*                41

1117

**APPENDIX C: STATISTICAL SAMPLING METHODOLOGY**

**SAMPLING FRAME**

We identified Cigna enrollees who: (1) were continuously enrolled in Cigna throughout all of the 2015 or 2016 service year and January of the following year, (2) were not classified as being enrolled in hospice or as having end-stage renal disease status at any time during 2015 or 2016 or in January of the following year, and (3) received a high-risk diagnosis during 2015 or 2016 that caused an increased payment to Cigna for 2016 or 2017, respectively.

We presented the data for these enrollees to Cigna for verification and performed an analysis of the data included on CMS's systems to ensure that the high-risk diagnosis codes increased CMS's payments to Cigna. After we performed these steps, our finalized sampling frame consisted of 8,667 enrollee-years.

**SAMPLE UNIT**

The sample unit was an enrollee-year, which covered either payment year 2016 or 2017.

**SAMPLE DESIGN AND SAMPLE SIZE**

The design for our statistical sample comprised nine strata of enrollee-years. For the enrollee-years in each respective stratum, each individual received:

- an acute stroke diagnosis (that mapped to the HCC for Ischemic or Unspecified Stroke) on only one physician claim during the service year but did not have that diagnosis on a corresponding inpatient or outpatient hospital claim (1,399 enrollee-years);

- a diagnosis (that mapped to an Acute Heart Attack HCC) on only one physician or outpatient claim during the service year but did not have that diagnosis on a corresponding inpatient hospital claim either 60 days before or 60 days after the physician or outpatient claim (609 enrollee-years);

- a major depressive disorder diagnosis (that mapped to the HCC for Major Depressive, Bipolar, and Paranoid Disorders) on only one claim during the service year but did not have an antidepressant medication dispensed on his or her behalf (4,869 enrollee-years);

- a diagnosis (that mapped to an Embolism HCC) on only one claim during the service year but did not have an anticoagulant medication dispensed on his or her behalf (256 enrollee-years);

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*    *42*

1118

- a diagnosis related to vascular claudication (that mapped to the HCC for Vascular Disease) on only one claim during the service year (a diagnosis that had not been documented during the 2 years that preceded the service year), but had medication for neurogenic claudication dispensed on his or her behalf (442 enrollee-years);

- a lung cancer diagnosis (that mapped to the HCC for Lung and Other Severe Cancers) on only one claim during the service year but did not have surgical therapy, radiation treatments, or chemotherapy drug treatments related to the lung cancer diagnosis administered within a 6-month period before or after the diagnosis (119 enrollee-years);

- a breast cancer diagnosis (that mapped to the HCC for Breast, Prostate, and Other Cancers and Tumors) on only one claim during the service year but did not have surgical therapy, radiation treatments, or chemotherapy drug treatments related to the breast cancer diagnosis administered within a 6-month period before or after the diagnosis (448 enrollee-years);

- a colon cancer diagnosis (that mapped to the HCC for Colorectal, Bladder, and Other Cancers) on only one claim during the service year but did not have surgical therapy, radiation treatments, or chemotherapy drug treatments administered within a 6-month period before or after the diagnosis (243 enrollee-years); or

- a prostate cancer diagnosis (that mapped to the HCC for Breast, Prostate, and Other Cancers and Tumors), for an individual 74 years old or younger, on only one claim during the service year but did not have surgical therapy, radiation treatments, or chemotherapy drug treatments administered within a 6-month period before or after the diagnosis (282 enrollee-years).

The specific strata are shown in Table 3 on the following page.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*                43

1119

**Table 3: Sample Design for Audited High-Risk Groups**

| Stratum (High-Risk Groups) | Frame Count of Enrollee-Years | CMS Payment for HCCs in Audited High-Risk Groups | Sample Size |
|---|---|---|---|
| 1 – Acute stroke | 1,399 | $2,853,179 | 30 |
| 2 – Acute heart attack | 609 | 1,121,163 | 30 |
| 3 – Major depressive disorder | 4,869 | 11,853,541 | 60 |
| 4 – Embolism | 256 | 638,640 | 30 |
| 5 – Vascular claudication | 442 | 903,526 | 30 |
| 6 – Lung cancer | 119 | 759,024 | 30 |
| 7 – Breast cancer | 448 | 515,140 | 30 |
| 8 – Colon cancer | 243 | 563,755 | 30 |
| 9 – Prostate cancer | 282 | 329,439 | 30 |
| **Total** | **8,667** | **$19,537,407** | **300** |

**SOURCE OF RANDOM NUMBERS**

We generated the random numbers with the OIG, Office of Audit Services (OAS), statistical software.

**METHOD FOR SELECTING SAMPLE ITEMS**

We sorted the items in each stratum by beneficiary identification number and then consecutively numbered the items in each stratum in the stratified sampling frame. After generating 300 random numbers according to our sample design, we selected the corresponding frame items for review.

**ESTIMATION METHODOLOGY**

We used the OIG, OAS, statistical software to estimate the total amount of overpayments to Cigna at the lower limit of the two-sided 90-percent confidence interval (Appendix D). Lower limits calculated in this manner are designed to be less than the actual overpayment total 95 percent of the time.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*    *44*

1120

## APPENDIX D: SAMPLE RESULTS AND ESTIMATES

### Table 4: Sample Details and Results

| Audited High-Risk Groups | Frame Size | CMS Payment for HCCs in Audited High-Risk Groups (for Enrollee-Years in Frame) | Sample Size | CMS Payment for HCCs in Audited High-Risk Groups (for Sampled Enrollee-Years) | Number of Sampled Enrollee-Years With Unvalidated HCCs | Overpayment for Unvalidated HCCs (for Sampled Enrollee-Years) |
|---|---|---|---|---|---|---|
| 1 – Acute stroke | 1,399 | $2,853,179 | 30 | $66,086 | 29 | $62,466 |
| 2 – Acute heart attack | 609 | 1,121,163 | 30 | 51,144 | 29 | 41,309 |
| 3 – Major depressive disorder | 4,869 | 11,853,541 | 60 | 143,843 | 3 | 7,247 |
| 4 – Embolism | 256 | 638,640 | 30 | 71,322 | 22 | 51,125 |
| 5 – Vascular claudication | 442 | 903,526 | 30 | 59,197 | 7 | 12,872 |
| 6 – Lung cancer | 119 | 759,024 | 30 | 190,116 | 28 | 169,930 |
| 7 – Breast cancer | 448 | 515,140 | 30 | 33,276 | 28 | 31,104 |
| 8 – Colon cancer | 243 | 563,755 | 30 | 64,177 | 28 | 56,923 |
| 9 – Prostate cancer | 282 | 329,439 | 30 | 41,234 | 26 | 35,396 |
| **Total** | **8,667** | **$19,537,407** | **300** | **$720,395** | **200** | **$468,372** |

### Table 5: Estimated Overpayments in the Sampling Frame
### (*Limits Calculated for a 90-Percent Confidence Interval*)

| Point Estimate | $6,897,950 |
|---|---|
| Lower Limit | $6,247,399 |
| Upper Limit | $7,548,502 |

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*    45

1121

**APPENDIX E: FEDERAL REGULATIONS REGARDING COMPLIANCE PROGRAMS
THAT MEDICARE ADVANTAGE ORGANIZATIONS MUST FOLLOW**

Federal regulations (42 CFR § 422.503(b)) state:

Any entity seeking to contract as an MA organization must . . . .

(4) Have administrative and management arrangements satisfactory to CMS, as demonstrated by at least the following . . . .

(vi) Adopt and implement an effective compliance program, which must include measures that prevent, detect, and correct non-compliance with CMS' program requirements as well as measures that prevent, detect, and correct fraud, waste, and abuse. The compliance program must, at a minimum, include the following core requirements:

(A) Written policies, procedures, and standards of conduct that—

(1) Articulate the organization's commitment to comply with all applicable Federal and State standards;

(2) Describe compliance expectations as embodied in the standards of conduct;

(3) Implement the operation of the compliance program;

(4) Provide guidance to employees and others on dealing with potential compliance issues;

(5) Identify how to communicate compliance issues to appropriate compliance personnel;

(6) Describe how potential compliance issues are investigated and resolved by the organization; and

(7) Include a policy of non-intimidation and non-retaliation for good faith participation in the compliance program, including but not limited to reporting potential issues, investigating issues, conducting self-evaluations, audits and remedial actions, and reporting to appropriate officials . . . .

(F) Establishment and implementation of an effective system for routine monitoring and identification of compliance risks. The

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*    *46*

1122

system should include internal monitoring and audits and, as appropriate, external audits, to evaluate the MA organization, including first tier entities', compliance with CMS requirements and the overall effectiveness of the compliance program.

(G) Establishment and implementation of procedures and a system for promptly responding to compliance issues as they are raised, investigating potential compliance problems as identified in the course of self-evaluations and audits, correcting such problems promptly and thoroughly to reduce the potential for recurrence, and ensure ongoing compliance with CMS requirements.

   (1)  If the MA organization discovers evidence of misconduct related to payment or delivery of items or services under the contract, it must conduct a timely, reasonable inquiry into that conduct.

   (2)  The MA organization must conduct appropriate corrective actions (for example, repayment of overpayments, disciplinary actions against responsible employees) in response to the potential violation referenced in paragraph (b)(4)(vi)(G)(1) of this section.

   (3)  The MA organization should have procedures to voluntarily self-report potential fraud or misconduct related to the MA program to CMS or its designee.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Cigna-HealthSpring Life & Health Insurance Company, Inc. (H4513) Submitted to CMS (A-07-19-01192)*    *47*

1123

**APPENDIX F: CIGNA-HEALTHSPRING LIFE & HEALTH INSURANCE COMPANY COMMENTS**



July 11, 2022

**Thomas A. Young**
Managing Director
Medicare Compliance Officer
Cigna Medicare

500 Great Circle Road
Nashville, Tennessee 37228
Email: Thomas.Young@healthspring.com

U.S. Department of Health & Human Services
Office of Inspector General
Office of Audit Services, Region VII
Attn: James Korn
Regional Inspector General for Audit Services
601 East 12th Street, Room 0429
Kansas City, MO 64106

Re:      Response to Draft Report Number: A-07-19-01192

Cigna HealthSpring Life & Health Insurance Company, Inc. ("Cigna") appreciates the opportunity to respond to the Draft Report provided by the U.S. Department of Health and Human Services Office of Inspector General ("OIG") in connection with the Medicare Advantage Compliance Audit of Specific Diagnosis Codes that Cigna (contract H4513) Submitted to CMS.[1]/ Through contract H4513, Cigna provides healthcare and prescription drug benefits to more than 115,000 Medicare Advantage ("MA") beneficiaries in Texas.

We are a committed partner to OIG, the Centers for Medicare & Medicaid Services ("CMS"), and the MA program. We believe the MA program serves Medicare beneficiaries so well because of the partnership between CMS and MA organizations ("MAOs") like Cigna. In the spirit of that partnership, we previously shared details regarding our risk adjustment policies, procedures, and practices with CMS a number of times over the course of many years. CMS has not instructed us that we are required to make any changes to our risk adjustment program.

We believe that the basic premise of OIG's audit is inconsistent with risk adjustment data validation regulations and CMS standards for data accuracy. OIG's sampling methodology targeted diagnoses that were already suspected to not be supported and did not include looking for unreported, unrelated diagnoses. OIG ignored the fact that there may be supported diagnoses not submitted to CMS.

---

[1]/      OIG, *DRAFT – Medicare Advantage Compliance Audit of Specific Diagnosis Codes that Cigna-HealthSpring Life & Health Insurance Company, Inc. (Contract H4513) Submitted to CMS,* A-07-19-01192 (April 2022) ("Draft Report").

1

As a result, OIG's audit was skewed toward identifying "overpayments" and was not an unbiased audit seeking to promote payment integrity and accuracy.

We believe these issues affected the audit results. In particular, we do not believe the audit results reflect the strength of Cigna's compliance activities. Cigna has a strong and effective compliance program that is designed to comply with all relevant legal and regulatory requirements. Cigna's current compliance program recently received positive feedback from both CMS and OIG. In Cigna's contract-level RADV audit of H5410 in 2021, OIG observed that Cigna "ha[s] a compliance program to ensure that [it] submitted accurate diagnosis codes for use in CMS' risk adjustment program" and that our "policies and procedures [are] generally effective." Also in 2021, Cigna underwent a CMS Program Audit and there were no findings related to the effectiveness of Cigna's compliance program.

As we describe in detail below, Cigna requests that OIG revise its Draft Report and withdraw its recommendations. We stand ready to work collaboratively with OIG, CMS, and other stakeholders to address the attached response together in an open, cooperative, and transparent way. We would appreciate the opportunity to meet prior to the finalization of the Draft Report to discuss our feedback and how it might be incorporated into the Final Report.

Thank you for your consideration.

Sincerely,

*Thomas A. Young*

Thomas A. Young
Medicare Compliance Officer

CC: Aparna Abburi, President, Medicare and Care Allies
Erin Wessling, Chief Counsel

Attachments

2

**RESPONSE TO DRAFT AUDIT REPORT A-07-19-01192**

**EXECUTIVE SUMMARY**

Cigna appreciates the opportunity to respond to the Draft Report provided by OIG. Through contract H4513, Cigna provides healthcare and prescription drug benefits to more than 115,000 MA beneficiaries in Texas.

We believe that the basic premise of OIG's audit is inconsistent with risk adjustment data validation ("RADV") regulations and CMS standards for data accuracy and that the audit methodology was flawed. These issues affected the audit results.

- OIG's audit was skewed toward identifying "overpayments" and was not an unbiased audit seeking to ensure payment integrity and accuracy.

- OIG's sampling methodology targeted diagnoses that were already suspected to not be supported and the review did not include looking for unreported, unrelated diagnoses. This type of biased review cannot produce a comprehensive picture of accuracy because it deliberately ignores the fact that there may be supported diagnoses not submitted to CMS.

- The audit methodology shared with us does not discuss how OIG and its contractor identified or evaluated potential underpayments. In general, the overall intent of MAO payment audits is to determine whether the MAO has been accurately paid. However, targeting nine specific diagnoses to the exclusion of anything that had previously not been submitted, artificially inflates the proposed "overpayment." OIG should have considered the previously unreported diagnosis codes when considering and calculating its proposed "overpayment."

- The flaws in OIG's audit methodology are evidenced by the fact that no MAO has performed well during any of the audits targeting high-risk diagnoses. Even MAOs like Cigna, that have had very high accuracy ratings in contract-level RADVs, have scored much lower because of many flaws in the methodology. In fact, OIG shared that Cigna's performance is in the "upper echelon" of MAOs under review in this audit series.

- We believe that 6 of the sampled enrollee-years that OIG and its contractor did not validate should have been validated under the applicable statutes, regulations, and CMS guidance. Our review also indicates that OIG and its contractor did not capture 19 previously unreported diagnoses that accurately reflect our enrollees' health status.

- OIG determined whether a diagnosis was at high-risk for noncompliance and was valid based on what a provider decided to recommend to a member, whether a member decided to seek recommended treatment within an OIG-defined period of time, and where or how a member sought treatment. This is inherently problematic and arbitrary. By applying these arbitrary standards of medical practice and "health status," OIG supplants its medical knowledge for that of members' treating providers and in turn applies arbitrary payment standards to Cigna.

- OIG's narrowly defined documentation timing standards conflicted with its sampling methodology. Specifically, OIG included members' diagnoses in its sample based on whether a provider recommended and a member followed up with treatment within an OIG-defined period of time. But, when OIG's defined period of time for treatment (for example, 6 months after a cancer diagnosis) fell outside of the audit time (2015 and 2016 dates of service), OIG refused to

i

**RESPONSE TO DRAFT AUDIT REPORT A-07-19-01192**

consider documentation outside of the audit time, even if the records were from a patient visit two or three days removed from when the original diagnosis was reached. By rigidly adhering to an artificially limited time period, and refusing to consider records from subsequent visits based solely on how the calendar fell, OIG improperly limited Cigna's ability to offer substantiating proof.

- OIG's extrapolation of potential overpayments is not appropriate or authorized by Congress.

In addition to these flaws in the OIG's audit methodology, Cigna does not agree with OIG's recommendation to conduct additional audits related to the high-risk diagnoses and Cigna does not agree with OIG's recommendation that Cigna examine existing compliance procedures.

For these reasons, discussed in greater detail below, we respectfully request OIG recalculate its estimated overpayment amount to account for these errors and withdraw its recommendations for extrapolation, additional auditing, and compliance program review.

RESPONSE TO DRAFT AUDIT REPORT A-07-19-01192

I. **Cigna Does Not Concur with OIG's Findings Because the Audit Design and Intent is Inconsistent with RADV Regulations and Standards for Data Accuracy.**

We respectfully request that OIG withdraw its findings given that its overall audit design and intent are inconsistent with risk adjustment data validation regulations and CMS standards for data accuracy. Specifically, (a) OIG's audit does not ensure payment accuracy; (b) OIG's sampling and review methodology was improperly skewed toward identifying "overpayments"; (c) OIG ignores the long-standing principle that MAOs are not required to have perfect data; and (d) OIG fails to recognize that perfection in risk adjustment data is not possible.

a. *OIG's Audit Does Not Ensure Payment Accuracy*

MA regulations at 42 C.F.R. §§ 422.2 and 422.311(a) establish that a payment audit of an MAO conducted by the Secretary of HHS ensures the integrity and accuracy of risk adjustment payment data. Over the last fifteen years, CMS has developed and proposed multiple audit and sampling methodologies and has undergone multiple rounds of industry engagement, in an attempt to establish a sampling methodology that ensures payment integrity and accuracy. However, OIG's audit was not designed to ensure risk adjustment payment integrity and accuracy.

OIG's audit methodology was so targeted that it could not equally identify overpayments and underpayments. In particular, the sample frame targeted nine specific diagnosis categories that OIG hypothesized, prior to conducting the audit, are likely to be at high risk for noncompliance based on medical claims data and prescription drug claims data, and therefore likely to have resulted in an "overpayment." This biased targeting resulted in findings that do not ensure accuracy because the audit was not designed to look at payment accuracy, which would include both overpayments and underpayments. OIG neither (1) simultaneously conducted an audit of members for which Cigna was most likely underpaid (i.e., members with no or few submitted HCCs), nor (2) allowed Cigna to demonstrate support for and receive credit for diagnosis codes that had not previously been submitted to CMS for the audited members that were unrelated to the target diagnosis codes ("net new").

These issues affected the audit results. In our view, the issues indicate that OIG's audit methodology is not sufficiently designed to identify underpayments, and, as a consequence, does not appear to generate a statistically valid "net" overpayment figure for the audit sample. And, as discussed in more detail below, this reinforces our concern that the proposed overpayment figure used by OIG cannot be an adequate basis for a valid extrapolation.

The flaws in OIG's targeted audit methodology are evidenced by the fact that no MAO has performed well during any of the audits targeting high-risk diagnoses. Even MAOs like Cigna, which recently completed a contract-level RADV audit of H5410 that resulted in a 97% payment accuracy rate finding, are scoring much lower because of the flawed audit methodology. In fact, OIG shared that Cigna's performance is in the "upper echelon" of MAOs under review in this audit series. Further, it indicates that if OIG's targeted audit was designed for payment accuracy, as required by 42 C.F.R. § 422.311(a), then the findings would be different and would be a much more accurate reflection of the MAO's risk adjustment data validation.

Finally, the timing of the audit also makes payment accuracy unachievable as a practical matter. This audit covered dates of service in 2015 and 2016. The five and six year gap between the encounters at issue and the audit creates a significant data validation issue for Cigna. Providers may have moved, left our network, retired, or passed away. Paper records may have been lost. Electronic health record (EHR)

1

RESPONSE TO DRAFT AUDIT REPORT A-07-19-01192

systems may have been upgraded or replaced, making older electronic records harder or impossible to access. Facilities and other practices may not cooperate with requests seeking records from that far in the past (and they face no realistic sanction for deciding they cannot or do not wish to cooperate). These and similar practical realities make it impossible for OIG to assess payment accuracy via a RADV-styled audit of targeted high-risk diagnoses.

> b. *OIG's Sampling and Review Methodology was Improperly Skewed Towards Identifying "Overpayments"*

> i. **Sampling Methodology**

OIG's sampling methodology targeted diagnoses that were already suspected to not be supported and as a result, OIG's audit was not an unbiased audit seeking to promote payment integrity and accuracy. OIG's audit was first biased towards overpayment by creating a universe of members who had only certain diagnoses, then OIG and a Medicare Administrative Contractor ("MAC") (as discussed below) limited that universe to instances where such diagnoses did not have evidence of Medicare-reimbursed follow-up care which the OIG determined to be an indication that the diagnosis was at high-risk of noncompliance, and then identified a sample from that limited universe. OIG only focused on samples that it viewed to be high-risk diagnoses so that it could only identify a potential overpayment. OIG did not simultaneously create a sample of members for whom it would seek to identify under-reported diagnoses or underpayments. As a result, OIG skewed any potential findings to only identify overpayments and exclude all other diagnoses.

Further, OIG's development of its sampling methodology was arbitrary and relied on a source that lacks sufficient MA experience. OIG relied on medical professionals from a MAC to identify HCCs that were at a high risk for noncompliance.[2] As CMS describes, "a MAC is private health care insurer that

[3] MACs do not process MA claims or encounter data.

MACs are assigned to CMS-established jurisdictions, and there are currently 12 MACs that focus on Parts A and B FFS claims. No MAC is assigned to evaluate the MA risk adjustment system. OIG did not explain why it consulted a MAC, disclose the MAC it consulted, indicate whether the MAC it consulted had expertise to assist OIG in determining which diagnoses submitted by an MA plan may be "high risk for noncompliance," or disclose the type of or qualifications of medical professionals employed by the MAC that OIG relied upon. This lack of transparency results in Cigna being unable to evaluate how the standards it, and its contracted treating providers, are being held to, were developed or the qualifications of the entity developing such standards. Further, given that MACs have expertise in identifying potential errors in FFS data, OIG's reliance on a MAC and its recognition of a MAC's familiarity with FFS errors further

---

[2]    *See* Draft Report, Appendix A: Audit Scope and Methodology, page 19.
[3]    *See* CMS, *"What's a MAC?"* at https://www.cms.gov/Medicare/Medicare-Contracting/Medicare-Administrative-Contractors/What-is-a-MAC#:~:text=A%20Medicare%20Administrative%20Contractor%20(MAC,%2DService%20(FFS)%20beneficiaries.

2

RESPONSE TO DRAFT AUDIT REPORT A-07-19-01192

underscores the need for a FFS Adjuster. But as discussed below in *Section II.e*, OIG did not apply a FFS Adjuster to any of its findings.

In addition, OIG's sampling methodology arbitrarily used the lack of Medicare prescription drug data or a member's decision to not seek follow up care that was evidenced in Medicare data within an OIG-invented timeframe to flag diagnoses as being at high risk for noncompliance. By developing and applying this sampling methodology, OIG was replacing its clinical expertise for that of members' treating providers. Further, OIG's reliance on the lack of Medicare prescription drug data to flag and potentially invalidate a provider-reported diagnosis stands in stark contrast to MA risk adjustment rules, which do not recognize pharmacies and prescription drug data as acceptable sources for risk adjustment data.

### ii. Review Methodology

OIG's review of medical records was also skewed to only identify overpayments. Once OIG identified the sample of members that it considered to have the targeted high-risk diagnoses, OIG's reviewers only reviewed the limited acceptable medical records for such members for evidence of the targeted high-risk diagnosis or a related diagnosis. OIG ignored the fact that for each identified member, there may be supported diagnoses not previously submitted to CMS (i.e., "underpayments"), creating additional bias toward identifying "overpayments." As OIG is aware, an MAO cannot reopen payment years to add diagnoses that it determines were not previously reported. The payment years subject to this audit were closed multiple years ago. By OIG limiting its review to only instances of potential "overpayments," OIG knew that Cigna would be unable, on its own, to demonstrate that it was not in fact "overpaid" because Cigna is not able to submit diagnoses identified in 2021 as support for dates of services in 2015 and 2016. The only way for Cigna to be credited for such previously unreported codes, and for this audit to ensure payment accuracy, is for OIG to take such diagnoses into account.

We also note that the medical record review was not limited to coding and documentation issues. Instead, it incorporated a review of the clinical validity of the provider's diagnosis. CMS requires that plans only be responsible for the accuracy of the coding of the diagnosis as provided by a practitioner.[4] The ICD Guidelines and American Hospital Association (AHA) Coding Clinic similarly state that coders do not have the ability or authority to question a provider's diagnostic statement, as documented.[5] For that reason, CMS has not permitted the certified coders conducting its medical record reviews to attempt to assess the clinical validity of diagnoses.[6] Unfortunately, we believe that OIG's contractor went beyond assessing coding and questioned the clinical validity of providers' diagnostic statements. For instance, the audit methodology indicates that a physician was required to serve as a tie-breaker when at least one coder already determined a code to be supported. The fact that a practitioner submitted the code to the MAO

---

[4]    65 Fed. Reg. 40170, 40251 (June 29, 2000) ("we have restricted the attestation requirement to confirmation of the completeness of the data and the accuracy of coding.") CMS also has refused on a number of occasions to specific clinical criteria for particular diagnoses. *See supra* n.30.

[5]    *ICD-10-CM Official Guidelines for Coding and Reporting*, 13 (2019) ("[A]ssignment of a diagnosis code is based on the provider's diagnostic statement that the condition exists. The provider's statement that the patient has a particular condition is sufficient."); AHA Coding Clinic, *Ask the Editor* (2016) ("Coders should not be disregarding physician documentation and deciding on their own, based on clinical criteria, abnormal test results, etc., whether or not a condition should be coded.").

[6]    CMS, *Statement of Work for the Recovery Audit Program*, 23 (2011) ("[C]ertified coders shall ensure they are not looking beyond what is documented by the physician. ... Clinical validation is beyond the scope of [a coding] validation, and the skills of certified coder.").

3

RESPONSE TO DRAFT AUDIT REPORT A-07-19-01192

and at least one coder found it to be supported should not require a physician tie-breaker unless that physician was questioning the clinical validity of the provider's diagnostic statements.[7]

Further, in direct conflict with the Coding Guidelines and the Coding Clinic, as discussed in *Section II.c.v*, OIG's review methodology was specifically designed to question a provider's diagnostic statement, as documented, because OIG's methodology was clinically targeted to determine whether a given member was prescribed or received care that OIG determined should have been provided.

### c. *OIG Disregards that MAOs Are Not Required to Have Perfect Data*

The perfection standard posited by the Draft Report reflects either a misunderstanding of CMS regulations or a rejection of the data standards set by CMS. For instance, the Draft Report cites 42 C.F.R. § 422.504(*l*) in taking the position that MA organizations "are responsible for the accuracy, completeness, and truthfulness of the data submitted to CMS." Importantly, however, the attestation referred to in the Draft Report and defined by subsection 422.504(*l*) is limited to the plan's "best knowledge, information and belief." CMS included this limitation to "allow for honest mistakes and unavoidable margins of error"[8] and "in recognition of the fact that [MA organizations] cannot reasonably be expected to know that every piece of data is correct."[9] CMS also recognized at the time that "it would be unfair and unrealistic to hold [MA organizations] to a '100 percent accuracy' certification standard."[10] CMS has since reiterated that there is no requirement "to verify every diagnosis submitted by every provider."[11] OIG, itself, also has recognized that an MA organization's attestation "does not constitute an absolute guarantee of accuracy."[12]

The Draft Report also cites 42 C.F.R. § 422.503(b)(vi), which requires organizations to adopt an "effective" compliance program, to suggest that because OIG concluded that some HCCs were not valid, Cigna should evaluate its compliance program to ensure compliance with 42 C.F.R. § 422.503(b)(vi). Perfection is not required in order for a compliance program to be "effective." OIG has "recognize[d that] the implementation of an effective compliance program may not entirely eliminate fraud, abuse and waste from an organization."[13]

---

[7]     Because the information has not been provided to date, we do not know how many records were subject to physician review during this audit. However, a recent report regarding another MA organization indicated that the physician reviewed the medical records related to approximately 10% of the audit sample. *See* OIG, *Medicare Advantage Compliance Audit of Diagnosis Codes that Humana, Inc. (Contract H1036) Submitted to CMS*, A-07-16-01165, 15 n.14 (Apr. 2021).

[8]     65 Fed. Reg. 40170, 40250 (June 29, 2000).

[9]     *Id.* at 40268.

[10]     *Id.*

[11]     79 Fed. Reg. 29843, 29925 (May 23, 2014).

[12]     64 Fed. Reg. at 61900. The draft report also appears to suggest that perfection is required by 42 C.F.R. § 422.310(d)(l), which states that MA organizations "must submit data that conform to CMS' requirements for data equivalent to Medicare fee-for-service data, when appropriate, and to all relevant national standards." That regulation, however, does not relate to data validation. That rule refers to the "national standards" that define the *format* used by providers to submit claims in the FFS program. *See* 63 Fed. Reg. 34968, 35006 (June 26, 1998) ("The format of the data we will require will be identical to the data we require of original Medicare providers...."); *see also id.* at 35007 (directing the use of the HCFA 1500 paper form or the electronic UB-92).

[13]     64 Fed. Reg. 61893, 61895 (Nov. 15, 1999). *See also* United States Sentencing Manual 8B2.1(a) ("The failure to prevent or detect the instant offense does not necessarily mean that the program is not generally effective in preventing and detecting criminal conduct."); Application Note 2(A)(i) ("effectiveness" must be assessed based on "applicable industry practice or the standards called for by any applicable governmental regulation"). We are not aware of OIG ever having indicated that an "effective" compliance program in any context needs to or is required to achieve perfection. *Cf.* Fed. Reg. 23731, 23732 (May 5, 2003) ("The OIG recognizes that the implementation of a compliance program may not entirely eliminate improper conduct from

4

RESPONSE TO DRAFT AUDIT REPORT A-07-19-01192

A perfection standard also would conflict with the "same methodology" requirement in 42 U.S.C. § 1395w-23(b)(4)(D). This provision mandates CMS calculate risk adjustment payments in the MA program using the "same methodology" as when calculating the average risk factor for the FFS program. CMS does not audit the FFS data it uses to establish the average FFS risk score using the RADV documentation standards; it, therefore, accepts that those data contain significant errors. Similarly, as discussed in greater detail below in connection with the extrapolation methodology used to prepare the Draft Report, a perfection standard also would violate the actuarial equivalence requirement in 42 U.S.C. § 1395w-23(a)(1)(C)(i).[14] Finally, we note that the federal courts uniformly decline to require perfection as a standard of measure in the Medicare program.[15]

d. *Perfection in Risk Adjustment Is Not Possible.*

The perfection standard reflected in the Draft Report also is inconsistent with the realities and limitations of attempting to perform a risk adjustment function. As CMS has recognized, risk adjustment data "come into [MAOs] in great volume and from a number of sources."[16] In particular, an overwhelming majority of the risk adjustment data for our Texas contract (more than 64%) were submitted by the healthcare providers that treated our enrolled beneficiaries. Although we do make coding and documentation training available to those providers, we ultimately cannot control their submissions.

In addition, coding and documentation disagreements are inevitable and often arise from factors outside the control of any MAO. Diagnosis coding is an inherently subjective process and there often are substantial differences in interpretation and opinion among health care practitioners and certified coders regarding a broad array of coding issues. CMS generally does not require providers to use any particular diagnostic or clinical criteria and allows providers to use their best professional judgment.[17] OIG is aware of these differences in interpretation as evidenced by its review methodology that included multiple reviewers for coding disagreements. "One study examining coding variation found that when 11 experienced, active medical coders reviewed 471 medical records and were told they would be reevaluated, all of the coders differed in one or more data fields for more than half of the records."[18] In addition, the coding standards (which have never gone through notice and comment) are often vague and ambiguous and the source of variable coding throughout the health care industry.[19]

---

the operations of a pharmaceutical manufacturer."); 70 Fed. Reg. 4858, 4859 (Jan. 31, 2005) ("The OIG recognizes that implementation of a compliance program may not entirely eliminate improper or unethical conduct from the operations of health care providers.").

[14]    *See infra* at Section II.e.

[15]    *See, e.g., U.S. ex rel. Janssen v. Lawrence Mem. Hosp.*, 949 F.3d 533, 543-44 (10th Cir. 2020) (citing *U.S. ex rel. Conner v. Salina Reg. H. Ctr.*, 543 F.3d 1211, 1220-21 (10th Cir. 2008)); *U.S. ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 310 (3d Cir. 2011)).

[16]    65 Fed Reg. at 40628.

[17]    *See, e.g.*, 75 Fed. Reg. at 73401 ("We believe that physicians can use their best clinical judgment in the detection and diagnosis of cognitive impairments ...."); 76 Fed. Reg. at 73308 (similar quote).

[18]    Kimberly O'Malley, *Measuring Diagnoses: 1 CD Code Accuracy*, 40 Health Serv. Res. 1620 (2005).

[19]    For instance, in a series of prior audits, OIG identified Kwashiorkor as a condition that had been frequently miscoded. OIG, *CMS Did Not Adequately Address Discrepancies in the Coding Classification for Kwashiorkor*, A03-14-00010 (Nov. 2017) ("We reviewed the medical records for 2,145 inpatient claims at 25 providers and found that all but 1 claim incorrectly included the diagnosis code for Kwashiorkor ...."). OIG determined that the root cause of this problem was an ambiguity in the ICD guidelines adopted by CMS. *See id.* ("The ICD-CM coding classification contained a discrepancy between the tabular list and the alpha index on the use of diagnosis code 260. In the alpha index, four other malnutrition diagnoses corresponded to diagnosis code 260, but in the tabular list, diagnosis code 260 was only for Kwashiorkor.").

5

RESPONSE TO DRAFT AUDIT REPORT A-07-19-01192

We do not think it is correct to automatically conclude that a diagnosis is unsupported if the relevant medical record is missing. When a provider submits a diagnosis code, that submission is evidence that the provider in fact made the relevant diagnosis. We agree that MAOs should be required to make a good faith effort to locate the relevant records. However, when the record cannot be obtained from the provider through reasonable diligence, particularly after a significant period of time has elapsed, the absence of the record is not, in our view, a sufficient basis to reject a diagnosis code submitted by a provider.[20]

Additionally, obtaining medical records from providers is often very challenging. For many of our provider partners who seek to provide such records, responding to medical record requests for visits that occurred five to six years prior can be administratively burdensome, and such burden has been further exacerbated by the COVID-19 public health emergency and staff shortages. For MAOs, the consolidation of hospital systems and large provider groups and the increasing number of providers who are publicly traded or private investor-backed has led to some large groups and health systems refusing to respond to records requests in a timely fashion, if at all, especially when they know that an MAO requires their participation in certain areas to satisfy network adequacy requirements. MAOs have very little leverage, and almost no recourse, when providers do not provide the medical records requested, even though the consequence of a provider's lack of cooperation is significant for the MAO, as is demonstrated by the Draft Report.

* * *

OIG designed and conducted an audit that was inconsistent with RADV regulations and CMS standards for data accuracy. By not focusing on payment accuracy and reviewing for both "overpayments" and "underpayments," OIG skewed any potential results towards identifying "overpayments." Further, OIG ignored long-standing principles that perfection in risk adjustment data is not possible and MAOs are not required to have perfect data. For these reasons, we respectfully request OIG withdraw its findings and reconsider its audit design and methodology.

II.   Cigna Does Not Concur with OIG's Estimated and Extrapolated Repayment Amount and Respectfully Requests OIG Recalculate to Address Errors in OIG's Analysis of Certain Enrollee-Years, Remove The Impact of Underlying Biases, and Ensure Actuarial Equivalence

We respectfully request OIG withdraw its recommended repayment amount and recalculate it, when possible, to (a) address errors in OIG's analysis of certain enrollee-years; (b) include previously unreported diagnoses; (c) remove the impact of underlying biases; and (c) ensure actuarial equivalence.

a.   *OIG's Recommended Repayment Amount is Incorrect Because Certain Sample Enrollee-years that OIG Found to be Unsupported are Supported by Documentation in the Relevant Medical Records*

---

[20]   Because RADV audits are not defined by statute, the Administrative Procedure Act (APA) places the burden on OIG to advance an adequate basis to overturn CMS's risk adjustment payments. *See* 5 U.S.C. § 556(d) ("Except as otherwise provided by statute, the proponent of a rule or order has the burden of proof."); *see also OWCP v. Greenwich Collieries*, 512 U.S. 267, 276 (1994) ("the drafters of the APA used the term 'burden of proof' to mean the burden of persuasion"); *Steadman v. SEC*, 450 U.S. 91, 95 (1981) (APA defines "the degree of proof which must be adduced by the proponent of a rule or order to carry its burden of persuasion in an administrative proceeding").

6

RESPONSE TO DRAFT AUDIT REPORT A-07-19-01192

We believe that 6 of the sampled enrollee-years that OIG and its contractor did not validate should have been validated under the applicable statutes, regulations, and CMS guidance. Discussions of these enrollee-years are attached at **Exhibit A**. Please note that these exhibits contain protected health information and are not eligible for public disclosure.

b. *OIG's Recommended Repayment Amount is Incorrect Because It Does Not Consider Previously Unreported Diagnoses*

Similarly, our review indicates that OIG and its contractor did not capture 19 other previously unreported diagnoses that accurately reflect our enrollees' health status. This includes diagnoses that are related to the targeted high-risk categories and some that are unrelated. A list of these enrollee-years are attached at **Exhibit B**. Though documented, OIG did not validate any of these diagnosis codes.

For a number of reasons, discussed above, we are concerned that the audit methodology was not structured to equally identify both overpayments and underpayments. In particular, the audit methodology shared with us does not discuss how OIG and its contractor identified or evaluated potential underpayments, including the additional diagnoses we identified in our review. In general, the overall intent of payment audits is to determine whether the MAO has been paid accurately. However, targeting nine specific diagnoses to the exclusion of anything that previously had not been submitted artificially inflates the proposed "overpayment." When calculating a proposed "overpayment" amount, OIG should have sought to determine accuracy, which must offset any proposed "overpayments" by underpayments.

c. *OIG's Review Methodology was Needlessly Opaque and Did Not Adequately Identify the Independent Medical Review Contractor or the Coding and Documentation Standards Applied during the Medical Record Review. OIG Should Update its Draft Report to Include Additional Information Regarding its Medical Record Review.*

i. **OIG did not provide information regarding its independent medical review contractor or the credentials of reviewers.**

We request that OIG provide additional information regarding its review. For example, OIG has not identified the "independent medical record review contractor." Given the importance of this audit, we believe we have the right to know who is performing the review so we can evaluate whether there is a conflict of interest, assess the contractor's credentials, coding policies, procedures, and training, and see if the positions taken are consistent with prior work undertaken by the contractor, or statements made by it.

Further, Cigna received only the "final" determination by the medical record review contractor. The Draft Report indicates, however, that there were two or three levels of review. We believe it is important for us to be able to evaluate the results at each level, as the subjective nature of coding determinations would be revealed by differing conclusions among contractor personnel. It also does not appear the individuals conducting each level of review were consistently subject to inter-rater reliability ("IRR") (which we believe to be a standard practice in CMS audits). If they were subject to IRR, we should have the ability to evaluate the results of such reviews. We believe these issues affect our appeal rights under 42 C.F.R. § 422.311 and should be disclosed pursuant to the Data Quality Act and generally accepted audit practices.

ii. **OIG did not provide the coding and document standards applied during its review.**

7

RESPONSE TO DRAFT AUDIT REPORT A-07-19-01192

MAOs, and their network providers, are expected to submit diagnosis codes in accordance with ICD-10 coding guidelines. But, because of the lack of specificity, CMS has directed providers and plans to rely on coding and documentation guidance from industry experts such as the American Health Information Management Association (AHIMA), the American Medical Association (AMA), the American Hospital Association (AHA), and the American Academy of Processional Coders (AAPC). The scope of these resources is quite broad, they are not always consistent with one another, and they change over time. For example, while ICD-10 greatly increased the codes and descriptive nature of such codes when compared to ICD-9, ICD-10 still does not have a code for every specific diagnosis that a provider may make. There are many times where providers must decide whether the medical diagnosis that they are making aligns with one ICD-10 versus another, and coding sources do not consistently align the same diagnosis with the same ICD-10. Further, the sources that CMS recommends providers rely on often do not respond to questions in a timely manner (e.g., the AHA Coding Clinic, a well-respected source, takes more than six months to respond). Because of these inconsistencies and variations, OIG should identify the specific coding and documentation standards that were used to evaluate the targeted high-risk diagnoses, as required by relevant auditing standards.

### iii. Any coding and documentation standards applied during OIG's review were not validly established.

Even if OIG were to provide its coding and document standards, any standards applied during OIG's review were not validly established. The Medicare statute provides that any "policy" that "establishes or changes a substantive legal standard governing ... payment" must be established through notice and comment rulemaking.[21] The Supreme Court has explained that this obligation is broad and is likely to invalidate many policies found only in the Medicare manuals.[22] The HHS Office of General Counsel has further advised that, when a Medicare manual "set[s] forth payment rules that are not closely tied to statutory or regulatory standards, the government generally cannot use violations of that guidance in enforcement actions, because ... it was not validly issued."[23] In late 2020, HHS promulgated regulations stating that a component of HHS may not "use any guidance" to compel regulated entities "to take any action, or refrain from taking any action, beyond what is required by the terms of an applicable statute or regulation."[24]

As applied to this audit, the coding and documentation standards are offered as the difference between valid risk adjustment payments and alleged overpayments. The audit uses sub-regulatory standards to define the scope of Cigna's entitlement to retain risk adjustment payments from CMS. CMS indicated in a 2018 proposed rule that the RADV coding and documentation guidance defines "the

---

[21]   42 U.S.C. § 1395hh(a)(2). The APA requires that all substantive rules be established through notice and comment. 5 U.S.C. § 553. However, because the notice and comment obligation imposed by the Medicare statue is broader than the equivalent APA requirement, *see generally Azar v. Allina Health Services*, 139 S. Ct. 1804 (2019), we focus on the Medicare statute.

[22]   *See Allina Health*, 139 S. Ct. at 1814.

[23]   Memorandum from Kelly M. Cleary, *Impact of Allina on Medicare Payment Rules*, 2 (Oct. 31, 2019); *see also, e.g., Polansky v. Exec. Health Res., Inc.*, 422 F. Supp. 3d 916 (E.D. Pa. 2019).

[24]   45 C.F.R. § 1.3(a)(2). Although HHS has proposed to rescind this regulation, it has not finalized that proposal, and the regulation therefore remains binding on the agency.

8

RESPONSE TO DRAFT AUDIT REPORT A-07-19-01192

payment standard" for MA risk adjustment payments.[25/] To be valid, that standard must be established through notice and comment.

The notice and comment issue is made more significant by the fact that many aspects of the payment standard are defined by private entities. The ICD-CM coding guidelines are a core RADV requirement. Those guidelines are established jointly by CMS and two private entities (the AHA and AHIMA) through a largely closed process that does not involve notice and comment. As noted above, the RADV process also relies on publications from the AMA, AHIMA, the AAPC, and others, which do not involve public input, are not always consistent with each other, and change without notice. The Medicare statute and the APA do not allow CMS to delegate its responsibility to establish risk adjustment standards to private, non-governmental entities.[26/] OIG's potential reliance on these standards is improper for all of the reasons stated.

> iv. **OIG's narrowly defined documentation requirements conflicted with OIG's sampling methodology such that records that would substantiate a diagnosis were not acceptable if outside of the narrow time frame of the audit.**

For many of the targeted high-risk diagnoses, OIG's determining factor for whether such diagnosis should be in the sample was whether a subsequent or previous claim or diagnosis was submitted to the MAO and then to CMS. For example:

- Diagnoses for lung, breast, colon, and prostate cancer were considered suspect by OIG and therefore included in the potential sample, if CMS had not received evidence of "surgical therapy, radiation treatments, or chemotherapy treatment drugs administered within a 6-month period before or after the diagnosis."

- Acute heart attack diagnoses from outpatient providers were included in the potential sample if the diagnosis was not also reported from an inpatient hospital encounter either 60 days prior or after the diagnosis in question.

- Acute stroke diagnoses from outpatient providers were included in the potential sample if the diagnosis was not also reported by either another outpatient encounter or an inpatient encounter.

- Both major depressive disorder and embolism diagnoses were included in the potential sample if the diagnosed member did not fill a prescription drug associated with the condition through their Medicare Part D plan, with no specific time frame set forth.

OIG developed the parameters for when a diagnosis would be considered a high risk of noncompliance; however, OIG's documentation requirements relating to timing prohibited Cigna from submitting documentation that would substantiate a diagnosis. For example, records for members diagnosed with cancer in late 2016 who later sought treatment in early 2017 would not be reviewed by OIG even though such treatment was obtained within OIG's arbitrarily defined 6-month window. Further,

---

[25/]     *See* 83 Fed. Reg. 54928, 55041 (Nov. 1, 2018) ("If a payment has been made to an MA organization based on a diagnosis code that is not supported by medical record documentation, that entire payment is in error and should be recovered in full, because the payment standard has not been met.").

[26/]     *See, e.g., U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565-56 (D.C. Cir. 2004) ("subdelegations to outside parties are assumed to be improper absent an affirmative showing of congressional authorization").

9

RESPONSE TO DRAFT AUDIT REPORT A-07-19-01192

for members who were diagnosed with major depressive disorder or embolism late in a plan year and filled a related prescription early in the following plan year, records for such a prescription fill would both be time barred as being outside of the audit time period and not considered to be a valid source of risk adjustment data. This disregard of documentation and support for a diagnosis code based on an arbitrary date range in such a targeted audit ignores the fact that for MA members and their plan providers, the end of a calendar year does not change how providers deliver care. Further, as discussed directly below, when, where or whether a member elects to obtain follow-up care is not a valid basis to determine that a documented diagnosis is not supported.

> v. **OIG Determining Whether a Diagnosis is Valid Based on What a Provider Decides to Recommend to a Member, Whether a Member Decides to Seek Recommended Treatment, or Where or How a Member Seeks Recommended Treatment is Inherently Problematic and Arbitrary.**

We know of no CMS guidance suggesting that the health status of a member that is reported through a diagnosis submitted by their treating provider is disproved solely by whether a provider prescribes a certain course of treatment or whether a member elects to follow through with such treatment. We believe that, absent indicia of fraud, the treating provider's notation of a diagnosis should be given wide latitude and deference, especially when significant time has passed from when the patient was seen and when the OIG reviewer evaluates the medical record. And we do not believe "indicia of fraud" includes a provider deciding to not prescribe treatment identified by OIG as being appropriate or by a member electing to not follow up. By applying these arbitrary standards of medical practice and "health status," OIG seeks to supplant its medical knowledge years later for that of members' treating providers.

As we discussed, OIG identified diagnoses that were at high risk of noncompliance by consulting with medical professionals at an MAC. How are a non-clinical federal agency and a randomly selected federal contractor well-suited to determine clinical guidelines that will identify whether a member has a given diagnosis assigned by the member's treating provider? If a member's provider decides not to prescribe a drug because such drug would interact poorly with the member's other drugs, this audit would identify the diagnosis as at high risk of noncompliance based on the provider's clinical decision making. Identifying such diagnoses as unsupported would be clinically inaccurate and such a finding would result in OIG and its MAC consultant supplanting the provider's clinical decision making with their own. OIG does not have this authority.

Further, if a provider counseled a member on treatment options all of the following common situations would result in the OIG considering the provider's diagnosis as being at "high risk of noncompliance:" (1) the member elected to not follow up, (2) the member was not able to afford the cost share charged for their prescribed prescription so they did not fill the prescription, (3) the member elected to fill a prescription through their Veterans Affairs ("VA") pharmacy, (4) the member paid cash and used a discount card (e.g., GoodRx, SingleCare, etc.), and (5) the member elected to use widely available manufacturer coupons (which continue to be offered by manufacturers to Part D members, sometimes with OIG's approval[27]). All of these situations result in an MA plan not receiving a claim or PDE for the

---

[27]    *See e.g.,* OIG Advisory Opinion No. 14-05 (Jul. 21, 2014) (approving manufacturer's direct-to-patient product sales program that offers a brand name drug (for which there is a generic equivalent) at a discount much lower than the manufacturer's wholesale acquisition cost, allowing the patient to pay for the drug out of pocket with no charge to the insurer); OIG Advisory Opinion No. 07-04 (Mar. 30, 2007) (approving pharmaceutical company patient assistance program that provides

10

RESPONSE TO DRAFT AUDIT REPORT A-07-19-01192

member filling a prescribed drug, but do not suggest that a member does not have a diagnosis that their provider assigned to them. Identifying such diagnoses as unsupported would be clinically inaccurate and such a finding would result in OIG and its MAC consultant supplanting the member's personal choices with their own. OIG does not have this authority.

For example, Cigna member assigned as "audit sample #11-280" was diagnosed with prostate cancer in 2014. The member was informed of the diagnosis and discussed treatment options with his provider, and elected to undergo watchful waiting with monitoring of his PSA levels. In 2015, the provider continued to monitor the member's PSA levels in June and documented in September that the member will continue to be monitored. Current American Society of Clinical Oncology guidelines state that men with low-volume Gleason prostate cancer (which this member had) may be considered for active surveillance, and that is what the member and his provider elected. The OIG invalided the diagnosis of prostate cancer. Identifying such a diagnosis as unsupported was clinically inaccurate, as summarized on **Exhibit A**, and this finding results in OIG and its MAC consultant supplanting the member's personal choices with their own.

Additionally, OIG ignored information regarding members seeking care outside of the Medicare program. The most blatant example of this is care provided through the VA. Cigna, like many MAOs, offers MA plans to many veterans who receive benefits from the Veterans Health Administration as well as an MA plan. Such members may elect to see providers under either benefit. Under OIG's audit, diagnoses that are documented by the member's provider are at "high risk of noncompliance" if such member seeks follow up care at the VA, because such care does not produce a Medicare claim. Invalidation on such basis is clinically inaccurate.

For example, Cigna member assigned as "audit sample #11-292" was diagnosed with and treated for prostate cancer in 2006, and continued to be prescribed Lupron for his prostate cancer in 2016. Further, in 2016, the member was prescribed an additional drug to treat prostate cancer (Casodex) and his treating provider noted that that member was obtaining oncology follow-up care through the VA. As OIG is well aware,[28/] Lupron is a widely used drug to treat prostate cancer, covered under a member's medical benefit and not under Part D. Even though the member was actively being treated with Lupron and Casodex, and was obtaining oncology follow-up care through the VA, OIG invalidated the diagnosis. Identifying such a diagnosis as unsupported was clinically inaccurate, as summarized on **Exhibit A**.

### vi. Cigna understands some of the coding and documentation standards applied during this audit are inconsistent with the statute and/or medical practice.

As the Draft Report recognizes, the Medicare statute requires that risk adjustment payments be made based on the "health status" of each enrolled member.[29/] The risk adjustment system relies on the ICD-CM diagnosis codes only as a proxy for such statuses.[30/] Often, however, the coding and documentation standards published by the AHA, AHIMA, the AAPC, etc. turn on formalities or criteria that do not address the beneficiary's health status. Such standards also have the effect of preventing Cigna and other plans from presenting important, credible evidence regarding their members' health statuses.

---

free outpatient prescription drugs to financially needy Part D enrollees entirely outside of the Part D benefit); OIG Advisory Opinion No. 06-04 (Apr. 18, 2006) (same).

[28/]     *See* OIG, *Medicare Reimbursement for Lupron*, OEI-03-03-00250, January 2004.

[29/]     *See* Draft Report at 1, 2, 3, and 6.

[30/]     *See id.* at 1 ("To determine the health status of enrollees, CMS relies on … diagnosis codes …").

11

RESPONSE TO DRAFT AUDIT REPORT A-07-19-01192

Cigna has submitted detailed comments to OIG and CMS previously relating to examples of how the coding and documentation standards applied during RADV audits, including this type of audit, are inconsistent with the statute that establishes payment based on health status. Some examples include the limited definition of a "medical record,"[31]/ limitations on physician[32]/ and provider and source types,[33]/ the signature requirement,[34]/ exclusion of attestations for all matters other than signatures, and inaccurate clinical guidelines.[35]/

In this specific audit, the exclusion of prescription data as a validation source when OIG itself used the lack of prescription data to determine whether certain diagnoses were considered high-risk for noncompliance, is arbitrary and further demonstrates the inaccuracy of the audit results. Additionally, the fact that RADV guidance currently precludes MAOs from using prescription data to establish beneficiary health status, even though the relationship between some medications and health status is clear (e.g., insulin is prescribed for diabetes), is particularly problematic given that the RADV rules for the Affordable Care Act expressly allow for the use of prescription data in risk adjustment.[36]/

We believe many of the above issues would have been addressed if the RADV rules and payment standards for MA had been established through notice and comment, and OIG had followed them. As the Supreme Court recently explained: "Notice and comment gives affected parties fair warning of potential changes in the law and an opportunity to be heard on those changes—and it affords the agency a chance to avoid errors and make a more informed decision."[37]/ The partnership between CMS and committed plans, like Cigna, works best when policy is the product of full and frank dialogue as occurs in notice and comment rulemaking. Because this dialogue has not taken place as it applies to documentation standards, it is inappropriate for OIG to rely on such standards in this audit.

d.   *Extrapolation of Potential Overpayments is Inappropriate and Not Authorized by Congress*

We do not believe that extrapolation has been authorized by Congress in this situation. Part C of the Medicare statute does not authorize extrapolated recoveries and, in the absence of explicit Congressional authorization, we believe extrapolation is not available.[38]/

Significantly, Congress addressed extrapolation in Part E of the Medicare statute. That provision states that an audit involving a contractor "may not use extrapolation ... unless the Secretary determines that—(A) there is a sustained or high level of payment error; or (B) documented educational intervention

---

[31]/     CMS, *Risk Adjustment User Group 2007/2008 – February 2008 Questions & Answers* (Feb. 13, 2008).

[32]/     Gregory C. Pope, et al., *Diagnostic Cost Group Hierarchical Condition Category Models for Medicare Risk Adjustment – Final Report*, ES-11 to ES-13 (Dec. 21, 2000) (prepared for the Health Care Financing Administration pursuant to Contract No. 500-95-048) ("Final HCC Report").

[33]/     *Id.* at 5-6 and 5-8.

[34]/     *See, e.g.*, 74 Fed. Reg. 54634, 54675 (Oct. 22, 2009).

[35]/     Compare AHA Coding Clinic 3Q 1993, *with* AHA Coding Clinic Q1 2019.

[36]/     HHS, *Creation of the 2018 Benefit Year HHS-Operated Risk Adjustment Adult Models Draft Prescription Drug (RXCUIs) to HHS Drug Classes (RXCs) Crosswalk* (Sept. 18, 2017).

[37]/     *Allina Health*, 139 S. Ct. at 1816.

[38]/     We note that CMS previously told Congress that it lacked such authority and unsuccessfully requested a legislative change to authorize extrapolation in RADV audits. *See* Departments of Labor, Health and Human Services, Education, and Related Agencies Appropriations for 2011: Hearings Before the H.R. Comm. on Appropriations, 111th Cong. pt. 7 at 14 (2010) (written statement of William Corr, Deputy Sec'y, Dep't of Health & Human Servs.); *see also* Ctrs. for Medicare & Medicaid Servs., Dep't of Health & Human Servs., Fiscal Year 2011 Performance Budget 177 (2010) (describing proposal that would "[c]larify in statute that CMS can extrapolate the error rate found in the risk adjustment validation (RADV) audits to the entire MA plan payment for a given year when recouping overpayments"). We believe this reflects an acknowledgement that CMS does not have the authority. *See U.S. House of Representatives v. Burwell*, 185 F. Supp. 3d 165, 186 (D.D.C. 2016).

12

RESPONSE TO DRAFT AUDIT REPORT A-07-19-01192

has failed to correct the payment error."[39] Neither of these conditions have been met here. Because of the many faults in the sampling and review methodology of this audit, discussed in detail above, we believe it is not possible to accurately identify a sustained or high level of payment error with the targeted methodology used by OIG in this audit. Further, Cigna did not fail to correct a payment error after receiving documented educational intervention by OIG or CMS. Instead, five to six years after diagnoses were reported by treating providers, OIG elected to work with an undisclosed MAC to develop a list of diagnoses and criteria for such diagnoses that OIG and the MAC determined were high risk. Cigna only received notice of what conditions OIG and the MAC considered high risk when it received the audit notice in 2019.[40]

Even if extrapolation were permitted, the methodology used would have to adhere to the final methodology established by CMS. In 2010, CMS created regulations governing the conduct of RADV audits using the Secretary's authority to establish MA program standards.[41] At the time, the regulations applied only to audits conducted by CMS.[42] Four years later, however, the regulations were amended to apply to all RADV audits conducted by any component of HHS, including OIG.[43] The preamble explained that the amendments were intended to clarify that the RADV regulations applied to RADV audits conducted by OIG pursuant to its authority under the Inspector General Act.[44] The preamble also addressed the statistical sampling and extrapolation methodologies to be used during such audits.[45] It stated that audits would be conducted using the methodology published by CMS in February 2012,[46] unless an updated methodology was published after opportunity for stakeholder comment.[47] To date, no update has been made to that methodology.[48] Even to the extent that extrapolation has been authorized by statute (which we believe is not the case), the 2014 rulemaking made the February 2012 methodology binding for all RADV audits.[49] And, as discussed further below, the February 2012 methodology adopted the use of a "FFS adjuster" to function as "an offset" to "account[] for the fact that the documentation standard used in RADV audits ... is different from the documentation standard used" in the FFS program.[50] OIG's proposed extrapolation disregarded this necessary adjustment.

---

[39]    42 U.S.C. § 1395ddd(f)(3).

[40]    As OIG is aware, while Cigna received notice of the audit in 2019, the audit was postponed because of the COVID-10 Public Health Emergency and the burden that record collection would place on health professionals during the PHE.

[41]    See 74 Fed. Reg. 54634, 54674-75 (Oct. 22, 2009) (explaining that the RADV appeals process was created pursuant to section 1856(b)(1) of the Social Security Act); 75 Fed. Reg. 19678, 19742 (Apr. 15, 2010) (same).

[42]    See 75 Fed. Reg. at 19804 (former 42 C.F.R. § 422.2: the term RADV audit meant "a CMS-administered payment audit"); id. at 19806 (former 42 C.F.R. § 422.311(a): "CMS annually conducts RADV audits ..."). We note, however, that OIG generally adhered to CMS's RADV policies in place at that time.

[43]    See 42 C.F.R. § 422.2 (RADV audit means "a payment audit of a MA organization administered by the Secretary"); 42 C.F.R. § 422.311(a) ('the Secretary annually conducts RADV audits ...").

[44]    See 79 Fed. Reg. 29843, 29934 (May 23, 2014).

[45]    See id. at 29927-28 (discussing the Final RADV Methodology).

[46]    CMS, Notice of Final Payment Error Calculation Methodology for Part C Medicare Advantage Risk Adjustment Data Validation Contract-Level Audits (Feb. 24, 2012) ("Final RADV Methodology")

[47]    See supra n.45

[48]    We are, of course, aware that CMS published a proposal to change the final methodology in November 2018. As discussed below, however, the February 2012 methodology remains binding on OIG until a new approach is finalized and takes effect.

[49]    We note that the decision by HHS to standardize all RADV audits is sound policy. It would be inconsistent with the APA for different components of HHS to conduct the same type of audits using different methodologies. This would raise the possibility of identically situated MA plans receiving different audit outcomes based on which HHS component conducted the audit.

[50]    Final RADV Methodology at 4-5.

13

RESPONSE TO DRAFT AUDIT REPORT A-07-19-01192

OIG's audit was designed to analyze targeted high-risk diagnoses that OIG expected to fail. As discussed earlier, this process is contrary to the data validation processes set forth in the February 2012 methodology. We are not aware of an analysis establishing that OIG's approach is superior to the final audit methodology that HHS adopted through the 2014 rulemaking, and warrants extrapolation. For these reasons, extrapolation is inappropriate and unauthorized by Congress.

e. *OIG's Estimated and Extrapolated Repayment Amount is Incorrect Because it is Not Adjusted to Ensure Actuarial Equivalence*

Statute and regulation require CMS to pay MAOs an amount that is "actuarially equivalent" to the expected cost that CMS would have otherwise incurred had it provided required Medicare benefits directly to the MAO's enrollees.[51] CMS does this by making risk-adjusted payments to MAOs that are based on actuarially sound calculations of the expected cost of providing traditional Medicare benefits to enrollees with differing health statuses.[52]

Actuarial Standard of Practice 45, section 3.2 requires that the "type of input data that is used in the application of risk adjustment should be reasonably consistent with the type of data used to develop the model."[53] In 2011, the American Academy of Actuaries wrote that the inconsistency between the unaudited data to create the HCC model and extrapolation in RADV audits "not only creates uncertainty, it also may create systematic underpayment, undermining the purpose of the risk-adjustment system and potentially in payment inequities."[54] More recently, most qualified statisticians and actuaries to consider the question concluded that a significant FFS adjuster was essential to meeting the statutory requirement of actuarial equivalence.[55]

CMS developed the MA risk adjustment model using FFS claims data from the traditional Medicare program. The FFS claims data is unaudited and contains numerous errors that CMS must account for when determining whether similar errors for MA enrollees resulted in an overpayment. In 2012, CMS published a notice stating that it would incorporate the FFS error rate into its methodology for calculating recovery amounts for unsupported HCCs identified during its RADV audits. CMS said that it would first identify a "payment recovery amount" based on the value of supported and unsupported HCCs identified during its review.[56] Then, "to determine the final payment recovery amount, CMS [would] apply a Fee-for-Service

---

[51]    42 U.S.C. § 1395w-24(a)(5)(A), (a)(6)(A)(i)-(iii).

[52]    42 U.S.C. § 1395w-23(b)(4)(C), (D).

[53]    CMS is required to follow actuarial standards. *See* HHS Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated to the Public, Part II: HHS Agency Responsibilities and Guidelines, E. Centers for Medicare & Medicaid Services, V. Agency Quality Assurance Policies, Standards and Processes (Oct. 1, 2002).

[54]    Letter from Thomas F. Wildsmith, American Academy of Actuaries, to Cheri Rice, Acting Director, Medicare Plan Payment Group, *Re: Comment on RADV Sampling and Error Calculation Methodology*, 2 (Jan 21, 2011).

[55]    *See, e.g.*, Avalere Health, *Eliminating the FFS Adjuster from the RADV Methodology May Affect Plan Payment* (Mar. 2019); Avalere Health, *Impact of Eliminating the FFS Adjuster May Vary Based on Plan Enrollee Characteristics* (Aug. 21, 2019); Sean Creighton, *The FFS Adjuster matters for accurate Medicare Advantage payment: An examination of the methodology and evidence behind a regulatory proposal to eliminate the adjuster*, RISE Health (Dec. 11, 2019); Rob Pipich, Milliman, *Medicare Advantage RADV FFS adjuster: White paper* (Aug. 23, 2019); Matthew G. Mercurio, *Response to CMS "Fee for Service Adjuster and Payment Recovery for Contract Level Risk Adjustment Data Validation Audits" Announcement* (Aug. 27, 2019); Bo Martin, Ankura Consulting Group, *Comment Regarding CMS's Proposals Not to Implement a "Fee-for-Service Adjuster" For RADV Audits and To Implement a Sub-Cohort Audit Method* (Aug. 27, 2019); Ross Winkelman, Wakely Consulting Group, *Actuarial Report on CMS' November 1, 2018 Proposed Rule* (Aug. 27, 2019); Julia Lambert, Wakely Consulting Group, *Actuarial Report on Medicare Advantage FFS Adjuster* (Aug 28, 2019); Stefan Boedeker, *Comment on The Centers for Medicare and Medicaid Services Proposed Rule* (Aug. 28, 2019).

[56]    CMS, *Notice of Final Payment Error Calculation Methodology for Part C Medicare Advantage Risk Adjustment Data Validation for Contract-Level Audits*, at 3–4 (Feb. 24, 2012).

14

RESPONSE TO DRAFT AUDIT REPORT A-07-19-01192

Adjuster ("FFS Adjuster") amount as an offset to the preliminary recovery amount." The FFS Adjuster would be based "on a RADV-like review of records submitted to support [traditional Medicare] claims data."[57]

CMS tried to shift away from this principle in 2014 when it implemented a rule stating that MAOs receive an "overpayment" when they submit any diagnosis code to CMS that is not sufficiently supported by underlying medical records, without adjusting for error rates in traditional Medicare data.[58] This rule was struck down when a federal district court found that it violated the actuarial equivalence mandate by defining "overpayment" as the payment of funds to MAOs based on unsupported diagnosis codes without applying a FFS Adjuster or other mechanism to maintain actuarial equivalence.[59] Although the district court's ruling was partially overturned by the D.C. Circuit's finding that actuarial equivalence does not apply to the overpayment rule,[60] the D.C. Circuit itself distinguished the overpayment rule from the actuarial equivalence standard that applies to CMS' calculation and disbursement of monthly payments to MAOs[61] and from RADV audits, which more broadly impacts payments to MAOs because such audits are designed to require repayment for all unsupported diagnosis codes.[62]

Amidst this litigation, CMS issued a proposed rule in 2018 suggesting that diagnosis coding errors in unaudited traditional Medicare data do not systematically impact payments to MAOs.[63] Many MAOs and numerous other parties, including actuarial and statistical experts, submitted comments to CMS explaining that the 2018 proposal does not satisfy the actuarial equivalence requirement. CMS was required to take action on this rule in November 2021 but instead, CMS extended its deadline for an additional year to November 2022 as it continues to contemplate how to handle this significant issue and potential significant change in practice and policy.[64] As a result, the proposed rule remains subject to the administrative rulemaking process.

The actuarial equivalence requirement extends to OIG's estimation and extrapolation of a potential "overpayment" amount in this audit. OIG did not apply a FFS Adjuster to account for errors in the data used to create the risk adjustment payment model. The lack of FFS Adjuster violates important principles of administrative law, in particular the requirement for prospective notice and comment rulemaking. It also would mark a departure from OIG's past audit practices. In prior contract-level RADV audits, OIG

---

[57]    *Id.*

[58]    *See* 79 Fed. Reg. 29844, 29921 (May 23, 2014), implementing 42 C.F.R. § 422.326.

[59]    *UnitedHealthcare Ins. Co. v. Azar*, 330 F. Supp. 3d 173, 187–90 (D.D.C. 2018). The court concluded that by measuring overpayments without adjusting for error rates in traditional Medicare, "The consequence is inevitable: while CMS pays for all diagnostic codes, erroneous or not, submitted to traditional Medicare, it will pay less for Medicare Advantage coverage because essentially no errors would be reimbursed." *Id.* at 187. This position was reaffirmed on January 27, 2020 when the same court denied the government's request to reconsider the court's prior holding. *Azar*, No. 16-cv-157 (RMC), 2020 WL 417867 (D.D.C. Jan. 27, 2020).

[60]    *See UnitedHealthcare Inc. Co. v. Becerra*, 16 F.4th 867 (D.C. Cir. 2021), *cert. denied*, No. 21-1140, 2022 WL 2203436 (U.S. June 21, 2022).

[61]    *See id.* at 884.

[62]    *See id.* at 892. Cigna does not agree with the D.C. Circuit's decision regarding the overpayment rule because actuarial equivalence in the MA risk adjustment system is statutorily required and cannot be achieved or maintained without it applying to all payment contexts within the risk adjustment system, but in any event, the D.C. Circuit's decision by its own terms was limited to the overpayment rule and "expresses no opinion" with respect to actuarial equivalence in RADV audits. *Id.* at 893 n.1.

[63]    83 Fed. Reg. 54982, 55041 (Nov. 1, 2018).

[64]    *See* CMS, *Extension of Timeline To Finalize a Rulemaking*, 86 Fed. Reg. 58,245.

15

acknowledged that the actuarial equivalence requirement made it inappropriate to estimate an extrapolated audit liability in the absence of a FFS Adjuster:

> Although an analysis to determine the potential impact of error rates inherent in FFS data on MA payments was beyond the scope of our audit, we acknowledge that CMS is studying this issue and its potential impact on audits of [MAOs]. Therefore, because of the potential impact of these error rates on the CMS model that we used to recalculate MA payments for the beneficiaries in our sample, we (1) modified one recommendation to have [the MAO] refund only the overpayments identified for the sampled beneficiaries rather than refund the estimated overpayments and (2) added a recommendation that [the MAO] work with CMS to determine the correct contract-level adjustments for the estimated overpayments.[65]

OIG made similar statements in two prior audits involving Cigna affiliates.[66] Because the relevant circumstances have not changed since those prior audits, the APA requires, in our view, that OIG follow the same approach in this audit.[67]

Considering this history, it is not possible for OIG to determine whether Cigna received an overpayment without establishing an actuarially sound methodology that takes into account diagnosis coding errors in the FFS data. As a result, OIG's estimated and extrapolated repayment amount is both legally and actuarially unsound.

### f.  OIG's Extrapolated Repayment Amount Relies on a Confidence Interval that is Too Conservative and Inconsistent with CMS RADV Audit Practice

OIG acknowledged it was taking a conservative position by using the lower limit of a two-sided 90-percent confidence interval to calculate the extrapolated repayment amount, rather than the statistically valid and more robust practice of using the lower limit of a 95-percent or 99-percent confidence interval.[68] OIG provides no explanation for its decision to do so, which is unusual because CMS uses the lower limit of a 99-percent confidence interval when calculating extrapolated repayment amounts for its Medicare Advantage RADV audits.

\* \* \*

For the reasons discussed here, we believe that OIG's estimated and extrapolated repayment amounts are incorrect. We respectfully request OIG withdraw its recommended repayment amount and recalculate it to (a) address errors in OIG's analysis of certain enrollee-years; (b) include previously unreported diagnoses; (c) remove the impact of underlying biases; (d) disregard unwarranted extrapolation, and (e) ensure actuarial equivalence.

---

[65]     OIG, *Risk Adjustment Data Validation of Payments Made to PacifiCare of California for Calendar Year 2007 (Contract Number H0543)*, A-09-09-00045, ii-iii (Nov. 2012).

[66]     OIG, *Bravo Health Pennsylvania, Inc. (Contract H3949), Submitted Many Diagnoses to the Centers for Medicare & Medicaid Services That Did Not Comply With Federal Requirements for Calendar Year 2007*, A-03-09-00003, 7 (Sept. 2013); OIG, *Cigna Healthcare of Arizona, Inc. (Contract H0354), Submitted Many Diagnoses to the Centers for Medicare & Medicaid Services That Did Not Comply With Federal Requirements for Calendar Year 2007*, A-0710-01082, iii (May 2013).

[67]     *See, e.g., Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 31 (D.D.C. 1997).

[68]     Draft Report at 8.

16

RESPONSE TO DRAFT AUDIT REPORT A-07-19-01192

III.  **Cigna Does Not Concur with OIG's Recommendation that Cigna Conduct Additional Auditing Related to the High-Risk Diagnoses Included in the Audit and Respectfully Requests that OIG Update its Draft Report to Withdraw this Recommendation**

OIG recommends that Cigna "identify, for the high-risk diagnoses included in [the Draft Report], similar instances of noncompliance that occurred before or after [the] audit period and refund any resulting overpayments to the Federal Government[.]"[69] However, MA regulations do not require the sort of audits that OIG recommends and do not require data perfection. By making this recommendation, OIG is holding MAOs to standards that are unknown, vague, and nonexistent. Further, if Cigna undertook an audit similar to OIG's, it could not result in "risk adjustment payment integrity and accuracy"[70] because Cigna would not be permitted to submit diagnosis codes that it determined were supported but not previously submitted given that all plan years other than 2021, and 2022 are closed for resubmissions.

As discussed above in *Section I*, a payment audit designed to target errors without considering and recognizing diagnoses that are supported but not previously submitted, does not ensure payment accuracy and is improper. For OIG to recommend that Cigna repeat such an audit across multiple years on its own is excessively penal. We respectfully request that OIG withdraw its recommendation that Cigna conduct additional audits.

IV.  **Cigna Does Not Concur with OIG's Recommendation that Cigna Examine Existing Compliance Procedures and Respectfully Requests that OIG Update its Draft Report and Withdraw its Recommendation**

OIG recommends that Cigna "continue its examination of its existing compliance procedures to identify areas where improvements can be made to ensure that diagnosis codes that are at high risk for being miscoded comply with Federal requirements...and take the necessary steps to enhance those procedures."[71]

However, Cigna has a strong and effective compliance program that is designed to comply with all relevant legal and regulatory requirements. In fact, in 2021, when conducting a contract-level RADV audit of H5410, OIG observed that Cigna "ha[s] a compliance program to ensure that [it] submitted accurate diagnosis codes for use in CMS' risk adjustment program" and that our "policies and procedures [are] generally effective." Also in 2021, Cigna underwent a CMS Program Audit and there were no findings related to Cigna's compliance program.

During its audit, OIG reviewed Cigna's diagnosis data from 2015 and 2016, and issued a finding regarding the overall effectiveness of policies and procedures that are in place today. But as part of its ongoing efforts to further strengthen its compliance program, Cigna has made numerous changes to that program over the last several years. This is standard practice for a company like Cigna. The current policies and procedures have no bearing on 2015 and 2016 dates of service and as such, there is no basis for findings related to Cigna's current compliance program. It is beyond the scope of OIG's audit to make recommendations related to Cigna's current compliance activities.

OIG's audit was not designed to determine whether Cigna's current practices would have addressed the issues potentially identified in 2015/2016 data. Cigna's current compliance program

---

[69]  Draft Report at 18.
[70]  *See* 42 C.F.R. §422.311(a).
[71]  Draft Report at 18.

17

RESPONSE TO DRAFT AUDIT REPORT A-07-19-01192

recently received positive feedback from both CMS and OIG. Cigna's recent contract-level RADV in Florida found a 97% coding accuracy rate and included positive statements regarding Cigna's compliance program. Also in 2021, Cigna underwent a CMS Program Audit and there were no findings related to Cigna's compliance program.

The Draft Report cites 42 C.F.R. § 422.503(b)(vi), which requires organizations to adopt an "effective" compliance program. But, as stated above, OIG has "recognize[d that] the implementation of an effective compliance program may not entirely eliminate fraud, abuse and waste from an organization."[72] OIG's Draft Report makes two potentially misleading statements in this respect.[73]

First, the Draft Report states that "[f]ederal regulations state that [MAOs] must monitor the data that they receive from providers and submit to CMS."[74] However, this statement is incomplete. CMS gives MAOs broad discretion to design their own compliance and risk adjustment data accuracy programs and has declined to require MAOs to implement any specific oversight measures.

Second, the Draft Report also states that federal regulations "state that [MAOs] are responsible for the accuracy, completeness, and truthfulness of the data submitted to CMS for payment purposes."[75] This statement is again incomplete because it fails to account for the qualified attestation standard that CMS explicitly adopted. MAOs are not held to a standard of guaranteeing the accuracy of the risk adjustment data that is submitted. Instead, MAOs have to attest that the submissions are accurate to their best knowledge, information and belief.

Relying on these misleading broad characterizations of CMS regulations, OIG has inappropriately expanded the MA compliance program requirements. CMS is undoubtedly aware of industry-wide trends related to the high-risk diagnoses audited by OIG. Nevertheless, CMS has not opted to take any action to implement regulations or additional requirements, let alone the broad recommendations OIG makes in its Draft Report. We observe again that we have shared details regarding our risk adjustment policies and procedures with CMS many times over the years. CMS has not asked us to change our policies or procedures or identified any specific areas that require additional enhancements. For this reason, too, we think that the second recommendation should be withdrawn.

OIG's recommendations based on 2015 and 2016 dates of service also fail to consider changes in medical documentation practices that have occurred over the last 6 to 7 years. During that time, MAOs, including Cigna, have put forth significant effort to educate providers regarding the appropriate use of some of the specific codes targeted by OIG in this audit (e.g., when to use acute stroke versus history of stroke, heart attack versus history of a heart attack). OIG's recommendation ignores this effort and the likely effect of this effort on coding in 2022.

Additionally, at the end of 2015, which was after many of the service dates at issue in the audit, providers transitioned from ICD-9 to ICD-10 coding. The more specific diagnosis codes available under ICD-10 changed physician diagnosis coding practices so that they were more easily able to identify "history of" codes as being the appropriate code to report for their applicable patients. As a result, the related

---

[72]   64 Fed. Reg. 61894, 61895 (Nov. 15, 1999).
[73]   64 Fed. Reg. at 61900. The Draft Report also appears to suggest that perfection is required by 42 C.F.R. § 422.310(d)(l), which states that MA organizations "must submit data that conform to CMS' requirements for data equivalent to Medicare fee-for-service data, when appropriate, and to all relevant national standards." However, 310(d)(1) does not establish or reference any standards that require 100% accuracy in order for a compliance program to be effective.
[74]   Draft Report at 9.
[75]   Draft Report at 8.

18

RESPONSE TO DRAFT AUDIT REPORT A-07-19-01192

compliance functions required today are entirely different from those needed to ensure compliance under ICD-9.

It also seems that, simply by virtue of the fact that it discovered supposedly unsupported diagnosis codes through its targeted audit, OIG believes Cigna's compliance policies and procedures must not have been effective. But as we have discussed throughout our comments, perfection is not the standard that CMS imposes and OIG has long recognized that. The fact that OIG identified supposedly unsupported diagnoses, through its skewed audit sampling and review methodology, does not indicate that Cigna's compliance program is ineffective, particularly when measured by MA program guidance.

## V.    Conclusion

For the reasons described, we believe that the overall intent and design of OIG's audit is contrary to MA regulations and the goal of payment accuracy audits. Cigna respectfully requests OIG withdraw its recommendations and update its Draft Report to account for the inherent bias in such a targeted audit. Cigna further requests that OIG revise its Draft Report and withdraw its recommendations that Cigna (a) refund to the Federal Government $6,281,045 of estimated overpayments, (b) identify similar instances of noncompliance outside of the audit period and refund any resulting overpayments, and (c) examine existing compliance procedures to identify where improvements can be made to ensure diagnosis codes that are at high risk for being miscoded comply with Federal requirements.

19

**EXHIBIT D-47**

# Department of Health and Human Services

## OFFICE OF
## INSPECTOR GENERAL

# MEDICARE ADVANTAGE COMPLIANCE AUDIT OF SPECIFIC DIAGNOSIS CODES THAT HEALTHFIRST HEALTH PLAN, INC., (CONTRACT H3359) SUBMITTED TO CMS

*Inquiries about this report may be addressed to the Office of Public Affairs at*
*Public.Affairs@oig.hhs.gov.*



Amy J. Frontz
Deputy Inspector General
for Audit Services

January 2022
A-02-18-01029

# *Office of Inspector General*

https://oig.hhs.gov

The mission of the Office of Inspector General (OIG), as mandated by Public Law 95-452, as amended, is to protect the integrity of the Department of Health and Human Services (HHS) programs, as well as the health and welfare of beneficiaries served by those programs. This statutory mission is carried out through a nationwide network of audits, investigations, and inspections conducted by the following operating components:

## *Office of Audit Services*

The Office of Audit Services (OAS) provides auditing services for HHS, either by conducting audits with its own audit resources or by overseeing audit work done by others. Audits examine the performance of HHS programs and/or its grantees and contractors in carrying out their respective responsibilities and are intended to provide independent assessments of HHS programs and operations. These audits help reduce waste, abuse, and mismanagement and promote economy and efficiency throughout HHS.

## *Office of Evaluation and Inspections*

The Office of Evaluation and Inspections (OEI) conducts national evaluations to provide HHS, Congress, and the public with timely, useful, and reliable information on significant issues. These evaluations focus on preventing fraud, waste, or abuse and promoting economy, efficiency, and effectiveness of departmental programs. To promote impact, OEI reports also present practical recommendations for improving program operations.

## *Office of Investigations*

The Office of Investigations (OI) conducts criminal, civil, and administrative investigations of fraud and misconduct related to HHS programs, operations, and beneficiaries. With investigators working in all 50 States and the District of Columbia, OI utilizes its resources by actively coordinating with the Department of Justice and other Federal, State, and local law enforcement authorities. The investigative efforts of OI often lead to criminal convictions, administrative sanctions, and/or civil monetary penalties.

## *Office of Counsel to the Inspector General*

The Office of Counsel to the Inspector General (OCIG) provides general legal services to OIG, rendering advice and opinions on HHS programs and operations and providing all legal support for OIG's internal operations. OCIG represents OIG in all civil and administrative fraud and abuse cases involving HHS programs, including False Claims Act, program exclusion, and civil monetary penalty cases. In connection with these cases, OCIG also negotiates and monitors corporate integrity agreements. OCIG renders advisory opinions, issues compliance program guidance, publishes fraud alerts, and provides other guidance to the health care industry concerning the anti-kickback statute and other OIG enforcement authorities.

# *Notices*

---

## THIS REPORT IS AVAILABLE TO THE PUBLIC
### at https://oig.hhs.gov

Section 8M of the Inspector General Act, 5 U.S.C. App., requires
that OIG post its publicly available reports on the OIG website.

## OFFICE OF AUDIT SERVICES FINDINGS AND OPINIONS

The designation of financial or management practices as
questionable, a recommendation for the disallowance of costs
incurred or claimed, and any other conclusions and
recommendations in this report represent the findings and
opinions of OAS.  Authorized officials of the HHS operating
divisions will make final determination on these matters.

## Report in Brief

Date: January 2022
Report No. A-02-18-01029



U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES
**OFFICE OF INSPECTOR GENERAL**

### Why OIG Did This Audit

Under the Medicare Advantage (MA) program, the Centers for Medicare & Medicaid Services (CMS) makes monthly payments to MA organizations according to a system of risk adjustment that depends on the health status of each enrollee. Accordingly, MA organizations are paid more for providing benefits to enrollees with diagnoses associated with more intensive use of health care resources than to healthier enrollees, who would be expected to require fewer health care resources.

To determine the health status of enrollees, CMS relies on MA organizations to collect diagnosis codes from their providers and submit these codes to CMS. Some diagnoses are at higher risk for being miscoded, which may result in overpayments from CMS.

For this audit, we reviewed one MA organization, Healthfirst Health Plan, Inc. (Healthfirst), and focused on seven groups of high-risk diagnosis codes. Our objective was to determine whether selected diagnosis codes that Healthfirst submitted to CMS for use in CMS's risk adjustment program complied with Federal requirements.

### How OIG Did This Audit

We sampled 240 unique enrollee-years with the high-risk diagnosis codes for which Healthfirst received higher payments for 2015 through 2016. We limited our review to the portions of the payments that were associated with these high-risk diagnosis codes, which totaled $787,928.

# Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (Contract H3359) Submitted to CMS

### What OIG Found

With respect to the seven high-risk groups covered by our audit, most of the selected diagnosis codes that Healthfirst submitted to CMS for use in CMS's risk adjustment program did not comply with Federal requirements. For 155 of the 240 enrollee-years, the diagnosis codes that Healthfirst submitted to CMS were not supported in the medical records and resulted in net overpayments of $516,509.

These errors occurred because the policies and procedures that Healthfirst had to detect and correct noncompliance with CMS's program requirements, as mandated by Federal regulations, were not always effective. On the basis of our sample results, we estimated that Healthfirst received at least $5.2 million in net overpayments for these high-risk diagnosis codes in 2015 and 2016.

### What OIG Recommends and Healthfirst Comments

We made a series of recommendations to Healthfirst, including that it: refund to the Federal Government the $5.2 million of net overpayments; identify, for the diagnosis codes described in this report, similar instances of noncompliance that occurred before or after our audit period and refund any resulting overpayments to the Federal Government; and continue its examination of existing compliance procedures to identify areas where improvements can be made to ensure diagnosis codes that are at high risk for being miscoded comply with Federal requirements and take the necessary steps to enhance those procedures.

Healthfirst objected to all of our recommendations; however, it did not object to any of the errors we identified. Instead, Healthfirst requested we limit our recommended recovery to the overpayments identified in our sample—not the extrapolated value of those overpayments. Healthfirst stated that OIG lacked the authority to use extrapolation to recommend a repayment and disagreed with our extrapolation methodology. It also stated that our audit methodology did not account for a payment principle known as "actuarial equivalence" and disagreed that it should perform audits of high-risk diagnoses or enhance its compliance program. After reviewing Healthfirst's comments, we maintain that our findings and recommendations are valid. No statutory authority limits our use of extrapolation to estimate a recovery and we correctly applied Federal requirements underlying the MA program.

The full report can be found at https://oig.hhs.gov/oas/reports/region2/21801029.asp.

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

    Why We Did This Audit .......................................................................................... 1

    Objective ................................................................................................................ 1

    Background ............................................................................................................. 2
        Medicare Advantage Program ....................................................................... 2
        Risk Adjustment Program .............................................................................. 2
        High-Risk Groups of Diagnoses ..................................................................... 4
        Healthfirst Health Plan, Inc. .......................................................................... 5

    How We Conducted This Audit .............................................................................. 6

FINDINGS ................................................................................................................... 7

    Federal Requirements............................................................................................ 7

    Most of the Selected High-Risk Diagnosis Codes That Healthfirst Submitted to
    CMS Did Not Comply With Federal Requirements ............................................... 8
        Incorrectly Submitted Diagnosis Codes for Acute Stroke...................................... 9
        Incorrectly Submitted Diagnosis Codes for Acute Heart Attack........................10
        Incorrectly Submitted Diagnosis Codes for Acute Stroke and
          Acute Heart Attack Combination .......................................................12
        Incorrectly Submitted Diagnosis Codes for Embolism......................................12
        Incorrectly Submitted Diagnosis Codes for Vascular Claudication....................13
        Incorrectly Submitted Diagnosis Codes for Major Depressive Disorder ............14
        Potentially Mis-keyed Diagnosis Codes ..............................................................14

    The Policies and Procedures That Healthfirst Used To Detect and Correct
    Noncompliance With Federal Requirements Were Not Always Effective...................15

    Healthfirst Received Net Overpayments ............................................................... 16

RECOMMENDATIONS ................................................................................................ 16

HEALTHFIRST COMMENTS AND OFFICE OF INSPECTOR GENERAL RESPONSE ...........................17

    Healthfirst Did Not Agree With The Extrapolation Methodology That The Office Of
    Inspector General Used To Estimate Overpayments...............................................17
        Healthfirst Comments...................................................................................17
        Office of Inspector General Response ..............................................................18

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359)
Submitted to CMS (A-02-18-01029)*

1152

Healthfirst Did Not Agree With The Office Of Inspector General's Application Of CMS
    Requirements For Calculating Overpayments ............................................................19
        Healthfirst Comments.........................................................................................19
        Office of Inspector General Response ................................................................20

Healthfirst Did Not Agree With The Office Of Inspector General's Recommendation
    To Perform Additional Reviews Before And After The Audit Period ...........................21
        Healthfirst Comments.........................................................................................21
        Office of Inspector General Response ................................................................22

Healthfirst Did Not Agree With The Office Of Inspector General's Recommendation
    To Enhance Its Existing Compliance Program ............................................................22
        Healthfirst Comments.........................................................................................22
        Office of Inspector General Response ................................................................23

**APPENDICES**

    A: Audit Scope and Methodology .........................................................................24

    B: Related Office of Inspector General Reports.....................................................27

    C: Statistical Sampling Methodology ...................................................................28

    D: Sample Results and Estimates.........................................................................31

    E: Federal Regulations Regarding Compliance Programs That
        Medicare Advantage Organizations Must Follow .....................................33

    F: Breakout of Potentially Mis-keyed Diagnosis Codes ........................................35

    G: Healthfirst Comments .....................................................................................39

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359)
Submitted to CMS (A-02-18-01029)*

1153

# INTRODUCTION

## WHY WE DID THIS AUDIT

Under the Medicare Advantage (MA) program, the Centers for Medicare & Medicaid Services (CMS) makes monthly payments to MA organizations based in part on the characteristics of the enrollees being covered. Using a system of risk adjustment, CMS pays MA organizations the anticipated cost of providing Medicare benefits to a given enrollee, depending on such risk factors as the age, sex, and health status of that individual. Accordingly, MA organizations are paid more for providing benefits to enrollees with diagnoses associated with more intensive use of health care resources relative to healthier enrollees, who would be expected to require fewer health care resources. To determine the health status of enrollees, CMS relies on MA organizations to collect diagnosis codes from their providers and submit these codes to CMS.[1] We are auditing MA organizations because some diagnoses are at higher risk for being miscoded, which may result in overpayments from CMS.

This audit is part of a series of audits in which we are reviewing the accuracy of diagnosis codes that MA organizations submitted to CMS.[2] Using data mining techniques and considering discussions with medical professionals, we identified diagnoses that were at higher risk for being miscoded and consolidated those diagnoses into specific groups. (For example, we consolidated 27 major depressive disorder diagnoses into 1 group.) This audit covered Healthfirst Health Plan, Inc. (Healthfirst),[3] for contract number H3359[4] and focused on seven groups of high-risk diagnosis codes for payment years 2015 and 2016.

## OBJECTIVE

Our objective was to determine whether selected diagnosis codes that Healthfirst submitted to CMS for use in CMS's risk adjustment program complied with Federal requirements.

---

[1] The providers code diagnoses using the International Classification of Diseases (ICD), Clinical Modification (CM), *Official Guidelines for Coding and Reporting* (ICD Coding Guidelines). The ICD is a coding system that is used by physicians and other health care providers to classify and code all diagnoses, symptoms, and procedures. Effective October 1, 2015, CMS transitioned from the ninth revision of the ICD coding guidelines (ICD-9-CM) to the tenth revision (ICD-10-CM). Each revision includes different diagnosis code sets.

[2] See Appendix B for a list of related Office of Inspector General reports.

[3] Healthfirst Health Plan, Inc. is a subsidiary of Healthfirst, Inc.

[4] All subsequent references to "Healthfirst" in this report refer solely to contract number H3359.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359) Submitted to CMS (A-02-18-01029)*    *1*

1154

## BACKGROUND

### Medicare Advantage Program

The MA program offers beneficiaries managed care options by allowing them to enroll in private health care plans rather than having their care covered through Medicare's traditional fee-for-service program.[5] Beneficiaries who enroll in these plans are known as enrollees. To provide benefits to enrollees, CMS contracts with MA organizations, which in turn contract with providers (including hospitals) and physicians.

Under the MA program, CMS makes advance payments each month to MA organizations for the expected costs of providing health care coverage to enrollees. These payments are not adjusted to reflect the actual costs that the organizations incurred for providing benefits and services. Thus, MA organizations will either realize profits if their actual costs of providing coverage are less than the CMS payments or incur losses if their costs exceed the CMS payments.

For 2019, CMS paid MA organizations $273.8 billion, which represented 34 percent of all Medicare payments for that year.

### Risk Adjustment Program

Federal requirements mandate that payments to MA organizations be based on the anticipated cost of providing Medicare benefits to a given enrollee and, in doing so, also account for variations in the demographic characteristics and health status of each enrollee.[6]

CMS uses two principal components to calculate the risk-adjusted payment that it will make to an MA organization for an enrollee: a base rate that CMS sets using bid amounts received from the MA organization and the risk score for that enrollee. These are described as follows:

- *Base rate*: Before the start of each year, each MA organization submits bids to CMS that reflect the MA organization's estimate of the monthly revenue required to cover an enrollee with an average risk profile.[7] CMS compares each bid to a specific benchmark amount for each geographic area to determine the base rate that an MA organization is paid for each of its enrollees.[8]

---

[5] The Balanced Budget Act of 1997, P.L. No. 105-33, as modified by section 201 of the Medicare Prescription Drug, Improvement, and Modernization Act, P.L. No. 108-173, established the MA program.

[6] The Social Security Act (the Act) §§ 1853(a)(1)(C) and (a)(3); 42 CFR § 422.308(c).

[7] The Act § 1854(a)(6); 42 CFR § 422.254 *et seq.*

[8] CMS's bid-benchmark comparison also determines whether the MA organization must offer supplemental benefits or must charge a basic beneficiary premium for the benefits.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359)
Submitted to CMS (A-02-18-01029)*     2

- *Risk score*: A risk score is a relative measure that reflects the additional or reduced costs that each enrollee is expected to incur compared with the costs incurred by enrollees on average. CMS calculates risk scores based on an enrollee's health status (discussed below) and demographic characteristics (such as the enrollee's age and sex). This process results in an individualized risk score for each enrollee, which CMS calculates annually.

To determine an enrollee's health status for the purposes of calculating the risk score, CMS uses diagnoses that the enrollee receives from acceptable data sources, including certain physicians and hospitals. MA organizations collect the diagnosis codes that physicians document on the medical records and submit these codes to CMS. CMS then maps certain diagnosis codes, on the basis of similar clinical characteristics and severity and cost implications, into Hierarchical Condition Categories (HCCs).[9] Each HCC has a factor (which is a numerical value) assigned to it for use in each enrollee's risk score.

As a part of the risk adjustment program, CMS consolidates certain HCCs into related-disease groups. Within each of these groups, CMS assigns an HCC for only the most severe manifestation of a disease in a related-disease group. Thus, if MA organizations submit diagnosis codes for an enrollee that map to more than one of the HCCs in a related-disease group, only the most severe HCC will be used in determining the enrollee's risk score.

For enrollees who have certain combinations of HCCs (in either the Version 12 model or the Version 22 model), CMS assigns a separate factor that further increases the risk score. CMS refers to these combinations as disease interactions. For example, if MA organizations submit diagnosis codes (in the Version 12 model) for an enrollee that map to the HCCs for acute stroke, acute myocardial infarction, and chronic obstructive pulmonary disease (COPD), CMS assigns a separate factor for this disease interaction. By doing so, CMS increases the enrollee's risk score for each of the three HCC factors and by an additional factor for the disease interaction.

The risk adjustment program is prospective. Specifically, CMS uses the diagnosis codes that the enrollee received for 1 calendar year (known as the service year) to determine HCCs and calculate risk scores for the following calendar year (known as the payment year). Thus, an enrollee's risk score does not change for the year in which a diagnosis is made. Instead, the risk score changes for the entirety of the year after the diagnosis has been made. Further, the risk score calculation is an additive process—as HCC factors (and, when applicable, disease interaction factors) accumulate, an enrollee's risk score increases, and the monthly risk-adjusted payment to the MA organization also increases. In this way, the risk adjustment

---

[9] CMS transitioned from one HCC payment model to another during our audit period. As part of this transition, for 2015, CMS calculated risk scores based on both payment models. CMS refers to these models as the Version 12 model and the Version 22 model, each of which has unique HCCs. CMS blended the two separate risk scores into a single risk score that it used to calculate a risk-adjusted payment. Accordingly, for 2015, an enrollee's blended risk score is based on the HCCs from both payment models. For 2016, CMS calculated risk scores on the Version 22 model.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359)*
*Submitted to CMS (A-02-18-01029)*     3

program compensates MA organizations for the additional risk of providing coverage to enrollees expected to require more health care resources.

CMS multiplies the risk scores by the base rates to calculate the total Medicare monthly payment that an MA organization receives for each enrollee before applying the budget sequestration reduction.[10]  Miscoded diagnoses submitted to CMS may result in HCCs that are not validated and incorrect enrollee risk scores, which may lead to improper payments (overpayments) from CMS to MA organizations.  Conversely, correctly coded diagnoses that MA organizations do not submit to CMS may lead to improper payments (underpayments).

**High-Risk Groups of Diagnoses**

Using data mining techniques and discussions with medical professionals, we identified diagnoses that were at higher risk for being miscoded and consolidated those diagnoses into specific groups.  For this audit, we focused on seven high-risk groups:[11]

- *Acute stroke*: An enrollee received one acute stroke diagnosis (which maps to the HCC for Ischemic or Unspecified Stroke) on one physician claim during the service year but did not have that diagnosis on a corresponding inpatient hospital claim.  A diagnosis of history of stroke (which does not map to an HCC) typically should have been used.

- *Acute heart attack*: An enrollee received one diagnosis that mapped to either the HCC for Acute Myocardial Infarction or to the HCC for Unstable Angina and Other Acute Ischemic Heart Disease (Acute Heart Attack HCCs) on only one physician claim but did not have that diagnosis on a corresponding inpatient hospital claim (either within 60 days before or 60 days after the physician's claim).  A diagnosis for a less severe manifestation of a disease in the related-disease group typically should have been used.

- *Acute stroke and acute heart attack combination*: An enrollee met the conditions of both the acute stroke and acute heart attack high-risk groups in the same year.[12]

- *Embolism*: An enrollee received one diagnosis that mapped to either the HCC for Vascular Disease or to the HCC for Vascular Disease With Complications (Embolism

---

[10] Budget sequestration refers to automatic spending cuts that occurred through the withdrawal of funding for certain Federal Government programs, including the MA program, as provided in the Budget Control Act of 2011 (BCA) (P.L. No. 112-25 (8-2-2011)).  Under the BCA, the sequestration of mandatory spending began in April, 2013.

[11] Unless otherwise specified, the HCCs described in this report have the same name under both the Version 12 and Version 22 models.

[12] We combined these enrollees into one group because an individual's risk scores could have been further increased if that enrollee also had a COPD diagnosis (which was not part of our audit).  If our audit identified an error that invalidated either the acute stroke or acute heart attack HCC, then the disease interaction factor would also be identified as an error.  By combining these enrollees in one group, we eliminated the possibility of including the disease interaction factor twice in overpayment calculations (if any).

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359) Submitted to CMS (A-02-18-01029)*                                                                                 *4*

1157

HCCs) but did not have an anticoagulant medication dispensed on his or her behalf. An anti-coagulant medication is typically used to treat an embolism. A diagnosis of history of embolism (an indication that the provider is evaluating a prior acute embolism diagnosis, which does not map to an HCC) typically should have been used.

- *Vascular claudication*: An enrollee did not receive a diagnosis related to vascular claudication (which maps to the HCC for Vascular Disease) for 2 years and then, in the subsequent year, received that diagnosis but had medication dispensed on his or her behalf that is frequently dispensed for a diagnosis of neurogenic claudication.[13] In these instances, the vascular claudication diagnoses may not be supported in the medical records.

- *Major depressive disorder*: An enrollee received one major depressive disorder diagnosis (which maps to the HCC for Major Depressive, Bipolar, and Paranoid Disorders) during the service year but did not have an antidepressant medication dispensed on his or her behalf. In these instances, the major depressive disorder diagnoses may not be supported in the medical records.

- *Potentially mis-keyed diagnosis codes*: An enrollee received multiple diagnoses for a condition but received only one—potentially mis-keyed—diagnosis for an unrelated condition (which mapped to a possibly unvalidated HCC). For example, ICD-9 diagnosis code 250.00 (which maps to the HCC for Diabetes Without Complication) could be transposed as diagnosis code 205.00 (which maps to the HCC for Metastatic Cancer and Acute Leukemia and, in this example, would be unvalidated). Using an analytical tool that we developed, we identified 811 scenarios in which diagnosis codes could have been mis-keyed because numbers were transposed or other data entry errors occurred that could have resulted in the assignment of an unvalidated HCC.

In this report, we refer to the diagnosis codes associated with these groups as "high-risk diagnosis codes."

**Healthfirst Health Plan, Inc.**

Healthfirst is an MA organization based in New York, New York. As of December 31, 2016, Healthfirst provided coverage under contract number H3359 to approximately 136,875

---

[13] Vascular claudication and neurogenic claudication are different diagnoses. Vascular claudication is a condition that can result in leg pain while walking and is caused by insufficient blood flow. Neurogenic claudication is a condition that can also result in leg pain but is caused by damage to the neurological system, namely the spinal cord and nerves.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359)*
*Submitted to CMS (A-02-18-01029)*                                                                                    5

1158

enrollees. For the 2015 and 2016 payment years (audit period),[14] CMS paid Healthfirst approximately $3.3 billion to provide coverage to its enrollees.[15]

**HOW WE CONDUCTED THIS AUDIT**

Our audit included enrollees on whose behalf providers documented diagnosis codes that mapped to one of the seven high-risk groups during the 2014 and 2015 service years, for which Healthfirst received increased risk-adjusted payments for payment years 2015 and 2016, respectively. Because enrollees could be classified in more than one high-risk group or have high-risk diagnosis codes documented in more than 1 year, we classified these individuals according to the condition and the payment year, which we refer to as "enrollee-years." We identified 5,721 unique enrollee-years and limited our review to the portions of the payments that were associated with these high-risk diagnosis codes ($14,847,742). We selected for audit a sample of 240 enrollee-years, which comprised (1) a stratified random sample of 200 (out of 5,646) enrollee-years for the first 6 high-risk groups and (2) a non-statistical sample of 40 (out of 75) enrollee-years for the remaining high-risk group.

Table 1 details the number of sampled enrollee-years for each high-risk group.

**Table 1: Sampled Enrollee-Years**

| High-Risk Group | Number of Sampled Enrollee-Years |
|---|---|
| 1. Acute Stroke | 49 |
| 2. Acute Heart Attack | 30 |
| 3. Acute Stroke/Acute Heart Attack combination | 11 |
| 4. Embolism | 30 |
| 5. Vascular Claudication | 35 |
| 6. Major Depressive Disorder | 45 |
| **Total for Stratified Random Sample** | **200** |
| 7. Potentially Mis-keyed Diagnosis Codes | 40 |
| **Total for All High-Risk Groups** | **240** |

Healthfirst provided medical records as support for the selected diagnosis codes associated with the 240 enrollee-years. We used an independent medical review contractor to review the medical records to determine whether the selected diagnosis codes that Healthfirst submitted to CMS were supported. If the contractor identified a diagnosis code that should have been submitted to CMS instead of the selected diagnosis code, we included the financial impact of the resulting HCC (if any) in our calculation of overpayments.

---

[14] The 2015 and 2016 payment year data were the most recent data available at the start of the audit.

[15] All of the payment amounts that CMS made to Healthfirst and the overpayment amounts that we identified in this report reflect the budget sequestration reduction.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359)*
*Submitted to CMS (A-02-18-01029)*                                                                                          *6*

We conducted this performance audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

Appendix A contains the details of our audit scope and methodology, Appendix C contains our statistical sampling methodology, and Appendix D contains our sample results and estimates.

## FINDINGS

With respect to the seven high-risk groups covered by our audit, most of the selected diagnosis codes that Healthfirst submitted to CMS for use in CMS's risk adjustment program did not comply with Federal requirements. For 85 of the 240 sampled enrollee-years, the medical records supported the diagnosis codes that Healthfirst submitted to CMS. However, for the remaining 155 enrollee-years, the diagnosis codes were not supported in the medical records.

These errors occurred because the policies and procedures that Healthfirst had to detect and correct noncompliance with CMS's program requirements, as mandated by Federal regulations, were not always effective. As a result, the HCCs for these high-risk diagnosis codes were not validated. On the basis of our sample results, we estimated that Healthfirst received at least $5.2 million in net overpayments for 2015 and 2016.[16]

### FEDERAL REQUIREMENTS

Payments to MA organizations are adjusted for risk factors, including the health status of each enrollee (the Social Security Act (the Act) § 1853(a)). CMS applies a risk factor based on data obtained from the MA organizations (42 CFR § 422.308).

Federal regulations state that MA organizations must follow CMS's instructions and submit to CMS the data necessary to characterize the context and purposes of each service provided to a Medicare enrollee by a provider, supplier, physician, or other practitioner (42 CFR § 422.310(b)). MA organizations must obtain risk adjustment data required by CMS from the provider, supplier, physician, or other practitioner that furnished the item or service (42 CFR § 422.310(d)(3)).

Federal regulations also state that MA organizations are responsible for the accuracy, completeness, and truthfulness of the data submitted to CMS for payment purposes and that such data must conform to all relevant national standards (42 CFR § 422.504(l) and 42 CFR

---

[16] Specifically, we estimated that Healthfirst received at least $5,221,901 ($5,023,530 for the statistically sampled groups plus $198,371 for the group of potentially mis-keyed diagnosis codes) in net overpayments. To be conservative, we recommend recovery at the lower limit of a two-sided 90-percent confidence interval. Lower limits calculated in this manner are designed to be less than the actual overpayment total 95 percent of the time.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359) Submitted to CMS (A-02-18-01029)*                    7

1160

§ 422.310(d)(1)). In addition, MA organizations must contract with CMS and agree to follow CMS's instructions, including the *Medicare Managed Care Manual* (the Manual) (see 42 CFR § 422.504(a)).

CMS has provided instructions to MA organizations regarding the submission of data for risk scoring purposes (the Manual, chap.7 (last rev. Sept. 19, 2014)). Specifically, CMS requires all submitted diagnosis codes to be documented in the medical record and to be documented as a result of a face-to-face encounter (the Manual, chap. 7, § 40). The diagnosis must be coded according to the ICD Coding Guidelines (42 CFR § 422.310(d)(1) and 45 CFR §§ 162.1002(b)(1) and (c)(2)-(3)). Further, the MA organizations must implement procedures to ensure that diagnoses come only from acceptable data sources, which include hospital inpatient facilities, hospital outpatient facilities, and physicians (the Manual, chap. 7, § 40).

Federal regulations state that MA organizations must monitor the data that they receive from providers and submit to CMS. Federal regulations also state that MA organizations must "adopt and implement an effective compliance program, which must include measures that prevent, detect, and correct non-compliance with CMS's program requirements . . . ." Further, MA organizations must establish and implement an effective system for routine monitoring and identification of compliance risks (42 CFR § 422.503(b)(4)(vi), See Appendix E).

## MOST OF THE SELECTED HIGH-RISK DIAGNOSIS CODES THAT HEALTHFIRST SUBMITTED TO CMS DID NOT COMPLY WITH FEDERAL REQUIREMENTS

Most of the selected high-risk diagnosis codes that Healthfirst submitted to CMS for use in CMS's risk adjustment program did not comply with Federal requirements. As shown in the figure on the following page, the medical records for 155 of the 240 sampled enrollee-years did not support the diagnosis codes. In these instances, Healthfirst should not have submitted the diagnosis codes to CMS and received the resulting net overpayments.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359) Submitted to CMS (A-02-18-01029)*                                                                                8

1161



Figure: Analysis of High-Risk Groups

**Incorrectly Submitted Diagnosis Codes for Acute Stroke**

Healthfirst incorrectly submitted diagnosis codes for acute stroke for all 49 sampled enrollee-years.  Specifically:

- For 26 enrollee-years, the medical records indicated in each case that the individual had previously had a stroke, but the records did not justify an acute stroke diagnosis at the time of the physician's service.

  For example, for 1 enrollee-year, the medical record (for a service that occurred in 2014) indicated that the individual had an acute stroke in 1998.  The independent medical review contractor noted that "there is no evidence of an acute stroke or any related condition that would result in an assignment of the submitted HCC [Ischemic or Unspecified Stroke] or a related HCC.  There is mention of a history of a stroke [diagnosis] . . . ."  The history of stroke diagnosis code does not map to an HCC.

- For 21 enrollee-years, the medical records did not contain sufficient information to support an acute stroke diagnosis.

  For example, for 1 enrollee-year, the independent medical review contractor stated that "there is no documentation of any condition that will result in assignment of [the] HCC [for Ischemic or Unspecified Stroke].  The patient was admitted from [the] emergency room for suspected acute [Cerebrovascular Accident] which was ruled out at discharge."

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359)*
*Submitted to CMS (A-02-18-01029)*                                                            *9*

1162

- For the remaining 2 enrollee-years, Healthfirst did not provide any medical records to support the acute stroke diagnosis; therefore, the HCC for Ischemic or Unspecified Stroke was not validated.

As a result of these errors, the HCCs for Ischemic or Unspecified Stroke were not validated, and Healthfirst received $129,370 in overpayments for these 49 sampled enrollee-years.

**Incorrectly Submitted Diagnosis Codes for Acute Heart Attack**

Healthfirst incorrectly submitted diagnosis codes for acute heart attack for all 30 sampled enrollee-years. Specifically:

- For 19 enrollee-years, the medical records did not support an acute myocardial infarction diagnosis. However, we identified support for another diagnosis of a less severe manifestation of the related-disease group as detailed below:

  - For 14 enrollee-years, we identified support for an old myocardial infarction diagnosis.

    - For 8 enrollee-years, which occurred in payment year 2015, the old myocardial infarction diagnosis mapped to an HCC for a less severe manifestation of the related-disease group. Accordingly, Healthfirst should not have received an increased payment for the acute myocardial infarction diagnosis. Rather, it should have received a lesser increased payment for the old myocardial infarction diagnosis.

      For example, for 1 enrollee-year, the independent medical review contractor noted that "there is no documentation of any condition that will result in the assignment of [the Unstable Angina and Other Acute Ischemic Heart Disease] HCC. There is documentation of history of myocardial infarction [diagnosis] that results in [the] HCC [for Angina Pectoris/Old Myocardial Infarction] which should have been assigned instead of the submitted HCC."

    - For 6 enrollee-years, which occurred in payment year 2016, the old myocardial infarction diagnosis did not map to an HCC.[17] Accordingly, Healthfirst should not have received an increased payment for acute myocardial infarction.

---

[17] In contrast to the enrollee-years that occurred in payment year 2015 (for which CMS used the Version 12 model), for payment year 2016, CMS used only the Version 22 model, which did not include an HCC for Old Myocardial Infarction, to calculate risk scores (footnote 9).

    o    For 2 enrollee-years, which occurred in payment year 2016, we identified support for an acute ischemic heart disease diagnosis, which mapped to an HCC for a less severe manifestation of the related-disease group. Accordingly, Healthfirst should not have received an increased payment for the acute myocardial infarction diagnosis. Rather, it should have received a lesser increased payment for the acute ischemic heart disease diagnosis.

    o    For 2 enrollee-years, which occurred in payment year 2015, we identified support for both an old myocardial infarction diagnosis and an unspecified angina pectoris diagnosis,[18] both of which mapped to an HCC for a less severe manifestation of the related-disease group. Accordingly, Healthfirst should not have received an increased payment for the acute myocardial infarction diagnosis. Rather, it should have received a lesser increased payment for the old myocardial infarction and unspecified angina pectoris diagnoses.

    o    For the remaining 1 enrollee-year, which occurred in payment year 2016, we identified support for an unspecified angina pectoris diagnosis, which mapped to an HCC for a less severe manifestation of the related-disease group. Accordingly, Healthfirst should not have received an increased payment for the acute myocardial infarction diagnosis. Rather, it should have received a lesser increased payment for the unspecified angina pectoris diagnosis.

- For 10 enrollee-years, the medical records did not support either an acute myocardial infarction diagnosis or a diagnosis of a less severe manifestation of the related-disease group.

- For the 1 remaining enrollee-year, Healthfirst did not provide any medical records to support the acute myocardial infarction diagnosis; therefore, the HCC for Acute Heart Attack was not validated.[19]

As a result of these errors, the Acute Heart Attack HCCs were not validated, and Healthfirst received $49,653 in net overpayments for these 30 sampled enrollee-years.

---

[18] Angina pectoris is defined as a disease marked by brief sudden attacks of chest pain or discomfort caused by deficient oxygenation of the heart muscles, usually due to impaired blood flow to the heart.

[19] For this 1 enrollee-year, we found in CMS's Risk Adjustment Processing System (RAPS) and Encounter Data System (EDS) a diagnosis code submitted by Healthfirst that mapped to an HCC for a less severe manifestation of the related-disease group, which we included in our calculation of the overpayment.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359) Submitted to CMS (A-02-18-01029)*        *11*

**Incorrectly Submitted Diagnosis Codes for Acute Stroke and Acute Heart Attack Combination**

Healthfirst incorrectly submitted diagnosis codes for all 11 of the sampled enrollee-years for which physicians had documented conditions for both the acute stroke and acute heart attack high-risk groups in the same year (footnote 12).

For 10 enrollee-years, the medical records did not support either the acute stroke diagnosis, the acute myocardial infarction diagnosis, or both (table 2).

**Table 2: Acute Stroke and Acute Heart Attack Combination Findings**

| Count of Enrollee-Years | Acute Stroke HCC | | Acute Heart Attack HCC | |
| | Medical Record Validated HCC | Support for Different HCC Found | Medical Record Validated HCC | Support for Different HCC Found |
|---|---|---|---|---|
| 4 | No | No | No | Yes – Old Myocardial Infarction[20] |
| 4 | No | No | No | No |
| 1 | No | No | No | Yes – Angina Pectoris |
| 1 | No | No | Yes | N/A |

For the one remaining enrollee-year, Healthfirst did not provide any medical records to support either diagnosis; therefore, the HCCs for Acute Heart Attack and Acute Stroke were not validated.[21]

As a result of these errors, the HCCs for either Ischemic or Unspecified Stroke, Acute Heart Attack, or both, were not validated, and Healthfirst received $46,496 in net overpayments for these 11 sampled enrollee-years.

**Incorrectly Submitted Diagnosis Codes for Embolism**

Healthfirst incorrectly submitted diagnosis codes for embolism for 27 of 30 sampled enrollee-years. Specifically:

- For 16 enrollee-years, the medical records did not contain sufficient information to support an embolism diagnosis.

---

[20] For these 4 enrollee-years, which occurred in payment year 2015, the old myocardial infarction diagnosis mapped to an HCC for a less severe manifestation of the related-disease group.

[21] For this enrollee-year, we found in CMS's RAPS a diagnosis code submitted by Healthfirst that mapped to an HCC for a less severe manifestation of the heart attack related-disease group, which we included in our calculation of the overpayment.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359) Submitted to CMS (A-02-18-01029)*    *12*

1165

For example, for 1 enrollee-year, the independent medical review contractor noted that "there is no documentation of any condition that will result in the assignment of [an Embolism] HCC. There is documentation of deep vein thrombosis [diagnosis] as a working diagnosis that would not be coded based on outpatient guidelines of suspected/ruled out diagnoses."[22]

- For 7 enrollee-years, the medical records indicated in each case that the individual had previously had an embolism, but the records did not justify an embolism diagnosis at the time of the physician's service.

  For example, for 1 enrollee-year, the independent medical review contractor noted that "there is no documentation of any condition that will result in the assignment of [an Embolism] HCC. There is documentation of a history of deep vein thrombosis [diagnosis] that does not result in an HCC."

- For the remaining 4 enrollee-years, Healthfirst did not provide any medical records to support the embolism diagnoses; therefore, the Embolism HCCs were not validated.

As a result of these errors, the Embolism HCCs were not validated, and Healthfirst received $72,442 in overpayments for these 27 sampled enrollee-years.

**Incorrectly Submitted Diagnosis Codes for Vascular Claudication**

Healthfirst incorrectly submitted diagnosis codes for vascular claudication for 4 of 35 sampled enrollee-years. Specifically:

- For 3 enrollee-years, the medical records did not support a vascular claudication diagnosis.

  For example, for 1 enrollee-year, the independent medical review contractor noted that "there is no documentation of any condition that would result in the assignment of [the Vascular Disease] HCC."

- For the 1 remaining enrollee-year, Healthfirst did not provide any medical records to support the vascular claudication diagnosis; therefore, the HCC for Vascular Disease was not validated.

As a result of these errors, the HCCs for Vascular Disease were not validated, and Healthfirst received $8,738 in overpayments for these 4 sampled enrollee-years.

---

[22] ICD-9-CM Coding Guidelines, which were applicable for the reviewed diagnosis code, state that diagnoses documented as "suspected" or "rule out" should not be coded for outpatient services.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359) Submitted to CMS (A-02-18-01029)*    13

1166

**Incorrectly Submitted Diagnosis Codes for Major Depressive Disorder**

Healthfirst incorrectly submitted diagnosis codes for major depressive disorder for 4 of 45 sampled enrollee-years. Specifically:

- For 2 enrollee-years, the medical records did not support a major depressive disorder diagnosis.[23]

  For example, for 1 enrollee-year, the independent medical review contractor noted that "there is no documentation of any condition that will result in the assignment of [the Major Depressive, Bipolar, and Paranoid Disorders] HCC. There is [an] assessment of anxiety [diagnosis] which does not result in an HCC."

- For the remaining 2 enrollee-years, Healthfirst did not provide any medical records to support the major depressive disorder diagnoses; therefore, the HCCs for Major Depressive, Bipolar, and Paranoid Disorders were not validated.

As a result of these errors, the HCCs for Major Depressive, Bipolar, and Paranoid Disorders were not validated, and Healthfirst received $11,438 in overpayments for these 4 sampled enrollee-years.

**Potentially Mis-keyed Diagnosis Codes**

Healthfirst submitted potentially mis-keyed diagnosis codes for 30 of 40 sampled enrollee-years. In each of these cases, the enrollee-years received multiple diagnoses for a condition but received only one—potentially mis-keyed—diagnosis for an unrelated condition.

- For 24 enrollee-years, the medical records did not support the diagnosis for the unrelated condition. Because of these errors, Healthfirst submitted unsupported diagnosis codes that mapped to unvalidated HCCs to CMS.

  For example, for 1 enrollee-year, Healthfirst submitted 107 diagnosis codes for acute myeloid leukemia (205.00) and only one diagnosis code for diabetes mellitus (250.00) to CMS. The independent medical review contractor limited its review to the diabetes mellitus diagnosis, for which it did not find support.

- For 3 enrollee-years, the medical records did not support the diagnosis for the unrelated condition. However, we identified support for another diagnosis that mapped to an HCC for a less severe manifestation of the related-disease group. Accordingly, Healthfirst should not have received an increased payment for the submitted diagnosis.

---

[23] For these 2 enrollee-years, the independent medical review contractor identified support for a diagnosis code for a milder form of depression, which does not map to an HCC.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359)*
*Submitted to CMS (A-02-18-01029)*                    *14*

1167

Rather, it should have received a lesser increased payment for the other diagnosis identified.

For example, for 1 enrollee-year, the medical records did not support a dissection of aorta diagnosis, which maps to the HCC for Vascular Disease With Complications. The independent medical review contractor noted that "there is no documentation of any condition that will result in the assignment of [the Vascular Disease with Complications] HCC. There is documentation of abdominal aortic aneurysm [diagnosis,] which results in [the Vascular Disease] HCC [that] should have been assigned instead of the submitted HCC." Accordingly, Healthfirst should not have received payment for the dissection of aorta diagnosis. Rather, it should have received a lesser increased payment for the abdominal aortic aneurysm diagnosis.

- For the remaining 3 enrollee-years, Healthfirst did not provide any medical records to support the potentially mis-keyed diagnosis code; therefore, the HCCs associated with the potentially mis-keyed diagnosis codes were not validated.[24]

Appendix F contains the HCCs that were not validated for the 30 enrollee-years (Table 6) and the HCCs for the less severe manifestation of the related-disease group that were supported for the 4 enrollee-years (Table 7).

As a result of these errors, the HCCs associated with the potentially mis-keyed diagnosis codes were not validated, and Healthfirst received $198,371 in net overpayments for these 30 sampled enrollee-years.

### THE POLICIES AND PROCEDURES THAT HEALTHFIRST USED TO DETECT AND CORRECT NONCOMPLIANCE WITH FEDERAL REQUIREMENTS WERE NOT ALWAYS EFFECTIVE

The errors we identified occurred because the policies and procedures that Healthfirst had to detect and correct noncompliance with CMS's program requirements, as mandated by Federal regulations (42 CFR § 422.503(b)(4)(vi)), were not always effective.

Healthfirst had compliance procedures in place during our audit period to determine whether the diagnosis codes that it submitted to CMS to calculate risk-adjusted payments were correct. These procedures included a provider education program that was designed to promote accurate diagnosis codes, which provided instructions to its providers on the proper coding of several frequently miscoded diagnoses, one of which was acute stroke. In addition, Healthfirst's compliance procedures included routine internal medical reviews to compare diagnosis codes from a random sample of claims to the diagnoses that were documented on the associated medical records. However, these internal medical reviews did not focus on any

---

[24] For 1 enrollee-year, we found in CMS's RAPS and CMS's EDS a diagnosis code submitted by Healthfirst that mapped to an HCC for a less severe manifestation of the related-disease group, which we included in our calculation of the overpayment.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359) Submitted to CMS (A-02-18-01029)*        15

1168

specific high-risk diagnosis codes, including those we identified as being at a higher risk for being miscoded. As a result, Healthfirst's compliance procedures to prevent and detect incorrect high-risk diagnoses during our audit period were not always effective. Additionally, Healthfirst was not always able to obtain medical records from its providers to support diagnosis codes submitted to CMS to calculate risk-adjusted payments.[25]

Healthfirst explained that, after our audit period, it revised its procedures for conducting internal medical reviews to include reviews of targeted diagnosis codes that we identified as being at a higher risk for being miscoded. In addition, Healthfirst updated its provider education program to include steps to notify providers of errors identified during the internal medical reviews, and provide them with guidance on how to avoid coding errors.

**HEALTHFIRST RECEIVED NET OVERPAYMENTS**

As a result of the errors we identified, the HCCs for these high-risk diagnosis codes were not validated. On the basis of our sample results, we estimated that Healthfirst received at least $5,221,901 in net overpayments ($5,023,530 for the statistically sampled groups plus $198,371 for the group of potentially mis-keyed diagnosis codes) in 2015 and 2016. (See Appendix D for sample results and estimates).

## RECOMMENDATIONS

We recommend that Healthfirst Health Plan, Inc.:

- refund to the Federal Government the $5,221,901 of estimated net overpayments;

- identify, for the high-risk diagnoses included in this report, similar instances of noncompliance that occurred before or after our audit period and refund any resulting overpayments to the Federal Government;

- identify, for the potentially mis-keyed diagnosis codes described in this report, similar instances of noncompliance that occurred during our audit period but were not included in our non-statistical sample and refund any resulting overpayments to the Federal Government; and

- continue its examination of existing compliance procedures to identify areas where improvements can be made to ensure that diagnosis codes that are at high risk for being miscoded comply with Federal requirements (when submitted to CMS for use in CMS's risk adjustment program) and take the necessary steps to enhance those procedures.

---

[25] For example, Healthfirst stated that the records associated with some patients were not in the providers' electronic record systems or were not available because the associated physician or medical practice was no longer active.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359)
Submitted to CMS (A-02-18-01029)*                                                                                    *16*

**1169**

**HEALTHFIRST COMMENTS AND OFFICE OF INSPECTOR GENERAL RESPONSE**

In written comments on our draft report, Healthfirst objected to all of our recommendations. However, it did not object to any of the errors we identified. Instead, Healthfirst requested we limit our recommended recovery to the overpayments identified in our sample rather than the extrapolated value of those overpayments. Specifically, Healthfirst stated that OIG lacked the authority to use extrapolation to recommend a repayment and disagreed with our extrapolation methodology. Moreover, Healthfirst argued that our audit methodology did not account for a payment principle known as "actuarial equivalence." Healthfirst also disagreed that it should perform additional audits of the high-risk diagnoses included in this report. Lastly, Healthfirst stated that, although it regularly evaluates its compliance programs, it believes its current compliance program is sufficient to meet its current obligations.

After reviewing Healthfirst's comments and for the reasons detailed below, we maintain that our findings and recommendations are valid.

A summary of Healthfirst's comments and our responses follows. Healthfirst's comments are included in their entirety as Appendix G.

**HEALTHFIRST DID NOT AGREE WITH THE EXTRAPOLATION METHODOLOGY THAT THE OFFICE OF INSPECTOR GENERAL USED TO ESTIMATE OVERPAYMENTS**

**Healthfirst Comments**

Healthfirst stated that OIG lacks the authority to base a recommendation for recovery on an extrapolation of individual overpayment amounts across a "broader universe." Specifically, Healthfirst referenced 42 U.S.C. § 1395ddd(f)(3), stating that it provides only "limited authority for CMS to extrapolate, and such authority is limited to *contractors* auditing *providers* under Medicare Parts A and B in limited circumstances not present here with respect to [MA organizations]" (emphasis in original). It further argued that there is "simply no statutory authority for the use of extrapolation of audit results of MAOs providing services under Part C."

Additionally, Healthfirst stated that CMS drafted regulations on extrapolation for 2011 through 2013; however, according to Healthfirst, nothing was published and there is no approved extrapolation methodology for the audit period (payment years 2015 and 2016). Healthfirst noted that using an unpublished extrapolation methodology is inconsistent with the Act's rulemaking requirements for notice and comment set forth in *Azar v. Allina Health Services*,[26] and therefore, "any purported authority for such extrapolation fails to comply with the required rule-making processes."

Healthfirst further claimed that retroactivity is prohibited by Federal law. Specifically, it stated that the Act "prohibits retroactive rules absent a statutory requirement, significant public

---

[26] *Azar v. Allina Health Services*, 139 S. Ct. 1804 (2019).

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359) Submitted to CMS (A-02-18-01029)* 17

safety concern or other critical need [42 U.S.C. § 139hh(e)(1)(A)], none of which are present here." Additionally, Healthfirst noted that seeking records from providers to support HCCs for services provided in 2015 and 2016 is often difficult. Healthfirst stated that, for these reasons, it believes that "even if a valid rule authorizing extrapolation i[s] promulgated, it should not be applied retroactively, and that extrapolation by the OIG based on audit findings from 201[5]-2016 is similarly not permissible."

Healthfirst also stated that our methodology for calculating the extrapolated repayment amount is faulty. Healthfirst specifically referenced our use of the 90-percent confidence interval instead of, according to Healthfirst, the "statistically valid and more robust practice" of using the lower limit of the 95- or 99-percent confidence interval. Additionally, Healthfirst noted that CMS uses the lower limit of the 99-percent confidence interval level for calculating extrapolated repayment amounts for its Risk Adjustment Data Validation (RADV) audits. Healthfirst stated that, if it were permissible to extrapolate, OIG would have to use the lower limit of the 99-percent confidence interval to be consistent with CMS's practice for RADV audits.

**Office of Inspector General Response**

Healthfirst relies on 42 U.S.C. § 1395ddd(f)(3) to say that OIG has no authority to extrapolate. This conclusion is misguided. No statutory or other authority limits our ability to recommend a recovery to CMS based upon sampling and extrapolation. Extrapolation has long been recognized as a permissible method of calculating overpayments in Medicare. Further, current case law supports the use of extrapolation as a means to determine overpayments so long as the methodology used is statistically valid.[27, 28]

Healthfirst alleged that OIG cannot use extrapolation without publishing our methodology through notice-and-comment rulemaking. OIG disagrees. We also note that because we are not recommending the application of any new statutory or regulatory requirements, the criteria cited by Healthfirst that prohibit retroactivity is not applicable to this audit.

Additionally, our estimation methodology does not need to mirror CMS's estimation methodology. Our use of the lower limit of a two-sided 90-percent confidence interval provided a reasonably conservative estimate of the total amount overpaid to Healthfirst for the

---

[27] See *John Balko & Assoc. v. Sebelius*, 2012 U.S. Dist. LEXIS 183052 at *12 (W.D. Pa. 2012), aff'd 555 F. App'x 188 (3d Cir. 2014); *Maxmed Healthcare, Inc. v. Burwell*, 152 F. Supp. 3d 619, 634–37 (W.D. Tex. 2016), aff'd, 860 F.3d 335 (5th Cir. 2017); *Anghel v. Sebelius*, 912 F. Supp. 2d 4, 18 (E.D.N.Y. 2012); *Miniet v. Sebelius*, 2012 U.S. Dist. LEXIS 99517 at *17 (S.D. Fla. 2012); and *Transyd Enters., LLC v. Sebelius*, 2012 U.S. Dist. LEXIS 42491 at *13 (S.D. Tex. 2012).

[28] We properly executed our statistical sampling methodology in that we defined our sampling frame and sample unit, randomly selected our sample, applied relevant criteria in evaluating the sample, and used statistical sampling software (i.e., the OIG, Office of Audit Services, statistical software RAT-STATS) to apply the correct formulas for the extrapolation.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359) Submitted to CMS (A-02-18-01029)* 18

enrollee-years and time period covered in our sampling frame.  Further, we note that this approach, which is routinely used by the Department of Health and Human Services (HHS) for recovery calculations,[29] results in a lower limit (the estimated overpayment amount to refund) that is less than the actual overpayment amount 95 percent of the time.

**HEALTHFIRST DID NOT AGREE WITH THE OFFICE OF INSPECTOR GENERAL'S APPLICATION OF CMS REQUIREMENTS FOR CALCULATING OVERPAYMENTS**

**Healthfirst Comments**

Healthfirst stated that OIG's extrapolated calculation of overpayments violated certain CMS requirements mandated under the MA program.  Specifically, Healthfirst stated that OIG's methodology did not account for a payment principle known as "actuarial equivalence," which, according to Healthfirst, is mandated by the Act.

Healthfirst cited the provision of the Act that mandates that risk-adjusted payments be made in a manner that ensures "actuarial equivalence" between CMS payments for health care coverage under MA and CMS payments under Medicare's traditional Fee-for-Service (FFS) program.  Healthfirst stated that "CMS developed the [MA] risk adjustment model using unaudited [FFS] claims data from the traditional Medicare program, which CMS has acknowledged contain high levels of erroneous diagnoses.  Accordingly, in order to ensure actuarial equivalence between the FFS and MA programs, CMS should measure overall rates of erroneous diagnoses in the [MA] program against the rates of erroneous diagnoses found within the traditional Medicare FFS program."  It further stated that, in 2012, "CMS said that it would first identify a 'payment recovery amount' based on the value of supported and unsupported HCCs identified during its review.  Then, 'to determine the final payment recovery amount, CMS [would] apply a Fee-for-Service Adjuster [(FFSA)] amount as an offset to the preliminary recovery amount . . . .'"

Healthfirst stated that "CMS departed from the principle that an FFSA is necessary by issuing a proposed rule in 2018 suggesting that diagnosis coding errors in unaudited traditional Medicare data do not systematically impact payments to [MA organizations] and released a corresponding study purporting to support this premise."  Healthfirst added that this rule is not final and is still subject to the administrative rule-making process.

Healthfirst also noted that a Federal district court vacated a different MA rule implemented by CMS because "the rule violated the [Act's] actuarial equivalence mandate by defining

---

[29] HHS has used the two-sided 90-percent percent confidence level when calculating recoveries in both the Administration for Child and Families and Medicaid programs.  See, for example, *New York State Department of Social Services*, DAB No. 1358, 13 (1992); and *Arizona Health Care Cost Containment System*, DAB No. 2981, 4-5 (2019).  In addition, HHS contractors rely on the one-sided 90-percent confidence interval, which is less conservative than the two-sided interval, for recoveries arising from Medicare FFS overpayments.  See, for example, *Maxmed Healthcare, Inc. v. Burwell*, 152 F. Supp. 3d 619, 634–37 (W.D. Tex. 2016), *aff'd*, 860 F.3d 335 (5th Cir. 2017); and *Anghel v. Sebelius*, 912 F. Supp. 2d 4, 17-18 (E.D.N.Y. 2012).

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359)
Submitted to CMS (A-02-18-01029)*                                                                                                          *19*

1172

'overpayment' as the payment of funds to [MA organizations] based on unsupported diagnosis codes, while not applying the same documentation standards to the traditional Medicare data used to calculate payments to [MA organizations]."[30]  Healthfirst noted that the Federal district court decision concluded "that CMS systematically devalues [MA organization] payments when it uses unaudited traditional Medicare data to set [MA organization] payment rates while measuring [MA organization] 'overpayments' based on audited patient records."  Healthfirst cited to the opinion by the U.S. Court of Appeals for the D.C. Circuit, which ruled on the U.S. District Court's decision; specifically, Healthfirst highlighted that the Appeals Court held that "the actuarial-equivalence requirement does not pertain to the statutory overpayment-refund obligation . . . ."[31]  However, Healthfirst noted that the court did not invalidate actuarial equivalence for use in RADV audits, for which the court stated "[w]e express no opinion on whether the actuarial equivalence requirement . . . requires such an adjuster in the [contract-level RADV audit . . .] context."

Healthfirst asserted that "the [MA] program requirements apply to OIG's audits" and that, without applying the FFSA, OIG's extrapolated repayment calculations violate the "actuarial equivalence" mandate.  Accordingly, Healthfirst requested that OIG withdraw our overpayment calculation and limit any recovery to the specific encounters reviewed during this audit and for which the unsupported codes were found.

**Office of Inspector General Response**

Our audit methodology correctly applied CMS requirements to properly identify the overpayment amount associated with unsubstantiated HCCs for each sample item.

We used the results of the independent medical review contractor's review to determine which HCCs were not substantiated and, in some instances, to identify HCCs that should have been used but were not used in the sampled enrollees' risk score calculations.  We followed CMS's risk adjustment program requirements to determine the payment that CMS should have made for each enrollee.  We used the overpayments and underpayments identified for each enrollee to estimate net overpayments.

Healthfirst stated that we did not consider "actuarial equivalence" in our overpayment calculations.  To this point, we recognize that CMS, not OIG, is responsible for making operational and program payment determinations for the MA program, including the application of any FFSA.  Moreover, CMS has not issued any requirements that compel us to reduce our net overpayment calculations.[32]  If CMS deems it appropriate to apply an FFSA, it will adjust our overpayment finding by whatever amount it determines necessary.  Thus, we

---

[30] *UnitedHealthcare Ins. C. v. Azar II*, 330 F. Supp. 3d 173 (D.D.C. 2018).

[31] *United Healthcare Insurance Co. v. Becerra*, 9 F.4th 868 (D.C. Cir. 2021).

[32] In 2018, CMS proposed not to include an FFSA in any final RADV payment error methodology (Proposed Rule at 83 Fed. Reg. 54982, 55041).

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359)*
*Submitted to CMS (A-02-18-01029)*                                                                              *20*

believe that the steps that we followed for this audit provide a reasonable basis for our findings and recommendations, including our estimation of net overpayments.[33]

**HEALTHFIRST DID NOT AGREE WITH THE OFFICE OF INSPECTOR GENERAL'S RECOMMENDATION TO PERFORM ADDITIONAL REVIEWS BEFORE AND AFTER THE AUDIT PERIOD**

**Healthfirst Comments**

Healthfirst disagreed with our second recommendation—that Healthfirst perform additional reviews to determine whether similar instances of high-risk diagnoses occurred before or after the audit period and to refund any overpayments—because, according to Healthfirst, "[MA] regulations do not require the sort of audits that OIG recommends." In addition, Healthfirst stated that it does not have the information necessary to identify additional potentially mis-keyed diagnosis codes similar to those that we identified and for which we recommended that Healthfirst refund any resulting overpayments to the Federal Government (third recommendation).

Healthfirst stated that MA regulations "do not require [MA organizations] to ensure data perfection as the [d]raft [r]eport implies." In this respect, Healthfirst stated that "[t]he government has long acknowledged that [MA organizations] are not expected to submit perfect risk adjustment data" and that "OIG has issued non-binding guidance stating that [MA organizations] should establish an 'information collection and reporting system reasonably designed to yield accurate information.'" Moreover, Healthfirst stated that CMS recognizes that MA organizations submit encounter data "'in great volume from a number of sources'" and that for the certification of these data, CMS holds MA organizations responsible for making good faith efforts to certify their accuracy, completeness, and truthfulness.

In this respect, Healthfirst stated that our citations of Federal regulations for MA organizations like Healthfirst to monitor the data that they receive from providers and submit to CMS were misleading. Specifically, Healthfirst stated that our citations did not address the "broad discretion" that CMS provided to MA organizations to design their own compliance programs and did not "account for the qualified 'good faith' attestation standard that CMS explicitly adopted." Thus, according to Healthfirst, OIG's second recommendation "would dramatically expand the [MA] compliance program requirements."

---

[33] OIG audit findings and recommendations do not represent final determinations by CMS. Action officials at CMS will determine whether an overpayment exists and will recoup any overpayments consistent with its policies and procedures. In accordance with 42 CFR § 422.311, which addresses audits conducted by the Secretary (including those conducted by the OIG), if a disallowance is taken, MA organizations have the right to appeal the determination that an overpayment occurred through the Secretary's RADV appeals process.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359) Submitted to CMS (A-02-18-01029)*     *21*

1174

**Office of Inspector General Response**

We do not agree with Healthfirst's interpretation of Federal requirements.  We recognize that MA organizations have the latitude to design their own federally mandated compliance programs.  We also recognize that CMS applies a "good faith attestation" standard when MA organizations certify the great volume of data that they submit to CMS for use in the risk adjustment program.  However, contrary to Healthfirst's assertions, we believe that our second recommendation conforms to the requirements specified in Federal regulations (42 CFR § 422.503(b)(4)(vi) (see Appendix D)).

These Federal regulations state that MA organizations must "implement an effective compliance program, which must include measures that prevent, detect, and correct noncompliance with CMS' program requirements."  Further, these regulations specify that Healthfirst's compliance plan "must, at a minimum, include [certain] core requirements," which include "an effective system for routine monitoring and identification of compliance risks . . . [including] internal monitoring and audits and, as appropriate, external audits to evaluate . . . compliance with CMS requirements and the overall effectiveness of the compliance program."  These regulations also require MA organizations to implement procedures and a system for investigating "potential compliance problems as identified in the course of self-evaluations and audits, correcting such problems promptly and thoroughly to reduce the potential for recurrence."  Thus, CMS has, through the issuance of these Federal regulations, assigned the responsibility for dealing with potential compliance issues to the MA organizations.

We believe that the error rates identified in this report demonstrate that Healthfirst has compliance issues that need to be addressed.  These issues may extend to periods of time beyond our scope.  Accordingly, we maintain that our second recommendation is valid.

With regard to the potentially mis-keyed diagnosis codes, during the course of our audit work, we explained to Healthfirst officials how we selected each target area, including mis-keyed diagnosis codes.  Additionally, after the issuance of our draft report we provided Healthfirst with a spreadsheet detailing the 811 scenarios that we identified in which diagnosis codes could have been mis-keyed.  Therefore, Healthfirst has the information necessary to identify additional mis-keyed diagnosis codes similar to those that we identified.  Accordingly, we maintain that our third recommendation is also valid.

**HEALTHFIRST DID NOT AGREE WITH THE OFFICE OF INSPECTOR GENERAL'S RECOMMENDATION TO ENHANCE ITS EXISTING COMPLIANCE PROGRAM**

**Healthfirst Comments**

Healthfirst noted that it made changes to its compliance program after the end of our audit period.  Additionally, Healthfirst stated that it regularly evaluates its compliance programs to respond to regulatory changes and to identify opportunities for improvement.  Healthfirst

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359) Submitted to CMS (A-02-18-01029)*     *22*

**1175**

stated that it believes its current compliance program is sufficient to meet its current obligations and requested that we withdraw our fourth recommendation.

**Office of Inspector General Response**

We limited our review to selected diagnoses and HCCs that we determined to be at high risk for noncompliance (i.e., miscoded). Our audit revealed a significant error rate for some of these areas. After our audit period, Healthfirst revised its procedures to include internal medical reviews of these high-risk diagnoses. The continued improvement of those procedures, based on the results of this audit, as well as the results of Healthfirst's internal medical reviews, will assist Healthfirst in attaining better assurance with regard to the "accuracy, completeness and truthfulness" of the risk adjustment data that it submits in the future. Accordingly, we maintain that our fourth recommendation is valid.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359)
Submitted to CMS (A-02-18-01029)*                                                               *23*

1176

## APPENDIX A: AUDIT SCOPE AND METHODOLOGY

### SCOPE

CMS paid Healthfirst $3,333,485,481 to provide coverage to its enrollees for 2015 and 2016. We identified a sampling frame of 5,721 unique enrollee-years on whose behalf providers documented high-risk diagnosis codes during the 2014 and 2015 service years. Healthfirst received $107,579,597 in payments from CMS for these enrollee-years for 2015 and 2016. We selected for audit 240 enrollee-years with payments totaling $5,432,013.

The 240 enrollee-years included 49 acute stroke diagnoses, 30 acute heart attack diagnoses, 11 acute stroke diagnosis and acute heart attack diagnosis combinations, 30 embolism diagnoses, 35 vascular claudication diagnoses, 45 major depressive disorder diagnoses, and 40 potentially mis-keyed diagnoses. We limited our review to the portions of the payments that were associated with these high-risk diagnosis codes, which totaled $787,928 for our sample.

Our audit objective did not require an understanding or assessment of Healthfirst's complete internal control structure, and we limited our review of internal controls to those directly related to our objective.

We performed audit work from August 2019 through September 2021.

### METHODOLOGY

To accomplish our objective, we performed the following steps:

- We reviewed applicable Federal laws, regulations, and guidance.

- We discussed with CMS program officials the Federal requirements that MA organizations should follow when submitting diagnosis codes to CMS.

- We identified, through data mining and discussions with medical professionals at a Medicare administrative contractor, diagnosis codes and HCCs that were at high risk for noncompliance. We also identified the diagnosis codes that potentially should have been used for cases in which the high-risk diagnoses were miscoded.

- We consolidated the high-risk diagnosis codes into specific groups, which included:

  - 6 diagnosis codes for acute stroke,
  - 35 diagnosis codes for acute heart attack,
  - 56 diagnosis codes for embolism,
  - 4 diagnosis codes for vascular claudication, and
  - 27 diagnosis codes for major depressive disorder.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359)*
*Submitted to CMS (A-02-18-01029)*                                                                                                    *24*

1177

- We developed an analytical tool that identified 811 scenarios in which either ICD-9 or ICD-10 diagnosis codes, when mis-keyed into an electronic claim because of a data transposition or other data entry error, could result in the assignment of an incorrect HCC to an enrollee's risk score. For each of the 811 occurrences, the tool identified a potentially mis-keyed diagnosis code and the likely correct diagnosis code. Accordingly, we considered the potentially mis-keyed diagnosis codes to be high risk.

- We used CMS's systems to identify the enrollee-years on whose behalf providers documented the high-risk diagnosis codes. Specifically, we used extracts from CMS's:

  o Risk Adjustment Processing System (RAPS)[34] to identify enrollees who received high-risk diagnosis codes from a physician during the service years,

  o Risk Adjustment System (RAS)[35] to identify enrollees who received an HCC for the high-risk diagnosis codes,

  o Medicare Advantage Prescription Drug System (MARx)[36] to identify the total Medicare payments that CMS calculated, before applying the budget sequestration reduction, for Healthfirst for the payment years, and

  o Prescription Drug Event (PDE) file[37] to identify enrollees who had Medicare claims with certain medications dispensed on their behalf.

- We interviewed Healthfirst officials to gain an understanding of (1) the policies and procedures that Healthfirst followed to submit diagnosis codes to CMS for use in the risk-adjustment program and (2) Healthfirst's monitoring of those diagnosis codes to identify and detect noncompliance with Federal requirements.

- We selected for audit a sample of 240 enrollee-years that included (1) a stratified random sample of 200 enrollee-years and (2) a non-statistical sample of 40 enrollee-years.

---

[34] MA organizations use the RAPS to submit diagnosis codes to CMS.

[35] The RAS identifies the HCCs that CMS factors into each enrollee's risk score calculation.

[36] The MARx identifies the payments made to MA organizations.

[37] The PDE file contains claims with prescription drugs that have been dispensed to enrollees through the Medicare Part D (prescription drug coverage) program.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359) Submitted to CMS (A-02-18-01029)*                                                         *25*

- We used an independent medical review contractor to perform a coding review for the 240 enrollee-years to determine whether the high-risk diagnosis codes submitted to CMS complied with Federal requirements.[38]

- The independent medical review contractor's coding review followed a specific process to determine whether there was support for a diagnosis code and the associated HCC:

  o If the first senior coder found support for the diagnosis code on the medical record, the HCC was considered validated.

  o If the first senior coder did not find support on the medical record, a second senior coder performed a separate review of the same medical record:

    ▪ If the second senior coder also did not find support, the HCC was considered to be not validated.

    ▪ If the second senior coder found support, then a physician independently reviewed the medical record to make the final determination.

  o If either the first or second senior coder asked a physician for assistance, the physician's decision became the final determination.

- We used the results of the independent medical review contractor to calculate overpayments or underpayments for each enrollee-year. Specifically, we calculated:

  o a revised risk score in accordance with CMS's risk adjustment program and

  o the payment that CMS should have made for each enrollee-year.

- We estimated the total net overpayment made to Healthfirst during the audit period.

- We discussed the results of our audit with Healthfirst officials.

We conducted this performance audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

---

[38] Our independent medical review contractor used senior coders all of whom possessed one or more of the following qualifications and certifications: Registered Health Information Technician (RHIT), Certified Coding Specialist (CCS), Certified Coding Specialist – Physician-Based (CCS-P), Certified Professional Coder (CPC), and Certified Risk Coder (CRC). RHITs have completed a 2-year degree program and have passed an American Health Information Management Association (AHIMA) certification exam. The AHIMA also credentials individuals with CCS and CCS-P certifications and the American Academy of Professional Coders credentials both CPCs and CRCs.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359) Submitted to CMS (A-02-18-01029)*                                                    *26*

1179

**APPENDIX B: RELATED OFFICE OF INSPECTOR GENERAL REPORTS**

| Report Title | Report Number | Date Issued |
|---|---|---|
| *Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Anthem Community Insurance Company, Inc. (Contract H3655) Submitted to CMS* | A-07-19-01187 | 5/21/2021 |
| *Medicare Advantage Compliance Audit of Diagnosis Codes That Humana, Inc., (Contract H1036) Submitted to CMS* | A-07-16-01165 | 4/19/2021 |
| *Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Blue Cross Blue Shield of Michigan (Contract H9572) Submitted to CMS* | A-02-18-01028 | 2/24/2021 |
| *Some Diagnosis Codes That Essence Healthcare, Inc., Submitted to CMS Did Not Comply With Federal Requirements* | A-07-17-01170 | 4/30/2019 |

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359) Submitted to CMS (A-02-18-01029)*                    *27*

1180

**APPENDIX C: STATISTICAL SAMPLING METHODOLOGY**

**SAMPLING FRAME**

We identified Healthfirst enrollees who (1) were continuously enrolled in Healthfirst throughout all of the 2014 or 2015 service year and January of the following year, (2) were not classified as being enrolled in hospice or as having end-stage renal disease status at any time during 2014 or 2015 or in January of the following year, and (3) received a high-risk diagnosis during 2014 or 2015 that caused an increased payment to Healthfirst for 2015 or 2016, respectively.

We presented the data for these enrollees to Healthfirst for verification and performed an analysis of the data included on CMS's systems to ensure that the high-risk diagnosis codes increased CMS's payments to Healthfirst. After we performed these steps, our finalized sampling frame consisted of 5,721 enrollee-years.

**SAMPLE UNIT**

The sample unit was an enrollee-year, which covered either payment year 2015 or 2016.

**SAMPLE DESIGN**

The design for our statistical sample was comprised of six strata of enrollee-years with either:

- an acute stroke diagnosis (which maps to the HCC for Ischemic or Unspecified Stroke) on one physician claim during the service year but did not have that diagnosis on a corresponding inpatient hospital claim (1,071 enrollee-years);

- a diagnosis that mapped to an Acute Heart Attack HCC on only one physician claim but did not have that diagnosis on a corresponding inpatient hospital claim either 60 days before or 60 days after the physician claim (560 enrollee-years);

- an acute stroke diagnosis and a diagnosis that mapped to an Acute Heart Attack HCC in the same year and that met the criteria mentioned in the previous two bullets (11 enrollee-years);

- a diagnosis that mapped to an Embolism HCC but for which an anticoagulant medication was not dispensed (362 enrollee-years);

- a vascular claudication diagnosis (which maps to the HCC for Vascular Disease) on one claim during the service year (and did not occur during the 2 years that preceded the service year), but for which medication was dispensed for neurogenic claudication during the service year (1,547 enrollee-years); or

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359)*
*Submitted to CMS (A-02-18-01029)* 28

1181

- a major depressive disorder diagnosis (which maps to the HCC for Major Depressive, Bipolar, and Paranoid Disorders) on one claim during the service year but for which antidepressant medication was not dispensed (2,095 enrollee-years).

The specific strata are shown in Table 3.

**Table 3: Sample Design for Audited High-Risk Groups**

| Stratum (High-Risk Groups) | Frame Count of Enrollee-Years | CMS Payment for HCCs in Audited High-Risk Groups* | Sample Size |
|---|---|---|---|
| 1 – Acute Stroke | 1,071 | $2,712,635 | 49 |
| 2 – Acute Heart Attack | 560 | 1,203,268 | 30 |
| 3 – Acute Stroke / Acute Heart Attack Combination | 11 | 54,748 | 11 |
| 4 – Embolism | 362 | 954,907 | 30 |
| 5 – Vascular Claudication | 1,547 | 3,712,264 | 35 |
| 6 – Major Depressive Disorder | 2,095 | 5,839,986 | 45 |
| **Total – First Six Strata** | **5,646** | **$14,477,808** | **200** |

*Rounded to the nearest whole dollar amount.

After we selected the 200 enrollee-years, we identified an additional group of 75 enrollee-years, from which we non-statistically selected 40 enrollee-years that represented individuals who received 1 of the 811 potentially mis-keyed diagnosis codes (which mapped to a potentially unvalidated HCC) and multiple instances of diagnosis codes for unrelated conditions that were likely keyed correctly. Thus, we selected for audit a total of 240 enrollee-years.

**SOURCE OF RANDOM NUMBERS**

We generated the random numbers with the Office of Inspector General (OIG), Office of Audit Services (OAS), statistical software.

**METHOD FOR SELECTING SAMPLE ITEMS**

We consecutively numbered the items in each stratum in the stratified sampling frame. After generating 200 random numbers according to our sample design, we selected the corresponding frame items for review. We also systematically selected a non-statistical sample of 40 items from the potentially mis-keyed group. This resulted in at least 1 enrollee-year being selected from each HCC group.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359) Submitted to CMS (A-02-18-01029)* 29

1182

**ESTIMATION METHODOLOGY**

We used the OIG, OAS, statistical software to estimate the total amount of net overpayments to Healthfirst at the lower limit of the two-sided 90-percent confidence interval (Appendix D). Lower limits calculated in this manner are designed to be less than the actual overpayment total 95 percent of the time. We also identified the net overpayments from the non-statistical sample of 40 potentially mis-keyed diagnosis codes and added that amount to the estimate for the statistical sample to obtain the total net overpayments.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359) Submitted to CMS (A-02-18-01029)*                    *30*

1183

## APPENDIX D: SAMPLE RESULTS AND ESTIMATES

### Table 4: Sample Details and Results

| Audited High-Risk Groups | Frame Size | CMS Payment for HCCs in Audited High-Risk Groups (for Enrollee-Years in Frame) | Sample Size | CMS Payment for HCCs in Audited High-Risk Groups (for Sampled Enrollee-Years) | Number of Sampled Enrollee-Years With Incorrect Diagnosis Codes | Net Overpayment for Unvalidated HCCs (for Sampled Enrollee-Years) |
|---|---|---|---|---|---|---|
| 1 – Acute Stroke | 1,071 | $2,712,635 | 49 | $129,370 | 49 | $129,370 |
| 2 – Acute Heart Attack | 560 | 1,203,268 | 30 | 63,009 | 30 | 49,653 |
| 3- Acute Stroke/ Acute Heart Attack Combination | 11 | 54,748 | 11 | 54,748 | 11 | 46,496 |
| 4 – Embolism | 362 | 954,907 | 30 | 79,669 | 27 | 72,442 |
| 5 – Vascular Claudication | 1,547 | 3,712,264 | 35 | 82,178 | 4 | 8,738 |
| 6 – Major Depressive Disorder | 2,095 | 5,839,986 | 45 | 126,317 | 4 | 11,438 |
| Totals—First Six Strata | 5,646 | $14,477,808 | 200 | 535,291 | 125 | $318,137 |
| 7 – Potentially Mis-keyed Diagnoses | 75 | $369,934 | 40 | $252,638 | 30 | $198,371 |
| Totals – All | 5,721 | $14,847,742 | 240 | $787,928* | 155 | $516,509* |

* Difference in total is due to rounding.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359)*
*Submitted to CMS (A-02-18-01029)*                                                                31

1184

**Table 5: Estimated Net Overpayments in the Sampling Frame**
***(Limits Calculated at the 90-Percent Confidence Level)***

| | **Estimated Net Overpayment for Statistical Sample** | **Overpayment for Potentially Mis-keyed Diagnosis Group** | **Total Estimated Net Overpayments** |
|---|---|---|---|
| Point Estimate | $5,593,899 | $198,371 | $5,792,270 |
| Lower Limit | $5,023,530 | $198,371 | $5,221,901 |
| Upper Limit | $6,164,268 | $198,371 | $6,362,639 |

**APPENDIX E: FEDERAL REGULATIONS REGARDING COMPLIANCE PROGRAMS
THAT MEDICARE ADVANTAGE ORGANIZATIONS MUST FOLLOW**

Federal regulations (42 CFR § 422.503(b)) state:

Any entity seeking to contract as an MA organization must . . . .

(4) Have administrative and management arrangements satisfactory to CMS,
as demonstrated by at least the following . . . .

(vi) Adopt and implement an effective compliance program, which must
include measures that prevent, detect, and correct non-compliance
with CMS's program requirements as well as measures that prevent,
detect, and correct fraud, waste, and abuse. The compliance
program must, at a minimum, include the following core
requirements:

(A) Written policies, procedures, and standards of conduct that—

(1) Articulate the organization's commitment to comply with all
applicable Federal and State standards;

(2) Describe compliance expectations as embodied in the
standards of conduct;

(3) Implement the operation of the compliance program;

(4) Provide guidance to employees and others on dealing with
potential compliance issues;

(5) Identify how to communicate compliance issues to
appropriate compliance personnel;

(6) Describe how potential compliance issues are investigated and
resolved by the organization; and

(7) Include a policy of non-intimidation and non-retaliation for
good faith participation in the compliance program, including
but not limited to reporting potential issues, investigating
issues, conducting self-evaluations, audits and remedial
actions, and reporting to appropriate officials. . . .

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359)
Submitted to CMS (A-02-18-01029)*                                                              *33*

1186

(F) Establishment and implementation of an effective system for routine monitoring and identification of compliance risks. The system should include internal monitoring and audits and, as appropriate, external audits, to evaluate the MA organization, including first tier entities', compliance with CMS requirements and the overall effectiveness of the compliance program.

(G) Establishment and implementation of procedures and a system for promptly responding to compliance issues as they are raised, investigating potential compliance problems as identified in the course of self-evaluations and audits, correcting such problems promptly and thoroughly to reduce the potential for recurrence, and ensure ongoing compliance with CMS requirements.

   (1) If the MA organization discovers evidence of misconduct related to payment or delivery of items or services under the contract, it must conduct a timely, reasonable inquiry into that conduct.

   (2) The MA organization must conduct appropriate corrective actions (for example, repayment of overpayments, disciplinary actions against responsible employees) in response to the potential violation referenced in paragraph (b)(4)(vi)(G)(1) of this section.

   (3) The MA organization should have procedures to voluntarily self-report potential fraud or misconduct related to the MA program to CMS or its designee.

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359)
Submitted to CMS (A-02-18-01029)*                                                                                    *34*

1187

## APPENDIX F: BREAKOUT OF POTENTIALLY MIS-KEYED DIAGNOSIS CODES

### Table 6: Potentially Mis-keyed Diagnosis Codes and Associated Overpayments

| Number of Sampled Enrollee-years | One Diagnosis for a Condition (Determined To Be Incorrect) | | | Multiple Diagnoses for a Condition (Not Reviewed) | | Net Overpayment |
|---|---|---|---|---|---|---|
| | Diagnosis Code | Diagnosis Code Description | Hierarchical Condition Category That Was Not Validated | Diagnosis Code | Diagnosis Code Description | |
| 6 | 714.9 | Unspecified Inflammatory Polyarthropathy | Rheumatoid Arthritis and Inflammatory Connective Tissue Disease | 174.9 | Malignant Neoplasm of Breast (Female), Unspecified | $20,123 |
| 4 | 205.00 | Acute Myeloid Leukemia, Without Mention of Having Achieved Remission | Metastatic Cancer and Acute Leukemia | 250.00 | Diabetes Mellitus Without Mention of Complication, Type II or Unspecified Type, Not Stated as Uncontrolled | 75,495 |
| 3 | 200.00 | Reticulosarcoma, Unspecified Site, Extranodal and Solid Organ Sites | Lymphatic, Head and Neck, Brain, and Other Major Cancers (Version 12 model) and Lymphoma and Other Cancers (Version 22 model) | 250.00 | Diabetes Mellitus Without Mention of Complication, Type II or Unspecified Type, Not Stated as Uncontrolled | 17,859 |
| 2 | 205.90 | Unspecified Myeloid Leukemia, Without Mention of Having Achieved Remission | Lung, Upper Digestive Tract, and Other Severe Cancers (Version 12 model) and Lung and Other Severe Cancers (Version 22 model) | 250.90 | Diabetes With Unspecified Complication, Type II or Unspecified Type, Not Stated as Uncontrolled | 16,752 |
| 2 | 482.0 | Pneumonia Due to Klebsiella Pneumoniae | Aspiration and Specified Bacterial Pneumonias | 428.0 | Congestive Heart Failure, Unspecified | 9,450 |

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359)
Submitted to CMS (A-02-18-01029)*                                                                 *35*

1188

| Number of Sampled Enrollee-years | One Diagnosis for a Condition (Determined To Be Incorrect) | | | Multiple Diagnoses for a Condition (Not Reviewed) | | Net Overpayment |
| | Diagnosis Code | Diagnosis Code Description | Hierarchical Condition Category That Was Not Validated | Diagnosis Code | Diagnosis Code Description | |
| --- | --- | --- | --- | --- | --- | --- |
| 2 | 493.20 | Chronic Obstructive Asthma, Unspecified | Chronic Obstructive Pulmonary Disease | 493.02 | Extrinsic Asthma With (Acute) Exacerbation | 8,261 |
| 2 | 402.01 | Malignant Hypertensive Heart Disease With Heart Failure | Congestive Heart Failure | 402.10 | Benign Hypertensive Heart Disease Without Heart Failure | 7,027 |
| 1 | 205.02 | Acute Myeloid Leukemia, in Relapse | Metastatic Cancer and Acute Leukemia | 250.02 | Diabetes Mellitus Without Mention of Complication, Type II or Unspecified Type, Uncontrolled | 18,997 |
| 1 | 433.01 | Occlusion and Stenosis of Basilar Artery With Cerebral Infarction | Ischemic or Unspecified Stroke | 433.10 | Occlusion and Stenosis of Carotid Artery Without Mention of Cerebral Infarction | 4,027 |
| 1 | 249.20 | Secondary Diabetes Mellitus With Hyperosmolarity, Not Stated as Uncontrolled, or Unspecified | Diabetes With Acute Complications | 294.20 | Dementia, Unspecified, Without Behavioral Disturbance | 3,988 |
| 1 | 482.1 | Pneumonia Due to Pseudomonas | Aspiration and Specified Bacterial Pneumonias | 428.1 | Left Heart Failure | 3,961 |

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359) Submitted to CMS (A-02-18-01029)*    *36*

1189

| Number of Sampled Enrollee-years | One Diagnosis for a Condition (Determined To Be Incorrect) | | | Multiple Diagnoses for a Condition (Not Reviewed) | | Net Overpayment |
|---|---|---|---|---|---|---|
| | Diagnosis Code | Diagnosis Code Description | Hierarchical Condition Category That Was Not Validated | Diagnosis Code | Diagnosis Code Description | |
| 1 | 250.00 | Diabetes Mellitus Without Mention of Complication, Type II or Unspecified Type, Not Stated as Uncontrolled | Diabetes Without Complication | 205.00 | Acute Myeloid Leukemia, Without Mention of Having Achieved Remission | 3,768 |
| 1 | 209.21 | Malignant Carcinoid Tumor of the Bronchus and Lung | Breast, Prostate, Colorectal and Other Cancers and Tumors (Version 12 model) and Breast, Prostate, and Other Cancers and Tumors (Version 22 model) | 290.21 | Senile Dementia With Depressive Features | 2,385 |
| 1 | E32.9 | Disease of Thymus, Unspecified | Other Significant Endocrine and Metabolic Disorders | F32.9 | Major Depressive Disorder, Single Episode, Unspecified | 2,349 |
| 1 | 441.01 | Dissection of Aorta, Thoracic | Vascular Disease With Complications | 414.01 | Coronary Atherosclerosis of Native Coronary Artery | 1,969 |
| 1 | 441.00 | Dissection of Aorta, Unspecified Site | Vascular Disease With Complications | 414.00 | Coronary Atherosclerosis of Unspecified Type of Vessel, Native or Graft | 1,960 |
| 30 | | | | | | $198,371 |

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359)*
*Submitted to CMS (A-02-18-01029)*                                                                 *37*

1190

**Table 7: Hierarchical Condition Categories (HCCs) That Were Not Validated, But We Found Support for an HCC for a Less Severe Manifestation of the Related-Disease Group**

| Count of Enrollee-Years | More Severe Hierarchical Condition Category That Was Not Validated | Less Severe Hierarchical Condition Category That Was Supported |
|---|---|---|
| 2 | Vascular Disease With Complications | Vascular Disease |
| 1 | Aspiration and Specified Bacterial Pneumonias | Pneumococcal Pneumonia, Emphysema, Lung Abscess |
| 1 | Metastatic Cancer and Acute Leukemia | Breast, Prostrate, Colorectal and Other Cancers and Tumors (Version 12 model)/Breast, Prostate, and Other Cancers and Tumors (Version 22 model) |

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359)*
*Submitted to CMS (A-02-18-01029)*     *38*

1191

## APPENDIX G: HEALTHFIRST COMMENTS



Health Insurance for New Yorkers

<u>VIA Electronic Mail "Kiteworks" to brenda.tierney@oig.hhs.gov</u>

October 18, 2021

Brenda M. Tierney
Regional Inspector General for Audit Services
Office Of Audit Services
Region II
Jacob K. Javits Federal Building
26 Federal Plaza,
Room 3900
New York, NY 10278

**RE: Report Number: A-02-18-01029**

Dear Ms. Tierney:

Healthfirst Health Plan, Inc. ("Healthfirst") writes in response to the United States Department of Health and Human Services ("HHS") Office of Inspector General's ("OIG's") Draft Report for Audit No. A-02-18-01029 ("Draft Report"). For the reasons described below, Healthfirst respectfully requests that OIG withdraw its recommendations that Healthfirst (i) repay an extrapolated amount of $5,221,901 (and instead limit repayment to the $516,509 in erroneous payments that were actually identified) and (ii) conduct additional self-audits beyond OIG's sample for periods during, prior to and after OIG's audit period and calculate any repayments based on those audits. Healthfirst objects to OIG's recommendations because (A) extrapolation is not permitted, (B) even if permitted, the proposed extrapolation methodology is inconsistent with the legal and regulatory requirements underlying the Medicare Advantage ("MA") program, and (C) there are currently open CMS audits in process for periods preceding the OIG's audit period and thus any self-audit would be duplicative and premature.

    **A.**    **The Recommended Repayment Amount is Based on Extrapolation, For Which OIG Has No Authority and Which is Calculated Incorrectly**

OIG reviewed medical records from a sample of Healthfirst beneficiaries and found overpayments totaling $516,509. The remaining over $4.5 million dollars OIG seeks to recoup is based on OIG's proposed extrapolation of those specific individual overpayments across a broader universe. Thus, OIG proposes to essentially use a sample to calculate a contract-wide error rate for similar codes and recover "overpayments" on that larger amount. OIG lacks authority to base its recovery on such an extrapolation. The Social Security Act ("SSA") only provides limited authority for CMS to extrapolate, and such authority is limited to *contractors auditing providers* under Medicare Parts A and B in limited circumstances not present here with respect to Medicare Advantage Organizations ("MAOs").[1]
The applicable statute, entitled "LIMITATION ON USE OF EXTRAPOLATION," states:

> A [M]edicare contractor may not use extrapolation to determine overpayment amounts to be recovered by recoupment, offset, or otherwise unless [CMS] determines that—
>
> (A) there is a sustained or high level of payment error; or

---

[1] 42 U.S.C. § 1395ddd(f)(3).

Healthfirst | 100 Church Street, New York, NY 10007 | www.healthfirst.org

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359)*
*Submitted to CMS (A-02-18-01029)*    *39*

1192

(B) documented educational intervention has failed to correct the payment error.

The language of that section does not provide CMS with authority to use extrapolation for anyone other than *providers and suppliers* under Medicare Parts A and B. There is simply no statutory authority for the use of extrapolation of audit results of MAOs providing services under Part C. [2]

While CMS purported to enact draft regulations regarding extrapolation for 2011, 2012 and 2013, they were never published with a prior notice and comment period. [3] More recently, CMS published for comment a methodology for audits of Part C contractors for 2020 and 2021, which have received substantial negative comments, in part based on the actuarial equivalence argument discussed in paragraph B below.

There is no published methodology whatsoever for the 2015 and 2016 audit period here, and therefore there was no opportunity for the public or the MAOs to understand the details of the methodology or make comments. Utilizing unpublished extrapolation methodology is inconsistent with the SSA requirements for notice-and-comment rulemaking as indicated by the Supreme Court in *Azar v. Allina Health Services*. [4] Thus any purported authority for such extrapolation fails to comply with the required rule-making processes.

In addition, the methodology OIG employs in its extrapolation is faulty. OIG used the lower bound of a 90% confidence interval to calculate the extrapolated repayment amount, rather than the statistically valid and more robust practice of using the lower bound of a 95% or 99% confidence interval. [5] In CMS's most recent disclosure of its own methodology for calculating extrapolated repayment amounts for its RADV audits, CMS stated that it uses the lower bound of a 99% confidence interval. [6] Accordingly, although we believe that extrapolation is impermissible here, Healthfirst respectfully requests that even if OIG were permitted to extrapolate, it would have to recalculate the extrapolated "overpayment" amount using the lower bound of the more statistically robust 99% confidence interval consistent with CMS practice for RADV audits.

---

[2] That this section is limited providers and suppliers under Medicare Parts A and B is clear from the context and from additional language in this section: "There shall be no administrative or judicial review under section 1869 [referring to appeal rights specific to Medicare Parts A and B], section 1878 [referring to additional appeal rights specific to certain providers of services under Part A], or otherwise, of determinations by [CMS] of sustained or high levels of payment errors under this paragraph." *See* America's Health Insurance Plans, Comments to the Proposed Rule (August 17, 2019), www.ahip.org/wp-content/uploads/AHIP_RADV_comments_FINAL_8_27_19.pdf at 25.

[3] CMS proposed its methodology for conducting RADV audits, including extrapolation, via the CMS website on December 20, 2010, instead of the Federal Register. *See* Policy and Technical Changes to the Medicare Advantage, Medicare Prescription Drug Benefit, Program of All-Inclusive Care for the Elderly (PACE), Medicaid Fee-for-Service, and Medicaid Managed Care Programs for Years 2020 and 2021, 83 Fed. Re g. 54982, 55038 (proposed Nov. 1, 2018)

[4] 139 S. Ct. 1804 (2019).

[5] Federal Judicial Center, National Academies Press, Reference Manual on Scientific Evidence 245 (3d ed. 2011) ("The 95% confidence level is the most popular, but some authors use 99%, and 90% is seen on occasion.")

[6] Centers for Medicare and Medicaid Services, Notice of Final Payment Error Calculation Methodology for Part C Medicare Advantage Risk Adjustment Data Validation for Contract-Level Audits, at 4 (Feb. 24, 2012)(to be codified at 42 C.F.R. Parts 422, 423, 438, and 498)(hereinafter *Notice of Error Calculation*)

Page 2 of 8

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359)*
*Submitted to CMS (A-02-18-01029)*                                                                                          *40*

1193

**B.    The Recommended Extrapolated Repayment Amount is Incorrect Because it is Not Adjusted to Ensure Actuarial Equivalence to the Fee-For-Service Medicare Program as Required by Law**

The SSA requires CMS to pay MAOs an amount that is "actuarially equivalent" to the expected cost that CMS would have otherwise incurred had it provided required Medicare benefits directly to the MAOs' enrollees. Actuarial equivalence measures whether different benefit packages have "the same value, based on the estimated spending that would be incurred by the insurer."[7] Because the SSA ties Medicare Advantage compensation to the expected cost of providing traditional Medicare benefits to an enrollee of average risk, the "actuarial equivalence" mandate requires CMS to base risk-adjusted payments on actuarially sound calculations of the expected cost of providing traditional Medicare benefits to enrollees with different health status.[8] That conclusion is confirmed by the SSA's separate requirement that CMS report to Congress on the "actuarial soundness" of the agency's proposed risk adjustment methodology.[9] CMS developed the Medicare Advantage risk adjustment model using unaudited Fee-for-Service ("FFS") claims data from the traditional Medicare program, which CMS has acknowledged contain high levels of erroneous diagnoses. Accordingly, in order to ensure actuarial equivalence between the FFS and MA programs, CMS should measure overall rates of erroneous diagnoses in the Medicare Advantage program against the rates of erroneous diagnoses found within the traditional Medicare FFS program.[10] CMS previously formally signaled its agreement with the requirement of measuring error rates in Medicare Advantage diagnoses against those in the traditional Medicare program. In 2012, CMS published a notice stating that it was adopting this requirement as part of its methodology for calculating recovery amounts for unsupported Hierarchical Condition Categories ("HCCs") identified during its RADV audits. Specifically, CMS said that it would first identify a "payment recovery amount" based on the value of supported and unsupported HCCs identified during its review.[11] Then, "to determine the final payment recovery amount, CMS [would] apply a Fee-for-Service Adjuster ('FFS Adjuster') amount as an offset to the preliminary recovery amount," and base the FFS Adjuster "on a RADV-like review of records submitted to support [traditional Medicare] claims data."[12]

This announcement reflected CMS's view (stated in internal CMS documents) that without applying an FFS Adjuster to calculated repayment amounts, audited MAOs are underpaid.[13] In a CMS presentation titled "Model Calibration Factor," for example, CMS explained that:

---

[7] U.S. Department of Health & Human Services, Payment for Medicare Advantage Plans: Policy Issues and Options (June 2009), *available at* https://aspe.hhs.gov/reports/payment-medicare-advantage-plans-policy-issues-options-0.
[8] 42 U.S.C. § 1395w-24(a)(5)(A), (a)(6)(A)(i)-(iii); *see also UnitedHealthcare Ins. Co. v. Azar*, No. 16-cv-157 (D.D.C. Dec. 4, 2017), ECF No. 57-1 (acknowledging, in the government's motion for summary judgment, that there must be equivalence "between the average payments that CMS would expect to make on behalf of a given beneficiary under traditional . . . Medicare, and the payments made to [MAOs] for covering an individual with those same characteristics").
[9] *See* 42 U.S.C. § 1395w-23(b)(4)(C), (D).
[10] *See generally* Wakely Consulting Group, Actuarial Report on CMS's November 1, 2018 Proposed Rule (Aug. 27, 2019) (enclosure to Letter from Anthony Mader, Vice President, Public Policy, Anthem, Inc., to Seema Verma, Administrator, Ctrs. for Medicare & Medicaid Servs. (Aug. 28, 2019), *available at* https://beta.regulations.gov/comment/CMS-2018-0133-0260).
[11] *Notice of Error Calculation, supra* note 6, at 3-4.
[12] *Id.* at 4-5.
[13] *See Azar*, 1:16-cv-00157-RMC (D.D.C. Oct. 2, 2017) (ECF 44-3) (Document authored by CMS titled "Model Calibration Factor"); *Azar*, 1:16-cv-00157-RMC (D.D.C. Oct. 2, 2017) (ECF 44-4) (Document authored by CMS titled "Three RADV Policy Issues").

Page 3 of 8

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359) Submitted to CMS (A-02-18-01029)*    41

1194

> "[i]n RADV audits, we expect coding perfection from [MAOs]," while "[i]n [traditional] Medicare,
> some portion of diagnoses on [traditional] Medicare] claims are not documented in medical
> records."[14]

As a result, for RADV audits, MAOs "are being held to a different (higher) standard for diagnoses"[15]
absent an FFS adjuster.

CMS said that these different document standards matter because traditional Medicare data were used to
calculate MA payments and the "[i]nclusion of undocumented diagnoses tends to reduce risk adjustment
values."[16] CMS then used numerical examples to demonstrate that MAOs would be underpaid (i.e.,
MAOs' costs would exceed CMS reimbursement) if MAOs were audited to a standard of data perfection
without properly calibrating the overpayment amount to account for traditional Medicare data errors.[17]
CMS departed from the principle that a FFS adjuster is necessary by issuing a proposed rule in 2018[18]
suggesting that diagnosis coding errors in unaudited traditional Medicare data do not systematically
impact payments to MAOs[19] and released a corresponding study purporting to support this premise.[20]
Healthfirst and numerous other parties, including actuarial and statistical experts, have submitted
comments to CMS objecting to this approach and advocating for the use of a "fee-for-service adjuster" as
originally proposed in connection with the proposed rule.[21]

In September 2018, a federal district court in *UnitedHealthcare Ins. Co. v. Azar II* ("Azar"), 330 F. Supp.
3d 173 (D.D.C. 2018), vacated CMS's Medicare Advantage Overpayment Rule because the rule violated
the SSA's actuarial equivalence mandate by defining "overpayment" as the payment of funds to MAOs
based on unsupported diagnosis codes, while not applying the same documentation standards to the
traditional Medicare data used to calculate payments to MAOs.[22] In doing so, the court concluded that
CMS systematically devalues MAO payments when it uses unaudited traditional Medicare data to set
MAO payment rates while measuring MAO "overpayments" based on audited patient records.[23] CMS
presented a study that purported to deny the need for a fee-for-service adjuster, but the court in *Azar*

---

[14] *Azar*, 1:16-cv-00157-RMC (D.D.C. Oct. 2, 2017) (ECF 44-3) at 6.

[15] *Id.*

[16] *Id.* at 7.

[17] *Id.* at 8–9.

[18] Notably, the 2018 proposed rule is not final and is still subject to administrative rulemaking process.

[19] Medicare and Medicaid Programs; Policy and Technical Changes to the Medicare Advantage, Medicare
Prescription Drug Benefit, Program for All-Inclusive Care for the Elderly (PACE), Medicaid Fee-for-Service, and
Medicaid Managed Care Programs for Years 2020 and 2021, 83 Fed. Reg. 54982 (proposed Nov. 1, 2018) (to be
codified at 42 C.F.R. §§ 422, 423, 438, 498) (hereinafter "Proposed Rule").

[20] Centers for Medicare and Medicaid Services, *Fee for Service Adjuster & Payment Recovery for Contract Level
Risk Adjustment Data Validation Audits* (Oct. 26, 2018), *available at* https://tinyurl.com/ve3737d; CMS, *Addendum
to the Fee-For-Service Adjuster Study* (June 28, 2019).

[21] *See* Public Comments on Proposed Rule (e.g., Anthem Letter dated August 28, 2019, supra n.12; Cigna Letter
dated August 28, 2019, available at https://www.regulations.gov/document?D=CMS-2018-0133-0254; CVSHealth
Letter dated August 28, 2019, available at https://www.regulations.gov/document?D=CMS-2018-0133-0259;
Humana Letter dated August 28, 2019, available at https://www.regulations.gov/document?D=CMS-2018-0133-
0257; Kaiser Permanente Letter dated August 28, 2019, available at
https://www.regulations.gov/document?D=CMS-2018-0133-0267; UnitedHealth Group Letter dated August 28,
2019, available at https://www.regulations.gov/document?D=CMS-2018-0133-0263).

[22] *Azar*, 330 F. Supp. 3d at 187–90; *Azar*, Case No. 16-cv-157 (RMC), 2020 WL 417867 (D.D.C. Jan. 27, 2020).

[23] *Id.* at 186–87 ("[T]he 'expected' value of payments from CMS for healthcare costs [to MAOs] will be lower than
the 'expected' payments CMS itself will make under traditional Medicare, since CMS does not audit or engage in
similar self-examination for accuracy of its own records. The consequence is inevitable: while CMS pays for all
diagnostic codes, erroneous or not, submitted to traditional Medicare, it will pay less for Medicare Advantage
coverage because essentially no errors would be reimbursed.").

Page 4 of 8

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359)
Submitted to CMS (A-02-18-01029)*                                                                           *42*

1195

found that CMS's study "does not persuade" and concluded that the government had failed to "adequately respond" to criticisms of the study raised during litigation.[24] On January 27, 2020, the same court reaffirmed this position in denying the government's request to reconsider the court's prior holding.[25] The D.C. Circuit in *United Healthcare Insurance Co. v. Becerra*, 9 F.4th 868 (D.C. Cir. 2021), while overturning *Azar* in part, recognized the requirement of actuarial equivalence in conducting RADV audits. The *Becerra* court recognized that "the system-level adjustment that CMS said it would apply in the context of contract-level RADV audits came in direct response to concerns about actuarial equivalence." *Becerra*, 9 F.4th at 872.  The court expressly limited its holding, striking down actuarial equivalence in the overpayment context: "we hold that the actuarial-equivalence requirement does not pertain to the statutory overpayment-refund obligation, or the Overpayment Rule challenged here . . . ." *Id.*  The Court, however, noted that it was *not* invalidating actuarial equivalence as applied to RADV audits, saying <u>"[w]e express no opinion on whether the actuarial equivalence requirement . . . requires such an adjuster in the [contract-level RADV audit . . . ] context."</u>  *Id. at n.* 1 (emphasis added).  Notably, the Overpayment Rule itself applies only to <u>known</u> overpayments. *Id.* at 880.  Any RADV audit can necessarily only identify individual overpayments, and it is therefore not proper to require repayment of extrapolated results across the contract without adjusting to account for the error rate in the FFS program in order to ensure actuarial equivalency (if such extrapolation is indeed ever proper, as discussed above).

These Medicare Advantage program requirements apply to OIG's audits and calculation of estimated repayment amounts for the same program.  Thus, OIG's extrapolated repayment calculations, by failing to apply an FFS adjuster, violate the "actuarial equivalence" mandate that underpins the Medicare Advantage program.

Healthfirst accordingly requests that OIG withdraw its overpayment calculation and limit any recovery in this audit to the specific encounters that were reviewed during this audit and for which the unsupported codes were found.

### C.    Retroactivity Is Prohibited By Federal Law and Is Unnecessary and Unjustified

This audit relates to services provided in 2015 and 2016, necessarily requiring looking back to significantly prior periods.  The SSA prohibits retroactive rules absent a statutory requirement, significant public safety concern or other critical need[26], none of which are present here.  In addition, retroactivity poses major operational barriers for MAOs and providers.  Seeking records from providers for services provided in 2015 and 2016 to support HCCs reported on claims related to those services is often difficult.  Most provider records from that period and earlier were paper, and while many providers have now converted to electronic records, it is not likely that they converted their older paper records.  Additionally, providers have often moved, closed their practices, or may be deceased, all of which makes obtaining supporting records difficult even they existed at the time the claims were submitted.

Both because retroactivity is prohibited and because, practically speaking, provider records are sparse if available for past periods, we believe that even if a valid rule authorizing extrapolation if promulgated, it should not be applied retroactively, and that extrapolation by the OIG based on audit findings from 2016-2016 is similarly not permissible.

---

[24] *Azar*, 2020 WL 417867, at *1, *5.

[25] *Id.*

[26] 42 U.S.C. § 139hh(e)(1)(A): "A substantive change in regulations, manual instructions, interpretive rules, statements of policy, or guidelines of general applicability under this subchapter shall not be applied (by extrapolation or otherwise) retroactively to items and services furnished before the effective date of the change, unless the Secretary determines that- (i) such retroactive application is necessary to comply with statutory requirements; or (ii) failure to apply the change retroactively would be contrary to the public interest."

Page 5 of 8

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359) Submitted to CMS (A-02-18-01029)*    *43*

1196

**D.      Healthfirst Requests that OIG Withdraw Its Recommendation that Healthfirst Undertake Additional Auditing for the Condition Categories Subject to OIG's Audit**

OIG recommends that Healthfirst "identify, for the high-risk diagnoses included in [the Draft Report], similar instances of noncompliance that occurred before or after [the] audit period and refund any resulting overpayments to the Federal Government[.]"[27] As further set forth below, MAOs are not required to audit to the standard that OIG suggests. Medicare Advantage regulations do not require the sort of audits that OIG recommends and certainly do not require MAOs to ensure data perfection as the Draft Report implies. In fact, the *Becerra* court notes that "[n]othing in the Overpayment Rule obligates insurers to audit their reported data," a fact the court notes that CMS did not dispute. *Becerra* at 884. Even if Healthfirst were to undertake additional audits, OIG has not provided Healthfirst with the information necessary to identify additional "potentially miskeyed diagnoses" similar to those audited by OIG here. Further, the implementation of ICD-10 in 2016 introduced a more precise alpha-numeric coding system which greatly reduced the likelihood of miskeying errors, which would likely moot this category of errors with respect to that year and going forward.

The government has long acknowledged that MAOs are not expected to submit perfect risk adjustment data. For example, it has stated that MAOs "cannot reasonably be expected to know that every piece of data is correct, nor is that the standard that [CMS], the OIG, and [the U.S. Department of Justice] believe is reasonable to enforce."[28] OIG has issued non-binding guidance stating that MAOs should establish an "information collection and reporting system reasonably designed to yield accurate information."[29] This guidance affords MAOs broad discretion in designing compliance mechanisms. As the federal district court acknowledged in *Azar*, there is a disconnect when the government "treats diagnosis codes as categorically valid for its own purposes under traditional Medicare," but then requires "Medicare Advantage insurers to certify 'based on best knowledge, information, and belief' that the information they provide to CMS, including all diagnosis codes, is 'accurate, complete, and truthful.'"[30]

This understanding is reflected in MAOs' annual data accuracy attestation requirements. MAOs are required to certify that their risk adjustment data is accurate based on their "best knowledge, information, and belief."[31] CMS has acknowledged that "[t]he requirement that the CEO or CFO certify as to the accuracy, completeness and truthfulness of data, based on best knowledge, information and belief, does not constitute an absolute guarantee of accuracy."[32] CMS has stated that MAOs "will be held responsible for making good faith efforts to certify the accuracy, completeness, and truthfulness of encounter data submitted."[33] This "good faith" standard is not defined by CMS or OIG but it recognizes "that encounter data [can] come into [MAOs] in great volume from a number of sources, presenting significant verification challenges for the organizations."[34]

---

[27] Draft report at "Report in Brief".

[28] 65 Fed. Reg. 40169, 40268 (June 29, 2000).

[29] 64 Fed. Reg. 61893, 61900 (Nov. 15, 1999) (noting also that MAOs "should exercise due diligence to ensure that these systems are working properly" but that "[t]he exact methods used . . . can be determined by the organization and that these methods "should ordinarily [include] sample audits and spot checks of this system to verify whether it is yielding accurate information").

[30] *Azar*, 330 F. Supp. 3d at 179–80.

[31] 42 C.F.R. § 422.504(l)(2).

[32] 64 Fed. Reg. at 61900.

[33] 65 Fed. Reg. at 40268.

[34] *Id.* Notably, OIG's Draft Report appears at times to conflate the source of diagnosis codes in a manner that suggests MAOs have more information than they actually do about the accuracy of the risk adjustment data submitted to CMS. See, e.g., Draft Report at 3 ("MA organizations collect the diagnosis codes that physicians document on the medical records and submit th[o]se codes to CMS."); id. at 12 ("Healthfirst had submitted diagnosis codes in which physicians had documented conditions. . . ."). Providers document patient encounters in their medical records and submit claims to MAOs with diagnosis codes based on those encounters. MAOs then

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359) Submitted to CMS (A-02-18-01029)*      44

1197

OIG's Draft Report makes two potentially misleading statements in this respect. First, the Draft Report states that "[f]ederal regulations state that [MAOs] must monitor the data that they receive from providers and submit to CMS."[35] As noted above, given the high volume of diagnosis codes that are submitted to MAOs through provider claims submissions, CMS gives MAOs broad discretion to design their own compliance and risk adjustment data accuracy programs. CMS has declined to require MAOs to implement any specific oversight measures, and certainly does not require verification of every code submitted by a provider. Second, the Draft Report also states that federal regulations "state that [MAOs] are responsible for the accuracy, completeness, and truthfulness of the data submitted to CMS for payment purposes."[36] This statement is misleading and not accurate because it suggests that the standard for accuracy, completeness and truthfulness is absolute and fails to account for the qualified "good faith" attestation standard that CMS explicitly adopted.

Accordingly, OIG's recommendation would dramatically expand the Medicare Advantage compliance program requirements.[37] CMS is certainly aware of industry-wide trends pertaining to the seven categories audited by OIG through CMS's years of RADV audits, communications with MAOs, and review of the traditional Medicare data it uses to calculate MAO payments. But CMS has not opted to take any steps to implement regulations in response to these trends, let alone the expansive steps OIG proposes in its Draft Report. Healthfirst therefore respectfully requests that OIG withdraw this recommendation.

### E.    Healthfirst Will Continue to Identify Opportunities to Enhance Its Existing RADV Compliance Program

As OIG acknowledges, Healthfirst has made significant changes to its RADV compliance program since the close of OIG's audit period. While Healthfirst regularly evaluates its compliance programs in order to both respond to regulatory changes and to identify opportunities for improvement, Healthfirst believes that its current RADV compliance program is sufficient to meet its current obligations. Accordingly, Healthfirst requests that OIG withdraw its recommendation that Healthfirst make changes to its existing RADV compliance program.

### CONCLUSION

For the foregoing reasons, Healthfirst requests that OIG withdraw all recommendations, with the exception of the recommendation that Healthfirst repay actual overpayments in the amount of $516,509.

---

extract diagnosis codes from provider claims data to submit to CMS. Contrary to OIG's description in the Draft Report, the majority of the diagnosis codes MAOs submit to CMS come from the claims data submitted to MAOs by providers and are not identified by MAOs following a review of patient medical records. Recognizing that MAOs are not the original source of most risk adjustment data, CMS applies a "good faith" standard to the annual data accuracy attestation, having expressly acknowledged that MAOs are not guaranteeing through that attestation absolute accuracy. OIG's Draft Report, and in particular its audit recommendations, appear to be in direct conflict with this express guidance from CMS.

[35] Draft Report at 8.

[36] *Id.* at 7.

[37] The fact that the CMS compliance requirements are not more comprehensive and proscriptive is consistent with (1) the fact that HCC coefficients are based on unaudited traditional Medicare data and (2) the implausibility of expecting MAOs to audit more than a small subset of the vast amount of data submitted to CMS that is generated by healthcare providers who are neither employed by an MAO nor under the direction and control of the MAO.

Page 7 of 8

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359) Submitted to CMS (A-02-18-01029)*    45

1198

Sincerely yours,

*Linda V Tiano*

Linda Tiano
Chief Legal Officer and General Counsel

cc:     Pat Wang
        President and Chief Executive Officer

        Christine Logreira
        Vice President, Regulatory Affairs

        Nahum Kianovsky
        Vice President, Deputy General Counsel

Page **8** of **8**

*Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Healthfirst Health Plan, Inc., (H3359)
Submitted to CMS (A-02-18-01029)*                                                                 *46*

1199

**EXHIBIT D-48**



**2014: Volume 4, Number 2**

*A publication of the Centers for Medicare & Medicaid Services, Office of Information Products & Data Analytics*

# Measuring Coding Intensity in the Medicare Advantage Program

*Richard Kronick[1] and W. Pete Welch[2]*

[1]Department of Health and Human Services—Agency for Healthcare Research and Quality
[2]Department of Health and Human Services—Office of the Assistant Secretary for Planning and Evaluation

**Background:** In 2004, Medicare implemented a system of paying Medicare Advantage (MA) plans that gave them greater incentive than fee-for-service (FFS) providers to report diagnoses.

**Data:** Risk scores for all Medicare beneficiaries 2004–2013 and Medicare Current Beneficiary Survey (MCBS) data, 2006–2011.

**Measures:** Change in average risk score for all enrollees and for stayers (beneficiaries who were in either FFS or MA for two consecutive years). Prevalence rates by Hierarchical Condition Category (HCC).

**Results:** Each year the average MA risk score increased faster than the average FFS score. Using the risk adjustment model in place in 2004, the average MA score as a ratio of the average FFS score would have increased from 90% in 2004 to 109% in 2013. Using the model partially implemented in 2014, the ratio would have increased from 88% to 102%. The increase in relative MA scores appears to largely reflect changes in diagnostic coding, not real increases in the morbidity of MA enrollees. In survey-based data for 2006–2011, the MA-FFS ratio of risk scores remained roughly constant at 96%. Intensity of coding varies widely by contract, with some contracts coding very similarly to FFS and others coding much more intensely than the MA average. Underpinning this relative growth in scores is particularly rapid relative growth in a subset of HCCs.

**Discussion:** Medicare has taken significant steps to mitigate the effects of coding intensity in MA, including implementing a 3.4% coding intensity adjustment in 2010 and revising the risk adjustment model in 2013 and 2014. Given the continuous relative increase in the average MA risk score, further policy changes will likely be necessary.

**Keywords:** Medicare, payment systems, FFS, Capitation, risk adjusted payments, Managed Care Organizations

ISSN: 2159-0354

doi: http://dx.doi.org/10.5600/mmrr.004.02.a06

*MMRR*                                                                    *2014: Volume 4 (2)*

### Medicare & Medicaid Research Review
2014: Volume 4, Number 2

## Mission Statement

*Medicare & Medicaid Research Review* is a peer-reviewed, online journal reporting data and research that informs current and future directions of the Medicare, Medicaid, and Children's Health Insurance programs. The journal seeks to examine and evaluate health care coverage, quality and access to care for beneficiaries, and payment for health services.

http://www.cms.gov/MMRR/

---

*U.S. Department of Health & Human Services*
Sylvia Mathews Burwell
Secretary

*Centers for Medicare & Medicaid Services*
Marilyn Tavenner
Administrator

*Editor-in-Chief*
David M. Bott, Ph.D.

---

The complete list of Editorial Staff and

Editorial Board members

may be found on the MMRR Web site (click link):

MMRR Editorial Staff Page

*Contact:* mmrr-editors@cms.hhs.gov

Published by the
Centers for Medicare & Medicaid Services.

All material in the *Medicare & Medicaid Research Review* is in the public domain and may be duplicated without permission. Citation to source is requested.

# Introduction

## General

Enrollment in the Medicare Advantage Program has increased dramatically, growing from 9.3 million beneficiaries in March 2008 to 15.4 million in March 2014, an increase of 66% in just six years.

Concerns about overpayment as a result of favorable risk selection have confronted the Medicare program throughout the history of Medicare contracting with health maintenance organizations and other private plans. In the late 1980s, Medicare paid health plans using a system that adjusted for demographic factors such as age and gender, but plan enrollees were healthier than fee-for-service beneficiaries with the same demographic characteristics, and, as a result, health plans were estimated to be overpaid by approximately 11% (Brown, Bergeron, Clement, Hill, & Retchin, 1993).[1]

In order to reward health plans for attracting sicker-than-average enrollees, and to discourage plans from constructing business models designed to avoid risk, Medicare and other payers have increasingly turned to diagnosis-based risk-adjusted payment systems in which health plans are paid more for enrollees expected to need more care. While mitigating the incentive to enroll only healthy people, diagnosis-based risk adjustment creates another set of incentives: to find and report as many diagnoses as possible. Risk-adjusted payment using plan-reported diagnostic information creates a dilemma—there are strong policy reasons to pay plans more if they enroll sicker people,

---

[1] Systems in which payment is based, at least in part, on patient diagnoses create an incentive for providers or plans to report all appropriate diagnoses. Most notably, after the advent of the inpatient prospective payment system, which used diagnosis related groups (DRGs), hospital case-mix increased.

but measuring morbidity using plan-reported diagnostic data provides strong incentives for plans to increase the reported morbidity of enrollees (Government Accountability Office, 2012).

## Medicare Risk Adjustment

The first Medicare risk program was established under the Tax Equity and Fiscal Responsibility Act (TEFRA) of 1982. From 1982 to 1999, this program paid health plans (known as TEFRA health maintenance organizations [HMOs]) a monthly amount per enrollee based on 95 percent of the estimated costs of treating an average beneficiary in the traditional fee-for-service (FFS) program. This amount was adjusted for demographic factors such as age and gender (Hellinger & Wong, 2000; Lichtenstein, Thomas, Adams-Watson, Lepkowski, & Simone, 1991).

The Balanced Budget Act of 1997 made significant changes under the Medicare+Choice (M+C) program, including requiring the development of a new risk adjustment system that incorporated morbidity information. Medicare began using diagnoses from inpatient hospitalizations in 2000 to adjust payments to health plans. The Benefits Improvement Protection Act of 2000 required the use of ambulatory diagnoses in Medicare risk-adjustment, and Medicare implemented the CMS-HCC (Centers for Medicare & Medicaid Services-Hierarchical Condition Categories) risk adjustment model in 2004 and fully phased it in by 2007. The CMS-HCC incorporated both inpatient and ambulatory diagnoses that were categorized into 70 HCCs that were determined to be predictive of costs (Pope, *et al.*, 2004). In 2003 the Medicare Modernization Act (MMA) renamed the program "Medicare Advantage (MA)."

The MA payment system uses diagnostic information to assign a risk score to each beneficiary, where the average beneficiary in

fee-for-service has a risk score of 1.0. MA plans are paid the product of their bid multiplied by the enrollee's risk score—that is, if an MA plan bids $1,000/month for an enrollee with a risk score of 1.0, and then enrolls a beneficiary with a risk score of 1.2, the plan gets paid $1,200/month for that enrollee (1.2 * $1,000/month).

This payment system creates incentives for MA plans to find and report as many diagnoses as can be supported by the medical record. For office-based services, physicians billing FFS are paid based on the procedures performed—for example, one amount for an intermediate office visit, a different amount for a skin biopsy—but are not paid based on the number of diagnoses that are reported (provided there is at least one that supports the need for the service provided). If, for example, a FFS patient with quadriplegia and a urinary tract infection (UTI) has an office visit for treatment of the UTI, the payment to the physician will be no more if both the UTI and quadriplegia are reported on the claim than if only the UTI is reported. Coding guidelines specify that the quadriplegia can legitimately be coded if it contributes to the complexity of care, but unlike the situation for MA plans, in FFS there is no incentive to report more than one diagnosis. In contrast, MA plans have a strong incentive to do so. In addition to the incentives to report more completely, the method of collecting diagnostic information also provides MA plans additional opportunities to increase risk scores. FFS diagnoses are drawn only from health care claims submitted for payment. MA plans may also review medical records and can report all diagnoses that are supported in the record, including those that were not reported by physicians on any health care claim or encounter record. MA plans can also employ nurses to visit enrollees in their homes to conduct health assessments and report diagnoses that are found.

*MMRR*                                                              *2014: Volume 4 (2)*

As noted, payment to MA plans is calibrated based on coding patterns in FFS. If, for example, Jane Doe would have a risk score of 1.0 if she were in FFS, the implicit assumption in the design of the MA payment system is that she would have the same risk score of 1.0 if she were enrolled in MA. Alternatively, if the same Jane Doe had a risk score of 1.1 if enrolled in MA, then her plan would be overpaid. As we use the phrase, 'coding intensity' is the difference between the scores that a group of beneficiaries would have if enrolled in MA and their scores in FFS.

If we find that MA plans code with high intensity, that does not provide information about whether MA plans are 'overcoding' or whether FFS providers are 'undercoding.' Similarly, one cannot infer whether MA coding is any more or less accurate than FFS. However, for the purposes of creating an equitable MA payment system, the relevant question is whether MA risk scores are systematically different than those risk scores would be in FFS, and not which set of scores is more accurate. Suppose, for example, that average expenditure per FFS beneficiary is $10,000/ year, and that the average risk score for all FFS beneficiaries is 1.0. The goal of the payment system is to assure that—if all of those beneficiaries were to enroll in MA—the average payment to MA plans would be approximately $10,000 per beneficiary. If, however, FFS systematically underreports diagnoses and MA reports them more completely, then the average risk score in MA would be greater than 1.0, and MA plans would be paid more than $10,000 per beneficiary. The goal of the risk adjustment system is to assure that MA plans that enroll sicker-than-average beneficiaries are paid appropriately, but not to increase payment for an average beneficiary.

As a result of concern about the effects of incentives to increase coding intensity on MA plan payment levels, the Deficit Reduction Act of 2005 directed CMS to measure and adjust for coding intensity (Department of Health and Human Services, 2007), and in the 2010 payment year CMS adjusted risk scores by 3.41% to reflect anticipated differences between MA and FFS coding (Department of Health and Human Services, 2009). The Government Accountability Office (2012) estimated that in 2010 MA beneficiary risk scores were at least 4.8% and perhaps as much as 7.1% higher than they likely would have been if the same beneficiaries had been continuously enrolled in FFS. The Affordable Care Act directs CMS to increase the coding intensity adjustment to at least 4.71% in 2014, and further increase it to at least 5.71% by 2018 (PPACA & HCERA, 2010). The American Taxpayer's Relief Act of 2012 further increases the minimum coding intensity adjustment to 4.91% in 2014 and 5.91% in 2018.

The risk adjustment model implemented in 2004 was recalibrated in 2007, 2009, and 2013.[2] These changes slowed the growth in measured MA risk scores somewhat. Further, as described in more detail below, since 2014, CMS has adopted substantial changes to the model, particularly relating to several diagnoses that have been subject to coding intensity efforts by MA plans (Department of Health and Human Services, 2013). In 2014 the risk score is a blend, weighting the risk score calculated using the 2013 model by 25% and the risk score calculated using the 2014 model by 75%.

Concerns about coding intensity in MA plans would be minor if coding in FFS were relatively complete, because in that case there would be little opportunity for MA plans to legitimately increase risk scores through efforts at increasing diagnostic

---

[2] HCCs are constrained for a variety of reasons, including methodological and policy reasons. Starting in 2013, the coefficients for the four most severe diabetes HCCs were constrained to the same amount, eliminating the opportunity to increase revenue by increasing the reported severity of diabetes within these four HCCs.

reporting. However, FFS coding is known to be both incomplete and variable. Incomplete coding is evidenced by lack of persistence in coding of chronic conditions. For instance, among Medicare beneficiaries diagnosed with quadriplegia in one year, only 61% had a diagnosis of quadriplegia reported in the subsequent year (Medicare Payment Advisory Commission, 1998). Coding intensity also varies geographically; in the Hospital Referral Regions (HRRs) with the most intense practice patterns, the probability that a beneficiary is diagnosed with three or more chronic conditions is double the probability in low-intensity HRRs, with no evidence of differences in underlying prevalence (Welch, Sharp, Gottlieb, Skinner, & Wennberg, 2011).

Incomplete and variable coding provide ample opportunities for MA plans to increase risk scores of beneficiaries through coding intensity efforts, and a number of vendors actively market services that help plans to do so (Gorman Health Group, 2013; Leprechaun, 2013), often advertising high returns on investment (ROIs) for their services.

This paper uses recent data as well as improved methods to estimate the effects of coding intensity on MA risk scores, with particular attention to variation over time in coding intensity, variation in coding intensity across plans, and variation in the diagnoses most subject to coding intensity efforts. Before describing our methods, we'll review what is known about risk selection in the MA program.

### Evidence on Risk Selection

Concerns about overpayment as a result of favorable risk selection have confronted the Medicare program throughout its history of contracting with HMOs and other private plans. For example, Brown *et al.* (1993) found that health plans were overpaid by approximately 11% under the Medicare risk program during the late 1980s

because plans experienced favorable selection; on average, risk plan enrollees were healthier than fee-for-service beneficiaries with the same demographic characteristics, with lower prior reimbursements and fewer indicators of chronic health problems (Brown *et al.*, 1993). Several studies confirmed that the favorable risk selection for early HMOs continued during the early 1990s (Mello, Stearns, Norton, & Ricketts, 2003; Call, Dowd, Feldman, & Maciejewski, 1999; Physician Payment Review Commission, 1996; Riley, Chiang, Ingber, & Tudor, 1996). For example, Mello *et al.* (2003) found that Medicare beneficiaries with a history of cancer or stroke were significantly less likely to be enrolled in HMOs.

Recent analyses suggest that the various policy changes that have been implemented over the past decade—such as the implementation of the CMS-HCC model, the addition of an open enrollment period, and additional refinements of the risk adjustment system—have reduced the degree of selection bias between Medicare Advantage (MA) and the traditional FFS program. For example, Newhouse, Price, Huang, McWilliams, & Hsu (2012) recently found that differences in risk scores for beneficiaries switching from the traditional FFS program to MA and beneficiaries remaining in the traditional program narrowed by a factor of 3 between 2004 and 2008 (with the difference between risk scores for beneficiaries switching into MA and those staying in the traditional FFS program changing from -0.113 to -0.037); and differences in adjusted mortality rates narrowed by a factor of 2 between 1988 and 2008 (with mortality among beneficiaries in MA as a percentage of mortality among beneficiaries in the traditional FFS program increasing from 85 percent to 93 percent) and were almost equal between persons enrolled in MA for five or more years and traditional FFS enrollees (Newhouse *et al.*, 2012). Similarly, McWilliams,

Hsu, and Newhouse (2012) found reductions in differences between MA and FFS for self-reported health and health care use between 2001 and 2003 and between 2006 and 2007. However, there continues to be evidence of selection bias in disenrollment from MA plans (Riley, 2012; Medicare Payment Advisory Commission, 2012; Morrisey, Kilgore, Becker, Smith, & Delzell, 2012).

## Methods

Ideally, we would measure coding intensity by running an experiment with a large group of beneficiaries, in which one-half of the group was randomly assigned to MA, the other half to FFS, and we observed the risk scores of each group. The difference between the average score in MA and FFS would be a good estimate of coding intensity. In the absence of performing this experiment, we use a variety of inferential approaches. As shown below, average MA risk scores increased much more rapidly than average FFS scores from 2004 to 2013. There are three potential explanations for the relative increase in MA scores. First, the composition of MA enrollment might have changed; for example, MA enrollees in 2013 might be older, relative to FFS, than MA enrollees in 2004, and, as a result have higher risk scores. Second, even if there were no change in the composition of MA enrollees, MA enrollees might have gotten sicker more quickly than FFS beneficiaries. Third, it is possible that coding intensity increased in MA. Below, we assess the plausibility of each of these three potential explanations concluding that greater coding intensity is by far the most likely explanation.

We evaluate whether changes in MA scores relative to FFS scores are due to coding intensity efforts or to changes in the composition of enrollees by analyzing the contribution of changes in risk scores for four types of beneficiaries: stayers,

leavers, joiners, and switchers—where stayers are beneficiaries in either MA or FFS for two consecutive years; leavers are beneficiaries, primarily decedents, who were in one sector in the first year, but not Medicare eligible in the second year; joiners are beneficiaries, primarily those turning 65, who were not Medicare eligible in the first year; and switchers are beneficiaries who move from FFS to MA (or vice-versa) between two consecutive years. To the extent that the contribution of leavers, joiners, or switchers differed between MA and FFS, then we will have evidence that part of the differential growth in risk scores between MA and FFS is a result of differences arising from enrollment decisions or mortality of beneficiaries, or "caseload dynamics" for shorthand. However, if risk scores increase more rapidly for MA stayers than for similar FFS stayers, then we will have evidence that coding intensity accounts for part of the more rapid growth in MA scores.

Our analysis assumes that in the absence of coding intensity efforts, the risk score for a given MA beneficiary would increase, on average, at the same rate as the risk score for an otherwise similar FFS beneficiary from one year to the next. This appears to be a reasonable assumption, and would only be incorrect if MA beneficiaries were actually getting sicker more quickly than FFS beneficiaries. We analyze changes in the relative mortality rate of MA and FFS enrollees as an independent method of assessing the relative morbidity of beneficiaries in the two sectors. If MA enrollees are, in fact, getting sicker more quickly than FFS beneficiaries, we would expect to see MA mortality rates increase relative to FFS mortality.

## Data

For each year from 2004 to 2013, we used three Medicare administrative files with beneficiary level data: the Enrollment Database (EDB); the

Common Medicare Environment, which contains the MA contract number; and the Risk Adjustment Processing System, which contains the risk score. For each year from 2004 to 2013, we computed the risk score using each HCC's coefficient (i.e., weight) that was used to pay plans in 2004–2006. Analyses of coding intensity based on risk scores have not appeared in the peer-reviewed literature.

We excluded beneficiaries not enrolled in both Parts A and B, because diagnostic information would be incomplete. Beneficiaries enrolled in cost contracts, hospice, or the ESRD program were also excluded, because of differences in payment methodology. Risk scores were computed prior to any normalization and MA-wide adjustment for differences in coding.

## Decomposition of Risk Score Growth

To decompose the changes in risk scores, we analyze beneficiaries based on their enrollment as of July 1 of each of two consequent years (called a "cohort"). We analyze nine cohorts, from the first cohort under the new adjustment system in 2004–2005 through the most recent one in 2012–2013, estimating the contribution of each type of beneficiary—stayers, joiners, leavers, and switchers—to the overall change in risk score. The decomposition method is described in the Supplemental Appendix.

## Contract-Level Analyses

To assess the extent to which coding intensity differs across contracts, we calculate the rate of increase in risk scores for stayers for contracts that continuously participated in Medicare from 2004 through 2011, had at least 10,000 enrollees in both 2004 and 2011, and whose ratio of 2011 enrollment to 2004 enrollment was between 25% and 300%. The subset of contracts account for approximately 85% of enrollment in 2004 and 42% in 2011.

For each contract and cohort, we define the excess increase in risk score for stayers as the difference between the increase in risk scores for stayers in the contract and the increase in risk scores for FFS beneficiaries, controlling for age and decedent status (details are in the Supplemental Appendix).[3] The cumulative excess increase in risk score is the sum of this amount over the seven cohorts from 2004 to 2005 through 2010 to 2011. Contracts are divided into deciles (weighted by 2011 enrollment) based on the cumulative excess increase in scores for stayers.

The growth in relative prevalence of each HCC was calculated separately for the MA and FFS sector as well as by decile of coding intensity among the continuously participating contracts.

## Analysis of Medicare Current Beneficiary Survey (MCBS) Data

We analyze the MCBS to provide an assessment of the relative risk of MA and FFS beneficiaries that is independent of the data reported by MA plans or FFS providers. As described more fully in the Supplemental Appendix, in the first stage of the analysis, we use MCBS data from 2004 to 2011 to estimate a regression model to predict the sum of Part A plus Part B expenditures. The regression is estimated on FFS enrollees. Independent variables are demographic characteristics (age, gender, Medicaid status, and institutional status), self-reported health status (excellent, very good, good, fair, or poor), and self-report of whether the respondent has ever been diagnosed with hypertension, heart attack, heart failure, stroke, cancer, or diabetes, and dummy variables for each year. In the second stage, we use the regression coefficients to predict expenditures for each FFS

---

[3] The contract-level analysis implicitly assumes that the increase in FFS risk scores for a beneficiary of a given age and decedent status is uniform geographically.

*MMRR*                                                                    *2014: Volume 4 (2)*

and MA respondent in the sample, and compare the average predictions for MA and FFS.

## Results

Mean risk scores in MA increased faster than in FFS from 2004 to 2013—by 0.305 in MA, compared to 0.106 in FFS (Exhibit 1). As measured using the risk model in effect in 2004, MA scores grew from 90.2% of FFS scores in 2004 to 109.1% in 2013, an increase of 18.9 percentage points.[4]

### Decomposition of Risk Score Growth

Risk scores among MA stayers increased more quickly than risk scores among FFS stayers in every

---

[4] As noted, the payment rules, however, did change in a variety of ways.

cohort (Exhibit 2). Across the two-year cohorts, the growth in risk scores for FFS stayers averaged 0.088. In contrast, in MA the growth in mean risk scores for stayers was 0.106 in 2004–2006, 0.119 in 2006–2010, and 0.132 in 2010–2013. The difference between the rate of growth in risk scores for MA and FFS stayers is substantial, with average MA scores increasing one-third more rapidly than FFS scores.

As was shown in Exhibit 1, the average MA risk score increased 0.025 more rapidly than the average FFS score from 2004 to 2005. Differential changes between MA and FFS in caseload dynamics account for approximately one-half of this 0.025 difference (Exhibit 3). As was shown in Exhibit 2, risk scores for FFS stayers increase by approximately 0.088 per year. However, as was shown in Exhibit 1, the



**Exhibit 1.** Mean Risk Scores, MA vs. FFS, 2004–2013 (2004 Model)



NOTE: 2004 HCC model, which here has been normalized to 1.00 for FFS in 2004. For payment purposes, this model was modified and recalibrated in 2007, 2009, 2013, and 2014. Risk scores were adjusted by –3.41%, starting in 2010. Diagnoses from FFS diagnostic radiology claims were excluded starting in 2008.
SOURCE: Authors' analysis of Medicare administrative data.

*MMRR*                                                                                   *2014: Volume 4 (2)*

**Exhibit 2.** Growth in Risk Scores Among Stayers, MA vs. FFS, 2004–2013



NOTE: 2004 model. Stayers are beneficiaries who were enrolled in MA (or in FFS) on July 1 of two consecutive years.
SOURCE: Authors' analysis of Medicare administrative data.

**Exhibit 3.** Sources of Differential Growth in MA and FFS Risk Scores, 2004–2005



NOTE: 2004 model. Caseload dynamics is the sum of leavers (e.g., decedents), joiners (e.g., newly eligibles), and switchers. Total is the sum of caseload dynamics and stayers.
SOURCE: Authors' analysis of Medicare administrative data.

average FFS risk score increases by approximately 0.012 per year. Caseload dynamics account for the difference between the 0.088 growth for stayers and the 0.012 for all FFS beneficiaries—relatively high risk score decedents exit the caseload and are replaced by relatively low risk score 65 year olds.

From 2004 to 2005, caseload dynamics caused greater restraint in the growth of FFS risk scores than in MA (Exhibit 3). Decedents are a greater proportion of FFS beneficiaries than of MA enrollees and, similarly, 65 year olds are a greater proportion of FFS than of MA. Primarily as a result of the greater proportion of decedents in FFS, the average MA risk score in 2005 increased by 0.009 more than the average FFS score. Similarly, as a result of the greater proportion of 65 year olds in FFS, the average MA score increased by 0.008 more than the average FFS score. These

effects were partially balanced by the effects of switchers—relatively low risk beneficiaries switching from FFS to MA, and relatively high risk beneficiaries switching from MA to FFS. Despite the partially counterbalancing effect of switchers, the net effect of caseload dynamics was to cause the average MA score to increase 0.012 more rapidly than the average FFS score from 2004 to 2005. The remaining 0.013 of the difference in growth rate between MA and FFS scores is accounted for by the fact that risk scores for stayers increased more rapidly in MA than in FFS.

Although caseload dynamics accounted for part of the more rapid growth in MA risk scores in 2004–2005, in 2012–2013 the effects of caseload dynamics reversed, causing the average MA risk score to grow more slowly than FFS (Exhibit 4). Decedents have a similar effect in 2012–2013 as in

**Exhibit 4.**  **Sources of Differential Growth in MA and FFS Risk Scores, 2012–2013**



NOTE: 2004 model. Caseload dynamics is the sum of leavers (e.g., decedents), joiners (e.g., newly eligibles), and switchers. Total is the sum of caseload dynamics and stayers.

SOURCE: Authors' analysis of Medicare administrative data.

2004–2005, but the effects of joiners and switchers are different in the latter period than in the former. In contrast to the 2004–2005 results, in 2012–2013 the proportion of 65 year olds was similar in MA and FFS, and joiners do not have much effect on the difference between MA and FFS in risk score growth rates. Switchers had a small negative effect in 2004–2005, but a much larger negative effect in 2012–2013.[5] As was shown in Exhibit 2, the difference between MA and FFS in the rate of increase in risk scores for stayers widened in 2013, accounting for the larger effect of stayers in Exhibit 4 than in Exhibit 3.

On average over the 2004–2013 period, caseload dynamics had virtually no net effect on

the difference between MA and FFS in the rate of growth of risk scores, and the greater increase in risk scores for MA stayers compared to FFS appears to account for most of the reason for the differential growth (Exhibit 5). Caseload dynamics led to more rapid increases in risk scores in MA in the early part of the period, but to slower increases in the latter part and, on balance, made very little contribution to the differential growth in scores.

We have shown that more rapid increase in risk scores for MA stayers than for FFS stayers largely accounts for the more rapid growth in MA risk scores seen in Exhibit 1.

## Relative Morbidity of MA Enrollees: Analyses of Mortality and MCBS Data

We analyze mortality rates in MA and FFS during the 2004–2012 period to test the hypothesis that

---

[5] The difference between 2004-05 and 2012-13 is primarily a result of the fact that disenrollees from MA to FFS had higher risk scores in the latter cohort than in the earlier one.

**Exhibit 5.  Sources of Differential Growth in MA and FFS Risk Scores, Average 2004–2013**



NOTE: 2004 model. Caseload dynamics is the sum of leavers (e.g., decedents), joiners (e.g., newly eligibles), and switchers. Total is the sum of caseload dynamics and stayers.
SOURCE: Authors' analysis of Medicare administrative data.

MA beneficiaries declined in health relative to FFS beneficiaries. Mortality rates declined somewhat more rapidly in MA than in FFS from 2004 to 2012, providing no support for the hypothesis that the underlying morbidity of MA beneficiaries increased relative to FFS (See Supplemental Appendix Exhibit A3 & A4). As noted earlier, mortality rates were lower in MA than in FFS.

We use MCBS data to provide an assessment of relative risk of MA and FFS beneficiaries that is independent of data reported by MA plans or FFS providers. As described in the Supplemental Appendix, we predict spending for each MA and FFS beneficiary using demographic information, self-reported health status, and the respondent's report of whether she has ever been diagnosed with hypertension, heart attack, heart failure, stroke, cancer, or diabetes. Predicted expenditures for MA

enrollees average approximately 96% of predicted expenditures for FFS beneficiaries, and the ratio does not appear to have changed systematically over the 2006 to 2011 period. Results from this analysis are shown in the Supplemental Appendix Exhibit A8.

### Contract-Level Analyses

There is a striking amount of heterogeneity across MA contracts in the extent to which risk scores for stayers increased from 2004 to 2011 (Exhibit 6). The fourteen contracts accounting for 10% of MA enrollment that coded least aggressively had cumulative increases in risk scores for stayers at or below the level in FFS (i.e., cumulative excess increase at or below zero). Conversely, the four contracts in the top decile, including one with over 200,000 members, had a cumulative excess increase

**Exhibit 6.** Cumulative Excess Increase in Risk Scores, All Enrollees vs. Stayers Only, by Contract, 2004–2011



NOTE: 2004 model. Continuously participating contracts (N=86).
SOURCE: Authors' analysis of Medicare administrative data.

*Kronick, R. and Welch, W. P.*                                                                    E12

of 0.59 or more (at least 0.08 per year). Contracts in which risk scores for stayers increased more rapidly than in FFS also had overall risk scores that increased more rapidly than FFS (r=.92).

Increases in diagnostic coding are especially large in a relatively small number of largely discretionary HCCs (Exhibit 7).[6] For example, in 2012, 1.2% of FFS beneficiaries were coded with drug or alcohol dependence, compared to 8.1% of beneficiaries in the 10% of MA contracts with the highest level of coding intensity (as measured by the cumulative excess increase in risk scores for stayers shown in Exhibit 6). Similarly, polyneuropathy is recorded three times as often in the top decile of MA plans as in FFS. In addition, MA plans, particularly those in the top decile of coding intensity, both increased the rate at which diabetes was reported, and shifted the distribution towards the highest paying diabetes HCC (HCC 15). Among the top decile of plans, the prevalence of this HCC increased from 2.5% in 2004 to 20.1% in 2012. In contrast, for diagnoses such as heart attack and hip fracture, where there is little discretion in diagnosis, prevalence in the top decile of plans is similar to, or below, FFS levels (see Supplemental Appendix Exhibit A5).

In 2014 Medicare started using a revised model, which we term the "2014 model." In part as a result of the analysis shown in Exhibit 7, the polyneuropathy HCC was restructured to remove diabetic neuropathy, and the renal failure HCC was restructured to exclude chronic kidney disease stages 1–3 and was split into acute and

chronic kidney conditions, among other changes. These changes build on the changes made in 2013 that constrained the payment weights for each of the four most severe diabetes HCCs to be equal, removing the ability of MA plans to generate extra revenue by increasing the reported severity of diabetes within these four HCCs.

As a result of the changes to the model in 2013 and 2014, the impact of coding effort on risk scores is smaller using the new 2014 model than with the older 2004 model. As shown in Exhibit 8, if the 2014 model had been in place in 2013, the average MA risk score in 2013 would have been slightly higher than the average FFS score. Even using the new model, the average MA score increased substantially relative to the average FFS score from 2004 to 2013, but the rate of increase was somewhat slower than when measured with the 2004 model—an increase of 2.2% per year in relative MA score using the 2004 model (Exhibit 1)—compared to approximately 1.6% per year using the 2014 model. This result suggests that some coding intensity efforts—such as increasing the reported severity of diabetes or coding chronic kidney disease more aggressively—have been neutralized by the 2014 model, but others have not.

## Discussion

In the 2004–2013 period, the mean MA risk score increased 2.2 percentage points per year more quickly than the mean FFS score using the 2004 model and 1.6 percentage points more quickly using the 2014 model. Comprehensive risk adjustment was first implemented in Medicare Advantage in 2004 and was not fully phased in until 2007 when 100% of Part C payments were risk adjusted. It is possible that during this phase-in period when plans were first reporting diagnosis codes from ambulatory settings, the level of coding by MA plans was not as comprehensive

---

[6] An HCC is considered "discretionary" if it is based on diagnoses that providers may or may not record for patients having the diagnosis. For example, there is relatively little discretion in whether a diagnosis of 'hip fracture' should be recorded for a patient presenting with an apparent hip fracture. In contrast, there is substantial discretion about whether a patient being assessed in an annual wellness visit should be recorded as exhibiting 'alcohol or drug abuse'. Discretion might also result from either a choice of ICD-9 codes (e.g., pneumonia vs. sepsis in an inpatient setting) or underlying ambiguity of the condition (e.g., depression vs. anxiety).

**Exhibit 7.  Top Ten HCCs of Relative Prevalence in the Top Decile of MA Contracts, 2004 vs. 2012.**

| | | | Prevalence | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 2004 | | | | 2012 | | | |
| Rank | HCC | Description | FFS Mean | MA Mean | MA Top Decile | Ratio, Top Decile:FFS | FFS Mean | MA Mean | MA Top Decile | Ratio, Top Decile:FFS |
| 1 | 52 | Drug/Alcohol Dependence | 0.6% | 0.4% | 0.5% | 0.75 | 1.2% | 1.7% | 8.1% | 6.64 |
| 2 | 15 | Diabetes with Renal or Peripheral Circ. Manifest. | 2.5% | 2.5% | 2.5% | 0.98 | 4.0% | 7.1% | 20.1% | 5.07 |
| 3 | 131 | Renal Failure | 3.5% | 2.7% | 2.7% | 0.79 | 9.9% | 14.6% | 38.2% | 3.85 |
| 4 | 71 | Polyneuropathy | 3.8% | 3.1% | 3.3% | 0.85 | 6.5% | 10.1% | 20.1% | 3.09 |
| 5 | 83 | Angina Pectoris/Old Myocardial Infarction | 5.3% | 4.6% | 5.0% | 0.96 | 4.9% | 7.9% | 15.0% | 3.03 |
| 6 | 55 | Major Depressive, Bipolar, & Paranoid Disorders | 3.9% | 2.4% | 3.0% | 0.76 | 5.7% | 7.5% | 14.1% | 2.50 |
| 7 | 105 | Vascular Disease | 11.2% | 7.8% | 8.1% | 0.73 | 13.6% | 15.4% | 33.3% | 2.44 |
| 8 | 108 | Chronic Obstructive Pulmonary Disease | 13.4% | 10.7% | 12.5% | 0.93 | 13.3% | 14.5% | 25.3% | 1.90 |
| 9 | 100 | Hemiplegia/Hemiparesis | 1.1% | 0.8% | 0.6% | 0.57 | 1.2% | 1.3% | 2.0% | 1.77 |
| 10 | 157 | Vertebral Fractures without Spinal Cord Injury | 1.1% | 0.8% | 0.7% | 0.62 | 1.1% | 1.0% | 1.7% | 1.58 |

NOTE: 2004 model. Low-prevalence HCCs (<1% in 2012) were excluded.

Top decile defined using 2004–2011 data.

SOURCE: Authors' analysis of Medicare administrative data.



**Exhibit 8.** Mean Risk Scores, MA vs. FFS, 2004–2013 (2004 & 2014 Models)



NOTE: CMS will use the "2014 model" for payment purposes for the first time in 2014, when it will receive a weight of 75%. This exhibit
simulates past payment assuming full implementation. Here, both models have been normalized to 1.00 of the FFS mean in 2004.
SOURCE: Authors' analysis of Medicare administrative data.

as FFS. If that were the case, the relatively faster growth in risk scores during this period could be attributable to plans "catching up" to FFS, rather than coding more intensely than FFS. The true difference in average MA and FFS risk, which is beyond the scope of this paper, is a worthy topic for future research.

It appears that most of the reason that MA risk scores increased more quickly than FFS scores is due to increases in relative coding intensity—measured as increases in risk scores for stayers—with little of it accounted for by changes in enrollment mix. There is little sign of coding intensity slowing; in fact, Exhibit 2 shows that it may be increasing (using the 2004 model).

Our conclusion is supported by several findings. Our analysis of joiners, leavers, switchers, and stayers shows clearly that changes in the composition of the MA caseload do not account for the increase in relative MA risk scores. Risk scores for stayers increased more quickly for MA enrollees than for FFS beneficiaries—by an average of 0.088 for FFS stayers, compared to 0.120 for MA stayers (Exhibit 2), and it is this difference that accounts for the relative increase in MA risk scores (Exhibit 5).

In principle, risk scores for stayers could have increased more quickly in MA because of differences in characteristics at baseline; for example, risk scores typically increase more quickly for older beneficiaries than for younger beneficiaries. If MA enrollees were older than FFS beneficiaries, then MA scores (unadjusted for age) would have increased more quickly than FFS, even if there were no change in coding intensity. However, the age distribution of MA enrollees is

*MMRR*                                                                                                    *2014: Volume 4 (2)*

relatively similar to the age distribution of FFS beneficiaries, and slight differences between the sectors in the age distribution do not account for differences in the rate of growth of risk scores. As a second example, risk scores may increase more quickly for beneficiaries with lower initial risk scores than for those with higher initial scores, because of regression toward the mean. However, baseline risk scores are higher in MA than in FFS in the later part of the analysis period, precluding a regression-toward-the-mean explanation for MA's more rapid growth in scores.

In addition, if MA enrollees were actually sicker, relative to FFS beneficiaries, in 2013 than in 2004, then we would have expected to see some reflection of this in our analysis of mortality rates and of self-reported health status information. In contrast, mortality rates in MA declined more quickly than mortality rates in FFS, and there was no evidence of a trend in self-reported illness, suggesting that MA enrollees did not actually become relatively sicker over the time period.

In an observational study such as this one, it is never possible to conclusively rule out all alternative hypotheses. MA risk scores increased more rapidly than FFS scores. We have shown that this did not result from a change in the composition of MA enrollees. And we have shown that using two independent measures of health status—self-reported health from the MCBS and information on mortality—that there is no indication that MA enrollees actually were getting any sicker than FFS beneficiaries. While it is theoretically possible that some explanation other than greater coding intensity accounts for the relative increase in MA risk scores, we are unable to suggest any plausible alternative hypotheses.

We have also shown that there is substantial heterogeneity across plans in coding intensity, with some plans coding at approximately the same level

as FFS, while several others created a cumulative increase in coding intensity from 2004 to 2011 of 60% or more.

Coding more carefully may have real health benefits. Better identification of problems and better documentation of problems that have been identified could improve the quality of treatment provided and may even lower costs—or they may lead to unnecessary treatment and higher costs. In either case, however, the purpose and design of the risk-adjusted payment system is not to improve the quality of coding. It is to ensure that plans are paid according to the health of the patients they enroll. It is unlikely that the increased payments achieved by plans through increased coding intensity are related to substantial health benefits that better coding might produce.

CMS and the Congress have responded to the increase in risk scores over time in several ways. First, starting in 2010, CMS lowered payment by 3.41% by applying an across-the-board coding adjustment. The coding intensity adjustment will increase to 4.91% in 2014 and to at least 5.91% in 2018. Second, starting in 2013, CMS set the four most severe diabetes HCCs (HCC15-HCC18) to have the same payment coefficient (Department of Health and Human Services, 2012). As a result, recording diagnoses that move enrollees from HCC18 (diabetes with ophthalmologic or unspecified manifestation) into HCC15 (diabetes with renal or peripheral circulatory manifestation) will no longer increase revenue for MA plans. Third, CMS made further changes to the model in 2014, removing some of the HCCs that were the subject of MA efforts at increasing coding intensity.[7]

---

[7] CMS is also recovering overpayments identified by risk adjustment data validation (RADV) audits of selected MA contracts.

Relative MA risk scores have been increasing at least 1% per year (Exhibit 8) and are likely to continue to do so, even though MCBS-based risk scores have been roughly constant.[8] The legislated increase in coding intensity adjustment is 0.25% per year from 2014 through 2018. The President's Budget for 2015 proposes increasing the minimum adjustment to 0.67% per year through 2020, plateauing at 8.51% in 2020 and thereafter, much closer to the expected increase in relative risk scores. The across-the-board adjustments do not address the substantial heterogeneity in plan-level results shown in Exhibit 6.

It is challenging to accurately measure the effects of coding intensity on MA risk scores and even more challenging to devise optimal policy responses. Uncertainty about the extent to which coding intensity would persist beyond the early years of using diagnostic information, uncertainty about whether some of the changes observed in MA risk scores might have been due to changes in underlying morbidity of MA enrollees, and heterogeneity across plans in coding intensity each create challenges in evaluating appropriate policy responses. In addition, it is unclear to what extent MA plans coded less completely than FFS in 2004, and how much of the increase in coding intensity reflects MA simply catching up to FFS levels, and how much represents going above and beyond. The Department of Health and Human Services is continuing its analysis of the relative risk of MA and FFS enrollees to improve the ability of the Medicare program to accurately pay for MA beneficiaries.

## Disclaimer

The authors report no conflicts of interest related to this analysis. The content is solely the responsibility of the authors and does not necessarily reflect the views of the Department of Health and Human Services.

## Correspondence

W. Pete Welch, Ph.D., Department of Health and Human Services—Assistant Secretary for Planning and Evaluation (ASPE), 200 Independence Ave., SW, Washington, DC 20201, Pete.Welch@hhs.gov, Tel. 202-260-6213

## Acknowledgment

Data were available through a data use agreement (#212990) between the Office of the Assistant Secretary for Planning and Evaluation (ASPE) and the Centers for Medicare & Medicaid Services (CMS). The authors appreciate the assistance of David Freund of Fu Associates and Andrew Bindman and the programming work of Acumen, LLC.

## References

Brown, R. S., Bergeron, J. W., Clement, D. G., Hill, J. W., & Retchin, S. (1993). Does Managed Care Work for Medicare? An Evaluation of the Medicare Risk Program for HMOs. Princeton, NJ: Mathematica Policy Research.

Call, K. T., Dowd, B., Feldman, R., & Maciejewski, M. (1999). Selection Experiences in Medicare HMOs: Pre-Enrollment Expenditures. *Health Care Financing Review, 20*(4), 197–209. PubMed

Department of Health and Human Services (2007). Advance Notice of Methodological Changes for Calendar Year 2008 for Medicare Advantage (MA) Capitation Rates.

Department of Health and Human Services (2009). Advance Notice of Methodological Changes for Calendar Year 2010 for Medicare Advantage (MA) Capitation Rates.

Department of Health and Human Services (2012). Advance Notice of Methodological Changes for

---

[8] Some would expect that MA plans will react to the 2013 and 2014 model changes by finding other HCCs on which to focus their efforts, and the success of coding intensity efforts may well increase in the future.

*MMRR*                                                                                          *2014: Volume 4 (2)*

Calendar Year 2013 for Medicare Advantage (MA) Capitation Rates.

Department of Health and Human Services (2013). Announcement of Calendar Year (CY) 2014 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter.

Government Accountability Office. (2012). Medicare Advantage: CMS Should Improve the Accuracy of Risk Score Adjustments for Diagnostic Coding Practices. *Report to Congressional Requesters* (GAO-12-51). Retrieved from the U.S. GAO Web site: http://www.gao.gov/products/GAO-12-51

Gorman Health Group (2013). Retrieved from https://www.gormanhealthgroup.com/#all

Hellinger, F. J., & Wong, H. (2000). Selection Bias in HMOs: A Review of the Evidence. *Medical Care Research and Review, 57*(4), 405–439. PubMed http://dx.doi.org/10.1177/107755870005700402

Leprechaun. (2013). Retrieved from http://www.lepmed.com/retrospective_chart_review.asp

Lichtenstein, R., Thomas, J. W., Adams-Watson, J., Lepkowski, J., & Simone, B. (1991). Selection Bias in TEFRA At-Risk HMOs. *Medical Care, 29*(4), 318–331. PubMed http://dx.doi.org/10.1097/00005650-199104000-00002

McWilliams, J. M., Hsu, J., & Newhouse, J. (2012). New Risk-Adjustment System Was Associated With Reduced Favorable Selection in Medicare Advantage. *Health Affairs, 31*(12), 2630–2640. PubMed http://dx.doi.org/10.1377/hlthaff.2011.1344

Medicare Payment Advisory Commission (1998). Report to the Congress: Medicare Payment Policy. Washington, DC.

Medicare Payment Advisory Commission. (2012, June). Issues for Risk Adjustment in Medicare Advantage. In *Report to the Congress: Medicare and the Health Care Delivery System* (chapter 4). Washington, DC

Mello, M. M., Stearns, S. C., Norton, E. C., & Ricketts, T. C., III. (2003). Understanding Biased Selection in Medicare HMOs. *Health Services Research, 38*(3), 961–992. PubMed http://dx.doi.org/10.1111/1475-6773.00156

Morrisey, M. A., Kilgore, M. L., Becker, D. J., Smith, W., & Delzell, E. (2012, October). Favorable Selection, Risk Adjustment, and the Medicare Advantage Program. *Health Services Research, 48*(3), 1036–1039.

Newhouse, J. P., Price, M., Huang, J., McWilliams, J. M., & Hsu, J. (2012). Steps To Reduce Favorable Risk Selection In Medicare Advantage Largely Succeeded, Boding Well For Health Insurance Exchanges. *Health Affairs, 31*(12), 2618–2628. PubMed http://dx.doi.org/10.1377/hlthaff.2012.0345

PPACA & HCERA (Patient Protection and Affordable Care Act & Health Care and Education Reconciliation Act). 2010.

Physician Payment Review Commission (1996). Risk Selection and Risk Adjustment in Medicare. In the *Annual Report to Congress* (chapter 15).

Pope, G. C., Kautter, J., Ellis, R. P., Ash, A. S., Ayanian, J. Z., Iezzoni, L. I., . . . Robst, J. (2004). Risk Adjustment of Medicare Capitation Payments using the CMS-HCC Model. *Health Care Financing Review, 25*(4), 119–141. PubMed

Riley, G. F. (2012). Impact of Continued Biased Disenrollment from the Medicare Advantage Program to Fee-for-Service. *Medicare & Medicaid*

*Research Review, 2*(4), E1–E17. PubMed http://
dx.doi.org/10.5600/mmrr.002.04.a08

Riley, G., Chiang, Y. P., Ingber, M. J., & Tudor, C.
G. (1996). Health Status of Medicare Enrollees
in HMOs and Fee-For-Service in 1994. *Health
Care Financing Review, 17*(4), 65–76. PubMed

Welch, H. G., Sharp, S. M., Gottlieb, D. J., Skinner,
J. S., & Wennberg, J. E. (2011). Geographic
Variation in Diagnosis Frequency and Risk of
Death among Medicare Beneficiaries. *Journal
of the American Medical Association, 305*(11),
1113–1118. PubMed http://dx.doi.org/10.1001/
jama.2011.307